UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA,  )<br>  )<br>v.                                  )<br>  )<br>JOHN W. HINCKLEY, JR.      ) | Criminal No. 81-0306 (PLF) |

OPINION

On March 30, 1981, John W. Hinckley, Jr. attempted to assassinate the President of the United States, Ronald Reagan, in the driveway of the Washington Hilton Hotel. He wounded the President, Presidential Press Secretary James Brady, Secret Service Agent Timothy McCarthy, and Metropolitan Police Officer Thomas Delahanty, and Mr. Brady suffered permanent brain damage. By a 13-count indictment filed on August 24, 1981, Mr. Hinckley was charged under federal law with attempted assassination of the President of the United States, assault on a federal officer, use of a firearm in the commission of a federal offense, and with attempted murder, multiple assault charges and a weapons charge under the District of Columbia Code.

After being found competent to stand trial, Mr. Hinckley filed a notice of intent to raise an insanity defense. At his criminal trial, Mr. Hinckley presented evidence that he suffered from a mental disease or defect that was responsible for his conduct on the day of the shootings, and, on June 21, 1982, a jury found him not guilty by reason of insanity on all counts of the

indictment. Judge Barrington Parker thereupon committed Mr. Hinckley to St. Elizabeths Hospital under D.C. Code § 24-301, where he has remained to this day.'

Two years ago, this matter came before the Court on Mr. Hinckley's petition for limited conditional release pursuant to D.C. Code § 24-501(k) and on the proposal by St. Elizabeths Hospital that Mr. Hinckley be granted a limited conditional release pursuant to D.C. Code § 24-501(e). After an evidentiary hearing, at which all of the experts agreed that conditional release was appropriate, the Court issued an Opinion and Order which denied Mr. Hinckley's petition and granted in part and denied in part the proposal submitted by St. Elizabeths Hospital. The Court granted Mr. Hinckley six local day visits within a 50-mile radius of the Hospital (Phase I) and two local overnight visits (Phase II) both under the supervision of his parents, but without Hospital accompaniment. The Court also imposed a series of stringent conditions on the preparation for the visits, the visits themselves and the debriefing after the visits.[2] By all accounts, these visits were entirely successful, Mr. Hinckley and his parents complied with all the conditions imposed by the Court, and the visits were very therapeutic.

---

[1]     This opinion refers to both D.C. Code §§ 24-301(e) and 301(k) and D.C. Code §§ 24-501(e) and 501(k). Section 501 is the current incarnation of the former Section 301. The historical petitions for conditional release were filed under Section 301.

[2]     Phase III of the Hospital's Section 501(e) proposal two years ago was six overnight 36-hour visits on weekends at his parents' home outside the Washington, D.C. area. The Court rejected this proposal in large part because of a lack of specificity and a lack of planning with respect to Phase III and because of a desire by the Court to have reports on the success of Phase I and Phase II before determining whether, and under what conditions, visits outside the Washington, D.C. area would be appropriate. See United States v. Hinckley, 292 F. Supp. 2d 125, 148 (D.D.C. 2003) ("Hinckley I").

Last year, this matter again came before the Court on Mr. Hinckley's petition for limited conditional release pursuant to D.C. Code § 24-501(k) and on the proposal by St. Elizabeths Hospital that Mr. Hinckley be granted a limited conditional release pursuant to D.C. Code § 24-501(e). Mr. Hinckley's Section 501(k) petition and the Hospital's Section 501(e) proposal each asked that Mr. Hinckley be allowed to have visits at his parents' residence outside the metropolitan Washington., D.C. area, though differing in the specifics of the proposed visits. The government, the Hospital, and the majority of testifying experts opposed Mr. Hinckley's petition. The Hospital's proposal for conditional release under Section 501(e) was opp  sed by the government and the government's expert witnesses.   Based on the evidence and arguments presented to the Court, as well as the evidence presented at the 2003 hearing and the entire record in this case, the Court denied Mr. Hinckley's petition and rejected the Hospital's proposal, citing particular concerns with the relationship between Mr. Hinckley and his former girlfriend, Leslie DeVeau. The Court did, however, allow Mr. Hinckley continued Phase II local overnight visits identical to those already successfully completed. See United States v. Hinckley, 346 F. Supp.2d 155 (D.D.C. 2004) ("Hinckley II").

This matter is now before the Court on John W. Hinckley, Jr.'s petition to enlarge the terms of his conditional release pursuant to D.C. Code § 24-501(k) and on the proposal by St. Elizabeths Hospital that Mr. Hinckley be granted an enlarged limited conditional release pursuant to D.C. Code § 24-501(e). Mr. Hinckley's Section 501(k) petition asks that he be allowed to have a series of six conditional release visits at his parents' residence outside the metropolitan Washington, D.C. area.  Mr. Hinckley's petition proposes that the first visit be for two nights,

with an additional night added to each visit until the last of the six visits is of seven nights in duration. He further requests that there be no more than three weeks between each visit. Mr. Hinckley's petition incorporates all the conditions set by the Court in its previous December 2003 and November 2004 orders, with any necessary modifications to accommodate the expanded privileges and any other conditions that the Court deems fit to set, including that the Secret Service notify local law enforcement of his presence in the area.

The Hospital opposes Mr. Hinckley's Section 501(k) petition and has submitted a different proposal for expanded conditional release. Under the Hospital's Section 501(e) proposal, Mr. Hinckley initially would be permitted three visits of three nights in duration to his parents' home outside the metropolitan Washington, D.C. area. These visits would take place on weekends, from a Friday at 9:00 a.m. to Monday at 1:00 p.m. If deemed successful by the treatment team and the Hospital Forensic Review Board, Mr. Hinckley would be allowed additional ongoing visits of four nights in duration, starting on a Thursday at 9:00 a.m. to the following Monday at 1:00 p.m. The proposal places no numerical limit on the number of visits Mr. Hinckley would be allowed. The Hospital further requests that there be at least a six week period between each visit to allow the Hospital opportunity for a full evaluation of each visit and an opportunity to plan for the next visit. The government opposes both Mr. Hinckley's petition and the Hospital's proposal.

The Court held an evidentiary hearing on the requested relief on September 19, 20 and 21, 2005. Closing arguments were heard on September 27, 2005. On September 29, 2005, the Court requested supplemental information from the Hospital which was submitted in writing

on October 14, 2005. The government responded on October 21, 2005, and Mr. Hinckley filed a reply on October 26, 2005. The Court notes that this year all of the testifying experts, including the government's experts, support some form of expanded conditional release for Mr. Hinckley. The majority of the experts, including one of the two government experts, supports the Hospital's 501(e) proposal. Based on the evidence and arguments presented to the Court, as well as the evidence presented in the hearings of the past two years and the entire record in this case, and for the reasons that follow, the Court denies Mr. Hinckley's petition and grants the Hospital's proposal in part and denies it in part.

## I.  BACKGROUND

### A. Legal Framework

D.C. Code § 24-501(k) provides that a person in the custody of a mental hospital after being acquitted by reason of insanity may seek his conditional or unconditional release from the custody of the hospital by tiling an appropriate motion with the court. D.C. Code § 24-501(e) provides that the superintendent of the hospital on his own may at any time certify that the mental health of the person has sufficiently improved such that he will not "in the reasonable future be dangerous to himself or others" if conditionally released. D.C. Code § 24-501(e); see Hough v. United States, 271 F.2d 458,461 (D.C. Cir. 1959) (for conditional release "the court must conclude that the individual has recovered sufficiently so that under the proposed conditions [or others] 'such person will not in the reasonable future be dangerous to himself or others.'"). In either case, it is for the court to determine whether the person warrants conditional release and, if so, under what conditions. See D.C. Code §§ 24-501(e), 501(k).

5

Whether the court is considering a patient's petition or the superintendent's certificate, unless the request is uncontested or the outcome plain, the court must hold a hearing to determine/ the present mental condition of the person and whether, if released, he will be a danger to himself or others in the reasonable future. See D.C. Code §§ 24-501(e), (k). /When the matter comes before the court on a petition under D.C. Code § 24-501(k), "the person [seeking release] shall have the burden of proof," and the court must find "by a preponderance of the evidence" that the person is entitled to conditional release. D.C. Code § 24-501(k). The statute does not make clear who carries the burden of proof in a hospital-initiated release proposal. See D.C. Code § 501(e). Regardless of who bears the burden of proof or persuasion, the hospital's proposal under D.C. Code § 24-501(e) should only be approved if the evidence shows that the proposed conditional release is appropriate under the standards set forth in the statute by a preponderance of the evidence. See United States v. Ecker, 543 F.2d 178, 188 (D.C. Cir. 1976) (district court must make an "affumative finding that it is at least more probable than not" that the patient will not be violently dangerous in the future); DeVeau v. United States, 483 A.2d 307, 3 10 (D.C. 1984) (preponderance standard endorsed).[3]

In considering either a hospital-initiated or a patient-initiated request for conditional release, the, court is obligated to make its own independent judicial determination regarding the patient's dangerousness. See United States v. Ecker, 543 F.2d at 184. The function of the court is to determine whether the facts as shown by the evidence offered "measure

---

[3]      For additional background on Mr. Hinckley's history and previous release requests as well as a further description of the legal framework, see United States v. Hinckley, 292 F. Supp. 2d 125, 127-133 (D.D.C. 2003).

up to the statutory standards for release." Id. at 185. In order to grant release, the court must determine that the patient, under the proposed conditions, "will not in the reasonable future be dangerous to himself or others." Hough v. United States, 271 F.2d at 461; see also United States v. Ecker, 543 F.2d at 187. Under this standard, the existence of "a substantial problem of danger in the reasonable future provides an adequate basis for the continued detention and confinement of an insanity acquittee" who has committed a violent act. United States v. Ecker, 543 F.2d at 188. If, on the other hand, the evidence shows by a preponderance of the evidence that the patient will not be a danger under the proposed or other reasonable conditions of release, then the court must grant the petition for conditional release."

In receiving and considering the evidence, a court is not required to accept the opinion of any expert witness, or even the unanimous opinion of all the experts, but must consider all relevant evidence including "the patient's hospital file, the court files and records in the case, and whatever illumination is provided by counsel." United States v. Ecker, 543 F.2d at 184-85; see also id. at 190 ("the issue of 'dangerousness' presents the district court with a difficult mixed question of law and fact, and the court is under no obligation to accept the experts' opinions on questions of law"). The court must independently weigh the evidence and decide for itself the ultimate question whether if released under appropriate conditions the patient will not in the reasonable future be dangerous to himself or others. See id. at 187. The court

---

[4]   The court may modify or expand upon the conditions proposed by the hospital. See D.C. Code §24-501(e))((conditional release "under such conditions as the court shall see fit").

must take care, however, to base any denial of release on the evidence itself, and not substitute its

own  opinion for the evidence presented by the parties. See id. at 185 and n.20.

### B.  Relationship with Leslie De Veau

The focus of last year's hearing was on Mr. Hinckley's 22-year relationship with

his former girlfriend, Leslie DeVeau. The government argued strenuously that it was not certain

how Mr. Hinckley was handling the end of his romantic relationship with Ms. DeVeau and that

his potentially adverse reaction was a major risk factor in a relapse of his mental illnesses.

Furthermore, the lack of clarity in the ongoing friendship between Mr. Hinckley and Ms.

DeVeau, and the fact that Mr. Hinckley may not have been forthcoming regarding his continuing

friendship with Ms. DeVeau, were pointed to as matters of concern expressed by both of the

government's expert witnesses, Dr. Robert Phillips and Dr. Raymond Patterson. The Hospital's

failure to address the nature of the relationship and its impact on Mr. Hinckley's mental state was

also of concern to Dr. Philips and Dr. Patterson. See Hinckley II, 346 F. Supp.2d at 160-65,

168-70. In an effort to address these concerns, the Hospital made contact with Ms. DeVeau

through her attorney during the hearing. Id. at 171-74.[5] At a meeting between the treatment team

and Ms. DeVeau, accompanied by her attorney, Ms. DeVeau discussed the nature of her

relationship with Mr. Hinckley and the change it had undergone, from a romantic relationship to

friendship, beginning around 2000. Id. at 172. Ms. DeVeau indicated at that time that she might

---

[5]       A few days, prior to the 2004 hearing, Ms. DeVeau had agreed to meet with one of
Mr. Hinckley's expert witnesses, but only in the presence of her attorney.

I

be open to becoming more involved in Mr. Hinckley's therapeutic process and meeting with his treatment team, outside the presence of her attorney. Id.

      The Court agreed with the government's experts that the hasty, eleventh hour meetings with Ms. DeVeau in an effort to address the Court's and the government's experts concerns was not an appropriate method of evaluating Ms. DeVeau's relationship with Mr. Hinckley, the impact it had on his mental state, the possibility of continued deceptiveness by Mr. Hinckley, or the potential for dangerousness that the change in that relationship could create in him. See Hinckley II, 346 F. Supp.2d at 177, 179. In addition to noting the "circus-like tenor" of last year's hearing, the Court noted that the Hospital had done itself no favors in ignoring Mr. Hinckley's relationship with Ms. DeVeau until it became critical that it respond to the concerns raised at the hearing. Id. at 179.

## II. THE 2005 EVIDENTIARY HEARING

      At this year's evidentiary hearing, Mr. Hinckley called three witnesses: (1) Dr. Sidney W. Binks, a Ph.D. psychologist specializing in neuropsychiatric disorders who has been a member of Mr. Hinckley's treatment team and his treating psychologist since 1999; (2) Dr. Robert Keisling, a psychiatrist and former Medial Director of the Forensic Inpatient Service at John Howard Pavilion at St. Elizabeths Hospital, who was Mr. Hinckley's treating psychiatrist from mid-1998 until September 1999; and (3) Dr. Paul Montalbano, Pretrial Chief at the Forensic Services Unit at John Howard Pavilion at St. Elizabeths Hospital, who has conducted six psychological risk analyses of Mr. Hinckley since 1999, most recently in July 2005 for the an updated assessment to present to the Court at this year's hearing. The government

called as witnesses: (1) Dr. Robert Phillips, a psychiatrist and former Director of Forensic

Services for the State of Connecticut Department of Mental Health, who examined Mr.,Hmckley,

at the request of the government in 2000, 2003, 2004 and 2005; and (2) Dr. Raymond F.

Patterson; a psychiatrist, former Medical Director and former Acting Associate Superintendent at

St. Elizabeths Hospital, former Commissioner of Mental Health in the District of Columbia, and

former Forensics Director for the State of Maryland, who testified in opposition to Mr.

Hinckley's conditional release at the 1997 hearing before Judge June Green, testified in support

of his conditional release at the 2003 hearing before this Court, and testified in opposition to Mr.

Hinckley's increased conditional release request at the 2004 hearing.  The government recalled

Dr. Montalbano at the end of its expert's testimony to clarify further the meaning of one of the

diagnostic tests he administered to Mr. Hinckley.

      All of the experts who testified had access to six psychological risk assessments

of Mr. Hinckley conducted by Dr. Paul Montalbano in 1999, 2003, 2004 and, most recently, July

*2005,* in addition to numerous other materials including hospital records, letters between Ms.

DeVeau's attorney and the Hospital, and other relevant materials.  Each of the government's

expert witnesses interviewed both Mr. Hinckley and Mr. Hinckley's parents in preparation for

their testimony.

### A.    *Diagnosis and Areas of Concern*

#### 1. Mr. Hinckley's Diagnosis

      The experts for both Mr. Hinckley and the government were in substantial

agreement about Mr. Hinckley's current diagnosis. All agree that he is currently mentally ill and

suffers from two Axis I disorders: psychotic disorder, not otherwise specified ("psychotic disorder NOS") and major depression.  All the experts agree that there have been no active symptoms or symptoms of any significance of these Axis I disorders in a number of years.  All experts describe Mr. Hinckley's psychotic disorder NOS and major depression as being, in full remission.

All the experts also agree that Mr. Hinckley suffers from an Axis II disorder: narcissistic personality disorder. Dr. Montalbano describes Mr. Hinckley's narcissistic' personality disorder as significantly attenuated. Dr. Patterson described it as reduced in intensity, but added that Mr. Hinckley continues to have outlets for it. At this year's hearing, Dr. Binks, in contrast to last year's testimony in which he also described this Axis II disorder as significantly attenuated, stated that in his professional opinion Mr. Hinckley's narcissistic personality disorder now is in remission. Dr. Keisling, as he did last year's hearing, described Mr. Hinckley as having had no symptoms of narcissistic personality disorder since 1998. Dr. Keisling noted in his testimony this year that even if Mr. Hinckley does continue to have the disorder, it alone would not make him violent.  He further stated that he knew of no person who had ever been involuntarily committed for narcissistic personality disorder alone.

Dr. Phillips and Dr. Patterson agreed with the Hospital's doctors, except with respect to Dr Binks' view about the Axis II disorder. Dr. Patterson stated that Mr. Hinckley's narcissistic personality was reduced but that he still had some elements of it, such as guardedness, defensiveness, isolativeness, and judgment issues, particularly in interpersonal relationships.  While Dr. Patterson agreed that the Axis I disorders were in full remission, he

11

stated that it was "absurd" to say that Mr. Hinckley showed no symptoms of mental illness during the 1    '0's. There are, however, no suicidal or homicidal indicators.

The Hospital's doctors noted that Mr. Hinckley remains on lmg of Risperdal per day. Accor    ig to them, the Risperdal is purely prophylactic and is intended to prevent a relapse of his psych    ic disorder. Dr. Patterson does not agree that the Risperdal is purely prophylactic, testifying tb    the medication is helpful to reduce the likelihood of decompensation. Dr. Keisling testified at t    2003 hearing that if Mr. Hinckley were to miss the medication, there would be no immediate I    ysiological change, and he would probably have to miss several weeks before the lack of med    ition would be physiologically significant. Dr. Keisling reiterated at the 2004 hearing that    'Mr. Hinckley did not take his medication during a four or five; day period away from the Hc    ital there would be no immediate effect.

At this year's hearing, Dr. Keisling testified that the longer a person is in remission, t    less likely it is that he will relapse. Dr. Binks similarly testified that Mr. Hinckley's    )e of illness takes a long time to develop and that there would be ample time to observe a re    pse of his disorders.

### 2. Leslie DeVeau

The primary focus of last year's hearing, the relationship between Mr. Hinckley and Leslie I    Veau, was resolved to the satisfaction of all the experts in the interim. According to Mr. Hinc    ey's treatment team, all of the experts who interviewed him, and the Hospital's own records, Mr    Iinckley has had no contact with Ms. DeVeau since January 15, 2005. The Hospital rep    ts that in the aftermath of last year's hearing, Ms. DeVeau communicated to the

Hospital, through her attorney, that she did not wish to participate in Mr. Hinckley's therapeutic process or meet with his treatment team.  Mr. Hinckley, believing this relationship to be the main obstacle between himself and further release privileges, decided to end the relationship completely. /According to Dr. Binks, he and Mr. Hinckley discussed Ms. DeVeau in every session between last year's hearing and January 15, 2005. Mr. Hinckley reported also discussing the matter with his parents and with his treatment team, eventually reaching the decision that he should end    l contact with Ms. DeVeau. On January 15, 2005, Ms. DeVeau came to visit Mr. Hinckley at  e Hospital, at which time he returned a ring to her that had symbolized their affection.  He has not seen or called her since that time and she has not called him.

Dr Montalbano, Dr. Binks, and Dr. Keisling all characterized Mr. Hinckley's decision to end his relationship with Ms. DeVeau as reasoned and rational. These experts d e s c r i b Md Hinckley as coping well with the end of the relationship, showing the kind of appropriate sadness anyone would on ending such a significant relationship, but showing no signs of decompensation.  Dr. Phillips noted that Mr. Hinckley has shown recent signs of dysphoria, or sadness, probably in consequence of the breakup, but noted no change in the dia noses o his mental disorders. Dr. Patterson, in speaking with Mr. Hinckley, stated that "it wa of cons derable note" that Mr. Hinckley believed Ms. DeVeau to be doing well without him and not in need of his support, given that the pathology that led to Mr. Hinckley's acts of violence in 1981 included a delusional belief that he needed to "rescue" Jodie Foster. See Dr. Patterson's Report at 26.  All of the experts agree that the end of Mr. Hinckley's relationship

with Ms. DeVeau is a noteworthy occurrence, but that the effects of its termination have not had such an impact on his mental health as to change his diagnoses or prevent an expansion of release conditions.

It appears that the major issue of the lack of clarity from last year's hearing has been resolve/l. The Court is unsure that the resolution was ideal, given that Mr. Hinckley's 22-year relation/hip with Ms. DeVeau was both the most significant and sustained adult relationship of his life – in Dr. Patterson's words "his only friend as an adult" -and a major source of support. Mr. Hinckley's decision, however, was apparently made thoughtfully and with appropriate input from family members and his treatment team. His ability to cope with this relationship's demise has been sufficiently healthy to answer the questions in the minds of the government experts, as is evidenced by their support of expanded release conditions for Mr. Hinckley.

### 3. Interactions with Other Women

Smce his breakup with Ms. DeVeau, Mr. Hinckley has had interactions with three women that have been the cause of some concern to the government's expert witnesses and some Hospital personnel, have been the subject of discussion between Mr. Hinckley and his treatment team, and was a major focus of this year's hearing. The first series of these interactions was with a woman MrHinckley has known for 10 years and who brings him cat food on a regular basis. Mr. Hinckley reported to his treatment team that after the end of his relationship with Ms. DeVeau, this woman expressed sympathy and asked if she could do anything for him. He replied by asking her if she had romantic feelings for him, and when she said that she did not, be stated

14

that he agreed. He told his doctors he was seeking "clarification of the relationship." The second interaction of concern was between Mr. Hinckley and a psychology intern at St. Elizabeths Hospital. According to the testimony and reports of the Hospital staff, Mr. Hinckley engaged the intern in conversation on a daily basis, primarily about his cats. She assisted him in finding homes where several of his cats were adopted. According to Dr. Patterson, Mr. Hinckley seemed impressed if not "enthralled" with the intern and described her as "beautiful." Mr. Hinckley was observed walking the intern to her car on several occasions and was instructed by the staff to stop doing so. He was not happy being so instructed, but he complied. Finally, Mr. Hinckley requested a session with the Hospital chaplain after seeing her one day. When questioned by his treatment team, he admitted that he had requested the session because he "thought she was pretty." He agreed to drop the request.

The expert witnesses' perception of these incidents differed greatly. Dr. Binks stated that all three incidents were appropriate and did not demonstrate any bad judgment or behavior on Mr. Hinckley's part. Dr. Keisling likewise bad no clinical concerns with Mr. Hinckley's behavior toward these three women, seeing no manifestation of mental disease or delusional or obsessive aspects to it. Dr. Montalbano interviewed the woman who brings Mr. Hinckley cat food and found that she was not disturbed by the incident. He further noted that the incident would not have been known but for Mr. Hinckley bringing it to his attention, stating that it demonstrated how Mr. Hinckley has become more open with the treatment team over time. Dr. Montalbano also stated that Mr. Hinckley's behavior toward the intern and the chaplain were not inappropriate, although his judgment in walking the intern to her car could be questioned. Dr.

Montalbano nevertheless believes that Mr. Hinckley's professed physical attraction to the intern and the chaplain were matters worthy of exploration by the treatment team. Drs. Binks, Keisling and Montalbano all agreed that Mr. Hinckley's behavior could be attributed in part to the end of his relationship with Ms. DeVeau, his resultant loneliness and a natural desire to make contact with a woman. Dr. Montalbano said Mr. Hinckley hoped to have a girlfriend and wanted intimate contact with a woman.

Dr. Phillips and Dr. Patterson were more concerned with the incidents in view of Mr. Hinckley's history, They stated that while the incidents in isolation were not terribly problematic, they had to be regarded in the context of Mr. Hinckley's history and prior pathology with regard to women.  In particular, Dr. Phillips cited as a serious area of concern Mr.' Hinckley's pattern of behavior toward female staff members of the Hospital over the years (including a pharmacist in the late 1990's). Dr. Patterson felt that the situation needed to be monitored closely, and both doctors felt that the Hospital had seriously erred by failing to explore these matter, fully and objectively as a matter of therapeutic interest rather than simply accepting Mr. Hinckley's explanations; they were particularly critical of Dr. Binks' uncritical acceptance of Mr. Hinckley's explanations. Dr. Phillips added that while "appropriate socialization" is a goal and Mr. Hinckley's behavior ought not to be misinterpreted, it also ought not to be ignored and go unexplored by the treatment team. Neither Dr. Patterson nor Dr. Phillips stated that the incidents changed their diagnoses of Mr. Hinckleys' mental disorders or their recommendations regarding his or the Hospital's proposed expanded conditions of release.

16

### B.   Proposals for Expanded Privileges

Every testifying expert agreed that it was appropriate to expand Mr. Hinckley's privileges to include time-limited conditional releases to his parents' home outside the Washington, D.C. metropolitan area. All of the experts except Dr. Phillips agreed with the Hospital's Section 501(e) proposal, although Dr. Patterson expressed his approval of the proposal as subject to certain caveats given in his report and testimony.   While Dr. Phillips did not approve of the Hospital's Section 501(e) proposal because it was not a structured, logical plan, his concerns went primarily to the lack of specificity and appropriate, well thought-out goals in it, but not to the concept of expanding privileges to the Hinckleys' home itself., Only Dr. Binks and Dr. Keisling believed that Mr. Hinckley's Section 501(k) proposal is appropriate at this time.

### 1. Activities in His Parents' Community

The government experts raised a number of concerns regarding the proposed activities in the Hospital's Section 501(e) report. In particular, both Dr. Phillips and Dr. Patterson expressed concern about the lack of specificity with regard to the recommendations that Mr. Hinckley use the Internet and take walks alone in his parents' community.   Both doctors, however, agreed with Mr. Hinckley's experts that these activities in and of themselves would be beneficial.   The concerns they raised were that the Hospital had not provided enough detail about the geographic and time restrictions with respect to Mr. Hinckley's walks without supervision, or with respect to his use of the Internet and any restrictions to be placed on that use.   Dr. Phillips applauded the presumed goals of such activities, stating that in reaching the ultimate goal of

17

integrated living for any individual it was necessary to allow the patient increased freedom and

degrees of independence.

In response to many of these concerns, the Court directed the Hospital in an Order

issued on September 29, 2005 to address the details of what therapeutic and practical goals

would be es[tab]lished for Mr. Hinckley's proposed visits to his parents' home and how they

would be ac[co]mplished. Among other suggestions, the Hospital stated that Mr. Hinckley would

be allowed [  ] minute walks, taking with him his parents' cell phone, unaccompanied throughout

his parents' [ga]ted community.

### 2. Proposed Reporting Requirements

Dr. Montalbano, testifying on behalf of the Hospital, agreed that the current

reporting re[qu]irements of an itinerary submitted to the Court before each visit could be relaxed

over time as the goals of Mr. Hinckley's visits became more general and his independence

increased. Dr. Keisling agreed that the reporting requirements could relax as time went on; as

Mr. Hinckley's privileges, expand, fewer details will be necessary or appropriate. Dr. Phillips

agreed that while feedback would continue to be important, the frequency of reports could be

decreased as time went on.

### 3, Proposed Role for Dr. John J. Lee

Dr. John J. Lee is a psychiatrist in the area of the Hinckleys' community who has

met with Mr Hinckley once, and separately with his parents, and has agreed to meet with him on

an ongoing basis should he visit his parents' home. The government raised concerns at this

year's hearing as to whether the Hospital was suggesting that Mr. Hinckley's treatment be transferred from the Hospital to Dr. Lee and how such transfer would be made when little to no preparation had been done for this. The Hospital responded that Dr. Lee was envisioned at this stage only as a safety net, not as a treating psychiatrist.

In its order of September 29, 2005, the Court directed the Hospital to clarify Dr. Lee's commitment to Mr. Hinckley and his role in any visits. In its response, the Hospital reiterated that, regardless of his future role, Dr. Lee will be first and foremost a "safety net" for Mr. Hinckley and that the two would merely try "to familiarize themselves with each other" during the proposed outings. Hospital's October 14, 2005 Filing at 4. Dr. Montalbano believes that Mr. Hinckley should meet with Dr. Lee with some regularity, at least once during each of the first three visits to Mr. Hinckley's parents' home. Dr. Phillips and Dr. Patterson believe Mr. Hinckley should meet with Dr. Lee every time he visits his parents' home. The Hospital agreed that Mr. Hinckley and his parents will assure that Mr. Hinckley meets with Dr. Lee on each outing so that Dr. Lee "can assess John Hinckley's mood and affective range and note any signs of decompensation while in Virginia." Id. It included a signed agreement between Dr. Lee and the Hospital that he would be available and willing to meet with Mr. Hinckley during any outings to Mr. Hinckley's parents' community, and clarifying Dr. Lee's role as not being that of the primary treating psychiatrist, therapist, or case manager for Mr. Hinckley.  The Court is satisfied with this understanding at this stage.

### C. Future Planning

#### 1. Phase III vs. Phase IV

Much of the focus of this year's hearing was on the goals and, expectations that would come with an expansion of Mr. Hinckley's privileges from the Washington, D.C. metropolitan area to his parents' home outside the area. These goals and expectations eventually resolved themselves into a kind of common understanding, first articulated by Drs. Phillips and Patterson, in which "Phase III" is conceived of as a "change of venue" outing from the Washington, D.C. area to the Hinckleys' community, while "Phase IV" is viewed as a transitional stage in which Mr. Hmckley might be expected to take steps to integrate hiiself into his parents' community. While therapy and therapeutic processes are more fluid than a particular "Phase" title can express or encompass, the Court finds it useful to have this practical distinction in mind, both for itself and for the Hospital, in order to understand the therapeutic goals at each stage and to evaluate Mr. Hinckley's progress.

This year, in particular, the designation of particular goals associated with each Phase became a point of contention, especially as it appeared that the Hospital's Section 501(e) proposal seemed to incorporate not just Phase III outings but also "Phase IV" type visits, in which Mr. IHinckley would "be more focused on social and potential vocational reintegration in [his parents'] community." Rospital Section 501 (e) Proposal at 1. The government experts expressed concerns that this sort of visit and the associated expectations and activities that would come with it are premature at this point. Specifically, they opined that it was too soon both to change the venue of the visits to a setting wholly unfamiliar to Mr. Hinckley and simultaneously

to suggest that he was ready to begin a reintegration into society and, into his parents' community in particular, The Court agrees. Unsupervised visits with his parents in the metropolitan Washington, D.C. area was one thing.  With over 200 "B" city visits throughout the area behind him, he was on familiar turf in Phase I and Phase II, and the Hospital (his home for 22 years) was nearby.  The/ contemplated Phase III visits to his parents' home will be to an unfamiliar community and an unfamiliar house and will last for longer periods of time.  Proceeding cautiously, slowly and incrementally in the circumstances therefore is appropriate. At the same time, the Court recognizes that the eventual goal for Mr. Hinckley -- as agreed upon by every testifying expert and dependant upon his continued mental health and improvement -- is his reintegration into society, whether that takes place in his parents' community or elsewhere.

    While the government's expert witnesses found fault with the Hospital's plan because it seemed to proceed to a transitional Phase IV stage too soon and without sufficient planning, at the same time Drs. Philips and Patterson also recognized the need to consider longer range goals in light of the desirable end goal of reintegration.  In fact, Dr. Phillips stated m his testimony that a protracted Phase III period could actually be more problematic if it led to loneliness and boredom because no further goals or activities were envisioned beyond mini-vacations for Mr. Hinckley to his parents' home. Similarly, Dr. Patterson stated in his testimony that the initial outings that Mr. Hinckley takes must eventually lead toward more directed activity (even suggesting that a possible goal for Mr. Hinckley at some point eventually might be going to a coffee bar/or sports bar with male friends).

The Court concludes that it is appropriate at this time to allow Mr. Hinckley only so-called "Phase III" visits that will permit him to acclimate himself to a community beyond the Hospital's walls and to begin the process of relearning certain skills -- primarily domestic and personal ones -- such as those suggested during the hearing like gardening, cooking, cleaning, taking out the garbage, shopping, etc. It is not appropriate at this time for Mr. Hinckley to proceed with any further integration into his parents' community without a full evaluation of these Phase III outings.

In balancing the twin goals of ensuring that Mr. Hinckley's continued conditional releases benefit him therapeutically while not advancing prematurely, the Court wishes to emphasize that simply because Mr. Hinckley's activities may be curtailed at this time, it is not premature for the Hospital to begin planning for "Phase IV" on the assumption that the Phase III visits will be successful. Indeed, it is vital that long-term goals and practical steps be incorporated into Mr. Hinckley's treatment to enable reintegration into society at some point. The Hospital should not lose sight of these long-time goals or how they can be accomplished. For example, Dr. Phillips and Dr. Patterson each recommended that once the Hospital moves from an outing to a transition phase it must identify a case manager in the community to which Mr. Hinckley goes, much as the Hospital identified Dr. Lee in preparation for the proposed Phase III visits. Simply put, the Hospital should plan ahead.

Furthermore, while the experts all agree, as does the Court, that Mr. and Mrs. Hinckley are responsible custodians, and there is an assumption by some at the Hospital that ultimately Mr. Hinckley will transition to his parents' community, the Court is not so sanguine.

22

As counsel for the Hospital said at the hearing, it is too soon to determine if Mr. Hinckley's parents or their community are appropriate in the long term. See September 27, 2005 Transcript at 16-17. Mr. and Mrs. Hinckley are getting older. If other members of Mr. Hinckley's family plan to be involved over the long-term as the Hospital moves to Phase IV, these family members need to meet with the treatment team at the Hospital and become more involved now in planning for the future and for any transition to a non-Hospital setting on a more regular basis.    hat may or may not include involving Mr. Hinckley's parents or his siblings in family counseling, for example.  If Mr Hinckley's siblings do not anticipate future involvement in his ongoing care, the Hospital's future planning must include the exploration of alternate support systems, such as the mental health department of any community into which Mr. Hinckley might be integrated.

It is not the role of the Court to dictate the course of Mr. Hinckley's treatment. Rather, it is the Court's role to evaluate the treatment he receives to determine if it has been of a quality and sufficiency to ensure that he will remain mentally stable and not decompensate, thereby becoming a danger to himself or others if conditionally released.  Mr. Hinckley's treating physicians and mental health professionals must decide upon and pursue the course of treatment they believe most effective in dealing with him and hi illness and in preparing him for each successive stage of conditional releases the Hospital proposes, assuming the Hospital intends over the years ahead to recommend more privileges. These decisions are best left to Mr. Hinckley's treatment team.

## 2. Interactions with Women

As discussed above, a second major focus of this year's hearing was Mr. Hinckley's interactions with women. These interactions necessarily are of great concern in the Hospital's planning for the future because Mr. Hinckley's feelings toward women have been the major triggering factor to his mental disorders. A paradox exists, however, in that the experts agree that Mr. Hinckley would benefit from healthy, normal friendships or relationship1 with women, as well as with men, but remain watchful and wary of his ongoing efforts to reach out to women. In the past, a similar paradox led to an undesirable result. During the 2003 hearing, much was made of Mr. Hinckley's reading habits, what he chose to read, and how it reflected on his mental state. As a result, Mr. Hinckley stopped writing and reading almost anything outside of non-controversial magazines related to cats, thereby creating yet another cause for concern that he had closed off another window into his mind and was displaying a defensiveness and guardedness that was not beneficial to him or to his therapy. Like Mr. Hinckley's treatment team and the government experts, the Court has been troubled by Mr. Hinckley's actions in ceasing to engage in pleasurable and potentially beneficial activities which he had enjoyed in the past because of the scrutiny he is under. The Court's understanding of Mr. Hinckley's behavior and mental health, through the testimony of the expert witnesses, can only be complete if he is as open, truthful, and natural as possible.

Many issues raised regarding Mr. Hinckley's relationships with women have come from the fact that Mr. Hinckley's efforts to reach out have thus far been toward female staff members at the Hospital, creating a problem of boundaries between staff and patients that should

24

not be breached, as well as legitimate concerns based on Mr. Hinckley's delusional and obsessive

behavior with respect to women in the past -- matters that must continue to be monitored.   One

would hope that in the upcoming visits to his parents' home, Mr. Hinckley will have the

opportunity to begin to develop normal, healthy, and appropriate friendships with both men and

women that will withstand the scrutiny necessarily given to them by the psychiatrists and

psychologist   treating him.
                a

### III. FINDINGS OF FACT

Based upon the testimony and exhibits offered by the government and counsel for

petitioner, the Court finds that the following facts have been established by a preponderance of

the evidenc

1.      Mr. Hinckley's current diagnosis is psychotic disorder not otherwise

specified (Axis I), in remission; major depression (Axis I), in remission;

and narcissistic personality disorder (Axis II).

2.      Mr. Hinckley's Axis I diagnoses have been in remission for at least eleven,

and perhaps as many as seventeen years.

3.      Mr. Hinckley's narcissistic personality disorder is significantly attenuated

from its previous state. Mr. Hinckley continues to exhibit symptoms of

grandiosity and self-importance, but no longer exhibits the intense

self-absorption that was present during the 1980s.

4.    Mr. Hinckley has exhibited no evidence of delusional thinking for

approximately sixteen years and no evidence of obsessive conduct for at

least nine years.

5.    Mr. Hinckley has continued to exhibit deceptive behavior even when there

have been no symptoms of psychosis or depression.  Such deceptiveness

may relate to his narcissistic personality disorder.

6.    Mr. Hinckley continues to be guarded and defensive.

7.    Mr. Hinckley's self-reporting underrepresents his problems and pathology

due to a tendency to minimize problems and avoid negative aspects of

situations to present himself in an overly positive light.

8.    Mr. Hinckley has exhibited no violent behavior, nor attempted suicide, in

over 20 years.

9.    While Axis IV was not discussed at this year's hearing, evidence in the

past showed that Mr. Hinckley's Axis IV diagnosis relates to his "current

stressors." In addition to his long-term mental illness (his Axis I

diagnoses) and his personality disorder (narcissism), they are:

involvement with the legal system, notoriety, reintegration into

society/living in the community, and the ending of his relationship with his

significant other.

10.   Historically, relationships and Mr. Hinckley's perceptions of those

relationships, especially relationships with women, have been inextricably

intertwined with Mr. Hinckley's mental illness and have been especially implicated when he has been most clinically dysfunctional.

11. Mr. Hinckley has never tried to escape from the Hospital or when on "B" city outings or unsupervised conditional release visits with his parents. He has participated successfully in over 200 Hospital-accompanied outings in the community without incident. During the past two years, he has participated successfully in all of the unsupervised overnight visits with his parents (Phase II) authorized by the Court. He has followed every condition imposed by the Court in authorizing these visits. These visits have been therapeutic and beneficial.

12. Were Mr. Hinckley to experience a relapse of his Axis I disorders, that relapse would not occur suddenly, but rather would occur gradually over a period of at least weeks or months. A relapse would not occur during the course of the conditional releases proposed by the Hospital.

13. Mr. Hinckley self-medicates with Img of Risperdal per day. There is no indication that Mr. Hinckley has failed to take his medication in the recent past or during any of the authorized outings with his parents. Were Mr. Hinckley to cease to take his medication over the course of the conditional releases proposed by the Hospital, it would have no physiological effect.

14. Mr. Hinckley's parents have proved themselves to be appropriate custodians for Mr. Hinckley's Phase I and Phase II outings under the

27

conditions approved by the Court.  There is no reason to believe that they will not be appropriate custodians for longer, Phase III outings outside the Washington, D.C. metropolitan area.

15.  Mr. Hinckley has ended his friendship with Leslie Deveau in order to increase his chances of increased privileges and further outings. He has had no contact with Ms. Deveau since January 15, 2005.

16.  Mr. Hinckley's relationship with Ms. Deveau has been the most important adult relationship of his life and its loss has great significance. Mr. Hinckley has coped with this loss appropriately, showing signs of sadness, but no relapse of his long term mental illnesses in reaction to that loss.

17.  In view of the opinions of Dr. Binks, Dr. Keisling, Dr. Montalbano and Dr. Phillips that Mr. Hinckley would not be a danger to himself or others in the foreseeable future with an expansion of release privileges to Phase III outings, the Court finds that Mr. Hinckley will not pose a danger to himself or others if his conditions of release are expanded to Phase III outings under the conditions set forth by the Court in the accompanying order.

On the ultimate mixed question of law and fact, dangerousness, the Court finds that, given the testimony by the Hospital and government experts, Mr. Hinckley will not be a danger to himself or others under the Section 501(e) proposal submitted by the Hospital under the conditions of release required by the Hospital and this Court in the accompanying Order.

28

IV.  DENIAL OF MR. HINCKLEY'S SECTION 50 1 (k) PETITION

Mr. Hinckley's Section 501(k) petition proposes visits to his parents' home outside the Washington, D.C. metropolitan area,  the first visit being for two nights, with an additional night added to each visit until the last of the visits is of seven nights in duration, with no more than three weeks between each visit.  The Hospital and the testifying experts oppose the petition.  Mr. Hinckley's petition for limited conditional release under Section 501(k) is denied.

## V. RULING ON HOSPITAL'S SECTION 501(e) PROPOSAL

With respect to Phase III visits to his parents' home outside the metropolitan Washingto n, D.C. area proposed by the Hospital, the Court concludes that under the conditions specified by the Hospital and required by the Court, Mr. Hinckley will not be a danger to himself or others. The major concerns raised by Dr. Phillips and Dr. Patterson last year concerning the lack of clarity in the relationship between Mr. Hinckley and Ms. DeVeau and that led to the Court's denial of the proposed Phase III visits have been resolved. While the outcome of that relationship may not be the most personally favorable one for Mr. Hinckley and Ms. DeVeau, given the long term romantic relationship and friendship that the two shared and that was important to both, their relationship is at an end. Furthermore, Mr. Hinckley has not shown any signs of decompensation or relapse of mental illness in the face of not just the end of his romantic relationship, but the end of all contact with Ms. DeVeau. The experts are in agreement that Mr. Hinckley would benefit from expanded conditional release and would not pose a danger if the proper conditions were set.

29

The Court therefore finds that it is not reasonably foreseeable that Mr. Hinckley will be a danger to himself or others if Phase III visits to his parents' home are permitted at this time. In keeping with the Hospital's proposal and the expert testimony suggesting that progression toward a goal will be beneficial to Mr. Hinckley, the Court will adopt the Hospital's plan of three initial visits, each of three nights in duration (76 hours for each visit), after which the Hospital will conduct an assessment of the success of these overall visits (in addition to the individual assessments), including an assessment of how Mr. Hinckley interacts with his parents in this new setting and whether he "achieves a reasonable level of family connectedness or bonding, support, and harmony with them in their home." Hospital's October 14, 2005 Filing at 2. With the recommendation of Mr. Hinckley's treatment team and the approval of the Hospital Review Board, there then may be an additional four visits of up to four nights in duration (100 hours for each visit).[6]

The Court, however, does not adopt the Hospital's proposed activities with regard to the second set of visits (should the first three visits be completed successfully and the next stage approved). The Hospital proposes various activities that Mr. Hinckley might be expected to undertake in its vision of the four-night duration visits -- activities such as obtaining a driver's license, seeking a job, or otherwise obtaining vocational assistance in his parents' community.

---

[6]     The Hospital's Section 501(e) proposal specifically mentions that the three-day visits would take place "from Fridays at 9:00 a.m. to Mondays at 1:00 p.m." and the four-day visits "from Thursdays at 9:00 a.m. to Mondays at 1:00 p.m." Hospital Section 501(e) Proposal at 1. The Court sees no need to put such rigid strictures of particular days of the week or times of day that these approved visits will begin and end. The timing of the visits — days of the week, times of day — are left to the discretion of the Hospital in planning, so long as they comply with all other requirements imposed by the Court.

These activities, however, are not proper Phase III activities but activities that might possibly be

appropriate later, during a Phase IV.  The Court agrees with the government experts that such

activities should be considered "transitional" in nature (so-called Phase IV) and that they

therefore are premature at this time.

As the Court noted above, there is much planning and forethought required before

the Hospital may legitimately put forth a true Phase IV transitional proposal. When that happens

only time will tell.  As the Hospital's counsel stated at the hearing, the visits now proposed "are

not meant to be a transition plan because it is too soon to know whether or not . [Mr.

Hinckley's parents'] home is appropriate for him reasonably or even therapeutically. There's no

evidence upon which the clinicians can make that determination at this point." See September

27, 2005 Transcript at 17.[7] For these reasons, the Court finds that this portion of the Hospital's

proposal is premature and does not approve it. On the other hand, the therapeutically directed

and beneficial activities mentioned by the experts in the hearing that will assist Mr. Hinckley in

---

[7]     The Hospital and the D.C. Attorney General's Office seem to be somewhat at odds with one another, despite their presumed representation of the same position, as can be seen in the Hospital's October 14, 2005 supplemental filing with the Court in response to its September 29, 2005 Order. In that filing, the Hospital states that it "does not perceive a dichotomy between what has been called a transitional approach or change of venue or outing approach," seeing the proposed expansion of Mr. Hinckley's conditional release. as a gradual process that "increases the time frame of the outings while also changing the venue . . [and] simultaneously represent[ing] a potential transition to a new community and a potential transition for convalescent leave." Hospital's October 14, 2005 Filing at 2. As discussed herein, the Court agrees much more with the Attorney General and Drs. Phillips and Patterson that it is useful to understand that there is a difference and to plan differently for each phase. It agrees with the Hospital, however, that there need be no actual long-term conflict in the process and planning leading to a possible transition to the outside world some day, so long as it is understood that the approved change of venue or outing approach (Phase III) precedes a transitional (Phase IV) phase that is currently only a "potential."

31

acclimating himself to the world outside the Hospital during these outings -- such as walking

around his parents' neighborhood, gardening, shopping or cooking -- are expressly approved as

proper goals of these "Phase III" outings.

, An Order consistent with this Opinion will issue this same day.

SO  ORDERED.

/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE: December 30, 2005

cc:     Thomas Zeno, Esq.                          Tanya Robinson, Esq.
        Assistant United States Attorney           D.C. Corporation Counsel's Office
        555 4th Street, NW                         64 New York Avenue, NE
        Room 5243                                  Washington,  DC  20001
        Washington, DC 20530

        Sarah Chasson, Esq.
        Assistant United States Attorney
        555 4th Street, NW
        Room 5243
        Washington, DC 20530

        Barry Wm. Levine, Esq.
        Dickstein Shapiro Morin & Oshinsky, LLP
        2101 L Street, NW
        Suite 800
        Washington, DC 20037

        Jodi Trulove, Esq.
        Dickstein Shapiro Morin & Oshinsky, LLP
        2101 L Street, NW
        Suite 800
        Washington, DC 20037