[pITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

UNITED STATES OF AMERICA,                    )
                                             )
                                             )
                                             )
        v.                                   )        Criminal No. 81-0306 (PLF)
                                             )
JOHN W. HINCKLEY, JR.                        )
                                             )
_____)

OPINION

        This matter is before the Court on the proposal of St. Elizabeths Hospital for the

conditional release of John Hinckley pursuant to 24 D.C. Code § 501(e) -- a so-called "(e)

proposal" or "(e) letter."  This is the third such proposal that the Hospital has submitted in the

last four years.  On each occasion, after considering the Hospital's proposal, Mr. Hinckley's

views on the Hospital's proposal, sometimes Mr. Hinckley's own petition under 24 D.C.

Code § 501(k) (a so-called "(k) petition"), and the government's opposition, and after an

evidentiary hearing, the Court has granted the Hospital's request -- never precisely under the

terms and conditions proposed by either the Hospital or Mr. Hinckley, and usually with

additional conditions crafted by the Court.

        At first, the Court allowed local day visits by Mr. Hinckley with his parents

outside of the confines of St. Elizabeths Hospital without the supervision of Hospital personnel

within a 50-mile radius of Washington, D.C. -- so-called Phase I visits.  It then permitted local

overnight visits by Mr. Hinckley with his parents within a 50-mile radius of Washington, D.C.

(Phase II).  Each visit was thoroughly assessed by the Hospital before a subsequent visit took

place.  There were a total of six Phase I visits and eight Phase II visits.  By order of December 30,

2005, the Court permitted so-called Phase III visits to begin in January 2006; these were visits

outside of the Washington metropolitan area to Mr. Hinckley's parents' community.  See United

States v. Hinckley, 407 F. Supp. 2d 248, 265-68 (D.D.C. 2005) ("Hinckley III").  The Court

permitted three initial visits by Mr. Hinckley to his parents' home, each visit to last three nights

or 76 hours.  See id. at 267.  Thereafter, the Court permitted visits of four nights, or 100 hours in

duration.  See id.  These periodic visits have continued to this day and each, according to the

Hospital's reports to the Court, has been therapeutic, without incident and, by all measures,

successful.[1]

        The Hospital's current (e) letter is premised on the notion that Mr. Hinckley is

ready for Phase IV in which, over the period of approximately one year, he would be integrated

into his parents' community with more and more absences from the Hospital, greater freedom,

more independence, and more privileges.  The ultimate goal of Phase IV is to determine if

Mr. Hinckley is ready to be released from the Hospital to live independently in his parents'

community.  Even then, of course, it is contemplated that he would have the support of his

parents, so long as they are alive and healthy, his siblings, and psychiatric and counseling

professionals in his parents' community.  In order to begin the Phase IV process, the Hospital's

---

[1]        On August 18, 2006, the Court issued an order granting Mr. Hinckley's request
to permit additional four-night Phase III visits of no specific number in the same form and
under the same conditions.  On November 21, 2006, the Court issued a further opinion and
order permitting an indefinite number of additional four-night Phase III visits to Mr.
Hinckley's parents' home outside the Washington, D.C. area, with slightly modified
conditions.  See United States v. Hinckley, 462 F. Supp. 2d 42, 45-47 (D.D.C. 2006)
("Hinckley IV").  To date there have been a total of 13 visits by Mr. Hinckley to his parents'
home.

(e) letter recommends the expansion of Mr. Hinckley's current conditional release to include the

following five elements:[2]  (1) the addition of Mr. Hinckley's siblings, Scott Hinckley and Diane

Sims, to be formally included as responsible persons/custodians in addition to Mr. Hinckley's

mother; (2) the addition of a case manager, Mr. Karl Beffa, a licensed social worker in his

parents' community; (3) six two-week visits, followed by one one-month visit in his parents'

community, with a reduction in the amount of supervised time he will be required to spend with a

custodian/responsible person; (4) permission to obtain a D.C. driver's license, and specific plans

for how to do so, including driver's education; and (5) Dr. John Lee's receipt of court letters

submitted to the Court under seal and other pertinent treatment team notes and individual therapy

notes from the Hospital.

      The most important of these recommendations, of course, is the expansion of

visits by Mr. Hinckley to his parents' community from what are now a maximum of four nights

or 100 hours to six visits of two weeks and one visit lasting as long as one month.  The Hospital

also recommends increasing the amount of time that Mr. Hinckley would be permitted to go

about unaccompanied in his parents' community without the supervision of his parents or

siblings, so that he could further his transition into the community, improve his life skills and

---

[2]     The Hospital's March 1, 2007 (e) letter also recommended a gradual implementation of privileges and unsupervised excursions in Washington, D.C., including impromptu meetings with a woman identified at the hearing in this case as Ms. M, a person with whom Mr. Hinckley has recently become romantically involved.  In its subsequent letter of March 14, 2007, the Hospital withdrew this recommendation, stating:  "Based on recent changes, social contact with Ms. [M] outside of St. Elizabeths Hospital, without prior treatment team and court approval, is no longer recommended . . . ."  At the hearing in this case, the Hospital made clear that it was withdrawing all aspects of its recommendation to expand unsupervised outings or visits into the Washington, D.C. area.  The only matter before the Court therefore is the Hospital's proposal with respect to Phase IV visits by Mr. Hinckley to his parents' community.

increase his independence.  Under the Hospital's recommendation, Mr. Hinckley would be permitted unaccompanied day visits throughout the community between the hours of 9:00 a.m. and 5:00 p.m. and from 9:00 a.m. to 9:00 p.m. during daylight savings time.  He would be required to personally prepare and submit itineraries to the treatment team twice a week outlining his proposed activities for each day, and he would meet both with a psychiatrist, Dr. John Lee, and with a licensed social worker, Mr. Karl Beffa, during the visits to his parents' community.

As has been its practice in prior years, the Court held an extensive evidentiary hearing on the Hospital's (e) proposal, and heard testimony over the course of five full days in April and May of this year and final arguments on the morning of the sixth day.  The witnesses who testified at the hearing were:  (1) Scott  Hinckley, Mr. Hinckley's brother; (2) Diane Sims, Mr. Hinckley's sister; (3) Dr. Paul Montalbano, Pretrial Chief of the Forensic Service Unit at John Howard Pavilion, St. Elizabeths Hospital, who for each proceeding before this Court has prepared a thorough Risk Assessment with respect to Mr. Hinckley; (4) Verne James Hyde, Mr. Hinckley's music therapist at St. Elizabeths Hospital; (5) Dr. Nicole Rafanello, a Clinical Administrator at St. Elizabeths Hospital, with clinical administrative responsibilities for Mr. Hinckley, and the author of the Hospital's (e) letter; (6) Dr. John Lee, a psychiatrist whose practice is located in the community in which Mr. Hinckley's parents reside; (7) Dr. Robert Phillips, a psychiatrist retained as an expert witness by the government and the former Director of Forensic Services for the State of Connecticut Department of Mental Health; and (8) Dr. Raymond F. Patterson, a psychiatrist retained as an expert witness by the government and the former Medical Director and former Associate Acting Superintendent at St. Elizabeths Hospital,

former Commissioner of Mental Health in the District of Columbia, and former Forensic Director for the State of Maryland.[3]

   The professionals who work with Mr. Hinckley at the Hospital (called to the stand by Mr. Hinckley's counsel) and the government's experts were all in substantial agreement about Mr. Hinckley's current diagnosis.  All agree that he is currently mentally ill and suffers from two Axis I disorders:  psychotic disorder, not otherwise specified ("psychotic disorder NOS"), and major depression.  All the experts agree that there have been no active symptoms or symptoms of any significance of these Axis I disorders in many years.  All the experts describe Mr. Hinckley's psychotic disorder NOS and major depression as being in full remission.  All the experts also agree that Mr. Hinckley suffers from an Axis II disorder:  narcissistic personality disorder.  Most of the experts believe that this disorder is "significantly attenuated," and all agree that it is significantly reduced, although he still shows some symptoms of this disorder.  For the Hospital, Dr. Rafanello testified that Mr. Hinckley currently has shown no active symptoms of depression or any delusions, has shown insight into his Axis I diagnoses, and is less socially isolated and

---

[3]  The background facts relating to Mr. Hinckley's attempted assassination of President Ronald Reagan; the serious wounding of the President, presidential Press Secretary James Brady, Secret Service Agent Timothy McCarthy, and Metropolitan Police Officer Thomas Delahanty; the trial of Mr. Hinckley pursuant to a 13-count indictment; the jury's finding that he was not guilty by reason of insanity on all counts; Mr. Hinckley's years at St. Elizabeths Hospital; his successful "B" city privileges under Hospital supervision over those years; decisions of this Court and the United States Court of Appeals; Mr. Hinckley's mental health over those years and the current state of his mental health; and the legal framework relating to 501(e) letters submitted by the hospital and 501(k) petitions filed by patients are all set forth in this Court's prior opinions in this case.  See United States v. Hinckley, 292 F. Supp. 2d 125 (D.D.C. 2003) ("Hinckley I"); United States v. Hinckley, 346 F. Supp. 2d 155 (D.D.C. 2004) ("Hinckley II"); United States v. Hinckley, 407 F. Supp. 2d 248 (D.D.C. 2005) ("Hinckley III"); United States v. Hinckley, 462 F. Supp. 2d 42 (D.D.C. 2006) ("Hinckley IV").

somewhat less self-absorbed and more open than in the past.  Transcript of Evidentiary Hearing

(April 18, 2007), Testimony of Dr. Nicole Rafanello ("April 18 Rafanello Test.") at 43-44.

      In its opinion of December 30, 2005, after having heard testimony from Dr.

Montalbano, Dr. Phillips and Dr. Patterson, among others, the Court found the following as facts:

1.     Mr. Hinckley's current diagnosis is psychotic disorder not otherwise specified (Axis I), in remission; major depression (Axis I), in remission; and narcissistic personality disorder (Axis II).

2.     Mr. Hinckley's Axis I diagnoses have been in remission for at least eleven, and perhaps as many as seventeen years.

3.     Mr. Hinckley's narcissistic personality disorder is significantly attenuated from its previous state.  Mr. Hinckley continues to exhibit symptoms of grandiosity and self-importance, but no longer exhibits the intense self-absorption that was present during the 1980s.

4.     Mr. Hinckley has exhibited no evidence of delusional thinking for approximately sixteen years and no evidence of obsessive conduct for at least nine years.

5.     Mr. Hinckley has continued to exhibit deceptive behavior even when there have been no symptoms of psychosis or depression.  Such deceptiveness may relate to his narcissistic personality disorder.

6.     Mr. Hinckley continues to be guarded and defensive.

7.     Mr. Hinckley's self-reporting underrepresents his problems and pathology due to a tendency to minimize problems and avoid negative aspects of situations to present himself in an overly positive light.

8.     Mr. Hinckley has exhibited no violent behavior, nor attempted suicide, in over 20 years.

9.      While Axis IV was not discussed at this year's hearing, evidence in the past showed that Mr. Hinckley's Axis IV diagnosis relates to his "current stressors."  In addition to his long-term mental illness (his Axis I diagnoses) and his personality disorder (narcissism), they are:  involvement with the legal system, notoriety, reintegration into society/living in the community, and the ending of his relationship with his significant other.

10.     Historically, relationships and Mr. Hinckley's perceptions of those relationships, especially relationships with women, have been inextricably intertwined with Mr. Hinckley's mental illness and have been especially implicated when he has been most clinically dysfunctional.

11.     Mr. Hinckley has never tried to escape from the Hospital or when on "B" city outings or unsupervised conditional release visits with his parents.  He has participated successfully in over 200 Hospital-accompanied outings in the community without incident.  During the past two years, he has participated successfully in all of the unsupervised overnight visits with his parents (Phase II) authorized by the Court.  He has followed every condition imposed by the Court in authorizing these visits.  These visits have been therapeutic and beneficial.

12.     Were Mr. Hinckley to experience a relapse of his Axis I disorders, that relapse would not occur suddenly, but rather would occur gradually over a period of at least weeks or months.  A relapse would not occur during the course of the conditional releases proposed by the Hospital.

13.     Mr. Hinckley self-medicates with 1mg of Risperdal per day.[4]  There is no indication that Mr. Hinckley has failed to take his medication in the recent past or during any of the authorized outings with his parents.  Were Mr. Hinckley to cease to take his medication over the course

---

[4]     Mr. Hinckley now also takes 75 mg. of Zoloft, 50 mg. of Benadryl, and 100 mg. of Colase each evening.  See April 18 Rafanello Test. at 58-59.

of the conditional releases proposed by the Hospital, it
would have no physiological effect.

Hinckley III at 263-64.  Other than the fact that another 18 months have passed and more

visits to his parents' community have been successfully completed, nothing in the testimony at

this year's evidentiary hearing fundamentally changes the Court's findings on these important

matters.

All of the experts agree that the visits by Mr. Hinckley to his parents'

community during Phase III have been therapeutic and successful.  The Hospital and Mr.

Hinckley believe he is ready to begin the re-integration into his parents' community with the

ultimate goal of transitioning him into that community as a resident who works (perhaps as a

volunteer, perhaps in a paid position) and lives full-time in the community.  The Hospital

therefore has proposed a move from Phase III to Phase IV at this time, and Mr. Hinckley and

his family support that proposal.  The primary goals of the Hospital's Phase IV proposal are to

permit Mr. Hinckley to gain and improve life skills, to increase his independence, to increase

his opportunities for socialization, to improve his judgment, to increase his empathy, self-

esteem and family interaction, and to increase his familiarity with his parents' community; all

of these goals, the Hospital suggests, can be furthered by providing more freedom and less

structure in his parents' community.  While the Hospital believes that there are risk factors in

releasing any patient from the Hospital back into the community, in Mr. Hinckley's case these

risk factors are viewed as minimal, and the Hospital asserts that they can be controlled and

monitored under the (e) proposal now before the Court.  The Hospital believes that between

Dr. Sidney Binks (Mr. Hinckley's treating psychologist) and other members of the treatment

team at the Hospital and Dr. Lee and Mr. Beffa in the parents' community, Mr. Hinckley will receive the treatment, counseling and monitoring he needs and that there will be sufficient feedback to the Hospital and to the Court to assure the safety of Mr. Hinckley and the community.

Dr. Phillips agrees that Mr. Hinckley has "demonstrated his readiness to transition to the next level . . . .  It is clinically appropriate that he be considered for expansion of conditional release privileges." Government Exhibit 07-5, Report of Dr. Robert Phillips (April 6, 2007) ("Phillips Report") at 50.  Dr. Patterson opines that Mr. Hinckley has not demonstrated "any signs or symptoms of overt dangerousness to anyone during his conditional release visits or at the Hospital.  Further, in [his] opinion, Mr. Hinckley has benefitted from the twelve visits to his parents' home (as reported by Hospital staff), and these have been part of the step-wise process for returning to community living." Government Exhibit 07-6, Report of Dr. Raymond Patterson (April 4, 2007) ("Patterson Report") at 23-24.[5]  As a result, Dr. Patterson recommends the expansion of Mr. Hinckley's current privileges, so that he could visit his parents' community for up to six days a week.  Dr. Patterson would limit the six-day visits to six such visits at this time, with sufficient time between visits so that the Hospital could continue its course of therapy and assessment of the visits.  See id. at 24; see also Transcript of Evidentiary Hearing (May 10, 2007), Testimony of Dr. Raymond Patterson ("May 10 Patterson Test.") at 10-11.

Neither Dr. Phillips nor Dr. Patterson believes that Mr. Hinckley is ready for Phase IV, at least not under the (e) proposal submitted by the Hospital.  Each of them sees

---

[5]        A thirteenth visit has taken place since Dr. Patterson submitted his report.

9

three significant problems with the Hospital's recommendations:  (1) The (e) letter lacks specificity.  It is not clear what Mr. Hinckley will be doing during the expanded Phase IV visits and how the risk factors will be monitored and controlled while he is away from the Hospital for significantly longer periods of time.  (2) The Hospital's (e) proposal does not make clear precisely what roles are to be played by Dr. Lee and Mr. Beffa, that Dr. Lee and Mr. Beffa have agreed to undertake these responsibilities, or that they fully understand (and have the information necessary to understand and carry out) the responsibilities expected of them in Phase IV.  This issue became even more ambiguous during the evidentiary hearing.  (3) Mr. Hinckley's relationship with Ms. M, like his earlier relationships with women (some real, some delusional), requires exploration by Hospital staff at the Hospital.  While relationship issues are by definition risk factors for Mr. Hinckley, they are not currently clearly understood by the Hospital in the context of Mr. Hinckley's recent relationship with Ms. M.  The relationship needs exploration and clarification before a proposal from the Hospital for Phase IV visits can be properly assessed by the experts and by the Court.

Dr. Patterson stated in his report that the Hospital's proposal "lacks specificity with regard to how [Mr. Hinckley] would structure and actually be spending the majority of his time [in his parents' community].  Indeed, several  hours per day will be unsupervised with no monitoring required."  Patterson Report at 22.  While Dr. Patterson agrees that Mr. Hinckley is "ready for some expansion of privileges," he believes that the plan submitted by the Hospital simply "does not look like the transition" contemplated by any rational view of Phase IV.  May 10 Patterson Test. at 16-17.  Rather, it looks like more of the same kind of visits under Phase III but consisting of longer, less structured periods with less supervision:

10

"[I]f this is fashioned as a Phase IV transition, for me this is not a transition.  This is let's

increase the visits for more time."  May 10 Patterson Test. at 51.

      Dr. Phillips does not believe Mr. Hinckley is an immediate danger to himself or

others and agrees that he is "ready for the next level," so long as the next level is carefully

planned out in quite specific ways that would assure adequate monitoring and reporting and

would control for risk factors, at the same time that it helps Mr. Hinckley to transition.

Transcript of Evidentiary Hearing (April 19, 2007), Testimony of Dr. Robert Phillips ("April

19 Phillips Test.") at 11.  Dr. Phillips does not believe that the Hospital has designed a plan

that adequately takes into account the risk factors identified in the Hospital's own risk

assessment, that controls for the worst case scenarios, and that protects society at the same

time that it meets the patient's needs therapeutically.  See id. at 8-11.  While he agrees that

Mr. Hinckley is not an immediate danger to himself or to others and that Mr. Hinckley should

focus his attention ultimately on the community where his parents reside, Dr. Phillips does not

believe that the plan proposed by the Hospital adequately deals with potential risks.  See id.

at 10-11.

      In Dr. Phillips' view, Phases I and II were "outings," with great specificity in

the plans prepared by the Hospital for each such outing and a carefully orchestrated

advancement of privileges.  See April 19 Phillips Test. at 13.  He viewed Phase III as

consisting not of outings but of "visits" to the area where Mr. Hinckley and his parents have

come to hope he ultimately will reside.  See id. at 13-14.  While Mr. Hinckley did very well

in all three phases, his success, in Dr. Phillips' view, can be attributed in large part to careful

planning by the Hospital, the specificity of the plans proposed by the Hospital and (with

modifications) approved by the Court, and the constant monitoring and assessment.  See id.

Dr. Phillips believes that because Phase IV contemplates much more than any of the prior

phases, it requires the same kind of careful planning, specificity, and assurance that the risk

factors can be controlled and monitored.  See id.  He believes that the goals and objectives of

the Phase IV visits should be carefully established before Phase IV begins, and that activities

and services should be clearly outlined in the plan to meet those goals and objectives.  See id.

at 14-15.  He is "greatly troubled" by the Hospital's plan because of the lack of specificity; it

"needs clarity."  Id. at 15.

       Dr. Patterson and Dr. Phillips both agree with the general goals and objectives

identified by the Hospital in its (e) proposal -- to enable Mr. Hinckley to develop greater

independence, to assist him in developing skill sets that will serve him well if ultimately he is

unconditionally released, to permit him to learn more about his parents' community and the

opportunities there, to develop better judgment, to increase opportunities for socialization, and

to obtain a driver's license to enable him to be more independent and to provide more help to

his parents.  See April 19 Phillips Test. at 16-17.  They agree that Mr. Hinckley would benefit

from support groups in his parents' community to assist him in improving his socialization

skills and to assist him in dealing with his aging parents.  Dr. Phillips and Dr. Patterson are

concerned, however, that the Hospital's (e) letter does not identify (with the exception of

recommendations with respect to the driver's license) the specific ways in which these goals

will be achieved.  Specifically, what will Mr. Hinckley be doing each day when he is out in

his parents' community without supervision from 9:00 a.m. to 5:00 p.m. or 9:00 a.m. to 9:00

p.m.?  Who will assist Mr. Hinckley in acquiring the skill sets that have been identified?

What services does Mr. Hinckley need and what agencies will provide these services?  What support groups and services are not only theoretically available but have been identified as being actually available to Mr. Hinckley and which ones are willing to work with and assist him?  <u>See</u> April 19 Phillips Test. at 17-26.  "It is essential that we have clarity with regard to who will be providing ongoing care, treatment and assistance in Mr. Hinckley's continuation along this path of recovery."  <u>Id</u>. at 11-12.  According to Dr. Phillips, these are "non-negotiable process issues" that have not been addressed in the Hospital's (e) proposal.  <u>Id</u>.

Related to this general concern about the Hospital plan's lack of specificity and clarity are the concerns that Dr. Phillips and Dr. Patterson expressed with respect to the roles to be played by Dr. John Lee and Mr. Karl Beffa.  During Phase III Dr. Lee saw Mr. Hinckley once on each of his four-day visits to his parents' community.  Typically, Dr. Lee's meetings with Mr. Hinckley lasted approximately 45 minutes, and they discussed how the visits were going.  Under the Hospital's (e) proposal for Phase IV, it is anticipated that Dr. Lee will continue to see Mr. Hinckley once during each visit to Mr. Hinckley's parents' community (even though the visits now will last two weeks under the Hospital's proposal), and Mr. Beffa will see him once during each visit.  During the evidentiary hearing, it was revealed that to this point Dr. Lee was not provided with Mr. Hinckley's full Hospital medical records, but only selected portions thereof.  Dr. Lee has been viewed by the Hospital as a "safety net" or, in Dr. Lee's words, the Hospital's "man in Havana" when Mr. Hinckley visits his parents' community.  Transcript of Evidentiary Hearing (April 18, 2007), Testimony of Dr. John Lee ("April 18 Lee Test.") at 156, 158, 173-74.  His responsibility has been to advise the treatment team at the Hospital if he observed or heard anything of concern.  <u>See</u> <u>id</u>. at 176-77.

During his testimony at the evidentiary hearing, Dr. Lee acknowledged that he knew that the Hospital expected him to play a larger role in Phase IV than he had played in Phase III, but he was not clear on exactly what that role would be.  See April 18 Lee Test. at 153.  He testified that he had discussed the matter briefly with Dr. Rafanello and with Dr. Thomas Green, but that he had not discussed it "in any great detail."  Id.  Indeed, Dr. Lee testified that he had had no discussions with the members of the Hospital treatment team about expanding his role up until the week just prior to the hearing, although he had had such discussions with Mr. Hinckley's lawyer.  See id. at 175-76.  He said specifically that he had not had any discussions with anybody at the Hospital about his performing a psychotherapeutic function for Mr. Hinckley in the future.  See id. at 174-75.  Dr. Lee testified that his expected role in Phase IV "is becoming clearer today as I sit here [in Court] and listen to the testimony about what that would be . . . .  I think it is becoming much clearer about what that would mean."  Id. at 153.  He testified, however that, in his view, he is to be neither the psychotherapist nor the medication manager for Mr. Hinckley under the (e) proposal.  Id. at 174.  Dr. Lee testified that he has "done a lot of therapy in my life, but it isn't something I am doing particularly much of lately," although he said he could serve as Mr. Hinckley's therapist if required.  Id. at 182-83.  Dr. Lee suggested that it might even be that going forward Mr. Beffa rather than he (Dr. Lee) would be a better person to provide therapy for Mr. Hinckley.  See id.

Dr. Lee testified that he has provided a written report to the Hospital after each of his meetings with Mr. Hinckley.  See April 18 Lee Test. at 161.  He acknowledged that the reports that he has provided in the past have been quite cursory, and he does not see that

changing in the future:  "I believe in brevity and being concise . . . .  They need to know how he is doing, he is doing well.  His mental status is good, his mood is good. . . .  How much more do you have to say than that?"  Id. at 194.

Dr. Phillips and Dr. Patterson testified that they were quite troubled by Dr. Lee's testimony; Dr. Phillips testified that "after hearing Dr. Lee's testimony . . ., I am more confused than when I started."  April 19 Phillips Test. at 27.  Dr. Phillips and Dr. Patterson do not believe that what Dr. Lee did during Phase III -- his "safety net"/"man in Havana" role -- would be sufficient for Phase IV.  See April 19 Phillips Test. at 29-31; see also May 10 Patterson Test. at 38-39.  They both believe that Dr. Lee needs to have access to and familiarity with the entirety of Mr. Hinckley's Hospital record, not just selected portions, and that there needs to be regular written and verbal communication between Dr. Lee and the Hospital during Phase IV, when (in Dr. Phillips' words) the Hospital will be "passing the baton" to Dr. Lee.  April 19 Phillips Test. at 31-34.  While Dr. Patterson is comfortable with Dr. Lee's role as a "safety net," he is "not comfortable with the information he does not know . . . if he is going to actually take over the treatment."  May 10 Patterson Test. at 38; see id. at 56.

Dr. Phillips, who interviewed Dr. Lee prior to the hearing, testified that Dr. Lee is "uncertain about whether he wants to do more," whether he wants to do psychotherapy for Mr. Hinckley.  April 19 Phillips Test. at 34-36.  Furthermore, according to Dr. Phillips, Dr. Lee has a very different view of what his written reports and written recordation of events ought to be than personnel at the Hospital traditionally have had.  Finally, the Hospital's plan, in Dr. Phillips' view, must make clear *in advance* whether Dr. Lee or Mr. Beffa or someone

else will be providing therapy to Mr. Hinckley in his parents' community.  <u>See</u> <u>id</u>. at 39-44.

It appears to Dr. Patterson that no one knows whether Dr. Lee or Mr. Beffa will be the

primary treater, and he is concerned that no one has ever talked to Mr. Beffa about this.  <u>See</u>

May 10 Patterson Test. at 39.  It is not good enough, in Dr. Patterson's view, for the Hospital

to say that "between the two of them somehow we'll work it out."  <u>Id</u>.  Once it is determined

who the therapist will be, there must be serious discussions by the Hospital with that person

about precisely what his or her role is, the nature of the reports and communications that are

required, and the history of Mr. Hinckley's treatment at the Hospital.  <u>See</u> <u>id</u>. at 15-16.  So

long as Dr. Lee and even some personnel within the Hospital are unclear about what Dr. Lee's

role is to be and what Mr. Beffa's role is to be in Phase IV, Dr. Phillips and Dr. Patterson

cannot support the Hospital's (e) proposal.  <u>See</u> April 19 Phillips Test. at 36-40; May 10

Patterson Test. at 38-40.

Between the fourth day of the evidentiary hearing on April 19, 2007 and the

fifth day on May 10, 2007 (a delay occasioned by Dr. Patterson's unavailability during the

latter part of April), Dr. Rafanello visited with Dr. Lee and Mr. Beffa simultaneously in Mr.

Hinckley's parents' community for approximately one hour and 15 minutes.  <u>See</u> Transcript of

Evidentiary Hearing (May 10, 2007), Rebuttal Testimony of Dr. Nicole Rafanello ("May 10

Rafanello Rebuttal Test.") at 61-63; 93-95.  Dr. Rafanello testified that she discussed Mr.

Hinckley's history with them and both the goals and the risk factors involved in expanded

visits for Mr. Hinckley to his parents' community.  <u>See</u> <u>id</u>. at 62.  She proposed to Dr. Lee

and Mr. Beffa that the Hospital develop a template for them to use when observing and

assessing Mr. Hinckley with respect to the risk factors.  <u>See</u> <u>id</u>. at 62, 103-04.  Dr. Rafanello

testified further that Mr. Beffa had told her that he had investigated possible activities for Mr.

Hinckley to engage in while in his parents' community and that Mr. Beffa had agreed to work

with Mr. Hinckley on the itineraries contemplated by the (e) proposal.  She further testified

that additional Hospital records recently have been provided to Dr. Lee.  See id. at 62-63, 95-

103.

Dr. Rafanello also testified that Dr. Binks would continue to be Mr. Hinckley's

primary therapist even if Mr. Hinckley spent up to six months a year in his parents'

community during Phase IV, but that there would be a transition.  See May 10 Rafanello

Rebuttal Test. at 70-71.  The Hospital contemplates that Dr. Lee "initially" will be Mr.

Hinckley's therapist in Mr. Hinckley's parents' community "for now," working with Mr.

Hinckley in the way he has in the past, but "there's a possibility it may transition to Mr. Beffa

. . . over time" and Mr. Beffa may become Mr. Hinckley's individual therapist in the parents'

community.  Id. at 91-92.  "[W]e are evaluating how Dr. Lee and Mr. Beffa serve in their

roles."  Id. at 92.  The Hospital will "make adjustments as necessary."  Id.

Between the end of the first phase of the hearing on April 19, 2007 and the

resumption of the hearing on May 10, 2007, the treatment team did not revise its

recommendations to the Hospital Review Board, based on any of the concerns raised by Dr.

Phillips and Dr. Patterson in their reports or by Dr. Phillips in his testimony, or based on Dr.

Lee's testimony or on Dr. Rafanello's meeting with Dr. Lee and Mr. Beffa.  Nor did the

Review Board provide a new or supplemental (e) proposal to the Court in writing.  Rather, the

Hospital's proposal remains exactly as it was stated in its March 1, 2007 letter, as modified by

its March 14, 2007 letter.  See May 10 Rafanello Rebuttal Test. at 87-88.

17

Dr. Phillips and Dr. Patterson were not impressed by what they viewed as Dr. Rafanello's oral supplementation of the Hospital's (e) proposal.  In Dr. Patterson's words, the fact that Dr. Lee and Mr. Beffa now have records and information that they did not have a month earlier "does not impress me."  May 10 Patterson Test. at 42.  Furthermore, one "doesn't modify recommendations on the fly," id., which, in the view of Dr. Phillips and Dr. Patterson, is what the Hospital was attempting to do through Dr. Rafanello's testimony on May 10.

The third area of concern expressed by Dr. Phillips and Dr. Patterson has to do with the very recent beginning of a romantic relationship between Mr. Hinckley and Ms. M. Ever since Mr. Hinckley's attempted assassination of President Reagan in an effort to impress the actress Jodie Foster, all of his treaters have agreed that relationships and Mr. Hinckley's perceptions of those relationships, specifically relationships with women, have been inextricably intertwined with Mr. Hinckley's mental illness and are among the primary risk factors to be constantly monitored and assessed.  As testimony at prior hearings has shown, Mr. Hinckley has had real, hoped-for, or imagined relationships with other women on the Hospital grounds over the years.  His long-term relationship with Leslie DeVeau, discussed in earlier opinions of this Court, was a very real relationship that was in many respects a positive and important part of Mr. Hinckley's life.  When Ms. DeVeau refused to talk further with professionals at the Hospital and to talk at all with the government's experts and then refused to participate in conjoint therapy, however, Mr. Hinckley decided to end the relationship in an effort to obtain greater freedom and privileges from this Court.  The termination of the

relationship was very sad for Mr. Hinckley, and all the experts agree that he handled that sadness and the break-up of that long-term relationship appropriately.

There is no need here to go into detail about Mr. Hinckley's burgeoning relationship with the mercurial Ms. M.[6] Her on-again, off-again expressed feelings for Mr. Hinckley, her statements to Hospital personnel and the government's experts (which the Court does not consider for the truth of the matters asserted therein), and Mr. Hinckley's responses to reports of those statements are all matters which give Dr. Rafanello, Dr. Montalbano, Dr. Phillips and Dr. Patterson concern. Dr. Montalbano and Dr. Rafanello agree that there is a need to monitor and explore the evolving relationship between Mr. Hinckley and Ms. M and the effect it may have on Mr. Hinckley's judgment -- and, ultimately his mental health. Dr. Montalbano testified that relationships with women is a risk factor for Mr. Hinckley insofar as it connects to the "primary risk factors" such as depression and delusions. Transcript of Evidentiary Hearing (May 10, 2007), Rebuttal Testimony of Dr. Paul Montalbano ("May 10 Montalbano Rebuttal Test.") at 126-27. Dr. Rafanello agrees that the relationship is best explored at the Hospital with the Hospital staff and Mr. Hinckley's current therapist, Dr. Binks. See April 18 Rafanello Test. at 100-01. Nevertheless, Dr. Montalbano and Dr. Rafanello do not believe that the relationship between Mr. Hinckley and Ms. M should interfere with the Court's approval of the Hospital's (e) proposal.

---

[6]  Ms. M suffers from bipolar disorder. Dr. Rafanello and other witnesses describe her mood as "labile" and her behavior as unpredictable. See April 18 Rafanello Test. at 65. By "labile," Dr. Rafanello means that "her mood shifts rapidly from one end of the spectrum being the happy end, to the angry or more depressed end rather quickly." Id. at 65.

Dr. Phillips and Dr. Patterson have a very different view.  Based upon his conversations with Mr. Hinckley and Ms. M and the testimony he heard in Court with respect to Ms. M, Dr. Phillips concluded that Mr. Hinckley's relationship with Ms. M is a potential risk factor that must be thoroughly explored in view of Mr. Hinckley's history of relationships and the ways in which he has handled rejection in the past.  See April 19 Phillips Test. at 50-55; see also May 10 Patterson Test. at 16-20.  According to Dr. Phillips, while Mr. Hinckley handled the break-up with Ms. DeVeau appropriately and has shown that he has been able to withstand rejection, the situation with Ms. M seems to change from moment to moment.  It is unclear that Mr. Hinckley is realistic in assessing it, that he has been completely open in discussing it, or that he has shown particularly good judgment with respect to it.  See April 19 Phillips Test. at 49; see also May 10 Patterson Test. at 17-19, 22-24.  Dr. Patterson testified that Mr. Hinckley has shown serious errors in judgment and perception with respect to this relationship, that he has minimized the problems with respect to it, and that the relationship with Ms. M causes Mr. Hinckley more stress than he may be able to handle.  See May 10 Patterson Test. at 23-27, 29.  Because Mr. Hinckley's relationship with women, in Dr. Patterson's view, is a central part of his pathology and because the relationship with Ms. M is unresolved and constantly changing, it must be further explored and explored intensively. See id. at 20-22, 25.  So long as the relationship with Ms. M is unresolved, Dr. Patterson believes that periods away from the Hospital for as long as two weeks (let alone a full month) would be "an unnecessary risk at this time."  Id. at 26.

Dr. Patterson believes that conjoint therapy involving Mr. Hinckley and Ms. M would be a valuable tool to use to explore the relationship and its effects on Mr. Hinckley's

mental health, but he was not clear whether Ms. M would be willing to participate.  See May 10 Patterson Test. at 22.  While Dr. Rafanello testified in rebuttal that between April 19 and May 10, Ms. M had agreed to participate in conjoint therapy, she attended only one conjoint therapy session with Mr. Hinckley, cancelled her attendance at the second, and has not participated since.  See May 10 Rafanello Rebuttal Test. at 82, 86-87.  To Dr. Phillips and Dr. Patterson, these facts just served to underscore the problem and its lack of resolution.  In their view, the relationship must be more vigorously explored and factored in to any (e) proposal before the Court grants expanded privileges and a transition to Phase IV.[7]

For all of these three reasons -- the lack of specificity and clarity of the (e) proposal, the uncertainty and lack of specificity concerning the roles of Dr. Lee and Mr. Beffa, and the historical relationship risk factor and the lack of understanding of Mr. Hinckley's relationship with Ms. M -- Dr. Phillips testified that in his opinion, "this motion is best left alone. . . .  It is such a moving target."  Transcript of Evidentiary Hearing (May 10, 2007), Rebuttal Testimony of Dr. Robert Phillips ("May 10 Phillips Rebuttal Test.") at 129.  While flexibility may be useful in enhancing Mr. Hinckley's independence in a conditional release plan under 24 D.C. Code § 501(e), there is a difference between flexibility and ambiguity.  See id. at 130-31.  In Dr. Phillips' view, there is no clarity on "where we are or where the Hospital is with Dr. Lee" or where Mr. Hinckley is with Ms. M.  Id. at 133.  In Dr. Patterson's view, it is a mistake to reduce the level of intervention and assessment by the Hospital for longer periods of time unless and until there is more structure to the plan under

---

[7]     The Hospital believes that Mr. Hinckley should be permitted to have telephone contact with Ms. M when he is in his parents' community, so long as they are in conjoint therapy together.  See May 10 Rafanello Rebuttal Test. at 110-112.

which this would be done, and until the situation with Ms. M is more thoroughly explored.

See Transcript of Evidentiary Hearing (May 10, 2007), Rebuttal Testimony of Dr. Raymond

Patterson ("May 10 Patterson Rebuttal Test.") at 139-40, 143.   While the treatment team has

discussed some of the matters raised by Dr. Rafanello in rebuttal, the ideas have not been

fleshed out in writing, considered fully by the treatment team, or presented by the treatment

team to the Review Board and by the Review Board to the Court.   See id. at 139.   In Dr.

Patterson's view, that must be done after a careful consideration of the problems identified

with respect to the March 1, 2007 proposal, the lack of clarity and commitment with respect to

the roles of Dr. Lee and Mr. Beffa, and the evolving situation with respect to Ms. M.

   Having carefully considered the Hospital's March 1, 2007 proposal under 24

D.C. Code § 501(e), as modified by its March 14, 2007 letter, and the testimony of all of the

witnesses at the evidentiary hearing, the Court agrees with Dr. Patterson and Dr. Phillips that

the current proposal must be denied largely for the reasons expressed by them with respect to

their three significant areas of concern.   The reasons the Court has reached this decision rest

with the Hospital, not with Mr. Hinckley.   The 13 visits by Mr. Hinckley to his parents'

community have been therapeutic and uneventful.   Mr. Hinckley, his parents and his siblings

have done all that has been asked of them.   To quote Dr. Phillips, Mr. Hinckley has

"demonstrated his readiness for the next level."   Unfortunately, the Hospital has not taken the

steps it must take before any such transition can begin.   While it waits for the treatment team

and the Hospital Review Board to address the concerns expressed by Dr. Phillips and Dr.

Patterson, as discussed further in this Opinion, the Court will expand from four days to six

days the length of the visits now permitted by Mr. Hinckley to his parents' home under this

Court's orders, subject to the same conditions as set forth in the Court's Order of

November 21, 2006.  As for the (e) proposal itself, however, it must be denied.  An Order

consistent with this Opinion will issue this same day.

        SO ORDERED.


/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE:  June 19, 2007