1                    UNITED STATES DISTRICT COURT

2                       DISTRICT OF COLUMBIA

3

4      UNITED STATES OF AMERICA          CRIMINAL ACTION NO. 81-306

5                                        WASHINGTON,D.C.

6      VERSUS                            MONDAY, JULY 21, 2008

7

8      JOHN W. HINCKLEY, JR. (ST. ELIZ.)  3:45 P.M.

9

10                      **EVIDENTIARY HEARING(DAY 1)**
                        **(Testimony of Dr. Montalbano)**

11

12                 BEFORE THE HONORABLE PAUL L. FRIEDMAN

13                   UNITED STATES DISTRICT COURT JUDGE

14

15     A P P E A R A N C E S:

16

       FOR THE PLAINTIFF                 THOMAS E. ZENO, ESQ.
17                                       SARAH T. CHASSON, ESQ.
                                         U.S. ATTORNEY'S OFFICE
18                                       555 Fourth Street, NW
                                         Suite 5423
19                                       Washington, DC 20530
                                         (202) 514-6957
20

21     FOR THE DEFENDANT
       JOHN W. HINCKLEY, JR.             BARRY W. LEVINE, ESQ.
22                                       ADAM S. PROUJANSKY, ESQ.
                                         ANN-MARIE LUCIANO, ESQ.
23                                       DICKSTEIN SHAPIRO, LLP
                                         1825 Eye Street, NW
24                                       Washington, DC 20006-5403
                                         (202) 420-2237
25

```
1    ST. ELIZABETHS HOSPITAL          TONYA A. SAPP, ESQ.
                                      D.C. ATTORNEY GENERAL'S
2                                     OFFICE
                                      441 4th Street, NW
3                                     Suite 1060 North
                                      Washington, DC 20001
4                                     (202) 724-5562

5    REPORTED BY:                     WENDY C. RICARD, OCR, RPR
                                      OFFICIAL COURT REPORTER
6                                     333 Constitution Ave., NW
                                      Room # 6718
7                                     Washington, DC  20001
                                      (202)354-3111

8

9    Proceedings recorded by mechanical stenography.

10   Transcript produced by computer-aided transcription.

11

12

13

14                       I N D E X

15   EXHIBITS:                               PAGE:

16       Patient No. 3.....................   43/52

17

18   WITNESSES:

19       Dr. Paul Montalbano................

20         By Mr. Levine...................... 3

21

22

23

24

25
```

**P R O C E E D I N G S**

1

2          (Whereupon, there were opening statements and the

3    testimony of Diane Sims & Scott Hinckley prior to the

4    testimony of Dr. Montalbano below.)

5          THE COURT:  Mr.  Levine, next.

6          MR. LEVINE:  Thank you, Your Honor.  Please the

7    Court, we'll call Dr. Paul Montalbano.

8          THE COURT: Dr. Montalbano.

9    *          *          *              *

10          **DR. PAUL MONTALBANO**, called as a witness in this

11   case, after having been duly sworn, testified as follows:

12

13   *          *          *              *

14          THE COURT: Good afternoon, sir.

15          THE WITNESS:  Good afternoon.

16          THE COURT:  How are you?

17          THE WITNESS:  Fine.  I don't know whether it was

18   poor judgment or wishful thinking that I would have already

19   been done by now, but maybe based on past experience, I never

20   should have had that thought.

21          MR. LEVINE:  Manifestation of dangerousness.

22          THE COURT: It' s not a lack of initiative on your

23   part.

24   **DIRECT EXAMINATION BY MR. LEVINE:**

25   Q.   Please state your name, sir.

1    A.    Paul Montalbano.

2    Q.    And what is your current occupation?

3    A.    I'm Pretrial Chief at St. Elizabeths Hospital.

4          MR. LEVINE:  Your Honor, may we dispense with the

5    inquiry about education and training?

6          MR. ZENO:  The government will stipulate that Dr.

7    Montalbano is an expert in the diagnosis and treatment of

8    mental illness, Your Honor.

9          MR. LEVINE:  And that he's educated and trained.

10   And that he's educated and trained.

11         THE COURT: And that he's educated and trained, yes.

12         MR. ZENO:  Very well educated and trained.

13         THE COURT:  Everybody agrees with that.  If we

14   didn't after five years of listening to him, we'd be in big

15   trouble.

16   BY MR. LEVINE:

17   Q.    What's -- how long have you been pretrial chief at the

18   Hospital?

19   A.    Since 1999.

20   Q.    And what are your responsibilities in that regard?

21   A.    I oversee the pretrial wards at the Hospital which

22   perform all the evaluations that are ordered by the Superior

23   Court, competency to stand trial, criminal responsibility;

24   essentially, all the court-ordered pretrial evaluations and

25   the treatment of all those individuals while they're

1    hospitalized.

2    Q.    Do you conduct psychological risk assessments?

3    A.    Yes.

4    Q.    And could you explain to us what a comprehensive

5    psychological risk assessment is?

6    A.    Yes.  I've I explained that before, so I'll try and give

7    a brief explanation.  Essentially, it's a combination of

8    methodologies to assess risks.  It includes methodologies,

9    such as actuarial which is looking at say a weighted

10   statistical formula to assess risks.

11       It uses structured clinical guides such as the HCR-20,

12   which stands for Historical Clinical Risk factors.  So you go

13   through these 20 risk factors, you code them, score them,

14   interpret the results.  You do an individualized analysis

15   which in this particular case or any case for that matter is

16   looking longitudinally at an individual to see what variables

17   or cluster of variability -- or excuse me -- cluster of

18   variables are present during the outcome behavior.

19       In this particular case, we're talking about dangerous.

20   So you would look at -- in Mr. Hinckley's case,  you would

21   look at what variables were present during the four suicide

22   attempts and during the instant offense, and you integrate all

23   this together.  You develop a formulation of risks, and then

24   you do everything possible to develop a comprehensive risk

25   management plan.

1     Q.   All right.  Now --

2          MR. LEVINE:  Your Honor, if I may make the proffer

3     to the Court that Mr. -- that Dr. Montalbano be received as an

4     expert in the assessment of dangerousness with respect to

5     conditional release?

6          MR. ZENO:  Sure.  No objection, Your Honor.

7          THE COURT:  Without objection, he will be treated as

8     an expert.

9          MR. LEVINE:  And that would enable Dr. Montalbano to

10    render opinions in this regard?

11         THE COURT:  Yes.  Yes.

12         MR. LEVINE:  Thank you.

13    BY MR. LEVINE:

14    Q.   Are you on the hospital review board?

15    A.   Yes, I am.

16    Q.   What is the review board?

17    A.   The review board is an internal hospital mechanism

18    composed of all the branch chiefs, nine, I believe in all.

19    It's a mechanism set up to provide oversight and feedback

20    about insanity acquittees progressing through the system.  So

21    if a person were to move from one security level to another,

22    if a person were to be recommended for some form of a

23    conditional release, then the review board would meet.  The

24    treatment team would do what's called a review board report,

25    get together, discuss their findings and their recommendations

1    before the assembled body of the review board, and the review

2    board would vote on any particular recommendation, either

3    approving it or disapproving it and stating the reasons why or

4    making additional recommendations.

5    Q.    Are you authorized to speak for the review board and for

6    the Hospital?

7    A.    Yes.

8    Q.    In this proceeding, of course?

9    A.    Yes.

10   Q.    Do you know what the (e)petition to this court consists

11   of?

12   A.    Yes.

13   Q.    Did you do with respect to Mr.  Hinckley a risk

14   assessment in the context of the Hospital (e)petition?

15   A.    Yes.

16   Q.    Are you familiar with the last (e)petition to the Court?

17   A.    Yes, I am.

18   Q.    And why is this petition seeking less than the last one?

19   A.    Well, whenever the Hospital gets feedback from the Court

20   about a particular recommendation, it takes that very

21   seriously and considers all the points and opinions of the

22   Court and attempts to formulate a strategy about how to

23   present the case differently.

24        In this particular case, there were a number of concerns

25   raised.  We took all those concerns very seriously.  One of

```
 1    the concerns was about, you know, the degree of freedom that
 2    we should be conceptualizing.  If you look at this case
 3    historically, he's gotten small degrees of freedom in terms of
 4    a conditional release.  We got the distinct impression that
 5    the recommendation the last time was expanding the release at
 6    too great a pace.  We took the concern about specificity into
 7    account.  We took the concern about clarity of roles into
 8    account, and we tried to develop a more comprehensive plan
 9    with smaller degrees of freedom that took all of those
10    recommendations into account to present it to the Court.
11        If the Hospital is rebuffed with a particular plan, we
12    react to that, take the concerns into consideration, and come
13    back with another plan.
14    Q.   Does it reflect an assessment by the Hospital there has
15    been some sort of erosion in Mr.  Hinckley's mental health?
16    A.   No.
17    Q.   Does it reflect an assessment by the Hospital that Mr.
18    Hinckley might be more dangerous?
19    A.   No.
20    Q.   Does the Hospital maintain the same confidence in Mr.
21    Hinckley as it had last time?
22    A.   Yes.  We have confidence in Mr.  Hinckley, and under that
23    plan and under this plan.
24    Q.   Have you conducted a number of comprehensive risk --
25    psychological risk assessments with respect to Mr.  Hinckley?
```

1    A.    Yes, I have.  More than in any other case.

2    Q.    Since you have been at the hospital?  In your life.

3    A.    In my life.

4    Q.    All right.  Now, can you tell us how many you've done for

5    Mr. Hinckley?

6    A.    I believe that this is the eighth.  It's a little bit

7    different.  Some of them I'd have to go through it in detail.

8    This is the ninth report; one of them was simply an addendum.

9    Some of them were simply psychological testing addendums, but

10   I would say this is probably at least the sixth or seventh --

11   Q.    I count nine if you include the addendum.

12   A.    A few of those were just adding psychological testing.

13   At least one of them was adding an update on psychological

14   testing to the prior comprehensive risk assessment, but,

15   probably, at least seven.

16   Q.    For a fact if I may help the Court, I can tell you that

17   they occurred on February 1999 with an addendum --

18            THE COURT:  They are listed on Page 4 of his report.

19            MR. LEVINE:  Okay.  Good.

20   BY MR. LEVINE:

21   Q.    What was the purpose of the most recent or the 2008

22   update?

23   A.    Well, to review his course over the last year; to aid the

24   Hospital in its formulation of a viable plan to present to the

25   review board and to the Court; to make any additional risk

1    management suggestions; to update the new data in light of all

2    the prior evaluations.

3    Q.   Now, can you describe, generally, the conditional release

4    proposal before the Court today?

5    A.   Yes.

6    Q.   Please do.

7    A.   Well, the current proposal consist of a recommendation

8    for 12 visits to his family's residence; 10 days, nine nights

9    in duration.  And his mother, brother, sister, will all

10   continue to function as responsible individuals.  Dr. Lee will

11   function as covering psychiatrist.  Mr.  Beffa will function

12   as social worker and individual therapist.

13       In addition, there are recommendations to increase the

14   amount of unaccompanied time he spends in his family's

15   subdivision and outside of the subdivision.  Specifically,

16   there is a recommendation that he be allowed to exercise up to

17   two hours twice a day unaccompanied within the subdivision.

18       Then there is recommendation that he be allowed to spend

19   four hours twice a week in a volunteer position in the greater

20   community and up to three hours twice a week to engage in

21   specific social, leisure, recreational activities.

22       Both the volunteer activities and the leisure,

23   recreational, or social activities would all need to be

24   submitted ahead of time to the treatment team incorporated

25   into his itinerary and approved by the treatment team.

1    THE COURT:  So are we talking about two hours, twice

2    a day similar to the two hours, once a day that is now in the

3    plan so he can walk around with a cell phone, do whatever?

4    Then four hours twice a week -- twice a week?

5    THE WITNESS:  Twice during the outing which is

6    longer than a week.  I just said a week.

7    THE COURT:  To do volunteer work.  And what was the

8    third piece of it?

9    THE WITNESS:  The third was three hours, twice a

10   week to engage in specific leisure, social, recreational

11   activities.  All to be presented to the treatment team and

12   incorporated into his itinerary and presented to the Court two

13   weeks ahead of time.

14   There are additional recommendations.  There are a

15   series of recommendations dealing with getting a driver's

16   license.  So that, at first, he would be recommended to go to

17   the Department of Motor Vehicles within the District of

18   Columbia accompanied by Mr.  Shamblee to get all the materials

19   and take the written test.

20   Then during the outings to his mother's residence,

21   he would engage in, I believe, it's seven driving lessons.

22   And then later he would take the driving test in the District

23   of Columbia, and then he would --

24   THE COURT: Why is this -- why is he getting a D.C.

25   driver's license and taking the driving test in the District

1   of Columbia as opposed to closer to his mother's residence?

2           THE WITNESS:  Well, my understanding, through Mr.

3   Shamblee, who is taking the lead in handling this is that,

4   one, he's a resident of the District of Columbia; and two, it

5   would be easy for Mr.  Shamblee to facilitate getting a

6   driver's license here in the District of Columbia.

7           MR. LEVINE:  I think it's no more complicated, Your

8   Honor, than residency.  I mean when you fill out the form, you

9   need to say where you live, and he could not fairly say

10  accurately that he lives in Virginia until the Court allows

11  that to be the case.

12          THE COURT: Okay.  Could we take about a three-minute

13  break?

14          MR. LEVINE:  Surely, Your Honor.

15          (Whereupon, there was a brief recess at this time.)

16          THE COURT:  Mr.  Levine.

17          MR. LEVINE:  Please, Your Honor.

18  BY MR. LEVINE:

19  Q.   Dr. Montalbano, you were just reviewing some of the

20  conditions of the proposal of the (e)letter.  I don't believe

21  you mentioned the time in the District of Columbia in

22  volunteer capacity.  Is there a provision in the proposal with

23  respect to that?

24  A.   Yes.  Well, there were 17 specific recommendations, so I

25  had not covered all of them.

1    Q.   Is that one of them, though?

2    A.   That is another one.

3    Q.   Now, with respect to the Hospital's proposal, do you have

4    an opinion to a reasonable degree of psychological certainty

5    as to whether Mr.  Hinckley will be dangerous to himself or

6    others in the context the of the proposal?

7    A.   Yes, I do.

8    Q.   What is that opinion?

9    A.   It is my opinion to a reasonable degree of psychological

10   certainty that Mr.  Hinckley would not pose a danger to self

11   or others due to mental illness under the context of the

12   Hospital's proposal.

13   Q.   Is it likewise your opinion that -- would you have the

14   same opinion under the proposal that was made before the Court

15   last time?

16   A.   It wouldn't be exactly the same, but I would still be

17   supportive of that proposal.

18   Q.   Okay.  Now, what is the basis for your conclusion with

19   respect to the one before the Court today?

20   A.   Well, the basis is essentially a careful review of his

21   perceived level of risk which I've consistently stated since I

22   began testifying in I think 2003 that he has a low level of

23   risk for future violence and a low level of risk for danger to

24   self.

25        If you look at what we focused on during the hearings in

1    terms of identified risk factors, and this is getting back to

2    the individualized analysis of risks that what we've looked at

3    are factors such as depression and delusions; isolation,

4    slash, self-absorption; deceit, slash, guardedness;

5    weapon access; and perception of relationships and with women.

6        Now, I have identified the psychotic delusions and the

7    major depression as the primary risk factors.  In reviewing

8    the data over the last year, I've moved even more to the

9    position that of all the identified risk factors that the

10   major depression is the primary risk factor.

11       And to some extent, I believe the data suggests that the

12   delusions developed out of the major depressive episode that

13   he was experiencing, and if you look at the progress that he

14   has made over the years you see considerable progress with

15   respect to the major depressive disorder.

16       The Court found, I believe, last year that the major

17   depressive disorder had been in remission for at least years

18   and possibly up to 16 or 17 years.

19   Q.   I believe it was 20.

20   A.   In my review of the information available at the

21   Hospital, I notice that Dr. Turkus -- he was the treating

22   psychiatrist as far as back as 1985 -- found that the major

23   depressive disorder was in remission.  So remember he had his

24   last suicide attempt in February of 1983.  So the data

25   suggests to me that the major depressive disorder has been,

1    perhaps, in full sustained remission for 25 years.  Now,

2    that's an almost unprecedented level in terms of the number of

3    years.

4              THE COURT:  Well, you said, Doctor -- Dr. "who"?

5              THE WITNESS:  Turkus; T-U-R-K-U-S.

6              THE COURT:  Said that -- but do you agree from

7    reviewing all of the data, including Dr. Turkus', but,

8    obviously, lots of other stuff, too, was that right or is that

9    -- was that overly optimistic or is that overly optimistic?

10             I mean if his last suicide attempt was in 1983 --

11   I'm not a psychiatrist or a psychologist -- but it seems

12   overly optimistic for lack of a better word to think that two

13   years later it was in full remission.

14             THE WITNESS:  Well, I noted that she just wrote in

15   remission.

16             THE COURT:  Okay.

17             THE WITNESS:  There are different degrees of

18   remission.  I can't say whether she meant in full, sustained

19   remission.  I can say at least since the time that I have been

20   involved in the case and had an opportunity to directly

21   evaluate Mr.  Hinckley and look at the reports of independent

22   experts that it appears there is a consensus that it is in

23   remission; whether in full, sustained remission, or there may

24   be some level of disagreement about that.

25             THE COURT: And for how long it's been in remission

1       or in full remission, there may be some disagreement about.

2                   THE WITNESS:  Right.  The exact length of time.

3                   THE COURT:  But I guess my real question was you're

4       not necessarily endorsing the conclusion of Dr. Turkus that

5       it's been 23 years?  You have reviewed a lot of information

6       and material since 1985 when that judgment was made, and I

7       assume that some of it's consistent with that and some of it

8       may be a little more cautious than that, and some of it may

9       even be inconsistent with that.

10                  THE WITNESS:  Well, my recollection of all the

11      material that I've reviewed nobody has said that he has even

12      approached a major depressive episode since that time.

13      BY MR. LEVINE:

14      Q.   And that's after a full examination of all the record.

15      A.   Yes.

16      Q.   Now, let me ask you about psychological testing.  We're

17      going to come back to the areas that you just identified.  Did

18      you administer psychological testing in connection with your

19      report?

20      A.   Yes, I did.

21      Q.   And what was the reason for this?

22      A.   Well, it had been a couple of years since I had

23      administered the test, and I wanted to update my findings to

24      see how consistent they were, to see whether there was any new

25      information, to see whether the findings that I had found

1    previously continued to be supported by the data.

2    Q.   And did you find that the results were generally

3    consistent with the last times you administered the tests?

4    A.   Yes.  There were some fluctuations, but I found similar

5    fluctuations in the past.  The results, I think, it's fair to

6    say are generally consistent.

7    Q.   And did you administer this thing called the MMPI, the

8    Minnesota Multiphasic Personality Inventory test?

9    A.   Yes, I did.

10   Q.   What were the results of the MMPI? I guess it's the

11   MMPI-2; is that correct to be perfectly accurate?

12   A.   That is correct.

13   Q.   What were the results of that?

14   A.   The results were generally consistent as I stated.  He

15   has an elevation for a particular scale we call the K-scale.

16   That measures being defensive and guarded for quite sometime

17   since at least 1995.  That characterizes individuals who are

18   not fully aware of all their thoughts and feelings and are

19   somewhat defensive; tend to restrict their activities to a

20   familiar routine; tend to present them-self in a somewhat

21   overly favorable light.  Those results were very consistent.

22        There were a series of elevations for some of the

23   clinical scales on the MMPI-2, specifically, hysteria and

24   psychopathic deviance, and they each get a number; hysteria is

25   three; psychopathic deviance is four.  So one of the ways of

1    interpreting the MMPI-2 data is by combining the highest

2    elevations to the one that is called the code type.

3         So this particular code type, the three, four or the

4    four, three code type because the elevations one versus the

5    other have varied somewhat over the years is indicative of an

6    individual who is, again, defensive and guarded; who tends to

7    restrict his range of activities; who has some level of

8    underlying hostility.  He may be outwardly conforming, but

9    inwardly rebellious or there may be some sematic complaints

10   and sexual maladjustment.  These results were again very

11   consistent.

12        In addition, he has been consistently elevated for a

13   scale called "over-controlled hostility".  He is again very

14   consistent with past tests and with the current results so

15   that characterizes an individual who tends to deny or minimize

16   anger or resentment.

17   Q.   Do these elevated scales as you characterized them show

18   dangerousness?

19   A.   No psychological test in and of itself should be utilized

20   to predict dangerousness except, perhaps, the psychopathy

21   checklist, which is a robust predictor of dangerousness, and,

22   as you recall, I administered that particular test during my

23   first evaluation in 1999, and he comes out in the low range

24   for that particular test.

25   Q.   Now, viewing these test results in the broader context

1    since 1981, what do they show?

2    A.   Well, when I looked at the test results, and one of the

3    advantages of using the MMPI-2 and the Rorschach is that there

4    are data going back all the way back to 1981 I believe so you

5    can look at the particular scale elevations, and back in the

6    early 1980's, he had very elevated scales, almost across the

7    board, including very elevated scales for depression.

8         And there are 10 clinical scales.  I think he had at

9    least six or seven scales that were elevated that tends to

10   indicate a pretty high level of psychopathology going on at

11   that particular time, and it has overall markedly reduced

12   since then.

13   Q.   So it would be fair to say that there has been an overall

14   significant reduction in psychopathology since 1981.

15   A.   According to the testing, yes.

16   Q.   Now, did you administer the Rorschach --

17   R-O-R-S-C-H-A-C-H -- test?

18   A.   Yes, I did.

19   Q.   And what did the results show regarding his reality

20   testing?

21   A.   That overall his reality testing is intact.  He may have

22   some idiosyncratic thinking.  He may overlook some subtle

23   social cues, but, overall, there's good reality testing, a

24   good ability to synthesize information or desire to engage in

25   interpersonal relationships.

1    Q.    Does it show that he generally perceives the world

2    accurately?

3    A.    Yes.

4    Q.    Does it show that he correctly interprets the actions and

5    intentions of others?

6    A.    There may be -- he may miss some subtle social cues, but,

7    overall, he's accurately perceiving reality and social

8    situations I think.

9    Q.    Do the results of the Rorschach test show not only good

10   reality testing, but sound judgment that constitutes a

11   personality strength?

12   A.    Overall, yes.

13   Q.    Now, what did the Rorschach test show regarding Mr.

14   Hinckley's interest in relationships?

15   A.    That both the MMPI-2 and Rorschach indicate -- and this

16   is, of course, confirmed by a wealth of data that this is an

17   individual oriented and interested in forming relationships.

18   Q.    Do the proposed releases, conditional releases, provide

19   for an opportunity in this regard?

20   A.    Yes.

21   Q.    Do they propose an opportunity to solidify relationships

22   and support systems?

23   A.    Well, I think that what we have seen over the last year

24   that there has been considerable improvement in solidifying

25   his relationship with his family, in particular with his

1    brother and sister.  They've proven to be invaluable supports,

2    and I think the relationship between all the siblings has

3    improved significantly even over the last year.

4    Q.    And does that boost Mr. Hinckley's mood?

5    A.    Yes.

6    Q.    What is the significance of a boosted mood?

7    A.    Well, if one views the data through the lens that I do,

8    that depression is a primary risk factor and that some of the

9    other risk factors even flow out of that particular dynamic,

10   ameliorating depression is of critical importance, and what we

11   see is his mood being clearly buoyed and elevated by the

12   outings; clearly buoyed and elevated by increased degrees of

13   freedom in the community; elevated and buoyed by feeling like

14   a normal person in the community to some extent; going to his

15   mother's residence; interacting with her, interacting with his

16   brother and his sister.  He really looks forward to these

17   outings.

18   Q.    Overall, compared to early psychological testing, do the

19   data show that he has made considerable progress?

20   A.    Yes.  When you look at the data administered in the early

21   -- in the 1980's, yes.

22   Q.    Did you consider all of the psychological testing, not

23   just the recent ones, and did you consider all in reaching

24   your conclusion that you would -- he would not be a danger to

25   himself or others in connection with this proposed release

1    plan?

2    A.   Yes.  I have all these files of all the test data and

3    comparing all the scores over time.  I looked at as much as I

4    could and utilized it all in forming my opinion.

5    Q.   Now, as to the psychological testing that you performed,

6    is it fair to say that the hypotheses that are generated by

7    the test may not necessarily apply to every individual or a

8    given individual?

9    A.   Yes.  It is important to understand especially with

10   tests like the MMPI-2 and Rorschach when you get the

11   responses,  you can essentially input them into getting

12   computer-generated interpreted reports and profiles, that what

13   you're getting is hypothesis that tend to be similar to

14   individuals who present with similar patterns of responses.

15        So, for example, if the Rorschach were to say he has

16   sound judgment, you might look at what he is actually doing in

17   terms of making judgment.  It is either supported or not

18   supported.  If the Rorschach, for example, says that he has

19   mild stimulus overload, which has to do with stress tolerance,

20   you need to look at how he is actually handling stress in his

21   environment.

22   Q.   So you need to look at his behavior.

23   A.   You need to look at his behavior.  You need to talk with

24   other people.  What the test results are doing are generating

25   hypotheses to be confirmed or dis-confirmed with other data

1    points.

2    Q.   So the hypotheses needs to be corroborated by the

3    behavior; is that a fair statement?

4    A.   Yes.  And I think over the course of the years, there is

5    a number of data that has been fairly well corroborated by

6    additional information and other hypotheses have not.

7    Q.   Well, have you evaluated Mr. Hinckley's behavior?

8    A.   Yes, I have.

9    Q.   And with respect to the test results concerning

10   guardedness and defensiveness, have you been able to observe

11   Mr. Hinckley's behavior as it applied to the conditional

12   releases?

13   A.   Yes.

14   Q.   And what has been his behavior?

15   A.   Are you asking me that -- I'm sorry -- with regard to

16   guardedness?

17   Q.   Yes.

18   A.   I think that he is a guarded individual, and I have

19   spoken about this at length in previous hearings.  I think

20   that is his character structure to some degree.  I think you

21   also need to take into account his own particular

22   circumstance, that in a way in part at least I believe that's

23   an adaptive reaction to his circumstances.  Everything he does

24   is under a microscope.  Everything he does is going to be

25   analyzed by the Hospital, by the government, by the Court.

1          So that if he makes a phone call to an individual and has

2     a discussion, and there is a discussion about going -- her

3     going to the mother's residence, when did he make that call;

4     who did he tell about that call, and other activities that he

5     engages in, it's almost -- it results in some degree of

6     restriction I think.

7     Q.   So you would expect him to be guarded and defensive.

8     A.    In some degree.  It results in some degree.  If I was in

9     a pattern, in a routine, that I have a comfort zone and that

10    seems to be working and that I'm not getting any undue

11    scrutiny, why don't I adhere to that particular routine.

12    So pushing him out of that routine, I think it is understood

13    that when you push somebody out of a comfort zone, there could

14    be some degree of resistance to that.

15          THE COURT: As an example of when you talk about

16    guardedness, I remember some years ago at one of these

17    hearings, there's testimony about Mr.  Hinckley being in a

18    bookstore and looking at a book about Ronald Reagan and some

19    other books, and that was the subject of a lot of testimony

20    after which he stopped reading books and just looked at

21    magazines or just sort of non-controversial kind of

22    documents.

23          THE WITNESS:  Uh-huh.

24          THE COURT:  Is that an example of guardedness  or is

25    that something else?

1          THE WITNESS:  Well, I'm saying you need to

2     understand the guardedness as being somewhat multi-facetted.

3     I think to some degree, that's part of his character

4     structure.  I think at some degree that's a reaction to his

5     unique circumstances.  So if you go into a bookstore and all

6     of a sudden there's intense scrutiny about that, well, maybe,

7     I should circumscribe my activity looking at books about cats.

8     What can they say about that?  So it's multi-facetted.  To

9     some degree, it's understandable.  To some degree, I believe

10     it's part of his character structure.

11     Q.   What is the Hospital's view with respect to his behavior

12     with respect to openness?

13     A.   I do believe based on my own personal observations of him

14     since 1999 that he is making a concerted effort to be more

15     open.  I think to some degree, although, there is still

16     progress to be made in this area that he gets it, that with

17     regard to the issue if he doesn't tell the treatment team

18     about something and then that information is known through

19     some other channels, he's going to be held accountable.  It

20     could well work against him.

21          So when you talk about let's talk just for a second about

22     intimacy with females.  When I talk with him about that, I get

23     the distinct impression he'd rather not go into any details

24     about that, but how unusual is that for someone to want to go

25     into details about physical intimacies.  I think a lot of us

1    would share that.  I think if he was bragging about it that

2    there would be more concerns raised then if he had some degree

3    of reticence about going into that, but when you ask him

4    questions about that, he will tell you, and I don't think he

5    is the most forthcoming individual, but I do believe that in

6    general when you ask him a direct question, he pretty much

7    will give you a direct answer.

8         And I think almost all the information that we know, for

9    example -- and I'm sure we'll be discussing it in great depth

10   throughout the hearing in terms of relationships with females

11   -- a great deal of that information, if not most of that

12   information, comes directly from Mr. Hinckley himself.

13   Q.   But for him telling it to you, you wouldn't know it.

14   A.   Well, we would know it through other sources to some

15   degree, but he's typically the first person talking about it,

16   and the vast wealth of information about it is coming from him

17   to, say, Dr. Binks in individual therapy or Mr.  Hyde in music

18   therapy.

19   Q.   Is that a manifestation of openness, of his openness?

20   A.   Yes, I believe it is.

21   Q.   And has staff, various staff people, reported to you an

22   increase of openness over the years?

23   A.   Yes.  I think in general I mean he's still somewhat

24   guarded, but he has made a concerted effort to be more open,

25   and I believe that overall -- this is an incremental process

1  -- but, overall, he's more open.

2  Q.   And in discussing his and evaluating his behavior on

3  conditional release, is it fair to say that since at least the

4  last hearing in 2007 that his compliance has been exquisite?

5  A.   His compliance with the conditions of conditional

6  release?

7  Q.   Yes.  His behavior during the release.

8  A.   He, apparently, didn't go to the Salvation Army volunteer

9  position appointment, and now, again, I don't know -- I'm sure

10 we'll be exploring that in more depth as to exactly how that

11 happened, but any time Mr. Hinckley is told he absolutely

12 needs to do something or that that is a condition of his

13 release, I think he has an excellent track record of

14 complying.

15 Q.   And with respect to this Salvation Army thing about which

16 we have heard a good deal and about which I suspect we will

17 hear still more, it's clear he didn't have an appointment;

18 isn't that correct?

19 A.   From what I understand, he didn't have an appointment

20 like go at two o'clock, but there was an expectation that he

21 would go.

22 Q.   All right.  Now, let's talk about his psychological

23 status.  Are Mr. Hinckley's Axis I conditions psychosis and

24 make major depression, major depression in full and stable

25 remission?

1    A.    It is my opinion that they are.

2    Q.    Do you see any evidence of an active Axis I mental

3    illness?

4    A.    Well, I mean there is some depressive affect from time to

5    time, feelings of sadness, but I would point out that myself

6    -- I gave him a score, for example --

7              THE COURT: You gave him what?

8              THE WITNESS:  A score.  There's a scale called the

9    Global Assessment of Functioning often simply called "GAF",

10   which is part of the multi-axial diagnosis system, and if you

11   score somebody in the GAF with a score between 70 and 80, that

12   means that the symptoms that are present are transient and

13   expectable reactions to stressors or events in the environment

14   and that their overall level of functioning there's only

15   slight impairment in the their overall level of functioning.

16              So to the extent that I see, for example, poor

17   judgment or the extent that I see, for example, depressive

18   affect, it's according to my view transient and expectable

19   reactions to stressors in the environment which we've already

20   talked about, the ups and downs in relationships; the decline

21   and death of his father; the rejections he's experienced in

22   seeking out a volunteer position or other rejections for that

23   matter.  He experienced a rejection from the Court.  He

24   experienced a rejection of being able to go to the recording

25   studio.  He experienced the rejection of what was -- I'm

1    blocking one of the rejection.  My mind is --

2              MR. LEVINE:  Tired.

3              THE WITNESS:  Not quite all there.  That's the

4    rejection.  And then when his brother had set up him

5    potentially being able to engage in the stock market and

6    become an agent, and he was told that the company that he was

7    working with would not accept him in that position, and he had

8    been looking forward to that.

9    Q.   That was something he really had taken an initiative and

10   really was interested in.

11   A.   Well, he and his brother, Scott -- and it was nice to see

12   that had they had an activity together, and he could benefit

13   from his brother's knowledge and expertise in that area.  I

14   mean I recall when he went to his mother's residence, he

15   seemed to have some degree of excitement about that particular

16   project.  He bought some books about investment, and then

17   shortly thereafter he was told he was not going to be able to

18   do that.

19   Q.   Is that the episode with the company called Scott Trade

20   and their invocation of the Patriot Act to reject him?

21   A.   I was trying to avoid saying their name, but I believe

22   that is correct.

23   Q.   Now, you testified that his psychosis and major

24   depression have been in full and stable remission.  Is it true

25   that that has been the case in your view for in excess of 20

1    years?

2    A.    Yes.

3    Q.    Does Mr.  Hinckley currently meet the criteria in Axis II

4    for narcissistic personality disorder?

5    A.    I believe he does.

6    Q.    And in the past, you have described it as significantly

7    attenuated; do you recall that?

8    A.    Yes.

9    Q.    Do you subscribe to that same description?

10   A.    Yes, I do.

11   Q.    Now, who is Emma Wright?   Is she a forensic psychiatric

12   technician; an FPT; do you recall?

13   A.    Yes.

14   Q.    Did she report that Mr.  Hinckley's stress tolerance is

15   very high?

16   A.    I believe so.

17   Q.    And is that reflected in your report?

18   A.    I believe so.

19   Q.    And does Mr.  Hinckley work at a clerical job at the

20   hospital?

21   A.    He works in the hospital library.

22   Q.    And what are his duties; do you know?

23   A.    Well, he scans documents into the computer.  He does

24   filing.  He has a role, I think, in when there are requests

25   for archival material at the library to respond to that the

1    library has some old rather unique collections, so they get

2    inquiries from all over the world.  He does other clerical

3    tasks such as sorting and labeling, and he does cleaning up

4    the library and tending to a small garden outside.

5    Q.    Does he use the Internet as part of his job?

6    A.    Yes.

7    Q.    And is his computer monitored?

8    A.    It is monitored by the librarian.

9    Q.    And has he engaged in any inappropriate computer use?

10   A.    Not to my knowledge.

11   Q.    Do you know Ms. Jernigan-Pedrick?

12         THE COURT:  Say that again.  Can you spell it?

13         MR. LEVINE:  Let me spell it because I think I won't

14   say it any better; J-E-R-N-I-G-A-N, dash, P-E-D-R-I-C-K.  In

15   the library.  Do you know who she is?

16         THE WITNESS:  Yes.

17   BY MR. LEVINE:

18   Q.    Who is that?

19   A.    She's the librarian.

20   Q.    And has she made comments about Mr. Hinckley?

21   A.    Yes.  She finds him -- yes.  She finds him to be

22   excellent and reliable worker.  She recently approached the

23   treatment team with the idea of hiring him into a permanent or

24   full-time position at the Hospital.  She greatly appreciates

25   his services.

1    Q.   And would she recommend him outside to a library to use

2    his library skills in working?

3    A.   Yes.  I feel confident that she would.

4    Q.   And has she said that to your knowledge?

5    A.   Yes.

6    Q.   Has Mr.  Hinckley continued to receive music therapy?

7    A.   Yes he has.

8    Q.   What kind of activities has Mr.  Hinckley done in music

9    therapy?

10   A.   Well, he now has two albums, as he calls them, which I

11   recently went through listening to the cd's.  There's about 24

12   songs.  Most of the songs are about females and about ideal

13   love.  There are other types of songs, such as, the one called

14   "Hero", which he wrote dedicated to his father.

15        There was a song that we talked about -- that was talked

16   earlier called the "Ballad of the Outlaw", which explored --

17   which was a song I believe he had written prior to his offense

18   that he had written I think in the late 1970's, so they

19   discussed that particular song in music therapy.

20        He talks a great deal about his relationships with Mr.

21   Hyde in music therapy.

22   Q.   Is Mr.  Hyde the music therapist?

23   A.   Yes.

24   Q.   And does he discuss his feelings with respect to these

25   relationships?

1    A.    Yes, he does.  The music therapy, in particular, seems to

2    be a treatment modality well suited for Mr.  Hinckley.  So he

3    is able to express himself through that particular medium, and

4    I think in certain ways when he is expressing himself

5    musically, he is able to access thoughts, feelings, ideas, and

6    express them musically in a way not always so easy for him to

7    do by talking so -- and he looks forward to the music therapy

8    and is quite productive in terms of producing music.  He

9    enjoys it and learns.

10   Q.    Has she shared with Mr.  Hyde, to your knowledge, his

11   feelings about his father and about his illness?

12   A.    Yes.

13   Q.    Has the song he wrote about his father demonstrated his

14   empathy?

15   A.    Yes, I think so.

16   A.    From what Mr.  Hinckley told me, from what his family

17   told me, they were quite moved by that song.  His mother, in

18   particular, was brought to tears by the song and found it very

19   touching.

20   Q.    It was a song that reflected his father being relieved of

21   the pain that he was suffering and now being with the angels.

22   A.    Yes.

23   Q.    Now, did Mr.  Hyde report that Mr.  Hinckley wishes

24   anonymity with respect to his music so that it could be

25   evaluated on its musical merit and not because of who he is?

1    A.   I believe he has.  They discussed in music therapy the

2    feasibility or appropriateness of him -- which I wasn't even

3    aware of which shows you how out of it I am -- websites where

4    you can post your music anonymously and get feedback.  This is

5    unpublished music.  There are any number of websites where

6    that can be done.

7    Q.   Has Mr.  Hinckley made songs describing his emotions?

8    A.   Yes, very much so.

9    Q.   Even about women.

10   A.   Especially about women.

11   Q.   And what does this indicate about his openness?

12   A.   I think it indicates that he's processing his feelings,

13   that -- you know, I think Mr.  Hinckley does have an identity

14   as an artist and, naturally, he's very interested and

15   motivated to express himself in music and in art and to

16   process his feelings and within those particular mediums as

17   most artists I suppose.

18   Q.   Did the Hospital search Mr.  Hinckley;s room and locker

19   prior to this hearing?

20   A.   Yes.

21   Q.   Find anything inappropriate?

22   A.   I don't think so.

23   Q.   Is there a general consensus at the Hospital that Mr.

24   Hinckley is much more open overall?

25   A.   He's more open overall.

1   Q.   Is there any evidence that Mr. Hinckley is currently

2   deliberately deceptive?

3   A.   Deceptive -- I haven't experienced him being deliberately

4   deceptive with me for some time, since 2000.

5   Q.   Is it the view of the Hospital, is it your view, that he

6   has remained behaviorally stable?

7   A.   Very stable.  Remarkably stable for our population.

8           THE COURT: Of course, he has been there a lot longer

9   than most.

10          THE WITNESS:  Longer.  We do have some other long-

11  term patients, however, including a number of patients who've

12  been in and out of the hospital many, many times.  The

13  typical course for most patients is that even when their

14  illness is still not in full remission or full sustained

15  remission, they go into the community with appropriate

16  supports, and then if the illness exacerbates or there is drug

17  use or any violation of the conditions of release, they come

18  back.

19          Many individuals go out and come back and go out and

20  come back, and their success tends to be measured by the

21  decreased amount of time they spend in the hospital and the

22  overall increased amount of time they spend in the community.

23  It doesn't happen too often that people have this degree of

24  remission for this period of time.

25  BY MR. LEVINE:

1    Q.   Were this not to have the political features of the case

2    that it has, is it your view that he long ago would have been

3    out?

4    A.   I think the political features are an essential part of

5    the case.  I think that high-profile cases certainly garner

6    more attention, and there are more complications with the

7    release procedure.

8    Q.   And you have told us that his behavior has been

9    incredibly stable.  Has he engaged in any violent behavior?

10   A.   The only violent episode that I'm aware of that in of him

11   aggressing against others was on March 30th, 1981.

12   Q.   And the last aggression against himself, suicide?

13   A.   That was I believe February 13th, 1983.

14   Q.   And other than those, are you aware of any subsequent

15   violent behavior?

16   A.   No.

17   Q.   Now, does Mr. Hinckley engage in any angry outbursts?

18   A.   No.  As I elucidated earlier, he intends to be over-

19   controlled in terms of expressing his anger which, to some

20   degree, I found somewhat interesting, and to some degree a

21   sign of improvement that he was directly telling Dr. Phillips

22   he was annoyed during the interview.  That was something I

23   don't think even several years ago he would have had a great

24   degree of reticence about telling any mental health

25   professional that he was annoyed at them or going on at the

1    interview.

2    Q.    There would be no question that Dr. Phillips would know

3    what Mr. Hinckley was thinking.  He was open with

4    Dr. Hinckley -- with Dr. Phillips.

5    A.    I think over the years, he is more prone to be able to

6    express anger, irritation, irritability.  He'll say I was

7    upset.  He'll say I'm angry.  He'll say I'm pissed off.

8    Where as before, you could see him hesitate before the word

9    "anger" and try to find another word and say, well, it didn't

10   go the way I wanted or something.  He seems to be having a

11   little more confidence about directly expressing those

12   feelings which overall I think is a good sign.

13   Q.    Did Mr. Hinckley ever try to leave the hospital or elope

14   I believe is the word that is applied?

15   A.    Never to my knowledge.

16   Q.    Would it be difficult to do if you wanted to do it?

17   A.    No.

18             THE COURT:  He has pretty much free reign of the

19   grounds, right?

20             THE WITNESS:  Right.  And right now we're right next

21   to Congress Heights Metro Station, and they've opened up the

22   gate to make it easier for patients and employees to access

23   the Metro system.  So it would be pretty easy to walk through

24   the gate and go into the Metro system.

25             And even before that, we had direct access to Martin

1    Luther King Junior Avenue, and any number of patients do elope

2    from the hospital with some regularity, unfortunately.

3    BY MR. LEVINE:

4    Q.    All right.   Is Mr. Hinckley's mental condition

5    significantly different from the condition it was in in the

6    1980's early?

7    A.    It's profoundly different.

8    Q.    How is it profoundly different?

9    A.    Remember, taking us back to say around 1976, Mr.

10   Hinckley drops out of school.   He begins to wonder around the

11   country erratically.   He begins to stalk and obsess about

12   Jodie Foster.   He begins to stalk various governmental

13   officials, including the president, including Senator Kennedy.

14       His weight fluctuates by more than 50 pounds.   He was up

15   to 222 pounds at one point in time, and this is relevant, I

16   think, because one of the questions that comes up in terms of

17   whether he would succeed in the Hospital's proposed plan is

18   that what is the risk of a relapse for a 10-day, nine-night

19   period, and I have to say the risk for a relapse is very low.

20       And that if he were to begin to deteriorate, if he were

21   to begin to decompensate, there would be behaviors that we

22   would notice.   I mean If he gained 20 pounds or lost 20

23   pounds, we would certainly notice.   If his mood began to

24   change significantly, I think that we would certainly notice.

25   He has so many people watching him, assessing his mood, both

1    in the Hospital and outside of the Hospital, that the

2    likelihood of a relapse is remote.

3    Q.   What caused him to be dangerous in 1981?

4    A.   I believe he spiraled into a severe depressive episode

5    and became psychotic; specifically, having delusions regarding

6    Jodie Foster; delusions about an idealized union with her for

7    eternity.  Keep in mind that he also was in therapy, but --

8    and at one point in time, his family was talking with

9    Dr. Hopper -- I think in December of 1980 about whether he

10   warranted inpatient hospitalization, and they were dissuaded.

11        So it is not as if his family had no idea what was going

12   on with him.  He had a suicide attempt shortly before he began

13   with Dr. Hopper.  He was roaming around the country.  They

14   knew that their son needed help, and then I think something

15   that also caused the spiral to exacerbate was the exile from

16   his parental home, that he was no longer allowed to stay

17   there.

18        That's another reason I think the proposed outings are so

19   important in terms of his therapy and so potentially

20   ameliorative of the depression.  He is now being welcomed into

21   the warm embrace of his mother's house, rather than being

22   exiled from the parental residence.  That has to have an

23   extremely salutary affect on him.

24        So exile from the parental residence, spiraling into

25   depression, delusional obsessional -- he became not only

1   suicidal, but homicidal, and then the events that we are all
2   aware of transpired.
3   Q.   Was it the confluence of those things that made him
4   dangerous in 1981?
5   A.   Yes.  And I think this is another critical component of
6   understanding and assessing and managing risks.  I've spoken
7   to this before in terms of the strands of the web.  I don't
8   know how successful that particular metaphor was.  If -- I'll
9   change metaphors and use something like a chemical reaction
10  like fire.  So in order for this combustible episode which
11  occurred in the past to occur, you need oxygen.  You need
12  fuel.  You need heat.  You take any one of those elements out
13  of the equation, and there is no fire.
14      So with this episode, if you take weapon access out of
15  equation, those events could not have transpired.  I believe
16  if you take suicidal depression out of the equation, those
17  events could not have transpired.  I think that what we
18  focused on in the past in these hearings, for example, what's
19  going on in relationships and his perception of what's going
20  on in relationships, I believe that that is important, but it
21  needs to be understood in the context of all these other risk
22  factors and that in and of itself it's not highly predictive
23  of risk.
24      It's highly predictive of risk insofar as it leads to
25  depression, insofar as it leads to obsessional delusions.  In

1  and of itself, it's important to monitor, it's important to

2  explore, and he certainly has a lot to learn about

3  relationships as do many other people, and this is an

4  important avenue for him to continue to grow in, but I think

5  taking out one risk factor and raising concerns about it

6  minimizes the importance of the context and the confluence of

7  all the risk factors that were present.  That's what produced

8  the risks.

9  Q.   And the confluence of the risk factors that were present

10  in 1981, is that confluence present today?

11  A.   No.

12  Q.   Now --

13       THE COURT:  When you talked about -- a few moments

14  ago, you talked about spiraling into severe depressive episode

15  and becoming psychotic.  Then you mentioned the delusions and

16  obsessiveness with respect to Jodie Foster.  Are delusions and

17  obsessiveness indicia of psychosis or indicia of narcissism or

18  can't that question be answered?

19       THE WITNESS:  Well, delusions are psychotic

20  symptoms.  Obsession -- depending exactly how the obsession is

21  defined, it could fit into different categories.  I think the

22  obsessionality(Phonetic) in this particular case was the

23  constant focus and rumination about Jodie Foster, and this

24  constant focus and rumination about Jodie Foster then became

25  delusional.

1          I believe that this person and I are destined for

2     some sort of special union without any data in the real world

3     to suggest that had any foundation whatsoever.

4               THE COURT: Okay.

5               THE WITNESS:  In all the relationships that he's had

6     since then, it has to be pointed out they are real

7     relationships with real people.

8     BY MR. LEVINE:

9     Q.    People who choose to come to see him.

10    A.    Yes.

11    Q.    People who if they didn't want to see him had only to

12    stay away.

13    A.    I think so, yeah.

14    Q.    Okay.  Now, you mentioned, Dr. Montalbano, this thing

15    called GAF, G-A-F. Do you recall that?  Do you recall our

16    testimony about GAF?  What does it stand for?

17    A.    Global Assessment of Function.

18    Q.    Is that an Axis V analysis?

19    A.    Yes.

20    Q.    All right.  Now, what does Axis -- well, you told us Axis

21    V measures the Global Assessment Functioning.  Is Axis V

22    scales in the DSM-IV?

23    A.    Yes, it is.

24               MR. LEVINE:  Can I have this marked, please?

25               THE COURT: What's the number?  Patient 3?

1              MR. LEVINE:  Patient 3.  One for the judge.  For the

2      government.  May I approach, Your Honor?

3              THE COURT: Yes.

4      BY MR. LEVINE:

5      Q.    Dr.  Montalbano, I show you what has been marked as

6      Patient No. 3.  It's an excerpt.  Can you identify it and tell

7      us where it comes from?

8      A.    This comes from the Diagnostic and Statistical Manual of

9      mental disorders, Fourth Edition, DSM-IV-TR, from the American

10     Psychiatric Association.  This is the book that has the

11     guidelines for providing the multi-axial diagnostic  criteria

12     that almost all mental health professionals use.

13     Q.    Could you please turn to Page 32 and reference Axis V

14     Global Assessment Functioning?

15     A.    I believe it's Page 34.

16     Q.    Well, I think --

17              THE COURT:  If you look at Page 32, there's a

18     narrative discussion, and then there is some other stuff

19     later.

20              THE WITNESS:  Oh, thank you.

21     BY MR. LEVINE:

22     Q.    And could you read the first two sentences under the Axis

23     V heading?

24     A.    Yes.

25     Q.    Aloud please.

1   A.   Yes.  I was about to.  Axis V is for reporting

2   clinicians' judgment of the individual's overall level of

3   functioning.  This information is useful in planning treatment

4   and measuring its impact and in predicting outcome.

5   Q.   Tell us please how the GAF is useful in predicting

6   outcome.

7   A.   Well, you would look at an individual's GAF -- for

8   example, in this particular case, we haven't gotten to Page 34

9   yet, but at the bottom, you'll see that if you are homicidal

10  and suicidal, your GAF has to be extremely low.  Let's say in

11  the 0 to 10 range.

12  Q.   It helps in explaining this, take us to the pages in this

13  document that you think you should cite.

14  A.   Okay.  Let's just go to Page 34.  You can see that the

15  GAF is broken into what they call "deciles".  Those are ranges

16  of 10 points, and, in general, as your level of functioning

17  improves, your GAF goes up.  However, keep in mind if you look

18  at how the GAF is organized, it's broken into two components;

19  one is symptom severity, and the other is level of

20  functioning.

21      So all of these -- if I look, for example, in the decile

22  that is rated 71 to 80, the first part has to do with symptom

23  severity.  So it says:  If symptoms are present, they're

24  transient and expectable reactions to psycho-social stressors,

25  and the second part has to do with your level of functioning.

1    No more than slight impairment in social, occupational, or

2    school functioning, and another important thing to keep about

3    the GAF is that whichever is lower, you score to the lowest

4    one.  So even if someone had transient and expectable

5    reactions to psycho-social stressors, the level of functioning

6    was somewhat lower, you'd have to score them in the lower

7    decile.

8    Q.   In your risk assessment update, did you assess Mr.

9    Hinckley's GAF?

10   A.   Yes, I did.

11   Q.   What was his score?

12   A.   I gave him a 75.

13   Q.   How many patients at the Hospital have a GAF of 75,

14   approximately? What percentage of its population?

15   A.   I would say less than a handful.  The ones that I can

16   recall, frankly, that might are those people who malingered

17   their way in and really had no mental illness to begin with.

18   Q.   Well, how did you determine that Mr. Hinckley's GAF was

19   75?

20   A.   Well, you look at the symptom presentation; so how

21   persistent are the symptoms or whether they are transient;

22   whether they are expectable reactions to psycho-social

23   stressors or not.  And then you look at the overall level of

24   functioning; how's he doing in terms of work; how's he doing

25   in terms of meeting the regular expectations of him in terms

1    of either relationships or whatever activities that he is

2    engaged in.

3    Q.   In your opinion, would you say that Mr.  Hinckley's mood

4    has been transient and expectable in reaction to the decline

5    and death of his father?

6    A.   Oh, I would say that in general when we see the dysphoria

7    or the depressive affect, the irritability, the sadness, that,

8    in general, that is what I would characterize as transient and

9    expectable reactions to psycho-social stressors.  So as we

10   heard so movingly this morning when Scott Hinckley and Diane

11   Sims were describing what was going on in the time frame of

12   Mr.  Hinckley, Sr.'s death, they were all experiencing

13   sadness.  They were all experiencing stress, and -- but that

14   is, you know, an expectable reaction to the death of a loved

15   one.

16              THE COURT:  Let's -- you tell me when -- I assume

17   you're not going to finish today, but you're --

18              MR. LEVINE:  I'm not.  But I'd like to finish this

19   inquiry about the GAF.

20              THE COURT: That's fine.

21              MR. LEVINE:  I think it won't be more than a few

22   minutes.

23              THE COURT: That's fine.

24              MR. LEVINE:  Thanks.

25              THE COURT:  Just tell me when you think is a

1     convenient time to break.

2              MR. LEVINE:  I didn't realize it was well past five.

3     Forgive me, Your Honor.

4              THE COURT:  Time passes quickly when you're having

5     fun.

6              MR. LEVINE:  I was about to make a remark that I

7     just censored.

8              THE WITNESS:  A little guardedness.

9              MR. LEVINE:  Guardedness, yes.

10    BY MR. LEVINE:

11    Q.   Well, what about with respect to ending the relationship

12    with Ms. DeVeau and even Ms. M; was that transient and

13    expectable?

14    A.   Yes.  I think what you see in terms of his reactions in

15    relationships, you see that his mood does fluctuate in terms

16    of how the relationship was going.  So that if someone is

17    being affectionate and that's withdrawn, you see a reaction to

18    that.  If he would like the relationship to endure, but

19    there's a decision to end the relationship, there's an

20    expectable reaction to that.

21    Q.   Now, what about Mr. Hinckley's handling of the court

22    process to determine his future conditions of release, is that

23    also expectable, transient?

24    A.   Yes.  Well, obviously, Mr. Hinckley is very invested in

25    increasing his level of freedom in the community, and his

1    petitions to the Court -- the Hospital's petitions to the

2    Court have gone on for many, many years, and he has

3    experienced many, many -- I can't think of any words but

4    rejection and rebuff anymore, but he has been disappointed

5    many times by the decisions, but, overall, I think  has

6    handled it well.

7    Q.    What did Dr. Patterson give Mr.  Hinckley in his report

8    with respect to GAF?

9    A.    A 70.

10   Q.    And what about Dr. Phillips?

11   A.    Seventy-five to 80.

12   Q.    Higher than yours.

13   A.    A little higher than mine.

14   Q.    Was there an assessment of Mr.  Hinckley's GAF at the

15   time of the offense?

16   A.    I would assume so.

17   Q.    Do you know what it was?

18   A.    No, I don't.  I'd have to go to archives.

19   Q.    How would you calculate it?  What would you do if you

20   looked at the scale that you invited our attention to on Page

21   34?  How would you calculate what Mr.  Hinckley's GAF would

22   have been in 1981?

23   A.    Well, to me, going by this scale, the indication is that

24   it would be in the range of zero to 10, which --

25              THE COURT: One to 10, probably.

1          THE WITNESS:  Excuse me?  Right.

2          THE COURT: Zero says inadequate information.  There

3     was a lot of information at the time.

4          THE WITNESS:  I stand corrected, Your Honor; one to

5     10 which is persistent danger of severely hurting self or

6     others with persistent inability to maintain personal hygiene

7     or serious suicidal act with clear expectation of death, and I

8     think he had a suicidal act with a clear expectation of death.

9     Q.   At the time when he committed the offense.

10    A.   Yes.

11    Q.   An expectation of his own death.

12    A.   Yes.  That's why he wrote the note to Ms.  Foster.  He

13    clearly enunciated that belief.

14    Q.   As of the time -- well, as of the time of the offense,

15    what was to your knowledge the longest period of time that Mr.

16    Hinckley held a job?

17    A.   Well, when I reviewed my first risk assessment, what I

18    found that the longest job he had held in the community prior

19    to the event was for six months as a busboy.

20    Q.   And now, how long has Mr.  Hinckley held a job at the

21    library?

22    A.   I believe offhand he's held that job for over or close to

23    six years, and he functions quite well in that environment,

24    gets --

25    Q.   That's the job for which Ms.  Pedrick is the supervisor

1    and said she would hire him?

2    A.    Ms. Jernigan-Pedrick.

3    Q.    Yes.  Thank you.

4    A.    Yes.

5    Q.    Now, is the GAF score an indication of dangerousness at

6    least in Mr. Hinckley's case?

7    A.    In Mr. Hinckley's case, I believe it is.

8    Q.    Why?

9    A.    Because we've identified critical risk factors such as

10   major depression, such as psychosis.  If either one of those

11   was present, his GAF would have to be significantly lower so

12   if those are important risk factors or the confluence of those

13   are important risk factors, he can't have a GAF of 70 to 80.

14   Q.    In your opinion, Dr. Montalbano, what does the increase

15   of Mr. Hinckley's GAF score to 75 compared to that which it

16   was at time of the offense say about his risk of

17   dangerousness?

18   A.    I don't think the GAF is strictly correlated with risk,

19   but to the extent it shows the absence of those critical risk

20   factors, it's important.  There are people who are high-

21   functioning who are dangerous, however, in Mr. Hinckley's

22   case, he was suicidally depressed and delusional.

23   Q.    What does all of this have to say?  What does it say

24   about his readiness for a nine-night, 10-day expansion of

25   privileges in the form of a letter?

A.   Well, in my view, a careful analysis of the risk factors
indicates that he is ready for an expansion of his conditional
release, and we're moving it from six nights to nine nights.
He has in over the past year had 11 additional outings.  I
believe eight outings of six nights in duration.  He had a
number of outings before that including local outings, local
overnight outings, and overnights to his parents area, and all
of those have gone well.  So to me, if you're simply
predicting what he will behave, will he decompensate or
relapse, within the context of simply expanding that release
from six nights to nine nights with all the safeguards that we
have in place, I don't think there is much risk of relapse.

I think the plan stands an excellent chance of
succeeding.  I don't not think he poses a danger to himself or
others possess under the proposed plan.

Q.   Do you have any hesitation about saying that?

A.   I think he has had 39 outings, I believe, all tolled so
far, and what we're doing, really, I think is predicting
whether he will succeed in additional outings of increased
duration.  I think all the data from the previous outings is
strongly suggestive of success in the future outings.

Now, we can talk about whether he did everything he
should have done or his judgment in relationships is impaired,
but there just has not been any dangerousness.  He has overall
done extremely well on the outings, and the outings, in my

1    view, continue to be a critical component of his risk

2    management plan insofar as they reduce and ameliorate the

3    primary risk factor of depression.

4    Q.   And you say that speaking for the hospital?

5    A.   Yes.

6         MR. LEVINE:  Your Honor, I want to move this into

7    evidence and have no further questions for this evening -- for

8    this evening.

9         THE COURT: Well, let's hope not.

10        MR. LEVINE:  Okay.

11        MR. ZENO:  No objection.

12        THE COURT:  All right.  It will be admitted.

13        THE COURT:  Dr. Montalbano, tomorrow morning --

14   we'll talk about when we're going to start up again, but

15   overnight don't discuss your testimony with anybody and your

16   anticipated cross and so forth.

17        So what's the prognosis as to how long you'll be

18   with Dr. Montalbano?

19        MR. LEVINE:  With Dr. Montalbano?  The prognosis?

20   That's a serious question, and I'll you a serious answer.

21        THE COURT: You may step down if you'd like.

22        THE WITNESS:  (Complies.)

23        MR. LEVINE:  I was asking whether we could do it in

24   another hour, and I was told it will take two.

25        THE COURT:  Okay.  And then there'll be cross, and

1      who is next witness from your perspective?

2                MR. LEVINE:  Dr. Rafanello.

3                THE COURT:  Okay.  So that means we'll be with

4      Dr. Montalbano all morning, I guess, assuming you can't

5      streamline it overnight which is a benefit --

6                MR. LEVINE:  I'm going to try to do that, actually.

7                THE COURT: Okay.

8                MR. LEVINE:  Thank you, Your Honor.

9                THE COURT:  All right.  Tomorrow morning I've got a

10     status conference and possibly a plea.  We don't know yet

11     whether it's a plea or another status conference beginning at

12     nine o'clock.  So I don't think we'll be able to get started

13     before 9:45 or 10, and then I have a status conference at 4:30

14     tomorrow.

15               MR. LEVINE:  Ten to four tomorrow or 4:30?

16               THE COURT:  Yeah.  So if everybody can be here at

17     five to ten, hopefully, the courtroom -- I'll be off the bench

18     because we'll be done I hope.   So you can all get set up, and

19     then we can start up at 10.  We'll see if we can make that

20     work.

21               MR. LEVINE:  Thank you, Your Honor.

22               THE COURT:  Yes, Ms. Sapp.

23               MS. SAPP:  Your Honor, I want to give you a small

24     addendum to my schedule for tomorrow.  Unfortunately,  over

25     the weekend, I developed some sort of welling in my gum, an so

1    I'm going to an emergency dental appointment tomorrow at 11,

2    but I will get here as soon as I can.  Hopefully, that they

3    don't somehow sedate me, and I don't wake up, but, otherwise,

4    I'll be here.

5               THE COURT:  Well, sedated or not.

6               MS. SAPP:  Sedated or not.  All right.  Thank you.

7               THE COURT:  Thank you, Ms. Sapp.

8               MS. SAPP:  Thank you, sir.

9               THE COURT:  So you all try to get here by five to

10   ten, and, hopefully, we'll be done with the other matters.

11   You can get organized and we can start up at 10.  Okay.  Thank

12   you.

13               MR. LEVINE:  Thank you, Your Honor.

14               [End of proceedings]

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5                     C E R T I F I C A T E

6

7            I, Wendy C. Ricard, Official United States Court

8    Reporter in and for the District of Columbia, do hereby

9    certify that the foregoing proceedings were taken down by

10   me in shorthand at the time and place aforesaid,

11   transcribed under my personal direction and supervision,

12   and that the preceding pages represent a true and correct

13   transcription, to the best of my ability and

14   understanding.

15

16

17

18                        _____

19                        Wendy C. Ricard, CCR, RPR

20                        Official U.S. Court Reporter

21

22

23

24

25