1                    UNITED STATES DISTRICT COURT

2                        DISTRICT OF COLUMBIA

3

4    UNITED STATES OF AMERICA          CRIMINAL ACTION NO. 81-306

5                                      WASHINGTON,D.C.

6    VERSUS                            FRIDAY, JULY 25, 2008

7

8    JOHN W. HINCKLEY, JR. (ST. ELIZ.)  2:30 P.M.

9

10                    **EVIDENTIARY HEARING(DAY 5)**
                   **(Rebuttal Testimony/Dr. Montalbano)**

11

12               BEFORE THE HONORABLE PAUL L. FRIEDMAN

13                  UNITED STATES DISTRICT COURT JUDGE

14

15   A P P E A R A N C E S:

16

     FOR THE PLAINTIFF               THOMAS E. ZENO, ESQ.
17                                   SARAH T. CHASSON, ESQ.
                                     U.S. ATTORNEY'S OFFICE
18                                   555 Fourth Street, NW
                                     Suite 5423
19                                   Washington, DC 20530
                                     (202) 514-6957
20

21   FOR THE DEFENDANT

22   JOHN W. HINCKLEY, JR.           BARRY W. LEVINE, ESQ.
                                     ADAM S. PROUJANSKY, ESQ.
23                                   ANN-MARIE LUCIANO, ESQ.
                                     DICKSTEIN SHAPIRO, LLP
24                                   1825 Eye Street, NW
                                     Washington, DC 20006-5403
25                                   (202) 420-2237

ST. ELIZABETHS HOSPITAL                TONYA A. SAPP, ESQ.
                                       D.C. ATTORNEY GENERAL'S
                                       OFFICE
                                       441 4th Street, NW
                                       Suite 1060 North
                                       Washington, DC 20001
                                       (202) 724-5562


REPORTED BY:                           WENDY C. RICARD, RPR, CCR
                                       OFFICIAL COURT REPORTER
                                       333 Constitution Ave., NW
                                       Room # 6718
                                       Washington, DC  20001
                                       (202)354-3111


Proceedings recorded by mechanical stenography.

Transcript produced by computer-aided transcription.




                         **I N D E X**

**EXHIBITS:**                                          **PAGE:**

Government No. 6    Dr. Rafanello's note(2/14/08)      4
Government No. 7    Dr. Lee's letter(2/8/08)           4
Government No. 8    Dr. Lee's letter(3/19/08)          4
Government No. 10   Letter/St. Elizabeths Hosp.(9/12/07) 4
Government No. 11   Scott Hinckley's form              5
Government No. 12   St. Elizabeths report(6/5)         5

**WITNESSES:**

    Dr. Paul Montalbano.................

        By Mr. Levine.......................    7,35

        By Mr. Zeno.........................    27

**P R O C E E D I N G S**

1

2          THE COURT:  Mr.  Zeno, do you have any additional

3    witnesses that you want to call today?

4          MR. ZENO:  No, Your Honor.  Thank you.

5          THE COURT:  Are there exhibits -- we need to talk

6    about where the state of exhibits are.

7          MR. ZENO:  Yes.  I'd like to move.

8          THE COURT:  You can step down, Mr. Patterson.

9          MR. ZENO:  I'd like to move in one, the report of

10   Dr. Phillips.

11         THE COURT:  Any objection to Dr. Phillips' report

12   coming into evidence?

13         MR. LEVINE:  No.  No objection.

14         MR. ZENO  Number 2, Dr. Patterson's, is already in I

15   understand, Your Honor.

16         THE COURT:  Yes.

17         MR. ZENO:  Number 3 came in through the defense so

18   we're not going to move it.

19         MR. LEVINE:  What was number three?

20         THE COURT:  Number 3 was the risk assessment.  I

21   think we've got it marked twice; once as a defense number and

22   once as the --

23         MR. LEVINE:  I think it was admitted by the patient,

24   Your Honor.

25         THE COURT:  By the patient, correct.

1          MR. ZENO:  Number 4 is Dr. Rafanello May 21st

2     recommendation.  That's already in I show.

3          THE COURT:  All right. Already in.

4          MR.  ZENO:  Number 5 is the (e) letter which has

5     already come in through the patients evidence.

6          MR. ZENO:  Number 6 we'd like to move in, which is

7     Dr. Rafanello's note from February 14th, 2008.

8          THE COURT:  Any objection?

9          MR. LEVINE:  One moment please.  No objection, Your

10    Honor.

11         MR. ZENO:  Number 7; we'd like to move which is

12    Dr. Lee's letter of February 8th, 2008.

13         THE COURT:  Any objection?  Two letters from Dr. Lee

14    Exhibit 7 is February 8 --

15         MR. LEVINE:  No, objection, Your Honor.

16         THE COURT:  Exhibit 8 is March 19th.  Any objection

17    to that one?

18         MR. LEVINE:  No objection, Your Honor.

19         THE COURT:  So those three; six, seven, and eight

20    will be admitted.

21         MR. ZENO:  Number 10 -- we would like to move in

22    which is the letter regarding outings from September 12th.

23         THE COURT:  Letter from the Hospital to the Court

24    dated September 12th, 2007.

25         MR. LEVINE:  No objection to that.

1            THE COURT:  That will be admitted.

2            MR. ZENO:  Number 11 is Scott Hinckley's form after

3      one of the visits.

4            MR. LEVINE:  Well, Your Honor, on that one, I think

5      if we're going to put in the form, we should put in all the

6      forms.

7            MR. ZENO:  I have no objection if the defense wants

8      to mark them, but this is my exhibit.  This is the one I'd

9      like to put in as my exhibit.

10            MR. LEVINE:  I think under the rule of completeness,

11      we can't isolate that and create an impression from that.

12            THE COURT:  Well, it's the only one that Mr.  Scott

13      Hinckley testified about I believe.

14            MR. ZENO:  That's correct.

15            THE COURT:  So I will admit it over objection, and

16      if the patient wants to mark all the others either separately

17      or as a group, we can consider that, and you can offer them.

18            MR. ZENO:  And Number 12 is the January 5th report

19      from the Hospital about the May trip.

20            MR. LEVINE:  Could you repeat that again?

21            MR. ZENO:  Sure.  Number 12 is the January -- I'm

22      sorry, not January; June 5th -- excuse me, Your Honor --

23      letter to the Court about the May trip.

24            MR. LEVINE:  No objection, Your Honor.

25            THE COURT:  That will come in.

1           MR. ZENO:  That' all the exhibits.

2           THE COURT:  Now, from the other --from the patient's

3      point of view, I think everything that was marked has been

4      admitted except I'm not sure whether 13 and 14 were offered or

5      admitted.  Thirteen is the Virginia DMV rules regarding

6      driver's license and 14 is the Virginia DMV application.  Do

7      you want to offer --

8           MR. LEVINE:  I believe they were offered and

9      admitted.

10          THE COURT:  Okay.  Well, then, Ms. Moon has it

11     right, and I have it wrong.  Mr. Zeno, do you -- if you have

12     the weekend, do you anticipate that you will have any other

13     witnesses that you want to offer because if the answer to that

14     is "yes", then I guess we'll do that; if the answer is "no",

15     then I'll ask Mr. Levine if he has any rebuttal witnesses or

16     witnesses he wants to call, and if he does, then you will have

17     right to surrebuttal and if he doesn't, then we're done with

18     the testimony.

19          So your case -- if we're doing this in a formal way,

20     your case is still open.  You have not rested your case.  So

21     the question I ask is whether you have any additional

22     witnesses.

23          MR. ZENO:  We rest.

24          THE COURT:  Okay.

25          MR. LEVINE:  We have a rebuttal witness, Your Honor.

1    We call Dr. Montalbano.

2              THE COURT:  Okay.

3

4    *          *          *               *

5              **DR. PAUL MONTALBANO**, recalled as a witness in this

6    case, after having been duly sworn, testified as follows:

7    *          *          *               *

8              MR. LEVINE:  Please the Court.

9              THE COURT:  Yes, sir.

10   **DIRECT EXAMINATION BY MR. LEVINE:**

11   Q.   Dr. Montalbano, I'd like to address some questions to you

12   about Mr. Karl Beffa.  First, did you hear the testimony of

13   Dr. Patterson?

14   A.   Yes.

15   Q.   And did you hear the portion of the testimony that

16   pertained to what documents and records at the Hospital, if

17   any, that Mr. Beffa has received and read?

18   A.   Yes, I did.

19   Q.   Has Mr. Beffa already received documents from the

20   Hospital?

21   A.   Yes.

22   Q.   And has he already, to your knowledge, read documents

23   from the hospital?

24   A.   Yes.

25   Q.   All right.

1    A.    He testified to that effect some day this week.

2    Q.    And did he read the 1999 risk assessment that you wrote?

3    A.    Yes.

4    Q.    Does that risk assessment in detail cite the history of

5    this matter?

6    A.    Exquisite and stellar detail.

7    Q.    We agree with that.  We do have other agreements of

8    record.  And did Mr. Beffa read the 2008 risk assessment form

9    that you did?

10    A.    Yes.

11    Q.    And did Mr. Beffa read the 2008 report from both Dr.'s

12    Patterson and Phillips?

13    A.    Yes.

14    Q.    And did Mr. Beffa read Dr. Binks' notes?

15    A.    I recall him testifying he had already reviewed several

16    months of Dr. Binks' individual therapy notes.

17              THE COURT:  I think he said June --

18              THE WITNESS:  June.  Okay.

19              THE COURT:  -- and maybe a few days in July.

20              THE WITNESS:  Okay.

21    BY MR. LEVINE:

22    Q.    Did Dr. -- did Mr. Beffa -- withdrawn -- in your expert

23    opinion, does Mr. Beffa have to have a complete familiarity

24    with the medical records in this case in order to perform

25    capably the role of case manager?  As distinct from therapist.

1    A.   I think that the records he's already reviewed are far

2    more than most case managers would review in order to execute

3    their functions.   This is, of course, a unique case, and, of

4    course, the more information you review the better.   Of

5    course, in this particular case, his role is in the process of

6    changing, but I think that is a sufficient amount of material

7    to review to exercise your function as a case manager.

8    Q.   Has Mr. Beffa committed to review all the salient

9    documents to learn the case as he undertakes the role of Mr.

10   Hinckley's therapist?

11   A.   Yes.   The Hospital's already engaged in the process of

12   exchanging all relevant information.   I might point out that

13   one of the recommendations in the (e)motion is for Mr. Beffa

14   and Dr. Lee to participate in what we call the "IRP's" or

15   Individual Recovery Plans.

16   Q.   Is that the treatment plan?

17   A.   That is the treatment plan.   So certainly, without

18   question, that would entail Dr. Lee and Mr. Beffa getting all

19   relevant treatment plans, all relevant "IRP" documentation.

20   They would be participating in the development of the next

21   "IRP" with the members of the treatment team at the hospital.

22   Q.   Now, you heard the testimony of Mr. Hyde.

23   A.   Yes.

24   Q.   And you heard the testimony that he has therapy notes.

25   A.   Yes.

1    Q.   Now, over the period of time that Mr. Hyde has been the

2    music therapist, he has generated notes.

3    A.   Correct.

4    Q.   How long would it take Mr. Beffa, in your view, to read

5    Mr. Hyde's notes?

6    A.   Maybe an hour.

7    Q.   And you mentioned a moment ago this thing called the

8    "IRP", an Individualized --

9    A.   Recovery Plan.

10   Q.   Recovery Plan; the treatment plan.  How long typically

11   are those?  How many pages approximately are the "IRP's"?

12   A.   Well, the initial "IRP" is somewhat longer.  Let's say

13   seven, eight, maybe an unusual case, up to 10 pages, and then

14   subsequent "IRP' s" which are based on the initial "IRP" tend

15   to be somewhat shorter.  Let's say four, five, six pages.  It

16   always depends upon how many issues, concerns there are

17   identified for treatment.  Some people have more.  Some people

18   have less.

19   Q.   And these "IRP' s" are they generated approximately every

20   three months?

21   A.   Yes.

22   Q.   And is it fair to say that it takes about five minutes to

23   read each of them?

24   A.   Five, 10, maybe 15 minutes; probably five or 10 minutes

25   for most of the them.

1    Q.   To read and then, of course, you reflect on them as you

2    wish, correct?

3    A.   Correct.

4    Q.   And will Mr. Beffa be receiving them?

5    A.   Yes.

6    Q.   And has he received some of them to date if you know; if

7    you know?

8    A.   I don't know.

9    Q.   Okay.  Now, Dr. Patterson did he have a chance to so call

10   "vet" Mr. Beffa?

11   A.   He had a chance to interview him as much as he pleased,

12   depending on availability, of course.

13   Q.   Did Mr. Beffa -- withdraw -- was Mr. Beffa a founder of

14   the Family Living Institute since 1981?

15            MR. ZENO:  Objection, Your Honor.  Not rebuttal.

16            THE COURT:  It may be --  I understand.  It may be a

17   foundational question.

18            MR. LEVINE:  It is.

19            THE COURT:  Go ahead.

20            THE WITNESS:  That's my understanding from reviewing

21   his resume, and I believe he testified to that effect in

22   Court.

23   BY MR. LEVINE:

24   Q.   Do you believe that Mr. Beffa is a well-credentialed

25   individual to have provided case management services and to

1    provide therapy services to Mr. Binckley(Phonetic) -- Mr.

2    Hinckley?

3    A.   Well I have reviewed his resume.  He has a diplomate in

4    social work.  He's the founder of the Family Living Institute.

5    He's been president of a local social work society.

6        From the information that we've gathered, he appears

7    well-respected in the community.  I know that Dr. Rafanello

8    has interviewed representatives of Colonial Services Board,

9    which is a facility in the area.  Mr. Beffa used to work

10   there.  From my understanding with Dr. Rafanello is that they

11   think very highly of Mr. Beffa.

12       I must say that I am dismayed by the testimony of

13   Dr. Patterson.

14   Q.   Greatly dismayed?

15   A.   Dismayed.  That based on Mr. Beffa's presentation in

16   Court, he would withdraw any number of recommendations that he

17   had previously endorsed.  I mean I don't usually speak in

18   colloquial manner in court, but you've got to be kidding me.

19   I mean the fact that he when asked to identify diagnoses

20   simply identified the Axis I diagnoses and omitted the Axis II

21   diagnoses, I'm not sure what weight, if any, can be put on

22   that.

23       I mean we all heard, for example, Dr. Rafanello testify

24   in court.  I think she was somewhat nervous when she testified

25   in court.  That was probably apparent, but to me, knowing her

1     as I do, being her direct supervisor and knowing the quality

2     of her work, the dedication, the meticulous attention to

3     detail that she demonstrates everyday, I would be dismayed if

4     someone were to draw a conclusion about what of type of

5     psychologist and clinical administrator she was simply based

6     on, perhaps, out of anxiety or nervousness, saying something

7     inaccurate, leaving something incomplete.  I just don't think

8     that that is the type of data that you substantially alter

9     your opinion based on.  That confounds me.

10    Q.    I'll say.  You heard Dr. Patterson talk about splitting.

11    Do you recall that, sir?

12    A.    Yes.  I have one more definition to add in that regard.

13    Q.    Go ahead, please.

14    A.    That's very much what I would like to do as soon as

15    possible.

16    Q.    Take us all with you.  All right.  What did you think of

17    his testimony in that regard?

18    A.    I think that splitting is an issue to be addressed any

19    time you're dealing with especially an individual with a

20    personality disorder.  You want to put appropriate safeguards

21    in place.  I think that conceptualizing splitting as just the

22    ability of a patient to somehow at times divide the treatment

23    providers in providing an effective and integrated treatment

24    plan is an area of concern, but, as has already been stated, I

25    think we have sufficient safeguards in place; many more

1   safeguards than are usually put in place.

2        The fact that Dr. Binks is going to be communicating with

3   Mr. Beffa after every outing.  The fact that, I believe, all

4   the notes that each of them generate with regard to the

5   individual therapy will be exchanged.  The fact that as many

6   members of the treatment team from St. Elizabeths as possible

7   will assemble and have a post-outing conference call with Dr.

8   Lee and Mr. Beffa.  I mean these are all mechanisms that

9   we're implementing to promote effective, continuous flow of

10  information, to provide the most effective and consistent

11  treatment that we can for this particular client, Mr.

12  Hinckley, and to reduce the likelihood of any splitting.

13  Q.   You heard Dr. Patterson talk about Ms. DeVeau.  Do you

14  recall that?

15  A.   Yes.

16  Q.   Is there -- do you regard some of what he had to say as

17  revisionism?

18  A.   Well, I think that term was introduced -- I think it was

19  the other day --

20  Q.   Yes, by Dr. Phillips.

21  A.   But they're becoming a blur in my mind by Dr. Phillips.

22  I just think that the record, from my review, is clear that

23  Ms. DeVeau has had concerns, historically, about intrusions

24  into her privacy.  I don't think because she gave an interview

25  with The New Yorker Magazine that that obviates all the

1    concerns that she would have about her privacy.

2        I think most people operate under the assumption that if

3    they want to reveal something about themselves, they can, but

4    if they choose to keep something private that that will be

5    respected, and my understanding of the history is that Ms.

6    DeVeau retained an attorney at the point that she was first

7    dealing with a government subpoena to review bank records,

8    credit card records, and other records that she was concerned

9    and felt threatened by that process.

10        And I think that's contributed, historically, to her

11   reaction to having to sit down with -- whether it's government

12   experts or even hospital experts or the treatment team -- and

13   openly reveal aspects of herself.  I mean how do you know if

14   your involved with John Warner Hinckley, Jr., in talking to

15   treatment team members that what you reveal at that time will

16   not suddenly appear -- I shouldn't say "suddenly", but

17   eventually appear in open court.  That seems like a legitimate

18   concern.

19   Q.   Dr. Patterson and I believe, also, Dr. Phillips testified

20   that Ms. DeVeau refused to meet with the treatment team and to

21   go into conjoint therapy; is that false?

22   A.   I don't recall her -- there was I think -- I'm not sure.

23   I don't recall exactly what they said.  The record is clear

24   that Ms. DeVeau engaged in conjoint therapy for a significant

25   period of time and then gradually withdrew.  The frequency of

1    the sessions of conjoint therapy diminished over the years.

2    We're talking about 2001 to 2002 at this particular point in

3    time, and then a decision was made for a variety of factors

4    that she didn't want to have any contact with the treatment

5    team.

6    Q.   Well, do you believe that the subpoena for her records

7    and, perhaps, the scrutiny of her trash, was a factor in her

8    decision to withdraw from this process?

9    A.   Well, I recall during my interview of Ms. DeVeau, I

10   believe it was May 12th of the year 2000, that I inquired

11   about -- I don't recall the episode with the trash, but I do

12   recall her speaking about the subpoenas for her records, that

13   that was upsetting to her and that was a certain that she had,

14   and she was trying to balance her desire to be a part of John

15   Hinckley's life with protecting her privacy.

16   Q.   Does that strike you as an inappropriate position for a

17   person to take?

18   A.   No, not inappropriate.

19   Q.   Now, in your view, is there a reason, a good reason, for

20   their to be a no contact rule with Ms. DeVeau during the times

21   of conditional release?

22   A.   No.  I never thought that that was a good idea.  I never

23   thought that barring Mr.  Hinckley from contacting Ms. DeVeau

24   during the outings was an effective risk management strategy,

25   and I mean the fact of the matter is that he is allowed to

1    call Ms. DeVeau whenever he is at the hospital and not allowed

2    to call Ms. DeVeau whenever he is in the vicinity of his

3    mother.

4         And I think that -- and I spoke about this earlier if I'm

5    recollecting anything correctly anymore -- that this has been

6    a very important relationship, that it's been mutually

7    supportive, that they've both grown.  I mean this is in some

8    ways a rather remarkable story of joint recovery.  Two people

9    suffering from significant and profound mental illness

10   engaging in desperate suicidal and homicidal acts getting

11   their lives back together in part through their relationship

12   with each other.

13        I don't know if you can ever replace that type of

14   contact.  I don't know who he's ever going to find who can

15   have the degree of empathy and understanding that they have

16   for each other, and I know there are problems.  I don't want

17   to be understood as not acknowledging that if the relationship

18   were to progress to a certain point, the hospital would feel

19   an increased need to initiate communication with Ms. DeVeau,

20   but, frankly, if they are simply calling each other as friends

21   or occasionally seeing each other, I don't think the fact that

22   she wouldn't meet with us should terminate the relationship or

23   should result in a Court order barring contact while he is

24   there.

25        What if, God forbid, Ms. DeVeau were to suddenly

1    experience a hospitalization?   She's getting up there in age

2    herself, and he was visiting his mother.  He couldn't call

3    her?  What's the risk?  What's the risk to his -- of dangerous

4    associated with him calling her?  I don't see it.

5    Q.   You recall Dr. Patterson speaking about the possibility

6    -- strike that -- not the possibility, the fact that under the

7    Hospital plan, Mr. Hinckley will miss sessions; a session

8    with Dr. Binks and a session with Mr. Hyde.  Do you recall

9    that testimony?

10   A.   Yes.

11   Q.   Now, is it a fact that with respect to each of the

12   conditional releases in which he now goes, he misses a single

13   session?

14             THE COURT:  With?

15             MR. LEVINE:  A single session.  Is that your

16   question?  Did you hear me, Your Honor? I'm sorry.

17             THE COURT:  A single session, but we're talking

18   about two people.

19             MR. LEVINE:  A single session with each.

20             THE WITNESS:  Well, the current outings are in time

21   frames -- I'm not sure if it's --  if we're talking about

22   outings of six-nights' duration whether it's possible during

23   some of them he would have to miss every session.  I think

24   it's safe to assume that he missed a significant number of

25   sessions with both Dr. Binks and Mr. Hyde during the course

1    of the previous outings.

2             THE COURT:  Do you know what day -- are there

3    specific days -- is there a specific day of the week that he

4    sees Dr. Binks or a specific day of the week that he sees Mr.

5    Hyde?

6             THE WITNESS:  I believe so, but I don't know,

7    frankly, offhand what day that is.

8             THE COURT:  Okay.

9    BY MR. LEVINE:

10   Q.   Now, did you hear the government say that it doesn't want

11   to take away that which he has, just as opposed to expansion?

12   Did you hear that?

13            THE COURT:  Did the government say it or

14   Dr. Patterson?

15            MR. LEVINE:  The government.  New position in the

16   Courtroom, Your Honor.

17            THE WITNESS:  I'm not sure.  I've heard some things

18   that are still -- I'm not -- I can't recall that exactly.  I'm

19   sorry.

20   BY MR. LEVINE:

21   Q.   Well, under the current conditional releases, the one

22   where Mr.  Hinckley now goes.

23   A.   Uh-huh.

24   Q.   He misses one session with each of those therapists; is

25   that correct?

1          MR. ZENO:  Objection.  Factual basis.  I believe

2    it's been established that he knows.

3          THE COURT:  I thought he just said he didn't know.

4          THE WITNESS:  The outings that he currently have are

5    for six nights.

6    BY MR. LEVINE:

7    Q.   Six nights, that means seven days.

8    A.   That means seven days.  I'm trying to visualize a

9    calendar and just be clear that if it is for like I guess

10   seven whole days, he must have missed one.  I guess there's

11   not a way --

12         THE COURT:  Well, you know what we could do is we

13   could ask the hospital to file something which regurgitates

14   the exact dates of each of the outings; each of the times he

15   has been away from the hospital -- and Ms. Sapp is nodding her

16   head so she's getting this down -- each over the last 14

17   months or since my last order -- not my last order, but since

18   the order after the last hearing because there have been some

19   interim orders, too.

20         The exact dates that he has been away and days that

21   he normally sees Dr. Binks and Mr.  Hyde and, you know,

22   presumably, somebody could either do the math or we could go

23   through -- somebody could go through and say whichever is

24   easier.  Here's the dates on which he saw Mr.  Hyde, and we

25   subtract that from 52 or -- and Mr Binks -- Dr. Binks or

1    here's the dates that he missed because -- somebody could do

2    that.  Couldn't somebody do that?

3              THE WITNESS:  Yes.  And, in fact, I already have a

4    list that I'll be glad to share of every single outing.  He

5    had 11 outings since the last court hearing; the exact dates

6    of every outing, so we could transpose that with the schedule

7    of Dr. Binks and Mr. Hyde and find out exactly how many

8    sessions he missed, plus, I'm sure there were other sessions

9    that were missed for various reasons.

10              THE COURT:  Somebody said they probably both are

11    entitled to take a vacation.

12              THE WITNESS:  We hope so.

13              MR. LEVINE:  Well, I think I could help.  First of

14    all, Your Honor has all the letters with all the outings, but

15    --

16              THE COURT:  I know I do, but I don't want to go back

17    and make my own list even though I don't charge $750-an-hour.

18              THE WITNESS:  Nor do I, Your Honor.

19              MR. LEVINE:  I think I can help the Court, Your

20    Honor.

21    BY MR. LEVINE:

22    Q.   On the current release schedule, he misses one session

23    that would be scheduled with each; is that correct?  Has to

24    be.

25    A.   He probably does.

Q.   All right.  Now, if you add the weekend before that week
and if you add the weekend after that week, so you do
Saturday, Sunday, plus the five days, that's seven; plus, two
more, Saturday and Sunday, that's nine days, nine nights,
right?  Which is what the Hospital is asking for.

A.   Correct.

Q.   All right.  And isn't it true that were this to be
expanded from six nights to nine nights, it would result in no
additional loss of therapeutic sessions?

A.   It appears that way.  I believe that Dr. Rafanello took
considerable thought in designing the exact time frame to
minimize the likelihood of missing therapies at St. Elizabeths
Hospital; so that having four of the days on the weekends
helps reduce the likelihood of missing therapies and
activities at St. Elizabeths Hospital.

Q.   And, in addition, as proposed by the Hospital, would he
gain a therapeutic session with Mr.  Beffa?

A.   Yes.

Q.   And, in addition, with the plan proposed by the Hospital,
would he gain a session with Dr. Lee?

A.   Yes.  And I must add, having sat through a number of
these hearings for a number of years now and having some
recollection of the last hearing, that it's my view that to
some degree Dr. Lee was unfairly caricatured in the last
hearing.  I mean we've heard about "our man in Havana".  If I

1        was a psychiatrist practicing, I don't know if I would like

2        that characterization affixed to me.

3            Now, I have some concerns that we may be unfairly

4        caricaturing Mr. Beffa simply based on what he said here.  I

5        just -- I mean, frankly, based on what I know, not just on the

6        testimony of Dr. Lee last year and Mr. Beffa this year, but,

7        in particular, from my conversations with treatment team

8        members, especially, Dr. Rafanello, overall, I'm more

9        satisfied with Mr.Beffa, but I don't want to be unduly fair to

10       Dr. Lee, either.

11           I mean these two individuals work at the Family Living

12       Institute and provide therapy to any number of individuals.

13       Do we have any reason to believe, despite their lack of

14       forensic training, that those individuals aren't getting good

15       treatment?

16               THE COURT:  Let me just say for the record if you

17       look at pages 156, 158, 173 through 174 of the April 18th,

18       2007 transcript of the evidentiary hearing, you will see that

19       the phrase "man in Havana" came from Dr. Lee, himself.  The

20       hospital used the phrase "safety net".  Dr. Lee coined the

21       phrase "their man in Havana".

22               THE WITNESS:  Right.  But I believe that was an

23       unfortunate phrase used by Dr. Lee, but I believe it has been

24       used by him by any number of individuals, including the Court,

25       and I just have some concerns about that.

1           THE COURT:  Right.  I understand.  It was just so

2    colorful that we all kind of latched onto it, but I

3    understand.

4           THE WITNESS:  Okay.  I have fallen victim to that

5    myself.

6           THE COURT:  I understand your point, but he started

7    it.

8           THE WITNESS:  He started it.

9           THE COURT:  Whether it was misused and used in a

10   pejorative way, thereafter, is a fair question.

11          MR. LEVINE:  And I think that's the point.  He

12   started it, but it was the pejorative subsequent use that has

13   been the subject of some critique here.

14          THE COURT:  And I take it you don't think that it is

15   a problem for him to spend more than 15 minutes?

16          THE WITNESS:  If we had reduced the amount of time

17   from Dr. Lee from 45 to 15 minutes, in light of, let's say,

18   one note where he had confronted Mr. Hinckley, I wonder if

19   the Hospital wouldn't be critiqued for being overly identified

20   with Mr. Hinckley.  I don't see it as being a substantial

21   problem of him meeting with Mr. Hinckley for 45 minutes.

22          I think having two qualified mental health

23   professionals in his mother's area both meeting with him in

24   different roles and sharing that information on a regular

25   basis with the Hospital helps to provide the sufficient

1    safeguards that makes the Hospital and the review board have a

2    degree of confidence with their (e)motion.

3              THE COURT:  But I take it you would agree with

4    Dr. Patterson that it's important that the communication be

5    adequate in terms of what was said and what was discussed when

6    they did meet with him.

7              THE WITNESS:  Absolutely.  And I believe

8    Dr. Phillips has made that recommendation in the past, also,

9    whereas, a recommendation we continue to take seriously and

10   make every effort to implement as far as possible.

11   BY MR. LEVINE:

12   Q.   And if you didn't get that communication that you

13   expected, you would make that note?

14   A.   Yes.

15   Q.   Now, you also heard Dr. Patterson use the word

16   dramatically "extortion".  Do you remember that?

17   A.   I recall that.

18   Q.   Is it extortion, Dr. Montalbano, for a clinician to

19   recognize the impact on the patient of a denial by the Court

20   of the patient's petition?

21   A.   I don't feel that's a fair characterization if that's

22   what Dr. Patterson meant.  I'm not sure that that's what he

23   meant.  I think any number of individuals have testified,

24   including myself, that, of course, we want to take into

25   account, monitor, assess, and potentially treat the potential

1    impact of a rejection by a court on the individual that we're

2    treating.

3        And it's been my view that I've expressed that the

4    outings are therapeutic, that the outings serve as a risk

5    management strategy especially insofar as they manage the

6    primary and critical risk factor of depression.  I have heard

7    a great deal of concern expressed about his risk to himself.

8    Well, insofar as Mr.  Hinckley is happy, I think we are

9    ameliorating that risk factor.  Insofar as expansion of

10   outings make him happier, we're further reducing that risk.

11   Q.   And, Dr. Montalbano, in the past, the Court has not

12   always granted the relief the Hospital has sought, has it?

13   A.   No.

14   Q.   And the expansions the Hospital has sought for Mr.

15   Hinckley's experiments in freedom have not been as expansive

16   as the Hospital thought appropriate; is that correct?

17   A.   Correct.

18   Q.   Has Mr.  Hinckley decompensated in the face of those

19   denials?

20   A.   No.  His major Axis I diagnoses has been in full

21   remission for many years.

22   Q.   And is this a manifestation of Mr. Hinckley's resilience?

23   A.   Yes.  And I think resilience is resilience, not bad

24   judgment.

25   Q.   Or poor judgment.

1    A.   Or poor judgment.  That if you experience a rebuff in

2    looking for a job; if you experience a rejection in a

3    relationship; if you experience a disappointment by a court

4    ruling, whatever it may be -- if you experience intense stress

5    by watching your father die, and you maintain your

6    psychological equilibrium that that's resilience.

7         I agree with Dr. Phillips when he says, his response and

8    his ability to maintain his equilibrium during the days of his

9    fathers dying is a benchmark of his stress tolerance.

10             MR. LEVINE:  Court's indulgence for a moment,

11   please.  If it please, Your Honor, nothing further.

12             THE COURT:  Thank you.  Dr. Montalbano, are you an

13   expert on either GPS technology or Virginia law?

14             THE WITNESS:  Thank God, no.

15             THE COURT:  I probably just used up many of Mr.

16   Zeno's questions.

17             THE WITNESS:  But we can all go on the Internet and

18   become experts too quickly I'm afraid.

19   **CROSS-EXAMINATION BY MR. ZENO:**

20   Q.   Good afternoon.

21   A.   Good afternoon, Mr. Zeno.

22   Q.   You were here last year, as you said, right?

23   A.   It's all starting to blur together.  I don't know about

24   --

25   Q.   Maybe we've been here since --

1      A.    -- stress tolerance for all of us is increasing my desire

2      for splitting.

3      Q.    I hope to help.

4      A.    Okay.

5      Q.    But you were here last year, right?

6            THE COURT:  He's the government, and he's here to

7      help.

8            MR. LEVINE:  I was just going to say.

9            THE COURT:  Go ahead, Mr. Zeno.  I'm sorry.

10     BY MR. ZENO:

11     Q.    You heard Dr. Patterson testify about his reasons for the

12     six days?

13     A.    Yes.

14     Q.    And that was actually an expansion; isn't that correct?

15     A.    Well, right now, he has outings of six nights and seven

16     days.

17     Q.    Yeah.  But last year --

18     A.    Last year --

19     Q.    -- when Dr. Patterson testified -- sorry.

20     A.    I'm sorry.

21     Q.    Are we okay?  Got it?

22     A.    Yeah.

23     Q.    Okay.  So last year when Dr. Patterson testified, he

24     actually testified to an expansion up to six nights -- six

25     days, correct?

1    A.   It was much less than what the hospital was recommending,

2    but it was an expansion, nevertheless.

3    Q.   Very good.  And his reason for that was specifically

4    because of this maintaining the weekly therapies; isn't that

5    correct?

6    A.   Well, I believe that Dr. Patterson testified that that

7    was part of it.

8    Q.   Okay.  But it was part of it.

9    A.   At least he testified today with regard to the same issue

10   that that was part of it.  I don't recall -- I'm sure that was

11   probably part of it last year, but I don't recall if  he

12   explicated additional reasons as to that.

13   Q.   But, certainly, that's -- well, I guess I was just

14   setting up the question of are you saying the Hospital didn't

15   insure that Mr.  Hinckley got his weekly therapies despite the

16   fact that the Court increased it to six days, but no more?

17   A.   I'm sorry, Mr.  Zeno?

18   Q.   Well, Dr. Patterson testified that the reason he was

19   recommending six days was so that Mr.  Hinckley would be

20   guaranteed to get weekly therapies; isn't that correct?

21          MR. LEVINE:  Objection.  There was nothing about a

22   guarantee in any of that.

23   BY MR. ZENO:

24   Q.   So he would be getting six days; isn't that correct?

25          MR. LEVINE:  So it would be available to him, Your

1 Honor.

2    THE Court:  Well, whatever.

3    MR. LEVINE:  It's only contemplated absences.

4    THE Court:  Well, the question is whether -- for

5 what it's worth -- the question is whether Dr. Montalbano

6 remembers what Dr. Patterson testified to a year ago and what

7 Dr. Patterson said he contemplated, and then we will find out,

8 I suppose, whether he got what Dr. Patterson contemplated if

9 Dr. Montalbano remembers what Dr. Patterson said he

10 contemplated.  Is that what we're trying to do here?

11    MR. ZENO:  Well, what I wanted to do is put it in a

12 hypothetical.

13 BY MR. ZENO:

14 Q.   Let's assume that that's what Dr. Patterson said just so

15 we don't have to spend a lot of time on it.

16 A.   Okay.

17 Q.   It that's true, did the Hospital do it?  Did they give

18 Mr. Hinckley the weekly therapies around his trips that

19 Dr. Patterson recommended?

20 A.   My understanding is -- and, of course, we'd have to look

21 -- I mean I think that that's what we're going to be doing in

22 some detail is looking at exactly when he went to his parent's

23 community and exactly when he was scheduled to see Mr.  Hyde

24 and Dr. Binks and exactly how many sessions he missed.

25    My understanding is that every effort is made by the

1    Hospital to keep -- to enable Mr. Hinckley to avail himself of

2    those particular therapies as much as possible.

3    Q.   So you would expect that there would be weekly sessions

4    despite the trips, right?

5    A.   Yes.  Weekly sessions except when he's not available,

6    when he's somewhere else.

7    Q.   But the six days was designed to insure that those would

8    occur every week.

9            MR. LEVINE:  Your Honor, he keeps on saying six

10   days, and the opinion by Your Honor explicitly says duration

11   of six nights or 148 hours, and it's found in 493 F. Supp. 2d

12   65 -- yes, Page 65. It's in the order.

13           THE COURT:  All right.

14           MR. ZENO:  I'll change it to seven days.  Obviously,

15   the order speaks for itself -- to seven days.

16   BY MR. ZENO:

17   Q.   Wasn't it designed to insure that Mr. Hinckley would get

18   the weekly therapies?

19   A.   We're still talking about last year, correct?

20   Q.   Well, since last year.  The order of last year and during

21   this current year, Mr. Hinckley was supposed to be getting as

22   close to weekly therapy according to Doctor --

23           MR. LEVINE:  Your Honor, I object.  I think this

24   inquiry is misleading, and if he wants to put the order of

25   this Court before this witness, that will be the best evidence

 1    of what was ordered in the last case.  That is in my hand, and

 2    I offer it to him if he wants to use it.

 3              MR. ZENO:  Sure.

 4              THE COURT:  The opinion says at 493 F. Supp. 2d,

 5    Page 70:  Dr. Patterson recommends the expansion of Mr.

 6    Hinckley's current privileges so that he could visit his

 7    parent's community for up to six days a week.  Dr. Patterson

 8    would limit the six-day visits to six such visits at this time

 9    with sufficient time between visits so that the Hospital could

10    continue its course of therapy and assessment of the visits.

11    That's what I wrote, and maybe I was wrong.

12              THE COURT:  Right.

13              MR. LEVINE:  That's what the opinion says, but the

14    order doesn't say that.  The order says that --

15              THE COURT:  No.  That's what the opinion says.

16              MR. ZENO:  That's right.

17              THE COURT:  And the opinion is -- attempts,

18    although, I said six days, and maybe I was wrong in the

19    opinion -- but the opinion at that portion and it cites to a

20    transcript is a effort in narrative form to summarize some of

21    what Dr. Patterson testified to; what he testified to is not

22    in the order, but an attempt to summarize it is in the

23    opinion.  And if it helps Mr. Zeno to frame his question or

24    Dr. Montalbano to answer it, I am refreshing everybody's

25    recollection as to what I said I thought the transcript showed

1   having reviewed the transcript of what Dr. Patterson said at

2   the time.

3   BY MR. ZENO.

4   Q.   All right.  My question is:  Did the Hospital try to

5   follow Dr. Patterson's recommendation during the last year?

6   A.   I believe the Hospital, in the past and currently, has

7   made every effort to insure that Mr.  Hinckley can avail

8   himself of music therapy and individual therapy as much as

9   possible and that whenever outings are scheduled, we take that

10   into account so that he misses the minimal amount of those

11   therapies as possible.

12   Q.   And by the term "available", you're allowing Mr. Hinckley

13   to decide when he's allowed to go to therapy and when he's

14   not?

15   A.   No.  Both --  I think it was actually a little confusing.

16   There was some earlier testimony -- I can't recall by whom --

17   about Mr. Hinckley deciding when he goes on an outing.  When

18   Mr.  Hinckley goes on an outing, it's decided by the treatment

19   team; Mr. Hinckley; his mother; potentially, his brother and

20   sister.  They discuss potential dates.

21       Dr. Rafanello and Dr. Green, everybody looks at the

22   schedule of the treatments that Mr.  Hinckley regularly

23   engages in.  A deliberate effort is made to especially avoid

24   missing important sessions, such as, music therapy and

25   individual therapy and depending on things that may be set up

in the area around his mother's residence and when those

particular, say, volunteer activities or an interview could be

scheduled.  And, then, finally, after much discussion, they

select a particular set of dates.

Q.    And as to the therapy I was speaking about -- and I was

unclear in my question -- as to music therapy and --

A.    Uh-huh.

Q.    -- individual therapy with Dr. Binks, Mr.  Hinckley is

assigned times he's supposed to go, it's not if he feels like

going.

A.    Well, typically, I mean his schedule is certainly taken

into account.  His desires are certainly taken into account.

The way it works at a hospital is that it is client centered.

That doesn't mean that the therapists' schedules aren't taken

into account.

     I believe that Dr. Binks doesn't work on Fridays, so I

think it would ever be scheduled on a Friday so depending on

the schedules of Mr.  Hyde and Dr. Binks to spend -- again,

depending on the schedule of other activities.  I mean I think

just in terms of his schedule, he goes and works in the health

science library every morning, so those individual therapies

are going to be scheduled in the afternoons depending on the

availability of the therapist.

Q.    I know it's late.  It's been a long week.  It's a rather

simple question I think.

1    A.    Okay.

2    Q.    When Mr.  Hinckley is assigned to go to music therapy or

3    individual therapy, he's supposed to go, right? It's not

4    optional as to whether he goes.

5    A.    He's supposed to go.

6              MR. ZENO:  Thank you.  Thank you, Your Honor.

7              THE COURT:  Mr. Levine.

8              MR. LEVINE:  Very briefly, Your Honor.

9    **REDIRECT EXAMINATION BY MR. LEVINE:**

10   Q.    With respect to assignment of therapies, isn't it a fact

11   that when therapy is available to him, he always invariably

12   goes, never is it canceled because of him?

13   A.    I can't -- I don't know.

14             MR. LEVINE:  I proffer that to be the case, Your

15   Honor.  Nothing further.

16             THE COURT:  Thank you, Dr. Montalbano.

17             THE WITNESS:  Thank you.

18             THE COURT:  Mr.  Levine, do you have any additional

19   witnesses this afternoon?

20             MR. LEVINE:  None this afternoon, Your Honor.  With

21   the Court's indulgence because I think I know what the next

22   question is.

23             THE COURT:  Each side gets one shot at his or her

24   cell phone going off whether they have the GPS capability or

25   not.

1          MR. LEVINE:  I think we're done, Your Honor.  We

2     rest with rebuttal case.

3          THE Court:  Mr.  Zeno, are you going to have any

4     additional witnesses?

5          MR. ZENO:  No, sir.  No rebuttal.  Thank you, Your

6     Honor.

7          THE COURT:  All right.  Well, what do you all want

8     to do -- what is the next event in this hearing?  I take it

9     that unless anybody thinks otherwise over the weekend, we're

10    done with testimony.  So what do you want to do next, and when

11    do you want to do it?  I offered the possibility of closing

12    arguments and/or supplemental filings.

13         R. LEVINE:  Please, Your Honor.  I know -- I think

14    we would like closing arguments.

15         MR. ZENO: Yes.

16         MR. LEVINE:  You agree?

17         MR. ZENO:  That's been the tradition, it seems to

18    me.

19         THE COURT:  Yes.

20         MS. SAPP:  The only thing I was going to say,  Your

21    Honor, since you have asked for a supplemental piece of

22    evidence from the Hospital, I didn't know if you wanted to

23    give us a specific date to get that to you.

24         THE COURT:  I don't think we need to postpone

25    closing arguments for that  because I think it would be just

1    to clarify what the facts are on this, and whatever is filed

2    should speak for itself so I don't think we'll need any

3    testimony about it.

4            MS. SAPP:  I didn't know just how long it would take

5    the Hospital to get that ready, but Tuesday should be fine.

6            THE COURT:  That's all right.  Don't worry about it,

7    Ms. Sapp.  Next week sometime.

8            MS. SAPP:  Next week is fine?

9            THE COURT:  Yeah.

10           MS. SAPP:  Thank you, Your Honor.  I just didn't

11   want people to be waiting, and the hospital formulating this

12   particular document.

13           THE COURT:  No.  Next week is fine.

14           MR. LEVINE:  Your Honor, of the days you proposed

15   and believing it would be useful to get some transcripts --

16           THE COURT:  Yes.

17           MR. LEVINE:  May I suggest that we take advantage of

18   the Court's offer of the afternoon of August 5.

19           THE COURT:  Was that my offer?  After 2:30 because I

20   have a conference call from 1:00 to 2:00.

21           MR. LEVINE:  That's what you said.  And you also

22   said, Your Honor,  you would be available all day on August

23   6th.  That would be okay, as well.

24           THE COURT:  I didn't bring my calendar with me this

25   time.

1          MR. LEVINE:  May I turn this on Your Honor?

2     (Indicating to cell phone.)  I want to make sure I do this

3     with permission.  August 6th is my preferred date, Your Honor.

4          THE COURT:  Let me ask one other question of the

5     Hospital and Ms. Sapp.  Is there somewhere in some

6     professional publication standards of practice a definition

7     and explanation of what a case manager is supposed to do?  Can

8     somebody give me something in writing that a professional

9     organization says:  Here's what you need by way of training to

10    be a case manager and here's what the job entails, and here's

11    what you're supposed to do or do I need testimony?  Because I

12    don't think I know.

13          I've assumed Mr. Shamblee is the case manager.  I'm

14    not sure that those words are used.  It says "social worker",

15    but I don't think I know what a case manager does, and I don't

16    know whether Mr. Beffa knows what a case manager is supposed

17    to do.  So it would be nice for me to know what a case manager

18    is supposed to do and for me to know whether or not the

19    Hospital and Mr. Beffa have a clear understanding between them

20    as to what a case manager is supposed to do and specifically

21    what he is supposed to do.

22          So if somebody has had that conversation with Mr.

23    Beffa or has written him a letter or there's been an exchange

24    of correspondence, then I'd like to know that in whatever form

25    it exists.  And if it hasn't happened, I'd like to know that.

1    And if there is some professional standard for case managers,

2    I'd like to know that.

3         So I don't know what the best way to do it is, but

4    that's, I think, important to know.  And whether there is any

5    problem ethically or otherwise with somebody performing both

6    roles because there has been no testimony about that.  People

7    are troubled by it; maybe even dismayed, I can't remember.  I

8    don't think there has been any testimony about whether there

9    is a problem with a therapist also serving as case manager,

10   but there clearly hasn't been anything about what a case

11   manager is supposed to do and whether Mr. Beffa understands

12   that.

13        So does anybody want to proffer additional testimony

14   or is there some other way that I can get the answers to those

15   questions?

16             MR. ZENO:  Can we have a moment, Your Honor?

17             THE COURT:  Yeah.

18             MR. ZENO:  Do you mind if we just talk for a second?

19             THE COURT:  No.

20             (Whereupon, counsel conferred with each other at

21   this time.)

22             MR. LEVINE:  Your Honor, we have conferred, and we

23   will continue to confer and try to get the Court something

24   that it wants.  We think we know what you want.

25             MR. ZENO:  We will get you something.  I mean we've

1    all agreed to get you something, it's just we're going to work

2    on that.

3              THE COURT:  That having been put on the --

4              MR. LEVINE:  And it won't need testimony, Your

5    Honor, I don't think.

6              MR. ZENO:  No.

7              THE COURT:  Putting that -- so do you want to have

8    closing arguments on August the 6th?

9              MR. LEVINE:  Yes.  I think we had agreed upon it, if

10   it's available to the Court, at 10:30 in the morning.

11             THE COURT:  10:30 in the morning.  Has anybody asked

12   the court reporter whether she's going to be able to get you

13   transcripts before then?  And we had another court reporter

14   one day, and I don't remember whose testimony --

15             MR. ZENO:  The government is not planing to order

16   transcripts before the argument.

17             THE COURT:  Well, you can talk with Wendy about what

18   you need and when she can provide it, and she can give you the

19   name and phone number of the other reporter.  I don't know

20   what day it was.

21             THE COURT REPORTER:  Tuesday afternoon and

22   Wednesday.

23             THE COURT:  Tuesday afternoon and Wednesday.  She

24   was here all day Wednesday?  Yeah.  So we have another court

25   reporter who was here Tuesday afternoon and Wednesday.

1          MR. LEVINE:  Lisa.

2          THE COURT:  Lisa.  So August 6th at 10:30.

3          MR. LEVINE:  Thank you, Judge.  Thank you for

4     hearing us.  We appreciate this.

5          THE COURT:  All right.  Absolutely.  See you then.

6                    [End of proceedings]

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

I, Wendy C. Ricard, Official United States Court
Reporter in and for the District of Columbia, do hereby
certify that the foregoing proceedings were taken down by
me in shorthand at the time and place aforesaid,
transcribed under my personal direction and supervision,
and that the preceding pages represent a true and correct
transcription, to the best of my ability and
understanding.

_____

Wendy C. Ricard, RPR, CCR

Official U.S. Court Reporter