UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA             CRIMINAL ACTION NO. 81-306

                                     WASHINGTON,D.C.

VERSUS                               MONDAY, JULY 21, 2008


JOHN W. HINCKLEY, JR. (ST. ELIZ.)  9:30 A.M.


**EVIDENTIARY HEARING(DAY 1)**
**(Testimony Diane Sims & Scott Hinckley)**


BEFORE THE HONORABLE PAUL L. FRIEDMAN

UNITED STATES DISTRICT COURT JUDGE


A P P E A R A N C E S:


FOR THE PLAINTIFF                    THOMAS E. ZENO, ESQ.
                                     SARAH T. CHASSON, ESQ.
                                     U.S. ATTORNEY'S OFFICE
                                     555 Fourth Street, NW
                                     Suite 5423
                                     Washington, DC 20530
                                     (202) 514-6957


FOR THE DEFENDANT
JOHN W. HINCKLEY, JR.                BARRY W. LEVINE, ESQ.
                                     ADAM S. PROUJANSKY, ESQ.
                                     ANN-MARIE LUCIANO, ESQ.
                                     DICKSTEIN SHAPIRO, LLP
                                     1825 Eye Street, NW
                                     Washington, DC 20006-5403
                                     (202) 420-2237

```
1    ST. ELIZABETHS HOSPITAL              TONYA A. SAPP, ESQ.
                                          D.C. ATTORNEY GENERAL'S
2                                         OFFICE
                                          441 4th Street, NW
3                                         Suite 1060 North
                                          Washington, DC 20001
4                                         (202) 724-5562

5
     REPORTED BY:                         WENDY C. RICARD, RPR,CCR
6                                         OFFICIAL COURT REPORTER
                                          333 Constitution Ave., NW
7                                         Room # 6718
                                          Washington, DC  20001
8                                         (202)354-3111

9

10   Proceedings recorded by mechanical stenography.

11   Transcript produced by computer-aided transcription.

12

13                        I N D E X

14   OPENING STATEMENTS:

15        By Mr. Levine........................7

16        By Mr. Zeno.........................16

17   WITNESSES:

18      Diane Sims.................

19        By Mr. Levine.......................20

20        By Ms. Chasson......................69

21      Scott Hinckley............

22        By Mr. Levine.......................111

23        By Ms. Chasson......................135

24

25
```

**EXHIBITS:**                                                        **PAGE**


**Patient Exhibit No.1** (Individualized Relapse Prevention     62

Plan Feedback form)

**Patient Exhibit No. 2** (Article/Gazette)                          108


*           *           *               *         *


                    **P R O C E E D I N G S**

          THE COURT: Good morning, everybody.  Well, we're

waiting.

          THE DEPUTY CLERK:  Criminal 81-306, United States of

America versus John W. Hinckley, Jr.  For the government, Mr.

Zeno and Ms.  Chasson; for the patient, Mr.  Levine, Mr.

Proujansky, and Ms.  Luciano.

          MR. ZENO:  Good morning, Your Honor.  Ready.

          MR. LEVINE:  Good morning, Your Honor.

          THE COURT: Good morning, everybody.  All right.  Is

Ms.  Sapp here from the hospital?

          MR. LEVINE:  I believe she's not, Your Honor.  I

believe in one of the conversations she said that she was

going to be unavailable.

          THE COURT:  I think that's right.  We had a couple

of conference calls in preparation for this hearing, and she

did indicate that she had certain other obligations to the

city and to the attorney general during this week, and she was going to be in and out as -- be here as often as she could be, but, in any event, we'll proceed without her.

So how do you want to proceed?  I guess -- it's technically, the Hospital's motion, which is why I asked if Ms. Sapp was here.  And why don't you all come and speak into the microphone, it's easier for the court reporter when we do that.  But, traditionally, I think we've begun with Mr. Hinckley's lawyers calling witnesses.

So why don't you, Mr. Levine, tell me how you think you'd like to proceed this week.

MR. LEVINE:  I think, Your Honor, that the way we have done it in the past would be the way we should do it today.  We will proceed.  We don't believe that the burden is ours, but I think Your Honor had concluded in an earlier ruling that it doesn't matter on whom the burden is imposed as long as the Court is convinced by a mere preponderance of the evidence that he won't be dangerous to himself or others in the context of the proposal.

So we're prepared to call witnesses, and we have a desired sequence.  I have exchanged communications with Mr. Zeno, and we have two lay witnesses, Your Honor.  We call them only because the Court had expressed a desire to hear from them.  They are Mr. Hinckley's siblings.

The government has advised that it intends, to my

1    regret, to invoke the rule on witnesses.  If it does that,

2    then we would call the witnesses out of sequence and start

3    with the siblings.  If the government doesn't invoke the rule,

4    we'll start with the mental health professionals.

5              THE COURT: Has anybody made any effort to get Mr.

6    Beffa here?

7              MR. LEVINE:  Mr.  Beffa will be here, Your Honor.

8    He is not here now.  He will be testifying, and his wife is

9    actually, I am advised, having some surgery on Tuesday, but he

10   thinks he will -- he has to be with her then.

11             THE COURT:  Sure.

12             MR. LEVINE:  But he is intending to be here on

13   Wednesday.  So there may be some shuffling of the order of

14   witnesses.  I've assured him that the Court is sensitive to

15   that.

16             THE COURT: Absolutely.  Mr. Zeno, what do you want

17   to say?

18             MR. ZENO:  Mr.  Levine has got it right, Your Honor.

19   We are ready to go, and he will be putting on the witnesses.

20   We have invoked the rule on witnesses for the siblings, the

21   brother and the sister, until they have testified, at which

22   point we would not object if they remained in the courtroom

23   for the remainder of the hearing.

24             THE COURT:  Okay.  Well, I think under Rule 650 --

25             MR. LEVINE:  It's mandatory.

```
1                    THE COURT: -- I have to do it.

2                    MR. LEVINE:  Yes.  I regret that.  I think it's a

3         harsh invocation of the rule, but it's the government's

4         prerogative, and it always exercises those prerogatives.

5         We're prepared to proceed that way.

6                    THE COURT: Okay. So who is -- and I take it Mrs.

7         Hinckley is not going to be testifying so she can stay in the

8         courtroom for the entire proceeding.

9                    MR. LEVINE:  That's our plan, Your Honor, yes.  And

10        sadly, we will note the absence of Mr.  Hinckley.

11                   THE COURT:  Yes.  And my condolences, Mrs.

12        Hinckley.  So who's going to be your --

13                   MR. LEVINE:  The first witness will be Diane Sims,

14        Your Honor.

15                   THE COURT:  Okay.

16                   MR. LEVINE:  Mr. Hinckley's sister.

17                   THE COURT:  Ms. Sims, why don't you come up, and Mr.

18        Scott Hinckley, I think you'll have to go to the witness room

19        for now.

20                   MR. LEVINE:  If it please, Your Honor, I was hopeful

21        that I would be able to make a few introductory remarks.

22                   THE COURT:  Oh, sure.

23                   MR. LEVINE:  Something in the nature of an opening

24        statement.

25                   THE COURT:   I would have been disappointed if you
```

1    hadn't, Mr. Levine.

2              MR. LEVINE:  Well, I know the Court is keenly aware

3    of the applicable law.

4              THE COURT:  Let me just say before you start that

5    Ms. Sapp is now here.

6              MR. LEVINE:  Oh.

7              THE COURT:  Good morning.

8              MR. LEVINE:  If I may, Your Honor, if it please the

9    Court.  We are, of course, here again on the Hospital's recent

10   motion under 501(E) to expand the privileges that Mr.

11   Hinckley has with respect to conditional release.

12             In summary, and only in most general terms, the

13   Hospital seeks 12 additional releases; each nine nights or ten

14   days.  It would be in the home of Mrs. Hinckley.  And the

15   Hospital also seeks, generally, to expand the amount of time

16   that he has both in that local community and the community-at-

17   large -- unaccompanied time.

18             And, further, the Hospital seeks the opportunity --

19   to give Mr. Hinckley the opportunity to engage in volunteer

20   work and both in the neighborhood or the area where Mrs.

21   Hinckley lives, as well as in the District of Columbia.

22             And lastly, again, generally speaking, they seek Mr.

23   Hinckley to have the opportunity to have a driver's license

24   and to drive with what has been denominated as a responsible

25   person.

1          The Court will quickly note that this request is far

2     more modest than the request that was before the Court the

3     last time we were here.  I think it is important to note at

4     the threshold that the modesty of this request does not

5     reflect a diminished confidence by the Hospital in Mr.

6     Hinckley, rather it is an attempt to be responsive to what the

7     Hospital perceives to be the views of this Court.

8          We believe that the evidence will show that he not

9     only would not be a danger to himself or others in the context

10    of the proposal before the Court, but also were there to be

11    releases of a far greater duration.

12         The standard of review, the legal standard, is

13    intended, we believe, to be deferential to the Hospital. The

14    Hospital need not show, nor need anyone show, proof beyond a

15    reasonable doubt that he won't be dangerous.  The standard, of

16    course, is, as we've said many times, mere preponderance that

17    he won't be dangerous as a result of a mental illness.

18         This is controlled by longstanding case law in the

19    District of Columbia.  Your Honor has long been aware of it.

20    I believe it was the case law in place while we were Assistant

21    U.S. Attorneys, all of us.  It starts with Huff which comes

22    out of the D.C. Circuit in 1959.

23         THE COURT:  That was before we were assistant U.S.

24    Attorneys.

25         MR. LEVINE:  That was well before we were, Your

1   Honor.  And much of it was well before, but it continued

2   during the time that we were there, Your Honor; but Huff is

3   important in that it says that temporary freedom is often an

4   essential part of the therapeutic process and, therefore, must

5   not be prevented.

6          Then, of course, the Court spoke in Covington

7   against Harris, and it said that a patient confined to St.

8   Elizabeths Hospital has a right to treatment and a right to be

9   held in the least restrictive environment consistent with

10  public safety.  Covington also went on to note that the

11  ultimate goal of therapy for persons involuntarily

12  hospitalized must be to shore up their capacity to function

13  satisfactorily in the unrestricted environment of the outside

14  world.  And Covington then continued to say that the goal can

15  be achieved by giving the patient the opportunity for

16  controlled experiments with freedom.

17         And, of course, Your Honor knows the role of Judge

18  Bazelon in many of the cases that followed.  They go into the

19  60's and to the 70's, and there's an opinion in McNeil where

20  Judge Bazelon summarizes all of these concepts. I would

21  provide the Court with the cites, but I suspect the Court has

22  them all.

23         So with respect to the law, Your Honor, we would

24  submit that the Court is required to grant Mr. Hinckley the

25  maximum freedom that does not endanger himself or the public,

1    and, again, in summary, the Court, to grant the petition, need

2    only find by a preponderance that he won't be violent under

3    the proposal.

4            Now, the evidence will show that he won't be

5    violent.  Over the years, there have been dozens of

6    conditional releases and countless numbers of "B" city -- I

7    believe the Court has already found in excess of 200, if I

8    recall correctly -- and in that entire range of events, there

9    has not been a single negative incident.  There has been no

10   danger events by Mr.  Hinckley either with respect to himself

11   or to others.  So these experiments in freedom to which the

12   Court has made reference have been successful.  They have been

13   therapeutic, and they have furthered the goal of reintegration

14   into the community, which brings us, of course, to the next

15   step.

16           The next step in treatment, of course, is to expand

17   the experiments in freedom, and here the Hospital proposes to

18   lengthen the visits, to have fewer restrictions and greater

19   opportunity to participate in community activities.  This

20   proposal, Your Honor, we would submit is far more modest than

21   is warranted in light of those past successes, but the

22   Hospital strongly supports this increase, and we submit that

23   this Court should defer to the Hospital in this regard.

24           Now, the government experts agree that the

25   conditional releases should continue even with some expansion.

1    Dr. Patterson supports more unaccompanied time for community

2    activities.  He supports the pursuit of voluntary -- as a

3    volunteer.  He supports getting a driver's license.

4    Dr. Phillips agrees that Hinckley is not a danger to himself

5    or others, and Dr. Phillips states -- I would think

6    unequivocally -- that Mr. Hinckley is ready for transition to

7    the next level.

8         As we have seen, of course, in previous hearings,

9    instead of presenting evidence of danger or dangerousness,

10   Drs. Patterson and Phillips raise concerns -- as they call

11   them -- and questions as they call them about whether Mr.

12   Hinckley -- about Mr. Hinckley and about certain aspects of

13   the Hospital's planning.

14        It is crucial for this Court, we submit, to stay

15   focused on the actual issue at hand; not about questions, not

16   about concerns, but about evidence.  Will he be a danger to

17   himself or others if the privileges are expanded as proposed

18   in the (e) petition.  We submit that the evidence in this

19   regard is crystal clear.  We think that the Court's earlier

20   findings support the incontrovertibility of this submission.

21        We note that the Court has concluded on earlier

22   occasions that Mr. Hinckley's Axis I diagnosis, the psychotic

23   disorder not otherwise specified and major depression, are in

24   full remission, and as the Court said have been in full

25   remission for at least 14 and, perhaps, as many as 20 years.

1    It is now longer.

2         The Court also found that Mr.  Hinckley's only other

3    diagnosis, narcissistic personality disorder, is significantly

4    attenuated.  The Court found that Mr.  Hinckley has exhibited

5    no violent behavior, nor attempted suicide in over 20 years.

6    Well, that period -- it's still over 20 years, and it's longer

7    still.  The Court found that if Mr.  Hinckley were to

8    experience a relapse of his Axis I disorders that relapse

9    would not occur suddenly, but rather would occur gradually

10   over a period of time of at least weeks or months.   The

11   evidence was when the Court found that there would be ample

12   time were those symptoms to be perceived to intervene.

13       The Court further found that Mr.  Hinckley has never

14   tried to escape from the Hospital or on "B" city or on the

15   conditional releases, whether they were -- whether it was at a

16   time when they were unsupervised or supervised.

17         The Court further found that Mr.  Hinckley

18   successfully participated in over 200 hospital accompanied

19   outings, without incident, and the Court found in previous

20   years -- and I would submit equally true today -- that Mr.

21   Hinckley followed every condition imposed by the Court during

22   the conditional releases, and those visits were successful,

23   therapeutic, and, as the Court said, beneficial.

24         So once again, the government has a different view.

25   The government's view is different from the Hospital.   The

1   government's view is different from the Court.  The

2   government's view is different from its own experts.  The

3   government has opposed every application for a conditional

4   release that has ever been made.  The government filed a

5   motion with respect to this application for a conditional

6   release and asked the Court to deny the proposal in its

7   entirety, but the government offers no evidence of danger.

8           Instead, as in the past, it appeals to unreasoned

9   fear.  It points out Mr. Hinckley has been involved in

10   relationships with women.  It applies, in some sinister way,

11   labels; that they are troubling, troubling in nature and

12   troubling in quantity.  The evidence will show, however, that

13   the relationships are not dangerous, and that there is nothing

14   troubling about their quantity.

15           I would remind the Court that in some 27 years of

16   hospitalization, he's had three different girlfriends: Ms.

17   DeVeau, Ms. [M], and Ms. [G], and none simultaneously.  The

18   government says the facts of the relationship with women is a

19   risk factor for violence; that Mr. Hinckley, they say, will

20   try to impress women through violence, but no expert believes

21   that having a relationship will make him dangerous.  These are

22   real relationships with real people who choose to come to see

23   him.

24           All the experts, including the government's,

25   encourage him to explore relationships with women.  If he had

1    not developed relationships with women and friendships, the

2    government would argue he was isolating himself, and the

3    isolation would be a risk factor.

4           He does not have in the Hospital, Your Honor, the

5    opportunity to meet a wide range of people.  He can only

6    befriend people who come to see him.  A small number have, and

7    he has developed friendships with them, and in a couple of

8    instances, something deeper.  These interactions enable him to

9    avoid loneliness and to learn from friendships.  The evidence

10   will show that the relationships in no way have made him

11   dangerous.

12          In the past, Your Honor, questions have been raised

13   regarding being rebuffed or being rejected.  As a result of

14   the relationships and his openness with respect to them, we

15   have much data and little concern.  He has been rebuffed in

16   relationships.  He has been rejected outside the context of

17   relationships, such as in the application for jobs.  In some

18   respects, some of the requests the Hospital has made on his

19   behalf from the Court have been rejected, and we see him to be

20   with this mass of new data to be a resilient person, to be a

21   strong person, and to be a stable person.  He has not

22   decompensated, and applying the test, he has not become

23   dangerous.

24          We submit that the Court should rebuff and reject

25   the government's efforts to cry danger in the absence of

1    evidence.  This case must be decided on the evidence, not fear

2    and not innuendo.  Another appeal to fear that the government

3    makes is reference to a song he wrote some 30 years ago.  The

4    government asserts that he continues to maintain inappropriate

5    thoughts of violence and references the song, but the evidence

6    will show that he played the song as part of music therapy

7    with a music therapist and was entirely appropriate.  It shows

8    he was properly involved in music therapy, which all experts

9    agree have been helpful to him.  Again, the Court should

10   rebuff and reject the government's --

11              THE COURT: Is there a difference between rebuff and

12   reject?

13              MR. LEVINE:  I'm not sure that there is, but they

14   have been used, Your Honor, in this case.

15              THE COURT:  It sounds good.

16              MR. LEVINE:  Well, there's a certain euphonics to

17   it, but it's been used in the context of the evidence in the

18   case and maybe the alliterative quality to it will remind the

19   Court that it should reject and rebuff --

20              THE COURT:  And rebuff.

21              MR. LEVINE:  -- the government's play on fear.  In

22   fact, Your Honor, there is no evidence that he would be

23   dangerous on the proposed conditional release.  The evidence

24   will be that the psychosis and major depression that made him

25   dangerous have been in full and stable remission for well over

1    two decades.  He has not decompensated even under the stresses

2    of his father's recent passing.  The evidence will be he

3    continues to have a perfect, perfect, record of success on

4    conditional release.

5            And in the end, Your Honor, we are confident that

6    the Court will be convinced by far more than mere

7    preponderance of the evidence that he will not be a danger to

8    himself or others during the conditional release proposed by

9    the Hospital.

10           THE COURT:  Mr. Zeno.

11           MR. ZENO:  Thank you, Your Honor, and good morning.

12           THE COURT:  Good morning.

13           MR. ZENO:   The government opposes an increase in

14   the amount of time Mr. Hinckley is permitted to spend in his

15   mother's community because the Hospital's proposal to increase

16   the length of his visits to 10 days is premature and

17   insufficient to guarantee the community's safety.

18           The main problem with the Hospital's proposal is

19   that it fails to appreciate Mr. Hinckley's difficulties in

20   handling the expanded release authorized by the Court last

21   year.  Mr. Hinckley's conduct during the past year

22   demonstrates that he remains narcissistic and focused on

23   inappropriate and unrealistic relationships with women,

24   including several women at the same time.

25           Dr. Phillips concluded that Mr. Hinckley's

1    narcissism is, quote, alive and well.  Dr. Rafanello described

2    Mr. Hinckley's, quote, thought content as focused on his right

3    to relationships versus his opportunity to gain further

4    expansions of legal freedoms, unquote.  Mr.  Hinckley also

5    remains secretive.  He continues to lack initiative as he has

6    for years, and he maintains feelings of entitlement.

7            Now is not the time to expand the length of Mr.

8    Hinckley's trips to his mother's hometown because -- and this

9    is the second reason for opposing an increase -- a local

10   support system is not yet in place in the mother's hometown to

11   insure the community's safety if Mr.  Hinckley is permitted

12   more unsupervised time there.

13           The decision to switch from Dr. Lee to Mr.  Beffa

14   has just been made.  Mr.  Beffa is untested in his role as an

15   individual therapist, and he is unfamiliar with --

16           THE COURT:  He's untested in his role as an

17   individual therapist with Mr.  Hinckley.

18           MR. ZENO:  Hinckely, yes.

19           THE COURT:  But I remember from the last time that

20   --

21           MR. ZENO:  That's correct.

22           THE COURT:  -- that he has -- this is something he

23   has done for years, correct?

24           MR. ZENO:  Absolutely, Your Honor.  And you'll hear

25   that.  I meant that to be untested with Mr.  Hinckley.  And he

1    is unfamiliar with Mr.  Hinckley's background, especially his

2    relationships with women.  Also, no volunteer opportunity has

3    been established to ensure that Mr.  Hinckley is active rather

4    that idle for six-day visits, let alone 10-day visits.

5         As Dr. Patterson warned, Mr.  Hinckley's depression,

6    sense of entitlement, isolation, self-absorption, lack of

7    empathy, and guarding and denial of his feelings, particularly

8    when they include disappointment and rejection, remain.  The

9    continued support of the Hospital and the treatment team

10   should not be decreased or transitioned to other healthcare

11   providers without considerably more demonstration that the

12   services will be adequate for Mr. Hinckley's needs.

13        The Court must balance the requested increase

14   against the risk of danger if Mr.  Hinckley is not adequately

15   supervised and vigorously so.  Waiting until something happens

16   is too late.  And even if there were not concerns about Mr.

17   Hinckley's current condition and about the local support group

18   in the mother's hometown, the third reason not to increase the

19   length of the visits is that enough time already exists for

20   Mr. Hinckley to do his Phase IV activities.

21        If he were to use his time effectively, trips of six

22   days are ample for Mr.  Hinckley to perform activities, such

23   as obtaining a driver's license; taking driver's lessons;

24   attending social functions; and beginning volunteer

25   activities.  The length of his time in the community does not

1      need to be expanded in order to accomplish his goals.

2              Finally, the idea of a, quote, D.C. local option

3      should be rejected.  Given his problems, Mr. Hinckley will

4      have enough difficulty trying to establish himself in his

5      mother's hometown.  Trying to establish an additional support

6      system in the District will divert effort from trying to make

7      a success of Mr. Hinckley's transition to his mother's

8      hometown.

9              Mr. Hinckley can obtain a driver's permit in his

10     mother's hometown.  He can learn to drive there, and that is

11     the only place that's been recommended for him to be driving.

12     Mr. Hinckley must overcome significant personal problems as

13     he attempts Phase IV activities plan for trips of six days.

14     Mr. Hinckley should not receive additional time in his

15     mother's hometown until he can demonstrate that he can handle

16     these problems and until the local support community is

17     established to insure that he is given the vigorous scrutiny

18     he needs to protect the community.

19              THE COURT:  Thank you, Mr. Zeno.

20              MR. ZENO:  Thank you.

21              THE COURT:  Ms. Sapp, is there anything you'd like

22     to add to what's been said?

23              MS. SAPP:  No, sir.  Not at this time.

24              THE COURT:  Thank you.  Mr. Levine.

25              MR. LEVINE:  Please the Court, we'll call Diane

1   Sims.

2                THE COURT:  Okay.  Ms.  Sims will come up, and Mr.

3   Scott Hinckley will go to the witness room for the time being.

4   *                    *                    *                    *

5                **DIANE SIMS**, called as a witness in this case, after

6   having been duly sworn by the deputy clerk, testified as

7   follows:

8   *                    *                    *                    *

9                MR. LEVINE:  Thank you, Your Honor.

10  **DIRECT EXAMINATION BY MR. LEVINE:**

11  Q.   Please state your name.

12  A.   Diane Sims.

13  Q.   And do you know this gentleman sitting at the end of

14  counsel table?

15  A.   Yes, I do.

16  Q.   Who is he?

17  A.   He is my brother.

18  Q.   And during the past year, have you participated in

19  conditional releases with your brother?

20  A.   Yes, I have.

21  Q.   Do you know about how many?

22  A.   During just -- just during the past year?

23  Q.   Yes.  Since the last hearing, about a half a dozen, five?

24  A.   About seven.  He's been up about seven times I think.

25  Q.   All right.  And did any other family member accompany you

1   in these releases?

2   A.   Sometimes my brother, Scott, was there, as well.

3   Q.   And your mom?

4   A.   Oh, yes, my mother was always there.

5   Q.   And in some instances, early on, your dad?

6   A.   Yes, that's correct.

7   Q.   Now, how would you describe the -- your experience on the

8   conditional releases, overall, with Mr.  Hinckley?

9   A.   My experience was -- you know, I mean everything was

10  perfect, and I hate to use the word "perfect", but there was

11  nothing I can say that was a red flag.  No red flags went up.

12  John did everything he was supposed to do.  He did it well.  I

13  was very observant about the things that we were doing

14  together, and he just -- he followed his guidelines admirably.

15  Q.   What kinds of things did you do with him?

16  A.   As far as activities or --

17  Q.   Activities, yes.

18  A.   We would -- this particular, this last year was a little

19  bit different than years past in that --

20  Q.   Tell us why that's the case.

21  A.   Well, it was different because my father was moved into

22  an assisted living facility about the same time that the

23  visits started with John last year.  So that affected a great

24  deal of what we did and how we spent our time in [the city].

25  Q.   Did you spend time visiting your dad?

```
1    A.   Oh, yes, definitely.

2    Q.   And with John, of course?

3    A.   Yes.

4    Q.   Did you go to restaurants and shop with John?

5    A.   Yes, we did.

6    Q.   Did you apply for volunteer positions with John?

7    A.   John did, yes.

8    Q.   Did you listen to John sing his music?

9    A.   Yes, we did.

10   Q.   Did Mr. Hinckley, John, help out in the daily chores

11   around the house?

12   A.   He absolutely helped out, yes, he did.

13   Q.   Did he prepare breakfast and set the table?

14   A.   Yes.

15   Q.   Did he clean up after meals, sweep, keep his room,

16   wash clothes?

17   A.   Yes, all of that.

18   Q.   Help in the yard, whatever?

19   A.   Every bit of that.

20   Q.   Was there ever an instance where he declined to assist

21   where assistance was useful?

22   A.   No.  No.

23   Q.   All right.  Did he socialize with the family?

24   A.   Yes, he did.

25   Q.   Was he engaged?
```

1    A.   Yes.  Definitely.

2    Q.   Was he isolative?

3    A.   No.  No.  I mean, obviously, he was not in our presence

4    24 hours a day.  There were times that maybe in the evenings

5    when it was time to settle in, that he might go into his room

6    and read a little bit or listen to music, but, absolutely,  as

7    far as being isolated, no, not at all.

8    Q.   No brooding or --

9    A.   No.

10   Q.   Now, as a result of these conditional releases, are you

11   closer to him now than before?

12   A.   Oh, yes.

13   Q.   All right.  Tell us about that.

14   A.   Well, just being able to spend time with him in my

15   parents' home, my mother's home, has been awfully nice; have a

16   chance to really sit down and talk with him, a chance to see

17   him away from the St.  Elizabeths' campus atmosphere.  It's

18   nice to have him be able to experience having a room to go to

19   as far as to sleep in at night that is his own room and is in

20   my parents' home.

21       It's just been wonderful spending time with him, going

22   places with him, talking to him, having him be there to help

23   my mother out with some things around the house.  It's been a

24   very nice, pleasant experience.

25   Q.   You find him to be an interesting guy?

1    A.    Oh, absolutely.

2    Q.    Now, with respect to your father, did you observe Mr.

3    Hinckley's relationship with your father during the

4    conditional releases -- when I say "Mr.  Hinckley" in this

5    instance, I mean John.

6    A.    Yes, yes.  Oh, yes, I did.

7    Q.    And what did John do for your dad during those times?

8    A.    Well, first thing he did when my dad was moved into the

9    assisted living facility, John painted a picture for my father

10   to put in his room.  When he my father was moved over to the

11   facility, it was just four blank walls and a floor and a

12   ceiling, and so anything that was going to decorative needed

13   to be brought from home, and John brought a nice painting that

14   he had done that was reflective of things that had been

15   important in my father's life.  It was kind of a collage-type

16   painting; it was lovely.  He did that.

17         When we were actually in the process of getting my father

18   moved in, he helped us build bookcases to put in my father's

19   room and he was always there.  He would interact with my dad

20   in a way -- he would walk with him around the hallways.  Later

21   on when my father was to the point when he needed a

22   wheelchair, he would go around the hallways with my father to

23   push him in the wheelchair, that type of thing.

24         So he was very engaged in helping out with my father in

25   that situation and being helpful to the rest of us, too, to

1      just -- so that we weren't the ones having to do all the

2      building of the bookcases and all of the pushing of the

3      wheelchairs and all that.  He was very much engaged in the

4      whole process.

5      Q.    And did he help you cope with your father's illness?

6      A.    Yes, he did.

7      Q.    And your mom and your brother?

8      A.    Yes.  I believe so, yes.

9      Q.    And did he demonstrate empathy and compassion for your

10     father's situation?

11     A.    Yes.  Yes, he did.

12     Q.    Did he appear to be affectionate to your father?

13     A.    Yes, he did.

14     Q.    Now, was there any reluctance by him to engage in these

15     activities or was he an eager participant?

16     A.    When I was there, he was an eager participant in the idea

17     of showing up.  There were times maybe in the very beginning

18     when we were getting adjusted to my father being in the

19     facility, and I wasn't necessarily there for the entire six

20     days of John's visit; I may come in at the last of the visit.

21     There were times maybe that John had been there every single

22     day with my mother because, of course, at that time he had to

23     go with my mother wherever she went.

24         So it's possible that maybe the fifth or sixth or seventh

25     time he had been over there in that first week, he maybe would

1    have preferred to have stayed home one of those times just

2    because of the fact that he didn't get to [the city] too

3    often.  But he was always very happy to go and be a part of

4    that experience.

5    Q.   Well, did you detect that -- any resentment from him that

6    all this attention was being paid to your father as opposed to

7    other activities?

8    A.   I didn't see resentment.  It was a change in a pattern

9    that had been established over the last many times that he had

10   been at home with my father in the home.  Now, my father was

11   no longer in the home, that changed the dynamics quite a bit.

12   So it was not resentment that I saw, it was just adjusting to

13   a change of pattern.

14   Q.   And did he adjust appropriately in your view?

15   A.   Oh, yes.  Yes, he did.

16   Q.   All right.  Now, there was in addition to the usual

17   conditional releases, some releases -- I think two in number

18   -- that might be deemed emergency releases.  You're familiar

19   with that?

20   A.   Yes.  Yes, I am.

21   Q.   Well, on the first of those, could you describe your

22   father's condition at that point?

23   A.   That was about a week before my father passed away.  My

24   brother, Scott, and I flew in a couple of days before John was

25   allowed to come down.  When I got there, my father was in the

1    bed in the facility.  He was still in the assisted living

2    facility.  He was not responsive to me or to Scott or really

3    to my mother.  He could open his eyes, and we weren't sure if

4    he was seeing us or not.  He was not verbally responsive to

5    anything we did.

6         At that point, we knew that we were close to the end of

7    his life, so we did request that John be able to come and be

8    with us at that time.

9    Q.   Had the hospice been called in?

10   A.   At that point, we met with the hospice nurse and decided

11   to begin the hospice treatment or at least have hospice --

12   Q.   Hospice care?

13   A.   Absolutely, yes.

14   Q.   And were you and Scott there before John got there?

15   A.   Yes, we were.

16   Q.   And were you there when John arrived?

17   A.   Yes, we were.

18   Q.   And could you describe John's reaction to seeing his

19   father in that condition?

20   A.   Very much the same way that my reaction and I believe my

21   brother, Scott's, reaction was.  We had never seen my father

22   in the bed non-responsive; very -- very, very ill.  Another

23   thing that we did notice several days before, that my father

24   had fallen out of a wheelchair, face down, and had a very big

25   goose egg up on his forehead that was black and blue and that

1    was disturbing to see that, as well.

2              THE COURT: I think the question was about John's

3    reaction when he saw this --

4              THE WITNESS:  His reaction was the same as -- he

5    walked in and had never seen him in that situation where he

6    was lying in the bed not responsive, and it did -- I think I

7    noticed with John the same reaction that Scott and I had

8    previously, how we had reacted two or three days before when

9    we arrived.  We were very surprised to see the degree of --

10   how far he had --

11   BY MR. LEVINE:

12   Q.   Shocked at the gravity --

13   A.   Yes, we were.  The last time we had seen him, he was

14   sitting up and responsive, and that had been about a month

15   before, and now he was pale.  He -- we didn't know if he could

16   see us.  You know, it was a very, very big change.

17   Q.   Sorry.  During that first of these two emergency releases

18   that you've been describing, how did John spend his time?

19   A.   During the first release?

20   Q.   Yes.

21   A.   Well, he spent his time at the hospital, at the assisted

22   living facility, with my dad and the rest of my family.

23   Q.   Was he supportive to you and your mom?

24   A.   Yes.

25   Q.   Your brother?

1    A.   He was supportive to all of us.  We were all supporting

2    each other, and he was as much of a support to us as I believe

3    we were to him at that time.

4    Q.   Could you describe his mood, John's mood?

5    A.   He was somber.  He realized that this was the last few

6    days of my father's life.  He was very appropriate, I believe,

7    in his reactions in the sense of appropriate to the way that I

8    was feeling.  Same appropriate to the way my brother, Scott,

9    was feeling.  I feel like he was quite in line with the same

10   things that we were experiencing.

11   Q.   Well, Mr.  Hinckley arrived down there on Friday, January

12   25, and he was required --

13   A.   Yes.

14   Q.   -- to go back on Monday, right?

15   A.   That's correct.

16   Q.   Do you remember that?

17   A.   Yes.

18   Q.   What did you learn on that Monday from the hospital

19   regarding your father's condition?

20   A.   The hospice nurse had come in and was there actually late

21   --  very, very late the night before and said that she felt

22   that my father's death was pretty much eminent at that point.

23   She -- the terminology they were using at the time was hours

24   to days, as opposed to days to weeks; that type of thing.  So

25   we knew that it was coming.

1          She also pointed out that his breathing had become a lot

2     more labored.  He was on some oxygen, but even that wasn't

3     helping the breathing as much.  So it was obvious to us that

4     it was eminent.

5     Q.   Who brought John back to St.  Elizabeths Hospital?

6     A.   My brother, Scott.

7     Q.   Was that on that Monday?

8     A.   Yes, it was.

9     Q.   What was John's feelings about having to return to the

10    Hospital at that time?

11    A.   He was very unhappy that he had to return because I

12    believe he knew he would not see my father alive again.  He

13    was unhappy about it, but he did it.  He didn't say I'm not

14    going.  He didn't say, you know, just -- make me go.  He got

15    in the car.  He went there.  He did exactly what he was told

16    he had to do despite the fact that he knew he would never see

17    his father alive again.

18    Q.   He was stoic?

19    A.   Yes, he was.

20    Q.   And in your mind, were his feelings in that regard, his

21    unhappiness, his stoicism, was that all appropriate?

22    A.   Oh, absolutely.  I would have reacted the same way if

23    somebody had told me I had to leave at that moment.

24    Q.   Well, what were your feelings about John and Scott having

25    to return?

A.   It was something that I had difficulty with because it was very obvious my father did not have long to live, and it was a time that my family needed --

Q.   I'm sorry.

A.   That's okay.

Q.   I apologize.

A.   Thank you.  I'm okay.  It was a time that I felt like we needed to be together, and it was a time that two of us were not with the family.  John wasn't there, and, of course, Scott couldn't be there because he needed to drive John back to the Hospital.  So I was unhappy that at that particular time that we, as a family, could not be together.

Q.   When did your father pass away?

A.   On Tuesday, the very next morning, yes.

Q.   The next day?

A.   Yes.

Q.   Did there come a time when Mr. Hinckley, John, returned to attend the funeral, the second emergency conditional release?

A.   Yes.

Q.   That was few days later?

A.   That was a few days later, yes.

Q.   And was there a funeral service?

A.   Yes, there was.

Q.   And was that at the church?

1    A.    Yes.  Yes.

2    Q.    About how many people were there?

3    A.    I would say anywhere between 100 and 200 people.  I

4    didn't -- I'm not good at numbers, but that would be my best

5    guess.

6    Q.    That's good enough.  One hundred to 200.  Who spoke at

7    the funeral, if you recall?

8    A.    Scott; my brother, Scott, spoke, and my husband, Steve,

9    spoke, as well as two pastors from the church.

10   Q.    Could you tell us about or describe John's behavior

11   during the funeral?

12   A.    He walked in -- we walked in as a family, and he sat down

13   beside my mother.  The rest of us were in the room with him.

14   He was sad during the service.  He reacted to what was said by

15   my brother, Scott.  He had said some lovely things that were

16   very touching.  He reacted very appropriately to that, and

17   then afterwards there was a reception for the family in the

18   fellowship hall area of the church, and he stood in the

19   reception line and greeted and shook hands and said hello and

20   accepted everybody's condolences along with the rest of us.

21   Q.    Did he stand next to you and Scott?

22   A.    Yes, he did.

23   Q.    So you were in a position to observe his --

24   A.    Oh, yes.

25   Q.    -- reaction to those with whom he shared conversation?

1    A.   Yes.  Yes.  We could hear what he was saying and watch

2    what he was doing.

3    Q.   And could you describe his mood?

4    A.   John -- well, he was receptive to meeting the people.

5    John was quiet like the rest of us.  It was not a party

6    situation, it was a time to --

7    Q.   Somber.

8    A.   Yeah, it was a somber situation.

9    Q.   What did people say to him as they approached him?

10   A.   They would say, we're so sorry to hear that -- you know,

11   we're so sorry that you've lost your father.  And John would

12   say thank you very much.  I appreciate that.  He would

13   introduce himself, and people would introduce themselves to

14   him, and it was a very -- it was a very typical, appropriate

15   exchange between friends and people actually who had never met

16   either one of us.

17   Q.   Was the media there to your knowledge?

18   A.   The only -- the only reason why I know at least one

19   member of the media was there was that there was an article

20   the next morning in the newspaper that pretty much detailed

21   everything that happened during the funeral service.  So one

22   would have had to have been there in the service to have

23   gotten that information.

24   Q.   So he didn't seek the media out, and the media did not

25   seek him out?

1    A.   No.  Oh, no.  No.

2    Q.   Now. with respect to both of these emergency conditional

3    releases, how did his presence affect the surviving members of

4    the family?

5    A.   John's presence?

6    Q.   Yes.

7    A.   He -- I mean, we needed him there.  We absolutely needed

8    him there, and I think he needed us as well.  Is that what

9    you're asking?

10   Q.   Yes.

11   A.   Okay.  Yes.  He's a part of our family, and he was as

12   much a part of our family as any other member, and he was a

13   comfort to my mother.  He was a comfort to myself, and I

14   really think that it just -- it wouldn't have been the same if

15   he hadn't been allowed to be there.  There would have been a

16   great big hole in the family.

17   Q.   Now, there was a requirement during both of these

18   emergency conditional releases that Mr.  Hinckley comply with

19   a contact to the Hospital?

20   A.   Yes.

21   Q.   Do you remember that?

22   A.   Yes, I do.

23   Q.   Could you tell us about that, what he did?

24   A.   During that time, we were having relatives flying in, and

25   a lot of confusion and a lot going on.  John still had to

1   maintain contact with the Hospital.  He had to have

2   appointments with Dr. Lee.  He had to make phone calls at

3   specific times to some of the doctors at the Hospital, and

4   every bit of that, he took care of.  He made sure he was on

5   time with his phone calls, and he made sure that he had his

6   visit with Dr. Lee, and that was all fed into the day.

7        And despite all the other things that were going on,

8   emotional things that were going on, and making plans for the

9   funeral, he took care of all of that on his own without being

10  prompted.  He was very disciplined about that and did it all

11  on his own.

12  Q.   Now, what does this show you about Mr.  Hinckley, about

13  his initiatives, about his --

14  A.   Oh, he was taking charge.

15  Q.   -- about issues of danger?

16  A.   As far as issues of danger, there was nothing that showed

17  that he is dangerous at all.  It showed that he took the

18  initiative.  He was disciplined enough to make sure that he

19  was doing the things that he was supposed to do in order to be

20  there on that conditional release, and he took full

21  responsibility for all of those things.

22  Q.   Now, have you seen Mr.  Hinckley, John, since those

23  emergency conditional releases, since the funeral?

24  A.   Yes, I have.

25  Q.   Other conditional releases?

1    A.   Yes.

2    Q.   All right.  And how would you describe how he is coping

3    with the loss of his father?

4    A.   I think he is coping well.  There have been times, of

5    course, that he's been a little saddened still thinking about

6    it, as, obviously, I am.  The first visit that he was able to

7    come back home after the funeral, one of the first things he

8    wanted to do was to go see where my father's ashes had been

9    placed in the columbarium at my parents' church, and so we all

10   went over there.  It was very important to John to see that.

11   Q.   And that visit to the columbarium was on his initiative?

12   A.   Yes.

13   Q.   His request?

14   A.   Yes.  Scott and I had already been over there before.  We

15   had spent some time with my mother at home during February

16   when John was not able to be with us, and so we had already

17   been there ourselves, but John had not.  So it was very

18   important to him to go and see that.

19   Q.   Now, over the past few years of conditional releases, did

20   he encounter any problems with the people from the local

21   community, the subdivision if you will -- should I call it a

22   subdivision where your mother's house would be?

23   A.   That would be fine.

24   Q.   Did he encounter any problems with any of the people

25   there?

1     A.    No, none of them.

2     Q.    Could it be said that some of the people didn't even seem

3     to recognize him?

4     A.    That's very true.

5     Q.    Did he have any trouble in opening a bank account?

6     A.    No.

7     Q.    Did store clerks and neighbors treat him generally

8     politely?

9     A.    Yes.  Yes, very politely.

10    Q.    Now, over the past year, has he tried to find volunteer

11    positions?

12    A.    Yes, he has.

13    Q.    And in that regard, did he send resumes?

14    A.    Yes.

15    Q.    Did he inquire of opportunities such as at the Salvation

16    Army?

17    A.    Yes, he did.

18    Q.    And has he been successful?

19    A.    So far, we don't have anything completely lined up, but

20    there are some things in the works.

21    Q.    Of which you're aware?

22    A.    Yes.  Of which I'm aware, exactly.

23    Q.    Now, after the Hospital filed this letter to the Court

24    which has been referred to as this (e)motion or petition, the

25    government publicly filed a motion in which it selected facts

```
1     from the sealed (e)letter that later found itself in a news

2     article in the Gazette.

3     A.    That's correct.

4     Q.    Have you seen that?

5     A.    Yes, I have.

6              THE COURT: Which Gazette are we talking about?

7              THE WITNESS:  The Virginia --

8              MR. LEVINE:  We're talking about -- in the city.

9              THE COURT:  Where Mrs.  Hinckley lives?

10             THE WITNESS:  Well, it's the state.

11             THE COURT:  The state.

12             THE WITNESS:  The Virginia Gazette.

13    BY MR. LEVINE:

14    Q.    And did it also find its way into the Geraldo show?

15    A.    Well, he dealt with it.  It wasn't necessarily his show,

16    but it was also on --

17    Q.    And did it also -- did the O'Reilly Factor factor in

18    this?

19    A.    Yes.  Yes.

20    Q.    And do you think this kind of journalism, if I may call

21    it that, and the public filings of legal positions, if I may

22    call it that, affected his ability to secure a volunteer

23    position?

24    A.    Absolutely.

25    Q.    Why do you say that?
```

```
 1    A.    The article, for instance in the newspaper, was done in
 2    such a way, written in such a way that it would have struck
 3    fear into me if I did not know John with the idea that he
 4    might be in my community.  It was a sensational article.  I
 5    don't believe the article was based on any kind of factual
 6    information and so, of course, it's going to have an affect on
 7    anybody who reads that.  We, as John's family, are not allowed
 8    to contact any media, so, therefore, the people in my mother's
 9    hometown have no other side of what's going on.  All they know
10    is what they read about and what they read about is just not
11    factual information, and it's really sad, so, of course,
12    that's going to have an affect.
13    Q.    And it forms a community view?
14    A.    Absolutely.
15    Q.    Now, in the current release -- releases allowed by the
16    Court, Mr. Hinckley has some unaccompanied time in that
17    community, but does he have any unaccompanied time outside of
18    that local community?
19    A.    No, he does not.
20    Q.    So when he applies for a volunteer position outside of
21    that local community, that subdivision if you will, is he
22    required to have with him either you, or Scott, or his mom?
23    A.    Yes, he is.
24    Q.    Well, do you think that affects his ability to get a
25    volunteer position?
```

A.    I think it affects his, maybe, excitement about wanting

to do that if he's always dragging one of us along with him,

it kind of just is -- it's just not the best way to do it.  I

think he would do better one-on-one with talking with a

volunteer project manager than to have his mother or brother

or sister sitting there 10 feet away from him.

Q.    It's just not the way a grown man gets a job.

A.    Correct.

Q.    Now, how do you think this affects the perception of a

volunteer organization that a parent or sibling is with him in

the application process?

A.    I think they certainly could assume that the reason why

there was somebody sitting there with him was because maybe

he's not capable of doing this on his own, and it just seems

like we being there as a chaperone.  There's always going to

be assumptions as to why someone is sitting there with him,

like why he can't be on his own with this.

Q.    Do you think that if he were granted more unaccompanied

time, as this petition to the Court requests, that that would

have a positive or salutary effect on his initiatives?

A.    Oh, I do think so, yes.

Q.    Let's talk about one of these conditional releases in

which Mr. Hinckley attended a meeting of SALT; S-A-L-T.

A.    Uh-huh.

Q.    What is SALT?

```
 1    A.    SALT is -- do you want me to tell you what S-A-L-T stands

 2    for?

 3    Q.    Do you know?  All right.  Sure.

 4    A.    Yes, I do.  Singles Affirming Life Together.

 5    Q.    Now, where is it and what is it?

 6    A.    It is a group of single people that get together on

 7    Wednesday nights at 6:30 at -- I believe it's the First --

 8    Q.    At the church?

 9    A.    -- Presbyterian -- yes.  One of the churches there in my

10    mother's hometown.

11    Q.    Right.

12    A.    And that's -- they get together for -- just to be

13    together.

14    Q.    Just to meet and mingle.

15    A.    Uh-huh; social reasons, uh-huh.

16    Q.    And did John attend one of these SALT gatherings?

17    A.    Yes, he did.

18    Q.    And were you required to attend with him?

19    A.    Yes, I was.

20    Q.    And did you do that?

21    A.    Yes, I did.

22    Q.    What happened at the SALT meeting?

23    A.    Well, we were told about the meeting; when to show up;

24    that you bring a covered dish --

25    Q.    Something in the nature of a potluck-type thing?
```

A.   Yes, a potluck type thing.  Everybody would bring a covered dish, and then everybody will share them when they get there.  And so since there were two of us going, we decided we would take two covered dishes and so we did.  And we walked in --

THE COURT:  Just one second, Ms. Sims.

THE WITNESS:  Oh, okay.  We walked in at about 6:30, maybe a few minutes afterwards, and put our dishes down on the table and went over and signed in, signed name tags and -- do you want me to go into the --

BY MR. LEVINE:

Q.   Did you put your first name, your last name?

A.   You put your first name on name tags.  I wrote "Diane", John wrote "John"

Q.   And what happened?

A.   We were -- a woman came over to us who had been sitting at the registration table, and she walked over to John and I had sat down at a table, and she walked over and she said, Now, just who are you?  And I explained who I was, and I said I was in town visiting my mother, and I was just getting ready to talk about John being there, and she turns to him and says, well, just who are you?  And he gives his name, and then she let us know she didn't know if she was comfortable with him being there.  And so I said, we'll do whatever makes you comfortable.  And she didn't say anything else, she turned

1    away from us.

2    Q.    And then you left?

3    A.    Well, we stayed for awhile.  We stayed for the meeting,

4    but it was pretty obvious that the choice of the group that

5    night was to ignore us which -- that was fine, but the main

6    reason why we left had nothing to do with that.  The reason we

7    left was because when we had a chance to really fully look at

8    everybody in the room as we were having the meeting and we

9    were standing in a circle and you could observe everybody, we

10   were by far the youngest people in that entire -- in the

11   entire room.  We were in the wrong group of people is where we

12   were.  We were --

13   Q.    They were around 70?

14   A.    They were -- probably the youngest was 65.  More of them

15   would be  --

16   Q.    Now, that's not so old.

17   A.    No, no.

18              THE COURT: No.

19              THE WITNESS:  I agree with you.

20              THE COURT: I agree with Mr.  Levine.

21              MR. LEVINE:  I know you do.

22              THE WITNESS:  Well, the point being, John was -- we

23   were told this was going to be a peer group for John, and it

24   was not.  It was not a peer group for John.  So -- and we

25   could tell, too, they were quite a cohesive group, that they

would meet -- had met quite a number of times together, and they enjoyed themselves.  So it was just not the appropriate group for John.

THE COURT: Was it clear to you that the woman came over knew who John was, is that --

THE WITNESS:  Yes.  Yes.  I think she was verifying that he was who she thought he was, and then when he answered her and said, I'm John Hinckley, then that's when she stood up and said, I'm not sure if I'm comfortable with this, and then proceeded to not do anything more -- have anything more to do with us.

BY MR. LEVINE:

Q.    Fairly clear that he was being rebuffed in this regard?

A.    Ignored, yes; if that's the synonym for rebuffed, yes.

Q.    And how did he react to that?

A.    You know, I was real proud of him, actually.  He was willing to stay and do the whole meeting if that's what he was supposed to do or needed to do, and, actually, after the meeting part was over and everybody got ready to go through the food line -- in the meantime, there were a couple of other things that were a little bit off.

We had been told to bring casseroles -- or covered dishes, excuse me, and we didn't know that that night was different, it was going to be pizza night.  So pizzas were the fare of the day, and here we bring our fried chicken.  That

1    was a little off.

2         And there was also going to be a game that was played

3    with gifts, wrapped gifts, that everybody had brought.  We

4    didn't know to bring wrapped gifts.  So we were going to be

5    just a little bit not in the loop from that standpoint as

6    well.  So we stayed for the meeting, and I said, John, I think

7    it's time for us to go.  I said, there's nobody, anybody here

8    that's a peer of yours or mine, and I just think we've come

9    and seen what we need to see, and it's time for us to leave.

10   And he was fine.  He would have stayed if I had said we were

11   going to stay.

12   Q.   Show any signs of decompensation?

13   A.   No.

14   Q.   Show any signs of danger?

15   A.   No, not at all.  None in the least.

16   Q.   Let's move on.  Let's talk about a conditional release

17   that involved a neighborhood block party.  Are you familiar

18   with that one?

19   A.   I was not present during that visit.  I just have my

20   understanding of what happened.  I was not there for it.

21             THE COURT: Do you know whether your brother, Scott,

22   was present?

23             THE WITNESS:  Yes, Scott was present.

24   BY MR. LEVINE:

25   Q.   Do you know of a Ms. G?

1    A.   I do.

2    Q.   All right.  Does Your Honor know who Ms. G is?

3         THE COURT: If I look at my list here, I do, yes.

4    BY MR. LEVINE:

5    Q.   Okay.  Were you involved in any of the discussions before

6    that block party as to whether it would be -- whether Ms.  G

7    should attend?

8    A.   A couple of conversations maybe with my mother over the

9    phone or by e-mail, that type of thing.

10   Q.   What was discussed?

11   A.   My mother had let me know that John had asked if he could

12   bring Ms. G -- or not bring her, but have her come down for

13   the day, and that just happened to be the same day that the

14   picnic was going to take place later on in the afternoon.  It

15   was on a Saturday.  It was the only day that she could come.

16   She works during the week, therefore, she would have to come

17   on a Saturday for a visit.

18   Q.   And did your mother -- did you and your mom discuss

19   whether that was a good idea or a bad idea or whether Ms.  G

20   would or would not be welcomed on that occasion or some other

21   occasion?

22   A.   We did.

23   Q.   Tell us about that.

24   A.   My mother -- John had never asked to have anybody come

25   visit before, so it was a little out of the blue that the

1    question was even there to begin with.  And then, also,

2    knowing the fact that there would be that picnic later on

3    during the day that my mother had hoped to go to with my two

4    brothers and so she could introduce them to her friends.  She

5    was just kind of gathering her thoughts in her mind; is this a

6    good idea at this time, you know, whatever.

7         So I don't think there was an immediate answer one way or

8    the other, but what it all boils down to is she knew John

9    wanted her to meet Ms. G, and there had been a previous

10   occasion at St.  Elizabeths Hospital where my mother was

11   supposed to have met her, but then the treatment team was

12   ready for my mother a little bit earlier for their meeting.

13   So the two just didn't get to meet that day.

14        So she -- my mother would not have objected, I think, to

15   John having her come there for the day or for the afternoon

16   because she did want to meet her, as well. So there would not

17   have been an objection from my mother for that visit.

18   Q.   All right.  Now, is it your impression --

19             THE COURT: Well, what happened?   Was there a

20   decision made by you and your mother?

21             THE WITNESS:  There was no decision made.  The

22   decision was that my mother said that she felt like she would

23   be able to make that work and have Ms.  G come visit her

24   earlier in the afternoon in the home.  But what happened was

25   before anything could really go to any great degree, the

1    doctors at the Hospital said no, we're not going to allow

2    this.  So at that point, all the conversations stopped.

3    BY MR. LEVINE:

4    Q.   All right.  Now, is it your impression that Mr.  Hinckley

5    at all was in any way dishonest about any of this?

6    A.   No, I don't believe he was.  I think -- I think he has

7    had every reason to believe that my mother was approving of

8    the visit, and I have spoken with my mother about it since

9    then, and she said that that's exactly right.  She would have

10   approved the visit if it had gotten to that point.  It's just

11   that it never got that far because the Hospital put a stop to

12   it before that decision was made by her.

13   Q.   Now, the fact that John's desire to have Ms. G visit

14   during that particular conditional release was rejected, did

15   he decompensate?

16   A.   No, he did not.

17   Q.   Did he do anything dangerous?

18   A.   No, he did not.

19   Q.   Did he ever, in all the conditional releases of which you

20   are aware and you participated, ever do anything to suggest

21   that he might be dangerous?

22   A.   No.

23   Q.   That he might escape or elope?

24   A.   No.

25   Q.   That he might seek out contact with the media?

```
1    A.    No.

2    Q.    With respect to your mom as a supervisory person or a

3    responsible person during these conditional releases, was she

4    diligent as a supervisory person?

5    A.    Absolutely.  Yes, she was.

6    Q.    Was she vigilant?

7    A.    Yes.

8    Q.    Was she present?

9    A.    Yes.

10   Q.    Now, if her abilities to participate in this regard were

11   to change as she gets older --

12   A.    Uh-huh.

13   Q.    -- will you and your brother assist your mom in those

14   supervisory responsibilities?

15   A.    Yes, we will.

16   Q.    Let's talk about relationships with women.

17            THE COURT: How much longer are you going to be; you

18   think awhile?

19            MR. LEVINE:  Yes.

20            THE COURT:  Okay.  Why don't we take about 10

21   minutes.  Take about a 10-minute break.

22            (Whereupon, there was a brief recess at this time;

23   thereafter, court resumed.)

24            THE COURT: Okay.  Everybody's here.  Mr.  Levine.

25            MR. LEVINE:  If it please the Court.
```

1    BY MR. LEVINE:

2    Q.   Ms.  Sims, now --

3    A.   Yes.

4    Q.   -- in 2007, Mr.  Hinckley had a relationship with Ms. M;

5    are you aware of that?

6    A.   Yes.

7    Q.   And that relationship ended some time at the end of 2007;

8    you're aware of that?

9    A.   Yes, I am.

10   Q.   Now, had you met Ms.  M?

11   A.   I had met her one time.

12   Q.   And would it be fair to describe her behavior as

13   unpredictable?

14   A.   That would be fair.

15   Q.   Is there something else about -- could you describe her

16   behavior with other words if you choose to describe her with

17   other words?

18   A.   Sporadic, maybe; op one day, down the next.  Kind of a --

19   you just kind of never knew what to expect.  She could get

20   very upset very quickly.

21   Q.   Now, did she say things that were hurtful or maybe even

22   vile?

23              THE COURT: Even what?

24              MR. LEVINE:  Vile.  Maybe --

25              THE COURT: Let me ask -- are you basing what you're

1    testifying to in your last answer on this one time you met her

2    or on other pieces of information, as well?

3              THE WITNESS:  Other pieces, as well.

4              THE COURT: Okay.

5              MR. LEVINE:  There's a lot of information here, Your

6    Honor.

7              THE COURT: Okay.  Maybe you could tell us what

8    you're basing your opinions on.

9    BY MR. LEVINE:

10   Q.   Okay.  To answer the Court's question:  On what are you

11   basing your statement that she was unpredictable or sporadic

12   or up and down or whatever words you were using to describe

13   her behavior?

14   A.   Just that I had -- I was under the understanding that

15   there'd be times that if things didn't go her way, she would

16   call the doctors at St.  Elizabeths and complain about

17   something that John was doing or things like that; that it was

18   just -- didn't seem to have a lot of basis for the phone

19   calls.

20   Q.   To your knowledge, to your knowledge, did she say things

21   that were hurtful with respect to the Hinckley family?

22   A.   Yes, she did.

23   Q.   Tell us about that.

24   A.   She, for whatever reason, decided that we were

25   anti-Semitic.  I don't have a clue as to where she got that.

1    I think she felt like we just were kind of selfish people.

2    And I don't know specifically other than that, but she was

3    just not very complimentary about us.  That's okay.  She

4    didn't have to compliment the family, but she did say things

5    that were not true about us.

6    Q.   Did she likewise say things, to your knowledge, that were

7    hurtful about John?

8    A.   Oh, yes.

9    Q.   Tell us about that.

10   A.   Well, she would say that he was -- he would be mean to

11   her or whatever.  I don't know.  He wouldn't say to her what

12   she wanted him to say to her and wouldn't do -- always do

13   everything the way she wanted him to do it.  She was being

14   erratic, I think, at that point.

15   Q.   Well, how did John cope with this mercurial personality?

16   A.   I think John really wanted to help her.  He knew she had

17   some problems and knew she had some instability, and he wanted

18   to help her.  He has been around that in his life, and he

19   wanted to help her.

20   Q.   Did John ever exhibit any signs that he would

21   decompensate as a result of her behavior?

22   A.   No.  No.

23   Q.   Did he ever exhibit any signs that he would be dangerous

24   as a result of his -- her behavior?

25   A.   No.

1    Q.   Did he ever indicate in any way that he would impress her

2    by doing something violent?

3    A.   No.

4    Q.   Once the relationship ended, did he exhibit any signs

5    that he would pose a danger to himself or others?

6    A.   No.

7    Q.   Now, did there come a time when he formed a relationship

8    with someone who has been denominated as Ms. G?

9    A.   Yes.

10   Q.   And did you meet Ms. G?

11   A.   Yes, I did; one time.

12   Q.   All right.  And has Mr. Hinckley's mental state

13   deteriorated in any way since he became involved with Ms. G?

14   A.   No, it has not.

15   Q.   Are you aware of other friendships he may have formed or

16   developed?

17   A.   Yes.  Not firsthand, but I'm aware.

18   Q.   And were these people, to your knowledge, that were

19   introduced to him by Ms. G?

20   A.   Yes, that's correct.

21   Q.   All right.  And how do you know that?

22   A.   He told me that.

23   Q.   Now, as a result of these various relationships, the one

24   with the mercurial Ms. M, the one with Ms. G, the ones with

25   people who Ms. G has brought to visit him; did he learn from

1      these relationships?

2      A.    Oh, I believe he did.

3      Q.    And is the word "relationship" to describe these things,

4      perhaps, over-dignifying the relation between him and some of

5      them because they're modest acquaintances?

6      A.    I agree.  Yes, definitely so.

7      Q.    And that would be, for example, a Ms.  B; do you know who

8      Ms.  B is?

9      A.    I do.

10     Q.    All right.  And do you agree that the Hospital has

11     allowed these relationships to develop?

12     A.    Oh, yes, they have.

13     Q.    And is it a good way for John to learn?

14     A.    It is.

15     Q.    And is it a good way for the Hospital to observe the

16     behaviors and to evaluate his condition?

17     A.    It is.

18     Q.    And in the face of the ending of the relationship with

19     Ms.  DeVeau who you've known, of course, for years, right?

20     A.    Yes, that's correct.

21     Q.    And the ending of the relationship with Ms.  M and the

22     face of the change of the intimacies that existed with respect

23     to Ms.  G, would you say that Mr.  Hinckley has exhibited

24     stability?

25     A.    I do.

```
1    Q.   And strength?

2    A.   Yes.

3    Q.   And resilience?

4    A.   Yes.

5    Q.   And did he deteriorate or exhibit any signs of danger or

6    violence as a result of these relationships?

7    A.   No.

8    Q.   And does Mr.  Hinckley readily talk about these

9    friendships and relationships?

10   A.   Yes.

11   Q.   Is he open with you about them?

12   A.   Yes.

13   Q.   He shares it with you?

14   A.   Yes.

15   Q.   Are you generally aware of the provisions of the

16   Hospital's (e)petition to the Court?

17   A.   Yes.

18   Q.   And is there anything about these relationships or

19   friendships with these women that makes you believe that the

20   proposal is in any respect ill advised?

21   A.   No.

22   Q.   Now, you indicated that you had a general awareness of

23   what is included in the Hospital's (e)letter.

24   A.   Correct.

25   Q.   You know, for example, that it seeks 12 conditional
```

1    releases, each one of which is nine nights.  You know --

2    A.    Uh-huh.

3    Q.    -- that it seeks more unaccompanied time, both in and out

4    of that subdivision.

5    A.    Correct.

6    Q.    You know that it would allow for him to obtain a driver's

7    license.

8    A.    Yes.

9    Q.    Do you support those Hospital recommendations?

10   A.    Yes, I do.

11   Q.    Based on all of the conditional releases in which you've

12   been involved and all the information that you have, do you

13   have any concerns about Mr.  Hinckley having an increase in

14   unaccompanied privileges?

15   A.    No, I do not.

16   Q.    Do you have any concerns about the extended periods of

17   time?

18   A.    No.

19   Q.    Do you have any concerns about him having a driver's

20   license?

21   A.    No.

22   Q.    Are you willing to participate yourself in the

23   conditional releases that the Court may permit as you have in

24   the past?

25   A.    Yes.

1    Q.   And with respect to coming from where you live to the

2    area where those releases are contemplated, will you and your

3    brother be able to work out which of the two of you would

4    attend?

5    A.   Oh, yes.

6    Q.   And there would be times when both of you would attend?

7    A.   There would, possibly.

8    Q.   And there might be times when only one of you might

9    attend?

10   A.   Possibly.

11   Q.   And there may be times or periods of time when John would

12   be with your mom?

13   A.   That's correct, too.

14   Q.   And is your participation in these past and in these

15   proposed conditional releases supported by your immediate

16   family, your husband, your family?

17   A.   Yes.

18   Q.   And as in the past, are you willing to fully comply with

19   the conditions set by the Court and the Hospital?

20   A.   Yes.

21   Q.   Just as in the past?

22   A.   Oh, absolutely.

23   Q.   All right.  Now, Ms.  Sims, there was -- may I have this

24   marked, Your Honor -- a document you have seen before.  Pass

25   one to the government, Your Honor, and one for the Court, as

```
 1    well.  May we have Patient's Exhibit 1 for this hearing --
 2    does that work?
 3              THE COURT: Yes, absolutely.
 4              MR. LEVINE:  Your Honor, are we going to use the one
 5    that was marked that I passed to the witness?  Is that the
 6    one?
 7              THE COURT:  Oh.
 8              MR. LEVINE:  It's -- the tag here is Defendant's
 9    Exhibit 1; we're going to call this Patient's Exhibit 1.
10              THE COURT: Right.
11              MR. LEVINE:  Approach the witness, Your Honor?
12              THE COURT: Yes.
13    BY MR. LEVINE:
14    Q.   I show you what has been marked as Patient's Exhibit No.
15    1 for identification; do you recognize this form?
16    A.   Yes, I do.
17    Q.   What is it?
18    A.   It is the Individualized Relapse Prevention Plan Feedback
19    form.  It's the form I fill out every time I visit with my
20    brother on one of his releases.
21    Q.   And what does this form identify for you in terms of your
22    reporting of symptoms, observed or unobserved, to the
23    Hospital?
24    A.   I am required to check several different boxes.  Do you
25    want me to go over the -- what they are?
```

Q.   Sure, why don't you do that.  Sure.

A.   These are certain -- this is a behavior and then a symptom.  I should -- and when I check the box, it's either not observed, a little present, or very present; but each of these behaviors and symptoms are: Homicidal thoughts and actions; suicidal thoughts and actions; escape planning thoughts; interest in weapons; delusions; strange beliefs; depressed mood; too sad; isolation; withdrawal; grandiosity; attention seeking -- in other words, the media; anger; unusual or intense interest in female; poor stress tolerance; poor judgment or decision making; guardedness or secretiveness; impulsivity; agitation; elevated mood or too happy; anxiety or nervousness; suspiciousness or paranoia; resistance to taking medication; non-compliance with directions; and restlessness or sleep disturbance.

Q.   All right.  And do you fill this form out on each time you're present during a conditional release?

A.   Yes, I do.

Q.   And then do you subsequently give an interview to the Hospital treatment team about your observations during the conditional release?

A.   Yes, I do.

Q.   And are you willing to continue to fill out this form were the Court to allow these releases to continue or to be expanded?

```
 1      A.   Yes, I will.

 2      Q.   And during the course of the conditional release, do you

 3      have this form with you so you can consult it during the days

 4      and evenings of the time you're present?

 5      A.   It is there at all times during the releases.

 6      Q.   And so you're able to consult it on a daily basis --

 7      A.   Yes.

 8      Q.   -- and review the things for which you're looking and

 9      make a determination as to whether you see them?

10      A.   That's correct.

11      Q.   During the conditional releases, did Mr.  Hinckley ever

12      demonstrate the symptoms of psychosis?

13      A.   No.

14      Q.   Symptoms of clinical depression?

15      A.   No.

16      Q.   Demonstrate symptoms of a narcissistic personality

17      disorder?

18      A.   No.

19      Q.   Did he ever have a sad mood that was inappropriate?

20      A.   No.

21      Q.   Did he exhibit some sadness?

22      A.   Sure, yes.

23      Q.   There were some events about which you've testified that

24      would give rise to sadness.

25      A.   Absolutely, yes.
```

1   Q.    So it would be an expected sadness?

2   A.    Yes.

3   Q.    Are you willing to continue to meet with the treatment

4   team after conditional releases to discuss with them in detail

5   that which you observed during the conditional releases?

6   A.    Yes.

7   Q.    And are you willing to continue to look for signs of

8   decompensation or danger?

9   A.    Oh, yes.

10  Q.    And if you were to observe any of these signs, would you

11  promptly share them with the appropriate authorities, such as

12  either staff in that community or the Hospital?

13  A.    Oh, absolutely.  I carry all the phone numbers with me at

14  all times.

15  Q.    And were you to be -- were a determination to be made

16  that Mr. Hinckley should return to the Hospital, would you be

17  willing to assure that that happened?

18  A.    Absolutely.

19  Q.    Would you be willing to make sure that he attends the

20  appointments with mental health professionals?

21  A.    Yes.

22  Q.    Final question, Ms. Sims.

23  A.    Okay.

24  Q.    Final question:  Do you have any reservation whatsoever

25  about Mr. Hinckley being granted increased privileges under

1          the Hospital's plan?

2     A.    No.

3               MR. LEVINE:  Nothing further, Your Honor.  May I

4     move this into evidence, Patient's Exhibit 1?

5               THE COURT: Any objection to Exhibit 1?

6               MS. CHASSON:  No.

7               THE COURT:  It will be admitted.  Ms.  Sims, I have

8     a couple of questions for you.

9               THE WITNESS:  All right.

10              THE COURT:  You can sit down, Mr.  Levine.

11              MR. LEVINE:  Thank you, Your Honor.

12              THE COURT:  Are you aware of renewed contact between

13    your brother and Ms.  DeVeau in the last year?  We were last

14    in court, I think, in May of 2007 -- in the last 14 months or

15    so.

16              THE WITNESS:  Yes.

17              THE COURT: And what -- how are you aware of it?

18              THE WITNESS:  He's spoken to me about it.

19              THE COURT: You haven't seen her in the last year?

20              THE WITNESS:  No.  No, I have not.

21              THE COURT: But he has?

22              THE WITNESS:  I think sporadically, very

23    sporadically; in the fall, possibly once to --

24              THE COURT: And what do you think or what do you know

25    is the nature of that relationship at this point?

```
 1            THE WITNESS:  I think it is a friendship, but I
 2    don't think it is a friendship that is maintained on any
 3    regular basis.  She was a big part of his life for quite a
 4    number of years, and I think -- especially when my father
 5    passed away, it was very -- it was very appropriate for him to
 6    call her because she had known my father.  It was an
 7    appropriate phone call, I think.
 8            THE COURT: Okay.  Do you think he misses that
 9    relationship, your brother?
10            THE WITNESS:  I think he does.  I could see why he
11    would.
12            THE COURT: Let's talk about the funeral a little
13    bit.  When -- did you all have any -- I know originally you
14    all grew up, as I recall, in Colorado.
15            THE WITNESS:  No.  Actually, we grew up in Dallas.
16    My parents moved to Colorado after I was up and out of the
17    house.
18            THE COURT: Well, were there any relatives who came
19    from anywhere to the funeral?
20            THE WITNESS:  Yes.  My children came.  My son and
21    daughter-in-law came from Dallas.  My daughter came from Los
22    Angeles.  My father's niece came from San Francisco.  We had
23    several people that came from different areas that were
24    friends of my father's.
25            THE COURT: Were any of these people people that John
```

1    had known 25-plus years ago and hadn't seen since then?

2          THE WITNESS:  The cousin, certainly the cousin, and

3    he had seen my children more recently than that, obviously,

4    but --

5          THE COURT: How did he react and how did they react?

6    Not your children because I know over the years they have seen

7    him, but these other relatives that maybe hadn't seen him

8    since 1980 or so.

9          THE WITNESS:  You know, it was nice after the

10    funeral was over, several of the relatives came and a few

11    close friends came back to the house, and it was a nice

12    evening in that it did give John time to see the cousin from

13    San Francisco, for instance, and they had a great conversation

14    between the two of them.  It was just a good reconnection

15    after all those years.

16          THE COURT: And the other people that came, I take

17    it, were friends of your parents from the community in which

18    they -- in which your mother and father --

19          THE WITNESS:  Yes.  Yes.

20          THE COURT: So I assume a lot of these people were

21    people that John had never met before?

22          THE WITNESS:  Yes, that's correct.

23          THE COURT:  And how did that go, were there any

24    difficult moments, any --

25          THE WITNESS:  There were no difficult moments that I

1   observed, and I was there, you know, right there in the same

2   room.  Everybody seemed to be very comfortable with each

3   other.  There wasn't that big pause of silence.  It was a very

4   comfortable situation, and people were very willing to speak

5   to him, and he was very willing to speak to them.

6           THE COURT: The other thing that I thought about --

7   and neither you nor I or a psychiatrist or a psychologist, but

8   this was probably the first time in decades that he has been

9   in a room with that many people.

10          THE WITNESS:  That's possible.  That's possible.

11          THE COURT: How did he do in this kind of setting?

12          THE WITNESS:  Well, at the fellowship hall

13  immediately after the funeral, he did very well.  He stood

14  there with the rest of us.  He stuck out his hand to shake

15  hands and say hello.  He received their condolences.  He was

16  helping to introduce my children who were kind of in there as

17  well.  You know, somebody said, well, who is this, and he

18  would say this is my niece, Stephanie, or this is my nephew,

19  Chris.  So he was just he was doing the very same things and

20  saying the very same things in essence that we were all

21  saying.

22          THE COURT: And in terms of his emotional reaction, I

23  think Mr.  Levine already explored this with you little bit,

24  but in terms of his emotional reaction to the death of a

25  parent, was that, in your view -- obviously, this is the first

1    time that you experienced that, as well.

2                    THE WITNESS:  Right.  Right.

3                    THE COURT: But in your view from having gone through

4    this presumably with friends or relatives, was his reaction,

5    his conduct, any different from what you would have expected?

6                    THE WITNESS:  Not from what I would have expected.

7    I really felt like he reacted in the same manner that I was

8    reacting, and the fact that we're just a couple years

9    different in age and the fact that it was our father, he was

10   appropriately saddened.  He was not overly to the point that

11   we had to worry about him.  He was very much in control of

12   himself, and we were all -- I think Scott and John and myself

13   were very much the same.  We reacted in very much the same

14   way.  It was sad.  It was emotional to a degree.  It was --

15   but we all -- there was nothing that I felt like he did that

16   was out of the ordinary at all during any of that time.

17                   THE COURT: Again, Mr.  Levine got into this a little

18   bit, but how do you see -- I think I asked you this before --

19   how do you see things evolving over the coming years?  As much

20   as we all hope so, your mother probably won't live forever,

21   and you and your brother live in Dallas.  How do you see

22   things evolving if John is given more and more privileges,

23   more and more time in that community, and if, ultimately, he

24   were released from the hospital?  He's going to be a single

25   man living in a community in which he never grew up at some

1    point by himself, and you're going to be in Dallas.

2              THE WITNESS:  I would be in the hometown, in my

3    mother's hometown.  I would spend a lot of time up there, and

4    I would definitely be involved in that.  The house there would

5    be available to Scott and to me to, in essence, take over the

6    situation.  John has expressed a desire to be in that

7    community at some point down the line, and I think that's

8    important that he be where he feels that he would like to be.

9              And so we would pretty much, Scott and I, would take

10   over the whole situation, and there would be a place for him

11   to come to.  So we would certainly do our part to make sure

12   this is continued in a proper manner.

13             THE COURT:  One -- this is kind of a broad question,

14   but what do you talk about?

15             THE WITNESS:  With John?

16             THE COURT: Not during the time of your father's

17   funeral or anything, but, generally, on these visits when you

18   spend time together.

19             THE WITNESS:  We talk about a lot of things.  He's

20   always very interested in what I am doing in my life at home

21   and my children.  He's very interested in knowing about my

22   children and how they're getting along, and he was thrilled to

23   find out that my son and his wife were expecting a child.

24             And one thing that I just really appreciate in John

25   is my daughter lives -- excuse me-- in Los Angeles, and he

1    briefly -- well, I shouldn't say briefly -- he spent time in

2    Los Angeles many, many, many years ago himself, and it's a

3    busy city, a dangerous city in some respects, and he's always

4    very concerned about her and is she being careful and does she

5    live in the right neighborhood, and he's very, very concerned

6    about her safety and welfare.  And I assure him that we're

7    doing the best we can as far as keeping her in a safe spot out

8    there.

9            And so, but we talk about my children. We talk about

10   his music and his painting, and things that interest him, and

11   we talk about my husband and things that my husband does.  So

12   it's a family kind of catching up type of thing. So we -- I

13   think we always have a lot to talk about, a lot of different

14   topics.

15           THE COURT: Thank you.  Mr.  Zeno?  Ms.  Chasson?

16           MR. LEVINE:  Your Honor, may I ask just one question

17   that follows up on a question that Your Honor asked?

18           THE COURT:  Sure.  Yes, sir.

19           MR. LEVINE:  And it's just one.  I thank you.

20           THE COURT:  Sure.  That' fine.

21           MR. LEVINE:  You mentioned that Mr.  Hinckley, John,

22   had telephone contact with Ms.  DeVeau after your father

23   passed away.  Was that telephone contact from the Hospital to

24   Ms.  DeVeau and not while he was on conditional release?

25           THE WITNESS:  I'm not sure if I know the answer to

1      that.  I don't know where he was when --

2                MR. LEVINE:  I can proffer to Your Honor that it was

3      from the Hospital.

4                THE WITNESS:  Okay.  I just don't know the answer.

5                THE COURT: I understand why you're doing that.  I

6      mean the thrust of my question was not to find out whether he

7      was violating -- the thrust of my question was to put that in

8      context.

9                MR. LEVINE:  Sure.  Thank you.

10               THE COURT: Ms.  Chasson.  Did you turn your cell

11     phone off?

12               MS. CHASSON:  I did.

13               THE COURT:  All right, Ms. Chasson, you may proceed.

14     **CROSS-EXAMINATION BY MS. CHASSON:**

15     Q.   Good morning, ma'am

16     A.   Good morning.

17     Q.   Now, you were -- you told Mr.  Levine that you were

18     generally familiar with the Hospital's (e)petition.  Have you

19     actually read the (e)petition?

20     A.   I have read it.

21     Q.   You have?

22     A.   Uh-huh.

23     Q.   And have you read Dr. Montalbano's Risk Assessment?

24     A.   Yes, I have, I guess.  I mean, if it was in there, I read

25     it, yes.

1              THE COURT:  The risk assessment is a separate

2     document.

3              THE WITNESS:  Oh, no.  Then I have not.

4     BY MS. CHASSON:

5     Q.   Okay.  And have you read the report that was prepared and

6     submitted by Dr. Phillips?

7     A.   Yes.

8     Q.   And have you read and received a copy of the report that

9     was prepared by Dr. Patterson?

10    A.   Yes.

11    Q.   Now, the Hospital in its (e)petition says that your

12    brother has displayed a lack of initiative with respect to

13    identifying volunteer positions; do you agree with that?

14    A.   Sometimes, yes, and sometimes, no.  I think there have

15    been times he did display initiative, but maybe not in every

16    instance.

17    Q.   Well, with respect to identifying volunteer positions,

18    what has your brother done that you think shows his

19    initiative?

20    A.   He has gone to the Salvation Army.  He has gone to turn

21    in resumes at libraries and at humane societies and things

22    like that, so he has done some things on his own.

23    Q.   Well, he's gone -- he's made one trip to the Salvation

24    Army?

25    A.   Yes.  At this point, one trip.

1    Q.   And it is actually just one humane society, isn't it, the

2    Heritage Humane Society?

3    A.   That's possible.

4    Q.   That he turned in one application at.

5    A.   Yes, I believe so.

6    Q.   Okay.  And he has turned in an application to what

7    library?

8    A.   It was the -- I believe it was the William and Mary

9    Library in [the city] or it was on the William and Mary

10   campus.  I don't know if that's the name of it.

11   Q.   So he has dropped off three applications to three

12   different places?

13   A.   As far as I know.  There may be more.  I'm not with him

14   every time he does it.

15   Q.   But in any event, those three that you're aware of you

16   think shows his initiative with obtaining a volunteer

17   position?

18   A.   Well, it is a show of initiative.

19   Q.   Okay.  Do you know what steps, if any, he's taken beyond

20   dropping off the applications to actually follow-up on those

21   applications?

22   A.   I believe he made some phone calls, follow-up phone calls

23   from time to time.

24   Q.   To where?

25   A.   To places that he has contacted.

1    Q.   To each -- so you think he followed-up with all three of
2    those places?
3    A.   I don't know that for sure.
4    Q.   Okay.  Did you ever ask him?
5    A.   I think I more just heard about it rather than asked him.
6    Q.   And who did you hear about it from?
7    A.   In either treatment team meetings or discussions like
8    that, just -- maybe even in the reports.  I don't know,
9    specifically.
10   Q.   Do you ever discuss with your brother how important it is
11   to obtain a volunteer position in your mother's hometown?
12   A.   Yes, I have discussed that with him.
13   Q.   And what was his response?
14   A.   His response was he understood that.  He understood that
15   it was important for him to do some volunteer work.
16   Q.   Okay.  Were you aware of whether -- did you know that Mr.
17   Beffa actually obtained an application for your brother to
18   volunteer at a local heritage foundation?
19   A.   I don't have knowledge of that.
20   Q.   Okay.  Were you aware that Mr. Beffa actually obtained
21   an application for your brother to obtain a volunteer position
22   at a local medical center?  And I'm, just for the record, not
23   reciting the entire name because it would indicate a hometown.
24   A.   What I am aware of is that he has gotten some interview
25   material and whatever for various ones.  I can't say that I

know every single one and which ones he followed-up on and
which ones that he didn't.

Q.   So you've really made no specific effort to follow-up
with him about his initiative with obtaining a volunteer
position?

A.   Well, we had discussed it, but as far as following up and
being very specific, I guess I didn't do a very good job of
that.

Q.   Now, you told us under questioning that -- from Mr.
Levine -- that you blame an article that appeared recently in
your local paper for your brother's inability to obtain a
volunteer position.

A.   I said that was part of the problem.  It definitely
played a part in that problem.

Q.   Well, in fact, from what you've just told us, from the
year previous to that, your brother has, to your knowledge,
only submitted three applications for a volunteer job?

A.   There may have been more.  I don't know about it, so I'm
not going to say whether he did or he didn't for sure because
I'm not the one who has all that information.

Q.   Okay.  Well, were you aware that he actually skipped a
meeting at the Salvation Army to discuss volunteering there?

A.   Actually, the knowledge I have about the Salvation Army,
he did not skip a scheduled meeting.

Q.   So is it your view that he didn't really have an

1    appointment there?

2    A.   He did not have in my -- from what I understand did not

3    have a two o'clock or a three o'clock appointment set where he

4    was expected to walk through the door at a particular time and

5    meet with a particular individual.  It was a day of the week

6    that he had intended to go by there.

7    Q.   Were you aware that Dr. Rafanello has said that the

8    excuse that he didn't really have an appointment is an example

9    of his immaturity and actually nothing more than an immature

10   excuse for not going?

11   A.   That certainly is an opinion she has right to have.

12   Q.   Well, do you agree with that assessment?

13   A.   I think there was more to it at the time it was taking

14   place.

15   Q.   Well, the more to it, isn't it that the weekend that he

16   was supposed to follow-up with the Salvation Army, that was

17   also the weekend where he wanted to bring Ms. G as his date to

18   the block party at your mother's community, right?

19   A.   That's correct.

20   Q.   And you're aware that Dr. Green's view of what actually

21   happened is that your brother's failure to attend the

22   Salvation Army interview was really like a tantrum and his

23   acting out about not being permitted to bring a date to the

24   block party; do you agree with that assessment?

25   A.   I don't agree with that assessment.

1    Q.    But you weren't there, right?

2    A.    No, I was not there.

3    Q.    And the people at the Hospital, the members of the

4    treating team, they're the ones that have actually spoken with

5    your brother about his not attending the Salvation Army; is

6    that correct?

7    A.    That's correct.

8    Q.    So you would have to defer to them as to their analysis

9    of what he said to them.

10   A.    No.  No, that's not correct.  I have spoken with my

11   brother.  I have been there since that visit.

12   Q.    And what did he tell you about why he didn't attend the

13   Salvation Army?

14   A.    The Salvation Army situation was on a day of the week, it

15   was not on the same day as the picnic.  So it was on a

16   different day of the week during that visit.  On his

17   itinerary, it said that in the afternoon he would be going by

18   the Salvation Army to say hello to the person or introduce

19   himself to the person.

20        In the meantime, he had a phone conversation that morning

21   with Dr. Rafanello who told him that she had spoken with the

22   person at the Salvation Army, had worked out the situation,

23   resolved whatever John was supposed to have been doing that

24   afternoon at the Salvation Army.

25        It also was the same afternoon that my brother's flight

```
1    was coming in that day; his flight was late.  Because there
2    was not a set two o'clock or 2:30 appointment, my mother said
3    that she wanted to wait until my brother got in.  Then -- and
4    John said, well, it doesn't matter anyway, Dr. Rafanello
5    worked it out.  That's why she called me, she worked
6    everything out so it's not necessary that I go.
7         So there were a lot of things playing into it.  It was a
8    late plane.  It was the fact that Dr. Rafanello called and
9    John talked with her, and they had worked out some answers on
10   the question.  It seemed like the appointment was not nearly
11   as necessary at that point as it had been before the visit
12   ever took place.
13   Q.   Well, this was in May, wasn't it?
14   A.   That's correct.  That's correct.
15           THE COURT:  May of which year?
16           MS. CHASSON:  May of 2008.  It was a month-and-a-
17   half ago.
18           THE WITNESS:  Right.
19   BY MS. CHASSON:
20   Q.   And by that point, this hearing had already been
21   scheduled, correct?
22   A.   That's correct, I guess.  Uh-huh.
23   Q.   And your brother at that point still had no volunteer
24   position; is that right?
25   A.   That's correct.
```

1    Q.   You're aware, aren't you, that one of the centerpieces of

2    his last year of what he's supposed to have been doing on

3    release was finding a volunteer position.

4    A.   That was correct.

5    Q.   And do you have an opinion about whether it displayed

6    good judgment or not for your brother not to follow through

7    with what appeared to be the only live volunteer position

8    opportunity that he had six weeks before a hearing to evaluate

9    his conditional release?

10   A.   I don't see it as the only viable opportunity at that

11   moment that he might have had.  There were other things in the

12   works.

13   Q.   What else did he have in the works?

14   A.   There were other -- there were eight or nine other places

15   volunteer places on the list that were still being worked on

16   and still being contacted at that time.

17   Q.   Well, your brother wasn't contacting them, was he?

18   A.   No.  Not initially.  Not initially.

19   Q.   Okay.  And so who was doing this for him?

20   A.   It was being done in conjunction with the treatment team

21   and Dr. Rafanello, specifically, making the contact -- the

22   list of names had been first given to Dr. Rafanello by Mr.

23   Beffa, for instance.

24   Q.   This is the same list of eight that Mr.  Beffa gave to

25   your brother last January in order to help him kick start his

1    job search.

2    A.   That's possible, but I hope you will recall last January

3    was when my father was dying.  It was a little difficult at

4    that time to be just real, real quick -- real -- even with

5    that schedule.  Other things were going on that kind of got in

6    the way.

7    Q.   But between -- at least as far as you know, though,

8    before that January, is that when he submitted the

9    applications to the three places you identified earlier; the

10   Heritage Humane Society and the Salvation Army?

11   A.   I don't know specifically when those were submitted.

12   Q.   Okay.

13   A.   Only that they had been.

14   Q.   And what are the other eight or nine places that

15   Dr. Rafanello was looking for a job for your brother at?

16   A.   Well, I don't have them in front of me.  They were just

17   other volunteer positions.  It was housing partnerships might

18   be one of them.  I just -- I don't have them all.  I think she

19   would have every one of them, and, frankly, you probably read

20   about the others, as well, so you would know what they are

21   better than I would possibly.

22   Q.   So my question to you was -- and I apologize if you

23   answered it, but I didn't hear you -- was do you think that it

24   displays good judgment on your brother's part not to follow-up

25   with the Salvation Army six weeks before his release hearing?

A.   It probably wasn't the best judgment, but he also was
taking his cue from the fact that Dr. Rafanello called him,
said she had worked out the situation.  That's the way he
understood the phone call.  So at that point, he didn't see
that it was as necessary for him to show up since the
communication had already taken place and whatever situation
that was going to be talked about with John had already been
decided, had already been resolved.

Q.   Well, did you discuss with your brother his judgment not
to go to the Salvation Army?

A.   No.  I didn't.  I wasn't there.

Q.   All right.  And in subsequent telephone calls, did you
ever discuss it with him?

A.   No, I did not.

Q.   Okay.

A.   Well, I did to the extent of I understood you were going
to go and you didn't.  He said that it had all been worked out
which alleviated the need for him to be there.

Q.   It had all been worked out because somebody else was
taking care of it for him?

A.   Yes.

Q.   Well, Dr. Binks has said that your brother hasn't taken
any responsibility for getting himself out of the Hospital
because he expects that others will assume that responsibility
for him.  Do you agree with that?

1    A.   I think in part he has had a good support group around

2    him and that we have all in our way tried to help him because

3    it's a little bit easier for us to start the initial process.

4    But, yes, we do want him to take over and follow-up with that.

5    Q.   So do you agree or disagree with Dr. Binks that your

6    brother expects others to assume the responsibility of

7    obtaining things like a volunteer position for him?

8    A.    I don't know if "expects" is the correct word, but I

9    think that is the way it has happened.  So if you want to use

10   that, then that's fine.  I think there is better word for it.

11   He's used to it I guess; maybe that's the same thing.

12   Q.   Well, your brother has been able to competently arrange

13   lots of social activities for himself for his releases has he

14   not?

15   A.   What social -- can you be specific about the social

16   activities?

17   Q.   You suggested to him actually that he might enjoy getting

18   massage therapy appointments, right?

19   A.   I never suggested that to him, but I do know he has back

20   trouble, and we thought it might be therapeutic.

21   Q.   And he's actually arranged for at least two massage

22   therapy appointments has he not?

23   A.   That is correct.

24   Q.   And he's also looked into taking art classes down in your

25   mother's hometown; is that right?

```
 1    A.    Yes, that's correct.

 2    Q.    And he's also looked into taking music lessons, right?

 3    A.    That's correct.  Uh-huh.

 4    Q.    And he -- also, he has access to a phone at the library

 5    where he works at the hospital; isn't that correct?

 6    A.    I don't know anything about that.

 7    Q.    Did you ever ask him?

 8    A.    I -- no, I didn't.

 9    Q.    Okay.  How often does he call you?

10          THE COURT:  What was the question?  I'm sorry.

11          MS. CHASSON:  How often does he call you?

12          THE WITNESS:  It's different amounts -- it's

13    different depending on -- sometimes I hear from him more often

14    and sometimes -- I would say on the average about a couple

15    times a month, sometimes more than that.

16    BY MS. CHASSON:

17    Q.    Does he typically call you from your mother's home or

18    does he call you when he's at the Hospital?

19    A.    From the Hospital.

20    Q.    Okay.  So he can actually use a phone at the Hospital?

21    A.    When he can get to it, yes.

22    Q.    Well, he calls Ms. G multiple times a day; were you aware

23    of that?

24    A.    That doesn't surprise me.

25    Q.    All right.  And he also receives calls from Ms. G at the
```

1    library; did you know that?

2    A.   No.  I wasn't aware of that.

3    Q.   And he has also been able to place international calls to

4    Ms. G when she has traveled; did you know that?

5    A.   I'm not sure if he was the one that placed the phone

6    call.

7    Q.   Would you be surprised to learn that he did in fact place

8    it?

9    A.   Not particularly.

10   Q.   And back when he was involved with Ms. M, he used to call

11   her once or twice a day, too, right?

12   A.   That's possible.

13   Q.   So you would agree with me, would you not, that your

14   brother when he wants to can get to the phone and use it,

15   right?

16   A.   I agree.  Okay.

17   Q.   So there's no communication impediment to him, say,

18   calling a potential volunteer organization to follow-up with

19   that?

20   A.   No.  I wouldn't think so.

21   Q.   And we've actually seen -- because he can arrange for

22   various social activities -- that he can go and arrange those

23   by himself, as well?

24   A.   I guess so.  Right.

25   Q.   Mr. Shamblee says that your brother is more interested

1    in the social and recreational aspects of his release plan and

2    has little investment in the other aspects; do you agree with

3    that?

4    A.   Repeat that please.

5    Q.   Mr. Shamblee has said that your brother is more

6    interested in the social and recreational aspects of his

7    release plan and has little investment in the other aspects;

8    do you agree with that?

9    A.   I think he is interested in the social aspects, but I

10   also do think he does have an interest in a volunteer

11   position.

12   Q.   Okay.  But except for the completing those three

13   applications, you can't identify anything else that he's

14   actually done in terms of obtaining a volunteer position?

15   A.   I cannot personally, no.

16   Q.   Both Dr. Rafanello and Dr. Montalbano and Dr. Binks have

17   stated that your brother's relationships with women show

18   impaired judgment; do we agree with that?

19   A.   At times.  But -- can I qualify that?

20   Q.   Sure.

21   A.   I don't think the judgment is really anything different

22   than what you find out in society when you have relationship

23   situations.  It is not an exact science, and I don't think a

24   lot of people use perfect judgment within relationships.

25   Q.   Well, your brother has become involved with a woman that

```
 1        we are referring to as Ms. G, and she at the time that your
 2        brother became romantically and physically involved with her
 3        was in a 15-year relationship with another man.  Do you think
 4        that decision shows good judgment on your brother's part?
 5   A.   I think it shows worse judgment on her part.
 6   Q.   What about your brother?
 7   A.   I think it takes two.  And he was taking his cues from
 8        her.
 9   Q.   And, well, your brother actually is the one that
10        initiated relationship with Ms. G, isn't he?
11   A.   That's correct.
12   Q.   And, in fact, he hadn't seen her in -- it's more than a
13        decade, isn't it?
14   A.   I believe so.
15   Q.   And then he somehow obtained her contact information
16        through public records; is that right?
17   A.   I believe so.  I'm not quite sure about that, though.
18   Q.   Did you ask him?
19   A.   No, I didn't ask him.
20   Q.   Okay.  So you didn't ask how he reconnected with this
21        woman after more than a decade?
22   A.   He said he had called her.  I didn't ask how he
23        specifically found her phone number.
24   Q.   Okay.  But she did not seek him out, did she?
25   A.   No.
```

1    Q.   All right.

2    A.   Not initially.

3    Q.   Okay.  And, actually, your brother sought her out just at

4    the time that his relationship with Ms.  M was on the wane.

5    Did you know that?

6    A.   Yes, I did.

7    Q.   Dr. Rafanello has said she believes your brother has to

8    stockpile women; do you agree with that?

9              THE COURT:  Has what?

10             MS. CHASSON:  Has to stockpile women; do you agree

11   with that?  It's her word.

12             THE WITNESS:  I think that's strong.

13   BY MS. CHASSON:

14   Q.   You do?  You disagree with that?

15   A.   I disagree with the term.

16   Q.   Okay.  So you don't think that identifying -- going and

17   locating the contact information of a woman that you haven't

18   seen in more than 10 years shows a desire to find somebody at

19   a very high cost?

20             THE COURT: What does that question mean?

21             THE WITNESS:  Well, I don't know either.

22   BY MS. CHASSON:

23   Q.   This shows a lot of effort on your brother's part to go

24   and locate Ms. G, doesn't it?

25   A.   I don't know how much effort there was.  I don't know

1    what he had to do find the phone number.

2    Q.   Okay.  Did you --

3              THE COURT: I take it there's no -- nobody knows

4    whether when me made that first -- do you know whether when he

5    made that first phone call he knew that she was in another

6    relationship?

7              THE WITNESS:  Do I know that?

8              THE COURT: Yeah.

9              THE WITNESS:  I don't know.

10             THE COURT: Okay.  I'll ask every witness that.

11   BY MS. CHASSON:

12   Q.   But at sometime, your brother learned that, in fact, Ms.

13   G was in that long-term relationship with another man?

14   A.   That's correct.

15   Q.   She's actually living with that other man; is that right?

16   A.   I believe so.

17   Q.   Did you have a view -- do you have a view as to whether

18   this was a good decision on your brother's part to pursue this

19   relationship?

20   A.   I think he initially wanted it as a friendship, and on

21   that basis, I think that's fine.  That's the way it started.

22   So I see nothing wrong with forming a friendship with someone

23   who happens to live with someone else.

24   Q.   Well, there came a time when that relationship with Ms.

25   G became more than just a friendship, right?

1    A.    I believe so.

2    Q.    Okay.  How did you hear about that?

3    A.    My brother and I talked about that, the fact that he had

4    feelings for her.

5    Q.    And at the time that the relationship with Ms.  G became

6    more than just a friendship, did you have a view as to whether

7    that showed good judgment on your brother's part?

8    A.    I would have preferred that if he was going to have

9    something more than a friendship it would be with someone who

10   was not encumbered with another relationship.  That would have

11   been my preference.

12   Q.    Did you tell your brother that?

13   A.    I told him that that certainly was going to present a

14   problem, the fact that she was living with someone for that

15   long.

16   Q.    What types of problems did you tell him you thought it

17   would present?

18   A.    I just felt like that that was an established

19   relationship with her live-in boyfriend and that that

20   certainly could put limits on his relationship with my -- on

21   his relationship with -- my brother's relationship with her.

22   Q.    And what was your brother's response to that advice?

23   A.    He said he enjoys being around her, he enjoys her

24   companionship, and he didn't see anything wrong with if she's

25   willing to come over and see him, he wasn't going to tell her

1    not to come.  I mean he enjoyed being with her.  I've met her.

2    She's an enthusiastic person.  She's vivacious.  I can see why

3    he was attracted to her.

4    Q.    But the bottom line is, he disregarded your advice?

5    A.    I didn't tell him to stop the relationship.  I said if

6    you want to have a friend -- it was fine with me if he had a

7    friendship with someone who was willing to come and see him.

8    John could never go see her, obviously, so she was playing her

9    part in this, as well.  She was showing him that she wanted to

10   be there with him, as well.  So it did give him companionship.

11   Q.    But you told him that this was going to be problematic

12   for him, right?

13   A.    That's correct.

14   Q.    And he ignored your advice.

15   A.    Well, he might not have agreed with my advice at the

16   time, and there were times when that relationship was

17   considered a friendship, and so based on that, there's nothing

18   wrong with a friendship with someone who happens to live with

19   someone else.

20   Q.    Do you know whether your brother also spoke to Mr.

21   Hinckley; your brother, Scott, ever spoke to Mr.  Hinckley

22   about his relationship with Ms. G?

23   A.    I believe he probably did.

24   Q.    Did you ever ask your brother, Scott Hinckley, whether he

25   had spoken to John Hinckley about the relationship with Ms.

1      G?

2      A.   I've asked Scott what he has thought about the situation,

3      but I don't know any specifics, and I'm not going to tell you

4      what Scott said, you can ask him those questions because he

5      would be better to answer those questions.

6      Q.   Well, did you and Scott agree that it would be

7      problematic for your brother to be involved with a woman who

8      was in a 15-year relationship with another man?

9      A.   We felt like there would not be a future in it for John

10     if you call that being problematic.

11     Q.   And as far as you know, you both shared that view with

12     John Hinckley?

13     A.   As far as I know.  That's the -- I can't speak for Scott,

14     but I can speak for myself.

15     Q.   Okay.  Dr. Green's view is that your brother's

16     relationship with Ms. G is causing him turmoil; do you agree

17     with that?

18     A.   I would say there are ups and downs, and, therefore,

19     there is going to be possibly turmoil.  It's not something

20     that I see him losing control over or anything like that, but

21     he's going to react just like anybody else is going to react

22     when a relationship maybe is not taking the turn that somebody

23     wants it to take.  People are going to have some turmoil over

24     that.  It's an appropriate reaction.

25     Q.   What did you think of your brother's plan to invite Ms. G

to the block party in your mother's hometown?

A.   I never saw it, and, again, I wasn't part of the visit.
I don't believe it was as much an invitation to the block
party as it was an invitation for my mother to be able to meet
Ms.  G.  My mother had not been able to meet her before that
even though an attempt had been made, and it was more about
letting my mother get a chance to meet her and sit down for
more than just a few minutes to speak with her.

I think that was the full thrust of the visit, and it
just so happened the day that Ms. G would be available to come
was the same day as the picnic because it was on Saturday.
She works full-time, nine to five, Monday through Friday.  So
Saturday just happened, coincidentally, but it's not that he
invited her -- in my understanding, it wasn't an invitation to
the picnic as much as it was an invitation to come meet my
mother in the home.  The picnic wasn't until the evening.

Q.   Did you think it was good idea for your brother to invite
Ms. G down to meet your mother in her hometown?

A.   I know that it was something that he wanted my mother to
meet her, and the fact is the way our system was, when my
brother and I would take turns coming to [the city], I would
often -- I would be the one to either drive John back and have
a treatment team meeting.  That's usually when Ms. G was able
to come and meet with one of us.  That's when my brother,
Scott, and I met her is when we had driven John back from a

home visit.

So the fact is since Scott does that one week, I do it another -- I mean one month, I do it another month.  It was not going to be as easy for my mother to have an opportunity to meet John -- to meet Ms.  G.  So from that standpoint, this was going to be the only way she was going to be able to meet her, so I don't see anything wrong with the fact that he wanted that to happen.

Q.   Okay.  So you do think it was a good idea?

A.   I think it was a good idea for my mother to meet her.  My mother has always wanted to meet any friends of any one of us, and on the other side of that, I think it's a very healthy thing for John to want his mother to meet the people that are important to him, rather than to hide them away or keep them secret.  He was very open and very anxious for anybody that he was interested in to meet my brother, myself, and my mother.

Q.   Well, the treatment team told your -- had a different view of this; did they not?

A.   About meeting my mother?

Q.   About Ms. G coming down to your mother's --

A.   Oh, treatment team did not feel like it was appropriate for her to drive down, so they were the ones that decided that this was not going to take place.  Yes.

Q.   So do you then disagree with the treatment team's view of your brother's decision to invite Ms. G down to your mother's

hometown?

A.   I don't disagree with his decision to invite someone

down.  I think they were correct in saying it was probably not

the most appropriate time for all of that to take place.  So

they had the choice to say "yes" or "no" to whether Ms. G

could go or not, but I don't disagree with the fact that my

brother wanted my mother to meet her and felt like this might

be an opportunity for her to do so.

Q.   Is it your understanding that the treatment team said

that Ms. G should not go to your mother's hometown because it

was a bad weekend or because the visit itself was not

appropriate?

A.   I think they felt like it was not -- the visit itself was

not appropriate, that they would prefer that she not drive to

my mother's hometown.

Q.   But you feel that it is appropriate for your brother to

have asked her to go down in this manner?

          THE COURT: Are we talking semantics here?

          MS. CHASSON:  We are.

          THE COURT:  And did the treatment team say that it's

a bad idea for Ms. G to meet Mrs.  Hinckley; or did the

treatment team say it was a bad idea for her to go to Mrs.

Hinckley's home; or did the treatment team say it was a bad

idea for her to go to Mrs.  Hinckley's home that particular

weekend, but it would be perfectly fine if they met at the

1    Hospital?  But because Mrs.  Hinckley wasn't going to the

2    Hospital very often, that meant it was never going to happen.

3              Why don't we ask the treatment team instead of

4    asking Ms. Sims?  I don't know what the treatment team thought

5    or said and how is she supposed to look into their mind.

6              MS. CHASSON:  I just want to know whether she agrees

7    or not.

8              THE COURT: Agrees with what, though?  What exactly

9    did the treatment team say?  Let's get somebody from the

10   treatment team on the stand and tell us what they said or read

11   verbatim from something they wrote about exactly what they

12   said.

13             I've listened to three possible scenarios.  Maybe

14   there's a fourth; maybe there's a fifth.  What exactly did

15   they say was inappropriate?  Then you can ask her whether she

16   thinks what they said was inappropriate was inappropriate, but

17   I have no idea what they said, and how is she supposed to

18   know.

19   BY MS. CHASSON:

20   Q.   Did you ever discuss this with the treatment team?

21             THE COURT: Discuss what?

22             MS. CHASSON:  Ms.  G's visit to your mother's

23   hometown.

24             THE COURT:  Okay.  So we're talking about the visit.

25             MS. CHASSON:  Yes, the visit.

1          THE COURT: In other words, is a visit a bad idea,

2     not a meeting between Ms. G and the mother, just a visit.

3          MS. CHASSON:  Yes.  I'm only -- I apologize if I

4     have been unclear, but a visit to the mother's hometown.

5          THE COURT:  So the treatment team thinks it's

6     perfectly fine for Ms. G and Mrs. Hinckley to meet each other;

7     is that right?

8          MS. CHASSON:  I think I will let Dr. Rafanello

9     testify to that.

10         THE COURT:  All right.  Maybe we should get Dr.

11    Rafanello on the stand, and then we can call Ms. Sims back.

12    Let's hear -- let Ms.  Sims hear it from Dr. Rafanello's mouth

13    exactly what the Hospital thought was inappropriate and what

14    the Hospital thought was appropriate because we're trying to

15    see how many angels can dance on the head of a pin here by

16    asking her an imprecise question about something that may or

17    may not have been said and then asking what she thinks of it.

18         If it's in writing in one of their reports, read her

19    the sentence or the paragraph, and then ask her what she

20    thinks.  Otherwise, we'll get Dr. Rafanello to tell us what

21    the Hospital thinks and then ask Ms. Sims what she thinks

22    about what the Hospital thinks.

23    BY MS. CHASSON:

24    Q.   Let me ask Ms. Sims this last question, again:  Did you

25    ever ask, discuss, with the treatment team Ms.  G's visit,

1      your brother's invitation to Ms.  G to visit your mother's

2      hometown?  Did you ever discuss that invitation with the --

3      A.   I don't recall that probably because I was not the one

4      involved in the visit anyway.  I did not -- I was not there.

5      So I would not have gone and spoken with them immediately

6      following that weekend.

7      Q.   But you were at the SALT visit, right?

8      A.   Yes.

9      Q.   When your brother went to the SALT meeting.

10     A.   Yes.

11     Q.   And you said you felt very uncomfortable at that meeting?

12     A.   Yes.

13     Q.   And as I understand it, there were two reasons: Really,

14     the first was the age of the other participants there, right?

15     A.   Correct.

16     Q.   Okay.  And the second was the demeanor of the group

17     leader when she discovered who you were?

18     A.   That wasn't -- that did make me uncomfortable, but it did

19     not make me -- it was not why we left later after the meeting

20     was over.

21     Q.   And you testified on direct that you thought that the

22     SALT group was going to be a group of your brother's peers?

23     A.   Yes.

24     Q.   Who told you that?

25     A.   The information that we had received -- in fact, we had

1     seen a -- it was a rather dated newspaper article on this

2     group listed people ages 40 and up.

3     Q.    How did you find the newspaper article?

4     A.    I believe Mr. Beffa gave it to my brother, John.

5     Q.    So it was Mr. Beffa's suggestion that the SALT group

6     would be appropriate?

7     A.    He was the one who gave us the first -- the information

8     on it that we had, yes.

9     Q.    Okay.  Did Mr. Beffa make any calls to figure out the

10    age of the other participants there?

11    A.    I don't know.  You'll have to ask him.  I doubt it.  I

12    don't know that he did.

13    Q.    Well, did you ask him if there was any steps that he

14    could take to make it easier for you?

15    A.    Due to the fact that the week before my brother and I --

16    or a couple of weeks before my brother and I were to attend

17    the SALT meeting, the article came out in the Gazette

18    newspaper that was just -- the one we had talked about before,

19    this morning.  I called and talked to Dr. Rafanello and asked

20    her if it was still appropriate for the timing as to go to

21    this social gathering because the newspaper article was just

22    -- it was awful.  It was awful.

23         And so she said, you know, we've got to continue with

24    this plan.  He can't stop his therapy because of newspaper

25    articles, and so she said, yes, of course you need to go, and

1    she then said it would probably be a good idea for Mr. Beffa

2    to call ahead and let the director or the people in charge

3    know that we were going to come just so there would be some

4    notice that we were going to be there and had asked --

5    Dr. Rafanello had asked me to be sure and tell John that when

6    he had his meeting with Mr. Beffa to mention that to him and

7    let him know we thought it would be a good idea for him to

8    call ahead.

9         So John did that.  John spoke with Mr. Beffa while he

10   was having his meeting, relayed that information, and at that

11   point Mr. Beffa, apparently, told John, he said, well, I just

12   don't think -- you know, he said it's a potluck dinner.  It's

13   at 6:30 on a Wednesday night.  It's open to the public.  I

14   just don't think it's necessary for you to call ahead or for

15   him to call ahead -- for him, Mr. Beffa, to call ahead and

16   make any advance -- give them any advance information that we

17   were coming.

18   Q.   Okay.  So when you showed up, though, that was not the

19   case as you've described on direct?  It wasn't an appropriate

20   -- it turned out it wasn't an appropriate social event.

21   A.   It was -- I think originally, according to the newspaper

22   article, it was a dated newspaper article on the group, ages

23   40 and up -- I think originally, possibly, that was the

24   intention for 40's and up; come one, come all.

25        But I do believe that it's possible that either very few

1    40-somethings and 50-somethings showed up and realized this

2    was -- the majority of the group were much, much older than

3    that.  And, frankly, mostly in society today, 40-somethings

4    usually don't go to a group like this to meet people.  They go

5    to bars.  They go to clubs.  They go to coffee houses.  They

6    go to -- that's how they kind of meet.  So it didn't surprise

7    me, you know, after thinking about it that there weren't a lot

8    of younger people in the group that night.

9    Q.   Do you feel that this showed an example of poor planning

10   on Mr. Beffa's part that he sent you there?

11   A.   I don't know if it was poor planning.  I do think we

12   learned a lesson, though, that I think it is important that if

13   it is an organized group of people who have been a cohesive

14   group for some time, I think it's only fair -- and due to the

15   fact that once again we -- you know, the newspaper articles

16   when they do come out are -- if they were just factual, I'd be

17   fine with those articles, but they're not, and it does give a

18   very false sense of who John is today.

19        So, therefore, the people there don't know anything but

20   that.  So taking into account, I think, maybe it would be a

21   good idea for some advance background to be given, that not

22   only is John -- would John like to attend the meeting tonight

23   -- not the SALT meetings, necessarily, but any group, that he

24   would like to attend.  He has been visiting on many occasions

25   here.  He not only has his doctor's permission, but the

```
 1        Court's encouragement for him to be doing these things.

 2            I think people in my mother's hometown are not aware of

 3        the process here, and so all they hear is he's going to show

 4        up in town.  They don't know how this process works and that

 5        it is definitely doctor encouraged and court encouraged for

 6        him to do these things.  I think that would go a long way if

 7        people were a little better educated about those things.

 8        Q.   So more preparation could have been done?

 9        A.   Could have been done, yes.  Could have been.

10        Q.   Okay.

11                MS. CHASSON:  Could I have the Court's indulgence

12        for one second?

13                THE COURT: Yes.

14                MS. CHASSON:  Thank you, ma'am.  We have no further

15        questions.

16                THE WITNESS:  All right.  Thank you.

17                THE COURT: Mr.  Levine?  I think Mr.  Levine may

18        have a few questions.

19                THE WITNESS:  Oh, okay.

20                THE COURT:  That may surprise you knowing Mr.

21        Levine as you do.

22                MR. LEVINE:  Thank you, Judge.  Please the Court.

23        REDIRECT EXAMINATION BY MR. LEVINE:

24        Q.   Ms.  Sims, we've heard Ms.  Chasson refer to Mr.

25        Hinckley's so-called lack of initiative.  You remember those
```

1    questions?

2    A.   Yes.

3    Q.   Does any perceived lack of initiative in your view make

4    him dangerous?

5    A.   No.

6    Q.   You heard Ms.  Chasson make reference to Dr. Green, and

7    she attributed to Dr. Green the statement that the lack of

8    initiative represents a kind of tantrum by Mr.  Hinckley.  Do

9    you remember that question?

10   A.   I do.

11   Q.   All right.  Now, let's explore what it is that

12   Dr. Phillips wrote about his interview with Dr. Green in that

13   precise regard.  Dr. Phillips writes at Page 20; speaking of

14   his interview with Dr. Green:  We explored the circumstances

15   surrounding Mr.  Hinckley's failure to attend the scheduled

16   appointment at the Salvation Army.

17       Now, first point:  Is Dr. Phillips' statement that there

18   was a scheduled appointment at the Salvation Army correct?

19   A.   There was not a scheduled time.  The day had been put on

20   the itinerary that some time in the afternoon John would run

21   over to the Salvation Army.  That was again before the

22   conversation with Dr. Rafanello and my brother that morning

23   where John got the information that things had already been

24   worked out, so he didn't see the point of going to the meeting

25   at that juncture.

1    Q.   And, in fact, there was no scheduled time and place for

2    the appointment?

3    A.   To the best of my knowledge, it was not a scheduled time

4    and place where somebody was expecting him to walk through the

5    door at a given time.

6    Q.   Then Dr. Phillips writes -- speaking of his interview

7    with Dr. Green:  When asked what Mr.  Hinckley's explanation

8    was, Dr. Green reports he was told -- and now we're quoting

9    Dr. Green -- that it wasn't necessary.  It was already

10   arranged or already made.  All he had to do now was to wait

11   until the Court permission to proceed and then he would

12   proceed.  So, you know, kind of putting the cart before the

13   horse behavior.

14        Is that tantrum behavior?

15   A.   I don't think so.

16   Q.   All right.  Or I'll say, perhaps, some avoidant behavior.

17   Is that tantrum behavior?

18   A.   No.

19   Q.   So Dr. Green is kind of figuring it out himself as a

20   response to Dr. Phillips; isn't that correct?

21   A.   I think so.

22   Q.   Then he goes on to say:  Or as I'm beginning to wonder

23   whether or not that represents kind of a tantrum.  So now he's

24   gone to a third point.  First it was cart before the horse

25   behavior; then it was avoidant behavior; and then he uses

1     maybe it's a tantrum.

2           Is that what he says here?

3     A.    In the report, yes.

4     Q.    Or then he goes on to say:  You really have -- you all

5     have really messed up the most important thing so I'm going to

6     really don't feel like doing all this other stuff, close

7     quote.  The statement of Dr. Green elucidating this matter

8     very clearly I am sure.

9     A.    Hmm.

10    Q.    All right.  Now, Ms. Chasson raises the question -- now

11    this time referring to Dr. Rafanello -- that perhaps missing

12    the meeting was a function of immaturity.  Could that be?

13    A.    It could be.

14    Q.    All right.  Now, it is true -- or was it true that

15    Scott's plane was late?

16    A.    Yes.

17    Q.    All right.  And does being immature make him dangerous?

18    A.    No.

19    Q.    Now, Ms. Chasson goes on and asks the question:  Is this

20    a manifestation of good judgment she asks.  Do you remember

21    that question?

22    A.    Yes.

23    Q.    And does questionable judgment in this regard -- should I

24    go, should I not go, to meet a volunteer opportunity; does

25    that make him dangerous?

1    A.    No.

2    Q.    Then she says that John expects others -- I think it is

3    attributed -- I think Ms.  Chasson attributes this to

4    Dr. Binks, but I'm uncertain, but surely to someone, that John

5    expects others to take responsibility to get him out of the

6    Hospital.  Do you remember her asking about that?

7    A.    Yes.

8    Q.    Well, it is in fact the case that it is the Hospital that

9    files the (e)petition; isn't that correct?

10   A.    That's correct.

11   Q.    And is the fact that others may in fact take over the

12   responsibility to get him out or to expand the conditions of

13   release, does that make him dangerous?

14   A.    No.

15   Q.    And she makes reference, I would submit disparagingly, to

16   the fact that Mr.  Hinckley when he wants to engage in

17   recreation or get a massage for an ailing back that he knows

18   how to make those plans; is that correct?

19   A.    That's what she said.

20   Q.    And she says that he knows how to pursue art lessons and

21   music lessons; isn't that correct?

22   A.    That's correct.

23   Q.    Does the pursuit of a massage therapy for an ailing back

24   or the pursuit of art and music lessons make him dangerous?

25   A.    No.

1    Q.   Now, there's also reference by -- as a matter of fact,

2    art and music lessons are things that the Hospital encourages

3    him to pursue.

4    A.   That's correct, yes.

5    Q.   Now, she also goes on to make reference to the fact,

6    raising the specter of impropriety, that he obtained access to

7    Ms. G's phone number through a public record.

8    Do you remember her reference to that?

9    A.   Yes.

10   Q.   Would that include a phonebook?

11   A.   It could.

12   Q.   And do you know if, in fact, that's exactly how Mr.

13   Hinckley got her phone number?

14   A.   I don't know.

15   Q.   All right.  Anything improper or suggests dangerousness

16   by looking up a telephone number in a phonebook?

17   A.   No.

18   Q.   Now, she also goes on to raise the specter of, again,

19   impaired judgment or questionable judgment by having a

20   relationship with Ms. G; remember that?

21   A.   Yes.

22   Q.   Now, does Mr. Hinckley have any choices as to whom it is

23   with whom he could have these relationships?

24   A.   No, not really.

25   Q.   The relationships he can have are those with whom -- are

1    the very people who are willing to come see him?

2    A.   That's correct.

3    Q.   Now, if Ms. G, in this committed relationship about

4    which Ms. Chasson speaks, chose not to come to visit Mr.

5    Hinckley, is it fair to say he'd have no relationship?

6    A.   That's pretty fair to say.

7    Q.   And if Ms. G chose not to take his calls, is it fair to

8    say he'd have no relationship?

9    A.   That's correct.

10    Q.   And is the fact that she comes or the fact that she takes

11    his calls suggest to you that this is a dangerous man?

12    A.   No.

13    Q.   And with respect to a man's judgment with respect to

14    women, have you heard, as I believe we all have, that probably

15    half the marriages in America result in divorce?

16    A.   More than that.

17    Q.   More than that.  Would you say there's some impaired

18    judgment going on there?

19    A.   Absolutely.

20    Q.   Now, of course, there was also raised in a disparaging

21    way the fact that Ms. G has this 15-year -- and if excuse the

22    word -- committed relationship with this person.  You heard

23    that?

24    Now, if Ms. G valued that relationship more than the

25    relationship she has with John, all she has to do is pursue

1    the one she has and not pursue the one with John.

2    A.    That's correct.

3    Q.    The fact that she pursues the one with John, in any

4    respect, however it's characterized, whether it be merely

5    platonic, maybe something more deep, maybe manifestations of

6    tenderness, does that make John a dangerous person in your

7    view?

8    A.    No, it does not.

9    Q.    In your view, is it better for Mr. Hinckley to be lonely

10   than it is to have relationships in whatever form he can have

11   them?

12   A.    No, I don't think that's better at all.  I think having

13   relationships is a better thing.

14   Q.    And were he to be lonely, going back to Patients Exhibit

15   1, were he to be alone and isolative, would you be expected to

16   report to the Hospital that that is a manifestation of a

17   symptom which poses -- which could be considered a risk

18   factor?

19   A.    If that were the case, yes.

20   Q.    Now, there was reference made to a -- again, excuse the

21   word -- news article that appeared in the -- I'll just call it

22   the Gazette.  Okay.  It has a name, but I'll mark this

23   document, Your Honor.

24          MR. LEVINE:  Giving a copy to the government, Your

25   Honor.  May I have this marked as Patient's Exhibit No. 2?

1             THE COURT: Thank you.

2     BY MR. LEVINE:

3     Q.   I show you what has been marked as the Patient's Exhibit

4     No. 2 for identification; do you recognize that?  It's in a

5     form -- it is from the -- do you recognize that article?

6     A.   Yes.  Yes, I do.

7     Q.   Is this the article to which you made reference when you

8     described it as being awful?

9     A.   Yes, it is.

10    Q.   Is that an article which in your view misleads the

11    public?

12    A.   Absolutely.

13    Q.   Is that an article which in your view creates a hostile

14    or inhospitable community environment?

15    A.   Yes, it does.

16    Q.   Is that an article which would create stress in the

17    family and for John?

18    A.   Yes.  Uh-huh.

19    Q.   And how did he react to that stress?

20    A.   To the stress?

21    Q.   Yes.

22    A.   Well, he certainly didn't fall apart over it.  He wasn't

23    happy with the article.

24    Q.   Did he become dangerous?

25    A.   No, he did not.

1    Q.    And under the media plan, no one from the patient's side

2    can ever respond to the these articles, can they?

3    A.    No, we can't.

4    Q.    You can't; Mr. Hinckley can't; his counsel can't; only

5    the government can generate a cause to be generated, these

6    kinds of articles?

7    A.    That's correct.

8    Q.    And I'd like to move that into evidence, Your Honor.

9              THE COURT: Any objection, Ms. Chasson?

10             MS. CHASSON:  No, Your Honor.

11             THE COURT: It will be admitted.

12   BY MR. LEVINE:

13   Q.    And lastly, Ms. Sims, you heard Ms. Chasson ask some

14   questions about poor planning, poor planning by the hospital;

15   poor planning by Mr. Beffa; poor planning.  Any of that poor

16   planning by any of them in any regard make Mr. Hinckley

17   dangerous?

18   A.    No.

19             MR. LEVINE:  Nothing further, Your Honor.

20             THE COURT: Ms. Chasson, any further questions,

21   disparaging or otherwise?

22             MR. LEVINE:  Point well made.

23             MS. CHASSON:  I only -- if you could give me just

24   one second.

25             THE COURT:  Yes.

1                MS. CHASSON:  My disparagement is done.  Thank you.

2                THE COURT: Thank you, Ms.  Sims.

3                THE WITNESS:  Thank you.

4                THE COURT:  I think we should --

5                THE WITNESS:  Oh, you need these?

6                THE COURT:  Yeah.  Thank you.

7                THE WITNESS:  Okay.

8                THE COURT:  You can step down.  I think we should

9     probably go to lunch.  Anything anybody want to raise before

10    then?

11               MR. LEVINE:  Not by the patient, Your Honor.

12               THE COURT: All right.  So right after lunch, I

13    assume that we'll hear from Mr.  Scott Hinckley?

14               MR. LEVINE:  Yes.  And I'm going to try and truncate

15    that, Your Honor.  Let me tell the Court that it was in

16    response to what I understood to be the Court's desire that it

17    hear from the siblings.

18               THE COURT:  Correct.

19               MR. LEVINE:  So I would hate to unduly elongate this

20    process.

21               THE COURT: I think that's fine.  We've heard a lot

22    from Ms. Sims, and you don't need to be duplicative.  There

23    are also some things that she suggested would be better coming

24    from her brother than from her, and there were some things

25    that Mr.  Scott Hinckley observed or participated in that she

1    didn't.  So we want to talk about that, some of the visits.

2                I'd be interested in his observations at the funeral

3    and his observations and discussions on the drive back from --

4    I guess it was the day before Mr.  Hinckley, Sr., died.  He

5    and his brother spent a lot of time together.

6                MR. LEVINE:  Yes.

7                THE COURT:  So, you know, those sorts of things.

8    But I don't think you need to be duplicative, and -- but we'll

9    also give the government some leeway so if there are some

10   areas you don't cover because you're trying to compress and

11   not duplicate, if they feel they want to go into it, they can,

12   and then you can come back on redirect, if necessary.

13               Mr. Zeno?

14               MR. ZENO:  Thank you, Your Honor.  It's my

15   understanding that Dr. Montalbano is going to follow Mr.

16   Hinckley.

17               THE COURT: That would be my guess; is that right?

18               MR. LEVINE:  That's my plan.

19               MR. ZENO:  Thank you, Your Honor.

20               THE COURT:  All right.  So why don't we be ready to

21   resume at 1:45.  Is that all right with everybody?

22               MR. LEVINE:  Surely.  Your Honor, how late is the

23   Court sitting today?

24               THE COURT:  Is five o'clock all right with

25   everybody?  What we'll do is we'll see how far we get and how

1    much time it takes.  I don't know how long Dr. Montalbano will

2    be, but we'll get to a convenient breaking point if we don't

3    finish with him today -- yy guess is we won't -- but he's

4    used to that.

5               THE DEPUTY CLERK:  All rise. This Honorable Court is

6    in recess until 1:45.

7               (Whereupon, there was a lunch recess at this time;

8    thereafter, court resumed.)

9               THE COURT:  All right.  Mr.  Levine.

10              MR. LEVINE:  Thank you, Your Honor.  Please the

11   Court, we'd call Scott Hinckley.

12   *              *              *              *

13           **SCOTT HINCKLEY**, having been called as a witness in

14   this case, after having been duly sworn by the deputy clerk,

15   testified as follows:

16   *              *              *              *

17              MR. LEVINE:  Proceed, Your Honor?

18              THE COURT:  Yes, sir.

19   **DIRECT EXAMINATION BY MR. LEVINE:**

20   Q.   State your name, sir.

21   A.   My name is Scott Hinckley.

22   Q.   Do you know this gentleman there(Indicating)?

23   A.   Yes, I do.

24   Q.   And who is he?

25   A.   That's my brother, John Hinckley.

1    Q.    Now, over the past year, approximately the past year,

2    have you attended conditional releases with your brother?

3    A.    Yes, I have.

4    Q.    And do you know approximately how many?

5    A.    I haven't marked them on the calendar, but I would say

6    eight or nine visits with the family.

7    Q.    And were you accompanied by other members of the family?

8    A.    Occasionally, my sister would accompany me.

9    Q.    And in all instances your mom?

10   A.    And always my mother.

11   Q.    And on some occasions, early on, your father?

12   A.    And my father early on.

13   Q.    All right.  And did you socialize with Mr.  Hinckley,

14   John?

15   A.    Yes.

16   Q.    And was he engaged in conversations with you?

17   A.    Yes, he would.

18   Q.    And there have been some who have said that he was

19   isolatative; would you agree or disagree with that

20   characterization?

21   A.    I don't believe isolation is a term I would use

22   describing John, no.

23   Q.    Did the fact -- did your father's illness change the

24   relationship or the dynamics within the family?

25   A.    Well, certainly, it was a time of transition for all of

1    us, and we all had to cope in our own ways, but I thought then

2    and I told the treatment team I thought he handled it well,

3    and it was a difficult situation, but I saw no -- no problems

4    during that period.

5    Q.   And did you, in fact, grow closer to your brother during

6    that period of time?

7    A.   Well, I think it was an event that brought everybody

8    closer to together.

9    Q.   All right.  Now, did you have occasion to observe your

10   brother John's relationship with your late father during the

11   conditional releases?

12   A.   Yes.

13   Q.   And what did John do for your father?

14   A.   He was -- he was, first of all, there to help comfort him

15   at the times he was there.  He spent a fair amount of time at

16   the hospital, at the assisted living facility, and I think at

17   some point during the visits, he painted several pieces of art

18   that he presented to my father, pieces that had some

19   remembrances from times past.  And then, of course, we -- he

20   accompanied us on some family outings, as well, to restaurants

21   and to other places that we visited.

22   Q.   Were the paintings designed by John to brighten up the

23   environment for your father?

24   A.   I think that's accurate.

25   Q.   And could you tell us if John's presence helped you cope

1    with the illness and demise of your dad?

2    A.    Well, certainly, I think all of us were glad to have John

3    there during this period.  We wanted to have the family

4    together, and, yes, he was a big part of that.

5    Q.    Was his presence comforting for your mother and for your

6    sister, as well?

7    A.    Absolutely.

8    Q.    Did you have occasion to witness John's affection for the

9    family?

10   A.    Yes.

11   Q.    And how would you describe that?  What were the

12   manifestations of that if you could talk to that issue?

13   A.    Well, again, he went out of his way in some of the

14   songwriting that he was doing.  He would occasionally write

15   songs that dealt with the family, but he would occasionally

16   play the guitar for the family, and, of course, household

17   chores as well to kind of lighten the load when people were

18   busy doing other things.

19   Q.    Was John eager to assist your father in the times of his

20   illness and decline?

21   A.    I never saw any resistance to helping my father.  He was

22   there to help.

23   Q.    Now, of course, when your father became ill and went to

24   the assisted living, the time that the family spent in

25   attending to him became much greater; is that right?

1    A.    That is true.

2    Q.    And did John ever manifest a resentment of that?

3    A.    I don't -- resentment is a harsh word.  I don't think he

4    resented that.  Certainly, we all remarked from time to time

5    just how much involvement that process required, and -- but

6    beyond that, I don't recall much.

7    Q.    Did you talk with John about the declining health of your

8    father?

9    A.    Oh, certainly.

10   Q.    And was he very actively engaged?

11   A.    As far as I could tell.

12   Q.    And as far as you could tell, was he appropriately

13   empathetic and compassionate?

14   A.    Yes.

15   Q.    All right.  Now, there came a time in addition to the

16   general conditional releases that there were emergency

17   conditional releases; do you recall that?  I believe there

18   were two in number.

19   A.    Yes, I do.

20   Q.    All right.  And the first one was when John came down to

21   the place where your father's health was declining, and --

22   were you there before he arrived?

23   A.    There were several visitations where John and I were

24   present.  I can't recall whether I preceded him or not, but

25   I'm sure on one occasion I did.

1    Q.    Can you describe what you saw and what John saw when he

2    visited your father when -- on his first conditional --

3    emergency conditional release?

4    A.    On the first emergency release, I think he saw my father

5    as I did in critical condition and looked like he was very

6    close to death at that point.

7    Q.    Had hospice been called in to your recollection?

8    A.    I believe we had discussed the hospice issue, and they

9    were being called in, yes.

10   Q.    Do you remember how John reacted to seeing his father in

11   that condition?

12   A.    I think he was in shock.  I think he was taken aback like

13   we all were and that he had just seen my father over the

14   Christmas holidays, and I think, as all of us, thought that

15   this was -- this illness was going to linger on a bit more

16   than it did.

17   Q.    How did John spend his time during this particular first

18   conditional release, emergency conditional release?

19   A.    He was with my father and with all of us during that

20   period.

21   Q.    And was it a vigil at the assisted living place,

22   essentially?

23   A.    Essentially, it was.  We all discussed the fact that we

24   needed to be there and not doing other things, and we all

25   agreed on that plan.

1    Q.    Could you describe John's mood during that first

2    emergency conditional release and whether you thought that

3    mood was appropriate?

4    A.    He seemed to be somber.  He seemed quite concerned for

5    our father, was very -- he was, I think, glad to be a part of

6    the group during that period, but he certainly was quite

7    concerned, and I thought all emotions were quite appropriate.

8    Q.    Now, John in that first conditional release arrived in

9    that area, in the area of the home, on a Friday, and you had

10   to take him and he returned to the hospital on a Monday.  What

11   was your father's condition on that Monday?

12   A.    Critical.  He was in poor health and not breathing well

13   and having a lot of difficulties at that point.

14   Q.    Was he able to recognize you and the family?

15   A.    I think he knew -- he could feel our presence in the

16   room.  I would like to believe that, but beyond that, it

17   wasn't --

18   Q.    You can't be sure.

19   A.    Can't be sure, no.

20   Q.    Now, it was in the midst of that uncertainty and the fact

21   that he was in apparent extremist that John had to return to

22   St. Elizabeths; is that correct?

23   A.    That is correct.

24   Q.    What was his feeling about that?

25   A.    He was quite upset.

1    Q.    And how did he manifest it?  Did he talk to you about it?

2    A.    He talked to us about and told us he was quite upset.  He

3    really wanted us to do what we could to try to keep him -- let

4    him stay in that area to be with our father and not have to

5    leave himself and not have to interfere with what other people

6    were doing as well.

7    Q.    Now, when you talk about what other people were doing,

8    does that mean you?  Did you have to take him back?

9    A.    At that point, that would be me.  Yes.

10   Q.    So did John have a feeling as to whether he would ever

11   see his father alive again?

12   A.    I think he felt that would probably be the last time he

13   would see him alive.

14   Q.    Did you take John back to St. Elizabeths?

15   A.    Yes, I did.

16   Q.    And that's a many hour ride; is it not?

17   A.    Yes.

18           THE COURT:  Was it just the two of you or was there

19   a driver?  Were you driving?

20           THE WITNESS:  I believe I was driving.  It was just

21   the two of us on that trip.

22   BY MR. LEVINE:

23   Q.    Did you talk to John on that trip?

24   A.    Yes, I did.

25   Q.    Would you tell us about the conversations you had with

1    him?

2    A.   Well, he was quite disappointed, quite still angry; quite

3    disappointed that he was leaving our father at that critical

4    point, and nothing could be done about it.  And we had, of

5    course, explored many alternatives and we talked about to try

6    to keep him there and, of course, that part of the discussion

7    was going back through all that.  But it was clearly a long

8    ride back.

9    Q.   And that was a discussion about, perhaps, making another

10   application to the Court or something in that regard to see if

11   he could stay longer?

12   A.   Exactly.  Of course, we were always looking at the

13   options and alternatives.

14   Q.   And would you describe John's feelings as appropriate

15   under the circumstances?

16   A.   I thought they were appropriate given the circumstances,

17   yes.

18   Q.   And what were your feelings about it?

19   A.   I, too, was saddened to see that he was not going to be

20   there and that we had to go through these motions.  You know,

21   I was -- I must say I was grateful that he was able to get an

22   emergency leave in the first place.  I do appreciate the

23   thought and action that went into that, but it was frustrating

24   for all of us to not be there at the end.

25   Q.   Now, when you brought him back to the hospital, back to

```
 1    St. Elizabeths Hospital, did you go back down to where the
 2    family was that same day?
 3    A.    Yes, I did.
 4    Q.    You did round trip?
 5    A.    Yes.
 6    Q.    And were you able to see your father again before he
 7    died?
 8    A.    I saw him that evening.  We spent a late evening, into
 9    the late evening with him, and I believe it was the next
10    morning that he passed away.
11    Q.    The next morning he passed away?
12    A.    Yes.
13    Q.    Did John return to the family home on a second emergency
14    conditional release?
15    A.    Yes, he did.
16    Q.    And how did he get from St. Elizabeths back down to the
17    family home area?  Did you go get him or --
18    A.    I believe I went to drive him back, as well.
19    Q.    Now, the second emergency conditional release was to
20    attend the funeral; is that correct?
21    A.    That is correct.
22    Q.    And did John attend the funeral?
23    A.    Yes, he did.
24    Q.    And were you at the funeral?
25    A.    Yes, I was.
```

1    Q.    How many people were there, approximately?

2    A.    Approximately, several hundred people; over 200 people

3    were there.

4    Q.    And who spoke at the funeral if you remember?

5    A.    Well, it would be my sister's husband, Steven Sims, and

6    myself.

7    Q.    And where was John while you were speaking?

8    A.    He was with the family in the front row.

9    Q.    Sitting with your mom?

10   A.    Sitting next to my mother, yes.

11   Q.    And could you describe whether his behavior during -- at

12   the funeral was appropriate in your mind?

13   A.    Totally appropriate.

14   Q.    Could you describe his mood?

15   A.    Reserved, saddened, but certainly able to talk to the

16   people there and was cordial when he needed to be and

17   especially greeting several hundred people during the day, but

18   beyond that, I have no other recollection.

19   Q.    When you say he greeted several hundred people during the

20   day, was there a receiving line after the service?

21   A.    That is correct.  That's where we had --

22   Q.    And do you remember where John was positioned?  Well, was

23   he in the receiving line?

24   A.    He was in the receiving line.

25   Q.    Do you remember where he was positioned?

1    A.    He was positioned next to me.

2    Q.    And were you in a position to witness and hear the

3    exchanges he had with others as they went through the line?

4    A.    Yes, I was.

5    Q.    And what did people say as they approached John?

6    A.    They gave their condolences.  They wished him well.  Some

7    of them knew him previously and talked a bit about that, and

8    others were meeting him for the first time and talked about

9    that.  And it was about what you would expect in any receiving

10   line.

11   Q.    And his responses in your mind were appropriate?

12   A.    Totally.

13   Q.    If I may use this word, did it seem like he was as normal

14   as anyone else in that line?

15   A.    I would agree.

16   Q.    Now, was there any incidents with the media?  Do you know

17   -- let me rephrase that.  Do you know if the media was there?

18   A.    I am not sure the media was there, although, the next day

19   there was an article in the paper, the local paper, which

20   reading between the lines you would have to presume that there

21   was some sort of media present to be able to write that

22   article.

23   Q.    The media did not reach out to John?

24   A.    No, they did not.

25   Q.    And did John seek any attention?

1    A.    None whatsoever.

2    Q.    So with respect to both emergency conditional releases,

3    how did Mr. Hinckley's presence affect the family?

4    A.    I'm sorry.  Could you restate that?

5    Q.    How did John's presence affect the family during both of

6    those emergency releases to the family home?

7    A.    Well, certainly, from a family perspective, he was well

8    received.  We wanted -- that was the time for families to be

9    together and support each other, and, certainly, we wanted him

10   to be a part of that, and I think he would say the same thing.

11   Q.    How would you describe his coping with the loss of your

12   father?

13   A.    Well, there again, I think he's handled that well.  I

14   have -- I think certainly there has been some sadness, maybe a

15   situation where he's not -- we all had some adjustments to

16   make and a transition to go through, and I think we made those

17   changes, and John has coped well through that event.

18   Q.    All right.  Now, let's move on to another subject,

19   although, about one of these conditional releases.  Let's talk

20   about the conditional release that involved a neighborhood

21   block party.  Were you present for that conditional release?

22   A.    Yes, I was.

23   Q.    And were you involved in any discussions before that

24   party was to occur about whether someone named Ms. G should

25   attend?

1    A.    Yes, I was.

2    Q.    And what was discussed?  What was discussed?

3    A.    The discussion actually centered around two parts really:

4    The fact that John would like Ms. G to meet my mother as she

5    had previously met myself and my sister.  And then the second

6    part of the discussion was whether or not it would be

7    appropriate to bring her to my mother's hometown for the

8    picnic on that same day.

9    Q.    So tell us about the first part and tell us about the

10   second part.

11   A.    Well, the first part I think my mother was certainly

12   agreeable to meeting Ms. G at some point that was convenient

13   for both of them and expressed interest in doing so.

14   Q.    And as far as you understand it, was it your mother's

15   view that Ms. G would be invited to come to meet her at a

16   suitable time?

17   A.    I never heard anything to the contrary.

18   Q.    All right.  Now, what about the second part, attendance

19   at the block party, the picnic?

20   A.    The picnic was scheduled for that same day, and John was

21   invited and we all thought that that would be a good

22   opportunity for him to meet some of the neighbors and get to

23   know them and for them to get to know him.  And I guess that's

24   where the conflict arose in that I think the family members

25   wanted John to concentrate on the picnic itself and be there

1    to meet and greet the others and that maybe if Ms.  G were

2    there that she would be, naturally, would be a distraction and

3    so that we felt like it would be best if they were going to

4    meet, if she was going to come to see my mother, that it would

5    be better to do it on some other day.

6    Q.   Now, did you have discussions with John about whether she

7    should or shouldn't attend?

8    A.   I think we discussed it briefly.  I don't think we had

9    any long, drawn out discussion over this.

10   Q.   Did you ever feel John was being anything other than

11   perfectly honest about his wishes in this regard?

12   A.   I never thought there was an issue over this until I read

13   about it in some of the reports, and so I -- again, one of the

14   reports said that there may be as many answers to this

15   question as there are people discussing it, but from my point

16   of view, there was -- it was a pretty cut and dry issue of

17   just the way I stated it.

18   Q.   She was welcome to come but just not at the block party.

19   A.   Correct.

20   Q.   And your mother was delighted to have her at some other

21   occasion.

22   A.   Correct.

23   Q.   All right.  Now, did Mr.  Hinckley attend the block

24   party?

25   A.   Yes, he did.

1    Q.    And was he polite?

2    A.    Yes, he was.

3    Q.    Was he receptive to meeting his neighbors?

4    A.    He was and he did.

5    Q.    And did he ever do anything to suggest he would be

6    dangerous to himself or others?

7    A.    No, I don't believe so.

8    Q.    And with respect to all of the conditional releases in

9    which you were in attendance, did he ever signal that he would

10   do anything that might be construed or arguably dangerous to

11   himself or others?

12   A.    No, he did not.

13   Q.    Did he ever suggest that he might try -- ever do anything

14   to suggest that he might try to escape or elope?

15   A.    That would be something that I just don't see a

16   possibility.  There was not a possibility during those

17   discussions.

18   Q.    And during the course of all these conditional releases,

19   did he ever seek out media contact?

20   A.    No, he did not.

21   Q.    And if you -- if your mother were to no longer be

22   available to continue in the role of a responsible person as

23   that term has been used in the context of this matter, would

24   you and your sister be willing to provide the resources and

25   support that would be required to assist John and comply with

1       conditions of the Court?

2       A.   Yes, we would.

3       Q.   Do you say that without any reservation?

4       A.   With no reservation.

5       Q.   Are you aware of John having contact with Leslie DeVeau

6       over the past year?

7       A.   Over the past year?

8       Q.   Yes.

9       A.   I certainly know he has had contact with her over a

10      recent period.  I don't know whether it was the last year.

11      Q.   Did Leslie DeVeau know your dad?

12      A.   Yes.

13      Q.   And after he passed away, do you know if John contacted

14      her?

15      A.   I don't know for a fact, but it would not surprise me.

16      Q.   Was Leslie DeVeau a significant part of John's support

17      group during his years at the hospital?

18      A.   She was significant for him and became very special to

19      our family, as well.

20      Q.   Was she good for John in your view?

21      A.   Absolutely.

22      Q.   Did they get well together?

23      A.   Certainly, from my brother's perspective, I would say,

24      yes.  I don't know her history.

25      Q.   Do you think it to be unfortunate that based on evidence

```
1    adduced in this courtroom that that relationship had to come
2    to an end?
3    A.    I think it was quite unfortunate.
4    Q.    Now, are you familiar generally, generally, with the
5    provisions of the petition before the Court which has been
6    known as the (e)letter?
7    A.    Generally, yes.
8    Q.    You know, for example, it contemplates 12 releases, each
9    one being nine nights?
10   A.    Yes.
11   Q.    You know, for example, that he would have expanded
12   unaccompanied time both in the subdivision and in the greater
13   community-at-large?
14   A.    Yes.
15   Q.    And do you know that he would have an opportunity to
16   pursue a driver's license?
17   A.    Yes.
18   Q.    And do you support the Hospital's recommendation in these
19   regards?
20   A.    Yes, I do.
21   Q.    And based on your observations of John during all of
22   these conditional releases, do you think that -- do you have
23   any concerns about him getting an increase period of time to
24   be unaccompanied?
25   A.    I don't have any particular concern about that, maybe
```

1    adding a random day here or there may or may not have any

2    broad affect, but, on the other hand, I do like what the

3    Hospital has put together where the -- the time away would

4    fall during a calendar week, and he would have that to do his

5    projects in the hometown and then have the weekends to

6    compress -- decompress and do other things.  I think that

7    makes more sense than kind of the random dates that have been

8    set so far.

9    Q.   Now, are you willing to participate in the conditional

10   releases at your mother's residence?

11   A.   Yes.

12   Q.   Just as you have in the past?

13   A.   Yes.

14   Q.   And are you willing to share with your sister the

15   responsibility of coming to and from that area to participate

16   in those releases?

17   A.   Yes, I am.

18   Q.   And are you willing to continue to comply with the

19   conditions that the Court might set or that the Hospital might

20   set with respect to these conditional releases?

21   A.   Yes, I am.

22   Q.   And are you familiar with -- I'm showing you Patient

23   Exhibit No. 1.  May I approach, Your Honor?

24           THE COURT: Yes, sir.

25           MR. LEVINE:  Thank you, Your Honor.

1    BY MR. LEVINE:

2    Q.   Are you familiar with Patient's Exhibit No. 1?

3    A.   Yes, I am.

4    Q.   And what is that?

5    A.    It is a feedback form that is put together by the

6    Hospital while patients are on conditional release, and there

7    are a list of behaviorial items and symptoms on that list, and

8    we're asked on each visit to note whether we have observed any

9    of these behaviors or symptoms.

10   Q.   And are you willing to continue to fill out that form or

11   any other form that may be engineered by the Hospital for the

12   purpose of supplying data to the Hospital and the Court?

13   A.   Yes, I am.

14   Q.   In the May conditional release, you checked off as a

15   little present; the box for depressed mood, too sad, a little

16   present.

17   A.   Yes.

18   Q.   Could you tell us why you checked that box?  What did you

19   mean by that?  Explain it to the Court.

20   A.   Well, it was as they asked for it, it was an observation.

21   You know, I'm not a doctor, but I observed that he seemed a

22   little down, seemed saddened, and the best way I could

23   describe that was a little depressed.

24        I think he had gone through a relationship that was at

25   that particular moment not going well.  I think he had been

1    through the death of our father.  He had been through some

2    situations, job hunting, and looking at new situations in the

3    town where he wants to be, and those were not going well at

4    that time.  So I think it was just natural that he may have

5    been a little down.

6    Q.   Would you regard that sadness as transient, come and go?

7    A.   In that regard, yes.

8    Q.   And given the circumstances of his life at that time,

9    would you say that was actually a fairly expected mood?

10   A.   Yes, I did.  I thought it was, and I think I made that --

11   tried to make that point to the Hospital.

12   Q.   Do you in any way perceive what you saw or construe what

13   you saw as being a psychotic episode in a major depression in

14   his life?

15   A.   Again, I'm not a doctor, but I did not observe that.

16   There are again many behaviors and symptoms that could have

17   been checked off along with the depression at that point, and

18   I did not do that.

19   Q.   The -- did you observe any brooding over a sustained

20   period of time?

21   A.   No, I did not.

22   Q.   Okay.  Final question, Mr. Hinckley:  Given your

23   knowledge of this petition to the Court, do you have any

24   reservation whatsoever about Mr. Hinckley being granted the

25   increase in privileges under the Hospital's plan?

A.   I have no reservations.

MR. LEVINE:  Nothing further, Your Honor.

THE COURT: Let me ask you a couple of questions, Mr.
Hinckley.  Talking about the time when your father was very
ill near the end and then the week of the funeral -- so
somebody had to go up from your mother's home to St.
Elizabeths and pick up your brother and then bring him back to
St. Elizabeths, and then the same on the second trip, right?

THE WITNESS:  Right.

THE COURT:  How many of those four drives were you
involved with?

THE WITNESS:  I think I was involved with all of
them.

THE COURT:  Now, was there another driver on some of
them and on others it was just you and your brother?

THE WITNESS:  Over the course of a month or so, we
had -- we did have another driver that was able to pitch in
and drive with my mother up to this area.

THE COURT: But the day before, as it turned out,
your father died, driving from your mother's home back to St.
Elizabeths, it was just you and John?

THE WITNESS:  I believe so.  Yes, sir.

THE COURT:  So what did you talk about?  It was,
what, about three or four hours, several hours; what did you
talk about to the extent you can remember?

1           THE WITNESS:  Well, of course, we'd talk about, in

2     that case, the shocking state that my father was in at that

3     time and, of course, John was telling me about the visit over

4     the Christmas holidays which, unfortunately, I was not able to

5     be a part of, so he brought me up to date on that and what

6     they were doing and how he was shocked as well to see the

7     deterioration.

8           And then, of course, we were talking a bit about the

9     future, as well.  You know, what's it going to be, how is it

10    going to be different once he's gone.

11          THE COURT:  And then the other drive was when you

12    drove up to bring him back for the funeral or was it after the

13    funeral when you brought him back here?

14          THE WITNESS:  I believe I went to get him to bring

15    him to the funeral and then I took him back after the funeral,

16    so, yes.

17          THE COURT:  You had a lot of time just one-on-one

18    over the course of a 10-day period or so?

19          THE WITNESS:  Yes.  Yes, I did.  That was a lot of

20    driving.

21          THE COURT:  Did you talk -- when you say you talked

22    about the future, you talked about the future without your

23    father, but did you also talk about John's future with less

24    and less supervision, presumably, in his view, in your view,

25    and, perhaps, even at a point when your mother was no longer

1    able to be intimately involved?

2              THE WITNESS:  Well, we have had those discussions,

3    certainly, and I think it's clear to me that he would like to

4    be in that area and to be more settled and to -- of course,

5    while we're all here, to spend more time in that part of the

6    world.

7              And one of the things that we talk about -- of

8    course, getting there, are the -- what he can do to be

9    productive, what he -- in the way of looking for a job or in

10   the way of looking for volunteer opportunities, and I think at

11   that at that time we had a couple of ideas.  Every time we

12   meet, we have a couple ideas that we want to explore, and so

13   far they have not panned out, but that -- a lot of the

14   conversation focuses on that.

15             THE COURT: How do you see things into the future if

16   John -- I mean you live in Dallas, right?

17             THE WITNESS:  Yes.

18             THE COURT: And your sister lives in Dallas?

19             THE WITNESS: Yes.

20             THE COURT:  And what does the future look like if

21   John were -- had more and more privileges and more and more

22   time away from the Hospital, and, particularly, as your mother

23   gets older?

24             THE WITNESS:  Well, of course, that's inevitable,

25   and I think we have talked about that, as well.  I know my

sister and I have had a number of conversations, and I think both are in agreement that we would help provide whatever we could in the way of shelter and living arrangements for him. We would certainly try to be there as often as we could, but I don't think either one of us at this point envisions being there full time.

We would hope that over the course of the next year or couple of years that he would develop a network of social workers that would help in whatever he is doing and that they would help keep him focused. And then on top of that, if, just like with my father or anybody else, if he needed any additional help, we would be willing to support any additional people, caretakers, that might need to be present.

THE COURT: All right. Ms. Chasson; Mr. Zeno.

**CROSS-EXAMINATION BY MS. CHASSON:**

Q.   Good morning, Mr. Hinckley. Good afternoon, how are you?

A.   Good afternoon to you.

Q.   Now, you participated in between, I think, seven and nine visits you said over the course of the last year.

A.   That sounds about right.

Q.   Okay. Was everything perfect during the course of those visits?

A.   No, they were not.

Q.   They never are, are they?

1    A.    No, they're not.  We're a family.

2    Q.    Absolutely.  And all families have just tensions in their

3    family dynamics that raise from time to time do they not?

4    A.    From time to time, certainly.

5    Q.    Yes.  Even though you may all love each other and be very

6    close, some visits are going to be better than others.

7    A.    I agree.

8    Q.    Now, let's talk a little bit about the May visit that you

9    were discussing with Mr.  Levine, and I'm going to hand you

10   what we've -- we're going to mark, I guess, as Government's

11   Exhibit No. 1.

12              THE COURT:  No.

13              MS. CHASSON:  Is it one?  We pre-marked that.  --

14              THE COURT:  You've premarked some I gather, so --

15              MS. CHASSON:  Right.

16              MR. ZENO:  It's 12; there you go.

17              MS. CHASSON:  Oh, it's 12.  I had it as -- there you

18   go.

19              THE COURT: What are we calling it?

20              MS. CHASSON:  We're going to call it 12, Your Honor.

21   BY MS. CHASSON:

22   Q.    Now, this is a report from the Hospital concerning a

23   visit that occurred with your brother that you attended over a

24   week -- a weekend, the third weekend in May, May 19th.

25   A.    Okay.

1    Q.   Do you remember that visit?

2    A.   Yes, I do.

3    Q.   Okay.  Now, I'd like you to turn your attention to Page 3

4    on the last paragraph, and I'll read it aloud for you:  On

5    Monday, May 19th, 2008, members of the treatment team met with

6    Mr.  Scott Hinckley to discuss with him the outing to [the

7    City].  He discussed his family's -- Mrs.  Hinckley; sister,

8    Mrs.  Diane Sims, and Mr.  Scott Hinckley's -- conversation

9    with John Hinckley, Jr. with regard to their strong objection

10   to Ms.  Christine [G]'s --

11            MR. LEVINE:  Your Honor, objection.

12            MS. CHASSON:  I apologize.

13   BY MS. CHASSON:

14   Q.   Ms. G's presence during the scheduled outing.  The

15   family's rationale, according to Mr.  Hinckley, was that Ms.

16   G's presence would be a detriment.  Mr.  Hinckley disagreed

17   with his family's viewpoint and was upset that they took that

18   position.

19        Did you strongly object to Ms. G coming down to visit on

20   that occasion?

21   A.   Well, as I said earlier, I thought she would be a

22   distraction to what was, in my mind, my -- the family's

23   objective, which was to allow John to get to know some of the

24   neighbors in the neighborhood.

25   Q.   But did you strongly object?

1    A.   I -- that's a fair term.  I have no problem with that.

2    Q.   And did your sister, likewise, share that strong

3    objection?

4    A.   I -- again, I had no feelings one way or the other.

5    That's probably a good point.

6    Q.   But did you discuss it with your sister?

7    A.   Oh, certainly, yeah.

8    Q.   And in your discussions with your sister, did she convey

9    to you that she strongly objected to Ms. G visiting?

10   A.    I think she thought that Ms. G would be a distraction

11   certainly, and so she did object.  I don't know -- the term

12   "strongly", I don't know that -- I don't want to speak for

13   her, but from my perspective, I strongly objected.

14   Q.   Did you hear from her a reaction that indicated to you a

15   strong objection?

16   A.   She was not -- she was not interested in -- or not happy

17   with that decision, certainly.

18            THE COURT:  She -- wait a minute.  I'm confused.

19            THE WITNESS:  Yeah.  I am, too.

20            THE COURT:  You said she was not happy with that

21   decision.  Who was not happy with which decision?

22            THE WITNESS:  I think my sister was not happy with

23   the decision that Ms. G would be coming to the picnic.

24   BY MS. CHASSON:

25   Q.   And your mother -- it's -- the Hospital's report

1    indicates that your mother also strongly objected; is that a

2    correct statement?

3    A.    It's fair enough.

4    Q.    It is?

5    A.    Yeah.

6    Q.    But your brother disagreed with your family's viewpoint

7    and became upset with that position; is that correct?

8    A.    Well, as I said earlier, he was upset that she was not

9    going to be able to meet my mother if she were in that area,

10   and I can certainly understand that, but beyond that, I think

11   we all discussed the value of attending the picnic and doing

12   that without any distraction.

13   Q.    Well, he was also upset, was he not, because he wanted to

14   bring a date to the picnic?

15   A.    Well, I'm sure he was disappointed that he couldn't bring

16   a date there.  That would be natural.

17   Q.    Did he tell you that?

18   A.    I don't think he ever told me that, but I think I

19   understood him to be disappointed.

20   Q.    Okay.  And after that visit was the visit that you

21   indicated on your relapse prevention form that a depressed

22   mood or too sad was a little present.

23   A.    Correct.

24   Q.    You didn't indicate any other factors on that form, did

25   you?  I think -- do you still have a copy in front of you?

1    A.   I don't believe so.  I think it's just that one

2    observation.

3    Q.   Would you be surprised to learn that Mr.  Beffa who saw

4    your brother that weekend for a therapy visit indicated that

5    your brother presented as significantly more depressed, flat,

6    blunt; he indicated that was a little present.

7    A.   A blunt mood, did you say; I'm sorry?

8    Q.   It says -- do you have Patient's Exhibit No. 1?

9         THE COURT: I think -- but Exhibit No. 1 is just a

10   blank copy of the form.  It's not the form from that

11   particular visit.

12        MS. CHASSON:  Okay.  I apologize.  I thought it was.

13   Let me give you a copy of -- let me hand up Government's

14   Exhibit No. 11.

15   BY MS. CHASSON:

16   Q.   Do you see on Government's Exhibit No. 11 that you

17   indicated that depressed mood/too sad was a little present?

18   A.   Yes, I do.

19   Q.   Okay.  And you -- but you indicated that you observed no

20   other behaviors or symptoms on the checklist.

21   A.   That's correct.

22   Q.   Would you be surprised to learn that Mr.  Beffa indicated

23   that presenting as significantly more depressed, flat, or

24   blunt was indicated as a little present?

25   A.   I wouldn't be surprised if he came to the same conclusion

1     on the same day or week that I did.

2               MR. LEVINE:  Your Honor, may we know where that is

3     on this form because I don't see it?

4               THE COURT: What's the language that you're talking

5     about?

6               MS. CHASSON:  I'm using a different exhibit that I'm

7     not going to introduce with this witness because it's not his

8     document.

9               THE COURT: But is it a term that finds -- that is

10    listed on this form?

11              MS. CHASSON:  Yes, it is.  The term itself is listed

12    as entry number one.

13              THE COURT:  Is it -- but what is it?  Just read it

14    out again, and we'll find it.

15              MS. CHASSON:  It says:  Reports as significantly

16    more depressed, flat, or blunt.

17              THE COURT:  That's on --

18              MS. CHASSON:  Yes.  It is the sixth line down.  Mr.

19    Hinckley indicated that that was not observed.  I'm asking if

20    he was surprised that Mr.  Beffa indicated that that was --

21              THE COURT:  What does it say, again?  I don't see it

22    on this form.

23              MS. CHASSON:  Well, I guess they have a different --

24              MR. LEVINE:  It's not on my -- it's not on the

25    government's exhibit, Your Honor.

1          THE COURT:  This is not -- the term that you read

2     out is not on Exhibit 1, which is the unmarked form, or

3     Exhibit 11, which is the form that Mr.  Hinckley and,

4     presumably -- and I believe Ms.  Sims and Mrs.  Hinckley fill

5     out after each visit.

6          MS. CHASSON:  You are correct, Your Honor.  They've

7     used different terms.  Let me ask it --

8          THE COURT:  So there is a different form that the

9     professionals use.

10          MS. CHASSON:  Yes.  Let me ask about a different

11     entry.

12     BY MS. CHASSON:

13     Q.   You indicated that your brother did not observe -- you

14     did not observe any unusual or intense interest in a female

15     during that visit?

16     A.   Correct.

17     Q.   Okay.  Would you be surprised to indicate that Mr.  Beffa

18     thought that your brother did indicate interest in a -- he was

19     expressing interest in a female and that that was very

20     present?

21     A.   I would be surprised because -- just because I would have

22     a hard time trying to figure out who that would be.

23          THE COURT:  This may also be -- you may both be

24     talking about the same person.  I mean Mr.  Beffa may have

25     been talking about the fact that he, in discussion, expressed

1   an interest in Ms.  G even though Ms.  G wasn't there, but it

2   sounds like you interpreted the question -- you didn't observe

3   him during that weekend, right?  Is that how you interpreted

4   it?

5            THE WITNESS:  That's exactly correct, Your Honor.

6            MS. CHASSON:  That is fair.

7   BY MS. CHASSON:

8   Q.   Okay.  Did you have any concerns about your brother's

9   relationship with Ms. G?

10  A.   Not initially when they met.  We were -- I was able to

11  meet her on one occasion and certainly thought she was a

12  bright, energetic woman, and someone that he might share some

13  time with.

14  Q.   Did there come a time when you developed concerns about

15  his relationship with Ms.  G?

16  A.   Well, over time, I think there were some complicating

17  issues that John himself raised about the relationship and

18  that we talked about at great length, and, again, while I was

19  still glad that he was seeing and spending time with her, I

20  thought these complications might lead to -- could lead to

21  other problems.

22  Q.   Well, was one of -- did you have any concerns about the

23  fact that she has been living with another man for quite some

24  time and has been in a relationship with the other man for 15

25  years?

1      A.    John and I discussed that at length, and, of course, he

2      was well aware of that situation, and as we discussed it, he

3      indicated to me that he wanted to remain good friends with Ms.

4      G, which was not the same as somebody that wanted to get into

5      a long-term involved relationship.

6      Q.    Did you think that it showed good judgment for him to

7      persist in a relationship with Ms. G after he learned about

8      her relationship with the other man?

9      A.    I think he was interested in maintaining a friendship

10     with her and, because of that, wanted to not do anything that

11     would quickly terminate that, and he thought that possibly

12     this was -- by continuing to talk with her and talk the

13     situation out maybe -- maybe that could change.

14     Q.    You were telling Judge Friedman that you spent a lot of

15     time with your brother during the times that you two drove

16     back and forth from the Hospital to your mother's hometown at

17     the end of January and beginning of February.  Did you discuss

18     Ms.  G during those trips?

19     A.    Yes, I believe we did.

20     Q.    Did you discuss Ms.  G with your brother on the trip that

21     you took to return him to the Hospital at the end of his first

22     emergency visit?

23     A.    I'm pretty sure we did.  I can't really place the

24     conversation, but if she were a part of his life at that point

25     in time, I'm sure we discussed her.

Q.   Do you know whether he planned to visit Ms.  G at the end
of that visit?

A.   Whether he planned to visit her?

Q.   Or have a visit with her?

A.   I was going to say, you know, that's part of the problem
is that they usually come to visit him and so -- I don't
recall any special visit being set up.

Q.   Did he call her at all from the road when he was with
you?

A.   He has called her in my presence; whether from the road
or from my mother's home, that could have happened.  I don't
recall.

Q.   How many times a day has he been calling her in your
presence?

A.   In my presence, maybe once a day from the home.  It
hasn't been that noticeable to me.

Q.   Well, you told Dr. -- I think it was Dr. Phillips that --
let me turn to this for a second -- that the calls are like --
that Dr. Montalbano has said that you have told him that the
numerous daily telephone calls to Ms.  G during one of the
visits are like a teenager.  Did you say that?

A.   I don't recall, but I'm not -- I'm certainly not going to
dispute what the good doctor said.

Q.   Well, do you agree with that assessment?

A.   I would agree that he may -- he might have made a lot of

1    phone calls to her, just not in my presence, which was the

2    question you had question.

3    Q.    Is there something about those calls in particular that

4    cause you to say that it was like a teenager?

5    A.    Just the large number of them and just the fact that I've

6    raised two teenagers, so --

7    Q.    I thought they'd be texting.  Were you aware that in

8    December of 2007 your brother wanted to bring two of his

9    romantic interests, Ms.  M and Ms.  G to a restaurant together

10   at the same time?

11   A.    I was not aware of that until I read it.

12   Q.    So it is safe to say that at the time you did not discuss

13   that with your brother?

14   A.    I don't believe so.

15   Q.    Do you believe that that shows good judgment on your

16   brother's part?

17   A.    That's difficult to answer.  Obviously, he had a reason

18   and a motive for wanting that, and I can't tell you what that

19   was.

20   Q.    Have you since discussed now that -- when you learned

21   about it, did you ask your brother about this plan?

22   A.    No, actually, I didn't.  That has not come up in a

23   conversation.

24   Q.    Okay.  Let's shift a little bit to your brother's

25   volunteer work.  The Hospital in its (e)letter says that your

1    brother has displayed a lack of initiative with respect to

2    identifying volunteer positions.  Do you agree with that?

3    A.   I think it's been a frustrating period of time for all of

4    us in looking at the volunteer opportunities.  Certainly,

5    given the base that we had to work with and -- before, and now

6    that John has some additional help with care providers in the

7    area, I think we have seen some improvement, but, certainly,

8    all of us, including John, are frustrated with the effort.

9    Q.   Okay.  Well, what do you think that your brother has done

10   that shows his initiative in obtaining a volunteer position?

11   A.   He has called several of the organizations that have been

12   on the list.  I know he and my mother have gone to visit

13   several organizations and talked to the people face-to-face,

14   and then on visits afterwards have -- were planning to go for

15   the follow-up visit, but, in many cases, the follow-up never

16   came because there was usually a message saying don't bother.

17   Q.   Well, where are the places that your brother has called?

18   A.   I'm sorry?

19   Q.   What places has your brother called?

20   A.   I believe he's talked to the folks at the Salvation Army.

21   I believe he's talked to the local library in the area where

22   my mother lives.  I think he's looked at -- he and with my

23   sister have looked at some other opportunities, as well.

24   Q.   But the only two that you know of for sure are the

25   Salvation Army and the library?

1    A.   Well, under oath, I can't come up with any other names at

2    this point.  That is correct.

3    Q.   Well, you've expressed frustration with your brother's

4    lack of initiative with identifying a volunteer position; have

5    you not?

6    A.   Certainly, the lack of progress.  I think when that --

7    and I won't deny that it is frustrating to not be able to land

8    a position, especially on a volunteer basis in a local

9    community.  So while I show frustration on that level, it

10   certainly is not just about John.  It's about all of us not

11   being able to collectively put something together.

12   Q.   Well, this is your brother's release plan; is it not?

13   A.   It's part of it, yes.

14   Q.   And one of the things that is being looked -- he's being

15   looked to here is to show how he's going to handle living

16   without such intensive supervision; isn't that right?

17   A.   That's true.

18   Q.   Right.  And one of the things that is expected of him is

19   that he is going to find some meaningful type of work; is that

20   right?

21   A.   Well, we hope so, and I'm sure he hopes so.

22   Q.   But as far as you know, he's called two places to try to

23   find that?

24   A.   Well, I know that many places have been discussed.  Many

25   places are on the list that are in the area, but, again,

1    through the help of the Hospital, through the help of the

2    organizations in [the community], a lot of those have already

3    been called out.  They're just not available.  So he has

4    called on the ones that have been available, and that's really

5    where we're at at this point.

6    Q.   Dr. Binks, your brother's individual therapist, says that

7    historically your brother has always disappointed others when

8    it comes to their expectations of his taking initiative and

9    that this was a central conflict between he and his father.

10   Do you agree with that?

11   A.   Well, I think it's difficult to compare a situation 25,

12   30 years ago with one today.  I don't think he -- in the last

13   few years, I don't think he disappointed my father on any

14   level.  I think my father was proud of what he has done, proud

15   of what he has been able to accomplish, and if there's any

16   issues that went back years ago, I think would be under other

17   circumstances.

18   Q.   Mr.  Hinckley, your brother's lack of initiative is not a

19   new issue, is it?

20   A.   Well, if we're talking about somebody who is coming out

21   of an institution after a number of years, going to a new

22   community, and being expected to pull him up -- pull himself

23   up by the bootstraps looking for work, I just -- I think

24   that's -- we have all come to realize that that's not going to

25   happen that way.

1          As with many of us, including many of us in this

2     courtroom, when we find that first job, when we find that

3     first advance in anything we do, we usually have had other

4     people help us to do that, and I think it's going to be the

5     same way for him, as well.

6     Q.   Well, your brother has shown a lot of initiative in other

7     areas of his life, has he not, Mr.  Hinckley?

8     A.   He definitely has interests in other things, for sure.

9     Q.   Well, he has been able to, for example, to arrange for

10    art classes.

11    A.   Art, yes.

12    Q.   And he's arranged for music classes.

13    A.   Yes, he has.

14    Q.   And when it comes to meeting women, he's shown quite a

15    bit of initiative, hasn't he?

16    A.   Well, I guess that's debatable.  He has certainly found

17    some interests in the D.C. area.  I would say that's debatable

18    in the area where he wants to be moving.

19    Q.   Well, Mr.  Hinckley, your brother, turning back again to

20    his relationship with Ms. G, he hadn't seen her in over a

21    decade before he decided to reinitiate contact with her.  Did

22    you know that?

23    A.   I was not aware of that, but I certainly am now.

24    Q.   Were you aware that your brother located her telephone

25    number and contact information from public materials?

1    A.    No, I was not.

2    Q.    Would you agree with me that his ability to do that shows

3    that he knows how to work the phonebook and can find things in

4    it that he wants to find?

5    A.    He is a resourceful fellow.

6    Q.    Right.  When he wants to be resourceful, he can do it.

7    A.    When he wants to, certainly.

8    Q.    And he just hasn't shown any responsibility for the less

9    appealing or more work-like aspects of his release plan, has

10   he?

11   A.    I don't know that that's quite fair.  I think he was

12   quite interested and motivated to work with the community

13   hospital, the local hospital -- I'm sorry -- not hospital,

14   library, in the local community and was very much looking

15   forward to a job -- taking a job with them where he could use

16   some of the skills that he has developed over the years, and

17   that was a logical step for him and one that he seemed quite

18   anxious to do, and when that didn't come through, that really

19   was upsetting.

20   Q.    Did he look for any other libraries that he could work

21   at?

22   A.    We, actually, not too long ago, recently, looked at a

23   possible situation with another -- with a hospital, actually,

24   a similar hospital in my mother's area.

25   Q.    Mr. Hinckley, you said --

1              THE COURT: A hospital or library?

2              THE WITNESS:  It was a library within a hospital in

3     the local area.  It was similar to St. E's.

4     BY MS. CHASSON:

5     Q.   You said "we", and I was asking you about your brother.

6     What other steps did he take after the original library job

7     fell through?

8     A.   Again, he's worked with the Salvation Army.  He has met

9     with Mr. Beffa on numerous occasions going through numerous

10    lists of possibilities.  We have all learned that just because

11    a name is on a piece of paper doesn't mean that it translates

12    into something that will work out, and so he has had to make

13    -- we've all had to make some calls or figure out what the

14    next step is.

15    Q.   But you have been -- other people have been making those

16    calls?

17    A.   No doubt.  He has had several people helping him with

18    this project.  I think that's fair.

19    Q.   Mr. Shamblee has said that your brother is more

20    interested in the social and recreational aspects of his

21    release plan and has little investment in other aspects.

22    Do you agree with that?

23    A.   Certainly, I think that he is interested in the things in

24    his passions in life, which are art and music, and let's hope

25    a little socializing.

1    Q.   Okay.

2    A.   But at this point until the right job or volunteer

3    project comes along, certainly, he has nothing that creates a

4    passion there because it's a void at this point.

5    Q.   Well, your brother also didn't attend a follow-up

6    appointment with the Salvation Army, did he?

7    A.   That was my understanding.  You're correct.

8    Q.   All right.  And it -- so that job is just not going to

9    fall in his lap, right?

10   A.   Well, my understanding was that it had fallen out of the

11   lap before he had a chance to do the follow-up.  Now, I don't

12   know the details leading up to that, but that's the way it was

13   presented to me.

14   Q.   So you -- would you be surprised to hear that he actually

15   had an appointment to go at some point during a day and just

16   for a follow-up meeting there and didn't attend?

17   A.   I would be surprised that he would not follow-up with a

18   true appointment at a given time with somebody who is

19   expecting him to be there.  I'm not sure that's what I was

20   told happened.

21   Q.   Well, at the time he didn't go to that appointment, that

22   was in May of this year.

23   A.   Okay.

24   Q.   And at that point, it's correct, is it not, he didn't

25   have a volunteer job, did he?

1    A.    No, he did not.

2    Q.    And this hearing had been set for quite some time, right?

3    A.    Correct.

4    Q.    And everybody knew that your brother needed to get some

5    type of a volunteer work assignment in place, correct?

6    A.    That is correct.

7    Q.    Do you agree that that shows poor judgment on your

8    brother's part not to follow-up with that meeting?

9    A.    I was told that he received a phone call or several phone

10    calls from the Hospital in D.C. on that very day saying that

11    either the meetings had been taken care of or the person was

12    already contacted, and, quite frankly, I don't know if that

13    was good news or bad news.  I don't know because of those

14    phone calls that the deal was off or if there -- they were

15    saying that it was taken care of, and you don't have to do it,

16    but he, I think, was under the impression that he did not need

17    to follow-up.

18    Q.    Do you think it shows good judgment not to have followed

19    up?

20    A.    I wish he had, but it didn't happen.

21    Q.    All right.

22          MS. CHASSON:  Court's indulgence.

23          THE COURT: Why don't we take a little break?

24          MS. CHASSON:  That's fine.  I may be done.

25          THE COURT:  Oh, you may be done.

```
1              MS. CHASSON:  Yes.  I may be done, but if you want
2     to take a break, I can tell you that I'm done afterwards if
3     you'd like.
4              THE COURT:  All right.
5              MR. LEVINE:  Why -- Your Honor, may I suggest that
6     we determine if she's done before we take a break?
7              THE COURT:  Sure.  I thought I -- go ahead.  Why
8     don't you consult, and then you can let us know.
9              MS. CHASSON:  Why don't we just take a break, and
10    I'll probably have five minutes.
11             THE COURT:  All right.  Fine.
12             (Whereupon, there was a brief recess at this time;
13    thereafter, court resumed as follows:)
14             MR. LEVINE:  Your Honor, we're waiting for the
15    patient.
16             THE COURT: Yes, we are. Ms.  Chasson.
17             MS. CHASSON:  Thank you, Mr.  Hinckley.  I have no
18    further questions for the witness.
19             THE COURT:  Mr.  Levine.
20             MR. LEVINE:  Thank you, Your Honor.
21    REDIRECT-EXAMINATION BY MR. LEVINE:
22    Q.   If it please the Court.  Mr.  Hinckley, during her cross-
23    examination of you, she asked a panoply of questions about the
24    marking on the form that reflects sadness being a little bit
25    present; do you remember those questions?
```

```
1    A.   Yes, I do.

2    Q.   And could you be sad about the loss of an intimacy?

3    A.   Certainly.

4    Q.   Could you be sad about the loss or inability to get a

5    job?

6    A.   Yes.

7    Q.   Could you be sad about the loss of a father?

8    A.   Oh, yes.

9    Q.   And being sad about those losses, does that suggest to

10   you danger in any way?

11   A.   Not to me.

12   Q.   Now, there were -- there was a question, maybe more than

13   one, about whether John wanted to bring both Ms. M or invite

14   both Ms. M and Ms. G to a restaurant at the same time; do you

15   remember that question?

16   A.   I do.

17   Q.   Now, whether he did that, would it suggest that he was

18   dangerous?

19   A.   That would not, no.

20   Q.   And if he didn't do that, would it suggest that he was

21   dangerous?

22   A.   No.

23   Q.   All right.  Now, there were some questions about whether

24   or not he takes initiatives to meet women, and there was a

25   question or two, perhaps, about how he got the telephone
```

1      number from the phonebook.  I believe the phrase used by Ms.

2      Chasson was:  He knows how to work the phonebook.  Remember

3      that?

4      A.   Yes, I do.

5      Q.   Okay.  All right.  Does that mean he knows how to do the

6      alphabet?

7      A.   I would think so.

8      Q.   Does it show a criminal mastermind of some sort?

9      A.   Not to me.

10     Q.   Does it show that the fact that he knows well how to work

11     the phonebook that he's at all dangerous?

12     A.   Not to me.

13     Q.   Now, there was some reference that she quickly noted when

14     you answered a question about "we", and she said, oh, no,

15     we're not talking about "we."  We want to know about him,

16     whether he had the initiatives.  Do you remember that

17     exchange?

18     A.   Yes.

19     Q.   Now, under the current plan, isn't he required to go on

20     these interviews in the form of a "we", rather than he alone?

21     A.   He is required to do that, yes.

22     Q.   All right.  And isn't that exactly what this new proposal

23     attempts to address, giving him more unaccompanied time so as

24     to be able to take the initiative to do those very things?

25     A.   That's my understanding.

1    Q.    Now, lots of questions about whether he took initiatives.

2    Is it difficult for a 50-year old man to find employment with

3    little work experience?

4    A.    I would think so.

5    Q.    And would you expect such a person, perhaps, to need a

6    little bit of help?

7    A.    Absolutely.

8    Q.    And isn't that the whole idea of the support by the

9    Hospital and case management, to provide that help?

10   A.    I think so.

11   Q.    And to address the question of:  What do we do with

12   people who have been hospitalized for a substantial period of

13   time and may not in fact have the initiative that others who

14   are -- have more privileges in life might have?

15   A.    I agree.

16   Q.    Now, does the fact that he may or may not have

17   initiatives or take initiative suggest to you that he is

18   dangerous one way or the other?

19   A.    Not to me.

20   Q.    Ms.  Chasson makes the point that he has little

21   investment in work, only an investment in socializing.  Do you

22   remember her making that point?

23   A.    Yes.

24   Q.    And is that different from a good deal of the work force

25   in America, they'd rather play than work?

1    A.   That is a familiar pattern, yes.

2    Q.   And many people are interested more in leisure than in

3    work; isn't that true?

4    A.   That is true.

5    Q.   And does that suggest to you that all these throngs of

6    people are dangerous?

7    A.   No.

8    Q.   And does it suggest to you that Mr.  Hinckley would be

9    dangerous because he may favor pursuing art, music,

10   socializing, maybe even women, to work?  Does that suggest

11   he's dangerous?

12   A.   Not to me.

13   Q.   Now, she makes the point further that everyone knew that

14   this hearing was coming and that he really needed a job before

15   the hearing.  Do you remember her making that point?

16   A.   Yes, I do.

17   Q.   Now, did the government help Mr.  Hinckley get that job

18   by putting out in the public distortions of facts, theories

19   without any factual support, to the local Gazette?

20            MS. CHASSON:  Objection, Your Honor.

21            THE COURT:  Yes.  I think you better ask a question

22   that doesn't have too many assumptions and presumptions built

23   into it.

24   BY MR. LEVINE:

25   Q.   Do you think that putting into the local media a theory

1    not supported by fact --

2              MS. CHASSON:  Objection, Your Honor.

3              THE COURT: I think the real question is the Gazette

4    published an article which they would not have been able to

5    publish had the government not filed this document publicly;

6    whether the government distorted the facts or not is not so

7    much the issue.  I mean, you can ask the questions any way you

8    want to, but the Gazette published facts, some facts, that

9    were not helpful and some distortions of fact, or

10   misapprehensions of the fact, that the government may or may

11   not have included in its filing and may or may not have

12   intended, or maybe the Gazette took it all out of context.

13             But the real issue is, it seems to me, that the

14   Gazette published an article, and it was based on what the

15   government filed, but whether the distortions of fact or the

16   facts taken out of context are the government's fault or the

17   Gazette's fault is a debatable question.

18             What is not debatable is the government filed this

19   thing publicly, and the Gazette picked and chose what it

20   wanted to from what the government filed publicly and may have

21   embellished and wrote an article.  So that's sort of the

22   predicate that I think you will not get an objection to if you

23   start from that premise.

24   BY MR. LEVINE:

25   Q.   With that predicate, with that predicate, do you think

1    the government helped in getting, in assisting Mr.  Hinckley

2    in getting this volunteer job that was so essential before the

3    commencement of this hearing?

4    A.    I would agree that is not helpful, no.

5    Q.    And would you agree that that created a stress on Mr.

6    Hinckley?

7    A.    It could have.

8    Q.    And do you agree it created stress in the family, that

9    article?

10   A.    It was not pleasant reading that article.

11   Q.    And would you agree that Mr.  Hinckley was strong,

12   resilient, and stable in the face of that disappointment?

13   A.    He appeared to be.

14   Q.    And would you agree further that there was nothing that

15   he did that signalled danger?

16   A.    There was nothing that I observed that created any

17   danger.

18   Q.    And lastly, there was a discussion or a series of

19   questions about whether Mr.  Hinckley went to the Salvation

20   Army or was relieved of the -- whether he was required to go

21   to the Salvation Army on -- during that day on the May visit.

22   Do you recall that question?

23   A.    Yes, I do.

24   Q.    And isn't it true that there was no scheduled appointment

25   for him to go to the Salvation Army?

```
 1      A.   That was my understanding that there was no schedule.

 2      Q.   And is it unusual for people who have a conversation to

 3      have different recollections about what that conversation was

 4      about?

 5      A.   Certainly.

 6           MR. LEVINE:  Nothing further, Your Honor.  Oh, one

 7      last question.  One last question.

 8      BY MR. LEVINE:

 9      Q.   Was Mr. Hinckley not going to the Salvation Army a

10      manifestation of danger in your view?

11      A.   No, it was not.

12           MR. LEVINE:  Nothing further, Your Honor.

13           THE COURT: Ms. Chasson, questions?

14           MS. CHASSON:  No further questions, thank you.

15           THE COURT: Thank you, Mr. Hinckley.

16           THE WITNESS:  Thank you.

17           (End of the testimony of Ms. Sims and Mr. Scott

18      Hinckley.  Thereafter, Dr. Montalbano was called as a witness

19      for the rest of the afternoon which has already been

20      transcribed and produced separately.)

21

22

23

24

25
```

1

2                    C E R T I F I C A T E

3

4          I, Wendy C. Ricard, Official United States Court

5    Reporter in and for the District of Columbia, do hereby

6    certify that the foregoing proceedings were taken down by

7    me in shorthand at the time and place aforesaid,

8    transcribed under my personal direction and supervision,

9    and that the preceding pages represent a true and correct

10   transcription, to the best of my ability and

11   understanding.

12

13

14

15                         _____

16                         Wendy C. Ricard, CCR, RPR

17                         Official U.S. Court Reporter

18

19

20

21

22

23

24

25