<pre>
 1                  UNITED STATES DISTRICT COURT

 2                     DISTRICT OF COLUMBIA

 3

 4    UNITED STATES OF AMERICA          CRIMINAL ACTION NO. 81-306

 5                                      WASHINGTON,D.C.

 6    VERSUS                            THURSDAY, JULY 24, 2008
                                        (REDACTED)

 7

 8    JOHN W. HINCKLEY, JR. (ST. ELIZ.)  2:00 P.M.

 9

10                      EVIDENTIARY HEARING(DAY 4)
                          (Testimony of Dr. Phillips)

11

12               BEFORE THE HONORABLE PAUL L. FRIEDMAN

13                  UNITED STATES DISTRICT COURT JUDGE

14

15    A P P E A R A N C E S:

16

17    FOR THE PLAINTIFF                 THOMAS E. ZENO, ESQ.
                                        SARAH T. CHASSON, ESQ.
                                        U.S. ATTORNEY'S OFFICE
18                                      555 Fourth Street, NW
                                        Suite 5423
19                                      Washington, DC 20530
                                        (202) 514-6957
20

21    FOR THE DEFENDANT
      JOHN W. HINCKLEY, JR.             BARRY W. LEVINE, ESQ.
22                                      ADAM S. PROUJANSKY, ESQ.
                                        ANN-MARIE LUCIANO, ESQ.
23                                      DICKSTEIN SHAPIRO, LLP
                                        1825 Eye Street, NW
24                                      Washington, DC 20006-5403
                                        (202) 420-2237
25
</pre>

ST. ELIZABETHS HOSPITAL                TONYA A. SAPP, ESQ.
                                       D.C. ATTORNEY GENERAL'S
                                       OFFICE
                                       441 4th Street, NW
                                       Suite 1060 North
                                       Washington, DC 20001
                                       (202) 724-5562


REPORTED BY:                           WENDY C. RICARD, RPR,CCR
                                       OFFICIAL COURT REPORTER
                                       333 Constitution Ave., NW
                                       Room # 6718
                                       Washington, DC  20001
                                       (202)354-3111


Proceedings recorded by mechanical stenography.

Transcript produced by computer-aided transcription.




                         **I N D E X**

**EXHIBITS:**                                      **PAGE:**

    Patient No. 13 & 14..................... 119


**WITNESSES:**

    Dr. Robert Phillips..................

       By Ms. Chasson...................... 3

       By Mr. Levine....................... 66

1                    **P R O C E E D I N G S**

2              MR. ZENO:  Good afternoon, Your Honor.

3              THE COURT:  Sorry to keep you all waiting.  Well,

4      are we ready?

5              MR. LEVINE:  We're ready, Your Honor.

6              THE COURT:  Mr.  Zeno; Ms.  Chasson.

7              MS. CHASSON:  Good afternoon.  The government calls

8      Dr. Robert Phillips.

9              THE COURT:  Good afternoon. Okay.

10     *             *             *             *

11              **Dr. Robert Phillips**, called as witness in this case,

12     after having been duly sworn, testified as follows:

13     *             *             *             *

14              THE WITNESS:  Good afternoon, Your Honor.

15              THE COURT:  Doctor, how are you?

16     **DIRECT EXAMINATION BY MS. CHASSON:**

17     Q.   Good afternoon.

18     A.   Good afternoon, Ms.  Chasson.

19     Q.   Would you please spell your first and last names for the

20     court reporter?

21     A.   R-O-B-E-R-T;P-H-I-L-L-I-P-S.

22     Q.   Thank you.  Dr. Phillips, you've previously been

23     qualified as an expert in this case in the preparation of

24     conditional release plans, the identification and management

25     of risks posed by insanity acquittees to themselves or the

1     community.

2             THE COURT: Can you pull the microphone a little

3     closer to you.

4             MS. CHASSON:  Your Honor, I would remind the Court,

5     as you well know, that Dr. Phillips previously has been

6     accepted as an expert in the preparation of conditional

7     release plans, as well as the identification and management of

8     risks posed by insanity acquittees to themselves and the

9     community.

10            I would ask that that stipulation be renewed again

11    this year.

12            THE COURT:  Mr.  Levine?

13            MR. LEVINE:  No objection, Your Honor.

14            THE COURT:  He'll be so qualified again and

15    recognized as an expert again.

16            MS. CHASSON:  Thank you.  If I may have the Court's

17    indulgence, though, to ask Dr. Phillips to remind the Court

18    just of his specific experience, very briefly, placing people

19    in the community.  Have you in fact done that yourself in the

20    past?

21            THE WITNESS:  Yes, I have.

22    BY MS. CHASSON:

23    Q.   And in what capacity was that?

24    A.   During the time frame that I was the Director of Forensic

25    Services for the State of Connecticut and the Chief Executive

1    Officer of the Whiting Forensic Institute which is

2    Connecticut's maximum security psychiatric hospital, which

3    would be the equivalent of the John Howard Pavilion, and,

4    additionally, throughout my career, I've been asked to

5    consult on cases in different jurisdictions for that expressed

6    purpose.

7    Q.    But you actually have hands-on experience yourself

8    assessing risks and drafting conditional release plans?

9    A.    Yes.

10   Q.    What is the purpose of a conditional release plan?

11   A.    Well, as I think you've heard through other testimony,

12   the whole concept of conditional release is to engage in

13   controlled experiments of ever-increasing responsibility and

14   freedom in moving a patient from an institution back into the

15   community in a way that balances their clinical needs while at

16   the same time addressing the public safety interest that must

17   be tended to by statute.

18   Q.    Do you have an opinion as to whether the (e)plan that is

19   currently pending before the Court adequately manages the

20   risks that Mr. Hinckley will be a danger to himself or to

21   others under the plan put forth?

22          MR. LEVINE:   Could we have that question again, Your

23   Honor.   That's an important question.

24   BY MS. CHASSON:

25   Q.    Sure.  Do you have an opinion as to whether the (e)plan

1       adequately manages the risks that Mr. Hinckley will be a

2       danger to himself or to others under the social and work and

3       other provisions contained within the plan?

4       A.    I do.

5       Q.    Okay.  And what is that opinion?

6       A.    Not as it is currently written, I do not believe it

7       addresses those risks adequately.

8       Q.    Do you have an opinion as to whether there is a reliable

9       therapeutic support place -- in place for Mr. Hinckley under

10      the (e)plan as it is currently formulated?

11      A.    Based on the testimony that I heard today, I'm unclear

12      what the actual therapeutic structure is and will be.

13      Q.    Okay.  So is your opinion then that the plan --

14            MR. LEVINE:  Objection.

15            THE COURT:  So the government's not allowed to ask

16      leading questions?

17            MS. CHASSON:  And it may not even have been leading.

18            MR. LEVINE:  I wasn't about to say that, Your Honor.

19      There may be occasions when they can, but not the one they're

20      about to ask.

21            THE COURT:  Why don't you ask your question, and

22      we'll see whether it's objectable.

23            MS. CHASSON:  Thank you.

24      BY MS. CHASSON:

25      Q.    Is it your opinion that the plan does or does not contain

1    an adequate therapeutic structure for Mr. Hinckley in his

2    mother's hometown?

3    A.   At this time, I'm unclear as to whether or not it does.

4    Q.   And do you have an opinion as to whether the (e)plan in

5    its current formulation has adequate work and social

6    structures put in place that will manage the risks posed by

7    Mr. Hinckley's clinical conditions?

8    A.   I do not believe that it does in its current iteration.

9    Q.   Okay.  Now, even assuming that the plan did adequately

10   manage risks, would it be necessary to expand Mr. Hinckley's

11   release from the current six days/seven nights that he

12   currently receives to the nine days/ten nights contemplated by

13   the plan?

14   A.   Initially, no; eventually, yes.

15   Q.   Okay.  Is there sufficient time, in your opinion, for Mr.

16   Hinckley to pursue his driver's license under a six-day

17   release plan?

18   A.   Yes.

19   Q.   And do you have an opinion as to whether there is

20   sufficient time under the current six day/seven night

21   framework to permit Mr. Hinckley to perform two mornings of

22   volunteer work?

23   A.   Yes.

24   Q.   And what is your opinion?

25   A.   I believe there is sufficient time.

1    Q.   And what about the three hours twice per week of

2    recreation in the community-at-large contemplated by the

3    (e)plan.  Do you have a view as to whether that, too, can be

4    accomplished under the current six days/seven night framework?

5    A.   I believe it can.

6    Q.   Okay.  Do you have any concerns about the accuracy of the

7    proposals contained within the (e)plan?

8    A.   Yes.

9    Q.   What are those?

10   A.   Well, first and foremost, once again, I look at an

11   (e)proposal in which the material that is referenced in that

12   proposal is simply inaccurate or not true.

13   Q.   Can you give an example?

14   A.   An example would be one of great -- of paramount

15   importance, and that is where will he be doing his volunteer

16   work.  The (e)proposal reflects one thing.  In fact, that job

17   opportunity was never offered as I have been told by the

18   agency themselves and yet the (e)letter indicates not only had

19   it been offered, but there was a time structure and framework

20   that's referenced in the letter that is inconsistent with

21   information provided to me.

22   Q.   Is that Housing Partnerships, Inc.?

23   A.   Yes.  And even in those that we heard in this courtroom,

24   there is uncertainty and confusion.  Early on this week, we

25   heard from Dr. Montalbano that he was going to -- that Mr.

1    Hinckley would be working at Services Board.  That clearly is

2    not the case.

3         And this morning, we heard that there were three

4    possibilities where he would be working, but, as yet, I don't

5    believe that has been corroborated by -- I don't know if it's

6    been corroborated by the hospital, by the review board, by the

7    treatment team or anyone other than hearing it today for the

8    first time.

9    Q.   Is it important in your view that any possible volunteer

10   position be corroborated by the treatment team and the review

11   board?

12   A.   Corroborated may be the wrong word.  The word I'm

13   searching for -- the concept is that it has to be something

14   that everyone is on board with and understands.  There should

15   be no surprises.  Certainly no surprises that are put in

16   motion by bad planning on the part of the treaters.

17        The whole purpose of a conditional release plan, a well-

18   written conditional release plan, is to try and mitigate the

19   problems in advance, to think through some of the things that

20   might thwart the patient's progress, and as I have testified

21   to previously, the courtroom is not the place to draft these

22   plans, and these plans should not be generated on the fly.

23        They need to be done in a carefully, well-thought out

24   manner in advance covering as many of the variables as

25   possible. No plan will ever be perfect.  We live in a world

1    that is ever-changing, but basic things should be tended to,

2    and the recurring concern in reviewing the last several

3    (e)motions that have come to my office for review and have

4    caused me to do an assessment of the case is that they always

5    seem to be premature.

6         We seem to be having these discussions at the wrong time

7    in the timeline.  We should be having these discussions when

8    everything has been set up to the best of the possibilities

9    and that things have been vetted and made certain -- as

10   certain as they can, and that doesn't seem to be the case.  We

11   seem to always be reacting to some self-imposed deadline that

12   we have to get into court and that we have to put something on

13   the paper rather than putting forward our best possible plan

14   that has been thoroughly vetted to the best of our clinical

15   ability, and we are now going to try and make this happen.

16   Q.   Well, both Dr. Rafanello and Dr. Montalbano have

17   testified that the hospital needs flexibility, that the

18   hospital needs to have discretion to identify and change

19   volunteer placements.  Do you agree with that view?

20   A.   In the right context.  There is a difference between

21   having flexibility and paying attention to the detail that we

22   must pay attention to in any case involving the conditional

23   release of the patient into the community.  Flexibility is

24   something that one relies upon when what is in place either

25   goes awry or there are changes that occur that necessitate

1    modification.

2         Flexibility is not the right construct when you're coming

3    out of the gate so to speak.  There ought not be anything

4    flexible about -- to use a sport's metaphor -- there are not

5    be flexibility about the play you're going to run.  Everybody

6    ought to know what that play is.  Everybody should know where

7    they should be on the field, and the person who's going to

8    carry the ball should realize they're going to get it and

9    what they're going to do with it.  Flexibility has no place at

10   the onset.  It is something that we deal with as matters arise

11   that warrant flexibility.

12   Q.   Well, Mr. Beffa was here this morning, and you heard his

13   testimony did you not?

14   A.   Yes, I did.

15   Q.   He described three volunteer opportunities that he

16   claimed were available to Mr. Hinckley right now and

17   proffered a letter from one of them, the Vibrant Life Services

18   Ministry, describing a job in a thrift shop that might be

19   available and also doing food manage -- food shelf stocking

20   that would be available to Mr. Hinckley combined with

21   transportation to and from that employment opportunity.

22        Why -- is that enough of an employment -- is that enough

23   verification for you?

24   A.   I would want to know more.  I'd want to know where the

25   hospital is on this matter.  Have they vetted this?  Have they

1    made contact?   Are they comfortable with the arrangements?

2    Who is the person that's going to be doing the

3    transportation?  Is it clear how many days, in fact, Mr.

4    Hinckley will be going?  Mr.  Beffa seemed to say two, three;

5    is it two; is it three?  Is the transportation going to be

6    available on each of those days?

7        If it sounds like I'm nitpicking, I am because that's

8    exactly what we do when we're putting these kinds of release

9    plans together because we do it not to make it difficult for

10   the patient, but in fact to protect the patient.  You don't

11   want to put the patient in a situation where he or she might

12   be blamed for a failure that really is something that could

13   have been tended to in advance, something that is structural,

14   something that is the fault of the clinicians for not in a

15   very rigorous way making sure the expectations are clear and,

16   more importantly,  what you're expecting of a particular

17   community provider is clear.

18       And so while what has been proffered may be fine, I think

19   there is a little homework that needs to be done in order to

20   satisfy, I would presume, those of responsible position in the

21   hospital, but as an independent examiner, I would have to say

22   there's a little more that has to be done to satisfy me, for

23   whatever that's worth.

24   Q.   Do you have an opinion as to whether Mr.  Hinckley will

25   be a danger to himself or to others without a defined

1    volunteer job to go to?

2    A.    Yes.

3    Q.    What is your opinion?

4    A.    I would answer it this way:  I have said before, and I

5    have agreed with other clinical assessments, that Mr.

6    Hinckley does not pose an immediate risk of danger as he sits

7    before me.  What we are concerned about doing is managing his

8    risk, and that's what conditional release is also about.  We

9    go through the process of identifying risk.  The detailed work

10   that Dr. Montalbano has done, all of the things that we do for

11   every insanity acquittee and, for that matter, any patient

12   that we're releasing into the community, we are engaged in the

13   effort of identifying the risk.  We don't identify the risks

14   for an academic exercise.  We identify them for one reason and

15   one reason alone, and, that is, once identified, we've got to

16   manage them.

17        And so absent adequate structure being put in place to

18   manage the risk, then -- and what is the risk, the risk of

19   future dangerousness; then we are not adequately controlling

20   for those factors.  If you don't control for those factors, it

21   is an inappropriate risk to the community and to the patient

22   to move someone out without controlling for those issues.

23   Q.    Well, why is it a risk factor for Mr. Hinckley not to

24   have some sort of a volunteer job set up to go to?

25   A.    In large measure because it has been determined, in his

1    case and in many other cases, that a significant portion of

2    his time should be spent engaged in some vocational pursuit,

3    whether it is volunteer work, whether it is ultimately a job.

4    Part of our concern in preparing a patient to return to the

5    community is getting them in a position where they engage in

6    the kinds of activities that we know clinically are going to

7    best support his continued recovery.  And so being engaged in

8    some vocational activity is a cornerstone of preparing someone

9    for reentry into the community.

10   Q.    Does Mr. Hinckley appear to you to want a job?

11   A.    That's an interesting question.  I guess it depends on

12   what job we're talking about.  The job that Mr. Hinckley, I

13   think, would ultimately love to have is one that has yet to

14   have been offered to him.  If there were a job that would

15   allow him to write music and play his music, I think wild

16   horses couldn't preclude him from doing whatever it took to

17   secure that position.

18       Absent that being put on the table, I think there has

19   been demonstrable evidence that his interest in the positions

20   that have been available has been less than overwhelming.

21   Q.    Okay.  Is Mr. Hinckley's lack of initiative in obtaining

22   a volunteer position a risk factor for dangerousness for him?

23   A.    I think his lack of initiative has to be understood in

24   the context of how it is demonstrated.  I think the bottom

25   line is all of these things factor in to his ultimate risk,

1    but if Mr.  Hinckley's lack of initiative means that he is not

2    going to fully engage or that he is not going to approach the

3    things that are required of him on conditional release and

4    lead to a situation where in fact he won't be engaged in

5    activities, then, yes, it is potentially a risk factor.

6    Q.   Have you been able to assess the level of initiative that

7    Mr.  Hinckley has displayed over the last year as he has made

8    efforts to obtain a volunteer position?

9    A.   Yes.

10   Q.   What is your opinion of that?

11   A.   I think he has displayed a lack of initiative.  And maybe

12   the way to frame it is I do believe he could have done more if

13   he wanted to.  He could have done much more if he wanted to,

14   but he has chosen not to.

15   Q.   We have heard testimony and you have read case reports

16   about Mr.  Hinckley's relationship with Ms. G.  Simply from a

17   perspective of initiative in assessing what Mr.  Hinckley's

18   capabilities are in that regard, do you find it significant

19   that he was able to locate Ms. G and reinitiate a relationship

20   with her?

21   A.   I think it is significant and demonstrative that when Mr.

22   Hinckley puts his mind to something, he has the skill set

23   necessary to accomplish it.  There are some patients who we

24   prepare for conditional release who simply don't have the

25   skill set, and we're constantly struggling with figuring out

1    ways of how to help them develop those skill sets or how to

2    help them augment those skill sets so that they can be

3    successful in whatever task that we have laid out in

4    conjunction with them for their continued recovery.

5         In Mr. Hinckley's case, I don't think the problem is a

6    lack -- a total lack of skills in the skill set.  There are

7    certain skills that he doesn't have or that need bolstering,

8    but the basic skills of knowing how to get from point "A" to

9    point "B, how to set things up, how to make the arrangements,

10   I think clearly he has those skills and has demonstrated his

11   capacity in exercising and demonstrating those skills himself.

12   What he has also demonstrated is that on those matters which

13   are of particular interest to him, he has the skills and

14   accomplishes it. For those matters that he is less interested

15   in, he has not utilized the skills that he has to accomplish

16   those goals.

17   Q.   What are those other areas that you were thinking of?

18   A.   Well, specifically, in the area of going through the

19   process of identifying and finding a volunteer placement, I

20   think there is much more that he could have done.

21   Q.   What about his social skills, his sort of more social

22   activities, has he demonstrated initiative and the ability to

23   follow up with respect to identifying social opportunities,

24   beyond Ms. G?

25   A.   Yes.

1    Q.    What are those?

2    A.    For example, his ability to make arrangements for his

3    massages; his ability to make arrangements for art lessons;

4    his ability to make arrangements for music lessons.  When it

5    is something that has been of interest to him, he has been

6    able to organize it and make it happen; and when it has been

7    of less interest to him, and it has not always been totally --

8    and I want to make sure that it's clear, this is not all --

9    this should not all be placed on his shoulders -- but on those

10   things that he is clearly responsible for and could have and

11   should have demonstrated more interest and more success, I

12   think at the core of his lack of success was a lack of

13   interest.

14   Q.    Okay.  Well, let's talk about some of those other

15   factors.  We have heard testimony both from Dr. Rafanello and

16   from Dr. Montalbano that they consider Mr.  Hinckley to some

17   degree institutionalized; do you agree with that?

18   A.    In part.  I'd be hard pressed to think that someone who

19   has been in the hospital for 27 years has not had some affect

20   in that process that might have a negative impact on him, but,

21   interestingly, and I say this -- maybe I'll frame it this way

22   -- the comments that I will make henceforth are not meant to

23   in any way condemn the hospital or the treatment team, but

24   just to point out as easily as an independent examiner has,

25   can, that there are other factors that have to be considered,

1    as well.

2         The institutionalization gate swings both ways.  So not

3    only does the affect of having a patient in hospital for such

4    a protracted period of time affect the patient, it also has

5    the potential to affect staff in a way that also could be

6    characterized as institutionalized behavior.  So both patients

7    and staff are at risk for this.

8    Q.   Well, you have been listening to the testimony over the

9    last three days now.  Based upon that testimony, have you

10   developed any concerns that perhaps empathy for Mr. Hinckley

11   may be overriding sound clinical judgments?

12   A.   I think that is a risk that we're always concerned about.

13   I think that risk increases when you have a patient who has

14   been under your care for such a long period of time, and it is

15   a risk that you can't take away.  It is something that you

16   have to at least be aware of and control for it, and I think

17   to a certain extent, there are some themes that would suggest

18   there is a loss of--  at times there has been a loss of that

19   critical objectivity because of an interest perhaps to -- that

20   could be characterized as being empathetic.

21   Q.   What are those themes?

22   A.   Making excuses.  Making excuses for behaviors that are

23   primarily the patient's responsibility.  You know --

24   Q.   What excuses have been made for Mr. Hinckley's

25   behaviors?

1    A.    Well, for example, if I understood Dr. Rafanello's

2    testimony yesterday, I mean, something either is or is not

3    expected as a part of your conditional release plan.

4    Conditional release plans are not ambiguous documents.   They

5    may be when they are submitted, but they are not by the time

6    they leave the judge's chamber.   The expectations are clear.

7    And so when you have a -- under the rubric of a conditional

8    release plan, if you have got a visit structured and there is

9    an expectation that you are to do something, these aren't

10   suggestions.   These are clear expectations of what should be

11   accomplished.

12        So if you're supposed to go to the Salvation Army, there

13   is no ambiguity about that, you are supposed to go.   You can

14   quibble about whether there's an appointment or not.   I think

15   that is a foolish academic discussion; that's not the point.

16   The point is the expectation was on a certain date you were

17   supposed to do something, and it didn't happen, and to try and

18   sort of explain it away as, well, maybe it wasn't clear, I

19   wasn't there.   I have a hard time with that.

20   Q.    Okay.  And do you find it significant that Mr.  Hinkley

21   failed to attend that appointment with the Salvation Army?

22   A.    Yes.

23   Q.    Why is it significant?

24   A.    Well, it is significant because it is an indication of

25   bad judgment, of doing what he wanted to do rather than what

1    he needed to do.  These are all the kinds of things that we

2    test and look for, and he wouldn't be the first patient who

3    has behaved in such fashion.  But the fact of the matter is

4    when you behave in that matter, we have a responsibility as

5    clinicians to call it as it is and then address it.

6    Q.    Okay.  Dr. Montalbano and Dr. Rafanello have both

7    testified that Mr. Hinckley's past behavior is the best

8    predictor of his future behavior.  Based upon what you have

9    seen of Mr. Hinckley's efforts to date for finding a job, do

10   you expect him to suddenly step up or expedite his job search

11   without further intervention?

12   A.    No.

13   Q.    All right.  Do you have an opinion as to whether the

14   conditional release plan as drafted adequately controls for

15   that risk factor?

16           MR. LEVINE:  Controls what.

17           MS. CHASSON:  Controls for the risk factor of Mr.

18   Hinkley's lack of initiative to which you testified earlier.

19           MR. LEVINE:  I don't think he's testified that lack

20   of initiative is a risk factor yet; maybe, I don't know, but I

21   don't think the question has been asked.

22           THE COURT: I'm not sure.  Did you say that --

23           MS. CHASSON:  I checked it off, but I can repeat it

24   again.

25           THE COURT:  Go ahead.

1    BY MS. CHASSON:

2    Q.   Is Mr. Hinckley's lack of initiative a risk factor for

3    him?

4    A.   Yes.

5    Q.   All right.  Why?

6    A.   Again, I think I had testified to a few moments earlier

7    that in the context of his overall behavior, if he doesn't

8    engage in the kinds of activities that are necessary to

9    support his continued recovery, then he is failing to meet the

10   objectives that are outlined in his plan; outlined in the

11   goals and objectives that we know are going to increase the

12   likelihood of his successful recovery in the community.  That

13   then means we're not adequately controlling for his risks if

14   we allow him to subjectively not comply.

15   Q.   Do you have an opinion as to whether the (e)plan

16   adequately manages the risk factor of Mr. Hinckley's lack of

17   initiative?

18   A.   I'm not sure that either the plan as written or any plan

19   per se will address that issue specifically.  It is a part of

20   the understanding of who this patient is and how he behaves.

21   That being said, the way you address something like that is

22   making sure the appropriate controls and supports are in

23   place.  Controls being what are clearly -- what are the

24   clearly defined expectations.  And who are the clinical

25   personnel who are going to insure that those goals and

objectives are met, and by "insure", I don't mean standing

there with a clipboard checking them off, but, more

importantly, what are the mechanisms, be they institutions, be

they warm bodies, that are going to assist him in meeting

those objectives.

I don't mean to run on, but let me sort of close the loop

on that question.  So that if you know someone has a problem

with initiative and you have an expectation that they do

certain things, doesn't it seem predictable that if you give

them a task and you know they're not self-starters, there is a

pretty high likelihood they're not going to meet that goal.

So in advance of giving them that task, you ought to put in

place the mechanisms that he or she can rely upon in order to

make that successfully happen, and that's the piece that I

have concerns about.  I'm not so sure that that has been

clearly articulated, that that's fully understood, that it is

in place, because there isn't a lot of mystery about where we

are and why we're here, again.

Q.   Let's talk a little bit about the community reaction to

Mr. Hinckley.  Do you agree with Dr. Rafanello and

Dr. Montalbano that it demonstrates Mr.  Hinckley's resiliency

that he has not become visibly depressed by the job rejections

that he's experienced?

A.   I'm sorry.  Can you repeat that please?

Q.   Dr. Rafanello and Dr. Montalbano testified -- and I think

1    it is evident in the record -- that Mr. Hinckley has not

2    gotten many of the jobs that he has either applied for himself

3    or that others have sought on his behalf.  They testified that

4    they identified resiliency in Mr. Hinckley from his reaction

5    to not getting -- from having those disappointments, from

6    being rebuffed, as they called it.

7    A.    Yes.

8    Q.    Do you agree that his reaction to not getting those jobs

9    shows resiliency?

10   A.    Well, perhaps.  It all depends on how you look at it.  On

11   the one hand, certainly if you are discouraged by what's

12   happening, if you are offended or upset by the fact that

13   people are being unwelcoming to you, it's hurtful to anyone,

14   independent of whether or not you have a narcissistic

15   personality disorder.  Obviously, if the latter is true, it is

16   going to be potentially an even more profound narcissistic

17   injury than it would be to someone normally.

18          On the other hand, if you don't want to do it in the

19   first place, it is kind of hard to see how you'd be upset by

20   it.  So you have to consider all the alternatives and, again,

21   there are no surprises here with Mr. Hinckley or any other

22   patient.  This is what we see and it's a function then of just

23   making sure you have got the appropriate structure in place to

24   deal with whatever may be the actual etiology without trying

25   to lay blame, and that's really the issue.  It's really not

1        trying to lay blame about these things, it's identifying the

2        issues that we know are likely to feed into what ultimately

3        may place him at greatest clinical risk.  It's like a domino

4        effect.  You're trying to minimize that process.

5                THE COURT: Your last point about if you don't really

6        want the job or the position or the opportunity in the first

7        place , but does that necessarily follow?  I mean let's

8        suppose that I apply at 10 jobs, and none of them are my dream

9        job.  I really don't care that much about any one of them

10       individually because there are other things I'd rather do.

11               THE WITNESS:  Yes.

12               THE COURT: But I get rejected from all 10 of them.

13       Isn't rejection in and of itself, even if it's rejection from

14       something that's not at the top of the "A" list, particularly,

15       repeated rejections, something that would have an impact and a

16       lack of self esteem impact on even the most normal person if

17       it happens over and over again and even more so somebody like

18       Mr.  Hinkley or is that not a fair observation?

19               THE WITNESS:  No.  That is a very fair observation,

20       Your Honor, and that is what I was saying in the first example

21       that I gave.  It is a normal response.  It is an expected

22       response.  And in someone with Mr.  Hinckley's diagnosis, it

23       may be an even more profound response.

24           But, alternatively, one must consider the fact that --

25       and when I say "if you didn't want the job in the first

place", I'm not suggesting that, well, I'd really like to
drive a bus, but I'm going to have to drive a taxi.  All
right.  I'll take it.  But you're still interested in doing
something.  You're still interested in being in the
workforce.  You're still interested in engaging in some
activity in this area.

You have to consider the possibility that if someone
really has no interest in driving a bus or a cab, and they get
rejected, the rejection may not have much meaning in terms of
their ego because they didn't want to engage in the activity
at all.

THE COURT:  I guess my question is isn't rejection in
and of itself something that affects your ego and your self
esteem even if it's rejection -- I mean, really, I'm in high
school, and I don't like any of these kids in my class, but,
you know, but when they all reject me, and I don't have
anybody, even the nerdiest kids,  doesn't it have some impact
on my self esteem?

THE WITNESS:  Absolutely.  And coming back to why it
is important to make sure you have the right therapeutic
connections because those issues have to be explored.  Because
what is the common response of someone in that situation?  It
doesn't bother me.  We know it does.  We know it consciously
or unconsciously, it has to have some affect even if it is not
what you wanted.

1             And so particularly in a case such as this, it is

2    important to make sure that everybody understands the history.

3    Everybody understands potentially how devastating that can be

4    independent of what the patient may say to you, and so you're

5    right on top of it, Your Honor.  It is something that has to

6    be factored in, and everything that we do then -- you know,

7             I'm always using these sports metaphors, but we're

8    playing defense here.  We're trying to think of all the

9    factors that we can control for and account for them in a way

10   that is going to allow this patient to be most successful and

11   at the same time address public safety concerns that will also

12   make him more successful because now you're able to respond to

13   those who are saying:  Well, how could you send this person?

14   Well, we can because these are the things that we're concerned

15   about and these are the things that we're doing in order to

16   address those concerns.

17            And so the point that you raise is an important one

18   and having the right therapeutic structure in place is

19   essential because these are the very kinds of issues that have

20   to be addressed locally by the therapist providing care and

21   treatment in the parent's community and certainly at the

22   Hospital, which they have been doing for years.

23   BY MS. CHASSON:

24   Q.   Well, let's talk about that, about the therapeutic

25   support contemplated by the (e)plan.  One of the proposals

1    contained within the (e)plan is that a switch will be made

2    from Dr. Lee to Dr. Beffa as Mr. Hinckley's therapist in the

3    local community.  Do you have any concerns about that?

4    A.   More concerns today than I did yesterday.

5    Q.   Why did those concerns develop today?

6    A.   Because of the testimony of Mr. Beffa.

7    Q.   All right.  Well, let's talk about the structure of just

8    what's --

9            THE COURT: Why are you concerned?

10           THE WITNESS:  If the -- well, I'll start from this

11   point of departure.  The therapy that has occurred thus far

12   with Dr. Lee has flagged or identified issues that have been

13   significant enough that there has been dialog back and forth

14   between the hospital.  That's a good thing and the issues have

15   been right on, and it suggests to me that it's working.  In

16   fact, I think those were the words that were used by the

17   person who was testifying:  It must be working because we're

18   flagging things and addressing them.

19           I don't know what is at the root of the switch.

20   It's certainly the hospital's prerogative to do so, but I hope

21   that in making the switch the same type of interaction will

22   occur and the same attention to the issues will be evoked.

23   One of the reasons it may have occurred is, in fact, because

24   there may have been a difference in therapeutic style, and I

25   think there need to be some comment about these differences in

1    therapeutic style.

2            I think the testimony yesterday was somewhat

3    incomplete in attempting to describe the range of

4    psychotherapeutic modalities.  It is not as simple as

5    psychotherapy and confrontation.  There is a range of

6    psychotherapeutic styles that some people devote their careers

7    to and others more eclectically try to use different

8    techniques with different persons, but I think it is -- I

9    think this issue of confrontation does require a more

10   elucidation.

11           The whole notion of confrontative therapy is a

12   well-established and well-relied upon treatment modality in

13   the forensic population, in substance abuse populations.

14   There are a number of individuals and clinical situations in

15   which it is the therapeutic intervention of choice, but it is

16   not a confrontation of therapist against patient.  The

17   therapist creates an environment where the patient has to

18   confront him or herself.  He is forced to confront his own

19   resistance.  He is forced to confront the realities of his or

20   her circumstance and what is causing the difficulties.

21           So that I think it is unfortunate to somehow suggest

22   the therapist is in there creating a hostile environment, and

23   I am not sure where the notion that morality is injected into

24   this process.  It's not about morals, it's about a recognition

25   of one's circumstance and what is it that one must accomplish

1    in order to get where they need to go, and that's causing the

2    individual to confront their own issues, not the issues of the

3    therapist.

4    BY MS. CHASSON:

5    Q.   Well, do you have an opinion as to whether Mr.  Hinckley

6    lied to Dr. Lee?

7    A.   Yes.

8    Q.   What is your opinion?

9    A.   He lied.

10   Q.   And is there --

11          THE COURT: You're talking about his relationship

12   with Ms. G?

13          THE WITNESS:  Yes.

14   BY MS. CHASSON:

15   Q.   Okay.  And is the fact that Mr.  Hinckley is involved or

16   at the time was involved in a triangular relationship with

17   Ms. G and her significant other something that, in your view,

18   was appropriate for a more confrontational-type of therapeutic

19   processing?

20   A.   Yes.

21   Q.   Do you think that Mr.  Hinckley is likely to make

22   progress with his choices with women on those issues absent

23   such confrontation?

24   A.   Whether it is done in the context of psychotherapy,

25   whether you do it in a treatment team setting and use the term

1    "reality testing" as opposed to confrontation, unless Mr.

2    Hinckley is forced to think about his choices and their

3    implications and what that means to him over the long run,

4    then I don't think he is going to be successful.

5             THE COURT: Let me ask you this, though.  As I

6    understand what Dr. Rafanello said about Dr. Binks was that

7    his approach or the way he did therapy was more exploratory,

8    let's talk about this, and not the, quote, judgmental.  And

9    isn't there evidence in the record that the treatment team at

10   the Hospital has over the years discussed with Mr.  Hinckley

11   his relationships with all of these various women?  And so I

12   guess my question -- well, there's two questions.  Well, isn't

13   there evidence that that's true?

14            THE WITNESS:  Yes.

15            THE COURT: And so I just want to be clear we're

16   talking about confrontational or confrontative therapy.  If I

17   say to you, Dr. Phillips, I think we really ought to talk

18   about Ms. G and her live in boyfriend, but I say it in that

19   tone instead of saying, we're going to talk about this because

20   this is a real problem.  Aren't I still confronting you with

21   this problem even though I begin by saying, let's explore it,

22   let's talk about it?

23            So are we talking about a difference in style

24   between Dr. Lee and Dr. Binks style just the way we have

25   different styles of trial lawyers? Ms.  Chasson's, for

1    example, style is a little different from Mr. Levine's, you

2    may have noticed. Is that -- but they're talking to the

3    witnesses about the same issues.

4              THE WITNESS: Well, let me respond in this way, with

5    no disrespect to Your Honor.

6              THE COURT: No. And I have none for either of them.

7              MS. CHASSON: It was sufficiently ambiguous, Your

8    Honor, that I think both Mr. Levine and I can be pleased.

9              THE WITNESS: Why did you choose to display the

10   affect that you did in illustrating confrontational therapy?

11   Wouldn't it be -- I'm sorry.

12             THE COURT: Because that's what I thought

13   Dr. Rafanello was talking about, the difference between

14   Dr. Lee being a confrontational person and Dr. Binks being

15   more exploratory, let's talk about these things, in a gentler

16   way, and that's what I mean by style as opposed to substance.

17   That there are different ways to discuss and explore the same

18   things and just because different people choose to do it

19   differently doesn't necessarily mean that their whole approach

20   -- it doesn't necessarily mean that one of them thinks a

21   particular issue is important and the other doesn't.

22             And so when you were talking about confrontative

23   therapy, I was, I guess -- the more I heard you talk about it,

24   the more I thought that maybe you and Dr. Rafanello weren't

25   disagreeing so much that both Dr. Binks and Dr. Lee were

1    raising the same issues, but in different ways.

2              THE WITNESS:  Well, let me go back.  I think it is a

3    an assumption on your part or on anyone that confrontation

4    therapy means that someone is being -- is behaving in a way

5    that would portend aggressiveness or something less than a

6    more -- a more comforting approach.  It certainly could be.

7    But, again, it's perhaps the use of the word, the

8    confrontation is not between patient and therapist, it's

9    between self and where you are.

10             So the same thing is affected by someone -- I would

11   give you this example: We really do need to talk about this.

12             THE COURT: Yeah.

13             THE WITNESS:  Not we need to talk about this.  So it

14   is that Dr. Lee's persona or is it his choice of clinical

15   modality?  The second issue is that the word "judgmental" has

16   been used.  Well, everything we do clinically is based on

17   ultimately some judgment, but judgmentalness(Phonetic)

18   suggests a pejorative presumption potentially of what is and

19   what should be, and, again, I don't think that is as much the

20   issue as forcing someone to do a reality check.

21             The difference I believe in Dr. Binks' approach is

22   that he does a more exploratory, long-term, let's sort of I'm

23   going to wait for you to get there as opposed to an approach

24   that is often utilized in situations where the task is to try

25   and help get the patient to identify what it is that's

1    precluding their movement and get them to move on because

2    there is some expectation. They have an expectation.  They

3    want to get somewhere, and so if you want to get to where you

4    need to go, you need to think about the treatment modality

5    that you put in place.

6            THE COURT: Well, I guess -- maybe this isn't worth

7    spending a lot of time on, but I was -- I came away from

8    yesterday's discussion -- we spent a lot of time talking about

9    a sentence in a letter from Dr. Lee that said:  Nobody seems

10   perturbed by this triangular romantic relationship.  And that

11   in common parlance, I came away thinking what we're talking

12   about is that in common parlance is confrontational, and

13   that's what I thought Dr. Rafanello was talking about.

14           You, today, are talking about confrontational

15   therapy being a well-established modality, and so it seems to

16   me that what -- that maybe there's -- you're talking about

17   something technical within the profession, and I thought what

18   we were talking about yesterday was more common jargon, you

19   know.  Dr. Lee throws out this sentence, one sentence in a

20   very short letter that did seem to be judgmental, did seem to

21   be making a moral judgment about a woman having a relationship

22   with two men at a time, or a man who happens to be a patient

23   having a relationship with a woman who is also having a

24   relationship with somebody else.  And didn't seem to me that

25   anybody was talking about a form of therapy or a therapy --

1           THE WITNESS:  I guess I didn't react to it that way

2       because of the benefit of my conversations with Dr. Lee and

3       understanding sort of where he's gone with him, and, if I may,

4       for example: If you have identified this as an issue, here's a

5       person who -- for whom relationships are very important.

6           THE COURT: Right.

7           THE WITNESS:  Who has zeroed in on an individual who

8       is involved in a relationship with another person, who has

9       made it clear that if a choice has to be made, the choice is

10      going to be not with you, but with this other person.  In that

11      context, if it appears to you that no one's -- maybe perturbed

12      was a bad choice of words -- but if no one is concerned about

13      this, as a therapist I would be concerned because there is a

14      critical issue here; to wit, at one point in the therapy, the

15      discussion was what are you going to do?  If you're willing to

16      risk all of this because of your feelings for this person who

17      has ultimately said, when push comes to shove, it ain't you,

18      what happens if you risk everything and then a month from now

19      she says, see ya?

20          So the concern that I think the therapist has and

21      what perhaps -- I mean I can't speak for Dr. Lee and his

22      letters.  The letters are problematic because they don't give

23      the detail, but a lot of the correspondence we see doesn't

24      give the detail, but the issue here is I think it's

25      appropriate to flag that.  There is concern about that

1   because, again, if a patient is ignoring something that is

2   clearly a potential problem, people ought to get somewhat

3   exercised about that and think about how they're going to help

4   the patient deal with it.

5           I do not see that as taking a moral stance.  I do

6   not see that as inappropriate. I see that as legitimate

7   identification of an issue that can negatively impact the risk

8   equation.  I believe that's how Dr. Lee sees it.  That's,

9   certainly, how I see it, and what words people have used to

10  express that and what was meant can only be left to them to

11  explain.

12  BY MS. CHASSON:

13  Q.    Are you trying to kind of Monday-morning-quarterback the

14  choice of therapist for Mr.  Hinckley in the hometown?

15  A.    No.

16  Q.    No.

17  A.    I think I've made it clear.  The Hospital is clearly

18  entitled to make whatever decisions they think are in the best

19  interest of the patient.  I just didn't -- here's what --

20  excuse me -- here's what has me confused.  When I was last in

21  the parent's community and spoke with Dr. Lee and Mr.  Beffa,

22  it was my understanding the switch was being made because it

23  would better -- it would better mirror the service delivery

24  that occurs in their clinical program, and that is that the

25  psychiatrist primarily serves as the medication manager,

1    clinical assessor, around those issues, and someone else does

2    the therapy.

3         That kind of split has been going on nationally for a

4    very long time.  When I heard that he would be spending 45

5    minutes with Mr.  Hinckley --

6                   THE COURT:  That who would?

7                   THE WITNESS:  Dr. Lee.  I was totally confused

8    because that is not consistent with the model I've just

9    described.

10   BY MS. CHASSON:

11   Q.   Well, have you ever heard of a practice where somebody

12   sees a therapist for 45 minutes, then another doctor in the

13   same practice for a 45-minute mental status check and

14   medication management meeting?

15   A.   I was trying to explain that.  I don't understand what's

16   going to occur in that time frame.  It has to be more than

17   just med management, med assessment, whatever label you want

18   to put on it.  If that's the case, then there's a bit of a

19   lack of clarity of who is doing what, what are the roles.  If

20   you're going to have somebody in the room for that long a

21   period of time, some form of therapy is going to emerge.  Are

22   you controlling for that?  What's the issue?  We've actually

23   now injected a second therapist because short of managing the

24   medications, anything else that you do has got to be seen as

25   some form of therapy.  I don't know what else it could be.

1          THE COURT: Although, as I recall Dr. Lee's testimony

2     a year ago, what he said was:  I haven't done therapy in

3     years.  I do medication management and assessment, but, of

4     course, there's always a little bit of therapy going on

5     whenever you talk to somebody.

6          THE WITNESS:  That's true.

7          THE COURT: I'm a psychiatrist.

8          THE WITNESS:  That's true.

9          THE COURT: So is the point that that little bit of

10    therapy should take place in 10 minutes instead of 45?

11         THE WITNESS:  The point is if you're doing -- if

12    you're spending 45 minutes with someone, you're doing more

13    than -- by default, you're going to end up doing more than med

14    management, and if that is the case -- and that's fine if

15    that's what you want to do -- but let's be clear about it.

16    What kind of circumstance does that create?  You've got Dr.

17    Binks doing therapy in his manner.  You've got Mr. Beffa

18    providing therapy.  We don't know what style he uses, at least

19    I don't.

20         THE COURT:  Uh-huh.

21         THE WITNESS:  We've got Dr. Lee, and we heard

22    yesterday, well, he's going to do that anyway because he's

23    going to be with him.  So what is the -- where's the

24    integration and how does that potentially impact?  These are

25    not things that are insurmountable, but can't we be clear

1   about what's going on therapeutically and what are our

2   expectations.

3           THE COURT: But at the hospital, maybe it is

4   different because it is in the context of an institution.  Dr.

5   Binks is his therapist.  Well, he spends a lot of time talking

6   to Dr. Rafanello, and he spends time talking to Dr. Green, and

7   there are other people -- and he certainly spends a lot of

8   time with Mr.  Shamblee.  And, you know, is Dr. Binks the only

9   one who is doing, quote, therapy?

10          THE WITNESS:  No.  And you're absolutely right.  My

11  only point is is everybody clear.  Is everyone clear?  I'm

12  striving for clarity.

13          THE COURT: Clarity.

14          THE WITNESS:  So that there are no mishaps that were

15  avoidable because we didn't get the ground rules straight for

16  everyone at the beginning, not explaining these things at the

17  end.

18  BY MS. CHASSON:

19  Q.   When did you speak to Dr. Lee?

20  A.   I believe I spoke with Dr. Lee in May and then again in

21  June.

22  Q.   And when you spoke with him at those times, did you ask

23  him what his understanding was on a going forward basis under

24  the (e)plan of how much time he'd be spending with Mr.

25  Hinkley?

1    A.   Again, what was represented to me was that it was going

2    to be, for the most part, similar to what he currently does

3    which is -- you know, he'd do med management and spend 15

4    minutes or so with him doing those assessments.   Again, it

5    doesn't mean that he has to be wed to that, and I think Your

6    Honor is correct, there are -- you can look at what others do.

7    He spends time periodically with Dr. Green.   Maybe it's

8    similar to that.

9        I'm just saying let's be clear about what it is so we

10   know that we don't confuse what may be happening and then can

11   anticipate if there are going to be problems how differences

12   of style may impact the expectations.   This is my greatest

13   concern: Whenever you have multiple clinicians involved in any

14   patient, but I think in particular with Mr.  Hinckley, you've

15   got to be concerned with a phenomena that we call "splitting";

16   what you tell one person different from what you tell the

17   other.

18       So that at the end of the day, you've got the clinicians

19   fighting with each other all done at the hands of the patient,

20   consciously or unconsciously, and without that clarity, it is

21   a set up for that kind of process to occur.   And so I'm just

22   looking for that clarity and that acknowledgement in

23   anticipation so that you can control for it, and we can get on

24   with the business of getting this man out of the hospital.

25   Q.   Were you surprised when Dr. Rafanello testified that

1    Dr. Lee would be meeting with Mr. Hinckley for an hour?

2    A.    Yes.  I think I just said that.

3    Q.    So that was the first you'd heard of it?

4    A.    Yes.

5    Q.    Let's talk about Mr. Beffa as a case manager.  You were

6    here when Mr. Beffa testified this morning, were you not?

7    A.    Yes, I was.

8    Q.    And did you hear him describe his view of case

9    management?

10   A.    Yes.

11   Q.    Okay.  Is that consistent with your own understanding of

12   case management?

13   A.    No.

14   Q.    Could you explain what your view is and how is it

15   different?  What are the differences with Mr. Beffa?

16   A.    In all my years of experience, case management is

17   something that is very proactive.  Exceedingly requires an

18   enormous amount of time and by and large in the mental health

19   system, the case load of case managers tend to be burdened

20   with patients who are deficient in a number of skill sets.

21   Their task is to assist the people who need the greatest

22   amount of help.

23        In the forensic setting, case managers have a broad range

24   of patients, some high functioning, some lower functioning,

25   but their critical task is to make sure that the conditions of

1   release are complied with, that institutions that can be

2   called into service can be identified and utilized.  I mean

3   they have -- it's not a desk job, for lack of a better

4   description.  It is something that requires a lot of hands-on,

5   in the field, work, and I didn't get the sense that Mr. Beffa

6   appreciates that.  My sense was that his perspective of this

7   is that it is something that could be done from the office.

8   In fact, he said it is something that can be done in the

9   context of therapy, which I have never heard of before.  This

10  may be a new modality of treatment, but I have never heard of

11  case management as a part of therapy.

12       So that my view of case management is something fairly

13  discreet, something that facilitates the process that

14  identifies issues that assists a patient moving through the

15  stages of recovery in attempting to reach their goals.

16  Q.   Can you give some examples of specific case management

17  skills that would -- or case management tools that might

18  benefit Mr. Hinckley?

19  A.   Mr. Hinckley was given a list of potential job sites.

20  Q.   Okay.  Let me just ask you one quick question about the

21  list.  Is that -- if Mr. Hinckley is your client, is that

22  appropriate just to give him a list of agencies and tell him

23  to go contact them?

24  A.   Well, this is the point I was trying to make.  If you

25  have a patient that you know has initiative issues, probably

not the best idea to give them a list and say check in with me

when you're done because the odds are, whatever time frame you

set, there's not going to be a lot accomplished or there may

not be -- your expectations may not have matched the

individual's.

Example of what a case manager might do:  A case manager

might do some role playing with the individual to prepare them

for an interview.  A case manager might say:  All right.

Here's an application.  Fill it out and give it to me.  Look

at the application, see if it was done completely; see if

things were omitted; help the individual understand this

process, especially someone who has been institutionalized for

awhile.

There are basic things, and it sounds remediary, and to a

certain extent it is, but that's what case managers do.  They

are trying to recreate experiences in advance so that when the

individual goes forth and has to execute, they have had some

experience.  So that would be one example.

Laying the foundation for the individual.  Probably not a

good idea with any patient of notoriety, but certainly a

forensic patient, and in this case a patient with the

notoriety of Mr.  Hinckley,  to just send him out to an agency

unannounced.  You have got to -- this has to be transparent

with the agencies, otherwise, they feel put upon.  They feel

that somehow they have been somewhat hoodwinked.

1              THE COURT: What?

2              THE WITNESS:  Hoodwinked.  I mean you don't want

3     that to happen.  You want them to understand the complexities.

4     You want to reassure them that this is appropriate.  You want

5     to show them that there are not only supports in place, that

6     it is appropriate for this to happen, but there are supports

7     in place, and, by the way, I'm the case manager.  I'm always

8     available.  I'll even come and be -- that's what case

9     managers, forensic case managers, do.

10             Is that Mr. Beffa's understanding?  Is he prepared

11    to do that?  Is he available to do those things?  He may be.

12    I didn't hear that, but those are some of the expectations.

13    If you find a forensic case manager and ask them what are the

14    things they do, I am certain among the list will be the things

15    I have just articulated.  In this case, those things are

16    essential.  They didn't occur, for whatever reason.

17    BY MS. CHASSON:

18    Q.   Is Mr. -- does it increase the risk to either Mr.

19    Hinckley or to the community to not have a case manager in

20    place that functions in the manner that you described?

21    A.   It does not address the risk if those factors aren't

22    tended to, whether it's done by someone you call a case

23    manager, whether it's done by someone else -- it matters less

24    to me the label of the person, more to me that these functions

25    are attended to.

1           Historically, in most instances, they are attended to by

2     the person we refer to as the "case manager", but whoever it

3     is, you have to do these things.  If you don't do these

4     things, you run into some of the very difficulties that we

5     experienced here.  And I'm certainly not saying that all of

6     these things are because of the failure to have, I think,

7     adequate case management controls in place, but there's a good

8     bit of this that I think can be attributed to it, but not all

9     because this is a very complicated case.

10           THE COURT:  On some of the cases Mr. Beffa talked

11     about, he did in fact make some phone calls.  They may have

12     been only recently, but he did make some phone calls and took

13     some steps himself I gather.

14           THE WITNESS:  Right.  But the phone calls have to

15     occur at the beginning of the process, not at the end, trying

16     to find out why it fell apart.

17     BY MS. CHASSON:

18     Q.   Do you have an opinion as to whether it was appropriate

19     for Mr. Beffa not to have called SALT before sending Mr.

20     Hinckley and his sister over to the meeting?

21     A.   Appropriate may not be the right word.  I think it was

22     imprudent not to do so.  Certainly imprudent if a family

23     member asks you to do it.  I think that's the first indicia

24     that if anybody is uncomfortable in the process, it ought not

25     be the people who are going through it.

1    Q.    And had Mrs. Sims asked him to phone over there?

2    A.    Yes.

3    Q.    Okay.

4    A.    But, more importantly, again, it speaks to the issue of

5    this is a patient of high notoriety, and you want him to be

6    successful.  You don't want to put him in a situation that is

7    going to be -- that is not only potentially uncomfortable, but

8    as Your Honor said earlier, you don't want to put someone in a

9    situation that is going to potentially fail and contribute to

10   that ego injury.

11        So to just sort of make sure that where you're sending

12   the individual is appropriate I think is basic.  How much

13   would it take to just pick up the phone and make sure?   Make

14   sure this is what you think it is.  The fact that a group may

15   have a certain complexion three or four years ago is no

16   guarantee that it's going to be the same today.  It just seems

17   to me that's a basic issue that you could control for simply

18   by picking up the phone and double checking.

19   Q.    Do you have any concerns that Mr. Beffa thought it was

20   appropriate or okay to send Mr. Hinckley unannounced to a

21   group where a stalking victim was attending?

22   A.    I think the issue is by doing your due diligence in

23   advance, you make sure that the referral that is being made is

24   appropriate.  It certainly would be an issue of concern.

25   Maybe it's appropriate, maybe it's not.  Odds are the latter

```
1    is true in most circumstances, but I don't think it's wise to

2    presume it's okay and they have to learn to deal with it.  On

3    the contrary, I think you have to make sure that the

4    environment is going to be welcoming and willing to

5    participate in the process, and the only way that's going to

6    happen is to make sure that your activities are transparent

7    and that everyone is clear what you're doing and why and

8    identify any potential resistance in advance.

9              MS. CHASSON:  Okay.  Your Honor, I'm about to switch

10   topics, and I would like to take a bathroom break.  May we do

11   those things simultaneously?

12             THE COURT: Sure.

13             MS. CHASSON:  Thank you.

14             THE COURT:  Why don't we take a little break.

15             MS. CHASSON:  I can be fast.

16             THE COURT:  No, take your time.  Take your time.

17   Okay.

18             (Whereupon, there was a brief recess at this

19   time;thereafter, court resumed.)

20             THE COURT: Okay.

21             MS. CHASSON:  I just wanted to pass along that there

22   are multiple people that thank you for the break.

23             THE COURT: I'm sure.

24             MS. CHASSON:  I spoke for a cast of thousands.

25   BY MS. CHASSON:
```

1    Q.   Dr. Phillips, let's talk about Mr. Hinckley a little

2    bit.  You have said that his narcissism is alive and well; is

3    that correct?

4    A.   Yes.

5    Q.   And do you have a view as to whether or not his

6    narcissism remains a risk factor for future dangerousness?

7    A.   Yes.

8    Q.   What is your view?

9    A.   Of course, it does.

10   Q.   How has Mr. Hinkley's narcissism displayed itself most

11   recently?

12   A.   I think there are a number of examples.  One would be to

13   understand his approach even to some of the things that he

14   needs to accomplish.  Part of what we have referred to as

15   potential institutionalization, part of what we have referred

16   to as resistance, can also be interpreted as a display of his

17   narcissistic character style.

18   Q.   How so?

19   A.   When you consider what he believes to be necessary,

20   whether or not it is important for him to do certain things,

21   why, for example, should he be forced to find a volunteer job

22   before being granted extended time?  In his view, he should

23   have had more time granted by this court last year and in

24   previous years simply because, in his view, he's done what he

25   should have done.  These are expensive proceedings as he has

1    described them, and he deserves it.

2         So devoid of any self-reflection of the process, the

3    expectation that because he is who he is, these things should

4    be granted, is I think illustrative of a narcissistic

5    character style.

6         The presumption that in spite of the indications by

7    someone in a relationship that, given the choice between

8    himself and another party, the other party would be selected,

9    and choosing to pursue the relationship with a belief that he

10   may be able to change her mind, is I think also an indicia of

11   narcissism.  It's important to recognize that these things in

12   and of themselves do not concern me to the extent that it

13   would change my opinion that this patient is ready to take the

14   next step.

15        It is something that we need to be mindful of and

16   recognize that we have to be paying attention to its

17   expression and making sure that it is routinely addressed as

18   he progresses through this progress.

19   Q.   And is it being addressed as he progresses through the

20   process?

21   A.   I believe it is in some instances; in other instances, it

22   may not be, but, ultimately, I think people are aware.

23   Q.   Do women remain an area of concern for you, Mr.

24   Hinckley's relationship with women?

25             MR. LEVINE:  Your Honor, may we have a little more

1    -- raise your voice, Ms. Chasson.

2         MS. CHASSON:  I'm sorry.  Sorry.

3    BY MS. CHASSON:

4    Q.   Do Mr. Hinckley's relationships with women remain an

5    area of concern for you?

6    A.   Yes.

7    Q.   More so than last year?

8    A.   More so than last year because there are more of them to

9    be concerned about than there were last year.  There are

10   different relationships, but the theme remains ostensibly the

11   same, and the pattern remains the same.  But relationships

12   with women, I think, will be a central area of clinical

13   concern with this patient for some time to come because it is

14   at the core of the psychodynamic that was of great importance

15   at the time of the instant offense, throughout his

16   hospitalization, and, clearly, has been a subject of

17   discussion for the last several years.  I don't expect that to

18   just disappear.

19   Q.   What is the pattern that you are referring to?

20   A.   Well, I think it has been accurately described that he

21   has a need to focus on these relationships.  It is something

22   that he is preoccupied with, and on some levels that

23   preoccupation may border on obsession.  The concern is whether

24   or not he is accurately interpreting the relationships; what

25   transpires in the relationships; how he processes those

1    issues.  And, ultimately, as has been articulated by other

2    examiners, how does he process rejection in these

3    relationships because, ultimately, these relationships have

4    led in some form of rejection, and it's usually rejection in

5    the way of removing some of the physical liberties that may

6    have been involved in the relationships and/or ultimately

7    bringing the relationships to a close.  How he reacts to that,

8    particularly in the face of having such a strong desire to

9    engage in these relationships.

10   Q.   Let's talk about Leslie DeVeau, one of the specific

11   women.

12   A.   Yes.

13   Q.   You have heard testimony from Dr. Montalbano about

14   possibly Mr. Hinckley renewing his relationship with Ms.

15   DeVeau.  What's your opinion about that?

16   A.   I have great concerns about the circumstances under which

17   that would occur, and I have even greater concerns about what

18   on some levels appears to be revisionist history about how we

19   are where we are.

20        There have been several references or intimations that

21   the relationship with Ms. DeVeau came to a close, either

22   because of the order of this court or the interference of the

23   third-party examiners.  If you go back to the record and,

24   certainly, I remember this well in 2000, this relationship was

25   troubled.  This relationship was falling apart.  Part of what

1     Mr. Hinckley was talking about in therapy was how much longer

2     this relationship would be viable.

3          Ms. DeVeau was no longer in the hospital.  She was out.

4     She was living her own life, and it was fairly clear,

5     according to the record, according to interviews, that she was

6     beginning to distance herself from him for whatever reason.

7     Whether it was that she no longer wanted to be in a

8     relationship with him, whether it was that he was in the

9     hospital, and she was out, the reality is the relationship was

10    ending.

11         There were descriptions about going to her apartment at

12    Christmas time in the hopes it would rekindle the same

13    feelings that were there previously; did not happen.  This is

14    the same time period where Ms. DeVeau in a meeting with the

15    treatment team disclosed when she's leaving that she happened

16    to purchase the autobiography of Jodie Foster, but hadn't

17    given to him.  The behaviors of Ms. DeVeau during that time

18    frame and the interactions between she and Mr. Hinckley, I

19    think, clearly established in my mind that this relationship

20    wasn't viable, and I think Mr. Hinckley recognized the

21    relationship wasn't viable.  To suggest what subsequently

22    happened was the effect of the Court, I think, is simply not

23    accurate, not accurate at all.

24         The biggest issue in any relationship that Mr. Hinckley

25    engages in that is considered a substantial relationship in

```
1    someone for whom women has been such a critical issue
2    clinically is making sure that the treatment team is able to
3    assess how well he is assessing what that relationship is, how
4    it affects him, and how he is reacting.
5         Her unwillingness to engage in communication with the
6    treatment team, from my advantage point, is the clinical deal
7    breaker; not whether or not she'll speak to myself or another
8    examiner.  Our task is transient, but if she is refusing to
9    work with the treatment team, it's difficult for me to
10   understand why anyone, then or now, would suggest it is a good
11   idea to reconnect in a way that does not control for the
12   team's ability to get that information.  It doesn't make sense
13   to me.
14   Q.   What is the revisionist history that you eluded to when
15   you began your answer?
16   A.   Simply that there seemed to be an abandonment of the
17   recognition that the relationship was falling apart and headed
18   toward closure well in advance of any opinions issued by the
19   Court or any attempts of third-party examiners to sit down and
20   engage in discussions with her.
21   Q.   Do you agree with the views suggested here in court that
22   perhaps the benefits of the renewed relationship with Ms.
23   DeVeau might outweigh any risks associated with it?
24   A.   If that's the case, let's lay them out and see -- weigh
25   how you're controlling for them.  How are -- and the critical
```

1    issue is how do any of the risks or benefits get assessed if

2    you have no access to the individual?  So it would seem to me

3    that if you don't have access to the individual, that

4    discussion is moot.

5    Q.   Even if -- assuming that the individual wanted to

6    participate in the relationship.

7    A.   Well, if the person wanted to participate -- I mean --

8    I'm sorry.

9    Q.   Even assuming Ms. DeVeau was interested in a

10   relationship.

11   A.   Yes.  But the point I'm making is she needs to be

12   interested in sitting down and talking with the treatment

13   team.  Absent that, there's no point in having this

14   discussion.  If she is, then let's look at what the benefits

15   and risks are, and it is well within the right of the team to

16   engage in that assessment and if, in their opinion, having

17   looked at what those factors are they think is it more of a

18   benefit than a risk, then it is certainly their prerogative to

19   go forward.

20        I haven't seen that analysis, but I certainly haven't

21   seen anything to suggest that she is willing to participate,

22   and absent the participation, I can't see how any benefit

23   could outweigh the risk of engaging in a significant -- in any

24   kind of relationship in that context with someone who has had

25   such a history and someone who has -- let me frame it this

way:  Ms. DeVeau is a former insanity acquittee.  She's a
former insanity acquittee for a fairly high visibility crime.
She knows the system.  She works for the system.  No one could
have more intimate knowledge of what's at stake in trying to
get from the hospital to the community.

     She doesn't want to participate.  There's a message being
given here, and I don't think it's simply, I want to keep
personal that which is personal to me.  If the person who you
are having a relationship with is of equal significance to
you, that posture in my opinion is inconsistent, and that's an
issue that needs to be part of the therapeutic grist as well.

Q.   Let's talk about a couple of the women that have come to
the fore this year.  There has been a lot of testimony about
Mr. Hinckley's desire to bring Ms. G to the block party in
his parents' -- in his mother's community.  Do you have any
concerns that Mr. Hinckley wanted to do that?

A.   My concerns are not -- well, on its face, my concerns are
not that he wanted to do that because I think wanting to do
that is certainly understandable.  The concerns that I have
are in what appeared to me to be examples of his being less
than candid with Ms. G.

Q.   In what way was he less than candid with her?

A.   He told Ms. G unequivocally that his mother and his
sister were very supportive of this idea.  That's not what we
have heard.  That's not what's been said, although, that has

1    been somewhat of a moving target understandably because I

2    think opinions may have changed over time.  But, clearly,

3    there are issues related to the accuracy of statements that

4    are being reported by him to Ms. G, by him to others, that

5    raises some concern about veracity.

6          Do I expect the issues such as veracity, the issue of

7    openness, all to have been resolved and without resolving them

8    all he should not be allowed to progress to the next step?  Of

9    course not.

10          I have said before and I stand by the position that this

11   patient is ready to transition.  In so doing, I must insist,

12   based on the standard of practice that I have always adhered

13   to, that we have to make sure we have put in place all the

14   appropriate controls to manage the identifiable risks, and

15   what I take issue with in this plan is that I'm not sure that

16   has been done, and once that's done, I think we're good to go.

17               THE COURT: Once what's done?

18               THE WITNESS:  Putting in place the appropriate

19   mechanisms to monitor the risk factors that have been

20   identified.

21   BY MS. CHASSON:

22   Q.   Are you aware that Mr.  Hinckley wanted to bring both Ms.

23   G and Ms. B to -- I'm sorry -- and Ms. M to the Golden Corral

24   restaurant at one time.  What clinical significance did that

25   signify to you, his desire to bring those two women to the

1    same place at the same time?

2    A.    One could certainly use that as an example of narcissism,

3    of boastfulness, of wanting to demonstrate to others that he

4    has not one girlfriend, but two.  Its relative importance on

5    the scheme of things; is it in and of itself a factor that

6    should dissuade us here?  No.  It is yet another example of

7    where he is and what we have to be paying attention to make

8    sure that it doesn't expand to something that is more

9    grandiose, but it is an indicator, an indicator that needs to

10   be acknowledged and dealt with.

11        And I think Dr. Rafanello had it right when she

12   identified it, made note of it, addressed it, and I think

13   that's appropriate.

14   Q.    Do you continue to have concerns about Mr.  Hinckley's

15   lack of candor?

16   A.    I think we must always have a concern about any patients

17   lack of candor, but, historically, in Mr. Hinckley's case, the

18   lack of candor has been a central issue, and so, yes, lack of

19   candor would be a big thing for me in this case.

20   Q.    Have there been any incidents over the past year that

21   come to your mind that would concern you about Mr.  Hinckley's

22   lack of candor?

23   A.    Well, I think the discussion that we had concerning the

24   Salvation Army is an example of what I would consider to be a

25   lack of candor; lack of candor or truthfulness in terms of

1    what transpired, what was said, what was being expected, what
2    he told to others, what he reports that others told him.  It
3    is this very issue that reenforces why we have to make sure
4    that we control for the potential splitting when we're dealing
5    with multiple examiners, and, again, the point here is to do
6    the best we can to acknowledge these potentials and be able to
7    recognize them.  Not to use them as reasons to pull the plug
8    on the activity, but to ignore them or to not recognize they
9    exist or to down play them, I think, is problematic and it is
10   that latter circumstances -- if you begin to get into a
11   pattern where you're trying to excuse the behaviors rather
12   than recognize they exist and process them for what they are,
13   that's when I think one's own empathy may be interfering with
14   clinical objectivity, and we all have to guard against that.
15   Q.    And have you been hearing testimony that gives you
16   concerns about perhaps minimizing that?
17   A.    Yes.
18   Q.    I'm going to return just back to one more of the
19   volunteer opportunities, and you and I will be almost done.
20   When you went down to [the city] to the mother's hometown,
21   you spent significant time speaking with members of an
22   organization called the "Services Board".
23   A.    Yes.
24   Q.    Yes.  After your meetings with them, what opinion did you
25   have as to whether that organization was open to working with

1    Mr. Hinckley?

2    A.   I was left with a very clear opinion that they had an

3    interest in working with him, both in the context of providing

4    any of the services that they offer, working collaboratively

5    with other providers in the area if that were Mr. Hinckley's

6    choice, and also trying to figure out a way to help him

7    ultimately meet the residency requirements, although, that

8    would not initially be a problem depending upon what services

9    they were engaged in and how necessary it was for them to

10   provide some of the primary activity.

11   Q.   We heard testimony yesterday that Mr. Hinckley had in

12   fact obtained a letter or a letter had been sent to Mr. Beffa

13   on Mr. Hinckley's behalf outlining various services that

14   could be performed.

15   A.   Yes.

16   Q.   And then later that those services no longer could be

17   offered to Mr. Hinckley.  Do you have an opinion based upon

18   your contacts with that organization as to whether services

19   nonetheless might be still available to Mr. Hinckley through

20   the Services Board?

21   A.   I received a phone call from David Coe, the director, on

22   I think it was --

23   Q.   Was it yesterday morning?

24   A.   I think it was.  I'm trying to remember the days.  After

25   sitting here for so long, they start to run into one another.

1    And I -- this phenomena that we have been hearing about is

2    very real, of agencies --

3    Q.   What phenomena?

4    A.   -- of agencies sort of making initial overtures,

5    regardless of the level in which you approach, and then

6    something happens, and then the something that happens is in

7    fact that as people think about this or as newspaper articles

8    appear or as people on the board start picking up the phone

9    and asking questions, people become concerned.  They become

10   concerned about funding and so forth.

11          I think there are some similar issues at play at the

12   Services Board, but, by and large, they're committed

13   to doing this work, and I believe, based on my discussions,

14   they are committed to doing the work for Mr.  Hinckley.  I

15   think it's clear to them that what will facilitate it --

16   depending -- again, on how much of the primary service they

17   must shoulder is going to be contingent on getting his

18   residency process initiated, as well as --

19   Q.   Finished or initiated?

20   A.   Pardon?

21   Q.   Does it even need to be finished or needed to just be

22   initiated?

23   A.   Well, if nothing's been done, it's awfully hard.  The

24   bottom line is the expectation that you are a resident, but

25   residency in Virginia is an interesting thing.  There is

1   nothing that fully describes what you do when someone is a

2   patient.  There is a lot statutory that describes establishing

3   the resident for a student, establishing it for a serviceman,

4   establishing it for someone who's coming in, but the recurring

5   theme in all of these is intent.  What is the domiciliary

6   intent of the individual, and in almost every instance, it's

7   the individual who has to demonstrate by their intent what

8   ultimately their domicile is, and there are a host of things

9   that an individual can do to begin that process, all of which

10  I think is appropriate to be initiated now.  If the commitment

11  and is desire is for Mr. Hinckley to be in [the city], there's

12  absolutely no reason, and I said this a year ago, for this

13  process not to begin.

14       Secondly, if the Services Board is deemed

15  to be a significant enough resource that those services need

16  to be accessed even in advance of his doing that, there is

17  another mechanism, and that mechanism is for him to be a

18  Medicaid recipient and he can select them as a provider, and

19  they must provide the services, and that was made clear, both

20  in testimony today and also by Mr.  Coe.

21       So that what has to happen is there has to be a

22  determination of what resources are there and are those

23  resources significant enough that we need to involve them in

24  the process, and I think the way of involving them in the

25  process, certainly based on my discussion with Mr. Coe, but,

1    more importantly, my years of experience of running an

2    institution and working with community agencies is that those

3    discussions should be initiated not from the bottom from a

4    provider, but from the top, from someone in the hospital who

5    has clinical administrative responsibility, and that simply

6    has not happened.

7    Q.   Lastly, the (e)proposal lays out --

8          THE COURT: The what?

9          MS. CHASSON:  The (e)proposal, the last topic.

10    BY MS. CHASSON:

11    Q.   The (e)proposal discusses that Mr.  Hinckley will be

12    permitted a certain amount of time to pursue volunteer

13    activities within the District of Columbia.  Do you have an

14    opinion about whether it is appropriate for Mr.  Hinckley to

15    be performing volunteer activities within the District of

16    Columbia?

17    A.   Yes.

18    Q.   What is that opinion?

19    A.   Let me try and answer it this way: Clinicians can differ

20    on approach.  There is a difference of opinion here, in mine

21    versus the hospital, which does not mean that either of ours

22    is more right or more wrong, but what is certainly clear to me

23    is that -- and I would agree with Dr. Binks on this -- I think

24    there is a fundamental risk of thwarting or making more

25    difficult his transition by diverting attentions to the

1    District of Columbia if the primary goal is the community of

2    his mother's residence and let me explain why.

3         If this is where the patient wants to be --

4              THE COURT: In his mother's community?

5              THE WITNESS:  Yes.

6              THE COURT:  All right.

7              THE WITNESS:  And there is no reason that he should

8    not be there, and I'll put a footnote: I'm not convinced that

9    some of the negative reaction we've seen is so overwhelming

10   that that means this is the wrong place, and the reason I say

11   that is because if, in fact, Mr.  Beffa could get three or

12   four placements in two weeks, how many more could there have

13   been if he had done this process a year ago, and the point I'm

14   am making is that it may not be as overwhelming as it seems.

15              It also may not be so overwhelming as it seems if

16   you approach the agencies with greater transparency, as

17   opposed to just thrusting him in the environment.  It's also

18   incorrect to assume that this community is not a good place

19   for someone of Mr.  Hinckley's age.  This is a college town.

20   There are two colleges in the city limits, not to mention the

21   other institutions that surround it.  There are plenty of

22   young people there, younger than Mr.  Hinckley.

23   Q.   And middle-aged people?

24   A.   Even them.  So that --

25              THE COURT: There are a lot of retirement communities

1      that say you can live there if you're over 50, which is really

2      upsetting.

3                  THE WITNESS:  Right.

4                  MS. CHASSON:  But you can go to the movies for $7.

5                  THE COURT:  In those communities?

6                  MS. CHASSON:  You know, the age is going down and

7      down and down.

8                  THE WITNESS:  That's right.  So we should not, I

9      think, overreact to that.  With that as a postscript, the

10     issue of any patient's movement -- and it has been said

11     repeatedly by other examiners and practitioners in the

12     hospital -- is that the uniqueness of this case has protracted

13     this process, and without getting into a discussion of whether

14     that is appropriate or not, the fact of the matter is it has

15     taken much longer to accomplish things that are accomplished

16     in much less time with other individuals.

17                 That being said, the focus and objective should be

18     to get him there as safely and as rapidly as possible.  When

19     the first plan was put forward, I forget -- when this plan was

20     put forward as it is written, the notion of having him engage

21     in volunteer activities at the Salvation Army here, which is

22     Harbor Lights, was because it was to mirror the volunteer

23     activity in his mother's community.  Well, what are we

24     mirroring?  I mean it's -- we're not even sure what the

25     volunteer activity is.

1          I appreciate the concept of keeping him busy and

2     giving him that community-based experience, but what -- is

3     that really a community-based experience if we put him in a

4     patient van, bring him over there, and he loads boxes and he

5     gets back in the van and he comes back?  I'm not -- I

6     understand the concept.  I'm not so sure that that is as good

7     a use of his time or the clinician's time, rather than

8     figuring out a way to make sure that we meet these objectives,

9     we expand the privileges that he has, and, most importantly,

10    as I've said before, you begin to shorten the period of time

11    between these visits because you're never going to get to the

12    point that he ultimately transitions if it's going to take you

13    six, seven, eight weeks between visits for this to accomplish.

14    So I see it as potential diversion and not really fully

15    committing all the resources to getting him there.

16          But, you know, reasonable minds can differ on the

17    approach.  I just think the time could be spent in a better

18    fashion or perhaps doing something else, but I just don't see

19    the benefit of that.  You can accomplish the same thing by

20    doing the work that he has to do at the library for that

21    matter.  I'm not quite sure how it fits into this plan.

22          MS. CHASSON:  Thank you, Your Honor.  I have no

23    further questions.

24          THE COURT: Yes, you do.  Mr.  Zeno thinks you might.

25          MR. ZENO:  I think she might.

1              MS. CHASSON:  Okay.

2       BY MS. CHASSON:

3       Q.   One last question:  You've gone to the Virginia DMV?

4       A.   Yes.

5       Q.   Did you get out of there without a learner's permit?

6       A.   It was almost impossible for me to do so.  These people

7       were bending over backwards to give me a permit.  This is not

8       a difficult thing to accomplish.

9              THE COURT:  Where are you a resident?

10             THE WITNESS:  I'm a resident in Maryland, and I

11      expressed that to them and -- but they told me what the

12      process was and what you needed to do, and, anecdotally, it

13      was just -- it is not an onerous task.

14      BY MS. CHASSON:

15      Q.   Do you have a view as to whether it would be more

16      appropriate for Mr. Hinckley to get a driving permit in the

17      District of Columbia or in Virginia?

18      A.   Again, people can differ.  I testified last year and I'll

19      say again, there is -- there seems to be much more consistency

20      in service, not only to his attempts to establish residency,

21      but just to facilitate the process of getting a permit in

22      Virginia.  Ultimately, if that's where he's going to be

23      living; ultimately, if that's where he's going to be driving;

24      ultimately, if that's what the goal is, it would seem that

25      that would be the logical place.

```
 1      Q.   That would be another way of shoring up Virginia
 2   residency?
 3      A.   Absolutely.
 4           MS. CHASSON:  Okay.  Now I have no further
 5   questions.  Thank you.
 6           THE COURT: Okay.  You may proceed, Mr. Levine.
 7           MR. LEVINE:  Thank you, Your Honor.
```
 8   **CROSS-EXAMINATION BY MR. LEVINE:**
```
 9      Q.   Good afternoon.
10      A.   Mr. Levine, how are you?
11      Q    Nice to see you again.  Let's see as we start this, Dr.
12   Phillips, let's look for some points of agreement.  In
13   connection with your evaluation of Mr. Hinckley, you examined
14   him on several occasions; is that correct?
15      A.   Correct.
16      Q.   And you interviewed members of his treatment team; is
17   that correct?
18      A.   Correct.
19      Q.   And you interviewed other staff members at St. Elizabeths
20   Hospital about Mr. Hinckley; is that correct?
21      A.   Correct.
22      Q.   Spoke to his mother?
23      A.   Yes.
24      Q.   And spoke to his siblings?
25      A.   Yes.
```

1     Q.   And you interviewed Dr. Lee?

2     A.   Yes.

3     Q.   And interviewed Mr. Beffa?

4     A.   Yes.

5     Q.   As a matter of fact, interviewed them as you called it

6     "conjointly" on an occasion or two; is that correct?

7     A.   On one occasion.   I saw them both separately and then

8     subsequently saw them together.

9     Q.   And you interviewed the inimitable Ms. M?

10    A.   Yes.

11    Q.   And the same for Ms. G?

12    A.   Yes.

13    Q.   And you reviewed all the medical records?

14    A.   Yes.

15    Q.   And, of course, Dr. Montalbano's -- I think you called it

16    exquisitely detailed -- do I remember that correctly?

17    A.   As it always is.

18    Q.   -- risk assessment?

19    A.   Yes.

20    Q.   And you explored Mr. Hinckley's past conditional

21    releases as well; is that correct?

22    A.   Yes.

23    Q.   And considering all of that information, it is your

24    opinion that Mr. Hinckley has demonstrated his readiness to

25    transition into the next level of conditional release

1      privileges; isn't that correct?

2      A.   Yes.

3      Q.   Okay.  Further, sir, considering again all of this

4      information, it is also your opinion that it is clinically

5      appropriate that Mr.  Hinckley be considered for expansion of

6      conditional release privileges, correct?

7      A.   Yes.

8      Q.   And you support him obtaining a driver's license; is that

9      correct?

10     A.   Yes.

11     Q.   You also agree, do you not, sir, that his Axis I

12     diagnosis of psychosis, not otherwise specified, and major

13     depression continue to be in full remission; is that correct?

14     A.   Yes.

15     Q.   And that was your view -- that was your view in the year

16     2000; is that correct?  When you did your first report?

17     A.   Correct.

18     Q.   And you again said in your report in 2003 that they were

19     in full remission; is that correct?

20     A.   Correct.

21     Q.   And again in 2004; is that correct?

22     A.   Correct.

23     Q.   And again in 2005; is that correct?

24     A.   Correct.

25     Q.   And then again in 2006; is that correct?

1    A.    Yes.

2    Q.    And then one more time in 2007; is that correct?

3    A.    Correct.

4    Q.    And, again, now in 2008; is that correct?

5    A.    That is correct.

6    Q.    All right.  Now, when he presented for examination, you

7    concluded that his thought processes were without delusion; is

8    that correct?

9    A.    Yes.

10   Q.    And likewise he was without hallucinatory experiences; is

11   that correct?

12   A.    Yes.

13   Q.    And it is likewise true that his thought content was

14   without ideas of suicide; is that correct?

15   A.    Correct.

16   Q.    And his thought content was without ideas of homicide; is

17   that correct?

18   A.    Correct.

19   Q.    And he has now completed 10 conditional releases.  I

20   believe as of the time you wrote your report, there were --

21   he had merely completed nine; is that correct?

22   A.    That is correct.

23   Q.    But he has completed 10; is that correct?

24   A.    Yes.

25   Q.    All right.  And you have concluded after evaluating the

1    ones that you evaluated, which I believe is all of them, that

2    he has abided by all of the requirements set forth under the

3    terms and conditions of the Court order; is that correct?

4    A.   I am hesitating in that I think he has abided by

5    everything that has been outlined in the Court order with the

6    exception of our discussion of whether or not he followed the

7    instructions of the treatment team with regard to making his

8    appointment at the Salvation Army.

9    Q.   Now, didn't you write on Page 63 of your report, without

10   exception, I quote:  Mr.  Hinckley has abided by all of the

11   requirements set forth under the terms and conditions of the

12   Court order?

13   A.   Yes.  I did write that, and all I merely attempted to do

14   here was to clarify our discussion with regard to that one

15   issue.

16   Q.   But the question that I asked was that you had concluded

17   and that you had written that he had abided by all of the

18   requirements set forth under the terms and conditions of the

19   Court order.  The answer to that is: Yes, without exception;

20   isn't that true, sir?

21   A.   The answer is what I responded, yes.

22   Q.   The answer is "yes".  And likewise, Dr. Phillips, you

23   concluded that he utilized the increased freedom of 90-minute

24   independent walks within the residential community to have

25   therapeutic benefit and without incident; is that correct?

1    A.    That is correct.

2    Q.    And you also concluded that Mr.  Hinckley never tried to

3    elope during any of these conditional releases; isn't that

4    correct?

5    A.    That is correct.

6    Q.    And he never sought out contact with the media; isn't

7    that correct?

8    A.    Yes, it is.

9    Q.    And you further concluded that under his parents'

10   supervision, he has successfully negotiated excursions into

11   the local community without incident or posing a significant

12   risk to himself or others; isn't that also your conclusion?

13   A.    Yes, it is.

14   Q.    And, Dr. Phillips, you continue to believe that the

15   therapeutic benefit of his experiences are cumulative; isn't

16   that correct?

17   A.    Yes.

18   Q.    What do you mean by "cumulative"?

19   A.    Simply put, the more you have and the more successful

20   they are, they become -- they are additively beneficial to

21   you.  You learn from those experiences.  The more success you

22   have, the more competence you have.  The more success you

23   have, the better demonstration of your capacities.  The more

24   success you have, the greater the expectations may be of what

25   is to be next put before you.

1    Q.   And further you concluded, Dr. Phillips, that the time

2    that Mr.  Hinckley has spent with his family and siblings has

3    allowed the family to develop an emotional connection; isn't

4    that correct?

5    A.   That is correct.

6    Q.   And further you found -- you even found that Mr.

7    Hinckley's presence in his father's clinical -- during his

8    father's clinical decline was both a support and comfort to

9    his family and to himself, which served as benchmarks of his

10   stress tolerance that cannot be ignored; did you conclude that

11   as well?

12   A.   Yes, I did.

13   Q.   And you further said, sir, that this experience with his

14   family has helped Mr.  Hinckley's clinical progress toward

15   community integration; is that correct?

16   A.   That is correct.

17   Q.   And you agree that during these numerous conditional

18   release -- releases, Mr.  Hinckley has demonstrated that he

19   has not posed a danger to himself or others while under his

20   parents' supervision in their residential community; isn't

21   that correct?

22   A.   Yes.

23   Q.   Now, you have told us that, considering all the

24   information that you identified, that it was your opinion that

25   Mr.  Hinckley has demonstrated his readiness to transition to

1        the next level; is that correct?

2        A.   Yes.

3        Q.   And, as a matter of fact, that was your opinion last

4        year, as well; isn't that true, sir?

5        A.   That is true.

6        Q.   What is your basis for that opinion?

7        A.   My basis for the opinion that he is ready?

8        Q.   Yes.

9        A.   Shall I repeat everything that you have just said?

10       Q.   If you want to, yes.

11       A.   I don't see the need to.

12       Q.   Give us the basis for your opinion.

13       A.   You've just given it; for all of the things that he has

14       done -- successfully.

15       Q.   And he -- you have nothing further to add to that?

16       A.   He has demonstrated by what you have articulated and what

17       I have acknowledged to be the kinds of things we look at to

18       determine whether or not a patient is ready for the next

19       level.

20       Q.   And you've also told us, Dr. Phillips, that it is your

21       opinion that it is clinically appropriate that Mr.  Hinckley

22       be considered for expansion of conditional release privileges;

23       remember saying that?

24       A.   Yes.

25       Q.   And likewise you said the same thing last year, as well;

1      isn't that correct?

2      A.    That is correct.

3      Q.    And what is the basis for that?

4      A.    All of the above.

5      Q.    Now, last year you were against expanding the conditional

6      releases from four days; is that correct?

7      A.    Last -- last year I was against the plan submitted as it

8      was written.

9      Q.    Isn't it a fact, sir, that last year you were against

10     expanding the conditional releases from four days?

11     A.    I believe that to be true, but, again, it needs to be

12     understood in the context of everything that was presented.

13     Q.    This is a simple question, sir, and maybe there it needs

14     to be understood in context, and maybe you'll get a chance to

15     give that context, but the question is last year, last year,

16     you were against the expansion of the conditional releases

17     from four days; isn't that true, sir?

18     A.    In the context of what was presented, yes.

19     Q.    You find it difficult to just say "yes"?

20     A.    Not at all, when the question can be answered that way,

21     but if you pose a question to me that can't be answered that

22     way, I will answer it to best of my ability.

23     Q.    All right.  And not withstanding your opposition to that

24     expansion, the Court permitted the expansion to six days -- or

25     six nights I think it was; is that correct?

1    A.   It's always the Court's prerogative to make those

2    determinations, yes.

3    Q.   And the Court did, in fact, expand it to six nights; is

4    that correct?

5    A.   Yes, it did.

6    Q.   Did that make Mr.  Hinckley dangerous?

7    A.   Expanding it?

8    Q.   To -- did the expansion from four nights to six nights

9    make Mr.  Hinckley dangerous?

10   A.   No, it did not.  But it did not happen in isolation.

11   Q.   Do you have a hard time just answering the question as it

12   is put to you?

13   A.   I never thought so.

14   Q.   Well, let's try this one more time, and let's see if you

15   do.  Did that make -- did the expansion from four nights to

16   six nights make Mr.  Hinckley dangerous?

17   A.   No.  Because it was done in the context of a well-

18   organized set of circumstances.  It did not happen in

19   isolation.

20        THE COURT: Suppose if I -- suppose if I expanded it

21   to 20 nights, it wouldn't make him dangerous, but it might

22   increase the risk of danger.

23        THE WITNESS:  That's correct.

24   BY MR. LEVINE:

25   Q.   It was done over your objection, wasn't it, sir?  I think

1    you already answered that one.

2    A.   You could certainly characterize it that way, yes.

3    Q.   Well, you would characterize it that way, wouldn't you,

4    sir?

5    A.   I had a difference of opinion as to what should be done.

6    Is it my objection?  Certainly, I didn't think it needed to

7    happen, but it did.

8    Q.   You advocated, you expressed the opinion, that it should

9    not happen; is that correct?

10   A.   That is correct.

11   Q.   And notwithstanding your expressed opinion, the Court did

12   it; isn't that correct?

13   A.   Absolutely correct, yes.

14   Q.   Better.

15   A.   See, if you ask a "yes" or "no" that I can answer, then I

16   will.

17   Q.   Well, I think you're learning.  Okay.  Now, sir, will an

18   increase from six nights to nine nights make him dangerous?

19   A.   I can't answer this "yes" or "no".  The issue is and I

20   think Your Honor --

21   Q.   Can the record reflect a substantial pause, and now,

22   please, can you answer the question:  Will an increase from

23   six nights to nine nights make him dangerous?

24   A.   The issue cannot be answered as simply "yes" or "no" in

25   the context of understanding what we talk about as being

1   dangerous.  The issue is will such an expansion contribute to

2   an increased risk of dangerousness if the appropriate controls

3   are not put in place.

4   Q.   Do you care to quantify the risk of danger from six

5   nights to nine nights, sir?

6   A.   These things are not discussed quantitatively.  They are

7   discussed qualitatively in the context of the identification

8   of risk factors and the implementation of structures that will

9   mitigate those risks.

10   Q.   That's not what Dr. Montalbano says.  He says that, in a

11   risk assessment, it's all statistical, and then you look to

12   the behavior to see if it is corroborated.

13   A.   That's what -- excuse me.

14   Q.   Isn't that correct?  Isn't that what he says?

15   A.   That's what most psychologists say, but I'm not a

16   psychologist.  I think about these things a bit differently.

17   Q.   But you're now talking about that exquisitely detailed

18   risk assessment done by Dr. Montalbano where he says it is

19   statistical and you test the validity of the statistical

20   analysis by observations of behavior; is that correct?

21   A.   Yes.  Yes, that is correct.

22   Q.   So it starts statistically?

23   A.   No.  It starts with observation.

24   Q.   It starts with -- would you agree that it is a

25   combination of statistics and corroboration by behavior?

1    A.    Those materials are one factor that's considered in the

2    assessment of risk.

3    Q.    Well, noting that it is both statistical and behavioral,

4    are you able to tell the Court how substantial, how

5    significant the risk would by enlarging -- risk of danger

6    would be by expanding from six nights to nine nights?

7    A.    In the absence of appropriate structure integrated into

8    the overall plan, in my opinion, there is an inadequate

9    addressing of those factors that we consider to be

10   significant, of significant risk, and it should not occur

11   until those things are addressed.

12   Q.    Are you able to tell the Court the quantification of that

13   risk?  Is this a big risk?  Is this a significant risk?  Is

14   this a risk that is wholly insubstantial?

15   A.    In my opinion, it is significant enough in the totality

16   of a plan that it should not be done unless the factors are

17   accounted for.

18   Q.    And I think you told us in your direct examination that

19   in your view it would be, I think to use your word, imprudent;

20   were you the judge, you wouldn't do it; is that

21   correct?  Imprudent.

22   A.    I don't think I said if I were the judge.

23   Q.    You didn't say "if you were the judge", you said it would

24   be imprudent to do it.

25   A.    As a clinician, I would say it would be imprudent.  Yes.

1     Q.   And that's because -- not because of his behavior, not

2     because the risk is other than very low as it has been

3     characterized or testified to by Dr. Montalbano, but because

4     not enough has been done to manage the risk; is that correct?

5     A.   Structures that we put in place routinely that insure

6     that we have attended to the risk factors in this patient's

7     case, I do not believe have been adequately attended to.

8     Q.   Well, we manage the risk, do we not, by giving this

9     patient medication, don't we?

10    A.   We manage some of those risks, yes.

11    Q.   We also manage the risk of this patient by giving him a

12    psychiatrist at the hospital, Dr. Green; isn't that correct?

13    A.   That's one factor.

14    Q.   We manage the risk by doing that, don't we?

15    A.   That's one factor.

16    Q.   We also manage the risk by giving him a therapist, Dr.

17    Binks; isn't that correct?

18    A.   Yes.

19    Q.   And we manage the risk by giving him a job at the

20    hospital, don't we?

21    A.   Yes.

22    Q.   And we examine his behavior -- I think we've learned,

23    through a microscope -- while he's on the grounds of the

24    hospital, don't we?

25    A.   Yes.

1   Q.   So we corroborate the testing by what we see at the

2   hospital; isn't that correct?

3   A.   Yes.

4   Q.   And we manage the risk by having Mr.  Hinckley have a

5   treatment team and ward administrator; isn't that correct?

6   A.   That is correct.

7   Q.   And we have the FPT's I think they're called; is that

8   correct?

9   A.   Yes.

10  Q.   That's another way of managing the risk.  And in going to

11  the place where his mother's home is located, we manage the

12  risk again by having medication; is that correct?

13  A.   Yes.

14  Q.   We manage the risk by having a psychiatrist, correct?

15  A.   Yes.

16  Q.   And we manage the risk by having a therapist; is that

17  correct?

18  A.   Yes.

19  Q.   And we manage the risk by trying to get him a job; is

20  that correct?  A job is part of the management of the risk?

21  A.   Well, we manage the risk by making sure he has the job.

22  Q.   All right.  And if he doesn't have the job, we manage the

23  risk by monitoring and participating in the effort to get him

24  a job; isn't that correct?

25  A.   We manage the risk by his participating in the process.

I'm not sure I'm following that piece of it.

Q.   So it seems like there's a lot of management of a very
insubstantial amount of risk; isn't that correct, sir?

A.   Maybe insubstantial to you.  The risks that I am
concerned about are the risks that are shared by other
examiners, including --

Q.   Well, I asked you, sir --

THE COURT: Let him finish his answer, Mr.  Levine.

MR. LEVINE:  I'm sorry.

THE WITNESS:  Including what we know and what we
know to be necessary in order to give us a degree of clinical
comfort that we have addressed -- that we have in fact
addressed the risks that are of concern to us.  And I would
like to make one note about this issue of expansion of days.
I have not articulated opposition to that expansion.  I've
articulated opposition to doing it in the absence of these
structures and doing it in the absence of some demonstration
that other factors that have been articulated are in fact in
place and that he demonstrates some success in accomplishing
those tasks before expanding that time.

BY MR. LEVINE:

Q.   Well, Dr. Phillips, in posing my question to you, I
characterize the risk as insubstantial.  You seem to want to
quarrel with that characterization, yet when I asked you to
quantify the risk, you said you couldn't do it.

A.    The characterization of insubstantial would suggest, or
at least I interpreted it to mean, that it wasn't necessary to
be of concern.  It is clearly of concern.  Anything that is of
concern is of some substance, in my opinion.  Is my concern
that there is an eminent risk at present?  I think I've been
very clear as have other examiners that that is not what is at
issue.  What is at issue is what are the things that lead to
the risks that we know exist moving in a direction that
intensifies our concern.  That's what I've attempted to
articulate in my report.  That's what I've attempted to
articulate in my testimony.

Q.    Well, Doctor, let's move on a little bit from this.
You've identified as a risk, relationships with women,
correct?

A.    Yes.

Q.    Lots of talk about women; is that correct?

A.    There has been?

Q.    Yes.

A.    Yes, there has.

Q.    And we talked a lot of about Ms. G and Ms. M; is that
correct?

A.    That is correct.

Q.    And there have been some others; is that correct?

A.    Yes.

Q.    Now, you've also said -- again, I think a point of

1    agreement -- that despite all of the developments with women

2    in the past year, you have concluded that as significant as

3    these issues are, in your opinion, they do not presently give

4    rise to the need to halt or reduce Mr. Hinckley's existing

5    privileges; is that correct?

6    A.    That is correct.

7    Q.    So whatever the risks may be, you are not prepared to

8    stop anything; is that correct?

9    A.    I'm sorry?

10   Q.    You're not prepared to stop any of this, any of these

11   conditions.

12   A.    Of these existing privileges?

13   Q.    Yes.

14   A.    No.

15   Q.    Now, what -- in what manner under the proposed plan would

16   you manage the risk that pertains to women?  What would you

17   do?

18   A.    I would do exactly what people are attempting to do, both

19   in the parents' community and continuing to do in the

20   hospital.

21   Q.    Tell Dr. Rafanello who is sitting over there and

22   Dr. Montalbano why the plan that is before the Court is

23   deficient with respect to managing that specific risk.

24   A.    The concern that I have about the plan cannot and should

25   not be relegated to that specific risk.  It needs to be

1    understood in the totality of what's being proffered.

2    Q.    Is your problem with this plan the fact that he does not

3    have in place at this time a volunteer position?

4    A.    That is one of them, yes.

5    Q.    If he had a volunteer position in place at this time,

6    would you support this plan?

7    A.    With modification, yes.

8    Q.    With modification?

9    A.    Yes.

10   Q.    What's that?

11   A.    Modification is that I would not advance the recreational

12   privileges without some demonstration of satisfactory

13   participation for some specified period of time in the work

14   placement, some demonstration that the clinical structure that

15   is being proffered is operational and working; for example, a

16   year has gone by and we are only now seeing a transmission of

17   records to the therapist in the mother's community and the

18   hospital and conversations beginning.

19        I would like to see some demonstration that that is in

20   fact working; that there is some clarity about what the roles

21   will be now of these two practitioners providing therapy.

22   Some demonstration that what's being put forward is in fact

23   operational, and I don't think that demonstration need to be

24   protracted, but I think there has to be some demonstration

25   that it is working before we start expanding other privileges.

1      It is appropriate to expand them.  I do not think it is

2      appropriate to expand them without such demonstration.

3      Q.   I'm not sure I understand that answer.  Let's see if we

4      can ask a few questions about it.  If he had a job in place as

5      of now --

6      A.   Yes.

7      Q.   -- and if that job were suitable to the hospital, would

8      you oppose this plan?

9      A.   All of the above.

10     Q.   That answer won't do.

11     A.   I'll say it again.

12     Q.   Please.

13     A.   With modifications.  The plan needs to allow for some

14     demonstration that not only he has the job, but that he is

15     attending the job, that it is working.  That he is going and

16     there isn't anything that's happened that has made it

17     disappear given the way things have materialized or not

18     materialized.  That the clinical -- excuse me.

19     Q.   Well, that would be done -- that would be done, would it

20     not, were -- after he showed up at the job if the Court were

21     to allow him to have this job.

22     A.   Yes.

23     Q.   And the supervisor of the job would report to Mr.  Beffa

24     or the Hospital or both that he showed up and he did his work

25     as he was supposed to do it.

1      A.    Yes.

2      Q.    That would give you the condition you seek to be in

3      place; would it not?

4      A.    That would be one of them.  Let me try and answer it this

5      way.

6      Q.    Are you changing the answer or is that the answer?

7      A.    No, I'm amplifying on the answer.

8      Q.    Okay.

9      A.    Because you didn't seem to understand the first one, so

10     let's see if this helps.

11     Q.    I think I'm pretty good at understanding this.  Go ahead.

12     A.    The Hospital has suggested, for example, that the

13     recreational privileges should not be expanded until he has

14     demonstrated successful participation in the work experience

15     for at least two cycles.  Whether the number is two, whether

16     it is four, whether it is six, the issue is there is some

17     connectedness between the expansion of those privileges and

18     his satisfactory participation and completion in certain tasks

19     that have been outlined.  That's appropriate.  We build

20     privileges based on demonstration of successful acceptance of

21     responsibility, and I am echoing that.

22     Q.    So if there were -- you would be looking for evidence of

23     success in cycles of performance, whether it be two or four or

24     some other number of cycles; is that correct?

25     A.    In both the patient and the institution.

1    Q.   Okay.  Now, let's talk about what a cycle is.  Could a
2    cycle be work on Monday, work on Wednesday, and work on
3    Friday;  would that be three cycles?
4    A.   No. I am thinking of cycles in the context of conditional
5    release visits.
6    Q.   Do you think this has to please you, satisfy you, or do
7    you think it has to satisfy the Hospital?
8    A.   Well, your question was to me.
9    Q.   Yes.
10   A.   And I responded, I believe, as to what it was that I
11   believed was necessary.  It is ultimately the Hospital's
12   decision, but if you asked me, and I believe you did, what it
13   was that I objected to or what it was that I concurred, I've
14   attempted in the last 15 minutes to explain that to you.
15   Q.   Do you think the plan is deficient because it doesn't say
16   in its text that he wouldn't get social privileges until he
17   demonstrated for a number of cycles his success in his work
18   privileges?
19   A.   The plan isn't deficient because of that, the plan says
20   that.  The plan is deficient because it references a work site
21   that simply doesn't exist and is wrong.  The plan is deficient
22   because it doesn't provide clarity about what the roles of the
23   local clinicians will be given the configuration that's
24   presented here.  The plan is deficient in those areas of
25   structure.  The plan is not deficient in its intent.  By your

1    own articulation, there is considerable agreement between what

2    the plan proffers and what I believe to be clinically

3    appropriate at this time.

4         But the simplest way of putting this forward is that the

5    plan was put forward prematurely.  It is far better to have

6    these issues resolved and articulated before we come in this

7    courtroom, in my opinion, than to have to do this, at least

8    for the last couple of years, as we sit here, hearing about

9    augmentation of the plan through testimony.

10   Q.   Assume with me, sir, that one of the three job

11   opportunities comes to fruition and that one meets the

12   approval of the Hospital.  Okay?

13   A.   Yes.

14   Q.   Now, is the plan then deficient only because of the lack

15   of clarity between the roles of the mental health

16   professionals?

17   A.   I'm pausing because I'm trying to understand what -- when

18   you say that it meets -- the job meets the expectation of the

19   Hospital, I'm not sure I'm clear what you mean.

20   Q.   I understood your first critique of this to be that the

21   plan was premature because it didn't have in place, in a hard

22   and solid way, a real identifiable job; is that correct?

23   A.   That is correct.

24   Q.   All right.  Now, assume with me that there is in place

25   such a job.

1       A.    Okay.

2       Q.    And assume further that the job meets the approval of the

3       Hospital?

4       A.    Okay.

5       Q.    Is the other -- is the sole other deficiency in the plan

6       the lack of the clarity in the roles of the mental health

7       professionals down in that area?

8       A.    That is certainly the next one that we should be looking

9       at, yes.

10      Q.    Is there any of it?

11      A.    I thought I had articulated them, but I will articulate

12      them again.  It is the issue of his place of employment.  The

13      expectations, what is in place to support that activity.  It

14      is the role of the mental health providers.  We have not yet,

15      in your hypothetical, to address the issue of his driving.

16      All of the things -- has your hypothetical now excluded those

17      aspects of the plan or is it including them?

18      Q.    The driving -- we understand your view of the driving.

19      A.    Yes.

20      Q.    You support it.  You support it.  You believe it should

21      be a Virginia permit rather than a D.C. permit, but you

22      support the fact that he gets a driver's license.

23      A.    Yes.

24      Q.    A permit, testing, gets a driver's license; we don't

25      think that is a real issue here.

1   A.   Correct.

2   Q.   That's your view, right?  Correct?

3   A.   Absolutely.

4   Q.   Okay.  So I'm trying to discern from you, from your

5   answers to the questions, whether the sole other problem were

6   there to be a satisfactory job in place, one that has the

7   imprimatur of the Hospital, that the sole other deficiency, if

8   you will, in the plan, is its lack of clarity with respect to

9   the mental health professionals?

10  A.   And, again, I'm asking are we talking about your

11  hypothetical or are we in realtime?

12  Q.   We're talking about this plan.

13  A.   Well, you're going back and forth.  If you're talking

14  about this plan, there's also the issue of what, if anything,

15  should be occurring in the District of Columbia.  If you want

16  me to consider the whole plan, you can't pick and choose the

17  things we're going to discuss.

18  Q.   All right.

19  A.   We have to talk about them all.

20  Q.   Well, let's assume that we have this job in place that

21  meets the imprimatur of the Hospital, that he gets his driving

22  permit, that there is no D.C. plan -- let's assume that for a

23  moment.

24  A.   Okay.

25  Q.   Is the sole other deficiency the lack of the clarity with

1    respect to the roles of the mental health professionals?

2    A.    Yes.

3    Q.    All right.  Let's talk about the roles of the mental

4    health professionals.  You've just testified that you were

5    surprised that Dr. Lee will spend 45 minutes with the patient

6    during each of these conditional releases; is that correct?

7    A.    Yes.  Based on my assumption that he would simply be

8    doing med management.

9    Q.    Would it be -- would it better, Dr. Phillips, would it

10   better manage risk were the session with Dr. Lee be a mere 15

11   minutes?

12   A.    Not necessarily.

13   Q.    So 45 minutes is a surprise, 15 minutes wouldn't improve

14   it?

15   A.    No.  I wouldn't frame it that way.  Having clarity about

16   what it is he is to be doing during that time would help me

17   better understand what that intervention is designed to do.

18   Q.    Well, you interviewed Dr. Lee how many times?

19   A.    For -- twice for this hearing.

20   Q.    Twice for this hearing?

21   A.    Yes.

22   Q.    Did you ask him, Dr. Lee, what will be your role under

23   the new plan or something to that effect?

24   A.    Yes.

25   Q.    You did ask him?

1    A.   Yes.

2    Q.   What did he say?

3    A.   Medication management.

4    Q.   And the fact that he would engage in a session some 45

5    minutes in length to do that, that would meet your approval,

6    although, it would surprise you that it would be 45 minutes?

7    A.   It's not a matter of it meeting my approval.  It is a

8    matter of my having clarity as to what he is doing so that

9    we're all clear and that we protect ourselves from exactly

10   what I explained earlier this afternoon and that is to make

11   sure we don't leave ourselves open to splitting, that we make

12   sure that if there was an issue with therapeutic style, that

13   those things will be accounted for if they continue to arise.

14   Q.   Is this lack of clarity a lack of clarity that you have

15   or is it a lack of clarity that Dr. Lee has?  He said,

16   medication management.  Seems pretty clear to me.

17   A.   He also said medication management 15 minutes just I like

18   I do with everyone else.  So, again, my point is trying to be

19   clear about expectations when we start so that there are no

20   confusions about what's happening down line.

21   Q.   Is this a failure of the artfulness of your inquiry of

22   him?

23   A.   I don't think so.  I think it's a failure of the ability

24   to articulate in advance what it is the hospital wishes to do

25   and how they're going to do it.

1    Q.   Let's see now.  He has three therapists, four maybe.  He

2    has Dr. Binks.  Also has Mr.  Hyde.  He has Dr. Lee.  And

3    Dr. Beffa -- and Mr.  Beffa.

4    A.   Yes.

5    Q.   Is he get getting too much therapy in your view?

6    A.   He may.  I haven't articulated that, but that's certainly

7    something that perhaps we should look at.

8    Q.   Might be getting too much therapy.  So we either have a

9    problem where he's either getting too little or too much.

10   A.   Again, the way you framed it and the manner in which you

11   framed it, I don't think does service either to my clinical

12   concern or what the hospital is legitimately trying to do.

13   Q.   Do you -- I'm sorry.

14   A.   What I am attempting to articulate here is an absence of

15   clear communication of expectation of roles of clinical staff

16   and how those roles interface and impact upon the patient.

17   Period.

18   Q.   Period.  Do you know if Mr.  Beffa has clarity in his

19   role?

20   A.   In his role?

21   Q.   Yes.

22   A.   I felt from his testimony he needs some education in his

23   role as case manager, and so what he may believe to be clear,

24   I would not concur that there is clarity about what my

25   expectations, and I would submit the expectations of many with

1    regard to case management services in a forensic population.

2    Q.    So if Dr. -- if Mr. Beffa were to say: I have a clear

3    understanding of what it is I am supposed to do.  I have

4    talked to the hospital.  I have spent time talking to Dr.

5    Binks.  I have worked very closely with Dr. Lee over a period

6    of -- I think it's a couple of decades now.  I have a very

7    clear understanding of what I am supposed to do.  Your view is

8    it's not so clear.

9    A.    Well, based on what we've seen in terms of the attempting

10   to get the jobs, I would say the best predictor of future

11   performance is past performance.

12   Q.    Maybe you wanted to see -- maybe the hospital wanted to

13   see what Mr. Hinckley would do himself.  Let's see if he has

14   sufficient initiative.  Let's see if he needs some assistance.

15   So they would have given him some time to try and perfect the

16   job -- to secure the job.

17   A.    And --

18   Q.    And if he was not able to secure the job, then it would

19   play an assisting role.  Any problem with that?

20   A.    If you could direct me to the record where it says that

21   that's what was being tested, I would say that's legitimate.

22   But I do not see any evidence that this was a test in that

23   regard.  What I see was the hospital expecting that these

24   things would be done and then realizing they weren't; and the

25   notion that there was some expectation and that this was a

1    test of his capacities de novo and that there was simply not

2    going to be any assistance provided to determine how much

3    capacity he had is an interesting hypothetical.  But in

4    realtime, I just don't believe that's what transpired here.

5    Q.   Did you ask Dr. Binks if he had conferred with Mr.  Beffa

6    about the clarity of the role that Dr. -- that Mr.  Beffa

7    would have in the therapy going forward?

8              THE COURT: Therapy or the case management?

9              MR. LEVINE:  Therapy.

10             THE WITNESS:  Not in those specific terms.

11   BY MR. LEVINE:

12   Q.   And you asked Dr. Binks if he had a conversation with Mr.

13   Beffa about the clarity of the role by Mr.  Beffa of case

14   management?

15   A.   If I'm not mistaken, at the time I spoke with Dr. Binks,

16   he and Mr.  Beffa had not spoken yet by telephone.

17             THE COURT: Let me just ask this question so we're

18   sure we're covering this area as fully as Mr.  Levine wants

19   to.  I think the same question should be asked with respect to

20   your conversations with Mr.  Shamblee because my recollection

21   from what we heard on the record was at least with respect to

22   case management, and maybe in general, that Mr.  Shamblee may

23   have been the primary point of contact with Mr.  Beffa over

24   the last year or 18 months.  And Mr.  Shamblee is the case

25   manager in the institution, correct?

1          THE WITNESS:  Yes.

2          THE COURT: So I think I would like to hear, to

3     follow-up on your questions, about whether you have any more

4     insights or knowledge, not insights, but knowledge about

5     conversations between Mr.  Shamblee and Mr.  Beffa about the

6     case management role, either from Shamblee or from Beffa.

7          THE WITNESS:  My sense from our discussions is that

8     there were not substantive discussions.  And --

9     BY MR. LEVINE:

10    Q.   Did you say your sense of that or did you ask of it?

11    A.   Yes.  We discussed what contacts were made.  And you have

12    copies -- you have the two-plus hours of my discussions with

13    Mr.  Shamblee on tape what was apparent from those

14    discussions, and what is apparent from what has transpired is

15    that there was not sufficient dialog about expectations about

16    what should be done.  There were many more assumptions, and

17    that -- this is a complicated case.  Those things may happen.

18    Regardless of how you explain their occurrence, you're still

19    left with the reality that that's not in the best interest of

20    managing his risk.

21         I do believe that it doesn't take much to address those

22    issues so that this patient's privileges can move along the

23    continuum, but these patient's privileges should not move

24    along the continuum in total until those things are addressed.

25    Q.   Is it your view that the failure here to address these

1    things, as you call them, that the failure here is that of the

2    Hospital?

3    A.    These administrative issues that we're talking about?

4    Q.    Yes.  Yes.

5    A.    These clinical administrative issues?

6    Q.    Yes.

7    A.    Yes.

8    Q.    Failure of the Hospital?

9    A.    Yes.

10   Q.    And you would hold that failure of the Hospital against

11   the patient?  You would say nothing further for him until the

12   Hospital does better; is that your view?

13   A.    We do not put --

14   Q.    Is that your view?  You can answer it and then give -- if

15   you want to explain, I invite you to do that, but I'd like to

16   hear your answer to the question.

17   A.    Yes, that is my view.

18   Q.    Okay.

19   A.    And it is my view because we do not put insanity

20   acquittees in the community absent the appropriate measures

21   commensurately being put in place to manage the risk

22   independent of whose fault it is and --

23   Q.    And what's appropriate is --

24   A.    Excuse me.

25   Q.    -- a determination that you --

1    A.    Excuse me.

2    Q.    -- make rather than the Hospital.

3          THE COURT: Let him finish, Mr. Levine.  Mr. Levine,

4    let him finish his answer.

5          MR. LEVINE:  I'm sorry.

6          THE WITNESS:  And in looking at this case in

7    totality, the fault, if you want to set it up as fault, is not

8    to be shouldered simply by the Hospital.  So when one looks at

9    the plan and when one looks at what needs to be in place to

10   remedy it, you attempt to address the issues that are the

11   responsibility of both the patient and the institution, and I

12   would again underscore that remedying that situation, in my

13   opinion, is not that difficult and doesn't require that much,

14   but it needs to be done.

15         I said it a year ago and I say it again now, there

16   is no change in my expectation in meeting what I think is the

17   appropriate standard of practice.

18   Q.    So as a clinician, Dr. Phillips, you would hold

19   accountable the blameless party, the patient, for the flaws of

20   the Hospital; is that what you would do?

21   A.    No, sir.  I don't accept your characterization.  You --

22   Q.    You would agree that Mr. Hinckley, in this regard, is

23   blameless?

24         THE COURT: In which regard?

25         THE WITNESS:  In which regard?

1   BY MR. LEVINE:

2   Q.   Mr. Hinckley has nothing to do with the provisions and

3   the clarity and the management of risk that is reflected in

4   the (e)petition before the Court; isn't that correct?

5   A.   No, that is not correct.

6   Q.   You don't regard that as the Hospital's petition, you see

7   some -- in some respect it is Mr. Hinckley's petition?

8   A.   As I said before, there are portions of this and portions

9   of the risk factors that have to be addressed because of Mr.

10  Hinckley's inability to demonstrate the initiative.  There are

11  issues that are clearly the responsibility of the institution.

12  You have framed it in a way that has said you, doctor, are

13  going to hold Mr. Hinckley responsible for the problems that

14  have been created by the Hospital.  I prefer to frame it as we

15  will not place an insanity acquittee in the community without

16  the appropriate safeguards being put in place.

17  Q.   Even when he is ready?

18  A.   Even if he is ready.  If the -- if he is ready and the

19  safeguards have not been put in place, we're not ready.

20  Q.   Even when the risk is very low?

21  A.   The risk is low while he is in the hospital.  The

22  management of the risks attendant with placing him in the

23  community without those safeguards are the very reason we're

24  in the courtroom today having the discussion.  Were it that

25  simple, we wouldn't need to be here.  You could just simply go

1    with a checklist and say he's ready and open the door.

2         We do this because we know what the factors are that

3    identify the risks.  We know what things we feel should be put

4    in place to, in fact, manage the risks we've identified, and

5    if you don't demonstrate in your application that those things

6    in fact have been put in place, then you have not met your

7    clinical responsibility.

8    Q.   Let me move on.  You testified in your response to Ms.

9    Chasson -- I'm sorry -- that the CSB was willing to provide

10   services to Mr.  Hinckley and that -- I think you said

11   yesterday -- you spoke with its director; is that correct?

12   A.   That is correct.

13   Q.   And it was the CSB with which Mr.  Shamblee spoke many,

14   many months ago; is that correct?

15   A.   Correct.

16   Q.   And the CSB said, no, there is a residency requirement,

17   can't do it; is that correct?

18   A.   Correct.

19   Q.   Then you went to the CSB and, as is reflected in your

20   report, they were enthusiastic in their receptivity; weren't

21   they, sir?

22   A.   They were.

23   Q.   And you specifically discussed the issue of residency; is

24   that correct?

25   A.   Correct.

1    Q.   And they maintained enthusiasm for this, not a problem;

2    is that correct?

3    A.   That's correct.

4    Q.   And being the careful and diligent person that you are,

5    you later went back and spoke to them again; isn't that

6    correct?

7    A.   Correct.

8    Q.   And you did it for the purpose to, I think as you wrote

9    it, reaffirm that residency wasn't a requirement, correct?

10   A.   Correct.

11   Q.   And that the job was still available or that their

12   services were still available; is that correct?

13   A.   Correct.

14   Q.   And then, based on your presentation of their

15   availability, Mr. Beffa went over to the CSB; is that

16   correct?

17   A.   It is not clear to me what the impetus for his going

18   forward was, whether it was to get services or to try and get

19   a job.

20   Q.   But he did go over to the CSB?

21   A.   Yes.

22   Q.   And that resulted in a letter from the CSB dated July 21;

23   is that right?

24          THE COURT:  Yes.  The first letter is the 21st.

25   BY MR. LEVINE:

1    Q.   In which they say, yes, services available, correct?

2    A.   Yes.

3    Q.   All right.  And then on July 22, the next day, they said

4    services not available; is that correct?

5    A.   Correct.

6    Q.   And they said not available because of the residency

7    issue; is that correct?

8    A.   That is correct.

9    Q.   And then I believe you told us, as this ping pong ball

10   keeps going across the net, you spoke to them yesterday, July

11   23; is that correct?

12   A.   Correct.

13   Q.   And yesterday, they told you they are available; is that

14   correct?

15   A.   They told me that they were willing to provide services

16   to him, that he was appropriate for services, but he would

17   have to meet the residency requirement.

18   Q.   All right.  So this requirement, this residency

19   requirement which Mr.  Shamblee identified at the very

20   beginning, which seemed to have had evaporated when you were

21   there, and the evaporation was reaffirmed when you went back,

22   and they stood by it until -- when Mr.  Beffa went back.  Then

23   it reappeared again, and then you're telling us it evaporated

24   again or it reemerged in some other form; is that right?

25   A.   They, I don't believe, have changed their posture on

1    standing behind the residency issue at this juncture.

2              THE COURT: Is what they told you yesterday on the

3    telephone inconsistent with what they wrote to Mr.  Beffa the

4    day before?

5              THE WITNESS:  No.

6    BY MR. LEVINE:

7    Q.   I believe you said to Ms.  Chasson on direct examination

8    that they were willing to provide services to Mr.  Hinckley

9    and that was what you learned speaking with its director on

10   the telephone yesterday.  I believe you said it was a "Mr.

11   Coe".

12   A.   The same person who generated the letter.

13   Q.   The same person.

14   A.   And they are willing to provide those services if he

15   meets the residency requirement, or if he identifies them

16   through Medicaid as his preferred provider.

17   Q.   Let's talk about the residency requirement.  He doesn't

18   live in Virginia, does he?

19   A.   Not at present, no.

20   Q.   So he cannot say that he lives in Virginia, can he?

21   A.   No.  But he can begin that process.

22   Q.   How does one begin the process of saying I live in

23   Virginia when one doesn't, in fact, live in Virginia?

24   A.   It happens all the time.

25   Q.   No.  You have to be in Virginia to say I live in

1    Virginia, don't you, sir?

2    A.    You have to live -- if your intent is to move into an

3    area, you can begin the process, and I think I made that clear

4    and if I haven't, I'll try and clarify it.

5    Q.    You made that quite clear.  By the way, are you a lawyer?

6    A.    No.  But after having researched this, it reaffirms why

7    I'm not.

8    Q.    All right.  Well, let's find out what you researched with

9    respect to what you have to do to become a resident.  What did

10   you learn?  What was your research?

11   A.    What I learned is that there are a number of ways of

12   looking at residency, none of which are directly on point for

13   a hospitalized patient.  Some of which may be analogous, but,

14   ultimately, the recurring theme is domiciliary intent; and,

15   ultimately, when these questions are challenged, it is -- the

16   burden again is on the individual to demonstrate their intent

17   and whether the efforts that they've engaged in satisfy

18   whatever agency is making the determination.

19        Whether it is a school trying to determine whether or not

20   someone should receive in-state tuition; whether it is a

21   serviceman who is trying to establish residency for other

22   purposes; whether it is with the taxation office in

23   determining whether one does or doesn't -- the fact of the

24   matter is there are steps that must be engaged in.

25        There are steps that have been suggested even by

individuals at CSB in earlier conversations that someone can
do to begin the process to demonstrate that it is their intent
to be in Virginia and that it is a function of what they're
evolving to.  When someone changes jobs and it is their intent
to be in location, there are a number of things that people do
in order to begin the process of establishing residency.

Q.   Sure.  And the first thing they do, as is required by law
were you to have done adequate research, is you have to be
there with the intent to remain.  You can't say I'm -- while
scratching ones' head, I think I'll move to North Dakota and
be eligible for a North Dakota benefit.  You have to move --
you have to be there with intent to remain.

A.   Well, without characterization of my research, my
research also indicated that in certain circumstances, the
parents' residence may be enough to overcome the burden that
you have suggested.

Q.   It may be if you're there.  If you haven't been there for
27  years, and you don't know that you're ever going to be
there, you can't manifest that intent; isn't that correct,
sir?  If you're going to be honest about what you're going to
say.

A.   I'm not suggesting dishonesty, but I am amazed at the
tenacity with which you're resisting the process that is done,
without being inconsistent with the law, that helps facilitate
Mr.  Hinckley getting to where he wants to be.

1    Q.   Dr. Phillips, this tenacity -- I am being tenacious to

2    make sure that we deal with truth in a truthful way and that

3    when Mr. Hinckley makes an application for anything that he

4    not falsely state that he lives where he doesn't.

5    A.   I completely understand that.

6    Q.   All right.

7            THE COURT: The reality is that if residency is a

8    requirement that the CSB is not realistic in the short term I

9    assume.

10           THE WITNESS:  Unless he goes through Medicaid.

11           THE COURT: Unless he goes through Medicaid.

12   BY MR. LEVINE:

13   Q.   Now, do you know, Dr. Phillips, whether the designated

14   Medicaid provider for Mr. Hinckley is St. Elizabeths

15   Hospital?

16   A.   I have asked that question and have not gotten an answer

17   from the clinicians that I have asked it to.

18   Q.   As one who has researched the law in this regard, do you

19   know if you can have two different designated Medicaid

20   providers in two different states or jurisdictions?

21   A.   It is not likely.

22   Q.   Not likely?

23   A.   Not likely.

24   Q.   Well, would it be relevant to your determination as to

25   whether or not he could be eligible for CSB services were you

1          to know that St. Elizabeths Hospital is, in fact, the

2          designated provider for Medicaid for Mr. Hinckley?

3          A.   It is relevant in that it is clear you can't get

4          out-patient services while you're in-patient either.  However,

5          this is exactly the point that was articulated by CSB in

6          earlier discussions.  Their willingness to be accommodating is

7          also driven by where he is in the process, what it is you have

8          sat down and talked with them about, and how they may

9          appropriately arrange for the provision of services.

10              I believe I reported in my report the flexibility that

11         they at least previously had articulated in terms of their

12         willingness to even consider providing certain services on a

13         fee-for-service basis.

14              The issue with CSB, and I think it was clearly

15         articulated by Mr. Coe when he called yesterday, is I believe

16         some concern that the contact -- forgetting a letter was

17         abrupt -- that there wasn't clarity.  There was some

18         communication that it was because someone had testified or was

19         testifying -- he wasn't clear in that communication -- that a

20         job had been offered, and he said clearly no job had been

21         offered, but that he also had not spoken with anyone other

22         than Mr. Beffa.  He hadn't had substantive conversation with

23         anyone in an administratively responsible position in the

24         hospital, and it was my sense, given my experience as a

25         hospital administrator, a former hospital administrator, that

1   he wasn't happy about that.

2   Q.   Mr.  Beffa is the case manager; is he not?  He would be

3   the appropriate person to speak with them unless you think, of

4   course, it should be the patient, a properly motivated patient

5   with sufficient initiative to go figure out the morass with

6   CSB; is that your view?

7   A.   No.  In a less sarcastic framing, I would suggest that

8   what Mr.  Coe was intimating is that given the magnitude and

9   importance of this case, the discussion about what services

10  could be provided and what is appropriate is a discussion that

11  should not initially and solely be left to someone who is a

12  local provider and really should be initiated by someone who

13  has substantive responsibility and clinical authority for the

14  host agency, and that had not occurred.

15  Q.   Now, Mr.  Coe called you yesterday; is that right?

16  A.   Correct.

17  Q.   And that was in response to a call you made to him

18  yesterday?

19  A.   That was in response to a call that I had made several

20  days earlier to his staff.

21  Q.   Several --

22  A.   And they had not gotten back to me.

23  Q.   You mean several days after this letter of July 22, the

24  letter which --

25  A.   Before.

1    Q.   Before?

2    A.   Before.

3    Q.   After this hearing started?

4    A.   Just as it started.  In fact, I think even the morning --

5    I don't even think it had started.

6              THE COURT: So Monday.  We started here on Monday.

7              THE WITNESS:  Monday.  I called his agency.

8              THE COURT: It seems a lot longer ago, but it was

9    only Monday, and that was -- what day was Monday?

10             THE WITNESS:  The 21st.

11             THE COURT:  The 21st.

12             THE WITNESS:  The 21st, yes.

13             THE COURT:  And the 21st you called him.  That's the

14   same day he wrote and faxed a letter to Mr.  Beffa at 2:24

15   p.m. saying okay.

16             THE WITNESS:  Right.  I'm sorry, Your Honor.  I did

17   not call him on the 21st.  I called --

18             THE COURT:  His staff.

19             THE WITNESS:  -- his staff.  The people that I had

20   spoken with earlier.  I actually called before the hearing

21   began to get some sense of --

22             THE COURT:  Where we were.

23             THE WITNESS:  -- had there been any changes.  This

24   is before hearing anything about these letters or hearing

25   about what was going to be proffered by Dr. Montalbano.  I

1    wanted to know if there had been any changes.

2              THE COURT: Okay.  But you didn't hear back from him

3    until yesterday.

4              THE WITNESS:  I did not.

5              THE COURT: And by time you heard back from him

6    yesterday, he had written two letters seemingly inconsistent

7    to Mr. Beffa.

8              THE WITNESS:  That is correct.

9    BY MR. LEVINE:

10   Q.   All right.  We can move on.

11             THE COURT: What's your --

12             MR. LEVINE:  I'm sorry -- may I -- I note the time.

13   I'm sorry, Your Honor.

14             THE COURT:  What's your prognosis in terms of time?

15             MR. LEVINE:  Your Honor, let me see if I can

16   mercifully do this very quickly.

17             THE COURT:  All right.

18             MR. LEVINE:  I would -- may I confer for one moment,

19   please?

20             THE COURT: Well, he always thinks you need more time

21   than you think, so I don't know.

22             MR. LEVINE:  Well, he does, but --

23             (Whereupon, Mr. Levine conferred with co-counsel at

24   this time off the record.)

25             MR. LEVINE:  Your Honor, I will be brief.  I'm

1    sorry.

2              THE COURT:  All right.  Mr.  Levine.

3              MR. LEVINE:  Thank you, Your Honor.

4    BY MR. LEVINE:

5    Q.   Dr. Phillips, let me talk to you briefly about driver's

6    license.  Now, in your research, you agree you have told us

7    that Mr.  Hinckley should get a driver's license.

8    A.   Absolutely.

9    Q.   Absolutely.  You believe, however, it should be in

10   Virginia because it's a step toward becoming a Virginian.

11   A.    It certainly can be one of the steps.  I also -- it

12   seemed that it would be easier and it would be consistent with

13   what he is doing.  It is consistent with where he wants to be.

14   It's consistent with who it is that he might practice with.

15   It's consistent with where he is getting his driver's

16   education and, certainly, consistent with making it easier on

17   the family for him to go through the testing experience.

18   Q.   So this is -- your view that it should be in Virginia is

19   to help him?

20   A.   Yes.

21   Q.   Now, of course, for him to be able to do it in Virginia,

22   he needs to be eligible in Virginia, doesn't he?

23   A.   Correct.

24   Q.   So the first question you would ask is is he eligible; is

25   that correct?

```
1     A.    Correct.  And to do the research in that regard is not

2     difficult, is it?

3     A.    No.

4     Q.    Internet; correct?

5     A.    Correct.

6     Q.    Go online; correct?

7     A.    Yes.

8     Q.    And you did that?

9     A.    Yes.

10    Q.    And you saw that the DMV, the Virginia Department of

11    Motor Vehicles, puts out a little form which talks about what

12    you have to do to get a driver's license; is that correct?

13    A.    Correct.

14    Q.    And in one part of that form it talks about the proof of

15    Virginia residency; isn't that correct?

16    A.    Correct.

17    Q.    And it says you must present one proof of Virginia

18    residency from the list below.  You saw that?

19    A.    Yes.

20    Q.    Now, what is it that was on that list that you thought

21    Mr. Hinckley could produce?

22    A.    I'd have to look at the list again.  I can't remember it.

23    Q.    Let's just quickly do a few of these things here:

24    Payroll check stubs.  Does he have one of those from an

25    employer within the last two months?
```

1    A.    No.

2    Q.    U.S. Internal Revenue Service tax reporting W-2 form or

3    1099 form not more than 18  months old.  Does he have one of

4    those for Virginia?

5    A.    He doesn't, but he certainly could if it's his intention

6    to become a Virginia resident, go through the process of

7    making the declaration and begin paying taxes.

8    Q.    Well, you interviewed Mr.  Hinckley, didn't you?

9    A.    Yes.

10    Q.    And in your interview of Mr.  Hinckley, did you tell him

11    that you supported him getting a driver's license?

12    A.    Yes, I did.

13    Q.    And did you tell him that you thought he would best do it

14    in Virginia?

15    A.    Yes.  I thought it would be easier.

16    Q.    And did you discuss with him how you do it?

17    A.    I don't recall that I went through great detail.

18    Q.    Your Honor, may I have this marked please as Patient No.

19    -- I think -- 13.  Thirteen.

20          THE COURT: All right.

21          MR. LEVINE:  Copy to the government, Your Honor.

22          THE COURT: Thank you.

23    BY MR. LEVINE:

24    Q.    Dr. Phillips, I show you what's been marked as No. 13,

25    Patient's 13 for identification.  Is that the document that

1    you saw online when determining whether Mr. Hinckley was

2    eligible for a driver's license?

3    A.   Yes.

4    Q.   All right.  And I invite you to turn to Page 2 of that

5    document, sir.

6    A.   Yes.

7    Q.   And you see in bold print the words "Proof of Virginia

8    Residency"?

9    A.   Yes.

10   Q.   And then do you see in the first line under that

11   paragraph, under that heading, "You must present one proof of

12   Virginia residency from the list below"?

13   A.   Yes.

14   Q.   All right.  And it says that the document must show your

15   name and address of your current Virginia residence as it

16   appears on the application, right?

17   A.   Yes.

18   Q.   So the document that you have to show is the document

19   that shows his Virginia residence, correct?

20   A.   Correct.

21   Q.   And does he have a Virginia residence, sir?

22   A.   Does he have a Virginia residence?

23   Q.   Does he have a residence in Virginia?  Is there something

24   difficult about that question?

25   A.   Oh, no.  There's something difficult right now about my

1    attention given the hour.  Excuse me for a moment.

2    Q.    Then take your time.

3    A.    Does he have a residence meaning an abode?

4    Q.    Yes.  Does he have an abode in Virginia; an abode;

5    residence; house; apartment; condominium; shack; tent;

6    anything?  In Virginia.

7    A.    Well, there's his parents' residence.

8    Q.    Well, is that his parents' residence or is that his

9    residence, sir?  Does he live with his mother and father?

10   Does he live with his mother in her home?

11   A.    That is his intent.  But may I say something?

12   Q.    No.  You can answer these questions.  That's what you may

13   do, unless His Honor let's you do otherwise.  It is always up

14   to him.

15          THE COURT: Go ahead, Dr. Phillips.

16          THE WITNESS:  Thank you.

17          THE COURT:  Maybe we can wrap this up pretty

18   quickly.

19          THE WITNESS:  I think we can.  If it's not

20   appropriate for Mr. Hinckley to have a driver's license in

21   Virginia, then he shouldn't pursue it.  You are approaching

22   this as if that is the critical factor in my concern about

23   this plan.  I suggested that that might make matters easier.

24   I've already articulated support of the issue.  That's not

25   what is of concern to me.  I am certainly not interested in

1    doing anything that could come back on Mr.  Hinckley in a way

2    that would suggest that he is doing something inappropriate.

3            If it is possible for him to do so, if it

4    facilitates establishing residency so he can access services,

5    by all means, we should be doing those things.  If it can't be

6    done, so be it.  That's not what's of great clinical concern

7    to me.  What is of great clinical concern to me is making sure

8    we attend to the risk factors so that he can successfully move

9    along this continuum.  Whether he gets a D.C. driver's license

10   or a Virginia license is not the critical issue.

11   Q.   Well, the critical -- one of the critical issues is the

12   validity of the observations that you make in your report.

13   May I have this document marked as No. 14, please?

14            MR. LEVINE:  This will be very brief, Your Honor.

15   BY MR. LEVINE:

16   Q.   Dr. Phillips, I show you what's been marked as Patient's

17   14 for identification.

18   A.   Yes.

19   Q.   Do you see that?

20   A.   Yes.

21   Q.   That's the driver's license and identification card

22   application; isn't that right, sir?

23   A.   Yes.

24   Q.   By the Virginia DMV?

25   A.   Yes.  Right.

1    Q.   And it asks for one to put down one's street address,

2    correct?

3    A.   Yes.

4    Q.   City, state and zip code; right?

5    A.   Yes.

6    Q.   And then it asks for, at the bottom left, one line from

7    the bottom, proof of residency, doesn't it?

8    A.   Yes.

9    Q.   And it asks you to specify that; is that correct?

10   A.   Yes.

11   Q.   And on the last page it asks -- right at the very bottom

12   known as under the bold-faced certification and signatures --

13   it says in a simple, declarative way:  I certify that I am a

14   resident of Virginia.  Is that correct?

15   A.   Yes.

16   Q.   Could Mr. Hinckley sign that and be truthful?

17   A.   I'm not a lawyer, but it's certain -- it has certainly

18   been my position that someone could answer that question and

19   based -- and I'll say what I said at the beginning of this

20   exercise.  Based on my reading, the issue of what constitutes

21   residency may be determined by domiciliary intent.  Certainly

22   when you look on this sheet of what proof of residency can be

23   proffered, a canceled check is one.  Mr. Hinckley does have a

24   local bank account.  He does have a canceled check.

25           THE COURT: A local bank account where?

1             THE WITNESS:  In the residence -- in the community

2    of his parent's residence.

3    BY MR. LEVINE:

4    Q.   Dr. Phillips, were Mr.  Hinckley to certify that document

5    that he lived in Virginia, would you be the first to cite that

6    document as an evidence of not being candid and being

7    dishonest?

8             THE COURT:  Or deceptive.

9             MR. LEVINE:  Or deceptive.

10            THE WITNESS:  All right.  I had made clear in my

11   testimony previously and if I haven't made it clear today --

12            MR. LEVINE:  I have no further questions, Your

13   Honor.

14            THE WITNESS:  -- if I haven't made it clear today, I

15   will state again, I put this out there as something that

16   should be investigated.

17            THE COURT: Okay.

18            MR. LEVINE:  Nothing further, Your Honor.

19            THE WITNESS:  I've simply said that it should be

20   tended to and that there are enough people in this room who

21   could do that work.  If half the effort was put into

22   determining whether or not it could be done than was placed in

23   trying to point out whatever it was you were trying to point

24   out, the question would be answered, but that's up to the

25   treatment team.

1            I pointed out that this might be an easy way to go,

2     but I certainty don't want Mr.  Hinckley to engage in any

3     activity that would reflect that he was engaging in deception

4     because that would be harmful and inappropriate.

5            MR. LEVINE:  Nothing further, Your Honor.

6            THE COURT: Ms.  Chasson?

7            MS. CHASSON:  No redirect, Your Honor.  Thank you.

8            THE COURT: Dr. Phillips, thank you.  Everybody can

9     pick up their exhibits.

10            MR. LEVINE:  Your Honor, may I move into evidence,

11     please, Patient's Exhibits 13 and 14?

12            THE COURT: Any objection to 13 and 14?

13            MS. CHASSON:  What are they?

14            THE COURT:  The DMV stuff.

15            MS. CHASSON:  No.

16            THE COURT:  They'll be admitted.  Okay.  See you at

17     9:30.

18            MS. SAPP:  Your Honor, may I say something to the

19     Court, please?

20            THE COURT:  Oh, Ms. Sapp.

21            MS. SAPP:  I know.  And I usually don't say

22     anything, I just want to say something about the last issue

23     with regard to the driver's license.  Where it may have never

24     been clearly stated by the Hospital that they had researched

25     that, I had research that for them and told them that he could

```
 1     not get a Virginia driver's license.  Where that may not have
 2     ever been made clear, I provided that sheet of paper that
 3     counsel had to Mr. Shamblee last year so that they would know
 4     that on that list of things he could not qualify.
 5             So whether or not that was ever made clear, it
 6     should have been, and I should have come forward and let the
 7     Court know that.
 8             THE COURT:  I certainly take judicial notice that
 9     you are a lawyer.  And a very good one.
10             MS. SAPP:  Thank you, sir.
11             THE COURT:  I'll see you all in the morning.
12                     [End of proceedings]
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1

2                          C E R T I F I C A T E

3

4              I, Wendy C. Ricard, Official United States Court

5      Reporter in and for the District of Columbia, do hereby

6      certify that the foregoing proceedings were taken down by

7      me in shorthand at the time and place aforesaid,

8      transcribed under my personal direction and supervision,

9      and that the preceding pages represent a true and correct

10     transcription, to the best of my ability and

11     understanding.

12

13

14

15                                    _____

16                                    Wendy C. Ricard, CCR, RPR

17                                    Official U.S. Court Reporter

18

19

20

21

22

23

24

25