1                  UNITED STATES DISTRICT COURT

2                     DISTRICT OF COLUMBIA

3

4      UNITED STATES OF AMERICA          CRIMINAL ACTION NO. 81-306

5                                        WASHINGTON,D.C.

6      VERSUS                            FRIDAY, JULY 25, 2008
                                         (REDACTED)

7      JOHN W. HINCKLEY, JR. (ST. ELIZ.)  9:30 A.M.

8

9                      **EVIDENTIARY HEARING(DAY 5)**
                       **(Testimony of Dr. Patterson)**

10

11              BEFORE THE HONORABLE PAUL L. FRIEDMAN

12                UNITED STATES DISTRICT COURT JUDGE

13

14     A P P E A R A N C E S:

15

16     FOR THE PLAINTIFF               THOMAS E. ZENO, ESQ.
                                       SARAH T. CHASSON, ESQ.
17                                     U.S. ATTORNEY'S OFFICE
                                       555 Fourth Street, NW
18                                     Suite 5423
                                       Washington, DC 20530
19                                     (202) 514-6957

20     FOR THE DEFENDANT

21     JOHN W. HINCKLEY, JR.           BARRY W. LEVINE, ESQ.
                                       ADAM S. PROUJANSKY, ESQ.
22                                     ANN-MARIE LUCIANO, ESQ.
                                       DICKSTEIN SHAPIRO, LLP
23                                     1825 Eye Street, NW
                                       Washington, DC 20006-5403
24                                     (202) 420-2237

25

```
1    ST. ELIZABETHS HOSPITAL              TONYA A. SAPP, ESQ.
                                          D.C. ATTORNEY GENERAL'S
2                                         OFFICE
                                          441 4th Street, NW
3                                         Suite 1060 North
                                          Washington, DC 20001
4                                         (202) 724-5562

5    REPORTED BY:                         WENDY C. RICARD, OCR, RPR
                                          OFFICIAL COURT REPORTER
6                                         333 Constitution Ave., NW
                                          Room # 6718
7                                         Washington, DC  20001
                                          (202)354-3111

8

9    Proceedings recorded by mechanical stenography.

10   Transcript produced by computer-aided transcription.

11

12

13

14                        I N D E X

15   EXHIBITS:                                    PAGE:

16   Government 08-02   Dr. Patterson's report    4

17

18   WITNESSES:

19       Dr. Raymond Patterson.................

20         By Mr. Zeno........................   3

21         By Mr. Levine......................   52

22

23

24

25
```

<pre>
 1                    P-R-O-C-E-E-D-I-N-G-S
 2              THE COURT: Good morning, everybody.
 3              THE DEPUTY CLERK:  Criminal 81-306, United States of
 4     America versus John W. Hinckley, Jr.; for the government, Mr.
 5     Zeno and Ms. Chasson; for the patient, Mr.  Levine, Mr.
 6     Proujansky, and Ms. Luciano.
 7              MR. LEVINE:  Good morning, Your Honor.
 8              THE COURT:  Mr. Zeno.
 9              MR. ZENO:  Good morning, Your Honor.  The government
10     calls Dr. Patterson.
11     *              *              *              *
12         DR. RAYMOND PATTERSON, called as a witness in this
13     case, after having been duly sworn, testified as follows:
14     *              *              *              *
15              THE COURT: Good morning, how are you?
16              THE WITNESS:  Happy Friday.
17     DIRECT EXAMINATION BY MR. ZENO:
18     Q.   Ready.  Okay.  Good morning.
19     A.   Good morning, Mr.  Zeno.
20     Q.   Would you please state your name and spell your first and
21     last names for the court reporter?
22     A.   Raymond F. Patterson; R-A-Y-M-O-N-D; P-A-T-T-E-R-S-O-N.
23              MR. ZENO:  Your Honor, we proffer Dr. Patterson as
24     an expert in the diagnosis and treatment of mental illness
25     based on his presence before the Court on multiple occasions.
</pre>

1          THE COURT: Mr. Levine.

2          MR. LEVINE:  No objection, Your Honor.

3          THE COURT: He will be recognized as an expert

4    witness.

5    BY MR. ZENO:

6    Q.   Dr. Patterson, have you had an opportunity to review the

7    Hospital's 501(e) request that was dated May 28th, 2008?

8    A.   Yes, I have.

9    Q.   At the request of the government, did you prepare a

10   report dated July 7th, 2008?

11   A.   Yes, I did.

12         MR. ZENO:  Your Honor, that's been marked already as

13   Government's 08-02, and we would move it into evidence at this

14   time.

15         THE COURT:  Any objection?

16         MR. LEVINE:  None, Your Honor.

17         THE COURT:  All right.  Dr. Patterson's report will

18   be admitted in evidence.

19   BY MR. ZENO:

20   Q.   Dr. Patterson, in your report, you agreed with many of

21   the recommendations of the Hospital's (e)letter.  Do you

22   continue to agree with those recommendations?

23   A.   No, I do not.

24   Q.   Would you please explain to the Court why you have

25   changed your opinion?

1     A.    I certainly will.  I disagreed with recommendation number

2     one, the expansion from six days to 10 days, in my report.  I

3     essentially agree with all of the other 16 recommendations

4     with some caveats, including a notice to the Court for

5     recommendation number 17 and the requirement for a cell phone

6     with GPS capacity for several other recommendations.

7          Since attending this hearing for the last four days, I

8     now withdraw my agreement with recommendations two, three,

9     four, five, six, and 14.

10              THE COURT: Two, three, four, five, six --

11              THE WITNESS:  And 14.  And I certainly can read them

12     all if necessary, but the summation of them is that all of

13     them have to deal with Mr.  Beffa and Dr. Lee being the

14     treatment team members in the family's hometown.  Those

15     withdrawals are based on my observation of the testimony of

16     Mr. Beffa.

17     BY MR. ZENO:

18     Q.    Well, let's talk about that a little.

19     A.    Why don't we?

20     Q.    Let's start with a more general question which is what is

21     your opinion about the proposed therapy relationship between

22     Dr. Binks, Dr. Lee, and Mr. Beffa.

23     A.    Well, I have always approached the Hospital's

24     recommendation with regard to specific treatment providers as

25     essentially the purview of the Hospital.  I had some

1    reservations last year with regard to Dr. Lee, which I think I

2    made clear to this Court, but I deferred to the Hospital as to

3    their selection.

4         I did the same thing in this recommendation when I

5    reviewed it, and I approach it, I think, in much the same way

6    as the Court might approach a competency hearing, that

7    individuals are presumed to be competent unless there is

8    information or objection that comes from one or any of the

9    parties that perhaps they're not.

10        My presumption was that this was a competent, good faith,

11   reasonable change based on the Hospital's review.  When I

12   heard Mr.  Beffa testify, however, I was greatly dismayed at

13   some of the things he had to say.

14   Q.   Why don't we start with a couple of the things that he

15   had to say that you thought were most dismaying.

16   A.   Well, most dismaying for me was --

17             MR. LEVINE:  Excuse me, Your Honor.  Mr.  Zeno,

18   could you move so I could see the witness?

19             THE WITNESS:   Can you see me now?

20             MR. LEVINE:  Yes.

21             THE WITNESS:  Okay.  Most dismaying was the initial

22   response that he didn't believe he needed to read the full

23   record to become the individual therapist --

24             MR. LEVINE:  Objection.  That's not the testimony,

25   Your Honor.

1          THE COURT:  Well, if that's what Dr. Patterson

2     heard, then that's what he heard.  He said he hadn't read the

3     full record.

4          THE WITNESS:  He said he hadn't and that he didn't

5     need to, as I understood his testimony -- and I've taken

6     notes, so I can refer to my notes and try to get it right for

7     Mr. Levine.  I'm sorry, I misspoke.  He stated he doesn't need

8     to know the full history to become the case manager and --

9          MR. LEVINE:  Case manager.

10          THE COURT: Let him answer the question.

11          THE WITNESS:  Case manager and individual therapist,

12     which is the role that has been designated by him for the

13     Hospital.  He also went on to state after questioning that the

14     only things he does need to read are the notes by Dr. Binks.

15     He didn't mention that he needs to read the individual

16     recovery plan known in other words as the treatment plan or

17     that he needs to read other information like, for example, the

18     notes from V.J. Hyde, the music therapist, and other

19     contributing members of the treatment team.  I found that

20     appalling, and in my practice as a forensic psychiatrist for

21     more than 25 years, I would not allow someone working for me

22     to make such a proclamation.

23          In addition, he seemed to forget about the Axis II

24     diagnoses when he was asked what were the diagnoses for Mr.

25     Hinckley.  He stated the psychotic disorder, NOS, and the

1    major depressive disorder, and only when Mr. Levine reminded

2    him that there were other diagnoses did he mention

3    narcissistic personality.  He didn't say narcissistic

4    personality disorder, he said narcissistic personality, and

5    there are enough narcissistic personalities in this room that

6    don't qualify for a diagnosis, but, nevertheless, certainly

7    have traits of narcissism.

8            So the recognition that someone has a narcissistic

9    personality disorder is essential in this case, particularly,

10   as Mr.  Levine reminds all of us, his psychotic disorder, NOS,

11   and major depressive disorder have been in full remission for

12   many years.  It is the narcissistic personality disorder that

13   has to do largely with risk management and why we are here

14   today.

15           So no one, no expert that I've heard, no one from

16   the Hospital, has said that Mr.  Hinckley is eminently

17   dangerous, including me today.  All of us have said there is a

18   need for risk management so that he does not decompensate and

19   become potentially dangerous, and the real issue here for that

20   is not six days, 10 days, 20 days.  It is that Mr. Hinckley,

21   by his history, has decompensated and nobody knew it.  Nobody

22   really recognized it.

23           On the day of the shooting, he was clearly overtly

24   psychotic and clinically depressed and had been for some time,

25   but let's not forget, that was the day of the shooting when he

shot four other people, but he also wrote a suicide note

intending to die.  The risk here -- you want to quantify risk,

I'll quantify for you -- he could become dangerous to himself.

So all the issues about, well, you know, he probably won't

ever get to another president.  Forget that.

He has attempted  to kill himself four times, twice

after he was in custody, and nobody else here in this

courtroom I don't believe from a clinical perspective was

around John Howard Pavilion in 1983 in February when he tried

to overdose on his anti-depressant medication.  I was.  And he

almost died had it not been for valiant efforts by a nurse by

the name of the Esther(Phonetic) Moore.  Had it not been for

Joe Henneberry getting in his car and driving through the snow

to the hospital, this man may not be sitting here today.  He

was place on a respirator.  That's how close he came.

So when you get into the discussion about, well,

he's not dangerous, don't forget for a second for those of you

who care about this man that the real danger, eminent danger,

if it should occur is to him, that he may kill himself.  Maybe

he might try to kill somebody else, who knows, but he didn't

say, I'm suicidal.  He didn't indicate that he was clinically

depressed in 1983 when he took the overdose that almost killed

him.

So the idea -- you can't have it both ways.  You

can't say, well, you know, here's this event, and he didn't

1    decompensate did he?  No. Here's the event, and he didn't

2    decompensate did he?  No.  Okay.  And then say if he does

3    decompensate, it's likely to be over weeks or even months.

4    The problem is Mr. Hinckley is not a particularly effusive

5    man.  He doesn't show a lot of symptoms to anybody.  You heard

6    testimony, it's in the documents, if you ask him the right

7    questions, you might get the right answer.  You might.  But if

8    you don't ask, he's not volunteering it.  He's not saying it.

9         So he could very well be in the process of

10   decompensating right now, and why do I say that?  Because of

11   what we've observed about his judgment in his relationships

12   with women over the last year-and-a-half.  There's good reason

13   to be concerned so.

14        So the reason I object to recommendation number one,

15   expanding the time is because this is not a time to reduce the

16   support and structure.  If anything, it's a time to increase

17   it, and I am not favorably impressed that by having Mr. Beffa

18   involved as individual therapist or case manager that that

19   increases anything.  If he's not sure if he's mentally ill --

20   well, that's a good question.  It's not a question at all.

21   The man is mentally ill.  Has been.  Is.  Will probably

22   continue to be.  So you've got to manage his mental illness.

23        It is not a "if".  It's not a hmm, I wonder.  It's

24   not that at all.  He has been.  He is.  And he needs to have

25   someone who is supposed to be the eyes of the Hospital, the

1    man number two in Havana, acutely aware of that, vigilantly

2    aware of that, and that requires reading the record.  That

3    requires really keying in on the right questions, and if you

4    don't think somebody is mentally ill, you just might not even

5    ask.  He might not even get into a discussion about how he's

6    feeling and what he is thinking about various situations, and

7    you gotta.  With Mr. Hinckley, you have to.

8         I have supported movement in a positive direction

9    toward the community for as long as I can remember.  I have

10   said that there are certain conditions and requirements that

11   have to be in place.  Dr. Phillips has said the same thing.

12   Dr. Montalbano has said the same thing.  The question is what

13   should they be, and the idea -- and I hate to even say this --

14   the idea that oh, well, you know, he might miss a therapy

15   session here and there.  We could double up.  Well, you know

16   what, you can are have three sessions in the same day if you

17   want.  You can have a session at nine, a session at 11, a

18   session at one and call it three sessions and not have to see

19   him again for three weeks.  What the hell difference does that

20   make?  None.

21        V.J. Hyde, who I have great respect for,  said that

22   in his music therapy he deals with Mr. Hinckley's emotions in

23   the moment.  There is a reason we do it in the moment because

24   things change.  So the idea that we can just double it up the

25   next week is nonsense.  Absolute nonsense.  Why?  Because we

1    are increasing the stressors.  We are increasing the

2    responsibility.  The patients -- not just Mr. Hinckley -- but

3    patients, generally, might see conditional release as I'm

4    getting my freedom.  I'm getting out.  Thank God.  Okay.

5            Us, the clinical people, the professionals may see

6    that part of it -- we're like, rightfully so, but it is really

7    the controlled experiment in responsibility.  How does someone

8    deal with additional responsibility?  How do they actually

9    adjust to what is now presently in their lives that was not

10   present in their lives when they were in the hospital?  And

11   the Hospital staff as I said in my report -- he's had some of

12   the best treatment you could possibly get in this country from

13   those people out there and the folks at the hospital over the

14   years.  He has.

15           But, now, we're talking about community.  We're

16   talking about moving him into another set of variables.  We're

17   talking about having him engage with other people, some as we

18   have heard in this courtroom, who may be receptive and

19   empathetic and some who may be very resistant and, at times,

20   hateful.

21           When Mr. Hinckley first came into John Howard

22   Pavilion in June of 1982, we had construction going on in the

23   building.  We had construction workers asking so which unit is

24   the guy who tried to kill the president on.  We put a special

25   lock on that door in 1982 to make sure that people could not

1    just walk onto that unit because they happen to be in the

2    building.

3             That's not the case now in John Howard or St.

4    Elizabeths Hospital, but in the community, we've heard a lot

5    of testimony that there has been tremendous resistance, and it

6    is not because the Hospital doesn't plan.  It's not because

7    Mr. Beffa or Dr. Lee are not trying to do something positive.

8    It's because John Hinckley is John Hinckley, and people

9    remember he tried to kill the President of the United States.

10   That is not going to go away.

11            And the fact that we'd like to say, well, you know,

12   if he was somebody else -- he's not somebody else.  He's not

13   been somebody else.  He won't be somebody else.  So we have to

14   factor that into the risk management, and that's the deal,

15   that's what this is about risk management.

16   BY MR. ZENO:

17   Q.   Let's talk just a little bit about the increased stresses

18   that he's facing.

19   A.   Sure.

20   Q.   What are they in terms of going down to the mother's

21   community?

22   A.   They are his looking for a volunteer position or being in

23   any environment where other people may be coming and going

24   that he has to interact with.  There is the social time, the

25   free time, and, again, the idea of freedom.  Well, what does

1    this recommendation say?  It says let's go to 10 days.  So

2    we've got the week, and we've got the weekend on one end and

3    the weekend on the other end.  Maybe the volunteer position

4    would be a Saturday or a Sunday.  Maybe.

5         But the real issue is the social stuff.  He can have

6    unaccompanied privileges out in the community.  I'm in support

7    of that.  Sure.  What's he want to do with it? Does anybody

8    know?  Does anybody have sense how he wants to spend that

9    time? There needs to be an itinerary developed.  What's that

10   itinerary likely to say?  He's going to go to Pet Smart.  He's

11   going to go to Target.  What else?

12        He has attempted to engineer a visit from one of his

13   significant others, Ms. G, to the area.  Is that how he plans

14   to spend the time?  I don't know.  Does anybody know?  I

15   haven't heard it here, and I haven't seen it.  So from my

16   perspective everything in that recommendation can be done with

17   the current six days.  This is -- a conditional release

18   proposal is to work.  It is to do therapeutic work.

19        If you want to call it a visit, then make it a visit.  If

20   he wants to visit at his mother's home and just be there and

21   do household chores and cook and go to restaurants and

22   whatever else people do on a visit, then call it a visit, but

23   don't call it a transition plan because a transition plan

24   means that he is going to do more activities.  He is going to

25   keep the mind busy because a idle mind -- my grandmother said

1      -- is the devil's workshop.  Okay.  Maybe it is, maybe it's

2      not, but part of this plan is to keep him occupied with

3      productive rewarding activity.

4           Does anybody know what that it is?  Maybe it's different

5      for him.  Maybe it's socialization.  Maybe it's being with

6      people, having fun with women.  Maybe it's something else to

7      the treatment team.  Maybe it's something else, again, to

8      somebody who says, that's a good question whether or not he

9      has a mental illness.

10     Q.   Do you think that Mr. Beffa has a sense of the

11     importance of monitoring what Mr. Hinckley's doing in the

12     community?

13     A.   Well, I don't think so, and I say that because of two

14     things; one, his testimony.  That the idea that he is going to

15     do case management from an office.  Case managers get out

16     there in the world.  They go to places.

17          The SALT experience -- I was truly disappointed with the

18     responses about the SALT experience as if it was somehow an

19     off night.  He went to the SALT potluck dinner on geriatric

20     night.  Nonsense.  Nonsense.  If indeed he was a case manager

21     in the sense that I understand it, he would have it adhered to

22     what Diane Sims asked him to do.  Can you call them?  Maybe, I

23     don't know, pave the way.

24          Let them know -- for someone who has the notoriety of Mr.

25     Hinckley, it's even more important that you let an agency know

1      that I've referred somebody to you.  There could be some

2      reaction of some of your members so I just want to let you

3      know ahead of time.  Maybe you can kind of greet him at the

4      door.  If you think I should come, maybe I'll come to.

5      Something.

6           But, no, no, just show up.  So they show up with meals

7      that they shouldn't have brought, but they didn't know it, on

8      pizza night and with a group that was inappropriate, as far as

9      I can understand, to what they were led to believe. So that

10     was a bad experience, but if past is prologue, you've got

11     someone who's been the case manager since the last hearing.

12     What does he do in that time period?

13          In January of this year, he gives Mr. Hinckley a list.

14     In May of this year, he checks on whether or not he's followed

15     through on things, and forgive me about the idea of well,

16     maybe, he was trying to see if he had initiative.  That's

17     nonsense.  That is absolutely nonsense.  The man needs

18     assistance.  He's been in the Hospital for 27 years.

19          Everybody in this room knows he needs assistance, and,

20     therefore, as a case manager, you assist him, and he didn't

21     come down for visits.  You don't have a phone number of the

22     Hospital.  You can't call the treatment team or Mr.  Hinckley

23     directly and say, hey, John, I gave you that list.  How many

24     places have you been to?  Did you call anybody?  What have you

25     been doing?  You can't do that as a case manager.

1          And then he proud -- Mr. Beffa -- proudly says in

2     two weeks, I got three places.  Where the hell were you for

3     the last year-and-a-half?

4     Q.   How do you evaluate his acceptance of responsibility for

5     what happened at the SALT meeting?

6               THE COURT: Whose responsibility?

7               MR. ZENO:  Mr.  Beffa's.

8               THE WITNESS:  As very defensive.  Oh, I believe he

9     said to Ms.  Chasson, you're wrong.  The experience speaks for

10    itself.  Ms.  Sims and Mr.  Hinckley were uncomfortable and

11    made to feel so when they were there.  They -- I don't believe

12    they misrepresented the age group that was there or how they

13    were treated or how they felt, and what does he say, you're

14    wrong.  I know this group.  What are you talking about?

15          That is in large part -- not just that, but the

16    testimony as a whole is in large part why I have withdrawn my

17    support for that part of the recommendation.  Now, the Court,

18    obviously, will make the final determination, but I would

19    implore that the Hospital needs to look at this a little more

20    closely and decide if it's the right choice.

21          The change from individual therapist from Dr. Lee to

22    Mr.  Beffa, okay.  There were some reservations, but it went

23    forward, and the Hospital has now decided let's make that

24    change.  Okay.  For whatever reasons.  Okay.  But based on his

25    representations of his understanding and that he really

1    doesn't need to know that much, in a forensic world, is

2    unparalleled.

3    Q.    How much do you rely on the medical record developed at

4    St. Elizabeths Hospital for understanding what Mr.

5    Hinckley's condition is and has been through, let's say, a

6    year since the last hearing?

7    A.    A great deal. I read the record. Everybody who sits in

8    this chair, I think, with perhaps one exception in this

9    hearing reads the record -- or I'm sorry, not one exception,

10   his family members don't read the record because they

11   shouldn't have to, but I know Dr. Rafanello reads the record.

12   She writes part of it. I know Dr. Montalbano reads the

13   records. I know Dr. Phillips reads the record. I certainly

14   read the record. Mr. Beffa sits here and says huh, um, hmm,

15   you know, I guess I got to read something.

16   Q.    How good is the quality of the reports, let's say,

17   prepared by Dr. Rafanello and Dr. Montalbano?

18   A.    Excellent. Excellent. I used to run the Hospital. I

19   used to be forensic director of St. Elizabeths Hospital and

20   I've done the same job in Maryland, and they write among the

21   best reports I've had the pleasure of reading. So they are

22   excellent reports, but that having been said doesn't excuse

23   the reviewer from reading other parts of the record. You

24   gotta do that.

25   Q.    Let's turn to Mr. Beffa. Would it be important for him

1    to be developing reports based on his case management and his

2    personal therapy treatments?

3    A.    Certainly.

4    Q.    Based on what you've seen and heard about Mr. Beffa at

5    this hearing, what is your opinion about the quality of the

6    record you think he will be producing?

7    A.    I hesitate to even guess.  I'm concerned about it.  Part

8    of the reason I objected to recommendation number one is

9    because I think it is essential that the therapeutic supports

10   continue on a weekly basis as they have been, and, yes,

11   sometimes a therapist may not be available.  The therapist

12   might be sick.  The therapist might be on vacation.  But this

13   recommendation guarantees that at least 12 times Mr. Hinckley

14   would not see Dr. Binks or V.J. Hyde on the week or 10 days

15   that he's going to be away from the Hospital.

16        So I think it is essential that that continue,

17   particularly, during a change, a transition, a state of flux,

18   and it's not just about going to the family's community.  It's

19   also in light of the un -- I started to say something else.

20   It is in light of the extremely poor judgment that Mr.

21   Hinckley has displayed with regard to his relationships with

22   women.  I've heard it re-characterized in this court as did he

23   show strength, did he show patience, did he show resiliency.

24   Nope.  He didn't.  He didn't decompensate, and no one expects

25   him to really decompensate spontaneously.

1        But what did he do? He clung to these relationships, held

2    on to them as long as he possibly could, despite having input

3    from his family, from members of his treatment team, and,

4    indeed, from his own attorney, according to Mr. Hinckley,

5    that you need to let this go. Did he?  Nope.  He didn't let

6    go of Ms. M, kept that going until December 2007 when there is

7    communication to Dr. Phillips if he puts his hands on me, I'm

8    calling the police.  That's when that stopped.

9        But along the way, he calls Leslie DeVeau in the summer.

10   Along the way, he calls Ms. G at Labor Day.  So, no, he didn't

11   let it go, and he didn't show this remarkable strength about

12   the relationship.  It is a flaw.  It is a narcissistic flaw

13   that he has and has had, and if you want to go through a whole

14   list of women he's been involved with, we can certainly do

15   that, but this is just the most recent two examples, Ms. M and

16   -- and Ms. G.

17       Mr. Levine makes the point, well, these women come to

18   see him.  Where did Ms. G come from?  As I understand it, he

19   was introduced to Ms. G by a former employee of Mr. Levine's

20   firm.

21                MR. LEVINE:  Your Honor, he's wrong.

22                MR. ZENO:  Is that Ms. G?

23                THE WITNESS:  I'm sorry.  Ms. M.

24                MR. LEVINE:  Your Honor, misstatement.

25                THE WITNESS:  Ms. M.  I apologize.

BY MR. ZENO:

Q.   Just so the record is clear --

A.   Ms. M.

Q.   -- was that Ms. G?

A.   That was Ms. M.  Ms. G, he resourcefully found her phone number after 15 years and called her to come and see him, so she did; but at one point, she said, I don't want him calling me anymore.  I don't want to have anything to do with this anymore.  She tells that to him.  She calls Dr. Green, Mr. Shamblee, tells it to them:  I don't want him calling me anymore.

So what does he do?  He doesn't call her.  He goes to the back door, he calls Ms. B; has Ms. B call her, and then she decides to come back and revisit.  So in at least that instance, one of these women said, I don't want to do this anymore.  Mr. Hinckley reinitiated that relationship.

Q.   Did the contact from Ms. B to Ms. G appear to be manipulation to you?

A.   It is as far as I'm concerned, and I -- let me just be real clear here because I don't consider all manipulations bad.  I don't.  People manipulate their way through life. Sometimes really badly and sometimes really successfully.  So I don't necessarily consider it a bad thing, but I consider it a manipulation just the same.

Q.   And is that something that has a relationship to

1    narcissism?

2    A.   It does to Mr.  Hinckley because he does not let go.

3    Even after the 2000 -- or I should say 1999, April of 1999,

4    the article "Strangelove" came out in which Ms. DeVeau gave an

5    interview to a New Yorker writer.

6        I interviewed Mr. Hinckley after that to get his

7    reactions to it.  I talked to the family.  They all hated it.

8    Hated it.  Wished it hadn't happened, but Mr.  Hinckley says

9    by the time the article came out, we weren't even holding

10   hands anymore.  He goes on at that time and place to say,

11   we're not a couple anymore, but one day maybe in the, quote,

12   family's home community -- he didn't say that -- we'll get

13   back together.  Maybe she'll visit.  He does not let go of

14   these relationships because they are very important to him,

15   and that's fine if they are healthy relationships.

16       But there are a lot of folks out there that you can get

17   into a relationship with and Ms. M might be a good example

18   where it's not particularly healthy, and his judgment is so

19   off that even when people that are close to him tell him you

20   gotta let this go, and he still clings onto it and holds onto

21   it.  That's a dangerous issue, from my perspective.

22   Q.   Do you have concerns about Mr.  Beffa's ability to spot

23   something of that importance?

24   A.   Well, if he's not looking for it -- as we've been told by

25   many people, you've got to ask the right questions of Mr.

1    Hinckley because he's not telling you a whole lot, and

2    sometimes even if you ask the right questions as with Dr. Lee,

3    he might not tell the truth.  So Mr.  Beffa would have to be

4    exquisitely aware of these issues and ask the questions.

5         I'm not really confident that somebody who says, well,

6    it's a good question whether he's mentally ill or not is going

7    to ask those questions.

8    Q.   Is splitting a problem for the treatment of Hinckley?

9              THE COURT: Is what?

10             MR. ZENO:  Splitting.

11             THE WITNESS:  Splitting.  It certainly has been in

12   the past, and I think it has reared its unwelcome head even

13   during this hearing, and I will give you the example that

14   concerns me.  The issue about the Salvation Army and the

15   itinerary saying he's supposed to go there -- much hay was

16   made -- and that's the most polite word I can use -- about

17   whether he had a scheduled appointment.  Are you kidding me?

18             There's a reason the Court specified you need more

19   specificity.  There's a reason it was on the itinerary.  The I

20   wasn't there and I'm not sure if Mr.  Shamblee really meant

21   it was an option makes no sense to me because when I asked Mr.

22   Hinckley about that issue and I asked him in June and July of

23   this year - it took place sometime ago -- I'm not a member of

24   the treatment team.  I'm not there every week with other

25   members of the treatment team where I can turn to somebody and

1    say, Kevin Shamblee, was he supposed to go or not.  Simple

2    question.  Yeah, he was or, no, he wasn't or it was an option.

3    Simple question.

4          I asked Mr. Hinckley.  What does he tell me?  He

5    tells me Dr. Rafanello called the Salvation Army and talked to

6    somebody and they worked it out.  He also tells that to his

7    family.  Dr. Rafanello on the stand says she didn't even talk

8    to Mr.  Hinckley until the day after he was supposed to be

9    there.  That would be called a "lie".

10   BY MR. ZENO:

11   Q.   Do you think Mr.  Beffa based on what you've seen and

12   heard of him during this hearing is in a position to handle

13   splitting well or not well?

14   A.   It's very hard for me to get a good read of what Mr.

15   Beffa would or would not handle, and I don't know if he would

16   handle splitting well.  I think that there's certainly the

17   potential that he wouldn't be exploring in depth the kinds of

18   areas that are necessary to explore of Mr.  Hinckley, and that

19   would promote splitting.  He tells me "a", he tells somebody

20   else "b".  I don't really question either one.  That promotes

21   splitting.

22   Q.   How do you evaluate -- to use Mr.  Beffa's word -- his,

23   quote, desperation, unquote, in getting jobs for Mr.  Hinckley

24   during the last two weeks?

25   A.   I would say that's directly related to having to appear

1    in this court or having to provide information to people who

2    might be testifying in this court.  Why is there suddenly this

3    scrambling in the last two weeks when you've been the case

4    manager for over the past year other than we're going to

5    court, and we better be able to produce something.

6         That's part of what troubles me.  The other part that

7    troubles me is this has not been before the treatment team.

8    It has not been before the review board.

9              THE COURT: What has not been?

10             THE WITNESS:  The issue of these newly acquired

11   positions or potential positions.  What if the treatment team

12   looks at it and says this ain't a good idea.  Are we going to

13   come back to court and say, Your Honor, you know, oops, I did

14   it again.  I hope not.  But that's why you have a treatment

15   team, not an eye, ain't no "I" in team.  That's why you have a

16   treatment team so they can discuss the issue and decide what

17   makes sense, and that's why you have the review board because

18   the review board is comprised of people who don't have direct

19   responsibility for the patient so that they may have,

20   hopefully, a more objective view of the pros and cons or

21   whatever.

22             In the patient treatment, patient care business, we,

23   as mental health professionals, certainly should be trying to

24   advocate for the best interest of our patients.  Sometimes we

25   can go a little too far.  It's called counter-transference.

1    Sometimes we decide, well, you know, he didn't really mean it,

2    so it's not important.  There is a theme that's kind of

3    floated through this hearing of "Poor John".  Well, I'll tell

4    you what, John's here because of John, and the issues of

5    trying to help John move further have been vigorously pursued

6    by the Hospital staff.  I think they have done an excellent

7    job of managing his care in-house.

8           The concerns that you hear from me and others is the

9    hand off to a community-based service.  Last year, the issue

10   of the driver's license was on the table.  Last year,

11   voluntary services were -- volunteer services were on the

12   table.  We get within two weeks of the hearing, and suddenly,

13   I've got three.  See, look how good I am, I've got three.

14   Where you been?

15   Q.   What is your opinion of Mr. Beffa's observation that it

16   would be anti-therapeutic to deny the proposed release

17   contained in the (e)letter?

18   A.   Extortion.  That's my view of that.  In a word,

19   extortion.  You're going to extort the Court and say, you know

20   what, if you don't give my patient what my patient wants,

21   you're responsible for what happens to my patient.

22         When my youngest son was five years old, he through a

23   tantrum in the supermarket.  If I don't get this toy, I'm

24   going to lay here cry and kick and scream, and I said, right

25   there(Indicating), that's the place where you should lay.  Lay

1    there so you can get the most attention and scream as loud as

2    you can and cry your little eyes out because I ain't buying

3    you this toy.  You're not going to extort me.  That's

4    extortion.  And "if", "if", hypothetically, "if" the treatment

5    team really believes that, it puts the Court in a very

6    perilous position to say if -- this man will decompensate if I

7    don't give him what he wants, what are my options?  Do I keep

8    giving him what he has where he has more opportunity to

9    perhaps hurt himself or do I take away the conditional release

10   and put him in the Hospital where he can be watched more

11   vigorously?  I don't think that was the intended purpose, and

12   that's why you don't try to extort the Court.

13   Q.   Let me turn to some issues about Mr.  Hinckley.

14            THE COURT:  Before we do that, you talked a lot

15   about Mr.  Beffa and your reaction to Mr.  Beffa.

16            THE WITNESS:  Yes, sir.

17            THE COURT: It seems like the only other alternative

18   that anybody has identified for a therapist in that community

19   is Dr. Lee, and we do have -- and so you expressed some

20   reservations last year about Dr. Lee, which I recall, and so

21   did I in my opinion, but we do have now another year, 14

22   months of experience with Dr. Lee.  So I don't know whether

23   Mr.  Zeno was going to get to that.

24            We've heard your views on what you think of

25   Dr. Beffa going forward.  What do you think of -- and maybe

1        there's a more precise way to ask these questions -- what do

2        you think of the experience with Dr. Lee and how he has

3        performed and what he has done over the last year or so?

4                THE WITNESS:  That's a very good question.  My

5        understanding with regard to Dr. Lee is that he has been

6        difficult to reach and sometimes, from my review of the

7        record, untimely in his responses and in providing

8        documentation.

9                My other understanding is that he has been -- the

10       word has been used "confrontational" with Mr.  Hinckley.  I

11       don't see that has a bad thing.  I don't see that as a bad

12       thing at all, and I'll give you an example of that in a little

13       bit, but that is a decision the Hospital, in my view, should

14       take a second look at and decide what makes sense.  They have

15       identified Dr. Lee and Mr.  Beffa from the --

16       The Services Board is actually a public

17       provider that I would expect has services and may possibly be

18       another provider to explore, but I can't imagine that only

19       those two entities exist in the family's hometown.

20               So it occurs that we are where we are because these

21       two clinicians have been identified.  That does not mean that

22       there can't be exploration of other clinicians or other

23       providers in the same area, and that again, as I have in the

24       past, I would defer to the Hospital unless there is some

25       reason to challenge or be concerned about their choices as I

1    have challenged and been concerned about the choice of Mr.

2    Beffa based largely on Mr.  Beffa.  But I had supported that

3    up front, and I supported it because I deferred to the

4    Hospital that they would make the right choice of who they

5    thought was the best person to do that, and they still may

6    believe that, and if they do, okay, have at it.  I don't.  And

7    that's what I'm sharing with the Court.

8            Now, the issue of confrontation -- just so I can

9    provide an example of that where I think it was appropriate --

10   with Mr. Hinckley and me last year and this year, but last

11   year when I examined Mr.  Hinckley, Ms. M was very much on

12   board, and I said to him, John, this person is calling me and

13   calling Dr. Phillips and she knows that we are likely to be in

14   court and saying harmful things about you.  She is saying

15   things about you being deceitful, you're lying, being

16   manipulative -- she's saying that to us.  If she's not

17   saying that to you, you need to talk to her and find out what

18   she is saying, and I know the treatment team was concerned

19   about that.  I know from him his family was concerned about

20   that, and his attorney was concerned about that.

21           This year with Ms. G, I asked him similar questions

22   about what is going on with this relationship, and the last

23   time I interviewed him was on July 3rd after he had the visit,

24   and at that point, Ms. G was requesting of him to cancel this

25   hearing and said to him an expletive that I will not repeat,

but is in my report and hung up the phone.  And he said to me,

well, the noble thing to do would be to cancel the hearing,

and I asked him if he could understand how she might be

feeling about this.  And he said, well, you know, she knew

what she was getting into, an initial might be used.  I'm not

cancelling this hearing.  That would be crazy.  I'm not doing

that.

Okay.  And I asked him, again:  Do you understand

why she might be having trouble with this?  And he said, it

sounds to me like you're trying to tell me I should cancel the

hearing.  I said, John, I can't tell you that.  That's not my

place.  That's not my role.  You to go people you trust.  Go

to whoever on the treatment team you trust, go to your family,

go to your attorney.  You talk to people who can advise you

because I can't.

Those are both instances of confronting him with the

reality of the situation, but not instructing him to do

anything other than find out about it himself. So I think

there are times when you don't just kind of explore and wait

for the patient to come to whatever conclusions the patient

comes to.  There are times when you have to say, here's what

it is, what do you want to do about it, and I think that

Dr. Lee may have done something like that and whether that's

useful or not as far as the treatment team is concerned, they

should decide.

BY MR. ZENO:

Q.   Assuming that there is exploration of other providers in the mother's community, does that mean an end to the privileges that Mr. Hinckley is being given in the community at this time?

A.   I don't know.  I don't think so.  I think that the visitations to home everyone has said have been good and therapeutic.  So I don't think that the idea of stopping those is a particularly therapeutic idea, but the issue of having supports available in the local community is an important concept, and, therefore, somebody should be identified that can respond locally if necessary.

If there is truly a transition plan, that plan from my perspective has to be tested.  You can't manage if you don't measure.  So you don't just assign responsibility and say, okay, here we go.  A good example of that might be the decision to change from Dr. Lee.  He was going to be the individual therapist.  He's a psychiatrist.  He used to do individual therapy.  The concerns last year were that he didn't seem to want to do it, and he said he hadn't done it in awhile.

Well, Mr. Beffa sits on the stand and says, I haven't done case management since I was in grad school and some decades -- several decades before, but I do case management and individual therapy with all my patients.  Are you kidding

1    me?  You -- what kind of sense does that make?  You're in a

2    therapeutic relationship with a patient.  You are of the

3    explore, let people discover things -- case management is

4    about direction.  It is about you find stuff.  You say, you

5    got to be here at this time to this place to get this service.

6    Maybe I'll pave the way for you, maybe I'll even go.  I'll

7    probably call afterwards to see how it went, the provider or

8    place, whatever the place is, and I'll even talk the you about

9    it before we set it up.

10         You don't come into court saying, I found three places.

11   Maybe Mr.  Beffa talked to John Hinckley about the three

12   places, maybe John said, yeah, those are great ideas; maybe

13   not.  The idea of him working in the library at Eastern State

14   Hospital, what the hell is that about?  I'm sorry.  What the

15   heck is that about?  Your Honor, I'm sorry. What is that?

16         If the idea is placing him in the community, you want to

17   get a him a volunteer job at a another state hospital?  Oh,

18   well, that makes a lot of sense.  You start where the patient

19   is.  No.  The patient has some skills in library science.  If

20   you want to apply them, start where you can like the libraries

21   in the community the family lives in.  I'm told there are

22   maybe 11 libraries, something like that, in that local area.

23   How about all 11, let's try them.  But to go to a state

24   hospital, why not just stay at St. Elizabeths and convert to a

25   regular employee and make some money.

1    Q.   I'm now going to turn to Mr. Hinckley.

2    A.   Turn.

3    Q.   I think you touched on this, but isn't it true that Mr.

4    Hinckley's narcissism, his Axis II diagnosis is the most

5    important diagnosis?

6    A.   It is currently, yes.  It is currently.  It has been.

7    His other diagnoses have been in remission as everyone has

8    been reminded repeatedly and that's so.  The concern is, as I

9    think Dr. Montalbano's Risk Assessment says it very well, that

10   he may become depressed, and there is exquisite attention paid

11   by hospital staff, those kind of issues that might cause him

12   to be depressed; breakups; his father's death; other

13   disappointments; rejections.  They're paying attention to

14   that.  They're on top of that.

15        So the idea and the concern is that if he becomes

16   depressed and it's not noticed or he doesn't tell anybody or

17   you don't ask the right questions or he chooses not to tell

18   you for whatever reasons, maybe you're confrontational so he

19   doesn't tell you, I don't know -- so he doesn't tell somebody,

20   and he has, according to the testing, a real need to try to

21   present himself in the most favorable light, and he always has

22   as long as I've known him since 1982, then he might not show

23   the decompensation, and if he doesn't and he gets clinically

24   depressed, the risk of danger and harm is most to him, and I

25   really hope that everybody in this court hears that that while

1   you are advocating that, yeah, this is important.  This is

2   what should be done.  If you do six days, then you should do

3   10 days.  If you do 10 days, you should do 20 days.  If you do

4   20 days, you should do 50 days.  If you don't manage the risks

5   all along the path and he gets sick again, the risk is death

6   of John Hinckley.  You get that.

7   Q.    What medication -- how did Mr.  Hinckley attempt suicide

8   in 1983?

9   A.    Anti-depressant medication he was on.

10  Q.    So he was on an anti-depressant medication?

11  A.    Sure.

12  Q.    So what did he do, squirrel it?

13  A.    He did what patients typically do.  You put it in your

14  mouth.  You drink the water or whatever.  You walk away, and

15  you take it out your mouth and you put it somewhere.  He

16  horded it, and he horded enough of it that put him into

17  respiratory distress when he took it.  We're not talking a

18  couple of pills.  We're talking about enough medication to

19  kill you, and if he hadn't been placed on the respirator, he'd

20  be dead.  Period.

21  Q.    And that meant that he was off of his depressive

22  medication for the period that he was taking those pills?

23  A.    However long it took him to squirrel away the pills.

24  That's right.

25  Q.    Did anybody notice that he had gone off of his

1    anti-depression pills?

2    A.   No.  At that time, he was being treated actively.  He was

3    improving.  He was getting better.  He was telling people that

4    he was feeling better.  People were looking at him.  He was in

5    therapy.  He was on a ward.  He wasn't in the community.  He

6    wasn't on ground's privileges, and they didn't see it, and

7    that's not a knock at them, it is a reality about him.  And

8    while we keep talking about, well, maybe the women are bad

9    because they keep coming to see him, maybe the community is

10   rejecting and they're bad -- this is about him.

11   Q.   What is your opinion about the observation that Mr.

12   Hinckley's narcissism is significantly attenuated?

13   A.   Well, you wouldn't find the phrase "significantly

14   attenuated" as a qualifier in a DSM, that's for sure, but it

15   has been phrase that has been used and latched onto as if it

16   has wings of its own.  I disagree with that.  I understand

17   that he is better.  Nobody, no expert, has said he is not

18   better.  Everybody has said he has.  He's made tremendous

19   improvement.  He has.  He's much better than he was in 1981

20   and '82 and '83, but his narcissism is evidenced largely

21   through his relationships with women.  It comes out.

22        And, fortunately, it hasn't reached proportions that it

23   did back in 1995 when his major depressive disorder and

24   psychotic disorder, NOS, were in full remission.  In 1995

25   while he was with Leslie DeVeau, who at that point, had

unconditional release and was living in the community, he

developed a relationship with Jeannette Wick, Commander of the

Public Health Service at St. Elizabeths Hospital, and in that

relationship -- and Mr. Levine may debate it, he can -- and

June Green -- I'm sorry, Judge June Green, the Honorable Judge

June Green's opinion, she makes reference to stalking.  So

whatever you want to do  with it, do with it.

He was told by the then Medical Director, Jack Kelly,

after Commander Wick filed an incident report, stay away from

Commander Wick.  Don't go over to the pharmacy because she was

chief pharmacist.  Don't hang out sitting on the picnic bench

as he had been doing.  Don't call there because he was

calling, and when she answered the phone, it was him, and when

somebody else answered the phone, it was a hang up, and that

only occurred after he started coming unannounced to the

pharmacy, and she said, don't do that anymore.

She called the individual therapist and said this a

problem, and the individual therapist said, well, you know, he

is kind of lonely, he needs friends.  Don't worry about it. It

kept happening.  She called Jack Kelly, the Medical Director,

and said, this has got to stop; filed an incident report,

which is an official document, when he delivered a package to

the pharmacy he wasn't supposed to deliver.

She filed the incident report.  Jack Kelly said, don't do

this anymore.  Well, Commander Wick had to go all over the

1    Hospital.  So she goes to the acute care hospital, and when

2    she went, John was there, and he would stare at her, and she

3    reported to me and testified, I believe, that when he would

4    stare at her, she would go towards an elevator or wherever,

5    and he would change his position to make sure he could keep

6    the line of sight and stare at her, and she felt frightened.

7    He had made tapes of his music, and one of the songs he

8    recorded had the name of her daughter in it.  She felt

9    frightened.

10        And that, in my opinion, was an obsessional relationship

11   that had some striking similarities, the same kinds of things

12   he did with Jodie Foster, but it got cut off by the Hospital

13   because she made a complaint about it.  The Hospital stepped

14   in and said, stop doing this.  Don't do it anymore.  So it got

15   stopped.

16        Now, we're talking about community placement.  We're

17   talking about where those eyes are not going to be there at

18   least a significant part of the time, and we're talking about

19   a handoff to someone who has, well, you know, it's a good

20   question whether or not he is mentally ill.

21   Q.   Is entitlement a symptom of narcissism?

22   A.   Absolutely.

23   Q.   And is Mr. Hinckley currently displaying narcissism --

24   I'm sorry -- entitlement?

25   A.   I believe so.

1    Q.   Is manipulation a system -- symptom of narcissism?

2    A.   It is.

3    Q.   Is Mr.  Hinckley displaying manipulation?

4    A.   I believe he is.

5    Q.   Is lack of empathy a symptom of narcissism?

6    A.   It is.

7    Q.   Is Mr. Hinckley currently displaying a lack of empathy?

8    A.   In some areas.  I think he has been very empathetic with

9    his family during time of his father's death, and I hope -- I

10   think so -- but I hope that it is clear that Mr.  Hinckley has

11   made tremendous progress, and the idea of the empathy that

12   others have reported that he's shared with his family around

13   his father's death is absolutely a positive, positive sign.

14        I personally have not explored that issue in depth for

15   reasons I've explained to this Court in the past.  There is a

16   privilege that exists regarding family therapy I conducted

17   with the Hinckley family, and, therefore, I have tried as

18   vigorously as I can to not cross lines where there could be

19   some relatedness to that privileged communication.

20   Q.   In your opinion, does Mr.  Hinckley remain guarded and

21   secretive?

22   A.   Oh, yes.

23   Q.   You touched on this and I think you may have covered it

24   all, but allow me to ask the question straightforwardly, and

25   if you have anything that needs to be added --

1    A.    Certainly.

2    Q.    What is your opinion about the observation that Mr.

3    Hinckley is not dangerous because his major depression has

4    been in full remission for 25 years?

5    A.    Well, I don't know if I agree with 25 years, but whatever

6    the time frame, whatever the time frame, his major depression

7    and his psychotic disorder, NOS, have been in remission.

8    Therefore, he is not eminently dangerous because of psychotic

9    symptoms or serious mood depression.

10         I believe he could be become dangerous if the structure

11   and the supports are not vigorously enforced, and my concern

12   is that if that happens that he becomes dangerous because he

13   is not forthcoming with information or he is not being

14   observed or treated effectively that the risk of harm is

15   mostly to him, and I don't think anybody in this courtroom

16   wants to see John Hinckley die.  Maybe somebody does, but not

17   me.

18   Q.    What is your opinion about the fact or the observations

19   that are made by some others that Mr.  Hinckley is now

20   involved in real relationships as to opposed to his delusion

21   about Ms. Foster during the shooting in 1981?

22   A.    Well, let's talk at that.  Real relationships versus not

23   real relationships.  The first relationship I'm aware that Mr.

24   Hinckley reported was with Lynn(Phonetic) Collins who did not

25   exist.  The second was with Jodie Foster which was clearly

1    delusional, obsessional.

2              MR. LEVINE:  Can we get the dates on this, Your

3    Honor, please?  Approximate time period.

4              MR. ZENO:  Sure.  Good point.

5    BY MR. ZENO:

6    Q.    Lynn Collins was approximately when?

7    A.    In the '70's.

8    Q.    And Lynn Collins was who?

9    A.    Nobody.  She didn't exist.  Mr. Hinckley Made her up.

10   Q.    How did the name arrive?

11   A.    I don't know why he picked Lynn Collins.  He just made

12   her up.  So she was a figment of his imagination.

13   Q.    How did he use Lynn Collins?

14   A.    He told his family that he was involved in a relationship

15   with Lynn Collins and he told me as we talked and he told

16   others.  Jodie Foster, I think we all kind of know that was a

17   around and before 1981, and that was clearly a delusional

18   relationship.  And there are references that I've seen -- I

19   think it was in the record, it may have been in the article

20   about strange love that Leslie DeVeau gave to The New Yorker

21   Magazine that the suicide attempt in '83 had some relatedness

22   to his realization that he could not have a relationship with

23   Jodie Foster.

24         Then there is Leslie DeVeau who he met in 1982, and that

25   relationship is describe as going for 22 years until 2004, but

1     it was clearly spiraling down in 1999 if not before that and

2     continue until it ended -- continued to spiral down until it

3     ended, and there has been some reaching out to her last year

4     and earlier this year.

5          Then, there was Jeannette Wick --

6               THE COURT: That was a real relationship.

7               THE WITNESS:  That was a real relationship, yes,

8     sir.  That was a real relationship and an important

9     relationship.  And I better make this clear:  I don't mean to

10    minimize that relationship at all.  That was an important

11    relationship.  It was a friendship that turned into an

12    intimate relationship, and Ms. DeVeau ended that relationship.

13               And the idea of it being rekindled -- I understand

14    from the testimony that Dr. Binks thinking it was a healthy

15    relationship, a good relationship for John, and that's fine,

16    but we need to know if that relationship is reestablished, we

17    need to know what he thinks; we also need to know what she

18    thinks.  Because if she thinks it's a friendship and it's not

19    going to go any further than that and he thinks something

20    different, we need to know that, and we won't know that unless

21    we talk to them both.

22               And importantly, as Dr. Phillips mentioned in his

23    testimony, she got to talk to the treatment team.  This, I

24    don't want to talk to anybody without an attorney present,

25    okay, there's ways to deal with that, but the idea that you're

1    not going to communicate with the treatment team and the

2    treatment team reached out and tried to get she and John into

3    conjoint therapy, couples' therapy, with Dr. Binks and Dr.

4    Stathas, and she said, no.

5           So it's not like they didn't try.  It's not like the

6    court process and outside experts and whatever else cost him

7    that relationship or that the Court somehow should shoulder

8    some guilt about that, that is utter nonsense.  Take it from a

9    really good shrink, that is utter nonsense.  So that was --

10          THE COURT: Do you agree with the statements that

11   people have made, though, in light of what you know about that

12   relationship that reaching out to her and talking to her

13   around the time of his father's death is perfectly normal?

14          THE WITNESS:  Sure. Sure.  He fell back on someone

15   who he had -- who he knew cared for him, and who he cared for,

16   and that would be fine.  That would be fine.  If it just

17   stopped there or just remained a friendship level, that would

18   be fine, but you got to know that because, unfortunately, as

19   part of John's poor judgment with women, he gets into this

20   mind-set that they're going to be his.

21          And with Ms. M, that -- despite people close to him

22   saying you've got to get out of this, he kept it going.

23   Despite Ms. G saying I don't want to talk to you anymore, he

24   finds a way to get back in touch with her, and when I last

25   talked to him says, I love her.  I'm in love with her.  She's

told me she loves me.  He still has it in his head even though
she said if it comes down to you or the other guy, he still
believes he can get her back.

so the idea of his judgment with women is a major
concern that any therapist dealing with him has got to be on
top of because we might see something very differently than
how he sees it and if that were something that were just
easily corrected, he's just got a bad perception, and you tell
him, you know, John, you really ought to not do that, and he
said, oh, okay, that would be one thing.  He didn't do that.
He said, I'm doing it anyway, and I'm going to keep this going
because I can get them because I'm John, and that's
narcissism.

BY MR. ZENO:

Q.   And is it significantly better that it's a real person
that he's doing this about than that it's a fantasy person?

A.   Oh, yeah.  Yeah.  It's better that he's doing this with a
real person than a fantasy person.  It is not adequate in
terms of his judgment because he misperceives the cues and the
information that he gets.

So the idea that he would take it to another level --
let's -- there are various ways this can go.  Let's say he
meets a really nice woman who really cares for him and they
have a nice relationship and they get along fine.  Great.
Terrific.  Everybody would be happy with that.

1          Let' say he meets somebody who's really, really has their

2     own mental health issues and might be manipulative.  He's

3     given them his music, which could appear on the Internet

4     tomorrow.  He shared with Ms. M the proposal from the Hospital

5     which actually was probably a good thing because it said that

6     he would go and visit her in her apartment, and she didn't

7     know it, and she blew up.  You ain't coming to my -- well, I

8     won't put words in her mouth because I don't know exactly what

9     she said.

10          But in the proposal, he was supposed to make trips to Ms.

11    M's apartment, and Ms.  M didn't know it until he showed her

12    the proposal, but if she's got the proposal -- the Court

13    sealed notwithstanding -- it could be out there.  So if he

14    meets somebody who is not particularly healthy or supportive,

15    really bad things could happen, particularly, if it's the kind

16    of scenario of you've got to do this for me to prove you love

17    me.  What could that be?

18    Q.   What is your opinion of the observation that Mr.

19    Hinckley has no choice in his relationships with women?

20    A.   That's nonsense.  As easily as the women could choose not

21    to come, he could choose not to see them.  It is a two-way

22    street.

23    Q.   How do you evaluate the comment that Mr. Hinckley is the

24    highest functioning individual at John Howard Pavilion?

25    A.   Well, that's nonsense, too, because -- well, I think it

1       was -- I would re-characterize that.  I think it was a

2       misstatement.  And I think it was a misstatement because there

3       are some pretty high functioning people in John Howard

4       Pavilion.  Some of the highest functioning people I've met

5       I've met in state hospitals and prisons.

6            So I would not simply say that because there are in a

7       mental hospital or a prison that they, by definition, are low

8       functioning.  But John Howard Pavilion also has an outpatient

9       department, so they have between 90 and a hundred people who

10      are, on average, living in the community who come in for their

11      outpatient appointments.  So they are functioning pretty well

12      or at least well enough to be outside of the Hospital, and

13      they come in the front door through the lobby and go into the

14      out patient clinic inside of John Howard.  If Mr. Hinckley

15      wanted to strike a conversation with one of them, he certainly

16      could.

17      Q.   And that's the same door that interns go through that he

18      was greeting in the morning?

19      A.   Same door the interns go through, same door everybody

20      goes through to get in and out of John Howard.  So the idea --

21      and I think it gets to the question of he doesn't have male

22      friends or he has very few, if any, that are related to

23      helping him take care of his cats, particularly when he's

24      away -- the reason he doesn't have male friends is because he

25      doesn't want them.

1    Q.   What is your opinion of the significance of Mr.

2    Hinckley's recent renewal of interest in the song "The Ballad

3    of the Outlaw"?

4    A.   Well, you know, it's an interesting issue.  Mr.  Hyde in

5    his testimony said they talked about it in music therapy which

6    I think is wholly appropriate.  They should talk about

7    whatever they need to talk about that is musically-related and

8    has something to do with how Mr.  Hinckley feels.  That's one

9    of the presentations of it.

10        The other, in talking with Ms. G, is that she asked him

11   after he had played some of his new stuff, you got any of your

12   old stuff, and he went right into "Ballad of the Outlaw" and

13   recalled it all from memory.  That's a little troubling for

14   me, why he would pick that particular song because it is a

15   dark song about being depressed, about being on the run, and

16   at the end of it, it has a couple lines that are repeated that

17   have to do with I think -- I forget the exact lyric -- but

18   something about being glad that he's -- it's all ended or that

19   he's dead or that he's in his grave.  It's something like

20   that.  It's a morose kind of song.

21        And of all the songs to recall, why that one?  Why -- it

22   -- you would hope that is a part of where I was, who I was, my

23   old life.  I don't even want to go there.  But that's what he

24   shared with her.  So, yeah, in a therapeutic setting, he

25   brought it up, and in a -- I -- in my best interpretation --

1    impressing a woman setting he brought it up.

2    Q.    Why did you report to Dr. Binks that Mr. Hinckley was

3    having Ms. K read him media reports about himself?

4    A.    Because I didn't know if Dr. Binks knew that, and,

5    actually, in my report it says "media reports", and that's

6    part of what she said.  The other part she said was blogs,

7    that she was going online and reading media reports and blogs,

8    people writing whatever they thought about Mr. Hinckley and

9    whatever was coming up.  And I don't know that he would have

10   otherwise been able to get that information, so I thought it

11   was important for Dr. Binks to have that to work with in

12   therapy.  That's why I told him.

13   Q.    Based on your experience, what is your opinion that the

14   Court before it issues a conditional release order know the

15   name of the organization to which Mr. Hinckley will be

16   volunteering?

17   A.    Oh, I think that's pretty important.  I think it is

18   recommendation number 17, I think, where I said there should

19   be two-week notice if the volunteer organization changes.  I

20   think that the Hospital certainly should know and the

21   treatment team and review board should process that, as well.

22   I think the Court should know as well.  There may be for

23   whatever reasons some place that is not appropriate, and the

24   only way to know that is to know that.

25        So it it's something that suddenly hits the Court's desk

1    during the course of a hearing, I don't think that is

2    satisfactory.  It's something that should hit the Court's desk

3    after the treatment team has said, yeah, we think so.  We

4    talked to the guy.  We talked to the place.  We talked to Mr.

5    Hinckley, and he's in favor of that.  What you don't want is

6    for there to be some recommendation for a place that he hates

7    because he is not a particularly effusive kind of guy.

8         So if you've got a volunteer who's just kind of sitting

9    there and looking pissed off all day or just not really being

10   involved, chances are you're not going to ask him to come

11   back, so it's important that he endorse where it is.  In my

12   discussion with him, he wasn't real big on the idea of going

13   to Eastern State Hospital, and I don't blame him.  Why would

14   you go from one state hospital to another state hospital to do

15   volunteer work?

16   Q.   What is your opinion of the D.C. option in the (e)

17   letter?

18   A.   I believe I understand it, and I think the Hospital is in

19   a very difficult place, and I think the Court has elucidated

20   that if for whatever reasons the family's home community is

21   not as viable an option, then what.  So I think the Hospital

22   is exploring what else could be done.

23        I also agree it does divert some of the resources,

24   meaning staff time and staff attention, to try and look at two

25   places instead of one, but, under the circumstances, I don't

1    know if they have much else that they can do.  Dallas is off

2    the table.  When I talked with Mr.  Hinckley, I said, hey,

3    what about Gettysburg, what about New York?  He'd love to live

4    in New York.  I don't know if New York has ever been

5    considered, and I'm not suggesting it needs to be, but the

6    point is if we're talking about a transition to some place,

7    his preference is to the family community.

8        If that is for whatever reasons not appropriate or not

9    available, then what?  And D.C. is where we are.

10   Q.   Are there problems with D.C. that need to be taken into

11   account?

12   A.   I think there are problems with any place as we've,

13   perhaps, seen in terms of response with the family's home

14   community.  There are lots of press here.  And, although, it

15   is a, what, multi-cultural community in D.C., particularly in

16   certain parts more than others, the idea that he could

17   experience some difficulties in being placed in this town I

18   think is legitimate concern.

19   Q.   How about his fascination with being in the nation's

20   capital and the political and famous people who are here?

21   A.    Well, I think as long as the Axis I diagnosis, the major

22   depression and psychotic disorder, NOS, remain in remission,

23   that it is not as concerning to me as it would be if they were

24   not.  The narcissism is going to be there and the issue is

25   managing it and, to some extent, his willingness to accept

that people close to him maybe have his best interest in mind.
So when they say to him, John, this woman is potentially doing
you harm, you need to get away from this, he might be able to
say, okay.  Up 'til now, he hasn't said that.

Q.   How do you evaluate the concern that Mr. Hinckley might
become depressed if he's not given an increase in his
privileges that he requests?

A.   One word, extortion.

Q.   And, in your opinion, has Mr. Hinckley been involved in
inappropriate and unrealistic relationships with women during
the past year?

A.   Yeah.  They have started as friendships.  Let's talk
about my cats.  You used to be here at the Hospital.  I
thought about you.  I got your number.  I'm calling you.  And
then they've evolved into romantic relationships, and then
each time, the two times that we're talking about, they have
deteriorated, and each of the women have said I don't want to
do that anymore.

          THE COURT: You're talking about Ms. M and Ms. G?

          THE WITNESS:  Yes.  And each time, he said, I still
want to do that, and with Ms. M, particularly, I want to do
that despite people close to me telling me I shouldn't do
that.  With Ms. G, I want to do that despite she's been with
someone else for the last 15 years, so I want to continue.

          I think that his judgment is flawed.  His perception

1    is flawed when it comes to relationships with women.  I think,

2    in part, that is why Dr. Rafanello instituted this log of

3    women he's been in contact with or talked to, etcetera,

4    because it is important to know who he is involved with or who

5    he is attempting to become involved with.  He puts one intern

6    on, he doesn't put the other intern on.  She says that's

7    because the instructions aren't clear.

8           I don't know about that, but, okay; if they're not

9    clear, clarify them.  Put everybody on because "we", the

10   treatment team, shouldn't hear about a relationship because

11   he's sitting on the bench in front of John Howard necking with

12   some woman, and the staff or security staff say, you know

13   what, John Hinckley is out here with some woman and here's

14   what they're doing. They shouldn't hear about it that way.

15   They should hear about it up front,  and I think there are

16   efforts to try to do that.

17           MR. ZENO:  Your Honor, if I may have moment.

18           THE COURT: Yes.

19           MR. ZENO:  Your Honor, I have no further questions

20   at this time.

21           THE COURT: Why don't we take a little break before

22   we begin the cross.

23           THE DEPUTY CLERK:  All rise.

24           (Whereupon, there was a brief recess at this time;

25   thereafter, court resumed as follows:)

1          THE COURT: Mr.  Levine, whenever you're ready.

2          MR. LEVINE:  Thank you, Your Honor.  Court's

3     indulgence.

4          THE COURT: Sure.  Take your time.  Mr. Levine.

5     **CROSS-EXAMINATION BY MR. LEVINE:**

6     Q.   Good morning, Your Honor; please the Court.

7     Dr. Patterson.

8     A.   Good morning, Mr.  Levine.

9     Q.   Dr. Patterson, with quite a level of emotion this

10    morning, you expressed your, I believe it was, great dismay

11    that Mr.  Beffa had changed your opinion about your support

12    for this petition by his testimony in this court yesterday.

13    A.   That's correct.

14    Q.   And you cite in part your basis for that by noting that

15    when responding to a question about diagnosis he talked about

16    Axis I, but not Axis II; is that correct?

17    A.   In part.

18    Q.   All right.  In part.  Now, what he said with respect to

19    Axis I was correct, wasn't it, sir?

20    A.   We all agree.

21    Q.   We all agree.  And when asked about Axis I, he responded

22    by saying narcissistic personality, but to your recollection

23    did not include the word disorder; is that correct?

24    A.   To my recollection, that's correct.

25    Q.   Now -- I'm sorry?

1    A.    To my recollection, that is correct.

2    Q.    Now, a narcissistic personality is only an Axis II

3    disorder -- it's only an Axis II diagnosis if it is a

4    disorder; isn't that correct?

5    A.    No.

6    Q.    Those of us in this room, and I think you told us there

7    are many --

8    A.    Yes, indeed.

9    Q.    You may have been thinking of yourself.

10   A.    And you.

11   Q.    And, perhaps, me.  Merely may be narcissistic or merely

12   may have a narcissistic personality; is that correct?

13   A.    That is correct.

14   Q.    But to be on a Axis II -- to get an Axis II diagnosis, it

15   has to be a narcissistic personality disorder; isn't that

16   correct?

17   A.    Usually.

18   Q.    Well, in Mr. Hinckley's case, that's what it is; isn't

19   it?

20   A.    In Mr.  Hinckley's case, it certainly is.

21   Q.    And when responding to the question about whether Mr.

22   Hinckley has an Axis II diagnosis references made by Mr.

23   Beffa to the narcissistic personality; isn't that

24   correct?  As you recall.

25   A.    That is correct, and that's in part why it was troubling,

```
1    Q.   I'm sorry?

2    A.   That is in part why it was troubling.

3    Q.   As I think you indicated, not being troubled, but greatly

4    dismayed.

5    A.   No.  I was greatly dismayed by his testimony.  I was

6    troubled by his saying narcissistic personality and his saying

7    it's a good question as to whether or not he is mentally ill.

8    Q.   Now, Dr. Patterson, you interviewed Mr.  Beffa before

9    write your report, didn't' you, sir?

10   A.   For just under an hour, yes.

11   Q.   I'm sorry.  I didn't hear that.

12   A.   For just under an hour, yes.

13   Q.   For just under an hour.  But that limitation wasn't a

14   limitation imposed by him, was it?

15   A.   No.

16   Q.   You had all the time you wanted to speak to Mr.  Beffa;

17   isn't that correct?

18   A.   I wouldn't say that, but I had adequate time to speak to

19   him.

20   Q.   Whatever limitation there was wasn't imposed by Mr.

21   Beffa, was it?

22   A.   It was not.

23   Q.   So if you needed more time, you had it, didn't you?

24   A.   I could have.

25   Q.   And as you did with others, you could have gone back on
```

1   another occasion to ask him other questions; isn't that

2   correct?

3   A.   That's correct.

4   Q.   And you were satisfied that you crafted all the questions

5   you wanted to; isn't that true, sir?

6   A.   At that time.

7   Q.   Yes.  No one said or Mr. Beffa didn't say to you, you

8   know, Dr. Patterson, I don't think we should talk about that;

9   he didn't do that, did he, sir?

10  A.   He didn't do the latter.  He may have said something

11  about wanting to think about things, but not the latter, no.

12  Q.   So any question you wanted to ask him, you asked him;

13  isn't that correct?

14  A.   Yes.  And it's clear I didn't ask the right questions

15  kind of like asking John.

16  Q.   Do we have a problem here with the inartfulness(Phonetic)

17  of the inquiry?

18  A.   Yeah, we do.  I didn't ask the right questions.

19  Fortunately, you and Mr. Zeno did -- or you and Ms. Chasson.

20  I forget who cross-examined -- Ms. Chasson.  You asked the

21  right questions, and he gave responses to those questions

22  which clearly greatly dismayed me.

23  Q.   Okay.  We're going to talk about that level of dismay.

24  A.   Why don't we.

25  Q.   Now, when you wrote your report having had all the

1    opportunity to ask about the diagnosis, correct?

2    A.    Correct.

3    Q.    And having had all the opportunity to discuss with him,

4    if you wished, about Ms. Wick.

5    A.    I didn't talk to him about Ms. Wick.

6    Q.    You chose not to.

7    A.    That's right.

8    Q.    All right.  And you had the opportunity to speak to him

9    about Ms. M; isn't that correct?

10   A.    That's correct.

11   Q.    And you had the opportunity to speak to him about Ms. G;

12   isn't that correct?

13   A.    Yeah.

14   Q.    And you -- actually, you could speak to him about any

15   subject matter literally in the world; isn't that correct?

16   A.    Literally, that's probably true.  I wouldn't choose to do

17   that, and in response to Ms. G and Ms. M, he didn't know

18   anything about them.

19   Q.    And at the time you wrote the report, however, you knew

20   all you thought you needed to know about Ms. Wick, didn't you?

21   A.    Sure.

22   Q.    And you knew all you thought you needed to know about Ms.

23   M?

24   A.    Hmm, probably.

25   Q.    You shake your head and you with some uncertainty and you

1    say, probably.  You had an opportunity to speak with Ms. M,

2    didn't you?

3    A.    Sure.

4    Q.    And you had an opportunity to ask her any of those

5    questions that came your mind?

6    A.    Sure.

7    Q.    All right.  And she was not one who shrunk from speaking

8    to you, is she?

9    A.    No.

10   Q.    All right.  So whatever you needed to know from Ms. M,

11   you knew from your own carefully posited questions; isn't that

12   true, sir?

13   A.    That and other information.

14   Q.    So it was not merely her response to you, but other

15   things in the way of information that was available to you; is

16   that correct?

17   A.    That's correct.

18   Q.    And, likewise, it is true for Ms. G; isn't that correct?

19   A.    That's correct.

20   Q.    And, of course, you took the opportunity this morning to

21   make reference to Ms.  Collins; isn't that right?

22   A.    Yes.

23   Q.    And you made reference, of course, to Jodie Foster,

24   correct?

25   A.    Of course.

1    Q.   And Ms. Collins, you told us, was an event in Mr.

2    Hinckley's life -- I believe you said in the late '70's; is

3    that correct?

4    A.   That's correct.

5    Q.   That was your testimony?

6    A.   That was my testimony.

7    Q.   And, of course, we all know it was Ms. Foster in the

8    early '80's; is that correct?

9    A.   Yes.

10   Q.   Now, all of that, you were fully aware of when you wrote

11   your report.

12   A.   I think so.

13   Q.   You shake your head here or there.  You think so.  Do you

14   have any doubt about that, sir?

15   A.   No.  I'm always cautious in answering your questions

16   because I want to make sure that I'm clear.

17   Q.   Because your guarded and defensive, correct?

18   A.   No.  Because of you.

19   Q.   All right.  You were fully aware of all of those things

20   at the time you wrote your report; isn't that correct?

21   A.   Yes.

22   Q.   And at the time you wrote your report with very few

23   exceptions, none of which pertained to Dr. Lee or Mr. Beffa,

24   you supported the Hospital, and we're going to go through

25   these.

1    A.   We're going to go through all the recommendations, again?

2    Okay.  Yes.  With very few exceptions, I supported all but the

3    first recommendation and with modifications several of the

4    others.

5    Q.   Things like cell phones.  We'll talk about that.  But

6    those are the kinds of modifications you had in mind, correct?

7    A.   Cell phones and notice to the Court, yes.

8    Q.   And notice to the Court.

9    A.   That's correct.

10   Q.   Other than that, you supported this recommendation of the

11   Hospital.

12   A.   No.

13   Q.   Item number one, duration.

14   A.   Item number one would be the duration.

15   Q.   We'll talk about that, too.

16   A.   Good.

17   Q.   Okay.  Now, in your direct testimony -- I'm not sure

18   whether it all was in response to Mr.  Zeno's questions, but

19   in your -- I don't know if it's dangerous to say in your

20   ramblings, but in your narrative, if you will, you made

21   reference to Ms. DeVeau; isn't that correct?

22   A.   You're asking me about ramblings?  Yes.  I made

23   references to Ms. DeVeau.

24   Q.   Yes.  I'm asking you about ramblings, yes.

25   A.   Yes.

Q.   You made references to --

A.   I made reference to Ms. DeVeau in my narrative.

Q.   In your narrative.  All right.

A.   That's correct.

Q.   For others to determine whether it rambled.  And with respect to Ms. DeVeau, you sought what you represented to be the history.

A.   Part of it.

Q.   Part of it, yes.  Did you leave out of that recitation of the history the fact that the U.S. Attorney had issued subpoenas to her, to her banks, to her credit cards, and other subpoenas?  Did you leave that out?

A.   I don't know if I even knew that, but I didn't make that statement.

Q.   You didn't make that statement, and you didn't know if you knew that.

A.   No.  I don't know if I knew that at all.

Q.   And did you leave out of your recitation the fact that with respect to Ms. DeVeau that either the Secret Service or some law enforcement agency was going through her garbage?  Did you leave that out?

A.   I don't think I know they were going through her garbage, either.

Q.   You don't think you knew that, huh?

A.   No.

1    Q.   Well, did you leave out the fact that she had a sense and

2    a well-placed sense of privacy?

3    A.   You mean the --

4    Q.   Did you leave that out, too?

5    A.   Do you mean before she gave the interview to the New

6    Yorker or after?

7    Q.   You don't understand my question, sir, or are you just

8    being slick with me?

9    A.   No, I'm not.  You said she had a sense of privacy.

10   Q.   Privacy.

11   A.   She gave a public interview to a national magazine.  So

12   I'm asking you was her sense of privacy before or after that

13   article?

14   Q.   Well, her sense of privacy, sir -- well, let's understand

15   the ground rules here.  I ask the questions; you answer the

16   questions.

17   A.   I'm attempting to do that.

18   Q.   Okay.  So your question isn't about -- there's a

19   question before you, I'd like it answered, and I'd like the

20   Court to instruct the witness to answer the question.

21              THE COURT: Well, put it in a time frame.

22              MR. LEVINE:  I'm sorry?

23              THE COURT: Put it in a time frame.

24   BY MR. LEVINE:

25   Q.   Any time.  Any time before, after, she had a sense of

1     privacy.

2     A.    In my opinion, in April 1999 when his article was

3     published where she gave an interview to a national magazine,

4     she did not have a sense of privacy.  She may or may not have

5     before and after.  Does that answer your question?

6     Q.    Not really well, but we're going to stay on that a little

7     bit.

8     A.    Let's do that.

9     Q.    Now, at or about that time, she chose to say to the New

10    Yorker whatever she chose to say unencumbered by the U.S.

11    Attorney or the Secret Service; isn't that correct?

12    A.    I don't know.  I wasn't there.

13    Q.    So you don't know.

14    A.    I don't know what she --

15    Q.    Nos, is it -- there came a time with her sense of

16    privacy, whether you would determine it to be just justified

17    or not, that she decided to obtain a lawyer to represent her

18    with respect to what she perceived to be her interest in

19    privacy; isn't that correct?

20    A.    If you say so.  I don't know.

21    Q.    You don't know that she retained a lawyer, sir?

22    A.    I know she retained a lawyer, I don't know why.

23    Q.    Did you ever ask?

24    A.    No, I wasn't allowed to ask.  She wouldn't grant an

25    interview, remember?

1    Q.    Did you ask Mr.  Hinckley why did Ms. DeVeau get a

2    lawyer?

3    A.    No, I didn't ask him that.

4    Q.    All right.  Now, in any event, with respect to all of

5    these issues, all of these issues -- in any event, whether you

6    knew about knew about them, and I suspect you knew about them

7    --

8    A.    Now, why would you say something like that?

9    Q.    -- or didn't know about them, and there may be things

10   about which you are unaware.  You had those things in mind

11   when you wrote your report to the Court supporting this plan?

12   A.    The things that I know about I had in mind.  What you

13   presume that, perhaps, you think I knew about is your

14   presumption.  Period.

15   Q.    Okay.  And your support for the plan wouldn't change by

16   learning the additional information that the Secret Service

17   may have gone through her garbage?

18   A.    No.

19   Q.    No.  And your support for the Hospital's plan wouldn't

20   change by learning that the U.S. Attorney had issued subpoenas

21   for her bank accounts and her credit cards?

22   A.    On Leslie DeVeau?

23   Q.    Yes.

24   A.    This is about John Hinckley, no.  It wouldn't.

25   Q.    It wouldn't change at all.  So all of these things about

```
 1      which you were aware with respect to Ms. DeVeau were things

 2      that you had in mind when you wrote your opinion in support of

 3      the Hospital's plan to the Court in March

 4      A.    They may have been things I knew about.  As I stated,

 5      having them in mind when I wrote my support for the

 6      conditional release plan for John Hinckley, no.

 7      Q.    You didn't have it in mind?

 8      A.    No.

 9      Q.    You didn't keep any of that history in mind when you

10      wrote your support for this plan?

11      A.    Why would I?

12      Q.    Well, let's examine that question, sir, although, it is

13      not your role to ask them.

14      A.    Well, let's examine it anyway.

15      Q.    You've told us that relationships with women matter.

16      A.    Sure.

17      Q.    Isn't that correct?

18      A.    Yes.

19      Q.    Ms. DeVeau is one with whom Mr.  Hinckley had a

20      relationship.

21      A.    Right.

22      Q.    Isn't that true?

23      A.    Yes.

24      Q.    And that matters?

25      A.    Of course.
```

1   Q.    So you would have the relationship he had with Ms. DeVeau

2   in mind when you wrote your report.

3   A.    The relationship with Ms. DeVeau and Mr.  Hinckley,

4   absolutely.  The Secret Service going through her garbage, I

5   could care less.

6   Q.    You could care less.  He might care about that, wouldn't

7   he?

8   A.    You should ask him.

9   Q.    Did you ask him?

10  A.    Did I ask him something I didn't know about, no, Mr.

11  Levine.

12  Q.    Did you ask -- you could care less.

13  A.    That's correct.

14  Q.    Rendering an opinion, perhaps, even pontificating about

15  relationships with women and with respect to this fact, you

16  could care less.

17  A.    That the Secret Service went through Leslie DeVeau's

18  garbage.  I don't care if they go through your garbage.

19  Q.    Well, that's because my garbage doesn't pertain to Mr.

20  Hinckley's relationship with women, but hers does.

21  A.    Well, I don't believe that -- well, maybe it does, but it

22  doesn't matter to me.  I don't go through her garbage.  If I

23  thought it was important, maybe I would.  I don't think I've

24  ever gone through anybody's garbage in the course of

25  rendering an opinion about a forensic matter ever.

1    Q.   Now, in response to some of these questions about women,

2    I believe Mr.  Zeno -- I believe Mr.  Zeno inquired with

3    respect to the issue of relationships with women whether Mr.

4    Hinckley had choices; remember that?

5    A.   Yes.

6    Q.   All right.  And he asked you, what do you make of that?

7    What do you make of that?  Remember that question?

8    A.   I think so.  I'm not precise on what the precise question

9    was.  I think that's what he said.

10   Q.   All right.  And your answer was nonsense; is that

11   correct?  Nonsense.

12   A.   To what question?

13   Q.   The question about whether or not Mr.  Hinckley had

14   choices.

15   A.   No, it wasn't.

16   Q.   It was nonsense.

17   A.   No, it wasn't.  I said it was a two-way street.

18   Q.   And that he, you said further, that he had the ability to

19   choose not to see those women when they came.

20   A.   Of course, he does.

21   Q.   Of course, he does.  Now, sir, while it is true, I think

22   you acknowledged, that these women had the choice not to come;

23   is that correct?

24   A.   That's right.

25   Q.   He had the choice not to see them if they did come.

1     A.    Sure.

2     Q.    Now, it would be nice, I take it from your perspective,

3     if Mr. Hinckley were to meet wholesome, unencumbered women;

4     isn't that correct?

5     A.    I don't think it's so much would be my choice -- I would

6     hope -- I would hope.  I wouldn't choose for him.  I would

7     hope he would choose someone that would be supportive and

8     helpful to him.

9     Q.    Now, just tell us today if you would, now, at this time,

10    if you would, who at the Hospital meets that standard?

11    A.    I don't know all of the people at the Hospital.

12    Q.    Do you know anyone at the Hospital?

13    A.    Yeah.  I know a lot of people at the Hospital.  There are

14    employees at the Hospital.  There's security staff at the

15    Hospital.  There are patients in John Howard.  There are

16    patients in other parts of the Hospital.  There are

17    outpatients.  There are visitors.  There are volunteers.

18    There are chaplains.  There are pharmacists.  There are lots

19    of people at the Hospital.  Who meets the standard of someone

20    he might choose?  I don't know.

21    Q.    Now, is it your view, Dr. Patterson, that Mr. Hinckley

22    should have relationships with staff?  Is that what you're

23    telling us?

24    A.    I'm not telling you that.  I'm telling you --

25    Q.    That's exactly what the issue was before Judge Green with

1    respect to Commander Wick, the pharmacist; isn't that true?

2    A.    No, it is not.  I am responding to your question, who was

3    at the Hospital.  I just told you who was at the Hospital.

4    Q.    Oh --

5    A.    If he decided he wanted to talk to a staff member like an

6    intern or two, he's done that.

7    Q.    And that's been -- withdrawn.  If he wanted to develop a

8    close relationship with a woman, a meaningful relationship,

9    whether it is a friendship that may evolve into a deeper

10   relationship, is staff a candidate for that?

11   A.    Yes.  After 1990 when Leslie DeVeau was unconditionally

12   released, she was a staff member at the Hospital.  He

13   continued a relationship with her for 10 years.

14   Q.    With the Hospital's imprimatur; isn't that true?

15   A.    You think nobody knew, yes, everybody knew that.

16   Q.    And she wasn't -- withdrawn.  Mr. Zeno inquired of you

17   about the testimony -- I believe it came from not only Mr.

18   Beffa, but also Dr. Rafanello and also Dr. Montalbano that if

19   the Court were to deny the plan as proposed by the Hospital,

20   that might be anti-therapeutic; do you remember that question

21   by Mr. Zeno?

22   A.    I don't remember it exactly as anti-therapeutic, but I

23   remember that there was testimony that it might cause him to

24   lose some hope.

25   Q.    Might cause him to lose some hope.  And he asked you your

1    reaction to that; do you remember that?

2    A.   I remember that.

3    Q.   And you remember the way you snapped the answer, one word

4    you said; isn't that correct?  Extortion.  Is that the word

5    you used?

6    A.   That's the word.  I don't know if I'd say snapped, but,

7    yeah, that's the word.

8    Q.   You may be objecting to my characterization, but not to

9    the fact that that was the word; is that correct?

10   A.   That's correct.  I have thoughts of your

11   characterization.

12   Q.   Tell me, Dr. Patterson, is it extortion to evaluate how a

13   person responds to a ruling by the Court?

14   A.   Not at all.

15   Q.   Not at all.

16   A.   That is necessary.

17   Q.   Not extortion.

18   A.   That is necessary.  To evaluate the response to a court

19   ruling is necessary.  That's not extortion.  To demand that if

20   the Court does not agree with the recommendation and,

21   therefore, the patient will suffer harm, that's extortion.

22   Q.   If it is the fact in the opinion of these treaters that

23   the patient would suffer harm, should they not tell that to

24   the Court?

25   A.   They should tell that to the Court, and they should also

1    cancel his privileges to make sure they protect him if they

2    really believe that.  If they believe that the risk goes up

3    because the privilege is denied then they should cancel the

4    opportunity for him to harm himself based on that.  Is that

5    what you want?

6              MR. LEVINE:  Move that it be stricken, Your Honor.

7              THE COURT: I'm not going to strike that.

8              MR. LEVINE:  There's no question pending, and it's

9    another instance of pontificating in response to no pending

10   question.  Ask that it be -- ask that that remark be stricken.

11             MR. ZENO:  Objection, Your Honor.  We think it's a

12   perfectly appropriate response.

13             THE COURT: I think it was part of the response so

14   I'm not going to strike it.

15   BY MR. LEVINE:

16   Q.   Dr. Patterson, in your report, the reason you do not

17   support the first item is because you believe the duration of

18   the conditional release proposed is too long, and by its

19   length deprives him of the opportunities of needed therapy at

20   the Hospital; is that correct?

21   A.   In part.

22   Q.   Is there any other reason you have with respect to item

23   number one?

24   A.   Yes.

25   Q.   What is that?

A.    In my opinion, the recommendations that follow can be
accomplished in the six days he already has.   If they want to
do it, do it, just do it in six days and allow for the
supports to continue at the hospital.   You can do both.

Q.    Now, the reason you picked the time period proposed, and
I believe the time period you proposed was six days, five
nights.

A.    I proposed it last year.

Q.    That's the number of days, six days, five nights.

A.    That's correct.

Q.    As to -- it would give his treaters, specifically,
Dr. Binks and Mr. Hyde, the opportunity to engage in therapy
with him.

A.    On a weekly basis.

Q.    On a weekly basis.

A.    That's correct.

Q.    Now, do you know on what day of the week Mr. Hinckley
sees Dr. Binks?

A.    I do not.

Q.    Do you know on what day of the week Mr. Hinckley sees
Mr. Hyde?

A.    I do not.

Q.    Do you know if they are on the same day?

A.    No.   Since I don't know which days.

Q.    Okay.   But you don't know -- apart from not knowing which

1    days -- without knowing which days, you don't know if it's the

2    same day.

3    A.    No.   I made a presumption.   It may be an error.   That the

4    Hospital would grant the privileges for him to go around his

5    therapy, not the other way around.

6            MR. LEVINE:   All right.   Your Honor, may I ask the

7    Court please to instruct this witness to answer the questions

8    that I ask --

9            THE COURT: I don't think the last thing was

10   responsive to a question.   The question had to do with whether

11   or not you have any information about whether he saw Dr. Binks

12   and Mr. Hyde on the same day or different days.

13           THE WITNESS:  And I don't know.

14   BY MR. LEVINE:

15   Q.    Okay.   Now, please, Dr. Patterson, please answer the

16   questions that I ask.

17   A.    Do my best.

18   Q.    Thank you, sir.   Now, over the conditional releases over

19   the past year or so, Mr. Hinckley has been in the location of

20   the family home for the whole of the week; isn't that true?

21   A.    It has been for six days.   I believe at least one of

22   those days has been a Saturday.

23   Q.    Isn't it a fact, sir, that with respect to every single

24   one of those conditional releases without exception that when

25   he went on conditional release he missed the therapy with Dr.

1    Binks?

2    A.    I don't know.  I would hope not.

3    Q.    You don't know?

4    A.    No.

5    Q.    And is it likewise true with respect to every single one

6    of them that he missed the therapy with Mr.  Hyde?

7    A.    Again, I don't know.

8    Q.    And did Mr.  Hinckley become more dangerous as a result

9    of having missed those therapies?

10   A.    I don't know that he missed them.

11   Q.    Accept hypothetically that he missed them.  In answering

12   this question, tell us whether he became more dangerous.

13   A.    Hypothetically, he didn't become more dangerous.

14   Q.    Hypothetically.  How about if you accept as true that he

15   didn't miss those therapies, tell us in fact whether he became

16   more dangerous.

17   A.    If he did miss those therapies, he did not become more

18   dangerous, and no one has said that he would.

19   Q.    Answer the question --

20   A.    I'm answering it.

21   Q.    -- you're asked sir.

22   A.    I'm answering it.

23   Q.    Now, let's assume for a moment that the therapies with

24   Dr. Binks was scheduled for a Friday of a week.

25   A.    Okay.

```
1    Q.   Can you assume that?
2    A.   Well, I shouldn't because I believe Dr. Binks takes
3    Fridays off, but I will if you want.
4    Q.   But you're not sure of that either.
5    A.   I believe he takes Fridays off.  That's what he told me,
6    but I'll assume your -- I will accept your assumption.
7    Q.   Okay.  And let's assume he missed the therapy with Dr.
8    Binks on that assumed Friday, and he got the therapy with Dr.
9    Binks on Monday morning.  Can you assume that?
10   A.   If you want, I'll assume it.
11   Q.   Would he become, in your opinion, more dangerous because
12   he had the additional time of Saturday and Sunday without
13   having had the therapy last week?
14   A.   Very probably not.
15   Q.   All right.  And, likewise, let's assume that he had
16   scheduled therapy with Mr. Hyde on Friday.  Does he have
17   Friday off?
18   A.   I don't think so.
19   Q.   You don't think so.  Let's assume it was scheduled for a
20   Friday.
21   A.   Okay.
22   Q.   And let's assume he missed it on the week of his
23   conditional release, and let's assume further that he had the
24   therapy on the following Monday.  Can you assume that?
25   A.   Sure.
```

1    Q.   Would he become more dangerous, in your opinion, for

2    having missed the therapy with Mr. Hyde on that Friday?

3    A.   Very probably not.

4    Q.   Do you have any doubt about that?

5    A.   Yeah.  Because I don't know what happened on Saturday and

6    Sunday.

7    Q.   All right.  Well, if he had the therapy on Friday, you

8    still wouldn't know what happened on Saturday and Sunday.

9    A.   That's correct.

10    Q.   Okay.  So do you need to know what's not knowable in

11    order to answer that question?

12    A.   I have no idea what that means.

13    Q.   Well, let's explore that.  You said you don't know if he

14    would become more dangerous if he had the therapy on the

15    Monday because you don't know what happened on Saturday and

16    Sunday.

17    A.   That's what I said.

18    Q.   Okay.  Now, if he had the therapy on the Friday before

19    the weekend --

20    A.   Yes.

21    Q.   -- you still wouldn't know what happened the next day and

22    the day after the next day.

23    A.   That does not mean that something may have happened that

24    made him more dangerous.

25    Q.   And if something made him more dangerous, sir, that would

1      be discerned the following Monday; isn't that true, sir?

2      A.   It depends on what the danger was.  If he became

3      suicidal, someone, hopefully, would see it on Saturday.

4      Q.   And you have told us, I believe over a period of years,

5      Dr. Patterson, that that would be psychotic and the psychosis

6      would take weeks or months to develop, and there would be

7      ample time to intervene, and that's been your testimony time

8      in and time out.

9      A.   No, it hasn't.

10     Q.   Let me move on, sir.

11     A.   Okay.

12     Q.   With some drama, reference was made to Mr.  Hinckley's

13     song, "The Ballad"; do you remember that song?

14     A.   I do.

15     Q.   And you expressed in response -- I'm not sure if it was

16     in response, but to Mr.  Zeno that he was able -- Mr.

17     Hinckley was able to recall the words of the song he wrote

18     with his therapist.

19               MR. ZENO:  Can you repeat that?

20               MR. LEVINE:  With his therapist.

21     BY MR. LEVINE:

22     Q.   Is that correct?

23     A.   Yes.

24     Q.   And, first, isn't that exactly where you're supposed to

25     bring the song to the attention of a mental health

1    professional in therapy?

2    A.    I believe I said words to that effect that it was

3    appropriate.

4    Q.    It was appropriate.

5    A.    Sure.

6    Q.    And does it surprise you that a songwriter would remember

7    the words or lyrics to a song he wrote?

8    A.    No.

9    Q.    Now, would it have been better for him to remember some

10   but not all of those words, Dr. Patterson?

11   A.    With his therapist?

12   Q.    Yes.  Some 30 years after he wrote the song.

13   A.    Not especially, no.

14   Q.    Wouldn't have mattered.  But you made a point of the fact

15   that he was able to write -- was able to state or recite the

16   lyrics, he remembered them all.

17   A.    Sure.

18   Q.    Would you be more concerned if he didn't remember the

19   words?

20   A.    Not especially.

21   Q.    Would you be less concerned if he didn't remember the

22   words?

23   A.    Not especially.

24   Q.    The fact that he remembers the words doesn't give you

25   concern at all.

1    A.   In therapy, no.

2    Q.   In therapy, no.   And the fact that Ms. G may have asked

3    him about old songs he had written, does that give you a

4    concern?

5    A.   Yeah.

6    Q.   And the fact that he, Mr.  Hinckley, brought Ms. G's

7    inquiry to the attention of his therapist right away, isn't

8    that exactly, precisely what he's supposed to do?

9    A.   It was a good thing to do.

10   Q.   Is the answer to that question "yes"?

11   A.   Well, I wouldn't say it is "exactly, precisely" what he's

12   supposed to do.  It was a good thing to do.

13   Q.   Would you have said, Doctor, if he hadn't done that that

14   would be bad thing to do?

15   A.   Yeah.  I would say it would be a bad thing to do to not

16   to bring it --

17   Q.   So what he did was good, not bad?

18   A.   Yeah.  I said that.  It was a good thing to do.

19   Q.   And what he did was exactly what he is encouraged to do.

20   A.   Yes.

21   Q.   And, of course, because you were careful to tell us that

22   you didn't treat -- since 1982.

23   A.   No, I didn't.

24   Q.   Or you've been involved with him since 1982.

25   A.   I've known him since 1982.  That's what I said.

1   Q.   You knew that and the existence of that song when you

2   wrote your report?

3   A.   I -- yes, I did.

4   Q.   All right.  Now, what years, Dr. Patterson, were you at

5   St. Elizabeths Hospital?

6   A.   I was there from 1979 to 1992 and 1998 to 2001.

7   Q.   All right.   And during the years that you were there,

8   who ran John Howard?

9   A.   First it was Dr. Dobbs, Bill Dobbs, William Dobbs, and

10  then it was Joe Henneberry.

11  Q.   When did Mr.  Henneberry come on the scene?

12  A.   At St. Elizabeths?

13  Q.   Yes.

14  A.   1967 I believe.

15  Q.   And when did he -- I think I remember.  All right.  A

16  little later for me, and I think for you.

17  A.   And for me.

18  Q.   And I know for His Honor.  When did Mr.  Henneberry

19  become -- is the word "director" the right word, right title,

20  for John Howard?

21  A.   Yeah.  Yeah.  It's varied over time, but, yeah, director

22  would have been right back then I think.

23  Q.   What's it now?

24  A.   It is the Associate Director for Forensic Services.

25  Q.   All right.  Just so what we're talking about here is it's

1    Joe Henneberry, and he runs John Howard?

2    A.    Everybody knows that.

3    Q.    All right.  And what year did he arrive in that role?

4    A.    I don't know.

5    Q.    Give us an proximate.

6    A.    Approximately, I'd say probably '79 -- maybe '80.

7    Maybe '80.

8    Q.    Maybe 80.  All right.  So it would be true that he was

9    there during the whole of the time that Mr.  Hinckley was

10   there.

11   A.    Sure.

12   Q.    All right.  Now, the people who you've  identified and

13   some you haven't who have been treating Mr.  Hinckley include

14   Dr. Rafanello and Dr. Montalbano.

15   A.    No.  Dr. Rafanello is his clinical administrator.

16   Dr. Montalbano has provided Risk Assessments, but I don't

17   believe he's had any treatment responsibilities.

18   Q.    Fair enough.  Fair enough, sir.  But he has been involved

19   in the reporting to the Court.

20   A.    Sure.

21   Q.    And the interviews after these conditional releases, as

22   well.

23   A.    Yes.

24   Q.    And, of course, there's Dr. Binks and a host of other

25   people who have contributed well, you would say, to Mr.

1    Hinckley's welfare.

2    A.    Over the years, unquestionably.

3    Q.    Unquestionably.  And is it Mr. Henneberry who signs each

4    of these conditional release forms or letters that go to the

5    Court?

6    A.    Yeah.

7    Q.    And that's true for Mr.  Hinckley and anybody else at

8    John Howard is that correct?

9    A.    Yes.  Unless for whatever reason, he's not there, but,

10   yes, that's his role.  That's one of his roles.

11   Q.    And these treaters who you've identified as being superb

12   in what they do.

13   A.    Yes, I have.

14   Q.    Before their recommendations go to the Court, you must

15   first take their recommendations to the review board.

16   A.    In most cases.

17   Q.    Okay.  And surely in Mr.  Hinckley's case?

18   A.    Well, no.  No.  That's part of the problem I have with

19   the newly identified volunteer service agencies that were

20   presented in court.  They didn't go to the treatment team,

21   they didn't go to the review board.

22   Q.    The plan that is before the Court which we have been

23   identifying as the (e)petition went to the review board, did

24   it not, sir?

25   A.    Certainly, this plan, yes.

1    Q.   This plan.

2    A.   Right.

3    Q.   All right.  And before -- and every one of these plans

4    before they go to the Court are signed in the first instance

5    by Joe Henneberry; is that correct?

6    A.   Yes.

7    Q.   You squint your eyes.

8    A.   Because some of them are signed I think by Dr. Green.  He

9    may sign them first.  So in the first instance, it might be

10   him, but, yes, Joe Henneberry signs the plans that come to the

11   Court.

12   Q.   All right.  So they may have multiple signatures, but

13   they always include Mr. Henneberry's.

14   A.   Unless, he's not there.

15   Q.   Is it your testimony that Mr. Henneberry signs the (e)

16   letters to the Court?

17   A.   When he's there, yes.  If he's on vacation, he doesn't

18   sign them.

19   Q.   Does someone else sign them or do they wait until he

20   comes back?

21   A.   Somebody else signs them.

22   Q.   And in Mr. Hinckley's case, a hundred percent of them

23   have been signed by Mr. Henneberry; isn't that correct?

24   A.   I don't know.  Most of them, certainly.  Probably all of

25   them.  I don't recall every letter.

1    Q.   You didn't look at every one of them?

2    A.   No.  Not in preparation for this hearing.

3    Q.   All right.  Now, these people who provide this excellent

4    mental health care, is it your view or -- strike that.  Do you

5    disagree with Dr. Phillips that these people who provide this

6    excellent mental health care are unable to write an (e)

7    proposal to the Court with respect to Mr. Hinckley, are

8    unable to write one without deficiencies?

9    A.   Let me make sure I understand what you just said:  Do I

10   disagree with Dr. Phillips that these people are unable to

11   write an (e)report without deficiencies?

12   Q.   Yes, that's my question.

13   A.   I don't know that he said that, but I don't agree that

14   they are unable to write an (e)petition to the Court without

15   deficiencies.

16             THE COURT: So you think they --

17             THE WITNESS:  I think they can write an (e)letter to

18   the Court without deficiencies.

19   BY MR. LEVINE:

20   Q.   And you think in this case the deficiency -- before

21   hearing from Mr. Beffa that the deficiency was in paragraph

22   one.

23   A.   In recommendation number one and some deficiencies where

24   I made some suggested modifications in several of the others.

25   Q.   Such as have a cell phone with a GPS.

1     A.   And notice to the Court.

2     Q.   And notice to the Court.

3     A.   That's correct.

4     Q.   All right.  Now --

5     A.   I'm sorry.  I was incomplete.  On two of them, I didn't

6     give a recommendation one way or the other that had to do with

7     Housing Partnerships and the other one because one was out and

8     the other was uncertain.

9               THE COURT: One was out and one was what?

10              THE WITNESS:  Uncertain.

11              MR. LEVINE:  Court's indulgence for a moment,

12    please, Your Honor.

13              THE COURT: Yes, sir.

14    BY MR. LEVINE:

15    Q.   Now, Dr. Patterson, Mr. Zeno asked you about splitting;

16    do you remember that?

17    A.   Yes.

18    Q.   And splitting is a problem that could exist if there are

19    multiple treaters; is that correct?

20    A.   That's true.

21    Q.   Can -- and the problem with multiple treaters is that one

22    might not know what the other is doing or saying?

23    A.   That's one, yeah.

24    Q.   Is that a fair definition of splitting?

25    A.   Not really.  It applies --

1    Q.   All right.  Give us a better one.

2    A.   It applies in that situation, but splitting doesn't just

3    occur with treaters.  Splitting has occurred with most people

4    in this room where parents -- where a child says to mom "a"

5    and says to dad "b", so it is a phenomena that happens

6    between people.

7    Q.   And the problem with splitting is cured by communication;

8    isn't that correct?

9    A.   It is certainly assisted by communication.

10           THE COURT: So the problem is -- the two problems I

11   think I hear identified is one treater may not know what the

12   other treater is doing, and the other is that the patient can

13   tell two different treaters two different things.

14           THE WITNESS:  That's exactly right.

15   BY MR. LEVINE:

16   Q.   Now, with respect to both of those items carefully

17   articulated by His Honor, if each treater confers with the

18   other, each will know what the other is doing; isn't that

19   correct?

20   A.   That is usually a way of trying to do it.  Sometimes they

21   don't know it, but, yes.

22   Q.   And each will know what the patient is saying to each of

23   them; isn't that correct?

24   A.   Hopefully.  Hopefully.  Sometimes --

25   Q.   If the communication is good, that will happen, and if

1    the communication is not so good, it may not happen; is that

2    your point?

3    A.   That's right.  That's my point.

4    Q.   So, in this matter, you heard Mr. Beffa say that it

5    would be his intention to speak with Dr. Binks not only after

6    each of these conditional releases as proposed in the plan,

7    but also before each of these conditional releases; do you

8    recall that?

9    A.   I recall that, sure.

10   Q.   That's a good idea, isn't it?

11   A.   The concept is a good idea, yes.

12   Q.   And if the concept is being a good idea is properly

13   implemented, the problem with splitting is not one about which

14   we should have a concern, is it, sir?

15   A.   Not exactly.  Your scenario presumes that the information

16   is garnered by each therapist or some information; meaning

17   that if you don't ask the right question and don't get the

18   information, you can't share it.

19   Q.   That's always -- that's not a problem with splitting,

20   that's a problem with the patient and the therapist, isn't it?

21   A.   It's usually a problem -- yes, that's correct.  Yes.

22   Q.   So that's not a splitting problem is it, sir?

23   A.   Oh, sure.  I mean it contributes to splitting.  If you

24   tell me something that you don't tell Dr. Phillips and Dr.

25   Phillips doesn't ask you precisely a question about it, he

1    can't know that he doesn't know something that he hasn't asked

2    you and you haven't told him.  So it may very well be that you

3    have split us in that instance.

4    Q.   No, Dr. Patterson.

5    A.   No?

6    Q.   In that example, sir, Dr. Phillips would know what I

7    would have said to you if you were good at communicating with

8    him about what I said.

9    A.   Dr. Phillips would know what you said to me if I tell

10    him.  He -- I will not know what he has not asked.

11          THE COURT: But if it's generally about the same

12    subject matter and you've gone into it in greater depth or you

13    explored other things or related things and Dr. Phillips

14    hasn't -- if you tell Dr. Phillips about your conversation

15    with the patient, say, about relationships with women, for

16    example.

17          THE WITNESS:  Yes.

18          THE COURT: And you said and while we were talking

19    about Ms. G, I said to him, well, isn't that the same thing

20    that happened with Ms. M, and Dr. Phillips said, well, gee,

21    you know, I never went back and talked about Ms. M.  I just

22    focused on Ms. G, but now that you've mentioned that to me,

23    Dr. Patterson, I probably should have done that, and I don't

24    have as much information as you do.

25          THE WITNESS:  That is correct in terms of correcting

1          the information, but the split has already happened.  The

2          splits already happened.

3                  THE COURT:  But I think what Mr.  Levine is getting

4          at is that even if you have a great therapist at the Hospital

5          and a great therapist in his mother's community, the best

6          people you could possibly get, you've got multiple treaters by

7          definition.

8                  THE WITNESS:  Right.

9                  THE COURT: So that's split, but what you said the

10         major problems with the splitting -- with splitting was is

11         that one may not know what the other is doing and that the

12         patient can tell different treaters different things, and this

13         can be at least ameliorated by careful communication.

14                 THE WITNESS:  Communication.

15                 THE COURT: But I guess what I want to explore -- I

16         don't know whether this is what Mr.  Levine wants to explore

17         is -- if we're going to -- if we're going to continue to have

18         -- whether they are merely visits or whether they are the

19         beginning of a transition to his mother's community, and we're

20         going to have support staff in both places, there is going to

21         be this problem?

22                 THE WITNESS:  Yeah.  And you minimize the problem

23         with effective and thorough communication.  Mr.  Levine is

24         right on point with that.

25                 THE COURT: Okay.  But your concern, as I understood

1      what you said earlier this morning, is that now that you heard

2      from Dr. Beffa, you have concerns about how good is he is at

3      the roles he's going to take on; certainly the case manager

4      role.

5                  THE WITNESS:  And the individual therapist role.

6                  THE COURT: And the individual therapist role.

7                  THE WITNESS:  I do.

8                  THE COURT:  As well as concerns about the extent of

9      communication.

10                 THE WITNESS:  Correct.

11                 THE COURT:  And the quality of the communication.

12                 THE WITNESS:  Correct.

13                 THE COURT: And fact that he has not immersed himself

14     in the complete history of this patient.

15                 THE WITNESS:  Right.

16                 THE COURT: And with respect to Dr. Lee earlier, I'm

17     not sure whether you said anything today about your evaluation

18     of the quality of the services you provided, but you certainly

19     expressed your view that the communication over the last year

20     has not been so good.

21                 THE WITNESS:  That's my understanding from the

22     treatment team notes and from talking with treatment team

23     members.  And if I might just amplify with Mr. Beffa, it is

24     not only what he has said he doesn't intend to immerse himself

25     in, but it's also what he does intend to read.  It is very

1    limited.  He wants to read Dr. Binks' notes, and he has read

2    Dr. Montalbano's past two risk assessments and the reports by

3    Dr. Phillips and me.

4              He has not said he wants to read the treatment plan;

5    he wants to read what V.J. Hyde has to say or any other

6    relevant information that has to do with Mr. Hinckley's

7    functioning, and that's what I'd expect him to want to.  Not

8    be forced to do, not be told to do, but to want to do.  I want

9    to know as much as I can know.

10             MR. LEVINE:  May I inquire about that, Your Honor?

11             THE COURT:  Absolutely.

12   BY MR. LEVINE:

13   Q.   As a matter of fact, I think it was the case,

14   Dr. Patterson, that in this regard you stated that you were

15   appalled; is that correct?

16   A.   That sounds like me, appalled, yes.

17   Q.   And it sounds like what you said in addressing this exact

18   subject matter.

19   A.   Yes.

20   Q.   Isn't that true?

21   A.   Sure.

22   Q.   Now, let's see if you remember it correctly, sir.  Is it

23   not a fact, sir, that he said that with respect to being the

24   case manager it was not essential to know the whole of the

25   medical history, case manager.

1    A.   Okay.  I'll accept that.

2    Q.   And you would agree with that, wouldn't you?

3    A.   No.  I wouldn't, but I'll accept that's what he said.

4    Q.   You think the case manager needs to know the whole of the

5    case history.

6    A.   Yeah, I do.

7    Q.   The whole of the case history?

8    A.   The whole of the case history, yes.

9    Q.   So you would think that -- I don't know if the word

10   millions of pages is sufficient to describe the bulk of the

11   whole of the case history in this case.  Is it your contention

12   that in order to find a job, for example, diligently pursued

13   by a case manager that that person has to know and, of course,

14   having been paid for, the study of that history -- of that

15   record?

16   A.   A study of that history, yes.

17   Q.   Of that record.

18   A.   No.  I didn't say he had to read millions of pages.

19   Q.   All right.  Is it sufficient if he reads a very

20   skillfully compiled recitation of all the relevant facts by

21   very capable people who put them together?

22   A.   I think that's a step in the right direction.  It might

23   be adequate.

24   Q.   And it might be adequate.

25   A.   It might be adequate.

1    Q.   And, surely, if he were to become the therapist, you

2    would expect that.

3    A.   Absolutely.

4    Q.   Now, is Dr. Phillips such a person who could compile the

5    history and synthesize the history of this case.

6    A.   He is stellar, yes.

7    Q.   Stellar.  And, in fact, Dr. Phillips did compile it in

8    one of his reports.  I believe it may have been his first.

9    A.   Okay.

10    Q.   You agree with that?

11    A.   I don't recall that it was his first or he compiled it in

12    his first, but I will accept that he did if that's what you're

13    saying.

14    Q.   Well, do you know that he in fact did compile the whole

15    of the history in one of his reports?

16    A.   In one of his reports, yes, I know that.

17    Q.   And would you agree that Dr. Montalbano is likewise a

18    suitable person --

19    A.   He's stellar --

20    Q.   -- to do the compilation of that history?

21    A.   He's stellar, too.

22    Q.   And would you agree that Dr. Montalbano did that, too?

23    A.   Yes.

24    Q.   So we have two stellar people putting together two

25    stellar reports assembling the history of this stellar case;

1    is that correct?

2    A.    That is correct in what you just said, yes.

3    Q.    Okay.   Fine.   Now, did -- isn't it a fact that Mr.  Beffa

4    said he has already read much of that in anticipation, in

5    anticipation, of his new role in this case were the Court to

6    approve it?

7    A.    He has read much of that meaning, I believe, Dr.

8    Montalbano's past two Risk Assessments, Dr. Phillips' report,

9    my report.   That does not include the treatment plan.   That

10   does not include V.J. Hyde's notes.   That does not include Sid

11   Binks' notes.

12   Q.    And he said he has received and reviewed some of Sid

13   Binks -- Dr. Binks' notes; isn't that correct?

14   A.    That's correct.

15   Q.    All right.   And he said if appointed by this Court to

16   serve in the capacity proposed by the Hospital, he will do all

17   of those things; isn't that true?

18   A.    No, he didn't say that.

19   Q.    He didn't say that?

20   A.    No.

21   Q.    Well, let me ask you this then, although, I maintain that

22   he did say that:  If he were to have said that, would you

23   withdraw your objection to Mr.  Beffa?

24   A.    No, I would not.

25            MR. LEVINE:  All right.  What he said, Your Honor,

1    a matter of record, and whether or not Dr. Patterson heard

2    that testimony accurately is for this Court to determine.

3    BY MR. LEVINE:

4    Q.   Now, with respect to the recommendations made by the

5    Hospital -- let's first talk about the ones that you support.

6    Is it fair to say without reservation?

7    A.   That's fair to say.

8    Q.   Number seven?

9    A.   Yes.

10   Q.   Mr. Hinckley will utilize "B" city privileges with Kevin

11   Shamblee.  I take it you don't care much care if Kevin

12   Shamblee or someone else, do you?

13   A.   I supported it as written with Kevin Shamblee.

14   Q.   Okay.  Is it to the exclusion of everybody else?

15   A.   No.  It depends on who other person might be.

16   Q.   And you think the identity of that person ought to be in

17   this report?

18   A.   Well, this identity is in the report.  I would expect the

19   same.

20   Q.   You have that in every report that goes through a court?

21   A.   I don't know.

22   Q.   To take a written test at the D.C. Department of Motor

23   Vehicles in order to obtain a learner's permit with two weeks

24   notice to the Court of the proposed date; you support that?

25   A.   I do.

1    Q.   Without reservation?

2    A.   Without reservation.

3    Q.   And you don't agree with Dr. Phillips that it ought to be

4    in Virginia?

5    A.   I don't care.

6    Q.   You support number eight, as well, don't you?

7    A.   I do.

8    Q.   That Mr.  Hinckley will be allowed unaccompanied time in

9    the area where the family lives, and it is really the area at

10   large, not just the local subdivision, to attend a driving

11   school for seven driving lessons, each of which would be 60

12   minutes in length.

13   A.   I support that.

14   Q.   And you further support "B" city privileges with Mr.

15   Shamblee to take the driving test at the D.C.  Department of

16   Motor Vehicles at the completion of the driving lessons, and

17   this will require 30 minutes of unaccompanied time with an

18   examiner.

19   A.   That's number nine, and, yes, I do support that.

20   Q.   You support number 10, he be permitted to drive the

21   family car with a learner's permit and, subsequently, with a

22   driver's license with a responsible person at all times.

23   A.   That's correct.

24   Q.   Let's go to number 11.  You have a footnote to your

25   support in number 11, don't you?

1    A.    Eleven, 13, and 16; same footnote.

2    Q.    All right.  Let's talk about that; Number 11, Mr.

3    Hinckley will be permitted to utilize up to two hours

4    unaccompanied privileges two times per day within his mother's

5    subdivision between 9:00 a.m. and 5:00 p.m., Standard Time,

6    and 9:00 a.m. to 5:00 p.m., Daylight Savings Time.  He will

7    carry a cell phone and will notify the custodian or

8    responsible person and the Hospital before he visits the

9    residence of any neighbor or new friend within the

10   subdivision.  You supported that with the footnote.

11   A.    Yes.

12   Q.    All right.  Now, the footnote is that the cell phone have

13   a GPS.

14   A.    That's correct.

15   Q.    Now, to your knowledge, sir, does a regular phone,

16   regular old cell phone -- they're not so old, but there are

17   regular ones -- is that -- does it emit a sufficient signal so

18   as to be able to know where the carrier of the phone is

19   located?

20   A.    I believe it does for the cell tower.  I don't know if

21   they all have GPS which is why I put it in the recommendation.

22   Q.    No.  I'm talking about without GPS, a regular old cell

23   phone.  I'd show you mine, but it's not all that old.

24   A.    Okay.

25   Q.    But it doesn't have a GPS.

```
1    A.   Okay.
2    Q.   Wouldn't it be true, sir, as a technical matter that one
3    could -- I'm going to use a word that's appeared in this case
4    before -- triangulate.  Another triangulate, Judge.  One could
5    triangulate from the tower to a tower to the cell phone holder
6    and know exactly where that person is.
7    A.   That's probably true.  I'm not absolutely sure.
8    Q.   So it's not necessary to have a GPS to know where the
9    holder of a cell phone is located; isn't that true?
10   A.   I don't know that for sure.
11   Q.   Well, don't you think it would be useful to know that
12   before you would require someone to go out and spend a lot of
13   money for a new cell phone that has a GPS?
14   A.   No.  I don't think it's necessary to know that.  I'm
15   suggesting, in my opinion, that he have a cell phone with a
16   GPS.
17   Q.   Is that because the amount of money it cost to get a cell
18   phone with a GPS just doesn't matter to you, although, it
19   might matter to the family?
20   A.   It very well may matter to the family.  It is my
21   recommendation to have a cell phone with a GPS however much it
22   costs.
23   Q.   And the sole purpose of having a cell phone with a GPS is
24   to be able to locate the holder of the cell phone.
25   A.   And also where he has been retrospectively.
```

```
1    Q.   And you don't think you could know that with a regular
2    old cell phone?
3    A.   I don't know that.
4    Q.   And do you know if -- well, wouldn't it be important to
5    know that before you recommend getting another kind of cell
6    phone?
7    A.   No.  I don't think so.
8    Q.   Not important to know that.
9    A.   No.
10   Q.   Just go out and buy another one.
11   A.   Get one with a GPS.
12   Q.   And pay for it.
13   A.   Okay.
14   Q.   Money runs pretty easily in your mind, then, doesn't it,
15   sir?  How much are you earning an hour here?
16   A.   Money does not run easily in my mind.
17   Q.   How much are you earning an hour here?
18             MR. ZENO:  Your Honor --
19             THE COURT:  There are two questions on the table.
20             MR. LEVINE:  Answer the second one, please.  How
21   much are you earning here?
22             THE WITNESS:  How much am I earning here?
23   BY MR. LEVINE:
24   Q.   Yes.  Per hour.
25   A.   My time costs $750 an hour; my time.  My opinion belongs
```

1      to me.

2      Q.    You are well-schooled in the world of forensic

3      examination, aren't you?

4      A.    You, too.

5      Q.    I've been doing it for awhile.

6      A.    Me, too.

7      Q.    Dr. Patterson, this case is worth a couple of hundred

8      thousand dollars to you every time we do it, isn't it?

9      A.    No.

10      Q.    Hundred for sure.

11      A.    I don't think so.

12      Q.    Pretty close.

13      A.    I don't know.  I haven't submitted a bill to Mr. Zeno and

14      Ms. Chasson.

15      Q.    Do you know what Dr. Phillips get an hour?

16      A.    I have no idea.  Ask him.  How much you get, Bob?

17      Q.    You have no idea?

18      A.    No.  How much you get?

19            THE COURT:  No.  No.  He's not on the stand, Dr.

20      Patterson.

21            THE WITNESS:  I'm sorry, Your Honor. But I don't

22      know.

23      BY MR. LEVINE:

24      Q.    Would you expect --

25            THE COURT:  I don't know what Mr.  Levine gets per

1    hour either, but when it comes --

2              MR. LEVINE:  Worth every penny, right, Judge?

3              THE COURT:  Yeah.  But when it comes to people in

4    private practice these days, that's the last thing I want to

5    know.  Everyday I wake up in the morning, I think about that.

6    Not about you in particular, Mr. Levine.

7              MR. LEVINE:  Not all cases, Your Honor.  Let me

8    assure you of that.

9              THE COURT: I understand.  I understand

10   BY MR. LEVINE:

11   Q.    So it is your testimony, then, Dr. Patterson, that you

12   want a GPS on the phone even if you don't know if it's

13   necessary to have a GPS on the phone?

14   A.    No.  I want a GPS on the phone so that he -- where he has

15   been can be located at the time he's there, and,

16   retrospectively, if the treatment team wants to know where

17   he's been.  That's why.

18   Q.    And you say that without knowing whether the good old-

19   fashioned cell phone will retrospectively supply that

20   information?

21   A.    If the good old-fashioned cell phone will retrospectively

22   supply that information, then the GPS wouldn't be necessary.

23   Q.    So you make this recommendation -- you put in place a

24   condition without knowing if it's necessary; is that correct?

25   A.    I put in the recommendation because I believe it is

1    necessary to know where he's been.  If it can be achieved in

2    another way, that's perfectly fine with me.

3    Q.   So the reservation you have with item number 11 is

4    subject to change?

5    A.   Eleven, 13, and 16.

6    Q.   All right.  Thirteen:  You would support even without a

7    GPS were one able to -- even without a GPS I take it.

8    A.   No.  Under the same circumstances you just described for

9    11, I would support 13 and 16 the same way.

10    Q.   All right.  Let's talk about 13.

11    A.   Okay.

12          THE COURT: Thirteen, just so we're clear, has the

13    phrase in it:  Specific social, recreation, worship, or

14    shopping related activities that will be included in the

15    itinerary.  That's part of the Hospital's recommendation.

16          THE WITNESS:  Yes.

17          THE COURT:  So the only thing you would add to that

18    -- you wouldn't subtract anything from that, right?

19          THE WITNESS:  No, I would not.

20          THE COURT:  The only thing you would add to it is

21    GPS.

22          THE WITNESS:  The cell phone with GPS.

23          MR. LEVINE:  If necessary.

24          THE WITNESS:  That's right.  Cell phone with GPS if

25    necessary.

1    BY MR. LEVINE:

2    Q.   If necessary.  To know where he is.

3    A.   And where he's been.

4    Q.   And where he's been.

5    A.   Where he's been.

6    Q.   It is your contention, sir -- is it your knowledge that a

7    GPS will tell you where he has been?

8    A.   Yes.

9    Q.   You know that to be the fact?

10   A.   That's my knowledge.  Where I heard it from, I don't

11   recall.

12            THE COURT:  But we don't need that.  We're accepting

13   Dr. Phillips' opinion on legal questions, so we can accept

14   yours on technical questions.

15            MR. LEVINE:  On technology, right.  That's correct.

16            THE WITNESS:  Okay by me.  Thank you.

17   BY MR. LEVINE:

18   Q.   What was the other one you had, 16, right?

19   A.   Sixteen.

20   Q.   Let's take these in some order here.  You would support

21   13 you told us even without a GPS if we could learn where he

22   has been.

23   A.   Yes.

24   Q.   And 15.

25   A.   No.  No.  16.

1          THE COURT: Mr. Levine wants to talk about 15.

2          THE WITNESS: Okay. Fine.

3     BY MR. LEVINE:

4     Q.   Fifteen is the one to which GPS does not apply.

5     A.   That's correct.

6     Q.   Okay. Now, you would support Mr. Hinckley will be

7     permitted unaccompanied time in the D.C. area, in Washington,

8     D.C., it says for up to four hours, twice per week, between

9     the hours of eight and three to volunteer at Harbor Lights;

10    transportation to and from Harbor Lights will be provided by

11    the Hospital, and a copy of his intended work schedule will be

12    submitted to the Court with a two-week notice.

13    A.   Yeah. In my report, what I said is that 12 and 15 -- 15

14    was uncertain at the time I wrote my report.  If it has been

15    secured, then I would support it.

16    Q.   All right, sir. And number 12, let's go right no number

17    12 because it relates to that.

18    A.   Right.

19    Q.   Is it -- you note -- well, let's read number 12:  Mr.

20    Hinckley will be allowed unaccompanied privileges in the area

21    of that community for up to four hours, twice per week, on

22    Tuesdays and Thursdays from eight to 12 for volunteer services

23    -- and this says at Housing Partnerships, Inc., plus one hour

24    to cover any transportation delays from the actual volunteer

25    sites.

1    A.    That is what it says.

2    Q.    Yes.  And you would support that were that to ripen into

3    a secure position.

4    A.    Yeah.  At the time I wrote the report, it was off the

5    table.

6    Q.    And were it to be on the table, you would support it.

7    A.    Have at it, yes.

8    Q.    All right.

9         THE COURT:   Now, I take it, though, just so we're

10   clear.  So you would support volunteer service at Housing

11   Partnerships if it were firm and were clearly on the table.

12        THE WITNESS:  And still supported by the treatment

13   team, yes.

14        THE COURT:  Still supported by the treatment team.

15        THE WITNESS:  Right.

16        THE COURT:  With respect to things that might be

17   substituted for Housing Partnerships in the area of his

18   mother's home.

19        THE WITNESS:  Yes.

20        THE COURT: I take it from what you said earlier

21   today that you support the concept of the voluntary service,

22   volunteer work while there.

23        THE WITNESS:  Yes, I do.

24        THE COURT:  But unless and until any of the things

25   that Mr. Beffa put on the table yesterday or any other

1        alternatives were vetted by the treatment team and review

2        board, you would not support them.

3                    THE WITNESS:  That's correct.

4                    THE COURT: But if they were vetted by the treatment

5        team and the review board, and they found them to be

6        therapeutically good  as they apparently did with Housing

7        Partnerships, you would support it.  So your objection, in

8        other words, is not to volunteer services.

9                    THE WITNESS:  No.  It's the process.

10                   THE COURT:  It's the process and the fact that a

11       specific, specific opportunity should be vetted by the

12       treatment team --

13                   MR. LEVINE:  By the Hospital.

14                   THE COURT: -- and the review board.

15                   THE WITNESS:  That's correct.  And the only

16       hesitation I have is that I heard mention of a prison.

17                   MR. LEVINE:  I'm sorry.  I didn't hear the word.

18                   THE WITNESS:  Mention of a prison from Mr.  Beffa.

19       I would not support Mr.  Hinckley volunteering in a prison.

20                   THE COURT: And I took -- it also struck me -- you

21       would not support --

22                   MR. LEVINE:  I hear what he said.  I don't think

23       that -- I think what Mr.  Beffa said was he spoke to somebody

24       who did this kind of work who had done it for a prison.  He

25       wasn't proposing that there be a position at a prison for Mr.

1   Hinckley.

2           THE COURT:  And the other thing you said earlier

3   this morning, Dr. Patterson, and, again, I'm not sure whether

4   you have an answer to this:  You personally think that working

5   in a library in a hospital with --

6           MR. LEVINE:  Mental hospital.

7           THE COURT: -- mental hospital is not a good idea,

8   and if the treatment team and the review board had a different

9   view, where would you stand or are you assuming they wouldn't

10  have a different view?

11          THE WITNESS:  Well, I don't know what view they

12  might have on it.  I don't think it's a good idea.  If they

13  think it's a good idea, I'd certainly want to hear the reasons

14  why and then render whatever opinion I have.

15          THE COURT: I think -- and I hope Mr.  Levine

16  appreciates what I'm trying to do here.  I'm trying to narrow

17  the problems you have with number 12, and I take it a prison

18  should be off the table.  You would say a library in a mental

19  institution you would have problems with, and from your

20  perspective, you would want to hear why the treatment team and

21  review board didn't have problems with it if they didn't.

22          THE WITNESS:  Except the one at St. E's where he

23  works now.  We're good with that one.

24          THE COURT:  But with respect to any of these other

25  things that either was on Mr.  Beffa's list originally or the

1          three or four he mentioned specifically, once it were vetted

2          by the treatment team and the review board, if they in their

3          professional judgment said that made sense to them, assuming

4          it was with the same other conditions that are listed in

5          Paragraph 12, you'd be okay with that?

6                    THE WITNESS:  Yes.

7                    THE COURT: Okay.

8          BY MR. LEVINE

9          Q.    Let's go to 16. This is one where you would be in

10         agreement if there was GPS or if it was determined that a GPS

11         was not necessary to know where he had been.

12         A.    And where he is.  That's correct.

13         Q.    Where he is and where he had been.

14         A.    Yes.

15         Q.    You support this?

16         A.    Yes.

17         Q.    Okay.  You support after six weeks of volunteering --

18         here, it says at HPI, meaning Housing Partnerships, Inc.,

19         but you would say there or elsewhere that has the approval of

20         the Hospital.

21         A.    I would.

22         Q.    You would.  Okay.  And/or Harbor Lights which does have

23         the approval of the Hospital.

24         A.    Right.  And I should say with the exceptions I mentioned.

25         Q.    The volunteer service hours may be increased up to five

1    days per week for four hours per day if deemed appropriate by

2    those volunteer places, Mr. Hinckley, and the treatment team.

3    A.   That's what it says, yes.  And my presumption would be

4    that would also go through a review board, but that's not what

5    it says.

6              THE COURT:  Would what?

7              THE WITNESS:  Go through the review board, same

8    process.

9              THE COURT: Oh.

10             THE WITNESS:  I agree with it as written.  I am

11   saying my presumption was that would also go through the

12   review board.  That would be my presumption.  That's not what

13   it says.

14             THE COURT:  So your presumption is that the

15   treatment team would approve it, and then it would go back to

16   the review board.

17             THE WITNESS:  That's my presumption.

18   BY MR. LEVINE:

19   Q.   And it wouldn't be sufficient for you were it merely to

20   be the treatment team that approved it?

21   A.   That's correct.

22   Q.   Got to have the review board imprimatur as well?

23   A.   You bet.

24   Q.   You bet.

25             THE COURT: It's a quarter to one, and I don't know

1      how much more you anticipate, and I assume Mr.  Zeno may have

2      some redirect, but I will leave it to you whether you think

3      you want to finish soon or whether you want to not finish soon

4      and take lunch and see.

5                  MR. LEVINE:  Would the Court indulge me for a

6      moment, please?

7                  THE COURT: Yes.

8                  MR. LEVINE:  Door number two, Your Honor.  The lunch

9      break.

10                 THE COURT: Okay.  Would -- let me ask counsel while

11     we're taking a lunch break to think about this, as well.  So

12     we finish with your examination of Dr. Patterson.  Mr.  Zeno

13     will have some redirect.  Then the question is whether or not

14     either side in view of developments thinks that they will have

15     any additional witnesses or want to have additional witnesses

16     or call back any witnesses that we've already had.

17                 We set aside this week for this hearing, but,

18     reluctant as I am to say this, I will tell you what my

19     schedule is for next week, and then we also have the issue of

20     closing arguments and/or closing arguments and/or post-hearing

21     submissions.

22                 So I'll tell you what my schedule is for next week.

23     Do you want to say anything, Mr.  Zeno, or --

24                 MR. ZENO:  Your Honor, I was talking with Ms.

25     Chasson.  It's my sense that we're also going to need to

1        consult with the experts because I think they're going to have

2        conflicts, as well.

3                THE COURT:  And your point that you should -- well,

4        you can talk -- even though Dr. Patterson is on the stand,

5        there's no objection to you talking to him about his schedule

6        next week, is there, Mr. Levine, if that's the limitation of

7        their discussion.

8                MR. LEVINE:  No objection to that, Your Honor.

9                THE COURT: Beyond that, there won't be any

10       substantive discussion.

11               MR. LEVINE:  Correct.

12               THE COURT:  But if that helps us think through what

13       we want to do next, I think we'll allow that conversation.

14       Okay.

15               MR. LEVINE:  Sure.

16               THE COURT: I'm available from ten o'clock on

17       Monday.  I'm available Tuesday afternoon and Wednesday

18       afternoon.

19               MR. LEVINE:  Tuesday p.m. and Wednesday p.m.

20               THE COURT: With the exception of I guess I can

21       fairly say from ten o'clock on Thursday.  Friday, no.

22               MR. LEVINE:  Your Honor, may I ask the Court's

23       availability the following week, as well?

24               THE COURT: The following week --

25               MR. LEVINE:  The week that starts with August 4th I

1    believe.

2            THE COURT:  August 4th -- I have a motion's hearing

3    in a case that's supposed to take all morning.  I think it

4    actually is going to take -- it's probably going to take an

5    hour-and-a-half beginning at ten o'clock.

6            MR. LEVINE:  That's August 4th.

7            THE COURT: August 4th.

8            MR. LEVINE:  If you can go through that week, that

9    would be good.

10            THE COURT: The fifth I've got sentencing that says

11    all morning.  I'm not sure which sentencing it is.  And then

12    I've got a conference --

13            MR. LEVINE:  What did you say on the fifth?

14            THE COURT: The fifth it looks like that sentencing

15    is going to have live witnesses, and then I've got a

16    conference call from one until 2:30.

17            MR. LEVINE:  Until 2:30, Your Honor.

18            THE COURT:  Yeah.  If I needed to I could maybe we

19    could start by two, but certainly the rest of the

20            MR. LEVINE: Tuesday at 2:00 p.m.?

21            THE COURT:  Right.  The sixth I've got all day, and

22    that's it for that week, but you know if --

23            MR. LEVINE:  That's it for the rest of the week, not

24    Thursday, not Friday?

25            THE COURT: Not Thursday or Friday.

1              MR. LEVINE:  Thank you, sir.

2              THE COURT:  Okay.  So we've got that clear in terms

3    of as you think about what we want to do with the remainder of

4    this afternoon or if not, once we finish with Dr. Patterson --

5    if there is something we can usefully do this afternoon, we

6    can do it, but, otherwise, that's my schedule after this

7    afternoon.

8              So you want to come back at two o'clock since it's

9    ten to one now?

10             MR. LEVINE:  Surely, Your Honor.

11   *                        *                        *

12             (Whereupon, there was a lunch recess at this time;

13   thereafter, court resumed.)

14   *                        *                        *

15             THE COURT:  Good afternoon, everybody.  All right.

16   Mr. Levine, if you're ready and Dr. Patterson is ready, we can

17   resume.

18             MR. LEVINE:  Thank you, Your Honor.

19   BY MR. LEVINE:

20   Q.   May it please the Court.

21             THE COURT: Yes, sir.

22   BY MR. LEVINE:

23   Q.   Good afternoon, Dr. Patterson.

24   A.   Good afternoon, Mr.  Levine.

25   Q.   Dr. Patterson --

1              MR. LEVINE:  Court's brief indulgence, Your Honor.

2              THE COURT: Yes, sir.

3              MR. LEVINE:  I'm going to try and really make this

4      short.

5              THE COURT:  We've got all afternoon.

6              MR. LEVINE:  Excuse me?

7              THE COURT: We've got all afternoon.

8              MR. LEVINE:  It doesn't mean I should use it all.

9              THE COURT:  My thoughts exactly, Mr. Levine.

10             MR. LEVINE:  We share a common view on that.

11             THE COURT: Nor should Dr. Patterson.

12             MR. LEVINE:  He's by the hour, Your Honor.

13             THE COURT: I'm not going to go down that road.

14     BY MR. LEVINE:

15     Q.   You say in your report, Dr. Patterson, that the six days

16     would be adequate because therapeutic sessions or services

17     provided by the treatment team have been very helpful to Mr.

18     Hinckley, and he shouldn't miss them; is that a fair

19     distillation of your view?

20     A.   Yes, sir.

21     Q.   Do you know if Dr. Lee has been likewise very helpful to

22     Mr. Hinckley while he was on conditional release?

23     A.   No, I don't.

24     Q.   You don't know.  As a matter of fact, you never even

25     talked to Dr. Lee; isn't that true?

```
1    A.    I did try, but we didn't reach each other; that's
2    correct.
3    Q.    You didn't speak to him?
4    A.    That's correct.
5    Q.    And you were appointed in this case to do an evaluation
6    when?  When did you know that this report would be due?
7    A.    I'm not quite sure when I knew it.  Probably, May
8    sometime.  Maybe --
9    Q.    Probably in May.
10   A.    Maybe around then.
11   Q.    And you didn't deliver your report until July 7th.
12   A.    That's the date it was due.
13   Q.    And between May and July 7th, you never talked to Dr.
14   Lee?
15   A.    No.  We left several phone messages for each other, but
16   we never did speak.
17   Q.    All right.  You called him, and he called you.
18   A.    And I called him, and he called me; back and forth.
19   Q.    It is important to know, is it not, whether Dr. Lee was
20   as the treatment team has been very helpful to Mr.  Hinckley
21   while he's on conditional release?
22   A.    No.  It wasn't as important to me because the conditional
23   release plan was to change Dr. Lee to covering psychiatrist.
24   Q.    Well, wouldn't it be -- wasn't it important for you to
25   know irrespective of a change in his role to know whether he,
```

the "man in Havana", would be available to provide helpful

services, indeed very helpful services to Mr. Hinckley while

on conditional release?

A.   My presumption was the treatment team would not have

listed him as the covering psychiatrist if he was not going to

be available.

Q.   Do you concede that he provided helpful services?

A.   The notes are difficult to get that sense from that he's

written.  They don't have a lot of content, but it seemed that

he was meeting with Mr. Hinckley regularly, but it also was

true that the treatment team determined that they wanted to

make a change.

          THE COURT: Okay.  Can you wait one second?  I think

--

          (Whereupon, the court reporter had to change tapes.)

          THE COURT:  Okay.  Go ahead, Mr.  Levine.

          MR. LEVINE:  Thank you, Your Honor.

BY MR. LEVINE:

Q.   You make -- you advance the contention in your report

that the treatment team is very helpful and the help it

provides should continue to be available each week; is that

correct?

A.   That's correct.

Q.   And that is why you oppose extending the time to the

length of time that the Hospital proposes.

1    A.    That's part of it, not all of it.

2    Q.    Now, with respect to that part, isn't it important to

3    know whether the very help that is provided by the treatment

4    team could be available to Mr.  Hinckley while on conditional

5    release in the area where his mother's home is located?

6    A.    In my opinion, it wouldn't be the very help.  It wouldn't

7    be the same therapist.

8    Q.    Well, does it need to be the very help?

9    A.    Yeah, it does.

10   Q.    Doesn't it need to merely be -- and I don't mean to be

11   dismissive of the import of this -- doesn't it merely need to

12   be helpful, very helpful, in working through the

13   disappointments and conflicts in his relationships?

14   A.    No.  It doesn't merely need to be very helpful in working

15   through the disappointments and conflicts in his

16   relationships.

17   Q.    Isn't it exactly that to which you made reference in

18   saying that's the reason why he needs to have access to the

19   treatment team each week?

20   A.    With these therapists, that's correct.

21   Q.    With these therapists.  So that's a formula,

22   Dr. Patterson, for saying never leave these therapists, isn't

23   it?

24   A.    No, it's not.

25   Q.    That's a paralysis, isn't it?

1    A.    No, it's not.

2    Q.    If you're going to keep him here to see these therapists,

3    that limits the opportunity, the days to be sure, that he has

4    to go elsewhere to reintegrate into the community located

5    elsewhere; isn't that true?

6    A.    It limits the days to what he already has, and the

7    benefit of his seeing these therapists and that treatment

8    team, I think, is essential during a transition phase, and

9    that's what this is, at least that's what it's promoted to be,

10   a transition.

11        So you have 12 visits to see if the transition is working

12   and that the handoff, which we talked about last year, is

13   being successful.

14   Q.    Is it your contention, sir, that -- or your opinion --

15   that these therapists are indispensable to Mr. Hinckley's

16   well-being?

17   A.    At this point in time, I believe that they are very

18   valuable.  I would not say they are indispensable because

19   something, unfortunately, could happen where they would not

20   available.

21   Q.    All right.

22   A.    But I have every confidence the Hospital would find good

23   therapists as part of the treatment team to replace them if

24   they had to, but they don't have to.

25   Q.    And with respect to whether or not Dr. Lee would be

1    equally valuable, that is a matter which you, at the time you

2    wrote your report, never perfected in the way of inquiry of

3    him?

4    A.   Didn't see any need to do that since he was not going to

5    be the therapist under this current proposal.

6    Q.   So it was only important to see if Mr. Beffa would be

7    equally valuable; isn't that correct?

8    A.   No.  I tried to contact Dr. Lee, as I mentioned.  I did

9    talk to Mr. Beffa, and at the time I talked to him, I thought

10   he was probably going to be okay, and then I heard him talk up

11   here.

12   Q.   Well, then you heard him talk.  The time -- withdrawn.

13   As a matter of fact, sir, you did your own vetting process of

14   Mr. Beffa during your interview with him, right?

15   A.   In part, that's right.

16   Q.   In part.

17   A.   Yes.

18   Q.   I mean you did it to your complete satisfaction.

19   A.   No.  No.  No.  That's not how this works.

20   Q.   Is there anything else you wanted to do that you weren't

21   able to do with respect to the vetting by you of Mr. Beffa?

22   A.   Well, that's why I said in part.  The other part of this

23   is to see how it works.  The same thing happened with Dr. Lee.

24   Last year, the treatment team said Dr. Lee.  After a year,

25   they decided, no, not Dr. Lee.  The treatment team has the

1    same process with Mr.  Beffa.  They might decide in a year,

2    yes, or, no, but that's part of what this is about.

3    Q.   This treatment team, this hospital, about -- what was the

4    word you used, the stellar hospital.

5    A.   I don't think I called the Hospital stellar.  That was

6    Montalbano.

7    Q.   Oh, Dr. Montalbano.

8    A.   Yes.

9    Q.   And the treatment team is stellar.  Mr. Henneberry is

10   stellar.  Is that your testimony?

11   A.   Joe is absolutely unique.

12   Q.   Unique and stellar.

13   A.   I didn't say it before, but I'll say it now, yes, and

14   stellar.

15   Q.   That's the team that vetted Mr.  Beffa and approved him

16   as reflected by the plan to the review board.

17   A.   Okay.  Yes.

18   Q.   They got it wrong?

19   A.   Yes.

20   Q.   In your not so humble view.

21   A.   I don't know if it's humble or not, but that's my view.

22   Q.   Now --

23            THE COURT: Well, did you feel that way at the time

24   you wrote your report or only after you heard the testimony?

25            THE WITNESS:  Only after I heard the testimony, Your

1    Honor, and I have admitted I did not ask him certain questions

2    that I pretty much assumed that he would know, and he didn't.

3    BY MR. LEVINE:

4    Q.   It is your view, Dr. Patterson, that the Hospital should

5    continue to pursue volunteer employment opportunities for Mr.

6    Hinckley; isn't that right?

7    A.   Yes, that's right.

8    Q.   And should the Hospital decide to change volunteer

9    opportunity -- volunteer positions for Mr. Hinckley, it is

10   your view that when an agreement for volunteer services is

11   reached that that agreement should be presented to the Court

12   for its approval; is that correct?

13   A.   I believe I said two weeks in advance.

14   Q.   Approval two weeks in advance.

15   A.   Yes.

16   Q.   All right.   Now, that's not merely giving notice to the

17   Court, is it?

18   A.   No.

19   Q.   That's seeking the Court to put its approval on that

20   change; is that correct?

21   A.   I believe it is.   I just want to check the language, but,

22   yes, I think so.

23   Q.   Well, if you want to find out where you wrote that, it's

24   on Page 39 of 39 pages.

25   A.   Oh, good.   Thank you.

1    Q.   And your recollection of it is correct, two weeks --

2    present to the Court for its approval at least two weeks in

3    advance of implementation.  That's what you wrote did you not?

4    A.   Yes, I did.

5    Q.   And is it your vision of this proceeding that the

6    Hospital would give the Court two weeks' notice, and then the

7    Court would hold a hearing to determine its approval?

8    A.   That wasn't my envisionment(Phonetic).  That's up to the

9    Court.

10   Q.   You would contemplate that the Court would approve it

11   without hearing or getting the benefit of the advocacy of the

12   government and Mr. Hinckley's counsel.

13   A.   I think that would be up to the Court.

14   Q.   Up to the Court.

15   A.   Yeah.

16   Q.   All right.  So on matters -- on that matter, the change

17   of a volunteer position, that not only requires the approval

18   of the Hospital and the Hospital Review Board as you would

19   have it.

20   A.   Yes.

21   Q.   But it also requires the approval of the Court.

22   A.   That's my recommendation, yes.

23   Q.   What is it that you envision the Court would provide that

24   the Hospital review board wouldn't provide?

25   A.   Judicial approval.

1  Q.  Does that contemplate that you at 750 an hour and

2  Dr. Phillips who undoubtedly, suitably compensated would then

3  get to opine on the change proposed by the Hospital's review

4  board?

5  A.  Not necessarily.  That would be, as I said, entirely up

6  the Court.

7  Q.  Up to the Judge.

8  A.  Sure.

9  Q.  And if the Judge were to conclude that that would be a

10 useful thing, this two-week notice provision would probably

11 become a six-to-eight month matter, wouldn't it?

12 A.  I wouldn't think so.

13 Q.  You wouldn't think so.   Maybe four to six months.

14 A.  I don't know.

15 Q.  Have we ever done it in less than six to eight months?

16 A.  I don't know.

17 Q.  You've been involved in this case a long time, sir.

18 A.  I have.

19 Q.  Have we ever done it in less than six to eight months?

20       MR. ZENO:  Objection.  What's the basis?  There's

21 never been a proposal to have volunteer activities submitted.

22       MR. LEVINE:  Have we ever -- is that an objection?

23       THE COURT:  I  think it's an objection.  I guess the

24 real objection is have we ever done "it" in less than "x"

25 number of months.  What is "it"?  I guess -- I interpreted the

1    question to mean have we ever had a situation where the

2    Hospital has recommended something and by the time we get

3    Dr. Phillips and Dr. Patterson to talk to whomever they have

4    to talk to and write a report, and the government writes a

5    memo and the defense writes a memo and we find a date when

6    everybody is available to show up and testify, has it ever

7    been less than "x" --

8              MR. LEVINE:  Six to eight months, and has it ever

9    been less than --

10             THE COURT:  Well, that's the question.  Has it ever

11   been less than six to eight months, question mark.

12             MR. LEVINE:  Yes.  Question.

13             THE WITNESS:  For what the Judge just described --

14             MR. LEVINE:  Yes.

15             THE WITNESS:  That sounds like ballpark to me.

16   BY MR. LEVINE:

17   Q.   That's at a pretty accelerated pace, too, isn't it,

18   because mostly it takes longer.

19   A.   I really don't know.  But this is a very limited change

20   from one site to another site.  If the Judge decided I'll look

21   at it and approve it or not approve it, who am I to say that's

22   not the right thing to do.  I'm not.

23             THE COURT: Well, I don't want to get in the middle

24   of this discussion, but it does seem to me that -- to me, at

25   least, this sounds more akin to I get an itinerary.  I look at

the itinerary. I know he's going to his mother's home on

certain dates, and to my -- and in my recollection, I have

never done anything after reading the itinerary, but it is

either explicit or implicit in everybody's mind that if

something bothered me about what was proposed that I could

take the initiative and get everybody in here.

MR. LEVINE:  Yes.  That's surely our --

THE COURT:  But there's no requirement that I

approve the itinerary, and, similarly, when the reports from

the trips come back, I get all of those, too, and everybody

assumes and presumes that if something has gone wrong, the

Hospital would put a stop to it before the next one.

MR. LEVINE:  Yes.

THE COURT: But if I had any inclination -- if I were

troubled, I could also get everybody in here or get everybody

on the telephone and say I'm troubled by this.  What's the

Hospital doing about it, right

MR. LEVINE:  Of course.  The Court could do as it

wishes.  It could summons the parties.  It could approve or

disapprove, but this recommendation, Dr. Patterson, is one

that says there should be an approval process by the Court; is

that correct?

THE WITNESS:  That's what it says, yes.

BY MR. LEVINE:

Q.   I'm sorry?

A.   That is what it says, yes.

Q.   You don't see that as something in the nature of somewhat officious intermeddling to the process of the Court and its prerogative?

A.   No, I don't.  I saw it more along the line as what the Judge just described as getting the itinerary.  The itinerary in this case would be about a volunteer services position that changed.

Q.   And it is your view that the Court should be involved in the assessment as to whether a volunteer position is suitable?

A.   I would say it is the same kind of process that the Court is getting the itinerary and could say this is not appropriate, I don't see why this would be any different.

        MR. LEVINE:  The Court's indulgence for a moment. Nothing further, Your Honor.

        THE COURT: Let me just ask one more question about Mr. Beffa.

        THE WITNESS:  Yes, sir.

        THE COURT: On Page 26 of your report, it says -- and this is in the midst of your discussion about your meeting with or interview of Mr. Beffa.

        THE WITNESS:  Uh-huh.

        THE COURT:  It says:  Mr. Beffa stated he has no impressions regarding Mr. Hinckley's relationship with women at this time, and the records are so voluminous, he hasn't had

1     much time to review them in his role as case manager.

2             Was there any further discussion with him about the

3     importance of getting impressions about his relationships

4     with women or how he would go about it or what Mr.  Beffa's

5     intentions were with respect to reviewing the voluminous

6     records?

7             THE WITNESS:  He said he didn't know anything about

8     the relationships and then he added that he hadn't had time to

9     review things, that he was going to be coming up to speed by

10    talking with the Hospital.

11    BY MR. LEVINE:

12    Q.   Is there anything about his testimony that you heard the

13    other day that is inconsistent with that?

14    A.   Yes.

15            MR. LEVINE:  I would submit the answer is "no".

16    Your Honor will recollect what the evidence is.  Nothing

17    further, Your Honor.

18            THE COURT:  Well, we just spent a couple of hours

19    hearing why Dr. Patterson thinks the answer is "yes".

20            MR. LEVINE:  I think Dr. Patterson may have

21    distinctly misheard the evidence.

22            THE COURT: Mr.  Zeno.

23            MR. ZENO:  No questions, Your Honor.  Thank you.

24            THE COURT: Okay.   Thank you, Dr. Patterson.

25            THE WITNESS:  Thank you, Your Honor.

**[End of Dr. Patterson's testimony]**

C E R T I F I C A T E

I, Wendy C. Ricard, Official United States Court Reporter in and for the District of Columbia, do hereby certify that the foregoing proceedings were taken down by me in shorthand at the time and place aforesaid, transcribed under my personal direction and supervision, and that the preceding pages represent a true and correct transcription, to the best of my ability and understanding.

_____

Wendy C. Ricard, RPR,CCR

Official U.S. Court Reporter