1              UNITED STATES DISTRICT COURT

2                  DISTRICT OF COLUMBIA

3

4    UNITED STATES OF AMERICA        CRIMINAL ACTION NO. 81-306

5                                    WASHINGTON,D.C.

6    VERSUS                          THURSDAY, JULY 24, 2008
                                     (REDACTED)

7

8    JOHN W. HINCKLEY, JR. (ST. ELIZ.)  9:45 A.M.

9

10                 **EVIDENTIARY HEARING(DAY 4)**
                   **(Testimony of KARL BEFFA)**

11

12            BEFORE THE HONORABLE PAUL L. FRIEDMAN

13              UNITED STATES DISTRICT COURT JUDGE

14

15   A P P E A R A N C E S:

16

17   FOR THE PLAINTIFF            THOMAS E. ZENO, ESQ.
                                  SARAH T. CHASSON, ESQ.
                                  U.S. ATTORNEY'S OFFICE
18                                555 Fourth Street, NW
                                  Suite 5423
19                                Washington, DC 20530
                                  (202) 514-6957
20

21   FOR THE DEFENDANT
     JOHN W. HINCKLEY, JR.
22                                BARRY W. LEVINE, ESQ.
                                  ADAM S. PROUJANSKY, ESQ.
                                  ANN-MARIE LUCIANO, ESQ.
23                                DICKSTEIN SHAPIRO, LLP
                                  1825 Eye Street, NW
24                                Washington, DC 20006-5403
                                  (202) 420-2237
25

```
1    ST. ELIZABETHS HOSPITAL           TONYA A. SAPP, ESQ.
                                        D.C. ATTORNEY GENERAL'S
2                                       OFFICE
                                        441 4th Street, NW
3                                       Suite 1060 North
                                        Washington, DC 20001
4                                       (202) 724-5562

5    REPORTED BY:                       WENDY C. RICARD, RPR,CCR
                                        OFFICIAL COURT REPORTER
6                                       333 Constitution Ave., NW
                                        Room # 6718
7                                       Washington, DC  20001
                                        (202)354-3111

8

9    Proceedings recorded by mechanical stenography.

10   Transcript produced by computer-aided transcription.

11

12                       I N D E X

13   EXHIBITS:                                          PAGE:

14       Patient No. 8 & 9(letters/Services Board       33

15       Patient No. 10(The Gazette article)            35

16       Patient No. 7(letter/Vibrant Life Ministries)  38

17       Patient No. 11(Risk assessment/Dr. Montalbano) 84

18       Patient No. 12(e)petition                      87

19       Patient No. 4 (9/4/07 note/Dr. Montalbano      87

20       Patient No. 5 (psychotherapy note/Dr. Binks    87

21   WITNESSES:

22       KARL BEFFA ...................

23          By Mr. Levine....................... 8

24          By Ms. Chasson...................... 49

25
```

# P R O C E E D I N G S

1

2      MR. LEVINE:  Good morning, Your Honor.

3      MR. ZENO:  Good morning, Your Honor.

4      THE COURT: Good morning, everybody.

5      THE DEPUTY CLERK:  Criminal 81-306, United States of

6  America versus John W. Hinckley, Jr.; for the government, Mr.

7  Zeno and Ms. Chasson; for the patient, Mr. Levine, Mr.

8  Proujansky, and Ms. Luciano.

9      THE COURT: Okay.  Anything anybody needs to raise

10  before Mr.  Levine calls his next witness?

11      MR. LEVINE:  Please, Your Honor.  I have one matter.

12      THE COURT: Could you come up to the microphone, Mr.

13  Levine, so everybody can hear you, particularly the court

14  reporter.

15      MR. LEVINE:  Please, Your Honor.  Yesterday, in the

16  course of the cross-examination and then following it, there

17  was a short colloquy with the Court about whether the

18  government had opposed the expansion of these conditional

19  releases, and Mr.  Zeno in his cross made the suggestion that

20  they didn't oppose everything, and it had always been our

21  belief that they had in fact opposed everything.

22      As a matter of fact, we recall even getting three

23  additional conditional releases pending the hearing was

24  opposed by the government.  They sought to stop them all.

25  Over that objection, Your Honor, entered an order allowing

1    three more.

2            That having been said, if the government's view is

3    that they don't oppose it all, we would ask them to tell us

4    that which they do not oppose so we can understand now what is

5    being litigated, what do they agree, and what do they disagree

6    to.  I think that's very important as we go forward.

7            THE COURT:  Mr. Zeno, do you want to respond to

8    that?

9            MR. ZENO:  Unless the Court wants me to do so.

10           MR. LEVINE:  Well, we would like a response, Your

11   Honor, because he put that right out there to the witness,

12   and if he opposes all expansion --

13           THE COURT:  Well, I think that that's what he

14   opposes, expansion.

15           MR. LEVINE:  Well, in the past he opposed even

16   giving a continuation of exactly what he had.  That's what we

17   sought.  The Court entered an order allowing three more of

18   exactly what we had.

19           THE COURT:  Mr. Zeno can speak to it if he wants

20   to.  I understand his colloquy in discussion with

21   Dr. Rafanello was -- the implication related to the word

22   "expansion", that the government opposes expansion of

23   privileges, more days, more freedom, more opportunities, and

24   you know he can speak for himself, but he did oppose the three

25   additional beyond the original six unless and until we had a

1    hearing.

2              MR. ZENO:  And Your Honor --

3              THE COURT:  Rather than be cryptic, why don't you

4    say something.

5              MR. ZENO:  Okay.  Your Honor, the government -- it's

6    not on the record, so the government should put it on the

7    record.  We did not oppose the emergency releases in this

8    case.  The government has not -- so Mr.  Levine may draw

9    whatever conclusions he wants from the positions we take.  We

10   stated in our motion what we believe about this, and we think

11   it should be litigated, particularly, now.  Our experts are

12   ready to say some things that this Court needs to hear because

13   the Court is finally signing the order, it's not the

14   government or the patient who makes the decision.  So we think

15   it's very important to proceed and to put all --

16             THE COURT:  Well, I understand that Dr. Phillips and

17   Dr. Patterson don't oppose everything.

18             MR. ZENO:  That's correct, they don't.

19             THE COURT: But it's not clear whether you -- to what

20   extent you agree with your own experts and to what extent you

21   disagree with your own experts, and I think in the past there

22   -- you know I recall some arguments that you or Mr.  Chapman

23   made at the end of the hearing where you didn't agree with

24   your own experts entirely.

25             MR. ZENO: That's correct.  And Your Honor, at the

1    beginning of this hearing, I believe our comments focused on

2    the extension of the days, and we have repeatedly said that

3    the things Mr.  Hinckley has asked to do regarding Phase IV

4    activities can be done within six days, and that is our

5    position.  There is no reason to go beyond the six days, and,

6    in fact, because of Mr.  Hinckley's condition, there are

7    significant reasons not to go beyond it.

8              MR. LEVINE:  Well, Your Honor, if I may ask this

9    question because I think this really helps the Court and helps

10   all parties in litigation of this matter:  Do they agree to

11   all the proposals made by the hospital with the exception of

12   the duration, the --

13             THE COURT:  Clearly not.  He said that in his

14   opening statement.  I've got my notes from his opening

15   statement.  Mr. Zeno made it clear that he didn't agree with

16   all of the proposals made by the hospital.

17             MR. LEVINE:  Well, I guess the question, Your Honor,

18   is and  I think it would be useful to get an answer:  Which

19   parts of this proposal --

20             THE COURT: Why don't we save that for closing

21   argument.

22             MR. LEVINE:  Okay.  I was trying to help the Court,

23   Your Honor.

24             THE COURT:  Well, I think it would be helpful for me

25   to hear from Dr. Patterson and Dr. Phillips, and Dr. Patterson

1    agrees with a lot of what's in the hospital proposal.  Some he

2    doesn't.  Some he agrees with caveats.  Some he -- the last

3    two pages of Dr. Patterson's report -- I'm not sure whether

4    Mr. Zeno agrees with everything Dr. Patterson said -- but the

5    last two pages of Dr. Patterson's report, I find quite helpful

6    and understanding where there is agreement and disagreement --

7    not between and among the lawyers, but between and among the

8    professionals and that I find very helpful.

9         Now, Dr. Patterson and Dr. Phillips have sat here

10   all week, and they may have modified their views in some ways

11   based on what they've heard; maybe it would be more favorably

12   to Mr. Hinckley's position or the hospital's position or it

13   may be less favorably.  The only way we're going to know is

14   after I hear from them.

15        And I know what Mr. Zeno said in his opening

16   statement, and one of the things he said was that:  Enough

17   time already exists, six days or six nights, whatever it is,

18   for Mr. Hinckley to engage in Phase IV activities, volunteer

19   activities, driving, social activities.  The goals can be

20   accomplished in six days.  He said he doesn't like the D.C.

21   option at all and that he is concerned that the local support

22   system is not in place.  And we've learned more about the

23   local support system during the course of the hearing, and

24   we've learned more about the availability or lack of

25   availability of volunteer activities, and I assume that this

1    morning we're going to learn a lot about what is in place or

2    almost in place and how things are going to -- I don't want to

3    put too much a burden on Mr. Beffa, but I think we'll learn a

4    lot from Mr. Beffa about what he's done and how he sees

5    things going forward and how he sees his role, and that will

6    help me considerably. It may help Dr. Patterson and

7    Dr. Phillips in terms of their current views, as well.

8              MR. LEVINE: With that, Your Honor, we'll call

9    Dr. Beffa with the Court's permission.

10              THE COURT: Good. Yes, sir.

11              MR. LEVINE: Mr. Beffa, excuse me.

12    *              *              *              *

13    **KARL BEFFA**, called as a witness in this case, after

14    having been duly sworn by the deputy clerk, testified as

15    follows:

16    *              *              *              *

17              MR. LEVINE: May I proceed, Your Honor?

18              THE COURT: Yes, sir.

19    **DIRECT EXAMINATION BY MR. LEVINE:**

20    Q.   Good morning, Mr. Beffa.

21    A.   Good morning.

22    Q.   Would you please for the record state your name.

23    A.   Karl Beffa.

24    Q.   And, sir, do you have an occupation?

25    A.   Clinical social work.

```
 1     Q.    And how long -- are you a licensed social worker?

 2     A.    I am.

 3     Q.    And how long have you been a licensed social worker?

 4     A.    Since 1971.

 5     Q.    And how long have you -- do you work at the Family Living

 6     Institute living Institute?

 7     A.    I do.

 8     Q.    And for how long have you worked at the Family Living

 9     Institute living Institute?

10     A.    I founded it in 1981.

11     Q.    Is your practice -- do you know the Hinckley family?

12     A.    Yes.

13     Q.    And you know where they live?

14     A.    Yes.

15     Q.    And is your practice located near the Hinckley residence?

16     A.    It is.

17     Q.    And how long have you been practicing in that area?

18     A.    In the local area?

19     Q.    In the area where that home is located.

20     A.    Has been since 1973.

21     Q.    And prior to working at the Family Living Institute, what

22     kind of -- what positions have you held in the area of that

23     home?

24     A.    Worked at what's call the "CSB", the local mental health

25     center from '73 until '81.  That's the only position.
```

1    Q.   So you've had -- from there, you went to the Family

2    Living Institute?

3    A.   Yes.  With some moonlighting in between.

4    Q.   What did you do in the earlier job?

5    A.   At the CSB?

6    Q.   Yes.

7    A.   Clinical social work.  Everything from intake to therapy

8    to discharge.

9    Q.   Do you have an expertise in the diagnosis of mental

10   illness?

11   A.   Yes.

12   Q.   And have you made diagnoses using the DSM-IV and its

13   various iterations over the course of that time?

14   A.   I have.

15   Q.   All right.  And you are familiar with the Axis I, II,

16   III, IV, and V?

17   A.   I am.

18   Q.   And is it part of your expertise to provide

19   psychotherapy?

20   A.   It is.

21   Q.   And for how long have you provided psychotherapy to

22   patients?

23   A.   Since 1971 when I graduated.

24   Q.   In the course of your work providing psychotherapy, do

25   you work with patients who have been diagnosed with psychosis?

1    A.    I do.

2    Q.    And do you work with patients who have been diagnosed

3    with major depression?

4    A.    I do.

5    Q.    And do you know a "Dr. Lee"?

6    A.    Yes, I do.

7    Q.    How do you know Dr. Lee?

8    A.    He joined our staff as our psychiatrist approximately

9    eight to 10 years ago.

10   Q.    And do you work with Dr. Lee?

11   A.    Closely.

12   Q.    And tell us about how you work with Dr. Lee?

13   A.    With him being the psychiatrist, he does all the

14   medication and the therapist in the institute to the therapy.

15   So we coordinate cases.  He'll refer to us when he needs a

16   therapist involved, and we refer to him when we need

17   medication involved.

18   Q.    And do you confer as appropriate with Dr. Lee about the

19   patients that you jointly service?

20   A.    Yes, uh-huh.

21   Q.    And do you typically provide therapy in case management

22   services?

23   A.    I would incorporate that into the therapy process.  I

24   don't technically do case management, per se, as I would have

25   done when I worked in state hospitals.  However, yes, in

1    general, I do do case management as part of my therapy.

2              THE COURT:  What does case management mean exactly?

3              THE WITNESS:  It's primarily assisting a person to

4    become acclimated in the community dealing with any life

5    issues that they need to address, that they need assistance

6    with; helping the person deal with everyday life.

7    BY MR. LEVINE:

8    Q.   Mr. Beffa, are you in the process of becoming familiar

9    with the history of Mr. Hinckley, mental health history?

10   A.   Yes.

11   Q.   And are you familiar with his diagnosis?

12   A.   I am.

13   Q.   And how have you learned or become familiar with or

14   become engaged in the process of becoming familiar with his

15   history?

16   A.   Initially, I believe it was October of '06, Kevin

17   Shamblee had interviewed me as a consideration to be involved

18   with the hospital team and with Dr. Lee to be a case manager,

19   and then I've had received reports from the hospital back --

20   starting - I was interviewed by the Hinckley family in

21   October, and then when it looked like I was going to be on

22   board, I started receiving reports back in February of '07.

23   Q.   And have you had occasion to read the risk assessment in

24   2008 by Dr. Montalbano?

25   A.   I have.

1   Q.   And have you read Dr. Montalbano's first Risk Assessment

2   in -- dated in 1999?

3   A.   I did.

4   Q.   And in the 1999 Risk Assessment is there copious and

5   lengthy reference to this patient's mental health history?

6   A.   Yes.

7   Q.   Have you read the 2008 reports by Dr. Phillips and

8   Patterson?

9   A.   I have.

10  Q.   And have you read Dr. Phillips' report of 2003?

11  A.   I did.

12  Q.   And have you received any of Dr. Binks' therapy notes?

13  A.   I have.

14  Q.   And what is Mr.  Hinckley -- well, do you know Mr.

15  Hinckley?

16  A.   I do.

17  Q.   Is that this gentleman right here?

18  A.   Good morning, John.

19  Q.   And what is his diagnosis?

20  A.   The first diagnosis is major depression in remission,

21  full remission, and the other one is psychosis specified, in

22  full remission.

23  Q.   Now, when did you start to meet with Mr.  Hinckley?

24  A.   My first meeting was with he and his mother in October of

25  '06.

Q.   And over the past year, approximately how many times have

you met with Mr.  Hinckley?

A.   It's been five or six with one phone call.

Q.   And how long are you meetings typically?

A.   Forty-five minutes.

Q.   And what was your role when you met with Mr.  Hinckley

during those occasions?

A.   To do case managing; to first of all, try to begin

establishing a relationship; assisting him with transitioning

in and around the community; knowing the community better;

assisting him in trying to find things that he would occupy

his time constructively in the area.  Basically, to getting

adjusted locally.

Q.   Would those be the goals of those meetings?

A.   Yes.

Q.   And what did you discuss with Mr.  Hinckley?

A.   The primary thing has been what we can work out that he

could use his time more constructively when he's in the area

in line with the various hurdles that were presented in the

process of doing that within the structure of the Court -- the

Court --

Q.   Court orders.

A.   Orders, yes.

Q.   Now, after your meetings with Mr.  Hinckley, did you

provide to the hospital in the form of an individual relapse

1    prevention form what you observed?

2    A.   Yes.  Dr. Lee and I would both coordinate on that and

3    checkmark and sign those forms.

4    Q.   And in addition to providing the hospital with those

5    forms, did you all participate in telephone calls with the

6    hospital before or after the conditional releases?

7    A.   Yes.  Uh-huh.

8    Q.   Let's talk a little bit about the activities in that

9    community that might be available for Mr.  Hinckley.  Let's

10   start with the social activities.  What types of recreational

11   or social activities have you looked into for Mr.  Hinckley?

12   A.   The primary one that I thought would be a fantastic

13   social outlet for John would be an organization called SALT;

14   acronym that stands for Singles Affirming Life Together.

15        We also talked about possibly recreational activities

16   like bowling or hiking or things of that nature, but some of

17   that was impossible because, obviously, he's not going to take

18   his mother on a hike on the trail, so it's mainly isolated to

19   walking around the community.  Other than that, it was very

20   limiting socially because of the restriction of having to be

21   accompanied everyplace.

22   Q.   In order to implement what you think would be appropriate

23   social or recreational activity, would there have to be a

24   lifting of those restrictions by the Court?

25   A.   Definitely.

1    Q.   What types activities do you for see Mr.  Hinckley

2    participating in assuming the Court were to approve them

3    without -- approve it so that he could do it unaccompanied by

4    a responsible or custodial-type person?

5    A.   In addition to the physical kinds of things like I say,

6    bowling or hiking or tennis or any kind of sports activities,

7    there's numerous museums; at least like about five or six art

8    museums plus other types of museums in [the city] area.

9         Within an hour drive of [the city] in the local

10   communities, there are other museums.  Being a nautical area,

11   there are those kinds of museums, so there's lots of art and

12   culture locally.

13   Q.   It's a historical place.

14   A.   It is.

15   Q.   And all those facilities would be available to Mr.

16   Hinckley, as well?

17   A.   Definitely.

18   Q.   Well, you mentioned "SALT", Singles Affirming Life

19   Together; how did the idea of that emerge?

20   A.   I had suggested it to him because, because as I said,

21   even though a family member may not accompany -- maybe would

22   not necessarily have to accompany, I understood that it might

23   be worked out that they could stay in the parking lot while he

24   went in and began to meet some people in his age group from

25   the community.

Q.   And there did come a time when his brother and sister were added to the Court order as responsible persons so we could do that without his mother.

A.   Yes.

Q.   Since Mr. Hinckley's visit, have you had -- or conditional release -- have you had the opportunity to speak with members of SALT about what happened when Mr. Hinckley and his sister attended one of those gatherings?

A.   I have had the opportunity of talking with members of SALT. I have not really talked with John yet to understand the experience that occurred.

Q.   With whom did you speak at SALT?

A.   I spoke with a -- every once and awhile, they advertise in the local newspaper, and I characteristically would cut out those articles and save them so I could pass them on to my patients, that I think would help them in their socialization process. So I had given two articles to John and included three or four different phone numbers, and I myself called those phone numbers after I heard the horrible experience he had and found out that -- I talked with a woman who had previously been with SALT and had stopped going about six months ago, and then I talked with the outgoing chairperson who actually was the person who came and introduced herself to John and his sister when they went there, and I spoke with the incoming chairperson. Those are the only three.

1    Q.   All right.  And did the SALT members know ahead of time

2    that Mr.  Hinckley would be attending?

3    A.   Unfortunately, I understand that Robert Phillips had

4    interviewed or talked with the SALT liaison with the church

5    where SALT is held.  So she had the information about John

6    coming, and that quickly, very quickly, got spread around to

7    SALT personnel.

8    Q.   And do you believe this affected how Mr.  Hinckley was

9    received when he and his sister arrived at the SALT meeting?

10   A.   In a greatly damaging manner.

11   Q.   I'm sorry?

12   A.   In a greatly damaging manner, yes.

13   Q.   If I may just go back to an area that I covered a moment

14   ago, I neglected to ask a question.  When you indicated the

15   diagnosis of Mr.  Hinckley, you gave us the Axis I.  You told

16   us psychosis, NOS, in full remission and you told us major

17   depression in full remission.  Does he have an Axis II

18   diagnosis?

19   A.   Narcissistic personality.

20   Q.   All right.  Let's talk briefly about the volunteer

21   positions.  Since you started to work with Mr.  Hinckley, has

22   he made application for volunteer positions?

23   A.   As far as I know, John had gone to about three or four of

24   the different organizations, has made contact with those, and

25   in addition to those organizations has also made contact with

1    some musicians in the area; had received lessons from a

2    musician; talked with a manager of multiple musical groups in

3    the area.

4        He had called and talked with that person at great

5    length. He may have even met with him individually -- I'm not

6    sure about that -- and also sought out some artistic

7    opportunities, both lessons and at museums, yes.

8    Q.   All right.  Well, let's talk about the volunteer

9    opportunities.  Could you name some of the places that he

10   either alone or together with your assistance or with the

11   hospital's assistance pursued volunteer positions?

12   A.   Are you talking about all of them, like 25 of them?

13   Q.   Well, whatever the number, whatever comes to mind.  Do

14   the best you can.  I'll help you a little bit if you need some

15   help.

16   A.   Okay.  Let's see.  There are Housing Partnerships; Humane

17   Society; the local town foundation; the local hospital; a

18   organization called -- well, also his church, the Presbyterian

19   Church there; the -- Housing Partnerships.

20   Q.   You mentioned that one.

21   A.   Okay.  Humane Society; did I say that?

22   Q.   Did you mention a museum?

23   A.   There are a couple of museums.  There's an art museum

24   attached to the college, and that was one; and also the

25   library attached to the college; the library attached to

```
 1    Eastern State Hospital; library with the local Unitarian

 2    Church; an organization called "Fish"(Phonetic) which assists

 3    homeless and indigent people with housing and clothing and

 4    food; United Way organizations; the -- let's see, what else?

 5    A couple other churches; a retirement home; the probation

 6    department; the local prison; Vibrant Ministries.  There's

 7    probably about five or six others.

 8    Q.   Did he also apply at Salvation Army?

 9    A.   He did.

10    Q.   All right.  Now, was he rebuffed from these places?

11    A.   Embarrassingly, embarrassingly from my town, I say, yes.

12    I could not believe the response that was -- he received.

13    Q.   You would not have expected it to be so inhospitable.

14    A.   No.

15    Q.   Un-welcoming.

16    A.   Being in this community and raising my children in that

17    community, being a rather forward -- what I consider a

18    forward-looking community -- yes.  It's a strongly mental

19    health community.

20    Q.   It surprised you and disappointed you.

21    A.   It totally shocked me.

22    Q.   And disappointed you.

23    A.   And disappointed me greatly.

24    Q.   Well, let's talk about some of these.  After you learned

25    that Mr. Hinckley was rejected or rebuffed in obtaining these
```

1    positions, did you attempt to speak with responsible people at

2    these various organizations?

3    A.   I not only attempted to speak on the phone, I went to

4    visit some of them personally.

5    Q.   All right.  Tell us -- identify one or two or three and

6    tell us your experience with respect to each of the ones you

7    identify.

8    A.   The Salvation Army was -- I was really surprised about

9    because I had contacted them initially back in January and

10   included that on the list for John to be in touch with, and I

11   spoke with the captain in charge, and she didn't really see

12   any hesitation or consideration.  She thought it would really

13   be great to have a guy available to be helping out lifting

14   things and working even said she might have something to be

15   like a receptionist at the front desk or to do some computer

16   work for them, and so she was rather enthusiastic about it.

17   So I was totally startled when -- I'm not sure who it was.  I

18   think it was Nicole told me that it came about --

19   Q.   By "Nicole", you mean Dr. Rafanello?

20   A.   Yes.  Yes.  And that it came out that they totally

21   changed their mind, and I think I read in one of the reports

22   that it's indicated that it was because of funding.

23   Q.   Now, did you, for example, speak with anybody at the

24   Housing Partnerships?

25   A.   I had.

1    Q.   Tell us about that.

2    A.   I know there was another initial contact I made in

3    January, and I spoke with a woman by the name of "Brandy",

4    who's the right-hand person of the Director Abbott(Phonetic),

5    and she informed me at that time that no application was

6    necessary, that they had basically once you show up at the

7    college parking lot or church parking lot, and they pick you

8    up and take you on teams and go do anything from minor to

9    major work at homes in the area that need repair, and it was

10   very encouraging.

11       And then I understand down the road that John did go get

12   an application and -- oh, no, he didn't get an application.

13   He went to talk with them, I understand, and that seemed to go

14   well, and Nicole also had everything lined up very

15   specifically, detail, in detailed fashion as indicated in the

16   report, and then all of a sudden I read in Phillips' report

17   that that got all squashed again due to funding concerns.

18       So it was a "yes", "yes", "no", and then as of July 9th

19   when I called to find out what fell through, what changed from

20   our original discussions, they said, oh, well, don't worry

21   about it, just come by and get an application or come by an

22   get an application.  And I said, well, could you just fax it

23   to me?  So they faxed me an application for John's completion

24   which was submitted back to them the Monday after July 9th,

25   and then I haven't heard from them.

1        So I called this past week, left three more messages.  I

2   got the secretary again, and she said, oh, yes, the director

3   will be back in touch, and I haven't heard anything.

4   Q.   Did you follow-up with respect to others, as well?

5   A.   I went to visit the volunteer director at Humane Society.

6   Q.   Tell us about that.

7   A.   After I did not get any response to my seven to ten phone

8   calls that I had left messages for her on her personal cell

9   phone, as well as the agency phones.  So I just showed up one

10  morning, early in the morning when I thought they'd be walking

11  the dogs and was able to talk with her, and she was very

12  congenial.  Said John had been by a couple of times, but also

13  that she had an extended visit with Dr. Phillips and made it

14  very clear that they were concerned for safety issues, as well

15  as funding issues and that John was not welcome.

16  Q.   Any others that come to mind that you followed-up on?

17  A.   Yes.  My-- the church I attend.  I talked with both the

18  pastor and the maintenance--the facility maintenance person

19  who himself had worked -- I think he said for six years -- at

20  Bellevue Hospital up in New York, and so he thought it would

21  be-- it would really be wonderful to have, to be of assistance

22  to John, to work there at the parish and also that he lived

23  close by John in the neighbor -- in the same neighborhood of

24  John and that he could transport John to and from, if

25  necessary, until he got his license.

1           And after a week went by and didn't hear from anybody,

2     and I wrote a full letter explaining what would be involved --

3     and, actually, very little would be involved in terms of just

4     reporting back to me and never heard so I sought out the

5     pastor, and he said, no, that liability and safety concerns

6     would prevent such participation.

7     Q.   Now, what did you understand the liability issue to be?

8     A.   That he maybe harmful to somebody.

9     Q.   Now --

10    A.   Especially, he mentioned children.  Ironically, several

11    of these organizations mentioned children, and where that

12    comes from, I don't know.

13    Q.   Now, would it be fair to say or do you believe that his

14    notoriety is working against him in this effort to obtain a

15    volunteer position?

16    A.   Definitely.  Definitely.

17    Q.   And do you believe, Mr. Beffa, that the fact that he

18    visits the area only sporadically and on unpredictable dates

19    works against him to secure a position?

20    A.   That was very clear with both Salvation Army, who said

21    they need somebody when they need them, with a day or two

22    notice; that was with Salvation Army, and a couple other

23    places indicated that same thing.

24    Q.   Is the lack of time in the area, if it's limited merely

25    to six nights and seven days and not knowing when the next one

1    will occur, does that lack of a schedule of conditional

2    releases undermine the effort to obtain a volunteer position?

3    A.    Tremendously so and, actually, you say seven days, but to

4    me it's five days because two days in travel, you know, you're

5    not going to be accomplishing a whole lot.

6    Q.    One day down, one day back?

7    A.    Right.

8    Q.    Were you specifically told that, as well, by some of the

9    directors or some of the institutions that to which an

10   application had been made?

11   A.    The unreliability of knowing exactly when he's coming and

12   what hours he'll be available and also the difficulty in being

13   in touch; you know, the lack of phone availability to be able

14   to have free call back and forth and making arrangements and

15   being able to reach them if they are out of the office, things

16   of that nature,  yes.

17            THE COURT: Did you have the sense that these were --

18   given what you said before about the un-welcoming nature of

19   this and the fact that some people just were concerned about

20   his notoriety -- were these comments in your view legitimate

21   reasons or were they excuses for the other reason, the

22   notoriety  reason?

23            THE WITNESS:  Well, initially -- because, you see,

24   initially, I felt there was a sense of confidentiality, so I

25   didn't even use John's name back in January when I was seeking

1    out these places, and then when it got to be closer to trying

2    to pin down somebody for definite and I was using his name and

3    the time restraints -- like you say, that could have been part

4    of it, as well the notoriety.

5                    THE COURT: Go ahead.

6                    MR. LEVINE:  Thank you, Your Honor.

7    BY MR. LEVINE:

8    Q.    Now, were you interviewed by Dr. Phillips with respect to

9    this matter?

10   A.    I think about three times over the past year.

11   Q.    All right.  And did you tell Dr. Phillips -- express your

12   view that were this conditional release not expanded to 10

13   days that it would undermine Mr. Hinckley's ability to

14   accomplish the tasks and goals that would be assigned to him?

15   A.    I had.

16   Q.    Do you believe that to be true?

17   A.    I do.

18   Q.    Why do you believe that to be true?

19   A.    First of all, due to the nature of, as I say, of being in

20   -- on location certainly makes it a lot more easy to be able

21   to be in touch with people.  I myself -- grant it, it may be

22   part of my own busy schedule, but their busy schedules, as

23   well, in the work they're doing, it's sometimes difficult to

24   reach them, and you have to catch them on the fly.  Like I

25   said, a couple times I just walked in and accidentally caught

1    somebody there.  A lot of times they're not in the office.

2         So it's a matter of that, plus, I think it would be

3    discouraging to John to be able to not have the expanded time

4    that he would be able to utilize his time wisely in that

5    regard to make those contacts.

6    Q.   All right.  Let me move onto to another area.  With

7    respect to your interviews by Dr. Phillips, do you remember --

8    you've told us that you have read his report; is that correct?

9    A.   Yes.

10   Q.   All right.  Do you remember in his report him quoting you

11   as saying -- and I'm going to read the whole quote:  The other

12   thing was I mentioned to you on the telephone about the phone

13   contacts.  He's telling me that he has no phone access at the

14   hospital.  So even if he puts in a call and leaves a message

15   before he leaves town or if he does call from someplace up in

16   D.C., he can't reliably give somebody a phone number to call

17   him back to make arrangements, close quote.

18        Do you remember reading that on Page 32, I believe it

19   was, of Dr. Phillips' report?

20   A.   I do.

21   Q.   Now, what did Mr. Hinckley tell you about his telephone

22   access?

23   A.   That it was difficult to make -- even with the person he

24   really enjoyed, Cabot Wade, the musician to have lessons, it

25   was even difficult that he left several messages I'm told, but

1    it was hard to really connect with the man with his busy

2    schedule, and so he was discouraged about the fact that it's

3    difficult to reach people and have any connection.

4    Q.   Did he say to you that it was difficult for him to

5    receive calls?

6    A.   Yes.

7    Q.   All right.  Now, tell us what you meant when you told

8    Dr. Phillips that Mr.  Hinckley said he had no phone access.

9    A.   I'd like to back up to the last issue about being able to

10   receive calls because a couple of the agencies when I -- I

11   said, well, you could -- might be able to reach him.  My

12   understanding is in the morning when he's at the library, you

13   might be able to reach him, and they said, we're on a budget,

14   we're not going to make long distance phone calls.  So that

15   was another aspect of that communication.

16        And your next question was about the access?

17   Q.   Well, may we have my last question read back, please.

18            (Whereupon, the court reporter read the last

19   question back at this time.)

20            MR. LEVINE:  That question.

21            THE WITNESS:  When I mentioned that to him in the

22   interview, I was -- it's like in the first sentence of a

23   paragraph, you state the general concept and then you

24   elucidate.  So I was underscoring or maybe I overstated the

25   initial summary, and then I explained what I was indicating

1       thereafter.

2       BY MR. LEVINE:

3       Q.   You may have overstated it when you said there was no

4       phone access, but what you were talking about was the

5       difficulty of reliably reaching Mr. Hinckley.

6       A.   Yes, sir.

7       Q.   Do I capture the essence of your message in that

8       question?

9       A.   Yes.

10      Q.   Now, Mr. Beffa, did you speak with Services

11      Board about potential services or a position for Mr.

12      Hinckley?

13      A.   That was another fiasco.

14      Q.   Fiasco.  What was -- so the answer is "yes".  Now, I'm

15      going to ask you to explain it.

16      A.   Yes.  Having worked there and having known some of the

17      people who are still there from when I worked back in '73,

18      '81, I thought it would be a breeze.  I started with the

19      person who answered the telephone, the intake person.  This is

20      back probably a year ago.  And I just asked -- I was concerned

21      about the residency requirements, if that would be a problem,

22      and they said they didn't really think so because his mother

23      does live there, but he would have to come in for an

24      interview, and they'd have to assess the situation and talk

25      with him and see what services would be available.

1           And then more recently --

2      Q.   So on that occasion, they seemed receptive.

3      A.   Yes.

4      Q.   And that was -- let's understand what it was.  Was it to

5      both provide services and to provide a volunteer position or a

6      prospect?

7      A.   No.  Not the volunteer part, initially.

8      Q.   Explain that to the Court please.

9      A.   Just initially, I was looking at John as a patient who's

10     coming out of a hospital and would need some services to help

11     acclimate to both the -- primarily the work culture of the

12     area, the work environment, as well as social environment,

13     because they have services for all range of mental health and

14     mental retardation.

15     Q.   And as one goes through that process by utilizing those

16     services, does there later come a time when one actually gets

17     the opportunity or the prospect for a volunteer job?

18     A.   In some aspects of it, yes.  Uh-huh.

19     Q.   All right.  So you start as a utilizer of the services

20     and then if you do a suitable job you actually obtain a

21     volunteer job?

22     A.   Correct.

23     Q.   Okay.

24     A.   Or even a paid job through the sheltered work shop.

25     Uh-huh.

 1    Q.    Through the sheltered workshop.  All right.  Tell us what

 2    happened then.

 3    A.    More recently, I called back to again check on residency

 4    and more specifically what kinds of opportunities would be

 5    available and --

 6    Q.    Was this after Dr. Phillips had been there?

 7    A.    I believe it was.  Because I think his interview with

 8    them might have been back in June; so it was either, it was

 9    probably late June when I was call being back to try to firm

10    up something.

11    Q.    Okay.

12    A.    Definite.

13    Q.    Tell us about that please.

14    A.    Especially after having read in his report that they were

15    so encouraging and listed all those opportunities that are

16    listed in the letter stated -- I think it's called Patient No.

17    7, the one about-- from the executive director, that full page

18    outline of everything available.  So I saw that, and I called

19    the executive director at that time -- that was before the

20    letter.  I called the executive director, and I said, I saw in

21    the report about all these services available and welcoming,

22    especially focusing on the recovering-- recovery process for

23    people coming out of hospitals, and he was extremely excited

24    about it because he said, as a matter of fact, they're also

25    having a -- early August, I think, they were sponsoring a week

1    on recovery, like a conference, a workshop.

2        So he was really excited, and I said, would you please

3    put that in a letter so I could present it to the Court

4    showing your definite commitment.  He said, no problem.  So

5    you saw the letter as of July 21, I believe, on Monday, and

6    the court document presented yesterday, and then all of a

7    sudden the next day I was just --

8            THE COURT:  The next day?

9            THE WITNESS:  Being Tuesday, the 22nd.

10           THE COURT: Okay.

11           THE WITNESS:  I received the follow-up letter

12   saying, oops.  There may be a residency concern, that he

13   doesn't qualify, and that no services other than emergencies

14   services would be available.

15   BY MR. LEVINE:

16   Q.   Is this characteristic of the experiences you had

17   received in the search for positions for Mr. Hinckley, that,

18   first, there would be some receptivity only followed by

19   reconsideration and a declination of a position?

20   A.   Time after time, yes.

21           MR. LEVINE:  Your Honor, just for housekeeping, I

22   believe the first letter is Patient's No. 8 and the second

23   letter is Patient's No. 9; eight being the letter dated July

24   21, 2008 to Mr. Beffa-- I can show him.

25           THE COURT: I've got them.

1          MR. LEVINE:  You have them.

2          THE COURT:  But you can show them to him if you'd

3   like.

4          MR. LEVINE:  I'm sorry?

5          THE COURT:  You can show them to Mr. Beffa if you'd

6   like.

7          MR. LEVINE:  Surely.  If I may approach, Your Honor.

8          THE COURT: Yes.

9   BY MR. LEVINE:

10  Q.   Let me show you, Mr.  Beffa, the letter that which has

11  been marked as Patients Exhibit No. 8.

12  A.   Yes.

13  Q.   And is that the letter you received dated July 21 in

14  which there was an expression of receptivity?

15  A.   It is.

16  Q.   And let me show you what is marked as Patient's No. 9.

17  Is that the letter reversing course and declining him the

18  opportunity?

19  A.   It is.

20          MR. LEVINE:  Your Honor, I'm quite certain these

21  letters are in evidence.  I move them in now.

22          MS. CHASSON:  No objection.

23          THE COURT:  They'll be admitted if they weren't

24  previously admitted.  Do you know whether anything happened or

25  what happened, if anything, between July 21st and July 22nd?

1              THE WITNESS:  I have no idea except I heard from a

2      couple of anonymous people that there may be some --

3              MR. LEVINE:  By "anonymous", you mean people who you

4      know, but you don't want to identify?

5              THE WITNESS:  Exactly.  Exactly.

6              MR. LEVINE:  Okay.

7              THE WITNESS:  That there may have been some

8      pressures that came to bear -- that he would not be welcome.

9              THE COURT: Pressure from people in the community?

10             THE WITNESS:  Yes, Sir.

11     BY MR. LEVINE:

12     Q.   In that regard, are you familiar with local press

13     reports, that is to say, local to that community, which stated

14     the government's vigorous opposition to Mr.  Hinckley being in

15     that community?

16     A.   I am, and, unfortunately, even in yesterday morning's

17     paper, I noticed the headline, one of every three days Mr.

18     Hinckley will be here.

19             THE COURT: What did it say?

20             THE WITNESS:  I'm paraphrasing it.

21             THE COURT:  What did it say?  I'm sorry --

22             THE WITNESS:  I gave it to Barry.

23             MR. LEVINE:  I'll mark it, Your Honor.  I have

24     yesterday's paper from -- I'll just call it "The Gazette".

25             MR.  ZENO:  I have no copies of it, Your Honor.

```
1              THE COURT: Show it to Mr.  Zeno, and then I'll take
2      a look at it.
3              MR. LEVINE:  Okay.  Would Your Honor like to see it?
4              THE COURT: I would.
5              MR. ZENO:  Your Honor, at some point at the break or
6      whenever we do it, could we have that back so we could make
7      some copies of it?
8              THE COURT: Sure.
9              MR. LEVINE:  Of course.  And are there -- excuse me,
10     Your Honor.
11             THE COURT: Let me just take a look at it.
12             MR. LEVINE:  Take your time.  I apologize.
13             THE COURT:  Okay.  Here you go.  You want this back
14     or do you want to show it to -- I can have copies made during
15     the break unless you need to show it to Mr.  Beffa.
16             MR. LEVINE:  Your Honor.  I thought I would just do
17     the business of authenticating it for the Court.
18             THE COURT:  Yeah.  Go ahead.  That's fine.  Yes.
19     BY MR. LEVINE:
20     Q.   Mr.  Beffa, I show you what's been marked as Patient's
21     No. 10 and ask you if this is the news article to which you
22     made reference a moment ago in your testimony?
23     A.   It is.
24             MR. LEVINE:  Move it into evidence, Your Honor.
25             MS. CHASSON:  No objection.
```

```
 1              THE COURT: It will be admitted.
 2      BY MR. LEVINE:
 3      Q.    And are you aware of other articles that have appeared in
 4      that newspaper and other local press that have promoted the
 5      government opposition and made Mr. Hinckley's presence in
 6      that community an unwelcome matter?
 7      A.    I am.
 8      Q.    Now, do those articles raise the specter of Mr. Hinckley
 9      continuing to be a violent person as represented by the
10      government?
11      A.    A what kind of person.
12      Q.    A violent person?
13      A.    Violent, yes.
14      Q.    Now, there was -- and I think you may have been present
15      during Dr. Rafanello's testimony reference to this institution
16      called "Vibrant Life Ministries"? Are you familiar with
17      Vibrant Life Ministries?
18      A.    Yes.
19      Q.    Now, is there an opportunity for Mr. Hinckley to be a
20      volunteer at Vibrant Life Ministries?
21      A.    There is.
22      Q.    And how did you learn this?
23      A.    Through -- I believe it was Reverend Warren who first
24      suggested I might call the local prison, the chaplain at the
25      local prison. No. I take that back. He told me about --
```

1    somebody told me about -- I think it's called "The Gideon

2    International", "Gideon Society" and I looked up phone

3    numbers.  They are in Richmond, and I found one for [the

4    city], and it turned out to be that the chaplain at the prison

5    was actually the local representative, and, apparently, they

6    are local businessmen who help people coming out of jail I

7    believe.

8         And so the Reverend, the chaplain at the prison, as I was

9    talking with him about the predicament that John has been

10   facing, he had a lot of empathy for the situation, as,

11   actually, several mental health people I have talked with

12   have, and he put me onto -- he said, I'll talk to some people

13   and have them give you a call.  So then this Mr. --

14   I think it's  Dennis Grunnum(Phonetic) -- Grannan.  I think

15   he's the one who called me 'cause he's the founder and

16   director of it.  Is that right, Dennis Grannan

17   Q.   Dennis Grannan -- G-R-A-N-N-A-N.

18   A.   Yes.  So he's the one who gave me a call and asked how he

19   could be of help, and he was delighted to have another

20   volunteer being possible because he said they have very few

21   paid staff.  Those are part-time people.  They primarily work

22   with volunteer staff to help the homeless; provide shelter,

23   clothing, food, thrift shop -- those kinds of things.

24   Q.   And would Mr.  Hinckley be expected were he to volunteer

25   in that position work in the thrift shop and do work in the

1    food warehouse?

2    A.   All of the above, yes, he would be, and, in addition, he

3    even offered --Dennis had offered today if he needs

4    transportation, I'll be glad to pick him up and transport him

5    back and forth.

6    Q.   And was Mr. Grannan willing to put that offer in a

7    letter?

8    A.   Yes.

9            MR. LEVINE:  May I approach, Your Honor?

10           THE COURT: Yes.

11           MR. LEVINE:  This is Patient's No.7.  I show it to

12   you.  Is that the letter?

13           THE WITNESS:  That's the one.

14           MR.  LEVINE:  Move it into evidence, Your Honor..

15           THE COURT: I think it was admitted yesterday, but if

16   it wasn't, it will be admitted.

17           MR. LEVINE:  Thank you.

18   BY MR. LEVINE:

19   Q.   Now, with respect to that particular opportunity, is

20   there -- is Mr. Grannan willing to report to the hospital his

21   observations of Mr.  Hinckley during the course of his

22   volunteer time?

23   A.   He asked his requirements, and that's what I told him;

24   both the hospital and to me -- or through me.

25   Q.   Now, is there another opportunity for Mr.  Hinckley at

1    the local Unitarian Church library?

2    A.    Yes.

3    Q.    Tell us about that.

4    A.    There is.  Excuse me.  One of my staff members at Family

5    Living Institute is a church member at that facility you

6    mentioned and suggested maybe I give the pastor a call when I

7    was describing the great difficulty in the area, and she is

8    actually co-pastor -- I think it's R-Y-U, Jennifer Ryu.

9    Q.    R-Y-U is the spelling of the name?

10   A.    Yes, sir.

11   Q.    Okay.

12   A.    So I asked her about it, and she said, well, we are a

13   very welcoming community and that they -- she thought there

14   would be strong possibility.  She just happened to be having a

15   board meeting next evening, and she reported back to me after

16   the board meeting that they were extremely positive.  They

17   just had a couple of concerns; again, liability.  For example,

18   if he were there volunteering and would walk off the premise,

19   would they be held liable for his absence or how that would

20   work out, and, also, about the dangerousness of the situation,

21   and I told her that she would just have to report to me in

22   terms of liability aspect and that there was no danger of

23   harm.

24   Q.    No duty to tackle somebody or just the duty to report?

25   A.    Correct.

1   Q.   And was this person also willing to report to the

2   hospital if it were to be required?

3   A.   Yes, she was.

4   Q.   All right.  Does -- so that job is not yet solidified is

5   it?

6   A.   I don't have it in writing, but I have her word.  As a

7   matter fact, she said the board called to her attention that

8   they were just in the process of -- to reorganize their

9   library, and when I mentioned about his library skills of some

10  history, they would be greatly welcome to help them with that

11  project as well as doing some other projects around the

12  facility.

13  Q.   So would it be your judgment that this job at the

14  Unitarian Church library would better suit Mr. Hinckley's

15  skill set than perhaps the job at the Vibrant Life Ministries?

16  A.   Definitely.  And she also mentioned in their services,

17  and she would hope then he might consider participating in

18  their services, their worship services; that they also make

19  use of musical instruments and could certainly benefit from

20  his talents in that regard.

21  Q.   Now, is this a reason why you think it would be

22  important, not just useful, but important as a case manager to

23  have the flexibility to change one volunteer job to another?

24  A.   Definitely.

25  Q.   If that -- the Court were to give you that flexibility,

1    would you do it in conjunction with the treatment team at

2    hospital?

3    A.    Definitely.

4    Q.    And the job wouldn't change but for the approval of the

5    treatment team?

6    A.    Yes.

7    Q.    And whatever mechanism the Hospital employs to provide

8    its approval?

9    A.    Correct.

10   Q.    Are there any other volunteer opportunity prospects you

11   would like to bring to the Court's attention?

12   A.    I would.  I'm delighted and excited to report the best

13   one and most -- how I can I say, un-limiting and welcoming,

14   was from the -- I'm not sure exactly his title, but he's the

15   head honcho at the Eastern State Hospital.  I think its

16   executive director, Mr.  John Favret(Phonetic).  He said, I

17   was wondering what was taking people so long to be in touch

18   with me.  I've been looking forward to offering assistance,

19   whatever would be needed, and when I suggested I had day or

20   two before I talked with him I was able to -- well, as an

21   aside, it's in a sense another fiasco because I thought from

22   reports I had received through Reverend Warren, Nicole, and

23   some other people, that the Eastern State Hospital, one of

24   their two libraries, the medical staff library or the patient

25   library, one or both would be or kind of a like a done deal,

1      that it was going to happen. This was about, oh, I'd say a
2      month ago or more, and so I was excited about that, using his
3      library skills.
4          However, when I never heard back from Reverend Warren
5      about that possibility, I contacted him, and he said he had
6      never heard back from the chaplain at the library -- at the
7      hospital who was coordinating this opportunity.  So I tracked
8      down that chaplain, and he said, oh, no, there must be some
9      misunderstanding; that, as a matter fact, the librarian had
10     retired some years ago, and they never replaced that person.
11         So it's kind of like a willy-nilly.  You kind of use it
12     as you want to, but there is no organization or structure to
13     it.  That was a month, six weeks ago or more.  More recently,
14     when I was talking, I tracked down through an organization
15     called "NAMI", the National Alliance For Mentally Ill, the
16     woman who is the most ardent supporter of that in the area,
17     gave me the name of the librarian at Eastern State Hospital.
18     I was successful in reaching her, and she laughed at what the
19     chaplain told me because she said, she is very much alive and
20     well and is the director of the medical library, and, as a
21     matter of fact, there is another librarian who is the director
22     of the patient library, and they would most likely both
23     welcome John to participate in their libraries.  They would
24     just have to check with the higher-up's.
25         So since time was becoming short, I went to the higher-up

```
1    myself, and I was successful in reaching John Favret, who
2    said, come aboard.
3              THE COURT:  When was this conversation?
4              THE WITNESS:  On my way here yesterday.  As I was
5    arriving in the D.C. traffic.
6    BY MR. LEVINE:
7    Q.   Mr. Beffa, during the various meetings that you had with
8    Mr. Hinckley, did you ever observe any signs or symptoms of
9    mental decompensation?
10   A.   No, I haven't.
11   Q.   Did you ever observe any signs or symptoms of psychosis?
12   A.   I have not.
13   Q.   Ever observed any signs or symptoms of major depression?
14   A.   I have not.
15   Q.   And you told us you are trained to recognize signs and
16   symptoms of psychosis and major depression.
17   A.   I am.
18   Q.   Are you trained to detect these symptoms in the patient
19   without even knowing their medical history?
20   A.   Yes.
21   Q.   All right.  Can you detect these symptoms, by and large,
22   if a patient were to meet with you for 45 minutes?
23   A.   I would.
24   Q.   Have you had sufficient information from the hospital in
25   order to carry out your role as case manager?
```

1    A.    I have.

2    Q.    And in your role as case manager, was it necessary to

3    have full prior knowledge of the medical records?

4    A.    I did not believe that would be the case.  No.  I would

5    not need it.

6    Q.    And do you need it in your role as case manager to have a

7    working knowledge of the history of this case?

8    A.    Say that again.

9    Q.    In your role of case manager, would it be important in

10   order to discharge the duties of case manager to know the full

11   history of the mental health case?

12   A.    No, not the full history.

13   Q.    Now, are you familiar with the hospital's proposal in

14   what has become known as the (e)motion, the "e" being the sub-

15   part of the D.C. statute that operates here?

16   A.    I am.

17   Q.    And do you know that it describes your role as changing?

18   A.    Yes.

19   Q.    And your role would change to include, not only case

20   management duties, but also therapy duties?

21   A.    Correct.

22   Q.    Are you willing to provide therapy role?

23   A.    I am.

24   Q.    And were the Court to allow the expanded privileges from

25   six nights to nine nights, which is seven days to ten days,

1    would you and Dr. Lee be willing to spread out during the

2    course of that time period the meetings with Mr. Hinckley?

3    A.   Yes.  We had talked about the consideration of me meeting

4    with him on Monday and John Lee meeting with him on Thursday

5    or Friday, the end of that week.

6    Q.   And if your role is expanded to become the therapist in

7    the area where the home is located, would you obtain still

8    more information about Mr. Hinckley from the hospital?

9    A.   Yes.  I've already begun receiving therapy notes from Sid

10   Binks.

11   Q.   All right.  Have you read them?

12   A.   Yes, I have.

13   Q.   And you've read other records, as well, as you've

14   testified today.

15   A.   I have.

16   Q.   All right.  Now, are you willing to comply with the

17   reporting requirements that the Court may impose and the

18   hospital may request?

19   A.   I am.

20   Q.   Are you willing to be available should there be an

21   emergency in that area?

22   A.   I am.

23   Q.   Are you willing to meet with Mr. Hinckley at least once

24   during each of the conditional release opportunities?

25   A.   I am.

1    Q.   Now, if the Hospital's proposal is granted and the

2    duration of the visits is increased from six to nine nights,

3    do you have any concern about Mr. Hinckley being away from the

4    hospital and their support staff?

5    A.   None, whatsoever.

6    Q.   Is the therapy that he ordinarily would expect to receive

7    from Dr. Binks -- withdrawn.  If the therapy that he would

8    ordinarily get from Dr. Binks would not occur, would he lose a

9    therapy session?

10   A.   You mean during those 10 days?

11   Q.   Yes.

12   A.   I don't see where he would lose one if he's meeting with

13   me.

14   Q.   All right.  So he would lose one with Binks, and he would

15   gain one with you.

16   A.   Correct.

17   Q.   And in addition to gaining one with you, would he also

18   have one, at least a meeting with Dr. Lee, the psychiatrist?

19   A.   Two for one.

20   Q.   What is your view of the impact on the effort to

21   reintegrate if the Court were to deny the hospital's motion

22   and were to merely allow that which currently exists to be in

23   place?

24   A.   I would think it would be extremely discouraging to the

25   progress of recovery.

1    Q.   You believe it would be anti-therapeutic?

2    A.   Yes, I do.

3    Q.   Now, Dr. Phillips writes that you said that you would

4    like to see the Court -- and I quote:  Would like to see the

5    Court at least do a trial period of two or three visits to

6    allow Mr. Hinckley and the treatment team the opportunity to

7    get more involved with you and Dr. Lee.

8         When you said that to Dr. Phillips, tell us why you said

9    it and what did you mean.

10   A.   I was in desperation because I was sensing that

11   Dr. Phillips was leaning strongly towards one more denial,

12   and, therefore, I was posing that in desperation that if not

13   the full permission is given by the Court that he at least be

14   given a couple to see if he would be able to utilize the time

15   as the Court was requesting and during that period of time.

16   Q.   Is that a statement that you made to Dr. Phillips as you

17   sensed his -- as he articulates and sensed his opposition to

18   the proposal?

19   A.   Yes.  Yes.  I even mentioned to him that -- actually, he

20   had mentioned to me if we would be able to -- the team, John,

21   everybody involved would be able to  have at least one

22   volunteer opportunity, structured detail available for John,

23   that he would come on board and support John in that effort,

24   and so I informed him yesterday when I arrived that we had

25   three, not one, and I would hope that he would stand behind

1       his word.

2       Q.    Now, do you intend to keep the hospital apprised of your

3       contacts with Mr. Hinckley?

4       A.    I do.

5       Q.    And is it your intention to stay in frequent contact with

6       Dr. Binks and to confer with him either before or after, or,

7       perhaps, both, each of these sessions?

8       A.    The (e)letter says in -- yes.  In answer to your

9       question, yes.  The (e)letter says after.  I would prefer

10      before and after.

11      Q.    Why is that?  Why do you prefer both before and after?

12      A.    Because after, Binks is getting the benefit of my

13      information.  I'd like the benefit of his, along with his --

14      along with his notes to be able to talk personally with him,

15      to integrate, kind of like wheels integrate --

16      Q.    Yes.  Cogs.

17      A.    Cog.  Thank you.  Integrating the process.

18      Q.    All right.  In conclusion, Mr. Beffa, can you affirm to

19      the Court, without any qualification whatsoever, that you are

20      both willing and able to provide therapy to Mr. Hinckley

21      under the terms required by the Court and the Hospital?

22      A.    I am.

23             MR. LEVINE:  Nothing further, Your Honor.

24             THE COURT: Okay.  Why don't we take a little break

25      before we start with the cross examination.

1          (Whereupon, there was a brief recess at this time;

2     thereafter, court resumed.)

3          THE COURT:  Okay.  Are we ready, Ms.  Chasson?

4     **CROSS-EXAMINATION BY MS. CHASSON:**

5     Q.   Good morning, Mr.  Beffa.

6     A.   Good morning.

7     Q.   You testified on direct that you understand your role

8     under the current Hospital (e)proposal to be as both a

9     therapist and a case manager?

10    A.   Coming up.  Not before.

11         THE COURT:  Not right now, but coming up.

12         THE WITNESS:  Not now.

13    BY MS. CHASSON:

14    Q.   But under the (e)proposal that is currently pending

15    before the Court; that's your understanding?

16    A.   Correct.

17    Q.   How many other patients besides Mr.  Hinckley do you

18    currently provide case management services for?

19    A.   At the current time, I don't do any strictly case

20    managing, however, I have done that in my previous career, and

21    I incorporated some of that aspect of it in my therapy.

22    Q.   When you say your "previous career", is that back when

23    you worked at Services Board before 1981?

24    A.   No.  Back in -- at Alton(Phonetic) State Hospital in

25    Illinois before I went to graduate school, after my bachelor's

1   degree, and before graduate school, and then during graduate

2   school as my internship field work in the state -- in St.

3   Louis State Hospital.

4   Q.   What decade was that?

5   A.   Pardon me?

6   Q.   What decade was that?

7   A.   Decade?

8   Q.   Yeah.

9   A.   In 1970.  During my graduate program in '69 to '71, and

10  just before that, late '60's -- '68.

11  Q.   So you haven't functioned strictly as a case manager

12  since the late '60's, early '70's?

13  A.   Correct.

14  Q.   Now, how many other patients in your practice today do

15  you provide a dual role as therapist and case manager?

16  A.   As I just indicated, part of that is included in the

17  therapy process since I have lived in town for 30-some-odd

18  years.  I'm known in the community, and that is part of a

19  social workers role, to help people acclimate to the

20  community, utilize community resources to their benefit.

21  Q.   How many people is that, Mr. Beffa?

22  A.   My entire caseload --

23  Q.   I'm sorry.  Is it Dr. Beffa?

24  A.   Thousands of people --

25  Q.   Is it Dr. Beffa or Mr.  Beffa?

1     A.    Karl Beffa is fine.

2     Q.    Well, I've got to be a little more formal here.

3     Dr. Beffa, how many patients in your caseload right now do you

4     currently serve a case management and therapist function for?

5     A.    I would say if you're asking specifically or technically,

6     I don't separate -- don't separate the roles, so all of my

7     patients.

8     Q.    All of your patients you provide case management services

9     for as part of their therapy?

10    A.    As very minimal aspect of it, yes.

11    Q.    Okay.  In a forensic setting, are you aware of whether

12    there is defined role for a case manager?

13    A.    I would assume that it is very similar to a hospital --

14    state hospital type of setting in terms of inpatient

15    hospitalization and what needs to happen for a person on the

16    way towards being discharged in the hospital -- from the

17    hospital.

18    Q.    Do you have any experience working with insanity

19    acquittees?

20    A.    No, I don't.

21    Q.    Have you ever provided any type of either case management

22    or therapy service to an insanity acquittee?

23    A.    No, I haven't.

24    Q.    Have you ever provided any kind of service in a forensic

25    setting before?

1    A.   Not a technical forensic setting.  I have seen prisoners,

2    but I have not in the technical setting, no.  However, social

3    workers skills go from, how can I say, workplace to workplace.

4    It can be incorporated along the way.  They're similar skills.

5    Q.   So it is your view that there is no difference in

6    providing, for example, case management services to an

7    insanity acquittee in a forensic setting than there is from

8    providing case management services to anybody else?

9    A.   I would think it'd have to be more -- very, a lot more,

10   how can I say, on top of it, very much specific and detailed.

11   Q.   Which would be more specific and detailed?

12   A.   In terms of working together as a team and in terms of

13   what the person would be doing and how they would be doing it.

14   Q.   Have you sought any guidance from the Hospital about that

15   matter?

16   A.   No, I haven't.

17   Q.   Okay.  Have you consulted with anybody else in your local

18   professional community to get advice about how to handle that

19   role?

20   A.   No, I haven't.

21   Q.   Have you received any training whatsoever about that

22   role?

23            THE COURT:  About what role?

24            MS. CHASSON:  Working, providing case management

25   services to an insanity acquittee in a forensic setting.

1           THE WITNESS:  No.  But I have many years of

2     experience in terms of social work.

3     BY MS. CHASSON:

4     Q.    How many of your current patients have a history of

5     violence, Mr. Beffa?

6     A.    Oh, very few.  I would say probably maybe 10 or 15 a

7     year.

8     Q.    Have you provided case management services to anybody

9     transitioning to your local community before from an inpatient

10    setting?

11    A.    Not that I can recall.

12    Q.    Okay.  Do you have any experience in risk assessment of

13    insanity acquittees?

14    A.    No, I haven't.

15    Q.    What about in planning for conditional releases of people

16    from inpatient hospitalization?

17    Q.    I've learned a lot over the past year.

18    A.    You have no formal training, though?

19    A.    No.

20    Q.    And you haven't done it before?

21    A.    No.

22    Q.    And you've learned a lot over the last year from

23    observing what the Hospital has been doing?

24    A.    From participating with the team members.

25    Q.    Okay.  So that's not really formal training; it's really

1      sort of kind of training as you go?

2      A.    Correct.

3      Q.    All right.  For those patients in your current population

4      that you say that you provide case management services for,

5      did those ones have a history of violence?

6      A.    Some of them would.

7      Q.    Okay.  And have you found any resistance in the community

8      to others patients with a history of violence?

9      A.    Speak louder.

10     Q.    Have you found any community resistance to your other

11     patients who have histories of violence?

12     A.    Some, but very minimal.

13     Q.    Okay.  Now, how long is each appointment that Mr.

14     Hinckley is going to have with you going to be?

15     A.    Forty-five minutes.

16     Q.    And how long will each of his appointments with Dr. Lee

17     be?

18     A.    Forty-five minutes.

19             THE COURT:  Is that to your knowledge, have his

20     appointments with Dr. Lee in the past year been 45-minute

21     appointments?

22             THE WITNESS:  That's my understanding.  That's his

23     typical time frame.

24     BY MS. CHASSON:

25     Q.    Now, is it typical for Dr. Lee to spend 45 minutes doing

1     a mental status check and medication management appointment?

2     A.    Not only mental status, no.  Mental status would be 15

3     minutes.

4     Q.    Okay.  So his typical mental status appointment is 15?

5     A.    Correct.

6     Q.    Okay.  What is he going to be doing in his 45 minutes

7     that is different from what you're going to be doing?

8     A.    Dr. Lee will -- in order to do a mental status, besides

9     doing the mental status and checking on medicine, it would

10    also be helpful to him to have an extended period of time in

11    order to know more about what the patient is doing in their

12    life; what they're up to; what they plan; how their

13    interactions in everyday life is affecting their medication.

14    Q.    And could you explain to us please how that is different

15    from a 45-minute therapy session with you?

16    A.    The difference would be I would be doing very similar

17    about knowing the patients on-going behavior, what their plans

18    are, interacting in the community.  In addition to that,

19    interacting -- like I say the cog in the wheel -- with

20    Dr. Binks and looking underneath the underlying personality

21    issues and how those play out in everyday living, whether it

22    be in the hospital setting or in the local community setting.

23    Q.    And in addition to that, you're going to get the case

24    management services in 45 minutes?

25    A.    Correct.

1    Q.   Were you aware that --

2            THE COURT:  You explained before what case

3    management is, but what does that mean in terms of what is

4    being done during the 45-minute period?

5            THE WITNESS:  The way a person is dealing with the

6    different issues in his life, whether it be the things we've

7    talked about regarding case management, per se, or

8    interactions in relationships in his community,  with his

9    family, whatever; personality issues don't change from

10   situation to situation, they're all inter-connected.

11           So the way he deals with case management issues and

12   other --

13           THE COURT:  And the way who deals with it, the

14   patient or the --

15           THE WITNESS:  Yeah.  John, the patient.

16           THE COURT: Yeah.

17           THE WITNESS:  Dealing with the community

18   interactions, his volunteer work so to speak, or social

19   activities, whatever, the way he deals with those is grist for

20   the mill for therapy.

21           THE COURT: But, for example, in the hospital

22   setting, am I correct that Dr. Binks is his therapist, and Mr.

23   Shamblee is his case manager?

24           THE WITNESS:  That's what I understand.

25           THE COURT: So I mean you're bringing to bear if you

1    do both and I know one doesn't have a rigid demarcation here,

2    but you're bringing to bear if you do both your social work

3    training, experience, and all these decades as a social

4    worker, that's sort of the case management role, and then your

5    training and experience as a therapist.

6              THE WITNESS:  All those same years.

7              THE COURT:  All those same years.  But there are a

8    lot of social workers who are not also therapists.

9              THE WITNESS:  Correct.  I'm a clinical social

10   worker.

11             THE COURT:  Right.  And is Mr. Shamblee also a

12   clinical social worker?

13             THE WITNESS:  I'm not sure about that.

14             THE COURT:  I'm not sure either.  Is there -- I mean

15   there's an implication certainly in Ms.  Chasson's questions

16   that there is a problem -- there is a problem of serving both

17   roles, so I guess my question -- I take it it's typical that

18   these roles be performed by separate people rather than the

19   same person or more typical.

20             THE WITNESS:  Technical case management most likely

21   would be, yes.  However, like I say in everyday therapy,

22   that's part of my role as a therapist.

23             THE COURT: But is there a reason from the point of

24   view of the patient or from the point of view either

25   profession that more typically they're done by two different

1   people or is it just because some people are trained as social

2   workers and some as therapists and not that many are trained

3   as both?

4           THE WITNESS:  Correct.

5           THE COURT: Is that the main reason why it's done by

6   different people or are there other reasons why?

7           THE WITNESS:  Correct.  I think it's more a matter

8   of choice of what you choose to do with your profession, with

9   your training.

10          THE COURT: But why is it that you, even though you

11  are trained in both fields, don't typically do both, but are

12  doing both in this case?

13          THE WITNESS:  Because I enjoy the inner workings of

14  people and relationships, and you get into that a lot more in

15  therapy.  To me, the case management, in a sense, is a lot

16  easier than doing therapy.

17          THE COURT: Okay.  Ms.  Chasson.

18  BY MS. CHASSON:

19  Q.   Okay.  Mr.  Beffa, I think -- what I am struggling to

20  find out is the patient that you're currently going to be

21  working with, Mr. Hinckley, has been living in an institution

22  for the last 27 years.

23  A.   Uh-huh.

24  Q.   And he's experiencing community resistance to his move to

25  your local area, and he has, really, only minimal job skills

and he has a lengthy psychiatric history.  I'm interested in
your view of how you're going to simultaneously provide
therapy to somebody with his Axis I and Axis II diagnoses and
also help him transition into a community where they haven't
lived before.

A.   Well, first of all, those are in remission, and,
secondly, he needs to be able to integrate into the community
and with me having lived there so long and knowing the
community very well and having many contacts, I think I can be
of help to him in that regard; and, secondly, that he is going
to be experiencing a whole range of emotions and difficulties
that he will need to bounce off of somebody, to help him in
terms of guidance and support to deal with the issues he'll be
wrestling with.

Q.   You said Mr.  Hinckley's diagnoses are in remission.  Is
he currently mentally ill?

A.   That's a good question.  You don't necessarily lose a
diagnosis your entire life.  If you're an alcoholic, you're an
alcoholic for life, and most likely the depression will be
there his entire life; the possibility of it increasing, so to
speak.  So it may be a manner of semantics in terms of whether
a person is really mentally ill or not.

Q.   What about his narcissism?

A.   As a personality issue, as has been stated before, that
will most likely continue his entire life.

1    Q.    You haven't read his whole clinical file,  right?

2    A.    Not the page from page since the time he was admitted.   I

3    have read the different voluminous reports that have been

4    created. the initial ones, as well as the more recent ones.

5    Q.    Okay.  You've read Dr. Montalbano's two risk assessments,

6    I think you testified, and then Dr. Phillips and

7    Dr. Patterson's current reports.

8    A.    Yes.

9    Q.    And you said you're received some of Dr. Binks' treatment

10   notes.  Since when have you been receiving Dr. Binks'

11   treatment notes?

12   A.    June.

13   Q.    Since June.  So you have two months worth of treatment

14   notes from his current therapist?

15   A.    I think primarily it goes until just the beginning of

16   July.

17   Q.    So six weeks?

18   A.    Yes.

19   Q.    Six weeks worth of treatment notes.

20   A.    Yes.

21   Q.    All right.  And you feel that that's enough of Mr.

22   Hinckley's file to permit you to serve as his therapist in the

23   community?

24   A.    Not all not.  Not at all.  However, I haven't really felt

25   the need that reading every word of every page is going to be

1    important up until this point because I have not been his

2    therapist and have not been intricately involved in his life.

3    However, the more I read, the more I'll learn, and the more I

4    work with the team and especially with Mr.  Binks that will

5    begin to occur.

6    Q.   What else from his file do you think you need?

7    A.   Primarily, the discussions with Binks about the issues

8    that he has over the years he's been involved with him, going

9    back to beginning years with him and the history of that of

10   his involvement with him.

11   Q.   Anything else?

12   A.   I can't think of anything else offhand.

13   Q.   Okay.  How many people did Mr.  Hinckley shoot?

14   A.   My recollection, it was four or five.  I think it was

15   four, but I'm not sure.

16   Q.   It was four.

17   A.   Uh-huh.

18   Q.   Did you think it might be difficult to find a volunteer

19   position in your community for somebody who shot four people?

20   A.   Well, I believe in recovery and that people who do have

21   problems in life, which we all do, hopefully, we can look at

22   what's occurred and deal with those problems.  So, in answer

23   to your question, I thought there would be some problem, but

24   not the degree that has occurred.

25   Q.   So it is fair to say that you were surprised in the

1    difficulty of finding a volunteer position for somebody who

2    had shot four people, including the President of the United

3    States?

4    A.    Yes.

5    Q.    Now, you've actually been officially Mr. Hinckley's case

6    manager since entry of the last Court order; is that correct?

7    A.    Yes.  Correct.

8    Q.    So you have been serving in that capacity for a year?

9    A.    Correct.

10   Q.    And you met with him five times during that year.

11   A.    Yes.

12   Q.    And did you help Mr. Hinckley -- yeah, I understand you

13   gave Mr. Hinckley some applications for various volunteer

14   positions.

15   A.    Two.

16   Q.    You gave him two.  All right.  Did you help him complete

17   those applications?

18   A.    I did not.  I thought that he would be able to do that on

19   his own and, if not, he would receive assistance back at the

20   hospital.

21   Q.    And then you also gave him a list of other places that he

22   could go to himself to seek work; is that correct?

23   A.    Seven others.

24   Q.    Now, if you'd actually read his whole file, you might

25   have seen in there that Mr. Hinckley has a history of a lack

1    of initiative.

2    A.    I've read that.

3    Q.    Okay.  So, now, you know that?

4    A.    I knew that before in discussions with the Hospital

5    staff.

6    Q.    Okay.  But, nonetheless, you just gave him two

7    applications and then the list of seven?

8    A.    Correct.

9    Q.    And left him on his own to go get a job.

10   A.    In therapy, if you've been in therapy, you know that you

11   discuss with the therapist that what needs to happen, and the

12   therapist will test you out to see if you're going to follow-

13   up on what you say you're going to do, and so it was part of a

14   testing, testing his limits, to see what might be possible on

15   his part.

16   Q.    Well, you gave him the list in January, right?

17   A.    Correct.

18   Q.    And by the middle of May, you had not seen him --

19   A.    Correct.

20   Q.    -- right, in the last five months?

21   A.    That's right.

22   Q.    And you had no idea where he was in his job search?

23   A.    That's right.  And I was looking forward to talking with

24   him about those experiences except from what I heard from

25   hospital staff.

1    Q.    So it's fair to say you thought somebody other than you

2    was going to be riding herd on Mr. Hinckley to get a job?

3    A.    I don't know about riding herd, but, certainly, helping

4    to monitor his progress.

5    Q.    But you really didn't know what else anybody else was

6    doing?

7    A.    I know that there was an active treatment team and that

8    he would be dealing with these issues on the grounds at the

9    hospital.

10    Q.    Okay.  But, for example, you gave him an application to a

11    local historical foundation, and by middle of May, you had no

12    idea what he had done with that application?

13    A.    That's right.

14    Q.    And you gave him an application to work at a regional

15    medical center, and by the middle of May, you had no idea what

16    he was doing?

17    A.    You're exactly right.

18    Q.    Okay.  And you had no idea whether he had followed-up

19    with Housing Partnerships?

20    A.    That's a question mark.  I knew that there was some

21    interaction going on back and forth, but --

22    Q.    Well, you told --

23    A.    I didn't know specifically about it.

24              MR. LEVINE:  Objection.

25              THE COURT: Let him finish, Ms. Chasson.

1          MS. CHASSON:  Sorry.

2     BY MS. CHASSON:

3     Q.    You told Dr. Phillips that since you hadn't spoken with

4     Mr. Hinckley, you really didn't know whether he had followed-

5     up with Housing Partnerships or not.

6     A.    Okay.

7     Q.    Did you make that statement to Dr. Phillips?

8     A.    I probably did if he has it in his report if that's the

9     exact date, yes.

10     Q.    And you had no idea what the status was of Mr.

11     Hinckley's follow-up, if any, with the Salvation Army,

12     correct?

13     A.    Correct.

14     Q.    And you had no idea what the status was of Mr.

15     Hinckley's follow-up with the local art museum, correct?

16     A.    Unfortunately, in the March, I believe he had a visit in

17     March and that did not take place.  So I was looking forward

18     to checking with him about those different -- the progress

19     that he has made, and my understanding is -- I mean I know

20     from talking with him that back in the fall of '07, a lot of

21     momentum had been building, and, as a matter of fact, I looked

22     at my note in December -- I think it was December 24th -- that

23     he, quote, was raring to go, to get busy on some more of these

24     projects.

25          However, with the demise of his father and then the death

1        in January and, also, the maternity leave of Nicole that

2        things -- the momentum was lost.

3        Q.   Okay.

4        A.   So in March, I didn't get a chance to meet with him and

5        so I didn't know until May.

6        Q.   But the fact of the matter remains that for five months

7        you had no idea what he was doing in terms of getting a job

8        even though at that point, you were his local case manager?

9        A.   Correct.

10       Q.   Okay.  Now, you also identified some social activities

11       for Mr. Hinckley, correct?

12       A.   One.

13       Q.   One.

14       A.   SALT.

15       Q.   All right.  And you didn't make -- did you contact the

16       SALT organization before you sent Mr. Hinckley to that

17       meeting?

18       A.   No, I did not.

19       Q.   Okay.  Now, so then you didn't know that the age range of

20       the people that would be attending the meeting was much older

21       then Mr. Hinckley, did you?

22       A.   That's incorrect.

23       Q.   You knew that everybody else there was going to be 70?

24       A.   You are wrong.  They are not.

25       Q.   Well, that was Mr. Hinckley's experience when he went.

A.   Well, as you may know from going to any meeting or any party, when you walk into a party,  there are going to be different people there and a different atmosphere.  So it depends on what night you arrive.

The stated criteria of SALT, including community knowledge of which I have, the people there -- because I have referred other of my patients there.  I had referred some in their 20's and 30's several years ago, and they came back and tole me it's a much older population, more 40 to 70.  So that's the population range, 40 to 70.  And, now, maybe the individual night that Mr.Hinckley was there, maybe there were a few older people, rather than younger people; younger being 40 and 50.

Q.   Thank you for that.

A.   Sure.  Well, I think that it's important that you understand the nature of the organization you're talking about.

Q.   But, Mr. Beffa, the fact remains that if you had telephoned somebody, you could have asked them what the age range is of the people that are currently attending now, right?

A.   I knew the age range.

Q.   Well, you thought you knew.

A.   That particular night you're talking about, you may have had more 70-year-olds.

1      Q.    Would you be surprised to learn that many of the other

2      people in that group had experienced the loss of a significant

3      other and were there, at least in part, to seek support over

4      the issue of that loss?

5      A.    Correct.  I, myself, have participated in that

6      organization.

7      Q.    All right.  And had you spoken to somebody in charge of

8      the meeting, you might have learned that there were actually

9      people attending that group who are victims of stalking?

10     A.    Of what?

11     Q.    Stalking.  Were you aware of that?

12     A.    I know that one person had that experience.

13     Q.    And are you aware that Mr. Hinckley has in the past

14     stalked other people?

15     A.    No.  Well, yes.  Jodie Foster, but --

16     Q.    Yeah.  And he has also stalked a pharmacist.

17             MR. LEVINE:  Objection, Your Honor.  That is a fact

18     in vigorous dispute.

19             THE WITNESS:  That's not what I read in the report.

20     BY MS. CHASSON:

21     Q.    You are aware of at least one person that he's stalked,

22     right?

23     A.    Correct.

24     Q.    Okay.  So it's fair to say that some other people in that

25     group might have felt very uncomfortable about Mr. Hinckley

1    attending that particular support group with them?

2    A.   You say some or one?

3    Q.   That other people in that group who had been stalked

4    might feel very uncomfortable at the presence of Mr. Hinckley

5    there.

6    A.   The one person who had been most likely would have been,

7    correct.

8    Q.   Yes.  But, nonetheless, you felt that was an appropriate

9    social placement for Mr. Hinckley.

10   A.   No question at all about it.  Because the person who was

11   stalked also needs to learn to deal with her own issues or his

12   own issues, whoever was stalked.

13   Q.   You don't think that it's, perhaps, the stalking victim's

14   choice about whether they would like to be in the same room

15   with somebody else who has a history of stalking?

16   A.   I'm not going to seek out every individual member of

17   assault to find out their personal problems and make sure that

18   they're all taken care of before another person comes to

19   attend.

20   Q.   But you knew about this one, right?

21   A.   Not 'til later, no.

22   Q.   And you also didn't know that this was pizza night so

23   that the Hinckley family didn't need to go to the trouble of

24   bringing a covered dish with them.

25   A.   No.  Because that had not been the way the organization

had been run in the past.

Q.    Right.  And you also didn't know because you didn't check that they should have brought a gift to participate in that night's activity.

A.    No.

Q.    All right.  And the result that they had to endure a really embarrassing social situation, right?

A.    I have a different attitude about that.  It may have been somewhat embarrassing, however, from the information I had available to me, it was as if they were prepped ahead of time that by the report or the phone contacts that Mister -- I want to say Billips(sic) -- Phillips had been involved in with the members of that organization, so they were very much ready -- in the sense ready for bear.

Q.    What exactly did Dr. Phillips tell the SALT organization leadership that they were ready for bear?

A.    I don't exactly the details of what was told, just that Mr. Hinckley would be participating, and what their concerns would be.

Q.    I'm sorry.  Dr. Phillips -- what is your understanding of what Dr. Phillips did to contaminate the SALT experience?

A.    When a problematic child or teenager is going from one school to another, and the teachers receive all the negative reports about the person, our impressions are somewhat formed before a person ever comes, and a lot of people ideally make

1    their first impressions based on without knowing the person at

2    all and allowing their own impressions to be made, but it

3    appeared, from what I was told from the outgoing chair and the

4    incoming chair, that impressions were greatly made before the

5    person ever arrived, before John ever arrived there.

6    Q.    And you blame that on Dr. Phillips?

7    A.    Not totally, no.

8    Q.    Because we're talking about Mr. Hinckley here.

9              MR. LEVINE:  Objection, Your Honor.  He was still

10   answering the question.

11             THE COURT:  You can finish your answer.

12             THE WITNESS:  Not totally, no.  Yes, John's history

13   precedes him, that goes without speaking.  However, to have a

14   government person come forward -- the same thing happened with

15   the United Way -- a government person had come forward, and

16   its like the scene is primed for concern.

17   BY MS. CHASSON:

18   Q.    By telling them that John Hinckley would be coming.

19   A.    Correct.

20   Q.    But your view is that but for Dr. Phillips telling the

21   incoming president or outgoing president of SALT, whichever

22   ones that he talked to, that John Hinckley might be attending

23   a meeting, everything would have been fine?

24   A.    I didn't say that.  No, you're incorrect.

25   Q.    Now, there's actually been a long history of articles in

1    your local newspaper about Mr. Hinckley, right?

2    A.    Yes.

3    Q.    And they didn't just start this year?

4    A.    Correct.

5    Q.    Okay.  And you actually have sat next to a couple at a

6    dinner party who indicated to you that they were not pleased

7    at Mr. Hinckley relocating to your local area.

8    A.    Correct.

9    Q.    Okay.  And did that -- was that at a dinner party with a

10   couple from the same gated community in which the Hinckleys

11   live?

12   A.    That's correct.

13              THE COURT: I didn't hear what you said.

14              MS. CHASSON:  A couple within the same gated

15   community that the Hinckleys live.

16   BY MS. CHASSON:

17   Q.    Okay. Now, so let's go back to Mr. Hinckley's volunteer

18   jobs.  We established that by the middle of May you really

19   didn't know where Mr. Hinckley was in his job search.  When

20   did you contact the Services Board on Mr. Hinckley's

21   behalf?

22   A.    As I indicated earlier, the initial time was back in like

23   the -- when I first became involved with him in, say, was it

24   the spring of '07?

25   Q.    Okay.  And when was the next time after that you spoke to

1   the Colonial Services Board?

2   A.   About four weeks ago.

3   Q.   Four weeks ago?

4   A.   Sometime within the last four weeks.

5   Q.   And what did you tell them when you contacted them four

6   weeks ago?

7   A.   That I was checking to see what services -- I was asking

8   them what services would be available that John Hinckley was

9   -- would be hopefully expanding time and what might be

10  available for him.

11  Q.   Did you ask what services would be available or did you

12  ask if they would be able to provide a volunteer opportunity

13  for him?

14  A.   Primarily, services; secondarily, volunteer.

15  Q.   Okay.  So you asked about both?

16  A.   Yes.

17  Q.   Okay.  And they gave you a favorable response at that

18  point?

19  A.   Yes.  I was told that a place called "People's Place" is

20  -- first, you become a member, and then I was told that the

21  next level, so to speak, that a person of higher functioning

22  may want to participate in a volunteer position of being on

23  the leadership and empowerment committee on which sit some

24  staff members, and then if that goes well, then the next level

25  up might be to be a peer counselor.

1    Q.    Okay.  When did you talk to them again after that?

2    A.    The -- let's see.  That was it.

3    Q.    Well, did you speak to them on Monday asking them for a

4    letter that you could bring to the Court?

5    A.    Oh, right.  Thank you for reminding me, yes.

6    Q.    So you called them then on Monday and said that you

7    needed a letter that you could bring to court?

8    A.    That I would like to have in writing what they had

9    indicated.

10   Q.    Okay.  Did you tell them that you needed a letter about

11   services or about a volunteer job?

12   A.    Both.  Because the director had indicated to me that John

13   would be able to volunteer like in a position of serving food

14   to the members that are there, that it would be like a

15   volunteer position.

16   Q.    Did you request a letter addressing his volunteer

17   opportunities?

18   A.    Both.

19   Q.    Now, when did you contact the Unitarian Church?

20   A.    Unitarian Church; about two weeks ago.

21   Q.    Okay.

22   A.    A week, two weeks, 10 days; around that time frame.

23   Q.    Okay.  So that was one or two weeks ago?

24   A.    Yes, ma'am.

25   Q.    Okay.  And when you first contact the Vibrant Life

1    Ministry?

2    A.    That would have been about five days ago.

3    Q.    And it's your understanding that Mr.  Hinckley has offers

4    to work at both of those places; one of them an oral

5    commitment to you and the other in writing?

6    A.    At Vibrant and -- what was the other one?

7    Q.    And the Unitarian Church in their library.

8    A.    Right.  Yes.  Uh-huh.

9    Q.    And you have a letter in writing from Vibrant life?

10   A.    Yes.

11   Q.    Now, so once you really started to dig around, in two

12   weeks you found two live volunteer opportunities for Mr.

13   Hinckley, right?

14   A.    That's right.

15   Q.    Okay.  And that's notwithstanding the community

16   resistance, correct?

17   A.    Correct.

18   Q.    And notwithstanding the fact that Dr. Phillips had

19   already been down there, correct?

20   A.    Correct.

21   Q.    Right.  You still produced two jobs in two weeks once you

22   really turned yourself to it.

23   A.    Three jobs.

24   Q.    What's the third one?

25   A.    Eastern State Hospital libraries.

1    Q.    Now, you're aware that the purpose of transitioning Mr.

2    Hinckley down to his parents' community is to remove him from

3    the state hospital setting, correct?

4    A.    That's correct.

5    Q.    And isn't it correct that another goal of community

6    transition is to perhaps try something new or expand their

7    horizons?

8    A.    You bet.

9    Q.    Okay.  But this is another job at a same state mental

10   health facility doing exactly what Mr. Hinckley has been doing

11   before?

12   A.    Exactly.  Because you have to have wings before you fly.

13   We get them to walk step by step, and you start where the

14   patient is until they feel comfortable and move them forward

15   in progress.

16   Q.    So you think that's an appropriate placement for Mr.

17   Hinckley?

18   A.    Ideal.

19   Q.    All right.  Is that -- how far away from his parent's

20   gated community is this state mental hospital?

21   A.    About a 10-minute drive.

22   Q.    Really?  Okay.

23             THE COURT: This is Eastern State Hospital?

24             THE WITNESS:  That's correct, yes.

25   BY MS. CHASSON:

1    Q.   So you produced three job in two weeks when you really

2    had to?

3    A.   Yes, ma'am.

4         MS. CHASSON:  If I may have the Court's indulgence

5    for one second.

6         THE WITNESS:  When you say "really had to", it

7    sounds a little derogatory, and I wanted to comment about

8    that.

9         MS. CHASSON:  Go right ahead.

10        THE WITNESS:  Because as I indicated before, when a

11   patient is trying to do something new in their life and

12   they're experimenting to accommodate their needs, it is left

13   primarily up to them, however, when the is person is having

14   difficulty doing that, and in John's case, being greatly

15   rebuffed, I thought it would be very supportive of me to step

16   in further, and since I hadn't had more contact with him more

17   recently that I would go ahead and take that on my shoulders

18   so that he would be able to have that opportunity.

19   BY MS. CHASSON:

20   Q.   Well, were you aware that in the context of transitioning

21   an insanity acquittee to the community, that's the expected

22   role of a case manager?

23   A.   It could be, yes.  No.  I was not aware of that.  Because

24   I was in the framework of working with private patients in --

25   Q.   I understand you have no experience in this.

1    A.   Yes.

2    Q.   Yes.  Now, how far is the Vibrant Life Ministries from

3    the Hinckley's home?

4    A.   It would be approximately a 20, maybe 25-minute drive to

5    where they have their thrift shop and their warehouse,

6    however, the other -- I was told that there are two offices in

7    the individual churches, and those would be probably about a

8    10, 15-minute drive.

9    Q.   So which of those locations will Mr.  Hinckley be working

10   in?

11   A.   It's uncertain at this time.

12   Q.   Okay.  So who's going to be driving him there?

13   A.   The man who is the founder and chair of the board.  He

14   offered to drive him until he has his license and, hopefully,

15   permission to do on his own.

16   Q.   And when is anybody going to learn which location Mr.

17   Hinckley is going to be working at?

18   A.   Which location of those -- of that --

19   Q.   Uh-huh.

20   A.   When it becomes more firm with, first of all, the Court's

21   permission, and, secondly, the coordination, as would take

22   place with all organizations with me and the Hospital staff.

23   Q.   Okay.  So it's your view that no further coordination was

24   necessary at this point to identify the precise location?

25   A.   How can something be -- I'm sorry.

1    Q.   No further work was needed to be done right now to

2    identify the precise location where he was working.

3    A.   Correct.  Until something is a definite, I think it's a

4    waste of energy to go ahead and make such more detailed

5    situations.

6    Q.   Okay.  You testified on direct that, in your view, one

7    barrier to Mr.  Hinckley obtaining a volunteer position in his

8    parents hometown has been the fact that his current release

9    conditions do not permit him sufficient time in the hometown.

10   Do you recall that testimony?

11   A.   That's right.

12   Q.   Were you aware that under the current (e)proposal that is

13   pending before the Court, he would only be spending five

14   business days in his parent's hometown?

15   A.   I am.

16   Q.   And were you likewise aware that he's currently given six

17   days of his own choosing to spend in his parent's hometown?

18   A.   Yes.

19   Q.   So it is Mr.  Hinckley's choice, is it not, as to whether

20   he chooses to allocate his time over a weekend or during a

21   work week?

22   A.   Correct.

23   Q.   And if he chose to allocate the days during the week,

24   then it would be easier to look for a job?

25   A.   I haven't asked him his reasoning in doing that.

1    However, I would think some of it has to do with other family

2    commitments and opportunities of being with family, and so,

3    yes, it would be up to his choice.

4    Q.   Right.  And so there would be a way to make the workday

5    possible if the family commitments could be eased?

6    A.   I would think so.

7           MS. CHASSON:  All right.  May have I the Court's

8    indulgence for one second?  Thank you, Mr.  Beffa.  I have no

9    further questions.

10           THE COURT: Let me ask you about these three

11   volunteer opportunities.  In the current proposal from the

12   Hospital in their May 28th letter, that letter contemplated

13   volunteer service at Housing Partnerships, right?

14           THE WITNESS:  Unfortunately,  yes.

15           THE COURT:  And what it says is up to five hours

16   twice a week, Tuesdays and Thursdays, from 8 o'clock until 12

17   o'clock.  And do you have that the kind of specificity with

18   respect to these three live options now in terms of are there

19   particular days of the week or particular number of hours that

20   they would like to have him there or is that all still to be

21   discussed?

22           THE WITNESS:  I made it very clear with all three

23   that from going according to what the document said that it

24   would be two or three days a week; initially, it would be two

25   or three days a week for three to four hours.

1           THE COURT: Okay.

2           THE WITNESS:  Each time.

3           THE COURT:  Okay.  But it doesn't have to be these

4    particular days as far as --

5           THE WITNESS:  No.

6           THE COURT:  Are each of them or some of them

7    flexible in the terms of the number of hours per session of

8    volunteer work and the number of days?

9           THE WITNESS:  Yes, they would be.

10          THE COURT: In view of your experience over the last

11   couple of weeks in locating these three possibilities, how can

12   -- well, in view of that and in view of everything else you've

13   said, I guess, too, how concerned do you remain about the

14   un-welcoming experiences or the un-welcomeness of this

15   community going forward?  Maybe I should say it a little

16   differently.  But up until now when his visits have been

17   within the confines of the gated community and to the extent

18   it's outside there, going to a dinner or something, he's been

19   with his parents or brother or sister.  This proposal and some

20   of these volunteer opportunities, maybe all of them, I'm not

21   sure, contemplate going outside the gated community into the

22   larger community, right?

23          THE WITNESS:  Yes.

24          THE COURT: Are you concerned going forward that his

25   notoriety in some of the experiences that you had in trying to

1     place Mr.  Hinckley are going to be an ongoing problem?

2            THE WITNESS:  I'm very concerned that it will be

3     ongoing, not to the degree it has been, because some of the

4     people I've talked with, like I said, had much empathy for him

5     getting, quote, a raw deal from these different agencies and

6     being un-welcoming.  So, yes, it's going to be there.

7            However, I also think that's grist for the mill for

8     John to be able to learn how to deal with relationships, and,

9     at the same time, simultaneously meeting his own needs.  But,

10    also, as a side comment, I'm still a "come here" is the

11    terminology that locals use for people moving to [the city]

12    community, and I've been there over 30 years, and I've

13    experienced somewhat similar, although, I'm not a criminal, I

14    have experienced -- and most people moving there have to

15    establish their own network, so you have to seek out different

16    people to have relationships with, and I would think John --

17    it would be his learning process to learn who those people

18    could be.

19           THE COURT:  I mean one of the questions that has

20    concerned me as we've talked about this -- and this is a

21    larger question -- but you're the one person we've heard from

22    at this hearing who actually lives there, but one of the

23    questions that concerns me is whether in the long run,

24    particularly in view of his mother's age, whether this is the

25    best community for him.

1          THE WITNESS:  Well, you've mentioned yesterday about

2     it being an "old-timers community" and I took a little umbrage

3     at that because we're not all that old there.  People move

4     there because of the voluminous amount of opportunities in the

5     community, and it does a -- once you find your niche, people

6     are very happy and stay and retire.

7          Military people return to the community for that

8     very reason, so, and that's the reason I raised my family

9     there because it's a close knit community.  At the same time,

10    it offers a lot of opportunities, as well as going far and

11    wide from Richmond to Norfolk to go get lost in the bigger

12    city if you want to.

13          THE COURT: Mr.  Levine.

14          MR. LEVINE:  No further questions, Your Honor.

15          THE COURT: Anything else, Ms.  Chasson?

16          MS. CHASSON:  No.  Thank you, Your Honor.

17          THE COURT:  Okay.  Mr. Beffa, thank you very much.

18    Mr.  Levine, do you have any additional witnesses?

19          MR. LEVINE:  No additional witnesses, Your Honor.  I

20    think I may want to just check what has been admitted.

21          THE COURT:  Yes.  You said you have a few house-

22    keeping matters before we moved on.  I assumed that had to do

23    with exhibits, but --

24          MR. LEVINE:  Your Honor, there is the risk

25    assessment that needs to be admitted.

1              THE COURT: Let me tell you what I've -- the risk

2      assessment, does that have -- this is Dr. Montalbano's?

3              MR. LEVINE: Yes, sir.  Yes, sir.

4              THE COURT:  That's listed as a government exhibit,

5      08-03.  Should we just admit that or do you want to mark --

6              MR. LEVINE:  Well, maybe we should mark it as a

7      patient's exhibit, as well.

8              THE COURT:  That's fine if you'd like to do that

9              MR. LEVINE:  Okay.  That would be a patient's

10     exhibit, Patient Exhibit 11.  I have copies of it, but I don't

11     think Mr. Zeno --

12             THE COURT:  No.  I think everybody has copies of it.

13             MR. LEVINE:  Let me just give one to the Court.

14     This is Patient 11.

15             THE COURT:  Eleven.

16             MR. LEVINE:  Your Honor, there is, of course, the

17     (e)petition itself.  Now, I'm not sure that needs to be marked

18     or admitted.  I think that is the motion before the Court, but

19     at the Court's pleasure, we're happy to mark it.

20             THE COURT: I'm not sure we --

21             MR. ZENO:  Your Honor, I think it needs to be put

22     into the -- Your Honor, at some point it should be put into

23     the record.  We need to redact it, of course, but it seems to

24     me that marking it as an exhibit is the easiest, most direct

25     way to get into the record.  The government would be glad to

1          do it, but Mr.  Levine -- I don't care who does it.

2                    MR. LEVINE:  I think all of these exhibits are, at

3          least from our perspective, are moved into evidence subject to

4          an agreement with respect to redaction.

5                    THE COURT:  Oh, absolutely. Everything is with

6          agreement with respect to redaction.  Nothing is being filed

7          in the public record until we deal with redactions.

8                    MR. LEVINE:  The Court was careful in requiring that

9          the (e)petition be filed under seal.

10                    THE COURT: Right.

11                    MR. LEVINE:  We see what happens when parts of what

12         is under seal become public, and we see the distortions that

13         are created.  So I am -- I think we should all be mindful that

14         as we move items into evidence that it's surely not our view

15         that they should necessarily become public documents.  I think

16         by making them public, we have to -- we witness the very

17         things, the very prejudices and that Mr.  Beffa identified.

18                    THE COURT:  I think in past hearings they've been

19         filed in public record in redacted form some time after the

20         hearing.

21                    MR. LEVINE:  That's correct, Your Honor.  And the

22         redactions, of course, have been very modest.  They've been

23         with respect to the names, but we all know the inflammatory

24         use to which these documents are placed by sensationalist

25         presidents -- excuse me -- journalists.  It is a -- the

1   "Casanova convict"; Geraldo brought us that one.  Comes from

2   these papers.

3           THE COURT:  Well, they haven't come from any of the

4   papers except from, presumably, what the government filed and

5   the way people have read it or misread it or extrapolated from

6   it because nothing has been filed in the public record.

7           MR. LEVINE:  Yes.  We saw what came when the

8   government filed and what it did, and it came from the cherry

9   picking from the (e)petition.  Now, the (e)petition is under

10  seal, and I think it is a good practice that the Court has

11  engaged in --

12          MR. LEVINE:  It is.

13          THE COURT: Well, it's all under seal.  The question

14  is -- I think the question we are discussing is whether we

15  want to give the (e)petition an exhibit number or not.

16          MR. LEVINE:  On that level, Your Honor, sure.  Give

17  it an exhibit number.  No problem.  Any way the Court wants to

18  handle it.

19          THE COURT: Should we give it a patient exhibit

20  number or a government exhibit number or set up a separate

21  exhibit list for the Hospital because the Hospital is -- it's

22  their letter.

23          MR. LEVINE:  Patient exhibit number, Your Honor.  As

24  a technical matter, Your Honor, I regard the (e)petition as

25  essentially the equivalent of a complaint, which is in the

1    record, civil complaint or -- but one could argue it's an

2    exhibit, and I'm perfectly happy to view it as that.  We can

3    give it a number, Patient 12.

4              THE COURT:  All right.  Let's give it Patient 12

5    will be the (e)letter.

6              MR. LEVINE:  Tender a copy to the court clerk, Your

7    Honor.

8              THE COURT:  Okay.  So that's Number 12.  So let me

9    tell you what -- unless there's anything else that we haven't

10   marked yet that you want to mark.  I think that from the

11   patient's side, No. 1 was the individualized relapse

12   prevention plan; that's in evidence; No. 2 is an article from

13   The Gazette; that's in evidence; then there's some pages from

14   the DSM, No.  3; that's in evidence.  Then the next two, I

15   don't think have been admitted yet; No.  4 was a September

16   4th, 2007 note from Dr.  Montalbano, and No. 5 was a

17   psychotherapy note from Dr. Binks, which were marked, but I

18   don't know if they were offered.

19             MR. LEVINE:  We move them in.

20             THE COURT: Okay.  I take it there is no objection.

21             MR. ZENO:  That's correct, Your Honor.  No

22   objection.

23             THE COURT: So four and five will be admitted;

24   6(a)and 6(b), the CD and the lyrics to "Hero" have been

25   admitted; No. 7, a letter from Vibrant -- what's it called --

1    Vibrant Life Ministries is No. 7.  That has been admitted.

2              MR. LEVINE:  Vibrant Life Ministries.

3              THE COURT:  No. 8 is a letter from Services

4    Board as is No. 9.  They were both admitted.  Number 10 was

5    marked this morning.  That's the article from The Gazette.  I

6    take it -- I can't remember whether we admitted it, but --

7              MR. LEVINE:  I think we did.  I know I moved it, and

8    I believe Your Honor received it.

9              THE COURT:  All right.  And 11 and 12 were just

10   admitted.  Whoever has got the original of The Gazette

11   article, if you want to give it to Ms.  Moon, she'll make

12   copies over lunchtime so that I have copies.

13             MR. LEVINE:  Tender it to the Court, Your Honor.  I

14   believe there have been some copies made.

15             THE COURT: Oh, have there?

16             MR. ZENO:  We have a copy.

17             THE COURT:  Okay. You already made the copies, then.

18             MR. LEVINE:  Does the Court want to keep the

19   exhibit?

20             THE COURT: Yeah.  I'll keep the exhibit unless you

21   want the original back.  So that's it, one through 12 from the

22   patient side.

23             MR. LEVINE:  With that, Your Honor, the patient

24   rests.

25             THE COURT: Okay.  So we're going to start with

1    Dr. Phillips after lunch, and we'll see how far we get.  So

2    it's 12:15 now.  Do you want to say 1:30 or do you want to say

3    1:45?

4              MR. LEVINE:  That's better, Your Honor.

5              MS. CHASSON:  That's fine, Your Honor.

6              THE COURT:  Okay.  We'll say 1:45.  Okay.  See you

7    all at 1:45.

8              (Whereupon, the lunch recess was taken at this

9    time.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T E

3

4          I, Wendy C. Ricard, Official United States Court

5    Reporter in and for the District of Columbia, do hereby

6    certify that the foregoing proceedings were taken down by

7    me in shorthand at the time and place aforesaid,

8    transcribed under my personal direction and supervision,

9    and that the preceding pages represent a true and correct

10   transcription, to the best of my ability and

11   understanding.

12

13

14

15                            _____

16                            Wendy C. Ricard, CCR, RPR

17                            Official U.S. Court Reporter

18

19

20

21

22

23

24

25