1                    UNITED STATES DISTRICT COURT

2                        DISTRICT OF COLUMBIA

3

4      UNITED STATES OF AMERICA         CRIMINAL ACTION NO. 81-306

5                                       WASHINGTON,D.C.

6      VERSUS                           TUESDAY, JULY 22, 2008
                                        (Redacted)

7

8      JOHN W. HINCKLEY, JR. (ST. ELIZ.)  10:00 A.M.

9

10                   **EVIDENTIARY HEARING(DAY 2)**
                     **(Testimony of Dr. Montalbano)**

11

12               BEFORE THE HONORABLE PAUL L. FRIEDMAN

13                 UNITED STATES DISTRICT COURT JUDGE

14

15     A P P E A R A N C E S:

16

17     FOR THE PLAINTIFF               THOMAS E. ZENO, ESQ.
                                       SARAH T. CHASSON, ESQ.
                                       U.S. ATTORNEY'S OFFICE
18                                     555 Fourth Street, NW
                                       Suite 5423
19                                     Washington, DC 20530
                                       (202) 514-6957
20

21     FOR THE DEFENDANT
       JOHN W. HINCKLEY, JR.           BARRY W. LEVINE, ESQ.
22                                     ADAM S. PROUJANSKY, ESQ.
                                       ANN-MARIE LUCIANO, ESQ.
23                                     DICKSTEIN SHAPIRO, LLP
                                       1825 Eye Street, NW
24                                     Washington, DC 20006-5403
                                       (202) 420-2237
25

WENDY C. RICARD, RPR, CCR
OFFICIAL COURT REPORTER

```
1

2    ST. ELIZABETHS HOSPITAL          TONYA A. SAPP, ESQ.
                                      D.C. ATTORNEY GENERAL'S
3                                     OFFICE
                                      441 4th Street, NW
4                                     Suite 1060 North
                                      Washington, DC 20001
5                                     (202) 724-5562


6
     REPORTED BY:                     WENDY C. RICARD, RPR,CCR
7                                     OFFICIAL COURT REPORTER
                                      333 Constitution Ave., NW
8                                     Room # 6718
                                      Washington, DC  20001
9                                     (202)354-3111

10

11   Proceedings recorded by mechanical stenography.

12   Transcript produced by computer-aided transcription.

13

14

15

16                          I N D E X

17

18   WITNESSES:

19        Dr. Paul Montalbano.................

20          By Mr. Levine........................ 3

21          By Ms. Zeno.......................... 64

22

23

24

25
```

**P R O C E E D I N G S**

1

2          THE COURT: Good morning, everybody.  All right.  Are

3     there any preliminary matters or are we ready to proceed with

4     Dr. Montalbano?  Here's Mr.  Hinckley.

5          MR. LEVINE:  We're ready, Your Honor.

6          MR. ZENO:  Ready, Your Honor.

7          THE COURT: Okay.  Dr. Montalbano.

8          THE WITNESS:  Good Morning, Your Honor.

9          THE COURT: Good morning, sir.  You're still under

10    oath from yesterday.

11         THE WITNESS:  Yes, sir.

12         MR. LEVINE:  May it please, Your Honor.

13         THE COURT:  Yes, sir.

14    BY MR. LEVINE:

15    Q.   Dr. Montalbano --

16         THE COURT: It's not you this morning.

17         (Cell phone ringing.)

18         MR. LEVINE:  But it's a reminder to me.

19         THE COURT: It's Dr. Rafanello.

20    BY MR. LEVINE:

21    Q.   Dr. Montalbano, let us turn our attention, please, to

22    relationships with women.  Now, let's start with Leslie

23    DeVeau.  Has Mr.  Hinckley had interactions with Ms.  DeVeau

24    since the last year's hearing?

25    A.   Yes.

1    Q.   And how did this start?

2    A.   I believe at some point after last year's hearing during

3    the --

4              THE COURT:  Could you talk a little more into the

5    microphone?  I'm having trouble --

6              THE WITNESS:  Is that okay?  I have divergent

7    requests to be closer and farther from the microphone.  I'll

8    try to resolve that with a happy medium.

9              MR. LEVINE:  You have to resolve conflict.

10             THE WITNESS:  During the ups and downs of the

11   relationship with Ms. M, Mr.  Hinckley sought out his longtime

12   confidante, Ms.  DeVeau.  I believe at the end of June, she

13   began to visit.  The visits and the contacts increased in

14   frequency, sorry, and they  began to relate to each other.

15   She visited -- he was getting different feedback from the

16   treatment team, from Dr. Lee, from people he was involved with

17   about the wisdom of proceeding with the relationship.

18             Finally, in November, I believe, he once again

19   decided to end the relationship with Ms.  DeVeau.  I believe

20   he had also sometime in August decided to, quote, end the

21   relationship with Ms.  DeVeau, and then she appeared on

22   campus, and he was somewhat surprised, but touched by her

23   presence and concern for him, and they again resumed some

24   level of contact.  Then in November, the relationship ended

25   again, and then he has had a few contacts with her since then.

1    BY MR. LEVINE:

2    Q.    Did he have contact with her after his father passed

3    away?

4    A.    Yes.

5    Q.    Tell us about that.

6    A.    Well, after his father passed -- his father passed on

7    January 29th of this year -- I believe he called her the next

8    day, January 30th.  He was already back on the grounds of St.

9    Elizabeths at that time.  She had been intimately involved not

10   only with Mr.  Hinckley, but with the extended Hinckley

11   family.

12   Q.    Well-known to the mother, the father, siblings?

13   A.    Well, yes.

14   Q.    Did they share the bulk of the 20-some-odd-years together

15   at St. E's?

16   A.    Yes.

17   Q.    Now, how did Dr. Binks view Mr.  Hinckley's

18   reestablishment of this relationship?

19   A.    I think overall Dr. Binks viewed it in a positive matter.

20   Dr. Binks in fact viewed the ending of the relationship as

21   leaving him more vulnerable to relationships that were

22   potentially more unstable.  I believe Dr. Binks characterized

23   it as something like the loss of a massive, emotional

24   long-term relationship, and I believe that Mr.  Hinckley

25   wishes he could continue to contact her, at least as a

1    confidante and friend, but feels in a bind about that in light

2    of the Court order barring contact during visits in light of

3    the treatment teams feedback about whether there is -- whether

4    it is ultimately futile to be pursuing a relationship with Ms.

5    DeVeau in light of the context of Ms.  DeVeau refusing to

6    contact -- to have regular meetings with the treatment team or

7    potentially additional experts.

8              THE COURT:  Potentially what?

9              THE WITNESS:  Additional experts; government

10   experts, hospital experts.  She does not want that degree of

11   scrutiny.

12             THE COURT: Right.

13   BY MR. LEVINE:

14   Q.   She wants to maintain some privacy in her life?

15   A.   She -- yes.

16             THE COURT: Has the treatment team or Dr. Binks or

17   Dr. Green or Dr. Rafanello or you or anybody else at the

18   Hospital revisited that question and asked yourselves whether

19   or not on balance an ongoing relationship with Ms.  DeVeau

20   would be a good thing even if she didn't talk to the treatment

21   team?

22             THE WITNESS:  That is certainly a question I've

23   asked myself, and that is also a recommendation I have at the

24   end of my risk assessment, that it may well be that the

25   benefits of contact with Ms.  DeVeau outweigh the

1    disadvantages and risks associated with it even if the

2    treatment team or other experts were not able to contact her.

3         Of course, I need -- my recommendation is to revisit

4    the parameters of the relationship, and I think it would

5    behoove the treatment team and other individuals involved with

6    Mr. Hinckley, including family members, to revisit that issue

7    and see whether there were any mechanisms of contact with Ms.

8    DeVeau.  I know at some times in the past she has been open to

9    limited contact with limited treatment team members, but once

10   it starts to increase in frequency, she tends to withdraw.

11        So, again, I think you would need to balance that.

12   If the relationship were to significantly intensify and it

13   would change -- it was to become romantic or there would be

14   greatly increased frequency, I think the team would feel

15   understandably more bound to increase the amount of

16   information coming from Ms. DeVeau; but if it remains a

17   friendship with phone calls and support, I don't know how much

18   additional information we need.  I don't know how imperative

19   it is that we get information from Ms. DeVeau.  I know that

20   has been a focus of hearings in the past.

21   Q.   The Hospital has lot of information from Ms. DeVeau over

22   the course of many, many years.

23   A.   Yes.  I believe we do have a great deal of information,

24   and then having interviewed Ms. DeVeau myself, I must say I

25   am impressed with her stability.  I am impressed with her

1    recovery.  I am impressed with her, I think, genuine degree of

2    concern for Mr.  Hinckley.

3          I think that whenever he becomes involved in a new

4    relationship, you have to wonder, number one, why that

5    individual is choosing to become involved with Mr.  Hinckley

6    who has a significant degree of notoriety associated with him.

7    Can he trust that person?  What if that person were to go to

8    the media?  What if that person were to give a CD that he had

9    given her to some person, and all of a sudden, it's out in the

10   public domain?  There are different risks associated with it

11   that would certainly complicate the transition that we are

12   endeavoring to undergo at the Hospital.

13         I feel confident that you can trust Ms. DeVeau.  I feel

14   confident that she has Mr.  Hinckley's best interest at heart.

15   With regard to Ms.  M, in particular, I did not have that

16   degree of confidence.  I have somewhat more degree of

17   confidence in Ms. G, but nowhere near the level of confidence

18   I had with Ms. DeVeau.

19   Q.   Would you agree with Dr. Binks' characterization of the

20   relationship as one of being critically supportive

21   relationship, each for the other?

22   A.   Well, this is the longest relationship he has ever had in

23   his life.  He met her in October of 1982, and their

24   relationship gradually intensified over time.  I mean these

25   are two individuals connecting in a sometimes bleak

1     environment, had similar histories, including significant

2     depression, violence associated with that depression, and I

3     believe they significantly helped each other in their recovery

4     from their severe mental illness.

5          So I believe with that kind of similar history, there has

6     to be degree of connection that would be hard to duplicate in

7     the future, and as the relationship progressed, I think they

8     each were able to help each other in their own recovery.

9          THE COURT: Is there any indication from anything

10    that you have in the record or from interviews with Ms.

11    DeVeau in the past that their -- if they were to resume a

12    long-term relationship that this would increase the potential

13    for dangerousness of either of them?

14          THE WITNESS:  I don't believe so.  From what I

15    understand, Ms.  DeVeau, who is an employee for the Department

16    of Mental Health, has maintained her stability, has maintained

17    the remission of her illness for quite some time.  And as I

18    testified yesterday,  I believe that Mr.  Hinckley has been in

19    remission for quite some time.  We can certainly debate the

20    exact number of years and the exact degree of remission, but I

21    think it has been in remission for a substantial period of

22    time, and I think that the support that Mr.  Hinckley

23    experiences from Ms. DeVeau is hard to replace.

24          THE COURT:  Did she -- before we began these

25    hearings five years ago or whenever it was, was she more

1    willing to talk to the treatment team or to participate in

2    conjoint therapy at that point and it was only when these

3    hearings started or was she always reluctant?

4              THE WITNESS:  No.  We went through a period in the

5    past, I believe before the hearing in 2003, where Ms. DeVeau

6    had engaged in a period of conjoint therapy with Dr. Binks, at

7    one point with Dr. Stahas -- S-T-A-H-A-S -- I believe.  And --

8    but even without the hearing approaching, over time the

9    frequency -- excuse me -- of the conjoint therapy decreased.

10   And then again with the approach of the hearing, I began to

11   believe there was some additional withdrawal, and then Ms.

12   DeVeau was very opposed to meeting with the government experts

13   without her attorney present.

14             THE COURT: Right.

15             THE WITNESS:  And there was a bind about whether

16   that particular issue could be resolved, and then she further

17   withdrew from the contacts with the treatment team.

18   BY MR. LEVINE:

19   Q.   Do you remember that it was Dr. Phillips who said that he

20   would only meet with Ms. DeVeau if she met with him alone, and

21   Ms. DeVeau said that she would only meet with Dr. Phillips if

22   she were allowed to do it with her attorney?

23   A.   I think so.  I don't know whether that was Dr. Patterson

24   or Dr. Phillips, but I remember there being a particular

25   conflict about the conditions under which an interview would

1    take place.

2    Q.   And then there was the impasse?

3    A.   Yes.

4    Q.   And then Dr. Phillips declined to interview her on the

5    terms that she be without her attorney?

6    A.   I just remember there being an impasse.  I don't remember

7    exactly who declined what, when.

8    Q.   And the result of that impasse was that that doctor

9    recommended to the Court that with respect to the conditional

10   releases that Mr. Hinckley have no contact with Ms. DeVeau

11   during those releases?

12   A.   Well, I believe -- if I can recollect correctly -- I'm

13   sure Dr. Phillips recollects more correctly than I what his

14   recommendation was -- that there was a concern about the lack

15   of clarity in the relationship with Ms. DeVeau and

16   specifically about not being able to access information from

17   Ms. DeVeau in light of Mr. Hinckley's guardedness and at

18   times deceitfulness in his self-report, having a desire to

19   augment the information he was providing with information from

20   Ms. DeVeau, and now that information was no longer available.

21   Q.   Not available because of the impasse; she was willing to

22   meet with him with her attorney.

23   A.   I believe at that point, yes.

24   Q.   And is it your recollection that Dr. Keisling, in fact,

25   met with Ms. DeVeau with her attorney?

1    A.   Yes, I believe so.

2    Q.   And is it your recollection that Dr. Keisling met with

3    Ms. DeVeau with her attorney, and the attorney during the

4    interview didn't say a single word?

5    A.   I don't recall.  I just recall Dr. Keisling meeting with

6    Ms. DeVeau with the attorney present.

7    Q.   And had unfettered access to Ms. DeVeau?

8    A.   I mean access fettered by the presence of the attorney,

9    but access to Ms. DeVeau.

10   Q.   And that access, similar access, I daresay, identical

11   access, was offered to Dr. Phillips who declined?

12   A.   I don't think either Dr. Patterson or Dr. Phillips ended

13   up meeting with Ms. DeVeau because of the impasse, as I

14   stated.

15          THE COURT:  Now, there's a difference between

16   interviewing somebody in preparation for a hearing and having

17   a therapy session with somebody, right?

18          THE WITNESS:  Yes, of course.

19          THE COURT: Would you ever have a therapy session

20   with somebody with a lawyer present?

21          THE WITNESS:  I would not want to, nor would I want,

22   frankly, to have an interview in preparation for a hearing

23   with an attorney present.  I think it is preferable to have

24   the interview without a third party observing.  Once you

25   introduce another variable into the equation, you're

1    potentially altering the way the information is typically

2    obtained.  There are times, of course, however, where you're

3    court ordered; you can only meet with the individual with a

4    third party present.

5    BY MR. LEVINE:

6    Q.   And that's not uncommon in the world of forensics where

7    an attorney would be present in an interview?

8    A.   I don't know how common it is.  It's something I think

9    that most experts would prefer to have more unfettered access

10   to the individual being evaluated.

11   Q.   Now, did Dr. Binks -- how did Dr. Binks view Mr.

12   Hinckley's decision to end the relationship?

13            THE COURT: At what point in time?

14            MR. LEVINE:  Excuse me?

15            THE COURT: At what point in time.

16   BY MR. LEVINE:

17   Q.   I'm sorry.  That -- you indicated that it was renewed

18   sometime last summer, and then it stopped in November, I think

19   you said, and then there was an exchange soon after the death

20   of Mr. Jack Hinckley.  Now, during the course of this, there

21   was therapy with Dr. Binks, and Dr. Binks made a comment about

22   his views of Mr. Hinckley's decision to end the relationship.

23   It is at that point in time that I direct this question.

24   A.   Well, I think that Dr. Binks knew -- Dr. Binks has

25   explicated that this dynamic of whether to continue in

1   relationships has become a theme for Mr. Hinckley,

2   especially, a pattern emerges that in light of upcoming

3   hearings, whatever relationship he's involved with is going to

4   undergo rather intense, perhaps, unparalleled, scrutiny, a

5   type of scrutiny that many relationships would have difficulty

6   enduring.

7        And while he has talked with the person he is involved

8   with about the level of scrutiny, I don't think there is any

9   way of that individual really understanding what it is like

10  until it actually occurs.  And relationships -- we recall what

11  happened last year during the relationship with Ms. M, who has

12  a mental illness, and I believe that it increased her

13  volatility and was a significant strain on the relationship.

14       And it has happened in the past with Ms. DeVeau, this

15  bind about whether she was going to talk with all the people

16  required to talk to or whether it was simply easier for her to

17  say, no, I want to maintain my privacy.  And I think there has

18  been some increased level of turbulence in the relationship

19  with Ms. G as this hearing approached.  There was one point

20  in May where she said, that's it.  She started thinking about

21  the level of scrutiny, whether certain things about her would

22  be revealed in open court, whether certain things would become

23  apparent to her long-time companion, and it is like, I don't

24  know if I can handle this; but then shortly thereafter, the

25  relationship resumed again.

1          So with regard to the question about Dr. Binks' view of

2     ending the relationship again with Ms. DeVeau in November, I

3     think he views it as a relationship that is an important

4     support that is difficult to replace, but it is a rational

5     decision; that essentially Mr.  Hinckley is placed in a bind,

6     he feels, and other treatment team members feel, of choosing

7     between maintaining a relationship or increasing his freedom.

8                    THE COURT: But why do people feel that way?

9                    THE WITNESS:  I think in part because of the

10     concerns that have been expressed in court.  I think in part

11     because he's had two relationships, and there is a Court order

12     barring contact --

13                    THE COURT: I know, but forget about the Court order

14     for a minute.

15                    THE WITNESS:  Okay.

16                    THE COURT: If the Court order is the problem, that's

17     one thing.  If the relationship is the problem, that's

18     something different.  One of the questions I was going to ask

19     you, for example, is Dr. Lee seems to be telling Mr.

20     Hinckley, stay away from Ms.  DeVeau.  Is that a judgment that

21     a -- conversations with her or meeting with her or having a

22     relationship with her is, in and of itself, a bad thing, and

23     Dr. Phillips and Dr. Patterson can speak to this, as well, or

24     is it because -- it seems to me there are at least three

25     options here:  One is that the relationship is a bad thing.

1    The other is that, well, there's a Court order, so be careful

2    because you're hurting your chance for more privileges,

3    without thinking through why there is the Court order.

4            In other words, you know, if it is just that there

5    is an order and, therefore, the judge might not like it,

6    that's different from someone trained like you or

7    Dr. Patterson, Dr. Phillips, saying there's something

8    inherently troubling about the relationship.

9            And then there is at least one other option that

10   comes to my mind, and that is that -- which is what I think

11   Dr. Phillips and Dr. Patterson were saying a few years ago,

12   which is we don't know whether it is a good or bad thing

13   without the opportunity to talk to her, and there is a lack of

14   clarity because we're not sure whether it's romantic anymore.

15   We're not sure whether it's platonic, we're not sure it's a

16   friendship.

17           And they can speak for themselves, but, as I recall

18   it, it was not to say that having this relationship is

19   necessarily a bad thing, and as you point out and I'm not

20   clear whether you're speaking for yourself or whether you're

21   reiterating what Mr. -- Dr. Binks has said --

22           THE WITNESS:  Uh-huh.

23           THE COURT:  -- -that maybe it's a good thing, maybe

24   it's a positive thing, and it's certainly more positive than

25   the relationship with Ms.  M, but without the ability to talk

1    to her, it's difficult to know.  So, you know, there are at

2    least three options:  One is -- again, I don't want to put

3    words in anybody's mouth, but a lot of people seem to be

4    saying, from what we know about Ms.  M, that's a bad thing in

5    and of itself.  Maybe not everybody is saying that, but some

6    people are saying that.

7            But with respect to Ms. DeVeau, what you and others

8    who have observed this for many years have said is that at

9    points in his life, this was a very positive thing.  It was a

10   very reenforcing thing.  They helped each other.  You just

11   said that five minutes ago.

12           And so what I guess I'm interested in knowing from

13   you and to the extent you can speak for Dr. Binks and the

14   Hospital and other people is has a judgment been made that the

15   relationship -- and Dr. Lee -- has a judgment been made that

16   for some reason it's now a bad thing in and of itself, this

17   relationship, or is it that it's a dangerous thing for Mr.

18   Hinckley because I put something in an order?  Well, what's in

19   an order can be changed if there is a reason to change it.

20           Or is it my third option -- and maybe there's a

21   fourth and fifth option, I don't know -- that at least some

22   mental health professionals can't be sure whether it's a good

23   or a bad thing at this point because there's a lack of

24   clarity, to use the words that were used a few years ago in

25   these hearings, which can only be fully explored not just by

1      talking to Mr. Hinckley, but also by talking to her, and she

2      won't talk to us.

3              So I guess what I'm asking -- and I put the question

4      to you now, but to Dr. Phillips and Dr. Patterson and

5      Dr. Rafanello, as well, and Dr. Lee if he were here -- if we

6      all step back from the Court order, what is it that is good

7      for Mr. Hinckley or might be good for Mr. Hinckley, and do

8      we have enough information to know the answer to that

9      question, and, if not, how can we get that information?

10             I'm just troubled from some of what I read here that

11     some of the mental health professionals -- and maybe it's just

12     Dr. Lee, I don't know -- that are saying, I'm worried about

13     your talking to Ms. DeVeau.  I'm troubled.  I'm concerned --

14     because there is a Court order.  Well, that's not a good

15     enough reason.  We have to look behind why I put it in the

16     Court order and ask is it good, is it bad, or don't we have

17     enough information to decide if it is good or bad; but if we

18     had more information, maybe most professionals who have been

19     dealing with Mr. Hinckley would say, you know, maybe this

20     would be better -- I think everybody would say it would be

21     better than Ms. M, but that's just me reading what I've been

22     reading -- but maybe this would be long term better than some

23     of these other potential relationships.

24             And that's not a question, but maybe you have an

25     answer.

1          THE WITNESS:  I think it's a complicated answer, and

2     you have framed it in terms of a number of different

3     possibilities explaining it, and each mental health

4     professional involved with Mr.  Hinckley is probably weighing

5     each of the concerns that you outline to varying degrees and

6     the interactions between those concerns to varying degrees.

7          I think there are people, frankly, who once there is

8     a Court order, say, well, we're trying to transition him out.

9     Why would you do that?  We've already been told not to do

10    that; let's not go there.  I think there are people, clearly,

11    like Dr. Binks who are saying, you know, I've been involved

12    with Mr.  Hinckley for a very long time, and I believe that

13    the relationship with Ms. DeVeau, the benefits certainly

14    outweigh the risks.

15         And factor in the course of the last year.  Mr.

16    Hinckley, I believe, at one point was getting some mixed

17    messages from Dr. Binks and from Dr. Lee about the wisdom of

18    pursuing a relationship with Ms. DeVeau.  So the treatment

19    team had to facilitate a call between Dr. Lee and the

20    treatment team to resolve that particular issue.

21         And I think what the treatment team overall is

22    looking for is for Mr. Hinckley to have appropriate support to

23    have an opportunity to engage in relationships and to learn

24    from those relationships.  He is going to make mistakes, he is

25    going to exercise poor judgment, but to withdraw from

1    relationships is not the course that we're recommending.  We

2    have to give him the freedom and the opportunity to make

3    decisions and then process those decisions in the therapies

4    that we're offering.

5          So I know I'm not answering your question directly.

6    I don't know if I have a direct answer except for myself, and

7    that is that with regard to Ms. DeVeau, I think the benefits

8    of the relationship clearly outweigh the risks, and I think we

9    already know a great deal about Ms. DeVeau and about Ms.

10   DeVeau's relationship with Mr.  Hinckley.  I mean I would

11   advocate withdrawing the order barring him contacting Ms.

12   DeVeau when he's in [the city].  I do not see that as

13   necessary.  I do not see that -- if he were to contact her, I

14   don't see that as inducing any unnecessary degree of risk to

15   the outing, and there are things I believe he can talk to her

16   about, a degree of rapport that he has with her, if something

17   were to come up, it might be a valuable support for him to be

18   able to access outside of the normal human desire to share

19   your joy at having achieved something that you've been working

20   for 25 years, to be able to share the experience of what it's

21   like to be in another community, living with your mother,

22   going out into the world like a, quote, normal person, I think

23   that's normal to want to share.

24         However, I want to put that all in context and say,

25   in light of his guardedness, in light of the history of

1    deceit, although, I have seen no recent evidence of that, if

2    the relationship were to intensify to a certain point, and I

3    don't have a clear idea about how to exactly define what that

4    point is, I believe then the pressure to work out some

5    mechanism of contact with Ms. DeVeau would increase.  But,

6    really, what I would like to see, and I'm not sure that I have

7    seen -- unfortunately to some degree I think some people are

8    interpreting the Court order as it is futile to encourage the

9    relationship with Ms. DeVeau.  I would like to see the

10   treatment team reaching out to Ms. DeVeau, if that is what Mr.

11   Hinckley desires, to see if there are any mechanisms for

12   contact with her.

13           MR. LEVINE:  Does that answer Your Honor's question?

14           THE COURT: To a point.

15           MR. LEVINE:  It truly includes a lot of the

16   questions I was going to ask.

17   BY MR. LEVINE:

18   Q.   Let me come back again to Dr. Binks, though,

19   Dr. Montalbano.  What has Dr. Binks recommended regarding the

20   evaluation of Mr. Hinckley's relationships by the experts?

21   A.   Well, I think that Dr. Binks has pointed out the pattern

22   of with the increased scrutiny by third-party examiners, it

23   puts intense stress on the relationship.  I'm not exactly sure

24   what Dr. Binks is recommending, but he said that unless there

25   was some resolution of that, we may likely see a pattern in

1    the future of him developing relationships and then the

2    relationships falling apart under the intense scrutiny.

3    Q.   So it would be the scrutiny that would cause the

4    disintegration of the relationship rather than some flaw in

5    the relationship itself?

6    A.   Well, I think it is probably more complicated than that,

7    and I think, you know, Mr. Hinckley should examine his own

8    judgment in relationships, and I don't think it is wise to

9    simply project all the responsibility for the relationship

10   going down hill onto the scrutiny.

11        But I would have to say at the same time that that level

12   of scrutiny certainly is a factor in what happens in the

13   relationships.  I think anyone would be hard pressed to wonder

14   how the relationship could continue as it had if there were

15   that level of scrutiny.  I can't imagine being or having my

16   spouse interviewed and me interviewed, and each of us

17   processing that interview.  It would be quite stressful.

18   Q.   It would be untenable.

19   A.   Hopefully, we'd survive, but it would be stressful.

20   Q.   Now, did you write or did Dr. Binks' note, quote:  It

21   remains this therapist's opinion that this type of dilemma,

22   which will likely come up repeatedly, can only be solved

23   setting reasonable limits to the magnification lens used by

24   third party examiners?

25   A.   Yes, that's a quote from Dr. Binks.

Q.    Do you agree with this?

A.    I think it's -- you know, as I've stated just moments ago
-- a little more complicated.  I think if we could work out
potentially mechanisms of contact that were less intense, that
he and whoever he is with may be able to endure the scrutiny a
little better.  I mean I don't know what to say about -- I
mean the government certainly has a right for Mr.  Hinckley to
be examined by their own experts and for them to conduct the
examinations as they see fit.  I'm certainly not recommending
any constraints around that.

     I think the Hospital does have some control over how it
gathers the information from the third party, and we should
strive to make that as, you know, not intrusive, and in a way
that facilitates communication and contact in a therapeutic
way as far as that's possible without putting too much
pressure on.  I think in part it's the cumulative effect of
all the scrutiny from all the different sources that becomes
so hard to weather.

Q.    In any event, Dr. Montalbano, does the relationship with
Ms. DeVeau make him dangerous; the fact that he had it, the
fact that it ended, and the fact that it is in the status that
you have just described?

A.    No.  I think it provides him with an important emotional
support, and support systems are critical for everyone's
recovery, everyone's success, and in terms of the particular

1    task at hand here, I believe, which is transitioning gradually

2    Mr.  Hinckley to a less restrictive environment.

3    Q.    Now, His Honor has made reference to you to Ms. M;

4    remember Ms. M?

5    A.    Yes.

6    Q.    Has Mr.  Hinckley ended the relationship with Ms. M?

7    A.    Yes.

8    Q.    Was that approximately in December of this past year?

9    A.    Yes.

10   Q.    And before ending the relationship, did Mr.  Hinckley

11   discuss his relationship with Ms. M with his therapist,

12   Dr. Binks?

13   A.    Yes.

14   Q.    And did he discuss his relationship with Ms. M with

15   members of the treatment team?

16   A.    Yes.

17   Q.    And did he talk to Dr. Lee about Ms. M?

18   A.    I believe so, yes.

19   Q.    And has the treatment had an opportunity to observe Mr.

20   Hinckley and Ms. M interacting together?

21   A.    Yes.

22   Q.    And how would you describe the degree of Mr.  Hinckley's

23   openness with the treatment team about his relationship with

24   Ms. M?

25   A.    As I stated yesterday, with regard to relationships with

1        women, I believe that the vast amount of information that we

2        have about the relationships is coming directly from Mr.

3        Hinckley.  You can always get into a particular dynamic of

4        exactly when he told what to whom, but we knew what was going

5        on in the relationship with Ms. M.  We -- I think we knew when

6        it was intimate, when it was not intimate, the frequency of

7        contact, the nature of the relationship as a whole.

8    Q.    Does Ms. M suffer from a mental illness?

9    A.    That's what I understand, yes.

10   Q.    You understand that mental illness to be that of bipolar?

11   A.    Yes.

12   Q.    What does it mean to be bipolar?

13   A.    It means you're going to have significant mood swings.

14       You can experience periods of intense depression.  You can --

15       that can alternate with periods of intense euphoric or related

16       mood called "mania".  You can be quite labile emotionally,

17       meaning that your emotions shift from moment to moment.

18   Q.    Instability?

19   A.    Mood instability.

20   Q.    Yes.  And has Ms. M's mood been volatile?

21   A.    Yes.

22   Q.    Has her behavior been unpredictable?

23   A.    At times, yes.

24   Q.    Have her statements been inconsistent?

25   A.    Inconsistent -- I mean she's --

1    Q.    Unreliable?

2    A.    Given the fluctuations in her mood -- and I mean even

3    when she's making some of these statements, she's -- I recall

4    one statement that she e-mailed to Dr. Phillips that he sent

5    to me where she said, I might be blowing things out to mythic

6    proportion.  So she realizes when she's getting upset, when

7    she's, perhaps, manic, that her thoughts are coming out rather

8    rapidly, and she may be exaggerating things herself.  So she

9    says highly divergent things at different points in time.

10   Q.    Has Mr. Hinckley been rebuffed by Ms. M upon occasion?

11   A.    Yes.

12   Q.    And has she said hurtful things about Mr. Hinckley and

13   about his family?

14   A.    Yes.

15   Q.    And has she called Dr. Phillips to make accusations about

16   Mr. Hinckley?

17   A.    Yes.  I'm not sure whether they were -- I think they were

18   more -- I think one was an e-mail, maybe another was a phone

19   call.  I'm not certain of the exact form of communication.

20   Q.    But she has communicated in that manner?

21   A.    Yes.

22   Q.    And has how has Mr. Hinckley handled these rebuffs and

23   even this hostile behavior?

24   A.    I think, overall, he's demonstrated good resilience, good

25   strength tolerance.

1   Q.   Has he shown strength?

2   A.   I think he has maintained his psychological equilibrium.

3   Q.   Has he shown patience with her?

4   A.   Perhaps, too much.

5   Q.   All right.  Has -- does his stability and his resilience

6   demonstrate that rejection, and even palpable hurt from a

7   woman, will not cause him to decompensate?

8   A.   Yes.  I think, you know, since my '99 risk assessment

9   when I said, perceived abandonment, rejection, rebuff, or loss

10   in a relationship is a potential risk factor, that we have had

11   considerable amount of data about how he has handled

12   rejection, loss, rebuff, and, overall, he's maintained himself

13   well.

14   Q.   And the experience with Ms. M, has it supplied the

15   Hospital with additional data in which to evaluate his mental

16   health?

17   A.   Certainly.

18   Q.   And was the experience with Ms. DeVeau similarly supplied

19   -- did it similarly supply the Hospital with data about his

20   disappointment in losing her?

21   A.   Yes.

22   Q.   And how has this additional data affected your opinion

23   since your original opinion with respect to risk?

24   A.   Well, I think the risk factor of perceived rejection,

25   rebuff, abandonment in relationships, I think we have more

1    data that suggests he is less likely to spiral into

2    depression, less likely to decompensate, less likely to suffer

3    significant relapse of any of the Axis I mental disorders.  I

4    recall yesterday the testimony about, from his brother and

5    sister, about how he handled the decline and death of his

6    father.

7         Now, that is a stressful event for almost anyone, and I

8    think the stress was further exacerbated by him having to

9    return to the hospital.  He knew his father was dying.  He had

10   to return to the hospital.  He did not want to return.  He

11   wanted to be with his family and -- but he did what was

12   required of him.  He went to the funeral, which is a stressful

13   event for anybody losing a loved one, and he weathered that

14   rather well.

15        I agree with Dr. Phillips who says in his report that his

16   handling of his father's death is a benchmark of the his

17   stress tolerance.

18   Q.   Dr. Montalbano, we're still talking about -- I think

19   that's a very useful comment, but we're still talking about

20   Ms. M. Has the experience with Ms. M been a learning

21   experience for Mr.  Hinckley as impaired as she may have been?

22   A.   Well, certainly.  I think all of us learn about

23   relationships only by having them.

24   Q.   Has Mr.  Hinckley written any songs about Ms.  M?

25   A.   Quite a few.

1    Q.    And does it -- do those songs demonstrate feelings of

2    empathy about Ms. M?

3    A.    To some degree, yes, I would agree.

4    Q.    Is the expression of empathy a positive development for

5    Mr. Hinckley?

6    A.    Yes.

7    Q.    What -- his progress?

8    A.    Yes.  And remember, too, deficits in empathy are a

9    symptom of narcissism.  So to the degree that we see

10   improvement in that area, that's also an occasion of

11   attenuation of his narcissism.  And when you heard his

12   siblings speak yesterday about how attentive he was to his

13   mother and to helping the whole family navigate their way

14   through the decline and death of his father, I mean, there is

15   more evidence of empathy.

16   Q.    Has the relationship with Ms. M made Mr.  Hinckley

17   dangerous?

18   A.    No.

19   Q.    You know Ms. G?

20   A.    Yes.

21   Q.    How does Mr.  Hinckley know Ms. G?

22   A.    Well, from what I understand, he knew her originally when

23   she was briefly hospitalized in the early 1990s at St.

24   Elizabeths Hospital, and after her release, it's my

25   understanding that she came back to visit several times.  And

that was it.  And then in September, September 10th of last
year, he found out her phone number, called her up; recall
this is the period where, you know, he is seeking out somebody
else to -- because the other relationships are up and down,
are faltering.  And she came to the campus and visited him and
the relationship has developed from that.

Q.   Has Ms. G consented to this relationship?

A.   Well, she voluntarily comes to see him.  She voluntarily
accepts his calls.  I assume so.

Q.   He -- we've heard that she has another relationship of
some long standing.

A.   Correct.

Q.   And not -- that notwithstanding, she decided to come and
to continue to come to visit Mr.  Hinckley?

A.   Yes.

Q.   And if she didn't want to see Mr.  Hinckley, is it true
that all she need do is not come to see Mr.  Hinckley?

A.   Yes.

Q.   Would it likewise be true if she didn't want to speak
with Mr.  Hinckley, all she had to do was not take his calls?

A.   Essentially.

Q.   Does she take his calls?

A.   I'm not sure whether she takes his calls all the time.  I
think there are times that she doesn't take his calls, but it
seems like there are certainly a number of times that she

1    does.

2    Q.    And she continues to come to visit him?

3    A.    Yes.

4    Q.    Now, did there come a time when he became intimate with

5    her?

6    A.    Yes.

7    Q.    And did she consent to that?

8    A.    Both he and she say that it was consensual.

9    Q.    And did there come a time when that stopped?

10   A.    Yes.

11   Q.    And did Mr. Hinckley learn from this experience?

12   A.    I believe -- being engaged in another relationship is a

13   learning experience.  He is talking to her.  She is a real

14   person.  He has to think about her life and how what he is

15   doing is impacting on her.  He has to make decisions about

16   what to do.  He doesn't always make the best decisions, but he

17   is learning.

18   Q.    And has the relationship with Ms. G made him dangerous?

19   A.    No.

20   Q.    Let's talk about Ms. B.  Is she a friend of Ms. G?

21    A.    I understand that they are best friends.

22   Q.    And was it Ms. G who brought Ms. B to the hospital?

23   A.    That's my understanding.

24   Q.    And what's the nature of the relationship with Ms. B?

25   A.    I understand it to be a friendship.

1    Q.    No romance?

2    A.    No romance.

3    Q.    And does a friendship with Ms. B provide Mr.  Hinckley

4    yet another social outlet from which to learn?

5    A.    Yes.  He has increased social contact.  He is relating,

6    talking to another person.  He is sharing his interest in

7    music or art.  It is a real conversation with a real person.

8    Q.    And is it a positive development?

9    A.    Well, I did not have the opportunity to speak with Ms. B,

10   unfortunately, but from what I gather, overall, there are no

11   significant concerns with that particular relationship.

12   Q.    So does a new friend, having a new friend, make him

13   dangerous?

14   A.    Not that I see.  Certainly, not at this point.

15   Q.    Now, there is another woman, another female, Ms. K.  Now,

16   is she the cousin of Ms. B?

17   A.    That's my understanding.

18   Q.    And did Ms. B bring Ms. K  to the hospital to visit with

19   John?

20   A.    That's my current understanding.

21   Q.    And is the nature of that relationship just friends?

22   A.    That's what I understand.

23   Q.    No intimacies?

24   A.    No intimacies that I'm aware of.

25   Q.    And is this, too, yet another positive outlet, social

1    outlet, for Mr. Hinckley.

2    A.    Yes. I think it was Ms. G who communicated that this is

3    a normal way of meeting people; that you have a friend, they

4    bring other friends. I mean it is certainly in contrast to

5    what we heard yesterday about the SALT meeting.

6           THE COURT: The what?

7           THE WITNESS:  The SALT meeting where -- I mean those

8    singles events, they're somewhat contrived. They're somewhat

9    stressful. I mean if you have a friend and you say, hey, I'd

10   like you to meet somebody, that's a little less stressful

11   format for meeting and talking with somebody.

12   BY MR. LEVINE:

13   Q.    Surely a more pleasant circumstance.

14   A.    It sounds like a more lot more pleasant than the potluck

15   dinner they experienced.

16   Q.    All right. Now, Dr. Montalbano, have you read the

17   government's motion in opposition to the Hospital's plan?

18   A.    Yes.

19   Q.    And do you agree with the government's characterization

20   that Mr. Hinckley has, quote, inappropriate and unrealistic

21   relationships with several women, close quote?

22   A.    Well, I mean, in some of the relationships, he exercises

23   poor judgment. Overall, you know, you could certainly --

24   especially at certain points in times with the relationship

25   with Ms. M  argue about its appropriateness, but to

1    characterize the relationships just blanket-ly as

2    inappropriate, I don't think is fair.

3    Q.   Are the relationships based on reality, real women,

4    really coming to see him?

5    A.   Yes.

6    Q.   What is the distinction between Mr.  Hinckley's

7    relationship with these women and his -- I put the word in

8    quotes, relationship, close quote, with Jodie Foster?

9    A.   The relationship with Jodie Foster was delusional.  He

10   was obsessed with her.  He believed they were destined for

11   some special union.  He thought that by engaging in a

12   historical deed he could profess his love to her.  He had very

13   little real contact with her, a few phone calls, I believe.

14   The relationship was really just in his mind in a psychotic

15   way.

16        I recall, too, at the time he professed a relationship

17   with a "Lynn Collins"(Phonetic), which was simply a

18   fabrication; there was no relationship.  All these people

19   we're talking about in court today, Ms. DeVeau, Ms. M, Ms. G,

20   and the other initials, as well, are all living, breathing

21   people that he is talking to, relating to, that are

22   voluntarily coming to see him.

23   Q.   These are people from whom he is learning, as well?

24   A.   Yes.

25   Q.   In his report, Dr. Phillips expresses concerns about Mr.

1    Hinckley's openness and candor about his relationships with

2    women; do you remember that?

3    A.   Yes.

4    Q.   Now, specifically, he expresses concern that Mr.

5    Hinckley had informed the treatment team that he had ended his

6    relationship with Ms. M with the exception of her care for

7    cats; but then he writes, quote, unbeknownst to staff, he had

8    developed what he, Mr. Hinckley, called fondling privileges

9    with her, correct?

10   A.   Yes.

11   Q.   Now, what is your view of Dr. Phillips' concern?

12   A.   Well, I'm not sure exactly what he is referring to.  I

13   mean the only reason that we know about the fondling is

14   because Mr. Hinckley told us.

15   Q.   So it wasn't unbeknownst to staff?

16   A.   I mean I recall specifically he had a visit in latter

17   August, and I typically interview him after every outing, and

18   I think it was August 29th, and he told me about the fondling.

19   So we knew about it.  I don't know whether Dr. Phillips is

20   referring to an earlier point in time.  All I know is that

21   when I asked him about the relationship, he told me that it

22   was intimate.

23   Q.   Do you feel Mr. Hinckley has been honest with you with

24   respect to it?

25   A.   Yes.  Again, as I said yesterday, I mean, he doesn't like

1   to get into the graphic details of the intimacy, which I try

2   to understand and respect, but he will let you know when it is

3   intimate, and, you know, at the same time, it could be an

4   issue exactly when he tells who about an intimacy.  I mean did

5   he tell Dr. Binks immediately after intimacy?  Did he

6   immediately tell Dr. Lee about an intimacy?  Did he

7   immediately tell Dr. Rafanello or Dr. Green?  I mean I don't

8   know exactly.  There could be contacts that he has when he is

9   not volunteering that information, but it seems to me that if

10  you ask him, he will tell you.

11  Q.   Now, is the accumulation of evidence that Mr. Hinckley

12  has been more open, overall, about his relationship with

13  women?

14  A.   Yes.  I think, overall, he's made a concerted effort to

15  be more open in terms of what's going on in relationships.

16  Q.   And has -- are Dr. Phillips' and Dr. Patterson's concerns

17  regarding Mr. Hinckley's interactions with women, in your

18  mind, overstated as concerns?

19  A.   Yes.  I think the relationships with women could serve as

20  a potential trigger for a more serious psychopathology, but to

21  be exhibiting poor judgment in a relationship or some mood

22  fluctuation based on what's going on in the relationship, to

23  me, does not immediately signal that he would spiral into a

24  depression or that it is an evolving depression.

25       If your GAF is 71 or higher, I think you would tend to be

1    viewing it as a transient and an expected reaction to a

2    psycho-social stressor, and the data simply indicate that over

3    many, many years, he has experienced a lot of rebuffs, ups and

4    downs in relationship, and he has maintained his psychological

5    equilibrium.  He has not decompensated.

6    Q.   Can you look at any one risk factor such as concerns with

7    women, relationships with women, without -- independent of the

8    confluence of other factors to conclude that he may be

9    dangerous?

10   A.   You can, but I think in this particular case the

11   perception in relationships, the rebuffs, the rejections,

12   could potentially set the stage for more serious

13   psychopathology, so you do need to monitor it.  You do need to

14   explore it.  You do need to process it.  You do need to gather

15   information.  But in and of itself, without the other factors

16   being present, again, as I expressed yesterday, I see this in

17   a contextual framework like if you have the ingredients for a

18   fire, but you're missing the oxygen, you're still not going to

19   have the fire.

20   Q.   And this is far more than three ingredients, a fire being

21   only three:  The combustible substance, the heat, and the

22   oxygen.  This is far more.

23   A.   Well, I think what you would really have to see first and

24   foremost is significant depression, major depression, and we

25   don't see that.

1    Q.   Let's move on, Dr. Montalbano, to the conditional

2    release.  The release since 2007, the last time we had been in

3    this Court.  Are you familiar with those conditional release

4    occurrences?

5    A.   Yes.

6    Q.   Did you participate in the interviews of Mr.  Hinckley

7    and his parents and siblings after each?

8    A.   Yes, I did.

9    Q.   And did you prepare memorandum documenting those

10   interviews?

11   A.   Yes.

12           MR. LEVINE:  Your Honor, you have the letters to the

13   Court.

14           THE COURT: I do.

15           MR. LEVINE:  Well-packaged.  How have we handled the

16   admissibility of those --

17           THE COURT:  What we have done in the past?  I don't

18   recall.

19           MR. LEVINE:  Do you stipulate to their

20   admissibility?

21           MR. ZENO:  Oh, sure.

22           MR. LEVINE:  Okay.

23           THE COURT: I don't know whether we have to --

24           MR. LEVINE:  The government stipulates to their

25   admissibility, Your Honor.

1            THE COURT: Do we need to give them an exhibit number

2    and as a package or individually or what do you want to do?

3            MR. LEVINE:  Well, maybe during a break we can agree

4    upon which ones they are.

5            THE COURT:  We could talk about it.

6            MR. LEVINE:  I think we all will agree, and I have

7    no objection to doing it as a package if the Court doesn't

8    mind.

9            THE COURT: Whatever the best way to do it is.  I

10   don't know whether -- actually, I guess I've got in this red

11   well, I've got everything going back many years, not just this

12   past year.  But I do have all the ones from the past year.  So

13   you and Mr. Zeno can talk about whether you want to give them

14   individual numbers or a package number or whatever.  I don't

15   know whether you intend to show them to Mr. -- to

16   Dr. Montalbano or to anybody else, but since he wrote them I'm

17   sure he remembers them all.

18           MR. LEVINE:  I'm not going to show them to

19   Dr. Montalbano, but I am going to ask him some questions if I

20   may.

21   BY MR. LEVINE:

22   Q.   Dr. Montalbano, is it fair to say that these conditional

23   releases are four to six to maybe seven weeks apart?

24   A.   That's fair to say.

25   Q.   And would it be more therapeutic if there were shorter

1    intervals between each of these conditional releases?   More

2    therapeutic.  We're going to get to the administrative issues.

3    I want to know about the therapy.

4    A.    Yes.

5    Q.    Now, did Dr. Phillips agree with that in his report?

6    A.    I think so, yes.

7    Q.    Now, why do we do this -- that's in-artful, withdraw.

8    Why are these conditional releases proceeding at the pace they

9    are?

10   A.    There is a tremendous amount of work involved in this

11   particular case for the entire treatment team and, certainly,

12   for -- particularly, for certain individuals in the treatment

13   team; particularly, Dr. Rafanello, who typically -- and Mr.

14   Shamblee filled in for Dr. Rafanello when she was out for

15   three months on maternity leave -- for generating the letters

16   to the Court detailing the proposed visits; for generating the

17   letters to the Court detailing what occurred during the visit;

18   how successful the visit was.

19         There is a requirement to get information from providers

20   at the mother's residence and incorporate that into the

21   report.  There is a requirement to interview Mrs.  Hinckley,

22   to interview either Ms. Sims or Mr.  Scott Hinckley, depending

23   on whether they were involved, and, potentially, Mr.

24   Beffa, whether he was involved; get all this information

25   integrated and presented in a coherent, detailed manner to the

1    Court.  It's a tremendous amount of work.

2    Q.   Do you have a view as to how this process could be

3    streamlined without losing any of the -- without losing the

4    ability to provide the Court with the information that it

5    would fundamentally want to have?

6    A.   Well, I think some of the information is probably -- some

7    of the information actually we could probably make an effort

8    to shorten already; I mean detailing what particular

9    restaurant he went to and what he may have had to eat.

10   Sometimes that information is in there.

11       I think there should be some mechanisms for streamlining

12   the reporting requirements.  I mean I think the essential

13   things -- I mean I'm struck by the Secret Service reports

14   which simply say -- you know, they give a brief, one-page

15   description of observations of Mr.  Hinckley, and then at the

16   bottom it says, no unusual incidents noted.  I mean,

17   essentially --

18           THE COURT: But their function is quite different

19   from the function of the Hospital.  I mean they're -- you all

20   are treating him, and you need a lot more detailed

21   information.  They're looking for dangerousness and risk and

22   deviation from what they understand to be the scheme.  They

23   don't actually even have an official function, right?

24   Basically, we notify them, and they can choose to observe or

25   not, and so I don't know that's a useful analogy.

1            MR. LEVINE:  May I help this, Your Honor, with a

2    question or two?

3            THE COURT: You can ask a question or two.  Whether

4    it will be helpful or not, we'll see.

5            MR. LEVINE:  Fair enough.  Fair enough.

6    BY MR. LEVINE:

7    Q.   Without a diminution of the information that you require,

8    but merely streamlining the letter to the Court to include

9    that what you believe to be psychologically significant, would

10   that streamline this process considerably?

11   A.   Well, I think you want to get information about how he is

12   functioning during the outings.  Certainly, whether there were

13   any signs of decompensation, any signs of change in mental

14   status, that's why we have all the responsible persons filling

15   out these relapse prevention forms.

16       We have Dr. Lee and we're recommending now that Dr. Beffa

17   fill out similar forms.  So I think it's very important to

18   have a focus on dangerousness or on any of the potential

19   precursors of dangerousness so that we are staying on top of

20   that as far as possible.

21   Q.   So you wouldn't reduce the amount of information you

22   would acquire?

23   A.   No.  I think those forms, they're helpful because you

24   just check off certain things.  They're not cumbersome.  I

25   think we want to -- I just, frankly, don't think I have a

1       clear answer to this.  I just know that we should be seeking

2       to strike some balance between the amount of detail in the

3       reports and how to decrease that to facilitate increased

4       frequency of visits if that is deemed appropriate.

5            Exactly where that balance is, I'm not sure.  I mean, in

6       light of Mr.  Hinckley's history, in light of the guardedness,

7       and in light of the history of deceit, we're making a

8       concerted effort to gather data from as many different sources

9       as possible to either corroborate or -- and confirm the

10      information that we're getting from him.  So we want to

11      continue to engage in that process.

12      Q.   What about the reporting of the information that you

13      acquire to the Court?

14      A.   Right.  I think, you know, that once -- I mean the

15      outline of the visit is detailed in the first letter,

16      including the itineraries in broad form at least.  So I think

17      that, hopefully, the more we do this, the more we'll be able

18      to streamline it and consolidate the information.

19           I think that if the visits, you know, for example, at a

20      certain point we were allowed to give two itineraries so to

21      speak in one letter.  So depending on the frequency of the

22      visits, if we were able to review two outings depending on how

23      far apart they were spaced, I think that reviewing two

24      together might streamline the process over time.  Again,

25      that's not what we're recommending exactly at this point in

1    time.  We want to increase the amount of time he spends at his

2    mother's residence, review them, but at some point in time, I

3    think we should certainly consider consolidating the reporting

4    requirements.

5    Q.   What is the therapeutic consequences of having these

6    conditional releases spaced as they currently are?

7    A.   Well, you know, as you eloquently articulated during your

8    opening statement, the ultimate goal, according to Covington

9    v. Harris, is to transition Mr.  Hinckley by controlled

10   experiments of freedom into the unrestricted environment of

11   the community.

12        So that's what we're striving to do for every single

13   insanity acquittee at John Howard Pavilion, and so we need to

14   build -- we're trying to increase the freedom in a reasonable

15   way and in a way that facilitates the ultimate transition.

16   Naturally, having the visits spaced further apart, we don't

17   gather -- it is not --

18   Q.   Does it undermine the objective?

19   A.   Well, number one, Mr.  Hinckley experiences the outings

20   as beneficial, as mood-elevating, and having them spaced

21   further apart, of course, increases the amount of time that

22   you can transition him, and, of course, there are just

23   logistical complications in terms of things like a volunteer

24   job.  The more you're there, the more regularly you're there,

25   the more regularly you can anticipate when you're there, the

1      easier it is probably, overall, to get a particular position,

2      volunteer or otherwise.

3      Q.   You need to tell a prospective employer when you can be

4      there -- to schedule.

5      A.   It would help.  It would help.

6            MR. LEVINE:  Court's indulgence.  Let me see if I

7      can streamline this, as well.

8            THE COURT: Okay.

9      BY MR. LEVINE:

10     Q.   With respect to the conditional releases he's had since

11     February -- I think it was of '07 when we were last here --

12     would it be fair to characterize all of them as having been

13     successful and without incident?

14     A.   Since our last hearing in April and May --

15     Q.   Is that when it was?

16     A.   I think so.

17     Q.   Okay.  Would it be fair to characterize them all as being

18     successful and without incident?

19     A.   Yes.  I think he has had 11 outings overall since then.

20     Q.   And would you say that they have yielded clear

21     therapeutic benefits?

22     A.   Yes.

23     Q.   And would you say that they enabled Mr. Hinckley to

24     solidify previously developed community living skills?

25     A.   Yes.

1    Q.    How so?

2    A.    Well, he's continuing to go out into the community,

3    engage in simple tasks that most of us take for granted like

4    shopping; eating; driving around in the community;

5    familiarizing himself with the environment; recreational

6    activities like bowling, you know, all the simple things that

7    we do in our home everyday, the chores; the meal; and food

8    preparation; filling up the dish washer.  I mean these are

9    things that he would never ever do at John Howard Pavilion.

10   Q.    Is it good that he does these things?

11   A.    Yes.

12   Q.    And what about these visits; have they assisted in

13   establishing closer family ties?

14   A.    Yes.  I think over the last year, in particular,

15   especially in light of the father's decline and eventual

16   death, it was a significant bonding experience for Mr.

17   Hinckley with his siblings, in particular, and then with his

18   mother.

19   Q.    Has he become better familiar with the community, both

20   the local one and the one-at-large?

21   A.    Certainly.

22   Q.    And has he been able to better establish relationships

23   with treatment providers there?

24   A.    Yes.

25   Q.    And would more frequent visits enable those to flourish

1    more, develop more?

2    A.    Certainly, I hope.

3    Q.    And did the Secret Service, to your knowledge, perform

4    surveillance during each of those visits?

5    A.    I don't know if it was every visit, certainly, the vast

6    majority of them.

7    Q.    And they were free to do it any time they wanted to?

8    A.    Yes.

9    Q.    And they were fully informed as to when it was to be?

10   A.    Yes.

11   Q.    And they rendered reports with respect to each of them?

12   A.    Yes.

13   Q.    And did you review those Secret Service memoranda?

14   A.    Yes, I did.

15   Q.    And did they corroborate the success of each of these

16   visits?

17   A.    Well, as I've stated, they corroborate there's no unusual

18   incidents.  How you measure success could probably be another

19   question.

20   Q.    Without unusual incident or to give -- did the fact that

21   they say there was no unusual incident provide a source of

22   comfort or additional data to the Hospital?

23   A.    Yes.

24   Q.    And did Mr.  Hinckley meet with Dr. Lee?

25   A.    Yes.

1    Q.   And did he also meet with Mr. Beffa?

2    A.   Not on every visit, but he did.

3    Q.   He wasn't required to meet with Mr. Beffa on every

4    visit; is that correct?

5    A.   That's correct.  He will be under our new proposal.

6    Q.   Okay.  Maybe you ought to address that right now.  Under

7    the new proposal, what will be the requirement for meeting

8    with Mr. Beffa?

9    A.   He will be required to meet with Mr. Beffa and Dr. Lee

10   during every outing, and they will both be required to write

11   reports, fill out relapse prevention checklists, and then they

12   will be required to participate in a post-outing conference

13   call with the treatment team, and Mr. Beffa will be required

14   to participate in a post-outing call with Dr. Binks.

15   Q.   And they will be at different intervals during the course

16   of the 10-day or nine-night experience?

17   A.   Yes.  From speaking with Dr. Rafanello as even an

18   additional mechanism for a relapse prevention, so to speak, we

19   have proposed 10 days in his mother's community.  So we would

20   space apart when he sees Dr. Lee and Mr. Beffa so that the

21   odds of a relapse are -- if you're thinking a relapse would

22   occur in five days versus six days or versus seven days, which

23   I, frankly, do not think at all, having them -- spacing the

24   contacts with the two mental health professionals just serves

25   as an additional safeguard.

1            THE COURT:  And Dr. Lee and Mr.  Beffa have both

2      agreed to what's proposed?

3            THE WITNESS:  Yes.

4      BY MR. LEVINE:

5      Q.   Did Mrs. Hinckley or one of his siblings accompany him to

6      each of the visits with either Dr. Lee or Mr.  Beffa?

7      A.   Yes.

8      Q.   And did Mr.  Hinckley have unsupervised time during those

9      visits?

10     A.   Yes.

11     Q.   And did he handle those periods -- I think two hours in

12     length -- responsibly?

13     A.   From all the information that we have, yes, he did.

14     Q.   And did he comply with all of the conditions set by the

15     Court on these conditional releases?

16     A.   Yes, he did.  He is very motivated to comply, especially

17     to the Court ordered conditions.  I recall when he was court

18     ordered to contact me during the emergency outings in late

19     January and early February, and the Court order said he needed

20     to contact me at 10 o'clock.  I knew at 9:57 or 9:58 that my

21     phone was going to ring, and it did.

22     Q.   And it did?

23     A.   Yes.

24     Q.   Did he tolerate stress well?

25     A.   Yes.  Overall.

1   Q.   Did he do anything to suggest that he would elope while

2   on unaccompanied time?

3   A.   Nothing that I'm aware of.

4   Q.   Did he engage in any attention-seeking behavior?

5   A.   None that I'm aware of.

6   Q.   Was there any indication of narcissism?

7   A.   He has a narcissistic personality.  I think there are

8   always some indications of narcissism to some degree, but, as

9   I have stated before, I think that overall compared to how he

10  was, let's say, in the early 1980's, that his narcissism is

11  significantly attenuated.

12  Q.   Have these releases been therapeutic for Mr.  Hinckley?

13  A.   Yes.

14  Q.   Did Mr.  Hinckley perform music for his family?

15  A.   Yes, he did.

16  Q.   Did he bond with his father before his passing?

17  A.   From what I understand, he did.

18  Q.   Did he paint for his father?

19  A.   Yes.

20  Q.   Did he bond with his siblings?

21  A.   Yes.  We heard testimony yesterday over how that

22  relationship has changed just over the last year.

23  Q.   Did he demonstrate devotion and affection for all members

24  of the family?

25  A.   Yes.  In many ways, it's a remarkable family.  Stayed

1    together the way that they have in light of the tragedy that

2    occurred in 1981, and they remain extremely committed to each

3    other, it's a very unique and admirable family.

4    Q.   I agree with that.  Dr. Montalbano, overall, would you

5    describe Mr.  Hinckley's impulse control during these

6    releases?   How would you describe them?

7    A.   I would describe it as adequate.  There have been no

8    unknown episodes of impulsivity; no known episodes of

9    outbursts; no known sudden decisions to do things that are not

10   on the itinerary.

11   Q.   We've heard some comment about -- surely in the cross-

12   examinations -- about his questionable judgment with respect

13   to women.  What is your view or how would you describe his

14   judgment during the conditional releases?

15   A.   Well, he hasn't had much interaction with women during

16   the conditional releases.

17   Q.   How would you describe his judgment, generally, overall,

18   in those releases?

19   A.   During the releases?  There's no indication of

20   significantly impaired judgment during the outings.

21   Q.   Does his successes in those conditional releases suggest

22   that he is ready to handle expanded releases from the six

23   nights to the nine nights?

24   A.   Yes.  And I think this is important.  As I've stated

25   before, you know, the best predictor of future behavior is

1    past behavior.  Mr.  Hinckley has to my count exercised 39

2    outings, beginning when he was first granted some outings; I

3    think local day outings in February of 2002.  Progressing from

4    local day outings to local overnight outings, to then having

5    12 outings to his parents' residence, and to last year adding

6    11 more outings to his mother's residence.  Twenty-three

7    outings, I believe, in all to his mother's residence.  They

8    have all gone well.  There has been no sign of relapse during

9    the outings.

10          What we are recommending simply is expanding, I think,

11   what has been successful from six nights to nine nights.  And

12   what I come back to with regard to this particular

13   recommendation, it's been a finding of the Court and one which

14   I believe, if a relapse were to occur, it would take weeks if

15   not months; I believe more the latter, months.  I believe that

16   the time frame that we're recommending for the proposed

17   outings that the likelihood of relapse occurring is, as I

18   stated yesterday, remote.

19          MR. LEVINE:  Would the Court indulge me for a

20   moment, Your Honor, please?

21          THE COURT: Yes, sir.

22          MR. LEVINE:  Thank you, Your Honor.

23   BY MR. LEVINE:

24   Q.  You have stated and testified that amongst the structure

25   of the proposed visits, there would be -- or within the

1    structure of the proposed visits, there would be unaccompanied

2    time both in the local community and in the greater community;

3    is that correct?

4    A.   Yes.

5              THE COURT: The local community and what?

6              MR. LEVINE:  The local community being the

7    subdivision and the greater community being the -- I guess we

8    can call it the city in which the subdivision is located.  I

9    think we know what we're talking about here?

10             THE COURT: Yeah.  Yeah.

11   BY MR. LEVINE:

12   Q.   All right.  What would be in your mind the therapeutic

13   purpose of unaccompanied time?

14   A.   Well, we're trying to facilitate Mr. Hinckley

15   demonstrating increased independence and autonomy.  We're

16   trying to increase the amount of freedom he exercised.  We're

17   trying to gradually decrease the amount of structure to see if

18   he can function more independently in the world.

19        I think that he experiences those opportunities as

20   therapeutic, as mood-elevating, as exciting, frankly, and I

21   mean, it remains his desire to achieve some degree of normalcy

22   in his life, to live his life the way many of us are able to

23   live our lives, and to get a job; to have a relationship; to

24   play music; to watch TV; to engage with his family and friends

25   in conversation.

1    Q.    Will this unaccompanied time give him an opportunity,

2    perhaps, to meet people within his age bracket?

3    A.    Yes.  I mean Mr.  Hinckley is quite frank around -- he

4    does not like the idea of trying to meet women being

5    chaperoned.  He feels he's 52 years old.  He would like to

6    approach somebody and simply talk to them without having his

7    mother or his brother or sister hovering in the background.

8    Q.    Does that strike you as an appropriate desire for him?

9    A.    I think most people would feel that way.

10   Q.    Does the Hospital believe that giving him this

11   unaccompanied time would present an undue danger to the

12   community-at-large?

13   A.    No.  We wouldn't be recommending it if we thought that.

14   Q.    And when you speak for this -- you say this, do you

15   testify on behalf of the review board the considered view of

16   the whole Hospital?

17   A.    Yes.

18   Q.    Who would provide case management services to Mr.

19   Hinckley under the proposal?

20   A.    Right now that role would fall to Mr.  Beffa.

21   Q.    And who would provide therapy to Mr.  Hinckley under the

22   new proposal?

23   A.    In the proposed plan, that role would also fall to Mr.

24   Beffa.

25   Q.    Do you agree with the expansion of Mr.  Beffa's role to

1    be both social worker and individual therapist?

2    A.   Yes, I do.

3    Q.   Is there some tension between providing services in both

4    of those capacities?

5    A.   From what I understand, many social workers are trained

6    to provide both individual therapy and case management

7    services and that Mr.  Beffa has provided and exercised both

8    those functions in the past, and in the model that operates at

9    the Family Living Institute where Dr. Lee practices and Mr.

10   Beffa practices is that they often collaborate where Dr. Lee

11   is the covering psychiatrist and Mr.  Beffa is the individual

12   therapist.

13   Q.   So they have worked well together?

14   A.   They have worked together in the past.  It is more

15   constant with the model that they tend to function in.

16            THE COURT: What would Dr. Lee's role be going

17   forward?

18            THE WITNESS:  Dr. Lee's role would be as the

19   covering psychiatrist.

20            THE COURT: What does that mean?

21            THE WITNESS:  That means he would assess his mental

22   status, talk about the medications with Dr. Green, provide

23   emergency psychiatric referral, if necessary; essentially, see

24   if there were any changes in his mental status.

25            THE COURT: Now, up until this point, has that pretty

1    much been Dr. Lee's role?

2            THE WITNESS:  Well, that has been one of his

3    functions, but he has also functioned more in the role of

4    providing some therapy.  So this came up, of course, during

5    the last hearing about the clarity of the role of Dr. Lee and

6    the quote about him characterizing himself as "our man in

7    Havana".

8            The Hospital is trying to provide additional clarity

9    about the roles and believes, overall, that Mr. Beffa is

10   better suited for the role of individual therapist, and he has

11   already started in that role.  We hope to expand and

12   consolidate that role under the proposed plan.

13   BY MR. LEVINE:

14   Q.   Does the Hospital plan call for Mr. Beffa and Dr. Binks

15   to contact each other after each outing, each conditional

16   release?

17   A.   Yes.

18   Q.   And does the Hospital's plan call for Dr. Lee to confer

19   with Dr. Green?

20   A.   It is not a requirement, but any issues that were to come

21   up with regard to medication, it would certainly be hoped that

22   the psychiatrists would consult with each other.  But there is

23   a requirement, overall, that Dr. Lee and Mr. Beffa

24   participate in a post-outing conference call with the

25   treatment team, and Dr. Green is a member of the treatment

1    team.  So, hopefully, he would be present during those

2    conference calls.

3         Let's hope that all the members of the treatment team

4    would be present.  Obviously, given when it occurs, one or two

5    of the treatment team members may or may not be there, but

6    that would certainly provide a mechanism for increased contact

7    also between Dr. Green and Dr. Lee.

8    Q.   So those who would be having a mental health role -- a

9    mental health provider role, would confer; the treatment team,

10   Mr. Beffa, and Dr. Lee?

11   A.   Yes.

12        THE COURT: Is it anticipated that Dr. Binks would

13   still be the primary therapist?

14        THE WITNESS:  Dr. Binks would still function as the

15   primary individual therapist, and he would be consulting after

16   every outing directly with Mr.  Beffa.

17   BY MR. LEVINE:

18   Q.   And is this protocol that you have just identified part--

19   envisioned by the Hospital as being part of the transition of

20   Mr.  Hinckley to that community?

21   A.   Yes.

22   Q.   Does the Hospital plan for an additional set of eyes in

23   the person of a Reverend Warren?

24   A.   Yes.

25   Q.   Who is Reverend Warren?

1    A.   He is an individual I understand with considerable

2    experience in reintegrating ex-offenders into the community.

3    So he has a number of contacts in the area around where Mrs.

4    Hinckley lives.  He has experience in mentoring individuals

5    transitioning back into the community after a period of

6    confinement.

7         I think one of the things we need to keep in mind about

8    Mr. Hinckley and just simply about mental illness in general

9    or in particular about insanity acquittees is that they're

10   dealing with a considerable amount of stigma when they return

11   to the community.

12        I recall a case -- there was a case of Frendak handled by

13   Judge Ugast where she decided to waive the insanity defense in

14   part because of what was called being doubly cursed.  So she

15   did not want to pursue an insanity defense because she already

16   had the stigma of being a criminal defendant and didn't want

17   to add to that the stigma of being mentally ill.  So they

18   called it, in that particular case, being twice cursed or

19   doubly cursed.

20        So individuals returning to the community have to deal

21   with the stigma that exists in our society of individuals who

22   have mental illness; the stigma that exists in our society

23   about people who have committed a crime; and insanity

24   acquittees have to deal with both, and Mr. Hinckley has to

25   deal with a whole other level of stigma.  So someone

1    experienced in dealing with that could be a helpful adjunct to

2    his transition to that environment.

3    Q.   So Reverend Warren would be available for that purpose?

4    A.   Hopefully, yes.  My understanding, too, is that Reverend

5    Warren has worked in that area for some time.  He has a number

6    of contacts, so, hopefully, he would be helpful, and,

7    hopefully, just having another experienced professional

8    interact with Mr. Hinckley, if he were to meet with Mr.

9    Warren, he would be another, quote, set of eyes.

10        So we would be asking Reverend Warren how he perceived

11   Mr. Hinckley, what they talked about,  what his assessment

12   was of how he was doing and incorporate that into our

13   assessment of how Mr. Hinckley was doing in another

14   environment.

15   Q.   Is Reverend Warren the director of a program known as

16   "Walk the Talk"?

17   A.   I believe so.

18   Q.   Now, has the Hospital researched plans for --

19            THE COURT: How much longer are you going to be?  I

20   thought you were almost done.  I thought we'd take a break

21   before the cross.  You've got a lot of pieces of paper in

22   front of you.

23            MR. LEVINE:  Don't be alarmed by that.  I would say,

24   Your Honor, I could finish within 10 minutes.

25            THE COURT: Okay.  Go ahead.

```
1              THE WITNESS:  Can we hold him to that?

2              MR. LEVINE:  Make it a Court order.

3     BY MR. LEVINE:

4     Q.   All right.  Has he tried to obtain volunteer positions?

5     A.   Yes.

6     Q.   Has the Hospital assisted in that regard?

7     A.   Yes, it has.

8     Q.   What's the status of that?

9     A.   Well --

10    Q.   As of your knowledge, say, of the last -- last couple of

11    days; if you have more current, please use that.

12    A.   Hopefully, it doesn't change by the end of today, but my

13    current understanding is that he has a position at

14    Service Board working at a day treatment program called

15    "People's Place".

16         This is a day treatment program for individuals with,

17    let's say, more serious impairment in terms of their mental

18    illness than Mr.  Hinckley, but he would be able to assist in

19    the provision of therapies there, such as, music therapy, art

20    therapy, food preparation, and other tasks.

21    Q.   And are there some other opportunities out there that

22    appear to still be viable?

23    A.   Well, he is exploring -- he has explored a number of

24    opportunities out there.  I mean this is another area where he

25    did experience some degree of rejection.  I think he was
```

hoping and excited initially about transferring his library

skills to a different environment.  So when he was rejected by

local libraries that was upsetting or in transferring his

interest in animals with Heritage Humane Society and being

rejected there.  These are things that he's motivated.  They

are consistent with interests that he has.

        So I think his level of motivation does decrease somewhat

when he's exploring volunteer opportunities that don't excite

him as much, but he is willing to go ahead with whatever

position is available at this point.

Q.    Dr. Montalbano, would the Hospital want some flexibility

from the Court in changing or selecting the place of

volunteering?

A.    Yes.  I believe that is the last recommendation in the

(e)letter to the Court, number 17, where it says something to

the effect that if one volunteer position were no longer to be

available or if we found a preferable volunteer position, that

we could transition Mr.  Hinckley without going back to court.

Something could change with -- so having a court order saying

you must go to Services Board twice a week for four

hours versus you must engage in a hospital approved volunteer

program in the community will give us more flexibility.

Q.    The former requiring before a change another hearing at

which the government would demand a hearing, at which the

government psychiatrist would participate, the scheduling

1    would be delayed as opposed to you just having the flexibility

2    if a library opportunity came up, that he could shift to it?

3    A.    Yes.

4    Q.    You mentioned all these rebuffs in the context of seeking

5    opportunities as a volunteer.  How has he managed those

6    rebuffs?

7    A.    I mean, overall, I think he has managed it well.  I think

8    that has contributed to him not being as motivated as he could

9    have been to seek additional opportunities at times because

10   the positions he was most interested in didn't seem to be

11   available., but I think he does continue to seek employment in

12   the area.

13   Q.    The (e)petition includes time to seek a driver's license.

14   A.    Yes.

15   Q.    Why does the Hospital believe that he should have a

16   driver's license?

17             THE COURT: I thought we talked about this yesterday.

18             MR. LEVINE:  I'm sorry, Your Honor?

19             THE COURT: I said I thought we talked about this

20   yesterday.

21             MR. LEVINE:  Okay.  You know, I've been through this

22   so many times that -- forgive me, Your Honor.  I don't want to

23   repeat.

24   BY MR. LEVINE:

25   Q.    Let's talk about the D.C. release plan.  Does the

1     Hospital propose that he have unaccompanied time in the

2     District of Columbia?

3     A.    Yes.  Four hours twice per week to engage in volunteer

4     activity in D.C.  At this point at Harbor Lights, which is a

5     satellite office of Salvation Army.

6     Q.    And what does the Hospital view as the benefit of these

7     local activities?

8     A.    Well, one, we believe he's ready for it.  We believe that

9     it would not pose a danger to himself or others due to mental

10    illness; two, I think it provides a backup plan to [the city].

11    I think that the Hospital is cognizant of the need to develop

12    an alternative release site.

13          The advantage of adding --  considering D.C. as that site

14    is that he already has any number of providers here in D.C.,

15    that we have experience with community providers in D.C., so

16    there would not be the need to put together and find all the

17    providers that we already have.

18    Q.    Dr. Montalbano, during the course of the several hours of

19    your testimony you expressed several opinions.  Do you have a

20    high degree of confidence in the opinions that you expressed?

21    A.    I think a reasonable degree of psychological certainty

22    just means more likely than not.

23              MR. LEVINE:  Nothing further, Your Honor.

24              THE COURT:  Okay.  We'll take 10 minutes.

25              (Whereupon, there was a brief recess at this time;

1     thereafter court resumed.)

2             THE COURT: Mr.  Zeno.

3     **CROSS-EXAMINATION BY MR. ZENO:**

4     Q.   Good afternoon, Your Honor.  Good afternoon, doctor.  How

5     are you?  Back again, huh?

6     A.   I'm fine, Mr.  Zeno.  Good afternoon.

7     Q.   You said something in that last 10 minutes that struck me

8     as a little new, and that was that Mr.  Hinckley had a

9     position with the Services Board?

10    A.   That's my understanding.

11    Q.   Now, that's not the understanding that's in the (e)letter

12    sent to the Court on May 28th, 2008; is that correct?

13    A.   Correct.

14    Q.   At that time, the proposal was that Mr.  Hinckley was to

15    be with Housing Partnerships?

16    A.   Correct.

17    Q.   And that's no longer correct?

18    A.   That's no longer correct.  My understanding is that he

19    has been rejected from that position since the time we

20    submitted the (e)letter.

21    Q.   And is there anything in writing to the Court about this

22    position with the Services Board?

23    A.   Not to my knowledge.

24    Q.   So the very first time anybody in this room has heard

25    about it or anybody at counsel table or on the bench has heard

1    about it is right now?

2    A.    I'm not sure.  Potentially, yes.

3             THE COURT: How did you learn about it?

4             THE WITNESS:  I learned about it from speaking with

5    Dr. Rafanello and Mr. Shamblee.

6    BY MR. ZENO:

7    Q.    When?

8    A.    I mean exactly when I found out, I mean, I'm not exactly

9    sure.  It could have been sometime last week or maybe a little

10   earlier than that, but recently.

11   Q.    Well, recently -- is there a reason that you didn't

12   recommend writing a letter to the Court providing a little

13   insight into what the volunteer activity would be?

14   A.    Well, I don't -- I'm not a member of the treatment team.

15   I'm the pretrial chief.  I don't generate (e)letters to the

16   Court.  I perform risk assessments.

17   Q.    Did you recommend it?

18   A.    Did I recommend --

19   Q.    That an (e)letter be written to the Court?

20   A.    I did not recommend the (e)letter be --

21   Q.    And you are member of the review board?

22   A.    I am a member of the review board.

23   Q.    For other patients than Mr. Hinckley, correct?

24   A.    Correct.

25   Q.    So you know the importance of having the review board

1        look at something and approve it in an objective fashion so

2        that notice can be sent to the Court, right?

3        A.    Correct.

4        Q.    Okay.  What exactly is Mr.  Hinckley supposed to do at

5        the Services Board?

6        A.    My understanding of the current position is that he would

7        be helping the provision of therapies offered at the day

8        treatment program, which is music therapy, art therapy, bingo,

9        food preparation.  I think he would be serving, to some

10       degree, as a receptionist there, in addition.  But Dr.

11       Rafanello -- I may be setting her up, but she has more of the

12       details about the functions that he would be engaged in in

13       that particular position.

14       Q.    Just one -- we'll talk to Dr. Rafanello about it I

15       presume.  You say helping the provision of therapy; is he

16       supposed to be in therapy or giving therapy?

17       A.    Well, if they're, you know, engaged in doing art, I

18       suppose he would be helping provide the art supplies or

19       collecting the art supplies.  Or bingo, helping, you know,

20       giving out what you need to play bingo; helping out for the

21       provision of those particular activities.  I don't know the --

22       exactly what he would be doing, frankly.

23       Q.    And you said you hope that -- did I hear this correctly

24       -- you said, I hope it doesn't change by the end of the day,

25       your understanding about this position?

1    A.    Yes.   Because he's had a number of provisional approvals
2    in [the city] like with Housing Partnerships.   My
3    understanding was, at one point in time, he had approval at
4    least preliminarily with Salvation Army, and then for various
5    reasons, those positions no longer became available.   So, you
6    know, in this particular case, I get the distinct impression
7    that you may talk with somebody at a volunteer service agency,
8    but then as the information filters up the chain of command,
9    you may get a different response.
10   Q.    So you've presented this to the Court even though you are
11   not sure that it is going to be offered to Mr.  Hinckley?
12   A.    I'm not positive.   It is my understanding that
13   Services Board has this position as we speak today.
14   Q.    Yeah.   But you're not sure they're going to offer it to
15   Mr.  Hinckley?
16   A.    He's got -- my understanding is they've spoken with
17   people high up at Services Board.   I'm blanking on
18   their names right now --
19   Q.    You don't need to --
20   A.    -- but they had approved it.
21   Q.    I'm sorry.   And you said, "he's" talked to.   Who's the
22   "he"?
23   A.    Well, Dr. Rafanello has talked to individuals in the
24   administration at Services Board.
25   Q.    Okay.   All right.   And the reason that this job or

1    position couldn't be done in a six-day visit is what?

2    A.   I mean, well, right now, he must be accompanied at all

3    times outside of the gated community by a member of his

4    family.  So he could engage in these activities, but only with

5    an additional individual present at all times.

6    Q.   Yes.  But my question was:  Is there a reason that he

7    couldn't do that in six days?  If the individual was -- if he

8    was given the unaccompanied privileges that has been discussed

9    in your letter, is there a reason he couldn't do this position

10   in six days?

11   A.   He could do that position under the current conditions in

12   one day, in two days, in three days, whenever it was made

13   available.

14   Q.   Okay.  And I may return to some thoughts about that.  I

15   hadn't thought of it, but I wanted to flush out a little bit.

16   A.   Okay.

17   Q.   For a minute, if we can, let's talk about the openness of

18   Mr.  Hinckley to Dr.  Lee.  Dr. Lee wrote a letter to the

19   Hospital in February.  Are you aware of the fact that he wrote

20   that letter?

21   A.   He writes letters after every visit.  I haven't memorized

22   every letter.

23           MR. ZENO:  Your Honor, if I may approach the

24   witness?

25           THE COURT: Do we have a number?

```
 1              MR. ZENO:  Number 0-8-0-7.

 2      BY MR. ZENO:

 3      Q.    Had you ever seen this letter before that you know of?

 4      A.    I believe so, yes.

 5      Q.    Please refresh your recollection.

 6      A.    May I refer to my risk assessment and see if I referenced

 7      this particular --

 8      Q.    Sure.  Do you have it up there?

 9      A.    Yes.  Yes.

10      Q.    So you have seen the letter, right?

11      A.    Yes.

12      Q.    The part I wanted to look at was in the one, two, three

13      -- third paragraph.

14      A.    Yes.

15      Q.    Third line.  Okay.  Dr. Lee writes:  He -- and that's

16      speaking about Mr. Hinckley, right?

17      A.    Yes.

18      Q.    He also spoke of his friend, Ms. G and their continuing

19      ongoing platonic relationship with --

20              THE COURT: I'm sorry.  Where are you reading from?

21              MR. ZENO:  Third paragraph, third line.

22              THE COURT: Oh, okay.  I'm sorry go ahead.

23      BY MR. ZENO:

24      Q.    Their ongoing plutonic(Phonetic), it says there, right,

25      as opposed to platonic I suppose.  But plutonic(Phonetic)
```

1    relationship and her cooperation in terms of working with the

2    treatment team.  That's what he said there, right?

3    A.    Yes.

4    Q.    Okay.  So Mr. Hinckley told Dr. Lee that he continued to

5    have a platonic relationship with Ms. G?

6    A.    It looks like that, unless -- I don't know -- I would

7    have to interview Dr. Lee, unless he was assuming that since

8    he had said that before it simply remained that way.  It

9    certainly looks like that's what Mr. Hinckley is telling Dr.

10   Lee.

11   Q.    Well, it says he spoke -- that is Mr. Hinckley spoke --

12   it didn't say, I assume.  It says Mr. Hinckley also spoke,

13   right?

14   A.    Yes.

15   Q.    Okay.  And, in fact, Dr. Rafanello found out about this

16   and had to write a note to file about the fact that Mr.

17   Hinckley had misinformed Dr. Lee?

18   A.    Okay.

19   Q.    Okay.  Or do you remember that?

20   A.    I don't remember the note by Dr. Rafanello.  I know that

21   --

22   Q.    But -- I'm listening -- you know that --

23   A.    I know that Dr. Rafanello has been in contact with

24   Dr. Lee and that Mr. Binks has been in contact with Dr. Lee.

25   I, frankly, don't recall the specifics of each time of what

1    the dialog was about.

2    Q.    So, in other words, do you consider this to be a

3    untruthful statement by Mr. Hinckley?

4    A.    If he is telling Dr. Lee that the relationship in

5    February of 2008 doesn't have an intimate component, that's

6    not accurate.

7    Q.    Right.  And that would be misrepresentation?

8    A.    Yes.

9    Q.    Be a lie?

10   A.    Potentially, yes.

11   Q.    If it's not true, what is not a lie about it?

12   A.    Well, I would want to see the exact comment.  I would

13   want to discuss it with Mr. Hinckley.  I would want to

14   discuss it with Dr. Lee before I came to a final judgment.  My

15   understanding is that there was an intimate component to the

16   relationship from the end of December to the end of March, so

17   that would fall into this time frame.

18   Q.    Right.

19             MR. ZENO:  Just a second, Your Honor.

20             THE COURT: Okay.

21             MR. ZENO:  May I approach the witness with

22   Government Exhibit No. 6, Your Honor?

23             THE COURT: Yes.

24   BY MR. ZENO:

25   Q.    Take a moment and let me know if you recognize what that

1    is.

2    A.    (Witness complies.)  I recognize the note.  I believe I

3    did review this note.

4    Q.    And this note -- in this note, Dr. Rafanello, second line

5    of the first paragraph.

6    A.    Yes.

7    Q.    Dr. Rafanello said:  Dr. Lee reported that Mr. Hinckley

8    had not informed him that his relationship with Ms. G had

9    progressed into a romantic one.

10   A.    Yes.

11   Q.    Is it a lie?

12   A.    Well, I think it's dishonest to say it's platonic when

13   there is an intimate component to it.  I think that is

14   different, however, from not revealing something.  Apparently,

15   he had not revealed to Dr. Lee that.  I mean my understanding

16   at the end after Mr. Hinckley returned from a Christmas

17   outing that the relationship with Ms. G progressed to a more

18   intimate component.  And so it looks like Dr. Lee was not

19   aware of that until being informed by Dr. Rafanello.

20   Q.    Right.  And that's not -- I was going to do a double

21   negative.  Let me to it differently.  Mr. Hinckley

22   affirmatively said something to Dr. Lee which was not correct.

23   A.    It looks that way, yes.

24   Q.    It is not a matter of Mr. Hinckley kept his mouth shut

25   and didn't say something.

1     A.    With regard to saying it is platonic, yes.

2     Q.    Right.  And that is false, correct?

3     A.    Yes.

4     Q.    Misleading?

5     A.    Yes.

6     Q.    And you're hesitant to say it's a lie?

7     A.    It's -- I suppose there's no difference.

8     Q.    So you would say it's a lie?

9     A.    Lie.  If it is -- if there is an intimate component, and

10    he's saying there is not one.

11    Q.    On direct, you were asked a question about Ms. Wright.

12    A.    Yes.

13    Q.    And Ms. Wright is an FPT at the Hospital, right?

14    Correct?

15    A.    Yes.

16    Q.    And she is, in fact, Mr.  Hinckley's one-on-one, correct?

17    A.    Correct.

18    Q.    And that means she's responsible to talk to Mr.

19    Hinckley, see how his treatment plan is going. She has a

20    regular relationship with him, right?

21    A.    She meets with him regularly, yes.

22    Q.    And on direct, you were asked hasn't she said that he has

23    good stress tolerance; do you remember that question?

24    A.    Yes.

25    Q.    Okay.  Isn't it also true that in your report, you point

1    out that Ms. Wright says that Mr. Hinckley will provide

2    information if he is asked, but does not typically volunteer

3    it.

4    A.   Yes.

5    Q.   And is it also true that she told you:  I don't think

6    he's that open.  Certain things he will tell you, and certain

7    things he won't; is that correct?

8    A.   Yes.

9    Q.   Now, Mr. Shamblee is Mr. Hinckley's social worker at

10    the Hospital; is that correct?

11    A.   Correct.

12    Q.   And Mr. Shamblee told you and you put in your report

13    that Mr. Hinckley, quote:  Appears open in discussing issues

14    with the treatment team as long as you ask the right

15    questions; isn't that right?

16    A.   Correct.

17    Q.   Let's talk about -- and your opinion is in the risk

18    assessment that Mr. Hinckley has been, quote, fairly open,

19    unquote, about discussing issues of his relationships with

20    women, correct?

21    A.   Correct.

22    Q.   He's not fully open, though, right?

23    A.   No.

24    Q.   For instance, there's a whole -- how did it come to light

25    about Ms. M and he having a physical relationship?

1    A.    At which point in time?

2    Q.    This is going to be on August 29th.

3    A.    Okay.

4    Q.    On August 29th.  Now, were you the first person to find

5    out about this?

6    A.    I don't know.  I would have to -- and Mr.  Hinckley is

7    talking to any number of individuals, both at the Hospital and

8    outside the Hospital.  I would have to look carefully at every

9    single note and interview every single person about what he

10   said when.

11           MR. ZENO:  If I could just have a second, Your

12   Honor.

13           THE COURT:  Yes.

14           MR. ZENO:  May I approach the witness with

15   Government's Exhibit No. 10, Your Honor?

16           THE COURT: Yes.

17   BY MR. ZENO:

18   Q.    You recognize what that is, right?

19   A.    Yes.

20   Q.    And what is it?

21   A.    It's a letter to the Court dated September 12th, 2007.

22   It looks like it is reviewing some recent outings.

23   Q.    Right.  Let's look at Page 5.

24   A.    Okay.

25   Q.    And we start out on Wednesday, August 29th, 2007.

1    A.   Okay.

2    Q.   Okay.  Now, read as much of the paragraph as you want,

3    but I was going to draw your attention to the one, two, three,

4    four, five, six, seven, eight, ninth line down.

5    A.   Yes.

6    Q.   "He" -- that's Mr.  Hinckley, right?

7    A.   Yes.

8    Q.   Described Ms. M as a quote, cat friend, unquote, and

9    stated that he is not pursuing Ms. M or Ms. DeVeau

10   romantically.  So that's what he said, right?

11   A.   Yes.

12   Q.   Then there's this phrase or this sentence: It was pointed

13   out to him that his behavior did not appear to be consistent

14   with that remark.  So somebody told him we've seen to the

15   contrary, right?

16   A.   Yes.

17   Q.   Is this refreshing your recollection?

18   A.   Well, I'm not sure reading it whether it's saying "his

19   behavior" or that he had already said that Ms. M was already

20   affectionate with him or both; but either the behavior or his

21   past statements were not consistent with saying he was not

22   pursuing Ms. Miller romantically.

23   Q.   And then let's look at the next few words:  And he

24   admitted that sometimes Ms.  M was affectionate with him and

25   sometimes she was not.  He reported that he has quote,

```
 1    fondling privileges with Ms. M.  Now, the words there are
 2    "admitted" and "reported".  Doesn't this sound like the first
 3    time it came up?
 4    A.   I'm not sure.  I think also -- I mean I remember
 5    discussing this with him.  I'd have to look exactly when that
 6    was, but he had a visit in August, and I interviewed him after
 7    the visit.  He also reported that at that particular point in
 8    time.  I could check to see when it was I had that particular
 9    conversation with him.
10    Q.   But the words here that we're talking about "admitted",
11    "reported" -- sounds like this was the first time it came up.
12    A.   Potentially.
13    Q.   Now, there are various levels of privileges at St.
14    Elizabeths Hospital; is that correct?
15    A.   Correct.
16    Q.   For instance, there's "B" city privileges is one that he
17    has; is that correct?
18    A.   Correct.
19    Q.   What level of privileges is fondling?
20    A.   Well, I discussed that with Mr. Hinckley.  He said that
21    was an unfortunate phrase.  There's no such thing.  I think
22    that's -- I don't even know who -- Mr. Hinckley said that a
23    staff member used that phrase first, but he did admit using
24    that phrase.
25    Q.   What does it mean?
```

A.   It simply means fondling.  It simply means from his

perspective that that activity is being granted by that other

individual.  So there are individuals he's wishing for more

intimacy from at different points in time, and they're

saying, no, and then there are times when they're allowing

intimacy.  So it is, according to him, an unfortunate phrase

for saying that that activity is being allowed during that

period.

Q.   Okay.  We're going to switch to a slightly different

topic, but we're going to talk about the oppositional style

that Mr. Hinckley has.

A.   Okay.

Q.   And you're aware of that term, right?

A.   Yes.

Q.   And in fact, in your report, you point out that Mr.

Hinckley has -- you call his oppositional style his

endorsement of conventionality which constitutes lip service

rather than a firm commitment, correct?

A.   Well, that's an interpretation of some of the

psychological testing findings that comes in particular from

the Rorschach data.  There are -- certain responses to the

Rorschach indicate -- and it's also consistent with the MMPI-2

data, but there are oppositional tendencies.  There is some

underlying anger and resentment and resentment of authority so

that, you know, certainly, Mr. Hinckley conforms with most,

1     if not all, of the requirements at the Hospital, but there's a

2     little bit of a rebel beneath the surface.

3              THE COURT:  A little bit of what?

4              THE WITNESS:  Of a rebel beneath the surface.  I

5     think some of his songs reflect that theme.  When I talk with

6     him in terms -- when you gather information from some of the

7     women that he's been involved with, some data emerges in that

8     theme.  I mean one of the reasons he likes being with these

9     women is that it's not interacting with an authority figure

10    where you have fairly well-defined and strict expectations

11    about how to behave.  He's at times glad to be relieved of

12    that.

13    BY MR. ZENO:

14    Q.   Like not having a chaperone.

15    A.   I think he would be relieved to not have a chaperone.

16    Q.   Let's go back to the phrase, though.  The phrase you

17    actually used in your report was:  Mr. Hinckley endorses

18    conventionality that constitutes lip service rather than a

19    firm commitment, correct?

20    A.   Well, keep in mind, as I explained yesterday, that all

21    these interpretive hypotheses need to be confirmed by external

22    data.  So people who generate that type of response to that

23    type of test may exhibit these types of tendencies.

24    Q.   Okay.

25    A.   I think there is some data in the external world to

1    suggest that's true to some degree, but it can be easily

2    exaggerated.  He does conform by and large rather well to the

3    expectations that are imposed on him by the authority

4    structure of the Hospital and by the authority structure of

5    the Court.

6    Q.   Okay.  Let me try one more time.  Your report says:

7    Mr.  Hinckley endorses conventionality which constitutes lip

8    service rather than a firm commitment; right?  Those are words

9    in your report.

10   A.   Well, yes, and that is an interpretive hypothesis.

11   Q.   Let's try a practical example.  Mr.  Hinckley's

12   oppositional style would be -- an example of that would be his

13   use of Ms. B in order to contact Ms. G after Ms. G said, I

14   don't want to talk to you anymore.  I don't want to have

15   anything more to do with you.  Do you remember that incident?

16   A.   Yes.

17   Q.   So what happened is there's this sexual relationship,

18   things grow, and, finally, Ms. G says, no more; isn't that

19   correct?

20   A.   Correct.

21   Q.   And she says, I don't want to have anything more to do

22   with it, correct?

23   A.   Correct.

24   Q.   Mr.  Hinckley said that he would honor her request and

25   not try to reach out to her anymore, right?

1    A.   Correct.

2    Q.   Okay.  And instead he goes to the friend, Ms. B, and

3    says, Ms. B, would you contact Ms. G and have her get back in

4    contact with me; isn't that what happened?

5    A.   Well, I don't know if I would affix the label

6    "oppositional" to that particular example of behavior.

7    Q.   Okay.  One second before -- just will -- I'll let you --

8         MR. LEVINE:  Your Honor, objection.  The question,

9    he's answering it, and --

10        MR. ZENO:  I was going to say, if I may, Your Honor,

11   could we just get the fact of whether that's what happened and

12   then you can discuss it.  I mean is that what happened?

13        THE WITNESS:  Well, this is around May 6th, I

14   believe.  And after a meeting with the treatment team and

15   Ms. G coming to the grips with the full implications of her

16   relationship with Mr.  Hinckley, for various reasons, said,

17   that's it.  Don't call me anymore.

18        Mr.  Hinckley was, obviously, upset by the

19   withdrawal of that relationship.  He called Ms. B, and they

20   talked about it, and the next thing you know Ms. G is calling

21   Mr.  Hinckley.  I mean I see it as Mr.  Hinckley -- ongoing

22   evidence that he is oriented to establishing and maintaining

23   relationships.  I mean he did not call Ms. G after she said,

24   no.

25   Q.   And you're aware that Dr. Binks about this incident has

1      said that Mr.  Hinckley was, quote, not following the rules

2      set by Ms. G; isn't that correct?

3      A.   Well, I don't know if I agree with that.  Ms. G said to

4      not call; he didn't call her.  I don't know what other rule

5      he's talking about.

6      Q.   Okay.  Just allow me to get the facts.

7      A.   Okay.

8      Q.   Did Dr. Binks say that he, Mr. Hinckley, was not

9      following the rules set down by Ms. G?

10     A.   If that's a quote by Dr. Binks, that's certainly a quote

11     by Dr. Binks.

12     Q.   You read that quote in Dr. Patterson's report; isn't that

13     correct?

14     A.   Yes.

15     Q.   Okay.

16     A.   I didn't recall it offhand.

17     Q.   Okay.  And you're saying that you don't believe that

18     shows oppositional style?

19     A.   Not necessarily.

20     Q.   Does it show manipulativeness?

21             THE COURT: Show me what?

22             MR. ZENO: Manipulativeness.

23             THE WITNESS:   Well, that's a rather loaded term,

24     but he is manipulating to reestablish contact with Ms. G.  I

25     believe that.

BY MR. ZENO:

Q.    Sort of like a narcissistic person would do.

A.    There are many people who -- I mean it could be a feature of narcissism, yes, but there are many people who, when they have something important from them withdrawn, try and figure out how they can reestablish it.

Q.    Okay.  Different statement.  Okay?  Anything you want to add to that?

A.    No, thank you.

Q.    Mr. Hinckley told Mr. Beffa that he, Mr. Hinckley, does not have access to a phone at the hospital in order to make contacts in his mother's hometown, correct?

A.    I'm sure it's correct if you're citing a quote from Mr. Beffa, Mr. Zeno.

Q.    Well, okay.  It's in Dr. Phillips' report at Page 32; do you want to see it?

A.    I believe you.

Q.    So assuming that that's true, if it's true that he said that, Mr. Hinckley said that --

A.    Yes.

Q.    That's not true, is it?

A.    The quote is that he told Dr. Phillips that he did not have access --

Q.    No.  No.  Let me give you the quote, again.  Actually, I'll read you the quote.

1              MR. ZENO:  Your Honor, may I --

2              THE COURT:  This is Dr. Phillips' report.

3              MR. ZENO:  This is Dr. Phillips' report, Your Honor.

4    Page 32, if Your Honor wants to look.  Do you want to read it,

5    too, or do you want me to just read it to you?

6              THE WITNESS:  You can just read it to me, yes.  I

7    trust you, Mr. Zeno.

8              MR. ZENO:  Yeah.  Great.  Thanks.  Your Honor, I'm

9    in the second paragraph on Page 32, second line, and this is a

10   quote that Dr. Phillips has put in and it says:  He's, meaning

11   Mr. Hinckley, telling me that he has no phone access at the

12   hospital.  Okay.  Now, you got that quote?

13             THE WITNESS:  Yes.

14   BY MR. ZENO:

15   Q.   Okay.  Not true?

16   A.   He has phone access.  There are certainly limitations

17   around phone access, but to say there's no phone access is not

18   true.

19   Q.   Misleading?

20   A.   It could be.  It could be, yes.

21   Q.   Lie?

22   A.   I don't know.  I mean I think an important thing to take

23   into account when you get these quotes, sometimes if you have

24   the whole transcript of the dialog with Dr. Phillips, it comes

25   across differently than just taking out a single line.  So

1    whether or not I would view it differently having access to

2    whole transcript or not, I don't know.

3    Q.   Let's talk about the fact that Mr. Hinckley has, quote,

4    some access to a phone.  Mr.  Hinckley, in fact, was calling

5    Ms. G at least three times a day.

6    A.   Yes.  That's what he's reporting.

7    Q.   He has even made international phone calls to Ms. G.

8    A.   That's what I heard in court.  Probably information

9    that's been reported.

10   Q.   Do you remember seeing that in the female log?

11   A.   I think there was something in there about calling to the

12   country that she was in.

13   Q.   And Mr.  Hinckley receives telephone calls in the

14   library?

15   A.   That's my understanding.

16   Q.   And he works in that library every working day.

17   A.   Monday --

18   Q.   Monday through Friday.

19   A.   Yes, Monday through Friday.

20   Q.   And he is there for about three-and-a-half hours.

21   A.   Yes.

22   Q.   And he has not only the ability to make outgoing phone

23   calls, he can receive incoming phone calls.

24   A.   Correct.

25   Q.   He does receive them.

1    A.    That's my understanding.

2    Q.    And he could have had people down in the parents' -- the

3    mother's hometown call him there because he would have

4    received a phone call there, right?

5    A.    Yeah, I think he could have.  I don't think the librarian

6    would have objected to that.

7    Q.    Mr. Hinckley also talks to Ms. K; isn't that correct?

8    A.    Yes.

9    Q.    And he talks to her several times a week?

10   A.    More recently I think so, yes.

11   Q.    And sometimes his conversations last as long as an hour

12   with her.

13   A.    I think that's what he told Dr. Patterson.

14   Q.    Okay.  He also makes calls to Ms. B a few times a week.

15   A.    That seems to be happening more recently, yes.

16   Q.    And he's also made calls to California to the former

17   staff member who is now out in California; is that correct?

18   A.    The art therapist, yes.

19          THE COURT: The "what" therapist?

20          THE WITNESS:  Art therapist.

21   BY MR. ZENO:

22   Q.    So Mr. Hinckley can use the telephone, right?

23   A.    Yes.

24   Q.    Okay.  Now, Mr. Hinckley feels that he does not need to

25   be supervised on his trips into the mother's community; is

1    that correct?

2    A.   Do you mean no supervision or less supervision?

3    Q.   Well, he has said:  I'm stuck in a place where I think I

4    am greatly impeded and need to have no supervision.  That's

5    what he told you, right?

6    A.   Yes.  I think when we were talking about it, it was in

7    the context of engaging in different activities --

8    Q.   Right.

9    A.   -- in [the city].  Not that he would have no supervision

10   in his mother's house, but, certainly, if he were trying to

11   meet a female, he would definitely prefer no supervision.  I

12   think he would also prefer no supervision if going to

13   interview for a volunteer position.  That he feels that's an

14   impediment to getting a position.

15   Q.   In fact, the way you put it was, quote:  Mr. Hinckley

16   does not want to go looking for women accompanied by his

17   sister, brother, or mother, right?

18   A.   Yeah.  He prefers to reach out to women, engage in

19   conversation, without a chaperone.

20   Q.   He's used the term "go looking for women"; that's what he

21   thinks, isn't it?

22   A.   Well, he's looking for female companionship.  Maybe that

23   was an unfortunate turn of phrase, but the point is simply

24   he's oriented towards having contact with women.  That's not

25   too unusual.

1    Q.    He's very motivated to do that, right, to meet women?

2    A.    He is motivated to meet women, yes, to engage --

3    Q.    And he intends to do it down in his mother's community,

4    right?

5    A.    He hopes to, yes.

6    Q.    Well, he doesn't just hope to, that's his intent, right?

7    A.    He would like to, yes.

8    Q.    The whole purpose of providing him with unchaperoned time

9    down there is to allow him to have social contact, right?

10   A.    Not the whole purpose.

11   Q.    Okay.  A purpose.

12   A.    A purpose.

13   Q.    And how many close male friends has he developed in the

14   last couple of years?

15   A.    I don't think he has any close male friends.  There are a

16   few males at the Hospital that he engages in more regular

17   dialog with, but to characterize any of those men as close

18   friends is probably a stretch.

19   Q.    So when he goes out in the community unsupervised, he's

20   going to meet women?

21   A.    He would like to, yes.  I don't think that precludes the

22   possibility of having a male friend.  It's something that we

23   have certainly encouraged him to do.  It has not come to

24   fruition.

25        Frankly, I believe that if he were to have a network of

male friends that I don't think they would be subject to the
same degree of scrutiny that females -- he would have an
additional support system that would be more likely to endure
in the future, and I think he might be a little less pressured
in his attempts to contact women if you have a network of male
friends.  So something like playing music with males and
establishing some degree of rapport in connection with those
individuals is, frankly, something I would encourage.

Q.   And you have encouraged him to develop a male friend for
years, right?

A.   Yes.

Q.   Now, on the other hand, he's not motivated to go for the
volunteer positions, right?

A.   I don't think it's fair to say he's not motivated.

Q.   He's not as motivated?

A.   Certainly, not as motivated.

Q.   In fact, the term use in the (e)letter is he has some
lack of initiative in following through on interviews with the
volunteer site, correct?

A.   Yes.  But I think that needs to be put in perspective.
As I stated earlier in my testimony, he did experience a
number of rejections in [the city].  Mr. Hinckley told me I
think it -- I don't know whether it's in my report or one of
the notes after one of the outings, I don't recall, but
something to the effect that the further I get out, the more

1      and more reality hits me; meaning the level of rejection.

2          And that does have an affect on your motivation and

3      initiative, as well as the obvious fact that this is an

4      individual who has been in a confined setting for 27 years.

5      There is degree of institutionalization occurring.  Now, I

6      don't mean that to excuse him not demonstrating more

7      initiative.  I think it's the responsibility of the Hospital

8      to help encourage him to display more initiative, and that is

9      something that we're working on, but he has displayed some

10     degree of initiative,  but he needs to make progress in that

11     area.

12     Q.   When you talked about him receiving some rejections and

13     handling it, he's received some rejections regarding women,

14     right?

15     A.   Yes.

16     Q.   And your comment -- I believe the term you actually used

17     in your report was:  He's almost frantic in his search for

18     women; isn't that right?  Isn't that the word you used?

19     A.   I would say, yes.  I recall that particular adjective

20     being used.

21     Q.   I mean you used it.

22     A.   Yes.

23     Q.   Right.

24     A.   I think that is a pattern.  You know, frantic may be a

25     little too strong, but there is this pattern of when a

1    relationship is dissolving or going down, he very much would

2    like to have some relationship.  So seeking out an old

3    relationship, finding a new relationship, keeping the

4    relationships alive, and that may be related to having what I

5    called "backups", that if something were to falter in one

6    relationship, he could fall back with a contact with another

7    relationship, even if it's a friendship.

8    Q.    And, in fact, Dr. Rafanello termed it in one of her

9    comments "stockpiling".

10   A.    I knew you were going to re-invoke that particular

11   phrase.  She did.

12   Q.    You agree, right?  I mean that's what we're talking

13   about.

14   A.    I think he is very oriented towards attachment with

15   women, and there's not -- he would very much like to have an

16   enduring, intimate relationship with a female.  If that were

17   to occur, I think there would be a diminution in some of these

18   other activities, such as, seeking out what I call "backups"

19   or Dr. Rafanello calls "stockpiling"  or the amount of energy

20   he exhibits, you know, to find, re-establish, or seek out

21   contact with females when one particular relationship is

22   faltering.

23   Q.    I'm going to switch gears.  Okay?

24            THE COURT:   Is there evidence that if there were an

25   enduring relationship with one woman that these other efforts

1    to meet other women and to have several relationships of

2    various degrees of intensity simultaneously would not occur

3    any longer?

4              THE WITNESS:  I'm not sure about that because,

5    certainly, the most enduring relationship has been the one

6    with Ms. Ms. DeVeau, and there was a period of time when he

7    was involved with her where he was still obsessed with Ms.

8    Foster early on.  Then there is a period of time we went --

9    there was a hearing back in the latter 1996, 1997, where he

10   expressed an interest with Commander Wick at the Hospital, and

11   he was still engaged very much with Ms. DeVeau at that

12   particular point in time.  So I'm not sure whether those

13   efforts would be reduced.

14             I think there is some data to suggest that when he

15   has a more -- you know, I don't think he has really ever had a

16   sustained, intimate relationship.  He has had sustained

17   relationships, but having intimacy for a significant length of

18   time, I don't think the degree of physical intimacy with Ms.

19   DeVeau was even sustained for a long period of time.

20   BY MR. ZENO:

21   Q.   You think it needs to be physical?

22   A.   I think that is an important component.

23   Q.   For Mr. Hinckley?

24   A.   Of the relationship for Mr. Hinckley.

25   Q.   It's not for everybody necessarily, though, right?

1      A.    Not for everybody.

2      Q.    But for him, it is.

3      A.    For him and for many other males, Mr. Zeno.

4      Q.    Good enough.  Okay.  New idea.  We're going to go to a

5      new place.  Okay?

6      A.    Yes.

7      Q.    As part of your preparation for the psychological risk

8      assessment this year, you administered two psychological

9      tests.

10     A.    Correct.

11     Q.    The MMPI-2, which is the Minnesota Multiphasic

12     Personality Inventory, right?

13     A.    Very good.

14     Q.    Thank you.  And the Rorschach test.

15     A.    Yes.

16     Q.    And the last time you administered these tests was in

17     2005.

18     A.    Correct.

19     Q.    So it has been nearly three years, correct?

20     A.    Correct.

21     Q.    And you feel that this current administration of the test

22     was valid.

23     A.    Correct.

24     Q.    But even though the test results are valid, your report

25     has an entry commentary about the validity and analysis

1    section; isn't that correct?

2    A.   Yes.

3    Q.   Okay.  And this is a standard section in the MMPI-2,

4    right?

5    A.   Yes.

6    Q.   And it's important because it gives you background for

7    interpreting the scores, correct?

8    A.   Well-phrased.

9    Q.   In your comments in the validity section, you found Mr.

10   Hinckley to, quote, have familiar resignation and he, quote,

11   reluctantly engaged, unquote, in the testing, correct?

12   A.   Yes.

13   Q.   And he remains, quote, markedly defensive, unquote.

14   A.   Yes.

15   Q.   And Mr.  Hinckley, quote, tends to minimize his problems

16   and pathology, correct?

17   A.   Correct.

18   Q.   And Mr. Hinckley tends, quote, to present himself in an

19   overly positive and socially virtuous manner, unquote.

20   A.   Correct.

21   Q.   And, quote, therefore -- you say -- many of the results

22   based on his self-report may underrepresent problems of

23   pathology, correct?

24   A.   Correct.  With the overall of the guarded, defensive

25   underreporting style, he doesn't readily acknowledge, you

1    know, negative thoughts, feelings, or impulses.  Most people

2    are more willing to acknowledge negative experiences than he

3    is.

4    Q.    And so Mr.  Hinckley, quote, tends to present more in

5    terms of how he would like to be seen by others, unquote --

6    A.    Uh-huh.

7    Q.    -- rather than how he really is.

8    A.    Correct.

9    Q.    And this has been a consistent problem with Mr.

10   Hinckley.

11   A.    It has been a consistent finding about his self-report

12   style as it's called.

13   Q.    Because he has been elevated on what's called the

14   repression score in the testings after 1982.

15   A.    Well, that -- I mean the findings as a whole as presented

16   in the MMPI-2 reflect that whether it's the so-called "three/

17   four profile", the repression scale, the over-controlled

18   hostility scale, they're all indicative of that particular

19   dynamic.

20   Q.    And the -- what we're talking about here though is that

21   has been elevated for him -- is that the right term,

22   "elevated"?

23   A.    Yes.

24   Q.    Okay.  Since the testing after 1982, correct?

25   A.    Well, what I recall -- are you talking just about the

1    repression scale?

2    A.   Well, I am at this moment.  We're going to talk about the

3    other scales, too, but repression is 1982, right?

4    A.   I think that's, yeah, one of the more long-term findings,

5    yes.

6    Q.   Do you --

7    A.   I don't recall the exact year offhand.

8    Q.   Okay.  You want to look at your report?

9    A.   Sure.

10   Q.   Thirty-seven at -- Page 37.

11          THE COURT: Mr.  Zeno, you're not going to finish in

12   the next five or 10 minutes I assume.

13          MR. ZENO:  Not unless I'm ordered to, Your Honor.

14          THE COURT:  So what do you want to do on --

15          MR. ZENO:  I can go for a few more questions -- I

16   mean I can pick up after lunch, obviously.  I don't expect to

17   be too long after lunch.  We can break right now is fine.  I

18   haven't really gotten very far into this.

19          THE COURT:  Okay.  Why don't we do that?  Can we

20   come back at two o'clock, and then we're going to try to end

21   by 4:30 because I've got another matter I've got to deal with

22   at 4:30.

23          (Whereupon, there was a lunch recess at this time.)

24

25

1

2                    C E R T I F I C A T E

3

4          I, Wendy C. Ricard, Official United States Court

5     Reporter in and for the District of Columbia, do hereby

6     certify that the foregoing proceedings were taken down by

7     me in shorthand at the time and place aforesaid,

8     transcribed under my personal direction and supervision,

9     and that the preceding pages represent a true and correct

10    transcription, to the best of my ability and

11    understanding.

12

13

14

15    _____

16    Wendy C. Ricard, CCR, RPR

17    Official U.S. Court Reporter

18

19

20

21

22

23

24

25