IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

       Government,

      vs.

JOHN W. HINCKLEY, JR.,

       Defendant.
_____

CR No. 81-306
Washington, DC
July 22, 2008
2:00 P.M.

PM Session

TRANSCRIPT OF EVIDENTIARY HEARING
BEFORE THE HONORABLE PAUL L. FRIEDMAN
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:       THOMAS E. ZENO, ESQUIRE
U.S. Attorney's Office
555 Fourth Street, NW
Suite 5423
Washington, DC  20530
(202) 514-6957

SARAH TOWNSEND CHASSON, ESQUIRE
U.S. Attorney's Office
555 Fourth Street, NW
Washington, DC  20530
(202) 514-7248

For the Defendant:       BARRY W. LEVINE, ESQUIRE
Dickstein Shapiro, LLP
1825 Eye Street, NW
Washington, DC  20006
(202) 420-2237

ADAM S. PROUJANSKY, ESQUIRE
Dickstein Shapiro, LLP
1825 Eye Street, NW
Washington, DC  20006
(202) 420-4739

(Appearances Continued)


For the Defendant:                ANN-MARIE LUCIANO, ESQUIRE
                                  Dickstein Shapiro, LLP
                                  1825 Eye Street, NW
                                  Washington, DC   20006
                                  (202) 420-2703



Court Reporter:                   Lisa M. Hand, RPR
                                  Official Court Reporter
                                  U.S. Courthouse, Room 6706
                                  333 Constitution Avenue, NW
                                  Washington, DC   20001
                                  (202) 354-3269

Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

1                              I N D E X

2     WITNESS                                              PAGE

3     For the Defendant:

4     DR. PAUL MONTALBANO

5     Cross-Examination by Mr. Zeno                           4

6     Redirect Examination by Mr. Levine                     20

7     VERNE J. HYDE

8     Direct Examination by Mr. Levine                       43

9     Cross-Examination by Ms. Chasson                       69

10    Redirect Examination by Mr. Levine                     73

11                        INDEX TO EXHIBITS

12    For the Government:                          Identified

13    No. 6 – document                               32

14    No. 7 – letter                                 32

15    No. 10 – letter dated 9/12                     26

16    For the Defendant:

17    Patient Exhibit No. 4 – Dr. Montalbano notes   27

18    Patient Exhibit No. 5 – Note by Dr. Binks      33

19    Patient Exhibit No. 6A – CD                    58/59

20    Patient Exhibit No. 6B – Lyrics                58/59

21

22

23

24

25

1                    P R O C E E D I N G S

2              THE COURT:  Mr. Zeno.

3              MR. LEVINE:  Thank you, Your Honor.

4              THE COURT:  We have to wait for Mr. Hinckley, but

5    other than that, you can get ready.  Mr. Hinckley is here.

6    Thereupon,

7                    DR. PAUL MONTALBANO,

8    the witness herein, having been previously sworn, was examined

9    and testified as follows:

10             MR. ZENO:  Thank you, Your Honor.

11   BY MR. ZENO:

12    Q.   Good afternoon, again.

13    A.   Good afternoon, again, Mr. Zeno.

14    Q.   I think we left off with the question of whether the

15   Repressions scale or score, which is it, score?

16    A.   Scale.

17    Q.   Scale -- for Mr. Hinckley had been elevated following

18   1982, that's correct, isn't it?

19    A.   Correct.

20    Q.   And individuals with elevated Repression scale tend to

21   underrepresent their psychopathology, as you said in your

22   report?

23    A.   True.

24    Q.   So, after 1982 Mr. Hinckley's elevated scores for

25   repression mean that you are not sure he's giving you an

1   accurate picture of himself?

2   A.   Well, it's another indicater that he tends to

3   underrepresent problems.

4   Q.   And so is it fair to say that you are not sure he's

5   giving you an accurate picture of himself?

6   A.   I think the better way to describe it is a full

7   picture.  He's underrepresenting things, it's not necessarily

8   a deliberate distortion or untruth, but if there are problems

9   going on he might tell you about a few of them and put them in

10  an overly favorable light.

11  Q.   And in 1981 and in 1982 Mr. Hinckley was not elevated

12  for repression, so you didn't have that problem of him trying

13  to put things in an overly favorable light?

14  A.   I don't recall the scales offhand for '81 and '82, I

15  may have referenced that in my report.

16  Q.   You don't remember them at all?

17  A.   I would have to check.  I know that's been in elevation

18  for some time, exactly when it wasn't in elevation, I don't

19  recall offhand.

20  Q.   Because Mr. Hinckley's, quote, self-report may

21  underrepresent problems of pathology, as you said in your

22  report, you don't know if his pathology is worse than it

23  appears?

24  A.   Well, keep in mind, we're not only assessing his

25  pathology based on his self-report, we're basing it on

1    behavioral observations by any host of individuals.  But

2    basing it on his self-report alone, you need to have a concern

3    about underrepresentation.

4    Q.    So, his pathology could be worse than it appears?

5    A.    Than what he's reporting.

6    Q.    And you cannot conclude the pathology is absent for Mr.

7    Hinckley?

8    A.    I think it would depend on what pathology.  Some

9    pathology is blatantly evident in your behavior, others is

10   not.

11   Q.    Let's turn to the K scale for a second.  That measures

12   Mr. Hinckley's defensiveness, right?

13   A.    Correct.

14   Q.    Mr. Hinckley's K scale has been consistently elevated

15   since 1995?

16   A.    Correct.

17         THE COURT:  Since when?

18         MR. ZENO:  1995.

19   BY MR. ZENO:

20   Q.    And that means that although the test in 2008 was

21   valid, it was, as you said, quote, of low clinical utility,

22   unquote, because he could be hiding information?

23   A.    Well, again, I would choose the word underrepresenting

24   information for various reasons.

25   Q.    But it still is of low clinical utility because of this

1   underrepresentation problem?

2   A.   Well, yes.  As you pointed out earlier, the validity

3   scales provide the filter or prism, so the speak, through

4   which you view all the data.  So, if you have an individual

5   who is overrepresenting or underrepresenting, you need to keep

6   in mind that the data need to be viewed through that lens.

7   Q.   In 2008 Mr. Hinckley was, quote, significantly elevated

8   on the Superlative scale, which means that he, quote, has a

9   tendency to deny problems and present himself as virtuous,

10  unquote?

11  A.   Right, and that was consistent with the administration

12  from 2005.

13  Q.   Your risk assessment said that Mr. Hinckley is, quote,

14  reporting less discomfort interacting with others, do you

15  remember that?

16  A.   Yes.

17  Q.   That's not necessarily a good thing, is it?

18  A.   Not necessarily.

19  Q.   Because it could be that he's not having proper

20  interaction with others because that would cause -- everybody

21  has a certain amount of nervousness when they interact with

22  people, right?

23  A.   Most people.

24  Q.   And his problem is he was reporting less discomfort in

25  his 2008 testing?

1    A.   Another way to view that is he's reporting more

2    confidence in social situations, but less discomfort overall

3    for whatever reason.

4    Q.   For whatever reason.  One of the reasons could be more

5    insight, the other could be he's less comfortable or he's

6    denying the problems that he's finding?

7    A.   Yes.

8    Q.   And, of course, you pointed out that he has, quote,

9    some increase in social and self-alienation?

10   A.   Yes, according to the subscales of the MMPI-2.

11   Q.   And as we talked a little bit earlier about -- he has,

12   quote, an avoidance style whereby he lacks in adequate

13   openness to experience, unquote?

14   A.   Yes, that's consistent with this -- an individual who

15   engages in a familiar repetitive routine.  You find out what's

16   working and you repeat that.

17   Q.   And your risk assessment said that, quote, the data

18   also rather consistently indicate that Mr. Hinckley is a

19   markedly defensive individual who strives to avoid, minimize

20   or deny unacceptable or uncomfortable thoughts, feelings and

21   impulses.  Over the last year this tendency is confirmed by

22   his tendency in relationships to consistently emphasize the

23   positive and deemphasize the negative?

24   A.   Yes.  That's one of the things I talk about with the

25   data.  Here you have a hypothesis that's been generated in

1  previous reports, and then you look at his behavior, and in

2  particular, I think the behavior with women confirms that

3  particular finding.  That when the relationship is going up

4  and down, when there's turbulence in the relationship, he'll

5  look for the positive in the relationship.  If only the

6  relationship could get back to the days when it was going

7  better.  She may be calling me and saying this or that, I tend

8  to focus on when the period was more positive.

9  Q.   Mr. Hinckley is also elevated on the scale for

10  overcontrolled hostility?

11  A.   Yes, and that's been another consistent finding.

12  Q.   And the elevations, as you said, for overcontrolled

13  hostility suggest individuals who may rigidly deny anger or

14  hostility and may be socially isolated, right?

15  A.   Right.  And that finding, the Repression, the

16  Defensive, K scale, these are all, I think, elucidating -- a

17  similar dynamic in Mr. Hinckley, they all overlap to some

18  degree.

19  Q.   Let's turn to two elevated scores for the 2008 testing.

20  The first -- the elevated scores were Hysteria scale and the

21  Psychopathic Deviant scale, correct?

22  A.   Yes.

23  Q.   On the Hysteria scale, Mr. Hinckley scored 66 this

24  year, correct?

25  A.   Correct.

1    Q.   And in 2005 he scored a 59?

2    A.   Correct.  That's a T score.

3    Q.   That means he went up seven points, is that what

4    they're called?

5    A.   Correct.  T scores.

6         THE COURT:  T?

7         THE DEFENDANT:  T.  It's a measure of statistical

8    variance.

9    BY MR. ZENO:

10   Q.   In fact, the MMPI is scored on a bell curve, right?

11   A.   Correct.

12   Q.   And that's that famous parabolar, right?

13   A.   Right.

14   Q.   And the median is in the middle, and you have standard

15   deviations off to the side, right?

16   A.   Correct.

17   Q.   And the median is 50 for the MMPI, correct?

18   A.   Well, T equals 50 in that particular scale, yes.  And

19   the elevations that are considered statistically significant

20   are T above 65.

21   Q.   Hang on a second, we'll get there.  But one standard

22   deviation is 10, correct?

23   A.   This is a T score.  I'm not sure whether the standard

24   deviation translates to 10 or 15 on the T score scale.

25   Q.   And let me suggest, if this helps to remind you, that

1    the standard deviation is one and a half and that's 15?

2    A.    Right, I understand that.  But the T score and the Z

3    score are different scales, I'm not sure whether the MMPI-2,

4    I'd have to check and translate -- I don't want to misspeak on

5    this, whether the elevation is measured by a standard

6    deviation score of 10 or 15.  I'm not sure.

7    Q.    In any event, back to what you said before, which is, a

8    statistically significant score is 65?

9    A.    Yes.

10   Q.    Correct.  And so in 2005 Mr. Hinckley was 59?

11   A.    Yes.

12   Q.    This year he was -- what was he this year?

13   A.    I'd have to check, I don't remember the exact score.

14   It's in the report.

15   Q.    Yeah, I know, I had my pages confused.

16   A.    Do you mind if I look?

17   Q.    I don't mind a bit if you look.

18   A.    Are we talking about Psychopathic Deviance or Hysteria?

19   Q.    We're at Hysteria right now.

20   A.    T equals 66.

21   Q.    So, in '05 he was within the standard, not noticed as

22   clinically significant, and now he's just outside clinically

23   significant, correct?

24   A.    Yes.  Yes.

25   Q.    Now, the same standard deviations apply to the

1   Psychopathic Deviance, correct?

2       A.   Correct.

3       Q.   So, you got -- 50 is the mean and 65 is clinically

4   significant, correct?

5       A.   Correct.

6       Q.   In 2005 Mr. Hinckley scored a 54 on Psychopathic

7   Deviance, is that correct?

8       A.   Correct.

9       Q.   In 2008 he scored a 69, correct?

10      A.   Correct.

11      Q.   And that's 15 points higher?

12      A.   Correct.

13      Q.   And it's outside the level of clinical significance,

14  correct?

15      A.   Correct.

16      Q.   New topic.  I'm going to go to Mr. Beffa for a second

17  and some other things.

18      A.   Okay.

19      Q.   Mr. Hinckley has had only one session with Mr. Beffa as

20  the therapist, correct?

21      A.   Yes.

22      Q.   And that is not much time in which to develop a

23  therapeutic relationship, is it?

24      A.   No.

25      Q.   Dr. Lee was supposed to be performing therapy for Mr.

1  Hinckley during the past year, correct?

2  A.  Correct.

3  Q.  And Mr. Lee has -- or Dr. Lee has now stopped providing

4  therapy?

5  A.  He stopped providing the individual therapy and moved

6  more into a mode of what we're labeling the covering

7  psychiatrist.

8  Q.  And Dr. Binks said that the reason for removing Dr. Lee

9  was the need to provide more support for Mr. Hinckley, is that

10  correct?

11  A.  Well, we are trying to build up the support systems in

12  that area, and for reasons that I've talked about, we think

13  it's better to have Dr. Lee in that more circumscribed role

14  and then have Dr. Beffa fill this role as the social worker

15  and individual therapist.

16  Q.  Well, I've heard you say that there needs to be that

17  split, but last year it was Dr. Lee and he was going to be

18  doing it.  What has changed to make it not a good idea for Dr.

19  Lee to be doing the therapy?

20  A.  I think that overall the data we've gathered over the

21  last year -- there have been at times some difficulties in

22  getting reports or communications in a timely manner from Dr.

23  Lee.  It's been the experience, from what I understand,

24  through primarily Dr. Rafanello that the interchange of

25  information is flowing more smoothly with Mr. Beffa.  And Mr.

1   Beffa has more experience in the role of individual therapy.

2   Having Mr. Beffa in the role of individual therapist and Dr.

3   Lee in the role of covering psychiatrist is consistent with

4   the model that they use at the Family Living Institute.  So,

5   for a variety of reasons, we've decided to go into that

6   particular modality with those roles in that manner.

7      Q.    So far Mr. Beffa has had one therapy session, is that

8   correct?

9      A.    Yes.

10     Q.    So, it could take a little while to figure out if there

11  is a good relationship, that is, Mr. Beffa and Mr. Hinckley?

12     A.    Right.  They have had prior contacts, they appear to

13  have gone well, but not exactly in the roles as we're defining

14  them now.

15     Q.    Currently, Mr. Hinckley meets with Dr. Binks about how

16  often?

17     A.    Once a week.

18     Q.    And Mr. Hinckley meets with V.J. Hyde how often?

19     A.    Once a week.

20     Q.    The current visits of six days allow Mr. Hinckley to

21  maintain weekly visits with Dr. Binks, is that correct?

22     A.    Well, depending on when the visit was scheduled, he

23  might miss a session with one or the other or both.

24     Q.    That's correct.  But it could be scheduled so that he

25  could maintain weekly sessions.  As a matter of fact, that was

1   what Dr. Patterson talked about last year, it's his

2   recommendation for only making it six days instead of longer,

3   isn't that correct?

4       A.   I'm sorry, what --

5       Q.   Didn't Dr. Patterson talk about the importance of the

6   six days as being the longest that he would recommend because

7   he thought it was important to insure weekly therapy?

8       A.   Yes.

9       Q.   And the same thing would apply to Mr. Hyde because he

10  gives weekly therapy, too, is that correct?

11      A.   I suppose so, yes.  I don't think that missing a

12  session with either one would have any dramatic consequences.

13      Q.   Now, Mr. Beffa will perform both case management and

14  therapy, correct?

15      A.   Yes.

16      Q.   Was Mr. Beffa involved in communicating with the

17           Services Board about the placement that you mentioned

18  during your direct?

19      A.   I believe so.  The exact timing and content of those

20  communications I'm less clear about.

21      Q.   Did you know you were going to be asked about that on

22  direct?

23      A.   Yes.  But Dr. Rafanello was more directly involved in

24  that.  I mean, there have been a number of changes,

25  unfortunately, some of them more or less at the last minute

1   with regard to the volunteer positions.  I mean, I had already

2   formulated my risk assessment.  And the crux of my risk

3   assessment is that he's ready to exercise these unaccompanied

4   privileges for a volunteer position.  I don't think it is that

5   important to know exactly what the volunteer position is and

6   where it is, as long as it fits into an appropriate structure

7   and we have appropriate mechanisms for contact.

8      Q.   Based on what you know, do you know if it's

9   appropriate, what you recommended or said was being

10  recommended?

11     A.   It doesn't sound like an ideal match for Mr. Hinckley's

12  interests, but it sounds like a structured volunteer activity

13  that he's more than able to comply with.  And this way we will

14  gather additional data about how he's able to function

15  unsupervised in the community in a structured activity.

16     Q.   Music therapy is extremely important to Mr. Hinckley,

17  isn't it?

18     A.   Well, it's certainly an activity that he enjoys and is

19  well-suited to his particular interests.

20     Q.   It's been beneficial for him?

21     A.   And it's been beneficial for him.

22     Q.   No music therapy has been arranged in the mother's

23  community, is that correct?

24     A.   Not to my knowledge right now.  I know explorations

25  have been made with a musician down there and that could

1    change.  That particular musician was unavailable for some

2    period of time.  I think he had two sessions with him.

3       Q.    That wasn't therapy, though, was it?

4       A.    No, it wasn't music therapy per se.

5                MR. ZENO:  No further questions, Your Honor.  Thank

6    you.

7                THE COURT:  You were just talking about Dr. Lee and

8    his therapy.  I mean, all of that was sort of predictable a

9    year ago, wasn't it?  If you look back at the testimony of Dr.

10   Lee, he wasn't clear on what his role was going to be.  He

11   wasn't sure that he wanted to do the therapy.  Things evolved

12   during this hearing.  We learned things about -- he learned

13   things about what the Hospital was expecting of him during the

14   hearing, and he wasn't sure that he wanted to do it.  So, I

15   mean, what -- what happened during the course of the year?

16   Was he, in each of these 11 visits or whatever they were,

17   actually doing therapy or was he just still the safety net?

18               THE WITNESS:  Well, I only had one direct contact

19   with Dr. Lee.  I did review Dr. Lee's notes.  It's my

20   understanding that he was functioning in a broader role than

21   simply the covering psychiatrist.  However, he was assessing

22   his mood and mental status during each of the visits.  They

23   were discussing relationships with women.  They were

24   discussing Mr. Hinckley's adjustment to the community.  They

25   were discussing Mr. Hinckley's reaction to his father's

1    decline.  In fact, at one point I believe Dr. Lee was also

2    treating Mr. Hinckley, Sr.

3              THE COURT:  That was true last year, he was

4    treating Mr. Hinckley, Sr.

5              THE WITNESS:  Yeah.  So, I think that, you know, we

6    got important information from Dr. Lee, but eventually a

7    determination was made that it would be better to clarify on

8    the roles and the way that we're currently conceiving it.  I

9    think you could certainly say:  Why didn't you do that sooner?

10             THE COURT:  Well, yeah, one could certainly say

11   that.  If you looked at -- if you looked at my Opinion of last

12   June, it was clear -- well, the hearing was clear that I was

13   skeptical about Dr. Lee.  Dr. Phillips and Dr. Patterson were

14   skeptical about Dr. Lee.  And as I listened to what you've

15   just said about Dr. Lee and the role he's played in the past

16   year, and the role he's played and is going to play going

17   forward, I mean, it seems to me that we all sort of expected

18   that he wasn't the right guy for the job a year ago.

19             And maybe, even though none of us had met Mr.

20   Beffa, I guess Dr. Rafanello had met Mr. Beffa and Mr.

21   Shamblee had had contact with Mr. Beffa.  But that Mr. Beffa

22   actually sounded like a year ago that he might be better

23   suited to the therapist role than Dr. Lee.

24             THE WITNESS:  I understand.  I hear all those

25   concerns.  Keep in mind that all these decisions are made by

1    the treatment team and potentially by the review board.  I

2    think, without speaking completely for the team, I think that

3    what is taken into account, that you have something in place

4    that appears generally to be working.  We're getting the

5    information, he's developing some rapport and relationship

6    with this particular mental health professional.  If we were

7    to recommend a change then of course there would be concern

8    about that.  Have we thoroughly vetted the new person?  Has

9    the new person been thoroughly vetted by other people?  Would

10   we need to go back to court to change things?  So, you know, I

11   think Mr. Hinckley, honestly, is not the only one who develops

12   a comfort zone with a familiar routine, sometimes the hospital

13   does, too.

14           THE COURT:  Yeah, I think --

15           THE WITNESS:  I think we're rightly criticized at

16   times for not taking constructive action sooner, but I don't

17   think whether he's seeing Dr. Lee or Dr. Beffa in one role or

18   the other really adds any significant risk.  That's my overall

19   opinion.

20           THE COURT:  Well, I mean, that may be right, but I

21   think if somebody had focused more on who the right treater

22   was six months ago or eight months ago or a year ago, then Mr.

23   Zeno wouldn't be able to say to you, but he's only had one

24   therapy session with Mr. Beffa, and we don't know what kind of

25   a relationship they are going to develop because they would

20

1   have by now either developed one or there might have been a

2   judgment made that it wasn't going to work.  But we just would

3   have had more information about Mr. Beffa in that role if some

4   of the hints that were clear at the hearing a year ago and in

5   the Opinion a year ago.

6            THE WITNESS:  I agree totally, Your Honor.  All I

7   can do is voice my own views to the treatment team and the

8   review board and then go along with what they decide also.

9            THE COURT:  I understand.  And, of course, we all

10  know that Mr. Zeno will always have some issues to raise no

11  matter what happens.

12           THE WITNESS:  He wouldn't be doing his job if he

13  didn't.

14           MR. LEVINE:  I'm not going to disagree with that.

15           THE COURT:  Mr. Levine.

16           MR. LEVINE:  If I can follow-up on Your Honor's

17  inquiry.

18                    REDIRECT EXAMINATION

19  BY MR. LEVINE:

20  Q.   If the treatment team had determined during the course

21  of the last many conditional releases the amount awarded or

22  allowed by the Court that a change was appropriate, would the

23  treatment team -- I meant the Hospital, would the Hospital

24  have to go back to court to effectuate that change?

25  A.   I'm sorry, Mr. Levine, I was in a daze for a second.

1   Q.   If the Hospital has concluded that a change would be

2   appropriate for Mr. Hinckley in the city where his family home

3   is located, that a different psychiatrist should play the role

4   of psychiatrist or therapist than the one identified in the

5   Court order, would the Hospital have to go back to court to

6   effectuate the change?

7   A.   My understanding is that Dr. Lee is in the Court order.

8   Q.   Yes.

9   A.   So, all the sections that pertain to Dr. Lee would then

10  come in to review, and unless the Government agreed, which has

11  never happened before, we would have to go back to court.

12  Q.   So, let's go through this process.  So, the Hospital

13  would then have to write an (e)letter to the Court and in the

14  (e)letter to the Court it would suggest a change in

15  psychiatrist?

16  A.   Yes.

17  Q.   Then the Government, by the statute, has the right to

18  demand a hearing, is that correct, as you understand it?

19  A.   As I understand it.

20  Q.   And is it your understanding that if the Government

21  merely asks for it, by operation of law, it gets it -- gets

22  the hearing?

23  A.   I'm not an attorney, but that's my understanding.

24  Q.   And then if the Government demands the hearing, then it

25  gets to have Drs. Patterson and Phillips to do their

1   interviews, subject of course to their professional schedules,

2   which are pretty significant schedules.  Is that the way you

3   understand it?

4     A.   Well, whoever they choose, yes.

5     Q.   And does that process strike you as being both very

6   expensive and equally cumbersome?

7     A.   Yes.  I think there is, you know, these hearings are

8   difficult, stressful, cumbersome for the Hospital as well, and

9   there probably is some reluctance to take on that workload.  I

10   think, you know, honestly one of the problems the Hospital

11   runs into is that after a hearing they want to relax, but I

12   think what we should do -- and I think there's more of a

13   commitment to doing it now, is that we can't relax, we have to

14   process what occurred during the hearing.  Process what we

15   find out from the Opinion and the Court, and be very actively

16   engaged, despite the tremendous burden it places on all of us,

17   to addressing any of the concerns that have been brought to

18   our attention.  But, yes, there's some resistance by staff who

19   are overburdened, tired, fatigued, to continually be dealing

20   with that.

21     Q.   Would it be better, from the perspective of the

22   Hospital, were the Court order to merely say that the

23   psychiatrist -- that Mr. Hinckley, during each of these

24   releases, should see a psychiatrist suitable to the Hospital?

25     A.   That would certainly give us more flexibility.  I can't

1   recall offhand any order for the insanity acquitees in

2   Superior Court that stipulates the treatment providers.

3       Q.   You know of none?

4       A.   Well, they may stipulate a core service agency, for

5   example.  Some of them don't even stipulate a core service

6   agency, but they don't stipulate a particular psychiatrist.

7       Q.   And that --

8       A.   I mean, there's no way -- I mean, psychiatrists leave

9   all the time.

10      Q.   They retire, they change jobs, they move?

11      A.   Does that mean the insanity acquitee has to go back to

12  the hospital or you have to have a hearing.  No, it's

13  understood that there are going to be changes in personnel and

14  staffing, and there needs to be some flexibility.

15      Q.   Is that the flexibility you understand the Hospital to

16  have in just about every case other than the one with Mr.

17  Hinckley?

18      A.   To my knowledge, in the vast majority of cases there is

19  more flexibility.  But I am the pretrial chief, not the

20  post-trial chief.

21      Q.   And would it be likewise true with respect to

22  specificity in the Court order that the Hospital would seek to

23  have the same flexibility pertaining to a volunteer job?

24      A.   Yes.  I mean, the volunteer job could fall through for

25  one reason or another.  You know, we've had situations where

1    it seems like the publicity in the community has resulted in

2    somebody deciding what -- well, we could be putting our

3    funding stream in jeopardy, let's not deal with this.  And

4    suppose he had got the job already, then we would have to go

5    back to court if the Court orders stipulated that he work at

6    this particular position with this particular agency.

7    Q.   Does the Hospital have to have an ability to react to

8    changed circumstances?

9    A.   Yes.

10   Q.   Does the Hospital have to have an ability to be nimble

11   in that regard?

12   A.   I think, you know, with any case there are going to be

13   emergent conditions and you need to be able to deal with them

14   in a flexible manner as they arise.  So that if a particular

15   provider is no longer available, if a particular agency is no

16   longer available, if Mr. Hinckley were to find a job in a

17   library, I mean, I think personally he would be very

18   well-suited to that particular position.  And if he was in a

19   position that he didn't particularly like, that he really

20   honestly had some resistance to doing and he found a position

21   much more in line with his interests, wouldn't it be better to

22   be able to switch him to that position without going to court?

23   Yes.

24   Q.   Now, of course, it was the Court, the United States

25   District Court for the District of Columbia, that committed

25

1    Mr. Hinckley to the custody of the Hospital, isn't that true?

2    A.    Yes.

3    Q.    And with respect to that commitment, doesn't the Court

4    rely or tend to give deference to the judgments of the

5    Hospital?

6    A.    Generally speaking in these matters, yes.

7    Q.    Would it be better for the Hospital if the Court order

8    to be entered in this case, rather than identify a

9    psychiatrist by name, merely say that on each of these

10   conditional releases he sees a psychiatrist.  And merely --

11   and on these conditional releases, rather than identify a

12   therapist, merely say that he see a therapist, of course,

13   suitable to the Hospital, the Hospital exercising its best

14   judgment.  Do you think that would be a better language for a

15   Court order?

16   A.    I think that would give us more flexibility.  If for

17   one reason or another things didn't work out, we could

18   hopefully find another individual and ameliorate the situation

19   without having to go back to court.

20   Q.    All right.

21   A.    And just in terms of the whole transition to the

22   community, it tends to be the Hospital, for various reasons,

23   gets so consumed with preparation for the Court, we have to

24   put the planning of the outings on hold, so to speak.  It gets

25   very hard for the people who are taking the lead, the

26

1    treatment team in particular, Dr. Rafanello, in particular, to

2    do her regular workload, the workload with all the paperwork

3    detailing the visits, detailing the reports of the visit, and

4    having an upcoming court hearing.  It's a great deal of work.

5        Q.    So, does that flexibility enable the Hospital to

6    actually administer therapy more effectively?

7        A.    Overall, I think so.  Yes.

8        Q.    Thank you.  Now, Mr. Zeno in his cross-examination,

9    with his customary opprobrium, puts to you three instances

10   where he asserts that Mr. Hinckley was less than candid, and

11   forced the words lied.  Do you recall that inquiry?

12       A.    Yes.

13       Q.    The first one was with respect to a letter dated

14   September 12, 2007, a letter to the Court in which Mr. Zeno

15   says that it was in that letter for the first time that Mr.

16   Hinckley disclosed -- excuse me, admitted rather than

17   reported, I think was the way he said it, that he had fondling

18   privileges with Ms."M", do you remember that?  And he gave you

19   Government's Exhibit Number 10, which is the letter dated

20   September 12, and he invited your attention to Page 5 of that

21   letter?

22       A.    Yes, I recall that.

23       Q.    And you see that he goes through it all, and he says in

24   the middle of the first paragraph there, that he admitted --

25   got you to admit, got you to say that, yes, he admitted it

1    rather than reported it.  And it sounds like it was the first

2    time that Mr. Hinckley disclosed, in response to your probing,

3    that he had fondling privileges with Ms."M"?

4     A.    Well, I'm not sure.  I don't know when he said what to

5    Dr. Binks, quite frankly, or some of the other providers.  But

6    within the context of meeting with the people he was meeting

7    with then, it was the first time.  It gets hard to keep track

8    of what he said to who when.

9     Q.    Let me invite your attention to your own note dated

10    September 4.  Do we agree that September 4 predates

11    September 12?

12             THE COURT:  September 4th predates what?

13             MR. LEVINE:  September 12th.  I think we can have

14    the agreement.  The Court can probably take judicial notice of

15    that.  Can I have this marked.  Next Patient's Exhibit,

16    please.  Patient Exhibit 4.

17    BY MR. LEVINE:

18     Q.    I show you what has been marked as Patient's Exhibit

19    Number 4 for identification, can you identify that?

20     A.    That's one of my notes detailing Mr. Hinckley's

21    response to an overnight outing dated September 4th, 2007.

22     Q.    May I invite your attention to the second page of the

23    report and the ultimate paragraph of that page.  Last word,

24    third line.  He reported -- did that say admitted?

25             THE COURT:  Where are you reading?

28

1        MR. LEVINE:  The last paragraph.

2        THE COURT:  The last page?

3        MR. LEVINE:  No, last paragraph, second page.

4        THE COURT:  Okay.

5        THE WITNESS:  Last paragraph, second page.

6   BY MR. LEVINE:

7   Q.   End of the third line, it starts with the word he, goes

8   on to the next line.  He reported, speaking of Ms."M",

9   correct?  Take a moment and read it, I want to make sure we

10  have context correct.

11  A.   I'm sorry.  You're on which paragraph?

12  Q.   The last paragraph of the page.

13  A.   Okay.

14  Q.   Starts with the words: Mr. Hinckley reported?

15  A.   Yes.

16  Q.   And it's the paragraph about Ms."M", is that correct?

17  A.   Yes.

18  Q.   That's the same person who is in the letter of

19  September 12th that we were just talking about to the Court?

20  A.   Yes.

21  Q.   Okay.  And it says:  Mr. Hinckley reported -- not

22  admitted -- right, reported?

23  A.   Yes.

24  Q.   These are your notes.  That her mood had improved

25  recently and that she had become more affectionate, correct?

1    A.    Yes.

2    Q.    And then it goes on to say, second from the bottom --

3    second line from the bottom?

4    A.    Yes.

5    Q.    When asked what he meant by the increase in affection,

6    he reported, I have fondling privileges?

7    A.    Yes.

8    Q.    Correct?

9    A.    Yes.

10   Q.    So, Mr. Zeno's thesis that on September 12 he for the

11   first time admitted, rather than reported, and he portrays

12   that as a lie, is actually inaccurate by Mr. Zeno?

13         MR. ZENO:  Objection, Your Honor, multi-foundation.

14   The letter may say September 12th, but the incident that was

15   read by Dr. Montalbano is August 27th, which we can note is

16   before September 4th.

17         MR. LEVINE:  And he admitted to fondling

18   privileges, so it wasn't the first time.

19         THE COURT:  Well, the documents speak for

20   themselves.  I understand what Mr. Zeno's objection is, is

21   that there's a letter dated September 12th that relates to a

22   conversation or an admission or a statement in August.  And so

23   that, therefore, the September 4th report, which reports on a

24   contemporaneous conversation does not precede the events

25   discussed in the September 12th letter.  That's his objection.

BY MR. LEVINE:

Q.   And it is a fact, is it not, Dr. Montalbano, that Mr.
Hinckley reported the facts of fondling privileges?

A.   Right, but just to be clear, the September 12th letter
he's talking with the treatment team on August 27th, and then
my September 4th letter he's talking with me on August 29th.

Q.   Do you regard that exchange as being deceptive?

A.   No, that's why -- when you ask him a direct question, I
think you typically get the answer.  As I've tried to
articulate previously, I don't think he likes talking about
the physical intimate sexual component of his relationships,
and it's often not until you directly ask him that he tells
you about it.

Q.   And if he were to brag about it or were to come out of
the box and talk about it without having been asked about it,
would one then say, well, that's a sign of narcissism?

A.   Well, I think we would certainly have concerns if he
was bragging about perceived sexual exploits.

Q.   So, if he's modest in his portrayal of it, it's a
problem, and if he's not modest in his portrayal it's a
problem, according to the Government?

A.   That's maybe a question for the Government.

Q.   All right.  Let me move on to the next suggestion by
Mr. Zeno that Mr. Hinckley was less than candid.  He cites an
exchange in Dr. Phillips' report where he said -- where Dr.

1    Phillips attributes to Mr. Beffa, who attributes to Mr.

2    Hinckley, that he did not have phone access.  Do you remember

3    that exchange?

4        A.   Yes.

5        Q.   And if one were to read the rest of the paragraph, it

6    would talk about he didn't have a reliable way to be

7    contacted, isn't that correct?

8        A.   I honestly don't recall that whole paragraph in its

9    entirety.

10       Q.   Does Mr. Hinckley have, while at the Hospital, a cell

11   phone?

12       A.   I don't believe so.

13       Q.   And does Mr. Hinckley, while at the Hospital, have

14   voice mail?

15       A.   I don't believe so.

16       Q.   Of course not.  And does Mr. Hinckley, while at the

17   Hospital, have an answering machine?

18       A.   No.

19       Q.   And does Mr. Hinckley, at the Hospital, have a phone in

20   his room?

21       A.   No.

22       Q.   So, is it not true that Mr. Hinckley does not have a

23   reliable way to be contacted -- reliable way?

24       A.   Well, I don't know his situation exactly at work.  I

25   don't know how close he is to the phone.  I don't know whether

1    calling him at work is a reliable way.  Certainly when you're

2    on the ward or you're outside exercising your privileges, it's

3    much more complicated having a reliable way to contact a

4    patient.

5    Q.    And the fact that he is able to make phone calls,

6    whether it is to call France or to call elsewhere, is that an

7    indicater that he has the ability to receive phone calls in a

8    reliable way?

9    A.    One doesn't necessarily entail the other.

10   Q.    Now, a third point made by Mr. Zeno where he suggests

11   that Mr. Hinckley was not candid was that he told Dr. Lee that

12   his relationship with Ms."G" was platonic, do you recall that?

13   A.    Yes.

14   Q.    And it was the Government who put before you Government

15   Exhibit Number 7, and invited your attention to the third

16   paragraph, where it says that he said that his relationship

17   with Ms."G" was platonic.  And then asked you whether that was

18   true.  And you believed it to be not true.  And he asked you

19   whether it was misleading or even a lie.  Do you remember that

20   exchange?

21   A.    Yes.

22   Q.    Now, that letter is dated -- let me show you what has

23   been marked by the Government as Government's Exhibit Number

24   6, and do you have that in front of you, Government 6?

25   A.    Yes.

1    Q.   Let me change the way I do this, Your Honor.  Can I

2    have this document marked Patient's Number 5.  One for the

3    Government.  I show you what is marked as Patient's Number 5

4    for identification, what is that, please?

5    A.   An individual psychotherapy note by Dr. Sydney Binks.

6    Q.   Now, let me invite your attention to the entry on

7    January 15, 2008?

8    A.   Yes.

9    Q.   Now, read the first two sentences?

10   A.   Under January 15th?

11   Q.   Yes, sir.

12   A.   Mr. Hinckley had normal mental status.  He used the

13   session to discuss his relationship with (Ms."G").

14   Q.   Ms."G", yes?

15   A.   Excuse me.  He used the session to discuss his

16   relationship with Ms."G", which has evolved into one that now

17   includes physical intimacy.

18   Q.   Now, that note is dated in January -- the second week

19   of January 2008.  It was Dr. Lee's letter of September?

20   A.   February.

21   Q.   I'm sorry.  Forgive me here.  February -- just a couple

22   weeks later, that said that it was platonic, do you recall

23   that?

24   A.   He actually says plutonic, so I'm not quite sure what

25   Dr. Lee might have been talking about, but I think he meant to

1    say platonic.

2      Q.    I'm going to construe it as what I think he meant to

3    say, platonic.  Clearly, the statement made to Dr. Binks shows

4    that it was more than platonic, that it was deeper and it

5    involved intimacy, didn't it?

6      A.    Yes.

7      Q.    Would Mr. Hinckley derive any benefit from telling Dr.

8    Binks that it was intimate, and Dr. Lee that it was merely

9    platonic?

10     A.    Derive any benefit?

11     Q.    Yes.  Was there any motive to do that that you could

12   conceive of?

13     A.    If he didn't want to talk about it, he wouldn't have to

14   talk about it.

15     Q.    He told Dr. Rafanello, because Dr. Rafanello's note,

16   which the Government has marked as Exhibit 10, shows that it

17   was a romantic relationship, doesn't it?

18     A.    But now we're moving into August.

19     Q.    No, Dr. Rafanello's note --

20     A.    Oh, the note, the 2/14/08 note, yes.

21     Q.    It shows that she knew, too.  So, is this the mind of a

22   master criminal to -- and a deceptive person, to tell Dr.

23   Rafanello to tell Dr. Binks that it's affectionate and it's

24   intimate, yet tell Dr. Lee that it is platonic?

25     A.    Well, I think -- and this is something, you know,

1    another thing that we probably could have expedited earlier,

2    that's why it's important to have an open exchange of

3    information between all treatment providers, which is why in

4    our current proposal we're advocating that Dr. Binks and Mr.

5    Beffa have a phone call after the outing.  That there be a

6    post-conference call between the St. Elizabeth's treatment

7    team and the providers around the vicinity of Mr. Hinckley's

8    mother.  That when you have an individual who is talking to

9    five, six, seven, eight different individuals, you probably

10   will get some different versions at different points in time.

11   But if you're telling one person one thing and another person

12   another thing that's inconsistent, that does need to be looked

13   at.

14      Q.   Indeed, in that regard, Dr. Rafanello's note notes that

15   while Dr. Lee had been provided Dr. Binks' notes that he had

16   not yet received the note of two weeks earlier, January 15th?

17      A.   Correct.

18      Q.   Now, as you put these documents together, do you think

19   it could have been that maybe Dr. Lee just got it wrong?

20      A.   That's why -- in order to really know what happened, I

21   would prefer to have been able to talk to Dr. Lee about this

22   particular incident, to Mr. Hinckley about this particular

23   incident, to other people involved in this particular

24   incident.  Weigh all the information as carefully as possible,

25   which it's probably an oversight on my part, which I honestly

1    didn't do.

2    Q.   Do you think that Mr. Hinckley was being deceptive with

3    Dr. Lee?

4    A.   I don't know.

5    Q.   Does any of this change your view as to whether or not

6    Mr. Hinckley would be dangerous while on conditional release

7    pursuant to the terms of the letter to the Court?

8    A.   If I saw any significant pattern of deceit, it would

9    change my opinion, but I certainly do not see any significant

10   pattern of deceit.  And, overall, it does not change my

11   opinion as to whether, under the conditions outlined by the

12   Hospital, he would pose a danger to self or others due to

13   mental illness, I do not think that he would.

14   Q.   Now, there was -- Court's indulgence for a brief

15   moment, Your Honor.  There was an inquiry made by Mr. Zeno

16   about the          Service Board and it offering a position.

17   Now, if the          Service Board position were to disappear,

18   would you still support the proposal that is before the Court?

19   A.   I would still support a proposal that he be able to get

20   equal amount of time in a volunteer position in that community

21   that had been reviewed and approved by the Hospital.

22   Q.   Do you think that Mr. Hinckley would be dangerous for a

23   10-day period in that community without any volunteer

24   position?

25   A.   I think it's unlikely.

1    Q.   So, whether he has one there or elsewhere or doesn't

2    have one at all, it is unlikely in your view that he would

3    become dangerous?

4    A.   It's unlikely for a 10-day period.

5         THE COURT:  If he didn't have one, presumably --

6    right now everybody is suggesting two two-hour periods to

7    wander freely around the area, instead of one two-hour period

8    every day, and additional time to do his volunteer activities.

9    I suppose if he had no volunteer activities the proposal would

10   change in terms of what to do with those hours?

11        THE WITNESS:  Right.  We're trying to structure

12   activities.  We're trying to manage risk.  We think that some

13   of the activities he's engaged in in the Hospital are

14   therapeutic and ameliorative of risk.  But whether -- even if

15   you -- I mean, frankly, if you removed all the therapies, all

16   the structure, all the activity, I still think it's unlikely

17   he would decompensate in 10 days.

18        THE COURT:  The point is -- I mean, I guess it

19   depends -- this is a shifting target here.  I mean, is he

20   dangerous if he does X or Y or doesn't do X or Y, is a

21   different question from what is therapeutic and what

22   contributes to a transition from what has basically been 25

23   years in a hospital to integration into a community.  So, he

24   could spend all of his time in his mother's home and never go

25   outside and never participate in any activities, and you might

1   still say he's not dangerous, but you would say at some point,

2   well, this isn't contributing -- it isn't all that therapeutic

3   and it isn't contributing to a transition.

4           THE WITNESS:  Yes.  And over time I think there

5   would be more risks associated with that type of set up.

6           THE COURT:  Counter-therapy.

7           THE WITNESS:  If he went on for years in that

8   particular type of setting it's not therapeutic, it's not

9   managing all of the risk factors as effectively as possible.

10  It's not what we're recommending.

11  BY MR. LEVINE:

12   Q.   Were there to be a withdrawal of a volunteer

13  opportunity, could the time be used to seek out another

14  volunteer opportunity where he could go supply a resume, be

15  interviewed for the position, address concerns that may be

16  advanced uniquely to him?

17   A.   Yes.  I think he's ready to do that independently for

18  limited periods of time.

19   Q.   So, it would be an appropriate use of unaccompanied

20  time either to do the volunteer work or to seek volunteer

21  positions in which to do work?

22   A.   I mean, that is not what the Hospital's petition

23  specifically outlines.  But, for example, personally I would

24  have no problem if his mother or brother or sister drove him

25  to an agency, and then he went in and did the interview

1    himself, and then came out when the interview was completed.

2    I don't think that poses any significant risk.

3    Q.   And is that the kind of flexibility or another example

4    of the flexibility that the Hospital thinks would be

5    appropriate were the volunteer opportunity to dissipate?

6    A.   Yes, that's another example of flexibility.

7    Q.   Now, Mr. Zeno went through an inquiry with you about

8    some fluctuations in the MMPI scores over the last 10 years,

9    do you recall that?

10   A.   Yes, I do.

11   Q.   And in your view do these fluctuations -- may I fairly

12   characterize them as small fluctuations?

13   A.   Yes.  I think, again, they also need to be put in

14   context.  As I recall, during some of the prior

15   administrations of psychological testing, which is in my

16   report, but I don't recall the exact scores and the exact

17   years, but he had elevations that were similar to, if not

18   exceeding, those particular scores.  To me what's important is

19   the relative stability of what I've called the three-four

20   profile, that those particular scales tend to be his highest

21   elevations, whether they're clinically significantly elevated

22   or not, but we've seen fluctuations in those particular

23   scales.

24            And then when you take the psychological test

25   data that we have available from, let's say, 1995 on and

1   compare it to the psychological test data that was done in the

2   early 80s, it demonstrates rather remarkable improvement.  So,

3   it needs to be put in a longitudinal context as well.  And

4   there have been minor fluctuations in the Rorschach also with

5   regard specifically to a score that demonstrates stress

6   tolerance.  He's had indications of having some stress

7   management risks, but then again when you think of that as a

8   hypothesis and look at how he's managed stress, you have to

9   think that that finding is not corroborated as well by

10  external data.

11    Q.   So, would it be fair to say that the small fluctuations

12  in the MMPI scores and the Rorschach scores over the last 10

13  years -- over the last 10 years do not indicate a change in

14  the level of dangerousness?

15    A.   No.  Back --

16    Q.   That would be fair to say?

17    A.   That would be fair to say.

18    Q.   All right.  And longitudinally speaking, if one can

19  speak that way, over the course of that time, indeed, it shows

20  a great improvement?

21    A.   Yes.  Dramatic improvement over the long term.

22    Q.   Now, there was also reference by Mr. Zeno about

23  whether, under the current conditional release provisions, he

24  misses therapy with Dr. Binks -- with Dr. Binks and Mr. Hyde.

25  As of now he has six days and seven nights, doesn't he?

1   A.   Yes.

2   Q.   And as of six days and seven nights, necessarily, a

3   matter of -- is it fair to say, physics, he doesn't have -- he

4   misses a meeting with each of those physicians if he's away?

5   A.   Yes.

6   Q.   Has that had any deleterious effect on his condition?

7   A.   I don't think so.  Even during periods when Dr. Binks

8   or Mr. Hyde were away for more extended periods for vacation,

9   I don't think it's had any significant negative impact on Mr.

10  Hinckley.  I just don't think that missing a session of

11  individual or music therapy poses any significant risk.

12  Q.   Would that be particularly true if he gained a session

13  of therapy in the neighborhood where he would be?

14  A.   I think that's a more than sufficient counterbalance to

15  missing a session.

16  Q.   And should the conditions in the hospital be mirrored

17  in the conditions of that community, or should they be

18  different?

19  A.   Well, both.  That's a contradictory answer, so let me

20  explain, if I can?

21  Q.   Please.

22  A.   The things that are working in the Hospital should to

23  some extent be replicated in the community.  For example, we

24  think that the job in the library has been very therapeutic

25  and it's been a very successful endeavor for Mr. Hinckley.  If

1  we could find a similar volunteer position or even employment

2  position in the community, I think that that is something

3  worth emulating.  But the over-arching objective is not to

4  have Mr. Hinckley have the same degree of structure that he

5  has at St. Elizabeth's Hospital in the community, it's to

6  gradually decrease structures to see how he functions in the

7  more unrestricted environment of the community.

8    Q.   Lastly, Dr. Montalbano, is there any issue or anything

9  about the cross-examination by Mr. Zeno that causes you to

10 change your view about whether Mr. Hinckley would be dangerous

11 to himself or others in the context of the proposal before the

12 Court?

13   A.   No.  The Hospital is proposing that he engage in a

14 series of visits for ten days and nine nights with a host of

15 safeguards in place.  Based on the past success of outings

16 that were six nights in duration and seven days, and adding

17 additional safeguards -- and turning back, if I can, just one

18 more time to the finding of the Court, that if a

19 decompensation were to occur, it would take weeks, if not

20 months.  I don't see a significant risk to self or others

21 under the Hospital's proposed (e)motion.

22           THE COURT:  Mr. Zeno.

23           MR. LEVINE:  Thank you, Your Honor.

24           THE COURT:  Why don't we take a little break and

25 then we have about an hour or so left for today.

```
 1              COURTROOM DEPUTY:  All rise.

 2   BRIEF RECESS at 3:15 P.M.

 3                        AFTER RECESS

 4              THE COURT:  Okay.  So, what are we going to do

 5   next, Mr. Levine?

 6              MR. LEVINE:  We'd like to call Mr. Hyde.

 7              THE COURT:  Oh, okay.

 8   Thereupon,

 9                   VERNE JAMES HYDE,

10   the witness herein, having been first duly sworn, was examined

11   and testified as follows:

12              MR. LEVINE:  For Your Honor's information, when the

13   Court changed the schedule a little bit, we informed the

14   Government that we would be calling Mr. Hyde next.

15              THE COURT:  Good.  Okay.

16              MR. LEVINE:  Court's pleasure, Your Honor.

17              THE COURT:  Go ahead.

18                   DIRECT EXAMINATION

19   BY MR. LEVINE:

20    Q.   State your name, please.

21    A.   Verne James Hyde.

22    Q.   Are you currently employed at St. Elizabeth's?

23    A.   Yes. Yes, I am.

24              THE COURT:  Is your first name Verne, V-E-R-N-E?

25              THE WITNESS:  Correct.
```

44

1    BY MR. LEVINE:

2        Q.    Are you known as V.J.?

3        A.    I am.

4        Q.    V.J. Hyde?

5        A.    Uh-huh.

6        Q.    What's your job at St. Elizabeth's?

7        A.    I'm the senior music therapist.

8        Q.    That's your title?

9        A.    Correct.

10       Q.    And could you explain to the Court what a music

11   therapist does?

12       A.    Sure.  Music therapy is a treatment modality that's

13   based within several frameworks, depending on who you are

14   working with in the population.  At the Hospital it depends on

15   where I am.  In this particular case, the framework I

16   typically work from is psychotherapeutic humanistic.  So, I

17   use music as a way of eliciting and dealing with treatment

18   objectives based on a treatment plan set forth by the

19   treatment team and myself.  In this particular case we use

20   song writing and recording as the means for dealing with those

21   treatment objectives.

22       Q.    Are you Board certified in this?

23       A.    Yes, I am.

24       Q.    What does it mean to be Board certified as a music

25   therapist?

1    A.    You have -- in order to become a music therapist and to

2    be eligible to become Board certified you have to go through

3    at least a Bachelor's level training in music therapy.  You

4    have to do a six month clinical internship.  Mine was focused

5    in clinical psychiatry.  And then once you've gotten all of

6    your credits in, you've done your internship, you're then

7    eligible to sit for a Board examination.  Then you sit for the

8    Board examination, you pass it, and you get to put the MTBC

9    behind your name.

10   Q.    And you have sat for the exam and you have been

11   certified?

12   A.    Correct.  And then every seven years you have to update

13   that certification, which I've just done.

14   Q.    Do you have a degree in -- a Bachelor's in music

15   therapy?

16   A.    Correct.  I'm currently also pursuing my Master's in

17   music therapy.

18   Q.    Now, are you trained to recognize symptoms of mental

19   illness?

20   A.    That's correct.

21   Q.    Are you trained to recognize symptoms of depression and

22   psychosis?

23   A.    That's correct.

24   Q.    And when you say that's correct, you mean, yes, you

25   are?

1   A.   Yes, I am.

2   Q.   And when did you started working at St. Elizabeth's

3   Hospital?

4   A.   In September 2005.

5   Q.   When did you start to work with Mr. Hinckley?

6   A.   That following spring.

7   Q.   When we speak of Mr. Hinckley, are we speaking of this

8   gentleman right here?

9   A.   I am (indicating).

10  Q.   Now, how often -- well, when you started to treat with

11  Mr. Hinckley, did you review his medical history?

12  A.   Yes, I did.

13  Q.   And how often do you meet with Mr. Hinckley?

14  A.   Once a week for an hour.

15  Q.   And could you describe a typical music therapy session

16  with Mr. Hinckley during the course of that hour?

17  A.   Usually Mr. Hinckley and I will meet in front of the

18  building in a lobby, go up to what -- we usually meet in one

19  of three places, either the auditorium, the library upstairs

20  or the chapel upstairs, depending on what's available at the

21  time.  I usually bring some instruments and a portable

22  sequencer, which is a digital recording device, some

23  microphones and other fun instruments that we can plug into

24  and play with.

25              Usually Mr. Hinckley will bring some songs that

1   he's been working on that week, that month, that year, to

2   record in our session.  We'll kind of check in, do a verbal

3   check-in, talk about how he's been since our last meeting, how

4   he's feeling at the moment, and then we start working on the

5   music that he's brought to the table.  Within that, you know,

6   we might work on, well, what do you want to get out of this

7   song, what are you trying to say in this song?  And then after

8   that as we're packing up getting ready to move on we sort of

9   close up and kind of recap what we've done.

10              THE COURT:  These are songs that he's written that

11  he brings to you?

12              THE WITNESS:  That's correct.

13  BY MR. LEVINE:

14   Q.   I take it that when you say pack up, he brought an

15  instrument as well?

16   A.   Sometimes.  Sometimes we'll -- depending on what we're

17  working on, he'll bring his acoustic guitar, otherwise, I

18  usually bring guitars of my own.

19   Q.   And he would play one of your guitars?

20   A.   That's correct, yes.

21   Q.   And when you work on the music, do you work both on

22  lyrics and notes?

23   A.   Yes.

24   Q.   Now, does listening to Mr. Hinckley's music provide you

25  with insight into how Mr. Hinckley is feeling?

1    A.    Yes, it does.

2    Q.    What have you learned about Mr. Hinckley's mood over

3    the past year?

4    A.    Over the past year, through his music and through the

5    process that we go through in music therapy, I've seen how Mr.

6    Hinckley deals with his mood as it is in the moment or as it

7    has been in the week or month that we've been working in.

8    Music, you have to understand, is both an expressive and a

9    receptive art form.  What I mean by that is the musician is

10   expressing their feelings, their memories, their emotions,

11   past and present.  It helps them -- it helps people access

12   parts of themselves that they can't readily access often in a

13   verbal context.

14         What I mean by receptive is that as an audience

15   member or as even another participant in music, you're also

16   receiving content that is being delved into in the music.  So,

17   like you say, you know, getting a sense of his mood.  As a

18   receptive art form, that's sort of what I'm working from, is

19   how is the song that he's working on, how is the way he's

20   playing, how is his approach to song writing indicative of how

21   he's feeling in the moment or how he's felt in the past.

22   Q.    When you talk about mood, does he -- do you only talk

23   about it in terms in which it's reflected in the lyrics or do

24   you just talk generally about how he's feeling about life?

25   A.    Both, as well as even how -- like I said, how he even

49

1    approaches playing the instrument or singing a song.

2    Q.    Does it matter if he decides to write a song in a minor

3    key as opposed to a major key?

4    A.    It may or it may not.

5    Q.    Do you discuss that?

6    A.    Occasionally, yes.

7    Q.    And can you describe the process that Mr. Hinckley goes

8    through to create a song?

9    A.    According to Mr. Hinckley, his process typically is to

10   sit down with his guitar, just start playing, just strumming

11   around.  Trying out different chords, see how they work

12   together.  The consonance or dissonance of those progressions.

13   And if he likes what he hears, he likes what's coming out,

14   he'll then focus on that progression.  And music is a

15   repetitive art form.  So, core progressions, melodies, you

16   know, we can memorize through that repetition.  So, if he

17   picks something he likes, he'll start playing it, and then

18   eventually words will come to it.

19   Q.    So the music precedes the voice?

20   A.    Typically.  That's not to say all the time, but that's

21   the way I understand his process to be.

22   Q.    Approximately, how many songs has he created over the

23   past year?

24   A.    Approximately between 20 and 25 songs.

25   Q.    And does he compose these songs independently?

1    A.    Yes.

2    Q.    And what input, if any, do you have in that process?

3    A.    I might have input in terms of instrumentation in terms

4  of his approach to playing or singing a particular song.  And

5  in terms of the content of the lyrics and how they are

6  representative of how he feels or what he's thinking.

7    Q.    Could you describe Mr. Hinckley's songs in terms of a

8  music genre?

9    A.    Singer songwriter, generally pop songs.

10    Q.    Pop music?

11    A.    Pop music.  They typically follow an A/B/A form,  a

12  rondo form.  Music is, like I said earlier, is a repetitive

13  art form.  So, you can look at different types of form or lack

14  thereof in songs, with specific genres.  Pop music is pop

15  music because it's easy to ingest, to take in, and that means

16  that it's usually just one verse and a chorus, an A/B or rondo

17  form as it's also known.  R–O–N–D–O.

18    Q.    Is an idealized love consistent with the pop music

19  genre?

20          THE COURT:  Is what?  What is the question?

21  BY MR. LEVINE:

22    Q.    The theme of idealized love consistent with the pop

23  music genre that he employs?

24    A.    Idealized love, I think, in my conception of pop music,

25  is a very typical theme.

1    Q.   A very typical theme?

2    A.   Uh-huh.

3    Q.   Has Mr. Hinckley written songs about women in the past

4    year?

5    A.   Yes, he has.

6    Q.   As he written about Ms."M"?

7    A.   Yes, he has.

8    Q.   Do you know who Ms."M" is?

9    A.   Yes, I do.

10   Q.   How about Ms."G"?

11   A.   Yes, he has?

12   Q.   Do you know who she is?

13   A.   Yes, I do.

14   Q.   Do you a Ms."B" as well?

15   A.   Yes.

16   Q.   Has he written a song about Ms."B"?

17   A.   Very recently, yeah.

18   Q.   Very recently.  The Ms."B" song, the one that was

19   recently written, what was that one about?

20   A.   If I remember correctly, it was about her life, the

21   struggles that she's gone through in her life, and you know,

22   it was sort of a supportive song for her.

23   Q.   Was it a song that had anything to do with idealized

24   love?

25   A.   Off the top of my head, no.

1   Q.    And did he write -- does Mr. Hinckley turn to music for

2   comfort?

3   A.    Absolutely.

4   Q.    And is there, in your view, if I may use this word,

5   anything abnormal about writing songs about women?

6   A.    No.

7   Q.    And in your sessions with Mr. Hinckley, have you

8   discussed his relationships with women?

9   A.    Yes.

10   Q.    And did he speak to you about Ms."M"?

11   A.    Yes.

12   Q.    And did he understand Ms."M"'s" mental illness?

13   A.    It seems as if he did, yes.

14   Q.    Did it demonstrate his empathy for Ms."M"?

15   A.    Yeah, it was something that we had discussed.

16   Q.    Tell us about that discussion?

17   A.    In terms of his own struggle and recovery in mental

18   illness, in relation to her own struggle with and recovery in

19   mental illness.

20   Q.    How did he weather the end of the relationship with

21   Ms."M"?

22   A.    When you say weather?

23   Q.    How did he cope?  How did he cope with the end of the

24   relationship with Ms."M"?

25   A.    I believe Mr. Hinckley really -- he turns to music as a

1    coping mechanism.  So, I believe that a lot of the music that

2    he wrote around that time was a way of him to cope with what

3    was going on in the relationship towards the end, as well as

4    in the middle of it and the beginning of it.  It was something

5    that was there for him to process his feelings, to process the

6    ups and downs of that relationship.  And especially near the

7    end, to go through what he had gone through as an individual

8    in that relationship, but this time from a more subjective

9    point of view, that the end could be objectively looked at

10   through his songs.

11       Q.   Did he cope well?

12       A.   I believe he did.

13       Q.   Did music help him in this regard?

14       A.   Yes.

15       Q.   How?

16       A.   Well, like I've said, it is a coping mechanism for Mr.

17   Hinckley and it has been for many, many years.  It is, again,

18   an expressive art form, so it is something that can be

19   considered cathartic.  A cathartic experience to just play.  A

20   cathartic experience to write down what he's feeling and

21   within metaphor and within the lyrics to work through those

22   feelings, to work through those memories.  And to also play

23   through those memories, because music is both a verbal and

24   nonverbal art form.

25               So, when he's talking about -- when he's singing

1    about things and in the lyrics he's also dealing with the

2    feelings and emotions through the act of playing, through the

3    act of performing.

4    Q.    Did he discuss with you his relationship with Ms."G"?

5    A.    Yes.

6    Q.    Did he share with you her requests of him regarding

7    this hearing?

8    A.    Yes, he did.

9    Q.    Tell us about that?

10   A.    From my understanding, Ms."G" at one point felt very

11   uncomfortable with the idea of their relationship coming to

12   light, and asked that perhaps if they could just postpone or

13   cancel the hearing.  It was something that Mr. Hinckley

14   brought up to me in our sessions to look, you know, to kind of

15   get a sense of what I thought about it.

16            THE COURT:  What do you think about it?

17            THE WITNESS:  Excuse me.

18            THE COURT:  What did Mr. Hinckley think about that

19   suggestion?

20            THE WITNESS:  Mr. Hinckley said that he could

21   understand where she was coming from because of past

22   relationships.  And the microscope has been used as a term --

23   I thought of it as a magnifying glass.  When you often use a

24   magnifying glass, it picks up the sun, whatever is under it

25   gets burnt to a crisp.  That's oftentimes what happens with

1   these relationships.  And I think that Mr. Hinckley understood

2   where she was coming from in her concerns for what could come

3   out in this hearing.  At the same time, he was also able to

4   consider what had to be done for his own sake.  And I think

5   part of why he was looking to get, you know, ideas, thoughts,

6   feelings, from other people in his support system and his

7   treatment team, was to kind of weigh the benefits and the

8   risks of canceling this hearing.  And in the end he decided

9   not to because there's a lot of money, a lot of effort, a lot

10  of work that has gone into this.

11  BY MR. LEVINE:

12      Q.   Does it demonstrate, at least in this regard, that he

13  was at least in the pursuit of larger freedoms, that he was

14  goal oriented and pragmatic?

15      A.   I believe so, yes.

16      Q.   Has he discussed with you his relationship with Ms."B"?

17      A.   A little bit, yeah.

18      Q.   Is that just a friendship?

19      A.   From what I understand.

20      Q.   No romance?

21      A.   No, sir.

22      Q.   And has he discussed with you his relationship with

23  Ms."K"?

24      A.   Yeah, a little bit, not a whole lot.

25      Q.   Is that just a friendship as well?

56

1    A.    From what I understand.

2    Q.    A fairly new one, too?

3    A.    Yeah.

4    Q.    In your opinion, would it be a positive development if

5    Mr. Hinckley no longer had any of those relationships with any

6    of those women?

7    A.    No, I don't think it would be a benefit.

8    Q.    Why is that?

9    A.    Well, as Dr. Montalbano has already testified to the

10   fact that Mr. Hinckley's focused on social relationships with

11   women.  And from my understanding of working with Mr.

12   Hinckley, social relationships with women and in general are

13   very important to him.

14           THE COURT:  Did you say social relationships or

15   sexual relationships?

16           THE WITNESS:  Social.  Sexual?  Sure.

17   BY MR. LEVINE:

18   Q.    Would you say that Mr. Hinckley has improved his

19   sociability by meeting and maintaining friendships with these

20   women?

21   A.    I think it's been beneficial for that, yes.

22   Q.    Has Mr. Hinckley also demonstrated to you an interest

23   to socialize with men at the Hospital?

24   A.    Yes, he has.

25   Q.    Tell us about that?

1   A.   Well, more recently Mr. Hinckley has been transferred

2   to another ward in John Howard.  The population in that ward I

3   think is a little closer to his functioning level than the

4   previous ward that he was in.  And he's spoken to me about how

5   he is already starting to form some friendships, relationships

6   with some of the men in that unit.  That he had known them as

7   acquaintances in the past, but now he's starting to talk to

8   them more often.

9           He's also, in the past, brought up other

10  individuals that are in John Howard that also play guitar,

11  share the same interest in similar music and creating music,

12  and looking into trying to foster those relationships.

13  Q.   Has he proposed a guitar group?

14  A.   Yes.

15  Q.   What does that demonstrate to you?

16  A.   I believe that demonstrates an initiative on his part

17  to increase his socialization, particularly with men, and

18  particularly within the Hospital setting to increase his

19  support system.

20  Q.   Has Mr. Hinckley written a song about his feelings

21  about his father?

22  A.   Yes.

23  Q.   What is the name of that song?

24  A.   It's entitled Hero.

25          MR. LEVINE:  And, Your Honor, last time -- and I

1  would propose we do it this time, I think we presented to the

2  Court a CD for it to play in chambers.

3              THE COURT:  Yes.

4              MR. LEVINE:  I would like to tender to the Court

5  the CD of the song Hero, and I could accompany it with the

6  lyrics.

7  BY MR. LEVINE:

8    Q.    Do you know when that song was written, sir,

9  approximately?

10   A.    Shortly after his father's passing.

11             THE COURT:  Do we want to give it an exhibit

12  number?

13             MR. LEVINE:  We have the CD for the Government as

14  well.

15             THE COURT:  Do you have any objection to this, Mr.

16  Zeno?

17             MR. ZENO:  No, Your Honor.

18             MR. LEVINE:  Patient Number 6 and it's going to be

19  A for the CD and B for the page of the lyrics.  Actually, may

20  I show it to the witness, as a matter of form, to authenticate

21  it?

22             THE COURT:  Yes.

23  BY MR. LEVINE:

24   Q.    Let me show you 6A and 6B.  6A being the CD, but 6B

25  being the lyrics.  Is that, 6B, the lyrics of the song Hero?

1   A.   Yes, it is.

2            MR. LEVINE:  Your Honor, I'm going to move it into

3   evidence as well.  I think there will be some more

4   housekeeping matters later.

5            THE COURT:  Any objection, Mr. Zeno, to its coming

6   into evidence?  Ms. Chasson?

7            MS. CHASSON:  No.

8            THE COURT:  They will be admitted.

9   BY MR. LEVINE:

10   Q.   Now, in this song Mr. Hinckley expresses the view that

11   his father is now with God and by the side of angels, is that

12   correct?

13   A.   Yes.

14   Q.   And he also expresses the fact that his father was very

15   good to him?

16   A.   Yes.

17   Q.   Now, he also acknowledges in his life that it was one

18   of ups and downs, is that correct?

19   A.   Yeah.

20   Q.   And he said in this song that his father was always in

21   his prayers and regrets that his father never got to see him

22   free?

23   A.   That's correct.

24   Q.   What, in your opinion, does this song demonstrate in

25   the way of empathy?

60

1    A.    Well, I believe Mr. Hinckley in this song is looking at

2    the relationship with his father, and as a retrospective --

3    and within the realms of grieving.  I think that, at least in

4    this -- within this song, you know, in terms of empathy, he's

5    recognizing the deterioration of his father and health and how

6    that impacts, you know, his life, his family's lives.

7    Q.    Did Mr. Hinckley talk to you about his feelings

8    regarding his father's illness and his father's death?

9    A.    Yes.

10   Q.    What did he share with you?

11   A.    He talked about how hard it was for him to see his

12   father decline in health and mental capacity.  How it was

13   to -- it was hard for him to watch his family members struggle

14   with this as well.  In some of our sessions Mr. Hinckley was

15   able to talk about the feelings that has brought up for him,

16   how it affected his mood, and how he dealt with those feelings

17   in the different stages of his father's decline.

18   Q.    Did he share with you his thoughts about how his father

19   may be feeling now, as free from pain -- the worldly pains, as

20   it were, being with the angels?

21   A.    I believe that's at least brought up in the lyrics.

22   Q.    Did he relate to you how his siblings and his mom

23   feel -- felt about visiting his dad?

24   A.    Well, he discussed what his family had to deal with in

25   terms of going there, you know, on a regular basis several

1    times a day.  It was taxing emotionally and physically.  Mr.

2    Hinckley, Jr., specifically spoke about his concern for his

3    mother's health and well-being and her devotion to her husband

4    at the time, and seeing the decline in his health and how that

5    would affect her as well.

6        Q.   Now, in the reports there has been reference to the

7    fact that Mr. Hinckley has recorded an old song entitled The

8    Ballad of the Outlaw, do you know about that?

9        A.   Yes, I do.

10       Q.   Did the song of Ballad of the Outlaw come up in

11   therapy?

12       A.   Yes, it did.

13       Q.   Did Ms."G" ask Mr. Hinckley about his old music?

14       A.   From my understanding, yes.

15       Q.   And did Mr. Hinckley bring this fact to your attention

16   during the therapy?

17       A.   Yes, he did.

18       Q.   What does this show in the way of his openness to you?

19       A.   Well, I think it shows the strength of our rapport, and

20   it also shows the way that Mr. Hinckley is using music therapy

21   in his day-to-day life.  And how when something like this --

22   something significant like a song like the Ballad of the

23   Outlaw comes up outside of the realm of music therapy, that

24   he's willing to bring it into -- into that realm and process

25   it, play through it, record it.  When I say process it, I mean

1    verbally process it, talk about it.

2            THE COURT:  What did he tell you about it?

3            THE WITNESS:  Well, he said it was a song that --

4    it was an early song that he can recall, since he's been

5    writing songs for a number of decades.  And it was something

6    that, you know, in terms of the earlier songs that he can

7    recall, something that he -- from this perspective today,

8    likes, the narrative of the song, likes the progression of the

9    chords.

10   BY MR. LEVINE:

11   Q.   Is this song about 30 years old?

12   A.   Just about, he said it was from the late 70s, yes.

13   Q.   Bringing this to your attention, is this precisely what

14   he's supposed to do, bring something like this to your

15   attention and engage in conversations about it?

16   A.   It's my hopes that he would do that in general, yes.

17   Q.   Well, what did he say about the song?

18   A.   That he liked the song.  That he, again, like I said,

19   it's the earliest one he can remember.  He likes it, he's kind

20   of proud of it.  At the same time he talked about it's sense

21   of despair and how that illustrates where he was at when he

22   wrote that song.

23   Q.   Did he talk about where he was when he wrote it and

24   where he is now?

25   A.   Yes.

63

1    Q.    Tell us about that?

2    A.    Well, we sort of juxtaposed that song with a lot of the

3    music that he writes today.  And you can see that the sense in

4    that song is very depressed, it's very -- I mean, obviously,

5    it's the Ballad of the Outlaw, it's about somebody that's on

6    the run, and kind of Mr. Hinckley's desperado.  It's the -- at

7    the end of the song he's writing his epitaph.  This character

8    is writing his epitaph.  In his music today there is so --

9    Q.    It's a song about suicide?

10   A.    Essentially.

11   Q.    Yes.

12   A.    That's something you can pull from that.  Today his

13   music is infused with a hope.  With love -- that's another

14   recurring theme.  But it's not -- the songs that he writes

15   today are not quite as dire as something that you can find in

16   that song.

17   Q.    Do you have any concern that Mr. Hinckley currently has

18   feelings of violence and suicide as reflected in that song?

19   A.    No, I'm not concerned about that, as reflected in that

20   song.

21   Q.    Now, did you read the Government's motion in opposition

22   to the Hospital's (e)letter where it portrayed Ballad of the

23   Outlaw as, and I quote the Government, evidence that Mr.

24   Hinckley continues to maintain inappropriate thoughts of

25   violence, closed quote?

1    A.    Yes, I read that.

2    Q.    What is your opinion of the Government's portrayal of

3    that?

4    A.    With all due respect, I disagree with the Government's

5    portrayal of that song as it being an indication of Mr.

6    Hinckley still being focused on violence.  Considering the

7    context of therapy and considering the context of the music

8    that he writes today, I think that it's a -- in fact, an

9    illustration of Mr. Hinckley's progress in being open about

10   his feelings, being open about his past and how that relates

11   to his present, and how that even relates to his future.

12          I don't believe that it shows any significant

13   risk in terms of his depression returning.  In fact, I think

14   it shows an effort on his part to look at how he was prior to

15   his instant offense and how that set of emotions, set of

16   events that lead to his stay at John Howard has brought him to

17   the place where he is today, and has made him the person that

18   he is today.

19   Q.    Today he's a person of hope?

20   A.    According to his music, he is.

21   Q.    Now, according to his sessions with you over the past

22   year, has Mr. Hinckley in any way shown a preoccupation with

23   thoughts of violence?

24   A.    No, he hasn't.

25   Q.    In any way has he shown a preoccupation with thoughts

1    of suicide?

2       A.   No, he has not.

3       Q.   And in any way has he shown a preoccupation with

4    thoughts of lawlessness?

5       A.   No, he certainly has not.

6       Q.   Is the Government wrong in its portrayal and has it

7    distorted the facts in a very significant way?

8              THE COURT:  Why don't you ask him one question at a

9    time because you might not get an objection if you ask him one

10   question at a time.

11   BY MR. LEVINE:

12      Q.   Is the Government wrong in its portrayal?

13      A.   Of the song and its representation?

14      Q.   The portrayal that that song is -- shows his continued

15   inappropriate thoughts of violence?

16      A.   Yes, it is wrong, in my opinion.

17      Q.   And -- why don't I just leave it at that question?

18             THE COURT:  Why don't you.

19             MR. LEVINE:  Yes.  Good counseling, Your Honor.

20   Court's indulgence for a moment, please.

21             THE COURT:  Sure.

22   BY MR. LEVINE:

23      Q.   Now, you've characterized Mr. Hinckley's music as music

24   of hope.  You've told us that he has discussed with you the

25   death of his father, correct?

1    A.   Yes.

2    Q.   And did he discuss with you his rebuffs from volunteer

3    organizations?

4    A.   Yes, he has.

5    Q.   And did he discuss with you his rebuff from Ms."M"?

6    A.   Yes.

7    Q.   And the apparent withdrawal of intimacy from Ms."G"?

8    A.   Yes.

9    Q.   And in light of that, does his music still reflect a

10   feeling of hope?

11   A.   Yes, it does.  And, moreover, I also think that there's

12   other songs that indicate his not necessarily only focusing on

13   the hope and on the positive things.  There are other songs I

14   think that he's dealt with those rejections.  He's dealt with

15   the emotions that come up in him when he is rebuffed.  His

16   songs are infused with hope and are positive in slant, but

17   they are also not completely an entirety blinded by that hope.

18   Q.   He has a strong fix on reality?

19   A.   Yes.

20   Q.   Now, did Mr. Hinckley talk to you about having others

21   listen to his music?

22   A.   Yes, he has.

23   Q.   And does he want others to hear his music?

24   A.   Yes, he does.

25   Q.   And for what purpose does he want others to hear his

67

1    music?

2       A.   I believe he has a couple of purposes.  Primarily, a

3    way of connecting with people.  Music has been in the past a

4    way for him to connect with the people in his life.  As has

5    been testified already, he's given CDs to his family members,

6    he's played his music for his family members.  He's given

7    songs to significant people in his life.  And it's also been

8    something that he's also wanted to introduce his music for --

9    to have some sort of objective light put to them.

10      Q.   Feedback, some critique?

11      A.   Feedback, critique, get another sense of what people

12   think about his music aside from the people that are close to

13   him.

14      Q.   Well, what did he tell you about wishing to remain

15   anonymous during the course of that critique?

16      A.   Well, I believe you're referring to when he had spoken

17   to me about the idea of putting his music on the Internet for

18   critique for analysis, and his understanding of the media

19   clause.  Beyond that, his understanding of the notoriety his

20   name is sort of attached to in our culture, and his want to

21   not have his name be a reason for people to look -- to listen

22   to his music out of a morbid curiosity.  To put the music up

23   under an anonymous name so that wouldn't color people's

24   objective views on his music.

25      Q.   He's seeking an honest critique of his music?

1    A.    From what he's told me, yes.

2    Q.    Do you participate in treatment team meetings?

3    A.    When I can make them, yes.

4    Q.    Do you read the reports with respect to the conditional

5    releases to his mother's home?

6    A.    Yes.

7    Q.    Do you provide music therapy notes to the treatment

8    team on a regular basis?

9    A.    Yes.

10   Q.    In your view, during the course of your work with Mr.

11   Hinckley, has he evidenced an overall sound mental status?

12   A.    Yes, he has.

13   Q.    And has he become and is he open with you?

14   A.    Yes.

15   Q.    Throughout the course of your work with Mr. Hinckley,

16   have you perceived anything that would indicate dangerousness?

17   A.    No.

18   Q.    Do you agree with the doctors from the Government who

19   say Mr. Hinckley should not have more time in the area of his

20   mother's home?

21   A.    In my opinion, I don't agree.

22   Q.    Tell us why?

23   A.    Well, I think it's been elucidated already, but I think

24   that it's an important feature of his conditional release to

25   gradually increase that time, particularly so he can be in the

1   supportive environment of his family unit to gain the skills

2   necessary to function normally in the community.  To also gain

3   access to that community and feel like a greater part of that

4   community.  I think it's an important -- I think it's very

5   important to instill a sense of normalcy.

6       Q.   Mr. Hyde, do you sometimes miss therapy sessions with

7   Mr. Hinckley during the course of a week?

8       A.   Occasionally, yes.

9       Q.   And have you ever noticed an adverse effect on Mr.

10  Hinckley's condition as a result of a missed session?

11      A.   No, I can't say that I have.

12          MR. LEVINE:  Nothing further, Your Honor.

13          THE COURT:  Thank you.  Ms. Chasson.

14                   CROSS-EXAMINATION

15  BY MS. CHASSON:

16      Q.   Good afternoon, Mr. Hyde.

17      A.   Good afternoon.

18      Q.   It sounds like Mr. Hinckley is really flourishing in

19  music therapy?

20          MR. LEVINE:  Can we have that question again?  Can

21  you speak into the mic, please.

22          MS. CHASSON:  Sorry.

23  BY MS. CHASSON:

24      Q.   It sounds like Mr. Hinckley has really flourished in

25  his music therapy?

1    A.    You can say that, yes.

2    Q.    And you've been able to work with him to reach emotions

3    that he's had trouble expressing through a verbal mode?

4    A.    From what I understand from his history, yes.

5    Q.    And in your work with him you two have been able to

6    access topics that have been historically difficult for Mr.

7    Hinckley to discuss?

8    A.    That's correct, yes.

9    Q.    Like his relationships with women, is that right?  And

10   his relationship with his father?

11   A.    A little bit, yeah.  Yes, we have.

12   Q.    And the song Hero that he was talking about was a good

13   processing, you think, for him?

14   A.    I think it was important for him to do that, yes.

15   Q.    Now, is playing music with other people the same thing

16   as engaging in music therapy?

17   A.    No, not exactly.  Playing music with other people can

18   be therapeutic.  Playing music with a music therapist in the

19   context of music therapy is much the same as having a

20   conversation with a psychotherapist versus having a

21   conversation with a friend.  You can have a conversation with

22   a friend and get a lot of good insight, feel better

23   afterwards, get an understanding of yourself.

24          When you're working with a psychotherapist,

25   you're doing the same thing, but it's also from an objective

 1   standpoint that your psychotherapist is working with your

 2   issues and working on treatment objectives.

 3      Q.   So, you're likely to see better progress in resolving

 4   issues?

 5      A.   Yes, because those issues are being specifically dealt

 6   with.

 7      Q.   Okay.  And you've actually told Dr. Patterson that

 8   collateral support with a music therapist whenever Mr.

 9   Hinckley might leave the Hospital is going to be very

10   important to Mr. Hinckley?

11      A.   I believe so, yes.

12      Q.   But there's no music therapist identified for Mr.

13   Hinckley in his mother's hometown, is there?

14      A.   At the moment, no, there is not.

15      Q.   And, in fact, you even told Dr. Patterson, didn't you,

16   that it would be unethical not to have a music therapist

17   identified in his mother's hometown?

18      A.   It would be unethical for me to not suggest that and to

19   refer him to another music therapist because it has been such

20   an important aspect of his treatment.

21      Q.   And it's still nowhere in the (e)proposal for the time

22   that he spends in his mother's hometown?

23      A.   Correct.  But that's also because the time allotted

24   that he currently has and with the proposal that's with the

25   Court today, does not necessarily warrant that because he's

1    still receiving music therapy services at the Hospital.  And

2    if we were to start transitioning him, I believe that the role

3    of a music therapist in his mother's community would be better

4    served for him once he was to have more time there.

5              THE COURT:  Let me ask you this.  How often do you

6    see him?

7              THE WITNESS:  Once a week.

8              THE COURT:  And if he were in his mother's

9    community for 10 days, say, even every month, so that would

10   mean he'd be here 20 days and there 10 days.  Are you saying

11   that it wouldn't be helpful to have him dealing with two

12   different music therapists, one there and one here

13   simultaneous?

14             THE WITNESS:  It wouldn't necessarily be -- it

15   wouldn't be unhelpful, but it wouldn't necessarily be

16   something at this stage to be very important.  I think that

17   he's still -- he's still working on his rapport with his other

18   therapist, with Mr. Beffa as he's moving into that role, and I

19   think that's an important thing to focus on.

20             THE COURT:  So, you would still be seeing him two

21   to three times a month instead of four times a month?

22             THE WITNESS:  Correct.

23   BY MS. CHASSON:

24    Q.   But under the Hospital's (e)proposal, which asks for 12

25   visits to the hometown over a full week in duration.  If you

73

1    do the math on that, he's missing 12 weeks or three months

2    worth of music therapy appointments?

3      A.    Yeah, you can look at it that way, absolutely.

4            MS. CHASSON:  Thank you.  I have no further

5    questions.

6            MR. LEVINE:  Very briefly, Your Honor.

7                    REDIRECT EXAMINATION

8    BY MR. LEVINE:

9      Q.    If you or Mr. Hinckley thought it useful, could you on

10   the week either before or the week after his conditional

11   release have two sessions?

12     A.    Yes.  It would be something I would bring up with Mr.

13   Hinckley, we would discuss the efficacy of that.

14     Q.    And when we talk about these nine nights, we're talking

15   about Saturday and Sunday, the five week days, and Saturday

16   and Sunday.  So, that's just one week of a missed lesson?

17     A.    A therapy session.

18     Q.    A therapy session, yes.  And that could be made up the

19   following week?

20     A.    Yes, it could.

21     Q.    And were that to be the case, he'd miss none, isn't

22   that correct?

23     A.    Well, he'd miss a therapy session during the week, but

24   in the month he would not.

25     Q.    In numbers he would gain -- he would have the same

1   number as before?

2       A.    (Nodded affirmatively).

3               MR. LEVINE:  Nothing further, Your Honor.

4               THE COURT:  I just want to be clear, Mr. Hyde.

5               THE WITNESS:  Sure.

6               THE COURT:  Are you saying that at this point if he

7   were in his mother's community for nine days, ten days,

8   whatever it is, every month, that it would -- that it would

9   not be a good thing to have a music therapist there, and it's

10  better to just be working exclusively with you for the time

11  being.  But that if that time were expanded to more than nine

12  or ten days and he were spending half his time there, your

13  view might change?  Or are you saying that the collateral

14  support of a music therapist in his mother's community would

15  be helpful now under the current proposal?

16              THE WITNESS:  It is -- this is a music thing, the

17  A/B thing, so, I would say A.

18              THE COURT:  Really what I'm trying to get at is --

19  I think the Government -- the Government is suggesting or at

20  least asking whether or not the Hospital's (e)proposal is

21  deficient by not having a music therapist there?

22              THE WITNESS:  I don't believe that.

23              THE COURT:  And I take it that you didn't say that

24  to Dr. Phillips or Dr. Patterson?

25              THE WITNESS:  I would have to look over what I said

1    to them.

2          THE COURT:  So, again, I don't want to put words in

3    your mouth, and I'm less A and B than you, but for now is it

4    accurate to say that you think it's better, at least in terms

5    of music therapy.  Not in terms of anybody else's therapy, but

6    in terms of music therapy, that Mr. Hinckley work just with

7    you even if it means one less session a month than if he

8    worked with two separate people simultaneously?

9          THE WITNESS:  Correct.  And I'd also like to add

10   that currently we're working on getting Mr. Hinckley to have

11   somebody to play music with while he's there in (Name of

12   City).  That's something that we've done in the past.  With

13   the person's schedule, it didn't happen as often as we

14   preferred, and that person has identified somebody else as

15   they are moving out of town.  They have identified somebody

16   else to work with Mr. Hinckley.

17          Now, I think Ms. Chasson said, and made a very

18   important point, that the difference between having somebody

19   to play music with and having a music therapist is great.  But

20   it's also important to understand that what would -- the way I

21   envision this, is that he would be able to meet with somebody

22   while there to talk music, to play music, to engage socially

23   within music, and then come back to process that

24   therapeutically with me.

25          THE COURT:  So, instead of coming to you, and

1    saying:  Here is a song that I've written in the last month,

2    let's talk about that.  He would be able to come back to you

3    and say, not only that, I played with this guy or I played

4    with this group and we talked about this and --

5                THE WITNESS:  And this was my experience, and this

6    is how I felt, and this is what it brought up to me.  Yes.

7                THE COURT:  And that would be sort of other real

8    world experiences that you could explore using your

9    professional background in addition -- your professional

10   psychotherapeutic background in addition to what you know

11   about music and musicians?

12               THE WITNESS:  Right.

13               THE COURT:  Okay.  So, the analogy used before, at

14   least to me made sense, whether it did to Ms. Chasson is

15   another question.  But the analogy used before about when we

16   as human beings interact with our friends, we get something

17   positive out of that because we're being open and we're

18   talking through our problems, even though they don't have the

19   professional training to identify what those problems are or

20   what the deeper meaning is.  So, it's a positive thing, but

21   different from talking to a therapist?

22               THE WITNESS:  Correct.  And, also, in that sense

23   it's also leading towards more normalcy, and that I think is

24   exigent with this case.

25               THE COURT:  Okay.  Any other questions in light of

1    the --

2              MR. LEVINE:  We have none, Your Honor.

3              THE COURT:  Ms. Chasson?

4              MS. CHASSON:  No, Your Honor.  Thank you.

5              THE COURT:  Thank you, Mr. Hyde.

6              THE WITNESS:  You're welcome.

7              THE COURT:  All right.  So, tomorrow what time --

8    we can start as early as 9:15 if you want to, or we can just

9    stick with 9:30.  I guess -- is Dr. Rafanello first up?

10             MR. LEVINE:  Yes.  And we would ask that it be

11   9:30.

12             THE COURT:  Fine.  Do we expect Mr. Beffa tomorrow?

13             MR. LEVINE:  I hope so.  Today was the day his wife

14   was to have surgery, and I hope we'll have him tomorrow.

15             THE COURT:  If we don't have him, who is the next

16   witness, or is that it for you?

17             MR. LEVINE:  After Mr. Beffa we will rest our case.

18             THE COURT:  Just so everybody is clear, if Mr.

19   Beffa is here he will follow Dr. Rafanello, but if he's not

20   here then the Government has to be ready with their first

21   witness, and we'll take Mr. Beffa on Thursday, if that's the

22   way it has to be.

23             MR. LEVINE:  Your Honor, may we ask the Government

24   to share which of their two witnesses will be first?

25             MS. CHASSON:  We're going to call Dr. Phillips

1    first.  I'm assuming that if we call Dr. -- if Mr. Beffa is

2    late and we start with Dr. Phillips, I'll be permitted the

3    opportunity to bifurcate the testimony so we can respond to

4    whatever Dr. Beffa says?

5              THE COURT:  Yeah.  Yeah.  We agreed we'd take Mr.

6    Beffa out of turn if we needed to because of his wife's

7    surgery, but I think it's fair for -- I mean, the idea of

8    having Dr. Phillips and Dr. Patterson listen to all the rest

9    of the testimony is so that they can react not to just what

10   they've seen in writing, but also in the interviews that

11   they've had, but also what they hear in the courtroom.

12             So, if Mr. Beffa comes we'll ask Ms. Chasson to

13   stop at a logical place with Dr. Phillips, put Mr. Beffa on

14   and then she can resume with Dr. Phillips.  Probably for his

15   travel schedule, the sooner we can get him in and out the

16   better anyway.

17             MR. LEVINE:  Court's pleasure.

18             THE COURT:  I assume he'd like to get back to his

19   wife who has just had surgery.  If we can do it all in one

20   day.  All right.  So, we'll see you at 9:30.  And we'll take a

21   10 minute recess before the next event -- the next hearing.

22   COURT ADJOURNED AT 4:25 P.M.

23

24

25

1                      C E R T I F I C A T E

2              I, Lisa M. Hand, RPR, certify that the

3    foregoing is a correct transcript from the record of

4    proceedings in the above-titled matter.

5

6

7                              /s/ Lisa M. Hand

8                         _____

9                              Lisa M. Hand, RPR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25