IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,

       Government,               CR No. 81-306
                                     Washington, DC
     vs.                         July 23, 2008

JOHN W. HINCKLEY, JR.,          AM Session

       Defendant.
_____


TRANSCRIPT OF EVIDENTIARY HEARING
BEFORE THE HONORABLE PAUL L. FRIEDMAN
UNITED STATES DISTRICT JUDGE


APPEARANCES:


For the Government:        THOMAS E. ZENO, ESQUIRE
                        U.S. Attorney's Office
                        555 Fourth Street, NW
                        Suite 5423
                        Washington, DC  20530
                        (202) 514-6957


                        SARAH TOWNSEND CHASSON, ESQUIRE
                        U.S. Attorney's Office
                        555 Fourth Street, NW
                        Washington, DC  20530
                        (202) 514-7248


For the Defendant:         BARRY W. LEVINE, ESQUIRE
                        Dickstein Shapiro, LLP
                        1825 Eye Street, NW
                        Washington, DC  20006
                        (202) 420-2237


                        ADAM S. PROUJANSKY, ESQUIRE
                        Dickstein Shapiro, LLP
                        1825 Eye Street, NW
                        Washington, DC  20006
                        (202) 420-4739

(Appearances Continued)


For the Defendant:                ANN-MARIE LUCIANO, ESQUIRE
                                  Dickstein Shapiro, LLP
                                  1825 Eye Street, NW
                                  Washington, DC  20006
                                  (202) 420-2703



Court Reporter:                   Lisa M. Hand, RPR
                                  Official Court Reporter
                                  U.S. Courthouse, Room 6706
                                  333 Constitution Avenue, NW
                                  Washington, DC  20001
                                  (202) 354-3269

Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

1                        I N D E X

2  WITNESS                                              PAGE

3  For the Defendant:

4  NICOLE RAFANELLO

5  Direct Examination by Mr. Levine                        6

6

7                    INDEX TO EXHIBITS

8  For the Government:                        Identified

9  Exhibit No. 4 – May 21st recommendation        27

10  For the Defendant:

11  Patient's Exhibit No. 7 – Letter dated 7/21     53/53

12  Patient's Exhibit No. 8 –          Services

13                          Board Letter        57

14  Patient's Exhibit No. 9 –          Services

15                          Board Letter        61

16

17

18

19

20

21

22

23

24

25

1                P R O C E E D I N G S

2          MR. LEVINE:  May we briefly approach the bench.

3          THE COURT:  Yeah, sure.

4  SIDEBAR DISCUSSION ON THE RECORD AS FOLLOWS:

5          THE COURT:  Do you want your client to have a

6  headset to listen to the conversation?

7          MR. LEVINE:  Not necessary.

8          MS. CHASSON:  Can we make sure that that waiver was

9  on the record.

10          MR. LEVINE:  Don't worry about this at all, this is

11  just –– I learned this morning that Mrs. Hinckley fell in the

12  lobby –– I think it was the lobby, a slick floor of the hotel.

13  And I understand she's got a shiner, a black eye, but that

14  explains why she's not here this morning.  And daughter Diane

15  is with her.

16          THE COURT:  Is she all right?

17          MR. LEVINE:  Scott, who is the source of my

18  information, seems to think that she'll be all right.  She

19  banged herself, but she's okay.  I just wanted to explain.

20  And John does know what I've just told you.

21          THE COURT:  I hope she's all right.  All right.

22  Okay, guys, are we ready to roll?

23          MR. LEVINE:  Ready.

24          THE COURT:  I have to say after listening to all of

25  this stuff about tests yesterday and this and that, and

1    Montalbano, Mr. Hyde was a breath of fresh air.  He was really

2    interesting.  I thought it was really interesting.

3               MR. LEVINE:  Agreed.  Good fellow and interesting.

4    Yes.

5               MR. ZENO:  He's done a good job.

6               MR. LEVINE:  I think, in part, Your Honor -- Your

7    Honor's reaction to perhaps the tedium of what we heard is --

8    we've been doing this for years, but the fact that he's doing

9    so well is our case.  So what we think we should do is to put

10   it before the Court that that continues to be the case.  And I

11   have no problem wanting to truncate it, so long as the Court

12   is comfortable that it knows -- there's no jury here, as long

13   as the Court is comfortable --

14              THE COURT:  You can proceed, both sides, the way

15   you think best.  The law is clear that I'm just to consider

16   the entire record in the case going back to 1981, including

17   all of our prior hearings.  So, I'll leave it to you as to how

18   you -- I've read all of it.

19              MR. LEVINE:  You read everything?

20              THE COURT:  Yeah.

21              MR. LEVINE:  It's good to have a diligent court.

22   Thank you, Judge.

23              THE COURT:  Thank you.  I hope she's better, but

24   give her all of our regards and best wishes, Mr. Zeno and Ms.

25   Chasson as well.

1          MR. LEVINE:  I will.  Thank you.

2   SIDEBAR DISCUSSION CONCLUDED

3          THE COURT:  Okay.  Mr. Levine, ready?

4          MR. LEVINE:  We are, sir.  With the Court's

5   permission, we call Dr. Rafanello.

6   Thereupon,

7                    NICOLE RAFANELLO,

8   the witness herein, having been first duly sworn, was examined

9   and testified as follows:

10                   DIRECT EXAMINATION

11  BY MR. LEVINE:

12   Q.   Please the Court, good morning.  Dr. Rafanello.

13   A.   Good morning.

14   Q.   Please state your name.

15   A.   Nicole Rafanello.

16   Q.   Could you just tell us how you are currently employed?

17   A.   I am a clinical administrator both on a women's

18  pretrial unit and for Mr. Hinckley, Jr.

19   Q.   Now, Your Honor, may we have a stipulation that the

20  educational background that we've gone into in the past

21  applies to today?

22          MR. ZENO:  The Government will stipulate that Dr.

23  Rafanello is an expert in diagnosis and treatment of mental

24  illness, Your Honor.

25          MR. LEVINE:  And also one who can give opinions

1  with respect to dangerousness in the context of conditional

2  releases.

3           MR. ZENO:  Yes, Your Honor, we will so stipulate.

4           THE COURT:  Stipulation is accepted and she will be

5  so recognized as she has been in the past.

6  BY MR. LEVINE:

7  Q.   What are your responsibilities at St. Elizabeth's

8  Hospital as clinical administrator?

9  A.   For Mr. Hinckley?

10  Q.   Yes.

11  A.   I plan treatment team meetings.  I write his orders for

12  his WATP assignment, for his privileges on the grounds.  I

13  write letters to the Court.  I communicate with the providers

14  in (Name of City).  I visit -- well, I talk with his family

15  after his visits to (Name of City) in preparation for the

16  letters to the Court.  Coordinate various aspects of the team.

17  So, I serve as the -- I don't want to say team leader, but I

18  essentially coordinate the team.

19  Q.   And you mentioned in that response WATP, can you tell

20  the Court what that is?

21  A.   It's his work assignment.

22  Q.   On the grounds?

23  A.   Yes.

24  Q.   And do you do -- do you provide psychological services

25  to others in the hospital who are there or have been found to

1    be incompetent for trial or not guilty by reason of insanity?

2    A.    Yes.

3    Q.    And do you evaluate them for purposes of conditional

4    release or other privileges?

5    A.    Yes.

6    Q.    Now, with respect to -- do you evaluate them with

7    respect to considerations of dangerousness?

8    A.    Yes.

9    Q.    And how long have you been working with Mr. Hinckley?

10   A.    Since March of 2006.

11   Q.    And were you, since March 2006, on maternity leave?

12   A.    Yes, I was.

13   Q.    And what was the period of time that you were on

14   maternity leave?

15   A.    Since mid-February of 2008 until mid-May of 2008.

16   Q.    And excluding that period of time, did you meet with

17   Mr. Hinckley on a regular basis?

18   A.    Yes.

19   Q.    And are you familiar with his medical records?

20   A.    Yes.

21   Q.    Are you familiar with his treatment and history at the

22   Hospital?

23   A.    Yes.

24   Q.    And have you reviewed the reports of the doctors from

25   the Government, Dr. Patterson and Phillips?

1    A.    Yes.

2    Q.    And have you reviewed the reports of Mrs. Hinckley and

3    of course John Hinckley's siblings regarding his behavior

4    while on conditional release?

5    A.    Yes.

6    Q.    And have you reviewed Dr. Montalbano's 2008 risk

7    assessment update?

8    A.    Yes.

9    Q.    And are you familiar with his previous risk assessment

10   updates?

11   A.    Yes.

12   Q.    And are you familiar with the conditional release

13   request that is before the Court today?

14   A.    Yes.

15   Q.    Did you draft that?

16   A.    Yes.

17   Q.    And do you have an opinion with a reasonable degree of

18   psychological certainty whether, in the context of what is

19   before the Court, Mr. Hinckley will be dangerous to himself or

20   others?

21   A.    Yes, I do.

22   Q.    And what is that opinion?

23   A.    I do not believe that he would be a danger to himself

24   or others under the current motion before the Court.

25   Q.    And could you tell the Court the basis for your belief

1    in that regard?

2       A.   I believe that the motion is essentially -- well, let

3    me go back.  I believe that the evidence is clear that Mr.

4    Hinckley has successfully completed nine outings under the

5    last order and he has not posed any danger to himself or

6    others.  Insofar as we are looking to extend that by three

7    nights, we are including additional safeguards and supports

8    for him.  We are adding Mr. Beffa.  We are adding Reverend

9    Warren, who is an additional support in the community for him.

10            I believe that the current (e)motion allows for

11   sufficient support for him in the community.  I believe that

12   we are allowing him a reasonable amount of unstructured time

13   that is a slow and gradual progression that allows for

14   reasonable amounts of unstructured time in the community that

15   does not pose a risk to himself or others in the community.  I

16   believe that we have carefully weighed any consideration of

17   risk.

18            I believe that we have taken into consideration

19   Dr. Montalbano's risk assessment, and we have made sure that

20   there is no risk to himself or others under this (e)motion.

21      Q.   And did you consider all -- in forming that opinion,

22   did you consider all of the documents we've just identified

23   before that question was asked?

24      A.   Yes.

25      Q.   Now, you've testified that you have been involved in

1    his treatment, could you describe in that regard your

2    understanding of his degree of openness during the past year?

3    A.    I believe that Mr. Hinckley has shared with the team,

4    shared with Dr. Binks and Mr. Hyde, in particular, a lot of

5    information about his relationships with women.  I believe in

6    particular that he is much more open than he has been in the

7    past.  I believe that the term 'the blinds are open' is

8    particularly relevant here.

9          He is allowing his therapists to sort of take a

10   look inside and see what's happening, what his -- what some of

11   his concerns are when things are -- when he's being rebuffed,

12   when he has concerns in relationships, when he's confused

13   about a situation, he brings it to his therapists.  I was

14   particularly glad when he went to Mr. Hyde about his concerns

15   about canceling this hearing.  I think he's developed a strong

16   rapport with them, and I think that he uses his therapy in a

17   very constructive and positive way.

18   Q.    Has he shared with his therapists his feelings about

19   his father's recent illness, decline and death?

20   A.    Yes.

21   Q.    And, in your opinion, how has he coped with the grief

22   from that?

23   A.    I believe that he has weathered that very well.  I

24   think that he was saddened by it, but also relieved in some

25   regard.  I know that dealing with the death of a parent is

1   very difficult, particularly a parent who has a progressive

2   illness and a long decline.  I believe that he talked with his

3   providers about that.  Some of his issues he even was able to

4   work out through music with Mr. Hyde.  I think that there is

5   some natural tendency to feel down about that, and I truly

6   believe that he has been working that through in therapy.

7   Q.   What privileges does he have at the Hospital?

8   A.   He has what's call D privileges.

9   Q.   What does that mean?

10  A.   It means that he is allowed grounds privileges from

11  9:00 a.m. to 5:00 p.m. during what we would call Standard Time

12  and 9:00 a.m. to 9:00 p.m. during Daylight Savings Time.

13  Q.   What is he allowed to do on the grounds with D

14  privileges?

15  A.   There is no clearcut restrictions with the exception

16  that he must remain on the grounds.

17  Q.   Has he always remained on the grounds?

18  A.   Yes.

19  Q.   Does Mr. Hinckley participate in B-City?

20  A.   Yes.

21  Q.   What is B-City?

22  A.   B-City means that he is accompanied by a staff member

23  or the recreational therapy department to local outings.  So,

24  they might be museums or bowling or a local restaurant to

25  engage in recreational activities, but it's with the staff

1    members.

2        Q.    Has he consistently exercised his grounds privileges

3    and his B-City privileges in a responsible manner?

4        A.    Yes.

5        Q.    Has there been a search of his room?

6        A.    Several.

7        Q.    And found any contraband in the room?

8        A.    No.

9        Q.    You've indicated that he's never tried to elope or

10   escape from the Hospital.  Would it be difficult to do that?

11       A.    No.

12       Q.    Has he ever tried to escape from B-City?

13       A.    No.

14       Q.    In your professional opinion, and the fact -- is the

15   fact that he's never tried to escape from the Hospital either

16   while on privileges or on B-City a precursor as to whether or

17   not -- or is it significant as to whether or not he would in

18   the context of the proposal before the Court, that he would

19   seek to escape?

20       A.    I think it is significant.

21       Q.    What is the significance?

22       A.    Well, of course, you know as mental health

23   professionals we always say the best predictor of future

24   behavior is past behavior.  I think we look to how he's

25   functioning in the Hospital environment as an indicator of how

1    he will function in the community.  And then we allow small

2    exercises or, I'm sorry, experiments in the community, and

3    then observe his behavior and then we increase those

4    experiments on a gradual basis.  So, we have increased to a

5    certain extent.  He has made no attempt to escape.  And so now

6    we believe that it's appropriate to increase some more.

7        Q.   Does Mr. Hinckley have a job at the Hospital?

8        A.   Yes.

9        Q.   What is the job?

10       A.   He works in the library Mondays through Fridays.

11       Q.   Is he evaluated at the job?

12       A.   Yes.

13       Q.   And are you familiar with those work evaluations?

14       A.   Yes.

15       Q.   What kind of reviews does he get with respect to

16   reliability and performance?

17       A.   Ms. Pedrick his supervisor has consistently said that

18   he is a reliable, hard worker, that he's always willing to do

19   his work, that he's very talented in the library, that he's

20   consistent in his work.  She values him as an employee, and

21   she has even made an offer to take him on as what she calls a

22   regular hire.

23       Q.   What's the difference between a regular hire and the

24   job he has now?

25       A.   A regular hire would be someone who would be on the

1   regular payroll.  A regular hire would be entitled to regular

2   pay raises.  It could ultimately -- if he were to be released

3   from the Hospital, he would be a regular employee.  A WATP

4   assignment is not entitled to those kind of pay increases and

5   is looked at as more of a therapeutic assignment.

6       Q.   Let's talk about the conditional release visits that

7   he's had in the past since the past court hearing.  How many

8   have there been?

9       A.   There have been nine.

10      Q.   There were a couple of emergency ones?

11      A.   Two.

12      Q.   Of the ones logged by the Court, what was the length of

13  time of those visits, the duration of those visits?

14      A.   Six days.

15      Q.   Six nights?

16      A.   I'm sorry, six nights.

17      Q.   Seven days?

18      A.   Seven days.  I stand corrected, yes.

19      Q.   And then the emergency ones was one four-night and one

20  three-night?

21      A.   That's correct.

22      Q.   Now, let's talk first about the emergency visits.  With

23  respect to the first one, in your estimation, how did Mr.

24  Hinckley cope with seeing his father, what appeared to be on

25  his death bed?

1    A.    I believe he handled that appropriately.  He hadn't

2    seen his father, I believe, since December, and so there was a

3    significant decline in his physical health since the last time

4    he saw him, and he was shocked.  He described that there was a

5    pallor of death surrounding him and he was very surprised to

6    see him in that state.  And when he returned to the hospital

7    he was upset and angry that he had to return.

8    Q.    Well, was he clinically depressed by what he saw?

9    A.    He was not in a major depression.  He was upset and

10   grieving, but not -- he had not decompensated in a major

11   depression.

12   Q.    Did he sense that he had seen his father alive for the

13   last time?

14   A.    Yes, that was evident.

15   Q.    When you say he was angry and upset, what was the

16   cause -- to your knowledge, what was the cause of that?

17   A.    He did not want to leave his family at that time or his

18   father.

19   Q.    Was that an appropriate reaction to the circumstance at

20   the time?

21   A.    I believe so.

22   Q.    Was the visit to his father therapeutic?

23   A.    Yes.

24   Q.    Who told him the news that his father had passed away?

25   A.    I did.

1    Q.    And how did he handle that news?

2    A.    I believe he told me that he was upset but relieved.

3    We discussed the relief in the sense that his father wasn't

4    suffering anymore.  And the family knew that it was imminent

5    and that -- the way he described it, it was a long slow

6    goodbye.

7    Q.    Did there come a time when there was a second emergency

8    conditional release?

9    A.    Yes.

10   Q.    Was that to attend the funeral?

11   A.    Yes.

12   Q.    Did he attend the funeral?

13   A.    Yes.

14   Q.    Do you know how many people attended that funeral?

15   A.    I don't know exactly, it was approximately a hundred, I

16   would say.

17   Q.    And was the crowd that was there probably the largest

18   crowd of people with whom he has been associated in literally

19   decades?

20   A.    Yes, that's fair to say.

21   Q.    And was he sad?

22   A.    Yes.

23   Q.    Was his sadness, in your view, appropriate?

24   A.    Yes.

25   Q.    Did it go to the level of clinical depression?

1   A.   No.

2   Q.   Overall, as a result of these two emergency releases,

3   what did the Hospital learn of his coping skills?

4   A.   We gained data that he has -- he was resilient toward

5   that situation, that he was capable of maintaining -- not

6   relapsing into a major depression in the face of his father's

7   death.

8   Q.   Did it show considerable stability and strength?

9   A.   Yes.

10   Q.   Now, with respect to the regularly scheduled

11   conditional releases, those that were initially ordered by the

12   Court.  Are you familiar with them?

13   A.   Yes.

14   Q.   Did Mr. Hinckley take music lessons with Cabot Wade?

15   A.   Yes.

16   Q.   Did he see Dr. Lee?

17   A.   Yes.

18   Q.   Did he meet on occasion with Mr. Beffa?

19   A.   Yes.

20   Q.   Did he plan meals?

21   A.   Yes.

22   Q.   Did he shop for those meals?

23   A.   Yes.

24   Q.   Did he prepare for those meals?

25   A.   Yes.

1    Q.    Did he assist in the household?  Assist his mother with

2    other household chores?

3    A.    Yes.

4    Q.    Within the subdivision, if you will, where they lived,

5    did he exercise unaccompanied privileges?

6    A.    Yes.

7    Q.    Did he bond with his siblings?

8    A.    Yes.

9    Q.    And when his father was still alive, did he visit and

10   take care of his father?

11   A.    Yes.

12   Q.    Did Mr. Hinckley apply for volunteer positions?

13   A.    Yes.

14   Q.    And did he apply to a library?

15   A.    Yes.

16   Q.    And a local foundation?

17   A.    Which?  Can you be more --

18   Q.    The one -- I'm going to leave out the middle name, the

19         , then the name of the city, Foundation?

20   A.    Oh, you can't say that.

21   Q.    I can't say the name.  Maybe I should withdraw.  I'll

22   withdraw that one.  And there was a museum associated with a

23   local university?

24   A.    Okay.

25   Q.    Did he apply there?

1    A.    I believe so, yes.

2    Q.    And a humane society?

3    A.    Yes.

4    Q.    And was he rebuffed?

5    A.    Yes.

6    Q.    And, in your opinion, how did he deal with those

7    rebuffs?

8    A.    He was not happy about it, but again, he did not

9    decompensate.

10   Q.    Did he demonstrate -- is it an indication of his

11   resilience?

12   A.    Yes.

13   Q.    Another indication of his stability?

14   A.    Yes.

15   Q.    Now, over the course of this week -- you've been in

16   courtroom?

17   A.    Yes.

18   Q.    And you've heard the Government raise concerns about

19   the Salvation Army and what they characterized as an

20   appointment, do you remember that?

21   A.    Yes.

22   Q.    Was there a scheduled appointment?

23   A.    My understanding in speaking with Mr. Shamblee was that

24   there was no scheduled appointment.  Mr. Shamblee put the

25   Salvation Army on the itinerary because it's required to put

1    any event that's going to happen down there.

2       Q.   Or might happen?

3       A.   Or might happen -- onto the itinerary.  So, it was put

4    onto the itinerary because Mr. Shamblee told him to stop by

5    there.  Mr. Shamblee informed me that the Salvation Army did

6    not know that he was coming.

7       Q.   Did the Salvation Army know to expect him?

8       A.   No.  Now, so that you understand, at that time I was on

9    maternity leave, that's why I'm saying Mr. Shamblee told me.

10      Q.   You weren't part of that process?

11      A.   No, I was not.

12      Q.   Now, was Mr. Hinckley encouraged to go by or was he

13   required to go by?

14      A.   He was encouraged to go by, in the sense that he was

15   told that it was on the itinerary and it was something that

16   would garner more approval in the sense that he would be there

17   and show his face and they would know him better and possibly

18   help him get more -- what is the word I want to use here --

19   get more face time with them.  But my understanding was that

20   the person in charge there did not know he was coming or

21   expect him.

22      Q.   Now, did you have a telephone conversation with Mr.

23   Hinckley in the morning of the day when the Salvation Army

24   matter was on the itinerary?

25      A.   It was not the morning of.

1    Q.   It wasn't that morning?

2    A.   No.

3    Q.   When was it?

4    A.   I spoke with him the next day.

5    Q.   Okay.

6    A.   And we -- I called him to inform him of the contact I

7    had made with Reverend Warren.  And to tell him to call

8    Reverend Warren and establish contact with him.  And also to

9    tell him that to be sure to meet with Mr. Beffa on that visit.

10   And at that point he informed me that he did not go to the

11   Salvation Army appointment.  I asked him what happened and he

12   told me that he didn't have an appointment and that Scott came

13   in late and his mother was concerned, that she wanted to wait

14   for him, and he didn't go.

15   Q.   Do you regard him as being deceptive in that regard?

16   A.   I don't see that as deceptive, he told me what

17   happened.

18   Q.   You learned it from him?

19   A.   Yes.

20   Q.   He disclosed it to you?

21   A.   Yes.

22   Q.   Is that a manifestation, indeed, of his openness?

23   A.   Yeah, he told me what happened.

24   Q.   All right.  Now, with respect to that visit and

25   including that episode, did Mr. Hinckley in your opinion do

1   anything to suggest that he might be dangerous to himself or

2   others during the visit?

3       A.    No.

4       Q.    Did he do anything dangerous during the visit?

5       A.    No.

6       Q.    Now, did he do anything that would suggest to you that

7   he might elope in the future?

8       A.    No.

9       Q.    Did he do anything that might suggest to you that in

10  the future he might become dangerous?

11      A.    No.

12      Q.    In the view of the Hospital, did Mr. Hinckley comply

13  with all of the conditions set by the Court?

14      A.    Yes.

15      Q.    Now, was there -- with respect to all of these

16  conditional releases, any signs of decompensation or

17  deterioration?

18      A.    No.

19      Q.    Were there any incidents with the media, again, with

20  respect to all of these conditional releases?

21      A.    No.

22      Q.    Were all of these conditional releases, in the mind of

23  the Hospital, therapeutic?

24      A.    Yes.

25      Q.    In what way were they so?

1    A.   Well, first and foremost, when we're trying to

2    transition someone down there it's important that he have the

3    opportunity to actually go down there.  So, he needs the

4    opportunity to practice.  He needs to opportunity to go down

5    there, to practice being in that environment, to practice his

6    living skills.  They were therapeutic in the sense that he had

7    an opportunity to bond with his family, to spend time with his

8    father before his unfortunate death.  They're therapeutic in

9    the sense that they boost his mood.  We know that the primary

10   risk factor is depression.  So, to the end that they boost his

11   mood, they're important.

12   Q.   And they ameliorate depression?

13   A.   Yes.  We know that they're important and therapeutic

14   because he has an opportunity to go down there and benefit

15   from other experiences besides the Hospital.  So, he's

16   engaging in other opportunities like art lessons that he may

17   potentially start on this next conditional release.  He has an

18   opportunity to explore some of the sights down there that he

19   doesn't get to see here in D.C.

20         He has an opportunity to meet some of his other

21   relatives when they come for the holidays to spend Christmas

22   in his family's home.  Those are things that are therapeutic

23   for him.

24   Q.   All right.  You mentioned that he has an opportunity to

25   practice.  Is practice in this regard like practice in almost

1  any regard, that the more you practice the better you do?

2  A.   Yes.

3  Q.   And would you encourage the Court to allow a lot of

4  practice?

5  A.   Yes.   These are controlled experiments in freedom.

6  Q.   Now, are these, in your view, practice sessions, if you

7  will, that impose low risk of danger to others?

8  A.   Sorry, can you repeat that?

9  Q.   Are these practice sessions, if you will, are these

10  conditional releases which are ways of practice accomplished

11  with very low risk of danger to the community at large?

12  A.   Yes.   The Hospital feels that it's very important that

13  we manage risk, and we do everything in our power to try to

14  manage that risk.

15  Q.   Now, did these conditional releases further the goal of

16  reintegrating Mr. Hinckley into a community?

17  A.   I'm sorry, can you repeat that?

18  Q.   Did these conditional releases further the goal of

19  reintegrating Mr. Hinckley into the community?

20  A.   Yes.

21  Q.   And did they improve his relationship with his family?

22  A.   Yes.

23  Q.   Are there any aspects of his behavior during these

24  conditional releases that cause you a concern?

25  A.   No.

26

1    Q.    Now, let's talk about Mr. Hinckley's mental condition.

2    In your opinion, are the psychosis and major depression that

3    he suffered previously in full remission?

4    A.    Yes.

5    Q.    Does that mean that we don't see symptoms of those

6    conditions?

7    A.    We're not seeing symptoms.  If he gets rebuffed, we may

8    see transient reactions to feeling rebuffed, but that is a

9    natural reaction to a transient stressor.

10   Q.    Is the stress from a transient stressor an appropriate

11   reaction to the stress?

12   A.    Yes.

13   Q.    Now, with respect to the secondary diagnosis of -- or

14   the Axis II diagnosis of Narcissistic Personality Disorder,

15   are you of the view that that is still, as in the past,

16   significantly attenuated?

17   A.    Yes, I agree with that.

18   Q.    Do you have any reason to believe that Mr. Hinckley's

19   condition will deteriorate or that he will decompensate during

20   the course of the conditional releases that are the subject of

21   the proposal before the Court?

22   A.    No, I agree with Dr. Montalbano's testimony and the

23   Court's finding that it would take weeks if not months for him

24   to decompensate, and the additional three nights I don't

25   believe would increase the risk that he would decompensate

27

1    during that amount of time.

2    Q.   Do you believe that Mrs. Hinckley and John's siblings

3    have the ability to identify signs of decompensation during

4    the course of conditional release?

5    A.   Yes, I do.  I also believe that they identified it

6    years and years ago prior to the instant offense.  I think

7    that they would be --

8    Q.   They saw it?

9    A.   -- they would be well-aware.

10   Q.   Now, are you aware of whether or not Mr. Hinckley takes

11   medication?

12   A.   Yes, I am.

13   Q.   And is there any problem with his taking the

14   medication?  Does he do it as required by the Hospital?

15   A.   Yes, he does.

16   Q.   Let's talk about Leslie DeVeau.  Do you know Leslie

17   DeVeau?

18   A.   Yes.

19   Q.   Has Mr. Hinckley discussed with you developments that

20   occurred over the past year with respect to Ms. DeVeau?

21   A.   Yes.

22   Q.   And has he had contact with Ms. DeVeau?

23   A.   Yes.

24   Q.   Can you tell us about that?

25   A.   He contacted her last summer around the time that he

1   was having difficulty with Ms."M".  He called her and then I

2   believe he saw her.  They began to communicate more.  I know

3   that he remarked about how kind and consistent and supportive

4   she was.

5       Q.   And all of this occurred while he was at the Hospital,

6   is that correct, not on conditional release?

7       A.   Yes, that's correct.

8       Q.   Okay.

9       A.   I believe that having her around and particularly at --

10  it was happening at the same time that he was sort of having

11  an on again off again relationship with Ms."M", I think

12  allowed him to see the differences between those two

13  relationships.  And it was something that he was processing in

14  therapy with Dr. Binks and remarking on the differences

15  between the two.

16      Q.   Did the relationship with Ms. DeVeau come to an end?

17      A.   It did.

18      Q.   Tell us about that?

19      A.   It ended -- the last time they spoke was after his

20  father's death.  He called her to tell her about his father's

21  death.

22      Q.   She knew his father?

23      A.   Yes.

24      Q.   Now, did Dr. Binks have a view as to whether or not the

25  end of the relationship with Ms. DeVeau was a good idea?

1    A.    Dr. Binks believes that she is very supportive of Mr.

2    Hinckley.   That she is one of the few females that could

3    actually withstand some of the scrutiny inherent in his case

4    and in his life.   And that the lack of the relationship with

5    Ms. DeVeau leaves him vulnerable to some less desirable

6    relationships.

7    Q.    Does he regard the end -- or the legal predicament with

8    respect to Ms. DeVeau as very unfortunate for John's mental

9    health for therapeutic reasons?

10   A.    Yes.

11   Q.    Do you agree with that?

12   A.    I do.

13   Q.    Has the end of the relationship with Ms. DeVeau caused

14   any increased risk of violence?

15   A.    No.

16   Q.    In your opinion, should the Court order be changed to

17   allow Mr. Hinckley to have contact with Ms. DeVeau when he's

18   on conditional release?

19   A.    I do not think that would increase the risk.   I believe

20   that she has consistently provided support to Mr. Hinckley.   I

21   believe that she has consistently allowed him to consider

22   what -- I'm sorry, let me take that back.   I think that she

23   has consistently supported him, given him very healthy

24   support.   I think that allowing --

25

1    Q.   I'm sorry, I didn't want to interrupt you.

2    A.   Allowing the relationship to continue would probably be

3    more beneficial to him.

4    Q.   Do you know Ms."M"?

5    A.   Yes.

6    Q.   And has the relationship with Ms."M" ended?  Mr.

7    Hinckley's relationship with Ms."M" ended?

8    A.   Yes.

9    Q.   And do you know when he last spoke with her

10   approximately?

11   A.   I believe it was sometime late -- well, no,

12   December 15th.

13   Q.   December of last year?

14   A.   Yeah.

15   Q.   And before ending the relationship with Ms."M", did Mr.

16   Hinckley discuss with his therapist and other members of the

17   treatment team his relationship with Ms."M"?

18   A.   Yes, he discussed his relationship with Ms."M".

19   Q.   Did he speak to you about Ms."M"?

20   A.   Yes.

21   Q.   And were you aware of the physical intimacies with

22   Ms."M"?

23   A.   Yes.

24   Q.   And do you believe that Mr. Hinckley has been honest

25   with you about the changing nature of the relationship with

                                                                                        31

1   Ms."M"?

2      A.   He informed the team at a post visit interview in

3   August.  I remember him telling us about having the so-called

4   fondling privileges during that August post visit interview.

5      Q.   So, do you believe he has been honest with you with

6   respect to the relationship with Ms."M" and its ebb and flow?

7      A.   Yes.

8      Q.   Has the treatment team had the opportunity to observe

9   Mr. Hinckley and Ms."M" interacting together?

10     A.   The team, yes.

11     Q.   And how would you describe Mr. Hinckley's openness with

12  the team pertaining to his relationship with Ms."M"?

13     A.   I believe that he has been open with the team and

14  described elements of their relationship that -- okay, sorry,

15  I just lost my thought there.

16     Q.   Take your time.

17     A.   I believe that he has described -- the elements of

18  their relationship that we are aware of, we have gotten the

19  information from him.  So, as far as anything that we know

20  about the relationship we only know because of him.  So, I

21  believe that he has been open.

22     Q.   Now, has Ms."M" suffered from a mental illness?

23     A.   Yes, she does.

24     Q.   What is that?

25     A.   Bipolar disorder.

1    Q.    And does that mean her moods are volatile?

2    A.    Yes.

3    Q.    And her behavior is unpredictable?

4    A.    Yes.

5    Q.    Does it mean that her statements are inconsistent?

6    A.    Yes.

7    Q.    And that her statements are unreliable?

8    A.    Yes.

9    Q.    And has Ms."M" rebuffed Mr. Hinckley on certain

10   occasions?

11   A.    Yes.

12   Q.    And has she said hurtful things to others about Mr.

13   Hinckley -- to Mr. Hinckley and to others?

14   A.    Yes.

15   Q.    And has she said hurtful things about his family?

16   A.    Yes.

17   Q.    And has she called Dr. Phillips to make accusations

18   about Mr. Hinckley?

19   A.    Yes.

20   Q.    And how has Mr. Hinckley handled Ms."M"'s rebuffs and

21   behavior?

22   A.    He has not decompensated, he has been disappointed.

23   Q.    Appropriately so?

24   A.    Yes.  I would be disappointed if someone treated me

25   that way.  But he has not decompensated.  And, again, it has

1    provided additional data to allow us to look at how does he

2    handle the rebuffs in relationships.

3        Q.   Does it show him to be resilient?

4        A.   Yes, to a certain extent, yes.

5        Q.   Does it show him to be patient?

6        A.   Yeah.

7        Q.   Does it show him to be stable?

8        A.   Yeah.

9        Q.   Does it show him to be dangerous?

10       A.   No.

11       Q.   Now, as to Mr. Hinckley, did it provide a learning

12   experience for him?

13       A.   Yes, it did.

14       Q.   Did he write any songs about Ms."M"?

15       A.   Several.

16       Q.   And what does that demonstrate?

17       A.   I believe that demonstrates that he has been trying to

18   process his feelings with regard to her.  He's been trying to

19   work through some of his emotions regarding their break up,

20   regarding her mercurial nature.  I think initially when things

21   were good he was writing happy songs about their relationship.

22   I believe it demonstrates his willingness to look at his

23   emotions and his feelings and work them through music.

24       Q.   Does it demonstrate his empathy toward Ms."M"?

25       A.   To some degree.

1    Q.   To the extent that it does show empathy, is that a

2    positive development?

3    A.   Yes.

4    Q.   Have the interactions between Mr. Hinckley and Ms."M"

5    caused him to do anything violent?

6    A.   No.

7    Q.   Do you believe that because of the relationship with

8    Ms."M" that he has become more dangerous?

9    A.   No.

10   Q.   Do you know Ms."G"?

11   A.   Yes.

12   Q.   How did you learn about Ms."G"?

13   A.   Mr. Hinckley told me about her.

14   Q.   Now, how does Mr. Hinckley know Ms."G"?

15   A.   He contacted her.

16   Q.   When did he first meet her?

17   A.   He met her first at the Hospital.

18   Q.   And do you know how they became reacquainted?

19   A.   Yes, I believe that he called Information and got her

20   phone number.

21   Q.   And did a relationship develop?

22   A.   Yes.

23   Q.   Was it at first friends?

24   A.   Yes.

25   Q.   And then did it become more intimate?

1    A.   Yes.

2    Q.   And then did it go back to a friendship?

3    A.   Yes.

4    Q.   And with respect to all phases of this relationship,

5    did Ms."G" consent to it?

6    A.   Yes.

7    Q.   If she didn't want to come to have this relationship,

8    all she had to do was stay away from the Hospital, is that

9    true?

10   A.   That is true.

11   Q.   And if she didn't want to speak with him by phone, all

12   she had to do was not take his calls, is that true?

13   A.   That is true.

14   Q.   Now, the intimacy has been withdrawn, you have told us.

15   How has he coped with the loss of that intimacy?

16   A.   He's dealing with it.  He's not happy about it, but

17   he's dealing with it.

18   Q.   Is his reaction or the way he deals with it appropriate

19   in the context of the way it exists?

20   A.   Yes.

21   Q.   Does the relationship provide a learning experience for

22   him?

23   A.   Yes.

24   Q.   Does it give the Hospital another means or more data in

25   which to evaluate his behavior?

1    A.    Yes.

2    Q.    And has the risk of violence been heightened by the

3    fact of that relationship?

4    A.    No.

5    Q.    Let's talk about the May conditional release, the one

6    when there was a neighborhood block party, are you familiar

7    with that particular conditional release?

8    A.    Yes.

9    Q.    It occurred on May 13th through May 19th, is that

10   consistent with your memory?

11   A.    Yes.

12   Q.    Now, was that when you were returning from maternity

13   leave?

14   A.    Yes.

15   Q.    Did there come a time when you were interviewed by Dr.

16   Phillips?

17   A.    Yes.

18   Q.    And was that your first day back from maternity leave?

19   A.    It was my first full day back, yes.

20   Q.    Well, is there a distinction -- why don't you inform

21   the Court as to when you came back part-time and when you came

22   back in full time?

23   A.    I came back part-time in the middle of May, pretty much

24   just four hours a day for two weeks.  And then at the end of

25   May I came back full days for eight hours.

1    Q.   And the end of May, starting on May 28th, and that was

2    the first full day back?

3    A.   Pretty much.

4    Q.   And that was the day you met with Dr. -- you were

5    interviewed by Dr. Phillips?

6    A.   Right.

7    Q.   Now, at that time were you aware of what happened with

8    regard to Mr. Hinckley wanting to have Ms."G" attend the block

9    party?

10   A.   At that time I was not aware of that incident.  I was

11   still coming up to speed on a lot of the records.  I still had

12   a lot of information to come up to speed on, so, I didn't -- I

13   wasn't up to the May records yet.

14   Q.   Well, after your meeting with Dr. Phillips, did there

15   come a time when you inquired of the members of the treatment

16   team about the block party?

17   A.   Yes.

18   Q.   And what did you learn?

19   A.   I found out that the team members had met with Ms."G"

20   in April and that she -- and that they had informed her not to

21   go.  But prior to that I had found out that Mr. Hinckley had

22   wanted to meet -- well, he had informed Ms."G" about the block

23   party, and that then Ms."B" was also informed about --

24   Q.   Ms."B"?

25   A.   I'm sorry.

1    Q.   Ms."B".

2    A.   Ms."B" was also informed about the block party and she

3  also wanted to go, and then ultimately did not -- could not

4  go.  Subsequently, I was informed by Dr. Binks that they

5  discussed it in individual therapy.  And it's his therapeutic

6  style to not necessarily pass a judgment on it, but to sort of

7  explore it in therapy.  And then I was informed that the team,

8  the rest of the team, Mr. Shamblee and Dr. Green, ultimately

9  met with Ms."G" and told her that it would not be appropriate

10 for her to go.

11   Q.   Did Mr. Hinckley want his mom to meet Ms."G"?

12   A.   Yes.

13   Q.   And from your understanding of the facts, was his mom

14 happy to meet Ms."G" -- willing to meet Ms."G"?

15   A.   My understanding is that she did want to meet Ms."G",

16 and from what John had told me was that when he had told her

17 about the block party she didn't say no, she kind of said,

18 well, okay.  But he did sort of get a sense that she wasn't

19 really a hundred percent happy about it, but she never gave an

20 emphatic, no.

21   Q.   Is it your understanding that she was happy to meet

22 Ms."G", but her preference was not at the block party?

23   A.   Yes, that was the sense I got.

24   Q.   Do you feel that Mr. Hinckley was in any way dishonest

25 about his portrayal of the views of his mother or siblings

1  with respect to Ms."G"'s attendance to the block party?

2  A.   I felt like he was telling me the truth when he told me

3  that he got the sense that his mother really didn't want her

4  to go, but she never really came out and said no.

5  Q.   Do you know Ms."B"?

6  A.   Yes.

7  Q.   Now, Ms."B" -- is Ms."B" a friend of Ms."G"?

8  A.   Yes.

9  Q.   And was it Ms."G" that brought Ms."B" to the Hospital

10  and introduced Ms."B" to Mr. Hinckley?

11  A.   Yes.

12      THE COURT:  Maybe we should call him Mr."H".

13      MR. LEVINE:  We can do that but we know who Mr."H"

14  is.

15  BY MR. LEVINE:

16  Q.   Okay.  What is the nature of Mr."H"'s relationship with

17  Ms."B"?

18  A.   They are friends.

19  Q.   Does Mr. Hinckley's friendship with Ms."B" provide yet

20  another social outlet for Mr. Hinckley?

21  A.   Yes.

22  Q.   In that regard, is it a possible development?

23  A.   Yes.

24  Q.   And with respect to Ms."B", no intimacies -- I should

25  ask, are there any intimacies?

1    A.    No.

2    Q.    And does Mr. Hinckley's interactions with Ms."B" cause

3    any increased risk of violence?

4    A.    No.

5    Q.    Let's talk about Ms."K". Do you know Ms."K"?

6    A.    Yes.

7    Q.    Is Ms."K" the cousin of Ms."B"?

8    A.    Yes.

9    Q.    And was it Ms."B" that brought Ms."K" to the hospital?

10   A.    Yes.

11   Q.    And was it Ms."B" that introduced Ms."K" to Mr.

12   Hinckley?

13   A.    Yes.

14   Q.    And do you know the nature of the relationship with

15   Ms."K"?

16   A.    I understand that they are friends.

17   Q.    And does Mr. Hinckley's friendship with Ms."K" provide

18   yet another social outlet for Mr. Hinckley?

19   A.    Yes.

20   Q.    And does the Hospital regard that as a positive

21   development?

22   A.    Yes.

23   Q.    And does the interaction that he has with Ms."K" cause

24   an increase in risk of violence?

25   A.    No.

1    Q.   Overall, do any of these interactions with any of those

2    women cause Mr. Hinckley to pose a risk of danger?

3    A.   No.

4    Q.   In Dr. Patterson's report he refers to you using the

5    word 'stockpile' to describe women that he has met.  Do you

6    recall that?

7    A.   Yes.

8    Q.   What did you mean?  Did you use the word stockpile?

9    A.   I used an analogy in our interview.

10   Q.   What did you mean by that?  Explain the use of that

11   word, if you used it, and tell us what you meant?

12   A.   Sure.  What I meant in that was, I used the analogy of

13   a person who is starving, and so they feel the need to harbor

14   food and stockpile lots of food because they've been starving

15   in the past.  And so now they feel that they have to stockpile

16   food because they are afraid of starving again.  So, what the

17   stockpiling of the women would mean is that someone who has

18   been without relationships and is in a restricted environment

19   where there aren't women, would almost feel like someone who

20   has very strong affiliative needs, would feel as though they

21   were starving.  And so would then want to feel that there

22   would always be sort of back-ups or individual --

23   Q.   Are you troubled by the quantity at this time of these

24   women?

25   A.   I don't think that it increases danger.  I think it's

1   an -- that Mr. Hinckley does this because he fears being

2   alone.  I think he --

3   Q.   Is that his choice?  Is his choice to either have the

4   people who come and are brought to him by people who come or

5   to be lonely?

6   A.   I'm sorry.

7   Q.   Is it his choice -- is it his choice to either

8   associate with people who come to visit him and are brought by

9   others to come to visit him, or be lonely?

10  A.   Yeah.  I'm sorry, I don't understand your question.

11  Q.   Is it his choice either to associate with the women who

12  come to visit with him or if he rejects them, to be alone?

13  A.   Yes, that's correct.

14  Q.   That's the simple equation.  He can't go out and meet

15  others, can he?

16  A.   (Nodded affirmatively).

17  Q.   You're nodding but you have to verbalize your response?

18  A.   Yes, that's correct.  Sorry.

19        THE COURT:  Is there any significance to the fact

20  that all of these social interactions and relationships are

21  with women and none of them appear to be with men?

22        THE WITNESS:  You're asking me?

23        THE COURT:  Yeah, I don't care what he thinks.

24        MR. LEVINE:  I'm prepared to answer that, Your

25  Honor, even under oath.

1              THE WITNESS:  I do think that he does have certain

2    dependency needs to a certain extent, and women tend to be

3    more nurturing.  So, to that end, it's more of a tendency

4    toward women.

5              THE COURT:  I mean, I understand there are obvious

6    limitations by being in an institution, but there are other

7    patients, right?

8              THE WITNESS:  Yes.

9              THE COURT:  And when he goes out on B-City trips

10   with other people, I assume they are both men and women on

11   these trips or more than one --

12             THE WITNESS:  It's really just men.  There is only

13   two post-trial women in the whole hospital.

14             THE COURT:  So, is there any insight by you or your

15   colleagues as to why he hasn't developed relationships with

16   any of the men that he's come in contact with over the years

17   that we've ever heard anything about in any of these hearings

18   so far as I know?

19             THE WITNESS:  I do think that he prefers women to a

20   certain extent.  And, again, I think that women are less

21   intimidating to a certain extent, they're more nurturing.

22   They have certain qualities that he might feel more

23   comfortable with.

24             THE COURT:  I mean, again, when we're talking about

25   his history, and as you said, trying to predict the future

1   from events in the past, is there -- does this raise -- it

2   obviously raises a level of concern on the part of some

3   people, Dr. Phillips and Dr. Patterson, to use two examples.

4   But you and Dr. Binks and Dr. Montalbano and Dr. Green and Mr.

5   Shamblee and others spend a lot of time with Mr. Hinckley, is

6   this something that we all ought to -- to what extent is this

7   something to be concerned about, that it seems to be

8   exclusively or almost exclusively women that he's developed

9   relationships with?

10          THE WITNESS:  This has been an ongoing thing for

11  many years.  We have encouraged him over the years to develop

12  relationships with men.

13          THE COURT:  You said we have or have not?

14          THE WITNESS:  We have.  Yeah, we have.  He has a

15  very strong preference for women.  It's not entirely clear

16  why.  Again, the level of dangerousness that that indicates --

17  I don't see that as increasing danger, I just don't.  Insofar

18  as relationships with women was -- is considered a risk

19  factor, it's not the primary risk factor.  And if we look at

20  risk factors, there's a large body of research that describes

21  risk factors as being either static or dynamic, meaning that a

22  static risk factor is one that would not change and a dynamic

23  risk factor is being one that is amenable to intervention.

24          So, to the extent that relationships with women is

25  dynamic and is something that we're intervening by providing

1   him with therapy and by having the relationships and learning

2   from them.  And he's learning from them by talking with his

3   brother and with his family and getting the therapy, we're

4   trying to ameliorate it to a large degree.

5          THE COURT:  I guess what I'm trying to think about

6   as we look towards the future in transitioning in the

7   community, we think about other people in the community, and

8   if you look at -- I mean, I'm not a professional, so you may

9   disagree with this observation.  But if you were to take a

10  hundred men in the community who have never had that kind of

11  history that Mr. Hinckley had, you would find some men, I

12  assume, who only think of women as sex objects and romantic

13  interests and people they interact with at the workplace.  But

14  they have no genuine friendships or few genuine friendships

15  with women.

16         But there are lots of men, at least in my

17  experience, that view some women as romantic objects and also

18  have women friends just as they may have men friends.  There

19  are some guys that only like to hang out with the guys, but

20  there are other men that have platonic friendship

21  relationships with both men and women, and I think that's

22  probably normal.  But it's at least unusual, isn't it, and

23  keeping in mind the fact that you don't meet that many people

24  in the institution, I mean, that is a factor that we all have

25  to factor in when we talk about this and think about this.

1          But isn't it unusual for somebody who does have

2    some opportunities to meet people of both sexes to only have

3    relationships, friendships -- for a man, only to have

4    relationships and friendships with women?

5          THE WITNESS:  I think also it's important to keep

6    in mind the average patient at John Howard.  Mr. Hinckley's

7    Axis I diagnoses are in full remission.  And the patients

8    there are all pretty low functioning, it's very rare to find a

9    patient whose Axis I diagnoses are in full remission.  So,

10   there are very low functioning individuals there.  Any patient

11   that would be at Mr. Hinckley's level probably would have been

12   on some sort of conditional release at this point.  So, they

13   are not necessarily going to be at his level of functioning,

14   so it's awkward for him to interact at this stage.

15         Now, I'm not necessarily saying that there aren't

16   other opportunities to maybe make friends in -- well, even in

17   (Name of City) like, you know, there are have been reports

18   that there are not individuals his age.  Even when he went to

19   the SALT outing, everyone was very old.  And then he's got --

20         THE COURT:  That's another issue that we need to

21   think about, but that's a separate issue.

22         THE WITNESS:  Yeah.

23   BY MR. LEVINE:

24   Q.   But it's not unlike the current issue, in that

25   difficulty to meet these people is both at the Hospital and

1    elsewhere.  And it's even made more difficult by the fact that

2    there are requirements that he be with others whose presence

3    make it, you know, encumbers the ability to achieve this goal.

4              I was going to inquire of you, and I think you

5    offered it to the Court, Dr. Rafanello, about the functioning

6    of other people at the Hospital at or about his age.  Talk

7    about, first, the men.  Are there other men there who are

8    functioning on the same level as he?

9    A.   As I said, there's very few individuals as high

10   functioning.  I think there's one or two other individuals,

11   and he does have a couple of friendships with another patient

12   that's sort of high functioning, and that individual was

13   taking care of his cats for him for a little while.

14   Q.   This is --

15             THE COURT:  This is a male?

16             THE WITNESS:  Yes.  This is a male.  And now that

17   he's moved to a different unit, Mr. Shamblee's unit, there is

18   another individual there that has a guitar, and he's looking

19   forward to kind of interacting with some of the individuals on

20   that unit who seem to be a bit more high functioning.

21   BY MR. LEVINE:

22   Q.   The move to the other ward, to Mr. Shamblee's ward, may

23   create another opportunity to develop a useful relationship

24   with a male friend?

25   A.   Yes.  Because the unit that he was on, most recently

48

1  they had converted it to a medical unit and there were a lot

2  of geriatric patients on that unit, so it's totally -- that's

3  why he was moved, it was a totally inappropriate unit.

4     Q.   Is his interaction with other patients, male and

5  female, appropriate?

6     A.   Yes.

7     Q.   Is the rest of the hospital population by and large

8  suffering from active mental disease?

9     A.   Yes.

10    Q.   Let's talk about the conditional releases that are

11 planned, the ones before the Court.  Could you explain?

12         THE COURT:  How long do you think you're going to

13 be because at some point we might want to take a break?

14         MR. LEVINE:  Well, Your Honor, I think a half hour.

15         THE COURT:  Then why don't we take a break.

16         MR. LEVINE:  Thank you, Judge.

17         COURTROOM DEPUTY:  All rise.

18 BRIEF RECESS AT 11:00 A.M.

19                    AFTER RECESS

20         THE COURT:  Mr. Levine.

21         MR. LEVINE:  Court's pleasure.

22         THE COURT:  Sure.

23         MR. LEVINE:  Please the Court.

24 BY MR. LEVINE:

25    Q.   Dr. Rafanello, we are about to discuss or to inquire

1  about the conditional release proposal that is before the

2  Court.  Can you explain that proposal for these extended

3  freedoms?

4  A.   Yes.  We're requesting a series of 12 visits, 9 nights

5  and 10 days.  We are requesting that Dr. Lee be the covering

6  psychiatrist and Mr. Beffa perform in the role of a social

7  worker, and that would include case management as well as

8  individual therapy services.  We are requesting that Mr.

9  Hinckley be permitted to obtain a driver's license.

10         We are requesting that Mr. Hinckley be permitted

11  the opportunity to engage in a volunteer position there twice

12  a week for five hours.  We also are requesting, if necessary,

13  an additional hour for transportation.  We are requesting

14  three hours twice per week for specific social recreational

15  activities in the (Name of City) community.  We are requesting

16  two hours --

17  Q.   Are these unaccompanied?

18  A.   Yes, unaccompanied.  We are requesting two hours of

19  unaccompanied time within the (Name of Subdivision)

20  subdivision twice daily.  We are requesting that he be

21  permitted unaccompanied time within D.C. for a volunteer

22  position.  And we are further requesting that should the

23  volunteer positions change that there be some flexibility

24  inherent so that we could notify the Court in advance and be

25  permitted the opportunity to obtain another position, or if a

1   more suitable position might arise we be permitted the

2   opportunity to allow him the opportunity to engage in that one

3   as well.

4      Q.   Now, this proposal, at least with respect to the amount

5   of days, is more modest than the proposal that was set by the

6   Hospital to the Court last time we were before the Court.

7   You're familiar with that?

8      A.   Yes, that's correct.

9      Q.   Why is that?

10     A.   I think there are a number of reasons.  First and

11  foremost, we took seriously the Court's opinion from last

12  year.  We wanted to provide the Court with a far more detail

13  oriented motion.  We also wanted to make clear that we were

14  not in any way going to be cavalier about making sure that we

15  were safeguarding Mr. Hinckley and the community's safety.

16  And that we were going to move slowly and progressively in

17  transitioning him.  And so we thought that an extension of

18  three nights was very much a careful and safe movement.

19            However, I would add that, you know, based on Dr.

20  Montalbano's risk assessment, based on the data that we

21  obtained over the last year, based on the review of his

22  record, we believe that he would not be a risk even were we to

23  recommend a more extensive conditional release plan.

24     Q.   Such as the one you had before the Court last year?

25     A.   Yes.

1    Q.    Let's talk about the volunteer positions.  Is there --

2    I want to talk about the prospects and what is available in

3    the way of volunteer positions, do you understand that?

4    A.    Yes.

5    Q.    Now, do you know of an entity or an institution known

6    as Vibrant Life Ministries?

7    A.    Yes.

8    Q.    Does that ministry minister to the homeless?

9    A.    Yes.

10   Q.    Does Mr. Hinckley have an opportunity with -- or is

11   Vibrant Life Ministries an opportunity being pursued by the

12   Hospital?

13   A.    Yes, it was made aware to me that they are offering a

14   position to him to work in their thrift shop.

15               THE COURT:  Which shop?

16               THE WITNESS:  Thrift.

17               MR. LEVINE:  Thrift shop, Your Honor.

18               THE WITNESS:  Thrift shop.  They administer to the

19   homeless and they have two offices in local churches.  And

20   they are offering a job to him sorting clothes, stocking

21   shelves and working in the thrift shop.

22   BY MR. LEVINE:

23   Q.    And the stocking of the shelves may be stocking food in

24   the warehouse as well?

25   A.    Yes.

1              THE COURT:  That's near his mother's community?

2              THE WITNESS:  Yes.

3              THE COURT:  I just want to be clear as we go

4     through these, whether we're talking about there or here in

5     the D.C. community?

6              THE WITNESS:  No, this would be in their community,

7     his mother's community.

8              MR. LEVINE:  And I will try to make sure in my

9     question, when I'm going to move from that community, but I

10    think it's fair to say that all of this inquiry is about the

11    community where the mother's home is located.

12             THE COURT:  Fine.

13             MR. LEVINE:  The larger community, not the

14    subdivision, Your Honor.

15             THE COURT:  Got it.

16    BY MR. LEVINE:

17    Q.   Is there someone, to your knowledge, at the Vibrant

18    Life Ministries who is available to report to the Hospital

19    about Mr. Hinckley's work there?

20    A.   I believe so.

21    Q.   And how was this prospect found?

22    A.   Mr. Beffa has been exploring opportunities for Mr.

23    Hinckley in that community and came upon this one.

24             MR. LEVINE:  Court's indulgence for a moment.  I'd

25    like to have this document -- letter marked as the next

1    Patient's Exhibit, Your Honor.  I believe it's Number 7.

2              THE COURT:  I think that's right.

3              MR. LEVINE:  One to the Court, one to the

4    Government, Your Honor.

5    BY MR. LEVINE:

6    Q.   Dr. Rafanello, I show you what is marked as Patient's

7    Number 7 for identification, do you recognize that?  Have you

8    seen it before?

9    A.   Yes.

10   Q.   This is the letter dated July 21 to Carl Beffa.  What

11   does that letter provide?

12   A.   It indicates that Vibrant Life Ministries is a

13   Registered 501(c)(3) nonprofit organization, and that they

14   survive on volunteers to help them accomplish their mission,

15   and that they would be pleased to accept Mr. Hinckley as a

16   part-time volunteer.  It further indicates that they would

17   provide transportation to and from their facilities as needed.

18   Q.   And that is signed by the Founder and President?

19   A.   That's correct.

20             MR. LEVINE:  Now, move into evidence, Your Honor.

21             MR. ZENO:  No objection.

22             THE COURT:  It will be admitted.

23   BY MR. LEVINE:

24   Q.   Does Mr. Hinckley have other volunteer prospects in

25   that area?

1    A.    We have been pursuing volunteer opportunities.  There

2  is another opportunity that is still being pursued, Unitarian

3  Universalist Church is another one that might --

4    Q.    Well, let's talk about the Universalist Church, we'll

5  come back to more of them, okay?

6    A.    Okay.

7    Q.    Now, what would be his position at this Unitarian

8  Universalist Church?  It has, Your Honor -- I proffer to Your

9  Honor that in the name of that church is the name of the city

10  in which it is located.

11    A.    They are looking to reorganize their library, and so

12  they have indicated that they would be willing to offer him a

13  position helping them do that.

14    Q.    Does such a job in a library better suit his skill set?

15    A.    Yes.

16    Q.    And why is that?

17    A.    Well, he currently works in a library and has

18  demonstrated skill set in doing that, and I believe he enjoys

19  that kind of work.

20    Q.    That is the library at the Hospital in which he's

21  worked for close to six years?

22    A.    Yes.

23    Q.    And in this regard would the Hospital request from the

24  Court the flexibility to move him from one volunteer position

25  to one that better meets his skill set?

1    A.   Yes.

2    Q.   Now, is there someone at that church who is, to your

3  understanding, in a position to report to the Hospital about

4  Mr. Hinckley's work?

5    A.   Yes.

6    Q.   Now, how was this prospect found?

7    A.   Again, Mr. Beffa explored and identified this

8  opportunity as well.

9    Q.   And when did you learn about that opportunity?

10    A.   Yesterday.

11    Q.   Now, are there other potential volunteer opportunities?

12    A.   I am unsure of what other opportunities are available

13  at this point.

14    Q.   Well --

15         THE COURT:  Did Dr. Montalbano mention something

16  yesterday?

17         MR. LEVINE:  I was going to ask about Dr.

18  Montalbano's testimony.

19         THE COURT:  Go ahead.

20  BY MR. LEVINE:

21    Q.   Do you recall Dr. Montalbano's testimony yesterday

22  about this thing called        Services Board as being an

23  opportunity for Mr. Hinckley?

24    A.   Yes.

25    Q.   Now, is this the same        Service Board that Mr.

1    Shamblee had inquired about and said was unavailable?

2    A.   Yes.

3    Q.   And is this the same        Service Board that Dr.

4    Phillips visited and expressed and in his report expressed

5    surprise at Mr. Shamblee's conclusion because the

6    Service Board was readily available, according to Dr.

7    Phillips?

8    A.   Yes.

9    Q.   And to your knowledge, based on Dr. Phillips' portrayal

10   of the availability of the        Service Board, did Mr.

11   Beffa go back to it?

12   A.   Yes.

13   Q.   And as a result of Mr. Beffa's efforts revisiting the

14        Service Board, was a position offered to Mr.

15   Hinckley?

16   A.   Yes.

17   Q.   Was that -- is that the offer of an opportunity about

18   which Dr. Montalbano testified yesterday?

19   A.   Yes, there was an offer made by the director there to

20   work in the People's Place.  They did say that they would want

21   him to come down for an intake and that he could work

22   assisting with the art program in the People's Place and the

23   music program, and possibly doing bingo, maybe handing out

24   food.  And that has since --

25   Q.   In response to that offer did Mr. Beffa ask for a

1    letter from the          Service Board confirming the

2    existence of that position for Mr. Hinckley?

3      A.   Yes, he did.

4           MR. LEVINE:  May I have this document marked as

5    Patient's Number 8, Your Honor?

6           THE COURT:  Yeah.

7           MR. LEVINE:  Copy to the Government, Your Honor.

8    BY MR. LEVINE:

9      Q.   Dr. Rafanello, I show you what has been marked as

10   Patient's Number 8 for identification and ask if you can

11   identify that?

12     A.   It's a letter from          Services Board, it says

13   that they're willing to consider provision of services to

14   include emergency crisis services, case management and case

15   monitoring, psychosocial rehab services, possibly others,

16   including volunteer opportunity in People's Place psychosocial

17   program.  It says that they're willing to consider these

18   services, not a commitment, but that they would provide them,

19   after a thorough assessment, and they would need to understand

20   better the documentation and security expectations held by

21   representatives at the Federal Government.

22     Q.   Held by representatives by the Federal Government?

23     A.   Right.

24          MR. LEVINE:  Move this into evidence, Your Honor.

25          MR. ZENO:  No objection, Your Honor.

1          THE COURT:  It will be admitted.  This letter

2    basically says that they are prepared to serve as case

3    managers and provide case managers, case monitors, and provide

4    services to Mr. Hinckley, right?  Not that they are offering

5    him a job, Doctor?

6          THE WITNESS:  It says possibly others, including

7    volunteer opportunities.

8          THE COURT:  Right.

9          THE WITNESS:  Right.

10          THE COURT:  And this organization was referenced

11    in -- I can't remember if it was Dr. Montalbano or Dr.

12    Phillips' letter as somebody that would be available to

13    provide support services to Mr. Hinckley, but was not

14    discussed in that report as a source of volunteer work for him

15    to do, right?

16          THE WITNESS:  Correct.

17          THE COURT:  And this letter, if I'm reading it

18    correctly, says the same thing.  We will provide these

19    services and would consider possibly volunteer opportunities,

20    right?

21          THE WITNESS:  Yes.

22          THE COURT:  So, this is not a firm offer of a

23    volunteer position, is it?

24          MR. LEVINE:  You're going to hear from Mr. Beffa on

25    this point.

```
 1              THE COURT:  The letter is not -- the letter is not.

 2   I think that's clear from its face.

 3              MR. LEVINE:  Well, we're going to explain this

 4   more.

 5   BY MR. LEVINE:

 6    Q.   Now, did there come a time after Dr. Montalbano

 7   testified yesterday that        Services withdrew its offer?

 8              THE COURT:  Which offer?  I mean, we're talking

 9   about an offer for a volunteer job or an offer to provide

10   services?  What I have before me is a letter offering to

11   provide services.

12              MR. LEVINE:  Yes.  And that is -- Your Honor, I can

13   explain to you my understanding of this, which I think is

14   accurate.  That the services include the provision of

15   volunteer opportunities for people like Mr. Hinckley.

16              THE COURT:  The letter says:  Possibly others, if

17   deemed appropriate at a later date, including volunteer

18   opportunities in our People's Place psychosocial program.  So,

19   I read the word possibly and I read the word later date, so

20   the letter speaks for itself.  And if somebody has had a

21   subsequent conversation with them, then that person who has

22   had a subsequent conversation, whether it's Dr. Rafanello or

23   Mr. Beffa, can speak to it.

24              MR. LEVINE:  We're going to put this evidence

25   before the Court, Your Honor.
```

```
 1              THE COURT:  Okay.

 2              MR. LEVINE:  All right.

 3   BY MR. LEVINE:

 4   Q.   Now, did there come a time, Dr. Rafanello, after Dr.

 5   Montalbano testified yesterday that you learned that the

 6        Services Board -- the        Services Board, the

 7   very one that Dr. Phillips had said was readily available,

 8   became wholly unavailable?

 9   A.   I received a phone call from Mr. Beffa indicating that

10   they were withdrawing everything, any offer of any kind of

11   service.  And the only way they could use him was under

12   federal regulations if he named them as a provider under

13   Medicaid because they cannot refuse him under Medicaid.

14   Q.   Was the observation made by the         Services Board

15   that Mr. Hinckley was not a resident of the community?

16   A.   Yes, that is also -- well --

17   Q.   And that is exactly what --

18              MR. ZENO:  Can she finish her comment?

19              THE COURT:  Yeah, she was in the middle of a

20   sentence.

21              MR. LEVINE:  I'm sorry.

22              THE WITNESS:  I was just going to say that I

23   believe that's what is in the letter that you have there.

24              MR. LEVINE:  That's correct.  I'd like to have this

25   marked, Your Honor, as Patient's Number 9.  Copy to the
```

1    Government, Your Honor.

2    BY MR. LEVINE:

3        Q.    Dr. Rafanello, I show you what is marked as Patient's

4    Number 9 for identification, can you identify that?

5        A.    Yes, it's a letter from            Services Board.

6        Q.    That is dated yesterday?

7        A.    Yes.

8        Q.    And what does it advise?

9        A.    It says that they learned that he has never been a

10   resident of James County, and as a result, he does not qualify

11   to receive nonemergency services from our agency.  Best wishes

12   to you as you continue to work on his behalf.

13       Q.    Is this change in the            Services Board position

14   from the initial denial to Mr. Shamblee, followed by the

15   welcoming to Dr. Phillips and the welcoming to Mr. Beffa, and

16   then the flat out rejection of Mr. Hinckley, generally reflect

17   the Hospital's experience in trying to place Mr. Hinckley in a

18   volunteer organization?

19       A.    This is pretty much consistent with what we've

20   experienced in trying to find a volunteer position for him.

21   This is -- we've been getting all kinds of double talk.  Every

22   time we've tried to pursue something, we will get different

23   stories.  For example, with regard to Housing Partnerships, it

24   was just as recently as last Monday, Mr. Beffa in his

25   diligence went back there to submit an application.  I think,

1    you know, I'm sure that he has since read Dr. Phillips' report

2    in preparation for this hearing, but I don't know that he had

3    read the part that they indicated that they would not accept

4    him.  So, he went back there to bring an application and they

5    accepted it, after they had already indicated to both myself

6    and Dr. Phillips that they wouldn't take him.

7              So, instead of indicating that, you know, we've

8    already said that we can't take this individual, they are

9    still accepting applications.  So, what ends up happening is

10   either we continue to follow a lead that we believe is

11   possibly going to be fruitful, and then it's not, and we're

12   not always given consistent information about what's fruitful

13   and what's not.  And so this is one of the reasons that the

14   team has started to take more of a lead in pursuing the

15   volunteer positions on Mr. Hinckley's behalf because this has

16   become such a difficult community to break into.

17   Q.   Is this another example of the reason why the Hospital

18   requests the Court for deference and to allow it to have the

19   flexibility to pursue and assign volunteer positions?

20   A.   Yes.  It's just such a fluid and flexible situation.

21   It's been very difficult to try to find placement that is

22   willing to make a firm commitment.

23   Q.   Have you had, do you believe, Dr. Rafanello, that this

24   ever changing status of the availability of volunteer

25   positions relates in part to Mr. Hinckley's notoriety?

63

1    A.    Definitely.

2    Q.    And have you been told that institutions or facilities

3    that have at first accepted him later rejected him because of

4    ostensible anticipated problems in funding?

5    A.    Yes.

6    Q.    Just fear that they will loss their funding if they

7    accept this person?

8    A.    Yes.

9    Q.    And was there any way for you to have anticipated that

10   that would be a grounds for them to reverse their position?

11   A.    Well, initially, no, we did not think it would be easy.

12   Initially our goal as early as the last hearing was to have

13   Mr. Hinckley work with Mr. Beffa, very clear-cut steps to

14   obtaining a volunteer position.  And we talked about, you

15   know, a very concrete way -- what would be the steps to

16   obtaining a volunteer position.  You would make a resume.  You

17   would seek out the places.  You would go ahead and call some

18   of them.  And that was the plan.

19         In fact, Mr. Hinckley after the last hearing,

20   developed a resume with Ms. Pedrick, the librarian at the

21   Hospital, and a cover letter, and was very excited about it.

22   And under the last order in June, he went to the (Name of

23   City) -- sorry.  Went to the regional library there and

24   brought it there, and was very proud of that.  He scoped out

25   the library a little bit, he wanted to learn a little bit

1    about it so that he could answer some questions during the

2    interview.  And after all of that work, received a very terse

3    letter, basically saying, we don't have anything for you.  And

4    he was rebuffed and it was a rejection to him because he

5    worked very hard on it.

6              So, we thought, well, maybe it's just that place.

7    So, after that then -- shortly after that then the new order

8    came out and his father had to be moved to            .  So,

9    there was some down time there with the family really

10   readjusting to his father being in the Hospital.  And then in

11   October and November he met with Mr. Beffa and they went over

12   what some places might be.  Unfortunately, in December and

13   January his father's health really declined, and

14   unfortunately, his father passed in January.

15             In January Mr. Beffa came out with an extensive

16   list of volunteer sites as to where he would go and some of

17   the places he could look into.  There was no visit in

18   February, but in March he went to places that interested him,

19   like the Heritage Humane Society and the Salvation Army, both

20   places during that timeframe.  The Heritage Humane Society he

21   went there twice.  First he went there to pick up the

22   application, and then he went back during that same visit to

23   drop it off.  He was very interested in that site because of

24   his obvious interest in animals.  And at that time they again

25   rejected him.

1            So, the Salvation Army, he met with the person

2    there, she seemed cordial, he liked her.  It seems like that

3    was a go.  At that point then it seemed like we had that

4    place.  So then we were ready -- in May, of course, he had

5    that visit, he believed that he had the position.  Mr.

6    Shamblee had suggested that he stop by there again, kind of

7    show his face.  He believed he had the job.  So, other events

8    happened down at the family home and chose not to go back.

9            At that point then we went forward with the

10   (e)motion.  We believed we had the Salvation Army in place,

11   and then it disappeared.  So, now we're starting -- we started

12   to believe that, you know, maybe there are other issues.  So,

13   at that point we recognized that maybe we needed to stop going

14   from the front desk up the ladder, because as things moved up

15   the ladder, it seemed like higher level individuals were

16   saying no to Mr. Hinckley getting the volunteer position.

17           So, then we started to think that maybe we needed

18   to go directly to the directors.  And at that point I elicited

19   the help of Reverend Warren, who has a lot of contacts in the

20   community, and he was a resource in working against some of

21   the resistance in the community.  So, he identified a Reverend

22   Spellman over at Eastern State Hospital, and we looked into

23   the possibility of working at the library over at Eastern

24   State Hospital.  And then there were some issues about that

25   because of him being a federal case and that being a local

1    state hospital.

2              We looked into Housing Partnerships, again, I

3    think at that point I had spoken with a person at the front

4    desk and by the time it had gotten up the ladder it was nixed

5    as well.

6    Q.   So, first it was welcomed and then it was nixed?

7    A.   Exactly.

8    Q.   Did there come a time that you were told in these that

9    the reason it was being nixed is fear that it would interfere

10   with funding?

11   A.   Yes.

12   Q.   I hope I didn't cut you off, I may have, so --

13   A.   No.  No.  I mean, it just became clear that after

14   this -- it got to a point that he kept getting rejected, that

15   it was more than just -- it was a little more complex than

16   just the lack of initiative.  While there was some validity to

17   some of that and that we still need to continue to motivate

18   him and work on what we might call institutionalization, it's

19   far more complex than that.  We're dealing with an unwelcoming

20   community and we really needed to intervene -- that the team

21   needed to intervene at that point.

22   Q.   And is this still yet another reason why the Hospital

23   asks for the Court's deference in the flexibility to pursue

24   and accept certain opportunities that Mr. Hinckley -- or

25   assign certain opportunities for Mr. Hinckley to engage in

1    volunteer work?

2      A.   Yes.

3              MR. LEVINE:  Now, I was going to move on to another

4    issue, Judge, but sometimes you have questions in this regard.

5              THE COURT:  I was going to ask a question about the

6    volunteer opportunities in D.C., unless you're going to get

7    there.  Well, let me ask my question.  My question is this:  I

8    don't know how much experience there's been in exploring

9    opportunities in D.C. for volunteer activities, but are you

10   experiencing the same kind of problems here, or is it -- or

11   are you not?  And if you're not, is it because, A, the

12   Hospital has more experience placing people out -- placing

13   people in the D.C. metropolitan area; or, B, it's a larger

14   community; or C, Mr. Hinckley's notoriety is not such a

15   significant factor in the Washington, D.C. community; or D,

16   people are more sophisticated or less afraid about funding

17   issues?

18             Those are my issues, and it's not a very focused

19   question, but what is your experience and what is your

20   reaction?

21             THE WITNESS:  Well, let me preface it by saying,

22   I'm not a music person, so, I'm not an A, B, C, D person.  I

23   can just explain it to you.  Fortunately, Harbor Lights is a

24   place where Dr. Binks works part-time.  And so we really

25   didn't explore other places besides Harbor Lights, and that's

```
1    a go.  I think Dr. Binks' influence there or his presence
2    there has been a positive thing.  And because Dr. Binks is
3    there, he's able to work there.  That's not to say that, you
4    know, things change, unfortunately, that's just the nature of
5    life.  And, so, that's not to say that at some point that
6    might not, you know, change.  But for the current time our
7    information we have now -- I learned with these volunteer
8    positions to say, the information we have now indicates that
9    that is a go.
10             THE COURT:  Is there any -- one of the things that
11   I -- and I don't mean to move into another topic, but one of
12   the things that is of concern, I think, is that -- as we've
13   over the years talked about his mother's community, we've
14   really been talking about the immediate community.  And now as
15   we're thinking about volunteer activities and other kinds of
16   activities, you're looking at the -- everybody is looking at
17   the broader community outside the immediate area in which she
18   lives.
19             And some of what I've read in Dr. Phillips' or
20   Patterson or both or maybe even Dr. Montalbano's, is that as
21   he's experiencing the broader community, or as you and the
22   support people down there are trying to, you're finding that
23   it may not be as welcoming.  And so then in terms of the long
24   term, I'm really going far afield from the volunteer -- in
25   terms of the long term, I guess there are three options:  That
```

1    community, the D.C. metropolitan community or Dallas.  Dallas

2    seems to have been taken off the table.

3            And Mr. Hinckley's connection to all of these

4    communities, I mean, 25 years ago is the last time he had a

5    connection to anything other than St. Elizabeth's.  So, given

6    this experience you're having in finding a volunteer

7    organization, given his mother's age, given what his brother

8    and sister have said about Dallas, are we focusing on the

9    right community when we're focusing on the broader community

10   outside the four walls of his mother's immediate community?

11   That is a big question.

12           THE WITNESS:  I think that's the reason why we felt

13   that it was important to have something in D.C. in this

14   (e)motion.  We felt that it wouldn't be prudent to leave that

15   out.

16           THE COURT:  Again, this is a very big question, but

17   all of these things come in together.  You said awhile -- we

18   talked about the problems of finding volunteer work for him in

19   that community.  We heard from his sister two days ago about

20   his experience at SALT and the people there were a lot older.

21   I think you made the point an hour or so ago that -- when we

22   were talking about women versus men, that that community is an

23   older community.  And yet over the last several years we've

24   heard that Mr. Hinckley feels comfortable in that community,

25   but -- and that's where he wants to be.  But the question is,

1    and you may not have an answer, nobody in this room may have

2    an answer.  But the question is:  Given his mother's age,

3    given the age of the community generally, given the experience

4    you're having finding volunteer activities, is that ultimately

5    the right community for him to transition into?  And will he

6    feel as comfortable there as his mother gets older and less

7    involved, and presumably will pass away before Mr. Hinckley

8    passes away?

9           And the reaction you're getting from the broader

10   community and the age of the community.  D.C. is a more

11   diverse community in lots of ways.  I don't know that -- this

12   may be a rhetorical question, but if you have any thoughts or

13   observations or if any of the professionals who are going to

14   testify do, I think it's something that needs to be thought

15   about deeply and explored, whether now is the time to do it or

16   going forward is the time to do it, I don't know.

17          Those are some of the things that have been

18   bothering me as I read the doctors' reports and as I listened

19   to the testimony the last couple of days.  You know, Scott

20   Hinckley and Diane Sims are still going to live in Dallas.

21          THE WITNESS:  Well, I do think that it certainly

22   would be easier to transition him to D.C.   I mean, the

23   resources are here as far as the mental health professionals.

24   The Hospital is here.  We have an outpatient department here.

25   The question of, you know, what we've been doing and how we've

1    been transitioning him to (Name of City) is because I think

2    Mr. Hinckley likes being in his mother's home, likes visiting

3    his family, being with his family.  But we have been trying to

4    be diligent in trying to put something in D.C. in the

5    (e)motion in the past two hearings, so that if there is some

6    untimely incident that there is at least something in place so

7    that we can go down that route if necessary.

8            THE COURT:  Let me just make one other comment.

9    I'm not sure that the context of this hearing is necessarily

10   the best place to explore this in depth, but it would seem to

11   me that you and the treatment team and Dr. Binks and others

12   ought to be talking to John about various other options going

13   forward, and seeing what he thinks, and what you together

14   think.  I don't want my comments to be driving what's best in

15   the long term for Mr. Hinckley.

16           MR. LEVINE:  Your Honor, if I may make this

17   observation as this has evolved into something of a

18   discussion.  It in large part turns on the vigor of the

19   Government's opposition.  You know, the Government is

20   steadfastly opposed.  I mean, if they were to embrace this

21   idea, to work with us in this regard, this would make it far

22   more easy to achieve.

23           THE COURT:  The D.C. option?

24           MR. LEVINE:  All these options.  I mean, if they

25   didn't file papers like they filed.  If it didn't result in

72

1   media attention that it gets, all unopposed, it wouldn't

2   generate the inhospitability that we have been enduring.

3          THE COURT:  That may or may not be so.  I mean, I

4   think it was not a wise thing for them to do that, clearly

5   that engendered the particular newspaper article.  But John

6   Hinckley is still John Hinckley, and it may just be that some

7   of these organizations when they hear his name, whether there

8   had been a newspaper article or not are going to react.  And

9   my only question is whether or not that would be as true in a

10  bigger or more diverse community.

11          And I'm not suggesting this is the time or place to

12  resolve this, but people who -- I mean, I assume there are

13  lots of things that are discussed in therapy and in treatment

14  and in conversations.  And I don't know whether -- again, I

15  don't want what's best for Mr. Hinckley's life in the long

16  term to be driven by the strictures of particular things in a

17  Court order, or particular language, or a particular

18  predictions or predispositions that we have.  And it may be

19  that his mother's community maybe -- maybe he would even think

20  that's not the best community.

21          I know he feels comfortable in his mother's home,

22  but his father is not there, his mother is not always going to

23  be there.  Maybe there are other options that he ought to

24  think about and that the treatment team ought to think

25  about -- wait a minute, just by way of analogy I made the

1    comment yesterday that -- I asked the question yesterday,

2    whether or not people think -- and we know what Dr. Binks

3    thinks -- that stopping the relationship with Ms. DeVeau was

4    the best thing for him.  And my question was:  If it weren't

5    for my Court order saying he shouldn't have contact with her,

6    would people have a different view about whether it was a good

7    or bad thing?

8         Do the doctors think it's a bad thing, period,

9    exclamation point?  Or it's a thing of concern, but not

10   necessarily bad, but it's hard to get clarity and full

11   information if she won't participate.  But is that in and of

12   itself, you know, a deal breaker, if that would be better than

13   some of these other relationships that are now causing

14   concern?

15        I mean, I'm just suggesting that as we go forward

16   here that people ought to be flexible and creative and open

17   into thinking about options and discussing options with Mr.

18   Hinckley, because his ultimate goal and your ultimate goal,

19   and the Hospital's ultimate goal, I think, after 25 or 26

20   years, is that he be back in a community with as few

21   restrictions as possible or no restrictions or, I don't know,

22   I don't know whether unconditional release always means --

23   what unconditional means.  Is there some ongoing relationship

24   that the Hospital has with patients who have been

25   unconditionally released?  Are there some people that there's

1    always a relationship with?

2           But if the ultimate goal is something beyond coming

3    back to court every year and discussing whether it should be

4    six visits or eight visits or 90 minutes unaccompanied or two

5    hours or something different, shouldn't everybody be thinking

6    about whether or not this community is the best thing.

7    Whether others might be what.  How will John Hinckley be

8    most -- how and where will he be most self-sufficient.

9           I don't want to be crass about this, but his mother

10   is going to die some day.  And I'm saying this today and she's

11   not here this morning, I wouldn't say that yesterday.  And

12   we've lost parents, we know, we understand, we've all been

13   through that.  And I think -- what I think is quite positive,

14   from what I've heard, is the fact that Mr. Hinckley has dealt

15   with his father's death the way most people would deal with a

16   death of a parent, or so it seems.  I haven't heard from Dr.

17   Phillips or Dr. Patterson yet, but I don't think their reports

18   suggest anything other than that, and that's a positive thing.

19   So, someday he's going to lose his second parent, just as we

20   have.

21          And so is he still going to be as comfortable and

22   as happy in that community then with his brother and sister in

23   Dallas, or are there other options that ought to be explored.

24   The answer may be yes, maybe that's where he wants to be

25   regardless of whether the circumstances change.  But I would

1    hope that the treatment team and the Government experts, too,

2    to the extent that they are involved at least once a year, and

3    Scott Hinckley and Diane Sims all think about, you know,

4    without the strictures that these proceedings have placed on

5    all of us, what is really best in the long run, and how do we

6    get there in the short term.  Rather than just saying we're

7    focusing on this goal only and that we should never deviate

8    from that.

9            So, my example is the mother's community versus

10   other alternatives.  My other example is Ms. DeVeau versus

11   other alternatives, and we've seen the --

12           MR. LEVINE:  We've seen them.

13           THE COURT:  And some of them may be positive

14   relationships, some of them clearly -- at least one of them I

15   think clearly is not.  The others might or might not be,

16   depending upon the nature of it.  You know, I just think we

17   ought to be open to -- without going back to square one, but

18   open to a variety of possibilities in the long term, and

19   that's not a question, and I don't know that it would be

20   necessarily prudent sitting on the witness stand to ask you,

21   given the careful way that professionals like you normally

22   approach things, that it might not be prudent to ask you to

23   just react to those comments.

24           And maybe upon reflection you or Dr. Montalbano or

25   Dr. Patterson or Dr. Phillips will say, you know, the Judge

1    doesn't know what he's talking about, he's not trained, and

2    these are stupid comments.  But I suspect they are not all

3    stupid comments.

4            MR. LEVINE:  Your Honor, in this regard, I think

5    your observations are, of course, very sound.  I think it

6    reflects the sense of urgency to get on with these proposals

7    and to expand these liberties now.  We cannot afford to wait

8    if we're going to have his mother celebrate some nation of --

9    some concept of freedom.

10           I also want to remind the Court that the last time

11   we were before it that there was a proposal about D.C., I

12   think it was the last time, it might have been the time

13   before, and it was Dr. Patterson speaking for the Government

14   who thought it to be a nonstarter.  It got condemned out of

15   the box.  Now, the Hospital, just like Mr. Hinckley, learns

16   from these experiences, they adjust in light of what the

17   Court's orders are.

18           If the Court -- I, for one, really welcome the

19   observations that all of us should be flexible, creative and

20   open, I believe those were the words used by the Court.  They

21   are exactly right.  But what we have seen, however, is the

22   incessant, unalterable, vigorous opposition to everything, and

23   when time -- when there's been a very successful performance,

24   a therapeutic performance, a highly beneficial performance, an

25   exquisite performance on all of these conditional releases,

1   the Government's position is, stop them all now.

2              One of the problems we had with respect to the two

3   emergency releases, why there were two rather than one.  When

4   he went down to see his father in his final days, the

5   Government insisted that it couldn't be extended another day.

6              THE COURT:  I think it was the Hospital, frankly,

7   through Ms. Sapp.

8              MR. LEVINE:  I think not, Your Honor.

9              THE COURT:  I think so.

10             MR. LEVINE:  Well, it is -- the record is what it

11  is, but whatever Ms. Sapp said, I do know that the Government

12  opposed it -- extending it even a day.  And the additional day

13  was the day that the father died.  And that's the kind of

14  stress that is imposed in this process by a position that I

15  think is really misplaced.  The law requires -- requires the

16  Government to join us and the Court to put this patient in the

17  least restrictive environment consistent with public safety,

18  and the Government never does that.

19             THE COURT:  If you're done, I think Mr. Zeno is

20  entitled to the right of rebuttal.

21             MR. LEVINE:  I have more questions, briefly.

22             THE COURT:  I know.

23             MR. ZENO:  I would propose we put off argument

24  until we have all the evidence.  The Government has evidence

25  on these matters and we are looking forward to getting to our

1    evidence.  If you would like some argument now I will --

2              THE COURT:  No, if you want to react to what Mr.

3    Levine just said or what I said, it's -- since we've taken a

4    little bit of a diversion, Dr. Rafanello --

5              MR. ZENO:  This is nonjury.  Your Honor, the

6    Government has thought very carefully about this and we intend

7    to ask, particularly, Dr. Phillips who has gone into great

8    detail, based on his experience as the head of a hospital, who

9    has had to place people in the community.  He has thought

10   about a lot of these issues and he has very careful thoughts

11   that he's willing to share with the Court.

12             This is a very difficult process.  The Government

13   is aware of it.  These controlled experiments are experiments.

14   And, Your Honor, the Government is not seeking to stop driving

15   lessons, volunteer activities, social activities.  We want the

16   controls in place, and that's what our discussion is about,

17   and that's why we're so concerned, because the controls aren't

18   there.

19             THE COURT:  I understand that.  One of the things

20   that has struck me over the years, and I understand Mr.

21   Levine's argument that the Government opposes everything, but

22   the fact of the matter is, one of the things that struck me

23   over the years is that if one carefully reads Dr. Phillips'

24   and Dr. Patterson's reports, my guess is that you may not --

25   you might have wished in some respects they reached different

1   conclusions on some points.  But if one reads their reports

2   every time, they don't disagree with the Hospital about

3   everything, they embrace some of what the Hospital recommends.

4          They seek modifications of some of what the

5   Hospital recommends.  I haven't gone carefully through and

6   made a comparison of the (e)letter in the last couple of days

7   and their reports.  But if you read the last couple of pages

8   of Dr. Patterson's report, and once you get beyond the number

9   of days issues, there are an awful lot of things in the

10  (e)letter that he agrees with or agrees with with some minor

11  modification.  Now, Mr. Levine may think they are major

12  modifications, but you know, so I take your point that --

13         MR. LEVINE:  Your Honor, if I may make a brief

14  comment.  It doesn't seem to matter to the prosecution what

15  the positions are of the experts.  It doesn't matter what the

16  Hospital's view is.  Nor does it seem to matter what the views

17  of Dr. Patterson or Phillips say.  They take the position,

18  without any facts to support it, that they're opposed to

19  everything.  Motion should be denied.  No alternative

20  proposal.  No creative thinking.  No open mind.  No

21  flexibility.  Just deny it.

22         And that, Your Honor, has been the hallmark of the

23  Government's case, and that, Your Honor, has been what I would

24  regard as the centerpiece of our problem.

25         THE COURT:  Well, I'm not sure that is the

1    centerpiece of the problem.  I think that these are hard,

2    difficult, complex things, and the treatment team has worked

3    very hard.  There have been issues that have arisen.  The

4    whole issue with Ms."M" last year threw a monkey wrench into

5    everything.  And, you know, there have been other things that

6    have arisen, some have been significant, some have been not

7    significant, some need to be explored by the treatment team.

8            And, you know, I think from everything I've read

9    and heard, it's really -- I think, again, I can't keep --

10   because I don't think anybody is getting paid by the page, but

11   there is a lot of -- these reports are lengthy.  And I can't

12   remember whether Dr. Phillips or Dr. Patterson said this in

13   their report, but at some point one of them said to Mr.

14   Hinckley, you know, you've gotten some of the best treatment

15   that anybody has ever gotten from the Hospital.

16           And it's clear when you listen to Dr. Rafanello and

17   Dr. Montalbano and read about Dr. Binks and hear from Mr. Hyde

18   that there's a lot of good stuff that's happened, you know.

19   But, on the other hand, Mr. Hinckley is frustrated, he's been

20   there a very long time.  He's 53 years old and he wants more

21   freedom and he want more privileges.  Anyway --

22           MR. LEVINE:  As Your Honor has observed, on the one

23   hand there have been those from the witness stand from the

24   Government who have praised the quality of the services

25   provided by the Government, and those very same people condemn

81

1    the Hospital for what it asserts, we think unfortunately as

2    inadequate planning.

3              THE COURT:  Well, I was one of those a year ago in

4    an Opinion who criticized the Hospital for inadequate

5    planning.  And, you know, it is what it is, and that was my

6    conclusion a year ago.  I think it was a year ago.  And, you

7    know, this is -- it's a moving target and very fluid in many

8    respects.  Some things happen in Mr. Hinckley's life that

9    creates issue that some people think need to be explored.

10   Some things happen in the broader community that -- the fact

11   that there have been some evolution of volunteer opportunities

12   just since this hearing began on Monday, and different

13   explanations for why.

14             These are things that, you know, you and Mr. Zeno

15   and Ms. Chasson are going to -- and I have been exploring with

16   the witnesses and ultimately I'll have to evaluate it.  Let me

17   ask you -- it's 20 after 12:00 and we got off on a tangent and

18   it's my fault that we got off on a tangent.  Does it make

19   sense to stop now or do you want to finish with your direct?

20             MR. LEVINE:  Well -- Court's brief indulgence.  I

21   can finish this, Your Honor, in five to ten minutes.

22             THE COURT:  That's fine.  If you think you can

23   finish in five or ten minutes then we'll take a break, and

24   then Mr. Zeno or Ms. Chasson can examine after lunch.

25             MR. LEVINE:  Thank you, Your Honor.  If it please

1    the Court, Dr. Rafanello.

2    BY MR. LEVINE:

3      Q.   In the Hospital plan there is a proposal for him to be

4    afforded the opportunity to take driving lessons and

5    unaccompanied time in that regard, do you know that to be the

6    case?

7      A.   Yes.

8      Q.   What are the value of these lessons to Mr. Hinckley?

9      A.   I believe that it will give him an opportunity to

10   relieve his family to a certain extent with some of the

11   driving.  I mean, although he's still going to be accompanied,

12   you know -- for example, think of when his father passed,

13   Scott had to do all the driving back and forth, back and

14   forth, so at least he could be one of the drivers.  So, in

15   that regard, you know, that's assistance.

16              But it's also an important step in transitioning

17   him.  So, we're doing the controlled experiment, so, the first

18   step is getting the license and drive with a responsible

19   person.  And then if he can demonstrate a responsible driving

20   record, prove that he's done well with that, then he could

21   move to driving independently, which would then allow him

22   greater freedom, give the family a lot more opportunity to

23   free up some of their time.  So that during his independent

24   free time he would be permitted to drive independently.  So,

25   it's, again, an opportunity for him to practice some more

83

1   increased freedom.  And, again, the goal is to transition him

2   back into the community and do things that people -- I don't

3   like to use the word, but normal people do.

4     Q.   He would be able to -- were he to perform adequately --

5   do his own shopping?  Get in the car, drive to the grocery

6   store, buy the food, and return to the home without a

7   responsible person, were he to merit that in the Hospital's

8   view?

9     A.   Well, that would be something further down the road,

10  that's not proposed in this (e)motion, but --

11    Q.   It would evolve to that?

12    A.   Potentially.

13    Q.   And that would be the objective?

14    A.   Yes.

15    Q.   And would he be able to then also drive himself to and

16  from his job?

17    A.   Potentially, yes.

18    Q.   All right.  Now, we've talked about the objective to do

19  volunteer work.  How would doing volunteer work help to

20  develop reentry skills?

21    A.   First and foremost, it's important for Mr. Hinckley to

22  be engaged in productive activity.  And he -- again, we're

23  looking to transition him into the community and to do things

24  that ordinary people would do.  And I don't like the word

25  ordinary, but we're looking to get him back into the community

1    so that he's doing -- having an ordinary day.  Getting up,

2    having breakfast, going to work, coming home, spending time

3    with his family.  It's amazing how much we take that for

4    granted, but that isn't necessarily something that individuals

5    at the Hospital get an opportunity to do.

6            I mean, they go to a work assignment, but it's

7    not the same thing when it's out in the community.  And then

8    another thing that the job would do would give him an

9    opportunity to socialize with individuals in the community.

10   His work assignment -- he's not really getting an opportunity

11   to socialize, he's not engaging in interpersonal relationships

12   of any nature.

13           When people go in the library there they are more

14   or less kind of just doing their work-related activities, and

15   he doesn't really engage in any kind of social interaction

16   there.  So, it's another opportunity for him to establish

17   relationships in a more ordinary way.

18   Q.   Now, in the past there have been itineraries supplied

19   by the Hospital to the Court in contemplation of each of these

20   conditional releases, is that right?

21   A.   That's correct.

22   Q.   Now, what role should Mr. Hinckley have in the

23   preparation of those itineraries?

24   A.   He's been developing the itineraries pretty much since

25   the last hearing under our guidance.  You know, we will

85

1    approve them, we'll refine them, we'll work with him on them,

2    but he's pretty much been developing them.

3        Q.    How detailed, in your view, should those itineraries

4    be?

5        A.    I think it's useful to have some degree of flexibility

6    in the sense that it's important that the Court be aware of

7    where he's going, what the important things are that he's

8    doing.  And certainly the Secret Service needs to know where

9    he's going to be, and we wouldn't want to interfere in that

10   regard.  But it's useful to be able to allow for some degree

11   of flexibility with regard to what he's -- what the activities

12   are.

13              For example, I don't think it's necessary to go

14   into the detail of the types of stores and things that he's

15   going to.  I mean, there are certain stores that he frequents

16   pretty consistently, and I know that we've always been

17   required to kind of put the address and the phone number, and

18   I'm not sure that all of that is always necessary.

19       Q.    In your view, should the itineraries be -- going

20   forward, as detailed as the itineraries have been looking

21   backward?

22       A.    I'm not sure I understand the question.

23       Q.    Should the itineraries and the -- that would be used in

24   the contemplated or the proposed conditional releases be as

25   detailed as the ones that have been offered to the Court thus

1  far or should it be less detailed?

2      A.   This is not something that we've requested in the

3  (e)motion, but certainly it would be something that would make

4  my life easier, but also something that would make things more

5  convenient for the family.  I know that they have talked

6  about, you know, it's sometimes easier for them if they can

7  shuffle certain things around, but because they are on the

8  itinerary they feel sort of locked into a schedule.

9      Q.   Well, let's talk about both of those things.  First in

10  terms of making life -- giving them the flexibility.  Is that

11  more approximating to what happens in real life, that people

12  have to change their plans given a host of factors, such as

13  you may plan to take a hike and it may rain that day, that

14  would change the plan.  Do you need the flexibility to be able

15  to change the plan?

16      A.   Yes.

17      Q.   And in terms of making your life easier, would that --

18  were there to be less detail required, would the -- both in

19  the itinerary and in the report to the Court, would that

20  enable the Hospital to make the outings more frequent?

21      A.   Yes.

22      Q.   Would that have a therapeutic benefit to Mr. Hinckley?

23      A.   Yes.

24      Q.   Now, why does the Hospital propose greater

25  unaccompanied time both in and outside of the community in

87

1    which the house is located?

2    A.   We believe that it's the next logical progression.  Mr.

3    Hinckley has successfully completed nine visits to the

4    family's community, and we'll start with the walks in the

5    subdivision.  They have been un -- I don't want to say

6    uneventful in the sense that they're not uneventful for him,

7    but what I mean to say is that they are without incident.

8    With regard to the unaccompanied time in the community, it's

9    time to break out of the (Name of Subdivision) bubble, which

10   is the expression that has been used.

11   Q.   Bubble of that community?

12   A.   Right.  Right.  He needs an opportunity to go out into

13   the community on an independent basis.

14   Q.   And do you believe that these unaccompanied times in

15   and outside of that community have therapeutic benefits?

16   A.   I do.  I think unless we allow him an opportunity to go

17   out independently -- there's a couple of things attached to

18   that.  Number one, we can't know that he's not going to be

19   successful in that situation unless we allow him the

20   opportunity to kind of do it and give him that success.  And

21   then in doing that -- in going out there, again, we're

22   boosting his mood.

23            It's frustrating to him, as Your Honor has said,

24   to not be allowed to go out, to walk around, say, you know, a

25   PetSmart, or whatever store, and stop independently at his

1   age.   To feel that he can do such a thing is definitely going

2   to boost his mood.   Definitely going to give him a sense of

3   accomplishment, a sense of freedom, of which he writes about

4   in his songs.

5   Q.   And all that boosting of mood ameliorates risk factors?

6   A.   Yes.

7   Q.   Now, in these contemplated releases would Mr. Hinckley

8   continue to see Dr. Lee?

9   A.   Yes.

10   Q.   And under this proposal is it contemplated that Dr.

11   Lee's role will change?

12   A.   Yes.   He will become the covering psychiatrist.

13   Q.   And will he also meet on a different day, perhaps, Mr.

14   Beffa?

15   A.   Yes.

16   Q.   And Mr. Beffa thus far has been his case manager?

17   A.   Yes.

18   Q.   And how will Mr. Beffa's role change, if any?

19   A.   Mr. Beffa will become the social worker, and so that

20   will entail doing both case management services as well as

21   individual therapy.

22   Q.   Now, was this change contemplated or was the

23   possibility of this change noted by the Court in its order of

24   last year and within the contemplation of the Hospital during

25   the past year?

1    A.    Yes.   I recall testifying last year that the Hospital

2    was contemplating who might be the individual therapist, and

3    that we were still kind of evaluating that.

4    Q.    Has the Hospital reached the conclusion that it would

5    be a better plan for Mr. Beffa to be the therapist and for Dr.

6    Lee to be the psychiatrist?

7    A.    Yes.

8    Q.    What are the plans formulated by the Hospital for

9    integrating Dr. Lee and Mr. Beffa into the Hospital's future

10   planning?

11   A.    Can you ask that question again, I'm not sure I

12   understand.

13   Q.    What has the Hospital proposed to integrate Dr. Lee and

14   Mr. Beffa in the Hospital's future planning?

15   A.    Oh.   We intend to have all records from Dr. Lee and Mr.

16   Beffa faxed to the hospital.   We also intend to have our

17   records sent to them on a regular basis.   There will be post

18   visit conferences with both Dr. Lee and Mr. Beffa.   After Mr.

19   Beffa has an individual therapy session with Dr. Binks, I'm

20   sorry -- after Mr. Beffa has an individual therapy session

21   with Mr. Hinckley, he will have a telephone conference with

22   Dr. Binks to discuss the individual therapy so that they can

23   discuss the course of the therapy.   In addition, both

24   providers will independently fill out check lists so that they

25   will be aware of and managing the risk factors identified on

1    the check lists.

2    Q.    Given the fact that the Hospital's proposal requires

3    Mr. Hinckley to visit both Mr. Beffa and Dr. Lee on each

4    occasion on each release, and that Mr. Hinckley is to call the

5    Hospital, I believe it was daily?

6    A.    Yes.

7    Q.    Do you believe that there is a heightened risk of

8    danger by giving Mr. Hinckley three more nights as this

9    proposal requests?

10    A.    No.   Now, it's been noted, of course, that Dr. Binks is

11    Mr. Hinckley's therapist while at the Hospital, and Mr. Hyde

12    provides music therapy at the Hospital, is that correct?

13    A.    Yes.

14    Q.    Now, are there times when Dr. Binks is either on

15    vacation or otherwise unavailable resulting in a missed

16    session?

17    A.    Yes.

18    Q.    And is it likewise true for Mr. Hyde?

19    A.    Yes.

20    Q.    And has the Hospital noted any, in those instances, an

21    erosion of Mr. Hinckley's mental health?

22    A.    No.

23    Q.    Has he suffered the loss of needed therapy?

24    A.    No.

25    Q.    Has he become more dangerous as a result?

1    A.    Okay.  Hold on.  I just want to go back.

2    Q.    Sure.

3    A.    I mean, he has missed therapy.  I just wanted to -- you

4    asked me, has he suffered the loss of --

5    Q.    A mental health erosion, a loss of mental health

6    status.  Has he degenerated in any way?

7    A.    No.

8    Q.    Okay.  And has he become more dangerous as a result of

9    having a session missed here or there?

10   A.    No.

11   Q.    And when you say no, that answer applies to both the

12   absence of sessions with Mr. Lee -- sorry, with Mr. Hyde as

13   well as Dr. Binks?

14   A.    That's correct.

15   Q.    Now, do you believe that an increase in the privileges

16   as proposed in the Hospital's (e)letter is necessary for Mr.

17   Hinckley's treatment?

18   A.    I do.  I believe, as I think Dr. Montalbano has

19   testified before, that if Mr. Hinckley were to believe that no

20   matter what he does, if he follows all of the stipulations of

21   his previous orders and he still can't get an increase, I

22   think it would really create a sense of hopelessness and

23   helplessness for him.

24   Q.    And that would be -- that would be a risk factor?

25   A.    Well, to the extent that it could contribute to, you

1    know, him feeling depressed.

2      Q.    So, Dr. Montalbano —— I'm sorry, Dr. Rafanello, forgive

3    me, please.  Taking into account your work with Mr. Hinckley,

4    his current condition and all the other factors that you have

5    deemed relevant and about which you have discussed today, do

6    you believe that he would present a risk of danger to himself

7    or others in the context of the proposal before the Court?

8      A.    No.

9            MR. LEVINE:  Nothing further, Your Honor.

10            THE COURT:  Come back at 1:45.

11   LUNCHEON RECESS

12

13

14              C E R T I F I C A T E

15            I, Lisa M. Hand, RPR, certify that the

16   foregoing is a correct transcript from the record of

17   proceedings in the above-titled matter.

18

19

20                          /s/ Lisa M. Hand

21                          _____

22                          Lisa M. Hand, RPR

23

24

25