IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

       Government,               CR No. 81-306
                                     Washington, DC
     vs.                         July 23, 2008
                                     2:00 P.M.
JOHN W. HINCKLEY, JR.,

                                     PM Session
        Defendant.
_____


TRANSCRIPT OF EVIDENTIARY HEARING
BEFORE THE HONORABLE PAUL L. FRIEDMAN
UNITED STATES DISTRICT JUDGE


APPEARANCES:


For the Government:        THOMAS E. ZENO, ESQUIRE
                         U.S. Attorney's Office
                         555 Fourth Street, NW
                         Suite 5423
                         Washington, DC  20530
                         (202) 514-6957

                         SARAH TOWNSEND CHASSON, ESQUIRE
                         U.S. Attorney's Office
                         555 Fourth Street, NW
                         Washington, DC  20530
                         (202) 514-7248

For the Defendant:         BARRY W. LEVINE, ESQUIRE
                         Dickstein Shapiro, LLP
                         1825 Eye Street, NW
                         Washington, DC  20006
                         (202) 420-2237

                         ADAM S. PROUJANSKY, ESQUIRE
                         Dickstein Shapiro, LLP
                         1825 Eye Street, NW
                         Washington, DC  20006
                         (202) 420-4739

(Appearances Continued)


For the Defendant:                ANN-MARIE LUCIANO, ESQUIRE
                                  Dickstein Shapiro, LLP
                                  1825 Eye Street, NW
                                  Washington, DC  20006
                                  (202) 420-2703




Court Reporter:                   Lisa M. Hand, RPR
                                  Official Court Reporter
                                  U.S. Courthouse, Room 6706
                                  333 Constitution Avenue, NW
                                  Washington, DC  20001
                                  (202) 354-3269


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

1                      I N D E X

2    WITNESS                                    PAGE

3    For the Defendant:

4    NICOLE RAFANELLO

5    Cross-Examination by Mr. Zeno                6

6    Redirect Examination by Mr. Levine          88

7

8                   INDEX TO EXHIBITS

9    For the Government:              Identification

10   Exhibit 4 – May 21st recommendation         7

11   Exhibit 2 – Dr. Patterson report           10

12   Exhibit 1 – Dr. Phillips report            13

13   Exhibit 7 – Dr. Lee letter 2/8/08          31

14   Exhibit 8 – Dr. Lee letter 3/19/08         45

15   Exhibit 10 – Letter dated 9/12             52

16   Exhibit 13 – Dr. Rafanello 5/21 recommendation   100

17

18

19

20

21

22

23

24

25

1                          AFTER LUNCHEON RECESS

2               THE COURT:  Sorry for the delay.  Do you want to

3      come to the bench for a minute.

4      SIDEBAR DISCUSSION ON THE RECORD AS FOLLOWS:

5               THE COURT:  You wanted to ask the court reporter to

6      make some changes to the transcript because people have been

7      saying things like (Name of City).  So, I talked to her over

8      lunch and I have no problem with changing Ms., whatever her

9      last name is, to Ms."B".  And if there have been any other

10     slips of the tongue, the only woman who on the record should

11     be identified by her full name is Leslie DeVeau, and everybody

12     else should be with the initials we agreed upon.  I think Ms.

13     Hand, our court reporter, knows that.

14               Now, what else do you want to do?

15               MR. LEVINE:  With respect to the name of the city,

16     I would just propose that the word (Name of City) be deleted

17     and in brackets, put in, Name of City.

18               MR. PROUJANSKY:  Same with (Name of Subdivision).

19               MR. ZENO:  That's fine.

20               THE COURT:  So, what we would do is wherever

21     somebody says (Name of City) we put brackets and Name of City.

22     And wherever somebody says (Name of Subdivision) we put

23     brackets, Name of Subdivision, is that all right with you, Mr.

24     Zeno?

25               MR. ZENO:  Does that --

1              THE COURT:  So we're all clear on that.  I thought
2     we should have this discussion formally rather than the
3     lawyers talking to the court reporter, and this way at least
4     I'm clear that both of you are in agreement.
5              MR. LEVINE:  We are.  We had discussed it before
6     and we were in agreement.
7              THE COURT:  So, we've got Dr. Rafanello, which will
8     take as long as it takes, and then what are we going to do?
9     Is Mr. Beffa here?
10             MR. LEVINE:  He is.
11             THE COURT:  All right.  Well, we'll see if we
12    can -- I don't know whether we can get him in and out.
13             MR. ZENO:  Is he able to come back tomorrow?  He's
14    got to be able to come back tomorrow or we have to think this
15    through.
16             THE COURT:  The question is, do we want to stop
17    with Dr. Rafanello and put Mr. Beffa on and then resume with
18    her?
19             MR. ZENO:  Or he has to come back tomorrow.
20             THE COURT:  Let me ask you this.  How long do you
21    think you'll be with Mr. Beffa?
22             MR. LEVINE:  One hour.
23             THE COURT:  And you'll be a little more than that
24    with Mr. Beffa.
25             MS. CHASSON:  Twenty minutes or a half an hour for

1    cross, it depends on what he says.

2           THE COURT:  It may be advisable, if it's agreeable

3    with everybody, and I'll give you a minute to talk with Mr.

4    Beffa and Dr. Rafanello.  It may be advisable to not begin

5    your cross of Dr. Rafanello, because we know she's going to be

6    here throughout, I assume, and put Mr. Beffa on.  And that

7    way -- unless he's planning to stay overnight anyway.  If he's

8    planning to stay overnight, we'll keep going in logical order.

9    But if he really wants to leave today, we can take him now.

10   So, do you want to check with the two of them?

11          MR. LEVINE:  Yes.  May I?

12          THE COURT:  Okay.

13   SIDEBAR DISCUSSION CONCLUDED

14          MR. LEVINE:  If it please Your Honor, we're going

15   to continue with Dr. Rafanello.

16          THE COURT:  That's fine.  Dr. Rafanello, you're

17   back.

18                      CROSS-EXAMINATION

19   BY MR. ZENO:

20    Q.   Good afternoon.

21    A.   Good afternoon.

22    Q.   I plan to divide this into talking about Mr. Hinckley,

23   and then we're going to talk about the release and the

24   (e)letters, those kind of things in two different parts.

25   We're going to start talking about Mr. Hinckley.  You wrote a

1   recommendation --

2              MR. LEVINE:  Can you keep your voice up?

3              MR. ZENO:  Yes.

4   BY MR. ZENO:

5    Q.   You wrote a recommendation to the review board dated

6   May 21st, 2008, is that correct?

7    A.   That's correct.

8    Q.   I'm going to provide you with a copy of it.

9    A.   Okay.

10   Q.   This will be Government's 08-04?

11              THE COURT:  Exhibit 4 for the Government.

12   BY MR. ZENO:

13   Q.   That's it, right?

14   A.   That's correct.

15              MR. ZENO:  Your Honor, we'd move that into evidence

16   at this time.

17              THE COURT:  Any objection, Mr. Levine?

18              MR. LEVINE:  No.

19              THE COURT:  It will be admitted.

20   BY MR. ZENO:

21   Q.   Now, near the end -- you don't have to go to it, I'm

22   going to read you a couple of passages, but if you want to

23   look at it, go ahead.

24   A.   Okay.

25   Q.   There's a section called Mental Status Exam, right?

1    And that's on Page 14.

2                   MR. LEVINE:  Your Honor, it's still difficult to

3    hear Mr. Zeno.

4                   THE COURT:  Move closer.

5    BY MR. ZENO:

6      Q.    Current Mental Status Exam is on Page 14, right?

7      A.    That's correct, yes.

8      Q.    And, for instance, you say that Mr. Hinckley was,

9    quote, not guarded or evasive when sensitive subjects were

10   explored, correct?

11     A.    No.  That mental status is by Dr. Green.

12     Q.    Oh, so he said that?

13     A.    Yes.

14     Q.    Very good.  Do you agree?

15     A.    I don't know how he was in that interview because I

16   didn't conduct that interview.

17                  THE COURT:  Does this thing have page -- does it

18   have a page number?

19                  MR. ZENO:  Fourteen.  At the bottom there's a small

20   one just above ward number, Your Honor.

21                  THE COURT:  I see.  Okay.  Go ahead.  I've got it.

22   BY MR. ZENO:

23     Q.    You weren't at that one?

24     A.    No.  That sentence continues, it says:  He was not

25   guarded or evasive when sensitive subjects were explored.  So,

1    in that context he was not guarded or evasive.

2       Q.    I thought I read the whole sentence, maybe I did not.

3    So, that's Dr. Green's comment, correct?

4       A.    That's correct, yes.

5       Q.    Do you agree with that?

6       A.    I agree with that -- if that's his observation, yes.

7       Q.    Do you agree that that's true with your contacts with

8    Mr. Hinckley during this year?

9       A.    In general, yes.

10      Q.    What do you mean by in general?

11      A.    When I make statements such as that, I look at the

12   totality of the data available to me.

13      Q.    Okay.  And a little bit further down Dr. Green had

14   said:  His affect was full range and appropriately coincided

15   with the content of the discussion and his expressed feelings.

16   That's what he said, right?

17      A.    Yes, that's in the mental status, yes.

18      Q.    Do you agree with that generally with regard to Mr.

19   Hinckley and your experiences with him?

20      A.    Yes.

21      Q.    Now, when Dr. Patterson examined and had a mental

22   status examination -- and you had an opportunity to read his

23   report, right?

24      A.    Yes.

25      Q.    Dr. Patterson said:  Mr. Hinckley always shows

1    constricted affect when discussing his father's death and

2    focuses more on the activities he was engaged in to support

3    his mother, than on any feelings about his father

4    specifically.  Do you agree with that statement by Dr.

5    Patterson?

6       A.   It would be helpful to me if I could have a copy of

7    that as well, and then I can --

8       Q.   Sure.  I'm going to have to look up which one this is.

9    If I can just have a moment?

10           THE COURT:  Yes.

11   BY MR. ZENO:

12      Q.   I'm going to get copies for the Court and counsel, but

13   if I can give this one to Dr. Rafanello.  I'm on Page 36.

14      A.   Okay.

15           MR. LEVINE:  Does Dr. Patterson's report have an

16   Exhibit Number, Your Honor?

17           MR. ZENO:  It should be Exhibit Number 2.  08-02.

18   I apparently don't have extra copies of that.

19           THE COURT:  I don't need a copy.  Dr. Patterson's

20   report -- I think Mr. Levine has a copy as well.

21           MR. ZENO:  I apologize for not having extra copies

22   with the Exhibit Number on it.

23           THE WITNESS:  With regard to Dr. Phillips' report,

24   I believe he's talking --

25

1   BY MR. ZENO:

2     Q.   Dr. Patterson.

3     A.   Dr. Patterson, I'm sorry.  I believe he's talking about

4   his affect when he's discussing his father's death and the

5   activities he was engaged in to support his mother.  And I

6   would agree that when he's talking about his father's death

7   that there is some affect that might be considered constricted

8   in relationship to dealing with his father's death.

9            I don't know, it's not made apparent in this

10  mental status whether the discussion centered around his

11  father's death in the mental status with Dr. Green.

12    Q.   With Dr. Green.  Gotcha.

13           MR. LEVINE:  Objection, Your Honor, because I think

14  under the Rule of Completeness he has to read the next

15  sentence or two now, not later, and it says here in Dr.

16  Patterson's report --

17           THE COURT:  You have to speak into the microphone,

18  Mr. Levine.

19           MR. LEVINE:  Under the Rule of Completeness at Dr.

20  Patterson's report, the very next sentence says:  I limited my

21  exam -- well, the sentence he read about was -- he also shows

22  constricted affect when discussing his father's death and

23  focuses more on activities he was engaged in to support his

24  mother than on feelings about his father specifically.  That's

25  where Mr. Zeno stopped.  The next sentence says:  I limited my

1    examination in that area, therefore, other clinicians may have

2    more information on his actual feelings about his father's

3    death.

4              MR. ZENO:  No objection, Your Honor.

5              THE COURT:  All right.  That's been read into the

6    record and Dr. Rafanello has heard it and she has the document

7    in front of her.

8    BY MR. ZENO:

9     Q.    A little bit further down, Dr. Patterson said:  Mr.

10   Hinckley's thought content does not demonstrate any evidence

11   of hallucinations or delusions, however -- see where I am?

12   Down about four lines more or five more.  Mr. Hinckley's

13   thought content?

14    A.    It just says his thought -- okay.

15    Q.    Okay.  Are you with me?

16    A.    What I see is his thought --

17    Q.    Hang on.  Are you there?  You got the spot?  Because

18   I'm going to read it now.

19              THE COURT:  Page 36.

20              MR. ZENO:  Page 36.  I'm going to read -- instead

21   of his, I'm going to now read Mr. Hinckley's.  So, Mr.

22   Hinckley's thought content does not demonstrate any evidence

23   of hallucinations or delusions, however, he is guarded when

24   talking about his feelings about relationships, particularly

25   if they have an uncomfortable -- if they have been

1    uncomfortable feelings related to loneliness or rejection.  Is

2    that what it says?

3       A.   Yes.

4       Q.   Do you agree with that?

5       A.   I think it's difficult for him to talk about his

6    feelings regarding loneliness and rejection.

7       Q.   Do you agree with Dr. Patterson's comment or not?

8       A.   I thought I just answered that question.  I think it's

9    difficult for him to talk about his feelings regarding

10   loneliness and rejection.

11      Q.   Do you have trouble deciding whether you agree or

12   disagree with the comment?

13      A.   Yes.

14      Q.   You agree?

15      A.   Yes, I agree.

16      Q.   Okay.  Now, let me -- you had a chance to look at Dr.

17   Phillips' report, correct?

18      A.   Yes.

19           MR. ZENO:  Your Honor, may I mark this as

20   Government Exhibit 08-01?

21           THE COURT:  Yes.

22           MR. ZENO:  And you have a copy, right, Your Honor?

23           THE COURT:  Yes.

24           THE WITNESS:  Actually -- I'm sorry, I have to

25   respond to that.  I do not agree with that sentence.

1              MR. ZENO:  That's what I want to know.

2              THE COURT:  With Dr. Patterson's?

3              THE WITNESS:  No, I think it's difficult for him,

4   but that says that he's particularly guarded.

5   Q.    Yes, exactly right.

6   A.    See, you weren't taking my answer.

7   Q.    That's right, because I wanted to know whether you

8   agreed or disagreed, and then you may explain, I don't care.

9   I want to hear your explanation.  Let me start again.  We just

10  read that statement from Dr. Patterson, does the Court need it

11  again?

12             THE COURT:  No, I got it.  Page 36 of Dr.

13  Patterson, where he says Mr. Hinckley is guarded when talking

14  about his feelings regarding relationships, particularly if

15  they have been uncomfortable feelings related to loneliness or

16  rejection, that's the Patterson statement?

17  BY MR. ZENO:

18  Q.    Right.  And my question to you is -- so we get this

19  started properly, yes or no, do you agree?

20             MR. LEVINE:  Objection, Your Honor, maybe it's not

21  a yes or no answer.

22             THE COURT:  She can answer -- she's already told us

23  that she doesn't agree, but now he wants to make sure that she

24  was talking about the same sentence he's talking about.

25             THE WITNESS:  Right.

1           THE COURT:  It's fair to ask the question, do you

2    agree or disagree, so long as the witness is then allowed to

3    explain her answer.

4           THE WITNESS:  No, I do not agree.

5    BY MR. ZENO:

6    Q.    Good.  Please explain why.

7    A.    Yes.  Because I think he talks about loneliness and

8    rejection in his therapies with Dr. Binks and Mr. Hyde all the

9    time.  He has addressed feelings of loneliness and rejection

10   in his songs.  He has addressed his issues with Ms."M" in his

11   therapy with Dr. Binks at length.

12   Q.    Okay.  Anything you want to add?

13   A.    No.

14   Q.    Now, we're going to switch to Dr. Phillips, which is

15   the other report?

16   A.    Yes.

17   Q.    And if you could turn to Page 61.  So we're now at

18   Exhibit 08-01, which is Dr. Phillips' report, and I'm on Page

19   61.  And there's a section there that's call Emotional

20   Expression, which is where I'm going to read from, do you see

21   where we are?

22   A.    Yes.

23   Q.    Second sentence.  Mr. Hinckley appeared somewhat sullen

24   in all sessions.  Mr. Hinckley also demonstrated a more

25   flattened affect than he exhibited during either of my 2006

1  or 2007 evaluations.  Do you agree with that?

2              THE COURT:  Wait a minute.  Wait a minute.

3              MR. LEVINE:  Objection, Your Honor.  How could she

4  know about how he was -- how Mr. Hinckley presented to Dr.

5  Phillips during that session?

6              THE COURT:  Or let alone the ones in 2006 and 2007.

7              MR. LEVINE:  Let alone those.

8              THE COURT:  I think that's a fair objection by Mr.

9  Levine.

10 BY MR. ZENO:

11   Q.   That's Dr. Phillips' opinion.  You've been with Mr.

12 Hinckley since 2006, correct?

13   A.   Yes.

14   Q.   Do you see him to be more flattened now in his affect

15 than he was during either 2006 or 2007?

16   A.   I belief when I was responding to Mr. Levine's

17 questions, I talked about some responses to some of the

18 stressors that Mr. Hinckley has experienced recently, and I

19 believe that he is experiencing some difficulties in dealing

20 with them.  I do not believe that he is in a full blown major

21 depressive episode.  I think that his responses to them are

22 transient expectable symptoms to these stressors that are

23 occurring in his life right now.

24   Q.   Do you believe that Mr. Hinckley has a more flattened

25 affect with you now than he did in 2006 and 2007?

1            MR. LEVINE:  Objection.

2            THE COURT:  I don't think it's been answered.  I

3    don't think it's been answered.  Objection is overruled.  Ask

4    it again.

5            THE WITNESS:  I think that it has fluctuated, I

6    don't think that it's a simple -- how is he now in relation

7    to 2006, because I think it's fluctuated over time.  I think

8    that in many ways it has fluctuated somewhat in relation to

9    how things have gone in his life.  I believe that when things

10   were difficult with Ms."M" his mood fluctuated and he was more

11   sullen.  I think that when things were better, when he had

12   some positive relation -- incidents with Ms. DeVeau his mood

13   elevated.  I think after his father's death his mood went back

14   down.  I think after some of the rebuffs his mood went back

15   down.  So, I do think that it has gone up and down over time.

16   Is that an answer --

17           MR. ZENO:  That's good.

18   BY MR. ZENO:

19    Q.   Now, Dr. Phillips did his examinations in June and

20   July, correct?

21    A.   Yes.  May, June, July, end of May.

22    Q.   Let's say May, June and July, take that period.

23    A.   Okay.

24    Q.   During that period, May, June and July, do you believe

25   that Mr. Hinckley showed a more flattened affect?

1    A.   I believe that at that time he was showing a more

2    flattened affect, yes.

3    Q.   And at that time, I'm going to go to the last sentence

4    in this section on Dr. Phillips' report, it says:

5    Nevertheless, Mr. Hinckley's emotional expression appeared

6    mildly depressed.  Do you agree with that for the period May,

7    June and July?

8         MR. LEVINE:  Objection, Your Honor, to the -- that

9    question asks about May, June and July, and Dr. Phillips'

10   report tells us when it was, and it was May and June, it was

11   not July.

12        MR. ZENO:  Okay.

13   BY MR. ZENO:

14   Q.   Just May and June then?

15   A.   I'm not sure that I would call it a depression.  I

16   would say that his mood was lower than before.  I would say

17   that it was in response to Ms."G" leaving and going to France

18   with her significant other.  And so there was a clear stressor

19   involved and something that we were able to identify as why --

20   what was happening.  I know that he was very discouraged by

21   what he believed the Hospital's (e)motion to be, certainly not

22   enough time in (Name of City), and feeling discouraged in the

23   sense that likely it would take somewhat of two years before

24   there would be possibly another motion.  And I think he was

25   feeling somewhat exacerbated by the whole process.  So, I'm

1    not sure that I would use that word.

2      Q.    His words were mildly depressed, right, correct?

3              THE COURT:  Dr. Phillips' words?

4    BY MR. ZENO:

5      Q.    Dr. Phillips' words, correct?

6      A.    Yes.

7      Q.    Do you accept them or not?

8      A.    Not.

9      Q.    For the reasons you've already stated?

10     A.    Yes, sir.

11     Q.    Okay.  You've just talked about the fact that Mr.

12   Hinckley was feeling depressed because of the fact that he

13   wasn't getting as much time as he wanted in his parents'

14   hometown, right?

15     A.    He had hoped for more, yes.

16     Q.    He had hoped for more.  And before lunch you had talked

17   about the fact that Mr. Hinckley would be depressed if he

18   didn't receive the expansion that the Court -- that has been

19   asked from the Court, is that correct?

20     A.    I believe --

21             MR. LEVINE:  Objection, that's not what she said,

22   Your Honor.

23             THE COURT:  She can answer the question.

24             THE WITNESS:  I believe I said it could lead to.

25

BY MR. ZENO:

Q.   And you were talking -- were you talking about the expansion from six to ten days?

A.   I said that his belief that no matter what he did, for example, if he followed the conditions of the previous conditional release and in general did well, and then believed that no matter how he followed the release and it went well and still couldn't get more privileges, I believe that he would again feel exacerbated and it could potentially lead to a depression.

Q.   Now, let's focus just on the increase from six to ten days, would that cause it?

THE COURT:   Cause what?

BY MR. ZENO:

Q.   Suppose he was denied the increase from six to ten days, would that cause what you're concerned about?

A.   You mean if he was permitted to continue for six days but not 10 days?

Q.   That's correct, under the other conditions which we're going to talk about in a minute that the Hospital has recommended?

A.   It's difficult to predict exactly what would happen, but I would say that it stopping would be the biggest predictor.

Q.   Just stopping all the trips?

1    A.    Yes.

2    Q.    Correct?

3    A.    Yes.

4    Q.    Is that a possibility right now?  Has anybody moved to

5    stop all the trips?

6    A.    Not to my knowledge.

7    Q.    Has anybody talked to Mr. Hinckley about the fact that

8    there is not an objection to the continuation of the trips?

9            MR. LEVINE:  That's not been the Government's

10   position, Your Honor.  The Government -- I've understood the

11   Government to be opposed to everything and to stop the trips.

12           MR. PROUJANSKY:  And they --

13           THE COURT:  One objection at a time, one counsel

14   can speak for a party.  Mr. Zeno almost never objected to your

15   leading questions, Mr. Levine.  We don't need objections to

16   every question, let alone by two lawyers.

17           MR. LEVINE:  Objection.

18           THE COURT:  You may proceed, Mr. Zeno.

19           MR. ZENO:  Thank you.

20   BY MR. ZENO:

21   Q.    Did anyone talk to Mr. Hinckley about the fact that

22   even if he lost the six -- lost the expansion from six days to

23   ten days, he was still going to have other things that he was

24   going to be receiving that he hadn't been able to do before?

25   A.    We made no promise of anything to him.

1   Q.   You didn't promise?

2   A.   No.

3   Q.   Did you talk to him about the different possibilities

4   of what could result?

5   A.   We've talked to him about -- and this occurs all

6   throughout the year.  We talked to him about the different

7   scenarios of what could potentially happen.

8   Q.   And he could get, under the Hospital's position,

9   expanded time alone in his mother's community, the

10   subdivision, correct?

11   A.   Yes, potentially.

12   Q.   And he could get expanded time unsupervised in the

13   larger community, isn't that correct?

14   A.   Yes.

15   Q.   Where he would be allowed to go on social trips, is

16   that correct?

17   A.   Yes.

18   Q.   And he would be able also to have time to go for

19   volunteer work, isn't that correct?

20   A.   Yes.

21   Q.   Do you consider that more than what he's doing now?

22   A.   Yes.

23   Q.   So, that would be an expansion, is that correct?

24   A.   That's correct.

25   Q.   Let's talk just a little bit about something on the May

1   trip, we're going to come back to it a little bit more, but I

2   wanted to talk about it at this point.  It's my understanding

3   of what you had said, and maybe -- let me just put it this

4   way.  What did you understand Mr. Hinckley to think about his

5   mother's position about having Ms."G" come down to the

6   community?

7   A.   Okay.  Let me just make sure I understand the question.

8   What do I understand Mr. Hinckley to think his mother -- what

9   his mother's position was?

10  Q.   Yeah.  I can rephrase it a little bit to help you -- if

11  this will help.  You said you talked to Mr. Hinckley and you

12  thought -- and I could put some words in your mouth, but why

13  don't you just tell us, what did Mr. Hinckley tell you?

14  A.   He told me that he spoke with his mother about it and

15  that she -- he asked her if it would be okay.  He said that

16  she kind of said, yes, but it wasn't -- he kind of got the

17  sense that she didn't give an emphatic yes and didn't give an

18  emphatic no.  It was sort of, yes, but there were reservations

19  to it.

20  Q.   So --

21  A.   And then he told me that -- she then spoke to his

22  siblings, I'm not sure which one or both, and that before he

23  had an opportunity to speak to her again, the treatment team

24  had spoken with him -- or with Ms."G" and told her that she

25  should not come down.

1    Q.    And Mr. Hinckley wanted to go forward anyway, is that

2    correct?

3    A.    Wanted to go forward with it?

4    Q.    With the trip.  He wanted to go forward with the --

5            THE COURT:  With the visit of Ms."G"?

6            MR. ZENO:  That's correct.

7            THE WITNESS:  Well, I think it was certainly, you

8    know, he would have liked it, but in no way did he indicate

9    that he intended to go forward with it after the team had said

10   no.

11   BY MR. ZENO:

12   Q.    Not once he had been turned down, but did he indicate

13   that his mother's less than full support would cause him to

14   change his desire to have Ms."G" come down?

15   A.    I think that because -- after speaking with Dr. Binks,

16   who sort of explored it with him and didn't discourage him,

17   and then after speaking with his mother who made clear that

18   she wanted to meet Ms."G"," but that perhaps that wasn't the

19   best environment, but didn't definitely say no.  And we know

20   from the testing with Dr. Montalbano that it can be -- there

21   can be some tendency to kind of take in too much information,

22   and then the information processing suffers as a result.  That

23   he is taking in this information and is sort of saying, well,

24   this is something I'd like to do.  No one is really telling me

25   a flat out no.  There's a lot of things going on here.  This

1    is kind of confusing, but this is really what I'd like to do,

2    and it's something I'd like to do.

3        Q.   Did it lack empathy for his mother?

4        A.   I would not say that it lacked empathy.

5        Q.   Why not?

6        A.   Because I think that all of the incidents up until now

7    where he has shown a preponderance of the empathy for his

8    mother, his concern for her throughout all that she had been

9    through with his father.  I think that this is an instance

10   where there was not an emphatic no, and you know, it was just

11   an opportunity to sort of, you know, see if maybe she could

12   come down.

13       Q.   Why did the treatment team tell Ms."G" she was not

14   allowed to go?

15       A.   There were a number of reasons for that.

16       Q.   Let's hear them?

17       A.   Initially there was -- it was not on the itinerary.

18       Q.   Mr. Hinckley prepared that itinerary or he did not?

19       A.   He prepares all the itineraries.

20       Q.   So, he did not put it on the itinerary that Ms."G"

21   would be there?

22       A.   No.  The itineraries were prepared -- it's a little

23   fuzzy only because I was not -- I was on maternity leave at

24   this time, so I'm getting a lot of this information through

25   looking through the records, but --

1    Q.    I know how you feel.

2    A.    What's that?

3    Q.    I know how you feel.

4    A.    Okay.  I know that they're prepared two weeks in

5    advance, so I'm not sure exactly of the dates, if he would

6    have known in advance, if this stuff happened within that two

7    week timeframe or not.  But certainly it would be

8    inappropriate if it weren't on the itinerary.

9          But, secondly, given that there is a court order

10   for him not to have contact with certain females in (Name of

11   City), I know after speaking with a number of the team members

12   that that was a major issue, and wondering how that might be

13   an issue for him.  And another major reason, after speaking

14   with a number of the team members who spoke with him about it,

15   I thought that there is a lot of uncontrolled variables there.

16   Q.    I'm sorry.

17   A.    Uncontrolled variables that could not potentially be

18   controlled so that, you know, it probably would not be a good

19   idea, that it was too -- sort of at the last minute.

20   Q.    That was explained to Mr. Hinckley, right?

21   A.    Yes.  I wasn't at that meeting, but I believe that was

22   explained to him.

23   Q.    And it's your understanding that he was quite upset?

24   A.    That is my understanding.

25   Q.    In fact, when he went down to his mother's community

1    that weekend, he spent more time in his room and was less

2    communicative with family members than on other trips, isn't

3    that correct?

4    A.   I don't have that information, so I can't answer to

5    that.

6    Q.   I'm going to go talk some about Mr. Hinckley's

7    openness?

8    A.   Okay.

9    Q.   You wrote in your recommendation of May 21st, which was

10   Government's Exhibit 4, but I'm just going to quote it, if you

11   need to look it up, we can go there.

12   A.   Okay.

13   Q.   Of late, Mr. Hinckley has engaged in a number of

14   relationships with women and had been candid with both his

15   treatment team and his family, right?

16   A.   Yes.

17   Q.   What did you mean by candid?

18   A.   Candid meaning open.

19   Q.   Now, on direct you talked a little bit about being more

20   open, correct?

21   A.   Yes.

22   Q.   Do you mean candid in the sense of more open or in the

23   sense of open?  Do you see the difference in what I'm talking

24   about?

25   A.   When I say more open, I mean as compared to his

1    history.

2    Q.   I know that's what you meant on direct, but when you're

3    using the word candid in your report, which way did you mean

4    it?

5    A.   I'm sorry, I see them both as synonyms.

6    Q.   But the point is, he's not completely open?

7    A.   Is that a question?

8    Q.   He's not completely open, is he?

9    A.   Again, I look at the entire record and consider in

10   totality all of the instances and then we'll make a judgment.

11   So, I won't look at particular specific examples.  So, when I

12   make a judgment about openness, it's not based on one

13   instance, it's based on the totality of all of his behavior.

14   Q.   Please do.  Is he completely open or not on the

15   totality of all his behavior?

16   A.   I think for the most part, yes, he is open.

17   Q.   I understand for the most part, yes, he is open.  Is he

18   completely open or is he not completely open?

19   A.   Completely open is hard to say.  I mean, I don't know

20   that any person is always completely open.  I mean, perhaps,

21   but you'd need access to every single thing that they've ever

22   said all the time.  From what I've seen, you know, he has for

23   the most part been open.  There are times when it seems that

24   the information is flowing from one person to the next and it

25   can be confusing and it seems that there's miscommunications,

1    which can lead individuals to raise questions about it.
2    However, for the most part, as I said, it seems as though he
3    is being significantly more open than he has been in many,
4    many years.
5      Q.    Okay.  Yesterday I mentioned to Dr. Montalbano about
6    FPT Wright, who is the one-on-one with Mr. Hinckley?
7      A.    That's correct.
8      Q.    Dr. Montalbano quoted her as saying:  Mr. Hinckley,
9    quote, will provide information if asked, but does not
10   typically volunteer it.  I don't think he's that open.
11   Certain things he will tell you and certain things he won't.
12   Do you agree with that?
13     A.    I think I understand what she's saying there, and I
14   agree with what she's saying in the way that she's saying it.
15   If I could explain?
16     Q.    Please do.
17     A.    What she's saying is -- when she's describing open, and
18   I guess this is my assumption of how she's saying it, but I
19   know her very well.  Is that her -- the way that she would
20   describe openness is being the type of person that would walk
21   up to you and start talking and share a lot of information
22   with you, sort of wear everything on their sleeve.  Mr.
23   Hinckley is not that kind of person.  An open individual is
24   someone who lets you in, lets you know something about
25   themselves.  That's not the kind of person that he is.  Does

1    that mean that he's deceitful?  I don't think that's what she

2    meant.

3      Q.    Mr. Shamblee -- I asked this of Dr. Montalbano

4    yesterday.  Mr. Shamblee told Dr. Montalbano that Mr.

5    Hinckley, quote, appears open in discussing issues with the

6    treatment team as long as you asked the right questions.  Do

7    you agree with that?

8      A.    I do.

9      Q.    Now, your comment that you wrote in your report said:

10   Of late, Mr. Hinckley has engaged in a number of

11   relationships, right?  What do you mean by of late?

12     A.    I meant since the last time we met with the review

13   board.

14     Q.    That would have been May?

15     A.    I'm sorry, are you -- can you ask me that question

16   again?

17     Q.    Sure.  Look at Page 6 of your report?

18     A.    Page 6 of the review board report?

19     Q.    Of your report?

20     A.    The (e)letter.

21     Q.    No -- well, it's the preparation for the (e)letter.

22   It's your recommendation to the review board?

23     A.    Okay.

24     Q.    You have it there, right?

25     A.    Yes.

1    Q.    On Page 6, you said:  Of late, Mr. Hinckley has engaged

2    in a number of relationships with women and has been candid,

3    right?

4    A.    Yes.

5    Q.    What did you mean by 'of late'?

6    A.    I meant since -- well, since I had met with the review

7    board, which had been since the previous year.  I was trying

8    to update the review board on the status of his relationships.

9    When they had last met with the review board, I was not there.

10   So, I'm not sure what -- the way that Mr. Shamblee had

11   developed the review board the last time.

12   Q.    So, we're basically talking April of 2007 to today?

13   A.    Right.  I was just trying to update them on the new

14   development.

15   Q.    That's the time period we're talking about, right?

16   A.    Yes.

17   Q.    And February 2008 would be within that time period,

18   right?

19   A.    February of 2008, yes.

20   Q.    Yes.  Okay.  Now, we talked a little bit about this

21   letter from Dr. Lee, which is Government Exhibit 08-7, and I'd

22   like to present it to you now.  You're familiar with this

23   letter, correct?

24              THE COURT:  Which letter is this?

25              MR. ZENO:  08-7.  Dr. Lee's letter of

1   February 8, 2008.

2               THE COURT:  Yeah.

3               THE WITNESS:  Yes.

4   BY MR. ZENO:

5    Q.   We're going to look at the third paragraph, the last

6   sentence, okay?

7    A.   Yes.

8    Q.   That sentence says:  He also spoke of his friend,

9   Ms."G", and their continuing ongoing platonic relationship and

10  her cooperation in terms of working with the treatment team,

11  isn't that what it says?

12   A.   Yes.

13   Q.   Not true, correct?

14   A.   That is correct.

15   Q.   So, Mr. Hinckley falsely told Dr. Lee that he was still

16  in a platonic relationship with Ms"G"?

17              MR. LEVINE:  Objection, Your Honor, that's not --

18  that's not the only conclusion.

19              THE COURT:  That's why he's asking the question

20  he's asking.

21              THE WITNESS:  I don't know how that discussion went

22  in their session, but I can offer some insight as to what I

23  think may have been going on.

24  BY MR. ZENO:

25   Q.   What are you going to base that on?  Before you do, let

1    me just ask you?

2     A.    Okay.  I can tell you what I base it on.  What I think

3    Mr. Hinckley's perception of Dr. Lee's perception of his

4    relationships may be.

5     Q.    Before you get there, did you talk to Dr. Lee?  I mean,

6    this is a pretty -- I'm sorry, did you talk to Dr. Lee?

7     A.    I did.  I called him in February and clarified that.

8     Q.    Right.  Just a couple of days later, right?

9     A.    That's correct.

10     Q.    And you wrote a note to the file about it?

11     A.    That's correct.

12     Q.    So, when you called Dr. Lee, did you say to him:  Did

13    Mr. Hinckley say to you that he was continuing in a platonic

14    relationship with Ms."G"?  Did you just ask Dr. Lee whether

15    that was just said?

16     A.    I did not come right out and ask about, you know,

17    whether that was said or not, no.

18     Q.    Why not?

19     A.    I'm trying to recall the exact way that the

20    conversation went.  It's possible that I did.  I remember that

21    it was important for me to clarify how it went.

22     Q.    Wouldn't that be a good thing to say?  What did Mr.

23    Hinckley say?

24     A.    I remember him telling me that he was not aware that

25    the relationship had progressed, and that was --

1          THE COURT:  What?

2          THE WITNESS:  Had progressed into a romantic

3    relationship, and that was a big red flag for me.

4    BY MR. ZENO:

5    Q.    It was a red flag?

6    A.    Yes.

7    Q.    Because?

8    A.    Because it had --

9    Q.    What did it mean -- it wasn't the fact of the -- it

10   wasn't just the fact that it had become physical that was the

11   red flag, was it, there was more?

12   A.    Well, it became -- it was a red flag because I was

13   concerned about what it would -- what he would be sharing in

14   the relationship with Dr. Lee.

15   Q.    Right.  It's about whether Mr. Hinckley is being

16   candid?

17   A.    It's more than that.

18   Q.    All right.  Tell us what more it is?

19   A.    I was also concerned that there would be a reluctance

20   on Mr. Hinckley's part to share things about relationships

21   given Dr. Lee's approach with Ms. DeVeau.

22   Q.    This may get to another topic, so let's get there now

23   for a minute.  Dr. Binks -- you remember how you described his

24   approach in individual therapy on direct, do you remember

25   that?

35

1    A.    Yes.

2    Q.    And it was -- just say it again, what's Dr. Binks'

3    approach?

4    A.    His approach is to explore.

5              THE COURT:  I think you said not to be judgmental.

6              THE WITNESS:  Okay.  Yes.

7              THE COURT:  I mean, they are not inconsistent,

8    but --

9              THE WITNESS:  I don't remember the exact testimony,

10   but thank you.

11   BY MR. ZENO:

12   Q.    The point is, let's talk, let's work it through, let's

13   let the patient think about it, we'll come back and talk

14   again, right?

15   A.    Yes.

16   Q.    That's not Dr. Lee, is it?

17   A.    No.

18   Q.    Because Dr. Lee told Mr. Hinckley he shouldn't have a

19   relationship with Ms. DeVeau, right?

20   A.    That's correct.

21   Q.    And Dr. Lee had gotten -- had been -- what Mr. Hinckley

22   was worried about was that Dr. Lee was going to start pushing

23   him about having a physical relationship with Ms."G", right?

24   A.    That was my thinking, yes.

25   Q.    Right.  So when Mr. Hinckley was faced with someone who

1    was going to do something that he didn't like, he didn't tell

2    the truth, did he?

3        A.   It seems that he didn't share that information, that's

4    correct.

5        Q.   He didn't share the information, he lied, right?

6        A.   Again, that's a strong word, but --

7        Q.   I understand it's a strong word, is it true or not, did

8    he lie?

9        A.   I don't have the answer to that.  I would imagine if

10   that's the -- if that's what happened, I would say yes.

11       Q.   And you had a chance to ask Dr. Lee if that's what

12   happened, but you didn't ask him?

13       A.   I didn't ask him flat out, did he lie.  I explored the

14   situation with him.  I gave him the proper information.  I

15   gave him the status of his relationship with Ms."G". I updated

16   him on the rest of the information.

17       Q.   It was news to Dr. Lee, wasn't it?

18       A.   That's correct.

19       Q.   That's correct.  And there's another thing that Dr. Lee

20   has brought up, even more recently, is that Mr. Hinckley might

21   need a different medication for his depressive symptoms, isn't

22   that correct?

23       A.   Yes.  Actually, no, he didn't say that he would need a

24   different medication.

25       Q.   He wanted to explore it, correct?

37

```
 1    A.   He said that he thought that Mr. Hinckley could benefit
 2  from an increase in --
 3    Q.   Keep going -- I understand what you're talking about.
 4  Go ahead.  Increase in the current medication, correct?
 5    A.   Yes.  And he called Dr. Green to discuss it.
 6    Q.   So, as opposed to a different medication, which is the
 7  way I said it, it was really an increase in medication,
 8  correct?
 9    A.   Yes.  And I think it's important that he is noticing
10  those things, because it speaks to the fact that Dr. Lee is
11  noticing if Mr. Hinckley is responding to the stress of the
12  hearing, which I believe it was two hearings ago that he
13  initially got put on the Zoloft.
14    Q.   Two hearings, meaning two years ago?
15    A.   Whenever the hearings were, yeah.
16    Q.   Okay.
17    A.   In reaction to the stress of the hearing.  And in
18  talking to Dr. Lee, he remarked that he will bump his
19  patient's up because the Zoloft can produce not just a
20  50 percent amelioration of feeling better but 95 percent
21  amelioration of feeling better.  And I asked him flat out, you
22  know, do you think that Mr. Hinckley is in a major depression
23  and in a major depressive episode or on his way to it?  He
24  said, no.  I think he's very exacerbated.  That he feels
25  frustrated.  That he's concerned about the process taking very
```

1   long.

2                   I think he's feeling the stress and rebuff of

3   this community.  I think he's dealing with the death of his

4   father.  I think that his reactions are very normal.  And I

5   think it's very appropriate that at this time in his life we

6   consider upping the medication.  And I think that speaks to

7   the fact that he's on the ball and that he's willing to call

8   and make an adjustment, if necessary.

9     Q.   By the way, you pointed out that you made a

10  straightforward question, is Mr. Hinckley in a major

11  depression, right?

12    A.   Yes.

13    Q.   But you didn't ask a straightforward question, did Mr.

14  Hinckley lie to you?

15    A.   Well, this conversation occurred -- that conversation

16  was in February.

17    Q.   Right.

18    A.   This conversation was recently.

19    Q.   Oh, more recent, I got you.  I'm sorry.

20              THE COURT:  The Zoloft conversation was more

21  recent?

22              THE WITNESS:  Yes.

23  BY MR. ZENO:

24    Q.   Closer to this hearing and closer to today, is that

25  correct, in time?

1    A.   My concern about the depression was because of the risk

2    factors.

3    Q.   Right, but it was closer?

4    A.   And the dangerousness.

5    Q.   But it was closer to this hearing rather than further

6    away that Dr. Lee indicated it might be appropriate to raise

7    the level of Zoloft, correct?

8    A.   Yes, that's correct.

9    Q.   And Dr. Lee was having his meetings with Mr. Hinckley

10   as the therapist, correct?

11   A.   As the therapist and covering psychiatrist.

12   Q.   And now he's been taken out of that role, isn't he?

13   A.   He is now going to be the covering psychiatrist, but

14   assessing mental status.

15   Q.   It's a different role, right?

16   A.   Yes.

17   Q.   We don't know exactly how that's going to work out

18   because it's a new role, isn't it?

19   A.   I think that his -- in assessing a mental status, a

20   psychiatrist will still conduct somewhat of a session.  He's

21   going to be still meeting with him for an hour.

22        THE COURT:  A year ago when Dr. Lee was described

23   as a safety net and our man in Havana, he wasn't doing therapy

24   then, right?  Right?  You have to say yes or not.

25        THE WITNESS:  No.  Since then he has been sort of

1    moving into that role because I believe at the end of the last

2    hearing it was undecided --

3            THE COURT:  Right.  But when he was the safety net

4    a year ago, and as the covering psychiatrist going forward, I

5    take it that his role then and his role going forward -- so

6    we'll carve out the middle year, is somewhat similar, right?

7            THE WITNESS:  Yeah.  I mean, he's been working --

8    I'm sorry, Your Honor, I'm not sure I understand your

9    question.

10           THE COURT:  Here's my question.  Let me just go

11   back.  A year ago when he was described as the safety net or

12   the man in Havana, the idea was that he would -- tell me if

13   I'm wrong, but the idea was that he would meet with him once

14   each visit, he'd talk to him.  If he noticed anything unusual,

15   anything untoward, anything -- his mood seemed down or he

16   seemed distressed, he would report back to Dr. Binks or to you

17   or somebody at the Hospital, right?

18           THE WITNESS:  That's correct.

19           THE COURT:  And if he thought -- would it have been

20   part of his role then if he thought that maybe Mr. Hinckley's

21   medication should be changed or increased to tell you that and

22   to tell you why he thought that?

23           THE WITNESS:  Yes.

24           THE COURT:  But he wouldn't be the one to change

25   it?

```
 1                THE WITNESS:  No.

 2                THE COURT:  You make the decision?

 3                THE WITNESS:  Dr. Green would adjust the

 4     medication.

 5                THE COURT:  Dr. Green.  Now -- and is that sort of

 6     going forward where things would be as well if he's the

 7     covering psychiatrist?

 8                THE WITNESS:  Yes, he would be doing the same

 9     thing.

10                THE COURT:  And in the last year, if he thought

11     that the medication should be increased while he was doing

12     therapy, would he have been in a position to do it himself or

13     would it still be a recommendation to the Hospital?

14                THE WITNESS:  It would still be a recommendation to

15     the Hospital.

16                THE COURT:  And do different psychiatrists have

17     different views about what the appropriate medication is or

18     the appropriate level of medication based on the same facts?

19                THE WITNESS:  Yes.  And that's why, you know,

20     there's a phone call so they can discuss it.  However, I

21     should let you know that in case of an emergency, Dr. Lee can

22     give the medication.

23                THE COURT:  No, I understand that.  If something

24     really bad happened?

25                THE WITNESS:  Right.
```

1        THE COURT:  But I guess one of the things that came

2    through from what you were talking about is that Dr. Lee and

3    Dr. Binks have a somewhat different philosophy.  Dr. Lee maybe

4    is a little more confrontational with his patients and Dr.

5    Binks is a little more -- let's explore, let's discuss it, I'm

6    not going to be judgmental, is that fair?

7        THE WITNESS:  That's fair.

8        THE COURT:  And, again, is one approach right and

9    the other one wrong, from your experience?

10       THE WITNESS:  No.  I mean, you know, each therapist

11   has their own approach.  You know, I think we factored a lot

12   of things into why we chose Mr. Beffa to be the individual

13   therapist, and I think that was one of them.  I think we

14   thought that Mr. Beffa was an individual that has more of a

15   day-to-day experience with individual therapy, that's what he

16   does every day.

17       Dr. Lee is really -- he called himself a medication

18   manager.  He really manages medication on a day-to-day basis.

19   So, it seemed more appropriate that he should be doing what is

20   his expertise and what he does every day, and Mr. Beffa should

21   be doing what is his expertise and what he does every day.

22       THE COURT:  My recollection of Dr. Lee's testimony

23   a year ago is, he says, I've done therapy in the past, I

24   haven't done much of it recently, but I can do that.

25       THE WITNESS:  That's correct.

43

1    BY MR. ZENO:

2        Q.    So, why did it take a year to switch?

3        A.    We needed to come back to court.

4        Q.    You felt you couldn't do that without a court order?

5        A.    To switch?

6        Q.    You couldn't switch them?

7        A.    It's my understanding that we needed to come back to

8    court and that Mr. Beffa was to be the case manager.

9        Q.    When did you decide that you wanted it to be Mr. Beffa

10   as the individual therapist down in the mother's community as

11   opposed to Dr. Lee?

12       A.    Well, it evolved -- over the year we started to

13   understand it, over the course of the year.  We kind of made

14   the decision as, you know, as the year progressed.

15       Q.    I understand.  That's why I asked -- you said you had

16   to come back to court.  Well, when did you decide -- if it

17   evolved -- when did you decide, oh, we should go to court, but

18   we can't, so let's not.  When was that?

19       A.    Probably at the beginning of the year.

20       Q.    So, around January?

21       A.    Yeah, January, February timeframe we started to

22   recognize that that was probably the best decision.

23       Q.    Okay.  While we're on the topic of Mr. Lee and Dr.

24   Beffa (sic), you just said that a lot of factors went into

25   choosing Mr. Beffa, what other factors?

1    A.    I think we found that Mr. Beffa is an individual

2    that -- I don't know if it's just his schedule, but he's a lot

3    easier to get in touch with.

4    Q.    How about something related to the ability of one to be

5    a good psychiatrist or therapist as opposed to the other?

6    A.    Well, I thought I already testified as to that.

7    Q.    Do you think Mr. Beffa is better?

8    A.    Better as a therapist?

9    Q.    Right.

10   A.    I think -- I mean, I haven't had an opportunity to

11   observe him providing therapy, but I do -- I would say that he

12   is -- it's something that he does on a daily basis, and it's

13   something that, you know, he is providing to his patients.

14   Q.    I understand that, but you haven't seen him personally.

15   What recommendations did you have that lead you to think that

16   Mr. Beffa should be the therapist?

17   A.    When Mr. Shamblee went to the Family Living Institute,

18   he obtained Mr. Beffa's resume, and his resume was quite

19   impressive with regard to his experience in offering therapy.

20   He was the one who developed the Family Living Institute.  He

21   founded it and then coordinated it.  He's very well-respected

22   in the community.  I've gotten a lot of recommendations about

23   him from other people in the community that know him, that

24   have spoken of him, and so we were aware that he's a very

25   well-known and good solid person there.

1    Q.    And he also calls back more often, right?

2              THE COURT:  Also what?

3    BY MR. ZENO:

4    Q.    Also calls back more often, right?

5    A.    That doesn't hurt, especially in this case.

6              MR. ZENO:  Your Honor, marking Government's Exhibit

7    08-08.

8    BY MR. ZENO:

9    Q.    And this is -- you recognize what this is, right?

10   A.    Yes.

11   Q.    And it's a letter from Dr. Lee to the hospital, right?

12   A.    That's correct.

13   Q.    And it's dated March 19, 2008, correct?

14   A.    Yes.

15   Q.    Look at the third paragraph, third line up, it says:

16   We did discuss -- do you see where I am?

17   A.    Yes.

18   Q.    We did discuss the fact that Ms."G" is living with her

19   boyfriend for 15 years, but nobody seems to be perturbed about

20   this triangular relationship.  Is that true?

21   A.    I knew --

22             MR. LEVINE:  Objection, Your Honor, is it true that

23   that was discussed?

24             MR. ZENO:  Okay.  I'll ask it both ways.

25

46

1   BY MR. ZENO:

2       Q.   Was it discussed?

3               THE COURT:  Wait a second.  I have to put this

4   sentence in context.  We did discuss -- who was discussing it?

5   In other words, we're talking about a discussion you had with

6   Mr. Hinckley, a discussion you had with the treatment team,

7   that sentence doesn't tell us that, maybe the rest of the

8   letter does.

9   BY MR. ZENO:

10      Q.   Based on what you know about this letter, the we refers

11  to who?

12      A.   Mr. Hinckley and Dr. Lee.

13      Q.   Right.  So, Mr. Hinckley and Dr. Lee did discuss the

14  fact that Ms."G" is living with her boyfriend for 15 years,

15  but nobody seems to be perturbed about this triangular

16  relationship.  Is it true that no one is perturbed about the

17  triangular relationship?

18      A.   It was true that Ms."G" -- well, no, that's not even

19  true.  When I saw this -- let me answer your question first.

20      Q.   Good.

21      A.   Ms."G" was perturbed about it.

22      Q.   Ms."G" was perturbed about it?

23      A.   After this date in May.  But on March the 19th when

24  this letter was written, she was not.

25      Q.   Okay.

1    A.    Mr. Hinckley was less perturbed about it.

2    Q.    Less perturbed than Ms."G"?

3    A.    Yes.

4    Q.    And she wasn't perturbed at all?

5    A.    Not at that point.  I think it did create some, you

6    know, conflict for her, and she had issues about it.  The team

7    was certainly perturbed.

8          THE COURT:  That was my question.  In other words,

9    does this sentence -- it's kind of a cryptic sentence.

10         THE WITNESS:  I actually called Dr. Lee -- another

11   red flag.  So, I called Dr. Lee in regard to this and asked

12   him:  Do you -- are you saying that the team is not perturbed?

13   And he said:  No, I did not mean that when I wrote that.  I

14   meant Mr. Hinckley and Ms."G", and also was wondering what her

15   significant other thought about this.

16   Q.    So, you were perturbed, you being the treatment team?

17   A.    Well, I think we were trying to help Mr. Hinckley

18   explore what was going on with this situation.  I mean, as

19   mental health professionals, generally it is not -- we don't

20   tell the person what to do because then the person doesn't own

21   it, so to speak.  If you tell the person, don't do this,

22   then -- and they're still thinking about doing it or they want

23   to do it, they haven't owned the reasons why they're not going

24   to do it.  So, it's better to explore it and help them

25   understand why they're not doing it so that they don't

1    continue to do it and they have their own reasons why they're

2    not going to do it.  So, that's why we don't necessarily say,

3    don't do this.

4    Q.    Got that.  My question is:  Was the treatment team

5    perturbed about this?

6    A.    Perturbed about him saying this?

7    Q.    No, perturbed about Mr. Hinckley being in a triangular

8    relationship with a woman who has been living with a man for

9    15 years.  Were you perturbed about this?

10   A.    We said that we thought that was probably questionable

11   judgment.  And that we thought that he needed to consider it

12   and work through it and understand that there were some

13   significant consequences perhaps related to it.

14   Q.    Was the treatment team perturbed by it?

15   A.    I wouldn't use the word perturbed, no.

16   Q.    But you did think it was -- that's all I asked.

17   A.    I'm sorry.

18   Q.    Are you okay?

19   A.    I'm all right.  I keep drinking the water.

20            THE COURT:  But you took this sentence to mean

21   nobody seems perturbed, meaning that Dr. Lee didn't think that

22   Mr. Hinckley was perturbed, and he didn't think that Ms."G"

23   was perturbed, but it was not a comment on the members of the

24   treatment team?

25            THE WITNESS:  No, I did call Dr. Lee to check that.

```
 1            THE COURT:  He said it was not a comment on the

 2   treatment team.

 3            THE WITNESS:  No, he said it was not.

 4            THE COURT:  So, you were -- before this letter --

 5   you were aware of this before this letter, this Ms."G"

 6   relationship, the treatment team was aware?

 7            THE WITNESS:  Yes.

 8            THE COURT:  And you were exploring this and

 9   discussing this -- I keep saying you, but it's probably more

10   Dr. Binks and maybe -- who else, Mr. --

11            THE WITNESS:  V.J.   But we also explore it when we

12   have treatment plans and things like that.

13            THE COURT:  So, you were exploring it and concerned

14   about it?

15            THE WITNESS:  Yeah.  I mean, it certainly is not

16   favorable to be in a relationship with someone who is living

17   with someone else because --

18            THE COURT:  Not easy, either.

19            THE WITNESS:  No.

20   BY MR. ZENO:

21    Q.   Not favorable.  Did you tell Mr. Hinckley it's not

22   favorable?  Did you use that kind of language?

23    A.   Yeah.  I mean, I think I probably did.  I don't know if

24   I used that particular word, it's possible I did.

25    Q.   Well --
```

1    A.    I mean, we discussed all the scenarios.  For example,

2    we discussed, you know, what if, you know, (Name) -- I'm so

3    sorry.

4    Q.    It's okay.  Go ahead.

5    A.    What if the significant other were to come to the

6    Hospital?  What if -- we did a series of hypotheticals to help

7    him understand some of the possible implications.  We went

8    through a series of thinking about the future, what are

9    some -- the potential future plans here.  Is there a future?

10   Is this something that is realistic?  We went through all of

11   the potential --

12   Q.    And the way you do that is -- you ask him, is this

13   realistic?  And then he tells you that, right, he gives you

14   his response?

15   A.    Pretty much, yeah.

16   Q.    Did anybody say:  This is not a good idea.  You may do

17   it anyway, it's your ability to be a free person, but it is

18   not a good idea.  Did anybody say that?

19   A.    That's not typically the way that therapy is done.  I

20   mean, it's just -- we say that to him, and in the sense that

21   we let him know that -- I know that his family has said that

22   to him pretty much.

23   Q.    Dr. Lee would have said it -- Dr. Lee uses that

24   approach of saying what he thinks, right?

25   A.    Yeah.  And I believe that he will continue to do so.

1    Q.   Of course, he's not in therapy anymore, is he?

2    A.   I'm not sure that there's a clear understanding here

3    about the fact that -- despite the fact that Mr. Beffa is

4    going to be his individual therapist, Mr. Hinckley is going to

5    continue in an hour long session with Dr. Lee, and I don't

6    believe that Dr. Lee is going to stop giving his opinions.

7    Q.   Okay.

8    A.   In that hour long session.

9    Q.   Did you ask him?

10   A.   Did I ask him if he's going to stop giving his

11   opinions?

12   Q.   Right.

13   A.   No, I didn't ask that particular question.

14   Q.   Okay.  Sure.  Let's turn to another incident, September

15   of '07.  Now, we're just -- you have to remember, I'm just

16   going to tell you where we are, I'll get you there.  September

17   '07.  You remember we were talking about openness, and you

18   said:  Of late, he has been candid.  Remember?  That's where

19   this all started.

20   A.   Okay.

21   Q.   September '07 is within the last year, so this is when

22   Mr. Hinckley is candid, correct?

23   A.   Okay.  Yes.

24   Q.   Got it?  See where we are?

25   A.   Yes.

```
1              MR. ZENO:  Now, Your Honor, we're going to look at
2    Exhibit 10.  I guess I should ask -- August is also within it.
3              THE COURT:  Exhibit 10?
4              MR. ZENO:  Yeah, 08-10.
5              THE COURT:  It's already been --
6              MR. ZENO:  It's been marked --
7              THE COURT:  -- and shown to Dr. Montalbano?
8              MR. ZENO:  That's correct.
9              THE COURT:  Okay.
10   BY MR. ZENO:
11   Q.   You recognize what this is, right?
12   A.   Yes.
13   Q.   And it is one of the letters to the Court, it was
14   written on September 12th, correct?
15   A.   That's correct.
16   Q.   And you're the major author for this, right?
17   A.   Yes.
18   Q.   And on Page 5 is the incident that we talked -- that I
19   talked to Dr. Montalbano about yesterday of Wednesday,
20   August 29th, right?
21   A.   That's correct.
22   Q.   So, you remember this incident, right?
23   A.   Is this the fondling privileges incident?
24   Q.   Right.  You remember it, right?
25   A.   Yes.
```

```
 1    Q.   So, what happened?  I mean, if you need to read this to

 2   refresh yourself, I just wanted to orient you, what's going

 3   on, what happened?

 4    A.   Can I just read this quickly?

 5    Q.   Sure.  Absolutely.

 6    A.   I'll be quick.

 7             THE COURT:  What page are we looking at?

 8             MR. ZENO:  Page 5, first paragraph.

 9             THE WITNESS:  Okay.  I'm ready.

10   BY MR. ZENO:

11    Q.   Remember the incident?

12    A.   Yes.  You mean this whole discussion that occurred.

13    Q.   The paragraph covers other things.  The thing that I'm

14   interested in is the thing I was discussing with Dr.

15   Montalbano yesterday, and it appears that he was not at this

16   treatment team meeting, correct?

17    A.   I don't recall.

18    Q.   But you were?

19    A.   Yes.

20    Q.   And so the discussion is about Ms."M", correct?

21    A.   Yes.

22    Q.   And someone asked the open-ended question:  What is

23   your relationship with Ms."M", correct?

24    A.   Yes.

25    Q.   And Mr. Hinckley says:  Oh, it's just limited to cats.
```

1   Correct?

2   A.    That's correct.

3   Q.    And then someone says -- the letter says, it was

4   pointed out.  I assume that means somebody says, you know --

5   what I want to know is what was said?  Do you remember what

6   was said?

7   A.    It was awhile ago.  I mean, most likely it was probably

8   pointed out to him, if I can remember the timeframe there --

9   Ms."M" -- I'm so --

10  Q.    Take a second.  Do you want to -- is this a good time

11  for five minutes or something?

12  A.    I'm kind of like -- my head is --

13          THE COURT:  Why don't we take a 10 minute break.

14  Okay.

15          MR. ZENO:  Fine.  You can even have a snack or

16  something.

17          THE COURT:  Let's take a break.

18  BRIEF RECESS

19                      AFTER RECESS

20          THE COURT:  We are we going to finish with Dr.

21  Rafanello today no matter what.

22          MR. ZENO:  Okay.

23          THE COURT:  To make her and her daughter happy --

24  and me.

25          MR. ZENO:  Okay.  I might ask for a few pauses as

```
 1    we go along.
 2                 THE COURT:  Yeah.
 3                 MR. ZENO:  Okay.
 4    BY MR. ZENO:
 5      Q.    September -- August 27th, right?
 6      A.    Yes.
 7      Q.    What happened?  What did somebody say to Mr. Hinckley?
 8      A.    Okay.  Mr. Hinckley was saying that he described Ms.
 9    "M" as a cat friend, and said that he wasn't pursuing her or
10    Ms. DeVeau romantically.  At this time they were having -- she
11    was being characteristically mercurial.  On certain days she
12    would be friendly, and then on other days she would not be as
13    friendly.  And so he was saying basically that he wasn't
14    pursuing her romantically.
15                 At that point someone pointed out to him that his
16    behavior was not consistent with that remark.  And he then
17    said that she was -- I'm just going to go right to this
18    because I can't remember exactly what he said.  But at that
19    point he said that she was sometimes affectionate with him and
20    that he had fondling privileges.
21      Q.    Okay.
22      A.    It's my understanding that perhaps the situation was
23    such that because of her changing nature, perhaps this term
24    arose as a result of his trying to describe the relationship
25    in a protracted manner because it was confusing.  It wasn't
```

1    clear what was going on.

2        Q.    Can we move along here?

3        A.    Go right ahead.

4        Q.    The female log, that's new, isn't that correct?

5        A.    Yes.

6        Q.    And you instituted the female log?

7        A.    Yes.

8        Q.    And what is the female log?

9        A.    It is a log of his interactions with females.

10       Q.    Why did you establish it, if it was brand new?

11       A.    For a couple of reasons.  First, because I had been

12   moved to a different unit and so it was more convenient for me

13   to have a log of his interactions, and also because there

14   became a number of new friends.  And it was important that we

15   stay on top of them, and the log would allow us to know who he

16   saw when.

17       Q.    Right.

18             THE COURT:  How did it work?  Who kept track of

19   things?

20             THE WITNESS:  It was Mr. Hinckley's responsibility.

21             THE COURT:  Did you explain this to him?

22             THE WITNESS:  Yes.

23   BY MR. ZENO:

24       Q.    He put the first intern?

25       A.    Yes.

1    Q.    He put the first intern on the log, right?

2              THE COURT:  Before you get to that, just so we all

3    are on the same page.  What were the ground rules for the log?

4    What did you tell him he was supposed to enter and not enter

5    or how it was supposed to work?

6              THE WITNESS:  That wasn't –– and this is my fault

7    to a certain extent, I didn't make it specifically clear to

8    him.  I said to put interactions with females on there.  And I

9    don't think I made it clear that they were to be significant

10   or insignificant interactions.

11   BY MR. ZENO:

12   Q.    Okay.  First intern, you know who I'm talking about,

13   right?

14   A.    Yes, I do.

15   Q.    The first intern –– I'm going to compound the question,

16   if I get it wrong, tell me.  First intern, Mr. Hinckley is

17   almost every morning saying good morning to her.  He takes her

18   to the cat area and he puts her on the log, correct?

19   A.    Correct.

20   Q.    And the cat area is a place that Mr. Hinckley uses to

21   make contacts and impress women, among other things?

22   A.    It's an area that houses his cats.

23   Q.    Okay.  Does he use it as a way to make contacts with

24   women?

25   A.    He showed it to three women, so if you want to draw

1    that conclusion, I suppose.

2       Q.   Do you?

3       A.   I think that the women -- cats are definitely a way

4    that he has connected with women.

5       Q.   You talk to him about, quote, selectively greeting a

6    woman, not in a bad sense, you were just counseling him,

7    right?

8       A.   Yes.

9       Q.   Then the second intern makes a report, isn't that

10   correct?

11      A.   Yes.

12      Q.   And the second intern is being greeted in the morning,

13   she gets taken to the cat area, and Mr. Hinckley escorts her

14   to her car, right?

15      A.   Right.

16      Q.   But she's not on the log?

17      A.   That's correct.

18      Q.   The only way you learn about her is when the intern

19   tells you about it?

20      A.   Yes.  When I spoke with Mr. Hinckley about this, he

21   informed me that he didn't see their interactions as

22   significant, and that he did not think that, in retrospect,

23   the interactions with the previous intern were significant.

24   And at that point we discussed that it really wasn't clear to

25   him who should be on the log and who shouldn't.

1   Q.   Well, did you believe him that it was insignificant?

2   A.   The first and second interns I think should have been

3   on the log.

4   Q.   And that's why you wrote up a note about the second

5   intern report, correct?

6   A.   Yes.

7   Q.   Now, another incident is Mr. Hinckley is watching a DVD

8   on the grounds with a woman, right?

9   A.   That's correct.

10  Q.   Is that Ms."G", did I get that correct, or is it Ms.

11  "K"?

12  A.   That's correct.

13  Q.   So, Ms."G".  And Ms."G" -- and somebody else sees it,

14  right, one of the other staff members?

15  A.   Someone in the lobby.  He was watching that in the

16  lobby.

17  Q.   And you get the report and you go to him and talk to

18  him, correct?

19  A.   Yes.

20  Q.   And he tells you that he was watching an episode from

21  the TV show called The Wire, correct?

22  A.   That's correct.

23  Q.   Then you tell him it's important for him to tell you

24  about movies that he sees, correct?

25  A.   That's correct.

1   Q.   And he tells you he will tell you if there are movies
2   that he sees, correct?
3   A.   Yes.
4   Q.   Has he told you about any more movies that he's seen?
5   A.   No.  We discussed, in that instance, the potential
6   ramifications of that.  I think over the years Mr. Hinckley
7   has learned that he's watched very closely, and that
8   ultimately individuals find out, be it sooner or later --
9   Q.   By the way, how do you know he was watching The Wire?
10  A.   He was doing it in the lobby of the John Howard -- he
11  made no attempt to hide it.
12  Q.   I didn't ask you whether he was watching the DVD.  How
13  do you know he was watching The Wire as opposed to something
14  else?
15  A.   He told me.
16  Q.   Did you believe him?
17  A.   Yes, I do.
18  Q.   Did you check in any way?
19  A.   I believe that Ms."G" corroborated that.
20  Q.   Let's talk about Ms."K" --
21       MR. ZENO:  May I have just a second, Your Honor.
22  BY MR. ZENO:
23  Q.   Ms."K"?
24  A.   Yes, Ms."K"."
25  Q.   Ms."K" is reading articles to Mr. Hinckley that come

 1  from the media, is that correct?

 2           THE COURT:  Reading articles about what?

 3  BY MR. ZENO:

 4   Q.   Reading articles from the media to Mr. Hinckley, is

 5  that correct?

 6   A.   I'm not sure I'm aware that --

 7   Q.   Would you check Dr. Patterson's report?

 8   A.   Oh, I think I know what you're referring to, but I'll

 9  check.

10   Q.   Sure.  Page 31, middle of the second paragraph, but the

11  first full one, it's the fourth line down.

12   A.   Page 31 of Patterson?

13   Q.   Patterson.  So, 31 of 39.  The paragraph begins, we

14  then briefly discussed?

15   A.   Yes.

16   Q.   If you go down to the fourth line, it says:  I told Dr.

17  Binks, Ms."K" also reported to me she had read the articles to

18  John.  Right?

19   A.   Yes.  These are the articles that were written in the

20  press that were related to Mr. Hinckley's case.

21   Q.   How do you know that?

22   A.   Because --

23   Q.   Well, let me ask it this way.  Is it based exclusively

24  on what Dr. Patterson says?

25   A.   Okay.  Just give me two seconds, okay?

1     Q.    Sure.

2     A.    Okay.  Because this is in the context of (Ms."G") being

3     upset.  I'm sorry.  Ms. --

4     Q.    K.  This is Ms."K", right?

5     A.    No.

6     Q.    The first names are the same but they are spelled

7     differently.  I'm sorry.

8                 THE COURT:  Where are you reading from?  Where are

9     you addressing her attention to?

10                MR. ZENO:  Page 31 of the Patterson report.

11                MR. LEVINE:  Which paragraph?

12                MR. ZENO:  The one that begins -- the first full

13    paragraph -- we then briefly discussed --

14                THE WITNESS:  Oh, I see.  Okay.  Okay.  I'm sorry.

15                MR. LEVINE:  Can I have moment to read, Your Honor.

16                MR. ZENO:  You're refreshed?

17                MR. LEVINE:  Let me have a moment, please.

18                MR. ZENO:  Well, I don't have many moments left.

19                THE COURT:  One of the people referenced in that

20    paragraph by first name is in fact Ms."G", is that right,

21    Doctor?

22                MR. ZENO:  No.

23                THE WITNESS:  Yes.  One is Ms."G" and one is

24    Ms."K".

25                THE COURT:  So, it's Ms."G" and Ms."K" that we're

63

1   talking about?

2           THE WITNESS:  I was getting confused.  Sorry.

3           MR. ZENO:  Easy to do.

4           THE COURT:  So, now that we have that clear, why

5   don't you reask your question.

6   BY MR. ZENO:

7     Q.   Ms."K" is reading the articles to him, is that correct?

8     A.   Yes.

9     Q.   And have you done anything to check what she is reading

10  to Mr. Hinckley?

11    A.   No.  However, I have spoken with Mr. Hinckley about

12  this and the content of the articles, and the reaction to the

13  articles, particularly because it related to the women that

14  are named in this paragraph.

15          THE COURT:  The articles?

16          THE WITNESS:  The articles, yes.  Indicated to me

17  that he had the knowledge of the articles.

18  BY MR. ZENO:

19    Q.   Of course he did.  The question is:  Are there more

20  articles that you don't know about?

21    A.   I don't have that information.

22    Q.   Because it would be important to counsel Mr. Hinckley

23  if he was getting media information that you didn't know

24  about, right?

25    A.   Yes.  I mean, every time he goes down to his parents'

1    community, I would imagine that there are articles that

2    potentially he could read.

3       Q.   Well, you would imagine, do you talk to him about what

4    he read when he comes back?

5       A.   Yes.  He provides me with a list of everything that he

6    purchases, everything that he -- and also what he leaves in

7    (Name of City) and what he brings to the hospital.

8       Q.   I understand that.  And that's what he purchases --

9       A.   If I can finish.

10      Q.   Sorry.  Go ahead.

11      A.   We discuss what he's reading there, what he's buying --

12   the books that he may purchase there.  And his family also

13   discusses that with us.

14      Q.   Okay.  Let's talk about -- got it -- a couple of

15   counseling things.  Mr. Hinckley has been counseling the son

16   of Ms."B", is that correct?

17      A.   I think that happened once, yes.

18      Q.   Do you know what counsel -- you don't have to say it

19   right this second, but do you know what Mr. Hinckley told to

20   the son?

21      A.   I can recollect, I believe.

22      Q.   You don't have to say it, I just want to know, do you

23   know?

24      A.   You don't want me to say?  Do I know is the only

25   question?

1    Q.    Do you know?

2    A.    Yes.

3    Q.    Okay.

4          THE COURT:  Do you know this because Mr. Hinckley

5    told you or another member of the treatment team or because

6    Ms."B" told you or another member of the treatment team?

7          THE WITNESS:  I know because Ms."B" was

8    interviewed.

9          THE COURT:  Right.  Okay.

10   BY MR. ZENO:

11   Q.    Now, on the topic of our counseling, I wanted to go

12   back just for a minutes to something about Dr. Lee.  You said

13   that Dr. Lee is going to be meeting with Mr. Hinckley for an

14   hour at a time as a medication manager?

15   A.    Yes.

16   Q.    How do you know that?  You're looking at me

17   quizzically, so I'm going to add to the question, if I may,

18   Your Honor.  Isn't it true that medication management meetings

19   are like ten minutes?

20   A.    He's not managing his medication, the medication is

21   managed at the Hospital.  He is providing psychiatric

22   coverage.  So, he will meet with him for an hour, and that is

23   the block of time that is allotted for Mr. Hinckley.

24   Q.    That's not just medication managing, but he's actually

25   going to do therapy, or what he's going to do during that

1   hour?

2       A.   He's going the assess him.  He's going to come up to

3   date on what's going on.  He's going to manage risk factors.

4       Q.   Is that what Mr. Beffa is going to do?

5       A.   Mr. Beffa will be providing the case management and

6   individual therapy at the same time.

7       Q.   My question is:  Is that -- Mr. Beffa's therapy the

8   same thing that Dr. Lee is going to do?

9       A.   No.

10      Q.   What's different?

11      A.   Dr. Lee will be providing mental status assessment,

12  emergency medication management, if necessary.

13      Q.   Okay.

14      A.   Manage risk factors.

15      Q.   And Mr. Beffa will provide?

16      A.   Individual therapy and case management.

17      Q.   Put case management aside, what's in individual therapy

18  that's different from what Dr. Lee is providing?

19      A.   Individual therapy is a much deeper exploration into

20  the issues.  He'll discuss Mr. Hinckley's reaction to some of

21  the potential rebuffs that he's been dealing with down there.

22  He will address on a more deeper level their relationship,

23  explore potentially his relationships with his family, and

24  look at some of the transparence and counter-transparence

25  issues in the relationship.  These aren't issues that Dr. Lee

1    would necessarily get into.  In fact, I've had Dr. Lee say,
2    you know, that he hadn't necessarily gotten -- wouldn't go as
3    deep into such issues.
4        Q.   So, he doesn't do as much as Mr. Beffa, is that right?
5        A.   I'm sorry, are you talking about now or in the past?
6        Q.   Now.  I thought you just said that Dr. Lee doesn't get
7    as deeply into issues as Mr. Beffa, was that correct?
8             THE COURT:  You're talking about going forward
9    under the (e)proposal?
10            MR. ZENO:  Right.
11            THE WITNESS:  That's correct.
12   BY MR. ZENO:
13       Q.   Not going as deep, right?
14       A.   No.
15       Q.   And, therefore, the kind of conflicts that Dr. Lee had
16   in the past are less likely to arise, isn't that correct?
17            THE COURT:  What kind of conflicts?
18   BY MR. ZENO:
19       Q.   The conflicts where he's going to be putting things to
20   Mr. Hinckley that Mr. Hinckley doesn't want to talk about?
21       A.   I don't know that that's necessarily so.  I mean, he
22   can still make comments.  In the context of that hour, he can
23   still address issues.  He's still going to be making those
24   comments.  I'm not Mr. Hinckley's individual therapist, but if
25   I see an issue I'll still address it with him.  I'll still

1    juxtapose conflicting situations to him.  That's still

2    therapeutic.

3              MR. ZENO:  Okay.  If I may have a moment, Your

4    Honor?

5              THE COURT:  Yes.

6    BY MR. ZENO:

7    Q.    The May trip?

8    A.    Yes.

9    Q.    The May trip we're talking about the Salvation Army,

10   right?

11   A.    Yes.

12   Q.    It was on the itinerary?

13   A.    Yes, it was.

14   Q.    And that means Mr. Hinckley put it on the itinerary?

15   A.    Well, not everything that's on the itinerary is

16   necessarily -- I mean, he develops the itinerary and then we

17   make adjustments and revise it and make recommendations, and

18   say to him, these things are things you really need to be

19   doing down there.  These are things that are nonnegotiable,

20   such as Dr. Lee's appointments.  And, for example, this

21   Salvation Army meeting was something that Mr. Shamblee thought

22   would be useful for him to show his face there.

23   Q.    A couple of things here.  First of all, my question

24   was:  Did Mr. Hinckley put it on the itinerary?

25   A.    No.

1    Q.    Secondly, you said that he, Mr. Hinckley, had an

2  appointment with Dr. Lee, right, isn't that what you just said

3  like in the last minute?

4    A.    Yes.

5    Q.    And isn't that precisely the term that you used with

6  regard to what Mr. Hinckley should do with the Salvation Army?

7  That he had, quote, an appointment?

8    A.    When did I say he had an appointment?

9    Q.    Do you remember saying that?

10   A.    I think I know what you're referring to in one of the

11 reports, it states that I said he had an appointment.

12   Q.    Right.  With the Salvation Army.

13   A.    Right.  Which is very possible that I said that.

14 Again, at the time that that was coordinated I was on

15 maternity leave and so I was not aware of what the

16 arrangements were with the team and who arranged what.  So, I

17 made reference to it as an appointment.  At the time I didn't

18 know that it was going to be -- you know, is this an

19 appointment or was this a suggestion.

20   Q.    Well, you didn't say it was a suggestion, did you, you

21 said it was an appointment.  That's what everybody thought it

22 was.

23   A.    It was my understanding that he was told, you really

24 should go there and show your face.  And in the context of my

25 interview with -- I can't remember which expert it was --

1    Q.   Dr. Patterson?

2    A.   Okay.  I explained that I thought the reason why he

3    didn't go was somewhat immature.

4    Q.   You didn't say somewhat, though, did you?

5    A.   Immature.  And the excuse being made was because he --

6    his brother was coming and that his mother had wanted to stay

7    there or get the brother, and that while it was something that

8    Mr. Shamblee thought would benefit him to go to this, Mr.

9    Hinckley believed he had an out.  And that a person that was

10   perhaps more mature would recognize that this was something

11   that maybe he should go to, but because he thought he had the

12   volunteer appointment --

13   Q.   Right.  I mean the words you just used were Mr.

14   Hinckley --

15            MR. LEVINE:  She's still answering the question.

16            THE WITNESS:  I'm sorry.  The volunteer job -- it

17   wasn't something that he needed to do.

18   BY MR. ZENO:

19   Q.   The words you just used were:  Mr. Hinckley thought he

20   had an out.  And that's exactly what he thought, isn't it?  He

21   had an out.  He used Scott's arrival as an out, right?

22   A.   Yes.

23   Q.   Entitlement and narcissism was one of the topics I was

24   going to go through.  Mr. Hinckley, you've said many times,

25   shows entitlement, right?

1    A.   At times he can, yes.

2    Q.   And he shows symptoms of narcissism, right?

3    A.   Well, he has Narcissistic Personality Disorder, which

4    is something that -- while significantly attenuated, it's

5    not -- it doesn't ever go away, I mean, they are personality

6    traits.  So, you know, you're going to see aspects of his

7    personality there.  Yes.

8    Q.   So the answer is yes, right?  He has -- he shows

9    symptoms of narcissism?

10   A.   At times, yes.

11          MR. ZENO:  If I may have a moment, Your Honor?

12          THE COURT:  Yes.

13   BY MR. ZENO:

14   Q.   Mr. Hinckley is undergoing -- new topic, okay?  Mr.

15   Hinckley is undergoing a new stressor which he hasn't had

16   before, which is the amount of rejection that he's receiving

17   down in the hometown, isn't that correct?

18   A.   Yes.

19   Q.   Something new for Mr. Hinckley, isn't that correct?

20   A.   Yes.

21   Q.   Let's talk about the (e)letter.  The (e)letter was

22   written on May 28th, is that correct?

23   A.   Yes.

24   Q.   I mean, it's dated May 28?

25   A.   Yes.

1    Q.    Which by the way is two weeks or so after Mr. Hinckley

2    was supposed to go to the Salvation Army, which is another

3    reason why there was so much impetus for him to go to the

4    Salvation Army, right?

5    A.    Again, I don't know what the impetus for Mr. Shamblee

6    saying that he should go.  I think it was important that he

7    have this position, yes.

8    Q.    You wrote the (e)letter, right?

9    A.    Yes.

10   Q.    And it contemplates that, according to the (e)letter,

11   he would be at Housing Partnerships, correct?  He being Mr.

12   Hinckley?

13   A.    Yes.

14   Q.    Now, a week before that you had written on May 21st

15   your recommendation to the review board about the volunteer

16   activity, correct, among other things, you had a lot of this

17   stuff in it?

18   A.    Yes.

19   Q.    And in your recommendation of May 21st you listed the

20   Salvation Army as the volunteer activity, correct?

21   A.    Yes.

22   Q.    And it went away between May 21st and May 28th,

23   correct?

24   A.    Correct.

25   Q.    And then inserted was the Housing Partnerships, and

1    that was what was recommended to the review board, is that

2    correct?

3      A.   That's correct.

4      Q.   And you thought it was important enough to actually

5    have a specific volunteer activity listed in the proposal to

6    the (e)letter, isn't that correct?

7      A.   Yes.  We were trying to respond to some of the

8    specificity that we believe was important to the Court.

9      Q.   And the items that you talked about on direct or the

10   places that you talked about on direct, none of that has been

11   to the review board yet, has it?

12            THE COURT:  What items?

13            MR. ZENO:  I'm trying to remember some of the

14   names.

15            THE COURT:  The other organizations.

16   BY MR. ZENO:

17     Q.   The other organizations.  The ones that were talked

18   about during your direct examination?

19     A.   No, but neither has Housing Partnerships.

20     Q.   Housing Partnerships -- you're saying you put something

21   in the official letter to the Court about Housing Partnerships

22   that was not approved by the review board?

23     A.   That's correct.

24     Q.   You just inserted it after it went to the review board?

25     A.   Something like a volunteer position is not something

74

1   that the review board would ordinarily need to review.  That

2   would be considered left to the treatment team to determine

3   its appropriateness.

4      Q.   Well, it wouldn't ordinarily apply, when would it

5   apply?  When would you need to provide the actual employment

6   or volunteer activity to the review board?

7      A.   The review board would approve something that would say

8   that, you know, there's a volunteer position would be

9   contemplated.  It wouldn't be as specific as which one.

10     Q.   Well, didn't you just a few moments ago say that -- I

11  asked you about specifically recommending one, and you said

12  ordinarily they wouldn't recommend the specific one.  And now

13  you're saying they never recommend the specific one or never

14  approve the specific one?

15     A.   We were trying to provide the specificity to the Court.

16  We don't provide that level of specificity to the review

17  board.

18     Q.   Then why did you put it in your May 28th recommendation

19  to the review board that the Salvation Army was the

20  recommended volunteer activity?

21     A.   If we can provide that level of specificity we will,

22  but if we don't have that level of specificity we don't

23  necessarily do that.  For example, there are other review

24  board reports that make recommendations for volunteer

25  positions or community service organizations that don't

1    ordinarily put that level of specificity into them.  And they

2    change, too, so, if something has been approved by the review

3    board, say, a community service agency, and then over time a

4    person decides that they want to call the access help line in

5    D.C. and change their community service agency, even though

6    one has been approved by the review board, we don't go back to

7    the review board to change a community service agency.

8              MR. ZENO:  If I may have a moment, Your Honor?

9              THE COURT:  I'm not trying to rush you, Mr. Zeno.

10             MR. ZENO:  I don't know, 5:00 o'clock seems a

11   little close.

12   BY MR. ZENO:

13     Q.    New topic.

14     A.    Go ahead.

15     Q.    On direct you said that additional supports had been

16   added to Mr. Hinckley because of the changes that he was going

17   to undergo -- changes he was going to face in a neutral sense,

18   I don't mean in a -- changes he was going to face when he went

19   on this proposed changes that are in the (e)letter.  Do you

20   remember talking about that?

21     A.    Yes.

22     Q.    And you said at the time that the additional supports

23   were Mr. Beffa becoming the individual therapist, right?

24     A.    Yes.

25     Q.    And Mr. Warren, right?

1    A.    Yes.

2    Q.    Those were the only two -- Reverend Warren?

3    A.    Reverend Warren.

4          THE COURT:  What was the first one, Reverend Warren

5    and --

6          MR. ZENO:  Mr. Beffa.

7          THE COURT:  Right.

8    BY MR. ZENO:

9    Q.    Those were the additional ones and those were the only

10   two that you mentioned, right?

11   A.    That's correct.

12   Q.    Mr. Beffa is already there, right?

13   A.    He will be serving in an additional capacity, he'll be

14   providing individual therapy.  And previously he wasn't seen

15   on every visit.

16   Q.    He's also going to be doing case management, is that

17   right?

18   A.    That's correct.

19   Q.    So he's going to be doing both of them?

20   A.    That's correct.

21   Q.    And then there's Reverend Warren, right?

22   A.    That's correct.

23   Q.    And what training does Reverend Warren have in working

24   with insanity acquitees?

25   A.    He's worked with ex-convicts and he has experience

77

1   working with Save the Life Foundation, which was for

2   individuals that had attempted suicide.  However, I should

3   stress that Reverend Warren is not going to be providing

4   therapy, he's going to be a support.

5   Q.   Right.  That's what I was going to ask you about, so

6   now I can move on to a different thing.  Let's talk about the

7   D.C. option.

8           THE COURT:  Is Reverend Warren mentioned in the

9   (e)letter?

10           THE WITNESS:  Yes.

11   BY MR. ZENO:

12   Q.   The D.C. option.

13   A.   Yes.

14   Q.   There is no recommendation, plan, hope or idea that Mr.

15   Hinckley is going to drive a car in or around the District of

16   Columbia, is there?

17   A.   No.

18   Q.   None?

19   A.   None.

20   Q.   The only thing you're thinking is he has to get a

21   license here in D.C. in order to take driver's lessons down in

22   the community?

23   A.   That's correct.

24   Q.   And if he could get a driver's license down in the

25   community, you wouldn't care where he got the driver's

1  license?

2     A.    That's correct.

3     Q.    Now, Dr. Binks thinks that the whole idea of the D.C.

4  option adds unnecessary complications, isn't that correct?

5     A.    I'm not Dr. Binks.  I'm not -- I can't testify as to

6  what Dr. Binks thinks.  I'm not sure I understand.

7     Q.    Not on this issue?

8     A.    No.  I don't know.  I can't -- I'm not sure I

9  understand that question.

10           THE COURT:  Is there -- is Dr. Binks' view stated

11  somewhere in Dr. Montalbano's report or Dr. Patterson's or --

12           MR. ZENO:  It's in Dr. Phillips' report at 19, if

13  you want to take a look.  I mean, if she doesn't know, she

14  doesn't know, but if that would refresh her recollection.

15           THE WITNESS:  Is there a page you can refer to me?

16           MR. ZENO:  Nineteen, I thought I said.

17           THE WITNESS:  Sorry.  Okay.

18  BY MR. ZENO:

19     Q.    Hang on a second.  I'll give you a little help where.

20  Last full paragraph, not the indented paragraph but the one

21  above it.  We also explored -- do you see that?

22     A.    Yes.  Okay.  Yes.

23     Q.    And that says that Dr. Binks told Dr. Phillips that the

24  D.C. plan was fraught with unnecessary complications, correct?

25     A.    Yes.

1    Q.    Even though he's at Harbor Lights, which is where Mr.

2  Hinckley is going to go?

3    A.    Yes.  He's never expressed that view to me.

4    Q.    Okay.

5          THE COURT:  I think we need to ask Dr. Phillips

6  about this because, as I read the sentence, it says:  At the

7  time of the last hearing, Dr. Binks thought that the concept

8  of the D.C. plan was not a good idea.  But the concept at the

9  time of the last hearing, I think, was different than the

10  concept at this time.

11         MR. ZENO:  We'll ask him.  That's fine.

12  BY MR. ZENO:

13    Q.    New concept.

14         THE COURT:  In fact, the next sentence says:  Dr.

15  Binks sees the current recommendation in this regard as more

16  toned down than those put forward in 2007.  And then it goes

17  on to explain what Binks said about his disagreement with

18  Shamblee.

19         MR. ZENO:  Okay.

20         THE COURT:  Anyway.

21  BY MR. ZENO:

22    Q.    New topic.

23    A.    Okay.

24    Q.    The letters that were marked Exhibits 7, 8 and 9, do

25  you remember we were -- you were talking about those on

1    direct, this is Patient 7, 8 and 9.  Do you know what we're

2    talking about, right?

3                  THE COURT:  Does this have to do with volunteer

4    opportunities in that community?

5                  THE WITNESS:  Yes.

6    BY MR. ZENO:

7    Q.    They are dated July 21st and July 22nd?

8    A.    That's correct.

9    Q.    That's Monday and Tuesday, right?

10   A.    That's correct.

11   Q.    Now, you said on direct that the treatment team has

12   decided it needs to be more involved in getting the

13   connections down in the mother's hometown, correct?

14   A.    Correct.

15   Q.    The treatment team wasn't doing this on the 21st and

16   the 22nd of July, was it?

17   A.    No.  Mr. Beffa was exploring these.

18   Q.    So, Mr. Beffa had been told to go do this, right?

19   A.    Well, over the course of several months he was told

20   that he would be doing this.  I was involved prior to this

21   hearing.  We've all been involved trying to find these

22   positions.  I mean, this is the result of his kind of pulling

23   something together at the -- feeling as though -- let me stop

24   and start again.

25                  This was Mr. Beffa and everyone trying to obtain

1    a position for Mr. Hinckley.  We have all tried extremely hard
2    to find something for him.  And even Mr. Hinckley spent --
3    went to a number of places and looked for positions, again,
4    was rebuffed.  The fact of the matter is that that community
5    is very unwelcoming to him, and it's not for lack of effort
6    that there aren't positions.  And I think it's unfair to
7    characterize that we're running around at the last minute
8    trying to find something because over the course of several
9    months we've been looking.
10   Q.   Right, I understand it's been over several months.  The
11   problem is with the dates of the 21st and the 22nd, you're
12   saying that there was no pressure whatsoever to try and put
13   something in front of this Court during this hearing?  That
14   this is just a natural consequence of what Mr. Beffa was
15   doing?
16   A.   I think it's -- the pressure is that it's important
17   that he have a position to go to.  I mean, it's important that
18   he have a volunteer job to go to.
19   Q.   Right.  And you could have come into this hearing and
20   said:  We need to have flexibility, this is hard, we need more
21   time to coordinate.  You could have done that, right?
22   A.   I suppose.  I'm not sure how well that would have been
23   received by yourself, Mr. Zeno.
24   Q.   May well be, but you could have tried.
25              COURT REPORTER:  I couldn't hear Mr. Levine.

1            THE COURT:  He said -- so the record is complete,

2   Mr. Levine said:  Spare me.

3   BY MR. ZENO:

4    Q.   And instead, what happened was, Mr. Beffa was put on an

5   accelerated schedule to try and get something in writing

6   before the Court this week?

7            THE COURT:  Question mark.

8   BY MR. ZENO:

9    Q.   Isn't that true?

10   A.   I would say yes to that.

11   Q.   And that made it really tough, didn't it?

12   A.   We're trying to produce something so that he can have a

13   productive work experience in (Name of City).  And we've been

14   working really hard at it.  We feel that it's important to

15   produce a specific volunteer opportunity to the Court.

16   Q.   And Mr. Hinckley has been to -- name them?  Colon,

17   please name them.  Count them.

18   A.   Right after the last hearing under the previous Court

19   order he went to (Name of City) Regional Library.  And I

20   believe I described that he was -- I thought I already

21   testified to this, but I'll do it again.

22            THE COURT:  I thought we went through a bunch of

23   these this morning.

24            MR. ZENO:  Your Honor, in light of the time.

25            THE COURT:  Let me just -- if I can look at my

83

1    notes for just a minute, maybe I can -- maybe I can go back

2    here a second.

3              MR. ZENO:  Your Honor, while you're looking, if I

4    can step away from the podium a second.

5              THE COURT:  All right.  The ones that I have listed

6    from this morning that you mentioned are Vibrant Life

7    Ministries, Unitarian Universalist Church.          Services

8    Board, Housing Partnerships and Heritage Humane Society,

9    Salvation Army.  I've already mentioned Housing Partnerships.

10   And then I think you mentioned, but I can't now find it, two

11   different libraries, one at a hospital and one someplace else.

12   Is that about the list or is there --

13             THE WITNESS:  It was the (Name of City) Regional

14   Library.

15             MR. LEVINE:  Also Eastern State Hospital.

16             THE COURT:  That's the other one I was thinking

17   about, a hospital.

18             MR. ZENO:  Has Mr. Hinckley been to Eastern State

19   Hospital?

20             THE COURT:  No, these are the ones that you

21   mention.  If that is the complete list, then I think what

22   Mr. Zeno -- and I'm not sure it is, but that is what I found

23   in my notes.  If I missed something, somebody will add it.  I

24   guess Mr. Zeno's question is from that list of seven or eight,

25   whatever the number is, which ones has Mr. Hinckley himself

1    been to?

2              MR. ZENO:  Right.  That's my question.

3              THE WITNESS:  Okay.  He went to the (Name of City)

4    Regional Library after the last hearing.  Then he went to the

5    Heritage Humane Society.  He went to the Salvation Army.  And

6    I believe during the May visit when he went to the local art

7    gallery, he inquired there about volunteer positions but there

8    was none.

9    BY MR. ZENO:

10    Q.    That's it, right?

11    A.    I believe so.

12    Q.    And the Salvation Army he hasn't been to, right?

13              THE COURT:  Was he there once?

14              THE WITNESS:  He went to the Salvation Army in

15    March.

16    BY MR. ZENO:

17    Q.    That was the follow-up that he missed?

18    A.    In May was the follow-up.

19    Q.    Okay.

20              MR. ZENO:  If I may have just another minute, Your

21    Honor.

22              THE COURT:  Take your time, Mr. Zeno, I'm not

23    trying to -- you got a whole 35 minutes here, assuming there's

24    no redirect.

25              MR. ZENO:  I've been told there's none.  Thank you.

```
 1   BY MR. ZENO:
 2     Q.   You said something on direct that I hadn't heard
 3   before, and since I have a minute, let me ask you about it.
 4   Do you remember talking about the May visit?  So we're back to
 5   the May visit.
 6     A.   Okay.
 7     Q.   And I believe you said something about events happened
 8   at the family home.  Do you remember saying something like
 9   that on direct?
10     A.   Events happened at the family home?  I'm not sure I
11   know what you're referring to.
12     Q.   It doesn't refresh your recollection?
13     A.   No.  I'm sorry, I don't know what you're referring to.
14          MR. ZENO:  Your Honor, I think that's it.
15          THE COURT:  Okay.  Stay where you are, Mr. Levine
16   may have some questions.  Excuse me, one second.  All right.
17   Mr. Levine.
18          MR. LEVINE:  No questions, Your Honor?
19          THE COURT:  Okay.  Since he has no questions, do
20   you want to use anymore --
21          MR. LEVINE:  No, no, no.  I thought I was
22   expressing surprise that you had no questions.
23          THE COURT:  Oh. Oh.
24          MR. LEVINE:  I have some questions.
25          THE COURT:  Oh.  Let me -- actually, now that you
```

 1    have invited me, there is a question that you put on the table

 2    and is on the table, and that is whether or not the voluntary

 3    activities in his mother's home area, just how flexible we

 4    should be about it?  But in the meantime, the (e)proposal

 5    itself has a specific thing in it, which is no longer -- is

 6    now off the table, right?

 7               THE WITNESS:  Yes.

 8               THE COURT:  What I wasn't clear about, and I don't

 9    know whether you are or not, and maybe we need to ask Mr.

10    Beffa, is how firm is the opportunity that was mentioned, I

11    think for the first time yesterday by Dr. Montalbano, and has

12    been alluded to by you today in terms of whether Mr. Hinckley

13    has a firm offer, and what the hours would be, and what he

14    would be doing there.  Do we know -- do you know the answer to

15    that?

16               THE WITNESS:  Well, I think in general these type

17    of positions -- they can change, unfortunately.  I know that

18    he is being accepted here.  There are a couple of more that we

19    are continuing to explore in case there is something that may

20    be more beneficial for him.  In case one of these has fallen

21    through, we've come to learn at this point that they either

22    fall through or whatever.  This one is pretty -- I mean, they

23    are willing to provide us with a letter, they are willing to

24    say that they will take him.  But it's probably safer to have

25    a mechanism in there.  I think we tried to do that by saying

 1    in the (e)motion that if there was a need to make a change, I

 2    think it's the last bullet in the (e)motion that we could do

 3    that with advance notice to the Court without necessarily

 4    having to come back.  So, we kind of anticipated that

 5    somewhat.

 6              THE COURT:  And I think my last question is --

 7              MR. LEVINE:  Your Honor, just for the last point,

 8    it's Number 17 of the (e)motion.

 9              THE COURT:  Right.  Could you tell us one more time

10    how you view Reverend Warren's role and how he would interact

11    with Mr. Beffa and with the Hospital?

12              THE WITNESS:  Yes.  Reverend Warren would serve as

13    an additional support and a mentor.  He would provide -- he

14    would serve as a resource working against the resistance in

15    the community.  He currently works with ex-convicts helping

16    them reintegrate into the community.  He has a lot of contacts

17    and resources in the community.  So, he's able to kind of make

18    some calls, he knows some people, he's tried to help us obtain

19    some volunteer positions, of course, they didn't always come

20    through, but he's helpful in that manner.

21              He also met with Mr. Hinckley on a previous visit

22    and they established some rapport.  So, he's then another

23    person for him to -- let's say Mr. Hinckley were granted this

24    unsupervised time in the community, they could meet at

25    Starbucks, it's a male, positive role model for him to

1    interact with that has experience working, albeit maybe not

2    with NGBRI acquitees, but with ex-convicts who help them

3    reintegrate in the community.  He's provided rides for

4    individuals.  He's already made contact with Mr. Beffa, they

5    have communicated.  He would be communicating with me after

6    each visit.  So, that's an additional support in addition to

7    Mr. Hinckley's family, Dr. Lee, Mr. Beffa, available to him in

8    that community.

9              THE COURT:  Thank you.

10             THE WITNESS:  Sure.

11             THE COURT:  Mr. Levine.

12             MR. LEVINE:  Thank you, sir.

13                       REDIRECT EXAMINATION

14   BY MR. LEVINE:

15     Q.   Please the Court.  Do you remember Mr. Zeno asking you

16   questions about the Government position with respect to the

17   pending motion, and that the Government doesn't oppose all

18   expansions of privileges, do you remember that?

19     A.   Yes.

20     Q.   And remember, for example, he said the Government

21   doesn't oppose the additional time that he would get in the

22   same period of -- I think it was six days of release?  Do you

23   remember that?

24     A.   Yes.

25     Q.   Now, have you had a chance to read the Government's

1    motion to deny Hospital's request for expanded conditions of

2    release?

3      A.   Yes.

4      Q.   And does the title tell you whether the Government

5    moves to deny the Hospital's request for expanded conditions

6    of release?

7      A.   Yes.

8      Q.   And in the first line of the motion, I read it in its

9    entirety.  Tell me if the Government opposes the Hospital's

10   request for expanded conditions of release.  Quote:  The

11   United States of America by and through its attorney, the

12   United States Attorney for the District of Columbia,

13   respectfully opposes the Hospital's request for expanded

14   conditions of release and presents the following in support of

15   its opposition.  Does that tell you that the Government in

16   fact --

17            MR. ZENO:  Excuse me, Your Honor, Rule of

18   Completeness.

19            THE COURT:  He did use the word -- he did quote the

20   word expanded.

21            MR. ZENO:  We then go on to explain the expansion

22   that we oppose.

23            THE COURT:  Do you want to read the whole --

24            MR. LEVINE:  If there's another line here that

25   would make this more complete, I invite at this time a

1    reference to that line.

2              THE COURT:  I would like to suggest that, you know,

3    asking Dr. Rafanello about this is kind of silly, with all due

4    respect, Mr. Levine.  I can read it, I've read it, I've

5    probably read it four times.

6              MR. LEVINE:  I had another point and that was the

7    introduction to the point, Your Honor.

8              THE COURT:  All right.

9              MR. LEVINE:  But that was surely the beginning of

10   the point.

11   BY MR. LEVINE:

12     Q.   Now, in your view, Dr. Rafanello, was the suggestion

13   made by Mr. Zeno that it didn't oppose the expansion of

14   conditions of release, somewhat misleading?  Did you notice

15   the infliction here, somewhat misleading?

16             THE COURT:  I think he's asking for your

17   professional opinion.

18             THE WITNESS:  I'm not sure.

19   BY MR. LEVINE:

20     Q.   Was it a lie?

21     A.   Can you be more specific with the question?

22             MR. LEVINE:  I'll move on.

23   BY MR. LEVINE:

24     Q.   Now, the Government asked some questions about the

25   candor -- about Mr. Hinckley's candor with respect to Dr. Lee.

1    And Dr. Lee attributed to Mr. Hinckley that he had a platonic

2    relationship with Ms."G", do you recall that?

3      A.    Yes.

4      Q.    Now, you knew, that is to say, the Hospital knew that

5    he was being intimate, that, he, Mr. Hinckley, was being

6    intimate with Ms."G"?

7      A.    Yes.

8      Q.    And you knew or the Hospital knew that Dr. Lee was

9    simply wrong in his letter when he called it platonic?

10     A.    Simply --

11     Q.    Is that correct?

12     A.    Well, I called him up to address the situation.

13     Q.    And this is an issue that had been addressed by Mr.

14   Hinckley with Dr. Binks, isn't that correct?  Mr. Hinckley had

15   already told Dr. Binks that he was being intimate with Ms."G",

16   isn't that correct?

17     A.    Yes, he had discussed it with Dr. Binks.

18     Q.    And he had discussed that intimacy with other members

19   of the treatment team, isn't that correct?

20     A.    Yes.

21     Q.    So, the Hospital knew, not only from Dr. Binks, but

22   from others within the Hospital that Mr. Hinckley had candidly

23   stated that he was being intimate with Ms."G", is that

24   correct?

25     A.    Yes.

1    Q.    Did you raise the specter with Dr. Lee that perhaps he

2  was just wrong?

3    A.    I'm trying to recall the exact conversation.

4    Q.    Well, do you have a reason why Mr. Hinckley would tell

5  Dr. Binks that he's being intimate with Ms."G", and tell other

6  members of the treatment team that he was being intimate with

7  Ms."G", but say something else to Dr. Lee?  Is that plausible?

8    A.    As I testified earlier, my belief was that he

9  explained -- he might not explain it to Dr. Lee because it

10 would be uncomfortable to talk about with Dr. Lee.

11   Q.    Yes, but that doesn't address the question of whether

12 or not he was misstating it to Dr. Lee.  Is it more plausible

13 that Dr. Lee was either confused as to time in which he was

14 being intimate or not intimate with her?

15   A.    It's possible.

16         THE COURT:  But is it also plausible that someone

17 like Mr. Hinckley, with all that you know about Mr. Hinckley,

18 would be less candid and less open with a treating

19 physician -- a treating professional who was more

20 confrontational and more judgmental, than he would be with a

21 treating professional that he's known for a longer time who is

22 not so judgmental and whose technique is to be more

23 exploratory and conversational.  Is that --

24         THE WITNESS:  Is that a question?

25         THE COURT:  Is that plausible?

93

1          THE WITNESS:  I think he would definitely be more

2   open with someone whose technique is more exploratory.  And I

3   think that's something that we see in Mr. Beffa, definitely.

4   And that's, again, another reason why we're going with Mr.

5   Beffa.  However, I'm not discounting the possibility that

6   there may be some confusion about the timeframe there.  And,

7   again, keep in mind, you know, this is one instance in a large

8   body of evidence, and I don't think this one instance creates

9   danger.

10          THE COURT:  I think what we're talking about here

11   is -- Mr. Levine would like you to draw an inference from this

12   event that Dr. Lee just got it wrong.  And I'm asking you,

13   isn't it just as plausible or even more plausible that Dr. Lee

14   got it right because Mr. Hinckley was more comfortable talking

15   with Dr. Binks than with Dr. Lee?  And I think the real

16   question -- I agree with you, this one little incident is

17   perhaps not even worth all the time that we're spending on it,

18   but what I'd be more interested in is not whether my

19   plausibility analysis, see            --

20          MR. LEVINE:  Yes, see Twombly.

21          THE COURT:  Whether my plausibility analysis makes

22   more sense to you than Mr. Levine's or whether his makes more

23   sense to you.  But rather whether you can recall anything from

24   your conversation with Dr. Lee that leads you to one

25   conclusion or another as to whether he might have got it wrong

94

1    or he probably got it right, and there might be reasons why

2    Mr. Hinckley was less forthcoming.

3            Is there anything that you remember -- I mean, it

4    raised a red flag with you enough so that you picked up the

5    phone and called Dr. Lee.  Is there anything about the

6    conversation with Dr. Lee that you can remember that will help

7    us sort through this?

8            THE WITNESS:  What I can remember of the

9    conversation is that I said, you know, you're stating that

10   this is platonic and they've been engaged in a much more

11   romantic relationship since this.  And his response was:

12   That's news to me.  I recall that much of the conversation.

13   That's what I can remember.  And I also -- the gist of the

14   conversation, unfortunately, was me discussing I'm going on

15   maternity leave and this person is covering and whatnot also.

16           MR. LEVINE:  All right.  If I may move on?

17           THE COURT:  Yes.

18           MR. LEVINE:  Sorry, Your Honor.

19           THE COURT:  I'm done with my plausibility inquiry.

20   BY MR. LEVINE:

21    Q.   You recall the Government makes reference to Government

22   Number 8, is that document before you?  It's a letter from Dr.

23   Lee to you, Dr. Rafanello, dated March 19, 2008.  And in that

24   letter he makes reference to the fact that Ms."G" has a

25   15-year relationship and there is a question about this

1    triangle, do you remember that -- that triangular

2    relationship?

3        A.    Yes.

4        Q.    Do you remember that inquiry by Mr. Zeno?

5        A.    Yes.

6        Q.    And Mr. Zeno poses the question, using the language of

7    the letter, the letter saying no one is perturbed -- no one

8    seems to be perturbed about it.  That raises the question as

9    though it were not plausible.  You mean to say no one was

10   perturbed, do you remember that, he was aghast.  Now, is it a

11   fact that Ms."G" comes to see Mr. Hinckley?

12       A.    Yes.

13       Q.    And is it a fact that Ms."G" chooses to engage in

14   intimacies with Mr. Hinckley?

15       A.    Yes.

16       Q.    And if Ms."G" didn't want to engage in intimacies with

17   Mr. Hinckley she needed merely tell him to stop or merely stop

18   herself or merely stop coming to see Mr. Hinckley, isn't that

19   true?

20       A.    Yes.

21       Q.    Does it raise the question of just how committed this

22   15-year relationship may be?

23       A.    Yes.

24       Q.    And does it reflect poorly perhaps on Ms."G's"

25   judgment?

1    A.    Yes.

2    Q.    And should he be perturbed if he merely enjoys her

3    present company?

4    A.    Should who?

5    Q.    Should Mr. Hinckley be perturbed if he enjoys in a

6    present sense her company?  She comes, she visits, he enjoys.

7    Should he be perturbed?

8    A.    No, I mean, he's clearly looking for companionship.

9    Q.    Maybe her boyfriend should be perturbed, but should Mr.

10   Hinckley be perturbed?

11   A.    Well, I think -- I just don't like that word perturbed.

12   Q.    The word used by Dr. Lee?

13   A.    All right.  Perhaps we can use our own words here.  But

14   I think that he enjoying her company is important to him, and

15   that considering the ramifications of the relationship is

16   grist for the therapeutic mill.  And engaging in the

17   relationships is an opportunity for him to learn about the

18   relationships.  His judgment has been questionable, that's

19   been clear, but we have been -- the only way he's going to

20   learn about relationships is like anyone else, by having them.

21   Q.    By having them and then examining them?

22   A.    Yes.  So, we're working to try to give him an

23   opportunity to learn about relationships and improve his

24   judgment.  He has to make some mistakes in order to get better

25   at having relationships.  He's had very few relationships.

1   He's been in a controlled environment for many years, so it's

2   important that he have some relationships, even if sometimes

3   they are bad, even if sometimes he makes mistakes so that he

4   can learn about them.

5       Q.    Is it okay and a learning device for him to have

6   relationships in which he doesn't really have to contemplate

7   the future of those relationships, just enjoying the present?

8       A.    At times, I mean, everyone wants to just enjoy the

9   present.  I think he is under a lot of pressure in many ways

10  to always be considering, you know, how will this look in

11  court or what will the treatment providers think, I mean,

12  everything he does is watched.

13      Q.    And is having a relationship an anecdote to loneliness?

14      A.    Yes.

15      Q.    And is it generally right, in your view, a good

16  practice, in your view, for a therapist to make moral

17  judgments?

18      A.    You're supposed to take a nonjudgmental stance in

19  therapy, at least that's what my training has been.

20      Q.    Should a therapist express approval or some

21  disapprobation about a relationship?

22      A.    Well, judgment and allowing a person to look at the

23  consequences of behavior are two very different things.  So,

24  if you're making moral judgments and condemning someone in

25  therapy is one thing, but allowing someone to see where

1   they're headed or what the potential ramifications are is more

2   along the lines of what therapy is.

3       Q.    Should a therapist be confrontational?  Should he say:

4   That's wrong behavior?

5       A.    That's not generally the way that therapy is done.  I

6   mean, certain therapists take a more active stance.  And there

7   is a difference between counseling and individual therapy.

8   And counseling is usually more of an active kind of role as

9   opposed to individual therapy, which is more of an exploratory

10  kind of guiding.

11      Q.    Is there any way to know about a patient's judgment

12  unless they are allowed to exercise their judgment?

13      A.    Not really.

14      Q.    Is it better in that respect to allow a patient to make

15  decisions rather than to tell him what to do?

16      A.    Definitely, because then you never really know what

17  their decision making is like.

18      Q.    Now --

19      A.    That's why I said before that you do that in therapy so

20  that they can own the decision as opposed to just having you

21  tell them what to do.

22      Q.    Now, the Government went on to ask questions in another

23  area in which it sought to challenge Mr. Hinckley's

24  credibility.  It made reference to Government Number 10, which

25  is a letter dated September 12th, do you have that?  I wrote

1    September 12th down in my note.

2    A.    September 12th.  Okay.  Yes.

3    Q.    The letter to the Court.  And while I don't have it

4    here, I'm still looking for it, I think it was on Page 5?  I'm

5    sorry, it's Government 10 and it's dated September 12th.

6    A.    Okay.

7    Q.    Do you have that in front of you?

8    A.    I do.

9    Q.    Now, this pertains to Ms."M"?

10   A.    Yes.

11   Q.    And John says -- it reports:  That we're just cat

12   friends.  And that's as of the day of the interview, isn't it,

13   that's August 29, 2007, is that right?

14   A.    Yes.

15   Q.    Now, he also says in the same document, essentially,

16   that the relationship is on again and off again.  And to

17   actually quote from the document, it says that:  Sometimes

18   Ms."M" was affectionate with him and sometimes she was not.

19   Is that what it says?

20   A.    Yes.

21   Q.    So that contemplates some days before then and some

22   days -- well, some days substantially before then and some

23   days a little bit before then, is that correct?

24   A.    Yes.

25   Q.    And with respect to those days that she was

1    affectionate, it says -- or he says that he had fondling

2    privileges, correct?

3        A.    Correct.

4        Q.    And he reports that to the hospital?

5        A.    Yes.

6        Q.    And your understanding of that is reflected in

7    Government 13, if I may invite your attention to it, which is

8    your recommendation dated May 21 to the review board.  Let me

9    invite your attention, please, to Page 6 of that document,

10   last paragraph.  Is this your document?

11       A.    Yes.

12       Q.    You write:  Since the last hearing, despite, quote, the

13   mercurial, closed quote, nature of Ms."M"", Mr. Hinckley

14   maintained an off again -- excuse me, an on again off again

15   relationship with her that was at times platonic and other

16   times allowed for fondling privileges, correct?  Is that your

17   understanding of it?

18       A.    Yes.

19       Q.    So do you understand him to have lied to the Hospital

20   about the nature of the relationship and whether he had

21   fondling privileges?

22       A.    No.  He told us about the -- he told us -- the question

23   I think was when -- and was he coming forward, I guess, you

24   know, immediately?  I don't know, I'm sorry.

25       Q.    Did he come forward when he was supposed to?

1    A.    When we asked -- I think the point is, when we asked

2    the pointed questions.

3    Q.    And did he give you -- did he give you accurate

4    answers?

5    A.    Yes.

6    Q.    There was a question asked about watching The Wire in

7    the lobby, do you remember that?

8    A.    Yes.

9    Q.    Do you know how much of this -- it's a program, is that

10   what it is, a TV program?  I can't say I ever saw it, Your

11   Honor.

12            THE COURT:  It's supposed to be very good.  I

13   haven't seen it.  One of my colleagues never misses it.

14            MR. LEVINE:  I've missed all of them.

15            THE COURT:  So have I.

16   BY MR. LEVINE:

17   Q.    Do you know how much of that program he may have

18   watched?  Do you know if he watched merely a few minutes of

19   it?

20   A.    I think he told me he saw a portion of it.  I don't

21   know that he saw the whole thing.  I do know that the FPTs

22   were there in the lobby and Ms. Wright made a note about it.

23   Q.    So, it was done in the lobby in front of the FPT, is

24   that correct?

25   A.    Yes.

1    Q.    Was he hiding it?

2    A.    No.

3    Q.    Then Mr. Zeno asked some questions about Ms."K", and

4    raised the sinister specter of her reading articles from the

5    media to him.  Do you remember those questions?

6    A.    Yes.

7    Q.    Now, is Mr. Hinckley allowed to watch television?

8    A.    Yes.

9    Q.    Is Mr. Hinckley allowed to watch the news?

10   A.    Yes.

11   Q.    Is Mr. Hinckley allowed to read the newspaper?

12   A.    Yes.

13   Q.    Is Mr. Hinckley allowed to actually read what the media

14   prints?

15   A.    Yes.

16   Q.    Do you think it is necessary for the treatment team to

17   ask Mr. Hinckley about every news article he reads or every

18   news program he watches?

19   A.    No.

20   Q.    Do you think it is wrong for Mr. Hinckley to have an

21   interest in -- were it to be the case, and there's no evidence

22   that it is, what the media reports about him in hearings like

23   this?

24   A.    I think that it's common human curiosity to know how

25   you're perceived out in the public and what is being said.

1    Q.    So, is there any problem that you perceive in Mr.

2    Hinckley hearing somebody read articles from the media to him?

3    Articles that apparently interest this reader?

4    A.    Is there any problem with him -- I'm sorry.

5    Q.    Is there any problem that you perceive to someone

6    reading a news article to him?

7    A.    I don't think that there's -- again, of course, there

8    has been history to him having information brought to him, but

9    at the current time I believe that he has demonstrated over

10   time that that's not something that is currently an issue with

11   him.  He's not been secretive.  We've done extensive searches

12   of his room.  He's not harboring things or hiding things in

13   his room.  I don't see anything that would lead us to feel

14   that him -- getting information about an article that was

15   written about him in his family's community creates danger.

16   Q.    Now, moving along.  Mr. Zeno asked some questions about

17   this Salvation Army matter and that Mr. Hinckley did not visit

18   the Salvation Army on a given date.  Do you recall that

19   inquiry?

20   A.    Yes.

21   Q.    Now, I think he brought out the fact that you had made

22   a comment that -- the fact that he didn't go may have

23   reflected on his maturity or immaturity?

24   A.    Yes.

25   Q.    Now, was he required to go with his mother to the

1   Salvation Army?  If he was to go, was he required to go with

2   his mother?

3      A.   Yes.

4      Q.   And at that time his brother Scott was detained in

5   transit to the family area, is that correct?

6      A.   Yes.

7      Q.   And was his mother concerned about that?

8      A.   Yes.

9      Q.   And, as you understand it, he was merely encouraged to

10  go by Mr. Shamblee but not required to go, is that correct?

11     A.   That's the understanding, yes.

12     Q.   And he had the prerogative to go or not go, is that

13  correct?

14     A.   I believe that he was encouraged to go.

15     Q.   But he wasn't required to go, is that correct?

16     A.   Yes, there was no appointment.  I believe that it

17  was -- he was told that it would be beneficial for him to go.

18  There was no appointment scheduled.

19     Q.   And is it plausible that his mother, somewhat stressed

20  by the fact that her other son was detained, didn't want to

21  go, given the fact that he was not required to go?

22     A.   I'm sorry, can you say that again.

23     Q.   Surely.  Is it not plausible that given the fact that

24  Mrs. Hinckley was feeling some anxiousness, some anxiety,

25  perhaps, that brother Scott was detained, that Mr. Hinckley,

1    who was not required to go, didn't go, perhaps in deference to

2    his mother.  Is that plausible?

3      A.   I'm not sure, you know, I suppose that that might be

4    plausible.  I think that he -- I can't really -- I can't

5    testify as to what the situation was, you know, in the home.

6    I know for a fact that Scott was coming in.  I know that it

7    was a recommendation.  I know that there was no scheduled

8    appointment.  I suppose that is plausible that he was

9    concerned that his brother -- that his mother had some anxiety

10   about Scott being late.  So, I guess in answer to your

11   question, it's plausible, yes.

12     Q.   He had a choice, didn't he?  He had a choice.  He had

13   to exercise a judgment whether to go or not to go, and under

14   the circumstances he chose not to go?

15     A.   Yes.

16     Q.   Now, does that make him a liar?

17     A.   No.  He told me that he didn't go.

18     Q.   And does that make him dangerous?

19     A.   No.

20          THE COURT:  Does it reflect on his initiative or

21   lack thereof or his judgment?

22          THE WITNESS:  Yes.

23   BY MR. LEVINE:

24     Q.   Well, does it reflect adversely on his judgment, given

25   the fact that his mother was somewhat anxious about the

1    situation, that maybe there was some deference there to that?

2      A.   If he was concerned about his mother, yes.  But I

3    think, again, he -- it was probably in his best interest to

4    go.

5      Q.   It may have been in his best interest to go, and he may

6    have perceived it to have been in his mother's best interest

7    that he not go.  And he may have elevated his mother's

8    interest over his own, is that possible?  Worthy of

9    exploration?

10           THE COURT:  The answer to the first question is,

11   yes, it's possible, right?

12           THE WITNESS:  Yes.

13           THE COURT:  Worthy of exploration?

14           MR. LEVINE:  Maybe not even worthy, correct, Your

15   Honor.

16           THE COURT:  I don't know if anyone has explored it.

17   BY MR. LEVINE:

18     Q.   All right.  Let's move on to the Government's reference

19   to Defendant's 7 or Patient's 7, 8 and 9.  The Government

20   notes that those are the letters dated July 21 and July 22,

21   Monday and Tuesday of this week.  And the Government

22   challenges the initiatives, if you will, of the Hospital in

23   getting a spot for Mr. Hinckley in which to volunteer.  Do you

24   recall that inquiry?

25     A.   Yes.

1    Q.   And you responded to Mr. Zeno by saying, all, the

2    Hospital, Mr. Beffa, tried extremely hard to find a position,

3    the community is unwelcoming.  Do you remember saying that?

4    A.   Yes.

5    Q.   Is it, in your view, unfair for the Government to

6    characterize the Hospital effort as a last minute effort?

7    A.   Yes.

8    Q.   Is the Hospital getting any help from the Government?

9    A.   (Indicating).

10   Q.   It's laughable, isn't it?

11             MR. LEVINE:  Nothing further, Your Honor.

12             THE COURT:  Mr. Zeno.

13             MR. ZENO:  No, thank you, Your Honor.  It's done.

14             THE WITNESS:  Thank you.

15             THE COURT:  Will we see you tomorrow?

16             THE WITNESS:  Yes, I'll be here, though.  Not here.

17             THE COURT:  Back there.  Thank you, Dr. Rafanello.

18             THE WITNESS:  Thank you.

19             MR. LEVINE:  Thank you, Doctor.

20             THE COURT:  You can leave the exhibits and you can

21   get off the witness stand, and Mr. Zeno or Mr. Levine will

22   pick up the exhibits.  So, tomorrow is another day.  And what

23   are we going to do tomorrow?  Mr. Beffa is next, I guess?

24             MR. LEVINE:  Yes, Your Honor.  Mr. Beffa is next.

25             THE COURT:  And after --

1              MR. LEVINE:  I would encourage the Government -- if

2    they would want to withdraw its opposition to this.

3              THE COURT:  After Mr. Beffa testifies and after the

4    Government declines your invitation to withdraw the

5    opposition, do you think you have any additional witnesses or

6    will you then move on to the Government's witnesses?

7              MR. LEVINE:  Move on to the Government's case.  We

8    will have some housekeeping issues about putting some things

9    in evidence, but other than that we expect to rest after that.

10             THE COURT:  I think Mr. Zeno told you the order in

11   which he was going to call.

12             MR. LEVINE:  Dr. Phillips followed by Dr.

13   Patterson.

14             THE COURT:  So, shall we say 9:30?

15             MR. LEVINE:  Sure.

16             THE COURT:  I'm looking forward to it almost as

17   much as Dr. Rafanello was looking forward to this afternoon.

18   I'll see you then.

19   COURT ADJOURNED AT 5:10 P.M.

20

21

22

23

24

25

1                    C E R T I F I C A T E

2              I, Lisa M. Hand, RPR, certify that the

3    foregoing is a correct transcript from the record of

4    proceedings in the above-titled matter.

5

6

7                              /s/ Lisa M. Hand

8                         _____

9                              Lisa M. Hand, RPR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25