UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
                                    )
                                    )
UNITED STATES OF AMERICA            )
                                    )
        v.                          )        Criminal No. 81-0306 (PLF)
                                    )
JOHN W. HINCKLEY, JR.               )
                                    )
                                    )
```

OPINION AND ORDER

        This matter is before the Court on the proposal of St. Elizabeths Hospital for the

conditional release of John W. Hinckley, Jr. pursuant to 24 D.C. Code § 501(e) – a so-called "(e)

proposal" or "(e) letter."[1]  This is the latest in a series of proposals submitted by the Hospital to

this Court over the years.  On each occasion, the Hospital has sought to enlarge the scope and/or

the duration of Mr. Hinckley's activities beyond the grounds of the Hospital, and the government

has opposed the Hospital's proposals in whole or in part.

---

[1]        The background facts relating to Mr. Hinckley's attempted assassination of
President Ronald Reagan; the serious wounding of the President, presidential Press Secretary
James Brady, Secret Service Agent Timothy McCarthy, and Metropolitan Police Officer Thomas
Delahanty; the trial of Mr. Hinckley pursuant to a 13-count indictment; the jury's finding that he
was not guilty by reason of insanity on all counts; Mr. Hinckley's years at St. Elizabeths
Hospital; his successful "B" city privileges under Hospital supervision during those years;
decisions of this Court and the United States Court of Appeals for the District of Columbia
Circuit; Mr. Hinckley's mental health during those years; and the legal framework relating to
Section 501(e) letters submitted by the Hospital and Section 501(k) petitions filed by patients are
set forth in this Court's prior opinions.  See United States v. Hinckley, 292 F. Supp. 2d 125
(D.D.C. 2003) ("Hinckley I"); United States v. Hinckley, 346 F. Supp. 2d 155 (D.D.C. 2004)
("Hinckley II"); United States v. Hinckley, 407 F. Supp. 2d 248 (D.D.C. 2005) ("Hinckley III");
United States v. Hinckley, 462 F. Supp. 2d 42 (D.D.C. 2006) ("Hinckley IV"); and United States
v. Hinckley, 493 F. Supp. 2d 65 (D.D.C. 2007) ("Hinckley V").

The Court has expanded Mr. Hinckley's freedom incrementally – though each expansion has been contingent upon Mr. Hinckley's and his family's compliance with a stringent set of court-imposed conditions.  At first, the Court allowed local day visits by Mr. Hinckley with his parents outside of the confines of St. Elizabeths Hospital without the supervision of Hospital personnel within a 50-mile radius of Washington, D.C. – so-called Phase I visits.  It then permitted local overnight visits by Mr. Hinckley with his parents within a 50-mile radius of Washington, D.C. (Phase II).  Each visit was thoroughly assessed by the Hospital and Mr. Hinckley's treatment team before a subsequent visit took place.[2]  There were a total of six Phase I visits and eight Phase II visits.  By order of December 30, 2005, the Court permitted so-called Phase III visits to begin in January 2006; these were visits outside of the Washington metropolitan area to Mr. Hinckley's parents' community.  See Hinckley III, 407 F. Supp. 2d at 265-68.  The Court permitted three initial visits by Mr. Hinckley to his parents' home, each visit to last three nights or 76 hours in duration.  See id. at 267.  Thereafter, the Court permitted visits of four nights or 100 hours in duration.  See id.[3]  In June 2007, the Court permitted six additional Phase III visits, and expanded the duration of those visits from four nights to six nights.  See Hinckley V, 493 F. Supp. 2d at 77-78.  In January 2008, the Court permitted two additional Phase III visits: one to allow Mr. Hinckley to visit his ailing father, and the other to allow Mr.

---

[2]     Presently, Mr. Hinckley's treatment team includes: Dr. Nicole Rafanello (clinical administrator); Dr. Sidney Binks (treating psychologist); Dr. Thomas Green (treating psychiatrist); Kevin Shamblee (social worker); and Verne James Hyde (music therapist).

[3]     On August 18, 2006, the Court issued an order granting Mr. Hinckley's request to permit additional four-night Phase III visits of no specific number in the same form and under the same conditions set forth in Hinckley III.  On November 21, 2006, the Court issued a further opinion and order permitting an indefinite number of additional four-night Phase III visits with slightly modified conditions.  See Hinckley IV, 462 F. Supp. 2d at 45-47.

Hinckley to attend his father's funeral.  In April 2008, the Court permitted an additional three visits to take place prior to the evidentiary hearing on the Hospital's current (e) Letter, which began on July 21, 2008.  Lastly, at the conclusion of the most recent evidentiary hearing, the Court permitted Mr. Hinckley "to continue with visits to [his] mother's home outside the Washington, D.C. area for six nights in duration, until further order of this Court[.]"  United States v. Hinckley, Criminal No. 81-0306, Order at 1 (D.D.C. Aug. 15, 2008).  These periodic visits have continued to this day and each, according to the Hospital's written reports to the Court, has been therapeutic, without incident and, by all measures, successful.

The Hospital's current (e) Letter is premised on the notion that Mr. Hinckley is ready for Phase IV – that is, the phase in which (1) Mr. Hinckley is permitted to utilize more absences from the Hospital, increased freedom, and additional privileges to begin integrating himself into his mother's community, and (2) the Hospital evaluates this process to determine whether Mr. Hinckley is ready to be released from the Hospital to live independently in his mother's community.  See Hinckley V, 493 F. Supp. 2d at 66 ("The ultimate goal of Phase IV is to determine if Mr. Hinckley is ready to be released from the Hospital to live independently in his parents' community.").  As the Court previously explained, Phase III is conceived of as an opportunity for "change of venue" outings from the Washington, D.C. area to the Hinckleys' community, while Phase IV is viewed as a "transitional stage" in which Mr. Hinckley would be expected to focus on "social and potential vocational" integration into his mother's community. Hinckley III, 407 F. Supp. 2d at 261.  Of course, even if Mr. Hinckley were to become a permanent resident of his mother's community in the future, it is assumed that he would have the

support of his mother – so long as she is alive and healthy – his siblings, and psychiatric and

counseling professionals in the community.

To begin the Phase IV process, the Hospital's (e) Letter asks the Court to expand

Mr. Hinckley's current conditional release privileges to include the following elements:

> 1. [Mr. Hinckley] will be allowed to utilize 12 overnight visits to
> [his mother's hometown] that will last from Saturday until the
> second Monday thereafter or for a total of up to ten days and nine
> nights.
>
> 2. John Lee, M.D. will remain as the covering psychiatrist in [Mr.
> Hinckley's mother's hometown].  This means that Dr. Lee will
> provide psychiatric coverage, assess mental health status, and if
> necessary, provide emergency medication management.  Mr. Carl
> Beffa, LCSW will be named as [Mr. Hinckley's] social worker in
> [Mr. Hinckley's mother's hometown].  He will provide individual
> therapy, guidance, and assistance, especially in the form of social
> services [and case management].
>
> 3. [Mr. Hinckley] will meet with John Lee, M.D. and Mr. Carl
> Beffa, LCSW once each during each visit to [his mother's
> hometown].  Both providers will independently interview, assess,
> and complete a Checklist [describing their observations] provided
> by the Hosptial and fax it to the Hospital within one week. . . .
>
> 4. John Lee, M.D. and Carl Beffa, LCSW will participate in post-
> visit telephone conferences with the treatment team after each visit
> to discuss the visit and any concerns/issues or additional treatment
> goals.
>
> 5. Carl Beffa, LCSW and Sidney Binks, Ph.D. will communicate
> by telephone after each visit to discuss and collaborate on the
> course of therapy with [Mr. Hinckley].
>
> 6. John Lee, M.D. and Carl Beffa, LCSW will participate . . . via
> telephone conference in Individualized Recovery Plans with the
> treatment team every three months, or as scheduled.

7.  [Mr. Hinckley] will utilize "B" city privileges with Mr. Shamblee, LICSW to take the written driver's test at the D.C. DMV to obtain a [learner's permit].  Two weeks notice of this occurrence will be given to the Court.

8.  [Mr. Hinckley] will be allowed unaccompanied time in [his mother's hometown] to attend [a specific driving school].  This will require seven driving lessons of 60-minutes each.

9.  [Mr. Hinckley] will utilize "B" city privileges with Mr. Shamblee, LICSW to take the driver's test at the D.C. DMV and will require approximately 30-minutes of unaccompanied time in the family's car with the examiner to take the driver's test.

10.  [Mr. Hinckley] will be permitted to drive the family car with a learner's permit and later with a driver's license with a responsible person/custodian present with him at all times.

11.  On each of the outings [to his mother's hometown], [Mr. Hinckley] will be permitted to utilize up to two-hours of unaccompanied privileges twice daily within his mother's subdivision with her cell phone between the hours of 9:00 a.m. to 5:00 p.m. standard time and 9:00 a.m. to 9:00 p.m. daylight savings time.  He will notify his custodian/responsible person and the Hospital and provide the name, address and telephone number before he visits the residence of a neighbor or new friend in the subdivision.

12.  [Mr. Hinckley] will be allowed unaccompanied privileges [in his mother's hometown] for up to five hours twice per week, Tuesdays and Thursdays from 8:00 a.m. to 12:00 p.m. for volunteer services at [a particular organization] . . . plus one hour to cover any transportation delays from the actual volunteer sites[.] A copy of his intended work schedule will be listed in his itinerary to the Court.[4]

---

[4]      At the hearing, the Court learned that the volunteer position at the organization identified in this recommendation is no longer available to Mr. Hinckley.  At least two other organizations near Mrs. Hinckley's residence, however, have confirmed that they would accept Mr. Hinckley as a volunteer.  See John W. Hinckley's Motion for Interim Relief During Court's Consideration of Hospital's Request for Enlargement of Terms of Conditional Release at 2 (May 20, 2009).

13.  [Mr. Hinckley] will be permitted unaccompanied time in [his mother's hometown] for up to three hours per day twice per week between the hours of 8:00 a.m. and 9:00 p.m. for specific social, recreation, worship, or shopping related activities that will be presented in an approved itinerary prior to the outing.[5]

14.  The treatment team will coordinate these visits and unaccompanied time with [Mr. Hinckley], his mother and siblings, John Lee, M.D., Carl Beffa, LCSW, and any other agencies involved.  An objective/goal list will be developed . . . for each outing and distributed to each of the above persons.

15.  [Mr. Hinckley] will be permitted unaccompanied time in Washington, D.C. for up to four hours twice per week between the hours of 8:00 a.m. – 3:00 p.m. to volunteer at [a particular organization]. . . .  Transportation to and from [the organization] will be provided by the Hospital.  A copy of his intended work schedule will be submitted to the Court with a two week notice.

16.  After six weeks of volunteering [in his mother's hometown] and/or [in Washington, D.C.], if deemed appropriate by [the participating] agencies, [Mr. Hinckley], and the treatment team, these volunteer activities may be increased such that he would work up to five times per week for four hours per day as per the previous conditions listed above.

17.  Should the above listed volunteer positions no longer be available to [Mr. Hinckley] he would be permitted to volunteer at another site under the same conditions as cited above and the Hospital will notify the Court two weeks in advance of any changes to his volunteer site.

Hospital's (e) Letter at 13-15.  Though not formally included in the list of elements of Mr.

Hinckley's proposed conditional release, the Hospital also anticipates that Mr. Hinckley will

receive support while in his mother's hometown from Reverend Harry Warren.  Reverend

---

[5]      The Hospital would not, however, "include independent social and recreational time in [Mr. Hinckley's itineraries] until he has established himself at a volunteer position for at least two weeks."  Letter from St. Elizabeths Hospital at 13 (May 28, 2008) ("Hospital's (e) Letter").

Warren is the director of Walk the Talk, "a free, non-profit program that provides assistance in community re-entry, mentoring, support, and assistance to inmates and ex-convicts recently released from jail."  Hospital's (e) Letter at 3.  Mr. Hinckley fully supports the Hospital's (e) Letter, and – unlike previous years – he has not submitted his own petition for an expansion of conditional release privileges under 24 D.C. Code § 501(k).

For reasons discussed below, the government opposes the Hospital's proposal and urges the Court to adopt a more conservative plan for the expansion of Mr. Hinckley's conditional release privileges.  As described in open court, the government's alternative plan includes the following elements:

> 1.  Mr. Hinckley will be permitted to engage in certain Phase IV activities during overnight visits to his mother's hometown, but the length of his overnight visits will not be expanded from the current length (up to six nights in duration) to the length proposed by the Hospital (up to nine nights in duration).

> 2.  Phase IV activities will be scheduled in a manner that will, to the greatest extent possible, permit Mr. Hinckley to attend weekly therapy sessions at the Hospital.

> 3.  Before Mr. Hinckley accepts any volunteer position, that position must be approved by Mr. Hinckley's treatment team and the Hospital's review board and submitted to the Court.  Moreover, the Hospital will notify the Court and counsel for both parties at least four weeks in advance of Mr. Hinckley beginning his first volunteer position.  For all subsequent volunteer positions, the Hospital will notify the Court and counsel for both parties at least two weeks in advance of Mr. Hinckley's proposed start date.

> 4.  Mr. Hinckley must participate in a volunteer position to enjoy the "expansion of his social privileges" proposed by the Hospital – that is, the "three hours [of] unsupervised [time] in the community and extra time alone in [his mother's] subdivision[.]"

5.  Mr. Hinckley will not be permitted to enjoy any of the expanded social privileges proposed by the Hospital "until he has demonstrated his commitment to the process by completing volunteer work on at least three consecutive [overnight] trips."

6.  Mr. Beffa will not be the case manager for Mr. Hinckley while he is in his mother's hometown.

7.  Mr. Hinckley will be required to carry a GPS-enabled cell phone while unaccompanied during his conditional releases.

8.  Mr. Hinckley will not be permitted to engage in any volunteer activities in the District of Columbia.

Transcript of Hearing at 44-46 (Aug. 6, 2008) (closing argument of counsel for the government).

## I.  THE PARTIES' ARGUMENTS

The Hospital and Mr. Hinckley offer a straightforward argument in support of the Hospital's Phase IV proposal.  In short, they contend that by compiling "a perfect . . . record of success on conditional release" thus far, Mr. Hinckley has demonstrated his readiness for Phase IV and a concomitant increase in conditional release privileges, Transcript of Hearing at 16 (July 21, 2008 – morning session) (opening statement of counsel for Mr. Hinckley); that Mr. Hinckley would benefit therapeutically from an increase in conditional release privileges; that the government has failed to present any evidence that Mr. Hinckley would be a danger to himself or to others under the Hospital's proposal; and that the terms under which the Hospital proposes to expand Mr. Hinckley's conditional release privileges adequately guard against the (remote) possibility that Mr. Hinckley may decompensate and become dangerous.  Accordingly, Mr. Hinckley and the Hospital ask the Court to adopt without modification the seventeen recommendations in the Hospital's (e) Letter.

As indicated above, the government does not object to every aspect of the Hospital's proposal.  For example, it is "not seeking to stop driving lessons, volunteer activities, [or] social activities."  Transcript of Hearing at 78 (July 23, 2008 – morning session) (comments by counsel for the government).  For various reasons, however, the government argues that the Hospital underestimates the risk that Mr. Hinckley's mental illness may cause him to become dangerous to himself or to others; the Hospital's proposal fails to address or ameliorate sufficiently the risk factors that contribute to Mr. Hinckley's potential dangerousness; and the support structure proposed for Mr. Hinckley in his mother's hometown is inadequate.  The government therefore urges the Court to adopt its more conservative plan.

With respect to Mr. Hinckley's mental health, the government argues that during the preceding year "we have seen a further development of several behaviors that have been universally recognized as risk factors for further violence" on Mr. Hinckley's part. Government's Motion to Deny Hospital's Request for Expanded Conditions of Release at 3 (June 4, 2008) ("Gov. Mot.").  Much of the government's argument on this score focuses on Mr. Hinckley's relationships with women.  In the government's view, "Mr. Hinckley's [mental] illness [still] prevents him from realistically appreciating his relationships with women; this puts him at an increased risk for violence due to depression or due to a request to act out to demonstrate his love for a woman."  Transcript of Hearing at 40 (Aug. 6, 2008) (closing argument of counsel for the government).  Thus, according to the government, it is worrisome that over the course of the preceding year

> [Mr. Hinckley] maintain[ed] near simultaneous sexual
> relationships with ["Ms. M," who suffers from bipolar disorder,
> and "Ms. G," who is in a long-term relationship with another man].

> While he was maintaining these two relationships, he rekindled his
> relationship with [former girlfriend Leslie DeVeau in June 2007].
> Then, in November 2007, he met a fourth woman [through Ms. G],
> [named "Ms. B"].  It is unclear whether his relationship with her
> has become romantic, but they meet and converse regularly . . . .
> The Hospital has asked Mr. Hinckley to keep a written log of his
> interactions with women "[b]ecause of the significant increase in
> his interactions with women."

Gov. Mot. at 3 (quoting Hospital's (e) Letter at 7); see also Hospital's (e) Letter at 5 (setting forth

a similar description of Mr. Hinckley's recent relationships).  At the evidentiary hearing, there

was also testimony to the effect that Mr. Hinckley had recently struck up a friendship with a "Ms.

K."  That friendship apparently continues to this day.  See Letter to the Court from St. Elizabeths

Hospital at 3 (May 14, 2009).[6]

     To be clear, the government finds troubling not only the number of Mr.

Hinckley's relationships but also certain decisions he has made and certain actions he has taken

in the context of those relationships.  For example, the government argues that Mr. Hinckley

demonstrated poor judgment when he attempted to invite Ms. G to a "neighborhood block party"

during one of his conditional releases, despite the objections of some of his family members.

Ultimately, the treatment team did not permit Mr. Hinckley to invite Ms. G to the party.

Relatedly, the government believes that Mr. Hinckley has demonstrated poor judgment (and

---

[6]    According to the Hospital's (e) Letter, Mr. Hinckley's renewed relationship with
Ms. DeVeau ended in November 2007, and his relationship with Ms. M ended in December
2007.  In addition, it appears that Mr. Hinckley and Ms. G are no longer romantically involved.
See Letter to the Court from St. Elizabeths Hospital at 3 (May 14, 2009).  Apparently, Mr.
Hinckley and Ms. B "continue to meet and talk to each other regularly," Hospital's (e) Letter at 7,
but their relationship is not currently romantic or sexual.  See Transcript of Hearing at 39-40
(July 23, 2008 – morning session) (testimony of Dr. Rafanello).  It is worth noting that the
Hospital's (e) Letter devotes approximately three pages to describing Mr. Hinckley's recent
relationships with women, and concludes that this "continue[s] to be an area in which he
struggles."  Hospital's (e) Letter at 5.

perhaps a willingness to deceive) by being less than candid with his treaters about several matters, especially his relationships with women.  See Gov. Mot. at 3.

The government also takes issue with the Hospital's – and Mr. Hinckley's – characterization of Mr. Hinckley's recent Phase III visits as "a wholesale success."  Gov. Mot. at 5.  Specifically, the government argues that Mr. Hinckley has demonstrated a troubling lack of initiative during his Phase III visits, and that this indicates that Mr. Hinckley is neither prepared for nor "committed to the difficult work of transitioning to his mother's hometown" included in Phase IV.  Id.  See also Transcript of Hearing at 38 (Aug. 6, 2008) (closing argument of counsel for the government) (arguing that Mr. Hinckley "will go to great lengths to contact women, play and record his music, and arrange for art lessons," but that he lacks initiative when it comes to less appealing tasks).  In the government's view, the primary evidence of Mr. Hinckley's lack of initiative is (1) Mr. Hinckley's failure, in general, to pursue as vigorously as possible volunteer positions in his mother's hometown; (2) Mr. Hinckley's failure, specifically, to keep an appointment to discuss a volunteer position with a particular volunteer organization in his mother's hometown; and (3) Mr. Hinckley's reluctance to end inappropriate or counterproductive relationships with women, even when advised to do so by family members or treaters.  According to the government, "Mr. Hinckley's refusal to engage in activities he considers unpleasant" is a symptom of a "reemergent narcissism," and demonstrates that "signs of [his] illness continue despite the medication and therapy he receives."  Gov. Mot. at 5.

Finally, the government argues that "there is evidence that Mr. Hinckley continues to maintain inappropriate thoughts of violence."  Gov. Mot. at 6.  In support of this argument, the government observes that Mr. Hinckley "recently recorded a music CD ROM which included a

song he wrote prior to the assassination attempt that is entitled 'The Ballad of the Outlaw,' a

song reflecting suicide and lawlessness." Id.  In the government's view, all of this is cause for

concern because it suggests that Mr. Hinckley is experiencing increased levels of stress under his

current conditional release plan (a plan that is considerably more restrictive than the Hospital's

proposed plan), and thus that he could decompensate and become dangerous in the future unless

he is adequately treated, closely monitored and regularly assessed by competent professionals.

See Government's Response to Request for Interim Relief at 1-2 (June 1, 2009) ("Although it is

the unanimous medical opinion that Mr. Hinckley is ready for the experiment with Phase IV

activities, there is no guarantee the experiment will succeed.  That is why the government

remains focused on the controls that must be put in place.").

   With respect to the structural and clinical soundness of the Hospital's proposal,

the government identifies at least four major concerns.  First, the government contends that it is

both unnecessary and unwise to extend the duration of Mr. Hinckley's conditional releases at this

time.  According to the government, it is unnecessary to extend the duration of Mr. Hinckley's

releases because six nights are long enough to permit Mr. Hinckley to begin engaging in Phase

IV-type activities.  See Gov. Mot. at 3.  It is unwise to extend the duration of Mr. Hinckley's

releases because doing so will disrupt his Hospital-based treatment schedule at a time of

increasing stress for Mr. Hinckley.  See Transcript of Hearing at 42-44 (Aug. 6, 2008) (closing

argument of counsel for the government).  Second, the government asserts that there is a lack of

clarity with respect to the roles to be played by Dr. Lee (as the covering psychiatrist) and Mr.

Beffa (as the individual therapist and case manager) when Mr. Hinckley visits his mother's

hometown.  See supra at 4 ¶¶ 2-3.  The government believes that the Hospital has not adequately

defined Dr. Lee's and Mr. Beffa's respective roles, nor explained how those roles do or do not

overlap.  Third, and relatedly, the government argues that Mr. Beffa's testimony at the

evidentiary hearing demonstrates that he is simply not qualified to provide therapy and case

management services to Mr. Hinckley – or at least not sufficiently committed to providing such

services.  Thus, any proposal that contemplates a substantial role for Mr. Beffa at this time is

unacceptable to the government.  See Transcript of Hearing at 48-62 (Aug. 6, 2008) (closing

argument of counsel for the government).  Fourth, the government believes that permitting Mr.

Hinckley to volunteer in the District of Columbia would be unnecessarily distracting, and that

any expansion of Mr. Hinckley's social privileges should be contingent on successful volunteer

work in his mother's hometown.

## II.  THE EVIDENTIARY HEARING

As has been its practice, the Court held an extensive evidentiary hearing on the

Hospital's (e) Letter in order to permit all parties to substantiate and elaborate upon their

positions with respect to the Hospital's proposal.  That hearing included opening statements by

counsel for the government and counsel for Mr. Hinckley, five full days of live testimony and an

additional day for closing arguments.  Counsel for Mr. Hinckley called the following witnesses:

(1) Scott Hinckley, Mr. Hinckley's brother; (2) Diane Sims, Mr. Hinckley's sister; (3) Dr. Paul

Montalbano, Pretrial Chief of the Forensic Service Unit at John Howard Pavilion, St. Elizabeths

Hospital, who for nearly every proceeding before this Court has prepared a thorough risk

assessment with respect to Mr. Hinckley; (4) Verne James Hyde, Mr. Hinckley's music therapist

at St. Elizabeths Hospital; (5) Dr. Nicole Rafanello, a Clinical Administrator at St. Elizabeths

Hospital, with clinical administrative responsibilities for Mr. Hinckley, and the author of the

Hospital's (e) Letter; and (6) Mr. Beffa, the aforementioned therapist and social worker whose

practice is located in the community in which Mr. Hinckley's mother resides.  Counsel for the

government called the following witnesses: (1) Dr. Robert Phillips, a psychiatrist retained as an

expert witness by the government and the former Director of Forensic Services for the State of

Connecticut Department of Mental Health; and (2) Dr. Raymond F. Patterson, a psychiatrist

retained as an expert witness by the government and the former Medical Director and former

Acting Associate Superintendent at St. Elizabeths Hospital, former Commissioner of Mental

Health in the District of Columbia, and former Forensic Director for the State of Maryland.

### A. Witnesses for the Hospital and Mr. Hinckley

 Mr. Hinckley's siblings testified that Mr. Hinckley has been conscientious about

observing the terms of his conditional release while in their mother's hometown, and that they

have observed no signs of decompensation or dangerousness during any of the visits in which

they participated.[7]  In addition, both siblings testified that during the visits Mr. Hinckley fully

participated in family activities (including visiting Mr. Hinckley's ailing father in an assisted

living facility); communicated openly and candidly about his relationships; demonstrated

empathy and compassion for all of his family members; and did not seek any media attention.

Neither of Mr. Hinckley's siblings witnessed any evidence of decompensation or

dangerousness as a result of Mr. Hinckley's relationships with women, though both conceded

---

[7]    Both acknowledged, however, that during his visits to his mother's hometown Mr. Hinckley could have tried harder to pursue volunteer opportunities, and that in their view his failure to do so indicated some "immaturity."  Transcript of Hearing at 102 (July 21, 2008 – morning session) (testimony of Diane Sims).

that Mr. Hinckley has not always exercised sound judgment in pursuing or maintaining these relationships. Nor did either sibling witness any evidence of decompensation or dangerousness on Mr. Hinckley's part as a result of the decline in his father's health, his father's eventual death and the stress of attending his father's funeral. According to them, Mr. Hinckley was predictably shocked by his father's worsening condition during the late stages of his illness, "appropriately saddened" by his father's death, Transcript of Hearing at 66 (July 21, 2008 – morning session) (testimony of Diane Sims), and comfortable and communicative at his father's funeral – despite the fact that it was perhaps the largest crowd Mr. Hinckley had experienced in decades. See id. at 65. Both siblings believe that Mr. Hinckley continues to cope well with their father's death.

Dr. Montalbano was permitted to offer expert testimony on behalf of the Hospital. Dr. Montalbano discussed Mr. Hinckley's current diagnosis and – like all of the expert witnesses – testified that Mr. Hinckley has recovered to the point that he poses no imminent risk of danger to himself or to others.[8] Dr. Montalbano also testified that Mr. Hinckley's "stress tolerance is very high," Transcript of Hearing at 30 (July 21, 2008 – afternoon session), and that none of the mood changes observed in Mr. Hinckley during the year preceding the evidentiary hearing indicate dangerousness or decompensation. Instead, Dr. Montalbano testified, those mood changes appeared to be "transient and expectable reactions to psycho-social stressors," such as changes in Mr. Hinckley's relationships with women and his father's illness and death. Id. at 46.

---

[8]     As was the case last year, all of the experts who testified were in substantial agreement about Mr. Hinckley's current diagnoses. All agree that he is currently mentally ill and suffers from two Axis I disorders: psychotic disorder, not otherwise specified, and major depression. All also agree that there have been no active symptoms or symptoms of any significance of these Axis I disorders in many years, and that these Axis I disorders appear to be in full remission. Finally, all agree that Mr. Hinckley still suffers from an Axis II disorder – narcissistic personality disorder – and that he continues to exhibit symptoms of this disorder.

In his psychological risk assessment update, Dr. Montalbano noted that "[t]here remains a general consensus that Mr. Hinckley is more open overall."  Psychological Risk Assessment Update at 424 (May 28, 2008) ("Montalbano Rpt.").  In both his report and his testimony, however, Dr. Montalbano acknowledged that Mr. Hinckley's openness has limits, and that Mr. Hinckley generally remains a guarded and defensive individual.  See Transcript of Hearing at 74 (July 22, 2008 – morning session) (acknowledging that "Mr. Hinckley will provide information if he is asked, but does not typically volunteer it").  In addition, he agreed with Mr. Hinckley's siblings that, at times, Mr. Hinckley has demonstrated poor judgment with respect to his relationships with women, and that Mr. Hinckley has demonstrated some lack of initiative in seeking out volunteer opportunities in his mother's hometown.

Dr. Montalbano also discussed the results of certain psychological tests he administered to Mr. Hinckley in 2008.  According to Dr. Montalbano, in this most recent round of testing Mr. Hinckley scored higher on two scales – the Psychopathic Deviance scale and the Hysteria scale – than he did when the tests were last administered in 2005.  See Transcript of Hearing at 9-12 (July 22, 2008 – afternoon session).  In 2005, Mr. Hinckley scored 54 on the Psychopathic Deviance scale and 59 on the Hysteria scale; in 2008, he scored 69 on the Psychopathic Deviance scale and 66 on the Hysteria scale.  Unlike his 2005 scores, Mr. Hinckley's 2008 scores fall within the "clinically significant" range.  Id. at 11-12.  In Dr. Montalbano's view, however, the most recent scores do not indicate an increased risk of violent behavior because they are consistent with an underlying pattern in Mr. Hinckley's psychological history.  As Dr. Montalbano explained:

> [D]uring some of the prior . . . psychological testing, which is in
> my report, . . . [Mr. Hinckley] had elevations [on the Psychopathic
> Deviance and Hysteria scales] that were similar to, if not
> exceeding, [the 2008] scores.  To me what's important is the
> relative stability of what I've called the three-four profile, that
> those particular scales tend to be his highest elevations, whether
> they're clinically significantly elevated or not[.]

Id. at 39.  When asked specifically whether "the small fluctuations in [Mr. Hinckley's] MMPI

scores and the Rorschach scores over the last 10 years . . . indicate a change in the level of [Mr.

Hinckley's] dangerousness," Dr. Montalbano replied "No."  Id. at 40.

        In view of all of these considerations, Dr. Montalbano testified "to a reasonable

degree of psychological certainty that Mr. Hinckley would not pose a danger to self or others due

to mental illness under" the Hospital's proposal.  Transcript of Hearing at 13 (July 21, 2008 –

afternoon session); see also id. at 51 (same).  Dr. Montalbano maintains that

> the current clinical, contextual and individualized risk factors are
> in the low range and do not indicate significant risk for a carefully
> planned and graduated expansion of [Mr. Hinckley's] existing
> conditional release [such as the one currently before the Court].

Montalbano Rpt. at 46.  Indeed, in Dr. Montalbano's opinion, granting the Hospital's proposal

may reduce the risk of depression, which is a major risk factor for Mr. Hinckley; increasing Mr.

Hinckley's freedom could ameliorate that risk factor.  See Transcript of Hearing at 26 (July 25,

2008 – afternoon session).

        Dr. Rafanello was also permitted to offer expert testimony on behalf of the

Hospital.  Like Dr. Montalbano – and for largely the same reasons – Dr. Rafanello testified that

she "do[es] not believe that [Mr. Hinckley] would be a danger to himself or others under the

current [proposal to expand conditional release privileges] before the Court."  Transcript of

17

Hearing at 9 (July 23, 2008 – morning session).  According to Dr. Rafanello, the Hospital's

proposal is the product of a careful consideration of all of the relevant risk factors, Mr.

Hinckley's condition and the Hospital's therapeutic goals.  See id. at 10 (characterizing the

Hospital's proposal as "a slow and gradual progression that allows for reasonable amounts of

unstructured time in the community that does not pose a risk to [Mr. Hinckley] or others in the

community," and noting that the Hospital has "carefully weighed any consideration of risk").

Like Dr. Montalbano, she believes not only that Mr. Hinckley is prepared for the expanded

conditions of release contemplated by the Hospital's proposal, but also that granting the

Hospital's proposal is likely to improve Mr. Hinckley's mood and thereby reduce the risk that he

may decompensate and become dangerous.  See Transcript of Hearing at 23-25 (July 23, 2008 –

morning session).

      With respect to Mr. Hinckley's mental health status and behavior, Dr. Rafanello

acknowledged – both in her testimony and in the Hospital's (e) Letter – that

> [d]espite significant strides in other areas of his recovery, [Mr.
> Hinckley's] relationships with women continue to be an area in
> which he struggles. . . .  [He] has strong affiliative and dependency
> needs.  As a result, he is always seeking out relationships or
> striving to remain in a relationship.  Because of this fact, he will
> almost never end a relationship, even one that may be considered
> detrimental to him.  Also, when a relationship appeared to be
> ending [during the preceding year], he quickly found another
> female interest, a "rebound" so to speak, to replace the relationship
> that he was losing.  His mood often fluctuates based on the status
> of the relationships.  It appears as though he believes the more
> relationships he has, no matter how trivial, the better, less anxious,
> and more loved he feels.  Because he tries to avoid being alone or
> without a "love interest," he will make excuses for his girlfriends
> when they reject him or may distort the facts so as to protect the
> relationship.

Hospital's (e) Letter at 5.  Still, in Dr. Rafanello's view, neither the quantity nor the quality of

Mr. Hinckley's relationships in the year preceding the submission of the Hospital's (e) Letter

indicate that he has become or is becoming more dangerous.  Moreover, Dr. Rafanello believes –

contrary to the government's assertions – that Mr. Hinckley has "been candid with both his

treatment providers and his family" about his relationships.  Id.; see also Transcript of Hearing at

11-13 (July 23, 2008 – afternoon session) (testifying that Mr. Hinckley has "allow[ed] his

therapists to sort of take a look inside and see what's happening" with respect to his

relationships).

Mr. Hyde, Mr. Hinckley's music therapist at the Hospital, testified that Mr.

Hinckley frequently "turns to [writing and recording songs] as a coping mechanism."  Transcript

of Hearing at 53 (July 22, 2008 – afternoon session).  He also testified that music therapy allows

Mr. Hinckley to "access topics that have been historically difficult for [him] to discuss."  Id. at

70.  For example, according to Mr. Hyde, Mr. Hinckley successfully relied on music to cope with

and analyze the major stressors in his life during the preceding year, including the death of his

father, his relationships with women and rejections from organizations for which he hoped to

volunteer in his mother's hometown.[9]  In Mr. Hyde's view, Mr. Hinckley's music and his

behavior in music therapy indicate that he has a strong fix on reality and a sense of hope about

his future.  Notably, Mr. Hyde firmly rejects the government's argument that Mr. Hinckley's

decision to record "The Ballad of the Outlaw" indicates that Mr. Hinckley harbors inappropriate

thoughts of violence.  See supra at 11-12.  Rather, Mr. Hyde believes that this decision

---

[9]     According to Mr. Hyde, Mr. Hinckley has written songs about many of the
women discussed at this year's hearing, including Ms. M, Ms. G and Ms. B.  He has also written
a song about his father, entitled "Hero."

"show[ed] an effort on his part to look at how he was prior to his instant offense and how that set of emotions, set of events . . . brought him to the place where he is today," and therefore indicates insight and openness.  Transcript of Hearing at 64 (July 22, 2008 – afternoon session).  Mr. Hyde, like Drs. Montalbano and Rafanello, believes that Mr. Hinckley is ready to transition to Phase IV.  He therefore supports the Hospital's proposal.

Mr. Beffa also testified at the hearing in July.  As noted above, under the Hospital's current proposal, Mr. Beffa would serve as Mr. Hinckley's case manager and individual therapist during Mr. Hinckley's visits to his mother's hometown.  With respect to his qualifications, Mr. Beffa testified that he has been a licensed social worker since 1971, and that he has been providing case management and therapy services to clients since that time.  In 1981, he founded the Family Living Institute, a private mental health facility located near the residence of Mr. Hinckley's mother.[10]  Mr. Beffa acknowledged that his practice has focused far more on therapy than on case management over the course of the last thirty years or so.  Moreover, while Mr. Beffa has treated thousands of individuals during his career, he has never provided case management or therapy services to an insanity acquittee (though some of his current patients do have a history of violence), nor "work[ed] in a forensic setting in any capacity."  Government's Response to Request for Interim Relief at 4 (June 1, 2009).  Mr. Beffa testified that he has begun preparing to become Mr. Hinckley's case manager and therapist by reading Dr. Montalbano's 1999 and 2008 risk assessments; reading Dr. Phillips' 2003 and 2008 expert reports; reading Dr.

---

[10]     Dr. Lee is also employed at the Family Living Institute, and Dr. Lee and Mr. Beffa often work closely together.

Patterson's 2008 expert report; and reading some – but not all – of Dr. Binks' therapy notes.  <u>See</u>

Transcript of Hearing at 12-13 (July 24, 2008 – morning session).

Mr. Beffa also discussed the case management services he provided to Mr.

Hinckley during the year preceding the hearing.  Mr. Beffa met with Mr. Hinckley five or six

times during Mr. Hinckley's visits to his mother's hometown.[11]  Those meetings lasted

approximately forty-five minutes each, and Mr. Beffa and Mr. Hinckley typically discussed

matters relating to Mr. Hinckley's search for a volunteer position in his mother's hometown and

potential social outlets for Mr. Hinckley.  Outside of those meetings, Mr. Beffa attempted to

support Mr. Hinckley's search for a volunteer position by contacting potential volunteer sites,

providing Mr. Hinckley with applications and following up with Mr. Hinckley and the

organizations for which Mr. Hinckley was interested in volunteering.  <u>See</u> Transcript of Hearing

at 21-24 (July 24, 2008 – morning session).  In general, Mr. Beffa described his activity during

this time as

> [doing] case managing; [trying] to begin establishing a
> relationship; assisting [Mr. Hinckley] with transitioning in and
> around the community [and] knowing the community better;
> assisting him in trying to find things that . . . would occupy his
> time constructively in the area.  Basically, [helping Mr. Hinckley]
> to [get] adjusted locally.

<u>Id</u>. at 14.

_____

[11]    These meetings were arranged by the Hospital in keeping with the Court's June
19, 2007 Order which "encouraged" the Hospital "to arrange for visits with [Mr. Beffa] during"
Mr. Hinckley's visits, <u>Hinckley V</u>, 493 F. Supp. 2d at 78 n.2, because the Hospital seemed to be
considering Mr. Beffa as a potential therapist or case manager for Mr. Hinckley.

Mr. Beffa admitted that he was disappointed that his efforts did not result in Mr.

Hinckley securing a volunteer position in Mrs. Hinckley's hometown before the Hospital filed its

current (e) Letter.  He attributed this failure mainly to community resistance and hostility, rather

than to a lack of initiative on Mr. Hinckley's part.  See Transcript of Hearing at 20 (July 24, 2008

– morning session).  On cross-examination, Mr. Beffa seemed to concede that he at least

contributed to Mr. Hinckley's failure to secure a volunteer position earlier by not monitoring Mr.

Hinckley more closely.  See id. at 66 ("Q [by counsel for the government]: But the fact of the

matter remains that for five months you had no idea what he was doing in terms of getting a job

even though at that point, you were his local case manager? A [by Mr. Beffa]: Correct.").  Mr.

Beffa also testified, however, that since the filing of the Hospital's (e) Letter, he had helped Mr.

Hinckley secure offers of volunteer employment from at least two organizations located near

Mrs. Hinckley's residence.  See id. at 36-43.

### B.  Witnesses for the Government

Dr. Phillips was permitted to offer expert testimony about Mr. Hinckley's mental

health and the Hospital's proposal.  With respect to Mr. Hinckley's mental health, Dr. Phillips

agreed with many of the observations made by Drs. Montalbano and Rafanello.  For example, Dr.

Phillips agreed that Mr. Hinckley is not imminently dangerous, and he agreed that all of the

evidence suggests that relationships with women remain a primary area of clinical concern for

Mr. Hinckley.  But Dr. Phillips also disagreed with some points made by other witnesses.  For

example, Dr. Phillips was "not as willing to join the chorus that heralds Mr. Hinckley's openness

and candor concerning his relationships with women. . . .  Simply put, I believe Mr. Hinckley

tells us only what he wants us to know." See Forensic Psychiatric Evaluation Concerning

Expansion of Terms of Conditional Release Under 501(e) at 65 (July 9, 2008) ("Phillips Rpt.").[12]

        Most importantly, Dr. Phillips disagreed with the witnesses for the Hospital and

Mr. Hinckley with respect to whether the Court should approve the Hospital's proposal.  In his

view, the Hospital's proposal should not be approved because it does not adequately guard

against the risk that Mr. Hinckley may decompensate and become dangerous to himself or others.

See Transcript of Hearing at 5-6 (July 24, 2008 – afternoon session).  Dr. Phillips offered two

main reasons for this opinion.  First, Dr. Phillips believes it is "unclear" whether the Hospital's

proposal "contain[s] an adequate therapeutic structure for Mr. Hinckley in his mother's

hometown[.]"  Id. at 6-7.  In particular, Dr. Phillips testified that he was concerned about (1) a

perceived lack of clarity with respect to the roles to be played by Dr. Lee and Mr. Beffa, and

(2) Mr. Beffa's understanding of his role as case manager, which Dr. Phillips regarded as flawed.

With respect to the former issue, Dr. Phillips explained:

---

[12]      Over the course of the five-day hearing convened to evaluate the Hospital's current proposal, the witnesses discussed four main examples of Mr. Hinckley's alleged deceptiveness; their competing views about Mr. Hinckley's "candor" (or lack thereof) rested mainly on their competing interpretations of these events.  First, Mr. Hinckley apparently told Dr. Lee that his relationship with Ms. G was "platonic," even though the relationship at that time had romantic components (and, it seems, other members of the treatment team were aware of that fact).  Second, on another occasion Mr. Hinckley apparently told members of the treatment team that his relationship with Ms. M was not romantic, though at the time other treatment team members knew "she was sometimes affectionate with him and . . . he had fondling privileges." Transcript of Hearing at 55 (July 23, 2008 – afternoon session) (testimony of Dr. Rafanello). Third, on yet another occasion, Mr. Hinckley neglected to include on his "female log" interactions with a woman at the Hospital because, in his view, those interactions were too minor to warrant inclusion.  Fourth and finally, at one point Mr. Hinckley may have misrepresented certain facts to absolve himself of blame for failing to attend an appointment with a particular volunteer organization.

> I don't understand what's going to occur [when Dr. Lee meets with
> Mr. Hinckley for approximately 45 minutes, as contemplated by
> the Hospital].  It has to be more than just med management, med
> assessment, whatever label you want to put on it.  If that's the case,
> then there's a bit of a lack of clarity of who is doing what, what are
> the roles.  If you're going to have somebody in the room for that
> long a period of time, some form of therapy is going to emerge.
> Are you controlling for that?

Id. at 36.  With respect to the latter issue, Dr. Phillips testified that the description of case

management offered by Mr. Beffa during his testimony was troubling because "case management

is something that is very proactive," and Mr. Beffa's description of the case management services

he had provided to Mr. Hinckley over the preceding year (and the case management services he

intended to provide under the Hospital's proposal) sounded more like "a desk job."  Id. at 40-41.

Dr. Phillips testified that it is critical to ensure that Mr. Beffa understands the "hands-on" nature

of a case manager's job because the case manager plays a unique and important role in

monitoring and ameliorating risk factors.  See id. at 43.

Second, Dr. Phillips testified that the Hospital's proposal does not include

"adequate work and social structures . . . [to] manage the risks posed by Mr. Hinckley's clinical

conditions[.]"  Transcript of Hearing at 7 (July 24, 2008 – afternoon session).  Specifically, Dr.

Phillips was troubled by the fact that, at the time of the hearing, there seemed to be much

"uncertainty and confusion" about Mr. Hinckley's volunteer opportunities in his mother's

hometown.  Id. at 8.  As Dr. Phillips put it:

> I would want to know more [about the potential volunteer
> opportunities].  I'd want to know where the hospital is on this
> matter.  Have they vetted this?  Have they made contact?  Are they
> comfortable with the arrangements?  Who is the person that's
> going to be doing the transportation?  Is it clear how many days, in
> fact, Mr. Hinckley will be going?

Id. at 11-12.  In addition, Dr. Phillips opposes permitting Mr. Hinckley to volunteer in the

District of Columbia under any circumstances because it would create "a fundamental risk of

thwarting or making more difficult his transition [to his mother's hometown] by diverting

attentions to the District of Columbia[.]"  Transcript of Hearing at 61-62 (July 24, 2008 –

afternoon session).

      In light of these deficiencies, Dr. Phillips does not support the Hospital's proposal

as written.  Instead, Dr. Phillips favors an incremental approach under which the Hospital would

not extend the duration of Mr. Hinckley's conditional releases or increase his unaccompanied

time until it is clear that (1) Mr. Hinckley has a firm, Hospital-approved volunteer position in his

mother's hometown; (2) Mr. Hinckley has demonstrated his commitment to that position and has

successfully performed in the position for an unspecified period of time; (3) the Hospital has

addressed the purported lack of clarity with respect to the roles to be played by Dr. Lee and Mr.

Beffa; and (4) the Hospital has demonstrated that the Lee-Beffa service arrangement is in fact

working for Mr. Hinckley.  See Phillips Rpt. at 64-70.

      Dr. Patterson was also permitted to offer expert testimony about Mr. Hinckley's

mental health and the Hospital's proposal.  Dr. Patterson's opinions about Mr. Hinckley's mental

health generally conformed to the other experts' opinions.  With respect to whether this Court

should approve the Hospital's proposal, however, Dr. Patterson's testimony departed

dramatically from the views of the other experts – and even Dr. Patterson's own report.  Dr.

Patterson's report generally supports the Hospital's proposal, with one major exception: it

opposes the proposal to extend Mr. Hinckley's releases to nine nights.  See Report of Dr.

Patterson at 38 (July 7, 2008) ("Patterson Rpt.") (recommending that "Mr. Hinckley should . . .

have 12 visits of six days and five nights to [his mother's hometown] to continue visits with his

family, and allow him to begin to develop the individual therapy relationship with Mr. Beffa.

More importantly, the visits should be limited to six days to allow for the individual therapy and

music therapy that he receives at St. Elizabeths Hospital to continue on a weekly basis").[13]   In

his testimony, however, Dr. Patterson did not merely reiterate his opposition to longer releases.

He also explicitly (and, it seemed, without qualification) withdrew his support for

recommendations two, three, four, five, six and fourteen of the Hospital's proposal, see supra at

4-6 – in other words, all of the recommendations that involved Mr. Beffa.  See Transcript of

Hearing at 5 (July 25, 2008 – morning session).

Dr. Patterson withdrew his support for recommendations two, three, four, five, six

and fourteen after listening to Mr. Beffa's testimony because Mr. Beffa's testimony "dismayed"

him in at least four ways.  Transcript of Hearing at 6 (July 25, 2008 – morning session).  First, in

discussing what he had done to prepare to be Mr. Hinckley's therapist, Mr. Beffa stated that he

had read certain relevant documents but "didn't mention that he needs to read . . . the treatment

plan or that he needs to read other information like, for example, the notes from V.J. Hyde, the

music therapist, and other contributing members of the treatment team."  Id. at 7.  Second, Dr.

Patterson suggested that Mr. Beffa "seemed to forget about [Mr. Hinckley's] Axis II diagnoses"

in his direct testimony – thus suggesting that Mr. Beffa lacked even a basic familiarity with Mr.

Hinckley's case history.  See id. at 7-8 ("[When asked about Mr. Hinckley's diagnoses, Mr.

Beffa] stated the psychotic disorder, NOS, and the major depressive disorder [without

---

[13]      Dr. Patterson's report also suggests minor modifications to the Hospital's
proposal, such as requiring Mr. Hinckley to carry a GPS-enabled cell phone when
unaccompanied.  See Patterson Rpt. at 39.

prompting], [but] only when [counsel for Mr. Hinckley] reminded him that there were other

diagnoses did he mention narcissistic personality.").  Moreover, even when Mr. Beffa identified

the Axis II diagnosis, he "didn't say narcissistic personality disorder, he said narcissistic

personality" – suggesting, in Dr. Patterson's view, that Mr. Beffa does not know the difference

between the two.  Id. at 8.

    Third, Dr. Patterson pointed to the following exchange from the cross-

examination of Mr. Beffa:

> Q [by counsel for the government]: You said Mr. Hinckley's
> diagnoses are in remission.  Is he currently mentally ill?
>
> A [by Mr. Beffa]: That's a good question.  You don't necessarily
> lose a diagnosis your entire life.  If you're an alcoholic, you're an
> alcoholic for life, and most likely the depression will be there his
> entire life; the possibility of it increasing, so to speak.  So it may be
> a manner of semantics in terms of whether a person is really
> mentally ill or not.

Transcript of Hearing at 59 (July 24, 2008 – morning session).  Dr. Patterson was troubled by this

exchange because in his view there is no ambiguity as to whether Mr. Hinckley is mentally ill.

See Transcript of Hearing at 10 (July 25, 2008 – morning session) ("The man is mentally ill.  Has

been.  Is. Will probably continue to be.  So you've got to manage his mental illness.").

    Fourth, Dr. Patterson was thoroughly unimpressed with Mr. Beffa's efforts at case

management since the last hearing, and criticized both his attempts to help Mr. Hinckley find a

volunteer position and his attempts to help Mr. Hinckley identify social outlets.  Dr. Patterson

was left with the impression that Mr. Beffa would not be capable of monitoring, assessing and

assisting Mr. Hinckley adequately during his conditional releases, either as a case manager or as

a therapist.  As Dr. Patterson put it:

> [Mr. Hinckley] needs to have someone [as case manager and
> individual therapist] who is . . . acutely aware [that Mr. Hinckley is
> mentally ill], vigilantly aware of that, and that requires reading the
> record.  That requires really keying in on the right questions, and if
> you don't think somebody is mentally ill, you just might not even
> ask.  He might not even get into a discussion about how he's
> feeling and what he is thinking about various situations, and you
> gotta. With Mr. Hinckley, you have to.

Transcript of Hearing at 10-11 (July 25, 2008 – morning session).  The government

wholeheartedly concurs in Dr. Patterson's assessment of Mr. Beffa.  <u>See</u> Government's Response

to Request for Interim Relief at 2 (June 1, 2009) ("[W]hen Mr. Hinckley begins volunteer work,

he will encounter new responsibilities, new pressures, and new social situations that could have

unanticipated effects on him.  The Court needs to be able to rely upon someone to ask the right

questions and monitor the experiment that Mr. Hinckley is about to undertake in the community.

The evidence shows that Mr. Beffa is not that person.").


### III.  FINDINGS OF FACT

Based upon the testimony and exhibits offered by counsel for the government and

by counsel for Mr. Hinckley, the Court finds that the following facts have been established by a

preponderance of the evidence:

> 1.  Mr. Hinckley's current diagnosis is psychotic disorder not
> otherwise specified (Axis I), in remission; major depression (Axis
> I), in remission; and narcissistic personality disorder (Axis II).

> 2.  Mr. Hinckley's Axis I diagnoses have been in remission for at
> least fifteen, and perhaps as many as twenty-one years.

3. Mr. Hinckley's narcissistic personality disorder is significantly attenuated from its previous state.  Mr. Hinckley continues to exhibit symptoms of grandiosity and self-importance, but no longer exhibits the intense self-absorption that was present during the 1980s.

4. Mr. Hinckley has exhibited no evidence of delusional thinking for approximately twenty years and no evidence of obsessive conduct for at least thirteen years.

5. Mr. Hinckley has continued to exhibit deceptive behavior even when there have been no symptoms of psychosis or depression.  Such deceptiveness may relate to his narcissistic personality disorder.

6. Mr. Hinckley continues to be guarded, defensive and sometimes secretive.

7. Mr. Hinckley's self-reporting underrepresents his problems and pathology due to a tendency to minimize problems and avoid negative aspects of situations to present himself in an overly positive light.

8. Mr. Hinckley has exhibited no violent behavior, nor attempted suicide, in more than twenty-five years.

9. While Axis IV was not discussed at this year's hearing, evidence in the past showed that Mr. Hinckley's Axis IV diagnosis relates to his "current stressors."  In addition to his long-term mental illness (his Axis I diagnoses) and his narcissistic personality disorder (his Axis II diagnosis), they include: involvement with the legal system, notoriety, reintegration into society/living in the community, and often his relationships with women.

10. Historically, relationships and Mr. Hinckley's perceptions of those relationships, especially relationships with women, have been inextricably intertwined with Mr. Hinckley's mental illness and have been especially implicated when he has been most clinically dysfunctional.  He has affiliative and dependency needs, and his mood often fluctuates based on the status of his relationships with women.  This is an area of ongoing clinical concern for the Hospital.

11.  Mr. Hinckley has never tried to escape from the Hospital or
when on "B" city outings or unsupervised conditional release visits
with his parents.  He has participated successfully in well over 200
Hospital-accompanied outings in the community without incident.
He has also participated successfully in all of the Phase I, Phase II
and Phase III visits authorized by this Court.  He has followed
every condition imposed by the Court in authorizing these visits.
These visits have been therapeutic and beneficial.

12.  Were Mr. Hinckley to experience a relapse of his Axis I
disorders, that relapse would not occur suddenly, but rather would
occur gradually over a period of at least weeks or months. A
relapse would not occur during the course of the extended
conditional releases proposed by the Hospital.

13.  Mr. Hinckley self-medicates with 1 mg. of Risperdal, 150 mg.
of Zoloft, 50 mg. of Benadryl, 100 mg. of Colace, 120 mg. of
Sudafed, 150 mg. of Zantac, and one multivitamin tablet per day.
There is no indication that Mr. Hinckley has failed to take his
medication in the recent past or during any of the authorized
releases. No evidence has been presented to the Court to suggest
that were Mr. Hinckley to cease to take his medication over the
course of the conditional releases proposed by the Hospital, it
would have any physiological effect.

On the ultimate mixed question of law and fact – dangerousness – the Court finds, for the reasons

stated below, that Mr. Hinckley will not be a danger to himself or to others under the conditions

proposed by the Hospital, as modified by the Court, *and* certain additional conditions.


IV.  DISCUSSION

Neither the government nor its experts oppose moving Mr. Hinckley from Phase

III to Phase IV, the transitional stage in which Mr. Hinckley would focus on vocational and social

integration into the real world outside the Hospital.  Nor do they object to Mr. Hinckley's

obtaining a learner's permit, taking driving lessons and obtaining a District of Columbia driver's

license.  Rather, the government and its experts object to various other aspects of the Hospital's

proposal, citing concerns about four interrelated issues: (1) Mr. Hinckley's current mental health status (especially as it relates to his ability to realistically appreciate his relationships with women) and what it may indicate about his potential for dangerousness under the Hospital's proposal; (2) the adequacy of the proposed support system for Mr. Hinckley in his mother's hometown, and in particular the clarity of the Lee-Beffa service arrangement and Mr. Beffa's ability to serve as a competent case manager and therapist; (3) the wisdom and necessity of extending the duration of Mr. Hinckley's conditional releases at this time; and (4) the terms under which the Hospital proposes to allow Mr. Hinckley to engage in volunteer activities and the relationship of those volunteer activities to the expansion of Mr. Hinckley's social privileges.[14]   The Court addresses each of these major issues below.

### A.  Mr. Hinckley's Mental Health and Risk of Dangerousness

All of the relevant psychological evidence – including the testimony at the evidentiary hearing, evaluations conducted by the parties' experts and the tests administered by Dr. Montalbano – indicates that Mr. Hinckley remains mentally ill; his Axis I diagnoses are in remission and his Axis II diagnosis is significantly attenuated.  Mr. Hinckley, however, does continue to struggle with his well documented "affiliative and dependency needs" and to demonstrate poor judgment in his relationships with women.  At certain times during the year preceding the hearing, Mr. Hinckley was guarded, defensive and less than fully candid with certain members of his treatment team with respect to his relationships with women.

---

[14]     The government also raises concerns about Mr. Hinckley's recent decision to record an old song, "The Ballad of the Outlaw," arguing that the decision indicates that Mr. Hinckley currently harbors inappropriate thoughts of violence.  See Gov. Mot. at 6.  Mr. Hyde's credible and persuasive testimony to the contrary dispels these concerns.  See supra at 19-20.

Furthermore, Mr. Hinckley failed to pursue volunteer opportunities in his mother's hometown with the utmost vigor, and it is certainly plausible to suggest that his ever-present narcissism contributed to that failure.  (To be fair, it should be noted that since the evidentiary hearing Mr. Hinckley has been diligent about staying in contact with the two organizations that have offered him volunteer positions, thereby ensuring the continued availability of those positions.  See, e.g., Letter from St. Elizabeths Hospital to the Court at 2 (Nov. 21, 2008); Letter from St. Elizabeths Hospital to the Court at 3 (March 31, 2009).)  In the government's view, these indications of ongoing mental illness require the Court to deny the Hospital's current proposal and adopt the government's more conservative proposal.  See Gov. Mot. at 6.  The Court disagrees.

It must be remembered that the statutory regime under which the Court conducts these proceedings and evaluates the Hospital's (e) Letter does not require Mr. Hinckley to recover completely in order to proceed to the next level of conditional release.  See 24 D.C. Code § 501(e); Hinckely III, 407 F. Supp. 2d at 254; Hinckley I, 292 F. Supp. 2d at 130-32 (noting that the Court must determine whether a preponderance of the evidence shows that the patient will not in the reasonable future be a danger to himself or to others under the release conditions proposed).  Nor would such a requirement be feasible or desirable as a practical matter. Cf. Transcript of Hearing at 55 (July 24, 2008 – afternoon session) (testimony of Dr. Phillips) ("Do I expect the issues such as veracity, the issue of openness, all to have been resolved and without resolving them all he should not be allowed to progress to the next step?  Of course not.").  Thus, the ultimate question is not whether Mr. Hinckley remains mentally ill – though of course that is an important issue.  The ultimate question is whether a preponderance of the evidence supports the proposition that Mr. Hinckley will not, in the reasonable future, be a

danger to himself or to others under the proposed conditions of release and/or other reasonable conditions of release imposed by the Court.  See 24 D.C. Code § 501(e); Hinckely III, 407 F. Supp. 2d at 254; Hinckley I, 292 F. Supp. 2d at 130-32.

After careful consideration, the Court answers that ultimate question in the affirmative.  The evidence suggesting that Mr. Hinckley will *not* become dangerous under the Hospital's proposal – including his uncontested record of abiding by the terms of this Court's orders; his uncontested empathy and compassion for his family members over the last year; his increased (if still imperfect) openness with his treaters; his ability generally to cope with the fluctuations in his romantic relationships without decompensating; and his demonstrated ability to cope with major, life-altering stressors, such as the loss of a father – far outweighs the evidence suggesting that he *will* become dangerous under the Hospital's proposal.   The Court therefore concludes that Mr. Hinckley will not in the reasonable future be a danger to himself or to others under the conditions of release proposed by the Hospital, subject to certain modifications and additional conditions.  The Court further concludes that even if Mr. Hinckley were to decompensate during the course of the extended releases proposed by the Hospital – an event the Court regards as highly unlikely – his decompensation would not occur suddenly but would occur gradually over weeks or months and would be detected easily by his family members and the mental health professionals responsible for monitoring him.  See *supra* at 29-30, ¶¶ 4, 10, 12.

### B.  The Proposed Support System: Dr. Lee and Mr. Beffa

The government has raised two concerns about the adequacy of the Hospital's proposed support system for Mr. Hinckley in his mother's hometown – *i.e.*, the Lee-Beffa service arrangement.  First, the government believes that the Lee-Beffa service arrangement (under which Dr. Lee serves as the "covering psychiatrist," while Mr. Beffa serves as case manager and therapist) suffers from a fatal lack of clarity.  Second, the government believes that Mr. Beffa is incapable of serving as a competent case manager and therapist for Mr. Hinckley.  In the government's view, Mr. Hinckley's conditions of release should not be expanded until these two concerns are addressed because, in the absence of an adequate support system in his mother's hometown, Mr. Hinckley may decompensate and become dangerous.

This Court has expressed its concerns about Dr. Lee in the past.  See Hinckley V, 493 F. Supp. 2d at 72-75; Hinckley III, 407 F. Supp. 2d at 387-88; United States v. Hinckley, Criminal No. 81-0306, Memorandum Opinion and Order at 2 (D.D.C. Sept. 29, 2005).  Indeed, it is largely as a result of Dr. Lee's testimony before this Court and his stated reluctance to be the primary therapist for Mr. Hinckley – and his own suggestion that Mr. Beffa was the better person to provide therapy for Mr. Hinckley, see Hinckley V, 493 F. Supp. 2d at 73 – that the Hospital now proposes that Dr. Lee be the covering psychiatrist, while Mr. Beffa be the one to provide individual therapy to Mr. Hinckley in his mother's community.  See Hospital's (e) Letter at 13-14.  This proposal thus provides some of the clarity the government has thought to be lacking in the past.  In the Court's view, the Hospital's current proposal sufficiently delineates and differentiates the roles to be played by Dr. Lee and Mr. Beffa.  Moreover, the Hospital's proposal includes specific mechanisms for (1) ensuring ongoing communication between Dr. Lee and Mr.

Beffa, and (2) ensuring ongoing communication between Dr. Lee, Mr. Beffa, and Mr. Hinckley's Hospital-based treaters.  See *supra* at 4 ¶¶ 2-6.  So long as those lines of communication remain open and active, the danger that Dr. Lee's and Mr. Beffa's roles will become blurred is minimal.

Nevertheless, the Court will require Dr. Lee, Mr. Beffa and the Hospital to engage in further discussions about the roles to be played by all of Mr. Hinckley's treaters and to reduce their understandings to writing before the Hospital's current proposal is implemented. Specifically, Dr. Lee will be required to discuss explicitly with the Hospital what is expected of him under the Hospital's proposal.  Similarly, Mr. Beffa will be required to discuss explicitly with the Hospital what is expected of him under the Hospital's proposal.  The Hospital must provide both Dr. Lee and Mr. Beffa with concrete and specific guidelines for performing their respective roles.  Finally, at least one week before Dr. Lee's and Mr. Beffa's first sessions with Mr. Hinckley under this Opinion, the Hospital shall file a report stating that Dr. Lee and Mr. Beffa have complied with these requirements.  That report shall summarize briefly the substance of the conversations between Dr. Lee, Mr. Beffa and the Hospital, and shall describe the parties' understanding of Dr. Lee's and Mr. Beffa's roles.

The government's concerns about Mr. Beffa are more substantial.  The Court agrees that certain aspects of Mr. Beffa's testimony at the evidentiary hearing were troubling. The Court concludes, however, that Mr. Beffa has the training and experience necessary to perform the roles of individual therapist and case manager assigned to him under the Hospital's (e) Letter.  What appears to have been lacking thus far is (1) adequate effort on the Hospital's part to educate Mr. Beffa about the importance and complexity of his proposed duties under the Hospital's proposal, and (2) adequate effort on Mr. Beffa's part to understand those duties and to

prepare himself fully to execute those duties.  If Mr. Beffa is to be Mr. Hinckley's case manager

and therapist while Mr. Hinckley is in his mother's hometown, then it is essential that Mr. Beffa

familiarize himself with all of Mr. Hinckley's case history, not just snippets; that Mr. Beffa act in

a more hands-on and proactive manner with respect to helping Mr. Hinckley find, secure and

maintain volunteer employment and otherwise adjust to life in his mother's hometown; and that

Mr. Beffa fully commit himself to the delicate and unique task of monitoring and ameliorating

Mr. Hinckley's risk factors.

Thus, Mr. Beffa may perform the roles assigned to him under the Hospital's

current proposal, but subject to the following additional conditions.  First, Mr. Beffa will be

required to thoroughly familiarize himself with the record of Mr. Hinckley's case before he takes

on these new responsibilities.  As part of his preparation, Mr. Beffa must read Mr. Hinckley's

current treatment plan and all previous treatment plans; all of the risk assessments prepared by

Dr. Montalbano since just before the first evidentiary hearing before the undersigned; all of the

expert reports prepared by Drs. Phillips and Patterson since just before the first evidentiary

hearing before the undersigned; all of Dr. Binks' therapy notes; all of Mr. Hyde's therapy notes;

and this Opinion and the prior Opinions issued by the undersigned in this matter.  See *supra* at 1

n.1.  Second, at least one week before Mr. Beffa's first session with Mr. Hinckley under this

Opinion, the Hospital shall file a report stating that Mr. Beffa has complied with these

requirements.  That report may be incorporated in the report called for above.  See *supra* at 35.

### C.  Duration of Releases

The government adamantly opposes extending the duration of Mr. Hinckley's conditional releases as proposed by the Hospital.  Both Dr. Patterson and, in a more qualified fashion, Dr. Phillips agree with the government on this score.  (Dr. Phillips appears to favor "phasing in" longer releases.)  As noted above, the government opposes longer conditional releases on two primary grounds.  First, according to the government, longer releases are not necessary to allow Mr. Hinckley to begin engaging in Phase IV-type activities.  Second, the government argues that Mr. Hinckley's conduct during the year preceding the hearing (particularly with respect to his relationships with women) indicates ongoing mental illness and increased stress levels; that the correct response to such conduct is *more* Hospital-based treatment and monitoring; and that the Hospital's proposal to extend the duration of Mr. Hinckley's conditional releases will likely result in *less* Hospital-based treatment and monitoring for Mr. Hinckley.  Despite these arguments, the Court will grant the Hospital's proposal to extend the duration of Mr. Hinckley's conditional releases for the following reasons.

As an initial matter, the Court does not agree with the government that longer releases should be rejected merely because they are not strictly necessary to permit Mr. Hinckley to engage in certain Phase IV-type activities.  In the Hospital's view, longer and more frequent conditional releases will not only allow Mr. Hinckley to engage in new activities, but will also provide substantial therapeutic benefits to Mr. Hinckley without increasing the risk that he will decompensate and become dangerous.  See, e.g., Hospital's (e) Letter at 10 ("[T]he Hospital believes that [its proposal] would take into consideration all of [Mr. Hinckley's risk factors] and help guide and challenge Mr. Hinckley, Jr. to a higher level of functioning.").  The evidence

presented at this year's evidentiary hearing tends to support that view.  For example, as Dr.

Montalbano testified:

> [I]t's been my view that I've expressed that the outings are
> therapeutic, that the outings serve as a risk management strategy
> especially insofar as they manage the primary and critical risk
> factor of depression.  I have heard a great deal of concern
> expressed about [Mr. Hinckley's] risk to himself [at this hearing].
> Well, insofar as Mr. Hinckley is happy, I think we are ameliorating
> that risk factor.  Insofar as expansion of outings make him happier,
> we're further reducing that risk.

Transcript of Hearing at 26 (July 25, 2008 – afternoon session).

      While the government's concerns about reducing Mr. Hinckley's interactions with

his Hospital-based treaters are legitimate, the Court concludes that they are not an adequate

reason to reject the moderate extension of conditional releases proposed by the Hospital.  Even

under the current terms of conditional release, Mr. Hinckley occasionally misses therapy sessions

at the Hospital – either because he is visiting his mother's hometown or because his treaters are

on vacation, ill, or otherwise unavailable – and there is no evidence that Mr. Hinckley has

become less stable or more dangerous as a result.  See Letter to the Court from St. Elizabeths

Hospital (Aug. 4, 2008) (detailing the number of therapy sessions Mr. Hinckley has missed since

the last hearing).  Of course, the Court does not mean to suggest that Mr. Hinckley's Hospital-

based therapy sessions are unimportant or "optional."  They are not.  It means only to make clear

that it is not a sharp departure from the status quo for Mr. Hinckley to miss the occasional

Hospital-based therapy session as a result of a visit to his mother's hometown.

Furthermore, the Hospital has represented (and the government has not disputed) that the longer releases proposed by the Hospital could be scheduled in a way that would not significantly reduce Mr. Hinckley's contacts with his Hospital-based treaters.  See Transcript of Hearing at 21-22 (July 25, 2008 – afternoon session) (rebuttal testimony of Dr. Montalbano). The Court expects that the Hospital will make every effort to follow through on that particular representation.

Finally, Mr. Hinckley will not be without therapeutic support when he is away from the Hospital.  To the contrary: each time he visits his mother's hometown, Mr. Hinckley will see both Dr. Lee and Mr. Beffa, and both Dr. Lee and Mr. Beffa will report their observations to the Hospital.  See supra at 4 ¶¶ 2-6.  Thus, in the highly unlikely event that Mr. Hinckley shows any signs of decompensation while he is visiting his mother's hometown, the Court is confident that those signs will be noticed and attended to by these professionals long before Mr. Hinckley presents any risk of danger to himself or to others.

### D.  Volunteer Work

#### 1.  Volunteer Work in the District of Columbia

The government opposes the Hospital's proposal to permit Mr. Hinckley to engage in volunteer work in the District of Columbia, presumably for the reasons stated by Dr. Phillips at the evidentiary hearing.  See Transcript of Hearing at 61-62 (July 24, 2008 – afternoon session) (testimony of Dr. Phillips) (arguing that permitting Mr. Hinckley to volunteer in the District of Columbia would create "a fundamental risk of thwarting or making more difficult his transition [to his mother's hometown] by diverting attentions to the District of Columbia").  The

Court agrees with the government on this score.  Thus, Mr. Hinckley will not be allowed to volunteer in the District of Columbia as proposed by the Hospital's (e) Letter at this time.  The Court reserves judgment as to whether it would be appropriate to permit Mr. Hinckley to engage in volunteer activities in the District of Columbia in the future.

### 2.  Volunteer Work in Mrs. Hinckley's Hometown

The government does not oppose the Hospital's proposal to permit Mr. Hinckley to volunteer in his mother's hometown.  See Gov. Mot. at 3.  The government and its experts argue, however, that the evidentiary hearing revealed a good deal of "uncertainty and confusion" surrounding which organizations are willing to permit Mr. Hinckley to serve as a volunteer and whether the Hospital has formally approved those opportunities; they therefore urge that Mr. Hinckley should not be permitted to begin volunteering in his mother's hometown until that uncertainty and confusion is resolved.  See Transcript of Hearing at 8 (July 24, 2008 – afternoon session) (testimony of Dr. Phillips).  The government also argues that the Hospital's proposal for approving volunteer positions should be more formal; that Mr. Hinckley should be required to successfully complete volunteer work on at least three overnight visits before he is permitted to enjoy the expanded social privilges contemplated by the Hospital's (e) Letter; and that Mr. Hinckley should not be permitted to enjoy those expanded social privileges in the future unless he continues to maintain a volunteer position.  The Court agrees with the government on all of these points.

At this writing, much of the uncertainty and confusion surrounding volunteer opportunities in Mrs. Hinckley's hometown have dissipated.  It is now clear that there are two volunteer opportunities for Mr. Hinckley in his mother's hometown, both of which the Hospital considers appropriate.  See generally Letter to the Court from St. Elizabeths Hospital (Oct. 9, 2008).  It is also clear that Mr. Hinckley is enthusiastic about both positions.  See John W. Hinckley's Motion for Interim Relief During Court's Consideration of Hospital's Request for Enlargement of Terms of Conditional Release at 2 (May 20, 2009).  Thus, the Court will permit Mr. Hinckley to begin volunteering at whichever one of these two organizations the Hospital deems most appropriate.

But the Court will also modify the Hospital's proposal with respect to Mr. Hinckley's volunteer work as follows.  First, before Mr. Hinckley begins any volunteer position – including any position that has already been identified – it must be approved by Mr. Hinckley's treatment team and the Hospital's review board.[15]  The Hospital must also notify the Court and counsel for the government at least two weeks in advance of Mr. Hinckley beginning any volunteer position (again, including including any position that has already been identified). After so notifying the Court and the government, the Hospital need not await formal approval from the Court to allow Mr. Hinckley to begin volunteering.  The Hospital's notification, however, must include enough detail to permit the Court to evaluate the appropriateness of the volunteer position in question.  Specifically, the Hospital's notification must include a statement

_____

[15]    While the Hospital has voiced its approval of the two potential volunteer positions in Mrs. Hinckley's hometown, it has not made clear whether these positions have been vetted and approved by the treatment team and the review board.  See generally Letter to the Court from St. Elizabeths Hospital (Oct. 9, 2008).

to the effect that the treatment team and the review board have approved the proposed volunteer

position; a description of the organization (including contact information); a description of Mr.

Hinckley's duties and hours; a description of Mr. Hinckley's travel arrangements; and an

explanation of how the proposed volunteer position is consistent with the Hospital's therapeutic

goals for Mr. Hinckley.

Second, Mr. Hinckley shall not be permitted to enjoy the expanded social

privileges contemplated by the Hospital's (e) Letter until he has successfully completed volunteer

work on three overnight visits.  Third, and relatedly, Mr. Hinckley shall not be permitted to enjoy

those expanded social privileges in the future unless he continues to maintain and participate in a

Hospital-approved volunteer position.

Finally, as an added precaution, Mr. Hinckley will be required to carry a GPS-

enabled cell phone "so that he can contact the treatment team and be contacted and also so that

his movements can be measured to assure he has adhered to the itineraries and requirements set

by the treatment team" any time he ventures beyond the Hospital grounds and is not accompanied

by Hospital personnel, his mother or his siblings.  Patterson Rpt. at 39.

## V.  CONCLUSION

For the reasons stated above, the Court will grant in part and deny in part the

Hospital's request to expand Mr. Hinckley's conditions of release.  Specifically, the Court will

grant the Hospital's request to the extent indicated in the body of this Opinion and as modified by

this Opinion, subject to the additional conditions described in this Opinion and subject also to the

conditions set forth in prior release orders of this Court (modified, as necessary, to be consistent

with this Opinion).  Accordingly, it is hereby

ORDERED that, on or before July 1, 2009, the Hospital shall submit to the Court

a proposed Order setting forth the proposed terms of Mr. Hinckley's conditions of release

consistent with this Opinion.  That Order, which shall be in the same format as previous

conditional release Orders issued by the Court, shall incorporate (1) all of the elements of the

Hospital's current proposal as modified by this Opinion; (2) all of the additional conditions

described in this Opinion; and (3) all of the conditions and terms from previous Orders that

remain relevant (modified, as necessary, to be consistent with this Opinion).  The Hospital shall

circulate the proposed Order to counsel for both parties for their comments (consistent with this

Opinion) before submitting it to the Court.

SO ORDERED.


/s/_____
PAUL L. FRIEDMAN
United States District Judge


DATE:  June 16, 2009