

GOVERNMENT
EXHIBIT

2011-01
U.S. v. Hinckley 81CR306

*Raymond F. Patterson, M.D., D.F.A.P.A.*

1904 R STREET, N.W.
WASHINGTON, D.C. 20009
———
TELEPHONE (301) 292-3737
FACSIMILE (301) 292-6272

DIPLOMATE:
AMERICAN BOARD OF PSYCHIATRY AND NEUROLOGY
IN GENERAL PSYCHIATRY
AMERICAN BOARD OF PSYCHIATRY AND NEUROLOGY
IN FORENSIC PSYCHIATRY
AMERICAN ACADEMY OF PSYCHIATRY AND THE LAW
IN FORENSIC PSYCHIATRY

FELLOW:
AMERICAN PSYCHIATRIC ASSOCIATION
AMERICAN COLLEGE OF MENTAL HEALTH ADMINISTRATION

**CONFIDENTIAL**

November 14, 2011

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
Assistant United States Attorneys
U.S. Department of Justice
555 Fourth Street, N.W.
Washington, D.C. 20530

Re: United States v. John W. Hinckley, Jr.  (Case No. 81-306(PLF))
   Independent Forensic Psychiatric Evaluation of John W. Hinckley, Jr.

Dear Ms. Chasson and Ms. Kennedy:

This report is in regard to my independent forensic psychiatric evaluation of John W. Hinckley, Jr., in the above referenced matter. As you will recall, on 7/29/11, St. Elizabeths Hospital submitted recommendations that Mr. Hinckley be granted an expansion of his current conditional release. Mr. Hinckley's conditional release order of 7/20/09 allowed him to visit with his family in Williamsburg, Virginia, for 12 ten-day visits. On May 13, 2011, after the twelfth visit, the Court extended the conditional release until a hearing is held on the hospital's proposal to expand the conditional release. On July 29, 2011, the hospital submitted a 501(e) Motion to expand the duration of Mr. Hinckley's visits with his family in Williamsburg to include two visits of 17 days and six visits of 24 days and subsequently transition to convalescent leave status after successfully completing the minimum of eight visits. The hospital further recommended that if the Court does not grant convalescent leave status after Mr. Hinckley completed the minimum eight visits then the 24 day visits will continue until further order by the Court. Further, the hospital is also recommending that Mr. Hinckley be allowed unaccompanied use of an automobile for activities specified in their letter to the Court.

I examined John W. Hinckley, Jr., at St. Elizabeths Hospital on 8/16/2011, 9/14/2011, 10/11/2011, and 11/9/2011. In addition, I conducted collateral interviews with hospital staff including Kevin Shamblee, LICSW, Katherine Murphy, Psy.D., Benjamin Adewale, M.D., Vern J. Hyde, MT, Sidney Binks, Ph.D., Velore Jernigan-Pedrick (librarian), and Diedre Cogan (art

1

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 2 of 80


therapist). I also interviewed Deborah Giorgi-Guarnieri, J.D., M.D., Carl Beffa, LCSW, David
Coe (CEO), John Brumfield and Liz Howard of Colonial Behavioral Health, and Sandy
Kochesperger (librarian at Eastern State Hospital). In addition, I interviewed Mrs. JoAnn
Hinckley. I attempted to interview "Ms. B" who has been in a relationship with Mr. Hinckley
for approximately two years, however, she refused to be interviewed.

In addition to examining Mr. Hinckley and conducting collateral interviews, I have reviewed my
previously submitted reports dated 11/18/1996, 6/2/1997, 8/3/2003, 10/29/2004, 4/4/2007, and
6/7/2008. In addition to my most recent examination of Mr. Hinckley, collateral interviews and
review of my past reports, I have reviewed a number of documents and other materials including
the following:

1.  Letter by Patrick J. Canavan, Psy.D., and Robert Benedetti, Ph.D., regarding 501(e)
    Motion, dated 7/29/2011

2.  Recommendation for an Expansion of the Current Conditional Release and for
    Convalescent Leave, by Kevin Shamblee, LICSW, and treatment team members, dated
    7/15/2011

3.  Violence Risk Assessment Update by Katherine Murphy, Psy.D., dated 8/31/2011

4.  Government's Opposition to St. Elizabeths Hospital's Request for Expanded Conditional
    Release by Ronald C. Machen Jr., United States Attorney, Robert D. Okun, Chief Special
    Proceedings Division, Sarah T. Chasson, Assistant United States Attorney, and Colleen
    M. Kennedy, Assistant United States Attorney, dated 9/30/2011

5.  John W. Hinckley's Reply Memorandum in Support of Hospital's Request for
    Enlargement of Terms of Conditional Release, by Barry William Levine, Esq., Adam
    Broujansky, Esq., and Ann-Marie Luciano, Esq., dated 10/21/2011

6.  Medical records by St. Elizabeth's Hospital, dated 2/2008 thru 9/2011

7.  Medical records by Deborah Giorgi-Guarnieri, J.D., M.D., 10/14/2011 thru 7/25/2011

8.  Curriculum Vitae of Deborah Giorgi-Guarnieri, J.D., M.D.

9.  Orders by the Honorable Paul L. Friedman, United States District Judge, dated
    1/24/2008, 1/31/2008, 4/11/2008, 7/20/2009, and 5/13/2011

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 3 of 80

10. United States Secret Service Surveillance Reports from 4/2008 thru 10/2011

11. Report of Computer Forensic Examination of St. Elizabeths Hospital computer, conducted by the United States Secret Service, dated 10/25/2011

12. Letter from St. Elizabeths Hospital by Patrick Canavan, Psy.D., and Robert C. Moran, Psy.D., requesting that Mr. Hinckley's privileges under the current conditional release order of 7/20/2009 be continued, dated 5/9/2011

13. Hospital letters regarding proposed itineraries for visits to Williamsburg, staff accompanied outings in the Washington Metropolitan Area, and reports on the individualized relapse prevention plans related to each visit to Williamsburg, dated 8/4/09, 9/4/09, 10/13/09, 10/22/09, 12/1/09, 12/15/09, 12/21/09, 1/7/10, 1/19/10, 1/22/10, 2/4/10, 2/18/10, 3/8/10, 3/11/10, 3/25/10, 4/23/10, 5/7/10, 5/14/10, 6/3/10, 6/18/10, 8/30/10, 10/6/10, 10/28/10, 11/3/10, 11/18/10, 12/16/10, 1/12/11, 1/24/11, 2/15/11, 3/3/11, 4/5/11, 5/9/11, 5/10/11, 5/25/11, 6/10/11, 7/5/11, 7/18/11, 8/15/11, 8/31/11, 10/6/11

14. Letters from St. Elizabeths Hospital regarding Mr. Hinckley's visits to Williamsburg under Phase 4, including 11/7-16/09; 12/19-28/09; 1/23-2/1/10; 2/20-3/1/10; 3/27-4/5/10; 5/8-17/10; 6/19-28/10; 10/9-18/10; 11/20-29/10; 12/18-27/10; 1/29-2/7/11; 3/5-14/11; 6/11-20/11; 7/23-8/1/11; 9/3-12/11; and 10/15-24/11.

15. Article entitled, "Caged Cassanova" from the Daily.com, dated 2/5/11

16. Article entitled, "Free John Hinckley" from the Washingtonian Magazine, October 2011

17. DVD entitled, "Stalker" documentary produced by CNN

18. CD's of 37 songs by John Hinckley from 11/20/10 – 10/2011

## Background Information and Reason for Referral

Mr. Hinckley is a 55 year old male who was admitted to the John Howard Pavilion at St. Elizabeths Hospital on 6/21/82 having been found Not Guilty By Reason of Insanity on 12 counts of attempted murder, possession of a prohibitive weapon, and carrying a pistol without a

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 4 of 80

license. This current evaluation was conducted because St. Elizabeths Hospital has submitted a
501(e) recommendation under Title 24 of the D.C. Code.

Mr. Hinckley's hospital course has been reviewed extensively since his admission in 1982 and I
will not repeat the details of his hospitalization prior to 7/20/2009, which is the date the Court
approved a series of 12 visits to the family home as Phase 4 of the Conditional Release Plan.

In its order dated 7/20/2009, the Court ordered the following:

1.  Mr. Hinckley would be allowed 12 visits of ten days and nine nights to Williamsburg and
    would be supervised and monitored by his mother and/or other family members;

2.  Mr. Hinckley would be allowed two hours of unaccompanied time within the family's
    gated community each day, and would be required to carry a cell phone;

3.  Mr. Hinckley would be allowed three hours of unaccompanied time in the Williamsburg
    community and would be driven to and from sites that would be identified by a pre-
    approved itinerary with the treatment team.;

4.  Mr. Hinckley would be allowed to volunteer in the library at Eastern State Hospital for
    two four-hour periods each week;

5.  Mr. Carl Beffa would continue in the role of case manager and individual therapist, and
    would be required to read all of the past reports and medical records;

6.  The Individual Relapse Prevention Plan would be completed by family members, Dr. Lee
    and Mr. Beffa and various activities would take place including communications after
    site visits and for relapse prevention treatment planning meetings;

7.  Mr. Hinckley would be allowed to participate in "B" City Privileges in the Washington,
    D.C. metropolitan area accompanied by St. Elizabeths Hospital staff;

8.  The Individualized Relapse Prevention and Media plans will remain in effect.

John Hinckley's Treatment Team submitted a Recommendation for an Expansion of the Current
Conditional Release and for Convalescent Leave, authored by Kevin Shamblee LICSW on
7/15/11. In their recommendation the team reviewed Mr. Hinckley's hospitalization and stated
their reason for Review Board approval was that Mr. Hinckley has traveled on accompanied

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 5 of 80

visits to Williamsburg since 2006 and the number of times he has been allowed to spend on those outings has continued to increase from four days to the current duration of ten days total. Mr. Hinckley has subsequently completed 12 outings to Williamsburg, and in May 2011 the conditional release was continued for an unlimited number of visits pending a ruling by the court regarding the hospital's recommendation for an expansion of the visits. Their recommendation continues that it is the treatment team's recommendation to let Mr. Hinckley begin the transition to spending more time in that area and less time at the hospital in D.C., and as such the Nichols House 2B treatment team is recommending Mr. Hinckley for an expansion of his current conditional release and that he is allowed to be placed on convalescent leave. The recommendation details the transition to include: (1) Duration of the visits to two visits of 17 days, (2) Six visits of 24 days, and (3) transitioning to convalescent leave status after successfully completing at least eight outings.

The Recommendation then identified the risk factors related to the instant offense to include:

1. <u>Depression</u> – Leading up to the instant offense in 1981, Mr. Hinckley had been prescribed Surmontil and Valium to treat his depression.

2. <u>Isolation</u> – Leading up to the instant offense, Mr. Hinckley had a history of being a loner and traveling extensively throughout the country in an erratic manner.

3. <u>Psychosis</u> – At the time of the instant offense Mr. Hinckley was operating under the delusion of having a relationship with actress Jodie Foster and therefore shot the President to prove his love to her.

4. <u>Lack of Insight into Mental Illness</u> – Mr. Hinckley discontinued recommended treatment leading up to the commission of the instant offense.

5. <u>Personality Disorder</u> – Leading up to the instant offense periods of grandiosity and self absorption was noted in Mr. Hinckley's behavior. He has a personality disorder and diagnosis on Axis II.

6. <u>Access to Weapons</u> – Leading up to the instant offense Mr. Hinckley had access to a number of firearms which he purchased over a period of time.

7. <u>Lack of Family Support</u> – Leading up to the instant offense Mr. Hinckley received limited support from his family. He was not allowed to reside in the family home.

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 6 of 80


Risk factors that have become evident or developed since the instant offense include:

8. <u>History of Suicides</u> – Mr. Hinckley has four prior suicide attempts and it is noted that the instant offense had a suicidal component (i.e., pointing and discharging a firearm at the U.S. president amid numerous armed agents).

9. <u>Difficulty in Relationships with Females</u> – Mr. Hinckley's delusional beliefs regarding Ms. Foster have been problematic for him during his initial trial as well as during periods of his hospital course. Additionally, he has experienced difficulty in his quest to have a relationship with different women as an inpatient at this hospital. Some of these female relational interests have caused problems for him during his court hearing as well as raised questions with regard to his judgment.

Mr. Hinckley's history and hospital course have been described in the Recommendation as well as the activities and treatments that he is currently involved in both at the hospital and in Williamsburg. It is noted that he has not been a management problem or noncompliant with his treatment since his last presentation for conditional release in 2008. He is described as interacting socially on a regular basis with a limited number of male and female peers, playing his guitar and being involved in artwork. It is also noted that he can usually be found sitting outside alone or with his female friend on a bench or off in the distance feeding his cats while on his grounds privileges.

The Recommendation provides a summary of his current visits to Williamsburg which is consistent with the Individual Relapse Prevention Plan reports that have been provided to the Court, which includes his meetings with Dr. Giorgi-Guarnieri (Dr. G-G) and Mr. Beffa, and his unaccompanied time in the                subdivision as well as the local community. The report indicates Mr. Hinckley has demonstrated that by transitioning to more time and freedom away from the hospital in D.C., his level of risk has not increased. The report also notes he has not attempted to veer from the stipulations of his court order while on these outings. His downtime at home, when not volunteering at Eastern State Hospital two times per week or visiting his mental health providers, resembles that at the hospital. He spends it relaxing in the quietness of his artwork or music.

Mr. Hinckley's interactions with females is next described in the team Recommendation, and notes he no longer contacts Ms. Leslie Deveaux and that he has not seen Ms. C      ; G for over a year but continues to call her about twice each month. They keep each other informed about his current female friend and her boyfriend. The report also describes the treatment team's meeting with Mr. Hinckley's current female friend and their relationship beginning in the fall of

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 7 of 80


2009 which continues, and in August 2010 she indicated the relationship was headed toward marriage. The report notes Mr. Hinckley was present at the meeting in August and did not object to her assertion.

The report continues that during 2010 Mr. Hinckley asked hospital staff and his family members about his female friend visiting him in Williamsburg, and neither supported the idea of those visits.

The Recommendation described Mr. Hinckley having obtained his driver's license, volunteering at Eastern State Hospital, and meeting with Colonial Behavioral Health (People's Place). Mr. Kevin Shamblee met with administrators of Colonial Behavioral Health to apprise them of the transition plan, and they discussed that the number of days attending groups at People's Place could be two days with Recommendations that he be present at least three weeks per month to provide greater opportunity to reach treatment objectives. The mental health coverage by Dr. G-G, and Mr. Carl Beffa is also described with the plan for Dr. G-G to meet with Mr. Hinckley at least once per week during the first two visits and each visit thereafter, and be available to Mrs. Hinckley to consult with her as necessary. She would provide psychiatric services and to be in touch with the hospital and Mr. Hinckley's assigned psychiatrist at the hospital as necessary, and would collaborate with Mr. Beffa. Her participation would include communication with the treatment team regarding her observations at the conclusion of each outing, participation in post visit telephone conferences, and participation via telephone in the individual recovery plan meetings every two months.

Mr. Beffa's role was described as both case manager and individual therapist and these roles would be separate. Mr. Beffa would perform visits with Mr. Hinckley during his outings, make recommendations to Mr. Hinckley as well as the treatment team for opportunities for increased socialization, enrichment or mental health support, and such recommendations would be made after first hand investigation through site visits or telephone contacts regarding the appropriateness for Mr. Hinckley's participation. It was anticipated Mr. Beffa would also work with Mr. Hinckley in developing the next outing's itinerary, and would followup on Mr. Hinckley's progress in day treatment activities by making one contact each visit through a face-to-face meeting or via telephone with responsible persons. Mr. Beffa was also to provide written feedback to the hospital at the completion of each outing, and collaborate with Dr. G-G, staff members at Eastern State Hospital, and Colonial Behavioral Health. These would be among Mr. Beffa's case management and social service duties. In terms of being Mr. Hinckley's psychotherapist, Mr. Beffa is to conduct a minimum of one psychotherapy session each week separate from his role as case manager. It is also anticipated Mr. Beffa would communicate with the hospital treatment team and provide written feedback to treatment team members at the

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 8 of 80


conclusion of each outing as well as participate via telephone at the individual recovery plan conferences scheduled for every two months for Mr. Hinckley. Any emergency issues discovered by Mr. Beffa or Dr. G-G would be communicated with each other as well as with the hospital.

The Recommendation briefly references the Psychological Risk Assessment done by Paul Montalbano in May 2008. The Recommendation then describes the Violence Risk Assessment update done by Katherine Murphy, Psy.D. on 7/14/11, and describes (a) historical risk factors, (b) updated status of clinical risk factors, (c) updated status of risk management factors, and (d) preliminary risk management conclusions and recommendations. In her conclusions and recommendations, Dr. Murphy stated Mr. Hinckley has demonstrated readiness for an increase in outings to facilitate his progression to convalescent leave and such expansions and freedoms should be incremental and contingent upon successful completion of a progression of treatment objectives integrated into his individualized recovery plan. She noted that the immediate focus should be on solidifying Williamsburg as the primary site for eventual convalescent leave, and treatment objectives should be designed to assist Mr. Hinckley in demonstrating initiative with securing and adjusting to a weekly structured routine and expanding his personal and professional support system. She also recommended increases in unaccompanied leave should time be offered as an incentive to promote therapeutic progression and cultivate his vocational skills. She noted the community reintegration of treatment objectives should include exhibiting responsible driving, acclimating to the day program, continuing with Mr. Beffa, and the psychiatric and psychological treatment objectives focus on utilizing Mr. Beffa and Dr. G-G to guide decision making in the context of intimate relationships as well as maintaining compliance with medication, developing peer relationships and pursuing musical and artistic endeavors.

Dr. Murphy continued that the next step in Mr. Hinckley's transition should involove shifting leadership to Mr. Hinckley's Williamsburg based treatment providers, including treatment objectives and risk factors integration into his treatment plans conducted at his psychosocial day program in Williamsburg. She added that treatment providers at the day program should be informed about Mr. Hinckley's risk factors and should consider collecting individualized relapse prevention plan forms from a provider at People's Place. She also recommended Dr. Binks and Mr. Hinckley develop a graded termination plan and it was recommended that Dr. G-G see Mr. Hinckley twice per visit with reassessment after the initial phase of transition. Lastly, she recommended that Mr. Hinckley continue to have weekly psychotherapy sessions with Mr. Beffa, case management sessions "as needed," and that Mr. Hinckley carry a GPS enabled cell phone when traveling independently. Finally, she recommended that the Individual Relapse Prevention and Media plans should continue to be implemented.

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 9 of 80

The Recommendation then describes the mental status examination by Dr. Benjamin Adewale performed on 7/14/11 in which Dr. Adewale described Mr. Hinckley's mental status as being essentially within normal limits, but noted that " his narcissistic personality has surfaced during conversations with the interviewer such as his insistence that his paperwork and medication orders should be completed prior to other hospital matters." Dr. Adewale also noted Mr. Hinckley's having dated several women in the past who were hospitalized including a current female former patient, with Mr. Hinckley inquiring taking this female friend to Williamsburg with minimal consideration about how his mother feels about her joining them on the outing. He also notes that Mr. Hinckley has recently reconsidered taking his female friend to Virginia due to her unstable mental status. Mr. Hinckley denied being suicidal or homicidal.

His current diagnoses are unchanged from his previous diagnoses, and include the following:

| Axis I: | 1. 298.90 Psychotic Disorder NOS in full remission |
| | 2. 296.36 Major Depressive Disorder in full remission |
| Axis II: | 1. 301.81 Narcissistic Personality Disorder |
| | 2. 301.20 Schizoid Personality Disorder (pre-morbid) |
| Axis III: | S/P (L) Hernia Repair, oinities GERD, constipation |
| Axis IV: | Prolonged involvement with the legal system |
| Axis V: | GAF 65 (current) |

Mr. Hinckley's medications at the time of the submission of this Recommendation were Risperdal 1 mg at bedtime, Zoloft 100 mg each day, and Zoloft 25 mg twice per day.  In addition, he is taking medications for rhinitis, GERD, and nutrition.

The Rationale for the Recommendation includes statements regarding the Risk Factors previously listed within the treatment team's Recommendation as being essentially stable or not of substantial concern, including risk factors 1 thru 9 with the exception of #5 indicating some evidence of narcissism, and #9 including his attempts to meet a female with whom he may carry out a romantic relationship, and his current relationship with a female friend. and having purchased numerous items for his current friend during his visits to Williamsburg including four rings, the latest of which was noted as intended as an engagement gift.

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 10 of 80

The Recommendation concludes with repeating the plans for expansion of the visits to 17 and
then 24 day durations and subsequently to convalescent leave.  The Recommendation also
includes that Mr. Hinckley:

1. Be allowed unaccompanied use of an automobile for specific activities,

2. Continue to volunteer at Eastern State Hospital with possible increases to five days per
   week,

3. Sttend groups or other activities at Colonial Behavior Health – People's Place for up to
   three days per week,

4. Continue weekly meetings with Dr. G-G,

5. Continue weekly meetings with Mr. Beffa, and

6. Unaccompanied outings outside of _____ for social recreational, shopping, dining
   out, or for the purpose of securing other related activities beginning with six four hour
   unaccompanied outings for the first two visits, nine four hour unaccompanied outings for
   the next two visits, and after that up to twelve eight hour unaccompanied outings outside
   of _____ within a 30 mile radius with specific geographic location.

It was noted that these increases would be assessed by the hospital staff and providers in
Virginia, and the activities would be approved by the hospital/Mr. Beffa in advance or with
notice on the day of the activity.  The specifics of the Recommendation also include that:

1. Mr. Hinckley when not involved in structured activities would be allowed to remain
   unaccompanied in the subdivision of his mother's residence,

2. Hhis mother, brother and sister remain as the identified responsible persons while on the
   outings,

3. Communication will continue for the first eight visits through the feedback forms as well
   as telephone conversations,

4. Mr. Beffa, and Dr. G-G remain in their roles as individual therapists and case manager,
   and psychiatrist, respectively, with feedback to the hospital as well as telephone
   conversations for the first eight visits,

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 11 of 80

5. Mr. Hinckley be allowed to continue his daily unaccompanied walks for up to four hours per day,

6. Rreceive adequate medications from the pharmacy at the hospital,

7. Tthe current internet restriction be continued, and

8. Tthe Individualized Relapse Prevention and Media plans remain in effect for the duration of Mr. Hinckley's time spent in Williamsburg.

The treatment team also recommends changes or additions in the current conditional release to include:

1. Seven day notice to the court, counsel, and secret service prior to each outing in Williamsburg,

2. One day notice for each outing in D.C.,

3. Mr. Beffa to see Mr. Hinckley for individual therapy each week and Dr. G-G to see Mr. Hinckley a minimum of once during each 24 day visit,

4. A minimum of two weeks occur between each visit,

5. Pplaces for unaccompanied social and recreational activities not be specified in an itinerary but listed in a catalog,

6. The hospital not provide the court with specific dates, times, addresses or phone numbers for Mr. Hinckley's unaccompanied activities,

7. A summary of two visits at a time on a report may be submitted to the court unless an emergency occurs, and

8. Mr. Hinckley may be driven to and from the hospital by a professional driver without his mother or siblings in the vehicle.

Lastly, the treatment team has recommended that Mr. Hinckley be conditionally released to reside permanently on convalescent leave after a minimum of successful completion of eight

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 12 of 80


outings at the discretion of the hospital and an assessment by the hospital staff and providers in Virginia, with the outplacement plan to include:

1. Placement into the community to reside with his mother in Williamsburg,

2. Psychiatric follow-up, and therapy and case management services by Dr. G-G and Mr. Beffa, respectively, who will communicate with the Outpatient Department of Clinical Operations (OPDCO) via a monthly checklist and summary, and telephone contact prior to Mr. Hinckley visiting the staff in the OPDCO,

3. Dr. G-G and Mr. Beffa will communicate monthly with the court via a summary submitted to the OPDCO,

4. Dr. G-G will assume writing Mr. Hinckley's psychiatric prescriptions to be filled at a pharmacy in Williamsburg,

5. The family will utilize the services of a general medical officer for Mr. Hinckley for his other medication needs during the eight visits,

6. Mr. Hinckley will make weekly calls to the OPDCO for the first three months and monthly thereafter at the discretion of the OPDCO

7. Mr. Hinckley will meet with the staff members of the OPDCO indefinitely on a monthly basis by traveling to D.C. unaccompanied for his regularly scheduled appointments and those meetings will be attended by a current member of his inpatient treatment team monthly for the first six months at the discretion of OPDCO,

8. Mr. Hinckley will continue to attend his scheduled activities at Eastern State Hospital and Colonial Behavioral Health until employment or alternative constructive daytime activity is located, and

9. Upon receipt of conditional release Mr. Shamblee or a designee of the hospital will work with Mr. Hinckley to ensure he has applied for social security and Virginia Medicaid leading up to his release.

Although the Treatment Team Recommendation and hospital's request make reference to the Violence Risk Assessment conducted on 7/14/11 by Katherine Murphy, Psy.D., they also note that these included the preliminary risk management conclusions and recommendations. The

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 13 of 80

actual Violence Risk Assessment Update was not completed until 8/31/11 by Dr. Murphy. Dr. Murphy provided a very detailed report regarding her violence risk assessment update including the sources of information, collateral interviews, review of medical records, review of forensic psychiatric evaluations by Drs. Robert Phillips and Raymond Patterson, psychological risk assessment reports by Dr. Paul Montalbano, as well as review of the conditional release visits, interactions with Dr. G-G, Mr. Beffa and the Hinckley family, and examination of John Hinckley, Jr. Dr. Murphy noted that she attempted a collateral interview with Ms. CB on 6/30/11.

Dr. Murphy opined that under the conditions proposed Mr. Hinckley would not in the reasonable future be a danger to himself or others. She noted he was at low risk of relapse of psychosis and depression without prolonged social isolation and that if major mental illness began to occur would likely be gradual and detected by treatment providers and responsive to pharmacology. She continued that Mr. Hinckley should continue to advance to the next levels of freedom provided ongoing assessments throughout the transition find him to remain at a low risk of being a danger to himself or others.

Dr. Murphy's recommendations were essentially an expansion of the recommendations represented in the Recommendation for Expansion of Conditional Release and Convalescent Leave with some additions particularly with regard to the need for ongoing assessments, communication between providers, supervisors and his family, treatment objectives and risk factors being integrated and treatment plans conducted in Williamsburg, comprehensive treatment planning conferences, prior approval by the treatment team before going to private residences or utilizing other unaccompanied time, treatment team approval prior to having acquaintances from the D.C. metropolitan area visit Williamsburg, an updated risk assessment be conducted to evaluate Mr. Hinckley's readiness for outplacement, development of a plan to implement should Mrs. Hinckley no longer be available to provide supervision including housing, and Mr. Beffa continue to work with Mr. Hinckley in locating therapeutic activities in the Williamsburg area that promotes self expression through the creative arts.

## Examination of John W. Hinckley, Jr.

Mr. Hinckley was seen for four appointments (8/16, 9/14, 10/11, and 11/9/11) for approximately 6 hours and 25 minutes. I have examined Mr. Hinckley multiple times in the past, but this was my first examination of him in the new St. Elizabeths Hospital. The first appointment took place in a hospital multipurpose room located in the Therapeutic Living Center (treatment mall). I reminded Mr. Hinckley of the nature and purpose of the examination, that the examination was

13

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 14 of 80

not confidential as it was part of the court process, and that the examination would be taped. I also reminded him of the reason for the examination at this time as being related to the hospital's most recent recommendation for an extension of his conditional release and eventual placement on convalescent leave. I asked him to bring me up to date as to what has occurred since I last examined him in 2008. Mr. Hinckley replied that since that time he had been on he believed 13 home visits that had all gone very well. He reported that he has continued to do volunteer work at Eastern State Hospital, and he had taken seven driving lessons when in Williamsburg. He added that he got his D.C. driver's license in January 2011, and also reported he has unaccompanied time when he is in Williamsburg, twice per visit for three hours each. He said his brother and sister try to make the visits, alternating each visit. He added they have not been able to come every time, but almost every time. He continued that his mother's health is good and she is doing well.

 Mr. Hinckley reported that "things are progressing right along" and that he has met with the Colonial Services Board, which he described as a core service agency in Williamsburg for "people like me who need their services." He added he had met with the Colonial Services Board twice and the most recent time he filled out all the paperwork so he would be onboard with them. He then said that when he gets the increased days in Williamsburg, two of the days will be working at Eastern State and the other three days will be at what is called "People's Place," which he stated is a day program. I asked Mr. Hinckley if the day program is all day or half day, and he replied, "well, I think it can be." He added that "they want me to go to two groups a day" and that his family has to pay for the service which is a consideration. I asked if he had an idea what types of groups were available and he responded, "It's very similar to this, very similar because I took a tour of the place." He continued that he was given a schedule of what is offered and the titles of the groups were very similar to the groups he has at St. Elizabeths Hospital for five days each week when he's not in Williamsburg. I told him it seemed to me that was not as much activity as he has at St. Elizabeths right now, and he replied that's because he is not involved yet, and he's not going there right now because the Judge has not approved his participation.

In addition to participating in the day program, I asked him how often he would be seeing Dr. G-G and Mr. Beffa, and he responded, "I'm not positive. I think with GG it'll be once a week, with Beffa I think it's once or twice, I think it's once or twice a week." He added he's sure it's in the motions to the court. He then continued that he started with Dr. G-G about a year ago and that he likes her a lot, thinks she's very caring and she's a forensic psychiatrist which is good. He continued that she knows Dr. Phillips quite well and worked with him at Yale. Mr. Hinckley then offered that Dr. G-G is moving to Portsmouth and is already down there and that he could he either go and see her there but for the time being she returns to Williamsburg on the weekends

because her husband is still there. He added that for the time being he would go to see her on Saturday mornings when he is in Williamsburg but if she is eventually in Portsmouth full time he can either go there to see her or stop with her and go back to see Dr. Lee who has come back to Williamsburg. I asked if he has a preference in seeing Dr. G-G or Dr. Lee, and he answered that he prefers Dr. G-G because he believes she is more involved with his care. I then asked what kinds of things he talks about with Dr. G-G and Mr. Beffa, and he said he brings them up to speed on what has been going on in the prior few weeks when he has not been there, and continued there are not a lot of conflicts going on that he is having to work out, "like my relationship with C          " He then added he has a girlfriend named C        who he met on the first day of being at the treatment mall. He reported she was a patient in another building who was going to the treatment mall as well. He stated they didn't start a relationship until approximately October 2010 and it continued after she was discharged from the hospital a couple of months later. He said she is an outpatient except for time when she was confined in a hospital in Baltimore and another time at St. Elizabeths for approximately two weeks last summer. He added she has her own apartment and right now "she's doing the best that she's been doing since I've known her." He said C        is being treated at the i                 . where she has a psychiatrist and case manager and people keeping pretty close tabs on her. I asked Mr. Hinckley what he meant when he said she was doing "well right now," and asked if she not been doing so well at other times, and he replied that when she was in Baltimore with her church group she got into difficulty at the hotel but said he doesn't really know all the circumstances. He continued that she was hospitalized for three to four weeks at i      . I asked about the church group, and Mr. Hinckley said that the church group is "staunch Catholics" and they take a lot of retreats. He said she is pretty deeply involved with her church and she is doing well right now on a different regimen of medications.

I then asked Mr. Hinckley how often he sees C         and he replied "almost every day," as she comes to the hospital by bus or metro to see him. He stated that her apartment is not far away in Southeast and he sees her a lot and talks to her a lot on the phone. He added that the conflict in the relationship "comes in in that my mother and I guess siblings, they're not really comfortable with her coming down to Williamsburg." He continued that he would like her to come down and in the past he would try to get the okay for her to come down to Williamsburg to see him. Mr. Hinckley then stated that his mother has met C        and likes her but she's afraid C        . is going to get sick in Williamsburg and his mother would "just panic" and wouldn't know how to deal with C        . in Williamsburg "and that's the reason she gives to me and to others for not saying it's okay for C        t to come down to see me in Williamsburg." Mr. Hinckley continued that he has been with C        when she has had anxiety and kind of shuts down and that he doesn't panic over it, he just sits with her for a while making sure she's okay and then takes her back to the gate or the metro station to make sure she gets home. He continued, however, that

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 16 of 80

his mother has not had a bad experience or any other mental patient other than him so she is just very uneasy about C⸳ coming down there and getting sick. He then added that he's not sure that C⸳ is capable of coming down to Williamsburg on her own and "not sure she's up to it all."

Mr. Hinckley reported that he and C⸳ have talked about her coming down and staying at a hotel, but as time goes on he has realized that she doesn't do well in crowds and when she came to the Christmas party on his ward she was fine in the beginning but it got crowded and noisy and she started having her anxiety. He stated that she doesn't do well in situations like that. I asked him if hypothetically the court agreed to the extension of his conditional release and two or three months later C⸳ was doing well and wanted to come down, what did he think would happen, and he replied that he wouldn't want to bring her to Williamsburg if his mother was not for it. He added that C⸳ could do it on her own, but he doesn't want to do that because his mother is not for it and he thought there would be a lot of tension going on.

I asked Mr. Hinckley what the current status of his relationship is with C⸳ and he replied that they are romantically involved, he is very close to her, and "we were talking engagement a while back" and then added "we don't consider ourselves engaged" because if he is spending so much time in Williamsburg, "what's the point of being engaged to her?" I asked if he thought C⸳ would be willing to talk to me or Dr. Phillips and he responded, "No." I then asked that since I can't ask her directly does he believe that she considers them not engaged, and he replied "I believe that's her point of view cause we discussed it time and again." When I asked how he thought she felt about that, he responded, "she's aware that if the judge approves the plan, even parts of it, I'd be spending quite a bit of time away from DC and she's not coming down so there's no need for us to be engaged right now."

Mr. Hinckley then told me more about C⸳ saying that she's 46 years old, has had Schizophrenia most of her life and multiple admissions to St. Elizabeths Hospital. He stated she has never been involved with the court system and doesn't get violent when she is ill, but gets loud and disruptive and that's what his mother is worried about, and he thinks Scott and Diane agree. He stated that he sees C⸳ on the grounds of the hospital essentially in the John Howard area which includes where he feeds his cats. He then added that he and C⸳ can go by themselves to another area which is one of the areas where he feeds his cats, around by RMB because if they want to be alone they have to go away from the building. I asked Mr. Hinckley, as he had said they are romantic, if he and C⸳ are intimate and he replied that they have been but asked me not to press him. When I questioned about not pressing him, he chuckled and said, "we've been intimate." I then told him I would not press him about the intimacy but that I was interested because if they are in a romantic and intimate relationship and are together

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 17 of 80

that would change if he goes and spends more time in Williamsburg and I asked how he
anticipated that would to be for him. He replied that he is not only going to lose C       but his
cats as well, and "that's no small thing either." He added that he can't take his cats home with
him, but occasionally he has taken one cat home where he can keep a cat in the house for ten
days but has to bring it back. He added that his mother does not want a cat to stay there when he
is not there and that when he is there for 17 days and 24 days, he will be without C       , and the
cats and he will just have to get used to it. He continued that the cats will have to get used to it
and C       is going to have to get used to it. He said his cats are really spoiled and he is
worried about what will happen to them.

I then asked Mr. Hinckley to tell me about other women in his life, and he said, "I still have
C       , and she's still a friend but he has not seen her in quite a while although he talks to her
on the phone. When I asked what they talk about, he responded that they talk about what's going
on in each of their lives adding that she still has her live-in boyfriend and they just returned from
France where they go every summer. He continued, "I can't say I'm really close to C
anymore, but we keep in touch with each other on the phone." Mr. Hinckley continued that
C       has come to two Christmas parties when the ward was on a "B" City Privilege to the
Golden Corral. I asked if that had been approved by the treatment team prior to her coming, and
he reported that the first year she came it had not been approved and she "just kinda showed up."
He said that neither Mr. Shamblee nor the Secret Service were aware and "I got in trouble." He
added he thought he was put on restriction for a week and therefore the second Christmas she
came he made sure everybody was aware that she was going to be there and everything went
fine. He said that this past Christmas he couldn't do that again because C       . was coming,
although they didn't actually go to the Golden Corral but had the Christmas party on the ward
and C       was there. I then asked if he had not invited C       to come because C       . was
going to be there, and he responded, "right." I asked if since he and C       have a friendship
whether he thinks there is the potential for more of a relationship, and he replied that he did not
think so but he has been trying to get her to visit because she has his best guitar at her house and
he'd like to get the guitar back. He stated she always has an excuse or she's busy and he doesn't
think he's seen her since the Christmas party two years ago, but he does still keep in touch with
her on the phone. He stated she agrees to bring the guitar but then doesn't visit; and when I
asked him if he's pissed, he replied, "yeah." He added, "I think I'd be really, really pissed and
annoyed and just dwelling on it if I didn't have C       " Mr. Hinckley added that C
doesn't have a "nurturing bone in her body" and it just doesn't mean much to her if she misses
visiting him but to him visits are important and it means something. He said he continues to talk
to her because she's a great person to talk to and he's known her for three or four years. Mr.
Hinckley said that C       may be retiring in two to three years and moving to France. When I
asked if that meant he might potentially not have C       or C       around that time, he replied,

17

"that's true." When I asked how that feels, he responded, "it doesn't feel anything yet because it's not happening," and chuckled. He then said, "I got both of them now." I then said to him, "Then until it happens, no need to talk about it?" and he replied, "Yeah, until it happens, Doc, let's not even worry about it."

I asked Mr. Hinckley if he had met anyone in Williamsburg, whether he had any friends. He replied that he does not really have any friends down there, and thinks that is his biggest deficit. He said the people in the building he works in are nice to him, they know him, and that there's one woman he talks to more than others who works down the hall from the library. He said her name is C     B     , and he had given her a painting as well as having given Sandy, his boss, a painting. He said that two visits ago, he had asked C    B      that when he is back in DC would it be okay if he called her, and she replied that she didn't think that would be a good idea. He said he didn't know if she was married, but to be honest, that's not going to go anywhere beyond being an office acquaintance. Mr. Hinckley said he is at the Eastern State Hospital library from 8:30-12:30, and that although C    did take the painting, he believes she does not want to do anything more than just chat with him for a minute or two.

I then asked Mr. Hinckley to tell me more about his painting and he replied "Yeah, quite the painter now." He continued that he has tons of paintings that he can't do anything with, but he shows them to his family and to to the people at St. Elizabeths. He told me that he had put eight of his paintings in a recent art show at St. Elizabeths, but he couldn't sign them although all of the other patients could sign their artwork. He said he couldn't sign it or sell it, and it was frustrating for him hat other patients' artwork could be sold and "they get joy, the appreciation and stuff." He said there was a book that people could sign regarding their thoughts about the paintings, and he got some pretty good comments even though they did not know they were his paintings. He stated he paints almost all landscapes, but also paints some portraits and some abstracts, but the eight in the show he thought were all landscapes. He said he thought a curator from an art museum told Dierdra, his art therapist, he thought Mr. Hinckley's work was the best work in the show, but he (Mr. Hinckley) doesn't consider himself a great painter. He added he likes to "create stuff, same with my music." When I asked if he paints at home, he replied "That's where I do almost all, most of my paintings, at home." He also paints in an art studio in the treatment mall with his art therapist. He then added that it becomes frustrating that "All this hard work that I create and all the music I create I can't do anything with." He stated he can't share it with the public and let them see him as something other than the image they've had about him for 30 years. He added "I would like to be known as something other than the would be assassin. But that's the image that has remained after 30 years, and although I do artwork, I do music, no one knows that." He then added that he has the "negative image out there of the would-be assassin mental patient who doesn't do anything else, which is not true at all." When

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 19 of 80

asked if he thought whether that negative public image will ever change, he replied that he
thought it could change somewhat if the public could see his artwork or hear his music, and they
might say "that sounds good, that's a good painting."

I then discussed with Mr. Hinckley that since we last met, the 30 year anniversary of his
shootings had occurred, as well as President Reagan's 100th birthday, and I asked if he had any
feedback, observations, or other thoughts around those times. He replied he got through the 30th
anniversary with no problem, but there was more attention about it than he thought there was
going to be. He added he didn't think it affected him in any negative way. I asked what
attention he was speaking of, and he said a show on CNN and a book came out, but that he didn't
watch the show even though it was repeated numerous times. He did admit to seeing the last
"five or ten minutes" when it was on one night. He said the part that he saw indicated he would
be a threat the rest of his life, but the rest of the show was pretty accurate. He stated he doesn't
believe he can change that image because he is prohibited from doing the things he wants to do.
I told him I believed I had seen part of the show and that the parts that were replayed had to do
with news reports and showing the shooting as well as pictures of him being wrestled to the
ground, as well as pictures of his victims. I asked him if he ever thought of his victims and he
replied "Well sure." He then said that he was surprised that it was on CNN because he thought
they were more fair and the thing about the shows on him is that they only have people
commenting who are negative towards him, "like DeGeneva," but they don't have "Barry Levine
or my family saying, 'Oh yeah, he's come a long way, he's doing great now. He's not the person
he was 30 years ago'." He then added "That's what bugs me." I asked how he feels when he
sees these shows and he replied that that's the main reason he didn't make a point of sitting
down, because he didn't want to see it. When asked what feelings he would rather not feel, Mr.
Hinckley replied that he thought at least after 30 years, and at least a lot of people knowing that
he does go home, that maybe his image had changed a little bit, but based on a show like the
CNN show, it hasn't changed. I asked if he anticipated more media attention as his hearing
approaches and he replied, " it always happens," but that at least at his hearings, "we hear both
sides, and at least for part of the hearing the media attention is somewhat positive."

We then switched topics as Mr. Hinckley left to get his lunch, and began eating lunch as we
continued the examination. I asked him to tell me how his day would go ordinarily. He replied
that he works from 9:00-11:00, and comes to the treatment mall from 11:00-3:00. I then asked
him to tell me what happens at the treatment mall, and he replied that he has a group from 11:00-
11:45, then he eats lunch, and has two more groups from 1:00-2:00 and 2:00-3:00. He stated that
patients then return to the unit at 3:00, where they remain until 4:00 in the afternoon, when he
gets to use his privileges from 4:00-5:00. He returns to the unit from 5:00 to 6:00 for dinner, and
in the summer months can go outside on privileges from 6:00-9:00p.m., but he usually comes

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 20 of 80

back around 8:00 p.m. Mr. Hinckley added that C usually visits at 6:00 and they will have dinner. On weekends, C would usually come over at 1:00 on Saturday and/or Sunday and he would be with her all weekend. Mr. Hinckley then described the groups he has throughout the week and the process by which they are managed. Mr. Hinckley next reported his physical health problems, including bursitis, arthritis, GERD, allergies, and constipation.

We discussed Mr. Hinckley's medications, including Risperdal, Zoloft, and Benadryl. He reported he no longer takes Benadryl and wants his psychiatrist to reduce his Zoloft from 150mg to 100mg because he doesn't' feel he needs 150mg and "could do a maintenance dose of 100 and be just fine." He reported his Zoloft had been increased from 75mg to 100mg because of anxiety. He continued that that anxiety was because he was unable to get home, and the judge had not ruled on the decision month after month, and it was really getting to him. Mr. Hinckley said he thought Dr. Adewale might reduce the medication if he asked him. I asked how long Dr. Adewale has been his treating psychiatrist, and he said since Dr. Green, the former medical director, left St. Elizabeths. He reported he likes Dr. Adewale better than Dr. Green because Dr. Green could be so "obstinate about everything" and that Dr. Adewale has a real friendly personality.

We then talked about the changes that have occurred since I last saw him, including changing psychiatrists to Dr. Adewale, change to a new building and new ward, as well as the composition of the ward. He said that he is on a coed unit with a mixture of forensic and non-forensic patients, and his experience with this is "not pleasant, because the civil patients are by and large a lot sicker than the forensic patients." He then gave his opinion that it's not very good having women and men mixed and having both forensic and non-forensic patients on the same ward, "because the women are just not stable at all." He added that he spends most of his time off the ward because he is out and about at work, on the treatment mall, or out on privileges, and he prefers that to being stuck on the ward all day.

I then asked Mr. Hinckley how things are different, in terms of how he is spending his time, when he's in Williamsburg. He reported he sees Dr. G-G, Mr. Beffa, and he volunteers at Eastern State Hospital two days a week for four hours at a time. I asked him if he sees Mr. Beffa twice, once as his therapist and a second time as his case manager, and Mr. Hinckley replied that "technically" that's right, but to him it runs together because the first time he sees him as a therapist and they talk about relationships and more personal issues, and the second time he sees Mr. Beffa they are "trying to come up with things I can do, it is more of a case manager role." For the case manager role, there were times when Mr. Beffa would take him out to practice his driving and to "Colonial CSA, CSP". I then asked what he does with the rest of his time, and he replied that he goes to movies and shopping in his free time, and he's been to Newport News

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 21 of 80

once with his brother, and practices driving sometimes with his mother or one of his siblings. He added that when he is at the mall, he is surrounded by people but he is not connecting with any of them other than to say "Hi, how are you doing type stuff."

Mr. Hinckley reported that he tried a singles group one time and that was a disaster. He said he went with his sister and they brought a dish, but found out it was pizza night, and added, "but the main problem was "they didn't want me there." He continued that the "main lady" told his sister Diane that they were not comfortable with him being there. Mr. Hinckley added that an additional problem was that the people weren't young at this meeting. I told him I recalled that had occurred prior to the last hearing, and asked if there had there been any other kinds of social activity or anything with younger people, and he replied that he met with Cabot Wade, who came to his house at Christmas and gave him a guitar lesson. He added that Mr. Wade has moved to Roanoke, VA, and is not in town very much, but is a "real good guy." He then added that he has a next door neighbor, I     , who is divorced, his age, and attractive, and he has tried on numerous occasions to get something going with her, even just friendship, but believes she doesn't want to do anything but be a neighbor.

I asked how the rest of the community has responded to his being there, and he replied that he crosses paths with many people and says hello to them, but they are usually on their power walk or doing something, so they don't engage him. I told Mr. Hinckley I recalled there was a restaurant or clubhouse, and he said there is R        Restaurant and he has gone to R once and had lunch, but nothing happens. Mr. Hinckley then described going to the      Movies, which has      theaters, a concession stand in the lobby, and video games, but that he doesn't play video games because he's "too old" and doesn't want to be embarrassed by kids beating him. I asked him how he thinks he can increase his opportunities for doing other social activities, and he replied, "That's what we're exploring right now." He added, "we're trying to think of what I'm going to do" if he has more hours to himself. He continued that he thought he could spend more time at the rec center in      because they have a wide variety of activities, including an Olympic size swimming pool, a spa, a game room, a weight room, and staff, but he has not done any of those activities. We also talked about the possibility of playing golf, and he told me that he doesn't play golf, but that he could see himself possibly going to the driving range, however he has not done that either.

I asked Mr. Hinckley if there are more opportunities to do things when Scott and Diane are there, and he replied that they try to schedule some activity for the Sunday they are in town, and they have done various things like going to a maritime museum in Newport News and to an art gallery. He also reported that they have talked about him possibly getting out of Williamsburg

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 22 of 80

and going to to Newport News, Norfolk, or Virginia Beach because Williamsburg just doesn't
offer a lot in the way of activities.

I then reminded Mr. Hinckley that some time ago there was some discussion about a "D.C.
plan" and relocating to D.C. as there is obviously a lot more to do in D.C., and he responded that
"the judge did not approve even the first step so that got nowhere" and that he tried to get
permission to volunteer at the Salvation Army "but the judge didn't go for it so it didn't work."

Mr. Hinckley went home for another home visit from 9/3/11 through 9/12/11. I saw him on
9/14/11 for continuation of the examination. Mr. Hinckley began by telling me he had enjoyed
the visit home and his mother was doing well. I asked him to tell me more about how the visit
went, and to essentially walk me through it. Mr. Hinckley reported he was picked up on
Saturday morning by his mother and her driver. He then added that in Williamsburg he does a
lot of driving himself and he drives her around in Williamsburg. Mr. Hinckley reported that
when he goes on his walks in the Williamsburg community, he will frequently go down to the
marina and there's a beach that he can sit on that overlooks the James River. Mr. Hinckley
reported that he will also walk through the          , or to a pond located within the
gated community. He reported that during his walks he may see other residents walking their
dogs, doing power walks, or jogging, but greetings are usually "Hello, how are you?" and no
more conversation than that. He sees the movie on Sunday afternoons. He stated that lately he
has seen Rise of the Planet of the Apes, Captain America, and Super 8 on Sundays. He
continued that on Mondays he takes a morning walk, usually has an appointment with Mr. Beffa
for individual therapy and he and his mother go shopping. I asked about his case management
appointments, and whether those were separate, and Mr. Hinckley replied that they have been in
the past, where he and Mr. Beffa have gone driving and to Colonial Behavioral Health, but on
this particular appointment Mr. Beffa called on Sunday morning and they talked by phone.

On Tuesday mornings, Mr. Hinckley volunteers at Eastern State Hospital, and he told me his
boss, Sandy, has a lot of work for him to do. I responded to him that his boss had many positive
things to say about his work, which he affirmed he already knew. I then asked him about the
employee who works down the hall that he had expressed some interest in, and I asked if he
knows she is married. He replied that he does now, because his boss had asked him not to go
down and talk to her anymore because she was uncomfortable with the situation. He said it was
not because of anything he had said. I reminded him that I thought he had asked her about
calling her, and she had told him that she didn't think that was a good idea. He explained that
the woman still has his painting hanging in her office and he said a few words to her on Tuesday,
but when he returned to work on Friday, his boss told him that she was uncomfortable with him
coming down to talk and that he should not do that anymore, to which he said okay. After work

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 23 of 80

on Tuesday, Mr. Hinckley took his walk in the afternoon, and he and his mother went shopping. I asked if when he goes to Eastern State or shopping to the mall, is he driving those times, and he replied "Usually yes." He continued they had dinner at home on Tuesday night. Mr. Hinckley reported he spends much of his time at home, painting and playing music.

On the subject of music, when I asked about his guitars, Mr. Hinckley reported that C. actually came to the hospital the past Saturday morning and brought him his favorite guitar. Further, she brought her three dogs for a visit as well. He reported he had not seen C      in over a year and they spent their time outside talking. He said that a few days prior, he had asked C      to come over, as C      usually does not come on the Saturday mornings when he is leaving, so he did not expect C      to be there, and she wasn't. He continued that he called her twice while he was in Williamsburg and that he hopes to see her again. I asked how his visit with C      had been after his return on Monday, and he said it was "good" and he bought her a meal. He reported that overall he believes she is doing well, and while he is in Williamsburg they usually talk multiple times per day, typically with her calling two times and his calling two times.

When asked if he thinks he may not have realized how mentally ill C      is, he replied that he knew how mentally ill she is from the start, and also that she is doing better now. He acknowledges that he loves C      and believes that she loves him because she says so and he takes her at her word. Mr. Hinckley said that C      and he had talked to the treatment team together approximately one year to one and a half years ago, but that very recently she verified on a speakerphone with Mr. Hinckley and Mr. Shamblee that she was unwilling to talk to any of the doctors, including doctors or clinicians on the treatment team.

As with the appointments that occurred in the morning, Mr. Hinckley asked to go and get his lunch, which he did, and brought it back and ate his lunch during the examination session. He also asked as, he has in most of my examination sessions with him, how much longer we would be and appeared to be impatient, wanting to get outside and wanting to finish the examination, particularly if it meant he could get outside and take care of his cats.

Mr. Hinckley then reported that he understood the court may want to hear from him during this hearing. He stated he was not looking forward to it, adding that if he could just talk to the judge one on one that would be fine, but he knows "the prosecutor is chomping at the bit" to get him on the stand. Mr. Hinckley also acknowledged he's aware that Mr. Zeno had retired and Ms. Kennedy had replaced him.

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 24 of 80

Mr. Hinckley then continued to describe his week at my request, adding that he had gone
Wednesday for his other unaccompanied time and went to                for shopping. I told Mr.
Hinckley that I travel a lot and when I am travelling I have seen in several book stores the new
book about President Reagan, Rawhide Down, and asked him directly if he had ever seen that
book. Mr. Hinckley replied "No, not that I remember." He added that he remembered when it
came out and he had read a review of the book, but he had never seen the book itself. I asked his
opinion of the review, and he replied that the review said that President Reagan became
bulletproof on that day and that from then on he was "like the Teflon President", adding that the
book itself got a pretty good review as he recalled.

I reminded Mr. Hinckley that he had said before he wanted people to get some sense of him now
and the things he has done and they (the media) don't, and his four victims and particularly since
it is such a huge recommendation to the court ultimately for convalescent leave I wondered how
he deals with the media attention. He replied that he has gotten used to it over the last 30 years
and in the early years he used to pay a lot of attention to it but now it just kind of roles off his
back. He added that he knows how to handle it. I asked if he talks about these types of issues
with his therapists or the treatment team, and he responded that he does if it bothers him but it
doesn't bother him, kind of rolls off his back so unless they bring it up it is not discussed. He
said he did talk about the 30th anniversary "stuff" with Dr. Binks and others.

I then returned to questions about his having searched on the internet for the dental student's
graduation pictures and asked him how he actually conducted that search. He replied, "I didn't
Google. I just typed in her name." He then added that in this day of social media, he didn't think
it was a big deal at all when millions and millions of people Google all the time. When asked
why he thought the treatment team thought it was a big deal, he replied that "yes it was" because
he didn't inform his boss about it. He again reiterated that to look at some innocent graduation
pictures "that's nothing." I asked if he remembered pulling up some information on C        that
same day, and he replied, "No, I did not." He then asked me, "Did I?" and I replied, "I think so."
I then asked him if he got it that the concern is that if he can do it for something that he
characterizes as innocent, then he can do it for other things that are not so innocent, and he
replied, "Anybody can do it." When I reminded him that he is not supposed to use the computer
for things like that, he replied that it was something innocent, not something dangerous, just
graduation pictures. I then told him I thought the team had restricted him, and he said that he
didn't remember the team doing that. He continued that he doesn't look at dangerous things and
he doesn't have the inclination to do that. He went on that he understands why the team would
be concerned about him looking up anything that he wasn't supposed to, and assured me that that

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 25 of 80

is why he tells Velore and that she monitors his searches. In response to a question about how he uses the computer in his mother's home, he said that the computer is so old and he doesn't do searches on that computer.

As it became closer to 1:00 o'clock during the appointment on 9/14/11, Mr. Hinckley began looking at his watch and asked "how much longer" because his privileges began at 1:00 o'clock and he wanted to get out and feed his cats. I said that I would think that going through this process of having the evaluations completed would be really important to him. He also offered that when Dr. Montalbano examined him in Williamsburg in his mother's home, he said the same thing that he could see Dr. Montalbano at the hospital so that he didn't want to use his "free time" for the purpose of seeing Dr. Montalbano. Mr. Hinckley then offered that he thought we were running out of things to talk about and that it was currently about 12:20 and we had started about 10:45. I continued with my questions about how he had spent the rest of his recent visit home, and he informed me he saw Dr. G-G on that Saturday. Mr. Hinckley offered that he thought it was better to see her on Saturday later in the visit because he can talk about the visit whereas he was previously seeing her early in the visit and still had several days in the visit to go.

We continued the examination on 10/11/11 and I began by asking Mr. Hinckley what he thought I'd ask him first, and he responded "was there anything I thought of since the last time that I wanted to tell you about"; and I told him he was exactly right. He stated that he initially had no thoughts and I asked if he had any particular thoughts he wanted to share with me, and he answered that he is going home Saturday for another visit. This would constitute the 16th visit since the court's order in 2009. I asked Mr. Hinckley what had been going on during the past month and he said he has been seeing C        and feeding his cats and there had been an article in the Washington Post Magazine titled "Free John Hinckley" and he laughed as he said that. He asked if I had seen it and when I said I hadn't he suggested I check it out. He said he hadn't read it but his attorney had told him about it. He said that throughout the 80's and 90's he was doing things to sort of mess himself up and he wasn't really focused on what he needed to do. He continued that beginning in the early 2000's and the change to Judge Friedman he has been progressively getting more freedom, adding that "some people have said I've been doing so well with the freedoms I've been given, it's time to release me." He also offered that people see him as he was 30 years ago and at this upcoming hearing he expects to testify and perhaps they'll see more of who he is now.

We talked about his history of involvement with the media and how early in his hospitalization he would write to the media and seek media involvement and for the past many years he has not done that. He offered that he has no interest in talking to the media and even if given permission

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 26 of 80

he is not sure what he would do with that because no matter what his says some members of the public might not hear what he has to say. He then offered that even 30 years later there have been shows, like a recent CNN produced show called "Stalker" showing the way that he was 30 years ago. He continued, "without it sounding trite because I really do have the feeling of regret and remorse." I asked if he ever thinks about Jodie Foster, and he replied that he does and that's how he knows he's gotten over it because he asks himself, "what was it about her that made me do this – I don't know what it was 30 years ago that made me pick her out and do this." He continued that he is not even very attracted to her now, but guesses that when he was 25 he was really attracted to her. I asked what he thought attracted him to her back then, and he said, "I don't know. I must have really been crazy." I reminded Mr. Hinckley that he came to John Howard after the conclusion of his trial and he still had very strong feelings for Jodie Foster. I reminded him that at trial back then, the movie Taxi Driver was brought up so it must have had something to do with his attraction to her, and he replied that he had related to the movie and that main character "Travis" because he was a loner and hated society and was down on everything, and "that's the way I was." I reminded him that in the movie she was a victim and he responded that she was a prostitute and Travis was trying to rescue her and that at the end of the movie he killed a bunch of scum balls who were ruining her life to rescue her from her life and "I guess I related to that." Mr. Hinckley agreed that he saw people that ran society as similar to "scum balls" and said that back then he was a racist and he hated everybody and shooting at the President "this is for all of you out there." He then added, "but I've come a long way from that."

I then asked Mr. Hinckley how he would respond to his critics who might say that he hasn't changed and that he's just learned to play the game, and he replied, "that's a long game, a 30 year game, and I don't think I'm that good to be playing the game for 30 years." He then offered, "I like the adage 'the proof is in the pudding'" referring to what he has done on his conditional release and that he has shown people he is different and he's "not just talking about it but doing it."

I said to Mr. Hinckley that from the old records and talking with the team it seems he is more social here at the hospital but it doesn't seem he is doing many social activities in Williamsburg, and he responded that he is "not an outgoing guy," that he is introverted but it's not that he hates people like he used to; he stated that that's his personality and he'll have that for the rest of his life.

He continued that he has relationships now and that's a big difference. When I asked him what relationships he meant outside of the treatment team and perhaps the patients on his ward, he responded Leslie Deveaux, Cr   G   , L   M   D   , and now C   and some other friends. I asked if he had spoken with C   since he got his guitar back, and he

responded that he talked with her a couple of times but she hasn't been over and her boyfriend was back from France. We discussed further his current relationship with C        . and he replied that he has a role of being protective of her because "she's kind of fragile," and added that people have said this is the best she has ever done and he believes he deserves a lot of credit for that. He added that if he just cut her off cold turkey it might be detrimental to her so he hopes he can talk to her and maybe visit when he is back at St. Elizabeths.

In Williamsburg, Mr. Hinckley stated that he is not isolating himself, but is being rejected and acknowledges this is very frustrating for him. Mr. Hinckley elaborated that he is just trying to be a "regular guy" in Williamsburg and they don't see him that way, and this is tremendously frustrating. When compared to "up here", Mr. Hinckley replied that it is a lot easier at St. Elizabeths because everyone has known him for all these years and they are comfortable with him and St. Elizabeths is a mental institution. Mr. Hinckley then took a break to go get his lunch, and upon return our examination continued.

I next asked Mr. Hinckley if he understood whether the idea of his being isolated was because he was not going anywhere, not going to activities, or because people were not welcoming him into their setting or area or jobs. I continued that if the outcome is that he becomes more isolated, then the risk factor of isolation is increased, which according to what he has been saying seems to be much harder to overcome than in D.C. He responded that he didn't think that he should stop trying because people won't accept him, concluding with "That's the way my life is." I then asked Mr. Hinckley that it appears that he is doing well here, and that what he has here in terms of treatment and socialization is not immediately or easily replicable someplace else, in this case Williamsburg, so one might ask the question why leave here. Mr. Hinckley laughed and said "Because I don't want to spend the rest of my life at St. Elizabeths Hospital," adding "I'm trying to get freedom." He added that through his plan, he's going to be involved in a lot more stuff, and I asked him then how does he see the plan rolling out, 17 days, 24 days. He responded that he was going to be busy every weekday with either Eastern State or People's Place, which he said is going to be a forced activity because what has been is hardly working in terms of making friends.

When I said to Mr. Hinkley that various interventions were being represented that were not part of the plan just before the time of the hearing, he responded by telling me to not let that "alarm" me because "this is the way life works", adding "everything's fluid in life." When I responded that the court may want to know what is going to be provided, Mr. Hinkley responded that I shouldn't be "flustered" about the music therapist in Williamsburg or other things being added that were not in the plan. I reminded him of the process that has been in place, which includes the treatment team identifying interventions and plans and presenting them to the review board

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 28 of 80

for approval. He then suggested that "if I didn't approve of the music therapist," and I reminded him I don't know anything about the music therapist and I don't believe the hospital does either, which is the point, he responded he didn't know whether or not the music therapist had even "gotten off the ground." Mr. Hinkley was notably frustrated and irritated by this discussion, as well as several others having to do with the specificity of the plan and the actual implementation issues. The issue of having art therapy in Williamsburg is similarly unidentified at this time. I continued this discussion by summarizing that there are a number of therapeutic interventions in place at St. Elizabeths that are not in place and don't appear to be at this point anticipated in Willaimsburg, and the point of the interventions in many instances is to try to reduce the risk factors for decompensation.

We returned to the discussion of his relationships with women, and I asked if Mr. Hinckley's belief was that the reason his relationships with the women he has discussed as having intimate and close relationships with had not worked out because of the scrutiny each of these women may have come under because of having a close relationship with him. He said that "one thing" L       may have said was "scrutiny ruins a relationship,"" adding "I agree with her." He also mentioned C:        and her saying that she would be his friend, but friend and long term girlfriend she didn't think so. I then asked him if he thought it was the "scrutiny" or the boyfriend, and he responded "I think both". When I asked Mr. Hinckley how he would compare his relationship with C,      to that of L      M_____, he replied "L      M      was crazy and C       was not crazy." He continued by stating that L      M      had a vicious streak in her, but then returned to her statement that scrutiny ruins a relationship. When I asked if he thought he may have underestimated Ms. M     's illness, he acknowledged that he did and he made excuses for it for a long time, "but in hindsight she was vicious." With regard to C       , Mr. Hinckley acknowledged that he didn't recognize the degree of her mental illness even though she was an inpatient at St. Elizabeths when he met her, but over time he came to recognize how ill she was. I asked if the family knew of the engagement, and he recounted having been at dinner at a restaurant with his mother and brother and telling them "You know C     and I are getting married, something like that." He then added "I think my mother made the comment "well she's not welcome down here.""

I asked Mr. Hinckley if the court approved the recommendations for the expansion to 17 and 24 days, were there any thoughts or feelings or anything that he might experience that would cause him to think he needs to go back in the hospital. He responded that he has so many checks and balances and so many doctors and psychiatrists that they would pick up on anything, so that even if he didn't pick up on his needing to go to the hospital, they would. I reminded Mr. Hinckley that in an earlier discussion with me, he had reported that in the 80's and 90's he did some things he should not have done, which have been referred to in risk assessments, such as being

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 29 of 80

deceptive, withholding, not forthcoming, and entitlement. He interrupted "But all that comes with narcissism," and he responded he believes that everyone has narcissism to some extent and his is greatly diminished. He said he does have some narcissism, and I asked if there are any parts of it that he thinks about when he says he has some narcissism. After some thought, he responded he thinks it's when he gets irritated when they are late getting out on privileges and the others will just stand around and wait and he's usually the one who speaks up.

I then said to Mr. Hinckley I thought he got irritated with me last time and he said he didn't remember what had happened. I reminded him he wanted to stop so he could get outside with his cats, and he exclaimed "That's right, and you can, you know, get up there on the stand and say "Your honor, he got irritated with me and that's his narcissism and he was angry." I then asked him if that was incorrect, and he replied "Why does it have to be narcissism, and why can't it just be a human emotion after we've been together for a long time, and why can't I get outside with my cats?" I continued by reminding him that the treatment mall was closing down early that day, so he would be getting out earlier than usual anyway, and he replied "I don't think it was narcissism, I just think it was human, and you know wanting to do what you wanted to do." He added that it was not like he got up and stormed out, and I agreed that was true, however during the session he checked his watch often, making it clear that he was ready to leave. I then commented that the point I was attempting to reach with him was that, ultimately, he wants to leave the hospital regardless of the amount of time it requires to meet with me, Dr. Phillips, or the treatment team and that was a much more significant goal than ending the examination early to be with his cats. Mr. Hinckley responded that he was doing that, and that if he did not want to leave the hospital he would simply say "I don't want to see Dr. Patterson today."

I then asked him if he had been having any psychotic thinking, delusional thinking, unrealistic thinking, fantasies of relationships, and that all of those things are for him all in the past, to which he replied "Yes." In response to another question, he responded he has never hallucinated, he has never heard voices, and that what he did have "was delusions like the Jodie Foster thing but they're long gone." He then said that's why he's on Risperdal at a low dose to guard against him having any delusions. When I asked Mr. Hinckley about anxiety, for which he had prescribed Zoloft, he replied that "It's okay now." and that he is currently taking 150mg, which he told Dr. Adewale could be easily be reduced to 100mg. Mr. Hinckley reports that Dr. Adewale agreed, but that they're getting ready for the hearing so let's wait until after the hearing. He said the only side effect from the medications is constipation. When I asked Mr. Hinckley if he was depressed, he responded that he is not depressed and is "Quite optimistic and hopeful." He added that he cannot say that he is happy because he is not where he wants to be every day. Mr. Hinckley reported he has not had suicidal ideation nor attempt since his last suicide attempt in 1982 or 1983.

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 30 of 80

We the discused the transition to People's Place after Mr. Hinckley made comments that the treatment mall at St. Elizabeths was sometimes difficult because there are mixtures of patients, some of whom are very stable, and some of whom he described as not stable at all. He reported that he has difficulty blending in to the background. With regard to People's Place he reported the tour was "Nothing to write home about." but that he and Dr. Phillips reviewed the list of groups and he found interest in several, including Spanish classes, Movie and Popcorn (to which he chuckled), and Music Appreciation, and he hopes what is offered at People's Place is better than what is offered at St. Elizabeths.

I returned to see Mr. Hinckley for a fourth examination session on 11/9/11, after having been provided information from United States Secret Service surveillance that a keyword search of the computer that Mr. Hinckley as well as others use at the St. Elilzabeths Hospital library. The surveillance of Mr. Hinckley's trips to Williamsburg as well as his "B" City Privileges accompanied by staff in Washington and some observations of his activities on the grounds of the hospital were provided. There were a number of visits in 2011 where the Secret Service surveillance indicates apparent discrepancies between the activities proposed in the itinerary for specific visits and the follow-up hospital letter regarding Mrs. Hinckley's attendance at those activities/itineraries.

The first of these occurred during the 3/5 thru 3/14/11 visit, which was the last of the 12 scheduled visits approved by the court's order of 2009. On 3/9/11, the itinerary was for Mr. Hinckley to shop unaccompanied at                     from 1-4pm, and the hospital letter of 6/10/11 reported that Mr. Hinckley used his unaccompanied time to shop and purchased several items. However, the Secret Service surveillance indicates that surveillance was established at 12:30 at both                     and                     , and there was a search for Mr. Hinckley from just after 1:00pm until 4:30pm because his mother had arrived at the                     Grocery Store driving alone. The Secret Service reported they could not locate Mr. Hinckley during that time period. The letter included a response from Mrs. Hinckley that Mr. Hinckley had used his Wednesday afternoon (3/9/11) shopping at the Williamsburg

During the home visit from 6/11-6/20/11, the itinerary indicated Mr. Hinckley would have dinner at the ,                     with his mother and brother on 6/18/11, and on 6/19/11 would visit the                     Museum after lunch. The hospital letter of 7/18/11 did not comment on either of those meals. The Secret Service surveillance on 6/18 indicated they were unable to locate the Hinckley family at the                     and on 6/19/11 were unable to locate the Hinckley family at the                     Museum. Deciding not to attend the meal with family may be a reasonable change to the itinerary but should be reported to the treatment team. The hospital letter of 7/18/11 indicated that Mr. Hinckley kept all of his appointments. Importantly, responses

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 31 of 80

from Mr. Beffa reported that Mr. Hinckley was doing all of the driving in town to relieve his mother of the stress, and from Dr. G-G that Mr. Hinckley "has been driving more and that has been good for his mother," adding "he thinks it is essential for him to drive so he can get more involved in the community." Reports from the Secret Service surveillance indicated that they observed Mr. Hinckley driving on two occasions, 9/6/11 and 10/18/11, however their observations were that Mrs. Hinckley drove all of the times that they conducted surveillances during the visits from January 2011 thru October 2011.

During the conditional release visit from 7/23-8/1/11, the itinerary indicated that on 7/24/11 Mr. Hinckley would attend the movie theater unaccompanied from 1:30pm-4:30pm. The hospital letter of 8/31/11 indicates Mr. Hinckley reported he watched the movie "Captain America" on 7/24/11. The Secret Service observations on 7/24/11 indicate Mr. Hinckley entered the movie theater at 1:25 but did not purchase a ticket and left, and then entered a Barnes and Noble Book Store at 1:30pm. This surveillance indicated that he browsed in several sections of the bookstore including areas regarding American History and true crime, but he did not pick up any of the books. He spent some time in the American History section that contained several books regarding President Reagan including Rawhide Down and other books on assassinations. Mr. Hinckley returned to the movie theater at 2:27pm, entered the lobby and stood inside looking outside toward the street. His mother arrived three minutes later and Mr. Hinckley got into the passenger seat and Mrs. Hinckley drove away. On 7/31/11, the itinerary indicated Mr. Hinckley would be visiting the            , Museum. The hospital letter of 8/31/11 indicates that Scott Hinckley reported skipping the              Museum due to John's foot pain. The Secret Service surveillance indicated that Mr. Hinckley was not observed visiting the Museum on that day. This is an example of the itinerary changing and it being reported to the treatment team by Scott Hinckley.

I was also provided pictures of the book section that the Secret Services reported Mr. Hinckley was observing in the Barnes and Noble on 7/24/11, which included "Rawhide Down", another book on President Reagan, a book entitled "The President and the Assassin," a book picturing President Kennedy and Fidel Castro in addition to a number of books regarding the revolution and other topics.

During the visit of 9/3-12/11, the itinerary indicated that Mr. Hinckley would attend the movie theatre on 9/4/11 from 1:30-4:30. The hospital letter of 10/6/11 indicates Mr. Hinckley watched "Planet of the Apes." The Secret Service report regarding their observations on 9/4/11 indicates that Mr. Hinckley was observed approaching the ticket window at the movie theater at 1:13pm but did not purchase a ticket. At 1:20pm Mr. Hinckley entered Barnes and Noble, subsequently went to Quiznos for a sandwich and drink, and returned to Barnes and Noble until 3:05. His

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 32 of 80

mother then picked him up in front of the movie theater at 3:38pm. In her responses regarding the visit, Mrs. Hinckley reported that Mr. Hinckley spent his three hours unaccompanied time "without a hitch as there were no problems on the visit". Mr. Beffa reported "John says he does most if not all of the driving." The Secret Service observations during this visit also indicate that Mrs. Hinckley did the driving with the exception of 9/6/11 when Mr. Hinckley drove home from an afternoon appointment with Mr. Beffa.

The 10/25/11 keyword search conducted on the computer used by Mr. Hinckley and others in the St. Elizabeths Hospital library provided a list of "Hits" for a number of items that ranged from 2 Hits to 797 Hits. Search results showed those Hits included: John Hinckley, Jodie Foster, Foster, Jodie, Assassination, Assassinated, Assassinate, Assassin, Reagan, Ronald Reagan, Rawhide, Rawhide Down, President, President Obama, Giorgi, Taxi Driver, Taxi, The Simpsons, Simpsons, The Beaver, Beaver, carnage, Elysium, G_____, L_____ M__ ; Leslie Deveaux, C: B:___ , Connie Desaulniers, The Beatles, Paul McCartney, Ringo Starr, George Harrison, Ted Bundy, and Charles Manson.

I returned to St. Elizabeths Hospital on 11/9/11 to discuss this information with Mr. Hinckley and met with him in the treatment mall. I reminded Mr. Hinckley that I had not thought I would be coming back to see him but during the course of the examinations I had told him that if there was reason for me to come back or I received other information that I would return. I asked him if he had an idea why I had come back to see him at this time. Mr. Hinckley replied that he had seen Dr. Montalbano earlier that day and had also seen his attorney, Mr. Levine, and said his understanding of why I had returned was because two weeks prior to this appointment his attorney Anne Marie had had a discussion with the prosecutor saying that there had been a computer search and what was found were art sites and music sites that Mr. Hinckley had looked up. He added that he had been telling Velora, his boss, what he had been doing and that she is aware of it and approved it. He continued that he heard ten days later from Mr. Levine that the Secret Service had put in names associated with his case, like Jodie and Reagan, and these Hits came up. Mr. Hinckley stated, "Well, I don't know what this is about. I don't even know what the hits mean." He then said, "all I can tell you is I didn't type in Ronald Reagan or Jodie Foster or any of these names." He reminded me that it is not his computer, it's there 24 hours a day, and he knows that coworkers use it. He reiterated that he did not type in those names, he just wouldn't do that. I asked him to tell me about the art and music searches he may have done, and he said he would look up Van Gough or a school of art called expressionism, and she would say go head look it up. With regard to music, he said he would come up with names of people he was interested in and he would look them up.

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 33 of 80

I asked Mr. Hinckley if anyone had gone through the list of the hits with him so that he would know what they were, and he responded that they had. And, when I asked if there was any name or anything that he might recall from that list, like the Beatles, he replied that the only Beatle he would look up would be John Lennon and he is not on the list. He then added the only one that he may remember is "a woman named Connie somebody" who he described as an artist in Williamsburg. He then reemphasized "all this other stuff I didn't look up." I then went over the specific names on the list with him and when I got to G         and asked if he had every looked her up, he responded that I told him at a previous meeting that he did; but, at that visit he had said "I don't remember doing that." I asked if he had remembered it since we talked, and he replied that if he did it was at the same time he typed in the name of the dental student, but added that the dental student's name was not on the list. When I got to the name of Connie Desaulniers, he said that may be the artist in Williamsburg. When said the last two names, Ted Bundy and Charles Manson, Mr. Hinckley replied, "Hell no." He added, "Give me a little more credit than that, please."

Mr. Hinckley then offered that what he has come up with in his mind is that the list may have come from the Washington Post being put on computers when it is not provided to the hospital so patients can read the Post online. He continued that he believes that once he told Velore that he and C.        were in the New York Post because they were this past January, and he doesn't know but Velore may have typed in John Hinckley and C.      B         adding "but I didn't do it."

I asked Mr. Hinckley at that point if he could understand why the list might raise some questions and that part of the reason I came back is to ask him, and he replied that he understood. I then asked how he felt about all this, and he responded, "these things seem to happen when I go to court, everyone gets hyper." He continued, "I just feel like people are trying to bring me down, trying to make me the way I was 30 years ago, but I'm not." I then returned to my impression that the name that seems to stick out would certainly be G       t, and he replied, "that would be the one that would make sense because she's my friend." When I asked Mr. Hinckley if he has talked with the treatment team about this, he replied he had talked to everybody including his attorney, Dr. Montalbano, me, and the treatment team.

I then asked Mr. Hinckley if the treatment team or others had talked to him about the Secret Service surveillance while he has been in Williamsburg, and he responded, "Montalbano, did." He added that these books were in the bookstore and that he didn't pick up the books and that to say that he was focusing in on the books where they took pictures is "not fair." He said he browses around the bookstore because it is a bookstore. He added that the Secret Service "in their desperate attempts to bring me down will do this, they'll take pictures of some book with

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 34 of 80

assassin in the title of the book or something and try to imply I was showing interest in that book which is not true at all." I then told him that one of the books was Rawhide Down and he said that he may have walked past it or even looked at it, but he didn't take interest in it. I asked if he remembered seeing it, and he replied, "I may have, could have, maybe I did but I don't think so."

I then asked Mr. Hinckley about the Secret Services saying that at least once or twice he was to have been in a movie and he wasn't. He said that once or twice he was going to see a movie and he has specific times when he has to see movies as 1:30-4:30 or 1o'clock to 4 o'clock on the itinerary, and there has been a time when the movie was at an odd time and he wouldn't be able to see the whole movie so he didn't go. He then said that he "didn't stray and go to the other side of town," and I asked what he did do and he said he probably just went into the general area of           He added he wasn't going to pay $7.50 for a movie when he couldn't see the whole movie or pay $7.50 to see a movie he doesn't want to see. I then asked him very specifically if he recalled a time when he may have gone to the movie theater, gone into the lobby, not gone to see the movie, and come out and gone across the street to the bookstore or possibly gotten something to eat or drink, then gone back into the lobby just prior to when his mother was due to pick him up, and coming out as if he had been in the movie? He responded that that would have been because of the weather. He continued that if it was "real hot or real cold outside," he would go into the lobby because "it would be more comfortable to wait there" for his mother to pick him up. He continued that he "didn't want to be standing out in the extreme hot or extreme cold weather."

Mr. Hinckley then said that I was "trying to make a big deal out of a little thing like this." I then asked if it was possible that the Individual Relapse Prevention forms from the hospital said that he had indeed gone to a movie when he hadn't and he responded, "you're telling me this, I don't read what they write." I then asked him specifically about what he has written and asked if he has ever written that he actually went and saw a movie when indeed he had not. Mr. Hinckley responded, "I don't think so," adding "cause people ask me what it's about – I have to explain it." I then said to him "that's why it's important and that's why I'm asking you," and he replied, "It's not that important. I saw a movie or I didn't see a movie." He then challenged me by asking "when did I say I saw a movie and I didn't see it?" And I replied "that's what I'm asking you," and he said, "no, I didn't do that." Mr. Hinckley told me during a previous session that he saw the movies "Rise of the Planet of the Apes" and "Captain America" (the two movies he did not see).

Mr. Hinckley then added that he doesn't study the movie charts before he goes, he just shows up at the theater and essentially reads the marquee to see the times. I told him I thought it was curious that he wouldn't look ahead and see what's playing and what time it starts, and he replied

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 35 of 80

that it wouldn't matter because he has set time frames. He added that he usually has a movie in mind and he just shows up, hoping that it's at a time that is good for him. He then added, "this is what I call nitpicking." He continued that "this is what happens when someone is so magnified, so scrutinized that you've got to focus on something like this." He then said and repeated several times after that, "cut me a little slack." He added there have been times when they don't follow the itinerary exactly and I asked when those times happen, does that come back to the team. He responded, "if I'm asked if I did go, I would say 'no' and then explain why." I gave Mr. Hinckley an example that I recalled of the itinerary around a Thanksgiving visit that his mother planned that the family would have dinner at home, and because it was only he and his mother, that the two of them decided to go out to eat. That would be a very understandable reason to change the itinerary, and it was reported in the feedback to the treatment team. I told Mr. Hinckley that it becomes a big deal if he doesn't follow the itinerary, and then does not report that to the team or says he did follow the itinerary, because it raises an issue as to whether he was being honest.

I then asked if I understood correctly in that Mr. Hinckley did not feel that any of this was significant, and he replied, "For what we're trying to do, for what the plan is, no." He then repeated that if one had to live like he has to live, with such scrutiny and the Secret Service following him around, and seeing if he goes to a movie, that "it's hard to live that way." I then told Mr. Hinckley that part of the reason it's the subject of discussion for the team, Dr. Montalbano, myself, certainly his attorney, appropriately is because the recommendation is for there to be over time a decrease or reduction in the itineraries and far less monitoring than is currently in place, to which he replied "That's a good thing." I then told him that it was my understanding that part of the reason the treatment team was making the recommendation was because they had stated that he is following the itineraries. I asked if that made sense to him, and he replied "To a degree, but I just feel people need to cut me some slack."

I then had a discussion with Mr. Hinckley about the most recent Violence Risk Assessment done by Dr. Murphy, and that she identified a number of risk factors for him. I asked him from his perspective what he thinks the greatest risk factors are for him, and he replied that he "got to Williamsburg for long periods of time, and became isolated, and didn't want to go to work and not really want to do anything," but the plan is for him to be active during the day and that's what he wants to do. I then asked if there were any other risk factors, and he responded that if he started getting depressed, and in the past he has become depressed, but there are so many people watching over him that he doesn't think it would get very far. I reminded him that I recalled that he wanted to decrease his antidepressant, and asked if he thought that was a good idea. He replied that he thought it was, because it is a moderate dose. I then asked if a period of less scrutiny, when there are less eyes watching him, if that is a good time to decrease his

antidepressant, and he responded that he would not press it, but if Dr. Adewale wanted to keep it at 150mg, he would stay at that dosage.

I asked if since isolation and depression would be two risk factors, are there others? He responded that if he "stopped my medications," which he said he has never done. Mr. Hinckley added that he has never had a problem with his medications. I reminded him that has been true for the past many years, but not long after he had first entered the hospital he attempted suicide by overdosing on his antidepressant medications, and that was when he was on a ward and people had eyes on him every day and no one was thinking he was thinking of taking his life. He responded that he is on medications now that he is fine with and it's not like he hates taking his medicine, adding he takes them without even thinking about them and they don't give him side effects.

I asked if he thought there were any other risk factors from his perspective, and he replied "No.", and then added "I'm doing so great Doc." and then smiled and said "That's grandiosity, he said he's doing so great." He then added that he knew what I'd say on the stand, that "He said he had no risk factors and that's grandiosity" and I corrected him and said that was not what he said, but that what he said was that the risk factors were isolation, depression, and going off his medications. I then asked him about relationships with women, and Mr. Hinckley replied "I don't agree with it, because there is a notion that if I end a relationship I'm going to decompensate, and time and again that's happened and I do fine, L      Mi    , Leslie, C₁      ." He then added "They didn't go the way I wanted them to go, but I didn't decompensate and do something rash, so I show that I adjust." I informed Mr. Hinckley that at least in my view its more than decompensating when relationships end, that it's also what happens during the relationship. I reminded him that all of the relationships he just mentioned were intense relationships with him, particularly in the beginning. Mr. Hinckley responded "Most relationships are if they're good ones." I then asked him how about is relationship with C currently, and he responded "It's pretty intense."

I then asked Mr. Hinckley how he felt he would do, not having contact with her by phone or in person, and he responded "Oh, I'll be fine." He responded that he stopped "cold turkey" with Leslie and L    M    , and it was very difficult with Leslie, and I told him that I thought he had a lot of support from different people at the hospital over time, including individual therapists, treatment teams, and psychiatrists, and that the primary support he would have in Williamsburg would be Mr. Beffa as his individual therapist. He added Dr. G-G, and I told him I thought she would be his psychiatrist, but that his primary support would be Mr. Beffa, and I asked how much does he and Mr. Beffa actually talk about his relationships. Mr. Hinckley responded that they do talk quite a bit about his relationships as the main topic. I asked if there were any

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 37 of 80

planned activities in upcoming months that he and Mr. Beffa have set up for him to do, and he responded Mr. Beffa wants him to join a psychotherapy group Mr. Beffa leads on Tuesday evenings

I began ending the examination by asking Mr. Hinckley if there was anything that he thought I should know that would help me in giving my best opinions to the court, and he replied "I'm doing as well as I can, I'm trying very hard, I'm not the person I was 30 years ago, I do fall short. But the overall picture is I'm doing well." He added he believes he is ready for and has earned increased responsibilities in Williamsburg. He then continued "You should cut me some slack, I have this hard life that I don't think anyone else has, under such scrutiny and it's hard to live this way when you have Secret Service sitting outside your house and following you around, but I try to do as well as I can." He added "Take into consideration how hard my life is." I asked if he thought there are people who might say he brought that on himself because he tried to kill the President of the United States, and he replied "I know, I know, I know why people would say that." I asked if, based on what he said, if he thought himself a victim and he replied he is not saying he's a victim, but he just has a hard life. He repeated he does not think he is a victim, and he knows why he has a hard life.

## Mental Status Examination

On mental status examination, John Hinckley, Jr., is a 55 year old Caucasian male who appear slightly younger than his stated age. He is appropriately dressed and groomed during all four examination appointments. His orientation is intact as his is attention span and memory. He does not report any psychotic symptoms or delusions and none are observed during the course of my examinations. His affect is generally constricted although he does show periods of humor as well as inappropriate annoyance, irritability, and anger based on the some of the topics discussed. His mood he reports as "fine," "not depressed" and there is no overt evidence of depression. His thought content does not demonstrate delusional ideation, however it does demonstrate his sense of entitlement, frustration with what he perceives as unnecessary "scrutiny" of him and his relationships, and thoughts he is being treated unfairly. Mr. Hinckley's insight is fair with regard to his diagnoses of a psychotic disorder and major depression, although he has requested a decrease in his anti-depressant mediations because he believes he would be "fine" with a lesser dosage, at a time when there may be increased stress related to efforts to become more socially and vocationally involved with others, and his upcoming court hearing. His insight is impaired regarding his personality dynamics as he is able to state some of the risk factors for decompensation including isolation, depression, and non-compliance with his medications, but not others, including relationships with women. He frankly disagrees with the

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 38 of 80

treatment team, this examiner, and others regarding his interactions with women being a risk factor for decompensation. His judgment is adequate for activities of daily living in the hospital, however appears to be limited with regard to accepting responsibility for himself and his situation, and for initiating activities and working intensively with his case manager to develop the social and other interactions and activities that his individualized plan asserts. He denies current suicidal or homicidal ideation and reports he has not had such ideations since the short term period before the instant offenses and the immediate months to years afterward.

## Diagnostic Impressions

| | | |
|---|---|---|
| Axis I: | 1. | Psychotic Disorder Not Otherwise Specified in full sustained remission (298.90) |
| | 2. | Major Depressive Disorder in full sustained remission (296.36) |
| Axis II: | 1. | Narcissistic personality Disorder (301.81) |
| Axis III: | 1. Bursitis | |
| | 2. Arthritis | |
| | 3. GERD | |
| | 4. Rhinitis | |
| | 5. Constipation | |
| Axis IV: | Stressors include difficulties in social relationships, changing conditions of confinement, including more exposure to community activities, and upcoming court hearing | |
| Axis V: | GAF 65 | |

## Collateral Interviews

*Katherine Murphy, Psy. D.*
Katherine Murphy, Psy.D. was interviewed on 8/15/11 in her office on Ward 2B Nichols House at St. Elizabeths Hospital. Dr. Murphy reported she started her psychology internship at St. Elizabeths Hospital in July 2008, first had contact with Mr. Hinckley when she was a resident in September 2009, became a staff psychologist in 2010 before the move to the new hospital, and her direct involvement with Mr. Hinckley began in approximately March 2011. Dr. Murphy

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 39 of 80

reported she has attended two of Mr. Hinckley's three treatment plans since March 2011 and she
conducted the Violence Risk Assessment update. Dr. Murphy stated she had completed the draft
of the Violence Risk Assessment update, and I mentioned to her that the recommendation from
the hospital contains a preliminary risk assessment but I questioned her as to how the hospital's
recommendation was completed and submitted before the final Violence Risk Assessment
update was completed. She said she thought that had occurred in the past with Dr. Montalbano's
risk assessment in 2008 and that it is common for the risk assessor to present preliminary
findings to the review board before the final risk assessment has been completed.

We then discussed development of the risk assessment, and Dr. Murphy said she reviewed the
risk assessments done prior to 2008 and then began looking at the factors since 2008 to be
included in the violence risk assessment update. She identified the risk factors as: (1) psychosis,
and that there wasn't any evidence in the record of any psychotic or delusional thinking; and (2)
narcissism, and her agreement with Dr. Montalbano that the narcissistic core is still there but the
features are attenuated. I asked Dr. Murphy to tell me more about what she meant regarding the
attenuated form, and she said there are some questions as to whether or not this was narcissism
or a healthy response to circumstances.

She went on to describe the issues regarding Ms. B        being able to come to Williamsburg and
the disagreement between Mr. Hinckley and his mother over that issue. She said that at one
point Mr. Hinckley asserted that his mother's refusal to allow Ms. B       to come was based in
prejudice and that his mother did not want her son to be involved with this African American
woman. Mrs. Hinckley had said that she did not want Ms. B        to come to Williamsburg
because of the potential for relapse and that she would not know what to do or how to handle
that. Dr. Murphy said that the treatment team spoke with Mrs. Hinckley after one visit and when
they brought up race, Mrs. Hinckley was surprised her son thought that was her reason. The
treatment team clarified to Mr. Hinckley that Mrs. Hinckley's reason for not wanting Ms. B to
visit in Williamsburg was not based on race but based on the potential for relapse, and over time
Mr. Hinckley appears to have accepted that. Dr. Murphy described a panic attack that Ms. B
had at the Christmas party, which she believes influenced Mr. Hinckley's views. Dr. Murphy
offered that for Mr. Hinckley the relationship has to do with his co-dependence and that he can
sooth her and help her, which helps guard against some anxiety he may feel about being
inadequate. When asked what she believes is the current status of their relationship, she replied
they are not engaged but when she first talked with Mr. Hinckley about Ms. B       in March
2011 they were engaged and he had given her three rings.

Dr. Murphy continued that she had discussed the concept of "mirroring" with regard to the
women Mr. Hinckley chooses to be involved with, and gave examples of Ms. G        who he

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 40 of 80


described as "vivacious" and of Ms. B      who he described as "nurturing and caring" as
qualities he would like to see in himself. When asked how she sees Mr. Hinckley's judgment
relative to his relationships with women, Dr. Murphy said she agrees with Dr, Binks that Mr.
Hinckley will need people in his life, including people like Dr. G-G, Mr. Beffa, and Mr. Hyde to
help him to "slow down and take a look" at various perceptions and interactions he may be
having with different women. She compared some of his interactions as akin to being an
adolescent in trying out relationships and there may be some saving face involved in not
acknowledging that he has made poor decisions..

When I asked Dr. Murphy how she envisioned Mr. Hinckley spending his expanded time, as per
the recommendations) in Williamsburg given how he has used his unaccompanied time for the
10-day visits since 2009, which has not been to involve himself in meeting people or other social
activities; and if he hasn't done it up to now , why would we think he would engage in these
activities with an expansion of time? She replied that there would be some itinieraries which
would need to be submitted for prior approval as well as a menu option of activities for Mr.
Hinckley to be involved in, as well as monitoring his use of time. She further reported that the
unaccompanied time would be increased in increments and he has so far used the unaccompanied
time responsibly. I then asked Dr. Murphy how we know that he has used the unaccompanied
time responsibly, other than by his own self report, to which she replied "We don't know for
sure.", acknowledging a certain amount of uncertainty inherent in these types of situations, and
her opinion is that there are improvements in Mr. Hinckley's level of disclosure and openness.
Dr. Murphy concluded that how Mr. Hinckley has done in Williamsburg, when looking at the
court ordered stipulations, following the rules, and the team's expectations, he has followed
through.

Dr. Murphy is also of the impression that he is making connections with coworkers at Eastern
State Hospital outside of any intimate relationships. I asked Dr. Murphy to tell me more about
what she described as the "Off the tables", which included hospital placements in Texas or D.C.
She replied that Texas is off the table because it is more conservative and the  site of the
Kennedy assassination, and Mr. Hinckley might be subjected to more public scrutiny. She
continued that the D.C. plan is not completely off the table, but "the kabash" was put on it
because it was going to thwart or otherwise detract from establishing the Williamsburg plan. I
then asked what the team, and Dr. Murphy objectively think about a D.C. plan from a risk
perspective, rather than from the perspective that the court will not approve it so why consider it
at all. She expressed that her risk assessment has been focused on Williamsburg, but that she
believes his risks will be well maintained in D.C. Dr. Murphy continued that she would have to
see what the exact D.C. plan would be.

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 41 of 80


Dr. Murphy then told me about Mr. Hinckley's risk factor of mood disorder, and that he has had medication increases, including one by Dr. Green approximately five years ago. She continued that there were actually two additional increases subsequent to the increase five years ago, including one in late 2008 concerning his becoming anxious about waiting to hear a decision form the court and at the same time having some difficulties with C        , and second increase in March of 2009 when he was again becoming anxious about a court decision. Dr. Murphy, as part of the risk assessment, asked Mr. Hinckley how he was feeling during those times as related to depression, to which he responded that it was not depression or hopelessness, but anxiety and irritability related to the issues described. Dr. Murphy concluded that over the years Mr. Hinckley has demonstrated more openness in talking to the key people, including Dr. Binks, Mr. Beffa, Mr. Hyde, and Dr. G-G, as well as Scott Hinckley and Diane Simms.

Dr. Murphy further concluded that Mr. Hinckley has been behaviorally stable. I asked Dr. Murphy if she had any concerns about Mr. Hinckley's computer use and she replied that she thought the current restrictions in the Court's order are sufficient. I then asked Dr. Murphy about the incident that occurred with the dental student, and she replied that she understood the dental student said that she did not tell Mr. Hinckley to look up her pictures and that there is an inconsistency, and exploration of that inconsistency was referred to his therapist. She continued that Dr. Binks spoke with him, and Mr. Hinckley recognized it was a problem that he had done this during his work shift. Dr. Murphy reported that when she was conducting the risk assessment on Mr. Hinckley, she asked him to walk her through how he actually did look up the dental student's pictures, and she was impressed that he could not really describe how to arrive at the search engine and actually look up the pictures, but that now he may be more skilled in looking things up than he was I back in June 2009 when this occurred.


*Benjamin Adewale, M.D.*
On 8/15/11, I interviewed Benjamin Adewale, M.D., treating psychiatrist at St. Elizabeths Hospital for John Hinckley Jr. I interviewed Dr. Adewale in his office on Ward 2B, Nichols House, at St. Elizabeths Hospital. Dr. Adewale has been at St. Elizabeths Hospital since 1993 as a resident, 1997 as an attending psychiatrist, and Mr. Hinckley's treating psychiatrist for approximately 15 months. Dr. Adewale became Mr. Hinckley's prescribing psychiatrist after May 2010 when the new hospital opened, with an initial role of medication management only. Dr. Adewale has more recently assumed the role of treating psychiatrist, including involvement in treatment planning and other therapeutic activities.

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 42 of 80

Dr. Adewale and I discussed his psychiatric management of Mr. Hinckley and began by discussing Mr. Hinckley's current diagnoses.  Dr. Adewale stated that Mr. Hinckley's diagnoses had been longstanding and unchanged.  His current diagnoses are as follows:

| | |
|---|---|
| Axis I: | 1. Psychotic Disorder NOS, in remission |
| | 2. Major Depressive Disorder NOS, in remission |
| Axis II: | 1. Narcissistic Personality Disorder; |
| | 2. Schizotypal Personality Disorder |
| Axis III: | 1. Status post left hernia repair |
| | 2. Rhinitus |
| | 3. GERD |
| | 4. History of constipation |
| Axis IV: | Involvement in legal system |
| Axis V: | GAF: 60-65 |

His medications of Risperdal 1mg every night, and Zoloft 125mg in the morning and 25mg at night, have not been changed.

Dr. Adewale opined that he considers Mr. Hinckley being "in remission" as being "stable", and he remains on medication to maintain that stability.  Dr. Adewale continued that he has not now or ever seen symptoms of psychotic disorder NOS or major depressive disorder NOS since he has been treating Mr. Hinckley.  Dr. Adewale reported that initially his role was limited to writing medication orders for Mr. Hinckley as well as writing medication orders for Mr. Hinckley's visits to Williamsburg.  Dr. Adewale further reported that when those visits were approaching, Mr. Hinckley would ask Dr. Adewale about whether his medications were ready.  Dr. Adewale continued that his role has been expanded to include treatment planning as well as interaction with Dr. G-G in Williamsburg, and he has "forced himself" on Mr. Hinckley.  I asked him what he meant by that, and Dr. Adewale replied that he has, over the past week or so, insisted to Mr. Hinckley that Mr. Hinckley has to come to his office, knock on the door, and discuss with him how he is doing as other patients have done, rather than only coming to Dr. Adewale when he is preparing for a trip to Williamsburg.  Dr. Adewale has instructed Mr. Hinckley that he needs to speak with him at least twice per week, which will facilitate the assessment and treatment process.

I asked Dr. Adewale to further explain Mr. Hinckley's other diagnoses, given that his GAF is 60-65 but his psychotic disorder and major depressive disorder are in remission. Dr. Adewale responded that the 60-65 is due to the personality disorder and that in his opinion the narcissism still persists. Dr. Adewale then provided an example of when his role expanded and he was going to be more involved with Mr. Hinckley's treatment as well as the forensic legal situation, he spoke with Mr. Hinckley and informed him that he wanted to know Mr. Hinckley's schedule so they could arrange time to meet. Dr. Adewale reported that Mr. Hinckley responded in what he suggested was a challenging way, with quote "Why? Why?" and Dr. Adewale responded to Mr. Hinckley that "Now I am your treating psychiatrist and your legal psychiatrist and we need to meet and we need to get this straight." He reported that Mr. Hinckley seemed to be surprised at his firmness and they came to an agreement.

Dr. Adewale then provided another example of what he described as a narcissistic trait; that when Mr. Hinckley was going home, that he would "Come after me" and further explained that even when there was a week or more before Mr. Hinckley was scheduled to go to Williamsburg, he would pursue Dr. Adewale asking repeatedly whether the medication orders had been written so that he would have them. Dr. Adewale found this to be an example of Mr. Hinckley feeling "He's the only one, he's the only one" despite Dr. Adewale telling him that he has 23 other patients he is responsible for. Dr. Adewale added that Mr. Hinckley's functionality had not been impaired by these traits.

Dr. Adewale provided a third example of this behavior in describing that he meets with each patient before their treatment plans and the patients report to him, however, Mr. Hinckley would not report and Dr. Adewale would have to seek him out.

In terms of the stressors on Axis IV, Dr. Adewale listed the involvement with the legal system, but he also made reference to the 30th anniversary of the shooting, the treatment team's concern about the CNN documentary and Mr. Hinckley watching that, particularly when the treatment team would not be present, and media issues related to his upcoming hearing as other stressors for Mr. Hinckley.

I asked Dr. Adewale his understanding of the risk factor of Mr. Hinckley's relationships with women, and he responded that he had done a review since having his role expanded, and that he has learned several things, including that Mr. Hinckley has "no allegiance to women," that he has a history of misreading the cues from women, such as "Hello" to John Hinckley may mean to him that you are very interested in him. Dr. Adewale then added that if a woman is not interested, she may reject him and Dr. Adwale is hopeful that would not cause a deterioration in Mr. Hinckley as a blow to his ego. Dr. Adewale continued that if Mr. Hinckley was to become

involved with a woman in Williamsburg, it would put an end to his relationship with C⸱        I
asked Dr. Adewale what he thought Mr. Hinckley's relationship with C⸱      B.     is currently,
and he replied "It's very confusing because they are engaged or they are not engaged, but it
seems even confusing to Dr. Binks that Mr. Hinckley has given her a ring." Dr. Adewale
provided another example of Mr. Hinckley's lack of allegiance, which occurred in a situation
where C⸱    ⸱⸱B     was in front of the building behaving in a bizarre way that indicated she
was psychotic, and Mr. Hinckley "walked in the other direction" rather than walking towards
her. Dr. Adewale reported this event occurred approximately two months prior to this meeting.

Dr. Adewale went on to describe Mr. Hinckley's not caring about his mother not wanting Ms.
B      to come to Williamsburg and being angry about that as an example of his sense of
entitlement and lack of empathy, as discussed in the last treatment team meeting. I then asked
Dr. Adewale about his opinion regarding Mr. Hinckley's transition to Williamsburg as per the
recommendation, if something should happen to his mother. Dr. Adewale replied that if Mr.
Hinckley's mother were to die before this recommendation was implemented or soon after, the
treatment team may have to start from scratch. Alternatively, if she continues to live and Mr.
Hinckley begins to transition and adjust to Williamsburg, the transition may be successful. He
referenced People's Place as another component of the ongoing treatment planning, including
possibly supervised housing. Dr. Adewale stated that the team does not believe Mr. Hinckley
should live in the current family home in Williamsburg should his mother not be available due to
their concern that he would become isolated and that that is when his thinking may become
distorted. Dr. Adewale reemphasized that the team would not hesitate to bring him back to the
hospital immediately if he decompensated or they felt it necessary.

Dr. Adewale stated that he has discussed with Mr. Hinckley the possibility of beginning an
injectible antipsychotic medication to ensure compliance with medication to the court, as
noncompliance with medication is a risk factor. He continued that Mr. Hinckley is in agreement
with that, although it would not be his preference to be on an injectible medication. Dr. Adewale
indicated Risperdal Consta 25mg by injection every two weeks would be the appropriate dosage.
Dr. Adewale concluded by stating that he did not have any psychiatric concerns regarding the
recommendation of the hospital for Mr. Hinckley to go to Williamsburg, but that he was hopeful
that People's Place would be able to provide services regarding art therapy and music therapy, as
Mr. Hinckley has had both at St. Elizabeths Hospital and has enjoyed them. Dr. Adewale further
reported he believes Mr. Hinckley knows what he needs to do to be free, to be with his mother,
and hopefully not to get into trouble. He also stated the support system in Williamsburg is there.
Prior to ending the appointment, Dr. Adewale offered that, with regard to the incident involving
the dental student, "It was John" that was at fault, not the dental student in that incident, and his

belief that was another expression of Mr. Hinckley's narcissism in his failure to read cues from women.

I had a follow-up telephone interview with Dr. Adewale on 11/10/11 after the US Secret Service had provided information to me as well as to the hospital regarding surveillance of Mr. Hinckley while in Williamsburg and a keyword search of his library computer. I asked Dr. Adewale whether he and the treatment team had the same information, to which he replied they did, and that it was information they were in the process of reviewing. I asked if there were any conclusions, and he replied there had not been, but they were reviewing the information.

### Velore Jernigan-Pedrick
On 8/15/11, I interviewed Velore Jernigan-Pedrick, hospital librarian and immediate supervisor for Mr. Hinckley at his WATP job in the St. Elizabeths Hospital library. Ms. Pedrick reported that she had been employed at St. Elizabeths Hospital for five years until 1995, then left the hospital and returned in 2002, where she has been employed since that time. Ms. Pedrick stated that Mr. Hinckley began working in the library in September 2002 in the same position he has now, however his hours have been reduced to 10 hours per week due to budget cuts.

Ms. Pedrick reported that Mr. Hinckley had worked a maximum of 20 hours per week prior to the budget cuts. Ms. Pedrick further reported that Mr. Hinckley's work station is at the circulation desk right outside her office, but that his work duties require that he go into the stacks or into the archives for specific tasks. Ms. Pedrick continued describing Mr. Hinckley's job duties, which include his utilization of Docline to go into the national database to satisfy requests for documents or journal articles. Mr. Hinckley's duties include pulling articles from the stacks or archives room and scanning them into pdf format in preparation for their being sent to libraries across the United States and Canada. He does not have an email address and therefore his job stops prior to the documents actually being sent to the other libraries.

I asked Ms. Pedrick what she knew about the June 2009 incident involving a dental student, and she replied that on that evening she had been scanning the history as she sometimes does and noticed that in the history, she found there was information about one of the dental residents. I asked Ms. Pedrick how Mr. Hinckley could have obtained that information, and she replied "Oh, he could have just gone into Google and google'd it." She reported the information was pictures of the dental student. I asked her if this was an easy or a complex process, to describe it to me, and she said that essentially all one would have to do is type in the name in Google, it was not a complex task at all, and it would not require an email address. She then brought it to the attention of Mr. Shamblee, and she was later told that the resident had told Mr. Hinckley that he

could find pictures of her if he just Google'd her. Ms. Pedrick said that was as far as it went as far as she knew.

I asked Ms. Pedrick if she found anything else of concern, either before or after that, and she said "On that day, it was the pictures of the resident and he had a friend who worked at ___ , C ___ somebody, and all of that was in the history on that day." I asked Ms. Pedrick what was on there about C ___ , and she recalled that she must have a unique name too, but maybe just the fact that she worked at ___ . She added "But somehow I knew from the name it was him." Ms. Pedrick confirmed that other than those two incidents on the same day, there had been nothing before or after that concerned her about what Mr. Hinckley was doing on the computer.

Ms. Pedrick offered that prior to the opening of the new hospital, Mr. Hinckley's work station was in another location and in that location his desk was outside her office as well but when she came out she had to look around the desk to see, as compared to currently where she can see without going around the desk and the library technician also has full view of the desk as well.

I asked Ms. Pedrick to tell me about Mr. Hinckley's interaction with staff, peers, and other visitors to the library, and she replied "He's cordial." and that people who knew him from John Howard would stop and ask him how he is doing, but he does not really have contact with anyone except Dr. Binks or his V.J. Hyde. She reported he would not have contact with his housemates in the library because the library is a staff area. She reported there has not been any complaint or concern expressed by anyone about Mr. Hinckley's performance in the library. She stated that overall, he is a "good worker." She continued that he is "quiet, blends into the woodwork, and doesn't stand out." Ms. Pedrick reported there are students who come to the library and sometimes new staff that may notice him, but only when he is out of the area do they ask staff whether that's really him, but people do not walk up to him and ask directly whether he is John Hinckley.

### Diedra Coga, LPC

On 18/15/11, Ms. Diedra Cogan, LPC, art therapist for John Hinckley, was interviewed at St. Elizabeths Hospital where she has worked for the past two years. Ms. Cogan reported she has been an art therapist for 22 years and is a registered art therapist and licensed professional counselor. Ms. Cogan reported she has worked with Mr. Hinckley for 1-1/2 – 2 years. She currently sees Mr. Hinckley in the studio art group twice per week, and there are approximately eight patients in the group, which is more like a large art club with an esthetic focus rather than being insight oriented. She continued that Mr. Hinckley loves to paint and he is relatively

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 47 of 80

contained, quiet, and thoughtful about his work, and further describes him as liking Van Gough
among other artists and that he studies the techniques. Ms. Cogan went on to say that the focus
is more about the art work itself rather than using the art work as a springboard to talk about
personal feelings or other issues.

Ms. Cogan reported the group is composed of individuals (all males and occasionally one
female) who are "the cream of the crop" who love to create art, and that Mr. Hinckley and other
members of the group are quite competent and very good at painting. Ms. Cogan stated that the
model is to promote social interactions and pro social behavior. She reported the group is pretty
self contained and almost runs itself and if someone asks John a question he will answer and he
will sometimes engage in conversation. She surmised that John does what he's supposed to do
in the group. She continued that the conversations in the group tend to be based on what's going
on the wards and that essentially all of the patients in the group are from the forensic side or have
been in the past. She stated that although the composition of the group is usually all men, they
don't talk about men's issues. Ms. Cogan reported she has never had any behavior problems
with John in any session and said he's really focused on art while in the group and gets most
excited about the guest artists and looking at the books and their techniques.

Ms. Cogan stated Mr. Hinckley is a little difficult to give direction to because he may hear it as
criticism but she thinks everybody is a little like that. She stated that in the beginning Mr.
Hinckley would not make eye contact with her so she thought he wasn't listening, but over time
as he has gotten to know her he does make eye contact. She further commented that John has
been the least provocative of the members and occasionally another member has said something
and he has commented to that person "that's not a nice thing to say because she's a nice lady."
She continued that John has never been particularly focused on her, which she believes is
appropriate.

In terms of the content of his art, Ms. Cogan reported Mr. Hinckley tends to do architectural
designs and landscapes, and she has never seen anything inappropriate in the content of the work
he has done, adding that if anything she would want him to loosen up a little. She added that
there was actually a very cute painting that he did of one of his cats.

Ms. Cogan reported that John's work was displayed anonymously on Friends and Family Day,
and people wrote comments in an open book she had provided for feedback. There were other
anonymous artists' works on the same table as John's and several people wrote comments
expressing that they liked the landscape he did as well as the cat he had done. When I asked if
Mr. Hinckley had done any paintings of human figures, she responded, "if they're part of the
picture but it seems he does more landscapes." I asked specifically if he had done any pictures

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 48 of 80

of human figures, weapons, or political or religious symbols, and she said she has not seen any of those in his work.

*Sidney Binks, Ph.D.*
On 8/16/11, I interviewed Sidney Binks, Ph.D., in his office at St. Elizabeths Hospital. Dr. Binks has been Mr. Hinckley's individual psychotherapist for the past 12 years and reported that there have not been any changes in an overall or broad sense regarding Mr. Hinckley's clinical situation since I spoke with him in 2008 prior to the last hearing. Dr. Binks reported that Mr. Hinckley got pretty upset since the last hearing due to the long time period before there was a decision rendered by the court regarding the hospital's recommendation, and there was a medication adjustment related to the delay. Dr. Binks reported that from his view all of Mr. Hinckley's home visits have been very successful. He stated that the focus of the individual therapy has been on his relationships with women and that he (Dr. Binks) and Mr. Beffa talk monthly or so and certainly every time Mr. Hinckley has a visit. Dr. Binks added that he shares his notes with Mr. Beffa so that he will have an appreciation of his impressions of Mr. Hinckley's situation.

Dr. Binks said the focus of therapy regarding Mr. Hinckley's relationships has been on C B, with whom Mr. Hinckley has had a relationship for over a year, and Mr. Hinckley's perceptions of that relationship. Dr. Binks described Mr. Hinckley's relationship with C B as being typical of most of his relationships with women where he becomes consumed with them initially but her mental illness has been so out of control off and on and that he had to cope with her mental illness from the very beginning. Dr. Binks remembers that Mr. Hinckley began seeing Ms. B before the new hospital opened in May 2010 because Dr. Binks attended a treatment plan of Ms. B and it was not in the new hospital building. Dr. Binks reported the two treatment teams met so they could share concerns and particularly so that Mr. Hinckley's treatment team could share their concerns about Mr. Hinckley. Dr. Binks offered that Mr. Hinckley's relationship with Ms. B mirrors other relationships he has had with women he has met in that she meets a need and the more recent work has focused on comparing that relationship with other relationships he has had. Dr. Binks further opined that when Ms. B was hospitalized in Baltimore while there with her Catholic group, Mr. Hinckley became very concerned and demonstrated a lot of empathy for her situation. Dr. Binks described Ms. B as being heavily medicated and sleeping a lot, and that as John is her whole life when she wakes up she gets herself together and comes to visit John, does so, and then returns home and goes back to bed. Dr. Binks said that Ms. B, in socializing with Mr. Hinckley, meets a lot of his needs in

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 49 of 80

that regard but Mr. Hinckley realizes that the viability of a long term relationship is not likely to happen, and if the new request is granted it would be unlikely that Ms. B would be a part of his time.

With regard to visits in Williamsburg, Dr. Binks reported that Mr. Hinckley was initially pushing very hard for Ms. B to be able to visit him in Williamsburg and Mr. Hinckley's mother was very opposed to that; however, Mr. Hinckley's position changed on that especially after Ms. B had been hospitalized in Baltimore and also re-admitted to St. Elizabeths. I asked Dr. Binks his impression of John's current view of the status of his relationship with Ms. B, and he said that John uses terms of friendship, romantic, or leading to or union as well as marriage and engagement, and John will use all those words in a very flexible way but from his (Dr. Binks) view, the relationship for John is about co-dependency and attachment. He continued that John wants C       because he has the person at the moment, and although he doesn't see much chance of long term viability he does not want to be alone. Dr. Binks was aware of and has discussed with Mr. Hinckley the incident at the Christmas party when C.       (Ms. B) became very anxious and had to leave; however, they have not discussed the other reported incident on the grounds when she was near the metro station or front gate yelling something about "free John Hinckley."

Dr. Binks offered that there had been discussions about the incident involving the dental student approximately two years ago and that Mr. Hinckley wanted to follow-up on her invitation to see photographs of her and she had invited him to attend her graduation at St. Elizabeths Hospital. Mr. Hinckley did not go to the graduation but did look her up and found photographs of the graduation, the librarian reported that to the team, and he had been placed on ward hold for that. When I informed Dr. Binks I was aware there had been some controversy or differences in how that occurred, he acknowledged that he has a bias as Mr. Hinckley's advocate and that the dental student did not acknowledge when interviewed with her supervisor that she had invited Mr. Hinckley to look at her photos, although John's position was that he wouldn't have known to look up the photographs and she had invited him to her graduation. Dr. Binks offered his view that he could easily imagine the dental student becoming anxious and not being as forthcoming in front of her supervisor.

Dr. Binks also said that Mr. Hinckley looks at any female as a potentially deepening relationship, any female who shows him attention. Dr. Binks further stated that was the only incident of any concern with regard to John's use of the computer at the hospital, and that his family is to monitor his computer use at home even though he doesn't know if they do that.

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 50 of 80

Dr. Binks and I discussed the hospital's recommendation for essentially developing services in Williamsburg including individual therapy, the treatment mall, psychiatric services, possibly art and other structured activities rather than continuing or expanding them at St. Elizabeths Hospital as well as the D.C. plan as the backup plan that had been discussed at the last hearing. His impression was that based on the last hearing the D.C. plan was not going to be a viable plan and that the primary reason or Williamsburg was because it is where John wants to go and his wishes should certainly be a big consideration of outplacement planning. He offered that the team will do what is necessary and if the court decides Williamsburg is not a viable option, then the team would re-work it here. Dr. Binks also stated that he has been a big proponent of educating the team in Williamsburg because it is difficult to understand how difficult this case is unless you have already been working in it, which is a part of why the OPD (outpatient department) at the hospital is involved in the current plan recommendation. With regard to Mr. Beffa's dual roles as individual therapist and case manager, Dr. Binks shared that he has never been in favor of Mr. Beffa having both roles but the team accepted his recommendation that the roles be very well defined. When I asked why, regarding his opposition, he responded that he doesn't want John's individual therapy to be "watered down" because John is not such a good individual therapy candidate to begin with, in that John is not going to lead the therapy and it could easily devolve into case management only. Dr. Binks then offered, however, that he believes Mr. Beffa has come to understand much more the forensic implications of the case, and that he (Dr. Binks) has also been very impressed with Mr. Shamblee and the way he has taken over responsibility for the case. In terms of activities while in Williamsburg, Dr. Binks said that John does not do a lot of activities; he leads kind of a boring life in that he helps his mother, does his music and art, and talks to C        . on the phone. I asked Dr. Binks if he or the team have an expectation that there will be an increase in community activities or anything like that other than the time extensions from 10 to 17 to 24 hours that are included in at least the initial part of the recommendation, and he responded that based on meeting of clinical and administrative staff at the hospital there was a realization that they needed to have structured activities for John so that the involvement of Colonial Behavioral Health and work would result in his having structured activities five days each week.

Lastly, in discussing the possibility of Mrs. Hinckley becoming incapacitated or passing away, Dr. Binks stated the team's position that if Mrs. Hinckley passed away during the initial phase of this plan, they would have to bring Mr. Hinckley back to the hospital and re-group. However, if it was much longer than that (i.e., convalescent leave) such that he had become more established in Williamsburg, his remaining in the current family home would not be likely. His brother suggested they might buy John a condo in Williamsburg, but the team rejected that idea. When asked why, Dr. Binks continued, "because John needs a certain amount of supervision even in

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 51 of 80

addition to what might be the structured activities that he would be involved in, such that he
would need some kind of supervised housing situation."

*Kevin Shamblee, LICSW*
On 8/16/11, I interviewed Kevin Shamblee, LICSW, Ward Administrator for 2B Nichols House.
Mr. Shamblee and I discussed the hospital's recommendation based on the treatment team's
report authored primarily by Mr. Shamblee. I asked Mr. Shamblee if there was anything he
wanted to discuss that is not in the recommendation, and he stated that in addition to what is
written in the recommendation, the highlights of the plan are essentially for an expansion in the
amount of unaccompanied time that Mr. Hinckley would have and permission to drive a car
without supervision such that he would be able to go to various activities including structured
group activities, volunteer activities, and possibly work activities. Mr. Shamblee said with this
increase in unaccompanied time it would be anticipated there would be expanded activities and
that Mr. Beffa has been working with Colonial Behavioral Health to facilitate such an expansion.
Mr. Shamblee indicated that the St. Elizabeths treatment team is very interested in Mr. Hinckley
participating in particular groups, including a men's group, discharge planning group, a forensic
group for men who are coming from Eastern State Hospital, and other groups that are intended to
facilitate integration into the Williamsburg community, and issues related to his relationships
with women. Mr. Shamblee indicated that the groups available for Mr. Hinckley's participation
will depend on what is available at the time should the court approve the recommendation.

I shared with Mr. Shamblee my impression that much of the recommendation is to attempt to
replicate much of what Mr. Hinckley has in place at St. Elizabeths Hospital, including individual
therapy, music therapy, art therapy, various groups that take place on the treatment mall, and
support from the clinical administrator, risk assessor, and administrative oversight, and I
wondered how the treatment team and hospital envision those services being provided in
Williamsburg. Further, I stated my understanding that Dr. G-G, as Mr. Hinckley's psychiatrist,
and Mr. Beffa, as Mr. Hinckley's individual therapist and case manager, and Colonial Behavioral
Health are listed in the plan to provide the services in Williamsburg and that other services
including increases in volunteer time at Eastern State Hospital and other activities do not appear
to have been worked out at this point. Mr. Shamblee explained that Colonial Behavioral Health
suggested two weeks as the minimum time needed for Mr. Hinckley to be available for People's
Place and that led to the recommendation for the 17 days for the first two visits so that Mr.
Hinckley can become involved in Colonial's group activities, and assuming that is successful
move up to the 24 days so there can be even more involvement and that could continue until Mr.
Hinckley is placed on convalescent leave. The Team's plan is that there will be a minimum of
two weeks between visits so that hypothetically Mr. Hinckley can be in Williamsburg for 17

days, then back at St. Elizabaths for 14 days, then back at Williamsburg for 17, then back at St. Elizabeths for 14, and if the recommendation is approved as written then the following visit will be for 24 days in Williamsburg and back to St. Elizabeths for 14 and so on through the remaining minimum of eight visits until there can be a decision by the team and the hospital to implement convalescent leave.

Mr. Shamblee said that the hospital learned in June 2011, prior to Mr. Hinckley's visit that month, the Family Living Institute might be breaking up and that information would be confirmed sometime after the 4th of July.  I told him of my concern about the possibility that Dr. G-G might not be a part of Mr. Hinckley's treatment as she is moving to Portsmouth and with the Recommendation going forward this important possibility was discovered very late in the process and does not appear to have been resolved at the time the Recommendation was filed. Mr. Shamblee stated the process was such that Mr. Beffa began working with Colonial Psychiatric Services while Dr. G-G remained with the Family Living Institute and it was unclear as to how that would work out.  Dr. G-G, however, expressed to the team that she would continue to remain Mr. Hinckley's psychiatrist regardless of her affiliation.  Mr. Shamblee said he learned that Dr. G-G was moving to Portsmouth from Scott Hinckley and he would have preferred to hear that information directly from her or Mr. Beffa; and, based on that information, he was concerned that Mr. Hinckley would have to travel to Portsmouth in order to continue psychiatric treatment with Dr. G-G.  Ultimately, it was determined that Dr. G-G would see Mr. Hinckley in Williamsburg on Saturdays so he would not have to drive to Portsmouth.  Mr. Shamblee clarified that Dr. G-G moved to Portsmouth County, which is approximately 30 miles from Williamsburg and that is a much shorter trip than if Dr. G-G had moved to Portsmouth, Virginia.

I asked Mr. Shamblee whether the team anticipates an intermediate or long range plan for Colonial Behavioral Health to provide not only the group therapies at Peoples Place but also psychiatric and case management services which are currently being provided by Dr. G-G and Mr. Beffa, respectively, and he responded that since Colonial Behavioral Health provides a full array of services, it is a possibility but that has not yet been determined.  Further, Colonial Behavioral Health provides housing, as per Mr. Shamblee, and that too if Mrs. Hinckley were not available, would be a consideration for working with them to arrange housing for Mr. Hinckley.  Mr. Shamblee also said he has talked to the Hinckley family and they support the idea of supervised housing if Mrs. Hinckley is not available to provide housing for John in Williamsburg.  Mr. Shamblee added that the issue of housing depends largely on Mrs. Hinckley's availability and the timing of the conditional release and convalescent leave process. He also asserted that Colonial Behavioral Health has case management services which would be available to assist Mr. Beffa in case management activities.

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 53 of 80

I then expressed my concerns regarding the way Mr. Hinckley has used his time during the visits since 2009, and that it is my understanding he meets with Dr. G-G and Mr. Beffa, volunteers time at Eastern State Hospital and other than when at home he spends his unsupervised time either within the \_\_\_\_ gated community, at the mall, shopping, or the movies but very little if any of his time is actually spent in any social activities or in building social relationships.

Mr. Shamblee added that the possibility of Mr. Hinckley having more volunteer work at Eastern State Hospital performing clerical duties is also being pursued. I recalled with Mr. Shamblee that the one social activity I was aware of happened prior to the last hearing, with the singles club in the church (SALT) which was described by Mr. Hinckley as "a disaster" because he was essentially asked to leave and the ages of the participants were by his description over age 65. This activity had been set up by Mr. Beffa and it was my understanding there had not been another social activity of any type other than the attendance at the Unitarian Church, which his family did not support, and which Mr. Hinckley reported as not appropriate for him. I asked Mr. Shamblee if he was aware of any other social activity that had occurred over the course of the visits since the 2009 court order. Mr. Shamblee responded that under the Department of Justice mandates for patient agreement and endorsement of activities that they had suggested to Mr. Hinckley that he attend a monthly National Alliance for the Mentally Ill (NAMI) meeting, but Mr. Hinckley did not agree and therefore did not attend. Mr. Shamblee reported that he had discussed other kinds of activities such as recreation centers or book clubs, and advised Mr. Hinckley that he would have to be thinking about how he would spend his time. Mr. Shamblee told me he had said to Mr. Hinckley they were not expecting him to be the "life of the party" or a "new" John Hinckley, but they also did not want him to have his pre-arrest behavior of being isolated and not involved with anyone. Mr. Shamblee included in our discussion a reference to my having said sometime in the past Mr. Hinckley having a beer at a bar, and we both agreed that was unlikely and probably not realistic, but a coffee at Starbucks and other activities there that are not unreasonable are possibilities he and Mr. Hinckley could be discussing. Mr. Shamblee indicated they have also explored such things as going to a jazz club and just listening to music, not having to drink alcohol or anything like that, and Mr. Hinckley is being encouraged to think of things he would want to do. He was also encouraged to look ahead as to what activities may be coming up during his next visit, and that if he is able to drive that would help things tremendously from Mr. Shamblee's point of view.

I asked Mr. Shamblee if he had any concerns about Mr. Hinckley's diagnoses beginning with the Axis I psychotic disorder NOS and major depressive disorder NOS and he responded they are both in remission but there was a period of time when Mr. Hinckley was sad, in part due to his relationship with C\_\_\_ "where she pulled back," and also the delay in receiving a ruling from the Court after the 2008 hearing. Mr. Shamblee stated the ruling came in approximately July

2009 but Mr. Hinckley did not go on a trip until approximately Thanksgiving 2009, and that he was noticeably sad during that period, but not to the degree of reaching the criteria for major depressive disorder. Mr. Shamblee added there was a two month period before Mr. Hinckley was able to go on the 6 day visits, and that was also a time period when Mr. Beffa was required by the Court to actually read the past reports, risk assessments, and other documents he acknowledged he had not read during the 2008 hearing.

I asked Mr. Shamblee to tell me his understanding regarding Mr. Hinckley's relationships with various individuals, beginning with C        , and he replied that he believes they still have a relationship by telephone, and they may speak approximately once per week, but he has not seen her on the campus for a very long time. We then discussed Mr. Hinckley's relationship with C    B.    and Mr. Shamblee began by saying that it's not unlike the other unstable relationships Mr. Hinckley has had. Mr. Shamblee reported that Mr. Hinckley's relationship with Ms. B      began on the treatment mall. Mr. Shamblee stated that after staff began reporting seeing Mr. Hinckley sitting on the bench outside with a particular woman, he approached the couple and the treatment team met with her and asked her if she understood the implications of becoming involved with Mr. Hinckley, and she expressed that she did. Mr. Shamblee continued that as Ms. B      was in the process of being outplaced, the treatment team met with her again and she reported she would be happy to come in and speak with them any time. Mr. Shamblee reported that during that time, Ms. B       described their relationship, stating that she and Mr. Hinckley were going to get married, that he would become a Catholic, and during that meeting Mr. Shamblee asked Mr. Hinckley if he would be converting to Catholocism, to which Mr. Hinckley responded "I don't know about that.", but he did not deny that they were getting married.

Mr. Shamblee said that as Mr. Hinckley was utilizing his 10 day visits from approximately the fall through December he was engaging his family as well as the treatment team in discussions that Ms. B.      should be able come to Williamsburg to visit, and that his family said "No.", and that the treatment team initially asked "Why?", and ultimately said "No." to her coming because he should be focused on his activities in Williamsburg. Mr. Shamblee indicated that Mr. Hinckley was "Working team members," as to why Ms. B       could not come to Williamsburg, until the Christmas party held on Ward 2B Nichols House. During the course of that party, Ms. B.      had an anxiety attack and Mr. Shamblee and Mr. Hinckley escorted her down to the lobby and waited with her until she got a cab. After that, Mr. Hinckley told Mr. Shamblee that he was not going to continue to ask his mother if Ms. B       could go to Williamsburg because he did not feel his mother could handle the behavior he had seen.

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 55 of 80

Mr. Shamblee then reported that shortly after that, in January at approximately 8:00am, Ms. B. was standing near the gate coming onto the hospital campus near the metro station with a big sign on a pole, which he did not read, and yelling "John Hinckley..." but he could not tell what else she was saying. Mr. Shamblee said he asked Mr. Hinckley about that, and Mr. Hinckley said he didn't know anything about it but a couple of days later Ms. B had notified Mr. Hinckley that she had been hospitalized in Baltimore, and again Mr. Hinckley repeated to Mr. Shamblee that her going to Williamsburg was not going to work due to concerns about his mother possibly having to handle this type of behavior.

Mr. Shamblee said that despite these events, in the spring of 2011, Mr. Hinckley showed him a ring saying that it was an engagement ring, and when Mr. Shamblee asked if someone was getting married, Mr. Hinckley responded "Oh it's for C      ." Based on that, the treatment team met with Mr. Hinckley and discussed his plans, and Mr. Shamblee noted that he would vacillate about marriage and becoming a Catholic, and depending on which day Mr. Hinckley was asked the questions, he might respond in ways that made team members feel it was just his buying a woman gifts whom he was having a relationship with or his need to have someone and attachment issues. Mr. Shamblee added that more recently Mr. Hinckley has made exclamations such as "Oh, we're not getting married," but he continues to buy gifts for Ms. B___.    Mr. Shamblee also said he spoke with Mr. Hinckley about his shopping, and because part of the plan is for Mr. Hinckley to pay for part of his treatment. Therefore, he should be saving money so that he can actually pay for some of his treatment, and if he is spending his money shopping for gifts, how is he going to be able to do that, so he should be providing bank statements or something to indicate that he is indeed saving money. He said Mr. Hinckley responded by smiling and kind of laughed at it, and perhaps thought it was "cute."

I then asked Mr. Shamblee about his thoughts regarding Mr. Hinckley's involvement with the dental student, and his response was "Oh, he did bad." He then elaborated that it was Mr. Hinckley's perspective that she invited him to look at the pictures, and her perspective that she did not, and with all of the issues regarding his relationships with women and misperceptions, why would Mr. Hinckley go on the computer or be doing this at work, when for him it could be construed as stalking? Mr. Shamblee was unaware of any other incident involving Mr. Hinckley's use of a computer and felt confident that his computer use was being effectively monitored at his work sites and he didn't believe Mr. Hinckley uses the computer lab in the treatment mall.

Mr. Shamblee and I discussed the violence risk assessment update, and that at the time of the submission of the recommendations and even at the time of this interview the final risk assessment had not been completed. Mr. Shamblee assured me the team had been discussing

with Dr. Murphy the risk assessment and that in this case particularly the recommendation is largely driven by the risk assessment, thus he is confident that the final risk assessment, which is in the process of being edited, would reflect what was presented to the review board in the preliminary findings. We next discussed the medical records and the difficulty in obtaining medical records and the organization of the records. Mr. Shamblee apprised me that the records were scanned from the blue charts and that after January 2011, particular documents were in the Avatar electronic medical records system.

Mr. Shamblee expressed his confidence in the plan, and that while it may not be perfect, the longer it takes for implementation the more things could change in terms of availablilty of the different services. The team is aware that Dr. Lee is returning to Williamsburg and may be an option. Also, Colonial has a number of services so there may be options to implement in the plan assuming it is approved, and if something has changed in terms of availablilty they will make whatever modifications are necessary. Among the most critical issues is the availability of Mr. Hinckley's mother and housing in that if she is not available, then his living in         is also not available, and therefore housing in Williamsburg or possibly D.C. would be the most immediate options.

I asked Mr. Shamblee that if this plan is approved and is underway and Mr. Hinckley has participated in the structured activities at Colonial Behavioral Health, with his therapist, and psychiatrist, and volunteer activities at Eastern State Hospital, and occasionally going to a movie on his free time but basically spends his time at home, how would the team assess success. Mr. Shamblee replied that if Mr. Hinckley was participating in his structured therapeutic and volunteer activities, including those listed above, but basically spends the rest of his time at home, that would not be like his 1979-1981 pre-offense history of dropping out of everything with no supports and therefore that would be satisfactory.

On 11/10/11 I conducted a telephone interview with Mr. Shamblee after having received information from the US Secret Service regarding surveillance of Mr. Hinckley in Williamsburg, the computer keyword search of the computer Mr. Hinckley and others use in the St. Elizabeths library, and some pictures that were taken at the Barnes and Nobel bookstore of books Mr. Hinckley was observed looking at. I had contacted Mr. Shamblee on 11/8/11 and requested another examination of Mr. Hinckley on 11/9/11 as well as a meeting with members of the treatment team, including himself, Dr. Murphy, and Dr. Adewale on that same date, however, the meeting with the treatment team members did not take place as they were not available.     I asked Mr. Shamblee if he and the team had received those materials/reports, and he informed me that they had, and the Secret Service had been to the hospital the day before my phone call. This was essentially a follow-up call given the meeting did not take place and I was apprised that the

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 57 of 80

team was in the process of reviewing the information received from the Secret Service. We also
had a brief discussion with regard to the dental student, whom Mr. Hinckley had Google'd or
searched for, in that the dental student's name was not on the list of keywords; however C
G 's name was on the list of key words, which was also discovered by Mr. Hinckley's
supervisor on the same day that the name of the dental student had been searched. Mr. Shamblee
reported that the staff had determined that another staff member and not Mr. Hinckley had
searched for at least some of the names on the list. I asked Mr. Shamblee if he had received the
surveillance of Mr. Hinckley's unsupervised activities, and he said that he had and that the team
was also in the process of reviewing that information.

### V.J. Hyde, M.T.
On 9/22/11, I interviewed Verne J. Hyde MT, Mr. Hinckley's music therapist for many years,
and asked him to bring me up to date since the last time we had a formal meeting, which was
prior to the hearing in 2008. He began by stating that since that time there has been "a lot of ebb
and flow" in their sessions, and the format of the sessions have been focused on what they have
been able to accomplish and what they have not been able to accomplish in creating music. Mr.
Hyde stated that for a long period of time the sessions were basically recording some of Mr.
Hinckley's original music and there were some technical problems with some of the equipment
so that it was a source of frustration when Mr. Hinckley was not able to record and that
frustration was particularly evident because the process had been such that Mr. Hinckley could
bring his music in, record it, and then they could use that re-recording as well as the process
itself reflectively.

Mr. Hyde stated, however, it turned out that the equipment problems were actually "a good
thing" in that it moved the sessions away from recording and sometimes Mr. Hinckley
defensively hiding behind the recording process itself and moving into the process of the
songwriting. Mr. Hyde used the equipment failures and the frustration from Mr. Hinckley to ask
him how he wanted to use the therapy time and what other ways they might be able to explore.
Mr. Hyde describes that the process was very helpful, with Mr. Hinckley beginning not only to
move away from simply recording songs but also playing the songs and playing them with him
as well as improvising with Mr. Hinckley taking the lead. Mr. Hyde describes Mr. Hinckley as
very much a musician, and that he has more recently been teaching himself piano in addition to
guitar. Mr. Hyde discussed not only Mr. Hinckley's using improvisation but also active in
receptive processing. He described receptive processing as not simply passive listening to music
in the background, but also identifying the emotions and other aspects of what the music
stimulates and discussing those types of thoughts and feelings. Mr. Hyde acknowledged his
awareness that emotions are traditionally difficult for Mr. Hinckley to express, and that even

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 58 of 80

when they are talking he sometimes feels that he is pulling emotions from Mr. Hinckley,
however when talking about new music vs. familiar music, Mr. Hinckley is very quick to
identify whether or not something is aesthetically pleasing or not to him, and will speak to that.

Mr. Hyde described that particularly when the music is familiar to Mr. Hinckley and when he
likes it, then he is inspired by it and he demonstrates that inspiration and good feeling, and when
it is something he does not like he also responds quickly with "I don't want to hear that" or other
spontaneous expressions of emotion that are again difficult for Mr. Hinckley to express in
different situations. Mr. Hyde also described Mr. Hinckley when hearing familiar music relating
that to times in his life, particularly when music brings back memories of times when he was
happy in his life.

We then discussed some of the changes that have occurred over the last three years, including the
new hospital, changes in relationships that Mr. Hinckley has had with women, and the
recommendation being put forth by the hospital at this time. In terms of the changes regarding
the hospital, Mr. Hyde's reflection is that it has been positive overall, and for Mr. Hinckley he
will on the surface dismiss the changes as "Oh, it's still St. Elizabeths Hospital." Mr. Hyde said
that John would say "It could be the Taj Mahal and still be St. Elizabeths Hospital." Mr.
Hinckley has said to Mr. Hyde that it is a nicer building, but Mr. Hyde's view is that Mr.
Hinckley feels he is still "stuck here." Mr. Hyde added that Mr. Hinckley is going through the
motions and going to his groups as he is supposed to, but Mr. Hinckley says he obviously would
rather not. He added that when Mr. Hinckley likes something he pursues it. Mr. Hyde continued
that his one-on-one therapy and the studio group are both places where John feels safe and able
to get into the creative process. Mr. Hyde also made reference to a group of about 3-6 patients
that is run by his students and John is one of the more advanced musicians in the group. He went
on to say that he has been impressed that John has taken the time to provide peer support in
helping other patients with suggestions on how they might play the guitar in various ways.

We talked about the hospital's recommendation and Mr. Hyde said he believes that it is positive,
particularly given all the foot work that has been done in Williamsburg. He said he feels that the
perspective brought to the processes by Dr. G-G is particularly good, and for John to be there for
longer periods of time is going to be very helpful even from an assessment level for St.
Elizabeths because Williamsburg is where John wants to be and "even when he's here, he's
there." Mr. Hyde then gave a musical analogy in which he said "you start at your root note and
you go out and you come back and you go out and you come back " and compared that to Mr.
Hinckley's starting at St. Elizabeths and coming back and that one gains perspective as you can
look at that process. Mr. Hyde included not only Mr. Hinckley having successes or failures in
Williamsburg and coming back to St. Elizabeths and talking about feeling "good" about

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 59 of 80

successes or "bummed out" about failures, but also in relationships , at this point with Ms. B. In his view, the more Mr. Hinckley can do that the better, particularly with the team in Williamsburg seeing how he is doing and what he is doing regularly.

When I asked Mr. Hyde his sense of how Mr. Hinckley spends his time in Williamsburg, he responded, "I think he's doing a lot of music and I think he's doing some art," and "he's checking out the area." Mr. Hyde added that he gets the sense that there is a feeling that he's not doing enough while he's there and that he could "turn the burners up" and make some things happen, but another part of him feels that when John has tried unsuccessfully to do that, like the art studio that had initially accepted him and then fell through, he thinks that's a prototypical experience that John uses in his mind to say "what am I gonna do, it's just gonna get pulled out from under me."

Mr. Hyde said he thinks that John is connecting with his mother in Williamsburg and he is experiencing freedom, and "if you look at his music probably 60% of it is about freedom on some level." Mr. Hyde continued that when Mr. Hinckley experiences freedom, which is when he is in Williamsburg, he is "basking in it but is he basking in it in a way that is proactive – maybe, maybe not." Mr. Hyde then offered that he and Mr. Hinckley had searched for a music therapist in Williamsburg and actually found one who works at Eastern State Hospital and sees private clients. Mr. Hyde is waiting to hear back from the therapist as to whether or not John may be able to see her. Mr. Hyde added that he thinks Mr. Hinckley's work at Eastern State gives him additional opportunities for social interactions with colleagues or at least people on the periphery. Mr. Hyde is aware of Mr. Hinckley's interest in the employee at Eastern State Hospital as well as the next door neighbor and that neither of those interactions went very far in terms of actually developing a friendship.

Mr. Hyde and I talked briefly about the previous considerations for an outplacement to D.C., and I asked why he thought that particular plan was off the table, and he expressed his understanding that it was because of the proximity of the federal government, and he thought it was the government saying that the DC plan was not a good idea. He continued that the hospital thought it was a good idea because there are more opportunities because it is a bigger city, a more liberal population that is more progressive-minded at least in terms of the various artistic communities that he would probably want to get involved with in some way and he would be closer to the hospital.

When I asked Mr. Hyde about his understanding of Mr. Hinckley's relationship with Ms. B, he answered, "it's very much like John's relationships." Mr. Hyde elaborated that Mr. Hinckley has "a limited pool of resources to draw from" and that he had met Ms. B in the treatment mall when

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 60 of 80

it was in CT-8. He continued that Mr. Hinckley sees himself as a protector with women who have a mental illness and this often comes up in his music where he is the protector, and his music is sometimes a "snapshot of the hero's journey where the hero meets the ideal woman and he falls madly in love and wants to do anything and everything for her – that's a lot of what you see in John's music – is that stage of that journey." Mr. Hyde went on to say that he gets involved with these women and they become the angelic figure in his life. There is also an element of John feeling he can provide some form of stability and that's especially evident with Ms. E     Mr. Hyde described Ms. B.     as sometimes being very "dynamic", and said that he has worked with Ms. B:     for a number of years so he knew her even before she met John. I asked Mr. Hyde his understanding regarding Mrs. Hinckley's issues with Ms. B:    · and he responded that initially John was very resistant to the his mother's reasoning and had the hope that there would be "an idyllic Thanksgiving dinner" in Williamsburg that would include Ms. B:     , and his mother was adamant about that not happening. Further, John saw that as a setback and thought part of it was somewhat racial and they were not being understanding of who she was or how she acted. Mr. Hyde said that he thought John realized pretty quickly that his mom was right after he had seen Ms. B     have some breaks and get sick. ·

I shared with Mr. Hyde that my impressions that the rescue component and concept of ideal love have been long standing as parts of Mr. Hinckley's personality and even part of the original crimes. He agreed that he sees parallels in Mr. Hinckley's music but he also is heartened by more realistic discussions by Mr. Hinckley regarding his relationship with Ms. B     He added that he hopes Mr. Hinckley can contain some of the rescue and ideal love issues in his music and in his art. We discussed further Mr. Hinckley's music and the songs that have themes of freedom, others that have themes of love or even ideal love, and I questioned Mr. Hyde on how the songs end because historically there have been different relationship endings, one very tragically 30 years ago, and he responded that the songs tend to end as "hopeful," which he opined is a positive change.

*Mrs. JoAnn Hinckley*
On 8/22/11 I interviewed Mrs. JoAnn Hinckley at her home in Williamsburg, Virginia. We discussed a number of changes that have occurred since I last saw her in 2008 including the death of her husband and how things were before and during that time and how life has been for her since then. She is still very active, her health is good, and although her social circle has decreased in that some people have moved away and others have passed on, she continues to actively live her life in Williamsburg.

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 61 of 80

We discussed John's visits and that there have not been any problems with any of them. She added that she is so proud of John, that he helps her, everything has gone very well, and she is hopeful that the court will approve the recommendation and John will be able to come and live with her. She said that every trip he has made there has been "absolutely problem free" but that the 2-1/2 hour drive to and from Washington has been sometimes taxing and she has now engaged a driver to drive her up and when Scott or Diane are in town they typically take John back to the hospital. She reported on the visits and that the current conditional release plan allows him to be unaccompanied in the            Development as well as unaccompanied for three hours at a time in Williamsburg and that she must drive him but those visits have also gone very well. She reported on the change in Dr. G-G's employment and that they have set up appointments for John to see her in Williamsburg on Saturdays and that has worked out well. She referred to the Colonial Psychiatric Institute as the new component of the current recommendation, but she said she doesn't know a lot about what their role will be or how they will be involved with John's care so she didn't feel that was something she could talk much about. In our discussion, we talked about John having brought a cat down on at least one occasion and that that was fine for the time John was there but the cat had to go back with him and that she is not at all interested in having a cat living at her home so that simply is not going to happen.

Mrs. Hinckley and I also talked about John's relationship with C        B        and that she had twice met Ms. B       briefly when she (Mrs. Hinckley) was at the hospital. She described her understanding that John cares for Ms. B        and that over time she doesn't know if the love has gone but it was clear it was not going to work out for her to come to Williamsburg. I asked if she had any knowledge of there being a concern that her not wanting Ms. B       to come to Williamsburg had to do with race. She said she didn't know anything about that and that it had to do with Ms. B      's mental illness and what could happen if she had problems in Williamsburg. She said that Ms. B       not coming to Williamsburg is something that John realizes. Mrs. Hinckley described Ms. B       as a "lovely, lovely person" and she was just sad that Ms. B       has the illness and doesn't have a family to support her. I asked Mrs. Hinckley if Ms. B       had ever gotten into her car, and she said, "one time" she believes. Mrs. Hinckley reported she has never seen Ms. B        when she wasn't stable.

Mrs. Hinckley reported her impression that "John is helping" Mrs. B        that he's a very helping person and that he had helped Leslie Deveaux before and even Ms. Deveaux has said that "without John's help she doesn't know if she could have survived." I asked Mrs. Hinckley if she thought that John's relationship with Ms. B        was more serious and included engagement, and she replied that she had never heard the word engagement and said that he truly cares for Ms. B        and wants to be a companion or just to be helpful. Mrs. Hinckley said that

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 62 of 80

Ms. B    calls "too much" and that Ms. B    knows she is not too happy about her calling so
frequently when John is home on his visits. She went on to say that she guesses Ms. B    must
be very much in love with John or in need of someone and that may be why she calls so much.

In response to my question about whether or not Ms. B    might come to Williamsburg and
stay in a hotel, Mrs. Hinckley replied that if she did that she would let the hospital know and
follow the hospital's advice but Ms. B    "would not ever stay" in her home.

We also talked about John and Diane's visit to the singles meeting some years ago and the
potluck dinner, and Mrs. Hinckley recounted her memory that one of the women there was so
shocked and was not comfortable, so John and Diane left, and it was very hurtful to them both.

When I asked Mrs. Hinckley her feelings about John coming to Williamsburg and/or his going
out on various outings in D.C. with staff, and she replied, "whatever works out best for him."
She continued, "I am just open to anything that's best for him." We also talked about Johns job
at Eastern State Hospital and she said that he likes that job and they like him, and she is very
proud of him working.

We discussed the 30 year anniversary of the shooting, and Mrs. Hinckley said she had seen news
reports about it but she really didn't understand why 30 years is such a big year. I continued by
asking if she had any concerns about the media given the way the media has covered hearings in
the past, and she replied, "I don't look forward to going through it, but I will get through it and
there's my friends, and my friends here are very sympathetic and helpful and, of course, my
children, Scott and Diane and their families are very supportive and helpful."

I asked Mrs. Hinckley how her health is these days, and she responded, "you know, I'm doing
okay" and she added, "you know my age group, my friends, I think I do a little better than they
do" and she chuckled. I asked about her golfing since that has been a hobby and she said she
hasn't really played golf much this year because of the golfers being a little upset with golf
course management, and her favorite foursome has been having their problems too and they've
had a hard time getting together, as well as rain and the weather. She added, however, that golf
is still her love. Toward the end of the interview, Mrs. Hinckley asked about Mr. Henneberry
and how he is doing, and I told her that he's doing well. She said she was surprised that he had
left the hospital, but she was surprised that all of us had left. It was clear from our interview that
Mrs. Hinckley has no reservations about the recommendations, and is hopeful the court will
approve the recommendations as the hospital has written them.

*Carl Beffa, MSW*

On 8/22/11, I interviewed Mr. Carl Beffa at his office in Williamsburg, Virginia. Mr. Beffa is the individual therapist and case manager for John Hinckley. I asked Mr. Beffa to tell me how things have been over the last three years since the last court hearing and his views on the hospital's recommendation. Mr. Beffa reported that he believes Mr. Hinckley is doing very well and in the three years he has been seeing him, he has progressed in a way that he is "delighted to see." He said that when he first came on to the case, he was concerned about the amount of initiative Mr. Hinckley showed and his sense of entitlement that "someone else would do it for him," but he has seen improvement in that area and also in the area dealing with women. He continued that there have been a couple of opportunities in the last three years in Williamsburg, and when the women didn't show interest Mr. Hinckley just backed off and his basic attitude was "you don't want to have anything to do with me, I'm not gonna beg you and that's okay." Mr. Beffa said that one of those people was a neighbor who moved in next door to John's mother's house in          and he very quickly after three attempts at trying to start up a conversation recognized that she was interested in being a friendly neighbor but nothing further. Mr. Beffa said that Mr. Hinckley respected those boundaries and didn't get pushy or anything of that nature and he was delighted to see that. Mr. Beffa then described his efforts to try to get Mr. Hinckley involved in a singles group that he thought might have been before the last hearing but he thought was probably since the last hearing where Mr. Hinckley went with his sister and they were both "sorely rejected." When I asked what he thought went wrong with that, Mr. Beffa replied, "I take partial responsibility because I thought he was functioning on a fairly good level and it was supposed to be a supportive group." He added, "well, as I'm finding more and more, the support quickly evaporates when they hear who he is."

Mr. Beffa then offered that about two months ago he made an inquiry at '          ', a warehouse operation that he thought would be an ideal place for John even at minimum wage, and he talked to the second in command and once the man realized it was John Hinckley, he said 'oh, that's the man who shot President Reagan and no way' and did not want to talk with him any further. Mr. Beffa then returned to the incident at the singles group and said that although there is no leader and it is sort of a self run self help group and he had talked to "two of the women on the phone who didn't seem very excited but didn't seem rejecting," he thought it would be okay. He then added, "come to think of it, I probably should have gone with him" but since his sister was in town he felt that would be a nice thing for them to do. Mr. Beffa said he has learned from that and that John took it well, and he was surprised at how well John took it in that he himself would have been a little angry about the situation. Mr. Beffa added that John was "a little angry and felt rejected but he didn't get all upset about it." Mr. Beffa then talked about the trip to the Unitarian Church and he thought that was going to be a good outlet for John. He transported John to one of the services and when they left John's first comment was, "there was

no talk about Jesus" and that John was quite disappointed about that. He cited another reason for the disapointment there was that the pastor                was not there, which he didn't know ahead of time, and the two guest Lesbian pastors conducted the service, and John asked if everyone there was gay even though Mr. Beffa had introduced him to several people in the lobby ahead of time. John indicated he did not want to return to that church.

There is also a feral cat rescue operation that Mr. Beffa approached about John possibly volunteering, and the feedback he got was that there were members of the board who were concerned that some of their volunteers might be a little wary around John and they didn't want to lose any of their volunteers. So the feedback was "let's leave it open down the road but right now no." Mr. Beffa also mentioned that this particular volunteer organization for feral cats was associated with I        .. and that the manager at I        . said he would welcome John, all he had to do was put in an application when he is available to work, and the fall would be a very good time. Mr. Beffa also offered that there are two volunteer rescue cat organizations that operate in        , but he has not been in touch with those organizations because John might not be able to get there.

When I asked Mr. Beffa if during his discussions with St. Elizabeths' staff the possibility of placement in D.C. has been discussed, and he responded that it is his understanding that "the judge or somebody thinks that D.C. would be too close to government officials," and that is the only recollection he has about it.

I then began a discussion about the Recommendation, particularly the increased amount of time Mr. Hinckley would spend unsupervised, and I asked what kinds of activities Mr. Beffa envisions John will do. Mr. Beffa said he believes both the case management and individual therapy are going well, and during his case management activities he was taking John out driving when he was practicing and they also talked while he was driving. I asked Mr. Beffa if he thought John was doing much driving while he was in Williamsburg, and he responded, "no, not really because he can't he has to have his mom with him." I then clarified that I meant actually driving himself with his mother in the car, and he responded, "oh, he does all the driving when he's here. Mom's the passenger." He went on to say he asked how 'mom' is with that, and John told him that "sometimes she's a little anxious and she holds onto the thing but tells him that he's a very good driver and she feels very safe with him." He added that's the feedback he gets, and added that she's also said that too when he talked with her.

Mr. Beffa said that it is his understanding from reading the hospital's Recommendation with regard to housing for Mr. Hinckley that if his mother were to become incapacitated or unavailable the plan would be independent living in an apartment run by the mental health center

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 65 of 80

in Williamsburg or an apartment that he rents. Mr. Beffa stated he believes John could do that because he talks about cooking at home and his mother talks about him cooking as well. He added that the mental health center, i.e, People's Place, could teach him things like that but certainly he would be one of the highest functioning people at People's Place.

I asked Mr. Beffa specifically what kinds of groups Colonial Behavioral Health offers, and he responded that he wasn't sure if they offered therapy groups. He knows they have drug and alcohol groups but he didn't discuss any other types of groups any further at the mental health center. Mr. Beffa said that he himself has two "support and growth groups," one at lunchtime and one in the evening, and John would be good for one of those groups, and he thinks that would be another possible therapy activity or social outlet for him.

We discussed the 30th anniversary of the shooting and whether he and John had talked about it. He said that he told John he had seen the articles and John's response was "well, what can you do" and he was very accepting about it.

We talked about John's relationships with women and talked a bit about C      . Mr. Beffa said he knew that C:      still had one of John's best guitars and that she kept saying she would return it but hadn't and that John was minimally upset about that as he really wants it but at the same time saying "what can I do if she won't bring it." Mr. Beffa went on to say he believed that when the relationship with C      was ending, the one with Ms. B      was beginning.

With regard to Ms. B      , I asked Mr. Beffa if Mr. Hinckley had ever said anything to him about possibly being engaged or getting married, and he answered that Mr. Hinckley had told him that Ms. B      wanted to be engaged and that was her wish but "there was no intent whatsoever on his part of that ever happening." I then said to Mr. Beffa that at this point Ms. B      does visit John every day or just about every day when he is in Washington and they have phone calls every day when he's in Williamsburg, and that would stop if he were here for extended periods of time. I asked how he thought Mr. Hinckley would deal with that as a loss issue. Mr. Beffa answered that he thought Mr. Hinckley would probably continue calling daily like most people who have an abandonment or loss and "would only do that to ameliorate until he found an interest here." He continued that in dealing with the loss, "I really don't think he would see it as a great loss and he would have the availability of the telephone." When Mr. Beffa talks with John about Ms. B      , John has told him that "there are times when she makes sense and they can have a decent conversation and other times when she can't." Mr. Beffa said, "they're company for each other and do an activity or whatever they do there." He added that he believes Mr. Hinckley "really does have care and concern for Ms. B      as a person and wants the best for her to work out" but he doesn't really see a true love relationship. I then asked if he thought

they were intimate or had a sexual relationship, and he replied, "you know, I've never asked him about that, if they have been intimate there." Mr. Beffa then said that on some level he assumed that since Mr. Hinckley had been intimate with other women they have a sexual relationship, but they haven't really talked about it.

I asked Mr. Beffa if he has met with Mr. Hinckley's brother and sister and he replied that he met them at court, and he's met with his brother once and emailed his sister. He added he also met his sister once in his office near the time of the court hearing, but nothing other than that. I asked if he thought they would remain a part of the short to intermediate plan, and he said "they always said they planned to come and visit whether mom's here or not."

Mr. Beffa said he has no reservations about the recommendation as written in terms of the 17 days and 24 days, but he hadn't read in detail the other parts of the recommendation. He concluded "John has really evolved in the three years he's been here on his own" and believes Mr. Hinckley should transition to Williamsburg. Mr. Beffa added that group therapy would be another important outlet for John but he wondered to himself why he hadn't thought of that before and mentioned it to the treatment team. He added that "if they have group therapy at Colonial Behavioral Health then that will be great" but if not he could provide group therapy. Mr. Beffa said that in running his groups he has several people who have come from individual therapy and he has told them that once you are accepted into the group and it's working then the individual therapy would meet once every two weeks/once per month and transition into group therapy; but in Johns case it might need to be both.

*Colonial Behavioral Health*
On 8/22/11, I met with Mr. David Coe, Chief Executive Officer of Colonial Behavioral Health, Mr. John Brumfield, Community Support Coordinator, and Ms. Liz Howard, Community Integration Coordinator. I explained the nature and purpose of my meeting with them to discuss Colonial Behavioral Health and their involvement/role/participation in the St. Elizabeths Hospital's recommendation for John Hinckley to transition to Williamsburg for mental health services. We discussed some background information of both myself and their organization as well as the process of the court hearings and the reason I was taping, with their permission, the interview as well as asking the questions I was asking. The overview of their program indicates they offer a full array of mental health services, including psychiatric services, case management services, and the Day Program at Peoples Place, which were the primary focus of our discussion given the hospital's recommendation. They described People's Place as a modified Fountain House, club house model that includes a day program and residential support services. Mr. Coe explained what has been discussed regarding Mr. Hinckley has been primarily two services,

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 67 of 80

some work at People's Place in their psychosocial program, and the possible provision of case management if Mr. Hinckley is going to spend the majority of his time in Williamsburg. He continued that if at some future date Mr. Hinckley has been discharged with more available time, there are potentially other services that might be available at that time but currently the two tangible services are the psychosocial day program and possibly case management provided he is in Williamsburg more time than in Washington. Mr. Coe offered that he and his staff have not seen the plan but they have met with Kevin Shamblee, who came down from the hospital to talk about their services. They have no other documents or information regarding Mr. Hinckley specifically other than an application.

Mr. Coe elaborated that the objective of the program is to maintain independent living, not simply to attain it. Mr. Brumfield explained that the People's Place program is a psychosocial program where members arrive about 8:30 and leave any time between 2:30 and 3:45. The program is structured as a clubhouse and has a clerical unit, kitchen unit, a volunteer placement where they travel twice each week to the local humane society, and pre-vocational activities. They currently have two members who are NGRI status and they don't extend outings with members to the NGRI guests, which Mr. Hinckley would be. Their program is focused on keeping NGRI guests in the program a couple of days each week and demonstrating appropriate behavior. There are a variety of different groups including communication groups, intro to Spanish group, coupon cutting groups, symptoms management group, recovery group, rap group, and others, and some may be three months or six months as well as others that are year round. Mr. Brumfield asserted that all members have in common some type of mental health diagnoses but they serve a wide range of functional levels from individuals with intellectual deficits to other individuals who are high functioniong.

I asked whether or not the hospital, Mr. Beffa, or Dr. G-G had spoken with them about individual recovery plans and whether there are any core groups of services discussed specifically for Mr. Hinckley, and they responded that there has not been that kind of discussion with anyone. In terms of funding, Mr. Coe informed me that Mr. Hinckley does not qualify for Virginia Medicaid because he has not established residency and therefore they have talked with Mr. Shamblee about the need for the family to pay the cost for the services, and it is Mr. Coe's understanding that the family is in agreement with that. He added that they have had no interaction with the family to this point. Mr. Coe stated that different staff have interviewed John Hinckley twice to see if they felt he would be appropriate for People's Place, and at this point they had agreed that he would be. Mr. Hinckley had a brief tour of People's Place with one of the other members and the response was favorable.

In response to my question whether or not the Colonial Behavioral Health administration thought there were any particular concerns or issues with regard to Mr. Hinckley's participation in the program, Mr. Coe responded there were none specific to Mr. Hinckley in terms of him. They were aware that there may be some response or reaction from some of their members or possibly their families when they learn that Mr. Hinckley will be a part of their program, but they did not anticipate that as being prohibitive of his participation. They were also aware that Mr. Hinckley was committed by federal court, and were hospitalization necessary at some point, he would return to St. Elizabeths rather than a hospital in Virginia unless there was some other arrangement or agreement. The administrative staff reported they have the support of their board and are moving forward with this process.

After my interview of the administrative staff of Colonial Behavioral Health, I was able to follow Mr. Coe and Mr. Brumfield over to People's Place , which is located in a warehouse district. It was toward the end of the day and there were only a few members left in the facility at the time of my arrival, however they were disengaging from activities and essentially leaving. I observed the physical plant which consists of a very large room that is the primary service area as well as a small kitchen off to the side, and a bulletin board with a chart of the group activities offered by People's Place on the various hours and days of the week that those groups are in operation. It appears to be a fairly typical day program set up with what appears to be adequate space for the purposes of a psychosocial day treatment program, based on the representations of Mr. Coe and his administrative staff.

### Debra Giorgi-Garnieri, J.D., M.D.

On 8/23/11, I met with Debra Giorgi-Guarnieri (Dr. G-G) in her office in Portsmouth County, Virginia to discuss her role as Mr. Hinckley's treating psychiatrist and treatment as well as her thoughts about the hospital's recommendation. Dr. G-G reported that she started with a new company on 8/1/11 and has been in this new building since 8/8/11. Dr. G-G stated that she last saw Mr. Hinckley in her office in Williamsburg on 7/25/11 prior to her relocation; however, prior to that the outpatient providers (she and Mr. Beffa) had discussions with the St. Elizabeths' treatment team regarding the recommendation and the overall plan is for Mr. Hinckley to spend more time in Williamsburg and to transition to Williamsburg for his mental health care. She said the goal would be to "literally flip the treatment plan" so that he would spend the time in the community that he was spending in the hospital and the time he was spending in the hospital would be spent in the community. She discussed the process of the plan of going from 10 to 17 days and then the flip, which would be spending 10 days in the hospital rather than 10 days in the community. This time frame is slightly different from the written recommendation but the goal, as per Dr. G-G, would be to progress to the 24 days in Williamsburg and then ten days at the

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 69 of 80

hospital and 24 in Williamsburg, and that sequence would continue through to the time for convalescent leave.

The plan would be for John to continue to see Dr. G-G in the same building on Jamestown Road where he initially saw her but that building is now owned by Colonial Psychiatric Associates. Her plan is to see John in that building on Saturday mornings until the court orders that he may be able to see her in Portsmouth County or she will continue to see him in Williamsburg. The plan will be to see him at least once per month over time, but initially to see him more often during the early months of the transition. Dr. G-G's impression was that Mr. Beffa would continue to be Mr. Hinckley's case manager but she thought he also might have someone at Colonial Behavioral Health, which is the mental health center. People's Place has a psychosocial day program available to Virginia NGRI's that is similar to the St. Elizabeths' treatment mall and for outpatient services. Dr. G-G's impression is that John will be able to travel within a 55 mile radius even though she acknowledged that there had been discussion of 45, 50 and 55 miles, but was fairly certain it wasn't as little as 30 miles, and whatever activities he participates in will be according to the court's order. Dr. G-G stated that a part of her concern is that Mr. Hinckley would not be in the government building part of Richmond because it would be a difficult place to be confronted and when they measured the distance, that part of Richmond was not within the 55 mile radius. She added that she doesn't think John would do anything to cause a confrontation, but is concerned about other people.

Dr. G-G said that she and John have talked about the issue of being confronted by other people many times and it is a concern of hers and his. She continued that the one time he went to a singles group in a church in Williamsburg he didn't appreciate the way he was treated because the minute he said his name they wanted him to leave the group. She said John asked her why she didn't want him near the government buildings and she replied that "Richmond is a very political place and they have students and protests and the whole thing and it would be much more difficult if he were recognized in Richmond than if he were in Williamsburg. Williamsburg may be more conservative, but they'd be more inclined to tell you how they feel than do anything." She said that John replied he certainly could appreciate that because he wants to find friends in the community and he doesn't want to draw negative attention.

When I asked Dr. G-G how she envisioned Mr. Hinckley utilizing his time given the expanded number of days, she replied, groups, his interest in art and music, and for example interest groups in Williamsburg that are social groups of people who go on mountain climbs, bike riding and others for people who like music and other activities. Dr. G-G said there are "older music groups" in Williamsburg and some that play colonial musical instruments and John is interested in trying to integrate into the community through some of those. Her expectation is that he

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 70 of 80

would work, attend groups, and hopefully would have some social activities as well. A full-time job is an expectation for the future and his family wants him to work full time but that could not happen in the beginning because he would need to go to People's Place during usual work hours and see Mr. Beffa and Dr. G-G. Dr. G-G offered that him feeling supported and welcome is very important to his stability, and she and Mr. Hinckley have discussed how strongly she feels about that and she has also discussed that with Mrs. Hinckley. In terms of housing, Dr. G-G stated that she had "a more solid read of that six months ago," but now she is not as sure. When asked what she meant, she continued that six months ago in talking with John he said that if something were to happen with Mrs. Hinckley he would stay in the condo, meaning the family residence, but now Dr. G-G is not sure that is the plan. She went on to say that the reality of it is that if John doesn't integrate well into the community in Williamsburg, and that if Mrs. Hinckley passes away they would have to rethink the whole idea of John living in Williamsburg. Dr. G-G continued that she has discussed that with John as well as with Mrs. Hinckley but she has not had a chance to discuss it with his brother and sister. Dr. G-G understands Mrs. Hinckley's health to be fine and that she is a wonderful support for John.

With regard to C        B        , Dr. G-G offered that Mrs. Hinckley does not want to have two people who are mentally ill in her home, and his girlfriend will not be visiting him in Williamsburg as long as he is in the hospital. I told Dr. G-G my understanding that Mr. Hinckley's social interactions in Williamsburg are with his mother and siblings, but there is also someone down the hall at his job with whom he has had some social contact and he has also made an attempt to engage his mother's next door neighbor. She said that was correct, and added that she thought he had taken music lessons from someone at some point and may still be doing that but she has explored that if he is in Williamsburg for longer periods what does he want to do. Dr. G-G elaborated that at each of her appointments with Mr. Hinckley, they go through a list of all the women he is involved with including the neighbor, the other employee at his job and his supervisor are all just friends. The women who have been more than friends are C        . and C        at the hospital. She added that she keeps both the next door neighbor and the employee at the library in the group of women that she needs to keep tabs on because John has expressed an interest in those two women in addition to those in D.C.

Dr. G-G then said that in the "class of just support friends, there is no one." Dr. G-G asserted that she and Mr. Beffa are the only two people who Mr. Hinckley sees in Williamsburg for regular appointments and, of course, those are not social. She added that she has heard less and less about C        and more and more about C        over the holidays and John wished before that that C        could come and visit, which his mother objected to vigorously. Dr. G-G said she has heard less about C        recently because John has said that she will not be visiting in the near future because his mother does not want her to come. She continued that John has said

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 71 of 80

that if getting out of the hospital means not seeing C.        , then he is interested in getting out of
the hospital. She also said the impact of not seeing C.       , i.e. the los of that depends on how
much he has integrated into the Williamsburg community, and if he does not have friends or
activities, it will make it more difficult because being with C.       is very much a part of the
things he looks forward to doing.

Dr. G-G said more about Williamsburg and her concerns about whether or not John will actually
like it in Williamsburg because it is a "slightly reserved community," and she has other patients
without John's history who have difficulty finding people to date. Dr. G-G said she has friends
in Williamsburg or has known people in Williamsburg who have lived there all their lives and
only had two or three friends. Dr. G-G stated very frankly that she is concerned about John's
level of integration within the community not only from his history of difficulties and isolation
as well as his difficulties in relationships with women but also from the Williamsburg
community aspects as it being reserved and there not being a great deal of social activities
available. There are some activities and there are efforts being made to integrate him into the
People's Place process as well as efforts by Mr. Beffa as his case manager to identify potential
activities and outlets for Mr. Hinckley.

With regard to the 30th anniversary of the shooting, Dr. G-G stated that she knew from some of
her staff that there was media coverage and something on TV, but she's talked with John about it
who said he did not watch any of it and was not involved in paying a lot of attention to what was
going on.

We talked about John's activities in Williamsburg, and I suggested he goes to the outlet malls
but Dr. G-G corrected me and said he goes to           , which is in a different area where he
goes to the movies and shopping, but that is the extent of his social activities. She stated he also
goes to          , which is in a strip mall that is not a part of          . Dr. G-G further stated
that in her discussions with Mr. Hinckley he has gone into various places and people look at him
straight in the eye and don't recognize him, however, if he were to go to colonial Williamsburg it
would be simply a question of whether somebody did or did not recognize him but that might be
another local area for him to explore.

Dr. G-G told me that Mr. Hinckley asked her if he could give her a painting that she could hang
in her office, and she declined. Mr. Hinckley had observed that she had a photograph taken by
another patient hanging in her office and wanted to know why if she could hang another patient's
work she couldn't hang his, and she said she replied bluntly to him, "because you shot the
President." She said Mr. Hinckley then said, "but that was years ago" and she replied, "but it
didn't change." She went on to explain to him that if everyone knows you come to this office by

his signature on a painting, it's no longer private. She said that he understood that and said he accepted it, but on his last visit he gave a painting to Sandy, his library supervisor and the other employee, C____. He reported to Dr. G-G that his treatment team knew that he was going to give the painting to Sandy. I told Dr. G-G that Mr. Hinckley has traditionally given his paintings or his music to various women, and asked if he has offered her any music and she answered, "no." Dr. G-G reported she has been seeing Mr. Hinckley for over a year beginning in approximately July 2010.

Dr. G-G reported she does not have any concerns about the recommendation other than those already mentioned, but has greater concerns about Mr. Hinckley's integration into Williamsburg and the timeliness of implementation of the plan, and, of course, the issues related to his mother and her availability as well as the availability of housing for him by extension. The activities at People's Place are a major step forward as well as continuing his volunteer work at Eastern State Hospital, and efforts by Mr. Beffa and Mr. Hinckley himself to find social and other activities to increase his integration into the Williamsburg community are necessary and ongoing. Dr. G-G told me the particular areas that he covers at each session including his progress in the hospital, his progress outside of the hospital, the conditional release plan, his relationships and the status of those relationships, and what he plans to do on the visit. She says these have been consistently documented and provided me with a copy of her notes since she has been seeing Mr. Hinckley from 10/14/10 through 7/25/11 for a total of seven sessions..

*Sandy Kochesperger*
On 8/23/11 I interviewed Sandy Kochesperger at the Eastern State Hospital library in Williamsburg, Virginia. Ms. Kochesperger is Mr. Hinckley's supervisor at his volunteer job at th Eastern State Hospital library. I asked Ms. Kochesperger as Mr. Hinckley's immediate supervisor how things have been in terms of Mr. Hinckley's volunteer services at the library, and she replied, "things have been quite fine." She said she has had no problems with Mr. Hinckley, he shows up on time, works hard, and gets everything accomplished that she gives him to do. She said that as she recalls he has been working about a year and a half at the library and he reports to work for four hours twice per week. His duties including shelving, photocopying articles, getting journals ready for the bindery, sometimes he uses docline, and basically all the things she does not have time to do. I commented that I had spoken with Mr. Hinckley's supervisor at St. Elizabeths and that there appears to be a line of communication between that library and this one, and Ms. Kochesperger confirmed that and complimented the St. Elizabeths' librarian saying that "she trained him well." I asked whether there are any plans to expand his duties or hours, and she said 'no' because she can't use him any more in the

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 73 of 80

library, so not that she knows of but the head of volunteer services would know better about other opportunities.

I asked if there had been any issues or concerns with regard to Mr. Hinckley's interactions with other people, and she said "generally no except there was one little incident a couple months ago when he approached one of the girls in .    .. He didn't do anything he shouldn't have been doing, he was just friendly and talking and it made her a little uncomfortable, and the last time he spoke with her, he asked for her phone number and she said 'no, I think not.'" Ms. Kochesperger continued that this woman is married and wears a "big one" (ring) on her finger. She added Mr. Hinckley never says anything inappropriate and only asks how people are doing on any particular day. She said she told Kevin Shamblee about Mr. Hinckley asking the other employee for her phone number. I then asked if she knew whether Mr. Hinckley had given the employee a painting, and she replied, "yes, he did but he gave me a painting too." She said that occurred about two months ago and she took the painting home. The other employee has the painting he gave her hanging in her office.

Ms. Kochesperger showed me where Mr. Hinckley's work station is located, which is very close to hers, and said that when he uses the computer it is very near hers. She reported she has no concerns about his use of the computer and that he does not have an email address or any way to do searches on the computer.

### Conclusions and Recommendations

While it may appear that the hospital's Recommendation has more specificity and detail than previous recommendations and therefore addresses many of my concerns with past recommendations, in my opinion the specificity and detail have to do with the number of days and the number of visits for Mr. Hinckley to complete prior to moving to less restriction and less monitoring. The details focus mainly on Mr. Hinckley being involved with treatment providers in Williamsburg, namely Dr. Giorgi-Guarnieri, Mr. Beffa, and Colonial Behavioral Health, and increasing his volunteer hours at Eastern State Hospital, and also the addition of other volunteer or vocational activities. There are also references to the possibility of him being involved in art and music activities, although these have not been secured. The monitoring component, however, would actually decrease markedly with Mr. Hinckley being required to see Dr. G-G and Mr. Beffa on a weekly basis for the first two visits, but after that he would see Dr. G-G once per visit and subsequently at her discretion, and see Mr. Beffa on a weekly basis for individual therapy while the frequency of case management activities would become increasingly at Mr. Beffa's discretion. Although it has been suggested that there are particular groups that Mr.

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 74 of 80

Hinckley can participation in at Colonial Behavioral Health on a two/three day per week schedule, my greatest concern is the lack of monitoring for the increases in Mr. Hinckley's unsupervised unaccompanied activities, including driving which gives him a much greater range for activities, and the decreasing involvement of the hospital to include the OPDCO on a monthly basis with participation of a member of the inpatient treatment team. This Recommendation essentially provides for less written information to the Court while these activities expand.

It appears that the basic premise is that Mr. Hinckley has not demonstrated overt dangerousness to himself or others during the past visits, and the risk factors are managed, he follows the itineraries and rules, and expansion would be clinically indicated. There appear to be some discrepancies relative to the Secret Service surveillance of Mr. Hinckley not attending activities on his itinerary while unaccompanied, including movies, and not revealing or lying about this to his treatment team, his treaters in Williamsburg, his family, and me. In addition, he denies any interest in some of the themes that have been problematic in the past including Ronald Reagan, and presidential assassins, but according to surveillance he did show an inordinate interest in books on these topics. Indeed, when he did not attend movies as his itinerary stated, he spent that time in Barnes and Noble surveying books on such topics. He did not purchase these books but appeared to be interested in them, which he denies on interview. He also reports to the hospital and Williamsburg treaters that he is driving with his mother in the car "all" or "most" of the time, again in contrast to the Secret Service surveillance reports.

Mr. Hinckley reported during the examination process that his interest in a former dental student was based on her having worked on his teeth and inviting him to Google her picture and information. The dental student denies this invitation but acknowledges that she invited him as one of her former patients to attend her graduation. While the treatment team restricted Mr. Hinckley for one week to the unit, when queried about their impressions of these two very different representations, it was described as ambiguous or unclear as to who may be telling the truth and explanations were offered as to why the dental student may be lying. Whichever it may be, Mr. Hinckley did not offer that he had searched on the internet Ms. C        G        during on that same day, which had been discovered by his library supervisor at St. Elizabeths Hospital. This appears to have been an overt omission by Mr. Hinckley as he did not inform his treatment team of either activity but they were discovered through monitoring by his library supervisor. His use of a computer for these activities is a violation of the intended use of computers. In my opinion, this is another example of Mr. Hinckley not being forthcoming, as he did not report this information, and deceptive as he, when confronted with it, gave an explanation that was inconsistent with the dental student's and did not include the full range of his activities on the

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 75 of 80

internet. Mr. Shamblee and Dr. Adewale clearly stated he should not have been doing a computer search on anyone.

The Secret Service surveillance of the St. Elizabeths Hospital computer that Mr. Hinckley and others use also revealed a number of concerns regarding the key strokes utilized on that computer, which could not be tied directly to Mr. Hinckley at the time of this report and which Mr. Hinckley denied, but based on that list at least raises questions that seem not to have been taken as potential increases in his risk factors by the hospital treatment team. At least some of the names on the list were searched by another employee.

Based on my interviews with Dr. G-G, it is my opinion that she is a well-qualified forensic psychiatrist and is certainly capable of providing psychiatric services to Mr. Hinckley, but her role in this process would be a secondary one, primarily psychiatric assessment and medication management, and with decreasing interactions with him. Mr. Beffa's role will be more primary with weekly individual therapy, however the case management activities may be reduced over time at his discretion. Many of the objectives identified in the hospital's Recommendation for increased socialization and exploration of particular activities were the same objectives presented in 2008 in support of expansion of privileges at that time. Unfortunately, very few of such activities have actually been realized.

While the difficulty of scheduling activities for Mr. Hinckley when he has been in Williamsburg for only ten days each visit is professed by the hospital as the problem with securing social and volunteer activities, there is also acknowledgment that there has been a lack of acceptance of Mr. Hinckley at several of the vocational/volunteer activity locations pursued. However, the socialization activities that were proffered as reasons to increase Mr. Hinckley's time in Williamsburg at the time of the 2008 hearings have not been actively pursued with the exceptions of attempts to see if he might be accepted for involvement in an art studio and cat rescue organization, and efforts by his music therapist at St. Elizabeths Hospital to possibly identify and secure a music therapist in Williamsburg which at the time of this report has not been confirmed. The only social activity offered since 2009 was that Mr. Hinckley attend a Unitarian Church which he did not return to because he did not like the activities and that his mother also did not support because she disagreed with this activity for her son. Other than that, despite the time period of two years and the 16 visits at the time of this report, the case management process in Williamsburg has not demonstrated prior research and/or obtained approval for any other socialization activities. There have been statements made by Mr. Hinckley, his mother, and his treaters in Williamsburg that there are not a lot of social activities for his peer/age group in Williamsburg, and yet a major part of the Recommendation has to do with him having more time and less monitoring to increase his socialization activities. His

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 76 of 80

participation at Colonial Behavioral Health is anticipated to be two or three days per week in limited group activities. This may be similar to the Therapeutic Living Center (Treatment Mall) at St. Elizabeths Hospital, but based on my onsite visit it appears to be a much smaller program and it was unclear whether or not Mr. Hinckley would be able to participate in the full range of activities because of his status as a forensic patient.

The health status and availability of Mrs. Hinckley has been discussed by the treatment team and presented in several reports, and based on my review of those discussions, documents and my own interview with Mrs. Hinckley, she is currently doing well, but it is acknowledged that should she become incapacitated or unavailable, the St. Elizabeths Hospital treatment team and Williamsburg providers would then move to revisit Mr. Hinckley's overall placement in Williamsburg. Based on information in the documents regarding his brother and sister's plans should his mother be unavailable to him, it appears those plans include the pursuit of an apartment or assisted living opportunities via Colonial Behavioral Health but does not include Mr. Hinckley continuing to reside at his mother's residence if she is not there for whatever reasons. I have concerns that should Mrs. Hinckley become unavailable during the process of this proposed plan or after implementation of a full convalescent leave with minimal monitoring, Mr. Hinckley's reactions to the loss of his mother would be a substantial risk factor for him becoming depressed and isolated, both of which would increase his risk for decompensation and dangerousness to himself and potentially to others.

The hospital's plan relies heavily on adequate communication between itself and Williamsburg providers, his work supervisor, and others where he may secure volunteer/vocational activities, as well as Mr. Hinckley's self reports of his activities and/or visits from D.C. friends or visits by Mr. Hinckley to the homes of any persons in Williamsburg. In my opinion, there is an over reliance that Mr. Hinckley will indeed report such things, and there is no monitoring in place to ensure he will be reporting his activities accurately.

(Mr. Hinckley's relationships with women have clearly been identified as a risk factor by essentially all treaters and examiners who have been involved with him, and yet the status of his relationship with C      B·      is not able to be adequately assessed because Ms. B·      will not meet with the hospital treatment team or any of the evaluators. Mr. Hinckley has been inconsistent in his representations of his relationship with Ms. B1      in that he stated to me that they were never engaged, that they were engaged, he told his mother and brother at dinner that they were going to get married, and this is in contrast to his stating that she is a female friend and that once he transitions to Williamsburg he anticipates his personal contact with her will decrease over time. This is also in contrast to Mr. Hinckley spending time with Ms. B      almost daily, if not daily, when he is at St. Elizabeths Hospital and/talking with her every day when he is in

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 77 of 80

at his mother's residence in Williamsburg.  Mr. Hinckley does not agree with the treatment team or examiners that his relationships with women are a major risk factor.

Mr. Beffa made a point of emphasizing that he sees no evidence of any mental health pathology, either psychotic disorder, major depressive disorder, or "Axis II" pathology, in Mr. Hinckley, and emphasized the empathy that Mr. Hinckley has demonstrated towards Ms. B      .  However, Mr. Beffa reported he did not discuss with Mr. Hinckley his having an intimate and romantic sexual relationship with Ms. B ___ that continues at the hospital.  Mr. Hinckley's essentially may not have a female friend actively in his life if he is placed in Williamsburg which does not appear to be fully considered by Mr. Beffa for its impact on Mr. Hinckley.  Mr. Hinckley stated that he will continue his relationship with Ms. B     unless he finds someone in Williamsburg.  This is a pattern that Mr. Hinckley has demonstrated in terms of his romantic relationships in that he continues the relationship with a particular female friend until he develops another relationship with a different female friend, all in the service on Mr. Hinckley.

In my opinion to a reasonable degree of medical certainty, Mr. Hinckley continues to demonstrate perceptual distortions and poor judgment with regard to his coming in contact with women who show him any interest as likely leading to a love and romantic interest and when possible sexual interest.  Further, when confronted with reality of what some of these women have said to examiners, have said to him directly or demonstrated through their behavior (including mental illness), his initial reaction is to defend the relationships, deny that there is any problem with the relationship, and continue the relationship until there is some potential or clear negative impact on him.  This has occurred in the past and appears to be present currently with Ms. B     He also continues to have difficulty in his approach to women who do not show an interest in him as demonstrated with the employee at Eastern State Hospital with whom he started a verbal acquaintance/association in hopes it would develop into something more.  Mr. Hinckley stated that he did not realize the woman was married, however, my interview with his supervisor revealed that the woman in question wears wedding rings that were described as quite large and Mr. Hinckley appears to have ignored or "missed" that and/or decided he would pursue her anyway.  His pursuit of women who are already in a relationship has also occurred in the past and has continued with Mr. Hinckley's hopes that Ms. "G" will ultimately leave her boyfriend and they will have a romantic relationship.  When confronted with these situations, he retreats into statements that he simply wants to be friends.  These are important areas for exploration by his individual therapists; and, while it appears Dr. Binks has engaged in such exploration as has Mr. Hyde during music therapy, and inquiries about his relationships have been made by Dr. Giorgi-Guarnieri, these interactions appear to be minimized by Mr. Beffa, his individual therapist and case manager in Williamsburg.

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 78 of 80

Further, in my opinion to a reasonable degree of medical certainty, Mr. Hinckley continues to
demonstrate evidence of his Narcissistic Personality Disorder, and his Psychotic Disorder NOS
and Major Depressive Disorder appear to be in full sustained remission. In my opinion, his Axis
I diagnoses do not appear to be active because of and consistent with his treatment at St.
Elizabeths Hospital including not only medication management but his overall interactions,
therapies, and monitoring by the St. Elizabeths Hospital staff. However, his Narcissistic
Personality Disorder continues to be evidenced by his sense of entitlement, self absorption,
deflecting, minimizing, or externalizing responsibility for his actions, and guarding and/or denial
of his feelings, particularly when they include disappointment or rejection. He continues to
demonstrate impaired perception and judgment in relationships.

Mr. Hinckley has told me that it is his belief that the difficulties he has had in his relationships
with women are because of the scrutiny he has had to undergo when there have been
recommendations about changes in his mental health treatment and privileges. While it is true
that there may be unexpected interactions and scrutiny on the women he has been involved with
when recommendations and processes are underway, such scrutiny is because of the risk factors
involving Mr. Hinckley and his relationships with women in relation to his crimes. While Mr.
Hinckley acknowledges his "notoriety," he does not appear to recognize or appreciate that that
notoriety will bring focus and/or scrutiny on his relationships with women by his treaters and
evaluators. Dealing with such focus should be a part of his treatment process, which may
intensify during such matters as these hearings but should not be simply taken at Mr. Hinckley's
word for what is happening in his relationships by those who are responsible for his care and
management. Ms. B       's decision not to have any discussions with the treatment team, or
examiners such as Dr. Phillips, Dr. Montalbano, or me only increases concerns as to what their
relationship actually is and her and his expectations of how the relationship will be in the future.

Mr. Hinckley had great difficulty initially accepting his mother's and then his siblings' decisions
that Ms. B      was not welcome to visit with him in Williamsburg at his mother's home. Mrs.
Hinckley reported and her son and daughter also support that this is because of Ms. Br    's
mental condition and the possibility of decompensation, which would be a hardship on Mrs.
Hinckley. Upon first hearing that Ms. B      was not welcome, Mr. Hinckley informed treatment
team members that he believed this was based on race and possibly religion, and only after
experiencing an increase in Ms. B1    's symptoms of mental illness did Mr. Hinckley state his
acceptance that Ms. B      would be an inappropriate visitor to Williamsburg because "she"
might not be able to handle the stress of being there.

The hospital's recommendation and the violence risk assessment, again, make reference to Mr.
Hinckley not having demonstrated any dangerousness to himself or others. However, the risk

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 79 of 80

assessments and my own examinations of Mr. Hinckley raise concern for long range risk of harm, to himself, i.e., suicide. Although Mr. Hinckley has made no suicide attempt or expressed suicidal ideation since his hospitalization in the early 1980's, his suicide attempts were not foreseen by anyone at that time. His suicide attempt by overdosing on his medication at St. Elizabeths Hospital, albeit many, many years ago was because of his ability to successfully hoard his antidepressant medication and take it all at once in an overdose attempt. This occurred on a ward where he interacted with staff daily. The instant offenses, i.e., the shooting of President Reagan, James Brady, James Delahanty, and Timothy McCarthy in March 1981, was both an attempt at homicide as well as an expectation by Mr. Hinckley that he would be killed in the process (a form of suicide). To decrease Mr. Hinckley's monitoring in the step-wise fashion without review by the Court and examination of Mr. Hinckley by an independent examiner, in my opinion, is unwise from both clinical and public safety perspectives. I, therefore, cannot support the hospital's recommendations for this increase in time and activities in Williamsburg without there being external review at crucial times in the actual process.

Although the anticipated activities may be spelled out in more detail in the hospital's recommendation, the actual specifics are not. The expansion from 10 days to 17 days for Mr. Hinckley to engage in these activities as well as for him to have more social interactions and more autonomy in Williamsburg is a reasonable goal, however, for the past 16 visits his itineraries have been essentially identical with very few changes. The itineraries have included having time alone, spending time with his mother at her residence, 2 to 4 day visits by his brother and/or sister, meals with family in local restaurants, and unaccompanied time in the and Williamsburg communities in which he takes walks, goes to movies, and goes shopping. These activities have not appeared to have significantly changed over the visits and additional social activities as being pursued and vetted by Mr. Beffa appear to be minimal at best. The increase in time to 17 days may allow for some increase in structured therapeutic activities (i.e., People's Place and volunteer activities at Eastern State Hospital), but in my opinion, until there is a demonstration and evaluation of such an increase, it would be unwise and counter-therapeutic as well as leading to potential increase in risk to increase unsupervised time. Therefore, I am recommending that there be no more than the increase to the 17 days, if at all, for each visit for Mr. Hinckley for an extended period of time rather than a set 2 visits of 17 days and then expansion for an additional set of 6 visits of 24 days, and then at the hospital's and Williamsburg treaters' discretion, convalescent leave.

It is therefore my recommendation, if the Court determines to maintain the number of days Mr. Hinckley is in Williamsburg at 10 days or to increase the number of days to 17 days, that the first step of this plan begin with implementation of these five day per week activities, including his volunteer work at Eastern State Hospital, and his participation at People's Place, and for there to

Ms. Sarah Chasson, Esq.
Ms. Colleen Kennedy, Esq.
November 14, 2011
Re: John W. Hinckley, Jr.
Page 80 of 80

be an evaluation of the impact of the actual structured therapeutic activities that Mr. Hinckley is involved in, as well as the clinical meetings he has with Dr. Giorgi-Guarnieri on Saturdays and his meetings with Mr. Carl Beffa and participation in a psychotherapy group run by Mr. Beffa before any further increase in the number of days Mr. Hinckley is in Williamsburg.

It is my recommendation that the unsupervised time not be expanded beyond what is currently in place, which includes his unsupervised time in ]          . and unsupervised hours (3 hours) twice per week in the Williamsburg area. The unsupervised time may be limited to only, as he has demonstrated not using the unsupervised time in the community responsibly on two occasions and being dishonest or withholding about it to hospital staff, examiners, and his family. I would further recommend that there be no change in the requirement that proposed itineraries be submitted regarding how he intends to spend that time, and that if there is any deviation from those itineraries they be reported so that it may be considered by the treatment teams at both St. Elizabeths Hospital and in Williamsburg.

Lastly, if the Court grants Mr. Hinckley independent unsupervised driving privileges, he should be required to carry a telephone with GPS tracking capability, keep a log of his travels and that log should be submitted to the treatment teams at St. Elizabeths Hospital and in Williamsburg and for ultimate review by the Court. Further, it is my opinion that Mr. Hinckley has not utilized his time in social activities either by his own initiation or through the assistance of Mr. Beffa over the course of the visits to Williamsburg since the Court's order in 2009; therefore there should be more vigorous case management efforts along with Mr. Hinckley's own efforts to find socialization opportunities for him to attend as well as leisure activities such as having coffee at the Starbucks, attending a book club, recreational activities, or student activities at the local college, and if activities such as art or music groups can be located for his participation, that they be included in the socialization activities if they cannot be more formally included in structured treatment activities such as those he has at St. Elizabeths Hospital.

I hope this report has been informative and I will remain available for further participation in this matter as necessary.

Sincerely,

Raymond F. Patterson, M.D.

80