Paul Montalbano, Ph.D.
5328 29th Street, N.W.
Washington, D.C. 20015
202-364-3932

# PSYCHOLOGICAL RISK ASSESSMENT UPDATE

November 28, 2011

Barry Wm. Levine, Esquire
Dickstein, Shapiro, Morin and Oshinsky, LLP
1825 Eye Street, N.W.
Washington, D.C. 20006-5403

Re:   United States v. John W. Hinckley, Jr.
      Criminal Case No. 81-306(PLF)

## IDENTIFYING DATA:

John W. Hinckley, Jr. is a 56-year-old male currently residing on Nichols House-2B, at St. Elizabeths Hospital. Mr. Hinckley was admitted to JHP on June 21, 1982 after being adjudicated Not Guilty By Reason of Insanity on 12 counts of Attempted Murder, Possession of a Prohibited Weapon and Carrying a Pistol Without a License. He has been hospitalized at St. Elizabeths for over 29 years.

## REASON FOR REFERRAL:

Mr. Hinckley was referred for an updated risk assessment by his attorney, Barry Levine, in relation to his upcoming hearing now scheduled to begin on November 30, 2011. The treatment team has recommended an expansion of his current conditional release. This evaluation will update the risk assessment in light of new data as it relates to identified risk factors and comment on the proposed plan. Mr. Hinckley will be evaluated to address the relevant section of the D.C. Code, Section 24-501(e) governing his release, specifically whether "such person has recovered his sanity" and whether "such person will not in the reasonable future be dangerous to himself or others" under specified conditions.

## NON-CONFIDENTIALITY WARNING:

Prior to the evaluation, Mr. Hinckley was informed of the nature and purpose of the evaluation and that any information acquired during the assessment would be used to formulate an opinion regarding his dangerousness and specifically what level of risk to self or others exists if recommended for some form of an expanded conditional release. He understood this and agreed to proceed. Mr. Hinckley is well aware of the non-

confidentiality of what he discusses and that such information may become part of the public record and has been through this process multiple times.

## SOURCES OF INFORMATION:

*Court Documents and Legal Submissions*

1) Transcript of Hearing, United States v. John W. Hinckley Jr. in 2008
2) Opinion and Order by United States District Judge, Paul L. Friedman (6/16/09)
3) Order by United States District Judge, Paul L. Friedman (5/13/11)
4) Order by United States District Judge, Paul L. Friedman (6/29/11)
5) John W. Hinckley, Jr. and St. Elizabeths Hospital's Joint Motion for Interim Relief Pending Hospital's Request for Enlargement of Conditional Release (3/29/11)
6) Government's Opposition to St. Elizabeths Hospital's Request for Expanded Conditions of Release (9/30/11)
7) John W. Hinckley's Reply Memorandum in Support of Hospital's Request for Enlargement of Terms of Conditional Release (10/21/11)

*St. Elizabeths Hospital Records*

8) Letter to Court from St. Elizabeths Hospital Supporting Pending Motion to Continue Conditional Release (5//9/11)
9) Forensic Review Board Report (7/20/11)
10) Letter to Court from St. Elizabeths Hospital Recommending Expanded Conditional Release (7/29/11)
11) Violence Risk Assessment Update by Katherine Murphy, Psy.D. (8/31/11)
12) Psychological Test Data and Interview Notes by Dr. Murphy and Dr. Rafanello, including the PCL-R, MMPI-2, WASI, HCR-20 and VRAG
13) Proposed Scale of Severity of Unreliable Reporting by K Murphy, Psy.D.
14) Individual Therapy Progress Notes by Sidney Binks, Ph.D. (June 2008 to August 2011)
15) Music Therapy Progress Notes by V.J. Hyde, MT-BC (June 2008 to August 2011)
16) Song Lyrics by John W. Hinckley Jr.
17) Art Therapy Progress Notes by Deidre Cogan, ATR-BC, LPC, CCTP (June 2010 to August 2011)
18) Individualized Relapse Prevention Plan Feedback From Patient While On Conditional Release [completed by John W. Hinckley Jr.] (September 2008 to September 2011)
19) Individualized Relapse Prevention Plan Feedback From Responsible Persons Supervising Patient While On Conditional Release [completed by Mrs. Hinckley] (September 2008 to September 2011)

20) Individualized Relapse Prevention Plan Feedback From Responsible Persons Supervising Patient While On Conditional Release- [completed by Mr. Scott Hinckley]

21) Individualized Relapse Prevention Plan Feedback From Responsible Persons Supervising Patient While On Conditional Release- [completed by Ms. Diane Sims]

22) Letters to the Court from St. Elizabeths Hospital informing the Court of proposed outings and reviewing the outings (October 2008 to October 2011)

23) Interviews of John W. Hinckley Jr. and Responsible Persons Following Overnight Outings by Paul Montalbano, Ph.D. (September 2008 to March 2009)

24) Termination Interview of John W. Hinckley Jr. by Paul Montalbano, Ph.D. (4/9/09)

25) Review Board Report- Addendum to Review Board Report from May 2008 Regarding Volunteer Position by Nicole Rafanello, Ph.D. (10/3/08)

26) Review Board Report- Recommendation to Participate in Activities Allowed Under the Current July 2009 Conditional Release by Kevin Shamblee, LICSW (10/6/09)

*Williamsburg Provider Reports*

27) Letter to Barry Levine, Esq. and Nicole Rafanello, Ph.D. by Carl Beffa, MSW, BCD confirming records review (9/9/09)

28) Signed Acknowledgement of Psychotherapist and Case Management Responsibilities by Carl Beffa, MSW, BCD (9/14/09)

29) Individual Therapy Progress Notes, Case Management Notes and Checklists by Carl Beffa, MSW, BCD (September 2008 to October 2011)

30) Signed Acknowledgement of Psychiatric Responsibilities by John Lee, MD (9/14/09)

31) Checklists and Progress Notes by John Lee, MD (September 2008 to June 2010)

32) Letter to Nicole Rafanello, Ph.D. from Deborah Giorgi-Guarnieri, MD, confirming records review (7/29/10)

33) Signed Acknowledgement of Psychiatric Responsibilities by Deborah Giorgi-Guarnieri, MD (8/30/10)

34) Checklists and Progress Notes by Deborah Giorgi-Guarnieri, MD (October 2010 to October 2011)

35) Letter from Eastern State Hospital to Kevin Shamblee, LCSW, ACSW (11/21/11)

*Government Reports and Documents*

36) Secret Service Surveillance Reports (6/30/08- 10/24/11)

37) Report of Computer Forensic Examination conducted by the United States Secret Service (11/2/11)

38) Notes of Agent Brian Dunlop from surveillance on 9/4/11 & 9/5/11

Psychological Risk Assessment Update of John W. Hinckley Jr          Paul Montalbano, Ph.D.

*Expert Reports*

39) Psychiatric Evaluation by William T. Carpenter, Jr., M.D. (11/16/96)
40) Psychiatric Evaluation by Raymond F. Patterson, M.D. (11/18/96)
41) Forensic Mental Health Assessment by Kirk Heilbrun, Ph.D. (6/3/970
42) Independent Forensic Psychiatric Evaluation of John W. Hinckley, Jr. by Raymond Patterson, M.D., D.F.A.P.A. (11/14/11)
43) Forensic Psychiatric Evaluation Concerning Expansion of Terms of Conditional Release under 501(e) by Robert T. M. Phillips. M.D., Ph.D. D.G.P.A. (11/17/11)

*Miscellaneous Documents*

44) "Caged Casanova: Reagan's Would be Assassin Goes Ga Ga for Gal Pal by Alex Dickinson, The Daily www.thedaily.com (2/5/11)
45) "John Hinckley [CB]: Love at Washington Psych Ward: Remembering How Gravely Reagan Was Wounded Video" by Maggie. Maggie's Notebook. www.magiesnotebook.com (2/6/11)
46) "Free John Hinckley" by Harry Jaffe. Washingtonian, October 2011

*Collateral Interviews of St. Elizabeths Staff*

- Interview of Sidney Binks, Ph.D. at St. Elizabeths Hospital on 10/27/11 for approximately 1 hour and
- Interview of Benjamin Adewale, M.D. at St. Elizabeths Hospital on 3/26/07 for approximately 35 minutes
- Interviews of Kevin Shamblee, LICSW, ACSW at St. Elizabeths Hospital on 10/17/11 for approximately 1 hour and 40 minutes and 10/27/11 for approximately 50 minutes
- Interviews of Katherine Murphy, Psy.D. at St. Elizabeths Hospital on 10/27/11 for approximately 1 hour and on 11/9/11 for approximately 50 minutes and a telephone interview on 11/18/11 for approximately 15 minutes
- Interview of V.J. Hyde, Music Therapist, at St. Elizabeths Hospital on 10/27/11 for approximately 55 minutes
- Interview of Velora Jernigan-Pedrick, MLS at St. Elizabeths Hospital on 10/27/11 for approximately 20 minutes
- Interview of Dierdre Cogan at St. Elizabeths Hospital on 11/9/11 for approximately 25 minutes

*Collateral Interviews of Williamsburg Providers*

- Interview of Deborah Giorgi-Guarnieri, M.D. in Williamsburg on 9/9/1108 for approximately 65 minutes
- Interview of Carl Beffa, LCSW, in Williamsburg on 9/9/11 for approximately 55 minutes

4

- Interview of Sandy Kochersperger in at Eastern State Hospital in Williamsburg on 9/9/11 for approximately 25 minutes

*Collateral Interviews of Hinckley Family Members*

- Interview of Mrs. Jo Ann Hinckley in           with Mr. Hinckley for approximately 15 minutes
- Interview of Mrs. Jo Ann Hinckley at ,           for approximately 20 minutes
- Telephone Interview of Diane Sims on 11/8/11 for approximately 1 hour
- Telephone Interview of Scott Hinckley on 11/7/11 for approximately 55 minutes

*Interviews of John W. Hinckley Jr.*

- Interview of Mr. Hinckley with his Mother in           on 9/9/11 for approximately 15 minutes
- Interview of Mr. Hinckley in .           for approximately 20 minutes
- Interview at St. Elizabeths Hospital on 10/27/11 for approximately 50 minutes
- Interview at St Elizabeths Hospital on 11/2/11for approximately 2 hours
- Interview at St Elizabeths Hospital on 11/9/11 for approximately 45 minutes
- Interview at St. Elizabeths Hospital on 11/20/11 for approximately 55 minutes

## ADDITIONAL RECORDS:

For detailed background information and a complete annotation of other records reviewed by this evaluator, please refer to my prior evaluations, including the Psychological Risk Assessment dated February 8, 1999, the Addendum to Psychological Risk Assessment dated February 22, 1999, the Psychological Risk Assessment Update dated November 30, 1999, the Psychological Risk Assessment Update dated January 22, 2003, the Psychological Testing Update dated August 4, 2003, the Psychological Risk Assessment Update, dated November 1, 2004, the Psychological Risk Assessment Update, dated July 20, 2005, the Psychological Risk Assessment Update, dated March 30, 2007 and the Psychological Risk Assessment Update, dated May 28, 2008.

## HOSPITAL PROPOSAL FOR EXPANDED CONDITIONAL RELEASE:

The hospital's proposal for the expanded conditional release is contained in a letter to the Court dated July 29, 2011.The following version represents a synopsis of those recommendations.

1. Unaccompanied use of automobile with GPS equipped cell phone to go back and from: a) Eastern State b) Colonial Behavioral Health c) Mr. Beffa's and Dr. Giorgi-Guarnieri's offices d) for unaccompanied time e) other activities which may be named at a later date.

2. The duration of the visits be expanded to 17 days for the first two visits and 24 days for the next six visits with a Saturday morning departure and Monday return. It is recommended that these visits continue until Mr. Hinckley is released to live in Virginia or until the issuance of the next conditional release.

An incremental amount of unaccompanied with a GPS enabled cell phone is recommended including:

- a. Volunteering at Eastern State Hospital (ESH) no more than 5 days per week.
- b. Attending activities at Colonial Behavioral Health, including People's Place up to 3 days per week. Staff will provide monthly progress notes detailing attendance and participation. Mr. Hinckley will contribute a minimum of 20% to the payment. Mr. Hinckley will discuss his adjustment with Dr. Binks and Mr. Beffa. The schedule of activities may be altered to allow for other structured activity.
- c. At the discretion of the hospital and Williamsburg treatment team the schedules at ESH or People's Place may be altered.
- d. Mr. Hinckley will meet with Dr. Giorgi-Guarnieri at least once per week for the first two visits and at least once while on the remaining visits with increased frequency if clinically indicated.
- e. Mr. Hinckley will meet with Mr. Beffa weekly. Mr. Beffa may perform case management duties during either week. Mr. Beffa will communicate with Colonial Behavioral Services to follow up on achievement of treatment objectives.
- f. For the first two visits Mr. Hinckley be allowed up to six 4 hour unaccompanied outings outside             with a GPS equipped cell phone. This outings are contingent on meeting goals such as discussing adjustment, contributing financially and interacting with male peers.
- g. For the next two visits (3-4) hospital and Williamsburg providers assess progress and adjustment. If approved, he be allowed up to nine 4 hour unaccompanied outings outside             These activities will be approved by the hospital/Mr. Beffa in advance with notice on he day of the special activity.
- h. During the remainder of the visits Mr. Hinckley be allowed up to twelve 8 hour unaccompanied outings outside             within a 30 mile radius with an itinerary. These activities will be approved by the hospital/Mr. Beffa in advance with notice on he day of the special activity.
- i. When not involved in an overnight activity, he be allowed to remain unaccompanied in the subdivision while his mother is away. Until such time as he may reach convalescent leave status, Mrs. Hinckley may not leave her on an overnight activity.
- j. The hospital recommends that the following items remain unchanged.
  1. Mr. Hinckley's mother, brother and sister remain identified responsible persons. Communication will continue for the first 8 visits through feedback forms and by telephone.

2. Mr. Beffa will remain as therapist and case manager. Communication will continue for the first 8 visits through feedback forms and by telephone.

3. Dr. Giorgi-Guarnieri will remain as psychiatrist. Communication will continue for the first 8 visits through feedback forms and by telephone.

4. Mr. Hinckley continue to receive medication from the hospital pharmacy.

5. Keep internet restriction in place while in Williamsburg.

6. Keep Individualized Relapse Prevention and Media plans in effect.

k. It is recommended that the following items be changed or added.

1. 14 day notice be changed to 7 day notice for outings to Williamsburg.

2. 4 day notice be changed to 1 day notice for staff accompanied D.C. outings.

3. Mr. Beffa see Mr. Hinckley once a week for therapy. Dr. Giorgi-Guarnieri see Mr. Hinckley weekly during the 17 day outings and once during the 24 day outings.

4. A minimum of two weeks occur between each visit to allow for preparation of feedback reports.

5. The places of social and recreational activities be listed in a catalogue and will not be specified in an itinerary.

6. That the hospital will not be providing to the Court specific dates, times, addresses and phone numbers for unaccompanied activities.

7. That a summary of two visits at a time may be submitted to the Court.

8. That Mr. Hinckley may be driven to and from the Hospital by a professional drivers without his mother or siblings in the vehicle.

3. At the discretion of the Hospital, upon successful completion of a minimum of 8 outings, and an assessment by Hospital staff and providers in Virginia indicating that Mr. Hinckley is experiencing good mental status and that he does not present as a danger to himself or others, that Mr. Hinckley be conditionally released to reside permanently on convalescent leave with the following outplacement plan:

a. Mr. Hinckley be placed on convalescent leave to reside with his mother in Williamsburg.

b. While in Williamsburg on convalescent leave, he receive psychiatric follow-up from Dr. Giorgi-Guarnieri, who will meet with Mr. Hinckley two times per month for the first 3 months and no less than monthly afterwards. He will receive therapy weekly from Mr. Beffa. Once in the community case management services will occur on an as needed basis. Dr. Giorgi-Guarnieri and Mr. Beffa will communicate with Hospital Outpatient Department of Clinical Operations (OPDCO) via a monthly checklist and summary was well as telephone contact prior to his visiting staff in D.C. Dr. Giorgi-Guarnieri will start prescribing his psychiatric medication which will be obtained at a pharmacy in Williamsburg. For medical services Mr. Hinckley will utilize the services of a physician in the Williamsburg area, who will be identified during the 8 visits. Dr. Giorgi-Guarnieri and Mr. Beffa will communicate with the Court via the monthly summary submitted to OPDCO.

c.  While in Williamsburg on convalescent leave, Mr. Hinckley will make weekly calls to OPDCO for the first 3 months and no less than monthly thereafter at the discretion of OPDCO.

d.  While in Williamsburg on convalescent leave, he will be required to travel to D.C. monthly to meet with OPDCO indefinitely. He may travel to D.C. unaccompanied.

e.  A current member of the inpatient treatment team will be present at the monthly OPDCO meetings for the first 6 months or longer at the discretion of OPDCO.

f.  While in Williamsburg on convalescent leave, he will continue to attend scheduled activities at ESH and Colonial Behavioral Health until employment or an alternative constructive daytime activity is located.

g.  Upon receipt of a conditional release to reside in Williamsburg, Mr. Shamblee or a designee of the Hospital will work with Mr. Hinckley prior to the conclusion of the 8 visits to ensure that he has applied for Social Security and Virginia Medicaid benefits leading up to his release.

## RECENT HOSPITAL COURSE:

Previous information on the entire hospital course can be found in all the prior reports. The last report was completed on May 28, 2008 and the following section covers the time frame since that report. For a thorough review of Mr. Hinckley's hospital course from July 2008 to August 2011, please refer to Dr. Murphy's Violence Risk Assessment Update, dated August 31, 2011.

### 2008

During July Mr. Hinckley appeared in Court for the hearings regarding the hospital's recommendation to expand his conditional release. At that time the hospital had recommended 12 overnight visits in Williamsburg for up to 10 days. It was further recommended that he received increased unaccompanied time of up to two hours twice daily in the subdivision and up to four hours twice per week in the community. It was also recommended that he be permitted to obtain a driver's license. It was further recommended that he be permitted to perform volunteer work in Washington, D.C. two days a week.

At the hospital Mr. Hinckley continued his familiar routine of working in the library, attending recommended therapies and tending to his feral cats. Mr. Hinckley continued to comply with his medication regime of Risperdal 1 mg hs, Zoloft 75 mg daily and Benadryl 50 mg hs. Mr. Shamblee contacted Eastern State Hospital in Williamsburg to explore volunteer positions there, identifying a potential position in the medical library. In August Mr. Shamblee traveled to Eastern State and met with staff to discuss the conditions of the position. Mr. Shamblee also explored a volunteer position at the Universalist Unitarian Church. Mr. Hinckley reduced the frequency of calls to Ms. G, at her request. Dr. Binks noted that these interactions with women "help him to develop realistic ideas about what women want and expect from a relationship." He called Ms. DeVeau and his offer to renew the relationship was rejected. He told Dr. Binks that Ms.

DeVeau did not want him back in her life and that she was angry that he had a sexual relationship with Ms. G. She also told him that a reporter had contacted her during the hearing. He told Dr. Binks that he was "sad that after so many years it had come to this."

In September he resumed exercising conditional releases to Williamsburg. During the outing he met with Sandy Kochersperger, staff librarian, and                volunteer coordinator, at Eastern State Hospital. The next day he met with           from the Universalist Unitarian Church to discuss volunteering. Mr. Hinckley was familiar with the interlibrary loan referral system, "docline," used at the library from his work at St. Elizabeths. The positive reception at the hospital appeared to boost his mood. His brother noted that he was "on an emotional high" and the interview at the library was a "tremendous boost to his ego." During the post outing interview with the treatment team "it was evident how much this improved his mood and was in marked contrast to the disappointment he displayed in response to the rejection and rebuffs he had previously experienced." During the outing Mr. Hinckley conversed with a neighbor, Ms. L. Mr. Beffa contacted        a local musician with a recording studio, to explore playing or recording there. This request was subsequently denied by the Review Board, noting the risk of his music being made public. Mr. Hinckley discussed his relationships with Ms. G and Ms. DeVeau and Dr. Binks noted that Mr. Hinckley "demonstrated a realistic approach and expectation in hoping he might be able to continue with genuine friendship with each of them, despite no possibility of having a romantic relationship with either."

On 9/10/08 Mr. Shamblee escorted Mr. Hinckley to the Salvation Army in D.C. Mr. Hinckley told Mr. Hyde that Ms. G was upset with him because of an "off color" comment he made to her on the phone. He talked about wanting Ms. DeVeau back in his life because "I don't want to be so reliant on Ms G." They discussed his "needing people for emotional security" and how he felt rejected by Ms. DeVeau and disappointed and angry with Ms. G and how he coped with these feelings. With Dr. Binks, he was noted to have become increasingly frustrated with Ms. G, who had become "quite abrupt" with him. In October he told Mr. Hyde that he was upset Ms. G did not bring a CD he wanted. With Dr. Binks they explored his disappointment with women and the loneliness that can result. It was noted that "struggled with feedback with Ms. G regarding frequency of calls," which had been reduced at her request.

On 11/3/08 Dr. Green noted that he appeared irritable but without signs of mood extremes. He exercised another outing to Williamsburg. He told this writer after the outing that he had called Ms. G and made a comment about sex with him being better than with her boyfriend and she hung up. When he called back, she told him not to call. He did not like the "new rules" and this had a negative impact on his mood. He described his mood to this writer as "down" and "somewhat irritable." He reported that he chatted with his neighbor, Ms. L.  On 11/24/08 Dr. Green increased his Zoloft from 75 to 100 mgs daily. Mr. Hinckley told me that this was because he was "moody and brooding." He exercised another outing during Thanksgiving. His mother called to cancel his appointments with Dr. Lee and Mr. Beffa because he was extremely groggy. Dr. Lee advised him to take the dosage at night. Mr. Hinckley was able to reschedule with Mr. Beffa and spoke with Dr. Lee over the phone. Mr. Hinckley told Mr. Beffa that he had

invited Ms. L over for Thanksgiving. He told Mr. Beffa about reservations his mother and sister had about the Unitarian Church because the beliefs "encompass all beliefs including atheism." Mr. Hinckley acknowledged that he had exchanged physical affection with Ms. DB. He was observed kissing her on the grounds during one visit.

In December Mr. Hinckley met with a local D.C. musician. The parameters of the relationship had been worked out with Mr. Hyde. The musician provided feedback about his music. On 12/13/08 Mr. Hinckley's ward celebrated the holiday season with an outing at a local restaurant. Mr. Shamblee reported that he had asked all the patients who they were inviting and Mr. Hinckley did not indicate that he was inviting anyone. Ms. G showed up at the restaurant. Mr. Hinckley was placed on ward hold for 10 days. Mr. Hinckley informed me that that he had discussed this decision with Dr. Binks and was uncertain she would show up since they had been fighting. He acknowledged that he had made a mistake but thought the duration of the ward hold was "excessive."

Over Christmas he exercised another outing to Williamsburg. His sister, Diane, joined the family. He gave his mother a painting of street scene for Christmas. He stated that he was frustrated that he had not heard from the Court. Mr. Hinckley reported calling Ms. G every day during the outing. Dr. Lee noted improved mood on the increased Zoloft. In the post outing interview Mr. Hinckley noted that this was the first Christmas without his father. His sister reported that Mr. Hinckley and her mother were handling Mr. Hinckley Sr.'s absence well. His mother reported that she was "thankful" to have her son there since it was the first Christmas without her husband. Over the holidays Mr. Hinckley gave Ms. G an abstract painting.

### 2009

With no decision forthcoming from the Court, Mr. Hinckley reported increased frustration. Dr. Binks noted that "though feeling desperate, it is noteworthy that he is not seriously depressed suggesting the resilience he has demonstrated for many years now continues to hold." His mother did not support the idea of Ms. G visiting him in Williamsburg. During the outing he purchased a pair of shoes for Ms. G. In February he exercised another conditional release to Williamsburg with his brother joining the family. Mrs. Hinckley noted that "we are in our 7th month waiting the judges' decision" and this "has been discouraging for John" but "I am proud of the way John has conducted himself throughout this long stressful period" and "his patience is admirable." Mr. Beffa noted that he was "greatly frustrated" with waiting for a Court decision. Dr. Rafanello noted that Mr. Hinckley reported that the increase in Zoloft was helping him cope with recent stressors. Mr. Hinckley told me that the delay in hearing from the Court was "incredibly discouraging" and "I feel like he's [judge] testing me to see if I crack." The Review Board did not support Mr. Hinckley recording at            studio or Ms. G visiting him in Williamsburg. Dr. Binks noted that while these disappointments were well tolerated, he was feeling lonely and "as a last resort" considered contacting Ms. M.

On 3/2/09 Dr. Green increased his Zoloft to 150 mgs daily. Dr. Green reported that Mr. Hinckley contacted him and wondered whether increasing the medication would help

since he was feeling more moody and irritable. Dr. Green cited the delay in hearing from the Court and his relationship with Ms. G as stressors. After the increase he told Dr. Green he no longer had "intense anxiety." In the weeks following the increase Dr. Binks noted improvement in mood and that Mr. Hinckley as "finally able to 'let go' of the anxiety" about the delay in the Court decision.

In April Mr. Hinckley exercised a conditional release to Williamsburg. Both his mother and sister noted improvement in mood. Ms. G had visited him and took a kitten. Dr. Lee noted that he was "appropriately frustrated with having to wait for a decision, but that he seemed resigned to his circumstances." He reported increased contact with a cousin of Ms. DB. Dr. Binks noted that he "has limited opportunity to actively engage in relationships with individuals with whom he can relate" and "Therapy would be accelerated by increased interaction outside of the Hospital and is necessary for him to grow as an individual and demonstrate safety and health." Mr. Hyde noted that he was "resigned to not knowing what is going on."

On 4/27/09 he went to the dental clinic at the hospital complaining of tooth pain. He declined medication and decided to wait until his regular dentist, Dr. TP, a dental resident, was available. Mr. Hinckley returned the following day and saw Dr. TP, who established a dental treatment plan and provided ongoing care. On 5/20/09 he went to the dental clinic for a scheduled appointment. He decided not to be seen and to wait. On 6/2/09 he returned to the clinic and was seen by Dr. TP, who noted that he "decided post arrival he didn't want to receive dental tx, but wanted to discuss his time @ home previously & get tx another day." On 6/11/09 Dr. TP restored an occlusion. In June, the hospital librarian, Ms. Jernigan-Pedrick, found that Mr. Hinckley had looked up pictures of Dr. TP online, while performing a routine review of internet history on the library computer. Mr. Jernigan-Pedrick informed the treatment team. Mr. Shamblee interviewed Mr. Hinckley, who reported that the resident had directed him to find the pictures. When Dr. TP was interviewed by Mr. Shamblee, she denied this. Mr. Hyde noted that Mr. Hinckley reported that "I wouldn't have looked them up if she hadn't told me about them" and "It's 2009- looking up pictures on the internet is the normal thing to do." Dr. Binks reported that Mr. Hinckley stated that the resident "told him about the photos and even given her first name so he could find them." Dr. Binks added that it "appeared to this therapist that he has a personal fondness for her based on a greater than average interest in restoring his teeth." Mr. Hinckley was counseled about his behavior but no further action was taken by the hospital.

Mr. Hinckley exercised another condition release in May. His brother noted that he appeared in "better spirits." Mr. Beffa noted that Mr. Hinckley was "more accepting and also less hopeful and anxious." Mr. Beffa further noted discouragement around not being able to develop relationships. When they discussed his potentially playing guitar at a local hospice, Mr. Beffa noted that "once again Mr. Hinckley showed his ability to empathize." Dr. Lee noted that he was "the same as before, serious, considered, both discouraged and hopeful." When discussing his mother, Dr. Lee reflected that "If she were to get sick, a whole different strategy and a different treatment plan would probably have to evolve."

On June 16, 2009 the Court issued a ruling granting Mr. Hinckley an expanded conditional release of twelve visits for 10 days and 9 nights with appropriate supervision. He was granted two hours of unaccompanied time in the subdivision twice daily with a GPS enabled cell phone. Mr. Beffa was approved to function as individual therapist and case manager under the condition that he review relevant records. Specific guidelines for the roles of the treatment providers would be formulated by the hospital and given to Dr. Lee and Mr. Beffa before the new conditional release could be implemented. The Court did not approve the plan for Mr. Hinckley to perform volunteer activity in D.C. Various records were sent to Mr. Beffa. On 9/9/09 Mr. Beffa reported that he had reviewed all the records. Mr. Beffa and Dr. Lee signed copies of the agreement on roles and responsibilities. Dr. Lee was to meet with Mr. Hinckley at least once during the outing, be available to consult, assess Mr. Hinckley's mental status, consult with Dr. Green about medication and prescribe emergency mediation if necessary and arrange for emergency hospitalization if required. Dr. Lee was to complete the checklist and participate in post outing conferences with the treatment team as well as Individual Recovery Plan meetings. Mr. Beffa was to engage in one case management activity with Mr. Hinckley per visit. His case management responsibilities included making recommendations for activities, assisting in developing itineraries and following up with his functioning in any volunteer position. As individual therapist Mr. Beffa meet with Mr. Hinckley at least once per outing and assessed risk factors on the checklist. Mr. Beffa was to provide written feedback to the treatment team and participate in Individual Recovery Plan meetings with the hospital. Both Dr. Lee and Mr. Beffa were to share information and observations.

In July Mr. Hinckley started attended the Therapeutic Learning Center in the new treatment mall program. While expressing some reluctance, he adjusted to the new environment. He began attending Creative Arts with, Deidre Cogan, art therapist. Mr. Hinckley met a female, Ms. K, in the program. Dr. Green noted that he "has drawn attention to his amorous behavior with a woman he acknowledges is psychotic." The behavior included what Dr. Green called "affectionate gestures, subsexual caresses, hugs and kisses." Dr. Green noted that he "excuses his behavior saying that many other patients behave similarly and even go beyond the limits having sex in the bathroom and such." Mr. Hinckley agreed to end this behavior and focus on his long term goal of conditional release. Mr. Hinckley was informed that his former individual therapist, Dr. Christian, had died and according to Dr. Binks was clearly moved.

In August it was agreed that Mr. Hinckley could begin volunteering at Eastern State Hospital working for four hours twice a week. His supervisor and primary contact person for this position was Sandy Kochersperger. Ms. G was in France and he spent time with his new female friend from the civil side of the hospital. Ms. Cogan noted that his art seemed to foster his self-esteem and he "seems to enjoy art as a way to increase socialization, self-expression and self-control." Dr. Green noted that he reported some distress about the length of time since his last home visit but "denies feeling excessively discouraged or despondent." In September in therapy with Dr. Binks it was noted that his female friend was about to be discharged and while he wished to continue the

relationship he realized that was unrealistic. He recorded two new songs about the relationship.

In October his treatment team presented a recommendation to the Review Board for him to participate in volunteer activities at Eastern State Hospital. This recommendation was approved. In music therapy he processed his feelings around his female friend's discharge and recorded a song dealing with issues. In individual therapy he expressed concern that she was being discharged without adequate resources.

In November he exercised another conditional release to Williamsburg and volunteered at the library at Eastern State Hospital. Mr. Hinckley reported enjoying the new volunteer position and felt welcomed. His sister underscored the positive impact of the new position noting that "the volunteer work gave him a positive new dimension to visit at home." Dr. Binks noted that he "particularly enjoyed that he felt well received at the hospital library." Around this time Mr. Hinckley had initiated relationship with another female he met in the treatment mall, Ms. CB. Mr. Hinckley told Mr. Beffa that he saw her on a daily basis and he "sees her as an intelligent, articulate woman who sometimes hears voices and he looks to continue the relationship after her discharge." He bought her a pendant and necklace and some CDs.

Over Christmas he exercised another outing in Williamsburg. The trip was delayed due to a snowstorm. Mr. Beffa visited Mr. Hinckley at his residence. Mr. Hinckley told Mr. Beffa that Ms. CB was hoping that he would convert to Catholicism. Mr. Beffa stated that "I don't see him converting anytime soon" and "nor do I see this particular relationship lasting beyond their particular needs for friendship and companionship." Mrs. Hinckley reported that her son called Ms. CB daily and Mr. Hinckley indicated that his mother seemed irritated by the frequency of the phone calls. Mrs. Hinckley reported that her son also spoke with Ms. G during the visit about the death of their friend Ms. DB. Dr. Lee found him to be "rational, subdued, thoughtful and free of any depression." Dr. Binks noted that he "understands that she has a mental illness and feels able to handle the complexity that mental illness symptoms can bring to a relationship" adding that dealing with the complexity is "better than loneliness." In music therapy he recorded a song "Always" about all of his relationships talking about wanting it to be played at his funeral because it "sums up my life." Mr. Hinckley told Mr. Hyde that "he has always acted in the interest of love, even when he was sick and made bad choices." He added Ms. CB was "afraid" of being in a relation with him due to meetings she has had with the treatment team and lawyers. Mr. Hinckley added "It has decimated my relationships with [Ms. D] and [Ms. G]" and "believes it played a role in the unraveling of his relationship with Ms. M." Mr. Hinckley added that he gave her a pendant and "we've been talking about the future" adding that she is "fragile" and "he is worried that she will become 'paranoid' about their relationship if these meetings have a similar impact like his past experiences."

### 2010

In January Mr. Hinckley took and passed the written driver's test and received his learner's permit. At the end of the month he exercised another outing to Williamsburg with his sister joining them. Mr. Hinckley attended a service at the Universalist Unitarian Church with Mr. Beffa but was "not very happy with the Church." He did not wish to return for spiritual purposes but maintained an interest in volunteering. Mr. Beffa reported that he bought Ms. CB a $10 friendship ring for Christmas and indicated that it was not an engagement ring. Mr. Hinckley told Mr. Beffa that she "continues to sabotage any progress that she appears to make at the hospital by demonstrating various inappropriate behaviors" and he "seems rather exasperated by her behavior." Ms. Kochersperger rated his work performance in the library as outstanding. While in Williamsburg, Ms. CB was released from the hospital. He told Mr. Beffa that he believed there was a "50/50 percent chance" of the relationship continuing. In music therapy he recorded a song about her.

In February Mr. Hinckley was assaulted by another patient while playing chess. He was not significantly injured. After her discharge Ms. CB's mental status reportedly deteriorated. Dr Binks noted that the treatment team met with her and "explored her statements that she believed they were engaged but this was apparently part of her decompensation." Dr. Binks noted that Mr. Hinckley "seemed to have a realistic view of their relationship and its limitations and he described it as not substantially romantic." In art therapy he was described as "very invested in using art as a tool of expression and enrichment." A former volunteer at the hospital invited Mr. Hinckley to display his art at a show in San Francisco. The treatment team denied this request. Mr. Hinckley expressed frustration with being an artist unable to show his work.

Toward the end of February he exercised his fourth outing under the new expanded order. He started driving lessons and drove his mother Jamestown. He began exercising his 3 hour privileges outside of            He went to the movies. His brother noted that his mood was good and he looked forward to more work at Eastern State. Mr. Beffa described him as "upbeat, positive, future oriented." In March Ms. CB continued to visit him regularly. Dr. Binks noted that he was "struggling with the reality that all his female friends will come under scrutiny of the government." Dr. Binks noted that he was "speaking to Ms. M irregularly." In art therapy he studied various artists to experiment with different brush strokes. Ms. Cogan noted that he is "resourceful and talented in visual art" and "highly invested in using art as a tool of expression, creativity and enrichment."

At the end of March he exercised another conditional release to Williamsburg. He utilized 2 unaccompanied 3 hour privileges outside of            His sister joined him and his mother for Easter. Mr. Hinckley continued to call Ms. CB daily and told his sister he considered her his girlfriend. Mr. Hinckley invited his neighbor, Ms. L, to his mother's house but she declined. He brought home a cat which he cared for. During this outing Dr. Lee informed him that he would be retiring. Mr. Hinckley expressed disappointment and concern about future visits. Dr. Green noted that Mr. Hinckley's

mother and sister were not enthusiastic about the idea of Ms. CB visiting Williamsburg. In April his art therapist noted that he was "fully absorbed in work to the extent his social interactions are limited" but "when he does interact with peers, his social interactions and boundaries are very appropriate." Dr. Binks noted that with regard to Ms. CB, Mr. Hinckley "clearly has significant insight into her mental illness but still hopes that there could be a relationship that is ongoing provided she gets the help she needs."

During May he exercised his 6th conditional release under the June 2009 Court order. He finished driving lessons and obtained a Virginia driving certificate. His brother, Scott Hinckley, noted that Mr. Hinckley was "more subdued" but still positive about his volunteer position. Dr. Lee processed his termination with Mr. Hinckley. Mr. Beffa reported that Mr. Hinckley was "calm and positive with some worries" expressing concern about some media attention around his relationship. Mr. Beffa reported that Mr. Hinckley discussed her psychiatric fragility and that "due to these reasons he does not see any type of close relationship in the long range" and that he displayed "sensitivity and good judgment." Mr. Hinckley and his brother and mother met with Dr. Deborah Giorgi-Guarnieri, a psychiatrist, to potentially replace Dr. Lee. Scott Hinckley reported that his brother was "clearly impressed" with Dr. Giorgi-Guarnieri and Mr. Hinckley told the treatment team that she was easy to talk to. Mr. Hinckley told the treatment team that Ms. CB called him during the outing from the Comprehensive Psychiatric Emergency Program.

In May all the patients at St. Elizabeths were transitioned to a new facility. Mr. Hinckley was placed on a co-ed unit, which housed forensic and civil patients. He adjusted well to his new surroundings. Dr. Binks noted that he was "increasingly concerned about the mental stability of CB" and had "better insight into the limits it puts" on the relationship. Dr. Binks noted that he was concerned about finding a new psychiatrist in Williamsburg and wrote that "a delay in visits will having increasingly negative consequences to his mental health." In art therapy he continued to experiment and it was noted that he "seems to enjoy the spontaneous nature of the studio experience." Ms. Cogan noted that his "mood seems dysphoric at times, however, art making seems to enhance his mood" and that his "mood is often sullen but he is more animated when he is painting."

In June he exercised another outing to Williamsburg. He bought an 8 track digital recorder to record music there. His sister joined him and his mother. He had his last appointment with Dr. Lee. His sister reported that he was in a "great mood." His mother reported a good visit but concern about a delay in visits. Mr. Hinckley expressed concern about a delay to Mr. Beffa. In discussing the relationships with Ms. CB, Mr. Beffa noted that he "tends to take a protective approach towards her since she has no family or close friends" and that he enjoys her company despite her chronic schizophrenia. Mr. Hinckley also expressed "some irritation" with Ms. G for not appearing during his birthday and according to Mr. Beffa he "had impression she was rather cavalier about her absence." Dr. Binks noted that his "mood is somewhat more anxious and is a direct result of the fact that he believes his ability to have continued visits is in jeopardy with loss of Lee." Regarding his relationship with Ms. CB, Dr. Binks noted it "seems clear she can never be more than a friend given her emotional instability."

On 7/2/10 Dr. Giorgi-Guarnieri was interviewed by the hospital treatment team. She was given the reports that Mr. Beffa had been ordered to review. On 7/29/10 she confirmed that she had reviewed the records. In July Dr. Green announced that he was leaving the hospital. Dr. Binks "expressed to the team that it would be countertherapeutic for him to have visits suspended for any length of time." In music therapy Mr. Hinckley expressed frustration with malfunctioning equipment impeding his ability to record music. On 7/29/10 Dr. Benjamin Adewale was assigned as his hospital psychiatrist.

In August Mr. Hinckley reported feeling stressed by the lack of outings. On 8/25/10 the treatment team met with Ms. CB. According to Mr. Shamblee she viewed the relationship as headed toward marriage and was waiting for them to be joined in a "God ordained union." Ms. CB expressed an intention to speak with experts. Mr. Hinckley requested that she participate in future treatment plans. In September Dr. Binks noted that Ms. CB was "helping him cope with being such a long time away from home" and that he was "mourning the loss of a favorite cat," who was run over.

From 10/9/10 to 10/18/10 Mr. Hinckley exercised his conditional release to Williamsburg after a delay of approximately four months. He had his first appointment with Dr. Giorgi-Guarnieri. Mrs. Hinckley reported that he liked his new psychiatrist and felt she was more interested in his case. Scott Hinckley reported some tension between his brother and mother over the issue of Ms. CB visiting. Scott Hinckley thought that his brother was "very stubborn" and "somewhat entitled" on the issue. Mr. Hinckley told the treatment team that he thought the resistance was related to race. Mrs. Hinckley reported that she was fearful she would get sick. Mr. Beffa reported that he was relieved to resume visits. They discussed the disagreement between Mr. Hinckley and his mother over the issue of Ms. CB visiting. Mr. Hinckley expressed some exasperation about the frequency of her calls. In therapy with Dr. Binks Mr. Hinckley discussed her religious practices in the conservative Catholic Neo-Catechumen organization. Dr. Binks noted that he "lives with the ambivalence about the long-term viability of the relationship- on the one hand recognizing the limitations like religious differences, the distance between DC and his future home and her illness, and, the wish/plan for being together in some long term commitment." Mr. Hinckley talked about running into Ms. DeVeau at the hospital but feeling that the conversation was "stifled."

Mr. Hinckley exercised another conditional release over Thanksgiving. During the outing he reportedly spoke daily with Ms. CB. Mr. Beffa reported that Mr. Hinckley indicated that he did not intend pursuing marriage because of family concerns, his reluctance to convert and concern it could hinder his chances for an expanded release. Mr. Beffa visited Mr. Hinckley at the library. Mr. Hinckley discussed his efforts to establish a relationship with a neighbor and Mr. Beffa noted that "he got the impression that she is not interested and he knows well not to force the issue." When Mr. Hinckley discussed his desire to have Ms. CB visit, Dr. Giorgi-Guarnieri assigned him the task of researching process of getting someone hospitalized in Williamsburg. Mr. Hinckley apparently never completed the assignment.

Over Christmas Mr. Hinckley exercised another conditional release to Williamsburg. He gave his mother several paintings. Due to his supervisor at the library receiving medical attention, he was only able to volunteer once at the library. Mr. Beffa noted that he "expressed positive anticipation" to securing additional activities in town and was "showing initiative." Mr. Beffa spoke with staff at          about securing a position there. He told Mr. Beffa that Ms. CB had anxiety at a Christmas party. However, Mr. Shamblee had to escort her out due to her anxiety. Dr. Giorgi-Guarnieri noted that he had found an art school but they decided he could not go there. Mr. Hinckley told the treatment team that the rejection "felt terrible. It really was discouraging. I meet with that a lot in the little town in Williamsburg." Mr. Hinckley added that the general public has the same image of him as thirty years ago and stated "I can't do interviews to change their opinion so that's it." Mr. Hinckley reported that Mr. Levine had been contacted by a reporter writing a book intended to be released around the 30 year anniversary of the attempted assassination and that his mother had been contacted by CNN requesting an interview.

## 2011

In January Mr. Hinckley passed road test and got his driver's license. Dr. Binks noted that he was happy to pass the test and "continues to be open and demonstrate insight into his understanding of his relationship with Ms. B." while he would "prefer to concentrate on the here and now and not consider the long-term view of the relationship." In music therapy, Mr. Hyde noted that "uses music as a narrative platform to explore relationships, emotions and thoughts" and has been "exploring themes of love and loss, freedom and confinement." He "introduced a song dealing with his negative encounters with individuals and organizations in Williamsburg" and "discussed his experiences and feelings dealing with rejection he has faced in VA and his concern that barriers are in the community based on his history." In this light he "discussed the recent shootings in Tucson, AZ and attempted to relate his feelings toward the alleged perpetrator to the way people may have (or continue) to feel about him." In art therapy he was noted to have "created a large body of work" and "has been brighter in affect while he interacts with peers."

From 1/29/11 to 2/7/11 he exercised another outing to Williamsburg. Neither his brother nor sister were able to come due to inclement weather. During the outing he met with representatives from the local community mental health center, People's Place from the Colonial Services Board and met Maureen Price, vocational counselor from the Department of Rehabilitation Services. He told Mr. Beffa that he was disappointed and lonely about knowing no one in Williamsburg outside of his mother and professionals. Dr. Giorgi-Guarnieri noted that he was upset that she was 20 minutes late. During the post outing interview with the treatment team, Mr. Hinckley reported that he spoke with Dr. Giorgi-Guarnieri about some paintings on her wall, including one done by a patient, and said he wanted to give her one. Mr. Hinckley stated, "when I brought it up to her, she was very willing to do it, but said to get the team's permission first." Dr. Murphy notes that Dr. Giorgi-Guarnieri did not provide a definite response but asked him to think through his decision.

On 2/25/11 Mr. Shamblee noted that Ms. CB was seen by the entry gate displaying "delusional/manic behavior" and shouting religious words and Mr. Hinckley's name. Mr. Shamblee reported that Mr. Hinckley walked away from the disruption and later told Mr. Shamblee that she "was being held near Baltimore in either a jail or mental health facility for similar behavior at a religious retreat." Mr. Shamble asked how this behavior would influence his choice to remain with her and "he indicated he would continue unless he met someone while on home visits."

From 3/5/11 to 3/14/11 Mr. Hinckley exercised another conditional release to Williamsburg. He bought a bracelet for Ms. CB. His brother and sister joined him. The family was noted to discuss increasing his activities and the next court hearing. Mr. Beffa explored the possibility of paid employment at          Mr. Beffa noted that a female employee at Eastern State was "receptive" toward him and told Dr. Giorgi-Guarnieri that he had made a "new friend." He told Dr. Giorgi-Guarnieri that the treatment team did not want him to give her a painting and he was a "little disappointed because he thinks it is very innocent and they make a big deal out of it." He told Dr. Giorgi-Guarnieri that Ms. CB had a hard month in a psychiatric facility and that she had been contacted by a reporter and an article was subsequently published about their relationship. He stated that he immediately reported this to the treatment team. Mr. Hinckley's family members reiterated their position that Ms. CB should not visit in Williamsburg due to her psychiatric instability. Several discrepancies were noted between what the hospital indicated he would be doing in their 2/15/11 letter to the court and what the Secret Service observed. On 3/9 he was not observed at                    ; however, his mother was seen shopping alone at          and on 3/11 he was not observed shopping at          as listed on the itinerary. Later in March, Mr. Shamblee spoke with David Coe and Mr. Hinckley was approved to receive services from Colonial Behavioral Health Mr. Shamblee also spoke with Maureen Price, who indicated he could receive vocational services once he resides there. Dr. Adewale noted that the treatment team spoke with him about the upcoming CNN program on the shooting of President Reagan and that he initially tried to say it was not a big deal but then thought about it and said that he will be on privilege and if given an extra ten minutes he will return after the program has ended. He also discussed the anniversary in music therapy, stating that he was "frustrated that there is only one side being shown in these things" and was concerned that the commercials would further the image of him as "deranged and violent."

On 4/21/11 Mr. Shamblee presented the treatment team's recommendation to continue 10 day visits in the Response to Motion Filed by Mr. Hinckley's Attorney to Continue Current Conditional Release. Nine risk factors were listed: 1) Depression, 2) Isolation, 3) Psychosis, 4) Lack of Insight into Mental Illness, 5) Personality Disorder, 6) Access to Weapons, 7) Lack of Family Support, 8) History of Suicides, 9) Difficulty in Relationship with Females. It was noted that his risk factors were controlled, his Axis I disorders were in remission, his mental status was stable and his mood was euthymic. During April Dr. Binks noted that he continued to see Ms. CB on a daily basis as she "helps with his need for companionship." Dr. Binks added that he "has a very realistic notion about her limitations in any future capacity to deepen relationship." In terms of presenting his art, Dr. Binks noted that he "explored feelings around hospital

administration decision to not allow him to participate in art display" and "therapy explored the level of narcissism involved in his wish to be present while people viewed his art" and that he "appears to genuinely want feedback on his art so he can become a better artist" and this is "same with music."

In May he continued to focus on his relationship with Ms. CB in individual therapy. Dr. Binks noted that he has "developed much better insight into the reality of their relationship- namely that she is mentally ill and he acts as a caretaker." He expressed frustration with not having ongoing visits. On 5/13 the Court issued an order supporting the motion of defense counsel supported by the hospital to continue his conditional releases to his mother's home under the previous conditions until such time as the Court rules on the hospital's petition for an enlargement of the terms of conditional release.

His next conditional release to Williamsburg was 6/11 to 6/20/11. Mr. Beffa had left the Family Living Institute and had a new office. Mr. Beffa took Mr. Hinckley for an intake interview at People's Place and he was formally accepted. Mr. Hinckley told Dr. Giorgi-Guarnieri that he continued to see Ms. CB almost daily and that the hospital was working on a new motion. He added that the judge had requested that he testify. In the post-outing interview he told the treatment team that he gave a painting to Ms. Kochersperger and to a female employee in the                    department. Again discrepancies were noted between the hospital itinerary submitted in a court letter dated 5/25/11 and Secret Service surveillance. On 6/18 he was not seen having dinner at the                    and on 6/19 he was not seen in the afternoon at the                    in Newport News.

In June he expressed mild disappointment around missing several weeks of music therapy. In individual therapy with Dr. Binks there was discussion about future goals and housing arrangements and his perception of someone at the library as a potential friend. On 6/29 the Court issued an order granting the motion by the hospital to postpone the submission of the 501(e) petition until 7/29/11. The next hearing was set for 11/28/11.

His next outing was from 7/23 to 8/1/11. His sister joined him and his mother. He told Dr. Giorgi-Guarnieri that Ms. CB was out of the hospital and doing well. On 7/24 he was observed at                    by the Secret Service. He was observed to "stop for a time" and look at the shelves in the American History section, which contained several books about President Reagan and his attempted assassination. He did not buy any books from this section but did buy one book about music on the British Invasion. The Secret Service did not observe him go to a movie as indicated on the itinerary. On 7/26 he was not observed by the Secret Service at Dr. Giorgi-Guarnieri's office and on 7/30 he was not observed at                    Dr. Giorgi-Guarnieri's notes indicate that she saw Mr. Hinckley on 7/25 although the itinerary indicated the meeting would be held on 7/26. On 7/31 he was scheduled to go to the                    The Secret Service did not observe him there. His brother, Scott Hinckley, subsequently reported that the family did not go because Mr. Hinckley was complaining of foot pain. The letter to Court indicated that Mr. Hinckley went to the movies. Mr. Hinckley subsequently reported that he lied about going to the movies.

In July Dr. Binks noted that he was pleased to continue with visits and "preparing emotionally for his interviews with the prosecutor's experts which he finds stressful." Dr. Binks noted that he was "heartened by the fact that the hospital is recommending convalescent leave" but disappointed that Ms. CB would not be able to visit him there. In August Mr. Shamblee phoned Ms. CB to verify that she would not be available to speak with hospital staff or experts. Dr. Binks noted that Mr. Hinckley found it stressful to be in the midst of three risk evaluations and to have pressure from the judge to testify. Dr. Binks noted that he "finds this pressure extraordinarily stressful however he is handling it quite well." In music therapy he told Mr. Hyde that the ring he gave Ms. CB was not an engagement ring but a romantic gift and acknowledged it will be difficult maintaining this relationship if he leaves the hospital.

From 9/3 to 9/12/11 he exercised his next conditional release to Williamsburg. He was noted by the Secret Service to retrieve a guitar from a car and to give a painting to a female. He walked and talked with her. Mr. Hinckley indicated that this was Ms. G. During this outing I visited Mr. Hinckley and his mother at their residence and spoke with Mr. Beffa, Dr. Giorgi-Guarnieri and Ms. Kochersperger. In his notes Mr. Beffa reported that he appeared "settled, future focused and hopeful." Mr. Beffa stated that Mr. Hinckley reported doing "most if not all of the driving" in Williamsburg. Mr. Beffa noted that Mr. Hinckley reported that Ms. CB seemed okay with not being part of the Williamsburg plan. Mr. Beffa reported "the woman down the hall from the library with whom John visits is an introvert and not very assertive; however she shared with her [Ms. Kochersperger] that she didn't appreciate John stopping by so often to visit with her, especially since she had recently been newly married." He was pleased that Ms. G returned his favorite guitar. Mr. Hinckley reported that Ms. Kochersperger asked him not to speak with the female        employee. Mr. Beffa noted that "he was accepting and said that he didn't want to make it difficult for the woman and had misread her interest in him because he continues to look for a friend in Williamsburg." Dr. Giorgi-Guarnieri noted that he viewed Ms. CB as his girlfriend and they were intimately involved and that she was alright with not being part of plan for Williamsburg. On 9/4 the Secret Service did not observe Mr. Hinckley at the movies and the hospital letter to Court indicated that he went. He again went to                    . On 9/5 the Secret Service did not observe him at a shopping center at            and on 9/8 the Secret Service did not observe him at            as had been indicated on the hospital itinerary. Mr. Hinckley subsequently reported that he lied about going to the movies.

In September David Coe, Executive Director of Colonial Behavioral Health wrote to Mr. Shamblee informing the hospital that Mr. Hinckley's case was being transferred from case management to discharge planning. Colonial Behavioral Health was to receive relevant documents such as his most recent risk assessment, treatment plan, psychosocial assessments and court documents. Dr. Adewale spoke with Dr. Giorgi-Guarnieri, who reported that Mr. Hinckley had permission to give the          employee the painting. Dr. Adewale noted that "none of us remember but we were not opposed to it."

Mr. Hinckley exercised his next conditional release from 10/15 to 10/24/11. His brother and sister joined him for the outing. Dr. Giorgi-Guarnieri reported that Mr. Hinckley

stated he was doing fine with Ms. CB, who reiterates that she does not want to talk with doctors. He reported that he felt unprepared to testify. On 10/16 the Secret Service observed him at                    noting that he appeared "momentarily fixated" on the middle of the third row of books which contained books about presidential assassins. He proceeded to buy books about Elvis Presley and Bob Dylan. On 10/22 he was not observed at the                    for dinner. When asked about marriage, by Mr. Beffa he stated that he and Ms. CB had discussed marriage but he later told her he had "no plans to marry." When Mr. Beffa discussed this with Dr. Binks, Dr. Binks indicated that previously Ms. CB was "highly enthused about John converting & marrying" but that "John's concepts of engagement and marriage are more loose than most peoples."

## INTERVIEWS OF MR. HINCKLEY:

The interviews with Mr. Hinckley focused on the time frame since my last report. The focus of the interviews was his adjustment to Williamsburg, his hospital course and his relationships over that time frame. The first interview occurred at the family residence in the gated community of                    in Williamsburg, Virginia. Mr. Hinckley greeted me at the door and escorted me inside. There was scenic view of a lake and golf course from the living room. Mrs. Hinckley greeted me warmly and I interviewed them in the living room after briefly chatting with both and explaining the nature and purpose of the interview and the limits of confidentiality.

Mr. Hinckley requested that the more extended interviews be conducted at the hospital so as to minimize the time he had to take away from enjoying his conditional release. At first Mr. Hinckley and his mother were interviewed together. Mr. Hinckley indicated that he was "very well pleased" with hospital's recommendation for an expanded conditional release and potential convalescent leave. Mr. Hinckley reported that his surroundings were "calm and serene and sedate" and "a lot better than St Es" and that it was a "combination vacation and down time away from the mess at St Es." Mr. Hinckley reported that during the outings he worked two days at Eastern State in the library, which has "always gone very well." He reported that he saw Dr. Giorgi-Guarnieri and Mr. Beffa in his roles as therapist and case manager. With his unaccompanied time outside of                    he would go shopping or to the movies. Mrs. Hinckley often drives him where his itinerary indicates and then later picks him up. He stated that it was a "priority" to increase his ability to drive independently. He labeled himself a "good driver" and indicated that he was familiar with his surroundings. He indicated that he would be glad to drive back and forth to D.C. but that was not in the motion. He reported that he had been accepted into a day program at Colonial Behavioral Health, going 2 or 3 times a week. He indicated that there were plans to expand his role at Eastern State, potentially working in a

When interviewed, Mr. Hinckley reported that he felt "calmer" in Williamsburg and that the hospital was institutional living which brought "stressors" and "crowds" and "noises." He stated he "felt better emotionally" and had some sense of freedom even knowing he had to come back in ten days. He indicated that as the amount of time in Williamsburg had historically expanded he felt more relaxed. He stated that he was "very hopeful;"

however, he realized that the hearing was not until the end of November and then he would probably have to wait some time before there was a decision. He reported that everything was going fine at the hospital. He was attending therapies and seeing Ms. CB daily. He reported that he had planned out carefully how to save his cats during the construction and transition to the new hospital. He was able to relocate all his cats to a new area. When asked how it would be to leave all his cats if he attains convalescent leave, he reported that it was already hard to be away from them for 10 days and he was paying a patient to feed them. He reported that he had "spoiled them rotten."

He reported that he lacked friends in Williamsburg. He had tried making friends with "a lady at my worksite" but it did not work out and "they don't want me talking to her." He reported that Ms. Kochersperger asked him to not talk to her, adding that he had not said "anything inappropriate" but that she was married. He reported that it "felt bad" to be told this. He stated that he "just wanted to chat" and was told to stop "so I don't know what to do" in terms of making friends. He pointed out that she had taken a painting and appeared grateful. He subsequently asked if he could call her from D.C. and at first she said he would have to ask "Sandy" but shortly thereafter told him she would not be comfortable with him doing that. He stated that he was only chatting with her one time each day at the library. Mr. Hinckley disagreed with his mother about the level of acceptance in Williamsburg "did not see the rosy picture" she did, stating that he had met with "quite a bit of rejection" pointing out that he "makes efforts to reach out to people but I get rebuffed." He reported that in addition to the lady in the                          he had just been rejected from participating in cat rescue. He had been rejected from an art class. When asked if this caused him to rethink Williamsburg at his destination, he stated it made him question it, but that he wanted to continue and was still committed to living in Williamsburg. He stated that "within           it's pretty comfortable." He reported that he did envision living in Williamsburg if his mother were to pass, adding that he would probably live elsewhere such as housing through Colonial Behavioral Health. When asked about Ms. CB visiting, he stated that he "wasn't happy" with the treatment and his family opposing his desire to have her visit but he "wasn't fighting it now" due to concerns about her mental state. He added that she is "not part of the Williamsburg plan" and that since she would not speak with other experts, such as Dr. Phillips and Dr. Patterson, she might be prohibited from visiting. He indicated that Mr. Shamblee called her and confirmed that she did not want talk to anyone. He hoped that not having her as part of the plan would "defuse the ire of the great Phillips and Patterson" over her not speaking to them. He hoped to be able to continue speaking to her by phone but that he was concerned he could be prohibited from talking to her in the future by court order since he was currently prohibited by court order from talking with Ms. DeVeau or Ms. M. With regard to medications he stated that he wanted to reduce the medication but had not even broached the topic with Dr. Adewale since he felt that Dr. Adewale would not change it until after the hearing.

Mr. Hinckley was interview on 10/27/11 at St. Elizabeths Hospital. When asked about the process of being repeatedly evaluated throughout the years, he stated that it was "tiresome and tedious," adding that he would rather be doing other things. He indicated there was anxiety associated with the upcoming hearing and that the hearing itself was

"not a pleasant process" since he was shackled and placed in a holding cell. He stated that all his outings had gone well and that he had "done everything that's been asked of me" and "proven I can live in the community." He described his mood as "good" and indicated that the Zoloft has helped with anxiety and but that he wants to reduce it after the hearing. When asked about his current treatments in the hospital, he reported that he enjoyed recording with new equipment in music therapy that "makes you sound like you're in a major studio." He estimated having composed over 200 songs and acknowledged that he "would like people to hear my songs." He wished other people could hear his music in part to alter the negative perception of him. He reported that he had an increased interest in painting and finds this medium "relaxing." Again he wished that others could view his productions and found it "totally frustrating" that he was prohibited from allowing others to view his art. He enjoys art therapy and painting in Williamsburg. He reported that his feral cats were "still a big part of my life" and he feeds them in the morning and late in the afternoon.

When asked about relationships, he reported that he had not spoken with Ms. DeVeau in quite a while. When he ran into her on the grounds during the summer, he felt the conversation was "strained." He reported that it was "disappointing" when he had reached out to her after the last hearing and she did not wish to renew the relationship. He stated that he felt rejected and that "I've had a lot of rejection since then and a lot of rejection in Williamsburg" but he believed he had "handled it pretty well." In Williamsburg he cited being rejected for art lessons, at the cat rescue group, at a singles group, at the Williamsburg library and humane society but stated all he could do was to "keep plugging" away at finding appropriate activities. He pointed out that he had been accepted at Eastern State Hospital and that the people within .           "are friendly." He hoped to expand activities at Eastern State and go to People's Place. He stated that he liked working with Mr. Beffa and "think we have bonded quite a bit since the last go round" and they have "pretty good rapport." He stated that "Binks knows me more in depth" and believes that Mr. Beffa and Dr. Binks are working together. He stated that Mr. Beffa wanted him to join his therapy group at night once a week. Mr. Hinckley reported that he "wasn't happy" about Dr. Lee giving "very little notice" about leaving and that it took him three months to resume visits but he was "very happy about Dr. GG," who he viewed as "more involved in my life and case." He reported that he had offered her a painting but she wanted him to ask his treatment team and Dr. Rafanello said no. He stated that he did give paintings to Ms. Kochersperger and the female       employee. When asked why, he stated that he thought they might like it.

On November 2, 2011 Mr. Hinckley was interviewed in the treatment mall at St. Elizabeths Hospital. When asked what his diagnoses were, he stated he was "not sure what it's evolved to now," but thought it was "atypical psychosis and depression in remission and the main one was narcissism." Regarding the psychosis, he stated that "in my case it was delusions I had 30 years ago" that were "around Jodie Foster." When asked to be more specific, he stated "we would be reunited at some point in the future." He stated that he has not been significantly depressed since the early 1980's. When asked to identify symptoms of depression, he stated "hopelessness" and "that despairing feeling" or "I can't go on." When asked about current depression, he stated that he has

not been that depressed for a long time, but that "my life is difficult" and he has "been confined for thirty years" and that variations in his relationships or ability to go to Williamsburg "can make me a little moody but I don't feel down all day." He reported that he was down after his favorite cat died. With regard to narcissism, he stated that "I think everybody has it to some extent" and "mine is greatly attenuated" in that he is "far less grandiose" and "far less self-centered" and "far more empathic" and less entitled. He stated that he cares about his family and his relationships and does not think that wanting his musical or artistic creations to be viewed is narcissistic since "any artist has that ambition" and that "you create to show others." He added that he knows "the feeling of depression" and "would know it when it came upon me." With regard to delusions, he stated that "others would notice" and he "didn't have those checks and balances many years ago" when "I was very isolated."

Mr. Hinckley was asked whether he thought his relationships with women were problematic and he stated, "I don't really agree that I have a problem with women" adding that he had "never harmed a woman" and "don't put them down." He stated his ideas about Jodie Foster "wasn't a relationship that was a fantasy." While "the crime involved a woman" it was "not like she was my girlfriend" and "not someone I had a relationship with." He stated that the relationship with Ms. DeVeau "was a wonderful relationship." With regard to being rebuffed in relationships, he stated "I show time after time that it's not a risk factor." He stated that he has had 4 or 5 relationships and "they've ended either by being rebuffed or dwindled." When asked if this risk factor was overblown, he stated "yes, very much so."

Regarding Ms. CB he reported that he met her in the summer of 2009 when he started in the treatment mall. They did not start a relationship until 3 or 4 months later. She was released from the hospital in early 2010 and "by and large" has been out since then with "brief stays back." She was also hospitalized in Baltimore for about one month back in March. Mr. Hinckley stated that she "has schizophrenia" but is "on meds" and has a "good support system" and is able to maintain her own apartment. He stated that she has "been what I would say is my girlfriend since around October or November 2009." She visits him around 4 times a week and they talk on the phone "quite a bit- more than once daily." Regarding the progression of the relationship, they "started having some kisses early on" and then after she was released "there was more affection." They talked about marriage but there was a "sticking point" since "she wanted me to be a Catholic and I didn't want to be a Catholic." He stated that it "never got to the point of being engaged." She was "expressing that she wanted us to be wed" and he was "not sure I said the same thing." He stated that he has given her several rings, a watch and bracelet. When asked if he gave her an engagement ring, he stated that "the closest one was a ring that she wore" that "looked like the one Prince William gave to Kate." He was "not sure how I expressed it to her." However, they were never engaged in terms of setting a date to get married. In terms of her visiting Williamsburg, her mother was opposed and he "couldn't get her on board" but he has not pursued this for a while in light of her psychiatric instability. He understands that his brother and sister also do not favor her visiting Williamsburg. He recounted the episode where she had to be escorted out of the hospital at the Christmas party. He stated "I don't panic but my mother would probably panic."

He stated that he still considered her his girlfriend. In future he thought he would continue to see her in DC and maintain phone contact while in Williamsburg.

With regard to Ms. G he reported that they still talk on the phone "about once a week or every other week." A couple of months ago she visited and brought back his guitar. In light of her having a boyfriend "I just don't think it can go any further." He recalled that he briefly met another female in the treatment mall before Ms. CB. They kissed and she was friend but he has not had contact with her since her discharge. He reported no recent contact with Ms. M. Ms.             visits him around once a year and wanted him to display his art at a show in San Francisco but this was turned down. He recounted what happened with the female          employee at Eastern State, stating that they chatted and he gave her a painting but then was told by Ms. Kochersperger not to talk with her anymore. He reported that Ms. CB was not aware of his relationship with Ms. G and "if I told her she would not be happy" and "would think there was a rival" and "wouldn't understand that she is just a friend." He reported that Ms. CB saw him one day in the lobby with Ms. G and "wasn't happy at all." He reported that she is "deeply involved" with a conservative Catholic group, called the Neocathecumenal Way and "goes on retreats with them." He reported that he tried to ask more about the group but did not have a complete understanding of their beliefs. When asked how her conservative beliefs affected having premarital sex, he stated that she was "conflicted" and had a "guilty conscience." He reported that he looked into converting to Catholicism and found that he would "have to do like six months of classes" and was "just not up to it."

We discussed his not informing the treatment team about Ms. G going to the restaurant in 2008 and the incident of looking up the graduation pictures of the dental resident in June 2009. Mr. Hinckley stated that he was not sure that Ms. G would show up and felt that being put on ward hold for ten days was not fair. With regard to looking up the pictures on the internet he reported that the resident was "a really good dentist" who "fixed my teeth" and "was friendly to me." The resident "told me there were graduation pictures of her online" and "if I wanted to see them." He should have told Ms. Pedrick-Jernigan but "fessed up" when questioned. He stated that the resident was attractive.

With regard to his medications, he stated that he believed the Risperdal was "just preventative" and that he was not psychotic when he started but "certain people wanted me on guard against getting psychotic." With regard to the Zoloft, he stated he went to Dr. Green around 2005 and reported he had anxiety. He has been on it ever since and had it increased when he was waiting for a decision from the Court. He reiterated that he thought it could be reduced from 150 to 100 once the hearing is over.

Mr. Hinckley reported that he felt "much more" integrated into Williamsburg than three years ago. He has been volunteering there regularly and has Mr. Beffa and Dr. Giorgi-Guarnieri. He has "done a lot of driving" and knows his way around. He had "met resistance and rejection" and "anytime anything happens" the newspapers "run articles with kind of a negative slant." However, he has never been confronted by anyone. He feels accepted at Eastern State and hopes to increase his time there. He hoped to eventually have a paid job there. He believed his immediate future would include going

to a day program at People's Place. He stated that this program has groups in Spanish and music appreciation and cooking.

When asked what he would do if his mother was no longer around, he stated that Williamsburg would still be the goal. He hoped to be working and perhaps have friends. He would like to play music with others and have a music therapist and art lessons. He reported that he remained focused on Williamsburg but "I've been confined so long I could live just about anywhere."

Mr. Hinckley reported that he continues to be actively engaged in various therapies at the hospital. He believes that he has a good relationship with Dr. Binks and Mr. Hyde and enjoys art with Ms. Cogan. He also attends Guitar class, Illness Recovery Management, Emotional Regulation, Mental Health Teaching and some fun and fitness.

On November 9, 2011 I resumed my interviews of Mr. Hinckley. When I asked about recent developments, he reported that there had been a computer search by the prosecution of the computer in the library. About two weeks he had heard from Ms. Luciano, who had spoken with the prosecution, that various music and art sites were found. However, more recently, Mr. Levine informed him that random names associated with his case were put were put in and "these hits came up." He stated that he did not know what this meant but that he "never typed in Jodie's name or Reagan's name" and other people have access to the computer. He reported that he did look at music sites but if he looked up a Beatles musician it would have been John Lennon and not Paul McCartney. He thought the name "Connie" might be an artist in Williamsburg that he did look up. Regarding President Obama, he stated that another person in the library, named Barbara, was "a big fan of the Obamas" and had "pictures in her office." He stated that he did not look up anything about sexual interaction.

When asked about the books referenced in the Secret Service report he stated that he did not pick up any books and "that's what bookstores have books." He added that portraying him as being interested particular books was "just sickening." When asked about the 30th anniversary, Mr. Hinckley reported that he was a "little surprised that there was so much attention." He stated that he watched the CNN show with Dr. Phillips, who asked if he was angry or had any strong emotions. He stated that he did not and pointed out some inaccuracies but overall the show was the "same old crap" and "they chose to end the show with DiGenova." He reported that he had been contacted by CNN and the author of "Rawhide Down" but did not respond.

Mr. Hinckley reported that Ms. CB had been outpatient committed but was recently converted to voluntary. He continues to see her 3 or 4 times a week and they talk regularly on the phone. He reported that he is anxious about testifying and that the judge has submitted some questions for him to answer which he is thinking about. He stated that one question had to do with what he would do and where he would live if his mother were gone. He stated that he would probably live outside          and that "Dr. GG has ideas and places in mind" where "I think there is supervision." Mr. Hinckley reported that

his mood was "okay" but that he was "not looking forward to seeing Patterson or Phillips" and "I don't know of any human being put through the grinder like I am."

A final interview was conducted on 11/20/11. Mr. Hinckley reported that the Review Board met on Friday and discussed his reporting that he went to a movie twice when he did not. He stated that the decision was to cut back on the unaccompanied time until he has four visits and half the time for the Christmas outing. The plan would still be to increase his time from 10 to 17 to 24 days. He would still go to the library and People's Place. When asked about the movies, he reported that he was not trying to be devious and do something else, but that the movie he wanted to see was at a bad time and he did not want to pay for a movie he could not see in it's entirety and did not want to pay for movie he was not interested in so he decided to stay in the general area for the allotted time. When asked why did not honestly report what he had done, he stated that he did not "want people to think I was so cheap" that he would not pay for movie he could not see all off. When asked if this reminded him of past mistakes, he stated that he had "slip ups here and there." When asked to assess the significance of lying about the movies, he stated that it is significant in terms of honestly reporting what he has done but not significant in that he did not see the movie. Mr. Hinckley repeated stated that he "was a human being" and "was not perfect," but added "I should have come back said it was at a bad time and didn't want to pay for half the movie." He stated that "in ten days things happen." He stated that in so many years with so much scrutiny there would be failings. Mr. Hinckley stated that he knew he should have told the treatment team about not seeing the movie. He did not think that his level of scrutiny would change in light of his mistakes since it has always been high. I pointed out there were other discrepancies between the court letters and the Secret Service observations and asked if there was plan to reduce the likelihood of that occurring in the future. Mr. Hinckley stated that there were probably times he went to          for example on a date other than what was indicated in the itinerary. He stated that "it was virtually impossible to follow an itinerary to the tee" depending on how things change or his mother's availability. When asked for example, if the itinerary had a          visit on a Thursday afternoon and he went on Friday, whether he would know there was a deviation. He stated that he would just report having gone to          not the exact day. Mr. Hinckley was receptive to having some kind of log to check off in terms of if and when he went to specified activity at a specified time. I asked how often Mr. Hinckley was driving. Mr. Hinckley reported that there was no requirement he had to drive a certain amount and that he and his mother "split" the driving but he did not know the exact percentage.

In terms of his relationship with Ms. CB, he expressed some exasperation, since he "had been over it a hundred times" with so many different people. He stated that they were never engaged but had talked it. His view was that "maybe early on" she thought they were engaged "but certainly not now." He believed that they were "talking engagement" around the time she met with the treatment team, which was 8/25/10. He was not sure how long they were considering engagement. He did not recall showing Mr. Shamblee an engagement ring. He reported that he sometimes wore a silver ring he bought from another patient but that "it had nothing to do with          " When asked if this reminded him of discussion in the past about rings with Ms. DeVeau and a Claddagh ring and what

the ring meant, he stated that "things change" and at one point the ring with Ms. CB was related to talks about engagement but everything has changed. He stated that it is frustrating that if he talks about engagement at one point but then things change and he says he is not engaged it seems to some evaluators that he is "devious or deceitful." He stated that "things change" even more rapidly with Ms. CB since she is "tumultuous in her emotions" due to her mental illness. When asked if he knew what made her change her mind about speaking with experts, he stated "no" that she "just said they're not my doctors." When asked what he thought Ms. CB would say if asked if they are engaged, he said, "I think she would say no." He stated that she is aware that he expects to spend more time in Williamsburg and will see her only when he is in D.C.

Mr. Hinckley stated that he thought it was "a good idea" that Ms. CB not be aware of his relationship with Ms. G because of how she would react. When asked if that was deceitful, he stated that he would not use that word, it was just being "smart." He stated that Ms. CB saw him with Ms. G one day and "was upset about it" and "still brings it up to me from time to time." He stated that Ms. G knows all about Ms. CB and is "fine with it." When asked if in the past he had concealed having a sexual relationship with one female from another, he asked what I meant. I pointed to a note from Dr. Binks about Ms. DeVeau being upset at finding out that he had a sexual relationship with Ms. G. Mr. Hinckley stated that it was a fair characterization to say he would not want her to find out but that at time [Summer of 2008] he was not in a relationship with Ms. DeVeau.

Mr. Hinckley was asked whether he ever thought about Jodie Foster and at first he stated "no." When confronted with a statement from Dr. Patterson's report, he stated that the only time he thinks of her is if he sees a commercial of one of her movies or it "might come up if I am thinking about my past" but "I don't dwell on her." When asked if googled Ms. G, he answered "I must have because Velora said I did but I don't remember."

When asked how all the recent developments have impacted him, he stated that he "would be very glad when it is all over." When asked if he had learned anything, he stated "I don't dismiss the matter of the movies. I should have come back and said it was a bad time. I didn't see the movies. I need to be accurate." He said that perhaps a checklist would help him be aware of deviations. He stated "I don't know if anybody else could live like this under this scrutiny" with "Secret Service agents lurking behind every corner trying to catch me at things, who could live like that?" He stated "I do the best I can sometimes I have a failing" and "99% of the time I do very well." He stated "who in life doesn't tell lies" and that "I try and be honest" and "I should have been honest with the matter of the movies." He stated "I don't go around trying to be devious. I try to be upright and honest but I am human." When read part of Dr. Phillips report about him saying that deception was not a big deal, he stated "I don't think that's accurate. I am trying to express to you that it is a big deal." When asked how the recent developments impact his mood, he stated that he was "still hopeful but that I don't think we will get everything we are asking for."

## COLLATERAL INTEVIEWS:

### St. Elizabeths Hospital Staff

Kevin Shamblee, Clinical Administrator, reported that he has been working with Mr. Hinckley since 2005 and currently acts as his clinical administrator as well as fulfilling certain social work responsibilities. He currently observes Mr. Hinckley on a daily basis on days he is at the hospital. Mr. Shamblee reports that his mood has remained stable over the years with fluctuations in anxiety around Court and women. He reported that he was "sad," when there was an extended period he could not engage in outings. Mr. Shamblee did not report significant irritability but did indicate that Mr. Hinckley could be "nagging" about making sure everything was ready for his outings, yet he was always "polite" in the process. In terms of narcissistic features, Mr. Shamblee reported that these were not prominent stating that in light of his socioeconomic status and hospitalization, it was not unusual for him to expect certain things to be done for him. Mr. Shamblee reported that he does display empathy, asking about someone if they are ill and has exhibited "general caring" for Ms. CB, when she is not doing well. In terms of being open versus guarded, Mr. Shamblee stated that he "answers every question" but often has to be asked. When asked about the incident resulting his ward restriction in December 2008, he reported that the patients were asked if they wanted to invite anyone and he did not respond. Mr. Shamblee found this somewhat "puzzling" since he could not understand what was to be gained by not telling.

Judgment with women remains a clinical concern. Mr. Shamblee reported that the current focus is on his relationship with Ms. CB. Mr. Shamblee reported the relationship has gone "back and forth" with prior talk of engagement and marriage and now more of friendship. Mr. Shamblee reports that he describes the relationship as "friends with benefit" meaning they exchange physical intimacies. Mr. Shamblee reported that after his family and treatment team were not supportive of marriage or her visiting in Williamsburg he began to appreciate that viewpoint and "also doesn't want to be Catholic," which was important to her. Mr. Shamblee stated that he has met with Ms. CB several times and she may have been "leading the way" in terms of marriage. Mr. Shamblee recalled when he and Mr. Hinckley escorted her out of the hospital after a panic attack and he then asked Mr. Hinckley about what would happen if this was Williamsburg. Mr. Hinckley stated that he could not subject his mother to something like that. Currently, she typically visits in the evening and will call during the day. Mr. Shamblee reported that the relationship with Ms. G has dwindled significantly but that she did visit recently finally returning his guitar. Mr. Shamblee estimated monthly phone contact. Mr. Shamblee reported that Ms. DeVeau does some trainings at the hospital as part of her job and they may stop and talk but there is no report of any regular contact. Mr. Shamblee reported that he recently asked an employee at Eastern State Hospital if he could call her when he was in D.C. but she said no and then he was advised by the librarian there not to stop by and chat with this person. Mr. Shamblee recounted the incident with the dental resident stating he probably engaged in looking at the pictures because she was "young and attractive." Mr. Shamblee reported that the resident denied inviting or telling Mr. Hinckley about the pictures. Mr. Shamblee stated that while some

of the behavior he exhibits in relationships "don't really help at hearings," he stated that he has learned from these relationship and the relationships are real and not delusional.

In terms of putting together the current hospital recommendation for expanded conditional release, Mr. Shamblee reported that there were frequent meetings and that he and Dr. Murphy would meet almost every day. Her report was not finalized "but the information was there" including "her risk level and recommendations." They made an effort to increase his driving since this was "one of the biggest requests from brother and sister" and would lessen the burden on Mrs. Hinckley. They did not discuss him driving back and forth independently from D.C. but focused on increasing his independent driving in Williamsburg. The logic around increasing the visits from 10 to 17 was to expand the format, which was working well, of leaving on a Saturday and returning on a Monday so he would only miss one week of treatment. When asked why the plan went from 2 visits of 17 days to 24 days, Mr. Shamblee stated that "that took a lot of discussion" and they "wanted to try and make this a quick process" where he would be assessed and move to extended visits. He would initially be seen weekly by his treatment providers. One goal is to cut down on his shopping and increase his structured activities. He can volunteer more often at Eastern State and attend People's Place. In terms of selecting six 24 day visits before assessing his readiness for convalescent leave, Mr. Shamblee stated that the decision was "based on risk and treatment needs." This would allow enough time for assessment and time to pursue vocational opportunities. Mr. Beffa has spoken with staff at                and this remains a vocational option. Mr. Shamblee was initially not clear whether the transitions from 17 to 24 and 24 to convalescent leave would require Review Board approval but then stated that the transition to convalescent leave would go before the Review Board, especially since an updated risk assessment was conceptualized as part of the process. Mr. Shamblee believed that the hospital should continue to focus on Williamsburg as the location for convalescent leave whether or not Mrs. Hinckley remained available for support.

Dr. Adewale reported that he was been Mr. Hinckley's treating psychiatrist since around May 2009. Dr Adewale added that Mr. Hinckley was on his ward in the past when Dr. Green was the treating psychiatrist and was familiar with him. Dr. Adewale stated that there had been a tradition for the medical director in forensics to assume the role of treating psychiatrist but that Dr. Jones stated that due to other duties this role would have to be delegated. Dr. Adewale reported that when he started working with Mr. Hinckley he had to counsel him to seek him out twice weekly, which he has diligently done. When Dr. Adewale assumed the role of treating psychiatrist, Mr. Hinckley was being medicated with Risperdal 1 mg daily and Zoloft 150 mgs in divided doses. He has not made any changes. Dr. Adewale reported that they discussed combining the Zoloft doses but that Mr. Hinckley preferred to receive it in divided doses. Dr. Adewale stated that "compliance has never been an issue." When told that Mr. Hinckley wondered if the Zoloft could be reduced to 100 mgs, Dr. Adewale stated that this had not been discussed and he is "working well on this dosage" and "changing dose at this time is not a good idea." If he remained stable for "maybe 6 months to a year" after being in Williamsburg this could be discussed with him and Dr. Giorgi-Guarnieri. When asked about changing the medication in light of both Axis I disorders being in full remission, Dr. Adewale

stated that "in the future that would be a consideration but not now." He stated that Risperdal "can be like a safety blanket" for potential psychosis and "helps potentiate the antidepressant" as a "mixed serotonin and dopamine antagonist activator." Dr. Adewale reported that he speaks with Dr. Giorgi-Guarnieri every treatment plan and has called her independently "at least twice." Dr. Adewale states that Dr. Giorgi-Guarnieri is "easy to collaborate with" and views her as "very capable" and has "every confidence" in her.

In terms of current diagnosis Dr. Adewale stated that Mr. Hinckley has Major Depressive Disorder, In Full Remission and Psychotic Disorder NOS, In Full Remission on Axis I and Narcissistic Personality Disorder and Schizoid Personality Disorder, Premorbid on Axis II. He listed his Axis III conditions as history of left inguinal hernia repair, constipation, sinusitis, rhinitis, gastritis and gastroesophageal reflux disease (GERD). Dr. Adewale reported that his mental status was stable and he remained calm. His memory was intact. There are no signs of thought disorder or significant depression and no evidence of suicidal or homicidal ideation. Dr. Adewale reported some "emotional change" when told not to see the lady he was chatting with in Williamsburg and that he was "a little angry" but Dr. Adewale stated he thought the anger was "appropriate."

Dr. Adewale reports that he believes he has a good rapport with Mr. Hinckley. They discuss his music and art and "very briefly" discuss his relationships. Dr. Adewale stated that he met Ms. CB in the lobby when "she stopped me to introduce herself." Dr. Adewale stated that outings "brighten his mood" and he definitely looks forward to them. Dr Adewale reported that he participated in the meetings to formulate the E motion and was in agreement with it. Dr. Adewale reported that he was aware of the new computer forensic report but had heard that different people log onto the same computer. Dr. Adewale reported that he "looked at him in the face and he said I did not."

Sidney Binks, Ph.D. continues to seek Mr. Hinckley on a weekly basis for individual therapy. Dr. Binks reports that Mr. Hinckley remains psychiatrically stable with "no substantive change in mental status." There are periods of irritability and dysphoria often in relation to relationships or the court process but overall he has "handled it well." His mood is "good" but he can become "mildly anxious" or "worried." For example, in his relationship with Ms. CB there have been "significant challenges" due to her mental illness but he "understands her illness" and "rolls with that." Dr. Binks reported that his mood is buoyed by the outings and that he "really looks forward to them."

In terms of relationships with women, Mr. Hinckley has "improved insight" but is still learning. While he spoke of engagement and marriage to Ms. CB, this was somewhat immature. Over time he realized how sick Ms. CB could become and appreciated his mother's reluctance to have her visit in Williamsburg. Dr. Binks believes that she was "pushing" the marriage but that over time he became more realistic and did not want to convert to Catholicism. Dr. Binks thought the incident with the dental resident was "a tad overplayed" but that Mr. Hinckley displayed bad judgment. Dr. Binks reports infrequent contact with Ms. G though she did recently visit and returned his guitar. Dr. Binks cited the course of this relationship as a good example of how he has learned to deal with disappointment and rebuff in relationships. Dr. Binks pointed out that at no point did the

rebuff or rejection lead to significant depression or delusions and he did "not fall apart." Dr. Binks stated in his view it was a significant mitigating factor that he has learned to handle break-ups and rejections in relationships as well as a measure of his resiliency.

In terms of being open versus guarded, Dr. Binks stated that he is "halfway there" and overall "much better" and has made efforts to share more information. However, in his view it remains wise to have continued monitoring. Dr. Binks reiterated that he does not view Mr. Hinckley as significantly narcissistic and that the grandiosity he exhibited decades ago was delusional and related to his "active Axis I" disorder. Dr. Binks stated that some narcissistic traits remain such as self-absorption. Dr. Binks reported that he demonstrates empathy in his relationships and to family members. Dr. Binks stated that he has become "a little more social" over time. His social needs tend to be met "with one person at a time." Dr. Binks thought that if his mother were to no longer be available, it would impact him "maybe more than he is aware" and this would be a "huge adjustment" and an "emotionally significant loss." Dr. Binks viewed his art and music as an important therapeutic activity and thought that the release of these productions should be monitored since there was a "potential for problems" if not regulated. Dr. Binks stated that Mr. Hinckley had talked of selling art to give restitution to the Brady family.

In terms of communication with Mr. Beffa, Dr. Binks reported that they talk during every visit. Dr. Binks shares all his notes and communicates what is going on in therapy. Dr. Binks reported that he was heartened by the addition of Dr. Giorgi-Guarnieri to the treatment team since she brings forensic experience to the mix. Dr. Binks stated that he supported the E Motion submitted by the hospital, which he reported went through numerous revisions with input from all treatment team members and Dr. Murphy and was "extremely carefully thought out."

Overall, Dr. Binks views his risk for decompensation as "very low." In his opinion he would have to develop a sustained and significant depression to become delusional. Decades of remaining stable have rendered that scenario unlikely. Dr. Binks described Mr. Hinckley as very resilient. In addition, he is monitored by skilled professionals familiar with his psychiatric history, who could intervene to prevent a full decompensation.

Dr. Murphy reported that the risk assessment was started in January 2011 by Dr. Rafanello, who performed most of the psychological testing. When Dr. Rafanello announced she was leaving, Dr. Murphy assumed the role of risk assessor. At one point there was a discussion about involving Dr. Tyler Jones but he was not able to dedicate the time. Dr. Jones did conduct one interview with her on 6/1/11. In terms of selecting a methodology for assessing general violence risk, Dr. Murphy reported that the hospital has a standard protocol. This involves the administration of an actuarial measure such as the VRAG and using a structured professional judgment tool such as the HCR-20. Dr. Murphy administered the PCL-R, VRAG and HCR-20 and achieved very comparable scores to what had been obtained by me or with regard to the PCL-R by me and Dr. Heilbrun. As noted in her report, Dr. Murphy concluded that under the plan proposed by the hospital, Mr. Hinckley was at low risk for violence. Dr. Murphy also viewed his risk

to self as low noting the absence of suicidal behavior since the early 1980's. In terms of the risk assessment being incomplete before the E motion was formulated, Dr. Murphy believed that all the collateral interviews were completed except Dr. Adewale. She reported that there were numerous meetings, maybe 10-13, with Mr. Shamblee, Dr. Binks, Mr. Hyde, Ms. Cogan, Dr. Morin and Tonya Sapp about formulating the proposal. On 7/12/11 there was a conference where she presented her preliminary findings. She delivered her feedback to the Review Board on July 19, 2011. The Review Board met for 3-4 hours. She performed a final interview with Mr. Hinckley on 8/12/11 to question him about remaining areas of concern.

In terms of risk management, Dr. Murphy recommended consistency in communication by all providers and ongoing monitoring. Dr. Murphy recommended further work on his judgment in relationships. She also recommended an updated risk assessment before being placed on convalescent leave. Dr. Murphy thought the media plan and internet monitoring should remain in place.

Dr. Murphy thought that his Axis I disorders had been in full sustained remission for many years and that the likelihood of a decompensation was low. She reported that she listed the Major Depressive Disorder as Mild in her report because that was the diagnosis in the electronic medical record system. When she discussed this with Dr. Adewale, he stated that the disorder was in full remission but that Avatar (the electronic medical record system) had somehow automatically populated it with that diagnosis. Dr. Murphy affirmed that her view was that his depressive disorder was in full sustained remission. She endorsed some ongoing narcissistic features but indicated that he has shown empathy in relationships. As noted in her report, she believed that the warning signs of a decompensation would be detected by mental professionals. Dr. Murphy expressed support for the hospital's E Motion.

When interviewed on 11/9/11 and asked about the computer forensic report, Dr. Murphy reported that it was her understanding that the "hits" were not necessarily words that Mr. Hinckley had typed in but "any words contained in an article." She added that "frankly at this point I'm waiting for more information." She also understood that there were other people in the library who logged in with the same password. She stated that "right now Mr. Hinckley is denying" that he typed in names such as Reagan or Jodie Foster. When asked what would happened if it were determined that he lied, Dr. Murphy stated that it "depends on what it is," adding that typing in Ms. G was different than typing in Jodie Foster. She believed that there was a plan to have the Review Board discuss this new development.

When interview on 11/18/11 Dr. Murphy reported that after a meeting of the Review Board various consequences were to be implemented for lying on two occasions about going to the movies. He would have no unaccompanied time outside            until April when he would be assessed for reinstatement. The 17 day visits may be extended to 3 or 4 at hospital discretion. Some sort of log would be implemented to track adherence to itineraries. There was contemplation of some sort of tool to rate the reliability of his self-report and then if and when deception is identified to help select consequences. Dr.

Murphy reported that the hospital had requested the Secret Service surveillance reports back in June but had not received them until much later.

V.J. Hyde, music therapist, reported that he continued to meet with Mr. Hinckley on a week basis for one hour. Mr. Hyde reported that Mr. Hinckley continues to work diligently composing and recording original music. There was a period of frustration when a digital recorder malfunctioned and Mr. Hinckley was forced to improvise and find new ways of playing and recording. In terms of songwriting, Mr. Hyde reported that he "still wants to idealize love" but is more able "to see negative sides." Mr. Hyde reported that he is "pretty open" and feels it is important to honestly express his emotions in music. Mr. Hyde stated that at times he is reluctant to explore certain themes out of concern for the government blowing it out of proportion, which Mr. Hinckley believed happened with "Ballad of the Outlaw." Mr. Hinckley continues to actively explore and process relationships in his music and his music can be "very telling" about how he is perceiving relationships. As noted he has gradually moved from idealized pop songs to more complex material dealing not only the initial infatuation but with the decline and eventual demise of the relationship. He is aware and sensitive to the likelihood that relationships "might not be sustainable." For example, with Ms. CB he realizes that she will likely not be in Williamsburg and that while he desires to protect and care for her that he may not always be able to do so. At present, Mr. Hyde reports that they are not engaged and do not want to get married. Mr. Hyde reported that Mr. Hinckley felt the incident with the dental resident was "innocuous" and that he had only looked at pictures of her online. Mr. Hyde reported that the topic of Jodie Foster has not come up since the last hearing.

Mr. Hyde reported that Mr. Hinckley identifies himself as an artist and musician, which leads in his view to a desire to want to share his creations and receive validation. This was probably related to why he sought out _____ a local musician, and shared his music with him to get feedback. They have also discussed the implications of Mr. Hinckley giving his music or art to others, often women, and what the implications are, especially since he can no longer control what that person decides to do with it. While Mr. Hyde understands the desire display one's creations, he believes that some monitoring and limitations should be in place, such as represented by the media plan. For example, the hospital recently displayed artwork by patients, which could be purchased. Mr. Hyde insisted that any art he displayed be anonymous and not for sale. Mr. Hyde stated that Mr. Hinckley is eager to demonstrate to others through his art that he "is not the person he was" and "really wants to change the perception of who he is." However, Mr. Hyde believes that he does not fully grasp the risks of potentially being exploited or creating a backlash or of increasing his narcissism. On the other side of the coin, music and art are an important modality for him to connect to others and sharing his music and art with others has a role to play. Mr. Hyde reported that he was actively seeking a music therapist for him in Williamsburg and had recently made a contact he was exploring.

Mr. Hyde characterized his mood as stable with periods of "brooding." However, there are intervals where he is "not effusive but can be happy." For example, when the music department received new Mac computers for recording music, Mr. Hinckley surprised

him with a high five. Mr. Hyde reported that his affect is often somewhat flat but he can be more animated at times. Mr. Hyde did not report significant depression but there is periodic anxiety and irritation. Mr. Hyde described Mr. Hinckley as a "prolific" composer and song writer, who "can sit down and bang out a pop song" and is "really a talented musician." Mr. Hyde pointed out that there is often a theme of hope in his music, which leads him to be focused in positive way toward the future.

Deidre Cogan, art therapist, reported that she has been working with Mr. Hinckley since around June or July of 2009. Ms. Cogan reported that prior to the initiation of the treatment mall a studio art therapy program was developed with an emphasis on "building an art community." She reported that Mr. Hinckley "really enjoys painting" and is "prolific." In art therapy not much time is spend "processing the art work." His techniques have evolved and he has become "much less rigid." He produces "at least two paintings a week" and is "pretty spontaneous." He typically paints buildings, landscapes and abstract designs. She has "never seen anything noteworthy in terms of violence, sex or thought disorder" in his work. She stated that it "may be noteworthy that there are no people maybe cats." Ms. Cogan reported that art was "really grounding for him" and a "mood enhancing intervention." The art provides him with an opportunity to socialize. While he is "not a really verbal person" he is "very supportive of his peers" and "relatively compassionate." Ms. Cogan reported that she "used to see him as more self involved" but he has "gotten better in the last year and half." Ms. Cogan stated that, "I really do think there is a narcissistic element to making art" and "people usually want that recognition" but "don't think that is abnormal, don't think he wants excessive praise," adding that it "is frustrating by not having his work recognized." Ms. Cogan would not recommend insight oriented art therapy in Williamsburg but would recommend art classes perhaps from a community college. More professional art classes might be too critical. Art classes would also provide an opportunity for socialization. Ms. Cogan reported that his affect it typically flat but he does "smile and interact" with others. Ms. Cogan stated that "some of his work is actually quite good" and others "have commented on the strength of his pieces." Ms. Cogan reported that he did present with "some dysthymia" but his overall affect is "brighter now than a year ago."

Velora Jernigan-Pedrick, hospital librarian, reported that Mr. Hinckley continue to perform well at his job and remained stable and reliable. She reported that she did talk directly with Sandy Kochersperger at Eastern State Hospital to explain what Mr. Hinckley did at St. Elizabeths Hospital and help set up a comparable position there. She has not had further contact with Ms. Kochersperger. In terms of the incident with the dental resident, Ms. Jernigan-Pedrick reported that she checked the internet history and found "something questionable." When she discovered the pictures, she informed Mr. Shamblee. She reported that she and Mr. Hinckley did not discuss the incident and that the consequences were handled by the treatment team. In their daily interactions she reports that Mr. Hinckley discusses his outings and his plans and that she jokes with him about learning how to cook. She reported that he has discussed his relationship with Ms. CB and "when sick that concerns him." She stated that she joked with him about buying her a ring, telling him that giving a woman jewelry would mean to her they were engaged. She stated that he has not discussed Ms. CB recently. Ms. Jernigan-Pedrick

reported that she told him not to have her call the library. Ms. Jernigan-Pedrick has not observed any significant depression or any usual thoughts. She characterized his mood as "relatively flat" but over time "more animated" perhaps because he was "more comfortable with us." She described him as very competent worker, who will occasionally show initiative. She believed that he would have no problem handling increased hours of library work.

### Williamsburg Providers:

Sandy Kochersperger, librarian from Eastern Shore Hospital, reported that she has been working with Mr. Hinckley for approximately two years. His duties include shelving, checking in new journals, photocopying, interlibrary loans and performing docline. He also performs additional tasks. Overall, Ms. Kochersperger reported that he "does wonderful" and is a "very good" worker, who "enjoys" his work and "knows what he's doing." She characterized him as "quiet" and "very polite" but willing to engage in conversation. They talk about his outings, his family and cats. He has shared his interest in art and music. She accepted a painting from him which she has at home. Ms. Kochersperger reported that he did develop an interest in a          employee and was visiting her "quite a bit." Mr. Hinckley also gave her a painting. More recently, the employee reported that she was a "little uncomfortable." She was "sweet and didn't want to hurt anyone's feelings" so she never said anything. Ms. Kochersperger indicated that she was going to speak with Mr. Hinckley about the situation. Ms. Kochersperger indicated that she would be in favor of Mr. Hinckley working increased hours. She reported that his mood "always seemed the same" but since he is quiet his mood is "hard to determine." She added that she has never seen him angry. Ms. Kochersperger reported that she has talked about his progress to Mr. Beffa and Mr. Shamblee.

Dr. Giorgio-Guarnieri reported that she has been working with Mr. Hinckley since July, 2010 after the departure of Dr. Lee. She reported that she was contacted by Barry Levine, Mr. Hinckley's attorney, and agreed to take over the psychiatric responsibilities in Williamsburg. She reported that she reviewed all the records sent to her, including her roles and responsibilities. She stated that her role was to assess his mental status, manage medications and hospitalization if required and to review his progress and facilitate his transition to Williamsburg. She understood that she was to fill out the relapse prevention checklist, document her encounters and consult the treatment team. She reported that he discusses relevant issues during their meetings, including relationships and his adjustment to the community. Some narcissistic features have been noted, such as wanting to be treated specially. She stated that he offered to give her a painting and this was discussed. When she did not accept it, he "accepted it quietly." They discussed his giving paintings to his library supervisor and another female in the          at Eastern Shore Hospital.

Dr. Giorgio-Guarnieri reported that she communicates regularly with Mr. Beffa and that they monitor his interactions in the community by talking with him. Mr. Hinckley has discussed Ms. CB, Ms. G, his neighbor and the          employee. For example, he reported that he met the          employee at work and they would have conversations and she accepted a painting. He has stated that his relationship with Ms. CB has moved from

"like a fiancé to a friend" and he has now accepted that she should not visit him in Williamsburg. Dr. Giorgio-Guarnieri reported that he discussed the disagreement with his mother about whether Ms. CB should visit him there. She stated that his relationship with Ms. G has moved to occasional phone contact. He has not reported any recent contact with Ms. DeVeau. In their meetings, the focus is on adjusting to Williamsburg. He wants to procure a paying job, meet people and continue with his art and music. Mr. Beffa and staff at Eastern State Hospital are striving to help him find activities and employment.

In terms of his mental status, Dr. Giorgio-Guarnieri reported that that she has never seen active Axis I symptoms and that his mental status has remained stable with no evidence of psychosis. While he was a "little more irritable and anxious in the beginning," there have been no significant fluctuations in anxiety or irritability. His mood will fluctuate congruent with the current circumstances. He is "excited" about potentially increasing his time in Williamsburg. Over time, she believes that he has become "more open" and she needs "to probe less and less." Mr. Hinckley is aware of his risk factors. Overall, his judgment is good but he "still needs support." It is "more of a struggle" to "get him to think about his behavior." In terms of how he would respond to his mother's demise, she stated that it would depend on "how well integrated he is here" and consideration might have to given to other locations. He is looking at attending a day treatment program, People's Place, but many of those patients will be lower functioning. A question remains as to whether he will be able to make friends in Williamsburg.

Carl Beffa, reported that he continued to function as his individual therapist and case manager in Williamsburg. He reported that he communicates regularly with Dr. Binks and receives all his treatment notes. He continues to work at finding him additional activities and potential employment. During their sessions, Mr. Hinckley is consistently cooperative. Mr. Beffa reported that his mood is "very stable," although he was anxious waiting for the Court decision. Now he also has some anxiety "because he heard the judge wants him to testify." Over the last six months he has displayed a "positive range of emotions" and is "future focused." With increased freedom, his mood improves. His thinking is "very rational."

During their sessions he discusses his relationships and his adjustment to the community. He continues to discuss Ms. CB. At one point Mr. Hinckley was "pushing his mother to have her come and visit" but "came to the realization that it may cause difficulty," especially "if she had an episode here." Mr. Hinckley reports that he continues to see Ms. CB "almost daily" but realizes that she is not part of the plan for Williamsburg. Mr. Beffa characterized his relationship with Ms. G as "realistic" in accepting the decrease in contact. Mr. Beffa reported that he was recently disappointed that she did not return his guitar, despite saying she would. Mr. Beffa reported that Mr. Hinckley pursued increased contact with a neighbor but "picked up quickly that was not her intent" and "honored that." More recently he pursued increased contact with an employee at Eastern State Hospital. She accepted one of his paintings. Mr. Beffa indicated that he had been in contact with Ms. Kochersperger, who informed that the employee was not interested in increased contact but did not know how to tell Mr. Hinckley that she was recently married. The current plan was for Ms. Kochersperger to address this issue with Mr. Hinckley. At the time of this report, this has been accomplished.

Mr. Beffa characterized his judgment as "fairly solid." However, he benefits from discussing certain decisions. For example, his "pattern of offering gifts" should be thought through in more depth. In terms of being open versus guarded, Mr. Beffa stated that "when confronted with specific questions found him to be very open" but that he does not see him as an "initiator." Mr. Beffa characterized his empathy was "excellent," stating that it had been demonstrated repeatedly with Ms. CB. Mr. Beffa reported "little signs of entitlement" but no grandiosity. Mr. Beffa described his frustration tolerance as "very good." Mr. Beffa points out that he receives excellent support from his family. If his mother were not longer available as a support, Mr. Beffa reported that he would "greatly miss her" but predicted that he "would be able to take over the reins of independence." Mr. Beffa stated that in his view his Axis I disorders were in remission and that there were "remnants" of narcissism. In Mr. Beffa's view there was "minimal risk" with the hospital's plan of expanded conditional release. Mr. Beffa reported that the overall transition was going "extremely well."

### Family Members:

Mrs. Jo Ann Hinckley reported that she was always glad to see her son in Williamsburg because he was such a help around the house. She noted that all of the visits were problem free with no worries about being bothered and that he is not typically recognized. She pointed out that some people do know him at this point and they call him by name and overall it has "been a lot easier" than she first thought it would be. She indicated that she drove her son around Williamsburg but she no longer drove back and forth to D.C. since her children in Dallas "had put their foot down" about her driving that far, so now that was done by a driver. She indicated that he helped her around the house "mostly outdoors" and that she "never has to ask him twice" and he is "eager to be helpful." Mrs. Hinckley thought that overall her son would be accepted in Williamsburg. She was very appreciative of the fact that the hospital had recommended that her son drive independently in Williamsburg, which would free her up to engage in other activities. She stated that it also "cramps his style."

Mrs. Hinckley reported that she was doing well overall but had an inner ear problem over the last year with vertigo. She indicated that her hearing was not as good as before and I had to repeat several questions. A recent mammogram was fine. Her mood was upbeat and she was pleasant and conversational. When asked about having female friends visit in Williamsburg, she stated that she that she "has never gone along with that" and "did not want the responsibility." With regard to his current companion, she stated that she was "so thankful" he had a companion but did not want her to visit. She stated that she had met her briefly and "had no problems with her personally" but knows that she is mentally ill. She stated that her illness "scares me" if she were "to have some sort of a spell." She stated that her son understands that she does not want her in Williamsburg. She stated that she was hoping he might be able to find companionship through the Colonial Services Board. She pointed out that her friends are in her age range and she has not been able to introduce him people in his age range. If she takes him to a social event with "mother's there" this is an impediment to social interaction.

With regard to his mood, Mrs. Hinckley reported that it has been good and that she has seen no problems when doing the checklist after every visit. She hoped he could increase his library activity and that with his "good mind" he could adapt to a job somewhere. She reported that he was very helpful around the house but did not cook frequently adding that was "her fault" since she preferred to cook. She stated he was "empathetic" and "caring" toward others. She pointed out that "Leslie told her she would not have survived without his help" and believes that he is now trying to help Ms. CB with her problems. She reported that he was very pleased with Dr. Giorgi-Guarnieri. She stated that if were son were start to become sick, she did not have that worry but that if he got depressed or belligerent, she would call the hospital.

Scott Hinckley reported that he regularly visits his brother in Williamsburg, estimating around 6 or more visits in a year. There is infrequent phone contact. He characterized the visits in Williamsburg as "predictable" with a regular "routine." The main difference over time has been his volunteering at the library at Eastern State Hospital. Scott Hinckley reported that his brother "really looks forward to that work" and "enjoys talking about it" and "wants to expand" activities there. He stated that the work was a boost to his ego and that being productive and valued and receiving positive feedback "works wonders." Scott Hinckley reported that during a typical day in Williamsburg, his brother would eat breakfast, go for a walk, clean up, play music or paint in his room, eat lunch, go to his appointments or volunteer position, perhaps go shopping, then resume art and music, eat dinner, then watch television and go to bed. Scott Hinckley reported that his brother has gradually acclimated to Williamsburg and now knows his way around but has still not made any real friends. Over time his brother's interest and engagement in art has increased. Scott Hinckley stated that his brother's art has improved and that his brother gave him several paintings. Scott Hinckley stated that his brother has "probably really not taken advantage of all he could have done" but does everything that is asked and "does not shy away from going out in public." His driving has improved.

Scott Hinckley and his brother talk about how things are going in Williamsburg and the hospital, sports, art and relationships. It was his understanding that his relationship with Ms. G has diminished over time. He reported that his relationship with Ms. CB intensified over time and "at one point got serious." There was disagreement on the issue of whether she should visit in Williamsburg. Scott Hinckley, Diane Sims and Mrs. Hinckley all thought it was unwise for her to visit, especially since it would place an unfair burden on Mrs. Hinckley if she became acutely ill while there. Scott Hinckley reported that at first his brother did not agree and "was upset." However, after she had another "episode," his brother gradually came around to their point of view. Scott Hinckley reported that his brother never told him they were engaged although there was an exchange of rings. According to Scott Hinckley the relationship is more of a "friendship" at this point. Scott Hinckley reported that he briefly met Ms. CB and chatted with her when returning his brother from an outing.

Scott Hinckley reported that the family has discussed what would happen if their mother was no longer available. Scott Hinckley believes that his brother would continue to focus

on Williamsburg as the site for outplacement. However, alternate housing would need to be located. Various options have been discussed from a structured government facility, to one with other residents and staff, to independent living. While open to discussion, Scott Hinckley believes that the most viable option at this point is "probably mid level" meaning support and monitoring would be available in the residence. Scott Hinckley pointed out that considerable effort has gone into finding an "established network of professionals" in Williamsburg and his brother is "comfortable with the community." Scott Hinckley reported that his brother was "very helpful" to their mother, took care of his own room, did his own laundry and helped clean up around the house, especially outside. Scott Hinckley stated that his brother has been an important support for their mother.

Over the last several years Scott Hinckley reported that his mood has been stable, with some "mood swings" and anxiety and irritability. For example, if something does not happen according to his desired schedule, he may display some irritability .In his view the work at the library at Eastern State was a "mood elevator." Scott Hinckley reported that his brother had been diagnosed with narcissism as well as delusions and depression in the past. Scott Hinckley believed that he would notice any significant change his brother's mental status and would refer him to mental health professionals for further evaluation.

Diane Sims estimated that she visited her brother in Williamsburg around "maybe four times a year maybe more" and maintained sporadic phone contact. She reported that her brother appeared "very comfortable in his surroundings" and "knows the town." He does not seek attention and "no one seeks him out." He has a familiar routine there. In his free time he likes to go to various stores, such as music and book stores. His volunteer position at Eastern State has "added a new dimension" and "given him confidence," especially "knowing some people are accepting." They talk about his life at St. Elizabeths, current events and his relationships. Ms. Sims has not met Ms. CB. She stated that they appear to care about each other but stated "I don't think that's the best situation for him" since she understood that she was psychiatrically unstable. She stated that she did "not necessarily think she was the one for life." She did not think that Ms. CB should visit in Williamsburg and knew it made her mother uncomfortable. She reiterated the family concern about what would happen if Ms. CB became acutely ill there. Ms. Sims stated that her brother ultimately agreed with this viewpoint "even though he would have liked a different answer." Ms. Sims reported that her brother told her that they were not engaged and not getting married. After Dr. Phillips visited the topic came up again and she asked her brother again. He stated that they had talked about it but never got engaged.

In terms of other females Ms. Sims reported that Mr. Hinckley mentions Ms. G, who recently came by for a visit but that she had not visited for a while. Ms. Sims reported that she was aware of the female     employee at Eastern State. Mr. Hinckley told her that they chatted. She stated that "people want him to make friends and develop relationships" but "if they are subjected to interviews don't know if that's possible."

Ms. Sims reported that his driving is "just fine." Overall her brother's mood is "good" and he is "happy to see me" and "engaged in conversation." She has not observed any significant irritability but he is "not happy" when he reads a negative article about himself in the paper. She believes that he is hopeful about the future. She believed that he was "very open" and that "if I ask a question I will get an answer" and he "doesn't appear to hesitate."

At the house he adheres to a familiar routine. He is up by 6:30 or 7:00 and fixes breakfast. He walks around                He return to the house and does chores such as laundry or plays music. He regularly keeps his appointments at Eastern State and with his treatment providers. In his free time outside of          he will go shopping or to a music store. In the evening he relaxes and works on his art or music. He will watch television or play a CD. He is "very self-sufficient" and tends to his own hygiene. Around the house he helps his mother, does chores and has been especially helpful cleaning up debris after the earthquake and hurricane. Ms. Sims stated that he "never balks at anything" and "does a lot of things on his own." She has noticed improvement in his art which he appears to "really enjoy."

When asked what the plan was if Mrs. Hinckley were not available, Ms. Sims still thought that Williamsburg would be the appropriate location "to keep the process on track." She stated that "Scott and I are absolutely dedicated to taking over" and would help locate housing and provide support. Ms. Sims pointed out that wherever he lived it needed to be close enough to Washington, D.C. for him to periodically check in. She stated that he likes Mr. Beffa and Dr. Giorgi-Guarnieri. She stated that Mr. Beffa "has known him for some time" and they have a "good connection." She thought that Dr. Giorgi-Guarnieri "can really engage him in important discussions." If granted expanded privileges they hoped he increase volunteer activities, go to People's Place and eventually locate a job.

When asked about his diagnosis Ms. Sims stated that her understanding was that he did not currently suffer from a major mental illness but still had a personality disorder with narcissism. In terms of detecting a potential relapse, Ms. Sims stated that he might get "too quiet" or be "not engaging" or "upset." Since he adheres to familiar routine, there might be change in his routine. She has not seen any evidence of dangerous behavior, characterizing her brother as "gentle and soft spoken." She stated that in her view his deep concern for his cats "says something about the nature of a person."

## CURRENT MENTAL STATUS/BEHAVIORAL OBSERVATIONS:

Mr. Hinckley is a 56-year-old, single, white male with blue eyes and light brown hair, which is balding and graying. Mr. Hinckley was initially seen at his mother's residence in Williamsburg. The subsequent interviews were conducted at St. Elizabeths Hospital. He was casually but appropriately dressed for each of the interviews. Mr. Hinckley approached the interview with a familiar air of resignation. He explained that being repeatedly interviewed was "tiresome" and "tedious." Mr. Hinckley made clear that he did not wish to be interviewed for over two hours and preferred not to have his limited

privilege time infringed upon. Over the course of an interview he demonstrated some increased capacity for rapport but also would check his watch and ask how much longer the interview would be.

Mr. Hinckley was consistently alert and fully oriented. Speech was consistently coherent and goal-directed. Thinking appeared logical. Overall, judgment and decision-making appeared adequate but variable. His judgment and decision-making during outings appears good overall. As noted in the report there were several discrepancies between what the hospital reported to the Court and what the Secret Service observations were. Mr. Hinckley currently states that it was a definite mistake and lapse of judgment to lie about having attended a movie on two occasions when he did not. Judgment in relationships remains a source of concern. Due to his need for companionship, Mr. Hinckley does not appear to fully appreciate the ramifications of maintaining a relationship with someone who is unstable and tends to persist in relationships despite potential risks or negative consequences. As noted previously this tendency appears to be motivated by a desire to maintain emotional contact and to avoid loneliness. There was no overt evidence of delusions or hallucinations. He specifically denied any interest in or preoccupation with Jodie Foster.

His mood appears generally stable. He described his current mood as "good." He expressed some anxiety about being evaluated by numerous experts and about potentially having to testify in court. He acknowledges that his mood fluctuates in response to how relationships are going and in relation to the prospects for increased or decreased freedom. He reported that he did get lonely in Williamsburg since he has not established friendships. He expressed hope that his conditional release would be expanded. He specifically denied current depression or suicidal or homicidal ideation.

## PSYCHOLOGICAL TESTING:

Results of my psychological testing have been detailed in previous reports. I reviewed and discussed the results of psychological testing performed by Dr. Murphy. In my view Dr. Murphy provided a careful review of the test results, which have largely remained consistent over the years. A summary of the results and their relevance to risk formulations and clinical issues will be provided.

Prior test results and testing by Dr. Murphy indicate overall intelligence in the high average range. Mr. Murphy readministered the Psychopathy Checklist-Revised. Three separate administrations by three separate evaluators have yielded total scores within one point. The scores from Dr. Heilbrun, myself and Dr. Murphy are listed below:

| Item | KH 1996 | PM 1999 | KM 2011 |
|---|---|---|---|
| 1.  Glibness/Superficial Charm | 1 | 1 | 1 |
| 2.  Grandiose Sense of Self Worth | 1 | 1 | 1 |
| 3.  Need for Stimulation/Proneness to Boredom | 1 | 1 | 1 |
| 4.  Pathological Lying | 1 | 1 | 1 |
| 5.  Conning/Manipulative | 2 | 2 | 2 |

| | | | |
|---|---|---|---|
| 6.   Lack of Remorse or Guilt | 1 | 1 | 1 |
| 7.   Shallow Affect | 2 | 1 | 1 |
| 8 ·  Callous/Lack of Empathy | 1 | 1 | 1 |
| 9.   Parasitic Lifestyle | 2 | 2 | 2 |
| 10. Poor Behavioral Controls | 0 | 0 | 0 |
| 11. Promiscuous Sexual Behavior | 0 | 0 | 0 |
| 12. Early Behavioral Problems | 0 | 0 | 0 |
| 13. Lack of Realistic, Long-Term Goals | 1 | 1 | 1 |
| 14. Impulsivity | 0 | 1 | 1 |
| 15. Irresponsibility | 1 | 2 | 2 |
| 16. Failure to Accept Responsibility for Own Actions | 1 | 1 | 1 |
| 17. Many Short-Term Marital Relationships | 0 | 0 | 0 |
| 18. Juvenile Delinquency | 0 | 0 | 0 |
| 19. Revocation of Conditional Release | x | x | x |
| 20. Criminal Versatility | 0 | 0 | 0 |
| TOTAL | 15.8 | 16.8 | 16.8 |

The summary point from this table is that Mr. Hinckley reliably falls in the low range of psychopathy when compared with normative data for a male forensic population. Elevated psychopathy scores are a robust predictor for future criminality and violence. Of all the psychological tests available the PCL-R has the most relevance and best empirical correlation to violence.

Results from the Minnesota Multiphasic Personality Inventory-2 (MMP1-2) remain relatively consistent when compared to prior administrations. One of the most consistent findings over time on this test is the elevation on the K scale, which assesses defensiveness. Individuals elevated for this scale tend to deny, avoid or minimize unacceptable feelings or impulses and project a façade of adequacy and control. Problems and distress may be minimized in an effort to present oneself favorably. His elevation on the S scale or Superlative scale tends to confirm this tendency. The S scale represents a tendency to deny problems and present oneself as overly virtuous. These elevations suggest poor insight and limited capacity for introspection, and therefore a limited capacity to benefit for insight-oriented therapies. As noted in prior elevations these tendencies to deny and minimize may reflect a lack of awareness and insight into one's problems and/or a deliberate effort to promote an overly positive view of oneself to others. Interestingly, Mr. Murphy noted a decrease in the K scale, which was not statistically significant but she stated "may signal a reduction in Mr. Hinckley's overall level of defensiveness."

Dr. Murphy noted that all the scores on the clinical scales were within normal limits. Highest elevations remained for scales 4 (Psychopathic Deviance) and 3 (Hysteria). Given the lack of significant elevations the interpretative utility of this so-called codetype (4-3 / 3-4) is limited. However, as noted in prior reports this codetype is associated with individuals who are defensive and guarded and are unwilling and/or unable to acknowledge problems. These individuals tend to harbor anger, which is often expressed indirectly. Consistent with prior administrations he remains elevated for supplementary

scales of Overcontrolled-Hostility. Such individuals tend to rigidly deny anger and hostility and may be socially alienated. His elevation for Repression is consistent with other data suggesting a tendency to underreport psychopathology and deny, minimize and externalize problems. In addition, Mr. Hinckley remains elevated for a subscale, entitled Need for Affection, suggesting that he tends to believe that others can be trusted and may naively believe that others have his best interest at heart.

The fairly consistent results of the MMPI-2 suggest that Mr. Hinckley is not psychologically sophisticated or introspective and strives to avoid, deny or minimize unacceptable or uncomfortable thoughts, feelings and impulses. As previously explicated in prior reports he strives to present in an overly favorable manner both because of a trait-like narcissistic tendency to present favorably and at times due to a more deliberate effort to present a positive impression of himself to others.

## DIAGNOSTIC FORMULATION:

Once again this updated evaluation finds no significant new information to substantially change my previous diagnosis. While there are fluctuations in mood, these appear to be transient responses to psychosocial stressors. There has been no evidence of major depression or psychosis. Consistent with prior reports staff interviewed do not view Mr. Hinckley as significantly narcissistic and note a gradual decrease in narcissism over the years. Various staff members, however, endorse varying degrees of narcissistic features such as self-focus, need for admiration, arrogance, and entitlement.

## DIAGNOSITIC IMPRESSION:

| | | |
|---|---|---|
| Axis I: | 296.36 | Major Depressive Disorder, Recurrent, In Full Remission |
| | 298.9 | Psychotic Disorder NOS, Unspecified Pattern, In Full Remission |
| Axis II: | 301.80 | Narcissistic Personality Disorder |
| Axis III: | | Status Post Left Hernia Repair, Rhinitis, History of Constipation, GERD |
| Axis IV: | | Psychosocial and Environment Problems- Problems with the Legal System/Crime, Notoriety, Variable Relationships with Females, Lack of Companionship in Williamsburg, Stress of Upcoming Hearing and Expert Evaluations |
| Axis V: | | GAF = 70 (Current) |

## RISK ANALYSIS:

Risk analysis may be broken down into the tasks of risk assessment, risk management and risk communication. All of the tasks are linked to another and help inform one another. The risk assessment helps identify risk factors and offers frameworks for formulating estimates of the level of risk. Identification of risk factors and formulation of

risk level help to guide relevant risk management strategies. Three broad approaches to risk assessment are generally described in the current literature, although this continues to be an evolving area with new approaches and with new combinations of existing approaches.

The oldest approach is unstructured clinical judgment, whereby the evaluator selects risk factors believed to be related to violence and then assesses the status of those risk factors. Since this approach is dependent on the judgment of the evaluator, there can be a range of factors emphasized and different weight placed on the assessed status of the factors and varying judgments formed regarding the overall risk. A variation of the clinical judgment is what is called the individualized or anamestic approach. In this approach the evaluator strives to ascertain what factors are associated in a given individual with a particular behavior such as violence. The individualized approach is longitudinal and case specific. A second approach to risk assessment is actuarial. In this approach risk factors are scored in a weighted fashion and compared to know base rates yielding varying probabilities of violent recidivism for specified time frames. Various meta-analyses which have conducted demonstrate that actuarial frameworks outperform clinical judgment in terms of predictive accuracy for violence risk. A third approach called structured professional judgment (SPJ) involves the review of set list of various empirically validated risk factors. Typically, each items is scored 0, 1 or 2, with 2 indicating the item is definitely applicable, with 1 indicating the item is applicable to some degree and with 0 indicating the item does not apply. Summing the items and weighing their importance introduces clinical judgment into assigned a level of risk. Both actuarial and SPJ approaches employ reviewing risk factors for violence which have been empirically validated in that they have been selected because of their empirical relationship to the outcome of violence. Both approaches specify the variables to be considered so that the selection of variables to be considered is not left up to the judgment of the evaluator. Both approaches require that the variables be adequately operationalized to permit reliable coding or rating as opposed to clinical judgment where the interrater reliability is not as well established.

As noted in prior reports I have chosen a multi-method approach which attempts to integrate actuarial, structured professional judgment and individualized approaches. A comprehensive risk assessment approach involves assessing overall risk, developing comprehensive monitoring and risk management strategies and periodically reassessing the status of dynamic risk factors targeted for intervention.

## ACTUARIAL ANALYSIS:

A widely utilized actuarial tool for violence risk assessment is the Violence Risk Appraisal Guide (VRAG). The VRAG is composed of twelve static historical factors. I initially administered the VRAG in 1998. Dr. Murphy readministered the VRAG for her current assessment. As expected since the 12 historical factors are unlikely to have changed, the estimate is unchanged. The scores from my 1999 application of the VRAG and Dr. Murphy's recent application are listed in the table below.

Psychological Risk Assessment Update of John W. Hinckley Jr          Paul Montalbano, Ph.D.

| Item |  | PM 1999 | KM 2011 |
|---|---|---|---|
| 1. | Lived with both biological parents until age 16 | -2 | -2 |
| 2. | Elementary school maladjustment | -1 | -1 |
| 3. | History of alcohol problems | -1 | -1 |
| 4. | Marital status (at time of index offense) | +1 | +1 |
| 5. | Criminal history score for nonviolent offenses | 0 | 0 |
| 6. | Failure on prior conditional release | 0 | 0 |
| 7. | Age at instant offense  Age=25 | +2 | +2 |
| 8. | Victim Injury | 0 | 0 |
| 9. | Any female victim | 0 | 0 |
| 10. | DSM personality disorder | +3 | +3 |
| 11. | Schizophrenia diagnosis | +1 | +1 |
| 12. | PCL-R Score | 0 | 0 |
| Total |  | 4 | 4 |

As noted in my prior reports and in Dr. Murphy's recent report, this total score places him in the 5th of 9 categories or bins. The measure has a degree of error of plus or minus one bin. If risk is communicated in terms of probability for a specified time frame, of individuals in this category in the VRAG sample, 35% violently recidivated in 7 years and 48% violently recidivated in 10 years. The normative sample for the VRAG consisted of several hundred patients in Canada. Another way for communicating the risk is to say that being in the 5th of 9 categories represents a moderate level of risk relative to the total sample. These percentages should be considered as advisory only since they may or may not apply precisely to other populations and since some features as different.

As noted in my first report and in Dr. Murphy's report this results should be interpreted with some caution. Of primary concern I believe is the risk factor of age. While 25 at the time of the offense, Mr. Hinckley is now 56. Advanced age tends to be correlated with lower risk. The VRAG sample did not have an average length of stay anywhere approaching 30 years. However, adjusting actuarial scores is quite controversial and generally not recommended, since the relevant research is based on this scoring system.

## STRUCTURED PROFESSIONAL JUDGMENT:

A review of available information and readministration of the HCR-20 suggests no significant change from the last assessment in May 2008. The scores from my administration in 1998 and the two most recent administrations by Mr. Murphy and myself are listed on the following page.

| Historical Items | PM 1999 | KM 2011 | PM 2011 |
|---|---|---|---|
| Previous Violence | 2 | 2 | 2 |
| Young Age at First Violent Incident | 1 | 1 | 1 |
| Relationship Instability | 1 | 1 | 1 |
| Employment Problems | 1 | 1 | 1 |
| Substance Use Problems | 0 | 0 | 0 |
| Major Mental Illness | 2 | 2 | 2 |
| Psychopathy | 0 | 0 | 0 |
| Early Maladjustment | 0 | 0 | 0 |
| Personality Disorder | 2 | 2 | 2 |
| Prior Supervision Failure | 1 | 1 | 1 |
| **H-10 Total** | 10/20 | 10/20 | 10/20 |
| **Clinical Items** | | | |
| Lack of Insight | 1 | 1 | 1 |
| Negative Attitudes | 1 | 0-1 | 0 |
| Active Symptoms of Major Mental Illness | 0-1 | 0 | 0 |
| Impulsivity | 0 | 0 | 0 |
| Unresponsive to Treatment | 1 | 0 | 0-1 |
| **C-5 Total** | 3-4/10 | 0-1/10 | 0-1/10 |
| **Risk Management** | | | |
| Plan Lacks Feasibility | 0 | 0 | 0 |
| Exposure to Destabilizers | 0 | 0 | 0 |
| Lack of Personal Support | 0 | 0 | 0 |
| Non-Compliance with Remediation Attempts | 0 | 0 | 0-1 |
| Stress | 1 | 0 | 0 |
| **R-Total** | 1/10 | 0 | 0-1/10 |
| | | | |
| **Total Score** | 14-15/20 | 10-11/20 | 10-12/20 |

## HISTORICAL RISK FACTORS:

Historical factors are conceptualized as essentially static or fixed. The historical factors are unchanged from the initial scoring. At the time of the offense major mental illness and personality disorder were definitely present. In terms of active mental illness Mr. Hinckley was in the throes of a major depressive episode with active suicidal ideation and psychotic as manifested by a delusional fixation on Jodie Foster. Narcissistic features at the time included grandiosity, lack of empathy, entitlement, fantasies of ideal love and power, need for excessive admiration and a sense of a special destiny. Previous violence is defined as any prior history of severe violence or three or more acts of violence, including the index offense. In this case the only know instance of violent behavior for Mr. Hinckley was the instant offense. It is fairly well established that the probability of future violence increases with the number of prior violent episodes. Young age at first violent incident is coded a 1, since that scoring represents the first known violent act

between ages of 20 and 39 and Mr. Hinckley was 25 at the time of the offense. In general advanced age tends to decrease risk for future violence for non-psychopathic individuals. Over 30 years have elapsed since the offense.

Relationship instability refers to unstable or conflictual relationships. This remains an area of concern but Mr. Hinckley does demonstrate the capacity to form and maintain relationships, especially as illustrated by his prior long-term relationship with Ms. DeVeau. While Mr. Hinckley had an unstable work history prior to his hospitalization, he has generally been a very stable and reliable employee at various institutional and now volunteer positions. Less serious supervision failures are coded a 1 and include any loss of privileges. Mr. Hinckley has been denied various privileges periodically during his lengthy hospitalization but has generally been compliant.

The absence of any significant history of substance abuse, the low level of psychopathy and the lack of any significant history of childhood maladjustment tend to lower risk. Various random urine screens continue to document the absence of any substance use.

**CLINICAL RISK FACTORS:**

Of note there continues to be no significant evidence of an active Axis I mental illness in the form of an active thought or mood disorder. Consistent with prior assessments he has probably experienced some intermittent sadness and dysphoria secondary to various psychosocial stressors and situational factors such as changes in relationships, waiting for a court decision, anxiety about the evaluation process and uncertainty of status of future visits. However, there has been no evidence of significant clinical depression or of homicidal or suicidal ideation.

As noted by Dr. Murphy the authors of the HCR-20 conceptualize insight as a multidimensional process, which takes into account the patient's understanding of his mental disorder(s), his treatment needs, the consequences of his mental disorders and how the disorders may contribute to the potential for decompensation or dangerousness. In terms of insight Mr. Hinckley accepts his need for medication. Since May of 1999 he has been taking Risperdal and since the Fall of 2005 he has been taking Zoloft, which he believes helps to manage anxiety and dysphoria. In March of 2009, he called Dr. Green stating that he was more moody and irritable and wondered if an increase in Zoloft was indicated. At that time his Zoloft was increased from 100 to 150 mgs daily. This demonstrates and awareness of his symptoms and the impact this medication can have in ameliorating the symptoms and therefore shows insight. In terms of the Risperdal, while he believes he could "take it or leave it," he understands that it was recommended for prophylactic reasons to prevent the onset of psychotic symptoms and he has complied with his medication for many years and indicates that he will continue to so, especially since he experiences no significant side-effects. He can describe the symptoms of depression and psychosis that marked his illness in the past. By all indications these are no longer present. He has less insight into his personality disorder. However, this is complicated as previously noted by his narcissism being significantly reduced from what it was many years ago. Consonant with his overarching tendency to deny and minimize

negative features he emphasizes this "attenuation" to minimize the ongoing impact that his narcissism has on his functioning and his judgment. As noted in prior evaluations I continue to believe that his insight, while improved over time is still compromised by his lack of psychological mindedness and by his tendency to approach the world and his feelings with a narrow, avoidant style. His viewing of the pictures of the dental resident online, inviting Ms. G to the Christmas party without explicitly informing the treatment team and lying about going to the movies illustrate that he continues to lack insight into how his actions and decisions may impact others and his own future.

Negative attitudes are defined as procriminal and antisocial attitudes and pessimism. Mr. Hinckley does not present with overtly negative attitudes and remains generally hopeful and optimistic, and at times, naively so. Prior and recent psychological testing indicates that there is probably some underlying oppositionality but despite some resistance he is generally compliant. In this regard his overall orientation toward treatment has improved over the years. He obviously enjoys and benefits from music therapy and art therapy. He has a good rapport with many of his treatment providers, including his long time individual therapist Dr. Binks.

There has been no recent evidence of behavioral or affective instability. Mr. Hinckley tends to adhere to a routine of activities both in the hospital and during outings. In general Mr. Hinckley has responded positively to the many treatments offered to him over the years. However, I believe that his personality disorder, his limited insight and his uneven judgment place limits on his capacity to benefit from treatment. He tends to go to whatever treatments and appointments are recommended but does not in my view always fully engage. In my view his motivation for treatment outside of art therapy and music therapy is somewhat limited.

In general there is good stress tolerance. Since my last assessment there have been multiple stressors including changing relationships, waiting for the court decision and more recently the stress of himself and those who know him undergoing intense scrutiny in preparation for the upcoming hearing. In response to these stressors there have been expected levels of anxiety and dysphoria but he has not displayed marked depression or any evidence of psychosis.

**RISK MANAGEMENT FACTORS:**

Risk management factors focus on how individuals can be predicted to adjust to future circumstances. The task of conditional release involves the formulation of suitable, safe and realistic plan. In brief the context of this risk assessment is an expansion of his current conditional release to include 2 overnight visits for 17 days, to 6 overnight visits of 24 days, to convalescent leave in Williamsburg, Virginia. In addition, there is a plan to increase the amount of unsupervised time in Williamsburg to allow up to six 4-hour unaccompanied privileges outside          then up to 9 4-hour unaccompanied privileges outside          then up to 12 8-hour periods of privileges outside for specified social and recreational activities. In addition there is a recommendation for

Mr. Hinckley to be able to drive independently to various recommended activities in and around Williamsburg.

Mr. Hinckley has a considerable history of exercising various levels of privileges on and off the hospital grounds appropriately. Since the issuance of the court order in June 2009, he has successfully completed 16 outings 10 days in duration. The next proposal again represents an incremental increase in the level of freedom he has been exercising appropriately to eventual placement in convalescent leave status.

In terms of risk management factors, a plan to gradually increase the duration of his conditional release in a stepwise manner from 10 days to 17 days to 24 days to convalescent leave appears feasible and realistic and without significant risk. His brother and sister are now able to function as responsible persons providing additional flexibility and additional sources of feedback and supervision. In addition Mr. Hinckley will be required to meet with both Dr. Giorgi-Guarnieri and Mr. Beffa during every visit. Each will be required to independently interview and assess Mr. Hinckley and complete a checklist provided by the hospital. Further, each will participate in a post-visit telephone conference with the treatment team. Both will continue to participate via telephone conference in Mr. Hinckley's Individualized Recovery Plans. Dr. Giorgi-Guarnieri will function as covering psychiatrist, with functions to include assessing mental status, providing emergency management as required and assessing Mr. Hinckley's ongoing adjustment. Mr. Beffa's role will continue to individual therapist and case manager.

Regular communication will continue between hospital providers and Williamsburg providers. If Mr. Hinckley reaches convalescent leave status the Williamsburg providers will assume central roles in individual therapy, case management and psychiatric coverage; however, ongoing communication and collaboration with continue between Williamsburg providers and the Outpatient Department.

In terms of exposure to destablizers there appears to be a low probability that Mr. Hinckley will be exposed to hazardous conditions that may trigger violence. There is low likelihood that he will have difficulty in managing basic social and life activities such as housing, finance, meals or leisure. Mr. Hinckley has readily available support systems in Williamsburg. The plan is for him to live with his mother, who has is an invaluable source of emotional and personal support. Mrs. Hinckley functions as a protective factor against potential decompensation and risk. On the other hand, it should be acknowledged that a potentially destabilizing stressor would be his mother's passing. His relationship with his mother is clearly important and a critical source of support. However, Mr. Hinckley successfully coped with the death of his father and has supports in place in the form of mental health professionals and family members were Mrs. Hinckley no longer available. His brother and sister regularly visit and he has improved and solidified these relationships over time. This area could be further strengthened by forming friendships in Williamsburg.

In terms of non-compliance with remediation attempts Mr. Hinckley has generally conscientiously conformed to the rules and conditions of his release. There is no data to

suggest non-compliance with medication. He regularly attends scheduled therapies. He continues to work regularly at the library at both St. Elizabeths and Eastern State Hospital. Secret Service surveillance, however, has revealed several discrepancies between itineraries submitted to the Court and what Mr. Hinckley actually did. This is notably illustrated by not going to the movies on two occasions and then saying that he did. Overall, however, in terms of the total scope of activities which are recommended he tends to be compliant.

Overall, and consistent with the previous assessments, I believe that there the HCR-20 yields a low level of risk for the recommended expansion of conditional release. For heuristic purposes, HCR-20 scores can be roughly divided into thirds, with scores in the lower third (roughly 0-13) representing low risk, scores in the middle third (roughly 14-27) representing moderate risk and scores in the upper third (roughly 28-40) representing high risk. Total scores from Dr. Murphy and myself range from 10 to 12. The HCR-20 employs a structured professional judgment model, meaning that while overall scores can be used as a guide for estimating risk level, professional judgment can be utilized to adjust risk. Thus, salient risk factors, for example active homicidal ideation, can result in a rating of high risk despite the absence of many other risk factors. On the other hand, salient mitigating factors, such as being physically infirm might result in a rating of low risk despite the presence of other risk factors. In my judgment, bearing in my mind the proposed plan, the overall rating generated from a review of the HCR-20 yields a rating of low risk.

## INDIVIDUALIZED ANALYSIS:

This approach applies behavior analytic strategies to guide information gathering. The evaluator examines the longitudinal historical pattern associated with a given outcome such as violence and generates hypotheses about what factors are associated with the outcome. Like running an imaginary recorder back in time, the individual being assessed is asked to report what the sequence of thoughts, feelings and behaviors were that preceded the violent event or events. Documents and collateral information is reviewed to help identify relevant risk factors. Some conceptualize the individualized approach as a process rather than a specialized risk assessment tool. It is arguably more relevant to the task of risk management than risk assessment. At any rate the individualized approach is a useful complement to the overall risk analysis. It individualizes the assessment process and provides valuable information for risk reduction and intervention planning.

Once again the constellation of primary risk factors previously identified such as depression, isolation, self-absorption and psychosis remain largely absent or significantly reduced. While core narcissistic features remain, as previously noted I continue to believe that overall his narcissism is significantly attenuated in comparison to his early years. His mood continues to be clearly boosted by these outings and by the prospect of increased freedom. The primary risk factor of depression continues to ameliorated by successful forays into Williamsburg. In general his stress management appears adequate. While his judgment in relationships is questionable, he has remained behaviorally stable.

Relationships with women remain an area of concern. The wealth of information from various staff and the focus in his therapies on this issue suggests that he has been fairly open about discussing relationships. A wealth of data, including current psychological testing, supports the view that Mr. Hinckley is an individual who is oriented toward having companionship and intimacy with a female. The data further support the view that when not involved in a relationship, he is lonely and yearning for contact. At present he is maintaining a relationship with Ms. CB, but if the proposed plan is approved, he will have less and less contact with her. As of yet he has been unsuccessful in his efforts to establish friendships or companionship in Williamsburg. This may result in increased loneliness and questionable judgment as he seeks to establish a new relationships there.

While relationships with females has been consistently identified as a risk factor, I believe, that data accumulated over the years now suggests that too much emphasis has been placed on this as a risk factor. The genesis of this particular risk factor appears to be based, largely, in the fact that in the time frame before the offense, Mr. Hinckley was fixated on and pursuing a relationship with Jodie Foster. In the mid to later 1990's debate on the importance and relevance of this risk factor was centered on a discussion of the meaning and risk relevance of Mr. Hinckley's relationship with Commander Wick. In his 1996 evaluation Dr. Patterson concluded that that "his involvement with Jeanette Wick has disturbingly similar dynamics to his delusional obsession with Jodie Foster." Dr. Carpenter noted that no dangerous behavior was reported during period in question and he easily discontinued the relationship. Dr. Heilbrun noted significant qualitative differences in the relationships pointing out that Mr. Hinckley did not have a real relationship with Jodie Foster, that there was no delusional quality to his relationship with Commander Wick, that his feelings about Jodie Foster were almost entirely based on fantasy and that he could not let go of the relationship with Jodie Foster. The data that has emerged over the years, I believe, supports the view that this risk factor was overemphasized at the time and that the dynamics of the two relationships were not "disturbingly similar." In 2004 this issue played itself out once again in the discussion of Mr. Hinckley's relationship with Ms. DeVeau and a perceived lack of clarity in the relationship. In my view what was lacking was a clear demonstration of how the perceived lack of clarity was relevant to risk. This relationship has diminished and largely dissolved over time without any evidence of dangerousness being linked to that gradual dissipation or any evidence that a perceived lack of clarity posed a risk.

In my first evaluation I stated that "I believe that his acting out violently and self-destructively can be viewed as acting out around attachment issues, specifically in relation to an idealized love object." In that report, I also opined that "what is important to Mr. Hinckley is not the reality of the relationship, but his perceived sense of loss, rejection, rebuff or abandonment" as a potential trigger for decompensation. However, over 12 years of additional data have emerged since that initial evaluation and I believe the importance and risk relevance of this risk factor should be modified. Further, I now believe that the reality of the relationship is important. The data now indicates that he has weathered the break-up of his long-term relationship with Ms. DeVeau, the break-up with Ms. M, and the withdrawal of sexual intimacy with Ms. G relatively well. In my view, while his judgment in relationship remains questionable, he has repeatedly demonstrated

resiliency in dealing with the rebuffs and shifts in interpersonal relationships and has in general maintained his psychological equilibrium throughout. Therefore, if the relationship with Ms. CB diminishes over time, there is good reason to believe that he has the psychological resources to weather the change.

In terms of the risk factor of deceptiveness, the genesis and identification of this appears to be rooted, at least in part, in his concealment from others of his delusional fixation with Jodie Foster. Although at one point in his treatment with Dr. Hopper in October 1980 he purportedly mentioned Ms. Foster. In addition, to gain her attention he subsequently devised various nefarious schemes, including assassination of important individuals, which were also concealed from treatment providers and family members. After denying interest in Ms. Foster to hospital staff for years, a nude caricature was discovered in his room in 1988. However, in the time frame before the offense, his depression was apparent. There were significant weight fluctuations. He was prescribed antidepressants and in treatment at various points and at one point Dr. Hopper apparently advised Mr. Hinckley's parents that he did not require inpatient hospitalization and could be treated as an outpatient. However, after his last suicide attempt in 1983, hospital staff noted that he did not "present major behavioral cues relative with the intensity of the depression he subjectively experiences." However, more recently, he appears willing to acknowledge feeling down or anxious and even to request medication adjustments.

Complicating the issue of deception or underreporting is Mr. Hinckley's underlying personality structure. As has been repeatedly noted in this and prior reports Mr. Hinckley is defensive and guarded and prone to minimize and deny negative aspects of the world and emphasize the positive. This is particularly true in relationships. When faults or problems or inconsistencies are pointed out, he is likely to minimize their importance. Prior psychological testing has suggested that Mr. Hinckley may engage in impression management and self-deceptive enhancement. Impression management is the tendency to present oneself as socially and morally virtuous and is conceptualized as representing a deliberate effort to present oneself in an overly favorable manner. Impression management often occurs in so-called high demand situations such as a job interview. Self-deceptive enhancement reflects a tendency to inflate self-descriptions due to underlying narcissism. Therefore, when asked for example how an outing went, Mr. Hinckley is likely to minimize any problems or stress and emphasize the positive aspects.

In my view to reasonably assess and react to the recent evidence of deception during the outings, namely, lying twice about attending the movies, this framework should be borne in mind. Other inconsistencies were noted such as not going to a particular store or shopping center. The recent deception highlights the need for ongoing monitoring and for reporting from multiple sources. However, the intensity of this monitoring should be contingent on the import that the underreporting and/or deception has on risk. If he is underreporting or concealing or lying about a topic with direct relevance to risk, then the concern reaches a high level and the response should be commensurate. If on the other hand, the underreporting, concealment or deception is largely unrelated to risk, then the level of concern is low and the response again should be commensurate. I do not see any direct connection between lying about movie attendance and dangerousness. However, it

does raise various concerns. Insofar as his risk is being managed by compliance with conditions of release, it calls into question his overall compliance with remediation and risk management. On the other hand, there is no evidence of non-compliance with medication, therapy or work. In addition, the lying does not appear to be linked in any direct manner to a risk for decompensation.

Further complicating the picture is accurately assessing the extent of his underreporting, deception and dishonesty. The reports by Dr. Patterson and Dr. Phillips raise concerns about whether deception or underreporting is occurring in other areas such as computer use, interpersonal relationships, interest in books and amount of driving. In each of these instances, one must ask, what would be the impact if Mr. Hinckley were dissembling. For example, if he is driving less than he represented, how is that linked to dangerousness? If Ms. CB believes they are engaged and they are not, how is that linked to dangerousness? In this regard, it should be noted that one of the factors on the Psychopathy Checklist is entitled pathological lying. When scored by three different evaluators spanning 15 years, this item was scored as partially present. This means that in the view of the evaluator the deceit was not pervasive and persistent but was present to some degree.

From what I understand the hospital is responding in a thoughtful and measured way to this breach of trust. Dr. Murphy has designed a scale to assess the level of unreliable reporting and to guide selection of consequences. The scale is reproduced below.

### Scale of Severity of Unreliable Reporting (K. Murphy, Psy.D.)

Omission of Information................→Fabrication................→Deception

| Low | The defining feature is that the unreliable report had little to no detrimental effect, or potential for detrimental effects.<br>This might be reporting accurate information, but only to one treatment team member.<br>Management: Address the unreliable report directly and the issue is followed-up in psychotherapies. |
|---|---|
| Low Moderate | The unreliable report or omission of information is of clinical concern, yet does not directly interfere with attainment of treatment objectives.<br>Management: Minor privilege restriction such as limits in unaccompanied time for one visit or limiting grounds privileges. |
| Moderate | Omitting/reporting discrepant information to multiple treatment providers in a manner that interferes with their ability to provide optimal care.<br>The behavior violates a treatment team expectation but does not raise immediate concerns about risk level.<br>Management: Major privilege restriction (i.e., ward hold, limiting unaccompanied time, limiting independent driving, etc.) |
| Moderate High | The deception is precluding treatment providers from accessing important information about JH's clinical condition.<br>The deception is directly and clearly interfering with attainment of treatment objectives and/or is a major rule violation.<br>Management: Suspension of visits and resumption of visits at the Hospital's discretion |
| High | The unreliable report resulted in 1) an increased risk of danger to self or others, and/or 2) a Violation of Court Order |

| |
|---|
| Management: Re-hospitalization and revocation of privileges is applied<br>This includes but is not limited to: Medication noncompliance, contacting the press, noncompliance with psychotherapies, unsupervised use of computer while on conditional release |

The scale provides a framework for assessing the type and importance of information that was omitted or misrepresented as well as how
pervasive the misrepresentation was. Next the scale provides a framework assessing how the misrepresentation is related to either interference with treatment goals, noncompliance with hospital rules or conditions of release, or with danger to self or others. In my view this is thoughtful and measured way of assessing and responding to unreliable reporting and demonstrates the seriousness with which the hospital views the issue.

Mr. Hinckley reports that he lied about the movies because he did not want others to know how "cheap" he was in terms of not wanting to pay for a movie he could only see partially. I believe that he may also have been motivated by a desire to present himself in overly virtuous manner and as having accomplished everything on his itinerary. In either case, it is a reasonable hypothesis, to say that his unreliable reporting was related to his underlying narcissism. In other words, he dissembled to protect a certain positive image to himself and to project a positive image of himself to others. As such it remains a worthy area of focus and should be addressed in his therapies.

Overall, in my view the current individualized analysis does not indicate significant risk, especially in light of the planned, graduated and controlled expansion of his conditional release.

**RISK TO SELF:**

There is no substantial change in this section. Mr. Hinckley has 4 prior suicide attempts and his actions during the instant offense had a suicidal component. At the time of this evaluation, I do not view Mr. Hinckley as posing a significant risk in terms of danger to self. However, as noted in prior evaluations I continue to have concerns about how prolonged isolation or lack of hope may impact on his long-term risk for suicide. Further, being able to maintain relationships is of importance to Mr. Hinckley. If he perceives that he has no hope for developing or sustaining a relationship and his long-term risk for suicide would be somewhat elevated. Further, his mood is clearly boosted by the outings. Mr. Hinckley remains relatively hopeful and optimistic about his future, even if somewhat naively so. There has been no evidence of suicidal behavior or suicidal ideation for approximately 28 years. In fact, expanding his conditional release and providing additional opportunities for socialization will probably further increase his sense of hope and improve his mood.

## INTEGRATED RISK ASSESSMENT AND RISK MANAGEMENT RECOMMENDATIONS:

John W. Hinckley, Jr. is a 56-year-old, single male, who has been hospitalized close to 30 years for the attempted assassination of President Reagan. Mr. Hinckley fired six shots, seriously wounding the President, causing irreversible brain damage to Presidential Press Secretary James Brady, and wounding Secret Service agent Tim McCarthy and police officer Tom Delahanty. Mr. Hinckley was 25 at the time of the instant offense and 27 when he was admitted to St. Elizabeths Hospital. He is now 56 and has spent more than half his life in secure settings.

Since his admission to the hospital many evaluators agree that there has been substantial positive change. Recent and past assessments indicate there is no evidence of active psychosis or clinical depression, both of which characterized his mental state in the time frame of the instant offense. Significant signs of depression continued, at least intermittently, until his last suicide attempt in February of 1983. Symptoms of grandiosity and an interest in Jodie Foster continued for several years beyond that to at least 1988. Over the last 20 years there has been no direct evidence of a major mood or thought disorder and no psychiatric or psychological evaluation has noted active psychosis or major depression. Therefore, in my view the primary risk factors of depression and delusions associated with being a danger to self or others have been in full sustained remission for many years. In addition, there is general agreement that his narcissism is decreased.

In his 1996 evaluation Dr. Heilbrun identified the following individualized risk factors are relevant: 1) Grandiose Delusions, 2) Social Isolation, 3) Deception 4) Suicidal Thinking and 5) Weapons Access and Possession. My risk assessments have identified the following factors: 1) Depression 2) Psychosis 3) Social Isolation and Self Absorption, 4) Openness versus Guardedness and Deception 5) Anger and 6) Relationships with Women. The current E motion of the hospital identifies the following risk factors: 1) Depression, 2) Isolation, 3) Psychosis, 4) Lack of Insight into Mental Illness, 5) Personality Disorder, 6) Access to Weapons, 7) Lack of Family Support, 8) History of Suicides, 9) Difficulty in Relationship with Females.

I have consolidated these risk factors into a table to illustrate how these various risk factors have been managed and described their current status. The first table addresses how these risk factors will be managed under the proposed plan for 17 and 24 day outings. The second table address how they will be managed if he reaches convalescent leave status

| Risk Factor | Intervention/Monitoring | Current Status |
|---|---|---|
| Depression | Medication, Therapies by HP & WP, Monitoring by HP, WP & FM, Improved by outings | In full sustained remission |
| Psychosis | Medication, Therapies & Monitoring by HP, WP & FM | In full sustained remission |

Psychological Risk Assessment Update of John W. Hinckley Jr                    Paul Montalbano, Ph.D.

| Isolation | Family Support, Therapies by HP & WP, Library work at Hospital & Williamsburg, Proposed day treatment | Significantly ameliorated |
|---|---|---|
| Lack of Personal Support | Family Support, Support by HP, WP & FM, Relationship with CB | Significantly ameliorated |
| Access to Weapons | Monitoring by HP, WP & FM | Appears monitored |
| Deception Openness v Guardedness | Monitoring by HP, WP & FM, Therapies by HP & WP, Periodic psychological testing, Provision of Secret Service reports, Implementation of Scale of Severity of Unreliable Reporting | Less deception & guardedness over the years, recent inaccurate reporting of activities on conditional release- however no direct indication this was linked to dangerousness, continue monitoring & implement new scale |
| Relationships with Women | Monitoring by HP, WP & FM, Therapies by HP & WP, Solidifying relationships with family members, Promotion of friendships with male peers | Remains an area of concern but accumulated data over last 15 years indicates that it's importance has been overemphasized |

HP= Hospital Providers, WP= Williamsburg Providers, FM=Family Members

The following table elaborates on how identified risk factors will be managed and monitored on convalescent leave.

| Risk Factor | Intervention/Monitoring for Convalescent Leave |
|---|---|
| Depression | Medication, Therapies by WP, Monitoring by OPDCO, WP & FM |
| Psychosis | Medication, Therapies & Monitoring by OPDCO, WP & FM |
| Isolation | Family Support, Therapies by WP, Volunteer work at ESH, Proposed day treatment at People's Place |
| Lack of Personal Support | Family Support, Support by OCDCO, WP & FM, Potential establishment of friendships &/or relationships in Williamsburg |
| Access to Weapons | Monitoring by OCDCO, WP & FM |
| Deception Openness v Guardedness | Monitoring by OCDCO, WP & FM, Therapies by WP, Periodic psychological testing, Provision of Secret Service reports, Implementation of Scale of Severity of Unreliable Reporting |
| Relationships with Women | Monitoring by OCDCO, WP & FM, Therapies by WP, Solidifying relationships with family members, Promotion of friendships with male peers |

OPDCO= Outpatient Department of Clinical Operations, WP= Williamsburg Providers, FM=Family Members

Mr. Hinckley's recent history provides evidence that a gradual and incremental expansion of his conditional release will be successful. As noted Mr. Hinckley has an extensive history of exercising various levels of privileges on and off the hospital grounds appropriately. He has gone on numerous recreational outings in the community under the supervision of staff. Beginning in 2004 he exercised local outings with family members, progressing to local overnight outings and then outings to Williamsburg starting with outings of 3 nights in duration. Overall prior to May 2007 he successfully completed an additional 28 outings, including 6 local day outings, 10 local overnights and 12 overnights to Williamsburg, including three of a 3 night duration and 9 of a 4 night duration. From May of 2007 to May of 2008 he successfully completed 10 overnight outings to Williamsburg, including 7 outings of six days in duration. From June of 2008 to May 2009 he completed an additional 8 outings 7 days in duration. Since the issuance of the court order in June 2009, he has successfully completed an additional 16 outings 10 days in duration. All have occurred without significant incident and all have yielded clear therapeutic benefits. The next proposal again represents an incremental increase in the level of freedom he has been exercising appropriately for years to convalescent leave status.

Risk assessment procedures including actuarial analysis and structured professional judgments has been articulated. Overall, under the conditions outlined by the hospital I believe that the current risk factors are in the low range and do not indicate significant risk for a carefully planned and graduated expansion of his existing conditional release to convalescent leave. As noted by Dr. Murphy and myself in prior evaluations, Mr. Hinckley is at low risk for decompensation and should a relapse begin to unfold, it would likely be gradual and detectable and amenable to intervention. I believe that the carefully planned incremental increases in freedom by the hospital would continue to provide therapeutic benefit without posing significant risk. While various concerns are noted by hospital staff and in the reports submitted by Dr. Patterson and Dr. Phillips, I believe that these concerns can be adequately managed without significant risk being posed. In my view, despite these concerns, he remains at low risk in the carefully articulated plan proposed by the hospital.

My current recommendations are as follows:

1) Continue to focus on Williamsburg as the primary site for expanded conditional releases and potential convalescent leave. Mr. Hinckley has developed a good relationship with Mr. Beffa and Dr. Giorgi-Guarnieri. He has functioned effectively in a volunteer position at Eastern State Hospital and is in a position to expand volunteer activities there. He should begin attending the day program at People's Place. Develop specific goals and objectives to be included into itineraries for the expanded outings in Williamsburg. It is suggested that these goals and objectives be developed in coordination with his family and treatment

providers in Williamsburg. When reviewing what was accomplished during the outings, there should be consequences for failing to attain objectives and potential rewards for achieving objectives. Each outing should be thoroughly reviewed before progressing to the next outing.

2) The goals and objectives for the outings should be integrated with Mr. Hinckley's current Individual Recovery Plan Goals. Various objectives can be established for the outings, including increased socialization, mood improvement, increased independent decision-making, judgment in relationships, increasing initiative and stress tolerance. Dr. Murphy lists realistic objectives such as exhibiting independent driving, acclimating to the day program and working with Mr. Beffa to pursue vocational opportunities. Encourage Mr. Hinckley to establish appropriate relationships and friendships. It is once again highly recommended that Mr. Hinckley pursue establishing male friendships as well as female companionship. I concur with Dr. Murphy's recommendation to utilize Williamsburg treatment providers to guide decision-making in relationships. As noted in this report, Mr. Hinckley enjoys and benefits from creative treatment modalities such as art therapy and music therapy. An effort should be made to locate art therapy or art classes and music therapy in Williamsburg.

3) The expansion of his activities in Williamsburg entails a commensurate expansion of communication networks to gather information from additional providers. The hospital has identified Mr. Beffa as responsible for gathering information from Ms. Kochersperger and from treatment providers at People's Place. Ms. ___ has been identified as the contact person for the Dream Shop and Ms. ___ as the contact person for the geriatric treatment center at Eastern State Hospital. A contact person for People's Place should be identified. It is recommended that designated treatment providers at ESH and People's Place be educated on the relapse prevention forms and fill them out and return them to Mr. Beffa on a monthly basis. As Mr. Beffa's role expands it is increasingly important for him to communicate with Mr. Shamblee in terms of case management and treatment goals and with Dr. Binks in terms of individual therapy.

4) I concur with the hospital plan to gradually increase the frequency and duration of unaccompanied outings outside of the ___ subdivision. The current proposal is to expand these outings from up to six 4-hour unaccompanied outings during the first two visits, to up to nine 4-hour unaccompanied outings during visits 3 and 4, to up to 12 8-hour unaccompanied outings. The expansion is contingent on achieving specified goals such as discussing his adjustment to new activities, interacting with male peers and contributing financially. Itineraries for unaccompanied time are to be submitted to the hospital treatment team and Mr. Beffa and Dr. Giorgi-Guarnieri for approval prior to each visit. Prior to the expansion of the outings and prior to the increase from 17 to 24 days, the treatment team will conduct a comprehensive treatment planning conference with all relevant providers. My recommendation is to then seek Review Board approval before moving onto the next stage.

In light of the deviations identified by the Secret Service reports between what the itinerary stated and what was observed and in light of his admission of lying on two occasions, additional safeguards should be implemented. I suggest that Mr. Hinckley be given a one page checklist listing tasks or locations on the itinerary with a checkbox. He would be responsible for checking off accomplishing a given task or verifying that he went to a given location. If the box is not checked, he should write a brief explanation on the back of what occurred and why. For example, as Dr. Patterson noted in his report, when Mr. Hinckley did not go to the _____ on 7/31/11, Scott Hinckley reported that the trip was cancelled because his brother had foot pain and that once the discrepancy is explained and documented the concerns have been addressed. Deviations are to be expected but there should be mechanisms in place to document and explain the deviation. Further, it would be helpful if the hospital could receive the Secret Service reports on a regular and periodic basis rather than once every several years before a scheduled hearing. A sample Itinerary Checklist is enclosed. For example, on the back, he would explain why he did not go to _____ If Mr. Hinckley has an opportunity to explain deviations to designated treatment providers, he should do so. For example, in the scenario outlined below, if he had not yet met with Dr. Giorgi-Guarnieri, he should explain the deviation to her. He should also be responsible for explaining the deviation to his mother and any other designated responsible persons.

| Time | Home | | Williamsburg | Check |
|------|------|---|--------------|-------|
| AM | | Unaccompanied Morning Walk | | √ |
| AM | Chores | | | √ |
| AM | Leisure Activities | | | √ |
| 11-12 | | | See Mr. Beffa | √ |
| 1-4 | | | Unaccompanied | √ |
| | | | Movie | √ |
| evening | | | with sister & mother | √ |

5) I concur with the recommendation to have prior approval from the treatment team before going to private residences and prior approval from the treatment team and Mrs. Hinckley before inviting individuals to visit there. Likewise it is recommended that Mr. Hinckley have prior approval from the treatment team at the hospital and in Williamsburg and from his mother before any friends or acquaintances from the D.C. area visit Williamsburg.

6) I concur with the recommendation to grant independent driving privileges in an incremental fashion. Pragmatically this would be an important benefit to his

mother and free her up engage in desired independent activities as well as providing Mr. Hinckley the opportunity to exercise increased independence. As noted whenever traveling independently, Mr. Hinckley should carry a GPS enabled cell phone. While Mr. Hinckley appears quite familiar with Williamsburg area, it may be worthwhile exploring purchasing a portable car GPS.

7) Continue to support and utilize Jo Ann Hinckley, Diane Sims and Scott Hinckley as responsible persons. They should be interviewed in person or by phone after every outing they participate in and these interviews should be documented. They should agree to and adhere to the "Media Plan," the "Agreement to Assume Supervisory Responsibility for Patient While on Conditional Release," and complete the "Individualized Relapse Prevention Plan" after every outing. They should be contacted periodically, if he has achieved convalescent leave status.

8) Continue to have all responsible persons implement the "Agreement to Assume Supervisory Responsibility for Patient While on Conditional Release," which includes immediately contacting the hospital if there are any signs of decompensation, danger to self or others, or elopement.

9) I concur with the recommendation that an updated risk assessment be performed to assess his readiness for outplacement. I would add that the risk assessment results and treatment team assessments be formally presented to the Review Board and approved by the Review Board before outplacement.

10) I concur with the recommendation for Mr. Hinckley to be able to travel with a designated driver to and from Williamsburg without his mother or siblings having to be present in the vehicle.

11) The hospital, Williamsburg providers and family members should focus on developing a realistic plan to be implemented should Mrs. Hinckley no longer be available to provide supervision, support and housing. Alternative housing arrangements should be identified. Alternative and additional mechanisms for monitoring and support should be identified. It is not recommended that Mr. Hinckley transition from his mother's residence to unsupervised independent living.

12) I concur with the recommendation for Dr. Binks and Mr. Beffa to develop and implement a graduated termination plan and that Dr. Binks and Mr. Beffa continue to regularly consult during this transition. It is further recommended that, if possible, a music therapist be located in Williamsburg and the Mr. Hyde consult with that individual and develop a transition plan. Similarly, if art classes or art therapy is located in Williamsburg, Ms. Cogan can help to develop a transition plan.

13) I concur with the hospital recommendation that Dr. Giorgi-Guarnieri see Mr. Hinckley weekly at least once per week for the first two visits and then at least

once for subsequent 17 day and 24 day outings. Further, if Mr. Hinckley reaches convalescent leave status, Dr. Giorgi-Guarnieri will see Mr. Hinckley at least two times per month for the first 3 months and then at least monthly thereafter. It is further recommended that at the requests of either the hospital or Dr. Giorgi-Guarnieri the frequency can be increased. This means that the frequency of the meetings will increase from once during a 24 day interval to twice a month. This will provide an additional safeguard to monitor his adjustment to convalescent leave status. Dr. Adewale and Dr. Giorgi-Guarnieri should consult regularly, especially during the proposed transition phase to outplacement, at which point Dr. Giorgi-Guarnieri will assume responsibility for medication.

14) Continue the weekly psychotherapy meetings with Mr. Beffa. Case management sessions should be scheduled at least once per visit but more often if pursuing or consolidating a new activity.

15) Continue to implement the "Media Plan." However, I think Mr. Hinckley should be afforded some opportunities to record music as he currently does at the hospital in a controlled manner. If he were to record music at a local recording studio, clear parameters would need to be established for what happens to the music.

16) Continue to implement the "Individualized Relapse Prevention Plan" forms to be independently filled out by Mr. Hinckley and Mrs. Hinckley and/or his siblings after the completion of each outing. It is further recommended that Dr. Giorgi-Guarnieri and Mr. Beffa continue fill out their checklists. In addition, other identified providers at Eastern State Hospital or Colonial Behavioral Services, should fill out similar forms. If Mr. Hinckley were to achieve convalescent leave status, such forms should be collected from Williamsburg providers by Mr. Beffa and submitted on a monthly basis to OPDCO. In addition, Mr. Beffa and Dr. Giorgi-Guarnieri should submit monthly summaries to OPDCO. Any signs of decompensation should be immediately reported to OPDCO.

17) Mr. Hinckley should continue to maintain phone contact with a frequency to be determined by the hospital. I would recommend that he or a responsible person call upon arrival and at least once during the outing. The hospital is recommending that he call OPDCO weekly for the first three months, if he attains convalescent leave and no less then monthly thereafter. Confirmation of medication compliance should be done during these calls. In addition, it is recommended that Mr. Hinckley sign a release from whatever pharmacy in Williamsburg he uses to receive medication, so that OPDCO can independently check records of medication purchase.

18) Clarify the current internet policies. It is clear that Mr. Hinckley is not to use the internet independently while in Williamsburg. It is not as clear to me exactly what restrictions or policies are in place at the hospital. Whatever the policies or restrictions are, they should be clearly stated in written form. My understanding is

that software exists, that will automatically monitor all sites visited on a computer. My own recommendation is that Mr. Hinckley only be allowed to use certain designated computers, at home, at St. Elizabeths, at Eastern State or wherever and only be allowed to access the internet with a unique password and that the software monitor his internet use. He should be explicitly told what is permissible and what is not and if there is any doubt Mr. Hinckley should request permission from an appropriate supervisor and/or treatment team member. Then a designated individual should periodically review his internet use and discuss it with the treatment team and Mr. Hinckley. A record of his internet use can be maintained and made available to individuals evaluating him, including the government. I do not recommend a blanket prohibition against independent internet use. The internet may prove very helpful in locating a job or finding recreational activities or researching artists he is interested in and any other of a host of valid endeavors. While I am not exactly sure of how this should be accomplished, I think this is worthy of further exploration.

19) I recommend that the phone restrictions in effect prohibiting Mr. Hinckley from calling Ms. DeVeau or              be lifted. He has very limited if any contact with either individual and in my view there was never any clear demonstration that making such calls was linked to dangerousness. Similarly, I do not believe there should be any restriction from Mr. Hinckley calling Ms. CB while in Williamsburg. Similarly, I do not believe that has been any clear link between calling Ms. CB and dangerousness. His relationship with her has resulted in some tension with his mother and siblings, especially regarding his previously articulated desire for her to visit him in Williamsburg, but this has apparently been resolved by allowing Mr. Hinckley to discuss the issue with treatment providers and family members. He has already reportedly reduced the frequency of these calls at his mother's request. It may be that these calls provide some level of support to both individuals and without any demonstration of how these calls would increase risk, I believe they should be allowed.

20) Mr. Hinckley is very focused on finding and maintaining an intimate relationship. If engaged in a meaningful and sustained interpersonal relationship, I believe that this would be protective factor against risk. Thought should be given to how to make this more rather than less likely. If he were to form a significant relationship in Williamsburg, I believe that one treatment provider should be designated to periodically contact the individual he is involved with. There may be some validity to Mr. Hinckley's view that intense scrutiny from multiple professionals undermines the likelihood of the relationship enduring. The designated individual could explore the relationship and provide feedback to other treatment providers and to St. Elizabeths hospital or OPDCO. The designated individual could also provide information about what the potential impact of having this individual interviewed by multiple professionals would be for the long term prospects of the relationship.

Psychological Risk Assessment Update of John W. Hinckley Jr            Paul Montalbano, Ph.D.

## LIMITS OF DATA INTERPRETATION:

This report is based on a large amount of information obtained from multiple sources. I believe that all the information contained herein is accurate and provides an adequate basis to form an opinion to a reasonable degree of psychological certainty. However, if any information is inaccurate, I would appreciate if this were called to my attention. In addition, should I learn of any additional new information which affects the substance of any of my opinions, I will notify defense counsel, and write an addendum to this report. Opinions are limited by the scope and accuracy of the data on which they are based and could possibly change if new data not previously considered alters analysis of the issues covered in this report.

Paul Montalbano, Ph.D.

11/28/2011

Date