# FORENSIC CONSULTATION ASSOCIATES, INC.

1726 DEACON WAY
ANNAPOLIS, MARYLAND 21409

TELEPHONE 410.757.6797

ROBERT T. M. PHILLIPS, M.D., PH.D., D.F.A.P.A
FORENSIC PSYCHIATRY

FACSIMILIE 410.757.6799

WWW.FORENSICCONSULTATIONASSOCIATES.COM

November 17, 2011



GOVERNMENT
EXHIBIT

2011-02
U.S. v. Hinckley 81CR306

Sarah Chasson, Esq.
Colleen Kennedy, Esq.
Assistant United States Attorneys
U.S. Department of Justice
Office of the United States Attorney
555 Fourth St. N.W.
Washington, D.C. 20530

RE:   United States v. John W. Hinckley, Jr.
      Criminal No. 81-306 (PLF)
      Forensic Psychiatric Evaluation Concerning Expansion of Terms of Conditional
      Release under 501(e)

Dear Attorneys Chasson and Kennedy:

At your request, pursuant to the order of Judge Paul L. Friedman, and in accordance with applicable law, I have examined John W. Hinckley, Jr. for the purpose of offering a forensic psychiatric opinion regarding the 501(e) Motion for Enlargement of Terms of the Conditional Release submission by St. Elizabeths Hospital dated July 29, 2011.

This report will address the relevant issues concerning the Hospital's request for expansion of privileges.

My examinations of Mr. Hinckley were conducted on the Treatment Mall at St. Elizabeths Hospital on August 9, 2011 for a period of approximately two and one-half hours; on August 10, 2011 for a period of approximately one and one-half hours; on September 29, 2011 for a period of approximately two and one-half hours; and on October 12, 2011 for a period of approximately two hours.

In offering the opinions contained in this report I have relied upon my forensic psychiatric examination as well as my previously submitted reports dated July 7, 2000; August 11, 2003; November 1, 2004; August 30, 2005; October 31, 2006; April 6, 2007, and July 9, 2008. I have also reviewed and relied upon Mr. Hinckley's life history as reported in medical, social, and judicial documents detailing his life circumstances up to and including his behaviors in connection with the instant offense, his adjudication, and his subsequent hospitalization to date. Included among these materials are:

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:   United States v. John W. Hinckley, Jr.
Page 2

*Court Documents and Submissions*

1. John W. Hinckley, Jr. and St. Elizabeths Hospital's Joint Motion for Interim Relief Pending Hospital's Request For Enlargement of Terms of Conditional Release dated March 29, 2011

2. Government's Opposition to Interim Relief filed April 11, 2011

3. John W. Hinckley, Jr's Reply Memorandum in Further Support of the Joint Motion of Mr. Hinckley and St. Elizabeths Hospital for Interim Relief Pending Hospital's Request For Enlargement of Terms of Conditional Release filed April 11, 2011

4. Hospital e-Letter dated May 9, 2011

5. Order granting Motion to Permit Mental Examination and Review of All Records and Materials at Saint Elizabeths Hospital Concerning Mr. Hinckley by Government Experts, signed by Judge Paul L. Friedman, dated May 25, 2011

6. Order by Paul L. Friedman, United States District Judge, dated June 21, 2011

7. Review Board Report – Recommendation for Expansion of the Current Conditions of Release and for Convalescent Leave by Kevin Shamblee, LICSW, ACSW, dated July 15, 2011

8. St. Elizabeths Hospital Request for Expansion of the Current Conditional Release and for Convalescent leave, dated July 29, 2011

9. Government's Opposition to St. Elizabeths Hospital's Request for Expanded Conditions of Release, filed September 30, 2011

10. John W. Hinckley's Reply Memorandum in Support of Hospital's Request For Enlargement of Terms of Conditional Release, Filed Under Seal, October 21, 2011

11. John W. Hinckley, Jr.'s Motion to File Under Seal, Filed Under Seal, October 21, 2011

12. Defendant's Proposed Order, Filed Under Seal, October 21, 2011

*Prior Court Opinions and Orders*

13. Opinion and Order by Paul L. Friedman, United States District Judge, dated June 16, 2009

14. Order by Paul L. Friedman, United States District Judge, dated April 11, 2008

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:   United States v. John W. Hinckley, Jr.
Page 3

15. Order by Paul L. Friedman, United States District Judge, dated January 31, 2008

16. Order by Paul L. Friedman, United States District Judge, dated January 24, 2008

*St. Elizabeths Hospital Letters to the Court*

17. St Elizabeths Hospital Letters to the Court, dated April 2, 2008; April 11, 2008; April 24, 2008; April 25, 2008; May 13, 2008; May 27, 2008; June 5, 2008; June 6, 2008; August 15, 2008 (two letters); August 19, 2008 (two letters); September 29, 2008; October 9, 2008; October 17, 2008 (two letters); November 5, 2008; November 21, 2008; December 4, 2008; December 5, 2008; December 16, 2008

18. St Elizabeths Hospital Letters to the Court dated January 27, 2009; February 2, 2009; February 2, 2009; February 11, 2009; March 9, 2009; March 16, 2009; March 31, 2009; April 8, 2009; April 28, 2009 (two letters); May 14, 2009; June 10, 2009; June 11, 2009; July 9, 2009 (three letters); July 15, 2009; August 4, 2009; August 20, 2009; September 4, 2009; October 13, 2009; October 22, 2009; December 1, 2009; December 15, 2009; December 21, 2009

19. St. Elizabeths Hospital Letters to the Court dated January 5, 2010; January 7, 2010; January 19, 2010; January 22, 2010; February 4, 2010; February 18, 2010; March 8, 2010; March 11, 2010; March 25, 2010; April 23, 2010; May 7, 2010; May 14, 2010; June 3, 2010; June 18, 2010; August 30, 2010; September 23, 2010; October 6, 2010; October 15, 2010; October 28, 2010; November 3, 2010; November 18, 2010; December 16, 2010

20. St. Elizabeths Hospital Letters to the Court dated January 12, 2011; January 24, 2001; February 15, 2011; March 3, 2011 (two letters); May 10, 2011; May 25, 2011; June 10, 2011; July 5, 2011; September 20, 2011 (two letters); October 6, 2011

*St. Elizabeths Hospital Records*

21. H1-H430

22. H431-H867

23. H868-H1106

24. H1107-H1276

25. H1277-H1365

26. H1366-H1403

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:    United States v. John W. Hinckley, Jr.
Page 4

27. H1404-H1454

28. H1455-H1508

29. Recommendation for an Expansion of the Current Conditional Release and for Convalescent Leave authored by Kevin D. Shamblee, LICSW, ACSW, Clinical Administrator, dated July 15, 2011

30. ~~Individual Psychotherapy Notes of Sidney Binks, Ph.D., dated June 2008 through June~~ 2011

31. Music Therapy Assessment and Progress Notes of Mr. V.J. Hyde, MT-BC, dated June 2008 through June 2011

32. Art Therapy Assessment and Progress Notes of Deidre Cogan, ATR-BC, LPC, CCTP, dated June 2010 through June 2011

33. Individualized Relapse Prevention Plan Feedback From Patient While on Conditional Release, dated July 3, 2008; September 9, 2008; November 30, 2008; December 29, 2008; November 16, 2009; February 1, 2010; March 1, 2010; April 5, 2010; May 17, 2010; June 28, 2010; October 18, 2010; October 29, 2010; December 29, 2010; February 7, 2011; March 14, 2011; August 1, 2011

34. Individualized Relapse Prevention Plan Feedback From Responsible Persons Supervising Patient While on Conditional Release, completed by Mrs. Jo Ann Hinckley, dated December 1, 2008; December 29, 2008; September 9, 2008; November 16, 2009; February 1, 2010; April 5, 2010; May 17, 2010; June 28, 2010; October 18, 2010; November 29, 2010; December 27, 2010; February 7, 2011; March 14, 2011; August 1, 2011

35. Individualized Relapse Prevention Plan Feedback From Responsible Persons Supervising Patient While on Conditional Release, completed by Mr. Scott Hinckley, dated September 8, 2008; November 30, 2008; March 1, 2010; May 16, 2010; October 17, 2010; July 31, 2011

36. Individualized Relapse Prevention Plan Feedback From Responsible Persons Supervising Patient While on Conditional Release, completed by Ms. Diane Sims, dated December 29, 2008; November 16, 2009; April 5, 2010; June 28, 2010; March 14, 2011

37. Interview of John W. Hinckley, Jr. and Responsible Persons Following Overnight Outings by Paul Montalbano, Ph.D., dated September 18, 2008; December 29, 2008; January 5, 2009; March 2, 2009

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:    United States v. John W. Hinckley, Jr.
Page 5

38. Termination Interview of John W. Hinckley, Jr. by Paul Montalbano, Ph.D., dated April 9, 2009

39. Clinical Evaluation of John W. Hinckley, Jr. by Deborah L. Giorgi-Guarnieri, J.D.,M.D. dated October 14, 2011

40. Progress and Medication Management Notes of Deborah L. Giorgi-Guarnieri, J.D., M.D., dated November 24, 2010; December 23, 2010; January 12, 2011; February 3, 2011; March 8, 2011; June 15, 2011; July 25, 2011

41. Individual Therapy, Case Management, and Checklists of Carl J. Beffa, MSW, BCD, dated November 26, 2008; February 16, 2009; April 2009; May 18, 2009; November 9, 2009; November 12, 2009; December 21, 2009; December 23, 2009; January 25, 2010; January 28, 2010; February 22, 2010; February 26, 2010; March 29, 2010; April 1, 2010; May 10 2010; May 13, 2010; June 21, 2010; June 24, 2010; October 11, 2010; October 15, 2010; December 20, 2010; January 31, 2011; February 2, 2011; March 2011; June 2011; July 29, 2011

*Colonial Behavioral Health Material*

42. Peoples Place Activity Calendar

*Clinical Responsibilities Outlines*

43. Confirmation of Records Reviewed Letter to Barry Levine, Esq. and Nicole Rafanello, Ph.D., from Carl Beffa, MSW, BCD, dated September 9, 2009

44. Confirmation of Records Reviewed Letter to Nicole Rafanello, Ph.D., from Deborah Giorgi-Guarnieri, J.D., M.D., dated July 29, 2010

45. Case Manager Responsibilities of Mr. Carl Beffa, MSW, BCD, signed September 14, 2009

46. Psychotherapist Responsibilities of Mr. Carl Beffa, MSW,BCD, signed September 14, 2009

47. Psychiatric Responsibilities of John Lee, M.D., signed September 14, 2009

48. Psychiatric Responsibilities of Deborah L. Giorgi-Guarnieri, J.D., M.D., signed August 30, 2010

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:    United States v. John W. Hinckley, Jr.
Page 6

### *United States Secret Service Reports*

49. 2008 United States Secret Service Reports.IIUSSS1 to IIUSSS35

50. 2009 United States Secret Service Reports.IIUSSS36 to IIUSSS122

51. 2010 United States Secret Service Reports.IIUSSS123 to IIUSSS255

52. 2011 United States Secret Service Reports.IIUSSS256 to IIUSSS365

53. 2011 United States Secret Service Reports.IIUSSS366 to IIUSSS388

54. United States Secret Service Report of Computer Forensic Examination, WFO Exam #11-109

### *Media*

55. 4 CDs of songs by John W. Hinckley, Jr. dated January 2011 (13 songs); November-December 2010 (14 songs); October 2011 (8 songs), October 2011 (2 songs)

56. Caged Casanova: Reagan's Would be Assassin Goes Ga Ga for Gal Pal. By Alex Dickinson, *The Daily* www.thedaily.com, Saturday February 5, 2011

57. John Hinckley C       B      : Love at Washington Psych Ward: Remembering How Gravely Reagan Was Wounded Video. By Maggie. *Maggie's Notebook.* www.magiesnotebook.com February 6, 2011

58. Free John Hinckley by Harry Jaffee. *Washingtonian*, October 2011

59. CNN Video Documentary entitled "Stalker", aired March 2011

### *Psychological Testing Data*

60. Psychological Risk Assessment Update by Paul Montalbano, Ph.D., dated May 28, 2008

61. Report of Rorschach administered by Paul Montalbano, Ph.D. on May 21, 2008

62. Report of Minnesota Multiphasic Personality Inventory-2 (MMPI-2) administered by Paul Montalbano, Ph.D. on May 9, 2008

63. Violence Risk Assessment Update conducted by Katherine Murphy, Psy.D., dated August 31, 2011

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:    United States v. John W. Hinckley, Jr.
Page 7

64. Answer Sheet for Minnesota Multiphasic Personality Inventory-2(MMPI-2) administered by Nicole Rafanello, Ph.D., dated January 19, 2011

65. Record Form of Wechsler Abbreviated Scale of Intelligence (WASI) administered by Nicole Rafanello, Ph.D., dated January 13, 2011

66. Edition Rating Form for Hare Psychopathy Check List-Revised (PCL-R) 2nd Edition administered by Katherine Murphy, Psy.D., dated July 8, 2011

67. Coding Sheet for Historical Clinical Risk Management-20 (HCR20) administered by Katherine Murphy, Psy.D., dated July 8, 2011

In addition to the above, I have also conducted the following collateral interviews:

*St. Elizabeths Hospital Treatment Team Members*

68. Kevin Shamblee, LICSW, ACSW, Clinical Administrator at St. Elizabeths Hospital on August 9, 2011 for a period of approximately two hours and on August 10, 2011 for a period of approximately one hour and ten minutes

69. Benjamin Adewale, Treating Psychiatrist at St. Elizabeths Hospital on August 10, 2011 for a period of approximately one and one-half hours

70. Sidney Binks, Ph.D., Psychotherapist at St. Elizabeths Hospital on August 24, 2011 for a period for a period of approximately two hours

71. Velora Jernigan-Pedrick, MLS at St. Elizabeths Hospital on August 24, 2011 for a period of approximately one hour

72. Katherine Murphy, Psy.D. at St. Elizabeths Hospital on September 30, 2011 for a period of approximately two hours

73. Mr. V.J. Hyde, MT-BC, Senior Music Therapist at St. Elizabeths Hospital on August 25, 2011 for a period of approximately one and one-half hours

74. Deidre Cogan, Art Therapist at St. Elizabeths Hospital on September 30, 2011 for a period of approximately one hour

*Williamsburg Treatment Team Providers*

75. Deborah Giorgi-Guarnieri, J.D., M.D. at the office in Williamsburg, Virginia on July 30, 2011 for a period of approximately two hours

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:   United States v. John W. Hinckley, Jr.
Page 8

76. Carl Beffa, MSW, BCD in his office at Colonial Psychiatric Services in Williamsburg, Va. on September 11, 1011 for a period of approximately two hours.

## Williamsburg Community Service Providers

77. Jack L. Wood, M.B.A., Director, Eastern State Hospital at his office in Williamsburg, Virginia on September 13, 2011 for a period of approximately thirty minutes

78. Sandy Kockersperger, Librarian; Christine Armstead, Psychosocial Rehabilitation Coordinator; Denese Gillis, Training Manager for Staff Development and Training; in the Davis Building Conference Room at Eastern State Hospital in Williamsburg, Virginia on September 13, 2011 for a period of approximately one hour and ten minutes

79. Christine Armstead, Psychosocial Rehabilitation Coordinator on tour of multiple potential volunteer sites at Eastern State Hospital on September 14, 2011 for a period of approximately one hour and fifteen minutes.

80. David A. Coe, Executive Director; Debbie Townsend-Pittman, Director of Rehabilitation Services; Amy Bland, Case Manager, Adult Mental Health and Substance Abuse; and John Brumfield, M.Ed., LPC Community Support Coordinator at Colonial Behavioral Health (formerly Colonial Services Board) in Williamsburg, Virginia on September 14, 2011 for a period of approximately one hour and forty minutes.

## Family Members

81. Jo Ann Hinckley and Scott Hinckley in Mrs. Hinckley's home in Williamsburg, Virginia on July 31, 2011 for a period of approximately two hours.

82. Dianne Sims and Scott Hinckley in Mrs. Hinckley's home in Williamsburg, Virginia on October 23, 2011 for a period of approximately one and one-half hours

At the time of the filing of this report I have been unsuccessful in interviewing:

83. Ms. C.B.

## Identifying Data

Mr. John W. Hinckley, Jr. is a 53-year-old white male who was found Not Guilty by Reason of Insanity on June 21, 1982 for the March 30, 1981 attempted assassination and wounding of Ronald Reagan, then President of the United States, and the wounding of Press Secretary James Brady, Secret Service Special Agent Timothy McCarthy, and police officer Thomas Delahanty. Pursuant to court order Mr. Hinckley had been confined continuously since his June 22, 1982 admission at the John Howard Pavilion of the St. Elizabeths Hospital until his relocation to the

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:    United States v. John W. Hinckley, Jr.
Page 9

new hospital on Nichols House 2B. Mr. Hinckley presented for evaluation in personal attire and was cooperative with the examination procedures.

I advised Mr. Hinckley that my evaluation was being conducted by Court order at the request of the United States government and that although I was a physician and psychiatrist, our discussions were not protected by doctor-patient privilege, would not be held in confidence, and that I would be reporting in writing and potentially testifying in court. Mr. Hinckley acknowledged that he understood these caveats and additionally acknowledged and consented to my standard practice of audio recording the examination.

## Proposed Expansion of the Terms of Conditional Release

Mr. Hinckley's treatment team has requested an expansion of the terms of his conditional release to include the following:

I.   That Mr. Hinckley be allowed unaccompanied use of a registered/insured automobile (with a GPS equipped cell phone, tow truck number, etc.) for the following purposes:

   a. While traveling to and from Eastern State Hospital for his volunteer activities.
   b. While traveling to and from groups at Colonial Behavioral Health.
   c. While traveling to and from Mr. Beffa's and Dr. Giorgi-Guarnieri's offices.
   d. While utilizing unaccompanied time mentioned in items below.
   e. While traveling to other activities which may be named at a later date.

II.  That the duration of the current visits be expanded to 17 days for the first two visits and 24 days for the next six visits with a Saturday departure and return to the Hospital on the corresponding Mondays. It is recommended that these visits continue until Mr. Hinckley is released to live in Virginia or until the issuance of the next conditional release.

So that Mr. Hinckley will be better prepared to reside in Virginia permanently on convalescent leave, an incremental amount of unaccompanied time (with a GPS equipped cell phone) is recommended to include:

   a. Mr. Hinckley will volunteer at Eastern State Hospital no more than 5 days per week for the 2 and 3 week periods. (Note: The total number may be less than 5 if limited work is available. The total may be closer to 5 if substantial work activities are available. As Mr. Hinckley is usually not participating in structured activities late afternoons on the weekdays or for the full day on weekends while at the Hospital, it will not be expected that he be required to do so in Virginia).

   b. Mr. Hinckley will attend groups or other activities at Colonial Behavioral Health-Peoples Place up to 3 days per week for the 2 and 3 week periods. The staff members at

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:   United States v. John W. Hinckley, Jr.
Page 10

Colonial will provide monthly progress notes detailing Mr. Hinckley's attendance and participation. The staff at this agency also intends to phone the Hospital in D.C. and Mr. Beffa, should any irregularities occur. To address his risk factor of entitlement related to narcissism, Mr. Hinckley will demonstrate initiative by contributing a minimum of 20% to the payment of his groups at Colonial. In this regard, he intends to save during the months leading up to the hearing. At the discretion of the Hospital, this amount may be altered based upon changes in Mr. Hinckley's financial situation or that the need for this goal may no longer be in evidence. To address his risk factors of isolation and difficulty in relationships with females, Mr. Hinckley will discuss with Dr. Binks and/or Mr. Beffa his adjustment to Peoples Place, engage in the discussions, and interact with his male peers in groups. (Note: Based upon the assessments of the treatment team and providers in Virginia, these objectives may be changed due to issues outside of Mr. Hinckley's control).

c. At the discretion of the Hospital and the Williamsburg treatment team the schedule of activity at Mr. Hinckley's volunteer site or Peoples Place may be altered to allow for other structured activity such as employment.

d. In order for Dr. Giorgi-Guarnieri to assess Mr. Hinckley's adjustment to the expansion of days in Williamsburg, Mr. Hinckley will meet with her weekly for the first two visits and at least, once while on the remaining visits with an increased frequency if clinically indicated. Dr. Giorgi-Guarnieri will assess Mr. Hinckley's risk factors for anger, psychosis, and depression as indicated in her roles and expectations outlined in preceding paragraphs. Mr. Hinckley will discuss among other issues that he has complied with his treatment by taking his medicine as it is prescribed.

e. Mr. Hinckley will meet with Mr. Beffa weekly for therapy while on visits authorized by this conditional release. As indicated in his duties listed above, Mr. Beffa will follow up on Mr. Hinckley's progress at Colonial with a weekly call to ensure that Mr. Hinckley is meeting his treatment objectives as well as addressing his risk factors. Mr. Beffa's roles and expectations are also outlined above. (Note: Mr. Beffa may perform case manager duties during either week).

f. For the first 2 visits, the Hospital is recommending that Mr. Hinckley be allowed to utilize up to a total of six 4 hour unaccompanied outings outside of _____ during the hours of 9:00 a.m. to 9:00 p.m. for social, recreational, shopping, dining out, or for the purpose of securing other related activities. Note: These unaccompanied outings will take place only after he has reached his objectives of discussing with Dr. Binks and/or Mr. Beffa his adjustment to Peoples Place, meeting his goals of contributing financially to the cost, and attending his scheduled groups, and engaging in the discussions and interacting with his male peers in groups. These activities will be listed in a general menu of current areas of interest approved by the Hospital/Mr. Beffa in advance or with notice

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:    United States v. John W. Hinckley, Jr.
Page 11

on the day of a special activity. Mr. Hinckley will be required to travel with his GPS equipped cell phone as during other unaccompanied privileges.

g. The Hospital recommends that for the next 2 visits, after the staff at the Hospital and the providers in Virginia have assessed the progress of the previous visits and provided that Mr. Hinckley has reached his objective of discussing with Dr. Binks and Mr. Beffa his adjustment to Peoples Place, meeting his goals of contributing financially to the cost, and attending his scheduled groups, engaging in the discussions, and interacting with his male peers in groups, that he be allowed to utilize up to a total of nine 4-hour unaccompanied outings outside of          , during the hours of 9:00 a.m. to 9:00 p.m. for social, recreational, shopping, vocational, or dining out related activities. Note: These activities will be listed in a general menu of current areas of interest approved by the Hospital/Mr. Beffa in advance or with notice on the day of a special activity.

h. The Hospital recommends that for the remainder of the visits or until the issuance of a new conditional release, provided that the staff at the Hospital and the providers in Virginia have assessed the progress of the visits and provided that Mr. Hinckley has reached his objective of discussing with Dr. Binks and Mr. Beffa his adjustment to Peoples Place, meeting his goals of contributing financially to the cost of his treatment and engaging in the discussions and interacting with his male peers in groups, he will be allowed to utilize up to a total twelve 8-hour unaccompanied outings outside of          within a 30 mile radius and to a specific geographic location during the hours of 9:00 a.m. to 9:00 p.m. with an itinerary for social, vocational, recreational, shopping, or dining out related activities. Note: These activities will be approved by the Hospital/Mr. Beffa in advance or with notice on the day of the activity.

Example of the unaccompanied activities menu to include:

1) Shopping = P          , T          B          , W          , P          , and similar establishments.

2) Recreational = movie theater, recreation center, concerts, activities at the resort in his subdivision, bowling alleys, area museums or amusement park, and similar establishments.

3) Social = Visiting with local newly established friends who have been identified by Mr. Hinckley to his providers in Virginia and his team members in D.C.

4) Enrichment = Religious establishments, support groups, vocational pursuits, exploring art and musical activities in the area.

5) Mr. Hinckley will avoid traveling to Government centers in Richmond or to areas where the President or members of Congress may be visiting.

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:    United States v. John W. Hinckley, Jr.
Page 12

i. It is recommended by the Hospital that when Mr. Hinckley is not involved in structured activities, that he be allowed to remain unaccompanied in his subdivision while his mother is away from the residence participating in her own shopping, social, recreational, medical, or other activities. Until the issuance of an order for him to reside in the community permanently on convalescent leave, Mrs. Hinckley may not leave her son to participate in an overnight activity during the visits authorized by this order.

j. To ensure that Mr. Hinckley's transition to reside in Virginia permanently on convalescent leave will be smoother, the Hospital recommends that the following items remain unchanged if a new conditional release is issued. They are as follows:

1. The Hospital recommends that Mr. Hinckley's mother, brother and sister be identified as responsible persons while on the outings authorized during these visits. Communication win continue to take place for the first 8 visits through the feedback forms as well as telephone conversations.

2. The Hospital recommends that Mr. Beffa remain as therapist and case manager for Mr. Hinckley while he is on authorized outings to Williamsburg. Here Mr. Beffa will have the opportunity to assess Mr. Hinckley for the presence of psychosis, anger, or depression and provide feedback in his decision making with regard to relationships with females. Communication between Mr. Beffa and the treatment team at the Hospital will continue to take place for the first eight visits through the feedback forms as well as telephone conversations.

3. The Hospital recommends that Dr. Giorgi-Guarnieri remain as psychiatrist while Mr. Hinckley is on outings authorized in Williamsburg. Communication will continue to take place for the first 8 visits through the feedback forms as well as telephone conversations.

4. The Hospital recommends that Mr. Hinckley be allowed to continue his daily unaccompanied walks in his subdivision for up to 4 hours per day.

5. The Hospital recommends that Mr. Hinckley continues to receive a corresponding amount of medication from the pharmacy at the Hospital for each length of visits.

6. The treatment team is recommending that Mr. Hinckley keep the current internet restriction while he is on outings to Williamsburg.

7. The Hospital is recommending that the Individualized Relapse Prevention and Media plans remain in effect for the duration of his time spent in Williamsburg.

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:   United States v. John W. Hinckley, Jr.
Page 13

k. In light of the treatment teams' opinion that Mr. Hinckley needs to spend more time in Williamsburg and less time at the Hospital and to ensure that his transition to reside in Virginia permanently on convalescent leave will be smoother, it is recommended that the following items be changed or added if a new conditional release is issued. The items recommended for changing/adding during these authorized outings will be as follows:

1. That the Hospital will provide a 7-day notice to the Court/counsel/Secret Service prior to each outing to Williamsburg. At present a 14-day notice is provided.

2. The Hospital will provide 1-day notice to the Court/counsel/Secret Service prior to each staff accompanied outing in D.C. At present a 4-day notice is provided.

3. That Mr. Beffa will see Mr. Hinckley for therapy each week; Dr. Giorgi-Guarnieri will see Mr. Hinckley a minimum of weekly during the 17 day visits and once during the 24 day visits. Additional visits may occur for each provider as it becomes clinically indicated.

4. That a minimum of 2 weeks occur between each visit to allow for the preparation of feedback reports.

5. That the places of unaccompanied social and recreation activities to be listed in a catalogue of places Mr. Hinckley currently visits and will not be specified in an itinerary.

6. That the Hospital will not be providing to the Court the specific dates, times, addresses, or phone numbers for Mr. Hinckley's unaccompanied activities.

7. That a summary of 2 visits at a time on a report may be submitted to the Court unless some emergency occurs requiring that the information be communicated immediately.

8. That Mr. Hinckley may be driven to and from the Hospital by a professional driver without his mother or siblings in vehicle.

III. **That at the discretion of the Hospital, upon successful completion of a minimum of 8 outings, and an assessment by the Hospital staff and providers in Virginia indicating Mr. Hinckley is experiencing a good mental status and that he does not present as a danger to himself or others, that Mr. Hinckley be conditionally released to reside permanently on convalescent leave with the following outplacement plan:**

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:   United States v. John W. Hinckley, Jr.
Page 14

a. Mr. Hinckley will be placed on convalescent leave to reside with his mother in Williamsburg.

b. While residing in Williamsburg on convalescent leave, Mr. Hinckley will receive his psychiatric follow up from Dr. Giorgi-Guarnieri. Dr. Giorgi-Guarnieri will meet with Mr. Hinckley two times per month for the first 3 months and no less than monthly afterwards. Mr. Hinckley will receive his therapy weekly from Mr. Beffa. Once Mr. Hinckley is placed into the community, case management services will occur on an as needed basis. Dr. Giorgi-Guarnieri and Mr. Beffa will communicate with the St. Elizabeths Hospital Outpatient Department of Clinical Operations (OPDCO) via a monthly checklist and summary as well as a telephone contact prior to his visiting the staff in D.C. Dr. Giorgi-Guarnieri will start prescribing his psychiatric medication which will be obtained at a pharmacy in Williamsburg. For medical services Mr. Hinckley will utilize the services of a physician in the Williamsburg area who will be identified by his family during the 8 visits listed above. Dr. Giorgi-Guarnieri and Mr. Beffa will communicate with the Court via the monthly summary submitted to the OPDCO.

c. While residing in Williamsburg on convalescent leave, Mr. Hinckley will make weekly calls to the OPDCO for the first 3 months and no less than monthly thereafter at the discretion of the OPDCO. This will provide an opportunity for him to notify and update OPDCO of any changes in his status.

d. While residing in Williamsburg on convalescent leave, Mr. Hinckley will also be required to travel to D.C. on a monthly basis to meet with staff members from the OPDCO indefinitely. He may travel to D.C. unaccompanied for his regularly scheduled appointments.

e. To ensure that Mr. Hinckley has good continuity of care during his transition to community placement, a current member of his inpatient treatment team will be present at his regularly scheduled monthly meetings with the OPDCO. This will occur for the first 6 months or longer at the discretion of OPDCO.

f. While residing in Williamsburg on convalescent leave, Mr. Hinckley will continue to attend his scheduled activities at Eastern State Hospital and Colonial Behavior Health until employment or an alternative constructive daytime activity is located.

g. Upon receipt of a conditional release to reside in Williamsburg, Mr. Shamblee or a designee of the Hospital will work with Mr. Hinckley prior to the conclusion of the 8 visits to ensure that he has applied for Social Security and Virginia Medicaid benefits leading up to his release.

In our opinion, Mr. Hinckley has sufficiently recovered from his mental illness to be granted an expansion of his July 20, 2009 conditional release without danger to himself

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:    United States v. John W. Hinckley, Jr.
Page 15

or others, in accordance with the provision of Title 24, Section 501(e) of the D.C. Code, as amended, if the conditions of the release are as outlined in the preceding paragraphs.

If the patient's condition warrants, or if he violates the conditions of this release, the Hospital will return him to total inpatient care with due notification to the Court.

## History of Events Giving Rise to the Present Motion to Expand the Terms of Conditional Release

On May 28, 2008, the Hospital filed a 501(e) motion recommending the expansion of Mr. Hinckley's conditional release that included the following 17 elements:

1) [Mr. Hinckley] will be allowed to utilize 12 overnight visits to [his mother's hometown] that will last from Saturday until the second Monday thereafter or for a total of up to ten days and nine nights.

2. John Lee, M.D. will remain as the covering psychiatrist in [Mr. Hinckley's mother's hometown]. This means that Dr. Lee will provide psychiatric coverage, assess mental health status, and if necessary, provide emergency medication management. Mr. Carl Beffa, LCSW will be named as [Mr. Hinckley's] social worker in [Mr. Hinckley's mother's hometown]. He will provide individual therapy, guidance, and assistance, especially in the form of social services [and case management].

3. [Mr. Hinckley] will meet with John Lee, M.D. and Mr. Carl Beffa, LCSW once each during each visit to [his mother's hometown]. Both providers will independently interview, assess, and complete a Checklist [describing their observations] provided by the Hospital and fax it to the Hospital within one week.

4. John Lee, M.D. and Carl Beffa, LCSW will participate in post-visit telephone conferences with the treatment team after each visit to discuss the visit and any concerns/issues or additional treatment goals.

5. Carl Beffa, LCSW and Sidney Binks, Ph.D. will communicate by telephone after each visit to discuss and collaborate on the course of therapy with [Mr. Hinckley].

6. John Lee, M.D. and Carl Beffa, LCSW will participate . . . via telephone conference in Individualized Recovery Plans with the treatment team every three months, or as scheduled.

7. [Mr. Hinckley] will utilize "B" city privileges with Mr. Shamblee, LICSW to take the written driver's test at the D.C. DMV to obtain a [learner's permit]. Two weeks notice of this occurrence will be given to the Court.

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:   United States v. John W. Hinckley, Jr.
Page 16

8. [Mr. Hinckley] will be allowed unaccompanied time in [his mother's hometown] to attend [a specific driving school]. This will require seven driving lessons of 60-minutes each.

9. [Mr. Hinckley] will utilize "B" city privileges with Mr. Shamblee, LICSW to take the driver's test at the D.C. DMV and will require approximately 30 minutes of unaccompanied time in the family's car with the examiner to take the driver's test.

10. [Mr. Hinckley] will be permitted to drive the family car with a learner's permit and later with a driver's license with a responsible person/custodian present with him at all times.

11. On each of the outings [to his mother's hometown], [Mr. Hinckley] will be permitted to utilize up to two-hours of unaccompanied privileges twice daily within his mother's subdivision with her cell phone between the hours of 9:00 a.m. to 5:00 p.m. standard time and 9:00 a.m. to 9:00 p.m. daylight savings time. He will notify his custodian/responsible person and the Hospital and provide the name, address, and telephone number before he visits the residence of a neighbor or new friend in the subdivision.

12. [Mr. Hinckley] will be allowed unaccompanied privileges [in his mother's hometown] for up to five hours twice per week, Tuesdays and Thursdays from 8:00 a.m. to 12:00 p.m. for volunteer services at [a particular organization] . . . plus one hour to cover any transportation delays from the actual volunteer sites[.] A copy of his intended work schedule will be listed in his itinerary to the Court.[4]

13. [Mr. Hinckley] will be permitted unaccompanied time in [his mother's hometown] for up to three hours per day twice per week between the hours of 8:00 a.m. and 9:00 p.m. for specific social, recreation, worship, or shopping related activities that will be presented in an approved itinerary prior to the outing.[5]

14. The treatment team will coordinate these visits and unaccompanied time with [Mr. Hinckley], his mother and siblings, John Lee, M.D., Carl Beffa, LCSW, and any other agencies involved. An objective/goal list will be developed . . . for each outing and distributed to each of the above persons.

15. [Mr. Hinckley] will be permitted unaccompanied time in Washington, D.C. for up to four hours twice per week between the hours of 8:00 a.m. – 3:00 p.m. to volunteer at [a particular organization]. . . . Transportation to and from [the organization] will be provided by the Hospital. A copy of his intended work schedule will be submitted to the Court with a two week notice.

16. After six weeks of volunteering [in his mother's hometown] and/or [in Washington, D.C.], if deemed appropriate by [the participating] agencies, [Mr. Hinckley], and the

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:    United States v. John W. Hinckley, Jr.
Page 17

treatment team, these volunteer activities may be increased such that he would work up to five times per week for four hours per day as per the previous conditions listed above.

17. Should the above listed volunteer positions no longer be available to [Mr. Hinckley] he would be permitted to volunteer at another site under the same conditions as cited above and the Hospital will notify the Court two weeks in advance of any changes to his volunteer site.

Following extensive hearings on the matter, the Court granted Hinckley twelve visits of ten-night's duration to his mother's hometown. The Order granted Mr. Hinckley two hours of unaccompanied time daily in the gated community where his mother resides and, twice per visit, three hours of unaccompanied time in the community at large to engage in recreational and social activities. These recreational activities were to be specifically identified in an itinerary that Mr. Hinckley and the Hospital submitted to the Court and the government before each visit. The Order also required Mr. Hinckley to obtain a volunteer position with gradually expanding hours up to a maximum of five days per week for four hours each day.

When Mr. Hinckley was not engaging in leisure activities or his volunteer position, the Order required him to meet with his treating psychiatrist, Dr. Lee, and, upon Lee's retirement, Dr. Giorgi-Guarnieri, at least once per visit and also to meet with Carl Beffa, his case manager and psychotherapist, once per visit.

Finally, Mr. Hinckley was permitted to obtain a driver's permit, take driving lessons with an approved driving instructor, and to obtain a driver's license. He was approved to drive the family car with a responsible custodian accompanying him at all times and was not to drive within 50 miles of the District of Columbia with the exception of driving to and from his visits to his mother's hometown.

On May 13, 2011, the Court extended the current conditional release to permit Mr. Hinckley to continue to visit his mother's hometown under the same conditions until a hearing is held on the Hospital's proposal to expand his conditions of release.

As noted above, on July 29, 2011 the Hospital proposed that Mr. Hinckley be granted an expansion of the current Order to allow him to have two visits of seventeen days and six visits of twenty-four days to his mother's hometown. After these eight 8 visits, the Hospital is requesting that, without any further review by this Court, it be given the sole discretion to place Mr. Hinckley on convalescent leave in his mother's hometown. During the first two 2 visits to his mother's hometown, the Hospital proposes that Hinckley be permitted to utilize "six 4 hour unaccompanied outings" to unspecified locations outside of his mother's housing community. Neither the government nor the Secret Service will be notified of Hinckley's specific destination in advance, thus precluding the Secret Service from conducting any surveillance of Hinckley.

During the subsequent two visits to his mother's hometown, the Hospital proposes that Mr. Hinckley be permitted "nine 4 hour unaccompanied outings" to unspecified locations outside of his mother's housing community and, thereafter, "for the remainder of the visits or until the issuance of a new conditional release," the Hospital proposes that Mr. Hinckley be permitted to "utilize up to a total [of] twelve 8 hour unaccompanied outings . . . within a 30 mile radius" of his mother's community. The Secret Service, again, will not be notified in advance of Hinckley's destination.

Instead, the "Hospital/Mr. Beffa" will approve Mr. Hinckley's outings in advance and provide notice "on the day of the activity." The only limit on Mr. Hinckley's outings is the proviso that he shall "avoid traveling to government centers in Richmond or to areas where the President or members of Congress may be visiting." When Mr. Hinckley is not engaging in unsupervised outings, the Hospital's proposal provides that he continue to volunteer at Eastern State Hospital for up to five days per week; participate in various unspecified social groups for "up to 3 days per week"; meet with Dr. Giorgi-Guarnieri "weekly for the first two visits and at least once while on the remaining visits"; meet with his social worker weekly for psychotherapy appointments; attempt to obtain employment; and continue to have daily unaccompanied time in his mother's community.

The goal of this expansion of Mr. Hinckley's release privileges is to consolidate Mr. Hinckley's mother's hometown as "the primary site for eventual convalescent leave."

At the time of filing this report, Mr. Hinckley has completed a total of sixteen overnight Phase IV visits to his mother's home outside the Washington, D.C. area. The first twelve were pursuant to the July 20, 2009 Order. On May 13, 2011, the Court allowed unlimited additional visits with the same conditions of the July 20, 2009 Order until a hearing could be held on proposed expansion of the conditions of release.

The Hospital has based its current 501(e) Motion on what they describe as "Mr. Hinckley's progress as documented in their records on the absence of any untoward occurrences during these visits" and the belief that he has demonstrated readiness to assume the additional responsibilities and enjoy the associated privileges of expanded terms of conditional release under Phase IV. The details of these visits are documented by the assessments, instruments, and court reports referenced in the medical record and will, in part, be the subject of my review and analysis herein.

## Hospital Course Since the 2008 Hearing

In her August 31, 2011 Violence Risk Assessment Update, Dr. Murphy has provided a detailed chronological accounting of Mr. Hinckley's hospital course covering this time period. I will highlight the important conceptual issues and clinical themes of relevance that I have identified since the last hearing.

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:    United States v. John W. Hinckley, Jr.
Page 19

*Family Dynamics*

Since the last Court hearing, one or both of John Hinckley, Jr.'s siblings, Scott Hinckley and Diane Sims, have been present for all but one of the scheduled visits due to inclement weather. They have executed the Individualized Relapse Prevention Forms and have participated in post visit interviews with staff. Their appointment by the Court as responsible persons/custodians for their brother continues to be of clinical benefit to Mr. Hinckley and extremely helpful to Mrs. Hinckley.

Mrs. Jo Ann Hinckley remains the strong and vibrant matriarch of the Hinckley family. She continues to do well physically and appears healthy. She acknowledges taking medication for high blood pressure but feels well. Despite "showing her age" and not being as "spry" as she used to be she remains vibrant and in charge of the family.

*Relationships*

Consistent with previous behaviors, Mr. Hinckley has repeatedly demonstrated poor judgment and questionable behavior in his quest to expand his relationships with women. This is true of existing, renewed, and new relationships. Of equal concern have been the inconsistencies he has told staff about his relationships.

*Ms. G.*

The relationship between Mr. Hinckley and Ms. G. began to erode in August 2008. Seeking distance she informed Mr. Hinckley that she did not wish to hear from him as often as had been the case previously. Mr. Hinckley was quite taken aback by Ms. G's stance. He felt betrayed and was upset by what he described as her "cold and objectionable" attitude. In therapeutic discussions with Mr. Hyde, Mr. Beffa, and Dr. Binks, Mr. Hinckley was able to articulate his realization that their relationship had become far too complicated by the "on-again off-again" physical intimacies. The narcissistic injury from Ms. G. choosing her fiancé over Mr. Hinckley was a bitter pill to swallow. Holding on to the hope that things might change he articulated a desire to remain friends with Ms. G.

In December 2008, Mr. Hinckley invited Ms. G. to the unit Christmas party at the Golden Corral restaurant unbeknownst to staff. He had already extended an invitation to Ms. C. G. and Ms. D.B. The record reflects several circuitous conversations with staff regarding the potential of who he might invite to the Christmas party. For example, at interview he told Mr. Shamblee that he informed Dr. Rafanello of both women's invitation. However, Dr. Rafanello indicated that he only asked her opinion as to who he should invite. With regard to Ms. G., Mr. Hinckley reportedly told Dr. Montalbano that he discussed her invitation with Dr. Binks but never informed Mr. Shamblee of his intention to invite her.

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:    United States v. John W. Hinckley, Jr.
Page 20

As a consequence of these actions Mr. Hinckley was placed on Ward hold from December 13 through December 22, 2008.

Leslie DeVeau

Displeased by that Ms. G. distanced herself, Mr. Hinckley took solace by attempting to rekindle his relationship with Ms. DeVeau. However, Ms. DeVeau told Mr. Hinckley that she did not want him back in her life as it would "be too stressful."

Ms. L.

Ms. L. is Mrs. Hinckley's next door neighbor in Williamsburg. Mr. Hinckley indicated to several clinicians that he had seen her from time to time when she was doing yard work or when out on his walks. They exchanged pleasantries and he described her as having been "quite cordial" during these exchanges. Sometime prior to Thanksgiving 2008 Mr. Hinckley invited Ms. L. to the family home for Thanksgiving dinner. Ultimately Ms. L. declined the invitation. Mr. Hinckley reported that he was disappointed and would henceforth only exchange verbal greetings with Ms. L.

Ms. D.B.

In 2008, Mr. Hinckley continued his relationship with Ms. D.B. who was a friend of Ms. G. In December 2008, Mr. Hinckley reported that relationship increased in intensity and physicality. Ms. D.B. also lived with a boyfriend who reportedly was aware of her visitations of Mr. Hinckley. In a subsequent collateral interview with Mr. Shamblee Ms. D.B. indicated that the only physical contact between herself and Mr. Hinckley was a greeting and departing kiss.

DDS

A dental resident training at St. Elizabeth's Hospital was assigned to Mr. Hinckley's care. In September 2008, the dental resident developed an ongoing restorative dental treatment plan for Mr. Hinckley. The record indicates that on April 27, 2009 Mr. Hinckley appeared at the dental clinic complaining of tooth pain. Radiographic study revealed two carious lesions that were not found on oral exploration. Mr. Hinckley was offered analgesic medication which he declined indicating he would wait to be seen in follow-up by the dental resident when she was available. The dental resident saw him the following day and determined additional treatment would be required. The record further indicates that at his June 2, 2009 scheduled appointment Mr. Hinckley did not want to receive dental treatment but rather wished to discuss his time at home.

Of significance in June 2009, while Ms. Velora Jernigan-Pedrick was performing a routine review of Mr. Hinckley's Internet use history she discovered that he had accessed pictures of on line. Ms. Pedrick immediately informed the treatment team and investigation followed. Mr. Hinckley reported that the dental resident had invited him to search the pictures online. In an

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:   United States v. John W. Hinckley, Jr.
Page 21

interview with and the dental program training director, the dental resident was surprised to hear
that Mr. Hinckley had searched for her picture and denied telling him to do so. In a subsequent
therapy session with Mr. Hyde, Mr. Hinckley took the position that he had done nothing wrong
in looking up the dental intern's graduation pictures on the Internet. He further stated that he
would not have done it if she had not told him to do so. Lost in his analysis was the fact that he
inappropriately accessed the Internet. As a result of these actions, Mr. Hinckley was placed on
Ward hold. During my interview I discussed with Mr. Hinckley what happened to him as a
result of this and remarkably, to my disbelief, he did not recall his sanctions.

Ms C.K.

Ms. C.K. is a cousin of Ms. D.B. with whom Mr. Hinckley was keeping weekly telephone
contact in the spring of 2009. Mr. Hinckley had hoped that Ms. C.K. would visit him on his
birthday. Mr. Hinckley also maintained some degree of telephone communication with Ms. C.K.
while he was on his April 2 to April 8, 2009 conditional release visit to Williamsburg. He shared
this information with his sister, Ms. Sims, who reported this to the treatment team.

Ms. X.

In July 2009, Mr. Hinckley began receiving clinical services at the new St. Elizabeths Hospital
treatment mall program, the Therapeutic Learning Center. Shortly thereafter he developed an
interest in a female patient who was also hospitalized and receiving services from the treatment
mall. Despite what Mr. Hinckley described as difficulty conversing with her because of her
delusional thinking, he said he was drawn to her because he believed she liked him and they
shared commonality of being one of the few white patients in the therapeutic community.
Moreover, he reported his attraction to her was also fueled by her asking him for quote
affectionate gestures, sub-sexual caresses, hugs and kisses." Mr. Hinckley rationalized his
behavior citing the length to which others would engage in frank sexual intercourse in the
bathrooms at the hospital. According to Dr. Green, Mr. Hinckley was unable to see why there
would be objection to his behaviors with this patient. Mr. Hinckley was encouraged to "proceed
with caution due to this patient's mental status." Ultimately, Mr. Hinckley lost interest and this
relationship ended.

Ms. C.B.

In the fall of 2009, Mr. Hinckley developed an interest in Ms. C.B. who was also an inpatient
patient at St. Elizabeths. During the late fall of 2009, the treatment team met with Ms. C.B. and
her and attorney while she was hospitalized as an inpatient. She was informed of the treatment
team's interest in meeting with her to discuss her relationship with Mr. Hinckley on a regular
basis. According to Mr. Shamblee, the treatment team provided Ms. C.B. with the "caveat" of
what a relationship with Mr. Hinckley would entail (i.e. interviews by treatment team members
and potential interviews by government experts) and she was "fine with that." Ms. C.B. enjoyed

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:   United States v. John W. Hinckley, Jr.
Page 22

substantial visits with Mr. Hinckley during her inpatient hospitalization and continued to do so after her discharge from hospital.

During Mr. Hinckley's Williamsburg visit in November 2009, Ms. C.B. is reported to have made repeated daily long distance telephone calls to the family's residence. Mrs. Hinckley was not pleased with the phone calls and asked her son to encourage Ms. C.B. to stop calling so frequently.

In January 2010, Mr. Hinckley purchased what he described to Mr. Beffa as a quote inexpensive friendship ring" for Ms. C.B. He reported to Mr. Beffa that he had made it clear to Ms. C.B. that it was not an engagement ring. He also left Mr. Beffa with the impression that he was exasperated with Ms. C.B. characterizing her as someone who is not genuinely interested in transitioning out of the hospital as she would demonstrate various inappropriate behaviors to sabotage the process.

According to Dr. Murphy's Violence Risk Assessment Update,

> While Mr. Hinckley was on conditional release in Williamsburg, Ms. C.B. was discharged from the Hospital to an apartment in D.C. On the day of her discharge, Mr. Hinckley told Mr. Beffa that he saw a "50/50 percent chance" of their relationship continuing on in the long-term. He was uncertain whether Ms. C.B. would be able to take public transportation to visit him at the Hospital. Ms. C.B. made regular visits to see Mr. Hinckley and the couple maintained frequent phone contact following her discharge from the Hospital.

He told Dr. Binks that he felt "close to her" and was enjoying her company, but was simultaneously "struggling with the reality that all of his female friends will come under the scrutiny of the government." Shortly after her discharge, Ms. C.B.'s mental status deteriorated. She apparently had come to believe that she and Mr. Hinckley were engaged, a belief Mr. Hinckley viewed as part of her decompensation. At that time he described his relationship with Ms. C.B. as "very close but not substantially romantic," and was concerned about her ability to be a reliable girlfriend. He told Mr. Beffa that she had a tendency to be "demanding, often becoming angry" but uses him as a "sounding board." Mr. Beffa felt that Mr. Hinckley was being realistic about the relationship. Dr. Binks noted, "He clearly has significant insight into the level of her mental illness but still hopes that there could be a relationship that is ongoing provided she gets the help she needs."

Ms. C.B. was out-placed in the spring of 2010. Not long after her discharge she was re-hospitalized.

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:   United States v. John W. Hinckley, Jr.
Page 23

Again Dr. Murphy reports:

> Mr. Hinckley reported to the treatment team that Ms. C.B. called him from D.C.'s
> Comprehensive Psychiatric Emergency Program while he was in Williamsburg.
> He indicated that she seemed to be getting sick the last time she visited him and
> he wondered if she was taking her medication. According to Mr. Beffa, Mr.
> Hinckley reported to him during their individual psychotherapy session that he
> remained friends with Ms. G. and they were keeping contact over the phone every
> few weeks. Ms. G. offered to come to the Hospital for a visit, however, both
> ultimately agreed that it was better if she did not visit, given his involvement with
> Ms. C.B. Mr. Hinckley explained to Mr. Beffa that Ms. C.B.'s mental status was
> too fragile for her to know about him having a female friend. He remarked to Mr.
> Beffa that he did not see any type of close relationship in the long range because
> "she hears voices and has paranoia and must have her medicine closely watched."
> He also explored his concerns about Ms. C.B. during individual therapy with Dr.
> Binks who wrote, "He discussed her recent hospitalization and was deeply
> concerned for her care given that she was only out of the hospital for a brief time
> before requiting re-hospitalization. He seemed heartened by the fact that she was
> quickly stabilized and released."

On August 25, 2010, Mr. Shamblee reports that the treatment team met with Ms. C.B. to discuss
the status of their relationship. She described the relationship as an engagement and that they
were headed toward marriage. Mr. Hinckley was seated next to Ms. C.B. at the meeting and did
not object to her description. Ms. C.B. went on to describe Mr. Hinckley as being a significant
part of her life and she looked forward to the day they would be joined together in a "God
ordained union." The issue of Mr. Hinckley's need to convert to Catholicism was also discussed.
She reported that the couple spoke on the telephone daily and enjoyed spending time on the
grounds together.

At that time Ms. C.B. indicated that she would be willing to speak with government experts. She
was also asked how she felt about the potential of a relationship with Mr. Hinckley becoming
public knowledge. She responded, "It comes with the package." She indicated a willingness to
work with Mr. Hinckley to overcome whatever negative attention the couple might receive.

Ms. C.B. expressed a hope that Mr. Hinckley would be allowed to visit with her at her apartment
in the District of Columbia. Mr. Hinckley requested that Ms. C.B. be allowed to participate in
his future treatment planning meetings.

Throughout the remainder of the year Mr. Hinckley focused on and made multiple requests to
have Ms. C.B. visit him while in Williamsburg. Family members and the treatment team were
not supportive of the visits. This issue was a source of emotional conflict for Mr. Hinckley who
on the one hand desperately wanted her company but was ambivalent about time investment that
would be acquired in order to make it happen.

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:   United States v. John W. Hinckley, Jr.
Page 24

It also became a subject of some resentment held by Mr. Hinckley towards his mother whom he felt resisted this relationship because Ms. C.B. is a woman of color. Mrs. Hinckley explained to this examiner and to others that her concerns were solely due to Ms. C.B.'s tenuous mental status and the complications that would arise should it be necessary to find emergency mental health treatment for Ms. C.B. during a visit.

Mr. Hinckley continued to push for Ms. C.B.'s visits until December 2010 when Ms. C.B. experienced a significant bout of anxiety during the Christmas party at the Hospital which necessitated her being escorted out of the building. Following this experience Mr. Hinckley believed it was not a good idea for Ms. C.B. to visit him in Virginia.

Mr. Shamblee reported that:

> On February 25, 2011, Ms. C.B.'s friend was observed on the Hospital grounds near the subway entry gate displaying delusional/manic behavior in the form of loudly shouting religious words and Mr. Hinckley's full name. She could be heard about 100-150 yards away from the disruption. Mr. Hinckley indicated that he did not see her that morning as he was feeding his cats and was not aware of her presence. On March 3, 2011, he indicated to his clinical administrator that his female friend had been either jailed or hospitalized near Baltimore for similar behavior while attending a religious retreat. When asked if this behavior impacts his choice to remain in a relationship with her, he indicated that he would continue unless he met someone while on his home visits. When asked about his feelings regarding her predicament, Mr. Hinckley indicated that he was concerned and that he had contacted her attorney earlier and told her (the attorney) about his friend's situation. In recent months, Mr. Hinckley has acknowledged that he has engaged in oral sexual acts with this female while on grounds privileges. The acts were consensual for both parties.

At the time of filing this report, the true status of the relationship is between Mr. Hinckley and Ms. C.B remains unclear. She has refused to be interviewed by the treatment team on several occasions and has declined to speak to this examiner. When questioned about Ms. C.B.'s change in attitude regarding her participation Mr. Hinckley simply states, "It's her prerogative."

Of concern to me is Mr. Hinckley's continued contact with Ms. C.B. and the lack of any contact between Ms. C.B. and the treatment team. Despite Mr. Hinckley's attestation we have only his word regarding the dissolution of the engagement. Nonetheless, he has continued episodically to wear one of the rings he purchased as a symbol of that engagement. A greater clinical concern given Ms. C.B.'s tenuous emotional status is that if she is being misled about the status of their relationship it could have profound consequences for her.

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:    United States v. John W. Hinckley, Jr.
Page 25

## Medications

Currently Mr. Hinckley is maintained on a regime of Risperdal (antipsychotic) 1 mg at bedtime, Zoloft (antidepressant) 125 mg in the morning and 25 mgs at bedtime, and Benadryl (antihistamine) 50 mgs at bedtime. He is also prescribed Colace (stool softener) 100 mgs daily for constipation, and multivitamins. There have been no positive urine screens for illicit substances during this report period.

I believe Mr. Hinckley has experienced substantial stressors since the last court hearing. During this time he had to deal with his father's declining health and subsequent death, the pressure associated with juggling multiple relationships, the angst associated with the volatility of one of those relationships, and the "on again" "off again" nature of two of the relationships. In addition, the new experience of repeated personal rejection by potential volunteer agencies and others has clearly affected him.

I have observed his mood to be noticeably more down at interview and he appears less enthusiastic about the upcoming hearing than I have noted previously. There is some difference of opinion among the physicians regarding the need for any changes in his medication regimen.

## Correspondence

Mr. Hinckley has not generated correspondence of any significance during the time period of my review.

## St. Elizabeths Hospital Staff Interviews

### Benjamin Adewale, M.D. Treating Psychiatrist

Dr. Adewale assumed the care of Mr. Hinckley in May 2010 when patients moved from the John Howard Pavilion to the new hospital. Upon Dr. Greene's departure Mr. Hinckley was transferred to the care of the Medical Director, Dr. Tyler Jones. Because of his enormous work load including responsibility for both sides of the new hospital, Dr. Adewale was asked to be Mr. Hinckley's treating psychiatrist.

I queried Dr. Adewale if it was his sense that fewer notes were being entered into the chart as a result of the hospital's change to computerized records and he answered affirmatively. He told me that he writes a note monthly, before treatment planning, and in conjunction with treatment team meetings surrounding Mr. Hinckley's visits. He also indicated that he will write a note if there is special need to do so. He gave the example of making the recommendation not to have the wing television tuned to the CNN "Stalker" broadcast when it aired.

I asked Dr. Adewale why the divided dose of Zoloft was prescribed. He indicated that he had asked himself the same question. Because he could not find any explanation in the record he

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:    United States v. John W. Hinckley, Jr.
Page 26

recently called Dr. Green who did not remember why. As a result, he is considering having Mr. Hinckley take 150 mg in the morning for ease of dosing. I asked Dr. Adewale why Mr. Hinckley was taking Zoloft and he indicated it was because of prior suicide attempts and his isolative behavior. I asked how long he had been on Zoloft and he was unsure. He was aware that the dosage increases occurred surrounding increasing stressors with relationships and environmental stressors. I asked if he was aware of when the dosage had been increased and he was unsure of the specific historic reasons. I asked Dr. Adewale why Mr. Hinckley was taking Risperdal. He responded "micropsychosis, psychosis." After some discussion and reflection, he concurred that it was for mood stabilization rather than psychosis.

Dr. Adewale believes that Mr. Hinckley's primary diagnosis is Narcissistic Personality Disorder. He gave as an example of Mr. Hinckley's narcissism the following:

> Despite his limited face to face contact as a result of deliberate avoidance, Mr. Hinckley expects me to drop everything and arrange for his medication supply when he is preparing to go to Williamsburg.

In the spring of 2011, Dr. Adewale told Mr. Hinckley they would have to be more proactive in seeking him out to "check-in" at least twice per week. Mr. Hinckley was not very responsive to that directive. Subsequently, Dr. Adewale indicated that "I put my foot down" and since then Mr. Hinckley has complied.

I asked Dr. Adewale what his greatest clinical concerns were regarding the proposed expansion Mr. Hinckley's conditional release. He indicated that while he is confident in the clinical work and supervision of Mr. Beffa and Dr. Giorgi-Guarnieri he remains concerned with:

> Mr. Hinckley's demonstrated tendency to jump from one relationship to another and inability to properly acknowledge the social cues of simple kindness from a female not meaning anything more than that. Additionally, Mr. Hinckley does not become emotionally invested in a relationship.

When asked what risk factors were most concerning he indicated " The time he spends alone. He has been known to become depressed when he is alone."

When asked what things he thought were likely to make Mr. Hinckley depressed he responded,

> For example, he sees a woman in the movies and he goes and talks with her and then thinks "this woman likes me" but then the woman puts him in his place. Or if someone recognized him and they begin making a mockery of him or if he is rebuffed. These things could make him depressed.

When asked about his relationship with Ms. C.B. Dr. Adewale acknowledged that Mr. Hinckley represented to staff that the couple was engaged. Dr. Adewale was also aware that at present Mr.

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:    United States v. John W. Hinckley, Jr.
Page 27

Hinckley has indicated that he and Ms. C.B. are not engaged. When asked if he believed that Ms. C.B. shared the understanding that they were not engaged he responded, "I would be surprised if she did."

I asked Dr. Adewale that if Mr. Hinckley is not being truthful to staff and his family about his relationship, or to Ms. C.B. about their relationship would that be of clinical concern. Dr. Adewale responded, " If Mr. Hinckley wants to play gigolo and is emotionally stable that's fine with me. The problem is if he is not stable. In the past, failed relationships and other problems have affected his stability."

**Sidney Binks, Ph.D., Psychotherapist**

Dr. Binks believes Mr. Hinckley is much the same regarding his emotional and cognitive functioning since our last interview in 2008. He stated, "By Mr. Hinckley's report and that of the family the visits appeared to have gone well. When they are interrupted, he becomes understandably upset. He appears to like his life there [Williamsburg]. That is where he wants to be."

When asked how he felt the visits have gone thus far Dr. Binks responded,

> You know John isn't the most exciting character. He is not working on developing the most fantabulous life. He's pretty much a homebody. He does his art, he plays his guitar, or he goes for walks and not even that a lot because of the foot problem that he's been having that has become quite chronic. He has begun to exercise some independent time down there which he is pleased to be able to do. He says he would like to have more contact with people but he is ambivalent about that.

Dr. Binks feels that Mr. Hinckley has not taken full advantage of the opportunities to increase his socialization. Dr. Binks indicated that he believes more structure was necessary in Williamsburg because Mr. Hinckley has a lot of idle time. He also believes that it is unrealistic to ask him to do more with his time because he is not there enough.

Regarding the absence of newly developed male relationships Dr. Binks believes this will always be difficult because of the history and family dynamics of his relationship with his father and his brother. Frankly, Mr. Hinckley is not someone who is inclined to develop male friends. Dr. Binks sees Mr. Hinckley as someone who is quite happy sitting on the floor with his guitar all day and not engaging in activities beyond his own home.

Dr. Binks confirmed that Mr. Hinckley's relationships with women remain a considerable focus of therapeutic attention. We discussed Mr. Hinckley's relationship with Ms. G., who he described as insincere, dishonest, and cruel, and Ms. X. He has had to learn to whether many emotional storms and had done so admirably.

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:    United States v. John W. Hinckley, Jr.
Page 28

The relationship with Ms. C.B. remains the central focus of his attention. She continues to come to see him daily. He has gone through being enamored with her, enjoying the energy of a new relationship, and having to come to terms with the reality that she is sick.

When discussing the issues of their engagement Dr. Binks described his impressions from his interview of her with the team,

Very unstable, cultishly preoccupied with Catholicism in a manner that reflects mental illness. For example, she doesn't go to mass nor does the group that she interacts with, but she maintains that Mr. Hinckley must become a Catholic before they are married.

I asked Dr. Binks if Mr. Hinckley believed he was still engaged and he said no. When asked if Ms. C.B. were of the same opinion he was unsure. When asked if he thought Mr. Hinckley had shared his current position on marriage with Ms. C.B. he was again unsure but felt if he had not it was because he was protecting her fragile feelings. When challenged with the possibility that if not it may be because Mr. Hinckley did not want to lose the company of Ms. C.B. he did not believe she would not stop coming because of that.

Dr. Binks believes too much has been made of the term engagement because Mr. Hinckley has a "loosey-goosey conceptualization of the term different than you or I." Terminology notwithstanding, I asked Dr. Binks if he was aware of Mr. Hinckley telling his family that he was engaged. He responded that Mr. Hinckley made his feelings for her well known and the importance of the relationship to him and that he wanted her to visit. Dr. Binks believes Mr. Hinckley did not tell his family he was engaged because he did not believe he was.

In discussing other female relationships, Dr. Binks did not see Ms. D.B. as being very significant as other women had in the past. Regarding Ms. C.B.2, he characterized his interactions with her as consistent with his nature. Rather than seeking out and getting together with the guys at work, Mr. Hinckley seeks out female relationships. Mr. Hinckley met a woman at work who was kind to him and so John pursued a relationship with her.

I discussed the dental resident matter with Dr. Binks.

John said that of the 25 years I've been here and I know her and she's the only person that ever created a treatment plan for my teeth. And he uses that exact phrase, which I find very funny, but he's making a point... she actually cared about his teeth and he appreciated that. And also she was young and presumably attractive and they developed a kind of friendship thing where she was being somewhat self revealing... she talked about her graduation, she invited him to her graduation and she had pictures online that she let him know about.

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:     United States v. John W. Hinckley, Jr.
Page 29

Dr. Binks believes that the dental resident did indeed invite Mr. Hinckley to view her pictures on line. He does not believe it was prudent to interview the resident in the presence of her supervisor and that her denial was a result of the supervisor's presence. He based this opinion on a similar situation involving another patient in which he observed a worker deny what he had done in the presence of his supervisor.

> I personally believe she [the resident] massaged the truth in order to make sure she did not get into trouble. I think the take-home message in all this is that there will always be people in John's life with the potential of being inappropriate with their boundaries, Jeannette Wick being the best example. And John has to protect himself from those situations. Instead he tends to fall victim to them and participate in them sometimes.

When pointed out that independent of this, Mr. Hinckley violated his computer restrictions Dr. Binks responded,

> John sure did go on the Internet and I was glad the library felt comfortable "turning him in" for that. He shouldn't have done that for sure and it underscores the need for supervision of John.

I mentioned to Dr. Binks that Mr. Hinckley denied there being any consequence to his actions. He acknowledged that Mr. Hinckley had been placed on ward hold for a week (even though Mr. Hinckley did not initially remember).

> It is unusual in that Mr. Hinckley is someone who always followed rules because he did not want to get into trouble. I would have thought he would remember.

We explored his contact and involvement with Dr. Mr. Beffa and he feels it has gone very well. He reminded me that he was the one who stressed the need to separate out the functions of case management from therapy in large measure because John was not very revelatory. He believes Mr. Beffa for the most part has gotten that message. He has not had much opportunity to speak with Dr. Giorgi-Guarnieri and reflected that he never spoke much with Dr. Lee. He believes Dr. Giorgi-Guarnieri is a real asset because of her forensic training. Dr. Binks believes the addition of Colonial Behavior Health is important for multiple reasons. It is an important structural element, an important community element, and over time it may evolve to being a more significantly responsible element for Mr. Hinckley.

When asked what he ultimately thought the current expansion request was attempting to accomplish he stated:

> The nuances between 17 days and 24 days was more reflection of attempting to adhere to the slowly progressive pattern we have followed previously. From our

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:    United States v. John W. Hinckley, Jr.
Page 30

perspective, the issue is that John is ready for the next step and the next step needs to be substantial time down there in Williamsburg and the emphasis should be Williamsburg and not here. And then presuming that all goes well then it is time for John to go.

When discussing risk factors Dr. Binks feels the greatest risk is when Mr. Hinckley is depressed. He has been suicidal multiple times and homicidal. Depression leads to psychosis in Mr. Hinckley.

The thing I have always been most concerned about is his depression. Even when he is dysthymic, you wonder what is this dysthymia? Is this realistic dysthymia? Is this the kind of dysthymia that anyone would feel under the circumstances? Disclosure. When he was committing his crime he was engaged in huge deception. John to this day was being very private closemouthed person by nature. It runs in the family. It's not a mental illness. But he certainly got the message over the years that that is not okay. The team has beaten it into him. I think rejection is a risk factor for him, but he's demonstrated time and time again that he is handled rejecting okay, with some mild depression and with medication.

We explored Mr. Hinckley's "lack of initiative" regarding the goals and expectations of conditional release. We also discussed Mr. Hinckley's isolation from the Williamsburg community and his use of time. Dr. Binks believes Mr. Hinckley has used his time in Williamsburg as well as he could have.

He is a psychiatric patient. I think he has used his time as well as he could have. If we think of our expectations as far as how we might use the time then he falls far short. But he will never be "us" as far as how he will use time. If I think of other psychiatric patients in this hospital and how they might fare under these conditions they would use even less time.

Regarding socialization Dr. Binks opined,

This is John's most important challenge: have a happy life or not.. Will John have a successful life or not? How much socialization he will have, not that he will have the same level of socialization that his mother has, or that you or I would have, but something that meets what his actual social needs are. He needs to be there in order for that to evolve.

I don't see socialization as an immanent risk issue but I think it becomes more of an issue if you look two [or] three years down the road and he is there and his life is empty.

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:    United States v. John W. Hinckley, Jr.
Page 31

We discussed retrospectively Williamsburg as a placement and the impact of any change in Mrs. Hinckley's ability to continue as a responsible person.

> John wants to be there. The emphasis has always been down there. It is where we are. If in the near future his mother is no longer available, and since the family has made it clear the home would not be an option, then supervised housing would be the next option. The treatment team would not be supportive of him living in a condo.

I asked Dr. Binks how he and Mr. Hinckley processed the 30th Anniversary.

> I don't recall it being processed in any depth. We discussed watching the CNN special together, but the video guy here didn't record it. Our discussion about the Anniversary wasn't so much about the crime, but a discussion about the public exposure issue….. "Oh God people are seeing this again; we are trying to move past this… there is always the chance that people will start recognizing me again." It wasn't much more than that. More recently we have talked about how he might repay the Brady's by selling his art.

### Kevin Shamblee, LICSW, ACSW, Clinical Administrator

Mr. Shamblee believes there has been little change in Mr. Hinckley's mental status over the past three years. He acknowledges there was a period of time when he appeared more depressed which he believes correlated with waiting for the current court order and the time when Mr. Hinckley was unable to exercise his privileges prior to beginning the new conditions of release.

Mr. Shamblee reports that Mr. Hinckley acclimated to his Nichols 2B transition without significant clinical indicia of difficulty. He has followed unit rules and has exercised his grounds privileges without incident. Socially, he interacts with other patients on the treatment mall and on board but does not appear to have established any significant friendships. Despite having expressed some uncertainty regarding his participating in treatment mall activities that he felt were unnecessary and not appropriate for him given his length of stay and treatment history, he has participated in all scheduled treatment activities assigned.

As previously referenced, Mr. Hinckley was placed on ward hold twice since the last hearing. First was in response to his failure to notify staff about Ms. G.'s attendance at the Christmas party as described above. The second was in response to the discovery that Mr. Hinckley had utilized the hospital computer to access pictures of his dental care provider. Mr. Shamblee indicated that not only had he been placed on ward hold for this infraction (but was not allowed to exercise Williamsburg visits for a period of time during the summer of 2009.

Mr. Shamblee discussed at great length Mr. Hinckley's relationships with women as documented above. I specifically queried Mr. Shamblee if he believed Mr. Hinckley had told his family that

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:   United States v. John W. Hinckley, Jr.
Page 32

he and Ms. C.B. were engaged. He did not believe so. He also indicated that in a post visit interview Mr. Hinckley told him that one of the rings he purchased was an engagement ring for Ms. C.B., yet he told Mr. Beffa it was a "friendship" ring. I asked Mr. Shamblee if he thought Mr. Hinckley has told Ms. C.B. that they are not getting married. He thought not and he did not believe anyone has asked Mr. Hinckley that specific question.

When asked if he felt Mr. Hinckley appreciated the consequences to Ms. C.B. of his misrepresenting their relationship he did not believe so. If it is true, such disingenuousness would not bode well for Mr. Hinckley in this relationship or in his attempts to develop other relationships.

We explored Mr. Hinckley's driving lesson history and his successful effort to obtain a drivers license. He reported that Mr. Hinckley did well with his lessons at the driving school and practice driving Scott and Mr. Beffa. He indicated that Mr. Hinckley failed his first road test because he did not appropriately yield to a fire truck. He was fully successful on his second road test.

Mr. Shamblee understands that since Mr. Hinckley became licensed he has been doing a considerable amount of driving in Williamsburg. By his description, Mr. Hinckley drives to his therapy appointments, to his volunteer work site twice per week, and to the various recreational activities such as movies shopping etc.

We discussed the changes that occurred at the Family Living Institute. Mr. Shamblee indicated that he learned of the changes while on a call with the treatment team.

I asked Mr. Shamblee if he had any concerns about not having been informed of the changes in Dr. Giorgi-Guarnieri's arrangements prior to the submission of the (e)-letter; specifically that her office was now in Portsmouth, Virginia. He acknowledged that it was troubling that he found out about this via Scott Hinckley at the end of the August visit and not from Dr. Giorgi-Guarnieri. Mr. Shamblee indicated that she apologized and assured him she would still provide clinical services to Mr. Hinckley.

We discussed the anticipated involvement of Colonial Behavioral Health (CBH). Mr. Hinckley completed his intake interview during the June visit. Mr. Shamblee met with the CBH Director and staff in July to discuss what clinical services would be available and to explore associated fees. After much discussion and telephone follow-up it was determined that until Mr. Hinckley was permanently residing in Williamsburg he would have to be billed the full fee-for-service (approximately $24 per day up to $250 per month) for any of the groups he attended. Once Mr. Hinckley becomes a Virginia resident then his services will be eligible for Virginia Medicaid billing.

Shamblee indicated that the plan is to enroll Mr. Hinckley in group activity at Peoples Place which was a part of their community based psychosocial rehabilitation service. When I queried

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:    United States v. John W. Hinckley, Jr.
Page 33

Mr. Shamblee about the groups Mr. Hinckley would attend he was unable to provide any specificity. He stated, "If we have to go to court in November and we don't get a ruling from the court until let's say June, then we would have to see what groups were available at that time."

I asked Mr. Shamblee if the plan over time was ultimately to have Colonial Behavioral Health assume such responsibilities as case management and other clinical services. He indicated that the plan as presented simply involved groups but that the door was left open for future discussion. When asked if Colonial Behavioral Health would be involved in treatment planning Mr. Shamblee indicated they would in all likelihood but how that would occur had not been fully explored. When asked if the Hospital anticipated or if he thought Colonial Services Board envisioned themselves as ultimately assuming total responsibility for Mr. Hinckley's clinical and forensic care Mr. Shamblee did not believe so. His response, which surprised me, suggested a lack of insight into the bigger picture of the potential future transitional and permanent role of the agency.

Our discussion turned to whether Mr. Hinckley could have accomplished more during his expanded conditions of release. Mr. Shamblee stated,

> Treatment-wise I don't think we could have expected much more. But I think socialization, were he someone else who was more of a social being, probably could've taken advantage of a lot more stuff... More recreation center. Going to different places. Look, you just can't create a stallion from a mule. You can't get someone to do what they normally don't do for recreation. Going to the recreation center, going bowling... He likes to go to the mall, going to the pet store, going to the movie theatre.

I asked Mr. Shamblee if in fact Mr. Hinckley was doing those things and he said yes.

I discussed with Mr. Shamblee Mr. Hinckley's rejection by the Williamsburg community. He assured me that such issues were being discussed by Mr. Beffa, Dr. Giorgi-Guarnieri, and his hospital treatment team. In his words,

> The SALT thing was a get your coat and go sort of embarrassment... the art class was less of an embarrassment but it hurt, "we don't want you", that's a tough thing to hear.

Mr. Shamblee believes that in the context of Mr. Hinckley's risk assessment being rebuffed is of less concern than the rejection by or the absence of a female relationship.

We discussed Ms. C.B.'s unwillingness to speak with the treatment team. He indicated that she just spontaneously changed her position on this matter and that he keeps asking John to check with her to see if she has changed her mind.

...and it is not like she has changed. Really, she will call, she still comes over the same and its is not like she has pulled back from him or that she doesn't want to be bothered with us because we are associated with him

I asked Mr. Shamblee how he knew this was in fact how Ms. C.B. felt. He said it was because that's what Mr. Hinckley had told him. I asked if there was anything stopping him from picking up the phone and calling her to which he responded. "No. Thank you. I really hadn't thought about that."

I pointed out to Mr. Shamble that there was little in the chart about the 30th Anniversary of the assassination attempt. He engaged Mr. Hinckley in a discussion about the CNN special and whether he should watch it on the unit. However, when I pointed out the clinical significance of the Anniversary he was unable to explain why, other than what may have been discussed with Dr. Binks, there were so few if any explorations of this with his treatment team.

**V.J. Hyde, MT-BC, Senior Music Therapist**

Mr. Hyde continues to be a significant and insightful therapeutic resource through his work with Mr. Hinckley in music therapy. Since our last discussion in 2008, Mr. Hyde informs me that,

Mr. Hinckley's mood in response to whatever is going on in his court hearings, changes from the old hospital to the new hospital, changes in groups, changes relationships, all of those things, I believe globally impact him. What I have seen is that he has been more stable throughout. Earlier on when we were at John Howard, the process with the court, the process with everything else that was going on in Williamsburg, relationships with women, all of these things definitely made him more susceptible to anxiety. I think it's still impacted by these things; however, one thing I have noticed is that he is more steady throughout the process. So while I see the anxiety throughout the sessions, for example he'll sometimes want to stand throughout part of the sessions, he will walk around a little bit, whenever I ask him he'll say, "Oh I've been sitting down a lot", which I can understand but I think there's more going on.

Mr. Hyde spoke of the stress Mr. Hinckley experienced waiting for the Court's last decision. He indicated that when things started to solidify Mr. Hinckley presented with a noticeable relaxation of mood and affect. Mr. Hyde notes that while Mr. Hinckley will often minimize these feelings he is able to articulate them if not directly then through his music in therapy.

We discussed the evolution of Mr. Hinckley's relationships with women over the past three years. Mr. Hyde believes Mr. Hinckley handled the loss (unexpected death) of his nonromantic friend quite well. He is able to talk about his feelings and wrote a memorial song for her. Regarding Ms. C.G., he describes Mr. Hinckley as having learned what real relationship is and what faux relationship is. He viewed the relationship as a contest for Ms. C.G.'s affections;

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:   United States v. John W. Hinckley, Jr.
Page 35

unfortunately he lost. Ms. C.B. has become the primary relationship throughout the most recent time frame. He acknowledges that the couple has been very serious and had reported their engagement to both himself and Dr. Binks.

> They talked about it and talked about it and then when they finally decided to exchange rings and promises I think that was a choice that he made knowing full well there were a number of things up in the air like Ms. B. not being able to come to Williamsburg for visits even in the interim and the issue of his conversion to Catholicism

I asked Mr. Hyde if he believed that Mr. Hinckley's continuing this relationship was giving Ms. B. the impression that they are still engaged. He responded,

> Yes. I asked him that recently. I believe earlier when the engagement first came up he held a glimmer of hope that things will work out for them. There was a possibility she would be stable enough and he would wind up in a situation where it would be possible.

Despite knowing full well the ultimate fate of this relationship, it appears Mr. Hinckley continues to give Ms. C.B. a false impression about the status of their relationship. Mr. Hyde is reluctant to comment on what Ms. C.B. is thinking because he has not spoken with her. However, Mr. Hyde does believe that Mr. Hinckley in his heart wants to see this relationship go on to marriage. Nonetheless, Mr. Hyde believes Mr. Hinckley is looking more realistically at where things are going.

Mr. Hyde continues to believe that Mr. Hinckley is making good progress at using music therapy as a means for exploring his inner feelings and expressing them through his songs. I asked Mr. Hyde to characterize Mr. Hinckley's "body of work" since the last hearing. He informed me that there have been fewer opportunities to record together because the hospital's equipment had been broken for some time. Mr. Hinckley has done a fair amount of recording on his machine at home and in the past year considerable recording on the equipment that Mr. Hyde has managed to acquire for the Hospital.

Mr. Hyde again reported that the majority of Mr. Hinckley's many musical compositions are dedicated to women. The songs allow him to express how the relationship affects him in the moment. Mr. Hyde characterizes Mr. Hinckley's work as "a hero's journey" and the woman in his relationship becomes a central figure, a sort of angelic being, with whom he travels through life trying to gain the riches of life to make her/their existence more comfortable. Formulaic at best, Mr. Hyde says these works are not Mr. Hinckley's most introspective. Pushed to do so he will respond and generate a more introspective piece.

Interestingly, Mr. Hyde states that Mr. Hinckley prefers to arrive at the therapy session with a "hero's journey" piece already in mind, record it, and be done in 50 minutes. Occasionally they

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:     United States v. John W. Hinckley, Jr.
Page 36

will go back to edit and change and fix things but it appears to be important to Mr. Hinckley to have that whole piece. And in Mr. Hyde's words, "so I can look back at it now, reflect on myself in the moment, and know that it is done. It is incredibly superficial."

When I pointed out that this seems to be exactly how Mr. Hinckley deals with his life, Mr. Hyde agreed.

It is all on the surface unless you prod him to go a little deeper. He will. He will go under there a little bit but it doesn't stay too long and it has to be pushed to do so.

I asked Mr. Hyde if through the therapy he had a sense of what Mr. Hinckley has accomplished on his current conditions of release. He responded,

In a very self-centered way to just be there. To be the hell away from St. Elizabeths. To be at home, to have a taste of freedom, to have his own space, be with his mother... I think what he's accomplishing is to just be in this life that he wants to be in. While at the same time doing some of the things he needs to be doing like his work at Eastern State. I think he sees his time there as a "pilot run."

I asked Mr. Hyde if he felt Mr. Hinckley had essentially accomplished only what was minimally asked of him.

Yes and no. I say yes for the caveat because he's going there, wanting to be there, and then once he's there it's almost like, okay I'm on vacation I've got all these things to do on vacation now get around to them. So yes I think he's accomplishing these things on a minimal level but I think he wants to go beyond that. My sense is that if doors hadn't been shut on him in the past, for example different volunteer job opportunities, that heuristically has peppered his approach to doing things.

I asked Mr. Hyde to explain how one wants to do more but does nothing about it. He offered this example:

Mr. Hinckley really wants to get a network of musicians in Williamsburg that he can play music with. He talks with me about this constantly. Wants to hook up with a singer who can lay down tracks in his recordings. He really wants to get a network of musicians in Williamsburg so he can play music with them. But he feels stymied in his effort to do this because he doesn't have the skill set to make this happen. I've asked him, Do you look on Craigslist? Do you call folks from ads in the newspaper? How do you deal with your identity when attempting to do this?

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:    United States v. John W. Hinckley, Jr.
Page 37

We discussed the public's perception of Mr. Hinckley particularly that of the Williamsburg community. He shared this vignette from one of their therapy sessions:

> Around the time that Jared Loughner shot Congresswoman Gifford, Mr. Hinckley commented, "Wow. Is that how people see me?" When I asked, "Tell me what you think" he said, "Yeah, I think that they do." Then he began to vent his frustrations. "It's impossible for me to change that. I don't have a microphone in my hand. I don't have the video camera. So no one can hear my music. No one can see my art. I have these other aspects of my life that no one knows about. I'm an artist. I'm a musician. Nobody knows that. They just see me as the guy who tried to kill Reagan."

Mr. Hyde informed me that he identified music therapy services for Mr. Hinckley in Williamsburg with Elizabeth Hurley a former music therapist at Eastern State Hospital who also sees private clients. Mr. Hyde provided Mr. Hinckley with the necessary contact information but it is unclear at this time if he has followed through.

We discussed the dental resident incident. Mr. Hyde indicated that in therapy sessions Mr. Hinckley's description of what had transpired was suggestive of a situation where a staff member should have exercised more boundary discretion. Nonetheless, he found no excuse for Mr. Hinckley's violation of his computer restriction and acknowledged that such behavior showed poor judgment in the context of the incident in the broader context of his case.

I asked Mr. Hyde if Mr. Hinckley shared any of his feelings about the 30th Anniversary of the assassination attempt. He indicated that there was somewhat of a confluence of discussion transition between Congresswoman Gifford's shooting and the 30th Anniversary. In particular, Mr. Hinckley made several references about media coverage. The CNN special, then *Rawhide Down* came out and it all became compacted for him. Mr. Hyde said Mr. Hinckley focused on how the world saw him. Seeing how much anger was focused on Loughner forced him to focus on how people in Williamsburg look at him – confronting the reality of how that one day in history painted an image of him that will last forever. Mr. Hyde said the 30th Anniversary was a wake-up call for Mr. Hinckley forcing him to deal with how people see him now and not being able to control that message.

## Deidre Cogan, ATR, Art Therapist

Mr. Hinckley began working with Ms. Cogan since the John Howard patients began coming over to participate in the TLC activities in the new Hospital. He is a member of her studio arts group. The group is not an insight oriented group; rather it functions as an artist studio for patients who have been in care for a very long time. Mr. Hinckley has taken an interest in learning how to paint abstractly.

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:    United States v. John W. Hinckley, Jr.
Page 38

For the most part Mr. Hinckley is very quiet in the group. It is all male and all former John Howard patients in large measure because that is who signed up for it. He talks mostly about the aesthetics of his work. He does landscapes, he copies painting of famous artists, and he paints portraits of his cats.

Describing his work as "pretty good" Ms. Cogan believes he has learned to accept constructive criticism and that he would benefit from continuing his art therapy in Williamsburg. She has made the suggestion that with the assistance of his Williamsburg clinician he search the Internet to find a group that he could join. Ms. Cogan feels that a course in art history or a studio art course at a community college would be an appropriate activity for Mr. Hinckley in Williamsburg.

She finds Mr. Hinckley to be somewhat guarded with her which is quite different than with Mr. Hyde. However, she acknowledges the group setting and the relationship they developed is very different. She is aware of Mr. Hinckley's past history regarding female staff and denies Mr. Hinckley ever demonstrating an interest in her as a woman.

Interestingly, as he has done in music therapy, Mr. Hinckley produces on average a painting a session. She is working on trying to get him to slow down. Ms. Cogan feels the art therapy has helped his socialization as demonstrated by his interactions with other group members.

Ms. Cogan notes that Mr. Hinckley is narcissistically frustrated by the exhibit limitations placed upon him. She has been consistent in refocusing his recognition that "that is the way it is." However, she recognizes that all artists are narcissistic regarding the desire to have their work admired by others.

She noted that six months ago Mr. Hinckley gave two of his paintings to a young attractive art therapy volunteer. She gave the paintings to Ms. Cogan who returned them to Mr. Hinckley. Her concern was that she felt it inappropriate for a therapist to accept such a gift and given Mr. Hinckley's history it was not a good idea. We discussed the several individuals to whom he has recently offered artwork. Interestingly, Mr. Hinckley has never offered her artwork. It should be noted that Ms. Cogan is herself an attractive woman.

**Velora Jernigan-Pedrick, MLS, Hospital Librarian**

Ms. Pedrick confirmed that Mr. Hinckley continues to competently and reliably perform the duties of a library aide in his work assignment at the staff library for two hours per day, five days per week and seems to enjoy his job. He continues with the primary responsibility of processing interlibrary loan requests through DOCLINE, the National Library of Medicine's automated interlibrary loan request routing and referral system. Additionally Mr. Hinckley is asked to do data entry, photocopying, electronic scanning, shelving, and labeling the library collection. He has also been called upon to do some research in the archives.

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:    United States v. John W. Hinckley, Jr.
Page 39

Ms. Pedrick informed me that Mr. Hinckley's computer access is limited to his workstation and his Internet access is limited to DOCLINE. From time to time he requests permission to access Medline Plus to look up such things as hay fever or other ailments he or friends may be experiencing. Additionally, Mr. Hinckley has asked permission to look up musicians in the Williamsburg area

I asked Ms. Pedrick about the incident involving the dental resident.

> One day I was checking John's web history and I noticed this dental resident's name and I wondered who was looking her up. When I accessed the page I saw pictures of her and reported it to Mr. Shamblee.

Ultimately Ms. Pedrick was informed that the treatment team talked to John and to the dental resident. When asked if she talked to Mr. Hinckley about this she could not recall.   However, she did recall that on the same day Mr. Hinckley Googled Ms. C.G. who worked at the

Recognizing that in the past Mr. Hinckley has had informal discussions with Ms. Pedrick concerning his relationships with women, I asked if they had any such discussions she could recall.

> Well Ms. C.B. certainly.  I know that he cares about her.  When she gets sick he is concerned about her and wants to know she is o.k.  There have been those instances where she comes back into the hospital and he is concerned.  She calls the library.  There was an instance where we had to ask her not to call.  he is at work.  But that might be when she is getting sick or has been admitted to the hospital.

Initially she would call early morning and they would touch base. Ms. Pedrick commented that he would call Ms. C.B. or she would call him...sort of like checking in.  This was discouraged and the calls ended.

Mr. Hinckley shared with Ms. Pedrick the fact that he purchased a ring for Ms. C.B. after one of his Thanksgiving visits. She told me that shortly thereafter the couple became engaged. She indicated that at first Mr. Hinckley told her that engagement is Ms. C.B.'s understanding of the relationship not his. When Ms. Pedrick asked him why he purchased a ring and gave it to her in light of that understanding he did eventually admit that he, too, considered their relationship an engagement and that he subsequently would refer to Ms. C.B. as his fiancée. I asked Ms. Pedrick if things had changed and she said, "No. I see them together and I know he gave her another ring a couple of months ago."

Ms. Pedrick was aware of the incident in which Ms. C.B. had to be escorted from the hospital, but Mr. Hinckley never talked about it with her.

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:   United States v. John W. Hinckley, Jr.
Page 40

I asked Ms. Pedrick what she thought was most important for Mr. Hinckley to be successful in the workplace. She indicated that he is not really a self starter and does best when he has a very clear task and he is given directions. Leaving it open for him is not likely to yield the same success as providing him with specific directions.

We discussed Mr. Hinckley's computer skills. She believes he is capable of doing Google searches, tracking down information, and the like.

I also asked Ms. Pedrick if Mr. Hinckley discussed the 30th Anniversary with her. She was certainly aware of it given the prominent coverage in the media but they had no discussions.

Ms. Pedrick says that Mr. Hinckley's mood has generally been stable. He is happiest when going home to Williamsburg and when he is in a relationship. He is more anxious when he goes to court.

### Katherine Murphy, Psy.D., Licensed Clinical Psychologist

Dr. Murphy completed the Violence Risk Assessment filed August 31, 2011. Dr. Murphy assumed responsibility for the completing the April 2011 assessment that was initially begun by Nicole Rafanello, Ph.D. Dr. Murphy does not have any treatment responsibility for Mr. Hinckley.

Dr. Murphy believes that Mr. Hinckley will not be a danger to himself or others in the reasonable future. She believes Mr. Hinckley is at a low risk for relapse of psychosis and depression if he does not experience prolonged social isolation. Should a relapse of symptoms or major illness begin to occur Dr. Murphy believes it would likely be gradual, detected by treatment providers, and responsive to pharmacologic intervention. In her opinion, Mr. Hinckley has demonstrated his ability to manage increases in the duration of his outings without presenting as a risk to himself or others. She believes Mr. Hinckley should continue to advance to the next levels of freedom provided ongoing assessments throughout the transition find him to remain in the low risk of being a danger to himself or others.

Dr. Murphy indicates that since the last risk assessment update Mr. Hinckley has exhibited moderate fluctuations in mood that have fallen below the threshold of an active Axis I disorder. Mr. Hinckley's personality disorder remains of primary clinical concern. Dr. Murphy believes that there is strong evidence across his entire hospital course to confirm improvements in his capacity for empathy as well as the development of a more realistic sense of self and his abilities. She indicates that since the last risk assessment update, expressions of narcissistic features have been apparent but remain attenuated. As in past assessments, Dr. Murphy believes that clinically depression is the primary risk for decompensation.

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:   United States v. John W. Hinckley, Jr.
Page 41

We reviewed Mr. Hinckley's relationship with Ms. C.B. in the context of Dr. Murphy's risk assessment. I focused our attention specifically on the subject of their engagement. Dr. Murphy related that in her early interviews, Mr. Hinckley shared his excitement about the relationship.

I asked Dr. Murphy her understanding of whether the couple was engaged. She indicated that in her March interview Mr. Hinckley did confirm that he presented a ring to Ms. C.B. as a symbol of engagement around the time she was discharged from the hospital. Mr. Hinckley told Dr. Murphy that "the ring was like the ring William gave Kate." I asked Dr. Murphy what she thought Mr. Hinckley meant by that. She did not ask a follow up question so could only speculate. Her speculation characterized his response as adolescent excitement.

> I've got this person who cares about me. I've got this person wants to share their life with me.

Dr. Murphy's August interview yielded a much different response from Mr. Hinckley. "I've changed my mind and I don't want to convert to Catholicism". She said Mr. Hinckley seemed to better take into account what Dr. Binks Mr. Beffa and Dr. Giorgi-Guarnieri had pointed out to him namely, how is this going to work? He seemed to better acknowledge that he enjoyed Ms. C.B.'s company, enjoyed the physical intimacy, enjoyed the bonding. He told Dr. Murphy,

> Ultimately my primary objective is Williamsburg. If C.B. cannot be in my life - so be it. If I meet someone in Williamsburg I won't stay with C.B.

We discussed Mr. Hinckley's interest in a female employee at Eastern State Hospital. He told Dr. Murphy that he first started talking with her because she was "attractive and friendly" and she "was not apprehensive like others." I asked Dr. Murphy how Mr. Hinckley addressed the issue that the woman was married. Mr. Hinckley laughed and remarked, "I have no friends in Williamsburg. I'm hoping to get some friends. I wanted to call her, maybe see her in social situation and see where it would go from there."

I asked Dr. Murphy if she thought Mr. Hinckley's response was appropriate given his recognition that the woman was married? She responded,

> No. But we've seen in previous relationships that Mr. Hinckley has trouble accurately assessing or using good sound judgment in relationships and this is something he needs support from his treatment team in strengthening.

When I suggested that this was another example of his narcissism she had no response.

We discussed the dental resident incident. Dr. Murphy told me that Mr. Hinckley seemed to enjoy the fact that she actually developed a treatment plan for him and that she seemed interested in helping his long-term dental care. He told her that over time they became friendlier and that

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:    United States v. John W. Hinckley, Jr.
Page 42

she talked to him about where she was going when she completed her training and shared a little bit about her experiences in dentistry.

> He recalled that she told him that she had recently graduated from Howard and if he looked up her name on the search engine then he could look at some of these pictures. He also said that she invited him to the hospital's graduation ceremony in the chapel.

We discussed the subsequent meeting that included the dental resident, her supervisor, and members of treatment. When told of what it happened Dr. Murphy confirmed what is already on record that the resident seemed truly surprised. The resident acknowledged inviting Mr. Hinckley to the St. Elizabeths graduation but denied ever inviting him to look at pictures.

I asked Dr. Murphy if she explored with Mr. Hinckley the violation of computer privileges. She seemed to think Mr. Hinckley had the privilege to use the computer for other than work purposes as long as he asked and his failure to do so was why he was placed on Ward hold.

> This brings up the issue of why he needs clear and explicit guidelines and explanation of consequences if he is not adhering to the rules and the expectations that are laid out before him. Diane actually said he almost never uses the Internet. Diane doesn't seem to think he has strong computer skills so that she is the one who sits down and he says quote when you look up this recording equipment" then she'll look it up on Amazon and purchase it for him. She said he rarely uses the computer.

I asked Dr. Murphy if she actually believed Mr. Hinckley did not have strong computer skills given the fact that he does DOCLINE searches and looks up information on medical illnesses, his musical interests, and apparently interests in individuals. I also asked her if Mr. Hinckley had informed her that he not only searched the dental resident on the library computer but also did a search for Ms. C.G.

> No, Mr. Hinckley said that was the only person he looked up. For my purposes I'm not investigating or trying to get at the objective truth. So I integrate it [information] in and if this is a concern how it can be monitored and supervised. This is sort of a "he said she said."

I asked Dr. Murphy if in the context of her risk assessment any of Mr. Hinckley's female relationships raise concerns. She responded,

> I think as long as there is oversight and Mr. Hinckley is in therapy and is talking about his relationship with Ms. C.B., talking about how it is unfolding, talking about how it's being impacted by court hearings, more time down there if he is granted that, and changes in his status as he's moving from inpatient to more

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:   United States v. John W. Hinckley, Jr.
Page 43

outpatient-based services; I think with adequate supports in place he has shown that he's been able cope with fluctuations. He has demonstrated a sturdy stress tolerance with some of the things that were going on with Ms. C.M., with losing Leslie DeVeau — so based on past behavior, based on what's being proposed I think that any problems that arise can be adequately managed to nip it in the bud.

Concerning the present circumstances, Dr. Murphy concurs with the treatment team's assessment that Mr. Hinckley is ready for the recommended expansion of his terms of conditional release. In that context I asked her if she would summarize what she felt the key issues are for managing Mr. Hinckley's risk with any extension of time. She provided the following,

- Building routine down there.

- Ensuring solid communication between treatment providers to minimize potential inconsistencies in communication.

- Making it explicit to Mr. Hinckley that he will be expected to be very active in talking about his female relationships with treatment providers, especially to Mr. Beffa and Dr. GG since they will be more actively involved in his treatment.

- Putting the onus on him in developing his time under the guidance of both treatment teams.

- Working with him on "what's next." For example, what's next if his mother should pass away; how is that going to be for him what does he anticipate his reaction will be and how is he going to cope with that?

- If he gets increases in freedom how is he going to deal with shifting his attachments from the Hospital to Williamsburg?

- How he manages meeting new people; how he manages the media should they approach him and what stress that may or may not cause him.

- Forecasting a bit further, his moving into public housing options and what those environments will be like for him; what it will be like not to be in his mother's home and being involved with others receiving mental health services and

- Actively talking with Dr. Giorgi-Guarnieri about fluctuations in mood and how changes might be made in medications as necessary.

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:    United States v. John W. Hinckley, Jr.
Page 44

> Ultimately we are trying to prevent too much isolation and self absorption, relapsing into a depression that would go untreated and end up decompensating in a psychotic and delusional proportion and then he starts to blur reality and fantasy, misinterpret relationships, or create relationships in his mind that don't exist.

## *Williamsburg Treatment Team Interviews*

### Deborah Giorgi-Guarnieri, J.D., M.D.

Dr Giorgi-Guarnieri's initial visit was in October 2011. She conducted a 45 minute new patient evaluation which focused on his medicines and his medical situation. When she and Mr. Hinckley regularly meet they go over his checklist and focus on three main areas: hospital progress, relationships, and his planning to come into the community. Dr. Giorgi-Guarnieri indicates that the sessions generally take 45 minutes. At the completion of the session she forwards the checklist and a copy of her progress note the treatment team.

She described Mr. Hinckley as always attending the sessions as scheduled. She indicates that he has become much more open about sharing his relationships and his interest in Williamsburg. He discusses his medication, his physical conditions, and discusses family issues with her. He has become progressively more open with her about what's going on in his life.
Dr. Giorgi-Guarnieri described the situation in which Mr. Hinckley wanted to present her with a painting to hang on her office wall. Mr. Hinckley noticed that Dr. Giorgi-Guarnieri had photographs hanging in her office that were taken by a patient and that there was other patient artwork displayed. Given his history, Dr. Giorgi-Guarnieri had hoped that Mr. Hinckley would have understood why such a request was inappropriate. They discussed the matter and ultimately Mr. Hinckley expressed an understanding of why making the request was not appropriate.

Regarding medication, Dr. Giorgi-Guarnieri says Mr. Hinckley is fine with his current regimen. She is aware that there has been some discussion at the Hospital suggesting he might come off of the Risperdal because it was such a small dose. She is not comfortable discontinuing the Risperdal and says Mr. Hinckley is fine with that. Dr. Giorgi-Guarnieri believes the stressors that Mr. Hinckley will experience in the Williamsburg community will be the same as the very stressors that he had thirty years ago when his parents asked him to leave the house and he was alone in the community and developed paranoia. She believes the Risperdal is an appropriate prophylaxis and that his Zoloft is effectively treating his anxiety.

Dr. Giorgi-Guarnieri reports that she and Mr. Hinckley have discussed where he would go if something happens with his mother and what different family members have thought about that. Her initial impression was that if something were to happen to his mother John would stay in the house. She is not sure if that is still the plan. Dr. Giorgi-Guarnieri stressed to Mr. Hinckley that she needs to know what that plan would be. She has strong feelings that if Mr. Hinckley gets here and he's comfortable with the house, and he settles into his job, and is comfortable with his

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:    United States v. John W. Hinckley, Jr.
Page 45

friends, and settles into the community that he would handle the loss of his mother better if his living situation were not radically disrupted. Dr. Giorgi-Guarnieri has not spoken directly with Scott or Diane and has only briefly spoken to Mrs. Hinckley.

Dr. Giorgi-Guarnieri has explored with Mr. Hinckley some of the difficulties other patients have had with transitioning into the Williamsburg community. Many complain about a lack of activities other than tourist attractions, which people have already done and/or find not very affordable. Many of her single patients complain that there are not many activities or groups for them seeing Williamsburg as more of a "married" town. Dating or meeting people who are not a part of your social circle or community can be very difficult. It is hard to get a job here if one loses a job. Dr. Giorgi-Guarnieri finds it important for Mr. Hinckley to openly articulate his fears or apprehensions about his transitional experience.

Dr. Giorgi-Guarnieri said that their discussion about his hospital progress has been relatively straightforward and focused upon his transition. He is happy with the pace at which the hospital has been proceeding with his plans for transition.

Much of their relationship talk is primarily about females specifically Ms. C.B., "who he talks about as his girlfriend", and Ms. C.G. Regarding relationships in the Williamsburg community, he has spoken about his neighbor who is a single mother and about the co-worker at Eastern State Hospital. Dr. Giorgi-Guarnieri was aware that Mr. Hinckley presented a painting to both Sandy Kockersperger and Ms. CB.2.

> He very much likes C.B. but is being realistic about the fact that she has chronic mental illness and sometimes does not do as well as other times. I think he even spends some of his free time in the St. Elizabeths Hospital community with her.

Regarding their discussions about having Ms. C.B. visit Williamsburg, Dr. Giorgi-Guarnieri noted,

> John wanted Ms. C.B. to visit around the holidays and Mom did not want her to come because she felt she could not handle it if something were to happen to her while there. John told me that his mother said there was enough to deal with making his visits comfortable and uncomplicated. At first I don't think John understood all of her concerns. He felt that she just didn't like C        . But when I explained to John how difficult it was to deal with someone who is acutely ill in this community, getting someone to see them, sitting in the waiting room, and waiting for Colonial Services to come I think he understands better. I think he still would like C.B. to visit but he has accepted the fact that not now.

I asked Dr. Giorgi-Guarnieri how Mr. Hinckley describes Ms. C.B. She said he is reluctant to describe her as anything more than a friend. "At times when she is doing well he describes her as more of a girlfriend."

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:    United States v. John W. Hinckley, Jr.
Page 46

When I pointed out that in other circumstances he has described her as a fiancée Dr. Giorgi-Guarnieri acknowledged that to be the case but she believed that has changed over the year. She stated that he was very close to her as a friendship and also knew that at one point he wanted to give her a ring. When I asked her if he had done so she responded,

> I know that he thought about giving her a ring and that he had a ring in mind, but I don't think that he ever did. And if he did, he got it back from her. When I asked him about that he said he decided not to give her the ring.

I asked Dr. Giorgi-Guarnieri what it would mean if he were telling her something different from what was actually happening. She responded, "We would definitely have to figure that out."

I asked if Mr. Hinckley ever mentioned converting to Catholicism. She said no. I asked if she knew whether C.B. understood that there had been a change in her relationship with Mr. Hinckley. Dr. Giorgi-Guarnieri told me she does not know what Ms. C.B. thinks because she has not spoken with her. I asked what the importance would be if Mr. Hinckley were leading Ms. C.B. to believe that they were engaged and at some point were to be married.

> I think it would be very important for me to know to work with him… If he wasn't sharing it would be very important for us to talk about it.

I asked if she felt this would be an example of Mr. Hinckley's withholding information from a clinician.

> My experience with John is that sometimes he doesn't think things are important, that's how he phrases it. But because we go over every relationship I would have to explore with him why he would not think about telling me something like that….The withholding would definitely be an issue. Whether as an issue of deceitfulness or of John's lack of insight and we would really have to bang that one out. Because I would have to know from him why you would think not to tell her or not to tell me about something like that because we have discussed at length how important what he does in his relationships are. Even though in the beginning he would say those are personal things and I would say, "No not for you. They're not personal for you because of what you're undergoing right now."

Regarding other relationship issues, Dr. Giorgi-Guarnieri indicated that Mr. Hinckley does like Ms. C.B.2 a lot. In fact he is very interested in her. He told her that he does have romantic interest in her but will not act on them because he has been told she is not interested. Mr. Hinckley also told Dr. Giorgi-Guarnieri that he would also be interested in the neighbor if she was interested in him but she is not.

Dr. Giorgi-Guarnieri reports that in therapy Mr. Hinckley is getting more into the issues and less into superficial discussions. Dr. Giorgi-Guarnieri believes for the transition to be successful Mr.

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:    United States v. John W. Hinckley, Jr.
Page 47

Hinckley needs to be in Williamsburg for lots of time and at St. Elizabeths very little time. She has discussed with Mr. Hinckley those issues that were in play before his crime. He was unsupported by his family, very unsupported by the community he lived in and just wandering. That was when he was at his worst. According to Dr. Giorgi-Guarnieri those circumstances cannot repeat themselves in any way when he does transition into the community.

I asked her if the Hospital was aware of the changes that were occurring at the Family Living Institute. She indicated that they were aware of the changes affecting Mr. Beffa but only a few days before our meeting she notified the hospital that she was changing her practice location. But they did not know of the details. She informed me that for now she will continue to see Mr. Hinckley at                          on Saturdays. In time she hoped Mr. Hinckley will have the option of seeing here there or traveling to her new office in Portsmouth, Virginia.

I asked Dr. Giorgi-Guarnieri if she was aware of Mr. Hinckley's Internet use. She said Mr. Hinckley acknowledged having Internet access. She said that he told her about the dental resident's pictures. Mostly he uses the internet for his music primarily purchasing songs from iTunes. He denies looking up anything about himself, Jodi Foster, or Dr. Giorgi-Guarnieri.

With regard to the increasing involvement of Colonial Behavioral Health, Dr. Giorgi-Guarnieri stated,

> My recommendation and my plan was that we pair John up with all the services that the Virginia NGRI's get so that we are as covered in as we can possibly be even though he has an overlay of private providers. The day programming as much as we can, the work placement as much as we can and whatever other services they are able to provide at the time. Whatever services they provide for Virginia and NGRI's John should be included in. Whatever their patients receive John should receive because he will be their patient.

Dr. Giorgi-Guarnieri confirmed that these services would be fee for service until Mr. Hinckley qualified for Virginia Medicaid.

Carl J. Beffa, M.S.W., BCD

I began our discussion by asking Mr. Beffa his impression of how Mr. Hinckley was doing since the last court hearing. He stated,

> Mr. Hinckley has progressed in much the same way as an adolescent progresses to adulthood. He's demonstrated ability to take responsibility for himself, to demonstrate empathy, realizing that when someone doesn't want him he may be hurt by it. He takes it in stride. He's doing so well at his job at Eastern State Hospital library - so I've seen some real progress with him in general.

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:    United States v. John W. Hinckley, Jr.
Page 48

Regarding the delay in the Court's ruling after the last hearing, Mr. Beffa felt that Mr. Hinckley handled the situation appropriately and well. He agreed that the increase in Zoloft was helpful and continues to be of benefit today.

We discussed Mr. Hinckley's relationship with women since the last hearing particularly the Christmas party and his inviting Ms. C.G. and other women. Mr. Beffa stated that in the session he admitted that he enjoyed the attention but ultimately realized that it was bound to be hurtful to someone.

We discussed the current significant relationship with Ms. C.B. Mr. Beffa felt Mr. Hinckley handled the situation much as an adolescent who wants his own way -- not appreciating the issues that made it complicated for his mother. Eventually he came around and saw the reasoning behind it. Particularly, Dr. Giorgi-Guarnieri told him to call the mental health center and find out how a crisis might be managed. Mr. Beffa was disappointed that he did not follow through on her recommendation, instead he simply acquiesced.

Regarding the matter of Mr. Hinckley's engagement, Mr. Beffa seemed unaware that Mr. Hinckley had made a commitment to marry Ms. C.B. and that there was documentation of such in the St. Elizabeths record. I asked Mr. Beffa what he thought about Mr. Hinckley telling the Hospital one thing and him another. He responded,

> Well I find that with John, it still takes the therapist to bring things up. Many times he will bring some things up and other things of his interest but many times he won't necessarily offer information unless it's brought up, discussed, and confronted.

Mr. Beffa indicated that his understanding was that Mr. Hinckley had told her the opposite. He said, "I will have to clarify that with him."

I attempted to discuss the situation involving the dental resident. Initially Mr. Beffa could not recall it until I reviewed the sequence of events with him. He could not recall if he had discussed this with Mr. Hinckley.

With specific regard to his case management activities, Mr. Beffa shared with me the history of his efforts regarding Mr. Hinckley's Eastern State Hospital placement and the successful negotiations with John Fabray, the former hospital Director, and Sansy Ko. We also discussed the promising opportunities for additional volunteer activities as encouraged by the new hospital director, Sansy Ko, and rehab staff.

Mr. Beffa recommended that Mr. Hinckley become involved with his outpatient support and growth group. He also said that Sandy Kochersperger indicated Mr. Hinckley might be able to attend a "Recovery Group" of former and current patients who explore their re-entrance into the

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:    United States v. John W. Hinckley, Jr.
Page 49

community. At the time of our discussion Mr. Beffa had not discussed these possibilities with Mr. Hinckley.

We discussed the interactions with Cabot Wade and J          . J         is an accomplished musician with whom Mr. Beffa has a personal relationship. Mr.        was opening a recording studio in town and Mr. Beffa thought this would be a good outlet and opportunity for Mr. Hinckley. Unfortunately, the Hospital did not agree.

> John has not followed up on my suggestion to reconnect with Cabot Wade. I saw his advertisement sign and suggested that he contact him. I mentioned it to John at this last visit but he did not follow up on it.

Mr. Beffa reports that his interactions with the treatment team have been very positive. He provides them with the post-visit checklists, psychotherapy and case management notes, attends case conferences by telephone, and is in touch with Mr. Shamblee regularly as necessary. Mr. Beffa indicates that he enjoys his case management responsibility.

In discussing Mr. Hinckley's driving experiences Mr. Buffett described it as "rough in the beginning because he didn't know how to park." The first time he was very open about my criticisms. The second time he was far less so I believe because he perceived my criticism as nagging and knew he was not doing what I thought he should do." Of note was an experience that he shared with the treatment team.

> A situation stood out when we were on 199 the four lane divided highway returning from a drive around town, trying to show him landmarks in town, he stayed in the passing lane, the left lane. I mentioned it to him and he didn't move over. So I raised the issue again and he kind of brushed me off the first time. So I raised the issue again and told him about the law. And so he didn't move over immediately but after about five or ten seconds he then moved over. He was kind of indicating to me that he wasn't pleased with my direction. And so in that respect, there is a semblance of the "I'm special. I can do what I want to do" raising its ugly head.

When I asked Mr. Beffa if he thought Mr. Hinckley did most of the driving when he was in Williamsburg he responded,

> Oh, all of the time. Ninety percent of the time. Very rarely would mom be doing the driving when the two of them were going places.

Mr. Beffa said that Mr. Hinckley handled Dr. Lee's departure with some sadness but more concern for what will happen to me now. With Dr. Giorgi-Guarnieri's appearance he settled right down and is doing well with her.

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:     United States v. John W. Hinckley, Jr.
Page 50

I asked Mr. Beffa if he saw any signs of entitlement such as Mr. Hinckley expecting people to do
things for him rather than his doing it for himself. He acknowledges that Mr. Hinckley only does
for himself when he is forced to, for example, making the arrangements for interview at Peoples
Place. But there is no problem if he wants to do something like his initial contact with Cabot
Wade.

We discussed Mr. Hinckley's continued lack of development of male relationships. Mr. Beffa
indicated this is one of the reasons he would like Mr. Hinckley to participate in his therapy group
which has a high percentage of male group members. He also expressed some disappointment
that Mr. Hinckley had not followed through with the men's pancake breakfast that is held at his
mother's church.

I asked Mr. Beffa how he thought things were going between Mr. Hinckley and his family.

> Since they got past the issue about Ms. B₁      coming down and also there seemed
> to be some hesitation about having another court hearing or paying for another
> court hearing - since they got past those issues, it seems things have been going
> well. From what I recall John seems to report the sister and brother have been in
> town less frequently for the visits but I don't have actual data on this. Otherwise,
> I think things have been going well.

Mr. Beffa indicated that he and Mr. Hinckley had discussed the 30th Anniversary. He indicated
that Mr. Hinckley expressed remorse, guilt, and sadness about what had happened and that he
wished it had not happened.

> We didn't really spend a lot of time on it but I was impressed with the empathy he
> showed.

I asked Mr. Beffa why the Hospital and Court were not given earlier notice regarding the change
of practice arrangements for himself and Dr. Giorgi-Guarnieri. He indicated that he and the
other principles of his practice were under a gag order and could not disclose any information.

I asked Mr. Beffa if the Hospital recommendations were approved, how would the information
flow would occur between Peoples Place, Colonial Behavioral Health, and St. Elizabeths. He
indicated that all information would flow through him to the Hospital.

I asked Mr. Beffa what risk assessment factors of concern were of concern at this juncture. He
responded,

> ∘   His forthrightness. My understanding is that in the past he's not been very
>     forthright with his treatment team. However, I believe in that situation is
>     much better and that he has been volunteering things to the treatment team

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:   United States v. John W. Hinckley, Jr.
Page 51

and Dr. Giorgi-Guarnieri. Nonetheless it is important for him to share with his treatment team what occurs whether or not he thinks it's important.

o   His mood. Whether or not things change in that regard is important and would be addressed by Dr. Giorgi-Guarnieri.

o   His narcissism. Whether he draws attention to himself in some way. If he displays arrogance, entitlement, or thinking that he is above others.

o   His utilizing people for his own gain as you described with Ms. C.B. If that were to occur down here, that specifically manipulative kind of situation, we would need to be on the look out for that.

I asked Mr. Beffa if he felt Mr. Hinckley could have done more with his time. He responded,

A little bit, not a lot but a little. He could have followed up more on suggestions I have made to him, as we have discussed. Additionally, for example, I had given him another task of checking out the                     Rec Center. Not only the exercise equipment, although he is not much of an exerciser they have a senior organization over there and I suggested he take a look and see what they've got going on. Take his mom over and show her what's going on, take a tour. And it's right next to Eastern State Hospital and he didn't do it so I was disappointed about that. Because on two different visits I said, "Hey you're right in the area driving by stop in." But he didn't. Often he would say "I don't want to tax my mother and keep her out longer than need be", but I think that was an excuse; he could have figured a way to follow up on these things.

*Eastern State Hospital Interviews*

**Jack Wood, MBA, Director**

Mr. Wood has been serving in his role as Director of Eastern State Hospital since November 2010. He was formerly the CEO of Catawba State Hospital near Roanoke, Virginia. Eastern State Hospital is the largest state hospital in Virginia. It is a marvelous institution boasting two brand new hospital facilities on the campus, the Hancock Geriatric Treatment Center and the Adult and Forensic Treatment Center.

Eastern State Hospital was founded in 1773 with a well intentioned emphasis on community focused mental health care. The Hospital is situated on 500 acres and consists of 16 buildings with 364 beds and maintains a staff of almost 900 to care for the roughly 350 resident patients. Eastern State Hospital is part of The Department of Behavioral Health and Developmental Services system of Virginia and is accredited by the Joint Commission.

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:   United States v. John W. Hinckley, Jr.
Page 52

Until it was mentioned at a meeting several months into his term Mr. Wood was unaware that Mr. Hinckley was working at Eastern State.

> I said, John Hinckley? They said yes. And knowing that we deal with a lot of conditional releases and forensic patients I asked O.K. Where is the Secret Service?

Mr. Wood learned that Mr. Hinckley had been well integrated into his volunteer position and that he was doing very well. Staff described Mr. Hinckley as very easy going, nonintrusive, cooperative, intelligent, and articulate. If you encountered him in the human resources staff building you would not be able to distinguish him from any of the other staff members you would encounter there.

In anticipation of our meeting, in consideration of possible additional volunteer opportunities, Mr. Wood inquired about Mr. Hinckley's demeanor to make sure he could interface with the public. He spoke with a number of staff including the Librarian, the Psychosocial Rehabilitation Coordinator, and the Training Manager for Staff Development and Training. No one expressed any concerns about Mr. Hinckley interfacing with the public.

Mr. Wood describes himself as an advocate for persons with mental illness. He believes Mr. Hinckley deserves an opportunity to transition into the community and sees Eastern State Hospital playing a role in that process. Expanding Mr. Hinckley's volunteer role to include possible reception duties or other activities would place him in more contact with the community.

Mr. Wood expressed some concern that Eastern State Hospital has not been provided with any of Mr. Hinckley's risk assessments, records, or conditional release plan. Mr. Wood was very familiar with the services offered by Colonial Behavioral Health and sees them as a viable community resource available to assist in Mr. Hinckley's transition.

**Sandy Kochersperger, Medical Librarian; Christine Armstead, Psychosocial Rehabilitation Coordinator; Denese Gillis, Training Manager for Staff Development and Training**

Ms. Kochersperger reported that Mr. Hinckley began in November approximately two years ago working four hours two days per week when he is home. She was originally contacted by Mr. Shamblee who inquired about the possibility of his volunteering at the library. She discussed the request with Mr. Fabray, the hospital director at that time, who asked if she was really comfortable having Mr. Hinckley work there. Ms. Kochersperger indicated that she felt Mr. Hinckley deserved a chance, that she could use the help, and that he appeared to have the knowledge and skills to do so. Mr. Hinckley was offered the position.

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:    United States v. John W. Hinckley, Jr.
Page 53

Ms. Kochersperger described him as very knowledgeable of the library, with skills acquired at the St. Elizabeths Medical Library. At Eastern State Hospital he shelves books and journals, makes copies as requested, does interlibrary loans, and prepares materials for the bindery. She said Mr. Hinckley is an extremely hard worker and accomplishes whatever task she assigns him. Mr. Hinckley is always on time and has never failed to show up.

While Ms. Kochersperger understands that Mr. Hinckley is on a 10-day conditional release when he comes to work for her she has never seen any court documents. She informed me that she has no contact with the treatment team but that she communicates with Mr. Shamblee and Mr. Beffa.

I asked Ms. Kochersperger if she had any risk management concerns about Mr. Hinckley's work at the library. She indicated that she had no concerns and that none had been identified for her by others. She was aware of his narcissistic personality diagnosis and that he tends to become a little infatuated with women. He has no contact with patients but does have contact with staff who enter the library.

Ms. Kochersperger is aware of Mr. Hinckley's computer restrictions and indicated that he only uses the computer to access DOCLINE. She has never checked his history but stated his use is right in front of her.

Ms. Kochersperger told me that Mr. Hinckley had developed an interest in a woman in about two or three months ago. Her office is near the vending machines and he would go down and visit her on his breaks. He never said anything inappropriate to her but brought the coworker a painting and also gave one to Ms. Kochersperger. Apparently the coworker did have some discomfort with the situation but did not want to hurt Mr. Hinckley's feelings.

Having discussed this with Mr. Shamblee, she addressed the issue with Mr. Hinckley explaining that the woman was happily married and not interested in having a relationship with him. Ms. Kochersperger indicated that Mr. Hinckley received the message well and on his last conditional release did not re-approach the co worker.

I asked the group their sense of how welcoming the Williamsburg community was of Mr. Hinckley. To a person their responses indicated that the community was not very welcoming and that he was working here because he was unsuccessful in finding volunteer work in the community.

We discussed other potential volunteer opportunities at Eastern State Hospital. Ms. Armstead mentioned the possibility of working with the master gardener in the horticultural program. This would involve participating with the grounds crew.

The Dream Shop was also mentioned. It is a fair trade shop operated by Eastern State Hospital resident volunteers selling handcrafted items from cooperatives in Guatemala and Africa. It is

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:    United States v. John W. Hinckley, Jr.
Page 54

located at the entrance of the Adult Mental Health Treatment Center so there would be interaction with patients, staff, and the community.

Mr. Hinckley could possibly work behind the counter in the Café taking orders from patrons who are primarily patients and staff.

As was described by Mr. Wood, the potential exists to begin as a receptionist in the Geriatric Center and progress to the other positions. In considering all of these options Mr. Hinckley could potentially volunteer at the hospital for up to four hours per day five days per week.

The group explained that Eastern State Hospital patients who are transitioning to the community work with their Jobs Training Program and often find work at fast food chains and hotels.

Ms. Kochersperger, Gillis, and Armstead shared the concern that they had little historical or current information about Mr. Hinckley's treatment plan, conditional release plan, or formal risk management issues. While acknowledging that there has been some verbal communication about these issues no records have been provided.
I asked the group what their concerns would be or what should be the risk management focus if the Court approves expanding Mr. Hinckley's conditional release. Ms. Armstead expressed concern about how Mr. Hinckley would handle interacting with a larger group of people in the workplace because he is so isolated in the library.

> He has very little contact and a lot of supervision. I would want to see him gradually enter into the population of people and have clinicians assess his transition of interacting with a larger group of people and especially his interacting with a larger group of females to see that he is interacting appropriately and that his thought process has more normalcy. Meaning that if someone is nice to him he doesn't see it as being more than that. We need to observe that because I don't think we can do that in the library.

Ms. Gillis pointed out that inherent in the risk consideration is not only how Mr. Hinckley reacts to exposure to larger and different groups but how the larger group [of patients] and community people react to Mr. Hinckley.

I asked Ms. Kochersperger specifically if she had ever seen Mr. Hinckley driving to or from work.

> I know he drives…at least that is what he tells me. I've seen her when she drives to pick him up. I do know that that is a concern for John. If he is working five days per week and his mother has to drive him.

Subsequent to our meeting, I had the benefit of Ms. Armstead giving me a tour by of each of the possible volunteer placements we discussed above.

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:   United States v. John W. Hinckley, Jr.
Page 55

*Colonial Behavioral Health*

David A. Coe, Executive Director; Debbie Townsend-Pittman, Director of Rehabilitation Services; Amy Bland, Case Manager, Adult Mental Health and Substance Abuse; and John Brumfield, M.Ed., LPC Community Support Coordinator

Mr. Coe began our discussion:

> We went a fairly lengthy period of time without any contact from Mr. Beffa or anyone else related to the case. When we left this three years ago, and even until now, our stance had been that we were not opposed necessarily to Mr. Hinckley coming and providing services. But he would have to do one of two things: 1. he would have to either establish Virginia Medicaid which was not an option for him or 2. according to our policies he would have to establish residency in James City County.

In order to establish residency in James City County, a person must show a utility bill in their name. Mr. Coe provided the family with the agency policy three years ago. Approximately three months ago Mr. Beffa called Mr. Coe and asked if this was still the case. Informed that it was the family produced utility bills with Mr. Hinckley's name and the           address on them. According to Mr. Coe at that point they had established residency by policy.

Mr. Beffa, perhaps Mr. Shamble and Mr. Hinckley had an initial meeting with John Brumfield, Community Support Coordinator, and Linda Norfleet, the manager of Peoples Place. They visited Peoples Place and the feedback was that Mr. Hinckley appeared to be essentially just like the other patients who received services there.

From that point Colonial Behavioral Health (CBH) talked about offering two services: he would be able to attend Peoples Place at a frequency that would be determined by his conditions of release and secondly, would be able to participate in case management services. Amy Bland would be the case manager.

Subsequently, Colonial Behavioral Health provided Mr. Beffa with a signed a letter stating that Mr. Hinckley appeared to be appropriate for Peoples Place. From that point CBH internally worked on who would do what and placed Mr. Hinckley into their electronic system, not as receiving services at this point but that the initial assessment had been done.

Recently, Mr. Shamblee called Ms. Pittman to inform them of my visit but he has not provided any of the materials needed. They did discuss some of the other services that might be possible in the future consistent with the services provided to Virginia's insanity acquitees but those services would not be made available at this time. Ms. Pittman indicated that in their discussions with Mr. Shamblee there was some hypothetical conversation about potential services years down line, after Mr. Hinckley was on convalescent leave.

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:   United States v. John W. Hinckley, Jr.
Page 56

Mr. Coe indicated that any services were provided now and in the future would need to be paid as fee for service based upon the Medicaid rate per unit of service. Ms. Pittman recalled being told the family felt that might be "too steep." This might have been in response to what would be charged for Mental Health Support Services beyond Peoples Place and Case Management. However, it was made clear to me that those were the only services being offered at this time.

The Colonial Behavioral Health staff explained that they are the agency responsible for Virginia insanity acquittees in the area. They are quite experienced in developing conditional release plans and reporting back to the Virginia courts. Peoples Place has a memorandum of understanding with Eastern State Hospital to provided services to their NGRI population transitioning to the community.

Mr. Coe indicated that before engaging in discussions with the Hospital he had a closed-door session with his Board of Directors to inform them of what was going on. The Board's reaction was that this was a fantastic opportunity for Colonial Behavioral Health to demonstrate that they believe in recovery. Mr. Coe pointed out that Mr. Hinckley was not the only person receiving services who had committed a violent crime. Some patients had committed crimes more recently and some acts were far more egregious. They have just been perpetrated against a victim of far less notoriety.

Mr. Coe has also notified state authorities. He called the Commissioner of Mental Health to make sure there were no issues at the state level and he was happy to report that there are none. The only concern Mr. Coe expressed was if people find out that Mr. Hinckley is at Peoples Place and want to come in to feed their curiosity or if patients who attend Peoples Place will become "freaked out" and as a result might want to abandon the services they need. He indicated that in the past they have had to ask certain patients not to return to Peoples Place because of the disruptive effect they have had on the milieu. They would exercise the same diligence in Mr. Hinckley's case if necessary.

Ms. Pittman reported that Mr. Shamblee has told them of Mr. Hinckley's interest in women and that he could become disruptive to the milieu if he developed an interest in a female patient.

When asked what specific services might be offered to Mr. Hinckley I was told that the psychosocial program is most likely. If Mr. Hinckley were working five days per week, four hours per day scheduling would require careful planning and balance because their groups are in the morning and their activities (which patients sign up for in the morning) are in the afternoon. Mr. Coe informs me that to date there has been no discussion with St. Elizabeths Hospital about Mr. Hinckley coming to Peoples Place five days per week. The most specificity that he could offer is that Mr. Hinckley would be at Peoples Place two to three days per week but what he would be doing or how long he would be there had yet to be determined.

I was provided with an illustrative monthly calendar of groups and activities.

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:   United States v. John W. Hinckley, Jr.
Page 57

The staff has had discussions with Mr. Shamblee about what case management services could be offered in the future if Mr. Hinckley ever needed employment assistance. Amy Bland, the forensic case manager could help with referral to the local employment assistance office. Peoples Place has a Virginia Department of Rehabilitation Services counselor who might help with securing supportive employment opportunities.

We next discussed the hypothetical scenario of Mrs. Hinckley no longer being able to supervise her son due to illness or death. In this scenario, Mr. Hinckley has been on extended conditional release for two months and working at Eastern State Hospital two days per week and attending Peoples Place two days per week. He is not able to remain in his current residence and would have to find a place to live. How would Colonial Behavioral Health be able to assist?

Colonial Behavioral Health does not provide supportive residential services. There are independent living facilities in the area that operate independent of Colonial that have their own admission criteria. One of the local facilities has some experience working with NGRI's.

Mr. Coe pointed out that if a trust had been established for Mr. Hinckley then a plan might be put together tailored to Mr. Hinckley's needs in an independent facility or private residence where services could be provided, however, there is no public funding for such services. When this was discussed with Mr. Shamblee, if for example Mr. Hinckley were living in a private town home, it was felt that he would require mental health services every day by staff coming into the home. Mr. Coe pointed out that he doubted you would find a provider in Virginia that would do it any other way.

Mr. Coe shared his concern that dating back to the agency's first involvement in discussions with St Elizabeths various individuals from the Hospital called and spoke with various individuals at Colonial. In short, there was no coordination between the Hospital and Colonial. Now all communication will flow through Mr. Coe

Mr. Coe expressed concern about having multiple providers from outside of Colonial providing care to Mr. Hinckley.

> The more care that is owned by and provided by Colonial, the better off we are and the more confidant we are about what is occurring. The more players there are in this the more complicated it is going to be to manage. We do not have NGRI cases with three different providers…. It would be simpler for us, and hopefully for the court, if the conversations were between ourselves and the Hospital and the court. Not ourselves, other providers, the Hospital, and the Court. We understand that it may not start that way.

Mr. Coe indicated that St Elizabeths had not shared any of the court filings or any of the hospital records despite their request for these materials. Mr. Brumfield indicated that he again requested this information from Mr. Shamblee in June 2011.

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:   United States v. John W. Hinckley, Jr.
Page 58

Mr. Coe asked me about Mr. Hinckley's medications indicating that there had been no discussions or information provided to Colonial as yet from St. Elizabeths. I provided that information to him as well as a brief history of the prescribing rationales and who had provided psychiatric care at St. Elizabeths and locally in Williamsburg.

I asked Mr. Coe and staff what risk management issues Elizabeths Hospital had shared and discussed with them. I was informed that the only issue discussed thus far were the relationship matters outlined above. I asked what materials had been provided to them up to this point by St Elizabeths and they said nothing. I asked what they sought and was told,

> A Psychosocial summary. Six months of doctor's notes see how he was progressing. Medications. The discharge summary or its equivalent given his current legal status. A treatment plan. These are things we have asked Kevin Shamblee for but have not received. We explained to Mr. Shamblee that it is important not only for the care of the patient but they are required in order for the agency to meet certain licensure requirements.

The agency staff did not know what Mr. Hinckley was or was not allowed to do. They have not been provided with any court orders or any documents outlining the scope breath of Mr. Hinckley's currently approved activities. I summarized his current conditional release activities including his construction of independent itineraries. Astutely, I was asked who monitored compliance of his activities. I explained that it was primarily the responsibility of the family, Dr. Giorgi-Guarnieri, and Mr. Beffa to execute feedback documents and report via interview to the treatment team.

Mr. Coe made some additional statements.

> We are going to figure relatively prominently in the plan of care, and we haven't seen one yet. But at some point will we have an opportunity to review or have input into that plan of care or are we just going to be named in the plan? There is going to be a document in November before the court that's going to have our name all over it. When will we see it?

I encouraged Mr. Coe to direct those questions to Mr. Shamblee.

## David Coe

On November 3, 2011, I spoke with Mr. Coe by telephone to inquire about whether he had received the requested materials from St. Elizabeths Hospital. He informed me he had not despite having sent a formal request in writing on September 30, 2011 which read as follows:

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:   United States v. John W. Hinckley, Jr.
Page 59

Dear Mr. Shamblee:

Please be informed, effective September 20, 2011 Colonial Behavioral Health (CBH) is transferring the case for John Hinckley from "Case Management" to "Discharge Planning." The decision for the status change is based on the fact that no service activity with the consumer has occurred in over 90 days and he remains hospitalized. Ms. Amy Bland will continue to be the staff contact for coordination of services as it pertains to any related discharge planning activity at this time.

In order to provide services at the Peoples Place program as planned, as previously discussed the following will need to occur before Mr. Hinckley can begin services:

- CBH will receive a copy of the most recent psychological evaluation.
- CBH will receive copies of current psychosocial assessments.
- CBH will receive a copy of the current individualized treatment plan.
- CBH will receive copies of service progress notes for the past one year.
- CBH will receive a current copy of he risk management plan for planned home visits.
- CBH will receive a copy of any federal court related documents that specify Colonial Behavioral Health or any of its programs as a service provider, and reserves the right to make edits to those documents as needed to clarify Colonial Behavioral Health's role in the provision and/or management of described services.

In addition to the items listed above, as a provider of services for Mr. Hinckley, Colonial Behavioral Health expects the following to occur on an ongoing basis for the purpose of service coordination:

- Notification by St. Elizabeth hospital staff and Carl Beffa when Mr. Hinckley is in Williamsburg for a home visit with planned dates/time for attendance at Peoples Place.
- Inclusion in treatment team planning for services provided at Peoples Place.
- Receipt of ongoing service progress notes upon admission at Peoples Place.
- Individual Services Plan developed for services received at Peoples Place to include days/hours of attendance.
- Risk management plan developed for when attending Peoples Place.
- Service fee agreement established for all services provided by Colonial Behavioral Health.
- Receipt of copies of any federal court related documents where Colonial Behavioral Health is identified as a provider.

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:    United States v. John W. Hinckley, Jr.
Page 60

> ◦    Copies of all hospital discharge plans that include increased
>      community integration time.

Lastly, as previously discussed, Colonial Behavioral Health is only willing to
provide services to Mr. Hinckley at Peoples Place at this time. Any future
increased services will need to be planned in accordance with our established
procedures for transitioning an NGRI consumer who does not originate from the
CBH service area and indicates his/her desire to live in the CBH area upon
discharge. This includes the CBH Director of Medical Affairs and the CBH NGRI
Coordinator conducting a) a review of medical record documentation to typically
include the Annual Continuation of Confinement Report, Request for Privileges
Report, Assessment of Aggressive Behavior, and Risk Management Plan and b) a
personal interview to assess for community readiness. The Medical Director will
make the final admission determination on a case by case basis.

Please do not hesitate to contact me at (757)253-4061 to further discuss this
matter.

Sincerely,
David A. Coe
Executive Director

*Family Interviews*

**Mrs. Jo Ann Hinckley and Mr. Scott Hinckley**

I met with Jo Ann and Scott Hinckley at the family residence in Williamsburg. Mrs. Hinckley
began the session by informing me that she only learned of Dr. Giorgi-Guarnieri's "leaving"
when Mr. Hinckley went in for his appointment that week.

> We only had six days notice, but John was able to tell me and I got a message to
> her that I wanted to speak to her and she did call me back on Saturday. Not being
> a Virginian I didn't know where Portsmouth was. I got a map of Virginia out and
> learned that it was about 45 miles from here.

> In any case, things have gone really, honestly, smoothly with all of John's visits
> here. We never have a problem. And I have to give most of that credit to John.
> Because he knows what the rules are and he is on his toes all the time and he
> keeps me on my toes too. Because, you know, we have certain requirements like
> making the daily phone calls to the Hospital and things like his work and his
> appointments—but problems absolutely no problems.

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:    United States v. John W. Hinckley, Jr.
Page 61

Mrs. Hinckley indicated that the transition between Dr. Giorgi-Guarnieri and Dr. Lee went smoothly and pointed out that Dr. Lee had given them two months notice. She indicated that she has no regular contact with Dr. Giorgi-Guarnieri but that both she and Mr. Hinckley like her very much.

Mrs. Hinckley reports that her son likes his volunteer job very well. She says they keep them very busy which he likes. He has received reports that they are delighted to have him especially because of the skills that he has in library work. She showed me some of certificates hanging on the wall that Eastern State Hospital had given him for his work.

Mrs. Hinckley was not aware of the plans to expand John's working hours at Eastern State Hospital. Scott, however, was aware through his conversations with St. Elizabeths Hospital that efforts to expand his work there were underway:

> They would like to do that and in particular if they could expand it to a five day a week program.

We spoke of Mr. Hinckley's music interests and what had become of Mr. Wade. Mrs. Hinckley said that unfortunately no arrangements have been made for him to continue lessons.

Mrs. Hinckley described her son as being very helpful to her.

> He is a delightful guest to have in the house. Maybe he doesn't keep his room or the bathroom too neat but other than that he never asks for anything extra. He knows what's required of him, he knows what he needs to do, and he plays his card guitar beautifully.

Mrs. Hinckley stated that she was sorry she could not have helped her son more socially, but that was because of her age group and friends in Williamsburg. Scott pointed out that ____ is an older community and not conducive to this.

Scott Hinckley believes that all things being equal his brother has done quite well.

> Three years ago we were not certain what he could do what he could handle. But he is showing us that he can do well.

I asked Scott what his greatest fear was three years ago as we went forward.

> I was very concerned that there might be some situations out in the public or that we would create situations with him when he was outside of the hospital. As I watched this develop the last number of years John has handled that very well. He doesn't look for any publicity and others in the community, whether or not they are aware of him, they've gone their separate way and we have not had a problem.

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:    United States v. John W. Hinckley, Jr.
Page 62

Mrs. Hinckley stated that her neighbors have been very supportive of John. She also noted that there has been a fair amount of turnover in the community bringing in new families. We talked about some of the negative press that appeared locally following John Hinckley, Sr.'s death acknowledging how difficult that was for John and the family. She also brought up the 30th Anniversary and the surrounding media coverage.

Scott Hinckley pointed out:

> Much of the negative press came from a distance, Newport News, etc. but not from the immediate town of Williamsburg. I don't know anyone who has met J John and then gone and written a negative article about him.

I asked if the Hinckley's had any discussions with John about 30th Anniversary during any of his visits. Mrs. Hinckley indicated that there was not much conversation. She felt he knew that there were things about him in the paper and he expected it to happen. However, they did not talk about it.

> We're just hoping it would just stop and it did. John is a strong person and he handled it beautifully. It was a stressful period for me.

Scott Hinckley said that the extent of coverage in Texas??? was in no way the same as it is in Williamsburg or in Washington, D.C. He reiterated that despite this kind of issue he believed John had done very well. He is personally very pleased with his brother's progress and hopes that he is ready for the next step.

We next discussed Mr. Hinckley's relationships. Mrs. Hinckley spoke to how difficult it is for her son to meet people with her "in tow" or waiting in the car. Mrs. Hinckley said she was reluctant to discuss his female relationships because she did not know enough about them personally.

> I do know that he has a lady friend now Ms. C.B. I don't know much about her but do know that she has an illness but I don't understand that much about her illness because "John never had that type of illness, mental illness." I just know that she has been a great companion to him and I'm pleased for that. I know that she is a part of his life at St. Elizabeths but she will not be any part of his life in Williamsburg.

Mrs. Hinckley's characterizations seem totally out of step with the reality of the relationship in its early stages as well as at present.

Mr. Scott Hinckley said that this was no different than other women his brother has met and wanted to bring down to Williamsburg. First it is a strong relationship, then it is a moderate relationship, and then they just decide to become good friends.

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:    United States v. John W. Hinckley, Jr.
Page 63

> I asked John about this on our drive back to the hospital at the end of the last visit.
> And he told me, "We have decided just to remain friends." I asked him, There's
> nothing serious in there? There is no marriage? You're not interested in taking
> this any further? "No, we're just going to remain good friends." Yesterday, he
> reiterated the same thing.

Mrs. Hinckley stated that before "the tragedy in '81" he did not have these experiences with
women. In her words "he was what you would call a late bloomer." She believes that these
relationships have all been a learning experience for her son.

When I challenged the Hinckleys that the record confirms that Mr. Hinckley and Ms. C.B.
considered themselves engaged and that he had purchased a ring for her, Mrs. Hinckley
responded, "Well, that may be but John does not know how to deal with women." Mr. Scott
Hinckley said that he was aware of the purchase of some jewelry but not that there was an
engagement. He believes his brother is on the latter stages of a relationship.

I redirected them to whether they were aware of the engagement. Mrs. Hinckley responded,
"John had never told me that." Mr. Scott Hinckley seemed to indicate that he may have had some
awareness but again reiterated that his brother had come to the conclusion based upon Ms. C.B.'s
continuing illness. As such, he had come to believe that there was an inevitable end to their
relationship.

Mrs. Hinckley acknowledged that Ms. C.B. still calls daily, but she believes it is due to her
illness. She further indicated that she does not question him about these things. When again
questioned about whether she was aware that Mr. Hinckley had given Ms. C.B. a ring she
acknowledged she did know he had given her jewelry but did not think it was of significance.

I asked Mrs. Hinckley if she had any knowledge of what services Colonial Behavioral Health
was considering. She did not. Mr. Scott Hinckley indicated that there had been some discussion
between the Hospital and himself about Colonial Behavioral Health. He also seemed to have an
understanding of the specifics of the terms for expansion of privileges.

I asked if Mr. Hinckley was a good driver. Scott said, "John will tell you so." Mrs. Hinckley
said he has not had any experience driving on the Interstate but "does well around town." I
asked what places Mr. Hinckley drives to. Mrs. Hinckley responded to his work, the grocery
store, fast food restaurants, and his appointments. I asked if they ever deviated from the plan
when Mr. Hinckley was on a visit. Mrs. Hinckley indicated that they may have only a few times
because of health or the weather but not many times.

We explored some of the financial questions relevant to the proposed plan. The Hinckleys
clearly understood the residency issues as they relate to Medicaid eligibility. With regard to the
clinical services proposed by Colonial Services Board and the continued services being provided

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:    United States v. John W. Hinckley, Jr.
Page 64

by Mr. Beffa and Dr. Giorgi-Guarnieri they understood that payment would be the family's responsibility.

We discussed what would happen if Mrs. Hinckley were incapacitated or died amidst this transitional process. Scott Hinckley stated that it was his father's and mother's wish that John would live independently. It is their understanding that John desires to remain in this community. Scott told me that the family will do what is necessary to make that happen.

> John does not have any independent source of income. His family has the means
> to provide for him to live a modest lifestyle.

I asked about Mr. Hinckley's computer use at home and was told that it was very minimal. Mrs. Hinckley stated that recently Diane went on the computer to order some musical things for John. He did not do it for himself.

**Diane Sims**

Ms. Sims was interviewed in the family residence in Williamsburg. Scott Hinckley, who had unexpectedly come to Williamsburg for this visit, joined us.

Ms. Sims believes that Mr. Hinckley's visits to Williamsburg have gone quite well, and that the family is very pleased with how Mr. Hinckley has done. "We've just had no worries to deal with at all with him." I asked Ms. Sims if she was pleased with how Mr. Hinckley spends his free time in Williamsburg. Ms. Sims stated,

> John spends his free time going to movies, shopping, going to book stores, doing
> the things he enjoys. I suppose there are a lot of worse things he could have done.

When asked she felt there was more Mr. Hinckley might have done with his free time, she thought not, indicating that the timeframe of his restricted free activity was somewhat confining in itself. Both she and Scott Hinckley commented that his activity was further restricted by his needing to be with his mother especially for transportation. Regarding his free time in _          ,
Scott Hinckley pointed out that when his father was alive he and Scott had encouraged Mr. Hinckley to take up golf. Scott Hinckley took him to the workout center and recommended that he spend time there for thirty minutes or an hour but "it just didn't take." Both Scott and Diane pointed out that John never was interested in these activities nor was he ever someone who would seek out people in order to establish a relationship.

Ms. Sims commented that the itineraries were very rigid and that while they tended to some degree "breed restriction" that would make it difficult to do more. She felt Mr. Hinckley follows his itineraries "to the letter."

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:   United States v. John W. Hinckley, Jr.
Page 65

We discussed the issues of community resistance that Mr. Hinckley has experienced. Ms. Sims feels he is aware of the problems both already experienced and potential experiences that might arise. She believes it is something he thinks about, recognizes, and accepts its reality, but does not allow it to get him off course.

We talked about the potential expansion of his work assignments at Eastern State Hospital and the specific placements that he might be offered. We also discussed the services that might be offered by Colonial Behavioral Health and the issues surrounding fee for service requirements. That discussion mirrored the discussion I previously held with Ms. Jo Ann Hinckley and Mr. Scott Hinckley and confirmed the family's financial commitment to Mr. Hinckley.

We discussed contingency plans in the event that something happened to Mrs. Hinckley. Ms. Sims agreed with her brother Scott that Mr. Hinckley should remain in Williamsburg. According to Ms. Sims, Williamsburg was where so much time and focus has been spent in transition. Williamsburg is where all of the services and providers have been mobilized and are focusing on this plan. Most importantly, Ms. Sims unequivocally stated,

> This is where John wants to be. People should live where they want to live. Not where they're told to live."

I asked Ms. Sims how she felt Mr. Hinckley was handling the transition with regard to "community resistance." With the exception of their experience at SALT, she felt that Mr. Hinckley has managed quite well and that he has had to deal with minimal overt resistance to his presence.

I asked Ms. Sims about female relationships since the last hearing. She indicated that there had been "a few" and that obviously there was one relationship currently that was important to him. She stated that he does not see or talk with Ms. L.M. He does not talk with Leslie DeVeau very often at all. He only recently saw Ms. CM at the hospital when she returned his guitar.

Ms. Sims indicated that Ms. C.M. feels more tied to Mr. Hinckley than Mr. Hinckley feels tied to her. Ms. Sims reports that Mr. Hinckley knows that Ms. C.M. will have no part in his life in Williamsburg and that if they wish to see each other in Washington that is fine. Ms. Sims indicates that Mr. Hinckley has made it clear that he will not let Ms. C.B. stand in the way of his transition to Williamsburg. Ms. Sims stated,

> While I think he enjoys some communication with her and having someone to talk to, it's not something that he sees as a future relationship with, a marriage with or anything like that. It just kind of "is what it is."

When challenged with the fact that Mr. Hinckley had previously referred to their relationship as an engagement, Ms. Sims immediately pointed out that Mr. Hinckley does not see himself as being engaged now. When asked if he had ever discussed with her the fact that this relationship

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:    United States v. John W. Hinckley, Jr.
Page 66

was an engagement she indicated that Mr. Hinckley and Ms. C.B. had discussed the possibility of their relationship perhaps evolving in that direction at some point in the future, she never got the call from her brother stating, "hey I'm engaged."

I inquired about the ring that Mr. Hinckley had given Ms. C.B. and I informed her of his/their public statements to treatment team members that they were indeed engaged. I asked if she thought there was anything equivocal about his description of their relationship and she stated, "no."

Scott Hinckley indicated that he was told the same thing at the treatment team meeting he attended and that he had not heard anything about this engagement prior to that. When he came for his next visit to Williamsburg he asked Mr. Hinckley what this relationship meant. He said that his brother told him that yes, it was a strong relationship at that point, but they were not engaged now and he did not have the ring on. He has asked his brother about the status of the relationship several times since then and Mr. Hinckley has consistently maintained that position that he and Ms. C.B. are "just friends."

I asked Ms. Sims what if Ms. C.B. still thought she was engaged? Ms. Sims stated,

> If she's not she needs to know that she's not. I don't think any woman needs to think she's engaged if she is not engaged.

Ms. Sims seemed to imply that perhaps Ms. C.B. was "embellishing" her thoughts given her fragile emotional state. She thinks Ms. C.B. is "lonely and clingy" and that her brother is sympathetic to her. Ms. Sims did not seem to have considered the possible implication that Ms. C.B. thinks this because that is what Mr. Hinckley has led her to believe.

## Interviews of "Significant Others"

I telephoned Ms. C.B. in an attempt to interview her but she declined to participate.

## Interviews with John W. Hinckley Jr.

Among the many points discussed over several days of interview, the following are illustrative highlights of our conversations.

Mr. Hinckley believes that the twelve visits have gone very well and feels that he has done everything expected of him. He says that he enjoys driving and does most of the driving when he is in Williamsburg. He enjoys his job assignment and is looking forward to the possibility of expanding his time at Eastern State Hospital. He reports that his greatest frustration thus far has been that he is not making friends in Williamsburg. He enjoys when his brother and sister come to visit you because that "spices things up."

Mr. Hinckley discussed some of the resistance he experiences in Williamsburg. He mentioned trying to sign up for an art class. Initially, while at St. Elizabeth's Hospital, he was told that he would be welcomed. When he arrived in Williamsburg the art teacher explained that her partner was not comfortable with his attending the class so he was unable to register.

Mr. Hinckley said he recognizes this is because of his reputation for what he has done. He states,

> I don't get angry. I don't say how dare you. I understand the reasoning behind it. I've had a few experiences like that. There was a singles group a while back, there was the .      Trade experience where I tried to sign up to do some day trading but they didn't want me as part of the group. I've always maintained it is my name that people react to, not me the person.

Mr. Hinckley indicated that he has been trying to make friends in Williamsburg but that it was difficult because of who he is. He mentioned being friendly with people he sees at Eastern State Hospital. He also mentioned that he had been desirous of forming a relationship with a woman that worked down the hall from him, Ms. C.B.2. He recently learned that she was not interested in anything more than being his friend at work. Mr. Hinckley told me that he had given Ms. C.B.2 a painting as he had Ms. Kochersperger.

We talked about relationships. He indicated that for the last year or so he has been involved with one person, Ms. C.B. Mr. Hinckley told me that he was still friends with Ms. C.G. despite the change in their romantic relationship around the time of the last hearing. Mr. Hinckley reports that they speak on the telephone weekly. She has attended the Christmas parties at the Golden Corral restaurant with him.

> But the problem now is that I don't want Ms. C.G. to visit because I don't want C.B. to see her visiting me, because that would not be a nice scene. C.G. knows about C.B. but C.B. does not know about C.G. because I have not told her. C.B. would not like that very much.

Mr. Hinckley described how he met Ms. C.B. at St. Elizabeths and told me of their shared interests. He indicated that she would not be visiting Williamsburg because of her mental illness and that because of her mental illness mother definitely did not want her visiting. He believed his mother was concerned she would not know how to handle things if Ms. C.B. were to decompensate. He, on the other hand, feels that he would have no problem handling a decompensation because he has managed her in that situation previously. He describes her shutting down and at that point he just calms her down and puts her on the Metro to go home. When I pointed out that there may be more to managing the compensation than simply bringing someone to a transportation stop, he agreed but still felt he could handle things.

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:    United States v. John W. Hinckley, Jr.
Page 68

Mr. Hinckley shared with me that Ms. C.B. suffers from schizophrenia. He states that while her condition is under the best control it has ever been, she still has difficulty in situations that create stress or anxiety for her. He recognizes that if her illness precludes her coming to Williamsburg then she simply cannot be a part of that plan.

I asked Mr. Hinckley how he would characterize their relationship. He stated that it was clearly romantic, he loved her and she loved him. I asked where he thought the relationship was going.

> I see it as a relationship that is going to have to stay here in DC unless something dramatic happens that I'm not aware of.

I told Mr. Hinckley that based on what I had read, he had given Ms. C.B. a ring and his relationship with her had been characterized as engagement. He responded,

> Well we talked about that. I've given her three rings just for the purpose of friendship but we're not engaged. Third ring was a nice-looking ring and we said, "let's call this engagement ring." But that was a while back. We're not engaged.

I acknowledged to Mr. Hinckley that is what he was telling me but inquired what he had told her and more importantly whether she still believed they were engaged. He emphatically stated that she knew there was currently no engagement. He went on to tell me that Ms. C.B. is Catholic and wanted her husband to be of the same faith. He also pointed out that Ms. C.B. belonged to an "offshoot of the Catholic Church" and asked that I not press him on describing what that group believed because it was too confusing. And he made it clear to me that he had no intention of converting.

Mr. Hinckley admitted that there was an earlier period of time when he was engaged to Ms. C.B. but it slowly began to dawn on him that it was not going to be able to work as an engagement or marriage because he was going to be spending a lot of time in Williamsburg without her. Mr. Hinckley claims that Ms. C.B. is fully aware of his pending court request for expansion of the conditions of his release and is supportive of the request.

I asked Mr. Hinckley his understanding of Ms. C.B.'s unwillingness to speak with me. He said they had previously spoken with the treatment team together on two occasions but that Ms. C.B. has subsequently decided not to speak with them any further.

He is also aware that she declined to speak with Dr. Murphy when she was conducting a risk assessment. I asked Mr. Hinckley if he thought it was important that staff and the experts be allowed to speak with Ms. C.B. He thought not because she was not a part of the Williamsburg plan. I asked Mr. Hinckley if he asked Ms. C.B. why she would not speak with any of us he said no.

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:    United States v. John W. Hinckley, Jr.
Page 69

The more I pressed Mr. Hinckley on this issue the more mildly irritated he became.

> I can't twist her arm.

If you believe speaking with the treatment team, Dr. Murphy, Dr. Patterson, and myself is important, and as you say she is important to you and you are important to her why do you think she will not speak with us.

> Ask C.B.

Have you asked her why she changed her position on this matter?

> No.

Why not?

> I don't know. If she doesn't want to talk to you it's fine with me. If she wants to talk to you it's fine with me too.

I asked Mr. Hinckley if he had informed his family of the engagement.

> I told my mother, my brother, and my sister that we were talking about being engaged. One night we were at a restaurant and I said, "he knows that she and I are getting married" and my mother said, "She's not welcome down here right now" or something like that.

Mr. Hinckley said that "stopped everything cold." If you cannot bring her to Williamsburg what was the point. Mr. Hinckley insisted that Ms. C.B. is fully aware that they are no longer engaged and she is satisfied with that. I asked Mr. Hinckley if he thought it odd that Ms. C.B. wished to remain in a relationship with him given the fact they were no longer engaged. He responded, "there's lots of things in my life that are odd." Mr. Hinckley said that Ms. C.B. was emotionally and somewhat financially dependent upon him.

We discussed his relationship with the dental resident. He seemed somewhat enamored by the fact that she had developed a dental treatment plan for him. He described her as being friendly to him and that they had six or seven appointments. Mr. Hinckley did not mention anything about accessing her pictures over the Internet until I brought it up. He then said,

> My graduation pictures are online if you want to see them just type in my name. So I did and that it was no big deal. I mean in this day and age how common is that?

I asked Mr. Hinckley where this occurred,

> In this library here.

We're you supposed to be using the computer for that purpose?

> No.   Then Velora told me not to do it anymore. So I didn't

I asked Mr. Hinckley if the dental resident was aware that he was looking at her pictures. He said of course because she was the one who told him about it in the first place.   I asked Mr. Hinckley if that was what the dental resident attested to when she was questioned by the treatment team. He replied rather cavalierly, "I don't know, I have no idea."

I asked Mr. Hinckley if there were any consequences for his actions and he replied, "No. I see it as a very very minor thing."

Mr. Hinckley maintains that he is not very computer savvy and that with the help of his brother and sister he orders things from Amazon.com. He takes this position despite the fact that he has had years of experience accessing DOCLINE.

Mr. Hinckley confirms that Williamsburg is where he wishes to be now and in the future.  If his mother were to die amidst his transition he still wishes to be in Williamsburg. We talked about the possibility of residential placement to which he is favorably inclined.  He is pleased with the case management services he is receiving from Mr. Beffa and he is particularly pleased with the psychiatric services of Dr. Giorgi-Guarnieri.

We discussed the potential expansion of work hours at Eastern State Hospital, as outlined earlier in this report, and he seemed quite excited about the possibility.  We also explored the potential services available to him through Colonial Behavioral Health. He seemed genuinely excited about their possible involvement.

We talked about his relationship with Dr. Adewale who he feels is a much easier psychiatrist to talk to than Dr. Green. We spoke about his long-standing relationship with Dr. Binks. He indicated that Dr. Binks is the person with whom he has the most discussions about Ms. C.B. and other relationships. I broached the topic of potential loss of this relationship and there was clear pushback to engage in that discussion.

Asked Mr. Hinckley about medications and whether he felt they were helpful. He does not believe that his Risperdal does anything for him because it is an antipsychotic and prior to taking it he was not psychotic.  He believes he is taking it only for the purpose of preventing psychosis. He believes that the Zoloft was originally prescribed for anxiety five or six years ago and he has been on it ever since. He does not believe that he experiences any sense of depression, for which he knows it can also be prescribed, but that it has been helpful for his anxiety.

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:   United States v. John W. Hinckley, Jr.
Page 71

I queried Mr. Hinckley about the 30th Anniversary, in particular how he dealt with it, what his emotions were, and who he spoke with about his feelings.

> I didn't do anything. They told me that there was going to be a program on CNN about me and about the anniversary of the shooting. If you want to watch it, watch it. But we are just making you aware that there's a show on CNN. They said it's probably not a good idea to watch it but if you want to watch it we can't stop you.

> I didn't watch it when it was originally aired. About three weeks later I was standing in the medication line and it was on and so I saw the last 10 or 15 minutes of it.

> A book came out by a *Washington Post* reporter who wrote to me but I didn't respond and by the way CNN wrote to me and I didn't respond to them either.

Mr. Hinckley told me that on March 30 there were numerous references on television, radio, and in the papers. He was actually surprised that there was so much coverage given the fact that this occurred 30 years ago. He said his family was surprised at the amount of coverage as well.

Mr. Hinckley told me that he is covered quite a lot by the Williamsburg media. I asked him if he had seen any of the coverage or news articles from Williamsburg and if his mother had saved any of them for him. He indicated that she had done so in the past and he thought he might have seen some of them regarding the Anniversary but he could remember.

I asked him what kind of slant was generally taken in these articles. He indicated that the Williamsburg articles generally talked about him being a resident there and his having potentially more time.

> The CNN program was particularly negative it was called "Stalker." Barry told me it was horrible, like the prosecutor put it out.

We talked about how this impression of him has impacted attitudes in the Williamsburg community. Mr. Hinckley was very clear that people see him as the person he was 30 years ago. He has thought about ways to try and change that impression and that the only thing available to him would be to sell his art or his music, which would show a different side of him. He indicated that counsel had suggested that the proceeds from sales could be turned over to the Brady's. That, however, is not a recommendation the hospital supports.

Related to the CNN program, I discussed with Mr. Hinckley plan that he and Dr. Binks had to view the program together. I offered to show video program to Mr. Hinckley and discussed with Dr. Binks a desire to do so and invited him to join us. Initially Dr. Binks was going to view the video with us but subsequently called indicating he would not be able to do so.

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:   United States v. John W. Hinckley, Jr.
Page 72

On the day of the viewing I distinctly pointed out that there had been a recent article published favorable to his release. I asked him if he had occasion to read it and he had not. Together, we downloaded the article and reviewed it. He was quite pleased with the thrust of the article.

We viewed the CNN program "Stalker." Mr. Hinckley maintained a stoic expressionless face throughout the viewing. There were occasions where he took exception with either what was being presented or what he thought was an inaccuracy of fact. But for the most part we watched and he occasionally commented. For example, he affirmed historically those thoughts of his which he felt were representative of his psychosis at the time. He rejected those representations which he felt were inaccurate or highly prejudicial, like that of Mr. DiGenova. On several occasions I checked with Mr. Hinckley to make sure he wished to continue and to determine that he was not experiencing any visibly overt negative impact from our viewing. That did not appear to be the case.

In the end, Mr. Hinckley reaffirmed that he felt programs such as this did much to perpetuate the negative image of him 30 years ago without any effort to show balance or suggest that he has in fact changed and is no longer the person he once was. In contrast, the article *Free John Hinckley* resonated much more positively with him.

I asked Mr. Hinckley about his use of free time when in Williamsburg. Specifically I asked him what movies he had seen. Among the list he reported to me, he indicated that he had seen *Captain America* and *Rise of the Planet of the Apes*. I asked him what he thought of *Planet of the Apes* and he said,

> Oh, it was alright. I had seen the original *Planet of the Apes* many years ago with Charlton Heston. And this is, you know, they are trying to make a remix of everything now.

Mr. Hinckley's attestation that he saw these two movies and his inaccurate description of the *Rise of the Planet of the Apes* story line were exposed to be absolute misrepresentations of the truth. United States Secret Service surveillance established that although Mr. Hinckley was dropped off at the movie theater on the two occasions that he claimed to see these films, he in fact never purchased a ticket for either of them. Instead, he went about visiting other establishments located in the area until it was time to be picked up by his mother. He neither reported this to his mother or to his Williamsburg treatment providers. The report to the Hospital and to the Court confirms Mr. Hinckley's attendance, which was untrue. This issue will be discussed in further detail later in this report.

## Review of Psychological Testing

Mr. Hinckley was administered the Minnesota Multiphasic Personality Inventory-2 (MMPI-2), the WAIS (Wechsler Adult Intelligence Scale); the Violence Risk Appraisal Guide (VRAG); the Psychopathy Checklist- Revised (PCL-R 2nd edition); and Historical, Clinical, and Risk

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:   United States v. John W. Hinckley, Jr.
Page 73

Management Guide (HCR-20). I will provide only a brief summary of Mr. Hinckley's cognitive and personality testing by excerpting from Dr. Murphy's report.

> Mr. Hinckley was administered the Wechsler Abbreviated Scale of Intelligence (WASI), and performed in the High Average range on subtests measuring both verbal and nonverbal abilities (VIQ = 110, PIQ = 112, FSIQ = 113). Test results indicate that Mr. Hinckley's verbal abilities associated with word knowledge, verbal concept formation, fund of knowledge, verbal reasoning and concept formation remain intact. His nonverbal abilities associated with visual information processing, abstract reasoning skills, analyzing abstract visual stimuli, nonverbal concept formation, visual perception and organization, simultaneous processing, visual-motor coordination, learning, and the ability to separate figure and ground in visual stimuli were intact as well.

> Mr. Hinckley was administered the Minnesota Multiphasic Personality Inventory-2nd edition (MMPI-2), an instrument used to assess personality and emotional functioning. Mr. Hinckley's MMPI-2 profile configuration remains fundamentally consistent with previous administrations. Test results were valid although meaningful interpretation of the extent of psychopathology continues to be limited by his defensive approach to disclosing psychological or adjustment problems. Elevated scores on the K and Superlative scales again highlight Mr. Hinckley's reluctance to acknowledge symptoms and problems, with possible pathology being overshadowed by a need to present himself favorably.

> Mr. Hinckley's profile pattern on the clinical scales of the MMPI-2 remains fairly stable relative to previous administrations. Results from Dr. Montalbano's last administration in 2008 were significant for moderate elevations on the Psychopathic Deviate and Hysteria scales. In contrast, Mr. Hinckley's scores on all of the clinical scales were within normal limits on the current protocol. Mr. Hinckley's scores on these scales have historically "hovered" on the threshold of significance, falling both just above and just below the cutoff score since at least 1995.

## Psychodynamic Formulation

Based on my examinations, my review of the above referenced materials, and my consultations and collateral interviews conducted as a part of this evaluation and those conducted during my 2000, 2003, 2004, 2005, 2006, 2007 and 2008 evaluations, I am of the opinion, within a reasonable degree of medical and psychiatric certainty, that Mr. John W. Hinckley, Jr. remains a man of average intellectual functioning who possesses concurrent deficits in adaptive functioning that at times have rendered him less effective in meeting some of the standards expected of a person his age in such areas as social skills and treatment related responsibility.

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:    United States v. John W. Hinckley, Jr.
Page 74

I am of the opinion, within a reasonable degree of medical and psychiatric certainty, that Mr. John W. Hinckley, Jr. continues to comply with his recommended pharmacologic treatment and has shown a positive response to his current therapeutic regimen of Risperdal 1 mg po qs daily, Zoloft 125 mg po qam and 25mg po qhs daily, and Benadryl 50 mg po qhs. Based upon my examination and record review and consultation with other physicians, I believe continued monitoring and assessment of his anxiety is warranted and ongoing evaluation for any signs of an evolving depression in the context of any continued or expanded transition to Williamsburg. Mr. Hinckley has not manifested any signs of psychosis since my examination of him in 2008. He has shown signs of anxiety and mild reactive depression that has responded to his current treatment regimen.

With specific regard to the visits to his parents' home completed thus far under the existing terms of conditional release, Mr. Hinckley has utilized the increased freedom of three hours independent walks within the residential community to his therapeutic benefit and without incident. Mr. Hinckley has not sought contact with the media and appears to have benefited to date from a functional anonymity that has been a by-product of the circumscribed nature of his privileges. I continue to believe the therapeutic benefits of his positive experiences are cumulative.

For the most part, Mr. Hinckley's excursions into the local community have been without incident or posing a significant risk to himself or others. However, in my opinion he has shown only the most minimal effort in utilizing his time in a proactive manner to advance his articulated desire to integrate into the Williamsburg community.

I continue to believe that the involvement of Scott Hinckley and Diane Sims has been positive and beneficial to the therapeutic process to date. The emotional connection they have made with their brother and that the family has made with each other continues to be enormously beneficial to Mr. Hinckley's clinical progress toward community integration. While certain familial tensions have arisen in the context of Mr. Hinckley's love pursuits, their resolution, consistent with the family dynamic, appears satisfactory to all. However, it cannot be ignored that while under the supervision of his mother and siblings, Mr. Hinckley's deceptive behavior became manifest and his lack of truthfulness, which is now apparent, went undetected.

Unfortunately, Mr. Hinckley has not abided by all of the requirements set forth under the terms and conditions of the Court's order. Mr. Hinckley's behaviors during some of the visits raise serious questions about his deceptiveness and truthfulness with staff. Specifically, he has demonstrated non-compliance with his self-constructed itineraries. He has misrepresented himself to his treatment team with regard to certain activities while on Conditional Release and he has lied about the same to this examiner.

In considering the Hospital's recommendation to expand the existing Phase IV privileges, as a consequence of his behaviors while on conditional release and his lack of forthrightness upon return to hospital as documented by the surveillance of the United States Secret Service, I cannot

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:    United States v. John W. Hinckley, Jr.
Page 75

support an expansion of privileges as requested at this time and believe it prudent to move more slowly. My reticence to support this plan does not rest upon these circumstances alone.

I have previously reported to the Court my belief in the importance of having a well articulated plan being in place before approval. Mr. Hinckley is very fortunate to have garnered the support of Eastern State Hospital and of Colonial Behavioral Health. They are extraordinarily dedicated professionals committed to patient recovery and the abolishment of stigmatization. The potential additional work opportunities at Eastern and the clinical opportunities that arise at Peoples Place go far to advance the clinical integrity of Mr. Hinckley's transitional plan.

It is unconscionable that the Hospital has yet to provide either institution with the necessary background information they require to further advance their ability to assist Mr. Hinckley. In the case of Colonial Behavioral Health, the Hospital's failure to provide routine clinical data that they have repeatedly requested is an embarrassment that defies explanation.

Mr. Hinckley's relationships with Ms. C.B. have been of great significance to Mr. Hinckley. However, the inconsistency of how he has presented the status of that relationship to the family and to clinicians and perhaps most of all to Ms. CB herself raises familiar questions about his openness concerning his relationships. Whether Ms. C.B.'s reversal of intent to speak with the treatment team and independent examiners is something that she came to of her own volition or with Mr. Hinckley's encouragement should be questioned and is being questioned by this examiner. As previously stated, Mr. Hinckley has always felt that intrusions upon his relationships by the Court and others are unjustified.

And so again, I remain unwilling to join the chorus that heralds Mr. Hinckley's openness and candor concerning his relationships with women. I have continuing concerns that Mr. Hinckley is not being as candid and open about his relationships as others believe. Simply put, I believe Mr. Hinckley tells us only what he wants us to know.

As significant as these issues are I do not believe they presently give rise to a need to halt or reduce his existing privileges, only to continue "as is" until the matters detailed above are satisfactorily addressed.

Diagnoses

| | |
|---|---|
| Axis I: | Major Depressive Disorder, Recurrent, Mild<br>Psychotic Disorder Not Otherwise Specified-In Full Remission |
| Axis II: | Narcissistic Personality Disorder – Primary Diagnosis |
| Axis III: | Rheumatoid Arthritis, Allergic Rhinitis, Constipation, Chronic Sinusitis, Reflux Esophagitis |

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:   United States v. John W. Hinckley, Jr.
Page 76

Axis IV:      Psychosocial Stressors – acutely related to Enlargement of Terms of Conditional
              Release; psychosocial and environmental problems related to his proposed
              transition to community living; interpersonal relationship problems

Axis V:       Current Global Assessment of Functioning: 61-70

## Forensic Psychiatric Opinion Regarding Proposed Expansion of Terms of Conditional Release

In my 2008 report I articulated the belief that Mr. Hinckley has demonstrated his readiness to transition to the next level and that I believed it is clinically appropriate that he be considered for expansion of conditional release privileges. After weighing all of the clinical evidence before me I have changed my opinion.

Because of the plethora of concerns that I have articulated herein, I cannot support the current 501(e) proposal as presented. Specifically, this proposal is far broader than prior submissions, yet in my clinical opinion the detail and specificity presented is customarily inadequate.

Expanding the length of his visits in the absence of establishing in advance a clearly defined schedule at Eastern State Hospital and at Colonial Behavioral Health is simply not prudent in my opinion. Reducing the amount of supervised time he will be required to spend with the custodian/responsible person without revisiting and reassessing the adequacy of monitoring places Mr. Hinckley in a situation that is clinically undesirable.

The existing order extended the length of Mr. Hinckley's visits to ten days. While there is some disagreement as to how much could have been accomplished due to the restrictions inherent in this Phase IV status, I believe significantly more could have been accomplished by both Mr. Hinckley and the Hospital within the time already available to them.

I do not support an expansion of the length of his visits at this time. I believe many of the goals outlined by the 501(e) proposal can and should be tested and accomplished within the existing time framework of the ten-day visits currently authorized by the Court before any expansion of privilege is entertained.

It is also my opinion that the Hospital and the Williamsburg Treatment Team must demonstrate that clinical structures are in place to support and adequately monitor Mr. Hinckley's unsupervised endeavors. We need to know that Mr. Hinckley is where he says he is going to be. We need to be able to trust in Mr. Hinckley's self-report. We need to be able to rely on the Hospital's assurance that treatment plans and itineraries are being adhered to and if not, that such is being accurately reported to the Court.

Mr. Hinckley does not think his deceptive behavior is a big deal. Mr. Hinckley never believes his negative behavior is a big deal. To Mr. Hinckley it is not a big deal when he breaks the rules.

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:    United States v. John W. Hinckley, Jr.
Page 77

It was not a big deal to Mr. Hinckley that he violated his computer access restrictions to voyeur photographs of his dental resident. It was not a big deal to Mr. Hinckley to claim to go to the movies when he did not. Nor was it a big deal to Mr. Hinckley that he lied about having done so to his mother, his treaters, or to other examiners.

What else has Mr. Hinckley done that he feels was not a big deal? Saying that he does most of the driving when it would appear at least during the times that he has been under surveillance that was not the case? Perusing book titles of great political charge and moment to his case historically when he should have been at the movies? The reality is we don't know. However, based on the totality of his actions, the acceptance of such behavior should not be clinically tolerated.

There is a reason to expect strict adherence to the conditions of release from insanity acquittees who are attempting community transition. Among those reasons is to allow for an opportunity to demonstrate the ability to perform appropriately and the capacity to comply with predefined mutually identified expectations.

Mrs. Hinckley in her own words said, "He knows what the rules are and he is on his toes all the time and he keeps me on my toes too."

Obviously that was not the case on more than one occasion.

I agree with the Hospital's recommendation that now that Mr. Hinckley has obtained his driver's license he be permitted to drive the family car without a responsible person/custodian present with him at all times. However, United States Secret Service surveillance raises a serious question as to whether Mr. Hinckley is actually utilizing his existing driving privilege with a responsible adult present.

I have stated previously that advancement to independent driving privileges should be incremental and linked to a record of demonstrated responsible driving and the incremental expansion of both social and nonsocial community activities. As such, I believe Mr. Hinckley should only be granted the privilege to drive independently pending review and confirmation that he demonstrates that he has fully satisfied these threshold expectations.

Finally, because of his demonstrated lack of candor, misrepresentation of the truth, and cavalier attitude as to the significance of his actions, I do not believe that adequate risk management oversight currently exists to support a further expansion of Mr. Hinckley's privileges as requested at this time.

In the absence of adequate risk management controls I believe that one cannot comfortably state that Mr. Hinckley does not present a danger to himself or others at this time.

November 17, 2011
Sarah Chasson, Esq.
Colleen Kennedy, Esq.
RE:   <u>United States v. John W. Hinckley, Jr.</u>
Page 78

Therefore, it is my opinion, within a reasonable degree of medical certainty, that any enlargement of the terms of conditional release as proposed by the 501(e) Motion without modifications would be ill advised and premature at this time.

I thank you for the opportunity to provide forensic psychiatric consultation on this matter. If I may be of any further assistance, please do not hesitate to contact my office.  If you have any additional materials you wish me to review, I will be happy to do so and consider their relevance to the opinions contained herein.

Respectfully Submitted,

Robert T.M. Phillips, M.D., Ph.D., D.F.A.P.A.
RTMP\kc