# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
)
UNITED STATES OF AMERICA      )
)
     v.                 )      Criminal No. 81-0306 (PLF)
)
JOHN W. HINCKLEY, JR.       )
)
_____ )

## OPINION

This matter is before the Court on the proposal of St. Elizabeths Hospital for the conditional release of John W. Hinckley, Jr., pursuant to 24 D.C. Code § 501(e) — a so-called "(e) proposal" or "(e) letter." Over the years, the Hospital has submitted a series of proposals to this Court, seeking to expand the scope or duration of Mr. Hinckley's activities outside the grounds of the Hospital. The government has consistently opposed these proposals in whole or in part. On some occasions, Mr. Hinckley has submitted his own petition for expanded conditions of release under 24 D.C. Code § 501(k) (a so-called "(k) petition"). On each occasion, the Court has considered the Hospital's proposal, the government's opposition, and Mr. Hinckley's position on the Hospital's proposal along with his own (k) petition, if any. After conducting an evidentiary hearing, the Court has either granted the Hospital's request, invariably with modifications or additional conditions imposed by the Court, or has denied the request.[1]

_____
[1] The Court's prior opinions in this matter set forth the relevant background facts relating to Mr. Hinckley's attempted assassination of President Ronald Reagan; the serious wounding of the President, presidential Press Secretary James Brady, Secret Service Agent Timothy McCarthy, and Metropolitan Police Officer Thomas Delahanty; the trial of Mr. Hinckley pursuant to a thirteen-count indictment; the jury's finding that he was not guilty by reason of insanity on all counts; Mr. Hinckley's years at St. Elizabeths Hospital; his successful use of "B" city privileges under Hospital supervision during those years; decisions of this Court

## I. BACKGROUND

Throughout these proceedings, the Court has expanded Mr. Hinckley's privileges outside the Hospital incrementally, always contingent upon careful monitoring and his and his family's compliance with the conditions imposed by the Court. The Hospital has characterized its requests for gradually expanding Mr. Hinckley's freedom as a series of phases, each of which entails greater integration into the world outside the Hospital. At first, the Court allowed local day visits by Mr. Hinckley with his parents outside of the confines of St. Elizabeths without the supervision of Hospital personnel and within a 50-mile radius of Washington, D.C. — so-called "Phase I" visits. The Court later permitted local overnight visits by Mr. Hinckley with his parents within a 50-mile radius of Washington, D.C. ("Phase II" visits). Each visit was thoroughly assessed by the Hospital and Mr. Hinckley's treatment team before a subsequent visit took place, and a written report on each visit was provided to the Court. There were a total of six Phase I visits and eight Phase II visits.

Beginning in 2006, the Court permitted visits outside of the Washington metropolitan area to the home of Mr. Hinckley's parents in Williamsburg, Virginia ("Phase III" visits). See Hinckley III, 407 F. Supp. 2d at 265-68. The Court permitted three initial visits by Mr. Hinckley to his parents' home, with each visit lasting three nights in duration. See id. at 267. Thereafter, the Court permitted additional visits of four nights. See id.; Hinckley IV, 462 F. Supp. 2d at 45-47. In 2007, the Court permitted six additional Phase III visits and expanded

---

and the United States Court of Appeals for the District of Columbia Circuit; Mr. Hinckley's mental health during those years; and the legal framework relating to Section 501(e) letters submitted by the Hospital and Section 501(k) petitions filed by patients. See United States v. Hinckley, 292 F. Supp. 2d 125 (D.D.C. 2003) ("Hinckley I"); id., 346 F. Supp. 2d 155 (D.D.C. 2004) ("Hinckley II"); id., 407 F. Supp. 2d 248 (D.D.C. 2005) ("Hinckley III"); id., 462 F. Supp. 2d 42 (D.D.C. 2006) ("Hinckley IV"); id., 493 F. Supp. 2d 65 (D.D.C. 2007) ("Hinckley V"); and id., 625 F. Supp. 2d 3 (D.D.C. 2009) ("Hinckley VI").

the duration of those visits to six nights.  See Hinckley V, 493 F. Supp. 2d at 77-78.  After

allowing several additional visits in 2008, later that year the Court permitted Mr. Hinckley to

continue making Phase III visits under the same terms and conditions until further order of the

Court.  See Order at 1, United States v. Hinckley (Aug. 15, 2008).[2]

        The Court's most recent set of orders addressed so-called "Phase IV" visits,

which have allowed Mr. Hinckley to make trips of up to ten days to Williamsburg.  While

Phase III was regarded as an opportunity for outings representing a "change of venue" from the

Washington, D.C. area to Williamsburg, Phase IV was conceived of as a "transitional stage," in

which Mr. Hinckley would be expected to focus on social and vocational integration into his

mother's community.  See Hinckley VI, 625 F. Supp. 2d at 6.  To that end, in 2009 the Court

authorized twelve Phase IV visits, each with a duration of ten days and nine nights, and each

subject to the successful completion of the previous visit, with a written report to the Court.  See

Order at 2, United States v. Hinckley (July 20, 2009).

        During these Phase IV visits, Mr. Hinckley was required to remain under the

supervision of his mother or siblings at all times whenever outside of his mother's home, except

for periods of limited duration in which he was allowed to engage in activities within a defined

geographic area that were designed by the Hospital to acclimate him to the Williamsburg

community.  See Order at 1-2, United States v. Hinckley (July 20, 2009).  Such activities

included establishing therapeutic relationships with two Williamsburg-area treatment providers

whose services had been arranged for him during his visits — a psychiatrist and a combined

individual therapist and case manager.  Mr. Hinckley also was permitted to spend four hours

---

[2]        Since 2006, when Mr. Hinckley's father's health began to decline, Mr. Hinckley's
mother has been the sole custodian or responsible person under the terms of the Court's orders.
See Hinckley IV at 43-44.  On January 29, 2008, John Hinckley, Sr. passed away.

twice a week performing volunteer work with a local organization, which could increase if deemed appropriate by the treatment team and his participating employer.  Id. at 11-12.

Contingent upon Mr. Hinckley's ongoing participation in local volunteer work, he also was afforded a limited amount of unsupervised time in the Williamsburg community to engage in social and recreational activities.  Specifically, Mr. Hinckley was allowed up to three hours of unaccompanied time, twice a week, between the hours of 8:00 a.m. and 9:00 p.m., "for specific social, recreational, religious, or shopping related activities."  Order at 12-13, United States v. Hinckley (July 20, 2009).  At least two weeks before each Phase IV visit, the Hospital was required to submit a detailed, day-by-day itinerary of Mr. Hinckley's proposed activities to the Court, the government, and Mr. Hinckley's counsel.  Id. at 4-5.  In particular, the Hospital was required to provide specific details, including time and place, of the time Mr. Hinckley was to spend out of the supervision of his family members.  Id. at 3.

Mr. Hinckley also was permitted up to two hours of unaccompanied time twice daily within the confines of his mother's housing subdivision during specified hours.  Order at 2, 13, United States v. Hinckley (July 20, 2009).  Mr. Hinckley also was given permission, subject to a number of conditions, to obtain a driver's license and to drive the Hinckley family's car with a family member or treatment provider with him at all times.  Id. at 14.  Among many other restrictions imposed on Mr. Hinckley during his visits to Williamsburg and during his use of unsupervised time in the community, Mr. Hinckley was required to carry a GPS-enabled cell phone anytime that he was not accompanied by his mother or siblings.  Id. at 2.  After each visit, the Hospital was responsible for submitting a detailed report of the visit to the Court, the government, and Mr. Hinckley's counsel prior to the next visit.  Id. at 10.

During each Phase IV visit, Mr. Hinckley was ordered to meet at least once with his Williamsburg-area psychiatrist, Dr. John J. Lee.  After interviewing and assessing Mr.

Hinckley during these sessions, Dr. Lee was required to complete a checklist describing his observations and fax it to the Hospital within a week of the appointment. Dr. Lee also was required to participate in a telephone conference call with Mr. Hinckley's treatment team after each visit to discuss the visit and any concerns or issues relating to Mr. Hinckley or his treatment goals, and to participate by telephone in the meetings of the treatment team to discuss Mr. Hinckley's Individual Recovery Plan every three months or as scheduled. Order at 3-5, <u>United States v. Hinckley</u> (July 20, 2009). [3] Mr. Hinckley also was ordered to meet at least once during each visit with his Williamsburg-area case manager and individual therapist, Mr. Carl Beffa. Mr. Beffa was required to communicate after each visit with Mr. Hinckley's primary therapist at St. Elizabeths, Dr. Sidney Binks, to discuss and collaborate on the course of therapy for Mr. Hinckley. He also was required to complete a checklist of observations, communicate with the treatment team after each visit, and participate in treatment team meetings in the same manner as Dr. Lee. <u>Id</u>. at 5-7.

Although the Court's authorization of Phase IV visits expanded the duration of Mr. Hinckley's visits to Williamsburg to ten days, St. Elizabeths remained Mr. Hinckley's residence and the Hospital treatment team remained his primary clinicians. The Court ordered that if there were any signs of "decompensation" or deterioration in Mr. Hinckley's mental condition during his visits, no matter how slight, or any indication of danger to himself or to others, or of elopement (that is, attempt to escape or abscond), Mr. Hinckley would immediately be returned to the Hospital. Order at 7, <u>United States v. Hinckley</u> (July 20, 2009).

---

[3] Upon Dr. Lee's departure from the institute where he practiced, he was replaced in 2010 by Dr. Deborah Giorgi-Guarnieri, a psychiatrist based in the Williamsburg area who assumed Dr. Lee's responsibilities under the Court's Order. <u>See</u> Stipulation to Modify July 20, 2009 Order (Sept. 28, 2010); Order, <u>United States v. Hinckley</u> (Sept. 30, 2010); Hospital's Revised (e) Letter of December 14, 2012 at 12-13.

Mr. Hinckley began making Phase IV visits in late 2009. He soon began volunteering two days a week, for four hours each day, at the hospital library of Eastern State Hospital, a psychiatric hospital located in Williamsburg. Although Eastern State is a psychiatric hospital, Mr. Hinckley's relationship with the institution is that of a volunteer employee, not a patient. Beginning in 2012, with the imminent closure of the hospital library due to staffing and funding changes, Mr. Hinckley began volunteering in the cafeteria at Eastern State, where he has been helping at the cash register and taking orders from patrons. He has received positive reviews from his supervisors in both volunteering capacities about his work and his interaction with patrons and employees. Hospital's Revised (e) Letter at 10-11. According to the Hospital, Mr. Hinckley has also made use of his twice-weekly periods of unsupervised time in the community, as well as his daily periods of unsupervised time within his mother's subdivision. He has obtained his driver's license and has operated the Hinckley family's vehicle during his visits, accompanied by a family member. Id. at 19.

In 2010, the Hospital and Mr. Hinckley's Williamsburg case manager, Carl Beffa, initiated discussions with Colonial Behavioral Health, a regional mental health services provider, about the possibility of providing therapeutic services to Mr. Hinckley. Colonial operates a non-residential day program of group therapeutic activities in the Williamsburg area known as People's Place. Mr. Hinckley participated in an orientation session with Colonial, which was followed by communication between Colonial and Mr. Hinckley's unit clinical administrator at St. Elizabeths, Mr. Kevin Shamblee, to facilitate his acceptance to participate in therapeutic activities at People's Place during his Williamsburg visits.[4]

---

[4] The Hospital originally included Mr. Hinckley's participation in People's Place as a major component of its proposal for his expanded conditions of release. As discussed later in this Opinion, the inability of St. Elizabeths and Colonial to reach a mutually satisfactory agreement about the terms of Colonial's prospective services to Mr. Hinckley — and confusion

By May 2011, Mr. Hinckley had completed twelve Phase IV visits, without any reported incidents of misbehavior and in compliance with all of the Court's specific directives. Upon motion by Mr. Hinckley and the Hospital, the Court entered an interim order permitting an indefinite number of additional Phase IV visits under the terms and conditions specified in the Court's July 2009 Order. Such visits were authorized to continue until the Court ruled on the Hospital's next petition for expanded conditions of release. See Order at 2, United States v. Hinckley (May 13, 2011). Since then, Mr. Hinckley has completed an additional 21 Phase IV visits without any reported incidents of misbehavior and in compliance with all of the Court's specific directives — with two notable exceptions discussed below.

On two separate occasions — in July 2011 and in September 2011 — the Secret Service observed Mr. Hinckley deviating from the terms of the itineraries that governed the use of his unsupervised time in the Williamsburg community. It was also discovered that Mr. Hinckley had lied to St. Elizabeths staff and others about these deviations. On each occasion, Mr. Hinckley was scheduled to attend a movie during his three-hour window of unsupervised time, and on each occasion, Mr. Hinckley reported afterward to his clinical unit administrator at the Hospital, Kevin Shamblee, that he had attended the movie, even describing and recommending it. See Patient's Ex. 5; Transcript of Hearing at 96 (Nov. 30, 2011 p.m.); Transcript of Hearing at 102 (Dec. 8, 2011 a.m.); Transcript of Hearing at 201 (Feb. 25, 2013). Mr. Hinckley made similar misrepresentations to the expert witnesses retained by the government when they later interviewed him in preparation for the upcoming evidentiary hearing

---

between them about whether they had reached a firm agreement or remained in the process of negotiation — led to a great deal of testimony during the latest evidentiary hearing held by this Court about the viability of the Hospital's plan. Those issues ultimately led Colonial to withdraw its willingness to participate in the Hospital's plan, forcing St. Elizabeths to submit a modified (e) letter. See infra at 9-12.

before this Court.  See Transcript of Hearing at 23-24 (Jan. 30, 2012 p.m.); Forensic Psychiatric

Evaluation Concerning Expansion of Terms of Conditional Release under 501(e) ("Phillips

Rpt.") at 72; Independent Forensic Psychiatric Evaluation of John W. Hinckley, Jr. ("Patterson

Rpt.") at 34.

The Secret Service had been monitoring Mr. Hinckley on both occasions, and

their surveillance reports showed his claims to be false.  On both days, as the Secret Service

reported, Mr. Hinckley arrived at the movie theater and spoke with someone in the ticket booth

but did not buy a ticket.  Instead, he spent the remaining hour or two of his unsupervised free

time at a nearby chain bookstore, Barnes & Noble, and a fast-food establishment, before being

picked up by his mother to return home.  See Patient's Exs. 9, 26; see also Transcript of Hearing

at 73-75 (Jan. 23, 2012 p.m.) (Special Agent Bordeaux).  When confronted with this evidence,

Mr. Hinckley later admitted being dishonest about the deviations from his itineraries.  See

Patterson Rpt. at 34; Psychological Risk Assessment Update ("Montalbano Rpt.") at 27.  These

incidents occurred after the Hospital submitted its July 2011 (e) letter to the Court, but before the

evidentiary hearing held with respect to that (e) letter.  Considerable time was devoted to the

incidents during the hearing.

As noted above, Mr. Hinckley was permitted in 2009 to advance to his current

regime of 10-day Phase IV visits "with the purpose of acclimating him to his mother's

community and permitting him to engage in the Phase IV activities discussed in [this Court's]

June 16, 2009 Opinion and Order."  Order at 2, United States v. Hinckley (July 20, 2009).  The

ultimate goal of these visits and activities was to determine if Mr. Hinckley is ready to be

released from the Hospital to live independently in Williamsburg with the support of his mother

(so long as she is healthy and alive), his siblings, and psychiatric and counseling professionals in

the community.  See Hinckley VI, 625 F. Supp. 2d at 6; Hinckley V, 493 F. Supp. 2d at 66.

## II.  THE HOSPITAL'S PROPOSAL FOR EXPANDED CONDITIONS OF RELEASE

### A.  *The Hospital's July 2011 (e) Letter*

On July 29, 2011, the Hospital submitted the original version of its current proposal for expanded conditions of release for Mr. Hinckley (the "Hospital's (e) Letter").  The core of the Hospital's proposal was to gradually increase the length of Mr. Hinckley's visits to Williamsburg from their current 10-day duration to visits lasting nearly a month, followed by conditional discharge from the Hospital on "convalescent leave" in that community.  Specifically, the plan called for two visits to Williamsburg of 17 days each, followed (if successful) by six visits of 24 days each, followed thereafter (if successful, and upon an assessment by Mr. Hinckley's treatment providers) by release from the Hospital to reside on permanent convalescent leave with his mother in Williamsburg, with psychiatric and therapeutic services to be provided by professionals in that area, rather than by St. Elizabeths, with whom Mr. Hinckley would only periodically need to touch base as an outpatient.

On September 30, 2011, the government filed an opposition to the Hospital's proposal, to which Mr. Hinckley's counsel filed a reply the next month.  The Court commenced an evidentiary hearing in late November 2011.  For a variety of reasons, including delays caused by the schedules of counsel and witnesses, the hearing proceeded intermittently until its conclusion in February 2012.  Furthermore, because the Hospital had to revise its (e) proposal in December 2012, it was necessary to reopen the hearing for additional testimony in February 2013.

### B.  *Withdrawal of Colonial Behavioral Health*

An important component of the Hospital's original (e) proposal was Mr. Hinckley's anticipated participation in therapeutic group activities at People's Place, the day

program run by Williamsburg-area mental health treatment provider Colonial Behavioral Health. It was contemplated that Mr. Hinckley's participation in these activities would replicate the therapeutic experiences that he now receives by taking part in similar group activities at the Therapeutic Living Center at St. Elizabeths (the so-called "treatment mall"), while also providing structure to his Williamsburg routine, opportunities for social interaction, and an additional set of clinicians monitoring his mental and emotional status.

During the evidentiary hearing, the government and its expert witnesses expressed serious concern over the lack of specificity in the Hospital's plan for Mr. Hinckley to receive services from Colonial Behavioral Health. These concerns arose not only from uncertainty about what specific activities Mr. Hinckley would participate in, but also from doubts about whether Colonial even offered groups that were appropriate for Mr. Hinckley, and — most fundamentally — whether the organization had committed to providing services to him or had merely reached an agreement in principle subject to further negotiation. A significant portion of the evidentiary hearing focused on these questions as they related to whether the Hospital's plan adequately managed Mr. Hinckley's risk of dangerousness.

After the conclusion of the evidentiary hearing in February 2012, but before the Court had ruled on the Hospital's proposal, the Hospital's discussions with Colonial fell apart. As reported to the Court, this result stemmed in part from the inability of the Hospital and Colonial to agree on certain terms regarding Colonial's role in Mr. Hinckley's mental health care treatment — specifically, whether Colonial would assume responsibility for Mr. Hinckley's case management and therapy, as it wished, in addition to providing therapeutic group services. Another contributing factor cited by Colonial in withdrawing its participation in the Hospital's plan was what it perceived as a "general lack of coordination of oversight and management of the plan at the local level." Hospital's Revised (e) Letter at 2 (quoting letter from Colonial). In

early June 2012, Colonial informed the Hospital that it would not be participating in the Hospital's plan.

After the Hospital notified the Court of Colonial's withdrawal, the Court informed the Hospital that it had two options: it could either withdraw its pending proposal and submit an entirely new one, or it could proceed with its original proposal but modify it to provide alternatives to fill the role that had been contemplated for Colonial.  See Memorandum Opinion and Order at 3-4, United States v. Hinckley (Sept. 19, 2012).  The Court also admonished the Hospital that, regardless of which route it chose, it needed to provide assurances that concrete agreements had been reached with whatever providers in Virginia were included in the plan, along with more specifics about these providers' roles than had previously been offered regarding Colonial.  Id. at 4.  As the Court explained, the Hospital was "on notice that the lack of specificity it provided about Colonial Behavioral Health, People's Place, earlier in these proceedings was a significant concern to the United States and its experts, as well as to the Court."  Id.

The Hospital opted to proceed with a modified version of its original proposal, and it submitted a revised (e) letter on December 14, 2012 (the "Hospital's Revised (e) Letter").  The revised proposal is essentially the same as the original, but it accounts for the loss of Colonial's participation by adding a weekly group therapy session led by Mr. Beffa and music therapy with Ms. Elizabeth Haley, a board-certified music therapist with whom Mr. Hinckley began meeting in late 2012.  The revised proposal also marks a significant change by transferring the role of Mr. Hinckley's case manager from Mr. Beffa to Mr. Jonathan Weiss, a licensed clinical social worker who has practiced social work and case management since the late 1960s and was the clinical director of what is now Colonial Behavioral Health for over 25 years.  This

change will leave Mr. Beffa in the exclusive role of therapist. Hospital's Revised (e) Letter at 11-13; Supplemental Report ("Murphy Supp. Rpt.") at 2.

The government opposes the Hospital's revised proposal for the same reasons that it opposed the original. In late February 2013, the Court held a supplemental evidentiary hearing that focused on the modifications to the Hospital's proposal and on new events that had occurred in the intervening year since the conclusion of the original evidentiary hearing.

### C.  The Hospital's December 2012 Revised (e) Letter

The Hospital believes that after more than six years of visits by Mr. Hinckley to Williamsburg, including visits of substantial duration that have included periods of unsupervised time in the community, Mr. Hinckley is now ready to "begin to transition to spending more time in that area and less time at the Hospital in D.C."  Hospital's Revised (e) Letter at 16.  As the Hospital stated in its proposal:

> Mr. Hinckley has utilized twelve visits on his July 2009 Court order and ongoing visits since being granted a continuance of that order in May of 2011. His family have reported no symptoms of attention-seeking behavior, attempts to contact Jodie Foster, or returning late from his unaccompanied times.  He has refused interaction with the media[.]  His mood has remained uplifted and his mental status stable while on these outings.  The visits to Williamsburg have assisted Mr. Hinckley in achieving various treatment goals including the establishment of closer, more connected relationships with his family members, to become more independent in his operating of a motor vehicle, to increase his opportunities to make good judgments, to establish therapeutic relationships with a psychiatrist in Williamsburg, Virginia, Dr. Debbie Giorgi-Guarnieri, and a therapist, Carl Beffa, LCSW, to utilize mature and effective coping strategies, to become more open and less secretive with the treatment team, to continue his vocational pursuits through volunteering at the Eastern State Hospital Library, to become more familiar and therefore more confident in navigating the Williamsburg community by automobile and, more recently in developing a therapeutic relationship with Elizabeth Haley, music therapist.

Id. at 20-21.

Accordingly, the Hospital proposes expanding the length of Mr. Hinckley's conditional release visits, while affording him greater freedom during those visits. The increased duration of the visits will, in the Hospital's view, allow Mr. Hinckley to more fully develop social, vocational, and therapeutic relationships in the Williamsburg community, facilitating the goal of moving him toward permanent residence there. Hospital's Revised (e) Letter at 21. It further proposes that upon successful completion of eight of these expanded visits — two of 17 days' duration and six of 24 days — the Hospital have the authority, without seeking further approval from the Court, to determine whether Mr. Hinckley should be placed on "convalescent leave" status, permitting him to live full-time in Williamsburg as long as he adheres to the conditions and restrictions placed upon him. Id. at 26-27.

Specifically, the Hospital's Revised (e) Letter of December 2012 asks the Court to expand Mr. Hinckley's conditional release privileges as follows:

1. The duration of the visits to Williamsburg will increase from their current 10-day duration to 17 days for the next two visits and to 24 days for six additional visits.

2. Mr. Hinckley will be allowed to volunteer at Eastern State Hospital for up to five days a week, depending on the availability of suitable work activities.

3. During each of the first two visits (of 17 days), Mr. Hinckley will be permitted up to six unsupervised outings lasting 4 hours each outside his mother's housing subdivision, for social, recreational, shopping, and dining activities, "or for the purpose of securing other related activities," between 9:00 a.m. and 9:00 p.m.

4. During the third and fourth visits (i.e., the first two 24-day visits), after his treatment providers have assessed the progress of his previous visits, Mr. Hinckley will be permitted up to nine unsupervised outings lasting 4 hours each under the same conditions.

5.  During the remainder of the visits or until the issuance of a new conditional release order, Mr. Hinckley will be permitted up to twelve unsupervised outings lasting 8 hours each, within a 30-mile radius and to a specific geographic location, under the same conditions.

6.  The increases in the frequency and duration of Mr. Hinckley's unsupervised outings, noted above, will take effect only after Mr. Hinckley meets certain treatment goals, including but not limited to attending his scheduled therapy sessions and contributing financially to the cost of his treatment.[5]

7.  The activities in which Mr. Hinckley engages during the periods of  unsupervised time "will be listed in a general menu of current areas of interest approved by [the] Hospital/Mr. Weiss in advance or with notice on the day of a special activity."  The Hospital will no longer provide the Court and the government with an itinerary prior to each visit that sets forth the specific date, time, address, and phone number of each activity in which Mr. Hinckley will engage outside of his mother's subdivision.  Rather, Mr. Hinckley will be free to choose from a range of pre-approved options that have been included in a list of activities that he will develop in consultation with his treatment providers.  In addition, special activities not included within this list will be permitted if approved on the day of the activity.

8.  During these unaccompanied outings, Mr. Hinckley will avoid traveling to government centers in Richmond or to areas where the President or members of Congress may be visiting.

9.  When Mr. Hinckley is not involved in structured activities, he will be allowed to remain unaccompanied in his mother's subdivision while she is away from the residence pursuing her own activities.  His mother or a sibling need not remain at home at all times, as now.  Mr. Hinckley's mother will not, however, be away from the home overnight.

10.  Mr. Hinckley will be allowed the unaccompanied use of an automobile while traveling to and from his volunteer activities and his appointments with his treatment providers; while utilizing his

---

[5]      This portion of the Hospital's original (e) letter was inadvertently omitted from the revised (e) letter, but Hospital staff confirmed during the evidentiary hearing that the omission was unintentional and that the Hospital expects Mr. Hinckley to meet certain treatment goals before receiving increases in his unsupervised time.

unsupervised free time; and while traveling to and from musical activities that he may hear about from his music therapist.

11.  Mr. Hinckley may be driven between Washington, D.C. and Williamsburg by a professional driver without his mother or siblings in the vehicle.

12.  A minimum of two weeks will occur between each visit to allow for the preparation of feedback reports by the Hospital.

13.  The Hospital will be permitted to submit to the Court reports that summarize two visits at a time, rather than submitting a separate report after every visit, unless an emergency occurs requiring that the information be communicated immediately.

14.  The Hospital will provide 7-day notice to the Court, the government, and Mr. Hinckley's counsel prior to each visit to Williamsburg, rather than the 14-day notice that it currently provides.

15.  The Hospital will provide 1-day notice to the Court, the government, and Mr. Hinckley's counsel prior to each Hospital staff–accompanied outing in Washington, D.C. in which Mr. Hinckley takes part, rather than the 4-day notice that it currently provides.

16.  Dr. Giorgi-Guarnieri will continue to serve as Mr. Hinckley's psychiatrist in the Williamsburg area.  Mr. Hinckley will meet with Dr. Giorgi-Guarnieri weekly during his visits of 17 days and at least once during his visits of 24 days.  Additional visits may occur as clinically necessary.  Dr. Giorgi-Guarnieri will monitor Mr. Hinckley for any signs of deterioration or decompensation in his mental condition and will be especially alert for anger, psychosis, depression, any ideas of elopement, endangerment to self or others, noncompliance with conditions of release, or rejection of the supervision provided to Mr. Hinckley by his responsible persons.  If any such items are detected, she will telephone the Hospital.  Dr. Giorgi-Guarnieri  will continue to assess and monitor the risk factors identified in the Hospital's checklists, which she will complete and return to the Hospital after each visit, along with written feedback summarizing her contact with Mr. Hinckley.  Dr. Giorgi-Guarnieri also will participate in post-visit telephone conference calls with the Hospital treatment team to discuss Mr. Hinckley's progress, and will participate by phone in the Hospital treatment team's Individual Recovery Plan meetings scheduled every two months for Mr. Hinckley.  Dr. Giorgi-Guarnieri will verify with Mr. Hinckley that he has been taking his medications

as prescribed.  If necessary, Dr. Giorgi-Guarnieri may prescribe medication for emergency psychiatric situations and may facilitate acute hospitalization for psychiatric emergencies.

17.  Mr. Beffa will continue to serve as Mr. Hinckley's individual therapist in the Williamsburg area.  Mr. Hinckley will meet at least once weekly with Mr. Beffa for therapy sessions until the completion of his first six 24-day visits, after which the frequency of the sessions may be decreased based on the assessment of treatment team members in Virginia and at the Hospital.  After each visit, Mr. Beffa will provide written feedback to Mr. Hinckley's Hospital treatment team that will summarize his weekly contact with Mr. Hinckley.  This feedback also will be shared with Dr. Giorgi-Guarnieri.  Mr. Beffa also will participate by phone in the Hospital treatment team's Individual Recovery Plan meetings scheduled every two months for Mr. Hinckley.  Any emergency issues that may be disclosed during the sessions with Mr. Hinckley will be shared with the Hospital and Dr. Giorgi-Guarnieri.

18.  Mr. Beffa, in addition to the individual therapy that he will provide to Mr. Hinckley, will conduct group psychotherapy sessions in which Mr. Hinckley will be included.  The goals of these sessions will be to improve socialization and relationship-building and to foster community reintegration.

19.  Mr. Jonathan Weiss, a licensed clinical social worker, will assume the role of Mr. Hinckley's Williamsburg case manager, taking this duty over from Mr. Beffa.  Mr. Weiss will make recommendations to Mr. Hinckley and the Hospital for opportunities to increase Mr. Hinckley's socialization, enrichment, or mental health support in the Williamsburg community; these recommendations will be made after first-hand investigation of the appropriateness of Mr. Hinckley's participation in the activities in question and their relevance to the objectives of the visits.  Mr. Weiss also will monitor Mr. Hinckley's progress in his volunteer and scheduled daytime activities by communicating at least once per visit with the relevant supervisor.  He may also accompany Mr. Hinckley on outings in the community.  After each visit, Mr. Weiss will provide written feedback to the Hospital treatment team summarizing any contact with Mr. Hinckley related to case management and providing recommendations.

20.  Ms. Elizabeth Haley, a board-certified music therapist, will provide individual music therapy sessions during his conditional release visits.  She will conduct at least one music therapy session during each visit, and will provide written feedback to the treatment team afterward.  She will report to the Hospital any

emergency issues that may be disclosed during the sessions. She also may communicate with Mr. Hinckley's music therapist at St. Elizabeths to promote continuity in this therapy.

The Hospital also recommends that certain conditions of Mr. Hinckley's Williamsburg visits that are presently in force remain unchanged with respect to future visits:

> 21. Mr. Hinckley will be required to travel with his GPS-equipped cell phone during all unaccompanied outings.

> 22. Mr. Hinckley's mother, brother, and sister will remain as the identified "responsible persons" supervising him in Williamsburg. They will continue to submit feedback forms to the Hospital after each visit as well as participate in telephone or in-person conversations with Mr. Hinckley's treatment team members after the visits.

> 23. Before each visit, Mr. Hinckley will continue to receive an amount of medication from the pharmacy at the Hospital to cover the duration of the visit.

> 24. Mr. Hinckley will be allowed to continue his daily unaccompanied walks within his mother's subdivision. Presently, Mr. Hinckley is allowed two such walks each day, of up to 2 hours in duration, except on the days in which he utilizes his unaccompanied community time, when he is permitted only one such walk.

> 25. The restrictions on Mr. Hinckley's internet use during his trips to Williamsburg will remain in force. These restrictions require that a family member be present in the room with him whenever Mr. Hinckley uses the internet.

> 26. The Individual Relapse Prevention and Media plans that were previously developed will remain in effect for the duration of Mr. Hinckley's time spent in Williamsburg.

Finally, the Hospital proposes that after the successful completion of two 17-day visits and eight 24-day visits to Williamsburg, the following additional conditions take effect:

> 27. Upon "an assessment by the Hospital staff and providers in Virginia indicating that Mr. Hinckley is experiencing a good mental status and that he does not present a danger to himself or others," at the discretion of the Hospital Mr. Hinckley will be

17

conditionally released to reside permanently on convalescent leave to reside with his mother in Williamsburg.

28. While residing in Williamsburg on convalescent leave, Mr. Hinckley will continue to receive psychiatric "follow up" from Dr. Giorgi-Guarnieri, who will meet with Mr. Hinckley twice a month for the first three months and no less than monthly afterwards. At the outset of convalescent leave, Dr. Giorgi-Guarnieri will begin to prescribe Mr. Hinckley's psychiatric medication, which will be obtained at a local pharmacy.

29. Mr. Hinckley will continue to receive weekly individual and group therapy from Mr. Beffa.

30. Case-management services will be provided on an as-needed basis.

30. Mr. Hinckley will make weekly calls to the Hospital's Outpatient Department of Clinical Operations ("OPDCO") for the first three months of his convalescent leave and no less than monthly thereafter, at the discretion of the OPDCO. Mr. Hinckley also will travel to Washington, D.C. monthly to meet with OPDCO staff members at the Hospital. He will be allowed to travel unaccompanied to Washington, D.C. for these regularly scheduled appointments. A current member of Mr. Hinckley's inpatient treatment team will be present at these meetings, for at least the first six months or longer, at the discretion of the OPDCO. Dr. Giorgi-Guarnieri and Mr. Beffa will communicate with the OPDCO "via a monthly checklist and summary as well as telephone contact prior to his visiting the staff in D.C."

30. Mr. Hinckley will continue to attend his regularly scheduled activities at Eastern State Hospital until employment or an alternative constructive daytime activity is arranged.

31. If the Hospital's proposal for convalescent leave is approved by the Court, a designee of the Hospital will work with Mr. Hinckley to ensure that he has applied for Social Security and Virginia Medicaid benefits prior to his release.

32. If the Hospital's proposal for convalescent leave is not approved by the Court at this time, the proposed visits of 24 days will continue until the Court issues another conditional release order.

Hospital's Revised (e) Letter at 9-27.

In the Hospital's opinion, Mr. Hinckley has sufficiently recovered from his mental illness to be granted the proposed expansions of his conditional release freedom without danger to himself or others, under the conditions outlined above. Hospital's Revised (e) Letter at 27. "If Mr. Hinckley's condition warrants, or if he violates the conditions of this release, the Hospital will return him to total inpatient care with due notice to the Court." Id.

Mr. Hinckley supports the Hospital's proposals and has not submitted his own, separate petition for expanded conditional release privileges under 24 D.C. Code § 501(k), as he has sometimes done in the past. See John W. Hinckley's Reply Memorandum in Support of Hospital's Request for Enlargement of Terms of Conditional Release (Oct. 21, 2011). Mr. Hinckley has, however, expressed the view that the proposed extended visits of 17 and then 24 days should take place on a regular monthly basis, in order to ensure predictability in his availability for vocational, employment and therapeutic activities. Transcript of Hearing at 19-20 (Nov. 30, 2011 a.m.). This recommendation is inconsistent with the Hospital's proposal that Mr. Hinckley's 24-day visits be scheduled at least two weeks apart, in order to afford the Hospital time to prepare the feedback reports submitted to the Court.

The government opposes the Hospital's proposal, deeming it "premature and ill conceived." See Government's Opposition to St. Elizabeths Hospital's Request for Expanded Conditions of Release at 4 (Sept. 30, 2011) ("Opp."). In particular, the government believes that the proposal fails adequately to address the persistence of key behaviors by Mr. Hinckley that have been recognized as risk factors for dangerousness on his part. Chief among the government's concerns is that Mr. Hinckley remains prone to secretiveness and deception about his thoughts, actions, and intentions — a trait that may stymie the efforts of his treatment providers to detect signs of decompensation or dangerousness on his part during any lengthy conditional release. Mr. Hinckley's deceptiveness and lack of candor, as the government sees it,

are tied to his ongoing diagnosis of narcissism, and they continue to manifest themselves in particular with respect to his relationships with and interest in women.

Pointing to the record of Mr. Hinckley's Phase IV visits to Williamsburg, the government further argues that these visits have utterly failed in their therapeutic objective of integrating Mr. Hinckley into that community. The government contends that Mr. Hinckley, rather than engaging in activities to foster social and vocational integration, has adhered to an isolated and repetitive pattern of activities during each of his visits, with the result that he has failed to develop any social ties in Williamsburg that would ameliorate his risk of isolation and depression. As the government puts it, Mr. Hinckley "has developed a routine of engaging in solitary pursuits that have no likelihood of permitting him to make friends or increase the support system that his treating physicians, and Hinckley himself, view as critical to preventing him from decompensating." Opp. at 11. According to the government, as a result of his lack of initiative and unwillingness to broaden the scope of his activities — even when prompted with specific suggestions by his treatment providers — Mr. Hinckley has not established the social ties necessary to alleviate the concern that, should he be conditionally released into his mother's community as proposed by the Hospital, he may become isolated, depressed, and ultimately unstable.

In light of what the government views as Mr. Hinckley's ongoing deception and secretiveness, his lack of meaningful integration in Williamsburg, and the potentially destabilizing influence of his relationships with women, the government faults the Hospital for failing to devise a detailed plan with sufficient monitoring, oversight, and structured activity to provide assurances that his risk of decompensation is being adequately managed.

In sum, the government argues, between Mr. Hinckley's continued demonstration of troubling risk indicators and the Hospital's failure to adequately account for those risks, it is

"impossible to find, even by a preponderance of the evidence, that Hinckley will not become a danger to himself or others if he is permitted to transition into the community in his mother's hometown." Opp. at 12. Indeed, the government raises the question of whether the "experiment" of transitioning Mr. Hinckley to Williamsburg has proven a failure, because, as the government puts it, "the Hospital appears to be unable to knit together either a web of effective mental-health providers or meaningful activities that Hinckley can use to integrate himself into the community." Id.

### III. THE EVIDENTIARY HEARING

As has been its practice, the Court held an evidentiary hearing on the Hospital's original (e) letter in order to permit all parties to substantiate and elaborate upon their positions with respect to the Hospital's proposal. That hearing included opening statements by counsel for the government and counsel for Mr. Hinckley, more than ten full days of live testimony (making this by far the longest hearing that the Court has held in this matter), and closing arguments. Counsel for Mr. Hinckley called the following witnesses: (1) Dr. Tyler Jones, Director of Psychiatric Services at St. Elizabeths Hospital and a member of St. Elizabeths Hospital Review Board, which oversees the development and submission of petitions for conditional release; (2) Kevin Shamblee, a Clinical Administrator at St. Elizabeths Hospital with responsibilities for Mr. Hinckley, and the author of the Hospital's (e) letter and revised (e) letter; (3) Dr. Katherine Murphy, Clinical Staff Psychologist at St. Elizabeths Hospital, who prepared an extensive risk assessment with respect to Mr. Hinckley; (4) Dr. Deborah L. Giorgi-Guarnieri, the aforementioned psychiatrist in private practice in the Williamsburg area who has been Mr. Hinckley's psychiatrist in that area since 2010; (5) Carl Beffa, the aforementioned therapist and social worker in private practice in the Williamsburg area who is Mr. Hinckley's case manager

and individual therapist in that area; (6) Diane Sims, Mr. Hinckley's sister; (7) Scott Hinckley, Mr. Hinckley's brother; and (8) Dr. Paul Montalbano, Deputy Director of the Forensic Psychology Postdoctoral Fellowship Program at Walter Reed Medical Center, formerly Pretrial Chief of the Forensic Service Unit at John Howard Pavilion, St. Elizabeths Hospital, who testified as a rebuttal expert witness for Mr. Hinckley.

Counsel for the government called the following witnesses: (1) Dr. Raymond Patterson, a psychiatrist retained as an expert witness by the government and the former Medical Director and former Acting Associate Superintendent at St. Elizabeths Hospital, the former Commissioner of Mental Health in the District of Columbia, and the former Forensic Director for the State of Maryland; (2) Dr. Robert Phillips, a psychiatrist retained as an expert witness by the government and the former Director of Forensic Services, State of Connecticut Department of Mental Health, Deputy Medical Director, American Psychiatric Association, Adjunct Professor of Law and Psychiatry at the University of Maryland School of Law, and Visiting Lecturer in Psychiatry at the Yale University School of Medicine; (3) Anthony Bordeaux, Special Agent with the United States Secret Service, who testified about his surveillance of Mr. Hinckley in Williamsburg, Virginia; (4) Jason Clickner, Special Agent with the United States Secret Service, who testified on the same topic; and (5) Richard Rolfes, an employee of a bookstore located in Williamsburg, who testified about a 2011 encounter with a customer whom he identified as Mr. Hinckley.

### A. *Witnesses for the Hospital and Mr. Hinckley*

#### 1. Witnesses from St. Elizabeths Hospital

Dr. Tyler Jones, the Director of Psychiatric Services at St. Elizabeths, testified on behalf of the Hospital and its Forensic Review Board, which oversees the work of individual

patients' treatment teams as they formulate recommendations for conditional releases. In addition to describing the work of Mr. Hinckley's treatment team, Dr. Jones was permitted to offer expert testimony on the issue of whether Mr. Hinckley will be dangerous to himself or others as a result of a mental disease under the Hospital's proposed terms of conditional release. Dr. Jones testified that in his opinion, to a reasonable degree of medical certainty, Mr. Hinckley represents a low risk of dangerousness to himself or others if conditionally released under those terms. Transcript of Hearing at 64-65 (Nov. 30, 2011 a.m.).

Dr. Jones testified about Mr. Hinckley's psychiatric diagnoses and prescribed medications. Transcript of Hearing at 13 (Nov. 30, 2011 p.m.). According to Dr. Jones, Mr. Hinckley is currently diagnosed with two "Axis I" conditions: major depressive disorder recurrent, in full remission; and psychotic disorder not otherwise specified, also in full remission. Being in full remission, Dr. Jones explained, "means that there are no signs or symptoms of the disorder." Id. at 14. Such conditions, although they no longer present any signs or symptoms, often continue to be included in a patient's diagnosis for a variety of reasons, including, as in Mr. Hinckley's case, for purposes of ongoing monitoring or prophylactic treatment. Id.

Mr. Hinckley also is diagnosed by the Hospital as having one Axis II condition, narcissistic personality disorder. While the signs of this disorder are still evident in Mr. Hinckley, in the Hospital's opinion the condition is attenuated and by itself represents less of a risk factor for dangerousness than his Axis I conditions once presented. Transcript of Hearing at 14-15 (Nov. 30, 2011 p.m.).

Since May 1999, Dr. Jones testified, Mr. Hinckley has taken one milligram of Risperdal daily, which is an antipsychotic medication for the treatment of psychotic disorders but which is also approved for other purposes. This prescription is in the low range of possible doses. Transcript of Hearing at 16 (Nov. 30, 2011 p.m.). At the time Mr. Hinckley began taking

Risperdal in 1999, his psychotic disorder was already in full remission and Mr. Hinckley had shown no symptoms of psychosis for many years. According to Dr. Jones, the treatment team believes that the medication serves a useful prophylactic function: if Mr. Hinckley's clinical depression were to return and he were to experience a severe decompensation, the medication would be helpful in preventing symptoms of psychosis, such as delusions. Id. at 19. In addition, the class of medications of which Risperdal is a part "has been approved for the use of adjunctive therapy for depression, that is for cases where one medication doesn't seem to be doing the full job." Id. at 19. In light of these two potential benefits, and because Mr. Hinckley has taken the medication for many years without experiencing any significant side effects, Mr. Hinckley has remained on the medication.

Dr. Jones reported that Mr. Hinckley has never failed to take his Risperdal. Transcript of Hearing at 21-22 (Nov. 30, 2011 p.m.). He further explained that if there were reason to be concerned about Mr. Hinckley's compliance with his Risperdal prescription while living in Williamsburg, he could be given the medication every two weeks by a health professional in a long-acting injectable form, or he could instead be prescribed a closely related medication, Invega, which comes in a long-acting injectable form that is given monthly. Id. at 25. In the opinion of the Hospital, however, even if Mr. Hinckley were to stop taking Risperdal or any similar medication, he would still be at low risk for a return of psychotic symptoms. Id. at 20.

Mr. Hinckley began taking his other medication, Zoloft, in 2005, after reporting feelings of anxiety to his treating psychiatrist relating to his upcoming transition to spending more time in Williamsburg. Transcript of Hearing at 23 (Nov. 30, 2011 p.m.). Since then, Dr. Jones reported, Mr. Hinckley's dosage has twice been increased in response to "contextual and appropriate" periods of anxiety. Id. at 23-24. On each occasion, the increase was prompted by

Mr. Hinckley's own request, and Mr. Hinckley has never failed to take his Zoloft. Id. at 24. He currently takes 125 milligrams of Zoloft in the morning and 25 milligrams in the evening. Id. at 15. Were Mr. Hinckley to abruptly stop taking this medication, his symptoms of anxiety might gradually reoccur, but this change would be observable by his treatment providers at the Hospital and in Williamsburg, according to Dr. Jones. Id. at 26. Moreover, an increase in anxiety would not, in and of itself, make Mr. Hinckley more dangerous. Id.

Dr. Jones further testified about certain details of the Hospital's proposal and their underlying rationales. He explained that Mr. Hinckley's current regime of irregularly scheduled 10-day visits to Williamsburg does not allow him to participate fruitfully in therapeutic groups there, because his schedule lacks the continuity necessary for him to operate as a functioning part of any group. Transcript of Hearing at 71, 92 (Nov. 30, 2011 a.m.). According to Dr. Jones, the 10-day visits similarly limit Mr. Hinckley's opportunities for employment and volunteer activities, which would help to cultivate self-reliance and confidence on his part, and therefore more time spent in Williamsburg each month, on a predictable schedule, is essential. Id.

Dr. Jones acknowledged that, in his view, if Mr. Hinckley were to find himself in Williamsburg without a social support network or a set of structured activities, he would be at risk for isolation and possibly depression, both of which have been identified as risk factors for dangerousness on his part. Transcript of Hearing at 19-20 (Dec. 1, 2011 a.m.). He also agreed that Mr. Hinckley has not taken full advantage of the opportunities available to him in Williamsburg to increase his socialization — a view consistent with that of Mr. Hinckley's treatment team — and that Mr. Hinckley has failed to show an interest in a number of things he could be doing to foster his integration into the community. Dr. Jones cited several examples in which a suggestion that was given to Mr. Hinckley to increase his socialization led nowhere — either because Mr. Hinckley did not follow through with the suggestion or because he was

rebuffed from taking part in an activity due to his notoriety. Id. at 24-29. And he acknowledged that Mr. Hinckley has no male friends in Williamsburg, which the Hospital thinks would be good for him. Id. at 25.

Despite the concerns that Dr. Jones acknowledged about Mr. Hinckley's potential risks of isolation and depression in Williamsburg and his failure to ameliorate these concerns by attempting to establish viable community ties, Dr. Jones still believes that Mr. Hinckley presents a low risk of danger under the Hospital's proposal. Transcript of Hearing at 28 (Nov. 30, 2011 p.m.). He also believes that Mr. Hinckley's scheduled meetings with his Williamsburg-area psychiatrist would be frequent enough under the Hospital's plan to allow her to observe any symptoms of decompensation on his part. Transcript of Hearing at 72 (Nov. 30, 2011 a.m.).

Further testimony about the Hospital's proposal was provided by Kevin Shamblee, who was a clinical administrator at St. Elizabeths, a member of Mr. Hinckley's treatment team, and the author of the Hospital's (e) letter. [6] As someone who coordinated the activities of patients and their various treatment providers, Mr. Shamblee worked with Mr. Hinckley on and off since 1995 and steadily from 2001 until recently; he saw Mr. Hinckley on a daily basis. Mr. Shamblee assists in preparing the itineraries for Mr. Hinckley's visits to Williamsburg, and conducts post-outing interviews with his family, treaters, and supervisor after each visit. Transcript of Hearing at 4, 6-10 (Dec. 8, 2011 a.m.); see also Transcript of Hearing at 33-37 (Feb. 25, 2013).

---

[6] Mr. Shamblee testified at the supplemental evidentiary hearing in February 2013 that he recently had taken a position with the outpatient division of the District of Columbia Department of Mental Health (which operates St. Elizabeths), but he continues to be Mr. Hinckley's clinical administrator and remains involved with planning and evaluating Mr. Hinckley's Williamsburg outings. Transcript of Hearing at 33-37 (Feb. 25, 2013).

Mr. Shamblee was questioned about the progress that Mr. Hinckley has made under the current regime of conditional releases and the steps he has taken to become integrated into the Williamsburg community.  He acknowledged that Mr. Hinckley's itineraries for each 10-day visit have been strikingly repetitive, hewing to a predictable pattern of solitary activities such as seeing movies, visiting a limited range of stores and restaurants, and taking unaccompanied walks in his mother's neighborhood — with few ventures aimed at making friends, joining social groups, or seeking vocational opportunities beyond his current position at Eastern State Hospital.  Nevertheless, Mr. Shamblee emphasized that when assessing the progress of a patient who has been hospitalized for 30 years, one should not undervalue the achievement made by that patient in simply becoming comfortable, for example, working 4-hour shifts with a volunteer employer or engaging in unaccompanied activities in the community. Transcript of Hearing at 84 (Dec. 8, 2011 a.m.).  Viewed in this light, Mr. Shamblee characterized Mr. Hinckley's record as "somewhat of a success."  Id.  In the view of the Hospital, he said, Mr. Hinckley needs more time in Williamsburg than that provided by his periodic 10-day visits in order to engage in activities that will foster his integration into the community.

Although Mr. Shamblee testified that the Hospital's proposal would afford Mr. Hinckley a level of therapy in Williamsburg similar to that which he now receives at St. Elizabeths, his testimony revealed that under the proposal Mr. Hinckley would have less frequent contact with a treating psychiatrist.  Presently, Mr. Hinckley meets weekly at St. Elizabeths with his treating psychiatrist.  While this pattern would be replicated during Mr. Hinckley's 17-day Williamsburg visits (in which he would meet weekly with Dr. Giorgi-Guarnieri), during each of the proposed 24-day trips he would see her only once.  Even this difference may understate the magnitude of the proposed change, because although Dr. Benjamin Adewale formally meets with

Mr. Hinckley only once a week when Mr. Hinckley is at St. Elizabeths, their mutual presence at the Hospital and ability to consult on a casual, ad hoc basis allow him to see Mr. Hinckley "quite a bit more" than Dr. Giorgi-Guarnieri would see him in Williamsburg.  Transcript of Hearing at 38-39 (Dec. 8, 2011 a.m.).  Although Mr. Shamblee views the proposed once-per-visit meeting with Dr. Giorgi-Guarnieri as adequate, he pointed out that the Hospital's proposal gives Dr. Giorgi-Guarnieri the discretion to increase the frequency of her meetings with Mr. Hinckley as clinically indicated.  Id. at 40.

Mr. Shamblee also testified briefly about the two occasions on which Mr. Hinckley lied to him about having gone to the movies — as his itinerary provided — when in fact he did not do so.  In a post-visit interview Mr. Shamblee had with Mr. Hinckley after his July 2011 visit to Williamsburg, Mr. Hinckley recommended the movie *Captain America* which he said he had seen while in Williamsburg.  Transcript of Hearing at 102 (Dec. 8, 2011 a.m.).  Mr. Shamblee had no idea at the time that Mr. Hinckley was not being truthful with him.  Id.  Some months later, Mr. Shamblee and Mr. Hinckley had a similar conversation about *Rise of the Planet of the Apes*.  "Mr. Hinckley said he saw it.  It was a good movie.  He would recommend it."  Id.  Mr. Shamblee had no idea Mr. Hinckley was not being truthful on this occasion either. Id.  The dates on which Mr. Hinckley said, falsely, that he had gone to the movies were July 24, 2011 and September 4, 2011, as reported by the Secret Service.  See Patient's Ex. 5 (Hospital Letter Re:  Sanctions) (Mr. Hinckley went to box office on both occasions, but did not purchase tickets); see also Transcript of Hearing at 3-8 (Nov. 30, 2011 a.m.) (testimony of Dr. Jones).

Dr. Katherine Murphy, a clinical staff psychologist at the Hospital who participated in the planning of the Hospital's (e) letter, testified about the violence risk assessment of Mr. Hinckley that she completed in 2011.  She also was permitted to offer expert testimony on the issue of whether Mr. Hinckley will be a danger to himself or others as a result

of mental disease during the conditional releases proposed by the Hospital. Transcript of Hearing at 7 (Dec. 1, 2011 p.m.).

Dr. Murphy's risk assessment concludes that under the conditions proposed by the Hospital, Mr. Hinckley will not likely be a danger to himself or others in the reasonable future:

> He is at low risk for a relapse of psychosis and depression without prolonged social isolation. Should a relapse of symptoms of major mental illness begin to occur, it would likely be gradual, detected by treatment providers, and responsive to pharmacology. He has demonstrated his ability to manage increases in the duration of his outings without presenting as a risk to himself or others. Mr. Hinckley should continue to advance to the next levels of freedom provided that ongoing assessments throughout the transition find him to remain at a low risk of being dangerous to himself and others.

Violence Risk Assessment Update ("Murphy Rpt.") at 55. Dr. Murphy further recommends that "expansions in freedom should be incremental and contingent upon successful completion of a progression of treatment objectives," which "should be designed to assist Mr. Hinckley in demonstrating further initiative with securing and adjusting to a structured routine in addition to expanding his personal and professional support system in Williamsburg." Id.

At the evidentiary hearing, Dr. Murphy elaborated on the psychological tests and risk assessment tools that she utilized to evaluate Mr. Hinckley's risk of dangerousness. She relied in part on the results of two psychological tests: the Wechsler Abbreviated Scale of Intelligence ("WASI") and the Minnesota Multiphasic Personality Inventory, Second Edition ("MMPI-2"). While not directly related to violence, she testified, these instruments are useful because they measure general personality traits and emotional functioning.

Among the most significant results of these tests, Mr. Hinckley's profile pattern on the MMPI-2 remained consistent with previous administrations of the test in prior years. These results must be viewed with caution, however, as Mr. Hinckley continues to display

elevated scores on the so-called "K scale," a measure of the patient's defensiveness. This

elevated score highlights Mr. Hinckley's "reluctance to acknowledge symptoms and problems,

with possible pathology being overshadowed by a need to present himself favorably." Murphy

Rpt. at 47; see Transcript of Hearing at 108 (Dec. 1, 2011 p.m.). Overall, according to Dr.

Murphy, Mr. Hinckley's MMPI-2 scores place him within a "stable codetype" characterized by

certain hallmark attributes, including "a tendency to harbor chronic hostility coupled with

marked difficultly expressing negative feelings appropriately." Murphy Rpt. at 47. Individuals

with this profile pattern "tend to lack insight into the origins and consequences of their actions,

and do not necessarily view their behaviors as problematic when others may. They are

hypersensitive to rejection and criticism, and demand attention and approval from others." Id.;

see also Transcript of Hearing at 17-18 (Dec. 1, 2011 p.m.). Mr. Hinckley's score on the K scale

was marginally lower than in recent years, which, consistent with reports from other sources,

"may signal a reduction in Mr. Hinckley's overall level of defensiveness." Murphy's Rpt. at 47.

In addition to discussing the results of these general psychological tests, Dr.

Murphy also administered psychological tests and other assessment measures specifically related

to the risk of violence. She described the results of her administration of the Psychopathy

Checklist – Revised ("PCLR"), a psychological test that she described as the "gold standard" for

evaluating levels of psychopathy — that is, "a personality construct that describes individuals

who are cold, callous, impulsive, hostile, have very little empathy and have antisocial lifestyles,

a strong disregard for the rights of others." Transcript of Hearing at 22-23 (Dec. 1, 2011 p.m.).

According to Dr. Murphy, research strongly supports the validity of the PCLR in measuring

levels of psychopathy and has shown that psychopathy is "a robust predictor of violence." Id. at

25. Mr. Hinckley's score shows a "low level of psychopathy" not associated with high

recidivism rates, which in Dr. Murphy's view indicates a diminished risk of violence. Id. at

25-26.  Her scoring of Mr. Hinckley on the PCLR is identical to the score rated by Dr. Montalbano in 1999 and nearly identical to the score rated by another evaluator in 1997.  Id. at 26.  In other words, "multiple evaluators have used this tool to examine the construct of psychopathy in the context of Mr. Hinckley's violence risk, [and] multiple evaluators find him to be in the low level, low range of psychopathy."  Id. at 27.

Dr. Murphy also administered a risk assessment instrument called the Violence Risk Appraisal Guide ("VRAG"), which is "an actuarial measure used to estimate a probability of future violence within a specified time period post-release" that "consists of twelve variables that are mathematically weighted," after which "a statistical analysis is performed to calculate a risk estimate."  Transcript of Hearing at 20 (Dec. 1, 2011 p.m.); see Murphy Rpt. at 49.[7]  Mr. Hinckley's VRAG scores placed him at a "moderate level of risk for future violence over a seven to ten year period post-release."  Murphy Rpt. at 49.  Of individuals within his moderate risk category, "35% violently recidivated within seven years of release and 48% violently recidivated within ten years of release."  Id.  Dr. Murphy emphasized an important caveat in interpreting the significance of these numbers: empirically, an individual's risk of violence heightens between late adolescence and early adulthood, while it declines after age forty.  "Therefore, Mr. Hinckley's risk status is tempered by the fact that he was a young age at the time of the offense, and now is middle-aged."  Id.; see Transcript of Hearing at 22 (Dec. 1, 2011 p.m.) ("[S]o over

---

[7]       An "actuarial measure" is one that takes into account "static, historical risk factors that remain unchanged that are empirically rooted, meaning that they have been validated in the scientific literature to be predictive of future violence."  Transcript of Hearing at 21 (Dec. 1, 2011 p.m.).  In other words, an actuarial measure like the VRAG tracks and weights specific traits of the subject that research has demonstrated are correlated with future violence.  Human judgment plays a minimal role in rating these factors, many of which are historical factors that will never change for a particular individual — such as age at the time he or she committed an offense.  Id.  In Dr. Murphy's view, actuarial approaches "have a lot of strong scientific weight behind them.  And in the literature there's a lot of support for them."  Id.

time what the research shows is that individuals who have low levels of psychopathy and are older, usually over forty . . . show a reduction in aggression.").[8]

Finally, Dr. Murphy utilized the Historical, Clinical, and Risk Management Violence Risk Scheme ("HCR-20"), a risk assessment instrument which she finds more reliable. It is designed to guide an evaluation by focusing the inquiry on twenty risk factors that have been empirically linked to violence, the relative weight of which the evaluator sets based on the subject's individual case history.  See Transcript of Hearing at 29 (Dec. 1, 2011 p.m.); Murphy Rpt. at 50-53.[9]  Applying historical factors to Mr. Hinckley, for instance, Dr. Murphy's report emphasizes that Mr. Hinckley's particular history of violence — a virtual absence of any violence punctuated by one episode of severe violence — is empirically correlated with a low risk of recidivism.  Id. at 50.  Dr. Murphy's appraisal of clinical risk factors within the context of the HCR-20 emphasizes the continued lack of evidence of delusional thinking or depression rising to the threshold of an Axis I disorder, as well as improvement in Mr. Hinckley's ability to cope with disappointment and relationship difficulties, his disclosure and openness with family members and treatment providers, and his judgment and decision-making capacity.  Murphy Rpt. at 52-53.  While noting recurrent signs of narcissism, particularly in the form of a sense of entitlement, she regards this condition as "attenuated" and cautions that some level of

---

[8]     Mr. Hinckley's rebuttal expert witness, Dr. Paul Montalbano, also noted that in the original research underlying the VRAG a subject's ability to reoffend began when the subject was on an open ward, and "in this particular case that Mr. Hinckley has had an opportunity to re-offend for well over seven or ten years."  Transcript of Hearing at 94 (Feb. 7, 2012 p.m.).

[9]     The HCR-20, Dr. Murphy explained, is an example of a "structured professional judgment" tool that, like an actuarial measure, involves consideration of historical risk factors that research has linked to violence.  But unlike actuarial measures, the HCR-20 also incorporates "dynamic factors, factors that are changeable and can fluctuate over time," allowing consideration of the subject's current "clinical risk picture."  Transcript of Hearing at 21 (Dec. 1, 2011 p.m.).  Compared with actuarial tools, the HCR-20 more directly relies on the professional judgment of the evaluator in weighing the risk factors.

maladaptive thinking and behavior persists across the lifespan of an individual with a personality disorder, regardless of treatment efforts. "Nevertheless, Mr. Hinckley has remained behaviorally stable, showed acceptance of his circumstances and handled rejection and loss well." Id. at 52.

Overall, Dr. Murphy acknowledges that while Mr. Hinckley's depression is in full remission, depression is a risk factor for Mr. Hinckley, see Transcript of Hearing at 68 (Dec. 1, 2011 p.m.), and that Mr. Hinckley's risk of violence "would be heightened by a significant and dramatic increase in depression, particularly in tandem with psychotic symptoms." Murphy Rpt. at 51. And she advises that "increases in freedom should be broken down into subcomponents that are easily digestible for Mr. Hinckley in the form of realistic and attainable objectives." Id. at 54.

When questioned about Mr. Hinckley's risk factors, Dr. Murphy testified that deception has not been identified empirically as a risk factor for violence, but that it has been identified as an individualized risk factor for Mr. Hinckley. Transcript of Hearing at 19 (Dec. 6, 2011 p.m.). She agreed that isolation is also an individualized risk factor for Mr. Hinckley, and she acknowledged that he has maintained a rigidly consistent routine during his Williamsburg visits, with little branching out beyond familiar and largely solitary pursuits, resulting in a lack of social ties in that community. Transcript of Hearing at 80-85, 88-89, 96 (Dec. 1, 2011 p.m.). She acknowledged that Mr. Hinckley "tends to be an introverted individual" and has not established friendships in Williamsburg. Id. at 82. She testified, however, that Mr. Hinckley has complied with "the big therapeutic endeavors" and that he has followed through with "the critical activities that both treatment teams put a lot of weight on." Id. at 89. More time in Williamsburg, she opined, would lend itself to more opportunities to meet people and engage in social groups. Transcript of Hearing at 7 (Dec. 6, 2011 p.m.). Dr. Murphy testified to being "very confident" in her opinion, to a reasonable degree of psychological certainty, that

Mr. Hinckley will present a low risk of danger to himself or others under the conditional release terms proposed by the Hospital.  Transcript of Hearing at 14 (Dec. 1, 2011 p.m.).

### 2.  Witnesses from Mr. Hinckley's Williamsburg Treatment Team

Dr. Deborah Giorgi-Guarnieri, who took over as Mr. Hinckley's Williamsburg-area psychiatrist in 2010, testified about her treatment of Mr. Hinckley and her views on the Hospital's proposal.  Dr. Giorgi-Guarnieri, who is in private practice, possesses an extensive background in both general and forensic psychiatry and is board-certified in both areas.  Her past work has included positions as the director of forensic psychiatry for the Medical College of Virginia in Williamsburg, the consulting forensic psychiatrist for the Eastern District of Connecticut, and assistant professor of psychiatry and associate director of forensic psychiatry residency at Yale University Medical School.  Transcript of Hearing at 18-20 (Dec. 5, 2011 a.m.).  She treats patients with diagnoses similar to Mr. Hinckley's, and she is trained to recognize signs and symptoms of psychosis and major depression.  Id. at 55.

Dr. Giorgi-Guarnieri explained the distinction between her role as Mr. Hinckley's psychiatrist and the roles of Mr. Beffa as the individual therapist and case manager. Mr. Beffa provides Mr. Hinckley's therapy and, as case manager, has been responsible for the "leg work" necessary to set up and maintain Mr. Hinckley's support system in Williamsburg.  In contrast, Dr. Giorgi-Guarnieri primarily manages Mr. Hinckley's medications and monitors him during evaluation sessions "to make sure there are no symptoms reemerging, and to make sure that the risk factors that might cause symptoms to reemerge are not present."  Transcript of Hearing at 40 (Dec. 6, 2011 a.m.).  She is aided in the latter endeavor by her background in forensic psychiatry, where the psychiatrist has "an expanded role" that involves "constantly assessing risk."  Id. at 40.

Currently, Dr. Giorgi-Guarnieri meets with Mr. Hinckley at least once during each of his 10-day visits to Williamsburg, and, at the time of her testimony at the evidentiary hearing, she had seen him for about ten sessions. Transcript of Hearing at 27, 84 (Dec. 5, 2011 a.m.). During each session they discuss his progress at the Hospital and in the Williamsburg community, including discussions for screening purposes of individuals he has been talking with and his relationships with women. Id. at 29. Dr. Giorgi-Guarnieri also proceeds through a checklist of risk factors, using her observations of Mr. Hinckley and his responses to her questions to determine whether and to what degree any of these risk factors is present. Id. at 52-53; see Patient's Exhibit No. 16 (checklist of risk factors). In Dr. Giorgi-Guarnieri's view, weekly visits with Mr. Hinckley are enough to allow her to observe any signs of major depression or psychosis — "maybe more than enough." Transcript of Hearing at 55 (Dec. 5, 2011 a.m.). If she were to observe any such signs, she would report them to the treatment team and could, if necessary, have Mr. Hinckley admitted to a hospital until he could be transferred back to St. Elizabeths.

Dr. Giorgi-Guarnieri expressed the same understanding about the function and effect of Mr. Hinckley's medications as was conveyed by Dr. Jones. If Mr. Hinckley were to stop taking Zoloft, Dr. Giorgi-Guarnieri testified, he might experience "rebound anxiety or depression" that would be observable within days. With Risperdal, by contrast, symptoms of stopping the medication might not be apparent unless his psychosis were to reemerge. Transcript of Hearing at 58-59 (Dec. 5, 2011 a.m.).

During the time that she has worked with Mr. Hinckley, Dr. Giorgi-Guarnieri reports, his thoughts have remained "realistic" and "hopeful," and he has been resilient in the face of disappointments, such as his rejection from an art class in which he had hoped to participate. Transcript of Hearing at 54 (Dec. 5, 2011 a.m.). She has observed no signs of

decompensation or any symptoms of an Axis I disorder. Although she has observed "traits" of a narcissistic personality disorder, she reports that Mr. Hinckley "has worked very hard . . . not to let it affect the way he is functioning." Id. at 55.

Based on her experience working with Mr. Hinckley, Dr. Giorgi-Guarnieri believes that the gradual transition proposed by the Hospital from two conditional releases of 17 days to at least six releases of 24 days, followed by convalescent leave, is appropriate. Transcript of Hearing at 61 (Dec. 5, 2011 a.m.). She expects that increased time in Williamsburg will open up additional social opportunities for Mr. Hinckley — citing, for instance, community recreational group activities that meet weekly and that are not open to someone who is in town no more than one week a month. In her view, for Mr. Hinckley to truly establish himself in the community in Williamsburg, it is important to "flip" the time that he spends in Williamsburg vis-à-vis Washington, D.C., so that his job, therapy groups, and social events are all in Williamsburg, "and he just visits the hospital for a check in." Id. at 65. Dr. Giorgi-Guarnieri further expressed the view that it is "important to switch now," and she agreed that to facilitate his involvement in local activities his time in Williamsburg should be regularly scheduled. Id. at 64-66, 95.

Dr. Giorgi-Guarnieri does not believe that under the Hospital's proposal Mr. Hinckley will become clinically isolated. Transcript of Hearing at 63-64, 66-67 (Dec. 5, 2011 a.m.). She acknowledged that, other than with the possible exceptions of a neighbor and a coworker at Eastern State Hospital, Mr. Hinckley has not made any friends in Williamsburg, and she suggested that it would be difficult for him to make a friend not connected to his family or his work. Id. at 104. Dr. Giorgi-Guarnieri agreed that in the event that Mr. Hinckley's mother were to pass away before he had established strong community support, he might experience isolation and stress similar to that which he faced as a young man prior to his offense. But a key

difference, in her view, is that Mr. Hinckley had no psychiatric care at that time. Id. at 66-67. As someone familiar with the Williamsburg community, Dr. Giorgi-Guarnieri observed that it can be a difficult place for a single person to move to and become established; nevertheless, she believes that Williamsburg is the right place for Mr. Hinckley right now. Id. at 79-80.

The Court also heard testimony from Mr. Hinckley's case manager and individual therapist in Williamsburg, Mr. Carl Beffa, a clinical social worker in private practice. Transcript of Hearing at 5-6 (Dec. 5, 2011 p.m.). Mr. Beffa has treated Mr. Hinckley since 2007, and he meets with Mr. Hinckley twice during each visit to Williamsburg, once for therapy and once for case management, a role that includes assisting Mr. Hinckley in forming connections with the community and facilitating his socialization and vocational integration. Id. at 10-11, 25-26.

Like Dr. Giorgi-Guarnieri, Mr. Beffa testified that Mr. Hinckley has maintained a positive attitude during the course of his Williamsburg releases, has shown resilience in the face of disappointments, and has exhibited no signs of decompensation or any symptoms of an Axis I disorder. Transcript of Hearing at 24 (Dec. 5, 2011 p.m.). Mr. Beffa has observed "appropriate" mood changes on the part of Mr. Hinckley in response to sad events, such as the death of his father, but he has seen no evidence of distorted thinking. Id. at 25. He agrees that an important factor behind the resilience Mr. Hinckley has demonstrated is the support provided to him by a variety of therapists and clinicians at St. Elizabeths, but he also believes that the structure envisioned for Mr. Hinckley in Williamsburg will provide the necessary therapeutic support — though he acknowledged that some of this support, such as the encouragement of a supportive supervisor at his volunteer position, will not involve "the same in-depth quality" as what he receives at St. Elizabeths. Id. at 67-68, 69. Mr. Beffa shares Dr. Giorgi-Guarnieri's belief that Mr. Hinckley will not likely become clinically isolated in Williamsburg. Id. at 48.

Mr. Beffa supports the Hospital's proposal to increase the duration of Mr. Hinckley's visits. He envisions the 17-day visits as a transition period allowing Mr. Hinckley to prepare for the longer 24-day visits, while also serving as a "test" for those longer visits. Transcript of Hearing at 35 (Dec. 5, 2011 p.m.). Mr. Beffa recommends that the 17- and 24-day visits occur on a predictable monthly basis, to facilitate employment as well as participation in therapeutic groups, where it is important to have consistency to develop the therapeutic relationship. Id. at 35-36.

Mr. Beffa was questioned at length about the efforts Mr. Hinckley has made to integrate into the Williamsburg community and about his own attempts, as Mr. Hinckley's case manager, to facilitate the transition. He discussed Mr. Hinckley's volunteer work at the Eastern State Hospital library, reporting that Mr. Hinckley's supervisor has been extremely enthusiastic about his work. Transcript of Hearing at 29-30 (Dec. 5, 2011 p.m.). Mr. Beffa emphasized that in order for Mr. Hinckley to expand his social and vocational opportunities, he would need to be regularly available in Williamsburg for longer periods of time. Id. at 34. For instance, Mr. Beffa recounted discussions with the manager of a pet store who had expressed openness to hiring Mr. Hinckley for a part-time job. In order to apply, however, Mr. Hinckley would need to be in Williamsburg on a predictable schedule. So too with veterinary clinics that Mr. Beffa investigated. Id. at 33-34. Likewise, Mr. Beffa discussed local music groups, classes at a community college, and meetings organized by the National Alliance on Mental Illness that could present valuable opportunities for Mr. Hinckley — emphasizing that Mr. Hinckley would need longer periods of unaccompanied time in the community and the freedom to drive alone to these activities, in order to alleviate the burden of having his mother transport him. Id. at 48.

On cross examination, Mr. Beffa was pressed about Mr. Hinckley's failure thus far to make any substantial social connections in Williamsburg, and about whether this failure is

attributable more to a lack of initiative than a shortage of time spent in the community. Mr. Beffa acknowledged that Mr. Hinckley has not pursued a variety of suggestions made by Mr. Beffa to increase his socialization. Transcript of Hearing at 71-76 (Dec. 5, 2011 p.m.). For instance, Mr. Beffa suggested that Mr. Hinckley attend a men's breakfast at his mother's church, but Mr. Hinckley did not take the suggestion. Id. at 71-72. Mr. Beffa suggested that Mr. Hinckley, who enjoys painting landscapes, set up his materials and paint in one of several outdoor park locations that Mr. Beffa showed him, but this suggestion also went unheeded. Id. at 73-74. Although Mr. Hinckley made contact with a locally based musician from whom he was interested in taking guitar lessons, that musician subsequently moved away from the Williamsburg area, and when he later moved back Mr. Hinckley did not take Mr. Beffa's suggestion to reestablish contact with him. Id. at 26, 77, 79. In terms of vocational integration, Mr. Beffa testified that although Mr. Hinckley did pursue volunteer opportunities at Eastern State Hospital, he has not followed up on any of Mr. Beffa's other suggestions with respect to employment. Id. at 95. For instance, Mr. Beffa twice suggested to Mr. Hinckley that he introduce himself to the pet store manager who had expressed interest in hiring him, to no avail. Transcript of Hearing at 93 (Dec. 5, 2011 p.m.). Mr. Beffa could not think of a single activity that Mr. Hinckley had attempted since the last Court hearing to demonstrate his effort to integrate himself into the Williamsburg community. Id. at 77-78.

Mr. Beffa also admitted to experiencing difficulties securing a volunteer or paid position for Mr. Hinckley in Williamsburg, and acknowledged instances in which Mr. Hinckley was rejected from consideration for such positions based on his identity. Transcript of Hearing at 87-89 (Dec. 5, 2011 p.m.). He agreed that Mr. Hinckley has met resistance from some quarters of the Williamsburg community, and that he has been working at Eastern State Hospital because Mr. Beffa was unsuccessful in finding volunteer work elsewhere. Id. at 89, 92.

In addition to the discussion about his case management efforts, Mr. Beffa also came under scrutiny in his role as a therapist, specifically regarding his effectiveness in monitoring Mr. Hinckley's risk of dangerousness. Particular focus was paid by the government on whether Mr. Beffa's style of therapeutic interaction — largely driven by the patient's choice of which topics to discuss rather than probing questions from the therapist — truly keeps him apprised of Mr. Hinckley's thoughts and actions. For instance, Mr. Beffa was unaware, and surprised to learn, that in March of 2011 Mr. Hinckley indicated both to Dr. Murphy and to the treatment team that he was engaged to a "Ms. CB." Transcript of Hearing at 61-62 (Dec. 5, 2011 p.m.).[10] Even though he understands that relationships with women are a risk factor for Mr. Hinckley, id. at 63-64, Mr. Beffa never directly asked Mr. Hinckley whether he had an intimate relationship with Ms. CB, assuming that Mr. Hinckley would tell him "if he chose to." Id. at 65. In fact, Mr. Beffa learned this information from one of the government's experts, Dr. Patterson. Id. Mr. Beffa also was surprised to learn that Mr. Hinckley had told Dr. Giorgi-Guarnieri that his interest in a female employee at Eastern State Hospital was not strictly platonic. Id. at 63.

Mr. Beffa recognizes that issues with women have been identified as one of Mr. Hinckley's violence risk factors, and he admitted that it would be helpful to know whether Mr. Hinckley's relationship with a particular woman is romantic or not, vowing to ask about such issues in the future. Transcript of Hearing at 64 (Dec. 5, 2011 p.m.). He testified that he has viewed his role as a therapist, thus far, as "primarily to establish an ongoing supportive relationship, and not to be involved in in-depth issues. Because in the 45 minutes, it's not only discussing various women's relationships that he has been involved with, but also in terms of what else is happening in his life every day at the hospital." Id. at 63-64.

---

[10]     For privacy reasons, full names of Mr. Hinckley's female acquaintances are not included in this Opinion.

Mr. Beffa also was questioned about his role in independent monitoring of Mr. Hinckley's conduct in Williamsburg. Mr. Beffa acknowledged that, as Mr. Hinckley's case manager, it is important for him to know whether Mr. Hinckley is following the itineraries for his conditional release visits, but he also admitted that he does not always ask Mr. Hinckley if he is complying with the items on his itinerary, promising to do so in the future. Transcript of Hearing at 82-83 (Dec. 5, 2011 p.m.). Until it was reported by the Secret Service, Mr. Beffa was not aware that Mr. Hinckley deviated from his itineraries twice in 2011 by failing to attend a movie and instead visiting a nearby bookstore — nor that Mr. Hinckley later lied to St. Elizabeths staff and others about this. Id. at 81, 103. (These incidents are discussed below. See infra at 47, 51-52, 53-58, 85-88.) Mr. Beffa's testimony revealed that he depends entirely on Mr. Hinckley's self-reporting about where he has been and what he has been doing during his unsupervised free time in the community. Transcript of Hearing at 84, 114-15 (Dec. 5, 2011 p.m.).

### 3. Witnesses from the Hinckley Family

Mr. Hinckley's brother and sister, Scott Hinckley and Diane Sims, at least one of whom has visited Williamsburg during nearly all of Mr. Hinckley's conditional releases since the last Court hearing, testified that his mood has improved as a result of these visits and that the siblings have grown closer. Both reported that Mr. Hinckley is helpful around the family home, doing chores and housework such as preparing meals. Both testified that they have never witnessed any behavior during these visits indicating that Mr. Hinckley might be a danger to himself or others. Neither sibling has any reservations about Mr. Hinckley being given more unsupervised time in the Williamsburg community or the ability to drive unaccompanied. To the contrary, they stressed that it would be useful for him to be able to drive himself to his

therapeutic appointments and volunteer positions, and that expanded driving privileges would also increase his opportunities for activities that promote social integration. Nor do Mr. Hinckley's siblings have any concerns about their mother's ability to continue to serve as a custodian for Mr. Hinckley. The siblings emphasized that they could come to Williamsburg on short notice in the event of an emergency and that, should their mother pass away, the siblings could spend more time in Williamsburg to provide support for Mr. Hinckley and, with the assistance of his treatment providers, help him transition to a new living situation. Transcript of Hearing at 19-20, 28, 35-39, 57 (Dec. 6, 2011 a.m.) (Diane Sims); Transcript of Hearing at 28, 33-35 (Dec. 6, 2011 p.m.) (Scott Hinckley).

Diane Sims testified that despite certain rejections Mr. Hinckley has experienced in Williamsburg, such as not being allowed to participate in a social group and in an art class, she regards the community as welcoming and tolerant. She reported that the family is treated well when they appear in public at restaurants or stores, and that she has never observed any incidents of anyone bothering Mr. Hinckley. She feels that Mr. Hinckley already is integrated in Williamsburg "to a certain extent": he is happy working at Eastern State Hospital; he is familiar and comfortable with the town; and he has a high degree of respect for Mr. Beffa and Dr. Giorgi-Guarnieri. Ms. Sims noted that her brother's current restrictions, which require his mother to accompany him for much of his time in public, make it difficult for him to socialize, though she acknowledged he is free to do things like go to the gym or take a golf lesson within his mother's subdivision but has chosen not to do so. Transcript of Hearing at 41-42, 56-57 (Dec. 6, 2011 a.m.).

Scott Hinckley testified that Mr. Hinckley is enthusiastic about his work at Eastern State Hospital and the positive feedback that he has received. He feels that for Mr. Hinckley socialization comes more easily through interactions in the workplace, outside of

which Mr. Hinckley is generally slow to pick up friends. Based on Mr. Hinckley's experiences in Williamsburg, including the support he receives from his local treatment providers and the satisfaction he receives from his volunteer work, Scott Hinckley believes that at this point in time Williamsburg is the best place for his brother to be. Transcript of Hearing at 37-39 (Dec. 6, 2011 p.m.). Scott Hinckley also indicated that Mr. Hinckley has never demonstrated any proclivity toward or interest in violence. He did acknowledge, however, that Mr. Hinckley "does not volunteer information" and that he could be doing more to integrate himself into the Williamsburg community. Id. at 42, 46.

### B. Witnesses for the Government

### 1. The Government's Expert Witnesses

The government's two expert witnesses, Dr. Raymond Patterson and Dr. Robert Phillips, were in agreement with Mr. Hinckley's treatment providers about his diagnoses, and they both acknowledged that his Axis I disorders —major depressive disorder and psychotic disorder not otherwise specified — have long been in full remission, with no signs of psychosis or major clinical depression for many years.[11]

The concerns about the Hospital's proposal expressed by Dr. Patterson and Dr. Phillips fall into five general categories: (1) Mr. Hinckley may not exhibit signs of underlying mental or emotional disturbance because of his secretive nature and his narcissistic tendencies, and so the outward indications of his present stability must be viewed with caution;

---

[11]     At the time of the original evidentiary hearing, Dr. Phillips diagnosed Mr. Hinckley's major depressive disorder as "mild," rather than in full remission, although he acknowledged on cross examination that Mr. Hinckley did not meet the criteria for that diagnosis under the DSM-IV but only under a proposed change (one ultimately never adopted) for the soon-to-be-issued DSM-V. By the time of the supplemental evidentiary hearing, Dr. Phillips had changed this diagnosis back to "in full remission," consistent with that of the other experts and his own testimony at prior hearings in this case.

(2) Mr. Hinckley's continued deceptiveness calls into question whether his risk of dangerousness can be adequately managed by any proposal that relies on his own honesty in self-reporting about his conduct and his intentions; (3) Mr. Hinckley has not used his Phase IV visits to meaningfully integrate himself into the Williamsburg community, calling into question why increasing his time in that community is appropriate and whether it is wise to have him spend much of each month in a place where he lacks social connections; (4) the Hospital's proposal lacks the structure and oversight necessary to ensure that Mr. Hinckley will not become isolated or clinically depressed, while also failing to provide for sufficient monitoring of his conduct; and (5) Mr. Hinckley continues to exhibit poor judgment and troubling tendencies in his relationships with women, making this aspect of his life a potentially destabilizing influence, a risk factor for decompensating.

Dr. Raymond Patterson, who has testified at numerous prior hearings in this case, was permitted to offer expert testimony on the diagnosis and treatment of mental illness and on risk management evaluations. He agrees with the Hospital's diagnosis of Mr. Hinckley and acknowledges the lack of any overt indications of dangerousness on his part. Nevertheless, Dr. Patterson offered a markedly different perspective on the success of Mr. Hinckley's current visits to Williamsburg and the wisdom of the Hospital's plan for an expansion of his privileges.

In Dr. Patterson's view, Mr. Hinckley's current regime of visits to Williamsburg has not significantly advanced its purpose of fostering meaningful integration into that community. As Dr. Patterson sees it, Mr. Hinckley has done little or nothing to build ties to the community beyond volunteering at Eastern State Hospital and attending his sessions with Mr. Beffa and Dr. Giorgi-Guarnieri. Transcript of Hearing at 47-48 (Jan. 25, 2012 a.m.). Dr. Patterson rejects the notion that Mr. Hinckley's lack of progress toward integration is attributable to the short duration of his visits to Williamsburg and the restrictions on his activities during

those visits.  Instead, Dr. Patterson blames the situation on three factors:  (1) an absence of aggressive case management by Mr. Beffa, particularly a failure to arrange activities for Mr. Hinckley and push him to participate in those activities; (2) resistance from the Williamsburg community, which has at times rejected Mr. Hinckley from social groups, vocational opportunities, and educational pursuits; and (3) a lack of initiative from Mr. Hinckley himself, including a failure to make productive use of the freedom that he already enjoys by engaging in activities that might promote his integration into the community.  Accordingly, Dr. Patterson does not agree that the remedy for Mr. Hinckley's lack of integration is a further expansion of the time he spends in Williamsburg and the freedom he is afforded during his visits.  Id. at 39, 48; Transcript of Hearing at 41-42 (Jan. 24, 2012 a.m.); Patterson Rpt. at 75.

Dr. Patterson also disagrees with the assessment that Mr. Hinckley will represent a low risk of dangerousness under the terms of the Hospital's plan.  That determination, as Dr. Patterson sees it, simply cannot be made without more information about how Mr. Hinckley's time will be spent in Williamsburg and how he responds to those conditions.  The proper clinical endeavor, Dr. Patterson emphasized, is not one of evaluating Mr. Hinckley's dangerousness in isolation, but of managing his risk under specific conditions, which must be observed over time.  Transcript of Hearing at 50 (Jan. 25, 2012 p.m.).

Although Dr. Patterson agrees that Mr. Hinckley's Axis I disorders have long been in remission, with an important caveat discussed below, he credits this success primarily to Mr. Hinckley's many years at St. Elizabeths, where he has received "about the best psychiatric care there is to offer in the public mental health system in this country."  Transcript of Hearing at 54 (Jan. 25, 2012 a.m.); see Transcript of Hearing at 84, 88, 95 (Jan. 24, 2012 a.m.).  Of concern to Dr. Patterson is the absence of a similarly comprehensive treatment regime and support system in Williamsburg.  In light of Mr. Hinckley's case history, there are a number of risk

factors about which Dr. Patterson is concerned: Mr. Hinckley's deceptiveness, his sense of entitlement, the fact that he minimizes his own responsibility for his actions, and his relationships with women. Transcript of Hearing at 3-8 (Jan. 25, 2012 p.m.). The risk factor that Dr. Patterson is most concerned about in light of Mr. Hinckley's lack of integration into the Williamsburg community is that Mr. Hinckley may become isolated, which could lead to depression and potentially a resurgence of his psychotic symptoms. Transcript of Hearing at 41-42 (Jan. 25, 2012 a.m.). This risk would be magnified if Mr. Hinckley's mother were to pass away or otherwise become unavailable during the period of his proposed expanded visits. Patterson Rpt. at 76.

In Dr. Patterson's view, the Hospital's proposal for managing these risks does not pay adequate heed to key traits of Mr. Hinckley's personality that could mask the signs of any decompensation. Particularly significant is Mr. Hinckley's guardedness — his tendency to withhold information about his thoughts and feelings unless prodded with direct questions from his treatment providers. The persistence of this trait undermines Dr. Patterson's confidence that any deterioration on Mr. Hinckley's part would be observed by his treatment providers. Transcript of Hearing at 60-61 (Jan. 25, 2012 a.m.). Citing Mr. Hinckley's suicide attempt in the early 1980s, which took his Hospital caregivers completely by surprise, Dr. Patterson observed that his own experience with Mr. Hinckley belies the assumption that Mr. Hinckley will necessarily exhibit outward signs of deterioration. Id. at 61. Also significant to Dr. Patterson is Mr. Hinckley's pattern of "deflecting" and "minimizing his own responsibilities for his own behavior," a trait related to his narcissism and "sense of entitlement." Transcript of Hearing at 8 (Jan. 25, 2012 p.m.). According to Dr. Patterson, this ongoing tendency raises concern about Mr. Hinckley's willingness to strictly follow rules that are part of his conditional release terms, an essential requirement of any successful risk management plan.

Most troubling, in Dr. Patterson's view, is Mr. Hinckley's demonstrated willingness to deceive his treatment providers and the success with which he is able to do so. This behavior was on display most recently when Mr. Hinckley told multiple interviewers, including Dr. Patterson, that on two occasions he had gone to a movie — consistent with what was in his itineraries — when in fact on each occasion he had skipped the movie and spent his time at a nearby bookstore. Transcript of Hearing at 21-22 (Jan. 25, 2012 a.m.). Even more disturbing to Dr. Patterson is that in lying to one treatment provider about this incident, Kevin Shamblee, Mr. Hinckley went so far as to "embellish" the lie by rating the movies as good and recommending that Mr. Shamblee see them. Id. at 22-25 (Mr. Hinckley told same lie to Dr. Giorgi-Guarnieri, Dr. Patterson, and Dr. Phillips, who also did not perceive that he was being untruthful); see also supra at 28, 41. Dr. Patterson testified that unlike some people, Mr. Hinckley is adept at telling convincing untruths, and so "[h]e tells people things and is convincing when he tells them. . . . [Y]ou don't know when he is lying." Transcript of Hearing at 25 (Jan. 25, 2012 a.m.). To Dr. Patterson, this state of affairs jeopardizes the viability of any risk management plan that relies on Mr. Hinckley's own honest reporting of his whereabouts and conduct.

In light of the foregoing considerations, Dr. Patterson's biggest objection to the Hospital's plan relates to the proposed expansion of Mr. Hinckley's unsupervised free time in the community and the absence of independent monitoring of his conduct during that time. Given Mr. Hinckley's lack of forthrightness and his ability to deceive his interviewers, Dr. Patterson is troubled by the extent to which the plan relies on accurate self-reporting of his activities by Mr. Hinckley. See Patterson Rpt. at 74. He is further troubled that while the Hospital's proposal significantly expands the amount of unsupervised free time available to Mr. Hinckley, it simultaneously diminishes the ability to monitor his behavior — by proposing to replace

detailed, pre-approved itineraries with a list or menu of activities from which Mr. Hinckley is free to choose on any given day and by granting him unaccompanied driving privileges. In fact, Dr. Patterson recommends eliminating unaccompanied time entirely or restricting it to within his mother's neighborhood. Because Mr. Hinckley "has not used the time he has responsibly," increasing these hours would simply be adding "more of the same." Transcript of Hearing at 45, 48 (Jan. 25, 2012 p.m.). Dr. Patterson also recommends against permitting Mr. Hinckley to drive unaccompanied. Id. at 46.

Dr. Patterson also expressed significant concerns, as he has in the past, about Mr. Beffa's performance as an individual therapist and case manager for Mr. Hinckley. As noted, Dr. Patterson believes that Mr. Beffa has not done enough to facilitate meaningful integration of Mr. Hinckley into the community. Furthermore, Mr. Hinckley's guardedness makes it crucial that his individual therapist take an aggressive and probing approach to their sessions — which Dr. Patterson believes that Mr. Beffa fails to do. Transcript of Hearing at 43 (Jan. 25, 2012 p.m.). Although Dr. Patterson offers high praise for Dr. Giorgi-Guarnieri's skill as a psychiatrist, he notes that "her role in this process would be a secondary one," as compared with Mr. Beffa, and that under the Hospital's plan the frequency of her contact with Mr. Hinckley would be reduced to one session per month (assuming, that is, that the Court authorizes visits of 24 days per month). In Dr. Patterson's view, weekly visits would be sufficient for Dr. Giorgi-Guarnieri to observe signs of decompensation in Mr. Hinckley, but a shift to monthly visits "would make it more difficult." Transcript of Hearing at 34 (Jan. 25, 2012 a.m.).

Dr. Robert Phillips, who also has testified in several prior hearings in this case, was permitted to offer expert testimony on the diagnosis and treatment of mental disease, on the assessment of future risk of dangerousness by insanity acquittees and those that pose a risk to the protectees of the Secret Service, and on the management of risk posed by insanity acquittees.

Dr. Phillips does not support the Hospital's proposal, which in his opinion does not adequately manage Mr. Hinckley's risk of dangerousness to himself or others. Transcript of Hearing 83-84 (Jan 30, 2012 a.m.). Compared with previous (e) letters submitted by the Hospital, writes Dr. Phillips, "this proposal is far broader than prior submissions, yet in my clinical opinion the detail and specificity presented is customarily inadequate." Phillips Rpt. at 76.

Dr. Phillips drew attention to possible signs of resurgent depression in Mr. Hinckley, including weight gain and changes in demeanor. Noting that in recent years Mr. Hinckley has articulated feelings of depression to treatment providers, he explained that in his view, part of the reason that Mr. Hinckley remains on the antidepressant medication Zoloft is that underlying symptoms of depression are being responsive to that treatment. Transcript of Hearing at 6-8 (Jan. 31, 2012). While Dr. Phillips does not believe these indications should preclude Mr. Hinckley from moving forward toward expanded freedom, he emphasized that they need to be considered when evaluating the nature and breadth of the treatment that Mr. Hinckley will receive in Williamsburg. Such concerns are particularly warranted, he testified, in light of the emotional stress that will accompany Mr. Hinckley's proposed transition to that community — including new challenges in a different environment and the loss of established relationships in Washington, D.C. — and in view of the fact that Mr. Hinckley has not yet integrated into the Williamsburg community and has been rebuffed from participating in certain social, educational, and vocational endeavors there. Id. at 7, 11. These concerns are compounded by Dr. Phillips' assessment that Mr. Hinckley is not always "honest with his clinicians when they query him about these things." Id. at 6.

In Dr. Phillips' view, the Hospital's proposal does not set forth a framework of therapeutic support that is comprehensive enough to address Mr. Hinckley's risks. He is particularly concerned that the Hospital's proposal contemplates much less therapy and contact

with treatment providers than Mr. Hinckley currently experiences.  Transcript of Hearing at 61 (Jan. 30, 2012 p.m.); Transcript of Hearing at 23, 59 (Jan. 31, 2012).  He also echoed Dr. Patterson's concerns about Mr. Beffa's performance as case manager and individual therapist, while similarly indicating greater comfort with Dr. Giorgi-Guarnieri, whom he recommends Mr. Hinckley see weekly.

The lack of a defined therapeutic structure is especially problematic to Dr. Phillips because it fails to adequately manage Mr. Hinckley's risk of isolation, a risk that is heightened by Mr. Hinckley's failure thus far to establish social connections in Williamsburg. Dr. Phillips acknowledges the success Mr. Hinckley has achieved in his volunteer position and the value of the connections he has reestablished with his family members.  Yet he maintains that Mr. Hinckley has not built meaningful ties to the Williamsburg community, or even attempted to do so, as envisioned by his present terms of conditional release:

> If we look at his conditional release outings up to now . . . I'm hard pressed to see that he is engaged in activities that have stretched the envelope, which is precisely what the hospital has indicated they want him to do . . . and was the rationale for expanding his visits to ten days.  He has not done anything to increase his socialization, which is the remedy for isolation.  He basically goes to work for his two hours, two days a week, and he comes back and takes his walks in the community.

Transcript of Hearing at 63-64 (Jan. 30, 2012 p.m.).  A failure to develop social bonds is of special concern because in the past isolation has been a significant contributor to his dysfunction and a "gateway" for Mr. Hinckley to a state of "dysphoria, depression, and in an extreme psychosis."  Id. at 62-63.[12]  Mr. Hinckley's resistance to meeting people and to other endeavors that might expand his social world therefore is troubling.  Id. at 53.

---

[12]  This same lack of initiative was noted by Dr. Phillips and Dr. Patterson at the hearing leading up to this Court's expansion of privileges to ten days in Williamsburg in 2009. See Hinckley VI, 625 F. Supp. 2d at 11-12, 18, 20.

Dr. Phillips disagrees that Mr. Hinckley's Phase IV visits can be viewed as successful merely because he has developed comfort being in public unaccompanied, adhering to a work schedule, and attending his treatment appointments. Transcript of Hearing at 78-88 (Jan. 30, 2012 p.m.). While acknowledging the reasonableness of some disagreement about how much Mr. Hinckley could have accomplished given the restrictions of his Phase IV visits, he believes that more could have been achieved. Id.

Dr. Phillips therefore does not support expanding the length of Mr. Hinckley's visits at this time. Instead, he recommends that "many of the goals outlined by the 501(e) proposal can and should be tested and accomplished within the existing time framework of the ten-day visits currently authorized by the Court before any expansion of privilege is entertained." Phillips Rpt. at 76. For similar reasons, Dr. Phillips does not endorse any increases in Mr. Hinckley's unsupervised free time at this point, because Mr. Hinckley has not demonstrated that he is using it to combat his isolation — as his treatment providers have encouraged him to do and as was contemplated by the existing plan. Transcript of Hearing at 68 (Jan. 31, 2012). Only if Mr. Hinckley shows that he is using his time in the community to work toward this goal should he be given increased time, in Dr. Phillips' opinion. Id. at 69.

Dr. Phillips also believes that caution is warranted in expanding Mr. Hinckley's unsupervised free time because of his narcissistic personality disorder, which in Dr. Phillips' view manifests itself not only in a sense of entitlement and need for attention but also in an "I'm going to do what I want to do" attitude that is not conducive to observing rules. Transcript of Hearing at 19 (Jan. 31, 2012). Disagreeing with the Hospital's witnesses, Dr. Phillips opined that this trait heightens Mr. Hinckley's risk of danger to himself or others, because it may lead him to disregard expectations that have been put in place to minimize his risk. Id. at 21. As an example, Dr. Phillips cited Mr. Hinckley's deceit about not strictly following his itineraries on

two occasions by visiting a bookstore instead of attending movies. Significant to Dr. Phillips is not only that Mr. Hinckley lied to numerous people about this, but also that his response upon being confronted with these lies was, as Dr. Phillips characterized it, a defensive attempt to deflect blame from his own misdeeds by accusing others of "nitpicking." Transcript of Hearing at 28 (Jan. 30, 2012 p.m.). As Dr. Phillips explains in his report: "There is a reason to expect strict adherence to the conditions of release from insanity acquittees who are attempting community transition. Among those reasons is to allow for an opportunity to demonstrate the ability to perform appropriately and the capacity to comply with predefined mutually identified expectations." Phillips Rpt. at 77.

Mr. Hinckley's prevarication about his whereabouts on two occasions highlights another area in which Dr. Phillips believes that the Hospital's proposal falls short: the management of Mr. Hinckley's deception. The Hospital's plan, in Dr. Phillips' view, relies excessively on Mr. Hinckley's self-reports and the corroborative reports of his family members. Transcript of Hearing at 61-62 (Jan. 31, 2012). Based in part on the two incidents involving the movies, Dr. Phillips testified that "there needs to be some other mechanism put in place other than self-report to determine compliance with his itineraries." Id. at 67. As an example, Dr. Phillips suggested requiring random spot checks by Mr. Hinckley's case manager to ensure that Mr. Hinckley is where he is supposed to be. Id. Without clinical structures in place to adequately monitor Mr. Hinckley's unsupervised endeavors, and "because of his demonstrated lack of candor, misrepresentation of the truth, and cavalier attitude as to the significance of his actions," Dr. Phillips "do[es] not believe that adequate risk management oversight currently exists to support a further expansion of Mr. Hinckley's privileges as requested at this time." Phillips Rpt. at 76-77.

By contrast, Dr. Phillips does support the Hospital's recommendation to permit Mr. Hinckley to drive the family car unaccompanied, but only upon review and confirmation that Mr. Hinckley has developed a record of responsible driving thus far and contingent upon an incremental expansion of his community activities.  Phillips Rpt. at 77.  And Dr. Phillips acknowledged that in the dozen years during which Mr. Hinckley has been participating in conditional releases, he has never engaged in any violent activity nor done anything on any release that would indicate that he has been a danger to himself or others.  Transcript of Hearing at 106 (Jan. 31, 2012).

## 2.  The Government's Other Witnesses

### a.  Secret Service Agents

During the course of 2011, special agents from the United States Secret Service engaged in surveillance of Mr. Hinckley while he made use of his unsupervised free time in Williamsburg.  Two of the agency's surveillance reports, which describe Mr. Hinckley's trips to a bookstore that he frequents, note instances in which Mr. Hinckley was observed briefly standing in front of a bookcase containing books on President Reagan and presidential assassinations, among other topics, though the surveillance reports indicate that Mr. Hinckley did not touch, pick up or read any of these books.  The government brought these reports to the attention of the Court during the evidentiary hearing and cited them as troubling evidence of Mr. Hinckley's continued interests.  Two of the Secret Service agents who observed Mr. Hinckley and prepared these surveillance reports were called to testify about the two episodes.[13]

---

[13]     One of these incidents occurred on July 24, 2011, the same day Mr. Hinckley failed to attend a movie as contemplated by his itinerary, and later lied about it to Mr. Shamblee and others.  The other incident occurred on October 16, 2011, when Mr. Hinckley did attend a movie, consistent with his itinerary, but also visited the Barnes & Noble bookstore.

Special Agent Anthony Bordeaux testified about surveillance that he conducted of Mr. Hinckley on July 24, 2011. During the surveillance, Agent Bordeaux took contemporaneous notes on his Blackberry device, then later compiled a surveillance report based on these notes. Transcript of Hearing at 113 (Jan. 23, 2012 p.m.); see Patient's Ex. 25. On that day, Agent Bordeaux, who had conducted surveillance of Mr. Hinckley many times, established surveillance with another agent at the shopping center where, according to Mr. Hinckley's itinerary for that day, he would be arriving to attend a movie. Transcript of Hearing at 70-71, 86 (Jan. 23, 2012 p.m.). The agents first observed Mr. Hinckley around 1:30 p.m., approaching the movie theater. Mr. Hinckley "walked up to the ticket window and spoke with an employee at the movie theater but did not buy a ticket at that time." Id. at 73. Agent Bordeaux could not hear the conversation and does not know what was discussed. Id. at 97. Mr. Hinckley then left through the front of the movie theater and walked to the bookstore in the same shopping center, with the agents following him inside. Id. at 73. Agent Bordeaux's surveillance report describes the ensuing events as follows:

> Inside the bookstore the subject was observed stopping and looking at bookshelves in several different sections to include Bargain Books about American History, True Crime, American History [sic]. In these areas the subject was not observed picking up and looking at any specific books. One item of note is the subject stopped for a time and looked at the shelves in the American History area that contain several books about President Reagan and his attempted assassination.

Patient's Ex. 9 at 1; see Transcript of Hearing at 99-100 (Jan. 23, 2012 p.m.).

At the evidentiary hearing, Agent Bordeaux elaborated on this portion of the surveillance report. As he explained, it was a "large bookstore," and Mr. Hinckley "perused different aisles in the bookstore, just walking, as anyone would, browsing at books." Transcript of Hearing at 74 (Jan. 23, 2012 p.m.). "There came a time when Mr. Hinckley stopped at one

particular section in the American history area at one particular bookcase and dwelled there longer than he had at any other time when he was perusing the shelves. And it drew my attention . . . to him." Id. at 74. At the time that Mr. Hinckley stood in front of this bookcase, Agent Bordeaux was standing about ten to twelve feet away, behind Mr. Hinckley and to his left, so that he was "looking at his back and a little bit of the left side of his body." Id. at 76. The agent did not make note of exactly how long Mr. Hinckley stood in front of the bookcase. Id. at 103. There were many other books on the shelves besides the books on President Reagan and assassinations, and Agent Bordeaux could not tell if Mr. Hinckley was focused on any book in particular. Id. at 77-78, 100-101, 123. As indicated in the surveillance report, Mr. Hinckley did not pick up any books from the shelves or touch any books. Id. at 77, 99; see id. at 100 ("I said he looked at shelves. I didn't say he looked at several books.").

As soon as Mr. Hinckley left the vicinity of the bookcase, and while the other agent kept Mr. Hinckley under surveillance, Agent Bordeaux walked to the area where Mr. Hinckley had been standing and looked at the bookcase. Transcript of Hearing at 75-77 (Jan. 23, 2012 p.m.). He then used a camera phone "to take a quick video of books that were on the bookshelf that I had seen him standing in front of." Id. at 78. Government's Exhibit 5B, a still photo captured from this video, shows the middle three shelves on the bookcase. While these were the shelves that Mr. Hinckley seemed to focus on, according to Agent Bordeaux, the agent also testified that another reason he chose to create a still shot of these particular shelves was that "obviously, there were books that I felt applied directly to what we were there for." Id. at 83, 121-22.

After Mr. Hinckley left the bookcase, he went to other sections in the store, and lingered for 30 more minutes, looking at other book sections as wells as music CDs and fitness DVDs, according to Agent Bordeaux. Transcript of Hearing at 79, 106 (Jan. 23, 2012 p.m.). As

the agent noted in his surveillance report: "During his time in the bookstore, the subject browsed the magazine section and was observed looking at various magazines referencing art and literature. . . .   The subject was also observed looking at rock music CD's and one book in particular, *The British Invasion: The Music, the Times, the Era*, by Barry Miles."  Patient's Ex. 9 at 1; <u>see</u> <u>also</u> Transcript of Hearing at 107 (Jan. 23, 2012 p.m.).  Mr. Hinckley also purchased a greeting card.  Transcript of Hearing at 80 (Jan. 23, 2012 p.m.).  He then left the bookstore, "walked towards the movie theater, sat on a bench which is in the courtyard area out in front of the movie theater, and appeared to fill out the greeting card."  <u>Id</u>. at 80.  After that, he "walked into the lobby of the movie theater and waited inside of the glass doors. And his mother arrived shortly thereafter, and he left in her vehicle."  <u>Id</u>. at 81.  Mr. Hinckley's mother arrived at 2:30 p.m., just over an hour after the agents first observed Mr. Hinckley.  <u>Id</u>.  Agent Bordeaux acknowledged that the weather was hot that day — it was late July — and affirmed that the movie theater lobby was air conditioned, agreeing with Mr. Hinckley's counsel that it would make sense to wait inside the air-conditioned lobby rather than outside in the heat.  <u>Id</u>. at 111.

Special Agent Jason Clickner testified about surveillance that he conducted of Mr. Hinckley on October 16, 2011.  Agent Clickner similarly took contemporaneous notes that he later incorporated into a surveillance memorandum.  Transcript of Hearing at 25 (Jan. 23, 2012 a.m.).  On that day in October, Mr. Hinckley was scheduled to attend a movie at 1:30 p.m. in the same shopping center, but Agent Clickner and his partner arrived early to familiarize themselves with the area and surrounding buildings.  <u>Id</u>. at 10, 32.  Just after 1:00 p.m., Agent Clickner was inside the nearby bookstore when he observed Mr. Hinckley enter the store and walk directly into his line of sight.  <u>Id</u>. at 14, 32-33.  The agent noted in his surveillance report:

> The Subject was observed near the section of "world history" and "new history."  When the Subject approached the area designated as "new history," he appeared to be focused on the center row of

books of the five row book shelf. The Subject appeared to be momentarily fixated on the middle of the third row of books.

Patient's Ex. 22 at 1; <u>see</u> Transcript of Hearing at 14 (Jan. 23, 2012 a.m.). Agent Clickner was about ten feet away from Mr. Hinckley at the time, looking at his right side profile. Transcript of Hearing at 15 (Jan. 23, 2012 a.m.). Mr. Hinckley did not touch or pick up any of the books. <u>Id</u>. at 15, 48, 57.

Agent Clickner testified that although Mr. Hinckley clearly was looking toward the center of the bookcase, he could not see whether Mr. Hinckley was focused on any particular book, or even a particular shelf. Transcript of Hearing at 15-16, 47-48, 58 (Jan. 23, 2012 a.m.). In the agent's estimation, Mr. Hinckley stood in front of the bookcase for 15 to 20 seconds, before continuing down the aisle of books. At the time, Agent Clickner did not know what was on the bookshelves that he observed Mr. Hinckley standing in front of, but the agent testified that "the manner in which he seemed to be locked on that center shelf . . . grabbed my attention," prompting him to later investigate what was on those bookshelves. <u>Id</u>. at 16, 20, 46.

Mr. Hinckley spent 30 more minutes in the bookstore, including some time spent "looking at a display of Beatles books." Patient's Ex. 22 at 1. He ultimately purchased "a book about Elvis Presley and a book about Bob Dylan." <u>Id</u>.; Transcript of Hearing at 17 (Jan. 23, 2012 a.m.). After leaving the bookstore, Mr. Hinckley went to the movie theater, purchased a ticket, and went inside to see the movie *Moneyball*. Transcript of Hearing at 58-59 (Jan. 23, 2012 a.m.).

After a few minutes passed, Agent Clickner returned to the bookstore, wrote down the titles of the books on the middle shelf, and used a camera phone to photograph the books that were on the bookcase, because he was "somewhat concerned based on the material" of the books on the middle shelf. Transcript of Hearing at 17-18 (Jan. 23, 2012 a.m.); <u>see</u>

Patient's Ex. 22. Government Exhibits 7A and 7B are two of the photographs that he took, showing the middle three shelves on the bookcase. Transcript of Hearing at 21, 62 (Jan. 23, 2012 a.m.). Among the books on the middle shelf was one about the assassination of President McKinley in 1901 and one about the assassination of President Kennedy. Id. at 48-58. The agent acknowledged that many of the books, even on the middle bookshelf, presented no cause for concern. Id. at 48.

The potential significance of the observations made by Agent Bordeaux and Agent Clickner is discussed later in this Opinion. See infra at 93-96.

### b. Bookstore Employee

The government also called as a witness an employee of the bookstore that Mr. Hinckley patronizes, Mr. Richard Rolfes, who testified about a 2011 encounter with a customer whom Rolfes later identified as Mr. Hinckley.

Mr. Rolfes began working as a customer service representative at a Barnes & Noble bookstore in Williamsburg in early June 2011, shortly after his graduation from college. Transcript of Hearing at 5 (Jan. 23, 2012 p.m.). While he was at work in early December 2011 — a few days after the opening statements in the evidentiary hearing in this case — a manager related to him that she had heard on the radio that John Hinckley shopped at their bookstore. Mr. Rolfes' manager also told him that the news report "said that [Mr. Hinckley] had been looking for books on the subject of Presidential assassinations." Id. at 9, 33, 43.[14] Upon hearing this,

---

[14] This inaccurate radio report, also widely reported in newspapers in the Williamsburg area and elsewhere, apparently was based on the inaccurate statements made by the government in its opening statement in this case on November 30, 2011, statements that were not supported by the Secret Service agents' reports or their subsequent testimony discussed above. See Transcript of Hearing at 56-66 (Dec. 1, 2011 a.m.) (discussion of basis for government's opening statement); Transcript of Hearing at 3-13 (Dec. 5, 2011 a.m.) (same). As the Court noted after first seeing Patient's Exhibit 9, Agent Bordeaux's report of the July 24,

Mr. Rolfes testified, he immediately recalled a conversation he had several months earlier with a customer who had asked about books on presidential assassinations. That conversation, for reasons described below, had "stuck out" in Mr. Rolfes' mind, and he wondered if Mr. Hinckley had been the customer whom he had assisted. Mr. Rolfes testified: "So I went on the computer, went to the Wikipedia page and saw a picture and was like, I think that was the guy." Id. at 9. The photograph he saw was from Mr. Hinckley's 1981 arrest. Id. at 34-35. Mr. Rolfes then told his manager about the encounter and his belief that the customer was Mr. Hinckley. Id. at 12.

About two days later, Mr. Rolfes was approached at work by a manager who told him that two agents from the Secret Service wished to speak with him. The agents showed him two photographs of Mr. Hinckley and asked if he had ever helped the person in the photographs. Mr. Rolfes told them that he had. After this meeting, a government prosecutor and another Secret Service agent contacted Mr. Rolfes by telephone, and in short order he was subpoenaed by the government to appear to testify at the evidentiary hearing before this Court. Transcript of Hearing at 6, 13-14 (Jan. 23, 2012 p.m.).

Mr. Rolfes testified that sometime in late summer or early fall, he saw a customer in the store's history section and offered to provide assistance. The customer asked him "if there were any new books about the Kennedy assassination." Transcript of Hearing at 6-7 (Jan. 23, 2012 p.m.). The two men were standing next to a bookshelf containing just such a book, *Betrayal in Dallas*, to which Mr. Rolfes directed the customer's attention. According to Mr. Rolfes, the customer then "asked about books generally on the topic of Presidential assassinations." Id. at 7. Mr. Rolfes explained that any such books would be in the same section

---

2011 incident "says nothing about McKinley, it says nothing about Kennedy, and it doesn't even say that he looked at books about President Reagan and his attempted assassination. It says only that he looked at shelves in the American History area and that the shelves in the American History area contain books about President Reagan and his attempted assassination." Transcript of Hearing at 9 (Dec. 5, 2011 a.m.).

where they were standing, and that he could help locate anything specific that the customer had in mind.  The customer asked no further questions, and the conversation ended.  Mr. Rolfes then proceeded to a different part of the store and did not see the customer again.  Id. at 8.

When asked why this particular conversation stood out in his memory, even though it occurred several months before he heard about John Hinckley, Mr. Rolfes responded that the topic of presidential assassinations was a "taboo subject" about which it was rare to receive questions.  Transcript of Hearing at 18-19 (Jan. 23, 2012 p.m.); see id. at 28.  "Usually when people ask for that subject [presidential assassinations] they are asking for a particular book or . . . seem to be a little wary of asking . . . whereas this customer just kind of threw it out there . . . he just seemed not so shy about asking that question."  Id. at 18.  While other customers have asked for books on the assassinations of specific presidents, Mr. Rolfes said this was the only customer whom he had ever encountered who asked for books about presidential assassinations generally.  Id. at 28.  Mr. Rolfes also noted the customer's very "neutral, detached," and "kind of odd" demeanor.  "Physically it made me very uncomfortable . . . .  The customer didn't seem very engaged, even though he was asking me questions . . . .  [He] seemed very detached from the conversation we were having."  Id. at 19.  The customer also stood unusually close to him, making Mr. Rolfes feel "very uncomfortable."  Id.  After that day, Mr. Rolfes testified, he would recall the encounter every time he passed the section of the bookstore where the two men had been standing or saw a particular book they had discussed.  As he explained: "It stuck in my mind.  It's definitely a unique feeling I got from helping that customer that was different from helping any other customer."  Id. at 20.

Cross examination revealed considerable uncertainty in Mr. Rolfes' recollection of the incident about which he testified.  Mr. Rolfes acknowledged that during the roughly four months between his conversation with the customer and his identification of Mr. Hinckley from

60

photographs in December, he had assisted between 5,000 and 10,000 other customers. Transcript of Hearing at 22-31 (Jan. 23, 2012 p.m.). He further acknowledged that the Williamsburg Barnes & Noble store receives many customer inquiries about American history materials, including "a fair amount" of requests for books on the Kennedy assassination. Id. at 26; see also id. at 40-43. Mr. Rolfes could not remember what clothing the customer was wearing, and he testified that when he first spoke with Secret Service agents he told them that the customer had worn glasses. Id. at 15, 45-47. As he explained: "I had thought I remembered glasses, but then right after I said that out loud I realized that, no, I was mistaken." Id. at 15, 45-47. He also acknowledged that, when speaking with the Secret Service agents, he had used the phrase "fairly sure" when asked whether he was certain that his identification of Mr. Hinckley was correct — he testified, however, that by "fairly sure" he meant "that I was sure." Id. at 44. Mr. Rolfes also testified, as he had stated in his earlier interviews, that his encounter with the customer took place in the evening somewhere between 6:00 p.m. and 10:00 p.m. Id. at 48, 54. He was surprised by the accurate proffer of Mr. Hinckley's counsel that Mr. Hinckley never shopped alone at those hours during his visits to Williamsburg. Id. at 48-49.

Additional uncertainty emerged on cross examination about the month in which this incident took place. Mr. Rolfes testified that he told the Secret Service agents, just as he later testified in court, that it had occurred in late summer or early fall. Transcript of Hearing at 6, 22 (Jan. 23, 2012 p.m.). When the agents asked whether the encounter could have taken place around August, he told them yes. In a subsequent interview with Mr. Hinckley's counsel, however, Mr. Rolfes said that the encounter definitely happened in August. Id. at 23. While on the witness stand before this Court, he stated more than once that the encounter did in fact take

place in August.  Id. at 22-23, 31-32, 46, 48.[15]  When Mr. Hinckley's counsel proffered that

Mr. Hinckley never shopped alone in the evening between 6:00 p.m. and 10:00 p.m. and was not

in Williamsburg at all during August of 2011 — which is true — Mr. Rolfes agreed that if this

were correct it would make his identification of Mr. Hinckley less than certain.  Id. at 48-49.

The final exchange between Mr. Hinckley's counsel and Mr. Rolfes on cross examination was as

follows:

> Q.  [I]f he was not there in August . . . [a]nd he was not there
> between 6:00 and 10:00, you would have to be a hundred percent
> certain that it wasn't him; isn't that true?
> A. Yes.

Id. at 49.

On redirect, government counsel suggested to Mr. Rolfes that he had

"consistently said that this took place in late summer or early fall," rather than during a specific

month, to which Mr. Rolfes agreed.  Transcript of Hearing at 54 (Jan. 23, 2012 p.m.).  Mr.

---

[15]     The following colloquy took place between Mr. Rolfes and counsel for Mr.
Hinckley:

> Q. Well, do you remember an occasion speaking with me and two
> of my colleagues . . . ?
> A. Yes.
> Q. And do you remember telling us that it was August, as a matter
> of fact, maybe early August. You do remember saying that?
> A. Yes.
> Q. Now, indeed, you told the Secret Service agent, as reflected in
> its memo, "Rolfes stated that sometime in late August 2011 he was
> working inside." Do you remember that?
> A. Yes.
> Q. All right. Now, does that refresh your recollection that it was
> August and not in September?
> A. Yes.
> Q. All right. So we are sure now it's August, it's not September; is
> that correct?
> A. Yes.

Transcript of Hearing at 23 (Jan. 23, 2012 p.m.).

Rolfes stated that, in testifying that the incident took place in August, he was wrong about the month of the encounter, but not about his identification of Mr. Hinckley. Id. at 56. Mr. Rolfes did maintain on redirect that the encounter took place between 6:00 p.m. and 10:00 p.m. Id. at 54. He explained that when he was pressed by Mr. Hinckley's counsel during cross examination about the seeming impossibility of his having interacted with Mr. Hinckley in August, he did not withdraw his earlier statement about the month of the incident because "I kind of felt like I had already said it, so I couldn't back out of that one . . . . I had already said it [was] August, and so I felt like if I said I wasn't sure about that, then I would look, I don't know." Id. at 56.[16]

The potential significance of Mr. Rolfes' testimony is discussed later in this Opinion. See infra at 93-96. Suffice it to say that the Court finds his recollection of the incident about which he testified wholly unreliable and gives it no credence.

---

[16] During recross examination by Mr. Hinckley's counsel, the following colloquy took place:

> Q. Now, in response to my questions during the interviews [over the telephone], when [the incident] was . . . you do recall saying it was in August?
> A. Yes.
> Q. And you felt like having said that to me then, you couldn't retreat from that now?
> A. Yes.
> Q. Well, do you feel trapped into saying something you don't want to say because someone has already — because you have already staked out a position?
> A. I mean — yes.
> Q. You do. All right.

Transcript of Hearing at 58 (Jan. 23, 2012 p.m.). On recross, the witness was also asked if he were to assume that Mr. Hinckley was not in Williamsburg in August and further assume that he was never in the bookstore between 6:00 p.m. and 9:00 p.m., "would you want to back out [of] your identification?" The witness responded: "I would want to." Id. at 61-62.

### C.  Mr. Hinckley's Rebuttal Expert Witness

Dr. Paul Montalbano, who has testified in previous hearings in this case, was called as a rebuttal witness by Mr. Hinckley and was permitted to offer expert testimony on the assessment of risk with respect to Mr. Hinckley's danger to himself or others.  He supports the Hospital's proposal, agreeing that under its plan "Mr. Hinckley is at low risk for decompensation" and that "should a relapse begin to unfold, it would likely be gradual and detectable."  Montalbano Rpt. at 58.  Dr. Montalbano believes that "the carefully planned incremental increases in freedom by the hospital would continue to provide therapeutic benefit," and that the concerns expressed by Dr. Patterson and Dr. Phillips "can be adequately managed without significant risk being posed."  Id.; see Transcript of Hearing at 28 (Feb. 7, 2012 a.m.).

In describing the methodology underlying the risk assessment and report that he prepared on Mr. Hinckley, Dr. Montalbano explained that, in his view, a goal of forensic assessments is to identify points where different methods and sources of data support the same hypothesis.  For this reason, he strives to integrate multiple methodologies when conducting a comprehensive risk assessment, including actuarial and structured professional judgment approaches (the same methods used by Dr. Murphy in her risk assessment).  Transcript of Hearing at 19-21 (Feb. 7, 2012 a.m.).  Actuarial data, while valuable, is limited in usefulness by its "static" nature, because many of the factors about the individual being assessed do not vary from year to year.  The benefit of the structured professional judgment methodology, Dr. Montalbano explained, is that it incorporates both static and dynamic factors, leading to "different scores at different points in time, so you can measure whether the risk is increasing or decreasing."  Id. at 25.  Clinical judgment remains central when using an assessment tool of this sort, because the ultimate assigning of a risk label — low, moderate, or high — is left up to the evaluator.  Id. at 26; Transcript of Hearing at 101 (Feb. 7, 2012 p.m.).  In addition to these two

approaches, Dr. Montalbano also incorporates what he termed the individualized assessment of risk. That method entails a case-specific inquiry into a particular subject's history of violent episodes and an attempt to ascertain which variables were present at those times. This approach "helps identify factors that might be targeted for intervention or amelioration." Transcript of Hearing at 17 (Feb. 7, 2012 a.m.).

Dr. Montalbano expressed reservations about the methodology employed by the government's expert witnesses, Dr. Patterson and Dr. Phillips. He characterized their approach as a blending of the individualized assessment of risk with a fourth method, unstructured clinical judgment. In the latter approach, according to Dr. Montalbano, "essentially the evaluator is free to look at the data, come to whatever conclusions he or she wants, and then formulate a risk." Transcript of Hearing at 17 (Feb. 7, 2012 a.m.); see id. at 20-21. In his view, exclusive reliance on this methodology may lead to skewed results. According to Dr. Montalbano, studies indicate that "structured professional judgment and actuarial tools significantly outperform unstructured clinical judgment in the prediction of risk." Id. at 19. And based on his review of the literature, he testified: "I don't think using totally unstructured clinical judgment . . . really has much scientific support." Id. As he explained:

> With unstructured clinical judgment the evaluator essentially has free reign to gather information in any way he or she sees fit, to combine the information in any way he wants to weigh the importance of any given factor as much as he or she wants, to attach any label to the information that he or she wants. And the unstructured method, I believe, research demonstrates is more prone to bias and error.

Id. at 21.

Similar problems, in Dr. Montalbano's view, arise from an exclusive reliance on the individualized assessment of risk, which also may give "too much free reign to the evaluator" and allow "more bias and error," because the choice of which risk factors to emphasize, how

much weight to give them, and what risk label to select are all left up to the evaluator. Transcript of Hearing at 22 (Feb. 7, 2012 a.m.). According to Dr. Montalbano, while the literature shows this method to be useful in identifying risk factors that can be targeted for treatment and risk reduction, "it is not as well suited for the prediction of risk for a given individual." Id. at 23. Among other flaws, the individualized approach fosters a "confirmation bias" or "adversary allegiance" in which evaluators place undue weight on observations that comport with what the evaluator already believes and expects to see. Id. at 71-74. By contrast, "a structured approach, either structured professional judgment or an actuarial approach, tends to be a safeguard against bias." Id. at 73.[17]

Having compared the psychological tests administered to Mr. Hinckley in 2011 with other administrations of those tests going back to the 1980s, Dr. Montalbano noted that the results, while largely consistent, indicated a "significant reduction in psychopathology" since the early 1980s, when Mr. Hinckley's results were "significantly elevated for a number of clinical scales like depression, things that would indicate thought disturbance." Transcript of Hearing at 39 (Feb. 7, 2012 a.m.). By contrast, none of those clinical scales now appear to be elevated, which "[w]ould suggest an overall significant reduction in psychopathology." Id. at 39-40. That finding is confirmed by "behavioral observations and interviews and other sources of data. It's

---

[17]     To illustrate the pitfalls of using individualized analysis as a predictive tool, Dr. Montalbano cited Dr. Patterson's concern, during a previous hearing, over behavior by Mr. Hinckley toward a St. Elizabeths staff member in the 1990s that Dr. Patterson characterized as "disturbingly similar" to his behavior toward Jodie Foster before his offense. According to Dr. Montalbano, however, Mr. Hinckley's interaction with this staff member was that of a real relationship, rather than a delusional fixation; when Mr. Hinckley was directed not to maintain contact with her, he complied, and these events did not produce any decompensation on his part. Dr. Montalbano sees Dr. Patterson's interpretation of these events as an example of confirmation bias. Transcript of Hearing at 69-71 (Feb. 7, 2012 a.m.).

confirmed by the fact that people say his Axis I disorders [have] been in full sustained remission for many years.  So the data fits together."  Id. at 42.

   Dr. Montalbano cautioned that one must keep in mind Mr. Hinckley's tendency to under-report problems, a trait evident in his consistent elevation on the so-called "K scale" of the MMPI-2 assessment tool, which indicates that Mr. Hinckley "is defensive and guarded," "strives to present himself in an overly favorable light," "tends to deny, minimize or avoid unacceptable feelings or impulses," Transcript of Hearing at 37 (Feb. 7, 2012 a.m.), and demonstrates an unwillingness to acknowledge problems.  Transcript of Hearing at 89-91 (Feb. 7, 2012 p.m.). Dr. Montalbano further explained that Mr. Hinckley's results on the MMPI-2 are consistent with a profile pattern characterized by "some underlying hostility which is expressed indirectly." Transcript of Hearing at 37-38 (Feb. 7, 2012 a.m.).  But like Dr. Murphy, Dr. Montalbano agreed that Mr. Hinckley's score on the PCLR — which he believes to be a reliable predictor of violence in community settings — puts Mr. Hinckley in the low range of psychopathy, and that the consistency in this score over many years with three different administrators indicates that the results are reliable.  Id. at 34, 39-40.

   Dr. Montalbano agreed that Mr. Hinckley's Axis I diagnoses are in full remission, and they have been so for two decades or more.  Transcript of Hearing at 42-43 (Feb. 7, 2012 a.m.).  Although some fluctuations in Mr. Hinckley's mental status have been observable throughout the years, characterized at times by moodiness, irritability, and sadness, Dr. Montalbano has seen nothing to indicate significant clinical depression or psychosis.  Id. at 42. While overall his mood is good, there are fluctuations "depending on what's going on in his relationships [with women] or with the Court."  Id. at 51; see Transcript of Hearing at 114 (Feb. 7, 2012 p.m.); Transcript of Hearing at 68 (Feb. 7, 2012 a.m.) (there are fluctuations "depending on what is going on in the relationship, but that has not resulted in

decompensation"). His mood improves when he gets increased freedom through his visits to Williamsburg. Transcript of Hearing at 85 (Feb. 7, 2012 a.m.). He has "a strong yearning for freedom." Transcript of Hearing at 114 (Feb. 7, 2012 p.m.). In sum, Dr. Montalbano believes that the mental conditions that characterized Mr. Hinckley in 1981 are "either significantly reduced or absent by and large." Transcript of Hearing at 54 (Feb. 7, 2012 a.m.).

While Dr. Montalbano views depression as an important, "if not primary" risk factor for Mr. Hinckley, he emphasizes the "clear evidence that he has not been significantly clinically depressed for decades" and notes that Mr. Hinckley's visits to Williamsburg have helped to ameliorate this risk factor. Transcript of Hearing at 54-55 (Feb. 7, 2012 a.m.). Based "on what numerous hospital staffs, numerous evaluators, numerous mental health professionals have consistently observed for 20 years," Dr. Montalbano believes that Mr. Hinckley is "simply not likely" to relapse into major depression under the Hospital's plan, and that he represents a low risk for decompensation. Transcript of Hearing at 45-46 (Feb. 7, 2012 p.m.). Moreover, Dr. Montalbano testified that Mr. Hinckley has shown a willingness to share feelings of depression, irritation, and moodiness with his treatment providers, and that signs of deterioration may also manifest themselves in observable behavioral indicators like increased sleep or weight gain. Id. at 96-97. In Dr. Montalbano's view, therefore, a significant change in his mental status would likely be noticed by his Williamsburg and St. Elizabeths treatment providers. Transcript of Hearing at 89-90 (Feb. 7, 2012 a.m.); see also Transcript of Hearing at 96-97, 117 (Feb. 7, 2012 p.m.).

Despite Mr. Hinckley's low risk of decompensation, Dr. Montalbano agrees that he should nevertheless be treated as a high-risk case, due to the unique nature of his offense ("[t]he high profile nature of the case") and the unreliability of his self-reporting. Transcript of Hearing at 83-84 (Feb. 7, 2012 a.m.). The latter consideration in particular calls for putting

mechanisms in place to ensure "adequate and realistic amount of supervision" of Mr. Hinckley's activities and his mental state.  Id. at 84.  Dr. Montalbano agrees, therefore, that Mr. Hinckley needs "ongoing monitoring" and recommends "gathering information from multiple sources, having adequate supervision and monitoring, so that everything is not simply contingent on his self-report."  Transcript of Hearing at 60 (Feb. 7, 2012 p.m.).  In this regard, Mr. Hinckley's lying about going to the movies is significant not because it has any direct link to dangerousness, but because his honest self-reporting of compliance with his conditions of release is an important component of the ability to supervise and monitor him while in Williamsburg.  Id. at 68-71.

## IV.  THE SUPPLEMENTAL EVIDENTIARY HEARING

After the Hospital submitted its revised (e) letter in December 2012, setting forth a modified proposal for expanding Mr. Hinckley's terms of conditional release, and after the government's experts were afforded a chance to complete supplemental expert reports responding to that modified proposal, the Court held a supplemental evidentiary hearing over three days in late February 2013, over a year after the conclusion of the first hearing.  The purpose of the supplemental hearing was to explore the ramifications of the changes the Hospital had made to its proposal, particularly in view of the withdrawal of Colonial Behavioral Health, People's Place, and to discuss any updates in Mr. Hinckley's status that had occurred during the previous year.  Counsel for Mr. Hinckley called two witnesses from the Hospital, Mr. Shamblee and Dr. Murphy, and the government called its two expert witnesses, Dr. Patterson and Dr. Phillips.

Mr. Shamblee testified about the modifications to the Hospital's proposal and the reasoning behind them.  He also discussed Mr. Hinckley's progress over the previous year.  Mr. Shamblee represented that during this period Mr. Hinckley complied with all rules and

requirements placed upon him, both in Williamsburg and at St. Elizabeths, without exception. Transcript of Hearing at 86-89 (Feb. 25, 2013). He described Mr. Hinckley's new volunteer work in the cafeteria at Eastern State Hospital (a substitution for his former position in that hospital's library, which was being phased out for funding and personnel reasons), reporting that Mr. Hinckley has acted appropriately in this new position, in a bustling environment that requires extensive interaction with coworkers and patrons, without adverse incidents of any kind. Id. at 101-04. He also discussed the Hospital's decision to substitute Mr. Jonathan Weiss for Mr. Beffa as Mr. Hinckley's case manager in Williamsburg, while retaining Mr. Beffa in his role as Mr. Hinckley's individual therapist. Id. at 56-62.[18] During the previous year, according to Mr. Shamblee, Mr. Hinckley's mental and emotional state has remained stable with no indications of clinical depression, and he has done nothing inappropriate in the Williamsburg community or shown any signs of being dangerous to himself or others. Id. at 92, 108-09, 119, 149. He reported that Secret Service memoranda during that period, which had been shared with the Hospital, reflected no failures by Mr. Hinckley to comply with his itineraries or other restrictions in the year between the February 2012 and the February 2013 hearings. Id. at 112. In the Hospital's view, Mr. Shamblee said, Mr. Hinckley has continued to show that his risk level does not increase as he transitions away from living at St. Elizabeths, and he does not pose a danger to himself or others under the terms proposed in the revised (e) letter. Id. at 47, 99.

Dr. Murphy testified about the supplemental risk assessment that she completed in conjunction with the development of the Hospital's revised (e) letter. Her assessment that Mr. Hinckley presents a low risk of danger under the Hospital's proposal remains the same.

---

[18] According to Mr. Shamblee, Mr. Weiss is a licensed social worker and mental health professional in the Williamsburg area, who had retired after spending about twenty-five years at Colonial Behavioral Health. Transcript of Hearing at 62, 68-71 (Feb. 25, 2013); see also Patient's Ex. 3 (resume of Jonathan Weiss).

Transcript of Hearing at 4 (Feb. 26, 2013 a.m.).  She confirmed that during the year between the

hearings there had been no symptoms of clinical depression (except for some weight gain, which

could be attributable to other factors), that Mr. Hinckley has consistently taken his medication,

and that there has been no evidence of deception of any sort.  Id. at 12-16, 21-22.  In sum,

Dr. Murphy continues to believe that Mr. Hinckley has a low likelihood of engaging in violence

in the foreseeable future and that the risk of danger to himself or others is low.  Id. at 28; see

Murphy Supp. Rpt. at 7.  Dr. Murphy supports the Hospital plan, including the continued

involvement of Dr. Giorgi-Guarnieri and Mr. Beffa, for individual and group therapy, and the

addition of Mr. Weiss as case manager.  Transcript of Hearing at 19-20, 24-25 (Feb. 26, 2013

a.m.); Transcript of Hearing at 6-7 (Feb. 27, 2013).  Because of the age and health of Mr.

Hinckley's mother — an issue that "looms over all of us through this entire process" — Dr.

Murphy recommends another risk assessment and updated psychological testing before

convalescent leave is recommended.  Transcript of Hearing at 29-31, 47-48 (Feb. 26, 2013 a.m.).

Dr. Patterson and Dr. Phillips both expressed the view that the Hospital's revised

proposal is in some ways even less structured than the original plan, lacking provision for a day

program of therapeutic activity, which formerly was to be provided by Colonial Behavioral

Health.  Transcript of Hearing at 105 (Feb. 26, 2013 a.m.) (Patterson); Transcript of Hearing at

100 (Feb. 26, 2013 p.m.) (Phillips).  Nevertheless, both expressed guarded optimism about the

value of Mr. Hinckley's new work in the Eastern State Hospital cafeteria, the potential benefit of

his participation in Mr. Beffa's group therapy sessions, the addition of Ms. Haley as a music

therapist, and, especially, the substitution of Mr. Weiss for Mr. Beffa as case manager.

Transcript of Hearing at 4-5 (Feb. 26, 2013 a.m.) (Patterson); Transcript of Hearing at 78-79,

94-96, 100 (Feb. 26, 2013 p.m.) (Phillips).  The latter change, in particular, Dr. Phillips

characterized as "long overdue," both because it was unwise to have a single individual serve as

both case manager and individual therapist, and because of the complaints that he and Dr. Patterson have long voiced about Mr. Beffa's proficiency as a case manager. Transcript of Hearing at 70-71, 78-79 (Feb. 26, 2013 p.m.). Dr. Patterson and Dr. Phillips both opined that, if there is any expansion of Mr. Hinckley's time in Williamsburg, it is imperative that all four Williamsburg treatment providers coordinate their efforts as a team. Transcript of Hearing at 92-93 (Feb. 26, 2013 a.m.) (Patterson); Transcript of Hearing at 72 (Feb. 26, 2013 p.m.) (Phillips).

Dr. Patterson's primary objection to the Hospital's revised (e) proposal is that the Hospital is proposing to move too quickly through several significant expansions of freedom — from visits of 10 days to 17 days, then to 24 days, and then to convalescent leave — without providing for adequate evaluation of each step before proceeding to the next. Transcript of Hearing at 88-89 (Feb. 26, 2013 a.m.); Transcript of Hearing at 24, 43 (Feb. 26, 2013 p.m.). He also reiterated that many of the purported goals of the expanded releases could already have been accomplished under the current regime of ten-day visits, but have not been accomplished for a variety of reasons. Transcript of Hearing at 66-69, 102 (Feb. 26, 2013 a.m.). Dr. Phillips agrees. Thus, both recommend a continuation of ten-day visits and a delay of any increase until an assessment has been done of the changes in activities and treatment providers contemplated by the new plan. Id. at 89-91, 121-22 (Patterson); Transcript of Hearing at 100 (Feb. 26, 2013 p.m.) (Phillips). Dr. Patterson continues to oppose any unaccompanied driving privileges, while Dr. Phillips feels that some driving privileges, tailored toward facilitating specific clinical goals, may be appropriate. Transcript of Hearing at 107-08 (Feb. 26, 2013 a.m.) (Patterson); Transcript of Hearing at 101 (Feb. 26, 2013 p.m.) (Phillips).

Dr. Patterson and Dr. Phillips acknowledge that over the past year Mr. Hinckley has not been reported to have done anything wrong whatsoever, that his diagnoses remain

unchanged, and that, as Dr. Patterson put it, he has even become "more contrite and less defensive" about his earlier dishonesty regarding the movies. Supplemental Independent Forensic Psychiatric Evaluation of John W. Hinckley, Jr. ("Patterson Supp. Rpt.") at 9; Transcript of Hearing at 6, 12 (Feb. 26, 2013 p.m.) (Patterson); id. at 87 (Phillips). They both agree that he has shown no overt signs of dangerousness in many years. Underlying their more cautious recommendations, however, Dr. Patterson and Dr. Phillips remain fundamentally less sanguine than the Hospital about the scope and durability of Mr. Hinckley's recovery from his mental disorders, the prospect that his current mental state will remain stable during his transition to Williamsburg, and the likelihood that any deterioration on his part will be noticed in due time by his treatment providers. Transcript of Hearing at 72, 113 (Feb. 26, 2013 a.m.) (Patterson); Transcript of Hearing at 87-88 (Feb. 26, 2013 p.m.) (Phillips). They emphasize the many stresses that Mr. Hinckley will confront as his life significantly changes during this phase, including the inevitable loss of significant personal relationships and activities in Washington, D.C. that are a source of emotional support to him. Transcript of Hearing at 86-89 (Feb. 26, 2013 p.m.) (Phillips). Both also identify deception as a risk factor that, according to Dr. Phillips, must be "closely looked at, recognized and . . . managed over the long term . . . ." Id. at 85. And they place less faith in the capacity of risk assessments — particularly those based on psychological tests and instruments that are not geared toward Mr. Hinckley's individualized circumstances — to predict how he will behave under these new circumstances or to generate useful guidance on managing his risk. Transcript of Hearing at 76 (Feb. 26, 2013 a.m.) (Patterson); Transcript of Hearing at 86 (Feb. 26, 2013 p.m.) (Phillips).

## V.  FINDINGS OF FACT

Based upon the testimony and exhibits offered by counsel for the government and by counsel for Mr. Hinckley, the Court finds that the following facts have been established by a preponderance of the evidence:

1.  Mr. Hinckley's current diagnosis is psychotic disorder not otherwise specified (Axis I), in full remission; major depression (Axis I), in full remission; and narcissistic personality disorder (Axis II).

2.  Mr. Hinckley's Axis I diagnoses have been in full remission for more than twenty years, and perhaps more than twenty-four years.

3.  Mr. Hinckley's narcissistic personality disorder is significantly attenuated from its previous state.  Mr. Hinckley continues to exhibit symptoms of self-importance, but he no longer exhibits the intense self-absorption and grandiosity that was present during the 1980s.

4.  Mr. Hinckley has exhibited no evidence of delusional thinking for approximately twenty-four years and no evidence of obsessive conduct for at least seventeen years.

5.  Mr. Hinckley continues to be guarded, defensive, and sometimes secretive, but he has made progress in becoming more open with his treatment providers.

6.  Mr. Hinckley's self-reporting underrepresents his problems and pathology due to his tendency to minimize problems and avoid negative aspects of situations to present himself in an overly positive light.

7.  Mr. Hinckley continues to exhibit deceptive behavior even when there are no symptoms of psychosis or depression.  Such deceptiveness may relate to his narcissistic personality disorder.  In combination with his guardedness, secretiveness and lack of forthrightness at times, deceptiveness makes it more difficult to monitor Mr. Hinckley's activities while away from St. Elizabeths, particularly his unaccompanied time where the monitoring is based largely on his own self-reporting.

8.  On two occasions in 2011, during Mr. Hinckley's use of his unsupervised free time in Williamsburg, he deviated from the strict terms of his pre-approved itineraries by not attending movies, as

scheduled, and instead spending his time at the Barnes & Noble bookstore located in the same shopping center. Mr. Hinckley later falsely told Hospital staff and other evaluators that he had attended these movies and made representations about their content and quality.

9. Isolation remains a primary risk factor for Mr. Hinckley, who is by nature an introverted person. Given the goal of Phase IV, it is of concern when he engages in too many solitary activities, rather than taking steps to integrate himself into the Williamsburg community through more vocational, social, and educational pursuits and through developing friendships, particularly as his time away from the structured environment of St. Elizabeths Hospital is increased.

10. Depression remains a risk factor for Mr. Hinckley, even though his clinical depression is in full remission. He is a low risk for decompensation. If Mr. Hinckley were to experience a relapse of his Axis I disorders, that relapse would not occur suddenly, but rather would occur gradually over a period of at least weeks or months, and would be detectable by treatment providers.

11. Mr. Hinckley has exhibited no violent behavior, nor attempted suicide, in more than twenty-nine years.

12. Mr. Hinckley self-medicates with 1 mg. of Risperdal, 150 mg. of Zoloft, and 50 mg. of Benadryl (antihistamine) daily, in addition to medications for physical ailments and multivitamins. There is no indication that Mr. Hinckley has failed to take his medications in the recent past or during any of the authorized releases.

13. Mr. Hinckley has never tried to escape from the Hospital or when on "B" city outings or on unsupervised conditional release visits with his family. He has participated successfully in well over 200 Hospital-accompanied outings in the community without incident. He has also participated successfully in all of the Phase I, Phase II, Phase III, and Phase IV visits authorized by this Court. These visits have been therapeutic and beneficial. He has followed every condition imposed by the Court in authorizing these visits, with the important exception of the two episodes of dishonesty regarding movie attendance described above.

14. Historically, Mr. Hinckley's relationships with women, his perceptions of those relationships, and the judgment he sometimes has exercised concerning such relationships have been inextricably intertwined with Mr. Hinckley's mental illness and have been especially implicated when he has been most clinically

dysfunctional.  He has strong affiliative and dependency needs,
and his mood often fluctuates based on the status of his
relationships with women.  This is an area of ongoing clinical
concern.

On the ultimate mixed question of law and fact — dangerousness — the Court

finds that, for the reasons stated below, Mr. Hinckley will not be a danger to himself or to others

if released for a series of 17-day visits to Williamsburg under the conditions proposed by the

Hospital, as modified and supplemented by the Court in this Opinion.

## VI.  DISCUSSION

### A.  *Matters of Concern*

#### 1.  Mr. Hinckley's Mental Health

All of the experts and treatment providers who testified during the evidentiary

hearing and the supplemental evidentiary hearing agreed that Mr. Hinckley's Axis I diagnoses —

namely, his clinical depression and psychotic disorder  — are in full remission and have been so

for many years.  During this long period of sustained remission — more than 24 years, in the

Court's view — by all accounts, Mr. Hinckley has shown no signs of delusional thinking or any

violent tendencies.  His treatment providers report that while he has experienced some

fluctuations in mood over the past few years, including periods of sadness or anxiety in response

to difficult or stressful life events (including the death of his father), his emotional health has

remained stable.

Although the government's expert witnesses raised some caveats about this

consensus — including the role that Mr. Hinckley's therapy at St. Elizabeths and medication

have played in keeping his symptoms at bay, the possibility that he may not be fully reporting his

symptoms to his evaluators, and some possible indications of a resurgence in depression —

neither expert fundamentally disagrees with the Hospital or Mr. Hinckley's expert about his

present lack of depression and psychosis. Transcript of Hearing at 82-85 (Jan. 24, 2012) (Patterson); Transcript of Hearing at 87-89 (Feb. 26, 2013 p.m.) (Phillips).

Dr. Patterson and Dr. Phillips disagree that symptoms of Mr. Hinckley's narcissistic personality disorder have diminished as much as the Hospital believes, and they are more concerned than the Hospital about the relationship between these symptoms — including guardedness, secretiveness and deception — and Mr. Hinckley's potential dangerousness. Even the government's experts, however, do not really regard Mr. Hinckley's ongoing narcissistic tendencies as evidence of dangerousness in their own right. Rather, to the extent that these tendencies may deter him from adhering to restrictions on his behavior or from being truthful in reporting his conduct and his thoughts, Dr. Patterson and Dr. Phillips say that they undermine confidence in the ability of treatment providers at the Hospital and, even more so, in Williamsburg, to accurately monitor Mr. Hinckley's conduct and assess his mental state as the length of his trips to Williamsburg increases.

Thus, the concerns expressed by the government and its experts about the Hospital's revised (e) proposal are not based so much on Mr. Hinckley's current mental stability as on the risk that by removing him for lengthy periods of time from the structured and supportive environment at St. Elizabeths to a situation lacking a comparable degree of oversight, therapeutic intensity, and social interaction, Mr. Hinckley may once again fall prey first to isolation and perhaps eventually to depression (risk factors for dangerousness) — which, if undetected, potentially could lead to suicidal thoughts or a reemergence of psychosis. That he is presently free of such symptoms, and has been for many years, is not seriously questioned.

The Court is persuaded that because Mr. Hinckley's Axis I diagnoses are in full remission, and because his narcissistic personality disorder is not evidence of potential dangerousness, he will not be a danger to himself or others if released to the Williamsburg

community for 17 days a month under the conditions to be imposed by the Court.  See infra at 97-106.

  2.  Success of the Phase IV Visits and Integration into Williamsburg Community

Over the past four years, Mr. Hinckley has participated in thirty-three 10-day visits to Williamsburg — following, of course, several years of shorter visits.  The immediate therapeutic goal of these "Phase IV" visits was to acclimate Mr. Hinckley to his mother's community and to permit him to focus on social and vocational integration there.  See Hinckley VI, 625 F. Supp. 2d at 6.  The broader aim of Phase IV, a "transitional stage," was to determine if Mr. Hinckley is ready to be released from the Hospital to live independently in his mother's community.  See Hinckley V, 493 F. Supp. 2d at 66.  Much of the evidentiary hearing and supplemental hearing focused on how much progress Mr. Hinckley has made toward the goals that were contemplated for his Phase IV visits.

Every witness who testified on the matter agreed that Mr. Hinckley could have accomplished more to integrate himself into the Williamsburg community during his Phase IV visits.  The government and its experts maintain that much more could have been accomplished on Mr. Hinckley's visits if he himself had shown more initiative and if Mr. Beffa, his case manager, had been more proactive.[19]  The Hospital and Mr. Hinckley respond that in assessing this argument one must keep in mind the limited duration and irregular timing of Mr. Hinckley's Phase IV visits, and the restrictions on his ability to go about in public without supervision.  The related question, of course, is whether with visits of 17 days (rather than 10) Mr. Hinckley — with the assistance of a new, presumably more aggressive case manager, Jonathan Weiss — can

---

[19]    Despite the fact that this same lack of initiative was noted after the hearing in 2009, see Hinckley VI, 625 F. Supp. 2d at 11, 18, 20, not much progress seems to have been made.

be counted on to take steps to integrate himself more into the community under the Hospital's revised (e) proposal.

The record is clear about what Mr. Hinckley has, and has not, achieved thus far. As required, he has met regularly with his Williamsburg treatment providers, having established a respectful and productive relationship with Dr. Giorgi-Guarnieri and continuing his good relationship with Mr. Beffa. He has volunteered up to three days a week for four-hour shifts at Eastern State Hospital — first in the library, then in the more bustling cafeteria, where he has had interaction with co-workers and patrons. He has earned praise from his supervisors in both volunteer positions. This appears to be the extent of the social and vocational ties he has established in Williamsburg.

Mr. Hinckley has not engaged in any additional volunteer activities beyond his work at Eastern State, nor has he participated in any ongoing social, recreational, or educational activities or even taken the initiative to identify such activities. He has not made any friends in the community. The itineraries for his visits are routinized; they do not vary and consistently show a familiar pattern: he visits stores, restaurants, and other attractions with family members or alone; takes solitary walks in his mother's neighborhood; and spends time alone in the family home working on art, music, or other pursuits. See Gov't Ex. 4; Transcript of Hearing at 84 (Dec. 8, 2011 a.m.). He has shown little engagement with other people in Williamsburg besides his treatment providers, his mother, and those with whom he comes in contact at Eastern State. He has taken no steps to expand beyond the same routine activities — in fashioning the itineraries for his 10-day visits, in making use of his free time, or in following up on some of Mr. Beffa's suggestions. This is so even after it became clear from the reports of Dr. Patterson and Dr. Phillips and their testimony at the evidentiary hearing in January 2012 — nearly two years

ago — that this was a significant concern that could affect this Court's decision on the Hospital's (e) proposal.[20]

Mr. Hinckley's lack of progress on this front is significant for two related reasons. First, as noted, his Phase IV visits were conceived as part of a transition in which he was expected to pursue social and vocational integration into Williamsburg with an eye toward demonstrating his readiness to make that community his primary place of residence rather than St. Elizabeths Hospital. Second, all of the clinicians and treatment providers who have evaluated Mr. Hinckley agree that isolation is one of his primary risk factors for decompensation. The understandable concern expressed by Dr. Patterson and Dr. Phillips is that allowing Mr. Hinckley to spend the majority of each month in Williamsburg, without the structure of his St. Elizabeths routine or the daily social and therapeutic interactions he has there, may foster isolation and, ultimately, depression. This danger is made all the more acute by the fact that fewer eyes will be observing him, and fewer people interacting with him, on a day-to-day and hour-to-hour basis.

Several factors are at play in Mr. Hinckley's lack of more sustained progress toward integrating into Williamsburg. As numerous witnesses noted, sporadic 10-day visits inherently limit the scope of the activities in which Mr. Hinckley can take part, including paid employment and organized groups. Mr. Hinckley's inability to drive himself places unless accompanied by his mother further limits his activities — because of the burden on his elderly mother of driving with him to activities, waiting in the car or elsewhere for him, and then driving

---

[20] Why, for example, did the Hospital not take the hint and vary Mr. Hinckley's itineraries beginning sometime in 2012 or 2013 in order to demonstrate that greater steps towards socialization and integration were underway? Or was it Mr. Beffa's continuing lack of initiative and creativity that was the impediment to greater progress? If that was the problem, the Hospital could have filed a stand-alone motion sometime in the last two years to substitute Mr. Weiss for Mr. Beffa and begin to rectify some of the concerns identified at the hearing.

home with him.  Resistance from the community has also sometimes been a problem, as certain avenues Mr. Hinckley has explored to participate in social or vocational endeavors in Williamsburg — including taking an art class, volunteering at an animal rescue organization, and participating in a church social group — have been rebuffed because of his notoriety.

Nevertheless, as even most of Mr. Hinckley's own advocates agree, these factors do not provide a complete explanation for the lack of progress.  A failure of aggressive case management by Mr. Beffa and insufficient initiative by Mr. Hinckley himself are largely to blame.  As has been noted by the experts, Mr. Hinckley is, by nature, an introverted person and prefers to engage in solitary pursuits; he therefore must be motivated to interact with others.  Mr. Beffa has not provided this motivation, and the routinized itineraries he, Mr. Shamblee, and Mr. Hinckley have prepared do not encourage it.  The upshot is that Mr. Hinckley has not cultivated any friends or established ties to any groups of people in Williamsburg, aside from his volunteer positions at Eastern State Hospital and spending time with his mother and his siblings (when they are present).  Visits of ten days were presented as an opportunity for more genuine integration than was possible during the "mini-vacations" afforded by shorter visits, but — with the exception of his work at Eastern State — it is difficult to say that Mr. Hinckley's 10-day outings to Williamsburg have amounted to much more than slightly longer "mini-vacations." While — with the two exceptions discussed supra at 28, 41, 47, 51-52 — Mr. Hinckley has complied with all of the specific requirements of his visits, he has demonstrated little effort to go beyond those minimum requirements.

The failure to achieve all of the goals contemplated for Mr. Hinckley's Phase IV visits does not mean, however, that he will be a danger to himself or others if he is permitted to spend more time in Williamsburg with appropriate conditions.  Indeed, being in Williamsburg on a set of regularly scheduled visits of longer duration might well provide new opportunities for

employment and structured community activities than are presently available to him because of his sporadic presence there. And the addition of Mr. Weiss as case manager provides hope that such opportunities will be pursued with more vigor than they have been previously by Mr. Beffa or by Mr. Hinckley himself. But Mr. Hinckley's failure to develop a social network beyond his mother, his treatment providers, and his associates at Eastern State Hospital — combined with the clinical consensus that isolation is one of his significant risk factors — means that continuing caution is warranted in expanding the duration of his visits and in determining what terms and conditions to impose to monitor him during those visits. Because of the unresolved concerns about Mr. Hinckley's failure to take steps to integrate himself into the Williamsburg community and to begin effectively the transition to that community during his 10-day visits — the goals of Phase IV — the Court has an insufficient basis to conclude that Mr. Hinckley is ready for the level of independent living in Williamsburg proposed by the Hospital. The Court therefore will limit the next stage of the Phase IV transition to Williamsburg to a series of at least eight 17-day visits, with the clear goal of genuine integration into the community as their centerpiece, and it will require written reports to the Court after each such visit. Only then will the Court consider any further expansion of Mr. Hinckley's freedom. See infra at 100-01.

### 3. The Proposed Support System in Williamsburg

Given the concerns about Mr. Hinckley's potential for decompensation if he were distanced from the support system now provided at St. Elizabeths, his tendency towards solitary activities and isolation, and the fact that Mr. Hinckley has not yet taken significant steps to integrate himself into the Williamsburg community, a key question is whether the Hospital's revised (e) proposal will provide a support network in Williamsburg that will be adequate to manage Mr. Hinckley's risk of mental or emotional deterioration.

Under the Hospital's plan, Mr. Hinckley will have a therapeutic team in Williamsburg made up of four individuals: a new case manager (Mr. Jonathan Weiss), a psychiatrist (Dr. Deborah Giorgi-Guarnieri), a therapist (Mr. Carl Beffa), and a music therapist (Ms. Elizabeth Haley). During the 17-day visits as proposed by the Hospital, Mr. Hinckley will meet at least once per week with Dr. Giorgi-Guarnieri, once per week with Mr. Weiss, once per week with Mr. Beffa for individual therapy, once per week with Mr. Beffa for group therapy, and once per visit with Ms. Haley. [21] It is also contemplated that Mr. Hinckley will have additional contact with Mr. Weiss regarding the development of opportunities for social, recreational, educational, and therapeutic activities in the community and potentially be accompanied by Mr. Weiss to some of those activities. Mr. Weiss will work with Mr. Hinckley on developing the itineraries for his trips to Williamsburg and — the Court expects — he will vary the itineraries to include social and educational activities with a view towards integrating Mr. Hinckley into the Williamsburg community. Furthermore, it is essential, in the Court's view, that there be coordination and communication among the Williamsburg providers — including meetings at regular intervals — so they begin to function as a team.

In addition to these therapeutic interactions, under the Hospital's revised (e) proposal Mr. Hinckley will be permitted to volunteer up to five days a week at Eastern State Hospital, where he will work in the cafeteria and in a fair-trade gift shop staffed primarily by patients. The Court endorses this increase in work activity. It is hoped that Mr. Hinckley will

---

[21] According to the Hospital's revised (e) letter, Mr. Hinckley would begin participating in Mr. Beffa's group therapy only with the commencement of his 24-day visits. Mr. Beffa, however, has indicated that Mr. Hinckley could begin to attend the group during his 17-day visits. See Patterson Supp. Rpt. at 19. The Court will require this as a condition of the 17-day visits. Similarly, the revised (e) letter does not specify how often Mr. Weiss is expected to hold case management meetings with Mr. Hinckley, but his current case manager, Mr. Beffa, meets weekly with Mr. Hinckley for case management. Mr. Weiss should do the same.

eventually secure a paying job or at least additional volunteer opportunities, as well as arrange opportunities to participate in other ongoing activities, such as educational classes or recreational groups. But it cannot be assured that any of these hopes will be realized even with visits to Williamsburg each month on a more predictable schedule. All that is guaranteed at present is that Mr. Hinckley will volunteer for five half-days each week at Eastern State. The rest of his time, beyond appointments with treatment providers, is presently unaccounted for under the Hospital's revised (e) proposal, and there is a legitimate concern that Mr. Hinckley will spend too much of this unscheduled time alone, given his solitary personality and his present lack of any significant social ties in Williamsburg. See Murphy Supp. Rpt. at 10.[22]

Together, these considerations suggest that Mr. Hinckley be given the opportunity to make regularly scheduled trips of 17 days to Williamsburg each month, in order to afford him — with Mr. Weiss' active assistance — a realistic chance of arranging additional structured activities, more social interaction and vocational and avocational activities designed to reduce isolation and increase integration. But the duration of Mr. Hinckley's visits will not be increased to 24 days until more significant integration into the community has occurred and after the Hospital and the Court carefully assess the series of 17-day visits. The Court agrees with

---

[22]     The Hospital's original (e) letter provided a somewhat more robust structure for Mr. Hinckley's proposed expanded visits: in addition to Mr. Hinckley's volunteering activities at Eastern State and his sessions with Mr. Beffa and Dr. Giorgi-Guarnieri, he was to take part at least two days a week in therapeutic group activities at Colonial Behavioral Health, similar to those in which he now participates at the St. Elizabeths treatment mall. The revised (e) letter lacks an equivalent amount of time devoted to structured therapeutic activity — although testimony suggests that the newly added group therapy sessions with Mr. Beffa and music therapy sessions with Ms. Haley may actually be more beneficial to Mr. Hinckley than some of the programs at Colonial, which resemble the treatment mall therapies he has been receiving for years and are geared toward people with more acute symptoms. As Dr. Murphy testified: "I think we are beating a dead horse at this point with some of the content of these groups [at the treatment mall]." Transcript of Hearing at 26 (Feb. 26, 2013 a.m.). Nevertheless, there is much more unstructured free time and much less time with his treators in the revised (e) proposal than there was when Colonial was involved.

Dr. Patterson and Dr. Phillips that further evaluation is required at each stage before moving to the next.  See supra at 72-73.  Therefore, at least eight visits of 17 days will be required before the Court will consider a well-structured and appropriate proposal for expansion of privileges from the Hospital.

### 4.  Deception, Underreporting, and Need for Monitoring

One of the challenges in assessing Mr. Hinckley's risk of dangerousness is his tendency to minimize problems and underreport negative feelings to his treatment providers.  This widely acknowledged trait, which is related to Mr. Hinckley's narcissistic personality, particularly his need to present himself in a positive light, undermines confidence in the ability to assess the overt signs of his mental health and stability.  It also raises the prospect that if Mr. Hinckley were to experience resurgent symptoms of his psychosis or depression, he might not report them to his treatment providers who, under the Hospital's proposal, would be seeing him much less frequently than they are now.

Even more troubling from a risk management perspective is Mr. Hinckley's demonstrated willingness to be deceitful with his treatment providers and others.  As the Hospital proposes granting Mr. Hinckley longer stretches of time in Williamsburg that include more unsupervised time in public and the ability to drive unaccompanied, it is imperative that his treaters and the Court have confidence that he will faithfully adhere to the rules that are prescribed for him — rules that the Hospital believes will mitigate his risk and promote continued stability.  As important, with more freedom and more unsupervised time, his treatment teams at St. Elizabeths and in Williamsburg must have confidence that Mr. Hinckley is open, honest, and not deceptive in his self-reporting.  Any further reasons for a continuing lack of confidence that Mr. Hinckley will adhere to the terms of the Hospital's proposal or for

concluding that he cannot be relied upon honestly to report his activities to his treatment teams would make it difficult to conclude that he can be effectively monitored if given more freedom.

In the months preceding the evidentiary hearing, Mr. Hinckley deviated twice from the approved itineraries for his use of unsupervised free time in Williamsburg, by spending time at the Barnes & Noble bookstore instead of at a movie theater as scheduled. Worse, Mr. Hinckley lied to his treatment providers and others afterward about what he had done. While the choice between seeing a movie and spending time in a nearby bookstore may seem trivial by itself, these incidents are significant for two reasons.

First, Mr. Hinckley twice was not where he was supposed to be according to his pre-approved itineraries. These deviations may have had a plausible explanation: Mr. Hinckley stated that on each occasion the show time for the film he intended to see (which he had not looked up in advance) did not match up with his scheduled arrival and departure times at the shopping center, so he would not have been able to see the entire film during the three-hour window of his free time. See Patterson Rpt. at 34-35; Transcript of Hearing at 24 (Jan. 30, 2012 p.m.) (Patterson).[23] But this explanation does not account for the second and more significant problem: that Mr. Hinckley lied about seeing these movies to several different clinical professionals, and embellished on these lies by describing the movies he did not in fact see and recommending them to others. See Patient's Ex. 5; Phillips Rpt. at 72; see also Patterson Supp. Rpt. at 14, 19. The fact that his deception was about a relatively insignificant matter is far from reassuring, because a willingness to casually lie about small matters for no real purpose suggests that Mr. Hinckley may be untruthful about more serious matters where he perceives he has something to gain. The fact that none of those to whom he lied about his whereabouts perceived

---

[23]     It is noted that Dr. Patterson did not find this explanation reasonable or acceptable. See Transcript of Hearing at 22-25 (Jan. 30, 2012 p.m.).

that he was being deceptive "[has] clinical significance to compliance," Transcript of Hearing at 26 (Jan. 30, 2012 p.m.) (Patterson), and raises concerns about the amount of unsupervised time Mr. Hinckley should be given in the community and how effectively to monitor Mr. Hinckley while he is in Williamsburg.[24]

After learning about Mr. Hinckley's untruthfulness from the Secret Service reports, the Hospital sanctioned him by cutting the length of his next visit in half and eliminating his use of unsupervised free time in Williamsburg for much of the ensuing year.  See Patient's Ex. 5 at 1-2; Transcript of Hearing at 7 (Feb. 26, 2013 p.m.).  Taking up a recommendation made by Dr. Montalbano, the Hospital now requires Mr. Hinckley to keep a daily log of his activities while on conditional release, which is reviewed by his treatment team in conjunction with his family members and Williamsburg-area treatment providers.  See Murphy Supp. Rpt. at 6. According to the Hospital, there is no indication that Mr. Hinckley has ever deviated from his itineraries again, and Secret Service surveillance reports made over the course of 2012 show no violations of his itineraries or any Court directives.  See id.  The Hospital believes that Mr. Hinckley has learned his lesson, particularly because of the enormous amount of attention these incidents garnered at the evidentiary hearing and the reaction of disappointment it provoked in his family.  Even Dr. Patterson acknowledges that, a year later, Mr. Hinckley was "more contrite and less defensive" about his dishonesty.  Transcript of Hearing at 9 (Feb. 27, 2013); see Patterson Supp. Rpt. at 9.

While the Hospital temporarily curtailed Mr. Hinckley's unsupervised free time in response to his dishonesty, and now requires him to complete a daily log of his activities, its

_____

[24] Also troubling is Mr. Hinckley's initial reaction when questioned by Dr. Patterson about these instances of dishonesty: instead of acknowledging the seriousness of his conduct, Mr. Hinckley characterized the focus on these incidents as "nitpicking" and expressed the view that people should "cut [him] a little slack" because it is difficult to have so much of his behavior scrutinized by the Secret Service.  Patterson Rpt. at 35-36.

revised (e) letter proposes that he be permitted significant additional unsupervised time in the community, during which he no longer would be required to follow an itinerary but rather could choose from a menu of pre-approved activities. Specifically, the Hospital proposes that it no longer provide the Court and the government with an itinerary prior to each visit that sets forth the time, date and place of each activity in which Mr. Hinckley will participate outside his mother's subdivision. See supra at 14. Instead, Mr. Hinckley would be free to choose from a general menu of pre-approved options and even some activities approved by the Hospital or Mr. Weiss on the very day the activity is to take place. Id. Furthermore, the Hospital's proposal still largely relies on Mr. Hinckley's own self-reporting to confirm his activities during the use of his unsupervised time. Mr. Hinckley's deception about attending the movies, however, suggests to the Court the need to have in place sufficient mechanisms to monitor his behavior and whereabouts, so that his treatment providers and, ultimately, the Court will know whether he is adhering to the rules of his conditional release. Indeed, even Dr. Montalbano acknowledges the unreliability of Mr. Hinckley's self-reporting and the need to put in place effective mechanisms for ongoing monitoring and supervision, so that everything is "not simply contingent on his self-report." See supra at 68-69 (quoting Transcript of Hearing at 60 (Feb. 7, 2012 p.m.)). The Court will continue to require detailed itineraries for at least four of the 17-day visits. See infra at 101-02.

### 5. Relationships with Women

As in the past, Mr. Hinckley's relationships with women were a significant topic for discussion during this evidentiary hearing. See, e.g., Hinckley VI, 625 F. Supp. 2d at 10, 15; Hinckley V, 493 F. Supp. 2d at 74-76. The government and its experts focused on two aspects of Mr. Hinckley's romantic inclinations that they found troubling. The first is that, in their view,

Mr. Hinckley's pursuit of female companionship has at times led him to exercise poor judgment, in some cases by being less than candid with his treatment providers or violating Hospital policies and expectations. The second concern is that the emotional toll on Mr. Hinckley of losing his current romantic relationship with Ms. CB — a loss that appears likely if he transitions to spending significantly more of his time in Williamsburg — may lead him to decompensate.

Mr. Hinckley's treaters agree that he continues to have a strong need to be in a romantic relationship, and that changes in his relationship status, along with limitations in his "capacity for self-reflection and insight into intimate relationships" remain salient risk factors for him. Murphy Rpt. at 52; see id. at 54. But they emphasize that "there continues to be no significant evidence that Mr. Hinckley harbors delusional notions about his relationships with women or fantasies of idealized love," as he did with Jodie Foster at the time he shot President Reagan. Id. at 52. And while the government's experts believe there still is evidence of Mr. Hinckley's idealization of women, they are not aware of any evidence that Mr. Hinckley is engaging in anything approaching the dysfunctional idealization of women as he has in the distant past. Transcript of Hearing at 59-60 (Jan. 30, 2012 p.m.) (Phillips). The Hospital also highlights indications that Mr. Hinckley has shown an ability to recognize and respond appropriately to social cues from women when they indicate a lack of romantic interest. Murphy Rpt. at 52-53. And Mr. Hinckley's individual therapist at St. Elizabeths, Dr. Sidney Binks, is reportedly of the view that over time Mr. Hinckley "has developed a more realistic view of relationships[,] has developed an increased capacity to weather the stressors or rebuffs and rejections in relationships[,] and has become more empathetic in his relationships." Transcript of Hearing at 58 (Feb. 7, 2012 a.m.) (Montalbano).

Mr. Hinckley's expert witness, Dr. Montalbano, expressed the opinion that Mr. Hinckley's relationships with women are being overemphasized by Dr. Patterson and Dr. Phillips

as a current risk factor.  He noted that "twelve years of data have accumulated" since the time that Dr. Montalbano himself first expressed similar concern about Mr. Hinckley's female relationships, and that during this period Mr. Hinckley has been through many relationships without incident:

> There have been rejections, there have been rebuffs, there have been terminations of relationships. And through it all, he has maintained his psychological equilibrium. He has not decompensated.  There are fluctuations in his mental status such as being moody or sad or irritable, depending upon what is going on in the relationship, but that has not resulted in a decompensation. It has not resulted in significant clinical depression. It has not resulted in any psychotic delusion. So he has remained stable.

Transcript of Hearing at 68 (Feb. 7, 2012 a.m.).  Dr. Phillips agrees that Mr. Hinckley has successfully navigated emotional rebuffs and the endings of serious relationships during this period, but adds the caveat that he has "handled it well in the context of an extremely clinical[ly] supportive milieu."  Transcript of Hearing at 60 (Jan. 30, 2012 p.m.).

Two instances that took place over four years ago have been identified as examples of Mr. Hinckley having used poor judgment in matters that involved women since the last evidentiary hearing.  First, in December 2008, Mr. Hinckley invited a woman with whom he was involved at the time to a St. Elizabeths Hospital Christmas party, without notifying the Hospital staff.  He was temporarily placed on unit restriction for violating a rule requiring prior approval to put people on the visitor list.  Murphy Rpt. at 39; Transcript of Hearing at 97-100 (Dec. 1, 2011 p.m.); Transcript of Hearing at 12-14 (Dec. 8, 2011 a.m.).  The Hospital did not view this as a serious infraction but as a reflection of questionable judgment.  Id. at 14.

Second, in 2009, after Mr. Hinckley befriended a dental resident who had treated him at St. Elizabeths, one day, while he was working in the Hospital library, he looked at photographs of her graduation from dental school that she had posted on the internet.  Murphy

Rpt. at 42; Transcript of Hearing at 10-12 (Nov. 30, 2011 p.m.).  When this was discovered by

Mr. Hinckley's library supervisor in the course of routinely viewing the computer's internet

history, Mr. Hinckley was placed on unit restriction "to reflect upon making better choices on the

proper use of the computer at his place of employment."  Hospital's Revised (e) Letter at 7-8; see

Murphy Rpt. at 42.  Using the computer to view these photographs did not violate any written

rules, according to Mr. Shamblee, but it was considered poor judgment on Mr. Hinckley's part

because it was not an appropriate use of his time at work.  More importantly, because of the

nature of Mr. Hinckley's offense and the focus on female relationships in previous court

proceedings, it was an especially bad idea for him to look up women on the internet.  Transcript

of Hearing at 16 (Dec. 8, 2011 a.m.); see id. at 103-04; Transcript of Hearing at 11-13 (Dec. 8,

2011 p.m.); Transcript of Hearing at 24-25 (Feb. 8, 2012); Patterson Rpt. at 55.[25]

More recently, the government and its experts have expressed concern about

whether Mr. Hinckley has been entirely forthcoming with his treatment providers about his

current relationship with Ms. CB — specifically whether he is engaged to her or plans to

continue their relationship if he is allowed to spend more time in Williamsburg.

As Dr. Phillips explained, evidence of whether a patient can exercise good

judgment is critical to assessing his or her risk.  According to Dr. Phillips:  "[W]e care if Mr.

Hinckley is making poor decisions in his relationships with women" because "judgment is an

issue that has a profound bearing on risk assessment . . . .  [A]s Mr. Hinckley presumably has

---

[25]     The government spent considerable time during the evidentiary hearing
suggesting that looking at these photographs violated Hospital rules with respect to computer
use, but the testimony from Hospital staff was unambiguous that at the time of the incident there
was no rule barring Mr. Hinckley from looking at the photographs.  It was simply seen as poor
judgment for the reasons explained above.  See Transcript of Hearing at 9-13 (Nov. 30, 2011
p.m.); Transcript of Hearing at 16 (Dec. 8, 2011 a.m.); id. at 103; Transcript of Hearing at 11-13
(Dec. 8, 2011 p.m.).

more time in the community with potentially less supervision, those decisions that he makes, if they are poor ones, can have profound consequences." Transcript of Hearing at 57 (Jan. 30, 2012 p.m.). The incidents described above, therefore, are worthy of note, insofar as they suggest that Mr. Hinckley's interest in women may lead him to exercise bad judgment or be less than forthright with his treaters. Id.

The focus on Mr. Hinckley's female relationships, however, can easily become unmoored from the question of whether he is a risk of danger to himself or others. The concerns expressed by the government and its experts can also have the effect of placing Mr. Hinckley in a Catch-22: for instance, as noted by Dr. Montalbano, Mr. Hinckley's desire to have Ms. CB visit him in Williamsburg has been presented as a narcissistic refusal to respect the contrary wishes of his family, but the openness he has expressed to ending his relationship with Ms. CB entirely if necessary to move forward with his transition to Williamsburg is viewed as narcissistic lack of empathy for her. Transcript of Hearing at 45-46 (Feb. 7, 2013 a.m.); see also Transcript of Hearing at 102-05 (Jan. 24. 2012). Significantly, the government's experts have expressed concern for years that Mr. Hinckley's romantic relationships may lead him to decompensate or become dangerous — yet as they acknowledge, despite numerous intense relationships and breakups that Mr. Hinckley has experienced, this has never come to pass.

In sum, Mr. Hinckley's relationships with women will continue to be of interest to his treatment providers and to the Court, given his history, the centrality of these relationships to his life, and their potential effect on his stability and judgment. As Dr. Murphy notes, "throughout the continued transition to Williamsburg [Mr. Hinckley] will require ongoing support and guidance in his decision-making processes, particularly those with emotionally laden qualities and in the context of interpersonal relationships." Murphy Report at 53. But over these many years there has been no evidence that Mr. Hinckley's romantic relationships — real

relationships, not delusional fantasies about movie stars or others — have caused him to be dangerous to himself or others.  The concerns that the government's experts continue to express about his female relationships, therefore, while legitimate, must be kept in perspective when evaluating whether Mr. Hinckley is likely to be a danger to himself or others when released to the community under appropriate conditions.

### 6.  Alleged Interest in Books on Presidential Assassinations

The government presented three witnesses in support of an allegation that Mr. Hinckley demonstrated an interest in books on presidential assassinations while shopping at a bookstore in Williamsburg.  The testimony of these three witnesses — two Secret Service agents and an employee of the bookstore — is described in detail earlier in this Opinion.  See supra at 53-63.  The Court finds that the witnesses' testimony does not support the government's assertions made in representations to the Court and in its widely publicized opening statement at the evidentiary hearing.  The evidence later presented at the hearing simply did not live up to the preview given by the government.

The government claimed in its opening statement that Mr. Hinckley twice "looked at books about President Reagan and about presidential assassins" in the Barnes & Noble bookstore; on one of those occasions, he should have been at the movies.  Transcript of Hearing at 28 (Nov. 30, 2011).  Special Agent Anthony Bordeaux's report, however, reads as follows:

> Inside the bookstore the subject was observed stopping and looking at bookshelves in several different sections to include Bargain Books about American History, True Crime, American History [sic].  In these areas the subject was not observed picking up and looking at any specific books.  One item of note is the subject stopped for a time and looked at the shelves in the American History area that contain several books about President Reagan and his attempted assassination.

The subject was also observed looking at rock music CD's and one book in particular, *The British Invasion: The Music, the Times, the Era*, by Barry Miles.

During his time in the bookstore, the subject browsed the magazine section and was observed looking at various magazines referencing art and literature.

Patient's Ex. 9 at 1.

Agent Bordeaux testified at the evidentiary hearing that, as stated in his report, Mr. Hinckley did not touch or pick up any books from the American History bookcase, and that the agent did not know what book covers Mr. Hinckley was looking at on the bookcase. The agent's testimony reflected exactly what his report attests and no more: that during the course of a 45-minute visit to the bookstore, in which Mr. Hinckley browsed many sections of the store and purchased a greeting card, he was observed standing for a few moments in front of a bookcase in the American History section that contained books on President Reagan and assassinations, among others. See supra at 53-56; Patient's Ex. 9; Transcript of Hearing at 74-78, 99-102, 123 (Jan. 23, 2012 p.m.). "I said [in my report] he looked at shelves. I didn't say he looked at several books." Transcript of Hearing at 100 (Jan. 23, 2012 p.m.). Furthermore, the surveillance report also clearly states, contrary to the government's representation in its opening statement, that during the visit Mr. Hinckley looked at music CDs, a book about music, and magazines about art and literature. Patients Exhibit 9; see Transcript of Hearing at 79, 106-08 (Jan. 23, 2012 p.m.).[26]

The other surveillance report that the government cited as evidence of Mr. Hinckley's alleged interest in books on presidential assassinations describes another visit to the

_____

[26]     The government had said in its opening statement: "He wasn't in the art section, he wasn't in the music section, he wasn't in the fiction section. Mr. Hinckley looked at books about President Reagan and about presidential assassinations." Transcript of Hearing at 28 (Nov. 30, 2011 a.m.).

same bookstore in October 2011.  It reports that Mr. Hinckley briefly paused in front of a bookcase that contained books on presidential assassinations (but did not touch or read any of these books) during a long visit in which Mr. Hinckley focused the rest of his attention on other book sections with innocuous content.

Special Agent Jason Clickner's surveillance report of October 16, 2011 states that while Mr. Hinckley browsed in the bookstore for 35 minutes before proceeding to the nearby theater and attending a movie, he at one point "appeared to be momentarily fixated" on a bookshelf in the "new history" section that contained books on the McKinley assassination and the Kennedy assassination, among other subjects.  Patient's Ex. 22 at 1; see also Transcript of Hearing at 14-16, 18-20 (Jan. 23, 2012 a.m.).  Agent Clickner testified that Mr. Hinckley did not touch or pick up any books from this shelf during the 15 to 20 seconds that he stood in front of it, and that the agent did not know whether Mr. Hinckley was focused on any particular book or even whether he was looking at the bookshelf in question as opposed to the one above or below it.  Transcript of Hearing at 15-16, 47-48, 58 (Jan. 23, 2012 a.m.).  The surveillance report also notes that during the visit Mr. Hinckley looked at "a display of Beatles books" and that he "ultimately purchased a book about Elvis and a book about Bob Dylan."  Patient's Ex. 22 at 1.

There is no evidence that on either occasion Mr. Hinckley ever touched, picked up, or read any books on presidential assassinations.  All that the surveillance reports and the agents' testimony show is that over the course of a year during which the Secret Service monitored Mr. Hinckley while he made several visits of considerable duration to the Barnes & Noble bookstore, Mr. Hinckley was observed twice, for brief periods of time, standing in front of a bookcase in the American History section, containing some books, among others, on President Reagan, President Kennedy, President McKinley, and assassinations.  This evidence is relevant, of course, but it does not have nearly the significance that the government attributes to it.

As for the testimony of Barnes & Noble employee Richard Rolfes, his memory of the incident about which he testified was far too shaky and uncertain for the Court to credit his identification of Mr. Hinckley as the customer he assisted months earlier.  That conclusion should be evident from the Court's summary of Mr. Rolfes' testimony earlier in this Opinion.  See supra at 58-63.  Most troubling, Mr. Rolfes' testimony was not truly independent.  Rather, his identification of Mr. Hinckley as the customer he assisted was directly prompted by press reports of government counsel's opening statement in this case in which the government inaccurately described what the Secret Service had observed in the Barnes & Noble bookstore.  See supra at 58-59 and note 14.  That inaccurate description by the government led to discussions at the bookstore that John Hinckley "had been looking for books on the subject of Presidential assassinations" there; those discussions then led Mr. Rolfes to seek out a photograph of Mr. Hinckley on the internet and conclude that he was the customer Mr. Rolfes remembered helping.  Transcript of Hearing at 8-9 (Jan. 23, 2012 p.m.).  Mr. Rolfes' identification of the customer he briefly assisted months earlier clearly was influenced by these inaccurate reports and undermines the independence and reliability of his testimony.  That testimony is further undermined by the fact that Mr. Rolfes said the person he assisted months earlier was present in the store during a month when Mr. Hinckley was not even in Williamsburg and at a time of day when Mr. Hinckley never frequented the bookstore alone.  See supra at 60-63 and notes 15 and 16.

For these reasons, the Court places no weight on the testimony that it was Mr. Hinckley with whom Mr. Rolfes interacted and who asked about books on presidential assassinations.  While the Court entirely credits the accuracy of the Secret Service surveillance reports discussed above and the agents' testimony, those reports do not show anything other than

a possible but unconfirmed expression of brief interest in the covers of such books by Mr. Hinckley.

## B.  Specific Proposals in the Hospital's (e) Letters

### 1.  Duration of Visits

The Hospital's first proposal is that the duration of Mr. Hinckley's conditional release visits to Williamsburg be increased from ten to seventeen days.  Based on the evidence presented at the hearing, the Court is confident that under appropriate conditions, Mr. Hinckley will not likely be a danger to himself or others if his visits to Williamsburg are expanded from ten days to seventeen days.  Mr. Hinckley has been making 10-day visits to Williamsburg for nearly four years, without in any way decompensating or doing anything that might suggest a risk of danger.  He now has made 33 such visits.  With the notable exception of the two movie incidents discussed above, all the evidence shows that he has obeyed every rule and restriction that has been prescribed for him.  He has complied with the specific obligations required of him under the Court's last Order, including meeting regularly with his Williamsburg treatment providers and maintaining a volunteer position.  Mr. Hinckley's mental status has remained stable throughout this long period, with no reemergence of psychosis or clinical depression, both of which have been in full remission for over two decades.  His track record of stability supports the first recommendation of his treatment providers — who uniformly believe that he is ready for an expansion of his time outside the Hospital — that his visits to Williamsburg be expanded to seventeen days per month.  That recommendation is consistent with the results of numerous risk assessments that, utilizing empirically supported methods of predicting dangerousness and recidivism, find Mr. Hinckley to present a low risk of danger under the Hospital's plan.

The Court finds that it is highly unlikely that symptoms of Mr. Hinckley's Axis I disorders will reemerge during visits to Williamsburg of seventeen days in duration, both because his medications will continue to serve a protective function in warding off such symptoms and because any symptoms of clinical depression or psychosis would develop gradually and would likely be noticed by his treatment providers in Williamsburg and/or when he returns every month to St. Elizabeths. The Hospital's plan puts Mr. Hinckley under observation by a number of people during these 17-day visits to Williamsburg. Every week he will be seen at least once by Dr. Giorgi-Guarnieri and by Mr. Weiss, and twice by Mr. Beffa. He will also see his music therapist, Ms. Haley, at least once per visit. Each weekday, he will spend several hours with supervisors, co-workers, and patrons at Eastern State Hospital. He will be seen by his mother daily, and by his siblings during any of their trips to Virginia. And after his 17-day visits, of course, Mr. Hinckley will spend the rest of each month back at St. Elizabeths, where he will be subject to observation by an additional group of treatment providers who are intimately familiar with him and with his history.

Based on Mr. Hinckley's consistent track record over several years of 10-day visits to Williamsburg, the consensus among his treatment providers about his stability and readiness for more freedom, the results of empirically rooted risk assessments, and the significant clinical oversight entailed by the Hospital's proposal, the Court believes that increasing the duration of his visits by seven days will not cause Mr. Hinckley to be a danger to himself or others. Furthermore, the Court agrees that these 17-day visits should occur on a regularly scheduled basis each month in order to enhance Mr. Hinckley's ability to secure paid employment or additional volunteering opportunities, and to participate in therapeutic or social

group activities.[27]  These longer and regularly scheduled visits will permit Mr. Hinckley a

greater opportunity to establish himself in the Williamsburg community, to have a regular

schedule of volunteer work and individual and group therapy sessions to a degree that has not

been possible with sporadic shorter trips, and — potentially — to begin to integrate himself

socially into the community.  The burden is on Mr. Hinckley now to meet the Phase IV goal of

greater integration into the Williamsburg community.

       The Court notes that nearly everyone who testified at the evidentiary hearing

expressed concern that with longer visits to Williamsburg, Mr. Hinckley is at risk of becoming

lonely and possibly depressed if he finds himself living in that community without developing

strong social and vocational ties.  Right now, he still lacks such ties.  He has made no friends and

has taken virtually no steps to socialize or participate in social, educational, or vocational

activities (other than his volunteer work) that would bring him in contact with people in the

community other than his mother, his treatment providers, and co-workers at his job.  Although

the Hospital's plan assures that many eyes will be watching Mr. Hinckley in Williamsburg, the

proposed schedule for his weekly activities remains skeletal, with many blocks of unscheduled

time outside of his clinical appointments and his volunteering duties.  The Hospital's intention is

that Mr. Hinckley — with Mr. Weiss' assistance — will over time fill in these blanks with

additional activities that cannot feasibly be arranged until Mr. Hinckley is visiting Williamsburg

for longer periods.  The Court concludes that a series of 17-day visits — at least eight — will

provide the opportunity for Mr. Hinckley to undertake some initiatives on his own and, with the

assistance of Mr. Weiss, to arrange for such activities, to develop interpersonal relationships and

---

[27]  The Hospital has requested at least two weeks between visits to prepare the
necessary feedback reports to the Court.  With visits of seventeen days each month, the Hospital
will have thirteen or fourteen days to prepare its reports before the next visit.

social opportunities, and generally to become more integrated into the community — the goals of the Phase IV transitional step.

The Hospital next proposes that after only two successful 17-day visits the duration of Mr. Hinckley's Phase IV visits be increased again — to 24 days. Approval of such visits would effect a more dramatic change to Mr. Hinckley's life, as he would be spending the majority of each month in Virginia. In addition, the Hospital's proposal calls for less clinical oversight of Mr. Hinckley during these proposed 24-day visits. The Hospital recommends that during its proposed 24-day visits, Mr. Hinckley would continue to meet once per week with Mr. Beffa for individual therapy and once per week for group therapy. He would meet only once per visit with Dr. Giorgi-Guarnieri, unless she concludes that more frequent meetings are clinically advisable, and he would meet twice per visit with Mr. Weiss for case management and twice per visit with Ms. Haley for music therapy. The recommendation that Mr. Hinckley meet twice per 24-day visit with Mr. Weiss and Ms. Haley is found in Dr. Murphy's supplemental risk assessment. See Murphy Supp. Rpt. at 8, 10.

Despite Mr. Hinckley's present stability and the many indications that he will pose no danger to himself or others under the Hospital's plan, the Court believes that it would be unwise to increase Mr. Hinckley's visits to 24 days without any evaluation by both the Hospital and the Court of what occurs during his 17-day visits and the steps he takes during these visits to meet the central goal of Phase IV: genuine integration into the Williamsburg community. Had Mr. Hinckley, with Mr. Beffa's assistance, been more proactive in seeking out less solitary and more integrative social, vocational and educational activities in the sixteen 10-day visits to Williamsburg that have occurred since the testimony of Dr. Patterson and Dr. Phillips in January 2012, or even in the seven visits to Williamsburg since the hearing finally concluded in February 2013, the Court might be more sympathetic to the Hospital's proposal. But the cookie-cutter

itineraries submitted over this period, with their repetitive pattern of routine and often solitary pursuits, were virtually identical to those presented in all of the earlier visits: visiting stores and restaurants, going to the movies, taking solitary walks in his mother's neighborhood, and spending time alone in the family home. After 33 visits of ten days' duration, the Court should have been able to evaluate the success of Mr. Hinckley's efforts to meet the goals of Phase IV, but, in the circumstances, it cannot. Nor will it be able to do so after only two 17-day visits.

For these reasons, the Court will require a minimum of eight 17-day visits before considering a further (e) letter from the Hospital recommending visits of up to 24 days or such other proposal as the Hospital thinks appropriate after — in conjunction with the Williamsburg treatment team — it has assessed the progress that has been made during the eight 17-day visits to Williamsburg. The Court will also continue to require detailed itineraries to be provided by the Hospital in advance for at least the first four such visits. Should these itineraries — prepared by Mr. Hinckley, Mr. Shamblee, and now Mr. Weiss — contain the kinds of social and other interactive activities that have up to this point been lacking, the Court will consider a motion from the Hospital or Mr. Hinckley to modify the requirement of detailed itineraries.[28]

---

[28] The Hospital's (e) letter also proposes that after eight visits — two of 17 days duration and six of 24 days — and contingent upon a favorable assessment by Hospital staff and Mr. Hinckley's local treatment providers, the Hospital in its discretion — without further Court involvement — be permitted to allow Mr. Hinckley to live permanently in Williamsburg on convalescent leave, reporting to St. Elizabeths once a month for outpatient checkup. The Court cannot conceive of permitting that step to be taken in this case without an evidentiary hearing and a Court order. Adequate evaluation at each stage by the health care professionals and by the Court is required before proceeding to the next. Indeed, even Dr. Murphy recommends another risk assessment and updated psychological testing before convalescent leave is recommended. See supra at 71. That having been said, the Hospital's proposed conditions 27 through 32, see supra at 17-18, therefore need not be considered.

## 2. Unsupervised Time in the Community

For Mr. Hinckley to pursue the social and vocational activities that will permit him to meaningfully integrate into the Williamsburg community, the Court agrees that he must be allowed to leave his mother's housing subdivision for more than simply attending his therapeutic appointments and volunteering at Eastern State Hospital. At the same time, Mr. Hinckley's dishonesty in 2011 about his attendance at two movies suggests that he may not confidently be relied upon always to accurately report his whereabouts, and it underscores the need for ongoing monitoring not contingent primarily on his own self-reporting. Reconciling these two considerations presents one of the greater difficulties in establishing terms for his conditional release that provide an appropriate degree of liberty while also assuring that Mr. Hinckley's risk is being adequately managed.

All of the experts recognize the importance of independently monitoring Mr. Hinckley's behavior while he is on conditional release. The pre-approved itineraries for his visits have facilitated such monitoring. But by spelling out in advance each of Mr. Hinckley's activities, both accompanied and unaccompanied, during every day of his visits, those itineraries also constrain his flexibility in pursuing opportunities for community integration. The Hospital therefore proposes changing the current itinerary system to one in which Mr. Hinckley, when utilizing his unsupervised time in public, is free to choose from among a list of preapproved locations and activities, a so-called "menu of current areas of interest approved by [the] Hospital/Mr. Weiss in advance or with notice on the day of a special activity." Hospital's Revised (e) Letter at 23; see supra at 14. Under this proposal, there would no longer be an itinerary prepared and provided to the Court in advance. For the reasons just discussed, the Court will continue to require detailed itineraries for at least the first four of Mr. Hinckley's eight 17-day visits to Williamsburg. In addition, the Court agrees with the Hospital that it is

appropriate to continue to require Mr. Hinckley to complete a daily log of his activities, with the goal of making him assume more responsibility for accurately representing his activities and his whereabouts.

The Hospital further proposes that Mr. Hinckley continue to be required to carry a GPS-enabled cell phone during all of his unsupervised activities, and the government has suggested requiring random spot checks by Mr. Hinckley's case manager to ensure that he is where he is supposed to be at given times. The Court will require Mr. Hinckley to continue to carry a GPS-enabled cell phone during all of his unsupervised activities, although the value of this monitoring tool may be limited.[29] It will not require Mr. Weiss to undertake random spot checks. The government shall notify the Court promptly if the data it obtains from the GPS tracking or from Secret Service surveillance yields any information of concern. In the absence of any negative reports for a period of six months, the Court will entertain a motion by the Hospital or by Mr. Hinckley to eliminate the GPS-enabled cell phone condition.

### 3. Driving Privileges

Mr. Hinckley has obtained a District of Columbia driver's license and has become comfortable driving in the Williamsburg area. He is not currently permitted to drive without having a family member present in the car with him. This restriction limits the scope of his activities and places a burden on his elderly mother, because she generally must drive with Mr.

---

[29] The government also has suggested requiring Mr. Hinckley to wear an ankle bracelet for GPS monitoring purposes while in Williamsburg. Mr. Hinckley has exhibited no behavior while on his conditional releases, however, that would justify the intrusiveness and stigma of being forced to wear an ankle bracelet, even taking into account his dishonest representations in 2011 about whether he had attended two movies on his itineraries. Further undermining the government's suggestion that this measure is needed, in 2009 the Court first ordered Mr. Hinckley to carry a GPS-equipped cell phone at all times while in public during his conditional releases — yet the government has never sought to take advantage of this proviso by obtaining GPS data about his whereabouts, even though apparently entire years have gone by in which the Secret Service conducted no monitoring of his conditional release visits at all.

Hinckley to each of his activities and either wait for him there or drop him off and return to pick him up later. The Hospital, Mr. Hinckley's treatment providers, and his siblings all support giving him permission to drive unaccompanied in order to ease this burden and widen the range of social, vocational, and educational activities in which he may participate. Dr. Phillips agrees that permitting Mr. Hinckley to drive unaccompanied may be necessary to facilitate the community integration that he is being encouraged to pursue. Only Dr. Patterson does not support granting such privileges, citing doubts about whether Mr. Hinckley will adhere to rules on his use of an automobile.

The Court agrees that permitting Mr. Hinckley to drive unaccompanied has the potential to promote his integration into the Williamsburg community, increase his sense of autonomy and self-confidence, and ease an unnecessary burden on his mother. So long as Mr. Hinckley is using the vehicle to travel to destinations where people will be expecting him, the Court does not believe these privileges will create any undue risk, and they should assist with his integration into the Williamsburg community. Thus, Mr. Hinckley will be allowed to drive himself to his therapeutic appointments with Dr. Giorgi-Guarnieri, Mr. Weiss, Mr. Beffa, and Ms. Haley and to his volunteering or employment activities, as well as to any specific social or educational activities that he and Mr. Weiss arrange. The Court therefore will permit Mr. Hinckley unaccompanied use of an automobile under the conditions outlined by the Hospital and in this Opinion.

4. Treatment Providers

While the Court's knowledge of the background and talents of Jonathan Weiss is based solely on his resume and what others have said about him in their testimony, the Court approves the substitution of Mr. Weiss for Mr. Beffa as case manager for Mr. Hinckley. By all

accounts, Mr. Weiss is eminently qualified to serve in this capacity. His experience as a case manager and his long familiarity with the Williamsburg area provide reason to believe that his involvement will foster more aggressive case management than Mr. Beffa has provided and more sustained and proactive efforts to integrate Mr. Hinckley into the community than have been evident thus far. Indeed, the success of Mr. Weiss' efforts in conjunction with greater initiative taken by Mr. Hinckley himself will be critical in determining whether and under what conditions this Court will expand Mr. Hinckley's freedom further in the future. Mr. Weiss' former professional ties to Colonial Behavioral Health may even lead to the possibility of that organization playing a role in Mr. Hinckley's treatment in the long term.

The Court also agrees with Dr. Phillips and others that Ms. Haley will be a welcome addition to the Williamsburg treatment team; her music therapy sessions promise to be beneficial to Mr. Hinckley's continued recovery. Participation in Mr. Beffa's group therapy sessions offers the possibility of learning from and fruitfully interacting with individuals who are dealing with mental health issues but who are doing so as free members of the community. Finally, as Mr. Hinckley spends more time in the Williamsburg area, the Court finds it imperative that these Williamsburg-area treatment providers and Dr. Giorgi-Guarnieri coordinate their efforts, communicate regularly with each other, and share information, so that the four of them function as much as possible as a cohesive treatment team.

## VII. CONCLUSION

For the reasons discussed in this Opinion, the Court will grant in part and deny in part the Hospital's request to expand Mr. Hinckley's conditions of release. Specifically, the Court will grant the Hospital's request to expand Mr. Hinckley's visits to Williamsburg from ten to seventeen days a month. The Court will require at least eight such visits before considering

any further (e) proposals from the Hospital or (k) petitions from Mr. Hinckley. It therefore will deny the Hospital's request to increase the duration of his visits to 24 days after only two visits of 17 days and the request to give the Hospital discretion to release him on convalescent leave without further Court involvement. As relevant, the conditions set forth in the Court's Order of July 9, 2009, as modified to be consistent with this Opinion, shall remain in force. In addition, or as appropriate in lieu of some of those conditions, the Court will adopt the Hospital's proposed conditions 2, 3, 8, 10, 11, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, and 26, except to the extent modified by this Opinion. An appropriate Order accompanies this Opinion.

SO ORDERED.

/s/_____
PAUL L. FRIEDMAN
DATE:  December 20, 2013          United States District Judge