1

```
1                UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
2


3


4   UNITED STATES OF AMERICA        :
                                     :
5                Plaintiff,          :Criminal Case No. 81-306
                                     :
6   v.                               :
                                     :
7   JOHN W. HINCKLEY, JR.            :
                                     :
8                Defendants.         :
    -----------------------------------------------------
9               Day 1, Afternoon session
             TRANSCRIPT OF EVIDENTIARY HEARING
10        BEFORE THE HONORABLE PAUL L. FRIEDMAN
             UNITED STATES DISTRICT JUDGE
11             Wednesday, April 22, 2015
                   WASHINGTON, D.C.
12


13


14


15


16  Proceedings reported by machine shorthand, transcript

17  produced by computer-aided transcription.

18


19


20


21


22


23


24


25
```

```
 1    APPEARANCES:

 2      For the GOVERNMENT:  U.S. ATTORNEY'S OFFICE
                             BY:  COLLEEN KENNEDY, AUSA
 3                                MARK AZIZ, AUSA
                                  MICHELLE CHAMBERS
 4                           555 Fourth Street, NW
                             Washington, D.C.  20530
 5                           (202)514-7248

 6      For the Defendant:   DICKSTEIN SHAPIRO, LLP
                             BY:  BARRY WILLIAM LEVINE, ESQ.
 7                                ANN MARIE LUCIANO, ESQ.
                             1825 Eye Street, NW
 8                           Washington, D.C.  20006-5403
                             (202)420-2237
 9
                             DINSMORE & SHOHL, LLP
10                           BY: E. MICHELLE TUPPER-BUTLER, ESQ.
                             101 S. Fifth Street, Suite 2500
11                           Louisville, KY   40202
                             (502) 540-2367
12

13      For St. Elizabeth's: ST. ELIZABETHS HOSPITAL
                             BY:  DEON MERENE, ESQ.
14                           1100 Alabama Avenue, SE
                             Washington, D.C.   20032
15

16

17

18

19

20

21

22

23

24

25
```

# TABLE OF CONTENTS

## EVIDENTIARY HEARING

### WITNESSES

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| Verne Hyde | 3 | | | |

### EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---------|-------------|------|
| Patient's 1 | Resume | 8 |
| Patient's 2 | Letter dated 12-19-14 | 16 |
| Patient's 3 | Follow-up recommendation | 44 |

1          P R O C E E D I N G S

2          THE COURT:  All right.  Good afternoon,

3     everybody.

4          MR. LEVINE:  Good afternoon, Your Honor.

5          THE COURT:  So who is next?

6          MR. LEVINE:  Your Honor, the next witness is

7     Mr. Hyde.  May we call him now, Your Honor?

8          THE COURT:  Yes, sir.

9                    * * * * * * * * * * * * * *

10         Thereupon,

11              V E R N E   H Y D E,

12    Having been called as a witness on behalf of the Patient

13    and having been first duly sworn by the Deputy Clerk, was

14    examined and testified as follows:

15                    DIRECT EXAMINATION

16    BY MR. LEVINE:

17         MR. LEVINE:  Proceed, Your Honor?

18         THE COURT:  Yes, sir.

19         MR. LEVINE:  Thank you.

20         BY MR. LEVINE:

21    Q.   Sir, would you please state your name?

22    A.   Verne James Hyde.

23    Q.   Are you known as VJ Hyde?

24    A.   Yes.

25    Q.   And are you currently an employee at

1    St. Elizabeths Hospital?

2         A.   Yes.

3         Q.   And what is your job?

4         A.   Forensic clinical administrator.

5         Q.   Is that your title?

6         A.   Correct.

7         Q.   How long have you been a forensic clinical

8    administrator?

9         A.   I believe I took on the responsibility in 2012.

10        Q.   Could you tell the Court what your

11   responsibilities are as a forensic clinical administrator?

12        A.   I basically am in charge of the unit's treatment

13   attachment, so that's comprised of a clinical

14   administrator, social worker, psychologist, psychiatrist,

15   nurse manager.  My role is to coordinate all of those

16   services across the board to write and coordinate

17   treatment plans for each patient on the unit; to help to

18   write responses in the forensic cases, either responses to

19   (k) motions or to write briefs for (e) motions; to present

20   these case presentations and some of our recommendations

21   for such cases to the forensic review board for the

22   hospital.  I help to run the day-to-day milieu on the

23   unit.

24        Q.   Day-to-day what?

25        A.   Milieu for the unit.  So what goes on, the

1    activities, the treatments, handling whatever comes up.

2    So that's sort of my role.  I see myself as sort of the

3    conductor of that symphony.

4        Q.   The maestro?

5        A.   Yes.

6             THE COURT:  You used that metaphor because you

7    used to be a music therapist, right?

8             THE WITNESS:  You would say that, yeah.

9             BY MR. LEVINE:

10       Q.   All right, maestro.  Do you interface with the

11   review board?  I think you testified about that, but I'm

12   not sure.

13       A.   Yes.

14       Q.   And do you know Mr. Hinckley?

15       A.   Yes, I do.

16       Q.   And how do you know Mr. Hinckley?

17       A.   I began working with Mr. Hinckley as his

18   individual music therapist back in 2006.  And then when I

19   took over the role of clinical administrator in 2012, I

20   was stepping into Mr. Kevin Shamblee's role, which was the

21   clinical administrator on Unit 2B, on which Mr. Hinckley

22   resides.  At that time I actually had requested -- I

23   requested that I be allowed a termination period before I

24   took over the role of clinical administrator specifically

25   for Mr. Hinckley's case.  So then I'd be able to

1  appropriately terminate our therapeutic relationship and

2  then take on the role of administrator for him.

3       Q.   During that time did you become or familiarize

4  yourself with the records that pertain to Mr. Hinckley?

5       A.   I was pretty well-familiarized with

6  Mr. Hinckley's records prior to that point.  I've only

7  become more saturated in it since.

8       Q.   And so what are your responsibilities with

9  respect to Mr. Hinckley as the clinical administrator?

10      A.   Well, again, I coordinate and write

11 Mr. Hinckley's treatment plans.  Our treatment team

12 meetings on Mr. Hinckley.  I help to prepare, draft the

13 itineraries for Mr. Hinckley's monthly visits.  I help to

14 collect all of the respective clinical notes from those

15 visits that come from his service providers in

16 Williamsburg.  I interview each of them.  I summarize

17 their notes.  I put all of that together into a -- the

18 summary letters.  I also will write addenda to any

19 itinerary as they are coming out and provide updates

20 through memorandum and through other letters to the

21 hospital, its leadership and to the Court and counsel on

22 other comings and goings.

23           I'm also involved in working, coordinating with

24 the Secret Service on a day-to-day basis as needed to

25 provide updates as to Mr. Hinckley's whereabouts or to

8

1    give them updates on anything that might be coming on,

2    cancellations in D.C., trips or anything going on in

3    Williamsburg.

4        Q.   You mentioned your musical background.  Just to

5    remind the Court, what is your training in music, your

6    formal education?

7        A.   I have a bachelor's of music therapy from Loyola

8    University in New Orleans.  I have a master's in music

9    therapy with the focus on music psychotherapy from Temple

10   University.  I'm a board-certified music therapist.

11            MR. LEVINE:  I think Your Honor has the records

12   in this case of Mr. Hyde's resume.  If you'd like another

13   copy, it's easy to mark.

14            THE COURT:  It's up to you.

15            MR. LEVINE:  May I approach the witness, Your

16   Honor?  May I have this marked, please.

17            BY MR. LEVINE:

18       Q.   Mr. Hyde, I am showing you what's been marked as

19   Defendant's Exhibit 1, but we know it to be Patient's

20   Exhibit 1.  Is that a copy of your resume?

21       A.   Yes.

22            MR. LEVINE:  Moving into evidence, Your Honor.

23            MS. KENNEDY:  No objection.

24            THE COURT:  Okay.  It will be admitted.

25                    (Defendant's Exhibit Number

1        1 admitted into evidence.)

2            BY MR. LEVINE:

3        Q.   Could you tell us how you use your music

4    background and your music therapy training with

5    Mr. Hinckley?

6        A.   Well, over the years I was his individual music

7    therapist.  We would get together on a weekly basis for

8    individual music therapy sessions.  A lot of the work

9    focused on looking at his canon of self-composed songs,

10   analyzing the contents, recording them; looking at the

11   significance of what those, you know, the mood that's

12   contained therein, the concepts, imagery, ideas, memories

13   that are associated with his music; his musical life and

14   culture and how those relate to his current functioning,

15   relationships and process of recovery.

16       Q.   Now, when you talk of music therapy, the therapy

17   component, tell us about what training you have in mental

18   health as it applies to music therapy.

19       A.   Well, music therapists are very, very much

20   trained.  We have sort of a parallel training in our

21   bachelor's programs throughout the world.  We have --

22   we're all classically trained musicians.  But then as well

23   as that, we're also being trained clinically in all of the

24   various populations we serve.  Music therapists are people

25   ranging -- I've worked in Neonatal Intensive Care Units

1    with infants and parents, to forensic psychiatry and

2    inpatient pretrial mental health situations.

3           So we learn through -- through being double

4    majors in psychology and through practical training.  That

5    is a major part of all music therapy training programs.

6    So I've, you know, been through all of that.  And then on

7    top of that have been working in the field for many, many,

8    many years with further training in my master's degree.

9       Q.   So is it accurate and fair to say that you are

10   trained to recognize symptoms of mental illness?

11      A.   Yes, it is accurate.

12      Q.   And that, of course, includes major depression

13   and psychosis?

14      A.   Correct.

15      Q.   And are you trained to recognize other symptoms

16   of -- other risk factors or behavior that suggests the

17   presence of a risk factor?

18      A.   Yes.

19      Q.   What is your impression of Mr. Hinckley's

20   self-awareness during the course of your therapy of him?

21      A.   I've seen over the past ten years of working

22   with Mr. Hinckley a certain increase in his

23   self-awareness.  I think that when I look back on our

24   initial days in therapy, I see Mr. Hinckley, especially

25   through his music, through his expressive process, that

1    he's come to a point now in his life where he is more able

2    to look into himself, to explore, to express that to

3    others as well.  And I think that that's a part of his

4    self-awareness, is that it's not only being aware of his

5    own inner world and thoughts and feelings but also being

6    able to connect that with others.

7          And I've seen both of those, I think, in the

8    past ten years, very much blossom for Mr. Hinckley.  His

9    self-awareness in terms of his regard for what his actions

10   might mean to others, what his relationships are and what

11   they have been, where his future lies, all of these things

12   have really grown over the last few years in my

13   relationship and understanding of Mr. Hinckley.

14     Q.   A question or two about his talent.  Does

15   Mr. Hinckley compose a song in his mind, retain it,

16   reproduce it without rehearsal?

17     A.   I believe I've written about that in some of my

18   notes, yes.

19     Q.   And what does that demonstrate to you?  What

20   does that tell you about Mr. Hinckley?

21     A.   Well, to me it tells me he's a talented

22   songwriter and musician.  I mean, I have a hard time doing

23   that myself, even being classically trained.  It gives me

24   a sense of some of his functioning, his cognitive

25   functioning in the moment too.  This is one of the things

1    I think I spoke about in my termination note and

2    assessment of Mr. Hinckley and understanding Mr. Hinckley

3    through the lens of music is that, yeah, his ability to

4    sit down, even probably while we're sitting here in the

5    courtroom, think of a melody line, think of an

6    accompanying harmony, come up with lyrics and keep them in

7    his mind until he gets to a guitar or piano and then can

8    let it out, that obviously shows that he has pretty

9    short-term memory, long-term retention abilities, and a

10    very creative personality.  Somebody that can -- I think

11    if you can see this idea of him being able to do those

12    sort of intensive cognitive tasks is a good indicator of

13    where he's at in terms of his -- like I said, his

14    functioning level in the moment and that you can use that

15    sort of as a -- as a barometer, as it were.

16        Q.   You've testified that you became his clinical

17    administrator in 2012.  Was there someone who took your

18    place as a music therapist?

19        A.   Well, somebody took my place both as the

20    director of the expressive art therapy department at the

21    hospital and then -- but she was an art therapist so they

22    also needed somebody to fill in in my role as a lead

23    therapist and they hired a person named then Henrick

24    Carlson who took over that role.

25        Q.   I didn't hear you?

13

1      A.    They eventually hired a person named Henrick

2   Carlson who took over my role as the music therapist.

3      Q.    Has Mr. Hinckley spent time with the music

4   therapist now?

5      A.    Yeah.  Well, he worked with Mr. Carlson for

6   several sessions, but eventually Mr. Carlson took another

7   position elsewhere.  Mr. Hinckley was since transferred to

8   the new lead music therapist, Mr. Ryan Carroll, who is

9   who -- was actually a trainee of mine many years ago.

10      Q.    Did you speak with Mr. Carroll about

11   Mr. Hinckley?

12      A.    Yes, I referred Mr. Hinckley to Mr. Carroll.

13      Q.    Mr. Carroll, is he also trained to identify the

14   presence of symptoms and mental illness?

15      A.    Yes.

16      Q.    You talked to Mr. Carroll about risk factors?

17      A.    Yes.

18      Q.    And the presence or their absence?

19      A.    Yes.

20      Q.    And in your mind as a result of your sessions

21   with Mr. Hinckley, your conversations with Mr. Carroll, is

22   there any indication that Mr. Hinckley presents a danger

23   to himself or others?

24      A.    No.

25      Q.    A very quick answer.  Is that an unequivocal

14

1    answer?

2         A.   Unequivocally.

3         Q.   Now, how often do you meet with Mr. Hinckley?

4         A.   On an almost a daily basis during the week.  I

5    see him when he's at the hospital.  It's less so these

6    days as I'm now running another unit that's on the

7    intensive wing of the hospital, pretrial.  It's a

8    completely different side so I'm not over there as much,

9    but I typically would see Mr. Hinckley almost every day

10   outside now since I'm no longer on that unit where he

11   resides.

12             So I'll see him in the parking lot, feeding the

13   cats.  We'll talk for a little while or I'll be able to

14   see him by going up to the unit.  But usually I don't see

15   him as much anymore since he's in Williamsburg so often.

16        Q.   So he spends more than half his time in

17   Williamsburg now?

18        A.   Yes.

19        Q.   Do you discuss with him the results of his

20   sojourns or conditional releases in Williamsburg?

21        A.   Yes.

22        Q.   Do you discuss his relationship with women?

23        A.   Yes.

24        Q.   Do you discuss with him his relationship with

25   male friends?

1      A.   Yes.

2      Q.   And have you discussed with him issues of his

3  insights into mental illness?

4      A.   Yes.

5      Q.   And do you discuss with him issues of family

6  support?

7      A.   Yes.

8      Q.   And have you discussed with him issues of

9  financial family support?

10     A.   Yes.

11     Q.   Now, general question here:  Is the ability to

12  pay for therapy a prerequisite for release, generally

13  speaking, at the hospital?

14     A.   Not in my experience.

15     Q.   Are most of the patients at St. Elizabeths

16  Hospital impecunious?

17     A.   Yes.

18     Q.   Does the fact that they are without resources

19  bar them from releases, whether they be conditional

20  release or convalescent leave?

21     A.   No.

22     Q.   I want to discuss with you the hospital's (e)

23  petition.  I'd like to have this marked as Patient's

24  Exhibit No. 2, Your Honor.  A copy for the government.

25          MR. LEVINE:  Does Your Honor have a copy?

1        THE COURT:  This is the December 19, 2014,

2   document?

3        MR. LEVINE:  Yes.

4        THE COURT:  Yes, I do.

5        MR. LEVINE:  Does the Court want another copy?

6        THE COURT:  Well, I think that Ms. Moon has the

7   originals, has a copy of every exhibit before we're done,

8   but during the course of the hearing I've got, I've got a

9   notebook with what I think are the most relevant

10  documents.

11                    So that's been marked for

12            identification.

13        BY MR. LEVINE:

14   Q.   I show you what has been marked as Patient's

15  Exhibit No. 2 for identification.  It's a letter from the

16  Government of the District of Columbia, Department of

17  Behavioral Health dated December 19, 2014.  Is that the

18  so-called (e) petition?

19   A.   Yes.

20        MR. LEVINE:  Your Honor, I move it into

21  evidence.

22        MS. KENNEDY:  No objection.

23        THE COURT:  It will be admitted.

24                (Patient's Exhibit Number

25                2 admitted into evidence.)

1          THE COURT:  Did you draft it?

2          THE WITNESS:  Yes.

3          MR. LEVINE:  Did you draft it?  Was that the

4    question?

5          THE COURT:  Yes.

6          MR. LEVINE:  All right.  That was my next

7    foundation question.  Okay.

8          BY MR. LEVINE:

9     Q.    So you're familiar, of course, with the letter.

10   Did you participate in meetings with the treatment team

11   prior to preparing the letter?

12   A.    Yes.

13   Q.    Approximately how many?

14   A.    Countless.

15   Q.    Countless.  All right.

16          Tell us about the process of how this petition

17   was prepared.

18   A.    Well, this particular petition was in the making

19   for some time.  I mean, when we received Your Honor's

20   opinion from 2013, reading through that, I mean, we were

21   really beginning to say, Okay.  This is, you know -- this

22   is the next step and let's really begin looking.  Let's

23   break down a lot of what, you know, the judge says about,

24   you know, where he's come, what the next steps are, what

25   these expectations are.

1    And so these conversations, at least with me at

2    the helm, began around that time in earnest because we

3    have been -- we were moving towards this.  In our minds we

4    were moving towards this from that stage, that we wanted

5    to make sure initially most of the planning and the

6    discussions we had were on, Okay, this is where we are

7    now.  We have the order.  We have our next steps.  Let's

8    get this moving.  Let's make sure there's nothing that's

9    kind of falling apart or that we need to address or

10   whatever.

11   So we, you know, we brought Mr. Weiss on.  Some

12   of that was a learning curve for Mr. Hinckley.  So while

13   we were working on this process, we were looking back

14   through the previous plans and ideas and discussions that

15   we've had both in Court and as a treatment team and at the

16   hospital overall and began this process.

17   Like I said, really from that point moving in

18   one direction trying to get John up to speed and moving in

19   the direction that it seems His Honor expected, while

20   saying, Okay.  Let's look back at these previous petitions

21   and plans, risk assessments, put together recommendations

22   so that when we get to the eighth visit as so ordered, we

23   can move forward on this.

24   And again, we had -- I can't tell you how many

25   meetings I had with everybody in the St. Elizabeths

1    treatment team, individuals with the Williamsburg team,

2    conference calls with multiple team members, you know,

3    individual discussions with our attorney, with, you know,

4    various parties.  So this has been a long process.

5        Q.   Did you feel that you had all the access to all

6    the information that you needed?

7        A.   Yes.

8        Q.   Was there any source of information that you

9    wanted that was unavailable to you?

10       A.   I mean, I would say the one thing, you know -- I

11   think I mentioned this in other interviews or before, but,

12   you know, the only thing that I felt we needed, if it was

13   available, was any information from the Secret Service

14   that would have pointed towards, you know, instances where

15   Mr. Hinckley was deviating and we weren't getting that

16   corroborated.  That was something that I was expecting as

17   had been ordered that it should be passed on to us, but I

18   never got that.

19       Q.   It was something you wanted?

20       A.   It was there, do you know what I mean.  It was

21   something that if I had to -- as we stated before in the

22   last round of hearings, you know, it's important for us to

23   know in the moment when something like that occurs

24   regarding like, say, the deviation from the 2011 movie

25   theater incident.

1        But I'm in such regular contact with the Secret

2    Service team, and they are very -- we've had very good

3    communication, even though a lot of their team has been

4    fluid throughout the couple of years that I've been

5    running this.  So I was pretty sure that they were, you

6    know, not going to hold something back from me, you know,

7    this time around.

8        THE COURT:  So you didn't get any written

9    records that you talked to frequently.

10        THE WITNESS:  Very frequently.

11        BY MR. LEVINE:

12    Q.   Have you had occasion to see any written reports

13    since this matter was scheduled for the Court?

14    A.   No.

15    Q.   You haven't?

16    A.   No, but it was offered to me.

17    Q.   There is nothing in that volume of paper that is

18    remarkable?

19    A.   Correct.

20    Q.   Now, let's start out by discussing what the

21    hospital recommends in the (e) petition.  May I invite you

22    to Exhibit 2.  Patient's Exhibit 2 and turn, please, to

23    page 5.

24    A.   (Witness complies with request.)

25        THE COURT:  Let me ask -- before you do that,

1    let me ask my law clerk.  Do you have a copy of this in

2    front of you?

3              THE CLERK:  No.

4              MR. LEVINE:  I have a copy, Your Honor.

5              THE COURT:  Why don't you give it to him.  And

6    believe me, I know he's read it.

7              BY MR. LEVINE:

8    Q.    Let's go over some of these.  Let's go over

9    these recommendations here, Mr. Hyde.  The first one is a

10   simple one.  "Mr. Hinckley will reside in Williamsburg,

11   Virginia, full time with his mother."

12             Tell us about the decision to propose that as a

13   condition.

14   A.    The hospital decided to recommend Mr. Hinckley

15   to reside full time in Williamsburg with his mother

16   because at this stage it has been many years in the

17   making, and he's -- he has really proven himself,

18   especially in the last couple, last 12 months or more now

19   that even beyond his clinical readiness, which we believe

20   and have stated so in the past that he's clinically ready

21   and has been.  He's been a very low-assessed risk for a

22   long time.

23             All of his symptoms have been in full or

24   sustained remission for many, many, many years.  He has

25   begun a very earnest settling in creating roots in that

1 area.  We've worked very diligently with all of the

2 providers there that he's been working with for several

3 years now in some cases and only just a year as well to

4 create a tight-knit team that knows him well, that

5 understands the risk factors and can leverage the

6 protective factors in his favor.

7    I know that we've been working very hard with

8 Mr. Weiss in establishing other ways for Mr. Hinckley to

9 connect with the community and eventually find employment.

10 The hospital has for a long time now been in support of

11 convalescent leave for Mr. Hinckley.  And we feel that at

12 this stage the move to live full time under convalescent

13 leave terms is the most therapeutic for him.

14    Really to make the point known, I mean,

15 Mr. Hinckley does spend most of his time now in

16 Williamsburg.  He really receives most of his treatment

17 and really the most effective treatment in Williamsburg.

18    Inpatient setting is not appropriate for

19 somebody in Mr. Hinckley's place clinically right now.  He

20 is very a very high-functioning individual.  He's

21 intelligent.  He's very capable.  He's very stable.

22 Mr. Hinckley has shown that in his time going to his group

23 therapy over the last year that the outpatient setting is

24 actually where he's getting the most therapeutic benefit,

25 because when he's in an inpatient group at the hospital,

1    he's, you know, among a cohort that are much lower

2    functioning, that have many more active symptoms that are

3    on plain exhibit.  And it can often be very difficult to

4    form meaningful relationships with individuals and often

5    for him to be able to attain certain treatment objectives

6    at this stage in his life and his recovery process, the

7    inpatient setting is not where that can be met.  And so

8    that is one of the main reasons the hospital has at this

9    stage put forward the recommendation for full-time

10   residence with his mother.

11       Q.   So is it your testimony that it's more

12   therapeutic for him to get his therapy in Williamsburg

13   rather than at the hospital?

14       A.   Yes.

15       Q.   Now, you mentioned in that illuminating answer

16   that he was a -- that he is a low risk.  When you say "low

17   risk," is that a low risk for danger?

18       A.   For violent recidivism, yes.

19       Q.   And is it also a low risk for relapse?

20       A.   Yes.

21       Q.   All right.  Let's go on to the second

22   recommendation that is found on page 5 of Exhibit 2.

23          "Mr. Hinckley," you write, "will continue to

24   receive his psychiatric follow-up from Dr. G.G.  He will

25   receive his group and individual therapy from Mr. Beffa

1   and case management services from Mr. Weiss.  Dr. G.G. and

2   Mr. Weiss will communicate with the outpatient

3   department."  That's the DOPT, that's of St. Elizabeths

4   Hospital, that's formerly of St. Elizabeths Hospital

5   related to St. Elizabeths Hospital.  Is that fair?

6        A.   It's a difficult relationship, yes.

7        Q.   Yes.  "Based upon a monthly checklist and

8   summary as well as a telephone contact prior to his

9   visiting the staff of D.C., Dr. G.G. will write

10  prescriptions to be filled at the Williamsburg pharmacy."

11            That's a whole paragraph.  Do you have a comment

12  as to why it is that the hospital made that

13  recommendation?

14       A.   That recommendation was based on the previous

15  recommendations the hospital has made and the orders that

16  have been set forth by this Court.  We wanted to make sure

17  that, you know, Mr. Hinckley's treatment team as it has,

18  as it stands, remains in place and that we have a -- you

19  know, a refined method of communication between those

20  providers and the outpatient department who would be

21  running the case overall for Mr. Hinckley as they do with

22  all of our outpatient posttrial patients.

23       Q.   The third recommendation --

24            THE COURT:  Wait.  Before we get to that.

25            MR. LEVINE:  I'm sorry, Your Honor.

1          THE COURT:  I have a question based on the last

2     part of your last answer.  In terms of the outpatient

3     department, you said, "As we do with all of our outpatient

4     people and all of our convalescent leave people."

5     Something was made this morning, and I can't remember

6     whether it was in opening statements or in questions put

7     to Scott Hinckley or Diane Simms, it may have been in

8     opening statements, Mr. Hinckley is not like any other

9     patient at St. Elizabeths Hospital.

10          And are there any other patients that in your

11     experience that had 30 years in the hospital in such

12     long-standing daily or weekly relationships with people

13     like Dr. Binks and Dr. Atawalle so that when you -- the

14     question really is by putting him exclusively with the

15     outpatient department, aren't we losing not only the

16     history and the context but the personal knowledge and

17     personal relationship that people like Dr. Binks and

18     Dr. Atawalle and you have developed with him over the

19     years?  And even when on convalescent leave, isn't that a

20     serious loss?

21          And I'm asking at least three or four questions

22     at once.  And -- but for the internal structure of the way

23     St. Elizabeths Hospital operates, is that really the best

24     thing, to turn all of this over to Dr. Johnson and to say,

25     VJ Hyde and Dr. Binks and Dr. Atawalle, we've got this

and, you know, I suppose I can call you up and ask you a

question, but does that really make clinical or

therapeutic sense when you're -- let's put all of your

other recommendations or most of your other

recommendations including the primary one, convalescent

leave is fine.  In terms of who at St. Elizabeths is

responsible for interfacing with this team in Williamsburg

and who at St. Elizabeths is responsible for meeting with

Mr. Hinckley when he returns or talking with him when he

phones, is this proposal to turn it over to the outpatient

department really the best anyone?

          THE WITNESS:  I respect your question.  I think

that it's an important one, and I think what it does, it

points to the process for most individuals, not only

somebody just in Mr. Hinckley's case, and I often refer to

this as the Hinckley paradox, because he's to be like all

other mentally ill patients receiving treatment, but he is

like no one else.

          You know, we have a joke in the hospital.  We

have a lot of people at the hospital who believe they are

being followed by the government, but there is only one

person that I know is being followed by the government

because I tell the government where he is at all times.

And this is something that I think is very difficult to

grasp in this process of looking towards convalescent

leave for somebody like Mr. Hinckley who has many times
been, you know, noted as a low risk, who's clinically
stable.  He's primary Axis I are in full and sustained
remission, which I find very rare throughout our clinical
record and documents, even amongst our outpatient folks.
Yet we still find ourselves 34 years later discussing this
case, and the efficacy of switching him from provider to
provider, from inpatient to outpatient.

Now, it's important to understand that the
relationship between St. Elizabeths Hospital and the
forensic outpatient department, although it has evolved in
recent years and is now in a way a separate entity from
the hospital as before it was part and parcel, we are now
a part of the Department of Behavioral Health under a
separate sort of representation, yet we are very well
connected.

In fact, Dr. Johnson is at the hospital quite
often throughout the week.  We have our review boards
whenever they are involving an individual that is in the
outpatient department's roles.  They are part of the
conversation.  We often do have, you know, folks that, if
they -- when they leave the hospital, many of them have
been, one of the questions you asked somebody who has been
here 40 years, Mr. Hinckley is not prepared in that case
amongst his peers at the hospital.

1          THE COURT:  He is or is not?

2          THE WITNESS:  He's not.  We have several people

3     who have been there for many, many decades.  Most of them

4     still, though, I would say, you know, they have other

5     difficulties that either, you know, present challenges

6     upon, you know, when we're working on an outplacement plan

7     or once they actually get out, that I don't know it

8     necessarily would be relevant to Mr. Hinckley's life

9     experiences or possible future recovery process.  So we

10    always have to take these in, you know, context.

11          Yet we have a lot of these people that will go

12    out with an individual therapist that they may have been

13    working with for 5, 10, 15 years in an inpatient setting.

14    And just like as in the hospital's proposal, we do want to

15    make sure that we still have either myself or Dr. Binks as

16    a part of those, you know, the connection and those

17    meetings with OPD, at least for some period of time

18    because this is something we often do.

19          We'll have that individual therapist that still

20    works with the patient from the inpatient life, let's say,

21    and they do outpatient treatment, individual therapy.  But

22    even in those cases, those relationships are also tapered

23    off.  You have to understand that the idea of outpatient

24    care is not necessarily to replicate all of the services

25    that are provided in the same duration and frequency as

1    inpatient but that are supposed to meet the person where

2    they are at and to provide the support that they require

3    at that time.

4          And that's what you see in the hospital's

5    initial proposal in the December 19 and the, whenever it

6    was, March letters where we say, you know, at the

7    discretion of.  This is something we typically put into

8    our language because we do think that the clinical

9    decisions are best made in concert with the outpatient

10   department and any providers that might be still connected

11   with the inpatient services through St. Elizabeths.

12   Because there's still a connection.  There is still a

13   thread of or a filament of institutional knowledge

14   attached to those outpatients, if I should put it that

15   way.

16         So even if Mr. Hinckley is returning to monthly

17   visits to the OPD, 35 K, you know, he would still be

18   talking with Dr. Binks for some time.  And then after the

19   fact, you know, that moves on.  And I think the idea is

20   that, you know, I mean, it took me ten years now to

21   achieve my understanding and in-depth knowledge of this

22   case, but I'd also like to point out that Mr. Beffa has

23   been working with Mr. Hinckley for many, many years now.

24   Mr. Weiss, like I said, he had a steep learning curve in

25   the beginning.

1          THE COURT:  And Dr. Johnson?

2          THE WITNESS:  And just as Dr. Johnson will.  And

3    I'd like to point out that, you know, we do have a

4    relationship.  We do connect and talk and that, you know,

5    my understanding of the case would not be shut off, nor

6    would any, anybody with a fund of knowledge about

7    Mr. Hinckley's case like Dr. Atawalle or Dr. Binks be shut

8    off once he goes into OPD.

9          In fact, as we proposed, we would still be a

10   part of that process.  We'd still have some insight and

11   provide some assistance with recommendations going

12   forward.  But the ideas that we don't want the individual

13   who's moving into a new life, an independent life in the

14   community be still so attached to the inpatient world,

15   because that is the idea.  They are moving towards

16   normalization and away from institutionalization.

17          BY MR. LEVINE:

18   Q.    To follow up on the judge's question, Mr. Hyde,

19   with respect to continuity of service providers, when

20   Mr. Hinckley would come up to see OPD on a once-a-month

21   basis as contemplated in this plan, he would see

22   Dr. Binks.

23   A.    Correct.  We only oppose the government's

24   stipulation that the meetings be held at the hospital,

25   because we would really like for Mr. Hinckley to have a

1    similar situation that people in an outpatient similar

2    situation would enjoy.

3        Q.   And Dr. Binks would go over to 35 K?

4        A.   He would be more than happy to.

5        Q.   Happy to.  All right.

6            MR. LEVINE:  If it please the Court, I'm

7    prepared to go on to the next one, unless the Court has

8    questions.

9            THE COURT:  No.

10           BY MR. LEVINE:

11       Q.   No. 3:  "Mr. Hinckley would utilize the services

12   of a primary care physician in moving forward.  The

13   hospital will supply the medical provider in Virginia, a

14   list of Mr. Hinckley's medication and medical concerns.

15   Dr. G.G. and Mr. Weiss will provide monthly summary of

16   Mr. Hinckley's treatment compliance to OPD."

17           Tell us about that.  Why is that a

18   recommendation?

19       A.   Well, the primary care physician is actually

20   something I've been talking with Dr. G.G.  I'll go ahead

21   and say it, Giorgi-Guarnieri.  She has been bringing this

22   up for some time as a concern.  And, you know, we

23   understand that because obviously, you know, while

24   Mr. Hinckley is in relatively good health, you know, we

25   always want to make sure we have that taken care of.

1        THE COURT:  He takes a lot of medications that

2   have nothing to do with his mental illnesses, though,

3   right.  So he does have some issues, as we all have.

4        THE WITNESS:  I was going to say, I don't want

5   to throw that out at you, Your Honor.

6        THE COURT:  That's true.

7        THE WITNESS:  Yeah, that's true, and he will be

8   aging obviously, and we want to make sure that that's

9   taken care of.  And so that's where that comes in.  And

10  then the monthly summary provision is something that we

11  feel like is obviously important and is a part of the risk

12  management piece of our plan.

13       BY MR. LEVINE:

14  Q.   No. 4:  "Mr. Hinckley will make weekly calls to

15  the OPD for the first three months and monthly thereafter

16  at the discretion of the OPD."

17       Please in responding tell us why you made that

18  recommendation.  Tell us why you proposed investing

19  discretion in OPD.

20  A.   This is something that we -- this has actually

21  been a part of our plan for a number of years.  And it

22  really kind of rolls out of the way that itineraries have

23  worked thus far in the Phases 1 through 4, conditional

24  release terms where Mr. Weiss has made weekly calls into

25  the hospital while he has been away in Williamsburg.  This

continues that and moving it into the -- the sphere of OPD

and their management monitoring of him.  This is simply

something that is going to -- that we intended to be

another way of having monitoring and self-monitoring by

Mr. Hinckley built into the plan so that OPD could have

some connection with him while he's away and hear him.

Q.   How is it determined that these weekly calls

would be for three months?

A.   That's something that we often do.  We will have

a three-month thereafter period, and we felt like this --

again, it's what I think is the most important piece of

this recommendation is not necessarily the first three

months or four months, but it's the discretion of the OPD.

And that it's a clinical decision.  If it feels like

after, you know, two months or three months or four months

that these are superfluous calls, that Mr. Hinckley is

doing well, that his providers in Williamsburg are

managing and communicating properly, then it might be

something that is not necessarily clinically indicated.

Q.   What would be the content of those calls?  What

would they be talking about?

A.   They would be essentially focused on checking in

on how his mood is doing, any other, looking into other

risk factors that might be salient, how his relationships

are, is he taking his medication, has he missed any

1   appointments, have there been any negative incidents in

2   the community, things along those lines.  Making his

3   appointments, those sort of things.

4       Q.   No. 5:  "Mr. Hinckley will travel to Washington,

5   D.C., to meet the OPD at least one current -- and at least

6   one current member of the inpatient treatment team each

7   month for the first four months.  Any future trips will be

8   at the discretion of the OPD."

9       A.   Again, this is a provision that was brought over

10  from previous recommendations.  And we've -- again, we've

11  gone on to adopt Dr. Murphy's time frame on some of these

12  in terms of the idea of six months thereafter.  This one

13  in particular was a point that we went back and forth on.

14  And when I say "we," I mean not only the inpatient team,

15  but I also had a lot of conference calls with Williamsburg

16  providers as well.

17          In addition, you know, so that we can all be

18  talking about these issues together.  Again, what I was

19  trying to do was not recreate the wheel in some of the

20  convalescent leave planning preparation part because so

21  much had been done over the years and much of the risk

22  mitigation that had been built into the plan originally

23  had come out of risk assessments done by Dr. Murphy and

24  Dr. Montalbano before her and some of these pieces were

25  graduated over to this plan.

1          Then we added specificity to it with more of the

2     current needs and to bring it up to date.  The idea of him

3     coming back and forth to OPD for the first four months,

4     and then thereafter at the discretion of the OPD was done

5     to consider the fact that we are moving him to outpatient

6     in Williamsburg.

7          We wanted him to be connected with OPD or the

8     hospital through OPD; yet, we also know that this could be

9     overtime, you know, a condition that could become onerous

10    for Mr. Hinckley in years to come, if not months to come

11    and wanted to build that in.  And also understanding that

12    this is a part of the negotiation process.  As we brought

13    in the information from Dr. Murphy's risk assessment,

14    again we see the relevance to her recommendations and have

15    thus updated our recommendations accordingly.

16    Q.   No. 6:  "Mr. Hinckley will continue to attend

17    his scheduled activities at Eastern State Hospital at

18    least until employment or an alternative constructive

19    daytime activity is arranged."

20         Why did you make that recommendation?

21    A.   This is a risk management recommendation that we

22    don't want Mr. Hinckley to be, you know, spending free

23    time sitting around on his laurels doing nothing.  This is

24    something that has interestingly, I think, from Your

25    Honor's recommendation, to make him do more.  I think it

1    was very -- it was a very smart recommendation in that it

2    really got him motivated, and I think actually opened up

3    the door to John going back to his self-awareness that he

4    actually enjoys things more when he's busy.  But it is

5    still a risk mitigation proposition that I want to make

6    sure that he's not spending large portions of his days and

7    weeks alone and isolated but that he's engaged in social

8    activities, that he has responsibilities for him.

9           And Mr. Hinckley has really come around to this

10   and has stated that he feels like this is something that

11   he wants to continue doing.  In fact, would like to do

12   more of, more activities in his life.  And eventually we

13   really are focusing on getting him paid employment

14   somewhere.  So -- but this particular condition is based

15   on the isolation risk factor.

16       Q.   You mentioned that, the objective of trying to

17   get him employment somewhere.  Do these 17-day limits

18   impair the ability of the hospital to get employment?

19       A.   Yes.  I mean, as I alluded to earlier,

20   especially in the beginning of the 17-day trips we were

21   doing a lot of work on trying to fill in his time, figure

22   out new things, go back to the old and see if we can, you

23   know, rejuvenate old days.  And Mr. Weiss did a tremendous

24   amount of work to try to give John opportunities, bring --

25   bring novel players into the game to see if we can get

1   something going for him in this regard.

2   And there is a couple of points obviously.

3   We've talked about rejections, rebuffs, even in the last

4   year.  Those have been ubiquitous.  Yet, there's a couple

5   of moments where we thought we might actually have a shot

6   at getting Mr. Hinckley a job.  But the issue was the

7   timing.  That having, especially in the current climate,

8   you know, people are scrambling to get part-time jobs, and

9   as we all know, part-time jobs don't necessarily come with

10  a set schedule.

11  And this was one of the major issues that we

12  were encountering with seeking out part-time employment

13  for Mr. Hinckley in this area.  That those -- those

14  companies or stores that were open and willing to work

15  with Mr. Hinckley and that we thought that it -- you know,

16  because there's a lot of people that were willing to work

17  with Mr. Hinckley, but then once it went up the chain,

18  that's when he hit barriers.  And some of these cases,

19  that wasn't the barrier, what the barrier was was his time

20  in the area.  So he couldn't provide a schedule that was

21  palatable to a potential employer.

22      Q.   Would 24 days a month be helpful or is that just

23  the same deficiency as 17 days?

24      A.   Same deficiency.

25      Q.   Sorry?

38

1     A.   Same deficiency.

2     Q.   Now, next item is No. 7:  "Mr. Hinckley will

3  continue to carry a GPS-enabled phone at all times."

4          Why is that a recommendation?

5     A.   Again, this is a recommendation we added that

6  was a risk mitigation piece, the plan that has been a part

7  of Mr. Hinckley's conditional release terms for some time

8  now.  And we felt was, you can't -- it's almost impossible

9  to carry a phone around nowadays that's not GPS-enabled.

10    Q.   Now, No. 8 says -- states that "The hospital

11 staff will assist Mr. Hinckley with trying to obtain

12 benefits."

13         Why is that --

14    A.   That is the process that we take for all

15 individuals seeking convalescent leave from the hospital.

16    Q.   And what does that process entail?

17    A.   Typically when we receive a convalescent leave

18 order, we are then able to begin applying for benefits.

19 Patients who are at the hospital are good at NGRI and

20 receiving treatment are not eligible to apply for or

21 receive federal benefits.  So once they have received an

22 order allowing their conditional release, then we are

23 allowed within 30 days to begin applying for the benefits.

24 As we've said, Medicaid, Social Security, so on and so

25 forth.

1          THE COURT:  Does it have anything to do -- this

2     paragraph talks about federal benefits as opposed to state

3     benefits.

4          THE WITNESS:  State benefits is similar.  And

5     that's something -- I mean, typically when we're releasing

6     people, obviously we're releasing them into D.C. so we

7     have a better mold on that and how that works.  And D.C.

8     apparently has some of the easier rules.  With Virginia we

9     have a benefits coordinator that I've been working with,

10    and she was able to locate some information and suggest

11    that with a situation like this and circumstance of

12    somebody living in a hospital for many years, you can

13    apply a little earlier.  So we've done that just even for

14    preapplication, I should say.

15         THE COURT:  Somebody at St. E's is under release

16    to the D.C. community, while at St. E's are they

17    considered a resident of the District of Columbia?

18         THE WITNESS:  Yes.

19         THE COURT:  So you don't have that problem, all

20    you have is you're saying, Okay, D.C. and federal

21    government, this person is no longer hospitalized.  This

22    person is in the community, but to establish residency.

23         THE WITNESS:  Right.  Right.

24         THE COURT:  You added a step and perhaps a

25    logistical problem is that to be eligible, am I right, to

1    be eligible for federal, nothing more has to happen than

2    an order that he's going to be living outside of the

3    hospital.

4            THE WITNESS:  Right.

5            THE COURT:  But to be eligible for the state, he

6    has to be established as a Virginia resident.

7            THE WITNESS:  That's my understanding.  Again,

8    it's not my area of expertise, but I've gleaned from

9    working with the experts, yes.  And looking into his

10   residency status in Virginia, there is a 183-day rule for

11   residency establishment in the commonwealth.

12   Mr. Hinckley, I think, this year played it to like 164

13   nonconsecutive days.

14           THE COURT:  That's true in a lot of

15   jurisdictions.

16           Paragraph 8 does not suggest that you're going

17   to also assist to the extent you can helping him figure

18   out state benefits?

19           THE WITNESS:  We'll do whatever we can to help,

20   yes, absolutely.  I think we say federal because that's

21   something that we would typically do, but yes.  State

22   benefits are also -- and I'd also like to add we're also

23   looking into, I think it has already been testified to,

24   private insurance for the family and for health, enrolling

25   him in the Health Exchange Program in Virginia.

1          BY MR. LEVINE:

2          Q.   Now, given the scarcity of resources and the

3     fact that one needs to be a resident of Virginia before

4     one can really make the full application for those

5     benefits, would it be appropriate use of resources to try

6     to do this investigation before the Court -- we know from

7     the Court whether Mr. Hinckley would be allowed to

8     actually go to Virginia to live full time?

9          A.   It's been sort of the way to handle this case is

10    to make sure we know what is going on as soon as possible.

11    There's a lot of unknowns.  Clearly this is one that we

12    have to -- we have to try to sort of balance the

13    wished-for and the expected.  And in this case we want to

14    do everything we can to try to get all that information

15    ahead of time.  But the way the system is set up in many

16    ways, regardless of whether it's John Hinckley or John

17    Smith, we don't know until we receive those orders and we

18    are able to move forward and get more information.

19         Q.   So in order to complete the application, to

20    actually acquire this information, what the numbers will

21    be, you first need a court order granting convalescent

22    leave?

23         A.   Right.  There's some -- again, I'm waiting to

24    find out from our coordinator at the hospital as to what

25    the information from Virginia might be with his

1    preapplication process.  But still, I don't know a hundred

2    percent.

3        Q.   Okay.  Now, under these proposed conditions, is

4    the hospital of the view that Mr. Hinckley would not be a

5    danger to himself or others if released into the

6    community, a danger to himself or others as a result of

7    mental disease if released into the Williamsburg community

8    on convalescent leave?

9        A.   No.

10       Q.   He would not be a danger?

11       A.   Right, that the hospital believes that he would

12   not be a danger to himself or others.

13           MR. LEVINE:  All right.  Now, there came a time,

14   Mr. Hyde, when the hospital filed another letter with the

15   Court.  And that was on March 20, 2015.  Your Honor, I'd

16   like to have this marked as Patient's Exhibit No. 3.  Copy

17   to the government, Your Honor.

18           MS. KENNEDY:  Thank you, Your Honor.

19           MR. LEVINE:  Copy to your clerk as well.

20           THE COURT:  Thank you.

21           BY MR. LEVINE:

22       Q.   Mr. Hyde, I show you what has been marked as

23   Patient's Exhibit No. 3.  Do you recognize that?

24       A.   Yes.

25       Q.   What is it?

1    A.   This is the follow-up recommendation the

2    hospital sent to the Court and counsel on March 20,

3    including further recommendations for the convalescent

4    leave conditional release terms.

5    Q.   Why did the hospital write this letter?

6    A.   Well, actually what we did was we wanted to make

7    sure that they were to further clarify the terms of our

8    proposal.  We had sent out the initial one.  The way the

9    process usually works is the team for the respective

10   patient will determine recommendations.  We bring those to

11   the review board, the forensic review board.  Those are

12   accepted or amended or opposed, and the final sort of

13   opinion and recommendation of the hospital is formed from

14   that discussion.

15        And in this case we had recommended to the

16   review board for convalescent leave under the terms that

17   we wanted to add further specificity to that, because we

18   did want to make sure, as Judge Friedman had opined and

19   then ordered, is that we would have eight visits within

20   which to sort of meet some of those expectations and then

21   propose any further petitions to the Court.  So we wanted

22   to honor that time frame given the fact that this has been

23   a very, very, very long and slow process for Mr. Hinckley.

24   And that we were taking the original December 19

25   stipulations in many ways from the former proposals for

44

1   convalescent leave.

2          Like I said earlier, we also wanted to make sure

3   that they were specific, more clear and delineated in a

4   way that's more reflective of the current situation

5   Mr. Hinckley has as well as risk mitigating factors that

6   we felt like would be helpful for the Court to consider.

7          Q.   If we may, with the Court's permission, go

8   through these --

9               THE COURT:  You've offered this in evidence?

10              MR. LEVINE:  I'm sorry.

11              THE COURT:  I'm not sure you offered it in

12  evidence.

13              MR. LEVINE:  May I please.  I offered this in

14  evidence, Your Honor.

15              THE COURT:  It will be admitted.

16                        (Patient's Exhibit Number

17                        3 admitted into evidence.)

18              BY MR. LEVINE:

19         Q.   Mr. Hyde, let me ask you, please, to turn your

20  attention to Item No. 1 of the recommendation.  "While

21  residing in Williamsburg, Virginia, on convalescent leave,

22  Mr. Hinckley will receive psychiatric follow-up from

23  Dr. Deborah G.G.  She'll write his psychiatric

24  prescription, which will be filled at the pharmacy in

25  Williamsburg.  Dr. G.G. will meet with Mr. Hinckley twice

1  per month for the first three months and no less than

2  monthly thereafter."

3       Why did you -- why did the hospital make that

4  recommendation?

5       A.   That recommendation was more of a follow-up from

6  our original recommendation about Dr. G.G.'s role in

7  Mr. Hinckley's treatment in Williamsburg.  Further, we

8  were adding a time frame to that and to look at the

9  frequency of contact for Mr. Hinckley in the initial stage

10  of convalescent leave.  This was something that was

11  actually -- we had worked out and discussed with Dr. G.G.

12  about whether seeing him weekly or every other week was

13  the most effective use of her role in his treatment and

14  care.

15       Obviously the medication management piece from

16  Mr. Hinckley is not very complicated from a psychotropic

17  perspective.  Most of the psychiatrists I've talked to

18  about this, including Dr. Atawalle and Dr. G.G., state

19  that this is a relatively easy regimen to manage.  In

20  terms of the other piece of her monitoring, supervising

21  some of his risk factors, that we felt that the two times

22  per month would be sufficient given all of the other

23  contacts he has on a weekly basis as well.

24       Q.   Did you discuss the number of times per month

25  with Dr. G.G. that he would see her?

1    A.    Yes.

2    Q.    And did she agree that twice a month would be

3    the right number?

4    A.    Yes.  That's where this came from, some of

5    which.

6    Q.    This twice a month is her recommendation?

7    A.    Yes.  This is something that we came together

8    with her as well as the other treatment team members.

9    Q.    Would more frequent -- a greater number of

10   visits per month be of therapeutic benefit to

11   Mr. Hinckley?

12   A.    Within Dr. Giorgi-Guarnieri's role, you could

13   argue maybe in the very initial stages, and I think as the

14   hospital since adopted Dr. Murphy's ideas that the first

15   six months would see about the same amount and that it

16   would taper thereafter.  Again, with her role, we do think

17   that it's very important for him to have regular contact

18   with her, but, you know, weekly contact might be a bit

19   overboard given Mr. Hinckley's clinical stability and the

20   actual management of his medication.

21   Q.    No. 2:  "Mr. Hinckley will receive both

22   individual psychotherapy and group therapy from Carl

23   Beffa, and he gives the credentials on a weekly basis."

24         Why did the hospital make that recommendation?

25   A.    Well, we felt that the group and individual

1  psychotherapy are both beneficial forms of therapy for

2  Mr. Hinckley.  The group modality is actually the most

3  beneficial for him at this stage.  Individual therapy is

4  very crucial as well.  And we wanted to make sure that

5  those are honored in his convalescent leave plan, which is

6  why we made the recommendation initially of weekly.

7       Q.   All right.  So is that your understanding then

8  with respect to No. 2, that he would see Mr. Beffa weekly

9  for individual psychotherapy and then again weekly for

10 group therapy?

11      A.   Correct.

12      Q.   So he would see Mr. Beffa twice a week?

13      A.   Correct.  Under our original recommendation.

14      Q.   This would be eight times a month?

15      A.   Correct.

16      Q.   Is that correct?

17           Okay.  So he would be seeing, for Item No. 1, he

18 would be seeing Dr. G.G. twice a month and Item No. 2, he

19 would be seeing Mr. Beffa eight times a month?

20      A.   Correct.

21      Q.   All right.  No. 3:  "Mr. Hinckley will continue

22 to receive case management services from Jonathan Weiss.

23 They will meet at least twice per month for the first

24 year.  So that's two times a month.  Thereafter case

25 management services will occur no less than once a month."

1           Why did the hospital make that recommendation?

2       A.   Well, again, we wanted to make sure that

3 Mr. Hinckley had the support that he needs, particularly

4 in this phase of convalescent leave in this initial stage

5 of living full time, case management services, and in

6 particular the case management services of Mr. Weiss in

7 that area were very important.  We wanted to make sure

8 that he had those contacts built in and that we understood

9 that this was going to be something that he would be

10 utilizing this particular service more often.  Yet just as

11 well as with any other outpatient, those case management

12 services do -- do slowly diminish over time as the person

13 becomes more fully integrated and connected to other

14 services in the community that they live.

15       Q.   Okay.  Now, you go on to No. 4:  "Dr. G.G.,

16 Mr. Beffa, Mr. Weiss and Elizabeth Haley, the MT-BC" --

17           What does that stand for?

18       A.   Music therapist, board-certified.

19       Q.   -- "music therapist board-certified will

20 communicate by email or fax with the director of forensic

21 services for the forensic outpatient department" --

22           That would be Dr. Johnson; is that correct?

23       A.   Correct.

24       Q.   -- "via receipt of monthly clinical notes.

25 Mr. Weiss and/or Dr. G.G. will make telephone contact with

1    the FOPD prior to Mr. Hinckley's monthly visits to

2    Washington.  The director of forensic services will be

3    responsible for forwarding these documents to the Court."

4         Why did you make that recommendation?

5         A.   This recommendation was made partly to make sure

6    that there was still monitoring and communication to the

7    Court about Mr. Hinckley's progress.  Clinical progress

8    and integration progress in the area.  Yet we wanted to

9    make sure that there wasn't too much of a burden placed on

10   the OPD, given that over the last year the amount of time

11   that goes into creating the summary letters that the Court

12   and counsel see on a monthly basis is not sustainable.

13   It's barely sustainable from the inpatient standpoint.

14        I draft those letters, as I said, go through the

15   summary process, the interview process, the narrative

16   process and the editing process.  And I am still running

17   26 other cases.  For -- you know, for anything meaningful,

18   most of the time, you know, it was felt that these were

19   rather redundant, given that I was regurgitating what was

20   contained within those notes.  But that we still wanted to

21   make sure that there was a connection to the Court and

22   counsel that they saw Mr. Hinckley's progress and could

23   track it on their own.

24        So we wanted to make sure that there was a

25   stipulation in there that the OPD would be receiving

1    monthly notes and that they would be passing them on.  But

2    we were seeking to prevent any OPD administrator from

3    becoming as overwhelmed as they possibly could be in a

4    condition in which they have to create major summations of

5    each month's progress.

6            THE COURT:  How do you envision this?  We have

7    four individuals here:  Beffa, G.G., Weiss and Haley.  Do

8    they typically -- do each of these professionals typically

9    prepare a monthly clinical notes or notes after

10   each visit.

11           THE WITNESS:  After each visit.

12           THE COURT:  Even you as a music therapist would

13   do that and Ms. Haley does that?

14           THE WITNESS:  Yeah.  Well, from the inpatient,

15   inpatient is a little different.  We would do that on, you

16   know, a monthly basis.  But the outpatient is provided on

17   a session-by-session basis.

18           THE COURT:  All right.  In terms of your field

19   of expertise and her field of expertise?

20           THE WITNESS:  Similar.

21           THE COURT:  Mr. Weiss as the case manager, does

22   he do that now?

23           THE WITNESS:  He would provide me case

24   management summaries, which are essentially like the case

25   management notes and giving me a sense of what he's done

1    on the back end of some of the case management work.

2              THE COURT:  What this sentence suggests is from

3    their perspective they don't have to bring anything more

4    than?

5              THE WITNESS:  They already do, correct.

6              THE COURT:  And they send this under this

7    proposal to FOPD.  And then FOPD, rather than do you what

8    have been doing, which is to write these three- or four-,

9    five-page --

10             THE WITNESS:  Six-page.

11             THE COURT:  -- six-page letters, FOPD would put

12   these together in a packet somehow, presumably with your

13   advice or the advice of counsel for the hospital or

14   somebody at least initially, and send them to me.

15             THE WITNESS:  Correct.

16             MR. LEVINE:  So the sufficiency of that is

17   something for the Court to consider.  It is obviously --

18   it's an obvious burden on the staff to write letters of

19   the kind that's been sent to the Court, but the Court has

20   to determine whether it wants that kind to continue or

21   whether it can relieve the burden.

22             THE COURT:  But I mean, I assume these notes are

23   not that lengthy.

24             THE WITNESS:  It depends.  Dr. G.G.'s notes are

25   more lengthy in that she goes through his day-to-day

1    activities, his relationships and all these things.  So

2    those are longer.  Mr. Beffa's group therapy notes are a

3    little more in-depth than his individual therapy notes

4    most of the time.

5            THE COURT:  One of the things that I get from

6    reading your letters are, you know, I learn about his

7    volunteer activities.  I learn about outings he's taken

8    with Mr. Weiss or is facilitated by Mr. Weiss.  I learn

9    about his interactions with Ms. L. and Ms. C.D.  And so

10   I'm able to -- and then the other thing that we have in

11   your letters is your debriefings of the family members.

12   So that -- that we haven't gotten through all of these 18

13   or 19 suggestions yet or recommendations yet.  But a lot

14   of that won't happen anymore.  I get the basic stuff.

15           THE WITNESS:  Yeah, you would get some of those

16   things that I include, sans the interviews with the family

17   in Dr. G.G.'s and Mr. Beffa's notes -- I mean, in

18   Mr. Weiss' case summaries as well.  Because a lot of that

19   is contained there.

20           THE COURT:  Not to jump ahead here, but if,

21   during the course of anything, any of these four

22   professionals observes anything of concern or hears

23   anything from Mr. Hinckley of concern, what do they do?

24   It may depend on what the nature of it is, what you do,

25   they do, and do they communicate to you -- not to you but

to Dr. Johnson?  I mean, I'm not being put in the position
of having to make a decision to pull the plug on the
situation without intermediaries advising me.  But under
the current situation -- and I understand fully that we're
trying to move to the next phase, but under the current
situation you're that intermediary, and if through
conversations with the family or any of the people at the
hospital or any of the people in Williamsburg there's
something of great concern that is communicated and it can
be communicated at the end of the month and not only do I
get the letters that you send but so does the government
get the letters that you sent.  Or it could be
communicated before the end of the month.

So where are the comparable fail-safe mechanisms
here?

THE WITNESS:  In this case the way we envision
this to work is that Dr. G.G. and Mr. Weiss, as I've sort
of laid out, are the primary communicators.  And that they
send information to Dr. Johnson.  And that in between
Dr. Johnson and Dr. Giorgi-Guarnieri, they are making the
weight of the decisions in a situation like this.

Let's say Mr. Hinckley starts showing signs of
decompensation and/or presenting some sort of signs that
something is wrong and it gets picked up by Ms. Haley in a
therapy session.  She's to call Mr. Weiss or Dr. G.G., who

1      then communicates that on and makes the decision with

2      Dr. Johnson in concert.  What we envision is that, you

3      know, and I think is laid out in some of our

4      recommendations is that, you know, we want to make sure

5      that Mr. Hinckley's not just floating out there as I think

6      it was said, that he's not just sitting out alone without

7      anybody watching him, not knowing what's going on but he

8      has a lot of service provision and therapeutic contact

9      hours throughout the week with a lot of people talking

10     amongst each other.

11            As well, I think it should be pointed out that

12     there will be regular contact over the phone with

13     Dr. Johnson as well.  So that there won't be, you know,

14     instances for something to get lost on the beginning of a

15     month in any way, shape or form by the end of the month by

16     the time he goes to see, you know, OPD or they talk.

17            THE COURT:  In what's described later on in this

18     list of recommendations is a psychiatric emergency, but

19     there could be something short of a psychiatric emergency.

20     But in the case of a psychiatric emergency, it says that

21     Dr. G.G. will arrange for immediate hospitalization in the

22     vicinity and then coordinate with OPD.

23            THE WITNESS:  Correct.  And I think, forgive me

24     if I'm wrong, but my sense is if what you're suggesting in

25     a situation where signs of something are a little bit off.

1          THE COURT:  Yes.

2          THE WITNESS:  Not like a full-blown

3    decompensation.

4          THE COURT:  Right.

5          THE WITNESS:  Right.  That we want to be

6    communicating that, and that goes between Dr. G.G. and

7    Dr. Johnson to make clinical choices.

8          THE COURT:  Okay.

9          MR. LEVINE:  Thank you, Your Honor.

10          THE COURT:  We're still on Paragraph 4, I think.

11          MR. LEVINE:  I'm sorry?

12          THE COURT:  I think we were still on

13    Paragraph 4, but at some point before we get through our

14    list, we may want to take our, quote/unquote,

15    mid-afternoon break.

16          MR. LEVINE:  The comfort break, between numbers

17    is a good time.  I think we're on 4.  Unless the Court has

18    more questions --

19          THE COURT:  Do you have any more questions on 4?

20          MR. LEVINE:  I think question 4 really is for

21    the Court to be satisfied that this kind of communication

22    is for, is satisfactory.

23          THE COURT:  I had one other question on

24    Paragraph 4, actually.  The second sentence of Paragraph 4

25    talks about how Mr. Weiss and/or Dr. G.G. will make

1    telephone contacts with FOPD prior to the monthly visit.

2    So I assume that that's, you know, let's chat about what's

3    going on in addition to reviewing our notes so that you're

4    fully ready to interact with Mr. Hinckley when you see him

5    in person.

6            THE WITNESS:  Part of this is that we want to

7    make sure that we're corroborating before, during and

8    after any meetings with Mr. Hinckley amongst treatment

9    team members.

10           BY MR. LEVINE:

11      Q.   Is this to understand what issues that may exist

12   so as to when he comes that he's able to address them with

13   the staff?

14      A.   That's very -- a very important piece of it.

15   Also to make sure that we're corroborating all information

16   gathered by each provider.

17           THE COURT:  And then the last sentence when it

18   refers to these documents, we don't anticipate that I'm

19   ever receiving any documents that memorializes a telephone

20   conversation.  That term refers to the monthly clinical

21   notes back in the first sentence; right?

22           THE WITNESS:  Yes, sir.

23           MR. LEVINE:  I'm prepared to go to No. 5, Your

24   Honor, if this is a good time for the afternoon break, I

25   invite that.

1          THE COURT:  Why don't we take a ten-minute

2  break.

3          (Recess)

4          MR. LEVINE:  Your Honor, may I ask, please, how

5  long does the Court intend to sit?

6          THE COURT:  Until you get through all 19

7  conditions.

8          MR. LEVINE:  So we can send out for some Chinese

9  food?

10          THE COURT:  We're going to have to end in an

11  hour.

12          MR. LEVINE:  Your Honor, I assume that the Court

13  has a great interest in knowing of the details in these

14  conditions and the reasons for them.  I want to give the

15  Court the information it seeks and it really wants, is

16  interested in.

17          THE COURT:  Go ahead.

18          MR. LEVINE:  I'm sorry?

19          THE COURT:  Go ahead.  Whatever you want to do

20  is fine.

21          MR. LEVINE:  Okay.  All right.

22          It's my intention to go through these

23  conditions, Your Honor.

24          THE COURT:  And then we'll go to the revised

25  conditions in the next letter.

1          MR. LEVINE:  Yes.  And because under pretrial

2    proceedings, it appears that the conditions is what this

3    is about.

4          THE COURT:  Conditions and the financing --

5          MR. LEVINE:  Yes.

6          THE COURT:  -- seem to be the heart of the

7    issues.

8          MR. LEVINE:  Yes.  Okay.  If it please the

9    Court, if I may inquire.

10         BY MR. LEVINE:

11    Q.    Mr. Hyde, No. 5 I think is where we were when we

12    broke for the break.  It says, "Mr. Hinckley will utilize

13    the services of a primary care physician, which would be

14    identified by his family following clarification of

15    benefits.  The primary care physician will be responsible

16    for any medication for Mr. Hinckley's medical concerns."

17         Please comment on why you made that -- why the

18    hospital made that recommendation and comment on the

19    timing of when this will be done.

20    A.    This is a recommendation that was also contained

21    within the December 19 recommendation.  We feel it's

22    important to include that because those -- those

23    particular services are not currently covered by

24    Dr. G.G.'s service provision, yet we do want to make sure

25    that that is a part of Mr. Hinckley's overall care in the

1    community and that we are not able at this time to be able

2    to make a determination as to who will be that particular

3    person for Mr. Hinckley in Williamsburg, because we're at

4    this stage on the other side of convalescent leave orders.

5         Q.   So is it your understanding then one must first

6    understand the benefits to which he will be entitled

7    before a primary care physician can be identified?

8         A.   Yes, sir.  Again, as I have testified, we're

9    also looking into enrolling Mr. Hinckley into the

10   healthcare exchange to see if there's any other available

11   provision through that.

12        Q.   Okay.  I'm moving to No. 6, Your Honor.  Does

13   the Court have any questions?

14             "For the first six months," No. 6 says, "the

15   Williamsburg treatment providers, Dr. G.G., Mr. Beffa,

16   Mr. Weiss and Ms. Haley will meet with Mr. Hinckley in

17   person for bi-monthly treatment planning conferences."

18             Bi-monthly, you mean every other month or twice

19   a month?

20        A.   Every other month.

21        Q.   Okay.  "Thereafter at the discretion of the

22   Williamsburg treatment team, these meetings may occur on a

23   semi-annual basis indefinitely."

24             Tell us why you made that recommendation.

25        A.   Well, this is actually one that we had discussed

1    in concert with both teams.  What we were looking at is

2    saying we do these current 60-day IRPs or treatment plans

3    for Mr. Hinckley, and that they would be -- we felt that

4    the time span of, you know, six months would be a good

5    period of time to get several of those in, be able to

6    connect with Mr. Hinckley's providers, OPD and looking at

7    the treatment plan and objectives and how his progress is

8    moving.  And that time frame would have been fine.  That

9    was sort of the thinking at that time.

10                THE COURT:  So you envision these four

11   individuals getting together with Mr. Hinckley in one

12   place physically?

13                THE WITNESS:  Correct.

14                THE COURT:  Three times during the course of the

15   first six months, and then twice a year after that?

16                THE WITNESS:  Right.  All together is what's

17   typically known as a treatment plan.

18                THE COURT:  Have you discussed this and perhaps

19   other recommendations that impact these four individuals

20   with them?

21                THE WITNESS:  Yes.  These were conversations

22   that we had.  I've either had individually or as a group

23   with everyone together.

24                BY MR. LEVINE:

25        Q.   No. 7 states, "While residing in Williamsburg on

1  convalescent leave, Mr. Hinckley will make weekly calls to

2  the FOPD."

3     A.   Correct.  Again, that's just another layover

4  from our December 19 recommendation of making sure that

5  he's connecting with OPD and they are having these weekly

6  check-ins.

7     Q.   And the purpose -- what will they discuss?  Is

8  that therapeutic in addition to giving information?

9     A.   It can be.  I mean, therapeutic requires that

10  the relationships develop, that there's a rapport

11  established and you're working from, you know, from that

12  angle.  A lot of what this is really about for Dr. Johnson

13  to be able to talk with Mr. Hinckley on a regular basis.

14        Again, as we're saying, she would also be

15  speaking with a team, Mr. Weiss and Dr. G.G. on the week

16  prior to those monthly meetings.  And so this is a matter

17  of risk mitigation corroboration, information sharing.

18  And for, you know, for Mr. Hinckley to, you know,

19  establish, you know, a relationship with Dr. Johnson or

20  the OPD team as well.

21     Q.   And so if it was weekly, that would be four

22  times a month?

23     A.   Yes, sir.

24     Q.   Okay.  No. 8:  "While residing in Williamsburg

25  on convalescent leave, Mr. Hinckley will also be required

to travel to Washington, D.C., on a monthly basis to meet

with staff members of the FOPD for the first four months,

at which time they will review and determine how often he

will need to come to their offices for appointments.  He

may travel to Washington, D.C., unaccompanied for these

regularly scheduled appointments."

Please tell us why you made that recommendation.

A.   Again, this is a recommendation that was brought

over from previous recommendations for convalescent leave

based on risk recommendations from our former risk

assessments.  And we were also talking with those members

to get a sense of what they thought might be appropriate

and that might be in time do-able for Mr. Hinckley over

the years.

We wanted to make sure that within this first,

you know, the first year that he's got more of those

connections we were making the recommendation that based

on the clinical efficacy and indication of that particular

condition would be reviewed and either determined to

continue or to be reduced as needed.  So that over time

Mr. Hinckley may not have to travel quite as often back

and forth from D.C. to Virginia.

Q.   Okay.  And No. 9:  "To ensure that Mr. Hinckley

has appropriate continuity of care during his transition

to community placement, current number of inpatient

1    treatment team will be present at his regularly scheduled

2    monthly meetings with the FOPD.  This will occur for the

3    first four months or at the discretion of the FOPD."

4           Now, is this contemplating that someone like

5    yourself would be present?

6      A.   Correct.

7      Q.   And are you willing to do that?

8      A.   Oh, absolutely.

9      Q.   And you're able to do that?

10     A.   Yes.

11     Q.   All right.  And so that would be four times --

12          THE COURT:  It says actually "First four months

13   at the discretion."

14          BY MR. LEVINE:

15     Q.   That would be once a month?

16     A.   Right.

17     Q.   Okay.  All right.  And are you able to tell us

18   why you made that recommendation?

19     A.   That's the -- again, this is something that

20   we've recommended in the past, that it's important that we

21   feel that he as -- you know, as he's transitioning, and as

22   I've spoken to earlier, I think that having the connection

23   of somebody from the inpatient team that has known

24   Mr. Hinckley for a long time, that can provide some of

25   that, that transitional information to get a sense of how

he's doing to see him in person is helpful.  And -- but
again, we think that is something that does not
necessarily have to happen indefinitely as the idea for
Mr. Hinckley as in most other outpatient plans for the
person to eventually move into new relationships, new
service providers and not necessarily have a tether to
their inpatient life.

Q.   No. 10:  "While residing in Williamsburg while
on convalescent leave, Mr. Hinckley will continue to
attend his scheduled structured activities in addition to
any future employment or alternative constructive
activity."

Why is that recommendation made?

A.   Again, this is a risk mitigation recommendation,
one that we felt was important to address the risk of
isolation and for Mr. Hinckley to be engaging in
activities that are going to have him in a proactive
stance, making connections socially, taking responsibility
for himself and for others and for him to be a -- you
know, a person in the community who is giving back and who
is providing as well.

THE COURT:  What do you mean by his "scheduled
structured activities"?  I mean, do you have the specific
things he's now doing in mind?  It doesn't quite say that.
I mean, are we talking he'll continue his volunteer work

1    even if he gets employment, or he'll continue -- I mean,

2    separate and apart from going to group therapy and other

3    things.

4           THE WITNESS:  Right.  This is I think what we're

5    referring to in this case is like, at that point I think

6    it was Eastern State, but we were also beginning to get

7    the church involved, so that was -- that's kind of

8    contained within that statement.

9           THE COURT:  But I take it -- I mean, at the end

10   of the day I'm going to have to write an order and I

11   understand what you're trying to accomplish with this, but

12   let's suppose the church work goes away.

13          THE WITNESS:  Right.

14          THE COURT:  Is he in violation of his condition?

15          THE WITNESS:  That's right.  I think that that's

16   an important point, yeah, yeah, yeah.

17          THE COURT:  What if he finds a bunch of other

18   things, say in photography or painting, which he finds

19   more interesting or more satisfying but fills up a lot of

20   his time.  That would be encouraged, not discouraged, even

21   though it's not one of his, quote, current activities.

22          THE WITNESS:  Right.  And that was one of the

23   things that we were concerned about in the writing of that

24   condition is to not sort of go through a semantic trap,

25   cut him off from other activities.  We don't want to have

1    to say that, you know, he'll only be working at Eastern

2    State because maybe that canteen closes down or they don't

3    have any more volunteer openings.

4           So these are things that we also wanted to say

5    this is what he's been involved in for many years.  He has

6    relationships he's established there, that's one.

7    However, structured activities, like Your Honor just said,

8    that could be a photography class down the line.  It could

9    be paid employment.  It could be other volunteer

10   opportunities.  It could be guitar lessons.  These are

11   things that we think when we say structured or

12   constructive, you know, activities as a matter of, you

13   know, time spent towards an end.  Not necessarily time

14   spent for time spent.

15           THE COURT:  Got it.

16           BY MR. LEVINE:

17   Q.   Could it include recreational activity, hiking

18   clubs?

19   A.   Yeah, absolutely.

20   Q.   Exercise classes?

21   A.   Yeah.  Cross fit.

22   Q.   Sorry?

23   A.   Cross fit.  Exercise.  He needs to get some

24   exercise, something like that.

25   Q.   No. 11:  "Upon receipt of the conditional

1    release for convalescent leave to reside in Williamsburg,

2    St. Elizabeths Hospital social work staff and Mr. Weiss

3    will work with Mr. Hinckley to apply for Social Security

4    and obtaining Medicaid benefits and any other benefits he

5    may be eligible for leading up to his release."

6         Why did you make that recommendation?

7    A.   We wanted to try to make that clear, that this

8    is something that is done once we have a convalescent

9    leave order and we're able to start applying for these

10   things.  I mean, typically we don't write these into

11   orders because it's assumed.  But in this case we wanted

12   to make sure that it was clear that there would be

13   benefits and these provisions sought on his behalf by the

14   hospital in the way that we normally do.

15   Q.   So the precursor to the application is the

16   order?

17   A.   Correct.

18   Q.   No. 12:  "Mr. Hinckley will be allowed to travel

19   unaccompanied and without supervision for personal,

20   recreational and clinical purposes.  Mr. Hinckley will

21   avoid traveling to government centers."

22        Why did you make that recommendation?

23   A.   One of the reasons why the hospital made the

24   recommendation in the first sentence that he be allowed to

25   travel unaccompanied without supervision for all of these

1    particular reasons is this is part of convalescent leave

2    at its heart; that he be able to live a normal life, do

3    the normal things and achieve his aims on a day-to-day

4    basis.  That's not going to be done with an itinerary

5    ahead of time.  We found that that's been very difficult

6    even with the -- you know, the greater freedom and time

7    available to Mr. Hinckley, the itineraries still present a

8    major barrier to him living dynamically and normally in

9    the community.

10        You know, I think for instance even the John

11   Tracey incident at the music studio is a good example.  I

12   think that most of us in a situation where we're hanging

13   out with a friend and we had planned to go to another

14   friend's house, we get a call that they are not well.  We

15   say, Okay.  Well, what are we going to do next?  I don't

16   know.  Let's go over here.

17        That's a very normal experience I think

18   everybody here has had in their lives.  If we were to have

19   to live our lives by a strict set itinerary, even a weekly

20   itinerary, it could make things very, very difficult,

21   burdensome to just take a step outside of your house.  And

22   this is what we want to avoid for Mr. Hinckley.  Thus, we

23   recommended that he be able to travel unaccompanied for

24   all of those purposes so that he may live his life as

25   normally and possible.

1          Secondly, the next part to that is that he will

2     avoid traveling to government centers.  This is something

3     that quite honestly the hospital is divided on.  We

4     included this piece as it was a –– something that's been a

5     holdover from the other conditional release and other

6     discussions in Court and from the 2014 order.  We do not

7     believe that this is –– the government's centers are

8     particularly relevant for Mr. Hinckley's risks and his

9     instant offense was not politically motivated.  However,

10    we do recognize the concern that is sort of embedded in

11    that condition and that we wanted to at least be able to

12    honor that concern for the risk of, that's been pointed

13    out in previous testimony and through the Court's orders

14    and opinions.

15       Q.   Well, Mr. Hyde, if he wanted to apply for Social

16    Security and go to a Social Security office, how would he

17    do that without going to a government center?

18       A.   That's not necessarily always a government

19    center.  I think with this, the language from the

20    government center is mainly like Richmond, Virginia,

21    something where the seat of that government might be.  On

22    this case again I've, you know, made claim that we are in

23    the seat of the federal government, that this is the

24    government center of all government centers.  And he's

25    been quite fine.

1          However, we've also -- he's been able to go to

2     Social Security offices.  Those aren't necessarily always

3     government centers, even though they are buildings and

4     services.

5          Q.   How about driving, driving license renewals and

6     things like that?

7          A.   Uh-huh.

8          Q.   Government centers.  How would he do it?  Would

9     he need to make an application to the Court, or would he,

10    would this be something that he can get by the exercise of

11    discretion by treatment providers?

12         A.   I mean, I think that that's a good point.  I

13    don't have an answer for that.

14         Q.   So would it be the hospital's recommendation

15    that if he were to determine that he needs to go to renew

16    his driver's license and he would inform one of the

17    relevant individuals of that need that he -- that they

18    should have the discretion to allow him to do that without

19    going back to court?

20         A.   I mean, I think in this what we were referring

21    to is government centers as not necessarily government

22    buildings like a DMV or a Social Security office but more

23    like a state house.  I think that that's what has been

24    built into this language.  Again, we, you know --

25         Q.   Does this mean, for example, that he's not

1    allowed to travel to Richmond?  If he wanted to go see the

2    Yankee farm team play baseball at Richmond, would he be

3    able to do that?

4        A.   Not with this, not in this particular condition.

5        Q.   He would not be allowed to do that?

6        A.   Right.

7        Q.   All right.

8             No. 13, Your Honor.  "In the event of a

9    psychiatric emergency, Dr. G.G. will arrange for emergency

10   hospitalization in the immediate vicinity.  She will

11   coordinate with FOPD to determine if further assessment

12   and treatment should be undertaken at St. Elizabeths

13   Hospital."

14            Tell us why the hospital made that

15   recommendation.

16       A.   This is an important recommendation for

17   Dr. G.G.'s role as his psychiatrist as well as for the

18   risk management role.  This would be one of the major

19   duties she would have as the treating psychiatrist in

20   Williamsburg.  In the event that something were to go

21   wrong that she would be able to have, you know, the option

22   to do so by emergency hospitalization and then

23   coordinating with FOPD the next steps.  We feel that

24   that's an important piece, I think as Judge Friedman

25   called it, a stop gap.

1    Q.    A safety net?

2    A.    A safety net.

3    Q.    All right.  No. 14:  "Mr. Hinckley shall not

4    travel 50 miles outside of Williamsburg, Virginia, without

5    Court approval.  He will be permitted to travel to and

6    from Washington, D.C., unaccompanied for the purposes of

7    meeting with the FOPD."

8    A.    This is a condition that we actually -- I would

9    call it a boilerplate condition we leave in most of our

10   convalescent leave recommendations.  However, we're

11   usually using a 30-mile radial constriction based on the

12   D.C.-DMV area, not necessarily Williamsburg.

13          In this case we still wanted to make sure that

14   we were honoring that particular risk mitigating

15   recommendation while also recognizing that he was being

16   discharged or recommended for discharge into a very

17   different area than a massive urban center like

18   Washington, D.C.  If you go 30 miles anywhere from here

19   outside, you can pretty much get what you need.  When we

20   were having these discussions in conference with the

21   Williamsburg team, Mr. Weiss made the recommendation that

22   we expand that to 50 miles, given the area and that you

23   sometimes have to drive 10 miles just to get to, you know,

24   a Walmart or something.  It's not necessarily as simple as

25   jumping on the Metro and going a couple stops.  So he

1    recommended the 50-mile radius.

2         Again, that reaches out to Richmond, but we were

3    wanting to make sure that that was in there as well, and

4    if Mr. Hinckley is not allowed to go to that part of

5    Richmond, he would not go to that part of the 50-mile

6    radius.  But this would also allow him opportunities and

7    his family opportunities to go to, say, Virginia Beach,

8    things of that nature so that they would be able to

9    utilize more of the resources of that area based on its

10   geographical area and some of the restrictions between

11   those places.

12        Q.   So Virginia Beach would be within the 50-mile

13   but outside the 50 miles?

14             THE COURT:  Where is Dr. G.G.'s office?

15             THE WITNESS:  Newport News, I believe.

16             THE COURT:  Is that within --

17             MR. LEVINE:  Well within 30.

18             THE COURT:  I believe it to be --

19        That's what I was confused about.  So all of the

20   professionals that he sees are within 30?

21             THE WITNESS:  Correct.

22             THE COURT:  So that would work in terms of

23   seeing a professional.  And if it were 50, if one were

24   trying to read paragraphs 12 and 14 consistently with each

25   other, one can say 50 except he can't go to Richmond?

1          THE WITNESS:  Or maybe specific areas of

2    Richmond, I would say.

3          THE COURT:  Specific areas of Richmond.  I mean,

4    we can ask Mr. Weiss this too, but were you -- was the

5    group trying to include Richmond as a potential place he

6    could go, or was the group trying to exclude Richmond but

7    make -- otherwise make the circumference broader than

8    30 miles for reasons of the fact there isn't much within

9    30 miles.

10         THE WITNESS:  I would say the latter.  I think

11   what we were trying to do is not necessarily exclude

12   anywhere.  I mean, Richmond is going to be within that

13   50-mile radius, but we also need to make -- you know, to

14   give those options to Mr. Hinckley geographically.  But

15   also make sure that there's, you know, that there's

16   resources available to him.  If there's a resource that's

17   35 miles away --

18         THE COURT:  I get that part of it.  But are

19   there going to be sufficient resources, job opportunities,

20   restaurant opportunities, painting and photography

21   opportunities within 50 miles even if we were to exclude

22   Richmond?

23         THE WITNESS:  That was something that I think

24   Mr. Weiss was trying to get at in his recommendation to

25   expand it.

1      THE COURT:  I think we should ask Mr. Weiss

2  about why he recommended 50 rather than 30 and what

3  exactly he envisioned.

4      BY MR. LEVINE:

5      Q.   Mr. Hyde, under this provision, if John Hinckley

6  and his mom wanted to go to Dallas to visit with the

7  siblings for Thanksgiving or Christmas, would that require

8  Court approval?

9      A.   Yes.

10     Q.   And if it required Court approval, would that

11 necessarily trigger the prospect of a hearing and then an

12 independent investigation by -- an examination by

13 Dr. Patterson?

14     THE COURT:  I don't want to make this analogy,

15 but I would envision similar to a situation where there's

16 an individual who's been convicted and is on supervised

17 release or on probation, and the conditions say within

18 50 miles of D.C. or something like that and then they want

19 to go visit family.  We have this frequently.  We want to

20 visit family halfway across the country or maybe even out

21 of the country.  They have family in Canada or in Germany.

22 And so the defense lawyer files a motion.  It's served on

23 the government and the probation office, and if the

24 probation office says, Given this guy's history, we don't

25 have a problem, the government will usually say we don't

1    either.  But nobody says we got to have a hearing unless

2    there's a problem.

3              MR. LEVINE:  So such a motion would not be

4    pursuant to an (e) petition.

5              THE COURT:  No, I think it would be --

6              MR. LEVINE:  The government gets one if they

7    want it.

8              THE COURT:  I don't think it would be a (e)

9    petition.  I think it would be -- there are some

10   conditions here, and on a one-time basis, although it may

11   be coming up more than once, but, you know, it's

12   Christmas.  Christmas only comes once a year for most

13   people.  And it would be great if they could all go to

14   Dallas.  But condition number X says 50 miles or 30 miles.

15   So the motion is filed, and whether you file it or

16   whether -- I don't know how it would work.  Whether FOPD

17   would file it through somebody or whether Mr. Levine would

18   file it.  There's no advocate that comes to court in the

19   Williamsburg team, here this is.  There's the hospital and

20   there's you, Mr. Levine.

21              But I think somebody would have to say we want a

22   one-time modification of condition number X, here is the

23   reason, and it would not trigger a hearing.  It would not

24   be a (e) petition.  But if convalescent leave has

25   conditions, and even though you want them as few and as

1    flexible as possible, if there's one that is clear that he

2    can't do X and for whatever reason he wants to do X, there

3    has to be a mechanism to ask me.

4            That's all I think we're saying; right?

5            THE WITNESS:  Yes, sir.

6            MR. LEVINE:  I think that I understand, Your

7    Honor, and, of course, this is all in the context of the

8    standard that we impart to the Court's attention in our

9    opening, which, of course, is that to maximize his

10   liberties and to only limit them based on public safety.

11           THE COURT:  But if there are limits in the

12   conditions, and there may be -- if the hospital petition

13   is granted, there will be conditions, and there may be

14   some conditions that you don't like and don't agree with.

15   But they are still going to be there.  And then somebody,

16   when they need a modification of them without triggering a

17   full-blown hearing, has to figure out a way to do that.

18   Whether you're still in the case or not in the case or

19   whether --

20           MR. LEVINE:  We can do, Your Honor.  We

21   understand that.

22           THE COURT:  Yeah.

23           MR. LEVINE:  All right.  Number --

24           THE COURT:  And it may fall on Mr. Weiss or

25   Dr. Johnson when Mr. Hinckley says, My brother and sister

1    wanted me to come to Dallas for Christmas and bring Mom.

2    Can I go?  I don't think I can because I can read too.

3           And that professional on his team is going to

4    say, Well, you can't, but let's figure out a way to go to

5    court and see if we can work it out.

6           If he's as good as he has been most of the time

7    about following his conditions going forward as he has

8    been in the past, he'll bring it to somebody's attention.

9           MR. LEVINE:  Surely.  Surely.  Thank you, Judge.

10          BY MR. LEVINE:

11    Q.   No. 15:  "Mr. Hinckley's media plan to refrain

12    from seeking and accepting invitations to give interviews

13    with members of the press should remain in place."

14    A.   Again, this is --

15    Q.   Why did you make that recommendation?

16    A.   This is a recommendation that has focused on

17    risk mitigation for fame seeking.  This has been -- the

18    media plan has been a part of Mr. Hinckley's conditions

19    and the hospitalization for many, many years, and we felt

20    like it should continue for that particular reason.

21    Q.   Okay.  No. 16:  "Mr. Hinckley will be permitted

22    to access the Internet as needed.  If Mr. Hinckley creates

23    any online account for email or social media services, he

24    is required to share the user name and password to the

25    FOPD as well as his Williamsburg treatment providers."

1    Why did you make that proposal?

2    A.    We proposed this in terms of the experiences

3    that we've had with trying to supervise Mr. Hinckley's

4    Internet usage and approve him for certain websites

5    throughout the last 12, 13 months of the 7-day trips.  We

6    found that it's much easier for Mr. Hinckley to be able to

7    utilize the Internet as he sees fit so that we don't have

8    to continually go back and approve one thing after

9    another.

10    The idea that he be given access to the Internet

11    is also important, we think, from a risk management and

12    therapeutic perspective as well, because you don't

13    necessarily want to prohibit somebody from accessing

14    something like -- with the amount of opportunity and power

15    that the Internet holds, we want to be able to provide

16    access to that for Mr. Hinckley so that he can use it to

17    its full extent, particularly in, you know, seeking out

18    employment, seeking out connections and social

19    connections.

20    You know, we are living in a very different

21    world than we were even the last time we were in this

22    courtroom when it comes to technology.  And making sure

23    that Mr. Hinckley has access to that is important, and

24    like I said, from a therapeutic and risk management

25    perspective.  It's also important because we want to make

1    sure that he is talking to people, that he's using the

2    experiences in his life as grist for the mill in therapy.

3    We would have access to his, to the information.

4           Keep in mind if he were to, let's say, establish

5    a GMail account, the GMail account would give anyone with

6    access to his user name and password, logging credentials.

7    Also give you insight into his Google search history.  It

8    would give you insight into the web pages visited.  It

9    would give you insight into any social connections he's

10   making.  These days the email is not just email.

11          And as well as social networking is an important

12   part of modern-day life, we speak to the risk of

13   narcissism.  And his sister has also said that she hasn't

14   met somebody who isn't narcissistic.  Sending Mr. Hinckley

15   to Facebook would be sending him to a swamp of narcissism.

16   I think it's also important for him to be able to connect

17   like everybody else does.

18          THE COURT:  What about a Facebook account?  Is

19   that going to be permitted or prohibited?

20          THE WITNESS:  That's something that we had

21   recommended he be permitted to utilize if he so chose.  I

22   would personally recommend against it because it's not all

23   that, not all that much for him, but I think he can do it

24   if he wanted, but we would want him --

25          THE COURT:  I'm sorry to interrupt you.  In

terms of Mr. Hinckley's notoriety, I mean, aren't there a

lot of people that are going to want to, quote, friend him

that aren't really going to be friends of his and are

going to be enemies of his and people that he's going

to -- I mean, one of the reasons I've always resisted it,

in addition to the fact that they recommend that judges

not do it, get on social media, period, LinkedIn or

Facebook or anything like that, is there's a lot of

uninvited and unwanted interchanges once you're in the

system.

And so if Mr. Hinckley wants to have an email

account, talk with you or talk to Mr. Weiss or talk to

Mr. -- you know, talk to some of the musicians he's met,

it seems to me, and I know less about technology than

anybody in this courtroom probably, it seems to me that

that's very different from having a Facebook account.

And while Dr. Patterson may disagree with even

that, I'm not sure, that to me seems much more positive

and therapeutic than having an open-ended Facebook

account.

THE WITNESS:  Right.  I mean, I want to use that

as an example.

I think that, you know, from my own personal

experience, you know, with the population I work in and

worked with over, you know, the past 15 years of my

1    career, when social media came around I was very concerned

2    about it.  And while I'm on it, I actually, I use a

3    nom de plume so I don't have any connection, and I think

4    that is something that can be considered.

5          Facebook is ubiquitous.  It's a part of our

6    lexicon.  We use that as part of a shorthand for social

7    media these days.  Mostly we were thinking of something in

8    terms of LinkedIn, something that's more professional.

9    And yet we still want to make sure, as you so rightly

10   mentioned, I mean, Mr. Hinckley sets up a Facebook account

11   or a LinkedIn account using, you know, his full name,

12   clearly people are going to look that up and not

13   necessarily be seeking him out for a friendship or any

14   kind of genuine good reason.

15         Yet again, this is why we want to make sure that

16   Mr. Hinckley is doing so under the supervision and with

17   the recommendations of his clinical providers and the

18   people that are looking out for him and caring for him.

19   But also not cutting him off from the possibilities of

20   modern life.

21   Q.   No. 17:  "Mr. Hinckley will submit to monthly

22   drug and alcohol screens at the FOPD and in Williamsburg

23   at the discretion of Dr. G.G."

24         Why did you make that recommendation?

25   A.   Again, this is more, as I would say, a

1    boilerplate recommendation we include in all of our

2    convalescent leave plans.

3         Q.   Is it a fact that there is nothing in

4    Mr. Hinckley's history that suggests that he has a drug or

5    alcohol problem?

6         A.   No.   Quite the opposite.

7              THE COURT:   Are inpatients allowed alcohol in

8    social settings in the environment or in moderation or not

9    at all?

10             THE WITNESS:   Not in an inpatient setting, no.

11             THE COURT:   So when you have people go out on

12   convalescent leave and you have this as a standard

13   condition, and somebody drinks moderately or socially,

14   that I suppose it may depend on the nature of the

15   diagnosis, does that give you pause or is that okay when

16   one reintegrates back into society, or does it just --

17             THE WITNESS:   I would say it depends.   And it's

18   also your school of thought.   There's the co-occurring

19   disorders model that in some ways they say, you know,

20   moderation is maybe more relapse preventive than fully

21   cutting yourself off.   But you're also talking about when

22   you're looking at co-occurring disorders, you're talking

23   in terms of the impact that whatever the drug might have

24   on one's symptoms of mental illness or the resurfacing of

25   those symptoms.

1          So typically we would say no, you should refrain

2     entirely.  This is a sort of a condition that tries to

3     leverage abstinence as the best policy for risk

4     mitigation, because typically when you are releasing

5     somebody back into the community and saying that they are

6     reasonably safe to themselves and others, you kind of

7     throw that reason out when you start bringing, you know,

8     substances into the picture.

9          MR. LEVINE:  Your Honor, No. 18.

10          BY MR. LEVINE:

11     Q.   "Should placement fail due to unavailability of

12     family in the Williamsburg area, FOPD will work with

13     Mr. Hinckley and the Williamsburg treatment team for the

14     development of an alternative placement."

15          Explain that one, please.

16     A.   So I think this is, you know, as we've discussed

17     in the past about the concern of Mrs. Hinckley's

18     availability or even of other issues that might come into

19     play for Mr. Hinckley's life in Williamsburg, his

20     residence in Williamsburg, the people surrounding him and

21     supporting him in Williamsburg, this is something we

22     wanted to make sure that we were bringing in and

23     addressing.  But that there's a connection to the clinical

24     teams through OPD and through Williamsburg to play a role

25     in that.

1          I think that this is something that the hospital

2     is very sensitive to, that we want to make sure that, you

3     know, as we have been doing this transitional process for

4     Mr. Hinckley into this area that is a way for sort of the,

5     you know, the vicinity of the hospital and the hospital's

6     reach, we still want to make sure that there's support and

7     there's stability for Mr. Hinckley, that we have some

8     sense of what might happen in the contingency.  And that

9     one of the things we've done is discussed that there's

10    several options actually for different placement, for

11    different plans in case something does occur so that he

12    would not have his mother's support immediately available

13    to him.  This is simply the hospital's attempt to state

14    that, you know, we will be doing contingency planning just

15    in case.

16         Q.   So this is a task for the hospital and for the

17    Williamsburg providers, not something that Mr. Hinckley

18    would do?

19         A.   Correct.

20         Q.   All right.  And the same I think goes to No. 19.

21    Let's read that one.  "Should one of the individually

22    named Williamsburg treaters, treatment providers, become

23    unavailable, FOPD will work with the team to establish a

24    replacement provider as soon as possible."

25         A.   Correct.

1        Q.   Again, that's something for the Williamsburg

2   providers to do, not for Mr. Hinckley to do?

3        A.   Correct.  And that we think --

4        Q.   Tell us why you made that recommendation.

5        A.   Well, because this is, you know, this is real

6   life.  And in real life providers retire.  They take new

7   jobs.  They fall ill.  You name it.  And we have to keep

8   in mind that not everybody will always be on his team,

9   just as throughout his hospitalization at St. Elizabeths,

10  his team and his individual providers have changed many

11  times over.

12            Mr. Hinckley is looking towards a very long life

13  enjoying the community and what it has to offer.  That

14  means that the treatment providers he's going to be

15  working with will not necessarily always be static in his

16  life but that we still need to have some semblance of

17  continuity.

18            And again, clinical input for the provision of

19  whatever service or services might be coming in and out of

20  his life and time.  But also that we're also considering

21  the fact that, you know, as we've already discussed so far

22  in these hearings, that, you know, Mr. Hinckley is

23  marching towards his 61st birthday and that there will

24  be other provisions and providers opening up for him in

25  the future.

1    Some of these changes might want to be made in

2  time to account for Medicare provision, or for somebody

3  retiring or moving, and we want to be able to have the

4  treaters be able to have more of a say in who is

5  recommended to take over some of those important pieces

6  for Mr. Hinckley's care and recovery.

7    Q.   So, Mr. Hyde, these 19 conditions that are now

8  endorsed by the hospital, they supplement the ones we

9  addressed earlier in Patient's Exhibit No. 2?

10    A.   Yes, sir.

11    Q.   And I believe your testimony was with respect to

12  No. 2 that under those conditions he would not be a danger

13  to himself or others as a result of a mental disease on

14  convalescent leave; correct?

15    A.   Correct.

16    Q.   I take it that with these additional conditions

17  the hospital would feel the same?

18    A.   Correct.

19    MR. LEVINE:  I think, Your Honor, this is a

20  convenient time to stop for tonight.

21    THE COURT:  So let's talk a little bit about

22  scheduling logistics.

23    Do you have any prognosis as to how much longer

24  you'll be with Mr. Hyde on direct?

25    MR. LEVINE:  Yes, Your Honor.  I think I have a

1    prognosis.  I would say it would consume tomorrow morning.

2              THE COURT:  The direct?

3              MR. LEVINE:  Yes.  I mean, what I intend to do

4    is to go over the letter of April 17.

5              THE COURT:  Okay.  So that means we probably

6    won't get to Dr. Murphy tomorrow.  Or we might at the very

7    end of the afternoon.

8              MR. LEVINE:  I think we might.  I know that from

9    Dr. Murphy's, I've conferred with her about her

10   availability, and I know she is available this week and

11   she is available on Monday of next week.  But then she has

12   private patients, and that's a problem.

13             THE COURT:  So we want to finish with her.

14             MR. LEVINE:  We want to finish her on Monday.

15             THE COURT:  Okay.  So what time did Mr. Hinckley

16   get to the courthouse this morning, do you know?

17             MR. LEVINE:  I know --

18             THE COURT:  About what time did you get her?

19             THE DEFENDANT:  9:00.

20             THE COURT:  How does anybody feel about starting

21   at 9:15 tomorrow morning?  Because there's some other

22   things going on in the courthouse which the later we

23   start, the more disrupted life may become and the harder

24   it may be to get into the building.

25             MR. LEVINE:  9:15 is acceptable to us.

1          THE COURT:  So if anybody would still be in

2     their seats, it still may be difficult to get into the

3     building.  Then again, it would be easier earlier rather

4     than later.  So starting time 9:15 tomorrow.  And

5     hopefully if the marshals get Mr. Hinckley here from

6     St. Elizabeths before 9:00, not too much before 9:00, we

7     can start at 9:15.

8          Does that seem possible in view of other

9     obligations too?

10          So -- and then we'll finish with Mr. Hyde

11     tomorrow.  We'll start with Dr. Murphy tomorrow.  Then on

12     Friday we'll move to Courtroom No. 5, and we're going to

13     start with Dr. G.G. at 9:30.

14          And is Mr. Weiss available immediately after we

15     finish with her, no matter what time that is?

16          MR. AZIZ:  Yes, Your Honor.  My understanding is

17     the two of them will both be there most of the day but not

18     all of the day.  I believe that Mr. Weiss will be there

19     for the morning.

20          THE COURT:  Okay.  So if we finish with

21     Dr. G.G --

22          MS. LUCIANO:  That's not correct, Your Honor.

23          MR. LEVINE:  My information was contrary, Your

24     Honor.  My information was that Mr. Weiss would be coming

25     in the early afternoons.

1      THE COURT:  Not according to the email from

2  Mr. Aziz that came from all of us the other day.  We're

3  going to start with Dr. G.G. first at 9:30.  We finish at

4  3:30 on Friday, whether we're done with him or not.

5      MS. TUPPER-BUTLER:  I have no objection to

6  changing or advancing the time, Your Honor.

7      THE COURT:  So if we can get him there.  She

8  wants to be done by 12:30.  He would prefer to be --

9      MR. AZIZ:  My understanding is Mr. Weiss

10  presumed, the defendant had a different --

11      THE COURT:  All I'm saying is you know that I

12  have to end early on Friday.  So if we can get Mr. Weiss

13  there mid-morning -- if we can get Mr. Weiss there

14  mid-morning or, say, by 11:00 or something.  I mean, I

15  don't know how long you're going to be with Dr. G.G.

16  Everything takes longer than you think it's going to take.

17  But I would hate to end with her by 11:00 or 11:30 and not

18  have anything to do for an hour, an hour and a half

19  because he's not coming until 1:30, when I have to leave

20  at 3:30.  So if we can get him there by -- I'm just saying

21  you all know how much time you need to spend with him --

22  get him there by 11:00 or something.

23      MR. AZIZ:  I'm fine with that.  And I would

24  inquire through the Court whether Mr. Levine wants to call

25  him.

1          MS. TUPPER-BUTLER:  I'd be happy.

2          THE COURT:  If we finish we can go right in

3    rather than take an early lunch and waste time.  Tomorrow

4    we'll start at 9:15.  Friday presumably 9:30 because

5    that's what we agreed to with Dr. G.G.

6          MR. LEVINE:  That's at Courtroom 5.

7          THE COURT:  Courtroom 5.  You-all probably ought

8    to be there a little early and check in with John Cramer

9    and make sure all the technical stuff is working properly.

10          MR. AZIZ:  John Cramer coordinated with the U.S.

11    Attorney's Office and ran tests.

12          THE COURT:  The last time I was supposed to do

13    one of these things, they ran a test and then the day we

14    were doing it, it didn't work.  So hopefully we'll be

15    fine.

16          MR. AZIZ:  No problems.

17          THE COURT:  All right.  So 9:15 tomorrow.

18          (Proceedings adjourned at 5:15 p.m.)

19

20

21

22

23

24

25

92

1            CERTIFICATE OF OFFICIAL COURT REPORTER

2

3            I, Barbara DeVico, certify that the foregoing is

4    a correct transcript from the record of proceedings in the

5    above-entitled matter.

6

7

8

9

10

11                                              4-22-15

12   SIGNATURE OF COURT REPORTER              DATE

13

14

15

16

17

18

19

20

21

22

23

24

25