1

                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,           :
                                    :
              Plaintiff,            :Criminal Case No. 81-306
                                    :
v.                                  :
                                    :
JOHN W. HINCKLEY, JR.               :
                                    :
              Defendant.            :
------------------------------------------------------
                  Day 2, Afternoon session
              TRANSCRIPT OF EVIDENTIARY HEARING
          BEFORE THE HONORABLE PAUL L. FRIEDMAN
                UNITED STATES DISTRICT JUDGE
                  Thursday, April 23, 2015
                    WASHINGTON, D.C.



Proceedings reported by machine shorthand, transcript

produced by computer-aided transcription.

APPEARANCES:

   For the Government:  U.S. ATTORNEY'S OFFICE
                         BY:  COLLEEN KENNEDY, AUSA
                             MARK AZIZ, AUSA
                             MICHELLE CHAMBERS
                        555 Fourth Street, NW
                        Washington, D.C.  20530
                        (202)514-7248

   For the Defendant:    DICKSTEIN SHAPIRO, LLP
                          BY:  BARRY WILLIAM LEVINE, ESQ.
                             ANN MARIE LUCIANO, ESQ.
                        1825 Eye Street, NW
                        Washington, D.C.  20006-5403
                        (202)420-2237

                        DINSMORE & SHOHL, LLP
                        BY: E. MICHELLE TUPPER BUTLER, ESQ.
                        101 S. Fifth Street, Suite 2500
                        Louisville, KY   40202
                        (502) 540-2367

   For St. Elizabeths:   ST. ELIZABETHS HOSPITAL
                          BY:  DEON MERENE, ESQ.
                        1100 Alabama Avenue, SE
                        Washington, D.C.   20032

TABLE OF CONTENTS

EVIDENTIARY HEARING

WITNESSES

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| Vern Hyde | | 4 | 89,112 | 104 |

EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---------|-------------|------|
| Government's 1 | Letter dated 1/23/15 | 112 |

4

1                    P R O C E E D I N G S

2              THE COURT:  Okay, Mr. Hyde.

3              (Witness resumes witness stand.)

4              THE COURT:  Ms. Kennedy, whenever you're ready.

5                       CROSS-EXAMINATION

6         BY MS. KENNEDY:

7         Q.   Good afternoon, Mr. Hyde.  May it please the

8    Court, counsel.

9              Now, you indicated, Mr. Hyde, that Mr. Hinckley

10   was very upset at the time that James Brady died; is that

11   correct?

12        A.   Yes.

13        Q.   And you felt that he was very empathetic;

14   correct?

15        A.   Correct.

16        Q.   Now, at that particular time did he also express

17   to you that he didn't want to be charged with homicide?

18        A.   Yes.

19        Q.   Okay.  So is it fair to say he was just upset

20   about that?

21        A.   No.

22        Q.   So you think he was equally upset about

23   Mr. Brady dying and the possibility of him being charged

24   with homicide?

25        A.   Yes.

1    Q.   And Mr. Hinckley is the only presidential not

2  guilty by reason of insanity at St. Elizabeths Hospital;

3  correct?

4    A.   Can you say that again?

5    Q.   He's the only presidential attempted assassin

6  that's been found not guilty by reason of insanity and

7  that is staying at St. Elizabeths Hospital?

8    A.   Yes.

9    Q.   And, in fact, he's probably one of the

10  higher-functioning individuals there; correct?

11    A.   Yes.

12    Q.   Not one of the usual patients at St. Elizabeths;

13  correct?

14    A.   Yes, you can say that.

15        THE COURT:  Are there usual patients?

16        THE WITNESS:  I was going to say --

17        BY MS. KENNEDY:

18    Q.   Usual or unusual.  He's the only patient that is

19  living in Williamsburg for 17 days a month; correct?

20    A.   That's correct.

21    Q.   And he's the only patient that has a driver come

22  up and pick him up every 17 days to go down there;

23  correct?

24    A.   Yes.  Although there are some patients that do

25  have some drivers pick them up on occasion for various

1    needs for conditional release terms, but he is the only

2    one for that --

3        Q.   As far as you know, he's the only one who has a

4    series of therapists out of state in Virginia that are

5    privately paid for?

6        A.   Yes.

7        Q.   Is it fair to say that Mr. Hinckley over the

8    years has in a way been known as, quote, big man on

9    campus?

10       A.   I don't -- I wouldn't say that.

11       Q.   Everybody knows him?

12            MR. LEVINE:  Your Honor, may I ask that

13   everybody keep their voice up a little higher, please.

14            MS. KENNEDY:  I'm sorry.  Can you hear me now?

15   Is this all right?

16            MR. LEVINE:  Yes.

17            MS. KENNEDY:  I'm sorry.

18            BY MS. KENNEDY:

19       Q.   Most people at the hospital, patients know

20   Mr. Hinckley; correct?

21       A.   Correct.

22       Q.   And most of the staff know Mr. Hinckley?

23       A.   Yes.

24       Q.   And, in fact, he's been there 35 years, so it's

25   fair to say that he's been through a series of therapists

 1    and staff and treatment providers there; correct?

 2         A.   Correct.

 3         Q.   And the only providers who are there now who

 4    treat him have, is it fair to say, only been there the

 5    last 10 to 15 years?

 6         A.   No.  Many of his providers have been there from

 7    the last 5 years, 10 years, 20 and 40 and depending on who

 8    we're talking about.

 9         Q.   And how many of them have direct treatment with

10    Mr. Hinckley, have been there beyond 20 years?

11         A.   I would say at least two or -- well, Dr. Binks,

12    Dr. Schwartz, Mr. Oliver.  I would say three or four have

13    direct treatment with him.

14         Q.   Thanks.  And so are most of the individuals who

15    are treating him now day-to-day -- yourself, those who are

16    on the treatment team, those who arrange the itinerary --

17    have they been there less than 15 years, the majority of

18    them?

19         A.   Yes.

20         Q.   And you've been there how long?

21         A.   Ten in September.

22         Q.   All right.  So since you've been there, have you

23    seen in the last ten years a change in philosophy at the

24    hospital as far as getting individuals out more quickly

25    than in the past at the hospital, if you know?

1    A.   Yeah.  I can certainly say that there's been a

2    change in overall philosophy in the hospital, not only in

3    terms of process of discharge but also in the process of

4    care for those that are currently receiving treatment at

5    the hospital.  There's been a major philosophical change

6    even within the last five years to be more humanistic and

7    to focus more on community reintegration, particularly for

8    those individuals who have been very much

9    institutionalized and who have been a part of the system

10   for a very long time, yet, pardon me, show the clinical

11   readiness to move on.

12       Q.   And how long have you been involved with

13   Mr. Hinckley's case?  Did you say ten years, or you've

14   been there ten years and it's been less that you've been

15   with his case?

16       A.   I've been with this case about eight or nine

17   years in total.

18       Q.   All right.  And you've gotten to know

19   Mr. Hinckley pretty well; correct?

20       A.   Yes.

21       Q.   And, in fact, you just became the case manager

22   responsible for his itineraries, what, in the last five

23   years?

24       A.   In the -- I would say in the last three years.

25       Q.   Okay.  Prior to that you were the music

1    therapist?

2        A.   Yes.

3        Q.   Okay.  And did you read in preparation for today

4    obviously the three (e) letters that were written in

5    December, March and April of this year?

6        A.   Yes.

7        Q.   And did you read the government's responses to

8    the hospital's three letters?

9        A.   Yes.

10       Q.   And did you read the defense response?

11       A.   Yes.

12       Q.   And Dr. Murphy's and Dr. Patterson's reports?

13       A.   Yes and yes.

14       Q.   All right.  Now, the first letter that was

15   written by the hospital to the Court, December 19, 2015,

16   and it is a --

17            THE COURT:  2014.

18            MS. KENNEDY:  I'm so sorry.  Thank you, Your

19   Honor.  We're not there yet.  That's right.  2014.

20            BY MS. KENNEDY:

21       Q.   It's a five-page report; correct?

22       A.   Correct.  I don't have it in front of me, but --

23       Q.   And there are eight conditions that are listed

24   that should apply to Mr. Hinckley on his convalescent

25   leave in Williamsburg?

1    A.    Yes.

2    Q.    And did you write that letter?

3    A.    Yes.  I was the primary author of that letter.

4    Q.    Okay.  And did you write those conditions?

5    A.    Yes, in concert with the treatment teams and the

6    review board.

7    Q.    Okay.  Now, was your view that those eight

8    conditions that you wrote were complete, those were the

9    only eight conditions you needed for Mr. Hinckley to go to

10   Williamsburg?

11   A.    No.  What had been determined by the review

12   board was that we wanted to present the recommendations to

13   the Court with the basic premise of the convalescent leave

14   plan as had been previously developed, and that the

15   intention was then to follow up with further -- the

16   details to help fill out the plan for the Court and

17   counsel's review.

18   Q.    Okay.  But that December 19th report doesn't

19   indicate that there's going to be further or amended or

20   more detailed plans submitted to the Court later, is

21   there?

22   A.    I don't believe so.

23   Q.    Okay.  And, in fact, that report was written in

24   December.  It's correct that you met with Dr. Murphy and

25   Dr. Patterson in early March of this year; correct?

1    A.    Correct.

2    Q.    And you had an opportunity you said to read

3    their reports?

4    A.    Yes.

5    Q.    So after talking to them on March 20th, the

6    hospital wrote a further letter putting in 11 more

7    conditions for release into the community; correct?

8    A.    Correct.

9    Q.    So you took into consideration what Dr. Murphy

10   and Dr. Patterson had told you; is that fair to say?

11   A.    To some extent.  However, prior to those

12   interviews we had already begun the process of filling in

13   the specifics and the discussions with the -- I'm sorry,

14   the OPD and the Williamsburg providers as well.  And have

15   been working with the treatment team and members of the

16   review board, even prior to and during the interviews with

17   the hospital's and the government's expert witnesses.

18   Q.    And then the April report, April 17, 2015, that

19   was written after you read and saw the 35 conditions of

20   the government; correct?

21   A.    That's correct.

22   Q.    And, in fact, in reading those conditions, you

23   agreed with even more of the conditions than the original

24   8 and then 11 conditions that you wrote in the December

25   and in the March report; correct?

1     A.   We agreed with it in some of the government's

2   response conditions, we agreed in part with some, and

3   again in all and others.  But, again, there was specifics

4   of certain ones that we did not agree with and opposed.

5     Q.   Okay.  And so you obviously thought that all of

6   the individuals -- Dr. Patterson, Dr. Murphy and the

7   government -- had substantive and helpful conditions to

8   add that the hospital considered and implemented?

9     A.   The hospital certainly considered Dr. Murphy's

10  recommendations as excellent enhancements to augment the

11  plan that had already been presented, and we did take into

12  consideration some of the criticisms and recommendations

13  set forth by Dr. Patterson.

14    Q.   Okay.  And the government as well?

15    A.   Yes.

16    Q.   All right.

17    A.   Absolutely.

18    Q.   And your role now as case manager involves

19  writing the itineraries for Mr. Hinckley's stays down in

20  Williamsburg; is that right?

21    A.   Yes.

22    Q.   And what else is involved as a case manager for

23  his case?

24    A.   I'm technically not a case manager, but what is

25  involved for this case is, you know, helping to prepare,

1    write and submit the itineraries; provide advance notice

2    to hospital administration, Secret Service; connect and

3    corroborate with the Williamsburg treatment providers to

4    ensure that all of the appointments are being made as

5    scheduled; to check in with Mr. Hinckley on a regular

6    basis; and to follow up with the Secret Service if there's

7    changes in itineraries; and further to then compile all of

8    the notes and various activities that Mr. Hinckley went

9    on; do the interviews with those providers, family members

10   and so on; put all of that together in our summary letters

11   which have been entered into evidence and then to also --

12   my other role for Mr. Hinckley is to facilitate treatment

13   planning meetings on a 60-day basis and to recommend him

14   for treatment at the hospital as well.

15        Q.   So you are basically the go-to guy in overseeing

16   the Hinckley case; is that right?

17        A.   Yes.

18        Q.   And in part of your responsibilities you

19   mentioned that you write summaries of his monthly trips;

20   is that correct?

21        A.   Yes.

22        Q.   And that's what comes to the Court, to the

23   defense and to the government?

24        A.   Yes.

25        Q.   Now, under the plan now, the hospital will no

1    longer be writing summaries to the Court, government or

2    counsel, will they?

3         A.   No.

4         Q.   Okay.  In fact, the outpatient department

5    doctor, Dr. Johnson, will be receiving notes from the

6    providers in Williamsburg; correct?

7         A.   Correct.

8         Q.   And then she will get those notes, and she will

9    submit those notes to the government, defense and Court;

10   is that correct?

11        A.   Correct.

12        Q.   Okay.  So at this particular time, even though

13   right now when he's only going down 17 days a month and

14   you write up an extensive summary, the hospital does not

15   think it's necessary any longer to write up any kind of

16   summary for the Court, the government or the defense on

17   what's going on in Williamsburg?

18        A.   That's correct.  And we actually had submitted a

19   petition prior to the December 19th (e) petition on

20   Mr. Hinckley's behalf seeking to have some of those

21   reporting requirements reduced or abolished, given that we

22   feel that much of the information garnered in the clinical

23   notes provided by the Williamsburg providers is

24   sufficient.  And, in fact, that many of -- much of the

25   work that goes into the summary letters are, in fact,

1   redundant.  And if we were to be moving Mr. Hinckley

2   towards outpatient treatment, it would be an overwhelming

3   burden, administrative burden to continue that practice

4   given the amount of time that it takes to produce those

5   types of letters and the fact that OPD is managing

6   considerably more cases than even I was -- I have been

7   managing in my role as the clinical administrator for this

8   case.

9       Q.   So the reason that the hospital isn't or doesn't

10  want to write any more summaries is because of the burden

11  on the hospital, on Outpatient and the view that it's

12  redundant of the notes that you already receive?

13      A.   Yeah.  But let me be clear, at the same time we

14  also feel that if it were clinically relevant or risk

15  relevant, then we wouldn't be recommending that reduction.

16  The redundancy I think is important to recognize in that

17  all of the elements that are important to understand how

18  Mr. Hinckley is functioning and progressing in the

19  community are contained within the notes that are provided

20  by his psychiatrist and his case manager and his

21  therapists.

22      Q.   So these notes that you're talking about from

23  his treatment team in Williamsburg, are these handwritten

24  notes?

25      A.   Yes.

1      Q.    Okay.  So let me just get this straight,

2   Mr. Hyde.  So you expect this Court to go through

3   handwritten notes that are submitted to the hospital every

4   month and then submitted to the Court to see how

5   Mr. Hinckley is doing down in Williamsburg?

6      A.    Well, I'd also point out that Dr. Johnson or

7   whoever will be involved in the OPD will also be writing

8   summary notes on their meetings and their weekly calls.

9   Those would also suffice, if need be, to provide some sort

10  of more concise record of his movements and his

11  whereabouts and progress in the area, if that so pleases

12  the government.

13     Q.    Okay.  So, again, she takes notes from the

14  clinical phone calls; correct?

15     A.    Yes.

16     Q.    So those would be written notes?

17     A.    Yeah.  Or typed, yeah.

18     Q.    And she would take notes from what other

19  clinical contact?

20     A.    From treatment planning meetings and other --

21  and whenever Mr. Hinckley calls in and when she has phone

22  contact with the providers prior to the monthly meetings.

23     Q.    Okay.  So she'll be writing notes as he calls in

24  in his chart indicating called today, this is how it went

25  today; correct?

1       A.    Yes.

2       Q.    And that's, again, a handwritten note of what's

3   going on?

4       A.    Typed.

5       Q.    Okay.  And then that would be one of the perhaps

6   many notes that goes to this Court every month, rather

7   than a written-up summary?

8       A.    Yes.

9       Q.    Now, of course, if the Court says the hospital

10  is going to write up a summary, then the hospital is going

11  to write up a summary?

12      A.    Yes, ma'am.

13      Q.    All right.

14            THE COURT:  So if that were to happen, in the

15  way you're structured and the way you view things, would

16  that burden fall back on you, or would it fall on

17  Dr. Johnson?  If I were to say I still want to get

18  summaries of -- similar to what you've been doing in the

19  past after you debriefed everybody -- what you do now,

20  right, is after the 17-day visit, you wind up having

21  conversations with John Hinckley, Mrs. Hinckley, Scott

22  Hinckley, Diane Simms, Dr. G.G., Mr. Beffa, Mr. Weiss,

23  Ms. Haley.

24            You do all that; right?

25            THE WITNESS:  Yes.

1          THE COURT:  And then you summarize it?

2          THE WITNESS:  In a week.

3          THE COURT:  I know.  In a week.  And all these

4    things that are part of Exhibit 5 and produced into

5    evidence this morning; right?

6          THE WITNESS:  Yes.

7          THE COURT:  So if I wanted something like that

8    or something -- or even an abbreviated version of that,

9    under your plan and the structure you're proposing, would

10   the burden continue to fall on you or would it fall on

11   Dr. Johnson?

12         THE WITNESS:  It would fall on Dr. Johnson, I'm

13   happy to say.

14         THE COURT:  She probably wouldn't.

15         And she has 80 patients?

16         THE WITNESS:  I think 81.

17         THE COURT:  And what does that mean?  We can get

18   into this with Dr. Johnson, but she has people working for

19   her?  Does she personally see 80 patients?

20         THE WITNESS:  You'd have to talk to Dr. Johnson

21   about her case load.

22         THE COURT:  So you have responsibilities other

23   than John Hinckley?

24         THE WITNESS:  That's what I've been told.

25         THE COURT:  You would hope that soon you'd be

1    able to find out.

2                THE WITNESS:  Right.

3                THE COURT:  Okay.

4                THE WITNESS:  If I may, one of the things that

5    we have discussed also in this regard and in recognizing

6    some of the concerns raised by the government is that it

7    might be feasible to create a document that would please

8    the Court to provide an easier way of summarizing

9    Mr. Hinckley's progress.  Something that would be more

10   akin to the checklist that many of the providers fill out

11   on a monthly basis to monitor risk factors, behaviors,

12   symptoms, and make the burden like that slightly less

13   onerous.

14               Again, the hospital does feel that this could be

15   accomplished through other means.

16               THE COURT:  Through?

17               THE WITNESS:  Through other means.

18               BY MS. KENNEDY:

19   Q.    And what would those other means be?

20   A.    Again, the sharing of the documentation and some

21   of the basic clinical summary notes provided by

22   Dr. Johnson in her weekly and monthly noting.

23   Q.    So meaning Dr. Johnson might write up part of

24   the summary and someone else would write up part of the

25   summary?

1      A.   No.  Dr. Johnson would -- if, in the case that

2  we're proposing, that Dr. Johnson's notes would be

3  submitted to the Court and counsel for review as

4  necessary, and that her weekly and/or monthly notes done

5  on those contacts could provide an appropriate snapshot of

6  Mr. Hinckley and how he's doing.

7          The other option is that we create a document

8  that makes it a little more streamlined for Dr. Johnson to

9  create a specific summarized, summarization of

10 Mr. Hinckley's progress.

11     Q.   Or the other option, to make it easier for the

12 Court, is to type up some sort of summary that

13 incorporates Williamsburg, incorporates what's going on up

14 in John Howard for his phone calls in and for his visits

15 once a month; correct?

16     A.   Yes.  In OPD, not John Howard.

17     Q.   Now, is it fair to say that Mr. Hinckley's case

18 takes more of your time than any other case?

19     A.   Yes.

20     Q.   And you're going to be relieved of that

21 responsibility when and if he is released on convalescent

22 leave in which you're not going to have to write any more

23 itineraries; correct?

24     A.   That's -- that would be the idea, yes.

25     Q.   No more summaries would you have to write up?

21

1    A.   Correct.

2    Q.   Correct.  And no reports?

3    A.   Correct.

4    Q.   Correct.  And no more meetings concerning

5  Mr. Hinckley?

6    A.   As would be with any of the patients from the

7  inpatients that have been outplaced.

8    Q.   And you wouldn't be putting obviously any notes

9  in his charts that would go up to Outpatient?

10    A.   Unless I was involved in the meetings, the

11  monthly meetings in outpatient department.

12    Q.   Okay.  So, Mr. Hyde, in all candor is it fair to

13  say that you will be to an extent relieved of having this

14  case?

15    A.   I like that word, yes.

16    Q.   Okay.  And you've had it for three years now --

17    A.   Yes.

18    Q.   -- having to write all these notes and things?

19    A.   Yes.

20    Q.   Okay.  Now, let's talk about these itineraries.

21  The hospital's position is that Mr. Hinckley doesn't need

22  any more itineraries; correct?

23    A.   That's correct.

24    Q.   Now, Mr. Hinckley has done very well under

25  supervision; correct?

1      A.    Uh-huh.

2      Q.    Structure?

3      A.    Yes.

4      Q.    Itineraries?

5      A.    Yes.

6      Q.    Being told to an extent what to do and what not

7   to do?

8      A.    I mean, yeah, he's done well with that.

9      Q.    Okay.  So having done all of that, the hospital

10   intends to remove all itineraries; correct?

11      A.    Correct.

12      Q.    And the hospital expects that he will do well

13   under this scenario despite the fact that for the last

14   several years under Judge Friedman's order he has

15   itineraries?

16      A.    Yes.

17      Q.    Again, if this Court were to order the hospital

18   to write some type of itinerary monthly while he's down

19   there, the hospital would do that; correct?

20      A.    Yes.

21      Q.    And it wouldn't be you, it would be Dr. Johnson

22   or someone on her staff; correct?

23      A.    Correct.

24      Q.    You indicated in the December letter from the

25   hospital that you would still plan on seeing Mr. Hinckley

1    for a monthly meeting for four months; correct?

2        A.    Right.  Myself or one of the other inpatient

3    team as previously recommended.

4        Q.    Okay.  Now, somehow that was deleted from the

5    April 2015 response that the hospital made, but you did

6    testify you're still willing to do that; correct?

7        A.    Correct.  As a part of the inpatient team and as

8    the plan has recommended that myself or somebody else from

9    the team be available for those meetings, yes.

10            THE COURT:  I just want to be clear about one

11   thing.

12            There's the December 19th letter, and then

13   there is the March 20th letter.  And as I read the

14   second paragraph of the March 20th letter, it says, "The

15   hospital is currently writing to include additional

16   conditions to recommend in convalescent leave."

17            Does that mean -- was it intended to mean that

18   the 19 conditions in the March 20th letter are to be

19   read along with the eight conditions in the December

20   letter so that all of them are a part of the hospital's

21   recommendation?

22            THE WITNESS:  Correct.  And I think some of

23   the -- if you look at the wording of the December letter's

24   recommendations, you'll see a lot of those contained

25   within and spread out through the other letters'

1    recommendations.

2              THE COURT:  But is it true that you did not --

3    or you did a spreadsheet.  I was saying I wish I had done

4    a spreadsheet of all the recommendations from the various

5    sources and reports and all of that.

6              So -- but that's attorney work product.

7              MS. KENNEDY:  If Mr. Levine agrees to that, we

8    would be happy to make it available to the Court.  He can

9    see it.  Because it is easier.

10             THE COURT:  It's a lot easier.

11             MS. KENNEDY:  It is.

12             THE COURT:  Maybe you can reach an agreement

13   that you can either combine your spreadsheets and give me

14   one too, or you can each give me your spreadsheets,

15   because, one, a comprehensive spreadsheet would be best;

16   two, a very similar spreadsheet is second best; and no

17   spreadsheet is the worst.

18             And since I don't have any interns at this point

19   because they are all studying for exams --

20             But my question, Mr. Hyde, was -- I understand

21   that some of what was in the first letter are within

22   paragraphs in the second letter, but the second letter was

23   not intended to delete anything from the first letter; is

24   that correct?

25             THE WITNESS:  Correct.  Right.

1          THE COURT:  So was there anything that you said

2  in the third letter which was mostly a response to the

3  government's that was intended to delete anything from

4  your first and second letter?

5          THE WITNESS:  If anything it was -- the

6  responses that the hospital presented in the most recent

7  letter was to incorporate certain conditions that the

8  government recommended that we felt were clinically

9  applicable and to oppose those that we felt were not.

10         MS. KENNEDY:  Can I ask something on that, Your

11  Honor?

12         THE COURT:  Sure.  Please do.

13         MS. KENNEDY:  All right.

14         THE COURT:  The reason why I started down this

15  road, Ms. Kennedy, is because you made some reference to

16  something being deleted?

17         MS. KENNEDY:  I did, Your Honor.

18         BY MS. KENNEDY:

19    Q.  Do you happen to have the hospital's April 17,

20  2015 letter?

21    A.  Yes.

22    Q.  Okay.

23         MS. KENNEDY:  Your Honor, do you have that?

24         THE COURT:  Yes.

25         MS. KENNEDY:  Does defense counsel have that?

1          BY MS. KENNEDY:

2      Q.   If you can refer to No. 3.

3           Now, that indicates that the hospital has

4      written that you would remain with the team for all of

5      your natural life.  Actually as long as you're employed by

6      the hospital and that the treatment team would include

7      someone else if you left.

8           And the hospital's response to that is that you

9      oppose the condition.  The hospital opposes that condition

10     because you are a clinical administrator for inpatient

11     services.  And FOPD is a separate division and requiring

12     you to remain a member of FOPD would be a modification of

13     your current position.

14          So my question is that seems to differ from the

15     March 20, 2015 letter when it was indicated you would stay

16     for four months on the team for Mr. Hinckley.

17     A.   I think it's more of a confusion.  We're not --

18     we're not deleting or removing our position on that.  What

19     we're trying to do is clarify the language that the

20     government injected into this stating that I would be

21     included in the outpatient department's treatment team.

22          What we are trying to clarify is that, as I've

23     stated before, OPD is a separate division from

24     St. Elizabeths Hospital, even though we are in many ways

25     connected.  That to state that I am explicitly in a court

1   order a member of the OPD treatment team is to confuse my

2   role, employment status in the Department of Behavioral

3   Health.  What we are in favor of and continue to support

4   is that myself or one of Mr. Hinckley's current treatment

5   team members from the inpatient realm would be involved in

6   those monthly OPD meetings.  But not that we would be --

7   excuse me -- named as a part of the team.

8        Q.   Okay.  But just to be fair, No. 3 does not

9   indicate or state that you would be part of FOPD.  It

10  simple asks that you remain on the team but not over in

11  Outpatient.

12       A.   Well, specifically it says that "The forensic

13  department treatment team shall include Verne, VJ Hyde."

14  That's where we take contention.

15       Q.   Now, when we talk about OPD, outpatient is over

16  on K Street, NW; correct?

17       A.   Correct.

18       Q.   Miles from St. Elizabeths Hospital; correct?

19       A.   Yes.

20       Q.   And they, in fact, are a totally separate entity

21  from the inpatient part of St. Elizabeths Hospital;

22  correct?

23       A.   These days, yes.

24       Q.   And, in fact, Dr. Johnson reports to a totally

25  different supervisor than anyone who is running the

1   hospital and the inpatient department; correct?

2       A.   Yes.

3       Q.   Okay.  So if she has a problem with Mr. Hinckley

4   or if something happens regarding her oversight of

5   Mr. Hinckley, she's going to be talking to her supervisor

6   who undoubtedly had never met Mr. Hinckley; correct?

7       A.   I don't know.

8       Q.   Okay.  Rather than anyone who's known

9   Mr. Hinckley for the last some, you said, 30 to 40 years?

10      A.   Yes.  But again, and I understand this is a

11  confusing relationship for the hospital and OPD.  Yet that

12  does not necessarily mean that Dr. Johnson or anybody from

13  OPD does not have any regular contact with the hospital or

14  does not come over to the hospital for various reasons.

15  And that even though we are separated by a few miles, we

16  are easily in touch with each other, instantaneously using

17  telephones or in emails, instant messaging.  There's never

18  been an issue with that.

19      Q.   I guess the question is, Dr. Hyde, is that it's

20  not so much whether you have contact with OPD and

21  Dr. Johnson has contact with you and you're all making

22  phone calls.  It's Mr. Hinckley who has needed the contact

23  of inpatient for the last 35 years, and certainly for the

24  near future will need contact with the inpatient

25  department.  And that's the key to success for

1    Mr. Hinckley is staying connected to the people who he

2    knows and who cared for him and who he cares for.

3            Would you agree with that?

4        A.   I would, but I would put it in a different way

5    because what we're trying to do is, and what I feel like

6    we've successfully done over the last ten years, is

7    connect him very deeply to providers in the outpatient

8    world in Williamsburg.  That's the ultimate goal,

9    therapeutic goal for Mr. Hinckley, not necessarily to keep

10   him tethered to the relationships he's developed in the

11   inpatient world.  While that's important and helpful in

12   the transition period, it's not exigent for his continued

13   success in the community.

14       Q.   But it's not just the fact that he's, quote, in

15   an inpatient world where he will not be any longer if he

16   were placed in Williamsburg.  It's the bonds that he's

17   formed with the people who have gotten him to the point

18   where he's able to go down to Virginia; correct?

19       A.   Well, yes, but that's been part of any process

20   that you would have.  You don't necessarily want to keep

21   somebody in an inpatient setting just because they formed

22   bonds with their therapists and doctors.  You want to be

23   able to leverage the bonds in the process of creating

24   those bonds so that they can use those strengths and

25   skills to create those bonds outside of an inpatient

1    setting.

2         Q.   Mr. Hinckley is going to a place where he's been

3    17 days a month for the last couple of years, and now he's

4    going to be living down there; correct?

5         A.   Correct.

6         Q.   It's hard for Mr. Hinckley to make friends;

7    correct?

8         A.   Less so now.

9         Q.   He has in Williamsburg two to three friends;

10   correct?

11        A.   Yep.  That's been living there part time for the

12   past couple of years he's managed to do that.

13        Q.   Okay.  And up at the hospital he has 15, 20

14   people who he considers friends?

15        A.   He is close to one person in particular, and he

16   has a couple of other acquaintances.  But unfortunately he

17   doesn't have any close friends that you can necessarily

18   say that are currently impatient with him.

19        Q.   But he has close bonds with his therapists?

20        A.   That's the hope of any therapeutic relationship.

21        Q.   Where he is right now he does?

22        A.   Yes.

23        Q.   He's got you; correct?

24        A.   Correct.

25        Q.   He's got Dr. Atawale who he's been with for a

1  while; correct?

2      A.  Yes.

3      Q.  You were his music therapist for a long period

4  of time; correct?

5      A.  Yes.

6      Q.  He has a new music therapist now?

7      A.  Yes.

8      Q.  He has an art instructor, somebody who runs an

9  art class there?

10     A.  One of the art therapists runs an studio class

11  there.

12     Q.  He's in group therapy there?

13     A.  Yes.

14     Q.  He's had Dr. Binks for close to or a little over

15  30 years; correct?

16     A.  About 20 years, I think.

17     Q.  Even though you're the clinical administrator

18  now, who was the clinical administrator prior to you on

19  his ward?

20     A.  My predecessor was Kevin Shamblee.  Prior to

21  that it was Dr. Rafanello.

22     Q.  Dr. Rafanello and Kevin Shamblee were very close

23  to Mr. Hinckley; correct?

24     A.  Yes.

25     Q.  So that's at least ten people that over the last

1    several years he's been very close to as an inpatient at

2    the hospital; correct?

3         A.    Yes.

4         Q.    He's now going to be going down to Williamsburg

5    where he will have four therapists that he sees, the

6    hospital has asked for, every other week once a month,

7    maybe once a week if needed; correct?

8         A.    Well, I would say what we're recommending is

9    that he be seeing Mr. Beffa on a weekly basis throughout

10   his life on convalescent leave basis.  For group therapy

11   he would be seeing Mr. Beffa on a very regular basis.  For

12   individual therapy and Dr. G.G., Ms. Haley, as well as

13   Mr. Weiss, who he's been developing strong relationships

14   and bonds with them over the years.  And it should not be

15   forgotten that his mother lives here.

16        Q.    But we're talking about therapists right now, so

17   for Dr. G.G., Dr. Weiss and Ms. Haley, Dr. G.G. and

18   Dr. Weiss are twice a month; correct?

19        A.    Well, Mr. Weiss is at least twice a month, most

20   likely he'll be meeting with him much more regularly,

21   especially in the first 6 to 18 months.  It will be

22   twice -- twice a month is the bare minimum and will

23   probably not meet that until many months.

24        Q.    And Dr. G.G. is just twice a month; correct?

25        A.    Well, it would be twice a month for -- what

1   we're recommending is twice a month for therapy, but then

2   for -- they would also be meeting for the treatment plans

3   as well.

4        Q.   And all of those individuals would be for a

5   period of a few hours every other week or once a month,

6   compared to seeing a team at the hospital at his beck and

7   call perhaps every day, every other day for any daylight

8   hour of the day; correct?

9        A.   Well, you can also -- you could -- I could argue

10  that that's actually been less and less so over the last

11  year, given the fact that he's spent more and more time

12  away from the hospital, and when he returns he's returned

13  to a team that in the last six to nine months really has

14  been sort of separated and spread throughout the hospital.

15           Dr. Atawale has been moved from that unit to

16  pretrial, and then I was shortly thereafter moved to the

17  same pretrial unit.  So it's not like Mr. Hinckley does

18  not see us, but it is certainly not the same regularity

19  that he used to enjoy our presence.  And again, what we

20  have been working towards all of these years is to

21  establish the roots and the relationships with his

22  providers in Williamsburg.

23       Q.   Now, best-case scenario, Mr. Hinckley calls and

24  says Mr. Hyde, I need to come up and see you, or I need to

25  come up and see who's ever replacing Dr. Atawale, or I

1    need to come up and see my art therapist, or I need to

2    come up and see someone that I have been working with for

3    the last decade or second decade, could we do that for a

4    few months.  You're not going to turn away, are you?

5         A.   I'm sorry.  I don't quite understand the

6    premise.

7         Q.   If Mr. Hinckley calls and says --

8         A.   From Williamsburg?

9         Q.   From Williamsburg to St. Elizabeths Hospital, to

10   D.C., and says, Look, I want to come up and see you.  I

11   don't know Dr. Johnson.  Dr. Johnson oversees 80 people.

12   She is overwhelmed.  I'm sure she's a nice person.  I

13   don't know her from a hole in the wall.  I know you.

14   You've been working with me.  Or I know whoever took -- I

15   don't know who some of the other teams are at present.

16   You said Dr. Atawale is leaving.

17        A.   No.  He's still there, but he just, like myself,

18   we now work in a different unit on a different side of the

19   hospital.

20        Q.   Let's say he called Dr. Atawale and say, Look,

21   you've known me for 25 years.  I want to come up and I

22   want to see you.  I want to have a session.  I want to see

23   you for an hour.  Can you do that for me?  I'd like to do

24   that for a couple months.

25             Normally the hospital's policy would be no,

1   you've got to go to outpatient; right?

2       A.   Right.  But in this case we've already built

3   this in that he would still be seeing somebody he's known

4   for years at these OPD meetings.

5           THE COURT:  That's only for the first how many

6   months?

7           THE WITNESS:  Six months unless clinically

8   indicated.

9           THE COURT:  Now, in terms of Ms. Kennedy's

10  hypothetical and your six-month time frame, does

11  Dr. Murphy have a different time frame?

12          THE WITNESS:  For the --

13          THE COURT:  Current in-house treatment team's

14  involvement.  You may not have the report memorized.

15          THE WITNESS:  I have a lot of it memorized.

16  That piece -- I don't know if she has a time frame for

17  that unless it is to be reviewed in Part C.

18          THE COURT:  Well, we'll ask her about that.  But

19  I think this is a useful question, because a lot of -- I

20  think a lot of what motivates or concerns you is this

21  institutional distinction between outpatient and inpatient

22  treatment.  And if he's going to be on convalescent leave,

23  he should be dealing with the outpatient department.

24          But Ms. Kennedy raises questions and we can

25  conjure up others where the intensive history that you and

1    Dr. Atawale and Dr. Binks and others in context that you

2    all understand and others don't, something could come up

3    where it would be important to have you involved or

4    available, because either Dr. Johnson seeks you out or

5    Dr. G.G. seeks you out, or Mr. Hinckley himself seeks you

6    out.  And the question is whether the conditions as you

7    propose them in their revised form accommodates for that.

8            THE WITNESS:  And I appreciate that, the concern

9    and the hypotheticals that are raised for this.  I think

10   that, you know, what is foremost is that the -- whatever

11   is chosen that the clinical team -- like in this case,

12   let's say in the hypothetical that Mr. Hinckley calls up

13   and says, VJ, you know, I'm coming up for my OPD meeting.

14   I really want you to be there.  Can you be there for this?

15   And it's after 18 months of him being in convalescent

16   leave, I would -- the first thing I would do is I feel

17   like any of the other treatment providers that he

18   currently works with and St. E's would do is to contact

19   Dr. Johnson, contact the Williamsburg providers, Mr. Weiss

20   and/or Dr. G.G. to discuss it and make it happen if so

21   clinically indicated.

22           We would not necessarily deny Mr. Hinckley, you

23   know, contact with us, but it would need to be done so

24   within a clinical framework that makes sense and would

25   also be important for assessment as well.

1              THE COURT:  I was going to say just in listening

2    to your answer, depending upon what he said and how he

3    said it, it might raise red flags if there was something

4    wrong; right?

5              THE WITNESS:  Right.

6              THE COURT:  On the other hand it might not?

7              THE WITNESS:  Right.

8              THE COURT:  And so are you saying that at the

9    very least you would, and you think others would, take

10   whatever information you get from that phone call and

11   explore with the Williamsburg providers and Dr. Johnson to

12   see if there was a cause for concern?

13             THE WITNESS:  Correct, and/or reason for me or

14   whoever else to either be there or to not be there.

15             THE COURT:  One could foresee a phone call

16   that's no reason for concern at all, but wants you there

17   for some reason.  But one could foresee a phone call that

18   might raise a red flag.

19             THE WITNESS:  Correct.  And I think that as I

20   stated before, I do believe that it is important to have

21   individuals like myself, like Dr. Binks, Dr. Atawale,

22   those of us who have had a longer period of time in

23   Mr. Hinckley's life and treatment to provide insights,

24   assessments, recommendations and guidance through the

25   initial stage of convalescent leave.  But, again, the idea

1    is to ultimately hand off that information, and I

2    certainly am not one to hold on to anything as a power

3    play when it comes to information over Mr. Hinckley or his

4    functioning or insights that could be helpful for his

5    treatment.  These are the things that we readily share

6    amongst each other and will continue to do so.

7          BY MS. KENNEDY:

8          Q.    And, Mr. Hyde, this move for Mr. Hinckley to

9    Williamsburg will be his biggest move from the hospital

10   since his admission 35 years ago; correct?

11         A.    Yeah.  Yes.

12         Q.    And continuity is important for anyone, but

13   particularly Mr. Hinckley; correct?

14         A.    Continuity is important for everyone.

15         Q.    All right.  And having a schedule?

16         A.    Yes, it's important to have a schedule.

17         Q.    Okay.  And going down there full time is much

18   different than spending just weekends or even 17 days a

19   month; correct?

20         A.    It's a bit different.

21         Q.    I'm sorry.  I didn't hear you.

22         A.    It's a bit different.

23         Q.    A bit.  Okay.  It's not a lot different from 17

24   to 31 days living full time with your mother in

25   Williamsburg than being an inpatient?

1    A.   It's a lot different in the fact that he would

2  be much more able to attain some of the objectives that he

3  wants to attain to engage in some of the activities he's

4  not been able to engage in.  It would -- we don't believe

5  that it would be such a major transition for him to go

6  from 17 days to 30 or 31 days, given that when he does go

7  down here; and over the past 12, 13 months, we've seen

8  that in each successive trip that he's made down there he

9  is looking better and better, more engaged and more ready

10  to have a full-time life there that's getting stymied by

11  the life in the hospital where the restrictions are such

12  that, you know, he cannot work towards the things that

13  he's working towards.

14    Q.   And you said he's been going down there 12 to 13

15  months?

16    A.   I'm saying on a 17-day basis.

17    Q.   Correct.  And prior to that it was --

18    A.   Ten days for about two years.

19    Q.   So it's been a total of about three years?

20    A.   It's been a grand total of, I think, 8 years or

21  more -- 11 years that he's been traveling to Williamsburg.

22    Q.   And those were -- some of those were weekends?

23    A.   Weekends, and then he's moved up to seven days,

24  and then he moved up to ten days for many years, and now

25  he's been at 17 days for over a year.  This is not a

1    new -- a new place for him.

2        Q.   And, in fact, the hospital recommended

3    convalescent leave rather than 24 days, going from 17 to

4    24, another week, because it wasn't considered

5    therapeutic?

6        A.   Correct.  It was seen as a barrier to him being

7    able to achieve the things that he's been trying to

8    achieve, namely with the employment status piece.

9        Q.   Now, you indicated that if he were in D.C., on,

10   quote, a D.C. plan, that it's difficult to find a job in

11   D.C.?

12       A.   It's not -- it's difficult to find a job

13   anywhere.  What I think was erroneously stated at some

14   point was that we have subsidized employment opportunities

15   for our patients, which we don't.

16       Q.   You do have work -- WTA, work training?

17       A.   We have WATP.

18       Q.   Right.

19       A.   That's the Work Adjustment Training Program on

20   the hospital grounds.

21       Q.   And they get paid for that; correct?

22       A.   Yes.  A little.  I think it's minimum wage or

23   less than that.

24       Q.   Okay.

25       A.   It's a nominal stipend.  He would still be able

1    to continue that position; although it's been on hold now

2    for a couple of weeks while he's -- regardless has nothing

3    to do with his trips.  But his supervisor is on an

4    extended medical leave, and they have not been able to get

5    the staffing together to help supervise him.

6        Q.   Okay.  Otherwise if they did have it, he would

7    be able to get a job, a paying job, minimum wage, but a

8    paying job at the hospital at WAPT?

9        A.   And it should be noted that with the cases our

10   patients that have a WATP position, when they are

11   inpatient and then they move to outpatient, they are

12   allowed to keep that WATP job until they find other

13   employment.  But it's not something that the hospital

14   encourages that they keep or that they rely on as

15   long-term employment options.

16       Q.   And Mr. Hinckley, he doesn't have a paid job now

17   in Williamsburg?

18       A.   Not yet, no.

19       Q.   He has a volunteer job?

20       A.   Two volunteer jobs, yes.

21       Q.   Is it fair to say that it's going to be more

22   difficult for Mr. Hinckley to get a job in Williamsburg

23   considering the job field and the nature of Williamsburg

24   versus the District of Columbia?

25       A.   It's hard for me to say that.

1      Q.    Okay.  Now, you know that he will be staying

2    with his mother as long as she is able; correct?

3      A.    That's correct.  Although we are -- we do

4    recommend that Mr. Hinckley begin working towards finding

5    independent housing in the Williamsburg area.

6      Q.    Okay.

7            THE COURT:  I can't remember.  Is there anywhere

8    in these proposals or letters, a timetable for that?  In

9    other words, we had a lot of discussion about if

10   Mrs. Hinckley, quote, becomes unavailable.  But let's

11   suppose she lives, you know, another 10, 12 years.

12           MS. KENNEDY:  Yes.

13           THE COURT:  You don't anticipate even in your

14   proposal that he live with his mother forever; right?

15           THE WITNESS:  No, sir.

16           THE COURT:  Is there a time frame that you've

17   identified by which you envision him moving on to

18   independent living, or does it depend on other factors

19   besides the passage of time?

20           THE WITNESS:  What we would like to see, and

21   this is sort of in conjunction with Dr. Murphy's

22   recommended time frames, is that in the first six months

23   Mr. Hinckley is, you know, focusing on living there full

24   time, getting everything together, working with Mr. Weiss

25   on a very regular basis to start seeking out the paid

1    employment options and other things that he would be

2    getting involved in with his extra time.  But then by the

3    Part B phase that they begin to seek out housing options.

4         And Mr. Weiss has already begun to do that and

5    find a lot of different things that could be available to

6    Mr. Hinckley.  But for them to begin doing the apartment

7    searching, the financial gathering for that, and that it

8    be proposed for Part C or even ahead of Part C, that

9    Mr. Hinckley begin seeking out independent housing away

10   from his mother's residence.

11        THE COURT:  Go ahead.

12        BY MS. KENNEDY:

13   Q.   And is this housing reduced income housing or

14   less expensive housing?  You've heard his brother and

15   sister speak here; correct?

16   A.   Yes.

17   Q.   So money being an issue, what kind of housing

18   are they looking for?

19   A.   Well, at the moment Mr. Weiss is seeking out

20   several options.  Again, we were also -- once we find out

21   and become more clear about Mr. Hinckley's Medicaid

22   eligibility, according to Mr. Weiss, that would also offer

23   up some other potential housing options for individuals

24   that can be connected with CBH.

25        However, he's also looking into, and I've

1    discussed with the family, their willingness to look at

2    independent housing or just a private apartment in the

3    area to see what they can find.  One of the suggestions

4    that has been made to us in this regard is to look at

5    certain areas in Newport News, which is close by, has a

6    lot to offer and has some other affordable housing.  Keep

7    in mind Williamsburg is a college town, so there is quite

8    a lot of affordable rental housing available in the area.

9        Q.   Now, Newport News is about 30 to 50 miles

10    outside of Williamsburg?

11        A.   No.  I think Newport News is like 15 miles

12    outside of Williamsburg.

13        Q.   Okay.  Now, in hearing his brother and sister

14    testify, isn't the plan that he live with his mother for

15    quite a long period of time?

16        A.   Well, the idea is that Mr. Hinckley would be

17    moving into Williamsburg to live with his mother, but not

18    necessarily for quite a long time.  We want to make sure

19    that he's transitioned and that he's settled, but that he

20    begin to move towards independent living.

21        Q.   And I believe it was Dr. Beffa who indicated

22    that they would be concerned if Mr. Hinckley were going to

23    be the caretaker for his mother if a physical ailment or

24    medical problem occurred.

25        A.   I remember reading that somewhere.  I'm not sure

1    if it was Mr. Beffa or who was saying that.

2        Q.   Is that a concern to the hospital?

3        A.   It is, and that's something that we've discussed

4    with the family as well, that we -- you know, while I

5    think Mr. Hinckley would be up for some of those tasks,

6    it's not necessarily -- we don't think that it would be

7    wise to have him be considered the primary caretaker for

8    his mother.  But that he is more than capable, responsible

9    and willing to provide assistance to her, to provide care

10   for her.  Yet we don't want to create a system for which

11   he becomes the -- you know, the only person that can --

12   that can provide help to her.

13           And in that, we want to make sure that, you

14   know, thank God she's in great health.  It sounds like she

15   comes from a very strong genetic pool in terms of long

16   life.  Yet we also want to make sure that Mr. Hinckley is

17   moving towards living his own life.  That doesn't

18   necessarily have to be under the roof of his mother.

19       Q.   Now, one of the risk factors that have been

20   mentioned by Dr. Murphy and Dr. Patterson is isolation;

21   correct?

22       A.   Yes.

23       Q.   If you know.  All right.

24           And isn't this type of major change something

25   that could cause anxiety and nervousness for Mr. Hinckley,

1    moving down to Williamsburg full time, losing the safety

2    net of the hospital?

3        A.    Possibly; although, from working with

4    Mr. Hinckley for many years in a number of ways, one thing

5    that has been seen as that the anxiety that he experiences

6    is actually greater when he's in the hospital in that he

7    wants to get back to Williamsburg and away from the world

8    of living in a psychiatric hospital in D.C. away from his

9    family; that he's displayed more anxiety on the returns to

10   the hospital than in the time leading, you know, up to or

11   inside Williamsburg.

12       Q.    How do you know, Mr. Hyde, whether or not he's

13   anxiety ridden or nervous down in Williamsburg?

14       A.    He's stated as -- no, that he's not.

15       Q.    That he's not, right.

16       A.    That he's actually -- the anxiety he feels is

17   when he has to return to the hospital away from the world

18   he has down in Williamsburg.

19       Q.    So that's what he's told you, that's how you

20   know?

21       A.    That's what he's told us, and that's what has

22   been noted by his providers both in Williamsburg and in

23   D.C.

24       Q.    Now, turning to outpatient.  Obviously you've

25   met Dr. Johnson.  You know Dr. Johnson.

1        A.    Yes.

2        Q.    Okay.  And what is her exact title?

3        A.    I believe it's director of Forensic Outpatient

4    Department.

5        Q.    Okay.  And --

6              THE COURT:  Dr. Johnson is nodding no, it's not.

7              MS. KENNEDY:  Could someone say what it is.

8    Dr. Johnson?

9              DR. JOHNSON:  Director of Forensic Services.

10             THE COURT:  These are very informal proceedings.

11             BY MS. KENNEDY:

12       Q.    And that is involving being the outpatient

13   director for the outpatient department; is that fair to

14   say?

15       A.    I think that's fair to say, yes.

16       Q.    Okay.  I'm going to be corrected here.

17             And at this point does she have anything to do

18   with Mr. Hinckley's care?

19       A.    No.

20       Q.    That will start when and if he goes down to

21   Williamsburg full time; correct?

22       A.    Yes.

23       Q.    Now, Dr. Johnson has been at one meeting with a

24   review board back in January 2015; is that correct, if you

25   know that?

48

1       A.    I believe she's actually been in two review

2  board meetings for Mr. Hinckley.  She was in person in one

3  and over the phone for another.

4       Q.    Okay.  And she just met Mr. Hinckley, I believe

5  it's two weeks ago for the first time; correct?

6       A.    Yes, that's my understanding.

7       Q.    Okay.  Why wouldn't Dr. Johnson have been

8  invited to an actual inpatient treatment team meeting,

9  particularly around the time you were all deciding that he

10  would go out on convalescent leave?

11      A.    We usually don't invite OPD to those meetings.

12  At that time OPD is usually brought in a little further

13  along in the process.

14      Q.    Even on a case that is the most unusual at

15  St. Elizabeths Hospital, one of the most notorious

16  patients that you have at the hospital, one of the most

17  complicated cases that you have at the hospital, you

18  wouldn't have brought in Dr. Johnson to discuss the fact

19  she was going to be getting this case?

20      A.    She's well aware and capable of handling that,

21  as also not -- she's also really been brought in earlier

22  for this case being a marquis case for the hospital.  She

23  was brought in earlier than typical and involved in the

24  planning of some of the conditions we've recommended

25  before what we would normally do.

1          So I would say that given the complexity of the

2     case, the high-profile nature of the case, we, in fact,

3     did bring Dr. Johnson in to -- her involvement in earlier

4     than we typically would.  It was very helpful to have her

5     there as a part of that process.  Yet, it was not

6     something that I feel was done in any way that is out of,

7     you know, mainly done to be cautious and to be aware of

8     the nature of the case.

9          Q.   Not that you wanted to exclude her

10    intentionally?

11         A.   Right.  This is just the process, and so we sped

12    up the process a little on her --

13         Q.   Did Dr. Johnson express to you that she wanted

14    this case?

15         A.   Yeah, she said that she would love the case and

16    would really enjoy having that on her resume.

17              THE COURT:  You're under oath.

18              BY MS. KENNEDY:

19         Q.   That would be facetious, correct, Mr. Hyde?

20         A.   That would be facetious, obviously.

21              Dr. Johnson stated that while she recognizes

22    that this is a complex case that this is a -- there's a

23    lot of scrutiny on this case and that there is a lot of

24    responsibility that falls to her; that she welcomes it as

25    much as she welcomes any other cases brought to her case

1   load as a part of her job.

2          THE COURT:  Let me ask you this question:  At

3   the time that -- if I'm remembering correctly, that

4   Mr. Beffa -- I think really at the time that Dr. Lee first

5   came on and was going to be involved, there was a real

6   concern that he had not read very much and gotten into the

7   history of Mr. Hinckley and notes in the files and all

8   this sort of stuff.  And there's a lot of background for

9   anybody who first comes into this case.  And it was a

10  concern at some of the hearings.

11         Has there been discussion between you and others

12  in the treatment team with Dr. Johnson about, despite her

13  other obligations, what she could do by way of

14  consultations and/or serious time-consuming reading of

15  records to immerse herself in the background of the case?

16         THE WITNESS:  I -- I would certainly be more

17  than available, as I've done with Mr. Weiss, as I've done

18  with Mr. Carroll, who is Mr. Hinckley's new individual

19  music therapist, and Ms. Haley and other providers who

20  have come on in my time, and I'd be more than happy to

21  provide any extra information.  But we, I think, have the

22  documentation that has been created for Mr. Hinckley over

23  the last couple of years, provides even -- and I've even

24  suggested reading Your Honor's 2013 opinion because of the

25  incredible job it does delineating and rolling out this

1    long case history in a very, you know, succinct way for

2    this case history.

3              So there's plenty of ways to get people caught

4    up and to provide consultation as we go.

5              BY MS. KENNEDY:

6        Q.   Has anyone such as yourself e-mailed her or sent

7    her via the computer the 35-year history of this case?

8        A.   The 35-year history of this case is actually --

9    not all of it is digitized.  I have a large portion of it

10   in two massive filing cabinets in my office.  The rest are

11   in a special locked area in the hospital records.

12       Q.   So let me just ask, will you be sending those

13   black file cabinets over to her?

14       A.   I can't wait.

15       Q.   I'm sorry?

16       A.   I can't wait.  Mr. Shamblee drops them off with

17   me.  It's a rite of passage.  But it is something that --

18   again, it's something that we've -- you can very easily

19   read through some of the summary reports including the

20   opinions, review board reports over the last couple of

21   years that do a very good job summarizing the 30-plus case

22   year history in addition to verbal consultations with

23   experts on the case.

24       Q.   She's never met any of the members of the

25   Williamsburg treatment team, has she?

1    A.   I think she attempted to.  She's spoken to them

2  on the phone.  I don't know if she's met them in person

3  yet or not.

4    Q.   She hasn't been able to make it to Williamsburg

5  through no fault of her own?

6    A.   Correct.  I think she had a plan to go down

7  there.  It was thwarted by weather.

8    Q.   So no one other than Dr. Johnson at this point

9  will be in charge of Mr. Hinckley's care?

10    A.   In OPD?

11    Q.   At all.  At the hospital, inpatient, OPD, she'll

12  be the head banana, so to speak.  She'll be the director.

13  She'll be the head contact person.  Is that fair to say?

14    A.   For DBH, for the Department of Behavioral

15  Health, yes.

16    Q.   And you don't know what, if any, significant

17  assistance she'll have, do you?

18    A.   I wouldn't be able to speak to that.

19    Q.   You had Mr. Shamblee as far as significant

20  assistance; is that fair to say?

21    A.   He gave me all of those files.

22         THE COURT:  Has he left the hospital?

23         THE WITNESS:  Yes.  He actually went to OPD, but

24  he's left OPD as well.  But yes, I would provide

25  significant assistance.

1       BY MS. KENNEDY:

2       Q.   You would provide significant assistance?

3       A.   Oh, yeah.

4       Q.   To Dr. Johnson?

5       A.   Oh, I would absolutely do that for her.

6       Q.   Which I know she would appreciate and you would

7  move over there to Outpatient?

8       A.   I would be more than happy to accept a contract

9  from the Department of Justice to run this case, thank you

10 very much.

11      Q.   All right.  Who in Williamsburg will be the main

12 contact regarding Mr. Hinckley's care?

13      A.   It would be Mr. Weiss and Dr. G.G.  What we

14 would like to try to do is have Dr. G.G. be in direct

15 contact with Dr. Johnson and that Mr. Weiss provide also

16 a -- as a contact, we would like for Mr. Weiss to be sort

17 of the primary care since he's very good and available,

18 and has been able to do a very good job coordinating with

19 the team down there as well as with us up here in D.C.

20 And we believe that between Mr. Weiss and Dr. G.G. it

21 would be an excellent connection for Dr. Johnson to have.

22      Q.   And have you ever met with him down in

23 Williamsburg?

24      A.   I have been to Williamsburg once.  I was not

25 able to meet with them at that time.  That visit that I

1    went down to Williamsburg was with Dr. Kiley and Stevens,

2    and we went to discuss Mr. Hinckley's volunteer program at

3    Eastern State and then went to visit Mr. Hinckley and his

4    mother at the family house.

5         Q.   Did you ever meet Mr. Weiss and Dr. G.G. up in

6    D.C.?

7         A.   Yes.  Not Dr. G.G. but I think Mr. Weiss.  I

8    should say Mr. Beffa was -- I was able to meet with

9    Mr. Beffa and Dr. Stevens at the time we went to

10   Williamsburg.  But we weren't able to meet with Mr. Weiss

11   at that time.  We have met with Mr. Weiss up here.

12        Q.   Okay.  So you met with Mr. Weiss up here?

13        A.   Yes.

14        Q.   And how long ago was that?

15        A.   Oh, man.  Maybe a year ago, less than that.

16        Q.   Okay.  And if and when Mr. Hinckley goes to

17   Williamsburg on convalescent leave, you won't be meeting

18   with him at all in the future?

19        A.   No.  I would likely be involved in some of those

20   monthly meetings at OPD.

21        Q.   And --

22             THE COURT:  But the contacts with Williamsburg

23   would be --

24             THE WITNESS:  Correct.  Dr. Johnson would be the

25   main contact for the Williamsburg providers.

1          MS. KENNEDY:  The Court's indulgence.  Oh, okay.

2          BY MS. KENNEDY:

3     Q.   Is it fair to say that Dr. Johnson for the most

4     part is going to be walking into this case cold?  She

5     knows very little past or present about the case and she

6     at this point does not know Mr. Hinckley.

7     A.   I would say she's not walking into this case

8     cold.  Maybe lukewarm, but certainly not cold.  She has

9     met Mr. Hinckley.  Has she established a relationship with

10    him yet, no.  That does not typically happen from my

11    understanding with any of the patients moving into

12    Outpatient until they've actually moved to that realm.

13    Q.   And is it fair to say this is one, if not the

14    most, labor-intensive cases in the hospital?

15    A.   I think that's fair to say.

16    Q.   And do you think that will also be fair to say

17    for the outpatient division?

18    A.   I believe that would depend on the results of

19    this, these hearings.

20    Q.   So separate and apart from these hearings -- you

21    don't think it would be labor-intensive, separate and

22    apart from these hearings?

23    A.   I mean, like I said, it really does depend.  It

24    depends on the amount of administrative oversight prior to

25    and the way that it is ultimately determined and how, you

1    know, contact with the Court or notes to the Court are

2    ordered.  As I said, I think that there are ways that the

3    burden could be reduced, made to be slightly more

4    streamlined.  Yet I also feel like there is -- the

5    information contained within what we've recommended thus

6    far would also provide enough detail for the Court.

7             THE COURT:  In the proposal, in the three

8    letters, is there built in somewhere -- what happens if

9    conditions are violated?  Under what circumstances do we

10   come back or who initiates that?

11            THE WITNESS:  That's typically the decision of

12   OPD.  And the -- in terms of monitoring any violations of

13   those conditions, you know, those often rely on the

14   providers and the family.  With Mr. Hinckley's case, he

15   would actually probably have a lot more supervision and

16   monitoring of his adherence to conditional release terms

17   than most other individuals in outpatient care.

18            And, again, the system of communication we have

19   recommended would certainly provide significant

20   corroboration and oversight to see how he's adhering.  I

21   believe that the parameters for recommending a return to

22   inpatient status or a recommendation to bring the matter

23   before a Court is well within the realm of ability and

24   authority of OPD.  This is something they do on a regular

25   basis.

1          THE COURT:  And are there conditions -- you got

2    19 conditions or some number of conditions and the

3    government has 35 conditions.  Are there in your mind

4    or -- not in your mind but in your plan, some of these

5    conditions which over time become less and less important

6    or not important at all, and what's the mechanism for

7    eliminating or modifying conditions?

8          THE WITNESS:  So, again, when you read our

9    December 19 proposal you see a lot of the discretion of

10   the OPD.  This is something that the hospital often turns

11   to the clinical discretion of outpatient department

12   providers.  What we have established in the plan for the

13   tapering off of either service provision on some level or

14   the reduction of certain conditions and time, we feel like

15   it was well conceptualized again under Dr. Murphy's plan

16   to have the sort of subpart steps which ultimately move

17   Mr. Hinckley towards a reduction in some conditions on an

18   automatic or clinically indicated basis; and yet further

19   reductions in conditions or proposals for, you know,

20   further release terms or anything else would be assumed in

21   upcoming hearings and for the risk assessments in the, you

22   know, first two years.

23          THE COURT:  Say that again.

24          THE WITNESS:  So if anything, we would be moving

25   towards anything that would require any sort of new

1    hearings or risk assessments would occur after about 15

2    months.

3              THE COURT:  So you envisioned or Dr. Murphy

4    envisioned that you would be back in court?

5              THE WITNESS:  Not necessarily, but we would be

6    seeking petitions or risk assessments on adjusting some of

7    the conditions or providing further freedoms for

8    Mr. Hinckley based on his progress.

9              THE COURT:  Asking me but not necessarily having

10   a hearing?  Or allowing it up to the discretion of OPD?

11             THE WITNESS:  The hospital prefers allowing it

12   to the discretion of OPD.  I know that often OPD will

13   take -- will do their recommendations as they see fit.

14   Sometimes they prefer seeking Court approval.  In some

15   cases we have -- you know, we have sought expansion of

16   release terms that might require a full hearing in these

17   cases and others that can be done in conference and not

18   necessarily require a full-blown hearing.

19             In this particular case I think that would be

20   helpful to see Mr. Hinckley's progression successes within

21   this time frame as has been recommended to give not only

22   the clinicians but also Court and counsel opportunity to

23   see his trajectory in convalescent leave and to recognize

24   how well those conditions are holding up to the reality of

25   the plan.

1          THE COURT:  I guess what I'm thinking of is if I

2     were to grant the hospital's (e) letter in some form with

3     a bunch of conditions, which would be some amalgam of the

4     conditions proposed by the hospital and the government and

5     Dr. Murphy, Dr. Patterson, although I think he's relying

6     on the government's submission, this is a rhetorical

7     question but one that if you're not comfortable answering,

8     I guarantee you Dr. Patterson will be, and I hope that

9     Dr. Murphy will be.

10          What does my order look like so that there are

11     certain things, for example, that say for the first six

12     months he does this weekly but then only twice a month?

13     That's pretty clear, you know.  If I accept that condition

14     he doesn't see -- this is the rule for when he sees

15     Dr. G.G. and so on and so forth.

16          But then what happens after six months or after

17     12 months or after 18 months?  And do we leave that to the

18     discretion of OPD in terms of -- or the discretion of

19     Dr. G.G. in terms of how often she needs to see him and

20     maybe she needs to see him more often for medication

21     management than for other things.  But what does the order

22     say about that?

23          Are there other things in the order that are

24     more open ended that after a period of time it would be a

25     clinical determination to be made by OPD or by OPD in

1    consultation with Dr. G.G. and others in Williamsburg.

2    And then are there other conditions that we really should

3    come back to Court for.  And does that last forever or

4    does that last for 18 months?  24 months? 48 months?

5            I haven't seen that written.  And in the real

6    world a lot of it depends on how things go.  But in --

7    flexibility is important, but so is knowing where we are X

8    number of years from now and whose responsibility it is to

9    make which decisions.

10           I'll stop there.  If you want to ask him some

11   questions, fine.  If you do have some thoughts, fine.

12   Otherwise we'll wait for Dr. Murphy and Dr. Patterson and

13   Dr. Johnson.

14           THE WITNESS:  If I may, you know, I respectfully

15   recommend that there be conditions that are set up to

16   address changes in a time frame like you suggested, you

17   know.  After six months, you know, if clinically indicated

18   service provision may go from this amount of time

19   frequency to this frequency of time, on an -- almost an

20   automatic or clinically indicated basis.

21           For something along the lines of housing,

22   alternative housing, seeking independent living, that

23   would be something that could be built in as a clinical

24   discretion and, you know, in consultation between

25   Williamsburg and OPD treatment providers after a certain

1    period of time without Court review.  And that further

2    almost as kind of in the way that Dr. Murphy's

3    recommendation to my memory recommends that, you know,

4    after the 18-month period that further -- further

5    recommendations could be made considering, you know,

6    travel locations, supervision during things like that, to,

7    you know, travel provisions for -- you know, to go further

8    than the 50 miles or for family vacations.  And then

9    ultimately for an unconditional release that would clearly

10   need to be done on a larger scale.

11           But that perhaps the order of time would be well

12   made to look at how service provision is ultimately

13   tapered.

14           BY MS. KENNEDY:

15       Q.   Mr. Hyde, these suggestions that you're making

16   after six months, something might become less as far as

17   appointments, et cetera.  This would only be done after a

18   written recommendation or a written letter went to the

19   Court; correct?

20       A.   You know, that would be up to the Court.  I

21   would imagine often we would make these recommendations

22   when we stage the discretion of OPD.  That doesn't

23   necessarily always have to require an updated summary to

24   the Court to my knowledge; however, I think that that

25   would be the best answered by Dr. Johnson as that's more

1    in her purview.

2        Q.   It's correct, isn't it, Mr. Hyde, that that in,

3    quote, regular cases of not guilty verdicts of insanity,

4    if an individual wants to go outside the miles that have

5    been set, whether it's 30 or 50, or someone wants to take

6    a trip for Christmas to Texas or New York, or if someone

7    is going to start with a new therapist, or if someone is

8    taking on a new job that a letter is written to the Court

9    and a copy is given both to the defense and to the

10   government with a request, if they want to ask for a

11   hearing under the statute?

12       A.   Okay.

13            THE COURT:  Well, let me suggest this:  Other

14   than Dr. Patterson for the moment, because I know where he

15   stands on a lot of this stuff, I'd be really interested in

16   Dr. Murphy's view of what's clinically appropriate.  And

17   I'd be really interested in Dr. Johnson's view on some of

18   the issues you just raised, Ms. Kennedy, because you've

19   had -- I won't say how many years' experience --

20            MS. KENNEDY:  Thank you.

21            THE COURT:  -- handling these cases, and I

22   respect your knowledge.  But she's the one that's actually

23   running this department.  And I would like to know what

24   she says would be the practice of OPD in the ordinary

25   course with respect to these kinds of conditions, versus

1    those kinds of conditions, versus those kinds of

2    conditions.

3                MS. KENNEDY:  Sure.

4                THE COURT:  Because it may raise some concerns,

5    but it also may raise various people's comfort levels as

6    well to know how that would work once things are

7    transferred to her.

8                MS. KENNEDY:  Okay.  That's fine, Your Honor.

9    Thank you.

10               BY MS. KENNEDY:

11        Q.   You mentioned, Mr. Hyde, about individual

12   therapists who are available in Williamsburg, but that

13   could change, just like it could change when you're at the

14   hospital.  People coming and going and finding other

15   employment; correct?

16        A.   Correct.

17        Q.   Now, you're aware that Mr. Weiss only works part

18   time as a case manager because he's doing research on

19   dementia?

20        A.   Yes.

21        Q.   And Mr. Beffa thinks that the music therapist

22   should be replaced as he's, quote, impossible to reach --

23        A.   Yes.

24        Q.   -- correct?

25               And one of his other treating doctors is already

1   retired, Mr. Beffa, though he's keeping Mr. Hinckley on,

2   but he is retired and only doing this half time; correct?

3       A.   Correct.  But he still does have a case load.

4       Q.   Okay.  So right upfront Mr. Hinckley is facing

5   some potential loss of therapists; correct?

6       A.   In the future.

7       Q.   Okay.  And the future may not be too far away

8   for some; correct?  Such as Ms. Haley, the music

9   therapist?

10      A.   Correct.  I know that she has been difficult to

11  get in touch with; although, I have noted that she does

12  meet with Mr. Hinckley quite regularly.

13      Q.   Have you ever been able to reach her?

14      A.   Yes.

15      Q.   Okay.  How long ago?

16      A.   It's been a while.

17      Q.   And you're aware that the therapists down in

18  Williamsburg have had a very difficult time to meet with

19  her?

20      A.   Yes.

21      Q.   And, in fact, she hasn't shown up for treatment

22  team meetings?

23      A.   She's called into ones.  I don't think she's

24  made it to the ones that they've had in Williamsburg that

25  I'm aware of.

1      Q.    And some she hasn't even called into?

2      A.    Correct.

3      Q.    Okay.  So whose responsibility is it in

4  Williamsburg then to try to find a new music therapist if

5  this becomes a further problem?

6      A.    I mean, that would be something that would be --

7  I think, Dr. -- I mean Mr. Weiss would be very capable of

8  doing.  It was actually -- I was the one who had initially

9  found Ms. Weiss --

10           THE COURT:  Ms. Haley.

11           THE WITNESS:  I'm sorry.  Ms. Haley through a

12  search through the American Music Therapist Association in

13  the area.  So that could be something done relatively

14  easily moving forward if need be.  I think Mr. Weiss would

15  be a good person to do that as well.

16           BY MS. KENNEDY:

17      Q.    Okay.  And --

18           THE COURT:  Does it make sense?  This is an

19  aside for either you or Mr. Weiss to have a conversation

20  with Ms. Haley now before we're into the next phase to

21  say, Look, you know, we've been having some problems with

22  you.  John likes you, and you're doing a great job.  But

23  in terms of being a part of the team, you're hard to reach

24  and all that.  How committed are you to this going

25  forward?  Because there may be more responsibilities.

1    There will be more responsibilities put on the

2    Williamsburg treatment team and each member of that team

3    if we were to order convalescent leave.

4            And it sounds like everybody else is committed

5    until they retire or something, but they are committed to

6    do what's required.  Mr. Beffa, Mr. Weiss and Dr. G.G.

7    And if she's not, maybe now is the time for you and

8    Mr. Weiss to identify somebody else.

9            THE WITNESS:  With respect to that, I'm way

10   ahead of you.

11           THE COURT:  Do you want to take a break at some

12   point?

13           MS. KENNEDY:  Can I just finish, let's see,

14   maybe -- oh.  Another page and then I won't have to do

15   much.  Or if you want to stop now, that's fine.

16           THE COURT:  Why don't we take ten minutes?

17           MS. KENNEDY:  All right.  That's fine.  Thank

18   you.

19           (Recess.)

20           BY MS. KENNEDY:

21       Q.   Just about done, Mr. Hyde.  Good to see you.

22       A.   You too.

23       Q.   Now, if you have to replace the treatment team

24   providers as you would at St. Elizabeths, this could cause

25   Mr. Hinckley some upset a bit, could it not?

1      A.    It could.

2      Q.    Okay.  And you-all would be -- well, the

3  hospital, you wouldn't, but his providers down there would

4  be on a lookout for it, Dr. G.G, Mr. Weiss; is that fair

5  to say?

6      A.    Correct.

7      Q.    Mr. Beffa?

8      A.    Yes.

9      Q.    Okay.  Now, the hospital is aware that no matter

10  what conditions are imposed that Mr. Hinckley's care is

11  still with the hospital and with the -- this Court in

12  which he will continually have jurisdiction over this case

13  and will not be under the jurisdiction of Virginia?

14      A.    That's -- that's my understanding as the plan

15  stands.

16      Q.    Okay.  Now, over a period of a month

17  Mr. Hinckley could become angry; correct?

18      A.    Yes.

19      Q.    Sad?

20      A.    Yes.

21      Q.    Manic?

22      A.    Never seen Mr. Hinckley exhibit manic symptoms.

23      Q.    Have you ever seen him psychotic?

24      A.    No.

25      Q.    But you understand his diagnoses; correct?

1    A.   Yes.

2    Q.   What are they?

3    A.   Mr. Hinckley is diagnosed with major depression,

4  full and sustained remission, psychotic disorder, NOS

5  along the Axis I.

6         THE COURT:  Speak up.

7         THE WITNESS:  Psychotic disorder NOS along the

8  Axis I, narcissistic personality disorder along Axis II.

9         BY MS. KENNEDY:

10   Q.   The narcissistic personality disorder will

11  always be with him; correct?

12   A.   That's considered with personality disorders,

13  that they are chronologically based.  They do attenuate

14  over time.  This has been assessed with Mr. Hinckley's

15  presentations of those symptoms.

16   Q.   And he was definitely showing signs of

17  narcissism and manipulation at the time of the

18  assassination; correct?

19   A.   I believe that that's been testified in court

20  before, but I can't speak to that.

21        MR. LEVINE:  Your Honor, I'm going to interpose

22  the objection of what's good for the goose is good for the

23  gander.

24        MS. KENNEDY:  But it's cross-examination.

25        THE COURT:  You objected to Mr. Levine asking

1    about narcissistic personality because he wasn't a

2    psychologist.

3            MS. KENNEDY:  I'll pass.

4            MR. LEVINE:  And I credit that as a valid

5    objection.  I trust you'll do the same.

6            MS. KENNEDY:  I'm sorry.  Yes, it's late.  I'll

7    move on.

8            BY MS. KENNEDY:

9        Q.   Now, while he, Mr. Hinckley, is in Williamsburg,

10   the hospital basically is not going to have any idea what

11   he's doing every day; correct?

12       A.   On a daily basis, no.

13       Q.   Okay.  And you wouldn't know unless Mr. Hinckley

14   tells you or there's an issue and one of his therapists

15   calls you; correct?

16       A.   You're saying me specifically?  I would not

17   know.

18       Q.   No, you would not know.

19           THE COURT:  And that's true of any other member

20   of the current treatment team.  They wouldn't know.

21           THE WITNESS:  Correct.

22           BY MS. KENNEDY:

23       Q.   And the only way the treatment team in

24   Williamsburg would know is if they've got some contact and

25   can see what's happening?

70

1        A.    Feasibly, yes.

2        Q.    Okay.  Now, the letter from the hospital

3    indicates that federal benefits have not been applied

4    for -- quote, for Mr. Hinckley; is that right?

5        A.    Correct.  We begin applying for those once we

6    received an order from the Court.

7        Q.    So you don't know if he's entitled or not?

8        A.    Pardon me, no.

9        Q.    I'm sorry?

10       A.    No.

11       Q.    Okay.  And you've heard Scott Hinckley testify;

12   correct?

13       A.    Yes.

14       Q.    And the financial situation as far as what they

15   can afford and what they can't, et cetera?

16       A.    Yes.

17       Q.    Okay.

18             MS. KENNEDY:  Court's indulgence.

19             BY MS. KENNEDY:

20       Q.    Now, are you aware of, I believe, the seven risk

21   factors that Dr. Murphy and Dr. Patterson stated that were

22   in effect or part of Mr. Hinckley's psychology makeup?

23       A.    Yes.

24       Q.    And do you know what they are offhand or do you

25   want me to just ask you if you know each one because it's

1   late?

2        A.   It's late.

3        Q.   I'll tell you.

4             Your understanding is depression one of them?

5        A.   Yes.

6        Q.   Isolation?

7        A.   Yes.

8        Q.   Psychosis?

9        A.   Yes.

10       Q.   Insight into mental illness?

11       A.   Yes.

12       Q.   Narcissistic personality?

13       A.   Yes.

14       Q.   Access to weapons?

15       A.   Yes.

16       Q.   History of suicide?

17       A.   Yes.

18       Q.   Difficulty in relationships?

19       A.   Yes.

20       Q.   And with friends.

21            And deception?

22       A.   Yes.

23       Q.   All right.  And does he continue to exhibit some

24   of the -- these risks?

25            MR. LEVINE:  Objection, Your Honor.

1          MS. KENNEDY:  I'll withdraw that, Your Honor.

2          BY MS. KENNEDY:

3     Q.   As far as what we spoke about before, what he

4     has as a patient at St. Elizabeths Hospital, you indicated

5     that there aren't any other patients who are driven back

6     and forth to a city like Williamsburg; correct?

7     A.   Correct.

8     Q.   And most don't have private therapists in

9     Williamsburg; correct?

10    A.   Correct.

11    Q.   And it's the cost of those therapists that has

12    over time concerned the family; correct?

13    A.   In addition to the driver and the years of legal

14    fees compounded with those issues.

15    Q.   Yet the private therapists for the most part you

16    believe are good therapists?

17    A.   Yes.

18    Q.   And for being in a place like Williamsburg, good

19    therapists would be able to treat Mr. Hinckley and any

20    illness he may have?

21    A.   Yes.

22    Q.   If he were able to get entitlement funds down in

23    Williamsburg, would the hospital -- I'll withdraw that.

24         Now, there was something on direct that you

25    mentioned about the burden on the hospital for writing

73

1    notes, et cetera.  Do you recall that?

2        A.   Yes.

3        Q.   Now, whether or not the hospital has the burden

4    of writing notes, sending summaries, et cetera, that does

5    not address the safety to the community in any way, does

6    it?

7        A.   Whether or not we are writing the summaries or

8    not?

9        Q.   Right.  Or that there's a burden on you for

10   doing that.

11       A.   No.  A burden to me has nothing to do with

12   safety to the community.

13       Q.   Okay.  And your consideration of whether or not

14   it's a burden to the hospital of writing notes and

15   summaries and following Mr. Hinckley has nothing to do

16   with any concern you may or may not have for the safety of

17   the community?

18       A.   I wouldn't go that far.  What I would say is

19   that what we are, what the hospital believes is that the

20   overwhelming detail of the summaries, the merit of which

21   do not meet the risk that Mr. Hinckley presents to the

22   community, that he has shown himself to be stable,

23   trustworthy and able to manage himself and to work with

24   his providers, family members and other responsible

25   parties throughout those visits, and that the detail to

1    which I go into in these letters, they are helpful, I

2    think, to some level.  And we do believe that the safety

3    of the community and the public is of utmost importance.

4            Yet, that due to the fact that Mr. Hinckley has

5    shown his success time and again in this regard, the

6    information contained within these detailed summaries does

7    not necessarily raise any safety factors for the community

8    at large, nor does it necessarily meet the needs that

9    Mr. Hinckley shows for risk.

10       Q.    Now, you were talking about Mr. Hinckley perhaps

11   having to spend the night elsewhere other than

12   Williamsburg; correct?

13       A.    If necessary.

14       Q.    And that would in all likelihood be the

15   circumstance when he's driving from Washington, D.C. --

16   I'm sorry, from Williamsburg up to Washington, D.C.?

17       A.    If need be.  Now, what we've maintained is that

18   this is a very easy day trip for Mr. Hinckley to be able

19   to do.  We were concerned about the government's

20   recommendation that because of any emergent issue that he

21   would have to stay overnight in the D.C. area that he

22   be -- do so at the hospital.  That's something that we

23   oppose based on the function of the hospital and the

24   community, and that if need be if he had to -- let's say

25   his car broke down once he got to D.C. or there is a

1    snowstorm or something where he was not able to leave,

2    that he would be able to stay at a nearby hotel or motel.

3         Q.   So you look at this as an emergency situation,

4    not kind of -- not a situation where he's coming up every

5    week, once a month and staying elsewhere, but based on an

6    emergency?

7         A.   Yes.  Absolutely.  That -- the idea is that

8    Mr. Hinckley would come, drive out of Williamsburg in

9    early morning, make it to D.C., get to his appointments,

10   have a bite to eat, make his way back to Williamsburg for

11   the evening.

12        Q.   You indicated that Dr. Binks will be going over

13   to the outpatient department for therapy of Mr. Hinckley

14   once a month?

15        A.   Yes.

16        Q.   So you indicated that you would stay with

17   Mr. Hinckley up to four months if the Court ordered four

18   months or whatever length of time the Court ordered;

19   correct?

20        A.   Correct.  And it would be -- what the hospital

21   is in agreement with is that, you know, myself or

22   Ms. Brown or Dr. Atawale, one of the current treatment

23   members are available for those meetings, in addition to

24   an individual therapy session with Dr. Binks at that time.

25        Q.   So would you stay at Inpatient and he would come

```
1    there, or would you go over to Outpatient?

2         A.   No, I would go over to Outpatient.

3         Q.   You would go over to Outpatient.  Okay.

4              Now, the Internet, at the present time the

5    hospital believes that he should be able to look at

6    anything and everything on the Internet.  Is that fair to

7    say?

8         A.   Correct.  We feel that that would be the most

9    helpful process for Mr. Hinckley is fully reintegrating.

10        Q.   So that would mean he could look at any sites,

11   correct?

12        A.   Correct.

13        Q.   He could contact anyone?

14        A.   Correct.

15        Q.   He could order anything he wanted off the

16   Internet?

17        A.   Correct.

18        Q.   He could go to pictures of celebrities; correct?

19        A.   Correct.

20        Q.   Crime photos?

21        A.   Yes.

22        Q.   Pornography?

23        A.   Yes.

24        Q.   And there would be no one monitoring him at all;

25   correct?
```

1      A.    Correct.

2      Q.    Now, Mr. Hyde, could you see that this could put

3  Mr. Hinckley in a fairly dangerous situation?

4      A.    I can understand where the concern is.  As I've

5  testified, I think that what we've also -- what we

6  discussed is that it's important for Mr. Hinckley to be

7  able to, you know, learn how to live his life in modern

8  society, as we all do.  We are all -- have access to

9  pornography, to web sites that sell all manners of

10  anything.

11      Q.    But, Mr. Hyde, we may all have access, but none

12  of us here except Mr. Hinckley attempted to assassinate

13  the President of the United States.

14      A.    That's absolutely correct.  And we've also --

15  none of us have been through 35 years of inpatient

16  psychiatric treatment and shown such incredible

17  turn-around reduction in symptomology and mitigation of

18  risk factors in that time.

19      Q.    But he still has shown manipulation in the last

20  couple years; correct?

21      A.    I disagree with that.

22      Q.    Well, we have the incident that you spoke of

23  where he called you the day after he went to an

24  individual's house, photographer's house -- actually I'm

25  sorry, the music recording house.

1     A.   Yes.

2     Q.   Rather than the photographer.

3          And then in 2011 we had the situation where but

4     for the Secret Service we found out that he didn't go to a

5     movie.  He went to a bookstore looking at pictures of

6     presidents and --

7          MR. LEVINE:  Objection.  Again, objection.

8     That's not what he was doing, and she knows it.

9          MS. KENNEDY:  That's not correct, Your Honor.

10    In fact, everyone here has testified to that.  And that's

11    exactly what is in the Court's order of what he was doing

12    at the bookstore.  And that's been discussed in therapy,

13    whatever you want to label it.

14         MR. LEVINE:  Your Honor, I'm going to maintain

15    my objection.

16         THE COURT:  He went to a bookstore instead of

17    going to a movie and lied to his treaters; right?

18         THE WITNESS:  Correct.

19         THE COURT:  You view that as deception?

20         THE WITNESS:  I view it as deception.

21         THE COURT:  You don't view it as manipulation.

22         THE WITNESS:  I don't necessarily view it as

23    manipulation.

24         THE COURT:  He went to visit with Mr. Tracey,

25    the musician -- the studio rather than going to the other

1    photographer's house because the photographer was sick and

2    didn't tell you, didn't ask permission or tell you before

3    but did tell you the next day; right?

4              THE WITNESS:  Correct.

5              THE COURT:  What do you call that?  Is that

6    deception or is it manipulation?  Is it narcissism?  Is it

7    narcissistic personality?  You're not an expert or

8    psychologist.  What is it?

9              THE WITNESS:  In the treatment team's view, it

10   was neither deception nor manipulation given the context

11   of the situation.  That it might have shown poor judgment

12   in the moment.  But even still, again, the context is

13   important to consider that Mr. Hinckley was with a friend

14   that he was supposed to be with and that he followed up as

15   he should have done with me and let me know exactly what

16   happened.  He did not in any way fabricate the story and

17   has since then been nothing but forthright about the

18   situation.

19             THE COURT:  And there was evidence before the

20   Court that on two occasions at Barnes and Noble for brief

21   periods of time he stood in front of a bookcase in the

22   American history section, and then there was some books,

23   among others, on President Reagan and President Kennedy,

24   President McKinley and assassinations; right?  That was my

25   finding.

1          MS. KENNEDY:  That's right.

2          THE COURT:  Right.

3          THE WITNESS:  Correct.

4          THE COURT:  And does that -- what's your

5    question about that?

6          BY MS. KENNEDY:

7     Q.   My question was whether or not that was

8    deceptive and narcissistic and manipulative.

9          THE COURT:  Or any of them.

10          BY MS. KENNEDY:

11     Q.   Or any of the above, or any of the risk factors

12    that are listed for Mr. Hinckley.

13     A.   I mean, he might -- with that if he was looking

14    at these things, you could say on some level that it maybe

15    was an indication of narcissism.  You could also say that

16    it was an interest in something that is a major aspect of

17    his life.  And this is the -- I think the lens through

18    which the hospital's opinion is being used for this

19    particular issue, is that the restrictions placed on

20    Mr. Hinckley, in terms of the itinerary, he has worked

21    very hard to maintain his adherence to those terms and to

22    work very diligently to keep contact and updates on his

23    whereabouts and his ins and outs.  That when you consider

24    the move towards outpatient freedoms, that Mr. Hinckley

25    needs to be understood as somebody who is considered

1    clinically ready, low risk and has been doing a very good

2    job managing his life and his interactions for some time.

3            I do not deny that the incident with the

4    deception about going to the movie was an issue.  And it

5    was very much an issue that has been dealt with over the

6    past several years in therapy with Mr. Hinckley.  And that

7    the hospital's recommendations reflect what we feel

8    Mr. Hinckley's ability to manage himself at this stage in

9    his life, and given the fact that we are seeking log-in

10   credentials for Mr. Hinckley does provide us a certain

11   level of monitoring and supervision of his ins and outs on

12   the Internet that would be -- would be helpful, not only

13   to allow him the access to certain things, even if it is

14   pornography.  This is something that is seen often as not

15   necessarily a bad thing for individuals to work through

16   fantasy, but to understand the difference between fantasy

17   and reality.

18           Something that Mr. Hinckley has been able to

19   show over many years, in fact, with relationships, real

20   relationships and pathic interpersonal connections that

21   he's had over the years to be able to separate fantasy

22   from reality and to show that he can be responsible with a

23   vehicle.  He's been able to do that.  And with ins and

24   outs in the community, he's done a very good job with his

25   photography.  He's shown that he's been very safe and

1    appropriate with that.

2         Q.   Now, even if Mr. Hinckley is looking at sites

3    for -- of presidential assassination, the hospital doesn't

4    think that's a problem; correct?

5         A.   The hospital -- the hospital believes that that

6    would be something that would be very important to

7    understand and to know about and to discuss in therapy.

8         Q.   But you wouldn't know unless Mr. Hinckley tells

9    you; correct?

10        A.   That's correct.  Unless we did a search of his

11   search history and we would be able to find that out.

12        Q.   Is that something the hospital recommends is

13   being able to do a search history?

14        A.   Yes.

15        Q.   Okay.  And a search history would allow you to

16   see any site that he's on at any time, anything that he's

17   pulled up; correct?

18        A.   We would be able to see quite a lot of what he's

19   done.  We would be able to follow his tracks pretty

20   easily.

21        Q.   And is that from a monitor on the computer or

22   some device on the computer?

23        A.   Yeah.  If you look into cookie history, browser

24   history, you can find all kinds of information.

25             THE COURT:  Is that true if -- can he use any

1    computer and still be able to track it once he entered

2    his --

3            THE WITNESS:  The log-in credential.  Let's say

4    if he was using GMail, yes, you would be able to find even

5    where he's logged in, mobile devices, IP addresses, those

6    things are all available once you have your log-in

7    credentials.  You can really track yourself along the

8    Internet.

9            BY MS. KENNEDY:

10    Q.    So you'd be able to see what he pulled up on

11    Google?

12    A.    Yes.

13    Q.    And that's through -- I don't really know

14    computers.  You put something on the computer or --

15    A.    It's in there already.

16    Q.    Do you know how to access it?

17    A.    Yes, I do.

18    Q.    So you can do the searches?

19    A.    If the Department of Justice would like to

20    contact -- contract with me individually, I would be happy

21    to.

22            THE COURT:  Let me ask you this question:

23    You've heard testimony a couple of times in these hearings

24    that at the request of the government I've required that

25    he carry a cell phone with him that tracks his location

1    and that nobody ever bothered to look at that data.  So

2    you're talking about the capability to look at sites and

3    track his history and search history.

4              Who is going to do that?  Anybody?

5              THE WITNESS:  I mean, I can tell you that when

6    this actually was -- this particular issue came up

7    following the last set of hearings, when there was concern

8    about whether Mr. Hinckley had been using the library

9    computer where he works at the hospital, one of the things

10   I did to address that was I had his supervisor create a

11   special log-in credential just for the IT worker that did

12   a WATP assignment person at the hospital or at the

13   library, which means it was Mr. Hinckley's specific log-in

14   credential.  I had checked that a couple of times,

15   actually.  This is the type of thing that would be

16   relatively easy for Mr. Weiss to do, something that could

17   very easily be shown.  It's not a difficult process.

18             BY MS. KENNEDY:

19   Q.   Mr. Hyde, is it easy to go the other way?

20   Instead of looking at everything after it's been looked

21   at, keeping it from being looked at, putting some sort of

22   software if the Court didn't want him to look at

23   pornography, didn't want him to look at presidential

24   assassinations, didn't want him to look at Jodie Foster,

25   is there something that would prohibit him from doing that

85

1    on the computer?

2         A.    Yeah.   There's definitely software that is

3    easily installed, and I think even some web browsers have

4    that capability for a safe search.

5         Q.    And you'd be willing to do that?  You yourself?

6         A.    Ms. Kennedy, for you, anything.

7         Q.    Thank you.

8              All right.  Now, there is some discussion in the

9    April 17th letter, 2015, about what a protected area is.

10   If Mr. Hinckley were to go to Richmond and there was a

11   presidential candidate speaking, vice presidential

12   candidate, senator, some noted politician, the Dalai Lama,

13   that is the kind of area and thing that's going on that

14   the government would be concerned with.

15             Do you think it would be appropriate to keep

16   Mr. Hinckley from that area of the State House or the

17   Convention Center or whatever it is that politicians or

18   celebrities would be appearing?

19        A.    The hospital feels that, you know, that this is

20   something that should be considered from the perspective

21   of Mr. Hinckley's risk factors at the time of the instant

22   offense.  They were not politically motivated.  We don't

23   necessarily feel that even though the target was obviously

24   a political figure, that Mr. Hinckley did not have any

25   interest in upsetting a -- you know, policies or anything

1    like that, that it was focused on his delusional system at

2    the time, which may be in remission and well controlled

3    for many, many years.

4              However, the hospital feels that, you know, this

5    has been a condition that has been placed on

6    Mr. Hinckley's travels throughout this time, that this is

7    a concern that is understood by the hospital, the treaters

8    for -- on the sake of the public, the public's perception

9    of the safety of our leaders.  And we would respect and

10   honor that.

11             However, we do feel that it would place a

12   certain burden on Mr. Hinckley to be able to understand

13   and follow these, follow the whereabouts and understand

14   when a protected person is in the area, he would have to

15   have some way of knowing that, which could be difficult

16   for him.

17        Q.   Well, if -- at present, if there is a situation

18   going on, the Secret Service informs you.  The government

19   may inform you that there's a large political or -- event

20   that they are concerned about Mr. Hinckley being at, and

21   then the hospital restricts him or tells him not to go to

22   that area.  And, in fact, he doesn't.  So that's how you

23   could find out if it wasn't in the front page of the

24   Williamsburg News that Hillary Clinton is going to be

25   speaking downtown the next day.  So that's the kind of

1    notification that the government is referring to.

2         A.   Okay.

3         Q.   If that were in existence, in fact, the letter

4    on April 17 indicates that the hospital doesn't really

5    have a problem restricting him from such activities or the

6    area.  They don't know what the protected area is; right?

7         A.   Right.  And again, that's what I said, while we

8    feel that it's not necessarily something that is salient

9    to his risk factors, we do feel that it is something

10   salient to the overall sense of safety for the public and

11   we respect that.  We do -- we would just want to know and

12   understand how that would be, you know, communicated to

13   Mr. Hinckley and what the operational definition would be

14   so that he wouldn't have, you know, a gray zone to worry

15   about.

16        Q.   Now, you made an interesting statement about

17   Mr. Hinckley's motivation for shooting President Reagan.

18   It wasn't politically motivated.  You can understand that

19   that would be a hard line to sell to most people?

20        A.   Completely understandable.  It takes a certain

21   level of critical thinking and understanding about this

22   particular case that we're not expecting the general

23   public to do, which is why we honor that, the

24   recommendation by the government.

25        Q.   Okay.  Having any notorious or unnotorious

1    politician or otherwise, if we were to notify the hospital

2    as you've always done of someone, undoubtedly Dr. Johnson,

3    calling down there and asking that he refrain from being

4    in that area, the hospital doesn't have a problem with

5    that?

6         A.    Correct.  We're not opposed to that.

7              THE COURT:  If the Secret Service calls up

8    Dr. Johnson?

9              MS. KENNEDY:  No.  The Secret Service usually

10   calls us and then we call Dr. Johnson, and they notify if

11   somebody is going to be speaking, could you ask the

12   hospital.  Not often.  But it has happened where there is

13   someone that they want to protect.

14             THE COURT:  It's going to be a big job for you

15   and the Secret Service and Dr. Johnson given all the

16   people running for the Republican presidency.

17             MS. KENNEDY:  I know.  I thought of that.

18   That's a problem.

19             Now, if we were in D.C., we wouldn't have as

20   much of a problem.  Just one second.  Court's indulgence.

21             BY MS. KENNEDY:

22        Q.    Lastly, Mr. Hyde, yourself, as you indicated,

23   you're not a psychologist.  You're not a medical doctor;

24   correct?

25        A.    Correct.

1    Q.   So you cannot say that Mr. Hinckley wouldn't

2  pose a danger to himself or others based on mental illness

3  if he were released on convalescent leave?

4         MR. LEVINE:  I invite him to answer that

5  question.

6         THE WITNESS:  I am torn.  Do you want me to

7  answer that based on my -- based on my consultation with

8  Dr. Murphy, Dr. -- all of the review board experts,

9  Dr. Chang, Dr. Stevens, Dr. Godwin, so on and so forth, my

10 opinion is that based on their assessments of Mr. Hinckley

11 that he is a low risk for violent recidivism if he were to

12 be granted convalescent leave to a full-time residence in

13 Virginia.

14        MS. KENNEDY:  I have no further questions.

15        THE COURT:  Mr. Levine?

16        MR. LEVINE:  Just a few, Your Honor.

17               REDIRECT EXAMINATION

18        BY MR. LEVINE:

19    Q.   That last answer to the last question, does it

20 also include your own observations?  You said based on

21 your conversations with a variety of professionals and

22 other staff at the hospital you concluded that he would

23 not be, that he would not be -- pose a danger to himself

24 or others in the context of the hospital's proposal.

25        Does it also include, in rendering that opinion,

1    your own observations?

2         A.   As a trained mental health clinician, yes, that

3    is also my opinion.

4         Q.   Now, there were a wide range of questions posed

5    to you by Ms. Kennedy.  I think she started with questions

6    about summaries to the Court by Dr. Johnson.  Now, of

7    course, as the patient we have a little stake in that

8    matter.  But knowing Dr. Johnson, as I believe you said

9    you do, do you believe that Dr. Johnson would hesitate at

10   all to call you if she had a question about Mr. Hinckley?

11        A.   No.

12        Q.   Now, there was a question next raised by

13   Ms. Kennedy about the itineraries.  The current

14   requirement is that itineraries be created in advance

15   before Mr. Hinckley goes on conditional release.  Is that

16   correct?

17        A.   Correct.

18        Q.   And does that hinder spontaneity?

19        A.   Yes.

20        Q.   And as a result of that, has the hospital tried

21   to inform the Court in a timely way when there would be

22   addendums to -- addenda I guess is the correct word, to

23   the itinerary?

24        A.   As quickly as possible.

25        Q.   And in some instances is it not possible at all

1    to supply the Court with an addenda?

2         A.   Right.  And in those cases what I have done is

3    I've contacted the Secret Service and phoned and via email

4    and have included the missed addenda in either a follow-up

5    summary letter with the Court's approval or in a follow-up

6    addendum that I could have, I could include what had just

7    occurred that we were not able to capture in a letter to

8    the Court previously.

9         Q.   And in some instances Mr. Hinckley just has to

10   forego the other opportunity because there was no

11   opportunity to amend?

12        A.   Correct.  For instance in this most recent trip

13   in April due to the intensive prep I was doing for the

14   hearing in addition to trying to also run a pretrial

15   psychiatric unit, Mr. Hinckley had asked me to do an

16   addenda or two to which I had to say, I'm sorry, John.  In

17   this case I can't do it.  I just don't have the time to

18   write a letter.

19        Q.   On convalescent leave, is flexibility important?

20        A.   Yes.  I think what should be understood is the

21   difference between a schedule and an itinerary in this

22   case.

23        Q.   Well, on convalescent leave is specificity

24   likely to be a hinderance to integration into the

25   community?

1          A.   I think specificity to the extent that it is

2     ubiquitous in his day-to-day routines is very -- is a

3     barrier.

4          Q.   And as a barrier is it counter therapeutic?

5          A.   Yes.

6          Q.   Now, Ms. Kennedy asked questions about the

7     relationship between OPD and St. Elizabeths, and she made

8     the point that the professionals at St. Elizabeths know

9     Mr. Hinckley very well.  Do you remember that?

10         A.   Yes.

11         Q.   And she suggested that it was important for

12    the -- Mr. Hinckley to maintain the relationships with

13    those people who know him so well.  Do you remember that?

14         A.   Yes.

15         Q.   And in that regard her thesis was that she

16    should -- that the hospital should have Mr. Hinckley

17    tethered to those mental health providers at

18    St. Elizabeths?

19              MS. KENNEDY:  Objection, Your Honor.  I didn't

20    say tethered.

21              THE COURT:  I think the word "tethered" came up

22    in Mr. Hyde's answer.  He should not be tethered.

23              MR. LEVINE:  Fair enough.

24              THE WITNESS:  I was trying to characterize

25    the --

1          BY MR. LEVINE:

2      Q.   Do you think he should be tethered to the

3  providers at St. Elizabeths Hospital?

4      A.   No.

5      Q.   Indeed, what was the purpose of Phase 4 of the

6  Court's order?

7      A.   To increase Mr. Hinckley's socialization

8  attempts, his engagement in novel activities and to

9  demonstrate that he was able to show responsibility and

10  accountability in his actions with increased freedom and

11  time, including driving privileges, increased

12  unaccompanied time, et cetera.

13      Q.   Was Phase 4 denominated the transition phase?

14      A.   Correct.

15      Q.   And by "transition," was that meant to be

16  transitioned from St. Elizabeths to Williamsburg?

17      A.   Yes.

18      Q.   Was that to lessen the reliance on the

19  St. Elizabeths practitioners and to enhance the reliance

20  on the Williamsburg physicians, practitioners?

21      A.   Yes.

22      Q.   And during this transition process, have new

23  bonds -- have new bonds been formed between Mr. Hinckley

24  and his Williamsburg practitioners?

25      A.   They've been formed and forged.  And forged in

1    some cases.

2        Q.   And is it your understanding that the

3    relationship between Mr. Hinckley and Mr. Weiss, who was

4    in Williamsburg, is a very solid one?

5        A.   Yes, and over the last 12, 13 months it has only

6    been growing.

7        Q.   And would you likewise characterize the

8    relationship he has with Dr. G.G.?

9        A.   Yes.

10       Q.   And with Mr. Beffa, who conducts both, who does

11   his book group and individual therapy?

12       A.   Correct.  And that -- in particular that

13   relationship is what I referred to as being forged in that

14   it's been a long-term relationship, but in the context of

15   individual and group therapies, that relationship appears

16   to have grown stronger as evidenced by Mr. Hinckley's

17   increasing openness with Mr. Beffa in both individual and

18   group sessions.

19           MR. LEVINE:  The Court's indulgence, Your Honor.

20           BY MR. LEVINE:

21       Q.   Ms. Kennedy asked you questions about the

22   ability of Dr. Johnson to serve in the role at OPD with

23   Mr. Kennedy -- with Mr. Hinckley in as much as she's had

24   by her view incomplete or insufficient contact with his

25   records.  Do you remember that inquiry of her?

1        A.   Yes.

2        Q.   Okay.  Now, throughout Mr. Hinckley's treatment,

3   new providers came on board; isn't that true?

4        A.   Yes.

5        Q.   Indeed, they were from Williamsburg in addition

6   to St. Elizabeths?

7        A.   Yes.

8        Q.   And materials were sent to Dr. G.G; is that

9   correct?

10       A.   Yes.

11       Q.   And similar materials were sent to Dr. Beffa?

12   Mr. Beffa, excuse me.

13       A.   Yes.

14       Q.   And indeed to Mr. Weiss?

15       A.   Yes.

16       Q.   And those materials are readily available to any

17   successors?

18       A.   Yes.

19       Q.   And those materials are readily accessible to

20   Dr. Johnson?

21       A.   Yes.

22       Q.   And during the course of these multiple

23   proceedings before this Court, those materials have been

24   collected and synthesized into discrete documents?

25       A.   Yes.

1      Q.   And those documents are easily made available to

2  Dr. Johnson; is that correct?

3      A.   Yes.

4      Q.   And were this Court to order convalescent leave,

5  there would be at least 30 days from that order to the

6  time when Mr. Hinckley would come and visit with

7  Dr. Johnson?

8      A.   Yes.

9      Q.   And would that be providing ample time for

10  Dr. Johnson to review those materials?

11      A.   I would leave that to Dr. Johnson to answer.

12      Q.   All right.  In her inquiry of you, Ms. Kennedy

13  asked you if you were familiar with the risk factors, and

14  I believe you said that you were, and then she went

15  through each of them with you.  I believe she took them

16  from page 71 as is listed in Dr. Patterson's report.

17      Do you remember her reviewing with you those

18  risk factors?

19      A.   Yes.

20      Q.   The first one that she asked about was

21  depression.  She didn't ask you any questions about them.

22  I'm going to.

23      First risk factor is that of depression.

24      Mr. Hyde, do you see any symptom of depression

25  in Mr. Hinckley?

1      A.   I have not in my time working with him seen any

2   symptoms of overt depression, no.

3      Q.   And that's close to but a little bit less than a

4   decade.  I don't remember the number of years.

5      A.   Yes.

6      Q.   Eight or nine, seven or eight.  I can't

7   remember.

8      A.   Eight or nine.

9      Q.   Eight or nine.

10          During that time period have you seen evidence

11   of the second risk factor, isolation?

12      A.   No.  And particularly in the last few years I've

13   seen quite the opposite.

14          THE COURT:  What in the last few years have you

15   seen?

16          THE WITNESS:  I would say that Mr. Hinckley did

17   not necessarily isolate, but that he did his best with the

18   situation he found himself in.

19          THE COURT:  What does that mean?

20          THE WITNESS:  Given that he was in the hospital,

21   he still had friends.  He still connected with people.  He

22   was not isolated, but he was still in a very restrictive

23   area, unit.  And, like, that is isolating in its own way.

24          THE COURT:  You also saw a concern raised by a

25   number of people that in years visiting Williamsburg he

1    wasn't proactive in seeking to socialize with friends,

2    activities.

3            THE WITNESS:  Right.  And I feel like that's

4    something that, again, was somewhat part and parcel to

5    having been institutionalized for so long.  I think that

6    that needs to be seen in that context, and as we loosened

7    or sort of defrosted some of the institutionalization over

8    the years, we've seen that Mr. Hinckley as he's thawed has

9    really come out and blossomed in that regard.  Even at the

10   hospital we see less of Mr. Hinckley alone and more of

11   Mr. Hinckley with others.

12           BY MR. LEVINE:

13   Q.   And the fact that he didn't some years ago seek

14   out friendships or show the initiatives to do that, does

15   that equate to isolation?

16   A.   No.

17   Q.   Psychosis is the third one.  Have you seen any

18   inference of psychosis?

19   A.   Never.

20   Q.   Never.

21           And then the next one was about insight into

22   mental illness.  And what do you have to say about

23   Mr. Hinckley's insight into mental illness?

24   A.   I've always seen Mr. Hinckley's insight into

25   mental illness as very good.

1      Q.   All right.  And then there is the personality

2  disorder, which has been in this Court denominated as a

3  narcissistic personality disorder.  And I think the Court

4  has found it to be significantly attenuated.

5          What's your opinion of Mr. Hinckley's

6  manifestation of narcissistic personality disorder?

7      A.   From my understanding of Mr. Hinckley's

8  manifestation of narcissistic personality disorder over

9  the years is that I do see an attenuation as a correct

10  description.  Mr. Hinckley, especially in the nine or so

11  years that I have known him, has shown that he is

12  certainly not the -- does not display the type of

13  characteristics that were noted about him in years prior.

14          I have not seen Mr. Hinckley as a typical

15  narcissistic.  I've seen Mr. Hinckley as being very

16  focused on his progress and making success and achieving

17  objectives for his own life goals.  But in no way has he

18  shown signs of narcissism or overt symptoms of narcissism

19  that I could point to.

20      Q.   The next one, of course, is No. 6.  It's called

21  access to weapons.  Have there been any access to weapons

22  whatsoever?

23      A.   He has not sought access to weapons.

24      Q.   Has he manifested an interest in weapons?

25      A.   Quite the opposite.  He discussed his aversion

1    to weapons and his nonviolent philosophy in life.

2        Q.   No. 7 is the bottom, the risk factors would be

3    lack of family support.  What is your observation based on

4    your multiple conversations with his mother, Scott and

5    Diane and, of course, your having heard their testimony in

6    this court yesterday.  What's your view about his --

7    what's your understanding about his family support?

8        A.   It is abundant.

9        Q.   All right.  As a matter of fact in forensic

10   patients, have you seen this kind of family support?

11       A.   In rare cases.

12       Q.   Rare cases.

13            And the eighth item is about hurting himself,

14   issues of suicide.  Has there been any, any indication

15   that Mr. Hinckley has the slightest interest in hurting

16   himself?

17       A.   No.

18       Q.   Tenth item -- the ninth item, excuse me, is

19   relationships with friends.  What's your observation with

20   respect to that risk factor?

21       A.   I believe that risk factor is very well

22   mitigated, and that is evidenced by Mr. Hinckley's

23   increasing friendships, social forays and interests in

24   this particular area in his life, with growing his social

25   sphere and developing more friends and deeper

1    relationships with others.

2        Q.    Then the last one that has been identified here

3    is that of deception.  Now, Ms. Kennedy has asked a series

4    of questions about events that predated the 2011 hearing.

5    What lessons were learned by Mr. Hinckley in your view

6    about the matter that involved the movie and the

7    bookstore?

8        A.    Not the movie, more recently where Ms. Foster

9    was on the screen, but the movie from the Captain -- I

10   refer to it as Captain America.

11       Q.    2011 movie?

12       A.    I think what Mr. Hinckley learned from that was

13   that it is in his best interest to be open and honest with

14   everybody involved in his care and monitoring, and that it

15   is, in fact, something that he has, I think, learned

16   indeed that if he merely needs to reach out to his support

17   through treatment team members and that if he is not able

18   to do something in the moment, then he will survive, be

19   resilient and he will be able to move on.  But that he

20   does need to connect, you know, in the moment, with the

21   people he is supposed to connect with.  And I think that

22   that is -- that has borne out in his ability to manage

23   himself throughout the last 12 months, really.

24       Q.    So would you say that lesson well learned from

25   that movie incident, movie/bookstore incident and that

1   since then issues with respect to deception is

2   nonexistent?

3       A.   Correct.

4       Q.   And although I am reluctant to do anything

5   repetitively, there was reference by Ms. Kennedy in her

6   question to you about the photographer and Mr. Hinckley

7   going over to the musician's house rather than to the

8   other musician's house, and she --

9            THE COURT:   The musician's house rather than the

10  other photographer's house.

11           MR. LEVINE:   I may have misstated that, Your

12  Honor.

13           BY MR. LEVINE:

14      Q.   What I meant to say was that he, Mr. Hinckley,

15  along with Bruce were supposed to go to a photographer's

16  house.  That photographer was ill.  It was canceled in the

17  moment.  They decided to go over to the musician's house.

18           Is that an instance -- and he reported it to you

19  after they went as opposed to before they went as he was

20  required to do.  Is that in your estimation simply a

21  mistake?

22      A.   Yes.

23      Q.   Is there anything about that that is in your

24  estimation manipulative?

25      A.   No.

1       Q.   Is there anything about that in your estimation

2  that is deceptive?

3       A.   No.

4       Q.   Do you think that he at any time wanted to hide

5  that fact from you?

6       A.   No.

7       Q.   Is there anything about his behavior going to

8  the musician's house as opposed to the photographer's

9  house that is bad behavior?

10      A.   No.

11      Q.   And I think we asked you this question, but it

12  seems like a good follow-up question now.  If he had asked

13  you for permission, would you have given him the

14  permission?

15      A.   Yes.

16           MR. LEVINE:  The Court's indulgence for a

17  moment, please Your Honor.

18           Nothing further, Your Honor.

19           THE COURT:  Ms. Merene, do you have any

20  questions?

21           MS. MERENE:  Nothing.

22           THE COURT:  Ms. Kennedy, anything else?

23           MS. KENNEDY:  Could I ask just one?

24

25

1                    RECROSS-EXAMINATION

2          BY MS. KENNEDY:

3     Q.   Mr. Hyde, there's a letter dated January 23,

4  2015 to the judge regarding, it looks like just an update,

5  additional changes to say current itinerary.

6          Does that sound familiar, though?

7     A.   From January?

8     Q.   It says January 23, yes, 2015.  I think it's

9  written by you.

10    A.   It's an addendum?

11    Q.   It says, "We wish to call your attention to the

12 case of John Hinckley.  We wish to inform the Court of

13 additional changes to Mr. Hinckley's current itinerary to

14 the dates January 24 and 25."

15         Does that sound like --

16    A.   I would have written that, yes.

17    Q.   Okay.  And in that, the last page, the last full

18 paragraph it talks about this incident of Mr. Hinckley

19 going over to this house.  And I'm going to ask if you

20 have a copy of this January 23rd, 2015 letter.

21         THE COURT:  It's not a part of Exhibit 5, is it?

22 Because the addenda are not part of Exhibit 5.

23         MR. LEVINE:  It's an addendum.

24         THE COURT:  There are a number of letters that I

25 received from the hospital that were addenda.  Some by

1    hand delivery; some by fax.

2              (Discussion held off the record.)

3              MS. KENNEDY:  All right.  I have it marked.  I'm

4    going to give you a copy.

5              THE COURT:  It's marked as?

6              MS. KENNEDY:  Government Exhibit No. 1.

7              THE COURT:  Government Exhibit No. 1 is a letter

8    of January 23, 2015.

9              BY MS. KENNEDY:

10       Q.   Do you recognize it?

11       A.   Yes.

12             THE COURT:  Did you write it?

13             THE WITNESS:  Yes.

14             BY MS. KENNEDY:

15       Q.   Mr. Hyde, I asked if you could look at page 2,

16   the last full paragraph that states, "In regard to the

17   change."

18       A.   Correct.

19       Q.   Okay.  Now, doesn't that indicate that --

20             MR. LEVINE:  Could you give him a moment to read

21   it, Your Honor?

22             MS. KENNEDY:  I'm sorry.

23             THE WITNESS:  Correct.  And in this I

24   incorrectly wrote Mr. Robert Levine instead of Mr. Robert

25   Lerner.

1          BY MS. KENNEDY:

2     Q.    Okay.  Did you read the whole thing?

3     A.    Yes.

4     Q.    But doesn't that indicate that Mr. Hinckley knew

5   a day before that he was going to go over to the

6   musician's house?

7     A.    Yeah.  Well, this is -- actually I can include

8   an update on this.  My understanding when I wrote this was

9   that he had said he had free time at the studio on that

10  day.  What he had said is that he's open for Mr. Hinckley

11  to come visit him, that he could always stop by.  That was

12  something that I think I had confused when I was putting

13  this together in that moment, that he had known that.

14          One of the things that I felt like this was

15  actually a very good step for Mr. Hinckley to take to

16  reach out to this gentleman to begin with, to look into

17  connecting with him, but that it was the type of situation

18  that in the moment when they found out Mr. Lerner was not

19  going to be available, Mr. Hinckley said, Well, maybe we

20  can try John Tracey because he said he was available and

21  is open to having people come by.  And I think that's when

22  they got in touch with him and he said yes, you can come

23  by.

24    Q.    But am I misreading that it states the two had

25  spoken?

1      A.    Right.

2      Q.    The two being Mr. Hinckley?

3      A.    Right.

4      Q.    And John Tracey?

5      A.    Correct.

6      Q.    These are musicians?

7      A.    Correct.

8      Q.    This is the day before.  They spoke the day

9    before, and Mr. Tracey indicated he had free time at his

10   studio on January 20.  So that suggests that Mr. Hinckley

11   knew the day before that he was going to go see the

12   musician?

13     A.    Right.  What I was saying -- what I'm saying is

14   that after I had written this and submitted it, I, you

15   know, continued to corroborate this and to get more

16   information.  And when I spoke to John about it, I was

17   like, oh, okay.  So you've spoken to him.  He said he had

18   free time and he decided -- I think I had put this down

19   incorrectly as specified that I spoke to him the day

20   before and said he would be available on the next day.

21           That was my understanding of it in that moment,

22   that, but, in fact, he had just -- he had spoken to him

23   the day before, two days before this meeting was supposed

24   to happen with Mr. Lerner.  In the moment he called and

25   they confirmed that they can come over.

1          THE COURT:  So this is not --

2          THE WITNESS:  So this is not a hundred percent

3     accurate in there.

4          MS. KENNEDY:  So it should have been Mr. Lerner

5     rather than Mr. Levine.

6          THE WITNESS:  Right.

7          BY MS. KENNEDY:

8     Q.    That he was supposed to go to instead of

9     Mr. Levine.  He was supposed to go see the photographer?

10     A.    There is the confusion.  So it's not Robert

11    Levine; it's Robert Lerner.  Lerner is the photographer.

12    He called and let them know that he was ill on the day of.

13    Mr. Hinckley had only just happened to have contacted

14    Mr. Tracey a few days, a day or two before just to see his

15    availability and to check in on what might be, you know --

16    what they might be able to do or whatever.

17          So in that moment once they found out that their

18    plans with Mr. Lerner had fallen through, John suggested

19    to Bruce, What do we do?  Well, I had talked to this guy

20    recently.  He says he has a studio.  We can swing by.

21    It's nearby.  He contacted them and he said, You can come

22    over.

23     Q.    That's a little more clear, a little more

24    problematic in that he talked to them a day or two before,

25    he knew he was free, he was going to go to the

1    photographer, the photographer got sick and he said, We'll

2    just go here anyway because I talked to the guy?

3        A.    Well, again, I don't see that as manipulative or

4    wrong.   I see that as actually being proactive and on top

5    of his objective of reaching out and socializing with more

6    people.

7        Q.    Yet he called you the day of to tell you.   So he

8    must have known that that would deviate from the itinerary

9    and is not a good thing?

10       A.    That's because he's been very good with making

11   sure I'm aware of anything that happens.   I think what --

12   in this case where I feel like I can, I understand where

13   Mr. Hinckley was coming from, and even though I recognize

14   it as a mistake on his part, that he was with his friend

15   in the car trying to figure out what to do in the moment.

16   This is again where the dynamic, the ability to

17   dynamically respond to social opportunities in the

18   community and the reintegration process is important.

19       Q.    Okay.   Despite the fact that you acknowledge it

20   would have been better for him to call you before?

21       A.    Oh, absolutely.   I don't deny that.   And I told

22   Mr. Hinckley that time and again.

23            THE COURT:   You don't mean necessarily it would

24   have been clinically better, but it would have been better

25   because that's what the court order requires.

1        THE WITNESS:  Right.  And that, in fact, it was,

2   you know, a bone-headed move on his part because he had

3   been doing so well up until that point.

4        THE COURT:  Particularly after the incident, the

5   two incidents two years earlier.

6        THE WITNESS:  Right.  But, again, I also point

7   out that this was -- this was a very different type of

8   incident than those.  I separate those particularly

9   because of the context.

10       BY MS. KENNEDY:

11   Q.   Let me ask you, throughout your testimony and

12   cross-examination, I don't know what you do, but you seem

13   to minimize a certain amount for Mr. Hinckley.

14   A.   I can tell you that I don't -- I do -- I'm very

15   aware of my long-term relationship with Mr. Hinckley.  I

16   also take it very seriously that I do not want to get my

17   wires crossed from being a therapeutic advocate for

18   Mr. Hinckley, for which I was for the bulk of our

19   relationship together versus my administrative duties in

20   running this case.  I think that this -- that my

21   connection to Mr. Hinckley has actually been very

22   beneficial overall.  But I'm also aware that I need to be

23   sort of self-monitoring for potentially minimizing, and

24   yet I do feel like while it may -- you may characterize it

25   as minimization.  It is not something that is in any way

1    subconscious.  If it were a subconscious minimization,

2    then we would be having a different -- different

3    discussion because I wouldn't be aware.

4         However, I've been hyperaware of that issue,

5    moving into this role and Mr. Hinckley's care.  And, in

6    fact, I feel like I maximize certain things because of

7    that.  And I have worked very hard to seek objective takes

8    on some of these issues.  And in this case to highlight

9    it.  I think that if I were minimizing, if I were more

10   towards subconsciously minimizing some of Mr. Hinckley's

11   ins and outs and actions, we would probably never know

12   about Mr. Tracey's music studio incident.

13        Q.   Okay.  So rather than subconsciously minimizing,

14   you feel you are consciously minimizing?

15        A.   No.  What I feel like I'm doing is actually

16   consciously being aware of the difference between

17   exhibition of risk factors, dangerousness, deception,

18   manipulation and what is actually occurring when he is

19   working through this process.  And I felt like I have

20   taken a lot of steps, not just clinically, but very --

21   through clinical supervision, administrative supervision

22   and through psychotherapy.

23        Q.   Isn't it fair to say, Mr. Hyde, that any

24   therapist who works with an individual for years and years

25   and been invested in his treatment and his overall

1    improvement and mental health at times, whether it's

2    subconsciously or consciously, minimizes that person's

3    behavior, outlook, whatever?

4         A.    I think that you can run into that, sure.

5              MS. KENNEDY:  I have no further questions.

6    Although, Your Honor, I would like to move in Exhibit

7    No. 1 for the government.

8              THE COURT:  Any objection?

9              MR. LEVINE:  No objection.

10             THE COURT:  It will be admitted.  And I think

11   I'd like Dr. Patterson's and Dr. Murphy's professional

12   opinions on the last ten minutes of Mr. Hyde's testimony.

13                  (Government's Exhibit Number 1

14                   admitted into evidence.)

15             THE WITNESS:  Me too.

16             THE COURT:  And he welcomes it, and that's

17   probably a good thing.

18             MR. LEVINE:  I knew she couldn't ask just one

19   question.

20             All right.  Briefly, Your Honor.

21                  REDIRECT EXAMINATION

22             BY MR. LEVINE:

23        Q.    Mr. Hyde, when Mr. Hinckley spoke with

24   Mr. Lerner a day before this -- I'm sorry.

25             When Mr. Hinckley spoke with Mr. Tracey a day

1   before the meeting that was scheduled for Mr. Lerner, did

2   Mr. Hinckley to your knowledge intend to go see

3   Mr. Lerner?

4        A.   Yeah, that was the intention.

5        Q.   And the cancellation of that meeting was just

6   before the meeting was commencing?

7        A.   Correct.

8        Q.   And it was at that time, now aware of

9   Mr. Tracey's availability, Mr. Hinckley suggested that

10  they go there?

11       A.   That, and they said that why don't we stop by

12  there if he's available and then we'll go on and do some

13  other things, but they had in their day planned to have a

14  visit to somebody and then go on to take more pictures.

15  So they still went and had a visit with somebody and went

16  on and took more pictures.

17       Q.   And lastly for Mr. Hyde, your thesis at the end

18  of your testimony about your relationship with

19  Mr. Hinckley, and your keen awareness that you have two

20  roles or you have this relationship with him as a

21  therapist or as a -- I guess as a music therapist and a

22  clinical administrator and come to know him well and care

23  about him, is that a good reason why having OPD bring in

24  the form of Dr. Johnson a new set of eyes to monitor the

25  convalescent leave?

1       A.    Perhaps.

2             MR. LEVINE:  Thank you.

3             Nothing further, Your Honor.

4             THE COURT:  It hadn't crossed your mind before

5       this moment; right?

6             So thank you, Mr. Hyde.

7             THE WITNESS:  You're welcome.

8             THE COURT:  I think you're excused.  And you're

9       not going to be back on the stand more than likely.

10            MR. LEVINE:  I hope this was very therapeutic.

11            THE WITNESS:  I hope it's very therapeutic for

12      you-all.  I've got enough therapy.

13            THE COURT:  Let's talk about scheduling.

14            (Witness excused.)

15            MR. LEVINE:  Well, I think there's one important

16      thing to say about scheduling, Your Honor.

17            THE COURT:  Okay.

18            MR. LEVINE:  And that is, I know Dr. Murphy only

19      has Monday available next week.  And so -- I mean, she's

20      in private practice, and so I would hope that we would

21      have everybody's cooperation in mind to make sure that she

22      is on and off by Monday.

23            THE COURT:  Well, you're putting her on the

24      stand; right?

25            MR. LEVINE:  Yes.

1          THE COURT:  So the scope of cross will depend on

2    the scope of direct.

3          MR. LEVINE:  I find that comforting, actually.

4    Good.

5          MS. LUCIANO:  Dr. Johnson is not available

6    Tuesday morning.

7          THE COURT:  All right.  Don't talk to him.

8    Dr. Johnson may have been sitting here for a couple of

9    days and said she's never going to be available.

10          Tomorrow, here is what's happening tomorrow.

11    We're going to be in Courtroom No. 5.  We'd like to start

12    promptly at 9:30.  Everybody should be there early enough.

13    That's on the second floor.  To just double-check with

14    Mr. Cramer.

15          And I guess he'll be there, Michelle?

16          DEPUTY CLERK:  Yes.

17          THE COURT:  To make sure everything is

18    functioning properly.

19          And then we'll start with Dr. G.G, hopefully as

20    close to 9:30 as possible, and as soon as we're done with

21    Dr. G.G., move on to Mr. Weiss.  I need to end by 3:30,

22    3:45 at the latest, so we need to get through Dr. G.G. and

23    Mr. Weiss tomorrow.

24          And if, for some reason, we can't, then we're

25    going to have to find another time to finish Mr. Weiss.

1    But everybody should try to, which will not be Monday.

2    Everybody should try to get that done.  If we had to take

3    a shorter lunch hour to get it done by 3:30 or 3:45, I

4    would be willing to do that.  But maybe if everybody is

5    efficient and focuses on the important things that they

6    can tell us about, we can get them both done by 3:30.

7          Then on Monday we'll be back in this courtroom

8    and start with Dr. Murphy and try to finish with

9    Dr. Murphy.  You should talk to each other about what you

10   want to do Tuesday morning and whether you want to start

11   with Dr. Patterson Tuesday morning, and then stop and go

12   to Dr. Johnson or whether you want to complete

13   Dr. Patterson and come back to Dr. Johnson, depending on

14   what her schedule is on Wednesday.

15         But if possible I would prefer not to waste

16   Tuesday morning.  You all need to figure that out.  The

17   goal is -- one other thing to say about tomorrow.  The

18   goal is to be efficient enough to get Dr. G.G. and

19   Mr. Weiss done tomorrow and to be efficient enough to get

20   Dr. Murphy on and off on Monday.

21         MR. LEVINE:  Yes, Your Honor.

22         THE COURT:  There are about 20 students coming

23   tomorrow.  Where are they from?  They are kids; right?

24   Possibly Georgetown Day School.  Something to do with --

25         MR. LEVINE:  I had nothing to do with it.

117

1          THE COURT:  Judge Howell had something to do

2     with it.  And they are coming and they are going to go to

3     her courtroom first to see something, and then they are

4     going to come in at some point during the course of the

5     morning.  So if you see 20 people walk in who look like

6     they might be friends of various children or the

7     successors to those kids, because they are long gone.

8               Are they still there?

9               MR. LEVINE:  I have one that's there, yes.  I'm

10     working hard, Judge.

11          THE COURT:  All right.  So I'll see you at 9:30.

12     I'll see you at 9:30 in Courtroom 5.

13               (Proceedings adjourned at 5:00 p.m.)

118

1        CERTIFICATE OF OFFICIAL COURT REPORTER

2

3            I, Barbara DeVico, certify that the foregoing is

4    a correct transcript from the record of proceedings in the

5    above-entitled matter.

6

7

8

9

10

11   _____        4-23-15

12   SIGNATURE OF COURT REPORTER            DATE

13

14

15

16

17

18

19

20

21

22

23

24

25