1

1          UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF COLUMBIA
2

3   UNITED STATES OF AMERICA,          :
                                       :
4               Plaintiff,             :Criminal Case No. 81-306
                                       :
5   v.                                 :
                                       :
6   JOHN W. HINCKLEY, JR.,             :
                                       :
7               Defendant.             :
    ------------------------------------------------------
8              Day 3, Afternoon session
           TRANSCRIPT OF EVIDENTIARY HEARING
9       BEFORE THE HONORABLE PAUL L. FRIEDMAN
           UNITED STATES DISTRICT JUDGE
10           Friday, April 24, 2015
               WASHINGTON, D.C.
11

12

13   Proceedings reported by machine shorthand, transcript

14   produced by computer-aided transcription.

15

16

17

18

19

20

21   APPEARANCES:

22     For the Government:  U.S. ATTORNEY'S OFFICE
                            BY:  COLLEEN KENNEDY, AUSA
23                               MARK AZIZ, AUSA
                                 MICHELLE CHAMBERS
24                          555 Fourth Street, NW
                            Washington, D.C.  20530
25                          (202)514-7248

2

For the Defendant:     DICKSTEIN SHAPIRO, LLP
                       BY:   BARRY WILLIAM LEVINE, ESQ.
                             ANN MARIE LUCIANO, ESQ.
                       1825 Eye Street, NW
                       Washington, D.C.  20006-5403
                       (202)420-2237

                       DINSMORE & SHOHL, LLP
                       BY: E. MICHELLE TUPPER-BUTLER, ESQ.
                       101 S. Fifth Street, Suite 2500
                       Louisville, KY   40202
                       (502) 540-2367

For St. Elizabeths:    ST. ELIZABETHS HOSPITAL
                       BY:   DEON MERENE, ESQ.
                       1100 Alabama Avenue, SE
                       Washington, D.C.   20032

TABLE OF CONTENTS

EVIDENTIARY HEARING

WITNESSES

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| JONATHAN V. WEISS | 4 | 40 | | |

4

1          P R O C E E D I N G S

2          THE COURT:  Good afternoon, everybody.  Good

3   afternoon, Mr. Weiss.

4          THE WITNESS:  Good afternoon, Your Honor.

5          THE COURT:  Anything anybody needs to raise

6   before Mr. Levine begins?

7          MR. AZIZ:  He needs to be sworn in.

8          THE COURT:  Yes, he needs to be sworn in.  Thank

9   you, Mr. Aziz.

10                  * * * * * * * * * * * * * *

11          Thereupon,

12      J O N A T H A N   V I C T O R   W E I S S,

13   Having been called as a witness on behalf of the Defendant

14   and having been first duly sworn by the Deputy Clerk, was

15   examined and testified as follows:

16          THE COURT:  All right, Mr. Levine.

17          MR. LEVINE:  Thank you.

18                  DIRECT EXAMINATION

19          BY MR. LEVINE:

20      Q.   Good afternoon, Mr. Weiss.

21      A.   Good afternoon, Mr. Levine.

22      Q.   Nice to see you.  Sir, would you please state

23   your name?

24      A.   Jonathan Victor Weiss.

25      Q.   All right.  In this video setup, Mr. Weiss,

1    there appears to be a little bit of a delay, so we're

2    going to wait to hear your responses, and please wait

3    until the question is complete.

4            Will you state your occupation, sir?

5        A.   I'm a licensed clinical social worker.

6        Q.   And how long have you been a licensed clinical

7    social worker?

8        A.   I've been a licensed clinical social worker

9    since 2000.  I've been in mental health work for over 35

10   years as a social worker but not licensed, clinical social

11   worker.

12       Q.   How long of -- how many of those 35 years were

13   in Williamsburg?

14       A.   Well, at this point, you know, and I'm probably

15   being a little bit shy, it's probably closer to 45 years.

16   I've been in Williamsburg since 1978, so that would be,

17   what, 37 years now.  Going on 37 years.

18       Q.   You know the community well?

19       A.   Yes, sir.

20       Q.   All right.  And are you currently in the private

21   practice of social work?

22       A.   I do consultation work.  Presently the main paid

23   work that I'm engaged in is in terms of working with

24   Mr. Hinckley.

25       Q.   Have you conferred with the treatment team about

1    Mr. Hinckley and his progress?

2         A.   Yes, I have.

3         Q.   Who do you regard as being the part of the

4    Williamsburg treatment team?

5         A.   Dr. G.G., Mr. Beffa, Ms. Haley, myself.

6         Q.   Do you confer with members of the treatment

7    team?  Let's start with Dr. G.G.

8         A.   Yes.  We've been meeting regularly every four or

9    five weeks since January.  We've conversed on the

10   telephone.  I met with Dr. G.G. a couple of weeks ago.

11   Prior to that -- I see Mr. Beffa regularly.  During those

12   proceeding months Dr. G.G. and I would talk on the

13   telephone probably every three or four weeks.  Mr. Beffa,

14   probably every couple of weeks.  Ms. Haley, more difficult

15   to get a hold of her for numbers of reasons, but we would

16   talk usually every four to six weeks.

17        Q.   And when you talk to these people, do you talk

18   to them about Mr. Hinckley?

19        A.   Yes.

20        Q.   Now, have you reviewed the report, the risk

21   assessment report from Dr. Murphy?

22        A.   Yes, I have.

23        Q.   And have you seen the report from Dr. Patterson?

24        A.   Yes, I've also seen that.

25        Q.   All right.  And are you familiar with the

1    hospital's proposal for convalescent leave?

2        A.   Yes, I am.  I haven't memorized it, but I'm very

3    familiar with it.

4        Q.   When you say you're "very familiar," it is the

5    letter of December 2014, a supplement in March of 2015 and

6    indeed a letter to the Court in, I think, it's April 17,

7    2015?

8        A.   Yes, I'm most familiar with the latest one.

9    That's what I paid the most attention to.

10       Q.   All right.  And are you familiar with the

11   hospital records, generally speaking?

12       A.   The hospital records, yes, generally speaking.

13       Q.   All right.  Now, do you have -- do you agree

14   with the hospital that Mr. Hinckley is ready for

15   convalescent leave?

16       A.   Yes, I do.

17       Q.   Do you do that without any reservation and

18   without any doubts?

19       A.   I have no reservation whatsoever at this point.

20       Q.   Now, I'd like to ask you some questions about

21   what it is that you do when you're with Mr. Hinckley.  Can

22   you summarize your role as -- your role on the treatment

23   team?

24       A.   The role that I have is to be Mr. Hinckley's

25   case manager, which means I see my major responsibility

8

1    has been since the beginning of working with Mr. Hinckley

2    to assist him in integrating into the Williamsburg

3    community.  This has been in the areas of assisting him

4    with social connections, educational connections,

5    recreational connections, employment, volunteer services,

6    and my belief was and hopefully will come to pass also in

7    the area of residential services.

8        Q.   All right.  How often do you see Mr. Hinckley?

9        A.   When -- during his 17-day visits, on average

10   five to seven times.

11       Q.   And how is it determined how many times you

12   should meet with him?

13       A.   Well, it's determined, we have some set things

14   that we do at the beginning of each visit.  I meet with

15   him.  I'm introducing him most of the time to eating

16   places in Williamsburg.  We meet at the end, both in the

17   beginning to assess what's occurred for him since he's

18   been gone for me to update him on what's transpired in the

19   community that would affect him, and then at the end we go

20   over the same thing, relooking at what has transpired

21   while he was there and also planning for the future.

22           In the middle of -- or during his visit, excuse

23   me, we may well embark on a social, educational event,

24   like going to the Muscarelle Museum.  I have seen him with

25   Mr. Brelsford.  Presently in the past number couple of

 1    months I also accompany him when he's doing his volunteer

 2    work at the Unitarian Universalist Church.

 3         Q.   Let's take a short walk through some of these

 4    activities.  Does he have a volunteer position at Eastern

 5    State Hospital?

 6         A.   He does.  He started out there -- when I first

 7    began, he was going four times during the visit.  Now he's

 8    going two times.

 9         Q.   All right.  And what does he do at the Eastern

10    State Hospital?

11         A.   Over there he works in the canteen, assists

12    patients, staff, I believe, with just general food needs,

13    does some cash register work.

14         Q.   All right.  Have you had occasion to speak with

15    his supervisor at Eastern State?

16         A.   I have not spoken with Mrs. Jones.  My contact

17    had been with Mr. Lyons, the former director.  He's no

18    longer director anymore.  Mr. Lyon, excuse me.

19              With Deborah Elliot, who is the volunteer

20    services director, and with Ms. Armsted.  When I began

21    working with Mr. Hinckley at Eastern State Hospital,

22    Ms. Jones was on extended medical leave.  And I gather she

23    has returned in the past few months.

24         Q.   And have you learned from them how well he's

25    doing at the Eastern State volunteer job?

1    A.   Yes.   When I first met with them on the two

2    times I've met over there, everybody was going very

3    positively.  They had no negative statements about him.

4    Since that was already in place and there was so much

5    else, we left it in terms of our relationship, myself and

6    the staff at Eastern State, that they would contact me if

7    there were any issues.  I would ask Mr. Hinckley how

8    things were transpiring there.  And that has been my

9    contacts with staff at Eastern State Hospital around his

10   placement.

11   Q.   You mentioned that you have been involved in --

12   with Mr. Hinckley with the Unitarian Church.  I think it

13   was the Unitarian Universal Church.  Tell us about that.

14   A.   Well, a number of years ago when Mr. Beffa was

15   doing the case management, he had made contact with the

16   pastor of the Unitarian Universalist Church.  At that

17   point for reasons it did not proceed.  So I initiated

18   another contact, I guess now maybe five or six months ago

19   with the pastor, Pastor Rue [phon.], and with another

20   church member, David Hopkins, who is a clinical

21   psychologist who I've known professionally in the

22   community.

23        They were willing to sit down with me initially.

24   Set up a meeting.  We discussed the possibility of John

25   having some type of volunteer relationship with the

1    church.  That proceeded with the pastor going back and

2    connecting with church members, and decided that John

3    could possibly work with Mr. Les Solomon, who does the

4    grounds and landscaping as a volunteer.  He's a member of

5    the church.

6              So I contacted Mr. Solomon.  We set up a meeting

7    for Mr. Hinckley, myself and Mr. Solomon.  And from there

8    we have proceeded twice during his visits, for an hour and

9    a half approximately, sometimes two hours, to be at the

10   church under the direction of Mr. Solomon, cutting grass,

11   raking leaves, picking up branches, moving things, really

12   building birdhouses, assisting in whatever endeavors that

13   they have requested to be performed.

14        Q.   How is John doing in that task?

15        A.   Excuse me, sir.

16              Beyond that, just wanted to add, approximately,

17   I guess, almost a month ago, the pastor called and said

18   would I be willing to meet with certain members of the

19   congregation after service, that they were very interested

20   in John, his notes that and would like to know more as to

21   where things were going.  I had an hour-long meeting.  And

22   I guess about 40 congregants were there with Mr. Solomon,

23   and a number of congregants, three or four, came up

24   afterwards, expressed their interest, support for John and

25   willingness really to have him engage in more things at

1    the church if he was willing to.

2         Q.   Well, how has he been doing?

3         A.   He's been doing excellent.  I've had no

4    complaints.  If there's been any issue, John's back and

5    shoulder have hurt a couple of times from lifting and

6    walking.  It's manual labor, so to speak.  It has not been

7    a major part of his life, and so it's a period of

8    adjustment.  But in general Mr. Solomon is pleased, I'm

9    pleased, the church is pleased.

10        Q.   And is John enthusiastic about the prospect of

11   doing more work at the church?

12        A.   John seems quite open and willing to work there.

13   I don't know, like any of us, that he's enthusiastic about

14   picking up branches, but he's enthusiastic about the

15   involvement and meeting with Mr. Solomon and getting to

16   know people at the church.

17        Q.   All right.  Now, does Mr. Hinckley go to NAMI

18   meetings?

19        A.   Yes, he does.

20        Q.   Tell us about that, please.

21        A.   Again, don't have the exact number of months in

22   my mind, but six or seven months ago I made a connection

23   with the -- which I say is the coordinator of the support

24   group for the Williamsburg NAMI.  It used to be the

25   Williamsburg Alliance for the Mentally Ill.  John and I

1    had talked about it months before that.  John expressed

2    interest, but we were having some transitional issues

3    because it's only, they only meet on Tuesday nights.  John

4    was doing group on Tuesday nights.  And that was an

5    important part of his treatment regimen.

6        Q.   So there was a conflict in scheduling?

7        A.   Yes, sir.

8        Q.   Okay.  Can you tell us --

9        A.   They were basically within a half hour of each

10   other, yeah.

11            So Mr. Beffa and Mr. Hinckley worked out the

12   arrangements so he could go to an afternoon or noontime

13   group.  That opened the door for us to begin John's

14   participation in the support group of the Williamsburg --

15   excuse me, I'm doing it again -- Williamsburg NAMI group.

16            And so I contacted the gentleman, as I mentioned

17   before.  I went over there with John.  We met with him.

18   And John went to his support group meeting that night and

19   has continued to go whenever he's been available to go

20   during the weeks he's in town.  I think he missed once

21   because of weather.

22       Q.   Has that been a positive experience for

23   Mr. Hinckley?

24       A.   I very much think so.  He's met other

25   individuals, from the conversations we've had.  He's heard

1    more about the community, I think it's helped him

2    understand aspects of the community and being an

3    individual with mental illness living in our community.

4    So yes, I'd say it's been quite positive.

5         Q.   All right.  Now, has Mr. Hinckley pursued paid

6    employment?

7         A.   Yes, he did.

8         Q.   Tell us about that.

9         A.   And we -- well, it was extremely limited.  Early

10   on I made some attempts, and what I've tried to do, sir,

11   is knowing the rejection John has had in the community,

12   and my approach was to try and, shall we say, smooth the

13   road a bit before I put John in the situation where he

14   might personally be rejected.  So I made entrees to the

15   Martin's supermarket store in town through a gentleman

16   that I served on the United Way board with and was manager

17   of that company or -- excuse me, that store.

18        Another contact, Master Craftsmen, which does

19   silversmithing in Williamsburg.  Neither of those could

20   work out for different reasons.

21        John went to the Subway, as I recollect.  And

22   this was quite early on.  And I think also to Starbucks to

23   see about applying.  And if my memory serves me correctly,

24   they said he needed to apply online.  At that point we

25   didn't have permission for those websites to be accessed,

1    so we let that stand.

2         In my conversations about employment, both of

3    those two individuals that I dealt with directly, and just

4    other -- other attempts to see what might be available,

5    the issue of him being there 17 days a month presented

6    some real barriers to begin with.

7         Q.   Explain that to us.  Explain the barriers of the

8    merely 17 days a month.

9         A.   Well, the 17 days a month would necessitate if

10   some organization, some firm was willing to hire him, to

11   have to give him some type of special scheduling, really

12   working -- not working almost half a month.  They felt

13   that really wasn't fair to other employees to do that.

14   And they wondered if that might not detract from John

15   being able to assimilate easily into their staff, as well

16   as asking for special permissions.  And so because of all

17   of that, I chose to back off on employment until John was

18   able to be on convalescent leave and put most of the

19   energy in terms of those type of endeavors into obtaining

20   volunteer services for John.

21        Q.   You mentioned that some of these efforts to

22   obtain employment, to use your words, didn't work out.

23   Can you tell us why.

24        A.   I think, again, the main issues were he's -- his

25   only being there 17 days a month.  Other issues were,

1   again, people's perceptions of Mr. Hinckley, erroneous

2   opinions about him and his mental health state.  Those

3   were probably the main reasons.

4          A little bit of concern about acceptance by

5   other employees because the belief was, as I said, that he

6   might be getting some special attention by only having to

7   work, you know, 17 days a month or parts thereof.

8          Q.   Would it be useful to him in obtaining

9   employment or seeking to obtain employment to have a more

10  open access to the Internet?

11         A.   Yes.  I think that, that would -- that will make

12  some difference, without a doubt.  I don't know that it

13  would have made a major difference then because of the

14  points that I mentioned.

15         You know, the other thing that we did around

16  employment was very early on to get his food handlers

17  certification, which we hoped would allow him to do more

18  things in his volunteer work at Eastern State Hospital and

19  make him more desirable as an employee in a food service

20  operation.

21         Q.   And did he successfully obtain that license?

22         A.   Yes, sir.  Very cooperative.

23         Q.   All right.  Has Mr. Hinckley made new friends in

24  Williamsburg, both male and female?

25         A.   Yes, he has.  And some were through connections

1    that we pursued together, and some were through group

2    therapy as I understand that he had when he was going to

3    the evening group with Mr. Beffa.  In terms of my

4    connections, he expressed an interest in photography, and

5    we have been working diligently to have him become

6    involved in the art community in Williamsburg.

7         He expressed his interest in photography.  And a

8    gentleman who I've known for 30-some years, a retired

9    principal, assistant principal and teacher in Williamsburg

10   I knew worked in photography and had contact with

11   Mr. Brelsford, spoke with him about really just trying to

12   find out if there were classes of photography in

13   Williamsburg that Mr. Hinckley might attend.  That

14   conversation ensued to him volunteering to spend time to

15   maybe work with Mr. -- and mentor Mr. Hinckley.  His

16   request was that we all get together.  I meet with them.

17   He gets to know Mr. Hinckley a little bit, and so

18   Mr. Brelsford in that relationship has grown over the

19   past, I guess, eight months now.

20        Through Mr. Brelsford he met Mr. Lerner, a very

21   accomplished retired lead chief photographer for Look

22   Magazine.  As I understand it, many, many of his works are

23   in Library of Congress.  So he has got to know Mr. Lerner.

24   Sadly he has had some medical complications, so John's

25   contact with him was lessened.

1          John and I went bowling with two other

2     individuals I know in town.  One is a retired banker; one

3     is a retired minister.  We went bowling a couple of times.

4     John's back and shoulder was hurting.  So we put that on

5     hold for a while.

6          He's met Mr. Solomon, and they have their

7     working relationship now.

8          Trying to think through everyone else that John

9     have met in the community.  He had met some people working

10    at Eastern State Hospital.  And I remember he and I

11    conversing about this one gentleman who he felt positively

12    about, and there seemed to be a relationship possible.

13    And I was extremely pleased.  John and I talked about it,

14    and I said, Well, Mr. Hinckley, John, why aren't you

15    pursuing that relationship?  And he said, Well, there's

16    some things that are going on with this gentleman's life

17    that I don't approve of and I don't want to put myself in

18    a situation where there may be some difficulty that would

19    come back to in some way be a detriment to my being in the

20    community.  So that was not pursued.

21         I think he has had contacts and attempted

22    follow-up with two people from the group.  While in the

23    NAMI meeting he has met folks.  This developed into a

24    friendship with a Ms. L., who I have not met but

25    understand from John's, and from other individual,

1    statements that they are able to see each other

2    periodically during the visit, that she has met

3    Ms. Hinckley, that things are very positive in terms of

4    that as a friendship for John.

5        Q.   During the course of your meetings with

6    Mr. Hinckley, have you had occasion to talk to him about

7    James Brady and his death?

8        A.   Yes, I have.

9        Q.   During the course of those discussions, tell us

10   if you will, what, if anything, Mr. Hinckley may have said

11   that reveals empathy?

12       A.   Well, I really had no discussion about Mr. Brady

13   until his death, which I think was in the early part of

14   August of this past year.  John and I were to meet that

15   morning with staff at the Heritage Humane Society about a

16   volunteer position.  That individual called me, everything

17   hit the news, and hit it in a big way in the Williamsburg

18   area.  They canceled that appointment.

19            I called John.  And on that telephone call, and

20   then I think on at least one occasion after that, John

21   spoke about how Mr. Brady's death -- he wished -- in other

22   words, he wished he could have taken all of that back.  If

23   there was some way that could have never occurred, he felt

24   bad about the pain he had inflicted on the family of

25   Mr. Brady and the harm he had done to Mr. Brady himself.

20

1    It was a short conversation, but that's what transpired.

2        Q.   Did you feel that his expressions, were they

3    prompted by you or were they spontaneous by him?

4        A.   No.  I did no prompting.  I wouldn't frankly

5    have wanted to hear it if I didn't believe it was genuine

6    and somehow drew it out of Mr. Hinckley.  No, it was of

7    his own volition, and I had no question that it was

8    sentiment that he meant.

9        Q.   With respect to the meetings that you have had

10   scheduled with him, has he been punctilious in making sure

11   he attends to every one of them on time?

12       A.   Yes.  You know, that's been another part -- I

13   guess I didn't expect, as you put it, the punctiliousness

14   of Mr. Hinckley.  He usually beats me to wherever we are

15   to meet.  He is standing there waiting for me at whatever

16   location we've decided, so, no, he's been excellent.  I'm

17   trying to think as I'm answering this question, sir, have

18   there been any times that he was not punctual.  I think

19   there was one time we went bowling.  The weather was bad.

20   He couldn't find the bowling alley.  But if there's been a

21   reason, they are hard to remember and I had no concern as

22   to why he might have been two or three or four minutes

23   late.  No, he's been excellent.

24       Q.   All right.  I believe you said you had occasion

25   to testify -- excuse me, to have conferred with your

1    co-treatment providers in Williamsburg:  Ms. Haley,

2    Dr. G.G. and Mr. Beffa.  Have you discussed with each of

3    them how he's doing as each of them perceives it?

4        A.    Yes.  The meetings that we have been having

5    regularly since January, that is part and parcel of what

6    we discuss.  We each exchange information about what we've

7    experienced with John professionally to the point that we

8    can, and as a team, we -- my sense has been very honest.

9    I bring them up to date on what John is involved in.  In

10   most every circumstance they are well aware of it because

11   John has shared this with Mr. Beffa in his individual

12   session, in his group sessions and with Dr. G.G.

13       Q.    Is there a consensus amongst those Williamsburg

14   treaters about his behavior on conditional release?

15       A.    On conditional release?

16       Q.    Yes.  On the releases that you have in

17   Williamsburg.

18       A.    Yes.  I'm sorry.  Yeah.  Yeah.

19       Q.    And what is that consensus?

20       A.    The consensus is that John has been doing an

21   excellent job.  I think what has been very striking to all

22   of us, and maybe more so to myself because I had not been

23   involved with Mr. Hinckley prior to about March of last

24   year, is their sense and my sense over the number of

25   months I've been involved of him opening up, of him being

1      more willing to take some risks, more initiative.  His

2      mood is elevated.  He seems to be more comfortable in

3      meeting new people and interacting with other people and

4      taking some initiative.

5           Q.   Mr. Weiss, are you trained as a licensed social

6      worker to observe behaviors that pertain to risk factors?

7           A.   Yes, sir.

8                MR. LEVINE:  The Court's indulgence for a

9      moment, Your Honor.

10               (Pause)

11               BY MR. LEVINE:

12          Q.   Mr. Weiss, I'm going to refer to a document that

13     is not yet in evidence.  It's a report that is written by

14     Dr. Patterson, and it's dated April 8, 2015.  I don't know

15     if that report is on your desk or not.  But actually it's

16     not necessarily.

17          A.   Yes, it is.

18          Q.   I'm going to read from --

19          A.   It is, sir, yes.

20          Q.   From a list that appears on -- in that report.

21     And --

22          A.   Yes, sir.  I have it in front of me.

23          Q.   -- this is a list of identified risk factors for

24     Mr. Hinckley.  I'm going to ask you with respect to each

25     of them whether you have observed behavior to indicate a

1    concern about each of those factors.

2            First one on that list is depression.  Have you

3    seen any indication from Mr. Hinckley of depression?

4        A.    I have not.

5        Q.    How about with respect to isolation?  Have you

6    observed him in isolative behaviors, perhaps thought of as

7    autistic withdrawal?  Have you seen any of that?

8        A.    I have not seen any of those type of behaviors

9    you described.  When I first met John, he was isolated,

10   and that's what we've been about, is integrating him.  But

11   no, sir.

12       Q.    And the third item here is psychosis.  That was

13   one of his diagnoses.  It was -- at the time of the crime

14   it was psychosis not otherwise specified.  For many years

15   now it's been denominated as being in full and stable

16   remission.

17           Do you see any evidence of Mr. Hinckley's -- of

18   a psychosis in Mr. Hinckley?

19       A.    No, I see no signs of thought disorder or mood

20   disorder.

21       Q.    All right.  Now, the fourth item on this list is

22   the level of insight into mental illness.  Do you have

23   some views as to Mr. Hinckley's insight into mental

24   illness?

25       A.    It's limited because I've tried very much to

1   remain his case manager, not his clinician.  It's easier

2   to slide into the clinical aspects of doing this, since

3   that's what I did for a major part of my career and still

4   do.  He's aware in terms of he needs to take his

5   medication, which to me is an insight into his mental

6   illness.  He's aware that if he stops taking his

7   medication, there may be some negative repercussions from

8   that.  He's aware that that was a major, major, if not the

9   whole element in terms of what occurred that brought him

10  to this situation he is in life now.

11       Q.   And are you aware of his record of compliance

12  with respect to medication?

13       A.   Yes.  From what I've been told and what I've

14  read, yes, sir, that he has been compliant.

15       Q.   And what have you been told or have you heard?

16  His compliance is impeccable?

17       A.   Well, with Dr. G.G., yeah, as far as I know and

18  from what I've heard from hospital staff at the conference

19  calls that I'm a part of usually every month with

20  St. Elizabeths staff.

21       Q.   All right.  And then the fifth item on this list

22  is known, as denominated a personality disorder.

23  Elsewhere in the record of this case it is referred as the

24  narcissistic personality disorder.  And it has been found

25  to have been significantly attenuated.

1          Do you see any evidence of a narcissistic

2     personality disorder?

3          MR. AZIZ:  Objection.  I object to the

4     description of the testimony of Mr. Levine in between

5     before the question.

6          THE COURT:  All right.  I understand.  I sustain

7     that.

8          The question is, have you seen any evidence of

9     that.  I guess that's the question.

10          BY MR. LEVINE:

11     Q.   Do you see any evidence of a narcissistic

12     personality disorder?

13     A.   Narcissistic personality disorder?

14     Q.   I'm sorry.  I may be talking over you.  I don't

15     mean to do that.

16     A.   Not a personality disorder, yeah.  No, sir, not

17     a personality disorder.  John, I guess, like I said in one

18     of my answers to maybe Dr. Murphy, you know, there are

19     elements of narcissism.  I've got them.  Lots of other

20     people do who are successful in this world.  But it's

21     nothing to me that in any way is of major concern or a

22     problem in terms of his mental health.

23     Q.   All right.  Then the sixth item here is access

24     to weapons.  Do you have a view of whether John has ever

25     had -- whether he has access to weapons or has manifested

1    an interest in weapons?

2        A.   He's not mentioned any interest whatsoever in

3    weapons, and as far as I've known has never had one on his

4    person.  And in terms of other access, he doesn't -- I

5    don't know beyond when I'm with him.

6        Q.   All right.  The seventh item is -- pertains to

7    family support.  Could you comment, please, on your view

8    of the support of the Hinckley family to John.

9        A.   I've been very positively impressed with the

10   support of the Hinckley family.  I've worked with so many

11   individuals who have been hospitalized who are in the

12   process or have recently been discharged and have no

13   family support.

14           Mrs. Hinckley is extremely supportive.  I've met

15   with her a few times.  She knows she has open access to

16   discuss any concerns with me about case management

17   services.  John's sister and brother visit regularly on

18   usually the last weekend of when he is in Williamsburg.  I

19   think the family support has been extremely, extremely

20   positive.

21       Q.   The next item on the list is -- pertains to the

22   history of suicide and attempts of suicide.  Really

23   addresses the question of Mr. Hinckley doing harm to

24   himself.  Do you see any evidence of Mr. Hinckley wanting

25   to hurt or do harm to himself?

1      A.   No, sir.

2      Q.   Ninth item is difficulty in relationships with

3  friends.  Do you have any comments or do you have any

4  observations to offer with respect to perceived difficulty

5  in relationships with friends?

6      A.   I guess I wouldn't use the word "difficulty."  I

7  think John is in the process of learning relationships

8  outside of the hospital and outside of his family.  He has

9  not had a tremendous amount of them in Williamsburg,

10  that's for sure.  And so he takes his time.  He is not

11  quick to engage or had not been quick to engage.  And as I

12  said earlier, that has improved tremendously over time.

13          So the difficulty in relationships, not that I'm

14  aware of.  But it's slow in developing.  But John has, as

15  I said, I'm now a witness to at least three relationships,

16  four relationships that John has engaged in to a major

17  extent since he's been in Williamsburg.  The individuals

18  who I'm speaking about think very positively of John, and

19  I know he thinks very positively of them.

20      Q.   And is that both male and female?

21      A.   The relationships I'm speaking of are male.  I

22  do not have, as I said, firsthand knowledge of his

23  relationship with Ms. L.  I do know when it's been people,

24  not in terms of friends, but in terms of professional

25  relationships, volunteer things, he's done quite well with

28

1    females.

2        Q.   All right.  And the last item that is on the

3    list is deception.  Have you seen evidence of deception,

4    lying?

5        A.   I have not seen -- no, I have not seen John be

6    deceptive with me or anything else -- or anyone else,

7    excuse me.  I think there was an incident that occurred

8    that there's some misunderstanding about and others might

9    have characterized it as deception, but I certainly

10   wouldn't.

11       Q.   What incident is that?

12       A.   This is an incident when John was, in terms of

13   his itinerary, to be out with Mr. Brelsford.  And

14   probably -- well, not probably, John jumped the gun and

15   made a contact with another gentleman around music and

16   recording in Williamsburg.  He and Mr. Brelsford went to

17   see that gentleman.  At that point it was not on his

18   itinerary.  Mr. Hyde became aware of it.  I became aware

19   of it within a day.

20            John knew that I talked to Mr. Brelsford every

21   week.  He volunteered the information to me after I said

22   did something occur like this, and he said yes.  He said,

23   in so many words, I got enthusiastic.  I should have let

24   VJ Hyde know and I should have let you know.  I'm sorry I

25   didn't do that.

1          And so, you know, I guess I see deception as

2     either trying to hide something or to mislead somebody

3     about something.  John was right upfront about the whole

4     thing once it was brought to his attention.

5          Q.   Did he attempt to mislead you or anyone else, to

6     your knowledge, about it?

7          A.   No.

8          Q.   Did he attempt to hide any aspect of it?

9          A.   Not that I'm aware of.

10         Q.   And was the behavior itself appropriate

11    behavior?  That is to say, the appropriate -- appropriate

12    to go over and talk about and do music with Mr. Tracey?

13         A.   Yeah.  It was quite appropriate.  It wasn't

14    maybe the right time and place, but part of what we've

15    also been doing, and to me the positive part of this, is

16    John took some initiative to pursue something in an area

17    that he was interested in.  He did that with a trusted

18    mentor, somebody he knew I knew and trusted.  It was a

19    matter of timing in my mind.  But no, the positive part

20    was he showed initiative in pursuing this.

21         Q.   All right.  Now, there has been some talk about

22    whether or not risk factors should have, should include

23    the issue of financial support for John.  Have you heard

24    about that discussion?

25         A.   Yes, sir.

1    Q.   Now, you were not in the courtroom on Wednesday

2    of this week when both Diane Simms, John's sister, and

3    Scott Hinckley, John's brother, testified.

4         MR. LEVINE:  With the Court's permission, if I

5    may, Your Honor, I'd like to make a proffer to this

6    witness.

7         THE COURT:  Yes.  And Mr. Aziz would be the

8    pitch man to make sure it's accurate.

9         MR. AZIZ:  I will.

10        MR. LEVINE:  I only intend to make it accurate.

11   If I don't, it's by inadvertence to be sure.  And I would

12   invite the Court's participation in this.  I want to make

13   sure it's accurate.

14        On Wednesday, the first witness in this matter,

15   Mr. Weiss, was Scott Hinckley.  And Scott testified that

16   the family places its moral, its emotional and financial

17   support behind Mr. Hinckley.  He said that his mother,

18   Jo Ann, has liquid assets of approximately a quarter of a

19   million dollars, and she has equity in a house which is

20   about the same number.  Those assets are set aside for her

21   and for Mr. Hinckley.  Should she pass away prior to their

22   consumption, that those assets go to Scott and Diane by

23   operation of her will, and there has been a family

24   discussion that those assets will be used by Scott and

25   Diane for the purpose of funding John's life.

1         He also said that should those assets run out,

2    that his assets, with some limitation, but his assets

3    would be available to supplement what was there.  He also

4    expressed the hope that there would be some sort of

5    benefits that come from various governmental sources,

6    perhaps some private sources as well, such as ObamaCare,

7    Affordable Care Act, and that they would defray some of

8    those costs.  But to the extent that there was still costs

9    above that, that his assets would respond to that.

10        Then Diane Simms testified, and she, without

11   equivocation, said that her assets, and she's discussed

12   this with her family, would likewise respond.  She is

13   hopeful that the costs of this would go down, but surely

14   they weren't going to ever let John be abandoned by any

15   means.

16        She also said that should there be a crisis and

17   Mrs. Hinckley become unavailable for whatever reason,

18   possibly by death but possibly by some other event, that

19   she would, quote, take the next plane to Williamsburg and

20   stay with John until such time as that crisis has abated.

21        With that in mind, Your Honor, I would invite

22   the Court's supplement to that if they think it's either

23   inaccurate or incomplete.

24        MR. AZIZ:  One minor thing.  I think that

25   Mr. Scott Hinckley said that, you know, I think,

1    reasonable amount of his assets will be available to

2    supplement, and regarding Ms. Simms, that she would stay

3    for as long as necessary to abate the crisis.

4              THE COURT:  I think that's fair.

5              MR. LEVINE:  I adopt it.

6              BY MR. LEVINE:

7         Q.   All right.  With that in mind, Mr. Weiss, do you

8    think that financial support is a real risk factor in this

9    matter?

10        A.   I'm not sure, sir, what you mean by "real

11   respecter"?

12        Q.   I didn't hear what you said, sir.  I apologize.

13        A.   Okay.  I was asking for a little clarification.

14   I thought the words I heard were "real respecter," and I'm

15   not sure what that means.

16        Q.   I'm sorry.  Risk factor.  It had been suggested

17   after we read those ten --

18        A.   Risk factor.

19        Q.   -- that we identified that financial support

20   might well be an 11th risk factor, and I was asking you in

21   light of the proffer that we made you regard it as a risk

22   factor.

23        A.   Thank you for the clarification.

24              Given what you had just said, and given what I

25   have been able to find in terms of potential supports in

1   Williamsburg and potential supports through conversations

2   with Ms. Brown, John's social worker at St. Elizabeths, I

3   do not see that as a major factor at all.  Added to that

4   is the strong hope and belief that John will be able to be

5   employed and earn some income himself and get whatever

6   benefits, financial that are available to him.

7        Q.   Well, this may be a good time for me to ask you,

8   sir.  What have you been able to find in the way of

9   benefits in Williamsburg for Mr. Hinckley and the prospect

10  of benefits?  And include in your answer what you've been

11  able to learn with respect to alternative housing.

12       A.   Okay.  Then maybe I'll start with the housing.

13            In terms of exploration, I checked on the

14  availability of Section 8 vouchers in James City County.

15  At the present time there is a wait list for that, and

16  that wait list is closed.  There are also special vouchers

17  available in general.  I don't know specifically the

18  number at this point in time.  I used to be aware of that

19  when I was the director of the mental health center, and

20  that's been for a while.  I don't know those, but I intend

21  to pursue that with the James City County housing

22  division.  The two times I was able to call I did not get

23  an answer and I left a message and no response back.

24            I'm also aware that there are subsidized housing

25  available in James City County, in at least one complex,

1    Lafayette Village.  There used to be another one called

2    Bird Ordinary [phon.].  And as we were going along I was

3    going pursue those in terms of seeing what's available

4    around housing.

5          Housing in Williamsburg is fairly expensive.  In

6    the environs it's a little less expensive.  So that's

7    pretty much the housing picture at this point as far as

8    I've been able to investigate it.

9          John, I understand, may well be eligible for

10   Medicaid.  I guess the question is also out there about

11   Medicare eligibility.  And so those are yet to be

12   determined, but if I could go out on a limb, I would be

13   extremely surprised with the experience I've had with

14   individuals leaving Eastern State Hospital, Central State

15   Hospital coming to our area in Williamsburg with John's

16   history that he would not be found eligible for some

17   supports in that area.

18         Also I've had conversations, and I know this has

19   been a big part previously, we talked about expenses with

20   Colonial Behavioral Health.  And in terms of conversations

21   with administrators there, as I understand it, if John

22   receives Medicaid and is found eligible for targeted case

23   management, which is a term used in the Virginia mental

24   health system, and maybe nationally, that if that is

25   available he would have to be accepted by federal law.

35

1    And if that occurs, then he can also in the future receive

2    counseling services and psychiatric services through

3    Colonial Behavioral Health.

4            I went further to ask if I'm involved -- and

5    they have limited resources.  I'm well aware of that in

6    terms of case management.  If I'm involved would they be

7    willing to work with me in a team that they might provide

8    some of those, that I might continue to follow John around

9    employment and housing, and they responded positively to

10   the potential for that occurring.

11       Q.   All right.

12            MR. LEVINE:  Your Honor, I am very mindful of

13   the clock, so let me truncate what is already a truncated

14   presentation and ask Mr. Weiss.

15            BY MR. LEVINE:

16       Q.   Have you seen the (e) petition from the

17   hospital?  I think you said you have.  I think I asked you

18   that.

19       A.   Yes, you have.

20       Q.   All right.  And I think you said you had seen

21   all three components of it?

22       A.   Yes, sir.

23       Q.   All right.  Are you willing to meet with

24   Mr. Hinckley in the first year twice per month and then

25   once per month thereafter?

1      A.   Yes, I am.  Certainly am, and my sense is to

2   do -- to do what needs to be done properly, it will

3   probably be more than that.  Initially maybe moving down

4   to two to one, but yes, yes, sir.

5      Q.   And if the Court were to order more, would you

6   be willing to do as many as the Court ordered?

7      A.   Yes, sir.  As long as I can keep my wife happy

8   and take vacations periodically, I'll be happy to.

9      Q.   I think we all feel that way.  All right.

10          Are you willing to communicate with the forensic

11  outpatient department up here in Washington once per month

12  and provide a checklist and summary and engage in

13  telephone conversations with them?

14     A.   Yes, sir.

15     Q.   All right.  And are you willing to provide your

16  notes and gather the notes of Dr. G.G. and perhaps even

17  Ms. Haley and provide them to the department of

18  outpatient -- the outpatient department at St. E's?

19     A.   Yes, sir.

20          THE COURT:  And I assume that includes Mr. Beffa

21  too?

22          MR. LEVINE:  Forgive me, Your Honor.  I meant to

23  include Mr. Beffa.  Would you be willing to gather his

24  notes and supply them to the outpatient department?

25          THE WITNESS:  Yes, I would.  I just see that as

37

1   an expansion of my role as trying to coordinate the team

2   in Williamsburg.

3        BY MR. LEVINE:

4        Q.   And are you willing for the first six months to

5   meet together with the Williamsburg treaters -- Ms. Haley,

6   Dr. G.G. and Mr. Beffa -- together with Mr. Hinckley,

7   either twice a month, or every other month, or as the

8   Court may order, to do treatment planning conferences?

9        A.   Yes, sir.  Whatever the Court's pleasure is, I'd

10   be happy to comply.

11        Q.   And do you say that without any reservation?

12        A.   None whatsoever.

13        THE COURT:  Are the services that you provided

14   eligible for Medicaid coverage?

15        THE WITNESS:  No, Your Honor, they are not.  The

16   Medicaid program in Virginia, at least at this point in

17   time, there's been discussion of opening up, are only paid

18   for through the services boards or behavioral health

19   authorities.  So I would be eligible if I worked at the

20   services board and the services board received a payment.

21   But as an individual provider, no, sir.

22        THE COURT:  Is the same true for Medicare when

23   John becomes eligible for Medicare?

24        THE WITNESS:  Right.  Again, as far as I

25   understand, Medicare I don't think pays for any case

1    management services, but my understanding is no.  I'm

2    eligible as a clinician to do it, but they do not pay that

3    as a service.

4            THE COURT:  So certain things that might be

5    covered that Dr. G.G. provides or Mr. Beffa provides,

6    you're in a different category and it wouldn't be provided

7    for by either Medicaid or Medicare.

8            THE WITNESS:  That's right.  In the case

9    management role, they would not.  If I was John's --

10   Mr. Hinckley's clinician, they would be.

11           BY MR. LEVINE:

12       Q.  All right.  And, Mr. Weiss, with respect to your

13   billings, are your bills always paid and paid on time?

14       A.  They have been always paid and paid on time,

15   yes, sir.

16       Q.  And have you conferred with the family about

17   possibly engaging in a fixed price contract for your

18   services?

19       A.  Yes.  I didn't have direct conversation with the

20   family at this point.  But I made that offer available to

21   Mr. Hyde as we were working out issues prior to this court

22   hearing.  So yes, I would be willing to work that out on a

23   monthly basis, which would allow them to be able to plan

24   for expenses.

25       Q.  All right.  Mr. Weiss, if the Court required you

1    to consult with the supervisors of Mr. Hinckley's

2    volunteer jobs, to confirm his attendance and the adequacy

3    of his performance, would you be willing to do that?

4         A.   Most certainly.  I see that as an integral part

5    of being case manager is knowing what's going on in terms

6    of what's happening and the satisfaction of those who are

7    offering volunteer options to a client.

8         Q.   And would you put those in your monthly progress

9    notes?

10        A.   Yes, sir.

11        Q.   All right.  And would you be willing to collect

12   on a monthly basis the progress notes of all the

13   Williamsburg providers and deliver them to the OPD in

14   Washington, specifically, probably, to Dr. Johnson?

15        A.   Yes, I would.  And I guess just a thought, sir,

16   in the prior question.  I would be willing to do the same

17   thing for whatever employers John has to the degree that

18   information could be exchanged as well as his volunteer

19   situations.

20        Q.   And would you be willing to attempt to

21   corroborate Mr. Hinckley's reports to the treatment

22   providers and family reports and where you note

23   discrepancies, identify them?

24        A.   Yes, sir.

25        Q.   If you find discrepancies.

1    A.   Yes.

2         MR. LEVINE:  Your Honor, I think that in the

3    interest of time, I am going to forebear from asking any

4    questions other than this last one.

5         BY MR. LEVINE:

6    Q.   How would you grade, if you were giving out a

7    high school or college grade, Mr. Hinckley's performance,

8    his behavior while on conditional release?

9    A.   Looking over the whole period of time I had

10   worked with John, with the progress he has made, the

11   initiative, the energy, and I'm a hard grader, I've taught

12   some college courses, at worst I'd give him an A minus.

13   At best I'd give him an A.

14        MR. LEVINE:  Pretty good.  Thank you, Judge.

15   Thank you, sir.

16                   CROSS-EXAMINATION

17        BY MR. AZIZ:

18   Q.   Good afternoon, Mr. Weiss.

19   A.   Good afternoon, sir.

20   Q.   You're a fellow Buckeye; right?

21   A.   You better believe it.

22   Q.   Great to talk with one.

23   A.   Start off on very positive grounds, yes.

24   Q.   Exactly.

25        Mr. Weiss, you're retired; is that right?

1      A.    Yes.   I do consultation part-time work, but I'm

2   retired from full-time employment, yes, sir.

3      Q.    You maintain some amount of cases including

4   since, you said, March of last year, this one; is that

5   right?

6      A.    That's correct.

7      Q.    And do you have any estimation of how long you

8   plan on continuing to work on -- at all or on this case?

9      A.    Well, that's a good question.   My wife asks me

10   that periodically too, sir.   I feel a real commitment to

11   Mr. Hinckley's future, to his integration in Williamsburg.

12   And as I view it now, I am willing to continue to work

13   with Mr. Hinckley until he is positively integrated into

14   Williamsburg and/or I can transition to Colonial

15   Behavioral Health and feel comfortable with that, or I am

16   directed to do such.

17      Q.    Thank you.

18            And as -- under the plan of the hospital, the

19   April 17 letter that you have in front of you which is

20   Patient's Exhibit 4, you'll become the case manager

21   under -- as you understand, the full case manager for

22   Mr. Hinckley; is that right?

23      A.    That's correct, sir.

24      Q.    And so everything that Mr. VJ Hyde does right

25   now you'll be taking over.   Do you understand that?

1     A.   Well, I guess I won't be taking over everything

2   Mr. Hyde does.  I mean, I'm not doing the hospital work

3   and everything.

4     Q.   No.  Absolutely.

5     A.   I will be taking over parts of what Mr. Hyde has

6   been performing, I understand.  In terms of connecting

7   with reports and other things to the things that

8   Mr. Levine mentioned, yes, sir.

9     Q.   And as the case manager, you'll be the point

10   person for the Williamsburg treatment team, as well as

11   with the employers, the family and then the connector to

12   the outpatient department here in D.C.

13          Do you understand that?

14     A.   Yes, sir.

15     Q.   And as Mr. Hyde testified as to the case manager

16   parts that would apply to you, you would still be writing

17   any itineraries that took place.  Are you comfortable with

18   that?

19     A.   I understand that.  That would continue to be a

20   part of it, and I'm well schooled in how to do that at

21   this point, yes, sir.

22     Q.   Absolutely.

23          THE COURT:  You say you're well schooled in

24   doing that.  Do you have a view about whether itineraries

25   are necessary?  If so, for how long?  And if so, in what

1    kind of detail?

2          THE WITNESS:  I guess my view would be that as

3    John continues to get more involved that they are able to

4    decrease and we show John confidence in terms of him being

5    able to make decisions and have more freedom.

6    Specifically, I would think that from where I sit I would

7    like him to continue at least a year, and then to decrease

8    in terms of the success of what John's involved in and

9    John's integration into Williamsburg.

10          But to me it's sensible for that to continue at

11   least for a year, sir.

12          THE COURT:  Now, the way it's worked in the past

13   is that those itineraries were sent by the hospital, and

14   that means to Mr. Hyde in recent years, to me, to the

15   Court, with copies to various people.  Is that how you see

16   it?

17          THE WITNESS:  Well, I'm certainly willing to do

18   that.  It would just change a step.  I usually send it to

19   Mr. Hyde, so it would now go to Your Honor or wherever

20   else.  Yeah, it's just a matter of knowing where it needs

21   to go, and I'm happy to provide that.

22          MR. AZIZ:  Does the Court have any follow-up

23   questions?

24          THE WITNESS:  Your Honor, if I could --

25          THE COURT:  Go ahead.

44

1          THE WITNESS:  Your Honor, if I could make one

2     other thing.

3          One concern would be, and maybe at some point

4     discussion about it, is we've been working on every little

5     change that occurs to this itinerary having to be moved

6     on.  Approved, I guess, might be the correct term.  I

7     would hope that there would be some latitude, some trust

8     maybe in my judgment, the team's judgment, whatever, about

9     some what we would consider minor changes in that

10    itinerary without having to continue to do it to the

11    degree we've done it.

12         THE COURT:  Well, for example -- and I don't

13    want to step on Mr. Aziz's lines.

14         Two examples that have been discussed during

15    this hearing that reduced Mr. Hinckley's flexibility to do

16    what he wanted to do.  One was Ms. L wanted to meet him

17    for a coffee or something and he said I can't do that

18    because it's not on my itinerary and so he didn't meet

19    him.

20         THE WITNESS:  Yes, sir.

21         THE COURT:  The other is the meeting with --

22    when Bruce Brelsford, when they were supposed to go see

23    Mr. Lerner and Mr. Lerner was unavailable and so they went

24    and saw the musician instead and did not run it by

25    Mr. Hyde first but did inform Mr. Hyde later.

1        Would your view be that however this is

2   structured either of those things would have been possible

3   without prior approval?

4        THE WITNESS:  I would -- I guess -- no, sir.

5   But I guess what I was asking was I would still want

6   Mr. Hinckley to let me know, but if it did not seem like

7   some major alteration to the itinerary that I would not

8   have to contact someone in the District of Columbia, the

9   Court, and let them know that this change occurred.  But

10  no, I would still like to be apprised of those type of

11  changes, without question.

12       MR. AZIZ:  Does the Court have any more

13  follow-up?

14       BY MR. AZIZ:

15  Q.   Mr. Weiss, the reason that that's important is

16  because Mr. Hinckley does well with structure and

17  accountability; isn't that right?

18  A.   Yes, sir.  And he's done increasingly well with

19  initiative.

20  Q.   And you've also mentioned in the past that it is

21  beneficial when he knows he will be questioned on where

22  he's going and his activities and such; is that right?

23  A.   Well, the way you phrase that, I don't know if

24  it came across that way that it would be beneficial.  I

25  think it's important for John as he integrates to know

1    that there are things expected of him and that he has

2    someone as this process unfolds to speak to.  I view that

3    as beneficial.  I'd like to believe he sees it as

4    beneficial.

5         Q.   And your point is very well taken.

6              Have you had a chance to speak with anyone from

7    the outpatient department yet, such as Dr. Nicole Johnson?

8         A.   You mean ever, sir, or recently or --

9         Q.   From the outpatient department here in D.C.

10   regarding Mr. Hinckley ever.

11        A.   Yes.  Yes.  She's been a part of treatment

12   meetings, conference calls.  She was set to come down, and

13   sadly the weather did not allow that to happen.  She was

14   going to come down to Williamsburg, going to attend our

15   meeting.  I think it was our March meeting, treatment team

16   meeting.  She wanted to see a number of locations where

17   Mr. Hinckley was employed or volunteered.  And we got one

18   of our March -- or February, March rash of snowstorms, and

19   she was not able to do that.  So we conversed about that

20   situation.  I called and offered again to do that if she

21   wanted to.

22        Q.   When was the first time you spoke with her?

23        A.   That's difficult, I guess, for me to remember

24   because when I'm on the phone in these treatment team

25   meetings, there are lots of people saying lots of things

1    from the hospital staff.  I don't remember which ones

2    she's attended, but I certainly can say I remember since

3    January having three or four conversations or being aware

4    it was Dr. Johnson conversing with me through those

5    conference calls or our own phone calls with each other.

6         Q.   Okay.  Thank you.

7              Are you comfortable becoming the chief contact

8    for -- with the Secret Service vis-a-vis Mr. Hinckley?

9         A.   Well, I guess I'd like a little bit further

10   information what that means by being the "chief contact."

11   In general I would say yes.  I talked to -- talked with

12   Mr. Hyde over the course of the past number of months

13   about being able -- again, if there were changes to have a

14   connection with the Secret Service so I can let them know

15   if something changed.  We didn't have to go through all

16   these layers.  As it is now, and it might be a matter of

17   me having a contact, letting them know what the itinerary

18   is, letting them know if any changes, no problem.

19        Q.   If there was a Secret Service agent or someone

20   of that regard who had your phone number and you had that

21   person's phone number, would you be willing to keep them

22   up to date on the itineraries and if there were any

23   changes to the itineraries for Mr. Hinckley?

24        A.   Yes, sir.  In fact, by mistake I got a call from

25   the Secret Service one day thinking they were calling

1    someone else about a connection in Williamsburg.  We had a

2    fine conversation.  So no problem.

3         Q.   Thank you, Mr. Weiss.

4              And would you be willing, if ordered by the

5    Court, to actually type up a summary of the notes,

6    basically like what Mr. Hyde does now?  Would you be

7    willing to do so if the Court ordered it and just laying

8    out what Mr. Hinckley had done in a month, any

9    conversations you had with employers or family in either

10   long form or more abbreviated form?

11        A.   Yes, sir.  I do a case management note every

12   month as it is.  To me it would just be an expansion.

13   Again, if the request is what's occurred in terms of the

14   knowledge of other team members, et cetera, to that note.

15   So no problem again.

16             THE COURT:  I just wanted to refine that a

17   little bit so you know what you're getting yourself into.

18             As I understood what you said earlier, one of

19   the things that is part of your job and would continue to

20   be would be to talk with the people where John is

21   volunteering, and if he gets paid employment to talk with

22   them; right?

23             THE WITNESS:  Yes, sir.

24             THE COURT:  And since that's part of your job,

25   when you keep your own notes, your own progress notes or

1    whatever -- whatever the proper term is, it would

2    incorporate that stuff just as a matter of course; right?

3             THE WITNESS:  That would be the way I've

4    envisioned it; that I do a broader summary note of all the

5    things that John is involved in.  Again, with whatever

6    guidelines the Court requires of me, what degree of

7    expansiveness, yes.

8             THE COURT:  So I think what Mr. Aziz is asking

9    is whether -- how you feel about going a step further than

10   that, which is to say to take Dr. G.G.'s notes and

11   Mr. Beffa's notes of all that they've done and Ms. Haley's

12   notes, and instead of just putting them in the same

13   envelope with your report, also summarizing what they've

14   said.  And I'm not sure how I feel -- whether I'd feel --

15   would feel at the end of this process it would be

16   necessary to require that.  It may depend on whether they

17   type or write by hand.

18            But the question is whether -- how you feel

19   about that responsibility in addition to what you would

20   normally do.

21            THE WITNESS:  Yeah.  I would have no problem

22   digesting them and then putting out a summary that

23   includes -- includes their work.  I'm used to doing that

24   from previously being director of the mental health center

25   in terms of notes to the State, other types of issues,

1      courts.  So it's no problem, Your Honor.

2              MR. AZIZ:  Thank you, Your Honor.

3              BY MR. AZIZ:

4      Q.   You had mentioned that Ms. Haley can be very

5      difficult to reach at times; is that right?

6      A.   Yes.

7      Q.   And she actually hasn't attended even the

8      majority of the treatment team meetings; is that right?

9      A.   Yes, sir.  I think when you say "majority," I

10     think we've had four, and she's batting.  500.

11     Q.   Okay.  So she's missed two of them?

12     A.   Yes, sir.

13     Q.   All right.  But you think it's important for

14     Mr. Hinckley, especially, that all of the treatment team

15     providers be present for each of these meetings; is that

16     right?

17     A.   You know, when you asked that -- I'm not certain

18     that Ms. Haley needs to be there.  Ms. Haley sees

19     Mr. Hinckley once a month.  They spend an hour or two

20     hours together.  She's got a busy life.  I don't

21     necessarily feel -- I trust her judgment.  If there was

22     something major, she connects with me, contacts me.  I can

23     contact her and get the surgery report of what transpired.

24             So in an honest answer to your question, I'm not

25     sure that it's real important that Ms. Haley have to

1    attend every meeting.  I would say I would certainly like

2    her to be at least quarterly during our meetings, you

3    know, at one of these meetings, but every month I don't

4    see that that's critically important.

5         Q.   When Mr. Hyde was testifying, I believe it was

6    yesterday, the issue of possibly finding a new music

7    therapist came up.  And Mr. Hyde was asked -- I can't

8    remember if it was by counsel or the Court -- who would be

9    in charge of coordinating finding a new music therapist if

10   that was something that was deemed necessary by the Court

11   or the team.  And you were the selection.

12              Would you be comfortable with that?

13        A.   I'd be honored.  Well, if I can get consultation

14   from other music therapists I know, I have not hired music

15   therapists or whatever.  But yes, I would be, given that I

16   can -- I can proceed the way I would like with the

17   recommendation.

18        Q.   Of course, you can talk to whoever you want.

19        A.   Thank you, sir.

20        Q.   No problem.

21              Now, in the suggested plan, the requirement in

22   the plan that's been proposed is that Mr. Hinckley would

23   meet with you twice a month.  But if you could see him as

24   often as you want, you've actually indicated that you'd

25   like to see him once a week or once every ten days, at

52

1    least in the beginning; is that right?

2         A.    That's correct.  And I would -- further, if it's

3    at all possible, like to see him once a week.

4         Q.    Okay.  So once a week.

5         A.    Because I see the whole case management issue as

6    critical to the integration and need to see him more

7    initially.  Hopefully as we get successes, we can back

8    off.

9         Q.    Regarding just -- and you clarified that there's

10   a difference between being the clinician or the case

11   manager; is that right?

12        A.    Yes, sir.

13        Q.    And is Dr. G.G. the clinician in the

14   Williamsburg team then?

15        A.    Mr. Beffa at least in my terminology would be

16   considered the clinician.  Dr. G.G. is the psychiatrist.

17   I am the case manager, and Ms. Haley the music therapist.

18        Q.    Yes, sir.

19              In your opinion how quickly would Mr. Hinckley

20   transition to separate living from his mother?

21        A.    That's based on a lot of factors.  Certainly one

22   is the financial factor.  I would -- I would hope, No. 1,

23   that John has some ability to assist in the cost of his

24   housing.

25              Secondly, it would be, as we proceed in terms of

1    my feeling, is living in Kingsmill, which I think for an

2    individual -- a number of individuals, could be isolating.

3    What that's about, the health of his mother.

4         So there would be multiple factors involved.

5    His social life and what else is going on in his

6    connections.  So my sense at present would be that I would

7    like to see John there for six months to a year,

8    evaluating how his, as I said, integration is occurring.

9    But be looking, all things progressing satisfactorily, to

10   be seeking housing after a year to a year and a half.

11        Q.   And given --

12        A.   It would also give us time -- yes, sir.  I'm

13   sorry.

14        Q.   No.  Sorry.  Please continue.

15        A.   That would give us time to assess other options

16   if there is a wait list for Section 8, to find out what

17   the other options are for subsidized housing, and to

18   locate a place that in my mind and John's mind and his

19   family's mind and the team's mind makes sense for John to

20   live in Williamsburg.  There are some places honestly I

21   don't think it would be to his benefit to live, and there

22   are other places that I think would be optimal, if it

23   could be afforded.

24        Q.   Now, given Ms. Hinckley's positive health at

25   this point, and given your timeline as well as the real

1   sparsity of public options in Williamsburg, the most

2   realistic option here is a private residence of some sort,

3   whether it's a condo or apartment or whatever; is that

4   right?

5        A.   Yes.  There are.  They are out there, and some

6   of them are very nice.  You can rent a room with a bath

7   and a living room or something like that.  There are a

8   number of rooms in the city of Williamsburg that one finds

9   in the Virginia Gazette with some regularity offered for

10  rent.  So it would be looking broadly, but I think in

11  general I agree with what you said, sir.  A private

12  residence that would be his own.  Maybe with a roommate.

13  Again, who that roommate is, how that transpires is

14  another issue.  But I can see the support of someone else

15  being with him, if he is interested in that, as -- all

16  things being equal, as being a positive rather than a

17  negative.

18       Q.   And that is an additional cost, though, that the

19  family needs to keep in mind; is that right?

20       A.   Well, I don't know.  If he's in an apartment or

21  renting a condo, say, and he's with a roommate, they would

22  share the cost.  It could be a cost saving for the family.

23       Q.   But he doesn't pay any rent at the house,

24  Ms. Hinckley's house; right?

25       A.   As I understand, he does not at the present

1    time, no, sir.

2         Q.   And do you know how close Mr. Hinckley is to his

3    mother?

4         A.   Everything I can ascertain is they are quite

5    close.  He helps her out with things.  They go out to eat

6    together.  I know I got called during one of the

7    snowstorms because he needed a snow shovel, and the Lord

8    had blessed me with three of them.  And I brought one over

9    and he was wanting to help his mom be able to get out.  He

10   picks up packages for her.  So, you know, I would

11   characterize it as quite close.

12        Q.   And do you know how close Mr. Hinckley was with

13   his father before he passed?

14        A.   I do not.  I did not know the relationship.  I

15   got to meet Mr. Hinckley through a couple of phone

16   conversations in terms of when I was at the mental health

17   center and some supports and questions he had.  But I

18   didn't know anything about their relationship, no, sir.

19        Q.   You told Dr. Patterson that Mr. Hinckley retains

20   a "narcissistic strain."  Is that correct?

21        A.   Narcissistic streak?

22        Q.   Strain.  Streak.  I believe it's typed as

23   strain.  This is on page 28.

24        A.   I don't remember using those words, but Lord

25   knows I could have.  Page 28, sir?

1      Q.    That's what I have written down.

2      A.    Just curious.  The context, if there is any.

3      Q.    Sure.  It's the first full paragraph, second

4  line of page 28 of Dr. Patterson's report.

5      A.    I'm there now, sir.

6            First paragraph, page 28.  Presently the

7  projected life -- there is a narcissistic strain to John.

8            Okay.  Thank you.  Just wanted to confirm

9  exactly what I said and see if there was context for that.

10           Yes, I think there is.  When I say "strain,"

11  that wasn't meant to be negative per se.  It was meant to

12  say that John -- I don't know if I want to call it a

13  positive ego.  I don't see it out of bounds.  I sensed

14  earlier on that that John had some -- in some ways had a

15  sense of entitlement about certain things.  I have not

16  seen that in our interactions.  I have not seen that in

17  his personality as he has become more comfortable, less

18  defensive, more open about things.

19     Q.    Thank you, Mr. Weiss.

20           You also told Dr. Murphy that -- this is on

21  page 30 of Dr. Murphy's report, if you would like to refer

22  to that.  I'll wait until you get there.

23     A.    Okay.  I'm there, sir.

24     Q.    That there were distant times when John,

25  speaking of Mr. Hinckley, seems to feel entitled around

1    issues, which I believe you just mentioned.  This I don't

2    need to do those things if I make an excuse that will get

3    me out of it.

4          Do you see that?

5    A.   Yes, I do.

6    Q.   And that is -- go ahead, please.

7    A.   Yes.  That I said that, and it was in reference

8    to probably the first four months I worked with John.  And

9    as I've seen him develop personality-wise, he was ready

10   for rejection.  And I felt very strongly that if John

11   sensed this is not going to go anywhere, I'm going to be

12   rejected again, I'm going to be treated negatively, he

13   wanted to back off.  And so I had on occasion -- I chose

14   to become a little bit more directive and a little bit

15   more pushy with John.  That has not been part of our

16   interactions for, I'd say, a good seven, eight months now.

17   Q.   Regarding -- we'll stay on the same page of

18   Dr. Murphy's report.

19   A.   Yes, sir.

20   Q.   Regarding the incident with Mr. Hinckley going

21   to the music studio without telling anyone, you said that

22   you gave him a warning, but he, quote, didn't necessarily

23   say I made a mistake, end quote, and wouldn't admit fault.

24          Isn't that right?  That was January of this

25   year?

1     A.   Yeah.  Yes.  Yeah.  We had a short discussion

2    about it.  I don't think John felt he was at fault.  He

3    made a misstep, and -- but I don't think he felt like he

4    did anything wrong in terms of being deceptive.  But he

5    should have done something more than what he did to alert

6    me and alert Mr. Hyde.  That was the context in which I

7    meant that statement.

8     Q.   And going forward, that's something that you see

9    as an instance of poor judgment that you would seek to

10   correct him on in the future, as you are managing --

11    A.   Yes.  Yes.  I mean, if again, we had a similar

12   type of situation where John overlooked alerting me to, or

13   requesting, alerting, whatever the right term may be, to a

14   change, yeah, we would have another discussion.  John,

15   this is -- this is the expectation of our agreement in

16   terms of how we work together.

17    Q.   Over the course of the time that you've worked

18   with Mr. Hinckley, sometimes he doesn't open up easily.

19   As time goes on I would assume it's less, but you have had

20   to periodically question him or pull things out of him; is

21   that right?

22    A.   Pull things out of him, I would not agree with

23   that terminology.  Question him, certainly, to be brought

24   up to date about events that have gone on, things in his

25   life.  As a matter of fact, we've kind of moved to a

1  converse where there are some things at time John wants to

2  converse with me about and I'd say why don't you deal with

3  that with your clinician.  I'm your case manager.  I'm

4  trying to have John understand our roles and do that,

5  because I don't want to start doing therapy with John.

6  That's not what I've been requested, hired to do.

7         So we've had a bit of a turnaround on that with

8  John sharing sometimes more than probably what I would get

9  involved in as his case manager.  And he follows up with

10 Mr. Beffa, as I find it later, because I seek information

11 from Mr. Beffa that that has transpired and a discussion

12 between them about that.

13     Q.   Mr. Levine asked you a question about the death

14 of James Brady.  Do you remember that question?

15     A.   Yes, sir.

16     Q.   And when you spoke with Mr. Hinckley, isn't it

17 also true that part of his focus and his anxiety and his

18 attention was focused on how does this impact me?

19 Specifically will I be arrested?  Will I be indicted?

20         MR. LEVINE:  Objection, Your Honor.

21         THE WITNESS:  Yes, it would.  If I was in his

22 situation, too.

23         MR. LEVINE:  Objection.

24         THE WITNESS:  Here is a gentleman who thought he

25 was moving towards being discharged from the hospital and

1    all of a sudden may be charged with a major felony.

2            And it also served --

3            THE COURT:  Mr. Levine has objected to this.

4    Mr. Levine has objected to this line of questioning.

5            THE WITNESS:  Okay.

6            MR. LEVINE:  I think it was mischaracterized by

7    the prosecutor in asking the question.  He talked about

8    his conversation with Mr. Hinckley last August when

9    Mr. Brady died.  It was much later that it was ruled a

10   homicide and it was another discussion about that.  So it

11   was the testimony that the witness gave on direct

12   examination pertaining to discussions upon Mr. Brady's

13   death.

14           THE COURT:  Well, I'm not sure what the question

15   was or whether -- is there a lack of clarity as to which

16   time frame?  Is that the problem?

17           MR. LEVINE:  Well, at least that's the problem.

18   Because the question that I asked, and which the witness

19   answered, pertained to a discussion about Mr. Brady and

20   everything pertaining to Mr. Brady at the time of his

21   death, which was, according to the witness, and I think

22   accurate, last August.

23           THE COURT:  And immediately within a week or so

24   after that, wasn't that when the Virginia medical examiner

25   ruled on the cause of death?

1          MR. LEVINE:  I don't think so.  I think it was

2     quite a bit later.

3          THE COURT:  All right.  Well, I'll let Mr. Aziz

4     try to clarify which time period and what he's asking

5     about.

6          MR. AZIZ:  Thank you, Your Honor.

7          BY MR. AZIZ:

8     Q.   Mr. Weiss, my question regarded any

9     conversations you've had with Mr. Hinckley regarding

10    Mr. Brady's death.  It wasn't just limited to what you

11    were asked on direct.  Is that what you understood the

12    question?

13    A.   Pretty much so, yes, sir.

14          The first conversation occurred the evening

15    after the news media broke it as a story.  We were to meet

16    with the Heritage Humane Society that morning on an

17    initiative I worked really hard on John's behalf to open

18    the door on.  They called and canceled that morning, and I

19    called John to alert him, it was a half hour before the

20    meeting, that we would both not be going to the Heritage

21    Humane Society for a tour and so on.

22          At that point, yes, he was concerned about what

23    this meant to him in terms of his future, which made all

24    the sense in the world to me.  He was concerned about what

25    this meant to his integration into the Williamsburg

1    community after I told him, Boom, this thing is over,

2    because of what had transpired, not Mr. Brady's death.

3    But as I recollect the news report spoke to the fact that

4    the coroner, if I've got the right title of the

5    individual, had ruled it a homicide and where that was

6    going to lead.

7            It was later on, and I don't know whether it was

8    a number of days later or a week later, I'm not sure, sir,

9    that John had the conversation with me when we were trying

10   to -- I think it was the end of that visit in August, the

11   facts that I relayed when Mr. Levine posed his question to

12   me.

13           MR. AZIZ:  Thank you, Mr. Weiss.

14           BY MR. AZIZ:

15   Q.   And staying on that issue, there have been a

16   number -- I believe a number of rejections from either

17   various organizations or from the community generally in

18   Williamsburg that Mr. Hinckley has had to weather and

19   face; is that right?

20   A.   Yes, sir.

21   Q.   And indeed you highlight, I believe it's in your

22   conversation with Dr. Patterson, that you had approached

23   some organizations that you thought accepted everyone, and

24   you noted that they accepted everyone except for John

25   Hinckley.  Do you remember mentioning that to him?

1     A.   I remember something in that line.  I don't know

2     if that's the exact same thing.  I remember saying that I

3     thought there would be a good chance that they would do

4     that.  And a number of these organizations, we were on a

5     very positive path, and then something would come up in

6     terms of someone's concerns.

7          In many of the circumstances that I can

8     recollect, it had to do with the getting to the board of

9     directors.  And sadly but honestly, a number of these

10    organizations, nonprofits, were worried that somehow if --

11    whoever their donors -- some of their donors became aware

12    that John Hinckley was volunteering there, they might stop

13    their support.  Strange, but that seemed to be the belief.

14         And so, yeah, I was surprised at a couple of

15    them.  The Arc of Greater Williamsburg, I was on their

16    board for seven years.  I was their treasurer.  I was

17    simply asking if John could volunteer on bingo night with

18    me.  I was going to be there with them.  But the anxiety

19    about John being there, even in my presence, was very

20    unexpected.  Yes, sir.

21    Q.   And what does that sort of rejection do to

22    Mr. Hinckley?

23    A.   I guess I hear your question.  I would -- if I

24    could paraphrase it more to --

25    Q.   Of course.

1       A.   -- what it did to Mr. Hinckley.  He no longer --

2  as we have gotten to know, John has handled that much

3  differently because he has supports in the community.  He

4  has people he can talk to.  But what it did to him was

5  make him retreat.  It made him, what shall I say, not

6  resistant, but less comfortable in trying on occasions.

7  But we're beyond that now.  That is not an issue that's

8  any part of our work together or my relationship,

9  professional relationship with John.

10      Q.   Do you remember when Mr. Levine was going

11 through the risk factors from Dr. Patterson's report with

12 you?  It's on page 61 of Dr. Patterson's report.

13      A.   Let me see if I can find it again.  I found 70.

14           Yes, sir.  I found it.  I've located it.

15 Uh-huh.

16      Q.   No. 9 is difficulty in relationships with

17 friends.  Do you see that?

18      A.   Yes, sir.

19      Q.   When you were answering Mr. Levine's question,

20 you had indicated that Mr. Hinckley had made progress in

21 this; is that correct?

22      A.   Yes, sir.

23      Q.   Nonetheless, it is still a risk for him in that,

24 though he had less difficulty than he may have had before,

25 he still has difficulty in it compared to other

1    individuals; is that right?

2        A.   When you say compared to what other individuals

3    could do or -- I'm not sure exactly what you mean,

4    "compared to other individuals."

5        Q.   Just it is still a source of potential risk for

6    him.

7        A.   I would not -- I would not say that, no, sir.  I

8    would say that the risk is not difficulty with

9    friendships.  The risk in my mind would be the lack of

10   friendships and connectivity which would lead to

11   isolation.  That would be the risk I would see.

12       Q.   Okay.  Definitely understood.  That was my point

13   but poorly worded.  So thank you for rewording that.

14            Now, with regards to job searching,

15   Mr. Hinckley -- or sorry.  Mr. Hinckley has been -- or the

16   idea is that Mr. Hinckley will at some point obtain paid

17   employment; is that right?

18       A.   Yes, sir.

19       Q.   And Mr. Levine was saying that access to the

20   Internet would facilitate that; is that correct?

21       A.   That's correct.  We found out, sir, that when

22   John went to the two establishments, as I recollect he

23   went to, they said, Well, you need to apply online.  And

24   that seems to be the ever more present way of applying for

25   at least those levels of applications -- I mean, those

1    types of jobs.  Food industry, maybe other areas I'm not

2    familiar.  But yes, that would be, I think, important to

3    John's ability and our team's need to pursue employment

4    for him.

5         Q.   But applying for jobs online does not require

6    completely unrestricted access to the Internet; is that

7    right?

8         A.   I would think not, yes, sir.

9         Q.   And so Mr. Hinckley doesn't need to look at

10   pornography in order to obtain a job, does he?

11        A.   No, sir.  I don't think any of us do, but that's

12   another area, yeah.

13            THE COURT:  Wait a second.

14            Go ahead.  There's an objection.

15            MR. LEVINE:  There's nothing in this record upon

16   which to predicate that question.

17            THE COURT:  Mr. Hyde's testimony.  Mr. Hyde's

18   testimony that he should have access to pornographic

19   websites.

20            MR. LEVINE:  Mr. Hyde's testimony was in

21   response to a question he should be able to look at

22   anything.  He should be able to look at this, this, this,

23   and the list included pornography.  But there's nothing in

24   this record to suggest that Mr. Hinckley does that.

25            THE COURT:  Well, Mr. Aziz is not asking whether

1    he does it.  He's trying to inquire of this witness the

2    extent to which Internet access is required to achieve the

3    goals of integration into the community and perhaps other

4    goals as well.

5           Because at some point I'm going to have to

6    decide whether to permit Internet access, to what extent

7    to permit Internet access, what restrictions to put on

8    Internet access, if there's going to be convalescent

9    leave.  Mr. Hyde's proposal, and I don't want to put words

10   in his mouth, I'm paraphrasing it, is, you know, almost

11   everything and anything is positive so long as he's open

12   about what he's doing and discusses it with his treaters.

13   And the Government, I expect, and maybe Dr. Patterson

14   doesn't share that view.

15          So the question for, on the table at the

16   moment -- there may be other questions -- for Mr. Weiss

17   who is the case manager, is, What does he need to help him

18   be successful in certain goals that probably everybody

19   agrees should be among the goals if there's to be

20   convalescent leave.

21          So I just -- I understand your point, but I

22   don't think it's well taken in this context.

23          Go ahead.

24          MR. AZIZ:  Thank you, Your Honor.  And I will

25   get to that next stage of whether it's appropriate

1    generally in a moment, but I want to go through this

2    avenue of inquiry with you, Mr. Weiss, first.

3              BY MR. AZIZ:

4         Q.   Is that okay?

5         A.   Yes, sir.

6         Q.   Does applying to jobs require Mr. Hinckley to

7    have access to websites regarding presidential

8    assassinations?

9         A.   No, sir.

10        Q.   Does Mr. Hinckley's applying to jobs require him

11   to have access to websites regarding Jodie Foster?

12        A.   No, sir.

13             (Discussion held off the record.)

14             BY MR. AZIZ:

15        Q.   Does Mr. Hinckley's applying for jobs require

16   him to have access for weapons or websites about weapons?

17        A.   No, sir.

18        Q.    Indeed does having access to any of these sites,

19   these sorts of sites or any like them, and I'm sure you

20   see where I'm going, facilitate his applications for jobs

21   in any way?

22        A.   No.  It does not.  And, again, I just want to

23   add to that I'm his case manager, not his clinician.  But

24   no, to do the type of work we need to do together, there

25   is no need for those type of websites.  Community

1    websites, social, recreational, educational, employment,

2    volunteer, yes, sir.  And to keep up with what's going on

3    in the world.  But the specific things you mentioned I

4    will reiterate, no, sir.

5        Q.   Do you think that it would be beneficial or do

6    you think it is a good idea for Mr. Hinckley to have

7    access to pornography or websites about presidential

8    assassination or Jodie Foster, weapons, anything of that

9    sort?

10       A.   I'm not his clinician.  All I can say, sir, is

11   it would not benefit the work we clinicians (video froze)

12   believe and they deal with these mental health issues in

13   terms of access to those areas.  So for our work as you

14   ask, no, it would not be necessary.

15       Q.   Okay.  You froze, but I think we got the gist of

16   what you were saying.

17       A.   Uh-huh.

18            MR. AZIZ:  One brief indulgence.

19            Thank you so much, Mr. Weiss.

20            THE WITNESS:  You're welcome.

21            MR. LEVINE:  Your Honor, we have no further

22   questions.

23            THE COURT:  Wow.

24            MR. LEVINE:  I've completely stymied the Court.

25            THE COURT:  Ms. Merene, anything you want to

1    ask?

2              MS. MERENE:  No questions.

3              THE COURT:  Mr. Weiss, I think we're done.

4              THE WITNESS:  Excellent.

5              THE COURT:  Thank you very much.

6              THE WITNESS:  You're welcome, Your Honor.

7    You're welcome.

8              THE COURT:  So you can be excused.  You can be

9    excused, Mr. Weiss.

10             (Witness excused.)

11             THE COURT:  And in terms of everybody else, I

12   guess we are done until Monday, unless anybody has

13   anything you want to say.

14             So Monday morning, 9:30 in Courtroom 29, back

15   where we started.  And as I understand it, the plan is

16   we're going to try to begin and end Dr. Murphy's testimony

17   on Monday.  Am I correct that if that doesn't happen for

18   some reason she's not available again the remainder of

19   that week?  Or do we know?

20             MR. LEVINE:  That is my understanding from my

21   conversation with her.

22             THE COURT:  So everybody should try to make

23   their best effort to begin and end with Dr. Murphy on

24   Monday, because otherwise it's going to delay the ending

25   of this hearing.  And I know it's going to be a lot of

1     effort because she's written a lengthy report.

2              And then -- what was the next thing?

3     Dr. Johnson is not available until Tuesday afternoon;

4     right?  Right.  So you-all have to figure out what we're

5     going to do with Tuesday morning, whether there's any

6     other witness on the patient side or the hospital side, or

7     whether you want to start with Dr. Patterson and then stop

8     and go to Dr. Johnson, or whether that's too truncated and

9     we just don't meet on Tuesday morning.  So we don't have

10    to decide that today, but we have to decide it.  And you

11    should talk to each other about what we can fruitfully do

12    on Tuesday morning.

13             And somebody should also -- if per chance

14    there's nothing we can fruitfully do Tuesday morning, then

15    the next question is how early Tuesday afternoon is

16    Dr. Johnson available.  Because if we didn't do anything

17    else Tuesday morning, there's nothing magic about 1:30 or

18    1:45.  Tuesday afternoon could begin at 11:30, or it

19    certainly could begin at noon if we weren't going to do

20    anything, have any other witness on Tuesday morning.

21             MS. MERENE:  Probably 1:00.

22             THE COURT:  Probably 1:00 would be a good time?

23             MS. MERENE:  Yes.

24             THE COURT:  Okay.  So then the question is, is

25    there anything we can do from there?

1          MR. LEVINE:  I can impress my preference, and

2    that is that we start with Dr. Patterson.

3          MS. KENNEDY:  Well, Your Honor, my preference is

4    that we start with Dr. Johnson and then do Dr. Patterson.

5    I don't think Dr. Patterson will be that long, won't be

6    that long, but I think we should put him on after

7    Dr. Johnson.

8          THE COURT:  I mean, that's the logical way to do

9    it, is to put Dr. Patterson on after Dr. Johnson.  So

10   unless we hear otherwise, the plan will be to start at

11   1:00 on Tuesday instead of 9:30 on Tuesday.

12         You've checked with Dr. Patterson about his

13   schedule the rest of the week?

14         MS. KENNEDY:  Oh.

15         DR. PATTERSON:  Your Honor, my time is your

16   time.

17         (Discussion held off the record.)

18         THE COURT:  So unless there's another witness

19   from the hospital or Mr. Hinckley's point of view that we

20   want to hear from on Tuesday morning, we'll not sit until

21   1:00 on Tuesday.  You'll let me know on Monday.

22         MS. KENNEDY:  Your Honor, can I just ask.  I'm

23   getting a little ahead of ourselves here, but once we

24   finish with Dr. Patterson, which I hope will be Wednesday,

25   maybe Thursday, but would you give us a day before for

1    closing argument?

2         THE COURT:  The first question will be when

3    Dr. Patterson is done, do they want to put anybody back on

4    in rebuttal?

5         MS. KENNEDY:  Oh.

6         THE COURT:  Right?

7         Barry, when you finish with Dr. Patterson, the

8    next question will be whether you want to re-call anybody

9    as sort of a brief rebuttal witness or whether not.  And

10   then we would -- and then Colleen was just asking whether

11   we can have a day between the close of all of the evidence

12   and closing arguments.

13        MR. LEVINE:  What is the Court's availability

14   next week?

15        THE COURT:  My availability next week is, though

16   I would prefer not to commit myself to this case for the

17   entire work week, I have blocked off the entire week.

18        MR. LEVINE:  I know I have a flight on Friday.

19   And I know that I have other appointments, other matters

20   Wednesday evening and Thursday evening, with clients.  But

21   I'll work it out.

22        THE COURT:  I mean, it's a problem.  Or whether

23   we take a half a day to prepare for closing arguments.  I

24   think closing arguments are useful -- but then there's

25   also, as long as we got the weekend you can think about

1    this.  There's also the question as to whether or not

2    post-hearing filings of any sort are helpful or not.

3           In the past I think we've not had post-hearing

4    briefs; we've had closing arguments.  At one of our

5    conference calls Barry suggested perhaps proposed findings

6    of fact and conclusions of law.  I don't think that makes

7    sense at this point.  It might have made sense earlier.

8           What would make sense, however, in view of the

9    testimony so far, is a sit-down to devise a proposed -- I

10   mean, assuming -- assuming I rule for the hospital in

11   whole or in part, there will be conditions.  And there's

12   been a lot of discussions about conditions and ways that

13   have refined what the hospital is saying, refined the

14   hospital's objections to the Government's stuff, refined

15   what the government was really saying, and so it is

16   probably would be a very useful exercise to try to come up

17   with a proposed order where there might be agreement on

18   75 percent of the things.  And then within particular

19   provisions, we want this bracketed language and they want

20   that bracketed language, but the general thing works.  And

21   then there are going to be a bunch of conditions that the

22   government wants and the hospital and Mr. Hinckley are

23   vehemently opposed to.  But last time it took us several

24   months going back and forth to develop an order.

25           This time I think we actually, on a vast

1    majority of the conditions, you're not that far apart.

2    And after the testimony is done, it will be even more so.

3    There were some things that came out today that I think

4    refine proposals for conditions in ways that were quite

5    useful and maybe the government has a slightly different

6    view than it did before they heard from Dr. G.G. and

7    Mr. Weiss.  Maybe Mr. Levine does; maybe the hospital

8    does.

9         If this happens in some fashion, they are the

10   people that are going to be on the ground.  And how they

11   do this in the real world is going to be important.  I

12   mean, I learned a lot from the two of them today in terms

13   of how they envision what their role is.  And I certainly

14   hope, and I'm sure -- and I know you guys have ordered a

15   daily copy of the transcripts, and Dr. Patterson wasn't

16   here this morning.  I think -- I assume you'll read

17   Dr. G.G.'s testimony because I think some of it was

18   quite -- I know you've had a conversation with her, but to

19   me it was quite enlightening and helpful and she was very

20   impressive.

21        So let's see if we can build in some time before

22   closing arguments.  But it will work easier, the more

23   efficient we are with the examination of witnesses.

24        MS. KENNEDY:  Yes, very.

25        MR. LEVINE:  I thought I did pretty well.

1          THE COURT:  When pressed.

2          MR. LEVINE:  Glad you said that.  Okay.

3          THE COURT:  And you notice the objections to

4    hearsay have -- are fewer and fewer, but the objections to

5    extreme hearsay.

6          See you Monday morning.

7          (Proceedings adjourned at 3:35 p.m.)

8                   *******************

9          CERTIFICATE OF OFFICIAL COURT REPORTER

10

11          I, Barbara DeVico, certify that the foregoing is

12   a correct transcript from the record of proceedings in the

13   above-entitled matter.

14

15

16

17

18

19   _____        4-27-15

20   SIGNATURE OF COURT REPORTER                  DATE

21

22

23

24

25