1

1          UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF COLUMBIA
2


3


4    UNITED STATES OF AMERICA,        :
                                      :
5                    Plaintiff,       :Criminal Case No. 81-306
                                      :
6    v.                               :
                                      :
7    JOHN W. HINCKLEY, JR.,           :
                                      :
8                    Defendants.      :
     --------------------------------------------------------
9              Day 4, AFTERNOON SESSION
           TRANSCRIPT OF EVIDENTIARY HEARING
10       BEFORE THE HONORABLE PAUL L. FRIEDMAN
            UNITED STATES DISTRICT JUDGE
11             Monday April 27, 2015
                 WASHINGTON, D.C.
12


13


14


15


16   Proceedings reported by machine shorthand, transcript

17   produced by computer-aided transcription.

18


19


20


21


22


23


24


25

1    APPEARANCES:

2      For the GOVERNMENT:   U.S. ATTORNEY'S OFFICE
                             BY:   COLLEEN KENNEDY, AUSA
3                                  MARK AZIZ, AUSA
                                   MICHELLE CHAMBERS
4                            555 Fourth Street, NW
                             Washington, D.C.  20530
5                            (202)514-7248

6      For the Defendant:    DICKSTEIN SHAPIRO, LLP
                             BY:   BARRY WILLIAM LEVINE, ESQ.
7                                  ANN-MARIE LUCIANO, ESQ.
                             1825 Eye Street, NW
8                            Washington, D.C.  20006-5403
                             (202)420-2237
9
                             DINSMORE & SHOHL, LLP
10                           BY: E. MICHELLE TUPPER BUTLER, ESQ.
                             101 S. Fifth Street, Suite 2500
11                           Louisville, KY   40202
                             (502) 540-2367
12

13     For St. Elizabeths:   ST. ELIZABETHS HOSPITAL
                             BY:   DEON MERENE, ESQ.
14                           1100 Alabama Avenue, SE
                             Washington, D.C.   20032
15

16

17

18

19

20

21

22

23

24

25

TABLE OF CONTENTS

EVIDENTIARY HEARING

WITNESSES

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| KATHERINE MURPHY | | 4 | 116 | |

EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---------|-------------|------|
| Government's 2 | Dr. Patterson's report | 81 |
| Government's 3 | Dr. Bega's notes | 115 |

4

1          P R O C E E D I N G S

2              MR. LEVINE:  Good afternoon, Your Honor.

3              THE COURT:  Good afternoon, everyone.

4              So you're still under oath from this morning.

5              (Witness Katherine Murphy resumes the witness

6      stand)

7              CROSS-EXAMINATION BYMS. KENNEDY

8              BY MS. KENNEDY:

9          Q.   Dr. Murphy, you've provided much more detail

10     than the hospital did in your risk assessment; correct?

11         A.   I expanded on their proposed conditions with

12     more specificity.

13         Q.   And your risk assessment was about 66 pages?

14         A.   Correct.

15         Q.   And the hospital's was substantially less;

16     correct?

17         A.   Their two filings were less than 66 pages, yes.

18         Q.   By about two-thirds?

19         A.   It was significantly less than my report.

20         Q.   When you did your report, approximately how much

21     time did you spend with the witnesses and Mr. Hinckley and

22     evaluating all of the records?

23         A.   A number of hours.

24              Do you want me to quantify that?

25         Q.   Just approximate.

1      A.    Okay.  More than 80 hours.

2      Q.    Is that about how much time you usually spend on

3  a risk assessment?

4      A.    I would say it depends, first of all.  This is a

5  risk assessment update.  Some of the comprehensive ones

6  could take longer than that, significantly longer than

7  that.  This is a bit more time than I would spend on an

8  average risk assessment update, yes.

9      Q.    Is this more time than the amount of time you

10  spent in this case a couple years ago on your risk

11  assessment?

12      A.    That's hard to quantify and compare.  It was a

13  period of three to four years that I was assessing during

14  the last risk assessment, and this was an update for a

15  two-year period.

16          THE COURT:  Was the last time, though, the first

17  time you were involved in this case?

18          THE WITNESS:  In 2011.  And then I did the

19  supplemental report in 2013.

20          THE COURT:  So in 2011 -- I'm just assuming, but

21  tell me if I'm right or wrong -- you had to really

22  familiarize yourself with 25 to 30 years of history?

23          THE WITNESS:  That is correct.  In fact, it goes

24  that Dr. Rafanello was leaving her position at the

25  hospital.  She was the one that was intended to do the

1    risk assessment.  When she left the administration,

2    conferred about it and decided that I could take on this

3    case, and I requested a bit more time to spend looking at

4    the number of records from his 30-plus-year hospital

5    course.  So it was very different, right, because it was

6    the initial time that I was involving myself in this case.

7            BY MS. KENNEDY:

8        Q.   Okay.  And in your interviews, you actually told

9    Dr. Patterson that there was a bare-bones support by the

10   hospital for this (e) petition and you wanted many more

11   specifics and more detail, particularly regarding risk

12   management factors; correct?

13       A.   Dr. Patterson asked me if I supported the

14   hospital's plan.  I told him, similar to what I wrote in

15   the report, that I support the fundamental structure of

16   the plan but that I did believe that the risk management

17   interventions needed more specificity and time frames,

18   which is common in a risk assessment process.

19           This is typical when I was a hospital employee

20   and a treatment team puts forth a proposed plan and I

21   would review it and add additional specificity to it.  The

22   same circumstance occurred in 2011; however, it occurred

23   while I was a hospital employee rather than being hired as

24   an independent contractor.

25       Q.   Okay.  But do you remember using the words with

1    Dr. Patterson, "your bare-bones support for the (e)

2    petition"?

3         A.   It could be, but I don't recall using that

4    phrase.

5         Q.   Okay.  You name all of the Williamsburg

6    providers by name in specifying how often they should see

7    Mr. Hinckley, except Elizabeth Haley, and that's the music

8    therapist; correct?

9         A.   Correct.

10        Q.   And for that, you only state that Mr. Hinckley

11   should meet with an individual music therapist once a

12   month; correct?

13        A.   That is correct.

14        Q.   And is that because Ms. Haley is phasing out,

15   and you expect another music therapist to come in, or you

16   didn't have an opportunity to talk to her?

17        A.   I didn't have an opportunity to talk to her, and

18   also a few of the core treatment team members on the

19   Williamsburg treatment team said that she's been difficult

20   to coordinate with at times.  And that was further

21   confirmed with my difficulty coordinating with her.

22             I think this is an avenue of therapy that is

23   useful for Mr. Hinckley that he derives great benefit

24   from, but I don't see it as a critical component to

25   keeping his risk low.  I think another therapist could

1   potentially take over her position, and that would be okay

2   so that the core treatment team feels that they can

3   readily access the music therapist and coordinate with

4   them.

5       Q.   Okay.  So although you don't look at a music

6   therapist as critical to the risk management phase, you

7   have indicated, both today and in your pleading as well as

8   the hospital pleading, that she is an important

9   individual, giving music support to Mr. Hinckley?

10      A.   Well, I think that he enjoys this modality, and

11  I think it's an avenue of expression.  I talked to

12  Dr. G.G. a bit about her impressions of this because she

13  is his risk assessor in Williamsburg.  She felt that it's

14  not absolutely critical that he have individual music

15  therapy from a risk management perspective; that if

16  eventually he were not to do this modality, that a

17  nonspecific -- a clinician who is not doing music therapy

18  or trained in music therapy could review his songs, and

19  the whole team could make decisions about him wanting to

20  record or making music.  But the actual treatment itself

21  isn't something that is necessary to keep him at a low

22  risk.

23      Q.   So Dr. Murphy, in your recommendations to the

24  Court, if you're going to state what specific therapies he

25  needed and how often, as you've done in your proposal, but

1    not include music therapy or music therapy could be phased

2    out over time because it was not critical to the risk

3    assessment for Mr. Hinckley?

4         A.   Well, I included it because I think that the

5    treatment providers can look at this and discuss it in

6    treatment plans of how this will look over time.  So I

7    don't think it should be taken away at this point.  But I

8    don't see it over the long term as something that is going

9    to be critical to convalescent leave.

10              THE COURT:  Critical to what?

11              THE WITNESS:  Convalescent leave.

12              BY MS. KENNEDY:

13        Q.   Now, you recommended and you discussed briefly

14   on direct that Mr. Hinckley not travel more than 30 miles

15   within the Williamsburg area; correct?

16        A.   Correct.

17        Q.   But as far as --

18        A.   I'm sorry, can I quantify that?

19             He can travel outside of 30 miles, from 30 to

20   50 miles with a treatment team provider.

21        Q.   And did you also say a family member, brother or

22   sister?

23        A.   We talked -- Mr. Levine posed, if he went to

24   Virginia Beach, outside of the 30-mile radius with a

25   family member, would that be acceptable?  And I think that

1    that's where some flexibility can be allotted; that that

2    can be okay.

3              Your Honor asked me about Richmond in

4    particular, and that's where I think it's -- as it's been

5    part of this court order that he avoid government centers

6    in Richmond, that that can continue to be implemented in

7    the current proposed plan for convalescent leave but that

8    that be relaxed over time as Mr. Hinckley shows that he is

9    adjusting to what's being proposed right now.

10        Q.   And that would include areas within the

11   Washington, D.C. area where there may be politicians

12   speaking, or the White House?

13        A.   No.  This hasn't been a part of his stipulations

14   and his court order.  It's always been that he will avoid

15   government centers in Richmond.

16        Q.   If the order indicated he should avoid

17   government centers, specifying exactly what places -- the

18   White House, the  -- is that something that you would

19   agree with or not?

20        A.   No.  I don't think that -- he's resided in

21   Washington, D.C. for decades and gone on city outings in

22   the local surrounding area to the Smithsonian.  I don't

23   know why at this stage that would be included in the

24   recommendation.

25              THE COURT:  But he's with hospital personnel

1    when he's done that; right?

2              THE WITNESS:  Correct.

3              And what I'm recommending is when he's traveling

4    outside of the 50-mile radius to come to Washington, D.C.

5    to go to the outpatient department, that he's going to the

6    outpatient department, and he's going to see Dr. Binks

7    during Part A, and then he's returning home.

8              BY MS. KENNEDY:

9        Q.   And he's alone, driving?

10       A.   Yes.  And he's unaccompanied while driving.

11       Q.   And if he's unaccompanied while driving, no one

12   knows where he goes other than if he shows up for the

13   outpatient; correct?

14       A.   Well, he's going to be reporting to Dr. Johnson

15   as well as his treatment team when he's going to

16   Washington, D.C., so they will know an informal itinerary

17   of his trip to Washington, D.C.

18              What I recommend is that Dr. Johnson -- or I

19   know Mr. Weiss may be offering to do these summaries as

20   well -- is that Dr. Johnson includes in her summary the

21   day, an informal itinerary, the day that he's coming to

22   Washington, D.C., the time frame.

23              When he gets to Washington, D.C., I'm

24   recommending that he call Mr. Weiss to confirm that he

25   arrived.

1          When he gets back to Williamsburg, I'm

2    recommending that he call Dr. Johnson to confirm that he

3    arrived in Williamsburg.

4          THE COURT:  Is that in your written report?

5          THE WITNESS:  It is.

6          THE COURT:  And presumably -- and you're sure in

7    Williamsburg that he would come back to see Dr. Johnson?

8          THE WITNESS:  Correct.

9          THE COURT:  And presumably, in order to

10   determine a specific day, he's going to have to know of

11   her availability; right?

12         THE WITNESS:  That's right.

13         THE COURT:  So she's going to know what day he's

14   supposed to be here.

15         And under your proposal, does she know what time

16   or what approximate time of day he's leaving Williamsburg

17   or what approximate time he will be arriving at her

18   office?

19         THE WITNESS:  Right.  She will.

20         And this is what I'm suggesting she put in those

21   monthly summaries ahead of time.  And that could be -- I

22   would advise against it being rigid, though.  If he were

23   to leave at 10:00 instead of, say, 9:00 in the morning,

24   10 a.m. instead of 9 a.m., that that would be okay; that

25   there is a general working plan of what he's doing and

1   that treatment providers are expecting him to show up at

2   specified places.

3             THE COURT:  And what about when he returns to

4   Williamsburg?  Is Mr. Weiss supposed to know approximately

5   what time he's going to be arriving back in Williamsburg?

6             THE WITNESS:  Well, I'm recommending that he

7   contact Dr. Johnson to say he arrived in Williamsburg.  I

8   suppose Mr. Weiss could be contacted as well and not --

9   but my recommendation is around a specific person knowing

10  that he arrived and not being confirmed.  And since

11  Dr. Johnson is sort of, as I put it, the gatekeeper of

12  this, that she would be the person to confirm that he's

13  returned to the community.

14            BY MS. KENNEDY:

15       Q.   But my question to you, Dr. Murphy, is:  No one

16  is going to know if leaving D.C. or coming from

17  Williamsburg, regardless of who he tells or what time he's

18  supposed to arrive, if he takes a detour to the

19  White House or takes a detour to the Capitol or some other

20  place that, at a particular time, is something the

21  Secret Service does not want him to go near?

22       A.   And this is just in the way that when he

23  exercises his unaccompanied time now, there is a similar

24  plan that he's not being followed; right?  That when he's

25  using his unaccompanied time, that he's not --

1    Q.   He's not driving from Williamsburg at this

2  particular point in time alone.  He's being either picked

3  up by a driver and driven back, and when he goes into the

4  community with staff, they are with him?

5    A.   Right.  This is the recommendation being made to

6  expand that he can drive to and from Williamsburg without

7  anyone accompanying him in the car, and that's because

8  he's done well with his unaccompanied time in

9  Williamsburg.  This is the next incremental increase in

10  freedom.  But he's shown responsibility in being able to

11  do that and now can do that, coming to and from

12  Washington, D.C., with it being reported to the Court by

13  Dr. Johnson.

14    Q.   So based on what you know of what's happened in

15  Williamsburg, you do not see a problem with him driving to

16  Washington, D.C.

17          If he detours at all, that's okay?

18    A.   I don't see a problem with him driving to and

19  from Washington, D.C.  I don't see any evidence to suggest

20  that he will detour.  He's followed these itineraries.  He

21  hasn't detoured before.  So why would I conclude that he

22  would detour on this now?

23    Q.   Well, let me ask you, Dr. Murphy:  You didn't

24  know Mr. Hinckley prior to him attempting to assassinate

25  the president, did you?

1    A.    I did not.

2    Q.    So in reading the records of his time up until

3    that point where he attempted to assassinate the

4    president, no one knew he was going to assassinate the

5    president, did they?

6    A.    No.   There was not -- to my knowledge, there was

7    no report from Mr. Hinckley that he was intending on doing

8    this.

9    Q.    Now, in the MMPI-2 test -- and again, MMPI is

10   the Multiphasic Minnesota Personality Inventory?

11   A.    Minnesota Multiphasic Personality Inventory,

12   second edition.

13   Q.    All right.   And you indicate in your report that

14   "Mr. Hinckley's defensivenesses and reluctance to disclose

15   psychological distress and problems relating to others."

16          Do you recall that?

17   A.    Can you reference --

18   Q.    Yes.   It's on page 49 of your report.

19   A.    Sure.

20   Q.    I'll tell you what paragraph as soon as I get to

21   it.   All right.   The Court's indulgence.

22          Under test results, where it states, "Minnesota

23   Multiphasic Personality Inventory."

24   A.    Yes.

25   Q.    "The results of the MMPI-2 again reveals

1    Mr. Hinckley's defensiveness and reluctance to disclose

2    psychological distress and problems relating to others";

3    correct?

4         A.   Yes.  Correct.

5         Q.   And that "His character structure gives an

6    outward appearance of adequacy by denying potential

7    shortcomings."

8         A.   You left out one short segment.

9         Q.   Right.  That "the prevailing need to maintain an

10   outward appearance of adequacy by denying potential

11   shortcomings"?

12        A.   That's correct.

13        Q.   And you actually spoke about that on direct

14   exam, that he wants to give the appearance that everything

15   is fine; that he's good.  Correct?

16        A.   Yes.  And I explained that this is a part of

17   Mr. Hinckley's personality, that he tends to want to put

18   forth a positive image of himself.  He wants to see

19   himself as positive.  He believes others have his best

20   interest in mind, sometimes to a naive degree, and this is

21   evidenced by a moderate elevation on the K scale.

22        Q.   And this is part of his personality disorder?

23        A.   No.  This is -- there is overlap in that there's

24   areas of wanting to see himself as a good, solid

25   individual.  But I would not in any way say that this has

1  to do with grandiosity or needing to see himself in a

2  superior way.  That's a very different thing.

3  Q.  So the defensiveness and reluctance to disclose

4  psychological distress is not part of his narcissistic

5  personality disorder?  Not directly, no.  And you found

6  that the HCR-20 testing -- and again, the HCR, is that the

7  Hare Psychopathy Checklist, or is that the --

8  A.  The Psychopathy Checklist --

9  Q.  That is 20.  That is a test that has 20

10  questions; correct?

11  A.  There's 20 items that you're rating an

12  individual on.

13  Q.  And they have to answer yes or no?

14  A.  No.  There is -- you can rate the person's --

15  you can rate these items based off of a records review.

16  However, typically what's done is there's an interview, a

17  PCL-R interview, which is several questions, an extensive

18  interview.  You're asking about the person's background,

19  their substance abuse issues, if there's any, mental

20  health history, family history, history of antisocial

21  behaviors.  It's an extensive interview that multiple

22  assessors have done with Mr. Hinckley over the years.

23  Q.  And there are ten items that are historical; is

24  that correct?

25  A.  No.  So --

1           THE COURT:  Which test are we talking about?

2           MS. KENNEDY:  It's called the HCR-20.

3           THE WITNESS:  Okay.  So I was responding to the

4    PCL-R.

5           THE COURT:  Okay.  She's asking about the

6    HCR-20.

7           MS. KENNEDY:  I'm asking about the HCR.

8           THE WITNESS:  Okay.  You had said "PCL-R."

9           THE COURT:  Where in your report is the HCR-20

10   discussed?

11          THE WITNESS:  It is at the end of my violence

12   risk analysis.  Perhaps --

13          MS. KENNEDY:  Fifty-seven, Your Honor.

14          THE WITNESS:  Fifty-four is where it starts.

15          THE COURT:  Beginning on 54?

16          MS. KENNEDY:  Starts.

17          THE WITNESS:  Perhaps the confusion was that in

18   the old HCR-20, PCL-R score was one factor in the

19   historical demain of the HCR-20.

20          So to go back and answer your question about

21   whether it's yes or no for the HCR-20, no.  This is

22   something that includes a records review, collateral

23   contacts, a clinical interview.  And sometimes testing is

24   incorporated into the person's clinical status factors.

25

1          BY MS. KENNEDY:

2      Q.   So it's basically an interview?

3      A.   No.  It's a records review.  It is -- it

4  includes an interview.

5          Of course, for clinical factors about a person's

6  lack of insight, violent ideation, you need an interview

7  for those.  However, the HCR-20 relies on multiple sources

8  for coding these factors.

9      Q.   And it indicates that the domains of the

10  HCR-20 -- this is on page 54, second paragraph, last

11  line -- are the historical, clinical, and risk management

12  scales; correct?

13      A.   Correct.

14      Q.   And is there a total score on this test that an

15  individual gets?

16      A.   No.  On the previous versions of the HCR-20,

17  there was a coding sheet that you could assign numerical

18  values.  However, the authors of this test admonished

19  against using quantitative values on the HCR-20 and really

20  only included these numerical values for research purposes

21  when they were trying to understand the test's predictive

22  accuracy in predicting violence.

23          So on the third version of the test, the test

24  that I used in the current assessment, there is no

25  numerical value.  What you're looking at is, is this

1   factor present, and is it relevant right now?

2       Q.   So if you don't get an overall score, how do you

3   rate this test?

4       A.   Well, you walk through each of the risk factors,

5   the 20 risk factors, and you look at those risk factors

6   that are most relevant; what were most relevant

7   historically at the time of the offense.  Are there any

8   residual risk factors now clinically that could

9   potentially make this person an increased risk of

10  violence?  And then you look into the future plans based

11  off of the context of the plan being proposed.

12      So it's dynamic in that way that it doesn't

13  pigeonhole the assessor into coming up with a very kind of

14  crude quantitative value for risk.

15      Q.   So it doesn't really give you a value for risk

16  at all, then, does it?

17      A.   Oh, it gives a great value for risk.

18      Q.   Let me just ask --

19      A.   It's a wide --

20      MR. LEVINE:  Objection.  She's answering the

21  question.

22      THE COURT:  Does it give you --

23      THE WITNESS:  This is a widely used test,

24  translated into, I think, at least 50 languages and is

25  used on every continent except for Antarctica.  So I say

1   that to say that this is something that has been used

2   invaluably --

3             THE COURT:   That's not the question.   The

4   question was --

5             BY MS. KENNEDY:

6       Q.   The question was that you don't have any score

7   on this test, so it doesn't measure risk; it doesn't

8   measure anything.

9       A.   No, it does -- it guides the assessor to

10  understanding what are the risk factors that need to be

11  addressed moving forward when making risk management

12  plans.

13      Q.   So do you get -- is there -- after you look at

14  one of the factors, do you get a point or something for

15  that, or a rating?

16      A.   No.   What you get is, you code whether or not it

17  was present or has been present during episodes of

18  violence, and then you look at if it's relevant right now,

19  currently.

20            THE COURT:   How do you look at that?

21            THE WITNESS:   So, for example, if a person has

22  committed violence primarily when intoxicated, this is on

23  the historical domain of the HCR-20.   That's a risk factor

24  that was present at the time of the offense or multiple

25  episodes of violence.

1      You want to look at over their hospital course

2 or outpatient treatment, depending on context, have they

3 gotten treatment for substance abuse?  How many relapses

4 have there been?

5      I'll qualify all this by saying this is not the

6 issue with Mr. Hinckley.  He has no history of substance

7 abuse problems.

8      But if the person has had multiple relapses

9 or -- versus if the person has been clean and sober,

10 participated in AA or NA for many, many years, then my

11 risk management recommendations will be very different

12 than if they've been actively using in the recent past.

13      BY MS. KENNEDY:

14    Q.   Now, Dr. Murphy, we haven't had any substance

15 abuse issues with Mr. Hinckley.

16      We've had extreme violence for Mr. Hinckley;

17 correct?

18    A.   Mr. Hinckley has had one episode of severe

19 violence.

20    Q.   Yes.  Resulting in the shooting of four

21 individuals; correct?

22    A.   That is correct.

23    Q.   And in your clinical scale here on page 56,

24 third paragraph, it includes part of the HCR-20 of

25 "insight with mental disorder" as one of the factors;

1   correct?

2       A.   Right.

3       Q.   And he has shown in the past limited insight;

4   correct?

5       A.   Well, this is in the time precipitating his

6   offense.  Now, 34 years later, he's made significant gains

7   in this area.  He takes his medication as prescribed.  He

8   attends his therapies as suggested.

9       Q.   How about --

10      A.   At the time of the offense, I don't think -- his

11  family knew something was not right with Mr. Hinckley.

12  They reached out to a few clinicians for support.  But I

13  don't think anybody really understood what was going on at

14  that time in the way that they do now.

15      Q.   Well, in fact, he wasn't even with his family

16  for a substantial period of time at the time he attempted

17  to assassinate President Reagan, was he?

18      A.   He would intermittently see them in the time

19  for -- a period of time he stayed with Diane.  He returned

20  to his parents' home a few times.  But, yes, he was not --

21  he was not with his family; however, they were very

22  concerned at one point and considered inpatient

23  hospitalization.

24      Q.   Would you say that as far as insight into his

25  mental disorder, he was showing insight a couple years ago

1    when he was supposed to go to the movie and instead went

2    to the bookstores and stood in front of a shelf of books

3    regarding presidential assassinations?

4        A.   Well, I don't directly link that to insight with

5    mental disorder.  I think that that was -- when he lied

6    about going to the movies, that was poor judgment; that he

7    felt pressed to want to say to treatment providers and

8    evaluators that he had followed his itineraries.  And in

9    that circumstance, that's why he lied about it.  But I

10   don't think that then translates to he wasn't aware that

11   he had a mental illness that's now in remission.

12       Q.   So you don't think it showed poor insight on his

13   part?

14       A.   I think it showed poor judgment into his

15   behavior.

16       Q.   Okay.  Then also --

17           THE COURT:  Doesn't it also show certain indicia

18   of one or more of his mental illnesses, and I think

19   primarily, if I'm correct, narcissism, deception,

20   manipulation, entitlement, wanting to do what I want to

21   do?  Aren't those characteristics of narcissistic

22   personality disorder sometimes in some people?

23           THE WITNESS:  Right.  I think the issue of

24   deception is there with this, obviously.  But extending

25   that to narcissism, when I look at this in the framework

1    of the HCR-20, what I look at is the fifth risk factor of

2    "appreciation for need for treatment" or, I should say,

3    "insight into appreciation for need for treatment and

4    insight."

5              Now, Mr. Hinckley, 99 percent of the time, has

6    full appreciation for his need for treatment and

7    supervision.  But in this instance, that's the 1 percent

8    that his insight into need for supervision and how

9    critical it was that he follow these itineraries, that

10   that became an issue.

11             If we're to relate it to narcissism that it

12   was -- that he didn't -- it was hard for him to say No, I

13   didn't do this.

14             And in that way, yes, but I think it's more

15   complicated than just saying that he doesn't have insight

16   into his narcissism or other mental illnesses, and that's

17   why he did this.

18             THE COURT:  But let me -- and I hate to

19   interrupt the flow here.

20             MS. KENNEDY:  No, no, that's fine, Your Honor.

21             THE COURT:  But the other issue, not necessarily

22   relating to danger that you're focusing on in your overall

23   proposal is:  How do you manage the risk; right?

24             THE WITNESS:  Uh-huh.

25             THE COURT:  And in the conditional releases that

1    he's been on, a large part of it was based on his own

2    self-reporting.  And if the treaters in the hospital and

3    in Williamsburg couldn't rely on his self-reporting, it

4    made it harder -- the honesty of the self-reporting -- it

5    made it harder to monitor him and to -- to monitor him?

6              THE WITNESS:  Right.  And I think from what I

7    gather from my interviews, he's learned his lesson from

8    this, A.

9              B -- and as I said during the last rounds of

10   hearings or the 2011 hearings -- they are all kind of,

11   yeah -- is that it didn't immediately put him at a risk of

12   violence.  It was a concern.  It was a treatment issue

13   that needed to be addressed, and it was addressed, and

14   there was some sanctions put on him too.  He shortened one

15   of his visits.  He didn't have unaccompanied time for a

16   few visits thereafter.  And I think that was appropriate.

17             But I don't think that this represents a large

18   concern that deception is present and prevailing in the

19   way that it was 30-plus years ago.

20             BY MS. KENNEDY:

21        Q.   Now, you just stated in response to the judge's

22   questions that as far as the insight regarding the movies

23   and the bookstore that he wasn't following, and did you

24   say the needed itineraries, or the specific itineraries at

25   that point?

1    A.   When he went to the movie -- didn't go to the

2   movies but said that he did?

3    Q.   Yes.

4    A.   At that point, the itineraries had been part of

5   the court order.  The team had made it crystal clear as,

6   You're getting more increases in freedom.  This is what

7   you need to do:  You needed to follow this itinerary.

8        In this instance, he didn't.

9    Q.   So in that particular point, you thought the

10   itinerary was very important for Mr. Hinckley?

11   A.   Well, I think that's when we were gathering data

12   about how he would deal with the increased freedom, so I

13   do think at that point it was important.

14   Q.   Okay.  And yet at this point, if this Court were

15   going to allow convalescent leave when Mr. Hinckley can

16   live in Williamsburg and, based on no itinerary at all, do

17   pretty much what he would like, you don't think that an

18   itinerary is important?

19   A.   I don't think right now it's necessary as a risk

20   management need.  As I said, I think he's shown over the

21   course of these expansions and his conditional release,

22   following itineraries was recommended to look at how he

23   would adjust.

24        He followed his itineraries.  We have all the

25   data of him following his itineraries to a T, with

 1    attention to these instances that he did not.  So these

 2    two things have to be held together.

 3            And ultimately, Mr. Hinckley has been

 4    responsible in following his itineraries and was

 5    subsequently responsible when he got the expansion to

 6    17 days, he was reporting -- with the except of

 7    John Tracey -- he was reporting every change in his

 8    routine and schedule to Mr. Hyde.  Mr. Hyde was

 9    documenting and sending this to the Court.

10            So he was -- I would characterize this as a

11    fairly diligent approach.

12    Q.   And Dr. Murphy, has it occurred to you that part

13    of the reason Mr. Hinckley has done so well is that he has

14    itineraries and he follows the rules and he wants the

15    schedule and he wants to do it right?

16    A.   Well, I think he is motivated and wants to

17    follow the recommendations of his treatment providers and

18    collaborate with his treatment providers.  And this was a

19    recommendation from years ago when he was first getting

20    expansions in this conditional release to be in

21    Williamsburg.  This was their recommendation.  And so he

22    wanted to follow their recommendation.

23            I don't think Mr. Hinckley wants to, at this

24    point, continue following the itineraries, if that's your

25    question.

1      Q.  Has he told you he doesn't want to follow any

2  more itineraries?

3      A.  He said something to the effect of it's hard to

4  live by these detailed itineraries.

5      Q.  And is that why you've recommended that he no

6  longer follow them?

7      A.  No.

8      Q.  And have you -- you testified that in following

9  the treatment providers that are provided for

10  Mr. Hinckley, that it remains essential that the treatment

11  providers continue to corroborate Mr. Hinckley's reports

12  so that any discrepancies can promptly be addressed and

13  resolved?

14      A.  Where are you?

15      Q.  That is page 58.

16      A.  I said something to this effect, but I just

17  wanted to --

18      Q.  Again, that's page 58, and that would be the

19  last paragraph, midway down where it starts with

20  "Nevertheless, it remains essential that treatment

21  providers continue to corroborate Mr. Hinckley's reports

22  so that any discrepancies can be promptly addressed and

23  resolved."

24         Have you found that yet?

25      A.  Yes, that's right.

1     Q.   Okay.  And that's important for Mr. Hinckley

2  because once again, Mr. Hinckley wants to succeed, but he

3  wants to know the rules, and he wants to follow the rules.

4          Is that fair to say?  Are you aware of that with

5  him?

6     A.   Mr. Hinckley does well when his expectations are

7  clearly communicated to him, but that's -- but that's

8  uncommon.  A highly institutionalized patient coming out

9  of the hospital into the community that they have had

10  somewhat of a disconnection from for many years, they want

11  to be clear:  What is it that I can and cannot do?

12          But I don't think that means that he feels that

13  he needs these itineraries in place right now.  I think

14  he's had lots of practice in the community with what is

15  and what is not expected of him.

16          THE COURT:  Let me ask -- you go ahead.

17          BY MS. KENNEDY:

18     Q.   I was going to say he's never had any practice

19  on convalescent leave, has he?

20     A.   Not on full convalescent leave, no.

21          MS. KENNEDY:  Go ahead, Your Honor.

22          THE COURT:  So expectations and convalescent

23  leave would be things like you're supposed to show up for

24  your volunteer work at Eastern State on these days at

25  these times; you're supposed to show up at the church on

1    this day at this time.  If he gets a job, you're supposed

2    to be at work on these days and these times.  You're

3    supposed to meet with these treaters on these days and

4    these times; right?

5                THE WITNESS:  Correct.

6                THE COURT:  Is Mr. Weiss supposed to be in

7    contact with the supervisors at the volunteer jobs and the

8    employer, if there's an employer?

9                THE WITNESS:  Yes, he is.  This is what I'm

10   recommending one of his roles be.

11               THE COURT:  So I don't want to put words in your

12   mouth any more than I want Mr. Levine to put words in your

13   mouth, but wouldn't those be a communication of the -- a

14   clear communication of what's expected from him on those

15   days and times that he's supposed to be at work at a

16   volunteer job or meeting one of his treaters?

17               THE WITNESS:  Right.

18               THE COURT:  And if he weren't there, Weiss would

19   know about it?

20               THE WITNESS:  Right.

21               THE COURT:  Even though there weren't

22   itineraries?

23               THE WITNESS:  Yes.  Mr. Weiss would be informed

24   if there was a change in schedule; that Mr. Hinckley would

25   be communicating with Mr. Weiss about those things.

1          THE COURT:  But what's missing is the

2    limitations on what he can do in his free time, when he

3    can go to the Starbucks or the movies or whatever.

4          That would be left to his discretion?

5          THE WITNESS:  That would.  And this is the

6    recommendation of convalescent leave.  This is the push to

7    convalescent leave is that in terms of those leisure

8    activities, that he would be allowed to do those without

9    having to first report them:  Going to a coffee shop,

10   going to eat at a chain.

11         There was one time when his family was coming

12   back from the airport and they wanted to stop for food,

13   but they couldn't stop because it wasn't on the itinerary.

14         In these instances, I think there should be more

15   leeway.

16         BY MS. KENNEDY:

17   Q.    Thank you.

18         How many outpatient patients do you see?

19   A.    Now?  Since I left the hospital, I see

20   approximately 30.

21   Q.    And are any of them potential presidential

22   assassins?

23   A.    No.

24   Q.    Is Mr. Hinckley the only individual who you're

25   seeing who was found not guilty by reason of insanity of

1  attempted assassination of the president?

2      A.   I don't treat him, so I don't see him in the

3  context you're talking about; but, right.  My other risk

4  assessments were not on a presidential assassin -- or

5  attempted presidential assassin.

6      Q.   You indicated on direct examination that in

7  Mr. Hinckley's case, you would be against having an ankle

8  bracelet; correct?

9      A.   That is correct.

10      Q.   And you'd be against having a GPS phone that he

11  would have with him at all times; correct?

12      A.   I recommended that he have a GPS phone at all

13  times.

14      Q.   And the car, are you against there being any

15  type of device on the car to keep track of where he's

16  going?

17      A.   Right.  I don't support this recommendation

18  either.  My recommendations did not change after the

19  government filed their response suggesting these more

20  intense risk management interventions.  They stayed the

21  same as they were when I did the risk assessment.

22      Q.   That's fine.  Just asking.

23           And as far as the Internet, you indicated that

24  there should be no limitations on the Internet for

25  Mr. Hinckley; correct?

1    A.   No.  That's not true.  I agreed with the

2   hospital's recommendation that Mr. Hinckley report his

3   account information, any online accounts, to the

4   outpatient department and the account details.  And then

5   Dr. Johnson could periodically review the details of his

6   activity on these accounts.

7    Q.   So with that caveat, do you believe Mr. Hinckley

8   should have access to pornography?

9    A.   I don't think that is a risk management

10  recommendation that I would make right now, that he should

11  be prohibited from looking at pornography, because looking

12  at pornography does not elevate his violence risk.  This

13  might be different in a sex offender evaluation, but in

14  the case of Mr. Hinckley, this is not a risk-relevant

15  need.

16   Q.   How would you know, Dr. Murphy, if he's not had

17  access to it for the last 33 years in the hospital or on

18  the Internet?

19   A.   How would I know?  I'm sorry, how would I know

20  what?

21   Q.   That it wasn't a risk factor of looking at

22  pornography.

23        How would you know?

24   A.   Well, I mean, there could have been times that

25  he -- what if he was deceptive and went on the Internet

1   and looked at it?  But there's been no history that he has

2   stepped outside of his court order to do any of those

3   things.

4        Q.   But Dr. Murphy, the only way the hospital would

5   know is if Mr. Hinckley told them.  There's no monitor on

6   the Internet; correct?

7        A.   I'm sorry.  Say that again.

8             Are you saying in the recommendation moving

9   forward --

10       Q.   No.  In the prior order, this coming order,

11  there's nothing limiting --

12            THE COURT:  In the prior orders, weren't there

13  limits on the sites he could visit?

14            THE WITNESS:  Yes.

15            THE COURT:  Very precise limitations?

16            MS. KENNEDY:  I'm sorry, Your Honor.  I step

17  back on that.

18            BY MS. KENNEDY:

19       Q.   My question on that is:  How would you know if

20  he violated any of that in the prior order or in what

21  you're proposing now, other than from his own

22  self-reporting?

23       A.   There's been -- but there has been no evidence

24  he's violated that.  He's had a log-in at the computer.

25  Mr. Hyde checked that there is nothing in there to suggest

1    that he's looked at anything untoward or that would

2    somehow increase his risk of violence.

3         Q.   Are you talking about Mr. Hyde looking at the

4    computer at the hospital?

5         A.   Yes.  His library.

6         Q.   Right.  Not his own computer?

7         A.   That's right.

8         Q.   All right.

9         THE COURT:  What's the monitor -- what

10   mechanism, if any, has been on his home computer use other

11   than his mother?

12        MS. KENNEDY:  That's it.

13        THE WITNESS:  Right.  It's under the constant

14   supervision of his mother.  He has been required to have a

15   preapproved list of sites.

16        BY MS. KENNEDY:

17        Q.   All right.  Again, with having total access to

18   the Internet, do you believe that he should have access to

19   sites on presidential assassinations?

20        A.   Well, I understand this point here, and I

21   understand this line of thinking about all of the what-ifs

22   of what Mr. Hinckley can do.  And all of these what-ifs

23   are present, again, with the insanity acquitees at the

24   hospital.

25        In my experience, no other insanity acquitees

1    have this form of restriction placed on their Internet.

2    There's --

3        Q.   Is there any other individual you've treated

4    that has been charged with assassination of the president?

5            MR. LEVINE:  Objection, Your Honor.  I think the

6    witness was in the middle of an answer when she cut him

7    off to ask him a question.

8            THE COURT:  Is there anything more you were

9    about to say before Ms. Kennedy asks the next question?

10           THE WITNESS:  So patients are often using the

11   Internet at the hospital in computer groups, or sometimes

12   they have leisure time where they are escorted by an RA to

13   the computer labs to be on the Internet to look at various

14   things of interest.  Mr. Hinckley's crime was not

15   committed using the Internet.

16           THE COURT:  Well, but the reason, who was using

17   the Internet 33 years ago?

18           BY MS. KENNEDY:

19       Q.   Right.

20       A.   And I understand that, but also, since the

21   Internet has come to be, he has not had instances of using

22   it inappropriately, with the exception of the dental

23   resident when he used it on a work shift to look at the

24   pictures.

25       Q.   And again, Dr. Murphy, that's based on the fact

38

1   that Mr. Hinckley hasn't told anyone?

2       A.   Right.

3       Q.   Right?

4       A.   Yes.  Correct.

5       Q.   So the -- as far as pornography, presidential

6   assassination, I assume your answer is the same for

7   attempting to buy an AK-47?

8       A.   Well, if he were to purchase anything online,

9   Dr. Johnson would have access to his accounts to see that

10  information.

11      Q.   Not necessarily if she just has the password or

12  user name; correct?

13      A.   Well, if he needed to purchase something online,

14  you have to put it -- you have to sign into an account to

15  use that, to use your credit card to purchase something

16  online.  So she would have access to that.

17      Q.   But if you wouldn't have access to what it is he

18  was going to be able to buy on the Internet, would your

19  position be that they should have access to that?

20      A.   Well, Mr. Hinckley has not shown any interest in

21  accessing weapons.  So you're talking about a what-if that

22  is outside the realm of any evidence that we've had in

23  looking at his adjustment to freedom.

24      Q.   But Dr. Murphy, we're looking outside the realm

25  of possibility here when he attempted to assassinate the

1    president.

2          No one expected that to happen; correct?

3    A.    There was also not 34 years of data to look at

4    his mental illness, personality characteristics, behavior.

5    He's been closely studied and scrutinized for 34 years in

6    a way that he was not at the time of the offense.  So I

7    don't think those things are comparable.

8    Q.    Now, now he's not going to be as closely

9    scrutinized and looked at because he's going to be living

10   on convalescent leave in Williamsburg; correct?

11   A.    There will be a step-down in the degree of

12   scrutiny, yes, and that's being recommended.  And all of

13   his treatment providers believe he's ready for this right

14   now and that there's no reason to believe that he would be

15   at an increased risk.

16         He's got several risk management interventions

17   in place to monitor his adjustment.  I think that the

18   Internet restrictions being proposed by the government are

19   over the top and intrusive to what Mr. Hinckley's current

20   status is.  He has -- common times that this becomes an

21   area of risk management is when I've done a sex offender

22   evaluation on somebody who has an offense, say child

23   pornography, and has made contact with minors through the

24   computer.  That's the type of offense that this form of

25   intervention is appropriate for.

1      Q.   I'm going to ask you the same question I asked

2  Mr. Hyde a couple days ago when he was testifying for an

3  extensive period of time regarding the treatment for

4  Mr. Hinckley and the proposal.

5           And it was like, Mr. Hyde, it seems that you are

6  minimizing Mr. Hinckley's actions in the past, recent

7  past, prior past, and that in looking at all of his

8  individual mental health issues of isolation and lack of

9  insight and narcissism that not as much emphasis is placed

10  on that by you; correct?

11     A.   Is that your clinical opinion?

12     Q.   That's my question to you.

13     A.   I do not believe I'm minimizing at all.  I think

14  I've spent a lot of time and energy considering all of the

15  relevant risk factors in Mr. Hinckley's case, his status,

16  his current status, his past status, past risk

17  assessments.  I think if I were minimizing these issues, I

18  probably would have said in my report, Okay, the

19  hospital's plan is fine; let's move forward.

20           But I didn't.  I used my own analysis and added

21  to bolster that plan.

22     Q.   And indicated that he should go on convalescent

23  leave with basically no limitations other than people who

24  are watching him, but no other --

25     A.   I would not characterize it as "no limitations."

1        Q.    Okay.

2        A.    That's a stretch.

3        Q.    Now, you indicated that Mr. Hinckley's treatment

4   intervention should remain in place, yet should not be

5   solely relied upon as the primary mechanism for

6   monitoring; is that correct?

7        A.    Yes.   Where are you?

8        Q.    Page 58 --

9        A.    Okay.

10       Q.    -- and that would be, it looks like, the last

11  paragraph.

12            THE COURT:   Last sentence, actually, isn't it?

13            MS. KENNEDY:   Yes, Your Honor.

14            THE WITNESS:   Yes.   Mr. Hinckley's treatment

15  intervention should remain in place.

16            THE COURT:   What does "treatment intervention"

17  mean?

18            THE WITNESS:   Group psychotherapy, individual

19  psychotherapy, the NAMI meetings, and during Part A seeing

20  Dr. Binks.   I want to make sure I have all of them.   So

21  those things.

22            THE COURT:   Is NAMI -- is that -- it's not like

23  group therapy, but it sort of is?

24            THE WITNESS:   It is a bit different.   So group

25  psychotherapy in the context that Mr. Hinckley is

1    participating with Mr. Beffa, it's much more looking at

2    the relationship patterns that happen in the group,

3    patients giving feedback to each other about different

4    life decisions, existential issues, losses, grief, those

5    types of topics.

6            NAMI is a bit different.  Sometimes it includes

7    more of a psychoeducational approach.  It's more of a way

8    for patients to come together, individuals with mental

9    health issues to come together and socialize and connect

10   around being diagnosed with a mental illness to sort of

11   serve as a destigmatization from having mental illness.

12   So it is different, but I believe it's therapeutic.

13           BY MS. KENNEDY:

14       Q.   And by "interventions," that would not include

15   an itinerary, would it?

16       A.   I'm sorry?  Say that again.

17       Q.   I said, by "interventions" that's mentioned in

18   this quote, that would not include an itinerary, would it?

19       A.   No.

20       Q.   Okay.  Now, you told Dr. Patterson that

21   Mr. Hinckley would not be engaging in high-risk activities

22   if there was appropriate monitoring.

23           Do you remember that?

24       A.   Well, I don't have a crystal ball, and I can't

25   say definitively he will never do anything, but that's

1    with any risk assessment.  I said he needs an appropriate

2    level of monitoring, which is exactly what I recommended.

3        Q.   And again, that monitoring being with the

4    individuals who are down there in Williamsburg?

5        A.   Well, and OPD and Dr. Johnson reporting to the

6    Court, all of these things together, not just the

7    Williamsburg treatment providers.

8        Q.   So we're looking at the treatment team as the

9    individuals who will be the appropriate monitoring here;

10   correct?

11       A.   Well, they are one component of it, and that's

12   one function that treatment-planning conferences serve

13   with forensic patients.  But it's also extended to case

14   management as well as treatment objectives.

15            But corroborating between each other, talking

16   about risk factors, and having a formal forum for the

17   treatment providers to do this is what I'm recommending.

18            But I don't think that that is the only avenue

19   of monitoring by any means.

20       Q.   In the past, at this past hearing that we had

21   before the Court in 2013, I don't know if you recall, but

22   you indicated that this case is unique; this is a unique

23   case with Mr. Hinckley?

24       A.   I maintain that.

25       Q.   Okay.  And as part of monitoring, you recommend

1    that Mr. Hinckley contact both Mr. Weiss and Dr. Johnson

2    when they go back and forth; correct?

3        A.   So that he contact Dr. Johnson when he goes to

4    Williamsburg and that he contacts Mr. Weiss when he

5    arrives in Washington, D.C.

6        Q.   Correct.  Do you know the days of the week or

7    the usual days of the week that Mr. Hinckley comes up to

8    Washington, D.C.?

9        A.   With what's being proposed, I suppose that's a

10   question for Dr. Johnson, according to her schedule.

11       Q.   Do you know, if Mr. Weiss is not available, who

12   it is he would make contact with?

13       A.   He could alternatively contact Dr. G.G.,

14   although it doesn't seem like this will be something that

15   will come up often with Mr. Weiss having a cell phone and

16   being available and already knowing Mr. Hinckley is going

17   to be traveling to Washington, D.C. on a specified day.

18   But I don't see any reason that Dr. G.G. couldn't

19   alternatively be the point of contact if he wasn't

20   available.

21            THE COURT:  We can ask Dr. Johnson this when she

22   takes the stand, but I'm assuming or have assumed that

23   she's in her office Mondays through Fridays and not

24   Saturdays and Sundays.  And if she works Saturdays, she'll

25   tell us.

1      So I've been assuming that whatever day of the

2  month he comes up here will be a weekday, Monday through

3  Friday.

4          THE WITNESS:  Me too.

5          BY MS. KENNEDY:

6      Q.   And you also recommend that Mr. Hinckley let

7  Mr. Weiss know before he goes to any private residences in

8  Williamsburg or the surrounding area?

9      A.   That is correct.

10     Q.   Okay.  And is that because you're not sure of

11 what might happen with Mr. Hinckley going to someone's

12 private residence?

13     A.   No.  This is a temporary risk management

14 intervention I'm recommending through the transition to

15 convalescent leave as itineraries when no longer being

16 stated.  But I think it's important that Mr. Hinckley --

17 and that this be explicit to Mr. Hinckley that he

18 communicate to Mr. Weiss where he's going if he's not

19 going to be staying at his mother's home.

20          THE COURT:  Well, wait a minute.  Is this

21 condition contemplated overnight staying someplace, or

22 just visiting?

23          THE WITNESS:  It's just visiting as well.

24          BY MS. KENNEDY:

25     Q.   You mentioned to Dr. Binks that you thought it

1    was all right at some point in time that he leave the

2    treatment team; correct?

3         A.   No.  My recommendation is that after six months

4    of Mr. Hinckley meeting individually with Dr. Binks one

5    time a month, that then their treatment relationship can

6    terminate at the end of Part A, my six-month duration.

7         Q.   Has Mr. Hinckley told you that he wants to

8    terminate that after six months with Dr. Binks?

9         A.   Mr. Hinckley and I had a conversation about

10   individual psychotherapy and what he thought he needed.

11        He did not think -- he was okay with terminating

12   his relationship with Dr. Binks, A; and he also thought

13   that with Mr. Beffa -- he agreed with Mr. Beffa that he

14   doesn't need weekly individual psychotherapy sessions in

15   conjunction with the group; that that biweekly would

16   suffice.

17        Q.   Were you talking about with Mr. Beffa?

18        A.   Yes.

19        Q.   Now, as far as Dr. Binks, were you here for the

20   testimony of Mr. -- Scott and Diane?

21        A.   Yes, I was, on Wednesday morning.

22        Q.   And so you know that finances are an issue for

23   the Hinckleys with the cost of all of this therapy?

24        A.   My perspective from their testimony is that they

25   are committed to providing continued financial assistance

1    to Mr. Hinckley for multiple years, up to at least five

2    years.

3         Q.   For the next two to five years; is that

4    accurate?

5         A.   Well, I think it's more complicated than putting

6    it in those terms; that both Scott and Diane discussed

7    does this mean that he would have no healthcare insurance

8    to help mitigate those costs; that that informs, that they

9    guaranteed a five-year financial commitment to

10   Mr. Hinckley.  And I believe the 500,000 that they would

11   have available to care for Mr. Hinckley would cover his

12   treatment providers that full dollar cost without

13   insurance benefits for whatever reason he didn't qualify

14   for those.

15        Q.   And as Mr. Scott Hinckley said, as long as the

16   funds are sufficient?

17        A.   He may have said that.  I don't know.

18        Q.   And are you aware, for whatever therapist that

19   Mr. Hinckley sees at the hospital, that it's no cost to

20   Mr. Hinckley?

21        A.   Right.

22        Q.   So there wouldn't be any -- the fact that he's

23   no longer going to see Mr. Binks, Dr. Binks, is not based

24   on a cost issue at all as far as him going down and seeing

25   someone in Dr. Binks's stead?

1          A.   It's not based -- he doesn't pay for Dr. Binks,

2     and it's not based on a cost issue.

3               I'm sorry, what is your question?  I want to be

4     clear in responding to it.

5          Q.   My question is:  If he's no longer going to see

6     Dr. Binks, is he going to have another session down in

7     Williamsburg with someone else who he's going to have to

8     pay for since he's no longer seeing Dr. Binks, whether

9     it's a group therapy, individual therapy, whatever?

10         A.   No.  So my recommendation is for Dr. Binks and

11    Mr. Hinckley to taper down their treatment together, which

12    is currently approximately twice a month, according to

13    Dr. Binks, in the interim period between visits to

14    Williamsburg.

15              My recommendation is then that the first six

16    months of convalescent leave, that that goes down to one

17    time a month.

18              And then it's clinically indicated to reduce

19    that, to terminate the relationship.

20              THE COURT:  What you also said in Part A was

21    that he would see Mr. Beffa for individual therapy three

22    times a month.  And one of the reasons you suggested three

23    times a month was because he would be seeing Dr. Binks

24    once a month.  And together, that would be four times a

25    month or once a week.  And there would be no logic to

1    having him see Mr. Beffa a day or two before he came up to

2    see Binks or a day or two after he went to see Binks;

3    right?

4              THE WITNESS:  Right.

5              THE COURT:  And when the Binks-Hinckley

6    relationship is terminated, we're still at three times a

7    month with Beffa; right?

8              THE WITNESS:  Well, for Part A.  And then Part

9    B, it goes down to every other week.

10             THE COURT:  It goes down to every other week

11   regardless?

12             THE WITNESS:  Right.

13             THE COURT:  So we're down from four times a

14   month between Beffa and Binks --

15             THE WITNESS:  Uh-huh.

16             THE COURT:  -- to two times a month with just

17   Beffa.

18             THE WITNESS:  Yes.

19             THE COURT:  Individual therapy.

20             THE WITNESS:  Yes.

21             THE COURT:  Group therapy would be at a higher

22   level.

23             THE WITNESS:  Group therapy would continue to be

24   weekly.

25             THE COURT:  That's because you think group

1    therapy at that point is probably more important than the

2    individual therapy?

3            THE WITNESS:  I think right now, this is

4    precisely what's indicated for Mr. Hinckley with some of

5    his treatment issues around relationships and making life

6    decisions.  It is the common practice for individuals

7    living in the community with mental health issues.

8            I think this weekly therapy is extraneous in

9    that he's been involved in individual therapy.  I don't

10   know the year he first began, but I know he met with

11   Dr. Sweeney for several years.  Then he met with

12   Maureen Christian for several years through the '90s on a

13   weekly basis, sometimes twice a week.  Then he started

14   seeing Dr. Binks in 1998.

15           We've reached maximum benefit at this point of

16   individual psychotherapy on a weekly basis, and it can be

17   tapered down, and group psychotherapy is emerging as the

18   indicated treatment modality for Mr. Hinckley.

19           BY MS. KENNEDY:

20       Q.   How long has Mr. Hinckley had therapy with

21   Dr. Binks?

22       A.   I believe Dr. Binks told me they began in 1998.

23       Q.   So that's a long time.

24       A.   That's a long time.

25       Q.   Fifteen years?

1      A.   Yes.

2      Q.   And Mr. Hinckley forms bonds with his individual

3  providers; correct?

4      A.   He does.  And Dr. Binks made note of this.  I

5  said a similar thing to Dr. Binks when I interviewed him,

6  and he said that they have an attachment, but it's not a

7  "critical connection" I believe is the terminology he

8  used.

9           THE COURT:  What does Mr. Hinckley think?

10          THE WITNESS:  Mr. Hinckley believes that it's

11  time to taper down this relationship and terminate it.  I

12  think he recognizes -- and Dr. Binks has spoken to him

13  about this in their therapy sessions -- I think he knows

14  he's attached to him, but I also think that he understands

15  the function of starting to meet with Mr. Beffa has been

16  to detach from the hospital and move into the community

17  and that he recognizes that Mr. Beffa is his primary

18  therapist there.

19          And I think the termination of their

20  relationship is significant but won't increase his risk.

21  I think it's something that can be talked about with

22  Mr. Beffa and perhaps with Dr. G.G. if she felt it was

23  necessary to talk about that.

24          But I don't think that the ending of this

25  relationship -- I think the ending of this relationship

1  has been planned now for many years, and he has seen

2  Mr. Beffa in individual therapy, I want to say, since

3  2009.  It could have been earlier or a little bit later

4  than that, so he's seen him now for seven years,

5  approximately.  I think that that's a point to be made,

6  too, and they have established a good relationship.

7         It's Dr. Binks's impression he shared with me

8  during both collateral interviews from last time and this

9  time that he believes Mr. Hinckley doesn't form bonds with

10  males in the same way.  So, for example, that he doesn't

11  form a bond with him like he does Dr. G.G. or other female

12  treatment providers.

13         BY MS. KENNEDY:

14     Q.   You indicated that it won't increase the risk if

15  it's terminated with Dr. Binks; is that right?

16     A.   Right.  His risk of violence, I do not believe,

17  will increase at the termination of their relationship.

18     Q.   And this is a violence risk assessment that you

19  conducted; correct?

20     A.   This is.

21     Q.   So if something doesn't show up as a factor for

22  a risk of violence, that's not really your concern;

23  correct?

24     A.   Well, it was something that I thoroughly

25  considered.

1    Q.   No, not just Dr. Binks.  I'm talking about

2   anything else in the testing.  If it doesn't have anything

3   to do with the risk of violence, it's not really your

4   bailiwick, is it?

5    A.   No.  I mean, these things will remain in the

6   background.  But if they are not presenting as the most

7   risk-relevant needs, then -- the level of supervision and

8   monitoring are not indicated, I'm not going to recommend

9   them.

10    Q.   On page 59, Dr. Murphy, second paragraph, third

11   sentence -- actually, second sentence, "Nevertheless, just

12   as depression," it states, "Nevertheless, just as

13   depression and psychosis are relevant risk factors that

14   are mitigated through risk management strategies, the

15   potential for fame-seeking and grandiosity, as separate

16   from grandiose delusions, shall remain an area of clinical

17   focus and monitoring through the transition to

18   convalescent leave."

19    A.   Yes, I did write that.

20    Q.   Okay.  So for Mr. Hinckley, part of his

21   narcissism is wanting to be known.  He is -- I don't know

22   if you know or not -- considered a, as I explained to

23   Mr. Hyde, a big man on campus at St. E's since he had

24   attempted to assassinate the president.  People know who

25   he is.  He gets fan mail.  He's somewhat of a notorious

1    character at St. E's; is that correct?

2        A.   I don't know about characterizing Mr. Hinckley

3    as a "big man on campus."  Well, I think his narcissism

4    and fame-seeking in the few years after his admission to

5    the hospital also was during a period of active symptoms

6    of severe mental illness.  So I think that that's

7    different.  And this is the point I'm making in what I say

8    in my report and the sentence that you've just read.

9        Q.   But he still does show narcissism?  Having had a

10   narcissistic personality diagnosis, that's not going to go

11   away, is it?

12       A.   He doesn't show the component of narcissism of

13   fame-seeking.  He's complied with the media plan.  He has

14   not reached out to the media.  He doesn't have the same

15   attention-seeking behaviors that he once did.

16       Q.   This is what I mean, again, Dr. Murphy.  Not to

17   be contrary at all, but again, it appears that there's a

18   minimization going on as far as what you yourself have

19   indicated for Mr. Hinckley and what your explanation is

20   now of why it is he doesn't show those symptoms.

21            So in this, right here, the second paragraph,

22   you go on to indicate that "It would be problematic if

23   Mr. Hinckley expresses an intention to move his music or

24   his art compositions to a public domain out of a desire to

25   salvage a tarnished reputation."

1       A.   Right.  So the first sentence, of this paragraph

2   is:  "Further, there continues to be minimal evidence of

3   active grandiosity in Mr. Hinckley, and he has

4   consistently refused and not shown interest in the media

5   or public attention for more than 20 years."

6            Nevertheless, just as depression and psychosis

7   are relevant risk factors, so in the same way that

8   Mr. Hinckley has not shown significant signs of severe

9   mental illness for the past several decades, nevertheless,

10  these were present at the time of the offense, and these

11  are something that we continue to look at through his next

12  stages of freedom, and it's something that treatment

13  providers should be aware of; and especially if new

14  treatment providers are coming on, that they are aware of

15  the specific risk factors that were present at the time of

16  the offense and how the hospital has been addressing them

17  and plans to continue addressing them.  I'm not posing

18  that right now, he's showing signs of fame-seeking that

19  need to be mitigated.

20      Q.   Although it does say "minimal evidence of active

21  grandiosity," it may be minimal, but there's still some

22  evidence of it; correct?

23      A.   Well, sort of in the way that Dr. G.G. or

24  Mr. Weiss said, Well, he says, I'm not going to do these

25  certain things -- and this was months ago when he was

1    first starting his 17-day -- Oh, I don't want to do these

2    things because I don't feel like it.

3            In that regard, he's shown some entitlement, but

4    it's not -- the whole point of this paragraph here is to

5    distinguish grandiose delusions that were present at the

6    time of the offense and fame-seeking at the time of the

7    offense from narcissism and how those two things need to

8    be picked apart when we look at how Mr. Hinckley might

9    want to make music, make -- create photographs, create

10   artwork and how these are going to be used and where the

11   limitations should be with that.

12      Q.   He certainly has shown signs of entitlement in

13   the past; correct?

14           MR. LEVINE:  Could we get a time-specific on

15   that question, Your Honor?

16           BY MS. KENNEDY:

17      Q.   His entire stay at St. Elizabeths Hospital?

18      A.   There's been times that Mr. Hinckley has shown

19   entitlement.

20      Q.   In this third photograph on page 59, it

21   indicates that "Mr. Hinckley's adjustment is optimized

22   when there are clear guidelines of what is expected of him

23   and explicitly held consequences if the guidelines are not

24   needed, from minor infractions all the way to violations

25   of his court order."

1          So again it shows that Mr. Hinckley does well

2     with following guidelines that are clear, correct?

3          A.   Yes.  This is a point I made earlier today and

4     during the last round of hearings that with patients

5     coming out of the hospital, they need to know clearly

6     what's expected of them.

7          Q.   And again, yet he does well with clear

8     guidelines.

9          You don't think that an itinerary or some other

10    way to check his compliance is essential?

11         A.   I don't think so.  That, my sentence and saying

12    "clear guidelines" does not mean that I believe that that

13    should be done through itineraries.  I think that, again,

14    we've used those itineraries to look at how he has dealt

15    with the freedom.  He's dealt with it responsibly, and now

16    it's time to step down from that.

17         Q.   And on page 51 of your report, you indicate

18    that -- and it's the second full paragraph, last line --

19    that "Mr. Hinckley's strong need for affection contributes

20    to a rigid inhibition against admitting his true feelings

21    and attitudes.  Furthermore, he's inclined to be a passive

22    and introverted individual who tends to be pessimistic and

23    dysphoric."

24         Is that correct?

25         A.   So this is what I was referring to earlier in

1    the findings on the MMPI-2.  He's shown the same profile

2    pattern for at least 15 years.  And again, he's not

3    showing elevations on clinical scales that indicate

4    symptoms of severe mental illness, but he's showing a

5    general personality pattern that is characterized by

6    difficulties saying how he feels about things.

7            His scores on these measures, though, are not so

8    high that this is indicating pathological levels of this

9    particular characteristic.  It's showing that this is

10   generally his defensive nature in dealing with the world,

11   and we all have our defensive natures in dealing with the

12   world.

13       Q.   And before, we mentioned the Psychopathy

14   Checklist-Revised, the PCL-R; is that right?

15           On page 54 in the first paragraph, just above

16   "Structured professional judgment," the last line, you

17   indicate that "Mr. Hinckley's scores on this indicate that

18   he demonstrates a higher degree of narcissism and

19   interpersonal deficits in the 66th percentile on Factor 1;

20   then traits indicative of a socially deviant lifestyle,

21   24th percentile on Factor 2."

22       A.   Right.  And this should be put in the context of

23   PCL-R items being rated according to the individual across

24   their entire life.  So these were stable characteristics

25   that were seen at the time of the offense.  So in writing

1    that it was not to suggest that right now he's showing

2    these particular symptoms of narcissistic personality or

3    characteristic traits of narcissistic personality

4    disorder.  This is saying across his lifespan these are

5    the particular PCL-R items that have been most evident.

6    He -- again, his Psychopathy Checklist-Revised score is

7    well below the cutoff for psychopathy, and that is the

8    thrust of looking at this data.

9        Q.    Okay.  And the fact that he does have a higher

10   degree of narcissism fits in with that narcissistic

11   personality disorder?

12       A.    Well, yes.  There's an overlap in the items on

13   the PCL-R with the criteria set in the DSM for narcissism.

14   The reason why I pointed this out here is because now in

15   the research, what is seen is that Factor 2 in the

16   antisociality component of the PCL-R is what's most

17   predictive of violence.

18            And the point to take away from this is that he

19   doesn't have the presence of those factors that are

20   associated with a risk of violence.  So a few of those are

21   poor behavioral controls, a history of criminal

22   versatility, a history of juvenile delinquency.  He

23   doesn't have any significant scores on those.

24       Q.    All right.  And again on page 30, the second

25   paragraph, the last line and the second-to-last line,

1    Mr. Weiss indicates that "There are distinct times when

2    John seems to feel entitled around issues, this 'I don't

3    need to do those things; if I make an excuse, that will

4    get me out of it.'  But this dissipated over time, and

5    there has been no evidence to any degree in the past three

6    or four months."

7            So let me ask:  Prior to the last three or four

8    months, it infers that he was showing this sense of

9    entitlement as he has for quite a while at the hospital;

10   correct?

11       A.   Well, this is consistent with what we've said

12   before about his narcissistic personality disorder being

13   attenuated; that it has not disappeared and is gone now,

14   but that it's not nearly significant in the way that it

15   was before.

16           And in my view, it was important that Mr. Weiss

17   was able to see this, that Mr. Weiss noted that that was

18   entitlement.  More than anything, it opened my eyes to the

19   fact that Mr. Weiss is a solid person assessing

20   Mr. Hinckley and is aware and keen to the nuanced issues

21   here.

22       Q.   Now, you've indicated both in the 2011 report

23   that you did -- I don't know if it's specified here -- but

24   I think you indicated on direct that if Mr. Hinckley

25   decompensates or deteriorates, it would be gradual and

1    detectable; is that correct?

2        A.    That it would be unlikely that it would happen

3    suddenly, yes.

4        Q.    Now, of course, in 1981, Mr. Hinckley was able

5    to fool everyone; correct?

6        A.    I wouldn't characterize it as that.

7        Q.    Although you did agree that no one knew he was

8    going to attempt to assassinate the president?

9            THE COURT:  I'm having trouble hearing you,

10    Ms. Kennedy.

11            BY MS. KENNEDY:

12        Q.    I'm sorry.  No one knew at that time that

13    Mr. Hinckley would attempt to assassinate the president?

14        A.    No.  But his, his major mental illness did

15    follow a very typical trajectory for individuals suffering

16    from this kind of psychopathology.

17            He went off to college.  His parents observed

18    that he tended to get more shy throughout his high school

19    years.  He became more increasingly and gradually

20    withdrawn during his college years.  He dropped out of

21    college on a few occasions.  He became increasingly

22    erratic, traveling around, going to Hollywood, going to

23    Nashville, going to various places in the U.S.  And he

24    got, then, increasingly depressed in late 1979 into 1980,

25    the suicide attempt.  And throughout here, you can also

1    see the coinciding development of the delusions as well.

2          So I think looking at that as the framework of

3    understanding how his illness manifests and expresses

4    itself, that that gives me solid ground to suggest that if

5    he were to experience a relapse in symptoms, that would

6    happen gradually; that, in addition to he has so much more

7    oversight, so much more treatment and supervision then he

8    did at that time.

9        Q.   Now, at the time that Mr. Hinckley shot the

10   president, that was a sudden action.

11         Did you ever talk to him about the offense?

12       A.   We did talk about it.  Sudden -- and just as an

13   aside, I've sort of tried to classify his type of

14   violence, and there's two kind of polar categories of

15   instrumental violence versus impulsive affective violence.

16         And, in short, I won't get into this too much,

17   but instrumental violence is committing an offense to

18   secure some secondary gain, and this is usually either

19   antisocial or psychopathic intent.

20         And then there's more affective violence that

21   is, for example, somebody who is very hotheaded who is

22   somehow is slighted or feels a pressing need to act in the

23   moment because they are overwhelmed by psychological

24   distress.

25         Mr. Hinckley, when you say "sudden," I guess I'm

1    asking myself, does that mean he's -- his violence was

2    impulsive, or was it instrumental?  And it was not

3    instrumental that it was to some secondary tangible gain

4    or some sort of vengeful act.  However, it was targeted.

5    It wasn't just out of the blue and sudden and with

6    erroneous delusional thinking.  He did put a limited

7    degree of forethought into his act.

8        Q.   And he's attempted suicide three times; correct?

9        A.   Four times.

10       Q.   And that is considered a sudden, not a

11   gradual --

12       A.   He hoarded pills in two or three of these

13   instances.  He hung himself -- he attempted to hang

14   himself once.  Just the act of hoarding suggests some

15   planning in terms of his suicide treatments.

16       Q.   And he also stalked President Carter prior to

17   President Reagan; correct?

18       A.   There was a brief period of time that he stalked

19   President Carter as well.

20       Q.   And he also was arrested at the Nashville

21   airport with handguns in his suitcase; is that correct?

22       A.   That is correct.

23            THE COURT:  When was that?

24            THE WITNESS:  That was 1980.  I'm not sure which

25   month of 1980.

1        BY MS. KENNEDY:

2        Q.   You indicated, again on page 57, you may recall

3    it, on the last paragraph, the second sentence:  "His

4    personality disorder remains attenuated.  He does,

5    however, require continued support in navigating

6    interpersonal relationships and understanding relational

7    interactions."

8             Is that correct?

9        A.   That is correct.

10       Q.   If Mr. Hinckley is granted convalescent leave,

11   he is going to be phased -- as we talked about with

12   Dr. Binks, the ending of some of his professional and

13   personal relationships; correct?

14       A.   That is correct, and he's already been facing

15   that issue.

16            THE COURT:  He's already what?

17            THE WITNESS:  He's already started that process

18   in transitioning to Williamsburg; seeing Dr. Binks with

19   less frequency, seeing his treatment team with less

20   frequency.  Less frequency, just less time at the hospital

21   altogether; that he's started to move away from the amount

22   of time and the amount of interaction that he's had with

23   individuals there.

24       Q.   Is it Ms. N, N as in Nancy, or Ms. CB or someone

25   he'll be leaving at the hospital who he's friends with at

1    this point?

2              THE COURT:  Ms. N is already over; right?

3              THE WITNESS:  Ms. N is over.

4              THE COURT:  The one who wrote him the Dear John

5    letter, literally?

6              BY MS. KENNEDY:

7         Q.   Is Ms. CB still active?

8         A.   Ms. CB comes to visit him.

9         Q.   In Williamsburg?

10        A.   No.  Not in Williamsburg.

11        Q.   At the hospital?

12        A.   Yes.  At the hospital.

13        Q.   And then, of course, he'll be terminating his

14   relationship with his cats, which are very important to

15   him; correct?

16        A.   He will be terminating that relationship, and he

17   pointed that out to me too.  We talked a little bit about

18   that.  He's aware of it.  It will be a loss.  His mother

19   actually told me -- she told me not to tell him but that

20   she would be okay with getting a house cat.  So I will

21   apologize to her for letting the cat out of the bag, yes.

22        Q.   You are in trouble now with Mrs. Hinckley.

23             THE COURT:  Whenever it's convenient to take a

24   break.

25             MS. KENNEDY:  Okay.  Let me just see.

1          THE COURT:  After my Dear John comment and her

2     let the cat out of the bag.

3          MS. KENNEDY:  Okay.

4          THE COURT:  Take your time.

5          MS. KENNEDY:  Three or four, just train of

6     thought here.

7          BY MS. KENNEDY:

8     Q.   Now, you did recommend that a member of his

9     treatment team makes Mr. VJ Hyde the logical choice to

10    follow him while he's coming up to visit, maybe sitting in

11    on a treatment team meeting?

12    A.   Oh, I did not specify -- in what context are you

13    specifying Mr. Hyde as being that person?

14         THE COURT:  In the first six months, I

15    interpreted what you're saying is that Dr. Binks might be

16    that person.

17         Or were you also contemplating, in addition to

18    the psychotherapy sessions with, the therapy sessions with

19    Dr. Binks, that there would be some other interaction with

20    some other member of the treatment team like Mr. Hyde who

21    has been the case manager?

22         THE WITNESS:  Right.  That could be for

23    convenience purposes, if Dr. Binks is at 35 K Street to

24    participate in those treatment plans as well.  I didn't

25    say that Mr. Hyde should be designated the person to

1    participate in the treatment planning conferences at OPD;

2    that it could be a member of his inpatient treatment team.

3            BY MS. KENNEDY:

4        Q.   Wouldn't it be logical, though, for it to be

5    Mr. Hyde who he's had such a close relationship with and

6    treatment with over the last several years?

7        A.   Well, I do think and Mr. Hyde has communicated

8    commitment to being involved in that process.  I foresee

9    him being a part of that and participating in that.

10            However, does he need to be designated as the

11    individual present at those treatment -- I'm sorry, the

12    monitoring checks at OPD?  I don't think he has to be

13    designated that person.  I think it could be another

14    member of his treatment team.

15        Q.   Anyone in particular that you would recommend?

16        A.   I mean, Dr. Adewale could be involved in that.

17        Q.   Does Mr. Hinckley have a close relationship with

18    Mr. Hyde and Dr. Adewale, if you know?

19        A.   Does Mr. Hinckley have a close relationship with

20    Dr. Adewale and then Mr. Hyde?

21        Q.   I'm sorry.  I meant Mr. Hyde than Dr. Adewale.

22        A.   Okay.

23        Q.   Closer to Hyde than to Adewale?

24        A.   Well, Dr. Adewale has been involved in this

25    since Dr. Green left five years, maybe.  And, sure,

68

1    Mr. Hyde has treated Mr. Hinckley for nine -- well, he was

2    his therapist for several years and then became his

3    clinical administrator, so he knows the case very well.

4    But I don't think that's to say that Dr. Adewale doesn't

5    know the case or couldn't be that person involved in

6    those, in those monitoring checks.

7         Q.   Okay.  Just this last question, Your Honor,

8    before we break if that's all right.

9              As far as you know, the Williamsburg therapists

10   or, quote, treatment team hasn't met with the

11   St. Elizabeths, quote, treatment team yet, have they?

12        A.   Well, I wouldn't characterize it as this.

13   They've been involved in multiple conference calls.  A few

14   of them are involved in the review board, motion planning

15   meetings.  Mr. Hyde testified on the specifics of their

16   coordination.

17             But meeting in person, no.

18        Q.   In your view, at some point in time, do you

19   think that would be important?

20        A.   Meeting in person?  Well, I have as --

21        Q.   Not you, but the two, Williamsburg and

22   St. Elizabeths team.

23        A.   I have in my recommendation between Part A and

24   Part B that there's a comprehensive treatment planning

25   conference involving all key members before Mr. Hinckley

1    progresses to the next phase.  I think in person is ideal,

2    but if a treatment provider or two had to conference call,

3    I don't see that as being a problem.

4         Q.   Okay.

5              MS. KENNEDY:  Your Honor, might now be a good

6    time?

7              THE COURT:  Why don't we take 10 or 15 minutes.

8              (Recess)

9              BY MS. KENNEDY:

10        Q.   Dr. Murphy, convalescent leave is a huge

11   transition, not just for Mr. Hinckley but for anyone at

12   the hospital; correct?

13        A.   I do think it is a big turning point for many

14   patients.

15        Q.   Especially moving to a different city and not

16   staying in D.C.?

17        A.   Yes.  And the fact that Mr. Hinckley has been

18   embarking on this process since 2006 is very different

19   from your average convalescent leave situation at the

20   hospital.

21        Q.   And it's been discussed with Mr. Hinckley the

22   Williamsburg, quote, plan and a D.C. plan; correct?

23        A.   Right.  The D.C. backup plan, uh-huh.

24        Q.   And he's told, I believe, Mr. Weiss, perhaps

25   Dr. Binks, that he's okay with the D.C. plan, but he wants

1    to go forward with Williamsburg at this point since that's

2    what they've been planning on?

3         A.    Right.  He explained to me that if any issue

4    were to arise, whatever that might be, that he -- it

5    didn't make sense for him to be in Williamsburg.  If some

6    unforeseen, you know, Jo Ann Hinckley passed away suddenly

7    in the next couple of months and the D.C. backup plan had

8    to be instated, that Mr. Hinckley would be comfortable

9    transitioning to D.C. instead.

10             However, he pointed out that he wants to be in

11   Williamsburg.  He wants to be with his mother at this

12   point in his and her life.

13        Q.    He's indicated that he feels D.C. is a liberal

14   city.

15             He likes the city?

16        A.    He likes D.C.  I don't think he described it as

17   "liberal," but he enjoys aspects in the surrounding area.

18        Q.    He's indicated that, I believe, he works in food

19   service.  And Mr. Lynch or whoever his boss is, he said

20   isn't wild about him; is that correct?

21        A.    Okay.  I think what you could be referring to,

22   Mr. Lyons --

23        Q.    That's it.

24        A.    -- the former CEO of Eastern State Hospital,

25   there was a point when -- I want to have this right --

1  when I believe Mr. Hyde and Dr. Stevens went down to

2  Williamsburg in the fall of 2013 to speak with Mr. Lyons

3  about Mr. Hinckley's hearings, getting an update of his

4  status and talking about volunteer opportunities at

5  Eastern State Hospital.

6       It was Mr. Beffa's impression, maybe Dr. G.G. as

7  well, that -- and at this point, Mr. Beffa was the case

8  manager still, I want to point out -- that Mr. Lyons

9  expressed something to the effect of that he wanted -- he

10  was okay with Mr. Hinckley being at Eastern State

11  Hospital, but that he also wanted his patients to be --

12  have those positions available to his patients.

13       There is now a new CEO, and I'm not real clear

14  on what the new CEO's perspective is on that.

15       Mr. Weiss, on the other hand, when I asked him

16  about that, he clarified that he thought it was important

17  that Mr. Hinckley transition out of the mental health

18  setting and get involved in work opportunities or

19  volunteer opportunities, actually, in the community rather

20  than just at another inpatient facility, even though he's

21  not an inpatient, he's there as a volunteer, but that he

22  should be out of that kind of mental health setting and to

23  free Mr. Hinckley up in his schedule to look into other

24  options.

25      Q.  Mr. Hinckley has had a series of rejections in

1    Williamsburg over time; correct?

2         A.    That's correct.

3         Q.    And in Washington, D.C., if he were moved up

4    here for whatever reason, in your view, is there a fairly

5    good mental health system to get you connected to housing,

6    potential jobs, therapists?

7         A.    It's okay in Washington, D.C.

8         Q.    Is it better than Williamsburg?

9         A.    Oh, that's hard to compare.  I will say for at

10   least maybe four patients that I've worked with in

11   individual therapy who have left the hospital,

12   transitioned to convalescent leave, that trying to find a

13   job has been really difficult in the supported employment

14   program.  It was an issue that we faced quite a bit when I

15   was on the treatment team, the minimum security treatment

16   team, and when I was in the outpatient department.

17             So in that respect, I think that could be one

18   difficult component.  In other ways, I think the housing

19   might be -- there's, you know, as I'm saying this, I'm

20   also thinking of some other drawbacks of many patients are

21   on wait lists.  There is one patient that was an

22   individual therapy patient of mine that had his

23   conditional release and then had to stay in the hospital

24   waiting on a wait list for housing for a bit of time.

25             So there's some caveats in both directions, I

73

1    think.

2         Q.   Now, Mr. Hinckley is not similar to the average

3    patient at St. Elizabeths, is he?

4         A.   In some ways, yes; in other ways, no.

5              THE COURT:   In terms of his intellect, his

6    mental ability, his -- I mean, he's higher functioning

7    than some people that are actually also out on

8    convalescent leave?

9              THE WITNESS:   That is correct.   Absolutely.

10             BY MS. KENNEDY:

11        Q.   Wouldn't you say he's significantly higher

12   functioning than the majority of the patients who are out

13   on convalescent leave?

14        A.   Yes.   He's higher functioning than a good

15   portion on convalescent leave, but there are, too, many

16   cases I can think of, of high-functioning patients on

17   convalescent leave.

18        Q.   So perhaps finding a job might be a little

19   easier for Mr. Hinckley?

20        A.   Some of the high-functioning patients that I've

21   done risk assessments on have experienced some challenges

22   there too and, you know, have had to take a position at

23   the hospital temporarily.

24        Q.   Of course, Mr. Hinckley would have some funds as

25   far as being able to pay for his own apartment, or most of

1    it; correct?

2        A.   His family has indicated that they would help

3    pay; that they would pay for this -- for an apartment.

4        Q.   Any of his treatment, psychiatric, psychological

5    at St. Elizabeths Hospital would be free; correct?

6        A.   Free for him?

7        Q.   Yes.  Free for him.

8        A.   The family would not incur expenses, yes.

9        Q.   Right.

10       A.   However, somebody has to foot that bill.

11            THE COURT:  I'm sorry, what would be free?

12            BY MS. KENNEDY:

13       Q.   The treatment, Your Honor, psychologists,

14   psychologists.  He would be getting all of his treatment

15   at St. Elizabeths Hospital or outpatient.

16            THE COURT:  That's what I'm not clear on, what

17   you and Dr. Murphy are clear on from your experience.

18            So in terms of a person released from the

19   hospital on convalescent leave within the D.C. community

20   or the D.C. metropolitan area, that person would still

21   report to FOPD on K Street, not to the hospital; right?

22            THE WITNESS:  That's right.

23            THE COURT:  But in terms of a treatment team or

24   treatment provider, psychiatrists, medication management,

25   psychologists, where does that come from; FOPD, or back at

1    the hospital?

2            THE WITNESS:  That comes from a core service

3    agency in the community, basically contracted agencies to

4    support patients.

5            Dr. Johnson can give a lot more detail about

6    this in her testimony as well.

7            I can speak as a psychologist.  What I would

8    typically do is see the patient in individual therapy for

9    the first few months of their transition to convalescent

10   leave.  If I felt that it was indicated that they needed

11   to continue therapy, they could be hooked up with a

12   therapist through their core service agency.

13           THE COURT:  When you do that -- and this would

14   be now in your private practice?  You could still do that,

15   or are you talking about back when you were at St. E's?

16           THE WITNESS:  Back when I was at

17   St. Elizabeths -- I could do it now if I were taking some

18   of the patients on Medicaid.

19           THE COURT:  I guess my question is this:  A

20   person on convalescent leave, is that person getting

21   treatment from people like you in private practice, being

22   paid for privately or by Medicaid, or is it more likely

23   that that person would be getting treatment paid for by

24   the government at St. Elizabeths, even though their

25   primary point of contact was Dr. Johnson or her staff at

1    FOPD?

2              THE WITNESS:  Right.  They would not be getting

3    treatment.  The idea is to deinstitutionalize them, not

4    have the treatment provided at the hospital anymore; that

5    it's facilitated through the core service agency in

6    conjunction with the outpatient department.

7              If, say, Dr. Johnson felt that she needed to be

8    in a certain case, the treating psychiatrist as opposed to

9    a psychiatrist in the core service agency, she can make

10   that decision.  But it is these agencies, these

11   government -- that are private agencies contracted by the

12   government.

13             THE COURT:  But paid for by the government?

14             THE WITNESS:  Paid for by the government.

15             THE COURT:  That's the thrust of Ms. Kennedy's

16   question.  In other words, if you were here in D.C., it's

17   likely that many of the services that he would need,

18   Dr. Johnson would determine that he needed, or whatever

19   plan I authorize --

20             THE WITNESS:  Right.

21             THE COURT:  -- would -- probably a lot of the

22   services would be paid for with government funds rather

23   than Hinckley family, if you understand?

24             THE WITNESS:  That's right.  That is correct.

25             THE COURT:  If they decided they needed you

1    rather than they needed somebody else, then they wouldn't

2    be paid for any longer with government funds.

3              THE WITNESS:  Right.

4              THE COURT:  Probably -- I don't know about music

5    therapists, whether there are people on contract with

6    government funds, or whether that would be private funds?

7              THE WITNESS:  I would assume private.

8              THE COURT:  I think the thrust of her question

9    is:  It would be -- there would be less of a financial

10   concern for the Hinckley family --

11             MS. KENNEDY:  That's right.

12             THE COURT:  -- if he were on convalescent leave

13   in D.C., based on experiences with other patients.

14             THE WITNESS:  Right.

15             THE COURT:  And you agree with that?

16             THE WITNESS:  Yes.

17             BY MS. KENNEDY:

18        Q.   Now, Dr. Binks indicated when you were

19   interviewing him that Mr. Hinckley does not initiate

20   disclosure to new treatment providers who are not familiar

21   with the case; that it's not in his character to disclose.

22             And that's on page 32, the third paragraph,

23   eight lines down.

24        A.   I'm sorry.

25        Q.   It starts with -- you're on page 32?

1        A.   Yes.

2        Q.   The third paragraph --

3        A.   Uh-huh.

4        Q.   And one, two, three, four, five, six, the

5   eighth sentence down that begins with "Hinckley" --

6   "Hinckley would not initiate disclosure to new treatment

7   providers."

8        A.   Would not -- he pointed out that it is possible

9   that Mr. Hinckley would not initiate to new treatment

10  providers who are not familiar with his case; would not

11  initiate disclosure to new treatment providers who are not

12  familiar with his case.

13       He clarified this is not out of sociopathic

14  intent.  It's not in his character to disclose, and he's

15  tired of the spotlight and how it has destroyed previous

16  relationships, such as his relationship with Ms. Devalle

17  [phon.].

18       Q.   And Mr. Hinckley, throughout his time at

19  St. Elizabeths, has had difficulty opening up or

20  disclosing information; is that correct?

21       A.   Dr. G.G. characterized this issue as you

22  essentially have to know the right questions to ask

23  Mr. Hinckley, and I believe Dr. Binks said that during my

24  interview with him last time.

25       But it's not out of intentional omission,

1    deception.  It is -- and the MMPI data points to -- part

2    of his character that he's not going to offer up

3    information readily.  He's introverted.  It's consistent

4    with that style of relating.

5            But treatment providers who have been involved

6    with Mr. Hinckley and understand this know the questions

7    to ask, and he offers up the information that they need.

8            And now Dr. G.G. has said that she's seen a

9    shift in this and that he's actually initiating more in

10   this regard and that sometimes she has to answer -- or ask

11   these questions; but oftentimes, he's initiating.

12           THE COURT:  But some of it is also, he's more

13   familiar with or more comfortable with Dr. G.G.; right?

14           THE WITNESS:  This is right.

15           THE COURT:  And that Mr. Weiss, as I recall,

16   also said that in the early months, it was, you know, a

17   lot more difficult.  But once it began, as Mr. Hinckley

18   began to feel comfortable with Mr. Weiss, he would open up

19   more, and they had become quite close and quite -- I don't

20   know what the word is -- but they spent a lot of time with

21   each other, and Mr. Hinckley is comfortable with him.

22           And so it's not just his introvertedness.  It's

23   something else, too, that has to do with a comfort level

24   with people that has evolved very well with certain

25   people.

1          THE WITNESS:  I agree.  You even can see it with

2     Les Solomon, the caretaker at Universalist Unitarian

3     Church.  He's known -- I think Mr. Hinckley is just -- he

4     wants to get a feel for the person and understand their

5     intentions and understand and really feel whether or not

6     they have his best interest in mind, which is

7     understandable and typical.

8          THE COURT:  Well, I suppose one could say -- and

9     I don't want to get off on tangents here -- but even for

10    people who aren't introverts and who don't have the

11    history of Mr. Hinckley, the better you get to know

12    somebody, the more you might share confidences, past

13    history.  You're not going to do it -- you and I and

14    Mr. Levine and Ms. Kennedy aren't going to do it the first

15    or second or third time we meet each other, necessarily,

16    either.

17         THE WITNESS:  This is true.  Right.  That's a

18    normal part of interpersonal functioning is to assess

19    another person, to assess their trustworthiness.

20         BY MS. KENNEDY:

21     Q.   Dr. Murphy, also when you were speaking with

22    Dr. Patterson, he indicated that any clinician must ask

23    Mr. Hinckley questions rather than wait for him to

24    volunteer information.

25         Does that sound familiar?

1      A.   That I responded to Dr. Patterson with that, or

2   that he --

3      Q.   No.

4      A.   Sorry.  It's late in the day.

5      Q.   It's actually on page 35, except it's

6   Dr. Patterson's report.  Dr. Patterson's report.  I don't

7   know if you have that.

8      A.   I don't have his report.

9      Q.   Let me just find it first.  Defense moved this

10  into evidence.  I'm pretty sure you have a copy of this.

11          MR. LEVINE:  What do you have?

12          MS. KENNEDY:  Dr. Patterson's report.  Page 35.

13  I'd like to show the witness what was marked by defense.

14          MR. LEVINE:  Is that right?

15          It has not been marked.

16          MS. KENNEDY:  It's not marked, Your Honor.

17          MR. LEVINE:  Are we on page 35?

18          THE COURT:  Dr. Patterson's report.

19          MR. LEVINE:  Okay.

20          THE COURT:  And it's going to be -- it's going

21  to be offered as Government Exhibit No. 2.

22          Government Exhibit 2 will be -- and I'm assuming

23  that there will not be an objection to its admission --

24  Government Exhibit No. 2, Dr. Patterson's report.

25                      (Government's Exhibit Number

1          2 admitted into evidence.)

2          BY MS. KENNEDY:

3     Q.   Okay.   Thirty-five is the top sentence,

4  Dr. Murphy.

5     A.   Okay.   Okay.   So the entire sentence in context

6  is:  "Dr. Murphy went on to say the clinicians and others

7  who are new to be involved with Mr. Hinckley would need to

8  familiarize themselves with his past history as well as

9  current functioning and that there is a need to understand

10  that in conducting risk assessments, the clinician must

11  ask Mr. Hinckley questions rather than wait for him to

12  volunteer information."

13          So the purpose of that is to say that as new

14  treatment providers come on, and we've talked about this

15  and I addressed it in my supplemental report, is that

16  there needs to be a period of time that, as Dr. Binks did

17  with Mr. Beffa or as was done with Mr. Weiss, by

18  Mr. Shamblee, and Mr. Hyde, is educating, educating the

19  new treatment provider to what are the issues with

20  Mr. Hinckley.

21          What do you need to ask him in particular?  What

22  are the risk factors, and how do you address these with

23  him and be clear that none of the risk factors have shown

24  any fluctuations?

25     Q.   Now, you had an opportunity to talk to

1    Mr. Hinckley about the death of James Brady; correct?

2        A.   I did.

3        Q.   And he indicated that everything he worked for

4    was in jeopardy until this point.

5             Do you remember that?

6        A.   Let me find --

7        Q.   It's on page 23, the --

8             THE COURT:  Dr. Murphy's report?

9             MS. KENNEDY:  I'm sorry.  This is Dr. Murphy's

10   report.  Dr. Murphy, page 23.

11            BY MS. KENNEDY:

12       Q.   Just one second.  I'm finding it.  It's the --

13            MR. LEVINE:  The discussion of Mr. Brady starts

14   at the bottom of 22.

15            MS. KENNEDY:  Actually, no.  It's the second

16   full paragraph on page 23, and it's the last sentence.

17            BY MS. KENNEDY:

18       Q.   It states, "Everything I worked for at this

19   point was in jeopardy."

20       A.   Right.

21       Q.   Do you see that?

22       A.   Yes.  So this was in response to my question.

23   When we talked about Mr. Brady, first I asked Mr. Hinckley

24   what was his initial reaction to finding out about

25   Mr. Brady's death.

1          He talked about feeling deeply regretful for

2     what did had, about how he, quote/unquote, so diminished

3     his life.

4          I then proceeded to ask Mr. Hinckley, "What was

5     your reaction upon learning about the coroner's ruling?"

6          So he told me about how VJ called him.  And he

7     shared with me some of his thoughts about that, and this

8     was one of them is, you know, sort of shocked that this

9     was happening and that, What does this mean for me?  What

10    does this mean for me in the next few years?  What does

11    this mean for me moving forward with the plans that have

12    been in place?

13        Q.   Okay.  So he was pretty concerned about what was

14    going to happen to him; correct?

15        A.   Correct.

16        Q.   And he told Dr. G.G., he wanted to know if he

17    was going to be charged with the murder of James Brady and

18    what that would do to his life; is that correct?

19        A.   In my report?  Where are you referencing that

20    from?

21        Q.   That is just -- one second.  That is in the --

22    it's in the paragraph right above the other one.  But it's

23    not Dr. G.G.  I can't find that quote.  It's the third

24    sentence that says, "I thought, am I going to be charged

25    with murder of James Brady?"

1       THE COURT:  What page?

2       MS. KENNEDY:  Still 23.

3       THE WITNESS:  Mr. Hinckley's quote to me?

4       BY MS. KENNEDY:

5   Q.   Yes.  "What will that do to my life and my

6   family's life"?

7   A.   Right.  Right.

8   Q.   Again, he's concerned about what's going to

9   happen to him as a result of James Brady's death; correct?

10  A.   Right.  In addition to some of his emotional

11  responses about Mr. Brady actually passing away.

12  Q.   Now, Dr. G.G., again on page 38 of your

13  report -- let me find the exact quote.

14      Okay.  It's the second-to-last sentence.

15      It says, "Dr. Giorgi-Guarneiri's concern lies in

16  the what-ifs."

17  A.   I'm sorry, what page?

18  Q.   Twenty-three.

19      So sorry, 38, 38.

20  A.   Okay.  Oh, the last sentence of Dr. G.G.'s

21  interview?

22  Q.   Yes.

23  A.   Okay.

24  Q.   Right.

25  A.   "Dr. Giorgi-Guarneiri's concern lies in the

1    what-ifs."  I see that.  Not in the what's happening right

2    now.  Specifically, she does not see what is set up if

3    something were to change such as his mother passing away

4    or family discontinuing financial support.

5        Q.  Now, I'm sorry.  Mr. Hinckley's very close to

6    his mother; correct?

7        A.  Yes.  He is.

8        Q.  So that if, God forbid, she becomes unavailable,

9    which happens to all of us eventually, that would be a

10   significant loss for him?

11       A.  It would.

12       Q.  And it wouldn't be surprising to see some

13   depression, grief, extensive sadness, isolation?

14       A.  I could see Mr. Hinckley potentially reacting

15   with sadness, dysphoria, the typical bereavement responses

16   that one experiences when they lose somebody very

17   important.

18       Q.  Do you see, based on the past of him suffering

19   from depression, that that could also occur over a period

20   of time?

21       A.  Actually, in the newest version of the DSM, I

22   would quickly point out.

23       Q.  The DSM-5?

24       A.  The DSM-5, there was a change in the criteria

25   for major -- the criterias that remained identical,

1    however, in the DSM-IV, there was a note about bereavement

2    and that you couldn't diagnose depression in the first two

3    months after losing somebody because this could be a

4    bereavement response.

5            And then in the updated version, they took out

6    that requirement and said that bereavement typically can

7    go on much longer, a year to two years, and that

8    bereavement should not be confused with depression.

9            However, in an instance like this, you,

10   treatment provider, the group of treatment providers would

11   want to assess this and see if there was any indications

12   of such.

13           However, I don't think that -- it's my

14   impression that this loss will not immediately result in a

15   significant risk of violence.  I think he will be sad.  He

16   will grieve.  It would be hard for Mr. Hinckley.  We have

17   some data about how he responded to the loss of his

18   father, and I do acknowledge that that's a different loss,

19   but still a very significant one.

20           So I think with everything that's in place, that

21   he's got a good support system through this possibility.

22           Q.   Now --

23           THE COURT:  So, I mean, I also agree because

24   I've written about this, that his reaction to the death of

25   his father was appropriate and the kind of reaction most

1    of us would have.  This would be the loss of a second

2    parent.  He still had the anchor of his mother after his

3    father died, and many of us have gone through the death of

4    both parents, but not with Mr. Hinckley's history.

5         So, you know, is there -- should there be -- is

6    there greater concern that he might not react to the death

7    of his mother as well as he did to the death of his

8    father?

9         THE WITNESS:  It could be.  And that's the

10   difficult thing to forecast.  But I see the logic in that

11   this is such a -- would be such a significant loss for him

12   and the point that you're making that this would be, then,

13   the second parent.  And all of the kinds of existential

14   issues that come with not having the generation above you

15   there anymore, and now you're the generation, the last

16   generation.

17        THE COURT:  Tell me about that.

18        THE WITNESS:  So I think that Mr. Hinckley could

19   certainly face those kinds of questions.

20        But then if we extend this to how does this

21   relate to him becoming violent, I don't -- I have much

22   less concern there because, again, it's the interactions

23   of all of the risk factors that were present at the time

24   of the offense that are noteworthy rather than one

25   standing alone.

1          So I won't -- I can't say, of course, if he's

2    going to meet the criteria set for major depressive

3    disorder when his mother passes away.  But I do know that

4    there will be several treatment providers, and Dr. G.G. as

5    the risk management assessor who will be looking at this

6    very issue and will be looking at this issue closely.

7          So I don't -- if he were to then show symptoms

8    of major mental -- I'm sorry, major depression, I think

9    this is where it would be detected.  It would be

10   addressed.  And the treatment team is competent to make a

11   decision about his treatment needs at that time.

12          BY MS. KENNEDY:

13   Q.   Dr. Murphy, I'm going to show you what's been

14   marked as Government Exhibit No. 3.  That's by Dr. Beffa,

15   signed at the bottom.

16          Under "Issues, behaviors addressed with

17   therapeutic intervention," what does that state about

18   Mr. Hinckley's father's death?

19   A.   Difficult to make out.  Okay.

20          So this is under -- is it the first sentence of

21   "Issues, behaviors"?

22   Q.   Yes.  I think it says "Discussed his difficult

23   relationship."

24   A.   Discussed --

25   Q.   If you can read it, at the bottom?

1      A.   Oh, at the bottom, I'm sorry.  I was looking at

2  the top, "Contact.  Discussed his difficult relationship

3  with his controlling, dismissing father and how father

4  maintained that" --

5      Q.   Disposition?

6      A.   -- "disposition until dying days despite

7  being" -- I'm not sure what that says about that.

8           THE COURT:  Mellow.

9           THE WITNESS:  Increased mellow.

10           BY MS. KENNEDY:

11      Q.   In the first sentence, it says "with his

12  controlling, domineering."  I think you said something

13  else?

14      A.   Maybe I said "dominating, domineering."

15      Q.   So this was not as close a relationship for

16  Mr. Hinckley with his father as it is with his mother, is

17  it?

18      A.   I think there was certainly a different dynamic.

19  And from what I understand from the record, he was not as

20  close with his father, but it's still a significant loss.

21  I mean, describing his father in this way, to then lose

22  somebody that you've had, whether it's negative or

23  positive, such a strong attachment to you who has

24  influenced your life in such a way, there's still

25  something to be said for that.

1          But I agree, the relationship with his mother is

2    more positive than the relationship was with his father.

3          Q.   And he didn't go into a depression, did he,

4    after his father's death?

5          A.   No.  He did not.

6          Q.   Now, if you could refer again to your report,

7    page 60, second paragraph, first line, "Looking forward,

8    Mr. Hinckley."

9          A.   Yes.

10         Q.   That states that "Looking forward,

11   Mr. Hinckley's ability to cope with stress and major life

12   changes will necessitate clinical attention" --

13         A.   Correct.

14         Q.   -- correct?

15         Certainly there's some anticipation, such as his

16   mother's death, that he's going to have to be looked at

17   very carefully to see if anything comes about mentally.

18         Is that fair to say?

19         A.   Right.  As with any patient in treatment, as

20   they are facing major stressors in their life or major

21   life changes, the treating clinician wants to be active in

22   addressing those.  But I'm not saying they have to be very

23   careful -- I'm not sure the phrase you used -- very, very

24   careful in attending to them.

25         I think that everyone on the treatment team is

1  well aware that if, when his mother passes away, that this

2  is going to be something that will be discussed between

3  them, that will be discussed with Mr. Hinckley, processed

4  with Mr. Hinckley, perhaps processed in his group

5  psychotherapy as well.

6       Q.   And the last sentence of that paragraph where it

7  begins "Moreover, it is clear," can you see that?

8       A.   Yes, I do.

9       Q.   "Moreover, it is clear that multiple treatment

10  providers will actively assess Mr. Hinckley for signs of

11  developing or worsening depression following his mother's

12  death"; correct?

13      A.   Right.  So as I said, that when that happens,

14  that the treatment team will be aware, and the outpatient

15  team will be aware of how Mr. Hinckley responds to that.

16      Q.   And again, as we discussed before, no one knew

17  Mr. Hinckley's mood before the assassination attempt, did

18  they?

19      A.   I wouldn't agree with that.  As I said, his

20  parents observed something to be off.  They reached out to

21  a few -- a psychiatrist, maybe at least two psychiatrists.

22  I'm not sure of their degrees, but he was involved in

23  treatment at the advice of his parents.

24      Q.   But the question is, Dr. Murphy:  No one knew he

25  was going to attempt an assassination on President Reagan

1    at that time, did they?

2        A.   No.   They did not know his plan to attempt an

3    assassination, but they did know that Mr. Hinckley was

4    starting to experience some problems psychologically.

5            MS. KENNEDY:   The Court's indulgence.

6            BY MS. KENNEDY:

7        Q.   Now, in your suggestions and recommendations for

8    what should happen with the convalescent leave, you do not

9    assume in your recommendations --

10           (Discussion held off the record.)

11           BY MS. KENNEDY:

12       Q.   Okay.   You don't adopt all of St. Elizabeths'

13   recommendations, do you?

14       A.   I adjusted, for example, the 50-mile radius.   I

15   included an explicit recommendation about Dr. Johnson

16   doing a brief, brief summary to the Court on a monthly

17   basis.

18           I would say overall that I agreed with the

19   hospital's recommendations, but I improved them with other

20   specificities.

21       Q.   Now, you've indicated -- in your opinion, do you

22   believe Mr. Hinckley has reached maximum benefit from his

23   mental health treatment?

24       A.   I said "maximum benefit in inpatient setting."

25       Q.   Okay.   And certainly if he has to return to the

1    hospital, based on mental deterioration or dangerousness,

2    then we start again.

3            We won't be at a maximum benefit for inpatient

4    treatment, will we?

5        A.   It depends on the -- his clinical status.  As

6    with any inpatient, there's been a few instances I can

7    think of in my time at St. Elizabeths of patients

8    rehospitalized briefly for, say, a relapse on

9    substances -- again, not an issue for Mr. Hinckley -- but

10   briefly for a dip into psychosis, which I do not foresee

11   happening in this case.  And then they are stabilized and

12   any additional recommendations in the community are looked

13   at.

14           The review board will usually look at the case

15   and say if there's other things that maybe this person

16   needs more substance abuse treatments, for example, or

17   whatever, that those things are put in place.  But there's

18   certainly times that it's for brief durations.  It's hard

19   to really say because that could, there could be a lot of

20   different situations with rehospitalization.

21       Q.   You indicated that some who come back stay

22   longer than others, based on the reason; correct?

23       A.   Right.  Depending -- of course, the patients who

24   go out a bit sicker and come back sick might need a bit

25   more time, but it's very individual.

1    Q.    Right.

2    A.    And I -- again, I think that any decompensation

3    would be very gradual and detected and could likely be

4    mitigated before necessitating a return to inpatient

5    status.

6    Q.    Although we don't know how gradual it was at the

7    time he got a gun and attempted to assassinate

8    President Reagan, do we?

9    A.    I do think there's evidence of years of active

10   symptoms of major mental illness before that offense.

11   Q.    The question was:  We did not know, you did not

12   know how gradual it was when he attempted the

13   assassination on President Reagan?

14   A.    I do think that, looking at his records, there's

15   clear evidence that these indicators were present in the

16   years precipitating his offense.

17   Q.    Okay.  What indicators were present specifying

18   that he was going to assassinate the president -- attempt

19   to assassinate?

20   A.    That he was decompensating to a point that then

21   led him to attempt to assassinate the president.

22   Q.    Dr. Murphy, you've treated a lot of patients who

23   have decompensated; correct?

24   A.    Yes, I have.

25   Q.    And again, as you indicated, you've never

1    treated anyone who attempted to assassinate the president;

2    correct?

3         A.    That is correct.

4         Q.    You talked about a writing log for Mr. Hinckley,

5    of his writing things down like a diary?

6         A.    A calendar.

7         Q.    A calendar?

8         A.    Uh-huh.

9         Q.    Again, we're not going to know whether he does

10   that or not because anyone who checks it assumes that he

11   is or he isn't.  He's the person who decides what he's

12   going to write down; correct?

13        A.    Well, right.  So he's doing this in

14   collaboration with Mr. Weiss and then showing his schedule

15   to Dr. Johnson when he goes to OPD.  And the treatment

16   providers are corroborating whether or not he's attended

17   his therapies.  His work supervisors are corroborating if

18   he's attended work; if there's been any issues at work.

19   So there's additional corroboration.

20        Q.    Now, Dr. Johnson, you indicated, is going to be

21   the monitor for Mr. Hinckley from D.C.; correct?

22        A.    Correct.  She'll be the -- as director of OPD,

23   she will be overseeing the case and monitoring.

24        Q.    It will be once a month that she sees him?

25        A.    She will see him in person once a month.  She'll

1   have weekly phone calls with him to bolster the monitoring

2   checks.

3      Q.   And do you know how many other patients she

4   sees?

5      A.   I believe it was 80.

6      Q.   Okay.  And this case will take certain amount of

7   extra work, wouldn't you agree?

8      A.   I think, yes.  What's being required is more so

9   than in other patient cases.

10      Q.   When you interviewed the, in your report, the

11   evaluation, the individuals, was Dr. Johnson one of them?

12      A.   Yes, she was.

13      Q.   Did she indicate to you whether or not she would

14   need some assistance in this case?

15      A.   No.  She did not specify needing assistance.  I

16   know she has psychiatry residents she works with.

17          What kind of assistance are you referring to?

18      Q.   I'm sorry, what kind of what?

19      A.   Assistance are you referring to, like, in what

20   capacity?

21      Q.   Another individual to monitor all these notes,

22   writing summaries, writing all the notes when he calls,

23   talking to individual therapists.

24      A.   My impression is that Dr. Johnson wants to

25   oversee this process.  I think she doesn't want to

1    delegate those responsibilities to somebody else, but

2    that, because she'll be responsible for this, she wants to

3    do these contacts herself.  She wants to write the notes

4    herself as well as the -- do the collateral interviews and

5    write a monthly summary.

6         Q.   Did you ask her that?

7         A.   Yeah.  We did talk about that.

8         Q.   And she told you she wants to do it all herself?

9         A.   I think she -- you know, you have to ask

10   Dr. Johnson this question because I don't want to put

11   words into her mouth.  I think Dr. Johnson is keenly aware

12   that this case is not the average outpatient case.  I

13   think she fully recognizes the responsibilities that come

14   along with it.  I don't think she's overjoyed to have

15   those responsibilities, but I also think she has

16   communicated her commitment to taking them on and seeing

17   Mr. Hinckley through the next several phases of

18   convalescent leave.

19        Q.   Now, in speaking with Dr. Patterson, if you

20   recall, he indicated that there may be a high risk if

21   Mr. Hinckley is not appropriately monitored.

22             Do you recall that?

23        A.   That Dr. Patterson said that to me in my

24   interview with him?

25        Q.   Yes?

```
1         A.    That there could be a high risk if Mr. Hinckley

2    is not monitored?

3         Q.    Yes?

4         A.    I'm not sure.

5              MR. LEVINE:  Could we have a citation to that,

6    please.  I don't believe that is a basis in the record for

7    that question.

8              MS. KENNEDY:  Actually, it might be in

9    Dr. Patterson's report.

10             THE WITNESS:  Are you saying that I said that to

11   Dr. Patterson, or he said that to me?

12             BY MS. KENNEDY:

13        Q.    No.  He said that to you.

14        A.    Okay.

15             MS. KENNEDY:  The Court's indulgence.

16             Your Honor, I'm going to come back to that after

17   I look under Dr. Patterson's section, which is going to

18   take longer.

19             THE COURT:  Do you think it's in Dr. Murphy's

20   report?

21             MS. KENNEDY:  I thought it was in Dr. Murphy's

22   report.

23             THE COURT:  Did you mention in your report about

24   your conversations with Patterson?

25             THE WITNESS:  No, I did not.
```

1          MR. LEVINE:  Your Honor, I believe there is no

2     basis for that.

3          THE COURT:  She's going to come back to it after

4     she finds a basis.  Mr. Aziz is looking.  It may be in

5     Dr. Patterson's report.

6          MS. KENNEDY:  Just a few...

7          BY MS. KENNEDY:

8     Q.   Now, just two last questions.  Dr. Murphy, if

9     you know, what would Mr. Hinckley's testing that you were

10    talking about giving him and gave him here, what would

11    that look like the day before an assassination attempt and

12    the day after?

13         Would it change in one day?

14    A.   We have data from Dr. Pauley who did his Bolton

15    report in 1982.

16    Q.   Right.

17    A.   He did the Bolton report and then a separate

18    report in conjunction with the Bolton report that was

19    presented, the psychological testing data he used, the

20    MMPI as well.  And the clinical scales that I referred to

21    earlier that help inform diagnosis, all of the clinical

22    scales were elevated except for one.  So that's the data

23    to address that question.  I guess you're asking:  Can it

24    change in a day?

25    Q.   Right.

1      A.   Unlikely that it would change in a day.  There

2  is not a circumstance you would give this test

3  back-to-back.

4           THE COURT:  Basically, what you're saying is

5  Dr. Pauley did -- Bolton is the name of the case; right?

6           THE WITNESS:  Correct.

7           THE COURT:  Dr. Pauley did this report in 1982,

8  which was after the assassination?

9           THE WITNESS:  Right.

10          THE COURT:  We don't have a report from right

11  before the assassination.

12          THE WITNESS:  Right.  There is no report.  There

13  is just his pretrial reports just after the assassination

14  attempt.  But I don't believe there was psychological

15  testing done.

16          THE COURT:  You don't know if he was seeing a

17  psychiatrist or a psychologist --

18          THE WITNESS:  Right.

19          THE COURT:  -- that we know of, right, before

20  the attempt?

21          BY MS. KENNEDY:

22     Q.   As a psychologist, would you expect it to be

23  different a week before, a month before?

24     A.   No.  He was ill at the time of the offense.  He

25  was ill in the months leading up to the offense, and he

1   was ill in his time at Butner, Butner Correctional

2   Facility and Fort Meade and into the early portion of his

3   hospitalization at St. Elizabeths.

4          I won't testify specifically what the profiles

5   or how they might change in a few-month period, but I

6   think it would be safe to say that the scales would

7   indicate that -- he was retested in 1985 and showed a

8   reduction in clinical scales in 1985.  However, there was

9   still evidence of active symptoms and major mental

10   illness.  Over time, it dissipated but continued to show

11   that he was -- that his disorder, his disorders at that

12   time were not in full, sustained remission.

13      Q.   So just to clarify, Dr. Murphy, you believe that

14   Mr. Hinckley should be released on convalescent leave to

15   Williamsburg with no restrictions on the Internet?

16      A.   I have a restriction on his Internet use, as I

17   mentioned.

18      Q.   Well, you are against having any kind of device

19   put on the Internet so individuals could look at it?

20      A.   Well, this has been an issue raised before, that

21   if the Secret Service were to put monitoring technology on

22   his computer, it's similar to that they monitor him now.

23   However, the hospital has no jurisdiction over the

24   Secret Service to say, You should do this, that, you know,

25   how to.

1      How they make their management decisions with

2  Mr. Hinckley is their process.  And those two things,

3  while there's been some collaboration between Mr. Hyde and

4  the Secret Service, that the risk management intervention,

5  the hospital can't say to the Secret Service, This is what

6  you need to do with the Internet.

7      And I say that to then say if I thought this was

8  necessary, I would have recommended it as something that

9  either the family pays for or something that the hospital

10  or outpatient team would then be the ones responsible for

11  monitoring his Internet use.

12      But I do not think that this is necessary.  This

13  is, again, a risk management intervention for sex

14  offenders usually or somebody who's committed a crime with

15  a computer.

16  Q.   Well, it's also use for parolees and probation.

17      Are you aware of that?

18  A.   Well, yes.  And that's what I'm saying.

19  Q.   Not just sex abusers?

20      MR. LEVINE:  Objection, Your Honor.  Still

21  answering the question.

22      THE WITNESS:  Well, there might be other

23  instances, certainly, and I can't, you know, I can't

24  speculate to all the possibilities of the individuals on

25  parole or probation who have this as a risk management

1   intervention.

2          However, I can say that it's typically for

3   individuals who are at risk of committing a crime with a

4   computer.

5          BY MS. KENNEDY:

6   Q.   Would you be surprised, Dr. Murphy, if every

7   other individual who attempted to assassinate the

8   president has an ankle bracelet?

9          MR. LEVINE:  Has what?

10         THE COURT:  An ankle bracelet.

11         Are there any other such people?

12         MS. KENNEDY:  Bremer.  Actually, that was

13   Governor Wallace.

14         THE COURT:  He was never president, as I recall.

15         MS. KENNEDY:  No, he wasn't.  He wasn't.

16         MR. LEVINE:  None of those people were --

17         THE WITNESS:  That's what I was going to ask.

18         Was he found guilty?

19         THE COURT:  That's not the question.  The

20   question is:  Are there people, as in "Squeaky" Fromme's

21   case, who attempted to assassinate President Ford and

22   Mr. Bremer's case attempted to assassinate

23   Governor Wallace?

24         THE WITNESS:  Perhaps in these cases, that fit,

25   but it does not fit for Mr. Hinckley.

1    Q.   Stop, Dr. Murphy.

2         MR. LEVINE:  Objection.  She's answering the

3    question still.

4         MS. KENNEDY:  It's a yes-or-no question.

5         BY MS. KENNEDY:

6    Q.   My question is --

7    A.   I can't -- I'm sorry to interrupt.  I can't -- I

8    can't talk about those cases.  I haven't assessed those

9    cases from a risk assessment perspective.  And if I had, I

10   could compare them.

11   Q.   Right.  Exactly.

12   A.   And there's probably reasons why, specific

13   reasons why those -- that individual needed an ankle

14   bracelet or felt that it was necessary in that case.

15        But in this case, in Mr. Hinckley's case, it's

16   not necessary.

17   Q.   And obviously, you don't know anything about

18   those cases?

19   A.   I don't know specifics.  I do not.  Even if I

20   knew as a layperson about those cases, I still wouldn't be

21   in a position to compare Mr. Hinckley to them.  I would

22   need to do a risk assessment to compare.

23        MR. LEVINE:  And there's nothing in this record

24   that suggests that Ms. Kennedy knows anything about those

25   cases.

1          MS. KENNEDY:  Well, I know more than you.

2          THE COURT:  She's got a basis in fact for her

3    question because we know what those two individuals tried

4    to do.

5          BY MS. KENNEDY:

6     Q.   So Dr. Murphy, again, going on with what it is

7    that you see that it's appropriate for any type of

8    monitoring for Mr. Hinckley in Williamsburg, you don't

9    think an itinerary is appropriate; correct?

10    A.   I do not think an itinerary is appropriate.

11    Q.   And, I'm sorry, did you say you did agree with

12   the car device to track where he's going, or was that no

13   also?

14    A.   No.  And my basis for that is that he has not

15   presented an elopement risk.

16    Q.   No ankle bracelet; correct?

17    A.   No ankle bracelet.

18    Q.   And the writing a log you thought was important,

19   or it doesn't matter?

20    A.   The --

21    Q.   Writing a log where he's sort of keeping a diary

22   as to what he does?

23    A.   This is what he's doing in collaboration with

24   Mr. Weiss to track his daily routine.

25          THE COURT:  This is what he's doing now?

1              THE WITNESS:  Well, I'm sorry.  It's what he's

2      doing now, but there's the addition of the itineraries.

3      But this is less rigid, and then it's not every hour what

4      he's doing.  It's his responsibilities.

5              THE COURT:  But what I'm not clear about is

6      there are three different -- putting aside itineraries for

7      a moment, there are three different things that have been

8      mentioned.  I'm not sure whether they are the same thing

9      or different things.

10              One is, you said, some sort of a calendar.

11      Other people have talked about a log, other witnesses.

12      And others have talked about a journal.

13              And so the question is:  What exactly do you

14      think is appropriate and inappropriate, and then who is

15      this calendar log or journal shared with?

16              At least that's my question.  It may not be

17      Ms. Kennedy's question.

18              MS. KENNEDY:  That's fine, Your Honor.

19              THE WITNESS:  I'm not recommending a calendar,

20      which is similar to a log.  That does a bit come down to

21      semantics.  But the log now is, is more specific, like,

22      what did he buy when he went to Walmart or PetSmart?  Who

23      did he talk on the phone with that day?  The thrust of my

24      recommendation for the calendar -- or we can call it a

25      log, but a bit different than the log that's been stated

1    right now -- is if there was a reason that he missed or

2    was unable to attend to one of his responsibilities, that

3    there's clarity in why that happened, which could be a

4    snowstorm, it could be Dr. G.G. had to go to a funeral, it

5    could be those things.  But I don't think it needs to be

6    what it is now in that it documents every detail.

7              THE COURT:  Well, let me ask you this:  There is

8    also this difference:  When you have an itinerary, it is

9    this is what I'm going to do on day one, two, three, four,

10   five, written in advance.  What I think you're talking

11   about, obviously, that's out as far as you're concerned

12   and I think as far as the hospital is concerned.  You're

13   talking about a log or a calendar that would deal with the

14   major events of, I didn't see Dr. G.G. because, or, My

15   volunteer hours were changed because.

16             But those things, Dr. Johnson and Mr. Weiss are

17   going to learn independent of the calendar or a log

18   because of the people that they are going to be in touch

19   with.

20             Why shouldn't any calendar or log also deal with

21   the unscheduled time?  So even if it's not written in

22   advance, that he says, And after I got off work, I went

23   and met with Ms. L, or, I had coffee with Ms. L, or, I

24   went to the library, or, I went to the store and did these

25   things, and then I went home to see my mother and have

1   dinner with my mother.

2              In other words, are we limiting it to the things

3   which are otherwise independently able to be corroborated

4   or cross-checked, or are we also including those things

5   which the only -- for which the only source is

6   Mr. Hinckley himself?

7              THE WITNESS:  Right.  And that's a good point.

8   In my mind, he would also report saying if he took a trip

9   to Virginia Beach with Mr. Weiss for some reason.  I think

10  that that would be -- and it's not a treatment

11  responsibility, but it's still something worthy of

12  reporting.

13             THE COURT:  What about my Ms. L example?

14  Mr. Weiss is not the best example because Mr. Weiss would

15  know; is one of the treatment team who would be

16  corroborating.

17             THE WITNESS:  That's true.

18             THE COURT:  So I'm talking about -- I mean, he's

19  free to go under the hospital's plan with Mr. Brelsford

20  any time he wants to, and he's not a member of the

21  treatment team.  He's free to have coffee with Ms. L any

22  time he wants to, and she's not a member of the treatment

23  team.  If he meets a new friend at NAMI, great.  And he's

24  free to go spend time with that person.

25             THE WITNESS:  I think that that would be

1   relevant information as well.  I would caution, just in

2   the area of, say he went to a Starbucks on his own, had a

3   coffee, didn't put it on his calendar, should he be

4   penalized for that?  No.

5           So that's the distinction I make.  That's really

6   what I want to point out here is that he shouldn't be

7   penalized.  And then there's this technical breach, you

8   know, of -- that, I think would be too overblown, and I

9   don't think attention needs to be placed on that kind of

10  thing.  So that's how I define it.

11          THE COURT:  One of the things that I raised the

12  other day with one of the other witnesses is this:  If I

13  grant convalescent leave and if there's a court order and

14  it contains the kind of flexibility and lack of rigidity

15  that you and others are recommending but still sets forth

16  certain parameters that allow people to monitor it, it

17  should be the kind of a -- I need to figure out how to

18  draft it so that each minor deviation doesn't trigger some

19  crisis.

20          THE WITNESS:  Right.

21          THE COURT:  I don't mean crisis in Mr. Hinckley.

22  I mean crisis among Dr. Patterson and the government and

23  everybody worrying about whether we have to come running

24  back to court.

25          And Mr. Levine has used the term which lawyers

1    understand, "material breach" or "material deviation" or

2    something like that.  So thinking through what you and the

3    hospital are recommending, if I grant convalescent leave

4    to the extent it's modified by what the government wants

5    or what Dr. Patterson thinks is appropriate, how do I

6    write it in a way that still gives Mr. Hinckley sufficient

7    flexibility and freedom and Mr. Weiss, Dr. G.G.,

8    Mr. Beffa, Dr. Johnson sufficient discretion to use their

9    professional judgment without everybody running back to

10   court all the time?

11              THE WITNESS:  Right.

12              THE COURT:  That's the -- that's the conundrum

13   if we get to that point.  And so it's a rhetorical

14   question unless you have something helpful to say.

15              THE WITNESS:  Right.  I do think it's, as we

16   step away from itineraries, then what instead?

17              And I could foresee, you know, what part of this

18   calendar being if he had any social visits that he list

19   those social visits.  But that's something that's more

20   included that he should include in those because

21   relationships are so important and who he's connecting

22   with is so important.

23              And I guess I didn't specify that because that's

24   covered so closely in his therapy as well as with Dr. G.G,

25   too, that I couldn't imagine Dr. G.G. not --

1        THE COURT:  Asking about it.

2        THE WITNESS:  -- asking about it.

3        So the calendar does serve a function, but it's

4    also to put more of the onus on Mr. Hinckley to be

5    involved in this process.

6        BY MS. KENNEDY:

7    Q.   Last question, Dr. Murphy.

8        In this case, reasonable medical minds can

9    differ that Mr. Hinckley wouldn't pose a danger to self or

10   others if conditionally released under your or the

11   hospital conditions.

12   A.   Medical minds can differ.

13        MR. LEVINE:  Is that a question?

14        THE COURT:  That's a question.

15        MS. KENNEDY:  That was a question.  I'm

16   finished.

17        THE WITNESS:  I'm a psychologist, first of all;

18   but, yes --

19        So in violence risk assessment, the tools that I

20   use are to actually improve the reliability between

21   clinicians assessing risk that ultimately, they will be

22   using these tools in a way that there will be minimal

23   variability in the conclusions that they come to the

24   person's risk of violence.

25        Now, in terms of the risk management

1   interventions, there could be -- that's an area where

2   there's more room for disagreement on what's necessary.

3          But overall, the structural professional

4   judgment in tandem with the actuarial assessment controls

5   for this issue to not allow too much, too many varying

6   views, based off of things that are not rooted in the

7   literature, impressionistic ideas.

8      Q.   Got it.

9          So still, reasonable minds can differ, as you

10  indicated?

11         MS. KENNEDY:  Your Honor, I move in Government

12  Exhibit No. 3, which -- yes.

13         Dr. Murphy has the original.

14         THE COURT:  You can give it to Ms. Moon.

15         So that is the Mr. Beffa note of 1/20 --

16  1/19/15 and 1/20/15.

17         Any objection?

18         MR. LEVINE:  The objection is context,

19  Your Honor.  It's one note out of a massive file that has

20  entries about that event, about the father's death.  And

21  standing alone, I think it's objectionable.  We object.

22         THE COURT:  Overruled.  It will be admitted.

23         And if anybody wants to, for the purposes of the

24  rule of completeness, offer any other documents, you may

25  do so including, although I'm not sure whether you all

1    intend to offer all of the letters from the hospital over

2    the last 15, 17, 18 visits or go back and reoffer some of

3    the letters from the hospital from earlier time frames,

4    because some of those letters certainly speak to

5    Mr. Hinckley's relationship with his father and his

6    reaction to his father's death.

7              MR. LEVINE:  In that regard, Your Honor, I

8    believe -- and I think it was Number 4 -- we did offer,

9    and I think the Court did receive --

10             THE COURT:  Some letters.

11             MR. LEVINE:  -- the letters.

12             I thought it was intended to be the full stack

13   of letters.  But if it was incomplete, we're happy to

14   supplement it.

15             THE COURT:  Those are the letters, Number 5, to

16   the Court following the visits since the last hearing.

17             MR. LEVINE:  Yes.

18             THE COURT:  They are not the letters prior to

19   the visits, which I'm not saying you have to offer, and

20   they are not the letters relating to any prior visits.

21             And so if there are things about Mr. Hinckley's

22   father's death and his reaction to it, that would not --

23   probably would not be included in Exhibit 5 because that

24   occurred earlier, occurred before our last hearing.

25             MR. LEVINE:  Yes.  And I think, and my

1    recollection is, Your Honor, that those were received by

2    the Court in evidence on other occasions.

3             THE COURT:  True.  They are in the record of

4    this case.  And since the case law says not only can I,

5    but I should rely on the entire record in this case from

6    1981 forward, Ms. Kennedy and I can discuss it with

7    Mr. Adelman next week when we see him.

8             MR. LEVINE:  I'll be there, Your Honor.

9             THE COURT:  I'm not sure you would want to

10   discuss it, even if we could or would discuss it with him,

11   and I will not be having any such discussions with him,

12   with you, Mr. Levine, or Ms. Kennedy on that occasion when

13   Mr. Adelman is so properly honored for his career.

14            MR. LEVINE:  Are you speaking of the

15   Potter Stewart dinner?

16            THE COURT:  Yes.

17            MR. LEVINE:  Yes.

18                     (Government's Exhibit Number

19                      3 admitted into evidence.)

20            THE COURT:  Redirect.

21            MR. LEVINE:  Thank you, Your Honor.  I'm aware

22   of the hour.  I will be brief.

23            THE COURT:  I've heard that before.

24

25

116

1                    REDIRECT EXAMINATION

2              BY MR. LEVINE:

3         Q.    Dr. Murphy, I think close to the beginning of

4    the cross-examination by Ms. Kennedy, she invited your

5    attention to Mr. Hinckley's travel to and from the

6    District of Columbia, and she asked, customarily, what if

7    he were to detour to the White House?

8              Do you remember that question?

9         A.    I do.

10        Q.    First, as an initial matter, is there anything

11   about this crime that was a political crime?

12        A.    It was not politically motivated.  He had a

13   political target.

14        Q.    Is there anything to do with the policies or

15   politics of the target that had anything to do with the

16   crime?

17        A.    No.

18        Q.    Motivated the crime?

19        A.    No.

20        Q.    Now, have you looked at the memoranda of the

21   Secret Service as they surveilled Mr. Hinckley?

22        A.    In the past two years, no.  I requested it, but

23   it wasn't made available.  The hospital didn't have it.

24             THE COURT:  Can I ask this question, not to

25   interrupt you, I meant to ask it before:  Is there

1    anything in your plan or in the hospital's plan that talks

2    about the role of the Secret Service going forward?

3    There's a lot of testimony from Mr. Hyde about how, you

4    know, he and the Secret Service talk to each other all the

5    time.  Is there anything in the hospital's plan or your

6    plan that talks about interactions between Dr. Johnson and

7    the Secret Service or Mr. Weiss and the Secret Service

8    going forward?

9            THE WITNESS:  No.  I don't have anything

10    explicit in that.  I do think Mr. Weiss can be the point

11    person to take over some of that responsibility from

12    Mr. Hyde.  I mean, I do think there should be

13    collaboration in reporting about Mr. Hinckley, but I

14    think, again, because the hospital and the outpatient

15    department don't have jurisdiction over the Secret

16    Service, that while that's important, it can't be solely

17    relied upon to track Mr. Hinckley.

18            BY MR. LEVINE:

19        Q.    So Dr. Murphy, when you did review the memoranda

20    by the Secret Service for its surveillance of

21    Mr. Hinckley, do you remember that the Secret Service

22    would routinely follow Mr. Hinckley as he went down to

23    Williamsburg and then routinely follow Mr. Hinckley when

24    he went from Williamsburg back to the District of

25    Columbia?

1        A.   I do.

2             MS. KENNEDY:  Object.  The routine following

3    back and forth, what's the basis for that?

4             MR. LEVINE:  The basis for it is I reviewed the

5    Secret Service memoranda, and it is my recollection that

6    there was a time when they did it on every single

7    occasion.  I'm not sure that they did it on every single

8    occasion over the last two or three or four years, but

9    they did it routinely.  That, I know.

10            THE WITNESS:  I do recall, when I was able to

11   review their records, that it was routine.  I can't say

12   either if it was every single time.  I know that, for

13   example, there was one fairly recent instance when the

14   professional driver showed up at Williamsburg instead of

15   the hospital to pick up Mr. Hinckley.  So there was a

16   delay in his departure.  Mr. Hyde notified the -- I think

17   the Secret Service contacted Mr. Hyde and asked about

18   this, and he confirmed that his departure was delayed

19   because of this.  So I know that it's, it's something that

20   is routinely, has been routinely done and has been done in

21   the recent past.

22            BY MR. LEVINE:

23       Q.   And as His Honor noted in, I think, a question

24   posited to you that there would be, because of the

25   vagaries of Dr. Johnson's schedule, that there would be a

1    time set for Mr. Hinckley, both a date and hour for his

2    appointment in Washington, and that would be scheduled

3    some days or weeks before the event would occur.

4        A.   Correct.

5        Q.   And then the Secret Service would know when he

6    was scheduled to go and when he was scheduled to return,

7    wouldn't it?

8        A.   Correct.

9        Q.   And the Secret Service could follow Mr. Hinckley

10   whenever it chose to do so?

11           MS. KENNEDY:  Objection, Your Honor.  Excessive

12   leading.

13           THE COURT:  Excessive leading.  Sustained.

14           BY MR. LEVINE:

15       Q.   Would the Secret Service be free to follow

16   Mr. Hinckley whenever it chose to do so?

17       A.   Yes.

18       Q.   And would that address the "what-if" question

19   posited by Ms. Kennedy, if he were to detour toward the

20   White House?

21       A.   Yes.

22           THE COURT:  That assumes that somebody, either

23   Mr. Weiss or Dr. Johnson, has an obligation to or does as

24   a matter of course notify the Secret Service every time

25   he's traveling between D.C. and Williamsburg.

1          Is that in the hospital's plan or your plan?

2          THE WITNESS:  No.  That's not explicitly stated.

3     But I do think -- well, perhaps Mr. Hyde addressed it in

4     the hospital's response to the government's response,

5     perhaps --

6          THE COURT:  I don't remember.

7          THE WITNESS:  -- that Mr. Weiss -- somewhere it

8     is written that Mr. Weiss would take over Mr. Hyde's

9     notification to the Secret Service.  And this, of course I

10    would assume, would be part of that.

11         BY MR. LEVINE:

12    Q.   And if the Secret Service wanted to know when it

13    would be, are they not free to ask Mr. Weiss?

14         MS. KENNEDY:  Objection.  Leading.

15         MR. LEVINE:  That's not leading.

16         MS. KENNEDY:  Yes, it is.

17         THE COURT:  That's fine.  Don't argue.

18         Sure, I mean, it's sort of a -- who knows.

19         THE WITNESS:  They could contact Mr. Weiss if

20    need be.

21         BY MR. LEVINE:

22    Q.   All right.

23         THE COURT:  But unless Mr. Weiss tells them when

24    the travel between D.C. and Williamsburg is taking place,

25    they're going to have to call every day to ask; right?

1          THE WITNESS:  This is true.

2          BY MR. LEVINE:

3      Q.   Does the Secret Service know -- they may be

4   sitting in this courtroom right now, I suspect, and

5   multiple persons -- they know that under this plan he

6   would be going back to the District of Columbia once a

7   month?

8      A.   Correct.

9      Q.   And if they were to ask for prior notice, would

10  prior notice be given to them?

11     A.   Yes.

12     Q.   Is anyone keeping it a secret from the

13  Secret Service?

14         THE COURT:  I'm not sure she's the right witness

15  to ask these questions.  She's not implementing this plan.

16  She's not Dr. Johnson.  She's not Mr. Hyde.  And she's not

17  Mr. Weiss.

18         Mr. Hyde has done it in the past, and neither

19  Dr. Johnson nor Mr. Weiss will do it in the future, if

20  anybody is going to do it.

21         The only question is whether it's part of a

22  plan; and if so, by whom.  And she's not the person who

23  knows other than reading the same things that you and I

24  have read, and I forget what I've read.

25         THE WITNESS:  Correct.

1            MR. LEVINE:  And as Your Honor knows, we have no

2    objection to the Secret Service watching, surveilling him

3    anytime they want.  All right.

4            BY MR. LEVINE:

5        Q.   Ms. Kennedy asked you about the relationship

6    with Dr. Binks, Mr. Hinckley's relationship with

7    Dr. Binks.

8            Do you recall that?

9        A.   I do.

10       Q.   And do you recall her asking you whether the

11   attachment Mr. Hinckley had to Dr. Binks was a good one?

12       A.   Yes.

13       Q.   And do you remember what your answer was?

14       A.   That they did have a good attachment.  It wasn't

15   a critical connection.

16       Q.   Did there come a time in your professional view

17   where that good attachment ought to start to become a

18   detachment?

19           THE COURT:  Could I interrupt you one second?

20           In the hospital's filing of April 17, 2015,

21   Paragraph No. 15, it says, "FOPD shall notify the U.S.

22   Secret Service, counsel for Mr. Hinckley, and counsel for

23   the Government of the date and time of the scheduled FOPD

24   appointment.  They shall provide the intended travel route

25   and time of departure from Williamsburg, Virginia."

1    And then they say they want this done two weeks

2    in advance, and they shall travel directly, blah, blah,

3    blah.

4    The hospital's response is:  "The hospital

5    agrees with this condition except that Mr. Hinckley should

6    be able to stop along the route for activities such as

7    answering his phone, avoiding an accident, or stopping

8    along the route for an approved activity that is planned

9    and approved in advance."

10    I'm not sure what that last means.  I mean, he

11    can stop to get a cup of coffee or a sandwich, I suppose.

12    But the hospital basically agrees that the

13    Secret Service should be notified in advance with the date

14    and time.  So that is -- I think that's in the hospital's

15    third filing.

16    MR. LEVINE:  And I think, speaking for the

17    patient, we have no objection.

18    THE COURT:  Go ahead.  I'm sorry to interrupt.

19    BY MR. LEVINE:

20    Q.   So we were asking about the relationship between

21    Mr. Hinckley and Dr. Binks, and I think you said it was a

22    good one.  And the question that was being asked at the

23    time, the question that was being phrased a moment ago

24    was:  Does there come a time when that good attachment

25    should start to become a detachment and he should go to

1    build a relationship in Williamsburg?

2        A.   I do think in the psychotherapeutic context,

3    especially with highly institutionalized patients, the

4    goal is to reduce their dependency needs.  So him being,

5    Mr. Hinckley being in a treatment relationship for 17,

6    almost 17 years with Dr. Binks, that the logical next step

7    is to reduce this relationship and then terminate the

8    treatment so as to open Mr. Hinckley up to reintegrating

9    into the community and using a community-based outpatient

10    therapist to engage in this process.

11        Q.   And has Mr. Hinckley established, in your view,

12    a sound attachment to his therapist, Mr. Beffa, in

13    Williamsburg?

14        A.   I do.

15        Q.   And has that process of attachment and

16    detachment and attachment again to another mental health

17    provider, has that increased any risk of danger to

18    anybody?

19        A.   For Mr. Hinckley, has that increased?

20        Q.   Of Mr. Hinckley detaching from Dr. Binks and

21    attaching to Mr. Beffa, has it posed any risk of danger in

22    any respect?

23        A.   No, it has not.

24        Q.   Then she asked you some questions about

25    Mr. Hinckley wants to be known, I think was the way she

1    phrased it.  And I think she quoted something in one of

2    the reports, might have been yours, that it should be the

3    subject of a clinical focus.

4            Do you recall that?

5    A.    Yes.  I recall that conversation.

6    Q.    Now, when she says Mr. Hinckley wants to be

7    known, has Mr. Hinckley, during the course of these

8    conditional releases to Williamsburg, utterly eschewed the

9    media?

10   A.    Has he utterly --

11   Q.    Eschewed or avoided the media?

12   A.    Yeah.  Yes, he has.

13   Q.    Have his activities demonstrated that he does

14   not seek fame?

15   A.    Yes.

16   Q.    Of course, there were many questions asked by

17   the Government about the need or the usefulness of

18   itineraries, and they noted that Mr. Hinckley does well

19   when he's given guidelines to follow.

20           Do you remember that?

21   A.    I do.

22   Q.    And, of course, they asked that those

23   itineraries be or continue to be in place during the

24   convalescent leave.

25           Do you recall that?

1        A.    I do.

2        Q.    All right.  And as a whole, has Mr. Hinckley

3   done very well in following the itineraries?

4        A.    He has.

5        Q.    And because he has done well, is it your

6   professional opinion that it is time now to progress past

7   that after successful incremental experiences with the

8   itineraries?

9        A.    Yes.

10       Q.    And what is your view as to whether there should

11   be itineraries at this time, convalescent leave?

12       A.    In the context of convalescent leave, I do not

13   believe itineraries are necessary.

14       Q.    All right.  Then there was some questions asked

15   by Ms. Kennedy about Mr. Brady and his passing.

16             Do you remember that?

17       A.    I do.

18       Q.    And do you remember the questions actually

19   focusing on two distinct areas, one being Mr. Hinckley's

20   emotional response to Mr. Brady's death and the other

21   being what will happen to him as a result of the ruling by

22   the coroner?

23       A.    I do recall that.

24       Q.    Speaking first, his emotional response to

25   Mr. Brady's death, did he show proper empathy, appropriate

1   empathy?

2        A.   He did.  He felt regretful, and this was

3   corroborated by all the treatment providers.

4        Q.   And did he express it in a most profound and

5   heartfelt way?

6        A.   He expressed it in a heartfelt manner and was --

7   had clearly thought about it before his death but

8   described it as when it actually happened, that it even

9   more so made him feel it at a more intense level than he

10  ever had before.

11       Q.   Did he say to you, quote, about Mr. Brady that

12  it got him thinking deeply into what I did with him with

13  my crime.  I so diminished his life and disrupted the

14  lives of his loved ones.  It made me feel so sad for him

15  and his family.

16       A.   Yes.

17       Q.   Did he say those things?

18       A.   This is what he reported to me in my interview

19  with him.

20       Q.   Then he also spoke, did he not, about the

21  coroner's ruling and the prospects of a criminal

22  prosecution of him for that homicide?

23       A.   He did.

24       Q.   All right.  And was that about his own sense of

25  fear?

1        A.    I would say that, yes, he was -- the uncertainty

2   involved across those several months that he waited to

3   find out if he would be charged, that the uncertainty

4   brought about a bit of fearfulness.

5        Q.    Would you call that a "stressor"?

6        A.    I do think that it was a stressful situation.

7        Q.    Did he react appropriately in all respects?

8        A.    I do believe so.  That's what his treatment

9   providers reported to me.

10       Q.    That was a pretty significant stressor?

11       A.    Yes.  I believe Mr. Hyde identified, he talked

12  about two different stressors occurring in the last two

13  years.  This was one of them.

14       Q.    And was there any evidence, in the face of that

15  important and significant stressor, of decompensation?

16       A.    No.  There was not.

17       Q.    Did he do anything at all that could be

18  construed or interpreted as dangerous?

19       A.    No.

20            MR. LEVINE:  The Court's indulgence for a

21  moment, please.

22            (Discussion held off the record.)

23            MR. LEVINE:  Nothing further, Your Honor.

24            THE COURT:  Is there anything else, Ms. Kennedy?

25            MS. KENNEDY:  No.

1          THE COURT:  Thank you, Dr. Murphy.

2          THE WITNESS:  Thank you.

3          THE COURT:  You don't have to come back on

4    Friday.

5          THE WITNESS:  Okay.

6          THE COURT:  I think we promised her that we

7    would end by 5:00.

8          THE WITNESS:  Yes.  Just one minute shy.

9          (Witness excused.)

10         THE COURT:  All right.  So what's our schedule

11   for tomorrow?

12         Dr. Johnson is the one remaining witness for the

13   hospital, and Mr. Hinckley; is that right?  Right?

14   Dr. Johnson is the one remaining witness?

15         MR. LEVINE:  In the patient's case, yes,

16   Your Honor.

17         THE COURT:  So what time are we going to start?

18         MS. MERENE:  1:00.

19         THE COURT:  You'll be here by 1:00?

20         DR. JOHNSON:  Yes.

21         THE COURT:  And there's nothing else we can

22   fruitfully do until we hear from Dr. Johnson; right?

23         MR. LEVINE:  It would be our preference that we

24   use the morning for Dr. Patterson.  But if it can't be

25   done, it can't be done.

1    THE COURT:  I think that in fairness to the

2  Government that we ought to let you finish, you and the

3  hospital finish with your case before Dr. Patterson

4  starts.

5    So if that's the case, I don't know how long

6  Dr. Johnson is going to be.

7    Are you, if necessary, available -- also

8  available Wednesday morning?

9    DR. JOHNSON:  Until 1:00, and then I have to go

10  to Superior Court for another hearing.

11    THE COURT:  Hopefully, it would be nice if we

12  can finish with Dr. Johnson tomorrow, but one never knows.

13  Then we go to Dr. Patterson, and then it depends on

14  whether Mr. Levine or the hospital have any rebuttal

15  witnesses.

16    There was then a discussion of when we get to

17  closing arguments, Ms. Kennedy asked if we can have a day

18  in between the close of all the evidence and the beginning

19  of closing arguments.

20    There was also mention by Mr. Levine that he --

21  at the moment, he was planning to leave town on Friday.  I

22  don't know for how long.

23    For what it's worth, I am available all week,

24  including Friday.  I'm available next Monday afternoon,

25  but not morning.  And I am available next Tuesday morning,

1    but not afternoon.  So if that helps you manage the

2    witness completion, including any rebuttal, the Levine

3    travel plans such as they are, and depending on how

4    important they are and Ms. Kennedy's desire for a day

5    between the end of the evidence and closing arguments, I

6    am available as I said.

7            And then you all have to work it out between

8    yourselves, depending upon how quickly we move through

9    Dr. Johnson and Dr. Patterson, what you want to do with

10   those time frames.

11           MR. LEVINE:  I think this discussion,

12   Your Honor, emphasizes the point of how difficult it is to

13   make an itinerary.  Subject to all kinds of changes.

14           THE COURT:  That's right.  Whatever.

15           When I blocked out this week, nobody told me

16   that on your itinerary was travel on Friday.

17           MR. LEVINE:  That's true.

18           THE COURT:  So 1:00 tomorrow.  The docket sheet

19   will reflect that in case there's any press or others that

20   otherwise plan to be here at 9:30.

21           (Proceedings adjourned at 5:09 p.m.)

22

23

24

25

132

1                    CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, Barbara DeVico, certify that the foregoing is

4    a correct transcript from the record of proceedings in the

5    above-entitled matter.

6

7

8

9

10

11    _____          4-27-15

12    SIGNATURE OF COURT REPORTER                DATE

13

14

15

16

17

18

19

20

21

22

23

24

25