1

                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,           :
                                    :
               Plaintiff,           :Criminal Case No. 81-306
                                    :
v.                                  :
                                    :
JOHN W. HINCKLEY, JR.,              :
                                    :
               Defendants.          :
---------------------------------------------------------
                    Day 5, Afternoon session
                 TRANSCRIPT OF EVIDENTIARY HEARING
            BEFORE THE HONORABLE PAUL L. FRIEDMAN
                 UNITED STATES DISTRICT JUDGE
                    Tuesday, April 28, 2015
                      WASHINGTON, D.C.




Proceedings reported by machine shorthand, transcript

produced by computer-aided transcription.










APPEARANCES:

   For the Government:  U.S. ATTORNEY'S OFFICE
                        BY:  COLLEEN KENNEDY, AUSA
                             MARK AZIZ, AUSA
                             MICHELLE CHAMBERS
                        555 Fourth Street, NW
                        Washington, D.C.  20530
                        (202)514-7248

```
 1    For the Defendant:    DICKSTEIN SHAPIRO, LLP
                            BY:  BARRY WILLIAM LEVINE, ESQ.
 2                               ANN-MARIE LUCIANO, ESQ.
                            1825 Eye Street, NW
 3                          Washington, D.C.  20006-5403
                            (202)420-2237
 4
                            DINSMORE & SHOHL, LLP
 5                          BY: E. MICHELLE TUPPER BUTLER, ESQ.
                            101 S. Fifth Street, Suite 2500
 6                          Louisville, KY   40202
                            (502) 540-2367
 7
      For St. Elizabeths:   ST. ELIZABETHS HOSPITAL
 8                          BY:  DEON MERENE, ESQ.
                            1100 Alabama Avenue, SE
 9                          Washington, D.C.   20032

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

TABLE OF CONTENTS

EVIDENTIARY HEARING

WITNESSES

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| NICOLE REID JOHNSON | 5 | 91 | 101 | |
| RAYMOND PATTERSON, M.D. | 137 | | | |

EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---------|-------------|------|
| Patient's 8 | Dr. Johnson's Resume | 6 |
| Patient's 9 | Consent Order | 35 |

4

1                    P R O C E E D I N G S

2              MR. LEVINE:  Good afternoon, Your Honor.

3              MS. KENNEDY:  Good afternoon, Your Honor.

4              THE COURT:  Good afternoon, everybody.

5              DEPUTY CLERK:  Please be seated.  This is

6    Criminal 81-306, United States of America v.

7    John Hinckley, Junior.

8              For the government, Ms. Kennedy, Mr. Aziz,

9    Ms. Chambers.

10             For the patient, Mr. Levine, Ms. Luciano.

11             For St. Elizabeths, Ms. Marene.

12             THE COURT:  Anything preliminarily we need to

13   discuss before we begin?

14             MR. LEVINE:  Not by the patient, Your Honor.

15             MS. KENNEDY:  No, Your Honor.

16             THE COURT:  Why don't you call the next witness.

17             MR. LEVINE:  Call Dr. Nicole Johnson,

18   Your Honor.

19

20

21

22

23

24

25

```
 1                      * * * * * * * * * * * * * *

 2         Thereupon,

 3              N I C O L E   J O H N S O N,

 4   Having been called as a witness on behalf of the Patient

 5   and having been first duly sworn by the Deputy Clerk, was

 6   examined and testified as follows:

 7                        DIRECT EXAMINATION

 8   BY MR. LEVINE:

 9              MR. LEVINE:  May I inquire, Your Honor?

10              THE COURT:  Yes.

11              BY MR. LEVINE:

12       Q.    Will you please state your name?

13       A.    Nicole Reid Johnson.

14       Q.    Are you a psychiatrist?

15       A.    Yes, I am.

16       Q.    Dr. Johnson, tell us, please, your educational

17   background.

18       A.    I attended New York Medical College in Valhalla,

19   New York, where I received my medical degree in 1999.  I

20   then did my adult psychiatric residency at the

21   St. Vincent's Medical Center in Manhattan, New York.  I

22   then did a forensic fellowship at the Albert Einstein

23   School of Medicine in the Bronx, New York.  And that

24   completes my educational, medical educational history.

25              MR. LEVINE:  Your Honor, I'd like to have this
```

1    marked, please, as the patient's next exhibit.  It's

2    Dr. Johnson's resume.

3              THE COURT:  What's the number?

4              DEPUTY CLERK:  Number 8, Your Honor.

5              THE COURT:  Plaintiff's 8 -- no, Patient's 8.

6              MR. LEVINE:  Copy for the government.  Copy to

7    your law clerk, Your Honor.

8              Your Honor, would you like a copy?

9              THE COURT:  Yes.  Give Ms. Moon a copy if you

10   have an extra one.

11             MR. LEVINE:  Approach the witness, Your Honor?

12             THE COURT:  Yes.

13             BY MR. LEVINE:

14       Q.   Dr. Johnson, I show you what has been marked as

15   Patient's No. 8 for identification.

16             Could you identify that, please?

17       A.   Yes.  It's my resume, my CV.

18             MR. LEVINE:  Move it into evidence, Your Honor.

19             THE COURT:  Any objection?

20             MS. KENNEDY:  No, Your Honor.

21             THE COURT:  It will be admitted.

22             (Patient's Exhibit Number

23             8 admitted into evidence.)

24             BY MR. LEVINE:

25       Q.   Are you currently employed, Dr. Johnson?

 1        A.    Yes.

 2        Q.    How are you employed?

 3        A.    I currently work for the Department of

 4   Behavioral Health for the District of Columbia.

 5        Q.    What is your title?

 6        A.    I'm currently the forensic services director for

 7   the department.

 8        Q.    Incidentally, Dr. Johnson, are you

 9   board-certified?

10        A.    Yes, I am.

11        Q.    Board-certified in what specialty?

12        A.    I have an adult general certification along with

13   a specialty in forensic certification.  I'm

14   double-boarded.

15        Q.    How long have you been in your current position

16   at St. Elizabeths at the outpatient department?

17        A.    I've been with the department officially since

18   March of last year; unofficially for six months prior to

19   that.

20        Q.    Could you explain to the Court what the

21   relationship is between the forensic outpatient department

22   and St. Elizabeths Hospital.

23        A.    Sure.  Individuals who are found to be NGI

24   acquitees, actually, once they are stabilized in the

25   hospital and they are no longer posing a danger to

1    themselves or others or the community and they have

2    sufficiently been restored with their mental health, they

3    are discharged in order of conditions.

4         At that period of time, they become the

5    responsibility of the outpatient department.  We continue

6    to monitor them and make sure that whatever orders that

7    are in their conditional release order are followed.  And

8    then we determine -- you know, we just make sure,

9    basically, that everyone's orders are followed by the

10   individuals in the community.

11        Q.   Now, the position that you have as director,

12   when was that position created?

13        A.   March of 2014.

14        Q.   So it's a relatively new position?

15        A.   Yes, it is.

16        Q.   And who ran the forensic outpatient department

17   prior to March of 2014?

18        A.   It wasn't really run by anyone.  It was more of

19   a collaboration between the individual staff members that

20   were employed by the Department of Behavioral Health.

21        Q.   All right.  Now, before you assumed your

22   position at the FOPD -- may I call it that --

23        A.   Yes.

24        Q.   -- or OPD -- did you have another position

25   associated with the hospital?

1      A.   Yes.

2      Q.   What was that?

3      A.   I was actually an attending psychiatrist at

4  St. Elizabeths Hospital for seven years prior to my

5  departure to come to the outpatient department.

6      Q.   All right.  And what was your -- what were your

7  responsibilities in that position?

8      A.   I primarily worked on an inpatient pretrial male

9  ward, and I did court-ordered competency assessments,

10  criminal assessments, did bulletin evaluations after they

11  had been found not guilty by reason of insanity.  I also

12  did medication management.  I did some group therapy in

13  the treatment mall, and I also worked on what we call the

14  "forensic consult service," which actually, during my

15  tenure at the hospital, they moved from kind of keeping

16  all the court-ordered evaluations from being done by the

17  treating psychiatrists and psychologists to being assigned

18  from the forensic consult service for us to actually do.

19      Q.   All right.  Now, in your current position as the

20  director of the FOPD, do you have staff?

21      A.   Yes.

22      Q.   And what does that consist of?

23      A.   I currently have an interim clinical

24  administrator.  I have a social worker.  I have a mental

25  health counselor.  I have a forensic staff assistant.  And

1     I have a registered nurse.

2          THE COURT:  No other psychiatrists on staff

3     besides yourself?

4          THE WITNESS:  Not yet.

5          BY MR. LEVINE:

6     Q.    Is it your plan to obtain another psychiatrist

7     on your staff?

8     A.    That is my hope.

9     Q.    Now, as director of the FOPD, do you attend

10    forensic review boards?

11    A.    Yes.  Both at the hospital and in the outpatient

12    department.  We have our own.

13    Q.    You have your own review board?

14    A.    Yes, we do.

15    Q.    Explain to the Court what the function is of the

16    OPD review board.

17    A.    Sure.  Once individuals are released into the

18    community, they, of course, will ask for various things in

19    the community.  They will want to come to FOPD less

20    frequently.  They will want to change their core service

21    agency.  Basically, anything from the court order they

22    want to change, they will come and they'll make a request

23    to the department, and then we will actually convene our

24    own review board and we'll go over the case with the

25    review board and they'll actually give us their input as

1    to what they think we should do at that point.

2              Then we will submit information to the Court in

3    letting them know, not only through our work but also

4    through the review board's input, we're asking the Court

5    to allow something to happen for the individual in the

6    community.

7         Q.    And who sits on the OPD review board?

8         A.    Currently, our chief medical officer sits in the

9    review board.  The -- there's two social workers on the

10   review board.  A psychologist sits on that review board,

11   and a consumer, the head of consumer relations is on that

12   review board.  So I think it's a total of five individuals

13   that's on that review board.

14        Q.    And is there interaction between the OPD review

15   board and the hospital review board?

16        A.    No.

17        Q.    As director of the OPD, do you attend hospital

18   review board meetings as well?

19        A.    Yes, I do.

20        Q.    All right.  So you're the bridge between the

21   two?

22        A.    Yes, I am.

23        Q.    Now, I want to ask some questions about the

24   typical convalescent leave process.

25              Currently, how many individuals are monitored at

1   the FOPD?

2       A.   Eighty-four.

3       Q.   Eighty-four?

4       A.   Yes.

5       Q.   All right.  And of these -- are these 84 people

6   on convalescent leave?

7       A.   Well, they are in order of conditions.  I don't

8   know --

9       Q.   They are on conditional release?

10      A.   Yes.  They are on conditional release, not

11  convalescent leave.

12      Q.   And are they --

13          THE COURT:  I'm sorry.  Conditional release and

14  convalescent leave are different?

15          THE WITNESS:  Well, in my mind, they are not.

16          THE COURT:  Okay.

17          THE WITNESS:  But these are individuals who

18  have -- they are no longer in the inpatient environment.

19  They are living in the community, and they have an order

20  that's been issued by a judge that says, You have to

21  follow these conditions to remain in the community.

22          THE COURT:  Okay.  And so you have some people

23  who are designated as being on convalescent leave and

24  others, the order says conditional release, but they are

25  in the community.

1          THE WITNESS:  They are all on conditional

2    release.  There are no -- if you're using -- I don't know

3    if you're using the terms differently, but all the

4    individuals that I'm talking about today are on an order

5    of conditions.  They are on conditional release from the

6    hospital, and they are solely residing in the community.

7          THE COURT:  And because --

8          MR. LEVINE:  And that does --

9          THE COURT:  Mr. Hinckley, for example, at least

10   I've always viewed his situation is he's on conditional

11   release when he's in Williamsburg, but he's not living in

12   the community when he's in D.C.  He's half the time there,

13   and half the time here.

14         THE WITNESS:  Right.  These individuals are

15   strictly living in the community.

16         MR. LEVINE:  And that is what we conceive of as

17   convalescent leave, Your Honor.

18         BY MR. LEVINE:

19   Q.   Now, of those, I think you said 84 --

20   A.   Yes.  We had three discharges last week.

21   Q.   Sounds like you just got another one.

22   A.   Yes.

23   Q.   All right.  Of those 84 individuals who are now

24   living solely in the community, how many of them,

25   approximately, have active symptoms of mental disease?

1    A.   I would say at least 20 of them have active

2    symptoms that we're following on a consistent basis.

3    Q.   In your experience, has the government ever

4    challenged the patient or the hospital's request for, I'll

5    say, convalescent leave or conditional release where they

6    live solely in the community?

7    A.   Yes.

8    Q.   Can you explain, please, the process of

9    accepting an individual into the FOPD?

10    A.   Basically, we accept them into FOPD once they

11    have a court order that says that they are our

12    responsibility.  If you want the process leading up to

13    that decision, I can tell you that; but technically, we

14    accept individuals once they have an order issued by the

15    judge saying that they are on the order of conditions in

16    the community, and then we accept them into our program.

17    Q.   What amount of contact do you generally have

18    with a patient before they enter the FOPD program?

19    A.   Minimal.  Very, very, very little.

20    Q.   If any?

21    A.   If any, yes.

22    Some individuals I meet in my office when they

23    come for their first medication management appointment.

24    Q.   So there's already been a court order, you have

25    not participated in a court hearing, and that the patient

1    gets ordered into the FOPD program, and you see them for

2    the first time upon their arrival in that program?

3        A.    That has happened.  We are trying to change that

4    process now where I am more involved prior to their

5    discharge, but there have been occasions where the first

6    time I've actually sat down and spoken with someone was in

7    my office in 35 K Street, which is where my office is, and

8    talking to them and meeting them for the first time.

9        Q.    What's the role of the St. E's staff once an

10   individual is conditionally released and monitored by your

11   program?

12       A.    None.

13       Q.    Let's talk about Mr. Hinckley's case.

14             Unlike the typical convalescent leave situation,

15   have you already met Mr. Hinckley?

16       A.    Yes, I have.

17       Q.    And have you read the report of Dr. Patterson?

18       A.    Yes, I have.

19       Q.    And how about Dr. Murphy's report?  Have you

20   read that?

21       A.    Yes, I have.

22       Q.    And have you read the (e) petition, essentially

23   the letter that requests that the patient go into your

24   program?

25       A.    Which date was that, because I know --

1    Q.    Well, let's enumerate them.

2          The first one was December 19, 2014.

3    A.    Yes.  I read that one.

4    Q.    All right.  And then it was supplemented by a

5    letter to the Court dated March 20, 2015.

6    A.    Yes.  I read that one.

7    Q.    You read that one as well?

8    A.    Yes.

9    Q.    And then the government filed a paper with its

10   conditions, and the hospital filed a response in which it

11   enumerates, I believe, in the language of the government's

12   proposals, the government's conditions and supplies the

13   government's response.  And that, I believe, is dated

14   April 17, 2015.

15   A.    I read that also.

16   Q.    You saw that, too?

17   A.    Yes, I did.

18   Q.    All right.  Now, have you attended the review

19   board meetings regarding Mr. Hinckley at the hospital?

20   A.    I have.

21   Q.    Have you attended any treatment team meetings

22   with respect to Mr. Hinckley?

23   A.    I have not.

24   Q.    I'm sorry?

25   A.    I have not.

1      Q.   Have you spoken with anyone on Mr. Hinckley's

2 treatment team regarding Mr. Hinckley?

3      A.   Yes.

4      Q.   Who was that?

5      A.   I've spoken to VJ Hyde.  I've spoken to

6 Benjamin Adewale, who is a psychiatrist.  And I actually

7 spoke with, prior to his departure from the department,

8 Kevin Shamblee.

9      Q.   Kevin Shamblee was the clinical administrator of

10 Mr. Hinckley during his many years at the hospital?

11      A.   Yes.  Then he was transferred to the outpatient

12 department where I worked with him for the last almost two

13 years doing work for the FOPD consumers in the community.

14      Q.   Did you get the sense that Mr. Shamblee was

15 fully informed of the history and condition of

16 Mr. Hinckley?

17      A.   Very much so.

18      Q.   Are you familiar with Mr. Hinckley's so-called

19 risk factors?

20      A.   Yes.

21      Q.   How would you compare your level of knowledge

22 and involvement in Mr. Hinckley's case to that of the

23 typical convalescent leave patient?

24      A.   I've actually put more work and more knowledge

25 into Mr. Hinckley's case at this point in time in his

1    court case than I have of anyone else that's come out of

2    the hospital on orders of conditions.

3        Q.   Let's talk about the hospital's convalescent

4    leave plan and conditions.

5            After hearing much -- I don't think you heard

6    all, but having heard much of the testimony in this

7    hearing -- you've heard a lot of it, have you not?

8        A.   I have heard a lot.

9        Q.   Do you have any concerns about your readiness to

10   fulfill your role under the hospital's plan?

11       A.   At this time, no.

12       Q.   All right.  And should the Court issue an order

13   for convalescent leave to start sometime in the future,

14   hopefully the near future, are you confident of your

15   ability to carry out the Court's order?

16       A.   Yes.

17       Q.   Do you carry out the Court's -- the orders of

18   the Court in each of the 84 cases that you have?

19       A.   Yes, I do.

20       Q.   Some of them are more onerous than others?

21       A.   Yes.

22           THE COURT:  This would be more onerous than

23   almost all the others?

24           THE WITNESS:  Yes, it will be.

25           BY MR. LEVINE:

1    Q.    If the Court orders you to provide periodic

2    summaries of notes submitted by Mr. Hinckley's treatment

3    providers, could you do that?

4    A.    If the Court orders it, yes.

5    Q.    If the Court ordered you to travel to

6    Williamsburg twice a year or perhaps even more frequently,

7    would you be willing to do that?

8    A.    Yes.

9    Q.    Do you have a view as to the appropriate number

10   of visits Mr. Hinckley should make to the OPD?

11   A.    I'm sorry, can you repeat the question?

12        (Discussion held off the record.)

13   Q.    Do you have a view as to the appropriate number

14   of visits Mr. Hinckley should make to the OPD, call it, in

15   the first three to six months?

16   A.    I think he should at least be coming to the

17   department on a monthly basis.

18   Q.    Once a month?

19   A.    Yes.

20   Q.    And do you have a view -- is that for a

21   three-month period, or a six-month period?

22   A.    I would say that that should be done until

23   there's a risk assessment on file that indicates that

24   less-frequent visits would not be detrimental to his

25   continued progress.

1      Q.    When you met with Dr. Patterson to discuss the

2   hospital's plan, did you express any concerns?

3      A.    29   13, I did.

4      Q.    With the plan?

5      A.    Yes.

6      Q.    And did you discuss those concerns with

7   Dr. Patterson?

8      A.    Yes, I did.

9      Q.    And what were those concerns?

10      A.    I expressed the concern that I would prefer not

11   to be responsible for compiling a monthly report from all

12   the treatment providers in Williamsburg.  I would prefer

13   to have those notes either compiled by someone in

14   Williamsburg or to be able to send those notes directly to

15   the Court.  And then I would provide my own progress note

16   regarding my phone calls to Mr. Hinckley during the month

17   and my visit with him during the month.  That was one

18   concern that I expressed.

19      Q.    And let's talk about that one.

20      A.    Sure.

21      Q.    And during the course of this testimony that you

22   heard, who do you think should do those -- gather those

23   notes and send them on to OPD?

24      A.    Mr. Weiss, the case manager.

25      Q.    And did you hear Mr. Weiss's testimony?

1       A.    Yes, I did.

2             No, I did not.  Sorry, no, I did not.  I was

3   told what he said.

4       Q.    Is it your understanding that he is amenable to

5   do that?

6       A.    Yes.  I have been told that.

7       Q.    Are you amenable to sending your progress notes

8   to the Court?

9       A.    Yes, I am.

10      Q.    From your notes of your phone calls with

11  Mr. Hinckley?

12      A.    Yes.

13            THE COURT:  The phone calls and your

14  once-a-month meeting?

15            THE WITNESS:  Yes.

16            BY MR. LEVINE:

17      Q.    What other concerns did you express?

18      A.    I expressed a concern from -- I can't remember

19  which report it was, but there was a report that said that

20  Mr. Hinckley should come to FOPD for the first four months

21  monthly, and then it would be up to the discretion of

22  myself and the team providers in Williamsburg to determine

23  whether he should still come at that frequency.

24            And I expressed concern because I felt like

25  there should be a more objective look at the situation

1    prior to him being told that he can come less frequently

2    to FOPD, so that would include, like, a risk assessment.

3        Q.   In the typical cases, is the decision as to the

4    number of times that a patient comes to FOPD addressed to

5    the discretion of the treaters at FOPD?

6        A.   No.  We are able to decide to go up to one

7    month, one-month visits.  Once the individual wants to

8    come less frequently, we then have to petition the Court,

9    and the Court basically has to sign off on us asking for

10   less frequent visits.

11       And that usually involves a risk assessment

12   that's done where we can actually show objective evidence

13   that less frequent visits to FOPD, less frequent

14   monitoring by us is not going to cause harm to the patient

15   or to their progress.

16       Q.   All right.  And is the FOPD capable of providing

17   those risk assessments?

18       A.   They are.  I've been told -- I was informed that

19   the hospital will allow Mr. Hinckley to come for risk

20   assessments there because we don't have actually a

21   psychologist on staff.  But they've been gracious enough

22   to allow him to come and have his risk assessments done

23   through their staff.

24       THE COURT:  When you're talking about a risk

25   assessment, are you talking about the kind of analysis

1    that Dr. Murphy did?

2            THE WITNESS:  Similar.  It's really just -- it

3    would be up to the discretion of the psychologist as to

4    what they feel they should have to do, they need to do, in

5    order to determine whether or not less frequent visits

6    would be harmful -- or I shouldn't say harmful, but would

7    cause --

8            THE COURT:  Would be justified.

9            THE WITNESS:  Yes.  Thank you.

10           And it's really, it's really a psychologist's

11   determination.  They review the notes, they review the

12   records, and they determine what instruments they might

13   use to determine if, you know, that would be feasible.

14           THE COURT:  And you were here yesterday when

15   Dr. Murphy suggested that under her provision, there would

16   be a Part A, a Part B, and a Part C?

17           THE WITNESS:  Yes.

18           THE COURT:  And there would come a point that,

19   before we move to Part C, there would be a risk

20   assessment?

21           THE WITNESS:  Yes.

22           So it's actually in concert with her because she

23   actually said that Mr. Hinckley should come to us for once

24   a month up through Part B.  And then at the end of Part B,

25   there would be risk assessments, which is the same thing

1    I'm saying now.

2              BY MR. LEVINE:

3         Q.   All right.  Now, did you express to

4    Dr. Patterson a concern about financial support?

5         A.   Actually, what happened was I hadn't talked to

6    either of the siblings, and so Dr. Patterson in our

7    meeting told me that his conversation with the siblings

8    said that there was a concern that in the next one to two

9    years, Mr. Hinckley would no longer have the financial

10   support he currently has from the siblings.

11             I was not aware of that prior to him telling me.

12   And I told him if that's the case, there would be a

13   concern that we're sending him to an environment where he

14   could fail if he's not financially supported by someone in

15   the next one to two years.

16        Q.   All right.  Now, have you been informed about

17   the testimony of Scott Hinckley and his sister, Diane?

18        A.   I have been.

19        Q.   And do you still have that concern?

20        A.   No.

21             MS. KENNEDY:  Objection, Your Honor.

22             What is the basis of her knowledge?

23             THE COURT:  Were you here when the testimony --

24             THE WITNESS:  No, I was not.

25             THE COURT:  So what did you learn?  From whom

1    did you learn, and what did you learn?

2            THE WITNESS:  Mr. Levine told me that the

3    testimony from, I think it was Ms. Simms, was that based

4    on the value of the home and the assets that the mother

5    currently has, there could be upwards of half a million

6    dollars available to Mr. Hinckley for providing support

7    for him in the community.

8            And if you calculate, you know, kind of what he

9    currently needs right now, that would last for at least

10   five years.

11           THE COURT:  One of the things he doesn't need

12   now but might need then is housing?

13           THE WITNESS:  Yes.

14           MR. LEVINE:  I didn't hear, Your Honor.

15           THE COURT:  Housing.  Right now, he doesn't have

16   to pay for housing.

17           MR. LEVINE:  Correct.

18           THE WITNESS:  Right.

19           BY MR. LEVINE:

20      Q.   All right.  And when you were informed about

21   that, was the hospital's lawyer on the phone?

22      A.   Yes, he was.

23      Q.   All right.  And was there an opportunity to

24   supplement my proffer to you?

25      A.   Yes.  She agreed.

26

1    Q.   All right.  And did you -- were you also

2    informed about the testimony of Diane Simms?

3    A.   Yes.

4    Q.   Do you remember, basically, what you were

5    informed in that regard?

6    A.   Yes.

7    MS. KENNEDY:  Again, what's the basis of her

8    knowledge, Diane?

9    THE COURT:  I think she's about to tell us that

10   in her conversation with Ms. Merene and Mr. Levine, they

11   also proffered what Ms. Simms said.

12   Is that right?

13   THE WITNESS:  That would be correct, yes.

14   BY MR. LEVINE:

15   Q.   And what do you remember to be the salient

16   features of her testimony?

17   A.   That there would be -- that not only would they

18   have the financial resources to be able to support him for

19   the next five years at least, if there was -- and I had

20   mentioned this concern to Dr. Patterson, the housing

21   situation -- that if there would come a time when

22   Mrs. Hinckley was no longer available to be in the home

23   with Mr. Hinckley, that she would immediately basically

24   drop what she's doing and come and stay with him in

25   Williamsburg until other arrangements could be made for

1    his housing.

2         Q.   All right.  So is your -- is the concern that

3    was introduced to you by Dr. Patterson about financial

4    support resolved in your mind?

5         A.   Well, he was just giving me information; but,

6    yes, it is.

7         Q.   Now, in terms of concerns or questions about a

8    plan for conditional release or convalescent leave,

9    however it may be described, is it typical to have some

10   questions?

11        A.   Yes.

12        Q.   All right.  And have the questions with respect

13   to Mr. Hinckley all been resolved in your mind?

14        A.   They have been.  I mean, we're going to wait on

15   whatever the Court orders to determine what resources

16   would be available.  But, yes, the answers to the

17   questions I had, precourt order, have been answered.

18        Q.   All right.  And do you have any concerns about

19   Mr. Hinckley's readiness for convalescent leave?

20        A.   No.

21        Q.   Do you support the hospital's plan?

22        A.   To have him live in Williamsburg, yes.

23        Q.   And you read Dr. Murphy's report?

24        A.   Yes.

25        Q.   And you read the hospital's responses to the

1    government's proposals?

2         A.   The 35 conditions?

3         Q.   Yes.

4         A.   Yes.

5         Q.   And do you support the hospital's plan?

6         A.   Yes.

7              THE COURT:  The hospital's plan, again, is that

8    a combination of the three letters from the hospital,

9    December, March, and April?

10             THE WITNESS:  Well, I think the April letter is

11   in response to the government's --

12             THE COURT:  Right.

13             THE WITNESS:  -- conditions, which I support.

14   And then I think that the March letter was kind of an

15   addendum to the December letter.  So yes, all of it in

16   concert I agree with.

17             BY MR. LEVINE:

18        Q.   Now, if Mr. Hinckley is granted by this Court

19   convalescent leave, could your office have weekly

20   conversations with him?

21        A.   Yes.

22        Q.   Would your office file a form or a summary, one

23   or the other, together with the Williamsburg treatment

24   team, to the Court?

25        A.   Yes.

1     Q.    Would drug testing be a requirement?

2     A.    Yes.  If it's ordered by the Court, yes.

3     Q.    Is it something that is indicated in this case?

4     A.    It's not indicated, but it's standard practice

5  for individuals who enter the community that they have

6  drug testing done by my department.

7     Q.    Okay.  So it's not because it's indicated for

8  Mr. Hinckley; it's because it's routine?

9     A.    Yes.

10    Q.    All right.

11         THE COURT:  Do you -- I know you're going to say

12  it depends on what the court order says, but typically --

13  let me put it this way:  There's some criminal cases that

14  come to this court.  There's a difference here because

15  he's been not out in the community for 30 years.  But

16  there's some criminal cases that come to court where

17  there's no drug history, but there's an initial drug test

18  and maybe a few follow-up tests, and then Pretrial

19  Services or Probation has total discretion to stop without

20  coming back to court.

21         What happens in your case when you've got, let's

22  not say Mr. Hinckley, but somebody who maybe has been at

23  St. Elizabeths for a short period of time.  And

24  Individual A did have some drug use in his past, and

25  Individual B never did.

1          How is that handled either by you in your

2     discretion or with the help of the Court?

3          THE WITNESS:  Well, the court orders actually

4     just identify that they have to have drug screening done

5     at our department.  It doesn't really say -- I have to

6     look at the actual wording, but it just says drug testing

7     is to be done by our department.  I don't believe it puts

8     in anything about use your discretion to determine if you

9     want to do the drug testing or not.  We just kind of

10    routinely, when they come in, do it.

11         THE COURT:  And do you do it thereafter?

12         THE WITNESS:  We do it until the order no

13    longer -- says to not do it.

14         BY MR. LEVINE:

15    Q.   Is the same true with respect to alcohol

16    testing?

17    A.   We do not do alcohol testing.

18    Q.   You don't do that?

19    A.   No, but the court order says they should refrain

20    from using alcohol.

21    Q.   Now, in the ordinary case, in the typical case

22    when a patient coming from the hospital, going into OPD,

23    is released into the community where he lives, he or she

24    lives the entire time, does the OPD have knowledge about

25    whether government assistance programs will be available?

1    Do they gather that knowledge after the release?

2         A.   Typically, when they -- when they are released

3    from the hospital, they are already linked to service

4    providers in the community.  So we don't have to get

5    involved in determining benefits or anything.  They are

6    usually already linked to our agency.

7         Q.   And that's typically the case when they are

8    released into the District of Columbia community?

9         A.   Yes, yes.

10        Q.   What about when they are released beyond the

11   District of Columbia, someplace, some state other than the

12   District?

13             MS. KENNEDY:  Objection, Your Honor.  There are

14   no other states at this time.

15             MR. LEVINE:  There are no what?

16             MS. KENNEDY:  There are no other NGI patients on

17   convalescent leave in other states.

18             MR. LEVINE:  That's just not true.

19             THE COURT:  Let's ask the witness.

20             Are there any NGI patients who come to OPD who

21   are released to places other than the District of

22   Columbia?

23             THE WITNESS:  There are individuals who are

24   related to other states at this current time.  They are

25   not -- they do not revisit us at OPD other than if they

1   live in Maryland.  Like, there's a gentleman right now who

2   lives in Illinois.

3           MR. LEVINE:  That's Mr. Wallace, Don Wallace?

4           THE WITNESS:  Yes.  Yes.  He lives in Illinois.

5   He lives in a nursing facility.  He does not visit us at

6   OPD.  We actually have to call his nursing home on a

7   regular basis to get input on what's going on with him in

8   Illinois.

9           There's a gentleman who lives in Maryland who

10  does visit us every three months, but that's because he's

11  local, so he comes and sees us every three months.

12          And then there's a gentleman who was in

13  North Carolina but was returned to the hospital in October

14  of last year.  Our obligation for him was to call his

15  service providers on a monthly basis to get an input on

16  him.

17          THE COURT:  There's nobody in the metropolitan

18  D.C. area who was in Virginia; only in Maryland?

19          THE WITNESS:  There was no one in Virginia.

20          BY MR. LEVINE:

21      Q.   In the typical release order, conditional or

22  convalescent leave order, does the -- does it typically

23  include the identity of the treatment providers for the

24  patient?

25      A.   If it's a known part of discharge, yes.

33

1   Q. And if it's not known?

2   A. Then it usually identifies the agency that they

3 are going to be assigned to.  And then we need to let the

4 Court know, once someone is assigned, who is assigned to

5 that.

6   MR. LEVINE:  Court's indulgence briefly,

7 Your Honor.

8   (Discussion held off the record.)

9   BY MR. LEVINE:

10   Q. Dr. Johnson, I want to show you a consent order

11 which I would like to first have marked as

12 Patient Number --

13   DEPUTY CLERK:  Nine.

14   THE COURT:  Nine.

15   MR. LEVINE:  -- 9.

16   Copy to your clerk, Your Honor.  Copy to the

17 Court, Your Honor.  And, of course, for the government.

18   BY MR. LEVINE:

19   Q. Dr. Johnson, I show you what has been marked as

20 Patient's No. 9.

21   What is that, please?

22   A. It's an order, a conditional release order for a

23 gentleman who was released from the hospital -- I want to

24 say actually, officially came out last week.  He's seeing

25 me next week, so he came out last week.

34

Q.    So you recognized his name?

A.    The name, yes.

Q.    All right.  Now, this is a consent order.

Does that mean the United States consented to it?

THE COURT:  She's not a lawyer.

THE WITNESS:  Yeah.

BY MR. LEVINE:

Q.    Do you understand it to be that?

A.    I know the government signed off on it, so they agree that the orders that are in this document are to be followed by the individual named there.

Q.    All right.  Now, is this an order that was signed by Chief Judge Lee Satterfield in the Superior Court?

A.    Yes, it was.

Q.    Let me invite your attention to Paragraph No. 13, the last page of that.

This paragraph pertains to what happens if there's a violation of the terms of the conditional release?

A.    Yes.

Q.    All right.  Let's read this together.

"If defendant fails to comply with any conditions of release such that the forensic outpatient

1   department staff determines that he is in need of

2   inpatient treatment, defendant shall cooperate with

3   transport to St. Elizabeths Hospital."

4           Do you see that?

5       A.   Yes.

6       Q.   Is that the standard that the Court generally

7   applies?

8       A.   Yes.

9       Q.   That there would be a violation of the terms of

10  release?

11      A.   Yes.

12      Q.   So it requires a determination by the staff that

13  inpatient release -- inpatient treatment is appropriate?

14      A.   As per the order, yes.

15          MR. LEVINE:  Your Honor, I move Number 9 into

16  evidence.

17          MS. KENNEDY:  No objection.

18          THE COURT:  All right.  It will be admitted.

19          (Patient's Exhibit Number

20          9 admitted into evidence.)

21          MR. LEVINE:  I'd like to have another document

22  marked, Your Honor.  Patient's No. 10, Your Honor, with a

23  copy to the clerk, copy for the convenience of the Court,

24  and, of course, for the government.

25          MS. KENNEDY:  Objection, Your Honor, no

1    question.

2            MR. LEVINE:  I haven't asked the question yet.

3            MS. KENNEDY:  I object to them being shown or to

4    admitting them.  This is another patient at St. Elizabeths

5    Hospital.  He's already admitted Ronald Embry, which has

6    nothing to do with Mr. Hinckley.  There's no basis for it.

7    Dr. Johnson hasn't treated Mr. Reed, and I would object to

8    its admission.

9            THE COURT:  He hasn't offered it yet.  It's been

10   marked for identification.

11           MR. LEVINE:  May I approach, Your Honor?

12           THE COURT:  Yes.

13           BY MR. LEVINE:

14   Q.   I show you what has been marked as Patient's

15   No. 10 for identification and ask if you can identify

16   that.

17   A.   That's another order of conditions for another

18   consumer that's in the -- living in the community.

19   Q.   And that's in Criminal Case No. 2008 CF2 23491,

20   assigned to Chief Judge Satterfield; is that correct?

21   A.   Yes.

22   Q.   Now, inviting your attention to the first page,

23   the last paragraph -- I'm sorry, the second paragraph.

24           This tells us, does it not --

25           THE COURT:  Have you offered it in evidence yet?

37

1        MR. LEVINE:  I'm sorry?

2        THE COURT:  Are you trying to lay a foundation

3   for offering it in evidence?  Because you have not offered

4   it in evidence yet.

5        MR. LEVINE:  I have not yet offered it in

6   evidence.  That's correct, Your Honor.

7        THE COURT:  All right.

8        BY MR. LEVINE:

9   Q.   Does this tell us that the patient in this case

10   was charged with three felony counts of assault on a

11   police officer and two misdemeanor counts of assault on a

12   police officer?

13   A.   That's what it says.

14   Q.   And does it tell us that he is diagnosed with a

15   mental disease of schizophrenia, paranoid type, and

16   dementia?

17   A.   That's what it says.

18   Q.   Now, turning to page 2, the portion of the

19   document that is ordered, it says the patient may be

20   placed -- Paragraph 1 -- the defendant may be placed on

21   convalescent leave to reside in hospital-approved housing.

22        Does that mean that he is allowed to go on

23   convalescent leave before the approved housing has been

24   secured?

25   A.   No.

1        Q.   Well, it says here the next sentence, "The

2    hospital shall notify the Court and counsel of defendant's

3    address upon his placement in the community."

4                MS. KENNEDY:  What number are we?

5                MR. LEVINE:  Paragraph 1.

6                THE COURT:  Paragraph 1.

7                THE WITNESS:  Prior to discharge from the

8    hospital, the hospital will petition the Court for these

9    orders.  Usually, during the period between when the order

10   is signed and when they are actually released from the

11   hospital, they are put into hospital-approved housing

12   before they can be released.

13               So prior to their discharge, even though the

14   order is written this way, prior to actually physically

15   leaving the hospital, they will be in hospital-approved

16   housing in the community.

17               BY MR. LEVINE:

18       Q.   All right.  So the sequence would be first the

19   order, then the housing?

20       A.   Yes.

21       Q.   First the order, then the housing?  All right.

22               Now --

23               THE COURT:  Then the release?

24               THE WITNESS:  Yes.  Because you can't release

25   them to homelessness.

1          BY MR. LEVINE:

2      Q.   Then the therapy, let me invite your attention,

3  please, to Paragraph 5:  "Defendant shall participate in

4  all therapeutic activities as recommended by the hospital

5  and/or Careco, Incorporated."

6          Careco is a private supplier of services?

7      A.   They are contracted through DBH to provide

8  community supports to our consumers.

9      Q.   It's a contract with an outside --

10     A.   Yes.  It's an outside contract, yes.

11     Q.   Okay.  All right.  And these therapeutic

12  activities would be recommended from time to time by the

13  OPD?

14     A.   I'm sorry.  I don't understand.

15     Q.   The therapeutic activities that the patient is

16  directed to participate in, are these activities that

17  would be recommended by the OPD from time to time?

18     A.   Sometimes.

19          MS. KENNEDY:  Objection, Your Honor.  Objection.

20          This has nothing to do with Mr. Hinckley's case.

21          THE COURT:  Why don't we -- I mean, I'm not sure

22  why you're doing this.  And it is not in evidence yet, and

23  you're asking her questions about it.

24          So if you want to offer it in evidence, then

25  she'll object, and then we'll discuss whether it's going

1    to be admitted in evidence.

2              MR. LEVINE:  I offer it in evidence, Your Honor.

3              MS. KENNEDY:  I object, Your Honor.

4              This has nothing to do with Mr. Hinckley's case.

5    These are conditions on two prior patients at

6    St. Elizabeths Hospital from 2014.  This is a 2008 case.

7    Obviously, the conditions in Mr. Hinckley's case, if

8    Your Honor grants convalescent leave, are going to be

9    totally different, much more extensive, and probably along

10   the lines of the 106-page order that Your Honor did four

11   years ago in this case.

12             So I would object to its admission.

13             MR. LEVINE:  Your Honor, of course, the Court

14   can write as long as it wishes.  But I think the Court --

15   I think the Court should know, I respectfully suggest,

16   what is done in the ordinary course.

17             THE COURT:  This isn't the ordinary course.

18             MR. LEVINE:  But, Your Honor, I think if it's

19   going to be different than the ordinary course, there

20   ought to be very good reasons for that.  I think what

21   we're asking for Mr. Hinckley is for him to be treated

22   by -- like others.

23             And the irony, of course, is when we treat him

24   outside the ordinary course, then we say he's

25   narcissistic; that he gets special attention; that he's

1    unique.

2              THE COURT:  That's not --

3              MR. LEVINE:  And.

4              THE COURT:  I sustained the objection.

5              We don't need to go into this order.

6              MR. LEVINE:  So the admission of this

7    document is denied?

8              THE COURT:  Right.

9              MR. LEVINE:  Thank you, sir.

10             BY MR. LEVINE:

11   Q.   Dr. Johnson, if a patient violates a condition

12   of release that is immaterial, what typically happens to

13   such a patient?

14   A.   Typically, we try our best to keep individuals

15   in the community as best we can.  If there's a violation

16   of an order that we believe we can rectify in the

17   community, we try to implement things that would be

18   helpful.

19             For instance, if someone comes in one day to the

20   office and they've had a drink, we would recommend they go

21   to AA.  We would then tell them they have to bring an

22   attendance sheet that proves to us they are going to AA.

23   And we have them visit us more frequently, and we would

24   probably implement things in the community to try to keep

25   them from going back to the hospital.

1           If they are amenable to our suggestions and they

2     actually show us that they are doing what we've asked them

3     to do, we will then continue on with the orders as they

4     are.

5           If they keep drinking and we can't get them

6     under control, we will then return them back to the

7     hospital.

8           Q.   All right.  So does the OPD exercise its

9     discretion as to what to do?

10          A.   We do when it's not presenting a harm or a

11    danger to the community in general.

12          Q.   All right, Dr. Johnson.  Can the OPD or the FOPD

13    meet the requirements of the proposed conditions outlined

14    in Dr. Murphy's report?

15          A.   Yes.

16          Q.   Are you confident in the ability of your team to

17    oversee Mr. Hinckley's progress during convalescent leave

18    under the plan proposed by the hospital?

19          A.   The plan from the, the response to the

20    government's plan, or the plan that they originally --

21          Q.   The plan proposed by the hospital.

22          A.   Yes.

23          THE COURT:  With respect to the -- wait.

24          The plan proposed by the hospital is the

25    December letter and the combination with the March letter;

1     right?

2             THE WITNESS:  Yes.

3             THE COURT:  Now, in the April letter, the

4     hospital responded to the government's 35 recommendations.

5             THE WITNESS:  Yes.

6             THE COURT:  And it seems to me that they agreed

7     with some of them, and to the -- and none of us have these

8     documents memorized -- but to the extent that they agreed

9     with some of them and those agreements went beyond the

10     December and March letters, can you -- are you confident

11     that you could implement those conditions as well?

12             THE WITNESS:  Yes.

13             THE COURT:  And to the extent that Dr. Murphy's

14     suggestions -- I think Dr. Murphy's suggestions don't,

15     quote, go further in concept, but they may impose a

16     practical day-to-day basis, more obligations on you and on

17     the treaters in Williamsburg.

18             Would you generally agree with that?

19             THE WITNESS:  Yes.

20             THE COURT:  To the extent that I were to issue

21     an order that also added some or all of the things she

22     suggests, are you still confident that you could comply

23     with the hospital's proposals as so modified?

24             THE WITNESS:  Yes.  We -- basically, our job is

25     to follow what the Court orders us to do, and we will do

44

1    that.

2              THE COURT:  But some things are harder to do

3    than other things.

4              THE WITNESS:  They are, but we will make the

5    resources available to be able to do what Your Honor

6    orders.

7              MR. LEVINE:  Cross-examination, Your Honor?

8              THE COURT:  At some point, as I said, it would

9    be useful -- it's not your job, but maybe the lawyers' --

10   to sort of, through spreadsheets or charts or something,

11   sort of cross-tabulate these various recommendations.  I

12   was going to say "and/or," but I won't say "and/or."  I'll

13   say and, in addition, come up with an agreed-upon order

14   that is an agreement as far as you can get.

15             So, for example, I think that there are some

16   things that the government proposed that they may, based

17   on what they heard in terms of how things operate in

18   Weiss's world or in G.G.'s world or in Johnson's world,

19   modify slightly even though they have the same basic idea.

20             So it seems to me -- and there are certain

21   things that the patient and the hospital could accede to

22   as well or have acceded to since this progress began.

23             So I think it's conceivable you could draft an

24   order where there's, you know -- again, if I were to grant

25   convalescent leave -- where there's agreement on

1    70 or 75 percent and then ways to indicate where there is

2    no agreement so my law clerk and I don't have to start

3    from scratch.

4            There's a lot of things floating around here,

5    but there's not, as Mr. Levine said, material, as I might

6    say, significant or substantive disagreements on a fair

7    number of things.

8            MR. LEVINE:  I think "significant" or

9    "substantive" is a good substitution for "material."  I

10   think it's better than "material."

11           THE COURT:  Thank you.

12           MR. LEVINE:  Thank you.

13           MS. KENNEDY:  If we came to an agreement on

14   75 percent, which I know Mr. Levine would definitely agree

15   to, the 25 percent that's left, you and your law clerk,

16   you would determine that that we couldn't agree upon?

17           THE COURT:  What you might want to do is figure

18   out a way, maybe, and the government's proposed additions

19   are in bold and the patient's are in italics so I at least

20   have --

21           MS. KENNEDY:  A chart?

22           THE COURT:  -- an order.

23           MS. KENNEDY:  Okay.

24           THE COURT:  A chart, perhaps?

25           MS. KENNEDY:  A chart and an order.

1          THE COURT:  And an order.  Because, in addition

2     to what you agree and don't agree to, there's a certain

3     logical order in which to include these things as well.

4          And, I mean, my earlier orders might serve as

5     models.

6          MS. KENNEDY:  Okay.

7          THE COURT:  Dr. -- Dr. Murphy's might.  I'm not

8     sure.

9          And -- or maybe, I'm not sure whether your

10    35 and their responses are in a logical order or not.  But

11    I'd love to see -- a chart or charts would be great.  An

12    order in a logical order, even where there are points of

13    disagreement, would be really helpful.

14         That's assuming we get to a decision that there

15    will be convalescent leave.

16         MS. KENNEDY:  Okay.

17         MR. LEVINE:  Thank you, Judge.

18                    CROSS-EXAMINATION

19         BY MS. KENNEDY

20         BY MS. KENNEDY:

21    Q.   Good afternoon, Dr. Johnson.

22    A.   Good afternoon.

23    Q.   You indicated that you had met Mr. Hinckley; is

24    that correct?

25    A.   Yes.

1      Q.   And was that about two weeks ago?

2      A.   Yes.

3      Q.   And was that based on your asking if you could

4   meet him --

5      A.   Yes.

6      Q.   -- as opposed to the inpatient telling you, We

7   think it would be a good idea for you to meet him,

8   Dr. Johnson?

9      A.   I know that I initiated wanting to meet

10   Mr. Hinckley at the hospital.

11      Q.   And you've been proactive in asking the

12   inpatient division for information on Mr. Hinckley;

13   correct?

14      A.   Yes.  I have been proactive.

15      Q.   And it hasn't always come that swiftly, has it?

16      A.   They've -- they've given me the information that

17   I think that they believe has been necessary to get

18   prepared for this hearing.

19      Q.   What about getting prepared for taking over this

20   case?

21      A.   In my mind, once the order is actually issued, I

22   probably will take more of an aggressive response in

23   trying to get the information.  But, you know, it's -- I

24   don't want to be flippant, but it's a waste of my time to

25   learn all about Mr. Hinckley if the order is not given

1    that he should be on convalescent leave.

2         Q.   Okay.  So based on that, did you read

3    Dr. Patterson's report?

4         A.   I did.

5         Q.   You actually spoke with him?

6         A.   I did.

7         Q.   And Dr. Murphy's report?

8         A.   I did.

9         Q.   And the last order in this case by

10   Judge Friedman?

11        A.   This 20 --

12        Q.   There was 2011, and then there was 2013.

13        A.   '13.  I briefly saw the 2013.  I did not read it

14   in its entirety.

15        Q.   Okay.  And the 2011, which was 106 pages?

16        A.   I did not see that one.

17        Q.   You did not see that?

18        A.   No.

19        Q.   And the government's response to the hospital's

20   request for certain conditions, did you see that?

21        A.   The April 17th letter you just did?

22        Q.   Yes.

23        A.   Yes, I did.

24        Q.   Okay.  And did you know that of the

25   35 conditions listed by the government, that the hospital

1    agreed with 19 of them?

2         A.   I know they agreed with a substantial number.   I

3    thought it was 18; but if it's 19, yes.

4         Q.   Okay.  And when you met with Mr. Hinckley, was

5    that for a couple of hours two weeks ago?

6         A.   No.

7         Q.   Was it longer, or how much time was it?

8         A.   It was about ten minutes.

9         Q.   Okay.  Was that on the grounds of the hospital?

10        A.   Yes.  It was -- it was in the transitional TLC.

11        Q.   Okay.  And did the inpatient division ever

12   arrange for you to have an interview with Mr. Hinckley?

13        A.   No.

14        Q.   And if the Court grants a release, a conditional

15   release, convalescent leave, some type of release, what

16   exactly will be your responsibilities with him?

17        A.   My understanding is that I will have to speak

18   with Mr. Hinckley on a weekly basis.  I'll have to speak

19   with his mother on a weekly basis for the first, I believe

20   it's three or four months for his mother.  His weekly

21   contact will continue.

22             I also am to meet with Mr. Hinckley once a

23   month.  I will have to submit a report based on those

24   conversations along with my meeting with him on a monthly

25   basis to the Court.

1          I also will have to speak with his various

2     treatment providers in Williamsburg prior to his visit to

3     Williamsburg to make sure that we're all kind of on the

4     same page, we all kind of understand what's going on with

5     his case.

6          I also have been informed that I will be asked

7     to physically attend treatment plan meetings in

8     Williamsburg at least twice a year so that we're all still

9     on the same page with Mr. Hinckley and possibly prepare a

10    monthly summary based on the notes that are received from

11    the Williamsburg team to present to the Court.

12         And, finally, alert the Secret Service, the

13    government, and I think it was the Court as to when

14    Mr. Hinckley is coming to FOPD for his monthly visits.

15         Q.   Now, Dr. Johnson, that is a lot of work, is it

16    not?

17         A.   Yes, it is.

18         Q.   Is it more than any other patient that you have

19    covered since you've been in outpatient?

20         A.   Yes, it is.

21         Q.   Is it more than any patient that you have

22    covered while you were in inpatient?

23         A.   Yes, it is.

24         Q.   And with you in outpatient, you do not have a

25    psychologist as of yet; correct?

1      A.    Correct.

2      Q.    And you're hoping at some time in the future,

3  that may occur?

4      A.    Hopefully, yes.

5      Q.    Have you been told that it will occur?

6      A.    I have not been told it will occur.

7      Q.    And that is an individual who would assist in

8  seeing Mr. Hinckley on occasion; correct?

9      A.    I mean, I don't know what their role would be.

10          For the most part, in my mind, I have determined

11  that more than likely, most of Mr. Hinckley's case will

12  reside with me.

13     Q.    But the psychologist would do a risk assessment;

14  correct?

15     A.    If we have one.  If not, it would be done by the

16  hospital.

17     Q.    Okay.  But you're trying to find a psychologist

18  to work -- who would do the risk assessments for

19  outpatient; correct?

20     A.    Eventually, yes, we would like that.

21     Q.    Okay.  At present, do you have an assistant of

22  any sort?

23     A.    What do you mean by an "assistant"?

24     Q.    Well, there are no other doctors other than you;

25  correct?

1      A.   Correct.

2      Q.   Who else is there to staff OPD?

3      A.   In terms of what?  Because we do have -- I have

4  a forensic staff assistant.  I have a nurse.  I have a

5  social worker.  I have a mental health counselor.  And

6  currently, I do have a psychiatrist in the building who

7  does some help with my medication management appointments

8  if I am otherwise detained.

9      Q.   But as you said, for the most part, you will be

10  doing the monitoring of Mr. Hinckley alone?

11      A.   Yes.

12      Q.   All right.

13           Now, do you know Mr. Shamblee?

14      A.   Yes.

15      Q.   And did he work in outpatient for quite a while?

16      A.   He did.

17      Q.   Okay.  He was a hard-working individual;

18  correct?

19      A.   Yes, he was.

20      Q.   Did he oversee Mr. Hinckley's case?

21      A.   For a few years, yes.

22      Q.   Okay.  And did you ever talk to him about that?

23      A.   Yes.

24      Q.   And did he indicate it was a lot of work?

25      A.   Yes, he did.

53

1    Q.   And he left recently; correct?

2    A.   He left in December, yes.

3    Q.   And did he ever tell you that part of the reason

4    he left was because of the work regarding Mr. Hinckley's

5    case?

6    A.   He did not tell me that.

7    Q.   Should you see, in your opinion, Mr. Hinckley

8    any more than what you would be seeing if an order is

9    granted by this Court?

10   A.   I'm sorry, say that again.

11   Q.   Do you believe you should see Mr. Hinckley any

12   more than what you've already stated you'll be seeing

13   him -- once a month, weekly on the phone -- if he's

14   granted convalescent leave?

15   A.   If I find that there's a clinical reason for it,

16   then I would ask that he come more frequently to me.

17   Q.   And that would be your decision alone; correct?

18   A.   Yes.

19   Q.   Okay.  And you are not in any way reviewed by

20   the inpatient division of the hospital; correct?

21   A.   No.

22   Q.   You say that with a smile.  Is that because you

23   prefer it that way?

24   A.   No, because Beth is sitting out in the audience.

25   I do prefer it that way.  I like to be independent, and we

1    are a different organization than the hospital.  Though we

2    are an arm of the hospital, we are different.  We report

3    to different individuals, and we do different work.  So we

4    should be independent.

5        Q.   So you are responding to someone at the

6    Department of Behavioral Health?

7        A.   Yes.  I actually directly respond to the interim

8    director at this current time.

9        Q.   And no one could override your decision in

10   treating or handling Mr. Hinckley's case; correct?

11       A.   Well, the Court could override it.  My director

12   could override it.

13       Q.   Who is your director?

14       A.   Director Barbara Bazron.

15           THE COURT:  How do you spell that?

16           THE WITNESS:  B-a-z-r-o-n.  She's a Ph.D.

17           BY MS. KENNEDY:

18       Q.   And has she ever overruled any of your decisions

19   while you were in outpatient?

20       A.   No.

21       Q.   It's not likely that that would happen, is it?

22           THE COURT:  Is she a psychiatrist, or a

23   psychologist?

24           THE WITNESS:  She is a psychologist.  I mean,

25   she has a Ph.D.  She's a psychologist.  I'm not sure what

1    her emphasis of study was.

2              THE COURT:  What's the role of the FOPD review

3    board once someone is already on convalescent leave?

4              THE WITNESS:  They make recommendations to our

5    department based on our requests.  So, for instance, if

6    someone wants to go from one-month to three-month visits,

7    we would present it to the review board and ask them their

8    opinion about whether or not they think this is a good

9    thing to happen at this point, and then they will say yes

10   or no.

11             If they say yes, we'll then present a report to

12   the Court.  If they say no, they usually give us

13   recommendations; you should get this and this and this in

14   place before you ask the Court for this new privilege

15   level.

16             THE COURT:  So there are certain things that --

17   is this written down somewhere that there are certain

18   things that you would have to go to the review board for

19   rather than simply rely on your own independent

20   professional judgment?

21             THE WITNESS:  It's not written down.  It's kind

22   of an understood.  You know, there are just certain things

23   that we would go to them for, but it's not written down

24   anywhere.

25

1          BY MS. KENNEDY:

2      Q.   And this is the inpatient review board?

3      A.   No.  This is the outpatient review board.

4      Q.   Okay.  And is it at 35 K Street where your

5  office is located?

6      A.   Yes.  They come to our office, yes.

7      Q.   Who is on the outpatient review board?

8      A.   Our current chief medical officer is on that.

9  That's Dr. Tyler Jones.  We also have the program manager

10  for the clinic.  Ms. Theresa Donaldson sits on that review

11  board.  Dr. Teresa Grant, who is the clinical psychologist

12  at the courthouse, currently sits on that review board.

13  There is Iona Fords.  I'm not sure of her title at DBH,

14  but she also sits on that board.  She's a licensed social

15  worker.  There's a fifth individual.  I can't remember the

16  name right now of that person.  But right now, there are

17  five individuals that sit on that review board.

18      Q.   Does that review board meet for any time you

19  believe someone should come back as an inpatient?

20          What do they meet for?

21      A.   They meet when we want to make a request to the

22  court regarding someone's privilege or status level in the

23  community.  For instance, we think that if someone comes

24  and says -- I keep using the word "one-to-three-month."

25  The typical thing we see is that someone says, I want to

1   come less frequently to FOPD.  I want to come to see you

2   once every three months instead of once a month.

3           We will then, you know, do what we need to do to

4   get ready for that request.  Once we, the FOPD department,

5   believe that that person is ready for that step, we then

6   present the case to the review board.  And we ask them

7   their opinion:  Do you think that this person is ready for

8   this next step?  They will say yes or no.

9           If they say no, they'll say, Well, you know,

10  before you go to this, maybe you should get them a

11  guardian, or maybe you should have them placed in a --

12  whatever their recommendations are, we'll try and get them

13  in place and then come back to them again once we have

14  those things in place.

15      Q.  Now, you indicated that it would involve someone

16  indicating, I don't want to come as much; I want to come

17  once every three months or not every month?

18      A.  I want to be on conditional release.  I want to

19  be on conditional release at this point from your

20  facility.

21          They will then meet, and we'll say, Get a

22  guardian first.  Once you get a guardian in place, we

23  think that this recommendation will be approved by the

24  court.

25      Q.  Wouldn't this be initiated by the attorney for

1    the patient stating they want unconditional release or

2    stating they only want to come once every three months?

3         A.   No.  Sometimes patients come to us and say

4    they'd like to; what do they need to do in order to get

5    that?

6              And then we will talk with them and try to work

7    on plans to get it in place.  So it can come from either

8    source.

9         Q.   Then you file something called, quote, an

10   (e) letter?

11        A.   Yes.

12        Q.   Under 24-501(e) stating they should be released

13   or come less in order to be on conditional release; is

14   that fair to say?

15        A.   Yes.

16        Q.   And when you indicated how much time you would

17   spend on this case, is it fair to say it's several hours a

18   month?

19        A.   Yes.

20        Q.   Okay.  How much time is that compared to time

21   spent with other patients who are outpatients that you are

22   seeing on a regular basis?

23        A.   On average, I probably spend -- if a person

24   isn't actively symptomatic, it's maybe about two hours a

25   month.

1     Q.   So when they come in once a month, do you

2  usually spend two hours with them?

3     A.   No.  They usually come in once a month, and I

4  see them for at least one hour for their medication

5  management if they are my patient, individual.  And then I

6  spend time, you know, drafting notes, reviewing the

7  records, just making sure that they are following the

8  orders of conditions, talking to the staff, making sure

9  that there are no violations that I'm aware of that we

10  need to address.

11          So that hour goes with just making sure that

12  they are following what they are supposed to be doing.

13     Q.   And you would be the doctor who prescribes

14  medication, psychotropic medication, for outpatients;

15  correct?

16     A.   I do.

17     Q.   You will not be doing that for Mr. Hinckley?

18     A.   I will not.

19     Q.   Dr. G.G. will be doing that, correct?

20     A.   That's what I've been told, yes.

21     Q.   Do you believe that you should be prescribing

22  the medication?

23     A.   No.

24     Q.   So the fact that Dr. G.G. will be doing it and

25  sending you notes is satisfactory to you?

1      A.    Yes.

2      Q.    What if he needs, in your opinion, a medical

3  change of his psychotropic medications?

4      A.    I would hope that Dr. G.G. and I can come to

5  some understanding as to why I want what I think is

6  necessary for him.  She can tell me why she does not

7  believe that, and we can come to some understanding as two

8  colleagues as to what should be done with Mr. Hinckley and

9  his medications.

10     Q.    But ultimately, would it be Dr. G.G. who

11 prevails since she's overseeing his medications?

12     A.    Yes.  She would have to be the one.

13     Q.    Now, you indicated that you have not met with a

14 Williamsburg treatment team as of yet; correct?

15     A.    Not in person.

16     Q.    But you've talked to them on the phone?

17     A.    I've talked to Mr. Weiss, and I think Mr. Beffa

18 was on a phone call that I was on in, I think, January or

19 February of this year.

20     Q.    Okay.  But not Dr. G.G.?

21     A.    I have not met Dr. G.G., no.  I have not spoken

22 to her.

23     Q.    So you haven't met her in person or by phone?

24     A.    No.

25     Q.    Okay.  And Ms. Haley, the music therapist, have

1    you had any luck reaching her?

2        A.   I have not tried.

3        Q.   Okay.  Have you heard, Doctor, through this

4    testimony, that she's tough to reach?

5        A.   Yes, I have.

6        Q.   In your view from what you know so far in this

7    case, Dr. Johnson, is a music therapist important for

8    Mr. Hinckley?

9        A.   From what I understand, yes.

10       Q.   Okay.  So if she dropped out, you would think

11   it's significant that he find someone else?

12       A.   I would hope so, yes.

13       Q.   Okay.  Now, how many of these conversations over

14   the phone have you had with Mr. Weiss, Mr. Beffa?

15       A.   Mr. Weiss and Beffa together was the one phone

16   call that we had back in, I want to say, February -- in

17   preparation for the March response.

18       Q.   Okay.

19       A.   I spoke to Mr. Weiss on March 5th because I was

20   scheduled to go down on March 6th and meet the

21   Williamsburg treatment team.  We had that really bad

22   snowstorm on March 4th, so he called me out of concern and

23   told me not to travel to Williamsburg because of the

24   storm, so I didn't go.  So I talked to him then.

25            He left me a voice mail in April indicating that

1    they were having a treatment team meeting on April 10th,

2    but I was taking my boards, so I was not able to make that

3    meeting.

4           And I don't know if he was on the phone when we

5    had the review board meeting in April.  I don't recall if

6    he was on the phone, but I was on the phone with the

7    review board at the hospital.  I don't remember if he was

8    on the phone also.

9       Q.   Okay.  Let me just deviate for a second here.

10          You said you couldn't make it because you were

11   taking your boards; is that correct?

12      A.   Yes, my forensic boards.

13      Q.   But you are certified?

14      A.   I'm sorry.  I was doing my recerts.  Every ten

15   years, we have to take our -- people tell me if they were

16   lawyers, that they wouldn't do it -- but physicians have

17   to take our boards every ten years.  And so mine was up

18   last -- this month.

19      Q.   Okay.  Good luck with that.

20      A.   Thank you.  I'll find out in about six weeks.

21      Q.   Now, having been involved in the case thus far,

22   do you know how often Mr. Hinckley meets with his

23   Williamsburg team?

24      A.   I believe in the 17-day trip that he goes down

25   there, he meets with Dr. G.G. twice.  And I believe he

63

1    meets with -- Mr. Beffa is the individual therapist.  He

2    meets with him weekly, and he has a group therapy meeting

3    he goes to weekly also.  So probably twice also.  And then

4    I'm not sure how often he sees Mr. Weiss when he goes to

5    Williamsburg.

6         Q.   Do you know if he sees Ms. Haley once a week?

7         A.   I don't know how often he sees Ms. Haley.

8         Q.   Okay.  And the amount of times that were

9    discussed for Mr. Beffa, Mr. Weiss, and Dr. G.G., do you

10   think that's an adequate amount of time?

11        A.   Going forward, or what he's currently doing at

12   the 17 days?

13        Q.   Going forward if he were granted convalescent

14   leave.

15        A.   Yes, I think the weekly meetings with Dr. G.G.

16   when he first comes out of the hospital is appropriate

17   until she deems that it's clinically -- it's clinically

18   sound for him to go less frequently.

19             I think that meeting with Mr. Weiss weekly and

20   Mr. Beffa weekly are all, you know, sound plans.

21             And, you know, they'd have to -- clinicians have

22   to use their discretion to determine that he should be

23   seen less frequently.

24        Q.   And the Williamsburg team thus far, if you know,

25   has it just been conference calls with the inpatient

1    division, or have they ever come up to meet with the

2    inpatient team?

3        A.   Based on the testimony from Mr. Hyde, they've

4    never physically come to the hospital.  It's been

5    conference calls.

6        Q.   And do you feel it's important that you do go

7    down there, as you indicated you would, twice a year to

8    meet with the treatment team?

9        A.   Yes.

10        Q.   And is that to see where Mr. Hinckley is working

11    and living and seeing his therapists?

12        A.   Yes.  I think that in person, a lot more is

13    shared than kind of over the phone.  So I think for me, it

14    would be helpful for me to be down there to see people's

15    faces, talk to them, see how he interacts with them, and

16    just get my own sense of how things are going in

17    Williamsburg.

18        Q.   And you indicated you've never spoken with

19    Scott Hinckley or Diane Simms; is that correct?

20        A.   No, I have not.

21        Q.   Are those two individuals who you feel you

22    should have some contact at some point with if he's

23    released to Williamsburg?

24        A.   If they come into contact with him and they see

25    him, yes.  I think that they should be able to let me know

1    how the visit went, whatever interactions they have.

2              But on a regular, consistent basis, I don't see

3    the need to speak with them when I'm going to talk to his

4    mom on a consistent basis.

5         Q.   You indicated with Mr. Levine, having spoken

6    with Mr. Levine, that you are aware that there is $500,000

7    for Mr. Hinckley which someone indicated would last a

8    five-year period; is that right?

9         A.   That's what he indicated, yes.

10        Q.   So you don't have any independent knowledge on

11   your own?

12        A.   No.  I don't have any knowledge from when

13   Dr. Patterson told me that they were having financial

14   problems, because I've never spoken to either one of them.

15        Q.   You've never read Dr. Patterson's report?

16        A.   I have.

17        Q.   And did you see the indication in there from the

18   interview with Mr. Hinckley?

19        A.   Yes.  I'm saying that outside of what

20   Dr. Patterson told me about what Ms. Simms relayed to him

21   and Mr. Hinckley relayed to him and what Mr. Levine told

22   me about their situation, I have no independent knowledge

23   about their financial situation in terms of Mr. Hinckley

24   and his support.

25        Q.   And as this case proceeds and if, in fact, he is

1    released on convalescent leave, that would be something

2    that's important for you to know?

3         A.   It would be, but it's also important to know

4    what benefits he's going to have available to him in

5    Williamsburg and how that's going to defray the cost that

6    the family is currently dealing with in terms of getting

7    him back and forth to the hospital and to Williamsburg.

8         Q.   But you do understand that it's the family who

9    has the substantial amount of money to support

10   Mr. Hinckley, not any public entitlements?

11        A.   Currently, yes.

12        Q.   Okay.  Now, you're aware of who is on the

13   inpatient team for Mr. Hinckley over in the hospital at

14   present?

15        A.   I know, yes.

16        Q.   And they've been with him a long time; correct?

17        A.   I don't know about Ms. Brown.  I don't know how

18   long she's been with him, but I know that Dr. Adewale has

19   been with him for probably double-digit years, yes.

20             I know that Mr. Hyde was with him through his

21   music therapy and then as a clinical administrator for the

22   last few years.

23             I know Dr. Binks has been with him for

24   double-digit years.

25             So, yes, the majority of the providers have been

1    with him for double-digit years.

2        Q.    You've seen that one of the conditions that are

3    proposed is that Mr. Hyde or another treatment team member

4    see Mr. Hinckley when he comes up to visit once a month to

5    keep contact with him for a period of time; correct?

6        A.    I do -- I did see that, yes.

7        Q.    And do you think that's a good idea?

8        A.    Yes.

9        Q.    Do you believe that Mr. Hinckley does best with

10   support from the hospital as well as family?

11       A.    I think anyone does best with support in

12   general.  I mean, I would think that he would be -- it

13   would be very good for him to have support with his family

14   and support of providers that are looking out for his best

15   interests.

16       Q.    Now, how would you know, Dr. Johnson, if

17   Mr. Hinckley is down in Williamsburg, you haven't seen him

18   in a month or, you know, the month part is coming up

19   slowly, how would you know whether or not he is

20   deteriorating mentally?

21       A.    Talking to his providers that see him on a

22   weekly basis and from, you know, my phone calls with him

23   every week.  Hopefully, my forensic skills and my

24   psychiatric skills would kick in that if he says things on

25   the phone that bring me pause, I would know there's

1    something wrong.

2        Q.   But isn't it much easier to tell if you're

3    having a personal, one-to-one interview or evaluation with

4    someone than over the phone?

5        A.   Of course it is.

6        Q.   And you're familiar with the D.C. Plan B plan in

7    case something were to occur and Mr. Hinckley were going

8    to come back up here to Washington, D.C.?

9        A.   I'm aware of the backup plan, yes.

10       Q.   And you're aware that he doesn't have a problem

11   with that plan; but right now, he would prefer

12   Williamsburg?

13       A.   I'm aware of that, yes.

14       Q.   And in your view, again, not knowing as much as

15   you hope to know at some particular point in time, do you

16   see that as a viable option for Mr. Hinckley?

17       A.   Yes, because I know the D.C. system very well.

18       Q.   Yes.

19            Do you know the Williamsburg system?

20       A.   I know the Outlet.

21       Q.   But you'll be learning it, is that fair to say?

22       A.   I will be learning it.

23       Q.   Now, you testified that it's not an ideal

24   situation in outpatient where you suddenly get a patient

25   just before they are to go on outpatient, and they've come

1    from inpatient, and you haven't met them; correct?

2    　　　A.　　It's not ideal, but it happens like the one I'm

3    seeing next week.

4    　　　Q.　　But you did say that the hospital is trying to

5    change that?

6    　　　A.　　We're working together to make sure that FOPD

7    has a presence, even prior to the hospital asking for an

8    order of release, is to have us involved to determine what

9    services are available in the community, determine what

10   will be best for that individual and the hospital, and

11   that we have worked diligently and made sure that we're

12   present when it comes to review board meetings and even

13   treatment plan meetings when it comes to certain

14   individuals in the hospital.

15   　　　Q.　　Because, as you indicated, them coming for the

16   first time to meet you before they go out into the

17   community is not ideal?

18   　　　A.　　It's not ideal, no.

19   　　　Q.　　Now, you indicated that you expressed concerns

20   to Dr. Patterson of not having to write those monthly

21   summaries; that that should be Mr. Weiss --

22   　　　A.　　Yes.

23   　　　Q.　　-- correct?

24   　　　　　　And if you were asked to do it rather than

25   Mr. Weiss, would you?

1    A.   Yes.

2    Q.   Do you believe Mr. Weiss is more appropriate

3  because he sees Mr. Hinckley more often?

4    A.   Yes.  And he's actually physically there with

5  the individuals that will be taking care of him.

6    Q.   When you spoke with Mr. Weiss, was it one time,

7  I'm sorry, that conference call?

8    A.   I've spoken to him twice.  He's left me a

9  message, and I've spoken to him twice.

10   Q.   And did he indicate -- did it come up during

11 that conversation that he would go ahead and write those

12 summaries?

13   A.   No, it did not.

14   Q.   It did not come up?

15   A.   Not in those conversations, no.

16   Q.   So you certainly plan on having a lot more

17 conversations before you would take this case on --

18   A.   Yes.

19   Q.   -- as to whose role is what?

20   A.   Yes.  Based on the court order, if the Court

21 says it's to come from myself, then it will come from

22 myself.  If it says it will come from Mr. Weiss, it should

23 come from Mr. Weiss.

24   Q.   And you stated that in proposal, I believe it

25 was by Dr. Murphy, that she did a step-down situation

1    where after four months, it would be determined how often

2    Mr. Hinckley would see a particular therapist or do

3    specific things.

4         A.   I thought it was six months.

5         Q.   One is four months, and then plan -- I think

6    Plan B is six months, and Plan C is four months.  There

7    are several plans.

8         A.   Right.  I thought Plan A was six months, and

9    then Plan B was between 6 to 18 months, and then Plan C

10   came on after the 18 months is what I thought.

11        Q.   Which is four months?

12        A.   Right.  After the Plan B.  But the first plan, I

13   thought, was a six-month period of Plan A.  And at the end

14   of six months, there could be a meeting and a

15   determination of what he required for services, and then

16   the next plan would be the next, basically, year.  And

17   after that period, now we're looking at 18 months, he

18   would have a risk assessment done and determine what he

19   needed at that point.

20        Q.   And that was four months?

21        A.   I'm not understanding the four-month part.

22        Q.   You indicated on direct examination that you did

23   not feel comfortable with Mr. Hinckley not going only four

24   months longer than what Dr. Murphy had recommended and

25   that you would rather see how he does after a risk

1    assessment, and you would have an opportunity to evaluate

2    him; not go by just a set standard from Dr. Murphy.

3         A.   I think it's hard to put time frames on

4    community progress.  And I think the four-month thing came

5    in because I think originally the hospital had recommended

6    that after four months it would be the discretion of OPD

7    to decide whether he still comes and sees us every month.

8              And I voiced concern about that and that it

9    should be until a risk assessment is done and a

10   determination is made by the outpatient providers that

11   it's clinically, it's clinically indicated for him to do

12   less.

13        Q.   And so that is something that you want to make

14   the decision.  You're not going to be bound by a decision

15   made from Williamsburg or someone else's risk assessment?

16        A.   Well, with their input.  But, yeah, the decision

17   should be made by us because we're the arm of the Court

18   that is in consultation with Williamsburg.

19        Q.   Okay.  And so you are indicating that you

20   wouldn't feel comfortable until this Court sets up a

21   schedule is accurate?

22        A.   Well, I'm not sure if that's accurate.

23   Basically, I think that Mr. Hinckley should come to see

24   FOPD a month before the first, at least a year, honestly.

25        Q.   Okay.

1     A.   And then at the end of that year, we will

2  determine via risk assessment whether or not it's

3  indicated clinically for him to be coming to see us less

4  frequently.

5          If that's the case, we would make that -- we

6  would make a proposal to the Court and have them sign off

7  on yes, based on your risk assessment and all the things

8  you've given us, we believe it's now time to have him come

9  see us once every three months or once every four months

10  or whatever the Court decides.

11          I wouldn't want to put a time limit on he's got

12  to come in six months, and then we decide what he's going

13  to do.  I think there should be a little more structure

14  with it.

15          THE COURT:  Okay.  Dr. Murphy's proposal --

16          THE WITNESS:  Right.

17          THE COURT:  -- which is the problem, at least as

18  I understand it, in her Part A, Mr. Hinckley would come

19  once a month.

20          THE WITNESS:  Yes.

21          THE COURT:  And that would last for six months.

22          THE WITNESS:  Right.

23          THE COURT:  For Part B, which would also last an

24  additional six months --

25          THE WITNESS:  Right.

1          THE COURT:  -- he would continue to come once a

2     month.

3          THE WITNESS:  Exactly.  Exactly.

4          THE COURT:  And then when she gets to Part C, on

5     page 65, as I understand this, it says after 12 to 18

6     months, then there would be a comprehensive treatment

7     planning conference involving all treatment providers to

8     collectively evaluate his adjustment, and an updated risk

9     assessment should be conducted at that time.

10          THE WITNESS:  Right.

11          THE COURT:  So I think what I'm reading is that

12     A is six months; B is six months.

13          THE WITNESS:  I think 6 to 12 months is B.

14     That's what the confusion is.  That's why she gets the 6

15     to 18 months when you get to Plan C.

16          THE COURT:  Part C.

17          THE WITNESS:  Part C.

18          THE COURT:  Whatever.

19          THE WITNESS:  Yes.

20          THE COURT:  Okay.  But she is contemplating in

21     Part A and Part B that he come to see her personally once

22     a month.

23          THE WITNESS:  Yes.  Then I agree with that.

24          BY MS. KENNEDY:

25     Q.   And Dr. Johnson, you indicated in certain of the

1   orders that you were looking at that if an order states

2   there is no alcohol use but the individual comes back and

3   you can tell has been drinking one time, that you would

4   still leave him in the community and not violate him if

5   that was the first time; is that correct?

6       A.   Yes.

7       Q.   That is in violation of the court order;

8   correct?

9       A.   I know.  It is.  But, you know, I -- I'm going

10  to stand -- it is a violation, you know, but I also

11  have -- I guess I've read between the lines and used some

12  discretion when it comes to minor incidents in the

13  community that I think don't rise to the level of

14  returning to the hospital.

15          If I'm told that every violation, regardless of

16  the severity or the minuteness of it is required to return

17  to the hospital, then that's what I'll do.  But I've read

18  it as I have some discretion in terms of trying to work

19  with him in the community to keep them in the community.

20      Q.   And they have discretion, you see, written in

21  the order somewhere?

22      A.   It's not.

23      Q.   Okay.  And if you had a situation with

24  Mr. Hinckley who has no drinking problem, does he?

25      A.   That I've been aware of, no.

1      Q.    And no drug problem?

2      A.    That I've been -- correct.

3      Q.    And he came to outpatient under the influence of

4   something and this order indicated he should be returned

5   if that circumstance happened, what would you do?

6      A.    Return him.

7      Q.    Is that because it's Mr. Hinckley's case?

8      A.    Yes.

9            THE COURT:  So, I mean, that gets to some of the

10  things we were talking about the other day with other

11  witnesses, which is providing enough flexibility and

12  discretion and, in Mr. Levine's word, not requiring that

13  he be returned --

14           THE WITNESS:  Right.

15           THE COURT:  -- every time he doesn't cross an

16  I -- or cross a T and dot an I.

17           But the problem is, it seems to me, that in his

18  case we can't -- if the order says X, the providers have

19  to comply to the letter with X.  If the order says there

20  is some discretion or some wiggle room, however we word

21  that, then that provides the level of flexibility that the

22  hospital is concerned about.

23           THE WITNESS:  Yes.

24           THE COURT:  So, I mean, I keep coming back to

25  examples from criminal trials that I've had where, you

1    know, somebody is out on supervised release and violates a

2    drug condition.  Typically, what Probation will do or what

3    Pretrial Services will do is they will impose some sort of

4    a sanction and advise the Court but not bring him in for a

5    hearing the first time.

6         But having been advised, if I think we need a

7    hearing, I can initiate one.  In other words, they

8    don't -- they don't say every time a guy used a little

9    marijuana -- the first time a guy used a little marijuana,

10   we got to run back to court.  We got to pull him out of

11   his job and pull him out of his school and run back to

12   court.  We slap him on the wrist, but we tell the Court

13   about it.

14        Or take the example of someone who's got a

15   curfew and violates the curfew.  They don't bring him back

16   to court -- violates a curfew one time -- they don't bring

17   him back to court, but they withdraw his privileges for a

18   while.

19        So the question is in fashioning some sort of an

20   order, I think the concern that Mr. Levine has raised with

21   a number of witnesses is it could be the most minor

22   violation of a condition.  And if the order is written a

23   certain way, you or Mr. Weiss or Dr. G.G. would have to

24   say, Okay, that's it.  He has to go back to the hospital.

25        And maybe that's not the best thing clinically.

1    We're trying to avoid risk of violence.  We're trying to

2    provide some flexibility and lack of rigidity, but we also

3    want him to be accountable and to follow the rules.

4           And all of this is hypothetical if I do grant

5    convalescent leave.  So I don't know how we say these

6    kinds of things.

7           THE WITNESS:  Well, as Ms. Kennedy has pointed

8    out, the orders that I have from the D.C. Superior Court

9    do say a violation or deterioration, return to inpatient

10   status.  I have personally read them as having some

11   discretion.  If I'm wrong, then I'm wrong.

12          But, you know, I just -- I feel like someone has

13   made it to the community, made it to a point where they

14   are functioning reasonably well in the community and they

15   have a minor setback, I don't believe that that rises to

16   the level of going to the hospital.  But that's my

17   interpretation, and maybe I'm incorrect in interpreting it

18   that way, but that's kind of how I've been operating.

19          THE COURT:  Well, the one word that I did admit

20   in evidence because Ms. Kennedy didn't object, and she

21   probably wishes she did, as I read Paragraph 13, it says

22   something like if he violates the conditions and the staff

23   determines he needs inpatient treatment --

24          THE WITNESS:  Right.  Exactly.

25          THE COURT:  -- then he's returned to the

1    hospital.

2          I'm not sure that it says if he violates the

3    conditions and the staff doesn't think he needs to be

4    returned, whether it tells the staff what it's supposed to

5    do or leaves it to your discretion.

6          THE WITNESS:  That's how I've read it.  I've

7    read it as if he violates an order and it doesn't rise to

8    a level of return to the hospital and we can work with it

9    in the community, we try to work with it in the community.

10          THE COURT:  The question was:  At what point

11    does it rise to the level of needing to return, and at

12    what point does it rise to the level of at least advising

13    the Court that there's been a problem?

14          THE WITNESS:  For a return, usually it's an

15    active, psychiatric symptom with risk of danger.  If the

16    person is not complying with taking their medications in

17    the community, that is a return.  If they have ongoing

18    substance abuse, that's a return.  If they become

19    homeless, that's a return.  If they are missing from their

20    place of residence and we make attempts to try to locate

21    and we can't find them because they are at their

22    boyfriend's house, that's a return.

23          We usually let the Court -- we don't usually let

24    the Court know of minor violations, at least currently, if

25    we feel that we can work with the individual and keep them

1   in their current status.

2          If the Court wants to be told of every minor

3   violation, I have no problem doing that.  It's just that

4   Judge Satterfield hasn't required that we tell them every

5   single time that someone does something.

6          Maybe from now on, Ms. Kennedy is going to

7   require that.

8          BY MS. KENNEDY:

9   Q.   But Dr. Johnson, there isn't anything in this

10  order that indicates that you have any discretion.

11  A.   I mean, I read 13 to say that if we believe --

12  if they violate and we believe that they should be

13  returned, they are.

14  Q.   But 14 -- and correct me if I'm wrong -- on this

15  order, states that "If a defendant's mental condition

16  deteriorates or if he violates the conditions of this

17  release, he shall be returned to inpatient care at the

18  hospital with due notification to the Court and counsel."

19          There's no discretion in there.

20  A.   You're correct if you read it that way, yes.

21  Q.   And Dr. -- excuse me, Judge Satterfield, the

22  only way this wouldn't be enforced is he wouldn't know.

23  A.   Very true, yes.

24  Q.   And again, this would not occur in this case?

25  A.   It doesn't seem like it should, no.

1      Q.   Correct.  Now, there's been some discussion and

2   things proposed as far as conditions about Mr. Hinckley

3   having an itinerary.

4           Have you heard that?

5      A.   I have.

6      Q.   And what is your view on that?

7      A.   I don't really have an opinion as to whether or

8   not he should or should not have an itinerary, honestly.

9      Q.   Okay.  So if he comes to you as an outpatient --

10     A.   Yes.

11     Q.   -- to live in Williamsburg, will you be forming

12   an opinion on that, or will you just let Williamsburg make

13   that decision?

14     A.   I mean, I was informed that Dr. G.G. is a

15   forensic psychiatrist as long as I am, and so I would

16   probably leave the discretion to the treatment team in

17   Williamsburg to determine whether or not he needed an

18   itinerary and the flexibility of them deciding where he

19   should and shouldn't be.  As long as he comes to his

20   activities at FOPD when they are set, then I would really

21   leave the decision to the treatment team in Williamsburg

22   to decide his day-to-day activities.

23     Q.   As far as what access Mr. Hinckley has to the

24   Internet, would you have an opinion on that, or would you

25   leave that up to Williamsburg?

1      A.    I would probably leave that up to Williamsburg.

2      Q.    Is that because it's easier?

3      A.    That, too.  You know, I have not combed through

4   the file cabinet in VJ's office –– I'm sorry, Mr. Hyde's

5   office to understand all the ins and outs of this case.

6   Maybe after I go through all of the records and the

7   35 years at St. Elizabeths, I may have a different

8   opinion.  But right now, I would leave that decision to

9   the treatment team in Williamsburg or the Court to decide

10  what he should and shouldn't be able to access on the

11  Internet.

12     Q.    And assuming at some point that you are able to

13  go through those file cabinets in Mr. Hyde's office, you

14  would have no problem changing your mind or forming an

15  opinion and letting Williamsburg know on certain

16  conditions?

17     A.    I would definitely give my recommendations.

18     Q.    And have you had an opportunity to read

19  Dr. Murphy's report?

20     A.    Yes.

21     Q.    And you've seen all of her recommendations?

22     A.    Yes.

23     Q.    Do you agree with all of them?

24     A.    I believe I agree with them.  They are all kind

25  of running together.  Let me think.

1          MR. LEVINE:  Your Honor, may I suggest that --

2          THE WITNESS:  I can look at them.

3          MR. LEVINE:  The question that asks about

4   agreeing is not a fair question.  If she has something she

5   can bring to her attention, she can do it that way.

6          THE COURT:  Or we can show her the document.

7          MS. KENNEDY:  Yes.  I can show you --

8          THE COURT:  Dr. Murphy's conditions of the last

9   three or four or five pages.

10          MS. KENNEDY:  Right.  And the April 17

11   conditions.

12          Let me just pull this, Your Honor.

13          (Discussion held off the record.)

14          BY MS. KENNEDY:

15   Q.   For right now, I show you, Dr. Johnson, the

16   April 17, 2015, letter by St. Elizabeths Hospital

17   commenting on all of the government's 35 conditions, and

18   that's been admitted into evidence.

19          I don't specifically remember the number, but

20   I'll get that.  And then Dr. Murphy's violent risk

21   assessment, which is Defense Exhibit No. 7.

22          THE COURT:  And the hospital's April 17 letter

23   is Exhibit 4.

24          MS. KENNEDY:  Okay.

25          THE COURT:  Do you want to take a break,

1    Ms. Kennedy?

2              MS. KENNEDY:  Oh, that would be great.

3              THE COURT:  Why don't we take 10 or 15 minutes?

4              MS. KENNEDY:  Thank you.

5              (Recess taken.)

6              All right, Dr. Johnson.

7              (Witness resumes witness stand.)

8              MS. KENNEDY:  Dr. Johnson and the Court and

9    counsel, you'll be happy to know I've elected to abandon

10   that line of cross-examination.

11             I said you'll be happy to know I've elected to

12   abandon that line of cross-examination.

13             THE WITNESS:  She likes me.

14             MR. LEVINE:  So there's very little more.

15             BY MS. KENNEDY:

16        Q.   Dr. Johnson, you indicated that you read

17   Dr. Patterson's report?

18        A.   Yes.

19        Q.   And you did say you spoke with him; correct?

20        A.   Yes.  We met the end of March.

21        Q.   And you told him your concerns about this being

22   a big job?

23        A.   Yes.

24        Q.   And did you read his conditions in his report

25   towards the end?

1       A.   I read them.  I don't remember them, but I read

2  them, yes.

3       Q.   Did you agree with him?

4       A.   I don't remember all of them.

5            MR. LEVINE:  Objection, Your Honor.

6            THE COURT:  It's a little broad question.

7            MR. LEVINE:  I don't know that I remember seeing

8  any conditions in Dr. Patterson's report.

9            BY MS. KENNEDY:

10      Q.   All right.  Did -- just let me rephrase that,

11  Dr. Johnson.

12           In reading Dr. Patterson's report, did you

13  recall that he indicated that Mr. Hinckley's mental

14  condition was, paraphrasing, was in a pretty good spot,

15  clinically?

16      A.   Yes.

17      Q.   It was clinically --

18      A.   Indicated.

19           Yes.  He did say that, yes.

20      Q.   All right.

21           MR. LEVINE:  Clinically what?

22           THE WITNESS:  Indicated.

23           MS. KENNEDY:  Clinically indicated.

24           THE COURT:  She said "clinically indicated."

25

1              BY MS. KENNEDY:

2      Q.   But yet that there had to be some overall

3   conditions to keep him and the community safe; correct?

4      A.   Yes.

5      Q.   And did you speak to him about this also?

6      A.   After our meeting in March?

7      Q.   Yes.

8      A.   Not in any detail.

9      Q.   Okay.  And in March when you met with him, had

10   he written his report?

11      A.   No.  He had not yet written his report.

12      Q.   Do you know from Mr. Hinckley's case that in

13   fact, obviously in the past, there have been risks with

14   Mr. Hinckley?

15      A.   Yes.

16      Q.   And would you agree that the hospital as well as

17   the -- that all the experts who have testified are

18   concerned and want to control all the risks for

19   Mr. Hinckley?

20      A.   Yes.

21      Q.   And you yourself would also?

22      A.   Yes.

23      Q.   Okay.  And what, if anything, would you advise

24   the present treatment team to do in improving, if at all,

25   their plan of risk assessment, risk management for

1   Mr. Hinckley down in Williamsburg?

2        A.   Outside of meeting with Mr. Hinckley on a very

3   regular basis and addressing risk factors that have been

4   discussed in various reports, including the list from

5   Dr. Patterson's report, I think as long as they have an

6   understanding of those risk factors and address whatever

7   symptoms they may or may not see, that should be

8   sufficient in terms of mitigating some of the risks that

9   he might present.

10       Q.   All right.  And in reviewing what you were able

11  to look at thus far for Mr. Hinckley and meeting with him

12  for a short period of time, would you agree that he still

13  has a narcissistic personality disorder?

14            MR. LEVINE:  Objection, Your Honor.  Witness is

15  not qualified to give opinions about that.

16            MS. KENNEDY:  She's a psychiatrist, Your Honor.

17  She's going to be the treating psychiatrist and he

18  qualified her through her own resume.

19            MR. LEVINE:  And she hasn't examined the

20  patient.  She knows the patient, of course.  She has some

21  background of the patient, but she has not done an

22  examination, and this witness --

23            THE COURT:  Well, I suppose, based on what she's

24  read; but then she's just telling us what she's read.

25            MS. KENNEDY:  And she did meet with him.

1          THE COURT:  For ten minutes.

2          MS. KENNEDY:  Well, ten minutes, but she also

3    has spoken to several people in the case down in

4    Williamsburg and the treatment team here in the hospital.

5          THE COURT:  Do you know whether -- or do you

6    have an opinion?  Do you have enough information to have

7    an opinion?

8          THE WITNESS:  I don't think I have enough to

9    make my own diagnosis.  But based on what I've read in the

10   reports, there's mention of him having narcissistic

11   personality disorder and it being attenuated, I think is

12   what Dr. Murphy wrote in her report.

13         BY MS. KENNEDY:

14   Q.   All right.  And Dr. Johnson, you did state how

15   much you actually have to do as the head of the outpatient

16   department; correct?

17   A.   I'm sorry?

18   Q.   Just in general your duties overseeing 84

19   patients?

20   A.   Yes.  I have a full-time job.

21   Q.   As a result, on occasion, it's correct that

22   there are times when you are unable to get your status

23   reports in to the Court in Superior Court regarding

24   specific patients when Judge Satterfield has asked for

25   them?

1          MR. LEVINE:  Your Honor, I'm going to object

2   again.  When we tried to introduce evidence about other

3   cases, we were met with objections.

4          THE COURT:  That's different.  That's completely

5   different.

6          The question is whether or not she's capable of

7   doing -- given all of her other responsibilities, of

8   meeting her obligations under the proposed convalescent

9   leave plan.

10         MR. LEVINE:  No objection to that question.

11         THE COURT:  Well, that's the thrust of the

12   question, I believe.

13         MS. KENNEDY:  It is, Your Honor.

14         BY MS. KENNEDY:

15   Q.   And I'm asking if, Dr. Johnson, in the past at

16   times, based on your overload, you've been unable to get

17   in certain status reports on particular patients that

18   Dr. -- excuse me, Judge Satterfield has requested.

19   A.   I don't recall not being able to get my reports

20   in, in a timely fashion.  But you may have information

21   that I'm not remembering right now.

22   Q.   All right.  And lastly, you are aware that it

23   would be this Court that would make any changes to the

24   order, if one is entered for convalescent leave, and not

25   the outpatient division or Williamsburg?

1      A.   Just as we do now, yes.  It's a judicial order

2  that changes the conditions of release.

3      Q.   And only the order that is set before you, you

4  would follow?

5      A.   Just like I do now, yes.

6      Q.   All right.  With no discretion?

7      A.   If that's --

8           MR. LEVINE:  Objection, Your Honor.  We don't

9  know what the order is going to say.

10          MS. KENNEDY:  Thank you, Your Honor.  I have no

11  further questions, Your Honor.

12          THE COURT:  Wait a minute.  We don't know what

13  the order is going to say.

14          MR. LEVINE:  We know what some orders say.

15  Number 9 --

16          THE COURT:  That's not -- it was Ms. Kennedy's

17  question.

18          MS. KENNEDY:  Yes.

19          THE COURT:  You'll follow the court orders;

20  right?

21          THE WITNESS:  Yes.  Just like I do now, yes.

22          THE COURT:  If there's a paragraph in there that

23  makes clear you've got discretion, you will exercise your

24  best discretion?

25          THE WITNESS:  Yes.

1          THE COURT:  If there's a paragraph in there that

2     says no matter what, you got to come back to court --

3          THE WITNESS:  I will come back to court.

4          If there's a paragraph in there that says you

5     want to know a minor violation in writing, I will put it

6     in writing.

7          MS. KENNEDY:  Thank you.

8          MR. LEVINE:  Thank you, Your Honor.

9          Briefly?

10          THE COURT:  Yes.

11                    REDIRECT EXAMINATION

12          BY MR. LEVINE:

13     Q.   If it please the Court.

14          Let's start with where Ms. Kennedy just left

15     off.

16          We showed you Number 9 in evidence, a consent

17     order in the case of Ronald Embry, and there was questions

18     asked about Paragraph 13 and Paragraph 14.

19          Do you remember that?

20     A.   Yes.

21     Q.   And in reading this order, do you see

22     Paragraph 13 as giving you or the OPD discretion?

23     A.   I do read it that way.

24     Q.   And do you read all of the provisions in the

25     order together, giving weight to all of them?

1      A.   I'm sorry.  Repeat that.

2      Q.   When you read a court order, do you construe all

3  the paragraphs together?

4      A.   I look at the whole thing as a whole.

5      Q.   So if one paragraph seems to give you discretion

6  and another paragraph perhaps limits that discretion, do

7  you read them together to exercise the amount of

8  discretion you believe is allowed under the language of

9  the order?

10     A.   I do.

11     Q.   You were asked several questions by Ms. Kennedy

12  about Mr. Hinckley's treatment thus far.

13          Do you recall that?

14     A.   Yes.

15     Q.   Have you ever known as much information about a

16  patient as you do about Mr. Hinckley prior to an order of

17  convalescent leave?

18     A.   No.

19     Q.   Ms. Kennedy asked you questions about how would

20  you know if Mr. Hinckley was having problems, inasmuch as

21  you don't see him face-to-face.

22          Do you recall that?

23     A.   Yes, I remember.

24     Q.   And would you know if he was having problems if

25  first you conferred with members of the treatment team in

1    Williamsburg and you knew what to look for?

2             Would that help you in evaluating whether he was

3    having problems?

4        A.   That would be -- that would be helpful.

5        Q.   And would that assist you in framing questions

6    for him during weekly telephone calls with him?

7        A.   That would be helpful.

8        Q.   And would that assist you in interpreting his

9    responses?

10       A.   It would be helpful.

11       Q.   And would face-to-face meetings that he would

12   have with Dr. G.G. be useful to you as she imparted the

13   content of those meetings to you?

14       A.   Yes.

15       Q.   And likewise for Mr. Beffa?

16       A.   Yes.

17       Q.   And likewise for Mr. Weiss?

18       A.   Yes.

19       Q.   Now, do you have any patients where the order

20   requires the return of the patient to the hospital for any

21   violation whatsoever, no matter how minor?

22       A.   No.  The orders are -- those are boilerplate

23   orders.  So it says whatever -- it says in Number 14 is

24   what it normally says in the orders.

25       Q.   And Number 13?

1    A.   Yes.

2    Q.   Together?

3    A.   Yes.  They usually have that at the end of

4    the -- the newer orders that have come out from the

5    hospital.

6    Q.   And in evaluating the transgression or the

7    violation, do you consider whether or not the violation

8    implicates danger?

9    A.   Yes.

10   Q.   And if it doesn't implicate danger, do you

11   typically not put the patient back in the hospital?

12   A.   We try not to, yes.

13   Q.   Now, I believe you said in direct examination

14   that there are many patients -- I can't remember the

15   number, but I believe it was over 20 -- that are in

16   convalescent leave or conditional release in the OPD that

17   have active symptoms; is that correct?

18   A.   At least, yes.

19   Q.   At least?

20   A.   At least 20.  I mean, there are probably more.

21   I have not physically met every individual in OPD because

22   there's some, as I said, who live in other states.

23   There's also individuals who come in every three months.

24   And so if they are stable and not receiving medication

25   management from myself, they may come and see other

1    members of my team and report to them and have a summary

2    done by them.

3            So there are actually members of the OPD -- we

4    call them "consumers" -- consumers that I have that I

5    haven't actually physically met.

6        Q.   So we have some patients, over 20, at least

7    20 --

8        A.   Yeah.

9        Q.   -- that have active mental disease, mental

10   disease, that are out in the community, living full time?

11       A.   Yes.

12       Q.   And so is it fair to say that the mere existence

13   of symptoms alone for active mental disease is not a

14   reason to return a patient to the hospital?

15       A.   That is true.

16       Q.   Do you look for indicia of dangerousness?

17       A.   That, along with compliance, along with the

18   willingness to work with the team to try and rectify

19   whatever we can in the community.  So there's a lot of

20   factors that go into whether we send someone back to the

21   hospital if they have active symptoms.

22       Q.   So a patient that may be out in the community

23   that decompensates, that goes from no symptoms to the

24   existence of symptoms, that alone would not be a basis for

25   the return to the hospital?

1    A.    Not by itself, no.

2         THE COURT:  Maybe it should be.

3         THE WITNESS:  It depends.  If there wasn't a

4    symptom, if the symptom is becoming more anxious because

5    I'm awaiting a recommendation from a job I applied for,

6    that to me is a symptom.

7         THE COURT:  But his question includes the word

8    "decompensate."

9         THE WITNESS:  Well, people use the word

10   "decompensate" to mean any change in a mental state.  I

11   guess --

12        THE COURT:  How do you use it?

13        THE WITNESS:  I use it to mean any change in the

14   mental state.  So I can, you know, some use it to mean a

15   florid change.  I use it to mean any real change in the

16   mental state that would require some kind of intervention,

17   whether it had be to sit down and talk to someone about

18   it; whether it be to increase a dose of their medication

19   to try and alleviate the symptoms for that period of time.

20   That's how I think about it.

21        But, no, if they are hearing voices and they

22   become psychotic, that may be a return to the hospital.

23        BY MR. LEVINE:

24   Q.    But a mere erosion of a condition, a worsening

25   of an active symptom by itself does not necessarily mean

1    return to the hospital?

2        A.   By itself, no.  I have individuals currently who

3    have baseline active symptoms and come in and are more

4    vocal about their symptoms.  They are willing to take a

5    change in medication.  They are willing to come and see me

6    more frequently.  And within a week or two, they are doing

7    better.  I would not send them back.

8            Now, if he came in off the street and that

9    symptom had never been there before, it wasn't a baseline

10   and came in off the street and was talking the way he

11   does, that would be a return to the hospital and have them

12   get him on a regimen that's going to keep him safe in the

13   community.

14       Q.   So the answer is:  It depends?

15       A.   Yes.

16           MR. LEVINE:  Thank you.

17           THE COURT:  This order, Exhibit No. 9 in

18   Paragraph 8 talks about a condition where this patient is

19   coming, at that point, once a week for treatment and

20   monitoring of his psychiatric condition and compliance

21   with the conditions of release.

22           Do you, for patients who come in monthly,

23   provide treatment?

24           THE WITNESS:  Yes.

25           THE COURT:  Even though they may be seeing other

1    mental health providers during the other parts of that

2    month?

3              THE WITNESS:  No.  If they are seeing another

4    provider, then I don't necessarily see them every month.

5              THE COURT:  So let's talk about Mr. Hinckley's

6    case.

7              THE WITNESS:  Yes.

8              THE COURT:  The proposal is that he would be

9    seeing Dr. G.G. for meds and for monitoring and for risk

10   assessment.

11             THE WITNESS:  Yes.

12             THE COURT:  And would be seeing Mr. Beffa for

13   individual therapy and for group therapy.

14             THE WITNESS:  Yes.

15             THE COURT:  So I think the proposal is that when

16   he comes up here once a month for the first six months --

17   I'm not sure if it's four or six -- Dr. Binks would come

18   over --

19             THE WITNESS:  Yes.

20             THE COURT:  -- and he would be the person

21   providing that --

22             THE WITNESS:  Individual therapy.

23             THE COURT:  -- individual therapy.

24             THE WITNESS:  Yes.

25             THE COURT:  So after that period and the

1   relationship ends with Dr. Binks but you're still seeing

2   him once a month --

3              THE WITNESS:  Yes.

4              THE COURT:  -- do you have a treatment role?

5              THE WITNESS:  Yes.  I would have a role in,

6   except for myself assessing his risk factors and making

7   sure those are minimized and taken care of in the

8   community, I would also do some supportive, you know,

9   psychotherapy to make sure that there are no issues that

10  are coming up that need to be addressed and maybe he

11  doesn't want to talk to the providers in Williamsburg

12  about.  And also, to also be the arm that would respond to

13  the Court.

14             THE COURT:  So -- but that's not treatment.

15             THE WITNESS:  Yes.

16             THE COURT:  That's monitoring and compliance.

17             THE WITNESS:  Okay.

18             THE COURT:  It's given a, right, under all the

19  proposal that's being discussed, that you're the linchpin

20  for monitoring compliance in that if he's an outpatient --

21  I guess what I'm trying to say is in your normal case, if

22  a person is out on convalescent leave out in the D.C.

23  community, in a group home or with a spouse or -- and may

24  be seeing a psychologist or may be in a group or whatever,

25  you're still -- your office is still the arm, I think you

1    said, the arm of the Court.

2              THE WITNESS:  Yes.

3              THE COURT:  So you're the one that's going to be

4    reporting to me.

5              THE WITNESS:  Yes.

6              THE COURT:  And you're the one who is ultimately

7    responsible for monitoring the compliance with conditions.

8              THE WITNESS:  Yes.  And ensuring that the

9    treatment that he's supposed to be getting he actually

10   receives.

11             THE COURT:  Even though it's in Williamsburg?

12             THE WITNESS:  Yes.

13             THE COURT:  So I guess the question is, and

14   maybe you've already answered it:  Do you, even six months

15   out when Dr. Binks is gone but Beffa and Weiss and G.G.

16   are involved on a day-to-day or week-to-week basis, do you

17   still envision your having a treatment role?

18             THE WITNESS:  Yes.

19             THE COURT:  And you said in response to

20   something Mr. Levine said that there's certain people that

21   come in once a month that you don't even see; that other

22   people on your staff see.

23             THE WITNESS:  Yes, there are.

24             THE COURT:  And what makes -- what determines

25   whether you're the person that sees them or other people

1    are?

2              THE WITNESS:  It depends on stability.  It

3    depends on risk management issues.  But even with those

4    individuals, we still meet as a team on them and we

5    discuss them as a team.  And then every three months,

6    three to six months, we have a treatment plan meeting

7    where we're all in the same room talking about that

8    individual.  So even though they may not see me

9    personally, I still get updates on them at every visit.

10             THE COURT:  Is there a role for anybody else at

11   FOPD to play in Mr. Hinckley's case, or is this basically

12   going to be your responsibility?

13             THE WITNESS:  Right now, it's going to be my

14   responsibility.  But, you know, depending on staffing

15   changes that may happen in the future, there might be an

16   opportunity for someone else to assist.

17             THE COURT:  Any other questions?

18             MS. KENNEDY:  May I, Your Honor?

19             THE COURT:  Yes.

20                  RECROSS EXAMINATION

21        BY MS. KENNEDY:

22        Q.   Dr. Johnson, Mr. Levine asked you if an

23   individual -- if the defendant comes in and his mental

24   condition has deteriorated, you don't necessarily bring

25   him back in if there's not a risk or there's no violence

1    or danger; correct?

2         A.   I told him it really depends on the person's

3    situation, the symptoms that I'm seeing.  It really

4    depends.

5         Q.   So the fact that the order indicates if a

6    defendant's mental condition deteriorates or he violates

7    the conditions of his release, he shall be returned to

8    inpatient care at the hospital, you realize that that's a

9    violation of this order?

10        A.   The way you said it, yes.

11        Q.   Okay.  And what would make it any different in

12   this case, if the judge were to grant convalescent leave,

13   that you wouldn't violate that order?

14        A.   Well, I didn't, prior to today, believe that I

15   was violating an order by using some discretion in terms

16   of trying to keep people in the community.  But at this

17   point, it's been pointed out that it's a violation, and so

18   it may change for all the orders at this point going

19   forward.

20        Q.   Because there isn't anything in this order about

21   discretion, is there?

22             MR. LEVINE:  Are we referring to --

23             THE COURT:  Which order are you talking about?

24             MS. KENNEDY:  I'm talking about the one that was

25   admitted, Your Honor, Number 9, Defense Exhibit No. 9,

1    Ronald Embry.

2              THE COURT:  I thought she just testified a while

3    ago that there was discretion.

4              BY MS. KENNEDY:

5         Q.   I'd like to know:  Where is the discretion?

6         A.   When I read Number 13 that says "If defendant

7    fails to comply with any conditions of the release such

8    that forensic -- such that the forensic outpatient

9    department staff determined that he is in need of

10   inpatient treatment, he shall cooperate with return to

11   St. E's."  If I don't believe that he needs inpatient

12   treatment, I wouldn't return him to St. Elizabeths.

13             If I believe that I could up his Zoloft because

14   he's feeling a little anxious and he can do fine in the

15   community, I don't believe that rises to the level of

16   inpatient treatment.

17             But if I'm reading it incorrectly, then I am.

18        Q.   But Number 14 definitely indicates that you are

19   reading it incorrectly by stating if his mental condition

20   deteriorates or he violates the conditions of his release,

21   he'll be returned to inpatient care?

22             MR. LEVINE:  Your Honor --

23             THE WITNESS:  Correct.

24             MR. LEVINE:  -- if Ms. Kennedy is objecting to

25   the language of this order --

1              MS. KENNEDY:  I'm not objecting.  I'm objecting

2      to her interpretation of it.

3              THE COURT:  She's objecting to Dr. Johnson's

4      interpretation of Paragraph 14.

5              Dr. Johnson, I believe, said in her testimony on

6      redirect that she believes she has discretion under both

7      Paragraph 13 and 14.

8              MR. LEVINE:  Yes.

9              THE WITNESS:  Right.  Sorry.

10             Do you have a question?

11             BY MS. KENNEDY:

12     Q.    I just want to know if the word "discretion" is

13     in 13 or 14?

14     A.    It doesn't say "discretion."  The way I'm

15     reading it is if the defendant's mental condition

16     deteriorates.  I guess my convention of "deteriorate" may

17     not be yours.  And so I'm using my discretion as to what

18     "deteriorate" means in terms of this order.

19             THE COURT:  What about the next phrase?

20             THE WITNESS:  Or he violates all conditions?

21     Well, okay.  Or if he violates the orders -- sorry, the

22     conditions of this release, he shall be returned to

23     inpatient status.

24             BY MS. KENNEDY:

25     Q.    That would be a violation of this order, would

1    it not, Dr. Johnson?

2         A.   If he drinks alcohol once, yes, he's in

3    violation of this court order.  Based on this, yes.

4              MS. KENNEDY:  Thank you, Your Honor.

5                   FURTHER REDIRECT EXAMINATION

6              BY MR. LEVINE:

7         Q.   Based on Paragraph 13, is he in violation of the

8    order?

9         A.   No, because I don't believe that rises to the

10   level of being returned to inpatient status.

11        Q.   Is it your testimony that you have read them

12   together so as to --

13        A.   Do I read them together?

14             MS. KENNEDY:  Objection.

15             THE COURT:  Well, she's not a lawyer.

16             THE WITNESS:  Right.

17             THE COURT:  And, you know, whoever drafts these

18   orders better go talk to Chief Judge Satterfield, because

19   Paragraph 13 by itself says, "If defendant fails to comply

20   with any conditions of release such that the forensic team

21   thinks that he's in need of inpatient treatment, then he

22   goes back."

23             That gives them discretion.  He violates, is it

24   of the level that he needs treatment, he goes back.

25             Paragraph 14, by contrast, says if his condition

1    deteriorates, he goes back; or if he violates the

2    conditions of this release, he goes back.  Any conditions

3    of the release.

4           Paragraph 14 says you violate a condition, you

5    go back.

6           Paragraph 13 says something different.

7           So, you know, if the chief judge -- I don't know

8    who drafts these orders.

9           Do you draft these orders?

10          MS. KENNEDY:  Sometimes.

11          THE COURT:  If the chief judge -- Ms. Merene, do

12   you draft these orders?

13          MS. MERENE:  No.

14          THE COURT:  If the chief judge -- if -- you

15   know, I'm not he.  I think that's the correct grammar.

16   I'm not he.  But if someone wants to talk to

17   Lee Satterfield or Chief Judge Satterfield about what

18   appears to some of us in this courtroom to be

19   inconsistencies between Paragraph 13 and Paragraph 14, you

20   know, they ought to make them consistent.

21          It may well be that Dr. Johnson is right, that

22   the intent has been, over the years, more the discretion

23   that seems to be built in in 13.  But 14 is inconsistent

24   with it.  And, you know, if there's an order in this case,

25   I hope that the provisions are consistent with each other.

1              MS. KENNEDY:  I'm sure they were if Your Honor

2     drafted them.

3              MR. LEVINE:  We are not she, but this is a

4     consent order --

5              THE COURT:  Right.

6              MR. LEVINE:  -- and the United States, through

7     Ms. Kennedy, consented to it.

8              THE COURT:  Yes, she did.

9              MR. LEVINE:  I would suggest that there is an

10    estoppel here from her arguing this.

11             MS. KENNEDY:  The defense --

12             THE COURT:  But I'd come back again to what I

13    said earlier several times over the past few days.

14             There may be some -- if there's a convalescent

15    leave and there's an order, there may be some things that

16    are going to be hard and fast, and you come back to court.

17    The government's view is there may be some things that he

18    goes immediately back to the hospital.  But there also may

19    be some things, because it clinically makes sense to allow

20    discretion in the providers in Williamsburg to deal with

21    it without rushing back to court each time and without

22    immediately having to return Mr. Hinckley to the hospital.

23             Now, the draftpersons of whatever I sign, if I

24    sign anything, really have to keep in mind that

25    Dr. Johnson and Mr. Weiss and Dr. G.G. and Mr. Beffa are

1    not lawyers. They need clear direction, and they are

2    professionals.

3            So when do we want them to have the discretion

4    to do what they do? And when do we, either because of

5    risk of danger or because Mr. Hinckley is Mr. Hinckley and

6    may need more monitoring and accountability than others

7    for some period of time, but maybe one would think not

8    forever, you know, how do we write the order so that those

9    that are trying to implement it can do what they are

10   supposed to do and so Mr. Hinckley can understand with the

11   help of his support team what's appropriate and what's

12   not?

13           This has pointed up that there's sometimes

14   problems in these orders.

15           Are there any other questions for Dr. Johnson?

16           MS. KENNEDY: No.

17           THE COURT: Thank you.

18           MR. LEVINE: We have none, Your Honor.

19           THE COURT: So is it your intention to start

20   with Dr. Patterson today, or not?

21           All right, Dr. Johnson.

22           (Witness resumes witness stand.)

23           MS. KENNEDY: Dr. Johnson and the Court and

24   counsel, you'll be happy to know I've elected to abandon

25   that line of cross-examination.

1          I said you'll be happy to know I've elected to

2     abandon that line of cross-examination.

3               THE WITNESS:  She likes me.

4               MR. LEVINE:  So there's very little more.

5               BY MS. KENNEDY:

6          Q.   Dr. Johnson, you indicated that you read

7     Dr. Patterson's report?

8          A.   Yes.

9          Q.   And you did say you spoke with him; correct?

10         A.   Yes.  We met the end of March.

11         Q.   And you told him your concerns about this being

12    a big job?

13         A.   Yes.

14         Q.   And did you read his conditions in his report

15    towards the end?

16         A.   I read them.  I don't remember them, but I read

17    them, yes.

18         Q.   Did you agree with him?

19         A.   I don't remember all of them.

20              MR. LEVINE:  Objection, Your Honor.

21              THE COURT:  It's a little broad question.

22              MR. LEVINE:  I don't know that I remember seeing

23    any conditions in Dr. Patterson's report.

24              BY MS. KENNEDY:

25         Q.   All right.  Did -- just let me rephrase that,

1    Dr. Johnson.

2              In reading Dr. Patterson's report, did you

3    recall that he indicated that Mr. Hinckley's mental

4    condition was, paraphrasing, was in a pretty good spot,

5    clinically?

6         A.   Yes.

7         Q.   It was clinically --

8         A.   Indicated.

9              Yes.  He did say that, yes.

10        Q.   All right.

11             MR. LEVINE:  Clinically what?

12             THE WITNESS:  Indicated.

13             MS. KENNEDY:  Clinically indicated.

14             THE COURT:  She said "clinically indicated."

15             BY MS. KENNEDY:

16        Q.   But yet that there had to be some overall

17   conditions to keep him and the community safe; correct?

18        A.   Yes.

19        Q.   And did you speak to him about this also?

20        A.   After our meeting in March?

21        Q.   Yes.

22        A.   Not in any detail.

23        Q.   Okay.  And in March when you met with him, had

24   he written his report?

25        A.   No.  He had not yet written his report.

1          Q.   Do you know from Mr. Hinckley's case that in

2     fact, obviously in the past, there have been risks with

3     Mr. Hinckley?

4          A.   Yes.

5          Q.   And would you agree that the hospital as well as

6     the -- that all the experts who have testified are

7     concerned and want to control all the risks for

8     Mr. Hinckley?

9          A.   Yes.

10         Q.   And you yourself would also?

11         A.   Yes.

12         Q.   Okay.  And what, if anything, would you advise

13    the present treatment team to do in improving, if at all,

14    their plan of risk assessment, risk management for

15    Mr. Hinckley down in Williamsburg?

16         A.   Outside of meeting with Mr. Hinckley on a very

17    regular basis and addressing risk factors that have been

18    discussed in various reports, including the list from

19    Dr. Patterson's report, I think as long as they have an

20    understanding of those risk factors and address whatever

21    symptoms they may or may not see, that should be

22    sufficient in terms of mitigating some of the risks that

23    he might present.

24         Q.   All right.  And in reviewing what you were able

25    to look at thus far for Mr. Hinckley and meeting with him

1    for a short period of time, would you agree that he still

2    has a narcissistic personality disorder?

3            MR. LEVINE:  Objection, Your Honor.  Witness is

4    not qualified to give opinions about that.

5            MS. KENNEDY:  She's a psychiatrist, Your Honor.

6    She's going to be the treating psychiatrist and he

7    qualified her through her own resume.

8            MR. LEVINE:  And she hasn't examined the

9    patient.  She knows the patient, of course.  She has some

10   background of the patient, but she has not done an

11   examination, and this witness --

12           THE COURT:  Well, I suppose, based on what she's

13   read; but then she's just telling us what she's read.

14           MS. KENNEDY:  And she did meet with him.

15           THE COURT:  For ten minutes.

16           MS. KENNEDY:  Well, ten minutes, but she also

17   has spoken to several people in the case down in

18   Williamsburg and the treatment team here in the hospital.

19           THE COURT:  Do you know whether -- or do you

20   have an opinion?  Do you have enough information to have

21   an opinion?

22           THE WITNESS:  I don't think I have enough to

23   make my own diagnosis.  But based on what I've read in the

24   reports, there's mention of him having narcissistic

25   personality disorder and it being attenuated, I think is

1    what Dr. Murphy wrote in her report.

2            BY MS. KENNEDY:

3        Q.   All right.  And Dr. Johnson, you did state how

4    much you actually have to do as the head of the outpatient

5    department; correct?

6        A.   I'm sorry?

7        Q.   Just in general your duties overseeing 84

8    patients?

9        A.   Yes.  I have a full-time job.

10       Q.   As a result, on occasion, it's correct that

11   there are times when you are unable to get your status

12   reports in to the Court in Superior Court regarding

13   specific patients when Judge Satterfield has asked for

14   them?

15           MR. LEVINE:  Your Honor, I'm going to object

16   again.  When we tried to introduce evidence about other

17   cases, we were met with objections.

18           THE COURT:  That's different.  That's completely

19   different.

20           The question is whether or not she's capable of

21   doing -- given all of her other responsibilities, of

22   meeting her obligations under the proposed convalescent

23   leave plan.

24           MR. LEVINE:  No objection to that question.

25           THE COURT:  Well, that's the thrust of the

114

1    question, I believe.

2              MS. KENNEDY:  It is, Your Honor.

3              BY MS. KENNEDY:

4         Q.   And I'm asking if, Dr. Johnson, in the past at

5    times, based on your overload, you've been unable to get

6    in certain status reports on particular patients that

7    Dr. -- excuse me, Judge Satterfield has requested.

8         A.   I don't recall not being able to get my reports

9    in, in a timely fashion.  But you may have information

10   that I'm not remembering right now.

11        Q.   All right.  And lastly, you are aware that it

12   would be this Court that would make any changes to the

13   order, if one is entered for convalescent leave, and not

14   the outpatient division or Williamsburg?

15        A.   Just as we do now, yes.  It's a judicial order

16   that changes the conditions of release.

17        Q.   And only the order that is set before you, you

18   would follow?

19        A.   Just like I do now, yes.

20        Q.   All right.  With no discretion?

21        A.   If that's --

22              MR. LEVINE:  Objection, Your Honor.  We don't

23   know what the order is going to say.

24              MS. KENNEDY:  Thank you, Your Honor.  I have no

25   further questions, Your Honor.

1          THE COURT:  Wait a minute.  We don't know what

2     the order is going to say.

3          MR. LEVINE:  We know what some orders say.

4     Number 9 --

5          THE COURT:  That's not -- it was Ms. Kennedy's

6     question.

7          MS. KENNEDY:  Yes.

8          THE COURT:  You'll follow the court orders;

9     right?

10          THE WITNESS:  Yes.  Just like I do now, yes.

11          THE COURT:  If there's a paragraph in there that

12     makes clear you've got discretion, you will exercise your

13     best discretion?

14          THE WITNESS:  Yes.

15          THE COURT:  If there's a paragraph in there that

16     says no matter what, you got to come back to court --

17          THE WITNESS:  I will come back to court.

18          If there's a paragraph in there that says you

19     want to know a minor violation in writing, I will put it

20     in writing.

21          MS. KENNEDY:  Thank you.

22          MR. LEVINE:  Thank you, Your Honor.

23          Briefly?

24          THE COURT:  Yes.

25

1          REDIRECT EXAMINATION

2          BY MR. LEVINE:

3      Q.   If it please the Court.

4           Let's start with where Ms. Kennedy just left

5   off.

6           We showed you Number 9 in evidence, a consent

7   order in the case of Ronald Embry, and there was questions

8   asked about Paragraph 13 and Paragraph 14.

9           Do you remember that?

10     A.   Yes.

11     Q.   And in reading this order, do you see

12  Paragraph 13 as giving you or the OPD discretion?

13     A.   I do read it that way.

14     Q.   And do you read all of the provisions in the

15  order together, giving weight to all of them?

16     A.   I'm sorry.  Repeat that.

17     Q.   When you read a court order, do you construe all

18  the paragraphs together?

19     A.    I look at the whole thing as a whole.

20     Q.   So if one paragraph seems to give you discretion

21  and another paragraph perhaps limits that discretion, do

22  you read them together to exercise the amount of

23  discretion you believe is allowed under the language of

24  the order?

25     A.   I do.

1     Q.   You were asked several questions by Ms. Kennedy

2  about Mr. Hinckley's treatment thus far.

3          Do you recall that?

4     A.   Yes.

5     Q.   Have you ever known as much information about a

6  patient as you do about Mr. Hinckley prior to an order of

7  convalescent leave?

8     A.   No.

9     Q.   Ms. Kennedy asked you questions about how would

10  you know if Mr. Hinckley was having problems, inasmuch as

11  you don't see him face-to-face.

12          Do you recall that?

13     A.   Yes, I remember.

14     Q.   And would you know if he was having problems if

15  first you conferred with members of the treatment team in

16  Williamsburg and you knew what to look for?

17          Would that help you in evaluating whether he was

18  having problems?

19     A.   That would be -- that would be helpful.

20     Q.   And would that assist you in framing questions

21  for him during weekly telephone calls with him?

22     A.   That would be helpful.

23     Q.   And would that assist you in interpreting his

24  responses?

25     A.   It would be helpful.

118

1      Q.    And would face-to-face meetings that he would

2    have with Dr. G.G. be useful to you as she imparted the

3    content of those meetings to you?

4      A.    Yes.

5      Q.    And likewise for Mr. Beffa?

6      A.    Yes.

7      Q.    And likewise for Mr. Weiss?

8      A.    Yes.

9      Q.    Now, do you have any patients where the order

10   requires the return of the patient to the hospital for any

11   violation whatsoever, no matter how minor?

12     A.    No.   The orders are -- those are boilerplate

13   orders.   So it says whatever -- it says in Number 14 is

14   what it normally says in the orders.

15     Q.    And Number 13?

16     A.    Yes.

17     Q.    Together?

18     A.    Yes.   They usually have that at the end of

19   the -- the newer orders that have come out from the

20   hospital.

21     Q.    And in evaluating the transgression or the

22   violation, do you consider whether or not the violation

23   implicates danger?

24     A.    Yes.

25     Q.    And if it doesn't implicate danger, do you

1    typically not put the patient back in the hospital?

2        A.   We try not to, yes.

3        Q.   Now, I believe you said in direct examination

4    that there are many patients -- I can't remember the

5    number, but I believe it was over 20 -- that are in

6    convalescent leave or conditional release in the OPD that

7    have active symptoms; is that correct?

8        A.   At least, yes.

9        Q.   At least?

10       A.   At least 20.  I mean, there are probably more.

11   I have not physically met every individual in OPD because

12   there's some, as I said, who live in other states.

13   There's also individuals who come in every three months.

14   And so if they are stable and not receiving medication

15   management from myself, they may come and see other

16   members of my team and report to them and have a summary

17   done by them.

18           So there are actually members of the OPD -- we

19   call them "consumers" -- consumers that I have that I

20   haven't actually physically met.

21       Q.   So we have some patients, over 20, at least

22   20 --

23       A.   Yeah.

24       Q.   -- that have active mental disease, mental

25   disease, that are out in the community, living full time?

1      A.    Yes.

2      Q.    And so is it fair to say that the mere existence

3    of symptoms alone for active mental disease is not a

4    reason to return a patient to the hospital?

5      A.    That is true.

6      Q.    Do you look for indicia of dangerousness?

7      A.    That, along with compliance, along with the

8    willingness to work with the team to try and rectify

9    whatever we can in the community.  So there's a lot of

10   factors that go into whether we send someone back to the

11   hospital if they have active symptoms.

12     Q.    So a patient that may be out in the community

13   that decompensates, that goes from no symptoms to the

14   existence of symptoms, that alone would not be a basis for

15   the return to the hospital?

16     A.    Not by itself, no.

17            THE COURT:  Maybe it should be.

18            THE WITNESS:  It depends.  If there wasn't a

19   symptom, if the symptom is becoming more anxious because

20   I'm awaiting a recommendation from a job I applied for,

21   that to me is a symptom.

22            THE COURT:  But his question includes the word

23   "decompensate."

24            THE WITNESS:  Well, people use the word

25   "decompensate" to mean any change in a mental state.  I

1    guess --

2           THE COURT:  How do you use it?

3           THE WITNESS:  I use it to mean any change in the

4    mental state.  So I can, you know, some use it to mean a

5    florid change.  I use it to mean any real change in the

6    mental state that would require some kind of intervention,

7    whether it had be to sit down and talk to someone about

8    it; whether it be to increase a dose of their medication

9    to try and alleviate the symptoms for that period of time.

10   That's how I think about it.

11          But, no, if they are hearing voices and they

12   become psychotic, that may be a return to the hospital.

13          BY MR. LEVINE:

14   Q.   But a mere erosion of a condition, a worsening

15   of an active symptom by itself does not necessarily mean

16   return to the hospital?

17   A.   By itself, no.  I have individuals currently who

18   have baseline active symptoms and come in and are more

19   vocal about their symptoms.  They are willing to take a

20   change in medication.  They are willing to come and see me

21   more frequently.  And within a week or two, they are doing

22   better.  I would not send them back.

23          Now, if he came in off the street and that

24   symptom had never been there before, it wasn't a baseline

25   and came in off the street and was talking the way he

1    does, that would be a return to the hospital and have them

2    get him on a regimen that's going to keep him safe in the

3    community.

4         Q.   So the answer is:  It depends?

5         A.   Yes.

6              MR. LEVINE:  Thank you.

7              THE COURT:  This order, Exhibit No. 9 in

8    Paragraph 8 talks about a condition where this patient is

9    coming, at that point, once a week for treatment and

10   monitoring of his psychiatric condition and compliance

11   with the conditions of release.

12             Do you, for patients who come in monthly,

13   provide treatment?

14             THE WITNESS:  Yes.

15             THE COURT:  Even though they may be seeing other

16   mental health providers during the other parts of that

17   month?

18             THE WITNESS:  No.  If they are seeing another

19   provider, then I don't necessarily see them every month.

20             THE COURT:  So let's talk about Mr. Hinckley's

21   case.

22             THE WITNESS:  Yes.

23             THE COURT:  The proposal is that he would be

24   seeing Dr. G.G. for meds and for monitoring and for risk

25   assessment.

123

1          THE WITNESS:  Yes.

2          THE COURT:  And would be seeing Mr. Beffa for

3    individual therapy and for group therapy.

4          THE WITNESS:  Yes.

5          THE COURT:  So I think the proposal is that when

6    he comes up here once a month for the first six months --

7    I'm not sure if it's four or six -- Dr. Binks would come

8    over --

9          THE WITNESS:  Yes.

10          THE COURT:  -- and he would be the person

11    providing that --

12          THE WITNESS:  Individual therapy.

13          THE COURT:  -- individual therapy.

14          THE WITNESS:  Yes.

15          THE COURT:  So after that period and the

16    relationship ends with Dr. Binks but you're still seeing

17    him once a month --

18          THE WITNESS:  Yes.

19          THE COURT:  -- do you have a treatment role?

20          THE WITNESS:  Yes.  I would have a role in,

21    except for myself assessing his risk factors and making

22    sure those are minimized and taken care of in the

23    community, I would also do some supportive, you know,

24    psychotherapy to make sure that there are no issues that

25    are coming up that need to be addressed and maybe he

124

1    doesn't want to talk to the providers in Williamsburg

2    about.  And also, to also be the arm that would respond to

3    the Court.

4         THE COURT:  So -- but that's not treatment.

5         THE WITNESS:  Yes.

6         THE COURT:  That's monitoring and compliance.

7         THE WITNESS:  Okay.

8         THE COURT:  It's given a, right, under all the

9    proposal that's being discussed, that you're the linchpin

10   for monitoring compliance in that if he's an outpatient --

11   I guess what I'm trying to say is in your normal case, if

12   a person is out on convalescent leave out in the D.C.

13   community, in a group home or with a spouse or -- and may

14   be seeing a psychologist or may be in a group or whatever,

15   you're still -- your office is still the arm, I think you

16   said, the arm of the Court.

17        THE WITNESS:  Yes.

18        THE COURT:  So you're the one that's going to be

19   reporting to me.

20        THE WITNESS:  Yes.

21        THE COURT:  And you're the one who is ultimately

22   responsible for monitoring the compliance with conditions.

23        THE WITNESS:  Yes.  And ensuring that the

24   treatment that he's supposed to be getting he actually

25   receives.

1            THE COURT:  Even though it's in Williamsburg?

2            THE WITNESS:  Yes.

3            THE COURT:  So I guess the question is, and

4    maybe you've already answered it:  Do you, even six months

5    out when Dr. Binks is gone but Beffa and Weiss and G.G.

6    are involved on a day-to-day or week-to-week basis, do you

7    still envision your having a treatment role?

8            THE WITNESS:  Yes.

9            THE COURT:  And you said in response to

10   something Mr. Levine said that there's certain people that

11   come in once a month that you don't even see; that other

12   people on your staff see.

13           THE WITNESS:  Yes, there are.

14           THE COURT:  And what makes -- what determines

15   whether you're the person that sees them or other people

16   are?

17           THE WITNESS:  It depends on stability.  It

18   depends on risk management issues.  But even with those

19   individuals, we still meet as a team on them and we

20   discuss them as a team.  And then every three months,

21   three to six months, we have a treatment plan meeting

22   where we're all in the same room talking about that

23   individual.  So even though they may not see me

24   personally, I still get updates on them at every visit.

25           THE COURT:  Is there a role for anybody else at

1    FOPD to play in Mr. Hinckley's case, or is this basically

2    going to be your responsibility?

3              THE WITNESS:  Right now, it's going to be my

4    responsibility.  But, you know, depending on staffing

5    changes that may happen in the future, there might be an

6    opportunity for someone else to assist.

7              THE COURT:  Any other questions?

8              MS. KENNEDY:  May I, Your Honor?

9              THE COURT:  Yes.

10                   RECROSS EXAMINATION

11             BY MS. KENNEDY:

12   Q.   Dr. Johnson, Mr. Levine asked you if an

13   individual -- if the defendant comes in and his mental

14   condition has deteriorated, you don't necessarily bring

15   him back in if there's not a risk or there's no violence

16   or danger; correct?

17   A.   I told him it really depends on the person's

18   situation, the symptoms that I'm seeing.  It really

19   depends.

20   Q.   So the fact that the order indicates if a

21   defendant's mental condition deteriorates or he violates

22   the conditions of his release, he shall be returned to

23   inpatient care at the hospital, you realize that that's a

24   violation of this order?

25   A.   The way you said it, yes.

1    Q.   Okay.  And what would make it any different in

2    this case, if the judge were to grant convalescent leave,

3    that you wouldn't violate that order?

4    A.   Well, I didn't, prior to today, believe that I

5    was violating an order by using some discretion in terms

6    of trying to keep people in the community.  But at this

7    point, it's been pointed out that it's a violation, and so

8    it may change for all the orders at this point going

9    forward.

10   Q.   Because there isn't anything in this order about

11   discretion, is there?

12           MR. LEVINE:  Are we referring to --

13           THE COURT:  Which order are you talking about?

14           MS. KENNEDY:  I'm talking about the one that was

15   admitted, Your Honor, Number 9, Defense Exhibit No. 9,

16   Ronald Embry.

17           THE COURT:  I thought she just testified a while

18   ago that there was discretion.

19           BY MS. KENNEDY:

20   Q.   I'd like to know:  Where is the discretion?

21   A.   When I read Number 13 that says "If defendant

22   fails to comply with any conditions of the release such

23   that forensic -- such that the forensic outpatient

24   department staff determined that he is in need of

25   inpatient treatment, he shall cooperate with return to

1   St. E's."  If I don't believe that he needs inpatient

2   treatment, I wouldn't return him to St. Elizabeths.

3           If I believe that I could up his Zoloft because

4   he's feeling a little anxious and he can do fine in the

5   community, I don't believe that rises to the level of

6   inpatient treatment.

7           But if I'm reading it incorrectly, then I am.

8       Q.   But Number 14 definitely indicates that you are

9   reading it incorrectly by stating if his mental condition

10  deteriorates or he violates the conditions of his release,

11  he'll be returned to inpatient care?

12          MR. LEVINE:  Your Honor --

13          THE WITNESS:  Correct.

14          MR. LEVINE:  -- if Ms. Kennedy is objecting to

15  the language of this order --

16          MS. KENNEDY:  I'm not objecting.  I'm objecting

17  to her interpretation of it.

18          THE COURT:  She's objecting to Dr. Johnson's

19  interpretation of Paragraph 14.

20          Dr. Johnson, I believe, said in her testimony on

21  redirect that she believes she has discretion under both

22  Paragraph 13 and 14.

23          MR. LEVINE:  Yes.

24          THE WITNESS:  Right.  Sorry.

25          Do you have a question?

1        BY MS. KENNEDY:

2        Q.   I just want to know if the word "discretion" is

3    in 13 or 14?

4        A.   It doesn't say "discretion."  The way I'm

5    reading it is if the defendant's mental condition

6    deteriorates.  I guess my convention of "deteriorate" may

7    not be yours.  And so I'm using my discretion as to what

8    "deteriorate" means in terms of this order.

9             THE COURT:  What about the next phrase?

10             THE WITNESS:  Or he violates all conditions?

11    Well, okay.  Or if he violates the orders -- sorry, the

12    conditions of this release, he shall be returned to

13    inpatient status.

14             BY MS. KENNEDY:

15        Q.   That would be a violation of this order, would

16    it not, Dr. Johnson?

17        A.   If he drinks alcohol once, yes, he's in

18    violation of this court order.  Based on this, yes.

19             MS. KENNEDY:  Thank you, Your Honor.

20                  FURTHER REDIRECT EXAMINATION

21             BY MR. LEVINE:

22        Q.   Based on Paragraph 13, is he in violation of the

23    order?

24        A.   No, because I don't believe that rises to the

25    level of being returned to inpatient status.

1      Q.   Is it your testimony that you have read them

2   together so as to --

3      A.   Do I read them together?

4           MS. KENNEDY:  Objection.

5           THE COURT:  Well, she's not a lawyer.

6           THE WITNESS:  Right.

7           THE COURT:  And, you know, whoever drafts these

8   orders better go talk to Chief Judge Satterfield, because

9   Paragraph 13 by itself says, "If defendant fails to comply

10  with any conditions of release such that the forensic team

11  thinks that he's in need of inpatient treatment, then he

12  goes back."

13          That gives them discretion.  He violates, is it

14  of the level that he needs treatment, he goes back.

15          Paragraph 14, by contrast, says if his condition

16  deteriorates, he goes back; or if he violates the

17  conditions of this release, he goes back.  Any conditions

18  of the release.

19          Paragraph 14 says you violate a condition, you

20  go back.

21          Paragraph 13 says something different.

22          So, you know, if the chief judge -- I don't know

23  who drafts these orders.

24          Do you draft these orders?

25          MS. KENNEDY:  Sometimes.

1          THE COURT:  If the chief judge -- Ms. Merene, do

2    you draft these orders?

3          MS. MERENE:  No.

4          THE COURT:  If the chief judge -- if -- you

5    know, I'm not he.  I think that's the correct grammar.

6    I'm not he.  But if someone wants to talk to

7    Lee Satterfield or Chief Judge Satterfield about what

8    appears to some of us in this courtroom to be

9    inconsistencies between Paragraph 13 and Paragraph 14, you

10   know, they ought to make them consistent.

11         It may well be that Dr. Johnson is right, that

12   the intent has been, over the years, more the discretion

13   that seems to be built in in 13.  But 14 is inconsistent

14   with it.  And, you know, if there's an order in this case,

15   I hope that the provisions are consistent with each other.

16         MS. KENNEDY:  I'm sure they were if Your Honor

17   drafted them.

18         MR. LEVINE:  We are not she, but this is a

19   consent order --

20         THE COURT:  Right.

21         MR. LEVINE:  -- and the United States, through

22   Ms. Kennedy, consented to it.

23         THE COURT:  Yes, she did.

24         MR. LEVINE:  I would suggest that there is an

25   estoppel here from her arguing this.

1          MS. KENNEDY:  The defense --

2          THE COURT:  But I'd come back again to what I

3     said earlier several times over the past few days.

4          There may be some -- if there's a convalescent

5     leave and there's an order, there may be some things that

6     are going to be hard and fast, and you come back to court.

7     The government's view is there may be some things that he

8     goes immediately back to the hospital.  But there also may

9     be some things, because it clinically makes sense to allow

10    discretion in the providers in Williamsburg to deal with

11    it without rushing back to court each time and without

12    immediately having to return Mr. Hinckley to the hospital.

13         Now, the draftpersons of whatever I sign, if I

14    sign anything, really have to keep in mind that

15    Dr. Johnson and Mr. Weiss and Dr. G.G. and Mr. Beffa are

16    not lawyers.  They need clear direction, and they are

17    professionals.

18         So when do we want them to have the discretion

19    to do what they do?  And when do we, either because of

20    risk of danger or because Mr. Hinckley is Mr. Hinckley and

21    may need more monitoring and accountability than others

22    for some period of time, but maybe one would think not

23    forever, you know, how do we write the order so that those

24    that are trying to implement it can do what they are

25    supposed to do and so Mr. Hinckley can understand with the

```
 1    help of his support team what's appropriate and what's

 2    not?

 3            This has pointed up that there's sometimes

 4    problems in these orders.

 5            Are there any other questions for Dr. Johnson?

 6            MS. KENNEDY:  No.

 7            THE COURT:  Thank you.

 8            MR. LEVINE:  We have none, Your Honor.

 9            THE COURT:  So is it your intention to start

10    with Dr. Patterson today, or not?

11            MS. KENNEDY:  I was hoping not.

12            Whatever the Court wants.

13            MR. LEVINE:  Your Honor, the Court sets the

14    itinerary for us all, but I would recommend that we start

15    with Dr. Patterson today.

16            THE COURT:  So do we know what our schedule is

17    for the remainder of the week?  Or does it depend --

18            MS. KENNEDY:  I'm here.

19            THE COURT:  Pardon me?

20            MS. KENNEDY:  I said I'm here all week, but I

21    thought that we had Friday --

22            MR. LEVINE:  Your Honor, I don't want to be a

23    burden on the Court.  I have travel plans for Friday, and

24    I have -- on Monday, I have a case that's in Florida.  I

25    have to travel to Florida on Monday.  So I need to finish
```

1    this week.

2              THE COURT:  Well, then, that gives --

3              MR. LEVINE:  I'd like to finish tomorrow and

4    Thursday, if possible.

5              THE COURT:  Well, then, Ms. Kennedy has asked

6    for a break between the end of the evidence and the

7    preparation for closing argument.  She'd like a day.  So

8    unless -- tomorrow is Wednesday?

9              MS. KENNEDY:  Yes.

10             THE COURT:  So if we finish with Mr. Patterson

11   tomorrow -- Dr. Patterson tomorrow, then we take off

12   Thursday and we have closing arguments on Friday.

13             If we finish with Dr. Patterson Thursday

14   morning, we take off Thursday afternoon and have closing

15   arguments on Friday.

16             MR. LEVINE:  May I suggest if we finish with

17   Dr. Patterson tomorrow, on Wednesday, then maybe we can

18   just take off Thursday morning and have closing argument

19   Thursday afternoon?

20             THE COURT:  Well, I don't think that's --

21             MS. KENNEDY:  Can I just say, Your Honor, this

22   is the problem with Thursday:  I will have been married 32

23   years, and so my husband has planned this surprise that I

24   don't exactly know what it is.  And so --

25             THE COURT:  All right.

1      MS. KENNEDY:  -- that's the problem.

2      MR. LEVINE:  She's married 32 years.  Should not

3  be a problem.

4      THE COURT:  I don't think she used the term in

5  the clinical sense.

6      MS. KENNEDY:  In the clinical sense, exactly.

7      THE COURT:  So, all right.  Here is our issue:

8  We can start with Dr. Patterson in 15 minutes --

9      MS. KENNEDY:  Okay.

10     THE COURT:  -- if you want to do that.

11     MS. KENNEDY:  That's fine.

12     THE COURT:  You know, everybody is going to have

13  to decide what's important in their personal and

14  professional lives.  And, you know, maybe we have to

15  postpone closing arguments for a week and a half.

16     MS. KENNEDY:  That's fine.  That's what we did

17  last time.  We waited a month.

18     THE COURT:  So you're going to have to figure it

19  out.  I don't know what your obligations are in the other

20  case, Mr. Levine, and I don't know what your obligations

21  are on Friday, but --

22     MR. LEVINE:  One of them is court, I imagine.

23     THE COURT:  You have to follow the court order,

24  but 31 years of marriage --

25     MS. KENNEDY:  Thirty-two, thank you.

136

1              THE COURT:  Thirty-two years of marriage.

2    Mr. Levine is a great believer in marriage.

3              MR. LEVINE:  I am.

4              THE COURT:  So am I.  I got 40 coming up in a

5    month.

6              MR. LEVINE:  That's great.

7              THE COURT:  So, okay.  So Thursday, we're going

8    to try to accommodate Ms. Kennedy.

9              MS. KENNEDY:  Thank you very much, Your Honor.

10             THE COURT:  Do you want that part of the

11   transcript sealed --

12             MS. KENNEDY:  Yes.

13             THE COURT:  -- talking about the anniversary

14   celebration?

15             MR. LEVINE:  So Thursday, we're not sitting?

16             MS. KENNEDY:  No, no.

17             THE COURT:  We're going to finish with

18   Dr. Patterson, even if we have to go into Thursday.  But

19   we're not going to force her to prepare overnight for a

20   closing argument or for a --

21             MS. KENNEDY:  Thank you.

22             THE COURT:  We're going to figure this out.  If

23   we finish with Dr. Patterson tomorrow, we may go down one

24   road.  If we don't, we may go down a different road.

25             I'm not sure what that means.

1          MR. LEVINE:  And the Court entertains the

2     prospect of having this closing argument in early -- well,

3     mid-May.

4          THE WITNESS:  The prospect of doing it Friday?

5     Depending on your schedule, perhaps.

6          Next week doesn't work for you.

7          MR. LEVINE:  It does not.

8          THE COURT:  And then I can give you some dates

9     in May.

10          MR. LEVINE:  Thank you.

11          THE COURT:  We're going to take 15 minutes, and

12     then we'll start with Dr. Patterson.

13          (Recess).

14          THE COURT:  So we'll go for an hour, an hour and

15     a quarter, when you reach a good breaking point.

16          Dr. Patterson.

17                    **************

18          Thereupon,

19                    RAYMOND PATTERSON,

20     Having been called as a witness on behalf of the

21     Government and having been first duly affirmed by the

22     Deputy Clerk, was examined and testified as follows:

23                    DIRECT EXAMINATION

24          BY MS. KENNEDY:

25     Q.   Good afternoon, Dr. Patterson.

1      A.   Good afternoon, Ms. Kennedy.

2      Q.   Could you please state your full --

3           MR. LEVINE:  Could you use the microphone?

4           BY MS. KENNEDY:

5      Q.   Could you please state your full name and spell

6  your last name?

7      A.   Raymond F., as in forensic, Patterson,

8  P-a-t-t-e-r-s-o-n.

9      Q.   Thank you.  I'm going to show you what's been

10  marked as Government Exhibit 4 and ask if you can identify

11  that.

12           And what is that, Dr. Patterson?

13      A.   That is a copy of my curriculum vitae.

14      Q.   And could you tell the Court and counsel a

15  little bit about your background.

16           First let me ask you, Dr. Patterson:  Have you

17  testified before in this case?

18      A.   I have.

19      Q.   About how many times?

20      A.   I've authored, I believe, 11 previous reports,

21  so somewhere in the vicinity of probably 8 to 11, maybe

22  12.  In fact, I --

23      Q.   I'm sorry?

24      A.   I'm sorry.  I may have given brief testimony

25  when I was still an employee of the hospital.

1      Q.   And have you always been accepted as an expert

2  in the diagnosis and treatment of mental illness?

3      A.   Yes, I have.

4      Q.   Okay.  Could you briefly tell us your

5  educational background.

6      A.   I'll try.  I attended Northwestern University

7  from 1970 to 1973.  Then the Howard University College of

8  Medicine from 1973 to 1977, where I obtained a degree of

9  doctor of medicine.  Completed my internship and first

10  year of psychiatric residency at the Howard University

11  Hospital and my second two years of psychiatric residency

12  at the National Institutes of Mental Health at St.

13  Elizabeths Hospital.

14      Q.   Are you board-certified?

15      A.   I am board-certified in general and -- general

16  psychiatry by the American Board of Psychiatry and

17  Neurology, and I have two board certifications in forensic

18  psychiatry, the first by the American Academy of

19  psychiatry and the Law, which sponsored the American Board

20  of Forensic Psychiatry.  And in 1992, the American Board

21  of Psychiatry and Neurology took over that board, that

22  specialty board, and I'm board-certified by that board in

23  forensic psychiatry.

24      Q.   And where are you licensed?

25      A.   I'm licensed in Maryland, the District of

140

1    Columbia, and the Commonwealth of Virginia.

2        Q.   And what have your faculty appointments been?

3        A.   Historically, I've been on the faculty of

4    Howard University College of Medicine Department of

5    Psychiatry since the mid-'80s, I believe.  I was

6    previously on the faculty of the Overhauser [phon.]

7    Division of Training at St. Elizabeths Hospital when it

8    was still federal; the faculty of the University Maryland,

9    Department of Psychiatry.  More recently, St. Elizabeths

10   Hospital forensic fellowship program.  And prior to that,

11   Georgetown University Department of Psychiatry.

12       Q.   And what have your appointments been in the

13   field of psychiatry?

14       A.   I began as a staff psychiatrist at John Howard

15   Pavilion, Division of Forensic Programs, at St. Elizabeths

16   Hospital in 1981.  I became the medical director of that

17   same division in 1983.

18            I became the director of forensic services

19   designated in 1986 and then the director of forensic

20   services in 1987 when the District of Columbia took

21   ownership of St. Elizabeths Hospital.

22            And then the commissioner of mental health for

23   the District of Columbia in 1992.

24            After I left the District, I was the director of

25   forensic services for the State of Maryland as well as the

1    superintendent of Clifton T. Perkins Hospital Center,

2    which is the forensic hospital for the State of Maryland.

3            Subsequently, the chief psychiatrist for the

4    Maryland Department of Corrections and public safety as

5    well as chief psychiatrist for the D.C. jail.

6        Q.    And have you done consultations?

7        A.    I've done a few.

8        Q.    Okay.

9        A.    Yes, I have.

10       Q.    Maybe you can give us the more recent ones.

11       A.    I am appointed by the federal judges as the

12   monitor for the Department of Corrections in the State of

13   Illinois to evaluate and make recommendations about

14   whether or not the state is meeting constitutional

15   mandates for mental health care to inmates.

16           I have a similar appointment by a different

17   federal judge for New Orleans, the City of New Orleans.

18           And for 18 years, I was appointed by the federal

19   judge, Judge Carlton in California, for the same purpose,

20   as a psychiatric expert and suicide expert for the federal

21   court, overseeing the California Department of Corrections

22   and Rehabilitation.

23           I was also a joint commissioner on accreditation

24   of health care services -- healthcare organizations for 11

25   years, from 1985 to 1996.

1     Q.   And approximately how many other consultations

2  have you had throughout your career since, actually, 1984?

3     A.   Well, actually, since about 1981, the past

4  34 years probably, ballpark, about 50 to 75 at various

5  venues, secure hospitals, prison systems, jails, various

6  organizations.

7          I've consulted with the -- in the past with

8  U.S. Secret Service, with the U.S. Marshals Service, with

9  the Baltimore City Police, with the D.C. Metropolitan

10  Police and hostage negotiations.  A few other things.

11    Q.   Have you been a lecturer/presenter throughout

12  your history there as a psychiatrist?

13    A.   I have.  I've made presentations at annual

14  meetings of the American Board of Psychiatry and the Law,

15  the American Psychiatric Association.  Also here locally

16  at St. Elizabeths Hospital, my alma mater, and other

17  venues where I've been invited.  I've also provided

18  consultation and lectures at NAMI.

19    Q.   And about how many presentation lectures have

20  you given?

21    A.   Oh, boy.  A whole lot.

22    Q.   A whole lot, okay.

23    A.   At least a hundred.

24    Q.   Okay.  And have you testified before as an

25  expert in the diagnosis and treatment of mental illness in

1  other courts?

2      A.   I have --

3      Q.   Okay.

4      A.   -- in this jurisdiction, in Texas, Florida,

5  New York, Pennsylvania, Virginia, Maryland.  That's what I

6  recall off the top of my head.

7      Q.   And including in this court?

8      A.   Yes.

9          MS. KENNEDY:  Your Honor, I would ask if defense

10  has any questions for Dr. Patterson; otherwise, I would

11  ask that he be accepted as an expert in the diagnosis and

12  treatment of mental illness.

13          THE COURT:  Do you have any questions,

14  Mr. Levine, before I before I qualify him and accept his

15  testimony as expert testimony?

16          MR. LEVINE:  No, Your Honor.  If I have

17  questions, I'll reserve.

18          THE COURT:  And you've offered him as an expert

19  in --

20          MS. KENNEDY:  In the diagnosis and treatment of

21  mental illness and risk assessment.

22          MR. LEVINE:  And risk assessment?

23          MS. KENNEDY:  Yes.

24          MR. LEVINE:  I object to that.

25          MS. KENNEDY:  Well, he was accepted as a risk

144

1    assessment expert the last time we were here also.

2              THE COURT:  Overruled.

3              BY MS. KENNEDY:

4         Q.   Dr. Patterson, are you familiar with the

5    hospital's request for convalescent leave in this matter

6    with letters dated December 19, 2014; March 20, 2015; and

7    April 17, 2015?

8         A.   I am with the first two letters and the response

9    to the government's motion dated April 17.

10        Q.   And did you prepare a report in this case?

11        A.   I did.

12        Q.   And who did you speak with in preparing that

13   report?

14        A.   At St. Elizabeths Hospital, I spoke with

15   Vernon J. Hyde, music therapist and clinical

16   administrator; Dr. Benjamin Adewale; Dr. Michele Godwin, a

17   Dr. Sidney Binks.  I'm going to look at my report because

18   I talked to a lot of folks.  Ryan Carroll, music

19   therapist; Denise Brown, social worker.

20             MR. LEVINE:  Is the witness reading from the

21   report?

22             THE WITNESS:  I'm sorry.  I was looking at my

23   report.

24             THE COURT:  He was looking at his report.

25             MS. KENNEDY:  I got it.  Thank you.

1          I hand what is marked as Government Exhibit

2     No. 2, Dr. Patterson's report to defense counsel and

3     Government Exhibit No. 2 to the Court.

4          THE COURT:  I've got it.

5          MS. KENNEDY:  Okay.

6          THE COURT:  Give a copy of it to Ms. Moon.

7     We're all set.  It's been previously marked.

8          MS. KENNEDY:  Right.

9          THE WITNESS:  And just two other people related

10    to the Department of Behavioral Health, Esther Koomson,

11    which is the nurse manager on Ward 2B, which is the ward

12    that Mr. Hinckley resides on, as well as

13    Dr. Nicole Johnson, director of forensic services for the

14    outpatient department.

15        Q.   Did you review medical records?

16        A.   I did.  I'm sorry.  I meant to add other people.

17             Did you want me to add the hospital?

18        Q.   Yes.  The other people, too.

19        A.   In addition to the staff I just mentioned who

20    are employed by the Department of Behavioral Health, I

21    also interviewed Carl Beffa in Williamsburg;

22    Dr. Giorgi-Guarneiri, spoken of as "Dr. G.G." in

23    Williamsburg; Jonathan Weiss.

24             I attempted to discuss his work situation with

25    Corliss Jones.  However, she advised me that she was

1    advised, because of confidentiality, she couldn't talk to

2    me.

3              I also interviewed Les Solomon, a volunteer

4    supervisor at the Unitarian Universalist Church, and

5    Bruce Brelsford, B-r-e-l-s-f-o-r-d, Mr. Hinckley's friend.

6         Q.   Okay.

7         A.   In addition, I also interviewed Jo Ann Hinckley,

8    Mr. Hinckley's mother, and Scott Hinckley, his brother,

9    and Diane Simms, his sister.

10        Q.   And did you read a risk assessment authored by

11   Dr. Murphy?

12        A.   I did.

13        Q.   And again, all of the review board letters

14   you've read?

15        A.   I believe I have.

16        Q.   And any other materials in preparing your

17   reported that you reviewed?

18        A.   Well, the St. Elizabeths Hospital records, the

19   individual notes from Dr. G.G., from Mr. Beffa, my own

20   past reports, as well as reports by Dr. Robert Phillips

21   and, I believe, the risk assessments by Dr. Murphy and by

22   Dr. Montalbano in the past.

23        Q.   And did you evaluate Mr. Hinckley?

24        A.   Yes.

25        Q.   And about how long did that evaluation interview

147

1    take?

2         A.    About three and a half hours in two separate

3    interviews --

4         Q.    All right.

5         A.    -- or examinations.

6         Q.    What is Mr. Hinckley's diagnosis?

7         A.    Mr. Hinckley's diagnosis is psychotic disorder

8    NOS and major depressive disorder.  The psychotic disorder

9    is noted as being in full remission.  The major depressive

10   disorder is also noted as being in full remission.  His

11   third diagnosis is narcissistic personality disorder.

12              THE COURT:  Could you just slow down a little

13   bit?

14              THE WITNESS:  Yes, sir.  I apologize.  And he

15   also has a premorbid diagnosis of schizoid disorder.

16   Those are the mental health diagnoses.

17              He also has a number of medical diagnoses:

18   Hypertension, hypercholesterolemia, I believe allergic

19   rhinitis, and I may be forgetting one or two.

20        Q.    Did you indicate narcissistic personality

21   disorder?

22        A.    I did, yes.

23        Q.    And is that in remission?

24        A.    No.

25        Q.    Does that ever go into remission?

1        A.    Well, it is not in remission in --

2        Q.    Uh-huh.

3        A.    -- Mr. Hinckley's case.  I don't believe I've

4    treated anyone where all the symptoms have gone into a

5    level that I would consider remission.

6        Q.    Okay.  So in your opinion, does he still show

7    signs of narcissism?

8        A.    Yes.

9        Q.    And you mentioned that fourth mental illness.

10   Was that schizoid?

11       A.    Premorbid schizoid personality disorder.

12             MR. LEVINE:  Your Honor, I just want to object

13   to the use of leading questions.

14             THE COURT:  Oh, come on.  After all these days?

15             MS. KENNEDY:  Really?

16             BY MS. KENNEDY:

17       Q.    So what is that, the "premorbid" diagnosis?

18       A.    That was a diagnosis that Mr. Hinckley had

19   before he came into the hospital in St. Elizabeths on

20   June 22, 1982.  The diagnosis was continued after he came

21   to St. Elizabeths.  And it was intended, and I believe

22   accurately, to describe his personality functioning prior

23   to the events of March 30, 1981, for the previous few

24   years.

25       Q.    And what medications is he currently on?

1        A.    Mr. Hinckley is prescribed Risperdal, an

2   antipsychotic medication at 1 milligram per day as well as

3   Zoloft, an antidepressant at 150 milligrams per day as

4   well as some other medications, as I mentioned:

5   Lisinopril, which is an antihypertensive, and other

6   medications for his medical conditions.

7        Q.    Can you explain why he is on medication if he,

8   in fact, is in remission?

9        A.    Well, they are not mutually exclusive.   In my

10   opinion, certainly part of the reason he has been in

11   remission is because he's on medication.

12            He is in association as well as all the

13   treatment that he has received -- Mr. Hinckley, since 1982

14   when he came to the hospital, has been in individual

15   therapy, I believe, without interruption except when a

16   therapist may have been leaving and another therapist

17   replaced them.   He's had a multitude of group

18   psychotherapies, even before the new hospital and the

19   therapeutic learning center.   He's had other therapies,

20   including music therapy, art therapy.

21            There's also something that's not frequently

22   referred to as a therapy, but is, I think, clearly

23   recognized called the "milieu."   What is the

24   circumstance -- m-a-l-i-e-u [sic], I believe, the

25   circumstances of his living environment.   And that's an

1    important consideration, particularly for someone who's

2    been hospitalized for a number of years and there's a

3    consideration in this case before the Court of ending that

4    hospitalization.

5        Q.   So do the medications treat his illness?

6        A.   They do.

7        Q.   And do they benefit him?

8        A.   From everything that I've seen and from talking

9    with Mr. Hinckley and my own examinations, I believe they

10   do.

11       Q.   And how long approximately, if you know, has he

12   been on meds?

13       A.   I believe the Risperdal was started in 1999.

14   Mr. Hinckley was taking a different antipsychotic, and my

15   memory is Trilafon, up until about 1993, and that was

16   stopped then.  And then he resumed on an antipsychotic in

17   1999.  The Zoloft came on later, in the mid-2000s, and I

18   just don't recall what year.

19       Q.   Has he always willingly taken his medications?

20       A.   Yes.

21       Q.   Is he self-medicated?

22       A.   He is.  There were some difficulties with

23   medications when he first came to the hospital that

24   culminated in an overdose attempt in 1983.  And at that

25   time, he was considered what's considered watch take or

1    direct observation therapy, meaning the medications are

2    administered by a nurse.  Everyone has to come up to the

3    nurse and get their medications.  And the other form is

4    keep on person, KOP.  They are not kept on person.

5         With Mr. Hinckley, my understanding is that they

6    are still administered in the hospital by a nursing staff

7    but that he takes them with him and takes them at home in

8    Williamsburg, and that would be self-medicating.

9         Q.   What if he stops taking the medication?

10        A.   There's a risk for decompensation if he stops

11   taking the medications, either/or both, in this case, the

12   Risperdal and the Zoloft.  And I don't believe anyone has

13   recommended or suggested that he should stop taking

14   medication.  I certainly don't believe that would be in

15   his interest.

16        Q.   Who would know if he stopped taking his

17   medication?

18        A.   Unless he told someone, it would be based on

19   whatever symptoms or presentation that he offered when he

20   came to the attention of someone, either because of

21   scheduled appointments or because of some need to contact

22   or to be seen in between appointments.

23        Q.   In your medical opinion, how long would it take

24   before someone would notice that he has not had his

25   medications?

1    A.   Well, I guess, I don't know if there's a time

2    frame that you could put on how long someone would notice

3    that he's not taking his medications.  It is the symptoms

4    that would reveal whether or not he has had some change in

5    mental status, and that could take some time.

6         He has been on these medications for a number of

7    years, so I would not expect it to be noticed right away.

8    But it could take some time, depending on his

9    circumstances, where he is, as well as the monitoring in

10   the hospital where he's seeing people every day.  It would

11   be more likely that someone could notice it as opposed to

12   in the community where he has scheduled appointments.

13   Q.   What would the symptoms be?

14   A.   Well, that depends.  There's been a lot of

15   discussion about the distinctions and the diagnoses.  At

16   the time of Mr. Hinckley's shooting of the president and

17   the other three men that we've talked about, Mr. Brady,

18   Mr. Delahanty, and our Secret Service agent, Mr. McCarthy,

19   he had a constellation of symptoms that are consistent

20   with all three diagnoses:  Depression as well as the

21   psychosis as well as the narcissistic personality

22   disorder.

23        So in their efforts to try to take two of them

24   out as remission, the other one, we're talking about one

25   person, one man.  So you would never, for example, suggest

153

1    someone who has diabetes and hypertension, well, if you

2    stopped treating one, then the other one is just fine.

3    This is a constellation of his mental health functioning.

4        Q.   And how often, if you know, does Mr. Hinckley

5    see Dr. G.G. in Williamsburg?

6        A.   Currently, he sees Dr. G.G. twice per visit.

7    He's there for 17 days.  He sees her twice.  And during

8    that -- those are scheduled appointments that he has -- I

9    think those have been pretty consistent, with a couple of

10   exceptions; at least one I can recall where Dr. Adewale

11   covered for her while she was away.

12       Q.   And is that the plan, to keep it twice a month?

13       A.   Not in the hospital's plan, no.  My interview

14   with Dr. G.G. and her testimony, from having read the

15   transcript, is different, is different than the hospital's

16   plan.

17            The hospital's plan was, I believe, once or

18   twice a month and then that to decrease at Dr. G.G.'s

19   discretion after some period of months.

20       Q.   And Dr. G.G. at present, is it still once to

21   twice a month for her, or has she increased it, if you are

22   aware?

23       A.   As it stands right now, Mr. Hinckley is still in

24   the 17-day conditional release, so it is two times per

25   visit.  That's my understanding.

1       Q.   So if it goes from two times every 17 days to

2   two times every 30 days, are we losing some, a partial

3   visit there?

4       A.   We're losing two visits there, in my opinion.

5   And because -- consider the weekend days -- 17 days

6   includes at least two weekend days, if not three.   So

7   we're talking about one visit per week currently.   That

8   would go to two visits per month, so we're losing half the

9   visits.

10      Q.   What, in your opinion, should the amount of time

11  that he sees Dr. G.G. per month be?

12      A.   It should stay at one time per week,

13  particularly during, in my opinion, the first year if the

14  Court does indeed grant a conditional release.

15           And I say that because of what you'll hear

16  through my testimony, I think fairly consistently, when

17  you increase the opportunities and the activities of

18  someone they have in the community and you perhaps plan to

19  decrease in some ways the monitoring of those activities,

20  the specificity of those activities through itineraries,

21  et cetera, in my opinion, it's very, very important to not

22  decrease the therapeutic interventions or decrease the

23  monitoring.

24           The goal of any conditional release is success

25  for the patient as well as success in that there is not a

1   recurrence of violent behavior; that there is not

2   decompensation; that there are not undue increases in

3   risks that may be mitigated with appropriate treatment and

4   interventions.

5           So you don't go down.  You go up because -- in

6   those activities -- because you're already decreasing the

7   hospital component.  You're taking away, even if it's 14

8   days a month, you're taking away all of the other people

9   who see Mr. Hinckley.

10          I do believe I've mentioned

11  Velora Pedrick-Jernigan [sic], his library supervisor.  I

12  interviewed her as well.  She's not a clinician, but she

13  knows Mr. Hinckley in the workplace.

14          The nursing staff, Esther Koomson as the nurse

15  manager, she's responsible for supervision of the nursing

16  staff, the recovery assistants, what used to be clinical

17  nursing assistants or forensic psychiatric technicians.

18  They see Mr. Hinckley on the grounds when he's attending

19  to his feral cats.  They have interactions with him.

20          You're taking away all of those.  So what you're

21  having now is the periodic -- it may be a week, it may be

22  two weeks, it may be a month -- evaluation, assessment,

23  interaction for a limited period of time.

24          And as I think has been represented in this

25  court in past hearings and in this hearing, Mr. Hinckley

1    is not particularly forthcoming with information.  That's

2    gotten better.  But he is still -- it is still a

3    requirement, in my view, to ask Mr. Hinckley questions and

4    ask him the right series of questions if you're going to

5    actually do a clinical assessment and also a risk

6    assessment with the intent of proper risk management.

7         Q.   What, if any, stress will be on Mr. Hinckley in

8    living in Williamsburg full time?

9         A.   Well, there's been quite a lot about the stress

10   he's already had in attempting to integrate into

11   Williamsburg.  I don't see this as a reintegration because

12   he's never been integrated.  So it's not a "re."  It's the

13   same thing about debilitation versus rehabilitation.  If

14   someone hasn't been habilitated, then it's very hard to

15   think that you're rehabilitating.

16             In this case, we're talking about integrating

17   into a community that has not been welcoming to

18   Mr. Hinckley over time.  So he's had rejections.  He's had

19   various things that have happened.

20             Since the onset of the 17-day visits, he has

21   done some things he hasn't done in the past.  Some of

22   those are certainly related to the length of time he's

23   been there, and others are not.

24             A good example is NAMI.  There is no reason that

25   while he had ten-day visits, he could not have attended

1    the National Alliance on Mental Illness.  I want to make

2    that clear, NAMI actually stands for the National Alliance

3    on Mental Illness.  It used to be the National Alliance

4    for the Mentally Ill.  They changed their name, and we in

5    mental health seem to get caught up with changing things

6    like the DSM-IV to the DSM-5, things like that.  So that

7    name has changed.

8            But even when he had ten days, he could have

9    gone to one of those meetings, but he simply refused to do

10   that.  And that's as per Mr. Beffa, who was his case

11   manager and individual therapist at the time.

12           Since the 17 days, it's my understanding that

13   around November or December -- and they started, I

14   believe, in April or May -- they may have been a little

15   later than that because the order was April, so it's right

16   after that, April of -- no, that's not right.  February of

17   2014 was the order.  So they may have started as early as

18   April the visits, the 17-day visits.

19           So April until November, December, is when he

20   went to his first NAMI meeting, and Mr. Weiss either went

21   with him or met him there.  And as fate would have it, he

22   met a woman the first time he went.  That could have

23   happened a long time ago, so it has nothing to do with 10

24   or 17 days.  It has to do with Mr. Hinckley's willingness

25   to participate in that activity.

1          That's not to say there have been other

2     activities where Mr. Beffa or Mr. Weiss have attempted to

3     make an entree for him, and he's been rejected from there.

4     So there is stress in the community.

5          There's stress in having less structure.  And

6     there's a continuum between rigidity and something that

7     might be impairing in some way and structure.  And

8     structure is important, particularly if you're attempting

9     to have a successful conditional release that is

10    measurable.  It is very difficult to manage if you don't

11    measure.  All you have is anecdotal reports and

12    he-said/she-said.  So you really do want to try to get in

13    place, if you can, those measures that allow you to look

14    at someone's progress.

15         Measures are not intended simply to say

16    someone's not doing right.  They are also intended to say

17    someone is; and, if so, how do we proceed from that point

18    to the next point?

19         That's what a conditional release plan is, and

20    convalescent leave is a part of conditional release.  They

21    are not exclusive.

22         Q.   So these measures, what, in your opinion, could

23    be set up, or are measures part of the risk management for

24    Mr. Hinckley?

25         A.   Yes.  They are part of clinical management of

1    Mr. Hinckley.  You mentioned one:  Medication compliance.

2    That's part of clinical management.  It's also a part of

3    risk management, to remain on medications.

4            The risk management measures that have been in

5    place in the past and currently, as it turns out, had to

6    do with the itineraries.  They have to do with specifics

7    as ordered by the Court.

8            The purpose, I hope -- and at least in my

9    opinion -- the purpose of any expert witness, doesn't

10   matter who retained them or if they are appointed by the

11   Court, the purpose is to assist the Court.  That's what we

12   should be doing.  That's what we're here for.

13           So how do we best assist the Court?  By saying

14   to the Court, Here is what we think is important; here is

15   what we're trying to measure; here is how we want to do

16   it.  And we will find ways to measure that and report to

17   the Court, yes, this is happening, or no, it's not and

18   what we think the reasons may be and how we may do

19   something differently.

20       Q.   What are some of the risk measures or risk

21   measurements that you advise?

22       A.   Well, I had advised in my report, I did oppose

23   the hospital's recommendation, not because I don't believe

24   that Mr. Hinckley has demonstrated at the current time,

25   based on his current clinical condition and the conditions

1    that the Court is required.  He has demonstrated low risk.

2    I've said that.  The issue is how do we keep the risk as

3    low as possible?  How do we manage that risk?

4          So there's some things that go into that.  One

5    of them is itineraries.  It's onerous.  It's tough to do

6    that.

7          There are two instances where I think

8    itineraries would not be necessary.  One is in the

9    hospital because everybody is there, and they are writing

10   progress notes every day.  The other is on conditional

11   release.  Anything between that, you really do want to

12   have some idea of what it is we're trying to do.

13         So you have the scheduled appointments.  How

14   many times are you going to see Dr. G.G.?  How many times

15   do you see Mr. Weiss?  How many group therapies,

16   individual therapies, music therapies?

17         And I have to comment, the music therapy issue

18   seems to have gotten lost in this, and I don't understand

19   why.  I really don't.  VJ Hyde, in his role as music

20   therapist, was outstanding with Mr. Hinckley and gave

21   information to the treatment team that they hadn't gotten

22   in other ways.  And this is why, while Mr. Hinckley is in

23   individual therapy with Dr. Binks, so that avenue was

24   there, he's in psychiatric treatment with Dr. Adewale,

25   that avenue is there, he's got the nurse manager and

1    nursing assistants and in this case, recovery assistants

2    in the hospital, that avenue was there.  He's got the job.

3    That avenue is there.  But the music therapy gave some

4    additional information that was important.

5              And in interviewing Ryan Carroll, who is the new

6    music therapist who essentially came into this under

7    Mr. Hyde's supervision and is now taking on the role

8    himself as therapist, he is looking at how Mr. Hinckley's

9    music and his interpretations and what he does has changed

10   from back then to now.  Those are important data points to

11   help us measure.

12             Ms. Haley, I don't get what is going on with

13   that.  I just don't, because everyone I talk to, from

14   Jo Ann Hinckley to John Hinckley to Carl Beffa to

15   Dr. G.G., says she's hard to reach.  I e-mailed her.  She

16   hasn't answered.  She has a phone and has no answering

17   machine.  I don't know how you're a clinician to be

18   available to people and you can't be reached by phone.  I

19   don't get that.  But somehow, that seems to have been

20   okay.

21             As a former administrator, it ain't okay with me

22   because if someone is part of the treatment team, they've

23   got to be part of the team.  They just don't have

24   responsibility to the patient.  They also have

25   responsibility to the fellow team members.  And because

162

1    it's a forensic matter, they have responsibility to this

2    Court.  If they don't allow themselves to be available for

3    their input about what is going on, there's something

4    wrong with that picture.

5              THE COURT:  Let me ask you this question,

6    because there's been a lot of question about this.

7              THE WITNESS:  Yes, sir.

8              THE COURT:  Music therapy is important.  But

9    having the same person, I mean, someone else could do

10   this.  Obviously, this person has developed a relationship

11   with John and so forth, but someone else could do this;

12   right?

13             THE WITNESS:  Someone else could do it, yes.

14             THE COURT:  And so if, under the -- let's take

15   it if this were a hypothetical and he were out on

16   convalescent leave and these problems came up with

17   Ms. Haley or someone, whose responsibility would it be to

18   say, This is -- or should it be to say, This member of the

19   team, even though she's talented, isn't performing as a

20   member of the team?

21             THE WITNESS:  Under the -- I guess the group

22   makes recommendations because there's several --

23             THE COURT:  Right.

24             THE WITNESS:  And under the recommendations, my

25   understanding is that would be primarily Mr. Weiss in

1    bringing together summaries; and secondarily and more

2    administratively, Dr. Johnson.

3              Dr. Johnson is forensically trained, excellent

4    psychiatrist.  So is Dr. G.G.  They are not rookies.  They

5    are not somebody who just -- this is not their first

6    rodeo.  So you need seasoned clinicians, and you need

7    seasoned risk assessors, managers for Mr. Hinckley.  And

8    I'm talking specifically about him.  There are some other

9    folks that might not need that level of expertise, but he

10   does.

11             And therefore, yes, she could be replaced by

12   someone else, or she could decide she's going to be

13   accessible to the team.  But the responsibility to let the

14   Court know what is going on with any of the treatment

15   staff has to be under the current proposals with Mr. Weiss

16   from Williamsburg and Dr. G.G. because Dr. G.G.'s role as

17   psychiatrist and medication manager has been, I think,

18   pretty well defined and discussed.

19             Her role as risk assessor and risk manager has

20   not been as much as I would think it should be, and that's

21   part of why I say once week and why I believe in her

22   testimony because I reviewed the transcript.  I wasn't

23   here.  And my interview with her, she said once a week.

24             Because this will be an intense time.  Could be

25   a very easy time.  I can't imagine it being very easy.  It

1   could be very intense, and it could be very intense and

2   dynamic in the sense of changes.

3          We talked lot about the possible unavailability

4   of Mrs. Hinckley.  What about if Mr. Hinckley does get a

5   job?  Then what?  How do we deal that?  What about

6   Ms. Haley?  What's going on with her?  What about Ms. CB?

7   What's going on with her?

8          The loss -- and when I say losses, and this is

9   from my own experience at St. Elizabeths -- there were

10  times when we would have individuals who were part of not

11  guilty by reason of insanity acquitees who would break the

12  rules and would wave at Mr. Henneberry and me as we were

13  driving out of the facility from across the street where

14  they knew they should not be.

15         What does that say?  And it says to a clinician,

16  We better talk to you and find out what's going on.  Maybe

17  you're not comfortable.  Maybe you are, et cetera.  So bad

18  judgment, rule-breaking is important to factor into this.

19  So you need all the players with that information coming

20  to the Court and coming to the Court in a palatable,

21  readable, readily accessible form.

22         I don't believe the Court, in my opinion, should

23  be reading progress notes unless they want more

24  information from the summaries.  I just -- I just don't

25  know where that comes from.

1          THE COURT:  I have nothing else to do.

2          THE WITNESS:  If you got the time, fine.

3          But I think in trying to do -- have due

4     diligence to the Court and give the best information we

5     can, we should make it information that's readily

6     reviewable.

7          So in answer to your inquiry, Mr. Weiss, I

8     think, Dr. G.G. specifically for risk assessment and risk

9     management, and Dr. Johnson because she's got a lot of

10    time, too.

11         THE COURT:  But back to Ms. Haley.  I'm not sure

12    because I don't remember whether or not -- whether or not

13    any of the monthly reports that Mr. Hyde sent after

14    Mr. Hinckley's visits suggested that Ms. Haley was --

15    there was difficulty communicating with her or not.  My

16    recollection is that somehow, there was enough

17    communication so they had their sessions.  And she showed

18    up, and they were fruitful, and they were good.

19         But in terms of her responsiveness to other

20    members of the treatment team, that's where the problem

21    came.

22         THE WITNESS:  Well, in part, yes.  And I think

23    keep in mind my understanding of Ms. Haley's role with

24    Mr. Hinckley has been to go to his home.  They do music

25    therapy at home.  This is particularly important because

1    one of Mr. Hinckley's primary interests is his music.

2         So the idea that Mr. Weiss and Mr. Beffa are

3    exploring whether he can be a part of an open mic or a

4    group or a something, I would think the opinion of the

5    music therapist would be particularly important in that.

6         But it's not only that, I say in part, because

7    of not responding to Dr. Murphy or to me.  We are

8    attempting to assist the Court, and somebody we want to

9    talk to is involved with him just says no or just doesn't

10   respond?  Again, that's why.

11        So there is a difference between being a really

12   good therapist and also being a team member and

13   participating in risk management.

14        THE COURT:  Well, I'm thinking about going

15   forward because the issue of her unavailability or lack of

16   communicativeness has come up, and I think Mr. Hyde said

17   in response to some questions about what if there were a

18   different person in place, said something like, I'm way

19   ahead of you.

20        THE WITNESS:  I recall that.

21        THE COURT:  So Mr. Hyde is apparently taking the

22   initiative to, perhaps -- which -- and he's the ideal

23   person because he's both a music therapist and a case

24   manager.  And so he's taking the initiative, it sounds

25   like, to explore the possibility of alternatives to

1    Ms. Haley in Williamsburg who would be more willing to

2    become a team player.

3            And you're the witness.  I'm not.  But that

4    sounds like a good idea.

5            But the hypothetical is:  What if we were six

6    months down the road and he were on convalescent leave and

7    I weren't getting reports about her lack of communication,

8    or is it going to be very, very clear to Mr. Weiss and

9    Dr. G.G. that this is important and very, very clear to

10   Dr. Johnson that she sees that when she does consult with

11   the team individually, she can't reach Haley, or if she

12   tries to meet with them together and one person is

13   sometimes missing, are they going to be -- how do we make

14   them responsible for doing what Mr. Hyde apparently is

15   exploring?

16           THE WITNESS:  I have no doubt that Dr. Johnson

17   and Mr. Hyde -- it sounds like a movie, Dr. Johnson and

18   Mr. Hyde -- both have the Court's concerns and perhaps

19   mine and Dr. Murphy's very keenly in mind.

20           Part of this process of doing the evaluations,

21   the risk assessments with Mr. Hinckley and doing the

22   collateral interviews is that while I'm asking questions,

23   these are very smart people.  So they are also taking away

24   information.  And that occurred in almost every interview

25   that I had with staff saying, Maybe which should think

1    about that, or maybe that's something to consider.

2            So I think that that's underway.  But I would

3    suggest that there's an authority that none of the

4    clinicians and none of the experts have, and I believe if

5    I were not doing something that the team thought I should,

6    and I got a call from the Court saying, You be in my

7    courtroom, I damn well be doing it before I saw you.

8            THE COURT:  Well, yeah.  But the theory is that

9    after 12 years at this, if convalescent leave is

10   appropriate, if he's ready to move to the next step,

11   shouldn't I be less involved rather than more involved?

12           THE WITNESS:  Down the line.  That's a great

13   question.  That's a great question because the whole deal

14   here is we want success.

15           So for the first year, in my view, let's have

16   this intensive approach to it.  And if there's something

17   that changes, for example, if Mr. Hinckley gets a job,

18   then his appointments by necessity are probably going to

19   be evening appointments, early morning appointments, or

20   weekend appointments.  So I would envision, if I were on

21   that end of managing him, notice to the Court, Judge,

22   we've got this job lined up for him at Subway, and he's

23   going to be there on the day shift or whatever it is, and

24   therefore we'd like to reduce something or change the time

25   frame of something as notice.

1          Whether or not that then encourages a hearing or

2     even further reviews by outside folks is obviously the

3     Court's call.  But it's the intent to keep the Court in

4     the loop and also allow Mr. Hinckley, when appropriate, to

5     take on more activities.

6          The itineraries, for example, it's not only the

7     scheduled activities.  It's the free time, and that's

8     related directly to the risk factors because one of the

9     risk factors is isolation.  So risk factors.  When we talk

10    about isolation, most of the time, people are thinking

11    he's off by himself or somebody is not in contact with

12    everybody.

13         Mr. Hinckley has lived at the hospital for

14    33 years.  I don't believe, other than women that he has

15    had contact with that he can, or anyone can say that he

16    has any male friends at the hospital.  There's only one

17    instance that I knew of back in the mid-'80s when I think

18    another patient was particularly -- male patient was

19    particularly friendly with him.  And the reason I know

20    that is because that male patient was in individual

21    therapy with me.

22         So the idea of isolation is not just a function

23    of whether you're around other people.  It also has to do

24    with interactions with other people.

25         In Williamsburg now, he has two friends, and he

1  has -- it's been indicated by Mr. Beffa -- that he wants

2  to reach out and possibly talk to some other group members

3  from his first group.  That hasn't happened or hadn't

4  happened at the time of my report; but again, that's

5  initiative in trying to do some things.

6           So let's see if that works out.  Let's see,

7  because in my view what's changed since April of 2014 and

8  the Court's order are a couple of things.  Mr. Weiss is

9  one change, and it actually happened before that.  The

10  length of time, the driving privileges, the unaccompanied

11  time, and the Court's opinion which translated loosely is,

12  The ball is in your court.  Now go out and do some stuff.

13  And he has gone out and started to do some stuff.

14           So would you then take away the measures, the

15  itinerary, calendar, a log?  Would you take away the

16  measures to at least do as much as you can to assure the

17  Court that he continues to do some stuff and maybe more

18  stuff as a purpose or as a goal of integrating into the

19  Williamsburg community, which is what this is, I believe,

20  all about.

21           BY MS. KENNEDY:

22       Q.  Now, Dr. Patterson, you indicated that an

23  itinerary is needed for Mr. Hinckley when he's down in

24  Williamsburg.

25           Does he have one now?

1     A.   He does.

2     Q.   And do you know who drafts these?

3     A.   Those are drafted, I believe, or written by

4 VJ Hyde in conjunction with talking with the treatment

5 staff at St. Elizabeths, the treatment providers.  And I

6 use the term purposely "providers" as opposed to

7 "treatment team" because I haven't seen that they are

8 providers in Williamsburg as a treatment team meeting with

9 Mr. Hinckley since they have never done that.  And that

10 was subject to testimony and reports back in 2011.  That's

11 four years ago:  How is it that they've never sat down

12 with him together one time to talk about him?

13     So the idea there is that Mr. Hyde prepares the

14 itineraries, and I will give credit where credit is due.

15 During these hearings, Mr. Hyde had a suggestion which I

16 think is excellent:  Let Mr. Hinckley start writing the

17 itineraries.  Let him do it.  So that he has a very, very

18 clear role in what it is that he is going to be doing,

19 what he wants to be doing.  And then those go to Mr. Weiss

20 so he can then interface with the rest of the team and

21 Dr. Johnson and say, Okay, this looks good, this doesn't

22 look so good, here is what we're going to try to do.

23     That's the starting point of the measures.

24 After that, then you have a log so that if the

25 unstructured free time is going to Merchant Square at

1    William and Mary and going to the Barnes & Noble

2    bookstore, and I'm to do that on Monday.  If the log says

3    we didn't do that on Monday, why not?  What is going on?

4    Is it weather?  I just didn't feel like it?  You know,

5    what?

6           So those are the kinds of things that allow you

7    to take a look at progress or lack thereof so that you can

8    then have some data points for whatever changes you think

9    are indicated in whatever direction that might be.

10          Q.   What sense of ownership, if any, would that give

11   Mr. Hinckley about doing his own itinerary?

12          A.   I think it would lessen his response to me when

13   I asked him about itineraries when he said, "I can't live

14   my life that way.  Nobody can."  And I get that.  I get

15   the idea that it's hard to write down what you're going to

16   be doing for the next however long.  But it's not

17   impossible to do.  And it has been being done for 17-day

18   periods of time.  There is no reason it can't be done for

19   a week at a time or two weeks at a time or further out, if

20   it can be done in that way.

21          But the ownership of it, then it becomes, for

22   most of us, it becomes it's mine.  It's something I'm

23   involved in.  It's something that they are not doing to

24   me; they are not putting on me.

25          And that is important in Mr. Hinckley's

1    narcissistic personality disorder.  And there's been

2    discussion or some statements about isn't narcissism just

3    narcissism, and everybody has got narcissism?  Well, okay.

4    Personality structure is based on a number of different

5    permanent traits that we learn and develop.  Some of it

6    may be internal stuff.  Who knows.  A lot of it has to do

7    with our upbringing, our interactions, et cetera.

8         So it has a lot to do with how we interact with

9    other people, how we see the world, how we see ourselves.

10   So narcissistic traits are not uncommon in, oh, I don't

11   know, expert witnesses, trial attorneys, some judges.  Not

12   all, but some.  And particularly in actors and actresses

13   and people that are on stage.  They are on display.  They

14   love the limelight.

15        There are other people who hate that stuff, and

16   they don't have those kinds of traits.  There are people

17   who have obsessive-compulsive traits.  Doctors, lawyers,

18   who reads all the stuff we read if we don't really believe

19   it's important?  And that's why some folks don't get

20   through that process, because they just can't stand it.

21        So the personality traits come together and they

22   form our personality.  It's a disorder when it interferes

23   with your social, occupational functioning, your

24   interpersonal relationships, your self-worth, your

25   self-esteem, what you believe about yourself.  Then it

1    becomes a disorder because it is impairing your

2    functioning.

3        Q.   Now, in talking about itineraries, do you think

4    for Mr. Hinckley that it is important to do an itinerary?

5        A.   I do.

6        Q.   And why is that?

7        A.   For a couple reasons, most of which, I said, in

8    terms of measuring, having goals, having some objectives

9    you're trying to meet in pursuance of the goals.  But it's

10   also something that allows the clinicians as well as the

11   risk assessors to have something to measure his

12   performance against.

13           And, you know, the itineraries have been

14   important in this case.  And not only what we talked about

15   in the last hearing and it's been referenced in this

16   hearing about not going to the movies twice and all that

17   went into that because the itineraries were court-ordered.

18   It's not just a choice.  It's not just Dr. X or Mr. Y or

19   Ms. z said, You should do this.

20           They were ordered, and those are measures.  So

21   when Mr. Hinckley violated those itineraries twice under

22   the ten days, that's an important measure.

23           He's violated again under the 17 days with going

24   to John Tracey's instead of going to the photographer,

25   Mr. Lerner.  Is that such a big deal?  From a clinical

1    perspective, you can have your own views.  It might be a

2    small thing, minimal.  It might be a big thing, maximum.

3    The issue is, from a risk management perspective, is it a

4    violation of what Mr. Hinckley knows he was supposed to

5    do?  Is it simply a mistake?

6          Well, if you call the guy before you go the day

7    before, and somehow you go, that doesn't seem like a

8    mistake to me.  And it's very difficult -- I mean, what's

9    good for the goose is good for the gander.  If you give

10   credit and say it was good that you didn't go and see

11   Ms. Haley when she invited you for coffee because you

12   couldn't get clearance from Mr. Hyde or Mr. Weiss, that

13   was good.  You can't then say you didn't get clearance to

14   go to John Tracey's studio, but that was kind of just a

15   mistake because there's a call before, and in the records

16   there's a reference in 2008 to the review board rejecting

17   Mr. Hinckley's wish to go to John Tracey's studio back

18   then.

19         John Tracey's studio, JT Asylum Productions.

20   Now, you can let your imagination run away with a CD by

21   John Hinckley produced by JT Asylum Productions.  That

22   doesn't sound like a very good thing.  But the review

23   board said no.  So there's history of no, don't go there.

24   But he went.

25         So it becomes grist for the mill.  What does

1  that mean?  Why would you do that?  Yes, it was at best

2  bad judgment.  But, you know, you violate the Court's

3  order when you do something that's not on the itinerary.

4  So they are important as measures.

5       Q.   Now, if an itinerary is not kept, could that be

6  a risk for Mr. Hinckley?

7       A.   In my opinion, it is.  And it is because of the

8  lack of structure.  The risk factors for Mr. Hinckley

9  include not only the isolation and depression; they also

10  include relationships.

11       And the idea of not having some idea of what

12  activities and what kind of things are going on for him on

13  the day-to-day, particularly when you have removed the

14  hospital component, you've removed those senior clinicians

15  who have known Mr. Hinckley for years from the equation,

16  you've removed the nursing assistant or recovery assistant

17  who walks out and says, Oh, I saw Mr. Hinckley with his

18  cats, and the cats really love him, and he loves them, and

19  here we go.  Those are going to be gone.

20       So you really do not reduce the clinical

21  services and reduce the monitoring simply because the

22  conditional release title is convalescent leave.  At least

23  for the first year, you really do want to measure that.

24  You do want to give him every possible support to be

25  successful out there.

1          And then if there's something that needs to

2    change, you notice the Court and say, We want to change

3    this because of this.

4          Dr. Johnson in her testimony, the issue of when

5    do you bring somebody back to the hospital, well, "It

6    depends" is the answer to that question.  It depends.

7          Somebody who is drinking, has a drinking history

8    and comes in intoxicated, they may need to come back to

9    the hospital.  But I would think the best way to address

10   the Court on that is to notice the Court and say, We're

11   going to keep him out right now because he's still got his

12   job, but he's coming in every day.  And we're doing

13   breathalyzers every day until we're satisfied he's not

14   drinking anymore.

15         So we want to promote that he remains in the

16   community, but we don't want to allow a risk factor to

17   increase when we can do something to mitigate that.

18   Q.    Now, you've heard testimony that the inpatient

19   treatment team will no longer be involved with

20   Mr. Hinckley once he's in outpatient.

21   A.    That's correct, yes.

22   Q.    Now, in your opinion, Dr. Patterson, do you

23   believe that Mr. Hyde or some other member of the team,

24   Mr. Hinckley would benefit for some months if they went

25   over and saw him at OPD when he came up from Williamsburg

1    once a month?

2        A.  Oh, certainly.  Certainly.  As I said, the

3    confidence I had in Dr. Johnson speaks for itself.  The

4    learning about this case and all the history, the

5    institutional memory about this case and various things

6    that have occurred, even though the psychotic disorder and

7    the major depression have been stated as in remission,

8    there have been things that have occurred that are

9    indicators, at least in my opinion, of the potential for

10   increased risk and decompensation.

11        No, Mr. Hinckley has not gone out and shot

12   somebody.  So, no, you can't say that he has committed

13   another act like "the act."  But you don't do risk

14   assessments based on whether or not that particular

15   element has been a part of the risk in the past.

16        The greatest example of that is the Internet.

17   The opinions about whether or not Mr. Hinckley should have

18   full access, unfettered access to the Internet have

19   varied.  My opinion is he should not.  My opinion is there

20   should be a vetting with probably Mr. Weiss or Dr. G.G.,

21   and they should make those decisions.  They may have to go

22   up to Dr. Johnson or not.  But the recommendation is

23   silent on that.  It should not be.  They should be

24   approved by the treatment team and sent to Dr. Johnson.

25        And then there should be a way to measure that.

1    Why do I say that?  Because you can access almost anything

2    on the Internet.  And one of the -- I believe the first

3    recommendation from the hospital, 301 (e) in 1987, the

4    hospital withdrew and withdrew it because we got

5    additional information because Judge Green ordered the

6    hospital staff to search Mr. Hinckley's room.  And that's

7    when we find over 50 pictures of Jodie Foster.  And he's

8    told the treatment staff, me specifically since I was the

9    hospital's representative, he had no interest, no

10   aspirations for Jodie Foster.  All that was gone.

11           It was not.  So now you have unfettered access

12   to the Internet where you can get anything, but you can

13   also put something on it.  How many YouTube musicians are

14   there?  So is having a carte blanche worth the risk?  In

15   my opinion, it's not.  It doesn't mean that you don't

16   allow him to make applications for jobs on the Internet,

17   et cetera.  But that should go through Mr. Weiss to say

18   yes, this is okay, and this is not, and as far up the line

19   as necessary so you don't get a surprise one day that he

20   has 2700 hits on something you don't want to see, because

21   then it's too late.

22       Q.   Now, Dr. Patterson, you indicated that you did

23   read Dr. Murphy's risk assessment?

24       A.   Yes.

25       Q.   And is it correct that her opinion of

1   Mr. Hinckley's risk for violence is low if there are

2   specific conditions?

3        A.   Yes.

4        Q.   And she also indicated that there was prolonged

5   isolation for Mr. Hinckley?

6        A.   As one of those factors.

7        Q.   Okay.  Now, she broke it up into Part A, B, and

8   C time frames; is that right?

9        A.   Yes.

10        Q.   What is your view on breaking it up into time

11   frames?

12        A.   I think I don't agree with that assessment or

13   that process.  I think that the minimum time for if there

14   is a condition on convalescent leave, the minimum time for

15   the first phase of that, if you want to call it a "phase,"

16   should be 12 months, a year.

17        And in that year, we have an opportunity to

18   measure things.  We have an opportunity for him to explore

19   opportunities for employment, for further activities, for

20   developing friendships, for remaining compliant with his

21   treatments, medications, et cetera.

22        In my opinion, you don't decrease, as I've said,

23   those kinds of things based on X number of months.  That's

24   like saying to your college student, If you just go to

25   class as a freshman, next year, you'll be a sophomore.  If

1   you just go to class as a sophomore, next year, you'll be

2   a junior.  Nonsense.  There has to be performance measures

3   as to whether or not that is appropriate.

4           When we're talking about if it fails and he

5   decompensates, we're talking about someone who has a

6   history of lethal violence.  So it's an one-time deal in

7   terms of the shootings on March 30, 1981.  But it is a

8   tremendously huge one-time deal.  You don't cut corners.

9   You don't set three months, four months, six months and

10  then automatically, without coming before this Court you

11  say, Okay, we'll do more, or we'll change it to something

12  else because I have confidence in a number of clinicians

13  in this matter, but we've also seen changes in clinicians

14  from Dr. Lee to Dr. G.G., from Mr. Beffa as case manager

15  to Mr. Weiss, which are good changes.  But if we had

16  simply gone by that model, you do it for this amount of

17  time, and then you go to something else, how does that

18  make any sense?  You have to measure.

19          What I do agree with in Dr. Murphy's risk

20  assessment is the need for updated risk assessments.  One

21  of the things that I said to everyone I interviewed is,

22  "Why is there no risk assessment?"

23          I did my interviews in the first week and second

24  week of March.  The hospital's letter from December 19 is

25  based on a treatment team recommendation from

1    September 26.  That's after six visits.  That's not even

2    the whole eight visits.  And then the recommendation of

3    March 20 is after both Dr. Murphy and I have conducted

4    interviews and before our reports, and suddenly we went

5    from 8 to 19 recommendations.

6              Back in the day of Henneberry and Patterson, we

7    would have been saying at the review board, Where is this

8    stuff?  Where is the forensic outpatient director since

9    she has so much responsibility in this matter?  Have you

10   talked to her?  Has she weighed in?  Has she given you her

11   opinions about how to do this and how it fits into what

12   she has?

13             I have great confidence in Dr. Johnson.  To have

14   84 people you're managing or responsible for is a lot of

15   people.  So I don't have any questions about her clinical

16   and forensic abilities, but it's a matter of how much can

17   you squeeze out of one person.  And when you squeeze them

18   too hard, sometimes they say, See you, and we really don't

19   want that.

20        Q.   What role does isolation play as one of the risk

21   factors for Mr. Hinckley?

22        A.   Well, it plays a very important role for

23   Mr. Hinckley because during the time that he was stalking

24   President Carter before stalking President Reagan, nobody

25   knew it.  Nobody noticed.  There wasn't something odd,

unusual, bizarre about his behavior.  And I've said that
in this court before and other courts as well.  You walk
outside a courthouse in my major city, and you're going to
identify a couple people you think probably need to see a
good shrink.  Mr. Hinckley would not be one of those, even
when he was psychotic and depressed, even then.

His assassination attempt, in my opinion -- and
I think it's shared with a number of people who evaluated
him pretrial, which we did not at St. Elizabeths -- we
didn't see Mr. Hinckley until he was found not guilty by
reason of insanity and landed in a helicopter in the yard
at John Howard in June of 1982.

Even those who evaluated him pretrial, I believe
the majority saw this as a homicide/suicide attempt.  He
never expected to survive because of who he targeted, and
it's in the broad daylight with lots of people.  And if
you -- as prologue, the shooting is almost always shown
during any of these kinds of proceedings repeatedly,
repeatedly, repeatedly, so there's more attention to it.

MR. LEVINE:  Your Honor, may we come to the
bench, please?

THE COURT:  Sure.

(Bench conference)

MR. LEVINE:  Your Honor, to hear this witness
talk about back then is appalling.  This witness was the

1    family therapist for Mr. Hinckley, and he was there during

2    the most wrenching sessions.  And his information is the

3    product of that role, and he has a profound conflict of

4    interest.  He was involved in this very case.  We made

5    this very point to Judge Green when she appointed him, and

6    she said, That's the guy we want.

7            What we're hearing now is the fallout from that

8    conflict.  This is not a substantially related matter.

9    This is the matter.  This is the matter.  This witness

10   should be disqualified.  This witness should be told in

11   full view that we'll hear no more of his evidence, and he

12   should be off of this case.

13           MS. KENNEDY:  Your Honor, he hasn't said one

14   thing about any therapy with the Hinckleys.  He's giving a

15   history which everybody and their brother knows from

16   reading the paper.  He's talking about the convalescent

17   leave program and who he has spoken to.  He's testified in

18   this case for the last who knows how many years 11 times,

19   and he has never gone into therapy or the treatment or the

20   confidences of Mrs. Hinckley, Mr. Hinckley, or

21   John Hinckley.  He hasn't said one thing here today about

22   that, and he hasn't in the past.

23           MR. LEVINE:  Is it possible to disregard the

24   years of information that he got on a confidential basis?

25   How can he say that nothing he says here today has

1  anything to do with the information he obtained during

2  that session?  It is a patent, flagrant conflict.  He

3  should not be allowed to do it.

4       MS. KENNEDY:  That's ridiculous.  He hasn't said

5  one thing that not everyone knows about any type of

6  therapies.

7       And this has come up -- he raised this during

8  every single time we're in court.

9       MR. LEVINE:  Yes.  Every single time.

10       MS. KENNEDY:  He has not stated anything about

11  his therapies.  And again, the history, everybody knows.

12  The convalescent leave plan, the convalescent leave plans,

13  everybody knows.  That's why we're here.

14       Name one thing he has said today that goes to

15  anything that's come out in therapy with the parents.

16       MR. LEVINE:  That argument shows how the

17  government doesn't understand this problem.  What he says

18  has nothing to do with it.  It's how he formulates what

19  he's going to say; how he uses the information.  He

20  doesn't have to say, This was said during that session.

21       It's how he uses the information.  And his use

22  of it, it is inescapable, it is unquestionable, and it

23  ought to be impermissible.  And we vehemently object to

24  it.

25       MS. MERENE:  The only description that was

1    somewhat concerning to me was his description of how he

2    was and how, you know, how you walk out in front of the

3    courtroom, and he sees the people.  He was not that way

4    back in, I don't know, 1980-something.  That was a little

5    concerning.

6         THE COURT:  I think that this issue has come up

7    numerous times, and I think that I've ruled on this

8    numerous times.

9         And I think all we have -- Ms. Kennedy can

10   admonish him overnight, but make sure he's staying away

11   from these areas.  The truth of the matter is that some of

12   what he's saying, particularly in the last few minutes, is

13   volunteered information and not directly responsive to

14   what you're asking.

15        MS. KENNEDY:  Okay.

16        THE COURT:  And I don't know whether that focus

17   on some of the questions -- you're cutting off your own

18   witness from time to time --

19        MS. KENNEDY:  Okay.

20        THE COURT:  -- is a way to guard against this.

21        I'm never going to say, Mr. Levine, that we can

22   separate out what we learn from those confidential

23   sessions is psychiatrist-patient privilege of Mr. Hinckley

24   and his family.  But I think we're getting -- I mean,

25   obviously, I don't know what happened during those

1  sessions, but he is certainly getting back to the very

2  early stages of his -- when he was in official capacity,

3  and some of it is not necessary for discussion by this

4  witness.

5          MS. KENNEDY: Okay.

6          THE COURT: I think you should talk to him and

7  admonish him.

8          MS. KENNEDY: Okay.

9          What time is it?

10          THE COURT: Is that right?

11          MS. KENNEDY: That's fine, Your Honor. That's

12  fine.

13          THE COURT: So I'll overrule the objection.

14          MS. KENNEDY: All right.

15          (Open court)

16          THE COURT: All right. We're going to call it a

17  day and start again at 9:30 tomorrow morning with

18  Dr. Patterson and see how much progress we make tomorrow.

19          (Proceedings adjourned at 5:17 p.m.)

20

21                  *******************

22

23

24

25

188

1                   CERTIFICATE OF OFFICIAL COURT REPORTER

2

3           I, Barbara DeVico, certify that the foregoing is

4    a correct transcript from the record of proceedings in the

5    above-entitled matter.

6

7

8

9

10

11   _____          4-28-15

12   SIGNATURE OF COURT REPORTER                 DATE

13

14

15

16

17

18

19

20

21

22

23

24

25