1

1          UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLUMBIA
2


3


4    UNITED STATES OF AMERICA,         :
                                       :
5                  Plaintiff,          :Criminal Case No. 81-306
                                       :
6    v.                                :
                                       :
7    JOHN W. HINCKLEY, JR.,            :
                                       :
8                  Defendant.          :
     ------------------------------------------------------
9              Day 6, Afternoon session
           TRANSCRIPT OF EVIDENTIARY HEARING
10      BEFORE THE HONORABLE PAUL L. FRIEDMAN
            UNITED STATES DISTRICT JUDGE
11           Wednesday, April 29, 2015
                  WASHINGTON, D.C.
12


13


14   Proceedings reported by machine shorthand, transcript

15   produced by computer-aided transcription.

16


17


18


19


20


21   APPEARANCES:

22     For the GOVERNMENT:  U.S. ATTORNEY'S OFFICE
                            BY:  COLLEEN KENNEDY, AUSA
23                               MARK AZIZ, AUSA
                                 MICHELLE CHAMBERS
24                          555 Fourth Street, NW
                            Washington, D.C.  20530
25                          (202)514-7248

```
 1     For the Defendant:    DICKSTEIN SHAPIRO, LLP
                             BY:  BARRY WILLIAM LEVINE, ESQ.
 2                                ANN-MARIE LUCIANO, ESQ.
                             1825 Eye Street, NW
 3                           Washington, D.C.  20006-5403
                             (202)420-2237
 4
                             DINSMORE & SHOHL, LLP
 5                           BY: E. MICHELLE TUPPER BUTLER, ESQ.
                             101 S. Fifth Street, Suite 2500
 6                           Louisville, KY   40202
                             (502) 540-2367
 7
       For St. Elizabeths:   ST. ELIZABETHS HOSPITAL
 8                           BY:  DEON MERENE, ESQ.
                             1100 Alabama Avenue, SE
 9                           Washington, D.C.   20032

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

TABLE OF CONTENTS

EVIDENTIARY HEARING

WITNESSES

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| RAYMOND F. PATTERSON, M.D. | 4 | 84 | 108 | |
| VERNON HYDE | | 123,127 | | |
| NICOLE JOHNSON | | | | |
| (By the Court) | 129 | | | |

EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---------|-------------|------|

1              P R O C E E D I N G S

2              (Dr. Raymond Patterson resumes the witness

3    stand.)

4              THE COURT:  All right, Dr. Patterson.

5              MR. LEVINE:  Your Honor, if it please the Court.

6              Your Honor, this is actually an unusual moment

7    for me.  My wife and my son are attending the session,

8    so --

9              THE COURT:  How are you?

10             So what does that mean?

11             MR. LEVINE:  That means you should be kind to

12   me.

13             THE COURT:  I don't know.  What persona will we

14   see now?  She knows what I mean.

15             MR. LEVINE:  She is fully informed.

16             If I may proceed, thank you, Your Honor.

17                       CROSS-EXAMINATION

18             BY MR. LEVINE:

19        Q.   Dr. Patterson?

20        A.   Mr. Levine.

21        Q.   We get to do this, as we always say, again and

22   again.

23             Let's start with your conclusion:  Mr. Hinckley

24   is clinically ready for convalescent leave; Correct?

25        A.   Correct.

1      Q.   So if this proceeding is about John and his

2  readiness, we have, in your mind, concluded that he is

3  absolutely ready; correct?

4      A.   Clinically ready, yes.

5      Q.   Clinically ready.  All right.

6           And we know that his diagnosis, Axis I,

7  psychosis NOS, is and has been in full and sustained

8  remission; correct?

9      A.   That is the record, yes.

10     Q.   And that is your opinion?

11     A.   Yes.

12     Q.   And we also know that his diagnosis, again,

13  Axis I, a term from the DSM-IV, and I'm not sure so sure

14  it applies to the DSM-5?

15     A.   It doesn't, but you're correct.

16     Q.   We know what we're talking about.

17          Major depression is in full and sustained

18  remission?

19     A.   Yes.

20     Q.   All right.  And we know that that has been the

21  case for approximately some 25 years; correct?

22     A.   No.

23     Q.   You're struggling a bit.  Let's rephrase it.

24          Do you know it to be more than two decades?

25     A.   We know that as part of the record.  There is a

6

1   question about 1995.  That's why you see my hesitation.

2       Q.   So the record says it's more than two decades.

3   And there is an open question, in your view, with respect

4   to the evidence about 1995?

5       A.   That's correct.

6       Q.   So at a minimum, we have 20 years; right?

7       A.   About.

8       Q.   So we also agree that his risk, danger is low;

9   correct?

10      A.   Under the current conditions, yes.

11      Q.   Under the current conditions.  Correct.  All

12  right.

13           Now, Dr. Patterson, you reviewed the data in

14  this case, haven't you?

15      A.   I've done my best, yes.

16      Q.   And there's a lot of data in this case, isn't

17  there?

18      A.   There is.

19      Q.   And in particular, in the last two years, the

20  approximate time since we were last in this court, we know

21  that Mr. Hinckley has done nothing dangerous; isn't that

22  correct?

23      A.   From all that we know, that's correct.

24      Q.   Well, we can only know what you know; right?  I

25  mean, are you hedging the answer --

1      A.   No.

2      Q.   -- or are you saying yes, that's correct?

3      A.   I'm saying from all that we know, that's

4 correct.

5      Q.   You think you are fully informed?

6      A.   I certainly hope so.

7      Q.   Okay.  And we know that he is in full and

8 faithful compliance with his medication regimen; isn't

9 that correct?

10      A.   As far as we know, that's correct, yes.  And I

11 say that because he's observed in the hospital.  He's

12 observed by his mother at home.  So that's the sources of

13 our information.

14      Q.   And the source of that information tells us with

15 100 percent certainty that if it's credible, if you

16 believe the reports, he's in full and faithful compliance

17 with his medication regime?

18      A.   That's correct.

19      Q.   All right.  Now, we also know that he keeps all

20 his appointments, don't we?

21      A.   Yes.  As far as --

22      Q.   Do you know --

23      A.   -- his participation, yes.

24           Whenever they've been canceled, it's been

25 because of someone else or because of weather, as far as I

8

1    know.

2         Q.   All right.  So the answer to the question is

3    yes, he keeps his appointments; isn't that correct?

4         A.   Well, if an appointment is canceled, then he

5    can't keep it, but it's not his fault.  That's my point.

6         Q.   And we know he attends his group; correct?

7         A.   Yes.

8         Q.   And we know he attends NAMI meetings?

9         A.   Yes.

10        Q.   And we know that particularly over this last

11   conditional release period, that he has taken many more

12   initiatives; correct?

13        A.   He has.

14        Q.   And we know that he has varied his activities,

15   correct?

16        A.   Yes.

17        Q.   And we know that he got his food handler's

18   license; isn't that correct?

19        A.   That's correct.

20        Q.   And we know that he attended lectures; correct?

21        A.   Correct.

22        Q.   And we know he looked for a job; isn't that

23   correct, a paying job?

24        A.   That's correct.

25        Q.   And he also tried to get additional volunteer

1    jobs; isn't that correct?

2         A.   It is.

3         Q.   And we know that in some of these regards, he

4    suffered some rejection; isn't that correct?

5         A.   That is.

6         Q.   And we know that he endured the stresses of

7    those rejections; is that correct?

8         A.   He has.

9         Q.   And we know that he has shown resilience in the

10   face of those rejections.

11        A.   Yes.  He keeps trying.

12        Q.   And that's good, isn't it?

13        A.   Of course it is.

14        Q.   Okay.  And we know that with respect to his

15   unsupervised time, that he has used that time responsibly;

16   isn't that correct?

17             MS. KENNEDY:  Objection.

18             BY MR. LEVINE:

19        Q.   During the last conditional release.

20        A.   With one exception, I think that's accurate.

21        Q.   One exception?

22        A.   That I know of.

23             THE COURT:  One exception where?

24             THE WITNESS:  To using responsibly.

25             THE COURT:  In terms of the Taylor incident?

1          THE WITNESS:  Yes, Tracey.

2          BY MR. LEVINE:

3     Q.   And incidentally, when you brought up Tracey, we

4  know that in his itineraries, that he has hundreds and

5  hundreds of appointments during the course of these

6  conditional releases.  Don't we know that?

7     A.   I don't know the hundreds and hundreds, but he

8  has appointments as per the itinerary, sure.

9     Q.   And each conditional release has an itinerary;

10  is that correct?

11     A.   That is correct.

12     Q.   And if one were to count them, one would see

13  that there are, should we say, scores and scores.

14          Does that make you more comfortable?

15     A.   Whatever the number is, it is.

16     Q.   A lot?

17     A.   A lot.

18     Q.   And we know that within those conditional

19  releases or since the last time we were in court, we know

20  that only one time has he varied from that itinerary, and

21  that's the Tracey matter; isn't that correct?

22     A.   Almost.  Yes, he has varied one time when there

23  was not clearance.  He's varied other times when there was

24  clearance from Mr. Hyde or Mr. Weiss.

25     Q.   Oh.  That's with permission?

1       A.   That's right.

2       Q.   So the only -- only once, only once in the last

3   several years has he varied from the itinerary, and that's

4   with respect to the Tracey matter; isn't that correct?

5       A.   Once since the institution of the 17-day visits

6   in April of last year, that's correct.

7            THE COURT:  And varying with permission doesn't

8   give you a problem, does it --

9            THE WITNESS:  No, it does not.

10           THE COURT:  -- because he's checking with his

11  member of his treating team --

12           THE WITNESS:  That's right.

13           THE COURT:  -- and they said sure, that's fine?

14           THE WITNESS:  Right.  And that's how it should

15  be.

16           BY MR. LEVINE:

17      Q.   So is it fair to say that he is in very

18  substantial compliance with the rigors of the itineraries?

19      A.   That would be fair to say.

20      Q.   All right.  And indeed, probably, if one were to

21  do the math, you would find that his level of compliance

22  is in the nature of 99 percent; isn't that correct?

23      A.   That's certainly possible.

24      Q.   Certainly possible.

25           And would you say that's approximately true?  I

1    understand you haven't done the math.

2         A.   I haven't done the math.

3         Q.   But would you say that's approximately true?

4         A.   I don't know.  It's certainly high.  So I'm not

5    quibbling with that, but I haven't done the math.

6         Q.   And we were talking before about how he uses his

7    time.

8              And would you agree, sir, that he has been

9    helpful at home?

10        A.   That is -- yes.  That's what's been reported,

11   certainly.

12        Q.   He does household chores?

13        A.   That's my understanding, yes.

14        Q.   Does cleaning, does tidying up?

15        A.   Yes.

16        Q.   He does yard work upon occasion?

17        A.   Not so sure about the yard work.  I think

18   Ms. Simms, I think, said not so much, but maybe some.

19        Q.   And he has bursitis?

20        A.   He's got some back issues.

21        Q.   He's got some arthritis issues?

22        A.   Yes.

23        Q.   Okay.  And at home, he does work on the bills,

24   does he not?

25        A.   Yes.

1      Q.    All right.  And at home, he goes shopping for

2  the family; for his mother and for himself?

3      A.    Yes.

4      Q.    All right.  And he does the groceries, and he

5  generally assists his mother in all of the household

6  tasks?

7      A.    As far as I know, that's correct.

8      Q.    All right.  And with respect to his driving of

9  the car, he does that responsibly?

10      A.    As far as I know, that's correct.

11      Q.    All right.  And he follows all the laws?

12      A.    I don't know.  I assume so.  I don't know.

13      Q.    You have no reason to disagree with that, do

14  you?

15      A.    No, I don't.  I don't have any information that

16  says he's gotten tickets or that kind of thing.

17      Q.    Many years ago -- many years ago, you had

18  proposed that he carry a GPS-equipped cell phone; is that

19  correct?

20      A.    I think that's right.

21      Q.    And to your knowledge -- all of your testimony

22  is to your knowledge -- he has carried that cell phone

23  with him faithfully on every occasion he was supposed to

24  have carried it?

25      A.    To my knowledge, that's correct.

1    Q.   To your knowledge -- well, you have reviewed the

2    Secret Service reports, have you not?

3    A.   Correct.

4    Q.   You know there to have been, over the last

5    conditional release, something in excess of 200 of those

6    reports; isn't that correct?

7    A.   I don't know the actual number, but there have

8    been substantial numbers.

9    Q.   All right.  You wouldn't disagree with that

10   number?

11   A.   I don't know the number.

12   Q.   You wouldn't disagree with that number?

13   MS. KENNEDY:  Objection.  He says he doesn't

14   know, Your Honor.

15   THE COURT:  I think he's answered.

16   MR. LEVINE:  All right.

17   BY MR. LEVINE:

18   Q.   And having reviewed the Secret Service

19   memoranda, surveillance memoranda, you would agree that

20   the Secret Service found no evidence of any misconduct;

21   correct?

22   A.   That's correct.

23   Q.   After the last court hearing, the Court entered

24   an order and wrote an opinion.

25   Do you remember that?

1    A.   Yes.

2    Q.   And that has sometimes been referred to as a

3    "road map" for Mr. Hinckley?

4    A.   I've heard that term.

5    Q.   I'm sorry?

6    A.   I have heard that term.

7    Q.   Okay.  And with respect to the Court's road map,

8    Mr. Hinckley did exceedingly well, didn't he?

9    A.   He's done very well in all things you've just

10   mentioned.  Some of them have begun in the fall, so that's

11   why I say "very" as opposed to "exceeding."

12   Q.   So you would say he's done very well, but you

13   would quibble with the word "exceedingly well"?

14   A.   At times, yes.

15   Q.   The testimony?

16   A.   Yes.  The word and the time frame, yes.

17   Q.   So to your knowledge, he's led an honorable

18   life?

19   A.   I don't know how to answer that.

20        MS. KENNEDY:  Objection, Your Honor.

21        BY MR. LEVINE:

22   Q.   You don't know what "honorable life" means?

23   A.   Sure, I do.  I don't know now to answer that in

24   the context of what we're talking about.

25   Q.   He's -- a decent lifestyle, a good citizen, an

1    honorable life.

2           Do you have any problems with those words?

3           MS. KENNEDY:  Objection, Your Honor.  I don't

4    know what he means.  If he's got a question, that's fine,

5    but we're not going to quibble about an "honorable life."

6           MR. LEVINE:  If that's an objection, I'll

7    rephrase the question.

8           THE COURT:  Rephrase the question.

9           We're still talking about the time period since

10   the last court opinion and order?

11          MR. LEVINE:  Yes, we are.  We are.

12          BY MR. LEVINE:

13     Q.   So, Dr. Patterson, while on conditional release,

14   Mr. Hinckley has followed the rules, done useful things,

15   and was basically a solid citizen; isn't that correct?

16     A.   He has certainly followed the rules as we've

17   already stated, with the exception.  He's engaged in more

18   activities.  That's correct.

19     Q.   All right.  Now, Dr. Patterson, you conferred

20   with a host of mental health providers before writing your

21   report; isn't that correct?

22     A.   That is correct.

23     Q.   And every single one of them, with no exception,

24   says he's ready for conditional release under the

25   hospital's plan; isn't that correct?

1      A.   No.  That's not correct.

2      Q.   Well, let's parse that out.

3           THE COURT:  "Hospital plan," let's define what

4    we're talking about.

5           MR. LEVINE:  Let's make the question even

6    easier, if I may, Your Honor.

7           BY MR. LEVINE:

8      Q.   Those mental health providers agree actually

9    with you that Mr. Hinckley is ready for convalescent

10   leave?

11     A.   That is correct.

12     Q.   All right.  And that includes Dr. Adewale, who

13   knows him very well; is that correct?

14     A.   Yes.

15     Q.   And that includes Dr. Binks, who I think you

16   said "double digits"; maybe it was what, 15 years or more

17   that he knows Mr. Hinckley?

18     A.   More.

19     Q.   That includes Dr. Binks, does it?

20     A.   It does.

21     Q.   And it, of course, includes Dr. Murphy; isn't

22   that correct?

23     A.   Yes.

24     Q.   And it includes Dr. G.G.?

25     A.   It does.

18

1     Q.   And it includes Denise Brown; isn't that

2   correct?

3     A.   Yes.

4     Q.   And it includes Dr. Godwin?

5     A.   Yes.

6     Q.   And it includes the hospital review board and

7   all its members?

8     A.   Yes.

9     Q.   And your understanding of the review board's

10  view in this regard is that they are unanimous in their

11  support of John for convalescent leave?

12    A.   As far as I know, they all signed the

13  recommendation.

14    Q.   All right.  And, of course, Mr. Hyde is in

15  support of John's convalescent leave?

16    A.   Yes.

17    Q.   And as best you can determine, so is

18  Dr. Johnson; is that correct?

19         You're nodding yes, but you're pausing.

20    A.   Yes, supportive of the -- that he is low risk.

21  But both Dr. Johnson and Dr. Murphy had additional

22  conditions or modifications and conditions.

23    Q.   All right.  All right.  So -- and those

24  modifications or conditions go to the issue of the

25  hospital plan; isn't that correct?

1       A.   I guess that's fair.

2       Q.   You guess that's fair?

3       A.   Yeah.  Because they also, the hospital also

4  responded to the government's conditions, and it was after

5  both Dr. Murphy's report and my report.

6       Q.   All right.  Now, you agree that he's ready, but

7  when you wrote your report, you said it should be denied

8  because you don't like the plan; is that correct?

9       A.   I didn't say that.

10       Q.   You said you wouldn't extend it beyond 17 days

11  because of deficiencies you perceived in the plan; isn't

12  that correct?

13       A.   That is basically correct.

14       Q.   So you would give him 17 days, but you wouldn't

15  give him 18 days, would you, with the plan?

16       A.   From the hospital's plan, no, I would not.

17       Q.   You would give him 17, but not 18.  All right.

18            And that's because, in your view, the plan

19  lacked specificity; is that correct?

20       A.   Specificity and clarity.  And what I said was to

21  maintain the 17 and not extend until there was further

22  specificity and clarity.

23       Q.   And it needed specificity, it needed clarity,

24  and, of course, you voiced your multiple concerns; is that

25  correct?

1        A.    That is correct.

2        Q.    I think you said that you had written in the

3   course of this case maybe a dozen or so reports?

4        A.    Close to that.

5        Q.    Ten, twelve, somewhere in there?

6        A.    I think this might be the 12th, I think.

7        Q.    Okay.  And in every one of them, you've said the

8   plan has lacked specificity, has lacked clarity, and you

9   have concerns; correct?

10       A.    I honestly don't remember if I said it in every

11  one.  I've certainly said it in several.

12       Q.    All right.  Let's look and some of your

13  concerns.

14             One of your concerns is the frequency of

15  contacts that Mr. Hinckley will have with the treatment

16  providers in the case; is that correct?

17       A.    That is correct.

18       Q.    All right.  Now, you saw Dr. Murphy's risk

19  assessment?

20       A.    Yes.

21       Q.    And it sets forth the number of contacts, does

22  it not?

23       A.    Yes.

24       Q.    And you heard the testimony of Dr. Murphy as we

25  went through the portion of the report that lists the

1    contacts; correct?

2        A.   Yes.   They are specified, as I recall, by time

3    period.

4        Q.   All right.   And we said in what she called

5    "Phase A" I think it was --

6        A.   Part A.

7        Q.   Part A.   Phase 5, Part A.   Correct.   That's

8    right.

9             And that was the first six-month period; is that

10   correct?

11       A.   It is.

12       Q.   And in the first six-month period, Dr. Murphy

13   had 19 contacts with mental health professionals per

14   month; correct?

15       A.   I don't recall her plan saying that at all.

16       Q.   Did you count them?

17       A.   No.

18       Q.   Did you count them with us as we counted them in

19   the courtroom?

20       A.   I observed you counting them, and you also

21   included NAMI meetings, which are not psychotherapies.

22       Q.   Well, there was testimony from Dr. Murphy -- I

23   trust you heard it -- that those meetings, in fact, were

24   therapy meetings; did constitute in part -- they were in

25   part therapeutic.

1          You heard that?

2          A.    Those are two different terms.  They can be

3     therapeutic.  It does not make them therapy.

4          Q.    But they were contacts with mental health

5     professionals; correct?

6          A.    No.  The NAMI meetings, if you want to know what

7     they are, I'd be happy to tell you, but that's not what

8     they are.

9          Q.    It would be going to NAMI meetings four times

10    per month; is that correct?

11         A.    That's correct.

12         Q.    Weekly.  And we counted others, and we came to

13    19 events plus weekly phone calls, four in number,

14    bringing the number to 23 events where Mr. Hinckley per

15    month would be in touch with mental health professionals;

16    correct?

17         A.    No.

18         Q.    All right.  However you were to count it,

19    Dr. Patterson, you would agree that after counting them,

20    you would know with specificity the number of times

21    Mr. Hinckley per month would be in contact with mental

22    health professionals; you would know the number?

23         A.    No.

24              MS. KENNEDY:  Objection, Your Honor --

25              MR. LEVINE:  Correct?

1          MS. KENNEDY:  -- he just stated "No."

2          If there's some specific number that counsel

3    wants to refer to in Dr. Murphy's testimony or report,

4    that's fine, but he's already answered that question.

5          THE COURT:  Well, if you exclude in Part A the

6    NAMI meetings, it comes to 15.  And if you include the

7    NAMI meetings, it comes to 19 in Part A.

8          THE WITNESS:  If I may, Your Honor, for a

9    limited period of time.  And then there is at the

10   discretion."

11         THE COURT:  I think that's the first six months

12   of Dr. Murphy's proposal.

13         MR. LEVINE:  That's right.

14         BY MR. LEVINE:

15   Q.   It's Phase 5, Part A, the first six months.

16         And she also told us, did she not, although she

17   finds it elsewhere in her report, specifically where she

18   describes the roles of the mental health professionals,

19   that there would be four contacts, one per week, phone

20   calls by Mr. Hinckley to her, to -- I'm sorry, to

21   Dr. Johnson.

22   A.   Yes.

23   Q.   All right.  So, however you count, whether it be

24   15; include NAMI, you get 19; if you include the four

25   phone calls, you get 23; but know with specificity the

24

1    number of contacts; isn't that correct?

2        A.   Based on your calculations of what you just

3    said, that is a specific number.

4        Q.   Okay.  And we know that with specificity, and we

5    know that with clarity; isn't that correct?

6        A.   We know what her number is.

7        Q.   All right.  Now, you may disagree with her as to

8    what the right number is, but the number is clear, isn't

9    it, sir?

10       A.   Depending on how you count it, there are clear

11   numbers; if you count NAMI, you don't count NAMI,

12   et cetera.

13       Q.   Okay.  Now, another concern you expressed --

14            THE COURT:  Have all your concerns been

15   alleviated?

16            THE WITNESS:  No, sir.

17            THE COURT:  Just checking.

18            THE WITNESS:  Thank you.

19            MR. LEVINE:  Well --

20            THE COURT:  Well, I was being facetious.

21            But all of his concerns about the frequency of

22   contacts has not been alleviated, but he's acknowledged

23   that there are a specific number of contacts.  So we know

24   what the number of contacts are per month under

25   Dr. Murphy's proposal.

25

1          Now, and with whom?

2          BY MR. LEVINE:

3     Q.   And the hospital adopts Dr. Murphy's proposals;

4  correct?

5     A.   I believe so.

6     Q.   Okay.  Now, the Court just asked, "And with

7  whom?"; correct?

8     A.   Yes.

9     Q.   You heard that question.

10         So you expressed a concern as to who was going

11 to provide these services; isn't that correct?

12    A.   Yes.  That's correct.

13    Q.   And Dr. Murphy's report gives us the answer,

14 doesn't it?

15    A.   Yes.

16    Q.   It does.

17         And it does so with specificity and with

18 clarity, doesn't it?

19    A.   Those are her recommendations.

20    Q.   All right.  And we know that Mr. Weiss is going

21 to be the case manager, do we not?

22    A.   That is right.

23    Q.   And we know that Mr. Beffa is going to be the

24 psychotherapist; isn't that correct?

25    A.   That is also the plan.

1      Q.   And we also know that Mr. Beffa is going to

2  be -- he's going to lead the groups; is that correct?

3      A.   That is correct.

4      Q.   All right.  And further, we know the role of

5  Dr. G.G., don't we?

6      A.   We do.

7      Q.   And we know that she is going to manage the

8  medication; correct?

9      A.   That's one of the things.

10      Q.   All right.  And we also know that she's going to

11  do risk monitoring or risk management?

12      A.   That's one of the things.

13      Q.   And you heard her testimony?

14      A.   No.  I saw -- I read the transcript, but I was

15  not here.

16      Q.   You read the testimony?

17      A.   Yes.  I was not here for the testimony.

18      Q.   You were not here on that date, but you read it.

19           It is very apparent, is it not, that her role is

20  clear to her?

21      A.   Sure.

22      Q.   Okay.  And --

23           THE COURT:  And you have confidence in her?

24           THE WITNESS:  I do.  I do.

25

1          BY MR. LEVINE:

2      Q.   I believe that someone in this courtroom, it may

3   be His Honor, said that she was an "impressive person," an

4   "impressive witness."

5          Do you agree with that?

6      A.   I don't believe I heard that comment, but I

7   certainly do agree with her being an impressive forensic

8   psychiatrist, yes.

9      Q.   And as an impressive psychiatrist, would you

10   agree that if she wants more sessions with Mr. Hinckley,

11   she will require it?

12      A.   I think she'll certainly request it.  I don't

13   know how far she can go on requiring it.

14      Q.   Well, she can request it?

15      A.   Sure.

16      Q.   And you think she would?

17      A.   And she has.

18      Q.   And if she requested --

19      A.   She said "weekly."

20          MS. KENNEDY:  Objection.  Let him finish his

21   answer.

22          THE COURT:  He didn't finish his answer.

23          MR. LEVINE:  I'm sorry.

24          THE WITNESS:  She has.  She said "weekly," as

25   has Mr. Weiss.  Weekly.  Neither of those are the

1    hospital's recommendation.

2              BY MR. LEVINE:

3         Q.   She didn't say "weekly," did she, sir?

4              She said at least once per month to see him, and

5    once with, I think, to check meds or with the Williamsburg

6    treatment team and such other times as she thinks would be

7    appropriate under the circumstances.

8         A.   No.   That's not what she said.

9         Q.   You don't remember that testimony?

10        A.   As I said, I read the testimony.   What she said

11   to me is that she would like to see him weekly, as did

12   Mr. Weiss.

13        Q.   All right.

14             MR. LEVINE:   Your Honor, I know the Court has

15   taken good notes, and I know there's a transcript being

16   generated, and I think it will be very apparent what it is

17   that her testimony is.

18             BY MR. LEVINE:

19        Q.   All right.   Another one of your concerns,

20   Dr. Patterson, is contacts with the forensic outpatient

21   department; correct?

22        A.   Sure.

23        Q.   And you were concerned that there is not enough

24   time with what is known as the "FOPD"; is that correct?

25        A.   I was concerned that the frequency of visits

1    with the FOPD was inadequate and could be changed at the

2    discretion of the director of forensic services for FOPD

3    without court approval.

4         Q.   So what the plan contemplates is that

5    Mr. Hinckley and, I think, Mrs. Hinckley as well, once a

6    week calls FOPD; is that correct, and speaks with

7    Dr. Johnson?

8         A.   That's right.

9         Q.   All right.  Once a week.

10        And that's only for four months under the plan;

11   right?

12        A.   Therein lies part of the problem, yes.

13        Q.   I didn't hear that.

14        A.   Therein lies part of the problem, yes.

15        Q.   And it is your view that weekly calls for four

16   months, to use your phrase, is "grossly inadequate"; is

17   that correct?

18        A.   That is correct.

19        Q.   And you think it should be a year and perhaps

20   indefinitely?

21        A.   That is correct.

22        Q.   And you heard Dr. Johnson testify, did you not?

23        A.   I did.

24        Q.   You know her well?

25        A.   I do.

1     Q.   All right.  You mentored her?

2     A.   I was one of the psychiatrists involved with her

3 development.

4     Q.   And you teach a course with her?

5     A.   Yes.

6     Q.   All right.  And you have great faith in her?

7     A.   Absolutely.

8     Q.   And she thinks -- well, do you think that she is

9 sufficiently capable to determine how many times a week or

10 a month and for how many months she wants to hear from

11 Mr. Hinckley on a weekly basis?

12     A.   I think she's sufficiently capable of

13 recommending what she thinks should be done.

14     I also think that recommendation requires court

15 approval.

16     Q.   All right.  So what we have here is we have a

17 situation where the hospital suggests in its plan that it

18 happens for four months; correct?

19     A.   Yes.

20     Q.   And you think it should be a year or perhaps

21 indefinitely; correct?

22     A.   That's correct.

23     Q.   And she thinks it's about a year?

24     A.   I'm not sure if she said that.

25     Q.   What do you think she did say?

1        A.   I think that she said that she would want for

2   any modifications in the conditions to be approved by the

3   Court.

4        Q.   All right.  So His Honor has heard your views;

5   correct?

6        A.   Almost.

7        Q.   Has heard her views?

8        A.   Yes.

9        Q.   And those views have been expressed with clarity

10   and specificity?

11        A.   Mine, absolutely.

12        Q.   And hers?

13        A.   I think so.

14        Q.   All right.  And it is feasible for the Court to

15   say there's a minimum amount and leave it to the

16   discretion of the FOPD to adjust that number as it sees

17   fit in its professional judgment; isn't that correct?

18        A.   It is feasible for the Court to say whatever the

19   Court wants.

20        Q.   And the concern you have must be something other

21   than clarity and specificity because we have both clarity

22   and specificity, don't we?

23             MS. KENNEDY:  Objection.

24             What's that question?

25             MR. LEVINE:  Is that an objection --

1          MS. KENNEDY:  Yes, it is.

2          MR. LEVINE:  -- or do you want to know what the

3   question is?

4          THE COURT:  She's objecting to what she thinks

5   is a lack of clarity and specificity in the question.

6          MR. LEVINE:  In my question.

7          Your Honor, I think I'll move on.

8          THE COURT:  Just an interjection for a second.

9          What I think, Mr. Levine, has developed here is

10  the extent that you don't think the plan is clear and

11  specific.  The addendums that have taken place to the

12  hospital's plan as a result of Dr. Murphy's more nuanced

13  suggestions and as a result of some of what the witnesses

14  from the hospital and Dr. Johnson have said here in court

15  provide some of the clarity and some of the specificity

16  that was missing.

17         Would you agree so far?

18         THE WITNESS:  Absolutely, I would.

19         THE COURT:  But even though it's clear and more

20  specific, you still think that substantively, some of what

21  they suggest, even as amended, is not sufficient?

22         THE WITNESS:  That's correct.  And I think not

23  sufficient because of changes in conditions that are based

24  on time frame rather than performance and updated risk

25  assessment and changes that would be governed by the

1    decision-making of the treatment provider or treatment

2    team or administrative oversight from Dr. Johnson rather

3    than changes being ordered by this Court.

4         And that is very consistent with what I've said

5    today and yesterday and in my report and in past hearings,

6    that the conditional release process requires that there

7    be an analysis of the success or not of the conditions and

8    the individual's clinical condition, and that should be

9    the basis of any recommendation that goes to the Court for

10   the Court's approval.  But it should not change without

11   the Court's approval.

12        BY MR. LEVINE:

13   Q.   You think that professionals should not exercise

14   their discretion based on what they -- what their analysis

15   is?

16   A.   I've never said that.  I think they should

17   exercise their discretion in making recommendations to the

18   Court for any changes that they believe are indicated,

19   either way, unless it's an emergency.

20   Q.   I recognize --

21   A.   If it's an emergency situation and their

22   discretion is that Mr. Hinckley should go back to the

23   hospital, I don't think they need to wait for the Court.

24   But --

25        THE COURT:  Even in your view with itineraries,

34

1    they would have discretion to approve changes in

2    itineraries?

3              THE WITNESS:  Sure.

4              THE COURT:  They don't have to come back to

5    court for that?

6              THE WITNESS:  No.  The only time -- the only

7    reason or the mechanism that I would be in favor of would

8    be that there would be notice to the Court so that if the

9    Court determined that this is not or this is sufficient

10   reason to do whatever it is they are recommending, that

11   the Court has sufficient information to make that

12   determination.

13             THE COURT:  But again, even under the current

14   conditions, absent something significant, material and

15   however you want to characterize it, the changes of which

16   I've been notified have come in notices that have come

17   weeks or a month after the fact and Mr. Hyde's written

18   reports of the events that took place in Williamsburg.

19             THE WITNESS:  Sometimes.  Since November of last

20   year, there have been several instances where there's been

21   a letter during the actual trip and said "This is a

22   change."

23             THE COURT:  That is true.  It comes sometimes by

24   fax or e-mail saying just to notify -- one page, sometimes

25   whole sentences.

1          THE WITNESS:  Yes.

2          THE COURT:  And, I guess, either when I receive

3     that or when I receive that if I were to say,

4     hypothetically, I don't like this, this doesn't seem

5     right, I could intervene?

6          THE WITNESS:  Absolutely.

7          THE COURT:  And if, after reading his monthly

8     report or a series of monthly reports, something that

9     strikes me as being inconsistent with my order or a trend

10    that makes me think, I'm not so sure about this, let's get

11    everybody in here and talk about it, I could do that.

12         THE WITNESS:  Absolutely.

13         THE COURT:  Now, if there were no itineraries

14    but Dr. Johnson and Mr. Weiss were providing monthly

15    reports accompanied by treatment provider progress notes,

16    I could -- I could still do that.

17         But I guess what you're saying is more of the

18    information I would have would be based on Mr. Hinckley's

19    self-reporting since he doesn't have a detailed regimen

20    that he's supposed to comply with.

21         THE WITNESS:  That is absolutely correct.

22         THE COURT:  But I'd still get something at the

23    end of every month from the people that are seeing him

24    weekly in Williamsburg -- Dr. G.G., Mr. Weiss, Mr. Beffa,

25    Ms. Haley -- all their notes with Mr. Weiss's summary

1    would come to me every month, as would Dr. Johnson's

2    summary of her weekly conversations, her monthly meeting,

3    and whatever she learned from conversations with the team

4    in Williamsburg.  So I get all of that still, although in

5    a different form.

6              THE WITNESS:  That's correct.  Yes.

7              And hopefully you would -- it would be unusual

8    for you to get a notice.  If there are itineraries and a

9    log, it would be unusual because most of that would

10   already be decided and be in the monthly report.  But if

11   there was something that -- and hypothetically -- that the

12   treatment providers or team or Dr. Johnson said is fine,

13   and I'll give you a bizarre kind of hypothetical,

14   Mr. Hinckley says to Mr. Weiss, You know what, I think I

15   want to campaign for Candidate X because I want to support

16   him and I want to be out there, and he's a great guy.  And

17   hypothetically --

18             THE COURT:  Or woman.

19             THE WITNESS:  Or woman, yes.

20             My hypothetical, the team says, Oh, okay.  That

21   sounds like it's okay.

22             You may get it and say, I wonder.

23             You might.  You might also say, That's fine.

24             But that's not --

25             THE COURT:  Probably wonder.

1          THE WITNESS:  Well, that's what I mean.  There

2   may be something that when the clinicians look at it as

3   advocates for their patient, which they should be, that is

4   important --

5          THE COURT:  I wonder, it's a little difficult.

6          You've been there; right?

7          THE WITNESS:  Yes.

8          THE COURT:  You're wearing two hats.  You're an

9   advocate for your patient, but you also have an obligation

10  to the Court.  And -- anyway --

11         THE WITNESS:  No.  That's exactly right.  It's

12  right on point, Your Honor, because I've got my clinical

13  hat on, and I'm fine with that.

14         But when we get to the obligation to the Court,

15  at some point, I want to take off the hat and toss it over

16  to you and say, Your Honor, is this okay?  Is this good as

17  far as you're concerned?

18         THE COURT:  You're relying on -- I mean, the

19  itinerary question is -- I know Barry wants to get back to

20  the itinerary question -- but the people that we're

21  relying on are people who are going to be advocates for

22  Mr. Hinckley.  But they are also people you have said here

23  today and previously in some cases whose judgments you

24  trust.

25         THE WITNESS:  That's right.

1          THE COURT:  Dr. G.G., though, you don't have --

2    you haven't known her forever.  You trust her judgment.

3          Mr. Weiss seems to be doing a really good job.

4          THE WITNESS:  He does.

5          THE COURT:  Mr. Beffa, I think, from everything

6    I've heard and read -- and tell me if you disagree -- has

7    therapists and group therapists, maybe not so much as case

8    managers, but as therapists and group managers, doing a

9    good job.

10          THE WITNESS:  That is what I'm told, and I have

11    no reason to dispute that.

12          THE COURT:  And Dr. Johnson you know well and

13    have great confidence in.

14          THE WITNESS:  I do.

15          THE COURT:  So we -- at the moment, we have good

16    people managing the situation in the proposal.

17          THE WITNESS:  In the proposal, yes.  We also

18    have the good people at the hospital led by VJ Hyde and

19    Dr. Binks, et cetera, who are also managing right now.

20          THE COURT:  But won't be.

21          THE WITNESS:  But won't be.

22          And that's the change that is really, really

23    important here.

24          And we left out Ms. Haley.  I don't know.  So I

25    think I've said that clearly.

1          THE COURT:  I think where we are on Ms. Haley,

2     and if I can read between the lines and interpolate from

3     what various people are saying, is that everybody agrees

4     that music therapy is a really good thing for Mr. Hinckley

5     and that a good music therapist, Mr. Hyde being one,

6     having been one and Ms. Haley being one, is important.

7          But maybe going forward, given difficulty in

8     communicating with her, not by Mr. Hinckley, but by other

9     treatment team members, it might be advisable to have a

10    different person in place.  But to have a person who does

11    that kind of work in place is important.

12         THE WITNESS:  Yes.  At least in my opinion it

13    is.  It has been.  And Mr. Hyde before, the current

14    Mr. Carroll, Ryan Carroll, the current music therapist,

15    that's all been good.

16         And as a former therapist, Mr. Hyde has

17    testified here and represented what the hospital's view

18    is.  So I think that he's been very important in the past

19    in that role as a therapist, and he's important now in his

20    role as a clinical administrator.

21         Those things will change.

22         MR. LEVINE:  Thank you, Judge.

23         BY MR. LEVINE:

24    Q.   Let's move on, Dr. Patterson.

25         Let's deal with your concern with financial

1    support by the family, financial support.

2              In your report, you expressed the concern about

3    the ability of the family to financially support the plan;

4    is that correct?

5         A.   No.

6         Q.   It's not correct?

7         A.   No.

8         Q.   Well, did you hear the testimony of

9    Scott Hinckley?

10        A.   I did.

11        Q.   And did you hear the testimony of Diane Simms?

12        A.   I did.

13        Q.   And at least for the foreseeable future, going

14   out approximately five years, does there appear to you to

15   be plenty of money for therapy?

16        A.   I don't know that I can say "plenty of money for

17   therapy."  What I can say --

18        Q.   Sufficient money.  I'll change --

19             MS. KENNEDY:  Let him explain.

20             THE COURT:  Don't interrupt.

21             MR. LEVINE:  I'm sorry.

22             THE WITNESS:  What I can say is that they

23   represented in their testimony in court that they would be

24   prepared to support his clinical, forensic, housing needs

25   for what sounded like up to five years.

1    Mr. Hinckley, Scott Hinckley, was a little more

2    definitive that a year or two outside of that, there could

3    be other changes that would not be something that would be

4    very predictable.

5    But let me clarify because you made the

6    clarification.  You said in your question that I expressed

7    concern about family -- financial support from the family.

8    My concern is about financial support, period.  Whether it

9    comes from the family or it comes from the federal

10   government or it comes from the State of Virginia or it

11   comes from the District of Columbia, that's not the issue.

12   The issue is that it's enough, whatever --

13   wherever it comes from, to support his successful

14   integration into the community, whether that's

15   Williamsburg --

16   Q.   All right.

17   A.   -- or D.C.

18   Q.   So you heard Scott Hinckley testify that his

19   mother's assets, liquid assets, are a quarter of a million

20   dollars --

21   A.   I did hear that.

22   Q.   -- approximately?

23   A.   Yes, I did.

24   Q.   And you also heard him testify that her equity

25   in the home is another quarter of a million dollars,

42

1    approximately?

2        A.   I did.

3        Q.   All right.  And you heard Scott Hinckley say

4    that after her assets are exhausted, that his assets, to

5    the extent that it's reasonable, will stand behind hers;

6    correct?

7        A.   Language to that effect, "if it's reasonable."

8    If it's reasonable.

9        Q.   And you heard Diane Simms say without any

10   equivocation whatsoever that she would stand behind John

11   100 percent; that she would come here on the next plane,

12   were it necessary, should there be a crisis, and stay here

13   until the crisis is resolved.

14            You heard that?

15       A.   I think it was "as long as necessary," but --

16       Q.   As long as --

17       A.   -- the substance is the same.

18       Q.   And stay here until it was resolved?

19            THE COURT:  The crisis being one thing, and the

20   other thing she said was when her mother dies.

21            MR. LEVINE:  I'm sorry, Your Honor, I didn't

22   hear.

23            THE COURT:  You used the word "crisis."

24            MR. LEVINE:  I did.

25            THE COURT:  She said that, I think, but that's

1    up to Dr. Patterson to recall.

2          But specifically, she also said that when her

3    mother dies, that she would be on the next plane --

4          MR. LEVINE:  Yes.

5          THE COURT:  -- so John would not be alone in the

6    house --

7          MR. LEVINE:  Yes.

8          THE COURT:  -- at that time.

9          MR. LEVINE:  All right.

10         THE COURT:  And for a sufficient period of time

11   after that; right?

12         THE WITNESS:  I believe that's correct.

13         BY MR. LEVINE:

14   Q.   And you heard, I believe, the testimony of

15   Mr. Weiss, or were you not here?

16   A.   I was here.  I was here for that, yes.

17   Q.   You were here for that.  All right.

18         And you heard Mr. Weiss say that upon

19   Mr. Hinckley's arrival in Williamsburg, they will

20   immediately, promptly, start the applications for benefits

21   in Virginia.

22   A.   I did hear him say they would start.  Whether

23   it's immediate, promptly, they are going to look into what

24   benefits are available in Virginia.  That, I did hear.

25   Q.   And with respect to subsidized housing or

1    alternative housing, that he would get on the waiting list

2    right away?

3         A.    No.  I didn't hear him say he would get on the

4    waiting list.

5         Q.    He would endeavor to get on the waiting list?

6         A.    That's right.  He would look into the various

7    necessary supports.

8         Q.    And that he would be examining the various

9    options; is that correct?

10        A.    Yes.

11        Q.    All right.  And there would be an effort to

12   understand with specificity the benefits that may be

13   available?

14        A.    Sure.  Yes.

15        Q.    Okay.  And so with Mrs. Hinckley's half a

16   million dollars and with the pledge to the Court from

17   Scott Hinckley that his assets, to a reasonable degree,

18   will stand behind hers and with the unwavering explicit

19   pledge from Diane Simms that she will be there, no matter

20   what -- I think that's a fair phrase -- does your concern

21   about financial support become resolved?

22        A.    It becomes greatly attenuated.

23        Q.    Greatly attenuated.

24              Not a concern that you would express, or those

25   are the facts?

1          I'll withdraw that question.  I'll withdraw that

2     question, Your Honor.

3          Let's talk a bit more about monitoring.  Do you

4     think there should be more monitoring than that in the

5     plan?

6          A.   Yes.

7          Q.   All right.  And you believe that he'll be there

8     longer, and inasmuch as he'll be there longer, there will

9     be more opportunities for things to go awry, and more

10    opportunity equates to more risk; is that correct?

11         A.   In part, that's correct.

12         Q.   All right.  Now, the hospital thinks that the

13    amount of monitoring in the proposal is the right amount,

14    doesn't it?

15         A.   That's my assumption, since that's what they

16    submitted.

17         Q.   So you disagree with them about the amount of

18    monitoring?

19         A.   I disagree with them about the frequency, the

20    changes in monitoring at their discretion, and the lack of

21    mechanisms to monitor, such as itineraries.

22         Q.   All right.  Well, we should talk a bit about

23    itineraries.

24         A.   That's --

25         Q.   If Mr. Hinckley puts on his itinerary that on

1   Tuesday at 11:00, he's going to go to -- what's the name

2   of the grocery store down there?

3       A.   Trader --

4       Q.   Let's call it Trader Joe's.  I don't know --

5       A.   Yeah, it's somebody else.

6       Q.   Let's use terms we know.  The Giant.  He's going

7   to go to the Giant supermarket.

8       A.   Yes.

9       Q.   And for some reason, he concludes that what the

10  family wants is not available there, and he wants to go to

11  the Safeway supermarket.  Change of itinerary.

12      A.   Yes.

13      Q.   Would it be your view that for him to

14  unilaterally decide with notice to no one that he's not

15  going to the Giant, he's going to the Safeway, would that

16  be a violation of the itinerary?

17      A.   Yes and no.

18      Q.   Yes and no?

19      A.   That's right.

20      Q.   I thought only lawyers could talk that way.

21      A.   I've been around you a while, Mr. Levine.

22      Q.   "Yes and no."  Surely it would be a decision

23  that wouldn't matter to anyone, and it would have no

24  clinical significance; isn't that correct?

25      A.   That is correct.

1    Q.   All right.  And is it your view that before he

2    takes off for the Safeway, because his itinerary says he's

3    going to the Giant, he should first call Mr. Weiss or

4    Mr. Hyde or the very busy Dr. Johnson?

5    A.   No.

6    Q.   Is that your view?

7    A.   No, sir.

8    Q.   He should get permission?

9    A.   No.

10   Q.   He should get authority?

11   A.   No.

12   Q.   What should he do?

13   A.   What he should do is, he should write down on

14   his log that, The itinerary said I was going to go to the

15   Safeway on Monday.  Changed my mind.  Went to Giant.

16        When he then sees Mr. Weiss or he talks to

17   Dr. Johnson, he says, You know what, here is a minor

18   change because we've talked about this since you are the

19   people I'm reporting to.  We've talked about this.  Here

20   is a little change.  I made it.  I didn't think it was a

21   big deal.  Is that right, or do you think I really ought

22   to be calling you?

23        And I would expect them to respond, That's fine,

24   John.  And now I know that's what you did because it was

25   in the itinerary.  You told me what you wanted to do, and

1    there's a log that says you didn't.  And those are the

2    kinds of things that are fine to do.

3              On the other hand, if it was something that was

4    a little bit more intensive than what you just gave as an

5    example, then I would expect him to call.

6              THE COURT:  But then if I take your answer just

7    now, do the itineraries have to be written differently

8    from the way they have in the past, or are we putting a

9    lot of faith in John to interpret them differently?

10             Example:  In the past, if they were going to go

11   to the Red Roof restaurant at such-and-such an address in

12   Williamsburg and then discovered that they were closed

13   that night, I would get a notice from Mr. Hyde saying that

14   John called to say they weren't going to the Red Roof

15   restaurant that night; they changed and decided to go to a

16   different restaurant.

17             That was a change in the itinerary which

18   everybody has felt, apparently, needed to be reported to

19   Mr. Hyde and then to me.

20             So why is the change from the Giant to the

21   Safeway any different?

22             THE WITNESS:  It is, and I'll be happy to

23   address it just the way you said.

24             First, in my view, John should be the active

25   participant in providing the itineraries.  Instead of this

1   being -- and I understand, it may be onerous in its own

2   way of having to write down what I think I'm going to be

3   doing this week.  I get that.  But it's also therapeutic

4   so that he can see where he's headed this week; what he's

5   going to be doing.

6           So I envision it slightly differently.  I'm

7   going out to dinner with the family tonight.  It doesn't

8   need to have what it used to have:  Where it is, the phone

9   number, et cetera, cetera.  I've already talked to

10  Mr. Weiss in my case management sessions, and he said,

11  John, listen.  On the itinerary, here is what we're going

12  to try to put on there so we will have ideas of where

13  you're going to be.  And it's going to be shopping Monday

14  night.

15          And then the log says, Okay, I didn't go

16  shopping Monday night.  Is that a big deal?  Probably not.

17  Or, I went shopping at the Giant or the Safeway, the log

18  says that.

19          That's a discussion.  That doesn't require

20  notice to you.

21          But if I'm going to dinner with my family

22  tonight and I changed my mind and I'm going to a

23  gentlemen's club in Newport News, that might be a little

24  something that Mr. Weiss might want to know.

25          And I'm hoping that they will be in such touch

1    with each other that they are discussing these things.  So

2    they are not bothering the judge, they are not bothering

3    Dr. Johnson, they are not being oppressive to John, but

4    they are trying to get an idea of the kinds of activities

5    and things that are going on.

6              THE COURT:  Let me give you another example.

7              THE WITNESS:  Yes, sir.

8              MR. LEVINE:  I was going to.

9              THE COURT:  I'm going to meet a friend for

10   coffee versus I'm going to meet a friend at Starbucks for

11   coffee versus I'm going to meet Ms. L for coffee.

12             I take it from what you've just said that the

13   Starbucks isn't important as opposed to whatever other

14   coffee place John likes to go to, but naming of the friend

15   is important.

16             THE WITNESS:  Very well can be.  And that's not

17   to say it's always going to be, but it should be at the

18   very beginning.  It should be at the very beginning.

19             MR. LEVINE:  Isn't -- I'm sorry.

20             THE WITNESS:  And if that's in place, I hope

21   that we keep in mind that this is not in a vacuum.  So if

22   that treatment team is actually meeting like they are

23   supposed to every month and they are talking to John, a

24   number of these things should be discussed in those

25   treatment team meetings.

1          BY MR. LEVINE:

2      Q.   Dr. Patterson, isn't this a formula to just put

3  John into a proverbial trick bag; I've got you?

4          Isn't it just a formula so that the government

5  can say, He didn't report the change in itinerary.  He

6  should be sent back to the hospital?

7          MS. KENNEDY:  Objection, Your Honor.  That's

8  just not even a basis in fact in the transcript, in the

9  testimony.  I don't think that Dr. Patterson can answer

10  it.

11          THE WITNESS:  Oh, I think --

12          THE COURT:  Well, I think he can answer whether

13  he -- whether his proposal causes problems for John or a

14  lack of clarity in John's mind in terms of how to follow

15  it.

16          THE WITNESS:  I think I can too, Your Honor.

17  Quite the opposite.  It's not a formula to set up some

18  kind of trick bag.  It is a formula to try and help him

19  integrate into the Williamsburg community.  That's the

20  point.

21          So if John has no itineraries and his time is

22  whatever his time is, how do you measure the integration

23  aspect of that?

24          BY MR. LEVINE:

25      Q.   How about the Secret Service follows him

1    wherever it wants to know -- wherever it wants to go.

2    It's the least intrusive way.  They follow him whenever

3    they want.  When they don't follow him, it's because they

4    don't care where he goes.  And when they do follow him,

5    it's because they do care where he goes.

6           And if the mission is to understand where he

7    goes -- the Safeway, the Giant, the Red Roof restaurant,

8    the gentlemen's club -- the way to determine that is for

9    the Secret Service to merely follow him?

10          MS. KENNEDY:  Objection.

11          BY MR. LEVINE:

12     Q.   Isn't that correct?

13          MS. KENNEDY:  Objection, Your Honor.  We've

14    argued this in the past.  He cannot look at the

15    Secret Service as his own private detail or security

16    detail for the Court or anyone else to follow

17    Mr. Hinckley.  It's got to be done on whatever order and

18    whatever resources are here, not on the Secret Service.

19    That's blatantly incorrect.

20          MR. LEVINE:  That's not the way we've operated.

21    What's happened here, this Court has never ordered the

22    Secret Service to surveil Mr. Hinckley.  They do it when

23    they want.  They are informed, and they do it when they

24    want.  And we have never voiced a single objection to it.

25    We invite it.

1          THE COURT:  I understand that.  But I think your

2     objection -- I think Dr. Patterson can answer the

3     question.

4          Her objection is we shouldn't be relying on the

5     Secret Service to provide the necessary monitoring.  And

6     you're both saying the same thing, but you draw different

7     inferences from it.  The Secret Service is not a formal,

8     official part of this plan or the treatment team.  They

9     can do what they want to do.  Therefore, they are free to

10    follow him if there is a level of concern.  That's your

11    point.

12         Her point is yes, but we can't rely on that in

13    formulating a plan.

14         I think both points are valid.

15         MR. LEVINE:  Your Honor, I respectfully suggest

16    that the government's point is not valid.  And the reason

17    is that if the Secret Service has this concern, if it

18    shares the views of the prosecutor, it can resolve those

19    concerns by merely doing what it wants to do.

20         THE COURT:  I understand that.  But let me

21    see -- let me ask Dr. Patterson, unless you want an answer

22    to the last question.

23         I hear you saying two different things, two

24    different functions for the itinerary.  One is sort of as

25    a planning document so that John Hinckley, as he tries to

1    integrate himself into the community, has to think about

2    what kinds of activities he wants to engage in in his free

3    time and write it into an itinerary so that when he wakes

4    up in the morning on a day he doesn't have a volunteer

5    position or job but is free to go wherever he wants in his

6    car, he doesn't just get up and say, I'm going to do this

7    today, or, I'm going to do nothing today.

8              He thinks about it in advance.  And to the

9    extent that it's a planning document for John to be more

10   motivated and take more initiative, that may be one

11   function.

12             The other function is as sort of a monitoring

13   document to allow the treatment team to see where he says

14   he's going to go and what he says he's going to do,

15   whether he does it; and if he doesn't do it, why and what

16   kind of changes he's made.

17             So one is as a discipline to him to be

18   self-motivated to do things, and the other is to allow the

19   treatment team to monitor him, although it relies a lot on

20   self-reporting anyway.

21             And, you know -- so I guess my example is if the

22   specific name of the restaurant or the coffee shop is not

23   listed, it becomes less of a monitoring tool, but it still

24   enables him -- it still requires him to think about what

25   he wants to do on Tuesday.

1          Maybe I've got it wrong.

2          THE WITNESS:  No, Your Honor.  I don't think you

3    do.

4          I'd just amplify the second part.  The first

5    part is a planning document.  I think we're right on the

6    same page, okay, for him to think about what he's doing,

7    what kind of activities, et cetera, and he's writing that

8    somewhere.

9          The second part is not just monitoring.  It's

10   also clinical.

11         Here is a hypothetical:  That John, after the

12   month and he has the monthly meeting, every Monday, he's

13   going to the park, and he's essentially then doing what?

14   That's grist for the mill for the treatment.  The

15   individual therapist should be asking about that.  Weiss

16   should be asking about that.  Possibly it comes up in

17   group.  G.G. should be asking about that.

18         And if it's every time he goes to the park, he

19   sits by himself, he's not doing very much with anybody

20   else, there is no -- any part of that that's integrating

21   into the community, it's not a violation.  It is something

22   that is not furthering the goal.

23         So John --

24         THE COURT:  He could be going to the park and

25   painting, which is a positive, albeit solitary activity.

1          THE WITNESS:  Yes.  And hopefully, then, the

2    discussion of therapy, I would hope, would be something

3    like, How about instead of the park, you go to where

4    people are and paint and put a little -- just sit there,

5    and somebody is going to walk up to you and say, Oh, what

6    about this painting?  And you get into some discussion.

7          Now you've added a socialization component to

8    it.  So it's not just to monitor and catch whether or not

9    something is done or not done.  It's also to look at what

10   the activity is and how that furthers the actual goal of

11   integrating into the community.  It's not any different

12   than the free time and trying to extend that and also have

13   it being used in an effort to further the integration into

14   the community.  If it's every Tuesday at the movies by

15   yourself, is that really moving in that direction?  That's

16   not to say there's nothing wrong with going to the movies

17   every Tuesday, but what else are we doing to try to

18   further that integration into the community?

19          BY MR. LEVINE:

20   Q.    Dr. Patterson, the log would tell us if he went

21   to the movie by himself or if he went to the park and sat

22   alone on the bench as opposed to going to the park with an

23   easel and a paint brush.  He could write on the log, I

24   went to the park with an easel.

25   A.    He could do that.

1    Q.   All right.  And then you would know what he did

2    and the socialization.  That would be less intrusive.

3         All right.  Now, Dr. Patterson, if you also

4    wanted to know where he was, another tool available is a

5    tool that you had proposed:  A GPS-equipped cell phone;

6    isn't that correct?

7    A.   That is a tool that would be helpful.

8    Q.   And you proposed it, and the Court adopted your

9    proposal.

10   A.   Yes.

11   Q.   Now, I believe you testified that you, to the

12   best of your knowledge, which is full knowledge, that he

13   has faithfully carried that phone with him wherever he was

14   supposed to carry that phone; isn't that correct?

15   A.   That's to the best of my knowledge.  I don't

16   know about the full knowledge, but yeah, to the best of my

17   knowledge.

18        THE COURT:  The GPS phone, I would suggest, was

19   intended for monitoring and not for clinical purposes

20   because as far as I know, it was never contemplated that

21   the treatment team would get the results of that

22   monitoring; right?

23        THE WITNESS:  That's correct.  That is correct.

24        And let me just amplify my thinking on that if

25   it's helpful to you.

1          MR. LEVINE:  No.

2          THE COURT:  Let me -- let him answer.

3          Why don't you answer my question.

4          THE WITNESS:  Yes.  That's right.  For

5     monitoring.

6          THE COURT:  Yes.

7          THE WITNESS:  Not with the idea of a clinical

8     purpose.  Okay?

9          And the monitoring in the instance of

10    Mr. Hinckley perhaps driving somewhere and he's supposed

11    to be at such and such --

12         MR. LEVINE:  Speak louder, please.

13         THE WITNESS:  I'm sorry.  He's supposed to be at

14    such-and-such a place, and he's not there.  Or he's

15    supposed to come to an appointment, and he misses it.

16    Then he certainly could be called on the phone to see

17    where you are or what's going on; why are you not here?

18         If -- and this is not, at this point it has not

19    been a risk that has been identified for elopement.  I'm

20    not saying it has, so please don't tell me that's never

21    been a risk because it has never been identified --

22         BY MR. LEVINE:

23    Q.   Never been an escape risk?  Never been an

24    elopement risk?

25    A.   It's only recently that he has had free use of

1    the car.  So if Mr. Hinckley decides --

2         Q.   Wait.

3              He's never been an elopement risk, and he's

4    never been an escape risk from the beginning to the end?

5              THE COURT:  Well, he said that he previewed the

6    answer to the question by saying that, and then you

7    interrupted him to get him to say it again.

8              So he's never been an elopement risk while he's

9    been at St. Elizabeths.

10             THE WITNESS:  That's correct.  Yes.

11             My experience is that if someone does leave the

12   designated area and they have GPS, then they can be

13   tracked as to where they are going.  It's used from a

14   monitoring security perspective in that way.

15             BY MR. LEVINE:

16        Q.   Now, if it's important to know where

17   Mr. Hinckley is, the fact is from the day you first -- the

18   Court ordered the carrying of that phone to this day, no

19   one has ever checked the data on the GPS phone; isn't that

20   correct?

21        A.   That's my understanding, yes.

22        Q.   All right.  And it was your proposal, and the

23   Court adopted your proposal, and you have been a

24   consultant to the Secret Service, have you not?

25        A.   Many years ago, yes.

1     Q.   All right.  And you never called anyone at the

2    Secret Service to find out, What have you done with the

3    data, have you?

4     A.   No.

5     MS. KENNEDY:  Objection.  That's not his job,

6    Your Honor.

7     MR. LEVINE:  It's what?

8     MS. KENNEDY:  That's not Dr. Patterson's job.

9     BY MR. LEVINE:

10     Q.   You wanted to know where he was going, and

11    that's why you said it would be useful for the Court to

12    require in its order that Mr. Hinckley carry a

13    GPS-equipped phone; isn't that correct?

14     A.   As a monitoring tool where he's going, not for

15    it to be reported to me.

16     Q.   I'm sorry?

17     A.   Not for it to be reported to me.

18     Q.   All right.  Well, you thought it would be

19    important to know that?

20     A.   Sure.

21     Q.   All right.  And here is something that you

22    thought was important to know, and you never endeavored to

23    learn it; isn't it true?

24     MS. KENNEDY:  Asked and answered, Your Honor.

25    It's not his job.  He indicated he hasn't done that.

1      That's not why he recommended it.  Asked and answered.

2              MR. LEVINE:  It's been asked several times.  It

3      hasn't been answered yet.

4              THE COURT:  So you never checked?

5              THE WITNESS:  No.

6              THE COURT:  Because your job isn't to monitor

7      his whereabouts for security purposes; your job is to

8      evaluate what's going on clinically.

9              THE WITNESS:  Clinically as well as the

10     monitoring, yes.

11             THE COURT:  Well, the risk management --

12             THE WITNESS:  The risk management monitoring,

13     yes.

14             BY MR. LEVINE:

15     Q.   Now, have you, Dr. Patterson, had occasion --

16     have you had occasion to confer with Ms. Kennedy about the

17     use of the GPS phone?

18     A.   I don't know if we've had that discussion.

19     Q.   You never talked about the use of the GPS phone?

20     A.   I don't know that we've had that discussion.

21             THE COURT:  Since you recommended it?

22             THE WITNESS:  Since I recommended it other than

23     that he would be carrying it.

24             BY MR. LEVINE:

25     Q.   Have you discussed over the last few months the

1    data that you thought was important to have from the GPS

2    phone?

3         A.   I didn't say I wanted there to be data from the

4    GPS phone, only that it is a mechanism to determine where

5    he is if that were necessary.

6         Q.   And you thought that was a useful thing to do?

7         A.   To have it as a --

8         Q.   Did you ever follow up, ever inquire of the

9    government how -- what does the data show with respect to

10   where Mr. Hinckley has been as it is recorded on the

11   GPS-equipped telephone?

12        A.   No.  No.

13        Q.   And even though it was in the court order over a

14   period of many years, you never discussed it with anyone

15   in the prosecutor's office?

16             MS. KENNEDY:  Objection.  Asked and answered,

17   Your Honor.

18             THE COURT:  I think it's been answered.

19             MR. LEVINE:  Is that sustained?

20             THE COURT:  I'll sustain it.  It's been

21   answered.  He said no.

22             MR. LEVINE:  Court's indulgence.

23             (Discussion held off the record.)

24             BY MR. LEVINE:

25        Q.   So, Dr. Patterson, inasmuch as over a period of

1    years -- might be a decade, I don't really remember --

2    that no one has checked the data on the GPS-equipped

3    phone, do you think it's still important for the Court to

4    include the carrying of a GPS-equipped phone in its order?

5         A.    Yes.

6         Q.    Even though no one checks it?

7         A.    No one has to date as far as I -- that's what

8    you represented.  No one has to date.

9         Q.    That's what you've represented.  I haven't

10   testified.  You've testified.

11        A.    Well, that's debatable.

12        Q.    You said yes to the question, did you not?

13   You're the witness, sir.

14        A.    Which question?  Be specific.

15        Q.    That no one has checked the data on the GPS

16   phone.

17        A.    I said not to my knowledge.

18        Q.    So it's your testimony, not mine; isn't that

19   correct?

20        A.    That's my answer.

21        Q.    Now, have you ever discussed with Ms. Kennedy

22   the use of an ankle bracelet?

23        A.    Yes.

24        Q.    You're not for it, are you?

25        A.    No.

1    Q.    And have you ever discussed with Ms. Kennedy the

2    use of a car-tracking device?

3    A.    Yes.

4    Q.    You're not for it, are you?

5    A.    The same as with the ankle bracelet.  I don't

6    see clinical indications for that.

7    Q.    Okay.  And with respect to the computer and to

8    know how Mr. Hinckley may use the Internet, in the past,

9    his mother has monitored the use; isn't that correct?

10   A.    When he's at home.  That is my understanding.

11   Q.    And when he's not at home, such as when he's on

12   the volunteer job, has he used it?

13   A.    I don't know if he's used it in the cafe.  He

14   did use it when he worked in the library, and that was

15   monitored by a supervisor.

16   Q.    And is it your best information, being as fully

17   informed as you are, that he has in the library, on that

18   job, never misused it?

19         MS. KENNEDY:  Objection, Your Honor.  Again,

20   Mr. Levine is testifying.

21         THE COURT:  No.  He's asking to the best of his

22   knowledge.

23         MS. KENNEDY:  He knows.

24         THE COURT:  And it is cross-examination.  It's

25   extreme cross-examination.

1          MR. LEVINE:  It's good cross.

2          THE COURT:  To your knowledge.

3          THE WITNESS:  May I make the assumption that you

4    mean at the library at Eastern State Hospital as opposed

5    to the one at St. Elizabeths?  There are two libraries.

6          BY MR. LEVINE:

7     Q.   At Eastern State, yes.

8     A.   To my knowledge, as long as -- until that job

9    ended, I didn't have any information that he had misused

10   the computer.

11    Q.   You spoke to the supervisors at the hospital, at

12   Eastern State, did you not?

13    A.   Ms. Cockasberger [phon.], yes.

14    Q.   And you talked about his performance?

15    A.   Of course.

16    Q.   And you talked about whether he was a behavioral

17   problem; isn't that correct?

18    A.   Sure.

19    Q.   And whether he was a cooperative and an

20   effective employee?

21    A.   Sure.

22    Q.   And in all respects, he was cooperative and

23   effective?

24    A.   Yes.

25    Q.   And that was the report of his supervisor?

1      A.    Yes.

2      Q.    And there was never the suggestion that he

3  misused the computer; isn't that correct?

4      A.    No.  It was not.

5      Q.    No, it's not correct?

6      A.    It is correct.  No, there was never the

7  suggestion.

8      Q.    It is correct.  All right.

9          THE COURT:  Do you want to take a break at some

10 point?

11         MR. LEVINE:  Sure.  Thank you, Your Honor.  That

12 would be fine.

13         THE COURT:  Why don't we take about ten minutes.

14         (Recess)

15         THE COURT:  Mr. Levine.

16         MR. LEVINE:  Thank you, Your Honor.  Maybe just

17 for some fastidiousness and housekeeping.  I'd like to

18 have this next document, a stack of documents, Your Honor.

19 It has Bates stamps with the Secret Service memoranda or

20 surveillance reports, and it bears Bates stamps P3000

21 through -3245.

22         Does Your Honor want a set?  I'm not going to

23 ask any further questions about it.

24         THE COURT:  Sure.  I'll take a set if you've got

25 an extra set.

1          This is going to be Exhibit 11?

2          MR. LEVINE:  Yes.  A copy to your clerk,

3    Your Honor.

4          MS. KENNEDY:  Your Honor, I know he's not moving

5    it into evidence now, which we would strenuously object

6    to.  But if Your Honor is going to look at it, we need to

7    redact it and then seal it because this is all Secret

8    Service.

9          THE COURT:  Everything is under seal at the

10   moment; right?

11         MS. KENNEDY:  At the moment.  But these you

12   would want redacted, which you did last time.  It's got

13   all kinds of names from the Secret Service.

14         THE COURT:  All right.

15         MR. LEVINE:  May I approach the witness,

16   Your Honor?

17         THE COURT:  Yes.

18         BY MR. LEVINE:

19     Q.   Dr. Patterson, I show you what has been marked

20   as Plaintiff's Exhibit No. 11.

21         Are those the Secret Service memoranda you that

22   you reviewed?

23     A.   Yes.  I believe they are.

24         MR. LEVINE:  Your Honor, I'd move them into

25   evidence.

1          MS. KENNEDY:  Again, we would object,

2    Your Honor.

3          THE COURT:  Let's talk about -- there are a

4    number of things that have been admitted in evidence which

5    will not be -- well, first of all, exhibits generally are

6    not -- tell me if I'm right about this, Ms. Moon --

7    exhibits generally are not entered on the docket.

8          DEPUTY CLERK:  Correct.

9          THE COURT:  They are admitted, they are

10   generally, in criminal cases, returned to the parties and,

11   I think, in civil cases too?

12         DEPUTY CLERK:  Yes.

13         THE COURT:  And they are responsible for putting

14   together the record for any appeal.

15            In this case, what we have typically done with

16   Dr. Patterson's report, Dr. Murphy's report, the

17   (e) letter, various other things is, I believe, posted

18   them on the public docket after the hearing in redacted

19   form, or at least it was our intention to do so.

20            Looking back at the docket from the last

21   hearing, there were some Secret Service reports, but not

22   all of them, that were also posted on the public docket --

23   and I can't remember -- in redacted form.  I went back to

24   look at -- but they were redacted.

25         MS. KENNEDY:  They are redacted, yes.

1           THE COURT:  And there was some reason we decided

2    to post those on the public docket.  I don't have my

3    docket sheet in front of me.  But when I went through it,

4    I noticed that -- when I was looking to see what exhibits

5    were posted on the public docket or what reports or what

6    (e) letters or what filings were posted on the public

7    docket after the hearing in redacted form, I was not able

8    to find on the docket all of the things that I thought we

9    had agreed would be redacted and put on the docket.

10          I only was able to find an entry for certain

11   Secret Service records.  So I don't know what happened

12   between our decision and whether you all actually got

13   together and redacted stuff.

14          MS. KENNEDY:  I know we did.

15          THE COURT:  And then what happened to them after

16   you got together and redacted stuff, I don't know --

17          MS. KENNEDY:  I don't know either.

18          THE COURT:  -- unless I'm just not reading the

19   docket clearly.

20          So the question is with respect to these, since

21   we're going to hand them back to whomever, should I admit

22   them in evidence now?  Should I admit them provisionally,

23   subject to redaction, which is the way -- I mean,

24   Dr. Patterson and Dr. Murphy's CV don't have to be

25   redacted, but Dr. Patterson and Dr. Murphy's reports have

1    to be redacted at some point.  But they've already been

2    admitted in evidence.

3              MS. KENNEDY:  Right.

4              THE COURT:  So what do you want to do with

5    respect to this Exhibit No. 11?

6              MS. KENNEDY:  Well, one of the many problems

7    with that, Your Honor, is Dr. Patterson hasn't testified

8    to any one individual yet he's been questioned on.  It's

9    just a whole pack that Mr. Levine wants to admit.

10             And without any kind of statement as to how this

11   has affected his opinion or how it comes into his

12   proposals on the decision, there's really no basis for it.

13             In addition to the fact that if there are going

14   to be one or two exhibits admitted for whatever reason he

15   establishes with Dr. Patterson, Your Honor has agreed that

16   it would be redacted because all of it is information

17   that's based on Secret Service and their protection of not

18   just other agents but other individuals.

19             THE COURT:  Including Mr. Hinckley's privacy.

20             MS. KENNEDY:  Good point.  Mr. Hinckley's

21   privacy also.  That's in there.  Mrs. Hinckley's privacy

22   is in there, not to mention where he's working, where he's

23   volunteering, either.

24             THE COURT:  So what's your pleasure?

25             MR. LEVINE:  My pleasure, Your Honor, is that

they be admitted into evidence for the Court to make such

use of it as it wishes in the writing of its opinion.

Whether it goes on the public record or not, I'm

happy to confer with the government to reach a suitable

conclusion.

I think they are offered for the specific

purpose of showing that there's been a number of occasions

where he has been surveilled and that on no occasion did

he do anything inappropriate.

MS. KENNEDY:  But Dr. Patterson's testified to

that, Your Honor.  So we have a whole slew of examination

on that point.  I don't think anything further is elicited

in his report other than a lot of names.  Half of it is

going to end up redacted.

MR. LEVINE:  If it should be redacted, it's

okay.  I have no intention of invading anyone's privacy or

undermining the United States' interest in those reports.

What I do have, Your Honor, I have the intention

of having the Court become aware as a matter of

documentary evidence that he has been surveilled and that

he has done nothing wrong.

THE WITNESS:  That, Mr. Levine, is what I want.

MS. KENNEDY:  Your Honor, I think the basis for

Mr. Levine's objection -- not objection, his admission, is

that he wants to show that there is nothing in the

1    Secret Service report.  We'll stipulate to that.

2            Dr. Patterson has testified to that.  Other

3    witnesses have testified to that.

4            They can't come in this way through

5    Dr. Patterson.  If he technically wanted to bring them in,

6    he would have to put on a Secret Service agent to say,

7    These are our records, and this is how we keep them.

8            But there's no basis for any objection here

9    between the parties that they think nothing has happened;

10   that he's been surveilled by the Secret Service.

11           MR. LEVINE:  Your Honor, I think that's an

12   inaccurate statement of the law.  I don't have a great

13   interest in litigating this proposition.  But the -- it is

14   data that the witness considered in forming its opinion,

15   his opinion.  He enumerated the items he looked at.  And

16   based on those items, he formed an opinion about which he

17   has testified.  That's just part of it.

18           MS. KENNEDY:  I would disagree, Your Honor.

19   Dr. Patterson testified that he reviewed them, and they

20   went into his overall conclusion as to whether or not

21   Mr. Hinckley had violated any conditions of release.

22           That report by the Secret Service for doing

23   anything, hadn't eloped from the hospital, it wasn't just

24   from the Secret Service reports.  He also went into what

25   every single Secret Service report said he read.  He just

1    looked at it and indicated that, yes, over the 200 times

2    that the Secret Service had followed Mr. Hinckley, he knew

3    that he had not been reported or violated any of the

4    conditions.

5           MR. LEVINE:  I must say, Your Honor, I don't

6    understand why the government is taking this position.  We

7    have qualified, we have properly offered in evidence.  If

8    the government has an interest in making sure that it

9    doesn't see the public, I will work with the government

10   assiduously to make that happen.  I have no interest in

11   making these items public.

12          MS. KENNEDY:  Your Honor, I just don't

13   understand what defense counsel -- if the government is

14   willing to stipulate that there is nothing in the Secret

15   Service reports.

16          MR. LEVINE:  I welcome that stipulation,

17   Your Honor.

18          THE COURT:  Here is what we're going to do:  I'm

19   going to ask that -- what I'm going to do with all of the

20   exhibits when we complete this hearing is -- which is what

21   I did last time, I believe -- is I had Ms. Moon give me

22   the original of all of the exhibits, and I kept them in

23   chambers so that I could refer to them when I was working

24   on the opinion.

25          And I don't remember whether we returned them to

1   you later or -- I think we did -- in unredacted form.

2          And so I'm going to suggest that if there aren't

3   going to be any questions to Dr. Patterson about

4   Exhibit 11, that all of the copies be collected, including

5   the one I'm holding and the one my clerk is holding and

6   the one that Dr. Patterson holding, and that the only one

7   we keep is the official one Ms. Moon has marked as

8   Number 11 and that I reserve ruling on the offering of

9   them in evidence and that the government and Mr. Levine

10  see if they can work out a stipulation.

11         And after -- and then there will be a

12  stipulation, presumably.  And then we'll see whether

13  Mr. Levine wants to persist in having this admitted in

14  evidence even though the redaction is going to take a lot

15  of effort on the part of a lot of people, or not.

16         And if the government -- if he persists and the

17  government resists, if there's any law one way or the

18  other, the government or somebody can cite me cases

19  without writing a brief.

20         So let's start by holding the question of

21  whether it can be formally admitted in evidence in

22  abeyance.  See if you can draft a stipulation, and then

23  see what the position of the respective parties are.

24         MR. LEVINE:  Thank you, Your Honor.

25         Do you want these?

1          THE COURT:  I'm going to give you all of them

2     back, including the one that my law clerk has.

3          MR. LEVINE:  Do you want me to take custody of

4     them, or do you want Ms. Moon to do it today?

5          THE COURT:  I want you to take custody of all of

6     them except the original.  Ms. Moon will keep the

7     original, and she will give it to me along with all the

8     other exhibits in the case.  And I will keep in mind that

9     if it is ever admitted, it will have to be redacted.

10          MS. KENNEDY:  Okay.

11          THE COURT:  That's the original.

12          THE WITNESS:  Right.

13          MR. LEVINE:  Right.  So, Your Honor --

14          THE COURT:  So give that one to Ms. Moon.

15          Ms. Moon, for my purposes, just put that Post-it

16     on there.  Thank you.

17          MR. LEVINE:  Okay.

18          May I briefly inquire further, Your Honor.

19          BY MR. LEVINE:

20     Q.    Now, Dr. Patterson, there has been in the course

21     of these last several days considerable comment about the

22     visit to John Tracey and that it was a departure from the

23     itinerary as you identified it.  And I believe you also

24     said that to your knowledge, it was the only time it was

25     such a departure during the last conditional release; is

1    that correct?

2         A.   It is.

3         Q.   All right.  Now, you asked Mr. Hinckley about

4    it, didn't you?

5         A.   Yes.

6         Q.   And Mr. Hinckley explained to you that he and

7    Mr. Brelsford went to go visit the photographer,

8    Mr. Lerner, formerly of *Look* magazine; correct?

9         A.   Yes.

10        Q.   And he also explained to you that shortly before

11   they were supposed to go to Mr. Lerner, that Mr. Lerner

12   canceled.  He was not feeling well.

13        A.   Yes.  I believe Mr. Lerner contacted

14   Mr. Brelsford, who then told Mr. Hinckley.  I think that's

15   the way it went.

16        Q.   Mr. Brelsford and Mr. Lerner, it's your

17   understanding, were colleagues?

18        A.   Yes.

19        Q.   And Mr. Hinckley then suggested that they go to

20   Mr. Tracey's; is that correct?

21        A.   Yes.

22        Q.   And Mr. Brelsford is also a friend of

23   Mr. Tracey's; is that correct?

24        A.   I don't know that.

25        Q.   Didn't Mr. Beffa tell you that?

1      A.    Mr. Beffa?  No.

2      Q.    Did Mr. Beffa --

3      A.    I don't think so.

4      Q.    Didn't Mr. Beffa tell you that Mr. -- I think

5  it's on page 14, if I remember this correctly, of your

6  report.

7      A.    Okay.

8      Q.    That would be impressive if I did because I

9  didn't write it down.  I think it is on page 14.

10          As a matter of fact, when you interviewed

11  Mr. Beffa, Dr. Patterson, you did it and had a transcript

12  made, did you not?

13     A.    I did.

14     Q.    All right.  And on page 15 of that transcript,

15  Mr. Beffa states that he remembered that and so he --

16  Well, I didn't even know he was doing it until after it

17  happened, but he had called Tracey because Tracey is also

18  a friend of Bruce, his friend.  Tracey is a friend of

19  Bruce.  That's Mr. Brelsford.

20          Is that what Mr. Beffa told you on page 15 of

21  your transcript?

22     A.    I don't recall him telling me that.  I don't

23  have the transcript in front of me.

24     Q.    Well, I read it to you.

25          Do you accept it as true?

1           MS. KENNEDY:  Objection, Your Honor.  He's got

2    to be able to see what he's reading.

3           THE COURT:  Show him the transcript.

4           When you interview people, you, what --

5           THE WITNESS:  Audiotape, yes.

6           THE COURT:  Audiotape.

7           THE WITNESS:  Yes.

8           THE COURT:  And then were they turned into

9    transcripts?

10          THE WITNESS:  Yes.

11          BY MR. LEVINE:

12     Q.   Who did that?

13     A.   The concern, the reason I hesitate a bit on it

14    is because in reviewing those transcripts, there were some

15    things they didn't get quite right.

16          So I don't recall Mr. Beffa telling me that he

17    was a friend of Mr. Brelsford's.  I just don't recall

18    that.

19          THE COURT:  Who did the transcripts?

20          THE WITNESS:  Diversified --

21          THE COURT:  A company that does transcripts?

22          THE WITNESS:  Right.

23          THE COURT:  So if he shows you the transcript,

24    might it refresh your recollection?

25          THE WITNESS:  It might.

1          MR. LEVINE:  Might I approach, Your Honor?

2          THE COURT:  Yes.

3          MR. LEVINE:  Does Your Honor want this marked?

4          THE COURT:  No.

5          BY MR. LEVINE:

6      Q.   I show you the transcript.  I have it opened to

7  page 15 of the interview that you conducted of Mr. Beffa.

8  And I invite your attention to line 11 where it says he

9  had called Tracey because Tracey's also a friend of Bruce.

10         Do you see that?

11     A.   I see that.

12     Q.   And you see Mr. Beffa referring to Bruce as

13 "Bruce Brelsford"?

14         Is that the context of that?

15     A.   Sure.

16     Q.   So you acknowledge that Mr. Beffa told you that

17 Mr. Brelsford was also a friend of Mr. Tracey's?

18     A.   I'll accept the transcript as it's written.  I

19 just don't recall it.

20         THE COURT:  There's no question that that's a

21 transcript of your interview with Mr. Beffa?

22         THE WITNESS:  That's correct, yes.

23         BY MR. LEVINE:

24     Q.   And you expressed concern that Mr. Hinckley had

25 called Mr. Tracey the day before the visit; is that

1    correct?

2        A.   Yes.

3        Q.   And Mr. Hinckley told you why he had called

4    Mr. Tracey, didn't he?

5        A.   He may very well.  I just don't recall.

6        Q.   Well, you wrote it in your report.  You said he

7    called John Tracey the day before to see if he could "hook

8    up with musicians in the Williamsburg area."  That's a

9    quote.

10           And Mr. Tracey invited him to stop by to talk

11   about it.

12       A.   Yes.

13       Q.   And when the photographer, Mr. Lerner, visit

14   fell through, he suggested that he, together with

15   Mr. Brelsford, friends of Tracey, go and stop by Tracey's.

16           Isn't that correct?

17       A.   He did suggest that, yes.

18       Q.   All right.  And Mr. Beffa said that showed

19   initiative and socialization; isn't that correct?

20       A.   I recall him saying "initiative."

21       Q.   All right.  It showed initiative; correct?

22       A.   Yes.

23       Q.   In addition to it showing initiative, it also

24   shows a desire to socialize; isn't that correct?

25       A.   Sure.

1      Q.   Both of which are good things for Mr. Hinckley

2   to do; isn't that correct?

3      A.   Both of those are good things for him to do.

4      Q.   All right.  And Mr. Beffa told you that he was

5   "delighted" with that; isn't that true?

6      A.   He did.

7      Q.   And at a prior hearing, Mr. Hinckley was

8   implored to take initiatives, wasn't he?

9      A.   He's been implored to take initiatives

10   consistently by the treatment team.

11      Q.   And when -- okay.  And when Mr. Hinckley went

12   over to Mr. Tracey's home with Mr. Brelsford, their

13   conduct there was in all respects entirely appropriate?

14      A.   I don't know what their conduct was there.

15      Q.   Did you ask?

16      A.   Yes.

17      Q.   And Mr. Hinckley told you what they did?

18      A.   He said they went there.

19      Q.   All right.  And you spoke to Mr. Brelsford in

20   your interviews; is that correct?

21      A.   Yes.

22      Q.   And you never asked him what happened at

23   Mr. Tracey's; isn't that correct?

24      A.   That's correct.

25      Q.   So Mr. Hinckley told you about it.  You thought

1   it was a significant event.  And you had Mr. Brelsford,

2   and you never asked him about it; isn't that correct?

3       A.   That's correct.

4       Q.   And indeed, you never interviewed Mr. Tracey;

5   isn't that correct?

6       A.   Yes.

7       Q.   And, of course, Mr. Brelsford told you that he

8   had no concerns regarding Mr. Hinckley's behavior or

9   conversations; isn't that correct?

10      A.   He did tell me that.

11      Q.   On your direct examination, you made reference

12  to the studio, the name of Mr. Tracey's studio, as

13  "Asylum"; isn't that correct?

14      A.   Asylum Productions.

15      Q.   Asylum Productions?

16      A.   Asylum Productions.

17      Q.   And to you, that conjured up some sort of

18  unsavory image?

19      A.   No.  I didn't say that.  I said that's the name

20  of the production company.

21      Q.   And there's nothing unsavory about it in your

22  mind?

23      A.   I don't know if I've ever considered it whether

24  it's unsavory or not.  It doesn't matter to me.

25      Q.   Did you ever go to the website for

1    Asylum Productions?

2         A.   No.

3         Q.   The website provides --

4              MS. KENNEDY:  Objection, Your Honor.  Relevance.

5              THE COURT:  I think it's relevant.

6    Dr. Patterson did not say "unsavory" -- I can't remember

7    exactly what he did say -- but he seemed to express some

8    concern about the name.

9              BY MR. LEVINE:

10        Q.   Some level of disapprobation, some level of

11   concern, as the Court says?

12        A.   I would say that.

13        Q.   Okay.  So the website provides a statement by

14   Mr. Tracey.  And I quote, it says, "Although 'Asylum' may

15   conjure up unsavory images to some, to me, it is a place

16   of refuge and a comfort and security.  Ever since my

17   mother sent me off to my first violin class" --

18             MS. KENNEDY:  Objection, Your Honor.

19             BY MR. LEVINE:

20        Q.   -- "music has been my refuge and comfort" --

21             THE COURT:  What's the objection?

22             MS. KENNEDY:  He's testifying, first of all.

23             MR. LEVINE:  I'm not testifying.  I'm reading.

24             MS. KENNEDY:  There's nothing in Dr. Patterson's

25   response on Asylum Productions.

1          THE COURT:  It has something to do with it.

2          BY MR. LEVINE:

3     Q.   Continuing from the website, "Ever since my

4  mother sent me off to my first violin class, music has

5  been my refuge and comfort as well as my passion.  If

6  you'd like to experience a passion for music and

7  creativity, give me a call or drop by, drop me a line.

8  You'll be glad you did."  He signs it "John Tracey."

9          Mr. Hinckley has a passion for music, does he

10  not?

11     A.   Yes, he does.

12     Q.   And all he did was drop by?

13          MR. LEVINE:  Nothing further, Your Honor.

14          THE COURT:  Would you like to answer the last

15  question?

16          THE WITNESS:  No, thank you, Your Honor.

17          THE COURT:  Do you want to drop by next time

18  you're down there?

19          THE WITNESS:  Well, while Ms. Kennedy gets

20  ready, the first division that I worked at St. Elizabeths

21  was the "Asylum Division."

22                    REDIRECT EXAMINATION

23          BY MS. KENNEDY:

24     Q.   Good afternoon again.

25     A.   Good afternoon, Ms. Kennedy.

1      Q.   I'll try to be short.  You do not want to spend

2   the day, including myself.

3      A.   I have.

4      Q.   All right.

5           Now, on cross-examination, you were questioned

6   about the diagnosis of narcissistic personality disorder.

7   You indicated that his last depression was in 1995.

8           THE COURT:  His last --

9           BY MS. KENNEDY:

10     Q.   Depression.

11          THE COURT:  Go ahead.

12          THE WITNESS:  No.  I believe what I indicated

13  was the question of whether or not he may have been

14  psychotic in 1995.

15          BY MS. KENNEDY:

16     Q.   Was he?

17     A.   That's still a question.

18     Q.   What happened in 1995?

19     A.   That was when there was the incidents with the

20  commander from the Public Health Service who was a chief

21  pharmacist.  And his, in my opinion, stalking --

22          MR. LEVINE:  Your Honor, this is beyond the

23  scope of cross.

24          THE COURT:  No, it's not.

25

86

1          BY MS. KENNEDY:

2     Q.   Continue, Dr. Patterson.

3          THE COURT:   The question was whether he was

4    still psychotic in 1995, and the reason you say that is

5    because that was the year of the episode with Commander

6    Wick?

7          THE WITNESS:   Yes.

8          BY MS. KENNEDY:

9     Q.   And it wasn't clearly determined if he was

10   psychotic at the time?

11    A.   There were differing opinions about his mental

12   state at that time, based on the behavior.

13    Q.   Could that behavior with Ms. Wick also have been

14   a result of his narcissistic personality disorder?

15    A.   Yes.

16    Q.   Okay.  Now, you are aware, are you not, that

17   Mr. Hinckley has a media plan where he's not to be selling

18   or putting his materials on the Internet?

19    A.   Yes.

20    Q.   And you were asked about him going to Tracey's

21   house, who is the musician.

22         Am I correct on that?  He has a music studio

23   there?

24    A.   Yes.

25    Q.   And in your transcript, it indicates that one of

1     the reasons Mr. Hinckley and Bruce went there was to talk

2     about Mr. Hinckley recording one of his songs, and it

3     would be $150?

4          A.   That's correct.

5          Q.   Is that not in violation of the media plan as

6     far as recording his music?

7          A.   Certainly to have recorded his music would have

8     been in violation of the media plan.

9          Q.   And, in fact, in the past, the hospital has told

10    him that he may not record his music for fear of it being

11    publicized; correct?

12         A.   That's correct.

13         Q.   Is that something that you agree with, that he

14    should not be publicizing or selling his music or

15    paintings?

16         A.   Yes, I do agree with that.  The recording of his

17    music and music therapy with the music therapist to

18    discuss his feelings about what he records and what, that

19    is a therapeutic intervention and activity.

20              Recording for publication potentially is outside

21    of the media -- is a violation of the media plan.

22         Q.   And besides Mr. Hinckley, the individual who

23    actually records it could take that copy, such as

24    Mr. Tracey, and publicize it; correct?

25         A.   I guess, depending on the contract, that

88

1    certainly could be possible.

2        Q.   Now, we were talking about itineraries.  And as

3    far as Mr. Hinckley with this specific incident that

4    occurred with Mr. Tracey and not going to the

5    photographer's, that was a deviation from the itinerary;

6    correct?

7        A.   Yes.  That was the point of --

8            MR. LEVINE:  Your Honor, may we have this

9    witness -- this lawyer -- excuse me, the prosecutor not

10   lead?

11           THE COURT:  Go ahead.

12           MS. KENNEDY:  Thank you.

13           THE WITNESS:  Yes.  That was the point of it

14   being of concern.

15           BY MS. KENNEDY:

16       Q.   And without that itinerary, no one would have

17   known that he deviated from the plan and went to the

18   musician's house; correct?

19       A.   That's true, unless he told someone.

20       Q.   And, in fact, without --

21           THE COURT:  He had written it in the log?

22           THE WITNESS:  Yes, I mean, if there were a log

23   in effect or if he told someone.

24           BY MS. KENNEDY:

25       Q.   And without the itinerary, no one would know

1  what Mr. Hinckley is doing in his free time, would they?

2       A.   Other than by his self-report, that's true.

3       Q.   Now, you indicated that Dr. G.G., she had a plan

4  that differed from the hospital plan of how often she

5  would like to see Mr. Hinckley; correct?

6       A.   Yes.

7       Q.   And Dr. Murphy also had her own plan which

8  deviated to an extent from the St. Elizabeths plan;

9  correct?

10      A.   Yes.

11      Q.   And you indicated that you did read the

12 government's response with 35 conditions separate and

13 apart or actually including 18 of the hospital conditions;

14 correct?

15      A.   I did.

16      Q.   And that certainly deviates from the hospital

17 plan; correct?

18      A.   Yes.

19      Q.   And do you know who is in favor of the hospital

20 plan besides the hospital?

21      A.   Besides the hospital, I think that's it.

22      Q.   All right.  And you were talking about NAMI.

23           Could you explain the name again for the

24 pseudonym of "NAMI"?

25      A.   Sure.  It's National Alliance on Mental Illness.

1      Q.   And what is it?

2      A.   It is an organization of, essentially, citizens,

3   consumers.  They have several, obviously, chapters across

4   the country.  They also have a professional membership

5   that I'm a part of and have been for years.  And it

6   consists of conferences where they invite speakers to talk

7   about mental illness.  Some of the speakers are

8   professionals, some of the speakers are people living with

9   mental illness and others, as well as others.

10          And the typical meetings are comprised of two

11  different groups.  One group are patients, former

12  patients, people who are living with mental illness.  The

13  other group are typically family members, interested

14  people, not individuals who are receiving or have received

15  care in the past.

16          They split into the two groups, and they serve

17  as support groups for each other on what it is like to

18  either have or live with people or be involved with people

19  who have mental illness.

20      Q.   And is that important for Mr. Hinckley?

21      A.   Yes.

22      Q.   Do you think he should continue that

23  participation in NAMI?

24      A.   Absolutely.

25      Q.   Do you know if that's part of the hospital plan?

1    Is it listed?

2        A.   I don't recall it being listed.  It certainly

3    should be part of the plan.  I just don't recall off the

4    top of my head if it's listed there.

5            MR. LEVINE:  Of course, it's part of the plan.

6            BY MS. KENNEDY:

7        Q.   You're saying that it should be part of the

8    plan?

9            THE COURT:  Mr. Levine just interrupted you.  He

10   said, "Of course, it's part of the plan."  I guess that

11   was an objection.

12           MS. KENNEDY:  Thank you.

13           THE COURT:  The hospital plan is -- again, we're

14   discussing the hospital plan, Dr. Patterson -- you're

15   referring basically to the two letters of

16   December 19, 2014, and March 20, 2015?

17           THE WITNESS:  Yes.

18           THE COURT:  Taken together?

19           THE WITNESS:  Yes.

20           BY MS. KENNEDY:

21       Q.   And you were talking about the hospital plan for

22   the 19 conditions.

23           Those did contain specificity and clarity;

24   correct?

25       A.   The hospital's 19 conditions?

1      Q.   Yes.

2      A.   To a greater extent than the hospital's eight

3  conditions, yes.

4      Q.   Yes.  Definitely.  The eight conditions were in

5  the December letter, and 11 more in the March letter;

6  correct?

7      A.   That's right.  That's correct.

8      Q.   And as you stated, you want to see Phase 5 or

9  the overall plan, if it's implemented by the Court, to

10  last at a minimum for a year --

11      A.   That's correct.

12      Q.   -- before anything is changed or added or

13  amended?

14      A.   Yes.  With the exception of whether or not there

15  is a change in Mr. Hinckley's clinical condition or the

16  conditions that are ultimately the Court's order.

17      Q.   And if anything was going to change, it would go

18  back to this Court to change it?

19      A.   Yes.  Absent an emergency, as I mentioned.

20      Q.   Now, you indicated that Dr. G.G. would request a

21  change if she felt it were needed, but we couldn't require

22  her to do that; correct?

23           Am I wrong on that?

24           THE COURT:  I think what you said was something

25  to that effect, that if she -- what she had testified to

1    was in her clinical judgment, she should -- she would like

2    the court order to say that she should see him every

3    month, a minimum of X times a month, but she should have

4    the discretion to see him, to ask to see him more than X

5    number of times a month; right?

6              THE WITNESS:  That's correct.

7              THE COURT:  And then you said something -- and

8    this may be what you're getting at, Ms. Kennedy -- in your

9    testimony about we couldn't require him to do what she

10   thought was best.

11             THE WITNESS:  That's right.  Well, the Court

12   could certainly require him to do that, but she couldn't

13   require that.

14             She could say, I want to see you twice a week.

15             If he says, No, I don't want to do that, or for

16   whatever reasons doesn't agree with that, she can't force

17   him to do that.

18             THE COURT:  I take it there might be a couple of

19   reasons.

20             One is, I just don't want to do that?

21             THE WITNESS:  Yes.

22             THE COURT:  And the other could be some feeling

23   on his part or his family's part that every visit costs

24   them money.

25             THE WITNESS:  Yes.

1    BY MS. KENNEDY:

2        Q.    And would it be Dr. Johnson who would write the

3    Court for any modifications of that release, should she

4    see it in the future?

5        A.    I think it would certainly have to have her

6    approval as the arm of the Court to come to the Court.

7              The actual change or management plan could be

8    written by possibly Mr. Weiss or the treatment team in

9    Williamsburg and then submitted to Dr. Johnson for her

10   approval.  Hopefully, there would be consultation with

11   Dr. Johnson before any submission to her.

12       Q.    And would it have to go to that outpatient

13   review board before it would be sent with a request to the

14   Court?

15       A.    That's not in any plan that I've seen.  And I'm

16   only speaking of the historical mechanism of all

17   recommendations going through the forensic review board.

18             But that was when there was only one forensic

19   review board at the hospital which also contained the

20   outpatient department.

21             THE COURT:  The review board, FOPD is new;

22   right?  And so we don't know how it works or does not

23   work.

24             THE WITNESS:  That's my -- that's my concern.

25             THE COURT:  And I don't recall whether

1    Dr. Johnson said in her testimony whether she would feel

2    the need to go to them before coming back to court or not.

3         Do you --

4         THE WITNESS:  I don't recall if she said that

5    she did.  I think -- or I think I recall her saying that

6    that would be the mechanism that they would use since they

7    now have a forensic review board for outpatients.

8         MR. LEVINE:  I don't think the question was ever

9    put to her.

10        THE COURT:  That may be.  What I recall -- and

11   maybe, Ms. Kennedy, you and Mr. Levine agree on it -- that

12   the question may not have been put to her.

13        MS. KENNEDY:  It may not have.

14        THE COURT:  I think she suggested that there's

15   nothing written in stone at this point about the

16   relationship between her and the review board and what

17   occasion she had to go to them, or perhaps it was because

18   of something new.

19        But the way you envision things, I take it that

20   she would be the primary arm of the Court, conduit of the

21   Court, and she and Dr. G.G. consult a lot and perhaps on

22   many occasions reach a consensus on what's the appropriate

23   thing to do or to ask me to do.

24        THE WITNESS:  Almost.  I agree with the part of

25   Dr. G.G. and Dr. Johnson consulting about what should come

1      to the Court.

2              My opinion regarding the involvement of the

3      forensic review board, outpatient review board, would be

4      that it would be an added layer similar to all the

5      conditional releases up to now where there would be review

6      by the administrative/clinical heads.  That's how the

7      forensic review board has been comprised in the past and

8      is currently comprised for inpatient and certainly did

9      review the hospital's recommendation before the Court

10     right now.

11             So my preference certainly would be that any of

12     those kinds of recommendations would come through the

13     appropriate forensic review board.  In this case, it would

14     be this new review board.

15             BY MS. KENNEDY:

16         Q.   In your opinion, Dr. Patterson, should it come

17     or be reviewed by someone other than just Dr. Johnson?

18         A.   Yes.  I think that would be very wise for it to

19     go through the forensic review board for recommendations.

20     The issue of notice to the Court, et cetera, I would see

21     it analogous to the role that Mr. Hyde plays in notifying

22     the Court or Secret Service or whomever needs notice

23     rather than that going to the review board, for example.

24         Q.   Now, I just asked you about the hospital's 18 to

25     19 conditions, and I say that because half of one

1    condition may agree with the government's condition.

2              Do the government's conditions, the additional

3    17 conditions, add more specificity and clarity to the

4    plan that this Court might implement for convalescent

5    leave?

6              MR. LEVINE:  Objection.

7              Which condition is she speaking of?

8              THE COURT:  All of them, I guess, the 17 --

9              MR. LEVINE:  The ankle bracelet?

10             MS. KENNEDY:  No, no.  Excluding the ankle

11   bracelet.

12             MR. LEVINE:  How about the car-tracking device?

13             MS. KENNEDY:  Excluding the car-tracking device.

14             MR. LEVINE:  How about the computer software?

15             MS. KENNEDY:  No.  Not excluding the computer

16   software.

17             THE COURT:  So do those conditions add clarity

18   and specificity?

19             THE WITNESS:  Yes, they do.

20             BY MS. KENNEDY:

21        Q.   Do you agree with those conditions?

22        A.   I do.

23        Q.   Now, if there was no itinerary --

24             THE COURT:  So you agree with all the conditions

25   the government proposed except for the ankle bracelet and

1    the car-tracking device?

2             THE WITNESS:  Yes.  I believe that's correct.

3             BY MS. KENNEDY:

4        Q.   We went over those yesterday and this morning;

5    correct.

6        A.   We did.  Yes.

7        Q.   If there are no itineraries, how often do you

8    think notes should be sent to the hospital of

9    Mr. Hinckley's activities and what's going on with him in

10   treatment?

11       A.   My understanding to this point is that all of

12   the notes would be sent prior to the monthly meeting with

13   Dr. Johnson and that they would be available for her

14   review so that when she does meet with Mr. Hinckley,

15   she'll have that information.

16       Q.   Now, you heard Scott Hinckley testify; correct?

17   Scott Hinckley testify?

18       A.   Yes, I did.

19       Q.   In fact, you interviewed him fairly extensively;

20   correct?

21       A.   Yes.

22       Q.   Was his interview regarding the finances a

23   little different than what he had testified to?

24       A.   It was.  I interviewed Mr. Hinckley,

25   Scott Hinckley, on October -- I'm sorry, on March the

1  10th, and I interviewed Diane Simms on March the 11th.

2  Both of them expressed to me that they really didn't --

3  they had a lot of questions about the financial issues and

4  who pays for what and the entitlements and housing that

5  they thought needed to be responded to.

6       Q.   And --

7            MR. LEVINE:  Objection, Your Honor.  This is the

8  problem with hearsay.

9            MS. KENNEDY:  You must be kidding.

10           MR. LEVINE:  It's one thing to rely heavily on

11  records which have indicia of reliability.  But when the

12  witness talks about his interview as he phrases the

13  question and induces the answers he wants and then records

14  and phrases it the way he wants and then says, This is

15  what they say, which is radically different than what the

16  cross-examiner's sworn testimony was, that's the problem.

17           Now, there's a basis, I suppose, from those

18  interviews to ask questions, but to introduce it for the

19  truth when it doesn't have any indicia of reliability is

20  misguided in my view.

21           MS. KENNEDY:  Can I say, Your Honor, that the

22  entire exposition of Mr. Beffa's conversation in the

23  transcript with Mr. Tracey and the photographer was

24  complete hearsay that Mr. Levine brought out, and the

25  government didn't object to so we can get through this.

1          And the fact that it's in a transcript with the

2    individual who took the information that's put into the

3    transcript to relay to this Court, not only is it

4    sufficient, but hearsay in these proceedings is

5    admissible.

6          So I would ask that I be allowed to proceed.

7          MR. LEVINE:  Your Honor, if you want me to

8    address this, I will.

9          And I understand how the hearsay rules have been

10   softly applied in this proceeding.  But in terms of what

11   is reliable evidence, there's a rule.  And we know that

12   some evidence is more reliable than others.

13         A hospital record may be more reliable because

14   there's no incentive to distort it, but an interview of a

15   witness, in this case Scott Hinckley or Diane Simms, when

16   we've had the benefit of their testimony under oath

17   subject to cross, that's the evidence in the case.

18         The other is a basis to ask questions to impeach

19   the evidence.  It is not a basis for it to be entered for

20   the truth of the matter.

21         MS. KENNEDY:  Oh.  I'm sorry, Your Honor.  I was

22   looking for something here.

23         It's nice that Mr. Levine believes there's

24   different levels of hearsay because certainly the level of

25   hearsay brought out with Mr. Beffa's discussion that was

1    totally opened up by Mr. Levine is no different than this

2    witness who took the testimony in this particular case.

3              THE COURT:  We can go on all afternoon

4    discussing this issue.

5              Here is the deal:  The experts' reports,

6    Dr. Murphy's on behalf of the hospital and Mr. Hinckley's

7    [sic] and Dr. Patterson's on behalf of the government, are

8    rife with hearsay.  And we all have acknowledged for at

9    least a dozen years in the interviews that they conduct

10   are part and parcel of the bases for the opinions and

11   conclusions that they reach in Dr. Murphy's case along

12   with objective test results and her interpretation of the

13   test, but also interviews.

14             We have historically relied on that hearsay for

15   what it's worth.  Sometimes it's worth more; sometimes

16   it's worth less.  We have historically not required, I

17   have not required, every witness to appear live in these

18   hearings because we were relying on hearsay.

19             There is a lot of -- there are a lot of things

20   that Mr. Beffa did and said, that Mr. Beffa did that he

21   reported to Dr. Murphy, Dr. Patterson.

22             And let's not forget the monthly reports

23   prepared by Mr. Hyde, which are nothing but hearsay.

24   Mr. Hyde doesn't spend 17 days a month in Williamsburg.

25   He collects the reports of John Hinckley, Mrs. Hinckley,

1  Diane Hinckley, Diane Simms, Scott Hinckley, Mr. Beffa,

2  Mr. Weiss, Dr. G.G., Ms. Haley.  I think he may be talking

3  to some of the people at the Eastern State Hospital.

4         It's all hearsay.  It's all hearsay.  And we

5  rely on it.  So I would suggest that the primary

6  difference right now is that I'm assuming that his

7  recordation, even though he's a government witness, of

8  what Scott and Diane said to him is as accurate as his

9  recordation as what Mr. Beffa said to him.

10         MR. LEVINE:  Your Honor --

11         THE COURT:  The difference is that we have the

12  benefit of live testimony from Scott and Diane.  And we

13  all, including Dr. Patterson, learned things from their

14  testimony and subject to cross-examination that

15  Dr. Patterson didn't know at the time of the interviews.

16  That's not to say that he didn't accurately record what

17  they said in the interviews and he drew certain

18  conclusions from what he learned with which you disagree,

19  Mr. Levine.  But as I've heard his testimony, he's

20  modified those conclusions because he's heard their live

21  testimony since.

22         So that's where I come out on all this.

23         MR. LEVINE:  Fair enough, Your Honor.

24         I just want to correct one aspect of the Court's

25  recitation, and that is in his collateral interviews with

1    various people, he recorded some and didn't record others.

2    And with respect to Scott and Diane, he did not record

3    them.  He took some notes, and they are very brief.

4              MS. KENNEDY:  Then I will move on.

5              THE COURT:  Isn't there a song that has a verse

6    in it about Scott and Diane?  What am I thinking of?

7              MR. LEVINE:  There's the musician.  It's Jack

8    and Diane.

9              MS. KENNEDY:  Jack and Diane.

10             I'll move on, Your Honor.

11             THE COURT:  I knew I was asking the right

12   person.

13             MR. LEVINE:  You had the right person.

14             BY MS. KENNEDY:

15    Q.   Dr. Patterson, you stated through Mr. Levine's

16   examination that the financial concern for Mr. Hinckley

17   was only attenuated.

18             Why is that?

19    A.   Because it's still not fleshed out as to Plan A,

20   a plan and a backup plan regarding what kinds of

21   entitlements and housing and where they would be,

22   Williamsburg versus D.C.

23             And there is still some -- it underscores the

24   need for treatment team meetings.  There's still some

25   different presentation from different members, just as

1   VJ Hyde says it was a lapse in judgment; he shouldn't have

2   gone to John Tracey's.  Carl Beffa says he's delighted he

3   went.  There needs -- G.G. says he shouldn't have done

4   that.  Beffa says he's delighted.  They need to be

5   together on this so that Mr. Hinckley gets the right

6   message from the treatment team as to what this means to

7   them.

8          Similarly, the issue of housing and a backup

9   plan, et cetera, is this transitional housing for a year

10  or two, and is everybody working in that direction as

11  Mr. Weiss says, or is this until Mrs. Hinckley is no

12  longer available, for however long that is, as other

13  treatment team providers have said?

14         There's a need for there to be at least

15  discussion and formulation of a specific and clear mission

16  for the plan.

17     Q.   You indicated that for Mr. Hinckley to write the

18  itinerary, you saw that as therapeutic --

19     A.   Sure.

20     Q.   -- and clinically appropriate?

21     A.   Yes.

22     Q.   Is having an itinerary similar to all of us

23  having our own personal calendar for the day?

24     A.   Very much.  Depending, of course, on how busy we

25  are; but, yeah.

1      Q.   And how important is a calendar to keeping an

2  individual under structure and knowing what they are doing

3  day to day?

4      A.   It's very important, again, depending on one's

5  level of activities.  Excuse me.

6      Q.   And you think that's something that's important

7  for Mr. Hinckley?

8      A.   I do.  And when I say "write the plan, the

9  itinerary," I also mean write the itinerary with the

10 review by Mr. Weiss.  He would -- as the case manager,

11 that would be an appropriate role.

12     Q.   You also indicated that an itinerary is a

13 formula to reintegration.

14     A.   Yes.

15     Q.   And can you explain that a little bit?

16     A.   Sure.  If the goal and mission here is

17 successful integration, not re, but integration into the

18 community, then having a way of looking at how that is

19 going, how that is working, how much progress are we

20 making here, what are we missing.  Is there some area that

21 we really haven't taken advantage of?  Those are the kinds

22 of things that in my view therapeutically would be

23 addressed by having it in front of you because, frankly, I

24 look back at my calendar sometimes and I can't figure out

25 how I've been to some of the places I've been to.  I think

1    I've just been traveling maybe a couple of times a week or

2    a couple times a month.  I look back, and it's every week

3    for eight weeks.  My wife knows it, but I don't because

4    I'm too busy doing stuff.  So it's helpful in managing

5    one's life.

6         Q.   Now, you were asked about the GPS phone;

7    correct --

8         A.   Yes.

9         Q.   -- and that there was no data on it to indicate

10   that he had deviated at all from where he was supposed to

11   be; correct?

12        A.   That's correct.

13        Q.   And is that because he stayed where he was, and

14   there was no deviation?

15        A.   I don't know why there's no data.  I have not

16   reviewed any data.  But from other reports, he stayed

17   where he's supposed to be.

18        Q.   And have you ever had a patient in the past

19   where a GPS phone has indicated where they are and that

20   there's some trouble going on?

21        A.   Yes.  Not a patient, but an evaluatee.  In

22   forensic, we don't refer to people; we evaluate our

23   patients because we are not their doctors.  We're

24   examiners; they are examinees.

25             So, yes, I've had the experience of examining

1    someone who was in the process of kidnapping and killing

2    another person and was tracked by their GPS.

3         Q.   And you think, as you indicated, a GPS phone

4    rather than an ankle bracelet, rather than a car detector,

5    is an important thing to continue for Mr. Hinckley?

6         A.   Yes.  Particularly as the conditions expand and

7    particularly if there's going to be driving to other

8    areas.

9         Q.   Now, you indicated that Mr. Hinckley's mother is

10   the one who's been monitoring the computer that

11   Mr. Hinckley is using; correct?

12        A.   Yes.

13        Q.   Did you ever have an opportunity to ask her what

14   her level of computer skills are?

15        A.   I didn't have to ask her.  She said that like

16   many of us, she didn't know much about computers.

17        Q.   Is she 89?

18        A.   Yes.

19        Q.   All right.  And is that one of the reasons you

20   feel that there should be a device on the computer to

21   monitor what Mr. Hinckley is doing on the computer?

22        A.   That would be one of the reasons to do that.

23             The other is to have access to his codes and his

24   password, et cetera, to be able to look if he uses a

25   different computer.

108

1          MS. KENNEDY:  I have no further questions,

2    Your Honor.

3          Thank you, Dr. Patterson.

4          THE WITNESS:  Thank you, Ms. Kennedy.

5          THE COURT:  Anything else, Mr. Levine?

6          MR. LEVINE:  The Court's indulgence for a

7    moment, Your Honor.

8          THE COURT:  Yes.

9                    RE-CROSS-EXAMINATION

10          BY MR. LEVINE:

11          MR. LEVINE:  Very briefly, Your Honor.

12     Q.    There were questions asked of you,

13    Dr. Patterson, about the number of times that Mr. Hinckley

14    should see Dr. G.G.

15          Do you recall that?

16     A.    I do.

17     Q.    All right.  And do you have any reason to

18    believe that if Dr. G.G. requested weekly sessions with

19    Mr. Hinckley, that Mr. Hinckley would refuse?

20     A.    I don't have a reason to believe he would

21    refuse.  I think --

22     Q.    And surely --

23          THE COURT:  Let him finish.

24          MR. LEVINE:  I'm sorry.

25          THE WITNESS:  I think he recognizes the need to

1    participate actively in treatment.

2              BY MR. LEVINE:

3         Q.   So it is your judgment and your opinion that

4    were he ordered by Dr. G.G. to see her with some

5    frequency, whatever that may be, he would comply?

6         A.   I would certainly hope so.

7         Q.   Is it your belief that he would?

8         A.   Well, historically, he has.  But that is

9    intended to increase, so I would certainly hope that he

10   would.  If he didn't, I think that would be very

11   significant.

12        Q.   Is it your belief that he would comply?  Is it

13   your opinion that he would?

14             MS. KENNEDY:  Objection.  Asked and answered.

15             MR. LEVINE:  I asked several times.  Answered

16   not at all.

17             THE COURT:  Well, I don't --

18             MS. KENNEDY:  He's not getting the answers that

19   he wants, but he's answering it.

20             THE COURT:  Historically, he has, based on that

21   history?

22             THE WITNESS:  I would hope that he would, yes.

23             THE COURT:  You would hope that he would.  All

24   right.

25

1          BY MR. LEVINE:

2          Q.   Now, Ms. Kennedy asked you some questions:  With

3    the exception of the ankle bracelet and the car-tracking

4    device, do you agree with all the government's proposed

5    conditions?

6          A.   Yes.

7          Q.   Do you remember that?

8          A.   I do.

9          Q.   And do you remember, I think you said yes?

10         A.   I believe I said, "I believe so" or I said

11   "Yes."  Right.  It was an affirmative, yes.

12         Q.   So is it your belief, or do you support --

13   withdrawn.

14              Do you support the condition that were

15   Mr. Hinckley to not follow his itinerary by going, for

16   example, instead of to the Giant but to the Safeway, that

17   he should be returned to the hospital?

18         A.   No.

19              MS. KENNEDY:  Objection.  That is not a

20   condition that if he goes to the Giant instead of going to

21   the Safeway, he should be returned to the hospital.

22              THE COURT:  Well, I think from that, that the

23   question is --

24              Can you find the specific condition that you're

25   alluding to?

1        But to paraphrase, what I think Mr. Levine is

2   referring to, I think there is a condition proposed by the

3   government that if he violates any condition, he should be

4   immediately returned to the hospital.

5        MR. LEVINE:  That is correct.

6        THE COURT:  And if I'm correct that that's what

7   it says in that exhibit, I guess the question is whether

8   you make a distinction between -- I mean, all -- are all

9   conditions equal for those sorts of purposes?

10        MR. LEVINE:  Your Honor, there are several.  I

11   would invite the Court's attention to Number 33, Number --

12        THE COURT:  In the government's -- in the

13   hospital's April 17th letter?

14        MR. LEVINE:  Yes.  I believe it's Patient's 4.

15        THE COURT:  Do you have that in front of you?

16        MR. LEVINE:  I think Number 35, Your Honor.

17        THE COURT:  The April 17th letter?

18        THE WITNESS:  Yes.

19        THE COURT:  Dr. Patterson has it as well.

20        BY MR. LEVINE:

21   Q.   Number 35 is kind of an interesting one.  It

22   says:  "If Mr. Hinckley's mental condition deteriorates or

23   if he violates the conditions of this release, he shall be

24   returned to inpatient care at the hospital with due

25   notification to the Court and counsel."

112

1        MS. KENNEDY:  And the hospital agrees with this

2    condition.

3        THE COURT:  Yes.  The hospital says they agree

4    with this condition.

5        BY MR. LEVINE:

6    Q.   Any violation, do you agree with that?

7    A.   I do.

8    Q.   So you believe that were he to go to the Safeway

9    when his itinerary says he's going to the Giant, that he

10   should be returned to the hospital?

11       MS. KENNEDY:  Objection.  It doesn't say that.

12       THE COURT:  Well, Dr. Patterson just said he

13   agrees with Condition 35.

14       MR. LEVINE:  Okay.

15       THE COURT:  So the question is a hypothetical

16   that Mr. Levine, at least the way he has proposed, from

17   Paragraph 35.  Justice Scalia asks hypotheticals all the

18   time.

19       So you can answer the hypothetical.

20       MR. LEVINE:  Pleasure to be associated with that

21   kind of inquiry, Your Honor.  All right.

22       THE COURT:  But you don't think that if he went

23   to the Giant instead of Safeway that he should be

24   immediately returned?

25       THE WITNESS:  No.  I think if the condition in

1    the order is that he will specify precisely where he will

2    go and he violates that, then he should be returned.  If

3    the condition says that the itinerary will specify his

4    going shopping at a store and he goes shopping at a store

5    and it's a different store, I don't think he should be

6    returned to the hospital for that.

7             THE COURT:  Is the distinction you're making

8    that if he violates a condition of the order, then under

9    this Paragraph 35, he should be returned to inpatient care

10   at the hospital, but the conditions of the order could be

11   written to provide some discretion and flexibility?

12            THE WITNESS:  Exactly.

13            THE COURT:  And so, for example, my example from

14   earlier, the old itinerary used to say he's got to go to a

15   certain restaurant with his mother, and then his mother or

16   he finds out the restaurant is closed on Sunday nights,

17   and they have to notify Mr. Hyde.

18            THE WITNESS:  Right.

19            THE COURT:  Your proposal would be:  We're going

20   to dinner on Sunday night.  It's going to be my mother, my

21   brother, and me.  They don't have to be more specific.

22            THE WITNESS:  No.  I don't believe they do.  If

23   the conditions also specify within 30 miles, then if they

24   go to a restaurant in Richmond, they have violated the

25   conditions.  They don't have to say which restaurant, but

1    they violated the condition of the 30 miles.

2              THE COURT:  So that's the distinction between

3    Mr. Levine's hypothetical and your agreement?

4              THE WITNESS:  That's right.  There you go.

5              (Discussion held off the record.)

6              THE COURT:  So, you know, I have to think about

7    this whole itinerary question, obviously, if I were to

8    grant the hospital's petition.

9              But in thinking about it -- and maybe Mr. Hyde

10   through Ms. Merene or through Mr. Levine can help us on

11   this, or Mr. Weiss -- I'm talking about a document that's

12   going to look somewhat different from the ones that we've

13   seen in the past.

14             THE WITNESS:  Yes, we are.

15             MR. LEVINE:  May I make an observation,

16   Your Honor?  And that is the -- during the transition,

17   Phase 4, during the Phase 4 when we were having an

18   experiment in incremental liberty, it may have been much

19   more important to know exactly where he was going to be at

20   a given period of time as set forth in the itinerary.

21             But now we're saying he's going to live in the

22   community.  We're past that.  Now we're saying we're

23   trying to restore normalcy.  That's not the way people

24   live their lives in a normal situation.  That was Phase 4.

25   Now we're Phase 5, and it's just another incremental step.

1    Sometimes it's called a "big step," but we've been taking

2    more than a decade to do this, so this is not a radical

3    proposition.

4            And all we're saying here is in the next phase,

5    we're past the transition.  Now we're in the community,

6    and we're going to live in the community the way normal

7    people live in the community.

8            MS. KENNEDY:  Objection, Your Honor.

9            MR. LEVINE:  We're doing this in the context of

10   a risk that is low.

11           THE COURT:  We're going to have closing

12   arguments later.

13           MS. KENNEDY:  Thank you.

14           THE COURT:  But I think that the conundrum that

15   I'm going to have to face if I grant the hospital's

16   petition is balancing what you say with the thrust of some

17   of what Dr. Patterson's testified to this afternoon.

18           What you say is correct.  It's a different

19   phase.  It's a more normal phase.

20           On the other hand, he is not going to have the

21   people at the hospital seeing him day in and day out 13 or

22   14 days a month.  He's going to have more free time.  He's

23   going to be able to drive without -- as I read the

24   proposals, you know, no longer will he be limited to a

25   two-hour walk or whatever, two-hour free time a day.

1          And, yes, his days, hopefully, will be filled

2     with more volunteer or paid employment, and he's going to

3     be seeing treaters a lot.  But there's going to be a lot

4     more free time with less monitoring.

5          And how do we balance the freedom, the normalcy,

6     the flexibility needed to live a life with enough

7     mechanisms in place to identify significant but not

8     necessarily insignificant events which raise red flags in

9     the minds of those who are charged with helping him

10    transition and at the same time minimizing the risk and

11    keeping FOPD and ultimately me advised?

12          MR. LEVINE:  Your Honor, to assist the Court, as

13    the Court contemplates this, you know, if the itinerary

14    says, as Dr. Patterson just testified, that to go out to

15    dinner, of what value is that?  It's a burden to create

16    the itinerary, but he goes out to dinner.  How are you

17    going to monitor that?  How are you going to monitor that?

18    Does he go to any restaurant at all with his mother or

19    alone?  But the itinerary says "Go out to dinner."

20          THE COURT:  Because presumably Dr. Beffa or

21    Mr. Beffa and Mr. Weiss and maybe even Dr. G.G. will say

22    to him, I see you were supposed to go out to dinner Sunday

23    night.  Where did you go?

24          Well, he can deceive them and not tell them the

25    truth, but this whole plan contemplates that he's going to

1    be honest with his treaters.  And so if he says, Oh, we

2    thought about going to this restaurant, but we went to

3    that restaurant instead, and it was great, and my brother

4    was there, and we had a nice time, that's fine.

5         And if he says, Well, I ditched my mother and

6    brother and went to a strip club, then maybe it's not

7    fine.

8         It's a hypothetical that probably is never going

9    to happen.  I guess it's twofold, helping him -- we've

10   been over this so many times -- helping him think about

11   how to live a life and not sit alone in his room, not that

12   there's any indication that he's going to anymore, but

13   help him plan his life just like your wife calls you up

14   and says, Can we go to dinner with Colleen and her husband

15   next week?

16        And you say, I don't want to go to dinner.

17        MS. KENNEDY:  Tomorrow.

18        THE COURT:  Tomorrow.  You don't want Mr. Levine

19   out tomorrow.

20        MS. KENNEDY:  No, no, no.

21        MR. LEVINE:  Why not?

22        THE COURT:  Tell us where you're going, Colleen,

23   and we'll all show up.

24        We all plan a social life.  We don't have to

25   report to anybody about whether we actually went to dinner

1    or canceled it, but it's in our planning.  You know --

2              MR. LEVINE:  It could just easily be that they

3    have an itinerary to go out to dinner and mom has a

4    headache and decides to stay home.

5              THE COURT:  That's fine, too.

6              MR. LEVINE:  Send him back to the hospital.

7              THE COURT:  No.  No.

8              MS. KENNEDY:  No.

9              THE WITNESS:  That's not what I said.

10             THE COURT:  Try to finish up with Dr. Patterson,

11   and we'll have plenty of time for the two of you to argue

12   between yourselves on a date to be set.

13             MR. LEVINE:  Yes.

14             BY MR. LEVINE:

15       Q.   And lastly, Dr. Patterson, you were asked some

16   questions about whether Mrs. Hinckley had some computer

17   skills, and I think you said, as best you can determine,

18   she has limited skills.

19       A.   I think what I said is that she told me she

20   doesn't know much about computers.

21       Q.   All right.  That would suggest limited.  I think

22   my characterization may be accurate.

23             Now, if one wanted to find out what sites

24   Mr. Hinckley visited on that computer, one could learn

25   that by asking Mr. Hinckley to keep a log of the sites;

1    isn't that true?

2        A.    That is a way.

3        Q.    And one could learn that by having Mr. Weiss

4    periodically or by spot check come to the computer and

5    visit its history; what sites have been visited over a

6    discrete period of time.

7              Isn't that a way?

8        A.    That, I believe, is a limited way, but a way.

9        Q.    You could learn every site to which that

10   computer went, couldn't you?

11       A.    If I knew a particular password.  If there's a

12   different password and you don't know that password, then

13   you wouldn't know.

14       Q.    And Mr. Weiss could be given that password,

15   then.

16       A.    Okay.

17       Q.    Far less than putting some sort of software on a

18   computer, a computer that people other than Mr. Hinckley

19   use, people who have privacy rights.  Maybe, for example,

20   his brother, Scott, comes and uses that computer.  Maybe

21   his sister, Diane, uses that computer.

22             MS. KENNEDY:  Objection, Your Honor.

23             BY MR. LEVINE:

24       Q.    Maybe in some limited way, Mrs. Hinckley uses

25   that computer.

1          MS. KENNEDY:  Objection, Your Honor.

2          BY MR. LEVINE:

3     Q.    Your only interest is --

4          THE COURT:  She's objecting.

5          MS. KENNEDY:  I'm objecting.

6          We're only talking about Mr. Hinckley's use on

7     the computer.  Dr. Patterson has no idea who's got access

8     to the computer, nor should he be knowing who has access

9     to the computer.  And I didn't ask him on my redirect as

10    to his access or Mr. Hinckley's relatives' on the

11    computer.  So I think it's really --

12         THE COURT:  So we're on rerecross, which should

13    be limited.

14         MS. KENNEDY:  I'm not doing any recross.  I'm

15    sorry.

16         THE COURT:  He's doing rerecross.

17         MS. KENNEDY:  Yes.

18         THE COURT:  You've already -- We've had direct.

19    We've had cross.  We've had redirect.  We're now on

20    rerecross --

21         MR. LEVINE:  Right.

22         THE COURT:  -- which should be limited.

23         MR. LEVINE:  I thought it was limited to the

24    scope of redirect.

25         THE COURT:  It is.

121

1          MR. LEVINE:  All right.

2          BY MR. LEVINE:

3      Q.   So Mr. Weiss could come and visit the sites and

4  learn -- visit the computer and with the password and

5  whatever else might be necessary to determine this, where

6  Mr. Hinckley went on the computer, couldn't he?

7      A.   That is a way to find out what has already

8  happened.

9      Q.   And that is a way that does not intrude upon the

10  rights of Mrs. Hinckley, Diane Simms, Scott Hinckley, or

11  any other authorized user of that computer; isn't that

12  correct?

13          MS. KENNEDY:  Objection.

14          How does he know that, Your Honor?

15          THE COURT:  These are rhetorical questions.

16          They can bring their iPads when they come from

17  Dallas.

18          MR. LEVINE:  I don't have one.

19          THE COURT:  Neither do I.

20          MR. LEVINE:  Nothing further, Your Honor.

21          THE COURT:  Anything else, Ms. Kennedy?

22          MS. KENNEDY:  No, Your Honor.

23          THE COURT:  Ms. Merene?

24          MS. MERENE:  Yes, Your Honor.  I would like to

25  call Mr. VJ Hyde.

122

1          THE COURT:  Wait.  We're not there yet.

2          Do you want to inquire of Dr. Patterson?

3          MS. MERENE:  No, Your Honor.

4          THE COURT:  Dr. Patterson, you're excused.

5          THE WITNESS:  Thank you.  If I may take just one

6     moment, I promise.

7          I'd like to thank the Court for your

8     acknowledgement of Dr. Phillips and his role in this, and

9     I will share that with his family and with my colleagues.

10         THE COURT:  Please do.  We miss him very much.

11    Despite the contentious nature of his interaction with

12    Mr. Levine from time to time, Dr. Phillips was a wonderful

13    guy and a wonderful professional, and I feel -- please

14    send them my best.

15         THE WITNESS:  I will do that.

16         MR. LEVINE:  And I would join that, Your Honor.

17    It's surely nothing personal in my examination of

18    Dr. Phillips.

19         THE WITNESS:  How about me?

20         MR. LEVINE:  You, however, are --

21         THE COURT:  All right.

22         Do you have any additional witnesses?

23         MS. KENNEDY:  I do not, Your Honor.

24         THE COURT:  Now, Ms. Merene wants to call

25    Mr. Hyde.

1          And other than Mr. Hyde, Ms. Merene or

2   Mr. Levine, are you going to have any additional witnesses

3   in these proceedings?

4          MR. LEVINE:  No, Your Honor.

5          MS. MERENE:  No, Your Honor.

6          MS. KENNEDY:  No, Your Honor.

7          THE COURT:  So do you think Mr. Hyde will be

8   brief?  Should we do it now rather than all coming back

9   tomorrow?

10          MR. LEVINE:  I would support that, Your Honor.

11          MS. MERENE:  Yes.

12          THE COURT:  I think we'll swear you in again.

13                   * * * * * * * * * * * * * *

14          Thereupon,

15                        VERNON J. HYDE,

16   Having been called as a witness on behalf of

17   St. Elizabeths Hospital having been first duly sworn by

18   the Deputy Clerk, was examined and testified as follows:

19                    DIRECT EXAMINATION

20          BY MS. MERENE:

21     Q.   Good afternoon, Mr. Hyde.  Or good evening.

22     A.   Good evening.

23     Q.   And can you state your name for the record?

24     A.   Vernon James Hyde.

25     Q.   Mr. Hyde --

124

1          THE COURT:  Could you keep your voice up, too,

2    so that I can hear you?

3          BY MS. MERENE:

4      Q.   Were you responsible for the itineraries in this

5    case thus far?

6      A.   Yes, ma'am.  I received the information from

7    Mr. Hinckley who prepared them in writing on his own,

8    prior to his return from each of his monthly trips.  He

9    worked in concert with all of his providers there and his

10   supervisors, wrote them all out.  And then he gives me a

11   copy when he returns, along with his feedback forms.  And

12   then from there, I take those, that copy, and I turn it

13   into a legal document which then gets submitted to

14   Dr. Godwin and then to the courts.

15     Q.   And so what you just mentioned, the feedback

16   document, can you explain that?

17     A.   Mr. Hinckley, along with his family members and

18   several providers, fill out feedback forms, essentially

19   stating -- I think it was Dr. Rafanelllo who originally

20   developed these -- but they are checklists that addressed

21   behavior symptoms and signs of decompensation specific to

22   Mr. Hinckley's risk factors.  And they state simply

23   whether they are present, not present, or not applicable.

24          And at the end of this -- it's about a two-page

25   document -- there's also another page that provides for

1    additional comments with regard to any items that were

2    marked as little present or any other additional comments

3    as well.

4           So those are some of the documents that

5    Mr. Hinckley provides me upon his return from each trip.

6       Q.   Okay.  Now, did you hear Dr. Patterson reference

7    your suggestion that Mr. Hinckley, going forward, would

8    prepare itineraries?

9       A.   Yes.

10      Q.   And did you make that suggestion to

11   Dr. Patterson?

12      A.   Yes.  This was actually something that I had

13   mentioned on Friday after Friday's testimony of Mr. Weiss.

14   He mentioned that he would be in support of continued

15   itineraries through at least the first year, if I remember

16   that testimony correctly.

17          My thinking was, at the time when I made the

18   suggestion to Dr. Patterson and my other colleagues, that

19   this would be something that, if it were to be added as a

20   specific condition, would be helpful, would be therapeutic

21   for Mr. Hinckley to take over the prime role in that

22   formulation and dissemination of his itineraries.

23          What I was trying to also point out is that I

24   think there should be an understanding or a distinction

25   placed on the difference between what might be considered

1    an itinerary as it currently is operationally defined

2    versus a daily schedule or routine, which I think is

3    something that still would follow a helpful structure to

4    be used by Mr. Hinckley in his day-to-day activities,

5    planning what he's doing.

6           Also, as far as Dr. Patterson has importantly

7    noted, for corroboration and for the therapeutic value of

8    him having a sense of self-agency and ownership in his

9    life.

10          Also, following his own sort of experiences and

11   his diary as suggested by Dr. Murphy and his log, I think

12   that that's important to understand and for him to be able

13   to maintain, especially in the early stages of a full

14   convalescent leave plan.

15          Yet that there's the difference between being --

16   and I think a lot of this has been discussed between my

17   testimony initially and Dr. Patterson's now -- but that

18   there should be a sense of, if Mr. Hinckley is to

19   continue, yes, there should be -- there should be

20   ownership; that it would be something that would be

21   helpful to share with Mr. Weiss and pass on to Dr. G.G.

22   and Dr. Johnson.

23          Yet, in terms of the specificity and the

24   required turn-around that we currently have on this

25   stipulation, for the paradigm of outpatient care, it would

1    not necessarily fit for his level of risk.

2        Q.   I guess my question is:  Do you envision this as

3    something that would be filed in advance with the Court?

4        A.   That would be something that I don't think would

5    be necessary and could be cumbersome to the Court, again,

6    if we were doing a similar approach as to what we

7    currently do.

8            However, if it were something that, again,

9    Mr. Hinckley were to share with his immediate team in

10   Williamsburg, his case manager specifically, that could

11   get passed on via fax or however to Dr. Johnson for their

12   regular meetings, that would be helpful.  It would not

13   overwhelm His Honor or the courts with too many of those,

14   and it would also provide some of the monitoring that the

15   hospital, Dr. Murphy, and Dr. Patterson have stated are

16   important for Mr. Hinckley.

17           MS. MERENE:  I have no further questions.

18           THE COURT:  Any questions?

19           MS. KENNEDY:  I just have one, Your Honor.

20           THE COURT:  Yes.

21                   CROSS-EXAMINATION

22           BY MS. KENNEDY:

23       Q.  Good afternoon, Mr. Hyde.

24           Whether this itinerary is done before

25   Mr. Hinckley goes down to Williamsburg or finishes a month

1  in Williamsburg or sends it up to D.C. after being down in

2  Williamsburg, you aren't going to be the one to write it;

3  is that fair to say?

4       A.   I guess it would be fair to say in this

5  hypothetical:  Mr. Hinckley has received convalescent

6  leave, he's no longer living here, and I'm no longer in

7  charge of the case.

8            MS. KENNEDY:  I have no further questions.

9            THE COURT:  Any questions?

10           MR. LEVINE:  No questions.

11           THE COURT:  I have a question that you may not

12  know the answer to.

13           Do you know anything more about the review

14  board, FOPD, and how it operates or is going to operate

15  going forward?

16           THE WITNESS:  No.

17           THE COURT:  Sorry.  Thank you.

18           You may be excused.

19           (Witness excused.)

20           THE COURT:  Any other witnesses?

21           Nobody has any other witnesses?

22           MS. KENNEDY:  No.

23           THE COURT:  All right.  One of the things that I

24  would be curious about, Ms. Merene, is the new review

25  board, and I'm wondering whether you and Ms. Johnson could

1    get together -- and perhaps she's told us all there is to

2    be said about the new review board because there's been no

3    experience with it yet -- and she, I believe, testified

4    there were no rules and regulations governing it yet.

5            But I wonder who is on it, what their

6    backgrounds are, and how it's going to function in general

7    and specifically in this case.

8            And we can call Ms. Johnson back if she's got

9    anything to say about it right now.

10           MS. MERENE:  Because I thought she did identify

11   the particular physicians and their qualifications, and

12   she also talked about whether or not the individual who is

13   in the community requested a change or whether, you know,

14   that would go to the review board, and then they would

15   make a decision about whether or not they would approach

16   the Court with the request.

17           Did I misrepresent that?

18           THE COURT:  I don't know.

19           Dr. Johnson, why don't you come up a second.

20   Let me ask you a question.

21           THE COURT:  I guess we'll put you back under

22   oath for a minute and a half.  It won't take very long.

23

24

25

1                       * * * * * * * * * * * * * *

2          Thereupon,

3                       NICOLE JOHNSON,

4  Having been called as a witness on behalf of the Court and

5  having been first duly sworn by the Deputy Clerk, was

6  examined and testified as follows:

7          THE COURT:  So from your time at St. Elizabeths,

8  you knew how that review board functioned.

9          THE WITNESS:  Yes.

10          THE COURT:  So this new review board that you're

11  going to have deal with in your new position --

12          THE WITNESS:  Yes.

13          THE COURT:  -- are there any rules, regulations,

14  or memoranda about how it's supposed to function and in

15  what context and situations?

16          THE WITNESS:  It's a similar review board to the

17  hospital in terms of the decision-making and the

18  recommendations of the treatment team.  It's actually been

19  in existence for a couple years, so it's not brand-new.

20  It was prior -- the prior lead of the review board was

21  Cameron Ritchie.  She has since left DBH, and it's now run

22  by our chief officer.

23          There are no regulations that I'm aware of that

24  actually stipulate when they are called, but we use them

25  for -- basically any time they were going to make a

1    recommendation to the Court for a change, we call the

2    review board, we review the case with them, and they give

3    us our -- they give us recommendations to help us

4    formulate what we need to put in our report for the

5    request to go forward.

6            THE COURT:  So when Dr. Patterson testified, you

7    were here this afternoon?

8            THE WITNESS:  Yes.

9            THE COURT:  He thought that what ought to

10   happen, I think I'm paraphrasing this correctly, is if you

11   learned something in your telephone conversations with

12   Mr. Hinckley or in your monthly meetings with Mr. Hinckley

13   that gave you concern or pause or something extremely

14   positive that made you think there ought to be a change or

15   if you learned something through your interaction with

16   Dr. G.G. or others in Williamsburg, either positive or of

17   concern that made you think that there ought to be a

18   change in conditions, that before you came to court, you

19   should go to the review board.

20           I think that's what he said.

21           Is that what you recall hearing him say?

22           THE WITNESS:  Yes.  If we want a definitive

23   change of the conditions, we usually do go to the review

24   board because they are our eyes and ears of things that we

25   might not recognize as the treaters.  They may be able to

1    point out and say, You actually should do this first

2    before you ask for this change.

3              But for, like, hospitalizations, that kind of

4    stuff, we do that without going to the review board.

5              THE COURT:  Hospitalizations, like bringing

6    someone back to the hospital?

7              THE WITNESS:  Yes.  If someone is in violation

8    and we use a clinical judgment that they should come back,

9    I don't go to the review board for that.  I put out a

10   bench warrant and have them returned.

11             THE COURT:  One reason would be that there's an

12   urgency to that.

13             THE WITNESS:  Yes.  Usually, there is.

14             But we do go to them whenever there's any

15   significant change we want to make in the orders that have

16   been given by the Court.

17             THE COURT:  So you anticipate --

18             THE WITNESS:  Yes.  We do that with all of our

19   current consumers.

20             MS. MERENE:  If I can make a proffer --

21             THE COURT:  Why don't you come to the mic.

22             It would help the court reporter.

23             MS. MERENE:  Your Honor, I just wanted to make a

24   proffer that there is a review board policy that exists at

25   the agency that provides guidelines.

1          THE COURT:  Could you -- assuming there's no

2    objection by either side, could we give it an exhibit

3    number, or can you e-mail it to me and to the parties and

4    we'll give it an exhibit number next time we come to

5    court?

6          MS. MERENE:  Yes.

7          THE COURT:  Send Dr. Johnson a copy.

8          Any questions for Dr. Johnson?

9          All right.  Thank you.

10          (Witness excused.)

11          THE COURT:  So the next question is:  When do we

12    want to do closing arguments?

13          I think we agreed we don't want to do them

14    tomorrow.

15          MS. KENNEDY:  No, please.

16          THE COURT:  And I think we've agreed we don't

17    want to do them Friday.

18          MR. LEVINE:  Could we do Friday morning,

19    Your Honor?

20          THE COURT:  I thought you were getting on a

21    plane.

22          MR. LEVINE:  I am, Friday afternoon.  The

23    following week, I'm not available.

24          THE COURT:  I understand.  I was going to -- the

25    following week, you're not available.  I am available the

134

1    entire week of May the 11th.

2            MS. KENNEDY:  I'm in court in the morning,

3    Your Honor, on Friday.

4            THE COURT:  You can come up here a second.

5            MS. KENNEDY:  I'm in court Friday morning.

6            THE COURT:  This Friday?

7            MS. KENNEDY:  Yes, the 1st.  I don't know how

8    long it's going to go, but whenever I say it's going to be

9    limited, it always goes longer, and it's Superior Court.

10           I'm totally available the week of the

11   11th also if that's -- except Friday, I'm not.

12           Would it be possible, Your Honor, the 11th or

13   the 12th or the 13th?

14           MR. LEVINE:  Your Honor, is there any way we can

15   do it this week and end this case?

16           THE COURT:  It's not going to end this case.

17   You all are still going to have --

18           MR. LEVINE:  The evidence.  And then I think all

19   the work is yours.

20           THE COURT:  No.  You're going to have to draft

21   an order for me that you're going to agree on.  You're

22   going to have to prepare spreadsheets or charts that

23   you're going to agree on.  You're going to file a motion

24   for disqualification if you want to pursue that.

25           I don't think I can do anything until I have an

1    order that you've all agreed upon.  I think it would also

2    help me to have spreadsheets or a chart that sets out the

3    recommendations of the hospital in their two letters, the

4    agreements or disagreements of the hospital with the

5    additional conditions, Dr. Murphy's conditions and how

6    they fit in with the other conditions so that you got a

7    chart of where there's fundamental agreement on condition

8    X between hospital, Murphy, government.  And, you know, to

9    the extent that Murphy agrees with Condition No. 5 that

10   has, you know, some nuanced suggestions, who is

11   responsible for what.

12            It would be great to have all that in one

13   spreadsheet that either the government could prepare

14   initially and Mr. Levine's team could review or vice

15   versa, and then somebody could take the laboring on the

16   order.

17            So I think there's a lot to be done.  It could

18   be done before and after closing arguments, but I don't

19   know why --

20            MS. KENNEDY:  We'll be here for a long time,

21   Your Honor.

22            THE COURT:  If we're not doing it tomorrow and

23   Ms. Kennedy is going to be in court Friday morning and

24   you're going to be on a plane Friday afternoon, I'm not

25   sure where that leaves us.

1          MS. KENNEDY:  Since we're going to be here for

2     the rest of our lives anyway, I think if we do it the

3     11th or that week sometime, it will keep it fresh in our

4     memories as we're trying to go through everything else

5     that Your Honor would like from us.

6          THE COURT:  If you're doing the order and the

7     spreadsheets, you can also be preparing for closing

8     arguments.

9          MS. KENNEDY:  Yeah.  We could be doing

10    everything.

11         THE COURT:  I'm serious.

12         MS. KENNEDY:  I know.  We'll be doing it.

13         THE COURT:  Eleventh, 12th, 13.

14         MR. LEVINE:  I suggest the 12th, Your Honor, at

15    10:00.

16         THE COURT:  I have something at 10:00.  I could

17    start at 11:00.

18         MS. KENNEDY:  Okay.

19         MR. LEVINE:  The 11th.

20         THE COURT:  Maybe I'll move it to 10:00.

21         What's at 10:00, Michelle?

22         MR. LEVINE:  Your Honor, 11:00 is fine.  You

23    don't have to change it.

24         THE COURT:  Then we'll get into lunch and take a

25    break.  If we start at ten, it's possible to finish before

1    lunch, although I won't put time limits on you.

2                (Discussion held off the record.)

3                THE COURT:  So we'll move my criminal case to

4    either the 11th or the 13th or the 14th, and we will

5    convene here at 10:00 for closing arguments in this matter

6    on May the 12th.

7                And I won't give you a deadline for drafting the

8    order or the spreadsheets or the charts or the chart or

9    whatever we're going to call it, but I really would like

10   you to do that.  And maybe, Mr. Levine, while you're away

11   on other matters, Ms. Luciano or Ms. Tupper Butler can

12   work with the government's people to try to figure out

13   what the order looks like and what the chart looks like.

14               MS. KENNEDY:  Your Honor, I guess --

15               MR. LEVINE:  So we're set for May 12 at 10:00,

16   Your Honor?

17               THE COURT:  Yes.

18               MS. MERENE:  May I approach?

19               THE COURT:  Is that all right with you,

20   Ms. Merene?

21               MS. MERENE:  Yes.

22               THE COURT:  And you want to approach, alone?

23               MS. MERENE:  No.  I wanted to make a request of

24   the Court --

25               THE COURT:  Yes.

138

1          MS. MERENE:  -- not approach-approach.

2          Yes, Your Honor, I just wanted to renew the

3  hospital's request to reduce some of the reporting

4  requirements.  I know the Court declined to make a ruling

5  previously.  That was filed, I believe, in November.  I'm

6  not sure at what point you'll take that up.  But because

7  it might be a while before we get to a new order, I'm just

8  asking that the Court again consider.

9          THE COURT:  So you filed something, that

10 request --

11         MS. MERENE:  Yes.

12         THE COURT:  -- and the government responded?

13         MS. KENNEDY:  Yes.  You denied it.

14         THE COURT:  I denied it?

15         MS. KENNEDY:  You did.

16         MS. MERENE:  But the government's response is:

17 Let's just wait until we have --

18         MS. KENNEDY:  An order.

19         THE COURT:  Will somebody, before you leave this

20 courtroom if possible or, if not, e-mail me or e-mail my

21 clerk tomorrow, remind me what -- if I'm going to revisit

22 that, what docket entries do I need to look at to see

23 precisely, because I remember more than one request.

24         One had to do with the Internet; one had to do

25 with reporting requirements; and then I wrote something,

1    and I wrote an opinion or two; and then I had a minute

2    order too.

3                So if someone or some -- or you and one person

4    from the government's team could get together and come up

5    with a list of the docket entries I should look at in

6    order to consider this oral motion, just e-mail it to

7    Nick, and we'll look at it.

8                MS. MERENE:  Thank you.

9                THE COURT:  All right.  So we'll see you then.

10               Happy anniversary.

11               MS. KENNEDY:  Thank you, Your Honor.

12               MR. LEVINE:  I join in that.

13               MS. KENNEDY:  Thank you very much.

14               (Proceedings adjourned at 5:22 p.m.)

15

16               CERTIFICATE OF OFFICIAL COURT REPORTER

17

18               I, Barbara DeVico, certify that the foregoing is

19    a correct transcript from the record of proceedings in the

20    above-entitled matter.

21

22

23

24    _____        6-16-14

25    SIGNATURE OF COURT REPORTER                DATE