IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,           )      CR No. 81-306
                                    )
          Plaintiff,                )      Washington, D.C.
                                    )      April 22, 2015
                                    )      9:30 a.m.
     vs.                            )
                                    )      Morning Session
JOHN W. HINCKLEY, JR.,              )
                                    )      Day 1
          Defendant.                )
_____)


TRANSCRIPT OF EVIDENCE HEARING
BEFORE THE HONORABLE PAUL L. FRIEDMAN
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Government:           U.S. ATTORNEY'S OFFICE.
                              COLLEEN KENNEDY, AUSA
                              MARK AZIZ, AUSA
                              MICHELLE CHAMBERS
                              555 Fourth Street, NW
                              Washington, D.C.  20530
                              (202)514-7248


For the Defendant:            DICKSTEIN SHAPIRO, LLP
                              BARRY WILLIAM LEVINE
                              ANN MARIE LUCIANO
                              1825 Eye Street, NW
                              Washington, D.C.  20006-5403
                              (202)420-2237

                              DINSMORE & SHOHL, LLP
                              E. MICHELLE TUPPER-BUTLER
                              101 S. Fifth Street.
                              Suite 2500
                              Louisville, KY 40202
                              (502)540-2367

APPEARANCES CONTINUED:

For St. Elizabeths:          ST. ELIZABETHS HOSPITAL
                             DEON MERENE, ESQ.
                             1100 Alabama Avenue, SE
                             Washington, D.C. 20032

Court Reporter:              William P. Zaremba, RMR, CRR
                             U.S. Courthouse
                             333 Constitution Avenue, NW
                             Room 6511
                             Washington, D.C. 20001
                             (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

- - -

WITNESS INDEX

- - -

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| DEFENDANT'S: | | | | |
| SCOTT HINCKLEY | 33 | 50 | 87 | 92 |
| SCOTT HINCKLEY | | | 94 | |
| DIANE SIMS | 97 | 106 | 148 | |

1             P R O C E E D I N G S

2             DEPUTY CLERK:  Please be seated and come order.

3             Criminal 81-306, United States of America versus

4     John W. Hinckley, Jr.

5             Counsel, please identify yourselves for the

6     record.

7             THE COURT:  Do you have -- excuse me a second.

8             Do you have a schedule for me?

9             (Pause)

10            MS. KENNEDY:  Good morning, Your Honor.

11    Colleen Kennedy on behalf of the United States.

12            MR. AZIZ:  Good morning, Your Honor.  Mark Aziz

13    for the United States.

14            MR. LEVINE:  Please the Court, I'm Barry Levine

15    from Dickstein Shapiro on behalf of Mr. Hinckley.  And with

16    me, going to introduce herself.

17            MS. LUCIANO:  Good morning, Your Honor.  Ann-Marie

18    Luciano, Dickstein Shapiro.

19            MS. BUTLER:  Good morning, Your Honor.

20    Michelle Tupper Butler, now with the firm of Dinsmore &

21    Shohl.

22            THE COURT:  Okay.

23            MS. KENNEDY:  I'm so sorry.  I neglected

24    Michelle Chambers, who is our paralegal in the office.

25            MS. BUTLER:  Your Honor, Deon Merene, deputy

1    general counsel, Department of Behavioral Health,

2    St. Elizabeths Hospital.

3              THE COURT:  Good morning.

4              If we're not going to use this overhead thing,

5    maybe somebody could lower that.  I feel like I have this

6    barrier between me and everybody else.

7              And good morning, Mr. Hinckley.

8              THE DEFENDANT:  Good morning.

9              THE COURT:  So let me just, by way of

10   introduction, say a couple things.  We're here on the

11   petition of the hospital under, I guess, it's 24 D.C. Code,

12   Section 501(e), their E-letter.  This is not the first time

13   we've been here on a petition from the hospital.

14             Beginning in 2003 -- I guess we begin in 1981.

15   Mr. Hinckley was found not guilty by reason of insanity in

16   1982.  He's been in St. Elizabeths Hospital ever since.

17   Obviously, this all arose from the shooting of

18   President Reagan and Mr. Brady and others from the Secret

19   Service and the FBI.  So he's been in St. Elizabeths

20   Hospital, having been found not guilty by reason of

21   insanity, since then.

22             Under the D.C. code, a patient is permitted to

23   file what's called a K motion or petition, and the hospital

24   is permitted to file an (e) letter petition every so often;

25   I can't remember -- Ms. Kennedy is the expert on this

1    statute -- whether it's every six months or every two

2    months.

3            But the point is that if the patient can

4    demonstrate to the Court that he is no longer mentally ill

5    and no longer a risk to himself or to others, then the Court

6    is to consider whether less onerous conditions of -- than

7    just confinement at the hospital are appropriate.

8            So beginning in 2003, Judge Barrington Parker was

9    the Trial Judge.  After Judge Parker's death, Judge June

10   Green had the case.  Maybe that's good news.  June Green

11   lived a long life, so maybe that will say something about my

12   future.

13           But June Green had the case for a long time.  And

14   after Judge Green died, it came to me randomly.  And I think

15   there was some intervening law from the D.C. Circuit that

16   suggested that possibly some things that she had -- requests

17   she had denied might have been appropriate at least to

18   consider.

19           So in 2003, after a hearing with evidence,

20   I permitted Mr. Hinckley to spend a number of weekends with

21   his parents in the D.C. area, I think, within 50 miles of

22   the Capitol, reporting in.  There were conditions and

23   checking in with the hospital during the course of the

24   weekend.

25           And there have been successive extensions of those

1   first visits.  And we've gone through four phases.

2   The first visits were called Phase 1; the second, Phase 2;

3   then Phase 3; Phase 4, from 2003 to 2013.  Each time the

4   hospital's filed a petition.  Sometimes Mr. Hinckley,

5   through Mr. Levine, has filed a K letter, K motion,

6   sometimes just joined in the hospital's petition.

7           We've always had an extensive hearing, with

8   testimony from people from St. Elizabeths Hospital, the

9   government's -- the United States government's expert,

10  Dr. Patterson, is here.

11          Good morning, Dr. Patterson.

12          DR. PATTERSON:  Good morning, Your Honor.

13          THE COURT:  And with us for all of those hearings

14  too is a friend of Dr. Patterson's, a friend of all of ours,

15  Dr. Phillips, also an eminent psychiatrist and scholar in

16  the field and with a résumé we all admired and a disposition

17  we all admired, who, sadly died suddenly within the last

18  year.  And so Dr. Phillips is not with us for this hearing.

19          Mr. Hinckley's mother has testified on occasion.

20  Mr. Hinckley's brother, who's here.

21          Good morning, Mr. Hinckley.

22          MR. SCOTT HINKLEY:  Good morning.

23          THE COURT:  Mr. Hinckley's sister has testified.

24  Good morning.

25          MS. DIANE SIMS:  Good morning.

1          THE COURT:  And each occasion, I've had a

2     difficult decision to make.  And on each occasion, I guess

3     on each occasion, I've expanded the privileges to certain

4     for -- first, four nights, then more than that.  And always

5     with a minimum number of visits before Mr. Hinckley or the

6     hospital could return, always with an extensive opinion in

7     which I described the factual basis based on hearings which

8     have lasted a minimum of three or four days and a maximum

9     of, I think, 11 or 12 days.

10          And each time I have made findings of fact about

11    his mental health and about his, the risk of danger, and

12    about the conditions that have been proposed by the hospital

13    and usually more stringent conditions proposed by the

14    government and Dr. Patterson and Dr. Phillips.  And I've

15    made my own independent determination as to how much --

16    whether to expand and how much to expand the privileges, if

17    that's the right word, and what conditions to impose.

18          And you can read my opinions and the orders that

19    accompanied them.  And they have been very extensive

20    conditions, which have only been relaxed as, in my view, the

21    facts warranted.

22          Phase 4 visits or trips to his mother's community

23    were originally for ten days a month.  Now they're for 17

24    days a month.  And this is what all of the professionals

25    have called the transitional phase, which I think everybody

1   agrees, means transition to what?  Transition to ultimately

2   becoming an outpatient from the hospital.

3          And during this transitional phase -- and there

4   have probably been two or three phases to Phase 4 -- Mr.,

5   you know, Mr. Hinckley, every time he goes out, he and the

6   treatment team at St. Elizabeths prepares a detailed

7   itinerary, which he's not supposed to deviate from.  He has

8   a limited period of time away from his mother's home.

9          But that time is increased because the whole

10  purpose was to see if Mr. Hinckley could integrate himself

11  into the community and develop some social and work-related

12  relationships.  And so he -- and there will be testimony

13  about all of this, I'm sure.

14         And I get monthly written reports, as does the

15  United States government and the hospital.  I mean, they're

16  reports from the hospital.

17         And he's done volunteer work, and he's developed

18  or increased his involvement in longtime interests like

19  music and art.

20         So there have been -- the filings to date with

21  respect to this hearing have all been under seal, which has

22  been true in the prior hearings too, where all or most of

23  the filings have been under seal, and, ultimately, they are

24  released in redacted form.  But that doesn't do anybody any

25  good who wants to write an article about it, because it

1    doesn't happen until well after the hearing is over.

2              But essentially -- and then we'll let the lawyers

3    say whatever they want to say preliminarily, and then we'll

4    have opening statements, I guess.

5              The conditions under which Mr. Hinckley has

6    operated since early 2014 are set forth in my opinion of

7    December 20, 2013, and my order of February 26th, 2014.

8    They're very extensive conditions, and they run about nine

9    pages.  There are 29 conditions.

10             December 19th of 2014, the hospital filed what we

11   call the E-letter, in which they have recommended that I

12   grant convalescent leave to Mr. Hinckley.  Again, as

13   I understand it -- and the lawyers know this better than I

14   do -- there's conditional release, unconditional release,

15   and convalescent leave.

16             Convalescent leave essentially means that his

17   residence will be with his mother and not at St. Elizabeths

18   Hospital, with conditions.  It's not unconditional release.

19   It's with conditions.

20             And the hospital laid out in its E-letter a series

21   of proposed conditions.  The hospital then filed a second

22   letter, dated March 20, 2015, with additional conditions.

23             The government filed its response on April 10th,

24   2015.  That response followed a written report from

25   Dr. Patterson.  Dr. Patterson will testify, I'm sure, about

1   the extensive work he did in developing his report, and what

2   conclusions he reached and what he recommends.  And the

3   hospital's response was written after its expert's report

4   was completed.

5           Prior to Dr. Patterson's report, there was a risk

6   assessment report done by Dr. Katherine Murphy, who had done

7   a previous -- psychologist who had done a previous risk

8   assessment.  So the government filed its response on April

9   the 10th.  And then Mr. Levine, on Mr. Hinckley's behalf,

10  filed a reply or response or reaction to that on April 17th.

11  And the hospital filed an additional document, in which it

12  reacted to the government's proposed conditions.  So that's

13  where we are.

14          And over the next few days, I think the plan is

15  we'll hear opening statements from Mr. Levine on behalf of

16  Mr. Hinckley; Ms. Kennedy, on behalf of the United States;

17  Ms. Merene, on behalf of St. Elizabeths Hospital, if she

18  chooses to make an opening statement or supplement what the

19  other lawyers have said.  And then we are likely to hear

20  from Mr. Hyde from the hospital and Dr. Murphy, and,

21  perhaps, one or two others from the hospital.

22          On Friday, we will by video, in courtroom No. 5,

23  hear from two of the treatment team from Virginia, Dr. --

24  the doctor, the psychiatrist whose name none of us can ever

25  pronounce.  So with her permission, she is always referred

1   to in these proceedings as "Dr. G-G."  Somebody, I think,

2   can pronounce her name.  I can't.  And Mr. Weiss, who's the

3   case manager in Virginia.

4           And then we'll hear from Mr. -- then we'll hear

5   from Dr. Patterson.  I think that's the order.

6           So I probably said all or more than I need to say.

7           Mr. Levine, is there anything preliminarily we

8   want to talk about before we do the --

9           MS. KENNEDY:  Yes, Your Honor.

10          THE COURT:  Could you come to the microphone.

11  It's just easier for the Court Reporter, Ms. Kennedy.

12          MS. KENNEDY:  I wondered if Mr. Levine,

13  Ms. Merene, and myself could approach very briefly.

14          THE COURT:  Sure.

15          (Bench conference)

16          THE COURT:  Yeah.  Mr. Hinckley has got a headset.

17  That's fine.

18          MS. KENNEDY:  Oh, okay.  He can hear all right?

19          MR. LEVINE:  There is a way to get rid of all of

20  us, Judge.

21          MS. KENNEDY:  Your Honor, I just wanted to bring

22  up to make clear that the conference calls that we had are

23  still under seal and that they're not going to be referred

24  to as to the content of those conference calls until you

25  lift the seal at the end of the hearing.

```
1              THE COURT:  Why does it matter if -- I mean, what
2    are we concerned about?
3              MS. KENNEDY:  I think it matters as far as the
4    negotiations, like a plea negotiation and not having that
5    come out before a trial.
6              THE COURT:  And I'll add something to that.
7    You don't intend to say -- you don't intend to argue, for
8    example, that in early conference calls it looked like you
9    were all going to be on the same page and then you weren't.
10   I mean, I know that.  It's not important.
11             What's important is what the government's position
12   is today.  And some of what Ms. Kennedy may have said
13   beforehand, you know, was before she had seen
14   Dr. Patterson's report.
15             MR. LEVINE:  Your Honor --
16             THE COURT:  I don't think that's relevant.
17             MS. KENNEDY:  Certainly, you can argue
18   Dr. Patterson's report, which is out there.  But I just feel
19   since it's still under seal, I don't think it's appropriate.
20             MR. LEVINE:  Your Honor, let me say, first, that
21   I did not contemplate making the argument Your Honor just
22   asked about.  So that ought to give people comfort.
23   The fact that documents in this case are under seal, every
24   document in this case is under seal, and --
25             THE COURT:  Of course.
```

1          MR. LEVINE:  -- every document is the subject of

2   fair inquiry.  There is a part of that April 7 call,

3   conference call, that I think is of some factual

4   significance, and I may want to make reference to that.

5          We'll see how the evidence unfolds.  But I may --

6   you know, we have had, and we continue to have, an issue of

7   candor with the Court.  And that issue continues.  And as

8   the government talks about deception, this issue of

9   deception applies also to the statements by the government

10  to the Court.  Of what use we'll make of that, we'll see.

11         THE COURT:  Very good.

12         Just let's try to avoid this sideshow stuff.

13         The reason the issue of candor on the part of the

14  government came up last time was because of some things that

15  were said in opening statement that set off the firestorm --

16         MR. LEVINE:  Correct.

17         THE COURT:  -- in Williamsburg, okay?  And,

18  therefore, it was relevant for you to deal with that.

19  I dealt with it in my opinion.

20         MR. LEVINE:  You did.

21         THE COURT:  I think I did.  I hope I did.

22         But anyway, I just I think we can -- we should

23  avoid -- let's try to stick to the heart of the matter.

24         MR. LEVINE:  We agree with that.  I think --

25         THE COURT:  We're closer than we've ever been

1    to --

2              MS. KENNEDY:  Yes.

3              THE COURT:  -- to -- there's not a consensus here,

4    but the parties are closer than they have ever been.

5              And so let's all try to be, while being zealous

6    advocates for our client, let's not be zealous where we

7    don't have to be and let's see if we can reach a result.

8              MS. KENNEDY:  Your Honor, I just want to say that

9    I would strongly object to any comment about the government

10   being deceptive to the Court.  I have been totally open

11   about this case with Mr. Levine, with Your Honor, and I just

12   think that's an unfair characterization.  So I would ask

13   that that not be stated in his opening, and we go on.

14             MR. LEVINE:  Your Honor, I think this entire

15   presentation is uncalled for.  I think I know how to behave.

16   I've always behaved properly in the Court.  I follow the

17   rules, and I'm prepared to follow the rules.

18             THE COURT:  All right.  Let's go.

19             MR. LEVINE:  Thank you.

20             While we're here --

21             THE COURT:  Colleen.

22             MR. LEVINE:  -- Your Honor, we're going to call

23   witnesses in a different order from the one you've just

24   identified, but we've advised the government of that.

25             THE COURT:  That's fine.

1          MR. LEVINE:  Okay.  We're going to lead with

2    Scott Hinckley and Diane Sims.

3          THE COURT:  Okay.  Fine.

4          I know you had them on the list, because you

5    weren't sure the last time.

6          MS. KENNEDY:  Okay.

7          MR. LEVINE:  Right.  Thank you.

8          (Open Court)

9          THE COURT:  All right.

10         Okay.  Are you ready?

11         MR. LEVINE:  Yes, Your Honor, of course.

12         Good morning, Your Honor, if it please the Court.

13         To supplement in part your very comprehensive

14   introduction to this case, this is the seventh round of

15   evidentiary hearings before Your Honor regarding

16   Mr. Hinckley's gradual reintegration into the Williamsburg

17   community.

18         In some respects, we believe that this will be the

19   least interesting of those hearings, because the important,

20   and what I believe to be mostly the contentious issues, have

21   largely been resolved.

22         Now we have broad agreement, I believe, by all of

23   the medical experts that Mr. Hinckley will not be a danger

24   to himself or others if this Court takes the next

25   incremental step and grants Mr. Hinckley convalescent leave,

1    and to allow him to live full time with his mother in

2    Williamsburg.  The only quibbles are regarding exactly what

3    the conditions should be imposed as part of the convalescent

4    leave.

5          So we'll hear a lot of testimony about logistics.

6    We'll hear testimony about funding.  We'll hear testimony

7    about GPS-enabled cell phones.  And we may even hear some

8    testimony about computer operating systems, might hear some

9    testimony about how often Mr. Hinckley should meet with

10   specific providers of mental health services.

11         But there is no dispute about a central fact, that

12   the psychosis and major depression that made Mr. Hinckley

13   dangerous in 1981 have been in full and stable remission for

14   over two decades.

15         There is no dispute that Mr. Hinckley has spent

16   literally hundreds, hundreds of days on conditional release

17   in Williamsburg or B-city visits in Washington.  And there

18   is no dispute that, indeed, Mr. Hinckley has spent, is now

19   spending the majority of his time outside of the hospital.

20   Likewise, there is no dispute that within that period of

21   time, there has not been a hint of dangerous behavior.

22         And, of course, I think most importantly, there is

23   no dispute that Mr. Hinckley is clinically ready for the

24   next incremental step in his treatment, which is

25   convalescent leave.

1          At every stage of this decades-long process, the

2     government expresses a myriad of concerns and questions.

3     It asks, what would happen if Mr. Hinckley left the

4     structured environment of the hospital?  What would happen

5     if Mr. Hinckley was permitted to walk around uncompanied for

6     hours at a time?  I think, as Mr. Zeno may have said years

7     and years ago, roam the streets of Williamsburg.

8          What would happen if Mr. Hinckley was approached

9     by the media?  What would happen if Mr. Hinckley experienced

10    unsuccessful relationships or rejections or rebuffs?

11    What would happen if Mr. Hinckley was permitted to obtain a

12    driver's license and drive himself in Williamsburg?

13    What would happen if Mr. Hinckley spent a majority of his

14    time in Williamsburg?

15         Well, now we know the answers.  We know all the

16    answers to all the questions.  And we know that the

17    government's dire warnings, its sense of foreboding at every

18    hearing was completely unfounded.  We know that Mr. Hinckley

19    confronted each of these challenges and successfully

20    overcame each of them.

21         So as Your Honor said before, we're here on the

22    hospital's petition, the (e) petition, to allow Mr. Hinckley

23    to begin the next incremental step of his reintegration into

24    the community and, under the plan proposed by the hospital,

25    live full time in Williamsburg, subject to a variety of

1    conditions and restrictions that will be, of course,

2    discussed at this hearing.

3            But contrary to the government's submission, the

4    standard here is not that we need to prove to a complete

5    certainty or even beyond a reasonable doubt that

6    Mr. Hinckley will not be a danger to himself or others under

7    these conditions.  Rather, as this Court has already held,

8    the Court need only determine by a mere preponderance of the

9    evidence, more likely than not, that Mr. Hinckley will not

10   be a danger to himself or others under the conditions

11   proposed by the hospital.

12           Mr. Hinckley has a right, a right grounded in the

13   constitution, to the least-restrictive environment,

14   consistent with public safety.  In other words, the Court is

15   required to grant Mr. Hinckley the maximum freedom that does

16   not endanger himself or the public.  The evidence will

17   clearly show that he's not a danger to himself or others

18   under the conditions the hospital's proposed.

19           You will hear from the hospital regarding

20   Mr. Hinckley's readiness for the next phase of his

21   transition into the community.  You will hear about his

22   unequivocal success on his previously -- in the previous

23   controlled experiments with ever-increasing freedoms.

24           You'll hear from the hospital as to why, in light

25   of Mr. Hinckley's mental status, in light of his impeccable

1    medication compliance record, in light of his long history

2    of successful conditional releases, as well as the strength

3    of his therapeutic relationships, that there is no concern

4    that Mr. Hinckley will be a danger to himself or others on

5    convalescent leave.

6            Indeed, Your Honor, this Court has already made a

7    number of key factual findings.  And we believe that those

8    findings, together with what Your Honor will hear this week,

9    will make this conclusion incontrovertible.

10           The Court has said that Mr. Hinckley's Axis I

11   diagnosis -- and we understand under DSM-5, they're evolving

12   away from some of the nomenclature of Axis I and Axis II.

13           But under Mr. Hinckley's Axis I diagnosis,

14   psychotic disorder not otherwise specified and major

15   depression, are in full remission and have been in full

16   remission for at least 20 years and, perhaps, 25 years.

17   That's what the Court has said several years ago.  So the

18   time period is still longer.

19           The Court said, Mr. Hinckley's narcissistic

20   personality disorder is, quote, significantly attenuated,

21   closed quote.

22           The Court said that Mr. Hinckley has exhibited no

23   evidence of delusional thinking in at least 25 years and no

24   evidence of obsessive conduct for at least 18 years, a

25   finding that is now longer in duration.

1          The Court said further that Mr. Hinckley has

2     exhibited no violent behavior, nor attempted suicide in

3     three decades.

4          The Court went on to say and find as a fact that

5     Mr. Hinckley is at a low risk for decompensation; and if

6     Mr. Hinckley were to experience a relapse of his Axis I

7     disorders, the primary diagnosis, that relapse would be --

8     would not occur suddenly but, rather, would occur gradually,

9     over a period of at least weeks or months, and would be

10    detectable by treatment providers.

11          And the Court said further that Mr. Hinckley has

12    never tried to escape from the hospital or when on B-city

13    outings or an unsupervised condition or release visits with

14    his family.  He has participated successfully in over

15    200 hospital-accompanied outings in the community without

16    incident.  He has participated successfully in all of the

17    Phase 1, Phase 2, Phase 3, and Phase 4 conditional releases

18    authorized by this Court.

19          So, Your Honor, even Dr. Patterson, the

20    government's expert, who has opposed each and every

21    expansion of Mr. Hinckley's liberty dating back to the

22    1990s, now agrees that Mr. Hinckley is clinically ready for

23    convalescent leave, for living full time in Williamsburg.

24          And, of course, no hearing would be complete

25    without Dr. Patterson's ritual airings of concerns about his

1    specificity and details of the hospital's plan.  But I am

2    sure you will hear that those concerns are properly

3    addressed.

4           The critical point here is this:  Dr. Patterson

5    agrees with the hospital's clinical assessment.  He is ready

6    for full time in Williamsburg.

7           Now, to be sure, as we've said, there will be a

8    dispute about conditions.  The government will ask for the

9    most draconian, gratuitously burdensome, wholly punitive

10   conditions imaginable.  But on the issue of dangerousness,

11   there is no dispute he is clinically ready for convalescent

12   leave.

13          There will be testimony from the hospital and the

14   treatment team members from Williamsburg about the proposed

15   conditions.  And those conditions are deemed by them, and we

16   suspect the Court to be sufficient.

17          Your Honor, the siblings will testify in this

18   case, both Scott Hinckley and Diane Sims.  And you will hear

19   evidence about the family's unwavering commitment to the

20   long-term success in Williamsburg and the plans that they

21   have should Mrs. Hinckley become unavailable.

22          You will hear about the family's love for John.

23   You will hear about the family's moral commitment to John.

24   You will hear about the family's emotional commitment to

25   John.  And you will hear about the family's financial

1    support for John.

2           At the end of the testimony of this hearing,

3    Your Honor, we are confident that this Court will be

4    convinced by far more than mere preponderance that

5    Mr. Hinckley will not be a danger to himself or others under

6    the conditions proposed by the hospital in the context of

7    convalescent leave.

8           Thank you, Your Honor.

9           THE COURT:  Thank you, Mr. Levine.

10          Ms. Kennedy.

11          MS. KENNEDY:  Good morning, Your Honor, may it

12   please the Court and counsel.

13          We are here today because St. Elizabeths Hospital

14   has requested Mr. Hinckley's release to live in

15   Williamsburg, Virginia.  The hospital has set forth

16   conditions that Mr. Hinckley is to follow while in

17   Williamsburg included in three letters sent to the Court,

18   dated December 19th, 2014; March 20th, 2015; and April 17th,

19   2015.

20          It is the government's position that the hospital

21   conditions are inadequate; lacking in structure, planning,

22   supervision; and, most importantly, lacking in risk

23   management in order to keep the community safe.

24          Mr. Hinckley's history is more than significant.

25   He attempted to assassinate the President of the

1    United States in 1981.  He also shot Press Secretary James

2    Brady in the head, who thereafter lived a torturous and

3    paralyzed life until his death this past year, which was

4    ruled a homicide as a result of Mr. Hinckley's actions.

5              And let us not forget that two law enforcement

6    officers were shot that day by Mr. Hinckley, who now live

7    out of the state due to their experience that day.

8              No other patient at St. Elizabeths Hospital was

9    found not guilty by reason of insanity for the attempted

10   assassination of a sitting president, press secretary, and

11   two law enforcement agents.  No other patients at the

12   hospital have had the privileges that Mr. Hinckley has had.

13   No other patients from the hospital have lived in a gated

14   community in Williamsburg, with full out-of-state visiting

15   privileges 17 days a month.

16             Moreover, Mr. Hinckley has been involved in

17   deviant conduct since his admission to the hospital,

18   including keeping photos of a celebrity in his room, against

19   the hospital prohibitions; writing letters both to

20   Charles Manson and Ted Bundy; stalking a female hospital

21   employee; inappropriate conduct towards a female hospital

22   dentist; and as recently as 2011, he lied to his treatment

23   team in telling them that he went to a movie rather than a

24   bookstore, where he was seen standing in front of a shelf

25   looking at books on presidents and presidential

1   assassinations.

2            And all of this was in violation of his itinerary,

3   which he was to have followed while in Williamsburg.

4   The only reason it was discovered and that he was discovered

5   at the bookstore was that the Secret Service happened to be

6   observing him that day.

7            And as recently as January 15th, 2015,

8   Mr. Hinckley, again, violated his itinerary in going to see

9   someone who owns a music studio about recording his music,

10  when, in fact, his itinerary indicated he was to be with a

11  photographer at his home at that time.

12           Mr. Hinckley did not call the hospital to inform

13  the hospital of this violation until the next day.

14           Neither the December 19th, March 20th, or April

15  17th letters of the hospital provide a current risk

16  assessment plan.

17           It is not the government's responsibility to draft

18  a structured and secure plan for Mr. Hinckley to live in

19  Williamsburg, though that is exactly what we have done in

20  setting forth at a minimum 35 conditions that we feel are

21  imperative and must be imposed for the Williamsburg

22  community and other communities to remain safe, should

23  Mr. Hinckley be granted a conditional release to live in

24  Williamsburg full time.

25           All of the hospital's 19 conditions listed in

1   their letters have been incorporated into the government's

2   response; however, the hospital and defense rejects the

3   government's 17 other suggested conditions.

4         Mr. Levine is correct:  The burden is on the

5   defendant to show that he would no longer pose a danger to

6   himself or others if released under the conditions proposed

7   in the hospital letters.  The government submits that this

8   same burden is placed on the hospital; but under the

9   hospital's conditions as proposed, this burden has not been

10  met.

11        And just as a small example, the 17 conditions

12  rejected both by the hospital and the defense should be

13  included in any plan contemplating Mr. Hinckley's release to

14  the community.

15        First, Mr. Hinckley should have at a minimum,

16  weekly phone calls to the outpatient division and monthly

17  visits to the District of Columbia indefinitely, not just

18  for a few months, as proposed by the hospital.

19        Mr. Hinckley should have weekly, not bi-weekly

20  visits, with his treating psychiatrist in Williamsburg.

21  Both the defense and the hospital are opposed.

22        If Mr. Hinckley is released, there must be more

23  oversight than is provided in the hospital plan of reviewing

24  all of Mr. Hinckley's activities, any employment, any

25  romantic or other relationship, all doctor and therapist

1    appointments, all recreation activities, and any other daily

2    and weekly activity that he engages in.

3            The hospital has not provided any risk management

4    plan, particularly if a therapist or a treating doctor of

5    Mr. Hinckley's can no longer treat him.  Already one

6    therapist has retired on his team, though he continues to

7    see Mr. Hinckley.  And another may retire as soon as one to

8    two more years.

9            There's no provision in the plan if Mr. Hinckley

10   loses family financial support.  We know his mother's house

11   may be sold when she becomes unavailable, but there are no

12   plans by the hospital at the present time as to what will

13   happen.  No plan B.  No plan of perhaps returning to the

14   District of Columbia.  Neither the hospital nor the

15   defense -- both, in fact, oppose this plan.

16           Mr. Hinckley's brother, Scott Hinckley, who has

17   been devoted to Mr. Hinckley since this occurred 35 years

18   ago, indicated to both Dr. Murphy and Dr. Patterson that

19   there's only enough family money to support Mr. Hinckley in

20   Williamsburg for about two, perhaps three more years.

21   Then what?  What is Mr. Hinckley supposed to do?

22   The hospital has made no plans for housing in Williamsburg

23   or in the District of Columbia.  Both the hospital and the

24   defense are opposed to making any such plan now.

25           No evidence has been provided by the hospital as

1    to what, if any, federal or Virginia state benefits,

2    including medical service, Medicaid, Social Security, would

3    be available to Mr. Hinckley in Williamsburg.  Both the

4    defense and the hospital oppose making a plan now.

5         Where will Mr. Hinckley's income come from if he's

6    released and the family funds expire?  The financial support

7    will no longer be there, according to Mr. Hinckley, or will

8    be substantially less.  And the family at present pays 5- to

9    $10,000 a month in psychiatric care for treatment programs,

10   therapy, and Mr. Hinckley's personal bills.  Both the

11   defense and the hospital oppose making any plan now.

12        Can a minimum job sustain Mr. Hinckley?  No.

13   What if any low-rent housing is in Williamsburg?  What can

14   he afford?  Has anyone looked?  Is he entitled to Section 8

15   housing?  It's not in the hospital's report.  Both the

16   defense and the hospital oppose looking at that at this

17   time.

18        There are no requirements for meeting with the

19   Williamsburg team and the D.C. team together.  In fact,

20   neither team have ever met together over all the years of

21   treating Mr. Hinckley.

22        If Mr. Hinckley is going to Williamsburg, some of

23   the Williamsburg team have never spoken to anyone at the

24   hospital.  If he's granted release, Mr. Hinckley should meet

25   with all the therapists in Williamsburg at least once a week

1    until further order of this Court, not the hospital.

2    Both the Defense and the hospital oppose that condition.

3             There's no plan at the present time for any

4    itineraries to be submitted by Mr. Hinckley to the hospital

5    or the Williamsburg providers.  Both the defense and the

6    hospital oppose that at this time.  That is an irresponsible

7    and significant risk to the community, as well as

8    Mr. Hinckley.

9             Now the hospital has a detailed itinerary; and if

10   it is not followed, the hospital is notified and individuals

11   know that it's not being followed.  Even with such an

12   itinerary in 2011, Mr. Hinckley violated it.  And the only

13   way anyone knew was that the Secret Service had been

14   monitoring him.

15            With no plan in place, Mr. Hinckley can drive

16   anywhere at any time.  No one's watching him.  The hospital

17   believes he should be able to go 50 miles outside the

18   circumference of Williamsburg.  The government does not

19   agree.

20            What about an ankle bracelet?  Both the defense

21   and the hospital are opposed.

22            What is going to keep track of Mr. Hinckley since

23   he will be entirely free in Williamsburg and, according to

24   the hospital, having no itinerary and no supervision?

25            What about the Internet being reviewed by the law

1  enforcement rather than the hospital?

2          Dr. Johnson is the doctor who's been assigned to

3  this case, head of outpatient.  Unfortunately, the

4  outpatient division is not part of St. Elizabeths Hospital

5  any longer.  They're not on the same campus.  They are

6  several miles away.  And if it there are any problems with

7  Dr. Johnson's job or her oversight, that is reported to the

8  department of behavioral health.  That is not acceptable.

9          Over the last several years, Mr. Hinckley has had

10  contact significantly with his inpatient team at the

11  hospital.  He is very close to some of his members, and yet

12  the hospital at this time indicates that there will be no

13  contact.  And if there is any contact with a member,

14  it would be only for three months.  This is very

15  problematic, considering relationships for Mr. Hinckley are

16  hard to make and to forge and are hard if it is broken up.

17          We are sending Mr. Hinckley into Williamsburg full

18  time, if that's what this Court orders, without any contact

19  from his inpatient team.  And with Dr. Johnson, who has met

20  him for the first time last week, she has not met with the

21  treatment team down in Williamsburg, not without a lack of

22  trying.  She's never been invited to meet with the treatment

23  team at the hospital, where all the inpatient contacts have

24  been for Mr. Hinckley.  She's not had an opportunity to

25  review 35 years of history at this particular point, and

1   this is not her fault.

2          She is overseeing over 80 patients as the

3   outpatient director.  She must do over 80 patients of

4   outpatient paperwork.  She's responsible for all emergencies

5   that occur with outpatients, including admissions.  And to

6   take on Mr. Hinckley is something she did not ask for.

7          She looks at this responsibility very seriously,

8   but she has no help.  She has no contact from the inpatient

9   division at the hospital.  She has no one from the treatment

10  team advising her.

11         More structure, supervision, and accountability

12  are needed in this plan.  For Mr. Hinckley to be released,

13  at the very minimum, all 35 conditions should be included in

14  such a plan, as well as other conditions imposed by this

15  Court.

16         If this plan is to succeed, it is only with a

17  tightly structured, danger-free plan that included an

18  itinerary, at least for a period of time.  Unfortunately, we

19  know the violence Mr. Hinckley has caused when he's had no

20  structure, no supervision, and no accountability.  Now is

21  not the time to loosen the reins of the hospital and cause

22  Mr. Hinckley to deteriorate or to fail, because he is placed

23  in Williamsburg with no supervisions.

24         The hospital plan at present is not feasible; it's

25  not safe.  They're abrogating its responsibility for the

1    treatment, care, and oversight of Mr. Hinckley to the

2    Williamsburg providers, who we all know have no allegiance

3    to this Court and are not under this Court's jurisdiction.

4          If the Court is inclined to grant the release of

5    Mr. Williams -- excuse me, Mr. Hinckley, we would ask not

6    only that every single condition is imposed along with the

7    hospital conditions that the Court, as it has done in the

8    past, look very seriously at what will keep Williamsburg and

9    Mr. Hinckley safe.

10         At this particular time, we do not believe that

11   the defense or the hospital can show that he would no longer

12   pose a danger to himself or others with these very limited,

13   limited conditions.  Thus, the government would ask that

14   under this present plan, the defense and hospital's request

15   for convalescent leave be denied.

16         MR. LEVINE:  The Court's indulgence for a moment,

17   please, Your Honor.

18         If it please the Court, if the Court is prepared

19   to hear evidence at this time, we would call the first

20   witness.

21         THE COURT:  Ms. Merene, is there anything you want

22   to add on behalf of the hospital?

23         MS. MERENE:  Not at this time, Your Honor.

24         THE COURT:  Okay.  Thank you.

25         All right.  You may call the first witness.

```
 1              MR. LEVINE:  Call Scott Hinckley, Your Honor.
 2              MR. AZIZ:  Your Honor, may we ask that the Court
 3    to impose the rule on lay witnesses?
 4              MR. LEVINE:  Really?
 5              THE COURT:  Who are the lay witnesses we're
 6    concerned about?
 7              MR. AZIZ:  Just Ms. Diane Sims.
 8              THE COURT:  You mean Ms. Sims?
 9              MR. AZIZ:  Yes.
10              THE COURT:  If you insist.
11              MR. LEVINE:  Your Honor, we oppose it.
12              THE COURT:  If you insist, fine.
13              MR. AZIZ:  Yes, Your Honor.
14              THE COURT:  Would you mind going to the witness
15    room, Ms. Sims.  Thanks.
16              MR. AZIZ:  Thank you, Your Honor.
17              (Witness is placed under oath.)
18              DEPUTY CLERK:  Please be seated.
19              MR. LEVINE:  If it please the Court?
20              THE COURT:  Yes, sir.
21                             - - -
22    SCOTT HINCKLEY, WITNESS FOR THE DEFENDANT, SWORN
23                        DIRECT EXAMINATION
24                             - - -
25                             - - -
```

```
 1   BY MR. LEVINE:

 2        Q    Good morning, Mr. Hinckley.

 3        A    Good morning.

 4        Q    Please state your name.

 5        A    Scott B. Hinckley.

 6        Q    Mr. Hinckley, is this your brother, John?

 7        A    Yes, yes, it is.

 8        Q    All right.  And you've testified in this

 9   proceeding on other occasions, have you not?

10        A    Yes, I have.

11        Q    All right.  Now --

12        A    Once or twice.

13        Q    Since the last proceeding, which I believe began

14   in 2011, have you attended any of the conditional releases

15   in Williamsburg?

16        A    Yes, I have.  I've --

17        Q    And has your sister done the same?

18        A    Yes, she has.

19        Q    And have you participated -- and have there been

20   occasions where both you and your sister have been there

21   together?

22        A    Yes, that is true.

23        Q    And have you had occasion to observe your

24   brother's activities while participating in these

25   conditional releases?
```

1    A    Yes, I have.

2    Q    And did you participate with him?

3    A    Yes, I did.  We --

4    Q    So while on conditional release in Williamsburg,

5  Mr. Hinckley, does John help out with the daily chores

6  around the house?

7    A    He does.  He does.  There's many little things

8  that have to be done on a daily basis with any house, and he

9  is good to take care of those without being asked and does

10  those on a regular basis.

11    Q    Does he do yard work?

12    A    He will do some of the yard work, yes.

13    Q    And will he do housecleaning?

14    A    He does some of them, housecleaning, deck

15  cleaning, some of the gutter, lower gutters that he can get

16  to, yes.

17    Q    Does he do laundry?

18    A    He does laundry on a religious basis, yes.

19    Q    Does he prepare meals?

20    A    He prepares, help -- he helps prepare some of the

21  meals, not 100 percent.  Yes.

22    Q    And does he maintain contact with the hospital as

23  required by the Court?

24    A    Absolutely.

25    Q    And does he write songs?

```
 1        A     He does write songs, yes.

 2        Q     He composes them.  Does he sing them?

 3        A     He sings them.

 4              He has a lady that comes by for music therapy at

 5    least once a week, and they get together and play those

 6    songs and discuss them and analyze them.  And we're usually

 7    there while they're doing that.

 8        Q     And has he become both a painter and a

 9    photographer?

10        A     He did both of those as well.  He enjoyed the work

11    that he had as a painter, going around the neighborhood and

12    actually going around the city, trying to compose scenes

13    that would be familiar to him.

14              And then that kind of evolved into the

15    photography, when he met a friend who actually is quite a

16    good, qualified photographer.  And this man took him under

17    his wing, and they have gone around and his -- they've spent

18    a lot of time together, and he's taken some very credible

19    photographs because of that.

20        Q     Is that Mr. Bruce Brelsford, B-r-e-l-s-f-o-r-d?

21        A     I believe so, yes.

22        Q     And when you're there with Mr. Hinckley, do you --

23    does he ask about your family?

24        A     He does.

25        Q     And nieces and nephews?
```

1        A      He does.

2        Q      All right.  And does he talk about his job?

3        A      He does talk about his job.  He is very proud of

4   the work that he does, both in the hospital, and he's

5   recently had some work doing some ground maintenance work

6   for a church.  And in both cases, his only comment was,

7   "Gee, I'd like to have more of it," and maybe at some point,

8   it would be a paying job.

9        Q      All right.  Does he talk about his music?

10       A      Talks about music, talks about his music, which is

11  in many ways, as you can imagine, stuck in the past.  But so

12  am I.  So when we're in the car together, we, when we talk

13  about, after we finish talking about football and baseball,

14  we always go right to rock and roll.

15       Q      Does he talk about his relationships, both with

16  male friends and female friends?

17       A      He does.  He does.  That's always a source of

18  interest for us as we arrive.

19              And it seems like the stars have aligned for him

20  there as well.  He has, according to my mother, who I think

21  is a good source of character, he has a girlfriend, a friend

22  in the Williamsburg area that he sees on a fairly regular

23  basis, and they seem to be somewhat compatible.  The same

24  with a male friend, who is the photographer, who helps him

25  out.  They spend time together pursuing that objective as

1   well.

2       Q    And during the course of these conditional

3   releases and over the many years, has your relationship with

4   your brother become closer?

5       A    Oh, I think so.  We have certainly shared more

6   activities together, put a dozen telephone systems together,

7   argued over the Internet and what it can and cannot do and

8   how fast it really needs to be.  And then, of course, the

9   girlfriend, boyfriends, friends situation, and just trying

10  to work through that.  So yes, I would say so.

11      Q    Now, Mr. Hinckley, did there come a time in the

12  recent past that you were interviewed by Dr. Patterson

13  before this hearing?

14      A    Yes, that's true.

15      Q    Was that about March 10?

16      A    Yes.

17      Q    All right.  Now, did Dr. Patterson ask about the

18  family's ability to fund John's expenses as proposed on

19  conditional -- on this convalescent leave, conditional

20  release?

21      A    Yes, he did.

22      Q    All right.  Now, as of the time that he asked

23  these questions of you, had you seen the letter which

24  proposes the conditional release?

25      A    I had not seen the letter.  I think Dr. Patterson

1    had not seen the final information that he was supposed to

2    receive so that he could put his report together.

3           So we made the comment that this is rather

4    confusing at this point and perhaps speculation to making

5    these statements.  But nevertheless, Dr. Patterson wanted to

6    have something for the record, and we -- he gave me a

7    scenario.

8           I would call it basically worst-case scenario.

9    Those are my words, not Dr. Patterson's.  But a scenario

10   where everything is full price, everything is as is.  We, we

11   might even be adding people.  Nobody gets a job.  Nobody

12   gets a break anywhere along the lines with the State or the

13   Federal Government for cost mitigation.  And that this

14   would, this is the way it was going to be.  And my response

15   was, well, then, in that case, this just may be

16   unsustainable.

17   Q    And when you talk about unsustainable, are you

18   talking about funding?  Did you understand him to be talking

19   about funding John's existence, mental health providers,

20   clothing, other expenses, food, for the rest of his life?

21   A    That's the way I thought the question was couched

22   to me.  And I very soon thereafter had a conference call

23   with Dr. Murphy, and -- who broached the same question.

24          And I made it clear to her that I thought that, in

25   fact, even if those -- that case did exist, looking at the

1    numbers that we had at this point, we certainly would be

2    looking at at least a two-year program with the cash on

3    hand.

4              And then we would have to make some adjustments

5    down the road or adjustments would be made for us.  But that

6    we were certainly, certainly not ready to just say, this is

7    the end of it.  We think we have a plan in place to help

8    John out and give him a very good footing for several years.

9        Q    All right.  So the hypothetical imposed or the

10   question imposed by Dr. Patterson, you interpreted to be

11   assuming everything was at full price; is that correct?

12       A    That's correct.

13       Q    And you assumed that there would be adding people

14   to the mental health staff?

15       A    That's correct.

16       Q    And there was no time limit?

17       A    Correct.

18       Q    And in answering the question, were you

19   disregarding any prospect of, for want of a better word, and

20   I think it's an unfortunate word, entitlements, public

21   assistance?

22             You have to answer the --

23       A    Yes, I agree.

24       Q    And did you also assume that John would be earning

25   no income?

1    A    We did.

2    Q    And it was in that context into the indefinite

3  future, perhaps for the rest of his lifetime, that you said

4  it may be unsustainable?

5    A    I made that statement, as I would probably for my

6  business, which I know as well, if not better.

7         You can make intelligent statements and

8  projections in year 1, possibly year 2; but you get out much

9  beyond year 5, and all of a sudden, these little errors,

10  these little presumptions that don't go quite right can skew

11  to the point that it becomes embarrassing.  So I don't do

12  that for my business, and I would not do that in this case.

13    Q    All right.  Now, assuming no entitlements and

14  assuming no job income from Mr. Hinckley and assuming

15  basically the same providers are providing the same

16  services, have you tried to assess from the current sources

17  of funds, both your mom's and the family's, whether the

18  family would be able to fund John's life, as it were, out

19  two years?

20    A    Well, we have started this as a family, my mother

21  and my sister and myself, and looked at taking a second look

22  at assets that are available from them and from us as well.

23  And we believe that there are now, based on the numbers that

24  we're seeing from the hospital, which probably are a little

25  bit, have a little bit more reality than the ones we were

1    looking at 30 days ago; that we can certainly have a

2    two-year plan based on cash on hand, and then perhaps a

3    longer plan based on the ability to sell or otherwise

4    financially change our family home, such that it would bring

5    in some additional cash as well.

6                THE COURT:  The home in which your mother is

7    living?

8                THE WITNESS:  Yes, sir.

9    BY MR. LEVINE:

10   Q    Now, have you been able to determine about your

11   mom's financial ability to pay for these services for the

12   next two, three, or even four years?

13   A    I have talked to my mother about this.  She's one

14   that controls the major IRA, major retirement fund that

15   would be handling most of these funds.

16                And although, as with any retirement fund, they do

17   fluctuate from day to day, month to month, this month a

18   little better than previous.  But we believe that there's

19   roughly $250,000 or so remaining in that account that we, as

20   a family, would help to disburse, not only for John but also

21   for John and my mother, over that period of time.

22   Q    Does the family have -- does your mother have

23   equity in the house?

24   A    She does have equity in the house as well.

25   Q    Do you have a sense as to the amount of equity in

1    that house?

2        A    My sense is, when you take out the financial

3    obligations that are on the house at present, it also has a

4    remaining fair market value, again, roughly on an order of

5    $250,000.

6        Q    So there's about $250,000 in the IRA, and there's

7    another 250- in equity in the house?

8        A    That's correct.

9        Q    That's approximately the case?

10       A    That's what we believe.

11       Q    So that's about $500,000.

12            So if it were to cost $100,000 a year, just to use

13    a number, to sustain John, that would take you out five

14    years?

15       A    Based on the math that's being now presented to me

16    through St. Es Hospital and with some breaks here and there

17    along the way, which we hope we will see, that it is not

18    unrealistic that we could be looking at something certainly

19    between that time period.

20       Q    So there was --

21            THE COURT:  There was some mention of 5- to

22    $10,000 a month in treatment providers in Williamsburg.

23    Is that what you're -- is that a correct number currently?

24            THE WITNESS:  That number was provided early on,

25    and that included transportation to and from the hospital

1   twice a month.  And unfortunately, at this point, we,

2   without either Diane or my assistance in doing that, that

3   was, that's $4,000 a month right there.  So if somehow we

4   can figure out how to get John down there and back, even if

5   I'm or Diane take him down on a bus, we can eliminate 4,000

6   right there.

7           There were some other costs that, again, we've

8   been told, once he becomes a member of the State of

9   Virginia, he would qualify for other benefits.  He does not

10  do that.

11          THE COURT:  That may be where Mr. Levine is going

12  eventually with this.

13          But as I understand it, some of the treatment

14  providers in Williamsburg take Medicaid and some don't.  And

15  your brother is about to turn 60?

16          THE WITNESS:  That's correct.

17          THE COURT:  So some of us know that in five years,

18  then, he'll be eligible for Medicare.  I think Mr. Levine

19  and I can take judicial notice of that.

20          So...

21          MR. LEVINE:  I think you can.

22          THE COURT:  And some of the providers can take

23  that too.  So that will be helpful five years from now but

24  not immediately.

25  BY MR. LEVINE:

1    Q    So that would take you to the time when he becomes

2    eligible for that?

3    A    Right.

4    Q    All right.  So the family has funds -- and all of

5    this is before -- withdraw it.

6         And all of this is with respect to your mother's

7    resources; is that correct?

8    A    About 90 percent of it is.  My sister and I do,

9    under the radar, provide some assistance to my mother with

10   the thought that she's -- she can use that for John.

11   But yes, that's true.

12   Q    And you have resources?

13   A    I have resources, yes.

14   Q    And Diane, your sister, her family has resources?

15   A    I really can't speak to Diane's resources.

16   You might ask her that question.

17   Q    I will.

18        But you have resources, and you've discussed this

19   issue with your family?

20   A    We have.

21   Q    All right.  And if necessary, are you prepared to

22   devote a reasonable amount of your resources to John's

23   well-being into the future?

24   A    Well, as I've said here on the -- I think we said

25   now we've been here seven times, and I've made seven

1    statements to the fact that our family, including me and my

2    sister, are here to support John in the best way we can.

3    We are here to provide a safety net for him.  We're here to

4    provide for him in the best -- in the best means reasonable

5    for him.

6             And I don't want to get into the specifics of

7    dollars at this point, being five years out, and a lot of

8    fluid things happen.  But we certainly are on record as

9    saying we will support our brother.  And some of these

10   ghastly thoughts of him walking around the streets looking

11   for his next fix are just not going to happen.

12        Q    And the family pledges to the Court that it will

13   not let that happen?

14        A    We will not let that happen.

15        Q    Now, with respect to the payment of providers,

16   mental health providers, have they all been paid?

17        A    The providers to date?

18        Q    Yes.

19        A    In my -- my understanding is that they have been

20   paid to date.  We have a -- my mother works with a firm that

21   handles that, and I'm not sure anybody's looking for a

22   check.

23        Q    Is it your understanding that all of the

24   providers, all their invoices are current?

25        A    That's my understanding.

1    Q    And is it your understanding that they have been

2   current on a regular basis throughout the time that they've

3   provided those services?

4    A    That is my understanding; they've been current.

5    Q    Now, have you discussed financial planning with

6   your mother in terms of estate planning?

7    A    Yes.

8    Q    And have you -- do you know if she has a will?

9    A    She has a will.

10   Q    Do you know its terms?

11   A    The terms of the will were much larger at one

12  point in time.  But with the one trust after another having

13  been dissolved because the funds were used for this project

14  or that project, it's down to pretty much a simple will,

15  which includes these very items we're talking about.

16       And the way the will is read now, these very

17  assets, the retirement funds, such as they are, the home,

18  such as it is, the furnishings in the home such as they are,

19  they would revert to my sister and myself.

20       So what we're essentially doing is using our funds

21  that would come to us in retirement to help our brother.

22   Q    All right.  And is it your understanding from

23  discussions with your mom and with your sister that should

24  she -- unfortunately, and forget -- please forgive the

25  grimness of the conversation -- but should she become

```
 1   unavailable by death, that those assets would go to you and

 2   your sister and that you and your sister would use those

 3   assets to fund John's existence?

 4        A     That is true.

 5              In addition to that, she does carry and has

 6   carried for a number of years, long-term healthcare policy

 7   by a reputable company.  And I'm sorry.  I don't have the

 8   dollar amount today, the dollar limit on that policy.

 9   She's sending it to me.  I'm sure I can give it to you by

10   the end of the week.  But it's -- it should cover major

11   medical events.  It wouldn't cover somebody to come in

12   during the minor work early on, but --

13        Q     For her?

14        A     For her.  Right.

15        Q     So we just asked some questions about were she to

16   pass away; but were she not to pass away but to suffer some

17   sort of condition that would require her to have long-term

18   care, she has insurance for that?

19        A     Correct.

20        Q     Mr. Hinckley, do you love your brother?

21        A     Yes, I do.

22        Q     Does your mother love your brother?

23        A     Oh, I think so.

24        Q     And does your sister?

25        A     Yes.
```

1      Q     Is your mother eager to have him at home?

2      A     Yes, she is.

3      Q     Does the family pledge its emotional support to

4  your brother?

5      A     We have -- I don't know if we've ever gotten in a

6  powwow and used the word "pledge," but certainly that's a

7  word that works out.

8      Q     Well, let's use the word now.

9      A     Pledging.

10     Q     Pledging to the Court, as you pledge to the Court

11 that the family will give John its emotional support?

12     A     He's always had our emotional support.

13     Q     And likewise, do you pledge financial support so

14 as to not let John ever become destitute?

15     A     We have -- and I have said this many times when

16 we've come to this point:  We pledge financial support

17 within reason to helping our brother, and that doesn't mean

18 putting him out on the street or kicking him to the curb.

19 It means that we will find a way to take care of him.

20     Q     Do you say that without any equivocation?

21     A     At this point, again, we're talking something that

22 is many years out.  It is not definable.  But the term,

23 using the term loosely, yes, we will do that.

24           MR. LEVINE:  Thank you.

25           THE COURT:  All right.

```
 1              How old is your mother?

 2              THE WITNESS:  She is the queen's age.  She's 89.

 3              THE COURT:  And you said a minute ago that John

 4    will be 60 next month; is that right?

 5              THE WITNESS:  Correct.

 6              MR. LEVINE:  I may want to ask a question in

 7    follow-up to the Court's question.

 8    BY MR. LEVINE:

 9         Q    How good is your mother's health?

10         A    How good does --

11         Q    Is your mom's health right now?  Is she healthy,

12    robust, feeling fine?

13         A    She's in excellent health.  She is, she really is.

14    She's got -- she had two parents, both of whom were born

15    before 1900, who lived past 100.  So her genetics are in

16    good shape.

17         Q    Good lineage.

18              MR. LEVINE:  Thank you, Your Honor.

19              MS. KENNEDY:  Cross-exam.

20                        -  -  -

21                   CROSS-EXAMINATION

22    BY MS. KENNEDY:

23         Q    Good morning, Mr. Hinckley.

24         A    Good morning.

25         Q    First, I want to thank you for coming, because
```

```
 1   clearing this all up from the person rather than hearsay is

 2   much more significant.

 3        A    Not a problem.  Thank you.

 4        Q    Now, you did indicate that you love your brother,

 5   correct?

 6        A    Correct.

 7        Q    And how long have you been supporting him exactly?

 8   For 35 years or less than that?

 9        A    Financially or --

10        Q    Financially.

11        A    -- emotionally or --

12        Q    Financially.

13        A    I would say it started with the visits to my

14   parents' home.

15             Beyond that, there really was not a whole lot --

16   other than an occasional Christmas gift, birthday gift,

17   occasional note, and money in a card.  But support was

18   really when he came down to the Williamsburg area.

19        Q    So that would have been around 2003, about the

20   last 12, 13 years or so?

21        A    Uh-huh.

22        Q    Okay.  Would you describe your relationship with

23   your brother as close?

24        A    Yes.

25        Q    And were you in contact with your brother at the
```

1    time of the assassination attempt?

2         A     No, I was not.  I was in another state.

3         Q     So for -- is it fair to say for a period of years,

4    you didn't have much contact or you weren't that close?

5         A     The 30-year period before that, there was not a

6    lot of contact.  I was doing a heavy amount of travel

7    myself, and so I was not, even though I lived close

8    proximity, I lived out of a suitcase for about four years,

9    traveling all over the world.

10        And I did that while John was in school, out of

11   school, learning the ropes.  I did -- when I -- towards the

12   end of that time --

13        THE COURT:  Whose cell phone?

14        THE WITNESS:  -- when I came back, at one point,

15   I was flush with cash.  I looked at John.  He didn't have an

16   automobile.  I said, "Here, just take mine.  Just take this

17   car.  You look like you need the car.  That would be good

18   for you.  Make some friends."  He did.

19        And I saw him a couple of other times.  I stopped

20   by Texas Tech University.  We spent the night together a

21   couple of times, talked about the car.

22        And then the next thing I know, the car was gone

23   and John was gone.  I was not really involved in those

24   conversations with my parents.

25        Q     And he was gone for a couple of years;

1   is that right?

2       A    He was off and on a couple of years.  It was not

3   like it was full time.  I mean, he would resurface.

4       Q    Right.

5       A    And would tell us that he was -- there was

6   something exciting going on in his life, and we just needed

7   to wait for it.  And then it didn't quite materialize, and

8   then something else would come up.

9            So we kind of listened to the stories, but I did

10  not follow him around through that period.

11      Q    And this was all before the assassination attempt,

12  correct?

13      A    That's correct.

14      Q    And have you ever talked to your brother about

15  that day?

16      A    About the assassination?

17           MR. LEVINE:  Can we have something that's more

18  relevant, timely.  This is -- we're talking -- we're here on

19  a petition of incremental enlargements of liberty based on

20  the record over -- since 2003, and 35 years ago seems to be

21  irrelevant.

22           MS. KENNEDY:  Your Honor --

23           THE COURT:  Well, the truth is, Mr. Levine, under

24  the case law, it's not irrelevant.  And I think I have said

25  that -- I think the statute or the case law says I can and

1    should look at the entire record.

2            What I've said in the past is, the further away

3    from in the past the events in question are, I give them

4    less weight, and maybe they're less relevant; but they're

5    not irrelevant.  I think the case law makes that clear,

6    which is why, you know, we keep coming back to the suicide

7    attempt and all that.

8            And you say, and I think I've said to

9    Dr. Patterson and others, "Well, that was a long time ago.

10   Isn't it less relevant now than it was at the time it

11   happened or two years or five years after it happened?"

12           But it's not irrelevant.

13           So go ahead.

14           MS. KENNEDY:  Thank you.

15   BY MS. KENNEDY:

16   Q    So did you ever talk to your brother about that

17   day?

18   A    I wrote him a letter.  He was in prison.  I didn't

19   know -- we didn't have cell phones, so I wasn't even sure if

20   any phone would work.

21           Wrote him a letter, told him I was terribly upset

22   with what happened and the events and also was upset with

23   how that affected our mother and father and asked that he

24   give some consideration to talking to them and letting them

25   know that that was not necessarily his fault, but it

1    certainly was something that I thought they would want to

2    hear.

3         Q    And why do you say it wasn't his fault?

4         A    Because of, at that point, the not guilty because

5    of reason of insanity, we were considering that.

6         Q    Prior to that, did you think your brother was

7    mentally ill?

8         A    You know, we went through that in the hearing.

9              He did have and he did exhibit some orders that

10   made us realize that whether there was mental illness or not

11   that he definitely had a -- he did some of the things that

12   we now know would be classified as mental illness, mental

13   illness.

14        Q    Had you ever seen your brother psychotic?

15        A    I had not seen him psychotic.

16        Q    Did you see him exhibiting symptoms of mental

17   illness?

18        A    I guess the only one that sticks out in my mind

19   was having given him a car to use to get him around and be

20   his mainstay, within a short period of time, ended up

21   selling the car and was on foot walking around.  And

22   I thought that is not the sign of someone that's using good

23   judgment, if nothing else, so...

24        Q    And what if your brother, while living with your

25   mother, exhibited signs of mental illness or psychosis?

1    A    I didn't -- we were -- we would get together for

2  an evening to either watch some television or to have a

3  meal.  We didn't -- I didn't spend the night with him or the

4  day with him, so I don't -- did not see any psychosis at

5  that point.

6    Q    I mean --

7          THE COURT:  I'm talking about -- which point are

8  we talking about?

9          MS. KENNEDY:  I'm talking about now, with him

10 living in Williamsburg, if he began to exhibit signs of

11 psychosis or mental illness, what would happen?  What would

12 you do?  What would you do as a family?

13         THE WITNESS:  Well, we would -- we could either

14 call 911 if we thought it was a serious problem.  We could

15 call the hospital if we thought it was a nonserious problem

16 that just needed help.  We could also call Dr. G-G and see

17 if she were available to help with some medications.

18         We would go down the list.  Mr. Weiss.

19         But I would prefer that he had a doctor that could

20 make that call.

21    Q    And I assume, do you think he needs medication?

22    A    I think he needs medication.

23    Q    Do you think the medications help him?

24    A    I do.

25    Q    Do you know if he thinks he needs some medication,

1   your brother thinks he needs some medication?

2       A    We've talked about it once or twice.  I think he

3   would like to maybe reduce some of it; but, you know, it, at

4   this point, seems to have done what everybody has asked for.

5            So there, again, as we get to the next level and

6   the level beyond that, we can address the situation of

7   whether he needs to stay on that high-level dosage.

8       Q    Now, what influence, if any, do you think you have

9   over him?

10      A    I'm sorry.  I missed that.

11      Q    What influence do you have over him, if any?

12      A    I am his older brother.  He does listen to me.

13  He doesn't always follow the advice, but he will listen.

14           We don't -- we don't get involved in the

15  discussion of his medications.  Those are -- I'm not a

16  doctor, and he's got plenty of doctors that he sees on a

17  weekly --

18      Q    But -- I'm sorry.

19      A    -- daily basis.  They should be able to monitor

20  that.

21      Q    But has he ever discussed with you not wanting to

22  be on medications?

23      A    Not really, no.

24      Q    And having gone through these hearings for the

25  last several years and having been here for, perhaps, all of

1   them, you know that in the past since he's been at the

2   hospital as well as in the community that he has lied in the

3   past?

4        A    About taking something when he didn't take it or?

5        Q    Or his behavior in general, being in a place where

6   he wasn't supposed to be, telling the staff that he was

7   there with the movies and the bookstore, you're aware of

8   that?

9        A    Well, I'm aware of that incident.

10            I guess there were a couple of others.  I guess it

11   all has to be put in the context of how important that -- is

12   that to the -- his overall standing in getting down into the

13   community.  I hate to see that.

14       Q    But in your view, Mr. Hinckley, do you believe an

15   incident like that isn't important?

16       A    It would be important to show up.  Isn't that what

17   you're asking?

18       Q    Yes, important as far as the fact that he lied and

19   lied to the staff as to where he was, do you view that as an

20   important incident?

21       A    That's an important issue.

22       Q    Okay.

23       A    I don't -- he's -- he shouldn't have lied.

24   There may have been other ways to have done that.

25            I know he does have some free time.  But, if he --

1   he's usually been pretty good about being where he says he's

2   going to be.

3        Q    And you're aware he's been manipulative in the

4   past, correct?

5        A    That he's done?

6        Q    That he's been manipulative in the past?

7        A    I would have to have an example.

8        Q    Well, the incident we're just talking about of him

9   going to the movie theater and then not going and going to

10  the bookstore and not telling the hospital, but instead

11  actually telling him he saw the movie, would you consider

12  that manipulative?

13       A    Okay.  I'll go with you on that.

14            I think this is all in the record from the last

15  hearing.

16       Q    That's -- yes.

17       A    I pretty much said the same things.

18       Q    Okay.  And in discussions in the past, it's come

19  up that Mr. Hinckley wouldn't be able to live with you;

20  is that correct?

21       A    Well, I don't know that we put it quite that way.

22  I think there were some objections to the fact that, that my

23  house is somewhat close to the house of a former president.

24  It's also in a city that doesn't -- that still has a lot of

25  scars from the Kennedy era.

```
 1              And so we just -- we thought at the time maybe
 2    there was a better alternative.
 3        Q    If you weren't in that area and you were in
 4    another area of Texas, would you be willing to have him live
 5    with you?
 6        A    I have no problem with him staying with us as long
 7    as he gets a job.  That's what he has to -- to -- what he's
 8    doing now, to get out of the house and be productive.
 9        Q    Have you had an opportunity to read the hospital
10    letters from December, March, and April of 2015?
11        A    No.
12        Q    Okay.  So you haven't had an opportunity to set --
13    to look at any of the conditions set forth in the
14    hospital's -- I'm sorry -- the government's response either?
15        A    I had -- I don't believe I've seen those, no.
16        Q    Okay.  Were you asked to look at any of those and
17    see --
18              MR. LEVINE:  Your Honor, is it possible to turn
19    the volume up?
20              MS. KENNEDY:  Okay.
21              MR. LEVINE:  I'm unable to hear.
22              THE COURT:  It's hard to hear Ms. Kennedy or
23    Mr. Hinckley?
24              MR. LEVINE:  It's difficult to hear the discourse.
25    I'm struggling.  It's too soft.
```

1          THE COURT:  Mr. Hinckley can draw the microphone a

2    little closer.

3          MS. KENNEDY:  This, I think, is as high as it will

4    go.  I can draw it closer.

5          MR. LEVINE:  That's good.  Thank you.

6          THE COURT:  Okay.  Thank you.

7    BY MS. KENNEDY:

8      Q    I have to say, Mr. Hinckley, I forgot what that

9    last question was.

10         THE COURT:  About whether he's read the letters

11   from the hospital.

12         MS. KENNEDY:  Thank you so much.

13   BY MS. KENNEDY:

14     Q    Mr. Hinckley, you indicated that you haven't had a

15   chance to read the letters from the hospital?

16     A    I haven't had a chance, I don't believe.

17     Q    Has the hospital sat down and told you what they

18   want the conditions to be for your brother when he goes down

19   and lives in Williamsburg?

20     A    Yes.  I did read the final e-mail from V.J. Hyde

21   which sets forth all the terms and conditions --

22     Q    And was that --

23     A    -- for that.

24     Q    -- the conditions that had 8 conditions in the

25   letter or 19 conditions in the letter?

1          A    I think it was in response to your letter, and he

2     was responding.  So I guess it would be the higher.

3          Q    Okay.

4               THE COURT:  How recently is the e-mail you're

5     talking about?

6               THE WITNESS:  Okay.

7               THE COURT:  How recent was the e-mail you're

8     talking about?

9               THE WITNESS:  Oh.  It was sent either over the

10    weekend or Friday.

11              THE COURT:  Okay.  So it may be, maybe Mr. Hyde

12    can clarify for us that, or maybe Mr. Levine can, maybe the

13    e-mail is sort of a summary of what the hospital filed on

14    the -- April 17th.

15              MS. KENNEDY:  April 7th, I believe, Your Honor.

16              THE COURT:  Yes.  Right.

17              MS. KENNEDY:  Thank you.

18    BY MS. KENNEDY:

19         Q    Now, Mr. Hinckley, you indicated that your brother

20    has a girlfriend; is that correct?

21         A    That's correct.

22         Q    And he met her at a meeting for the National

23    Association [sic] of the Mentally Ill?

24         A    That's what I heard.

25         Q    And is it also correct that she, in the past, has

1    had substance abuse problems?

2         A    That's what I've heard.

3         Q    Okay.  And do you think that that's a good

4    relationship for him?

5         A    I think at this point, it's a good relationship

6    for him.  She seems to be, from what I'm told, beyond that

7    stage.  And John is in a good in a good point in his life.

8    And she is, I think, at present, living with her parents.

9              So, you know, we --

10             THE COURT:  Have you met her?

11             THE WITNESS:  I have not met her.  My mother has

12   met her.

13             THE COURT:  Your mother's met her more than once,

14   right?

15             THE WITNESS:  More than once.  And really thinks

16   highly of her, as does John.

17             And I've offered, it just didn't work out.  We had

18   weather issues or whatever.

19             But certainly, given the extent of the

20   relationships over the past several years, I would -- is the

21   only way you can measure that.  I think she, far and away,

22   is somebody that's -- that the family can --

23        Q    The family accepts?

24        A    Can accept, yes, for sure.

25        Q    And is it fair to say in the past, some of the

1    girlfriends were not acceptable?

2        A    I -- from my point of view, yes.

3        Q    Now, in discussing the finances, you did indicate

4    that you spoke with Dr. Patterson and I believe Dr. Murphy

5    about the finances of the family and the cost and perhaps

6    only be able to support John around two to three years;

7    is that correct?

8        A    (Nodding head.)

9            THE COURT:  Is that a yes, Mr. Hinckley?

10           THE WITNESS:  That is a yes.

11   BY MS. KENNEDY:

12       Q    Okay.  Have you ever sat down with your family

13   together and discussed the finances for John?

14       A    Yes.  After that report came out, we did just

15   that.  We sat down and Diane penciled in the numbers that

16   she got from her mother, our mother.

17           I looked at some numbers.  I listened to what my

18   mother had told me.  And it turns out that we were, I think,

19   being -- we were a little on the high side when it came to

20   the oversight that John has, and -- on the one hand.

21           On the other hand, at the time, I was only

22   thinking about the funds that were immediately available and

23   not going beyond that.

24           So -- and we were also not sure about the travel

25   arrangements, which could add significant funds each month,

1  so...

2          But be that as it may, I told a week later,

3  Dr. Murphy, that I think, in the long run, again, with those

4  costs the way they were presented, that they may not be

5  sustainable.  In the short run, they would be; the short run

6  being one year, two years out, I think we can do that.

7          And certainly, from what we've seen from the

8  letters now coming from St. Es saying, well, it turns out he

9  can get this stay date; we can do this; we can make a change

10  here.  It can be a little bit more fluid than just what we

11  were dealing with, cast-and-stone argument.

12          And so based on that, I think it's the term

13  "unsustainable" should have been more like it's going to be

14  a challenge, but...

15          But we then went back -- based on that, went back

16  and looked at the numbers and said, well, maybe it is.

17  Maybe just the retirement money alone is not going to be

18  enough.  Maybe we need to look at the house, what other

19  assets we have; and that's when we decided that that needed

20  to be part of the plan as well.

21      Q    Now, Mr. Hinckley, you indicated that you got

22  letters from the hospital setting forth what John would be

23  entitled to down in Virginia, is that right, money

24  entitlements?

25      A    I don't know that they used the word

1    "entitlement."  But they said they were -- they said if he's

2    there a certain amount of time during the year, he would be

3    eligible, should be eligible for this and that and the

4    other.

5            We were just trying to find out what is it we've

6    been told for years with others who have been in a similar

7    situation who go out from St. Es in a similar situation and

8    there's, the cost of money is just irrelevant.  And we're

9    saying, "What is the difference?"

10           And so we backtrack and we go through -- well, of

11   course, he needs more supervision; he needs this; he needs

12   that, doctor supervision.

13           But even so, there's got to be a reasonable limit

14   to all this.  I would like to believe that there's not too

15   many people in this courtroom, based on the numbers I was

16   given and talking to with Dr. Patterson, I don't believe

17   there's too many people in this courtroom that would be able

18   to do anything like what we were talking about doing.

19           So I'm not upset about it, but I do think there

20   needs to be some mitigation in there somewhere, and that's

21   where we are.

22       Q    Mr. Hinckley, you indicated you got --

23   I don't know.  Is it one letter or two letters you got from

24   the hospital stating what he's entitled to?

25       A    There were, I guess, two letters, two letters.

```
 1              Again, they referred to what he's entitled to, but
 2    it's after he would be --
 3         Q    A resident?
 4         A    -- a resident.
 5         Q    Right.
 6         A    You know, it's --
 7         Q    Did it indicate --
 8         A    -- if then, when then?
 9         Q    Okay.  Did it indicate numbers?  Did it indicate
10    how much he would be entitled to?
11         A    It indicated that he would start receiving a fee
12    somewhere around $800 a month from the State, $818 a month
13    from the State.
14              It also indicated that there would be -- some
15    charges would be such as Medicaid, could be reduced.
16    But others like Jonathan Weiss, who is at a minor airline
17    fee anyway, probably would not.
18         Q    Do you recall where that $800 a month came from?
19    What was that?  Social Security?  Medicaid?  What's that --
20         A    Yeah.  I think it was a Medicaid payment, Social
21    Security payment.  I don't know which it was, yeah.
22              MS. KENNEDY:  Your Honor, I would ask for those
23    letters.  We've never had those supplied by the hospital --
24              THE COURT:  All right.
25              MS. KENNEDY:  -- or in the medical records.
```

1    BY MS. KENNEDY:

2        Q    Let me just clarify something.

3            So at one point earlier, five or ten minutes ago,

4    you referred to an e-mail from the hospital, and now you're

5    talking about letters.  Do you recall -- and now you've said

6    you think there were two correspondences.  Were these

7    e-mails or letters, if you recall, that you're --

8        A    These are e-mails.  They were sent out to all the

9    staff at St. Es.  They were sent out, getting ready, we're

10   going to have a meeting and discuss the situation.

11           We, V.J. Hyde had dutifully asked each of the

12   providers to give their best information as to what they

13   could charge and what they could do and whether they would

14   be -- whether they would qualify for Medicaid, Medicare.

15           And so the e-mail went to probably 20, 20

16   individuals, and we get a mass of individual e-mails coming

17   back.  And reading those, that's where I got some of that

18   information.

19           THE COURT:  And did the e-mail to you, which may

20   have had attachments or a chain, come from Mr. Hyde?

21           THE WITNESS:  It came from Mr. Hyde, yes.

22           THE COURT:  So why don't -- and you don't have

23   that e-mail with you?

24           THE WITNESS:  I don't have it with me.  I can see

25   if I can pull it up.

```
 1              THE COURT:  Well, let me suggest -- why don't we
 2    take a break.  Mr. Hyde is here, right?  Mr. Hyde is here?
 3              MS. KENNEDY:  Okay.
 4              MR. LEVINE:  Yes, he is, Your Honor.
 5              THE COURT:  So maybe if there's a document or a
 6    series of documents --
 7              MS. KENNEDY:  Yeah, I can look at that.
 8              THE COURT:  -- that Mr. Hinckley is recalling --
 9              MS. KENNEDY:  Okay.
10              THE COURT:  -- somebody in the courtroom may have
11    it or be able to get it.
12              MS. KENNEDY:  Thank you.
13              THE COURT:  And you can use it in further cross.
14              MS. KENNEDY:  Thank you, Your Honor.
15              THE COURT:  So why don't we take about ten
16    minutes.
17              DEPUTY CLERK:  All rise.
18              (Recess from 11:18 a.m. to 11:33 a.m.)
19              DEPUTY CLERK:  All rise.
20              Please be seated.
21              MR. AZIZ:  Your Honor, if we could approach with
22    defense counsel briefly.
23              THE COURT:  Sure.
24              MR. AZIZ:  And the witness.
25              (Bench conference)
```

```
 1              THE COURT:  All right.  All right.  Mr. Aziz.
 2              MR. AZIZ:  The issues never cease to arise.
 3   We made a demand of the defense of Jencks Act materials
 4   before any witnesses were to testify.
 5              And a good reason to believe that there are
 6   e-mails and such of Mr. Hinckley, Ms. Sims and numerous
 7   other witnesses and probably other notes and other materials
 8   that haven't been turned over -- I've spoken to Levine --
 9   I think his position is that the Jencks Act doesn't apply
10   because he claims it's not a criminal case.
11              MS. MERENE:  Right.  And certainly no one's
12   requested any --
13              MS. KENNEDY:  We have.
14              MR. AZIZ:  We have.
15              MS. MERENE:  From who?
16              THE COURT:  From Barry.
17              MR. AZIZ:  And we're making -- I mean, considering
18   that we have --
19              THE COURT:  We can brief the issue later.
20   I don't think it applies, but I'll let you write a brief
21   about it.
22              But then you got what you need for
23   cross-examination?
24              MS. KENNEDY:  I have enough.  I'm sorry.  I have
25   enough for Mr. Hinckley.  I don't really have it, but I can
```

1 ask.

2           MR. AZIZ:  We're still waiting on the stuff from

3 Ms. Sims.

4           THE COURT:  So why don't we get the stuff from

5 Ms. Sims between now and lunch?

6           MR. AZIZ:  Okay.

7           THE COURT:  I don't want to have to stop the

8 examination for every witness to do that.  I'm not sure what

9 applies.  But if somebody is going to testify about it, the

10 correspondence, you've got to have the correspondence for

11 cross-examination.

12          MR. LEVINE:  I can help, Your Honor.  I mean, my

13 recollection, there is no e-mail from Scott Hinckley or from

14 Diane Hinckley other than, can they be available on a call,

15 such as an outlook.  There may be something about that, but

16 nothing substantive.  I know of none.

17          THE COURT:  Well, maybe we ought to brief this.

18          But in this case, what we're talking about is an

19 e-mail, series of e-mails that he's recalling that he got

20 from the hospital.

21          MS. KENNEDY:  Right.  And we don't know unless we

22 see it.

23          MR. AZIZ:  And the reason that it's important is

24 because -- I mean, the reason we have the Jencks Act is

25 because to the extent that they're talking about finances

1    and financial limitations and considerations, it's important

2    for us to be able to know, you know, the progression of

3    that.  Are they saying things different now than before?

4    The Court may consider that in terms of judging it.

5                MR. LEVINE:  Just not a statement of a witness.

6                THE COURT:  Well, it's not a statement of a

7    witness, so it wouldn't be Jencks.

8                MR. AZIZ:  Well, the e-mails would be.

9                THE COURT:  I mean, that's the issue.

10               MR. AZIZ:  Yeah.  Absolutely.

11               THE COURT:  If Jencks applies.

12               MR. AZIZ:  I've seen none.

13               THE COURT:  He says there are.

14               MS. KENNEDY:  But, Your Honor, I just want to say

15   that every NGI I've had, 300 of them for 34 years, the

16   Jencks Act applies.

17               THE COURT:  Brief them.  Give me a case.

18               MS. KENNEDY:  Right.  Okay.

19               THE COURT:  But what you can do is -- why don't we

20   do this.  I mean, until I decide whether the Jencks Act

21   applies, if I have to decide, you can come before each

22   witness and ask if there's any -- assuming the Jencks Act

23   applies, is there anything?

24               MS. KENNEDY:  Exactly.  Okay.

25               THE COURT:  I'll just make a representation.

1               But there's no substantially verbatim statements

2     from Mr. -- in writing from Mr. Scott Hinckley that makes

3     sense, right?

4               MR. LEVINE:  That's correct, Your Honor.

5               THE COURT:  That are relevant?

6               MR. LEVINE:  The only ones I remember, there were

7     some questions asked about availability of a phone -- for a

8     phone call to be scheduled at a time.  And there may be

9     something where someone said, "I can't be available then,

10    but I can be available at a later time."  There might be

11    that.  I'm not sure if it pertains to Scott or Diane.

12              MS. KENNEDY:  But, Your Honor, let me just say,

13    besides Jencks altogether, under Devo versus United States,

14    Your Honor, as well as the parties, are entitled to

15    everything that goes to the defendant's mental health.

16              So if they're going to be referring to e-mails and

17    letters that go to a substantial issue as to how he's going

18    to afford that, we're entitled to that.

19              We've given everything to Mr. Levine.  We've given

20    him everything that Patterson did.  We always have, and we

21    didn't even get a response from Mr. Levine on this.

22              MR. LEVINE:  Well, Your Honor, I respectfully --

23    this is much ado about nothing.  I mean, the testimony is

24    that irrespective of entitlements other benefits that

25    whatever -- if there's a shortfall, the family's behind it.

1   And Ms. Hinckley's assets are for five years at a minimum.

2           THE COURT:  I'm not sure you're correct to

3   characterize the testimony.

4           The question is, Mr. Hinckley has been testifying

5   for an hour, a half an hour about e-mails he's had from

6   Mr. Hyde.  So the government should have those to examine

7   him.

8           MS. KENNEDY:  Right.  And he doesn't have it

9   because he doesn't have his computer.

10          THE COURT:  Who?  Mr. Hyde?

11          MS. KENNEDY:  Yeah.

12          THE COURT:  Then we'll bring Mr. Hinckley back

13  later.

14          MS. KENNEDY:  Okay.  I still have a few questions,

15  and I'll bring him back after he goes and gets them.

16          THE COURT:  Go get all of these e-mails over

17  lunch.

18          MS. KENNEDY:  Okay.

19          THE COURT:  I mean --

20          MS. KENNEDY:  I understand.

21          THE COURT:  -- the financing question is a huge

22  issue.

23          MS. KENNEDY:  Right.

24          THE COURT:  It's a huge issue.  And if there's

25  something different in writing from what Dr. Patterson got

1    during his interviews --

2              MS. KENNEDY:  Right.

3              THE COURT:  The truth of the matter is very, as

4    I understand it, which is, is I, this written material is

5    more likely to help you than to hurt you.

6              MR. LEVINE:  I have no objection to any of it.

7              MS. MERENE:  We'll, just -- I would just like to

8    ask that Mr. Hyde be allowed to look at his e-mails, because

9    at the point, there were -- what he saw just now was mostly

10   scheduling.

11             Because there were a series of conversations,

12   telephone conferences, that could be in writing if not so.

13   I just want to say, let them take a look and then we'll come

14   back after lunch.

15             MR. LEVINE:  No objection to that.

16             MS. KENNEDY:  No.  I mean, if Mr. Hinckley stated

17   it, that's why it's my question.  I can't imagine -- he

18   would know the difference between a conversation and reading

19   an e-mail or a letter.

20             THE COURT:  We can explore.

21             MS. KENNEDY:  I will.  I will.

22             MR. AZIZ:  This is one of the things -- I promise

23   I won't belabor the point.  It's my understanding that there

24   were some Court findings from Mr. Beffa and maybe Mr. Weiss

25   about the amounts that they were willing to charge --

1    rate --

2             MR. LEVINE:  The rates.

3             MR. AZIZ:  -- modifications.  And that's sort of

4    information.

5             THE COURT:  That's already in the record, the

6    rates.

7             MR. AZIZ:  Not the exact rates and not the

8    modifications.  We don't have any of that evidence.

9             We just know that from Mr. Hyde's letter of April

10   17th, 2015, his response to our filing, there's some sort of

11   modification plan that's in the works.

12            That sort of information is helpful for the Court,

13   and it's helpful for us.  It's not an acting toward

14   Mr. Hinckley or anything of the sort, just for us to be in

15   the know of the workings of all that as well as the Court.

16   That's all I want to say.

17            THE COURT:  Okay.

18            MS. KENNEDY:  Thank you, Your Honor.

19            (Open court)

20            MS. KENNEDY:  Thank you.

21   BY MS. KENNEDY:

22        Q    Hello again, Mr. Hinckley.

23        A    Hello.

24        Q    Now, you mentioned that your mother is in good

25   health, which is wonderful, and that she has some legacy

1    there to having a nice long life.  And she's presently 89.

2    If your mother lives for another ten years or longer,

3    hopefully, then there isn't going to be any money available,

4    as far as the $250,000 from the house, to be split up or

5    given to your brother, is there?

6         A    There may not be.  It's -- you know, we will have

7    to see.

8         Q    Okay.  And you have children; is that correct?

9         A    Yes.

10        Q    And grandchildren?

11        A    Yes.

12        Q    So all of this disbursement of funds to your

13   brother, is that going to affect what you're able to leave

14   your children and grandchildren?

15        A    You know, if we went -- we haven't gotten that

16   far.  But, of course, we would have to look at it as a

17   family situation, whether, you know --

18        Q    All right.  Now, you talked about some e-mails,

19   perhaps, or letters that you got from the hospital,

20   explaining what John would have gotten -- would get if he

21   was accepted as a resident in Virginia --

22        A    Uh-huh.

23        Q    -- and applied for some entitlements, correct?

24        A    Right.

25        Q    What if you learned that he was not eligible for

1   all of those entitlements, whether from 800 or $1200, that

2   simply was not part of the money he was going to get from

3   the State, would that make a difference every month in what

4   you were able to give or how much you were able to give to

5   your brother?

6       A     That would just -- that would limit the amount

7   that would be given over time.  We would -- we would have --

8   we would not stop the program for that.  But instead of

9   they'll be -- there might be mitigation in the travel fees.

10  There might be mitigation somewhere else.

11          But, you know, there's only X-amount that we've

12  put in the original pot; and if it's $1,000 a month less,

13  then it would go just that much further.

14      Q     Okay.  A thousand dollars, meaning there would be

15  less to pay --

16      A     Right.

17      Q     -- to whatever the needs are.

18          Have you discussed with your brother the

19  possibility in the future of perhaps not being able to pay

20  for specific therapies:  Individual therapy, group therapy,

21  music therapy, that kind of thing?

22      A     No.  No.  I'm still waiting to get the specifics

23  on all of that and what, what would be available, what would

24  not, and what the costs are going to be.

25      Q     Now, you said what would be available.

1          Does that -- are you referring to what's available

2     as far as the fees from Mr. Weiss or Mr. Beffa or Dr. G-G?

3     Is that what you mean, what's available?

4     A     What I'm saying is that my family has very little

5     or no control over this whole process.  And if we are told

6     that the supervision level is high, then we have to address

7     it that way.  If we're told that it's medium, another way;

8     if it's low, another.

9          We have no real control over those expenses.

10    And we would hope that there will, at the end of the day,

11    that there will be some amount of mitigation, there would be

12    some amount of responsibility, and history as with my

13    brother as to what he really needs pressing on.

14    Q     And so my question to you, Mr. Hinckley, is if the

15    expenses continue, you're not receiving any entitlements,

16    Mom lives a long time, in your estimation, it may be two or

17    three years that you're able to support your brother at that

18    level that you are now?

19    A     It's our sense now, based on the numbers we're

20    looking at, that it could be enough to support four or five

21    years; and that's what we're looking at.  We're hoping

22    it would be -- should be enough for four to five years of

23    treatment.

24          THE COURT:  And when you say "four or five years,"

25    are you assuming no support from any state or federal

1    programs, or are you assuming some support?

2            THE WITNESS:  No.  I'm assuming no support,

3    although I would hope for maybe some transportation fee

4    diminishment.  I would hope.

5            But no, I'm not expecting any handouts or any

6    government aid at this point.

7            THE COURT:  Because, again, it may be that

8    Mr. Hyde has this information or Mr. Beffa or Mr. Weiss has

9    this information.

10           But we know from some of the submissions that some

11   of the current providers take Medicaid and some don't.

12   And if John were on Medicaid, then there will be less to pay

13   them out of your pocket, right?

14           THE WITNESS:  Right.

15           THE COURT:  Who he turns 65 and he's on Medicare

16   and the providers that take Medicare, there would be less to

17   pay out of your pocket, right?

18           THE WITNESS:  (Nodding head.)

19           THE COURT:  And then there's something which I

20   don't fully understand, but maybe some witness is going to

21   explain this, which is SSI, which is a part of Social

22   Security, where you don't have to reach a certain age if you

23   have a disability, and that may provide some money too,

24   correct?

25           THE WITNESS:  I have heard that along those same

1   lines.

2           THE COURT:  Now, is it your recollection that

3   these e-mails that you alluded to earlier contain discussion

4   of some of these things?

5           THE WITNESS:  Yes, they did.  In fact, one of them

6   mentioned a possibility of him being Medicare eligible as

7   early as 62 rather than 65, so...

8           THE COURT:  And you believe -- and your

9   recollection is that these were e-mails from Mr. Hyde or

10  collected by Mr. Hyde?

11          THE WITNESS:  They were collected.  They were not

12  scrutinized.  There was no legal footnote at the bottom.

13  But these were ideas that were put forth to help the family

14  try to put a handle around all the monthly expenses.

15          THE COURT:  And then the other issue is, the other

16  two issues, I guess, or one, the hope that Mr. Hinckley

17  might be able to -- your brother, Mr. Hinckley, might be

18  able to get a paying job, rather than the volunteer work --

19          THE WITNESS:  Right.

20          THE COURT:  -- or in addition to that, correct?

21          THE WITNESS:  That is correct.

22          THE COURT:  And then the other issue is when your

23  mother's house is sold -- let's put it this way:

24  If he can't live there any longer, he's going to have to

25  live somewhere?

```
1              THE WITNESS:  Right.
2              THE COURT:  And that's going to cost money, right?
3              THE WITNESS:  Right.
4              MS. KENNEDY:  Thank you.
5    BY MS. KENNEDY:
6         Q    You mentioned, Mr. Hinckley, that you understand
7    some other patients who are on convalescent leave hardly pay
8    anything; is that correct?
9         A    Yes.
10        Q    And are you aware that the majority of those
11   individuals live in the District of Columbia?
12        A    Yes.
13        Q    And have you been told by the hospital that those
14   who do live in the District of Columbia pay substantially
15   less, if anything, than what your family would be paying
16   when they're on convalescent leave?
17        A    I've been told that, yes.
18        Q    All right.  And your mother, assuming,
19   unfortunately, if at some point she become unavailable, have
20   you and your family discussed with the hospital of him going
21   back to the District of Columbia?
22        A    My sister and I have.  My mother's not real keen
23   on it.
24             But my sister and I have talked about, at some
25   point, if that's a necessity, then the final option, then
```

1    yes, we would.

2        Q    And by necessity, you mean financial necessity?

3        A    Financial, primarily, yes.

4        Q    Okay.  Have you had an opportunity to talk to your

5    brother about that?

6        A    Just briefly, in some of the meetings that

7    we would have after the visits; but they've been very brief

8    and just thrown out there as a possibility, no in-depth

9    study.

10       Q    And is it fair to say that your brother has

11   indicated, as he has in the records, that if that has to

12   happen, that that's all right with him?

13       A    He has mentioned to me on a number of occasions

14   that he likes the D.C. area; he likes what's going on there.

15   It's a younger crowd.  He knows -- probably knows more

16   people.  That's about as far as we got on that.

17       Q    Okay.  Do you know from the hospital that if he

18   lived in the housing in the District of Columbia as a not

19   guilty by reason on insanity patient, that the cost often is

20   very insignificant, if anything, at all?

21       A    I probably don't know, even know that.

22       Q    All right.  Do you know that if they're in the

23   District of Columbia, they go to the outpatient division

24   where they receive therapies or group counseling and medical

25   or whatever they may need and pay nothing to the outpatient

1    division?

2         A    I was told that, yes.

3         Q    Do you know if they deteriorate, that the

4    individual is brought back once a consult is done to

5    St. Elizabeths Hospital, and you wouldn't have to rely on an

6    out-of-state hospital?

7         A    I believe that was pointed out as well, yes.

8         Q    Did they indicate that jobs in the community,

9    subsidized jobs are ready available for those who are on

10   convalescent leave?

11        A    I was not told that, no.

12        Q    Okay.  And are you aware that most of the

13   individuals on convalescent leave are entitled and do get

14   Social Security, Medicaid, and other state subsidies or city

15   subsidies?

16        A    Uh-huh.

17        Q    All right.

18             THE COURT:  That's a yes, or you're not sure?

19             THE WITNESS:  I'm not sure.  I think I've heard

20   that, but maybe not.

21             MS. KENNEDY:  Okay.

22             THE COURT:  So your question is, in the

23   District of Columbia?

24   BY MS. KENNEDY:

25        Q    In the District of Columbia; if he were to live in

1    the District of Columbia?

2         A    Okay.

3         Q    Correct?

4         A    Correct.

5         Q    And obviously, your brother has lived in the

6    District of Columbia for 35 years, correct?

7         A    Right.

8         Q    And he has a lot of contacts here, correct?

9         A    Yes.  Correct.

10        Q    And, in fact, everyone knows him at the hospital

11   after 35 years, correct?

12        A    Correct.

13        Q    And do you assume or do you know that the

14   District of Columbia is a lot more accepting of individuals

15   such as your brother who have been found not guilty by

16   reasons of insanity or those who have been convicted of a

17   crime?

18        A    I'm finding that out as I see the daily papers in

19   each area, yes.

20        Q    And, in fact, is it fair to say that Williamsburg

21   is a fairly conservative community?

22        A    It's very conservative, yes.

23        Q    And hasn't been entirely welcoming to your

24   brother?

25        A    That is true.

1     Q    Okay.  So if it came to the situation where it was

2    economically more feasible for the family and considering

3    his history here, what would be available up there versus

4    Williamsburg, would you object if at some point in time he

5    had to move back to the District of Columbia?

6     A    I would not object upon discussing it with the

7    family, but I would not object at this point, no.

8         MS. KENNEDY:  I have no further questions,

9    Your Honor.

10        THE COURT:  Are you going to have further

11   questions possibly after lunch?

12        MS. KENNEDY:  Well, I might, depending on how soon

13   Mr. Hyde can get this information.

14        But I -- you know what, Your Honor?  I think not.

15   I know he has a flight to catch.  I think I've made my

16   points.  It can be brought up through Mr. Hyde.

17        THE COURT:  Okay.  I do think that if there are,

18   Mr. Hyde, if there is this series of e-mails or something

19   that Mr. Hinckley obviously had something in his mind that

20   he's seen, that the government ought to see it.

21        MS. KENNEDY:  Yeah.

22        THE COURT:  And you ought to be prepared to talk

23   about it as well.  And maybe you can check on that over

24   lunchtime.

25        MS. KENNEDY:  Okay.

1          THE COURT:  Mr. Levine, have you got anything?

2          MR. LEVINE:  Thank you, Your Honor, briefly.

3          Thank you, Judge, if it please the Court.

4                         - - -

5                  REDIRECT EXAMINATION

6    BY MR. LEVINE:

7      Q    Mr. Hinckley, in the initial inquiry by

8    Ms. Kennedy, she asked you about medication, John taking his

9    medication.  Do you recall that inquiry?

10     A    Yes.

11     Q    All right.  Now, does John take his medication

12   religiously?

13     A    Yes, he does.

14     Q    Has there ever been a basis for concern about

15   Mr. Hinckley not taking his medication?

16     A    Not to my understanding.

17     Q    Has his record of taking his medication been

18   impeccable with respect to compliance?

19     A    That's my understanding.

20          Now, Ms. Kennedy then went on to ask you some

21   questions about John being manipulative, I think is the word

22   she used, that he went to -- she uses an example that he was

23   ostensibly going to the movies, but instead he went to the

24   bookstore.  Do you remember that?

25     A    Yes.

1      Q    All right.  Now -- and do you remember that being

2   a significant part of the hearing that we had some years

3   ago?

4      A    Yes, I do.

5      Q    And has John learned his lesson from that, in your

6   view?

7      A    Very much so.

8      Q    And since that hearing --

9           MR. LEVINE:  I think we said that was 2011,

10  Your Honor.  Is that the Court's recollection, 2011?

11          THE COURT:  That we began the hearing?

12          MR. LEVINE:  Yes.

13          MS. KENNEDY:  Yeah.

14          THE COURT:  Yes.

15          MR. LEVINE:  Yes.

16  BY MR. LEVINE:

17     Q    Since that time, has there been any instant of

18  which you're aware that John has been involved in deceptive

19  behavior?

20     A    Not that I can recall.  In fact, maybe just the

21  opposite, where we were -- had intended to go to a movie,

22  and the movie was during a certain time frame that we had to

23  be there.

24     Q    Please raise your voice.

25     A    We couldn't --

1      Q    You were about to say you went to a movie?

2      A    Went to a movie at -- during a certain time

3  period, the movie apparently was sold out.  We just picked

4  the next movie that was in a similar time frame, went to the

5  movie theater, sat down; and in the first five minutes, I

6  get a nudge from John, and he says:  "We got to get out of

7  here."

8           And I said, "What did you mean?  Why do we have to

9  get out of here?"

10          He said, "That lady up on the screen, that is

11  Jodie Foster."

12          And I said, "Okay.  I don't recognize her, but

13  I'll take your word for it."

14          And we got up.  Secret Service got up.  We all

15  walked out of the room.  And so he definitely takes that

16  very seriously.

17          THE COURT:  And when was this, roughly?  This was

18  in the last couple of years?

19          THE WITNESS:  Last couple years, yes.

20  BY MR. LEVINE:

21      Q    Now, then, of course, Ms. Kennedy asked a series

22  of questions about financing, and there was frequent

23  reference both by Ms. Kennedy and the Court to e-mails of

24  which we think you've received.  Do you recall the -- and

25  those --

1       A     Yes.

2       Q     And those e-mails go to the question of finance

3   and ability of the family to pay for the services that it is

4   expected that John will receive; is that correct?

5       A     That's correct.

6       Q     All right.  And now, if no money comes from Social

7   Security and if no money comes from Medicare and if no money

8   comes from Medicaid and if no money comes from the

9   Affordable Care Act and if no money comes from his

10  employment, is it your understanding that Jo Ann's assets,

11  your mom's assets, would be able to fund his existence for a

12  period of approximately five years?

13      A     It is my understanding that the funds she has

14  available should be enough to cover that period.

15      Q     All right.  And that's assuming some $100,000 a

16  year, right?

17      A     Right.

18      Q     All right.  Now, Mr. Hinckley's birthday,

19  I believe, is May 29.  We're within a month of that

20  birthday, approximately; is that correct?

21      A     That is correct.

22      Q     So those funds, Jo Ann's fund, Mom's funds, would

23  be able to cover him, as you understand it, until he becomes

24  65 years old; is that correct?

25      A     That's correct.

1     Q    And at that time, the other benefits, we know,

2  will kick in.  We may not know the amount, but we know that

3  the benefits necessarily, as a matter of law, kick in;

4  is that right?

5     A    That's correct.

6     Q    All right.  Now, should there be a shortfall,

7  should there be some benefits but not sufficient benefits to

8  pay for all of the providers that he would be seeing, is it

9  your testimony that the family will supplement as needed?

10    A    The family will supplement as needed on that plan.

11    Q    Okay.  Now, do you think, Mr. Hinckley, that a

12 mental health patient whose mental health has been restored,

13 who suffers from no -- who has no symptoms of mental disease

14 should have his liberty or his freedom turn on ability to

15 pay?

16         MS. KENNEDY:  Objection, Your Honor.  First of

17 all, incredibly leading, compound question, way beyond my

18 cross-examination.

19         MR. LEVINE:  I think it goes to the heart of a

20 what she's asking.  It's a question of whether or not --

21 whether freedom --

22         THE COURT:  Do we really --

23         MR. LEVINE:  -- turns on affluence.

24         MS. KENNEDY:  No.

25         MR. LEVINE:  That's what the question is.

1          THE COURT:  But why do I care what Scott Hinckley

2    thinks about that?  Isn't it more important what I think

3    about that?

4          MR. LEVINE:  I think -- I think it's important to

5    know what you think about it; but I'm asking the question of

6    Scott, because I think it's important to know what he thinks

7    about it.

8          THE COURT:  I'm going to sustain --

9          MR. LEVINE:  I think it's important to know what

10   he thinks about it.

11         THE COURT:  I'm going to sustain the objection.

12         With all due respect, Mr. Hinckley.

13         MR. LEVINE:  One moment, please, Your Honor.

14         No further questions, Your Honor.

15         THE COURT:  Okay.

16         MS. KENNEDY:  Now, can I just ask one?

17         THE COURT:  Sure.

18         MS. KENNEDY:  Thank you.

19                           - - -

20                    RECROSS-EXAMINATION

21   BY MS. KENNEDY:

22       Q    Now, Mr. Hinckley, you indicated that you did not

23   know of any other manipulative or wrong conduct by your

24   brother other than the 2011 movie-bookstore situation;

25   is that right?

1      A    That's correct.

2      Q    So are you not aware that in January of this

3  year --

4           MR. LEVINE:  Your Honor, the question was about

5  deception.

6  BY MS. KENNEDY:

7      Q    Well, deception, deception, manipulation, in any

8  way, bad behavior, that in January of 2015, your brother's

9  itinerary indicated that he was supposed to go to a

10 photographer's home to discuss photography; and rather than

11 do that, he went to a friend's home who had a music

12 recording studio?  The next day, he did call Mr. Hyde to

13 tell him that he was sorry and he knew that it was wrong.

14          Are you aware of that behavior?

15     A    I was aware of that.

16          I was under the impression -- and no one had told

17 me that he had a certain amount of free time and that he was

18 using some of his free time.  That turned out to be wrong,

19 and so I apologize.

20     Q    That's all right.  But do you consider that

21 conduct that is deceptive?

22     A    That was not good conduct.

23          MS. KENNEDY:  Thank you.

24          THE COURT:  Okay.

25          MR. LEVINE:  Briefly, Your Honor.

```
 1                              - - -

 2                      REDIRECT EXAMINATION

 3  BY MR. LEVINE:

 4      Q     With respect to that instant, Mr. Hinckley, is it

 5  your understanding that your brother, John, was with

 6  Mr. Brelsford, the photographer?

 7      A     That was my understanding.

 8      Q     And was it further your understanding that under

 9  the itinerary, the two of them were supposed to see another

10  photographer, a former photographer, from Look magazine, as

11  a matter of fact?

12      A     That was my understanding.

13            MS. KENNEDY:  Objection, Your Honor.  There's no

14  relevance to that.

15            THE COURT:  You can go on if you really want to.

16  BY MR. LEVINE:

17      Q     And is it your understanding that that gentleman

18  was sick that day?

19      A     Yes, I believe so.

20      Q     And is it your understanding that the two of them

21  decided to go to another person they knew who is a musician?

22            THE COURT:  And not sick?

23  BY MR. LEVINE:

24      Q     And not sick, yes.

25      A     That was my understanding.
```

1        Q    And it's your understanding that Mr. Hinckley,

2   because that was a change, a change in the itinerary, should

3   have given a call to Mr. Hyde or to Mr. Weiss to inform them

4   of that change?

5        A    Yes, that's true.

6        Q    And is it your understanding that they went to the

7   musician; they spent the time there; and then, thereafter,

8   Mr. Hinckley informed Mr. Hyde and Mr. Weiss of that change?

9        A    Correct.

10        Q    And during the course of that incident, is there

11   any behavior, any misbehavior by Mr. Hinckley of which

12   you're aware?

13        A    None that I was aware of.

14        Q    So he went to a musician rather than a

15   photographer and reported it after the meeting rather than

16   prior to the meeting?

17        A    That's correct.

18             MR. LEVINE:  Nothing further, Your Honor.

19             THE COURT:  Can Mr. Hinckley be excused?

20             MS. KENNEDY:  Yes, Your Honor.

21             THE COURT:  Okay.  Thank you very much,

22   Mr. Hinckley.

23             THE WITNESS:  Thank you, Your Honor.

24             THE COURT:  And why don't we -- is your sister on

25   the same plane?  Are you and your sister taking the same

1   plane?

2            THE WITNESS:  No, but she's -- she would like to

3   go next.

4            THE COURT:  Well, she'll go next.  So -- right?

5            MR. LEVINE:  Yes, Your Honor, yes.

6            THE COURT:  So why don't we get Ms. Sims in, and

7   perhaps -- perhaps we could finish before lunch with

8   Ms. Sims.

9            MS. KENNEDY:  Depends on when lunch is.

10           THE COURT:  Depends on when lunch is?

11           MR. AZIZ:  Your Honor, I don't know how long

12  Mr. Levine has for direct, but I think that's very unlikely.

13           THE COURT:  Okay.  But we can start.

14           MR. LEVINE:  Call Diane Sims, Your Honor.

15           THE COURT:  Yes.

16           DEPUTY CLERK:  Good afternoon, ma'am.

17           THE WITNESS:  Good afternoon.

18           DEPUTY CLERK:  Would you please raise your right

19  hand.

20           (Witness is placed under oath.)

21           DEPUTY CLERK:  Thank you.

22                        - - -

23  DIANE SIMS, WITNESS FOR THE DEFENDANT, SWORN

24                   DIRECT EXAMINATION

25                        - - -

BY MR. LEVINE:

Q    If it please Your Honor, will you please state your name.

A    Diane Sims.

Q    And spell your last name, please.

A    S-i-m-s.

Q    And do you know this gentleman over here?

A    Yes, I do.

Q    Is he your brother?

A    Yes, he is.

Q    All right.  And, Ms. Sims, you have been to this courtroom before and have testified before in hearings of this kind?

A    Yes, I have.

Q    All right.  And since the last hearing, which I think began in 2011, have you had occasion to attend conditional release visits to Williamsburg?

A    Yes, I have.

Q    Have you visited with your brother?

A    Yes.

Q    And your mother?

A    Yes.

Q    And have there been occasions where you have been joined by your brother Scott?

A    Yes.

1     Q    And have there been occasions, to your knowledge,

2   where your brother Scott went to Williamsburg but you were

3   not there?

4     A    Yes.

5     Q    And during the time that you were in Williamsburg,

6   did you have occasion to participate with John in his

7   activities?

8     A    Yes.

9     Q    And did you observe him do chores around the

10  house?

11    A    Yes.

12    Q    Did you observe him do housework?

13    A    Yes.

14    Q    Yard work?

15    A    I'm not sure about -- well, sweeping outside, if

16  that's considered yard work.  It's outside work.

17    Q    Okay.  And general household chores, such as doing

18  laundry or preparing meals, did you see him do those things?

19    A    That's correct.

20    Q    And do you know if he maintained contact with the

21  hospital during the time that you were accompanying him?

22    A    Yes.

23    Q    And did you watch him write songs and do paintings

24  and take photographs?

25    A    I didn't watch him doing the writing or the

1    painting; but I, you know, saw the evidence of that, that he

2    had been writing and painting.

3         Q    Did you hear him play guitar?

4         A    Oh, yes, I have certainly heard him play the

5    guitar.

6         Q    And you heard him singing the songs?

7         A    Yes, I've heard him sing songs, yes.

8         Q    Does he have some talent?

9         A    Yes, he does.

10        Q    I think so.

11             All right.  Now, did there come a time, Ms. Sims,

12   where in preparation for this hearing today, that you were

13   interviewed by Dr. Raymond Patterson?

14        A    Yes.

15        Q    All right.  And do you remember when that was?

16        A    I believe it was on March 11th of this year.

17        Q    And did you know to expect his call?

18        A    No.

19        Q    All right.  Were you surprised when he called?

20        A    Yes.

21        Q    And you've talked to him before?

22        A    I have never been interviewed by him before.

23        Q    Never, okay.

24        A    Never.

25        Q    So this is the first time you talked to

1    Dr. Patterson; is that correct?

2        A    That's correct.

3        Q    And as of the time that he surprised you with his

4    call, had you seen or known the terms of the hospital's (e)

5    petition?

6        A    Not at that time.

7        Q    All right.  Now, did Dr. Patterson ask you if the

8    family could continue to support Mr. Hinckley financially at

9    current levels indefinitely?

10       A    He did.

11       Q    All right.  Tell us about that conversation.

12   What did he ask?  How did you interpret his questions, and

13   what were your responses?

14       A    We were talking about if, as John went on in his

15   life, you know, from now on, were we going -- we, as a

16   family, going to be able to continue to support him

17   financially.

18            And based on at that time what the expenses had

19   been sometimes during some of the months, I couldn't say

20   that for the rest of John's potential life, that we would

21   have that kind of money for that length of time.

22            But not knowing how long John is going to live and

23   not going what the expenses are going to be down the road,

24   it was a difficult question to answer.

25            And not knowing what the petition is -- was at the

1  time, which obviously, now that the petition has been turned

2  in, it changes things quite a bit.

3      Q    All right.  Did you tell Dr. Patterson that,

4  unequivocally, you support John being able to live in

5  Williamsburg on convalescent leave?

6      A    Yes, I did.

7      Q    And did you tell him that with respect to the

8  ability of the family to finance his mental health needs in

9  Williamsburg, that the family had discussed these issues?

10     A    Yes.

11     Q    All right.  And is it your -- what is your

12  understanding about the family's commitment to support John

13  on convalescent leave in Williamsburg?

14     A    We have some cash, money that we can get to, at

15  this point of about $250,000.

16         We also have, at some point in the future, my

17  mother, from the sale of my mother's home, that we have

18  dedicated to -- the proceeds from that to going into helping

19  John out with his expenses.

20     Q    All right.  So is it your understanding that your

21  mom's resources, whether it be cash she has on hand in

22  whatever form it may exist, plus the equity in her house,

23  those resources would go toward taking care of John's

24  financial needs?

25     A    That's correct.

1      Q    And assuming approximately, and I think it's an

2    extravagant assumption, about $100,000 a year, do you have

3    an idea about how long it would pay for those expenses, were

4    there to be no entitlements at all?

5      A    Well, assuming 100,000 a year, which I think is a

6    very high assumption, at this point, with this new

7    information in the petition, several years.

8      Q    Several years?

9      A    Several years, yes.

10     Q    At least four or five?

11     A    Oh, yes.

12     Q    All right.  And if there were to be some

13   entitlements or some benefits from the State of Virginia,

14   maybe from Obamacare, maybe from Social Security, maybe from

15   Medicaid, maybe from Medicare, and depending on John's age

16   and eligibility, would that help defray the costs?

17     A    Yes, I think it would.

18     Q    And is it your understanding that your resources

19   and Scott's resources would stand behind your mom's

20   resources to supplement whatever is needed?

21     A    That's correct.

22     Q    Now, in giving this testimony, is this, has this

23   issue been the subject of your discussion with Scott and

24   with your mom?

25     A    Yes.

1    Q    Now, there's been some question about what would

2  happen if your mom became unavailable, a euphemism, perhaps,

3  for death or perhaps some sort of other kind of disability.

4         If your mom were to become unavailable, would you

5  be willing to come to Williamsburg and stay with John until

6  such time as the situation, as it was comed [sic], as it

7  became known, was resolved?

8    A    Absolutely.

9    Q    Do you say that without equivocation?

10   A    Absolutely.

11   Q    And have you had occasion to discuss that with

12  your husband?

13   A    Yes, I have.

14   Q    And he's in accord with that?

15   A    Yes, he is.

16   Q    And you have children, do you not, Ms. Sims?

17   A    I have grown children, yes.

18   Q    Grown children.  By "grown children," you mean,

19  are they out of the house?

20   A    They're out of the house, yes.

21   Q    Are they self-sufficient?

22   A    They are.

23   Q    So are you able to come at a moment's notice

24  should that be the case?

25   A    Yes, I am.  Yes.

1      Q     Now, did you tell that to Dr. Patterson?

2      A     I'm -- let me think back.

3      Q     Let me ask you this:  Did Dr. Patterson ask you

4  that?

5      A     I don't recall that; but if he had asked that,

6  I would have given the same answer.

7      Q     All right.  And when you would come to

8  Williamsburg to address the, I guess I can call it the

9  crisis, that may -- visited the family, would you work with

10  the Williamsburg treatment team and the D.C. treatment team

11  to resolve the crisis?

12     A     Oh, of course, yes.

13     Q     Now, there's been some testimony in this case

14  about the cost of travel to and from D.C. and Williamsburg.

15  Are you familiar with the approximate cost of travel to and

16  from D.C. when John goes on these monthly releases?

17     A     Yes.  When a car service is used, the car service

18  each way has been about $448.  You add about a ten percent

19  tip to that.  So it's right at about $500 each way.

20     Q     $498, call it 500?

21     A     Yeah, call it 500.

22     Q     And that's in each direction?

23     A     In each direction.

24     Q     And if Mr. Hinckley were permitted to drive

25  unaccompanied as the hospital asks in its petition -- and

```
 1    I don't believe the government has opposed -- unaccompanied,

 2    to and from, would that save the family $1,000 immediately

 3    per month?

 4         A    Per month, yes, it could.  It absolutely could.

 5         Q    And if he were allowed to go by bus, the cost

 6    would be insubstantial?

 7         A    Correct.

 8              MR. LEVINE:  The Court's indulgence for a moment,

 9    please.

10              THE COURT:  Yes.

11    BY MR. LEVINE:

12         Q    Ms. Sims, indulge this question.

13         A    Okay.

14         Q    Do you love your brother?

15         A    Absolutely.

16         Q    Do you think your mom and brother love your

17    brother.

18         A    Yes, they do.

19         Q    And have you talked to your mom about her

20    eagerness to have him home?

21         A    Yes, I have.

22         Q    And tell us about that eagerness.

23         A    She is as ready for this as she could ever be.

24    She has been hoping for this and wanting this for a very

25    long time.
```

1      Q    Do you pledge to this Court your moral support for
2  John Hinckley?
3      A    I absolutely do.
4      Q    Do you pledge to this Court your emotional
5  support --
6      A    Absolutely.
7      Q    -- for John Hinckley?
8           And do you pledge to this Court your financial
9  support to John Hinckley?
10     A    Yes.
11     Q    Without equivocation?
12     A    Without equivocation.
13          MR. LEVINE:  Thank you, Judge.
14          THE COURT:  Mr. Aziz.  Thank you, Your Honor.
15                         - - -
16                   CROSS EXAMINATION
17  BY MR. AZIZ:
18     Q    Good afternoon, ma'am.
19     A    Good afternoon.
20     Q    Where in the country do you live?
21     A    I live in Dallas.
22     Q    In Texas?
23     A    In Texas, yes.
24     Q    Do you know how many miles away from either D.C.
25  or Williamsburg that is?

```
 1        A      1,200 to 1,500 miles.

 2               THE COURT:  When you go up to visit your mother,

 3     you fly?

 4               THE WITNESS:  I fly to -- into Richmond and then

 5     rent a car and drive on into Williamsburg.

 6     BY MR. AZIZ:

 7        Q      And then do you have a rental car for the time

 8     that you're in Richmond or, I'm sorry, in Williamsburg?

 9               THE COURT:  Could you move the microphone a little

10     closer to you?

11               MR. AZIZ:  I'm sorry, Your Honor.

12     BY MR. AZIZ:

13        Q      Do you have a rental car the time that you're in

14     Williamsburg, for that time?

15        A      Yes, I do.

16        Q      When your brother -- when Scott comes, does he

17     have a rental car as well?

18        A      If he comes at the same time that I'm there, we

19     generally will share one.  But if he comes on his own, he

20     does have a rental car on his own.

21        Q      Okay.  And how many vehicles are there with, at

22     your mom's house?

23        A      There are two.

24        Q      And does she drive a car as well?

25        A      Yes, she does.
```

1    Q    Okay.  And then there's another car that John

2    uses, is that correct, Mr. Hinckley?

3    A    That's correct.  There is an extra car there.

4         The reason why I would rent a car rather than just

5    using one that was there -- I have done that on occasion.

6    But for me to get from the airport to my mother's house,

7    I have to have a way to get there.

8         The airport is just a little over 50 miles away,

9    so John or my mother could not have come to get me because

10   of the, you know, the parameters there with the 50-mile

11   radius that John needs to observe.

12        And then when I'm there, I do drive John back up

13   to Washington, D.C. at the end of my trip.  So I also need

14   the rental car for that reason.

15        And then from that point, I get myself to the

16   airport using that rental car.

17   Q    Okay.  Thank you.

18   A    Uh-huh.

19   Q    It's just, just so I'm clear, just the three of

20   you, is that right, the siblings, you, Scott, and John?

21   A    Yes, three children, yes, uh-huh.

22   Q    And you've been -- you're married currently;

23   is that correct?

24   A    I am, uh-huh.

25   Q    Correct me if I am wrong, but I'm doing the math

```
1    from your prior testimony.  I believe it's about 41 years?

2         A    It will be 41 years next month.

3         Q    In May?

4         A    In May.

5              THE COURT:  What date?

6              THE WITNESS:  25th.

7              THE COURT:  Me too.

8              THE WITNESS:  Oh, well, isn't that fun?

9              THE COURT:  40 years.

10             THE WITNESS:  Good for you.  Good for you.

11   BY MR. AZIZ:

12        Q    You're one year apart.

13             You have two children; is that right?

14        A    I do.

15        Q    And one of them is a son who's 38; is that right?

16        A    He will be 38 on Sunday.

17        Q    Happy early birthday.

18        A    Thank you.

19        Q    And you have a daughter who is 34, I believe?

20        A    Yes, that's correct.

21        Q    Does your son still live in Dallas with you?

22        A    He lives in a suburb of Dallas.

23        Q    Is that, do you live in the same suburb?

24        A    Pardon?  Do I?

25        Q    Do the two of you live in the same suburb?
```

1       A    No.  I live in Dallas.  He lives in a town called

2    McKinney.

3       Q    And does your daughter still live in LA?

4       A    Yes, she does.

5       Q    Are your children married?

6       A    My son is married.

7       Q    And does he have any children?

8       A    He has one son.

9       Q    How old is that son?

10      A    Six years old.

11      Q    I'm sure he's a bundle of joy.

12      A    He is a delight.

13      Q    Does your daughter have any children?

14      A    No, she does not.

15      Q    And so just one grandchild; is that right?

16      A    Yes, just one.

17      Q    Do you ever take care of those grandchildren?

18      A    I do.

19      Q    How often?

20      A    Well, it's kind of on an as-needed basis, but it's

21   not -- now that he is in kindergarten and that's a full day

22   from -- until 3:00 in the afternoon, I try to get up there

23   at least once a week to pick him up and spend some time with

24   him in the afternoon.  I just -- that's just something that

25   I've always wanted to do, and I -- he enjoys it, and I enjoy

it.

Q And do you work at all?

A No, I do not.

Q When was the last time that you worked, do you remember?

A It was actually up until a month before our son was born.

Q Okay.

A My son was born.

Q Okay. What kind of work did you do?

A I worked in a bank. I was a bank teller.

Q Do you remember speaking with Dr. Murphy about your husband's business?

A Yes.

Q He -- and he has an insurance business, I believe; is that correct?

A He does.

Q Unfortunately, because of the healthcare act, it affected the business badly; is that right?

A That portion of the business, yes, it did.

Q Okay. Is there another portion that's doing better?

A Yes.

Q What is that?

A It is -- it's actually kind of a brand-new

1    position, because my husband's former business targeted,

2    well, those that couldn't get normal benefits through

3    employers, such as part-time employees or those that worked

4    on, you know, you know, base fees, contract work, that kind

5    of thing.  A lot of times they couldn't get insurance that

6    way because they were not considered full-time employees.

7    So he had policies that would cover those workers and give

8    them benefits.

9           When Obamacare came into being, that pretty much

10   wiped out what he was doing, because it took the place of

11   what he was doing.  So he has, in the last several months,

12   worked with people developing new strategies and working

13   with some of the ancillary care packages that are not

14   affected by Obamacare, such as dental packages, vision

15   packages, things like that.  So there are other avenues that

16   he's directed his business in at this point.

17       Q    Is he the primary and the soul source of finances

18   for your family?

19       A    Yes, he is.

20       Q    And do you all own your house already?

21       A    We do.

22       Q    No mortgage?

23       A    Oh, no.  I'm sorry.  We do have a mortgage on it.

24   But yes.  We don't rent.  We do own.

25       Q    Any cars over in Dallas?  I assume the answer is

1   yes.

2        A    We do have two cars.

3        Q    And any mortgages for those cars or car payments.

4   There's a car payment on his car.

5             Is that a new car?

6        A    No, it's not a new car.

7        Q    Okay.  I'm just going to ask you a couple of

8   questions about coming here.

9             When did you find out that you were going to

10  testify for today?

11       A    The date, the specific date that I was to show up

12  here or the fact that I would be testifying in the hearing?

13       Q    Let's start with just the fact that you would be

14  testifying.

15       A    Well, early February was when I was notified that

16  the hearing dates had been set.

17       Q    And who notified you?

18       A    Mr. Levine.

19       Q    Okay.  Now, when did you find out about the exact

20  date?

21       A    That I would -- that today would be the day

22  I would -- Friday.  Last Friday.

23       Q    How many times did you speak with Mr. Levine or

24  anyone from his staff?

25       A    At least three.

1      Q    And when were those times?

2      A    Within the last two weeks.  Several times, you

3  know, one.  And then, you know -- one, maybe two weeks ago.

4  Then somewhere in the middle.  And then last week, last

5  Friday.

6      Q    About how long did you guys talk for?

7      A    Maybe a couple of hours total.

8      Q    Across all three?

9      A    Across all three, uh-huh.

10     Q    Okay.  And when you were talking, what was the

11 nature of the discussion that you guys were talking about?

12     A    Well, I guess we were talking about the finances.

13 He did want to know about that; wanted to know about John

14 and the visits that I, you know, how our visits had been.

15         I hadn't talked to Mr. Levine in quite some time,

16 so we caught up a little bit there and, you know, and

17 mentioned that he would like to have me testify here at the

18 hearing.  That's basically what we talked about, just those

19 kind of details.

20     Q    You said it had been quite some time since you

21 talked with Mr. Levine last.  Do you remember when that was?

22     A    Yeah, around the last hearing, period of time.

23     Q    2011?

24     A    Yes.

25     Q    And you've actually testified several times in

1    this case; is that right?

2         A    Yes, I have.

3         Q    So you testified in 2007, 2008, and 2011?

4         A    I believe so.

5         Q    Am I missing anything?

6         A    Oh, well, I'm not sure.  I'm not sure of the

7    years, but I have been here on several occasions.

8         Q    Okay.  When you were talking with Mr. Levine about

9    the finances, do you know, do you know if he recorded any of

10   these?

11        A    Did I know if he what?

12        Q    Recorded any of them, audio-recorded them?

13        A    I don't believe so.

14        Q    Now, let's turn to talking about those finances,

15   if that's okay.

16        A    All right.

17        Q    When you were speaking with Dr. Murphy,

18   do you remember that conversation?

19        A    Yes.

20        Q    When did that happen in relation to your

21   conversation with Dr. Patterson, before or after?

22        A    A few days after.

23        Q    Okay.  That was on the phone, I assume?

24        A    It was on the phone.  I believe Dr. Patterson

25   called me, I believe it was on a Wednesday.  And I believe I

1   spoke with Dr. Murphy the following Monday.

2       Q    Okay.  When you were speaking with Dr. Murphy, you

3   were talking about the fact that the costs had recently

4   increased.  Do you remember that?

5       A    Yes.  But, again, I had not seen the new plan.

6   That was just based on old information at that -- the only

7   information I had at that time.

8       Q    Absolutely.

9       A    Yeah.

10      Q    And we'll get to that, I promise.

11      A    Okay.

12      Q    And part of the reason that you gave Dr. Murphy

13   that the cost had increased is because of Mr. Weiss;

14   is that right?

15      A    That was part of it, yes.

16      Q    What's the other part?

17      A    Well, I mean, all -- the -- because John was

18   going -- was home more often for longer -- more -- excuse

19   me -- was home more days at a time, the services were, of

20   the providers were being used more often; therefore, that

21   was an obvious result of that, you know.  If you're getting

22   more services, you certainly have to pay more to get them.

23      Q    Makes sense.

24      A    Make sense, exactly.

25      Q    Let's turn to Mr. Weiss specifically, though.

1    A    Okay.

2    Q    You called him, quote, amazingly wonderful

3  addition, end quote?  Do you remember that?

4    A    That is the way that he has been described to me.

5  He really has been a wonderful asset and addition for John,

6  I think.  John, I think, likes him.  My mother likes him.

7  You know, I've not had the -- I've not been able to meet him

8  in person myself.  I've spoken to him briefly on the phone

9  just the other day.

10    Q    That was my next question.

11    A    Oh.

12    Q    So you haven't had a chance to meet him in person

13  yet?

14    A    No.

15    Q    Do you know when the first time you spoke with

16  him, though, was?

17    A    Oh, it was just this last week.

18         Actually, it was on Monday.

19    Q    This past Monday?

20    A    This past Monday, exactly, yes.

21    Q    That was the first time you spoke with Mr. Weiss?

22    A    Yes.

23    Q    Yourself, I mean.

24    A    Myself, yes.

25    Q    And before that point, the positive things that

1    you had heard about Mr. Weiss were from either your brother

2    John or your mother; is that right?

3        A    Yes.

4        Q    And how has your brother described Mr. Weiss?

5        A    He really likes him.  He feels like he has --

6    Mr. Weiss grasps a lot of what John needs.  He understands

7    what John needs.  He goes after that.

8             He has a wonderful sense of the community down

9    there.  He knows a lot of people.  And he's -- he has a lot

10   of wonderful ideas for how to integrate John better into the

11   community.  And he has spent a lot of time with him

12   personally, making sure some of these things happen and

13   making -- introducing him to new things and to new people.

14   So it's just been -- it's been a wonderful situation.

15       Q    Do you know when he was first introduced to John

16   and -- Mr. Hinckley and when he joined that team?  The year,

17   I mean.  I mean, if you know the month, sure, but --

18       A    The year, well, it would have been, in my

19   opinion -- I don't know exactly, but it was, I think --

20   well, it had to have been before John started on the new,

21   what would have been the most current ruling at that point,

22   because he became a part of that, I believe, at that time.

23       Q    So before the -- you're talking about the hearings

24   that took place back in 2011 and 2013?

25       A    It was after the 2011 hearings -- or the 2013

1    hearings.

2              Wait a minute.  I'm getting confused on my dates.

3              THE COURT:  It's all a matter of public record,

4    actually.  So unless you need this for a predicate

5    question --

6              THE WITNESS:  Okay.  Thank you.

7              MR. AZIZ:  That's fine.

8    BY MR. AZIZ:

9         Q    And have you had a chance to meet Dr. G-G?

10        A    Yes.

11        Q    And when was the -- in person?

12        A    In person.

13        Q    When was the first time you met with her?

14        A    Now, that had to have been -- probably before the

15   last hearing was the first and last time I've met -- I just

16   met in person with her one time.

17             And then I saw her at the hearing.  So I,

18   you know, said hello to her then, but we didn't, you know,

19   discuss anything.

20        Q    Have you ever spoken with Dr. G-G on the phone as

21   well?

22        A    I don't recall.

23        Q    Have you ever met Mr. Beffa in person?

24        A    Yes, I have.

25        Q    How many times?

1      A      In person -- well, I've taken John to some

2   appointments that he's had, and I'd say hello to him then.

3   And I did sit in on one of John's appointments with him

4   earlier on, several years ago.  And then I've seen him here

5   at some of these hearings.

6      Q      Have you ever spoken with him yourself?

7      A      Well, in what way?  I mean --

8      Q      Not in passing, not hi, bye.

9      A      No, no, no.  Only in passing.

10     Q      And do you know the name of your brother's music

11  therapist down in Williamsburg?

12     A      Well, if you hadn't asked me, I could tell you her

13  name.  I've only met her once --

14            No.  Excuse me.  I met her once.  And then she

15  came to the house this last month when I was there, and

16  I did briefly get to speak to her again at that point.

17     Q      That's Ms. Haley?

18     A      That's correct.  That is her name.

19     Q      Now, turning to -- how essential do you feel that

20  each of these individuals are for John's treatment?

21  How helpful have they been?

22     A      I do believe each one of them have been helpful

23  doing what they do for -- they do each provide a little

24  different something for John.

25            Of course, G-G being the psychiatrist, I think

1    that kind of speaks for itself.  You know, she is the

2    psychiatrist down there.  I do think very highly of her.

3            Mr. Beffa has -- does the individual and the group

4    therapy with him, and I think those two different types of

5    therapies are good for John.

6            And then Mr. Weiss, again, more on the community

7    aspect of getting him into the community and opening new

8    avenues for him for things that are there for -- in

9    Williamsburg that could be of interest for John.

10       Q    And you'd agree that Mr. Weiss appears to have

11   served a social aspect for John as well?

12       A    He does.  He does.

13       Q    As a friend almost?

14       A    Yes, I would say so.

15       Q    Now, a couple of times you've said that --

16   I believe when Mr. Levine was asking you, that your

17   conversation with Dr. Patterson took place before you had

18   seen the new petition?

19       A    That's correct.

20       Q    And that now with the new petition, your words,

21   I think, were something to the effect of things are

22   different?

23       A    Yes.

24       Q    Can you explain what you mean, please.

25       A    Yes.  When I spoke with Dr. Patterson, we had

1    everything set in place that John has been doing for the

2    last year.  And in general, in the beginning of that,

3    especially when there were maybe more outings with Mr. Weiss

4    and just getting the -- I think there were -- there were

5    certainly months that the bills fluctuated, depending on

6    what was being done that month.  And I think most of the

7    fluctuation did come from the outings with Mr. Weiss or the

8    meetings with Mr. Weiss.

9         But as time went on, I think a lot of his time, he

10   wasn't needing to see -- John wasn't needing to see

11   Mr. Weiss quite as often; so, therefore, you know, the cost

12   of that went down.

13        And Mr. Weiss has even indicated, you know, as it

14   continues to go on, he's going to find it probably less

15   necessary to be with John as much, you know, to pare it

16   down.

17        And we'll be working probably mainly on, you know,

18   finding John work and things like that, and it won't be as

19   much of a day-to-day type existence.

20   Q    So when Mr. Levine is asking you questions about

21   how many years, given the amount of money, it's with that

22   understanding that you're answering his questions;

23   is that right?

24   A    Answering your question, yes.

25   Q    And Mr. Levine's questions?

1      A     Of course.  I'm saying -- I'm separating from

2    Dr. Patterson's questions.

3      Q     Yeah, yeah.

4      A     Okay.

5      Q     The lawyers here today?

6      A     Yes.  Okay.

7      Q     Have you had a chance to read the letters by the

8    hospital in this case for your brother's release to

9    convalescent leave?

10     A     Yes.

11     Q     Have you read all three of them, the December 2014

12   one, the March 2015 one, and then the April 17th one?

13     A     I have, let's see.  One -- yes.

14     Q     You have read those?

15     A     Yes.

16     Q     And --

17           THE COURT:  You've read the most recent, including

18   the most recent one from --

19           THE WITNESS:  From just last week.

20           THE COURT:  -- four or five days ago?

21           THE WITNESS:  Yes.

22           THE COURT:  Okay.

23   BY MR. AZIZ:

24     Q     That's the one that goes through the government,

25   our filing, and then responds to that?

1          A    That's correct.

2          Q    Just so we're talking about the same thing.

3          A    Right.  Okay.  Uh-huh.

4          Q    Did you have a chance to read

5    Dr. Katherine Murphy's 67-page risk assessment written on

6    March 31st of 2015?

7          A    No, I did not.

8          Q    Did you --

9               THE COURT:  Takes a long time to read Dr. Murphy

10   and Dr. Patterson, believe me.

11              MR. AZIZ:  I have no doubt, Your Honor.

12              THE COURT:  You read it too.

13              MR. AZIZ:  Yes, absolutely.

14   BY MR. AZIZ:

15         Q    Did you read Dr. Patterson's 73-page independent

16   forensic evaluation of your brother written on April 8th,

17   2015?

18         A    No, I did not.  I was -- I spoke to Mr. Levine

19   about that.  I asked him if I could read that, and he felt

20   like maybe it was not the appropriate thing for me to do.

21   So I didn't want to do anything that was inappropriate.

22   So I did not read that.  He did not send it, and I did not

23   read it.

24              THE COURT:  You would be on the witness stand a

25   lot longer if you had, I'm sure.

```
1              THE WITNESS:  Oh.
2    BY MR. AZIZ:
3         Q    Did you read our filing, the United States' filing
4    of April 10th, 2015?
5         A    No.
6         Q    So the document that the hospital's responding to,
7    you didn't read that document?
8         A    Well, I did read that, but I did not -- okay.
9    I did read that, which it was in response.
10             MR. LEVINE:  Objection.  I think this record may
11   be becoming confused.
12             I think it would be a better process if he would
13   show her the document and ask her if she read it, because
14   there are a lot of communications.  And that's the way to
15   know which one she saw, not by reference to the date.
16             MR. AZIZ:  Okay.  That's fine.  We don't need to
17   go through any more.
18   BY MR. AZIZ:
19        Q    Did you know that -- are you aware that in the
20   plan as -- the government has proposed that the frequency of
21   the visits would actually increase?
22             THE COURT:  Frequency of which visits?
23   BY MR. AZIZ:
24        Q    I'm sorry.  The frequency of Mr. Hinckley's
25   treatment visits in Williamsburg with the different
```

1    providers would actually increase vis-à-vis what they are

2    now?

3         A    I did see that in their plan when I was reading

4    the hospital's response to the plan.

5         Q    So if that were the case, if, for example, instead

6    of meeting with Dr. G-G twice during his visit, which is 17

7    days, he were to meet once a week, then that would double

8    the cost of Dr. G-G, Dr. G-G's provision; is that right?

9         A    That -- I did not read to go on into infinity,

10   though.  I read that that there was a time limit on that.

11        Q    There's -- assuming for purposes of this question

12   that there is no time limit, that doubles the cost of

13   Dr. G-G's payments; is that right?

14        A    Well, it would.  I have been told that Dr. G-G

15   would be able to provide some benefits along the way that

16   would alleviate some of those costs.

17        Q    We'll get to that in just a second.

18        A    Okay.  All right.

19        Q    But setting aside any provision from Medicare or

20   Medicaid, anything like that, Dr. G.G.'s cost would double;

21   is that right?

22        A    If she doubles her visit -- her visits with John,

23   of course, it would.

24        Q    And that would also -- would you be surprised to

25   know that Mr. Weiss actually would recommend increasing the

1    frequency of his meetings with your brother, Mr. Hinckley,

2    at least in the beginning of his --

3         A    In the beginning.  I agree.  I understand that.

4    In the beginning.

5         Q    So it would become once weekly to once every ten

6    days or so?

7         A    Correct.

8         Q    And so at least for the beginning, that would also

9    increase the cost?

10        A    Yes, that's correct.  That's correct.

11        Q    And if he were to meet with Mr. Beffa once weekly

12   for group as well as once weekly for individual therapy,

13   that would also increase the cost, because it's something --

14        A    Yes, it would.  I'm sorry.

15             Yes, it would.

16        Q    No, not at all.

17             Now, and that's in addition to the music

18   therapist; is that right?

19        A    Yes.

20        Q    Music has been a very important part of your

21   brother's treatment; is that right?

22        A    I believe it has.

23        Q    And it would be, in your opinion, a good idea for

24   that to continue; is that right?

25        A    I think so, as long as John enjoys it, I believe

1   so.   And she is not one of those that's terribly costly.

2   I think she provides a service that John enjoys.

3        Q    So taking into account all of those increases,

4   that greatly changes the landscape of how many years, if

5   even we can call it a year, that -- under the finances that,

6   as you've described it, that the family would be able to

7   support this level of treatment; is that right?

8        A    It could.   We also need to, if we're going to go

9   down the road and, as you want to here, there will be some

10  benefits along the way, as John does get older and as

11  services are applied for.   Those need to be taken into

12  account.

13         And, you know, there are other things too down the

14  road that, as you asked me earlier, supplementing some of

15  these things.   It's just, it's very difficult to be able to

16  give a very honest -- I don't mean an honest, but a specific

17  answer, because a lot of this is going to be in the future.

18  It's hard to know what's what until we know what a ruling is

19  going to be.   It's hard to know.

20         But, yes, the way you put it, you're exactly

21  right.   If services increase, costs are going to increase.

22  That makes perfect sense.

23       Q    So the -- let me just talk for a second about the

24  benefits, because we've talked a lot about the possible

25  benefits that are out there.

1          To be clear, the only person who, the only one of

2    the providers that we've talked about down in Williamsburg

3    who accepts any sort of public assistance, except for

4    Medicaid -- or Medicare, which he's not eligible for over

5    five years, is Dr. G-G, and she would take Medicaid;

6    is that right?

7               THE COURT:  If you know.

8               THE WITNESS:  I don't know exactly how it works.

9    I mean, I don't know how she does what she does.  She's just

10   indicated that she could possibly make that work.

11   BY MR. AZIZ:

12      Q    And did you know that she doesn't, that Medicaid

13   would not cover any forensic costs?  Do you know what

14   forensic costs are?

15      A    Pretty much.

16      Q    Okay.

17      A    I think I do.

18      Q    Like testifying in court?

19      A    Correct.

20      Q    Or preparing her reports?

21      A    Uh-huh.

22      Q    Did you know that?

23      A    Oh, I did know that, yes.

24      Q    So given that and given an increase in costs, how

25   much time do you realistically expect, under that worst-case

1    scenario, you could provide, you could continue to fund the

2    services at this increased rate?

3         A    Oh, my.  Let's see.

4         Q    It is a worst-case scenario, I understand.

5         A    I would really love to give you a real good

6    answer, because I really would like to do that.  I think

7    there are just so many unknowns figured in.

8              We can go for some time.  We have talked about a

9    potential of about a half million dollars that we know of

10   up front between the sale of my mother's house, the

11   situation at hand right now.  I have said I'd be willing to

12   supplement down the road.  Again, I'm not trying to avoid

13   the question.

14        Q    Sure.  Let me ask a more specific question then,

15   if that one's difficult.

16             You said a second ago that the bills fluctuate,

17   have been fluctuating.  And sometimes they're low and

18   sometimes they're high at current levels; is that right?

19   Do you remember testifying to that?

20        A    That's correct.

21        Q    What the high end of that?  Is that the 10,000

22   that Scott had mentioned?

23        A    The 10,000 were not all provider bills.  It was

24   living expenses included with that.

25        Q    How much is the high end of what the provider

1   bills is per month that you've seen?

2       A    Probably -- again, it fluctuates.  It's hard to

3   say from month to month.

4       Q    I'm just asking for the high end.

5       A    For provider bills, I don't know, 5,000.  I mean,

6   that is a guess.  I'm speculating here.  So that's really

7   not going to --

8       Q    You don't know?

9       A    Oh, I don't know specifically.  That is not what

10  I -- I didn't take care of that.

11      Q    Sure.  Who does take care of those bills?

12      A    My mother takes care of those bills, and my

13  brother helps to monitor what's going on in the financial

14  area.

15      Q    And is it right that -- is it true that the three

16  of y'all got together in the past week or two to discuss

17  finances and the financial situation?

18      A    The three of us being --

19      Q    You, your brother, brother Scott, and your mother?

20      A    We didn't all at one time.  We have -- we have

21  been discussing this off and on for a while; but we didn't

22  get together on one phone call, if that's what you're

23  talking about.

24      Q    Okay.  So there hasn't been a time, say, even in

25  the last month, where the three of you either sat down or

1    talked on the phone and discussed finances?

2         A    No.  We didn't feel the need to.

3         Q    Was that a no?  I'm sorry.

4         A    The answer is, no, we have not done that.

5         Q    Okay.  I don't mean to be rude.  I just didn't

6    hear the first part.

7         A    Okay.  I'm sorry.

8         Q    No.  It's okay.

9              So how much -- and how much is the valuation of

10   the house if you sell it?

11        A    The homes in her area, at this point, I think, and

12   her -- probably somewhere in the neighborhood -- anywhere

13   from 500,000 up.

14             THE COURT:  Does she have a mortgage on her home?

15             THE WITNESS:  She does have a mortgage on the

16   home.

17   BY MR. AZIZ:

18        Q    Do you know how much the mortgage is?

19        A    Around 300,000 at this point.

20        Q    If you don't know how often or how much the

21   providers cost per month, then it makes it very difficult to

22   estimate what the amount of increase would be;

23   is that right?

24        A    I know what their hourly rates are.  But, again,

25   not knowing how many hours each month it's going to be,

1    that's where the question comes in.

2         Q    What are those hourly rates?

3         A    For each of them?

4         Q    Yes, please.

5         A    Isn't that their place to tell you that?

6              THE WITNESS:  Do I need to tell them that?

7              MR. AZIZ:  If the witness knows, it factors into

8    her calculation.

9              THE COURT:  Well, if you know it, what each of

10   them is being paid, you can answer.

11             THE WITNESS:  Okay.

12             Mr. Beffa is -- let me make sure I'm saying this

13   right -- I believe 125 an hour.  G-G is 225 an hour, and

14   Mr. Weiss is 82.50 an hour.

15   BY MR. AZIZ:

16        Q    Do you know for the music therapist?

17        A    I don't know hers.  But I don't -- I just hear

18   that she's not considered expensive, so --

19        Q    Now, given the financial situation that your

20   husband has found himself in after Affordable Care Act, it

21   makes it difficult for you personally to contribute to any

22   sort of funds at this point; is that right?

23        A    You've made that assumption.  That's not the

24   correct assumption.

25        Q    So do you have funds as well that you have

1    available, your family has available to contribute?

2         A    Yes, I do.

3         Q    And how much are those funds that --

4         A    Well, let's see.

5              MR. LEVINE:  Is that a question about her wealth?

6              MR. AZIZ:  Not general wealth.  Just if we're

7    factoring in how much she is able to contribute to the

8    treatment in this worst-case scenario.

9              MR. LEVINE:  Unless the Court has an interest in

10   this, I really regard that question as intrusive and

11   impertinent and irrelevant.  But if the Court has an

12   interest in knowing that --

13             THE COURT:  Well, we need to get a time frame.

14   Basically, I think we have testimony now that -- three,

15   four, five years out.

16             I think the testimony from earlier was, without

17   any government subsidies, state or federal, Mrs. Hinckley,

18   through the home and the IRA and other things, in estimating

19   $100,000 a year, we got five years.

20             I think Ms. Sims just said -- I don't know what

21   you said exactly about that, because Mr. Aziz threw in the

22   fact that any amount of services might increase if Mr., if

23   your brother were there full time; and, therefore, you

24   acknowledge that costs would increase.

25             So whether your mother's resources still last four

1    or five years, I'm not sure whether you answered that

2    question or not, absent any government benefits.

3            So, I mean, what I'm trying to get at is, as

4    I understand what both you and your brother have been

5    saying, is that at some point you would be willing and able

6    to contribute some of your own funds; but that only kicks in

7    after your mother's funds are exhausted; is that what --

8            THE WITNESS:  Not necessarily.

9            THE COURT:  Okay.

10           THE WITNESS:  I mean, it's when needed, whenever

11   needed.

12           THE COURT:  Okay.

13   BY MR. AZIZ:

14       Q    Let me get us back on track.

15           The reason that you said that you -- that your

16   perspective is different now than it was when you spoke with

17   Drs. Patterson and Murphy was because of your perception

18   that the frequency of seeing -- of your brother seeing

19   providers down in Williamsburg would decrease;

20   isn't that right?

21       A    Yes.  If you notice the, for instance, the first

22   petition that came out from the hospital, the one that I had

23   not seen when I spoke with Dr. Patterson, did have time

24   lines for 6 months this versus 6 to 18 months that, and that

25   did change the nature of things.

1          Also, in discussing the fact of some of these

2    expenses being included, that could hopefully be eliminated

3    altogether with car service expenses, which are outrageous;

4    that type of thing.

5          Also, in general, I've always heard, myself and

6    from people there at St. Elizabeths over the years, that

7    once you reach a convalescent leave status, that that is --

8    normally part of the plan is that as you're being released

9    more into the community, you are also being, you know,

10   paring down, rather than amping up so much on the outpatient

11   services.

12         I understand, you know, John may be different than

13   some of the others, but that was what I was told to expect.

14   So I'm going on what I've been told, you know, in the past,

15   and just as an anticipation potentially for the future.

16   Q    So assuming that those are not correct and that

17   it's not going to ramp down but it's going to amp up or at

18   least stay the same, then you agree that your statement --

19   do you agree that your statement to specifically Dr. Murphy,

20   that the financial bounds of paying for the current costs

21   rests at one to two years, assuming that we're not going

22   downwards?

23   A    I don't know where you're getting the one or two.

24   I still say it's longer than that.

25         You're saying that based on that, that in one or

1    two years, we're going to be just wiped out?  Is that what

2    you're saying?

3         Q    No.  Let me be more clear.

4         A    Okay.

5         Q    Do you remember telling Dr. Murphy that you agreed

6    with your brother Scott that the financial bounds of paying

7    for the current costs rested at one to two years?

8         A    That did, but that did not include the house.

9         Q    Okay.

10        A    So that was partially right, partially not.

11        Q    So then the answer is yes, but it didn't include

12   the house; is that what you're saying?

13        A    Okay.  That's -- all right.  Yes.

14        Q    So when you're talking about not including the

15   house, you're just talking about the retirement?

16        A    And that is taking into account the very highest

17   amount it has ever been in a month, assuming that is every

18   single month.

19        Q    Okay.

20        A    So we're talking the highest dollar amount it's

21   ever been and assuming that will never go down.

22   That's worst-case scenario, is what I'm talking about.

23             THE COURT:  And that highest amount per month also

24   included the $4,000 for car -- or the $1,000 for car

25   service?

1           THE WITNESS:  Exactly.

2    BY MR. AZIZ:

3       Q    I think it's 2,000, right?  It's 500 each way,

4    twice a month?

5       A    No; once a month.

6            He's been going once a month.  And so the round

7    trip is 500 each way, so $1,000 per visit.

8       Q    So it's 1,000 a month.  I apologize.

9       A    Correct.

10      Q    If he supposed -- so do you know that he's

11   supposed to be still returning to Washington, D.C., once a

12   month in the plan as proposed by the hospital?

13      A    Yes.

14      Q    Would the car service still be needed for that?

15      A    We're hoping not.  That's part of this petition is

16   that, hopefully, John could be driving himself back and

17   forth to do that.

18      Q    Would he be able -- do you know -- if you know the

19   answer, would he be allowed to take one of the two cars up

20   to D.C.?

21      A    Yes.

22           THE COURT:  About how much longer do you think

23   you're going to be?

24           MR. AZIZ:  Probably about 30 minutes or so, maybe

25   15 minutes.

1          THE COURT:  Can't you make it 10 or 12?

2          MR. AZIZ:  Absolutely.

3          THE COURT:  So we can go to lunch, so Ms. Sims can

4    get on a plane.

5          MR. AZIZ:  Absolutely.

6    BY MR. AZIZ:

7      Q    So turning to housing, a lot of times the Court

8    has asked you over the years, as well as counsel, but

9    Judge Friedman as well, about this sort of worst-case

10   scenario and what would happen in case of a worst-case

11   scenario, about you possibly going to Williamsburg.

12          Do you remember some of those inquiries over the

13   years?

14     A    Sure.

15     Q    And when Mr. Levine was questioning you, you said

16   that you would move -- you would be able to move back to,

17   I guess, address the situation, is the way, something to

18   that effect, was the way that --

19     A    I don't know if using the word "move" is correct,

20   I will not "move" back.  I will go there and stay as long as

21   it takes.

22     Q    What's the outer bounds of that "as long as it

23   takes"?

24     A    As long as it takes.

25     Q    One month?

```
1        A     If that's --

2              THE WITNESS:  As long as it takes.

3              THE COURT:  So your husband's still working?

4              THE WITNESS:  Yes.

5              THE COURT:  But he's a big boy.  He can take care

6   of himself.

7              THE WITNESS:  He absolutely can.

8              THE COURT:  I don't know how to cook, but I can

9   take care of myself for whatever.

10             And your kids are grown?

11             THE WITNESS:  Yes, they are.

12             THE COURT:  So I don't want to put words in your

13  mouth.  So the biggest trauma to you to move to Williamsburg

14  for as long as it takes is you wouldn't see your grandchild?

15             THE WITNESS:  That's correct.

16             THE COURT:  Other than that, everything is doable?

17             THE WITNESS:  That's exactly right.

18  BY MR. AZIZ:

19       Q     Now, when is the last time you lived with just

20  your brother?

21       A     That I did what?

22       Q     Lived with just your brother.

23       A     Well, had to have been until I left for college.

24       Q     When was that?

25       A     1975.
```

1     Q    And --

2     A    Oh, pardon me.  That's when I graduated.

3           I left for college in '71.

4     Q    What's the most amount of time that you've spent

5 in Williamsburg consistently?

6     A    The most amount.  You mean the longest?

7     Q    Longest stretch.

8     A    Probably 10, 12 days.

9     Q    When was that?

10    A    About three years ago.

11    Q    When you go these days, how long do you stay

12 usually?

13    A    I usually stay a couple of days.  John is so busy

14 while he's there that -- and I want -- I've been trying to

15 coordinate my trips with being able to drive him back to

16 D.C., not only to help alleviate that car cost, but also to

17 be able to sit down with the treatment team there at

18 St. Elizabeths and have a meeting at the end of John's

19 visit.

20    Q    Have you ever taken care of anyone with mental

21 health issues before?

22    A    No.

23    Q    Do you have any training or education for that?

24    A    Not formal, no.

25    Q    Do you know how your brother John's psychosis

1  presents itself?

2      A    Do I know how it presents itself?

3      Q    What sort of behavior?

4      A    I've never -- no, I don't know.

5           I mean, I know what he is.  I know how he is

6  normally, and I would know when he is not acting normally.

7      Q    Do you think that his behavior back before the

8  assassination attempt was normal behavior?

9      A    I was not with him then.  I was living in a whole

10  different city, so I wasn't around him.  But no, it was not

11  normal behavior back then.

12     Q    And you have no specific thoughts about what it

13  would look like were he to become, quote/unquote, psychotic?

14     A    I would know when he's not acting himself is the

15  best answer I can give you.

16     Q    Ms. Sims, over the years when you've testified,

17  you've consistently said that he has done great.

18  You know --

19     A    Yes.

20     Q    Is that right?

21     A    Yes -- yes.

22     Q    That he has not violated any conditions;

23  is that right?

24     A    That's correct.

25     Q    That he hasn't been deceptive; is that right?

1        A     That's correct.

2        Q     That he hasn't been narcissistic?

3        A     Well, frankly, I don't know anybody who isn't

4   sometimes narcissistic, to be honest with you.

5              But no, I mean, not to any point that seems to be

6   out of hand.

7        Q     Sorry.  I apologize.

8        A     That's all right.

9        Q     That he hasn't been manipulative?

10       A     No.

11       Q     But -- and do you care about your brother;

12   is that right?

13       A     Yes, I do.

14       Q     And you really care you about mother as well;

15   is that right?

16       A     Yes, I do.

17       Q     And you take -- you think it's really important

18   that she be able to have her son down there with her because

19   this is what she wants; is that right?

20       A     Oh, absolutely.

21       Q     Now, what do you think about your brother's

22   issues?  I mean, what about his relationships, his

23   troublesome relationships with women?  How does that factor

24   into you never having seen any issues with him?

25       A     I think John handles his issues well.

```
 1   I don't know anyone who has relationships that doesn't have

 2   an issue now and then.

 3           So, you know, he has not fallen apart over

 4   breakups or situations like that.  So I think all in all, he

 5   handles himself very well.  It does not throw him off.

 6       Q    But you'd agree that most people who have

 7   relationship issues do not, on the basis of one of those

 8   relationship issues or believed relationship issues, shoot

 9   the President and several other people; is that right?

10       A    Well, of course not.

11       Q    Okay.

12       A    That was also 34 years ago.  Things have changed a

13   little bit since then.

14       Q    What about your brother's actions towards J.W.,

15   who didn't want the advances that your brother was --

16           THE COURT:  Do you know who that is a reference

17   to?

18           THE WITNESS:  I don't think so.

19           THE COURT:  Well, the person that's in

20   St. Elizabeths Hospital about 20 years ago?

21           MR. AZIZ:  Yes.

22           MR. LEVINE:  I don't know who he's referring to.

23           THE COURT:  J.W.

24           MR. AZIZ:  I'll move on from there.

25   BY MR. AZIZ:
```

1    Q    What about during the course of what you perceive

2 to be your brother behaving well, the fact that he lied

3 about where he was going twice and went to the movies?

4 Were you surprised by that?

5    A    I was surprised by that, but I don't think he did

6 that -- I don't think he planned to do that ahead of time,

7 and I think it was literally just one of those times when

8 the movie that he wanted to see didn't start -- the movie

9 time was wrong with the time that he needed -- could be

10 away, the hours that he could be away from the house.

11        He had to -- he put the itinerary together, you

12 know, a month before he made that visit, not knowing what

13 movies were going to be showing.  So he had to guess.

14 And, you know, it wasn't a good decision.

15        But, you know, it is what it is.  It wasn't a good

16 decision.  He walked a few feet away to a bookstore instead.

17 He didn't try and leave.  He didn't try and run.  And I know

18 he regrets making that decision.

19    Q    And you didn't see that coming, though, right?

20    A    No.

21    Q    What about your brother's decision to go to a

22 music studio that was not on his itinerary, knowing that

23 that was going to be an issue?  Would you consider that poor

24 judgment too?

25    A    That was poor judgment.

1      Q    And did you see that one coming?

2      A    No.

3      Q    And we've talked about -- I believe her name is --

4    the woman in Williamsburg, his new girlfriend, do you know

5    her?

6      A    I don't -- she's not a girlfriend.  She's a

7    friend.

8      Q    She's just a friend?

9      A    Yes.

10      Q    There's no romantic interest there at all?

11      A    No.

12      Q    Have you met her?

13      A    No.

14      Q    But she's been around the home; is that right?

15      A    Yes.

16      Q    And she has a history of substance abuse;

17    is that right?

18      A    I believe so.

19           THE COURT:  Your mother's met her, right?

20           THE WITNESS:  Yes, she has.

21           THE COURT:  And your mother has met her -- this

22    woman's parents?

23           THE WITNESS:  That's correct.  Uh-huh.

24           THE COURT:  But you haven't met either her or the

25    parents?

1      THE WITNESS:  No.  I would have had the

2  opportunity to meet her, but my -- long story.  I'll try to

3  make it real short here.  There's only one airline that

4  flies into Richmond nonstop from Dallas, and it has merged

5  with a new airline, and the flight schedules have gotten

6  totally messed up.  So the flight I normally take in is no

7  longer available.

8      Had I been able to take that flight, I would have

9  been able to meet her.  I had to take a later flight, so

10  that was not possible.

11      MR. AZIZ:  I'm almost done, I promise, Your Honor.

12  BY MR. AZIZ:

13      Q    Ms. C.B., do you know who she is?

14      A    I'm sorry.  I didn't hear you.

15      Q    Ms. C.B.?

16      A    Yes.

17      Q    And you don't have a good view of her.

18  She's relatively unstable, I believe, is what you testified

19  last hearing?

20      A    Well, yes.  I -- yes.

21      Q    Do you agree that she's a relatively unstable

22  person?

23      A    I believe so.

24      Q    And that I believe your testimony was in 2011 that

25  it would be a bad idea for her to come around the house

1    because she was so unstable?

2        A    It would be a bad idea for her to come around the

3    house because my mother would feel very responsible having

4    her there.  And if something happened to where she might

5    suffer a setback, I did not think that was a good idea for

6    my mother to have to be the one to handle that or feel like

7    she should have to handle that.

8              MR. AZIZ:  Brief indulgence, Your Honor.

9              No further questions.

10             THE COURT:  Thank you, Mr. Aziz.

11             MR. LEVINE:  Very brief, Your Honor.

12             THE COURT:  I hope so.

13             MR. LEVINE:  It's your wish.

14             THE COURT:  No, no.  I want you to be brief,

15    because I'm getting hungry and other people are too, and I

16    think Ms. Sims and Mr. Hinckley would like to leave town.

17             MR. LEVINE:  Thank you.

18             THE COURT:  Rather than have us go to lunch while

19    they wait around.

20                        - - -

21                   REDIRECT EXAMINATION

22    BY MR. LEVINE:

23        Q    Ms. Sims?

24        A    Yes.

25        Q    Remember the inquiry here made by Mr. Aziz about

1    the amount of services that may be provided to Mr. Hinckley

2    while on convalescent leave and they may, indeed, go up?

3            Do you remember that inquiry?

4      A    Yes.

5      Q    And he posited the prospect that if the services

6    were to increase, the cost of those services would likewise

7    increase.  Do you remember that?

8      A    Yes.

9      Q    Is it also likewise true that if the amount of

10   services were to decrease, the cost of those services would

11   decrease?

12     A    That's correct.

13     Q    And if --

14          THE COURT:  He's only asking you these hard

15   questions because he knows you used to work in a bank.

16          MR. LEVINE:  That's it.  This is math.  Right.

17          THE WITNESS:  Oh.

18   BY MR. LEVINE:

19     Q    And, indeed, if the benefits obtained were to go

20   down, the cost would go down.  If the benefits obtained

21   would go up, increase in benefits, then the cost to the

22   family would go down; is that correct?

23     A    Correct.

24     Q    All right.  So if Mr. Hinckley got money under the

25   Affordable Care Act, the cost to the family would go down?

1          A     That's correct.

2          Q     And if they got money under Social Security, would

3     the cost of the family go down?

4          A     Yes.

5          Q     And if he got Medicare, would the cost of the

6     family go down?

7          A     Yes.

8          Q     And if he got Medicaid, would the cost of the

9     family go down?

10         A     Yes.

11         Q     And if he got employment, paid employment, would

12    the cost to the family go down?

13         A     Yes.

14         Q     And if, indeed, he became, as a result of being of

15    becoming a Virginia resident, entitled to Virginia-based

16    benefits and service providers, would the cost of the -- to

17    the family go down?

18         A     Yes.

19         Q     And if, indeed, he gets better, he just gets

20    better and better and better as a matter of medicine and he

21    needs fewer services, would the cost to the family go down?

22         A     Yes.

23         Q     And, indeed, if you were to be given, upon

24    application to this Court, an unconditional release, might

25    the cost of the benefits -- might the cost to the family go

1  down?

2      A    Yes.

3      Q    And irrespective of the costs and irrespective of

4  the benefits, is it your testimony that whatever is needed

5  and whenever it is needed, the family will supply the

6  resources that are necessary?

7      A    Yes.

8      Q    And Mr. Aziz posited another series of questions

9  to you.  He asked you questions about your training, if any,

10  in psychology and your ability to identify symptoms.

11         Did you remember that inquiry?

12      A    Yes.

13      Q    Were you found to be by this Court, quote, a

14  responsible person, close quote?

15      A    Yes.

16      Q    That John could be in your custody in doing

17  various things in Williamsburg?

18      A    Yes.

19      Q    All right.  Now, when you were trained by the

20  hospital, did they give you a checklist of things to look

21  at?

22      A    Yes.

23      Q    And are you familiar with that checklist?

24      A    Well, I guess so.  I haven't looked at it in a

25  long time.

1    Q    But each of those visits, they asked you questions

2    with respect to, did you see any evidence of then the things

3    is on that checklist?

4    A    That's correct.

5    Q    And that checklist includes things that are

6    so-called risk factors; isn't that correct?

7    A    That's correct.

8    Q    And you respond to the inquiry after every single

9    visit in which you're in attendance to the hospital?

10   A    Yes.

11   Q    And you tell them whether you see any evidence --

12   A    Yes.

13   Q    -- of those symptoms?

14   A    That's correct.

15        THE COURT:  Is this -- do you fill out something

16   in writing after each visit, or do you have a telephone

17   debriefing or a personal debriefing?

18        THE WITNESS:  Both.  There's a checklist that I

19   fill out that I bring to the hospital with me when I have

20   the treatment team meeting.  And then I do have the meeting

21   face to face at the hospital.

22   BY MR. LEVINE:

23   Q    All right.  Then there was an inquiry by Mr. Aziz

24   about housing.  And he asked the asked the question, if

25   there's a crisis, if there's a need for you to go quickly to

1    Williamsburg, would you be able to do that?

2           Do you remember that inquiry?

3    A    Yes.

4    Q    And would you be able to go extremely quickly?

5    A    Get me on the next flight.

6    Q    Be on the next flight.  All right.

7           And then there was a question about who provides

8    for your family's income, and I believe your testimony was

9    it was your husband.

10          How close to retirement is your husband?

11   A    I don't think he's close at all.  He is not -- he

12   is not ready to sit at home.

13   Q    He's not ready to sit at home?

14   A    No, he is not.

15   Q    How old is he?

16   A    He is 64.

17   Q    All right.  And then there were some instances, of

18   course, by Mr. Aziz and by Ms. Kennedy, unfailingly, to

19   inquire about the movie incident, the thing that was the

20   subject of the Court inquiry last time.

21          Do you remember that inquiry?

22   A    Yes.

23   Q    All right.  And it is always characterized by the

24   government as an instance of bad judgment; is that correct?

25   A    Yes.

1     Q    Are there instances, a multitude of instances of

2  Mr. Hinckley exhibiting good judgment?

3     A    Absolutely.

4     Q    Does he follow the rules?

5     A    Yes, he does.

6     Q    Does he keep his appointments?

7     A    Yes, he does.

8     Q    Does he take his medication?

9     A    Yes, he does.

10    Q    And then there was the inquiry about this person

11 who the government insists upon calling a girlfriend but you

12 describe as a friend who is a woman who he met at NAMI?

13    A    Correct.

14    Q    All right.  You're familiar with what NAMI is?

15    A    Yes.

16    Q    And are the people at NAMI people who have real

17 lives?

18    A    Yes.

19    Q    They work?

20    A    Yes.

21         MS. KENNEDY:  Objection.

22 BY MR. LEVINE:

23    Q    They have family?

24    A    Yes.

25         THE COURT:  What's the basis?

 1              Wait a minute.  There's an objection.  There's an

 2     objection.

 3              MR. LEVINE:  Oh, I didn't see that.

 4              MR. AZIZ:  Sorry.  I just object to what is the

 5     basis for knowledge of what the people at NAMI do or do not

 6     have?

 7              THE COURT:  Yeah, what's the foundation for her

 8     knowledge?

 9     BY MR. LEVINE:

10        Q    How do you know about NAMI?

11        A    How do I know about NAMI?

12        Q    Yes.

13        A    It's a -- the National Alliance for the Mentally

14     Ill.  It's an organization that deals with mental illness.

15     It's -- I think it's a wonderful organization.

16              MR. AZIZ:  There's still no foundation for that

17     question.  The fact that she knows about the organization is

18     one thing.  It has nothing to do with knowing about the

19     specifics of the individuals.

20              THE COURT:  Mr. Levine, do we really need to do

21     all of this?  It's 23 minutes after 1:00.

22              MR. LEVINE:  I had just one or two questions about

23     it because it was triggered by the government's inquiry.

24              If the Court thinks it's not relevant, I'm going

25     to abandon it.

1          THE COURT:  Only if there's a foundation for her

2     knowledge.

3          MR. LEVINE:  All right.

4          THE COURT:  You're going to be have a half a dozen

5     other witnesses here, two of whom are from Williamsburg and

6     know NAMI backwards and forwards, and two of whom are who

7     are in the courtroom and know a lot about it too.

8          MR. LEVINE:  Your Honor, I only was asking about

9     it because the government asked about it; and I only had one

10     or two questions to ask.

11          THE COURT:  You still need a foundation for

12     what -- the basis for her knowledge.

13     BY MR. LEVINE:

14     Q    What is the basis for your knowledge of what NAMI

15     does?

16     A    Well, I'm not really sure.  I guess having a

17     brother for the last 34 years that's been dealing with

18     mental issues earlier on in those 34 years, you come across

19     issues -- you hear about organizations that deal with the

20     mentally ill.

21          MR. LEVINE:  If you're satisfied, I'm satisfied,

22     Judge.  I mean, if you think there's more -- if you're not

23     interested in knowing, then I'm not interested in eliciting

24     this.  I'm fine.

25     BY MR. LEVINE:

1          Q    And lastly you heard a question about Ms. C.B. as
2     a troubled woman who mental health -- unstable with mental
3     health issues?
4          A    Yes, I remember.
5          Q    Have you talked to Mr. Hinckley about Ms. C.B.?
6          A    What?  I'm sorry.
7          Q    Have you talked to Mr. Hinckley, to your brother
8     about Ms. C.B.?
9          A    Well, yes, uh-huh.
10         Q    All right.  And could you describe the empathy
11    that he evinces with respect to her condition?
12         A    He does.  He does have empathy for her.
13         Q    And how does he show that to you?
14         A    I think one of the reasons why he continues to
15    allow her to be a part of his life is because I think he
16    realizes that having him in her life is good for her.
17    It gives her something to look forward to.
18              He cares about her.  He understands that, you
19    know, she doesn't have a lot of support in her life.  And I
20    think he is somewhat of a support system for her.
21              MR. LEVINE:  No further questions, Your Honor.
22              THE COURT:  Anything else, Mr. Aziz?
23              MR. AZIZ:  No, Your Honor.  We're ready to go to
24    lunch.
25              THE COURT:  Thank you, Ms. Sims.

1          THE WITNESS:  Thank you.

2          THE COURT:  You can be excused.

3          THE WITNESS:  Thank you.

4          THE COURT:  So do we want to come back at 2:30?

5   Is that time enough to get everything together we need?

6          MR. LEVINE:  Yes, Your Honor.

7          MS. KENNEDY:  A quarter to three?

8          THE COURT:  2:30 is fine.

9          DEPUTY CLERK:  All rise.

10          This Court is in recess until 2:30.

11          (Recess from 1:30 p.m. to 2:30 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

I, William P. Zaremba, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.


Date: April 22, 2015_____   /S/__William P. Zaremba_____

William P. Zaremba, RMR, CRR