IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR No. 81-306 |
| | ) | |
| Plaintiff, | ) | Washington, D.C. |
| | ) | April 23, 2015 |
| | ) | 9:15 a.m. |
| vs. | ) | |
| | ) | Morning Session |
| JOHN W. HINCKLEY, JR., | ) | |
| | ) | Day 2 |
| Defendant. | ) | |
| _____ | ) | |

TRANSCRIPT OF EVIDENCE HEARING
BEFORE THE HONORABLE PAUL L. FRIEDMAN
UNITED STATES DISTRICT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Government: | U.S. ATTORNEY'S OFFICE. |
| | COLLEEN KENNEDY, AUSA |
| | MARK AZIZ, AUSA |
| | MICHELLE CHAMBERS |
| | 555 Fourth Street, NW |
| | Washington, D.C.  20530 |
| | (202)514-7248 |
| | |
| For the Defendant: | DICKSTEIN SHAPIRO, LLP |
| | BARRY WILLIAM LEVINE |
| | ANN MARIE LUCIANO |
| | 1825 Eye Street, NW |
| | Washington, D.C.  20006-5403 |
| | (202)420-2237 |
| | |
| | DINSMORE & SHOHL, LLP |
| | E. MICHELLE TUPPER-BUTLER |
| | 101 S. Fifth Street. |
| | Suite 2500 |
| | Louisville, KY 40202 |
| | (502)540-2367 |

APPEARANCES CONTINUED:

For St. Elizabeths:          ST. ELIZABETHS HOSPITAL
                             DEON MERENE, ESQ.
                             1100 Alabama Avenue, SE
                             Washington, D.C. 20032

Court Reporter:              William P. Zaremba, RMR, CRR
                             U.S. Courthouse
                             333 Constitution Avenue, NW
                             Room 6511
                             Washington, D.C. 20001
                             (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

– – –

WITNESS INDEX

– – –

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|-----------|--------|-------|----------|---------|

DEFENDANT'S:

| VERNE J. HYDE | 5 |
| VERNE J. HYDE | 97 |

– – –

INDEX OF EXHIBITS

– – –

| PATIENT'S | IDENTIFIED | ADMITTED |
|-----------|------------|----------|
| 4 | | 6 |
| 5 | | 68 |

P R O C E E D I N G S

1

2          DEPUTY CLERK:  All rise.

3          MR. LEVINE:  Good morning, Your Honor.

4          MS. KENNEDY:  Good morning, Your Honor.

5          THE COURT:  Good morning, everybody.

6          DEPUTY CLERK:  Please be seated.

7          Criminal 81-306, United States of America versus

8  John W. Hinckley, Jr.

9          For the government, Ms. Kennedy, Mr. Aziz,

10  Ms. Chambers.

11          For the patient, Mr. Levine, Ms. Luciano,

12  Ms. Tupper Butler, Mr. Levine.

13          THE COURT:  Okay.  Anything anybody wants to raise

14  before we resume with the witness?

15          Okay.

16          All right.  Is mr. Hyde, here?  All right.

17  We were partway through the direct testimony of Mr. Hyde

18  from St. Elizabeths Hospital.

19          Good morning, Mr. Hyde.  You're still under oath

20  from yesterday.

21          MR. LEVINE:  May Your Honor please, thank you.

22  If it please the Court.

23                              - - -

24

25

```
 1                            - - -

 2   VERNE HYDE, WITNESS FOR THE DEFENDANT, HAVING BEEN

 3   PREVIOUSLY SWORN, RESUMED THE STAND AND TESTIFIED FURTHER AS

 4   FOLLOWS:

 5                            - - -

 6                  DIRECT EXAMINATION (CONTINUED)

 7   BY MR. LEVINE:

 8       Q    Mr. Hyde, yesterday when we completed the inquiry,

 9   you had stated the hospital's position with respect to the

10   conditions and recommendations of the hospital in the

11   March 20, 2015, letter denominated as Exhibit 3 in evidence.

12            Do you remember that?

13       A    Yes.

14       Q    Now, I'd like to invite your attention, please, to

15   a letter dated April 17, 2015.

16            MR. LEVINE:  May I have this marked, please,

17   Your Honor?

18            THE COURT:  Yes.

19            MR. LEVINE:  Patient's No. 4.

20            A copy to your clerk, Your Honor.

21            THE COURT:  Thank you.

22            MR. LEVINE:  A copy to the government.

23            Your Honor has -- the Court has its own copy?

24            THE COURT:  I do.

25            MR. LEVINE:  Thank you.
```

1    BY MR. LEVINE:

2        Q    Mr. Hyde, I show you what has been marked as

3    Patient's Exhibit 4.  Do you recognize it, sir?

4        A    Yes, I do.

5        Q    What is it, please?

6        A    This is our follow-up -- or, I'm sorry, our

7    response letter to the government's response.

8        Q    All right.  And was this -- what's the date of

9    that letter, please?

10       A    This is April 17th, 2015.

11       Q    And was that after the government filed its

12   recommendations?

13       A    Yes, sir.

14       Q    And was it after the expert report for

15   Dr. Patterson was filed by the government?

16       A    Yes, sir.

17       Q    And was it after Dr. Murphy filed her report?

18       A    Yes.

19            MR. LEVINE:  All right.  Your Honor, I move No. 4

20   into evidence.

21            MS. KENNEDY:  No objection, Your Honor.

22            THE COURT:  It will be admitted.

23
                                    (Patient's Exhibit 4
24                                   received into evidence.)

25

1    BY MR. LEVINE:

2        Q    Now, Exhibit 4 makes reference to Dr. Patterson's

3    report.  Did Dr. Patterson say in his report to the Court on

4    April 10 that both -- excuse me.

5            Withdrawn.

6            Did the government state that both Dr. Patterson

7    and Dr. Murphy conclude that Mr. Hinckley is mentally

8    stable, generally compliant with his treatment, and

9    clinically ready to reside in the community, given

10   appropriate conditions?

11       A    Yes.

12       Q    Now, did the government then raise concerns about

13   the conditions and the plan?

14       A    Yes.

15       Q    And the government requested other conditions in

16   addition to those suggested by the hospital?

17       A    Yes.

18       Q    Now, Dr. Murphy in her report, did she state that

19   the fundamental structure of the hospital's proposed plan is

20   supported by the current assessment?

21       A    Yes.

22       Q    And did Dr. Patterson say that the hospital's

23   recommendation for conditional release, for the conditional

24   release process to progress to convalescent leave, i.e.,

25   outpatient placement of Mr. Hinckley in Williamsburg,

1    appears to be clinically appropriate based on Mr. Hinckley's

2    clinical presentation and his increased participation in

3    activities in Williamsburg?

4        A    Yes.

5        Q    But then Dr. Patterson made some observations that

6    suggested that, on occasion, Mr. Hinckley makes some

7    precipitous judgments; is that correct?

8        A    Correct.

9        Q    And in the hospital's view, does a precipitous

10   judgment, or even a judgment that is maybe not the best

11   judgment, does that equate to mental illness?

12       A    Not necessarily.

13       Q    All right.  Now, the government made a series of

14   suggestions or recommendations, some of which the hospital

15   agrees with.

16       A    Correct.

17       Q    All right.  Let me invite your attention starting

18   on page 4 of Patient's No. 4, to the government's

19   suggestions or recommendations and the hospital's response.

20           Now, the first suggestion that the government

21   makes is that Mr. Hinckley lives solely with his Mom; there

22   will be no guests in the house; and that when Mr. Hinckley

23   is in the District of Columbia to see the Office of -- the

24   OPD, that he resides only at the hospital.

25           What is the hospital's reaction to that?

1        A     Well, we're -- we were opposed on the specific

2    wording of "living solely with his mother" and in terms of

3    the concern that it might present an issue for Mr. Hinckley

4    and his family and any friends going forward, in addition to

5    the fact that the plan is to ultimately transition

6    Mr. Hinckley to his own living situation separate from this

7    mother's house.

8            Further, we were also concerned about the

9    stipulation the government included into this condition,

10   stating that Mr. Hinckley, when he's in D.C., that he should

11   only reside, if he has to, overnight in the hospital.

12   That's something that the hospital simply cannot agree to.

13           We are not a hotel.  We have very limited space.

14   Our -- typically, our census is full.  And the bed space

15   that is available is specifically for people who are being

16   committed either civilly or forensically on a pretrial or

17   posttrial basis.  We simply don't have the bed space ability

18   or function to provide that piece of the condition the

19   government required.

20           So those are the two specific conditions contained

21   in there that the hospital opposed.

22       Q     All right.  Now --

23           THE COURT:  Where does an outpatient who comes

24   back for a monthly visit, or whatever frequency, normally

25   stay?

1          THE WITNESS:  I don't know if I could answer that

2   for you, Your Honor.  My discussions with Dr. Johnson from

3   the OPD, typically we don't have people coming in to stay.

4          THE COURT:  That's rare.

5          THE WITNESS:  This is rare, right.

6          One of the suggestions we had made, because the

7   idea is that Mr. Hinckley would drive down in the morning --

8   or up in the morning and then back to Williamsburg after his

9   appointment, so it would be a day trip for him.  However,

10  obviously conditions can change; things can happen.

11         One of the ideas that Dr. Johnson had floated was

12  to identify specific motels or hotels in the area nearby

13  that could be included on an itinerary on an as-needed

14  basis.

15         THE COURT:  When he travels now between D.C. and

16  Williamsburg, have there ever been occasions where he and

17  the driver or he and his mother or he and his brother or

18  sister have had to stay overnight someplace or it's just a

19  straight --

20         THE WITNESS:  It's a straight shot.

21         THE COURT:  There's been --

22         THE WITNESS:  Yeah, there's been occasion where

23  they have hit traffic snags that have, you know, kept them,

24  you know, made the trip that much longer, or have gotten

25  rerouted because of driving conditions and have had to get

1    back on track.  But to my knowledge, I don't believe they've

2    ever had to do any, you know, overnight stays in between.

3    BY MR. LEVINE:

4        Q    Generally speaking, is the trip between Washington

5    and Williamsburg about two and a half hours?

6        A    Depending on who's driving, yeah.

7        Q    By car?

8        A    Yeah.

9        Q    Typically?

10       A    Yes.

11       Q    All right.  Now, item No. 2 of the government's

12   recommendations is essentially, in substance, to provide the

13   contact information with the Williamsburg providers.

14            Is the hospital in agreement with that?

15       A    Yes.

16       Q    So we're in agreement on No. 2, hospital's in

17   agreement?

18       A    Yes.

19       Q    No. 3, while at the OPD -- that's during the one

20   day a month that's contemplated by this plan -- a treatment

21   team member should be at the meeting.  And they ask that

22   you, so long as you're employed there, that you do it.

23   First, are you willing to do it?

24       A    Oh, absolutely.

25       Q    And are you -- is it feasible?

1     A    I would have to talk to my supervisor and the

2   feasibility of it.  But, yeah, absolutely.

3     Q    All right.  So there's no objection to that,

4   except -- well, tell us the hospital's position.

5     A    Well, the fact that they are stating that I would

6   be included as a part of the outpatient department treatment

7   team is not something that we can agree to based on the way

8   that the hospital is setup.  And my employment status is

9   that of inpatient employee.

10          I would have to be, in order to be considered a

11  part of the outpatient department, I would actually have to

12  leave the inpatient department and move to the outpatient

13  department.

14    Q    So there's some logistical issues there?

15    A    Correct.

16    Q    And, Dr. Binks, who's also in the government

17  proposal No. 3, it's contemplated by this plan that he would

18  see Mr. Hinckley during the visit to OPD; is that correct?

19    A    Correct.

20    Q    All right.

21          THE COURT:  It's contemplated in the hospital's

22  plan?

23          THE WITNESS:  Yes.

24          The difference in the hospital's plan versus the

25  government's recommendation is that they were requesting

1  that Mr. Hinckley go to the hospital to meet with Dr. Binks

2  for his monthly meeting.  We opposed that specific condition

3  only on the grounds of where those meetings should attend,

4  not the fact that they should attend, be attended.

5  BY MR. LEVINE:

6      Q    And it's the hospital's position that Dr. Binks go

7  to OPD on 35 K Street?

8      A    Correct.

9      Q    And is it your understanding that Dr. Binks is

10 both willing and able to do that?

11     A    Correct.

12     Q    All right.  Now, No. 4, maintaining weekly

13 contact, what's the hospital's position with respect to

14 No. 4?  Are you in agreement?

15     A    Yes.

16     Q    No. 5, this is one where the hospital, excuse me,

17 the government asked the Court to impose several conditions

18 on Mr. Hinckley:  One, that he be required to wear an ankle

19 bracelet; two, that there be a car tracking device on the

20 car he drives, and he only be permitted to drive that car

21 with the device; that, three, that computer software be

22 applied to the computer he uses at home, it be the sole

23 computer that he uses.

24         And what is the -- what is the government's,

25 excuse me, the hospital's view with respect to the proposals

1    found in the government's No. 5?

2        A    Well, the hospital adamantly opposes the

3    requirement that Mr. Hinckley wear an ankle monitor in the

4    community.  These, as we stated in our letter, are reserved

5    for, typically, for violent sex offenders.

6            In fact, we don't even have, as it says

7    erroneously in this, any individuals in the outpatient

8    department, as I've been told by Dr. Johnson, that are

9    actually monitored by an ankle bracelet.  That's typically

10   reserved for violent sex offenders, usually monitored by

11   CSOSA or the like.

12           We feel --

13       Q    Can you tell the Court what that means.

14       A    That's the -- that is the agency that's in charge

15   of monitoring sex offenders in the community and other

16   parolees and such.

17           THE COURT:  Well, they're actually responsible for

18   monitoring all sorts of people in Superior Court, not just

19   sex offenders.

20           THE WITNESS:  Okay.

21           My experience with CSOSA has been with our sex

22   offenders that do have to attend.

23           THE COURT:  But they do pretrial supervision,

24   Superior Court people.

25           THE WITNESS:  Okay.

1           We feel that this particular requirement, as we've

2    already gone over in the Court process in the past, would

3    be, one, far overreaching restriction on Mr. Hinckley in the

4    community, given the fact that he has presented such a low

5    risk for such a long time, that his part -- the part of him

6    going back into the community and that, from someone like

7    Mr. Hinckley with a history of infamy, is already a

8    difficult transition.

9           Adding something that is beyond the scope of the

10   necessary mitigation standards to manage his risk, this

11   would further separate him from the community that he's

12   moving into in a way that would not be therapeutic, nor

13   indicated for risk management appropriate to his level.

14          We feel like this would be something that would

15   stigmatize him further than he already has to work through

16   for no good reason, given all of the other management,

17   monitoring, and supervision requirements that we have in

18   place and feel are sufficient for his level of risk.

19       Q    An ankle bracelet, that's worn 24/7, as they say?

20       A    Yes.

21       Q    So that would be for the whole of his life.

22   He would be just wearing this thing and it would be out in

23   the summer in the shorts; and he would be identified as a

24   dangerous person, merely by the fact that he has this

25   bracelet on his ankle?

1      A      The one thing that I can say that works in

2   Mr. Hinckley's favor, even given the fact that I said that

3   he does live with the infamy associated with his instant

4   offense and his place in sort of the American, you know,

5   popular construct of his case, is that many people don't

6   recognize him anymore.  He can go through a crowd and not

7   necessarily be pointed out.

8      Q      Would this device make him more identifiable?

9      A      The hospital believes so, yes.

10      Q      All right.  What is the hospital's view with

11   respect to a tracking device and the use of computer

12   software to track computer use?

13          THE COURT:  First, you're talking about computer?

14   You're not talking about the vehicle?  Two separate things.

15          MR. LEVINE:  The tracking device for the vehicle.

16          THE COURT:  Let's take them one at a time.

17          MR. LEVINE:  Let's do that first.  Thank you, sir.

18          THE WITNESS:  The hospital does not necessarily

19   feel like the tracking device on his car would be necessary,

20   but we would not necessarily also be opposed to it if that

21   would make, you know, the Court feel more comfortable;

22   however, again, just as much as the ankle bracelet for

23   tracking his movements, we also feel that he's required to

24   have a GPS-enabled cell phone, which would also be able to

25   provide some sort of tracking, if necessary.

1    Q    And, of course, the Secret Service can follow him

2  whenever it chooses to do so?

3    A    That's correct.

4        THE COURT:  Well, I guess the other --

5  I don't know if this is a concern in Mr. Hinckley's and his

6  mother's real world or not, but does he ever drive -- his

7  sister talked yesterday about how there are two cars.

8  Does he always drive the same car?

9        THE WITNESS:  That's my understanding.

10        MR. LEVINE:  Your Honor, I believe the evidence

11  would be there are two old cars.  One was the car that his

12  father used that remains in the family, and the other is the

13  car that the mother uses.  And both are old.  And I think he

14  may use one dominantly, but he feels free to use the other.

15        And I think in this context, Your Honor, they're

16  not his cars.  They're his mother's cars.  And just like the

17  computer is his mother's computer, and it would be tracking

18  his mother's computer and tracking his family's car.

19        THE COURT:  Well, we do that with, when people are

20  released with location-monitoring devices at home.

21  It's usually their mother's or their spouse's or their

22  girlfriend's or their brother's or their uncle's or their

23  minister's home.  So we interfere with other people's lives

24  all the time.

25        But the thrust of my question was whether or not,

1   in terms of Mr. Hinckley's integration into the community,

2   whether he sometimes drives one car and sometimes drives the

3   other car or whether the way his -- not that this is

4   immutable.  It could change over the years.  But, typically,

5   whether he drives one of the, you know, car A and his mother

6   typically drives car B, and I gather Mr. Hyde's information

7   at least is yes.

8        THE WITNESS:  I believe so.  That would also --

9   I would feel more comfortable absolutely confirming that,

10  but that's what I believe.

11       THE COURT:  But if there were a tracking device on

12  a vehicle and he happened to drive another vehicle or the

13  car were in the shop and they gave him a loaner, would that

14  be a violation of conditions, or would the fact that he also

15  has the GPS cell phone make everybody happy?

16       Maybe that's a question for the government or

17  Dr. Patterson.  We're trying to figure out how this is all

18  going to function in the real world.

19       MR. LEVINE:  I think the Court's very astute

20  observations demonstrate that both the zeal to have

21  specificity creates inflexibility.  And they're -- in the

22  management of one's life, there's a need for flexibility.

23       THE COURT:  All right.

24  BY MR. LEVINE:

25       Q    Does the hospital have any opposition to providing

1   OPD with vehicle information?

2       A    No.

3       Q    Of course not.  Okay.

4            Now, number -- well, before I leave that one, now,

5   the issue of the ankle bracelet, that has already been

6   addressed once by the Court?

7       A    Yes.

8       Q    Are you familiar with that, with what the Court

9   said with respect to that?

10      A    Yes.

11      Q    Is there anything that has happened since the

12  Court wrote that opinion and denied the government's request

13  for an ankle bracelet that would suggest that maybe at this

14  stage, such a bracelet would be appropriate?

15      A    No.

16      Q    Nothing has happened?

17      A    Nothing.

18      Q    All right.  Now, No. 6 --

19           THE COURT:  What about the computer in No. 5?

20  We haven't talked about that.

21           THE WITNESS:  Thank you.

22  BY MR. LEVINE:

23      Q    What about the computer?

24      A    Well, the hospital opposes that request by the

25  government.  We feel that, specifically that he only

1   accessed the Internet on his personal computer in the home

2   would be very difficult for him to live in the modern

3   society.

4          As I've discussed earlier in my testimony

5   yesterday, this is -- the Internet is a resource that the

6   hospital believes is very important for Mr. Hinckley in his

7   integration process and in his work towards finding

8   employment and increasing his social sphere in general.

9          The idea that he would have to, you know, identify

10  to his supervising parties that he's, you know, has access

11  to any kind of device that has Internet access -- by the end

12  of this decade, I'm sure our garbage cans will have Internet

13  access.

14         This is something that, as we look at

15  Mr. Hinckley, the world Mr. Hinckley's currently integrating

16  into, out of this hospital -- which, by the way, also has

17  Internet access available to the patients.  And he's not, to

18  our knowledge, has ever done anything circumspect with that

19  beyond the time when he was looking at the pictures of the

20  dentists -- the dentist students.

21  BY MR. LEVINE:

22     Q    There was no question then as to whether it was

23  permissible?

24     A    Correct.

25         That Mr. Hinckley's having restricted, such

 1   restricted access to not just the Internet, as we've

 2   discussed before, but also to Internet sites and searches,

 3   but also to devices is an onerous restriction on his process

 4   of integration, especially at this stage in his life and in

 5   modern society.

 6        Q    No. 6, this pertains to the use or the carrying of

 7   a GPS-equipped cell phone.

 8             And there is in this, in substance, it requires

 9   that Mr. Hinckley only use one phone, and it be the phone

10   that has the GPS equipment on it and that he consent to

11   Secret Service or other contracting designees in looking at

12   the data from the phone.

13             Could you tell us the hospital's view of that.

14        A    Well, we oppose that in terms that he not be

15   allowed to use any other phone other than his GPS-enabled

16   cell phone.

17             Given the fact that Mr. Hinckley will need to have

18   access to other phones for, you know, any given

19   circumstance, be it work, be it for an emergency, that he's,

20   you know, he is going to need to be able to have access to

21   phones in general; and that obviously his main phone would

22   be the phone that he uses as much as he should and needs to;

23   however, that he shouldn't be restricted from using all or

24   any phones available to him for that reason.

25        Q    And there's no objection to him carrying a

1   GPS-equipped phone?

2        A    No, sir.

3        Q    Does there seem to be any reason why the

4   governments asks for it inasmuch as it has never once since

5   it's been required looked at the data?

6        A    Not that I'm aware of.

7        Q    There is in item No. 7 a recommendation by the

8   government that he be restricted in his travel to a 30-mile

9   radius from Williamsburg, Virginia; and if it's to go

10  further, that there be specific notice.  And if the

11  government objects to whatever it is that he's doing, that

12  they require court approval.

13           Can you address No. 7, please?

14       A    Yes.

15           And actually, I'd like to make a point that I

16  erroneously spoke yesterday.

17           We had initially -- we typically have a 50-mile

18  radius around D.C. for our orders for outpatients.  We had

19  discussed in our meetings that we turn that to a 30-mile

20  radius due to its -- the fact that that 50-mile radius does

21  touch Richmond and there is the government center

22  stipulation.

23           What I -- what was -- what I testified to

24  yesterday was correct in that Mr. Weiss recommended we do

25  keep the 50 because of the need to access all of those

1    resources in that area.  So we do -- the hospital certainly

2    proposes the 50-mile limit without court approval.

3           And I believe that Dr. Murphy's recommendation,

4    that if he were to travel past 30 miles within that 50-mile

5    zone, that he have -- that he be accompanied by a treatment

6    team member or family, is something that the hospital is in

7    agreement with.

8    Q     Okay.  No. 8 is a simple one, that Mr. Hinckley

9    notify Mr. Weiss before going to any private residence.

10          Is the hospital in agreement with that?

11   A     Correct.

12   Q     All right.  No. 9, this pertains to Mr. Hinckley

13   going to government centers and limits on that and

14   requirements that he leave the area when he becomes aware

15   that there is a government official or some Secret Service

16   protectee in the area.  What's the hospital's view of that?

17   A     Well, we oppose the condition as we are unclear as

18   to what the government refers to as protected areas.

19   Further, as -- reading through this and recalling my

20   testimony from yesterday, I think it's important to also

21   recognize that, as the government says facilities or sites,

22   that could exclude Mr. Hinckley from, as we discussed

23   yesterday, going to a DMV or a Social Security office to

24   take care of normal business.

25          We feel that this particular condition goes too

1   far in that regard.

2       Q    So the hospital opposes it?

3       A    Yes.

4       Q    And how will he know -- how could he know when a

5   government official would be there?  How would he know if a

6   Secret Service protectee is in the area or whatever the

7   area, however the area may be defined?

8       A    I don't know.  I mean, other than, you know,

9   scouring news report, which I don't think would be a wise

10  decision to follow the movements of these individuals.

11      Q    Sure.

12           I mean, should the Secret Service be advising him

13  as to when it's going to be in the area?

14      A    I would doubt that.

15      Q    All right.  No. 10, this is one that imposes a

16  duty on the government and not on Mr. Hinckley.  It's about

17  notification to the Court if there is data that the

18  government learns from these devices, the use of which we

19  oppose, and who the government informs.

20           What's the hospital's view of that?

21      A    Well, the hospital just wants to be clear that the

22  government should notify the Court and the OPD.

23           I understand that the language gets confusing

24  often between the hospital and OPD.  But we just wanted to

25  be clear about that, that the information should not be

 1   going to Mr. Hinckley's presumed former treatment team or

 2   officials at the hospital, but instead to Dr. Johnson or to

 3   somebody at the OPD.

 4        Q    All right.  No. 11 imposes a duty on the

 5   Department of Behavioral Health.

 6             THE COURT:  Who is the Department of Behavioral

 7   Health?

 8             MR. LEVINE:  OPD.

 9             THE WITNESS:  Well, Department of Behavioral

10   Health --

11             MR. LEVINE:  I'm sorry.

12             THE WITNESS:  -- is the new name of D.C.'s

13   Department of Mental Health.  We took the "behavioral" on

14   about a year ago.  So we're -- it's the District's

15   Department of Mental Health.

16             THE COURT:  So what's it -- is OPD part of it?

17             THE WITNESS:  Right.  So St. Elizabeths Hospital

18   and OPD are similar but separate divisions within the

19   Department of Behavioral Health.

20             THE COURT:  So both are under the umbrella,

21   though, of --

22             THE WITNESS:  Correct.

23             THE COURT:  Okay.

24   BY MR. LEVINE:

25        Q    And this is the one where we're in No. 11.

1        This is the one that would require Dr. Binks to go

2   into K Street, rather than meet with Mr. Hinckley at

3   St. Elizabeths?

4        A    Correct.  The hospital is opposed to any

5   requirements that would force Mr. Hinckley to return to the

6   hospital without any need.

7        Q    All right.  No. 12, this is one that imposes a

8   duty on the OPD.  What is the hospital's view on the duty it

9   seeks to impose?

10       A    Well, the hospital generally agreed with this

11  condition; however, the one opposition we hold is that

12  we believe Mr. Hinckley should be allowed to stop along the

13  route for activities, such as having to answer his phone.

14       Or, again, as I've stated before, there's been

15  times when the route has had to be altered or something else

16  occurs so that Mr. Hinckley is still allowed to make his way

17  in a normal fashion without being -- without fears of,

18  you know, breaking a condition and on his way to OPD getting

19  stopped and sent to inpatient instead.

20       Q    All right.  No. 13 is one that pertains to the

21  continuation of structured activities.

22       Is this one in which the hospital is in

23  substantial agreement?

24       A    Yes.

25       Q    All right.  No. 14, Mr. Hinckley shall complete a

 1   daily log.  And it goes on to talk about that.

 2           Is this one in which the hospital is in

 3   substantial agreement?

 4       A    Yes.

 5       Q    All right.  No. 15, Dr. G-G will provide

 6   psychiatric treatment and medication for Mr. Hinckley.

 7   And he would meet with her twice per month.

 8           What's the hospital's view of that?

 9       A    The hospital agrees with this condition.

10           I do believe that -- was this the condition that

11   was updated very recently?

12       Q    Well, let's take a moment, if you're unclear about

13   what it is that this condition says, let's make sure, as you

14   respond, that you understand it completely.

15           MS. KENNEDY:  I'm sorry.  Are we at No. 15?

16           THE WITNESS:  Yes, ma'am.

17           MR. LEVINE:  Yes, No. 15.

18           THE COURT:  The question is whether that's the one

19   to which the government filed an amendment.

20           MR. AZIZ:  Yes, Your Honor.  That's the one where

21   there was a typo, a typographical error in the submission.

22   And so the requirement or the condition that's brought on by

23   the government indicates weekly meetings with Dr. G-G.

24           MR. LEVINE:  This says twice a month.

25           So the government proposes --

```
 1              THE COURT:  Where is the -- tell us exactly,
 2  Mr. Aziz, how this is amended by -- this is a -- this is
 3  supposed to be verbatim from your filing to which Mr. Hyde
 4  is responding.
 5              MR. AZIZ:  Absolutely.
 6              THE COURT:  But this was amended.
 7              MR. AZIZ:  Correct.  So on the second line of
 8  page 9 of Defense Exhibit 4, this is condition No. 15.
 9  It says -- I'll just read from the beginning.
10              On number, condition No. 15, it begins,
11  "Dr. Giorgi-Guarnieri will provide psychiatric treatment and
12  prescribe medication for Mr. Hinckley at a frequency of at
13  least once per month for the first six months of his
14  convalescent leave."
15              The change, the amendment, is that it should be at
16  least once per week for the first six months of his
17  convalescent leave.  And, thereafter, it gets reduced to
18  twice a month.
19              MR. LEVINE:  So twice per month, is that right,
20  Mr. Aziz?
21              MR. AZIZ:  Yeah.  The rest of it stays the same.
22  The only amendment is at the beginning, it's more; it's once
23  a week.
24              THE COURT:  Right.  It seems as -- with the typo,
25  it seemed that for the first six months, it was less
```

 1    frequent, and then it became more frequently.

 2              MR. AZIZ:  Yeah, exactly.

 3              THE COURT:  So it's once per week in the

 4    government's proposal for the first six months, and then

 5    every other week.

 6              MR. LEVINE:  Well, if I may inquire, Your Honor.

 7    BY MR. LEVINE:

 8         Q    In light of that amendment, does the hospital

 9    agree or does it think that once per week to do medication

10    monitoring is too frequent --

11              MS. KENNEDY:  For six months.

12    BY MR. LEVINE:

13         Q    -- for six months?

14         A    The hospital would prefer to follow the

15    recommendation about the specific condition as laid out by

16    Dr. Murphy, which I believe, from my memory, states that the

17    first six months of phase 4, part A, would be seeing Dr. G-G

18    for psychiatric treatment and medication prescription

19    management every other week.

20              So it would be twice per month and then once a

21    month thereafter, if I'm correct.  That's what the hospital

22    would prefer to see from a --

23         Q    You expect the psychotropics, the pharmacology

24    with respect to mental health.  Has that medication changed

25    at all over a period of years?

1      A     No, sir.

2      Q     Does that suggest to the hospital that the

3   likelihood of there being a change, meaningful change, is

4   remote?

5      A     Correct, I think.

6            But the hospital agrees with Dr. Murphy's

7   recommendation based on the efficacy of the fact that the

8   medication management portion is very minimal for

9   Mr. Hinckley's care.

10           And that while it is important because she does

11   provide an important piece of risk management, supervision,

12   monitoring, Mr. Hinckley is also receiving a considerable

13   amount of treatment and supervision via Mr. Beffa,

14   Mr. Weiss, Ms. Haley throughout the months and that their

15   corroboration, communication between each other and OPD

16   should be sufficient, given the roles that each play.

17           And the fact that Dr. G-G's role with medication

18   management will be so minimal, that the recommendation for

19   twice-monthly meetings in the first six months seems to be

20   more clinically indicated for Mr. Hinckley.

21      Q     All right.  Now, No. 16, this pertains to the role

22   of Mr. Jonathan Weiss as the clinical social worker.

23           Is this one in which the hospital is in

24   substantial agreement?

25      A     Yes.

1     Q     And is the same true with No. 17 that pertains to

2   the role of Mr. Beffa?

3     A     Yes.

4     Q     No. 18, that pertains to the role of the music

5   therapist, Ms. Haley.  And what is the hospital's view with

6   respect to her?

7     A     The hospital is in agreement.

8     Q     And what's required of her?

9     A     The hospital is in agreement.

10          We do feel that this is important therapeutic

11   modality for Mr. Hinckley, particularly under the treatment

12   of a board-certified music therapist.

13          And we agree with the condition and feel that, as

14   Mr. Hinckley progresses through his recovery, if this is a

15   modality that is indicated to continue, it should.

16          And if any issues arise with Ms. Haley's

17   availability as his therapist, that they would seek another

18   board-certified music therapist.  But if that's difficult to

19   find in that moment, that should not necessarily prohibit

20   Mr. Hinckley from continuing on in his convalescent leave.

21     Q     Now, in your response, in the hospital's response,

22   it makes reference to Dr. Murphy's risk assessment and the

23   phased step-down plan.  What's the hospital's thinking in

24   that regard?

25     A     Well, the hospital very much agrees with the way

1    Dr. Murphy conceptualized the time frame of looking at the

2    phase 4 in three separate steps, working towards a tapering

3    down of certain services, while still maintaining those

4    connections, contacts; that that would be, as clinically

5    indicated, moved to a frequency that would be more fitting

6    for Mr. Hinckley's outpatient treatment needs and

7    monitoring, given his low risk.

8           The idea also, I think, is well-noted, because it

9    also works towards further steps for Mr. Hinckley, given

10   both clinical input and also seeking ultimate court approval

11   for further movement.

12   Q    No. 19 is one in which there is some agreement and

13   some disagreement.  It pertains to the role of

14   Dr. Nicole Johnson.

15          Please tell us the hospital's view with respect to

16   No. 19.

17   A    Again, it was something that I did speak a little

18   bit about yesterday and that we do agree with the condition;

19   however, we do feel that Dr. Johnson should not necessarily

20   have to create a summary letter from those notes; as I said,

21   that most of those notes are not necessarily very long;

22   however, they do contain a lot of the information that is

23   needed to maintain a good eye on Mr. Hinckley's progress and

24   functional status, symptom status, the like.

25          We do feel that, you know, as I've testified, that

1    the process of doing these summations while you're also

2    managing, in Dr. Johnson's case, you know, upwards of

3    80-plus outpatient cases, can be overwhelming, given that

4    the information contained within those clinical summary

5    notes are sufficient and typically well-done.

6            So that it would provide enough information about

7    his progress without overwhelming Dr. Johnson or other OPD

8    staff with too many administrative tasks associated, given

9    that there's also still a lot of contact being made and

10   weekly calls and notes written on those.

11       Q    All right.  No. 20 talks about the treatment team

12   and bimonthly treatment planning conferences.

13           Is the hospital in substantial agreement with

14   No. 20?

15       A    Yes.

16       Q    And No. 21 --

17           THE COURT:  And are the members of the

18   Williamsburg treatment team amenable to that?

19           MR. LEVINE:  Your Honor, it's difficult to hear.

20   I'm sorry.

21           THE COURT:  I said, are the members of the

22   Williamsburg treatment team amenable to that?

23           THE WITNESS:  Yes.

24           THE COURT:  You've talked to them?

25           THE WITNESS:  Yes.

BY MR. LEVINE:

     Q     No. 21 talks about the identification of a primary
care physician, and the need for such a person to be
identified after clarification and benefits have been
attained, which as I understand your earlier testimony,
means after convalescent leave is awarded or ordered by the
Court?

     A     Correct.

     Q     All right.  What's the hospital's position with
respect to that?

     A     We're in agreement.

     Q     And No. 22, this requests Mr. Hinckley comply with
requests by the hospital for information relating to medical
and psychiatric treatment.  What's the hospital's view of
that?

     A     We are in agreement.

     Q     All right.  No. 23, this is one where the hospital
has a, some disagreement here.

          Prior to Mr. Hinckley's placement on convalescent
leave, the hospital social work staff and Mr. Weiss shall
identify all possible government assistance programs for
which Mr. Hinckley may be eligible and to work with him to
apply for such programs.

          What's the hospital's view there?

     A     Well, the hospital opposes the condition as a

 1    prerequisite to convalescent leave.  This is something that

 2    is simply done in every case.  Once we receive convalescent

 3    leave, we seek this out.

 4            And as I've testified earlier, we've already begun

 5    looking into any and all possible options for Mr. Hinckley's

 6    benefits and assistance plans.  If --

 7            THE COURT:  Is your concern really a matter of

 8    timing --

 9            THE WITNESS:  Correct?

10            THE COURT:  -- that you're not going to be able to

11    get all this done before --

12            THE WITNESS:  A lot of it requires having an order

13    and then moving and -- yeah.

14            THE COURT:  So you're researching it, looking into

15    it.

16            And once, if I issue such an order, then you're

17    able to go to people and say, he's going to be on

18    convalescent leave; we need more detailed information.

19            THE WITNESS:  Correct.  And we'd be happy to

20    provide the Court with whatever information comes out of

21    that as well.

22    BY MR. LEVINE:

23       Q    All right.  No. 24 pertains to restrictions placed

24    on Internet use.

25            What's the hospital's reaction to the proposal

1 advanced by the government?

2     A     Again, the hospital opposes this condition based

3 on the fact that in modern society it would be virtually

4 impossible for him to identify all Internet-enabled devices.

5 And, you know, simply cannot be able to go through,

6 you know, day-to-day activities without coming into contact

7 with something.

8         We do agree that he should provide his e-mail

9 account information to OPD, Secret Service.

10         And, again, we, as I testified earlier, we also

11 believe that he should have access to, you know, the

12 Internet and what it has to offer, as long as all log-in

13 credentials are provided to the appropriate parties.

14     Q     All right.  Number --

15         THE COURT:  What about the restrictions on access

16 to Websites or searches for information relating to himself

17 and certain other people?

18         THE WITNESS:  We, the hospital treatment teams,

19 we've gone back and forth about this particular idea a lot.

20         What we've kind of come to the decision from,

21 you know, clinical basis, is that allowing Mr. Hinckley the

22 ability to do -- to have open searches is important because

23 we don't necessarily:  One, we won't necessarily be out of

24 step with what he's doing.  If he's doing these searches,

25 you know, at his home or from his phone or something like

1    that, we would have access to search history.

2             But we also want to be sure that he's able to,

3    you know, discuss these things, to talk about himself, to do

4    things that would be important from a therapeutic standpoint

5    for him to discuss.

6             And if he's feeling like he wants to Google

7    himself as, you know, we all do, we -- that would be

8    something that would be important for him to be able to

9    discuss with his treatment providers.

10            And Mr. Hinckley's very much shown over the last

11   several years that in regards to his relationship and his

12   openness with treatment providers and especially with

13   Mr. Beffa and Dr. G-G and increasingly Mr. Weiss, that he is

14   open to discussing these things and wants to consider the

15   use of Internet resources for his life but also very much

16   wants to discuss these things with the people that he sees

17   as his advocates and his support network, because he does

18   see that there is potential danger there, particularly for

19   himself, given that there could be lot of negative attention

20   drawn to him by doing things like that.

21            THE COURT:  Let me ask you this question:

22            Is this a change in the hospital's position?

23   By that I mean, maybe because of a change of Mr. Hinckley's

24   situation, but in the past at various hearings and

25   particularly the last hearing when he went to the bookstore,

1    one concern was that we went to the bookstore when he

2    shouldn't have, when he was supposed to be someplace else.

3            THE WITNESS:  Uh-huh.

4            THE COURT:  The other concern -- we spent a lot of

5    time on this at the hearing -- was standing in front of a

6    bookshelf, and was he looking at the bookshelf or wasn't he

7    looking at the bookshelf, but it was a shelf that contained

8    books on presidential assassinations.  And, you know, going

9    back to Millard Fillmore, and I think there was a book about

10   the Reagan assassination; and there certainly was

11   Mr. Wilber's book about the Reagan assassination.

12           So was that, were those kinds of things of concern

13   to the hospital then but are not now?  Or were they only of

14   concern -- I don't mean to say only.

15           Were they of concern to Dr. Patterson and

16   Dr. Phillips and the Secret Service but not so much to the

17   hospital?

18       A    Well, if I remember correctly from that particular

19   incident -- and I know, having read about, you know, this

20   hearing and previous hearings in the media that it's, this

21   still comes out is that he was standing and staring at these

22   books -- but from my understanding of the hearing and the

23   outcomes is that it was well and clear.  It was --

24           THE COURT:  It was well-overblown.

25           THE WITNESS:  Well-overblown.

```
 1              However --

 2              THE COURT:  The question is, the more basic

 3    question is, that -- assuming, whatever the facts were,

 4    certainly, an interest in or a focus on these things --

 5              THE WITNESS:  Yes.

 6              THE COURT:  -- if it had occurred, was considered

 7    by some, and I think Dr. Patterson, Dr. Phillips, to be risk

 8    factors, to be of concern.

 9              I don't remember, but I'm sure we can find out

10    later today or Monday what Dr. Murphy thought.

11              So was that, were those things of concern to the

12    hospital at some point in the past but not now or -- because

13    now you're talking about it as being a positive thing?

14              THE WITNESS:  Right.

15              I can tell you that from that, at that moment,

16    being a part of the treatment team, particularly from more

17    of the -- more of a therapist standpoint, that was seen as,

18    well, yeah, you can look at the risk sort of idea behind

19    that, if, you know, whether he was looking and staring or

20    not, interested in it.

21              Regardless, it's -- it was very important from a

22    therapeutic standpoint and something that we took very

23    seriously and see this idea of Internet searches, Internet

24    access through a similar lens, as we did then, with this

25    idea that if he's going to a bookstore and seeing pictures
```

1   of him or, you know, discussions about his life and history

2   or the assassination attempt, that this is a part of his

3   life that he has to come to terms with and that he has to be

4   able to understand, explore, and manage; that he should not

5   necessarily be censored from the reality of the world and

6   his impact on it; that, in fact, it should actually be used

7   to help him better manage his understanding of himself, his

8   own risk factors, and to better mitigate them with some

9   self-agency as opposed to being drawn to them like some sort

10  of dirty candy.

11          We want to make sure that he can really, you know,

12  as I said, understand the impact that he has had on his own

13  life, the lives of others, and society at large; and that's

14  not necessarily going to happen by restricting his access to

15  it.

16  BY MR. LEVINE:

17      Q    His name is inextricably tied to the names that

18  are listed in the government's recommendation.

19      A    Right.

20          And I can -- and I'm not saying that their

21  condition and the -- what they're trying to address through

22  this condition does not make sense.  I can see where they're

23  coming from, from a pure sort of security standpoint.

24          But what the hospital feels is that there's --

25  that there is, yes, you have to mitigate risk.

1          Yes, you have to consider the particular case, the

2     ramifications of the risk factors that were salient at the

3     time of the offense and that have since been shown.  But you

4     also have to weigh them with the protective factors and

5     understand that the role of therapy in the monitoring and --

6     of and mitigation of risk factors in the community is a very

7     important one, but that the most important monitor of those

8     is, in fact, the individual himself.

9          And if we are to begin to move Mr. Hinckley

10    towards greater freedom and independence, we also want to

11    make sure that he is not doing so in a cloistered, closed

12    way that's going to be to overprotective; that in so doing,

13    is going to, you know, prevent him from, you know, gaining

14    self-actualization, further self-realization, and engaging

15    in the world around him in a way that is, that is aware and

16    that is empathic.

17         Q    Would the hospital or would a therapist want to

18    know if he had any interest in doing that, as opposed to him

19    being barred from doing it?

20         A    Yes.  And I think what would be important is that

21    Mr. Hinckley would bring that sort of thing to his therapist

22    and say, I would like to Google myself.  What do you -- you

23    know, But I'm kind of -- what do you think would happen?

24         Or what if I read a Washington Post article about

25    my hearing and then, you know, I want to look at the

1     comments about it?  You know, that -- we could say, well,

2     there's, you know, there's his narcissism coming up;

3     he's very interested in himself.  But who isn't?

4            And, in fact, it would be very, I think, very

5     helpful, from a therapeutic standpoint, for Mr. Hinckley to

6     enter into a process like that with the guidance and the

7     support of his clinicians, the people that know him well.

8        Q     Does putting a bar on his access to that

9     information enhance or undermine therapeutic process?

10       A     The hospital's view is that it undermines the

11    therapeutic process.

12            THE COURT:  There were times in the past, were

13    there not, when the hospital had a different view, like when

14    there was -- I can't remember now -- magazine article about

15    Jodie Foster or something that he was looking at in his room

16    or --

17            THE WITNESS:  Uh-huh.

18            THE COURT:  -- or some -- my memory is vague --

19    but some other things involving the President or himself,

20    and those I know were always viewed by the government's

21    experts as risk factors.  But I have a recollection that

22    maybe it's a much earlier stage in the last three decades

23    the hospital was concerned about things like that, too.

24            THE WITNESS:  Absolutely.  I do recall that, and

25    that was obviously before my time by a couple of decades.

```
 1              But it was an important piece, especially, I think
 2    it was in the '90s, that some of those materials were found
 3    in his room and John Howard.
 4    BY MR. LEVINE:
 5        Q    '80s.
 6        A    Oh, late '80s, yes; or something along those
 7    lines, yeah.
 8        Q    '87, '86, '87?
 9        A    And yes, I think that those were risk factors
10    then.
11              And they are -- they need to be seen as risk
12    factors now.  I'm not denying that.
13              However, I do see that there's a major difference
14    between who Mr. Hinckley was in the '80s and even '90s and
15    to who Mr. Hinckley is in 2015.
16              And I also believe that this is a very different
17    world from that time till now; and, in fact, is probably
18    even more impossible for Mr. Hinckley to go through the
19    world without having -- encountering these types of
20    materials and needing to understand how he's supposed to
21    live with them without allowing the risks that are inherent
22    in them to overwhelm him.
23        Q    Do you remember the testimony of Dr. Phillips some
24    hearings ago, where I believe there was an anniversary of
25    some event pertaining to President Reagan?
```

1       A      Uh-huh.

2       Q      And he was critical of the hospital of not

3  exploring John's views with respect to that event.

4              Do you remember that?

5       A      I do.

6       Q      And does barring his access to this information

7  make it more difficult for the hospital to actually explore

8  with him or for therapists to actually explore with him his

9  reaction to these events?

10      A      Yes.

11             And I even recall the conversation I had with

12  Dr. Phillips about that specific time and the importance

13  that he placed on it and later then meeting with

14  Mr. Hinckley individually and talking about it.  And I do

15  believe that Dr. Binks, in fact, went through and watched

16  that piece with him, if I remember correctly.

17             THE COURT:  All right.  What number are we up to?

18             MR. LEVINE:  I think we're up to No. 25,

19  Your Honor.

20  BY MR. LEVINE:

21      Q      This is one that enables a Secret Service to

22  examine some of the devices, the Internet devices that we've

23  discussed, and requires Mrs. Hinckley, I guess, to put on

24  her computer certain operating systems and software such as

25  Windows and DOS.

1          Frankly, as I ask those questions, I'm not sure

2    what those terms mean.  But they're computer terms, and

3    they're computer systems; and I don't know if they're

4    readily available or obsolete.

5          But whats the hospital's view with respect to

6    them?

7      A    Well, the hospital opposed the condition as not

8    being clinically indicated nor consistent with convalescent

9    leave, that we feel that it does impede his ability for

10   gradual autonomy in the world.

11     Q    And if Mr. Hinckley were to, perhaps, with his

12   Mom, want to update the cell phone and would go to Best Buy

13   or Verizon or AT&T or any of those providers and they wanted

14   to see how it worked, would he be able to do that if these

15   conditions were imposed?

16     A    Right.  I mean, he wouldn't be able to have any

17   fun at the Apple store.  He would have to be on a Windows

18   operating system.

19     Q    He could live in a modern society without being

20   able to go into the Apple store?

21     A    Depends on who you talk to.

22          We have been teaching him C prompt; however, just

23   to make sure that he is ready for DOS.

24          THE COURT:  I have no idea what that means.

25   BY MR. LEVINE:

1     Q     I was just going to say, I know that comment was

2   amusing, but it alludes me.

3           No. 26 is, of course, deals with his -- whether he

4   can display publicly his paintings, his photographs, his

5   music, et cetera.  Apparently, the hospital -- the

6   government thinks that's a bad idea.

7           Does the hospital have a position with respect to

8   that?

9     A     Well, the hospital agrees with the condition,

10  although it should be -- it should be noted that just as

11  much as I've been discussing the importance of Mr. Hinckley

12  having access to the world around him, you know, there is

13  also the understanding that, you know, it should be

14  important for Mr. Hinckley to be able to express himself

15  through means other than those digital; that he is an

16  artist; that he is a musician.  He's a painter,

17  photographer.  He is a creative individual.

18          This is a -- this is more part of his identity and

19  sense of self-worth than pretty much most of what we've been

20  discussing in this courtroom to date.

21          He is very much interested in creating a life and

22  making social connections through the arts.  And I think

23  that that -- those are not only noble pursuits for him, but

24  I think they're also very therapeutic in value for him to

25  continue pursuing.

1          Where the hospital agrees with this condition is

2     that at this stage it would be important for Mr. Hinckley to

3     focus solely on his integration process and getting himself

4     paid work and moving towards the autonomy that he deserves

5     and that he should not necessarily be barred from creating

6     at this stage, nor expressing himself.

7          But the hospital does feel that what would be

8     important, namely, in the first six months to a year, is

9     that he be considering more about the idea of how do I find

10    work, how do I make myself, you know, in my day to day, and

11    continue working with his clinicians to determine the best

12    route forward for further public exhibition, you know,

13    whether he should do it anonymously with this name, what are

14    the ramifications, and perhaps seeking further -- seeking

15    this out further after the 6- to 18-month part A and part B.

16    Q     In these proceedings, there's been considerable

17    attention given to the question of whether there is some

18    sort of indication of narcissism in his behavior.

19          And the fear that has been expressed has been that

20    if he shows people his paintings, exhibits his paintings or

21    his photographs or plays his music that that might be an

22    indication of narcissism.

23          Is there a distinction between narcissism as we

24    generally know it and narcissistic disorder?

25          Would there be a -- is it a disorder for him to

1  want to display his work?

2          MS. KENNEDY:  Your Honor, I'm going to object

3  because Mr. Hyde is a clinical administrator.  He's not a

4  Ph.D.  He's not an M.D.  He's not a psychiatrist who will be

5  able to talk about diagnoses, medication.

6          And we've had -- we're going to be having a lot of

7  testimony on that from physicians, so I would ask that that

8  be reserved.

9          MR. LEVINE:  That's a well-placed objection.

10  I think that's a fair point.

11  BY MR. LEVINE:

12      Q    Mr. Hyde --

13          THE COURT:  You should order that page of the

14  transcript.

15          MS. KENNEDY:  I'm going to do that.  I'm going to

16  do that.

17          MR. LEVINE:  I think the Court will detect it as a

18  real distinction between our reactions to these things and

19  the government's.  They're unalterably opposed to

20  everything.  We actually consider what they say.

21  And I'm sure we'll get that evidence, so I'm not afraid of

22  the answer.

23  BY MR. LEVINE:

24      Q    As we talk about this narcissism and its

25  manifestations, Mr. Hyde, are we also concerned about

1    Mr. Hinckley's sense of self-esteem?  Does that matter?

2         A    Yes.

3         Q    All right.  No. 27 talks about, should

4    Mr. Hinckley receive communications relating to his offense,

5    that he notify OPD.

6              The hospital has no objection to that?

7         A    Correct.

8         Q    And No. 28, likewise, it's the media plan, to the

9    extent that the media plan is interpreted to be the one that

10   has been in place.

11             Does the hospital agree with that?

12        A    Yes.

13        Q    Then they have a proposal, No. 29, that deals with

14   what they call negative incidents regarding public or media.

15             Do you know what -- does the hospital know what

16   that means, what negative incident is?  Does that mean being

17   approached by the press or something else?

18        A    We're not exactly sure.

19        Q    All right.  What's the hospital's response to the

20   government recommendation No. 29?

21        A    Well, we are in general agreement in that it,

22   when, you know, that this condition parallels the media

23   plan; however, we do oppose the requirement that law

24   enforcement or the Secret Service be called, unless there's

25   a threat of harm.

1            So if Mr. Hinckley were to be approached by a

2    camera person or a reporter, which has, indeed, happened in

3    the past, in recent weeks, and years, that he not

4    necessarily be required to call a law enforcement official,

5    unless, of course, that is needed to help prevent harm.

6            We do feel that, you know, he's shown his ability

7    to manage the media plan very, very well.  He's not sought

8    out any connections and is very vigilant and diligent in

9    staying away from any of these issues.

10           We do feel that the requirement that he be

11   returned to the hospital is associated with this is not

12   appropriate whatsoever, unless he experienced a serious

13   psychiatric episode, decompensation, for which Dr. G-G would

14   be involved in helping him as needed.

15           THE COURT:  So the media plan currently says, if

16   approached by the media, he and members of his family will

17   decline to speak with them if media persists and members of

18   his family will withdraw.

19           Then there's a paragraph that says -- that says,

20   it's still -- it uses the same phrase that you say is

21   unclear, and I think is unclear too -- but if there are any

22   negative incidents regarding the public or the media, then

23   it says, Ms. Hinckley will immediately return to her

24   residence and call the nursing supervisor's office at the

25   hospital; and if so, directed, they will return to the

1    hospital.

2            So there is the same lack of clarity about what a

3    negative incident means.  But the current mechanism to call

4    in the hospital, and this open-ended thing, if so directed,

5    they will return to the hospital.

6            What that suggests is that there could be some

7    incidents regarding the public or the media that are so

8    negative or Mr. Hinckley's response to them is so negatively

9    that the hospital would say you need to come back to the

10   hospital.

11           Now, that's never happened, but -- so if one were

12   to take that same provision and sort of adapt it to his

13   being in Williamsburg, I guess the answer would be to call

14   Dr. G-G or Mr. Weiss, but not to -- or some other member of

15   the treatment team, and possibly also include calling the

16   OPD back here.

17           But I don't understand why we were adding the

18   Secret Service and local law enforcement when we don't even

19   know the nature of the negative incident.

20           And someone should -- would parallel the current

21   provision if we eliminated that and gave someone, either

22   FOPD or someone from the treatment team there, to say, you

23   need to go back to the hospital in view of this negative

24   incident, whatever it is.

25           So the unclear and the lack of clarity is in the

1    current condition --

2           THE WITNESS:  Uh-huh.

3           THE COURT:  -- as well.

4           But what is clear is who gets called and who makes

5    the discretionary decision.

6           In this proposal, we still have the same lack of

7    clarity, but there are a lot of other treatment team people

8    or providers involved, not so clear who makes the decision

9    to direct them; but I could see writing this so it could

10   either be FOPD or somebody in Williamsburg saying, this is

11   so awful; you have to return to the hospital.

12          But we could write this condition to be almost

13   like the current condition but eliminate law enforcement and

14   the Secret Service, and we're back where we started from.

15          MR. LEVINE:  I note the irony, Your Honor, that

16   the government has complained for years about the lack of

17   clarity, and they're injecting a lack of clarity into this

18   one.

19          THE COURT:  But, apparently, they've injected the

20   same lack of clarity into earlier ones and I've signed them.

21   So blame us all.

22          MR. LEVINE:  Yes.

23          THE COURT:  Maybe Dr. Patterson wants to write an

24   addendum talking about my lack of clarity.

25          All I'm saying is that if the primary objection,

```
 1   if there are two objections are lack of clarity, we've

 2   already got it in a similar provision.

 3            And the real heart of the objection seems to be

 4   the need to immediately contact local law enforcement and

 5   Secret Service, and we can talk more about that when

 6   Dr. Patterson or others are on the stand.

 7            But I think paragraph 29 could be modified to your

 8   satisfaction and mine without injecting law enforcement,

 9   because we've had a very similar provision before.

10            THE WITNESS:  Uh-huh.

11   BY MR. LEVINE:

12   Q     Is there any behavior attributed to Mr. Hinckley

13   that has occurred since the last order that would suggest

14   that this plan in this regard should be changed?

15   A     The only incident that I can recall is not in this

16   most recent trip but the prior trip in March where

17   Mr. Hinckley was leaving the hospital in a vehicle and his

18   car was approached by camera people.  And then, again,

19   later --

20   Q     That was in D.C.?

21   A     This was here in D.C.

22            And then that same trip later, walking to his

23   volunteer position at Eastern State, he was approached by a

24   camera person.  And the person continued pursuing him, and

25   he turned, instead of going into work.  Because this person
```

1    was following him everywhere, he got into his car and drove

2    away without any further incident.

3           So, again, I think Mr. Hinckley's behavior has

4    shown that he can manage himself very well in this regard.

5       Q    Was this reaction to both of those instances

6    appropriate?

7       A    Correct.  Yes.

8       Q    And would they justify the fact that those

9    occurred and his reaction to it, would it justify any change

10   in the media plan that would make it more onerous?

11      A    No, sir.

12      Q    I believe we're up to No. 31, that he would abide

13   by all laws, of course, and not consume alcohol or illegal

14   drugs.

15          Does the hospital agree with -- are we up to

16   No. 31?

17      A    I think we're up to 30.

18          MS. KENNEDY:  30.

19          MR. LEVINE:  Sorry.  30.  I apologize.  30.

20   BY MR. LEVINE:

21      Q    If a family member becomes aware of any violation,

22   the government makes some proposals there.

23          What's the hospital's reaction to this proposal in

24   No. 30?

25      A    We're generally in agreement; however, we believe

1    that a treatment provider should work with FOPD to request

2    Mr. Hinckley's return to inpatient status at the hospital.

3         Q    And I presume there's a materiality aspect to what

4    a violation might be?

5         A    Yeah.  I mean, a violation, you know, could be

6    that he has, you know, started, you know, doing things along

7    the lines of, you know -- what's the word I'm looking for --

8    you know, bothering people, stalking somebody, get,

9    you know, getting.

10        Q    How about the timing on his parking meter runs

11   out?

12        A    Right, something like that.

13             Running a stop sign, I can't see that.

14             But I would see, you know, if he's doing things

15   that are clearly illegal, criminal, or present a clear

16   evidence that there's decompensation, in effect, that would

17   be something that would arise to it.

18             Whatever, if he's doing, you know, like you said,

19   if he accidentally, like, yeah, lets his parking meter run

20   out, then that would be an overreach to return him to the

21   hospital.

22        Q    And No. 31 addresses the question that he has to

23   abide by all laws.  Of course, the government agreed -- the

24   hospital agrees that he should abide by all laws?

25        A    Correct.

1      Q    And but there, too, there's a materiality feature

2  that is implicit in the hospital's view?

3      A    Correct.  That, you know, this is something that

4  actually we make sure is in all of our convalescent leave

5  plans.

6      Q    Okay.  And this one, which is routinely applied to

7  all convalescent leave plans, addresses the question of or

8  imposes the prohibition against consuming alcohol and drugs,

9  illegal drugs, controlled substances.  That's just routinely

10 applied?

11     A    Correct.  And even while those don't necessarily

12 match Mr. Hinckley's risk profile, the possession of

13 firearms, weapons, ammunition, again, would; but they are

14 also boilerplate for all of our releases.

15     Q    There's been no indication whatsoever of abusing

16 alcohol or drugs; is that correct?

17     A    No.

18     Q    Correct?

19     A    Correct.

20     Q    Okay.  All right.  Now, then No. 32, the hospital

21 raises the specter that Ms. Hinckley may become unable to

22 monitor Mr. Hinckley, I guess, for a variety of reasons,

23 including her age.

24          What's the hospital's view of that?

25     A    Well, the hospital opposes that Mr. Hinckley

1  should be returned to the -- to inpatient status or assessed

2  by the government's expert in the event that Mrs. Hinckley

3  is unable to monitor him, given the fact that Mr. Hinckley

4  has a pretty significant support network already instilled

5  in the area with his treatment providers, his family, as

6  Ms. Sims has already stated, has a long-standing plan to act

7  on a moment's notice to come stay with him.

8         There's plenty of provisions in place, given the

9  fact that, you know, Mr. Hinckley would be living with his

10 mother, at least in the short term of, you know, six months

11 to a year, a little bit more of his convalescent leave, that

12 to make sure that he is in a solid, stable, psychological

13 place so that when he's -- and he's also been able to show

14 his resilience time and again throughout his stays in

15 Williamsburg, even with the loss of his father, with other

16 rejections and rebuffs and major stressors he's encountered,

17 he has done very well while there.

18         And some of these have even occurred at the very

19 outset of a trip and not necessarily at the end where he

20 would be returning shortly to the hospital.

21         We feel that the family is supportive enough of

22 Mr. Hinckley and would provide that help for him as needed

23 and that his providers as well would be able to, at a

24 moment's notice, activate and come to his support and his

25 side if something were emergent to occur with his mother.

1      Q    All right.  Now, the government raises the specter

2  in No. 33 that if the family cannot continue to finance the

3  treatments in Williamsburg, that he be returned as an

4  inpatient to the hospital.

5           Were you here for the testimony of both Diane Sims

6  and brother Scott?

7      A    Yes.

8      Q    All right.  Now, with that in mind, could you give

9  us the hospital's response to this prospect and the remedy

10  proposed by the hospital -- by the government?  Excuse me.

11      A    Well, the hospital opposes this condition, given

12  that Mr. Hinckley should be -- should not necessarily be

13  returned to inpatient status if there is some sort of

14  financial issue arising.

15           Returning to inpatient status, for anybody in this

16  situation, regardless of who he or she may be, is something

17  that is based on clinical need, the increase in risk for

18  dangerousness to himself or others, and an increase in risk

19  for violence, Mr. Hinckley, his family have stated that they

20  are not going to pull out any plugs on his plan to live in

21  the community, to live away from the hospital, to receive

22  the treatment he requires.

23           Further, the hospital, as we do with all of our

24  outpatients, are applying for benefits, which Mr. Hinckley

25  will most likely receive in full or in part, to cover most

1    of those expenses, in addition to the reduction of the

2    massive costs of transportation that each trip requires of

3    the family and pursuing other forms of assistance.

4           We don't believe that it is clinically appropriate

5    to return Mr. Hinckley to the inpatient status based on

6    dollar amounts.

7       Q    Okay.  No. 34.

8           MR. LEVINE:  And we're coming to the end,

9    Your Honor, mercifully.

10   BY MR. LEVINE:

11      Q    This is a recommendation that pertains to members

12   of the Williamsburg treatment team and raises the specter

13   that one or more of them may become temporarily or

14   permanently unavailable; and were that to happen and if

15   clinically indicated, he'd be returned to inpatient status.

16          What's the hospital's view of that?

17      A    Again, we feel that any return to inpatient status

18   should be made on -- through clinical judgment by providers

19   based on Mr. Hinckley's presentation of active

20   symptomatology and not necessarily based on either dollar

21   amounts or the presence or absence thereof of one of those

22   providers.

23          They are important.  We're not saying that.

24   They have been well-vetted.  We're not saying that.

25          What we are saying is that as Mr. Hinckley moves

1   into convalescent leave status that he is moving both in age

2   and toward the benefit status of Medicare; and that the fact

3   that we still -- that is, I testified yesterday, there's

4   still the reality of people's lives and careers moving on,

5   and that removing one of these individuals from

6   Mr. Hinckley's witness treatment team should not be cause

7   for sending him back to the hospital, as it would not

8   necessarily cause him to show or to have a decline in his

9   mental capacity.

10      What we would -- what we have stated in our

11  recommendation was that if one of these providers become

12  unavailable, that the OPD will work with Williamsburg team

13  to establish a replacement provider as soon as possible.

14      One of the things that I think would be important

15  to keep in mind is that, you know, as Mr. Hinckley's, you

16  know, gone through the trips, there have been times that

17  he's not seen his music therapist.  There have been times

18  when he's not seen Dr. G-G.  There's been times when he's

19  had a group therapy canceled or individual therapy canceled.

20      Mr. Hinckley did not decompensate.  Mr. Hinckley

21  did not crumble.  He said, "Okay, that's fine.

22  I'll continue on."  If we were able to get a new appointment

23  scheduled, we did so; otherwise, Mr. Hinckley did well.

24      There's enough people monitoring him and

25  safeguards in place clinically for him to be able to manage

1    for a short period of time as another provider is found to

2    fill in services.

3            It should also be pointed out that, as Mr. Weiss

4    has stated, that if Mr. Hinckley does receive Medicaid, that

5    in the State of Virginia, Colonial Behavioral Health would

6    be required to work with him to find treatment provision and

7    provide services that are allowed -- that are provided to

8    all Virginia residents with that type of benefit.

9            And so this type -- this would actually make

10   things slightly easier to find a provider who is

11   well-qualified and affordable and in his location.

12           THE COURT:  Let me just raise this:

13           You just said -- and this is a good point -- that

14   given what we know about some of the current providers'

15   willingness to accept Medicaid and then eventually Medicare,

16   there could be, that could necessitate a change in

17   providers.

18           THE WITNESS:  Right.

19           THE COURT:  And I understand that.

20           One of the things, though, thinking back to the

21   history of the case and -- is that there was a lot of

22   discussion over several hearings about Mr. Beffa's

23   performance as case manager.

24           And since there was this great concern about

25   Mr. Hinckley's integration into the community and

1  socialization and meeting people and getting volunteer work

2  and all of these other things, that, for a while, impeded

3  progress because Mr. Beffa wasn't doing as much as he should

4  have done and Mr. Hinckley wasn't taking the initiative

5  himself.

6        The change from Beffa to Weiss was a huge plus --

7  and I'm not criticizing Mr. Beffa's ability as a therapist

8  in the -- and the group therapy seems to be very, I guess

9  the individual therapy, too, a very good thing.  But as a

10 case manager, he wasn't very proactive.  And Dr. Phillips

11 and Dr. Patterson commented on this.  I commented on it in a

12 number of opinions.

13       And so under the hospital's view of the

14 government's proposal in paragraph 34, if Mr. Weiss,

15 hypothetically, were to leave -- that's a very important

16 player -- and there wouldn't be a court or a Dr. Patterson

17 in the picture to assure that the next person had the same

18 or comparable skills and talents and commitment as

19 Mr. Weiss, this would all be left to FOPD.

20       On the one hand, maybe that's the normal

21 progression of things.  But one could see a perhaps not a

22 regression but a stage that just stays in place and nobody's

23 pushing it, helping Mr. Hinckley push it to the next step,

24 unless the right person is selected.

25       And, again, I think a similar thing in my

1    memory -- and my memory is little vague on this one --

2    I think Dr. G-G" wa a great improvement over Dr. Lee.

3          And so I'm not saying I want to be involved in all

4    of this.  And I'm not saying we should come back to court

5    for everything for the rest of Mr. Hinckley's life.

6          But those people, Dr. G-G and Mr. Weiss, have been

7    really significant players in Williamsburg.  And we're

8    asking them, under the hospital's proposal, to take an even

9    greater role in Mr. Hinckley's life.

10         And who is going to make sure that, let's say, one

11   of them retires in the short term or one of them can't take

12   Medicaid and the family and consultation with everybody

13   agrees it would be better to have somebody that would take

14   Medicaid, who is going to be or what group of people is

15   going to be in the picture to assure that the substitute for

16   the new Mr. Weiss, the new Dr. G-G, if it comes to that, is

17   of that caliber and has those characteristics that have

18   really made a difference over the last few yours?

19         THE WITNESS:  My response to that would be the

20   providers themselves making referrals and recommendations

21   for their replacements.  One of the things I think that

22   would be very helpful for.

23         In addition to that is to then go through a

24   process of review, including Dr. Johnson, and maybe even in

25   that case, somebody from the former inpatient team,

1    depending on the timing.

2          You know, the further we get away from the

3    inpatients -- inpatient life, I think the less, you know,

4    that that will have a much -- should have much weight on

5    future decisions.

6          But I think that in terms of understanding

7    Mr. Hinckley, understanding his process and the trajectory

8    of his treatment and recovery, and the, you know, some of

9    the strengths and weaknesses we've seen over the years with

10   his various providers and outpatient settings would be

11   helpful.  But I think, you know, for, you know, certain

12   members with a longer sort of institutional memory of the

13   case be a part of that vetting process earlier on.

14         But, again, I think that it should be something

15   that is done in concert with the recommending referring

16   clinicians, whoever is leaving, and to present a list of

17   possible alternative providers that then gets reviewed by

18   OPD, in concert with the other members of the Williamsburg

19   team, and perhaps given timing, an inpatient member like

20   myself or Dr. Binks or Dr. Adewale.

21         THE COURT:  But I remember, for example, if I'm

22   again remembering correctly, and I know we're moving to a

23   new stage if some version of the hospital's program proposal

24   is adopted, but Mr. Shamblee spent lot of time talking to

25   Mr. Beffa and to Mr. Weiss, and I believe, to Dr. G-G?

1              THE WITNESS:  Uh-huh.

2              THE COURT:  He, on behalf of the hospital, maybe

3    other people talked to them to --

4              THE WITNESS:  Uh-huh.

5              THE COURT:  -- felt comfortable with the people.

6              And because he felt comfortable, I assume that

7    other members of the treatment team felt comfortable.

8    That were face-to-face visits, as well as telephone

9    consultations, before some of these people were put in

10   place, right?

11             THE WITNESS:  Right.  Right.  Correct.

12             In this, you know, and I would say, Mr. Shamblee

13   went above and beyond in the amount of research and time

14   travel that he -- I mean, he really went above and beyond

15   and was able to find great people over time.

16             I think that it's, it would actually be an easier

17   process and probably one with less bets to hedge on the

18   résumés if these are recommendations coming from the area --

19             THE COURT:  Yeah.

20             THE WITNESS:  -- as opposed to somebody

21   researching from outside.

22             THE COURT:  Okay.

23             MR. LEVINE:  If I may continue, Your Honor?

24             THE COURT:  That answers my questions.

25             MR. LEVINE:  All right.

1   BY MR. LEVINE:

2        Q    No 35 goes to the question of Mr. Hinckley's

3   mental condition deteriorating and the violation of

4   conditions.

5              And, of course, it's the hospital's view, I take

6   it, that were he to materially deteriorate or violate the

7   conditions in some material way, that the consequences would

8   be as here, and the hospital agrees?

9        A    Correct.

10              MR. LEVINE:  Your Honor, I think this would be a

11   reasonably good time to take the mid-morning break.

12              THE COURT:  Good.  Let's do that.

13              Be back in 10 or 15 minutes.

14              DEPUTY CLERK:  All rise.

15              (Recess from 11:03 a.m. to 11:35 a.m.)

16              DEPUTY CLERK:  This Honorable Court is again in

17   session.

18              Please be seated.

19              MR. LEVINE:  Thank you, Your Honor.

20              I appreciate the Court's indulgence.

21              There was some discussion about whether there

22   could be some agreement on conditions.  The government has

23   indicated its willingness to withdraw some of the

24   objections, but we don't have something precise to advise

25   the Court about.  But thanks for the opportunity,

1   Your Honor.

2          THE COURT:  You're welcome.

3          MR. LEVINE:  Okay.  I would like to do introduce

4   responses to questions about Mr. Hinckley's progress since

5   the last hearing.  I think it useful, Your Honor, to have

6   the letters that went to the Court marked and introduced.

7          THE COURT:  Which letters?

8          MR. LEVINE:  These are the monthly letters, the

9   detailed letters to the Court following each of --

10          THE COURT:  Following each?

11          MR. LEVINE:  -- following each of the conditional

12   releases.

13          Your Honor --

14          MS. KENNEDY:  No objection.

15          MR. LEVINE:  Okay.  That's good.

16          I don't have each one stapled, so I'm just going

17   to have them as a package.  Is that satisfactory to the

18   Court?

19          THE COURT:  Yes.  Yes.  Yes.

20          MR. LEVINE:  Thank you.  I'd like to have this

21   stack of letters marked, I think it's Patient's 5.

22          A copy to the government, Your Honor, a copy to

23   the Clerk.

24          THE COURT:  I need one.

25          MR. LEVINE:  You need one, Your Honor.

1          May I approach, Your Honor?

2          THE COURT:  Yes.

3          Thanks.  I have read all of these, but

4   I don't have them with me.

5          MR. LEVINE:  Well, Your Honor, this is going to be

6   largely administrative.

7          Approach the witnesses, please?

8          THE COURT:  Yeah.

9   BY MR. LEVINE:

10      Q    Show you what has been marked as Exhibit 5,

11   Patient's Exhibit 5.

12          Do you recognize that, Mr. Hyde?

13      A    Yes, I do.

14      Q    What is it, please?

15      A    These are summary letters that follow each of

16   Mr. Hinckley's monthly visits to Williamsburg that are

17   submitted by the hospital to Court and counsel.

18      Q    Do you know who prepared those letters?

19      A    I largely am the author who drafts these letters.

20          MR. LEVINE:  Your Honor, I move them into

21   evidence.

22          MS. KENNEDY:  No objection, Your Honor.

23          THE COURT:  They will be admitted.

24
                                   (Patient's Exhibit 5
25                                 received into evidence.)

1  BY MR. LEVINE:

2       Q    Now, let's talk a bit about the activities in

3  which Mr. Hinckley engaged since the last conditional

4  release hearing by this Court.

5            THE COURT:  Do you know offhand how many -- I know

6  it's written down somewhere, but let's get it in the

7  records.

8            How many separate visits to Williamsburg do the

9  letters contained in Exhibit 5 represent?  I'm sure we could

10  stipulate to that, but I just don't...

11            MR. LEVINE:  If these were stapled, it would by an

12  easy answer.

13            THE COURT:  No.  It's okay.

14            THE WITNESS:  March 2013 to --

15            MR. LEVINE:  Your Honor, I think probably we can

16  gave you the exact answer right following lunch.  Probably

17  give you a stack -- Exhibit 5 stapled.

18            THE COURT:  That's okay.

19            The first one is dated March 21, 2013.

20            And the most recent one is dated fairly recently,

21  March 13, 2015.

22            MR. LEVINE:  And largely, Your Honor, they're

23  monthly.

24            THE COURT:  Yeah.

25

1    BY MR. LEVINE:

2         Q    All right.  Let's talk --

3              THE COURT:  And then there was a visit since this

4    last one, which just concluded on two days ago, three days

5    ago.

6              MR. LEVINE:  Yes.  That was a truncated one,

7    Your Honor, because of the scheduling of this hearing.

8              THE COURT:  Right.

9              MR. LEVINE:  That was not 17 days.

10   BY MR. LEVINE:

11        Q    All right.  Mr. Hyde, let's talk about

12   Mr. Hinckley's activities since he, since the last hearing

13   conducted by the Court starting at about 2011, I think, is

14   when the activities -- when the court held the last hearing.

15             All right.  Did Mr. Hinckley increase the number

16   and variety of activities in which he participated?

17        A    Yes, he has.

18        Q    Did he join a community center?

19        A    Yes.

20        Q    What was the purpose of that?

21        A    That was to provide Mr. Hinckley with

22   opportunities to get exercise in and to possibly even to

23   socialize and to join classes that might be available and

24   open to him at a free or reduced price for --

25        Q    Did Mr. Hinckley take classes at the community

1    center?

2        A    He's looked into classes at the community center.

3    Nothing has been taken to date.  Most of the offerings that

4    they have are for younger adults or children.  But he's

5    still continuing to look.

6        Q    Did Mr. Hinckley go bowling?

7        A    Yes.

8        Q    Did he attend lectures?

9        A    Yes, several.

10       Q    Did he attend lectures at a museum?

11       A    Yes.

12       Q    Did he attend lectures at a local university?

13       A    Yes.

14       Q    Did he attend musical events?

15       A    Yes.

16       Q    Did he take up photography?

17       A    Yes.

18       Q    Did he work with multiple photographers, including

19   Mr. Brelsford?

20       A    Yes.

21       Q    Is this new avocation with photography, is that a

22   tool to express himself and interaction with others?

23       A    Yes.

24       Q    Is that a -- is that viewed by the hospital as a

25   positive development?

1    A    Yes.

2    Q    What is NAMI?

3    A    I'm sorry?

4    Q    NAMI, N-A-M-I.

5    A    National Alliance for the Mentally Ill.

6         It's an organization that supports those living

7    with mental illness and their families and friends in the

8    community to provide support groups, information, and

9    resources for those stakeholders.

10   Q    And did Mr. Hinckley participate in NAMI meetings?

11   A    Yes, he has.

12   Q    Compare those meetings, if you will, to the kind

13   of similar meetings or meetings with a similar purpose at

14   the -- the treatment mall in the hospital.

15   A    I mean, I've not attended one of the NAMI support

16   groups in Williamsburg, so I can't really speak to exactly

17   what that process is, although from my understanding, it's

18   set up and there's two parallel support groups that go on.

19   One is for those living in recovery, and the other occurs

20   for those acting as support networks.

21        And that the -- my understanding is that the

22   makeup of the peer group is -- it's a mix of individuals in

23   functioning levels.  And some of whom are more further along

24   in their recovery, while others are not so much and are

25   still struggle with more active symptomatology; however,

1  they are living in the community and do still receive

2  support.

3           And so the support group, I think, in some ways is

4  maybe slightly reflective of some of the higher functioning

5  groups that Mr. Hinckley may attend in the inpatient setting

6  at St. Elizabeth's; however, it's not considered a

7  therapeutic group.  It's more of a support group.

8           And it's on the outpatient -- it's an outpatient

9  status.  It's not necessarily considered therapy.  And it

10  has a broader range of individuals attending it.  And the

11  purposes of it, I think, are slightly different than what

12  you would be getting in the inpatient setting and, as you

13  said, in the hospital's treatment mall.

14     Q    By and large, would it be expected that he would

15  have in the group people of higher functioning -- people

16  that function higher than those he would have at the

17  treatment mall in the hospital?

18     A    Yes.  And that's certainly the case in the --

19  particularly in his group therapy sessions; but also in the

20  NAMI group, there is a larger percentage of those, I think,

21  that you could typify as higher functioning, from my

22  understanding, while there also is a cohort there that are

23  still struggling.

24     Q    Now, how has his level of engagement changed since

25  2011?

1        A      Mr. Hinckley's level of engagement in, not only in

2    his activities in Williamsburg but also in his day-to-day

3    activities at the hospital, interactions, outings, across

4    the board, everybody who is either intimately involved in

5    Mr. Hinckley's care in the hospital or in, even in

6    Williamsburg and even those in the periphery have all noted

7    a marked increase in Mr. Hinckley's level of engagement, in

8    his affect, you know, the way he expresses himself and his

9    emotions.

10        He -- Mr. Hinckley's always been somebody with a

11   wry sense of humor, somebody who's very intelligent, likes

12   to joke but doesn't always come out as an effusive sort of

13   personality.

14        This is something that even, you know, in recent

15   months has even been noted by people who have been working

16   with him and living with him on the unit at the hospital.

17   Nursing staff and the like have said he's like a new man.

18        And his treatment providers even those -- you

19   know, I've spoken to Mr. Beffa about the most recent visit

20   and how Mr. Hinckley did in his sessions, and still says

21   he's -- each time he seems more engaged, more active, more

22   energetic, more, you know, activated.  He says that he seems

23   more human every time, is what Mr. Beffa said it me,

24   I believe.

25        Q      Does he show more initiatives, take more

1    initiatives?

2        A    Absolutely.

3        Q    Has he increased his social interaction with his

4    peers?

5        A    Absolutely.

6        Q    Would you say he is highly invested in group

7    therapy?

8        A    Yes, very much so.

9        Q    Has he been more open in group therapy?

10       A    Yes.  And even in individual therapy as well, he's

11   been opening up even more.

12       Q    Has he expressed empathy in an appropriate way?

13       A    Absolutely, yes.

14       Q    Can you give us some examples?

15       A    Well, I can give you several examples ranging

16   from, you know, as has been noted about his long-term care,

17   taking of the feral cat community in the hospital, to his

18   long-term role in the relationship between he and Ms. C.B,

19   to his -- the types of overtures he's made at home to help

20   his mother; to more specifically and on, I think, a larger

21   level, following the death of Mr. Brady, and even

22   previously, following the death of former President Reagan,

23   that Mr. Hinckley has demonstrated not only through his

24   actions but through his words that he has some genuine

25   empathy for others, you know, both from a perspective of a

1    caretaker and from the perspective of another person.

2         Q    With respect to Mr. Brady, did he initiate

3    discussions?

4         A    He did.

5         Q    And did he express in a profound way his regrets?

6         A    He did.

7         Q    Has he tried to develop new friendships from group

8    therapy?

9         A    Yes, he has.

10        Q    Can you tell us about that?

11        A    There was -- well, when we decided to pursue the

12   NAMI option, one of the ideas was to help with the

13   socialization.

14             Group therapy was indicated for Mr. Hinckley to

15   address that particular issue, yet one of the problems that

16   we faced with that is in many group psychotherapy settings,

17   contracts are often made so that, especially from an

18   outpatient setting and in this case in particular, that

19   current peers into that group are either prohibited or

20   discouraged, strongly, from socializing outside of the group

21   setting so as not to disrupt the process in any particular

22   way.

23             So what had been set up was that because there was

24   a Tuesday evening group therapy that Mr. Hinckley had been

25   attending and doing very well and opening up and making

1   connections with his peers in that group, he was initially

2   actually kind of concerned about moving off of that group,

3   because the NAMI was scheduled for the same time as his

4   group therapy.

5           And he was concerned because he had been actually

6   developing some good, strong relationships.  He had been

7   opening up, forming trusting rapports with those in that

8   group.  And he was like, I didn't necessarily want to lose

9   that, particularly when you look at the group therapies that

10  he's in at the hospital, again, very different group makeup

11  and processes involved in that inpatient setting.

12          But when he was, you know, when he began to see

13  that this would be an option for him to actually get more

14  social opportunities, he jumped on the opportunity,

15  especially because Mr. Beffa was able to assure him that he

16  could still be working in a group therapy with a very

17  similar peer group, just in the morning, and that he would,

18  in fact, be able to socialize with some of those individuals

19  that had been in his former group therapy in the evening.

20          So Mr. Hinckley has done so.  He went to a

21  termination session with that particular group.

22  He exchanged some contact numbers with both female and a

23  male member of the group that he had some type, you know,

24  some connections with.  They were both cat people and the

25  like.

1          And so he's since made some contacts with them to

2   try to arrange social meetings.  Unfortunately, both of them

3   have had various and -- personal problems or setbacks, where

4   they have had to travel for family reasons and whatnot.

5   But he's still in contact with them, is trying to set up

6   those relationships.  And he's very excited about that as

7   well.

8          Q    And is that something the hospital encourages him

9   to do?

10         A    Very much so.

11         Q    In your December 19 letter to the Court, you also

12  made reference to his use of unaccompanied time.  I believe

13  that was Exhibit 2.  Since the last hearing, generally, how

14  has he used his unaccompanied time in Williamsburg?

15         A    He's actually expanded his use of the

16  unaccompanied time from the way it used to be set up,

17  especially during the ten-day visits and previously where,

18  you know, he will now on occasion maybe go on a walk around

19  the development.  It used to be, you know, as you said, the

20  cookie cutters of going to the marina and coming back and

21  all of that.

22         Now, I mean, he does do his walks and that's fine.

23  And he's actually using those, you know, to, with his new

24  interest and pursuit in photography.

25         But he's also with his unaccompanied free time,

1   he's been trying to do certain things, like use that to

2   socialize; to, as time for him to meet up with his friend;

3   to look at different employment options.

4          So this was actually one of the ways we determined

5   that it was very difficult for him to do some of the

6   job-seeking requirements or expectations we had for him,

7   with the, not only the itinerary restrictions, the Internet

8   restrictions, but also the time restrictions of the release

9   plan.

10         You know, as he went to a Starbucks and a Subway

11   to look for applications and found that he had to go online

12   to get applications.

13         You know, these sort of things are what he's been

14   doing with this unaccompanied time more so nowadays.

15         And he'll also try to use those -- he's used those

16   times to, you know, get stuff for his -- him and his mother

17   as well.  So he still uses that to shop.  He still uses that

18   for, you know, just social time and also for relaxation.

19      Q    Does he use his time to do driving?

20      A    Yes.

21      Q    Does he use his driving privileges responsibly?

22      A    Absolutely.

23      Q    All right.  Has he assisted his mother around the

24   house with chores?

25      A    Yes.

1     Q    Play a role in the buying of groceries?

2     A    Yes.

3     Q    Play a role in the actual administration of the

4  life in Williamsburg, the payment of bills, for example?

5     A    Yes.

6     Q    Has he demonstrated both increased responsibility

7  and increased independence?

8     A    Yes.

9     Q    How?

10    A    Mr. Hinckley has demonstrated increased

11 independence in pretty much every aspect of his life.

12 He has -- and his mother corroborates this and lauds him on

13 a regular basis.

14        He has -- he's up in the morning.  He gets

15 everything ready.  He makes sure that her morning paper is

16 prepared for her when she wakes up.

17        He is up and ready to leave for any appointments.

18 She says that she does not have to remind him of anything.

19 In fact, he's the one reminding her of obligations or

20 appointments or things that need to be done around the

21 house.  He's really demonstrated an increase in that

22 independence and his responsibility overall.

23        I could say, I think, from a very, an important

24 risk management clinical perspective, his responsibility has

25 also been demonstrated in terms of his medication

1   management, leaving the hospital.

2          And while he's in Williamsburg, where he's very --

3   he really works hard to make sure that he has all of the

4   medications he's going to need, and that there have been a

5   couple of occasions where not -- not really of his own

6   fault, that he's arrived at the -- from the hospital in

7   Williamsburg missing a medication.  And he took -- he took

8   all of the efforts himself to make sure that he, you know,

9   reached out to the appropriate parties and received that

10  prescription.

11         It was not a psychotropic; however, it was one of

12  his, the medicines that he has for his heart, blood

13  pressure, so that he was very on top of that and

14  responsible.

15     Q    In terms of the medication, is he proactive in

16  making sure that he has it?

17     A    Yes.

18     Q    How -- what does he do to demonstrate that, to

19  manifest that proactivity?

20     A    Well, you know, within the days prior, weeks prior

21  to a planned trip, he's talking to me about privilege --

22  you know, making sure that the orders are placed in the

23  computer so that he can, in fact, leave.  And with the

24  medication, he talks to Dr. Adewale to make sure that those

25  orders have been placed.

1          Then he does that on a couple of occasions just to

2    ensure, because Dr. Adewale, you know, like myself, we cover

3    multiple wards and a lot of cases.  So he double-checks with

4    Dr. Adewale and with myself as the time draws near for the

5    trip.

6          Then on the day of, he gets with the medication

7    nurse and goes through the bag that they've prepared for him

8    that contains all of the medications for that trip to ensure

9    that he has everything he would need.

10   Q    Does this show a particular insight into mental

11   illness?

12   A    I believe it shows an insight into, yes, into the

13   understanding of the management of mental illness, which is,

14   I think, the higher order.

15   Q    All right.  Now, there has been some discussion

16   through these letters and in these court proceedings about

17   his adherence to itineraries.  All right.

18          Generally speaking, what has been his level of

19   adherence?

20   A    It's been very, very good.

21   Q    All right.  Now, when there's a change of plans,

22   does he communicate with the hospital?

23   A    Yes.

24   Q    All right.  Now, how would you describe

25   Mr. Hinckley's commitment to abiding by the terms of his

1   conditional-release visits?

2       A    I would say he's overwhelmingly committed to them.

3   Being on the receiving end of calls from Mr. Hinckley,

4   updates, I can say that Mr. Hinckley does -- has not shirked

5   his responsibilities with that.

6           Now, I do -- I made a point to highlight that one

7   moment during the last 12 months, 13 months now, in which

8   that did not occur.

9           And I thought that that was an important piece to

10  look at, because it was an anomaly from his -- the way he

11  had been proceeding with these itineraries and updates with

12  me throughout.

13          And I thought that it was a very important

14  situation to look at and understand better, to make sure

15  that we weren't seeing an increase in risk or particularly

16  of the deception.

17          What I feel and what the hospital and the

18  treatment team feels was that in this particular instance

19  when he was on the itinerary set up to go to meet with

20  Mr. Lerner, while he was in -- when he was alongside

21  Mr. Brelsford --

22      Q    Mr. Lerner being the former Look magazine

23  photographer?

24      A    Creative director and photographer, yeah.

25      Q    Okay.

1      A    This was -- how it was a lapse, I think, in,

2  especially in the way John had been handling these types of

3  situations and has since handled them, is probably --

4  I think it's important to take it into context, especially

5  since we've thus far heard this particular incident

6  connected directly to the issue in 2011 with the Captain

7  America movie and the bookstore.

8           This case was -- I think it was very different in

9  that, one, Mr. Hinckley was not unaccompanied.  And I think

10 that this also played into his, the decision to go ahead to

11 the second location without first notifying me.

12          I believe that this was something that occurred in

13 the moment.  He was with his friend, his approved party, who

14 was on the itinerary; and they decided to go to this place

15 instead of that place because it was canceled in the moment.

16     Q    Because of the visit with the photographer was

17 canceled because, I think, of some illness?

18     A    Illness.

19     Q    So they went to see this musician?

20     A    Correct.

21          And I feel that if Mr. Hinckley had acted in any

22 way, if this was something done while he was on his own

23 unaccompanied, that would have very much risen to a much

24 higher level of concern.

25          I feel like if he was -- then did not inform me at

1   all about it or had told other people other things, that it

2   could be seen as manipulative or deceptive.  That's not what

3   occurred.

4        Q    He didn't lie about anything in this instance?

5        A    No.  He told me exactly what happened.

6        Q    Did he try to hide it?

7        A    No, not at all.

8        Q    Did he actually inform you about it?

9        A    He did.

10       Q    All right.  And had he advised you of it before he

11  had gone to this musician's house, would you have approved

12  it?

13       A    Absolutely.

14       Q    All right.  So this is a question of the timing of

15  advising him?

16       A    Correct.

17       Q    Now, was there another instance where -- was there

18  an instance where Mr. Hinckley was invited to join a friend

19  at a coffee house in Williamsburg?

20       A    Yes.  This actually occurred from the -- the first

21  NAMI meeting, which we've saw was a tremendous success and

22  were very pleased with the outcome, John especially, because

23  he had met somebody who was at the NAMI meeting the first

24  time he went, who he hit it off with.

25            This is his friend that has been, we've discussed

1    already.

2        Q    And she invited him to join him, invited him to

3    join her at a coffee house in Williamsburg?

4        A    Correct.  They had exchanged contact information.

5    And she got in touch with him and invited him to meet for

6    coffee at a Starbucks.  Actually, I think it was right

7    across the street from there, from the Hinckleys'

8    neighborhood.

9        Q    And was that on the itinerary?

10       A    No, it was not.

11       Q    So what did Mr. Hinckley do?

12       A    Well, Mr. Hinckley tried to get in touch with me;

13   unfortunately, he was unable.

14            And as Mr. Hinckley had been instructed in certain

15   situations, that if he's not able to reach me, that he

16   should go through sort of a phone tree that we had set up

17   for him to reach out to Mr. Weiss, then to reach out to

18   Ms. Brown, so on.

19            In this case, he couldn't reach me, so he did what

20   he had been instructed to do.  He reached out to Mr. Weiss.

21            Mr. Weiss stated that he didn't know if it was a

22   good idea to go ahead and do it yet, because this was still

23   relatively early on.  As I said, you know, Mr. Weiss has

24   been sort of climbing the learning curve and had been trying

25   to take things in stride, but also to defer to me for any

1    decisions about that.

2            They weren't able to reach me.  And so John

3    decided to say, "Okay.  Well, that's too bad.  I won't be

4    able to meet you for coffee.  Hopefully, we can do it

5    again."

6       Q    He declined the invitation?

7       A    He declined the invitation.

8            THE COURT:  And this is a person referred to in

9    various papers and otherwise as Ms. L?

10           THE WITNESS:  Correct.

11           MR. LEVINE:  I believe so, yes, Your Honor.

12   BY MR. LEVINE:

13      Q    All right.  Did he act appropriately there?

14      A    Yes, he did.

15      Q    Was that an instance of him acting appropriately,

16   to use the phrase, in the moment?

17      A    Yes.

18      Q    Would it have been good were he able to have

19   actually been able to join Ms. L at that coffee house?

20      A    Oh, I think it would have been for him to do that.

21      Q    Is this an instance where not being able to do it

22   was unfortunate; it would have been better had he been able

23   to do it?

24      A    Yes.  Thankfully, it didn't squash that nascent

25   relationship right there.  But they were able to continue to

1    connect and have since gotten to know each other better.

2              MR. LEVINE:   The Court's indulgence for a brief

3    moment, Your Honor.

4    BY MR. LEVINE:

5         Q    In the past, Mr. Hyde, there's been some

6    discussion about Mr. Hinckley, it would be useful for

7    Mr. Hinckley to establish some relationships with some male

8    friends, male figures.

9              Do you recall that?

10        A    Yes.

11        Q    Has he established a sound and wholesome

12   relationship with Mr. Brelsford?

13        A    Yes.

14        Q    And who is Les Solomon?

15        A    Les Solomon is the gentleman who works at the

16   University Unitarian church where Mr. Hinckley has begun

17   volunteering more recently.  He's the -- I believe he's sort

18   of the groundskeeper and has been identified as

19   Mr. Hinckley's volunteer supervisor.

20        Q    And has Mr. Hinckley established or in the course

21   of establishing a sound friendship with Mr. Solomon?

22        A    Thus far, yeah, they seem to be on that path.

23        Q    I'm sorry?

24        A    They seem to be on that path.

25        Q    All right.  And what does Mr. Hinckley do with

1   Mr. Solomon at the Unitarian church?

2       A    Well, they've only had a few meetings so far, and

3   the weather has been changing.  But when he's -- he's helped

4   with various landscaping like cleaning up leaves, shoveling

5   snow.

6           And when the weather was too bad, they went in and

7   actually made some birdhouses for the coming spring.

8       Q    And does Mr. Hinckley want the opportunity to do

9   more with Mr. Solomon?

10      A    Yes, my understanding.

11      Q    And has he told you that?

12      A    Yes.

13      Q    Now, there has been also some discussion in these

14  proceedings about what's been referred to as plan B, should

15  we and her plan not work, is there another place where

16  Mr. Hinckley may go?  And it has been largely indicated that

17  the hospital should consider the District of Columbia.  Are

18  you familiar with that?

19      A    Yes.

20      Q    Now, do you remember some years ago during one of

21  these hearings where the hospital had put forward a

22  so-called plan B in the District of Columbia?  And Mr. --

23  and excuse me.  And Dr. Phillips opined on the wisdom of

24  that?

25      A    I do recall that.

1     Q    Do you remember Dr. Phillips calling that a

2    distraction?

3     A    That rings a bell, yes.

4     Q    And that it was his judgment that the hospital

5    should focus on Williamsburg as the main objective and not

6    consider the District of Columbia?

7          MS. KENNEDY:  Your Honor, I'm going to object on

8    all this leading.

9          THE COURT:  On what?

10         MS. KENNEDY:  On all the leading questions here.

11         THE COURT:  Oh, just now?  You've waited a whole

12   day and a half?

13         MS. KENNEDY:  I know I have, but now he's getting

14   where he's testifying, Your Honor.

15         THE COURT:  All week and all year.

16         MS. KENNEDY:  It's gotten to be too much.

17         MR. LEVINE:  But I think this is well within the

18   realm of the Court's recollection as well.  I feel very

19   confident of that.

20         MS. KENNEDY:  I would think he could bring it up

21   through direct exam, Your Honor, because obviously Mr. Hyde

22   doesn't know what happened 10, 15 years ago there.

23         MR. LEVINE:  Well, this is not 10 or 15 years ago.

24         THE COURT:  Try to ask non-leading questions.

25         MR. LEVINE:  Surely, Your Honor.

1          THE COURT:  Let's see whether Mr. Hyde really does

2     remember any of this.

3     BY MR. LEVINE:

4          Q    Do you remember or -- Dr. Phillips' testimony with

5     respect to the hospital creating a D.C. plan?

6          A    I remember that that was a -- that was a issue

7     that had been raised by Dr. Phillips at that time, that this

8     was something -- I can recall specifically from my

9     involvement in the treatment team during that period of the

10    discussions about the D.C. plan and then moving towards just

11    focusing solely on Williamsburg.

12         Q    So was it the hospital's view prior to

13    Dr. Phillips' testimony to actually create a D.C. plan?

14         A    We had discussed it many times.

15         Q    All right.  And in light of Dr. Patterson's

16    critique of the absence of a D.C. plan, does the hospital,

17    has the hospital, again, commenced cogitating on a D.C.

18    plan?

19         A    Yes.  It was my intention when I took over the

20    management of this case to ensure that we did have a backup

21    plan that included D.C., that included other alternative

22    housing.  I felt that this was something that was a logical

23    step, that it was an important step to have in place, and

24    that it would not require too much work or resource to

25    create a plan B, a.k.a., a D.C. plan.

1    Q    All right.  And what are the broad outlines of a

2    D.C. plan as conceived by you and the hospital?

3    A    As -- well we -- and I believe we had this in one

4    of our response letters --

5    Q    Yes.

6    A    -- that --

7    Q    Would it help you to have that letter in front of

8    you or --

9    A    I think I can say it off memory, but we can

10   probably pull it up here.

11            THE COURT:  Which exhibit?  It's already in?

12            MR. LEVINE:  I believe it's in Exhibit 4,

13   Your Honor.

14            THE WITNESS:  It's in 4, page 4.

15            MR. LEVINE:  It's the first full paragraph on

16   page 4 of Exhibit 4.

17   BY MR. LEVINE:

18   Q    Could you, Mr. Hyde, summarize for the Court the

19   general thinking of the hospital with respect to a D.C.

20   plan, an alternative plan?

21   A    Absolutely.

22            Considering the typical plan of release for

23   convalescent leave into D.C., we looked at Mr. Hinckley's

24   particular needs and his strengths, the risk factors, the

25   protective factors, and other considerations.

1              We felt that Mr. Hinckley's requirements for

2    monitoring, given the fact that he would be so close to the

3    seat of the Federal Government, to the President, to the

4    area of his instant offense, that it would be useful to have

5    an ACT team associated with him.

6              Initially, he would need to be referred to what's

7    called a Core Service Agency in the District.  They would be

8    responsible for providing case management service for some,

9    depending on the release order, some medication work.

10             And particularly with the ACT team, they would be

11   involved as sort of -- the ACT team is in sort of a

12   community treatment team that provides -- I refer to it as

13   sort of carte blanche treatment provision in the community,

14   where you have your own team that's devoted to you.

15   They can come to you at any given moment for help,

16   supervision, medication as needed.

17             So we would refer him to an assertive community

18   treatment team, not necessarily because of his -- his

19   clinical requirements, but for a certain amount of extra

20   supervision while living in Washington, D.C.

21             We also would refer him initially for an SRO.

22   This is a form of step-down housing referred a single-room

23   occupancy that is a -- has a certain amount of supervision

24   involved, but it provides the individual with a level of

25   autonomy and independence that would not otherwise be found

1   in a more restrictive living environment, such as a CRF, or

2   community residential facility.

3           In those sort of instances, that would be a much

4   higher level of monitoring and security on Mr. Hinckley; but

5   we felt that he would wind up being an unpaid employee at

6   one of these places, as he would be very high functioning,

7   comparatively.

8           At an SRO, he would be, he would still have

9   individuals who are closer to his functioning level and his

10  management of symptoms.  He would have a key, his own room.

11  He would share the kitchen facilities and the bathroom

12  facilities that were open to those individuals.  But it

13  would still be his own.

14          Further, we would, again, we would apply for,

15  you know, everything else that we would apply for in terms

16  of benefits as well, just as much as we would for Virginia.

17          But the idea then would be for him to have an SRO

18  in the hospital -- outside of the hospital, work with the

19  Core Service Agency, an ACT team; be working, continue

20  working at the hospital until he found other paid employment

21  elsewhere; and continue with medication management at OPD

22  and seeing his individual therapist at OPD, is what many of

23  our outpatients do.

24          THE COURT:  What's -- the other thing mentioned in

25  this paragraph is the District's Home First 2 list, the

1    number 2.

2              THE WITNESS:  Correct.

3              THE COURT:  What is that?

4              THE WITNESS:  So that was explained to me as sort

5    of the District's, it's kind of like a Section 8 for

6    individuals living with mental illness in the community.

7    It provides them through DBH, a higher placement on that

8    list, which can often be years and years long.

9              THE COURT:  So is that, so this, is this to

10   supplement the cost of the SRO?  Or is this a different --

11             THE WITNESS:  This would be for him to move into

12   independent housing in the area, affordable independent

13   housing.

14             THE COURT:  I see.

15   BY MR. LEVINE:

16        Q    It sounds like the hospital is very nimble in

17   putting together plans in the District of Columbia.

18        A    It's much easier.  It's our neighborhood, so we

19   know what we're doing more easily.

20             Does any of this suggest that the hospital is even

21   the slightest bit tepid about the Williamsburg plan?

22        A    No, not at all.

23        Q    Does the hospital firmly and unequivocally support

24   the Williamsburg plan?

25        A    Yes.

1          MR. LEVINE:  The Court's indulgence for a moment,

2    Your Honor.

3          Nothing further, Your Honor.

4          THE COURT:  All right.  Do you want to take lunch?

5    Or do you want to start?

6          MS. KENNEDY:  Whatever you want, Your Honor.

7    I don't care.

8          MS. MERENE:  Your Honor, I did have a few

9    questions.

10         THE COURT:  All right.  Good.

11         MR. LEVINE:  Your Honor, what did we just decide?

12         THE COURT:  We just decided that Ms. Merene has a

13   few questions.

14         MR. LEVINE:  Oh, yes.  I knew that.  I should have

15   advised the Court.  I apologize.

16         Oh, Your Honor -- and Your Honor asked a question

17   before.  We have an answer for you.  You asked the total

18   number of conditional releases since February of 2013

19   through April of 2015.  There have been 21.  And 12 of those

20   are of the 17-day visits.  And I'm not sure if this last

21   one, which was less than 17 days, was amongst them.

22         THE COURT:  So some of those, so this is since my

23   last opinion or this is --

24         MR. LEVINE:  Well, Your Honor, the note I have

25   here is there have been a total of 21 conditional-release

```
 1   visits since February 2013.

 2            THE COURT:  Okay.

 3            MR. LEVINE:  And that's through April of 2015.

 4            THE COURT:  I see.  So some of those are the

 5   10-day visits?

 6            MR. LEVINE:  Yes.

 7            THE COURT:  I see.  Tell me again, how many were

 8   17 days.

 9            MR. LEVINE:  I believe a dozen.

10            MS. MERENE:  That, Your Honor, was assuming that

11   the April visit was a 17-day --

12            THE COURT:  It probably was less than that, but it

13   was an authorized.

14            MR. LEVINE:  It was authorized 17.

15            THE WITNESS:  That was the 13th.  That was the

16   baker's dozen.

17            THE COURT:  Got it.

18            MR. LEVINE:  Ms. Merene, Your Honor.

19            THE COURT:  Thanks.

20            MS. MERENE:  Thank you, Your Honor.

21                           - - -

22   VERNE HYDE, WITNESS FOR THE DEFENDANT, HAVING BEEN

23   PREVIOUSLY SWORN, TESTIFIED FURTHER AS FOLLOWS:

24                           - - -

25                    DIRECT EXAMINATION
```

BY MS. MERENE:

Q    Mr. Hyde, in planning for Mr. Hinckley's request for convalescent leave, have you been working with forensic outpatient department?

A    Yes.

Q    And when did that begin?

A    We began talking in earnest probably sometime around the winter, in December, when we began the process towards this hearing.

Q    And when you say you began talking in earnest, can you provide more detail about what that means?

A    Well, typically in these cases when we're -- when we are recommending or planning to recommend an individual in our care for convalescent leave, the plan -- the progress is that we go before the review board, get their blessing and their recommendations, and then we move forward from there.

Usually when we are recommending somebody for convalescent leave, we will have a brief discussion, usually by e-mail or over phone, with OPD to get their sense, and then we move forward.  This doesn't always happen.  It's increased more recently, where OPD is a part of the, more initiating part of the convalescent leave recommendations.

But typically once we have moved forward, we've

1 received a convalescent leave order. Then we have another

2 meeting and a treatment plan with OPD present to facilitate

3 the transition.

4 In this case, we began discussing more aspects of

5 the conditional release terms that we'd be recommending and

6 discussing some of these -- the roles with Dr. Johnson

7 earlier on than we do in typical process for recommendation

8 for convalescent leave.

9 Q    Okay.  And so did Dr. Johnson attend any of the

10 review board meetings regarding this release or request?

11 A    She was -- I believe she was present on the phone

12 for at least one and in person for another.

13 Q    I'm sorry.  Can you give a time frame?

14 A    This was in, from, we've had about two or three

15 review boards on Mr. Hinckley's since November.

16 I can't tell you the exact dates.

17 THE COURT:  But you're saying she was present for

18 two of the three reviews --

19 THE WITNESS:  At least two of the three review

20 boards.

21 I'm also getting a little confused because

22 Dr. Johnson was present on the phone during conference calls

23 we had in the discussion and the development of our further

24 conditional release terms that were provided to the Court

25 and counsel in April -- or March, rather.

1    BY MS. MERENE:

2        Q    And as far as the conditions that were provided in

3    March, so did Dr. Johnson make any suggestions or raise any

4    concerns about the conditions?

5        A    Yes.  She was actually very helpful in that

6    process.

7        Q    And has Dr. Johnson been in involved in conference

8    calls involving the Williamsburg team?

9        A    Yes.

10       Q    And when did that occur?

11       A    We had one very recently just in the last week.

12   And we had one, this was a couple months prior.  Again, in

13   concert with them to develop the conditions that we

14   recommended.

15       Q    Okay.  And to your knowledge, has Dr. Johnson ever

16   met Mr. Hinckley?

17       A    Yes, very recently, but they've met.

18       Q    Okay.  And were you present for the meeting?

19       A    No.

20       Q    Do you know where the meeting occurred?

21       A    I believe it occurred on the hospital grounds with

22   the units at colleges from 2B.  I wasn't able to attend as I

23   was in another meeting, but I had arranged that, for them to

24   meet.  And Dr. Trent Tucker had escorted Mr. Hinckley to

25   meet Dr. Johnson.

1      Q     And now, have you yourself requested, been

2   involved in requesting a convalescent leave for other

3   patients at St. Elizabeths Hospital?

4      A     Yes.

5      Q     And as far as your interaction with forensic

6   outpatient, can you do any sort of comparison of your

7   typical experience versus your experience with

8   Mr. Hinckley's request?

9      A     Well, again, you know, usually, the hospital

10  brings OPD into review board meeting after we've gotten to

11  that point.  Sometimes -- we've been trying to do better

12  these days about bringing OPD into the decision-making

13  beforehand and to have them involved.

14         But typically what we'll do is the inpatient

15  treatment team will develop recommendations, present those

16  recommendations to the board.  We'll often notify OPD of our

17  intention for those recommendations to be set forth.

18         And then once we have the hospital's final opinion

19  on that -- on the recommendations, we move forward with the

20  hearing process, if need be, and then OPD is then brought in

21  after the fact once we have a convalescent leave plan and

22  we're working towards transitioning this, the individual to

23  the care of OPD.

24         So in comparison, we've brought OPD in earlier

25  than usual for the case, and they have been more heavily

1    involved in the planning and development of recommended

2    conditions.

3              MS. MERENE:  Nothing further, Your Honor.

4              THE COURT:  Thanks, Ms. Merene.

5              All right.  So we probably should go to lunch so

6    you can start fresh.

7              MS. KENNEDY:  Thank you.

8              THE COURT:  1:45?

9              MS. KENNEDY:  Sounds good.  Did you say 1:45?

10             THE COURT:  Yes.  Does that work for everybody?

11             MR. LEVINE:  That's strikes me, sure, Your Honor.

12             DEPUTY CLERK:  All rise.

13             This is Honorable Court is in recess until 1:45.

14             (Luncheon recess from 12:26 p.m. to 1:45 p.m.)

15                      C E R T I F I C A T E

16             I, William P. Zaremba, RMR, CRR, certify that

17   the foregoing is a correct transcript from the record of

18   proceedings in the above-titled matter.

19

20

21

22   Date: April 23, 2015_____ /S/__William P. Zaremba_____

23                            William P. Zaremba, RMR, CRR

24

25