IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR No. 81-306 |
| | ) | |
| Plaintiff, | ) | Washington, D.C. |
| | ) | April 24, 2015 |
| | ) | 9:15 a.m. |
| vs. | ) | |
| | ) | Morning Session |
| JOHN W. HINCKLEY, JR., | ) | |
| | ) | Day 3 |
| Defendant. | ) | |
| _____ | ) | |

TRANSCRIPT OF EVIDENCE HEARING
BEFORE THE HONORABLE PAUL L. FRIEDMAN
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:            U.S. ATTORNEY'S OFFICE.
                              COLLEEN KENNEDY, AUSA
                              MARK AZIZ, AUSA
                              MICHELLE CHAMBERS
                              555 Fourth Street, NW
                              Washington, D.C.  20530
                              (202)514-7248

For the Defendant:            DICKSTEIN SHAPIRO, LLP
                              BARRY WILLIAM LEVINE
                              ANN MARIE LUCIANO
                              1825 Eye Street, NW
                              Washington, D.C.  20006-5403
                              (202)420-2237

                              DINSMORE & SHOHL, LLP
                              E. MICHELLE TUPPER-BUTLER
                              101 S. Fifth Street.
                              Suite 2500
                              Louisville, KY 40202
                              (502)540-2367

APPEARANCES CONTINUED:

For St. Elizabeths:               ST. ELIZABETHS HOSPITAL
                                  DEON MERENE, ESQ.
                                  1100 Alabama Avenue, SE
                                  Washington, D.C. 20032

Court Reporter:                   William P. Zaremba, RMR, CRR
                                  U.S. Courthouse
                                  333 Constitution Avenue, NW
                                  Room 6511
                                  Washington, D.C. 20001
                                  (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

APPEARANCES:

For the GOVERNMENT:  U.S. ATTORNEY'S OFFICE
                     BY:  COLLEEN KENNEDY, AUSA
                     MARK AZIZ, AUSA
                     MICHELLE CHAMBERS
                     555 Fourth Street, NW
                     Washington, D.C.  20530
                     (202)514-7248

For the Defendant:   DICKSTEIN SHAPIRO, LLP
                     BY:  BARRY WILLIAM LEVINE, ESQ.
                     ANN MARIE LUCIANO, ESQ.
                     1825 Eye Street, NW
                     Washington, D.C.  20006-5403
                     (202)420-2237

                     DINSMORE & SHOHL, LLP
                     BY: E. MICHELLE TUPPER-BUTLER, ESQ.
                     101 S. Fifth Street, Suite 2500
                     Louisville, KY   40202
                     (502) 540-2367

For St. Elizabeth's: ST. ELIZABETHS HOSPITAL
                     BY:  DEON MERENE, ESQ.
                     1100 Alabama Avenue, SE
                     Washington, D.C.   20032.

- - -

WITNESS INDEX

- - -

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
| --- | --- | --- | --- | --- |
| DEFENDANT'S: | | | | |
| DEBORAH L. G-G | 6 | 42 | 90 | 113 |

```
 1                    P R O C E E D I N G S
 2          DEPUTY CLERK:  All rise.  This Honorable Court is
 3  now in session; the Honorable Paul L. Friedman presiding.
 4          Please be seated and come to order.
 5          THE COURT:  Good morning, everybody.
 6          DEPUTY CLERK:  This is criminal 81-306,
 7  United States of America versus John W. Hinckley, Jr.
 8          For the government, Ms. Kennedy and Mr. Aziz.
 9          For the patient, Mr. Levine, Ms. Luciano
10  Ms. Tupper-Butler.
11          For St. Elizabeth's, Dion Merene.
12          THE COURT:  All right.  Anything we need to do
13  preliminarily?
14          MR. LEVINE:  I think not, Your Honor.
15          MS. KENNEDY:  No, Your Honor.
16          THE COURT:  Okay.  So I see Dr. G-G.
17          Good morning.  How are you?
18          THE WITNESS:  Good morning.  I'm fine.  Thank you.
19          THE COURT:  So she's going to be the first
20  witness.  Why don't you proceed, Mr. --
21          MR. LEVINE:  Thank you, Your Honor.
22          THE COURT:  -- Levine.
23          And I'll ask Ms. Moon to swear her in, and then
24  Mr. Levine can proceed.
25          DEPUTY CLERK:  Would you please rise and raise
```

1    your right hand and be sworn, please.

2              (Witness is placed under oath.)

3              DEPUTY CLERK:  Please be seated.

4              THE COURT:  See, there's a little bit of delay.

5    So we'll just work around that.

6                         - - -

7    DEBORAH L. GIORGI-GUARNIERI, WITNESS FOR THE DEFENDANT,

8    SWORN

9                    DIRECT EXAMINATION

10                        - - -

11             THE COURT:  Go ahead, Mr. Levine.

12             MR. LEVINE:  Thank you, Your Honor, if it please

13   the Court.  This is actually a familiar court to me.

14             THE COURT:  It's familiar to you and me, if not to

15   others.

16             Mr. Aziz, it's familiar to you?  Ms. Kennedy?

17             MS. KENNEDY:  Definitely.

18             THE COURT:  Ms. Kennedy has been around a little

19   while too.

20             MR. LEVINE:  If it please Your Honor, if I may

21   inquire.

22   BY MR. LEVINE:

23        Q    Dr. G-G, please give us your full name.

24        A    My full name is Deborah Giorgi-Guarnieri.

25        Q    And could you spell your last name, please.

1       A     It's a hyphenated last name.  The first part is

2   Giorgi, G-i-o-r-g-i, and then the hyphen, then Guarnieri,

3   G-u-a-r-n-i-e-r-i.

4       Q     Doctor, is it satisfactory if we refer to you as

5   Dr. G-G?

6       A     I'm fine with that, yes.

7       Q     Are you commonly referred to by that name?

8       A     I am.  For a while now, yes.

9       Q     All right.  Please, what is your occupation?

10      A     I'm a psychiatrist.

11      Q     And could you briefly tell us -- well, for how

12  long have you been a psychiatrist?

13      A     I've been a psychiatrist for 22 years.

14      Q     And briefly tell us your background.  I know you

15  have both a medical degree and a legal degree.  Tell us

16  about that, please.

17      A     Okay.  So I went to undergraduate school at the

18  University of Virginia, and I graduated from there in 1982.

19            Then I went to law school at the College of

20  William and Mary.  I graduated from there in 1985.

21            And then I went to Eastern Virginia Medical

22  School, and I graduated from there in 1989.

23            And then I did my residency at, two years at LSU

24  and two years at the Oxner Clinic in Louisiana.

25            Then I did my fellowship at Yale.

1          And then I started to teach for a while.

2          So I taught for a little while, two years at

3     Tulane, then about four years at Yale, and then at the

4     Medical College of Virginia for about four years.

5     Q    And when you say you teach, that's with respect to

6     medicine, not with respect to law; is that correct?

7     A    Almost everything.  In every single situation,

8     I was part of the forensic psychiatry division.  So I taught

9     law and psychiatry.

10          MS. KENNEDY:  Your Honor, I submit that Dr. G-G is

11    an expert in psychiatry, and that she is qualified to give

12    an opinion.  And we'd be asking her for an opinion about

13    danger and risk management.

14          MR. AZIZ:  No objection.

15          THE COURT:  No objection on behalf of the

16    United States.  So she is accepted as an expert once again.

17    BY MR. LEVINE:

18    Q    Dr. G-G, do you -- are you licensed to prescribe

19    medication?

20    A    Yes, I am.

21    Q    And have you prescribed medication for patients

22    with Axis I diagnoses?

23    A    Yes, I have.

24    Q    And do you have the ability to admit patients to a

25    hospital, should the occasion arise?

1      A      At this point, I don't have admission privileges,

2   but I would be able to refer them to the hospital.  And the

3   doctors which I work with will admit them there.

4      Q      And have you qualified as an expert in court on

5   other occasions other than this occasion?

6      A      Yes.

7      Q      Now, what -- do you know Mr. Hinckley?

8      A      Yes.

9      Q      And how do you know Mr. Hinckley?

10      A      Mr. Hinckley has been my patient for about the

11   last five years.

12      Q      And are you familiar with his treatment history?

13      A      Yes, I am.

14      Q      And have you read the risk assessment reports of

15   Dr. -- of, most recently, by Dr. Murphy?

16      A      Yes, I have.

17      Q      And have you reviewed the report by the government

18   doctor, Dr. Patterson?

19      A      Yes, I have reviewed his report.

20      Q      And over the course of these five years that

21   you've treated Mr. Hinckley, have you had occasion to both

22   take notes about his -- take notes at the sessions you've

23   had with him and to deliver your opinion to St. Elizabeths

24   Hospital?

25      A      Yes, I have.

1        Q    And have you -- are you familiar with the views of

2   Mr. Beffa, Carl Beffa?

3        A    Yes, I am.

4        Q    And are you familiar with the views of Mr. Weiss?

5        A    Yes.

6        Q    And have you had occasion to learn the views of

7   Mr. Hinckley's family, including Mrs. Hinckley, Diane Sims,

8   and Scott Hinckley?

9        A    Yes.  I haven't dealt with -- I haven't dealt with

10  them directly, but I do understand their views.

11           THE COURT:  You say you haven't talked to them

12  directly.  Have you talked to John Hinckley's mother,

13  Mrs. Hinckley, directly?

14           THE WITNESS:  On the phone.  But I have not

15  interviewed her.

16           THE COURT:  Okay.

17  BY MR. LEVINE:

18       Q    You've discussed the management of John and

19  medical issues that you think appropriate to discuss with

20  her?

21       A    Yes.  Mrs. Hinckley is very easy to reach.

22       Q    And are you familiar with the hospital's petition

23  to this Court as it currently exists?  It's in three

24  letters.  It's one dated December 19, 2014, supplemented by

25  a letter dated March 20, 2015.  And there is a filing by the

1   hospital dated April 17, 2015.

2        A    Yes.  I have reviewed them and I'm familiar with

3   them.

4        Q    And having reviewed the entire record in the case,

5   having reviewed the petitions, the views of the doctors that

6   have filed reports, do you have an opinion to a reasonable

7   degree of medical certainty regarding whether or not

8   Mr. Hinckley will be dangerous to himself or others as a

9   result of a mental disease during convalescent leave

10  proposed by the hospital?

11            MR. AZIZ:  Objection to foundation.  Her opinion.

12            THE WITNESS:  I have reviewed everything.

13            THE COURT:  Wait a second.

14            THE WITNESS:  And I do have an opinion.

15            THE COURT:  Doctor, hold on a second.

16            What's the nature of the objection?

17            MR. AZIZ:  The sufficient foundation for --

18            THE COURT:  What's missing?  She's reviewed all of

19  the reports.

20            MR. AZIZ:  Yeah.  The assessment of his

21  dangerousness and her conclusions as to that before she

22  gives her ultimate opinion as to the nature of the risk.

23            THE COURT:  Well, he can ask the question any way

24  he wants to ask the question.  I think the Federal Rules

25  permit him to elicit the opinion even before he elicits the

1   basis once she's qualified.

2          Go ahead.

3          MR. LEVINE:  Thank you.

4   BY MR. LEVINE:

5     Q    Will you answer that question, please, Dr. G-G, if

6   you remember it.  If you don't, I'm willing to restate it.

7     A    Yes.

8          Well, I think you asked me if I have an opinion.

9   And, yes, I do have an opinion.  And it was my opinion that

10  he was ready for convalescent leave and that he would not

11  present a danger on convalescent leave.

12    Q    All right.  Now, I want to talk about --

13         THE COURT:  Now, let me just -- I want to

14  interrupt to ask one question to be sure I understand your

15  opinion.

16         When you say he would not present a danger when on

17  convalescent leave, does that opinion, is that based on the

18  inclusion of the conditions that the hospital has

19  recommended in its first two letters?  Or are you saying he

20  would not pose a danger based on convalescent leave even if

21  none of these conditions were required?

22         THE WITNESS:  No.  I meant that he would have to

23  follow the conditions of the convalescent leave.

24         As the hospital has proposed, I think that he

25  would not present a danger to himself or others if he

```
 1   follows the conditions and he continues on the course he's
 2   been on.
 3   BY MR. LEVINE:
 4       Q    Dr. G-G, let's talk about Mr. Hinckley's
 5   diagnosis.  The Axis I diagnosis is psychosis, NOS, and
 6   major depression; is that correct?
 7       A    Yes, that's correct.
 8       Q    And is he in full and stable remission with
 9   respect to both of those?
10       A    Yes.
11       Q    And do you have a high degree of confidence that
12   that is the case?
13       A    Yes.  I've never seen John show symptoms that
14   would qualify as either a major depressive episode or
15   symptoms that would give him a psychotic disorder in the
16   five years I've treated him.  So I'm fairly confident that
17   they're in remission --
18       Q    All right.  That acts as two diagnoses.
19            THE COURT REPORTER:  Whoa, whoa.  She's still
20   answering.
21            MR. LEVINE:  I'm sorry.
22            THE COURT REPORTER:  "So I'm fairly confident
23   that..."
24            MR. LEVINE:  I thought she had completed.
25            THE WITNESS:  I think the only thing I said was
```

 1    that they're in remission, was the last of what I said, that

 2    he's not met the criteria for the diagnosis and that I'm

 3    fairly certain he's been in remission.

 4    BY MR. LEVINE:

 5        Q    Now, his Axis II diagnosis is that of narcissistic

 6    personality disorder; is that correct?

 7        A    That's correct.

 8        Q    And is it your view that he has a narcissistic

 9    personality disorder?

10        A    Yes, I would agree with that diagnosis.

11        Q    It has in the past been said that that disorder is

12    significantly attenuated.

13             Do you agree with that?

14        A    Yes, I agree with that.

15        Q    All right.  And since we've last been in this

16    court, which is, I think it started in about 2011, do you

17    think he's even -- that his narcissistic personality

18    disorder is even more attenuated?

19        A    I think that John works all the time to keep his

20    narcissistic traits in his mind and under control.

21             The "more or less" is a little hard to answer.

22             I think he has a better understanding of how his

23    personality structure affects his judgments.  So in that

24    case, yes, he has a greater understanding.  And I think he's

25    been able to act appropriately around them most of the time.

1    Q    How often do you meet with Mr. Hinckley during his

2    17-day conditional releases?

3    A    We meet twice for 45 minutes.

4    Q    Is it your understanding -- what is your

5    understanding about his compliance with respect to the

6    taking of medication?

7    A    He is compliant.

8    Q    Do you know of any instance where he's been less

9    than perfect with respect to compliance on medication?

10    A    He's always been perfect with the psychiatric

11    medication.  I think there was one incident where he forgot

12    his lisinopril, and he did work right away to get it.

13    And so he's been completely compliant and has made sure he

14    had his medicine at all times.

15        THE COURT:  What was the medicine you just

16    mentioned, and how do you spell it?

17        THE WITNESS:  It's l-i-s-i-n-o-p-r-i-l.  It's an

18    anti-hypertensive.  It's lisinopril.

19    BY MR. LEVINE:

20    Q    And has he attended all his sessions with you in a

21    timely way?

22    A    Yes.

23    Q    Now, when you meet with him, do you discuss what

24    has been commonly referred to as risk factors?

25    A    Yes, I do.

1        Q    Do you evaluate his risk factors?

2        A    I monitor them for deviations or from -- for

3    things I think I would need to let the treatment team know

4    about.  I don't do full risk assessments every time, but I

5    monitor each risk factor.

6        Q    All right.  Now, you indicated or testified that

7    you read Dr. Patterson's report.  I don't know if you have

8    it nearby, but I do.

9        A    Yeah.  They provided me copies.

10       Q    Okay.  If you have a copy of it, please -- it's

11   not yet in evidence, but let me invite your attention to

12   page 71 of that report.

13            MS. KENNEDY:  I'm sorry.  What was that page?

14            MR. LEVINE:  Page 71.

15            THE WITNESS:  Okay.  I'm on page 71.

16   BY MR. LEVINE:

17       Q    Do you see on the top half of the page where

18   Dr. Patterson identifies the risk factors?

19       A    I do.

20       Q    All right.  First one is depression.

21            Have you seen any evidence of depression from

22   Mr. Hinckley over the five years that you have been with

23   him?

24       A    No, I have not.

25       Q    How about isolation?  Is the second -- the second

1  risk factor is isolation.  Do you see any indication that he

2  seeks to isolate himself or go into some sort of autistic

3  withdrawal?

4      A    No, I have not.

5      Q    Psychosis is the third one.  Do you see any

6  evidence of any symptoms of psychosis?

7      A    No.

8      Q    The fourth one is insight into mental illness.

9  Do you have any comment about his insights into mental

10  illness?

11      A    Insights into his illness have improved in the

12  five years I've treated him.

13      Q    Has he exercised better judgment?

14      A    I think so.

15      Some of that might be as he gets comfortable with

16  me as his treating physician, he becomes more open.

17      But I know that he thinks a lot about whether his

18  behaviors are considered narcissistic, and he cares very

19  much what the Court and his family say.

20      Q    The fifth one is the personality disorder, and

21  that's one we've already talked about.  You've testified

22  that it is significantly attenuated.  How does, even in its

23  attenuated status, manifest itself?

24      A    Well, Mr. Hinckley has always been monitored for

25  the way he relates to other people.  So his relationships

1    are one of the things we always look at and how he's

2    interacting with others.

3            We looked at whether or not he is willing to

4    distort reality for his own personal self-esteem.

5            And we also look at the way that he presents

6    himself in the community, you know, whether he's seeking

7    attention or he's really interacting with the community.

8            So we monitor his relationships.  Every time he

9    comes in and talks to me, we talk about did he meet anyone

10   new, has he been calling his friends, that type of thing.

11           The deception, I really have not seen him be

12   manipulative or deceptive with his everyday events.

13           And third one, in terms of his integration into

14   the community, he's done a very good job of staying away

15   from the media.  I think he is interested in being a

16   productive part of the community, but he's not necessarily

17   interested in bringing attention to his past behaviors.

18       Q    All right.  So you've just covered a lot of ground

19   there.  You've talked about relationships with friends.

20   You've talked about deception.  Those are two of the risk

21   factors.

22           Any issue with respect to access to weapons or

23   interest in weapons?  That's No. 6.

24       A    No.  No.  I've never heard him talk about getting

25   a weapon or even any interest in them.

1      Q     Family support is an issue here that's been --

2   it's been identified as a risk factor.  Have his siblings,

3   Scott and Diane, to your knowledge, throughout the course of

4   these releases, visited him in Williamsburg?

5      A     Yes, they have visited.

6      Q     And how about, how would you characterize his

7   mother's attention to him?

8      A     John and his mother get along very well.

9            I know that John's mom really likes it when he's

10  home and she has his companionship and his help.

11           And John likes living with his mom.  He does not

12  feel like she's a burden or -- he really enjoys talking with

13  her and spending time with her.

14     Q     So how would you describe the family support for

15  Mr. Hinckley?  And maybe compare it to the kinds of support

16  that you witness in other forensic -- with other forensic

17  patients.

18     A     I think the Hinckleys have been extremely

19  supportive of John, and that's a very, very important factor

20  for him to enter into the community.  And I've expressed

21  this before, and now I express it as testimony.

22           In the State of Virginia, a lot of patients who do

23  not have family support don't survive in the community very

24  well.  With the Hinckleys' support, I think John will do

25  extremely well.

1      Q    All right.  The last one to which reference is

2  made in Dr. Patterson's report is, it pertains -- it's No. 8

3  on that report.  It's on page 71.  I see you've closed it.

4  Page 71, No 8.

5           And have you ever seen any evidence of John

6  wanting to hurt himself?

7      A    No.

8      Q    All right.  Now, Dr. Patterson suggests that it

9  might be a good idea to include as a risk factor financial

10  support and stability.  Are you familiar with that?

11      A    Yes.

12      Q    Well, you did not have occasion to hear the

13  testimony of Scott Hinckley earlier in this case, nor that

14  of his sister, Diane Sims, in this case.

15           MR. LEVINE:  Your Honor, may I make a proffer to

16  this witness about that testimony?

17           MR. AZIZ:  I would object.

18           THE COURT:  Well, if she were here as an expert,

19  she would have listened to it.

20           MR. LEVINE:  She would have heard it, yes.  That's

21  right.

22           THE COURT:  So if I sustain your objection,

23  Mr. Aziz, you won't be able to ask Dr. Patterson about

24  anything that happens today since he's not here today.

25           MR. AZIZ:  Okay.  I'll withdraw.

1          THE COURT:  Go ahead, Mr. Levine.

2          MR. LEVINE:  Thank you, Your Honor.

3   BY MR. LEVINE:

4     Q    Well, let me represent to you  Dr. G-G, that Scott

5   Hinckley testified before this Court on Wednesday of this

6   week.  And during that testimony, he said that Jo Ann,

7   within her resources, has approximately $250,000 of liquid

8   assets and, in addition, has equity in her home, which he

9   believes to be approximately $250,000.

10         He further testified that her assets, without

11  regard to his or Diane's, would be sufficient to easily go

12  five years -- no.  I strike "easily."

13         THE COURT:  Yeah, strike "easily."

14  BY MR. LEVINE:

15    Q    Would go about five years, would go five years,

16  assuming that the costs were approximately $100,000 a year.

17         He further testified that John is now about 60; he

18  turns 60, I believe, next month; and that in five years when

19  he's 65, as he understands it, he'll be eligible for other

20  benefits that citizens get when they turn 65.

21         And then he said that should the assets be, should

22  there be benefits and the assets run out, that his assets

23  and those of his sister would supplement Jo Ann's assets.

24         He further said that were she to die before that

25  time period, that there is -- there has been a family

 1   discussion about the disposition of her assets.  And the

 2   terms of her will provide that the assets that she has go to

 3   Scott and Diane, and they are to use them exclusively for

 4   John's care.

 5           THE COURT:  And the total is the $500,000 that

 6   Mr. Levine already referred to; that if she were to die or

 7   the house were otherwise sold, that would be 250,000

 8   roughly; and her IRA is 250,000 roughly, which is the

 9   totality of the assets we're talking about.  There's not

10   additional assets beyond the $500,000, whether she's still

11   with us or not, is the way I understood the testimony.

12           MR. LEVINE:  I agree with that, Your Honor.

13   BY MR. LEVINE:

14   Q    And then his sister, Diane, testified.  And she

15   testified -- I think her language was, without equivocation,

16   that her family assets would -- would be applied to

17   supplement those of Mrs. Hinckley.

18           THE COURT:  Not without limit.

19           MR. AZIZ:  Yeah, not without limit.

20           MR. LEVINE:  To the extent that she has those

21   assets.

22           THE COURT:  I'm not sure that's an accurate

23   statement.

24           MR. AZIZ:  I don't think that's an accurate

25   statement.

```
 1   BY MS. KENNEDY:
 2       Q    Well, whatever assets there are, perhaps with some
 3   limits, she would devote them to Mr. Hinckley's well-being.
 4            And she further said that should there be some
 5   crisis, that she would make -- take the next plane, I think
 6   she said, to Williamsburg, and to stay with John until such
 7   time as the crisis abated, and that she would work with the
 8   various treatment teams, the Williamsburg team and the
 9   hospital, to work their way through that crisis.
10            With --
11            MR. LEVINE:  Do you agree that's an accurate
12   recitation?
13            MR. AZIZ:  I do.  Well, except for the --
14            THE COURT:  Except for how much Diane and Scott
15   would throw in of their own resources?
16            MR. AZIZ:  Exactly.
17            MR. LEVINE:  All right.
18   BY MS. KENNEDY:
19       Q    So with that in mind, do you have a view as to
20   whether or not risk factors include financial support and
21   stability?
22       A    I have many thoughts about that particular risk
23   factor.
24       Q    Okay.
25       A    I think it was myself -- I think it was myself who
```

1    brought it up with Dr. Patterson in the sense that I think

2    John's family support is very important to John, and John's

3    financial situation was something that was very poor before

4    his crime was committed.

5            And I think that if the family has committed to

6    their support and there is money there, that that should

7    satisfy that particular risk factor for John.  And I'm

8    pleased that the family is willing to show that support, and

9    I think it's very important to John's success.

10           THE COURT:  Now, Mr. Levine may be planning to get

11   there; but the, as I understood the discussion that was had

12   with Scott Hinckley and Diane Sims, the estimate of $100,000

13   a year, which could last up to five years, that would be

14   before there were any state or federal benefits, such as

15   Medicaid, for which he might be eligible, and SSI, for which

16   he might be eligible and, five years from now, Medicare, for

17   which he would be eligible.

18           And one question -- and Mr. Levine may have

19   more -- is whether you and, to your knowledge, the other

20   providers would continue to treat John if he were a Medicaid

21   patient in 2015, 2016, whatever, and if he were a Medicare

22   patient five years from now.

23           THE WITNESS:  Okay.  So that depends a little bit

24   on our willingness to treat him and a little bit on what the

25   rules are.

1          THE COURT:  Right.

2          THE WITNESS:  So the things that have -- right.

3          So the things that have held us up a bit is that I

4   accept Medicare and Medicaid, so that's not an issue.

5   But Medicare and Medicaid cover his medication reviews; they

6   don't cover forensic work for me.

7          And the same thing, there's certain services that

8   the community service board, which is our mental health

9   center, could pick up once he has Medicare and Medicaid.

10  But then there are rules about who the doctor is and whether

11  they're part of the mental health center or not.

12         So as long as there's financial support until we

13  can get him the other resources, I am more than willing to

14  treat him.

15         If the other resources require him to see another

16  physician, I'm more than willing to transition him to

17  another physician.

18         But I both have to follow the rules, and I have to

19  be able to do what John needs.  If I need to do a risk

20  assessment, I need to do a risk assessment.

21  If Medicare/Medicaid doesn't pay for that, then the family

22  needs to financially support that.

23         So I guess what I'm trying to say is, I'm willing

24  to treat him, but I also need to follow the rules.  And I --

25  the cost of following the rules, I have to be sure that the

1   money will be there if Medicare doesn't pay for it and that

2   John will get the services he needs, because I can't have a

3   situation where I need to see John weekly and they say, "No,

4   John can't afford it."

5   BY MR. LEVINE:

6       Q    Are you satisfied based on the proffer that the

7   asset are there to satisfy your financial -- the financial

8   needs of your practice?

9       A    I'm satisfied that the support and the finances

10  are there.  And both are important to me --

11          THE COURT:  So let me just --

12          THE WITNESS:  -- in my opinion.

13          THE COURT:  Because some of what you said is --

14  a lot of what you said is really important.

15          But if I understand what you're saying is, if you

16  believe he needs certain things, either because you, in your

17  medical judgment believe so, or because the conditions that

18  I might impose, if there is convalescent leave -- say, for

19  example, you've got to see him every week for X-number of

20  months or whatever -- that you will make sure he gets what

21  he needs, so long as it's covered either by state or federal

22  payments and/or in combination with the family support.

23          But if either of those did not make it possibly --

24  possible for you to provide what he needs, you would let

25  somebody know:  "I can't do this anymore.  He needs more.

1   There's no financial support for what he really needs."

2   Is that what you're saying?

3            THE WITNESS:  That is exactly what I'm saying.

4            And I'm saying that it is a risk factor for John

5   to have to deal with:  "Maybe I can't get the services I

6   need because there's no money," because that was one of the

7   things he dealt with in his life before it led up to the

8   crime.

9            So I think that whether or not I get paid on time

10  is not the issue, as much as it is that the family will do

11  what they need to do and John will get the treatment he

12  needs to get, and John does not have to be worried about not

13  coming to group or not coming to treatment team or not

14  coming to my office because there's no money.

15           THE COURT:  And if this were -- if the's

16  hospital's petition were granted in whole or in part, he'd

17  be on convalescent leave with his -- living in Williamsburg,

18  with you and others being his primary treatment providers.

19  But he and the Williamsburg providers would be in contact

20  with the outpatient department connected with

21  St. Elizabeth's.

22           And those are the people -- this is a question.

23  It sounds like a statement, but it's a question.

24           And I take it those are the people that you would

25  feel an obligation to report to if he were not getting what

1   you believed he needed in Williamsburg?

2          THE WITNESS:  Absolutely.

3          If I think John needs something he's not getting,

4   I would let the outpatient services know immediately.

5   BY MR. LEVINE:

6      Q    And, Dr. G-G, has the family been willing to pay

7   for all the services that, in your judgment, he has needed?

8      A    Yes.

9      Q    And are your bills current?

10     A    Yes.  My bills are really not that -- I mean, I

11  see him twice a month.  And I look at the plan, and I'm also

12  looking at treatment teams and risk assessments and things

13  that I'm not sure exactly if at some point I will need to do

14  or -- you know, it's a little unclear to me how many times a

15  month they're expecting me to see him or the times of month

16  are me seeing him and risk assessment and treatment team.

17         But I understand there will be a minimum of two

18  times a month that I see John, whether those are in

19  individual therapy or -- I mean, it's not therapy -- in our

20  individual sessions or in treatment team.  So I know at

21  least that is necessary and that there might be more

22  expenses if I need to see him more often.

23     Q    All right.  And has there ever been -- withdrawn.

24         If you think that you need to see him more often,

25  you're willing to tell him that; is that right?

1        A      Absolutely.   Absolutely.

2               And I'm satisfied that the family is willing to

3    support him in that.

4        Q      And has there ever been a single occasion where

5    the family said, you're seeing him too much, because it

6    costs too much?

7        A      Not directly to me.

8               But when I look at the outpatient plan and I look

9    at the number of visits, I'm -- that's a lot of visits --

10       Q      That's a lot of visits.

11       A      -- not just for me, but for everyone else.

12       Q      To your knowledge, has every one of the mental

13   health treaters been paid in full in a timely way?

14       A      I only know about myself, and I have been paid in

15   full in a timely way every time.

16       Q      And that's over the full course of five years?

17       A      Absolutely.

18              MR. LEVINE:   The Court's indulgence briefly,

19   Your Honor.

20              THE COURT:   Yes.

21              (Pause)

22   BY MR. LEVINE:

23       Q      Dr. G-G, do you believe that this plan has too

24   many mental health meetings, too much therapy?

25       A      Well, the way -- the way I would like to see the

1    plan is I would -- I mean, ideally, the way I thought it was

2    is I would like to see my minimum number of visits with him.

3    And if I choose, if I think he needs more, I can have him

4    into my office more.

5            What confuses me about the plan is it looks like

6    I'm meeting with him individually twice a month and I'm

7    having two treatment teams a month with him.  And that would

8    be, I would see -- was seeing him four times a month.

9        Q    Well, how often do you think you should see him?

10       A    I think I should see him a minimum of once a month

11   individually and a minimum of once a month in treatment

12   team.

13       Q    And then under the circumstances, you would --

14   would you like the discretion to see him more frequently or

15   less frequently?

16       A    I would like the discretion to be -- like I want

17   it mandated that I can see him more often if I need to see

18   him more often.

19       Q    And do you think the Court should make clinical

20   judgments as to how often you should see him, or should the

21   Court merely make the judgment of a minimum?

22       A    I think the Court can do whatever it likes.

23       Q    Of course.

24       A    I'm requesting the minimum of one of each, and I'm

25   willing to do whatever the Court says.  If the Court says I

 1    need to meet with him four times a month, I will meet with

 2    him four times a month.

 3            THE COURT:  So -- but currently, you're meeting

 4    him, like in 17 days, you see him twice individually, right?

 5            THE WITNESS:  I do.  But we don't meet as --

 6    I mean, his treatment team is at St. Es.  We do meet as a

 7    treatment team in Williamsburg, but we don't include John in

 8    that, because he's there 17 days, and that would be another

 9    visit.

10            When he comes to Williamsburg on convalescent

11    leave, there will be at least once a month he'll meet with

12    the entire treatment team in Williamsburg, and that's a

13    second or a third time I would be seeing John every month.

14            THE COURT:  I see.

15            So by "treatment team," as you understand it, that

16    would be you, Mr. Weiss, Mr. Beffa, and Ms. Haley?

17            THE WITNESS:  That's correct.

18            And then John would be invited to those now.

19            THE COURT:  Right.

20            THE WITNESS:  And if it we need a family member,

21    if Mrs. Hinckley needs to come, we can invite Mrs. Hinckley.

22    BY MR. LEVINE:

23        Q    Would you like the discretion as to whether to

24    invite her or not, or do you think it should be court

25    ordered?

1        A      I'd like the discretion.

2               MR. LEVINE:   The Court's indulgence, Your Honor,

3    please.

4    BY MR. LEVINE:

5        Q      Dr. G-G, do you accept Medicare?

6        A      I do.

7        Q      And do you accept Medicaid?

8        A      I do.

9               I'm not currently taking new Medicaid patients,

10   but any of my patients I have currently who are on or

11   convert to Medicaid, I retain them.

12       Q      So that would include Mr. Hinckley;

13   is that correct?

14       A      Yes, yes.

15       Q      Now, in addition to this concern that you

16   discussed with Dr. Patterson about financial support, there

17   was some discussion about the discussion -- some discussion

18   about the stability of the Williamsburg treatment team.

19              And not that it's a risk factor about John, but

20   the discussion included whether or not all the members of

21   the treatment team would be available to continue to provide

22   that treatment.  Do you remember that?

23       A      Yes, I do.

24       Q      All right.  Now, is it your intention to keep

25   practicing in Williamsburg?

1       A       It is.

2       Q       And do you talk with Mr. Weiss frequently?

3       A       I do.

4       Q       And do you know if it is his intention to continue

5   to practice in Williamsburg?

6       A       I believe it is.

7               You know, he is partially retired, so that was

8   what I had in mind when I was talking about the stability of

9   the treatment team.

10              And Mr. Beffa is also partially retired.

11      Q       And have you discussed with each of them,

12  Mr. Weiss and Mr. Beffa, their intention to keep their

13  practice going and to include John in it?

14      A       I think we all have a commitment that's pretty

15  secure for the next two years.  And in those two years,

16  we'll also be looking at his getting other benefits.

17              So I think that it has been thought about, spoken

18  about, and planned for that he have all the services he

19  need, at least for the next two years.  And any changes or

20  intentions to change our practices, we would let the

21  forensic outpatient people know, as well as the Court.

22      Q       All right.  And if a member of the treatment team

23  were to either retire or become unavailable for some other

24  unfortunate reason, will you be in a position to make a

25  recommendation or referral for a replacement?

1       A    I hope so.  Everybody in Williamsburg has been

2  changing around and moving and retiring.

3            But I think that the treatment team itself, we

4  have discussed what would happen if one of the four core

5  people were to change, and we are willing to work with each

6  other and work with the Court to make sure John has his

7  support at all times.

8       Q    And you say "work with the Court."  You also would

9  be willing to work with the hospital?

10      A    Absolutely.

11      Q    All right.  And all four of you, at least three of

12 you, you, Mr. Beffa, and Mr. Weiss, are entrenched in the

13 Williamsburg community; is that right?

14      A    Yes.

15      Q    And you know other practitioners within your

16 fields?

17      A    We do.

18      Q    And you make referrals all the time;

19 is that correct?

20      A    We do, yes.

21      Q    And you would be -- and would you be in a position

22 to do likewise in this case should one of you become

23 unavailable?

24      A    Yes.

25            And we've made that commitment to each other as

1   well.  We've discussed this, because it is so important for

2   John to have consistency.  And we will help each other get

3   through things if there -- if one of the four of us becomes

4   unable to do what we need to do.

5        Q    All right.  Now, let's talk for a moment, please,

6   about how John has done on conditional release.  How has he

7   done?

8        A    He's done very well.

9        Q    All right.  Now, there is -- there's been some

10  discussion about an incident that occurred actually in this

11  year 2015, where John went to see a musician named

12  John Tracy.  Are you familiar with that, that incident?

13       A    I am familiar with the incident, yes.

14       Q    And the incident included an itinerary that had

15  him scheduled to meet, along with Mr. Brelsford, a

16  photographer whose name is Mr. Lerner, formerly of Look

17  magazine.

18            Do you remember that?

19       A    That's correct.

20       Q    All right.

21       A    Yes.

22       Q    And there came a time when Mr. Lerner was

23  unavailable, apparently ill, and gave notice just before

24  they were scheduled to meet.  Do you remember that?

25       A    I do.

1      Q    All right.  And Mr. Brelsford and John went to

2    then see Mr. Tracy.  Do you remember that?

3      A    Yes, I do.

4      Q    All right.  And they were supposed to -- or,

5    excuse me.

6           John was supposed to advise Mr. Hyde or Mr. Weiss,

7    I think it was Mr. Hyde, of the change in the itinerary, but

8    didn't do that until after they went to see Mr. Tracy.

9           Do you remember that?

10     A    That's the way I understand it happened, yes.

11          THE COURT:  Is that something you would normally,

12   or in this case did, discuss with John?

13          THE WITNESS:  Yes.  I saw John toward the end --

14   I always see him at the end of the week, and he actually

15   brought it up to me.  And he said he had talked to V.J.

16   after it had happened.  And he said he realizes now, he

17   should have let V.J. know.  And he has done that

18   subsequently.  He has let us know when things are going to

19   change.

20     Q    All right.  And what is the mental-health

21   significance of that incident?

22          I mean, is it a big -- is it material?  Does it

23   matter, in your view?

24     A    Well, the way I assessed it, I don't think he was

25   trying to be deceptive, because Bruce was with him,

1  Mr. Brelsford was with him, and he, you know, thought it was

2  appropriate at the time.

3          You know, sometimes when more than one risk factor

4  shows up at the same time, it gets a little harder for John

5  to think of everything to do.  And I think he was very

6  interested in getting somewhere with his music.

7          I think he was enjoying being out with Bruce,

8  because they do enjoy each other's company.

9          And I think he just was trying to get more

10 contacts in the community and thought, well, since I'm not

11 going to be able to meet with the other person, maybe we

12 could do this.

13         And that's when I think that, you know, John needs

14 a little bit of a check, is when more than one of his things

15 he likes to do and risk factors pop up at one time.

16         You know, I'm kind of comforted by the fact that

17 Bruce was with him.  And I think that he -- Bruce just

18 doesn't know the rules because he's more of a friend than he

19 is a treatment provider.

20         But I don't think John was deliberately trying to

21 deceive anyone or trying to put himself out in the media or

22 trying to make money on something.  I think that he just saw

23 the opportunity as something he wanted to do and didn't

24 think about making the contact first.

25         So I don't really think it -- it's a terrible

1  thing.  It's something we always keep in mind, though, as to

2  when John still needs a little guidance.

3      Q    All right.  Does it show an initiative to advance

4  a social activity?

5      A    Well, I think that was one of the things he wanted

6  to do, yes.

7      Q    And do you believe that his behavior was

8  well-intended?

9      A    I don't think he believed he was doing --

10 I don't think he thought about, "I'm doing something wrong."

11      I think the only misjudgment he had was he should

12 have called.  I don't think the actual behavior was a risk

13 at all.

14     Q    And do you know Mr. Brelsford?

15     A    I do.

16     Q    And what's your opinion of him?

17     A    He's a lovely person and really well-intended

18 person.  And he's really a very, very good photographer.

19          MR. LEVINE:  One moment more, Your Honor, please.

20          (Pause.)

21 BY MR. LEVINE:

22     Q    So, Dr. G-G, if the Court were to order you to see

23 Mr. Hinckley for psychiatric follow-up any number of times

24 per month, would you follow the court order?

25     A    I would.

1    Q    All right.  And is it your view that -- well, what

2   is your view as to the proper number of times per month that

3   you think you should see him at a minimum, at least for the

4   first six months?

5    A    I think the minimum should be once a month

6   individually and once a month in treatment team.

7    Q    All right.  So that would be twice a month, once

8   with you and once with the team.  All right.

9    A    I think that should be the minimum.

10    Q    All right.  And then would you like the discretion

11   to adjust that number?

12    A    Absolutely.

13    Q    And, Dr. G-G, are you willing to monitor his

14   prescription drugs?

15    A    Oh, yes, definitely.

16    Q    And are you willing to write prescriptions on a

17   Williamsburg pharmacy?

18    A    I am.

19    Q    And would you be willing to inform both the Court,

20   if ordered, or the forensic outpatient department of any

21   adjustments that you think are appropriate and that you

22   would be making?

23    A    I will, yes, I will.

24    Q    Would you like the discretion to adjust the

25   medication as you see medically fit?

1    A    Yes, I would.  And also to do the labs as I need

2    them.

3    Q    That would be blood work, that type of thing, when

4    you say "labs"?

5    A    Yes.

6         Blood work.  If John gets Medicare/Medicaid,

7    sometimes we do a genetic testing to make sure his dosing is

8    correct.  I'd like the discretion to order what I think

9    would be best -- what I think he needs for his treatment.

10   Q    Now, if you saw, if you observed any psychiatric

11   emergency, would you be willing to arrange for emergency

12   hospitalization in the Williamsburg area?

13   A    Yes.  Yes.

14   Q    And would you be willing to coordinate whatever it

15   is that you do in that regard with the outpatient department

16   at the hospital?

17   A    Yes.

18   Q    All right.  And if the Court were to order drug

19   and alcohol screening, would you be willing to participate

20   in that?

21   A    I would.  He -- I don't have it in my office, so

22   he would have to go to, like, a local lab for that.

23   Q    All right.  Do you see, are you aware of any

24   evidence whatsoever of a drug or alcohol problem in

25   Mr. Hinckley?

1         A     No.

2         Q     Do you think that would be an appropriate

3    condition to have in this -- in a court order?

4         A     I don't know if he's been doing that when he goes

5    to St. Es.  We certainly haven't been monitoring him in the

6    community at the point.  So I'm not sure that it has to be

7    mandatory.

8         Q     All right.  And, Dr. G-G, are you firmly of the

9    view that Mr. Hinckley is absolutely ready for convalescent

10   leave?

11        A     Yes..

12        Q     Do you believe that Mr. Hinckley's risk of danger

13   in the context of this plan is low?

14        A     I do.

15        Q     And do you think Mr. Hinckley's risk of relapse in

16   the context of this plan is decidedly low?

17        A     I do.

18              MR. LEVINE:  The Court's indulgence.

19              THE COURT:  Yeah.

20              MR. LEVINE:  Nothing further, Your Honor.

21              THE COURT:  Okay.  Dr. G-G, are you ready for

22   cross, or would you like to take a ten-minute break?

23              THE WITNESS:  I think I'd like a ten-minute break.

24              THE COURT:  Okay.  The Court Reporter probably

25   would too.  So why don't we come back in about ten minutes.

```
 1            MR. LEVINE:  Thank you.  Thank you, Dr. G-G.

 2            THE WITNESS:  Thank you.

 3            DEPUTY CLERK:  All rise.

 4            (Recess from 10:33 a.m. to 10:47 a.m.)

 5            DEPUTY CLERK:  All rise.

 6            Please be seated.

 7            THE COURT:  Okay, Mr. Aziz.

 8            MR. AZIZ:  Thank you, Your Honor.

 9                           - - -

10                      CROSS-EXAMINATION

11   BY MR. AZIZ:

12       Q    Good morning, Doctor.

13       A    Good morning.

14       Q    And may I call you G-G as well -- Dr. G-G as well?

15       A    Absolutely.

16       Q    Thank you.

17            When you were being asked some questions by

18   Mr. Levine, you've been discussing a plan, specifically the

19   hospital plan.  Which one of those plans that you had

20   received from them were you talking about?

21       A    I was looking at the, actually their response to

22   the government one.

23       Q    Okay.

24       A    And the reason why is because I think it says

25   "bi-monthly treatment teams" and that I met with them
```

1    twice -- I met with John twice a month.  I think it says

2    that in two separate sections.

3         Q    Yes, it does, Doctor.

4              I think you're referring to conditions 15 and 20,

5    if I'm correct.  And that's on pages 9 and 11 of the

6    April 17th, 2015 letter, which I believe is Patient's

7    Exhibit 4.

8              THE COURT:  Correct, Patient's Exhibit 4.

9              So are you looking at the April 17th, 2015 letter,

10   Doctor?

11             THE WITNESS:  Yes.

12   BY MR. AZIZ:

13        Q    So let me take you, first, to the second of those

14   two.  I want to clarify something.  So page 11?

15        A    Okay.  I'm on page 11.

16        Q    Are you there?

17        A    Yeah.

18        Q    Okay.  So the first sentence of condition,

19   proposed condition 20, is the Williamsburg treatment team,

20   Dr. Giorgi-Guarnieri, Mr. Weiss, Mr. Beffa, and the music

21   therapist shall meet with Mr. Hinckley in person for

22   bi-monthly treatment planning conferences.

23             Do you see that?

24        A    I do.

25        Q    And when you said that there was going to be two

1    group therapies between the treatment team and Mr. Hinckley

2    a month, is that the sentence that you were referring to?

3         A    Yes.

4         Q    Now, if I am to proffer something, Mr. Hyde was

5    actually on the stand yesterday, and his intention what

6    he said is bi-monthly to him means once every two months.

7         A    Oh.  Well, I actually looked that definition up

8    this morning, and it said "twice a month."

9         Q    No.  I tend to agree with you.

10             THE COURT:  Actually, I went to the dictionary and

11   looked up "bi-monthly," and "semi-monthly," because I always

12   thought "semi-monthly" meant twice a month and "bi-monthly"

13   meant every other month.

14             Well, "semi-monthly" does mean twice a month.

15   But at least according to the dictionary that I looked at,

16   "bi-monthly" can mean either twice a month or every other

17   month, which is strange.

18             MR. AZIZ:  Very strange.

19             THE COURT:  I read it as every other month.

20             And I think Mr. Aziz is correct, Doctor, that

21   Mr. Hyde, who wrote the hospital's plan, intended it to mean

22   every other month.

23             THE WITNESS:  Okay.  I honestly Googled it this

24   morning, because I wanted to see what it said, and it said

25   twice a month.  And I thought, okay, that's two there.

 1    And then there's another one that says I meet with him
 2    individually twice a month.
 3              So I accept the dictionary definition over Google.
 4    BY MR. AZIZ:
 5         Q    I guess the more important question, now that
 6    we're clear, Dr. G-G, is which of those -- not just those
 7    two; but if not the minimum, because a lot of what you were
 8    saying with Mr. Levine was regarding the minimum number of
 9    visits, but between your group meetings with him and the
10    treatment team, as well as individual meetings with
11    Mr. Hinckley per month, what is your ideal clinical
12    recommendation?
13         A    Okay.  Let me -- let me explain how I divide these
14    things up, because I think, you know, I -- you think about
15    it as treatment.  I think about it treatment and billing and
16    all these other things.
17              So right now I see Mr. Hinckley for two 45-minute
18    sessions, where we go over his psychiatric status, his
19    medications, and then we go through his risk factors.  We go
20    through his relationships and that type of thing, and that
21    takes me 45 minutes.  So I need at least one of those
22    sessions a month to keep up with everything.
23              And then I was hoping for once a month that the
24    treatment team meets with John and does both risk assessment
25    and catches up on our plans.

1            The thing that, if I'm limited to a med check at

2    the once a month, you know, like if I'm limited to only

3    doing the physical and the medication, then I need a second

4    session either in a treatment team once a month or by myself

5    with John where I do risk assessment, because I feel very

6    responsible for making sure that he is -- he is following --

7    like, the risk -- the risk factors are in check.

8            So like I really would like --

9            THE COURT:  When you meet with him now, does it --

10   if I understood you correctly, you do a med check both times

11   you meet with him, right?

12           THE WITNESS:  Yes.

13           THE COURT:  And the med check doesn't take your

14   full 45 minutes?

15           THE WITNESS:  No, because then we go in -- well,

16   we have, you know, the list of symptoms that I go over for

17   the hospital and fill out.  Then we go through his physical:

18   Has he been injured?  Is he okay?  Has he been taking his

19   medicines?  Has he had any side effects?

20           THE COURT:  And then you go through the risk

21   factors?

22           THE WITNESS:  You know, his visits to the

23   hospital, his risk -- yes.  And that is all paid for by the

24   Hinckleys, you know, directly right now.

25           So what might happen is when he gets Medicare or

1   Medicaid, the part about the medical is covered by Medicare

2   and Medicaid; but my reviewing risk factors with him would

3   not be, because they do not allow you to bill for forensic

4   work.

5            THE COURT:  Right.

6            THE WITNESS:  So that's where, yeah, that's where

7   all the division comes in, because I don't want to do

8   anything that makes me, you know, Medicare-ineligible as a

9   provider because of the fact that I'm -- because they'll

10  call that Medicare fraud if I'm doing anything other than

11  medical care in that med check.  I can do therapy, but

12  I don't do therapy with John.  Mr. Beffa does.  I do risk

13  assessment and med checks.

14           But right now, he does not have benefits, and I

15  would like him for one of those 45-minute visits at least a

16  month, where I do the medical and the risk assessment or the

17  risk factors.  I won't say "assessment," because I don't

18  really do an assessment.  I go over risk factors.

19           And then I would like to see him once a month with

20  the treatment team, because I think it will help us

21  coordinate John in the community transition early on.

22  And we will, again, go over risk factors with John in that

23  treatment team.

24           And I understand from this that I'm also -- we

25  will also submit a treatment plan to the forensic outpatient

1    department.  Now, I thought we were being asked to do that

2    twice a month.  Now I understand that we're being asked to

3    do that once every other month, and that is fine.

4              In the beginning, I'm probably to ask that we --

5              THE COURT:  Is it still -- is it your personal

6    preference to have the treatment team one time a month?

7    You said, "Every other month is fine," but --

8              THE WITNESS:  Yes, but I --

9              THE COURT:  -- is your personal preference once a

10   month?

11             THE WITNESS:  I don't mind every other month as a

12   minimum.

13             When he first comes down, we're going to do it

14   once a month, okay, because I'm going to ask that we do it

15   once a month.

16             And to me, that would satisfy my two visits a

17   month as a minimum: once a month with the treatment team,

18   once a month individually.

19             Now, there's another part of this says that I'll

20   meet with him twice a month as a minimum.

21   BY MR. AZIZ:

22   Q    And that's on page 9, is that right, of the same

23   document?

24   A    Well, pages are stapled on mine; but, yes, page 9,

25   yes.  It says that I will meet with him at least once a

1    month for the first six months.

2        Q    Just to proffer that, proffer something to you,

3    that was actually amended after that to say once a week.

4            So do you see the word "month" in the second

5    sentence of condition 15?  That would be changed to once a

6    week for the first six months, and then get downgraded to

7    twice a month.

8            MR. LEVINE:  Your Honor, I'm going to object in

9    the context of this video proceeding here.  I don't believe

10   that this witness has the amendment, and she does have the

11   document that says the hospital agrees with this condition.

12           The testimony was that the hospital agrees with

13   Dr. Murphy two times a month, not weekly.  She wouldn't know

14   that from the document he has.

15           MR. AZIZ:  Let me clarify that.  I'm happy to.

16           MR. LEVINE:  Well, that's my objection.

17           THE COURT:  All right.  Well, the government filed

18   an amendment to its filing, which said they really meant

19   paragraph 15 to say that you should meet with him once a

20   week for the first six months, not once a month.  That's

21   their view.  The hospital does not agree with that.

22           So to the extent that the document before you

23   says, "Hospital response:  The hospital agrees," they agreed

24   with it when it said once per month.  They do not agree with

25   it now that it says once a week.

1        And you -- based on what you've just said,

2   I assume you don't agree that once a week is necessary?

3        THE WITNESS:  I think that a mandated once a week

4   might be difficult for me and John in the sense that there

5   are times when I'm not there and the once a week --

6   you know, I mean, I follow the rules and I make -- and John

7   follows the rules.  We follow the rules together.  And if it

8   says once a week as -- you know, that means that once a

9   week, no matter where I'm coming from or flying in or

10  whatever, John and I are going to meet.  That's why -- you

11  know, that to me, if I needed to see him once a week,

12  I would make sure I saw him once week.

13        But I would like it to be -- that's why I said, it

14  would really be nice if it were a minimum.  And if they want

15  to do -- I mean, I will do whatever the Court wants.  To me,

16  my preference would be a minimum of once a month, a minimum

17  of one treatment team a month in the beginning.

18        THE COURT:  You know, one of the things that has

19  sort of pervaded this hearing is, if we move to convalescent

20  leave, you know, how involved should I be?  How involved

21  should the Court be?  And to what extent should we all be

22  relying on the clinical judgments and discretion of the

23  professionals?

24        You're a professional.  I'm not a professional.

25  And so there is this tension between transition to the

1    community with a lot more freedom and a lot more discretion

2    in his providers and, ultimately, perhaps, independent

3    living away from his mother.

4            But the more freedom he has and the less

5    monitoring he has, there is -- I mean, now he can only go

6    out a couple hours on his own and drive to certain places;

7    and he's back 13 days a month, and I get monthly reports.

8            And a lot of that is just going to change under

9    the hospital's proposal.  The government thinks it's

10   changing too much and that it doesn't give the Court enough

11   oversight, monitoring, information to do the oversight and

12   monitoring.

13           And the hospital and Mr. Levine, on behalf of his

14   client, and apparently you and those in Williamsburg think,

15   well, if we're moving -- if we're truly moving to this new

16   phase, we should be placing more trust in John and relying

17   on you and Mr. Beffa and Mr. Weiss, who are the

18   professionals on the scene, to exercise your discretion

19   without such rigidity, because the more rigidity, the

20   argument goes, the less -- the more rigidity, the more

21   difficult it is to him -- for him to achieve the ultimate

22   goals.  The less rigidity, the more the government's

23   concerned that if problems develop, we won't have sufficient

24   ways to monitor them.

25           So that's my little speech.  And maybe before

1    Mr. Aziz continues his cross and I shut up, I don't know if

2    you have any reaction to what I just said, Doctor.

3          THE WITNESS:  Well, I think that my concern -- and

4    I've been doing this transition for NGRIs from a hospital

5    into a community from all different aspects for years, and

6    the Court is always involved.

7          The Court -- even when the patient is in the

8    community on, we call it -- your convalescent leave is like

9    our conditional release in Virginia.  We still have the

10   Court involved.  So the providers are still giving

11   information back to the Court.

12         The part that's hard for me as an outpatient

13   provider is I'm not sure I can provide the type of

14   observation of John that you're requiring.  I mean, when

15   somebody is in the community, I don't know where he is all

16   the time, and I don't really have any way of monitoring it.

17         Now, I see the provisions for the, like the phone

18   with the GPS.  I think that's extremely helpful.  If John

19   isn't where he's supposed to be or doesn't show up where

20   he's supposed to be and somebody gives a provider a call, if

21   he has a phone with a GPS, at least we can locate where he

22   is.  I mean, I think that would be very helpful.

23         But there are certain things that I can't do as an

24   outpatient provider.  I can't follow him around all day

25   long.  I don't know when he's leaving the grounds or leaving

1    his home.  I'm just not going to know.

2            So when we get these very strict guidelines,

3    I think, can we really do that?  Can we really monitor him?

4    Can -- like, am I going to be responsible for making sure

5    someone goes into his home and checks his computer?

6    And that, I think, is more the role of the Court than it is

7    of the outpatient team.

8            So I don't mind reporting -- I mean, I understood

9    that my progress notes are going to the Court and to the

10   outpatient providers, and I'm fine with providing that.

11   I'm used to communication with the -- like the hospital

12   outpatient divisions, as well as the Court.

13           But in terms of actually physically monitoring

14   John in the community, I'm not sure how we're going to do

15   that.

16           MR. AZIZ:  Thank you, Your Honor.

17           THE WITNESS:  So meetings, I think, are

18   appropriate, but I don't -- I think that's why the treatment

19   team is so important, because when we get together, we'll

20   hear, you know, Jonathan will be able to tell me what John's

21   been doing in terms of, like, interviews with jobs and

22   things.

23           But the close monitoring of where he's going

24   physically is what I think we're all thinking, John has to

25   be able to move around.  And as much as we can, we can

1    monitor that, but there are some things we just can't

2    monitor when you're outpatient.

3    BY MR. AZIZ:

4         Q    Dr. G-G, speaking of the GPS phone, you think

5    that's a good idea in order to be able to determine his

6    whereabouts; is that right?

7         A    I do.  I mean, my daughters and I have iPhones,

8    and we have that "find your iPhone."  And that has been

9    extraordinarily important to me when I didn't get a phone

10   call I thought I was going to get and I can look up and see

11   where they are.

12              And I think that would be very helpful.  If John

13   is supposed to be at a meeting and he's not there,

14   it would be nice for us to be able to know where he is.

15        Q    And another form -- way, there are places where

16   our phones don't have reception, such as this courtroom.

17   I mean, you don't know that, but there are places where our

18   phones don't have reception; isn't that right?

19        A    I got a pretty good phone; and usually as long as

20   it's turned on, I can find my children.  If it runs out of

21   juice, yeah -- if it runs out of, you know, then I'm in

22   trouble, but --

23        Q    And do you ever forget your phone or do your kids

24   ever forget their phones?

25        A    Yes.  I'm pretty good about not forgetting it,

1  but --

2      Q    It happens?

3      A    -- I have accidentally touched a button and turned

4  off the ringer before, so --

5      Q    And so additional means of monitoring where

6  Mr. Hinckley would be would be a good idea in order to know

7  where he is; isn't that right?

8      A    Well, when you're in outpatient, I don't know what

9  the -- I don't know what the Court considers how much

10  monitoring is enough.

11      And I do understand the judge's question to me

12  about, you know, how are we going to monitor him?  But when

13  you're an outpatient, are you supposed to know where

14  everyone is all the time?

15      Q    Isn't that the point of the GPS-enabled phone,

16  just in case?

17      A    It's in case he doesn't show up where he's

18  supposed to be.  And then the question would be, was he in

19  an accident?  Did he go somewhere he wasn't supposed to go?

20  That type of thing.

21      And, you know, phones are pretty sophisticated.

22  We can figure out where you've been.

23      Q    But there's also a safety element of that, right,

24  at least for the Court monitoring public safety?

25      A    Sure.

1      Q    And so in case there was any question of

2  Mr. Hinckley decompensating or having any sort of issue or

3  episode, it would be very important to know exactly where he

4  was at that point; isn't that right?

5      A    It would be great to be able to find him if he

6  decompensated, yes.

7      Q    And so one of the devices that would be very

8  helpful in that regard, indeed essential in that regard,

9  would be something like a GPS ankle bracelet;

10 isn't that right?

11     A    I've not -- I've not had much luck with that with

12 NGRI's.

13          I mean, if we, if the patient wants to take them

14 off, they can take them off.

15          And the one time we had a patient escape with a

16 GPS ankle bracelet.  He took it off.

17     Q    Let me posit for you, an ankle bracelet that

18 couldn't be taken off or that would have a tamper alert if

19 it were to be taken off, would that assure more securely for

20 you?

21     A    I think it would be more security.  I don't know

22 if that's appropriate for an outpatient.

23     Q    Even for someone who at one point had shot the

24 President?

25     A    I mean, when you enter the community, I believe

1    that there's a certain assessment that's been done that you

2    are safe enough to walk around without an ankle bracelet on.

3    But I'm not going to, I'm certainly not going to suggest

4    otherwise if the Court feels the ankle bracelet is

5    necessary.

6           But I don't think that's my decision.  I think

7    it's the Court's.  And I don't think the ankle bracelet is

8    absolutely necessary.

9        Q    Now, going back to talking about the frequency

10   with which you would see Mr. Hinckley per month, you said

11   that two times a month, you think that's good -- or at least

12   two times a month is appropriate?

13       A    For when he first comes into the community, at

14   least two times a month.

15       Q    Okay.  And at the same time, you told

16   Dr. Patterson that you would anticipate weekly meetings with

17   him in the beginning; is that right?

18       A    I do.

19           Now, it might be me seeing him; it might be me in

20   treatment team with him.  But I do anticipate that in the

21   beginning.

22       Q    Okay.  And, of course, with the idea that we're

23   not chaining you to Williamsburg, and you can still go on

24   vacation; is that right?

25       A    Yeah.  Thank you.

1        Q    Of course.

2        A    Yes.

3        Q    Now, regarding your -- well, let me ask one more

4    question on there.

5             Were you involved in the development of what your

6    role would be under this convalescent leave plan?

7    Did anyone reach out to you?

8        A    Yes.  Yes.

9        Q    And when did they reach out?  When did they reach

10   out to you?

11       A    I think we've been talking about this since the

12   fall of last year.

13       Q    Okay.  Well, that's with St. Elizabeths?

14       A    With -- V.J. and I have talked about what I would

15   be doing.

16       Q    Did V.J. consult with you or show you the proposed

17   (e) letter, what, they're called (e) letters, the December

18   one or the March one, before submitting them?

19       A    Yes.  We both spoke and he did e-mail them to me.

20   I have to admit I didn't read them before.

21       Q    Okay.  Did you have a chance to look at --

22       A    I --

23       Q    -- the defense's response from April 17th?

24            THE COURT:  The government's.

25            THE WITNESS:  I did.

```
 1              THE COURT:  The government's response.

 2              MR. AZIZ:  No.  Defense.  I was asking about the

 3  defense's response.

 4              THE COURT:  Oh, I'm sorry.

 5              MR. LEVINE:  The 17th is the hospital's response.

 6              MR. AZIZ:  I apologize.

 7              THE WITNESS:  I have seen both of them.

 8  BY MR. AZIZ:

 9      Q    Okay.

10      A    I don't have -- I don't have the government's

11  response in front of me, but I do have the one from

12  April 17th.

13      Q    Okay.  To be clear, the April 17th letter goes

14  through the government's, well, it goes through the

15  conditions that are listed in the government's filing.

16  And then the hospital response is put in bold underneath.

17  Do you understand that?

18      A    Yes.  I have it right in front of me.

19      Q    Okay.  Now, regarding your specific duties, there

20  are two categories; is that right?

21      A    Well, I think they're, I mentioned but those two

22  that we discussed are the two big ones, yes.

23      Q    The med -- and those being medication and risk

24  assess, right?

25      A    Yes.  And reporting to the doctor in the forensic
```

1    outpatient department based on that --

2         Q    And based on your understanding of the plan --

3              THE COURT:  Are you still talking, Doctor?

4              THE WITNESS:  No.  I'm listening.

5    BY MR. AZIZ:

6         Q    So based on your understanding of the plan, who is

7    the team lead down in Williamsburg?  Is that you or

8    Mr. Weiss?

9         A    I think it's primarily me.

10        Q    And as the team lead, what do you understand your

11   role to be vis-a-vis the Court, as well as the outpatient

12   department here in D.C.?

13        A    My understanding is that I'm to touch base with

14   the doctor in the forensic outpatient department every time

15   after I meet with John, by phone; I'm to send all of my

16   progress notes; and that -- my understanding was the

17   progress notes would then be forwarded to the judge.

18        Q    And do you understand your role to be collecting

19   all the progress notes from all the other providers in

20   Williamsburg as well?

21        A    Oh, no, I didn't.  I thought it was just that

22   we would each send our progress notes.

23        Q    Okay.  If Mr. Weiss was involved in collecting

24   those notes, would that make sense or would it make more

25   sense for you to do that?

```
1        A    Mr. Weiss, is his more -- I don't spend as much

2   time in the Williamsburg office, and he would be able to do

3   that better than I would.

4        Q    And if the Court requested and -- let me withdraw

5   that for a second.

6             You said that you felt the need to do labs or

7   possibly do labs, do you remember that, with Mr. Levine?

8        A    Do what?  I'm sorry.

9        Q    Labs?

10       A    Oh, yes.

11       Q    What would that be?

12       A    We're supposed to monitor anyone on an atypical.

13            The Risperdal is an atypical.  We're supposed to

14   monitor them once or twice a year for weight, for, you know,

15   fasting blood sugar, fasting lipid levels, that type of

16   thing --

17       Q    Okay.

18       A    -- prolactin levels, those kinds of things.

19       Q    That's one of the things that you're not doing

20   right now, though, is it?

21       A    No.  The inpatient treatment -- the inpatient

22   physician is doing it.

23            THE COURT:  At St. Elizabeths?

24            THE WITNESS:  Yes.

25
```

BY MR. AZIZ:

Q    And they're, as -- if the Court does grant this petition for convalescent leave, there are a number of things that are currently happening here at the hospital in D.C., St. Elizabeths, that will be transitioned to you and the other Williamsburg providers; is that correct?

A    Yes, I assume so.

Q    And convalescent leave is a relatively large step for any individual, especially someone who's been institutionalized for so long; is that right?

A    I'm sorry.  You froze.  I didn't hear the rest of your question.

Q    No problem.

Convalescent leave is a big transition step for anyone, especially someone who's been institutionalized for as long as Mr. Hinckley has; is that right?

A    I agree.

Q    And that's why you want to see him more in the beginning, because there's more oversight necessary in the transition; is that right?

A    I would like that flexibility.

But if I think he's having a difficult time transitioning him into the community, I can see him more often.  But if I -- if I feel like it's being a smooth transition, I don't want to impose that upon him.

1      Q      Understood.

2             And as people transition from being inpatient to

3      being outpatient, there is a necessity to monitor that in

4      the beginning and to continue at least with the same amount

5      of oversight; is that right?

6      A      That would -- that would usually be the way we do

7      it.  We would continue around the same amount, and then we

8      would gradually decrease it.

9      Q      And so any oversight, any treatment that

10     Mr. Hinckley would be getting here in St. Elizabeths that

11     would be eliminated should be supplemented down in

12     Williamsburg, at least in the beginning; is that right?

13     A      Well, I'm not sure how many treatments we're

14     talking about.  But as much as we can, because there are

15     some things that are offered to inpatients that don't exist

16     in the community.  But as much as we can, that would be

17     great.

18     Q      Is there anything at all, including but not

19     limited to Mr. Hinckley's notoriety, that makes you question

20     whether you'd be able to provide the services that are being

21     requested and required of you from the Court for as long as

22     is necessary?

23     A      I'm not sure.  Can you repeat the question about

24     his notoriety.

25     Q      Is there anything?  I just mentioned notoriety as

1    one.

2         A    Oh.

3         Q    Is there anything that makes you question whether

4    you'd be able to provide the services that are being

5    requested and ultimately required by the Court of you, for

6    as long as necessary to Mr. Hinckley?

7         A    There's nothing about the, certainly about the

8    medical services.  And there's nothing I saw in the request

9    that I can't do.  And I'm willing to do whatever the Court

10   seems -- or deems necessary.

11        Q    And you agree that it's important for Mr. Hinckley

12   and the Williamsburg team to meet together, right?

13        A    Yes.  I mean, it's -- yes.  When he is in the

14   community, I think it is important for John to attend the

15   treatment teams.

16        Q    And that's never taken place yet, correct?

17        A    No, but the, you know, when he has his inpatient

18   treatment teams, the community providers are invited to

19   those.

20        Q    Do you know if the community providers have ever

21   fully, the entire community providers have attended one of

22   those?

23        A    Well, it occurs when I see patients, so it's very

24   hard for me to attend them.  But I am -- I know Mr. Beffa

25   does.  And there have been times when Mr. Beffa and I have

1    attended them together.

2              I'm not sure about Mr. Weiss.  But I know that,

3    just like I work during the day, Liz works during the day.

4    So it's hard to say to your job, "I'm not going to see my

5    patients because I have to go to a treatment team."  So --

6         Q    Speaking of -- and when you say "Liz," do you mean

7    Elizabeth Haley?

8         A    Yes.

9         Q    She's --

10        A    Yes.

11        Q    -- actually been relatively hard to get ahold of

12   for many members of the team; is that right?

13        A    That's what I understand.

14        Q    And you had mentioned when you were answering

15   another question, I can't remember which one, that

16   consistency is very important for Mr. Hinckley;

17   is that right?

18        A    I agree.

19        Q    And for the treatment team to be meeting together

20   once a month, which is what you recommend, or at least once

21   a month, it would be essential for each member of the team

22   to be present for those meetings; is that right?

23        A    I would agree with you.  And I hope that everyone

24   realizes that, that that's a certain responsibility you take

25   on when you provide services for an NGRI in the community,

 1   yes.

 2        Q     And if someone weren't able to -- through no fault

 3   of their own, through busyness or whatever -- uphold that

 4   responsibility, there would be a need for the treatment

 5   team, and specifically for Mr. Hinckley's benefit, to find

 6   someone else; is that right?

 7        A     Yes, especially when he's in the community.

 8        Q     Especially when he's in the community?

 9        A     Uh-huh.

10        Q     Have you ever spoken with anyone from the

11   outpatient department here in St. Elizabeths or -- sorry.

12              Have you ever spoken with anyone from the

13   outpatient department here in D.C.?

14        A     No, I haven't.

15        Q     Do you know who the outpatient department contact

16   will be?

17        A     Yes.  It was, I think her name is Dr. Jones.

18        Q     I think it's Dr. Johnson.  I think it's in there

19   somewhere.

20        A     Johnson.  Sorry.  Johnson.

21        Q     But you've never spoken with her yet?

22        A     I have not.

23        Q     Now, because we're transitioning to a new stage or

24   because, if the Court grants this petition, you'll be

25   providing all of the risk assessment services for

1   Mr. Hinckley; is that right?

2        A     I think Jonathan and I will be doing it together.

3             THE COURT:  Let me ask you, when we talk about

4   risk assessment, we've seen over the years very extensive

5   risk assessment reports from Dr. Murphy now and in the past,

6   Dr. Montalbano.

7             When you talk about doing a risk assessment,

8   is that something that you do or have done or that Mr. Weiss

9   does or has done?  Or is that, if we needed, if anybody

10  needed that kind of formal risk assessment, is that an

11  additional professional that would have to be engaged?

12            THE WITNESS:  So what we have done in terms of

13  risk assessment in the community is to review risk factors

14  with John.  We have not prepared or provided reports.

15            I am capable of doing them, but that is -- a risk

16  assessment is just like the risk assessments you've seen.

17  It's very formal.  It's very in-depth.  It takes lots of

18  time.  And it takes lots of interviewing other people.

19            So my understanding, what I was talking about just

20  now, is that we'll continue to go over risk factors and

21  bring up any issues that are occurring.  But the way

22  I understand this, it's Dr. Johnson who writes the monthly

23  report to the Court.

24            THE COURT:  And, again, from your professional

25  point of view, is a risk assessment, when is a formal risk

 1    assessment done?  Is it only done when somebody is about to

 2    come to court?  Is it something that's clinically indicated

 3    from time to time or in certain patients or in certain

 4    situations?

 5              THE WITNESS:  The last hospital I worked in in a

 6    forensic division, risk assessments were done every six

 7    months.

 8              THE COURT:  The kind of formal assessment we've

 9    seen from Dr. Murphy?

10              THE WITNESS:  They were.  But those were

11    un-inpatients.  That was -- this is the state of Virginia.

12    And that is -- you know, I worked at Eastern State Hospital.

13    And it was our psychologists who put them together, and they

14    put them together once every six months for the Court.

15              THE COURT:  But it was done because the Court

16    needed to be apprised, not because --

17              THE WITNESS:  And --

18              THE COURT:  -- the clinicians thought it was

19    necessary for some other reason?

20              THE WITNESS:  That's correct.

21              And at every treatment team, we reviewed risk

22    factors.  And then the risk assessments, the full risk

23    assessment was done every six months and sent -- and sent to

24    the Court.

25              But that was the Court's request.  Like the Court

 1  could order it every three months if they wanted to, or they

 2  could order it annually if they wanted to.

 3          But, typically, in the treatment team -- I mean,

 4  in the State Hospital in Virginia, we were asked to do full

 5  risk assessments on our NGRI patients every six months.

 6          Now, the outpatient division did it less often.

 7  When a patient transitioned into the community, I think they

 8  did them once a year for the Court.  But at every treatment

 9  team meeting, they reviewed risk factors -- it was part of

10  the treatment plan -- and they said how the patient was

11  doing.  And then, you know, you would say, "These are the

12  things we're working on," or your treatment goals.

13  But that's where -- how it was done.

14          So when -- I do kind of interchange the words.

15  Every time I see John, I go over his risk factors.  And then

16  the risk assessments thus far have been done by the

17  hospital.

18  BY MR. AZIZ:

19      Q    And do you know why the Court in Virginia has

20  requested them once a year?

21      A    From the outpatient treatment team?

22      Q    From the outpatient team, yes.

23      A    Is that what you're asking me?

24          It's because they annually review the patient.

25  And I think that has to do with things like civil commitment

1    requirements, so that they have set it at once a year, the

2    case is reviewed.  But it has only to do with the Virginia

3    laws.

4              But, you know, that -- my practice -- my

5    understanding of the difference between reviewing risk

6    factors and providing risk assessments is that reviewing

7    risk factors is something you do at every treatment team,

8    and providing risk assessments is done according to the

9    Court's request.

10   Q    What is the risk management plan that you have for

11   Mr. Hinckley specifically?  Just going through the

12   factors -- is it just going through the factors and ensuring

13   that there isn't any instance of that taking place or --

14   A    Well, there are some things that we have as goals

15   for John.

16             I mean, one of the things is we would really like

17   to see him get a job.  So one of the things we always look

18   at is, how has that progressed?

19             We would like John to get involved with community

20   events, and we go over what would be appropriate and what

21   would not be appropriate.

22             John's very interested in reaching back and

23   getting in touch with some of the music that he really

24   enjoyed writing before he had been hospitalized.  And, also,

25   he's fairly talented with that.

1        So we would be looking at helping John to form --

2   to have hobbies and to enjoy his music and his photography

3   without it presenting a risk for him or for others.

4        So I guess part of the plan is the integration

5   into the community, and then there's also always the review

6   of whether there is some risk factor that we're aggravating

7   or opening up for a problem to occur by having him

8   transition.

9        So when you ask me about the treatment plan or the

10  risk management plan, so we would say, okay, John's been to

11  so many interviews this month.  He may or may not have been

12  rejected by those people.  Do we want him to continue with

13  interviewing next month?  Or do we want to try a different

14  avenue?  That's the type of risk management I think about

15  that will occur at the treatment team with John present.

16       Q    And if you see a problem or a risk, what do you do

17  specifically?

18       A    My understanding is that I, you know, make a

19  progress note and that I'm to call Dr. Johnson after the

20  meetings and talk with her.

21            THE COURT:  Now, is it your understanding that you

22  would call --

23            THE WITNESS:  Or she calls me.  We just set it up.

24            THE COURT:  You would call Dr. Johnson after each

25  meeting or only if you thought there were problems?

1          THE WITNESS:  No.  I think if you read the plan,

2    it says that we're to touch base after every time I meet

3    with John.

4          THE COURT:  Okay.

5          THE WITNESS:  I don't think it specified who

6    called who.

7          And, you know, I do work all day.  So we would

8    have to find a time that both of us could agree upon that we

9    can communicate that won't be a problem with her schedule or

10   with mine.

11   BY MR. AZIZ:

12   Q    You mean you see other patients?

13   A    I basically see patients every day all day, the

14   entire time the State workers are working and past that

15   time, except for Friday.  I do finish early on Friday.

16        And so sometimes Friday afternoons are an ideal

17   time to get in touch with me.  And sometimes the State

18   workers are still working Friday afternoon as well.

19   So that's how it works.

20   Q    And do you recall testifying in 2011, talking

21   about how Dr. Phillips taught you that when you assess risk,

22   you look at what you can do to prevent the person from

23   putting them in risky situations and anticipate it?

24   A    Yes.

25   Q    And you said that in the context of prohibiting or

1    recommending prohibition on Mr. Hinckley going to Richmond

2    and specifically government centers in Richmond.

3              Do you remember that?

4        A    Yes.

5        Q    And isn't it true that one of the most important

6    aspects of managing Mr. Hinckley's risk is corroborating

7    what he tells you, because he doesn't volunteer information

8    generally?

9        A    Well, he's getting a little better at volunteering

10   information.  But in doing any risk assessment, you always

11   make sure -- you always try to use other sources to make

12   sure it's consistent.

13       Q    And one way in which you could corroborate what he

14   was telling you is if you knew where he was going to be

15   going on a day-to-day basis; is that right?

16       A    That's correct.

17       Q    And another is, it's important with Mr. Hinckley

18   in particular to build a rapport and a relationship with

19   him; isn't that right?

20       A    Yes, it is.

21       Q    And so it's very important that you know what

22   questions to ask him; isn't that right?

23       A    Yes.  I'm always open for suggestions, though.

24       Q    I have no -- I don't necessarily -- I'm not the

25   person to give you those suggestions.  I don't think

1    I'm better than you.

2         A    Well, I know, but I don't always know -- the

3    reason I said that is I don't always know all the questions

4    to ask.  But, yes, if somebody tells me, "You're not asking

5    this," I will.

6         Q    And you told Dr. Murphy, along those same lines,

7    that it would be prudent for Mr. Hinckley to check in with

8    someone or tell someone where he's going when he goes

9    somewhere; is that right?

10         A    That's correct.

11             And Jonathan Weiss and I have also talked about

12    that, that I think it would, Jonathan would probably be the

13    person that he would let know if he's traveling,

14    particularly far from Williamsburg.  Not necessarily if he's

15    going to the Burger King, but more if he's going to make a

16    trip to Newport News or to Gloucester or to another place.

17         Q    And in your conversations with Mr. Weiss, has

18    Mr. Weiss, in fact, told you that he believes that continued

19    itineraries, at least in the beginning, are a good idea?

20         A    Yes.  That was his preference, and I agree with

21    him.

22         Q    Now, regarding risk and Mr. Hinckley, you told

23    Dr. Patterson that 80 percent of the time John gets the

24    right understanding of what he's supposed to report; and the

25    other 20 percent is that instinct to do what John wants to

```
 1   do and not really be concerned about what everyone else
 2   wants to; isn't that right?
 3        A    Just like every other 60-year-old man with
 4   narcissism, about 80 percent of the time they get it right
 5   and about 25 percent of the time they need someone to watch
 6   them.
 7        Q    And that's one of the reasons that, when you were
 8   answering questions from Mr. Levine, you said that he,
 9   quote, acts appropriately most of the time;
10   isn't that right?
11        A    That's true.  Most of the time, John really knows
12   what to do and he think about what he does in terms of the
13   way his treatment providers have taught him to think about
14   his actions.
15        Q    And when you were going through -- when Mr. Levine
16   was going through the risk factors on page 71 of Mr. -- of
17   Dr. Patterson's report, when we got to No. 4, level of
18   insight into mental illness, you answered that question
19   slightly differently than the first three.
20             Do you remember that?
21             Where at -- I'll wait.
22        A    Well, I do.  I don't remember exactly what I said.
23             And I've got the wrong report here.  Hang on.
24   You're talking out the risk factor insight into mental
25   illness?
```

1     Q    Exactly.  Level of insight into mental illness.

2          Your answer was more --

3     A    Yes.

4     Q    -- more nuance -- I'm not to imply that your first

5     answers weren't nuance, but there was a little bit more two

6     sides to that.

7          I think you said something to the effect of,

8     I think he works to keep his narcissistic personality

9     disorder in his mind.  Do you remember that?

10    A    Yes.  I think he thinks about his actions in terms

11    of what he's been told about his personality disorder.

12    Q    But he's not always successful; isn't that right?

13    A    I think that it gets harder when there's more than

14    one risk factor involved.

15         And the example I would use is the example of the

16    day he made a phone call to the musician, that I think that

17    he was -- he really wanted to pursue his music.  I think he

18    really was -- you know, wanted to do something fun that

19    would please Bruce and himself.  And I think that he also

20    wanted to, you know, impress people with his talent.

21         And I think that sometimes when more than one

22    thing piles up, he forgets he has 100 restrictions to follow

23    and he does what he feels like doing, which in this case was

24    not particularly anything destructive.  It just was that

25    he didn't stop and call and say, "We're going to go visit

1    this person now."

2        Q    And when speaking with Mr. Beffa, you told

3    Mr. Beffa that he was hurting himself by doing these sorts

4    of things; isn't that right?

5        A    I did.  I said, "John is going to tell us whether

6    he's ready for convalescent leave or not.  Because if he

7    keeps doing these things, then, of course, he's not ready."

8            But he didn't keep doing them.  He did the one

9    thing, and then he really pulled himself together after

10   that.

11           And he's been excellent about letting people know

12   since then when -- like, when someone can't show up that

13   he's supposed to meet with or if I've changed the

14   appointment, he's called V.J. before I have.

15       Q    When you were speaking with Dr. Murphy, you

16   actually gave her another example, a slightly different

17   example, even, of when two risk factors arose with him,

18   specifically regarding his relationship with Ms. L.

19           Do you remember that?

20       A    I don't remember which example I gave her.  But if

21   you want to tell me, I --

22       Q    Sure.

23       A    -- I can remember.

24       Q    You said -- and if you want to refer to it, it's

25   on page 37, or I can just tell you, of her report.

1          THE COURT:  Page 37 of Dr. Murphy's report?

2          MR. AZIZ:  Dr. Murphy's report.

3          THE WITNESS:  Okay.

4   BY MR. AZIZ:

5     Q    You said that there was the confluence of two

6   things:  One, being zealous about starting a band and, two,

7   wanting to impress a girl.

8          And especially that "impress a girl" is very

9   similar to the behavior that was at issue in his crime in

10  this case; isn't that right?

11    A    Oh, I don't think so.  This girl actually knows

12  him.  I mean, this girl --

13    Q    That is a fair point.

14    A    -- that they're actually -- yeah.

15    Q    But you agree that you identified those two as

16  risk factors coming together, which is a higher need for

17  looking at what's going on?

18    A    That's -- that's correct.

19         When more than one thing is present -- and I

20  talked to John about this as well -- that's when my scrutiny

21  goes up.  And I think, is he doing something that's

22  ultimately not going to lead to something he intends, or is

23  this just getting into the community?

24         And so in that particular case, I knew of his

25  desire to start a band; I knew that he had met Mizell and

1    that they were getting to know each other better and that

2    music is one of their areas of interest they both have.

3              And then he, I hear that he talked to someone in

4    the music business who -- I think actually the gentleman is

5    in a band, and he also has his own home studio.  So that is

6    why I think John wanted to talk with him and wanted to see

7    the studio.

8        Q    And you recommended to Dr. Murphy that

9    Mr. Hinckley shouldn't be able to publish his music or

10   perform publicly, is that right, at least at the point?

11       A    No, I don't believe I said that.

12             I said that I didn't think John should be able to

13   perform, but that I thought there would be a way for him to

14   anonymously publish his music.

15       Q    You went in and out.  I think the word that we

16   missed was "publicly."  You didn't think that he should --

17       A    Publish.

18       Q    Okay.

19       A    I did not recommend that he perform publicly, but

20   I did say that I thought it was okay for him to publish his

21   music anonymously.

22       Q    Okay.

23             And when speaking with Dr. Murphy, you recommended

24   that he work at least three days a week; is that right?

25       A    Yes.  I would like to see him -- doesn't have to

1    be full-time, but at least three stays a week going to a

2    job.

3        Q    One more question on the risk section.

4            When you were being -- when you were speaking with

5    and being interviewed by Dr. Patterson, you said, quote, the

6    higher his needs are, the less empathy he has, end quote.

7            Is that right?

8        A    Yes, I think so.

9        Q    And if you want to refer to it, it's on page 23 of

10   Dr. Patterson's report.

11           (Pause)

12       A    Yes.  We were talking about his relationships.

13   Yes.

14           I think we were talking about Ms. C.B.

15           And I was saying that right now, he's really

16   pretty understanding of the fact that she would be --

17   it would be difficult for her to live in Williamsburg,

18   because there would be a lot of responsibility on John.

19   And there aren't many services here for her compared to the

20   support she has in D.C.

21           And right now, John and Ms. L are becoming friends

22   and enjoying each other's company, and I just thought that

23   would be a conflict.

24           But what I said is if John doesn't have friends in

25   Williamsburg and he doesn't have, you know, different

1   relationships going on, that I'm sure that he would be

2   more -- be contacting Ms. C.B. more, because she has been a

3   constant friend to him for years.

4       Q    Now, when speaking with Dr. Murphy, you expressed

5   that you supported convalescent leave if things stayed the

6   same.

7            Do you remember that?

8       A    Yes.  And I was --

9       Q    Go ahead.

10      A    -- speaking in terms of -- I was speaking terms

11  of -- I was speaking in terms of living with Mrs. Hinckley,

12  having the same treatment providers, you know, being able to

13  continue with the activities he started.

14      Q    Part of that is what you were expressing when

15  Mr. Levine was questioning you, right?  That if there's no

16  family support, people, individuals don't survive very well

17  in the system in Virginia, right?

18      A    No.  I just think -- they don't.

19           And I think that housing is very difficult to come

20  by.  John doesn't have supportive services from the mental

21  health center right now.

22           And in -- if John were to be, again, without, you

23  know, a comfortable living situation, without the proper

24  treatment, it would be very similar to when he was

25  struggling with things before he committed his crime and

1    living on his own and with very little support.

2           Now, right now, you know, John cares very much

3    about his family.  He's very connected to his family.

4    He's enjoying Williamsburg.  He's enjoying his friends.

5           You know, I know we haven't done very well with

6    the work environment, but I think John is understanding the

7    atmosphere in Williamsburg and that sometimes you don't get

8    the job you want because of whatever reason.  The person

9    doesn't have to hire you if they don't want to.

10          But if things changed considerably, if we were

11   looking for public housing for his discharge, if the

12   finances were running out, if his mom were not present in

13   the home, that would be changes that I think we would need

14   to reassess his convalescent leave.

15   Q    How close is Mr. Hinckley with his mother?

16   A    They seem to get along beautifully.

17          He -- he likes living with her.  He never

18   complains that she says anything to him he doesn't like.

19   She chats with him, family, about the community.  Just -- it

20   seems like a very healthy relationship.

21   Q    And do you know how close he is with his sister?

22   A    He is close to Diane.  He always says Diane is a

23   big talker, but he likes to listen to her.  And he enjoys

24   hearing about the family and his nieces and his cousins.

25   He likes all of that.

1      Q     Now, turning to the mental health services that

2    are available publicly, it's CSB.  Is that the right

3    acronym?

4      A     Yeah.  They call them the community service boards

5    instead of the mental health centers.  But the one in

6    Williamsburg is actually called Colonial Behavioral Health.

7      Q     And when speaking with both Dr. Murphy and

8    Dr. Patterson, you expressed concern whether, regarding

9    whether Mr. Hinckley would be able to qualify and receive

10   services from CBH or CSB; is that right?

11     A     I did.  But I think that talking with

12   Jonathan Weiss, who's worked at Colonial Behavioral Health

13   before, I think we -- you know, I'm kind of comfortable that

14   he has a better understanding of how it works than I do.

15           And I also talked to my old social worker at the

16   Eastern State Hospital, and it seems like once John has

17   Medicaid or Medicare, that the services offered to him will

18   increase.

19     Q     And you take Medicaid, but, correct me if I'm

20   misremembering, the way that your insurance is structured,

21   you can only take it at your Newport News location;

22   is that right?

23     A     That's correct.

24           THE COURT:  How many miles away is that from

25   John's mother's home?

1          THE WITNESS:  I think it's 20, 25.

2          THE COURT:  Okay.

3          THE WITNESS:  It's probably actually less in

4   mileage.  If takes me about 25 -- I live in Williamsburg.

5   It takes me about 20, 25 minutes to get to work, depending

6   on the traffic.

7   BY MR. AZIZ:

8      Q    Now, even notwithstanding the proffer that

9   Mr. Levine gave you regarding what Mr. Scott Hinckley and

10  Ms. Diane Sims said about the family support, you still

11  think that the financial support and stability is a risk

12  factor that needs to be considered; is that right?

13     A    I think it's a risk factor.  I think that I'm

14  satisfied that if Scott and Diane and Mrs. Hinckley say that

15  they will meet the financial needs, that they will.

16     Q    And the reason that it appears -- well, one of the

17  reasons that it appears in Dr. Patterson's report is because

18  that's one of the things that you stress to him;

19  is that right?

20     A    I did.

21          There had been a lot of discussions about money

22  running out and the need for public services.  And my

23  concern was, how long, you know, and how quickly do you

24  expect him to have complete public services?

25          I'm not saying it will never happen.  It's just

1   that I would like John to have the treatment he needs until

2   we're able to put -- the hospital helps too.   The hospital

3   and the outpatient team are able to put those kind of

4   services in place for him.

5        Q    And, indeed, in discussing that risk factor, you

6   said that that's the biggest risk factor; and if the family

7   support falls out, he should actually go back to the

8   hospital; is that right?

9        A    Yes.

10        Actually, that was the biggest risk factor that

11   I can imagine at the time, is that if all of a sudden,

12   there's no money and John can't pay for his services and

13   John can't live in the family home; then I think we need to

14   send him back to the hospital and get a new plan in order.

15        Now, I always say that a lot of what we discuss

16   are the what-ifs, and that's a what-if.

17        So it's what if something, unfortunately, happens

18   to Ms. Hinckley -- Mrs. Hinckley or if something happens to

19   John's money right now?   But that's a big what-if.   So if

20   the finances fall out, then we really need to think about

21   John's transition in a different way.

22        THE COURT:   Let me say this based on the testimony

23   earlier this week.   And Mr. Aziz may disagree with what I

24   say, and Mr. Levine may disagree.

25        It struck me after listening to Diane and Scott --

1    let's assume his mother dies.  We all do.  So hopefully, it

2    won't be soon.  But what if it were soon?  As I understand

3    what they said, he would be able to live in his mother's

4    home for a period of time.  Diane would immediately come to

5    Williamsburg to stay there for a period of time.  They would

6    sell the house, and the proceeds from the house and

7    Mrs. Hinckley's IRA would be available to support him.

8    But he would need someplace to live, and Diane Sims would

9    not stay in Williamsburg forever.  So what would be your

10   recommendation under that scenario?

11           THE WITNESS:  So, you know, when -- all these

12   situations come up, and then we discuss them.

13   So I understand now that there are supervised settings that

14   are private that are coming in the area.  And I've talked to

15   John, and he said he'd be okay with something like that.

16           So I really do believe it would be dependent upon

17   what housing and what is available at the time those things

18   happen.  Some of them are private, and the family would have

19   to be able to put a fair amount of money in them till John

20   can transition into them.

21           And Jonathan has actually talked about maybe

22   transitioning John into an apartment or independent living

23   within the next two years, which then if something happens

24   to Mrs. Hinckley, there wouldn't be this issue.  So some of

25   it is the timing.

1          But if he were to go out on convalescent leave and

2    in a month something happened to Mrs. Hinckley, we would at

3    this time not have anything set up to support him in the

4    community.

5          And if we couldn't work through something,

6    provided that John works through the death of his mom well,

7    then he would have to come back to the hospital if we

8    couldn't find a proper place for him to transition.

9          MR. AZIZ:  And I don't know if the Court has any

10   follow-up to that.

11         THE COURT:  No.

12   BY MR. AZIZ:

13   Q    That "provided he works through the death of his

14   mom well" is a pretty big "provided"; isn't that right?

15   A    Yes.  And that would be something we would assess.

16   And we would -- he'd be seeing me weekly, and we would be

17   checking on how he's doing with that.

18   Q    And you actually -- the what-ifs are actually one

19   of the biggest pieces that you raised with -- as lacking

20   from the hospital plan as it's written.  You raised it with

21   both Dr. Murphy and Dr. Patterson; is that right?

22   A    Well, that's an interesting take on it.

23         What I said is that they've always focused on the

24   what-ifs, but that's not something we can predict.

25   They're the what-ifs.  So that's -- the hospital can't make

1   plans around what-ifs.

2            And that's what I was saying, is that it's really

3   hard to make plans around these what-ifs.  And -- because we

4   don't know when and we don't know what would be available.

5   And things change all the time in Williamsburg.

6            Now, I'm not as familiar with if he were to go

7   somewhere else, like to D.C. or to Dallas, because I don't

8   deal with those systems.

9       Q    And based on your reading of the hospital plan,

10  what is -- what happens if or when Ms. Hinckley were to pass

11  away or the funds were to run out, based on the hospital

12  plan as you understand it?

13      A    So the plan right now is for John to go and live

14  with his Mom.  And within the next two years, we're going to

15  be getting him benefits and transition into independent

16  living.  Now, Mrs. Hinckley, you know, will work with us.

17  She always does.

18            And then at the end of those two years, if John

19  has completely transitioned into independent living, I think

20  the what-ifs are done, because if something happens to

21  Mrs. Hinckley, he has his own place to live and he has his

22  own support system in terms of providers.  I think so that

23  we're really talking about a two-year period where if

24  something happens, then we have to kind of work on our feet

25  and decide what we're going to do.

1          So the plans are there for him to transition into

2     independence in the community.  It's just that we keep

3     getting caught up on these, well, what if it happens sooner?

4     Well, what if the housing isn't available?  And we can't

5     predict that, because we're not sure what's going to happen.

6     And we don't know how long it will take John to get

7     Medicaid.  We're not really sure how the system will work.

8          Q     Dr. G-G, I understand that that's the discussions

9     and the long-term idea from you and Mr. Weiss, at least the

10    two of you.  But that's not actually -- the idea of a

11    transition into independent living or a two-year time frame

12    isn't actually written into any of the plans, is it?

13         A     No.  And it can't be, because there's no way we

14    can predict when John will get benefits.

15         Q     Or get, not get better fully, but reach the point

16    at which that would be clinically indicated; is that right?

17         A     And whether he really wants to do that, whether he

18    wants to move into independent living when his mom is alive.

19         Because a lot of these supervised settings, you

20    have to apply for them and you have to get admitted.

21         Q     Uh-huh.

22         MR. AZIZ:  Brief indulgence.

23         No further questions.  Thank you, Dr. G-G.

24         THE COURT:  Mr. Levine.

25         MR. LEVINE:  Thank you, Your Honor.

1    A lot of disparate areas to cover, Your Honor.

2    I'll try to do them with some speed.

3                          -  -  -

4                    REDIRECT EXAMINATION

5    BY MR. LEVINE:

6    Q    Dr. G-G, I think the cross-examination started

7    with the question of the meaning of "bi-monthly" and

8    "semi-monthly" and what number that really was.

9    Irrespective of that kind of debate about the meaning of

10   these words, are you willing to meet with Mr. Hinckley as

11   often as the Court requires?

12   A    I am.

13   Q    And do I understand correctly that it is your view

14   that it should be once a month with you and one time a month

15   with the treatment team?

16   A    Yes.

17   Q    All right.  And in your view, should the Court be

18   making clinical judgments as to the number of times that

19   our -- that would constitute the best number?

20   A    I don't know that the Court makes clinical

21   judgment, but the Court is going to say how many times

22   I'm going to be in their convalescent leave plan.  So I'm

23   willing to do whatever the Court wants.

24   Q    And would you like the discretion to adjust the

25   number at least upward and the Court, perhaps, making a

1    ruling about the minimum number?

2        A    So my preference is to set a minimum; and then if

3    I need to see him more often, that he -- that I am able to

4    do that.

5        Q    All right.  Now, there was some discussion or some

6    short inquiry by Mr. Aziz about, I'll call it itinerary,

7    but -- or specificity.

8             Dr. G-G, does rigidity within a plan impede the

9    plan's goals.

10            Should the plan have --

11       A    Sometimes.

12       Q    -- flexibility?

13       A    Well, the -- just real life has flexibility.

14   So you can say -- set things in plans, but there's always

15   going to be a little flexing.

16       Q    All right.  Now -- and is the flexibility

17   important in the context of a plan for convalescent leave?

18       A    I would think so.

19            In the community, there are things we -- I mean,

20   we've had to deal with that right along.  We'll set up

21   meetings and we'll set up things.  And things will come

22   up:  weather, people's other engagements, and we have to

23   flex around those.  So I assume the plan has flexibility

24   built into it.

25       Q    An example might well be indeed exactly what

1    happened with respect to Mr. Tracy and the visit to

2    Mr. Lerner, that a circumstances -- a circumstance arose;

3    Mr. Lerner became unavailable; and a decision was made to go

4    see Mr. Tracy.

5            Is that the kind of flexibility that for sure

6    should be available to an individual on convalescent leave?

7        A    I would think on convalescent leave, that could --

8    that could be a flexibility that can be worked in.  And John

9    could let Mr. Weiss know after it's happened, as an

10   outpatient.

11           Because right now the rule is, he's supposed to

12   let them know before he changes the schedule.  But I -- just

13   as long as he lets Jonathan go, I think it's a good idea

14   that we have a little flexibility around what he does.

15       Q    All right.  And "Jonathan," by that, you mean

16   Mr. Weiss?

17       A    Mr. Weiss, yes.

18       Q    Very well.

19           Now, there was an inquiry by Mr. Aziz about the

20   need to monitor Mr. Hinckley and to know where he is.

21           Do you remember that inquiry?

22       A    Yes.

23       Q    All right.  And he raised the specter of a need

24   for the GPS.  Do you remember that?

25       A    Now, are you talking about the phone or the ankle

1   bracelet?

2        Q    Well, he, I think he used the word "GPS" once in

3   one sense, and then he said "GPS ankle bracelet" in another.

4   But I'm sure he's talking about tracking -- the devices that

5   pertain to an ability to track and know where Mr. Hinckley

6   is.  Do you remember that?

7        A    I do remember it.

8        Q    All right.  Now, do you know that the Secret

9   Service is available to follow Mr. Hinckley whenever it

10  wants?

11       A    I'm aware of that.

12       Q    And do you know that indeed the Secret Service

13  made -- makes decisions as to how often to see Mr. Hinckley,

14  follow him?

15       A    Yes, I know that.

16       Q    And do you know that in the year 2013, the Secret

17  Service made 119 surveillances of Mr. Hinckley while in

18  Williamsburg.  Do you know that?

19       A    Well, I didn't know the number, but I am aware

20  that they were there a lot.

21       Q    And in 2014, they did, by my count, 89

22  surveillances.  Do you know that?

23       A    I don't know the exact numbers, but I'm aware that

24  they're there.

25       Q    All right.  So that -- those numbers add up to

 1   over 200.  I believe it's 208 times that they followed

 2   Mr. Hinckley while on convalescent leave.  Is that --

 3            THE COURT:  Barry, not convalescent leave.

 4   You mean conditional release.

 5            MR. LEVINE:  I'm sorry.  While on conditional

 6   release.

 7   BY MR. LEVINE:

 8       Q    Is Secret Service following a means for tracking

 9   where Mr. Hinckley is?

10       A    Yes.

11       Q    So is it not a fact that the government can know

12   where Mr. Hinckley is whenever it wants to know where

13   Mr. Hinckley is merely by the Secret Service following him?

14            MR. AZIZ:  Objection just to the form of the

15   question.  It's super leading.

16            THE WITNESS:  I think the government can know

17   where Mr. Hinckley is anytime they want, yes.

18            THE COURT:  The objection is noted, yeah.

19   BY MR. LEVINE:

20       Q    And with respect to the carrying a GPS phone, as

21   I think you observed, those phones are pretty sophisticated

22   nowadays, aren't they?

23       A    Yes, they are.

24       Q    And a phone that is equipped with a GPS mechanism

25   is a phone that would allow the government to know where

1   Mr. Hinckley is when -- wherever he carries the phone;

2   is that correct?

3       A    That's correct.

4       Q    All right.  And would it surprise you to know that

5   since the time that the Court has ordered that the GPS phone

6   be carried by Mr. Hinckley, which was many years ago, never

7   once has the government looked at GPS data?

8            MR. AZIZ:  Objection.  Form of the question and

9   foundation for this witness knowing any of that.

10           THE COURT:  Well, she -- the question is whether

11  she knows.

12           MR. AZIZ:  It's still a leading question.

13           THE WITNESS:  But, no, I didn't know they had

14  never looked at it.  I know he carries the phone.

15           THE COURT:  All right.  So if, in fact, it is true

16  that they never looked at it, she never knew that it was

17  true that --

18           MR. LEVINE:  Your Honor, this would be a, I think,

19  a propitious time for a stipulation from the government

20  right now that never once has the government, the Secret

21  Service, looked at the GPS data.

22           MS. KENNEDY:  And, Your Honor, that's because it's

23  never been hooked up because it never had an order from this

24  Court, so we have never viewed --

25           THE COURT:  Wait a minute.

1           MR. LEVINE:  That is preposterous.

2           THE COURT:  Wait a minute.  It's been a condition

3   of several of my orders.

4           MS. KENNEDY:  It's never been hooked up because

5   they need a particular order to do it.

6           THE COURT:  Well, no one asked me for one.  No one

7   asked me for an order.  I put a condition in several orders.

8   And if it wasn't a sufficient language, somebody should have

9   come in and told me what you needed.

10          MS. KENNEDY:  Mr. Levine objected to it.  So --

11          THE COURT:  Objected to what?

12          MS. KENNEDY:  Objected to the government asking

13  for an order to have a GPS phone.

14          So I spoke with the Secret Service.  We went

15  through the whole thing, as far as what they would need with

16  the phone.  They said, Look, it wouldn't make any difference

17  anyway, because he could throw it out the window.

18  He doesn't have to take it with him.

19          THE COURT:  So why are you asking for it again if

20  he can throw it out the window?

21          MS. KENNEDY:  Because at this point it's

22  convalescent leave.  So if he throws it out the window,

23  hopefully we can find out he's thrown it out the window.

24  He may not.  We may not be able to find out.

25          MR. LEVINE:  Your Honor, talk about there not be

1  being a basis for this.  I mean, we have been -- we have had

2  this question asked on several of these hearings, and never

3  once were we told that there was an inability by the

4  United States to access the GPS information they demanded be

5  imposed.

6          THE COURT:  Paragraph 17 of the February 26th,

7  2014 order says, "Mr. Hinckley is to continue to carry a

8  GPS-enabled cell phone during all unsupervised activities."

9          And until this very moment, no one has ever told

10  me that that language was insufficient to monitor him.

11  No one.  In writing or orally.

12          MR. LEVINE:  And, Your Honor, I would supplement

13  that by saying we have never had an objection -- we have

14  never had an objection to the Court ordering that he carry a

15  GPS phone.

16          MS. KENNEDY:  Yeah, he is carrying a GPS phone?

17  It's never been -- the Secret Service has never had access

18  to where he is on the GPS phone.  We have had the

19  conversation --

20          THE COURT:  That's their fault.  That's not my

21  fault.

22          MR. LEVINE:  Yes.

23          THE COURT:  That's not Mr. Levine's fault.

24  It's surely not Mr. Hinckley's fault.

25          MR. LEVINE:  It's surely not Mr. Hinckley's fault.

1          MS. KENNEDY:  I didn't say it was Mr. Hinckley's

2     fault, Your Honor.

3          MR. LEVINE:  I think what it says, Your Honor, is

4     that the government was very comfortable to live and have

5     him go out on conditional release in their ignorance.

6          THE COURT:  All right.  If we're going to have a

7     GPS cell phone as a condition going forward, then

8     Ms. Kennedy can give me language that will satisfy the

9     Secret Service.

10          MS. KENNEDY:  Very well, Your Honor.  Thank you.

11          THE COURT:  And if we're going to have an ankle

12     bracelet, which we're not, you can give me similar language,

13     too.

14     BY MR. LEVINE:

15     Q     Now, Mr. Aziz asked you, did you ever forget your

16     phone, Dr. G-G?

17     A     Yeah, I do.  I have forgotten my phone before.

18     Q     And he asked you that.  And now you're not under a

19     court order to carry one, are you?

20     A     No.

21     Q     All right.  And --

22          THE COURT:  And your children would probably

23     prefer that you didn't, in light of your testimony earlier?

24          THE WITNESS:  My children have willingly put "find

25     my iPhone" on my phone so that I don't call them repeatedly

1    when they're out and about New York City late hours, that I

2    just look and see that they're not home yet.  So they have

3    done it willingly.

4           And they have shared, you know, you have to share

5    an iCloud for it to work, and they have willingly shared the

6    iCloud.  So...

7    BY MR. LEVINE:

8        Q    Dr. G-G, knowing that the government has in mind

9    that he wear an ankle bracelet that cannot be removed, that

10   has protected features to it so it cannot be removed, do you

11   think that's appropriate as a means for tracking

12   Mr. Hinckley while on convalescent leave?  Is there any

13   basis for that?

14       A    I'm not really -- I'm not an expert in ankle

15   bracelets, but I don't think the ankle bracelet is necessary

16   if the condition is that he carry the phone.

17          MR. LEVINE:  The Court's indulgence.  I'm going to

18   make this shorter if I can.

19          THE COURT:  Never short enough.

20   BY MR. LEVINE:

21       Q    Mr. Aziz asked you some questions about whether

22   convalescent leave was a big step and the need for

23   continuity.  And, now, we have been in what is known as

24   Phase 4 for some time, have we not, some years?

25       A    Yes.

1      Q     And what do you understand Phase 4 to be?

2      A     His transition into community living.

3      Q     That means a lessening of the hold in

4  Washington, D.C., and a gradual or incremental gravity

5  towards Williamsburg.  Is that what you understand it to be?

6      A     Yes.

7      Q     All right.  And during that time, he solidifies

8  his relationships with his treaters in Williamsburg;

9  is that correct?

10     A     Yes.

11     Q     Has he done that?

12     A     Yes.

13     Q     His relationship with you is a solid one?

14     A     I think so.

15     Q     And is his relationship with Mr. Weiss a very

16  useful and positive one?

17     A     Very useful and very positive thus far.

18     Q     And would you say the same with respect to

19  Mr. Beffa?

20     A     Yes.

21     Q     And how about Ms. Haley?

22     A     Well, you know, Liz, I mean, Ms. Haley, she does

23  music and John loves music.  They really do enjoy their

24  sessions together, because they have a very -- and when

25  she's taken him to concerts.  He's enjoyed his work with

1   Ms. Haley.

2       Q     And they make beautiful music together, would you

3   say?

4       A     Well, they have -- they have a shared interest,

5   and they're both very good at it.  And, you know, she is

6   an -- she does -- she's done her degree in music therapy,

7   and they seem to work together very, very well.

8       Q     All right.  Well, Mr. Aziz has characterized this

9   as a big step.  Would you say it's the next logical step in

10  the progression of his treatment?

11      A     I think it's the next logical step, yes.

12      Q     And would you say it's the appropriate step to

13  take at this time?

14      A     Yes.

15      Q     And would you say that at this time, there is

16  consistency and continuity in the treatment team?

17      A     Yes.

18      Q     And would you say at this time that he has already

19  come to know and function within the Williamsburg community?

20      A     Yes.

21      Q     And would you say that --

22            MS. KENNEDY:  Objection, Your Honor.

23  BY MR. LEVINE:

24      Q     -- although there was --

25            MS. KENNEDY:  Objection, Your Honor.  I don't know

1   how close we are to the end, but this is just so much

2   leading, I can't stand it anymore.

3            THE COURT:  Yeah.  Absolutely.

4            Now, it's Mr. Aziz's witness, Ms. Kennedy.

5            MS. KENNEDY:  I know.

6            THE COURT:  But I keep overruling him.  So -- and

7   I actually like Mr. Aziz's last objection --

8            MS. KENNEDY:  All right.  I'm sorry.  I take it

9   back.

10           THE COURT:  -- which was a new category under the

11  Federal Rules of Evidence, but it applies, excessive --

12  objection; excessive leading.

13           MS. KENNEDY:  Okay.

14           THE COURT:  So it's not just leading, Barry; it's

15  excessive leading.  And on that basis, I'm going to sustain

16  the objection.

17           MR. LEVINE:  All right.  On the excessive?

18           THE COURT:  Yes, for now.  We may come back to the

19  subset.

20           MR. LEVINE:  Okay.  I am trying to speed it up,

21  Judge.

22           THE COURT:  Which you can't speed it up through

23  excessive leading.

24  BY MR. LEVINE:

25       Q    Do you have a view as to the level of resistance

1    within the Williamsburg community to John, comparing it to

2    John's presence, comparing it to when he first started to

3    where he is now?

4        A    I actually was not his doctor when he first

5    started, but it does seem like there's always been a little

6    bit of resistance from the community and sometimes more than

7    others.

8        Q    Would you have a view as to whether it has

9    lessened?

10       A    I really don't have an opinion on that.

11   I don't -- I don't work with him in the community.  I work

12   with him individually in my office.  Jonathan might be the

13   person to ask that about that.

14       Q    Now, there was an inquiry by Mr. Aziz about the

15   fact that you have never spoken to Dr. Johnson at the

16   outpatient department?

17       A    That's true.

18       Q    All right.  Did you speak with Mr. Hyde?

19       A    Yes.

20       Q    Did you speak with him often?

21       A    I try to talk with him every time he wants to.

22   Every time he calls, and every time I need to change things,

23   I contact him.  Sometimes it's a text, and sometimes it's a

24   phone call.

25       Q    But would you say there is good communication

1    between you and Mr. Hyde?

2         A    I think there is, yes.

3         Q    And would it be appropriate for you to speak with

4    Dr. Johnson before Mr. Hinckley is on convalescent leave?

5         A    If she'd like to, that's fine.  I'm perfectly

6    willing to work with Dr. Johnson any way she'd like.

7         Q    There was a question by Mr. Aziz about whether you

8    would accept questions from the government or from other

9    sources with respect to the therapy you -- or with respect

10   to the services you provide.

11             MR. AZIZ:  Objection.

12   BY MR. LEVINE:

13        Q    Remember that?

14             MR. AZIZ:  That's not a question.

15             THE WITNESS:  If I accept questions?

16             THE COURT:  I'm not --

17   BY MR. LEVINE:

18        Q    Yes.  There was some question as to whether you

19   were asking the right questions at such a -- during the

20   session you have with Mr. Hinckley.

21             THE COURT:  I don't recall that question.

22             But do you remember anything like that, Dr. G-G?

23             THE WITNESS:  Well, I think there was a question

24   about, do I ask all the risk assessment questions?

25             And I said I ask all the ones I know to ask; but

1    if there were other questions that people thought I should

2    be asking, I would ask them.

3    BY MR. LEVINE:

4        Q    So you have an invitation now to supply some

5    questions if the government wants them, so if the government

6    wants them asked?

7        A    If there are things that I -- if there are things

8    I am missing in terms of his risk factors and there are --

9    like I have a checklist of things I ask John every time.

10   If we need to revise the checklist, that would be fine.

11   If they don't think I'm asking enough about his risk

12   factors, I'd be glad to add it to our routine when we meet.

13       Q    And has the U.S. Attorney ever supplied to you

14   proposed questions?

15           THE COURT:  That's not a fair question.

16           Let me ask this:  Is the checklist of risk factors

17   something you developed yourself?

18           THE WITNESS:  It was something that was developed

19   between the -- Dr. Lee, the doctor that treated John before

20   myself, and the treatment team at St. Elizabeths.  And I was

21   told that -- or I inherited doing the checklist every time.

22   And if there need to be other things on the checklist, we

23   can put them on there.

24           It's something that I'm perfectly willing to work

25   with Dr. Johnson or V.J. on if there are more things that

1    need to be on there when he transitions into the community.

2           THE COURT:  What I was going to suggest -- and

3    I'm not going to tell Barry he can't ask the question.

4           But it's not so much whether the government is

5    suggesting things for the checklist or whether I'm

6    suggesting things for the checklist even; it's whether the

7    professionals are and whether if the professionals at

8    St. Elizabeths Hospital or at the outpatient division think

9    that there are additional things, if we move to the next

10   phase, that should be included in the checklist.

11          I take it your answer is, if Mr. Hyde or Dr. Binks

12   or whomever at the hospital or Dr. Johnson thinks so, you're

13   open to that?

14          THE WITNESS:  Exactly.

15   BY MR. LEVINE:

16   Q    And are you open to suggestions by Dr. Patterson?

17   A    Sure.

18   Q    Has he ever made a suggestion or has he ever asked

19   you to ask questions or to inquire about a specific feature

20   of the session?

21          MR. AZIZ:  Your Honor, I would object to this

22   question.

23          THE WITNESS:  No.  He hasn't asked me to add

24   anything to the session questions.

25          THE COURT:  Mr. Aziz has objected to that, and I

1    suppose the basis of the objection is it's really not

2    Dr. Patterson's role.

3              MR. AZIZ:  No.

4              THE COURT:  But if there were things suggested by

5    a report by Dr. Patterson or a report by Dr. Murphy that

6    suggests to Dr. G-G or to the team presently at

7    St. Elizabeths or to Dr. Johnson, that those are sources

8    that people ought to look to.

9              Fair enough, Dr. G-G?

10             THE WITNESS:  That's fair.

11   BY MR. LEVINE:

12       Q    Any constructive suggestion, you'll consider;

13   is that correct?

14       A    I will, yes.

15       Q    Now, there was a question about risk and that you

16   said 80 percent of the time John gets it right; that he

17   thinks a lot about appropriate action; and that 20 percent

18   of the time, he needs someone to help him to get it right.

19             Is that an accurate statement of your testimony?

20             MR. AZIZ:  Objection; that mischaracterizes the

21   quotation.

22             THE WITNESS:  That is.

23             THE COURT:  Well, Mr. Aziz is objecting saying

24   it's not accurate.  Dr. G-G is the witness saying it is

25   accurate at least as a paraphrase, but --

1          THE WITNESS:  It is paraphrased.  But I did --

2          THE COURT:  Go ahead.

3          THE WITNESS:  -- I -- that is what I said to

4   Dr. -- that is what I said to Dr. Patterson when he asked me

5   about it.  He asked about his risk factor, the narcissistic

6   personality.

7          And I said right now, John, 80 percent of the time

8   he does what he's supposed to do; he has the right response.

9   The other 20 percent of the time, we talk about things.

10         For example, when he met Ms. L, I asked him, how

11  much do you know about Ms. L?

12         And the next time he said, you know, I don't know

13  that much about her.  And the next time he went and talked

14  about her.

15         That's the type of thing I'm talking about.

16         You know, and I think that 80 percent of the time

17  is excellent for someone with a narcissistic personality

18  disorder.

19    Q    And with respect to the 20 percent, when he learns

20  more about Ms. L, for example, is there anything about that

21  20 percent that would indicate that he is dangerous?

22    A    No, I have not noticed anything about it -- it

23  being dangerous.  But it is something he needs to think

24  through more carefully.

25    Q    Then Mr. Aziz asked you some questions about

1    impressing a girl and the suggestion that an effort to

2    impress Ms. L was a -- similar to his condition when -- just

3    prior to the crime in the early 1980s.

4    Do you remember that?

5         A    I remember the question, yes.

6         Q    All right.  Now, and you indicated real quickly

7    that this is an actual relationship; is that correct?

8              MR. AZIZ:  He's leading again.

9              THE WITNESS:  That's correct.

10             THE COURT:  It's all right.

11             THE WITNESS:  It's a good thing.

12   BY MR. LEVINE:

13        Q    Now, was the relationship that existed in the

14   1980s, 1980, 1981, was that an actual relationship?

15             MR. AZIZ:  Same objection; leading.

16             THE WITNESS:  No, I don't think so.

17             THE COURT:  What's the objection?

18             MR. AZIZ:  Leading.

19             MR. LEVINE:  It's not leading.

20             THE COURT:  It's not leading.

21   BY MR. LEVINE:

22        Q    All right.  And was Mr. Hinckley at that time

23   psychotic?

24        A    Oh, I don't know.  I don't know what -- you know,

25   I was not even a psychiatrist at that time, so I couldn't

1    even guess.

2        Q    In your review of the records, does the record

3    show that at that time he was delusional and in the throes

4    of active psychosis?

5        A    I understand that was the opinion of the

6    physicians who examined him or some of them at least, and

7    I understand that's what the Court found.  So I guess I

8    accept that he was exhibiting psychotic symptoms at the

9    time.

10       Q    There was, of course, substantial inquiry by

11   Mr. Aziz about financial support as a risk factor and what

12   if, to use your words, that support ran out.

13            Do you remember that?

14       A    Yes.

15       Q    And the concern was running out of money;

16   is that correct?

17       A    Right.

18       Q    And --

19       A    For the services that John needs, yes.

20       Q    And the introduction of that concern to you was

21   made by Dr. Patterson; is that correct?

22       A    I think I made it to him.

23       Q    Well, that would be -- that would be the concern,

24   and that would be the biggest risk factor --

25       A    My concern was that if -- to me, that would be his

1    greatest risk factor is if his support system, financial and

2    family, drop out.

3         Q    Right.  So your major -- was your major concern

4    any of the other risk factors in items 1 through 10 on

5    Dr. Patterson's list?

6         A    No.  No.  I think that although those three that I

7    mentioned, the personality, the relationships, and the

8    support, are the three active risk factors, I was not

9    concerned about those as being a danger at this point.

10        Q    But the issue of financial support you were

11   concerned about?

12        A    I was at the time I mentioned it to Dr. Patterson,

13   but I understand that he's been --

14        Q    Are you satisfied now that that is no -- there is

15   no longer a basis for that concern, although it might be

16   something --

17        A    I am satisfied.

18        Q    -- you still want to monitor?

19        A    Yes.  I am satisfied.

20        Q    One of the what-ifs that Mr. Aziz raised was, what

21   if Mrs. Hinckley died?  Do you remember that question?

22        A    I do.

23        Q    All right.  And do you remember saying you have to

24   work through the death, work through that death?

25             Do you remember that?

1       A     Yes.

2       Q     And what do you mean by that?

3       A     Yes.  I don't know what John's response will be to

4    that.

5       Q     We have somebody -- do we have some experience

6    with John working out and working with the death of a close

7    relative?

8       A     Yes, with his dad.

9       Q     His father died.  And how did he react?  How did

10   he respond?

11      A     Well, now, I was -- I don't believe I treated John

12   at the time, but I understand that he did very well working

13   through that.

14      Q     All right.  And that was with the additional

15   stressor of the government opposing his attendance at his

16   father's funeral?

17            MR. AZIZ:  Objection.

18            THE WITNESS:  Oh, I didn't know that.

19            THE COURT:  And I don't know that the record shows

20   it was a stressor.  It shows that the government opposed it,

21   and I overruled the objection.

22            MR. LEVINE:  Yes, the Court allowed Mr. Hinckley

23   to attend, that is right.

24            Your Honor, I have no further questions.

25            THE COURT:  Mr. Aziz, take your -- no.  You can

1   ask more than one.

2           MR. AZIZ:  Okay.  Just, you know --

3           THE WITNESS:  And you can lead as long as it's not

4   excessive.

5           But come to the microphone.

6           MR. AZIZ:  Thank you, Your Honor.

7           THE COURT:  You can actually lead, because it's

8   cross.

9           MR. AZIZ:  Even if it is excessive.

10                           - - -

11                  RECROSS-EXAMINATION

12   BY MR. AZIZ:

13       Q    Hi, Dr. G-G.

14       A    Hi.

15       Q    I know you have to get out of here in five

16   minutes, so I won't take much of your time.

17       A    Thank you.

18       Q    The checklist that we were discussing that you

19   inherited, is that the way that you would go about doing the

20   risk assessment evaluation each time with Mr. Hinckley if it

21   were up to you, or would you prefer something else?

22       A    Well, I do both the checklist and what I prefer,

23   which if you've ever seen my notes, I actually ask him about

24   every relationship he has.  I ask him about what he's been

25   doing at the hospital.  I ask him how work goes.  I ask him

1   how his outings go.  And he's gotten so used to it that it's

2   almost a narrative now.  Knows exactly what I'm going to ask

3   next.  This is what changed on Monday.  This is what changed

4   on Tuesday.  You know, this is what I've learned about

5   Ms. L.  This is what Ms. L and I did.  So he really -- he

6   knows the routine.

7          But a I actually do both.  I do the check list,

8   and I do my own little review.

9      Q    And Mr. Levine asked you how often you -- well,

10  the question was raised regarding how often you talk with

11  Mr. V.J. Hyde.  You said you talk to him every time he calls

12  you.  How often is that?

13     A    Well, he calls me every time he has to prepare a

14  report.  And he calls me, like, when we were putting -- when

15  they were putting together, we were putting together the

16  plans.  It's at least twice a month.

17         THE COURT:  And if there are changes in itinerary,

18  do you talk about that?  Or is that between him and

19  Mr. Weiss?

20         THE WITNESS:  Well, I have texted him when I have

21  to change my meetings with John, and he has said okay.

22         And then sometimes John has told him that I

23  changed the meeting before I even call.  So I try to

24  coordinate it.  If I see John and he says, "I already told

25  V.J.," I don't make a second phone call.

1          MR. AZIZ:  I have no more questions for Dr. G-G.

2     Thank you so much for your testimony.

3          THE COURT:  Ms. Merene, do you have any questions?

4          MS. MERENE:  No.  Thank you.

5          THE COURT:  May we excuse Dr. G-G?

6          MR. LEVINE:  Yes, Your Honor.

7          THE COURT:  Thank you very much, Dr. G-G.

8     We appreciate it.

9          THE WITNESS:  Thank you.  Bye now.

10          THE COURT:  Bye.

11          Okay.  It's almost 12:30.  And we are going to try

12     to do Mr. Weiss before 3:30 -- get done with Mr. Weiss by

13     3:30 or 3:45.

14          So what's your -- when do you all want to come

15     back?

16          MR. AZIZ:  I actually don't know.  Is Mr. Weiss

17     there?  I would inquire of the defense through the Court

18     whether he's ready to go over there, if the defense knows.

19          THE COURT:  Well, I think we were -- I think we're

20     all ready for lunch, aren't we?

21          MR. AZIZ:  Yeah, absolutely.  I just wanted to

22     make sure he had arrived.

23          THE COURT:  So assuming he's in the building or

24     about to be, do we want to come back at 1:30?  Or do you all

25     think we should come back earlier than 1:30?  I mean, if we

1  could start promptly at 1:30, do you think we could do this

2  in two hours or so?

3          MR. AZIZ:  My cross is shorter, so I guess it

4  depends on Mr. Levine.

5          THE COURT:  1:30 to 3:30 going to be enough?

6          MR. LEVINE:  I think so, Your Honor.

7          THE COURT:  1:30 to 3:45?

8          MR. LEVINE:  Okay.  I think so.

9          THE COURT:  All right.  Does your team agree with

10  you, Mr. Levine?

11          MS. LUCIANO:  I believe so.

12          MR. LEVINE:  They're rooting for that.

13          MR. AZIZ:  Great.

14          THE COURT:  Okay.  So 1:30.  We'll all be back

15  here at 1:30.

16          MR. LEVINE:  Thank you.

17          DEPUTY CLERK:  All rise.

18          This Honorable Court is in recess until 1:30.

19          (Recess from 12:28 p.m. to 1:30 p.m.)

20

21

22

23

24

25

C E R T I F I C A T E

        I, William P. Zaremba, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.

Date: April 26, 2015_____   /S/__William P. Zaremba_____

                             William P. Zaremba, RMR, CRR