IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR No. 81-306 |
| | ) | |
| Plaintiff, | ) | Washington, D.C. |
| | ) | April 27, 2015 |
| | ) | 9:30 a.m. |
| vs. | ) | |
| | ) | Morning Session |
| JOHN W. HINCKLEY, JR., | ) | |
| | ) | Day 4 |
| Defendant. | ) | |
| _____ | ) | |

TRANSCRIPT OF EVIDENCE HEARING
BEFORE THE HONORABLE PAUL L. FRIEDMAN
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:                U.S. ATTORNEY'S OFFICE.
                                   COLLEEN KENNEDY, AUSA
                                   MARK AZIZ, AUSA
                                   MICHELLE CHAMBERS
                                   555 Fourth Street, NW
                                   Washington, D.C.  20530
                                   (202)514-7248


For the Defendant:                 DICKSTEIN SHAPIRO, LLP
                                   BARRY WILLIAM LEVINE
                                   ANN MARIE LUCIANO
                                   1825 Eye Street, NW
                                   Washington, D.C.  20006-5403
                                   (202)420-2237

                                   DINSMORE & SHOHL, LLP
                                   E. MICHELLE TUPPER-BUTLER
                                   101 S. Fifth Street.
                                   Suite 2500
                                   Louisville, KY 40202
                                   (502)540-2367

APPEARANCES CONTINUED:

For St. Elizabeths:          ST. ELIZABETHS HOSPITAL
                             DEON MERENE, ESQ.
                             1100 Alabama Avenue, SE
                             Washington, D.C. 20032

Court Reporter:              William P. Zaremba, RMR, CRR
                             U.S. Courthouse
                             333 Constitution Avenue, NW
                             Room 6511
                             Washington, D.C. 20001
                             (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

- - -

WITNESS INDEX

- - -

WITNESSES                    DIRECT CROSS REDIRECT RECROSS

DEFENDANT'S:

KATHERINE MURPHY, PSY.D.      5

- - -

INDEX OF EXHIBITS

- - -

PATIENT'S                 IDENTIFIED   ADMITTED

6                                        7
7                                       10

P R O C E E D I N G S

1          DEPUTY CLERK:  All rise.  This Honorable Court is

2   now in session; the Honorable Paul L. Friedman presiding.

3          Please be seated.

4          THE COURT:  Good morning, everybody.

5          DEPUTY CLERK:  Criminal 81-306,

6   United States of America versus John W. Hinckley, Jr.

7          For the government, Ms. Kennedy, Mr. Aziz,

8   Ms. Chambers.

9          For the patient, Mr. Levine, Ms. Luciano.

10         For St. Elizabeth's Hospital, Ms. Merene.

11         THE COURT:  All right.  Anything preliminary that

12  we need to do?

13         MR. LEVINE:  Not by the patient, Your Honor.

14         MS. KENNEDY:  No, Your Honor.

15         THE COURT:  Then you may call your next witness.

16         MR. LEVINE:  If it please the Court, we call

17  Dr. Murphy, Katherine Murphy.

18         (Witness is placed under oath.)

19         DEPUTY CLERK:  Please be seated.

20         THE COURT:  Hello.

21         THE WITNESS:  Greetings.

22         THE COURT:  How are you?

23         THE WITNESS:  Good.  How are you?

24         THE COURT:  I'm good.  Nice to see you.

1          THE WITNESS:  I didn't think I would be back on

2    the hot seat, but here I am.

3          MR. LEVINE:  This case stands for reunions, lots

4    of them.

5          THE COURT:  I guess so.

6          MR. LEVINE:  Yes.  Thank you, Judge.

7          If I may inquire?

8          THE COURT:  Yes, sir.

9                              - - -

10                             - - -

11   KATHERINE MURPHY, PSY.D., WITNESS FOR THE DEFENDANT, SWORN

12                     DIRECT EXAMINATION

13                             - - -

14                   KATHERINE MURPHY, PSY.D.

15   BY MR. LEVINE:

16        Q    Please state your name.

17        A    Katherine Murphy.

18        Q    Are you a doctor?

19        A    I am.

20        Q    All right.  Dr. Murphy, tell us about your

21   educational background, please.

22        A    I first started in my post-graduate work in 2003.

23   I got a master's degree in forensic psychology in 2005 from

24   the Chicago School of Professional Psychology.  I then went

25   on to complete my doctorate degree at the American School of

1    Professional Psychology in 2009.

2         Q    What was your -- did you write a dissertation?

3         A    I did.

4         Q    What was it on?

5         A    Identifying subtypes of violent offenders using

6    the HCR-20, a violence risk assessment measure.

7         Q    Do you regard yourself as an expert with respect

8    to that particular psychological test?

9         A    I do.

10             MR. LEVINE:  May I have this marked.

11             This is Dr. Murphy's résumé.  Copy to your clerk,

12   Your Honor.

13             THE COURT:  So that's Plaintiff's Exhibit --

14   Patient's Exhibit Number --

15             DEPUTY CLERK:  6, Your Honor.

16             THE COURT:  -- 6.

17             MR. LEVINE:  Approach, Your honor, please?

18             THE COURT:  Yes.

19   BY MR. LEVINE:

20        Q    Dr. Murphy, I show you what has been marked as

21   Patient's No. 6.  Do you recognize it?

22        A    I do.

23        Q    What is it, please?

24        A    This is my curriculum vitae.

25             MR. LEVINE:  Your Honor, I move it into evidence.

```
1              THE COURT:  Any objection?

2              MR. LEVINE:  No, Your Honor.

3              THE COURT:  It will be admitted.

4                                    (Patient's Exhibit 6
                                     received into evidence.)
5  BY MR. LEVINE:

6      Q    Are you currently employed?

7      A    I am.

8      Q    And describe -- how are you employed?

9      A    I'm working in private practice.

10     Q    And describe your practice, please.

11     A    Right now, I'm part of a group psychotherapy

12 practice in Alexandria.  I see individuals, families,

13 couples, and children in therapy.

14         I also do independent contracting to do PTSD

15 evaluations of veterans through the Veterans Administration.

16     Q    Prior to your private practice, where were you

17 employed?

18     A    At St. Elizabeths Hospital.

19     Q    And what were your duties at St. Elizabeths

20 Hospital?

21     A    I was a staff psychologist as St. Elizabeths

22 Hospital, providing individual and group psychotherapy, as

23 well as supervising interns, residents, and externs.

24         I did psychodiagnostic evaluations.  I did

25 forensic evaluations.
```

1           I was part of the forensic consult service there,

2    which is a multidisciplinary team of assessors who perform

3    various forensic assessments throughout the hospital from

4    pretrial, all the way to posttrial.

5           I also was -- worked part time at the outpatient

6    department overseeing the risk assessment referrals.

7       Q    What years were you at St. Es?

8       A    I began as an intern in 2008.

9       Q    And when did you leave?

10      A    In 2014.

11      Q    And while there, did you conduct risk assessments?

12      A    I did.

13      Q    Have you evaluated patients for convalescent

14   leave?

15      A    Yes, I have.

16           MR. LEVINE:  And, your Honor, I'm going to

17   proffer, again, Dr. Murphy as an expert and ask that the

18   Court allow her to give her opinions with respect to

19   Mr. Hinckley's danger to himself or others as a result of

20   mental disease and the proposed conditions.

21           THE COURT:  Any objection?

22           MR. LEVINE:  No objection.

23           THE COURT:  She'll be accepted as an expert for

24   those purposes.

25

DIRECT EXAMINATION

BY MR. LEVINE:

Q    Dr. Murphy, how many risk assessments have you performed on Mr. Hinckley?

A    This is the second risk assessment update.

I also did a supplemental report, which was essentially an update from the 2011 risk assessment to 2013.

Q    When did you begin the initial risk assessment of Mr. Hinckley in preparation for this hearing?

A    I began it in early March.

Q    And we've -- how did it come, inasmuch as you were in private practice, that you were doing a risk assessment for Mr. Hinckley?

A    I was contacted by the director of psychology, Richard Gontang, sometime in late February, and he asked if I would be able to take this on.

Q    And?

A    And I told him -- we talked about the timeline and time frames, when the Court hearings were scheduled, when I would need to submit the report.

We negotiated, you know, the terms of my contract through the Offices of Procurement and Contracting, and then I agreed to take this on.

Q    Did you generate a risk assessment, violence risk assessment report?

1          A     I did.

2                MR. LEVINE:  Your Honor, I'd like this marked,

3     please, as Patient's No. 7.

4                Copy to the government, copy to your clerk,

5     Your Honor.

6                Does the Court need a copy?

7                THE COURT:  No.  I have a copy.  Thanks. I've read

8     it thoroughly.

9                THE WITNESS:  Takes some time.

10               THE COURT:  It does take some time.

11    BY MR. LEVINE:

12         Q     Dr. Murphy, I show you what has been marked as

13    Patient's Exhibit No. 7 and ask if you can identify that.

14         A     This is my violence risk assessment update, dated

15    March 31st, 2015.

16               MR. LEVINE:  Your Honor, I move it into evidence.

17               THE COURT:  Any objection?

18               MS. KENNEDY:  No objection.

19               THE COURT:  It will be admitted.

20                                    (Patient's Exhibit 7
                                      received into evidence.)
21    BY MR. LEVINE:

22         Q     Now, Dr. Murphy, since leaving the hospital in,

23    I think you said, 2014, was that August?

24         A     Correct.  My last day was July 31st.

25         Q     Did you refamiliarize yourself with Mr. Hinckley's

1   medical record and, in particular, the recent medical

2   records?

3       A    I did.

4       Q    And are you familiar with his recent treatment and

5   the history of his treatment at the hospital?

6       A    Yes, I am.

7       Q    And have you met with Mr. Hinckley since you left

8   the hospital?

9       A    Yes, I have.

10      Q    On how many occasions?

11      A    It was four occasions.

12      Q    Have you -- four occasions?

13      A    Four occasions.

14      Q    All right.  And have you reviewed additional

15  records since your last testimony?

16      A    I have.

17      Q    And are those records that you've reviewed

18  detailed in your report on page -- starting on page 2?

19      A    Yes.

20      Q    Looks like it goes for several pages.

21      A    It does.

22      Q    Or a couple of pages; is that correct?

23      A    Yes.  Pages 2 and 3.

24      Q    All right.  Have you interviewed members of

25  Mr. Hinckley's treatment team at the hospital?

1     A     I have, yes.

2     Q     And have you interviewed members of Mr. Hinckley's

3 treatment team in Williamsburg?

4     A     Yes, I have.

5     Q     And were you here for the testimony of

6 Scott Hinckley and his sister, Diane Sims?

7     A     Yes, I was.

8     Q     And are there other individuals who work with

9 Mr. Hinckley that you interviewed that are detailed in your

10 report?

11     A     Yes.

12     Q     Did you perform psychological testing of

13 Mr. Hinckley?

14     A     I did.

15     Q     And are you familiar with the hospital's requests

16 for convalescent leave?

17     A     I am.

18     Q     And in particular, there was a letter of

19 December 19, 2014.  Are you familiar with that?

20     A     Yes, I am.

21     Q     Are you familiar with the subsequent letter to the

22 Court?

23         MR. LEVINE:  I think No. 19, by the way,

24 Your Honor, was Patient's No. 2.

25         THE COURT:  Yes.

1    BY MR. LEVINE:

2        Q    And, Dr. Murphy, are you familiar with the

3    subsequent letter from the hospital to the Court, dated

4    March 20, 2015, denominated as Patient's No. 3?

5        A    I am.

6        Q    And are you familiar with the fact that the

7    government filed proposed conditions?

8        A    I am.

9        Q    And are you familiar with the fact that the

10   hospital filed a response to the government's proposed

11   conditions, in which they set out the proposed conditions

12   and their response to each of them?

13       A    Yes, I am.

14       Q    And that was dated April 17, 2015?

15       A    Correct.

16       Q    Denominated No. 4, I believe, marked in evidence?

17            THE COURT:  Yes.

18   BY MR. LEVINE:

19       Q    Did you reach a conclusion about the fundamental

20   structure of the hospital's plan?

21       A    Yes.

22       Q    What was that conclusion?

23       A    I was in support of the fundamental structure of

24   the hospital's plan with additional specificity and time

25   frames.

1     Q     And since you filed Patient's No. 7, have you had

2     discussions with the hospital about the plan?

3     A     Yes, I have.

4     Q     And has the hospital adopted some of your

5     proposals?

6     A     Yes, the hospital has.

7     Q     And has the hospital adopted your proposed phased

8     approach?

9     A     Yes, the hospital has.

10    Q     Tell us what the phased approach is.

11    A     Well, so I broke down my recommendations into

12    three parts:  part A, part B and part C.

13          Part A is the first six months of convalescent

14    leave.

15          Part B covers the next, subsequent 6 to 18 months.

16    So I'll say that that period of time is primarily the 6- to

17    12-month period, but I'm also recommending an updated risk

18    assessment.  So I allotted an additional six months to cover

19    that period of time, as the treatment team plans for the

20    next steps forward.

21    Q     And what was phase part C?

22    A     Part C was simply reviewing Mr. Hinckley's

23    adjustment to convalescent leave for the first year, getting

24    together as both treatment teams having a comprehensive

25    treatment plan to assess his progress and then look at

1    moving forward, and coming together to decide what the next

2    recommendations would be for convalescent leave.

3        Q    All right.  Now, Dr. Murphy, do you have an

4    opinion based on your familiarity of all the items we've

5    just identified to a reasonable degree of psychological

6    certainty regarding whether or not Mr. Hinckley will be a

7    danger -- will be dangerous to himself or others as a result

8    of a mental disease during convalescent leave?

9            MS. KENNEDY:  Objection, Your Honor.  There's no

10   foundation or basis right now with what her perception is as

11   far as Mr. Hinckley's history, what the St. Elizabeths plan

12   is.  I'm sure that can be established after some further

13   questioning, but in the government's opinion, it's not now.

14           MR. LEVINE:  I think the basis is there, and I

15   think we're going to inquire out the basis.

16           THE COURT:  You can go ahead.  And whatever is

17   missing will be provided at some point, I'm sure.

18           THE WITNESS:  I do have an opinion.

19   BY MR. LEVINE:

20       Q    What is that opinion?

21       A    That Mr. Hinckley is currently low risk and would

22   be a low risk of future violence if granted convalescent

23   leave under the specified conditions.

24       Q    And how confident are you of that opinion?

25       A    I'm very confident in this opinion.

 1      Q    And do you have an opinion as to whether
Mr. Hinckley would suffer -- well, withdrawn.

 3           Do you have an opinion as to the risk of relapse
under the plan?

 5      A    I believe the risk of relapse is low of
decompensation without prolonged isolation and that he would
be readily assessed throughout his transition by several
treatment providers based off of his adjustment to the plan.

 9      Q    And should he, Dr. Murphy, have a relapse, would
it be gradual?

11      A    I believe so.

12      Q    And would it be easily detected, detectable by
mental health professionals?

14      A    I do.

15      Q    And, in your view, would it be responsive to
pharmacology?

17      A    I do.

18      Q    Let's discuss some of the bases for your opinion.

19           Did you do psychological testing of Mr. Hinckley?

20      A    I did.

21      Q    And what tests did you do?

22      A    The Minnesota Multiphasic Personality Inventory
was the psychological instrument that I used for his
personality and emotional functioning.

25           I used a different set of measures to assess his

1    violence risk and included the violence risk appraisal

2    guide, its revised version, as well as a psychopathy

3    checklist revised and the HCR-20.

4        Q    And this violence risk assessment guide, is that

5    often referred to as the VRAG?

6        A    Yes.

7        Q    Let's talk about these.

8             The MMPI, the Minnesota Multiphasic --

9        A    Personality.

10       Q    -- Personality Inventory, No. 2; is that right?

11       A    Yes.

12       Q    Okay.

13       A    Second edition.

14       Q    Tell us about -- what results did you have for

15   Mr. -- for the testing of Mr. Hinckley for the MMPI-2?

16       A    Well, Mr. Hinckley showed a very similar profile

17   that he showed in 2011 and across multiple administrations

18   since at least 1995.

19            He shows a tendency towards defensiveness.

20   This was the scale that we talked about at length last

21   hearing, the K scale.  His score is at the threshold of

22   significance, indicating that he tends to portray himself in

23   an overly favorable light and has some difficulty

24   acknowledging psychological symptoms and problems.

25            Essentially, this means that he wants to see

1  himself as a good person and is going to put his best foot

2  forward in discussing his adjustment.

3         He also showed -- he did not show any elevations

4  on the clinical scales.

5         He showed --

6         THE COURT:  What does that mean?

7         THE WITNESS:  The clinical scales are those

8  10 scales that we talked about.  He's -- his scores over the

9  past several years, for 10, 15 years, have shown a few

10  scales hovering at clinical significance.  So that indicates

11  that he's not showing any overt psychological distress, not

12  showing bizarre ideation, not showing paranoia, not showing

13  remarkable depression.

14         That really what we're looking at when we're

15  interpreting these scores, and that needs to be done

16  cautiously when they're not elevated, is more of a

17  personality style, rather than acute symptomatology.

18         He has historically shown some slight elevations

19  in the past 10, 15 years on the hysteria -- the scale 3,

20  hysteria.

21         And I will qualify this by saying that the

22  clinical scales use very outdated names.  The original MMPI

23  was developed in 19 -- in 1943, and so some of the names of

24  these scales aren't quite representative when we use numbers

25  now to describe these scales.

1          But -- are you having trouble hearing me?

2          So scale 3 and scale 4 are the two scales that

3    Mr. Hinckley has shown slight elevations on over the past

4    decade or so.

5          This code type, these two scales in tandem

6    together suggest that he does harbor some degree of anger

7    but has a difficult time communicating and expressing this

8    anger.  And part of this ties into the elevated K scale,

9    is that he wants to see himself and see others as good

10   people, as well-adjusted.  So he has a hard time expressing

11   this negative emotion.

12        Q    All right.  Did you reach a conclusion about his

13   overall pattern of psychopathology?

14        A    I did.

15             Right now, he's not evidencing significant

16   psychopathology based off of the MMPI-2 data.

17        Q    What is the basis for that finding?

18        A    Well, the basis for that finding, across the

19   evaluation, is a records review, collateral contacts,

20   interviewing Mr. Hinckley myself, test results from the

21   MMPI-2, and looking at his adjustment under the risk factors

22   of the HCR-20.

23        Q    What does it mean when we use the word

24   "psychopathology"?

25        A    Psychopathology is outside of the norm of how

1   people respond to stress and how people respond to

2   fluctuations in their life.  So psychopathology is

3   disordered -- it could be disordered thinking, disordered

4   affect or emotional responses to situations in life.

5       Q    Now, let's talk about the VRAG that you

6   administered.  This is the test that you wrote your

7   dissertation on?

8       A    No.  I wrote my dissertation on the HCR-20.

9       Q    Oh, I'm sorry.  The HCR-20.  I misspoke.

10  I apologize for that.

11      A    That's okay.

12      Q    Was is the VRAG?

13      A    The VRAG is the violence risk appraisal guide.

14  This is an actuarial instrument used to assess violence

15  using statistically driven methods.

16           There's 12 variables of the VRAG.  They're all

17  weighted and put into -- and scores are put into a final

18  mathematical probability, looking at a person's risk of

19  recidivism based on qualifying them in a group of

20  individuals with similar characteristics.

21      Q    Are these actuarial measures of violence seen as

22  being superior to clinical measures?

23      A    Well, there's quite a bit of data, research data,

24  to suggest that actuarial prediction is superior to clinical

25  judgment alone.  And when I say that, that's unstructured

1    clinical judgment, impressionistic ideas about a person's

2    violence risk.

3            When you look at structured professional judgment,

4    such as the HCR-20, those instruments perform better and

5    perform at least at the same level as actuarial instruments.

6        Q    All right.  Have you administered the VRAG to

7    Mr. Hinckley prior to the more recent one?

8        A    I did.

9        Q    And how did his score on the recent exam compare

10   to his older score?

11       A    Well, as I note in my report, it doesn't change.

12   These are static dispositional historical factors that won't

13   change unless, say, somebody incurs a new violent offense or

14   a new nonviolent offense.  That might change their score a

15   bit.  But other than that, his score remains the same

16   because these factors don't change over time.

17       Q    Are there caveats that you perceive to

18   interpreting this data?

19       A    In the case of Mr. Hinckley, absolutely,

20   because --

21       Q    What are those caveats?

22       A    He's been in the hospital for 30 -- 33 years.

23   And the average length of stay for the folks in the original

24   VRAG study was four to five years.  So he's been in --

25   hospitalized far longer than the normative sample was.

1          Also, V -- when they were looking at recidivism of

2     the normative sample, they were looking at recidivism when

3     the individual had been transferred to either the community,

4     a halfway house, or a minimum-security forensic hospital.

5          Mr. Hinckley has been on minimum security since

6     1992 and has had open access to the grounds since 1992 as

7     well when he got D privileges, is the term that

8     St. Elizabeths used to describe those privileges.

9          Also, an individual's risk of violence

10    significantly dissipates over time if they're not -- if

11    they're deemed non-psychopathic.  Mr. Hinckley has a low

12    PCL score.  This is the test that's studied -- that looks at

13    and rates an individual on psychopathy.

14          This low score suggests that he's

15    non-psychopathic, meaning that his risk of violence is going

16    to dissipate over time.  He committed the crime when he was

17    25 years old, and he's now almost 60 years old.  So we have

18    to keep these things in mind as we interpret the VRAG

19    results.

20     Q     So when we note his age, note the number of years

21    that he's been in the hospital; that when we note that he is

22    non-psychopathic, what does that tell us about risk of

23    violence?

24     A     His risk of violence is low.

25     Q     Is it decidedly low?

1          A     It is decidedly low.

2          Q     All right.  Now, let's talk about the VRAG

3     revised.  Did you also score him on the VRAG revised?

4          A     I did.

5          Q     Tell us, what is the VRAG revised?

6          A     This was -- the manual for this was published just

7     in February of 2015.  The actual research data was published

8     in February -- at some point in 2013.

9                This is the researcher's attempt to deal with some

10    of the caveats that came with the administration of the

11    original VRAG.  So they aimed to put together a tool that

12    was going to be useful for both general violent offenders,

13    as well as sex offenders.

14               And also, they wanted to expand those -- the --

15    they wanted to expand who would be able to administer this

16    test.  So the original VRAG has two variables, personality

17    disorder and schizophrenia, that then require a qualified

18    professional to diagnose.

19               In the newer version, they got rid of these

20    variables so that probation officers and other

21    non-psychological or non-mental health professionals could

22    use this tool.

23         Q     Does the data show that this VRAG revised is even

24    a better predictor of violence?

25         A     It's at about the same level of predictive

1    accuracy as the VRAG.

2        Q    And what was Mr. Hinckley's score on the VRAG

3    revised?

4        A    There, as you'll recall, I testified last time

5    that there are nine bins, they're called, or nine categories

6    of risk, both on the VRAG and the VRAG revised.

7            On the VRAG revised, Mr. Hinckley's risk of

8    category falls in the second of nine categories, putting him

9    at a low risk of violence.

10       Q    What is the PCLR?

11       A    This is the psychopathy checklist revised.

12       Q    All right.  Did you administer that?

13       A    I did.

14       Q    Tell us about that.  What were the results?

15       A    Similar to the VRAG, this is something that

16   remains unchanged.

17           The score on this measure is -- is the same exact

18   score that I had for my last risk assessment and that

19   Dr. Montalbano had in his previous risk assessments as well,

20   and is also very close to the score that Dr. Heilbrun

21   arrived at in his 1996 or '7 violence risk assessment.

22       Q    Does the fact that he scored low, low risk on the

23   PCLR, tend to validate the score of low risk for the VRAG?

24       A    Well, so I'll back up in saying that the PCLR is

25   simply looking at the construct of psychopathology.

 1   And this is a robust predictor of violence, so it's

 2   important to look at.  But standing alone, it's not

 3   something we would just use to look at a future risk of

 4   violence.  It's incorporated into the VRAG as one variable

 5   in the risk analysis equation of those 12 variables.

 6           But standing alone, it's important because it

 7   tells us that he doesn't, Mr. Hinckley does not show these

 8   very callus, antisocial, socially deviant traits that

 9   individuals who are at a high risk of violence show.

10   Q    Is it fair to say that his score is well below

11   established cutoffs of psychopathy?

12   A    Yes, that's fair to say.

13   Q    Now, let's turn to a test that I think you are a

14   real expert in, the HCR-20.

15           What does the HCR-20 measure?

16   A    This is a structured professional judgment tool

17   that relies on empirically based risk factors.

18           There's a scale -- there's three domains.  The

19   first domain is the historical domain.  And these are ten

20   risk factors, many of which overlap with those in the VRAG.

21   Again, they're static.  They're dispositional.  They won't

22   change over time generally.  And just give us some

23   information about, in previous violent acts, what are some

24   of the risk factors and ingredients to those acts that led

25   to the commission of these crimes or crime.

1              Then there's the clinical domain.

2      Q    So the historical, that's the H in the HCR?

3      A    Correct.

4      Q    Okay.

5             Then we come to the C.

6      A    The C.

7              These are clinical risk factors.  And what we're

8    looking at is the person's recent adjustment to any changes,

9    recent hospital cores, or recent adjustment to the

10   community, whatever the context may be.

11             Is the person showing insight into their major

12   mental illness and need for treatment?

13             Are they evidencing any violent ideation?

14             How is their coping?  What is their response to

15   treatment and supervision?

16             And then, finally, is the risk management domain.

17   And this is a future-oriented scale, and it includes five

18   risk factors that -- empirically rooted risk factors that

19   pay attention to how a person will adjust to whatever

20   context is being recommended.

21             So in some cases, that might be somebody for the

22   very first time going from maximum-security to a

23   minimum-security unit.  It could be somebody already in the

24   community on conditional release, who's going for an

25   unconditional release or, in this case, going from inpatient

1   to full outpatient.

2        Q     All right.  Now, did you administer the updated

3   version of the HCR-20?

4        A     I did.  This --

5        Q     How does that version differ from the other ones?

6        A     It is fundamentally the same.

7             The researchers incorporated more of the updated

8   research in this measure, and narrowed some of the

9   definitions of risk factors, and then also brought in them.

10            So they included a risk factor, for example, on

11  the historical scale that looks at antisociality, in

12  particular, and they got rid of the PCLR score.

13            The first and second version had the PCLR score as

14  one factor on the historical scale.

15            And the reason that they did that is because now

16  research is showing that antisociality is the -- a

17  subcomponent of the PCLR, is the strongest predictor of

18  violence.  So these are some of the changes that they made

19  in the updated version.  They looked at treatment and

20  supervision response, historically, clinically, and in the

21  future as well.

22       Q     Well, with respect to the historical risk factors,

23  what were your findings?

24       A     I walked through some of the risk factors that

25  were most salient at the time of the offense.  We talked

1   about this at length in these hearings, Mr. Hinckley's major

2   mental illness, psychosis at the time, major depression,

3   isolation, narcissistic personality disorder.

4          And we -- and I looked at also his response to

5   treatment and supervision across his hospital course.

6          What was really helpful for me was looking at the

7   MMPI-2 data, in that early in his hospital course, he showed

8   multiple elevations on the clinical scales, suggesting the

9   presence of psychopathology.  But over time, we saw this

10  significantly reduced.

11         And all of this coincided with being involved in

12  treatment and individual therapy with Dr. Christian through

13  the '90s; a solid supportive relationship with Ms. Devoe;

14  and treatment providers, impressions that Mr. Hinckley

15  showed improvements and empathy across his hospital course

16  in the mid-'90s through the 2000s.

17     Q    All right.  Well, in your report -- and it was on

18  page 55 -- you find that through -- quote, through more than

19  30 years of monitoring, treatment, and data collection, it

20  has become clear that depression and narcissism as risk

21  factors of violence, are inherent --

22         MR. LEVINE:  Some dots there, Your Honor.

23  BY MR. LEVINE:

24     Q    -- are inherently mitigated in the absence of

25  active psychosis.  Is that an accurate statement of your

1    finding?

2        A    Yes.  This is a point I made in my discussion of

3    the HCR-20.

4            MS. KENNEDY:  Your Honor, can we get a paragraph

5    on page 55?

6            THE COURT:  Yes.  Where is this?

7            MR. LEVINE:  It is on page 55.  Yes, and I'm happy

8    to do that, Your Honor.

9            (Pause)

10           MR. LEVINE:  It's on the second full paragraph.

11           THE COURT:  Second full paragraph?

12           MR. LEVINE:  Yes.

13           THE COURT:  Okay.

14           MR. LEVINE:  It starts with -- what I read starts

15   with the second sentence.  I'm happy to read the whole

16   paragraph if that would --

17           THE COURT:  The paragraph beginning "At a

18   fundamental level"?

19           MR. LEVINE:  Yes.

20   BY MR. LEVINE:

21       Q    And it's the next sentence that I read:

22   "Through more than 30 years of monitoring, treatment and

23   data collection, it has become clear that depression and

24   narcissism, as risk factors of violence in the case of

25   Mr. Hinckley, are inherently mitigated in the absence of

1    active psychosis."

2            Is that what you wrote?

3       A    Right.

4       Q    And we're evaluating Mr. Hinckley in the absence

5    of psychosis?

6       A    Uh-huh, correct.

7       Q    What has been Mr. Hinckley's response to treatment

8    and supervision over time?  And what does that tell you

9    about risk?

10      A    Mr. Hinckley has responded well.  He is compliant

11   with medication.  He's compliant with his therapies.

12   He more recently in these 17-day expansion, he has adhered

13   to his itineraries.  And, of course, this comes with the

14   exception of going to John Tracy -- this comes with the

15   exception of going to John Tracy's house.

16           But he has otherwise been very diligent in his

17   approach to following through with what's been asked of him

18   and what are in his court orders.

19      Q    Dr. Murphy, as for the clinical risk factors, what

20   are they designed to assess?

21      A    The clinical risk factors look at a person's

22   present adjustment, if there's any signs of mental illness,

23   any signs of violent ideation, how they're coping with life,

24   what does their support network look like, how they're

25   responding to their treatment.

1      Q    What were your findings in that regard?

2      A    Mr. Hinckley remains stable.  He has not shown any

3  fluctuations in mood, has not shown any psychotic symptoms

4  at all.

5      Q    Did you find in here on page 56 -- and I quote --

6  that Mr. Hinckley's, quote, psychotic symptoms and mood

7  disorder have remained in remission --

8      A    Yes.

9      Q    -- and he has not undergone any medication

10  adjustments since the last risk assessment update?

11      A    Correct.

12      Q    What is the significance of the fact that he

13  hasn't undergone any medication adjustments in the context

14  of that sentence?

15      A    Well, as you recall, he did have adjustments in

16  the last -- prior to the last hearing in his Zoloft in

17  response to some mild anxiety.

18          He hasn't required, despite being faced with some

19  stressful circumstances over the last few years -- and I'm

20  referring to, for example, the James Brady -- the potential

21  ruling of James Brady through the summer of 2014 -- that

22  he's been able to show increased resilience here; that he

23  has reached out to his support system, both professional and

24  personal, to deal with and cope with any stress; that he

25  hasn't necessarily needed pharmacological intervention to do

1    that.

2        Q    What does his improved mood and level -- you have

3    a comment on his improved mood and level of motivation.

4        A    I think he -- I think the addition of Mr. Weiss

5    has been a large part of this.  He responds really well to

6    Mr. Weiss.  Mr. Weiss has used a balanced approach to

7    dealing with Mr. Hinckley, in that when Mr. Hinckley may shy

8    away from things or, you know, perhaps has been faced with

9    so much adversity in not being able to secure various

10   employment and volunteer opportunities.  He has sort of

11   shown times that he has avoided moving forward with these.

12   Mr. Weiss has facilitated a process of increasing

13   Mr. Hinckley's motivation in doing so.

14        So I think that's been a large part, and I think

15   Mr. Hinckley looks forward to his visits.  He enjoys his

16   visits.  He's connected with other individuals on these

17   visits, with friends and with his treatment providers more

18   so, and relies on the inpatient treatment providers less so

19   and has been sort of weaning off the hospital, so to speak,

20   and is becoming less and less institutionalized as he has

21   more time in the community.

22        Q    And is that exactly what we hope for when we have

23   these increases, incremental increases in liberty?

24        A    Yes.

25        Q    All right.  Now, has Mr. Hinckley suffered some

1    rejections and rebuffs?

2        A    Mr. Hinckley has.

3        Q    And how has he reacted to those?

4        A    He's been accepting of the circumstance.

5             I think he feels disappointed at times when he

6    doesn't -- for example, the Heritage Humane Society, when

7    that fell through, he felt disappointed about that.

8             He felt disappointed by Ms. N ending their

9    relationship after she was discharged to the community.

10            So I think he's dealt well with it but showed

11   appropriate levels of disappointment and feeling down about

12   it.

13       Q    Did it show appropriate levels, show good levels

14   of resilience?

15       A    It did.

16       Q    How does that impact on the assessment of risk?

17       A    Well, when we think of your typical insanity

18   acquittee and coming out of the hospital to reside on

19   convalescent leave, usually the level of psychopathology

20   that we're looking at and active symptoms are far higher

21   than and far more acute than what Mr. Hinckley shows.

22   He's very high functioning.  His symptoms are quite stable

23   and have been, as we talked about for a long time.

24            There's patients I've worked with in the

25   outpatient department who continue to hear voices, who

 1   continue to feel depressed, and, although may not be

 2   suicidal, are still actively dealing with depression.

 3        Q    And that's not Mr. Hinckley?

 4        A    No, this is not Mr. Hinckley.  Right now, I'm

 5   distinguishing the case of Mr. Hinckley from your typical

 6   insanity acquittee coming out of St. Elizabeths Hospital.

 7             So this says a lot that this is where he's at

 8   right now with his symptoms and how long he's been stable

 9   and that he's really ready to move forward at this point.

10        Q    Does Mr. Hinckley comply with the recommended

11   psychological, psychiatric, vocational, and social

12   interventions?

13        A    Mr. Hinckley does, yes.

14        Q    Has Mr. Hinckley, as -- this is part of clinical

15   factors here.  Has Mr. Hinckley exhibited any signs of

16   isolation or withdrawal?

17        A    No, he has not.

18        Q    And any signs of brooding or alone?

19        A    No.

20        Q    Has he relied upon the support system he has in

21   Williamsburg?

22        A    Yes, he has.

23        Q    And he exercised sound, basically, sound judgments

24   in his relationship?

25             MR. LEVINE:  Objection, Your Honor; leading.

1          THE COURT:  Objection?

2          MS. KENNEDY:  Leading.

3          THE COURT:  Leading.

4          MR. LEVINE:  I didn't think it was.

5          THE COURT:  You may answer.

6          THE WITNESS:  Repeat the question.

7   BY MR. LEVINE:

8      Q    Yeah.  Has he basically -- has he exercised sound

9   judgment in his relationships?

10     A    Yes, he has.

11         THE COURT:  If Mr. Levine asks you questions that

12  can be answered by yes or no, you can always feel free to

13  elaborate.

14         THE WITNESS:  Okay.

15  BY MR. LEVINE:

16     Q    Absolutely.  Please.  I mean, if you have more to

17  say about that, I invite that in the response.

18     A    Okay.

19         During the last hearing, we spoke a lot about

20  Ms. C.B.  And some of the concerns that were raised were,

21  will he end this relationship if he goes to Williamsburg?

22  Has he been straightforward with her about transitioning to

23  Williamsburg and what -- to what extent she'll be involved

24  in his life, should that happen?

25         He has continued to be friends with Ms. C.B.,

 1    continued to provide support to her; however, has been

 2    direct with her in stating that he cannot continue to have

 3    her in his life in the same way that he had her in his life

 4    prior to -- if he is transitioned to full convalescent leave

 5    in Williamsburg.

 6         Q    How does that show sound judgment in a

 7    relationship?

 8         A    I don't think this has been easy for Mr. Hinckley

 9    to do this.  This is an attachment that he's had since at

10    least 2009.

11              But I also think that he understands and

12    appreciates that this relationship can potentially bring

13    about a lot of stress for him; that she has been unstable

14    psychiatrically, non-compliant with her medications, and

15    that he can't have her be a part of Williamsburg.

16         Q    All right.  Now, you mentioned earlier in your

17    testimony, I think you referred to it, to Mr. Weiss, and

18    that he played a positive role in Mr. Hinckley's

19    Williamsburg experience --

20         A    Yes.

21         Q    -- is that right?

22         A    Uh-huh.

23         Q    How did that manifest itself?

24         A    Can you ask the question again, please.

25         Q    Yes, of course.

1          You mentioned that Mr. Weiss has played a positive

2     role in Mr. Hinckley's life.  How did Mr. Weiss make changes

3     in Mr. Hinckley's Williamsburg experience?

4          A    Mr. Weiss brought about a lot of new opportunities

5     for Mr. Hinckley.  He's well-connected in the area.

6     He knows quite a few people in administrative positions at

7     various agencies.  And he's also attuned to, after being

8     involved in the mental health treatment in Virginia and

9     working within that system for decades, he's aware of the

10    mental health issues, as well as Mr. Hinckley's abilities

11    and what he should be responsible for, versus his treatment

12    provider should be responsible for.

13         He's, in my mind, he's made it clear that in the

14    past, some of Mr. Hinckley's rejections or, I should say,

15    not -- not obtaining more volunteer opportunities or not

16    making as many friends or what's been looked at as a lack of

17    initiative is really the resistance from the community down

18    there and how his level of notoriety has impacted this.

19         Q    All right.  Dr. Murphy, let's move on to the

20    R part of the HCR-20, risk management.

21         What are the risk factors -- well, I think we know

22    the risk factors in Mr. Hinckley's case.  Let's talk about

23    them one by one.

24         First one that has been noted is that of

25    depression.  Do you see any evidence of depression in

1  Mr. Hinckley's conduct?

2       A    No, I do not.

3       Q    And is the diagnosis of major depression in full

4  remission?

5       A    Full sustained remission.

6       Q    Full sustained.  Stable?

7       A    Correct.

8       Q    And for how long?  Would you say for over two

9  decades?

10      A    Yes.

11      Q    All right.  You mentioned earlier that he, from

12  time to time, that he does take some Zoloft; that -- for

13  anxiety -- hasn't changed at all.

14           Are his anxious moments rational and well-placed,

15  appropriate?

16      A    Yes.  They're understandable, given the situation

17  that he faces.

18      Q    All right.  Second risk factor often identified

19  with Mr. Hinckley as a risk factor is that of isolation.

20  Is there any evidence of Mr. Hinckley going into isolation?

21      A    No, there is not.

22           THE COURT:  What do you mean --

23           MR. LEVINE:  I'm sorry?

24           THE COURT:  What do you mean by "isolation"?

25  Is it a clinical term, or is it just somebody sitting in his

1    room and not doing anything with his life?

2            THE WITNESS:  Right.  It's used clinically, but

3    it's not -- it doesn't give us a lot of information

4    clinically standing alone.

5            So when I think of isolation with Mr. Hinckley,

6    I think of, in the time of the offense, he was withdrawing

7    from his key relationships.  He was going for days, weeks

8    and months without having contact with family members and

9    the few friends that he had had at the time.

10           And isolation now, he's very far from anything

11   that resembles that level of isolation then; that even a few

12   hours of working on music a day in his room is, should not

13   be considered isolation.

14           THE COURT:  So when we were concerned in prior

15   hearings about the fact that he had not, either on his own

16   initiative or with the help of Mr. Beffa originally, done

17   very much in the community, going out and trying to find

18   volunteer jobs, trying to make friends, trying to socialize,

19   staying by himself a lot, even though he was listening to

20   music and painting, was that a concern about isolation as

21   it's identified as a risk factor in part or in whole?

22   Or was it more a concern about not doing what phase 4 was

23   intended to do, which was to integrate more into a community

24   so he can transition to whatever this phase is going to be

25   called --

1          THE WITNESS:  Right.

2          THE COURT:  -- or both?  Is it some of both of

3    those things?

4          THE WITNESS:  Well, I think there are varying

5    views on to what extent it represented isolation, but really

6    that he wasn't meeting -- to what extent he was meeting the

7    objectives of community reintegration was more of the issue.

8          And I testified last time about he tends to be an

9    introverted individual, that he needs people to help him

10   feel motivated to do things, or not even motivated but get

11   pushed past some anxiety about being around others.

12          And the testing shows this.  He's an introvert.

13   He's always been an introvert.  So we have to be realistic

14   in what we can expect of him.

15          And I do think through the 17 days, he's met the

16   expectation that both teams have put forth for him.

17          Has, during these releases into the Williamsburg

18   community and, in particular, the 17-day releases, has his

19   mood become more elevated?

20   A     It has.

21          Multiple treatment providers noted this, that they

22   see he seems to be showing more of a brighter affect.

23   He seems to be more engaged.  He seems more relaxed.

24   Q     Has he made new friendships?

25   A     He has.

1      Q      And does he have a more positive outlook?

2      A      He does.

3      Q      Is he more engaged in his activities and taking

4  more initiative?

5      A      Yes, he is.

6      Q      And is this the antithesis of isolation?

7      A      This is the antithesis of isolation.

8      Q      Okay.  The next risk factor that has been

9  identified for Mr. Hinckley is that of psychosis.

10  Any evidence of psychosis?

11      A      No evidence of psychosis.

12      Q      In full, sustained, and stable remission?

13      A      Yes.

14      Q      For more than two decades?

15      A      Yes.

16      Q      The next risk factor that has been identified is

17  that of lack of insight into mental illness.  Are you

18  familiar with that risk factor?

19      A      Yes, I am.

20      Q      Has his regimen of taking medication been

21  impeccable?

22      A      Yes, it has.

23      Q      What does that tell you about an insight into

24  mental illness?

25      A      It's a risk factor when an individual does not

1    comply with their medications.  It predicts

2    rehospitalization and also predicts violence.

3           So the fact that Mr. Hinckley has been fully

4    compliant with his medication regimen and reaches out and is

5    proactive in being sure that his medications are readily

6    available for him before he leaves for Williamsburg suggests

7    that this is not a risk factor that elevates his risk in any

8    way and contributes to an overall risk profile that's low.

9       Q    Does Mr. Hinckley understand what factors made him

10   sick back in 1981?

11      A    We did have this discussion.  I like to ask

12   patients about it at each update, because I want to

13   understand if there's been any changes in this.

14          He understands -- he identified isolation,

15   withdrawing from his family and friends, as a risk factor.

16   He identified psychosis.  He identified major depression

17   and, I believe, narcissism.  I can't remember about the

18   narcissism in particular.  But we talked about these

19   factors.

20      Q    All right.  Now, this personality disorder, this

21   narcissistic personality disorder has been identified as a

22   risk factor for Mr. Hinckley.  Do you agree with the fact

23   that -- with other mental health professionals that have

24   called this in his case, significantly attenuated?

25      A    Yes.  His personality disorder is significantly

1  attenuated at present and for many years.

2      Q    And has there been any indication of dangerousness

3  from his narcissistic personality disorder?

4      A    This was a factor that was present at the instant

5  offense but is not present now -- can you clarify the

6  question?

7      Q    Sure.

8      A    You, you didn't say a time frame.

9      Q    I'm sorry.  I don't want to talk over you.

10     A    It's okay.  I want to be clear in your question.

11     Q    All right.

12         Has there been any indication of dangerousness

13  from any of his narcissistic behaviors?

14     A    No, not at present.

15     Q    And not over a very long period of time?

16     A    Correct.

17         THE COURT:  Is there a difference between

18  narcissism and narcissistic personality disorder?

19         THE WITNESS:  That's a good question.

20         And this has been a challenge for researchers to

21  look at in violence risk assessment, because personality

22  disorders tend to be very heterogeneous.  And they aren't

23  these discrete categories that we once thought they were,

24  and there tends to be a lot of overlap between them.

25         And psychopathy, for example, which is not a

 1    personality disorder in the DSM but is a personality

 2    construct, looks at both narcissistic and interpersonal and

 3    affective problems a person faces with more of their

 4    antisocial behaviors.  And so narcissism can be present in

 5    almost any personality disorder.

 6             So in assessing Mr. Hinckley's risk of violence,

 7    what I looked at were what were the specific components of

 8    narcissistic personality disorder that were associated with

 9    his violent act, rather than saying, just globally, this

10    personality disorder is a risk factor, because that's a

11    stretch in the literature to make that statement.

12             Does that answer your question?

13             THE COURT:  Well, there have been a couple of

14    people who have testified here sort of colloquially and

15    facetiously, perhaps, that lots of people are narcissistic.

16    I mean, Mr. Levine and Ms. Kennedy and I understand that

17    almost every trial lawyer we know is narcissistic; they want

18    to be on the stage, right?

19             THE WITNESS:  Right.

20             THE COURT:  But that doesn't mean they have a

21    mental illness or that they're a risk for violence, right?

22             So that is sort of what motivated my question,

23    whether there's a difference between narcissism and a

24    narcissistic personality disorder.

25             THE WITNESS:  Right.

1        So for Mr. Hinckley, a lack of empathy and a need

2   for admiration and a strong need for dependency at that time

3   contributed to -- with depression and psychosis to the

4   commission of his crime.

5        So generally speaking, for example, like

6   narcissistic injury, which is not part -- necessarily part

7   of narcissistic personality disorder, is kind of an older

8   concept but applies here in that -- say a very psychopathic

9   individual who has a reckless disregard for the rights of

10  others, a reckless disregard for the law.  If they --

11  violence is often associated with them feeling some sort of

12  narcissistic injury; that they have been this bravado and

13  somebody slights them, and they need to resecure their image

14  as being superior.  And that form of narcissistic injury is

15  associated with violence.

16       In Mr. Hinckley's case, I've thought a lot about

17  this, how narcissism contributed to what he did.  And I

18  think he was very despairing at the time:  Years of

19  withdrawing, a worsening depression.  He got suicidal.

20       And he's described to me himself that he was

21  experiencing such a despair that his obsession with

22  Jodie Foster seemed to be a counterweight to this level of

23  despair; that it gave him something, delusionally, but gave

24  him something that almost gave him reason to live, to keep

25  going, a focus, a special union with her that would take

1    away this despairing feeling and desire to off himself.

2         He -- there were few instances of her rebuffing or

3    not -- that he -- that communicated to him that she would

4    not reciprocate this.  And delusionally based thinking led

5    him to believe that by committing this act, he would seal a

6    spiritual, special union with her; that it was essentially

7    his need to salvage this idealized love object that he had

8    in his mind.

9         And also, I've come across hypotheses in the

10   records about perhaps it was her not reciprocating that was

11   a narcissistic injury.  And with delusions, he felt that he

12   needed to do this to resecure, you know, a relative sense of

13   stability, psychically and internally.

14        So in that respect, I see how elements of

15   narcissism are associated with this, but I can't -- I'm

16   pressed to say that narcissistic personality disorder is

17   elevating, or the residuals of his narcissistic personality

18   disorder are in any way elevating his risk.

19        Does that -- okay.

20   BY MR. LEVINE:

21        Q    I think that was illuminating.

22        Do you see evidence of a narcissistic personality

23   disorder?

24        A    I -- well, I --

25        Q    Or is it just by history that you acknowledge it?

1    A    I asked Dr. G-G.  I asked Mr. -- I asked all the

2  treatment providers about what their view is on this, and

3  all of them agree it's attenuated.

4         Mr. Weiss referred to, early on when he was

5  getting to know Mr. Hinckley, there was this attitude of,

6  well, I don't want to do that, so I'm not going to do that.

7         And I don't know specifically what he was

8  referring to, maybe NAMI or --

9    Q    Was that in regard to the NAMI meetings?

10   A    One of those pursuits.

11        And he felt that to be -- he didn't use the word

12 "entitled," but that was what he related to narcissism, sort

13 of, I'm going to do what I want to do with some of this.

14        He said he has not seen any traces of this for the

15 last several months.  And I think that this is something

16 treatment providers have pointed out.

17        And I think it may come off as narcissistic, but

18 I also wonder how much of it is -- he has experienced a lot

19 of adversity.  He's introverted, and he doesn't want to put

20 himself out there.  It makes himself anxious and

21 uncomfortable to do so.

22   Q    And that's understandable?

23   A    That is understandable.

24        MR. LEVINE:  Unless Your Honor has more questions

25 about that --

 1          THE COURT:  No.

 2          MR. LEVINE:  -- I'm going to move on.  I think it

 3  was very interesting.

 4  BY MR. LEVINE:

 5      Q    Dr. Murphy, the next risk factor that has been

 6  identified and associated with Mr. Hinckley is this one

 7  called access to weapons.  Does he have any interest, to

 8  your knowledge, any manifested, any interest whatsoever in

 9  weapons?

10      A    No.  There's been no evidence of this.

11      Q    And then there's been this reference to family

12  support and the lack of family support.  Has the Hinckley

13  family -- that is to say, Mrs. Hinckley, brother Scott, and

14  a sister Diane -- have they shown an unusual amount, a

15  tremendous amount of support?

16      A    Yes, they have.

17      Q    Tell us about that.  How has that shown up?

18      A    Well, this is in contrast in many of the insanity

19  acquittees that are coming out of the hospital that have

20  minimal to no support.

21          Mr. Hinckley's family has been emotionally

22  supportive, financially supportive.  They've communicated

23  their desire, continued desire to be fully involved in his

24  treatment through -- involved in his community reintegration

25  efforts as he comes out of the hospital.

1           It's been -- Jo Ann Hinckley in particular has

2     been unwavering in her support of Mr. Hinckley.

3           Q     She wants him home?

4           A     I'm sorry?

5           Q     She wants him home?

6           A     Mrs. Hinckley does want Mr. Hinckley home.

7           Q     And have Scott and Diane frequently participated

8     in the conditional releases in Williamsburg --

9           A     Yes.

10          Q     -- coming from their home in Texas?

11          A     They have.

12          THE COURT:  And you've talked to both of them in

13    your interviews?

14          THE WITNESS:  I did.

15    BY MR. LEVINE:

16          Q     How does that compare to the kind of family

17    support you frequently encounter in forensic cases?

18          MS. KENNEDY:  Objection, Your Honor; no relevance.

19          THE COURT:  Well, in a lot of her testimony, she's

20    compared Mr. Hinckley's situation to others, sometimes --

21    I mean, in discussing some of the test results, she's

22    described the fact that, why it's different, because he's

23    been in the hospital over 30 years and because of his age

24    and so forth, to others.

25          So what was the specific question?

1          MR. LEVINE:  I asked how it compared, how the

2     family support --

3          THE COURT:  Family support?

4          MR. LEVINE:  -- that he has experienced compared

5     to the support that is typically found with other forensic

6     patients.

7          THE WITNESS:  It's different in that many patients

8     don't have a lot of support or -- and what I found in my

9     dissertation, which was -- I used a sample of St. Elizabeths

10    patients, were that their -- it was sort of a double-edged

11    sword, in that family were oftentimes the victims of the

12    violence; that there was tense and conflictual relationships

13    with family members.

14          So they don't -- more often than not, the insanity

15    acquittees being discharged from the hospital are relying

16    solely on professional support, artificial supports, to keep

17    them stable and adjusting well to the community.

18     Q    All right.  The next risk factor that has been

19    associated with Mr. Hinckley has been this thing called

20    history of suicides.  Is there any evidence of Mr. Hinckley

21    wanting to hurt himself?

22     A    No.  His last attempt was in 1983.

23          THE COURT:  19?

24          THE WITNESS:  '83.

25          He's had four attempts:  one prior to the instant

1    offense, two following -- two in -- both in 1981, one at

2    Fort Meade, one at Butner Correctional Facility.

3              The one at Butner, I believe, was just after he

4    found out that he would not qualify for the Youthful

5    Offender Act, which had, you know, significant bearing on

6    his case.

7    BY MR. LEVINE:

8         Q    Sure.

9         A    The second one was at Fort Meade.  He attempted to

10   hang himself when the staff there was watching a football

11   game.

12             1983 was shortly after, so, you know, less than a

13   year after his admission to St. Elizabeths, and he attempted

14   to overdose on some pills.

15             He had had -- from how I read the records, he had

16   had a suicide contract in place, which I'm led to believe

17   the treatment providers at the time, given his recent

18   history of suicide, thought that this would be important.

19   And so he was in violation of that contract when he

20   attempted suicide.

21        Q    So is it fair to say that it's been well over 30

22   years since there's been any time that he has attempted to

23   hurt himself in any way?

24        A    Yes.

25        Q    All right.  Now, the next risk factor associated

1    with Mr. Hinckley is this thing called the difficulty in

2    relationships with females.  Now, I believe you made some

3    references to that when you discussed insights into mental

4    illness and perhaps into even isolation.

5         A    Uh-huh.

6         Q    Do you have -- do you see the difficulty in

7    relationships with females being a component of

8    dangerousness for Mr. Hinckley?

9         A    It's not a risk of violence as it stands right

10   now.

11             He -- again, these are real relationships with

12   real women.

13             It is a clinical issue, I believe.  I think he's

14   gotten a lot of support from Dr. Binks, Mr. Beffa, Dr. G-G,

15   on looking at and examining these relationships and making

16   decisions in them that help continue to support his own

17   stability.

18             But I don't think that -- I do think too much

19   emphasis has been placed on this as a risk factor.  I think

20   these relationships have offered Mr. Hinckley a source of

21   affection that he needs, as evidenced from testing, and that

22   he's been able to derive a sense of connectedness with the

23   people who he's been in relationships with.

24        Q    Has his response to those relationships been

25   reasonably mature, given his circumstance?

1    A    Yes, reasonably mature.  My conceptualization of

2 where he's at developmentally in relationships is sometimes

3 he seems to show behaviors that are consistent with an

4 adolescent level or young-adult level of relationships.

5    Q    All right.  Now, Dr. Patterson -- you read

6 Dr. Patterson's report?

7    A    I did.

8    Q    In his report, he suggests that there may be

9 another risk factor; that is the risk factor of financial

10 support as a risk factor.

11        You heard the testimony of Scott and Diane,

12 I think you said?

13    A    I did.

14    Q    Do you regard lack of financial support as a risk

15 factor for Mr. Hinckley?

16    A    No, I do not.  I do not view this issue in the

17 same way.

18        I think that it's always inevitably and inherently

19 a component of putting together outplacement plans.

20        Is the person -- the person's treatment and

21 supervision needs, can they be accommodated based off of

22 whatever resources are available?  Whether that's through,

23 you know, entitlements or through employment, et cetera.

24        In the risk management scale of the HCR-20,

25 professional service plans is one of the risk factors that

1   you assess.  And financial issues are looked at in that, but

2   my main objective in doing my violence risk assessment was

3   to look at the time frame that -- I was looking at risk of

4   the 6- to 18-month time frame.  Could the family -- would

5   the family continue to support Mr. Hinckley through this

6   period of adjustment if he didn't immediately get government

7   assistance, entitlements, benefits, Medicare, Medicaid?

8   That was my goal in this.

9           But I don't think that the fact that the family

10  can't sustain the same level over time represents a risk

11  factor.  I think that's reasonable.

12      Q    Dr. Murphy --

13          THE COURT:  Did you skip one of the risk factors,

14  by the way?

15          MR. LEVINE:  I didn't think so, Your Honor.

16          THE COURT:  The tenth one, I don't think you asked

17  her about, on Dr. Patterson's list.

18          Deception.

19          MR. LEVINE:  Deception.  I didn't mean to skip it,

20  but I don't have it before me.

21  BY MR. LEVINE:

22      Q    Let's talk about deception; it's been identified

23  as a risk factor.

24          Do you see the Tracy incident, which you

25  identified earlier in your testimony, the going to visit

1   Mr. Tracy as opposed to Mr. Lerner, Mr. Tracy being the

2   musician, Mr. Lerner being the photographer.  Do you regard

3   that as an instance of deception?

4        A    No, I don't regard that as an instance.

5        Q    Tell us -- how do you evaluate that particular

6   episode?

7        A    I think he used poor judgment.  I think he

8   thought, oh, well, Mr. Lerner is sick, so let's go to

9   John Tracy's house.  I talked to him yesterday.  I've been

10  interested in connecting with him, and let's go.

11            And then he called Mr. Hyde the next day, and he

12  told -- Mr. Hinckley told me that he thought, well, I'll

13  call Mr. Hyde and update him about this change.

14            So I don't think he was trying to deceive or omit

15  or withhold information.

16       Q    Not trying to hide it?

17       A    I don't think he was trying to hide it.  I just

18  don't think he thought in advance, you know, put enough

19  forethought into his decision to do that.

20       Q    He was with Mr. Brelsford?

21       A    Correct.

22       Q    And do you understand the relationship between

23  Mr. Brelsford and Mr. Weiss?

24       A    Yes.

25       Q    What is that relationship?

1       A    They've been longtime friends.

2            Mr. Weiss initially introduced Mr. Brelsford and

3    Mr. Hinckley to do photography together.  He was going to be

4    Mr. Hinckley's photography mentor and has been for several

5    months, but this has involved into more of a friendship over

6    time.

7       Q    So were Mr. Hinckley to have thought about it,

8    would he have thought that Mr. Brelsford, of course, would

9    tell Mr. Weiss that they had gone from -- they had gone to

10   Mr. Tracy's home?

11      A    Right.  I think what Mr. Hinckley told me is he

12   did feel comfortable with Mr. Brelsford and felt, okay,

13   well, I'm going to go.

14           Mr. Weiss' point to me was, well, Mr. Hinckley

15   felt comfortable because of Mr. Brelsford, but this was a

16   music endeavor and not a photography one, and those should

17   be distinguished from each other.  And Mr. Weiss admonished

18   him not to engage in this type of behavior again.

19      Q    Right.  Do you regard that as an instance of --

20           MR. LEVINE:  Excuse me, Your Honor.  Just looking

21   for the term.

22   BY MR. LEVINE:

23      Q    Do you regard that as an instance of manipulation?

24      A    No, I don't think it was manipulative.

25   Manipulation is characterized by somebody planning and

1   thinking about and hiding information or deceiving multiple

2   people or trying to change the facts of a circumstance, and

3   I don't think that this was the case with Mr. Hinckley going

4   to John Tracy's house.

5        Q    So other than the Tracy incident, the incident

6   we've just been discussing, are there any instances of

7   deception or manipulation to which you can point, say, since

8   the 2011 hearing?

9        A    No.  There's no evidence of deception since the

10  last period of evaluation.

11            MR. LEVINE:  Your Honor, if it please the Court,

12  this would be a good moment, if it's convenient to the

13  Court, for a short break.

14            THE COURT:  Very good.  We'll take a 10- or

15  15-minute break.

16            DEPUTY CLERK:  All rise.

17            (Recess from 10:50 a.m. to 11:06 a.m.)

18            DEPUTY CLERK:  All rise.

19            Please be seated.

20            THE COURT:  Mr. Levine.

21            MR. LEVINE:  Thank you, Your Honor.

22  BY MR. LEVINE:

23       Q    Dr. Murphy, during your testimony, you indicated

24  that were Mr. Hinckley to have some sort of psychological

25  episode and some symptom of relapse, that it would be

1    readily detectable and would be gradual?

2         A    Correct.

3         Q    Do you believe that -- do you believe that were

4    that to happen -- well, first, let's ask, what do you think

5    is the likelihood of that happening?

6         A    I think it's unlikely.

7         Q    And were it to happen, would Dr. G-G be in a

8    position to detect it?

9         A    Yes, Dr. G-G, Dr. Johnson.

10        Q    Dr. Johnson as well?

11        A    Mr. Beffa, Mr. Weiss.

12        Q    And Mr. Beffa and Mr. Weiss?

13        A    Uh-huh, correct.

14        Q    And how about, would Mrs. Hinckley be able to

15   detect it?

16        A    Well, sure.  I think she would be able to identify

17   changes in John's mood, changes in John's behavior.

18   She's not the point person to do that and is not trained to

19   do that.  But certainly the treatment team has worked with

20   the family for the past several years to help her be a

21   collateral source to provide information about

22   Mr. Hinckley's functioning.

23        Q    And in that regard, would brother Scott be able to

24   do that?

25        A    Yes.

1       Q    And how about sister Diane?

2       A    Yes.

3       Q    And how about the likes of Mrs. Kochersperger,

4  I think her name is, the people who are observing him on his

5  job, Ms. Jones?

6       A    Right.  His current supervisor is Corless Jones.

7  She would -- she reported to Mr. Hyde about his work

8  progress on a few occasions, and she noted her impressions

9  about Mr. Hinckley and that he tends to be -- not offer up

10 greetings and pleasantries.  But once he gets to know

11 somebody, that he's more engaging.  And so I think that she

12 would be able to provide information and data associated

13 with if there's any changes with him.

14      Q    And were there to be changes, it would be the

15 first time in some 20, 25 years that those changes of

16 decompensation would be detected?

17      A    Right, of decompensation.

18           He's had moderate, reasonable, understandable

19 fluctuations in mood; but, right, decompensation is

20 something different than that.

21      Q    Okay.  Now, let's talk a bit about his successes

22 on conditional release.  Have you had occasion to examine

23 the detailed letters principally authored by Mr. Hyde to the

24 Court?

25      A    Yes, I have.

1     Q    And what do those letters address?

2     A    They address Mr. Hinckley's new endeavors in

3  Williamsburg; the status of any potential opportunities; his

4  violence risk factors; the collateral interviews with

5  Dr. G-G, with Mr. Weiss, with Mr. Beffa; interviews with his

6  individual music therapist, Ms. Haley.

7          He -- Mr. Hyde also incorporates interviews with

8  Mr. Hinckley about how he's doing, did he follow the

9  itinerary, were there any changes in the itinerary, what was

10  his general activities down there.

11     Q    And what, if anything, is indicated in those

12  letters, set forth in these letters that would suggest the

13  presence of illness, mental illness?

14     A    There's -- there's nothing in the letters that

15  suggests he's shown any fluctuations, declines in mood or in

16  psychosis or major mental illness or changes in his

17  personality disorder.

18     Q    And what, if anything, is in those letters that

19  bear upon the issue of -- or that show the presence of the

20  prospect of danger?

21     A    There's no data.  There's no information in those

22  letters that suggests that he's at an increased risk of

23  violence.

24     Q    Indeed, during these conditional releases, the

25  single instance that he went to Mr. Tracy's house, did he do

1    anything dangerous?

2         A    No, he did not.

3         Q    Oh, okay.

4              Now, there's been some discussion about whether

5    Mr. Hinckley should have an itinerary while on convalescent

6    leave.  Are you familiar with that?

7         A    Yes, I am.

8         Q    What's your view about whether there should be an

9    itinerary on convalescent leave?

10        A    I don't think it's necessary from a

11   risk-management perspective.  I understand that Mr. Weiss

12   testified a bit about having some itineraries worked out

13   between he and Mr. Hinckley.

14             In that respect, if Mr. Weiss is comfortable with

15   a, perhaps, truncated version of an itinerary or something

16   that he and Mr. Hinckley are working on together to

17   coordinate Mr. Hinckley's care there and vocational and

18   rehabilitative efforts down there.

19             But from a risk-management perspective, my plan

20   steps down each of the -- steps down the level of monitoring

21   and supervision in a way that accounts for there being an

22   absence of itineraries.

23   BY MR. LEVINE:

24        Q    How does your plan do that?

25        A    Well, one recommendation I made is that Mr. -- and

     1   putting the onus on Mr. Hinckley, is that he would keep a
     2   calendar.
     3          And it doesn't need to be an hour-by-hour
     4   calendar, detailing everything he's doing, but just a
     5   general calendar of his activities there and whether or not
     6   any -- there's been any scheduling changes or, for some
     7   reason, something falls through, so that he has something
     8   tangible to bring to Mr. Weiss, as well as Dr. Johnson, on
     9   his visits to the outpatient department to talk about and
    10   update his providers about his adjustment there.
    11          I also -- and, you know, in terms of the 50-mile
    12   radius and where he can and the stipulations -- the
    13   potential stipulations around the supervision and
    14   monitoring, that these account for the step down and moving
    15   away from itineraries as one form of supervision.
    16   Q    And would --
    17          THE COURT:  Say that again.  To the limitation of
    18   his driving to what?
    19          THE WITNESS:  The limitation -- the 50-mile
    20   radius --
    21          THE COURT:  Yeah.
    22          THE WITNESS:  -- that's being included in my
    23   recommendation and the hospital's recommendation, I also add
    24   with that -- I spoke with Dr. Johnson a bit about this, that
    25   when traveling outside of the 30 miles, that he's

1   accompanied by a treatment provider.

2           So this recommendation is to look at, okay, now

3   he's no longer following this fairly strict schedule; and so

4   he is allotted more freedom in that, but there's a

5   limitation to that freedom.

6   BY MR. LEVINE:

7       Q    And with the benefit of this calendar or a log of

8   activities in which he has engaged, would one who was

9   monitoring his behavior be able to call people with whom he

10  says he did an activity and verify that he, in fact, engaged

11  in that activity?

12      A    Correct.

13          One of my recommendations when I look at the role

14  of Mr. Weiss in convalescent leave is that he is routinely,

15  on a monthly basis, consulting with Mr. Hinckley's work

16  supervisors and/or volunteer supervisors to talk about if

17  there's been -- if he didn't report to a shift maybe because

18  of weather or if there were changes in Mr. Hinckley's

19  schedule, what the reasons were for those changes.

20      Q    Would rigidity in an itinerary impede or enhance

21  the goal of socialization and integration?

22      A    Well, I think, through phase 4, they were useful

23  to gather data about how Mr. Hinckley was going to adjust to

24  this increase in freedom.  And we have enough data at this

25  point to suggest that he uses, overall, uses his time there

1    responsibly.

2           And I do think, moving forward on convalescent

3    leave, when you're asking for this increase in freedom, that

4    an itinerary becomes less realistic, that it does -- it does

5    bring a degree of rigidity to convalescent leave.

6        Q    And what's the impact of rigidity on restoration

7    of a normal lifestyle?

8        A    Well, I think it can interfere with Mr. Hinckley

9    being more spontaneous in terms of meeting friends, going

10   out with friends, going to a coffee shop.  If he needs to

11   negotiate changing his volunteer schedule, that he can do

12   that without needing to go through several hoops before he

13   has to do that.

14       Q    And is that kind of flexibility desirable?

15       A    Yes, that -- at this stage of the process,

16   absolutely.

17       Q    All right.  Now, what, if anything, did you learn

18   from a review of the detailed letters to the Court about

19   Mr. Hinckley's engaging in community activities and

20   excursions with his family?

21       A    I learned that he derives benefit from spending

22   time with his family; they're invested in his treatment and

23   discharge out of the hospital.

24       Q    Did Mr. Hinckley attend lectures?

25       A    He did.

1     Q    And did he have a significant volunteer work

2  experience?

3     A    Yes, he did.

4     Q    And what were the reports of his performance at

5  the work site?

6     A    At the Unitarian Universalist church, Mr. Solomon

7  reported to me that Mr. Hinckley is doing quite well there;

8  he's enjoying connecting with Mr. Hinckley.  Mr. Solomon

9  talked a bit about bringing his mother to the Williamsburg

10 area.  She was declining in health.

11       And Mr. Hinckley shared about sometimes that he

12 feels concerned about his own mother.  I think he's making

13 connections with the individuals at the Unitarian

14 Universalist church.  And he's doing the -- he's following

15 through with the responsibilities that are expected of him.

16       Eastern State Hospital, likewise, has always

17 provided positive reports that Mr. Hinckley has done exactly

18 what they expect him to.

19    Q    He's performed well and has he been a cooperative

20 and -- a cooperative employee?

21    A    Yes.

22    Q    All right.  What about the media plan and media

23 interaction; have there been any instances where media has

24 approached Mr. Hinckley while on conditional release?

25    A    There was an instance when he was leaving the

1    grounds of St. Elizabeths that two individuals, I believe,

2    approached the car to take pictures.  And I believe Diane

3    was in the car when this occurred.

4            And he was also approached by an individual on his

5    way to Eastern State Hospital, when he was approaching the

6    building on foot.  And he wasn't real clear if the

7    individual was from the media, but he ultimately turned

8    around, got in his car, and left.

9        Q    All right.  Was that an appropriate reaction?

10       A    Yes.

11       Q    Did he do all that was expected of him in that

12   regard?

13       A    He did.

14       Q    Is he, in your estimation, in full compliance of

15   the requirements of the media plan?

16       A    Yes, he is.

17       Q    All right.  Now --

18           MR. LEVINE:  The Court's indulgence, briefly,

19   Your Honor.

20           (Pause.)

21   BY MR. LEVINE:

22       Q    Dr. Murphy, in your professional opinion, is

23   Mr. Hinckley ready for convalescent leave?

24       A    Yes, he is.  Yes, in my professional opinion,

25   Mr. Hinckley is ready for --

1     Q     And you say that without hesitation?

2     A     Yes, I do.

3     Q     All right.  Now, you set forth in your report a

4  series of recommendations for the plan; is that correct?

5     A     Correct.

6     Q     All right.  Let me invite you, please --

7  do you have a copy of your report in front of you?

8     A     I do.

9     Q     Let me suggest that we turn to page 61 of your

10 report, Patient's No. 7, and review your recommendations.

11          MR. LEVINE:  And may I suggest that, as we go

12 through these, Your Honor, it may be good to make a tally of

13 one column, perhaps, of frequency of these visits and

14 another column, perhaps, of the cost associated with these

15 visits so, at the end of this analysis, we can understand

16 how many visits and what the costs are?

17          THE COURT:  I don't know if this witness is

18 qualified to talk about the costs.

19          MR. LEVINE:  Well, we're going to -- let me

20 make -- let me ask some questions, and you'll make some

21 rulings.

22          THE COURT:  And if anybody wants to prepare such a

23 chart, they'd be welcome to do it.

24          MR. LEVINE:  Okay.  Thank you, Your Honor.

25

1    BY MR. LEVINE:

2        Q    All right.  Let's go on page 61.  You see on

3    page 61 there in the middle of the page, just above the

4    middle, you have a, in bold letters, a statement called

5    recommendations.  Do you see that?

6        A    I do.

7        Q    All right.  And then you have in italics, you've

8    divided these recommendations -- you've divided this into

9    three time periods, part A of phase 5 being six months;

10   part B, another six months with, perhaps, another six months

11   after that for evaluation?

12       A    Correct.

13       Q    And then you have part C --

14       A    Correct.

15       Q    -- correct?

16       A    Correct.

17       Q    All right.  Let's talk about the first item you

18   speak of, which is frequency of treatment and reporting

19   during phase 5, part A, for the first six months.

20            First recommendation you make, you say,

21   "Mr. Hinckley should participate in monthly treatment

22   planning conferences with the Williamsburg treatment team."

23            Do you see that?

24       A    I do.

25       Q    All right.  Now, the Williamsburg treatment team,

1    who would that consist of?

2        A    Mr. Weiss, Dr. G-G, Mr. Beffa, as well as

3    Ms. Haley or another identified individual music therapist.

4        Q    Okay.  And if that's monthly, that would be one

5    time a month seeing those three people or the fourth person

6    together; is that correct?

7        A    Correct.

8            MR. LEVINE:  All right.  Your Honor, may I suggest

9    to the Court that in earlier testimony, there was a

10   statement --

11           THE COURT:  Well, I don't know that this is a

12   useful exercise with this witness.  Why don't you prepare a

13   chart, get the government to stipulate.

14           It's a matter of math.  We know how much each

15   person is charging per hour, and do it that way.  This is

16   going to take forever if we're trying to do it with her.

17           MR. LEVINE:  Okay.  So we'll leave that part for

18   later, then.

19   BY MR. LEVINE:

20       Q    All right.  So what we have here is in A --

21           THE COURT:  You can call Mr. Weiss back or

22   Mr. Hyde back if you need a sponsoring witness for the

23   chart, but we know what the hourly rates of these people

24   are.

25           MR. LEVINE:  We do.  We do.

BY MR. LEVINE:

Q    All right.  And so in your A recommendation, it
says, "These conferences should include a review of the
status of Mr. Hinckley's risk factors and his community
reintegration risk efforts, and Dr. Johnson and a member of
the inpatient team should be routinely included via
conference call in these conferences."

So your recommendation is that they meet, that the
three Williamsburg treaters, together with perhaps
Ms. Haley, together with Dr. Johnson, should meet with John
once a month?

A    Well, I think the part about Dr. Johnson that she
should be routinely involved in this, but I don't think it
should be a rigid thing that if she were to be unavailable
for one of these meetings, that it would then present an
issue.

I think instead what I have is that she --
Dr. Johnson is speaking with each of the treatment providers
before Mr. Hinckley comes to the outpatient department, and
that's where she's gathering most of the specific
information.

But I think it's -- it would be good practice for
Dr. Johnson to be involved so that, as the treatment team is
deciding what are the treatment objectives that Mr. Hinckley
needs to meet at the time, that she has some awareness and,

1    perhaps, input into that.

2         Q    Okay.  So your second item, 1-B, is "Mr. Hinckley

3    should travel to the forensic outpatient department located

4    at 35 K Street, Northeast, once a month for monitoring

5    checks, and a member of the inpatient treatment team should

6    be present for these meetings."

7              So that would be a second meeting with

8    Mr. Hinckley with mental health providers on a once-a-month

9    basis?

10        A    Correct.

11             THE COURT:  And the idea is that he would drive

12   back -- we haven't gotten to the driving yet.  But he would

13   drive back to Washington and meet with Dr. Johnson at the

14   outpatient place?

15             THE WITNESS:  Correct.

16             THE COURT:  But that somebody, whether it's

17   Dr. Binks or Mr. Hyde or another member of his current

18   team -- inpatient team would have to attend that meeting?

19             THE WITNESS:  Yes, for the first six months.

20   BY MR. LEVINE:

21        Q    All right.  Then the third item, 1-C, you

22   recommend that Mr. Hinckley should participate in individual

23   psychotherapy sessions with Dr. Binks once a month until the

24   conclusion of part A, which is the first six months,

25   correct?

```
 1          A    Correct.

 2          Q    When their treatment relationship can be

 3   terminated, he can schedule these sessions during his trips

 4   to the forensic outpatient department?

 5          A    Correct.

 6          Q    All right.  So that would be a third session that

 7   he would have during the month.

 8               Then we have D, "Mr. Hinckley" should

 9   participate -- "Should continue participating in weekly

10   group psychotherapy sessions.  This is a rather valuable

11   forum for Mr. Hinckley to address deficits in interpersonal

12   functioning associated with his personality disorder, a key

13   clinical issue at present."

14               Okay.  So that would be --

15               THE COURT:  And that's Mr. Beffa's group therapy

16   session?

17               THE WITNESS:  Correct, yes.

18   BY MR. LEVINE:

19          Q    So that would be four more per month?

20          A    That's right.

21          Q    Okay.  Then you say, "Mr. Hinckley should continue

22   participating in weekly NAMI meetings"?

23          A    Correct.

24          Q    All right.  That's another four?

25          A    Uh-huh.  Yes.
```

1      Q     Then you say on F, "Mr. Hinckley should meet with

2  Dr. Beffa for individual therapy three times a month"?

3      A     Yes.  I say this because in part A, my suggestion

4  is that he's meeting with Dr. Binks once a month as well.

5  So this will be a total of four individual therapy sessions.

6  I think it would be redundant for Mr. Hinckley on the fourth

7  week, on the week he's traveling to Washington, D.C., to see

8  Dr. Johnson, see Dr. Binks, and then go back and have a

9  scheduled session with Mr. Beffa, that this seems

10 extraneous.

11     Q     Okay.  And that makes sense.

12           All right.  So then you go on to G, "Mr. Hinckley

13 should meet with Dr. G-G twice monthly."

14     A     Right.

15           And I do want to mention here.  When I spoke with

16 Dr. G-G, when she was making her recommendation, she was

17 also including a treatment plan meeting as one of her

18 contacts with Mr. Hinckley.  So from that framework, she

19 would be meeting with him three times a month in part A.

20           THE COURT:  Under your proposal?

21           THE WITNESS:  Under my proposal.

22           THE COURT:  Not necessarily under hers?

23           THE WITNESS:  Well, this is what I posed to her.

24 And I know she wants to meet with him weekly in the first

25 few months.  And whether it's three times through my plan or

1    four times a month through hers, I don't see us being too

2    disparate.  I think it's okay.

3         Q    In your view, should that be a judgment, the

4    number of times for these meetings, that should be made by

5    the clinician?

6         A    Yes, I do.

7         Q    And maybe the Court -- is it your view that the

8    Court should have, perhaps, in its order, a minimum number,

9    but leave to the discretion of a menial health provider the

10   number above the minimum?

11        A    Right.  This was my thinking in making these

12   suggestions.

13        Q    Then in H of this section, you say he should

14   meet -- "Mr. Hinckley should meet with Mr. Weiss at least

15   twice monthly for case management sessions."

16             Do you see that?

17        A    Yes, I do.

18        Q    All right.  Now, so that could be two or more

19   times?

20        A    Correct.

21        Q    All right.  Then you go on to I, "Mr. Hinckley

22   should meet with an individual music therapist once a

23   month."

24             All right?

25        A    Correct.

1    Q    So then we go to J and we have, "At the conclusion

2   of six months, a comprehensive treatment planning

3   conference, including all key providers, should be scheduled

4   to address Mr. Hinckley's progress and risk management

5   needs.  Dr. Johnson should facilitate this meeting.

6   If there is a consensus that Mr. Hinckley is ready to

7   advance, part B should be implemented."

8    A    Correct.

9    Q    Now, what you don't have in this section but have

10  elsewhere is that Mr. Hinckley would be making weekly calls

11  to Dr. Johnson?

12   A    I included this under my suggestions for

13  Dr. Johnson's roles and responsibility during the first year

14  of convalescent leave.

15   Q    So if we were to add these up, we would have

16  Mr. Hinckley seeing mental health professionals, no fewer

17  than 19 times, as listed in part A, plus four times with

18  Dr. Johnson by phone, plus other times that Mr. Weiss might

19  suggest that they get together?

20   A    Correct.

21   Q    All right.  So we have well in excess of 23 times

22  in a 30-day time period?

23   A    Uh-huh.  That's right.

24   Q    All right.  Do you think seeing mental health

25  professionals 23 or more times a month would be -- would

1    provide those professionals with ample opportunity to assess

2    Mr. Hinckley and his progress or his deterioration, should

3    there be either?

4         A    Yes.

5         Q    Okay.  And this is far above what is typically

6    recommended.

7              Far above?

8         A    Far above.

9         Q    Okay.  Let's move on to B.  That would be the

10   second six-month period, all right.

11             You have there, "Mr. Hinckley should continue

12   participating in treatment planning conferences once a month

13   with the Williamsburg treatment team."

14             So that's one time.

15             "Regular and consistent planning treatment

16   conferences should be a primary mechanism to monitor

17   Mr. Hinckley's self-reporting at the meetings, as the

18   meeting offer a formalized forum for providers to connect to

19   one another and with Mr. Hinckley as a group.

20             Again, the status of risk factors in

21   Mr. Hinckley's community reintegration efforts should be

22   thoroughly assessed during conferences.  As previously

23   discussed, the multidisciplinary format offers an effective

24   approach to treating and supervising insanity acquittees

25   residing in the community."

1          All right.  So that's one time per month?

2     A    Yes.  And I'd like to make a point about this.

3     Q    Please.

4     A    In contrast to the hospital's proposal -- so the

5  hospital, you know, is proposing bimonthly treatment

6  planning meetings -- I had a slightly different approach to

7  how I conceptualized the convalescent leave process.

8          And you can --

9     Q    Tell us about that.

10    A    And you can see in here that I'm recommending less

11 individual therapy through part B, through the second six

12 months.  I'm recommending that he meet with Mr. Beffa every

13 other week, while he maintain his weekly group

14 psychotherapies.

15         But as you transition a patient to convalescent

16 leave, risk management, case management, become the more

17 salient foci and objectives of transitioning a patient out.

18         Mr. Hinckley requires continued involvement in his

19 therapeutic interventions and objectives; however, this

20 doesn't remain to be the critical component that it was

21 before.

22         So inpatient -- as an inpatient, he's reached

23 maximum benefit of treatment there in the inpatient setting.

24 And he requires assistance and guidance with Mr. Beffa and

25 Dr. G-G and then his group psychotherapy to talk about his

1   relationships, to talk about how he's doing, how does it

2   feel as he's adjusting to the community more and spending

3   more time out.  If there were any major life changes, his

4   mother fell ill, these are things that should be addressed

5   in psychotherapy.

6           I maintain the recommendation through both parts A

7   and B for weekly treatment planning conferences, because

8   this is the avenue that's going to address self-reporting.

9   It's going to address corroboration between treatment

10  providers and address the channels of communication.

11          And I think that this is an important point of

12  contact here.  So it is different from what the hospital

13  recommended for that reason.

14      Q    Interesting.  All right.

15          2-B, you have here, "Mr. Hinckley should continue

16  traveling to the forensic outpatient department once a month

17  for monitoring checks."

18      A    Correct.

19      Q    So that's another single time.  That's when he

20  would meet with Dr. Johnson or a designee; is that correct?

21      A    Correct.

22      Q    All right.  Now, then you go on --

23          THE COURT:  But his relationship in your approach

24  with Dr. Binks has concluded at the point?

25          THE WITNESS:  He's, at this point in part B, is

1  terminated with Dr. Binks, that their therapeutic

2  relationship has tapered down, and he's no longer seeing

3  Dr. Binks and is seeing Mr. Beffa.

4          I spoke with Dr. Binks and Mr. Beffa about this

5  recommendation, and Dr. Binks didn't think it was necessary

6  that Mr. Hinckley have weekly therapy, per se.

7          He agreed with Mr. Beffa's approach that, with --

8  Mr. Beffa mentioned that he takes with his other patients in

9  the group psychotherapy, is that once they've started the

10  group, that that becomes the primary modality of treatment

11  and that individual therapy is used as an adjunct to bolster

12  that; however, the -- what's discussed in individual is

13  largely around the issues that came up in group

14  psychotherapy.

15          So I believe that at this point, that that's what

16  Mr. Hinckley clinally needs.  Mr. Beffa agrees.  Dr. Binks

17  was in support of this.

18  BY MR. LEVINE:

19      Q     All right.  So that's how you got to number C

20  here -- or letter C.  "Mr. Hinckley should continue

21  attending group psychotherapy sessions on a weekly basis."

22          So that's with Mr. Beffa?

23      A     Correct.

24      Q     So that's another four times a month.

25          Now, in D, you have, "Mr. Hinckley should continue

1    attending NAMI meetings on a weekly basis."

2         Is that correct?

3    A    Correct.

4    Q    So that would be another four times a month?

5    A    Right.

6    Q    All right.  Then we go to E, "Mr. Hinckley should

7    participate in individual psychotherapy with Mr. Beffa twice

8    monthly."  That's two times a month, all right?

9         "This therapeutic relationship remains

10   significant, yet much of their work together has been

11   effectively transitioned into the group therapy format,

12   psychotherapy format.

13        "Mr. Beffa has ample opportunity to continue to

14   monitor any changes in Mr. Hinckley's clinical status in

15   both group and individual sessions, as well as during

16   monthly treatment planning conferences.

17        "Mr. Beffa may opt to increase the frequency of

18   these meetings during any periods of increased stress, such

19   as prior to court hearings, family illness, or relationship

20   changes."

21        So that's at least another two, and perhaps more

22   times per month?

23   A    Correct.

24   Q    All right.  And F, "Mr. Hinckley should meet with

25   Dr. G-G at least once a month for medication and monitoring

1    checks.  Dr. G-G can increase the frequency of

2    Mr. Hinckley's appointments as clinically indicated."

3            So that's at least one time a month, and perhaps

4    more if Dr. G-G would think it useful?

5        A    And this is consistent with what she's

6    recommending, that one of her contacts be a treatment plan,

7    and one of her contacts be an individual medication check

8    with therapy.

9        Q    Right.  You heard the testimony of Dr. G-G?

10       A    I was not present for the testimony of Dr. G-G,

11   but got a summary of it after the fact.

12       Q    All right.  Then you go to G.  2-G, you say,

13   "Mr. Hinckley should continue meeting with Mr. Weiss twice a

14   month."  So that's another two times a month.

15           And we heard Mr. Weiss say that he may, in the

16   early stages -- and, of course, this is six month into it --

17   increase the number?  All right.

18       A    Correct.

19       Q    So that's at least two more.

20           And then H, you say, "Mr. Hinckley should meet

21   with the individual music therapist once a month."

22           So that's another instance.

23           MR. LEVINE:  By my count, Your Honor, that's at

24   least 16 times a month for the second six-month period.

25

1  BY MR. LEVINE:

2      Q    And that is in addition to the telephone calls

3  that Mr. Hinckley would be making to Dr. Johnson at the OPD?

4      A    Correct.

5           MR. LEVINE:  Okay.  The Court's indulgence for a

6  moment, please.

7           (Pause)

8  BY MR. LEVINE:

9      Q    All right.  Now, Dr. Murphy, you were also in your

10  report -- and I invite your attention to page 63 of it,

11  Patient's 7, you go through the roles and responsibilities

12  of each of the treatment providers.

13          Do you remember that?

14     A    I do.

15     Q    All right.  What do you recommend with respect to

16  Mr. Weiss?

17     A    Mr. Weiss, in my collateral interview with him,

18  suggested that he could take on the role of liaison between

19  the Williamsburg treatment team and the outpatient

20  department.  I think he can be responsible for collecting

21  progress notes, talking to work supervisors, being the point

22  person to coordinate the treatment down there, and relaying

23  this information to Dr. Johnson at the outpatient

24  department.

25     Q    Now, would Mr. Weiss be in a position to confirm

1    Mr. Hinckley's attendance at various places, work sites,

2    et cetera?

3         A    Yes.

4         Q    Appointments with mental health providers?

5         A    Yes.

6              And I had spoke with Mr. Weiss, what about doing

7    sort of an unannounced, pop-in visit at his work?

8    And he said he would be happy to do that kind of thing.

9         Q    So that would be, would that be a way of

10   corroborating his performance and his attendance?

11        A    Yes, it would.

12        Q    Verifying it.

13             All right.  And what role would Mr. Weiss play in

14   terms of collecting evidence of Mr. Hinckley's performance

15   at the job-sites.

16        A    He would routinely speak with work supervisors to

17   talk about his progress and attendance to work and volunteer

18   sites.

19        Q    And what role would Mr. Weiss play with respect to

20   collecting progress notes?

21        A    He would reach out or -- well, Dr. G-G and

22   Mr. Beffa and Ms. Haley would provide their progress notes,

23   perhaps, via email to Mr. Weiss, and he would compile them

24   and send them to Dr. Johnson.

25        Q    For her --

1        A      Review.

2        Q      -- report to the Court?

3        A      Correct.

4        Q      Now, would this be a means by which Mr. Weiss

5   could identify discrepancies, if any, in Mr. Hinckley's

6   report -- in Mr. Hinckley's self-report?

7        A      Yes.  This is one opportunity for Mr. Weiss to do

8   that.

9               And in addition to that, I think during treatment

10  plans, this will be, as each provider is updating and

11  providing their synopsis of Mr. Hinckley's adjustment and

12  how he's doing in relationships and any potential changes in

13  risk factors, his clinical status, that this would be an

14  avenue where that would be addressed.

15       Q      And it would also be a means to corroborate the

16  accuracy of Mr. Hinckley's self-report?

17       A      Correct.

18       Q      All right.  Now, you in your report, page 64,

19  recommend a role and responsibility for Dr. Johnson at OPD?

20       A      Yes.

21       Q      What is that?

22       A      Dr. Johnson would sort of, under the plan that I'm

23  suggesting, she would sort of be the gatekeeper before the

24  Court to ensure that Mr. Hinckley is following the

25  stipulations of his court order, having collateral

1    interviews with each one of the Williamsburg treatment

2    providers, reviewing the notes.

3            I suggest that she puts together a brief summary

4    of Mr. Hinckley's adjustment and provides that to the Court,

5    hitting all the big things:  if he has a new volunteer

6    position; if he has a new job; if he has a new relationship;

7    if, for some reason, his mother gets ill or is unavailable,

8    that that, of course, is communicated there.

9            Something that is less detailed than what is

10   currently reported to the Court, but that provides a summary

11   of everything that she's learned in the month period.

12   Q    And she would consult with the treatment team in

13   Williamsburg?

14   A    That's right.

15   Q    Okay.  You address a role for Dr. G-G?

16   A    I do.

17   Q    What do you suggest there?

18   A    That she's in charge of prescribing medication

19   locally in Williamsburg, as well as being the point person

20   to notify Dr. Johnson of any changes in Mr. Hinckley's

21   mental status.

22           She's also been previously identified as the point

23   person that in the event that there's a psychiatric

24   emergency, that she would be in charge of facilitating

25   inpatient care.

1      Q      And you actually make a recommendation with

2   respect to Mr. Hinckley and what he should be responsible

3   for?

4      A      Right.

5      Q      What is that?

6      A      That he keep the daily calendar that I described

7   earlier; that he volunteer or work three days a week; and

8   that once he's able to -- if and when he's able to

9   contribute to his treatment costs, that he do that as well.

10            THE COURT:  So the daily -- not the daily.

11            But the calendar is in place of the itinerary?

12            THE WITNESS:  Well, it's one thing to support

13   communication about what he's doing, any changes, if he

14   couldn't show -- for example, when he went to Eastern State

15   Hospital and was approached by the individual who could have

16   been media and he got in his car and left, that he's writing

17   that down.  "I did not go to my Eastern State Hospital shift

18   because of this incident."

19            And that he -- it's sort of his accountability and

20   sort of memory as he's going on a monthly basis to report to

21   his treatment team, and then to Dr. Johnson, that he has

22   this in writing, and that the onus is put on him to present

23   this information.

24            I think at this point, it's consistent with the

25   level of freedom that he's ready for.

1          THE COURT:  Now, somewhere in these

2   recommendations -- and I can't remember whether it's the

3   hospital's or Dr. Patterson's or the government's -- there

4   is a suggestion that he keep a log or daily log or a daily

5   journal.  Is this the same thing or is this something

6   different?

7          THE WITNESS:  I suppose it's similar.

8   My recommendation is not so detailed that he's logging all

9   of his activities.  Dr. Johnson told me in her interview, we

10  don't need to know that he goes to a coffee shop.  Right.

11  If he's stopping by a Starbucks, that's not something that's

12  clinically -- like risk relevant.

13          And so what I want, I could flesh this out, too,

14  and be more specific, too, in this recommendation, is he's

15  expected to go work or volunteer three days a week; did he

16  go do that?  Did he go to his appointment with Dr. G-G?

17          There was a few instances when Dr. G-G, I think

18  she had to go to a funeral and couldn't have her

19  appointment.  So he instead called Dr. Adewale.  We want to

20  know that.  Why was that -- his responsibility in this area,

21  why did it not happen that particular week or that

22  particular day?

23          So it's for accountability purposes, but it's

24  not -- I'm not suggesting that Mr. Hinckley take on writing

25  detailed itineraries.

1          Although, Mr. Hyde did mention to me that in

2     his -- in the November filing, I believe, there was sort of

3     a truncated itinerary that was included in that as an

4     addendum or -- and perhaps Mr. Weiss could rely on this

5     shorter version of an itinerary, if he's interested in doing

6     that.

7          But for risk management and risk-relevant needs,

8     I don't think right now an itinerary is necessary.

9     BY MR. LEVINE:

10     Q    Is an itinerary actually feasible?  I mean, when

11     would you write it?  You have a calendar for a day, and

12     things happen during the course of a day that change the

13     plan.

14     A    That's right.  If we're -- if the recommendation

15     is for convalescent leave and the hospital believes he's

16     ready for it and, consistent with other patients, none of

17     which that I know of have itineraries, he's ready for this

18     level of responsibility, this step down from the

19     itineraries.

20          Itineraries are not, they don't fit the

21     convalescent leave framework.

22     Q    All right.  You have a section in your report on

23     page 65 denominated risk management interventions?

24     A    Correct.

25     Q    You make reference to driving, Mr. Hinckley's

 1  driving.  Has he demonstrated responsibility and reliability

 2  in driving?

 3       A    Yes, he has.

 4       Q    You have a section about whether he should be

 5  permitted, without approval, without court approval, to go

 6  beyond 50 miles or 30 miles.  Tell us your recommendation

 7  with respect to that.

 8       A    This recommendation came out of my conversation

 9  with Dr. Johnson.  What's typical, and she can speak more to

10  this, is a person being discharged from the hospital

11  initially is not allowed to leave a 50-mile radius of

12  Washington, D.C.

13            Mr. Hinckley, however, isn't being discharged to

14  Washington, D.C., he's being discharged out of state.

15  Not far away, but it is out of state.

16            So the 50-mile recommendation, I agree, should be

17  instated; however, I have an additional risk management

18  piece this where if he travels 30 miles outside of -- I used

19  Kingsmill Road where his mother lives, as the center point

20  of the radius, that if he travels 30 miles outside, that

21  he's with a treatment provider.  This is consistent with

22  the, in previous court orders, the stipulation that he avoid

23  government centers in Richmond.

24            I think as we move through convalescent leave,

25  that that stipulation should remain in place.  I think it

1    can be relaxed over time; but right now, that there's no

2    reason to change that.

3                THE COURT:  Is your recommendation based entirely

4    on the fact that Richmond is within a 50-mile radius, or is

5    it based on other things as well?

6                THE WITNESS:  It's based -- I would say that that

7    was the thrust of my recommendation, is that Richmond is

8    outside of that.

9                But also that he's being transitioned out of

10   state, and so it doesn't equate to being discharged to

11   Washington, D.C.  So I think those two things together.

12               But, yes, I will say that -- the piece about

13   Richmond.  Being -- Mr. Hinckley being close to a government

14   center, it doesn't put up red flags for me that he's high

15   risk of being -- when he's in Richmond, that this somehow

16   changes his risk.  But this is just sort of a catch-all

17   recommendation that's used for all people transitioning, all

18   forensic patients transitioning out of the hospital, and I

19   think that it should -- he should be included.

20        Q    All right.  Well, you say beyond a certain

21   distance, it would require the presence of a treatment team

22   member.

23               I mean, it's not likely that John will go to the

24   beach with Mrs. -- with Dr. G-G, for example.  He might go

25   with Mr. Weiss.

1          What about going with a responsible person?

2    What if he wants to go to Virginia Beach, which is beyond

3    the 30 miles, but I believe within the 50, with his brother

4    or sister?

5         A    Right.  I think that that would be acceptable

6    for -- if, under the scenario that he went to Virginia Beach

7    with, say, his mom or his brother or sister, that that would

8    be okay, and that that's outside of the 30-mile radius.

9         Q    And is that something you would, although not in

10   the language of your proposal, you would adopt that for your

11   proposal?

12        A    Yes, I would.

13        Q    Okay.  The government has proposed that

14   Mr. Hinckley be required to wear an ankle bracelet.

15             MR. LEVINE:  I think Your Honor has already

16   commented on that.  So if that's no longer in this matter,

17   I'm prepared to move past it.

18             THE COURT:  I have to think.  I think I have to

19   explain my reasoning at some point.  So if you want to

20   elicit some testimony from some mental health professionals,

21   that would probably be a good idea.

22             THE WITNESS:  I have some thoughts about it.

23   BY MR. LEVINE:

24        Q    What is your view as to whether an ankle bracelet

25   is appropriate for a low-risk patient?

1          A     I think it's intrusive and unnecessary in this

2     case, and the direction that the hospital is trying to go

3     with providing Mr. Hinckley the freedom that he's entitled

4     to from the least-restrictive setting.

5               What I want to say is, in my experience,

6     electronic monitoring systems are generally used in

7     conjunction with house arrest, that individuals who have the

8     ankle bracelet are to remain inside their home; and they

9     might be able to leave to go to work; they might be able to

10    leave under the supervision of law enforcement.

11              The reason the ankle monitors were -- began being

12    used with more frequency is because there was overcrowding

13    in jails and in prisons.  And so the correctional system

14    opted to take individuals, inmates who had not violated any

15    rules in the correctional setting or who were ill and could

16    be monitored at home medically, they would put ankle

17    bracelets -- they put ankle bracelets on these individuals

18    as a way to decrease crowding in prisons.

19              It's also used for repeat DUI offenders.

20    There's actually a function --

21              MS. KENNEDY:  Objection, Your Honor.  I don't know

22    what the basis is for Dr. Murphy's knowledge at all on ankle

23    bracelets.

24              THE COURT:  Well, she can tell us.

25              MS. KENNEDY:  What's the basis of her knowledge?

1   Because up to this point, it's totally inaccurate.

2               I'll ask on cross, but I'd like to know what she's

3   speaking about other than her opinion.

4               THE WITNESS:  Well -- okay.

5               THE COURT:  Fair enough.

6               What's the basis for your knowledge of how ankle

7   bracelets often are usually used?

8               THE WITNESS:  This is from coursework in forensic

9   psychology when I was doing my master's degree, as well as

10  I did a yearlong internship at the 19th Judicial Circuit

11  Court in Waukegan, Illinois, outside of Chicago.

12              I worked -- I did mental health evaluations of sex

13  offenders and other violent offenders.  It wasn't

14  necessarily always an issue that we looked at, but it's

15  something I've been exposed to and I'm aware of.

16              And I'm not -- in no way trying to say that the

17  circumstances I'm describing, this is the only way it's

18  used; but I'm trying to illuminate generally what the

19  function of an electronic monitoring system is and why

20  I think in this case it doesn't seem to fit the risk

21  management needs.

22              THE COURT:  Well, why don't you try to focus more

23  on why it doesn't fit the risk management needs in this

24  case.

25              THE WITNESS:  Okay.  So Mr. Hinckley, as I

1   described earlier, as we're stepping down from -- or my

2   suggestion is, is to step down from itineraries and from

3   detailed reporting, that the additional risk management

4   recommendations that I make account for his supervision and

5   monitoring.

6           When you look at risk management, there's four

7   different domains that you look at.  There's victim safety

8   planning, there's supervision, there's monitoring, and

9   there's treatment.  So each one of the recommendations that

10  I make is -- falls into one of these categories.

11          Supervision is the more restrictive form of risk

12  management, where an individual's liberties are being

13  somehow restricted.  Monitoring, on the other hand, does not

14  involve this level of intervention or this level of,

15  I guess, intrusiveness or -- and monitoring is surveilling

16  the individual.

17          So like Dr. Johnson's monitoring checks with

18  Mr. Hinckley on a monthly basis, she's not in any way

19  restricting his liberties, but she's monitoring how he's

20  doing.

21          The ankle bracelet is a high -- in my opinion, is

22  a high level of supervision that is inconsistent with his

23  needs right now.

24  BY MR. LEVINE:

25          Q    Does an ankle bracelet identify someone who was in

1    the criminal justice system?  If one walks around with it

2    and a pair of shorts in Williamsburg in the summer, will he

3    be identified as being in the criminal justice system?

4         A    Yes.  There's a certain stigma to this.

5         Q    And how does that bear upon the objective of

6    community integration?

7         A    Well, it can further impede upon it.

8              Already, there's his name and notoriety.

9    Generally speaking, people don't seem to recognize him; but

10   when his name is brought up, there's some resistance from

11   the surrounding community.  And if you add an ankle bracelet

12   to that, it further -- you know, it further impedes his

13   ability to sort of just reintegrate as a member of society.

14        Q    Does it further suggest that there's an element of

15   dangerousness that no one appears to be seeing?

16        A    I would agree, yes, it does.

17        Q    All right.  Now, the government also suggests that

18   there be vehicle tracking, a vehicle tracking device and a

19   computer monitoring software.  Let's talk about each of

20   these.

21             Do you have a view about the propriety or wisdom

22   of having a vehicle tracking device?

23        A    There hasn't been evidence to suggest across this

24   hospital course or during his stays in Williamsburg that he

25   is an elopement risk; and so I don't see this as being

1    necessary, the monitoring on his vehicle.

2        Q    Is it, to your knowledge, as manifested in the

3    medical records of the case, that over the 30-some-odd years

4    of his stay at the hospital, there has never been a single

5    instance of elopement or escape?

6        A    That's correct.

7        Q    All right.  With respect to computer monitoring

8    software, the government has suggested that some software,

9    I believe it was DOS -- I'm not sure what that is -- be

10   attached to Mr. Hinckley's computer at home -- I guess it's

11   Mrs. Hinckley's computer at her home -- and that he not be

12   allowed to use any computer other than that computer.

13           Do you have a view of that?

14       A    I don't think -- I've thought a lot about his

15   Internet restrictions during the last risk assessment and

16   this risk assessment.  I don't think that that's indicated

17   right now, given his -- there hasn't been data to suggest

18   that Mr. Hinckley is going to use the Internet in some way

19   to commit a crime or commit a violent crime.

20           I suppose certainly there's many what-ifs that

21   come along with that.  But I have to go from the evidence

22   and my review of his record that there has been no --

23   nothing outstanding or noteworthy or red flags to suggest

24   that he should not be afforded the opportunity to use the

25   Internet.  It's a vital part of existence today.

1          During my last risk assessment update,

2    I recommended that the Internet restrictions remain the

3    same.  And in that instance, what I was looking at was, I

4    originally thought that at that time he could step down from

5    that, to something less restrictive.

6          There was an incident with the dental resident.

7    And there was a lot of testimony last time about that.

8    And that was -- that primarily informed my thinking around

9    making that recommendation.

10          But I will add that with the dental resident

11    incident, as we will call it, he -- the treatment team

12    suspended his privileges for one week because he was using

13    the Internet inappropriately during his work shift.  So that

14    was the, quote/unquote, crime of that action, not that he

15    was somehow obsessed with this woman or that this was a

16    clinically significant thing.  It was more of a behavioral

17    thing that was poor judgment, was associated with poor

18    judgment.  So I decided at that time that I wouldn't

19    recommend increases in his Internet use.

20          Again, sort of in the same vein of the

21    itineraries, he's, Mr. Hinckley has given enough data at

22    this point in Williamsburg that he would not -- that there

23    is no evidence to suggest that he's going to misuse the

24    Internet to somehow commit a crime.  That logic becomes

25    fuzzy for me.

```
 1              That becomes more of an extrapolating into extreme
 2    what-ifs that are outside of his risk factors that have been
 3    identified.
 4        Q    So you would object the government's supposition
 5    or basis for a restriction on his Internet use?
 6        A    Correct.
 7              THE COURT:  Well, let me ask you a couple
 8    questions about that.
 9              And putting aside the technological feasibility or
10    infeasibility of doing certain things for the moment, he's
11    trying to reintegrate into the community; he's trying to get
12    a job.
13              You've suggested -- other people have said
14    explicitly -- in this day and age, you have to apply for
15    jobs online; you have to look for jobs online; you have to
16    do all sorts of things online; you have to do certain things
17    at your job online.
18              But it's also been suggested that, if you put that
19    aside somehow, what about restrictions with respect to his
20    going online to look up things about himself or about
21    President Reagan or about Mr. Brady or about presidential
22    assassinations or other forms of violence or, although this
23    is a totally different category, pornography?
24              Do you make any distinction between those kinds of
25    categories of things and the things that one must do in this
```

1    day and age to live an ordinary life, to apply for a job, to

2    do a job, to communicate with friends?

3            THE WITNESS:  Right.

4            Well, I think Mr. Hyde testified a bit about how

5    this is used therapeutically.

6            And I will say there's, in my experience, I know

7    that there's been two other high-profile cases at the

8    hospital whose therapists have directly used this as a

9    psychotherapeutic intervention, that they spend several

10   weeks Googling the individual, looking at the articles,

11   talking about empathy, talking about the impact of the

12   crime.  So I agree that it can be used as a therapeutic

13   tool.

14           But in addition to that, I can't find the reason,

15   the evidence to argue that he should not be able to use the

16   Internet for leisure purposes.

17           And, again, I know there's many what-ifs that come

18   with that, but I just don't see that he's engaged in

19   behaviors that suggest that that's the way he's going to use

20   the Internet.  So it's possible but not probable.

21   BY MR. LEVINE:

22       Q    To your knowledge, has he ever indicated a desire

23   to use the Internet to look at any of those kinds of sites,

24   whether it be public figure sites or Mr. Reagan sites or his

25   name or indeed pornography.  Has he ever indicated an

1    interest in that?

2        A    He has not.

3        Q    The government has suggested, and the Court has

4    ordered in the past, that he use a cell phone equipped with

5    a GPS capability.  And the government now is saying,

6    I believe for the first time, that he should be restricted

7    to that single cell phone for telephone communications.

8            Do you have a view as to that kind of restriction?

9        A    I don't think that's necessary.  I think he should

10   be able to use his mother's phone.  If he needs to for some

11   reason in a work position or volunteer position use the

12   phone, he should be at will to do that.  I don't agree.

13       Q    Has there been any report or any instant of his

14   misuse of the telephone, of any telephone?

15       A    No.

16            I know that Ms. Jernigan-Pedrick, his work

17   supervisor at St. Elizabeths Hospital, has talked about

18   Ms. C.B. contacting him during his work shift, which she

19   hasn't found to be a problem.  It was her observation.

20            And he occasionally used the phone to try and

21   reach out to Ms. C.B. from the library.  But it wasn't used

22   inappropriately.  It was his mode of communication to

23   connect with friends and family.

24       Q    The government has suggested that should

25   Mr. Hinckley engage in some behavior that may constitute a,

1  even a minor, arguably, a trivial violation of the terms of

2  the convalescent leave, that he be returned to the hospital.

3        Do you believe that there should be a materiality

4  standard before he be returned to the hospital?

5    A    I don't think he should be automatically returned

6  to the hospital.  I think the violation needs to be looked

7  at.  And I have full confidence in the treatment teams to

8  assess any issues that arise.

9        So, for example, wouldn't that then mean that with

10  the John Tracy incident, that he would have to go back to

11  the hospital if this occurred on convalescent leave?

12  I don't think he would need to go back to the hospital on

13  that.  I think he would need to talk to his treatment

14  providers about why he didn't reach out.  And, I mean, this

15  is a different issue because under convalescent leave, he

16  wouldn't have itineraries.

17        But I think my point is that issues like these

18  don't necessitate rehospitalization.  Hospitalization and

19  being on inpatient status is because you have a mental

20  disorder that makes you a risk of violence to yourself or

21  others.

22    Q    And there was nothing about the Tracy incident

23  that suggested a mental disorder and danger to self or

24  others?

25    A    Right.  Correct.  I'm using it to illustrate why

1    that stipulation or proposed stipulation would be too far

2    reaching and rigid.

3        Q    All right.  The government also suggests that if a

4    member of the treatment team, having nothing to do with

5    John W. Hinckley, if a member of the treatment team becomes

6    temporarily unavailable, that Mr. Hinckley should go back to

7    the hospital.  What's your view of that?

8            MS. KENNEDY:  Objection, Your Honor.  If they're a

9    member of the treatment team, they do have something to do

10   with John Hinckley.  I don't know if Mr. Levine spoke or

11   what, but he said even if they have nothing to do with

12   John Hinckley.

13           MR. LEVINE:  I didn't misspeak.

14           THE COURT:  What's the question?

15   BY MR. LEVINE:

16       Q    The question is, what's your view of the

17   suggestion, the government recommendation, that should a

18   member of the treatment team become temporarily unavailable,

19   that Mr. Hinckley be sent back to the hospital?

20       A    I don't agree with that.

21           I was trying to remember back a bit, and I think

22   Dr. G-G came onboard before the Court hearing.

23           The only reason I think -- it just happened to

24   coincide during the 2013 hearing that the treatment team was

25   making the recommendation to bring Mr. Weiss onboard and

1    that Dr. G-G was later approved to be a treatment provider,

2    but she had already started working with Mr. Hinckley as he

3    transitioned from his work with Dr. Lee.  I don't -- I don't

4    think that that's a reason to hospitalize him, for the same

5    reason that it has nothing to do with his mental state or

6    risk of violence.

7         Q    Well, Dr. Murphy, should there be flexibility in

8    the hospital or the OPD in evaluating when and if it's

9    necessary to return Mr. Hinckley to the hospital?

10        A    I do think there should be some flexibility there.

11        Q    And there should be -- should there be discretion

12   exercised by the mental health professionals?

13        A    Yes.

14             MR. LEVINE:  One moment, please, Your Honor.

15             (Pause)

16   BY MR. LEVINE:

17        Q    Dr. Murphy, in reaching the conclusions you've

18   articulated today, did you take into account Mr. Hinckley's

19   psychiatric history?

20        A    Yes, I did.

21        Q    Did you consider the current clinical, contextual

22   and individualized risk factors?

23        A    I did.

24        Q    Did you take into account Mr. Hinckley's

25   performance on previous conditional releases?

1       A       I did.

2       Q       Did you take into account the myriad of concerns

3  expressed by Dr. Patterson in his report?

4       A       I did.

5       Q       And, indeed, consider the concerns he articulated

6  in earlier hearings before this Court?

7       A       I did.

8       Q       And what is your conclusion regarding risk of

9  dangerousness based on your assessment of the current

10 clinical, contextual, and individualized risk factors?

11      A       It is my opinion with a reasonable degree of

12 psychological certainty that Mr. Hinckley has a low risk of

13 future violence under the proposed conditions.

14      Q       And is it similarly your view, your opinion, your

15 professional opinion, to a reasonable degree of

16 psychological certainty, that the prospect of relapse into a

17 stage of mental illness is decidedly low?

18      A       Yes.

19              MR. LEVINE:  Nothing further, Your Honor.

20              THE COURT:  Okay.  I have a couple questions.

21              THE WITNESS:  Okay.

22              THE COURT:  Absent decompensation or some major

23 incident, under your proposal, what do you see as my role

24 either as part of -- during part B of your proposal?

25 And probably you might have totally -- this is a second

1   question.

2           THE WITNESS:  Uh-huh.

3           THE COURT:  And after the risk assessment in

4   part C, do I have any role to play under the

5   hospital/Dr. Murphy plan going forward?  And if so, what is

6   it, and when does it kick in?

7           THE WITNESS:  Right.

8           I think something that I've thought about and

9   I believe you made reference to was that you shouldn't be

10  the responsible person to pull the plug on the plan, right?

11  And that everything I'm recommending is for the treatment

12  providers, all sound individuals, that discretion is left to

13  them to a certain extent to decide when to pull the plug on

14  this, as should be.  And that it's certainly important for

15  them to report to you that you know that Mr. Hinckley is

16  following the stipulations of the court order.

17          The Court ordered to -- serves to provide explicit

18  instruction to Mr. Hinckley about what is expected of him.

19  But you can't be the risk assessor, and you can't be the

20  person to monitor all of this.

21          And we can't -- I can't suggest that, if there's

22  some significant problem that rears its ugly head during

23  this course, that it doesn't become an issue until it

24  reaches you, I think that's a problem.  I think it needs to

25  be addressed far before that.  So I think you should be

1    involved, but I don't think you should play that role, if

2    that makes sense.

3             In terms of part C, the reason why I recommended,

4    as I did, with little specificity about the step-downs from

5    there, is that, you know, really risk assessment should be

6    done on an ongoing basis.

7             And so for me, it's largely about that there's a

8    risk assessor who looks at how Mr. Hinckley has done in the

9    last year.  Does he still need to see Dr. Johnson on a

10   monthly basis?  Does he still need these monthly treatment

11   plan and conferences with the Williamsburg folks?  Does he

12   still need to talk to Dr. Johnson on a weekly basis?

13            That all of these things are considered after

14   there's more data about how he's done on convalescent leave

15   and that that risk assessment serves as an objective point

16   for the treatment providers to look at in considering what

17   next.  But I do think that they can be largely in charge of

18   that decision and providing updates to you about that

19   decision.

20            What I did speak to Dr. Johnson about was the

21   typical course that forensic patients take.  As they're

22   coming out of the hospital, they report OPD in person on a

23   weekly basis for the first three months.  This goes down to

24   twice a month if -- if OPD feels that that's the level of

25   reporting that the person needs.  But it's pretty typical

1   they go down to twice month and then they go gown to

2   monthly.

3            And then they sort of stay in this routine for a

4   set period of time until the outpatient department believes

5   that this person is ready to come once every three months.

6   And that's when a petition is filed, typically.  You know,

7   there's some divergences from that, but typically it's once

8   every three months.

9            And I think in the case of Mr. Hinckley, that that

10  is appropriate; that another hearing could take place

11  when -- that level of reporting when the treatment team and

12  outpatient department consider him ready to report OPD once

13  every three months.

14           THE COURT:  Well, if I understand it, I mean,

15  there's clearly a difference between conditional release and

16  convalescent leave.  The primary -- from the point of view

17  of the treatment team and clinically, what it really means

18  is he's full time in Williamsburg, instead of half time

19  there and half time here; and, therefore, the primary

20  treaters are in Williamsburg, right?

21           THE WITNESS:  Uh-huh, correct.

22           THE COURT:  And the coming back once a month,

23  which is more complicated in Mr. Hinckley's case because of

24  the geography, whereas, the normal outpatient person could

25  get on the -- I don't know where Dr. Johnson's office is,

1    but get on the metro or get to her office somehow pretty

2    easily, it becomes more complicated here.

3                THE WITNESS:  Right.

4                THE COURT:  So -- and consistent with that, it

5    seems to me -- and I'm just trying to figure this out -- if

6    I were to grant convalescent leave under conditions like the

7    hospital's or the hospital's as modified by some of the

8    government's and Dr. Patterson's or yours, that absent any

9    major event, that they have lots of discretion, right?

10                THE WITNESS:  Uh-huh.

11                THE COURT:  Say "yes" or "no" --

12                THE WITNESS:  They do have.

13                THE COURT:  -- for the Court Reporter.

14                You can't say "uh-huh."  You have to say "yes" or

15    "no."

16                THE WITNESS:  Okay.  You're saying for the

17    court reporting, the monthly summaries that I'm suggesting

18    they submit --

19                THE COURT:  No.  I'm saying this Court Reporter

20    needs to hear you say "yes" or "no" --

21                THE WITNESS:  Oh, okay.  I'm sorry.

22                THE COURT:  -- as opposed to "uh-huh."

23                THE WITNESS:  Okay.

24                THE COURT:  So they have lots of discretion;

25    whereas, in the past, I'd say a minimum of eight visits at

```
1   this number of days or whatever, and then the hospital would

2   come back -- they'd have to come back if their suggestion

3   was to provide more privileges and so forth, right?

4              THE WITNESS:  Right.

5              THE COURT:  So now they have the discretion.

6   And even when we -- if I hear you correctly, even when I get

7   to the risk assessment -- when the risk assessment is done,

8   this time the risk assessment under your proposal would be

9   done primarily for the treaters and not primarily for me.

10             THE WITNESS:  Right.  That this would be an

11  objective person outside of the treatment team to look at

12  everything that's in place and how he's done.

13             THE COURT:  And so the only time -- again, if I

14  understand correctly what you're saying and I think what the

15  hospital is saying -- that I would be involved is, I would

16  be involved in that I would still get monthly reports,

17  right?

18             THE WITNESS:  Correct.

19             THE COURT:  If there were any major event that

20  gave anybody serious pause or raised red flags --

21             THE WITNESS:  Correct.

22             THE COURT:  -- they would be back here?

23             THE WITNESS:  That's right.

24             THE COURT:  And if they wanted to modify the terms

25  of the order.
```

1        So even in your scenario of going down, unless the

2   order -- if the order is written to say, for the first

3   X-number of months, this happens; and then within the

4   discretion of the treaters, we go from so many visits to

5   fewer visits -- I mean, if it's written so that everything

6   is in the discretion of the treaters, then they don't have

7   to come to court.

8        But if there are things that are not so

9   discretionary in the order --

10       THE WITNESS:  Uh-huh.

11       THE COURT:  -- and they, in their clinical

12  judgment, either in Williamsburg or Dr. Johnson or most

13  likely in consultation, think, oh, well, we don't need once

14  a month doing this anymore or we don't need that anymore, if

15  it's written in the order, the court order, then they'd have

16  to come back, right?

17       THE WITNESS:  Right.

18       And this is the reason I suggested minimums, that

19  that's the bottom level of how often these treatment

20  contacts should occur.

21       THE COURT:  And why you're recommending

22  flexibility and not rigidity?

23       THE WITNESS:  Correct?

24       THE COURT:  So that the treaters are making a lot

25  of these decisions rather than a Judge?

1              THE WITNESS:  The clinical decisions.

2              THE COURT:  Right.  Okay.

3         So a lot, in terms of the frequency, if there's

4    convalescent leave, the -- I mean, I'm envisioning if

5    there's convalescent leave -- and the lawyers can tell me on

6    both sides what they think.  And Dr. Patterson, I'm sure,

7    will tell me what he thinks.

8              If I understand the concept in its distinction

9    between -- in its distinction between convalescent leave and

10   conditional release, there's no longer going to be a need

11   for five-, six-, seven-, eight-day hearing to determine

12   whether to increase the number of days and, by increasing

13   the number of days, increasing the conditions.  But instead,

14   if all is going well, big "if" --

15             THE WITNESS:  Right.

16             THE COURT:  -- but if all is going well, that he's

17   living there and he's an outpatient, that then a lot of the

18   decisions going forward will be made without coming back to

19   court, right?

20             THE WITNESS:  Right.  Yeah.

21             THE COURT:  And even when we come back to court,

22   it may be a much more truncated, you would hope and the

23   hospital would hope, a more truncated proceeding.

24             THE WITNESS:  That's correct.

25             THE COURT:  And I'm sure I'll hear from

1   Ms. Kennedy about this, too, because she's got many, many,

2   many years of dealing with outpatients on convalescent leave

3   and, essentially, this same sort of hearing but they're a

4   lot shorter usually.

5            MS. KENNEDY:  Yes.

6            THE COURT:  She does this every week.  This is

7   what she does.  Yeah.

8            So if I'm misstating my --

9            MS. KENNEDY:  No.  You're right, Judge.

10            THE COURT:  If my concept of this is wrong, you'll

11   tell me.

12            MS. KENNEDY:  No.

13            THE COURT:  So one last question and then we can

14   go to lunch.

15            Is today the only day this week that you're

16   available?

17            THE WITNESS:  I can be available Friday, but I

18   know that's well after Dr. Patterson will probably be

19   through or maybe not.

20            THE COURT:  Maybe not.

21            THE WITNESS:  Yeah.

22            THE COURT:  So let's see where we are, whether we

23   can finish with you today.  That would be ideal, because

24   Dr. Patterson would prefer and the government would prefer

25   to have Dr. Patterson testify after everything else, every

1  other professional has been heard from, if at all possible.

2  So -- but that's good to know just in case.

3          THE WITNESS:  Okay.

4          THE COURT:  All right.  So 1:45, is that good?

5          MS. KENNEDY:  That's fine, Your Honor.

6          MR. LEVINE:  Sure, Your Honor.

7          THE COURT:  Okay.

8          MR. LEVINE:  Thank you, Your Honor.

9          THE COURT:  Thank you.

10          DEPUTY CLERK:  All rise.

11          (Luncheon recess from 12:25 p.m. to 1:45 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

        I, William P. Zaremba, RMR, CRR, certify that
the foregoing is a correct transcript from the record of
proceedings in the above-titled matter.

Date: April 28, 2015_____   /S/__William P. Zaremba_____

                                William P. Zaremba, RMR, CRR