IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR No. 81-306 |
| | ) | |
| Plaintiff, | ) | Washington, D.C. |
| | ) | April 29, 2015 |
| | ) | 9:30 a.m. |
| vs. | ) | |
| | ) | Morning Session |
| JOHN W. HINCKLEY, JR., | ) | |
| | ) | Day 6 |
| Defendant. | ) | |
| _____ | ) | |

TRANSCRIPT OF EVIDENCE HEARING
BEFORE THE HONORABLE PAUL L. FRIEDMAN
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:          U.S. ATTORNEY'S OFFICE.
                             COLLEEN KENNEDY, AUSA
                             MARK AZIZ, AUSA
                             MICHELLE CHAMBERS
                             555 Fourth Street, NW
                             Washington, D.C.  20530
                             (202)514-7248


For the Defendant:           DICKSTEIN SHAPIRO, LLP
                             BARRY WILLIAM LEVINE
                             ANN MARIE LUCIANO
                             1825 Eye Street, NW
                             Washington, D.C.  20006-5403
                             (202)420-2237

                             DINSMORE & SHOHL, LLP
                             E. MICHELLE TUPPER-BUTLER
                             101 S. Fifth Street.
                             Suite 2500
                             Louisville, KY 40202
                             (502)540-2367

APPEARANCES CONTINUED:

For St. Elizabeths:              ST. ELIZABETHS HOSPITAL
                                 DEON MERENE, ESQ.
                                 1100 Alabama Avenue, SE
                                 Washington, D.C. 20032

Court Reporter:                  William P. Zaremba, RMR, CRR
                                 U.S. Courthouse
                                 333 Constitution Avenue, NW
                                 Room 6511
                                 Washington, D.C. 20001
                                 (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

- - -

WITNESS INDEX

- - -

WITNESSES                          DIRECT

GOVERNMENT'S:

RAYMOND F. PATTERSON, M.D.          24

- - -

INDEX OF EXHIBITS

- - -

DEFENDANT'S                              ADMITTED

4                                        117

```
1                  P R O C E E D I N G S

2           DEPUTY CLERK:  All rise.  This Honorable Court is

3    now in session; the Honorable Paul L. Friedman presiding.

4           Please be seated.

5           MR. LEVINE:  Good morning, Your Honor.

6           MS. KENNEDY:  Good morning, Your Honor.

7           DEPUTY CLERK:  Criminal 81-306, United States of

8    America versus John W. Hinckley, Jr.

9           For the government, Ms. Kennedy, Mr. Aziz,

10   Ms. Chambers.

11          For the patient, Mr. Levine, Ms. Luciano,

12   Ms. Tupper-Butler.

13          For St. Elizabeths, Ms. Merene.

14          THE COURT:  Okay.  Anything preliminarily or shall

15   we just proceed with Dr. Patterson?

16          MR. LEVINE:  Your Honor --

17          THE COURT:  Why don't you come up to the podium so

18   we can hear you.

19          MR. LEVINE:  Your Honor, I appreciate the Court's

20   indulgence in so many respects.  When we ended the

21   proceedings yesterday, you had or requested that the

22   government admonish Dr. Patterson with respect to the scope

23   of his testimony.

24          Your Honor, in the most respectful way, heartfelt,

25   I want to move the Court to reconsider the motion to
```

1    disqualify Dr. Patterson.

2              The last questions that were proposed -- that

3    were -- the last answers -- I'm not sure it was responsive

4    to the Court's questions -- that Dr. Patterson gave to this

5    Court was, how do we know what Mr. Hinckley was like before

6    the 1981 shooting.

7              Now, I know what Dr. Patterson knows.

8    Dr. Patterson was the family therapist.  He met with the

9    family and Mr. Hinckley in a confidential environment on a

10   weekly basis for years, for years.  For years.  This is not

11   an isolated, single communication for a brief period of

12   time.

13             This was the modality of therapy.  And it

14   included -- the Court's indulgence, Your Honor.  It includes

15   the very things, exactly, precisely, the very things we're

16   considering now.

17             It included depression.  It included isolation.

18   It included psychosis.  It included the level of insight

19   into mental illness.  It included personality disorders.

20   It included the question of access to weapons.  It included

21   the question of family support.  It included attempts at

22   suicide and self-harm.  It included the difficulty of

23   relationships with friends.  And, of course, it included the

24   issue of deception.

25             Now, Your Honor, in the world of psychiatry, it's

1    about the collection of data.  The more you have, the more

2    you consider, the more confident you can be in your opinion.

3              You can never isolate some of the testimony.  You

4    can never isolate -- I didn't mean testimony -- isolate what

5    it is that you know, carve that out from your opinion and

6    say, "I don't rely on it."  It's not possible.  And it's a

7    human, mental gymnastic.  It's not -- particularly so when

8    you have done it on a weekly basis over a period of years.

9              Your Honor, I think it was ill-advised for the

10   government to have proposed that Dr. Patterson be its

11   expert.  I would have thought that better judgment would

12   have suggested that he would recuse himself and say, "Get

13   another psychiatrist."  We live in a metropolitan area where

14   there are many other luminaries.  It's not like we live in

15   an isolated part of the country where he's the only one.

16             Now we're kind of stuck.  We have -- we have him

17   having been appointed.  We have the government having spent

18   over a million dollars on him, for sure.  And he's

19   conflicted.  And he considers, in expressing his opinion,

20   confidential communications, a ground rule of family

21   therapy.

22             One of the things that made it as wrenching as it

23   was, was the absolute assurance, the unequivocal, absolute

24   assurance, that what was said in that room stayed in that

25   room.  And our experience over the last decade is, it's out

1    of that room.  It's in this courtroom.  It's in the

2    newspapers.  It's all over the world.  And that's just

3    wrong.

4            And I ask the Court to reconsider its decision and

5    disqualify Dr. Patterson from this case.  I think the case

6    law is ample.  One that immediately comes to mind is Wang

7    against Toshiba.  It establishes a bright-line with respect

8    to it.

9            But, Your Honor, there are -- this is not a

10   controversial proposition.  This issue is well-settled,

11   and we think the right judgment is to exclude his testimony

12   and disqualify him from this case.

13           Thank you, Judge.

14        MS. KENNEDY:  Your Honor, each and every time we

15   have had a hearing in this case with Dr. Patterson,

16   Mr. Levine has raised the same argument.

17           Your Honor has ruled not just yesterday but each

18   and ever a time it's been raised.  The government would

19   submit that it's the law of the case.

20           Dr. Patterson has not testified to one thing that

21   has happened in therapy.

22           Mr. Levine countered that Mr. Hinckley, he

23   testified what he was like before and after the shooting.

24   Everybody at the hospital knows what Mr. Hinckley was like

25   before and after the shooting.  Every therapist, whether it

1    was in family therapy or not.  Every treatment provider.

2    Every psychologist.  Every expert, including Dr. Phillips,

3    who Mr. Levine knows we no longer have to put on here.

4            And if he were so concerned for the 11th time

5    about Dr. Patterson, he should have filed something

6    beforehand, and the government would have had an opportunity

7    and take the time to attempt to find a new expert.

8            But we submit we don't have to do that in this

9    case.  This Court has heard not one thing from Dr. Patterson

10   that came out of family therapy.  He gave a history that

11   everyone in the hospital and at this point all of us know,

12   from Dr. Phillips, from Dr. Murphy, from Dr. Adewale years

13   ago, from Mr. Hyde.  There is nothing new about the history

14   of Mr. Hinckley.  Nothing has been talked about as far as

15   his mother, his father, in therapy with Mr. Hinckley.

16           I spoke with Dr. Patterson yesterday, as the Court

17   asked, to keep away from that area, as he has always done.

18   And he agreed for the 11th time that he would absolutely do

19   that, because it's not professional.

20           At this point in time, the government, as

21   Mr. Levine knows, has no other experts.  So to dismiss

22   Dr. Patterson ends and truncates this hearing, which is

23   unfair to the government.

24           And it's been raised in so many years in the past

25   in which this Court has ruled against that request that

1   we would ask that Your Honor, again, deny that request as it

2   did yesterday.

3             Thank you.

4             MR. LEVINE:  That is a remarkable presentation,

5   Your Honor.  On the one hand --

6             THE COURT:  You don't mean that in a good way,

7   I assume.

8             MR. LEVINE:  I do not make it -- I do not mean it

9   in a good way.  That's correct, Your Honor.

10            Let me be very clear:  I do not mean that in a

11  good way.

12            On the one hand, they say that every time I've

13  raised this issue -- 11 times they say I raised this issue.

14  And then they say if I wanted to raise the issue, I should

15  have filed a motion.  Well, how many times do I have to

16  file -- how many times do I have to raise it to keep the

17  issue alive?

18            But what happened here yesterday was his specific

19  invocation about things he learned in the therapy.  It is

20  not possible, it is not possible for him to have carved what

21  he learned in therapy from the opinions he expressed, not

22  possible.

23            And notwithstanding their suggestion that it's

24  possible, a suggestion with which we are in total

25  disagreement, it's the government's burden, not ours.

1    Once the patient invokes the privilege, the privilege

2    belongs to the patient.

3         And it's the government's burden to prove this

4    so-called independent source of information that had nothing

5    to do with the years of weekly therapy.  I mean, the notion

6    that he could carve that out is utterly preposterous.

7         The other point she makes, the government makes,

8    is this thing called law of the case.  This Court is free to

9    reconsider its rulings.  It is not bound by any of the

10   rulings it makes if the Court believes that the better

11   wisdom, upon more information, upon reflection, is to change

12   that ruling.  The law of the case does not preclude this

13   Court from changing its view.

14        And her factual statement that not one thing that

15   occurred in that therapy is -- was the subject of testimony

16   is ridiculous.  It's ridiculous because the testimony at --

17   in this hearing is precisely the very risk factors that were

18   the subject of the family therapy.

19        It couldn't be more congruent, Your Honor.

20   It couldn't be more congruent.

21        THE COURT:  These are the risk factors we've been

22   discussing in this case and in these hearings since 2003.

23   And they didn't, the list of risk factors didn't come

24   exclusively or maybe even primarily from Dr. Patterson.

25   Dr. Phillips talked about them.  Dr. Montalbano talked about

1    them when he talked.  I bet if we go back and look at the

2    transcripts, Dr. Binks talked about them.

3              The risk factors for Mr. Hinckley -- and I

4    certainly have written about them in numerous opinions,

5    based on the testimony of lots of different people, and

6    different people assess them differently.

7              MR. LEVINE:  Right.

8              THE COURT:  And the psychologist had risk

9    assessments that in some ways agreed with Dr. Patterson, in

10   some ways agreed with Phillips, in some ways didn't, based

11   on the objective standards and the interpretation of those

12   objective standards that were in all the tests that the

13   Dr. Murphy discussed.

14             So the fact that the same -- the risk factors that

15   were identified by Dr. Patterson and others at the hospital

16   immediately after their first contacts with Mr. Hinckley in

17   the early '80s are the same risk factors, I'm not sure

18   carries the day for you.

19             MR. LEVINE:  Well, Your Honor, your observation,

20   of course, that the listing wasn't of those factors, wasn't

21   until -- is correct, that it wasn't until in the beginning

22   of our hearings that they found -- those risk factors found

23   themselves on a list.  That's for sure true.  But what is

24   likewise true is that those very things were the subject of

25   therapy, of weekly therapy for years.

1          Now, Your Honor, you know, I don't want to suggest

2    for a second that my sense of rectitude is any better than

3    anyone else's, but these issues raise the most important

4    ethical propositions.

5          And this is a case that gets a lot of scrutiny.

6    As Your Honor observed yesterday, this case is different.

7    And I think it's really important for those who watch it to

8    understand that ethics matters and that conflicts matter and

9    that privileged communications matter.

10          And that when a series of people, Mr. Hinckley,

11   Mrs. Hinckley, John Hinckley, and maybe other members of the

12   family, are assured that what they say in that room is

13   absolutely confidential, will never leave that room, that we

14   have to honor that as a matter of law and as a matter of

15   ethics, as a matter of rectitude.

16          We can't cut curved corners on that.  We have

17   to -- we have to be punctilious, the word again.  We have to

18   be exact in our application of those very significant

19   principles.

20          I mean, that's what we're all about.  This is a

21   Court of Law.  This is about truth.  How could we ignore

22   that?  And I think the government ignores that.

23          And I think that Dr. Patterson has been frivolous

24   with that on the issue of ethics, on the issue of truth, on

25   the issue of his ability to carve out from his opinions the

1   things that are impossible to carve out.

2          MS. KENNEDY:  Your Honor, I must respond.

3          Despite Mr. Levine's protestations here on

4   Dr. Patterson and family therapy, he has failed to cite one

5   communication, one statement that Dr. Patterson has stated

6   that came about from family therapy.  There is nothing that

7   he said yesterday.  There was nothing that was stated in the

8   past about what happened in family therapy.

9          Mr. Levine seems to paint the brush and the entire

10  picture with the fact that he was at the hospital; he gave

11  family therapy; and, therefore, he is absolutely precluded

12  from testifying.  This was addressed repeatedly, and it has

13  never been stated what it is that he has said in family

14  therapy that came out on the stand.  And there certainly

15  wasn't anything that came out on the stand yesterday, not

16  having been in this case forever, but I have for many years.

17         I just think this is a red herring.  I think

18  Mr. Levine would love to have Dr. Patterson dismissed and

19  then the case would end.  But that would not occur, since

20  the government at that point would ask for another expert.

21         But it's not needed.  There's absolutely no

22  evidence that Dr. Patterson said yesterday or at any time,

23  this is what happened in family therapy, or this is what I

24  learned in family therapy or in the general discussion of

25  answering your question about risk assessments, about the

1    conditions, about the factors that cause risk management and

2    risk factors.  There is nothing in there that he got out of

3    family therapy.

4            The only thing we've learned about family therapy

5    is what Dr. -- excuse me -- Mr. Levine just revealed, that

6    they discussed risk factors.  No one stated that before.

7    No one's revealed that, that that came out in family

8    therapy.  Nothing's come out regarding what happened in

9    family therapy.

10           Dr. Patterson's a professional.  He's testified

11   before.  I spoke to him again yesterday.  Nothing has been

12   stated as to what he learned, and we would ask that the

13   motion be denied.

14           THE COURT:  Do you recall whether or not -- I know

15   this question has come up numerous times over the years.

16   I don't recall that I've ever written an opinion on it.

17   I think it's all been resolved or that I've made my

18   decisions orally in court.

19           And I also don't recall that there's ever been any

20   written briefing on the question.  Maybe Mr. Levine or

21   Ms. Tupper or Ms. Luciano will recall.  If -- but

22   I don't recall a written opinion, and I don't recall a

23   written briefing.

24           MS. KENNEDY:  I only go so far back.

25   So I don't recall that, Your Honor.

1          I don't know if it was ever addressed in an order.

2     I can take that up.

3          But if you don't remember, then I'm assuming

4     that --

5          THE COURT:  I don't.

6          MS. KENNEDY:  -- there probably wasn't.

7          MR. LEVINE:  I remember it, Your Honor.

8          THE COURT:  Well, then tell us what you remember.

9          MR. LEVINE:  Thank you, Judge, if it please the

10    Court.

11         This Court has not written an opinion on the issue

12    of disqualification, as I remember it.

13         Your Honor, I don't think the government

14    understands this principle.  The reason I say that,

15    Your Honor, is Dr. Patterson doesn't have to say that in a

16    family therapy session, Mr. Hinckley said X about that.

17    That is not the framework of this analysis.

18         All Dr. Patterson has to do is to frame opinions.

19    He has to consider it.  He doesn't have to say a word about

20    it.  If he frames an opinion based on what he learned from

21    years of weekly wrenching communications, privileged

22    communications, and never says a word about what anyone in

23    those sessions said, he would be subject to

24    disqualification.  He doesn't have to assign to Mr. Hinckley

25    a statement or to Mrs. Hinckley a statement or to the father

1    a statement.  He just has to know about the statement.

2              This is what we do all the time when we talk about

3    Fifth Amendment and immunity issues.  We talk about

4    independent source.  We talk about burdens.  But he can't do

5    that.  The government has a burden to show that he is not

6    considering it.  It's not enough for Dr. Patterson to say,

7    "I thought about this, and I'm not considering it"; or

8    "When I formed this view, I'm doing it excluding what I

9    learned over years of therapy."  That doesn't carry it.

10             Your Honor may want to consider whether it wants

11   to conduct a voir dire of Dr. Patterson.  But that aside,

12   I think this Court is fully informed about the fact that

13   there was years of therapy; that it was -- involved the

14   family; it was at a time when John's condition, when he was

15   ravaged by mental disease.  And Dr. Patterson has been

16   talking about it for years, and he should not have been.

17   And we have objected every time.  And we continue that

18   objection, Your Honor.

19             As one thing Ms. Kennedy said that is accurate, it

20   would not be professional for him to have considered -- for

21   him to consider it.  It would not be professional for him to

22   do that.  It would be unethical for him to do that, and it

23   is impossible for him not to have done it.

24             THE COURT:  She didn't say the last.

25             MR. LEVINE:  I said the last.

1          She said -- only she said it would be -- it would

2     not be professional for him to do it.

3          I think that's an important concession,

4     Your Honor.

5          And, of course, that's the case:  It would not be

6     professional.  It would not be ethical.  And I submit,

7     Your Honor, it is not lawful.

8          Thank you, Judge.

9          MS. KENNEDY:  Your Honor, I think it's quite

10    interesting that Mr. Levine would bring this up in the

11    middle of Dr. Patterson's testimony, when he has known for

12    months that Dr. Patterson is our only witness.

13         He should have raised it before Dr. Patterson even

14    testified.  But he's raised it numerous occasions in the

15    past, and nothing has changed.

16         He has no evidence that he has spoken of whatever

17    he learned in family therapy.  Your Honor knows what he

18    testified to yesterday, as well as what he's testified to

19    over the last several years in this case.  If Mr. Levine

20    were that concerned, he could have filed something years

21    ago.

22         There's nothing here that has changed in the last

23    several years, other than Dr. Patterson obviously no longer

24    has family therapy, is no longer at the hospital, hasn't

25    been there for years, and has testified repeatedly before

1  this Court -- and, the government might add, fairly

2  favorably for Mr. Hinckley, in where it is he thinks he

3  should be going and what his release should be.  To now

4  raise that he shouldn't be testifying at all, the government

5  finds totally disingenuous.  Nothing has changed here.

6          Again, based on what's happened in the past, the

7  testimony yesterday, where we are in this case, not having

8  one iota of evidence that he's used anything in family

9  therapy -- it's not the government's burden to show that.

10 Mr. Levine hasn't cited what the information was that he got

11 in family therapy that he's testifying to now.

12          So, once again, we would ask for the, I don't know

13 how many times, that Your Honor deny the motion.

14          THE COURT:  Okay.

15          Well, my recollection of the history of this case

16 and Dr. Patterson is that he's been one of the two -- the

17 government's two experts from the first time the matter ever

18 became before me and the first time we ever had a hearing.

19 Everybody knew his history with Mr. Hinckley and the

20 Hinckley family.

21          The issue came up -- on a number of occasions

22 Mr. Levine has raised it.  I don't think there's ever been a

23 written motion to disqualify Dr. Patterson.  I don't think

24 it's ever been briefed with case law as to whose got which

25 burdens, but it was certainly raised orally, on where the

1  case law leads.  But it was certainly raised orally numerous

2  times when Dr. Patterson testified in these proceedings.

3         To the best of my -- well, to the extent that the

4  request -- the requests may have been to disqualify

5  Dr. Patterson on some or all of those occasions.  They may

6  have been to limit his testimony or admonish him on other

7  occasions, I can't recall.  But if somebody wants to go back

8  and review the transcripts of the last 13 years, they're

9  welcome to do so to find the arguments made and the

10  responses given.

11         I can't recall whether Dr. Patterson himself

12  testified that he, while under oath, that he was not

13  revealing confidences.  I think he did.  And so the question

14  that is now a little more nuanced, I suppose, is whether

15  disqualifications should or may follow only if he reveals

16  confidences or whether it should or may follow if he bases

17  his opinion in part about what he learned in those sessions.

18         I think he has expressed himself in this courtroom

19  as understanding his ethical responsibilities, and at other

20  hearings, and that he understands that, like any

21  psychiatrist or psychologist, he can't disclose confidences

22  that were conveyed to him or conversations had -- I suppose

23  almost everything, if not everything, that's said in those

24  sessions is confidential, although for the last dozen years,

25  I guess Mr. Hinckley has understood that whatever he says to

1    his therapists will ultimately be revealed to me in the

2    context of these hearings.

3         So we've learned a lot about discussions he's had

4    with treaters in St. Elizabeths and treaters in Williamsburg

5    and probably the kinds of things that would otherwise be

6    confidential but for the fact that we're coming to court.

7         Nevertheless, Dr. Patterson has been admonished by

8    Ms. Kennedy yesterday, been admonished by me and the

9    government lawyers in the past, has testified in the past

10   that he understands his ethical obligations and that he has

11   not disclosed things that he learned in those family therapy

12   sessions those many years ago.

13        Now, whether Mr. Levine's point that one can

14   never -- that his opinions are necessarily based implicitly

15   or consciously or subconsciously on what he learned, then,

16   is -- I don't know what the law says about that.

17        But I do know that on numerous occasions, I've

18   ruled against Mr. Levine when he's raised these questions.

19   And we've proceeded with Dr. Patterson as one of the two

20   primary government witnesses for a dozen or more years.

21   And I've denied the motions in the past.  Certainly, I can

22   reconsider my prior rulings.  I don't see any reason to do

23   so.

24        And without invoking law of the case, waiver,

25   laches, or any other legal doctrine that might arguably

1   apply, I would only say this:  We've all known now for

2   18 months or more that Dr. Phillips is no longer with us;

3   and we, therefore, have known, for all that period of time,

4   that Dr. Patterson was the government's only witness.

5          And the government announced during one of our

6   conference calls, if not earlier, that rather than delay

7   these proceedings by engaging another expert so that they

8   would then have two experts, Dr. Patterson and a substitute

9   for Dr. Phillips, that they would proceed with

10  Dr. Phillips -- Dr. Patterson alone.

11         For anybody new to have come in, I think the

12  representation was made by the government at the time, would

13  have taken -- no matter how qualified and how experienced

14  that person was, it would have taken a huge amount of time

15  to master the history and the context of this case, before

16  that new person could engage in the kinds of intensive

17  interviews and analysis that Dr. Phillips always did for us

18  and that Dr. Patterson has done.

19         That would have been the time to have raised the

20  question, to have said, well, we still continue to object to

21  Dr. Patterson.  You better go get yourself another witness,

22  because we're going to file a motion to disqualify.

23  That didn't happen.

24         And I'm -- you know, if the law were abundantly

25  clear and the transgression that is alleged were clear, that

1    would be one thing.  But it does seem to me that I've ruled

2    on this question numerous times before.  Dr. Patterson has

3    testified about what he has and has not done and has

4    understanding of his ethical obligations.  There has never

5    been a written motion to disqualify him.

6          There wasn't a written motion this time, even

7    though we have known for -- we have assumed for, I can't

8    remember when Dr. Phillips died.  I'm sorry.

9          MS. KENNEDY:  It was a year.

10         THE COURT:  It will be a year.

11         MS. KENNEDY:  It was a year.

12         MR. AZIZ:  April 18th.

13         MS. KENNEDY:  April 10th.

14         THE COURT:  So we've known for a year that

15   Dr. Phillips would not be available and that Dr. Patterson,

16   unless the government teed up a new witness, would be the

17   sole witness.  And I assume that Dr. Patterson will be the

18   sole witness.

19         And then it was made explicit by the government

20   that they were not going to engage a new witness, in part,

21   to avoid even more delay in this process to get us to a

22   hearing.

23         So despite all of that, the issue was not raised

24   until partway through Dr. Patterson's testimony.  And my

25   recollection of yesterday as it was raised is he described

```
1    the helicopter landing on the grounds of St. Elizabeths,

2    which, of course, conjured up his role back then as senior

3    person at the hospital.

4            So I, you know, I'm going to deny the motion to

5    qualify.  I suppose I'll say I'm going to deny it without

6    prejudice, because if the government -- if the patient,

7    through Mr. Levine and his team at this late date, want to

8    file a written motion with citations to case law, that

9    would, of course, mean that the government would have to

10   respond.  And then I would have to decide it -- see whether

11   any of the case law persuaded me that the decisions that

12   I've consistently made numerous times over a dozen years are

13   wrong.

14           I think it was Justice Frankfurter who said when

15   reversing himself one time from a long-standing position:

16   Just because wisdom comes late, we ought not to ignore it,

17   or something to that effect.

18           So, you know, just because I've ruled countless

19   times over a dozen years, if there were a case or cases that

20   said I was wrong, I would tell you I was wrong.

21           But I think I'm right.  And so for those reasons,

22   I'm going to deny the motion to disqualify Dr. Patterson,

23   subject to if the patient wants to file a brief and a formal

24   motion after the fact, fine.

25           But I think at this point, it might be better to
```

1    finish the evidentiary hearing so we can move on to closing

2    arguments whenever we set them, and decision on the

3    hospital's (e) petition, sooner rather than later.

4            So unless there's anything else, I think we should

5    call Dr. Patterson back to the stand.

6            Good morning.

7            THE WITNESS:  Good morning, Your Honor.

8            THE COURT:  You're still under oath from

9    yesterday.

10           THE WITNESS:  Yes, sir.

11                           - - -

12   RAYMOND F. PATTERSON, M.D., WITNESS FOR THE GOVERNMENT,

13   HAVING BEEN PREVIOUSLY SWORN, RESUMED THE STAND AND

14   TESTIFIED FURTHER AS FOLLOWS:

15                           - - -

16               DIRECT EXAMINATION (CONTINUED)

17   BY MS. KENNEDY:

18       Q    Good morning, Dr. Patterson.

19       A    Good morning, Ms. Kennedy.

20       Q    Now, yesterday, we were discussing narcissistic

21   personality disorder --

22       A    Yes.

23       Q    -- correct?

24            And is it correct you indicated that that will be

25   a lifelong diagnosis for him?

1      A      Yes.

2      Q      And does Dr. Murphy agree with that?

3      A      I believe she does.

4      Q      Did Dr. Adewale agree with that?

5      A      Yes.

6      Q      And did you speak with Dr. Adewale in preparing

7  for the case this time?

8      A      Of course.

9      Q      And did he agree with the overall diagnoses that

10 the hospital has given him, in addition to narcissistic

11 personality disorder?

12     A      Yes.  Those diagnoses have been long-standing.

13 They haven't changed.

14     Q      And does he no longer treat Mr. Hinckley, or is he

15 continuing to treat him until he --

16     A      He does.  Both Dr. Adewale -- I'm sorry.

17     Q      Okay.  Does he still treat Mr. Hinckley, or is he

18 waiting to -- Mr. Hinckley to go on convalescent leave, if

19 this Court grants it, to terminate his relationship with

20 Mr. Hinckley?

21     A      Both Dr. Adewale and Mr. Hyde continue to have

22 their roles with Mr. Hinckley, although they both have been

23 assigned to different units.  So they're no longer are on

24 Ward 2B, which is where Mr. Hinckley resides at the

25 hospital.

1           THE COURT:  And is Dr. Binks also part of the

2    treatment team now?

3           THE WITNESS:  Dr. Binks remains part of the

4    treatment team as well.

5    BY MS. KENNEDY:

6       Q    Now, Dr. Patterson, do you know the hospital's

7    opinion on whether or not someone from the treatment team,

8    other than Dr. Binks, who is the therapist, Mr. Hyde,

9    Dr. Adewale, anyone would remain on the team and meet

10   Mr. Hinckley when he came up once a month for his outpatient

11   appointment?

12      A    The hospital's recommendation is that it would be

13   time-limited or visit-limited for the first four months or

14   six months, I believe.

15      Q    What is your position on that?

16      A    My position is that it should continue for at

17   least a year and indefinitely until there's a change in the

18   conditions as ordered by the Court.

19      Q    And why is that?

20      A    Because we have -- in my opinion, as I expressed

21   yesterday, it is important to continue and, in some

22   instances, with the Williamsburg providers, intensify their

23   contacts with Mr. Hinckley.

24           The context, the hospital, if convalescent leave

25   is granted, would stop in the sense of his being there for

1   two-week periods at a time.  And, therefore, everyone else

2   who has contact with Mr. Hinckley on the ward, et cetera,

3   would be terminated.

4           And Dr. Murphy's assessment, I believe she

5   indicated Dr. Binks to continue for a six-month period and

6   meeting at the same time that Mr. Hinckley comes to the

7   forensic outpatient department.

8       Q    Does Mr. Hinckley have strong ties to his

9   treatment team?

10      A    Certainly.

11      Q    Do you know how many years that team has been

12  treating him?

13      A    I think the longest member of that team, the

14  current team, would be Dr. Binks, for the -- since 1999.

15  So that's 16 years, 17 years.

16          Dr. Adewale, I think, would be next behind that,

17  at about ten years or so.

18          Mr. Hyde, who was his music therapist and then

19  became clinical administrator and, of course, has testified,

20  has been involved with Mr. Hinckley, I believe, about nine

21  years, and as the clinical administrator for two, I believe.

22      Q    And has Mr. Hinckley expressed to you his

23  closeness or non-closeness with his treatment team?

24      A    He has.

25          And it's been, I think, demonstrated by the

1    progress that he's made.  Mr. Hinckley has made progress,

2    and I think a large part of that is attributable to the

3    treatment that he's received at the hospital.

4        Q    You indicated that to go to Williamsburg and live

5    full time is a stressful situation; is that correct?

6        A    Yes.

7        Q    And what stress, if any, in your opinion, would

8    Mr. Hinckley have cutting himself off from his inpatient

9    team, other than Dr. Binks, once he lives in Williamsburg

10   full time?

11       A    Well, the context is very important.  The idea of

12   those long-term relationships ending and their being

13   replaced, hopefully, by the Williamsburg providers, would be

14   a stressful transition.

15           The other component of it, however, is changing

16   from a hospital environment to the community.  As it turns

17   out in the hospital, many things are much more predictable,

18   much more structured, much more regular, than in the

19   community.

20           And in the community, what we really can't predict

21   very much about is how the community and individuals within

22   that community will respond to Mr. Hinckley.  We certainly

23   have information that he has had rejections.  He has more

24   recently had some successes.  It would be important to

25   monitor that so that we can support as much as possible the

1    successes, and hopefully help him manage the rejections.

2        Q    Do you agree with Dr. Murphy's conclusion that

3    Mr. Hinckley, if he decompensates, it would be gradual with

4    visible symptoms?

5        A    It could be gradual.

6            The issue of visible symptoms is where we

7    disagree, Dr. Murphy and I.

8            Mr. Hinckley does not really demonstrate visible

9    symptoms.  He has never done that.

10           So you have to inquiry with him.  You have to

11   measure --

12           MR. LEVINE:  Your Honor, I'm going to object to

13   the part of the testimony that says he has never done that.

14   I mean, that is what we're talking about.  That goes back to

15   the early years.

16           THE COURT:  Go ahead.

17           THE WITNESS:  The issue of the gradual

18   deterioration, we don't agree with.  It's the demonstration

19   of visible symptoms.  Mr. Hinckley doesn't report symptoms.

20           THE COURT:  So you don't agree with gradual

21   deterioration or you do agree with gradual deterioration?

22           THE WITNESS:  I do.  I do agree that it may be a

23   gradual deterioration.  The difficulty is detecting it.

24   That's the issue.

25           And the way that we detect symptoms is people

1   report them to us or we observe them based on their

2   behavior.

3           Mr. Hinckley, traditionally, doesn't report

4   symptoms.  His psychological testing shows that, as well as

5   his interactions with treatment staff.  So that's historic.

6   BY MS. KENNEDY:

7       Q    And if he decompensates, could that pose a danger

8   to Mr. Hinckley and others?

9       A    Yes.  The issue of decompensation in that context

10  has to do with whether or not the risk factors increase.

11  And if the risk factors do increase, then that indicates

12  that his risk of dangerousness or violence.

13          And in my assessment of risk, I not only assess

14  dangerousness to others, I also assess dangerousness to

15  self.  And that is relevant in Mr. Hinckley's particular

16  case.

17      Q    Dr. Patterson, is that why, in your opinion,

18  structure and supervision are so important for Mr. Hinckley

19  on release?

20      A    In my opinion, they're essential.  They're not

21  "so important"; they're essential.

22      Q    And the fact that he suffers from narcissistic

23  personality disorder, can that affect his danger to self or

24  others?

25      A    Certainly.

1        As I've said in the past, and I believe yesterday,

2   Mr. Hinckley is one person.  He has three diagnoses.

3   Those diagnoses in concert is what has to be treated and

4   managed from a risk perspective.

5        Q    Now, did you have an opportunity in preparing for

6   this case to read the hospital's letters requesting release,

7   beginning in December 19th, 2014; March 20th, 2015; and

8   April 17th, 2015?

9        A    Yes, I did.

10       Q    And the December letter and their conditions, they

11   just cite eight conditions; is that correct?

12       A    That's correct.

13       Q    And do you know why that is, why there were just

14   eight?

15       A    I am probably not the best person to respond to

16   that, as to why just eight.  I found it insufficient, and I

17   asked those questions to pretty much everyone I interviewed

18   or examined.

19       Q    And then the March 2015 letter, that added 11 more

20   conditions, correct?

21       A    That's correct.

22       Q    Okay.  And so a total of 19, correct?

23       A    That's correct.

24       Q    And are you aware of the response the government

25   filed regarding 35 conditions that were listed that the

1   government felt was important --

2       A    Yes.

3       Q    -- for Mr. Hinckley to follow, correct?

4       A    Yes.  I had read that.

5       Q    Okay.  And are you aware out of that 35

6   conditions, that the government does agree with the 19

7   conditions that the hospital has put forth for Mr. Hinckley,

8   if he is conditionally released to Williamsburg, that he be

9   under these conditions?

10      A    My understanding is that the hospital and the

11  government agree on 19 conditions.

12      Q    Okay.  Now, in looking at those conditions, not

13  all, just a few, do you happen to have that April 17th,

14  2015 --

15      A    I believe I do.

16      Q    -- letter?

17          THE COURT:  Which is the hospital's response to

18  the government's?

19          MS. KENNEDY:  It is, Your Honor.  April 17th,

20  2015.  I believe it was moved in by the defense.

21  I don't know the exhibit number.

22          THE COURT:  It was Exhibit 4, I believe.

23          MS. KENNEDY:  Exhibit -- Defense Exhibit 4.

24  BY MS. KENNEDY:

25      Q    If you don't have it, Dr. Patterson, I can get you

1    a copy.

2        A    I'm pretty sure I do.  Just give me a moment.

3        Q    Okay.

4        A    I think you may need to give it me, Ms. Kennedy.

5            MR. LEVINE:  Your Honor, is it possible to turn

6    the microphones up a bit.  Is that doable?

7            THE COURT:  No.  The witness and -- Dr. Patterson

8    and Ms. Kennedy are going to have to speak more into the

9    microphone.

10           MS. KENNEDY:  Oh, okay.

11           MR. LEVINE:  Thank you.

12   BY MS. KENNEDY:

13       Q    I'll show you what's been marked as defense

14   Exhibit No. 4, page 4, which begins to list the conditions.

15       A    Thank you.

16       Q    This is a clean copy, Dr. Patterson.

17       A    Thank you.

18       Q    Now, what is your opinion, Dr. Patterson, with

19   condition 1 of Mr. Hinckley not being able to spend any

20   other -- spend the night at any other location other than

21   the hospital, if he was returning to the hospital for his

22   outpatient appointment?

23       A    My opinion about that is that Mr. Hinckley,

24   should, should there be a need for him to stay overnight in

25   Washington, that wherever he may be staying should certainly

1   be pre-approved by the treatment team.

2          And given that, I believe the anticipation would

3   be that that would not be a regular event but perhaps might

4   occur in response to weather or traffic or something not

5   foreseen.  Then the question is, who approves that?

6          And the Williamsburg team probably doesn't know

7   much about Washington.  So it either would be someone from

8   the hospital or perhaps Dr. Johnson who would do the

9   pre-approval.

10   Q    And what is your opinion on Mr. Hinckley staying

11   overnight at another place in Williamsburg or surrounding

12   Williamsburg, other than his mother's home?

13   A    Well, again, that is something that is both a

14   clinical circumstance, as well as a risk management.

15          In my interviews with the Williamsburg providers,

16   as well as the St. Elizabeths providers, Mr. Weiss has said

17   that he sees Mr. Hinckley coming, if convalescent leave is

18   granted, coming to Williamsburg to his mother's home as a

19   transition, that it would be a six month to one year looking

20   at housing opportunities availability, et cetera, and

21   perhaps up to a second year of Mr. Hinckley obtaining his

22   own independent placement.

23          Dr. Binks, on the other hand, told me that the

24   treatment team at St. Elizabeths' perspective, is that he

25   would live with his mother until his mother is no longer

1   available.  I think that's an issue should be clarified for

2   everyone involved, so that -- particularly for his family,

3   not only because of financial issues and what that may mean,

4   but because of his mother.

5           I did not get any information from Mrs. Hinckley

6   or anyone else, his family, that this would be a transition.

7   And I think it's really critical to ask Mrs. Hinckley if she

8   expects he's going to stay there for as long as possible, or

9   anticipates that this is a transition and he will be living

10  somewhere else in the next year to two years.

11          THE COURT:  What does Dr. Murphy say about that

12  issue?

13          THE WITNESS:  I don't believe Dr. Murphy

14  commented.  If she did, I don't recall what her comment is.

15          But I think it's critical in terms of planning,

16  future planning as to where he is going to be and how that

17  is put in place.

18          And the emotional component of that, particularly

19  with his mother.

20  BY MS. KENNEDY:

21      Q    So, Dr. Patterson --

22          THE COURT:  But if -- if he gets convalescent

23  leave and if he's to be living in Williamsburg and if we all

24  know that some day his mother is going to die, isn't it

25  clinically appropriate to begin, at some point -- the number

1    of months or years is another question -- to look at other

2    housing options that are available to someone in

3    Mr. Hinckley's situation, hopefully with government

4    financial support, rather than to wait until the moment she

5    dies?

6              THE WITNESS:  That would be my opinion, yes.

7              And I believe that opinion is shared by Mr. Weiss,

8    in saying that he is going to be the person looking into

9    those housing opportunities, not only in Williamsburg, but

10   he mentioned Newport News as a potential, at Gloucester as a

11   potential because of a group home he knows of there.

12   So I believe he's certainly thinking that way.

13             THE COURT:  But what about Dr. Binks?  I think you

14   just said that Dr. Binks thinks he should stay with his

15   mother until she's no longer available.

16             THE WITNESS:  No, no.  I'm sorry if that's how it

17   sounded.

18             What Dr. Binks told me is that the St. Elizabeths

19   treatment team anticipated that he would stay with his

20   mother until she is no longer available.

21             And much of the language that's been used is, if

22   Mrs. Hinckley becomes unavailable, then...

23             And Mr. Weiss, I think, is in a different place in

24   saying, however long she may be available, this placement

25   with her is transitional, with the intent that Mr. Hinckley

1    will go sooner, rather than the longer term, to independent

2    living.

3            THE COURT:  Well, do you agree with Mr. Weiss'

4    concept, even if not with his timeline, that it should be

5    transitional?

6            THE WITNESS:  Absolutely.  Absolutely.

7            THE COURT:  Okay.

8            THE WITNESS:  And that's, in part, why the

9    clinical services and monitoring is so important, because if

10   Mr. Hinckley -- if Mr. Weiss and Mr. Hinckley were to find a

11   placement, then that is something that should be worked on

12   with all concern so that it goes smoothly.

13           THE COURT:  Uh-huh.

14   BY MS. KENNEDY:

15      Q    I just want to be sure that Mr. Levine can hear me

16   on this.

17           MR. LEVINE:  I'm working hard on it, but I'm

18   hearing you.

19           MS. KENNEDY:  Okay.  Because I don't know how to

20   turn it up any further.

21           MR. LEVINE:  That's okay.

22           MS. KENNEDY:  I'd be happy to.

23           MR. LEVINE:  Thank you for trying.

24           MS. KENNEDY:  Sure.

25

1    BY MS. KENNEDY:

2        Q    Now, could you look at No. 3 on page 5,

3    Dr. Patterson.

4        A    Yes.

5        Q    You've already indicated that you believe someone

6    on the treatment team, whether it's V.J. Hyde or Dr. Adewale

7    or someone in addition to Dr. Binks, should keep in contact

8    with him for a year, correct?

9        A    Yes.

10       Q    And, in fact, the hospital opposes that, right?

11       A    Yes, that is what it says.

12            And I wanted to distinguish Dr. Binks for just a

13   moment, if I may.

14       Q    Sure.

15       A    Dr. Binks is an individual therapist; and,

16   therefore, the idea of a six-month period, to focus on

17   termination of the individual therapy would be the focus, in

18   my view, my opinion, of his being there.  He could also

19   represent the treatment team.

20            But the idea is that he would be meeting

21   separately with Mr. Hinckley in individual therapy for that

22   six-month period, six sessions, for termination purposes, of

23   the therapy.  That's separate and apart of a treatment team

24   member, which, again, could be Dr. Binks sitting with

25   Dr. Johnson for the monthly appointments that would review

1    his progress and risk assessment.

2         Q    And, No. 6, Dr. Patterson, you already indicated

3    you think Mr. Hinckley writing his itinerary would be a good

4    idea, correct?

5         A    I do, yes.

6              MR. LEVINE:  Objection; leading.

7              THE COURT:  Overruled.

8    BY MS. KENNEDY:

9         Q    And what is your view as to keeping a log?

10        A    Oh, I think a log would be very important.  Again,

11   it is another way of measuring Mr. Hinckley's progress, and

12   it relates directly to risk factors, particularly isolation.

13        Q    And your position as to having a GPS phone for

14   Mr. Hinckley in Williamsburg.

15        A    I think that has been part of the past conditions,

16   and I would -- in my opinion, should be continued as an

17   ongoing condition.

18        Q    And do you know Dr. Murphy's opinion on

19   Mr. Hinckley staying within a 30-mile radius of

20   Williamsburg?

21        A    I did hear her testimony.  And we did, of course,

22   speak with each other.

23              And I've seen her report.  The synopsis of that,

24   as I recall it, is that Dr. Murphy is of the opinion that

25   the 30-mile radius would be acceptable.  And if to go beyond

1   30 miles, it should be approved by, I believe, Mr. Weiss or

2   a treatment team member.

3        Q    And would someone be with him in the car if he

4   goes beyond 30 miles?

5        A    Yes.

6        Q    Okay.  Do you agree with that?

7        A    I would agree with that, yes.

8        Q    Now, No. 9 on page 7, what is your position

9   regarding Mr. Hinckley visiting government facilities in

10  sites such as the White House or the capitol or a federal

11  building if a political dignitary was in the area?

12       A    I would agree that that should be avoided.

13  In terms of risk-benefit there, in my view, in my opinion,

14  there's very little potential benefit.  There is certainly

15  possible risk that there's no reason to take.

16       Q    Now, No. 11 on page 8, the appointments -- what

17  are the requirements for Mr. Hinckley to report to the

18  outpatient department of St. Elizabeths Hospital?

19       A    That would be once per month, I believe for the

20  first -- and I believe it's four months.  And then at the

21  discretion of the forensic outpatient director.

22       Q    Who overall is responsible for Mr. Hinckley's

23  care?

24       A    Care?

25       Q    Treatment, care, everything.  What institution?

1      A      Well, if we go by institution, it is

2 St. Elizabeths Hospital where he has been committed and, by

3 extension, the Department of Behavioral Health.

4      Q      And that's because he was found not guilty by

5 reason of insanity?

6      A      That's correct.

7      Q      So in your opinion, Dr. Patterson, in

8 Williamsburg, if Mr. Hinckley begins to fail or miss

9 appointments or there's something to be concerned about,

10 who's responsible for getting him back to the hospital?

11     A      The way I understand the current proposals and

12 conditions is that the Williamsburg treatment team,

13 primarily Dr. G-G, would be responsible for identifying

14 whatever need there may be and that St. Elizabeths would

15 essentially be responsible for him returning to the

16 hospital.

17     Q      Now, in No. 11, the hospital response indicates

18 that Mr. Hinckley should not report to the hospital for any

19 appointments, only the community office on K Street;

20 is that correct?

21     A      That's what it says, yes.

22     Q      What is your position on that?

23     A      That's a relative change since the hospital and

24 the outpatient department have been in separate locations.

25             The forensic outpatient department used to be

1    inside of the John Howard Pavilion prior to the construction

2    of the new hospital.  So everyone who was an outpatient came

3    back to the hospital.  There were benefits to that

4    situation.

5            Currently, it's report to 35 K Street.  I think

6    that that is in part because of the location of the

7    outpatient department and in part because of Mr. Hinckley's

8    wishes that he not return to the hospital for pretty much

9    anything, if he is on convalescent leave.

10       Q    Now, you heard Dr. Johnson testify, correct?

11       A    I did.

12       Q    And is it correct she indicated, as the testimony

13   went on, that she would write a summary of Mr. Hinckley's

14   visits when he came every month?

15       A    She did.  I believe her testimony was essentially

16   that she would do whatever the Court required or ordered her

17   to do, including writing a summary.

18       Q    And Mr. Weiss would be writing a summary down in

19   Williamsburg, correct?

20       A    That is my understanding, yes.

21       Q    And both would be submitted to this Court,

22   correct?

23       A    Yes.

24       Q    Now, you understand that there are some

25   entitlements that they're going to be applying for for

1  Mr. Hinckley, Social Security, perhaps Medicaid or Medicare,

2  for him to get down in Williamsburg?

3         MR. LEVINE:  What number are we on now?

4         MS. KENNEDY:  That actually is not on a number.

5  I'm just asking.

6         MR. LEVINE:  I'm sorry.

7         THE WITNESS:  Yes, that is my understanding.

8  BY MS. KENNEDY:

9     Q    And if at this point Mr. Hinckley is not eligible

10 for those entitlements, what is your view as to his

11 financial situation?

12    A    My understanding, largely based on the testimony

13 in the Court, not on my interviews of Scott Hinckley and

14 Diane Sims, is that the family is prepared to continue their

15 financial support for Mr. Hinckley's clinical and,

16 I believe, forensic, as well as housing needs.

17    Q    And No. 24 on page 12, what is your position on

18 monitoring the Internet that Mr. Hinckley would be using?

19    A    My opinion is that Mr. Hinckley should be able to

20 use the Internet and go to sites with pre-approval of, very

21 likely, Mr. Weiss and/or Dr. G-G; which would mean,

22 essentially, the Williamsburg treatment team and Dr. Johnson

23 as a responsible party for the department of behavioral

24 health; and that there should be a mechanism for monitoring

25 his use of the Internet.

Case 1:81-cr-00306-PLF  Document 540  Filed 05/12/15  Page 44 of 118

1        Q     Now, you again heard the testimony of Dr. Murphy

2    and V.J. Hyde?

3        A     I did.

4        Q     And is it -- what is your view, Mr. Hyde and

5    Dr. Johnson -- I'm sorry.

6              Dr. Murphy indicated they didn't think there

7    should be any monitoring of the Internet?

8        A     I certainly respect their views.  I disagree with

9    them.  I think there should be monitoring of the Internet

10   for two reasons.

11             One of them is what you can get out of the

12   Internet, meaning that there is information that is

13   accessible that Mr. Hinckley has been restricted in the

14   past.  Frankly, that didn't exist when he first came into

15   the system, if you will.

16             But there's also what you can put on the Internet.

17   And the issue of publishing music or other writings,

18   et cetera, artwork, all of that, I think, should be

19   something that is monitored and would require pre-approval

20   from the treatment providers, including assessment of risk.

21       Q     And why do you think it would be important to

22   monitor that as far as putting his music or pictures on the

23   Internet?

24       A     Because that has been a part of his pathology

25   historically.  And that -- the removal of the hospital as an

1    entity where he resides and where the great majority of his

2    activities are under some form of observation or review

3    means that you have to substitute some other form of

4    monitoring under other conditions; in this case, a potential

5    convalescent leave.

6         Q    Now, in your opinion, Dr. Patterson, if

7    Mrs. Hinckley becomes unavailable and Mr. Hinckley is

8    beginning to deteriorate mentally, in your opinion, should

9    the hospital do an evaluation regarding his condition?

10        A    I think the first step in that would be an

11   evaluation by the Williamsburg treatment providers,

12   particularly Dr. G-G; that, then, should be communicated to

13   Dr. Johnson, who will then decide whether or not she needs

14   to also evaluate Mr. Hinckley.  And at that point, there

15   should be certainly notice to the Court that an evaluation

16   has taken place, and the management plan.

17        The management plan may be return to the hospital.

18   The management plan may be continue in the community with

19   these changes or modifications in treatment.  So that, from

20   my perspective, is the appropriate process.

21        Q    And, Dr. Patterson, do you have an opinion if

22   Mr. Hinckley is returned to the hospital, he's there for a

23   period of time, and the hospital wants to release him again

24   to Williamsburg, whether or not yourself, as the government

25   expert, should be able to evaluate him?

1    A    I would certainly want to know why he was returned

2    to the hospital and what the management plan was in doing

3    that, whether that had been achieved, and what the plan was

4    for return.  So I would certainly be willing to evaluate

5    Mr. Hinckley under those circumstances.

6    Q    And you've heard testimony regarding how often

7    individual therapists in Williamsburg should be seeing

8    Mr. Hinckley; is that correct?

9    A    I have.

10   Q    And you went through that yesterday as to how many

11   times?

12   A    I believe I did.

13        MS. KENNEDY:  Okay.  The Court's indulgence.

14   BY MS. KENNEDY:

15   Q    Do you believe that it's important that the media

16   plan continue --

17   A    Yes, I do.

18   Q    -- for Mr. Hinckley?

19   A    Yes, I do.

20   Q    And what is your view on drug and alcohol

21   screening at the hospital or in Williamsburg?

22   A    Again, that's a standard condition in conditional

23   releases, at least in my experience.  Mr. Hinckley does not

24   have a drug or alcohol history.  There is limited

25   availability of alcohol and illegal drugs typically in

1    hospital environments?

2           There would be more availability in the community,

3    so that condition should remain.

4       Q    Now, you spoke to Dr. Beffa, correct?  I'm sorry.

5    Mr. Beffa.

6       A    Mr. Beffa, I did, yes.

7       Q    And he had spoken to Mrs. Hinckley; is that right?

8       A    I don't -- I know he has in the past.

9    I don't know if he has recently.

10      Q    Did he give or tell you what Mrs. Hinckley had

11   expressed as far as how she felt about the financial strain

12   on her and her family regarding Mr. Hinckley's care?

13      A    I believe it was Mr. Beffa.  I don't think it was

14   Mr. Weiss.  I believe it was Mr. Beffa who said that the

15   family was concerned about cost and having fewer

16   appointments.

17      Q    And in speaking with Mrs. Hinckley, did she

18   indicate any of that to you?

19      A    I asked Mrs. Hinckley directly about that, and she

20   said the family had not talked about it.  And she didn't

21   make any comment about whether she'd talk with Mr. Beffa

22   about it one way or the other, as I recall.

23      Q    What was your view -- what's your view of that?

24      A    It certainly should be something that is

25   discussed, not only with Mrs. Hinckley but Scott Hinckley

1  and Diane Sims.  All of them told me that they had questions

2  about how various services would be paid for.  Housing,

3  clinical services, et cetera.  Those are very legitimate

4  questions.

5      Q    Did Scott Hinckley indicate that they had

6  discussed it as a family?

7      A    No.  He told me that he had talked with,

8  I believe, with his sister about it.

9          I don't think he said they talked with

10  Mrs. Hinckley about it, I don't think.  But I'd need to

11  refer to my report to be more specific.

12     Q    And Mr. Hinckley's treatment -- some of this

13  treatment team members down in Williamsburg are now part

14  time or retired; is that correct?

15     A    Mr. Weiss is retired and follows selected cases.

16  Mr. Beffa has reduced his time to half time and told me he's

17  involved with a research project.

18     Q    Did you get any view from them as to how long they

19  would stay with Mr. Hinckley's case?

20     A    They indicated to me that they would continue with

21  Mr. Hinckley.  Mr. Weiss was a little more specific, saying

22  that he believed that the family and he could work something

23  out, because he does not accept Medicaid.

24     Q    And they have been with Mr. Hinckley for a few

25  years now, correct?

1      A      Now, Mr. Beffa longer.  Mr. Weiss, in the last two

2 to three years.

3             And let me correct that last answer.  Mr. Weiss

4 didn't say he doesn't accept; he said Medicaid would not pay

5 for his services.

6      Q      Okay.  And do you have any knowledge in

7 Williamsburg of the ease or difficulty of finding competent

8 therapists?

9      A      I would defer that to the Williamsburg providers.

10 It is not a metropolitan area like Washington, D.C.; and in

11 my experience, that makes it more difficult.  But I don't

12 know specifically about Williamsburg.

13     Q      Do you know if Mr. Beffa had even gotten a copy of

14 the convalescent leave plan from St. Elizabeths?

15     A      He told me he had not; that there had been some

16 discussions by phone, but he had not seen the plan.

17     Q      Did he have the plan by the time you interviewed

18 him?

19     A      No.

20     Q      Did Mr. Weiss?

21     A      I don't believe he had it either.

22            Mr. Weiss sent me an e-mail after I saw him that

23 said that he had gotten, he believed, a draft at some point.

24 So he wanted to be clear with me as to what information he

25 had and didn't have, which I thought was good.

1          THE COURT:  So is it your understanding he was --

2     the draft that he got was the December letter or the March

3     later or both letters?

4          THE WITNESS:  It would have had to have been the

5     March -- I'm sorry -- the December later, because I met with

6     the Williamsburg providers the second week in March before

7     the March 20 letter.

8          THE COURT:  Okay.

9     BY MS. KENNEDY:

10         Q    Do you know how many times the Williamsburg team

11    has gotten together and discussed this case?

12         A    I got different answers to that question.

13    My overall impression is they've gotten together once and

14    discussed Mr. Hinckley together, but not with Mr. Hinckley

15    present.  They have not met, at least at the time of my

16    report, ever, as a group with Mr. Hinckley.

17         Q    How important is that, in your view?

18         A    I found it surprising that they had not.

19         And I believe my testimony at the last hearing was

20    that the Williamsburg team, to become a team, should meet as

21    a team and include Mr. Hinckley.  That is so fundamentally

22    necessary, I was surprised it had not occurred.

23         Q    Do you believe if, in any order from this Court,

24    if Mr. Hinckley were granted convalescent leave, that they

25    would follow it?

1        A     I would certainly hope so.

2              Forensically trained folks are very, very clear

3        about following the Court's orders as best we can.

4        So I would expect they would, given that that would be the

5        Court's order.

6              The recommendations, on the other hand, vary with

7        regard to how that should happen:  once every two months for

8        six months.  So essentially three meetings.  And then once

9        every six months after that.  I believe that was the

10       hospital's plan.

11             Dr. Murphy said once a month.  I would agree with

12       that.  They should meet once a month at least for the first

13       year.  And it should not change unless there's approval by

14       this Court.

15       Q     And how important is it, if at all, in your

16       opinion, that the Williamsburg team also meet with the

17       St. Elizabeths team?

18       A     I think that that is going -- in the

19       recommendations, that it would be addressed by the meetings

20       with Dr. Johnson in having an inpatient team member present

21       for those meetings.

22             I think that would address that issue.

23       I don't believe that it would be necessary for the

24       St. Elizabeths team to continue to meet as a team over --

25       regarding Mr. Hinckley, if the convalescent leave is granted

1    and, in part, because Mr. Hinckley wouldn't be there.

2            And the treatment team concept recovery model,

3    treatment team model, is really very dependent on the

4    patient being a part of that and present.  So there are

5    various issues that may come up where team members may be in

6    different places.

7            And the example I've already given is about the

8    housing.  Mr. Beffa told me that Mr. Weiss is going to

9    handle the housing.  And he's the case -- Mr. Weiss is the

10   case manager, so he's going to deal with that.

11           And Mr. Weiss tells me that that's very difficult;

12   and that he had been recently at a dinner with someone,

13   people he knew and that available housing is very, very hard

14   to find in Williamsburg.  That's a disconnect.  They need to

15   be on the same page.

16           And they also have to be on the same page with

17   Mr. Hinckley.

18           Mr. Hinckley may say, "You know what?  I've got a

19   job now.  I really want my own place."  We need to,

20   everyone, be working together on that.

21      Q    In your view, should that be worked out before

22   Mr. Hinckley, if this Court grants convalescent leave?

23      A    Those matters that can be addressed should be.

24           I think there was Mr. Hyde who mentioned the

25   benefits coordinator as a position as a -- someone at the

1    hospital.  If that's a resource, use it.

2             Mr. Weiss and his contacts in Williamsburg, if

3    that's a resource, use it.

4             Find out what you can find out, as much as you can

5    ahead of time.

6             But this is a work in progress.  It is a

7    calculated risk.  So you try to do as best you can in

8    reducing the likelihood of risk and increases in risk.

9    And the more information you have to do that, the better.

10       Q    And why is it a risk?

11       A    It is a risk because it may not work.

12       Q    Okay.  And who will be monitoring that if it

13   doesn't work?

14       A    Well, the broad shoulders of Dr. Nicole Johnson

15   seem to be mentioned frequently as the person who would be

16   the arm of the Court; and, therefore, she has and will have,

17   if granted, primary responsibility for that.

18            But she's not in Williamsburg, and she's not one

19   of the treatment providers in Williamsburg.  So Mr Weiss and

20   Dr. G-G, in my opinion, are the two team members that would

21   be most important to communicate directly with her and

22   provide information as to how things are going there, in

23   addition to Mr. Hinckley himself, via the telephone calls

24   and the monthly visits.

25       Q    In your view, can Dr. Johnson do this at

1   St. Elizabeths Hospital alone as far as monitoring this

2   case?

3       A    Well, again, she's no longer at the hospital --

4       Q    Okay.

5       A    -- as being a forensic outpatient department.

6           And it's an important distinction, because as I

7   heard in testimony, the forensic outpatient review board is

8   a different entity than the inpatient review board.

9   So there are some changes that have to be factored in.

10          And I have great confidence in her abilities.

11  It's, for me, an issue of volume of availability.  How much

12  can any one person do?

13      Q    In your view, is 84 patients a lot of patients to

14  oversee for Dr. Johnson?

15      A    84 forensic patients in an outpatient department

16  is a lot to oversee by one psychiatrist, yes, and

17  administrator.  She not only is serving in the role as

18  psychiatrist, she's serving the role as the director of

19  forensic services for outpatient.

20          THE COURT:  By the way, going back to your

21  testimony a little while ago about your thinking it's

22  fundamentally necessary that the team, the Williamsburg

23  team, meet as a team, and you were surprised that they had

24  not met as a team?

25          THE WITNESS:  Yes, sir.

1          THE COURT:  I just found in my opinion of

2    December 20th, 2013, a statement that, after discussing

3    Mr. Weiss' role, it said:  "Furthermore, it is essential, in

4    the Court' view, that there be coordination and

5    communication among the Williamsburg providers, including

6    meetings at regular intervals so they begin to function as a

7    team."  So --

8          THE WITNESS:  Thank you, Your Honor.  I appreciate

9    that.

10          THE COURT:  I know it was a long opinion.

11          MR. LEVINE:  Your Honor, for the sake of

12    completeness, the Court also said, Dr. G-G also will

13    participate in the post-visit telephone conference calls

14    with the hospital team to discuss Mr. Hinckley's progress

15    and will participate by phone in the hospital treatment

16    team's individual recovery plan, meaning scheduled every two

17    months for Mr. Hinckley.  So the Court specifically allowed

18    telephone participation.

19          And I think the question that was asked by

20    Ms. Kennedy about, "Do you think the team will follow the

21    order of the Court?" presupposed that the Court ordered

22    face-to-face meetings when, in fact, it specifically allowed

23    telephone participation.

24          THE COURT:  By her with the St. Elizabeths team?

25          MR. LEVINE:  Yes.

1          THE COURT:  Right.

2          I was alluding to Dr. Patterson's statement that

3     the team in Williamsburg should meet at regular intervals,

4     which he said in his testimony last time and I said in my

5     opinion last time, and, apparently, that didn't happen.

6          It's just an observation.

7     BY MS. KENNEDY:

8     Q     Dr. Patterson, you interviewed many people in your

9     evaluation of Mr. Hinckley, correct?

10    A     Yes, ma'am, I did.

11    Q     And did you interview someone by the name of

12    Esther Koomson?

13    A     I did.

14    Q     And who is that?

15         THE COURT:  How do you spell that?

16         THE WITNESS:  K-o-o-m-s-o-n.  First name Esther,

17    E-s-t-h-e-r.

18    BY MS. KENNEDY:

19    Q     And who is that?

20    A     Esther Koomson is the Registered Nurse.

21         She is a nurse manager on Unit 2B, which is the

22    unit that Mr. Hinckley has resided on, I believe, since the

23    new hospital was opened.

24    Q     And does she have contact with Mr. Hinckley?

25    A     When he is in the hospital, very likely, five days

1  a week.

2     Q    And you interviewed her because she sees him

3  frequently?

4     A    She sees him frequently.

5          And as I mentioned a little while ago, both

6  Dr.Adewale and Mr. Hyde are no longer on that unit; so they

7  don't have that kind of presence in the main unit.

8     Q    So is she the only one left with Mr. Hinckley who

9  has had him on that unit for a period of time?

10    A    Well, I believe Denise Brown is a social worker,

11 is also on the unit.  Her contact, I believe, is about the

12 last three years or so.

13         The other individuals who would have that kind of

14 contact would be the recovery assistance, the RAs, which

15 have been historically referred to in these proceedings as

16 forensic psychiatric technicians.

17    Q    And did you ask her about Mr. Hinckley, how he was

18 doing?

19    A    Yes, I did.

20    Q    And what did she say?

21    A    Well, she said that he is pretty much as he has

22 always been in terms of his interactions with other

23 patients, his peers.

24         And to be more accurate, he's pretty much as he

25 always has been in his interactions with other individuals

1    in care.  The hospital no longer refers to patients as

2    patients.  They refer to individual -- refer to people who

3    are committed to them as individuals in care, IIC.

4    So I want to be as accurate as I can.

5              Yes.  And that would be to exchange greetings:

6    Hello.  How are you doing?  Those kind of things.  But not

7    more in the way of interactions with him.

8              She did also say that he has been brighter.

9    His affect has been brighter.  He has been happier since

10   he's been going home or to Williamsburg for the 17-day

11   periods.  And that has been noticed by the staff as well.

12             The staff also have noticed his activities outside

13   of the unit, which include his feeding of his feral cats,

14   which, according to Ms. Koomson, Mr. Hinckley usually leaves

15   at about 8:30 to feed the cats.  So he will start getting

16   ready before that and is ready to go as soon as the time is

17   right to go out and attend to his cats.

18             And they also have the observations of his

19   interactions with Ms. C.B. -- and, for a time, I believe,

20   Ms. N -- on the grounds of the hospital, meaning essentially

21   in front of the new hospital building because of various

22   construction changes and restrictions that are on the campus

23   now.

24        Q    And did she have a view or did you ask her about

25   his moving to Williamsburg?

1      A      She indicated that she was in support of the

2  recommendation; that convalescent leave seemed to be the

3  right way to go from her clinical perspective.

4      Q      And was it discussed with her or anyone at the

5  hospital or Mr. Hinckley regarding a loss of taking care of

6  the cats if he's in Williamsburg?

7      A      With her and with interesting -- well, not

8  interesting.   With Dr. Binks certainly.

9            But also with Ms. Velora Jernigan-Pedrick, who is

10  his work supervisor in the library, each of them in response

11  to questions or simply offering that his activities on the

12  campus are involved -- are essentially involved with either

13  the cats or his visits with Ms. C.B.

14            So the loss of the cats -- and Mr. Hinckley, in my

15  examination of him, he is trying to work with, I believe, a

16  humane society, but I'm not sure.   I believe a former

17  volunteer at the hospital -- on getting an appropriate

18  placement for his cats.   They have all been neutered.

19            He told me, Mr. Hinckley, that he spends $100 a

20  visit when he goes to Williamsburg buying cat food and other

21  supplies; that he has someone who will tend the cats when

22  he's gone, when he's in Williamsburg, currently, but that

23  he didn't expect that to continue.   So it will be a loss of

24  cats.

25            And there are some places that have formal pet

1    therapy as a part of the therapeutic interventions.

2          And most people who identify with animals tend to

3    identify themselves as cat people or dog people or some even

4    reptile, bird people.

5    Q    Okay.  Now, moving on, Dr. Patterson, what risk

6    assessment, if any, has the hospital provided?

7    A    The risk assessment for -- prior to this hearing

8    that was provided was provided through a contract with

9    Dr. Murphy, there was no risk assessment prior to her risk

10   assessment, which was, I believe, published on March 31st.

11         And, again, in my interviews, I asked pretty much

12   everyone on the team about that, why there was no risk

13   assessment prior to a recommendation to the Court,

14   particularly of this magnitude.

15   Q    What was their reason?

16   A    I didn't get much of a reason at all; that the

17   team either didn't think it was necessary -- Dr. Binks told

18   me explicitly that the team didn't think it was necessary,

19   and that he told them it was.

20         THE COURT:  He told them it was?

21         THE WITNESS:  Yes.

22         THE COURT:  Now, do you recall in prior, in prior

23   hearings, Dr. Montalbano, when he was still at the hospital,

24   gave risk assessments?  And were those done prior to the

25   (e) letter submission or after the --

1        THE WITNESS:  I believe they were.

2        My memory is that there was one.  And I think that

3  may have been with Dr. Murphy, not Dr. Montalbano.

4        I think that was done while the hearing was in

5  progress.  And I believe both Dr. Phillips and I commented

6  on that being inappropriate.  It should have been a part of

7  the process prior to or recommendation coming to the Court.

8        THE COURT:  So your view is that there should be a

9  formal risk assessment before the hospital makes

10  recommendations for major changes?

11        THE WITNESS:  Yes.

12        THE COURT:  And based on Dr. Murphy's report, it

13  seems to be her view as well?

14        THE WITNESS:  My understanding is the part C of

15  her report is for there to be a comprehensive treatment team

16  meeting of all involved, as well as an updated risk

17  assessment at 12 to 18 months.  I believe that's correct.

18        THE COURT:  And you think that's a good idea?

19        THE WITNESS:  I absolutely think that's a good

20  idea.  Essential.

21  BY MS. KENNEDY:

22    Q    In Dr. Murphy's plan, her risk assessment plan or

23  risk management plan, what is your opinion on that plan?

24    A    Well, I believe that Dr. Murphy brings some very,

25  very good points for risk management, including the monthly

1    treatment team meetings.

2             Where I disagree and I have, I believe,

3    consistently in past recommendations, that changes in the

4    conditions should not be based on a time frame.  They should

5    be based on demonstration that over whatever period of time

6    it is, the conditions have been met, not met, sometimes met,

7    whatever that may be, that the clinical condition is

8    whatever it is at that time.  And it takes into account

9    whatever other influences there may be on the clinical

10   condition and risk.

11            And some of those may not have to do directly with

12   John Hinckley at all, in the sense that it's about him or

13   something that he has done or is not doing.  And the best

14   example of that is the death of James Brady, which occurred

15   since the last hearing.

16   Q    And in your opinion -- tell me if I'm misstating

17   this -- yesterday, did you indicate that Mr. Hinckley should

18   call once a week to outpatient?

19   A    Yes.

20   Q    And did Dr. Murphy agree with that?

21   A    Yes.

22   Q    Okay.  And she indicated that he should be

23   traveling to OPD monthly, at least for the first four

24   months.  Your view is it should be a year?

25   A    It should be indefinite until there's a

1  different -- there's change in condition or a --

2  I'm sorry -- a recommendation to this Court for changes in

3  condition.  But I would, in my view, that should be, at

4  minimum, at least a year.

5       Q    Now, let's --

6            THE COURT:  Tell me when you want to take a break.

7            MS. KENNEDY:  Now would be fine, Your Honor.

8            THE COURT:  Okay.  All right.  Why don't we take a

9  15-minute break.

10           THE WITNESS:  Yes, sir.

11           DEPUTY CLERK:  All rise.

12           (Recess from 11:14 a.m. to 11:34 a.m.)

13           DEPUTY CLERK:  All rise.

14           Please be seated.

15  BY MS. KENNEDY:

16       Q    Good morning, again, Dr. Patterson.

17       A    Good morning, again, Ms. Kennedy.

18       Q    I wanted to just quickly go over some of the risk

19  factors, some you mentioned, some you did not, and some

20  Dr. Murphy listed.

21           You indicated depression is a risk factor?

22       A    Yes.

23       Q    And that's something that Dr. Murphy also

24  mentioned, correct?

25       A    Correct.

1      Q    And has he shown depression in the past?

2      A    He has in the past, yes.

3           There has been the institution of an

4  antidepressant, Zoloft, in efforts to help him with anxiety

5  and to forestall him becoming depressed.

6      Q    And was depression an issue when he attempted

7  suicide?

8      A    Yes.

9      Q    Do you know if he was suffering from depression at

10  the time he attempted to assassinate the President?

11     A    In my opinion, he was.  I believe that agrees with

12  the opinions of at least some of the evaluators who saw him

13  prior to his commitment.

14     Q    So depression has been --

15          MR. LEVINE:  Your Honor, can we have fewer leading

16  questions, please?

17          THE COURT:  Would you please ask fewer leading

18  questions than Mr. Levine did.

19          MS. KENNEDY:  Oh, thank you so much.

20          Yes, Your Honor.

21          MR. LEVINE:  That's a good ruling.

22          MS. KENNEDY:  Yeah.  Right.

23  BY MS. KENNEDY:

24     Q    So what, if any, danger has depression been for

25  Mr. Hinckley?

1    A    Oh, it is a component of his mental --

2         MR. LEVINE:  Can we have time frames on these

3    questions?

4         THE COURT:  Yes.

5    BY MS. KENNEDY:

6    Q    At the time that he attempted to assassinate the

7    President and shot Jim Brady and two other law enforcement

8    agents?

9    A    Oh, it was certainly a part of his pathology at

10   that time and prior to that time and subsequently, after

11   having shot the individuals you just mentioned, in 1981.

12   Q    And what were some of the subsequent episodes of

13   depression that involved violence or danger?

14   A    The primary one would be in 1983 when Mr. Hinckley

15   attempted an overdose on himself while in the hospital, and

16   that would be violence to himself.

17   Q    Is depression addressed in the risk management

18   plan?

19   A    It is addressed as a risk factor.

20        And the clinical interventions, many of them, are

21   designed to address his mood, which would include any

22   emergence of depressive symptoms.

23   Q    He's presently on an antidepressant?

24   A    Yes.  Zoloft.

25   Q    Is that what the main remedy is for depression for

1    Mr. Hinckley?

2         A    No.   That's part of it.

3              Both with antidepressants and antipsychotics and

4    anxiolytics, medications to treat anxiety, the intent is to

5    reduce symptoms so that individuals can then utilize other

6    therapeutic interventions.   So you treat depression so

7    someone is able to more appropriately and effectively

8    utilize individual therapy, group therapy, various other

9    forms of interventions.

10             Depression, particularly, as a mood disorder,

11   presents typically with people having under- or

12   over-exaggerations of usual activity.   So people sleep too

13   much; they don't sleep enough.   They overeat; they don't eat

14   enough.   They have no energy.   They come, maybe come in an

15   extreme form, manic and, therefore, have boundless energy.

16             The intent is to reduce those symptoms so that

17   people can do other activities, like go to work, go to

18   volunteer activities, be social, have friendships.

19             So in and of itself, if you just gave someone an

20   antidepressant and said, "Go away," that doesn't necessarily

21   mean their condition is going to improve.   It may be less in

22   the sense of how they feel, but it may not be enough for

23   them to actually engage any other activities.

24             THE COURT:   In other words, things like having no

25   initiative and not wanting to do anything and not getting up

1  in the morning, that's more likely to be dealt with through

2  therapy and other interventions than just the medication?

3          THE WITNESS:  Well, it's a combination.

4  It's a combination.

5          You want to treat someone with the antidepressant

6  so that you can address whatever biochemically is going on

7  in their head, in their brain.

8          But once you try to stabilize that, then you also

9  want to have these other activities so that they can get

10 involved with it.

11         Mr. Hinckley, as we said, doesn't have an alcohol

12 or drug problem, as far as anyone has ever identified.

13 But a number of people who are depressed do self-medicate

14 with those kinds of things so that that they can feel

15 better.  But they still don't go work, and they still --

16 they go out socially and get into trouble.  They get into

17 fights because they get drunk, those kinds of things.

18 BY MS. KENNEDY:

19    Q    Has Mr. Hinckley exhibited those symptoms since

20 he's been at the hospital?

21         THE COURT:  Which symptoms?

22 BY MS. KENNEDY:

23    Q    The depressive symptoms of mania, sleeping too

24 long, of not eating or eating too much, anything that shows

25 a depression setting in.

```
 1              MR. LEVINE:  Your Honor, is that the question that

 2    goes back to 1982 to date?

 3              THE COURT:  Well, the question as phrased was

 4    since he's been at the hospital.

 5              MS. KENNEDY:  Hospital.

 6              MR. LEVINE:  Yes.  1982 to date?

 7              MS. KENNEDY:  Yes.

 8              MR. LEVINE:  Again, the question --

 9              THE COURT:  That's the question since he's been in

10    the hospital.

11              MR. LEVINE:  I object to the question as framed,

12    Your Honor, and I think that she had more discrete time

13    periods.

14              MS. KENNEDY:  Well, that's the time period that

15    I want to ask.

16              THE COURT:  Well, she can ask the question, and

17    then either she will follow up or you will follow up or I

18    will follow up.

19              THE WITNESS:  Answer?

20              Certainly, yes.  In the '80s, particularly,

21    possibly into the '90s, there was some concerns, which is

22    why the antidepressant Zoloft was prescribed.

23              And I believe it was Dr. Green who first

24    prescribed it, but that's my recollection, because of the

25    anxiety and issues of relationships.
```

1        Q      And psychosis, has he exhibited signs of that at

2    the hospital?

3        A      Again, he did during the '80s.

4               And to my knowledge, he has not demonstrated or

5    reported psychotic symptoms since that time.

6        Q      And is that based on medication?

7        A      Medication as well as the therapeutic

8    interventions, yes.

9               THE COURT:  And what medication is that?

10              THE WITNESS:  The medication is Risperdal,

11   R-i-s-p-e-r-d-a-l.  And it is an antipsychotic medication.

12   He is prescribed one milligram per day, which is a minimal

13   dosage, and has been, I believe, since 1999.

14       Q      I'm sorry.  What type of dosage did you say that

15   was?

16       A      One milligram per day.

17       Q      Is that minimum?

18       A      That's a minimal dosage.

19       Q      Minimal.  Okay.

20              And, again, the psychosis is a risk factor for

21   Mr. Hinckley?

22       A      Yes, certainly.

23       Q      And isolation, is that a risk factor for

24   Mr. Hinckley?

25       A      Yes, it is.

1      Q    And how is that?

2      A    Well, the isolation, again, excuse me, has to do

3  with his being self-absorbed and distant from other people,

4  interactions with other people, not necessarily physically

5  distant in the sense that nobody's around.  That's one, what

6  people generally may think of as isolation.

7           But when you're talking about psychological

8  isolation, it really is not having interactions and

9  meaningful interactions with other people.

10     Q    And his level of insight into his mental illness,

11  is that a risk factor?

12     A    It is certainly a risk factor.

13     Q    And how is that?

14     A    It has improved since the 1980s when he first came

15  in.

16           Mr. Hinckley was at that time, at least in 1982

17  when I first met him, still delusional and having psychotic

18  symptoms, et cetera.  That has improved, as I mentioned, and

19  others have testified to as well.

20           But, again, the insight into personality disorder

21  is difficult for most people, whatever the personality

22  disorder may be, because personality disorders are

23  ingrained; they're lifelong maladaptations.  So that the

24  individual with a personality disorder, more times than not,

25  believes that they're justified in whatever impact that has

1    on them.

2        Q    So is the level of insight always going to be

3    somewhat impaired based on his narcissistic personality

4    disorder?

5        A    It's -- well, it's more than simply insight.

6    Insight has a direct correlation or at least impact on

7    judgment.

8            And, in my opinion, his narcissistic personality

9    disorder is lifelong.  So it's not attempting to put it into

10   remission.  It is really attempting to manage it and to help

11   him learn to manage it.

12           And opinions that I've gotten from various people

13   as I've conducted this evaluation relevant to here and now,

14   Dr. G-G" says t me that about 80 percent of the time,

15   Mr. Hinckley gets it right; he makes the right decisions.

16   The other 20 percent, he needs help.

17           Dr. Murphy in her testimony said 99 percent of the

18   time.

19           And the one percent I think she associated with

20   the issue of not going to the movies, et cetera, or not

21   following the itinerary.

22           So there's some variability in what different

23   evaluators have opined about his judgment, and a part of

24   that has to do with his insight into his behavior and the

25   expectations of others.

1        Q    Do you have a percentage of how many times --

2   I mean, what percentage he gets it right and doesn't get it

3   right?  Or is that based on a psychologist testing?

4        A    No, no.  Dr. G-G, as a psychiatrist, is -- her

5   opinion was 80 percent.  I am consistent with that.  I think

6   about 80 percent is a reasonable approximation.

7             But even if it were 99 percent, if the one percent

8   results in some very seriously impaired judgment, the

9   percentage is not as relevant as the behavior.

10       Q    And are access to weapons a risk factor?

11       A    They have not been since his hospitalization.

12  Like with drugs and alcohol, there's limited, hopefully,

13  very limited, access to weapons in a hospital environment,

14  depending on the weapon.  But certainly, firearms should not

15  be something that patients in hospitals have any ready

16  access to.

17            And the hospital staff, at least in my time there

18  and I believe subsequently, make very serious efforts to

19  make sure nobody comes into the hospital with a weapon.

20  It has happened, but that is some time in the distant past.

21       Q    Dr. Patterson, in your view, should Mr. Hinckley

22  have access to weapons via the Internet, as well as

23  pornography or presidential assassination information, or

24  certain celebrities?

25       A    Well, I don't believe he should have access to

1    weapons in any form, Internet or otherwise, gun dealer on

2    the side of the road selling out of the back of this truck,

3    no.  He shouldn't have access to weapons ever, firearms.

4            There are other things like kitchen knives; that

5    certainly could be a weapon as part of how we live.

6    So certainly that in terms of weapons.

7            In terms of access to other materials on the

8    Internet that are available by the Internet, I think they

9    should have a realistic purpose in helping him to recover

10   and to integrate into the community, not simply because

11   everybody has access.

12           There are people you don't want to have access.

13   And we do that classically when we put parental controls on

14   computers and televisions so our kids don't see things they

15   shouldn't see.

16           I would offer that a similar kind of vetting of

17   what is accessible and a monitoring of what is accessed

18   would be appropriate for Mr. Hinckley.

19       Q    And that would be access to -- decline access to

20   something such as presidential assassinations --

21       A    Yes.

22       Q    -- or Jodie Foster?

23       A    Certainly.

24       Q    And you indicated that parents can sometimes limit

25   this for kids, correct?

1      A      Sure.

2      Q      And there's been testimony that Mr. Hinckley,

3    there's a certain level of maturity that sometimes is on an

4    adolescent level, correct?

5      A      I did hear that testimony, yes.

6      Q      Would you agree with that?

7      A      Yes, I would.

8      Q      So those prohibitions that you would put on the

9    Internet, for Mr. Hinckley, would be similar to keeping it

10   from an adolescent or someone in their young 20s?

11     A      Actually, they would be expanded.

12     Q      Oh.

13     A      They would be expanded based on his history and

14   psychopathology.

15            For example, if a high school or even elementary

16   school is doing a paper on the assassination of

17   President Kennedy, certainly, they should be able to find

18   information on the Internet.  My opinion, that would not be

19   an appropriate item for Mr. Hinckley to be involved with,

20   because it relates directly, not the assassination of

21   President Kennedy, but presidential assassination relates

22   directly to his pathology.

23     Q      Now, another risk factor for Mr. Hinckley is a

24   lack of financial support and stability, correct?

25     A      Well, our initial original risk factor was lack of

1   family support.  That was identified in early risk

2   assessments at the hospital.  The lack of financial support

3   or financial stability is an additional risk factor that

4   I have added.

5              THE COURT:  So the originally identified risk

6   factor for Mr. Hinckley was lack of family support?

7              THE WITNESS:  Yes.

8              THE COURT:  Maybe we should talk about -- do you

9   want to talk about them together with the financial support

10  issue or a separate issue?

11             MS. KENNEDY:  I'll ask that separately, if that's

12  all right.

13  BY MS. KENNEDY:

14      Q    And what about a lack of financial support, if

15  finances should become a real issue for Mr. Hinckley?

16      A    Yes, that's a concern.  It's a concern.

17             And it does not mean that the financial support

18  must come from his family.  It means that the financial

19  support is enough, wherever it comes from, to support his

20  stability; that is, his remaining in the community and

21  remaining clinically stable.  That's what that means.

22             It doesn't mean that his family has to pay for.

23  It only means that somebody is going to have to address the

24  financial elements in support of his clinical services, his

25  housing and his forensic requirements.

1      Q     And obviously, his history of suicide attempts is

2   a risk factor, correct?

3      A     Yes.

4      Q     And what about his difficulty in relationships

5   with friends, is that a risk factor for him?

6      A     Again, the original risk factor was relationships

7   with females.  And, again, that was identified by hospital

8   staff way back when.

9          The relationship with friends, I think, is

10  appropriate, because it expands as he becomes more involved

11  with the community.  And friendships with men have not been

12  a part of his history, at least since he's been at the

13  hospital.

14         So the idea of developing friendships with men and

15  how that works and what kinds of things to do and where to

16  go and who to hang out with, et cetera, is something that

17  should be reviewed as a potential risk.

18         And in my review of this, Mr. Hinckley, according

19  to Mr. Beffa, I believe, wanted to have a friendship with

20  someone he met at Eastern State Hospital but decided not to

21  do that, because, as I recall, the individual was a

22  Rastafarian.  He did not want -- Mr. Hinckley did not want

23  to be around someone who might be using an illegal drugs and

24  declined to do that.  That's good.  That's good.  That's

25  what risk factors are for.

1          Let's look at whether or not there's an increased

2    risk or perhaps a decreased risk in how someone is making

3    decisions on their own.

4          On the other hand, his relationships with women

5    have classily been very difficult, sometimes more difficult

6    than others.  And in fairness in that regard, he has

7    improved.  So that's why the conditional release to the

8    community will open up, hopefully, more opportunity, but

9    potentially more risk.

10          THE COURT:  Well, in fairness, too, his

11    opportunities to meet women while at St. Elizabeths Hospital

12    has kind of been limited.

13          THE WITNESS:  Yes, that is certainly true.

14          THE COURT:  And they weren't all totally mentally

15    stable.

16          THE WITNESS:  That is certainly true.

17          THE COURT:  So in terms of relationships, I take

18    it there -- I mean, treating women and men differently,

19    there are two separate things.  One is, in the past, his

20    lack of effort to make friends, I suppose, related to his

21    isolation.

22          THE WITNESS:  Related to his isolation and to,

23    initially, all three conditions, the depression, the

24    psychosis, and a personality disorder; subsequently,

25    primarily, the personality disorder.

1          THE COURT:  So now, as he's in this phase 4 stage

2     that he's been spending 17 days a month in Williamsburg, one

3     of the things that Mr. Weiss and he -- that he has done with

4     the help of Mr. Weiss is to try to -- sometimes with the

5     help of Mr. Weiss -- is to try to make friends.

6          THE WITNESS:  Yes.

7          THE COURT:  And so Mr. Brelsford, for example, has

8     been a new addition to his life?

9          THE WITNESS:  That's correct.

10          THE COURT:  And that's a male friend?

11          THE WITNESS:  That's right.

12          THE COURT:  So in that regard, that's a plus --

13          THE WITNESS:  It is.

14          THE COURT:  -- in terms of his history?

15          THE WITNESS:  Yes.

16          THE COURT:  But as he goes forward, the other

17     aspect of relationships with friends is not only that it's

18     good that he make friends and develops relationships, but

19     the example you just gave, also the exercise of good

20     judgment in who to develop these friendships with?

21          THE WITNESS:  Precisely.

22          THE COURT:  Okay.

23          THE WITNESS:  And to be complete, the development

24     of the friendship with Mr. Brelsford came through Mr. Weiss.

25          The potential development of friendships with

1    former group therapy members with Mr. Beffa -- because

2    Mr. Hinckley was in an evening group.  It was changed to a

3    day group so that he can now then have friendships with

4    those past group members.  Part of the rules is you can't

5    have outside interactions with a current group member.

6    So that's a potential source as well.

7            But on that continuum, that's part of why I have

8    the concerns about the Internet.  People will represent

9    themselves in all kinds of ways on the Internet so that if

10   you're naive to it and you don't know, it can be something

11   that can be very harmful, if not properly understood and

12   managed.

13           So that's why I say that that should be something

14   that is monitored and pre-approved so that when those kinds

15   of things come up, then the treatment team member -- in this

16   case, I believe, Mr. Weiss, and very possibly Dr. G-G, and,

17   if necessary, Dr. Johnson -- would advise on, yes, this is a

18   good idea; no, this isn't.  And if it is something, how is

19   it working?

20   BY MS. KENNEDY:

21       Q    Deception, Dr. Patterson, how does that -- how is

22   that a risk factor for Mr. Hinckley?

23       A    Oh, it's a risk factor in that Mr. -- there's been

24   considerable testimony that Mr. Hinckley is not forthcoming

25   with information.  You have to ask him questions.  That's my

1    experience as well.

2         But there have been instances where Mr. Hinckley

3    has simply not told the truth.  And they have to do with

4    adhering to the itinerary, most recently, both in 2011 and

5    this year.  So those are --

6         THE COURT:  Wait a minute.  This year is it not

7    telling the truth or telling the truth but too late?

8         THE WITNESS:  Well, it is telling the truth -- it

9    is but too late.  But it's not following the itinerary.

10        THE COURT:  Right.

11        THE WITNESS:  And the following of the itinerary

12   is a fundamental requirement under the current conditional

13   release.

14   BY MS. KENNEDY:

15   Q    But the hospital doesn't have him writing

16   itineraries once he's on convalescent leave, correct?

17   A    That's correct.

18   Q    But that's something you think is absolutely

19   needed, correct?

20   A    I think that's absolutely needed.  So does

21   Dr. G-G.  So does Mr. Weiss, I believe.

22   Q    Okay.  Now, lastly, the offense, was that a risk

23   factor or continues to be a risk factor for Mr. Hinckley?

24   A    It was not prior to the offense.  It certainly is

25   after the offense.  And it, therefore, factors into what

1   kinds of conditions should be in place and what kinds of

2   limitations should be in place.

3        Q    And how does the current plan by St. Elizabeths

4   Hospital address --

5             THE COURT:  The proposed plan by St. Elizabeths?

6             MS. KENNEDY:  Yes.  The current convalescent leave

7   plan, by the hospital, yes.

8             THE COURT:  Right.

9   BY MS. KENNEDY:

10       Q    How does that address these risks?

11       A    The current plan by the hospital -- and I'll be

12  specific.  The plans that were submitted December 19th,

13  2014, and April 20th, 2015, do not adequately --

14            THE COURT:  April 20th or March 20th?

15            THE WITNESS:  March 20th.  I'm sorry.

16            -- March 20th, 2015, do not adequately address all

17  of the risk factors, and that's why I was opposed to the

18  plan.

19            And I'll reinforce and reemphasize, it wasn't

20  based on Mr. Hinckley's current level of functioning under

21  the current conditional release.  In my opinion, which I

22  think is in concert with the hospital and Dr. Murphy, he is

23  a low risk currently.

24            To go forward, there need to be risk assessment

25  and risk management interventions and protocols, and that's

1    where I found the hospital plan lacking.

2    BY MS. KENNEDY:

3        Q    And in your view, how often should risk

4    assessments be done for Mr. Hinckley?

5        A    They should be done, as a rule of thumb, whenever

6    there may be significant events or changes in Mr. Hinckley's

7    mental state or in the conditions that are currently in

8    place.

9            My suggestion is that it should not be done,

10   assuming that all of those things remain essentially stable

11   and are moving forward, for at least a year.

12           Dr. Murphy, I believe, is 12 to 18 months, in her

13   estimation.

14       Q    Now, in looking at his past conduct, some of which

15   you have mentioned, you mentioned the assassination attempt,

16   correct?

17       A    Yes.

18       Q    And is it four or three suicide attempts?

19           MR. LEVINE:  Can we have time periods, Your Honor,

20   please?

21   BY MS. KENNEDY:

22       Q    If you know them, Dr. Patterson.

23           THE COURT:  Yes.  The first question is, since

24   he's been -- I guess the question is post 1981?

25           MS. KENNEDY:  Right.

1          THE COURT:  Are you going before 1981?

2          MS. KENNEDY:  I'm doing post, Your Honor.

3          THE COURT:  So since the attempt to assassinate

4    President Reagan, do you know how many suicide attempts

5    there have been and when?

6          MS. KENNEDY:  Right.

7          THE WITNESS:  Since -- well, this is a difficult

8    question to answer and I'll say why.

9          Since the --

10   BY MS. KENNEDY:

11        Q    Well, let me just say, if it has anything to do

12   with you learning anything in therapy, please don't address

13   that.

14        A    I would not.

15        Q    Okay.

16        A    Absolutely would not.

17        Q    Okay.

18        A    And I will just offer so you will --

19        Q    No.  Thank you.

20        A    -- know -- no, no, no.

21        MR. LEVINE:  We offer our continuing objection,

22   Your Honor.

23        THE WITNESS:  That you'll know ahead of time.

24   BY MS. KENNEDY:

25        Q    Okay.

1       A    One risk factor that I thought you were going to

2   come back to is lack of family support.

3       Q    Yeah.

4       A    That one I will not address.

5       Q    Okay.  Very good.

6       A    I simply will not address that.

7       Q    Yeah.  Okay.  Thank you.

8       A    Okay?

9            In terms of suicide attempts, the reason it's a

10  difficult question is because at least some of the examiners

11  at that time and some since, including me, believe the

12  assassination attempt itself was also a suicide attempt.

13  So that is contemporaneous.  It is simultaneous.  It's at

14  the time, March 30th, 1981.  If the expectation of

15  Mr. Hinckley is that he would not survive the attempt, that

16  is a homicide-suicide.  So that's one.

17      Q    Okay.

18      A    1983 is the overdose.

19           THE COURT:  That's the kind of things that we see

20  sometimes in these school shootings and stuff like that,

21  that the theory is -- and maybe the fact is that the

22  individual goes in and does what he does with no expectation

23  that he or she will survive it.

24           THE WITNESS:  That's absolutely correct.

25           And in some instances, the individual, when

1    confronted or unable to escape, kills himself.  So it's

2    suicide by cop or law enforcement or self-inflicted.

3    So 1981 is one.

4           The overdose on medications being administered at

5    the hospital was, I believe, February, of 1983.  That is

6    two.

7           The other attempts would precede the assassination

8    attempt.

9    BY MS. KENNEDY:

10       Q    Okay.  Before he went into the hospital?

11          THE COURT:  There was some testimony by somebody a

12   couple of days ago about another attempted overdose,

13   I believe, and an attempted hanging.

14          Were they both before the assassination?

15          THE WITNESS:  That was by Dr. Murphy.  And, yes,

16   they were.  One of them was after the assassination attempt.

17   The attempted hanging was at Fort Meade in 1981 but prior to

18   the finding of not guilty by reason of insanity.

19   BY MS. KENNEDY:

20       Q    So he was awaiting trial?

21       A    I'm sorry.  It was -- yes, it was in 1981 after

22   the attempt, the assassination attempt --

23          THE COURT:  Right.

24          THE WITNESS:  -- but prior to the finding.

25

```
 1    BY MS. KENNEDY:

 2         Q    Okay.  And then prior to --

 3              THE COURT:  So the most recent one was the one at

 4    the hospital in 1981?

 5              THE WITNESS:  1983.

 6              THE COURT:  1983.

 7              THE WITNESS:  Yes, sir.

 8              THE COURT:  Nothing since then?

 9              THE WITNESS:  Not to my knowledge, no.

10              THE COURT:  I think we'd know.

11              THE WITNESS:  I would think so.

12    BY THE COURT:

13         Q    All right.  And other prior conduct with -- that

14    is problematic was stalking President Carter for a while;

15    is that correct?

16         A    That, yes, is my understanding.

17              MR. LEVINE:  Your Honor, now, this was absolutely

18    the subject of the family therapy.

19              MS. KENNEDY:  Oh, no.  It's been in the papers.

20    The Secret Service knew it.

21              THE COURT:  There's been lots of testimony.

22    There's been testimony about that.

23    BY MS. KENNEDY:

24         Q    And did he stalk any females at the hospital,

25    professionals?
```

1      A      In my opinion, yes, he did.

2      Q      Okay.  And do you know what they were?  I mean,

3  nurses, pharmacists?

4      A      That was in 1995.  It was a commander in the

5  public health service.  It was the chief pharmacist at the

6  hospital.

7      Q      Okay.  And was there any inappropriateness with

8  the dentist at the hospital?

9           MR. LEVINE:  Your Honor, I just want the record to

10  reflect at this time that we disagree with that finding.

11  There is no finding.

12           And the director, the medical director of the

13  hospital, Dr. John Kelly, specifically concluded that he did

14  not believe Jeannette Wick and that he credited the

15  patient's version of what happened over hers.

16           THE COURT:  And I think whatever -- I think I

17  discussed that in --

18           MS. KENNEDY:  You did.

19           THE COURT:  -- a number of earlier opinions.

20           MS. KENNEDY:  You did, Your Honor.

21           THE COURT:  I don't recall whether I made specific

22  fact findings, but I discussed the evidence with respect to

23  it.

24  BY MS. KENNEDY:

25      Q      And almost lastly, Dr. Patterson, on this

1    subject --

2            THE COURT:  I thought you were going to get to --

3    he interrupted your question.  Are you going to skip the

4    question he interrupted?

5            MS. KENNEDY:  Oh, I'm sorry.

6    BY MS. KENNEDY:

7        Q    The dentist, do you know anything about the

8    dentist, Dr. Patterson?

9        A    I do.

10       Q    And can you tell us?

11       A    This involved Mr. Hinckley using a computer at

12   work to look at pictures of a dental resident's graduation.

13   Mr. Hinckley's explanation of that was that he believed that

14   he had been given permission by the dental resident.

15   The dental resident's report was that she had not given that

16   permission.

17           The supervisor, Ms. Velora Jernigan-Pedrick,

18   discovered that information when she took a look at what

19   Mr. Hinckley had been doing.

20       Q    And you are aware of, at the last hearing it was

21   discussed, Mr. Hinckley, going from the movies to a

22   bookstore and looking at books --

23       A    Very much aware.

24       Q    -- on presidential assassination?

25       A    Yes, ma'am.

1       Q     Now, current conduct, would you say, is much

2    improved?

3       A     I would.

4       Q     And you are aware of the incident in 2014 of

5    calling Mr. Hyde after he had gone to a music studio when he

6    was supposed to be going to the photographer's home,

7    correct?

8       A     I am aware of the incident, yes.

9       Q     And how would you describe that incident as far as

10   Mr. Hinckley's involvement in that?

11      A     I would describe that as a violation of the

12   itinerary, and I would describe it as deceptive.

13      Q     Okay.  Did you have an opportunity to review

14   Dr. G.G.'s report in which she indicated that he had known

15   the night before he was going to go to the music studio?

16      A     I believe she indicated that he had called and

17   talked to Ms. -- Mr. Tracy the day before.

18      Q     Now, in 2014, when this occurred, is that similar

19   to Mr. Hinckley's deceptive behavior in the past?

20      A     It is similar in the sense of there being a very

21   clear itinerary that was violated and there having been a

22   previous ruling by the forensic review board that he should

23   not go to the recording studio of Mr. Tracy.

24      Q     Now, what, if any, effect does his narcissistic

25   personality have on that kind of behavior?

1    A    Well, there is several components of narcissistic

2    personality disorder.

3         In my opinion, the relevant ones in that

4    particular instance had to do with the sense of entitlement

5    that he can do whatever he wants to do when he wants to do

6    it, which is a way of explaining entitlement.  The other

7    would be a disregard for the rules.

8    Q    Do you know if there were any consequences for

9    Mr. Hinckley for that violation?

10   A    I talked with Mr. Hyde about that.  They certainly

11   did talk about it.  I believe Mr. Hyde told me that he asked

12   John, "Why would you do something like that?"  Just wasn't a

13   good judgment.

14        But that he also, in fairness to Mr. Hyde, also

15   thought it may have had something to do with Mr. Hinckley

16   being with his friend, Mr. Brelsford.  And since the

17   photographer was ill and they were together, then let's just

18   go and go over to this other place.

19   Q    What is your view of that, Dr. Patterson?

20   A    You can look at that in two ways.  One is the way

21   that Mr. Hyde has looked at it; that maybe it was, by

22   extension, some form of kind of peer pressures, don't want

23   to have to call and get permission when I'm hanging out with

24   my friend.

25        The other way to look at it is that Mr. Hinckley's

1   very much aware that Mr. Brelsford is in contact with

2   Mr. Weiss, and that Mr. Brelsford very well may have said to

3   Mr. Weiss, "You know what?  John and I went over to the

4   music studio," which Mr. Weiss would have known was not on

5   the itinerary.

6        Q    What kind of message does it send to Mr. Hinckley

7   with this kind of conduct to not be chastised or in any way

8   discussed with the hospital about this behavior?

9        A    Well, it has to be placed in the therapeutic

10  context.  Any of these kinds of activities that happen

11  should be a focus of therapy.  And they may be a focus of

12  multiple therapies.  This is the kind of situation that

13  might be discussed in group therapy, but certainly is much

14  more likely to be discussed in individual therapy, so you

15  need both.  They have different purposes.

16       But then there has to be some assessment of

17  whether or not that, indeed, indicates an increase in the

18  risk.  And if that assessment is that it does, then there

19  should be some management plan.  And that plan could be:

20  You can't do that anymore.  It can be:  You can't do

21  anything anymore.  Could be:  Come back to the hospital.

22  But a plan to manage whenever there are those kinds of

23  deviations.  And the message, hopefully, will support that

24  they don't recur.

25       Now, in this particular case, Mr. Hinckley was

1    following an itinerary, correct?

2        A    Yes.

3        Q    So if there's no itinerary for Mr. Hinckley, not

4    only this --

5            MR. LEVINE:  Objection, Your Honor; leading.

6    BY THE COURT:

7        Q    What, if there is no itinerary at all, can happen

8    with Mr. Hinckley related to something like the bookstore?

9        A    Well, the bookstore and pretty much anything else,

10   if there's no itinerary, then Mr. Hinckley, as the hospital

11   had recommended, should be free to use his unsupervised time

12   or meaning non-therapy time, in any way he wants.

13           If there's no itinerary, if there's no log, if

14   there's no calendar, then you don't know ahead of time what

15   kinds of activities are anticipated, and you don't know

16   after the fact what actually did happen.

17       Q    How important is supervision for Mr. Hinckley --

18       A    Very important.

19       Q    -- in Williamsburg?

20       A    It is very important.  It is, in my opinion, an

21   essential part of risk management and for a variety of

22   reasons.

23       Q    And what would those variety of reasons be?

24       A    Oh, one of them is because, as I mentioned, as the

25   opportunity increases, so does the risk and, in part,

1    because you don't know what other people will do.

2              You may have very good plans for Mr. Hinckley --

3    for example, that he's going to volunteer at an agency in

4    Williamsburg -- and that agency at the lower level says, oh,

5    that might be a good idea.  We welcome everybody.  And it

6    gets to a board of directors who says, nope, I'm not doing

7    that.

8              So you don't know what they're going to do out

9    there in the community.  You don't know --

10             THE COURT:  That's -- but that example strikes me

11   as not being the kind of primary reason you might want an

12   itinerary, because any volunteer activities and any

13   employment activities will be coordinated with and through

14   Mr. Weiss.  So that kind of a problem would emerge, it seems

15   to me, with or without an itinerary.

16             THE WITNESS:  Well, depending on how that's

17   reported.  You're relying on Mr. Hinckley to tell you.

18             An example on the other end of that spectrum, free

19   access to the Internet.  How about there's a job opportunity

20   taking pictures of whatever, and nobody knows that.  And it

21   turns out it's really something nefarious.  That's the kind

22   of thing you want a pre-approval of.  Let's check this out.

23   Let's not just look at it and see what the ad says.  It may

24   not be legitimate.  It may be whatever it is.  Let's check

25   it out and see.  And then let's find out what happened

1    afterwards.

2            But in those kinds of semi-structured activities,

3    it's less so than in non-structured activities, going to

4    whatever social event, going to whatever party, going to

5    someplace that may or may not be appropriate.  And that's

6    why you want the assistance.  This is to assist.  It's not

7    to impede.  It's to assist in making the right decisions.

8        Q    You just mentioned, Dr. Patterson, submitting --

9    or having pictures; is that -- did you state pictures?

10       A    The idea of, yes, someone perhaps advertising to

11   do something along that line.

12       Q    What is your opinion on Mr. Hinckley submitting

13   pictures and music on the Internet?

14       A    Oh, I think that would be a very bad idea.

15       Q    And why is that?

16       A    Because the notoriety-fame issue is one that is a

17   part of his pathology.

18           Even the idea of anonymity is a very elusive thing

19   in these days of Internet discovery.

20           And I will make it brief; but during the course of

21   this hearing, as I was preparing to come one day, I was

22   watching news and weather and saw a picture of

23   Mrs. Hinckley's house.

24           I mean, many things are discoverable, including

25   the identities of people who may have submitted something,

1    thinking it was anonymous.

2         Q     How important is Mr. Hinckley's contact with the

3    authority of the hospital, authority figures, just the

4    institution in general?

5         A     Oh, again, I think that's very important.

6               The ultimate authority, when you asked me

7    questions about who's responsible for his care, his

8    treatment, et cetera, the ultimate authority is this Court;

9    and, therefore, there has to be an administrative liaison

10   from the treatment providers, whomever they are, to this

11   Court.

12        Q     And even in the past with the supervision and

13   structure of the hospital, Mr. Hinckley has violated

14   hospital rules, correct?

15              MR. LEVINE:  Objection; leading.

16              THE COURT:  You can answer.

17              What's the question?

18   BY MS. KENNEDY:

19        Q     Even with the supervision and structure of the

20   hospital, living there as an inpatient, he has violated

21   rules, correct?

22              MR. LEVINE:  Objection.

23              THE COURT:  As an inpatient?

24              MS. KENNEDY:  As an inpatient, yes.

25              MR. LEVINE:  Objection; leading and time frame.

1   BY MS. KENNEDY:

2        Q     His entire time there.

3              THE COURT:  Yeah, it's overruled.

4              Go ahead.

5              THE WITNESS:  Yes, he has.

6              Some of them formal rules and others that, on

7   discussion by the treatment team at the time, may have been

8   thought to have been miscommunications or a misunderstanding

9   by Mr. Hinckley.

10             I'm referencing the issue with the dental resident

11  and whether that was a misunderstanding or if that was a

12  violation of how he should have been using the computer.

13             There was an off -- I'm sorry.

14             There was a Christmas present -- a Christmas party

15  in which patients were allowed to invite guests from outside

16  of the hospital, I believe, in a restaurant.  Mr. Hinckley

17  didn't inform Mr. Hyde that he had invited one of the women

18  that he had been interested in, and she appeared at the

19  restaurant without there being any expectation she would

20  come.

21             That is not in concert with the rule of telling

22  the treatment team who you're inviting, who's coming.

23  So there have been those kinds of things that have occurred.

24             Ultimately, the overdose, there's a violation of

25  the --

1          THE COURT:  The what?

2          THE WITNESS:  The overdose in 1983, in terms of

3   time frame, is a violation of compliance with medication.

4   So that has occurred.

5   BY MS. KENNEDY:

6     Q    Now, the Court asked you about particular women

7   that Mr. Hinckley has seen or dated at the hospital,

8   correct?

9     A    Yes.

10    Q    And the Court indicated that they had mental

11  health issues; is that correct?

12    A    Yes.

13    Q    What about Ms. L in Williamsburg, does she have

14  any mental health issues?

15    A    My understanding from Mr. Hinckley is that she has

16  both mental health and substance abuse issues and --

17         THE COURT:  Or has had substance abuse issues?

18         THE WITNESS:  I'm not sure of how current.

19         And that her current living situation is in a

20  group home for support, rather than with her parents.

21         THE COURT:  But you're not suggesting that a

22  relationship with someone who's had mental health issues is

23  necessarily problematic?

24         THE WITNESS:  Not at all, no.

25         THE COURT:  I mean, some of the relationships have

1    been real problems.  Others, I mean, I -- you know more

2    detail than I do, but it seems like the relationship with

3    Ms. Devoe was positive for a period of time in many ways.

4            THE WITNESS:  In my opinion, it certainly was.

5            And I would agree with you.  I would not suggest

6    for a moment there should be a prohibition on having

7    relationships with anyone because of their mental state.

8    The real issue for me is that, whomever it is, that's being

9    discussed in therapy, because Mr. Hinckley has historically

10   been -- I don't want to use the term "infatuation," but has

11   been attracted with the anticipation that this could be the

12   one.

13           And when there have been some information,

14   including mental state, that would suggest maybe that's not

15   quite accurate and there are other factors to consider, he

16   has had difficulty with that.  So you want someone to assist

17   him in how he manages his relationships.

18   BY MS. KENNEDY:

19       Q    And, Dr. Patterson, you indicated, I believe, on

20   direct that Mr. Hinckley is not, quote, a regular NGI?

21       A    I very likely would have said that.

22       Q    Well, if you hadn't, is he?

23       A    No.

24       Q    Okay.  So what is your view as to whether or not

25   there should be any change if this Court were to grant

1    convalescent leave, any change in the order with any of his

2    conditions until further notice of the Court?

3         A    Oh, my view of that is that if the Court does

4    grant convalescent leave, that there should be an increase,

5    not a decrease, in clinical services and in risk management

6    monitoring in Williamsburg, and the extension through the

7    forensic outpatient department with Dr. Johnson, and

8    whomever else may be a part of the forensic outpatient

9    department team.

10        As written right now, Dr. Johnson has all of the

11   responsibility as far as the Department of Behavioral Health

12   is concerned, with the exception of meeting for a limited

13   time with Dr. Binks and with a member of the inpatient

14   treatment team.

15        So from my perspective, there should be an

16   increase because of the relative decrease in his involvement

17   at the hospital and the increase in opportunities and risk

18   in the community.  So that's -- and that should remain in

19   effect, unless and until the Court orders a change in those

20   conditions.

21        Q    Who would write the treatment plan for

22   Mr. Hinckley now that he is in the outpatient, if he were in

23   the outpatient division?

24        A    From my interviews, I think that that

25   responsibility would be with Mr. Weiss, I think.

1          And I say "I think" because, as the case manager

2     in an outpatient setting, he is more closely aligned to the

3     clinical administrator as -- Mr. Hyde is -- in an inpatient

4     setting.

5          Dr. G-G, on the other hand, is the forensically

6     trained clinician in Williamsburg.  So arguably, she should

7     be writing the treatment plans.  But my understanding

8     currently is that Mr. Weiss will be responsible for writing

9     them.

10          The whole treatment team, including Mr. Hinckley,

11     should be reviewing them and making sure that they are,

12     indeed, what they are intended to be, which is a roadmap of

13     how things have gone and how we intend to get to the next

14     place.

15     Q     Wouldn't Dr. Johnson with outpatient have anything

16     to do with writing the treatment plan?

17     A     I would expect she would have to approve them.

18     I don't expect that she would have to actually write them.

19          I think that the process would be, at least in my

20     opinion, one where they're written in Williamsburg,

21     presented to her and -- for her input and approval before

22     they are actually adopted.

23     Q     And the risk assessment, which is written at

24     various times, in your view, should it be one time -- once a

25     year or a longer period of time?

1          A    I think going forward, it should be a year from

2    now, unless there is some significant change in either the

3    conditions or Mr. Hinckley's mental status.  But I wouldn't

4    suggest that they should be an annual event.

5                THE COURT:  You would not?

6                THE WITNESS:  I would not.

7                I think they depend on how the conditional release

8    at the time that's in effect is actually being

9    operationalized.  And if there is a need for or a

10   recommendation for a change, that that should be accompanied

11   by an updated risk assessment.

12   BY MS. KENNEDY:

13         Q    You mentioned that Mr. Hinckley is in both group

14   therapy and individual therapy, correct?

15         A    That's correct.

16         Q    And does Mr. Weiss run both those groups?

17         A    Mr. Beffa --

18         Q    Mr. Beffa.  I'm sorry.

19         A    -- runs the group, and he is his individual

20   therapist.  That is Mr. Beffa's role.

21               And, of course, Dr. Binks continues with the

22   individual therapy at the hospital.  And when Mr. Hinckley

23   is at the hospital, he has several group therapies, for

24   example, music therapy with Ryan Carroll.

25         Q    And does Mr. Hinckley participate in group

1  therapy?

2        A    He does.

3        Q    And he actually speaks, as far as you know?

4        A    Well, in the group therapy -- that's one of the

5   information points Mr. Carroll informed me of when I

6   interviewed him.  He is the new music therapist.

7   He's looking back at Mr. Hinckley's previous therapy, music

8   therapy, and also changes or differences in his current

9   music therapy.  So he does participate -- one of the things

10  Mr. Carroll said is that he does participate more now than

11  he used to in the music therapy at the hospital.

12        Mr. Beffa has reported that Mr. Hinckley is an

13  active participant in the group therapies in Williamsburg,

14  and that's a good thing.

15        Q    You mentioned Mr. Hinckley's personality disorder

16  throughout this examination.  What, if any, blame does

17  Mr. Hinckley place on other individuals for his behavior?

18        A    Well, part of --

19        MR. LEVINE:  Time frame, please, Your Honor?

20        MS. KENNEDY:  Since he's been at the hospital.

21        MR. LEVINE:  And what behavior specifically are we

22  talking about?

23        MS. KENNEDY:  I'm asking Dr. Patterson what that

24  would be.

25        MR. LEVINE:  Well, I think the question --

1          THE COURT:  Ask the question again.

2    BY MS. KENNEDY:

3      Q    What -- I have to rethink it.  What is

4    Mr. Hinckley's action in blaming others for his bad

5    behavior?

6          MR. LEVINE:  Objection, Your Honor.  What behavior

7    are we referencing?

8          THE COURT:  Yeah.  I'm not clear either.

9          Are we talking about the crime?  Are we talking

10   about things that he's done?

11         MS. KENNEDY:  At the hospital.  I'll rephrase

12   that.

13   BY MS. KENNEDY:

14     Q    Has Mr. Hinckley done bad behavior at the

15   hospital?

16     A    If by "bad behavior," we mean not following the

17   rules, then the answer to that is yes.

18     Q    Okay.  And has he shown that he hasn't followed

19   the rules also down in Williamsburg?

20     A    Yes.

21     Q    And what reasons does Mr. Hinckley place for that

22   bad behavior?

23         MR. LEVINE:  Your Honor, can we know what behavior

24   we're talking about?

25         MS. KENNEDY:  Not following rules.

1          THE COURT:  All right.  He said not following the

2    rules in the hospital and not following the rules in

3    Williamsburg.  So I think you're going to have to be a

4    little more specific before you tell us --

5          MS. KENNEDY:  Okay.

6          THE COURT:  -- what Mr. Hinckley or who

7    Mr. Hinckley blames.  It may differ depending upon what

8    incident or what kind of behavior you're referencing.

9    BY MS. KENNEDY:

10     Q     Starting with recent behavior down in

11   Williamsburg, did he -- did he indicate to you or were you

12   able to get any information on Mr. Hinckley's reasons for

13   why it is he went to the music person's house versus the

14   photographer's house?

15     A     Yes.  The behavior regarding not going to the

16   photographer's house and going to the musician's studio,

17   Mr. Hinckley explained as it was bad judgment, and he should

18   have called and gotten permission from Mr. Hyde before he

19   did that.

20     Q     And when a couple years ago he was not at the

21   movies but at the bookstore, did he take any responsibility

22   for that action?

23     A     Not initially.  Initially, he was confrontational

24   as to who said he did this and what are we talking about.

25   And during the course of the interview, minimized that that

1   was an important thing that he had done in not following the

2   itinerary and in lying to the treatment team, to the

3   examiners, and to his mother.  So initially, it was

4   minimizing that it was important.

5           In my opinion, that is part and parcel of his

6   narcissistic personality disorder.  To minimize or

7   externalize responsibility for one's own behaviors is part

8   of the disorder.

9       Q    And he's demonstrated that type of behavior in the

10  past?

11      A    He has.

12      Q    Now, in the -- since he, in the last 20 years, has

13  Mr. Hinckley always been truthful regarding his behaviors?

14      A    No.

15      Q    And if he were granted convalescent leave in

16  Williamsburg, how would that be monitored?  Who would check

17  that?

18      A    Well, if there are no itineraries and no logs to

19  review what he's actually been doing, it would be

20  essentially based on his self-report.  And it would be based

21  on the self-report to his treatment providers in

22  Williamsburg and possibly to Dr. Johnson during the monthly

23  visits and the phone calls.

24      Q    What are the reasons that an individual is

25  returned from outpatient to inpatient in the hospital?

1        A    Oh, they can -- they can be a wide variety.

2   They can be changes in their mental status.  There can be

3   changes in their housing.

4           Mr. Hinckley, to my knowledge and to the knowledge

5   of everyone I interviewed, has never had a roommate at the

6   hospital.  If down the road there's a plan -- and I think

7   you heard Mr. Hyde mention an SRO, a single-resident

8   occupancy.  So the plan might be for him to have his own

9   apartment, his own condo, his own room.

10          If, on the other hand, that were --

11          MR. LEVINE:  Your Honor, I think the question was,

12  why are people returned to the hospital?  And I don't

13  understand how this answer could include whether

14  Mr. Hinckley has had a roommate.

15          THE COURT:  I think this is an example of why

16  people might be returned to the hospital, if they --

17  I don't know what he's going to say next, but I can assume

18  what he's going to say next.

19          THE WITNESS:  Well, I prefaced that issue of

20  house -- roommate, et cetera, with changes in housing.

21  If there are -- people can be returned to the hospital when

22  there are changes in their mental condition, changes in

23  housing.  It's an important consideration.

24          If someone loses their housing, they may be

25  returned to the hospital, even though their mental status

1    has remained the same.

2           If there is a change in housing and an

3    unanticipated problem, such as someone having a roommate who

4    has not had a roommate and they get into conflicts, that may

5    be a conflict between two people.

6           But the alternative, at that time, may be to

7    return to the hospital.  So there are a number of different

8    reasons that people come back to the hospital.

9        Q    Why hasn't Mr. Hinckley had a roommate at the

10   hospital?

11       A    Initially, it was a safety issue, primarily.

12   It was also during an evaluation period.

13          After Mr. Hinckley was committed in 1982, there

14   was some Bolter evaluation, et cetera, Bolter v. Harris to

15   advise the Court as to whether or not he needed to remain

16   hospitalized, so there was an evaluation period.

17          But as it turns out, at the time, the John Howard

18   Pavilion was having construction.  And we had a lot of

19   outside people, construction workers.  And one of the staff

20   overheard one of them asking, "What unit is John W. Hinckley

21   on?"  So we thought it very important to make sure that he

22   was in a safe environment.

23       Q    And that stayed that way over time?

24       A    It stayed that way.

25          When he was transferred from a, I believe, a

1   pretrial unit to a special treatment unit, it remained that

2   way.

3           And it remained that way, for reasons I don't

4   know, throughout his hospitalization and once he went to the

5   new hospital.

6       Q    How many patients have their own room?

7       A    That I'm not sure of in terms of the new hospital.

8   I just don't know.  If everyone does or if some people have

9   rooms, I don't know.

10          In the old hospital, John Howard Pavilion, most

11  people had at least a roommate, a two-person room or even

12  sometimes four and, when I first got there, six.  So that

13  decreased over time.

14      Q    So for Mr. Hinckley having his own room, is that

15  something that's out of the ordinary?

16      A    I -- at this point, I don't know.

17          MR. LEVINE:  Your Honor, I'm going to object,

18  because there is no basis --

19          MS. KENNEDY:  He's answered it, Your Honor.

20          MR. LEVINE:  -- for the questions about

21  Mr. Hinckley not having a roommate.  I mean --

22          MS. KENNEDY:  Well --

23          MR. LEVINE:  There's no --

24          THE COURT:  The basis is that it's a fact.

25          MR. LEVINE:  It is not a fact.

1          As a matter of fact, he's had roommates.

2     He's lived in dormitories.  And this witness ought to know

3     that, and this prosecutor ought to know that --

4          MS. KENNEDY:  I have no idea.

5          MR. LEVINE:  -- as well, because it's in the

6     records of the hospital.

7          THE COURT:  Well, you can call some rebuttal

8     witness.  Mr. Hyde can testify to that.  Maybe there are

9     other people.

10    BY MS. KENNEDY:

11    Q    Now, you indicated, Dr. Patterson, that with more

12    privileges, there's more risk --

13    A    Certainly.

14    Q    -- in Mr. Hinckley?

15    A    Yes.

16    Q    So in speaking with the staff in Williamsburg,

17    were you able to discuss with them at all or what were you

18    able to discuss about this Court's potential order asking

19    them, since he can't require, but asking them to do certain

20    things with Mr. Hinckley?

21    A    Their answer -- well, Dr. G.G.'s answer, and

22    certainly Mr. Weiss' answer was that they would certainly do

23    whatever the Court ordered.  And both of them offered that

24    they thought that Mr. Hinckley should be seen for their

25    services once a week, rather than the hospital's

1  recommendations.

2          Dr. G-G also amplified that her role is not simply

3  as a psychiatrist and medication management, but also as a

4  risk assessor.  And she goes over the risk factors at every

5  appointment.

6      Q    And Mr. Weiss, did he indicate that it should be a

7  fast or slow approach with Mr. Hinckley when he gets down to

8  Williamsburg?

9      A    Oh, a slow approach.  The integration into the

10  community, the efforts in the past had not been as

11  successful as one might hope, for a variety of reasons.

12  So that it would be a slow process.

13      Q    And in your view, is the hospital plan a slow

14  process?

15      A    Not when it's tied to time frames where there

16  would be essentially automatic change in conditions.

17      Q    And in your view, Dr. Patterson, would

18  Mr. Hinckley pose a danger to himself or others based upon

19  mental illness, if granted a convalescent leave at some

20  point in time?

21      A    Well, it depends the point in time.  And it

22  depends on the risk management, as well as his clinical

23  condition.

24          Currently, I don't believe that he constitutes a

25  significant, beyond low risk, of danger or violence to

1    himself or others under the current conditions.

2         Whether he will continue to pose a low risk

3    depends on his clinical condition, as well as the risk

4    assessment, risk management practices.  So that's why this

5    is so important to make sure that it's clear and that

6    everyone is on the same page when -- if there is a

7    conditional release -- I'm sorry -- conditional release to

8    convalescent leave.  And that is today, and that would be

9    anytime in the future.

10        Q    Dr. Patterson, if there was one person that you

11   could make the point person to coordinate all of this, who

12   would it be?

13        A    I don't think it can be one person.

14        The liaison to the Court, I believe, Dr. Johnson,

15   in her role as the director of forensic services for

16   outpatient, is the right person.  The role of the outpatient

17   forensic review board, that's a new one for me.  Ordinarily,

18   in days gone by, as I said, the outpatient department was

19   part of John Howard.

20        So conditional release changes for any outpatient,

21   including convalescent leave, were reviewed by the forensic

22   review board.  They did come through the forensic review

23   board.  So it would be up to the Court to decide Dr. Johnson

24   does it and it comes straight to the Court.  Or Dr. Johnson

25   does it; it goes to through the review board process.

1    That's an operation in the Department of Behavioral Health.

2         Q    So do you know who controls the review board for

3    the outpatient division?

4         A    I do not.  I know the membership that Dr. Johnson

5    elucidated when she was testifying of the five members, but

6    I don't --

7         Q    And that's not coordinated with anyone at

8    inpatient who has known Mr. Hinckley for the last 30-some

9    years?

10        A    That's my understanding.

11        Q    And what should trigger notice to this Court that

12   there is a violation of the conditional release, or mental

13   deterioration?

14        A    Either.

15             If there is mental deterioration, the Court should

16   be noticed.

17             If there is a violation of the conditional

18   release, the Court should be noticed.  But it shouldn't

19   simply be, here's what happened.  It should also be the

20   management plan.

21             Let's take the example of going to the wrong

22   place, not on the itinerary.  In my view, my opinion, that

23   should be noticed to the Court:  Mr. Hinckley violated the

24   itinerary as it stands, and here's what we did or are doing

25   to manage that, which then gives the Court the opportunity

```
1    to be able to say what the hospital or, in this case, the

2    outpatient providers, did is fine; or maybe not.

3    Maybe there needs to be some further review.

4              But the Court won't know unless the Court is

5    noticed.  And that is in concert with both supporting the

6    patient, in this case, Mr. Hinckley, remaining in the

7    community, if possible, but also supporting that its

8    clinical condition and public safety also have to be

9    considered.

10             THE COURT:  So in the case of going to the

11   musician's house instead of the photographer's, that was, of

12   course, under the current order -- I was not advised the

13   next day.  But when I got the hospital's report on the trip

14   shortly after the conclusion of the trip, it was discussed

15   there.  And copies of that monthly report also go to,

16   I believe, Ms. Kennedy and Mr. Levine and Ms. Merene,

17   somebody else.  I don't remember.

18             MS. KENNEDY:  The Secret Service.

19             THE COURT:  Who?

20             MS. KENNEDY:  The Secret Service.

21             THE COURT:  The Secret Service.

22             So, you know, Mr. Weiss and whomever else was

23   involved, Dr. G-G and Mr. Hyde, would not think it was

24   significant enough to bring to anybody's attention as soon

25   as they learned it.  But it was in that monthly report.
```

1   And that -- seems to me that's fine, because there wasn't a

2   major event that related to risk.  It related to management

3   in the short term.

4           THE WITNESS:  In the short term, yes.

5           And -- I'm sorry.  Go ahead.

6           THE COURT:  And so what would occur under the

7   proposed plan is there would not be an itinerary, but there

8   would be some sort of a log or journal, and there would be

9   treatment providers' notes collected by Mr. Weiss and,

10  perhaps, with a summary, written by Mr. Weiss and a summary

11  written by Dr. Johnson of her discussions with Mr. Hinckley

12  and others that would come, but not based on whether an

13  itinerary was filed?

14          THE WITNESS:  That, under the current plan, that's

15  correct.

16          THE COURT:  Yeah.  Okay.

17          THE WITNESS:  Okay.  And the input from Dr. G-G

18  and Mr. Weiss and from me is that there should be an

19  itinerary.  And there should -- and from Dr. Murphy, there

20  should be a log.  So the idea there is that you get the

21  information.

22          But I think I understand the dilemma of balancing

23  clinical judgment and giving some discretion to absolute

24  violation of a condition.

25          And I think that that makes a lot of sense in the

1   sense that you will be getting the monthly reports, provided

2   that they don't only tell you if there was some deviation

3   from what was expected.  And that's where the itineraries

4   and law come in, because, without them, how do you know,

5   except by self-report?

6           If there's some deviation, here's what we did to

7   manage it.  And it gives you, I think, gives the Court the

8   thinking behind either returning to the hospital or

9   remaining in the community.

10          What's minor and what's major is going to be

11  something that falls decidedly on the clinicians and risk

12  management folks, meaning Dr. Johnson, Dr. G-G, and the

13  Williamsburg providers and, to a limited degree, the

14  inpatient participation and Dr. Binks.  What's major and

15  what's minor is going to be kind of left to them.

16          So if it's -- and the positions could be, on the

17  one end, any violation, any -- anything, when noticing the

18  Court right now or within 24 hours or 72, whatever.  Or it

19  could be, we'll do it in the monthly report.

20          But in either case, I think, for completeness,

21  it should include, "And here's what we're doing or did about

22  it and why."

23          MS. KENNEDY:  I have no further questions,

24  Your Honor.

25          I would like to move into evidence Dr. Patterson's

1   report, which is Government's Exhibit No. 2, and his résumé,

2   which is Government's Exhibit No. 4.

3            THE COURT:  Okay.  I thought the report was

4   already in; but if not, is there any objection to the report

5   coming in?

6            MR. LEVINE:  No. 4 is the hospital's --

7            THE COURT:  No. 2 is Dr. Patterson's report.

8   Is there any objection to that coming in?

9            MR. LEVINE:  Yes, we object.

10           THE COURT:  Oh, for the reasons that you've --

11           MR. LEVINE:  Yes.

12           THE COURT:  -- articulated.

13           So if I haven't previously admitted it -- I think

14   I previously admitted it.

15           MS. KENNEDY:  I think you did, but just in case --

16           THE COURT:  I will admit it.

17           What about his résumé, which is Exhibit 4?

18           MR. LEVINE:  Government's 4, his résumé?

19           THE COURT:  Yes.

20           MR. LEVINE:  I guess, for the reasons we advance,

21   we think he shouldn't be testifying, so we object to his

22   résumé.

23           THE COURT:  Okay.  I'll admit his CV over the

24   objection of the patient.

25           Oh, Dr. Patterson's report came in, my notes show,

1  at the time that Dr. Murphy was testifying --

2            MS. KENNEDY:  Oh, right.

3            THE COURT:  -- because there were questions of

4  her --

5            MS. KENNEDY:  Right.

6            THE COURT:  -- about the report.

7            MS. KENNEDY:  Yeah.

8            THE COURT:  And I think it was offered and

9  admitted then.

10            But I'll note the patient's objection to its

11  admission based upon the arguments this morning to strike

12  Dr. Patterson or disqualify Dr. Patterson.  And having

13  considered all of that, I will admit his report over the

14  patient's objection.

15
                                (Defendant's Exhibit 4
16                               received into evidence.)

17            MS. KENNEDY:  Okay.  Thank you, Your Honor.

18            THE WITNESS:  Thank you.

19            THE COURT:  So it is now 12:45.  When would you

20  like to come back, if at all?

21            Do you want an hour, or do you want an hour and a

22  quarter?

23            MR. LEVINE:  I think an hour and a quarter would

24  be better.

25            THE COURT:  Okay.  2:00.

1          MR. LEVINE:  Thank you, Your Honor.

2          DEPUTY CLERK:  All rise.

3          This Honorable Court is in recess.

4          (Recess from 12:43 p.m. to 1:45 p.m.)

5                C E R T I F I C A T E

6          I, William P. Zaremba, RMR, CRR, certify that

7    the foregoing is a correct transcript from the record of

8    proceedings in the above-titled matter.

9

10

11

12   Date: April 29, 2015_____  /S/__William P. Zaremba_____

13                         William P. Zaremba, RMR, CRR

14

15

16

17

18

19

20

21

22

23

24

25