UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

|  |  |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No. 81-0306 (PLF) |
| ) | |
| JOHN W. HINCKLEY, JR. ) | |

---

## OPINION

In 1981, John W. Hinckley, Jr. was a profoundly troubled twenty-five-year-old

young man suffering from active and acute psychosis and major depression. His mental

condition had gradually worsened over the preceding years — beginning as early as 1976 —

ultimately resulting in a deep obsession with the actress Jodie Foster and the film *Taxi Driver*.

Mr. Hinckley began to identify with the main character in the film, Travis Bickle, who

unsuccessfully plots to assassinate a presidential candidate in order to win the affections of a

young woman. At numerous points in the years leading up to 1981, Mr. Hinckley travelled to

Yale University in New Haven, Connecticut seeking to establish contact with Jodie Foster,

leaving notes, letters, and poems at her dormitory and even speaking with her on the phone

several times. After failing in his effort to establish a personal relationship with Ms. Foster, Mr.

Hinckley then sought to impress her through stalking President Jimmy Carter, travelling to

Washington, D.C., Columbus, Ohio, and Dayton, Ohio over a three-day period in September of

1980. On October 9, 1980, Mr. Hinckley was arrested with several firearms and ammunition in

his suitcase at the Nashville, Tennessee airport, where President Carter was scheduled to make a campaign appearance.

After the presidential election in November, 1980, Mr. Hinckley next travelled to Washington, D.C. and began following President-elect Ronald Reagan. On March 30, 1981, after several more unsuccessful trips to New Haven, Mr. Hinckley wrote a letter to Ms. Foster describing his plan to kill President Reagan in order to impress her. That same day, Mr. Hinckley attempted to assassinate the President of the United States in the driveway of the Washington Hilton Hotel, shooting and severely wounding President Reagan, Presidential Press Secretary James Brady, Secret Service Agent Timothy McCarthy, and Metropolitan Police Officer Thomas Delahanty. Mr. Brady suffered permanent brain damage and eventually died from his injuries in 2014. After a seven-week trial before a jury in 1982, Mr. Hinckley was found not guilty by reason of insanity and committed to St. Elizabeths Hospital. Shortly after his trial, Mr. Hinckley attempted suicide and continued to suffer from active symptoms of serious mental illness.

Today, more than 34 years later, Mr. Hinckley is 61 years old and suffering from arthritis, high blood pressure, and various other physical ailments like many men his age. He has been under the care of St. Elizabeths Hospital for over three decades. Since 1983, when he last attempted suicide, he has displayed no symptoms of active mental illness, exhibited no violent behavior, shown no interest in weapons, and demonstrated no suicidal ideation. The government and the Hospital both agree that Mr. Hinckley's primary diagnoses of psychotic disorder not otherwise specified and major depression have been in full and sustained remission for well over twenty years, perhaps more than 27 years. In addition, since 2006, Mr. Hinckley has successfully completed over 80 unsupervised visits with his family in Williamsburg, Virginia, fully complying with the Court's strict conditions, with two minor exceptions. The government

2

and its expert, Dr. Raymond Patterson; an independent expert who conducted a comprehensive risk assessment in this case, Dr. Katherine Murphy; and all of Mr. Hinckley's treatment providers both at St. Elizabeths Hospital and in Williamsburg now agree — unanimously — that Mr. Hinckley is clinically ready for full-time convalescent leave and that, with certain conditions, he will not be a danger to himself or others. In the view of most of the experts who testified before this Court, Mr. Hinckley has by now received the maximum benefits possible in an in-patient setting.

After carefully considering the relevant legal authorities, the expert reports, the testimony presented at the evidentiary hearing held in April of 2015, Mr. Hinckley's entire history and clinical record over thirty-four years, and the briefs filed by the parties, the Court will grant the Hospital's proposal for full-time convalescent leave in Williamsburg, Virginia, with additional and modified conditions as discussed below. A summary of the testimony, the Court's findings of fact, analysis of Mr. Hinckley's risk factors, the Court's conclusions, and the conditions that will be required by the Court for convalescent leave are detailed in the remainder of this Opinion.[1]

---

[1] The Court's prior opinions in this matter set forth the relevant background facts relating to Mr. Hinckley's attempted assassination of President Ronald Reagan; the serious wounding of the President, presidential Press Secretary James Brady, Secret Service Agent Timothy McCarthy, and Metropolitan Police Officer Thomas Delahanty; the trial of Mr. Hinckley pursuant to a thirteen-count indictment; the jury's finding that he was not guilty by reason of insanity on all counts; Mr. Hinckley's years at St. Elizabeths Hospital; his successful use of "B" city privileges under Hospital supervision during those years; decisions of this Court and the United States Court of Appeals for the District of Columbia Circuit; Mr. Hinckley's mental health during those years; and the legal framework relating to Section 501(e) letters submitted by the Hospital and Section 501(k) petitions filed by patients. See United States v. Hinckley, 292 F. Supp. 2d 125 (D.D.C. 2003) ("Hinckley I"); United States v. Hinckley, 346 F. Supp. 2d 155 (D.D.C. 2004) ("Hinckley II"); United States v. Hinckley, 407 F. Supp. 2d 248 (D.D.C. 2005) ("Hinckley III"); United States v. Hinckley, 462 F. Supp. 2d 42 (D.D.C. 2006) ("Hinckley IV"); United States v. Hinckley, 493 F. Supp. 2d 65 (D.D.C. 2007) ("Hinckley V");

# TABLE OF CONTENTS

I.   BACKGROUND ................................................................................................5

II.  THE HOSPITAL'S PROPOSAL FOR CONVALESCENT LEAVE ....................................16

III. THE EVIDENTIARY HEARING .........................................................................30

    *A. Witnesses from St. Elizabeths Hospital* ..........................................................31

        1.  Verne "VJ" Hyde – Forsenic Clinical Administrator .......................................31

        2.  Dr. Katherine Murphy – Forensic Psychologist .........................................37

        3.  Dr. Nicole Johnson – Director of the Forensic Outpatient Department ...........53

    *B. Witnesses from Mr. Hinckley's Williamsburg Treatment Team* .........................56

        1.  Dr. Deborah Giorgi-Guarnieri – Treating Psychiatrist ...................................56

        2.  Mr. Jonathan Weiss – Case Manager ........................................................60

    *C. Witnesses from the Hinckley Family* ...............................................................65

    *D. The Government's Expert Witness: Dr. Raymond F. Patterson* .........................67

IV.  FINDINGS OF FACT .......................................................................................73

V.   DISCUSSION ................................................................................................77

    *A. Mr. Hinckley's Identified Risk Factors* .............................................................77

      1. Mr. Hinckley's Mental Health: Depression, Psychosis, and Personality Disorder ..........78

      2. Isolation and Mr. Hinckley's Integration into the Williamsburg Community ................80

---

United States v. Hinckley, 625 F. Supp. 2d 3 (D.D.C. 2009) ("Hinckley VI"); and United States v. Hinckley, 40 F. Supp. 3d 8 (D.D.C. 2013) ("Hinckley VII").

    3. Mr. Hinckley's Level of Insight into his Mental Illness ....................................82

    4. Access to Weapons..........................................................................................83

    5. The Hinckley Family's Support .......................................................................83

    6. History of Suicide Attempts ............................................................................83

    7. Difficulty in Relationships with Others, Particularly Women .........................84

    8. Deception, Underreporting, and Need for Monitoring......................................86

  *B. Specific Proposals in the Hospital's (e) Letters* ...................................................88

    1. Full-Time Convalescent Leave........................................................................88

    2. The Hospital's Proposed Treatment Plan and Frequency of Appointments ....................90

    3. Monitoring, Risk Management, and Accountability .........................................94

    4. Financial Support and Housing .....................................................................100

VI. CONCLUSION...........................................................................................................101

## I. BACKGROUND

This matter is before the Court on the proposal of St. Elizabeths Hospital for the conditional release of John W. Hinckley, Jr. to full-time convalescent leave in Williamsburg, Virginia, pursuant to 24 D.C. Code § 501(e) — a so-called "(e) proposal" or "(e) letter."[2] Over the years, the Hospital has submitted a series of proposals to this Court, seeking to expand the scope or duration of Mr. Hinckley's activities outside the grounds of the Hospital. The

---

[2]    24 D.C. Code § 501(e) provides that if, "after a hearing and weighing the evidence," the Court finds that the patient "has recovered his sanity and will not in the reasonable future be dangerous to himself or others" such that "the condition of such person warrants his conditional release, the court shall order his release under such conditions as the court shall see fit . . . ."

government has consistently opposed these proposals in whole or in part. On some occasions, Mr. Hinckley has submitted his own petition for expanded conditions of release under 24 D.C. Code § 501(k) (a so-called "(k) petition"). On each occasion, the Court has considered the Hospital's proposal, the government's opposition, and Mr. Hinckley's position on the Hospital's proposal along with his own (k) petition, if any. After conducting an evidentiary hearing, the Court has either granted the Hospital's request — invariably with modifications or additional conditions imposed by the Court — or has denied the request. The Hospital's latest proposal contemplates full-time "convalescent leave" in Williamsburg, Virginia — in short, the Hospital proposes fully transferring Mr. Hinckley's care to a team of mental health professionals in Williamsburg, with oversight by the Hospital's Forensic Outpatient Department, permitting Mr. Hinckley to reside full-time in Williamsburg.

Over the course of the last twelve years, the Court has incrementally expanded Mr. Hinckley's privileges outside the Hospital, always contingent upon careful monitoring and his and his family's compliance with the numerous conditions imposed by the Court. The Hospital has characterized its requests for gradually expanding Mr. Hinckley's freedom as a series of phases, each of which entails greater integration into the world outside the Hospital. In December 2003, the Court allowed six local one-day visits by Mr. Hinckley with his parents outside of the confines of St. Elizabeths without the supervision of Hospital personnel and within a 50-mile radius of Washington, D.C. — so-called "Phase I" visits. Beginning in November 2004, after review of the Phase I visits by the St. Elizabeths Hospital Review Board, the Court permitted local overnight visits by Mr. Hinckley with his parents in a hotel within a 50-mile radius of Washington, D.C. ("Phase II" visits). Each visit was thoroughly assessed by the Hospital and Mr. Hinckley's treatment team before a subsequent visit took place, and a written

report on each visit was provided to the Court. There were a total of six Phase I visits and eight Phase II visits.

Beginning in 2006, the Court permitted visits outside of the Washington metropolitan area to the home of Mr. Hinckley's parents in Williamsburg, Virginia ("Phase III" visits). See Hinckley III, 407 F. Supp. 2d at 265-68. The Court permitted three initial visits by Mr. Hinckley to his parents' home, with each visit lasting three nights in duration. See id. at 267. Thereafter, the Court permitted additional visits of four nights. See id.; Hinckley IV, 462 F. Supp. 2d at 45-47; Order, United States v. Hinckley (Aug. 18, 2006) [Dkt. No. 229]. In 2007, the Court permitted six additional Phase III visits and expanded the duration of those visits to six nights. See Hinckley V, 493 F. Supp. 2d at 77-78. After allowing several additional visits in 2008, later that year the Court permitted Mr. Hinckley to continue making Phase III visits under the same terms and conditions until further order of the Court. See Order at 1, United States v. Hinckley (Aug. 15, 2008) [Dkt. No. 281]. Mr. Hinckley made at least 24 Phase III visits. See Hinckley VI, 625 F. Supp. 2d at 5-6.[3]

In 2009 — after an evidentiary hearing that lasted six days — the Court authorized so-called "Phase IV" visits, which allowed Mr. Hinckley to make visits of up to ten days to Williamsburg. While Phase III was regarded as an opportunity for outings representing a "change of venue" from the Washington, D.C. area to Williamsburg, Phase IV was conceived of as a "transitional stage," in which Mr. Hinckley would be expected to focus on social and vocational integration into his mother's community. See Hinckley VI, 625 F. Supp. 2d at 6. To that end, the Court authorized twelve Phase IV visits, each with a duration of ten days and nine

---

[3] Since 2006, when Mr. Hinckley's father's health began to decline, Mr. Hinckley's mother has been the sole custodian or responsible person under the terms of the Court's orders. See Hinckley IV at 43-44; Order, United States v. Hinckley (Nov. 21, 2006) [Dkt. No. 244]. On January 29, 2008, John Hinckley, Sr. passed away.

nights, and each subject to the successful completion of the previous visit, with a written report to the Court. See Order at 2, United States v. Hinckley (July 20, 2009) [Dkt. No. 311].

During these Phase IV visits, Mr. Hinckley was required to remain under the supervision of his mother or siblings at all times whenever outside of his mother's home, except for periods of limited duration in which he was allowed to engage in activities within a defined geographic area that were designed by the Hospital to acclimate him to the Williamsburg community. See Order at 1-2, United States v. Hinckley (July 20, 2009) [Dkt. No. 311]. Such activities included establishing therapeutic relationships with two Williamsburg-area treatment providers whose services had been arranged for him during his visits — a psychiatrist and a combined individual therapist and case manager. Mr. Hinckley also was permitted to spend four hours twice a week performing volunteer work with a local organization, which could increase if deemed appropriate by the treatment team and his participating employer. Id. at 11-12.

Contingent upon Mr. Hinckley's ongoing participation in local volunteer work, he also was afforded a limited amount of unsupervised time in the Williamsburg community to engage in social and recreational activities. Specifically, Mr. Hinckley was allowed up to three hours of unaccompanied time, twice a week, between the hours of 8:00 a.m. and 9:00 p.m., "for specific social, recreational, religious, or shopping related activities." Order at 12-13, United States v. Hinckley (July 20, 2009) [Dkt. No. 311]. At least two weeks before each Phase IV visit, the Hospital was required to submit a detailed, day-by-day itinerary of Mr. Hinckley's proposed activities to the Court, the government, and Mr. Hinckley's counsel. Id. at 4-5. In particular, the Hospital was required to provide specific details, including time and place, of the time Mr. Hinckley was to spend outside the supervision of his family members. Id. at 3.

Mr. Hinckley also was permitted up to two hours of unaccompanied time twice daily within the confines of his mother's housing subdivision during specified hours. Order at 2,

13, United States v. Hinckley (July 20, 2009). Mr. Hinckley also was given permission, subject to a number of conditions, to obtain a driver's license and to drive the Hinckley family's car with a family member or treatment provider with him at all times. Id. at 14. Among many other restrictions imposed on Mr. Hinckley during his visits to Williamsburg and during his use of unsupervised time in the community, Mr. Hinckley was required to carry a GPS-enabled cell phone anytime that he was not accompanied by his mother or siblings. Id. at 2. After each visit, the Hospital was responsible for submitting a detailed report of the visit to the Court, the government, and Mr. Hinckley's counsel prior to the next visit. Id. at 10.

During each ten-day Phase IV visit, Mr. Hinckley was required to meet at least once with his Williamsburg-area psychiatrist, Dr. John J. Lee. After interviewing and assessing Mr. Hinckley during these sessions, Dr. Lee was required to complete a checklist describing his observations and fax it to the Hospital within a week of the appointment. Dr. Lee also was required to participate in a telephone conference call with Mr. Hinckley's St. Elizabeths Hospital treatment team after each visit to discuss the visit and any concerns or issues relating to Mr. Hinckley or his treatment goals, and to participate by telephone in the meetings of the treatment team to discuss Mr. Hinckley's Individual Recovery Plan every three months or as scheduled. Order at 3-5, United States v. Hinckley (July 20, 2009) [Dkt. No. 311].[4] Mr. Hinckley also was ordered to meet at least once during each visit with his Williamsburg-area case manager and individual therapist, Mr. Carl Beffa. Mr. Beffa was required to communicate after each visit with Mr. Hinckley's primary therapist at St. Elizabeths, Dr. Sidney Binks, to discuss and

---

[4]     Upon Dr. Lee's departure from the institute where he practiced, he was replaced in 2010 by Dr. Deborah Giorgi-Guarnieri, a psychiatrist based in the Williamsburg area who assumed Dr. Lee's responsibilities under the Court's Order. See Stipulation to Modify July 20, 2009 Order (Sept. 28, 2010) [Dkt. No. 312]; Order, United States v. Hinckley (Sept. 30, 2010) [Dkt. No. 432]; Hospital's Revised (e) Letter of December 14, 2012 at 12-13 ("Hospital's Dec. 14, 2012 Revised (e) Letter") [Dkt. No. 396].

collaborate on the course of therapy for Mr. Hinckley. He also was required to complete a checklist of observations, communicate with the treatment team after each visit, and participate in treatment team meetings in the same manner as Dr. Lee. Id. at 5-7.

Although the Court's authorization of Phase IV visits expanded the duration of Mr. Hinckley's visits to Williamsburg to ten days, St. Elizabeths remained Mr. Hinckley's residence and the Hospital treatment team remained his primary clinicians. The Court ordered that if there were any signs of "decompensation" or deterioration in Mr. Hinckley's mental condition during his visits to Williamsburg, no matter how slight, or any indication of danger to himself or to others, or of elopement (that is, attempt to escape or abscond), Mr. Hinckley would immediately be returned to the Hospital. Order at 7, United States v. Hinckley (July 20, 2009) [Dkt. No. 311].

Mr. Hinckley began making Phase IV visits in late 2009. He soon began volunteering two days a week, for four hours each day, at the hospital library of Eastern State Hospital in Williamsburg. Although Eastern State is a psychiatric hospital, Mr. Hinckley's relationship with the institution was and is that of a volunteer employee, not a patient. Beginning in 2012, with the imminent closure of the hospital library due to staffing and funding changes, Mr. Hinckley began volunteering in the cafeteria at Eastern State, where he helped at the cash register and took orders from patrons. He has received positive reviews from his supervisors in both volunteering capacities about his work and his interaction with patrons and employees. Hospital's Dec. 14, 2012 Revised (e) Letter at 10-11. According to the Hospital, Mr. Hinckley also made use of his twice-weekly periods of unsupervised time in the community, as well as his daily periods of unsupervised time within his mother's subdivision. He obtained his driver's license and now operates the Hinckley family's vehicle during his visits, accompanied by a family member. Id. at 19.

By May 2011, Mr. Hinckley had completed twelve ten-day Phase IV visits, without any reported incidents of misbehavior and in compliance with all of the Court's specific directives. Upon motion by Mr. Hinckley and the Hospital, the Court entered an interim order permitting an indefinite number of additional Phase IV visits under the terms and conditions specified in the Court's July 2009 Order. Such visits were authorized to continue until the Court ruled on the Hospital's next petition for expanded conditions of release. See Order at 2, United States v. Hinckley (May 13, 2011). Subsequently, Mr. Hinckley completed an additional 21 ten-day Phase IV visits — or a total of 33 ten-day Phase IV visits — without any reported incidents of misbehavior and in compliance with all of the Court's specific directives, with two notable exceptions discussed below.

On two separate occasions — in July 2011 and in September 2011 — the Secret Service observed Mr. Hinckley deviating from the terms of the itineraries that governed the use of his unsupervised time in the Williamsburg community. It was also discovered that Mr. Hinckley had lied to St. Elizabeths staff and others about these deviations. On each occasion, Mr. Hinckley was scheduled to attend a movie during his three-hour window of unsupervised time, and on each occasion, Mr. Hinckley reported afterward to his clinical unit administrator at the Hospital, Mr. Kevin Shamblee, that he had attended the movie, even describing and recommending it. See Hinckley VII, 40 F. Supp. 3d at 13, 37, 39-40, 59-60. Mr. Hinckley made similar misrepresentations to the expert witnesses retained by the government when they later interviewed him in preparation for the upcoming evidentiary hearing before this Court. See id. at 13, 37, 39-40.

The Secret Service had been monitoring Mr. Hinckley on both occasions, and their surveillance reports showed his claims to be false. On both days, as the Secret Service reported, Mr. Hinckley arrived at the movie theater and spoke with someone in the ticket booth

11

but did not buy a ticket. Instead, he spent the remaining hour or two of his unsupervised free time at a nearby chain bookstore, Barnes & Noble, and a fast-food establishment, before being picked up by his mother to return home. See Hinckley VII, 40 F. Supp. 3d at 13-14, 42. When confronted with this evidence, Mr. Hinckley later admitted being dishonest about the deviations from his itineraries. See id. at 13-14. These incidents occurred after the Hospital submitted its July 2011 (e) letter to the Court, but before the evidentiary hearing held with respect to that (e) letter. Considerable time was devoted to the incidents during the hearing. See id. at 59-61.

The ultimate goal of these Phase IV visits and activities was to determine if Mr. Hinckley is ready to be released from the Hospital to live independently in Williamsburg with the support of his mother (so long as she is healthy and alive), his siblings, and psychiatric and counseling professionals in the Williamsburg community. See Hinckley VI, 625 F. Supp. 2d at 6; Hinckley V, 493 F. Supp. 2d at 66. With this goal in mind — and after an evidentiary hearing lasting a total of more than ten full days — the Court authorized Mr. Hinckley's Phase IV visits to Williamsburg to expand from ten to seventeen days in February 2014. See Hinckley VII, 40 F. Supp. 3d at 66-71; Order at 1, United States v. Hinckley (Feb. 26, 2014). As has been the case with every one of Mr. Hinckley's visits to Williamsburg, Mr. Hinckley was required to remain under the supervision of his mother or siblings at all times, except when he was participating in preapproved unsupervised activities. Order at 7, United States v. Hinckley (Feb. 26, 2014). The Hospital, as always, was required to thoroughly assess each visit before any subsequent visits took place. Id. at 1.

In addition to expanding the number of days in Williamsburg, the Court also expanded Mr. Hinckley's unsupervised time and various privileges. Hinckley VII, 40 F. Supp. 3d at 68-70; Order at 1, United States v. Hinckley (Feb. 26, 2014) [Dkt. No. 455]. On each trip, Mr. Hinckley was permitted: (1) up to six unsupervised outings outside of his mother's housing

12

subdivision lasting up to four hours, between the hours of 9:00 a.m. and 9:00 p.m.; and (2) two 120-minute unaccompanied walks per day within his mother's subdivision, between the hours of 8:00 a.m. and 5:00 p.m. standard time and 8:00 a.m. and 9:00 p.m. daylight savings time. Order at 2-3, United States v. Hinckley (Feb. 26, 2014) [Dkt. No. 455]. Mr. Hinckley was further permitted to volunteer at Eastern State Hospital or engage in other work or volunteer activities with the Hospital's approval. Id. at 2. Mr. Hinckley also was given permission to drive the Hinckley family's car unaccompanied while in Williamsburg as long as he was "using the vehicle to travel to destinations where people w[ould] be expecting him, such as to mental health treatment appointments, approved volunteer and employment activities, as well as to any specific social or educational activities arranged by him and Mr. Weiss." Id. at 1-2.[5]

The Court, however, continued to require detailed itineraries to be prepared by the Hospital in advance of each visit. Order at 3, United States v. Hinckley (Feb. 26, 2014) [Dkt. No. 455]. The Court stated that if the itineraries "contain the kinds of social and other interactive activities that show progress," the Court would consider a motion to modify the itinerary requirement at a later date. Id. In addition to the itineraries, Mr. Hinckley was ordered to continue his practice of maintaining a daily log of his activities while in Williamsburg. Id. Mr. Hinckley also was required to continue carrying a GPS-enabled cell phone anytime his mother or siblings did not accompany him. Id. at 6.

Mr. Hinckley was permitted to use the Internet during his visits "only under the constant supervision of his mother or siblings or with the use of technology or technologies that can both track his internet use and restrict it to the use of certain sites." Order at 7, United States

---

[5] Mr. Jonathan Weiss is the successor to Mr. Beffa as Mr. Hinckley's case manager. See infra at 60-61.

v. Hinckley (Feb. 26, 2014). Mr. Hinckley's use was restricted to particular sites approved by the Hospital in advance, which were to be included in the itineraries. Id.

During each 17-day Phase IV visit, Mr. Hinckley was ordered to meet weekly with his Williamsburg-area psychiatrist, Dr. Deborah Giorgi-Guarnieri. Order at 4, United States v. Hinckley (Feb. 26, 2014). Additional visits were permitted if "clinically necessary." Id. At each appointment, Dr. Giorgi-Guarnieri was required to "monitor Mr. Hinckley for any signs of deterioration or decompensation in his mental condition" and be "especially alert for anger, psychosis, depression, any ideas of elopement, endangerment to self or others, noncompliance with conditions of release, or rejection of the supervision provided to Mr. Hinckley by his responsible persons." Id. Dr. Giorgi-Guarnieri also was ordered to assess and monitor the risk factors identified in the Hospital's checklists, which she was required to complete and provide to the Hospital, along with "written feedback summarizing her contact with Mr. Hinckley," after each appointment. Id. In addition to these meetings, Dr. Giorgi-Guarnieri was tasked with participating by telephone in: (1) post-visit conference calls with the Hospital's inpatient treatment team to discuss Mr. Hinckley's progress; and (2) the inpatient treatment team's Individual Recovery Plan meetings scheduled every two months for Mr. Hinckley. Id. Dr. Giorgi-Guarnieri also was charged with verifying that Mr. Hinckley was taking his medications as prescribed, prescribing any additional medications in the case of an emergency psychiatric situation, and facilitating any acute hospitalization needed in such a situation. Id. at 4-5.

The Court also approved the substitution of Mr. Jonathan Weiss, a licensed clinical social worker, for Mr. Beffa as Mr. Hinckley's case manager. Order at 5, United States v. Hinckley (Feb. 26, 2014). Mr. Weiss was tasked with identifying opportunities to increase Mr. Hinckley's "socialization, enrichment, or mental health support in the Williamsburg community." Id. Mr. Weiss was required to monitor Mr. Hinckley's attendance and progress in

14

his volunteer and daytime activities and communicate at least once per visit with Mr. Hinckley's work supervisors. Id. As with Dr. Giorgi-Guarnieri, Mr. Weiss was required to provide written feedback to the Hospital after each visit. Id. Mr. Beffa continued in his role as Mr. Hinckley's individual therapist, with whom Mr. Hinckley was required to meet weekly for both individual and group therapy during his visits. Id. at 5-6. Mr. Beffa also was required to provide the Hospital with written feedback after each visit. Id. at 6.

As of this writing, Mr. Hinckley has completed twenty-seven 17-day visits to Williamsburg. With the exception of one incident described below, see infra at 35-36, 63. Mr. Hinckley appears to have complied fully with the conditions imposed by the Court. See Patient's Ex. 1, Hospital's Dec. 19, 2014 (e) letter at 2-4.

By all accounts, Mr. Hinckley's socialization has improved dramatically since the Court's last Opinion and Order. Mr. Hinckley has participated in numerous activities at the suggestion of his case manager, Mr. Weiss, including bowling, attending lectures, attending outdoor musical concerts, and joining a community center for exercise and the ability to take various classes. Hospital's Dec. 19, 2014 (e) letter at 2. Mr. Hinckley also has developed several new social relationships in the Williamsburg community, in particular with two local photographers. Mr. Hinckley has begun attending regular group meetings with the local chapter of the National Alliance on Mental Illness ("NAMI"). Id. According to the Hospital, Mr. Hinckley also has demonstrated initiative in developing relationships. For example, he expressed an interest in developing relationships with certain members of his therapy group. But establishing social relationships outside the group with group members is prohibited by the group's rules so long as Mr. Hinckley continued within that cohort. Therefore, at Mr. Beffa's suggestion, Mr. Hinckley agreed to switch his group therapy time and has since begun

developing relationships with at least two former group members, in addition to individuals he has met at his NAMI meetings.  Id.

Despite diligent efforts by both Mr. Hinckley and Mr. Weiss, Mr. Hinckley has been unable to secure additional volunteer or paid employment opportunities due to some resistance within the Williamsburg community.  Mr. Hinckley has, however, begun assisting with landscaping and yardwork at the local Unitarian Universalist Church.  Id. at 3.  Mr. Hinckley's efforts to obtain paid employment have been further hindered by his part-time residence in the area.  Id.[6]

## II. THE HOSPITAL'S PROPOSAL FOR CONVALESCENT LEAVE

On December 19, 2014, the Hospital submitted the original version of its current proposal for full-time convalescent leave for Mr. Hinckley.  Patient's Ex. 1, Hospital's Dec. 19, 2014 Letter to the Court [Dkt. No. 494] (the "Hospital's Dec. 19, 2014 (e) Letter").  On March 20, 2015, the Hospital filed a revised (e) letter, Patient's Ex. 2, Hospital's March 20, 2015 Letter to the Court [Dkt. No. 516] (the "Hospital's March 20, 2015 Revised (e) Letter"), adding eleven proposed conditions of release to the original eight listed in the December (e) letter.  The core of the Hospital's proposal is to transition Mr. Hinckley from 17-day visits to residing full-time on convalescent leave in Williamsburg, Virginia — initially with his mother.  Dr. Katherine Murphy, the forensic psychologist who has performed risk assessments in this case, appropriately refers to this as Phase V convalescent leave.  Patient's Ex. 7, Violence Risk Assessment Update at 61 (Mar. 31, 2015) [Dkt. No. 558] ("Murphy Rpt.").  Although the

---

[6]    The Court has recently been advised — by letter from St. Elizabeths Hospital of June 27, 2016 [Dkt. 618] — that Mr. Hinckley has been offered a paid position at the Unitarian Universalist Church where he has been volunteering for the past two years.  The government has given its approval for Mr. Hinckley to pursue this paid employment opportunity.  See Hospital's July 6, 2016 Letter to the Court [Dkt. No. 620].

Hospital previously proposed that the next step in Mr. Hinckley's integration would be a series of 24-day visits, the Hospital now believes that 24-day visits would provide only minimal clinical benefits to Mr. Hinckley above the 17-day visits, while continuing to hinder Mr. Hinckley's ability to establish residency in the Commonwealth of Virginia, become eligible for government benefits, obtain paid employment, and otherwise complete his integration into the Williamsburg community. See Hospital's Dec. 19, 2014 (e) Letter at 1-2. The Hospital proposes that Mr. Hinckley's professional services would be provided by a Williamsburg treatment team — consisting of Dr. Giorgi-Guarnieri, Mr. Weiss, and Mr. Beffa — as well as a board-certified music therapist, and that over time Mr. Hinckley would cease meeting with the Hospital's inpatient treatment team in the District of Columbia. Id. at 4-5; Hospital's March 20, 2015 Revised (e) Letter at 1-2.[7] Mr. Hinckley's case would be overseen and managed by the Hospital's newly-created Forensic Outpatient Department, headed by Dr. Nicole Reid Johnson.

The Hospital believes that after countless visits of gradually expanded duration to Williamsburg over nearly thirteen years, Mr. Hinckley is ready for full-time convalescent leave — with conditions. As the Hospital explained in its proposal:

> Mr. Hinckley has spent several years, since 2006, gradually integrating into the community in Williamsburg. Over the course of the past several months, he has undertaken noticeable efforts at addressing the concerns raised in the December 2013 Opinion regarding the quality of these efforts. Notably, Mr. Hinckley has made tremendous efforts to diversify his activities, increase his

---

[7]     Ms. Elizabeth Haley was Mr. Hinckley's music therapist until December 2015, when she relocated to Mississippi. See St. Elizabeths Hospital's Letter to Court of December 10, 2015 at 4 [Dkt. 591]. So far as the Court knows, neither Mr. Weiss nor anyone else responsible for Mr. Hinckley's treatment has yet identified a new music therapist to join the treatment team. Indeed, the Hospital informed the Court on May 3, 2016 that "[t]he quest for a Music Therapist to replace Ms. Haley has ended. The Williamsburg team was unable to secure another licensed Music Therapist to work with Mr. Hinckley for the amount the family will be able to afford." The Court notes, however, that both the Hospital and the government included appointments with a music therapist in their proposed conditions for convalescent leave. Music therapy will be included by the Court as a condition of release. See infra at 92-93.

exposure and engagement to others, and has begun to create social roots from which his further development in this community can grow. He has not evidenced any signs of decompensation or increased risk for violent recidivism during this time period. His attempts at fully integrating into this area continue to be Mr. Hinckley's primary focus. It is the Hospital's opinion that this process will be more effective for him as a full-time resident in the area.

Hospital's Dec. 19, 2014 (e) Letter at 4.

Specifically, the Hospital's (e) Letter of December 2014 and Revised (e) Letter of March 2015 state that full-time convalescent leave in Williamsburg now is appropriate, with the following court-imposed conditions:

1. While residing in Williamsburg, VA on [convalescent leave ("CL")], Mr. Hinckley will receive psychiatric follow up with Deborah Giorgi-Guarnieri, M.D. She will write his psychiatric prescription which will be filled at a pharmacy in Williamsburg. Dr. Giorgi-Guarnieri will meet with Mr. Hinckley twice per month for the first three months and no less than monthly, thereafter.

2. Mr. Hinckley will receive both individual psychotherapy and group therapy with Carl Beffa, LCSW, on a weekly basis.

3. Mr. Hinckley will continue to receive case management services from Jonathan Weiss, LCSW. They will meet at least twice per month for the first year. Thereafter, case management meetings will occur no less than once per month.

4. Dr. Giorgi-Guarnieri, Mr. Beffa, Mr. Weiss, and Elizabeth Haley, MT-BC, will communicate via email or fax with the Director of Forensic Services of the Forensic Outpatient Department (FOPD) via a receipt of monthly clinical notes. Mr. Weiss and/or Dr. Giorgi-Guarnieri will also make telephone contact with FOPD prior to Mr. Hinckley's monthly visits to Washington, DC. The Director of Forensic Services will be responsible for forwarding these documents to the Court.

5. Mr. Hinckley will utilize the services of a Primary Care Physician (PCP) which will be identified by his family following clarification of benefits. The PCP will be responsible for any medication for Mr. Hinckley's medical concerns.

6. For the first six months, the Williamsburg treatment providers, Dr. Giorgi-Guarnieri, Mr. Beffa, Mr. Weiss and Ms. Haley, will meet with Mr. Hinckley in person for bi-monthly treatment planning conferences. Thereafter, at the discretion of the Williamsburg treatment team, these meetings may occur on a semi-annual basis, indefinitely.

7. While residing in Williamsburg on CL, Mr. Hinckley will make weekly calls to the FOPD.

8. While residing in Williamsburg on CL, Mr. Hinckley will also be required to travel to Washington, DC on a monthly basis to meet with staff members from the FOPD for the first (four) 4 months at which time they will review and determine how often he will need to come to their office for appointments. He may travel to Washington, DC unaccompanied for these regularly scheduled appointments.

9. To ensure that Mr. Hinckley has appropriate continuity of care during his transition to community placement, a current member of his inpatient treatment team will be present at his regularly scheduled monthly meetings with the FOPD. This will occur for the first four (4) months or at the discretion of the FOPD.

10. While residing in Williamsburg on CL, Mr. Hinckley will continue to attend his scheduled structured activities in addition to any future employment or alternative constructive activities.

11. Upon receipt of a [court order] for CL to reside in Williamsburg, Saint Elizabeths Hospital Social Work staff, and Mr. Weiss, will work with Mr. Hinckley to apply for Social Security and Virginia Medicaid benefits and any other benefits he may be eligible for leading up to his release.

12. Mr. Hinckley will be allowed to travel unaccompanied and without supervision for personal, recreational or clinical purposes. Mr. Hinckley will avoid traveling to government centers.

13. In the event of a psychiatric emergency, Dr. Giorgi-Guarnieri will arrange for emergency hospitalization in the immediate vicinity. She will coordinate with FOPD to determine if further assessment and treatment should be undertaken at SEH [Saint Elizabeths Hospital ("SEH")].

14. Mr. Hinckley shall not travel fifty miles outside of Williamsburg, VA without Court approval. He will be permitted

to travel to and from Washington, DC, unaccompanied for the purpose of meeting with FOPD.

15. Mr. Hinckley's Media Plan to refrain from seeking or accepting invitations to give interviews with members of the press should remain in place.

16. Mr. Hinckley will be permitted to access the Internet, as needed. If Mr. Hinckley creates any online account for email or social media services, he is required to share the username and password to the FOPD as well as his Williamsburg treatment providers.

17. Mr. Hinckley will submit to monthly drug and alcohol screens at 'the FOPD, and in Williamsburg at the discretion of Dr. Giorgi-Guarnieri.

18. Should placement fail due to unavailability of family in the Williamsburg area, FOPD will work with Mr. Hinckley and the Williamsburg treatment team for the development of an alternative placement.

19. Should one of the individually named Williamsburg treatment providers become unavailable, FOPD will work with the team to establish a replacement provider as soon as possible.

Hospital's March 20, 2015 Revised (e) Letter at 1-3.

Mr. Hinckley supports the Hospital's proposals and has not submitted his own, separate petition for expanded conditional release privileges under 24 D.C. Code § 501(k), as he has sometimes done in the past. See Patient's Response to the Government's Opposition to Saint Elizabeths Hospital's Recommendation for Convalescent Leave (Apr. 17, 2015) [Dkt. No. 524] ("Patient's Response").

On April 10, 2015, the government filed an opposition to the Hospital's proposal. The government acknowledges that "[b]oth Dr. Patterson and Dr. Murphy conclude that Mr. Hinckley is mentally stable, generally compliant with his treatment, and clinically ready to reside in the community given appropriate conditions." Government's Response to St. Elizabeths Hospital's Recommendation for an Expansion of Defendant's Conditional Release at 1-2 (Apr.

10, 2015) [Dkt. No. 522] ("Opp."). It nevertheless opposes the proposed convalescent leave plan

without significant additional conditions beyond those suggested by the Hospital. Id. In the

government's view, the Hospital's plan inadequately addresses: (1) "financial sustainability of

Mr. Hinckley's placement in Williamsburg;" (2) "communication and coordination of duties

between treatment providers in Williamsburg and the District of Columbia;" (3) "a housing

transition plan [in Williamsburg], and the possible alternative placement in the District of

Columbia should [the] Williamsburg placement become infeasible;" and (4) "Mr. Hinckley's

potential accelerated mental deterioration based upon his clinical history." Id. The government

therefore requests that the Court instead impose the following 35 conditions, some of which

overlap substantially with the Hospital's proposals:

1. Mr. Hinckley may reside in the community solely with his mother at her home in Williamsburg, Virginia. If his mother is not present, Mr. Hinckley may not have an overnight non-family guest or stay at any location other than his mother's home. Mr. Hinckley may only return to the District of Columbia for the purpose of scheduled visits with the Hospital. While in the District of Columbia, Mr. Hinckley may not reside or spend the night at any location other than the Hospital.

2. Prior to placement on convalescent leave, the Hospital and Williamsburg treatment teams shall provide each other, the Court, both counsel, and the U.S. Secret Service with a list of all treatment team providers, their telephone numbers and email addresses. Both treatment teams shall notify all parties of any changes in the contact information.

3. The Forensic Outpatient Department (FOPD) treatment team shall include Verne "VJ" Hyde so long as he is employed by the Hospital. If Mr. Hyde is no longer employed by the Hospital, the treatment team shall include at least one of the following inpatient treatment team members: Dr. Benjamin Adewale, Denise Brown, or Dr. Sidney Binks.

4. Mr. Hinckley shall maintain weekly telephone contact with Mr. Hyde, Dr. Nicole Johnson or another designated member of the Hospital's FOPD treatment team. For the first three months of Mr. Hinckley's outplacement, Mr. Hyde, Dr. Johnson or another designated member of the FOPD treatment team shall speak

with Mrs. Joann Hinckley at least once per week. Thereafter, the FOPD treatment team shall maintain telephone contact with Mrs. Hinckley bi-monthly. They shall document their contact with Mr. Hinckley and his mother in Mr. Hinckley's medical chart.

5. Prior to his outplacement, Mr. Hinckley shall be fitted with an ankle monitoring device, to be supervised by the U.S. Secret Service or another United States Government agency or contractor for the Government. Mr. Hinckley shall consent to the installation of a tracking devise on his vehicle, which will be monitored by the U.S. Secret Service or another United States Government agency or contractor for the Government. Mr. Hinckley shall provide the FOPD treatment team with this vehicle's information, and shall drive no other vehicle without previously giving that vehicle's information to the FOPD. Mr. Hinckley shall also consent to installation of monitoring software on his computer, which will be monitored by the United States Secret Service or another United States Government agency or contractor for the Government. Mr. Hinckley shall provide the FOPD treatment team with this computer's information. Mr. Hinckley shall use no other computer, laptop, tablet, netbook, phone, or other internet-enabled device without providing that device's information to the FOPD. The FOPD shall immediately notify both parties of any changes in Mr. Hinckley's vehicle or electronic devices.

6. Pursuant to this Court's February 26, 2014 Order, Condition #17, Mr. Hinckley shall carry a GPS-enabled cell phone when he is away from his mother's residence. Mr. Hinckley shall provide the cell phone company, subscriber information and phone number of this cell phone to the FOPD. If the number, cell-phone company, or any subscriber information changes, Mr. Hinckley must immediately inform the FOPD. FOPD shall immediately notify both parties of any changes relating to Mr. Hinckley's cell phone. Mr. Hinckley shall not use any other phone at any time except in case of emergency if his cell phone is not functioning. Mr. Hinckley consents to the United States' (or any of its agents or contracting designees) obtaining and using any cell-site or other geopositional data from his cell phone to determine his location at any point in time.

7. Mr. Hinckley may be permitted to drive unaccompanied only within a thirty mile radius of Williamsburg, Virginia, unless he is traveling to Washington, D.C. for the purpose of his monthly scheduled appointment with his FOPD treatment team. Except for his scheduled monthly visit to the Hospital in Washington, D.C., if Mr. Hinckley desires to travel further than thirty miles

22

outside of Williamsburg, he must make a request to the FOPD at least seven business days in advance. The FOPD shall notify the parties in writing with[in] 24 hours of receiving the request. If the Government files an objection, Mr. Hinckley may not travel unless approved by the Court.

8. Mr. Hinckley shall notify Mr. Weiss before going to any private residences.

9. Mr. Hinckley shall not travel to government centers, facilities and sites, or to areas where the current or former Presidents, Vice Presidents, members of Congress or the Executive Branch, any other federal or state political figure, or any U.S. Secret Service protectee who will be visiting in the District of Columbia, Williamsburg, or any other area. If Mr. Hinckley enters a protected area, he shall leave the area immediately if requested by law enforcement or as soon as he becomes aware that an above individual is or will be present. On other occasions, Mr. Hinckley may enter government facilities to attend to personal business only with prior notice and approval of the FOPD or if accompanied by a family member or Williamsburg treatment team member.

10. The Government shall notify the Court and Hospital promptly if the data it obtains from the ankle bracelet, cell phone, vehicle or computer- or internet-usage yields any information showing that Mr. Hinckley has violated any conditions of release.

11. The Department of Behavioral Health through the FOPD shall be responsible for ensuring that Mr. Hinckley receives appropriate psychiatric treatment and medication while residing in Williamsburg. Mr. Hinckley shall travel to the FOPD at 35 K Street N.E., Washington D.C., once per month for monitoring of his mental condition and compliance with the conditions of his release. He shall meet with the FOPD treatment team and shall participate in an individual psychotherapy session with Dr. Binks at the Hospital during that same monthly visit. Immediately following that appointment, Mr. Hinckley shall return directly to his home in Williamsburg, Virginia.

12. FOPD shall notify the U.S. Secret Service, counsel for Mr. Hinckley and counsel for the Government of the date and time of his scheduled FOPD appointment. They shall provide the intended travel route and time of departure from Williamsburg, Virginia. Notice shall be provided at least two weeks prior to the scheduled appointment by all parties. Mr. Hinckley shall travel directly to and from the FOPD on the designated route and may stop only for food and/or gas along the route.

13. Mr. Hinckley shall participate in structured activities in the [Williamsburg] community, such as a volunteer position or paid employment, which are approved by the FOPD treatment team. He shall be responsible for volunteering and/or working at least three days each week. Mr. Hinckley shall provide a weekly schedule of his volunteer/employment activities to Mr. Weiss and his treatment team at the FOPD. Mr. Hinckley shall consent to any employer or volunteer organization speaking with any treatment clinicians involved in his care. Mr. Hinckley shall promptly notify Mr. Weiss and the FOPD treatment team of any changes in his place of employment and/or volunteer activities.

14. Mr. Hinckley shall complete a daily log of his activities while on convalescent leave which shall include his work/volunteer hours, social contacts/meetings, scheduled appointments with treatment providers, errands and recreational activities. He shall bring the log to his monthly appointments at the FOPD for review.

15. Dr. Giorgi-Guarnieri will provide psychiatric treatment and prescribe medication for Mr. Hinckley at a frequency of at least once per [week][8] for the first six months of his convalescent leave. Thereafter, Mr. Hinckley shall meet with her as often as required but not less than twice per month. Dr. Giorgi-Guarnieri shall promptly notify the FOPD treatment team of any changes in Mr. Hinckley's prescribed psychiatric medication. Dr. Giorgi-Guarnieri will monitor Mr. Hinckley for any signs of deterioration or decompensation in his mental condition and will be especially alert for anger, psychosis, depression, any ideas of elopement, endangerment to self or others, noncompliance with the conditions of release, or rejection of the supervision provided to Mr. Hinckley by his responsible persons. If any such items are detected, she will immediately notify designated staff at the FOPD. Dr. Giorgi-Guarnieri will continue to assess and monitor the risk factors identified in the Hospital's checklists, which she will complete and return to the FOPD and Williamsburg treatment teams along with written feedback summarizing her contact with Mr. Hinckley prior to his scheduled monthly FOPD appointment. Dr. Giorgi-Guarnieri also will participate in monthly telephone conference calls with the FOPD treatment team and other Williamsburg treatment providers prior to Mr. Hinckley's scheduled monthly FOPD appointment. If

---

[8] This condition originally stated "once per month." On April 21, 2015, the government filed an amendment clarifying that this was a typographical error and was meant to state "once per week." See Government's Amendment of its April 10, 2015 Response to Saint Elizabeths Hospital's Recommendation for an Expansion of Defendant's Conditional Release at 1-2 (April 21, 2015) [Dkt. No. 527].

necessary, Dr. Giorgi-Guarnieri will facilitate acute hospitalization for psychiatric emergencies. She shall immediately notify designated members of the FOPD treatment team of any psychiatric emergency. FOPD shall notify the Court and counsel within 24 business hours.

16. Mr. Jonathan Weiss, a licensed clinical social worker, will provide case management services to Mr. Hinckley. Mr. Hinckley shall meet with Mr. Weiss at least twice per month. Mr. Weiss will make recommendations to Mr. Hinckley and the FOPD treatment team for opportunities to increase Mr. Hinckley's socialization, enrichment, or mental health support in the Williamsburg community. Mr. Weiss will consult with each of Mr. Hinckley's work and volunteer supervisors no less than once a month to confirm Mr. Hinckley's attendance and adequate work performance. These reports shall be integrated into Mr. Weiss's monthly progress notes for Mr. Hinckley's case management. Prior to Mr. Hinckley's monthly FOPD appointment, Mr. Weiss will provide written feedback to the FOPD and Williamsburg treatment teams, summarizing any contact with Mr. Hinckley related to case management and recommendations. He will also participate in monthly telephone conference calls with the FOPD treatment team and other Williamsburg treatment providers prior to Mr. Hinckley's scheduled monthly FOPD appointment. Mr. Weiss will collect monthly progress notes from Williamsburg providers and ensure their delivery to Dr. Johnson every month. Mr. Weiss will also corroborate Mr. Hinckley's self-report with the reports of treatment providers and family members by noting and addressing any discrepancies.

17. Mr. Carl Beffa will continue to serve as Mr. Hinckley's individual and group therapist in the Williamsburg area. Mr. Hinckley will meet at least once weekly with Mr. Beffa for individual therapy sessions and at least once weekly for group therapy sessions. Prior to Mr. Hinckley's monthly FOPD appointment, Mr. Beffa will provide written feedback to the Hospital and Williamsburg treatment team, summarizing his contact with Mr. Hinckley. He will also participate in monthly telephone conference calls with the FOPD treatment team, Dr. Johnson and all Williamsburg treatment providers prior to Mr. Hinckley's scheduled monthly FOPD appointment.

18. Mr. Hinckley shall participate in individual music therapy sessions at least once per month in Williamsburg, either with Ms. Elizabeth Haley or another board-certified music therapist. The music therapist shall agree to maintain monthly contact with the treatment teams. Prior to Mr. Hinckley's monthly FOPD

appointment, the music therapist will provide written feedback to the FOPD and Williamsburg treatment teams, summarizing his or her contact with Mr. Hinckley. He/She will report to the FOPD and Williamsburg treatment teams any emergency issues that may be disclosed during sessions. He/She will participate in monthly telephone conference calls with the FOPD treatment team and other Williamsburg treatment providers prior to Mr. Hinckley's scheduled monthly FOPD appointment.

19. Dr. Nicole Johnson of the Hospital shall conduct weekly telephone calls with Mr. Hinckley to assess the status of risk factors. She shall prepare a progress note summarizing the content of weekly phone calls. Dr. Johnson shall consult with each member of the Williamsburg treatment team and a family member of Mr. Hinckley's prior to [the] FOPD visits. Dr. Johnson shall oversee the preparation of a monthly summary of Mr. Hinckley's progress in Williamsburg. Dr. Johnson shall submit the monthly progress notes of all Williamsburg treatment providers along with her monthly summary to the Court and both counsel every month. Dr. Johnson shall corroborate Mr. Hinckley's self-report with the reports of treatment providers and family members by noting and addressing any discrepancies.

20. The Williamsburg treatment team, Dr. Giorgi-Guarnieri, Mr. Weiss, Mr. Beffa, and the music therapist shall meet with Mr. Hinckley in person for bi-monthly treatment planning conferences. They shall provide a copy of the treatment plan to Mr. Hinckley's FOPD treatment team. At a frequency of not less than twice per year, the FOPD treatment team shall meet in person with Mr. Hinckley and the Williamsburg treatment team in Williamsburg for purposes of treatment planning and communication of treatment progress, concerns, and goals.

21. Mr. Hinckley will utilize the services of a Primary Care Physician (PCP) which will be identified by his family following clarification of benefits. The PCP will be responsible for any medication for Mr. Hinckley's medical concerns.

22. Mr. Hinckley shall comply with all requests by the Hospital and/or the FOPD for information relating to any medical and/or psychiatric treatment he may receive by parties in the community. Any health care provider shall provide all treatment information and records regarding Mr. Hinckley's care to the Hospital or the FOPD upon request.

23. Prior to Mr. Hinckley's placement on convalescent leave, the Hospital's social work staff and Mr. Weiss shall identify all

possible government assistance programs for which Mr. Hinckley may be eligible and shall work with him to apply for programs.

24. Mr. Hinckley shall be permitted access to the internet, as needed. He shall provide a list of all internet enabled devices that he is able to access to both treatment teams. The FOPD treatment team shall provide this information to both parties. Mr. Hinckley shall not become a member of, subscribe to, or make any postings on any social media site such as Facebook, Twitter, Instagram, LinkedIn or any other social media site. Mr. Hinckley may have only one email account and shall provide his username and password to the FOPD treatment team. The FOPD treatment team shall provide this information to both parties. The FOPD treatment team shall review Mr. Hinckley's email transactions on a monthly basis and discuss any concerns that may arise during his monthly appointment. Mr. Hinckley shall not access any website or search for any information relating to himself, Jodie Foster, President Reagan, James Brady, Jeanette Wick, presidential assassinations, firearms or weapons of any kind or any other topics or individuals relating to his criminal case. The Williamsburg treatment team and/or the FOPD treatment team shall immediately notify the Court and counsel of any questionable internet or email activity.

25. The U.S. Secret Service may examine all of Mr. Hinckley's internet-enabled devices. Mr. Hinckley shall permit the installation of any hardware or software systems which monitors (real-time and/or historically) record and/or filters computer use and he shall not attempt to remove, tamper with or reverse engineer, or in any way circumvent the software. Mr. Hinckley shall not use any software program or device designed to hide, alter, or delete records/logs of his computer use, internet activities or the files stored on his computer, including the use of encryption, steganography, cache/cookie removal software. Mr. Hinckley shall only utilize the identified internet enabled devices and will not permit anyone else, other than the U.S. Secret Service personnel, access to those devices. Mr. Hinckley's computer must have a Windows or DOS operating system. Mr. Hinckley shall not install new hardware or effect repairs on his computer system without receiving prior permission from the U.S. Secret Service. Mr. Hinckley shall disclose all online accounts including user-names and passwords, to the U.S. Secret Service upon request, and shall also provide telephone/internet service provider billing records upon demand, as well as proof of the disconnection or termination of such services. Mr. Hinckley shall execute a

release form allowing the U.S. Secret Service to access account information directly from his Internet Service Provider. Mr. Hinckley shall not create or assist directly or indirectly in the creation of any electronic bulletin board, ISP or any other public or private network. If password protection is required on Mr. Hinckley's system, application or files, such passwords shall be provided upon request to the U.S. Secret Service. Upon request, Mr. Hinckley shall permit the U.S. Secret Service to examine any internal or external storage media, including hard discs, zip discs, floppy diskettes, CD ROMs, optical discs, magnetic tapes, or any other storage media.

26. Mr. Hinckley may not publicly display by exhibition or sale any memorabilia, writings, paintings, photographs, art work or music created by him. He may not participate in any public musical performance either individually or with a group.

27. If Mr. Hinckley should receive any communication either by mail, phone or electronic communication relating his offense and/or notoriety, he shall immediately notify the FOPD treatment team and shall not respond to the communication.

28. Mr. Hinckley, his mother and his siblings will continue to adhere to the "Media Plan to be Utilized for Patient While on Conditional Release" which provides that any effort to contact the media, either by Mr. Hinckley or by his mother, in person or by any other means while Mr. Hinckley is on conditional release, will constitute a violation of his conditional release. If approached by media, Mr. Hinckley and the members of his family will withdraw.

29. If there are any negative incidents regarding the public or media, Mr. Hinckley, Mrs. Hinckley and/or Mr. Hinckley's siblings will immediately return to the home and call a member of Mr. Hinckley's Williamsburg treatment team, the FOPD treatment team, local law enforcement, and/or the U.S. Secret Service. If so directed, Mr. Hinckley will be returned to the Hospital.

30. If a Hinckley family member becomes aware of any violation of the conditions of release or any other concerning behavior either through their own observations or information revealed by Mr. Hinckley or his social contacts, they shall immediately notify [] Dr. Giorgi-Guarnieri. If any FOPD or Williamsburg treatment team member becomes aware of such risk they shall immediately notify the Court and both parties. If requested, Mr. Hinckley shall voluntarily return to the Hospital escorted by a family member, FOPD member or Williamsburg treatment team member.

31. Mr. Hinckley shall abide by all laws, shall not consume alcohol, illegal drugs or controlled substances absent prescription, shall not possess any firearm, weapon or ammunition, and shall not be arrested for cause. He shall comply with all requests for drug and/or alcohol screening.

32. If for any reason Mrs. Joann Hinckley is not able to adequately monitor Mr. Hinckley in her home, Mr. Hinckley shall be returned to inpatient status at the Hospital. Thereafter, the Hospital, FOPD and the Williamsburg team shall work together to develop an alternative plan for Mr. Hinckley's conditional release and shall present the plan in writing to the Court and counsel for review. The government's expert(s) may conduct a full evaluation of Mr. Hinckley and the proposed plan and will provide an opinion with respect to the plan. A hearing shall be set to review the plan and Mr. Hinckley may not resume his conditional release privileges until the conclusion of the hearing and ruling by the Court.

33. If for any reason Mr. Hinckley or his family cannot continue to finance any of the required treatments in Williamsburg as detailed above, Mr. Hinckley shall be returned to inpatient status at the Hospital until further Court Order.

34. If for any reason, a member of the Williamsburg treatment team becomes temporarily or permanently unavailable, the FOPD shall immediately notify the Court and counsel. They shall identify an alternative treatment provider and provide information about the provider to the Court and counsel. If clinically indicated, Mr. Hinckley may be returned to inpatient status until the completion of this process. The government's expert(s) may conduct a full evaluation of Mr. Hinckley and the proposed providers. A hearing shall be set to review the alternative providers and if Mr. Hinckley has been returned to inpatient status during this process, he may not resume his conditional release privileges until the conclusion of the hearing and ruling by the Court.

35. If Mr. Hinckley's mental condition deteriorates, or if he violates the conditions of this release[,] he shall be returned to inpatient care at the Hospital, with due notification to the Court and counsel. Thereafter, he may not resume convalescent leave without prior notice to the Court and counsel. If the government objects to Mr. Hinckley's return to convalescent leave[,] a hearing shall be set and he shall remain an inpatient until the conclusion of said hearing.

Opp. at 5-17.

Mr. Hinckley's counsel and the Hospital each filed a reply to the government's opposition on April 17, 2015. Mr. Hinckley agreed with certain of the conditions proposed by the government but argued that many others are "unnecessary and counter-therapeutic." Patient's Response at 4. The Hospital responded to the concerns raised by the government and provided specific responses to each of the government's 35 proposed conditions, agreeing with 16 of them in whole and explaining its reasons for disagreeing with the others in whole or in part. Patient's Ex. 4, St. Elizabeths Hospital's Response to the Government's Opposition at 4-15 (Apr. 17, 2015) [Dkt. No. 526].

## III. THE EVIDENTIARY HEARING

As has been its practice, the Court held an evidentiary hearing on the Hospital's (e) letter in order to permit all parties to substantiate and elaborate upon their positions with respect to the Hospital's proposal. That hearing, which began on April 22, 2015, included opening statements by counsel for the government and counsel for Mr. Hinckley, six days of live testimony, and closing arguments. Counsel for Mr. Hinckley called the following witnesses: (1) Scott Hinckley, Mr. Hinckley's brother; (2) Diane Sims, Mr. Hinckley's sister; (3) Mr. Verne James ("VJ") Hyde, Forensic Clinical Administrator at St. Elizabeths Hospital, and Mr. Hinckley's former music therapist; (4) Dr. Deborah L. Giorgi-Guarnieri, the aforementioned psychiatrist in private practice in the Williamsburg area who has been Mr. Hinckley's psychiatrist in that area since 2010; (5) Mr. Jonathan V. Weiss, a licensed clinical social worker and Mr. Hinckley's Williamsburg case manager; (6) Dr. Katherine Murphy, former Clinical Staff Psychologist at St. Elizabeths Hospital, now in private practice, who once again prepared an extensive risk assessment report with respect to Mr. Hinckley; and (7) Dr. Nicole Reid Johnson, Forensic Services Director for the District of Columbia's Department of Behavioral Health.

In contrast with prior hearings, counsel for the government called only one witness: Dr. Raymond Patterson, a psychiatrist retained as an expert by the government and the former Medical Director and former Acting Associate Superintendent at St. Elizabeths Hospital, the former Commissioner of Mental Health in the District of Columbia, and the former Forensic Director for the State of Maryland. Sadly, its other primary expert over the years, the highly regarded Dr. Robert Phillips — the former Director of Forensic Services, State of Connecticut Department of Mental Health, Deputy Medical Director, American Psychiatric Association, and lecturer at both the University of Maryland School of Law and Yale University School of Medicine — died unexpectedly a year before the evidentiary hearing commenced.[9]

### A. Witnesses from St. Elizabeths Hospital

#### 1. Verne "VJ" Hyde – Forensic Clinical Administrator

Mr. Verne "VJ" Hyde, the Forensic Clinical Administrator at St. Elizabeths Hospital, testified on behalf of the Hospital and its Forensic Review Board, which oversees the work of individual patients' treatment teams as they formulate recommendations for conditional releases. Although Mr. Hyde previously served as Mr. Hinckley's music therapist from 2006 to 2012, he transitioned to his current role in 2012. Transcript of Hearing at 6-7 (Apr. 22, 2015 p.m.). His primary responsibility as Forensic Clinical Administrator is to coordinate services and develop treatment plans for individual patients, write responses in forensic cases, and present the

---

[9]      Throughout this Opinion, the testimony of witnesses will be cited by references to the transcript by the date of the testimony and, where appropriate, the morning or afternoon session, and by page. For example: "Transcript of Hearing at __ (Apr. 23, 2015 a.m.)" Each transcript is available on the public docket of this case. Exhibits will be referred to by the proponent of the exhibit number — the United States ["Gov't Ex. No. __"]. Mr. Hinckley ["Patient Ex. No. __"], or St. Elizabeths Hospital ["Hospital Ex. No. __"]. The exhibits, some in redacted form, also are available on the public docket.

Forensic Review Board's recommendations. Id.[10] As to Mr. Hinckley, Mr. Hyde "coordinate[s] and write[s] Mr. Hinckley's treatment plans," "draft[s] the itineraries" for each of his visits to Williamsburg, interviews each of Mr. Hinckley's Williamsburg providers after each visit and collects and summarizes their clinical notes, and coordinates with the Secret Service as needed. Id. at 7-8.

Mr. Hyde first testified regarding his experience as a music therapist and his now-terminated therapeutic relationship with Mr. Hinckley. Mr. Hyde is a board-certified music therapist and is trained to recognize symptoms and risk factors of mental illness. Transcript of Hearing at 8-10 (Apr. 22, 2015 p.m.). He testified that Mr. Hinckley's self-awareness "in terms of his regard for what his actions might mean to others, what his relationships are and what they have been, where his future lies" has "very much blossom[ed]" over the past ten years. Id. at 11. Since terminating the therapeutic relationship, Mr. Hyde continues to meet with Mr. Hinckley on almost a daily basis when Mr. Hinckley resides at St. Elizabeths. Id. at 14. Mr. Hyde further stated that he "unequivocally" believes that Mr. Hinckley is not a danger to himself or others. Id. at 13-14.

Mr. Hyde was the principal author of the Hospital's (e) letter, which was the result of "countless" meetings with Mr. Hinckley's treatment teams at the Hospital and in Williamsburg. Transcript of Hearing at 17 (Apr. 22, 2015 p.m.). He stated that the treatment teams first reviewed the Court's earlier opinion, previous petitions, and risk assessments, and Mr. Hinckley's progress in Williamsburg over the course of numerous meetings and conference calls. Id. at 17-19. Mr. Hyde testified that Mr. Hinckley is a low risk for violent recidivism and a low risk for relapses, id. at 23: he is "low risk; "clinically stable," with his primary Axis I

---

[10]      Mr. Kevin Shamblee held this position before Mr. Hyde.

[diagnoses] "in full and sustained remission." Id. at 27. The treatment teams determined that the "[i]npatient setting is not appropriate for somebody in Mr. Hinckley's place clinically" and that an outpatient setting, in Williamsburg in particular, "is where he's getting the most therapeutic benefit." Id. at 22. Beginning in 2013, following the Court's last opinion in this matter, the Hospital has worked to "create a tight-knit team [in Williamsburg] that knows him well, that understands the risk factors, and that can leverage the protective factors in his favor" in order to transition Mr. Hinckley full-time to an outpatient setting in Williamsburg. Id. at 20-22.

As part of the transition, Mr. Hyde testified, his role in coordinating and overseeing Mr. Hinckley's treatment would transfer to Dr. Nicole Reid Johnson, Forensic Services Director for the District of Columbia's Department of Behavioral Health. See Transcript of Hearing at 24 (Apr. 22, 2015 p.m.). Under the Hospital's proposal, Mr. Hyde would no longer be involved in the day-to-day treatment of Mr. Hinckley. See Hospital's March 20, 2015 Revised (e) Letter at 1-3. Mr. Hinckley's treatment would shift entirely to the Williamsburg treatment team, with monthly outpatient visits with Dr. Johnson in the District of Columbia. During the monthly return visits to the District of Columbia, Mr. Hinckley initially would continue to meet with Dr. Sidney Binks, Mr. Hinckley's treating psychologist at St. Elizabeths since 1999. Transcript of Hearing at 29-31 (Apr. 22, 2015 p.m.).

Mr. Hyde further testified about many details of the Hospital's proposal and each of the 19 proposed conditions and their underlying rationales. For each condition, Mr. Hyde provided the Hospital's reasoning and described why it is necessary or helpful for risk management or for Mr. Hinckley's continued treatment. Transcript of Hearing at 21-87 (April 22, 2015 p.m.). With respect to a number of the conditions proposed by the Hospital, Mr. Hyde testified that a certain amount of discretion would be given to Dr. Johnson and the outpatient department, in consultation with the Williamsburg treatment team, and a certain amount of

discretion would be reposed in the Williamsburg treatment team. Id. at 29, 33, 35. Mr. Hyde testified that such discretion is appropriate because the implementation of conditions of release are "clinical decision[s]" that Mr. Hinckley's providers should be able to tailor to Mr. Hinckley's treatment needs as they evolve. Id. at 33. For example, the proposed conditions specify the frequency of Mr. Hinckley's visits to Dr. Giorgi-Guarnieri for the first three months, and then provide only a minimum of one meeting a month thereafter; but they give Dr. Giorgi-Guarnieri the discretion to determine whether more than one meeting per month is needed. Id. at 44-46. Mr. Hyde also explained that Mr. Hinckley's current regime of 17-day visits to Williamsburg hinders his integration into the community and limits Mr. Hinckley's opportunities for paid employment and volunteer activities. Id. at 36-38.

As to the summary letters of Mr. Hinckley's progress — which the Hospital has prepared and the Court has received and reviewed after each of Mr. Hinckley's visits to Williamsburg over the last twelve years — the Hospital proposes eliminating this step and simply forwarding the Williamsburg treatment team's clinical notes to the Court instead. Transcript of Hearing at 48-51 (Apr. 22, 2015 p.m.). According to Mr. Hyde, the summary letters are "not sustainable" due to the amount of work it takes to prepare them, and they are "redundant," id. at 15, because the letters essentially regurgitate the information contained in the treatment providers' notes. Id. at 49-50. Mr. Hyde also testified that the Hospital does not believe that the summaries are any longer "clinically relevant" or "risk relevant." Transcript of Hearing at 15 (Apr. 23, 2015 p.m.). The Hospital therefore proposes that Dr. Nicole Reid Johnson collect the Williamsburg treatment providers' notes, as Mr. Hyde has done for the past several years, and forward these documents to the Court without an attached summary letter. Transcript of Hearing at 32-33 (Apr. 23, 2015 a.m.).

Mr. Hyde also testified that the Hospital's proposed conditions would eliminate the requirement that the Hospital and Mr. Hinckley prepare advance itineraries of his daily activities, which Mr. Hinckley has followed for each of his previous visits to Williamsburg. Transcript of Hearing at 67-68 (Apr. 22, 2015 p.m.). Under the Hospital's proposed conditions, Mr. Hinckley would be allowed to travel unaccompanied and without supervision without a pre-determined itinerary, with the exception that he avoid "government centers," a term which is left undefined. Id. The Hospital believes the elimination of itineraries is appropriate for convalescent leave because itineraries "present a major barrier to him living dynamically and normally in the community." Id. at 68.

Mr. Hyde stated that Mr. Hinckley's compliance with the itineraries, since the two incidents in 2011, has been "very, very good" and that he "has not shirked his responsibilities with that." Transcript of Hearing at 82 (Apr. 23, 2015 a.m.). With the exception of one "lapse," as Mr. Hyde described it, Mr. Hinckley has complied with his scheduled itineraries and received permission from Mr. Hyde in advance for any changes. Id. at 82-83. The "lapse" occurred on January 20, 2015. Mr. Hyde testified that Mr. Hinckley was scheduled to go with his friend, Bruce Brelsford, a local photographer, to meet with Robert Lerner, a former creative director and photographer with Look Magazine. Id. at 83-84. Mr. Lerner, however, was ill and canceled the meeting. Mr. Hinckley and Mr. Brelsford instead went to visit a musician, John Tracy, but failed to notify Mr. Hyde in advance to obtain his approval to the change in itinerary. Id. at 84. The following day, Mr. Hinckley did inform Mr. Hyde of the change. Id. at 85. In Mr. Hyde's view, unlike the incidents in 2011, when Mr. Hinckley went to a book store instead of to a movie as required by his itinerary, and then lied to his treaters — which Mr. Hyde viewed as deceptive, Transcript of Hearing at 78-81 (Apr. 23, 2015 p.m.) — the decision to visit Mr. Tracy, the musician, instead of Mr. Lerner in January 2015 was not deceptive or manipulative "given the

context of the situation." Id. at 79.  Rather, it was an exercise of "poor judgment in the moment." Id.

Mr. Hyde also discussed Mr. Hinckley's continued integration into the community in Williamsburg with the considerable assistance of Mr. Weiss.  Transcript of Hearing at 30-31, 61-62 (Apr. 23, 2015 a.m.).  Unlike the most recent prior hearing in this matter — at which the Hospital's witnesses acknowledged that Mr. Hinckley had not taken advantage of opportunities to increase his socialization in Williamsburg — Mr. Hyde believes that there has been a "marked increase in Mr. Hinckley's level of engagement," id. at 74-75, and that the switch from Dr. Beffa to Mr. Weiss as Mr. Hinckley's case manager in Williamsburg has been a "huge plus." Id. at 62.  For example, Mr. Hinckley has joined a community center and attended lectures at a museum and a local university.  In addition to group therapy with Dr. Beffa, Mr. Hinckley also has begun attending group meetings with the National Alliance on Mental Illness ("NAMI"), which is a national organization that supports those living with mental illness and their families and friends. Id. at 76-77.  Mr. Hinckley has expanded his use of unaccompanied time, pursing his new interest in photography, arranging times to meet with different friends, and exploring employment opportunities. Id. at 79.  Mr. Hinckley has also established friendships with several members of the Williamsburg community, including Mr. Brelsford, a photographer, and Mr. Les Solomon, who works at the Unitarian Universalist Church where Mr. Hinckley volunteers. Id. at 88-89.

Mr. Hyde testified that with the conditions proposed in the original December 14, 2014 (e) letter and those contained in the revised March 20, 2015 (e) letter, the Hospital believes that Mr. Hinckley would not be a danger to himself or others.  Transcript of Hearing at 44 (Apr. 22, 2015 p.m.).

## 2. Dr. Katherine Murphy – Forensic Psychologist

Dr. Katherine Murphy has a master's degree in forensic psychology from the Chicago School of Professional Psychology and a doctorate from American School of Professional Psychology. Transcript of Hearing at 5-6 (Apr. 27, 2015 a.m.). Dr. Murphy formerly was a clinical staff psychologist at St. Elizabeths Hospital. Id. at 7-8. She first conducted a risk assessment of Mr. Hinckley in this case in 2011, with a supplement completed in 2013, in preparation for the previous evidentiary hearing in this matter. Id. at 9. She conducted an extensive risk assessment update in advance of this evidentiary hearing. Dr. Murphy was permitted to offer expert testimony at the hearing on the issue of whether Mr. Hinckley will be a danger to himself or others as a result of mental disease if released on convalescent release to Williamsburg under the conditions proposed by the Hospital. Id. at 8.

Dr. Murphy testified that she supported the Hospital's plan for convalescent leave, so long as certain additional specified conditions were added, Transcript of Hearing at 13-14, 66-67 (Apr. 27, 2015 a.m.), because, in her expert opinion, Mr. Hinckley is "currently low risk and would be a low risk of future violence if granted convalescent leave under the specified conditions." Id. at 15; see id. at 104. She further testified that she is "very confident" in this opinion. Id. at 15. She further believes that "the risk of relapse is low of decompensation without prolonged isolation and that [Mr. Hinckley] would be readily assessed throughout his transition by several treatment providers based off of his adjustment to the plan." Id. at 16. If a relapse did occur, Dr. Murphy testified that in her opinion it would be gradual, detectable by his treatment providers, and responsive to pharmacology. Id.; see id. at 57-59.

In conducting the risk assessment update, Dr. Murphy interviewed Mr. Hinckley and all of his treatment providers in Williamsburg and at St. Elizabeths Hospital, among others. See Murphy Rpt. at 19-48. She also administered several psychological tests of Mr. Hinckley.

Mr. Hinckley's results on the first test, the Minnesota Multiphasic Personality Inventory ("MMPI-2"), showed a "very similar profile that he showed in 2011 and across multiple administrations since at least 1995." Transcript of Hearing at 17 (Apr. 27, 2015 a.m.). This test showed that Mr. Hinckley "shows a tendency towards defensiveness," "indicating that he tends to portray himself in an overly favorable light and has some difficulty acknowledging psychological symptoms and problems." Id. The test "did not show any elevations on the clinical scales," "indicat[ing] that he's not showing any overt psychological distress, not showing bizarre ideation, not showing paranoia, [and] not showing remarkable depression." Id. at 18. The two scales where Mr. Hinckley historically has shown some "slight elevations" over the past decade or so, Scales 3 and 4, "suggest that [Mr. Hinckley] does harbor some degree of anger but has a difficult time communicating and expressing this anger. . . . he has a hard time expressing this negative emotion." Id. at 19. Overall, Dr. Murphy testified that Mr. Hinckley is "not evidencing significant psychopathology based off of the MMPI-2 data." Id.

Dr. Murphy next administered the Violence Risk Appraisal Guide ("VRAG"), which "is an actuarial instrument used to assess violence using statistically driven methods" Transcript of Hearing at 20 (Apr. 27, 2015 a.m.), comprised of twelve predictor variables. Murphy Rpt. at 52. Mr. Hinckley's score on the VRAG did not change in comparison to his score in 2011. Dr. Murphy testified that this result was expected, however, because the test uses "static dispositional historical factors," in other words "factors [that] don't change over time." Transcript of Hearing at 21 (Apr. 27, 2015 a.m.). This is not surprising because Mr. Hinckley has been institutionalized at St. Elizabeths for over 30 years, whereas "the average length of stay for folks in the original VRAG study was four to five years." Id. In addition, the original VRAG study looked "at recidivism when the individual had been transferred to either the community, a halfway house, or a minimum-security forensic hospital," and Mr. Hinckley "has been [in]

minimum security since 1992 and has had open access to the grounds." Id. at 22. Mr. Hinckley

scored in the second lowest category, out of nine, indicating a low risk of violence. Murphy Rpt.

at 53. Mr. Hinckley's low test scores "suggest[] that he's non-psychopathic," meaning that his

risk of violence dissipated over time. Transcript of Hearing at 22 (Apr. 27, 2015 a.m.). Based

on the VRAG results and the caveats discussed above, Dr. Murphy concluded that Mr.

Hinckley's risk of violence is "decidedly low." Id. at 22-23.

   In addition to the original VRAG, Dr. Murphy also administered the VRAG

revised, which was published in February of 2015 based upon research data published in 2013.

Transcript of Hearing at 23 (Apr. 27, 2015 a.m.). The purpose of the VRAG revised was "to

deal with some of the caveats that came with the administration of the original VRAG." Id. The

VRAG revised, however, has "about the same level of predictive accuracy as the VRAG

[original]," in Dr. Murphy's opinion. Id. at 24. Dr. Murphy testified that Mr. Hinckley again

scored in the second lowest category, out of nine, on the VRAG revised, the same score Mr.

Hinckley received on the VRAG original. This score puts Mr. Hinckley "at a low risk of

violence." Id. at 24.

   The final test Dr. Murphy administered was the HCR-20.[11] This test "is a

structured professional judgment tool that relies on empirically-based risk factors." Transcript of

Hearing at 25 (Apr. 27, 2015 a.m.). The test incorporates three domains: historical (H), clinical

(C), and risk management (R). The first domain, historical, overlaps substantially with the

VRAG and involves static factors that generally do not change over time. Id. Regarding this

---

[11]  Dr. Murphy testified that she administered the updated version of the HCR-20 which is "fundamentally the same" as prior versions. Dr. Murphy stated that the researchers incorporated updated research, narrowed the definitions of certain risk factors, and made small additions, such as adding a risk factor on the historical scale for antisociality, which research has shown "is the strongest predictor of violence." Transcript of Hearing at 27 (Apr. 27, 2015 a.m.).

domain, Dr. Murphy analyzed the historical risk factors that were the most salient at the time of the offense: "psychosis at the time, major depression, isolation, [and] narcissistic personality disorder." Id. at 27-28. Dr. Murphy testified that "Mr. Hinckley has responded well" to treatment at St. Elizabeths and has been compliant with his medication and therapies. Id. at 30. With the exception of the incident in January of 2015 discussed by Mr. Hyde, Dr. Murphy also testified that Mr. Hinckley has been "very diligent in his approach to following through with what's been asked of him and what are in his court orders." Id. In total, Dr. Murphy concluded that Mr. Hinckley no longer exhibits signs of psychosis and that "[t]hrough more than 30 years of monitoring, treatment and data collection, it has become clear that depression and narcissism, as risk factors of violence in the case of Mr. Hinckley, are inherently mitigated in the absence of active psychosis." Id. at 29-30.[12]

The clinical domain measures "clinical risk factors," including "a person's present adjustment, if there's any signs of mental illness, any signs of violent ideation, how they're coping with life, what does their support network look like, [and] how they're responding to treatment." Transcript of Hearing at 30 (Apr. 27, 2015 a.m.). Dr. Murphy testified that "Mr. Hinckley remains stable," "has not shown any fluctuations in mood," and "has not shown any psychotic symptoms at all." Id. at 31. Dr. Murphy stated that it was significant that, despite "some stressful circumstances over the last few years," including the death of James Brady, Mr. Hinckley has not needed any adjustments to his medication, a fact which shows "increased resilience." Id.

---

[12]     In her Report, Dr. Murphy noted that psychosis is the linchpin to Mr. Hinckley's overt expressions of violence in the past, and Mr. Hinckley "has not exhibited psychotic symptoms for more than two decades." Murphy Rpt. at 55

As for future anticipated significant stressors, Dr. Murphy noted that there obviously will come a time when Mr. Hinckley will have to deal emotionally with the loss of his mother, "who has been a source of unwavering support." Murphy Rpt. at 60. Dr. Murphy envisions Mr. Hinckley "reacting with sadness, dysphoria, the typical bereavement responses that one experiences when they lose somebody very important." Transcript of Hearing at 86 (Apr. 27, 2015 p.m.). "[H]e will be sad. He will grieve," but, she noted, "bereavement should not be confused with depression." Id. In Dr. Murphy's view, Mr. Hinckley's manner of grieving this loss will "require clinical attention," and treatment providers will have to assess Mr. Hinckley for signs of depression following his mother's death. Murphy Rpt. at 60.[13] She testified, however, that "there will be several treatment providers, and Dr. Giorgi-Guarnieri as the risk management assessor, who will be looking at this very issue and will be looking at this issue closely." Transcript of Hearing at 89 (Apr. 27, 2015 p.m.). She is confident that "[a]ny symptoms of major depression . . . would be detected" and "would be addressed." Id.

Dr. Murphy further testified that Mr. Hinckley has responded well to the addition of Mr. Weiss as case manager, which has improved Mr. Hinckley's mood and level of motivation. Transcript of Hearing at 32 (Apr. 27, 2015 a.m.). She noted that Mr. Weiss has been a positive addition that has "brought about a lot of new opportunities for Mr. Hinckley." Id. at 37. Dr. Murphy stated that Mr. Hinckley has not exhibited any signs of isolation or withdrawal, has relied upon his support system in Williamsburg, has connected with other individuals on his visits to Williamsburg, and has exercised sound judgment in his relationships. Id. at 32, 34-35. In comparison to a "typical insanity acquittee . . . coming out of the hospital to

---

[13]     The death of Mr. Hinckley's father was also stressful and a cause for clinical concern. The record shows, however, that Mr. Hinckley's mood and emotional reaction were appropriate. See Hinckley VII, 40 F. Supp. 3d at 31, 54; Hinckley VI, 625 F. Supp. 2d at 23.

reside on convalescent leave," whose "active symptoms are far higher than and far more acute than what Mr. Hinckley shows," Mr. Hinckley's symptoms are "quite stable and have been . . . for a long time." Id. at 33. Dr. Murphy testified that, as to the clinical factors, Mr. Hinckley thus is "really ready to move forward at this point." Id. at 34.

The final domain, the risk management scale, is a "future-oriented scale" that measures "empirically-rooted risk factors that pay attention to how a person will adjust to whatever context is being recommended." Transcript of Hearing at 26 (Apr. 27, 2015 a.m.). There are five risk factors considered as part of the risk management scale: future problems with (1) professional services plans; (2) living situation; (3) personal support; (4) treatment or supervision; and (5) stress or coping. Murphy Rpt. at 58. "The recommended time frame for examining these considerations is the 'near future,' which is specified as a few weeks to several months following the evaluation." Id. Dr. Murphy analyzed each of these factors, noting that "Mr. Hinckley has sufficiently adjusted to the expansion in his conditional release to 17-day visits, and he followed each of the stipulations outlined in the 2014 Court Order." Id.

Dr. Murphy stated that, going forward, "a few specific risk management issues will need to be addressed on convalescent leave" — most prevalently Mr. Hinckley's history of unreliable self-reporting. Murphy Rpt. at 58. While Dr. Murphy noted that Mr. Hinckley has shown improvements in this area, she stated that "it remains essential that treatment providers continue to corroborate Mr. Hinckley's reports so that any discrepancies can be promptly addressed and resolved." Id. Dr. Murphy noted that Mr. Hinckley "is fortunate that he has personal support available to him that many insanity acquittees do not," although she noted that the Hinckley family's financial backing "cannot be guaranteed over the long term," so "further establishing [Mr. Hinckley] in the community as financially independent from his family should be the primary case management objective through the next phase of transition." Id. at 59. As to

stress and coping, Dr. Murphy concluded that Mr. Hinckley "is currently in a stable position to manage the[] losses [of his professional and personal relationships at the Hospital] with resilience" and that, in the event of his mother's death, "multiple treatment providers will actively assess Mr. Hinckley for signs of developing or worsening depression following his mother's death." Id. at 60.

Dr. Murphy also testified regarding her assessment of the ten risk factors particular to Mr. Hinckley that have been identified by the Hospital and Dr. Patterson.[14] As to the first risk factor, depression, Dr. Murphy testified that she has not seen any evidence of depression and that Mr. Hinckley's diagnosis of major depression is in "full sustained remission" and has been for over two decades. Transcript of Hearing at 38 (Apr. 27, 2015 a.m.). She further testified that she has not seen any evidence of isolation, the second risk factor with Mr. Hinckley. Id. at 38-39. In fact, Dr. Murphy noted that Mr. Hinckley is "very far from anything that resembles" the isolation that occurred at the time of the offense. Id. at 39. Although Mr. Hinckley "always has been an introvert" — and this will not change — Dr. Murphy testified that he has "met the expectation that both [treatment] teams have put forth for him" as far as

---

[14]     These risk factors were identified by the Hospital as related to Mr. Hinckley's original offense and his future risk for violence. See Patient's Exhibit 1 from Feb. 2013 Evidentiary Hearing [Dkt. No. 415-1] (Mr. Shamblee's Recommendation for an Expansion of the Current Conditional Release and for Convalescent Leave). These ten risk factors are included as part of the Hospital's "checklist" that each treatment provider completes for each of Mr. Hinckley's visits to Williamsburg. See Transcript of Hearing at 19 (Apr. 23, 2015 p.m.). The risk factors are: (1) depression; (2) isolation; (3) psychosis; (4) level of insight into mental illness; (5) personality disorder (specifically, in Mr. Hinckley's case, narcissism); (6) access to weapons; (7) lack of family support; (8) history of suicide attempts; (9) difficulty in relationships with friends; and (10) deception. Dr. Patterson agrees that this is the appropriate list of risk factors, although, as discussed later he now would add an eleventh risk factor. See infra at 73.

becoming integrated into the community. Id. at 40. He has shown a brighter affect and more positive outlook; he is more relaxed, the antithesis of isolation. Id. at 40-41.[15]

As to the next risk factor, psychosis, Dr. Murphy testified that she found no evidence of psychosis and that Mr. Hinckley has been in full, sustained, and stable remission for more than two decades. Transcript of Hearing at 41 (Apr. 27, 2015 a.m.). Dr. Murphy also testified that Mr. Hinckley has been fully compliant with his medication regime, which is directly relevant to the fourth risk factor, insight into mental illness. Id. at 42. Dr. Murphy stated that Mr. Hinckley's compliance with his medications, including being proactive "in being sure that his medications are readily available for him" in Williamsburg, "suggests that [insight into his mental illness] is not a risk factor that elevates his risk in any way and contributes to an overall risk profile that's low." Id.. As to the fifth risk factor — Mr. Hinckley's narcissistic personality disorder — Dr. Murphy agreed that his narcissistic personality disorder is significantly "attenuated at present and [has been] for many years." Id. at 42-43. Dr. Murphy also testified that there is no evidence of interest in weapons, the sixth risk factor. Id. at 48. Regarding the seventh risk factor, family support, Dr. Murphy testified that, "in contrast [to] many of the insanity acquittees that are coming out of the hospital that have minimal to no support," "Mr. Hinckley's family has been emotionally supportive, [and] financially supportive." Id. Mr. Hinckley's mother, Dr. Murphy noted, "in particular has been unwavering in her support of Mr. Hinckley." Id. at 49.

---

[15]     Dr. Murphy also stated that Mr. Weiss has "made it clear" that Mr. Hinckley's previous lack of volunteer opportunities and relationships in Williamsburg — which in the past had been perceived as "a lack of initiative" — actually was often a result of "the resistance from the community down there and how his level of notoriety has impacted this." Transcript of Hearing at 37 (Apr. 27, 2015 a.m.).

The next risk factor associated with Mr. Hinckley is a history of suicides. Dr. Murphy testified that Mr. Hinckley has shown no evidence of wanting to hurt himself since his last suicide attempt in 1983, about a year after his admission to St. Elizabeths Hospital. Transcript of Hearing at 50-51 (Apr. 27, 2015 a.m.). As to the ninth risk factor, difficulty in relationships with women, Dr. Murphy testified that this is "not a risk of violence as it stands right now," in part because the relationships he has had in recent years are "real relationships with real women," as opposed to delusional or fantasized relationships in the past. Id. at 52. In Dr. Murphy's opinion, "too much emphasis has been placed on this as a risk factor," and Mr. Hinckley's recent response to relationships with women has been "reasonably mature." Id. at 51-52. Dr. Murphy did note, however, that Mr. Hinckley sometimes "seems to show behaviors that are consistent with an adolescent level or young-adult level of relationships." Id. at 52-53.

Regarding the tenth or final risk factor, deception, Dr. Murphy testified that there has been no evidence of deception since her last evaluation of Mr. Hinckley. Transcript of Hearing at 57 (Apr. 27, 2015 a.m.). Dr. Murphy further testified that she does not view the January 2015 incident, where Mr. Hinckley met with Mr. Tracy instead of with Mr. Lerner, as his itinerary indicated, as an instance of deception. Id. at 54-55. Dr. Murphy stated that she thought Mr. Hinckley "used poor judgment" on that occasion, but does not believe "he was trying to deceive or omit or withhold information." Id. at 55. Nor does she believe it was an instance of manipulation. Id. at 56-57. In contrast to the two previous occasions where Mr. Hinckley has violated his itinerary, Dr. Murphy noted that there is no indication that Mr. Hinckley lied at any point about this incident, and instead appears to have been relatively forthcoming about it to his treatment providers. Murphy Rpt. at 16-17.

Dr. Murphy further offered her opinion regarding Dr. Patterson's suggestion that an eleventh risk factor, financial support, should be added. Transcript of Hearing at 53 (Apr. 27,

2015 a.m.). She testified that she does not "view this issue in the same way" And does not

believe lack of financial support should be added as a risk factor. Id. Instead, Dr. Murphy stated

that financial support is "always inevitably and inherently a component of putting together

outplacement plans." Id. In conducting the HCR-20 assessment, Dr. Murphy noted that her

"main objective" is to analyze the risk "of the 6- to-18-month time frame" and that she does not

believe "that the fact that the family can't sustain the same level [of financial support] over time

represents a risk factor." Id. at 54.

Regarding the Hospital's proposal to eliminate Mr. Hinckley's requirement to

follow daily itineraries, Dr. Murphy testified that she does not "think [itineraries are] necessary

from a risk-management perspective." Transcript of Hearing at 61 (Apr. 27, 2015 a.m.). She

stated that, through Phase IV of Mr. Hinckley's integration, the itineraries were "useful to gather

data about how Mr. Hinckley was going to adjust to this increase in freedom," but that we now

"have enough data . . . to suggest that he uses . . . his time there [in Williamsburg] responsibly."

Id. at 63-64. Moreover, Dr. Murphy noted that an itinerary "becomes less realistic" and brings

"a degree of rigidity" that "can interfere with Mr. Hinckley being more spontaneous," which

should be encouraged during convalescent leave. Id. at 64. In Dr. Murphy's opinion, itineraries

"don't fit the convalescent leave framework." Id. at 88.

As to Mr. Hinckley's music therapy, Mr. Murphy testified that it is "an avenue of

therapy that is useful for Mr. Hinckley that he derives great benefit from," but that she does not

see it as "a critical component to keeping his risk low." Transcript of Hearing at 7 (Apr. 27,

2015 p.m.). She stated that she discussed Mr. Hinckley's music therapy with Dr. Giorgi-

Guarnieri and that both agreed that music therapy is "not absolutely critical . . . from a risk

management perspective" such that "the actual treatment itself isn't something that is necessary

to keep him at a low risk." Id. at 8. In fact, Dr. Murphy suggested that "a clinician who is not

doing music therapy or trained in music therapy could review his songs." Id. Dr. Murphy noted, however, that in her opinion music therapy "should [not] be taken away at this point." Id. at 9.

Dr. Murphy testified that her proposal — involving three phases, with decreased structure and fewer conditions over the next several years — see infra at 48-51 — "steps down the level of monitoring and supervision in a way that accounts for there being an absence of itineraries." Transcript of Hearing at 61 (Apr. 27, 2015 a.m.). For example, instead of an itinerary prepared in advance, Dr. Murphy recommends requiring Mr. Hinckley to maintain a general calendar or log of what he has done each day that he can present to Mr. Weiss and Dr. Johnson for discussion about his adjustment. Id. at 61-62; Transcript of Hearing at 107-08 (Apr. 27, 2015 p.m.). Dr. Murphy testified that her "recommendation is not so detailed that he's logging all of his activities," but would require only a general log, particularly regarding changes to his scheduled activities, that is for "accountability purposes." Transcript of Hearing at 87 (Apr. 27, 2015 a.m.). Dr. Murphy believes that such a daily log or calendar, rather than an advance, detailed itinerary of daily activities, is "consistent with the level of freedom that [Mr. Hinckley is] ready for." Id. at 86. With such a log or calendar, the "onus" would be on Mr. Hinckley, and Mr. Weiss would then be responsible for contacting people to confirm the activities detailed by Mr. Hinckley in his daily calendar or log. Id. at 63. In her opinion, in view of Mr. Hinckley's history of unreliable self-reporting — an important risk factor — Mr. Weiss and other treatment providers need to continue to corroborate Mr. Hinckley's reports of his activities and whereabouts. Murphy Rpt. at 58.

Based upon her conclusions from the results of the risk assessment and the various tests she administered, it is Dr. Murphy's opinion that Mr. Hinckley is ready for full-time convalescent leave in Williamsburg, Virginia. Transcript of Hearing at 66-67 (Apr. 27, 2015 a.m.); Murphy Rpt. at 60-61. In her view, Mr. Hinckley is a low risk of further violence under

47

the proposed conditions, with the modifications she proposes, and the prospect of relapse is decidedly low. Transcript of Hearing at 104 (Apr. 27, 2015 a.m.).

Dr. Murphy made a series of recommendations, dividing Phase V into three time periods: (1) the first six months of convalescent leave ("Part A"); (2) the next six to twelve months ("Part B"); and (3) after eighteen months on convalescent leave ("Part C"). Murphy Rpt. at 61-65; Transcript of Heating at 68 (Apr. 27, 2015 a.m.). These recommendations largely were incorporated into the Hospital's revised conditions in its April 17, 2015 letter. During Part A, Dr. Murphy recommends the following minimum treatment schedule for Mr. Hinckley:

1. Monthly "treatment planning conferences" with the Williamsburg treatment team, and Dr. Johnson when available, to "review the status of Mr. Hinckley's risk factors and his community reintegration efforts;"[16]

2. Monthly "monitoring checks" with Dr. Johnson and a member of Mr. Hinckley's former inpatient treatment team at the Forensic Outpatient Department in D.C.;

3. Monthly individual psychotherapy sessions until the conclusion of Part A with Dr. Binks at the Forensic Outpatient Department in D.C.;

4. Weekly group psychotherapy sessions with Mr. Beffa;

5. Weekly NAMI group meetings;

6. Individual therapy with Mr. Beffa three times a month;

7. Semi-monthly (twice per month) meetings with Dr. Giorgi-Guarnieri;

8. Case management meetings with Mr. Weiss at least twice a month; and

9. Monthly meetings with an individual music therapist.

---

[16]     In her written report, Dr. Murphy recommended that "Dr. Johnson and a member of the inpatient treatment team should be routinely included (via conference call) in these conferences." Murphy Rpt. at 61.

Transcript of Hearing at 68-74 (Apr. 27, 2015 a.m.); Transcript of Hearing at 47-50, 68-69 (Apr. 27, 2015 p.m.); Murphy Rpt. at 61-62. Dr. Murphy acknowledged that this schedule is "far above" what is typically recommended for a patient on convalescent leave and opined that this schedule would provide ample opportunity for Mr. Hinckley's treatment providers to assess and monitor his condition and integration. Transcript of Hearing at 75-76 (Apr. 27, 2015 a.m.).

After six months of convalescent leave, Dr. Murphy testified that she recommends a "comprehensive treatment planning conference" with all of Mr. Hinckley's "key providers," including the Williamsburg treatment team and Dr. Johnson. Transcript of Hearing at 75 (Apr. 27, 2015 a.m.); see Murphy Rpt. at 62. If all participants in the conference concur that Mr. Hinckley has met expectations during Part A and is ready to proceed to Part B, Dr. Murphy recommends that Mr. Hinckley then progress to a somewhat reduced minimum treatment schedule under Part B. Transcript of Hearing at 75 (Apr. 27, 2015 a.m.); Murphy Rpt. at 62. For Part B — a period of six to twelve months following the initial six month period — Dr. Murphy stated that she recommends the following minimum treatment schedule for Mr. Hinckley:

1. Monthly "treatment planning conferences" with the Williamsburg treatment team;

2. Monthly "monitoring checks" with Dr. Johnson at the Forensic Outpatient Department in D.C.;

3. Weekly group psychotherapy sessions with Mr. Beffa;

4. Individual psychotherapy sessions with Mr. Beffa two times a month;

5. Weekly NAMI group meetings;

6. Meetings with Dr. Giorgi-Guarnieri at least once a month;

7. Semi-monthly meetings with Mr. Weiss at a minimum; and

8. Monthly meetings with an individual music therapist.

49

Transcript of Hearing at 76-81 (Apr. 27, 2015 a.m.); Transcript of Hearing at 49-52 (Apr. 27, 2015 p.m.); Murphy Rpt. at 62-63. Mr. Hinckley would no longer meet with Dr. Binks once Part B begins.

Dr. Murphy noted that, in contrast to the Hospital's proposal of treatment planning meetings occurring every other month, she recommends that the meetings continue on a monthly basis during Part B, because risk management and case management "become the more salient foci and objectives of transitioning a patient out" at this point in convalescent leave. Transcript of Hearing at 77 (Apr. 27, 2015 a.m.). She recommends maintaining monthly treatment planning meetings "because this is the avenue that's going to address [Mr. Hinckley's problem with] self-reporting." Id. at 78. She further testified that her proposal involves less individual therapy in Part B because it does not "remain to be the critical component that it was" id. at 77, and because Mr. Hinckley, at that point, will have "reached maximum benefit [from] individual psychotherapy on a weekly basis, and it can be tapered down, and group psychotherapy is emerging as the indicated treatment modality for Mr. Hinckley." Transcript of Hearing at 51-52 (Apr. 27, 2015 p.m.); see also Transcript of Hearing at 78-79 (Apr. 27, 2015 a.m.). Dr. Murphy testified that Dr. Binks and Mr. Beffa agreed with the approach of decreasing individual therapy and continuing group therapy because "once [a patient has] started the group [therapy], that [] becomes the primary modality of treatment and [] individual therapy is used as an adjunct to bolster [group therapy]." Transcript of Hearing at 79 (Apr. 27, 2015 a.m.).

Under both Parts A and B of Dr. Murphy's proposed plan, Mr. Weiss would take on the role of liaison between the Williamsburg treatment team and Dr. Johnson and the outpatient department at St. Elizabeths Hospital. Transcript of Hearing at 82 (Apr. 27, 2015 a.m.). He would collect progress notes from treatment providers in Williamsburg, talk to Mr.

Hinckley's work supervisors, confirm Mr. Hinckley's attendance at work and appointments with treatment providers, and relay all of this information to Dr. Johnson. Id. at 82-83; see Murphy Rpt. at 64. Dr. Johnson would review the material provided by Mr. Weiss and conduct collateral interviews with the Williamsburg treatment providers. Transcript of Hearing at 84-85 (Apr. 27, 2015 a.m.). Under Dr. Murphy's proposal, Dr. Johnson would put the material together and draft a monthly summary of Mr. Hinckley's adjustment and progress in Williamsburg, and provide all this information to the Court. Id.; see also Murphy Rpt. at 64.[17]

Following Part B, Dr. Murphy recommends that an updated risk assessment be conducted and a comprehensive treatment planning conference be convened to evaluate Mr. Hinckley's adjustment to convalescent leave and assess how to proceed. Murphy Rpt. at 65. After there is more data, the risk assessor will look at how Mr. Hinckley has done on convalescent leave in the last year or so, and then decide what treatment providers he needs to see going forward and how frequently. Transcript of Hearing at 105-07 (Apr. 27, 2015 a.m.).

Dr. Murphy further testified regarding additional risk management conditions she recommends. First, she testified that she agrees with the Hospital's proposal that Mr. Hinckley be limited to a 50-mile radius of Williamsburg. She testified, however, that she also recommends that "if he travels 30 miles out of . . . the center point of the radius . . . that he's with a treatment provider" or a family member. Transcript of Hearing at 89, 91 (Apr. 27, 2015 a.m.).

---

[17]     Dr. Murphy believes that the community reintegration objectives for Parts A and B are as follows: (1) applying for health care entitlements; (2) researching housing options in the Williamsburg area; (3) obtaining consistent employment; and (4) locating a primary care physician in Williamsburg. She believes that the psychiatric and psychological treatment objectives are: (1) utilizing the support of Mr. Beffa, Dr. Giorgi-Guarnieri and the psychotherapy group to guide decision-making in intimate relationships, as well as in forming and maintaining friendships; (2) assisting Mr. Hinckley in identifying and expressing his emotional responses effectively; (3) continuing to encourage openness and disclosure in a consistent manner to all those involved in his treatment; and (4) reviewing community reintegration efforts and changes in routine. Murphy Rpt. at 63.

This condition would be consistent with the proposal that Mr. Hinckley avoid government centers in Richmond (which is within the 50 mile radius, but outside the 30 mile radius). Id.

Dr. Murphy testified that requiring a GPS-monitoring ankle bracelet would be "intrusive and unnecessary in this case." Transcript of Hearing at 92 (Apr. 27, 2015 a.m.). Because Mr. Hinckley will be monitored under the conditions proposed by the Hospital, Dr. Murphy testified that she believes such "a high level of supervision is inconsistent with [Mr. Hinckley's] needs right now." Id. at 94. In her opinion, an ankle bracelet would also "further impede[] his ability to . . . reintegrate as a member of society" because of the stigma and recognition that would come with an ankle bracelet. Id. at 95. Dr. Murphy further noted that "there hasn't been any evidence to suggest across [his hospital stay] or during his stays in Williamsburg that [Mr. Hinckley] is an elopement risk." Id. Dr. Murphy testified that she therefore also does not believe a vehicle tracking device is necessary. Id. at 95. And while Dr. Murphy recommended that Mr. Hinckley continue to carry as GPS-enabled phone at all times, she opposes any restrictions on which phones Mr. Hinckley may or may not use to make calls, either from his mother's home or at employment or volunteer work. Id. at 100; Transcript of Hearing at 33 (Apr. 27, 2015 p.m.).

As to restrictions or monitoring of Mr. Hinckley's Internet access, Dr. Murphy testified that she does not believe "that's [clinically] indicated right now" because there is no "data to suggest that Mr. Hinckley is going to use the Internet in some way to commit a crime or commit a violent crime." Transcript of Hearing at 96 (Apr. 27, 2015 a.m.). In her risk assessment, Dr. Murphy found "nothing outstanding or noteworthy or red flags to suggest that [Mr. Hinckley] should not be afforded the opportunity to use the Internet," which is "a vital part of existence today." Id. at 96. Dr. Murphy also testified that there is no reason why this access should not include information about himself, President Reagan, James Brady, presidential

assassinations, or other forms of violence — because such information "can be used as a therapeutic tool." Id. at 99. As to pornography, Dr. Murphy noted that "looking at pornography does not elevate his violence risk," which "might be different in a sex offender evaluation, but in the case of Mr. Hinckley, [such a restriction] is not a risk-relevant need." Transcript of Hearing at 34 (Apr. 27, 2015 p.m.). Dr. Murphy further noted that Mr. Hinckley has never shown interest in visiting pornographic websites or websites with the information listed above. Transcript of Hearing at 99-100 (Apr. 27, 2015 a.m.). Dr. Murphy therefore opposes the government's proposal to restrict and track Mr. Hinckley's Internet access because it is "extrapolating into extreme what-ifs that are outside of his risk factors that have been identified." Id. at 98. Dr. Murphy, however, does agree with the Hospital's proposal that Mr. Hinckley report any online accounts, account details, and passwords to the Forensic Outpatient Department for Dr. Johnson's review. Transcript of Hearing at 34 (Apr. 27, 2015 p.m.).

Dr. Murphy testified that she opposes any conditions that Mr. Hinckley be returned to the Hospital for either a de minimis violation of his conditions or if a treatment team member becomes unavailable to continue Mr. Hinckley's treatment. Transcript of Hearing at 101-03 (Apr. 27, 2015 a.m.). She testified that issues such as the January 2015 incident "don't necessitate rehospitalization," which instead should be reserved only for an individual with a "mental disorder that makes [them] a risk of violence to [them]self or others." Id. at 101.

3. Dr. Nicole Johnson – Director of Forensic Outpatient Department

Dr. Nicole R. Johnson, a forensic psychiatrist and currently the Forensic Services Director for the District of Columbia's Department of Behavioral Health — also referred to as the Forensic Outpatient Department or FOPD — testified regarding her proposed role in the Hospital's proposal for convalescent leave. Dr. Johnson began her current position in March of

2014, prior to which she was an attending psychiatrist at St. Elizabeths for seven years. Transcript of Hearing at 7-9 (Apr. 28, 2015). The Forensic Outpatient Department monitors individuals found to be not guilty by reason of insanity "once they are stabilized in the hospital and they are no longer posing a danger to themselves or others or the community and they have sufficiently been restored with their mental health" such that they can be discharged under certain conditions. Id. at 7-8. Dr. Johnson is the first person to hold this title — before March of 2014, the outpatient oversight duties were handled by "a collaboration between the individual staff members that were employed by the Department of Behavioral Health." Id. at 8.

   Dr. Johnson testified that her department currently monitors 84 individuals on conditional release residing in the District of Columbia community. Transcript of Hearing at 12-13 (Apr. 28, 2015). She said that in a typical case, her department has "minimal" contact, if any, prior to a court order granting conditional release. Id. at 14. That process is currently changing, however, as Dr. Johnson testified that the Hospital is trying to involve her prior to an individual's discharge to conditional release. Id. at 15. Generally, once an individual is discharged to conditional release, responsibility for the patient transfers to the outpatient department, and the inpatient staff at St. Elizabeths have no further involvement. Id..

   Dr. Johnson testified that she has not attended any of the Williamsburg treatment team meetings, but that she did attend the Hospital's review board meetings regarding Mr. Hinckley. Transcript of Hearing at 16 (Apr. 28, 2015). She has also spoken with Kevin Shamblee, V.J. Hyde and Dr. Benjamin Adewale regarding the Hospital's proposed conditions and her proposed role. Id. at 17. She had met with Mr. Hinckley for the first time approximately two weeks before the evidentiary hearing. Id. at 46-47. She testified that she is familiar with Mr. Hinckley's identified risk factors and stated that she has "actually put more work and more knowledge into Mr. Hinckley's case at this point in time in his court case than [she had] of

anyone else that's come out of the hospital on orders of conditions." Id. at 17-18. Dr. Johnson stated that she has no concerns regarding her ability to perform her proposed role if Mr. Hinckley were released on convalescent leave. Id. at 18.

Dr. Johnson testified that she agrees with the hospital's proposal that Mr. Hinckley visit the outpatient department in the District of Columbia on a monthly basis and that she speak with Mr. Hinckley on the phone once a week. Transcript of Hearing at 19, 49 (Apr. 28, 2015). In her opinion, the monthly visits should continue "until there's a risk assessment on file that indicates that less frequent visits would not be detrimental to [Mr. Hinckley's] continued progress." Id. at 19; see id. at 21-23. She did, however, express several concerns during her interview with Dr. Patterson regarding Mr. Hinckley's convalescent leave. Id. Dr. Johnson testified that she "would prefer not to be responsible for compiling a monthly report" or summary, from all the treatment providers in Williamsburg, but would do so if the Court required it as a condition of convalescent leave. Id. at 19-20; see id. at 70. Dr. Johnson testified that she would prefer to send the treatment providers' notes directly to the Court and also provide her own progress notes regarding her weekly phone calls and monthly visits with Mr. Hinckley. Id. Another concern was Mr. Hinckley's financial support. She testified that Dr. Patterson told her "that his conversation with [Mr. Hinckley's] siblings suggested that there was a concern that in the next one to two years, Mr. Hinckley would no longer have the financial support" he currently has. Id. at 24. Dr. Johnson testified, however, that after being informed of the testimony of Scott Hinckley and Diane Sims, she no longer has that concern. Id. at 24, 27, 65-66; see infra at 65-67.

Dr. Johnson testified that she agrees that Mr. Hinckley is ready for convalescent leave to live in Williamsburg and that she supports the Hospital's proposed conditions. Transcript of Hearing at 27-28 (Apr. 28, 2015).

*B. Witnesses from Mr. Hinckley's Williamsburg Treatment Team*

1. Dr. Deborah Giorgi-Guarnieri – Treating Psychiatrist

Dr. Deborah Giorgi-Guarnieri, who took over as Mr. Hinckley's Williamsburg-area psychiatrist in 2010, testified about her treatment of Mr. Hinckley and her views on the Hospital's proposal. Dr. Giorgi-Guarnieri, who is in private practice, possesses an extensive background in both general and forensic psychiatry and is board-certified in both areas. Transcript of Hearing at 7-8 (Apr. 24, 2015 a.m.). She also has a law degree. Id. Her past work has included positions as the director of forensic psychiatry for the Medical College of Virginia in Williamsburg, the consulting forensic psychiatrist for the Eastern District of Connecticut, and assistant professor of psychiatry and associate director of forensic psychiatry residency at Yale University Medical School. See Hinckley VII, 40 F. Supp. 7 at 29. She treats patients with diagnoses similar to Mr. Hinckley's, and she is trained to recognize signs and symptoms of psychosis and major depression. Id. Dr. Giorgi-Guarnieri also was involved in the development of the Hospital's convalescent leave plan, at least as to the aspects that concern her treatment and visits with Mr. Hinckley. Transcript of Hearing at 58 (Apr. 24, 2015 a.m.).

Dr. Giorgi-Guarnieri testified regarding Mr. Hinckley's diagnoses and current condition. She stated that Mr. Hinckley's Axis I diagnoses are psychosis, not otherwise specified, and major depression. Transcript of Hearing at 13 (Apr. 24, 2015 a.m.). She testified that she is "fairly confident" that both conditions are in full and stable remission and that she has not seen Mr. Hinckley "show symptoms that would qualify as either a major depressive episode or symptoms that would give him a psychotic disorder in the five years that [she has] treated him." Id. Mr. Hinckley's Axis II diagnosis is narcissistic personality disorder, which Dr. Giorgi-Guarnieri agreed is "significantly attenuated." Id. at 14.

During each of Mr. Hinckley's 17-day conditional releases to Williamsburg, Dr. Giorgi-Guarnieri has met with Mr. Hinckley twice for 45 minutes each. She testified that he has "always been perfect with [his] psychiatric medication" and "has made sure he had his medicine at all times." Transcript of Hearing at 15 (Apr. 24, 2015 a.m.). During each session, Dr. Giorgi-Guarnieri has evaluated Mr. Hinckley for each of the risk factors that have been identified by the Hospital. Reviewing the risk factors as itemized in Dr. Patterson's Report, she testified that she has not seen any indication of the first, second, third, and sixth risk factors: depression, isolation, psychosis, and access to weapons. Id. at 16-18. As to the fourth risk factor — insight into mental illness — she noted that Mr. Hinckley's "insights into his illness have improved in the five years [she has] treated him." Id. at 17. As to the fifth risk factor — personality disorder — Dr. Giorgi-Guarnieri testified that his narcissistic personality disorder is significantly attenuated. Id. at 17. She has not observed any deceptive or manipulative activity, the tenth risk factor; Mr. Hinckley has not distorted reality, and he has not sought attention in the community. Id. at 18. As to the seventh risk factor, family support, she stated that "the Hinckleys have been extremely supportive of John, and that's a very, very important factor for him to enter into the community." Id. at 19. And as to the eighth risk factor, Dr. Giorgi-Guarnieri testified that she has never seen any evidence of Mr. Hinckley wanting to hurt himself. Id. at 20. Finally, as to difficulty in relationships with others, she stated that she carefully monitors Mr. Hinckley's relationships and discusses his friendships and romantic relationships during their discussions. Id. at 18.

Dr. Giorgi-Guarnieri agreed with Dr. Patterson's proposal, detailed in his report, that an eleventh risk factor should be added regarding Mr. Hinckley's financial support and stability. Transcript of Hearing at 20 (Apr. 24, 2015 a.m.). She stated, however, that in her opinion "if the family has committed to their support and there is money there, that that should

satisfy that particular risk factor" for Mr. Hinckley. Id. at 24; see id. at 84-85. On the issue of

finances, she also stated that she accepts Medicare and Medicaid, so that she could continue to

treat Mr. Hinckley if he were to become eligible for assistance under those programs. She noted,

however, that such assistance does not cover forensic costs, such as risk assessments and

preparing for court hearings. Id. at 24-25; see id. at 32. She further testified that, based on the

testimony of Scott Hinckley and Diane Sims, she is "satisfied that the support and the finances

are there." Id. at 26; see id. at 28-29. She emphasized that if the family's resources "require him

to see another physician, [she is] more than willing to transition him to another physician." Id. at

25. She testified that "[i]f [she] think[s] John needs something that he's not getting, I would let

the outpatient services know immediately." Id. at 28. Dr. Giorgi-Guarnieri emphasized that she

believes financial support is Mr. Hinckley's biggest risk factor in the sense that if "all of a

sudden, there's no money and John can't pay for his services and John can't live in the family

home; then I think we need to send him back to the hospital and get a new plan in order." Id. at

85. "But that's a big what-if." Id.

Regarding the incident where Mr. Hinckley visited with a musician, John Tracy,

instead of going with Mr. Brelsford to see Mr. Lerner, as scheduled on Mr. Hinckley's itinerary,

Dr. Giorgi-Guarnieri testified that Mr. Hinckley raised the issue in their session that week and

stated that "he realizes now, he should have let [Mr. Hyde] know [in advance]." Transcript of

Hearing at 35-36 (Apr. 24, 2015 a.m.). She noted that she did not "think John was deliberately

trying to deceive anyone or trying to put himself out in the media or trying to make money on

something." Id. at 37. She thought that he "just saw the opportunity as something he wanted to

do and didn't think about making contact first." Id. Dr. Giorgi-Guarnieri testified that

"sometimes when more than one risk factor shows up at the same time, it gets harder for John to

think of everything to do" and that, at those times, Mr. Hinckley "still needs a little guidance."

Id. at 37-38. She stated, however, that she did not believe that "the actual behavior was a risk at all," but that "the only misjudgment he had was he should have called." Id. at 38. She also stated that since that incident, Mr. Hinckley has "been excellent about letting people know." Id. at 77.

Dr. Giorgi-Guarnieri testified that, in her opinion, the conditions imposed for convalescent leave should grant her the discretion to meet with Mr. Hinckley "a minimum of once a month individually and a minimum of once a month in treatment team." She also would like the authority to "see him more often if I need to see him more often." Transcript of Hearing at 30 (Apr. 24, 2015 a.m.). As to the Williamsburg treatment team visits, although the Hospital's proposal only would require that the treatment team meet together with Mr. Hinckley every other month, Dr. Giorgi-Guarnieri testified that she would prefer the number of meetings with the treatment team to be once a month. Id. at 30-31, 46. She stated that this would be her preference because, in addition to her individual sessions with him, she would like "a second session either in a treatment team once a month or by myself with John where I do risk assessment, because I feel very responsible for making sure that . . . the risk factors are in check." Id. at 46. She therefore does not "mind every other month as a minimum," but "when he first comes down, we're going to do it once a month . . . because I'm going to ask that we do it once a month." Id. at 48. And she testified that, if she observed any psychiatric emergency with Mr. Hinckley, she would coordinate with the outpatient department at St. Elizabeths to arrange for emergency hospitalization, if necessary. Id. at 40.

Dr. Giorgi-Guarnieri also testified that she believes the Williamsburg treatment team — consisting of herself, Mr. Weiss, Mr. Beffa, and (until recently) Ms. Haley — is stable and that everyone involved has "a commitment that's pretty secure for the next two years. And in those two years, [they'll] also be looking at getting [Mr. Hinckley] other benefits." Transcript

of Hearing at 33 (Apr. 24, 2015 a.m.). She stated that "if one of the four core people were to change," the treatment team would work with the Court and the Hospital to find a suitable replacement and "make sure John has his support at all times." Id. at 34.[18]

As to monitoring of Mr. Hinckley while on convalescent leave, Dr. Giorgi-Guarnieri agreed that a condition requiring Mr. Hinckley to carry a GPS-enabled phone "would be very helpful." Transcript of Hearing at 52 (Apr. 24, 2015 a.m.); see id. at 54-55. She disagreed, however, with the government's proposed condition to require an ankle bracelet, stating that she has "not had much luck with that with [patients who have been found not guilty by reason of insanity]" and she did not "know if that's appropriate for an outpatient" because, in order to qualify for outpatient treatment, "there's a certain assessment that's [already] been done that you are safe enough to walk around without an ankle bracelet on." Id. at 56-57.

In Dr. Giorgi-Guarnieri's opinion, Mr. Hinckley is ready for full-time convalescent leave in Williamsburg and would not present a danger to himself or others under the conditions proposed by the Hospital. Transcript of Hearing at 12-13, 41 (Apr. 24, 2015 a.m.). She further agreed that Mr. Hinckley's risk of relapse under the conditions of the plan is low. Id. at 41.

### 2. Mr. Jonathan V. Weiss – Case Manager

The Court also heard testimony from Mr. Hinckley's case manager in Williamsburg, Mr. Jonathan V. Weiss, a licensed clinical social worker in private practice. Transcript of Hearing at 5 (Apr. 24, 2015 p.m.). As Mr. Hinckley's case manager, Mr. Weiss'

---

[18]    Despite these assurances, the Hospital has reported that, as noted, supra at 17 n.7, Ms. Haley, the music therapist, is no longer part of the treatment team, no new music therapist has been identified, and that the Williamsburg treatment team and the Hospital have ceased their efforts to find a new music therapist.

major responsibility is to assist Mr. Hinckley with integrating into the Williamsburg community, which has included assisting with "social connections, employment, volunteer services, and . . . hopefully . . . residential services." Id. at 8. During each of Mr. Hinckley's 17-day visits to Williamsburg, Mr. Weiss has met with him five to seven times on average. Id. Mr. Weiss noted that Mr. Hinckley has been very punctual at their meetings and "usually beats [Mr. Weiss] to wherever we are to meet." Id. at 20. Mr. Weiss testified that, since January 2015, the Williamsburg treatment team has met regularly, at least by phone, to exchange information about Mr. Hinckley's treatment and status. Transcript of Hearing at 21 (Apr. 24, 2015 p.m.). Mr. Weiss stated that it is his understanding that the treatment team agrees that Mr. Hinckley "has been doing an excellent job" and that recently he has been "more comfortable in meeting new people and interacting with other people and taking some initiative." Id. at 22.

Mr. Weiss was integral to Mr. Hinckley obtaining his volunteer position at Eastern State Hospital. At the hospital, Mr. Hinckley "works in the canteen, assists patients, staff . . . with . . . general food needs, does some cash register work." Transcript of Hearing at 9 (Apr. 24, 2015 p.m.). Mr. Hinckley's supervisors have reported "very positively" about his work there. Id. at 10. Within six months prior to the hearing, Mr. Weiss also made contact with the Unitarian Universalist Church in Williamsburg and set up another volunteer position for Mr. Hinckley. At the church, Mr. Hinckley works on the grounds with Mr. Les Solomon doing landscaping, including "cutting grass, raking leaves, picking up branches, building birdhouses, [and] assisting in whatever endeavors that they have requested to be performed." Id. at 11. Mr. Weiss also testified that the members of the church have been supportive of Mr. Hinckley's involvement there. At the request of the church's pastor, Mr. Weiss stated that he met with approximately 40 members of the congregation to explain Mr. Hinckley's role and that "a number of congregants, three or four, came up afterwards, expressed their interest, support for

John and willingness really to have him engage in more things at the church if he was willing to." Id. at 11-12.

Mr. Weiss further testified about Mr. Hinckley's recent attendance at regular meetings with the Williamsburg chapter of NAMI – the National Alliance on Mental Illness. He stated that, during Mr. Hinckley's visits to Williamsburg, he has attended the NAMI meetings every Tuesday evening. Transcript of Hearing at 12-13 (Apr. 24, 2015 p.m.). Mr. Weiss testified that he believes the meetings have been a very positive experience for Mr. Hinckley and that "it's helped him understand aspects of the community and being an individual with mental illness living in our community." Id. at 14.

Mr. Weiss and Mr. Hinckley engaged in "extremely limited" efforts to pursue paid employment for Mr. Hinckley during his 17-day visits. Transcript of Hearing at 14 (Apr. 24, 2015 p.m.). Mr. Weiss testified that he made several attempts with local businesses, but that each "could not work out for different reasons." Id. Most notably, Mr. Weiss stated that "the issue of him being thère 17 days a month presented some real barriers to begin with." Id. at 15. The businesses that Mr. Weiss contacted felt it "wasn't fair to other employees" if Mr. Hinckley received special scheduling for only half a month, and that "they wondered if that might detract from John being able to assimilate easily into their staff, as well as asking for special permissions." Id. at 15. Mr. Weiss also noted that other reasons included "people's perceptions of Mr. Hinckley, erroneous opinions about him and his mental health state." Id. at 16. Because of these issues, Mr. Weiss decided to hold off on pursing paid employment opportunities any further until Mr. Hinckley was in Williamsburg on full-time on convalescent leave. Id. at 15.[19]

---

[19]     As noted, however, see supra at 16 n.6, Mr. Hinckley has recently been offered a paid position at the Unitarian Universalist Church, and the government has no objection to him accepting the job.

Mr. Weiss also discussed Mr. Hinckley's relationships in Williamsburg and his increased effort to make new friends. Transcript of Hearing at 16 (Apr. 24, 2015 p.m.). Mr. Weiss testified that Mr. Hinckley has developed new relationships through group therapy, as well as connections that Mr. Weiss was able to facilitate. For example, Mr. Weiss testified that Mr. Hinckley has developed a relationship with a photographer in Williamsburg, Bruce Brelsford, over the eight months preceding the hearing, and that Mr. Brelsford has introduced Mr. Hinckley to Robert Lerner, an accomplished retired lead photographer for a national magazine. Id. at 17. Through his group therapy, Mr. Hinckley has also developed a friendship with Ms. L, whom Mr. Weiss has not met. In Mr. Weiss' opinion, Mr. Hinckley's willingness to engage and develop relationships "has improved tremendously over time." Id. at 18-19, 27.

As to the January 2015 incident where Mr. Hinckley did not inform Mr. Hyde in advance of a change in his itinerary, Mr. Weiss stated that he believes "there's some misunderstanding about [the incident] and others might have characterized it as deception, but I certainly wouldn't." Transcript of Hearing at 28 (Apr. 24, 2015 p.m.). He testified that he became aware of the issue "within a day" after Mr. Hinckley "volunteered the information" to Mr. Hyde. Mr. Weiss asked about it because he had spoken with Mr. Brelsford, the photographer who accompanied Mr. Hinckley that day. Mr. Weiss further testified that "John was right upfront about the whole thing once it was brought to his attention" and did not attempt to hide the incident or mislead Mr. Weiss. Id. at 29. In his view, this incident did not reflect deception or an intent to deceive. Id. Despite the fact that Mr. Hinckley erred in not informing Mr. Hyde before the change in itinerary, Mr. Weiss testified that he believes the behavior itself was "quite appropriate" and "positive" because Mr. Hinckley "took initiative to pursue something in an area that he was interested in" and did so "with a trusted mentor, somebody that [Mr. Hinckley] knew [Mr. Weiss] knew and trusted." Id..

Mr. Weiss testified about the ten risk factors particular to Mr. Hinckley identified by the Hospital and Dr. Patterson in his report. Mr. Weiss said that he has seen in Mr. Hinckley no indication of depression, deception, isolation, psychosis (thought or mood disorder), Mr. Hinckley's wanting to harm himself, or narcissistic personality disorder. Transcript of Hearing at 23-25 (Apr. 24, 2015 p.m.). While acknowledging that there are "elements of narcissism" in Mr. Hinckley, Mr. Weiss said this is not "a major concern in terms of his mental health." Id. at 25. As to family support, Mr. Weiss testified that "Mrs. Hinckley is extremely supportive," as are Mr. Hinckley's brother and sister. Id. at 26. Finally, Mr. Weiss testified that he does not view financial support as a major risk factor, considering the testimony by Scott Hinckley and Diane Sims, and his knowledge of the available support in Williamsburg and "conversations with Ms. [Denise] Brown, John's social worker at St. Elizabeths." Id. at 32-33. In addition, Mr. Weiss stated that it is his "strong hope and belief that John will be able to be employed and earn some income himself and get whatever benefits . . . that are available to him." Id. at 33.

Concerning itineraries, Mr. Weiss testified that he believes it would be "sensible for that to continue at least for a year" and then "as John continues to get more involved that [the treatment team is] able to decrease" the itineraries. Transcript of Hearing at 43 (Apr. 24, 2015 p.m.). Mr. Weiss stated that he would prefer if "there would be some latitude" and "flexibility" in the itineraries to allow "minor changes" without prior approval from either the Court or someone in the District of Columbia. Id. at 44. He stated, however, that he would "still want Mr. Hinckley to let [him] know" of any changes. Id. at 45.

Mr. Weiss testified that under the convalescent leave plan, he would like to meet with Mr. Hinckley once a week at first, perhaps decreasing the frequency of meetings as Mr. Hinckley becomes more integrated into the community. Transcript of Hearing at 51-52 (Apr. 24, 2015 p.m.). Mr. Weiss also stated that, in his opinion, Mr. Hinckley should live with his mother

for at least the first "six months to a year" to "evaluate how his . . . integration is occurring," as a sort of transition stage. Id. at 53. Mr. Weiss then would begin "seeking housing after a year to a year and a half" if "all things [are] progressing satisfactorily," the ultimate goal being independent living for Mr. Hinckley. Id.[20] Mr. Weiss also testified that he would be willing to collect all the progress notes of all the treatment providers in Williamsburg and deliver them to Dr. Johnson. Id. at 39. He would also "have no problem digesting them and then putting out a summary" for transmission to Dr. .Johnson and the Court. Id. at 49-50.

Mr. Weiss testified that he agrees with the Hospital "without any reservation whatsoever" that Mr. Hinckley is ready for convalescent leave in Williamsburg. Transcript of Hearing at 7 (Apr. 24, 2015 p.m.).

## C. Witnesses from the Hinckley Family

Mr. Hinckley's brother and sister, Scott Hinckley and Diane Sims, who have visited Williamsburg during many of Mr. Hinckley's conditional releases over the years, testified that Mr. Hinckley helps out with daily chores around his mother's house, including housecleaning, cleaning the gutters, laundry, and preparing meals. Scott Hinckley testified that his relationship with his brother has grown closer over the many years of the conditional releases. Transcript of Hearing at 38 (Apr. 22, 2015 a.m.).

Scott Hinckley and Diane Sims also testified at length regarding the Hinckley family's financial support of Mr. Hinckley, in particular the family's ability to fund the expenses that are proposed in the Hospital's (e) letter. Scott Hinckley testified that the family has

---

[20] Both Mr. Weiss and Mr. Hyde told Dr. Patterson in his interviews with them that they saw the ultimate goal for Mr. Hinckley as being able to live independently in Williamsburg or its environs. See Gov't Ex. 2, Dr. Raymond F. Patterson's Independent Forensic Psychiatric Evaluation of John W. Hinckley, Jr. at 27-28, 55-56 (Apr. 8, 2015) [Dkt. No. 552] ("Patterson Rpt.").

diligently paid all of Mr. Hinckley's providers and will continue to do so in the future. He further testified that the family expected Mr. Hinckley would receive government benefits in the future to assist with expenses. The family also hopes that, upon residing in Williamsburg full-time, Mr. Hinckley will be able to secure paid employment that would also assist with the expenses.

Scott Hinckley reported that Mr. Hinckley's mother currently has available approximately $500,000 in assets, including equity in her home and funds in her Individual Retirement Account ("IRA"), to continue Mr. Hinckley's treatment. Transcript of Hearing at 42-43 (Apr. 22, 2015 a.m.). Both siblings stated that they, together with their mother, would provide reasonable financial support to their brother as needed. In what Scott Hinckley described as a "worst-case scenario" —without any government assistance, including Medicare, Medicaid, and state health benefits, and without Mr. Hinckley obtaining any paid employment — he testified that he was confident the family could fully support Mr. Hinckley for at least two years, but that beyond that would be a "challenge." Id. at 39-41, 65. He did state, however, that his mother's funds "should be enough for four to five years of treatment" even without any government assistance. Id. at 79, 90; see also id. at 101-102. Scott Hinckley also testified that the Hospital had provided him with information regarding potential benefits Mr. Hinckley may be eligible for once he is a resident of Virginia and how to apply. Id. at 66-67.

Diane Sims testified regarding the family's plan in the event that Mr. Hinckley's mother became unavailable, either through illness or death. Ms. Sims stated that she would immediately move to Williamsburg and live with Mr. Hinckley until a permanent living situation for Mr. Hinckley was approved by St. Elizabeths Hospital and this Court; she could and would come "at a moment's notice." Transcript of Hearing at 103-04 (Apr. 22, 2015 a.m.). Ms. Sims also testified regarding Mr. Weiss, describing him as a "wonderful asset and addition for John."

Id. at 117. She stated that Mr. Weiss has "a wonderful sense of the community down there" and has "spent a lot of time with [Mr. Hinckley] . . . introducing him to new things and to new people." Id. at 118.

### D. The Government's Expert Witness: Dr. Raymond F. Patterson

The government's expert witness, Dr. Raymond F. Patterson, who has testified at numerous prior hearings in this case, was permitted to testify as an expert on the diagnosis and treatment of mental illness. Transcript of Hearing at 143-44 (Apr. 28, 2015). In preparing his report, Dr. Patterson interviewed Mr. Hinckley and all of his treatment providers in Williamsburg and at St. Elizabeths Hospital. See Gov't Ex. 2, Independent Forensic Psychiatric Evaluation of John W. Hinckley, Jr. at 2 [Dkt. No. 552] ("Patterson Rpt."). Dr. Patterson was in agreement with Mr. Hinckley's treatment providers about his diagnoses, and acknowledged that his Axis I disorders — major depressive disorder and psychotic disorder not otherwise specified — have long been in full and sustained remission, with no signs of psychosis or major clinical depression for many years. Transcript of Hearing at 147 (Apr. 28, 2015); Transcript of Hearing at 5 (Apr. 29, 2015 p.m.). Mr. Hinckley's third diagnosis is narcissistic personality disorder. Transcript of Hearing at 147 (Apr. 28, 2015). Mr. Hinckley is prescribed Risperdal, an antipsychotic medication, at 1 milligram per day, which is considered a minimal dosage, and Zoloft, an antidepressant, at 150 milligrams per day, and is in full compliance with his medication regimen. Id. at 149; Transcript of Hearing at 69 (Apr. 29, 2015 a.m.); Transcript of Hearing at 7 (Apr. 29, 2015 p.m.); see also Patterson Rpt. at 5-6.

Dr. Patterson testified that he now agrees with the Hospital and its witnesses that Mr. Hinckley is clinically ready for full-time convalescent leave (outpatient placement) in Williamsburg, Virginia, and that he is a low risk of violence under appropriate conditions.

Transcript of Hearing at 159-60 (Apr. 28, 2015); Patterson Rpt. at 67-68; Transcript of Hearing at 81 (Apr. 29, 2015 a.m.). Dr. Patterson opposes the Hospital's plan for convalescent leave, however, because, in his view, the conditions proposed by the Hospital lack sufficient monitoring and risk management planning necessary to keep the level of risk low. Specifically, Dr. Patterson raised three principal objections to the conditions proposed by the Hospital: (1) the frequency of Mr. Hinckley's meetings with the Williamsburg treatment team should increase, rather than decrease, on convalescent leave; (2) any changes in conditions should not be left to the discretion of Mr. Hinckley's treatment providers, but instead should be approved by the Court; and (3) the plan does not contain sufficient mechanisms to monitor Mr. Hinckley's activities.

In Dr. Patterson's opinion, the first twelve months of convalescent leave should involve intensive monitoring; and an increase, rather than a decrease, in clinical services and risk management from the levels on Mr. Hinckley's current 17-day visits. Transcript of Hearing at 180 (Apr. 28, 2015); Transcript of Hearing at 99 (Apr. 29, 2015 a.m.). Dr. Patterson testified that he believes this increase is necessary due to "the relative decrease in [Mr. Hinckley's] involvement at the hospital and the increase in opportunities and risk in the community." Transcript of Hearing at 99 (Apr. 29, 2015 a.m.). Any reductions in the frequency of treatment meetings and monitoring after twelve months then would be based on "performance measures as to whether or not that is appropriate," particularly another full risk assessment, and a further court order approving the decrease. Transcript of Hearing at 180-81 (Apr. 28, 2015).

Dr. Patterson testified that he believes the Hospital's proposed treatment schedule contains too few contacts with both the Williamsburg and the Hospital inpatient treatment teams. Transcript of Hearing at 154-55 (Apr. 28, 2015). For example, Dr. Patterson stated that, in his opinion, Mr. Hinckley should meet with Dr. Giorgi-Guarnieri once per week, which is

approximately the same frequency as under the conditions of the current 17-day visits. Id. at 154. He makes this recommendation because "when you increase the opportunities and the activities of someone . . . in the community and you perhaps plan to decrease in some ways the monitoring of those activities . . . it's very, very important to not decrease the therapeutic interventions or decrease the monitoring." Id. Dr. Patterson believes therapeutic interventions actually should increase "because you're already decreasing the hospital component." Id. at 155. It is essential, in his view, that the Williamsburg treatment team meet at regular intervals and work as a team. Transcript of Hearing at 50-51 (Apr. 29, 2015 a.m.). Similarly, Dr. Patterson recommends that members of the St. Elizabeths Hospital individual inpatient treatment team — including Dr. Binks and Dr. Adewale — should remain involved in Mr. Hinckley's case by, for example, participating with Dr. Johnson in treatment team meetings indefinitely, until a court order changes the conditions. Id. at 26-28. He does not believe, however, that it is necessary for the St. Elizabeths treatment providers to continue to meet as a team if convalescent leave is granted. Id. at 51-52.

   Dr. Patterson testified that increased frequency of the Williamsburg treatment team's contacts with Mr. Hinckley and more structure and supervision are important because, if there were any mental deterioration or decompensation, Mr. Hinckley "traditionally[] doesn't report symptoms." Transcript of Hearing at 29-30 (Apr. 29, 2015 a.m.). Dr. Patterson does not agree that, should Mr. Hinckley decompensate and his risk factors increase, it would be a "slow process" and "readily detectible." Patterson Rpt. at 68. In Dr. Patterson's view, Mr. Hinckley's history of failing to accurately self-report therefore makes detection of any decompensation — and the consequent possible increased risk of danger — difficult. Transcript of Hearing at 29-30 (Apr. 29, 2015 a.m.).

Dr. Patterson also opposes Dr. Murphy's proposal to divide the convalescent leave plan into the three parts, Part A, Part B, and Part C, and the time frames she proposes for each part. Transcript of Hearing at 180-81 (Apr. 28, 2015); Transcript of Hearing at 32-33 (Apr. 29, 2015 p.m.). Specifically, Dr. Patterson objects to any change in conditions that is based upon such specific time frames as opposed to an evaluation of Mr. Hinckley's performance. Transcript of Hearing at 32 (Apr. 29, 2015 p.m.). In his view, there must be a new risk assessment before each significant change in conditions so that an evaluation can be made of how Mr. Hinckley has performed under the current conditions. Transcript of Hearing at 81-82 (Apr. 29, 2015 a.m.). Dr. Patterson also believes any change must be ordered by the Court, rather than left to the discretion of Mr. Hinckley's treatment providers. Transcript of Hearing at 33 (Apr. 29, 2015 p.m.).

Because he believes there should be increased structure and monitoring if Mr. Hinckley is released on convalescent leave, Dr. Patterson testified that he opposes removing monitoring conditions that are currently in place, including specifically itineraries. Transcript of Hearing at 170-71 (Apr. 28, 2015).[21] Dr. Patterson testified that he believes itineraries should continue in some form in order to monitor Mr. Hinckley's "progress or lack thereof" and, specifically, to keep track of Mr. Hinckley's unsupervised free time in relation to his identified risk factor of isolation. Id. at 172, 169. Itineraries would allow "the clinicians as well as the risk assessors to have something to measure his performance against." Id. at 174. Dr. Patterson expressed the view that itineraries also are essential to risk management of Mr. Hinckley to

---

[21]     Despite his concerns regarding monitoring under the Hospital's plan, Dr. Patterson testified that he does not agree with the government's proposals that Mr. Hinckley wear an ankle bracelet and that a GPS-tracking device be installed on the Hinckley family's vehicles because he does not "see clinical indications for that." Transcript of Hearing at 64 (Apr. 29, 2015 p.m.). He does, however, continue to support the condition that Mr. Hinckley carry with him a GPS-equipped cell phone as a monitoring tool. Id. at 57-63.

supervise his activities and his self-reporting of what happened. Transcript of Hearing at 92-93 (Apr. 29, 2015 a.m.). Dr. Patterson thinks it would be an "excellent" idea to require Mr. Hinckley to draft his own itineraries. Transcript of Hearing at 171 (Apr. 28, 2015); Transcript of Hearing at 39 (Apr. 29, 2015 a.m.). Dr. Patterson also testified, however, that he thinks the current level of specificity required in itineraries is unnecessary — for example, if the itinerary stated that the Hinckley family was going to go out to dinner, Dr. Patterson did not think it was necessary to include the specific name of the restaurant and address, as the current conditions for itineraries require. Transcript of Hearing at 49 (Apr. 29, 2015 p.m.).

In Dr. Patterson's opinion, the January 2015 incident where Mr. Hinckley violated his planned itinerary, was not a mistake and raised serious risk monitoring concerns. Transcript of Hearing at 174-75 (Apr. 28, 2015). He believes that Mr. Hinckley's call to Mr. Tracy the day before indicates that Mr. Hinckley likely intentionally violated the conditions of the court order and was "at best bad judgment." Id. at 175-76. Dr. Patterson therefore categorizes the incident as "deceptive" — in addition to being a violation of his scheduled itinerary — despite the fact that Mr. Hinckley did not lie or attempt to hide the incident, as he has on those few previous occasions where he violated his scheduled itinerary. Transcript of Hearing at 89-91 (Apr. 29, 2015 a.m.). Dr. Patterson did acknowledge on cross-examination, however, that this incident was Mr. Hinckley's only unapproved variation from his itinerary in the two years preceding the April 2015 hearing, and that he otherwise has been in substantial compliance with his itineraries and appears to have used his free time responsibly. Transcript of Hearing at 11 (Apr. 29, 2015 p.m.).

Dr. Patterson also opposes Mr. Hinckley being given unrestricted access to the Internet. Transcript of Hearing at 44 (Apr. 29, 2015 a.m.). Dr. Patterson testified that Mr. Hinckley instead should be able to access only pre-approved websites and "that there should be a

mechanism for monitoring his use of the Internet." Id. at 43. Dr. Patterson stated that his

opposition was two-fold. First, he believes there is information available on the Internet from

which Mr. Hinckley should be restricted from access. Id. at 44, 74. For example, in Dr.

Patterson's opinion, Mr. Hinckley should not have access to information about presidential

assassinations because it "relates directly to his pathology." Id. at 74. And second, Dr. Patterson

is concerned that Mr. Hinckley could publish his music, photographs, paintings, or writings on

the Internet, which should be monitored and require pre-approval from his treatment providers,

including assessment of risk, and because "the notoriety-fame issue is a part of his pathology."

Id. at 44; Transcript of Hearing at 94 (Apr. 29, 2015 a.m.). "Even the idea of anonymity is a

very elusive thing in these days of Internet discovery." Id. at 94.

      Dr. Patterson acknowledged that Mr. Hinckley's engagement with the

Williamsburg community has increased and that he has taken greater initiative since the last

hearing in this matter, although he emphasized that Mr. Hinckley could have previously engaged

in these efforts but had refused to do so. Transcript of Hearing at 156-57, 170 (Apr. 28, 2015).

In particular, Dr. Patterson pointed to the weekly NAMI meetings. In Dr. Patterson's opinion,

"[t]here is no reason that while he had ten-day visits, he could not have attended the National

Alliance on Mental Illness." Transcript of Hearing at 156-57 (Apr. 28, 2015). Dr. Patterson

expressed his continued concern that the Williamsburg community "has not been welcoming to

Mr. Hinckley over time," which further impedes his integration. Id. at 156. Dr. Patterson did

acknowledge, however, that Mr. Hinckley's integration into the community has improved since

Mr. Weiss took over as case manager. Id. at 170.[22]

---

[22]    This concern regarding barriers to Mr. Hinckley's integration into the community
had been a principal part of Dr. Patterson's opposition to the Hospital's previous proposal to
increase visits from ten days to seventeen days. Hinckley VII, 40 F. Supp. 3d at 35-36.

As to the Hinckley family's financial support, Dr. Patterson testified that his primary concern is that Mr. Hinckley receive sufficient financial support, either from the family or from government assistance, to support his clinical, forensic, and housing services needed to remain in the community. Transcript of Hearing at 75 (Apr. 29, 2015 a.m.). He stated, however, that after hearing the testimony of Scott Hinckley and Diane Sims, he now understands "that the family is prepared to continue their financial support for Mr. Hinckley's clinical, . . . forensic, as well as housing needs." Id. at 43. Dr. Patterson testified that his concerns as to financial support therefore are "greatly attenuated." Transcript of Hearing at 44 (Apr. 29, 2015 p.m.).

## IV. FINDINGS OF FACT

The Hospital, Mr. Hinckley's treatment providers, and Dr. Patterson have identified ten principal risk factors for Mr. Hinckley based on the circumstances leading up to the offense and his conduct at the Hospital and on his visits to Williamsburg. These risk factors are: (1) depression; (2) isolation; (3) psychosis; (4) level of insight into mental illness; (5) personality disorder; (6) access to weapons; (7) lack of family support; (8) history of suicide attempts; (9) difficulty in relationships with others; and (10) deception. Because an assessment of these risk factors is critical to determining whether Mr. Hinckley will become a danger to himself or others in the reasonable future if released on full-time convalescent leave, in contrast with prior opinions the Court will organize its findings of facts by risk factor.

Based upon the testimony and exhibits offered by counsel for the government and by counsel for Mr. Hinckley, the Court finds that the following facts have been established by a preponderance of the evidence:

> 1. Mr. Hinckley's current diagnosis is psychotic disorder not otherwise specified (Axis I), in full and sustained remission; major depression (Axis I), in full and sustained remission; and narcissistic personality disorder (Axis II).

*Depression*

2. Mr. Hinckley's diagnosis of major depression (Axis I) has been in full remission for more than twenty years, and perhaps more than twenty-seven years.

3. Even though his clinical depression is in full and sustained remission, depression remains a risk factor for Mr. Hinckley. He is a low risk for decompensation. If Mr. Hinckley were to experience a relapse of major depression, that relapse would not occur suddenly, but rather would occur gradually over a period of at least weeks or months, and would be detectable by his treatment providers in Williamsburg.

*Isolation*

4. Although Mr. Hinckley has exhibited no signs of isolation or withdrawal in recent years, isolation remains a primary risk factor for Mr. Hinckley, who is by nature an introverted person. Particularly if Mr. Hinckley is to reside in Williamsburg full-time and no longer spend time in the structured environment of St. Elizabeths Hospital, it would be of concern if he engaged in too many solitary activities, rather than continuing to take steps to integrate himself into the Williamsburg community through more vocational, social, and educational pursuits and through developing friendships. This issue has become of less concern over the last three or four years, however, as Mr. Hinckley's socialization and community engagement has dramatically improved under the case management of Mr. Weiss.

5. Mr. Hinckley continues to be guarded, defensive, and sometimes secretive, but he has made significant progress in becoming more open with his treatment providers.

*Psychosis*

6. Psychosis was the linchpin of Mr. Hinckley's overt expressions of violence in the past. Mr. Hinckley's diagnosis of psychotic disorder not otherwise specified (Axis I), however, now has been in full remission for more than twenty years, and perhaps more than twenty-seven years.

7. Mr. Hinckley has exhibited no evidence of psychotic symptoms or of delusional thinking and no evidence of obsessive conduct for at least twenty years and perhaps as many as twenty-seven years.

8. Mr. Hinckley self-medicates with 1 milligram of Risperdal, an antipsychotic medication, and 150 milligrams of Zoloft, an antidepressant, in addition to medications for physical ailments and multivitamins. There is no indication that Mr. Hinckley has failed to take his medications in the recent past or during any of the authorized releases. In fact, his treatment providers report that Mr. Hinckley has been fully compliant with his medication regime and that Mr. Hinckley has been proactive in coordinating with his providers and the Hospital to ensure that his medications are available for his visits to Williamsburg. Overall, his insight into his mental illness is greatly improved in recent years.

*Personality Disorder*

9. Mr. Hinckley's narcissistic personality disorder is significantly attenuated from its previous state. Mr. Hinckley continues to exhibit symptoms of self-importance, but he no longer exhibits the intense self-absorption and grandiosity that was present during the 1980s.

10. Mr. Hinckley's self-reporting underrepresents his problems and pathology due to his tendency to minimize problems and avoid negative aspects of situations and to present himself in an overly positive light.

*Access to Weapons*

11. There is no evidence that Mr. Hinckley has had or sought access to weapons during his visits to Williamsburg or at any time in the last 34 years.

*Lack of Family Support*

12. Mr. Hinckley currently enjoys significant emotional and financial support from his mother and siblings. The Hinckley family possesses sufficient financial means to fully support Mr. Hinckley's treatment needs in Williamsburg for the foreseeable future.

*History of Suicide Attempts*

13. Mr. Hinckley has exhibited no violent behavior, nor attempted suicide, in more than thirty-two years.

14. Historically, Mr. Hinckley's relationships with women, his perceptions of those relationships, and the judgment he sometimes has exercised concerning such relationships have been inextricably intertwined with Mr. Hinckley's mental illness and have been especially implicated when he has been most clinically dysfunctional. He has strong affiliative and dependency needs, and his mood has often fluctuated based on the status of his relationships with women. While there have been no mood fluctuations in recent years, this remains an area of ongoing clinical concern. Mr. Hinckley continues to require some guidance and support in navigating interpersonal relationships, and Mr. Weiss is effectively providing what is required.

*Deception*

15. Mr. Hinckley has on two occasions in 2011 exhibited deceptive behavior even though there have been no symptoms of psychosis or depression. Deceptiveness may relate to Mr. Hinckley's narcissistic personality disorder. In combination with his guardedness, secretiveness, defensiveness, and lack of forthrightness at times, deceptiveness makes it more difficult to monitor Mr. Hinckley's activities while in Williamsburg, particularly his unaccompanied time where the monitoring is based largely on his own self-reporting to his treatment providers. Self-reporting and the treatment providers' ability to rely on Mr. Hinckley's being candid with them will be ever more important. Despite the fact that Mr. Hinckley has not exhibited any deceptive behavior in the approximately two years since the Court's last Opinion and Order, deceptiveness continues to be a salient issue.

16. On two occasions in 2011, during Mr. Hinckley's use of his unsupervised free time in Williamsburg, he deviated from the strict terms of his pre-approved itineraries by not attending movies, as scheduled, and instead spending his time at the Barnes & Noble bookstore located in the same shopping center. Mr. Hinckley later falsely told Hospital staff and other evaluators that he had attended these movies and made representations about their content and quality.

17. Oh one occasion in 2015, Mr. Hinckley again deviated from his pre-approved itinerary by visiting a musician acquaintance as opposed to a local photographer. Mr. Hinckley was accompanied that day by Mr. Brelsford, an individual whom Mr. Weiss knows well. Mr. Hinckley self-reported this deviation to Mr. Hyde the

following day and did not lie or deceive his treatment providers or his family.

18. Mr. Hinckley has never tried to escape from the Hospital or when on "B" city outings or on unsupervised conditional release visits with his family. He has participated successfully in well over 200 Hospital-accompanied outings in the community without incident. He has also participated successfully in all of the Phase I, Phase II, Phase III, and Phase IV visits authorized by this Court. These visits have been therapeutic and beneficial. He has followed every condition imposed by the Court in authorizing these visits, over nearly thirteen years, with the important exception of the three episodes described above.

After thirty-four years as an inpatient at St. Elizabeths Hospital, and in view of the foregoing findings, and the successful completion of over 80 Phase III and Phase IV visits to Williamsburg over the last ten years, the Court finds that Mr. Hinckley has received the maximum benefits possible in the in-patient setting and — as even Dr. Patterson acknowledged — that he is clinically ready for full-time convalescent leave. On the ultimate mixed question of law and fact, dangerousness, the Court finds by a preponderance of the evidence that Mr. Hinckley will not be a danger to himself or to others if released on full-time convalescent leave to Williamsburg under the conditions proposed by the Hospital, as modified and supplemented by the Court in this Opinion.

## V. DISCUSSION

### A. Mr. Hinckley's Identified Risk Factors

In assessing the Hospital's proposal for full-time convalescent leave, the Court considered each of the ten risk factors identified by the Hospital and Dr. Patterson. Each factor will be addressed in turn, with the exception of the first (Depression), third (Psychosis), and fifth (Personality Disorder) risk factors which will be discussed together because they are closely related.

1.  Mr. Hinckley's Mental Health:  Depression, Psychosis, and Personality Disorder

All of the experts and treatment providers who testified during the evidentiary hearing agreed that Mr. Hinckley's Axis I diagnoses — namely, his major depression and psychotic disorder — are in full and sustained remission and have been for many years.  During this long period of sustained remission — more than 27 years, in the Court's view — by all accounts, Mr. Hinckley has shown no signs of delusional thinking or any violent tendencies.  His treatment providers report that while he has experienced some fluctuations in mood in the past, including periods of sadness or anxiety in response to difficult or stressful life events (including the death of his father and the death of James Brady — both of which Mr. Hinckley responded to appropriately), his emotional health has remained stable.  Mr. Hinckley's narcissistic personality disorder (Axis II) also is significantly attenuated.

Although the government's expert witness raised some caveats about this consensus — including the role that Mr. Hinckley's therapy at St. Elizabeths and medication have played in keeping his symptoms at bay — Dr. Patterson agrees with the Hospital and Dr. Murphy that Mr. Hinckley's Axis I diagnoses are in full remission.  Transcript of Hearing at 159-160 (April 28, 2015).  He also agrees that Mr. Hinckley is ready for full-time convalescent leave.  Transcript of Hearing at 4-5 (April 29, 2015 PM).

Thus, as with the government's opposition to the previous expansion to 17-day visits, the concerns expressed by the government and its expert about the Hospital's proposal are not based so much on Mr. Hinckley's current mental stability as on the risk that by removing him from the structured and supportive environment at St. Elizabeths Hospital to a situation lacking a comparable degree of oversight, therapeutic intensity, and social interaction, Mr. Hinckley may once again fall prey first to isolation and perhaps eventually to depression (risk factors for

dangerousness) — which, if undetected, potentially could lead to suicidal thoughts or a reemergence of psychosis. That he is presently free of such symptoms, and has been for many years, is not seriously questioned.

Dr. Murphy and many of Mr. Hinckley's treatment providers have noted what an important supportive role Mr. Hinckley's mother has played over the years, and how close he and his mother have become. As Dr. Murphy has noted, Mrs. Hinckley's death, when it occurs, would undoubtedly be traumatic for Mr. Hinckley, perhaps the most significant loss in his life. Transcript of Hearing at 86-88 (Apr. 27 p.m.). As Mr. Hinckley's treatment providers and the Court have observed, however, Mr. Hinckley has handled his other most significant loss — the death of his father in 2008 — quite well. While the relationship between Mr. Hinckley and his father historically was a troubled one and the relationship with his mother has always been much better, Mr. Hinckley's level of sadness and change of mood on the occasion of his father's death were "appropriate," see Hinckley VII, 740 F. Supp. 3d at 31, and his emotional health "remained stable" "in response to difficult or stressful life events (including the death of his father)." Id. at 54; see also Hinckley VI, 625 F. Supp. 2d at 23. While the treatment team in Williamsburg will have to assess Mr. Hinckley for signs of depression following his mother's death, the Court is confident, based on this prior history, that Mr. Hinckley will not decompensate or become dangerous at that time and that, as Dr. Murphy found, any symptoms of major depression — as opposed to appropriate sadness characteristic of bereavement — will be detected and addressed by the treatment team in Williamsburg.

The Court is persuaded that because Mr. Hinckley's Axis I diagnoses — psychotic disorder and major depression — are in full and sustained remission, and because his attenuated narcissistic personality disorder is not evidence of potential dangerousness, he will not

be a danger to himself or others if released on convalescent leave to the Williamsburg

community under the conditions to be imposed by the Court. See infra at 88-101.

2. Isolation and Mr. Hinckley's Integration into the Williamsburg Community

Over the past seven years, Mr. Hinckley has participated in sixty 10- and 17-day

visits to Williamsburg — following, of course, several years of shorter visits. The immediate

therapeutic goal of these "Phase IV" visits was to acclimate Mr. Hinckley to his mother's

community and to permit him to focus on social and vocational integration there. See Hinckley

VI, 625 F. Supp. 2d at 6; Hinckley VII, 40 F. Supp. 3d at 11. The broader aim of Phase IV, a

"transitional stage," was to determine if Mr. Hinckley is ready to be released from the Hospital to

live independently in his mother's community. See Hinckley V, 493 F. Supp. 2d at 66. The

question before the Court now is whether Mr. Hinckley has sufficiently achieved that goal such

that he is ready to be released on full-time "Phase V" convalescent leave, and, if so, on what

conditions.

Every witness who testified on the matter agreed that Mr. Hinckley has made

significant progress towards integrating himself into the Williamsburg community since the

Court's last Opinion over two years ago. While the government and its expert maintain that Mr.

Hinckley could have shown more initiative earlier in this process, they acknowledge that Mr.

Weiss has been a very positive addition to the Williamsburg treatment team and that Mr.

Hinckley's community engagement and socialization have improved.

The record demonstrates that Mr. Hinckley has continued volunteering at Eastern

State Hospital, while also beginning to volunteer at a local Unitarian Universalist Church, where

he has recently been offered a paid position. He has earned praise from his supervisors in both

his volunteer positions. Mr. Hinckley and Mr. Weiss have also diligently pursued additional

volunteer opportunities, which failed to come to fruition for a variety of reasons. Although Mr. Hinckley has pursued paid employment, he has been unable until quite recently to secure a paid position, see supra at 16 n.6, in large part due to his irregular part-time residence in the area.

Mr. Hinckley has also participated in numerous social, recreational, and educational activities, both accompanied by his case manager Mr. Weiss and independently by himself. Mr. Hinckley has gone bowling, attended several lectures, attended outdoor musical concerts, and joined a local community center to exercise and take classes offered. Mr. Hinckley has recently begun pursuing photography as a hobby and has explored taking photography classes. He also has begun regularly attending group meetings with the local chapter of the National Alliance on Mental Illness or NAMI. While Mr. Hinckley has continued to face rejection and reticence in some instances from the Williamsburg community, these activities show marked improvement from the last evidentiary hearing in this matter.

In conjunction with increased social, recreational and educational activities, Mr. Hinckley also has made significant strides towards developing friendships in the community and displayed improved self-initiative. To further his new interest in photography, Mr. Hinckley has developed a relationship with two local photographers. He also has started socializing with at least two members of his former therapy group, in addition to several individuals he has met at his NAMI meetings.

Mr. Hinckley's progress in this area is in significant contrast with the lack of progress noted at the prior hearing, after which the Court raised concerns that "Mr. Hinckley has not engaged in any additional volunteer activities beyond his work at Eastern State, nor has he participated in any ongoing social, recreational, or educational activities or even taken the initiative to identify such activities." Hinckley VII, 40 F. Supp. 3d at 55. The Court also noted that "[h]e has not made any friends in the community." Id. Mr. Hinckley and his treatment team

appear to have taken the Court's words to heart over the last two-and-a-half years. The Court commends both Mr. Weiss for his aggressive, and seemingly successful, case management to identify potential opportunities and Mr. Hinckley for his initiative in following through with the opportunities identified, as well as pursuing independent interests, such as photography and music. There has been "a marked increase in his level of engagement," Transcript of Hearing at 74 (Apr. 23, 2015 AM) (testimony of V.J. Hyde), and Mr. Hinckley has developed some friendships in the community. The progress shown has significantly alleviated the Court's prior concern that "allowing Mr. Hinckley to spend the majority of each month in Williamsburg, without the structure of his St. Elizabeths routine or the daily social and therapeutic interactions he has there, may foster isolation and, ultimately, depression." Hinckley VII, 40 F. Supp. 3d at 56. The Court is confident that Mr. Hinckley's progress towards integration and socialization will continue on full-time convalescent leave.

### 3. Mr. Hinckley's Level of Insight into his Mental Illness

Dr. Giorgi-Guarnieri reports that Mr. Hinckley's insights into his mental illness "have improved" during the last five years and that "he thinks a lot about whether his behaviors are considered narcissistic, and he cares very much what the Court and his family say." Transcript of Hearing at 17 (Apr. 24, 2015 a.m.). Mr. Hinckley's treatment providers also report that he has been fully compliant with his medication regime and that he has been proactive in coordinating with the Hospital and his providers to ensure he has sufficient medication for the duration of his visits to Williamsburg. Dr. Patterson concluded in his report that "Mr. Hinckley's insight is appropriate regarding psychiatric and depressive symptoms, but fair with regard to narcissistic elements of his personality disorder as he minimizes their importance." Government Exhibit 2 at 67 [Dkt. No. 552]. Although Mr. Hinckley's insight into his mental illness remains

a risk factor that his treatment providers should monitor and assess, the Court is satisfied that this risk factor is significantly attenuated and currently does not increase Mr. Hinckley's risk for violence.

### 4. Access to Weapons

There is no evidence that Mr. Hinckley has had access to any weapons at the Hospital or during his visits to Williamsburg. Nor is there any evidence that Mr. Hinckley has sought such access or displayed an interest in weapons of any kind.

### 5. The Hinckley Family's Support

The Court believes that this risk factor is critical to Mr. Hinckley's success on full-time convalescent leave. Mr. Hinckley, however, has enjoyed significant emotional and financial support from his mother and siblings during his visits to Williamsburg. As Dr. Murphy noted in her report, Mr. Hinckley's mother has been flexible and accommodating to Mr. Hinckley's treatment needs and has fully complied with the conditions imposed by this Court's orders. Murphy Rpt. at 59. Both of Mr. Hinckley's siblings also testified that they have participated in several of Mr. Hinckley's visits and that they have grown closer to their brother as a result. As to financial support, the Court is satisfied by the testimony of Mr. Hinckley's siblings that Mr. Hinckley's treatment needs will be fully supported by the Hinckley family as needed and that there is no risk in the immediate future that Mr. Hinckley will not receive the treatment and monitoring ordered by the Court due to financial concerns.

### 6. History of Suicide Attempts

Mr. Hinckley has not attempted suicide in more than thirty-two years. Neither Dr. Patterson, Dr. Murphy, nor any of Mr. Hinckley's treatment providers noted any concerns

regarding suicide attempts at the evidentiary hearing, although it remains a risk factor for Mr. Hinckley.

### 7. Difficulty in Relationships with Others, Particularly Women

Unlike in the past, the issue of Mr. Hinckley's relationships with women was not as central to the April, 2015 hearing as it has been in prior evidentiary hearings. See, e.g., Hinckley VII, 40 F. Supp. 3d at 61-63; Hinckley VI, 625 F. Supp. 2d at 10, 15; Hinckley V, 493 F. Supp. 2d at 74-76. Neither the government nor its expert raised any new concerns in this area and, since the last evidentiary hearing, there have been no reported instances of concern or of inappropriate behavior in Mr. Hinckley's relationships with women.

To the contrary, Mr. Hinckley has fostered new healthy relationships and there continues to be no indication of delusion or idealization. Mr. Hinckley developed a friendship with a woman he met at a NAMI meeting, Ms. L. He saw or spoke with her during a number of his 17-day visits to Williamsburg. Hospital's March 13, 2015 Letter to the Court [Dkt. No. 514]; Hospital's October 8, 2015 Letter to the Court [Dkt. No. 586]; Hospital's April 7, 2016 Letter to the Court [Dkt. No. 608]. More recently, however, Mr. Hinckley has been trying to distance himself from Ms. L. because of her drug and alcohol use. Hospital's May 3, 2016 Letter to the Court [Dkt. No. 612]. As for Ms. CB, a woman whom Mr. Hinckley has known since 2009, the Hospital noted in its (e) Letter that Mr. Hinckley's relationship with Ms. CB has had "ongoing difficulties," particularly regarding her mental health. Mr. Hinckley, however, "remained an anchor and advocate for her," and "has been willing and able to turn to his clinical providers to discuss his challenges with her." Hospital's December 22, 2014 (e) Letter at 3-4 [Dkt. No. 494]. Mr. Hinckley also has firmly rebuffed Ms. CB's interest in moving to Williamsburg, after the Hospital strongly discouraged it and Mr. Hinckley himself concluded that it was not a good idea.

Patterson Rpt. at 53. Mr. Hinckley reported to Dr. Patterson that he has told Ms. CB that they

can continue to communicate over the phone, but "he will not be coming up to Washington to

see her and that she cannot come to Williamsburg." Id. at 61-62. More recently, although Mr.

Hinckley continues to speak frequently with Ms. CB by telephone and continues to give her

moral support, see Hospital's February 11, 2016 Letter to the Court [Dkt. No. 598]; Hospital's

July 6, 2016 Letter to the Court [Dkt. No. 620], he has made it clear to her that she cannot be a

part of his life in Williamsburg. See Murphy Rpt. at 57 (Mr. Hinckley "has begun to slowly

detach himself from Mrs. CB" as he transitions to Williamsburg).[23]

        In the past, the Court has noted that "[t]he focus on Mr. Hinckley's female

relationships . . . can easily become unmoored from the question of whether he is a risk of danger

to himself or others." Hinckley VII, 40 F. Supp. 3d at 63. "Significantly, the government's

experts have expressed concern for years that Mr. Hinckley's romantic relationships may lead

him to decompensate or become dangerous — yet as they acknowledge, despite numerous

intense relationships and breakups that Mr. Hinckley has experienced, this has never come to

pass." Id. And "over these many years there has been no evidence that Mr. Hinckley's romantic

relationships — real relationships, not delusional fantasies about movie stars or others — have

caused him to be dangerous to himself or others." Id. It remains the case, however, that past

incidents have "suggest[ed] that Mr. Hinckley's interest in women may lead him to exercise bad

judgment or be less than forthright with his treaters." Id.; see generally id. at 61-63. Given his

history, the centrality of these relationships to his life, and their potential effect on his stability

---

[23]    Mr. Hinckley also "successfully handled" a difficult breakup with a former
romantic partner, Ms. N, who abruptly stopped communicating with Mr. Hinckley and
eventually sent him a "Dear John" letter in the mail, by "turning to his support networks and
focusing his attention on his recovery process," as his treatment providers have encouraged him
to do. Hospital's (e) Letter at 4.

and judgment, Mr. Hinckley's relationships with women therefore will continue to be of interest to his treatment providers and to the Court.

### 8. Deception, Underreporting, and Need for Monitoring

One of the challenges in assessing Mr. Hinckley's risk of dangerousness is his tendency to minimize problems and underreport negative feelings to his treatment providers. This widely acknowledged trait, which is related to Mr. Hinckley's narcissistic personality — particularly his need to present himself in a positive light — undermines confidence in the ability to assess the overt signs of his mental health and stability. It also raises the prospect that if Mr. Hinckley were to experience resurgent symptoms of his psychosis or depression, he might not report them to his Williamsburg treatment providers.

More troubling from a risk management perspective is Mr. Hinckley's demonstrated willingness — on two occasions in 2011 — to be deceitful with his treatment providers and others. On full-time convalescent leave, it is even more imperative that his treaters and the Court have confidence that he will faithfully adhere to the rules that are prescribed for him — rules that the Hospital believes will mitigate his risk and promote continued stability — and that he fully and accurately report his activities. With more freedom and flexibility, more unsupervised time, and less contact with the Hospital, his treatment team in Williamsburg must trust that Mr. Hinckley is being open, honest, and not deceptive in his self-reporting. Any further reasons for a continuing lack of certainty that Mr. Hinckley will adhere to the terms of the Court's orders or for concluding that he cannot be relied upon honestly to report his activities to his treatment team would make it difficult to conclude that he can be effectively monitored if given more freedom. The Court notes, however, that Mr. Hinckley has made great progress in this area, as there have been no further instances of deception since the Court's last Opinion, and

Mr. Hinckley appears to have established an open and productive relationship with Mr. Weiss and his other treatment providers in Williamsburg.

While the Court understands the government and its expert's concern regarding Mr. Hinckley's deviation from his itinerary in January of 2015, the Court agrees with the Williamsburg treatment team and the Hospital that Mr. Hinckley exercised poor judgment, but did not engage in deceptive or manipulative behavior. While Mr. Hinckley should have received prior approval for the deviation from his itinerary, as required under his conditions of release, he self-reported it to Mr. Hyde the following day and there is no evidence that Mr. Hinckley lied or minimized the event at any point. This distinction is important because, on the two prior occasions in 2011, Mr. Hinckley did lie and hide deviations from his itinerary. The January 2015 incident therefore is of far less concern from a risk management perspective than the 2011 incidents. Putting aside the deviation without pre-approval from Mr. Hyde, the Court also notes that the activity itself was positive — Mr. Hinckley was socializing with a new friend, seeking to develop a relationship with a local musician whom he had contacted on his own initiative, and exploring one of his recreational interests. Aside from this incident, Mr. Hinckley has complied fully with his scheduled itineraries since the Court's last opinion.

The suggestion by Dr. Murphy that Mr. Hinckley maintain a daily log of his activities and deliver it to Mr. Weiss and Dr. Johnson and that Mr. Weiss corroborate Mr. Hinckley's account of his activities with employers, supervisors, and family will encourage Mr. Hinckley to consistently and accurately report his activities and enable Mr. Weiss to monitor them. Discussing his activities with Mr. Weiss and Dr. Johnson could also serve a clinical/therapeutic function.

*B. Specific Proposals in the Hospital's (e) Letters*

### 1. Full-Time Convalescent Leave

The central proposal made by the Hospital in its (e) Letter is that Mr. Hinckley should reside full-time in Williamsburg on convalescent leave. Based on the reports of the experts, the testimony and other evidence presented at the evidentiary hearing, and the entire record in this case, the Court is confident that under appropriate conditions, Mr. Hinckley is clinically ready for full-time convalescent leave and that he will not be a danger to himself or others in the reasonable future if released on full-time convalescent leave in Williamsburg.

Mr. Hinckley has been making 10-day and 17-day visits to Williamsburg for approximately seven years, without in any way decompensating or doing anything that might suggest a risk of danger. He now has made 60 such visits. With the notable exception of the two movie incidents and the January 2015 incident discussed above, all the evidence shows that he has obeyed every rule and restriction that has been prescribed for him. He has complied with the specific obligations required of him under the Court's last Order, including meeting regularly with his Williamsburg treatment providers and maintaining two volunteer positions. Mr. Hinckley also has dramatically increased his recreational, social, and educational activities and developed several new social relationships under the guidance of Mr. Weiss. Mr. Hinckley's mental status has remained stable throughout this long period, with no reemergence of psychosis or clinical depression, both of which have been in full remission for well over two decades. His track record of stability supports the first recommendation of his treatment providers — who uniformly believe that he is ready for convalescent leave — that Mr. Hinckley be permitted to reside full-time in Williamsburg. That recommendation is consistent with the results of a thorough risk assessment that, utilizing empirically supported methods of predicting

dangerousness and recidivism, found Mr. Hinckley to present a low risk of danger under the Hospital's plan.

The Court finds that any symptoms of clinical depression or psychosis would develop gradually and would likely be detectable by his treatment providers in Williamsburg or by Dr. Johnson during Mr. Hinckley's monthly visits to the FOPD. The Court also finds that Mr. Hinckley's medication will continue to serve a protective function in warding off such symptoms. The Hospital's plan for convalescent leave involves numerous contacts with mental health professionals on a regular basis. Under the conditions that the Court will include in its Order, in the first six months Mr. Hinckley will see Dr. Giorgi-Guarnieri at least twice a month, Mr. Weiss once per week, and Mr. Beffa twice per week. Unless modified by the Court on motion of the parties, the Court's Order will also require that Mr. Hinckley work with a music therapist once a month. For this six-month period, he will be seen by his mother every day — so long as she remains physically and mentally healthy, as by all accounts she is — and by his siblings during any of their trips to Virginia. Mrs. Hinckley, Scott Hinckley, and Diane Sims are all relatively familiar with Mr. Hinckley's identified risk factors and symptoms of mental illness and have been conscientious custodians for each of his many periods of unsupervised conditional release — for nearly thirteen years. During the first six months of convalescent leave, Mr. Hinckley also will be seen each month by Dr. Johnson and Dr. Binks, his long-time treating psychologist, at the FOPD in Washington, D.C.

Based on Mr. Hinckley's consistent track record over approximately seven years of 10- and 17-day visits to Williamsburg, the consensus among his treatment providers about his stability and readiness for convalescent leave, the results of empirically rooted risk assessments, and the significant clinical oversight entailed by the Hospital's proposal, as it will be modified by the Court, the Court believes that residing full-time in Williamsburg will not cause Mr. Hinckley

to be a danger to himself or others. The Court further believes that full-time residence will promote Mr. Hinckley's continued integration into the Williamsburg community and his efforts to obtain paid employment.

The Court notes that its previous concern about the risk of Mr. Hinckley becoming lonely, isolated, and possibly depressed — while still present due to Mr. Hinckley's risk factors and history — has been considerably mitigated. As discussed above, Mr. Hinckley has made convincing efforts towards developing social and vocational ties. He has made several friends in the community and participated in frequent social, recreational, and educational activities, including the pursuit of his interests in music and photography. The Court has every reason to believe that this progress will continue on full-time convalescent leave.

2. The Hospital's Proposed Treatment Plan and Frequency of Appointments

Given the concerns about Mr. Hinckley's potential for decompensation if he were distanced from the support system now provided at St. Elizabeths, and his tendency towards solitary activities and isolation, a key question is whether the Hospital's (e) proposal will provide a treatment schedule and support network in Williamsburg that will be adequate to manage Mr. Hinckley's risk of mental or emotional deterioration.

Under the Hospital's proposal—as reflected in its March 20, 2015 revised (e) Letter and its April 17, 2015 Letter — Mr. Hinckley will have a therapeutic team in Williamsburg made up of four individuals: a new case manager (Mr. Jonathan Weiss), a psychiatrist (Dr. Deborah Giorgi-Guarnieri), a therapist (Mr. Carl Beffa), and a music therapist. The members of this "Williamsburg treatment team" have all now been involved with Mr. Hinckley's case for several years. On full-time convalescent leave as proposed by the Hospital, Mr. Hinckley will have regular, frequent appointments in Williamsburg with Dr. Giorgi-

Guarnieri, Mr. Weiss, Mr. Beffa, and his music therapist. It is also contemplated that Mr. Hinckley will have additional contact with Mr. Weiss regarding the development of opportunities for social, recreational, educational, and therapeutic activities in the community and that he will be accompanied by Mr. Weiss to some of those activities. Mr. Hinckley also will be required to make weekly telephone calls to the FOPD, attend in-person meetings with the Williamsburg treatment team every month, and travel to Washington, D.C. on a monthly basis to meet with Dr. Johnson at the FOPD. With the exception of a music therapist, the Williamsburg treatment team now has been stable in its membership for at least three years and each member is well-acquainted with Mr. Hinckley's mental health, history, and identified risk factors. The Court is confident that the Williamsburg treatment team, in conjunction with the Hospital, the FOPD, and the Hinckley family, will provide an adequate support system for Mr. Hinckley on full-time convalescent leave.

The Hospital proposes the following appointment schedule with Mr. Hinckley's treatment providers:

- Twice per month with Dr. Giorgi-Guarnieri;

- Twice per month with Mr. Weiss;

- Weekly individual psychotherapy with Mr. Beffa;

- Weekly group psychotherapy with Mr. Beffa;

- Semi-monthly treatment planning conferences with the Williamsburg treatment team and Mr. Hinckley;

- Once per month with Dr. Johnson at the FOPD in Washington, D.C.

The Court agrees that this schedule will be sufficient for Mr. Hinckley's psychiatric care and risk management, with three exceptions. First, the Court agrees with Dr. Murphy's recommendation that Mr. Hinckley continue meeting with Dr. Binks for individual psychotherapy once per month, for the first six months, during Mr. Hinckley's appointments at

91

the FOPD in Washington, D.C. Following six months on convalescent leave, Mr. Hinckley's

therapeutic relationship with Dr. Binks may terminate. Mr. Hinckley therefore need only meet

with Mr. Beffa for individual psychotherapy three times per month, rather than weekly, during

the first six months to avoid overlap during the week of his appointment with Dr. Binks.

Second, the Court continues to believe that "it is essential . . . that there be

coordination and communication among the Williamsburg providers — including meetings at

regular intervals — so they begin to function as a team." Hinckley VII, 40 F. Supp. 3d at 58.

Despite this concern expressed in the Court's Opinion of December 2013 and the agreement of

the importance of this condition by virtually every witness at the evidentiary hearing, the

Williamsburg treatment team only began meeting as a team telephonically in January 2015 and

apparently had met in person just once as a team prior to the April 2015 evidentiary hearing. To

ensure that such communication and coordination among the Williamsburg treatment team

providers occurs regularly, the Court will require that the Williamsburg treatment team meet in

person with Mr. Hinckley to review and discuss Mr. Hinckley's progress and treatment on a

monthly, rather than semi-monthly, basis for at least the first year of convalescent leave.

Third, the Court will require Mr. Hinckley to work with a music therapist once

per month, as proposed by both the Hospital and the government. Although the Hospital

informed the Court that it has ceased its search for a new music therapist to replace Ms. Haley,

the Court directs the Williamsburg treatment team to re-open that search and identify a music

therapist to join the treatment team.[24] If the treatment team is unable to identify a replacement

---

[24]      Dr. Murphy and Dr. Giorgi-Guarnieri agree that "it's not absolutely critical that
[Mr. Hinckley] have individual music therapy from a risk management perspective" despite the
fact that he "derives great benefit" from it. Transcript of Hearing at 7-8 (Apr. 27, 2015 p.m.).
Dr. Murphy expressed her opinion at the time of the evidentiary hearing, however, that music
therapy should not be removed yet. Id. at 9.

within a reasonable period of time and the Williamsburg treatment team unanimously agrees that music therapy is unnecessary from a risk management perspective, the Hospital must file a motion, with justifications, to modify the conditions of convalescent leave to remove this condition or propose an alternative.

The Court emphasizes that the conditions imposed in this Opinion and accompanying Order are minimum requirements and encourages Dr. Johnson, Dr. Giorgi-Guarnieri, Mr. Weiss, or Mr. Beffa to increase the frequency of appointments if, in their professional judgment, it is clinically indicated or would further assist Mr. Hinckley's integration into the Williamsburg community. To that end, the Court will leave to the discretion of each treatment provider — in consultation with Dr. Johnson of the FOPD — the authority to increase the frequency of Mr. Hinckley's appointments. This, of course, is consistent with the view of most witnesses at the evidentiary hearing that clinical judgments should largely be left to the clinical professionals and treatment providers, and that the Court's involvement should decrease as Mr. Hinckley successfully completes each part of Phase V convalescent leave.

The Court also agrees with the phased approach to convalescent leave recommended by Dr. Katherine Murphy, as well as with Dr. Patterson's concern that further evaluation is required at each stage before moving to the next. After the first six months of convalescent leave — what Dr. Murphy described as "Part A" — the Court will permit the minimum frequency of appointments with Mr. Hinckley's providers and the FOPD to decrease slightly, provided that each member of the Williamsburg treatment team and Dr. Johnson agree that such a reduction is clinically indicated and appropriate for risk management. If each member of the Williamsburg treatment team and Dr. Johnson so agree, the minimum frequency of appointments with Dr. Giorgi-Guarnieri may reduce to monthly, as opposed to twice monthly,

and the frequency of individual psychotherapy with Mr. Beffa may reduce to twice monthly, as opposed to weekly.

After a full year to eighteen months on convalescent leave, and consistent with Dr. Murphy's recommendations, the Hospital must conduct a further risk assessment before any further reductions in the frequency of Mr. Hinckley's appointments will be approved. The Court does not agree with Dr. Patterson and the government, however, that a full evidentiary hearing will be required at that point. Instead, if Mr. Hinckley's progress has continued, the risk assessment reveals no new areas of concern, and the Williamsburg treatment team and Dr. Johnson are in full agreement that a further reduction is warranted, the Court encourages the Hospital, counsel for Mr. Hinckley, and counsel for the government to meet and come to mutual agreement regarding a proposed further reduction in the frequency of Mr. Hinckley's appointments to be submitted to the Court for approval, along with other changes to the conditions contained in the Order that accompanies this Opinion that the parties agree are no longer necessary.

### 3. Monitoring, Risk Management, and Accountability

The Court agrees with the Hospital that the current regime of rigid itineraries runs counter to the purposes of convalescent leave and would hinder Mr. Hinckley's socialization and integration into the Williamsburg community. The January 2015 incident is in fact a prime example of the kind of flexibility needed to encourage the growth of Mr. Hinckley's social relationships and ability to pursue educational and vocational opportunities. The Court, however, continues to believe that accountability, planning, and monitoring will be crucial to the success of Mr. Hinckley's integration, as well as important for risk management. Mr. Hinckley therefore will be required to complete a daily log of his unsupervised activities. This log should

be far less detailed than the previously-required itineraries and will not be submitted to the Court for approval. Instead, Mr. Hinckley should contemporaneously log his daily activities, including the people with whom he spent time, and submit his logs to Mr. Weiss and Dr. Johnson at his appointments with them. Mr. Weiss should discuss the logs with Mr. Hinckley during his appointments, and will be required to make periodic calls and visits to confirm the veracity and accuracy of the daily logs. Nevertheless, acknowledging Mr. Weiss' suggestion that it might be therapeutic for Mr. Hinckley to prepare itineraries for a period of time, see supra at 64, the Court will leave to the discretion of Mr. Weiss and other members of the Williamsburg treatment team, in consultation with Dr. Johnson, the authority to determine whether a flexible, prospective itinerary — in addition to Mr. Hinckley's daily log — also would have therapeutic benefits and, if so, for how long, or whether, since Mr. Hinckley has continued to prepare monthly itineraries for an additional fifteen months since Mr. Weiss testified at the evidentiary hearing, the therapeutic benefits already have been achieved.

The Court will not require an ankle bracelet or a vehicle tracking device, as there is no evidence that Mr. Hinckley is an elopement risk, despite hundreds of opportunities to elope during his visits to Williamsburg and trips outside of the Hospital over the last twenty or more years. As Dr. Giorgi-Guarnieri indicated, such requirements does not seem appropriate for an outpatient and are not clinically indicated for Mr. Hinckley for whom the goals of convalescent leave include more flexibility and integration into the community. The Court will require, however, that the make, model and license numbers of any cars Mr. Hinckley may drive — presumably one of Mrs. Hinckley's two vehicles — be provided to Mr. Weiss and to the FOPD. Mr. Weiss shall provide this information to the United States Secret Service. If there are any changes in the vehicles Mr. Hinckley may be driving, the same information should be so provided.

The Court will adopt Dr. Murphy's recommendation to restrict Mr. Hinckley's travel outside of Williamsburg. Mr. Hinckley may not travel further than 30 miles from Williamsburg without being accompanied by his mother or a sibling or a member of the Williamsburg treatment team, but never more than 50 miles from Williamsburg. Mr. Hinckley, however, will be permitted to drive unaccompanied to and from Washington, D.C. for his scheduled appointments at the FOPD.

One of the more hotly contested debates among the parties with respect to conditions of release has been whether as a condition of convalescent leave Mr. Hinckley should be required to carry a GPS-enabled cell phone whenever he is away from his mother's residence. The government and Dr. Patterson think he should; Mr. Hinckley does not. Dr. Murphy recommends that Mr. Hinckley continue to carry such a phone at all times but opposes any restrictions on which phones Mr. Hinckley may or may not use to make calls, either from his mother's home or at employment or during his volunteer work. See supra at 52. Dr. Giorgi-Guarnieri also believes that it would be "very helpful" for Mr. Hinckley to carry such a phone as a condition of release. See supra at 60. On the other hand, over the years in which the Court has required Mr. Hinckley to carry a GPS-enabled phone during his visits to Williamsburg, the government never once sought to obtain any information from the device — a fact which raises questions about the purpose of such a requirement. The only utility, it seems to the Court, would be to monitor Mr. Hinckley's self-reporting of unaccompanied outings and activities, which will become more frequent with Mr. Hinckley on full-time convalescent leave. If the government does not look at such data, however, it is hard to see how such a condition would be helpful from a risk management and monitoring perspective.

Nevertheless, even though Mr. Hinckley is not an elopement risk and the government has never sought the GPS data from Mr. Hinckley's cell phone, the Court will

require that, at least for the first year of his convalescent leave, Mr. Hinckley carry a GPS-enabled cell phone whenever he is away from his mother's residence, and that he provide the name of the cell phone company, subscriber information, and phone number to the FOPD and his treatment providers in Williamsburg in light of the recommendations of Drs. Murphy, Giorgi-Guarnieri, and Patterson. Mr. Weiss shall provide the information to the United States Secret Service. Mr. Hinckley shall also advise the FOPD and his treatment providers of any change in the cell phone number, cell phone company, or other subscriber information. Dr. Johnson and the members of the Williamsburg treatment team will be authorized to access the GPS data from Mr. Hinckley's cell phone. The Court also agrees with Dr. Murphy, however, that, even though Mr. Hinckley will be required to carry a GPS-enabled phone, there should be no restrictions on which phones Mr. Hinckley may use to make calls, either from his mother's home or at employment or volunteer work. Indeed, such a restriction would be counterproductive to the goals of convalescent leave, as it would impede Mr. Hinckley's ability to get a job and to successfully maintain employment.

Over the years, during which Mr. Hinckley has traveled to Williamsburg on court-approved Phase III and Phase IV visits, there have been severe restrictions on his use of the Internet. Dr. Murphy believes these restrictions should be lifted if he is granted full time convalescent leave in Williamsburg. She does not believe such restrictions are clinically appropriate and that it might even be therapeutic to allow him to visit sites, for example, concerning President Reagan, presidential assassinations, violence, and even pornography, and then to discuss his observations and reactions with his treatment providers. Mr. Hyde agrees that this might be helpful therapeutically. Dr. Patterson strongly disagrees, particularly with Mr. Hinckley living full time in Williamsburg and the increased freedom he will enjoy to work and travel throughout the community without supervision and with decreased monitoring. Dr.

Patterson believes that Mr. Hinckley should continue to be able to access only pre-approved websites, primarily because there is information available on the Internet to which Mr. Hinckley should not have access. The Court agrees that, at least for the first six months to a year, Mr. Hinckley should not access any website or search for any information relating to Mr. Hinckley's crimes or his victims, weapons, or hardcore pornography. This condition may be revisited by Dr. Giorgi-Guarnieri, Mr. Weiss, Mr. Beffa and Dr. Johnson after this six to twelve-month period and may be modified if in their judgment such modification is clinically appropriate. The Court, the Secret Service, and counsel for the parties shall be advised of any such change.

Dr. Patterson also is concerned that Mr. Hinckley could publish his music, photographs, paintings or writings on the Internet and suggests that any such publication — even if done anonymously — should require pre-approval by Mr. Hinckley's treatment providers in Williamsburg, including the assessment of risks, particularly because, in Dr. Patterson's words, "the notoriety fame issue is a part of his pathology." Transcript of Hearing at 94 (Apr. 29, 2015 a.m.). Since the evidentiary hearing in April 2015, the Court has been advised that Mr. Hinckley and Les Solomon are thinking about publishing Mr. Hinckley's songs on YouTube anonymously, see Hospital's May 3, 2016 Letter to the Court [Dkt. No. 612], and that Mr. Hinckley has an ongoing interest in exhibiting his music and art work anonymously at future art shows facilitated by Bruce Brelsford. See Hospital's June 9, 2016 Letter to the Court [Dkt. No. 616]; Hospital's June 27, 2016 Letter to the Court [Dkt. No. 618]. The Court has further been advised that, at least preliminarily, the Williamsburg treatment team has agreed that it would be therapeutic for Mr. Hinckley to engage in such activities anonymously as part of preparing him toward eventual community reintegration. See id. In view of Dr. Patterson's concerns, however, the Court will require the treatment providers to first assess any risk involved in such activities, including the risk involved if the media or public identify Mr. Hinckley's work — keeping in

mind Dr. Murphy's salient observation that "it is essential that the grandiose delusions and fame-seeking behaviors" in the past "be distinguished from his presently held desire to create and produce artistic compositions." Murphy Rpt. at 59. Only after such a risk assessment may Mr. Hinckley's Williamsburg treatment providers, in consultation with Dr. Johnson, approve such activities. Such approval should include some method for monitoring them for risk and evaluating them clinically and therapeutically. The Court, the Secret Service, and the parties shall be advised.

Furthermore, Mr. Hinckley shall not create any accounts with, or upload content to, social media websites, including, but not limited to, Facebook, Twitter, Instagram, YouTube, and LinkedIn without unanimous authorization from the Williamsburg treatment team and Dr. Johnson of the FOPD. Mr. Hinckley also shall not upload any content at all, including music or photographs, to the Internet, even anonymously, without unanimous authorization from the Williamsburg treatment team and Dr. Johnson of the FOPD, after assessing the risk of his doing so in light of his pathology. See supra at 71-72 (summarizing testimony Dr. Patterson). The Court will not require the installation of monitoring or tracking software onto Mrs. Hinckley's computer or limit which computers Mr. Hinckley may access. There is no evidence that Mr. Hinckley has misused the Internet or accessed inappropriate or unauthorized websites under his mother's supervision during his visits to Williamsburg. The Court, however, will require that Mr. Hinckley (1) provide the username and password for any online accounts, including email accounts to Mr. Weiss and the FOPD; (2) refrain from tampering with or erasing any browser's Internet history; and (3) permit Dr. Johnson and the Williamsburg treatment team access to any computer or phone owned by Mr. Hinckley or his mother to review the Internet history at any time.

#### 4. Financial Support and Housing

Before the evidentiary hearing, the Court shared Dr. Patterson's concern that the Hospital had failed to adequately plan and investigate: (1) the financial support required to sustain Mr. Hinckley's required treatment on convalescent leave; and (2) a contingency plan for the death or unavailability of Mr. Hinckley's mother, who will be his primary guardian on convalescent leave. As noted above, the testimony of Mr. Hinckley's siblings, Scott Hinckley and Diane Sims, as well as the expert testimony of Dr. Murphy, have assuaged those concerns. See supra at 45-46, 65-67.

First, the Court is confident that the Hinckley family possesses sufficient funds to continue Mr. Hinckley's treatment and care as required by this Opinion for the foreseeable future, and that his mother, brother, and sister are committed to providing the financial support necessary to do so. The Court understands that Mr. Hinckley will be able to begin applying for government benefits once full-time convalescent leave has been approved and he becomes a resident of the Commonwealth of Virginia. The Court also hopes that full-time residence in Williamsburg will enable Mr. Hinckley to obtain paid employment. His ability to obtain employment and certain government benefits ultimately will lessen the financial burden on the Hinckley family.

Second, the Court will require that Mr. Hinckley reside with his mother in her home in Williamsburg for at least the first full year of convalescent leave. After a year on convalescent leave, following the comprehensive risk assessment conducted by the Hospital, Mr. Hinckley may reside in a separate residence, either alone or with roommates, or in a group home within a 30-mile radius of Williamsburg, provided that all members of the Williamsburg treatment team and Dr. Johnson agree and approve the selected living situation. Despite this one-year restriction, the Court encourages Mr. Weiss to begin exploring housing options for Mr.

Hinckley if his integration into the community is progressing satisfactorily. In the event that Mrs. Hinckley becomes unavailable while Mr. Hinckley is still residing with her, the Court will require that one of Mr. Hinckley's siblings reside with Mr. Hinckley until an alternative living situation may arranged.

## VI. CONCLUSION

Thousands of times every day, judges across this country attempt the difficult, daunting task of predicting with confidence what a human being may do in the future. Judges must do so every time a criminal defendant is sentenced or conditions of pretrial release, supervised release, or probation are set. This is typically done with considerably less information, analysis, and expert opinion than this Court has about John W. Hinckley, Jr. Between the many psychiatrists, psychologists, social workers, case managers, therapists, and other professionals who have treated John Hinckley since 1982, or independently examined him as part of the proceedings before this Court since 2003 — many of whose work and opinions have been dissected by lawyers on direct and cross-examination in open court for over a decade — it is fair to say that the lives of few people have been scrutinized with the care and detail that John Hinckley's has been. Indeed, it is difficult for the Court to imagine a more thorough evidentiary and clinical record on which to base a conclusion as to whether a specific person will present a danger to himself or others in the reasonable future.

This Court has carefully considered all of the expert reports of the independent experts presented by the government, by Mr. Hinckley, and by the Hospital over the years; the expert and lay testimony presented at the evidentiary hearing held in April of 2015, and the records of the seven prior lengthy evidentiary hearings over which this Court has presided since

2003; Mr. Hinckley's entire history and clinical record over his 34 years at St. Elizabeths Hospital; and the relevant legal authorities and the briefs filed by the parties.

All of the experts and treatment providers who testified during the evidentiary hearing, including Dr. Patterson, are in agreement that Mr. Hinckley's Axis I diagnoses — his major depression and psychotic disorder — are in full and sustained remission and have been for more than twenty years. During this long period of sustained remission — more than 27 years, in the Court's view — Mr. Hinckley, by all accounts, has shown no signs of psychotic symptoms, delusional thinking, or any violent tendencies. After 34 years as an inpatient at St. Elizabeths Hospital, and in view of the findings of fact set forth in this Opinion and the successful completion of over 80 unsupervised visits to Williamsburg over the last ten years, the Court finds that Mr. Hinckley has received the maximum benefits possible in the in-patient setting, that in-patient treatment is no longer clinically warranted or beneficial, and that — as even Dr. Patterson has acknowledged — Mr. Hinckley is clinically ready for full-time convalescent leave. On the ultimate mixed question of law and fact — dangerousness — the Court finds by a preponderance of the evidence that Mr. Hinckley presents no danger to himself or to others in the reasonable future if released on full-time convalescent leave to Williamsburg under the conditions proposed by the Hospital, as modified and supplemented by the Court in this Opinion and accompanying Order.

For the reasons set forth in this Opinion, the Court will grant the Hospital's proposal for full-time convalescent leave, rejecting or modifying some of the Hospital's proposed conditions and adding others proposed by the government and the expert witnesses, or devised by the Court itself in view of its findings and conclusions. Specifically, the Court will allow Mr. Hinckley to reside full-time in Williamsburg, Virginia on convalescent leave under the conditions discussed in this Opinion and memorialized in an Order of the Court issued this same day.

SO ORDERED.

DATE: 7/27/16

PAUL L. FRIEDMAN
United States District Judge