*Raymond F. Patterson, M.D., D.F.A.P.A.*

1904 R STREET, N.W.
WASHINGTON, D.C. 20009
———
TELEPHONE (301) 292-3737
FACSIMILE (301) 292-6272

DIPLOMATE:
AMERICAN BOARD OF PSYCHIATRY AND NEUROLOGY
  IN GENERAL PSYCHIATRY
AMERICAN BOARD OF PSYCHIATRY AND NEUROLOGY
  IN FORENSIC PSYCHIATRY
AMERICAN ACADEMY OF PSYCHIATRY AND THE LAW
  IN FORENSIC PSYCHIATRY

FELLOW:
AMERICAN PSYCHIATRIC ASSOCIATION
AMERICAN COLLEGE OF MENTAL HEALTH ADMINISTRATION

October 16, 2018

Ms. Kacie Weston, Esquire
Assistant United States Attorney
U.S. Department of Justice
555 4th Street, N.W.
Washington, D.C. 20530

Re: United States v. John Hinckley, Jr., (Case Number 81-306) PLF))

**Supplemental Independent Forensic Psychiatric Evaluation
of John W. Hinckley, Jr.**

Dear Ms. Weston:

**Introduction**

This Supplemental Report is based on my independent forensic psychiatric evaluation of John
W. Hinckley, Jr. in the above referenced matter. It is intended to serve as a supplemental report
to my last report dated April 8, 2015 and to respond to the Department of Behavioral Health's
501(e) recommendation as stated in their report to the Court received August 29, 2018. The
Department of Behavioral Health's recommendation was provided as a part of their "Report for
the Time Period of July 12, 2018 through August 15, 2018" and addressed to the Honorable Paul
L. Friedman.

I include the historical information provided in my previous report dated April 8, 2015 regarding
Mr. Hinckley's hospital stay at Saint Elizabeths Hospital as well as review of the Conditional
Release Order of February 26, 2014 allowing a minimum of eight 17-day visits, unsupervised
driving in the family car to specific appointments, expansions in the amount of time for him to
have unsupervised activities in the Williamsburg, Virginia community and the continuation of

Ms. Kacie Weston, Esquire
October 16, 2018
Re:  John W. Hinckley, Jr.
Page 2 of 30

the provision of detailed itineraries prior to each visit to Williamsburg and detailed reports following each visit with those reports to be submitted under seal to the Court prior to the next visit.

On July 27, 2016, the Court granted Mr. Hinckley Convalescent Leave allowing him to reside full-time in Williamsburg, Virginia, pursuant to specific conditions and reporting requirements. Mr. Hinckley was released from Saint Elizabeths Hospital on September 10, 2016 and has resided in the family home in Williamsburg since that date.  Mr. Hinckley has continued in active treatment with the Williamsburg treatment team including Dr. Giorgi-Guarnieri for psychiatric and risk management, Mr. Carl Beffa for individual and group therapy, Mr. Jonathan Weiss as case management and Ms. Nicole Drozd, music therapist as well as having ongoing monthly meetings at the Department of Behavioral Health's Outpatient Offices with Dr. Nicole Johnson, Deputy Chief Clinical Officer for the Department of Behavioral Health, as well as weekly telephone calls by Dr. Johnson to John Hinckley, Jr. and Mrs. JoAnn Hinckley, his mother.  Mr. Hinckley's participation in his treatment and adherence to Court required conditions have been well documented in approximately monthly submissions to the Court by Dr. Johnson detailing her contacts with the treatment team and with Mrs. Hinckley and John Hinckley, Jr., updates on various issues including John Hinckley's having obtained volunteer and paid employment, and most recently paid employment by ███████████ in the Williamsburg ███████████, and descriptions of his other activities with members of the Williamsburg community and NAMI meetings in Williamsburg.  Also during this time period, Mr. Hinckley's treatment team in consultation with Dr. Johnson has reduced his psychiatric visits to once per month and reduced his individual therapy appointments to twice per month with the continuation of weekly group therapy, monthly music therapy, and case management services.

I examined John W. Hinckley, Jr. at the family home on October 1, 2018.  I also conducted collateral interviews with JoAnn Hinckley and his brother, Scott Hinckley, on October 1, 2018.  I conducted collateral interviews with treatment team members Carl Beffa, MSW, on October 1, 2018, Deborah Giorgi-Guarnieri, J.D.,M.D., on October 2, 2018 and Jonathan Weiss, MSW on October 2, 2018.  I conducted a collateral interview by telephone with Mrs. Diane Sims, Mr. Hinckley's sister, on October 4, 2018 and left a message for Nicole Drozd MT, music therapist, on October 4, 2018 however had not heard back from Ms. Drozd prior to the submission of this report.  In addition, I conducted a collateral interview with Nicole Johnson, M.D., FAPA, on October 5, 2018.

Ms. Kacie Weston, Esquire
October 16, 2018
Re: John W. Hinckley, Jr.
Page 3 of 30

In addition to examining Mr. Hinckley and conducting collateral interviews, I reviewed my previously submitted reports as well as the following documents:

1. St. Elizabeths Hospital records from 3/2015 thru 9/2016

2. The Department of Behavioral Health (DBH) Reports and Attachments for:
   A. 9/16/16 - 10/12/16
   B. 11/10/16 - 12/14/16
   C. 12/18/16 - 1/10/17
   D. 1/11/17 - 2/10/17
   E. 2/11/17 - 3/17/17
   F. 3/18/17 - 4/14/17
   G. 4/13/17 - 5/12/17
   H. 5/15/17 - 6/14/17
   I. 6/15/17 - 7/17/17
   J. Summary for the months of August/September 2017, received 9/21/17
   K. 8/10/17 - 9/28/17 and Addendum
   L. 9/29/17 - 10/17/17
   M. 10/18/17- 11/16/17
   N. 11/17/17 - 12/14/17
   O. 12/15/17 - 1/18/18
   P. 1/19/18 - 2/15/18
   Q. 2/16/18 - 3/15/18
   R. 3/16/18 - 4/11/18
   S. 4/12/18 - 5/11/18
   T. 5/12/18-6/13/18
   U. 6/14/18 - 7/11/18
   V. 7/12/18 - 8/15/18, including Department of Behavioral Health Recommendations (501-e) as noted in this report.

3. Violence Risk Assessment Update by Samantha Benesh, Psy.D., ABPP

4. Violence Risk Assessment by Mitch Huggonet, Psy.D.

Ms. Kacie Weston, Esquire
October 16, 2018
Re: John W. Hinckley, Jr.
Page 4 of 30

## Background Information and Reason for Referral

Mr. John W. Hinckley, Jr. is a 63-year-old Caucasian male who was admitted to Saint Elizabeths Hospital on 6/22/82, having been found Not Guilty by Reason of Insanity on 12 counts of attempted murder, possession of a prohibited weapon, and carrying a pistol without a license. He was committed to Saint Elizabeths Hospital on 6/22/82 pursuant to the provisions of Title 24, Section 501(d)(1) of the D.C. Code. He was found Not Guilty by Reason of Insanity on these charges involving his assassination attempt on the life of President Ronald Reagan as well as the shooting of Press Secretary James Brady, D.C. Police Officer Thomas Delehanty, and Secret Service Agent Timothy McCarthy. I make reference to my previous report and will not detail the background information further.

The reason for referral is that the Office of the United States Attorney for the District of Columbia requested that I conduct an independent forensic psychiatric evaluation in response to the Department of Behavioral Health's 501(e) recommendations.

The Department of Behavioral Health recommended changes to Mr. Hinckley's Conditional Release order to include:

1. Mr. Hinckley reduce his in-person visits to FOPD to no less than once every two months (every other month) for monitoring of his mental condition and compliance with the conditions of his release.

2. Mr. Hinckley be allowed to specifically display his art work and/or photography anonymously in public forums. He should also be allowed to share his music via the internet anonymously, only through his music therapist.

3. the Risk Assessment, Williamsburg treatment team members, Dr. Johnson and DBH agree that Mr. Hinckley can live independently.

4. Mr. Hinckley be allowed to travel up to 50 miles from his primary residence in Williamsburg or the surrounding area unaccompanied. DBH recommends he be able to travel between 50 and 75 miles with a family member or member of his clinical Williamsburg treatment team from his primary residence without notification to the Court.

5. Mr. Hinckley would no longer be required to complete daily logs.

Ms. Kacie Weston, Esquire
October 16, 2018
Re: John W. Hinckley, Jr.
Page 5 of 30

6. DBH does not approve of Mr. Hinckley having his own web site or posting his private antique items on web sites for financial gain.

7. Mr. Hinckley's mental health care be transferred to either the public mental health system or a new team of private providers.

8. DBH does not support an unconditional release at this time.


## Violence Risk Assessment Update by Samantha M. Benesh, Psy.D., dated 7/27/18

Dr. Samantha Benesh conducted a Violence Risk Assessment Update and listed in her report her review of multiple records and reports since 1981. She also reported her recent collateral interviews and examination of Mr. Hinckley as well as the administration of psychological tests. I will not repeat Dr. Benesh's findings however will state her recommendations as follows:  1) Mr. Hinckley can reduce his visits to the Forensic Outpatient Department (FOPD) in Washington, D.C. from every month to every two months for monitoring of his mental condition and compliance with the conditions of his release, 2) Mr. Hinckley be permitted to physically display his art work and/or photography in public forums and share music created by him via the internet, with the caveat that steps should be taken to ensure that the displays are anonymous and there is no financial benefit associated with the activities, 3) Mr. Hinckley be permitted to reside in a separate residence in the community, either independently or with his brother, Scott Hinckley, within 50 miles to Williamsburg, 4) Mr. Hinckley be permitted to drive unaccompanied within 75 miles of his home in Williamsburg, Virginia, unless he is travelling to Washington, D.C. for the purpose of a scheduled appointment with FOPD. It is also recommended that he be permitted to travel up to 100 miles from his home in Williamsburg, Virginia with a family member or member of his treatment team, 5) The Court remove the requirement for Mr. Hinckley to complete daily logs of his activities while on convalescent leave, 6) Mr. Hinckley be permitted to sale items from his ▮▮▮▮▮▮▮▮ online as long as anonymity can be maintained. This could be completed by establishing his own web site, 7) the treatment team begin transfer of Mr. Hinckley's treatment to Colonial Behavioral Health (Public Mental Health System) over the next 12-18 months.


## Review of Violence Risk Assessment by Dr. Mitchell Hugonnet

The Violence Risk Assessment by Dr. Hugonnet was not available at the time of completion of my report, however my brief discussion with Dr. Hugonnet indicated his general support for the

Ms. Kacie Weston, Esquire
October 16, 2018
Re: John W. Hinckley, Jr.
Page 6 of 30

Department of Behavioral Health's 501(e) Motion with his specific comments, including but not limited to Mr. Hinckley continuing to maintain daily logs of his activities and participation in monthly meetings in person and via Skype with Dr. Nicole Johnson. Dr. Hugonnet will provide more detail on his assessment and recommendations in his report.

## Collateral Interviews

I conducted collateral interviews with the Williamsburg treatment team members Dr. Giorgi-Guarnieri, Mr. Beffa, and Mr. Weiss. I conducted a collateral interview with Dr. Nicole Johnson and attempted a telephone interview with Ms. Dzord. I also conducted collateral interviews with John Hinckley's family members Joanne Hinckley, Scott Hinckley, and Diane Sims. I will not go into extensive detail regarding the content of the collateral interviews because all of the collateral interviews were digitally recorded as required by the Court and the transcripts of all of my interviews were provided to the Office of the United States Attorney of the District of Columbia, for distribution to the Court and to defense counsel. Therefore, summarize of the content of the collateral interviews are included in this report.

### *Carl Beffa, MSW*

On 10/1/18 I interviewed Carl Beffa, case manager for John Hinckley, at his office in Williamsburg, Virginia. I have previously interviewed Mr. Beffa on several occasions, most recently on 3/4/15. I asked Mr. Beffa to tell me how John Hinckley's adjustment has been since he was placed on convalescent leave and released from the Hospital on September 10, 2016. Mr. Beffa reported that Mr. Hinckley has continued to attend his psychotherapy groups on a weekly basis and that each group includes 10-members consistently. Mr. Hinckley received individual outpatient psychotherapy from Dr. Sidney Binks at St. Elizabeths Hospital thru 3/22/16 with transition to Dr. Beffa during his conditional release to Williamsburg. Mr. Beffa continues to provide individual psychotherapy for Mr. Hinckley although it has been reduced from weekly to bi-weekly. Mr. Beffa stated that Mr. Hinckley has been very responsible and that his diagnoses has been in abeyance. He further reported that he has been very impressed by Mr. Hinckley's adjustment to the Williamsburg community and even though there have been some issues with regard to Mr. Hinckley participating in exercise programs and his weight gain as well as physical health complaints that are most likely attributable to arthritis, Mr. Hinckley has continued to be very responsible in attending his group therapy and individual therapy appointments and arriving in a timely manner.

Ms. Kacie Weston, Esquire
October 16, 2018
Re:  John W. Hinckley, Jr.
Page 7 of 30


Mr. Beffa told me he is aware of Mr. Hinckley's call to 911 upon his discovery of his mother's fall in the bathroom.  He added that John has essentially been the caretaker for his mother and his older brother, Scott, since Scott has moved into the family home and it appears that he will remain in the family home for the foreseeable future.  In terms of short term, intermediate and long-term planning, Mr. Beffa reported that he himself has reduced his work time further from when I last saw him, and is currently present in his office two days per week with plans to continue toward full retirement.  Mr. Beffa also reported his awareness that after his retirement or discontinuation by any or all of the Williamsburg treatment team members the services for Mr. Hinckley will be provided by the Colonial Services Board (CSB), which is the public mental health authority for Williamsburg.

Mr. Beffa reported that although there have been some changes in Mr. Hinckley's involvement with some of his friendships including ▮▮▮▮▮▮▮▮ (with whom John Hinckley shared his photography interest), the loss of support from their friend, mentor and former Look Magazine photographer who has become ill, and the death of ▮▮▮▮ who was a friend of Mr. Hinckley's from NAMI, that Mr. Hinckley continues to try to explore social relationships but has not been successful in developing any romantic interests.  Mr. Beffa and I discussed John Hinckley's ongoing relationship with a former patient at the hospital, ▮▮▮▮.  Mr. Beffa reported that his impression is that John Hinckley continues to have daily telephone contact with ▮▮▮▮ for whom he considers himself a support and friend but clearly tells her that there is no possibility of a romantic relationship or her ever visiting Williamsburg.  Mr. Beffa reported he is very impressed by Mr. Hinckley's empathy for ▮▮▮▮ and her serious and persistent mental illness, and his placing limits on their relationship as a supportive friendship.  Mr. Beffa further reported that Mr. Hinckley's involvement in the ▮▮▮▮▮▮▮▮▮▮▮ has been another social outlet for him.

Mr. Beffa reported the treatment team has been actively discussing the possibility of Mr. Hinckley being involved on a dating site and/or through a matchmaking service attempting to facilitate his meeting a woman who may be more appropriate for him and with providing information regarding his identity.

Mr. Beffa reported that John Hinckley has attempted to have appropriate contact with female ex- group members on two occasions after those members left the group.  Mr. Beffa emphasized his rule that there cannot be social contacts between group members as long as they are both still in the group; however, if a group member leaves the group they are permitted to have social relationships with current or former group members.  Mr. Beffa reported that John Hinckley did pursue a social relationship with the two ex-group members, however those did not go very far.

Ms. Kacie Weston, Esquire
October 16, 2018
Re:  John W. Hinckley, Jr.
Page 8 of 30

Mr. Beffa shared, as did other treatment team members, the likelihood of several if not all of the
treatment team members (with the exception of Ms. Dzord) retiring or relocating within the next
year or two and the need for there to be a transition plan with the next service providers.  Mr.
Beffa re-emphasized that Mr. Hinckley has been very responsible in taking his medications,
attending appointments, and adhering to the conditions of the convalescent leave.  He reported he
has seen no symptoms and does not believe there are any risk factors that are active in Mr.
Hinckley's mental health care and treatment, or adjustment to the Williamsburg community.

### *Deborah Giorgi-Guarnieri, J.D., M.D.*

I interviewed Dr. Giorgi-Guarnieri (Dr. GG), treating psychiatrist in Williamsburg for John
Hinckley, on 10/2/18.  I previously interviewed Dr. GG on multiple occasions the most recent
being on 3/4/15.  I asked Dr. GG to tell me about Mr. Hinckley's adjustment and any issues or
concerns she may have since his convalescent leave began on September 10, 2016.

Dr. GG went over her notes with me topic by topic including the risk factors and her medication
management regarding Mr. Hinckley.  With regard to medication management, Mr. Hinckley
continues to receive Zoloft and Risperdal as previously reported.  Dr. GG reported that Mr.
Hinckley is a rapid metabolizer of these medications such that they do not stay in his system for
a full 24 hours, however they appear to be effective and he has not had any re-emergence of
psychotic symptoms or depression.  She reported that he has had some sexual side effects and
that they have talked about whether or not there should be some adjustments to his medications.
She also reported that his primary care physician wanted to give him a short-term trial of
Gabapentin, however Mr. Hinckley did not want to take the medication, and the primary care
physician also recommended a trial of Naltrexone for approximately five weeks to increase Mr.
Hinckley's energy.  Dr. GG also reported that with regard to the sexual side effects she had
recommended a trial of Buspar, an anti-anxiety medication that could be helpful, however Mr.
Hinckley declined to take that medication because he did not want to have any medication
changes prior to the Court's hearing on the current recommendation.  Dr. GG said she has
concerns that the whole treatment team has expressed to Mr. Hinckley regarding his weight gain
and his resistance to participating in essentially any exercise program.  She stated that his reasons
tend to be because he has arthritis or pain and/or that the exercise groups are comprised of "old
people".

Dr. GG reported that she and Mr. Hinckley discuss other topics including his efforts to engage in
romantic relationships that have not been successful.  She reported they did discuss to a limited
extent the suicide of his friend, ████, which she deferred primarily to his individual therapist,
Mr. Beffa.  She reported that Mr. Hinckley and ████ had become friends through NAMI and
even though Mr. Hinckley appeared to want to have a romantic relationship, he became

discouraged after further interactions with ▮▮▮▮ and at the time of her death he had not been in direct contact with her and did not appear to be seriously adversely affected by her death.

Dr. GG also reported that Mr. Hinckley has been essentially the caretaker for his mother since she broke her hip and he is also very supportive of his brother as Scott Hinckley does not drive and is dependent on John Hinckley for transportation to appointments and other activities.

Dr. GG in discussing the risk factors talked about her concern with regard to his potential isolation. She continued that even though he has been very active in the caretaking role of his mother and brother and has independently established his own business at the ▮▮▮▮▮▮▮ and on the internet, her concerns are for when there may be changes in the household composition, including the unavailability of Mrs. Hinckley either through her passing or possible placement in assistant living and the plan of John and Scott Hinckley continuing to live together as roommates in a separate dwelling after the sale of the family home.

Dr. GG further expressed her own plans to very likely relocate from the Williamsburg area in the next year or so pending family and other vocational pursuits.  Dr. GG said she has a psychiatric colleague with whom she has had prior professional assignments and who is well versed in the forensic issues regarding Virginia State insanity acquitees; however, to her knowledge this colleague has no familiarity with the requirements for Federal insanity acquitees and the required reporting.  She expressed her concerns that when a new treatment team is established due to her relocation and the very likely retirements within the next year or two of both Carl Beffa and Jonathan Weiss, a transition period with very careful monitoring will be required.

Dr. GG also reported her understanding that the Colonial Services Board would offer services to John Hinckley as an "all or none" manner, which could include psychiatric medication management, individual and/or group therapy services, and/or case management services.  Dr. GG expressed her concerns that these services should be well defined prior to any transition and that both the clinical and forensic components of Mr. Hinckley's care, treatment, and management would have to be clearly determined.  She expressed her concerns that although less expensive, the Colonial Services Board, as the public entity, would not be able to dedicate the kind of time and activities via case management as has been done by Jonathan Weiss, a former director of the Colonial Services Board.  Dr. GG also said that if there is a combination of private providers for John Hinckley, he has expressed his concerns for the cost of such providers which would include not only direct service but also adherence to the Court's requirements for reporting either indirectly to the Department of Behavioral Health or directly to the Court.

Dr. GG reported that the family comprised of Joanne Hinckley, John and Scott Hinckley, and "Theo", the family cat, has come together with John Hinckley taking the lead on managing the

Ms. Kacie Weston, Esquire
October 16, 2018
Re: John W. Hinckley, Jr.
Page 10 of 30

movements, appointments and other outside activities that may require driving and that he has done so very responsibly.

Dr. GG expressed her very serious concerns about Mr. Hinckley's continued weight gain and lack of exercise and the impact of those factors on his overall physical health functioning, as well as the potential medication changes as noted above. Dr. GG reaffirmed that she sees part of her role as risk management in that she goes over in detail the risk factors with Mr. Hinckley, which is reflected in the DBH approximately monthly reports that have additions from the Williamsburg treatment team. Mr. Hinckley continues to have challenges with regard to his socialization and his desire for romantic relationships.

Dr. GG also reported that the treatment team has discussed in some detail the possibility of researching the specifics of John using a dating service to facilitate his having contact with women who may be age appropriate and aware of his circumstances in a more organized and structured way.

Overall, Dr. GG reported that she believes Mr. Hinckley has demonstrated appropriate adjustment to the conditions of the convalescent leave and that she supports the recommendation of the Department of Behavioral Health including decreased contact with DBH and extension of the limits for Mr. Hinckley's travel independently and with a treatment team member or family member to areas including Richmond (excluding Government buildings), Newport News, and possibly Virginia Beach or other longer distances with prior treatment team approval.

Dr. GG reported that she agrees with the DBH recommendations for expansion of the convalescent leave and also agrees that it would be inappropriate for Mr. Hinckley to apply for or receive an unconditional release at this time or in the near future.

*Jonathan Weiss, MSW*

I interviewed Jonathan Weiss on 10/2/2018. I previously interviewed Mr. Weiss on 3/4/15. We focused our discussion during this current interview on Mr. Hinckley's adjustment and compliance with the conditions of his convalescent leave since September 10, 2016. Mr. Weiss became the case manager/care manager for Mr. Hinckley prior to the last Court hearing and reported that he has been very positively impressed by Mr. Hinckley's continuing adjustment in Williamsburg since the implementation of the convalescent leave status. Mr. Weiss reported that initially he was seeing John Hinckley on a weekly basis, however that has changed and he currently sees Mr. Hinckley at least monthly and on an as needed basis. Mr. Weiss reported that he attended a number of therapeutic and social activities with Mr. Hinckley prior to his brother

Ms. Kacie Weston, Esquire
October 16, 2018
Re:  John W. Hinckley, Jr.
Page 11 of 30

Scott joining the family home and that since Scott has become a resident in the home Mr. Weiss has attended a number of activities with John and Scott together.  These have included baseball games and other community activities as well as Mr. Weiss facilitating John and Scott becoming ███████████████████████████.  Mr. Weiss reported he has been very favorably impressed by John attending these activities as well as his enthusiasm for participation in not only the sporting and social activities but also ███████████.

Mr. Weiss also expressed his very positive impressions of John having independently arranged, orchestrated and implemented ████████████████████████ and actually becoming so successful that he has ████████████████.  Mr. Weiss reported that not only is it ████████ itself with John ████████████████



Of note, I took the opportunity to visit ████████████ during my visit to Williamsburg and was impressed by the business end of the operation in that the ████████████████ ██████████████████ I visited the ████ on a Tuesday in early afternoon and there were ████ at that time.  The staff informed me that they have ██████████████████ The ████ themselves do ████████████████

Continuing my interview with Mr. Weiss, he reported his view that John Hinckley has not demonstrated any symptoms of psychosis or depression nor has he been concerned about any active risk factors with the exception of Mr. Hinckley continuing to have difficulty engaging in social relationships that may lead up to a romantic relationship.  Mr. Weiss told me he had become aware of the death of John's friend, ████, through the newspaper and notified John who was not aware of her death until he informed him.

Mr. Weiss also reported being in the process of retirement and having responsibility for two clients, one of whom is John Hinckley.  He reported further that he intends to fully retire within the next two years and that he and the treatment team have discussed that John Hinckley continue to receive outpatient mental health services either through a private group of clinicians or through the Colonial Services Board.  Mr. Weiss agreed that his role in John Hinckley's recovery has been very supportive in that he, as case manager/care manager, has researched, planned and attended activities with John Hinckley and during the last year included his brother

Ms. Kacie Weston, Esquire
October 16, 2018
Re: John W. Hinckley, Jr.
Page 12 of 30


Scott to facilitate socialization. Mr. Weiss, being a former director of the Colonial Services
Board, expressed his concerns that he knows the staff at Colonial Services is "overworked" and
have large caseloads such that it would be unlikely to impossible that they would be able to
replicate the level of services that have been provided by his current Williamsburg treatment
team. Mr. Weiss also expressed his concerns that John Hinckley not become isolated and less
socially involved than he currently is. Also, he affirmed that the treatment team has confronted
Mr. Hinckley repeatedly about his weight gain and physical health but despite their
encouragement, John Hinckley's resistance to organized or formal exercise programs has
continued. Mr. Weiss also reported that the idea of engaging in a match making/dating service
essentially came from him as he has knowledge of demonstrated success of such services and
that the application and participation of John Hinckley could be helpful and successful for John
and would be assisted by the treatment team members.

Mr. Weiss reported he had been contacted by the U.S. Secret Service on three occasions since
Mr. Hinckley has been on convalescent leave. He said one occasion was after his mother had
fallen and broken her hip and John had made the arrangements for transportation to the hospital.
The second contact occurred when Vice President Pence was scheduled to visit Virginia and was
a check to determine John Hinckley's whereabouts and activities. The third contact by the U.S.
Secret Service had to do with the Secret Service having been notified that John Hinckley had
sent a note via U.S. Mail to a neighbor who contacted the local police who then contacted the
U.S. Secret Service. Mr. Weiss provided details of this event which included John Hinckley
having met the neighbor in passing in the ███████████community as ███was walking ███dog.
Mr. Weiss reported that John Hinckley expressed███might be someone he would like to have
coffee with but through discussion it was determined that it would not be a good idea for him to
knock on███door or to leave a note in███mailbox but rather to send by U.S. Mail a note to███
asking about possibly having coffee. What was not factored into that suggestion was Mr.
Hinckley signing his name to the note as "John Hinckley" which, based on the response,
generated some concern from the recipient and the notifications were made. Mr. Weiss offered
that he and John discussed this incident and it was clear that ███ only knew his name as "John"
and when ███ became aware that it was "John Hinckley" ███reaction prompted the response as
noted. Mr. Weiss said he did not believe there was any danger or ill intent by John Hinckley in
attempting to contact his neighbor for a possible social interaction.

Mr. Weiss reported that since becoming John Hinckley's case manager in Williamsburg, he has
assisted John Hinckley with obtaining appropriate financial supports that have included not only
his Virginia driver's license but also Medicare and SSDI, and that these supports and residence
would make him an eligible candidate for services by the Colonial Services Board.

Ms. Kacie Weston, Esquire
October 16, 2018
Re:  John W. Hinckley, Jr.
Page 13 of 30

*JoAnn Hinckley*

I interviewed Mrs. JoAnn Hinckley at her home on 10/1/18.  The last time I interviewed Mrs.
Hinckley was 3/3/15.  Mrs. Hinckley greeted me warmly as she always has in the 30+ years that
I have known her.  She reported the transition of John living full-time in Williamsburg has been
as she expected, without any problems and excellent.  She reported further that she has not had
and continues not to have any concerns, issues, or problems with regard to her son John's
adjustment and living in the family home full time.  She reported that she is "turning 93" and
since she broke her hip "John takes care of me."  She stated that he has been very responsible and
responsive to her needs including the night she fell and broke her hip in getting her to the
hospital, attending to her at the hospital and after her discharge attending to her health and other
needs.  She reported that at one point John was responsible for giving her ███████████████
███████████████ ███ and that more recently when using
her walker she had scraped her arm on the doorknob and her son John insisted and took her to
the Emergency Care Center where she received steri-strips ███████████████████████
███████████████████.

Mrs. Hinckley emphasized that she believes her son John should be "independent" and that she
really doesn't need any help in taking care of herself.  She acknowledged, however, that John has
been very helpful to her in the home and that he has also assisted her son Scott, as Scott does not
drive, going to and from appointments and other activities such as shopping, etc.

Mrs. Hinckley reported she has no misgivings, concerns or reservations about her son John
continuing to live in the family home, with the expansion of his being able to travel further with
and without a family member or treatment team member, and a reduction in the contacts he and
she have with the Department of Behavioral Health.

*Scott Hinckley*

I interviewed Scott Hinckley on 10/1/18 in the family home and he reported that he has been
living in Virginia in the family home for approximately the last year ███████████████████
██████. He reported he has adjusted to living in Williamsburg ███████████████████
███████████████ He also said he keeps in contact with his kids and ███████████████████
Williamsburg.

I had not spoken with Scott Hinckley since 3/10/15.  He reported that the life changes he has
experienced have brought him to live permanently in Williamsburg and that the future plan is
whenever his mother is no longer available and the family home is sold, he and his brother John

Ms. Kacie Weston, Esquire
October 16, 2018
Re: John W. Hinckley, Jr.
Page 14 of 30

will be roommates and live together in the Williamsburg area. He further reported that his
brother John has become "the designated chauffeur" and is very helpful as a care giver to his
mother. Scott Hinckley also reported that he is aware of the discussions regarding the
Williamsburg treatment team members very likely no longer continuing with John's care in the
next year or two and that the Colonial Services Board would be an option that the treatment team
has looked into. He reported further that he believes this would be the appropriate transition if
the team approves of the Colonial Services Board or private providers may be necessary.

Scott Hinckley also told me that he appreciates living in the family home with his mother, John
and the family cat, Theo. I observed that Scott currently

Scott Hinckley also stated his support for an extension of the convalescent leave to include his
brother John having permission to travel greater distances, with or without treatment team
members or family members, and having less contact with DBH. Scott Hinckley also reported
that he has enjoyed attending the                                  with his brother John and the
interactions with Jonathan Weiss. Scott Hinckley said he has no reservations or concerns with
the DBH proposal.

*Diane Sims*

I interviewed Diane Sims by telephone on 10/4/18, and had last spoken with her on 3/11/15.
Mrs. Sims acknowledged that she had been contacted by her family to alert her that I would be
calling to discuss John's adjustment as I had requested they do during my interviews with them.

When I last spoke with Mrs. Sims she reported she was absolutely in favor of the Hospital's plan
for her brother to live in Williamsburg with their mother and that she has been very favorably
impressed by her brother's adjustment to Williamsburg in the last two years since the
implementation of the convalescent leave. She reported further that she believes there are no
problems or issues within the family home and that her brother John has essentially "stepped up"
to becoming in-charge as the care giver for their mother. She also said she believes the addition
of Scott to the family home has also been a positive development and the family home is running
well. She noted that had she had any concerns with regard to how the family is doing in
Williamsburg she would have made far more frequent visits and would have stayed longer when
she does visit but does not believe there was a need for her to do so.

Mrs. Sims also endorsed her support for the expansion of the convalescent leave conditions
including her brother possibly being able to come to the Richmond Airport to pick her up when
she visits as well as to attend more activities in the Williamsburg area.

14

Ms. Kacie Weston, Esquire
October 16, 2018
Re: John W. Hinckley, Jr.
Page 15 of 30

*Nicole Johnson, M.D., F.A.P.A.*

I interviewed Dr. Nicole Johnson on 10/5/18 in her office at the Department of Behavioral Health. Dr. Johnson has been the forensic manager for John Hinckley since prior to and since the implementation of full convalescent leave to Williamsburg, and has also been the liaison between the Williamsburg treatment team to the Court. Dr. Johnson has prepared approximately monthly reports detailing Mr. Hinckley's adjustment, treatment and management issues, and any concerns or recommendations, as well as appending to her reports, progress notes and documents by the Williamsburg treatment team members including information regarding treatment team meetings, contacts with John and JoAnn Hinckley, and John Hinckley's daily logs.

Dr. Johnson and I went over the DBH recommendations as well as the recommendations from the Violence Risk Assessment Update by Samantha Benesh, Psy.D., ABPP. Dr. Johnson reported that she believes those recommendations from the DBH, having been reviewed by the Outpatient Forensic Review Board, are appropriate and reflect the DBH's position on expansion of the convalescent leave conditions. Dr. Johnson reported that her concerns with regard to John Hinckley's adjustment since September 10, 2016 and residing full-time in Williamsburg have largely to do with his socialization. She said that his socialization is very limited and he has limited interactions with others outside of his family. She continued he does not appear to have the necessary tools to conduct a romantic relationship and appears to be surprised when there may be unwelcoming responses from women that he has met and that he is "John Hinckley".

She reported that she is not aware of any negative reports from the U.S. Secret Service but she was contacted when Mrs. Hinckley broke her hip and when Vice President Pence was to be travelling in Virginia. We discussed in detail the risk factors, including the isolation, deception, relationships with women, socialization, suicidality, possession of weapons and symptoms of psychosis and depression, and Dr. Johnson reported she has not had concerns about there being active evidence or exacerbation of the risk factors with the exception of her concerns about socialization and relationships with women, and potential isolation  Dr. Johnson also reported that the issue of financial support is an ongoing concern particularly given the high likelihood of the current Williamsburg treatment team no longer providing services within the next year or two.

Dr. Johnson reported further that she shares the concerns of the treatment team with regard to the Colonial Services Board providing services, not because they are an inappropriate entity but because of the level of intensity and commitment that have been provided to Mr. Hinckley beginning with his hospitalization through his transition to Williamsburg and currently on his convalescent leave status. Dr. Johnson reported that the services of Dr. GG as the psychiatrist

Ms. Kacie Weston, Esquire
October 16, 2018
Re: John W. Hinckley, Jr.
Page 16 of 30

who is forensically trained, Mr. Weiss as the very skilled, active and supportive case manager, and Mr. Beffa as the individual and group therapist as well as Ms. Dzord as music therapist have been very helpful with John's adjustment and continued progress. She noted however that with regard to John Hinckley's interests and activities, his interest in his art and music has declined over time, in part because he has expressed frustration at not being able to display his art or music. Dr. Johnson reported she is in support of allowing Mr. Hinckley to display his art and music in an anonymous fashion and that the Williamsburg treatment team has been actively discussing such possibilities. She also reported that John Hinckley understands fully that he is not able to profit from the sale of his art or music or performance of music in a public forum. Dr. Johnson noted that Ms. Dzord has been more encouraging for John by giving him music assignments to increase his writing music and songs as he has in the past. She also reported she believes this is a very positive step and is hopeful it will continue.

With regard to increasing the distance Mr. Hinckley can travel accompanied and unaccompanied, Dr. Johnson stated she supports the extension to 50 miles from home unaccompanied and 75 miles from home accompanied, which will include Richmond and Newport News, however, travel to Virginia Beach should be accompanied and only with prior approval of the treatment team. Dr. Johnson also reported she is in favor of eliminating the requirement that John Hinckley keep daily logs as the logs are very repetitive because Mr. Hinckley does not vary much from his daily activities including his limited socialization. She did endorse however that John Hinckley should keep track of having 20 hours of work per week. Dr. Johnson reported that she has also visited ███████████████████████, and said her visit ██████████ ████ was very similar to mine and that there was very little social activity going on in a very well run operation.

Dr. Johnson is in support of the reduction in the telephone contacts with her by John and JoAnn Hinckley, reduction of the visits to DBH to every two months rather than monthly, and the elimination of the daily logs. Dr. Johnson reported that John Hinckley has been very diligent in keeping appointments and calling her regarding any changes or events as well as managing the schedule of regular calls in compliance with the Court's Order.

Dr. Johnson also reported her awareness that Dr. GG has concerns about John Hinckley's medication regimen including the side effects and the likelihood of either augmenting the medication or changing the medication to address issues of side effects. She repeated Dr. GG's information that John Hinckley is reluctant to make any changes in medications prior to the Court's ruling on the current motion from DBH. Dr. Johnson also expressed her concerns that

Ms. Kacie Weston, Esquire
October 16, 2018
Re:  John W. Hinckley, Jr.
Page 17 of 30

the issue of his difficulties in socialization would need to be closely monitored for signs of his becoming more isolated and the potential re-emergence of symptoms of depression or other risk factors.

Dr. Johnson concluded the interview by showing me an unsigned painting Mr. Hinckley has given her and reinforcing that it is her belief that the current DBH recommendation is appropriate and that it would be inappropriate for Mr. Hinckley to have a recommendation for an unconditional release at this time or the foreseeable future.

**Examination of John W. Hinckley, Jr.**

I examined John W. Hinckley, Jr. (DOB: 5/29/55) on 10/1/18 in his home in Williamsburg, Virginia.  This is the first time I have examined Mr. Hinckley in his family residence and the last time I examined him was in March 2015 and before that February 2013.

John Hinckley greeted me at his front door with a smile and said "right on time, good to see you".  I had arranged the appointments for John, Scott and JoAnn Hinckley with John Hinckley via telephone prior to my arrival in Williamsburg.  This was the first time John Hinckley had taken charge of arranging appointments for himself and his family and being responsible for their completion.  I interviewed John Hinckley independently from his mother and brother as we began to discuss his adjustment since the implementation of convalescent leave on September 10, 2016.  Initially Scott Hinckley accompanied us into the family room where the interview took place but John Hinckley instructed his brother to leave so the two of us could talk privately. Mr. Hinckley told me that he met with Dr. Mitchell Hugonnet the previous Saturday and Sunday for five hours and six hours, and added that he believed Dr. Hugonnet is "a great guy".  He went on to tell me that they "hit it off well" because Dr. Hugonnet is a rock and roller like he is and they chatted and chatted and also conducted the evaluation.  Mr. Hinckley said he believed the evaluation by Dr. Hugonnet went very well and that he had taken three tests in addition to their discussions.

I advised Mr. Hinckley that the focus of this examination would be for us to discuss how things have been since he has been on convalescent leave and if I said anything that was incorrect he should straighten me out as always, and he responded that he would. ███████████████

██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

Ms. Kacie Weston, Esquire
October 16, 2018
Re:  John W. Hinckley, Jr.
Page 18 of 30

████████████████████████████████████████████████████████████████

██████████████████ Mr. Hinckley elaborated that he would like to go to other cities and said that he likes Newport News because there is so much more to do than in Williamsburg, which is more of a tourist town and college town.  He stated he had gone to the Ferguson Center in Newport News to a Beach Boys concert years ago and that Williamsburg doesn't offer those kinds of venues.

Mr. Hinckley reported that in addition to extending the distance for his driving, he currently drives himself to D.C. only for his meeting with Dr. Johnson and he would like to reduce that to once every other month because he does not think monthly visits are necessary and he does not like the traffic in D.C., and he added that Dr. Johnson agrees with him.  He also reported he keeps his log of what he does every day and does not believe that would be necessary.  Mr. Hinckley continued that with his music, art and photography he'd like to put that out anonymously publically in whatever venue is deemed appropriate.  He said that he would do this with the assistance of his music therapist, Nicole Dzord, and that they might ████████████ ██████████.  He described this as ███████████████████████████ and it could be posted anonymously or under her name.  He also said that Dr. Hugonnet had the idea that his music and art should be vetted by the team prior to putting it out and that he would have no problem with that.

Mr. Hinckley concurred that he currently sees Mr. Beffa for individual therapy twice per month and in group therapy every week and there is no plan to reduce that frequency.  Mr. Hinckley also reminded me that he was seeing Mr. Beffa at his home for the first year and one-half of convalescent leave but he currently sees him at his office.  Mr. Hinckley endorsed that he believes he has a "fantastic case manager, Jonathan Weiss.  Everybody loves him, including me."  He described his relationship with Mr. Weiss is "more like a buddy" than a case manager because Jonathan goes to baseball games, concerts and he has ████████████████████ ██████████.  He reported he is currently ████████████████████████████ as well as having done it last spring.  He noted that sometimes he and his case manager have breakfast together or lunch together and he has helped him in setting up ██████████████████.  He reported that although he believes the requirement is to see Mr. Weiss twice per month, he sees him much more frequently than that and that they have a very good relationship.  Mr. Hinckley added that in his discussion with Dr. Hugonnet, Dr. Hugonnet proposing that perhaps Mr. Weiss would go with him the first time that he goes to Virginia Beach or Norfolk which would be fine with him.

Ms. Kacie Weston, Esquire
October 16, 2018
Re: John W. Hinckley, Jr.
Page 19 of 30



Mr. Hinckley reported he continues to see his friend ███████████ and that prior to the convalescent leave would see him every time he came down for a visit and they would be involved in photography together but since he has come down full time he does not see him as much and he (John) has gotten a little bit away from his photography. He stated that ██████ suggested he get a new camera and he thought he would but he has not yet. He also reported that they have lost their interactions with ██████████ who was a former master photographer at Look magazine because of declining health.

I asked Mr. Hinckley to tell me more about what has changed since I last saw him and he reported that he ████████████████████████████████ last September. This occurred after he heard from a couple of guys that they ███████████████████████ and he pursued what that meant with them, became really intrigued, and described to me the process of ██████████████████████████████████████. He reported there are ██ and that he decided to █████████████ which was supported by Dr. Johnson and the team. He stated he signed a ██████████ last August (2017). He reported further that he ████████████ and has a ████████████ but that also increased his ███████████████ ████████████. He added that he has always been able to ███████████ and described the process ████████████████████████████. He said that he gets paid by check, and in terms of his actual involvement ████████████, he is really enjoying it and loves it there. Mr. Hinckley reported that he ███████████████████████████████████. He reported that he goes to ████████████████ almost every day and that the people who know him call him "John". He added that there has never been one single incident of any kind ██████████ and that everyone is friendly and he strikes up conversations and they strike up conversations with him. He added "that's where I really do my main socializing, ██████████████ because I feel so comfortable out there." He referred to █████████ "totally my baby", and added that he feels a sense of accomplishment. He continued that he is not getting rich from it but he is making money as a small businessman, and said he does not ██████████████████ and that could be worked out down the line if it is approved.

Mr. Hinckley reported he has not been devoting enough time to his music and that his music therapist, Nicole Dzord, has been giving him assignments for the last six months to come up with a song for the next session. They meet monthly and he's come to therapy with a song of his for the last four to six months, and he and his music therapist play guitar and sing together. He reported he has written lots of songs over the last 30 years and that he is getting back into writing songs with the support of Ms. Dzord. He also reported she is getting married on October the 6th so it may be difficult to reach her. He subsequently provided her cell phone number to me.

19

Ms. Kacie Weston, Esquire
October 16, 2018
Re:  John W. Hinckley, Jr.
Page 20 of 30



We next discussed Mr. Hinckley ████████ and he reported that he is currently ████████ ████████ who was with NASA for over 41 years and the ████████. He reported they have been ████ and that he loves ████. He also reported with regard to his health that being seated ██ ████████ was very bad and his back started to go out and he had to get up a time or two and walk around. He also said his right knee has been giving him troubles and maybe it's just getting old. We shared that we both know the feeling of having back and knee pains. He asked me whether or I still have a "knee thing going on" from the past and I affirmed that I do and that I had been engaged in treatment for that. Mr. Hinckley then spontaneously stated that he had heard "our friend Joe Henneberry passed" adding that he found out when he asked Dr. Johnson if he was still around. He also asked me if I had gone to the funeral and I responded to him that I had gone to the funeral as well as the Memorial Service that was held at Saint Elizabeths. Mr. Hinckley continued that he recalls having "a lot of ups and downs with Mr. Henneberry" but he had great respect for him and we agreed that you always knew what Joe was thinking because "he would tell you, he would let you know quick."

I redirected Mr. Hinckley to tell me more about what's changed or what's different and how things have progressed since he has been living in Williamsburg full-time, and he said the one thing was his mother broke her hip. He elaborated that it was August 25th in the middle of the night when she got up to go to the bathroom. He found her and she was trying to minimize that she was hurt and wanted to just go back to bed and he insisted that they call 911. He elaborated he has taken responsibility for all of her care and that the ambulance came out and took her to the ████████████████ across the street from where they live and she had surgery the next day. He reported she was in the hospital for three to four days and that his sister had come over the weekend and they talked to the surgeon together who agreed they could take her home. He reported that his mother was getting ████████ to prevent ████████ and that the nurse taught him how to do it so that he was able to give her ████ every day and do everything that she needed. He continued that he had become her care giver "24/7" including making meals for her, doing laundry, making appointments and taking her to the appointments as well as going to the pharmacy to get her medications. He told me that I would hear the same thing from her when I talk with her stating "she gushes about everything I've done." He added it doesn't bother him one bit to take care of his mother because she has taken care of him for so many years. He added that for a while she was seen as his supervisor and the person who looked over him and now it is reversed and he is her supervisor and he thinks he is doing it very well, and others say he is as well. He stated he believes this will continue until she passes but as of today she is in fine health and fully recovered from her broken hip. He reported that she did develop a ████ ████ in November of last year and he took charge of that too and took her to her primary care doctor and when she was started on ████████, he continued to take her each month to her

Ms. Kacie Weston, Esquire
October 16, 2018
Re:  John W. Hinckley, Jr.
Page 21 of 30

██████clinic appointment until she was discharged four or five months ago.  Mr. Hinckley added that his mother absolutely did not want to go to assisted living and that he has become her nurse, and others are telling him that he "should have been a nurse "like Henneberry."  He also told me about his mother having injured her arm when she was walking with the walker with her head down and he insisted that she receive care and took her over to the MD Express where they dressed her wound with steri-strips because██████████████  He reported that he changes her dressing and the wound specialist saw her the previous week saying that the wound was healing nicely.

We briefly discussed his father's death in 2008, 10 years ago, and also the history that there had at one time been a "DC Plan" for his placement that no longer exists.  He reported that the current long term plan is that when his mother does pass away, he and his brother are going to live together in the Williamsburg area and they already have a realtor lined up.  He continued that his brother Scott has been living with them for approximately one and one-half years and although it was not anticipated, they have decided that he would remain in Williamsburg and John pointed out the bed that Scott sleeps on in the same room where we were talking, as the home is a two bedroom house.  He reported that his brother is very helpful with anything he asks him to do and he is quiet, and added that he "just get along great with Scott."  He added the plan is also to sell the current house because██████is very expensive.

Mr. Hinckley asked me if I have any concerns or if I'm not for something in the plan that he and I talk about it, and I told him that's why I wanted to talk him and others including Dr. Johnson.  I suggested "let's think about it in a different way" regarding what concerns or issues there could be, using for example the distance that he wants to travel including driving to Richmond and the Government buildings in Richmond.  Mr. Hinckley responded that he and Dr. Hugonnet talked about it and Dr. Hugonnet believes that he should avoid Government buildings as well as any big political functions, and that that is fine with him.  He reported when he thinks of Richmond he does not think of the Government buildings but all the things that he could do in Richmond.  He then mentioned that he used to have a friend, ████, who was living in Richmond and she would talk about all the things there are to do and he added that he has "done everything here 20 times over" in reference to Williamsburg.

I told Mr. Hinckley that I thought ████was the friend he met at NAMI and he said "let me tell you the story of ████."  He then went on to say he did meet ████at NAMI, they became pretty fast friends and he asked for her phone number.  He reported she would come to his house and they would visit and watch TV and movies as well as go for walks and shopping.  Mr. Hinckley told me that ████had some serious issues including substance abuse and drinking and that after she moved to Richmond it became harder and harder for her to visit so she would not come over each time he came to Williamsburg, as he was still living in the hospital when they first met.  He

reported his belief that the same week his mother broke her hip "████ laid down on the railroad tracks and let the train run over her." He said he was "very stunned" because she had been at his house a couple of months before and he had no idea she was thinking about hurting herself. He stated that his mother and her mother "got along famously, liked each other a lot" and that after ████████ death her mother stopped coming to NAMI so he hasn't seen her for a long time. He reported that he and████were getting kind of close and that it was tough because she was fun to be with.

Our conversation segued from that to talking about Mr. Hinckley's relationships with women as a risk factor and began by talking about his longstanding relationship with████████, a former patient at the hospital when he was there. Mr. Hinckley said he has not seen████████since he has been on convalescent leave but she does still call, and he initially stated he felt it was his "duty" but corrected it to "need" to help her through her day because of her illness. He reported she is doing better, has her own apartment, and has been out of the hospital for well over a year as well as having a guardian. He added however that she still struggles every day of her life and he asks her if she is taking her medication every day and continues to check up on her. He said that he recalls at the last hearing there was "a question about how John shows empathy" and he continued that he still kind of looks over████████to see how she is doing and that that is being empathic. He reported he is helping her because she has had a hard life with serious mental illness as well as estrangement from her family so he feels like he is there to help her out each day from a long distance. I asked him if he thinks she understands that he is more a friend than perhaps a romantic interest and he responded he didn't know because she has delusions but he makes it clear saying "absolutely not" in response to her coming to Williamsburg or ████████ and she seems to not be pressing coming there lately. He said she has never tried to come to Williamsburg and he has been firm about her not coming, telling her that he will not see her if she does come.

I asked Mr. Hinckley if there were any other women that we should be talking about and he responded "no" elaborating that it is kind of different from his days at the hospital "when they were complaining I had too many women. Now I don't have any." He reported he does not have any girlfriends although he does have female friends out at the████but he does not see them socially outside of the████. I asked him if he had met any women in the group that were kind of interesting and he responded that he did become friends with a woman after she left the group but she was a little older and married so he could not really look at her in romantic terms. He reported he went to her apartment one time and she fixed dinner for him and her husband, and that he took her to an Italian restaurant for lunch one Saturday. He said they lost contact because she is a professional artist and travels, but for a while they were quite good friends. He reminded me that Mr. Beffa has a strict rule that you cannot socialize with group members, but once they leave you can. He reported he also became friends with another group member who was a fantastic musician, a guitarist, and he went to his place one time and played music and the friend

Ms. Kacie Weston, Esquire
October 16, 2018
Re:  John W. Hinckley, Jr.
Page 23 of 30

had come to John's place several times to play music and talk, but he has lost contact with him.
John told me he has left voice mails but this friend is a newlywed and moved to Newport News
and they lost contact after he got married.

Mr. Hinckley said at one point he had tried to participate in a group of musicians that meet in the
park and jam. He reported that the outpatient lawyer for DBH felt that that was not a good idea
because it was a public park and he could be seen as performing or anyone could just show up
and take pictures. He stated that his understanding of his Court Order is that he cannot perform
publically. He added that the recommendation is not asking that anything be changed about
performing in public. I said to Mr. Hinckley it does not seem that many people are actually
recognizing him physically and he replied "they don't". He said that he thought Dr. Hugonnet
was amazed because he has "never not one time had someone harass or hassle" him and he
concluded that it is "my name that is well known but not my persona." He stated that "no one
ever gives me a second look" and added that he wears a baseball cap that may be helpful. I said I
thought that Mr. Hinckley was correct that the baseball cap might help but he does not appear to
be doing anything to draw attention to himself and he responded "no, I'm trying to be low
keyed." I added "as opposed to performing?" and Mr. Hinckley responded "right". He added
that he has done everything he can to maintain a low profile and not make waves at any level.
He reported he tries to steer clear of politics but "you can't help hearing about it." He stated,
"when people were having a conversation about the news like the Kavanaugh hearing or
whatever" that he tries to stay away from it and does not jump in.

I told John Hinckley that I was sorry to hear about the suicide of ███ and reminded him suicide
is one of the risk factors as well for him. He told me that he has not been depressed since 1983
after he first came to Saint Elizabeths and made a suicide attempt. He continued that he thinks it
has been all uphill since then, he has not had any kind of depression since then, and he is still on
Risperdal and Zoloft, which he thinks have done well for him over the years. He added that he
has not had any problems taking his medications because he thinks they are helpful. Mr.
Hinckley continued by saying he tells people that "this is the best time of my life now." He
added that in the past two years he has been even happier, more content and he is so glad to be
away from inpatient living, which he had been for 35 years. I asked him what does he miss most
about having been in the hospital and he immediately responded "my cats." He added that he
missed his cats because they were a big part of his getting through the day at the hospital and he
became very attached to the cats. He stated he had to leave them cold turkey on September 10,
2016 and one of the first things he did after starting to live in Williamsburg full-time was to
adopt a cat named Theo from the Heritage Humane Society and he is now the house cat. He said
that all his focus is on Theo and that his mother loves him and that he and Scott get along okay.
Mr. Hinckley then said that he thought perhaps I was looking for something besides cats in my

Ms. Kacie Weston, Esquire
October 16, 2018
Re: John W. Hinckley, Jr.
Page 24 of 30


question and I told him it was really an open question, and he replied "I don't miss anything. I miss some of the people. I did become close to some of the people there, staff, too. I do miss some of the daily conversations I would have with them." He then added "to be totally honest I didn't miss anything about being an inpatient at the hospital" and that life is so much better in Williamsburg. He looked out of his back window and said "it is so peaceful, just look at what I have here" adding "what a life."

Mr. Hinckley told me that he believes the social connection he has to the ███████████ is very good for him and he is always chatting with people just about every day and they are very welcoming of him. He said the camaraderie makes him feel good. He added that he and Scott talk about various things, and that they have never been close and this is the closest he has been to his brother who is five years older. He restated that they go to ███████ together as well as baseball games and shopping. I reminded Mr. Hinckley that it has been about three years since we last talked in 2015, and he told me that he remembers the last time and that he saw my son and asked how my son is doing. I responded that my son finished his training and now he is in practice.

I asked Mr. Hinckley about his mood on a scale of one to ten, with one being life sucks and couldn't be worse and ten being on top of the world and couldn't be better, he responded "10". I asked if that is on an average day and he responded "I would say 9 or 10". He added that some days when his back is bothering him it may be a 9 but he has never been so happy and content in his life. He added that he likes everyone on the treatment team and they are all so helpful to him and that he and Jonathan (case manager) have become "buddy buddy".

I reminded Mr. Hinckley that when he was first coming down to Williamsburg on conditional release that he had gone to a group program of some kind to see how it worked and that there were some very sick folks from Eastern State hospital attending the program. He reminded me that it was called "People's Place" and said it was "ewe." He continued that the program was not very good and there were some very low functioning people there. I asked him if becoming a patient at Colonial Services Board was still a part of the active discussion and Mr. Hinckley responded "my case manager and therapist are both up in age, more or less retired, and they are not going to be doing this forever." He said that when they are no longer working and when GG is no longer available, the plan would be for him to go to the CSB and added that his case manager Jonathan used to head it up. He then went on to tell me that Dr. GG may be going to live with her daughter because Dr. GG writes screen plays and sitcoms and she is trying to sell a sitcom in Hollywood. He reported that she may be thinking of moving at the end of 2019 or 2020 to be with her daughter and get into those activities further. He said he does not believe

Ms. Kacie Weston, Esquire
October 16, 2018
Re:  John W. Hinckley, Jr.
Page 25 of 30

that it is right around the corner but more like the end of 2019 or 2020.  He said he believes
Jonathan Weiss will facilitate his going to the Colonial Services Board.

Mr. Hinckley told me he believes treatment is working for him in Williamsburg and "everything
is going very well, you know."  He added that he has become "totally independent in the way
that I live.  I've lived independently since the day I became on convalescent leave."  He repeated
that he is taking care of his mother rather than her taking care of him for over two years and he
does everything "beautifully."  He stated "they cannot talk high enough about - well about what
I've done."

I then asked Mr. Hinckley if he had been having any symptoms of serious mental illness that he
previously experienced or that he has observed in others including hallucinations, delusional
thinking, preoccupation with persons or situations, and he responded "No. I'm symptom free."
He denied any symptoms of delusions or hallucinations or preoccupation.  He added that he
believes his lifestyle in Williamsburg has a lot of people depending on him, and that has put him
in a different frame of mind with a sense of responsibility.  He said he has a routine that he does
every day taking care of his mother, taking care of his brother to a certain extent because he
doesn't drive, and taking care of Theo.  He added he feels an obligation to live up to what he
needs to do.  He does not have any thoughts of hurting himself or thoughts of hurting anyone
else.  When I asked these questions as part of the mental status examination, Mr. Hinckley told
me "Dr. Johnson does this checklist, this little checklist every time I talk to her."  He added that
she says "any new weapons" and he responds "no, Judge Johnson. There are no new weapons."
Then I asked "new weapons or old weapons for that matter," and he responded "no doc there are
no weapons."

In conclusion to our discussion, Mr. Hinckley again added that he is hopeful that the frequency
of visits to DBH Outpatient Clinic would be once every other month because he hates driving in
D.C. and doesn't think that he needs monthly visits.  He said there have been no problems even
though he has to do mostly defensive driving.  He added that it may be hard to explain and he
doesn't want to overstate it but "this is the best I've ever felt in my life.  This is the happiest I've
ever been in my life.  This is the most content I've ever been in my life, you know, I'm just
asking for these little incremental changes that would help me more.  But I'm happy as a clam, to
be honest.  I really am."  I reminded Mr. Hinckley that if he thinks of anything else that he thinks

Ms. Kacie Weston, Esquire
October 16, 2018
Re: John W. Hinckley, Jr.
Page 26 of 30

I need to know or that he wants to tell me, to call his attorney first because he is his advocate and he wants to make sure of what you do.

*Mental Status Examination*

On mental status examination, John W. Hinckley Jr. is a 63-year-old Caucasian male who appears slightly younger than his stated age. His appearance is different in that he has gained an estimated 30 to 40 pounds since the last time I saw him approximately three and one-half years ago, however it is otherwise appropriate and he is appropriately dressed and groomed. He greeted me with a smile and hand shake and maintained eye contact and his affect is appropriate displaying a range of frustration with past events, humor at appropriate times, and an overall sense of contentment. He estimates his mood as a "9 or 10" on an average day and denies any signs or symptoms of depression.

With regard to his attention span he is attentive, alert and without any evidence of distractibility or difficulty in tracking information. He demonstrates appropriate memory for recent and remote events and does not report any difficulties with his memory.

With regard to his perception, Mr. Hinckley denies the presence of any hallucinations currently or in the past for many years, and there is no evidence or observation of Mr. Hinckley responding to internal stimuli such as hallucinations. He denies any delusional thought content and none was elicited during the course of the examination. His thought stream is appropriate without evidence of looseness of associations or flight of ideas. Mr. Hinckley denies any thoughts or plans of harm to himself or suicide and denies any thoughts or plans to harm others. He reports his last suicidal thoughts and attempt was in 1983. Mr. Hinckley's judgment appears to be appropriate for his activities of daily living based on his self-report and this examination, with the exception of an exercise program to improve his physical health. His insight appears to be good with regard to his mental illnesses and need for continued treatment and management as prescribed by his current treatment team and endorsed by the Department of Behavioral Health.



Ms. Kacie Weston, Esquire
October 16, 2018
Re:  John W. Hinckley, Jr.
Page 27 of 30


**Diagnostic Impressions**

1. Unspecified Schizophrenia Spectrum and Other Psychotic Disorder,  Delusions with Significant Overlapping Mood Episodes, in Remission, 298.8

2. Major Depressive Disorder, Recurrent, in Full Remission, 296.36

3. Narcissistic Personality Disorder, 301.81

4. Allergic Rhinitis

5. Hypertension

6. Arthritis

7. Gastric Esophageal Reflux Disease (GERD)

8. Obesity, moderate


**Forensic Opinion**

Based on my examination of John W. Hinckley, Jr., collateral interviews as listed in this report, and documents and materials reviewed as reflected in this report, it is my opinion to a reasonable degree of medical certainty that John W. Hinckley, Jr., continues to suffer from the above diagnoses although his Unspecified Schizophrenia Spectrum and Other Psychotic Disorder, Delusions with Significant Overlapping Mood Episodes (298.8) and his Major Depressive Disorder, in Remission, Recurrent, in Full Sustained Remission (296.36) are in full sustained remission.  While he demonstrates elements of Narcissistic Personality Disorder, the symptoms are well known to the treatment team and DBH and appear to be largely attenuated.  It is my opinion further that the impact of his treatment, both at Saint Elizabeths Hospital prior to his Conditional Release and subsequent Convalescent Leave for him to be able to live full-time in Williamsburg with the required conditions as listed in the Order, medical records, and this report have resulted in his having made substantial progress in the goals of his being able to live in the community as well as travel independently.  He continues to be prescribed Risperdal 1 milligram every evening and Zoloft 125 milligrams every morning and 25 milligrams every evening.

Ms. Kacie Weston, Esquire
October 16, 2018
Re:  John W. Hinckley, Jr.
Page 28 of 30

Further it is my opinion to a reasonable degree of medical certainty that the Department of Behavioral Health's 501(e) Motion and recommendations for expansion of his Convalescent Leave is appropriate as recommended with two modifications:

1. John Hinckley continue to maintain his daily log, both as a therapeutic and forensic measure to monitor his progress in increased socialization and reduce possible isolation as a risk factor.

2. Consideration of monthly meetings with Dr. Johnson to consist of alternate months of face-to-face evaluation with video (skype) evaluation.

I have not been provided information from any source that would suggest that John W. Hinckley, Jr. has demonstrated dangerous behaviors to himself or others since the implementation of Convalescent Leave on September 10, 2016.

It is my opinion that the Williamsburg treatment team and the Department of Behavioral Health have worked vigorously as has John Hinckley himself and his family to reduce the identified risk factors.

In my report of April 8, 2015 I listed the previously identified risk factors to include:
1. depression,
2. isolation,
3. psychosis,
4. level of insight into mental illness,
5. personality disorder,
6. access to weapons,
7. lack of family support,
8. history of suicide attempts,
9. difficulty in relationships with friends,
10. deception, and
11. financial support and stability.

John Hinckley has not been observed or to have reported symptoms of 1) depression, 2) isolation, although his socialization remains challenging, 3) psychosis, 4) level of insight into his mental illness has improved 5) personality disorder, although he continues to have some difficulties in his interpersonal relationships and expectations, 6) access to weapons, 7) lack of family support, which has been clearly eliminated in his current and future planned living situation, 8) history of suicide attempts, which have not recurred since 1983, 9) difficulty in

28

Ms. Kacie Weston, Esquire
October 16, 2018
Re:  John W. Hinckley, Jr.
Page 29 of 30

relationships with friends, which remains challenging in part because some of the friendships he
has made being limited due to the choices of friends to move to other areas, reduced contacts by
them, and illness, 10) deception, which has not been reported in the records or in collateral
interviews with his treatment team, observed by family members, or reported or observed during
my examination with him, and 11) financial support and stability, which has been largely
addressed by his case manager, Jonathan Weiss, in assisting with his obtaining financial support
via Medicaid, SSDI, and Mr. Hinckley's efforts at self-employment via his ██████████████
and his internet sales.

The identified risk factors require continued treatment and/or monitoring, however none of those
risk factors appear to have been exacerbated by his placement in the community on Convalescent
Leave and several are absent.  The Violence Risk Assessments conducted by Mitchell Hugonnet,
Ph.D. and Samantha Benesh, Psy.D. and medical records also support the Department of
Behavioral Health's recommendations, as do the collateral interviews with his Williamsburg
treatment team, Dr. Nicole Johnson representing the Department of Behavioral Health, and
collateral interviews with his family members.

Based on my examination of Mr. Hinckley and collateral interviews I conducted, it appears the
future plans for Mr. Hinckley's treatment include the continuation of his current Williamsburg
treatment team members in support of his recovery and continued residence in the family home
in Williamsburg.  However, Dr. Giorgi-Guarnieri, Mr. Weiss and Mr. Beffa have all indicated
they may not continue in providing treatment to Mr. Hinckley for more than the next year or two.
Part of the treatment plan should they discontinue treatment is for Mr. Hinckley to receive
services from the Colonial Services Board which has been explored and as he is now a resident
of Williamsburg, Virginia, he would be eligible for services.  Of concern expressed by treatment
team members as well as based on my own experience is that the Colonial Services Board would
not likely be able to provide the intensive case management services provided by Jonathan Weiss
or the familiarity and levels of experience of other treatment providers to comply with the
Court's requirements and forensic reporting.

In addition, the plan for Mr. Hinckley's independent living could include his living on his own in
his own residence as well as the expressed plan of John and Scott Hinckley becoming roommates
in a living environment such as an apartment or a house.  These plans are critically important and
transition from his current highly interactive and supportive Williamsburg treatment team and
continuously supportive and forensically responsible Department of Behavioral Health are
essential for successful implementation.  I believe I have identified my reasons for agreeing with
the Department of Behavioral Health's 501(e) recommendations including not recommending
John Hinckley, Jr. for unconditional release at this time.

Ms. Kacie Weston, Esquire
October 16, 2018
Re:  John W. Hinckley, Jr.
Page 30 of 30


This report is based on available information as listed/noted in this report.  Should additional information be provided I will assess that information in an updated report or addendum, as necessary.

I hope this report has been informative and helpful and I will remain available for further participation in this matter as necessary.

Respectively Submitted,

Raymond F. Patterson, M.D., DLFAPA