### MITCHELL H. HUGONNET, PH.D.
CLINICAL, FORENSIC & NEUROPSYCHOLOGY
**4405 EAST-WEST HIGHWAY**
**SUITE 312**
**BETHESDA, MD 20814 - 4585**
EMAIL: MITCHELL.HUGONNET@GMAIL.COM
EMAIL: FORENSIC.CONSULTATION@GMAIL.COM
MOBILE: 202.246.4846   FAX: 866.362.4846
LICENSED IN DC, MD, VA

October 22, 2018

United States Attorney for the District of Columbia
Judiciary Center Building
555 4th Street, N.W.
Washington, DC 20530

Re:  *United States v. John W. Hinckley, Jr.*, Case No. 1981- CR- 306

<u>Introduction</u>:

I was retained by the Office of the U.S. Attorney to independently review John W. Hinckley's
mental condition and risk of dangerousness, with respect to proposed modifications of the
requirements specified in U.S. District Court Judge Paul L. Friedman's 2016 court order
governing Mr. Hinckley's convalescent leave. Judge Friedman signed the order approving the
government's motion to retain this psychologist on August 17, 2018:

> ORDERED that Dr. Mitchell Hugonnet, may conduct such examination of John
> W. Hinckley in order to determine Mr. Hinckley's present mental condition and
> risk of dangerousness if unconditionally released or conditionally released under
> the conditions proposed by the Department of Behavioral Health.

The Violence Risk Assessment Report authored by Samantha M. Benesh, Psy.D., ABPP on
behalf of and under the auspices of the Department of Behavioral Health considered these
proposed modifications to Mr. Hinckley's current court order, signed by Judge Paul L. Friedman
on July 27, 2016. Mr. Hinkley was discharged from St. Elizabeths Hospital inpatient services to
full-time convalescent leave on September 10, 2016.

> Mr. Hinckley was referred by FOPD for an updated risk assessment. The purpose
> of this assessment was to provide risk management recommendations relevant to
> his convalescent leave status and long-term treatment planning. Specifically, the
> Forensic Outpatient Review Board is seeking recommendations regarding the
> court modifying the conditions of Mr. Hinckley's release to permit him to:
>
> a.    Reduce visits with Dr. Johnson at FOPD in Washington, DC;
> b.    Reduce phone contact with Dr. Johnson;
> c.    Display and/or sell his artistic works, such as photographs, paintings and
>       music;
> d.    Live independently;
> e.    Travel independently outside the 30-mile radius stipulated in the current
>       order;
> f.    Obtain a website to sell items as part of his antique mall business;

g.      Transfer his care from his current treatment providers to the public mental health system in Virginia, namely Colonial Behavioral Health.

When asked about his current community supervision plan and goals for the future, Mr. Hinckley stated his current court order lists nearly 35 conditions for his release, which are "all easy to follow." However, he noted several conditions he would like to see modified in the future. Mr. Hinckley stressed that the court recognizing his ability to care for himself and live independently was his main goal, but he also is requesting that the conditions of his release to be modified to allow him to travel to Richmond and Norfolk independently; reduce contact with Dr. Johnson; permit him to share his music online anonymously; and authorize online sale of items for his ███████████████████ ▌ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████

Executive Summary:

John W. Hinckley, Jr. is a 63-year-old man (DOB: May 29, 1955), presently residing in Williamsburg, Virginia in the Hinckley family home. Mr. Hinckley shot President Ronald Reagan and others in a foiled assassination attempt, outside the Washington Hilton Hotel, on March 30, 1981. The bullets struck the President, Press Secretary James Brady, Secret Service Agent Timothy McCarthy, and Metropolitan Police Officer (MPD) Thomas Delahanty. Mr. Hinckley was adjudicated Not Guilty by Reason of Insanity (NGBRI), by jury trial, on June 21, 1982. The jury verdict found Mr. Hinckley NGBRI with respect to four counts of attempted murder, four counts of criminal possession of a weapon, and four counts of possession of a prohibited weapon. The next day, on June 22, 1982, Mr. Hinckley began a 34-year forensic inpatient commitment to the John Howard Pavilion (JHP), Saint Elizabeths Hospital's (SEH) forensic inpatient services division. On July 27, 2016, the Court granted Mr. Hinckley convalescent leave. Mr. Hinckley was discharged from inpatient care at SEH on September 10, 2016. Mr. Hinckley is presently on convalescent leave and requesting modifications to Judge Friedman's July 27, 2016 order.

Mr. Hinckley's social history, and his extensive 36 year legal and mental health history are well documented in the reports I have reviewed and referenced below. Please refer to these reports and records for this information.

Mr. Hinckley has been living at the home of his mother, JoAnn Hinckley and older brother, Scott Hinckley in Williamsburg, Virginia. Mr. Hinckley remains under the supervision of the District of Columbia Department of Behavioral Health (DBH) Forensic Outpatient Department (FOPD); every month he reports to senior psychiatrist Nicole Johnson, MD, at the DBH office on 35 K St., NW, in Washington, DC. Mr. Hinckley drives himself to these monthly appointments in the District of Columbia. Mr. Hinkley maintains telephone contact with Dr. Johnson weekly. Both report that this arrangement has been working very well. In Williamsburg, Mr. Hinckley is in active treatment with a multidisciplinary treatment team; Mr. Hinckley holds all members of his treatment team in high regard. The treatment team is presently comprised of psychiatrist, Deborah Giorgi-Guarnieri. MD (Dr. G-G), individual and group therapist Carl Beffa, LCSW, case manager Jonathan Weiss, LCSW, and music therapist Nicole Drozd, MS, MC-BT. Mr. Hinckley has worked with Dr. G-G, Mr. Weiss and Mr. Beffa going on 3 years now.

The consensus of the Virginia treatment team and DC DBH Dr. Nicole Johnson is that Mr. Hinkley's progress has been excellent. Mr. Hinckley's mental status has remained stable,

asymptomatic and within normal ranges across multiple emotional and behavioral domains. All of the Mr. Hinckley's current treating professionals consider Mr. Hinckley to be at low risk for psychological decompensation (e.g. depression and extended isolation) and consequently at low risk for harming others.

Dr. Sidney Binks was Mr. Hinckley's individual therapist at St. Elizabeths since 1998, for approximately 19 years; Dr. Binks terminated with Mr. Hinckley on March 22, 2017. Dr. Binks's termination note contained a sole diagnosis of Major Depressive Disorder, with psychosis, in remission. Dr. Binks (and other evaluators) noted that Mr. Hinckley never suffered a recurrence of psychosis or Major Depressive Disorder during the 19 years Dr. Binks had direct knowledge of Mr. Hinckley. Dr. Binks believes that Mr. Hinckley's risk for future violence will be "*entirely dependent*" on *whether* Mr. Hinckley becomes "*severely depressed, with no treatment, for a long time*." Other risk assessors, (Drs. Carpenter and Murphy), had already put forth similar opinions that were consistent with Dr. Binks' March 2017 termination note.

Simply put, if Mr. Hinckley remains in treatment, defined here as adhering to the conditions, requirements and programming specified in Judge Friedman's current and subsequent convalescent leave court orders, Mr. Hinckley's risk for becoming depressed and isolated is low. Sustaining these negative conditions over a sustained period of time would be impossible with the extensive monitoring, multiple weekly treatment contacts and near daily programming requirements and guidelines that are spelled out in the convalescent leave orders issued by Judge Friedman. Mr. Hinckley's risk for psychosis is especially low under present court ordered conditions; it follows that risk of violence has been and remains especially low and unlikely. Risk of violence is the last and least probable link in a four or five link chain; four other conditions must be in effect before risk of violence becomes remotely possible.

The treatment plan in effect since Mr. Hinckley began full time convalescent leave, has been comprehensive, with specific goals, plans and responsibilities for implementing and monitoring treatment adherence and progress. Mr. Hinckley's current treatment team believes that he will continue to make significant strides towards independent living; Mr. Hinckley attends all appointments on time, participates actively in all therapies, and exhibits responsible decision making. He has been able to successfully apply for government benefits as planned. Mr. Hinckley maintains a busy schedule, including taking care of his mother, organizing and maintaining the family household, including cleaning, shopping and meal preparation. Under the supervision of Mr. Weiss, Mr. Hinckley started his own profitable ███████████; he successfully maintains a ████████████████████████ near his home, keeping it ████████████████████████. He anonymously sells books on the internet working with a local pastor and under supervision of Mr. Weiss.  Finally, Mr. Hinckley continues to write and record music with his guitar and keyboard. He paints and takes photographs; at one point, his photography was supervised by a retired professional photographer.

Mr. Hinckley has expressed interest in exhibiting his music and art in an anonymous fashion, without monetary gain. This information was conveyed to me by Mr. Hinckley and members of his treatment team.  Mr. Hinckley's activities, treatment response and clinical condition are extensively documented every month by Mr. Hinckley's treatment team. These records are sent to DBH monthly and reviewed by Dr. Johnson before being submitted to the US District Court. During my interviews with Mr. Hinckley, we discussed his requested modifications to the present court order in effect since his release from inpatient treatment in 2016.  Our conversations included discussions about his life in Williamsburg, thoughts about his future and recollections from his past.  Consistent with current clinical reports and records, (as well as reports and records from St. Elizabeths spanning 34 years), Mr. Hinckley's mental status is within normal ranges, he

is completely asymptomatic. His long-standing mental health diagnoses continue to be in full remission, as has been the case for the past 20 plus years. Mr. Hinkley continues to adhere to his prescribed medication regimen, which has remained the same since his final days as an inpatient at St. Elizabeths Hospital.

*DSM-5 Diagnoses:*
296.36 Major Depressive Disorder, Recurrent, In Full Remission
298.8 Other Specified Schizophrenia Spectrum and Other Psychotic Disorders
301.81 Narcissistic Personality Disorder
301.20 Schizoid Personality Disorder, premorbid

*Medications:*
Zoloft 125mg AM & 25mg PM
Risperdal 1mg AM

Interviews:
- Forensic Interviews and Psychological Assessment:
  - Forensic Clinical Interviews and Psychological Assessment of Mr. Hinckley on September 29 & 30, 2018, lasting approximately 9 hours.
    - Tests Administered:
      - Minnesota Multiphasic Personality Inventory, second edition, (MMPI-2)
      - Minnesota Multiphasic Personality Inventory-2, Restructured Form (MMPI-2 RF)
      - Personality Assessment Inventory (PAI)
      - NEO-3
- Collateral Interviews:
  - Telephone interviews with members of Mr. Hinckley's treatment team in Williamsburg, Virginia:
    - Jonathan Weiss, LCSW, Case Manager, October 12, 2018, 1 hour
    - Nicole Drozd, MS, MC-BT, Certified Music Therapist, October 14, 2018, 1 hour
    - Deborah Giorgi-Guanari, MD, Psychiatrist, October 16, 2018, 45 minutes
    - Carl Beffa, LCSW, Group & Individual Therapist, October 22, 2018, 15 minutes
  - Telephone interview with DC Department of Behavioral Health:
    - Nicole R. Johnson, MD, Psychiatrist, Director FOPD October 12, 2018, 25 minutes
  - Collateral Interviews with Mr. Hinckley's family
    - JoAnn Hinckley, mother, September 30, 2018, 1 hour
    - Scott Hinckley, older brother, September 29, 2018, 1 hour
  - Consultation with Raymond Patterson, MD, Forensic Psychiatrist, October 14, 2018, 25 minutes

Documents Reviewed:

*SEH/JHP Inpatient Records*:

- Report of Forensic Psychiatric Evaluation by Thomas Goldman, MD, November 09, 1981

- Report of Forensic Psychiatric Evaluation by William Carpenter Jr., MD, November 13, 1981
- Report of Forensic Psychiatric Evaluation by David Bear, MD, October 25, 1981
- Psychological Test Report by Thomas J Polley, PhD, July 28, 1982
- Bolton Report by Glenn Miller, MD, July 30, 1982
- Order of Commitment, US District Court, Washington, DC, August 10, 1982
- Nursing Note re: Mr. Hinckley's suicide attempt by Esther Moore, February 13, 1983
- Neurological Consultation by Kenneth Rickler, MD, March 4, 1983
- Psychological Evaluation by Timothy Koltuniak, PhD, August 2, 1985
- Psychiatric Evaluation Report by Glenn Miller, MD, February 12, 1987
- Clinical Summary by David Powell, PhD, September 11, 1989
- Recommendation for Transfer by John D Wilson, MSW, November 27, 1990
- Recommendation for Transfer to Minimum Security by Susan Lerner, PhD, May 11, 1992
- Recommendation for Class D Privileges by John Kelley, MD, October 8, 1992
- Status Report by John Kelley, MD, January 3, 1996
- Psychiatric Evaluation by William T. Carpenter Jr, MD, November 16, 1996
- Psychological Evaluation by David Shapiro, PhD, November 18, 1996
- Psychological Evaluation by R. Mark Binderman, PhD, November 20, 1996
- Recommendation for B City Privileges by John Kelley, MD, May 30, 1997
- Forensic Mental Health Assessment by Kirk Heilbrun, PhD, June 3, 1997
- Psychological Risk Assessment by Paul Montalbano, PhD, February 8, 1999
- Psychological Risk Assessment Update by Paul Montalbano, PhD, November 30, 1999
- Updated Risk Assessment by Paul Montalbano, PhD, January 22, 2003
- Psychological Testing Update by Paul Montalbano, PhD, August 4, 2003
- Psychiatric Evaluation Report by Raymond Patterson, MD, October 29, 2004
- Psychiatric Evaluation Report by Robert Phillips, MD, November 1, 2004
- Psychological Risk Assessment Update by Paul Montalbano, PhD, November 1, 2004
- Psychological Risk Assessment Update by Paul Montalbano, PhD, March 30, 2007
- Psychological Risk Assessment Update by Paul Montalbano, PhD, May 28, 2008
- Comparison of Psychological Testing, 1981-2008
- Violence Risk Assessment Update by Katherine Murphy, PsyD, August 31, 2011
- Forensic Psychiatric Report by Raymond Patterson, MD, November 14, 2011
- Forensic Psychiatric Report by Robert Phillips, MD, November 17, 2011
- Violence Risk Assessment Update by Katherine Murphy, PsyD, March 31, 2015
- Court Opinion & Order for Conditional Release on Convalescent Leave by US District Judge Paul L. Friedman, July 27, 2016

*DBH/FOPD Outpatient Records*:

- Nicole R. Johnson, MD, monthly progress notes, September 2016 to September 2018
- Treatment Team Progress Notes by Jonathan Weiss, LCSW, Carl Beffa, LCSW, Deborah Giorgi-Guarnieri, MD, Nicole Drozd, MS, MT-BC, Sidney Binks, PhD (DBH), and Les Solomon, September 2016 to September 2018
- John Hinckley, Handwritten Daily Activity Logs, October 2016 to September 2018

Forensic Qualifications:

I have practiced forensic psychology for 30 years in a variety of evaluation and treatment settings. Over the course of two (2) years I completed an APA internship and residency in clinical psychology under the auspices of the clinical division of the National Institute of Mental Health (NIMH), St. Elizabeths Hospital (SEH) in the forensic inpatient division, John Howard Pavilion (JHP). Three years later I returned to St. Elizabeths' JHP where I directed a forensic inpatient pre-trial evaluation and treatment unit for 14 years. My forensic work at SEH-JHP included training psychology interns, residents and medical students. In this capacity, I personally conducted pre- and post-trial forensic assessments involving competence to stand trial (CST), criminal responsibility (insanity), competency to waive the insanity defense (Frendak), Miranda rights waivers, sexual and violence risk assessments, and eligibility for civil commitment.

For 15 years, I have been a supervisory forensic psychologist at the Child Guidance Clinic of the Superior Court of the District of Columbia; I served as the Director of Internship Training at the Clinic for nine years. The Clinic conducts forensic evaluations and provides specialized treatment, including risk management, for adolescents in Washington, DC's juvenile justice system. As the Director of Internship Training for the Superior Court's APA accredited psychology internship program, I developed and administered a comprehensive clinical training program with an emphasis on forensic psychological assessment of delinquent youth charged in the Family Division of Superior Court. These court-ordered evaluations include competence to stand trial (CST), competency to waive Miranda rights, juvenile transfer to adult court, assessment of violence and sex offense risk, neuropsychological, psychological and psycho-educational assessments, both pre- and post-disposition. I regularly conduct juvenile CST assessments and I designed and direct the Superior Court's juvenile trial competency attainment training program (CAT). In 2004, I developed and continue to direct the SAVE (Sexual Abuse Violates Everyone) assessment and treatment program for juvenile sex offenders adjudicated and supervised by the Superior Court of the District of Columbia; until recently, SAVE was the first and only juvenile sex offender treatment program in Washington, DC.

In my private practice with adult forensic cases, I have been qualified as an expert witness in forensic psychology in U.S. District Courts in Maryland, Virginia and Washington, DC, state and county courts in Maryland, Virginia and Washington, DC.  I have never failed to qualify as an expert in any jurisdiction. I regularly conduct privately retained adult CST evaluations, sexual and violence risk assessments, insanity examinations, and sentence mitigation. I have been retained by both the United States Attorney and the Public Defender Service in the DC metropolitan area.

I served as consulting psychologist to Police and Fire Clinic Associates for eight years (2001-2008). In this capacity, I conducted over 200 psychological and neuropsychological evaluations to determine fitness for duty or retirement disability for the Metropolitan Police Department (MPD) and District of Columbia Fire Department (DCFD) in Washington, DC.

To practice in Virginia, I completed training in juvenile and adult forensic assessment at the University of Virginia's Institute of Law, Psychiatry & Public Policy (ILPPP). ILPPP training is required to practice forensic psychology in Virginia. I am certified (CSOTP) by the Commonwealth of Virginia to evaluate and treat individuals charged with and convicted of sex offenses. I completed post-doctoral training in clinical neuropsychology at the Fielding Graduate University under the supervision of Dr. Allan F. Mirsky.

<u>Disclosure of Limited Confidentiality and Interview Parameters</u>:

The interviews and psychological testing of Mr. Hinckley, his mother and brother were conducted at the family residence in Williamsburg, VA on September 29 & 30, 2018. Members of the treatment team were interviewed by telephone. Prior to each interview, all were advised of the parameters of the interview and limits of confidentiality:

- This psychologist was retained by the Office of the U.S. Attorney to review the status of Mr. Hinckley's convalescent release.

- U.S. District Court Judge Paul L. Friedman issued an order approving the government's motion to retain this psychologist on August 17, 2018.

- As applicable, all those interviewed were informed that their interview would be recorded and was not confidential; likewise, testing and all provided records associated with the Hinkley case, would not be confidential. Interviewees were informed that any information provided to me may be contained in my forensic report which would be provided to all parties, including the Court, government and the defense.  Furthermore, Court testimony may be required which would likely involve sharing this information in open court.

- Mr. Hinckley, family members, and members of his treatment team referenced above, affirmatively stated an understanding of these limits of confidentiality and associated parameters of this evaluation. All verbalized consent to be interviewed and recorded. After affirming an understanding of these caveats, the interviews commenced.

<u>Psychological Testing</u>:

As referenced above, I administered four psychological tests to Mr. Hinckley on September 29 & 30, 2018 in the family residence. Three of these tests were broad band measures of psychopathology typically used in forensic settings and used in prior risk assessments by clinicians at St. Elizabeths Hospital and John Howard Pavilion. The fourth test assessed normal personality rather than psychopathology. There were no indications of psychopathology in the present testing; results were within normal ranges across all three tests.  The primary domains of interest with respect to Mr. Hinckley's risk of mental decompensation or risk of dangerous behavior, his measured level of depression, degree of social isolation, presence of significant narcissism, antisocial attitudes, were not elevated at all.

Not only were Mr. Hinckley's psychological test results remarkably consistent with each other, these test results were comparable to results from the psychological testing administered by St. Elizabeths Hospital/John Howard over the past 10 to 20 years that reflected clinical improvement over time. Tracing Mr. Hinckley's psychological test results over 30 plus years, the graphed results steadily move downward over the decades; Mr. Hinkley's early hospital profiles were highly elevated due to his severe mental illness. Over years of continuous inpatient treatment, as his mental health and behavioral stability improved, the test profiles begin dropping from being in high ranges of severe psychopathology in the 1980's to the flattened low normal range profiles evident in this century.

The clinical profiles derived from the present administration of the MMPI-2, MMPI-RF, and PAI were essentially within normal limits. There were no elevations on clinical scales measuring degrees of psychopathology. There were the usual elevations on the Repression and Superlative Self-Presentation scales, which are manifestations of chronic traits of defensiveness that are characterological in nature – to prop up his self-esteem, rather than any attempt to consciously manipulate answers to appear well adjusted. Dr. Murphy's 2015 Risk Assessment noted this pattern:

> Mr. Hinckley has produced this profile pattern marked by defensiveness at every administration since evaluated by Marc Binderman, Ph.D. in 1995 and David Shapiro, Ph.D. in 1996. Dr. Shapiro offered [that Mr. Hinckley's] self-favorable …approach to the inventory…appears entirely attributable to emotional reserve and to genuinely self-favorable attitudes, rather than any deliberate effort to bias his responses to look good (on the test).

These current results are generally consistent with multiple test administrations by St. Elizabeths/John Howard as part of the formal risk assessments prepared for Mr. Hinckley's court hearings. These normal range test results, over this very long period of time, accurately reflects the successful treatment of Mr. Hinckley's mental illness and his post-illness mental and behavioral stability reflected in decades of unremarkable entries in Mr. Hinckley's inpatient hospital records, by multidisciplinary treatment providers over two decades. Furthermore, the current test results were completely in line with the positive reports from Mr. Hinckley's treatment team, a consensus of his treatment providers in both Williamsburg, Virginia and Washington DC.

*NEO-3*

Test results from NEO-3 describe Mr. Hinckley as an agreeable individual. He is good natured, trusting, well-intended, cooperative, helpful, and modest. He is kind and quick to forgive if slighted.  Mr. Hinckley rarely experiences episodes of psychological distress. He is not sensitive or moody; he is calm and even-tempered. Mr. Hinckley is willing to consider novel ideas but he does not seek novelty for its own sake. Mr. Hinckley has a normal need for achievement.  He is organized and reliable. Mr. Hinckley enjoys the company of other people but has periods when he prefers to be alone. He has an average energy and activity level. He has the capacity to experience pleasant, cheerful feelings.

Mr. Hinckley is said to cope with everyday life stresses and challenges by using humor, problem solving and direct action. Mr. Hinckley is unlikely to react with hostility toward others, self-blame, or escapist fantasies.

Results of Violence Risk Methods:

The Violence Risk Assessment by Samantha M. Benesh, Psy.D., ABPP, done on behalf of and under the auspices of the Department of Behavioral Health, employed two methods to assess Mr. Hinckley's risk of future violence: The HCR-20 Version 3, employs the structured professional judgment method to evaluate risk factors. The HCR-20 is a widely used method of violence risk assessment.  I reviewed Dr. Benesh's ratings for each of the 20 items that comprise the HCR-20 Version 3. I agree with her ratings and her consequent conclusion that Mr. Hinckley is at low risk for future violence according to the HCR-20 Version 3. The actuarial method of evaluating risk of future violence, the VRAG-R was scored properly and placed Mr. Hinckley in the second lowest of nine risk categories. In 2015, Katherine Murphy's VRAG results were identical, placing Mr. Hinckley in the second lowest risk of re-offense category.

Interviews:

*Interview with Jonathan Weiss, LCSW*:

Mr. Weiss, Mr. Hinckley's case manager in Williamsburg, Virginia, has been working therapeutically with Mr. Hinckley for approximately four years. Mr. Weiss was involved in planning for Mr. Hinckley's full-time convalescent leave, came his full-time case manager approximately two years ago and maintains an excellent therapeutic relationship with Mr. Hinckley as well as the confidence of the Hinckley family. Mr. Weiss said that he is very proud of John described him as doing an excellent job over the past two years living full time in the

community. Mr. Weiss described Mr. Hinckley as becoming progressively more resilient after facing multiple rejections for jobs, volunteer activities and social engagement. Mr. Weiss recalled how shy and quiet Mr. Hinckley was two years ago; Mr. Weiss stated that John has exceeded the goals set for him by his treatment team in many areas of functioning. For example Mr. Weiss stated that nowadays Mr. Hinckley believes in himself, he is not shy or timid as he was two years ago, he is more interested in people and he has become competent at managing his own affairs. Mr. Weiss added that Mr. Hinckley was managing his mother's health issues compassionately and actively. Mr. Weiss stated that Mr. Hinckley is active every day. Although Mr. Weiss sees no need for Mr. Hinckley to continue documenting his activities in daily logs, (a modification to the court order that this psychologist disagrees with), my inspection of logs confirmed how busy Mr. Hinckley tends to be every day.

Mr. Weiss described Mr. Hinckley's ██████████ as a continuing success story. His small business there structures his time, motivates him to learn about ████████ ███, provides opportunities to learn business skills and to connect constructively with other people. Mr. Weiss reported John's confidence in working with others and being with others comfortably has been greatly enhanced by his efforts at the ████. Mr. Weiss's opinions were in line with Mr. Hinckley's own views about the beneficial effects of his business at ███████ ███. Mr. Weiss stated that Mr. Hinckley has good relationships with other small businessmen at the ████████. There have been no problems with members of the public harassing Mr. Hinckley at the ████.



Mr. Weiss spoke highly of Mr. Hinckley's brother, Scott. He opined that the current plan for John and Scott to share an apartment together in the future was sound. He believed the brothers will continue to be a solid source of support for each other. Mr. Weiss has already referred the brothers to a real estate agent who can help them locate an apartment or condominium when the time comes for them to leave the family house. They plan to look at Newport News and Norfolk in addition to Williamsburg for appropriate, safe housing.

Mr. Weiss discussed his views about treatment planning for Mr. Hinckley over the next two years. Mr. Weiss believes that he and Mr. Hinckley's therapist, Carl Beffa, will probably retire at the end of two years so a new arrangement will need to be developed prior to that event and adequate time should be allowed (several months) for the transition in service providers.  While present case management and therapy will stay in place for the next two years, Mr. Hinkley's psychiatrist, Dr. G-G, will terminate with Mr. Hinkley in mid to late 2019.

Mr. Weiss corroborated what Mr. Hinckley had told this psychologist, namely that, he [Mr. Hinckley] knows virtually every point of his lengthy court order and is scrupulous about following every point. For example, Mr. Weiss noted that Mr. Hinckley has been especially conscientious about sticking to the mileage limit imposed upon him for solo driving. When Mr. Weiss and Mr. Hinckley plan a trip, Mr. Hinckley measures and checks the mileage to be sure the trip is appropriate. Mr. Weiss reports that Mr. Hinckley tends to be on time or early for all of his appointments and has been even more conscientious about his mother's medical appointments. Mr. Hinckley was responsible for the majority of his mother's care after she fell and suffered immobilizing injury. Mrs. Hinckley is presently recovering well, due in no small part to her son's daily and strenuous efforts caring for her.

Reflecting upon an incident where a young woman called the police when Mr. Hinckley sent a note to her asking her out for coffee, Mr. Weiss believes that problematic situation may have been do to the fact that the treatment team may push Mr. Hinckley too hard to socialize, without working out step-by-step plans in advance of making such a specific attempt. In any event, in the

wake of that incident, Mr. Weiss reports that Mr. Hinckley is more cautious and is reluctant to take chances meeting any woman without extensive discussion in preparation with his therapist, case manager, and treatment team.

Mr. Weiss affirms that Mr. Hinckley's family continues to be a solid support system for him and Mr. Hinckley reciprocates with significant emotional support for his mother and brother. He believes communication between the family and all members of the treatment team has been and continues to be functional and clear.

Mr. Weiss endorsed the following modifications to the court order: Mr. Hinckley should be able to drive independently destinations such as Richmond, Virginia Beach, Newport News, and Norfolk Virginia. This would require extending the approved radius from 25 to 75 miles. (On this point, this psychologist agrees with Mr. Weiss and Mr. Hinckley). Mr. Weiss endorses Mr. Hinckley's request to display his photography and artwork ███████████████ provided that complete anonymity is guaranteed and no profit would accrue to Mr. Hinckley. Mr. Hinckley wants to display his photography and other works of art in an anonymous nonprofit fashion in order to derive artistic satisfaction from others appreciation of his work. Mr. Weiss also endorsed Mr. Hinckley's plan to display his music on the Internet in a fashion that is also guaranteed to be anonymous and not for profit. This would be done under the supervision of Mr. Hinckley's music therapist, Nicole Drozd, who would have exclusive access to the site and vet all music and lyrics. This vetting of content would need the approval from the treatment team in Virginia and Dr. Nicole Johnson or her designate in the DC Department of Behavioral Health.

Mr. Weiss summarized Mr. Hinckley's progress as steady and positive. He reported that therapist Carl Beffa has been pleased with Mr. Hinckley's progress, especially his active contributions in group therapy where John established helpful connections with other members of the therapy group.  Mr. Weiss emphasized how well Mr. Hinckley has learned to navigate through various bureaucracies to advocate for himself or family members to secure benefits, documents, appointments, etc.

*Interview with Nicole Drozd, MS, MC-BT music therapist:*

Ms. Drozd supported efforts to enable Mr. Hinckley to display his photography/artwork or his music in discrete, safe public forums for others to appreciate. In her professional opinion, this would be extremely therapeutic for Mr. Hinckley as long as there were procedures in place to maintain his anonymity as the artist and ensure no monetary gain would accrue to Mr. Hinckley. She had appropriate concerns about doing each project slowly and deliberately, one project at a time. In other words, Mr. Hinckley would have to choose between displaying his photography and art ██████████ versus displaying his music on the internet. She did not endorse public performances for either his music or artwork.  She pointed to technical and logistical issues that would need to be identified and worked out for either of these new ventures to succeed; therefore initiating and completing one project before starting the other project would be essential for her to endorse this modification to the court order. (I agree with Ms. Drozd's therapeutic opinion and her practical guidelines.) Ms. Drozd would be the point person for the display of recorded music online.  She alone would have the passwords needed to implement any change to music displayed online.  The account would likely be in her name or anonymized in; this would not be Mr. Hinckley's account. She would do initial vetting of the music and lyrics and send the information on to the treatment team in Virginia and to Dr. Johnson at DBH for final approval before uploading to the Internet site. Finally, while Ms. Drozd appreciated how feedback from listeners would be most therapeutic for Mr. Hinckley, satisfying his need as an artist to connect with an audience, Ms. Drozd explicitly did not endorse two-way communication (or chats) on the music

site.  In other words, Mr. Hinckley would not be able to respond to listener feedback, or engage in two-way reciprocal texting between artist and listener. I agree with Ms Drozd; anonymity and all associated safeguards, would be compromised should Mr. Hinckley be allowed to communicate with others via the proposed music share site.

Aside from the issues derived from establishing a safe and therapeutic way for Mr. Hinckley to display his recorded music, Ms. Drozd had many positive things to say about Mr. Hinckley's use of music therapy. She agreed with Mr. Hinckley that music therapy should continue once every month, consistent with present arrangements. She believes that Mr. Hinckley needs music to comfort himself, process his emotions, formulate and convey his ideas about life to others in a thoughtful and constructive fashion. She stated that she had listened to at least 10 of his composed songs, including careful review of his lyrics. She stated that Mr. Hinckley is a good lyricist and plays guitar and keyboards well. Discuss his songwriting, she described his lyrics as "thoughtful and sweet" songs, typically inspired by things going on around him. She also said that he was able to write songs around an assigned theme. She described his mental status as "positive, there is no depression; John continues to find comfort in this new environment." Over the course of working with him during the past year "there been no red flag incidents." Ms. Drozd confirmed the task oriented nature of Mr. Hinkley nowadays, noting "his mood is so up when he is creating." Ms. Drozd agrees with expanding his independent driving distance to 75 miles.

*Interview with Deborah Giorgi-Guarnieri, MD, (or Dr. G-G, as she is known to colleagues and patients), forensic psychiatrist:*

Dr. G-G had multiple positive points to make about Mr. Hinckley's psychiatric treatment: Mr. Hinckley keeps all of his appointments, he is compliant with his medication regimen, he rapidly metabolizes medication, but his medication levels are maintained within a therapeutic range. He remains on the medications he was taking at St. Elizabeths, namely Zoloft and Risperdal.  There have been no psychiatric emergencies, even in times of high stress; Dr. G-G noted, "he handled his mother's illness very well." Mr. Hinckley's mental status has remained within normal limits throughout psychiatric treatment with Dr. G-G: there have been no symptoms of depression or psychosis noted. Dr. G-G's report is consistent with medical records and practitioner reports over decades that note Mr. Hinckley's mental disorders to be in full remission.  Dr. G-G described Mr. Hinckley's behavior as predictable and reliable; "John does everything we ask him to do." Dr. G-G supports extending Mr. Hinckley's solo driving range to 75 miles, noting no problems over the past two years driving himself to DC for monthly appointments with DBH staff. Dr. G-G termed Mr. Hinkley's desire to put his music online for others to hear, "a reasonable next step," as long as Mr. Hinckley maintains anonymity and does not profit monetarily: "This would be a good way for John to feel connected, more a part of the world, with other musicians." Dr. G-G did not consider Mr. Hinkley's desire for others to hear his music and receive feedback an example of the kind of narcissism that is a risk factor for Mr. Hinckley. Dr. G-G said there had been some talk from the treatment team in Virginia about exploring internet dating for Mr. Hinckley; Dr. G-G would be opposed to such efforts, as would music therapist Nicole Drozd; both consider internet dating far too risky, possibly endangering Mr. Hinckley's personal safety.  I agree with both Dr. G-G and Ms. Drozd, Internet dating is not appropriate for Mr. Hinckley. Dr. G-G confirmed she would be ending her practice in Newport News within a year; she stated that she will help with the transition to a suitable psychiatrist. She believes Mr. Hinckley can readily handle this transition. Dr. G-G (and Mr. Hinckley) acknowledged to me that he had readily transitioned to many psychiatrists over the course of the past 36 years in treatment.

*Interview with Nicole R. Johnson, MD, Deputy Chief Clinical Officer, DBH, forensic psychiatrist*:

As the DBH Chief of Forensic Services, Dr. Johnson has been Mr. Hinckley's clinical contact point since his discharge to full time convalescent leave and relocation to Williamsburg Virginia two years ago. Dr. Johnson was promoted in February 2018 to the position of DBH Deputy Chief Clinical Officer. Nevertheless, Dr. Johnson is amenable to continuing as Mr. Hinkley's monitoring clinician and liaison to the Court for the foreseeable future. Both Dr. Johnson and Mr. Hinckley acknowledge having a satisfactory professional relationship. Mr. Hinkley told this psychologist that he was happy to find that Dr. Johnson is continuing to work with him, despite her promotion. Since discharge from inpatient services in July 2016, Mr. Hinckley drives to the DBH outpatient department once a month to discuss various treatment issues with Dr. Johnson. This arrangement allows Dr. Johnson to clinically evaluate and monitor Mr. Hinckley face to face. Dr. Johnson stated that Mr. Hinckley has never had any problem driving himself from Williamsburg, Virginia to Washington, DC and back again, on the same day. Dr. Johnson supports changing the court order to allow Mr. Hinckley to drive solo, within 75 miles of his residence. Mr. Hinckley asked this psychologist to support changing his meeting schedule with Dr. Johnson to every other month. I suggested to Mr. Hinckley, and subsequently to Dr. Johnson that an application such as Skype could be utilized on the months he did not drive to DC. I believe monthly face to face communication is still helpful to both parties. Both Mr. Hinckley and Dr. Johnson considered every other month Skype sessions, alternating with every other month office visits in Washington, DC, a reasonable compromise.

Dr. Johnson's monthly notes document Mr. Hinckley's stable mental status and schedule of activities in great detail. Dr. Johnson described Mr. Hinckley as "a likable person," with a "wry sense of humor." Dr. Johnson stated that Mr. Hinckley was typically receptive to her suggestions and their therapeutic relationship allowed both of them to "joke with each other."
Dr. Johnson noted Mr. Hinckley continues to exhibit normal mental status with no evidence for depression or psychosis. Dr. Johnson noted as a positive factor that the stress associated with transitioning to convalescent leave after 34 years of hospitalization did not precipitate decompensation. Furthermore, she stated that Mr. Hinckley has coped exceedingly well with his mother's illness the stress and responsibility of taking care of her without any deterioration in his mental state. Dr. Johnson praised Mr. Hinckley's comprehensive efforts to nurse his mother back to health.

**Forensic Opinion**:

Mr. Hinckley has requested reconsideration of several conditions contained in Judge Friedman's convalescent release order signed July 27, 2016. Throughout my assessment, I have approached each of these requests by explicitly trying to broker a deal or compromise with the involved parties, to include Mr. Hinckley, his family members and treatment team members in DC and VA. On the one hand, worthy modifications held promise to sustain, bolster and enhance Mr. Hinckley's emotional health, quality of life, meaningful engagement with others, opportunities for artistic and musical expression, responsible independence, self-esteem, sense of security and his pursuit of happiness, broadly defined. On the other hand, some elements of a proposed modification might unnecessarily increase risk for the entire treatment system, the Court and Mr. Hinckley. Taking each request in order:

     a. ***Reduction in visits with Dr. Johnson at FOPD in Washington, DC from monthly to every other month***:

Mr. Hinckley would like to meet with Dr. Johnson in Washington, DC every other month. I suggested that Mr. Hinckley and Dr. Johnson use Skype every other month to ensure continued monthly visual contact. Both said this compromise would work for both of them.

b. ***Reduction in phone contact with Dr. Johnson from weekly to every other week:***

Both Dr. Johnson and Mr. Hinckley agree that weekly phone contact has been helpful. Nevertheless, both Mr. Hinckley and Dr. Johnson would be willing to reduce phone contact to every other week, with the option for increased phone contact if necessary.

c. ***Display and/or sale of artistic works, such as photographs, paintings and music***:

This request is complex; the reader is referred to summaries of my interviews with Mr. Hinckley's music therapist and case manager for details. In the course of discussions with Mr. Hinckley and his treatment providers, two items emerged as non-negotiable. First, Mr. Hinckley agreed to forgo any and all financial gain or profit from display of his artistic works such as his photographs, paintings and his recorded musical compositions. Second, Mr. Hinckley agreed to maintain his anonymity throughout and after the conclusion of any exhibition process; the exhibition process could include display in a gallery or in a suitable on-line site. Public performance of his musical compositions would be out of the question because of the need to maintain and abide by the guiding principal of anonymity.  On-line suitability would require site security, procedures to ensure anonymity and Mr. Hinkley would have no ability administer, upload or download material or to communicate to or from the on-line site. Mr. Hinckley's music therapist, Nicole Drozd, MS, MC-BT, agreed to control the administration of the website and vet all musical material; she would then forward her recommendations to treatment providers in VA and DC for final approval. Mr. Weiss, Mr. Hinckley's case manager would perform similar functions to display Mr. Hinckley's photography and paintings ███████████████ ████. Finally, Mr. Hinckley and his treatment team need to choose to display either his art or his music. These different media pose different, significant and time intensive challenges to realize these plans.  It would be unrealistic if not impossible to attempt both at the same time.

d. ***Transition to independent living***

Mr. Hinckley plans to continue living with at least one family member for the foreseeable future. In the event of his mother's death, Mr. Hinckley and his brother Scott plan to co-locate an apartment or condominium and live together.

e. ***Increase in the approved independent travel distance from 30miles to 75 miles***:

Everyone I interviewed agreed that Mr. Hinckley is ready for an extension of his independent travel up to 75 miles from his residence. This would enable him to pursue additional opportunities for work, socializing, education, attending events, visiting etc.  It should be noted that Mr. Hinckley has successfully traveled from his home in Williamsburg, VA to Washington, DC (a distance of more than 150 miles) on a monthly basis to meet with DBH treatment providers. These journeys have been without incident.

f. ***Obtain a website to sell items as part of his*** ███████████ ***business***:

Mr. Hinckley and I did not discuss this request during our time together. This request involves even more complexity than displaying artworks in a gallery or displaying music online. I, therefore, do not believe this is feasible at the present time.  Displaying recorded music online might be a useful pilot project to better understand the requirements and issues associated with the potential creation of an online presence for his ███████████████.

g. ***Transfer his care from his current treatment providers to the public mental health system in Virginia, namely Colonial Behavioral Health***:

I do not have sufficient information to offer an opinion on this issue.

h. ***Discontinue use of the daily log of activities that Mr. Hinckley submits to his treatment team and Dr. Johnson monthl*y:**

Mr. Hinckley's use of the daily log benefits all parties. I recommend that Mr. Hinckley continue to document his daily activities and submit the log according to established procedures.

Mr. Hinckley has been engaged in treatment for three decades and has been even more engaged during his 2 years on full time convalescent leave in Williamsburg, VA.  The treatment team in VA and DC has treated, monitored and documented his hard work and progress towards specific treatment goals.  These treatment goals are addressing remaining vulnerabilities associated with risk of decompensation leading to increased violence risk.  As Dr. Binks said at termination, Mr. Hinckley's violence potential is the last domino to fall in a chain reaction, that starts with prolonged social isolation, leading to the exacerbation of Mr. Hinckley's major depression and psychotic episodes that may involve grandiose delusions. The current psychological testing and results of the actuarial and structured professional judgment risk methods are consistent with the conclusions of risk assessments conducted over the past 20 years:  Mr. Hinckley's mental illness has been in full remission for at least 20 years and he has been at low risk for decompensation and acts of violence throughout this time.

This report is based on information obtained from multiple sources. It is believed that all information contained herein is accurate and provides an adequate basis to form both clinical and forensic opinions. However, if the information is later found to be substantially inaccurate or should additional relevant information become available, such information may require a review of and/or an amendment of the opinions stated herein.

The opinions and conclusions contained in this report are offered within a degree of reasonable psychological certainty. I am available to testify about the findings in this report.


Sincerely,


Mitchell H. Hugonnet, Ph.D
Licensed Psychologist