**Benesh & Yeaw Consulting LLC**
15912 Crain Highway, Unit B #430 ◆ Brandywine, Maryland 20613
Phone: 202-868-6806 ◆ Fax: 202-417-3948 ◆ forensicpsych@beneshyeaw.com

# Violence Risk Assessment Update
July 27, 2018

## 1.  Identifying Information

Mr. John W. Hinckley, Jr. is a 63-year-old (Date of Birth: ███████, 1955) male who was committed to Saint Elizabeths Hospital (SEH) on June 22, 1982. He was found Not Guilty by Reason of Insanity (NGRI) on June 21, 1982 on four counts of attempted murder, four counts of criminal possession of a weapon, and four counts of possession of a prohibited weapon after he attempted to assassinate President Ronald Reagan on March 30, 1981, wounding the President and press secretary James Brady, Secret Service agent Timothy McCarthy and District of Columbia (DC) police officer Thomas Delahanty. Mr. Hinckley was discharged from SEH on convalescent leave status on September 10, 2016 pursuant to the Court's conditional release order dated July 27, 2016.

Mr. Hinckley currently resides at the home of his mother, JoAnn Hinckley, in Williamsburg, Virginia (VA). He is under the supervision of the DC Forensic Outpatient Department (FOPD) and receives care from a multidisciplinary treatment team in Williamsburg consisting of a psychiatrist (Dr. Deborah Giorgi-Guarnieri), individual/group therapist (Mr. Carl Beffa), case manager (Mr. Jonathan Weiss), and music therapist (Ms. Nicole Drozd).

## 2.  Reason for Referral

Mr. Hinckley was referred by FOPD for an updated risk assessment. The purpose of this assessment was to provide risk management recommendations relevant to his convalescent leave status and long-term treatment planning. Specifically, the Forensic Outpatient Review Board is seeking recommendations regarding the court modifying the conditions of Mr. Hinckley's release to permit him to:

a.  Reduce visits with Dr. Johnson at FOPD in Washington, DC;
b.  Reduce phone contact with Dr. Johnson;
c.  Display and/or sell his artistic works, such as photographs, paintings and music;
d.  Live independently;
e.  Travel independently outside the 30-mile radius stipulated in the current order;
f.  Obtain a website to sell items as part of his ████████████████;
g.  Transfer his care from his current treatment providers to the public mental health system in Virginia, namely Colonial Behavioral Health.

When asked about his current community supervision plan and goals for the future, Mr. Hinckley stated his current court order lists nearly 35 conditions for his release, which are "all easy to follow." However, he noted several conditions he would like to see modified in the future. His primary concern centered on his mother, brother and sister being listed as "responsible persons" in his case. He acknowledged that upon his initial release from SEH this condition made sense as he transitioned to living full-time in the community for the first time in over 34 years but he noted that since late 2016 he has assumed the role

of primary caregiver for his mother and to some extent also fulfills a caretaking role for his brother, Scott Hinckley. Mr. Hinckley described himself as "totally independent," and stated that, despite the fact that he wishes to remain in his mother's home until her death, he would like the flexibility to live independently in the future should he chose to do so. Mr. Hinckley stressed that the court recognizing his ability to care for himself and live independently was his main goal, but he also is requesting that the conditions of his release to be modified to allow him to travel to Richmond and Norfolk independently; reduce contact with Dr. Johnson; permit him to share his music online anonymously; and authorize online sale of items for his ███████████. ████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████

### ■ Notification of the Limits of Confidentiality

This evaluation was conducted at the DC Department of Behavioral Health (DBH)/Mental Health Services Division (MHSD) offices located at 35 K St NE, Washington, DC on June, 26, 2018. Mr. Hinckley was advised of the following:

    a.  The undersigned was contracted by DBH/MHSD to complete this evaluation;

    b.  The evaluation was to gather information relevant to his risk for re-offending and to assist the court in making decisions regarding the conditions of his release;

    c.  The evaluation would include a comprehensive psychological interview, collateral interviews and review of medical and court records;

    d.  The evaluation was for legal purposes, and would not include a treatment relationship;

    e.  A report of the evaluation would be made available to his treatment team, defense attorney, government's attorney and the court;

    f.  If the undersigned was called to testify, the information obtained from this evaluation, as well as other conclusions, could be made public in court.

Mr. Hinckley voiced understanding of the parameters of the evaluation, indicating he has undergone numerous similar evaluations in the past, and agree to participate in the interview.

Similar notifications regarding the limits of confidentiality were provided to all individuals interviewed as collateral sources. All individuals participating in collateral interviews voiced understanding of the purpose of the interview, including limits on confidentiality, and agreed to participate in the interview.

### 4.  Evaluation Methodology

A forensic psychology evaluation involves answering a question relevant to the court through the collection of information using several methods.  This evaluation included the following methods:  interview of Mr. Hinckley about his personal and medical history for over 3 hours; review of Mr. Hinckley's medical and court records; and collateral interviews with JoAnn Hinckley; Scott Hinckley; Diane Sims; Jonathan Weiss, LCSW, Mr. Hinckley's case manager; Carl Beffa, LCSW, Mr. Hinckley's individual and group therapist; Nicole

Drozd, MS, MC-BT, Mr. Hinckley's music therapist; Deborah Giorgi-Guarnieri, MD, Mr. Hinckley's psychiatrist; and Nicole Johnson, MD, FAPA from FOPD. Specialized techniques were also used to assess Mr. Hinckley's relative risk of reoffending while on convalescent leave and to identify viable targets for rehabilitation.

For this evaluation, the risk factors that were considered are empirically selected variables that are known to be correlated with the potential for future general violence (i.e. common attributes among offenders who reoffend). There are several classifications of risk factors. Static factors generally do not change over time and include things such as age at the time of offense, gender, and history of offenses. Dynamic factors can change over time and include employment stability, substance use, and social support. Dynamic risk factors can be potential targets for treatment and rehabilitation.

There are two general approaches to risk assessment. Actuarial methods use statistical probabilities (quantitative factors) to determine the relative risk of an individual offender by comparing him to a sample of similar offenders. This allows the evaluator to identify how often offenders with a similar number of risk factors are rearrested after release. One actuarial tool, the Violence Risk Appraisal Guide – Revised (VRAG-R), was used for this evaluation.

Structured professional judgment is a method in which empirically or theoretically derived risk factors are reviewed systematically and then used to estimate level of risk within qualitative ranges. This method allows for consideration of factors that are more difficult to quantify but have been associated with recidivism in the professional literature. The structured professional judgement tool used for this evaluation was the Historical Clinical Risk Management-20, Version 3 (HCR-20).

The findings of the risk assessment tools are then combined with the clinical evaluation into an integrated risk management assessment.

## 5. Sources of Information

All records were provided by SEH/FOPD staff. An exhaustive list of all records reviewed is not provided below but rather a summary of the most relevant records considered in this assessment.

SEH Inpatient Records
- November 09, 1981 - Report of forensic psychiatric evaluation by Thomas Goldman, MD;
- November 13, 1981 - Report of forensic psychiatric evaluation by William Carpenter Jr., MD;
- October 25, 1981 – Report of forensic psychiatric evaluation by David Bear, MD;
- June 22, 1982 - Handwritten psychiatric assessment by Joan Turkus, MD;
- June 22, 1982 - Handwritten initial social work assessment dated by John Haram, ACSW;
- June 23, 1982 - Nursing assessment by Ruth Brooks, RN;
- June 28, 1982 - Comprehensive social work assessment by John Haram, ACSW;

- July 28, 1982 - Psychological test report by Thomas J Polley, PhD;
- July 30, 1982 - Bolton report by Glenn Miller, MD;
- August 10, 1982 - Order of Commitment from US District Court, Washington, DC;
- August 13, 1982 - Psychiatric note by Joan Turkus, MD;
- September 3, 1982 - Psychiatric note by Joan Turkus, MD;
- February 13, 1983 - Nursing note pertaining to Mr. Hinckley's suicide attempt by Esther Moore;
- March 4, 1983 - Neurological consultation by Kenneth Rickler, MD;
- April-August 1983 - SEH nursing and case management notes;
- August 2, 1985 - Psychological evaluation by Timothy Koltuniak, PhD;
- September 8, 1985 - Recommendations for B privileges (accompanied) and revision of diagnosis by Joan Turkus, MD;
- February 12, 1987 - Psychiatric evaluation report by Glenn Miller, MD;
- March 9, 1987 - Recommendation for expansion of limited "C" privileges, transfer to medium security and a holiday visit by Robert C Morin, PsyD;
- April 26, 1988 - Recommendation for expansion of limited "C" privileges by Susan Lerner, PhD;
- September 11, 1989 - Clinical summary progress note by David Powell, PhD;
- November 27, 1990 – Recommendation for transfer to a less secure unit by John D Wilson, MSW;
- December 30, 1991 - Recommendation for special C privileges for Christmas Eve Day by Susan Lerner, PhD;
- May 11, 1992 - Recommendation for transfer to minimum security by Susan Lerner, PhD;
- October 8, 1992 - Recommendation for class D privileges by John Kelley, MD;
- May 11, 1993 - Recommendation for additional two hours of structured grounds privileges by James C Word, PhD;
- January 3, 1996 - Status report by John Kelley, MD;
- June 25, 1996 - Recommendation for: 1) Conditional release – one day per month, 9-9 with parents and 2) Regular B city privileges (lift requirements for prior notification to US Govt) by Susan Lerner, PhD;
- July 30, 1996 - Addendum to recommendation for conditional release and regular B city privileges by Susan Lerner, PhD;
- August 29, 1996 - Interview with Ms. Bateman (secretary for Ms. Wick) by Thomas J Polley, PhD;
- August 27, 1996 - Interview with Ms. Wick by Thomas J Polley, PhD;
- November 16, 1996 - Psychiatric evaluation by William T. Carpenter Jr, MD;
- November 18, 1996 - Psychological evaluation by David Shapiro, PhD;
- November 20, 1996 - Psychological evaluation by R. Mark Binderman, PhD;
- November 20, 1996 - Psychiatric note/Revised opinion regarding privilege increase by John Kelley, MD;
- May 30, 1997 - Recommendation for B city privileges by John Kelley, MD;
- June 3, 1997 - Forensic mental health assessment by Kirk Heilbrun, PhD;
- February 8, 1999 - Psychological risk assessment by Paul Montalbano, PhD;
- February 9, 1999 - Recommendation for B city privileges by Robert Keisling, MD;

- May 11, 1999 - Recommendation for B city Privileges by Robert Keisling, MD;
- November 30, 1999 - Psychological risk assessment update by Paul Montalbano, PhD;
- July 10, 2000 - Investigative report regarding conditional release motion by Teresa Stathas, MD;
- July 31, 2000 - Recommendation for B and B city privileges to be advanced to C privileges at the treatment teams discretion by Teresa Stathas, MD;
- August 7, 2001 - Recommendation for transfer to minimum security by Teresa Stathas, MD;
- January 22, 2003 - Updated risk assessment by Paul Montalbano, PhD;
- July 29, 2003 - Response to 501(k) motion by Glenda C James, DSW;
- August 4, 2003 - Psychological testing update by Paul Montalbano, PhD;
- October 29, 2004 - Response to 501(k) motion by Glenda C James, DSW;
- October 29, 2004 - Psychiatric evaluation report by Raymond Patterson, MD;
- November 1, 2004 - Psychiatric evaluation report by Robert Phillips, MD;
- November 1, 2004 - Psychological risk assessment update by Paul Montalbano, PhD;
- 2004 - Social work assessment for overnight visitations and eventual placement with family members by Kevin Shamblee, LICSW, ACSW;
- 2004-2005 - Summary notes of overnight visits by Paul Montalbano, PhD;
- July 20, 2005 - Submission of 501(e) motion by Glenda James, DSW;
- July 20, 2005 - Psychological risk assessment update by Paul Montalbano, PhD;
- April 27, 2006 - Recommendation to continue home visits with parents by Nicole Rafanello, PhD;
- December 4, 2006 - Social work assessment update for expansion of overnight visitations with family members by Kevin Shamblee, LICSW, SCSW;
- 2006-2008 - Summary notes of Mr. Hinckley's overnight visits with his parents by Drs. Montalbano, Rafanello and Lee;
- March 30, 2007 - Psychological risk assessment update by Paul Montalbano, PhD;
- May 28, 2008 - Psychological risk assessment update by Paul Montalbano, PhD;
- August 31, 2011 - Violence risk assessment update by Katherine Murphy, PsyD;
- November 14, 2011 - Forensic psychiatric report by Raymond Patterson, MD;
- November 17, 2011 - Forensic psychiatric report by Robert Phillips, MD;
- September 26, 2014 - Recommendation for 501e motion by VJ Hyde;
- February 13, 2015 - Annual status update by VJ Hyde;
- March 31, 2015 - Violence risk assessment update by Katherine Murphy, PsyD;
- 2014-2016 - Various letters to the court from SEH on travel itinerary and outcome of visits;
- July 27, 2016 - Opinion regarding SEH proposal for full-time convalescent leave for Mr. John Hinckley Jr by US District Judge Paul L. Friedman;
- July 27, 2016 - Court Order for conditional release on convalescent leave by US District Judge Paul L. Friedman.

FOPD Outpatient Records

- September 2016 to June 2018 - Monthly progress notes to the court drafted by Nicole Johnson, MD, FAPA;
- September 2016 to May 2018 - Progress notes by Jonathan Weiss, LCSW; Carl Beffa, LCSW; Deborah Giorgi-Guarnieri, MD; Nicole Drozd, MS, MT-BC; Sidney Binks, PhD; and Les Solomon.
- October 2016 to June 2018 - Handwritten daily logs of work and travel by Mr. John Hinckley.

Also considered were the following:

a. Clinical interview with Mr. Hinckley on June 26, 2018 for approximately 3 hours;
b. Collateral interview with Nicole Johnson, MD, FAPA, on June 26, 2018;
c. Collateral interview with Jonathan Weiss, LCSW, case manager, on July 13, 2018;
d. Collateral interview with JoAnn Hinckley, mother of Mr. Hinckley, on July 13, 2018;
e. Collateral interview with Scott Hinckley, brother of Mr. Hinckley, on July 13, 2018;
f. Collateral interview with Carl Beffa, LCSW, individual and group therapist, on July 19, 2018;
g. Collateral interview with Nicole Drozd, MS, MC-BT, music therapist, on July 19, 2018;
h. Collateral interview with Deborah Giorgi-Guarnieri, MD, psychiatrist on July 23, 2018;
i. Collateral interview with Diane Sims, sister of Mr. Hinckley on July 23, 2018;
j. Violence Risk Appraisal Guide-Revised (VRAG-R);
k. The Historical, Clinical, Risk Management-20, Version 3 (HCR-20).

## 6.  Summary of Background Information

*Family and Early Social History*

Mr. Hinckley was born on May 29, 1955 in Ardmore, Oklahoma. He is the youngest of three children born to JoAnn Moore and John W. Hinckley, Sr. His parents remained married until his father's death on January 29, 2008, with no significant periods of separation or marital discord. Mr. Hinckley's childhood has been described as relatively uneventful, with no history of behaviors consistent with conduct disorder and no juvenile arrest record. However, he became increasingly isolated and socially withdrawn in late adolescence and exhibited deceptive behavior during his early twenties (e.g., lying to his parents about his college attendance, having a girlfriend, and his whereabouts). In the five years leading up to the instant offenses, Mr. Hinckley had a strained relationship with his parents and had minimal contact with his siblings, Scott Hinckley and Diane Sims.

*Legal History*

On October 9, 1980, Mr. Hinckley was arrested for the first time after three handguns were found in his suitcase at the Nashville, Tennessee airport. The handguns were confiscated by law enforcement and Mr. Hinckley was released after paying a fine. According to records, he had no other history of involvement with law enforcement prior to the instant offenses.

*Substance Abuse History*

Mr. Hinckley previously reported using marijuana twice in college but has no other history of illicit drug use. He reported occasional alcohol use prior to the instant offenses but has not consumed alcohol since his admission to SEH in 1982.

*Employment History*
Prior to his arrest for the instant offenses, Mr. Hinckley had an erratic work history including approximately 15 jobs, with his longest employment lasting 6-8 months. During this timeframe he also had extended periods of unemployment. Mr. Hinckley has previously reported that he was never fired from a job but often left a job without having another one in place. After his admission to SEH, he began an Industrial Therapy (IT) assignment in 1987. He was consistently employed in clerical and library positions at SEH through IT and the Work Adjustment Training Program (WATP) from 1992 until his discharge in 2016. In November 2009, during period of conditional release to Williamsburg, Mr. Hinckley began volunteering at the library at ███████████████ in VA two days per week. He later transitioned to working five mornings per week in the hospital canteen and continued volunteering there until September 2016, when a change in hospital policy resulted in his position being reallocated to an inpatient consumer.

*Relationship History*
Prior to the instant offenses, Mr. Hinckley dated "irregularly" but never had a reciprocal romantic relationship. His fixation on Jodie Foster has been well documented, as has its association with the instant offenses and his continued attempts to contact her through the 1980s while hospitalized. After his admission to SEH, Mr. Hinckley was noted to develop an "obsession" with an SEH nurse in 1983 but later that year began his first reciprocal romantic relationship with another SEH consumer, ██████.  He continued his relationship with ██████ for many years, even after she was discharged from SEH. In 1995, an SEH staff member reported Mr. Hinckley was demonstrating an inappropriate interest in her and said she was feeling uncomfortable with the attention he was paying to her. After an investigation by staff, Mr. Hinckley was admonished to stop contacting her and he complied with the instruction. By the end of 2004, Mr. Hinckley's relationship with ██████ changed to a platonic one at her request, which was attributed to ██████ discomfort at the level of attention directed toward her by the media and the court as a result of her involvement with Mr. Hinckley. Although Mr. Hinckley was noted to struggle with the ending of his over 20-year romantic relationship with ██████, he stated it was "not a stinging disappointment."

In October 2006, Mr. Hinckley began a relationship with ██████. The relationship changed back and forth from a romantic one to a platonic one throughout 2007. However, Mr. Hinckley ended the relationship in late 2007 after he became upset with comments ████ made to an evaluator performing an updated risk assessment for the Government's attorney. In January 2008, Mr. Hinckley was noted to be involved with another woman, ██████ but she had a boyfriend, which led her to end her romantic involvement with Mr. Hinckley. They maintained a platonic relationship throughout 2008. In August 2008, Mr. Hinckley renewed contact with ██████ in order to rekindle their relationship, but she declined to do so. In early 2009, it was discovered that Mr. Hinckley had used the SEH library computer to look up pictures of a dental resident who treated



him, as well as ▮▮▮▮▮. Later in 2009, his relationship with ▮▮▮▮▮ grew increasingly distant and he eventually decided to stop calling her.

During the end of 2009, Mr. Hinckley became interested in a woman he met on the treatment mall, ▮▮▮▮. Throughout 2010, Mr. Hinckley made requests for ▮▮▮▮ to visit him during his conditional release visits to Williamsburg, which both his treatment team and his mother opposed. In December 2010, following ▮▮▮▮ having a "panic attack" at an SEH holiday party, Mr. Hinckley stopped pressing his request for ▮▮▮▮ to visit him in Williamsburg. Mr. Hinckley reportedly proposed marriage to ▮▮▮▮ in March 2011 but in August 2011 stated they were not engaged because she could not be in Williamsburg with him. Mr. Hinckley has maintained contact with ▮▮▮▮ to the present but he has consistently stated that the relationship is a friendship only.

Mr. Hinckley met ▮▮▮▮ on the SEH treatment mall at the end of 2013. They quickly developed a friendship that continued after ▮▮▮▮ was discharged from SEH in early 2014. They maintained contact primarily via phone and she visited him on weekends through May 2014. Mr. Hinckley described the relationship as an emotional, rather than physical, connection. Shortly after his birthday in May 2014 he received a letter from ▮▮▮▮ requesting to end the relationship. Mr. Hinckley was reportedly surprised because they did not have a "falling out" but acceded to her request.

In February 2015, Mr. Hinckley began a relationship with a woman he met at a NAMI group in Williamsburg, ▮▮▮▮. He reported that the relationship was not romantic but about "companionship." He noted spending time with her at Starbucks and watching movies and playing music during visits together at their parents' homes. ▮▮▮▮ later moved to a group home in ▮▮▮▮ and Mr. Hinckley's contact with her was significantly reduced.

*Brief Psychiatric History*

Mr. Hinckley did not have a history of psychiatric hospitalizations prior to the instant offenses. He first began outpatient treatment with a private psychiatrist, Dr. Rosen, in April 1980. He self-discontinued the antidepressant prescribed by Dr. Rosen after a few weeks, although he continued to take Valium® (diazepam) daily. In October 1980, his parents sought consultation with another private psychiatrist, Dr. Hopper. Dr. Hopper attempted to taper Mr. Hinckley off Valium® and treated him using biofeedback. Mr. Hinckley was noted to attend appointments irregularly leading up to the time of the instant offenses and has previously reported taking up to 20mg of Valium® on the day of the instant offenses.

Mr. Hinckley first attempted suicide via an overdose of Valium® in October 1980 immediately prior to his first appointment with Dr. Hopper. While awaiting trial for the instant offenses, he attempted suicide via an overdose of Tylenol ® (acetaminophen) in May 1981. He attempted suicide for the third time in November 1981 via hanging. His last suicide attempt occurred on February 13, 1983 when he overdosed on Tofranil® (imipramine). He was found unconscious in his room at SEH and was transported to the Greater Southeast Community Hospital. Although he suffered anoxia secondary to the suicide attempt, records indicate he did not experience any negative sequela as a result.

Mr. Hinckley's inpatient treatment at SEH has been documented extensively over the years in numerous reports and motions filed in the court. Upon admission, he was noted to have depressive and psychotic or psychotic-like symptoms, including grandiose delusions. Although treatment providers initially considered diagnoses of Schizophrenia, Schizotypal Personality Disorder, and Borderline Personality Disorder, Mr. Hinckley was ultimately diagnosed with Major Depressive Disorder, Psychotic Disorder Not Otherwise Specified (NOS), Narcissistic Personality Disorder and premorbid Schizoid Personality Disorder. These diagnoses have remained unchanged since 1985, with the exception of being updated in 2015 to be consistent with the Diagnostic and Statistical Manual of Mental Disorders – 5th Edition (DSM-5)[1].

Throughout his hospitalization at SEH, Mr. Hinckley was treated with a number of different antipsychotic and antidepressant medications, as well as group and individual therapy. Throughout the 1980s, he continued to collect pictures of Ms. Foster and was noted to be deceptive about his correspondence (e.g., writing to Ted Bundy, requesting nude caricatures of Ms. Foster). His faulty judgment and continued deceptive behavior led him to be transferred from medium security back to maximum security in August 1988; he was not transferred back to medium security until January 1991. In July 1992, Mr. Hinckley was transferred to minimum security for the first time.

Mr. Hinckley continued to take antipsychotic medication (i.e., Trilafon ®) until May 1993 when it was discontinued. He remained psychiatrically stable through 1994, engaging in twice weekly individual therapy and monthly family therapy. According to SEH records, his mood remained stable and he showed no signs of thought disorder despite his psychiatric medication being discontinued. He continued to demonstrate gradual improvements in his judgment, empathy and interpersonal skills, although he retained a tendency toward self-isolation. In 1995, Mr. Hinckley again demonstrated poor judgment in interpersonal relationships after he became "infatuated" with a SEH staff member. He reportedly discussed the situation with his therapist and his girlfriend and stayed away from the staff member when directed to do so. In 1996, Mr. Hinckley's petition for unsupervised city privileges was not supported by SEH due to the administration's opinion that the positive changes he was evidencing were "superficial in nature." In September 1998, Mr. Hinckley's family therapy was discontinued by the therapist. In October 1998, Mr. Hinckley was informed that information shared in individual therapy would no longer be confidential (i.e., it would be shared with the treatment team) and, as a result, he terminated individual therapy.

After six years without being treated with antipsychotic medication, Mr. Hinckley was started on a prophylactic dose of 1 mg Risperdal ® (risperidone), nightly, beginning in May 1999. In June 1999, he reinitiated individual therapy with a new therapist, Dr. Sydney Binks. In September 1999, Mr. Hinckley had his first outing off hospital grounds in 10 years. These city privileges were noted to have a "profound impact upon his mood and motivation for treatment." In July 2000, during an investigation conducted in response to

---

[1] American Psychiatric Association. (2013). **Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition.** Washington, DC: American Psychiatric Publishing.

Mr. Hinckley's request for once weekly conditional release visits with his parents, it was discovered that ▬▬▬ had purchased a book about Jodie Foster in 1998 and that Mr. Hinckley failed to disclose the information to the treatment team despite learning of it in May 2000. In response to the treatment team discovering this information, Mr. Hinckley was transferred back to medium security to allow for increased monitoring of his relationship with ▬▬▬. He was approved for Class B city privileges in December 2000 and was approved for Class C grounds privileges in October 2000. He began a WATP assignment at the SEH library in February 2001. Mr. Hinckley was transferred back to minimum security in August 2001.

In December 2003, the court granted Mr. Hinckley conditional release for local day visits with his parents. After his first visit with his parents, Mr. Hinckley was described as "ebullient" by his individual therapist, Dr. Binks. By November 2004, Mr. Hinckley had successfully completed six local day visits and two local overnight visits under the supervision of his parents. SEH records note that his mood continued to be stable and no psychotic symptoms had been in evidence for many years. In addition, it was noted by Dr. Montalbano that Mr. Hinckley's "decision-making, stress tolerance and impulse control have been good both within the hospital and in the community." After he reported in October 2004 that he was feeling anxious, had headaches and was not "just not feeling right," Mr. Hinckley's Risperdal® dose was increased and he was started on Zoloft® (sertraline) 25mg twice per day. He was noted to report increased loneliness but not depression. In April 2006, his Risperdal® had been decreased to 1mg again but his Zoloft® dosage had been increased to 75mg.

In December 2005, after identifying a psychiatrist in Williamsburg (i.e., Dr. Lee) to provide local psychiatric care and support for Mr. Hinckley, he was approved for seven conditional release visits to his parents' home. Three of the visits were of one-night duration and four of four-night duration. He successfully completed the visits from February to August 2006. In August 2006, the court permitted Mr. Hinckley to utilize additional visits of four-night duration with no specific cap. During 2006, Mr. Carl Beffa, LCSW, was added to Mr. Hinckley's Williamsburg treatment team to provide case management services.

In 2006, Mrs. Hinckley was ▬▬▬▬▬▬▬▬▬▬▬▬▬▬, Mr. Hinckley, Sr. died ▬▬▬▬▬. Mr. Hinckley was noted to manage the stress of both situations well, without signs of depression or thought disorder. In late 2008, while awaiting the court's decision on his request for expanded conditional release, Mr. Hinckley reported feeling more anxious and requested an increase in his Zoloft®, which was subsequently changed from 100mg to 150mg. In spring 2009, Mr. Hinckley was put on ward hold after he used the library computer during his WATP assignment to look up pictures of a dental resident who treated him. In June 2009, the court expanded his conditional release to 10 days and nine nights. In February 2010, after obtaining his driving permit, Mr. Hinckley began driving during his conditional release visits to Williamsburg. During this timeframe he also began utilizing three hours of unaccompanied leisure time in the community. By summer 2010, Mr. Hinckley was doing most of the driving for his mother. In October 2010, Dr. Giorgi-Guarnieri took over from Dr. Lee as Mr. Hinckley's psychiatrist in Williamsburg. In January 2011, Mr. Hinckley passed the road test and received his driver's license.

In December 2013, Mr. Hinckley was granted 17-day conditional release visits, including 4-hour blocks of leisure time and permission to drive unaccompanied to and from scheduled appointments and work. Mr. Jonathan Weiss, LCSW, was added to the treatment team as a case manager, while Mr. Beffa transitioned to become Mr. Hinckley's individual and group therapist. Mr. Hinckley continued 17-day conditional release visits without incident up to the time he was granted convalescent leave in July 2016.

## 7. Outpatient Course

On September 10, 2016 Mr. Hinckley began living full-time in the home of his mother in Williamsburg, VA. In compliance with his court order, Mr. Hinckley attended appointments with Mr. Weiss on a weekly basis, Dr. Giorgi-Guarnieri twice monthly, Mr. Beffa weekly for group therapy and three times per month for individual therapy, Nicole Drozd monthly for music therapy, and he met with his treatment team as a group on a monthly basis. Mr. Hinckley maintained weekly telephone contact with Dr. Johnson and met with her on a monthly basis at FOPD in Washington, DC. Mr. Hinckley continued meeting with Dr. Binks, his individual therapist from SEH, on a monthly basis during his appointments at FOPD. No problems were noted with his independent travel to Washington, DC and he complied with travel routes and times submitted on his itinerary to the Secret Service.

Within the first three months of being in Williamsburg full-time, Mr. Hinckley had, with the assistance of Mr. Weiss, obtained Supplemental Security Income (SSI) and had applications in process for Medicaid, Medicare and Social Security Disability Insurance (SSDI)[2]. A primary care physician was located and he began medical treatment for ███████████████████████████████████. He was working 30 hours per week selling ██████ for ██████████████ with ████████████ and, on his own initiative, ██████████████████████████████████. Mr. Hinckley also adopted a kitten, Theo, through the local humane society. He continued attending NAMI meetings on a weekly basis, as well as all his scheduled appointments with his treatment providers. Progress notes by Mr. Weiss documented that "his initiative and adjustment to life in Williamsburg has exceeded where they [the treatment team] envisioned he would be after three months."

In December 2016, Mr. Hinckley's female friend, ██████, whom he had met at NAMI, moved back to the area from ██████████. However, Mr. Hinckley's contact with her was limited as he was reportedly "uncomfortable with her continued use of substances." In December 2016, Mr. Hinckley also began spending time with ████████████████████ ████████████████ who shared his interest in music. The two would meet to play music, write songs, and record ██████ playing music. However, Mr. Hinckley's contact with him diminished in January 2017 after ██████ moved to ████████████.

After his transition to full-time residence in Williamsburg, Mr. Hinckley maintained phone contact with ████████, but his requests for her to visit diminished. In January 2017, Mr. Hinckley reportedly attempted to end his relationship with ████████. He was described as "conflicted" about the decision but his therapy group offered him support in his decision.

---

[2] He was subsequently approved for all applied for benefits.

He ultimately decided to maintain a supportive role in ███████ life but rarely initiates phone contact with her.

On March 22, 2017, Mr. Hinckley attended his last individual psychotherapy session with Dr. Binks. In his termination note, Dr. Binks expressed his opinion that Mr. Hinckley's only diagnosis was Major Depressive Disorder (MDD) with psychosis, in remission; and wrote that his Narcissistic personality traits are only prominent when he is experiencing a psychotic episode. Dr. Binks noted that Mr. Hinckley had not had a recurrence of psychosis or MDD in the 19 years that he had been working with Mr. Hinckley. He further indicated that, in his opinion, Mr. Hinckley's risk for violence was "entirely dependent" on Mr. Hinckley becoming "severely depressed with no treatment for a long time." This opinion echoed the opinion offered by several previous risk assessment evaluators (e.g., Drs. Carpenter and Murphy).

In May 2017, Mr. Hinckley's treatment team, in consultation with Dr. Johnson, made the decision to reduce his psychiatric visits to once per month (from twice per month) and reduce his individual psychotherapy appointments to twice per month (from three times per month). He continued to attend group therapy on a weekly basis. As of May 15, 2017, Dr. Johnson's contact with Mrs. Hinckley was also reduced from weekly to twice per month.

In June 2017, Mr. Scott Hinckley arrived in Williamsburg for a visit ███████ ███████████. ██████████████████, he decided to move to Williamsburg permanently and has resided at Mrs. Hinckley's home for the past year. Mr. Scott Hinckley has reported to the treatment team his intent to continue living with his brother in Williamsburg after his mother's death. He indicated he may purchase a condo and have his brother pay rent, or they may share the costs of renting an apartment together.

In late August 2017, Mrs. Hinckley ██ ████████████████. Mr. Hinckley assumed the primary caregiving role for his mother after her injury, transporting her to doctor's appointments and running errands for her, including picking up her medications. Although Mrs. Hinckley's physical health has improved she currently ambulates with a walker and Mr. Hinckley continues to serve as her caregiver, assisting her with many activities of daily living.

In August/September 2017, Mr. Hinckley learned that ██████ committed suicide. Mr. Beffa noted that Mr. Hinckley appeared to cope appropriately with ██████ death. He also indicated that Mr. Hinckley's contact with her had diminished over the preceding year due to his concerns about her continued substance use and their relationship had grown more distant as a result.

In September 2017, Mr. Hinckley opened a ██████████████████. Progress notes indicate the treatment team was pleased with Mr. Hinckley's initiative in starting a new business endeavor; Mr. Beffa reported that Mr. Hinckley earned $300 in the first 12 days ████████████. As he began spending increasing amounts of time ████████ for his ██████ the time Mr. Hinckley spent working for the ██████████████

 decreased significantly. At present, Mr. Hinckley no longer works with Mr. █████████ and is entirely devoted to his own business ███████████, primarily ████████████████████ His daily logs indicate he spends time nearly every day working in support of his business and is occasionally accompanied by Scott Hinckley when he goes to the ███████████ or visits ████████████████████ ████████████.

As Mr. Hinckley began earning increasing amounts of money from his business, Mr. Weiss identified a program called Achieving a Better Life Experience (ABLE) which would allow Mr. Hinckley to deposit money in excess of $2000 without negatively impacting his SSI, Medicaid and SSDI benefits. Mr. Weiss worked with Mr. Hinckley to set up an ABLE account and encouraged him to begin saving money for long-term goals. Mr. Weiss also assisted Mr. Hinckley with applying to remove Mrs. Hinckley as his representative payee; Mr. Hinckley now manages his benefits independently.

Mr. Hinckley's attempts to initiate relationships with women in the community have been documented in progress notes. Mr. Beffa noted that Mr. Hinckley approached a woman from group therapy in the parking lot after group, which was against group rules. The woman did not return to group therapy after the encounter. Mr. Beffa addressed the issue with Mr. Hinckley, who stated he was "just trying to help her get ██████████████ up and running." The woman reportedly did not perceive the interaction that way and apparently believed Mr. Hinckley was interested in her romantically. Mr. Hinckley also wrote a letter to a woman he met in ████████████████ inviting her to meet him for coffee. Although he reported having a nice conversation with her prior to delivering the letter, she reacted negatively to the letter and reported the incident to the local authorities, who notified the Secret Service. It was later learned that she was not aware of Mr. Hinckley's identity during their conversation and became uncomfortable once she learned his last name from the letter.

Overall, progress notes from the treatment team document Mr. Hinckley's satisfactory adjustment to the community and his adherence to the conditions of his release. However, he is noted to have a tendency to interact with people who are 20-30 years younger than him, which may be a barrier to forming close friendships and romantic relationships. In addition, his treatment team has expressed some concern with regard to his lack of motivation to engage in recommended social activities. He does not appear to initiate activities; a treatment team member typically must accompany him to an activity for the first time before he will engage in the activity. Exercise and/or physical activity was identified as a particular area in which Mr. Hinckley appears resistant.

Dr. Giorgi-Guarnieri indicated she plans to relocate to California in late 2019 or early 2020. Discussions have taken place among the treatment team and with Dr. Johnson regarding transferring Mr. Hinckley's care to a new provider within the community. In addition, as of February 2018, Dr. Johnson has assumed a new position within DBH/MHSD but will remain in her role as Mr. Hinckley's FOPD point of contact.

<u>Interview with Mr. John Hinckley, Jr.</u>

Mr. Hinckley expressed his opinion that his transition to convalescent leave went very smoothly because it was a normal progression to live full-time in the community after increasingly longer visits to Williamsburg over the preceding 10 years. He did not identify any challenges to his community integration other than overcoming people's preconceived ideas about him in order to build relationships. Mr. Hinckley discussed his effort to maintain a "low profile" as a way of changing people's perceptions of him; he believes that the longer he remains in Williamsburg without any incidents coming to the attention of the public the more likely it is that people will "think 'wow, maybe he's an ok guy'" and be willing to take the time to get to know him better. Mr. Hinckley said he generally feels more comfortable in social situations now than in the past. He no longer feels nervous in groups and said he is more willing to strike up conversations with people. He stated that although "all my life I was introverted," he would no longer describe himself in those terms; "I wouldn't call myself the life of the party but I think I have come out of my shell so to speak."

Mr. Hinckley reported that in June 2017 his brother, Scott, came to Williamsburg for a visit ███████████████████████   ████████████████████ Scott decided to remain in Williamsburg at his mother's home. Mr. Hinckley has been happy to have Scott living with him and noted that their relationship is closer now than it has ever been. They regularly run errands together and have attended baseball games and concerts in the community together. Mr. Hinckley said it is "very easy" to live with Scott and, as a result, they are planning to live together after their mother dies. Mr. Hinckley said although he would do well living on his own, he feels obliged to live with brother because Scott does not drive and Mr. Hinckley provides transportation for him. He noted that Mr. Weiss has introduced them to a realtor who will assist them in finding a short-term rental while they are looking for permanent housing, which will be either an apartment or condo. Mr. Hinckley expressed some concern about the high cost of housing in Williamsburg and indicated he is interested in moving to ████████████. However, he stated his brother has told him he prefers to stay in Williamsburg, to which Mr. Hinckley is not opposed.

Mr. Hinckley said although he has discussed with Mr. Weiss and his brother what would happen with their housing after his mother's death, he would like to remain living in her home until that time. He said his mother, who is in her early nineties, is "doing fine health-wise" and has "recovered" from ████████████ in August 2017. However, he continues to take her to appointments and assists her around the house. He is "fine" with his role as his mother's caregiver and said it "gives me pleasure and gratification to be able to take care of her." When asked about how he will cope with his mother's death, Mr. Hinckley said, "I will miss her terribly but I know I will be fine." He then discussed his father's death in 2008 and their "estranged relationship up until the last few years" before his death. He stated, "I had what I think a lot of people have that 'I wish I had said this or done this' and so, I think I am trying to do that with mom now." He described "working hard" to take care of his mother in order "to give her good things in her final - I don't want to say days, but time."

Mr. Hinckley spoke with pride about starting ████████████████ in September 2017. He described striking up a conversation with a man at a ████████ who told him he was

looking ████████████████████████. Mr. Hinckley became "intrigued" and took the initiative to investigate the █████opportunity further. He eventually ████████ ██████████████. Mr. Hinckley spends time nearly every day ████████ ██████████████. From September 2017 to May 2018 he earned between $200-500 per month ████████████, although he noted 10% of his sales are paid ████████████. On June 1, 2018 ████████ and reported earning $800 in his first month. Mr. Hinckley said he appreciates that he is able to run his business anonymously ████████████; ██████████████████████ ████████████████████. Mr. Hinckley indicated he would like to expand his business in the future ████████████████. He said he does not have the skills to manage a ██████ on his own but would like to explore the costs associated with hiring someone to create and manage a website for him.

Mr. Hinckley stated that although his ████████████ is going well, "this [████████ is not going to make me rich, [it is] something to have money in my pocket." Mr. Weiss has assisted him in applying for SSI and SSDI but he noted that with these benefits he is not permitted to have more than $2000 in his bank account. However, Mr. Weiss recently helped him set up an ABLE account, which allows him to save more money without negatively impacting his SSI and SSDI benefits. Mr. Hinckley said he currently has a "small amount" in his ABLE account.  He does not presently have any concerns about his finances, stating "I always have spending money." He said his brother "has some money" and shares in household expenses, including groceries and upkeep of their vehicle, while his mother pays for utilities and property taxes. When asked about how his financial situation would change after his mother's death, Mr. Hinckley stated that while some expenses would increase (e.g. housing costs) other expenses would decrease (e.g. food). He also said that his mother has a ████████████ and that he would have up to 90 days to move out of the house after her death.

In regard to other activities outside of his ████████████, Mr. Hinckley continues to shoot photography "occasionally…either on my own or with ████████ and he plays "music a little more than occasionally." He acknowledged that he does not play music as often as in the past, stating that this change is largely due to his involvement with his ██████ ████████, "but also because of the frustration of producing songs and I can't do anything with it." He described his current process of recording songs.

> I get it where I think it is really nice. [I] play it for a few family members and then I have to discard it. That becomes frustrating. I know there is a concern that 'if he wants to put things up anonymously can he stay anonymous?' but I am sure there are ways.

Mr. Hinckley said that displaying his art and music anonymously is "something we [the treatment team] talked about for years but never came to fruition." He did not express an interest in selling his art but he said the ability to share his music or art with others would "help me have a sense of accomplishment to put it out there, to get feedback, have others

enjoy it." When asked his thoughts about what would happen if it were discovered that he was the creator of the art or music, he stated,

> I think they [the public] would want to judge me on who I am instead of just seeing the work as it is. They would only have an interest in the artwork or music because it's me - if it is known that I produced the art work or whatever. The key to doing this would be to try to stay anonymous.

In regard to how he would handle negative feedback on his work, Mr. Hinckley said he is not "thin skinned" and that it would not upset him if "someone said that song sucks." He further stated, "I just think artists, what drives them is they create something and they want to share it. They don't want to create and then put it in a drawer."

Mr. Hinckley said that although he has felt frustrated with his inability to share his music in a larger forum, he still enjoys creating music and engaging in music therapy. He elaborated,

> I like it a lot. I think she [Ms. Drozd] was getting the wrong impression that I wanted to stop it. Not quite sure how that developed. I enjoyed it. I think she was thinking 'He's not motivated the way he used to be and wants to stop it.' I don't feel it that way. I would really like to continue [with music therapy].

He then proceeded to discuss a recent project he completed during music therapy wherein he produced a song with a color in the title. He enjoyed the project and the feedback he received from Ms. Drozd when he shared his song with her.

When asked about interpersonal relationships, Mr. Hinckley said he has a few friendships but does not have any "close" friends, which he described as people he spends time with on a consistent basis. He said friendships are something he needs to work on, stating "I think I would be happier if I had a close friend in Williamsburg, if I had a day-to-day close friend." He identified a friend, ███ with whom he used to play music, but said ███ was recently married and he has not had any contact with him in the past few months. He continues to meet with ████████████ to take photographs occasionally and attended a baseball game with him, but their contact has also dropped off over the past year as Mr. Hinckley has been spending considerable amounts of time on his ██████████ and has become frustrated with his inability to share his photography with a broader audience (e.g., enter it anonymously in an █████████).

Mr. Hinckley said he is not currently involved in a romantic relationship and stated his last romantic relationship was with ████████ ████████ continues to call him on a daily basis but he said their relationship primarily consists of him providing her support as she continues to struggle with symptoms of mental illness. He indicated that although at one time he wanted her to visit him in Williamsburg, he no longer believes it would be a good idea. He cited his treatment team's concerns that she could decompensate while visiting Williamsburg or act out behaviorally, calling negative attention to Mr. Hinckley. Mr.

Hinckley acknowledged ███████ "propensity for getting in trouble" and said this would be at odds with his desire to maintain a "low profile" in Williamsburg.

When asked about recent attempts to cultivate relationships with women in Williamsburg, Mr. Hinckley related that a few months ago he met a woman in ████████████████ while he was driving home. He said he noticed the woman ████████████ and stopped to engage in conversation with her for approximately five minutes. He felt the conversation went well and, afterward, wanted to ask her to meet him for a cup of coffee. He called Mr. Weiss to discuss the matter, asking for advice, and they determined together that a good approach would be for Mr. Hinckley to leave a note ████████████ inviting her to a local coffee shop and providing his contact information. Mr. Hinckley did so but the woman was apparently upset when she learned his last name and "called the authorities." This resulted in the Secret Service being notified. Mr. Hinckley later discussed the event with his treatment team, who suggested he make sure women are aware of his identity prior to him pursuing further social interaction. When asked his thoughts about the event now, he stated, "I don't know if it's fear but people have such a built-up impression of me all these years but once they talk to me and get to know me I think they have a good impression of me." He expressed current interest in a woman he sees regularly at a local grocery store but he is proceeding slowly in his conversations with her to ensure she is aware of his identity and to determine whether she is already involved in another relationship.

Mr. Hinckley said he has been discussing his desire for relationships and efforts to build relationships with his treatment team, as well as during group therapy. He stated, "I think in the beginning individual [therapy] was more helpful but I have really come to like the group, so right now the group [therapy] is more helpful." He identified "the camaraderie" and "feedback" he receives through group therapy as its most helpful aspects. Although he was involved in group therapy while at SEH, many of the group members were "so deep in their illness that I couldn't relate to what was going on in their lives." However, in his current therapy group, "I can relate and help them with their situation and they can help me."

Mr. Hinckley finds it easy to talk with all of his treatment providers and he is happy with the composition of his current treatment team. He is aware that Dr. Giorgi-Guarnieri is planning to relocate in either 2019 or 2020 and although he wishes he could continue meeting with her, he said he accepts that he cannot "change the situation." When asked about how he will handle switching to a new psychiatrist, he stated "I have had many, many psychiatrists in my life. It won't be much of a shock to have another one."

In a discussion of his contacts with FOPD, Mr. Hinckley said he updates Dr. Johnson on his activities and progress during their weekly phone calls. As a result, he finds there is little to talk about during their monthly in-person meetings. In addition, he noted that the drive to Washington, DC each month is sometimes stressful due to traffic, which has contributed to his request to decrease the frequency of his visits to FOPD.

Mr. Hinckley identified his main treatment goal as increasing socialization. He acknowledged that he has been focused on his ███████████ and his mother's care to the detriment of engaging in social activities in the community. However, he does view his ███████████ as an opportunity for socialization; he reported interacting with the people at the ███████ on a nearly daily basis as well as employees at ███████████. He indicated that as part of increasing his socialization and engaging in more activities in the community, he would like the ability to travel further than 30 miles from his home. He expressed a specific desire to visit Richmond and explore the Norfolk area further.

Interview with Nicole Johnson, MD, FAPA
Despite transferring to a new position within DBH, Dr. Johnson said she will remain Mr. Hinckley's point of contact at FOPD as long as she is employed by DBH.

Dr. Johnson currently speaks with Mr. Hinckley on the phone once per week and meets with him at FOPD in Washington, DC on a monthly basis. He has always been compliant with the conditions of his release requiring him to call Dr. Johnson on a weekly basis and meet in-person monthly. She noted that Mr. Hinckley would like to reduce in-person visits to every 6-8 weeks and phone contact to every other week. However, she expressed concern that Mr. Hinckley's risk to isolate himself may increase if he reduces contact with FOPD. She observed that Mr. Hinckley appears to have "very little motivation" and may be "less engaged" if his appointments are reduced. Dr. Johnson provided the example of Mr. Hinckley's unwillingness to do activities unless a member of the treatment team goes with him and further stated, Mr. Hinckley "always has excuses" for "why he can't do things." Dr. Johnson and the treatment team have prompted Mr. Hinckley to join and utilize a recreation center for exercise, but he repeatedly fails to do so citing various injuries and health concerns. She questioned whether his apparent lack of motivation to engage in activities was due to his personality, a fear of rejection or a combination of the two. In regard to Mr. Hinckley's request to expand the distance he can drive independently to increase opportunities to engage in social activities, Dr. Johnson noted that Mr. Hinckley has never submitted a request to travel alone outside of 30 miles nor has he expressed to her any interest in traveling outside of 30 miles until recently, in the context of this updated risk assessment.

As far as plans for the future, Dr. Johnson said it was her understanding that Mr. Hinckley would remain living in his mother's home until her death, at which time he would move into a new residence with his brother, Scott. Dr. Johnson speaks with Mrs. Hinckley every other week and she had not reported any issues with her son's behavior, mental or physical health. Mr. Hinckley has taken on a "caregiver/nurse role" with his mother and also takes care of his brother "to some extent".

Dr. Johnson is not aware of Mr. Hinckley having any female friends or romantic partners in his life, other than ███████. According to Dr. Johnson, Mr. Hinckley "broke it off" with ███████ but he continues to speak with her on a daily basis. She stated that Mr. Hinckley "initially didn't understand the risk" of ███████ visiting him in Williamsburg but now appears to understand it would not be in his best interests to have her visit him. Dr. Johnson

expressed concern that Mr. Hinckley has a tendency to focus on women who are 20-30 years his junior and that this may be a barrier to him developing a romantic relationship.

Mr. Hinckley has not had any changes to his psychiatric medications since he was discharged from SEH. Dr. Giorgi-Guarnieri has informed Dr. Johnson she would like to start Mr. Hinckley on ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ Dr. Johnson expressed her opinion that with Dr. Giorgi-Guarnieri relocating in 2019 it may be a good time to transfer all of his mental health care to the public system. However, Dr. Johnson noted that Dr. Giorgi-Guarnieri is currently the only person with a forensic background on Mr. Hinckley's treatment team and it will likely be difficult to find another forensically-trained psychiatrist to add to the team.

Interview with Jonathan Weiss, LCSW

Mr. Weiss described himself as the "care coordinator" for Mr. Hinckley and has been working with him for approximately four years. He is currently in contact with Mr. Hinckley 7-8 times per month. He stated, "I have been surprisingly pleased by the progress John has made" since he was discharged from SEH. He further said, there have been "no major problems with John or his behavior" and that he has been "very direct and honest" with Mr. Weiss during their work together. When he initially began meeting with Mr. Hinckley, he was reticent to become involved in activities and would walk with his "head down," which Mr. Weiss partly attributed to the rejection Mr. Hinckley experienced early on in his attempts to integrate into the Williamsburg community. However, since his release on convalescent leave, Mr. Hinckley "has really blossomed;" he is now "more willing to take some risk and not dismiss things if he has misgivings about them." He sees Mr. Hinckley being more social than he was previously, often striking up conversations with people he meets in the community.

Mr. Weiss said Mr. Hinckley has shown great determination and the ability to handle frustration in a sensible, "not overreactive" manner. He provided the example of navigating "some bumps generated by getting benefits." Mr. Hinckley now receives SSI, SSDI, Medicaid and Medicare benefits. Mr. Weiss also assisted him with the application to remove his mother as his representative payee and become his own social security payee. Although Mrs. Hinckley is "mentally great," Mr. Weiss described her as physically "feeble" and indicated that the reporting requirements for being Mr. Hinckley's payee were becoming increasingly difficult for her to manage. He also indicated that Mr. Hinckley demonstrated the ability to manage his own money and had no need of a representative payee. In addition to applying for benefits and changing his payee, Mr. Weiss assisted Mr. Hinckley is setting up an ABLE account, which allows Mr. Hinckley to deposit up to $14,000 per year, to a maximum of $100,000, without resulting in a reduction in his SSI or Medicaid benefits. Mr. Weiss has been "a little frustrated" that Mr. Hinckley has not moved more money into his ABLE account[3] but he acknowledged that Mr. Hinckley recently expanded his ████████████, which required him to ████████████████.

---

[3] Mr. Weiss estimated Mr. Hinckley has $2000 in his ABLE account.

Mr. Weiss described Scott Hinckley moving to Williamsburg last year as "extremely positive." It was his understanding that prior to the move, Mr. Hinckley did not have a strong relationship with Scott; he was closer to his sister, Diane. However, since Scott moved in, "they go out and do all the shopping together" and "do more together in the community." Although Scott was historically the "leader of the family," Mr. Weiss said that now Mr. Hinckley "seems to be the leader between the two of them."  Mr. Weiss has discussed future housing plans with Mr. Hinckley and Scott and has put them in touch with a realtor. Scott has told Mr. Weiss that he and his brother will have 60 days to vacate their mother's house after her death due to a ███████████████ but that ███████████ ████████████████ it is possible they will be given longer than 60 days. The current plan is to find a rental in the Williamsburg area that the brothers could share. Mr. Weiss said Scott has committed to contributing "some resources he has" toward either the purchase or rental of a shared residence. While Mr. Weiss sees Mr. Hinckley as having a stable housing situation currently with a plan for the future in place, he also indicated he would like to see Mr. Hinckley and his brother get their own place sooner rather than later to ensure his housing remains stable.

Mr. Weiss was most recently at the Hinckley home at the end of June 2018 and described the house as "spotless" and "well kept." Mr. Hinckley takes care of most of the household maintenance and chores, occasionally cooks meals for his brother and mother, and does all of the driving for the household. He visits the local grocery store several times per week and has been making an effort to cut down on fast food purchases. Mr. Weiss observed that everyone in the household seems "content" with how bills are paid and expenses are shared. Mr. Hinckley also takes his mother to all of her medical appointments and has been "a major support" for her since she ██████████████ in August 2017.

Mr. Weiss had lunch with Mr. Hinckley and Scott on July 12, 2018 and visited Mr. Hinckley's ████████ ████████████████ that same day. Mr. Weiss noted Mr. Hinckley seemed "like he belongs" at the ████████████ and was pleased to see his progress, stating that the ████████ is going "extremely well." Mr. Weiss has supported Mr. Hinckley in learning about ████████████████, using computers and getting his taxes completed. He was very complimentary of Mr. Hinckley's ████████████████ and the initiative he has shown in this area. Mr. Hinckley spends time at the ████████████ "almost every day" and his involvement with the business has increased his number of social connections due to the approximately ████████████████████████████████.

Despite the progress Mr. Hinckley has made in socialization, Mr. Weiss identified this as the area in which he would like to see Mr. Hinckley make the most progress. He said there has "clearly been resistance" from Mr. Hinckley to becoming more involved in activities in the community. However, Mr. Weiss suggested that some of this resistance may be attributed to the treatment team recommending Mr. Hinckley become involved in activities that "are not things that resonate with him tremendously." He provided the example of the treatment team encouraging Mr. Hinckley to exercise either at the ████████████████ or by doing yoga despite the fact that Mr. Hinckley does not enjoy physical activity. Mr. Weiss identified past rejection by the community as another possible

contributor to Mr. Hinckley's resistance to engaging in social events. He discussed Mr. Hinckley being denied positions at the ████████ and ████████, being asked to leave a ██████ group event he attended with his sister, and the negative reaction to Mr. Hinckley in the media and community after Mr. Brady's death. Mr. Weiss would like to see Mr. Hinckley become involved in activities that are "meaningful" to him rather than participate only because "he is required or pressured to do things." As an example, Mr. Hinckley took a class on ████████ with Mr. Weiss through the ████████ ██████ in Williamsburg, which is ████████████████. Mr. Weiss said Mr. Hinckley has since talked with his brother about taking additional classes together. Mr. Weiss also noted that Mr. Hinckley spends a great deal of time at ████████████████ looking for ██████ and has even driven to Newport News to look for ██████ He sees the time Mr. Hinckley devotes to his ██████ as an indication that it is something he enjoys and finds meaningful.

Mr. Weiss suggested that increasing the distance Mr. Hinckley can independently drive from his home may "allow for more integration" and help Mr. Hinckley "get involved in more things." Mr. Weiss observed that Mr. Hinckley has driven to Washington, DC every month without issue and has strictly adhered to the restrictions on his travel. Mr. Weiss related that Mr. Hinckley "made ████████] turn around because there is a certain spot in Newport News that is over 30 miles [away from his home.]" He also recalled that Mr. Hinckley appeared concerned about the distance he would need to travel to attend an ██ ████████ game in Norfolk with Mr. Weiss, which was ██ miles from his home. Mr. Weiss stated he is "strongly in favor" of the court allowing Mr. Hinckley to travel further than 30 miles from his home independently.

Although he is of the opinion that increasing Mr. Hinckley's travel radius would be beneficial, Mr. Weiss stated that the treatment team "all have come to believe the one real issue for John is his music and art with the restriction the court has placed." Mr. Weiss indicated it "took a while" for the treatment team to realize that the restriction on Mr. Hinckley playing his music publicly "meant anywhere outside his home." Mr. Weiss connected Mr. Hinckley with ████████ and they began taking photographs together, but Mr. Weiss said Mr. Hinckley "has backed off from that" due to frustration with his inability "to put art out there and see what is thought of it." Mr. Weiss explored Mr. Hinckley displaying his photography anonymously at ████████████████ ████████ but learned through Dr. Johnson that it was not "permitted" due to "the way the [court] order was written." Mr. Weiss said,

> I believe that if those doors could be opened somehow – he should not be gaining anything monetarily or credit-wise but if somehow the door could be opened to allow him to connect with others, if that would be permissible – making sure he in no way profits from it except emotionally – then from where I sit I think that would be a positive move in the potential to connect and improving his connection.

When asked about Mr. Hinckley's relationships with women, Mr. Weiss said Mr. Beffa would have more in-depth knowledge of that particular area. However, he said he believes Mr. Hinckley "really wants a relationship," although he is not currently involved

in one. Mr. Weiss described Mr. Hinckley's most recent relationship as being with ████ Mr. Hinckley met her through NAMI and he discussed his friendship with her with Mr. Weiss. ████committed suicide 9-10 months ago and Mr. Weiss noted that "it rocked his [Mr. Hinckley's] world" when he learned of her death. Mr. Hinckley does not talk about ████ very much with Mr. Weiss and it was Mr. Weiss' perspective that the relationship has "dwindled." Mr. Hinckley indicated to Mr. Weiss that ████ calls him but "I don't really call her." However, he describes himself as supportive of and empathic toward ████ With regard to Mr. Hinckley's ability to engage in relationships, Mr. Weiss stated,

> He seems to need to continue to refine skills. He is learning how to approach women in the community…I think on occasions in his desire to connect with women he may have gone too fast, maybe because of who he is – maybe pushing the issue to connect, not in an unseemly way or anything. Carl [Beffa] is working with him on that.

Mr. Weiss then discussed a recent incident where a woman ████████████ called the police after receiving a note from Mr. Hinckley. Mr. Weiss said Mr. Hinckley called him to discuss his interest in the woman after he had a friendly conversation with her. Mr. Weiss suggested Mr. Hinckley leave a note in ████████ inviting her to coffee and Mr. Hinckley did so. Mr. Weiss was later contacted by the Secret Service after the woman called the police expressing concern about receiving a letter from John Hinckley. Mr. Weiss said Mr. Hinckley "did nothing wrong" in the situation but that it was a matter of the woman be unaware of Mr. Hinckley's identity. The treatment team has since discussed with Mr. Hinckley the importance of ensuring people are aware of his identity before he attempts to establish a relationship.

Mr. Weiss stated that overall Mr. Hinckley is "doing well" and has been "cooperative." He has not observed any signs of depression, hopelessness, thought disorder, suicidal or homicidal thoughts/behaviors. He observed that when Mr. Hinckley experiences rejection he appears "hurt" but he does not evidence hopelessness. Mr. Weiss said, "He likes life and likes living here and would like a relationship and to express his art."

When asked about transitioning his care to the public system, Mr. Weiss responded by saying "I am torn." Mr. Weiss said the way the current treatment team works together "is positive for John" but that they are "at a point where we are all ready to move forward – to finish retirement." However, Mr. Weiss also said,

> I have some real misgivings with the degree of services and care he [Mr. Hinckley] would get through Colonial Behavioral Health [the public mental health provider in Williamsburg] due to limited resources. I know the case managers have 70-80 clients…crises come up and you do the best you can…but psychiatrists there have hundreds of patients…I am real hesitant about that. I wish I wasn't.

In Mr. Weiss' opinion, forming another team of private providers would "make more sense." However, he acknowledged that Mr. Hinckley would then continue to be burdened with the out-of-pocket expense of case management services and music therapy because

Medicare/Medicaid do not cover those services. Therefore, moving Mr. Hinckley's care to the public mental health system would save him money.

When asked if there were any other aspects of Mr. Hinckley's conditional release that he would recommend modifying, Mr. Weiss said that given Mr. Hinckley's strict adherence to the conditions of his release and openness with his treatment team, he believes the requirement for Mr. Hinckley to continue to maintain a written daily log is unnecessary. He acknowledged Mr. Hinckley's past deceptive behavior but noted that there are been no incidents since 2011.

<u>Interview with Carl Beffa, LCSW</u>

Mr. Beffa said he has been working with Mr. Hinckley for 8-10 years, first as his case manager and currently as his individual and group therapist. Mr. Hinckley engages in individual therapy twice per month and group therapy weekly. Mr. Beffa noted Mr. Hinckley "always is five or 10 minutes early and believes if he gets there on time he's late." Mr. Beffa observed that Mr. Hinckley "has been very adamant about doing what needs to be done" and "doing things by the book." He provided the example of Mr. Hinckley becoming "very concerned if he gets to be 5-10 miles from that boundary" of 30 miles or 50 miles with a member of his treatment team. Mr. Beffa also described Mr. Hinckley as "very responsible" and someone who "follows through with what is expected." He acknowledged Mr. Hinckley had "some mess-ups" when he was in SEH but that since he has been in Williamsburg full-time there have not been any issues with deceptive behavior or compliance. Mr. Beffa echoed Mr. Weiss' comments that Mr. Hinckley has "blossomed…seems to be more relaxed and open," as well as "being more social and connected to people." His affect was also described as being brighter, with Mr. Hinckley smiling and generally responding in a light-hearted manner toward the treatment team. In addition, Mr. Beffa has observed Mr. Hinckley being "very empathic and caring" toward his mother, especially in light of her medical problems over the past year.

In individual therapy, Mr. Beffa has been focusing on increasing Mr. Hinckley's socialization, observing him for signs of narcissism, and monitoring his relationships with women. His relationship with ██████ has been an ongoing topic of treatment over the years; with both the treatment team and Mrs. Hinckley discouraging Mr. Hinckley from inviting her to visit Williamsburg.  Mr. Beffa said ██████ has a tendency to discontinue her medication and "acts up so often…that could easily draw more attention if she gets involved with local authorities" in Williamsburg. Mr. Hinckley "came around to our way of thinking" by January 2017 and realized it "would be detrimental with his goals" to have ██████ visit Williamsburg. Mr. Beffa described it as a "rather slow process." ██████ continues to call Mr. Hinckley "almost daily" but he describes his relationship with her as that of a "caring friend." He reportedly "worries a little bit" about her but he "knows he can't do anything for her [other than] be there in terms of emotional support."

When asked about other romantic relationships Mr. Hinckley has engaged in over the past two years, Mr. Beffa discussed Mr. Hinckley's relationship with ██████ whom he met through a NAMI meeting prior to his discharge from SEH. Mr. Beffa recalled them meeting for coffee at ██████ several times and spending time at each other's residences. After

█████ moved to █████████, their contact reduced significantly. However, even when she returned to the area approximately 18 months ago their contact did not increase substantially. Mr. Beffa said to his knowledge, they last met just over a year ago when █████ requested to come over to the Hinckley residence in order to watch an LGPA tour event. Mr. Hinckley discussed in therapy that he felt "used" by █████ in this instance because "they hadn't had much contact and all of a sudden she wanted to come over and watch" the LGPA event. Within a week of that interaction, █████ took her own life██ █████ ██████████████████████. Mr. Hinckley responded with visible concern and sympathy but Mr. Beffa observed that █████ death occurred "at the same time they were distancing as a relationship due to her continued relapse [with substances]. He was realizing that she was not going to be an ongoing entity [in his life] that would have much long-term potential."

Other than █████ Mr. Beffa said Mr. Hinckley has not engaged in any close relationships with women since his release on convalescent leave. Mr. Beffa described Mr. Hinckley's failed attempt to invite a female █████ for coffee by leaving a note in █████████. He noted that the treatment team had been "cheering him on" because this was the "first time he had taken the initiative and we were encouraging him to strike up conversation" with a woman. Mr. Beffa said the encounter went "poorly," referencing the woman calling the police when she learned Mr. Hinckley's identity. However, through discussions with the treatment team, Mr. Beffa said that Mr. Hinckley "now realizes he needs to make his last name known" and "be up front" about his interest in establishing a relationship. According to Mr. Beffa, Mr. Hinckley has recently mentioned a woman "at a grocery store where he does virtually all of his shopping" who "has apparently taken a liking to him." Mr. Hinckley discussed the "possibility" of developing a relationship with her but so far has only engaged in casual conversation with her.

Apart from romantic relationships, Mr. Beffa said Mr. Hinckley made attempts to develop relationships with █████ therapy group members. Mr. Beffa has a rule of "no meeting outside of group to socialize," so Mr. Hinckley waited until he switched to a █████ therapy group before inviting members from █████████ therapy group to socialize. Mr. Beffa was aware of Mr. Hinckley spending time with both a man and a woman from the █████████ therapy group and indicated that Mr. Hinckley appeared to spend more time socializing with the man due to their mutual interests. However, neither of these interactions developed into close friendships.

Mr. Beffa identified Mr. Hinckley's brother, Scott, as a personal support for Mr. Hinckley and someone with whom he attends community events. However, he noted that Mr. Hinckley "has to be the instigator or initiator" in order for his brother to engage in an activity outside the home. Mr. Hinckley's █████████████ has also been another source of socialization. Mr. Beffa said overall Mr. Hinckley "has become more engaged and caring" not only with family members, but also with members of his therapy group and people he has met at the █████████ Despite his progress in socialization, Mr. Beffa is continuing to work with Mr. Hinckley to "try to integrate him more into everyday living" in the community of Williamsburg by establishing relationships.

Mr. Beffa indicated that increasing Mr. Hinckley's ability to travel independently is an aspect of continuing his integration into the community. He would like to see Mr. Hinckley's travel radius increased to 100 miles to allow him to visit places in Richmond and Virginia Beach without being "so concerned about being over the limit" of the travel radius. Mr. Beffa said the increase in the travel radius would open up more opportunities for Mr. Hinckley to attend entertainment, cultural and sporting events in the area. Although Mr. Hinckley has not expressed any political views and has only rarely discussed his past offenses in broad terms when the topic has been broached by other members of his therapy group, Mr. Beffa supported keeping in the place the restriction on Mr. Hinckley going to government buildings.

Mr. Beffa identified displaying art, photography or music as another "avenue" for Mr. Hinckley to increase socialization and community integration. Mr. Beffa observed that Mr. Hinckley has "given up on all three" artistic endeavors because he is unable to have others enjoy or judge his work, stating to Mr. Beffa that "no one is going to appreciate it other than my closet." Mr. Hinckley is "constantly shot down" in Mr. Beffa's opinion, whether it be in his attempts to volunteer in the community or share his art, which Mr. Beffa sees as "debilitating" for Mr. Hinckley. Therefore, he is in support of Mr. Hinckley being allowed to display his work anonymously. When asked about the role of narcissism in Mr. Hinckley's request to display his work, Mr. Beffa said he did not see Mr. Hinckley's narcissism increasing if he were allowed to share his art with others. He noted that Mr. Hinckley has had "a lot of opportunities, if he wanted to take them, to brag" about his accomplishments but that he has not done so either individually or during group therapy. Mr. Beffa recalled Mr. Hinckley only noting "in passing" the compliments on his work he received from a well-known photographer. Furthermore, although Mr. Hinckley is clearly "proud" of his ███████████████████, Mr. Beffa does not see it as narcissism but rather simple pride by a ████████████ on a job well done.

Motivation is one area where Mr. Beffa sees room for improvement for Mr. Hinckley. He stated "Jonathan [Weiss] and I always jest with John about the fact that if he has little to no interest in something he doesn't follow through with it." Mr. Beffa provided the example of the treatment team encouraging Mr. Hinckley to become a member of a local gym in order to increase the amount he exercises. Although Mr. Hinckley "hints at doing it" he does not have any "energy or enthusiasm to do it." Mr. Beffa acknowledged that Mr. Hinckley has had some "physical issues" that "could get in the way" of him exercising but he also sees Mr. Hinckley's lack of interest in physical activity as an aspect of his "creative personality." However, Mr. Beffa said there are other areas in which Mr. Hinckley does not "follow through" or "take initiative" such as signing up for ████████████████ ████████████████ Mr. Hinckley typically attends community events such as concerts and baseball games with Mr. Weiss but seems less willing to attend these events on his own. Mr. Beffa stated, "In some ways he is kind of a lump. He just doesn't have the energy to put into initiating something unless he knows he is going to like it or he is going to get something from it." Again, Mr. Beffa emphasized that he sees this as primarily being related to Mr. Hinckley's personality, with his history of being rejected by the community as a lesser, secondary contributor to his lack of motivation.

Apart from occasional lack of motivation to participate in some activities, Mr. Beffa said he has also noted "minor" depression and anxiety in Mr. Hinckley related to situational stressors. He observed some anxiety in Mr. Hinckley when his mother ███████████, which Mr. Beffa said Mr. Hinckley "handled very well." Mr. Beffa said Mr. Hinckley was also upset with some aspects of █████ behavior during their relationship, which he handled by identifying problems and "keep[ing] his distance" from ███ █ when appropriate. Mr. Beffa described Mr. Hinckley as "really astute" in these situations and further stated, "he always handles things very well … in a healthy manner." When Mr. Hinckley does experience anxiety in relationships, Mr. Beffa said it is "in an emotionally attached, empathic manner."

In light of Dr. Giorgi-Guarnieri's upcoming departure from the treatment team, Mr. Beffa said they have discussed transitioning Mr. Hinckley's mental health care to Colonial Behavioral Health, the public mental health provider in Williamsburg. Mr. Beffa indicated that Colonial Behavioral Health provides psychiatric and case management services, as well as supervised apartments[4]. Regarding the possibility of assembling another private treatment team, Mr. Beffa cited concerns about the costs associated with private care and also expressed his belief that Mr. Hinckley "would be hard pressed to find a treatment team like he has now." When asked if he had any concerns that Colonial Behavioral Health would not be able to provide the level of support Mr. Hinckley receives now, Mr. Beffa agreed that a case manager from Colonial Behavioral Health would likely not be able to be as involved with Mr. Hinckley as Mr. Weiss has been over the past two years. However, Mr. Beffa also stated "I think John can take care of himself. He has shown the ability to have independence. Very rarely does John call up Jonathan with any problems." Mr. Beffa opined that "if somebody is on call and checks in once a month [with Mr. Hinckley], I don't see really an issue. I think John has really become rehabilitated in a very fine way."

<u>Interview with Deborah Giorgi-Guarnieri, MD</u>
Dr. Giorgi-Guarnieri (GG) has been Mr. Hinckley's psychiatrist in Williamsburg since 2010. She currently meets with him once per month individually, as well as once per month with the entire treatment team. There have been no changes in Mr. Hinckley's psychiatric medications since his release on convalescent leave, he continues to take 125mg Zoloft® every morning and 25 mg Zoloft® and 1mg Risperdal® every night. Although she has discussed changing medications with Mr. Hinckley due to side effects, he has indicated he is content with his current medications, on which he has been stable for many years. Therefore, Dr. GG has determined that the best approach is to try to manage the side effects through other medications.

Mr. Hinckley's primary care provider (PCP) recently started ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

---

[4] However, Mr. Beffa noted that Mr. Hinckley would not need residential services because he plans to reside with his brother.



. Dr. GG reported some initial challenges in working with Mr. Hinckley's PCP because the PCP was not familiar with the court reporting requirements and did not notify Dr. GG when she prescribed new medications. However, Dr. GG said she discussed the matter with the PCP, who now forwards her treatment records to Dr. GG.

Dr. GG said Mr. Hinckley has "done really well" adjusting to living full-time in the community. She described his mood as "very stable" and has not noted any signs of suicidal or homicidal thoughts, thought disorder or relapse of major depression. She stated that her primary goal for Mr. Hinckley is for him to "lose a little weight and exercise more." She acknowledged that is "hard to do when you have your aches and pains" but that if Mr. Hinckley's health were improved it would "make him more continuously stable."

Dr. GG opined that Mr. Hinckley's community socialization has been adequate, particularly since he has started his business at the ▮▮▮▮▮▮▮▮ where he "talks to ▮▮ ▮▮▮▮▮▮▮▮▮▮▮." However, Dr. GG observed that the public's generally negative view of Mr. Hinckley has been an obstacle in his ability to socialize.

> I think he is more social than he is able to effect in the community. I generally think he likes people and it would be nice for him to be more involved in social things. But it has to be in a setting where they are expecting John. It is not a good idea for him to show up places where nobody knows him. People get worried very quickly.

Dr. GG indicated that this issue is particularly prevalent in Mr. Hinckley's relationship with women. She described the balance between the treatment team "cross examining" Mr. Hinckley on his interactions to ensure he is not creating risk for himself while also suggesting he increase his efforts to establish relationships. She stated "I think a lot of times he is uncomfortable where that leaves him." She provided the example of Mr. Hinckley being encouraged to establish contact with a woman he knew from another setting, to which Mr. Hinckley responded that he was not comfortable doing so without confirming that the woman knew his identity. In this case, Dr. GG felt that Mr. Hinckley appropriately "put the brakes on." Overall, Dr. GG said she is not aware of Mr. Hinckley engaging in any "questionable" behavior around women and there has specifically not been any evidence of him engaging in stalking. From her perspective, the issue has been "more how do you socialize someone who has been institutionalized for 31 years."

Dr. GG stated although she has not finalized when she will step down from Mr. Hinckley's treatment team, she anticipates doing so in the next 18-24 months. She provided notice so far in advance to allow for enough time to locate another forensically-trained psychiatrist and have overlap during the transition. When asked about her thoughts on a transfer to the public mental health system versus locating another private psychiatrist, Dr. GG said there are no other forensically-trained psychiatrists working in the Williamsburg area in private practice. Therefore, Mr. Hinckley would be required to travel a much greater distance if his care was transferred to a private forensic psychiatrist.

However, she noted that Colonial Behavioral Health (i.e., public mental health system) does not have a psychiatrist who is board-certified in forensic psychiatry, although there is a psychiatrist at Colonial Behavioral Health who has been forensically-trained through the state of VA.

With regard to changing contact frequency with FOPD or the treatment team, Dr. GG said "the key" is for the treatment team to be able to increase contact as they deem appropriate. She views this as particularly important as Mr. Hinckley's care is transferred to a new psychiatrist, as he or she will need to "establish a level of comfort" with the conditions of Mr. Hinckley's court order, as well as the reporting and risk assessment requirements.

Dr. GG stated it has been "very reassuring" to have Mr. Hinckley's brother living with him and she feels "calmer about transitioning out of the case" knowing that Scott Hinckley is now living in the local area. She described Scott Hinckley as a "solid guy" and observed that the brothers "like each other" and seem "genuinely concerned for each other's well-being."  Although Mr. Hinckley has discussed with Dr. GG his plans to live with his brother after his mother's death, she indicated that he manages his life in an independent manner and she would also be supportive of him living on his own, if he chose to do so. However, Dr. GG cautioned that following Mrs. Hinckley's death the treatment team should "reassess his adjustment" to ensure he is appropriately handling the loss. Dr. GG said Mr. Hinckley "has always been closest to his mom" and even though the caretaker roles have reversed since Mr. Hinckley has been in the community, she anticipates that Mrs. Hinckley's death will have a large impact on Mr. Hinckley.

With regard to Mr. Hinckley's desire to publicly display his photography and music, Dr. GG stated "both his music and his art are really good. I understand why he would want to have the community say something positive about his work." She identified money and exposure to an audience as the two biggest factors in assessing the risk of Mr. Hinckley sharing his art in public forums. In her opinion, the lowest risk activity would be Mr. Hinckley posting his art anonymously online with no financial profit associated with the display, while the "most risky" activity would be for him to play his music in the community while earning money for his performance. From Dr. GG's perspective, Mr. Hinckley earning money from his art poses a larger risk of contributing to narcissism. She noted he has mentioned to her in the past that he would like to profit from his art or music and that if he were permitted to do so, his activities would need to be monitored much more closely than if he received no financial gain and posted his work anonymously. However, she stated "I am comfortable with whatever the court decides" regarding Mr. Hinckley displaying his photography or performing music publicly. Dr. GG opined that Mr. Hinckley putting his art on display for the community could be a positive step because it would allow the community to "appreciate his contribution to the community after years of being condemned by the community and society for what he did."

Dr. GG said she has no concerns about Mr. Hinckley being allowed to travel independently more than 30 miles from his home. She indicated she was the one who initially raised concerns about Mr. Hinckley traveling to Richmond, primarily due the possibility he would be exposed to protestors near government centers. Dr. GG recalled

that at the time the court was considering convalescent leave for Mr. Hinckley, there was a great deal of racial unrest in Richmond and she was concerned for his safety should a protestor recognize him in the vicinity of a government building. However, she said Mr. Hinckley has proven uninterested in politics, even in the aftermath of the 2016 elections. Furthermore, she is confident he will stay away from government buildings if instructed to do so.

Interview with Nicole Drozd, MS, MT-BC

Ms. Drozd meets with Mr. Hinckley in his home on a monthly basis for approximately one hour. She identified her primary goal as assisting Mr. Hinckley in using music to express himself and to engage in recreational activity through music. He frequently plays his own compositions.  Ms. Drozd said when she first started meeting with Mr. Hinckley "he would share music and record but because he hasn't been able to perform or engage… [it was] stagnating a bit of what we did in music therapy." She noted that he has seemed more engaged in therapy recently since she introduced a "song writing challenge" where he writes a song centered on a topic she provides and then he performs the song for her the following month.

Ms. Drozd has explored events in the local community that would allow Mr. Hinckley to "███ with other musicians in the area, participate in an "███████████ or take a group music class in order to increase his socialization. However, she said all options available would not be permissible within his current court order. She expressed concerns for his "safety" and "privacy" if he were to perform in public but also said she believes "he would be happier and more engaged" if he were allowed greater "access to a little more freedom in a public forum." She noted that while he was in SEH he could share his music with peers but his ability to do so now is very limited. From her perspective, Mr. Hinckley has "been thrown into work he can do" such as the ███████████ because he is prevented from using his music as a social outlet.

> If he has the opportunity to perform at ██████████ or with local musicians he would not only be engaging with other people through music but also would be able to share his own gifts and strengths. He is a great guitar player and songwriter and he doesn't get any feedback other than from [the] treatment team…. He would get social interaction and also validation. He used to do a lot of photography but doesn't as much because he can't submit [his work] anonymously.

When asked whether she recommends that Mr. Hinckley continue in music therapy, she said that although he has indicated he would like to continue meeting with her it is "not necessarily something he needs in this moment." She further explained that a "constant issue is [his] lack of freedom to perform" which creates more "resistance to songwriting or music creation." Ms. Drozd opined that the therapy "might continue to stagnate without an order being changed at least a little bit…Music is a big part of his life… he is a very creative person and it would bring more happiness and fulfillment to his life to have some restrictions off."

Interview with Ms. JoAnn Hinckley

Mrs. Hinckley began the interview by stating she "couldn't speak well enough" of her son's transition to living full-time in Williamsburg. She said,

> John just does everything that he needs to do here and for me. It's like having a maid in the house. He takes care of all his appointments. I never have to remind him about appointments. He does the grocery shopping, drives everywhere for me. . . [he] never has to be reminded to take medications… I am just so happy with the way things have gone. From day one. I just have no complaint at all to give you.

She said her son, Scott, has also moved into her home and that it "couldn't be nicer to have two sons together." She did not identify any problems in John's relationship with Scott and observed that Scott occasionally helps John at the ▇▇▇▇▇▇▇. She recalled Diane visiting a few times over the past two years. She indicated that Diane has been very involved with her new grandson in Los Angeles but has expressed her willingness to travel to Williamsburg should they need her to do so. Mrs. Hinckley described her children as "so compatible with each other."

When her own health was inquired about, Mrs. Hinckley said she ▇▇ and ▇▇▇▇▇▇▇ last year but is "doing well." She described herself as "still dependent" on a walker for ambulation but she hopes to "get rid of it" in the future. John "nurses" her and transports her to her doctor's appointments. He also does chores around the house, including the laundry and shopping. She is no longer his representative payee for his benefits and has noted no problems with John managing his financial affairs.

Mrs. Hinckley affirmed that there are no weapons in their home. She has noted no fluctuations in John's mood over the past two years and said "his health is good." In her opinion, he has been enjoying being in Williamsburg full time and she hopes he will be granted UCR in the future so he could be "completely separated" from the court.

<u>Interview with Mr. Scott Hinckley</u>

Mr. Scott Hinckley has been living in Williamsburg, with his mother and brother, full-time since summer 2017. He stated, "From my perspective John's settlement in Williamsburg has been first rate." He described attending baseball games and outdoor music concerts with his brother, as well as visiting his ▇▇▇▇▇▇▇▇▇▇ "several times." Mr. Scott Hinckley said his brother "spends quite a bit of time" on his ▇▇▇▇▇▇▇ and that it is "a good social outlet, surprisingly so." He noted that his brother appears to have a "very cordial relationship" with the "half dozen people" who work ▇▇▇▇▇▇▇. He expressed his belief that his brother's relationships with other people are more extensive now "because of the continuity he has with being able to stay here, he has developed working relationships with folks at the ▇▇ and I think he's also been able to do a few things on his own that he wasn't able to do before when he was going back and forth to the DC area." Mr. Scott Hinckley noted that John "has a very good relationship with Jonathan Weiss; they do a lot of things together." He said his brother also still talks to ▇▇ ▇▇ on the phone but he is unaware of any other relationships he may have with women. He remarked that John has" tried hard to develop relationships with folks in the Williamsburg area."

When asked about finances, Mr. Scott Hinckley stated "we're in pretty good shape with finances" although they maintain a "tight budget." He said when their mother dies, they will have 60 days to vacate the house because it is under a ████████████. He has spoken with both his brother and Mr. Weiss about housing options once their mother dies and the current plan is to share either an apartment or condo in Williamsburg, which they would locate with the assistance of a realtor identified by Mr. Weiss.

Mr. Scott Hinckley said his brother "does a good job" keeping track of all of his appointments, as well as their mother's appointments. He noted that his mother "needed a lot of care" after she ███████ in August 2017 and that John took the lead in "dealing with our mother." He indicated that his brother adheres to his schedule of meetings very closely and has never complained about the conditions of his release. However, Mr. Scott Hinckley expressed that it "would be nice if he were allowed to travel more than 25 miles from home" on his own so he could visit more places and pick up family from the airport.

<u>Interview with Diane Sims</u>
Ms. Sims said she calls to speak with her mother and brothers at least once, and sometimes twice, a week. She last visited Williamsburg in October 2017. She indicated her mother's home is not conducive to her visiting (e.g., she must sleep on the couch) now that her brother, Scott, has also moved into the home. Ms. Sims also stated if she had been concerned about anything with John or her mother she would have visited more often in the past year. However, she said she is "on call 24/7" and available to fly to Williamsburg at a moment's notice if she is needed by her family.

When asked her perspective on how John has been doing since moving to Williamsburg full-time, she opined that he is "doing very well." She described him as "a good worker," "smart," and "confident." She said she has been "very proud" of his adjustment to the community "but not surprised by it." Ms. Sims discussed John's ███████████ as "something that suits him" and she believes him being "productive" and earning his own money for the first time in years has "done him a world of good; he is very happy with what he is doing."

Ms. Sims stated John has been doing an "amazingly wonderful job taking care of" their mother. She described John as "very devoted to her" and "very patient with her." She perceives John as being "happy" to be able to help their mother and be a part of her care. Ms. Sims noted her brother has never once complained about running errands for their mother or doing things for her around the house. When asked her thoughts about how John will handle their mother's death, she said, "I really don't have any specific concern. He's in very good control of his emotions…certainly he will be sad, but I don't think it will cause him to go into any dark place." In her opinion, he will be "able to function properly through it." Ms. Sims said the plan after her mother's death is for her brothers to live together in a condo or apartment. She stated, "I think it's a great plan." According to Ms. Sims, her brothers "get along beautifully" and she believes it is good for them to "have each other for companionship."

Finances have not been an area of concern for the family according to Ms. Sims. She said she is not aware of anyone "spending extravagantly" and her mother would bring to her attention any problems if there were any.

With regard to future hopes or goals for her brother John, Ms. Sims said she simply would "like to see him be happy." She noted that his mood has seemed stable and "happy" when she speaks to him and that she does not "worry about him." She opined that he is "suited to be where he is."

## 8.  Current Mental Status
Mr. John Hinckley, Jr. was a Caucasian male of average stature and above average weight who appeared his stated age.  He was dressed appropriately and he evidenced adequate grooming.  During the interview, Mr. Hinckley was alert and oriented to person, place, and time.  Throughout the evaluation, he was calm, pleasant and cooperative with the evaluator. His eye contact was good.  He demonstrated no significant psychomotor agitation. His rate, tone and volume of speech were normal.  He has consistently demonstrated average to high average intellectual functioning on past formal testing and during the current evaluation his cognitive functioning appeared intact.

When asked to describe his mood, he stated "pretty good." Throughout the evaluation, he demonstrated a full range of emotional expression that was appropriate to the conversation content. He did not demonstrate flat or blunted affect, as has been noted in prior evaluations. His thought processes were goal directed and flowed logically, with no evidence of abnormalities of perception, delusions (erroneous fixed beliefs) or grandiosity.   He did not endorse experiencing auditory, visual, tactile or olfactory hallucinations during his lifetime.  His judgment appeared non-impaired although it has historically been poor, particularly early in his hospitalization at SEH.  His insight was good and according to records has been improving over recent years. He did not endorse any suicidal thoughts since 1983 or homicidal thoughts since the time of the instant offenses.  He was able to report the names and dosages of his medications, as well as the purpose of his medications.

## 9.  Current Psychiatric Medications
Zoloft® 125mg every morning/25mg every evening
Risperdal® 1mg every evening

## 10. DSM-5 Diagnoses
296.36 Major Depressive Disorder, Recurrent, In Full Remission
298.8 Other Specified Schizophrenia Spectrum and Other Psychotic Disorders
301.81 Narcissistic Personality Disorder
301.20 Schizoid Personality Disorder, premorbid

## 11. Risk Assessment
*Actuarial Assessment of Violence Risk: VRAG-R*
Actuarial assessments of risk give estimates of risk for general violence; they do not provide predictions of how serious the violent recidivism would be if it did occur.

Furthermore, assessments of risk are a measure of individuals' risk when they are given the opportunity to reoffend such as when placed in the community upon release, in a minimum-security psychiatric hospital or at a halfway house.

The VRAG-Revised[5] was first published in 2013, with wider release in 2015, and is markedly different than its predecessor the VRAG. While it still utilizes a total of 12 items to rate risk for future violence, scoring on the VRAG-R gives more weight to charges for violent and non-violent offenses occurring prior to the index offense than its predecessor. In addition, rather than using the total score from the Psychopathy Checklist-Revised (PCL-R) it only takes into account scores on Facet 4 of the PCL-R, which includes items on Poor Behavioral Controls, Early Behavioral Problems, Juvenile Delinquency, Revocation of Conditional Release and Criminal Versatility. Finally, items pertaining to mental health diagnoses (i.e. Schizophrenia and Personality Disorders) were removed from the VRAG-R, as were items on victim gender and whether a victim was injured. These items were replaced with items regarding previous admissions to corrections facilities, sexual offending history and history of Conduct Disorder prior to age 15. Research on the VRAG-R has shown it to be slightly more accurate than the VRAG when assessing re-offense opportunity over periods of less than 25 years; it has been demonstrated to be as accurate as the VRAG for periods over 25 years.

Consistent with Dr. Murphy's evaluation in 2015, Mr. Hinckley's score on the VRAG-R was -22, placing him the 2nd category of 9 total risk levels (with the 9th category being highest risk). Offenders in this category violently recidivated at an average rate of 12% over five years and 24% over twelve years. This places him at a low likelihood of recidivism compared to violent offenders generally. Given the standard error of measurement (SEM) for the VRAG-R (+/- 2.19 points), Mr. Hinckley's risk score could be as low as -24 or as high as -20, with the former score moving him down to the 1st risk category with an average rate of violent recidivism of 9% over five years and 15% over twelve years.

Follow-up research on the VRAG-R has demonstrated lower recidivism rates across all nine risk levels as time in community offense-free increases. The authors of the VRAG-R suggest adjusting expected recidivism rates .10 lower for each year an individual resides in the community without re-offending. However, it must be noted that Mr. Hinckley's case differs significantly from the population on which the VRAG-R was normed: He remained on inpatient status over 34 years as compared to the population sample average of four years and although he was given access to the community beginning in 1999, he was frequently observed by the Secret Service and the majority of his community access was supervised by his parents or treatment providers. However, even conservatively adjusting Mr. Hinckley's VRAG-R scores for only the past two years of full-time access to the community results in expected recidivism rates consistent with the lowest category of risk (i.e. 7-19%).

    1.  Lived with both biological parents to age of 16 (yes)        =     -2

---

[5] Harris, G.T., Rice, M.E., Quinsey, V.L., Cormier, C.A. (2015). **Violent Offenders: Appraising and Managing Risk, Third Edition**. Washington, DC: American Psychological Association.

2. Elementary school maladjustment (no)                         =       -3
3. History of alcohol or drug problems (0 out 6)                =       -2
4. Marital status (never married)                               =       +1
5. Criminal history score for nonviolent offenses prior to
   the index offense (score of 1)                               =       -1
6. Failure on prior cond. release (no)                          =       -2
7. Age at index offense (26)                                    =       +1
8. Criminal history score for violent offenses prior to the
   index offense (score of 0)                                   =       -2
9. Number of prior admissions to correctional institutions (0)  =       -2
10. Conduct Disorder before age 15 (0 point)                    =       -2
11. Sex offending history (no known hands-on offenses)          =       -2
12. PCL-R Facet 4 score (score of 0)                            =       -6

TOTAL VRAG-R SCORE  = -22

*Structured Professional Judgment of Risk Factors: HCR-20 Version 3*
In order to further delineate and describe the risk level Mr. Hinckley may pose, he was rated on the 20 items of the HCR-20 Version 3[6]. The HCR-20 is the most widely used violence risk assessment measure at present. The HCR-20 is considered to be a structured professional judgment model of risk. By its design as a structured professional judgment method of assessment, this method does not provide specific classifications or normative data. What is thought to be important in using the HCR-20 is the evaluator's judgment of risk, not a score or actuarial assessment, as was utilized in the VRAG-R. The HCR-20 allows the evaluator to rate risk on 20 items that pertain to an offender's past (H - Historical), present (C -Clinical), and assessed future (R - Risk) functioning. Items are scored according to whether the item description does not match the person who is being evaluated (a No rating), matches to some extent (rating of Possible), or matches the individual considerably or well (rating of Yes). Further, the HCR-20 includes a rating of the Relevance of each item to the current assessment of risk and development of risk management strategies (either Low, Moderate or High). The HCR-20 rating scheme allows the evaluator to rate the five Risk items under scenarios of whether the offender is in a restricted environment (IN) or allowed to reside in the community (OUT). Finally, descriptive risk ratings of Low, Moderate or High are marked for each of three categories: Future Violence/Case Prioritization, Serious Physical Harm, and Imminent Violence.

Mr. Hinckley's ratings on the HCR-20v3 fall in the low range of risk for Future Violence, Serious Physical Harm and Imminent Violence.

My ratings of Mr. Hinckley on these items is listed in the below table.

| ITEM | RATING | RELEVANCE |
|------|--------|-----------|
| H1. Violence | Y | High |
| H2. Other Antisocial Behavior | N | Low |

---

[6] Douglas, K.S., Hart, S.D., Webster, C.D., Belfrage, H. (2013). **HCR-20v3: Assessing Risk for Violence**. Vancouver, Canada: Mental Health, Law and Policy Institute: Simon Fraser University.

| | | |
|---|---|---|
| H3. Relationship Instability | Y | Moderate |
| H4. Employment Problems | Y | Moderate |
| H5. Substance Use Problems | N | Low |
| H6. Major Mental Disorders | Y | High |
| H7. Personality Disorder | Y | Moderate |
| H8. Traumatic Experiences | N | Low |
| H9. Violent Attitudes | N | Low |
| H10. Treatment Response | Y | Moderate |
| | | |
| C1.  Lack of Insight | N | Low |
| C2.  Violent Ideation or Intent | N | Low |
| C3. Active Symptoms of Major Mental Illness | N | Low |
| C4. Instability | N | Low |
| C5. Treatment or Supervision Response | N | Low |
| | | |
| | **OUT** | |
| R1. Professional Services and Plans | P | Moderate |
| R2. Living Situation | P | Moderate |
| R3. Personal Support | P | High |
| R4. Treatment or Supervision Response | N | Low |
| R5. Stress or Coping | N | Low |

The following HCR-20v3 factors have been identified as potentially increasing Mr. Hinckley's risk for future violence:

History of Violence/Access to Weapons
Mr. Hinckley's instant offenses were his first serious acts of violence and increase his risk for future violence. However, he has not engaged in any further acts of violence since the instant offenses, nor has he evidenced any other antisocial behaviors. Mr. Hinckley's past acts of violence occurred in the context of a lengthy period of serious mental illness, marked by prolonged social isolation, depression and grandiose delusions. However, these symptoms of mental illness have been in remission for decades (see next section).

Mr. Hinckley committed his violent acts using firearms he had spent several months acquiring. There is no indication Mr. Hinckley has sought access to weapons since the instant offenses and both his mother and brother report that there are no firearms in his residence, in compliance with his court order.

Major Mental and Personality Disorders
Mr. Hinckley is diagnosed with Major Depressive Disorder (MDD), Other Specified Schizophrenia Spectrum and Other Psychotic Disorders (i.e., Psychotic Disorder NOS), and Narcissistic Personality Disorder. His major depressive and psychotic disorders have been in full and sustained remission for over 30 years. In addition, Mr. Hinckley has not verbalized or shown evidence of suicidal ideation since 1983, when he last attempted suicide. Although Mr. Hinckley has demonstrated some fluctuations in mood in the past, this has primarily occurred in the context of stressful life events. Mr. Hinckley has not had any notable periods of low mood or hopelessness since his release on convalescent

35

leave. In fact, his treatment team and family have noticed marked improvements in his mood and emotional expression; he was repeatedly described as appearing "happy" and having "blossomed" since his discharge on convalescent leave.

As previously noted, the death of Mrs. Hinckley has the potential to be traumatic for Mr. Hinckley when it occurs. However, he has managed other significant losses (e.g. death of his father) appropriately, demonstrating normal bereavement reactions rather than symptoms of a major depressive episode. It is evident that Mr. Hinckley has thought about his mother's death and has been preparing himself for its eventuality through discussions with his treatment team and members of his therapy group, as well as planning for future housing. Furthermore, he described trying to make the most of his time with his mother by taking care of her and providing for her comfort, in part, to reduce feelings of regret and/or guilt after her death. In addition, he has previously informed his SEH treatment providers when he was experiencing increased anxiety and requested changes in medication to manage his mood symptoms. Therefore, he is likely to reach out to his treatment team in the future should he experience an increase in anxiety or depressive symptoms in the context of his mother's death or any other stressful life event.

Although Mr. Hinckley is diagnosed with Narcissistic Personality Disorder, treating providers and other evaluators have noted that Mr. Hinckley's narcissism has been significantly attenuated over the past three decades. Consistent with prior risk assessments, there were no overt signs of this disorder present during the current evaluation. Furthermore, as noted by other evaluators, Narcissistic Personality Disorder is not by itself directly correlated in the scientific literature with increased risk for violence. Rather increased risk is associated with antisocial personality traits and characteristics of hostility and dominance, which are not demonstrated by Mr. Hinckley.

Relationship Instability

As previously noted, Mr. Hinckley did not have a history of reciprocal romantic relationships prior to the instant offenses. Furthermore, his obsession with Jodie Foster, and related grandiose delusion of winning her love and respect, was related to his conduct in the instant offenses. While he engaged in several romantic relationships while hospitalized, with his most significant and longest-lasting relationship being with ████ he has not been involved in a romantic relationship for several years. However, over time Mr. Hinckley has demonstrated increased insight into his relationships with women and has exercised better judgment with regard to these relationships over the past two years. His evolving acceptance of the treatment team's views on ████ demonstrates his improved judgment, as did his decision to distance himself from ████ as she continued to use substances.

Although, after over three decades of institutionalization, Mr. Hinckley still needs to improve his social skills, particularly with regard to establishing romantic relationships, he recognizes a need to make improvements in this area, has demonstrated a willingness to work on these skills with his treatment team and has sought out their guidance and advice. Despite, at times, engaging in ineffective communication strategies, there is no evidence

that Mr. Hinckley has interacted inappropriately with women and there is no evidence he is experiencing any obsessions or delusions relating to women.

Treatment Response - Minimization/Deception

Mr. Hinckley has a lengthy history of minimizing negative emotions, engaging in deceptive behavior and failing to report pertinent information (i.e., being secretive) to his treatment team, particularly early in his hospitalization as it related to his relationships with women and correspondence with others. However, there have been no documented incidents of deceptive behavior since 2011, when Mr. Hinckley lied on two occasions about his whereabouts. In addition, since his discharge from SEH in 2016, there have been no reports he has failed to comply with the conditions of his release. In fact, family and treatment providers have commended Mr. Hinckley for his rigid adherence to the rules set out in his court order, particularly with regard to the travel restrictions. Mr. Hinckley has maintained a daily log, as instructed by the court, and has consistently reported on his activities to Mr. Weiss and Dr. Johnson. He has also developed productive relationships with the members of his treatment team, who have noted his honesty and increasing openness during both individual and group sessions.

Insight

Poor insight has historically been a risk factor for Mr. Hinckley and was clearly present throughout the first two decades he was at SEH. However, through years of individual and group therapy, Mr. Hinckley has increasingly demonstrated improved insight into his emotions and behaviors. He reflects on feedback provided by his treatment team and incorporates it in his decision-making, most notably in regard to his relationships with women. Although Mr. Hinckley occasionally exhibits errors in judgment (e.g., approaching a woman in his therapy group outside of group), his insight, overall, is quite good and is not presently a risk factor.

Professional Plans and Services

It is anticipated that Mr. Hinckley will experience changes in the composition of his treatment team and level of care over the next two years. However, he has managed previous changes of treatment providers well, without signs of psychiatric decompensation, and it is not expected that these upcoming changes will result in an increase in his risk. However, steps should be taken to mitigate risk by making changes gradually and overlapping transitions between current and new providers when possible.

Living Situation

Mr. Hinckley's current living situation is stable and also provides a source of socialization for him, particularly since his brother moved into the home in June 2017. His brother's presence and willingness to continue to reside with Mr. Hinckley after their mother's death also increases the long-term stability of his living situation, reducing Mr. Hinckley's future risk. However, there is also some uncertainty with regard to Mr. Hinckley's current plans for his future living situation as he would need to locate a new residence and move within a 60-day period while grieving the loss of his mother, who is a significant source of emotional support for him. While it is understandable that Mr. Hinckley does not want to move from his mother's home prior to her death, both due to his role as her caretaker and

the increased costs associated with living independently, it may provide increased long-term stability for Mr. Hinckley to obtain his own residence (either with or without his brother) prior to Mrs. Hinckley's death.

<u>Personal Support</u>
Mr. Hinckley's family continues to be extremely supportive of him, both emotionally and financially, and have expressed willingness to continue to be very involved in his life. Mr. Scott Hinckley moved to Williamsburg in June 2017 and has repeatedly expressed his intent to continue living with his brother in Williamsburg after their mother's death. Both brothers and the treatment team reported that Scott and John's relationship has grown much closer over the past year and they now routinely spend time together both running errands and attending community events. Diane Sims, Mr. Hinckley's sister, calls on a weekly basis and has also indicated she is available to travel to Williamsburg as needed to assist Mr. Hinckley and/or their mother. With regard to financial support, although the family is on a budget, they all stated they are comfortable with the current manner in which expenses are shared. Scott Hinckley also indicated he will be able to contribute to the cost of either purchasing or renting a residence with his brother in the future. In addition, Mr. Hinckley's benefits, income from his ███████████████ and ability to save up to $14,000 per year through his ABLE account increases his financial stability.

In addition to family support, Mr. Hinckley has also begun to establish relationships in the community through his business endeavors, attendance at NAMI meetings, group therapy and introductions made by Mr. Weiss. However, both Mr. Hinckley and his treatment team agree that this is an area in which Mr. Hinckley needs to continue to make progress.

<u>Social Isolation</u>
While social isolation is not a risk factor specifically delineated on the HCR-20v3, it is related to relationship instability, employment instability, and personal support and has been identified as a specific risk factor for psychiatric decompensation for Mr. Hinckley.

Although members of the treatment team have questioned Mr. Hinckley's motivation to engage in community activities, there is substantial evidence that Mr. Hinckley has been making concerted efforts to increase his level of socialization, including striking up conversations with people he has met at the grocery store, thrift store, coffee shop and in his ███████████ developing what his brother described as a "cordial" relationship with employees at ███████████; attending NAMI meetings and continuing to make an effort to attend meetings even when group membership dwindled; participating actively in group therapy; and attending concerts with his brother. The presence of Mr. Scott Hinckley in Williamsburg has clearly helped to decrease Mr. Hinckley's isolation, as they frequently run errands and attend community events (e.g. outdoor concerts, baseball games) together.

Mr. Hinckley has expressed a desire to develop close friendships and a romantic relationship, both of which he admitted are lacking in his life. However, his notoriety in the community continues to be a barrier to socialization, as recently demonstrated by his female ███████████ reaction upon learning of his identity.  Repeated social rejection has

certainly impacted the manner in which Mr. Hinckley engages with others and led him to feel some trepidation when he is encouraged by his treatment team to participate in community events on his own.  In addition, over the past two years Mr. Hinckley has lost several friends due to suicide (█████, life changes (█████ and illness (████████████). Despite these losses, he continues to reach out to others, attempting to develop new friendships and establish a romantic relationship.  Finally, although Mr. Hinckley's interest in music and art has been a point of connection for him in the past through his relationships with █████ and █████ his motivation to engage in artistic pursuits has diminished over the past two years. This lack of motivation has been attributed to his frustration with his inability to share his work and obtain feedback from a broader audience, which is unfortunate for Mr. Hinckley as it represents a lost opportunity for him to increase socialization through shared interests with others.

Currently, Mr. Hinckley is not displaying signs of the isolative behavior that marked the years prior to the instant offenses and contributed to his psychiatric decompensation and psychosis. He appears very engaged in his business endeavors and has welcomed the opportunity to become a productive member of the community through the ████████ Although he does not take advantage of all opportunities for social engagement suggested by his treatment team, he has clearly made efforts to socialize with members of the community and has attended some events when he feels comfortable doing so (e.g., after he has attended an event at least once with a treatment team provider).

## 12. Conclusions and Risk Management Recommendations

Consistent with prior evaluations, Mr. Hinckley's scores on actuarial and structured professional judgment risk tools suggest there is a low likelihood he will re-offend with a violent crime over the long term. His potential to act out violently is primarily associated with prolonged social isolation, major depressive episodes and psychosis marked by grandiose delusions. However, his psychiatric symptoms have been in remission for over three decades and he has demonstrated significant improvements in his response to treatment, including improved insight and judgment. Given the stability in his psychiatric symptoms and excellent adjustment to the community over the past two years, his level of risk is primarily due to static historical factors that are relatively stable and not expected to change over time.

As already noted, the primary contextual factors associated with Mr. Hinckley's previous acts of violence are:

     a. Grandiose delusions
     b. Social isolation
     c. Deceptive behavior
     d. Suicidal thinking
     e. Weapons access

It is my opinion, in concordance with prior risk assessment evaluators, that Mr. Hinckley is at low risk for another psychotic episode, as onset would follow a lengthy period of social isolation concomitant with other depressive symptoms. As such, any relapse of

major mental illness would be gradual, allowing for detection by treatment providers and/or family members.

*Recommendations*

In accordance with the conditional release goal of assisting Mr. Hinckley with rehabilitation and reintegration into the community while maintaining both his safety and the safety of the community, it is recommended that conditions set forth in the July 27, 2016 order for convalescent leave remain in place with the exception of the following modifications:

1. It is recommended that Mr. Hinckley reduce his visits to the FOPD at 35 K Street NE, Washington DC from every month to every other month for monitoring of his mental condition and compliance with the conditions of his release. Dr. Johnson may increase Mr. Hinckley's visits to FOPD as clinically indicated (e.g., following Mrs. Hinckley's death or while transitioning to a new psychiatrist in Williamsburg), with notification to the court. During the first six months after reducing his appointments at the FOPD, Dr. Johnson will continue to conduct weekly telephone calls to assess the status of risk factors and document her calls in monthly progress reports. After six months, Dr. Johnson may decrease the frequency of telephonic contact to twice monthly, at her discretion, as already permitted by the current court order.

   Although Dr. Johnson expressed concern that Mr. Hinckley may decrease his social engagement and continue to demonstrate lack of motivation without consistent contact with the FOPD, it is my opinion that his treatment team plays a much more significant role in encouraging Mr. Hinckley's increased socialization than does Dr. Johnson. However, FOPD plays an important role in assessing risk and ensuring Mr. Hinckley's compliance with his court order, particularly given the lack of forensic experience in the treatment team (with the exception of Dr. Giorgi-Guarnieri who will be stepping down in the next year). Nevertheless, it is my opinion that after two years of strict adherence to the conditions of his release, significant progress in achieving his community integration objectives and the long-term stability in his mental condition it will not increase Mr. Hinckley's risk to reduce his contact with FOPD over the course of the next year.

2. With the approval of his treatment team, it is recommended that Mr. Hinckley be permitted to physically display his artwork and/or photography in public forums and share music created by him via the internet, with the caveat that steps should be taken to ensure the displays are anonymous and there is no financial benefit associated with the activities.

   Granting increased freedom and flexibility in this area should be viewed as a balance between the clinical benefit associated with Mr. Hinckley sharing his artistic works and the risk of fame-seeking and/or increased notoriety. The court, the FOPD, and the treatment team have expressed concerns regarding the media and/or public's reaction if Mr. Hinckley's work were to be identified by the media

and/or members of the public. Consistent with the views of the treatment team, it is my opinion that the clinical benefit of providing an emotional outlet for Mr. Hinckley and increasing his opportunities for social connection substantially outweighs the risk of increasing his narcissism, which has not been apparent in many years. In addition, it is my opinion that the risk to Mr. Hinckley is low should there be a negative outcry. Over the past two decades, Mr. Hinckley has weathered negative scrutiny by both the media and the public without any incidents of attempted malice or violence against him, including after the death of President Regan, the death of James Brady, and following his release on convalescent leave. Furthermore, although he has been rejected on numerous occasions by the community, he has not exhibited feelings of hopelessness or depression nor has he self-isolated or retaliated in response to these rejections. In fact, Mr. Hinckley has continued to make efforts to be a productive member of the Williamsburg community through his business and attendance at public events. Finally, despite receiving praise and accolades for the quality of his artistic work and the success of his business, Mr. Hinckley has not been observed bragging about his success nor have any overt signs of narcissism been observed in him by his treatment team. Therefore, as long as Mr. Hinckley is not seen to financially benefit from the display of his artistic works and efforts are made to ensure the displays are anonymous, it my opinion that there is low risk to the personal safety of Mr. Hinckley and low risk for increasing Mr. Hinckley's narcissism if he is permitted to display his artistic work.

With regard to participating in public musical performances, it my opinion that Mr. Hinckley should continue to be restricted from engaging in this activity but that this condition be reassessed after a minimum of a one-year period in which Mr. Hinckley has been allowed to display his artistic work anonymously. This will allow for observation of Mr. Hinckley as he is permitted increased freedom to express his artistic talents, while also allowing more time for Mr. Hinckley to integrate into the community prior to engaging in performances in a public forum.

3. Consistent with the current court order, it is recommended that Mr. Hinckley be permitted to reside in a separate residence in the community, either independently, should he choose to do so, or with his brother, Scott Hinckley. The residence should be within 50 miles of Williamsburg[7]; allowing Mr. Hinckley to reside outside the immediate Williamsburg area would open up lower-cost housing options in neighboring communities which may not be available in Williamsburg. However, it is preferable that the residence be no further than 30 miles from Mr. Hinckley's treatment providers. The residence must be approved by his treatment team and Dr. Johnson in advance. Given Mr. Hinckley's desire to live with his mother until her death and will be required to move out of her home within 60 days after her death, it is recommended that a budget for his housing and short-term rental options be identified in advance (e.g., low cost apartment complexes). Finally, it is recommended that the court remove the condition requiring Mr. Hinckley to return

---

[7] This provision assumes the recommendation in Item 4 is approved by the court.

to inpatient status at SEH if either Ms. Diane Sims or Mr. Scott Hinckley are not present in Williamsburg.

Over the past two years, Mr. Hinckley has demonstrated he is very capable of managing his affairs independently. Not only has he remained in stable mental condition during his transition to full-time living in Williamsburg, he has reportedly thrived in the community. Mr. Hinckley has started his ███████████, which he has run successfully for nearly a year. He has applied for, and received, benefits and has become his own payee. He had not only shown a strong sense of personal responsibility and accountability in adhering to the conditions of his release but has also become the primary caregiver for his aging mother. His brother and sister both commend him for the care and support he provides for their mother and expressed no concerns for their brother's ability to live independently. Therefore, it is my opinion that allowing Mr. Hinckley to reside in his own residence in the community will not substantially increase his risk.

4. It is recommended that Mr. Hinckley be permitted to drive unaccompanied within 75 miles of his home in Williamsburg, VA, unless he is traveling to Washington, DC for the purpose of a scheduled appointment with FOPD. It is recommended he be allowed to travel up to 100 miles from his home with a family member or member of his treatment team. Mr. Hinckley should continue to be restricted from traveling "to areas where the current or former Presidents, Vice Presidents, members of Congress, senior members of the Executive Branch, or any US Secret Service protectee are or will be present imminently," as described in the July 27, 2016 court order.

The July 27, 2016 court order identifies a "thirty mile radius of Williamsburg, Virginia" for independent travel, which has been interpreted by Mr. Hinckley and his treatment team as point-to-point mileage rather than as the radius identified in Dr. Murphy's 2015 risk assessment. This appears to be due to the difficulty in quantifying a radius as opposed to point-to-point mileage.

Mr. Hinckley's desire to strictly adhere to the mileage limitation has caused him some stress and also has limited his ability to attend cultural, athletic and social events in the area surrounding Williamsburg. Over the past two years, Mr. Hinckley has demonstrated responsibility and reliability in traveling independently within 30 miles of his home in Williamsburg. In addition, he has shown no interest in traveling to government buildings and has not traveled near restricted individuals. Increasing the distance Mr. Hinckley is permitted to travel independently will allow him to visit Norfolk, Richmond and Virginia Beach, while still restricting him from traveling to Washington, DC independently outside of his scheduled FOPD appointments. It will open up new areas for him to procure products for his business, as well as increase opportunities for socialization and spontaneity.

5. It is recommended that the court remove the requirement for Mr. Hinckley to complete a daily log of his activities while on convalescent leave. The log is

redundant with the requirement for Mr. Hinckley to report his activities to Dr. Johnson and Mr. Weiss. Although it initially served as a tool to support Mr. Hinckley's disclosure of activities, there have not been any reports of problems with Mr. Hinckley's level of disclosure nor have any inconsistencies between his report and his observed activities been identified by Dr. Johnson, Mr. Weiss or the Secret Service according to available records. Therefore, it is my opinion that removing the requirement to complete a daily log will not increase the risk for deceptive behavior by Mr. Hinckley and that continued verbal reporting to Mr. Weiss and Dr. Johnson will be sufficient to promote accountability.

6. Mr. Hinckley is currently permitted access to the internet with limitations, which he has adhered to during his release on convalescent leave. During the first 18 months of his convalescent leave, Mr. Hinckley utilized the internet to █████ for the █████████████████████ as a volunteer activity and later ██████ anonymously through ████████████ as a side business. Mr. Hinckley now requests permission to sell items ███████████████████████. If Mr. Hinckley maintains his anonymity, similar to his past business ████████ through █████████, I do not believe it would increase his risk to sell items from his ████████████ ████████ However, before releasing any website he develops████████ ████████ the website should be approved by the treatment team and Dr. Johnson.

7. Although no immediate changes are recommended in the roles and responsibilities of the current treatment team, it is recommended that they begin transfer of Mr. Hinckley's treatment to Colonial Behavioral Health over the next 12-18 months. Dr. Giorgi-Guarnieri has already provided notice of her intent to step down as Mr. Hinckley's psychiatrist at the end of 2019 or early 2020. It has also been suggested that Mr. Weiss and Mr. Beffa are both planning to enter full retirement in the next few years. Given that there are no board-certified forensic psychiatrists in private practice in Williamsburg to provide care for Mr. Hinckley, he would either need to travel to Portsmouth or Virginia Beach for psychiatric appointments or receive care from a forensically-trained, but not board-certified, forensic psychiatrist at Colonial Behavioral Health. Alternatively, a psychologist with forensic training/board-certification could be located and join the treatment as Mr. Hinckley's individual therapist. However, it is my opinion that transfer to the public mental health system would make future transitions easier, as Mr. Hinckley's treatment team would continue to be composed by providers from Colonial Behavioral Health rather than new private practice providers needing to be located each time a member of the treatment team retires or relocates. This, in turn, would increase the stability of Mr. Hinckley's professional services. In addition, although it may be possible to form another private treatment team for Mr. Hinckley, the out of pocket costs associated with private case management and music therapy services may not be sustainable over the long-term for Mr. Hinckley. Finally, Mr. Hinckley's community reintegration continues to progress and as he develops more relationships in the community and maintains clinical stability his need for the level of care currently provided by his treatment team is likely to decrease.

Therefore, it is my opinion that, despite the fact that Colonial Behavioral Health will be unable provide the level of support offered to Mr. Hinckley by his current treatment team[8] it offers the best option to compose a treatment team with some forensic background without necessitating significant travel time or expense for Mr. Hinckley.

As already noted, it is not expected that Mr. Hinckley will decompensate psychiatrically if transitioned to a new treatment team in light of the fact that he has experienced many transitions in his treatment providers over the nearly four decades he has been in care without decompensating. However, the transition should occur allowing for overlap with his current treatment providers. In addition, treatment providers and Dr. Johnson should increase Mr. Hinckley's appointments during the transition, as clinically indicated, to appropriately assess his adjustment.

*Treatment Objectives*

Mr. Hinckley has met all the community reintegration objectives outlined by Dr. Murphy in her 2015 risk assessment including:

1.) Applying for health care entitlements;
2.) Researching housing options in the Williamsburg area;
3.) Obtaining consistent employment; and
4.) Locating a primary care physician in Williamsburg.

Mr. Hinckley has made significant strides over the past two years in community reintegration and increased socialization, particularly through his ███████████. In addition, his treatment providers and family have remarked on the improvement in his ability to express his emotions in an open, honest manner. However, Mr. Hinckley should continue progress toward the following psychiatric treatment objectives:

1.) Utilize the treatment team and therapy group as a resource in decision-making while developing intimate relationships and as support in establishing and maintaining close friendships;
2.) Maintain direct, honest communication with his treatment team, family members and friends; and
3.) Increase socialization through community engagement and participation in leisure and educational activities.

## 13. Limits on Conclusions Reached and Interpretation of Data

This report is based on a large amount of information obtained from multiple sources. I believe that all information contained herein is accurate and provides an adequate basis to form both clinical and forensic opinions. However, if any information is substantially inaccurate, I would appreciate it if this were immediately called to my attention. In addition,

---

[8] While Colonial Behavioral Health would be able to provide monthly psychiatric appointments and weekly individual and/or group therapy, the level of interaction provided by Mr. Weiss (e.g., attending baseball games and community events with Mr. Hinckley) is unlikely to be available through case management services at Colonial Behavioral Health due to limited staffing resources.

should I learn of any additional new information which casts substantial doubt upon either my clinical or forensic opinions, I will immediately notify the FOPD and write an addendum to this report.

_____          _____
Samantha M. Benesh, Psy.D., ABPP                              7/27/2018
Board-Certified Forensic Psychologist                          Date
Partner, Benesh & Yeaw Consulting LLC