```
 1                 IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2
        - - - - - - - - - - - - - - - x
 3      THE UNITED STATES OF AMERICA,
                                        Criminal Action No.
 4                    Plaintiff,        1:81-cr-00306-PLF-1
                                        Wednesday, September 23, 2020
 5      vs.                             10:07 a.m.

 6

        JOHN W. HINCKLEY, JR.,
 7
                      Defendant.
 8      - - - - - - - - - - - - - - - x

 9      _____

10                   TRANSCRIPT OF STATUS CONFERENCE
              HELD BEFORE THE HONORABLE PAUL L. FRIEDMAN
11                    UNITED STATES DISTRICT JUDGE
        _____
12      APPEARANCES:

13      For the United States:    KACIE MCCOY WESTON, ESQ.
                                  U.S. ATTORNEY'S OFFICE FOR D.C.
14                                555 Fourth Street, NW
                                  Washington, DC 20530
15                                (202) 252-7509
                                  kacie.weston@usdoj.gov
16

17      For the Defendant:        BARRY WILLIAM LEVINE, ESQ.
                                  BLANK ROME LLP
18                                1825 Eye Street, NW
                                  Washington, DC 20006
19                                (202) 420-2237
                                  BLevine@BlankRome.com
20

21      Court Reporter:           Lisa A. Moreira, RDR, CRR
                                  Official Court Reporter
22                                U.S. Courthouse, Room 6718
                                  333 Constitution Avenue, NW
23                                Washington, DC  20001
                                  202-354-3187
24
        Proceedings recorded by mechanical stenography; transcript
25      produced by computer-aided transcription
```

```
1                          P R O C E E D I N G S
```

2            THE COURTROOM DEPUTY:  This is Criminal Action

3    81-306, *United States vs. John W. Hinckley, Jr.*

4            For the United States, I have Ms. Kacie McCoy

5    Weston.  For defendant John Hinckley, I have Mr. Barry

6    Levine by phone.  For Saint Elizabeths Hospital, I have

7    Ms. Shilpa Krishnan; and from the Office of General Counsel,

8    I have Ms. Kamilah Oliphant.  Our court reporter is Lisa

9    Moreira.  All parties are present.

10           Counsel, please be reminded that when you are not

11   speaking please place your phones on mute.  All parties are

12   present.

13           THE COURT:  Okay.  Good morning, everybody.  And

14   what I did want to say to everybody before anybody spoke is

15   this is a public proceeding, and there may be some members

16   of the public listening in by phone or members of the press

17   listening in by phone.  And all of our proceedings in this

18   case have been public, although there are certain documents

19   that are under seal and have always been in this case, and

20   we sometimes file them later on the public record in

21   redacted form.

22           And one such document was filed yesterday.

23   Frankly I haven't read it yet because it's lengthy, but it

24   is a recent risk assessment that was done by one of the

25   doctors, the same doctor, fortunately, who did the last one

1    from -- at Saint Elizabeths.

2            But we're not here to talk about the substance and

3    the current assessment except in general terms.  We're

4    really here to talk about scheduling, and I guess maybe

5    we'll start with Ms. Weston, and -- because she filed a

6    motion for a status conference.  And that motion actually is

7    not under seal, and it relates to the fact that in its

8    August 21st letter to me, which is under seal, the

9    Department of Behavioral Health at Saint Elizabeths made

10   certain recommendations to the Court for further

11   modifications and, in fact, much reduced -- a request for

12   much reduced conditions on Mr. Hinckley going forward

13   because things have gone so well over the last four -- I

14   guess it's been four years now.  I think it was 2016 when

15   I released him conditionally full time to stay at his

16   mother's residence in Williamsburg and to volunteer there

17   and to be -- remain connected to the same treatment team he

18   had had on a part-time basis when he was in Williamsburg.

19           And Mr. Beffa and Mr. Weiss and Dr. GG and the

20   music therapist have all been reporting at first monthly and

21   then every other month, and the team at Saint Elizabeths has

22   been talking to those people in Williamsburg, the

23   professionals in Williamsburg, over the years and have been

24   talking to Mr. Hinckley and have been talking to his mother

25   and his brother.  And then in the early stages of this

1     recent four-year period when he's been full time in

2     Williamsburg he has reported I think it was once a month,

3     then it was once every other month, in person to the

4     professionals at Saint Elizabeths, and more recently it's

5     been by telephone that they've had their sessions with him.

6              And then, when I first released him conditionally

7     to live at home with his mother, there were, as I recall,

8     some 35 conditions that I imposed, and he complied with all

9     of them.

10             And then in I want to say November and -- I may be

11    wrong.  Sometime in 2018 there was a request that there be

12    some significant modifications in those conditions, and

13    after the government -- the United States government, that

14    is -- reviewed the proposal from Saint Elizabeths and from

15    Mr. Levine, I think there was some negotiation back and

16    forth, as I recall, but essentially we didn't need a hearing

17    because the government agreed to reduce the conditions,

18    not quite as far as Mr. Levine would have liked on behalf of

19    Mr. Hinckley, but substantially.

20             So that's my recollection of the recent history,

21    and, Ms. Weston, if you want to add anything or if Mr.

22    Levine does or the lawyers from Saint E's and the District,

23    but maybe we'll start with Ms. Weston.

24             MS. WESTON:  Thank you, Your Honor.  I don't have

25    anything to add as far as the history.  I think that's an

1     accurate recitation of what has happened to date.  And I can

2     go more into what we're here for today, I think, if you

3     want, but I'll defer to anyone else if they want to add

4     first to any historical changes.

5              THE COURT:  Does anybody else want to add to what

6     I just said, or should we proceed to talk about where we go

7     next?

8              MR. LEVINE:  I think we should proceed to where we

9     go next.

10              THE COURT:  Okay.

11              All right.  Ms. Weston.

12              MS. WESTON:  Thank you, Your Honor.

13              Mr. Levine and I have been in contact over the

14     last couple of days, and I think it's fair to say, though I

15     am sure he will correct me if I'm wrong --

16              MR. LEVINE:  Really?  Mr. Levine?

17              MS. WESTON:  I'm confident he will correct me, if

18     not interrupt me, to tell me I'm wrong, but I believe the

19     parties are in a similar position to where we were in

20     November of 2018.  I think we are at a place where we have a

21     largely substantive agreement on a reduction, again, of the

22     conditions somewhat significantly from the last order in

23     2018 that would be consistent with the recommendations made

24     in the hospital's letter with one notable exception on the

25     part of the government, which is that the hospital's letter

1    recommends and asks for essentially a self-effecting

2    unconditional release to occur at the end of a certain set

3    period of time.  The government opposes that.  We do not

4    believe this is a type of case for an order to be self-

5    effecting.  We believe that decision for an ultimate

6    unconditional release should be in the hands of the Court

7    with an opportunity for the parties to weigh in after that

8    actual order is signed.

9         And so with that exception, we otherwise are

10   willing to agree to a reduction in the conditions largely

11   down to very little that Mr. Hinckley himself will actually

12   be responsible for doing that is consistent with those

13   recommendations that are in the August 21st letter from DBL,

14   so most specifically -- I'm sorry.

15        THE COURT:  So, in other words, there may be some

16   points on the specific conditions that we need to talk

17   about, but the basic substantive disagreement about process,

18   as I understand what you're saying, is that what the

19   hospital is recommending is an unconditional release, and

20   that there be a substantial reduction in conditions for six

21   to twelve months while he is monitored and remains under

22   conditional release; but that if he is successful over

23   whatever period I choose, six months or twelve months, then

24   there's an unconditional release.

25        And I guess what I hear you saying is that you may

1    actually wind up agreeing, for the most part, with this

2    substantial reduction in conditions, but then you would want

3    to come back to court again rather than have it be self-

4    executing just based on successful completion.

5            MS. WESTON:  Yes, Your Honor.  And what

6    specifically Mr. Levine and I talked about, and I believe

7    what we would be proposing, is a consent order that we would

8    present to the Court.  And in all candor, Your Honor,

9    because we just came to this agreement yesterday, we don't

10   have the language finished yet, but it has -- Ms. Chamber,

11   my paralegal, has already begun drafting a consent order.

12   And we expect that we can get a copy of that to Mr. Levine

13   before the end of the week, and then to chambers as soon as

14   we can agree on the language.  But, again, I have every

15   reason to think that we are largely in agreement on the

16   substance so hopefully we can get that to Your Honor

17   quickly.

18           But what the government would be proposing is that

19   that consent order would essentially set out the reductions

20   that are laid out in the hospital's letter for a period of

21   time, and that then there would be a status date set.

22           Now, the government's going to be asking for nine

23   months.  I think Mr. Levine would probably want to argue

24   about the timing of this.  But the government would propose

25   a status date be set at nine months, that the hospital be

1    required to submit a status letter some period of time

2    before that, two weeks or some period of time within the

3    Court's discretion, to let the parties know how that

4    preceding six months or eight months or whatever has gone,

5    and then at that point, at the status hearing, the

6    government would be in a position to be able to say whether

7    or not we thought we would be able to agree with whatever

8    the next step recommended is or whether we wanted to

9    challenge it, if there was any problem area that we thought

10   needed to be addressed; and that if there was a dispute,

11   that at that point -- and in the order we could go ahead and

12   set an evidentiary hearing date also so that it's on the

13   calendar, but that that date may or may not be necessary

14   depending on how things go over the course of the next year.

15           THE COURT:  And before I get to Mr. Levine, so I

16   take it that if there is some sort of a consent order

17   presented, A, we don't need an evidentiary hearing at this

18   point or in the near term, and B, your original request that

19   we have a status conference in order for you to subpoena

20   records, you don't need the records or you're going to get

21   them voluntarily, or does Dr. Benesh's report do the trick?

22           MS. WESTON:  No, Your Honor, this status date

23   allowed us to get the records; so we've already received

24   them and reviewed them in preparation for today.

25           THE COURT:  I see.  Okay.  And that includes the

1    risk assessment that was filed under seal yesterday?

2              MS. WESTON:  Yes, Your Honor.

3              THE COURT:  Which was basically very positive, and

4    the good news is that, as I said earlier, we've had some

5    changes in personnel along the way, and I think it's always

6    very helpful to both sides if the same professional who, in

7    her case, did the risk assessment two years ago or whatever

8    it was, is the same professional doing it again.  And she's

9    good, I think, and you have confidence in her.  We all have

10   confidence in her.

11             MS. WESTON:  Yes, Your Honor.  And, in fact, the

12   risk assessment and the records we reviewed are the reason

13   that the government is comfortable making this type of offer

14   for a consent reduction at this time.

15             THE COURT:  Okay.  Mr. Levine.

16             MR. LEVINE:  Yes.  Thank you, Judge.  I only offer

17   to substitute, not disagree with, what Ms. Weston has said.

18             I think the issue of timing is really important.

19   You know, we all know the standard question for release, and

20   that is whether in the foreseeable future Mr. Hinckley would

21   pose a danger to himself or others as a result of his

22   disease, mental disease, and we have had -- we have answers

23   to this question.  We have a lot of experience.  We have

24   expert opinion.  We have been able to assess his behavior

25   for ourselves, and we know that he will not be a danger.  We

1    know that everyone who has opined on this has agreed that he

2    will not be a danger.  There is no equivocation.

3              And I think it's probably not an overstatement to

4    say that few people probably in the world, not a grandiose

5    statement, have had their behavior scrutinized as intensely

6    as his and over such a long period of time.  I mean, he's

7    been evaluated by countless experts; none selected by us.

8    He's been watched on the ward at the hospital by people not

9    selected by us.  He's been watched on release by Secret

10   Service not selected by us, and he's been doing this for it

11   seems like three years or so.  He's been subject to all

12   kinds of psychiatric and psychological tests, both actuarial

13   and structured.

14             We have had the years and years of experiments

15   with gradually enlarged liberties.  We know that his mental

16   disease has been in remission for over -- it seems like over

17   three decades.  I believe that's in the record here as well.

18   We know that the narcissistic personality disorder has been

19   described as largely attenuated and on examination not even

20   seen.  There's been no symptoms of a mental disease that

21   have been discerned.

22             So we know he's been totally compliant with every

23   condition imposed by the Court.  We know that he has morphed

24   or evolved into someone who was cared for to someone who is

25   a caregiver.  We know how responsible he's been doing, and

1    the reports suggest he's close to flawless.

2           Your Honor mentioned that what was filed yesterday

3    you have not had a chance to read, but I think it is useful

4    to note in the letter written by the DBH on August 21st on

5    Page 5 says:  In summary, it is the opinion of DBH that

6    Mr. Hinckley no longer meets the criteria for commitment to

7    the Department of Behavioral Health under the code section

8    and that the review board relies on the underlying rationale

9    of Dr. Benesh's risk assessment and the treatment team and

10   the FOPD's recommendation in opining -- my copy here is very

11   faint so forgive me for pausing as I read -- in opining that

12   Mr. Hinckley is entitled to unconditional release from his

13   commitment to DBH and has sufficiently recovered his sanity

14   and will not, in the reasonable future, be a danger to

15   himself or others due to mental illness.  And, of course,

16   they suggest a gradual approach.

17          I think it's also useful to look at Page 24

18   of the risk assessment which, as Your Honor properly

19   described, is lengthy, but it concludes.  It says, "Given

20   these factors," and it's -- after 23 pages of factors and

21   analysis it says:  Given these factors, it is my opinion

22   that Mr. Hinckley will not pose a danger to himself or

23   others if he is granted unconditional release from the

24   Court.

25          So, Your Honor, we believe the Court should grant

1   unconditional release, and the question is how does the

2   Court get there?  Is it going to hold a hearing; and if so,

3   when?

4           The review board had suggested the six- to

5   twelve-month period, but in the notes that were filed with

6   the Court I would invite the Court's attention to the note

7   on Page 4.  I don't have that directly in front of me, but

8   he also has six- to twelve-month period, largely an

9   arbitrary period.

10          We would ask the Court to hold the hearing or to

11  schedule a hearing in the near future.  Those who have

12  weighed in on this have advocated the removal of all

13  conditions.  Dr. Benesh reviewed the conditions that

14  concluded that the removal of each and every condition does

15  not create an increase in risk, and, of course, there is the

16  requirement of law.

17          The Court is required to hold -- to put the

18  patient in the least restrictive environment consistent with

19  public safety, and all the experts, all of our experience,

20  and all of the experiments and gradual enlargement of

21  liberties suggest that an unconditional release does not

22  pose a risk on the public, so waiting for a period of time

23  in which to order an unconditional release is something we

24  think is not appropriate.

25          So I would ask the Court to set a hearing date in

1    the near future.  Of course, under this pandemic I don't

2    know the Court's calendar.  I don't know what is convenient

3    to the Court, but I would urge that it be at the earliest

4    convenience to the Court.

5         THE COURT:  You're not talking about a hearing --

6    when you say "in the near future," if the two of you have a

7    consent order that you want me to enter, then I don't need a

8    hearing to enter the consent order, right?

9         MR. LEVINE:  That's correct, Your Honor.  Our view

10   is -- our view is that there should be no conditions between

11   now.  All the conditions should be eliminated, with the

12   single exception that Mr. Hinckley be required to appear at

13   the hearing as scheduled by the Court.  In that way,

14   assuming this would be three months from now, which I don't

15   presume to know what's available --

16        THE COURT:  Wait a minute.  Wait a minute.  Wait a

17   minute.  They said twelve months.  You're saying three

18   months.

19        MR. LEVINE:  Yes.  The review board said six to

20   twelve months.  And Dr. Tillbrook, who is the director, put

21   in his notes on Page 4 he thought that that six- to twelve-

22   month period was, in his word, arbitrary.

23        THE COURT:  Well, anyway, let's start with six to

24   twelve months.

25        I want to raise one other question because for the

1    last four years I have said that we need a proposal for

2    where Mr. Hinckley is going to live should his mother become

3    unavailable.  No such proposal has been forthcoming, and

4    nothing was mentioned in any of the documents that I've seen

5    recently from either the hospital or the Williamsburg

6    treatment team about that.  And I don't know how I can

7    consider unconditional release until that's resolved.

8           MR. LEVINE:  I think it's largely resolved, Your

9    Honor.

10           THE COURT:  Well, it's not in any of the papers --

11    it's not in any of the papers that have been presented to

12    me, and I want Mr. Weiss's input and Mr. Beffa's input and

13    Dr. Tillbrook's input as to whether the proposal for housing

14    is appropriate for someone who has no conditions on him.

15           We know that if he were here in D.C. that things

16    would have been very different over the last several years,

17    and that's through no fault of his, but he was fortunate to

18    have family that he could live with.  But for other patients

19    at Saint E's -- and the lawyers from Saint E's can correct

20    me if I'm wrong.  For other patients from Saint E's there

21    would be a determination that would have been made somewhere

22    along the way, is it appropriate to go back with his family?

23    Is there family at home?  Should this be a group home

24    situation?  Should the person live with a boyfriend,

25    girlfriend, spouse; or is that not a good idea?  Should the

1  person live with a roommate?  And all of those things would

2  have been vetted and thought about by Saint Elizabeths, and

3  that would have all been done before there was an

4  unconditional release, as I understand the way it normally

5  works.

6        The good news is that Mr. Hinckley had a place to

7  go that was much better than many of the patients at Saint

8  Elizabeths ever have the option to go to, with his mother,

9  who remarkably is still apparently in good health at her

10  age.  But, you know, we started this process ten years ago

11  when he was going down there 10 or 17 days a month.  Now

12  it's full time while she's 10 or 12 or whatever number of

13  years older than she was when we started this process.  And,

14  you know, he's fortunate that she's been able to provide for

15  him a nice good environment in which to reside, nice house

16  and a good community, and most of Saint E's patients don't

17  have that option.

18        But my only point is that -- I don't want to put

19  the horse -- or the cart before the horse.  I do want to put

20  the horse before the cart, and I want -- I want, among other

21  things, for there to be -- not for purposes of this consent

22  order you're discussing now, but for whatever period of time

23  is going to elapse between the dramatically reduced number

24  of conditions agreed in the consent order and the hearing,

25  which may or may not ever have to take place, I want, in

1   that interim period, to know what the specifics of the

2   proposal and the plan are.

3          I mean, I've heard on and off about it over years

4   whether he and his brother would live together.  If his

5   mother were no longer with us, whether they'd live in the

6   house or whether the house is part of the estate or whether

7   they'd sell the house.  None of that, though, is in any of

8   the hospital's papers or the Williamsburg treatment team,

9   and I think the burden was on Mr. Weiss to figure this out.

10  It hasn't happened.

11         Let me put it this way.  If it's happened, no one

12  has advised me or Ms. Weston.  You may or may not have

13  advised the hospital.  I don't know.

14         MR. LEVINE:  I think they have, Your Honor.  I

15  know I've seen in some of the paper that I've read --

16  frankly I can't recall whether it was in letters to the

17  Court or otherwise, but there's been a discussion about

18  that, and I think suitable proposals were -- or

19  opportunities were identified.  They couldn't be seized upon

20  because they couldn't commit to leases or that type of

21  thing, but it was that he was to live with his brother, and

22  there is available housing nearby, but they would not take

23  advantage of that housing until such time as they were

24  required to move out of the house in Williamsburg.

25         So -- and, of course, that is indeterminate.  That

 1     is limited by the life of the mom, and we wish her a long

 2     life, or a longer life.  She's had a long life.

 3              So I think that is well under control, but given

 4     the comments by the Court I will endeavor to have that issue

 5     addressed in a letter to the Court so that the Court can

 6     feel its comfort about this issue because Your Honor has

 7     asked that question upon occasion.

 8              THE COURT:  Well, if you do it by way of letter,

 9     then it should be a letter attached to a filing on the

10     docket.  Whether it's in the public docket or under seal

11     will have to be determined, but I don't want just a letter.

12     I want it as part of the record.

13              MR. LEVINE:  Of course.

14              THE COURT:  So my suggestion would be this, and I

15     should -- before I make my suggestion, do either of the

16     lawyers from Saint Elizabeths or from the District want to

17     say anything about what we've discussed thus far?

18              MS. OLIPHANT:  Nothing from the department, from

19     the Department of Behavioral Health.  Yes, nothing to be

20     added from the Department of Behavioral Health, Your Honor.

21     Thank you for that opportunity.

22              THE COURT:  Thank you.

23              My suggestion would be the following, that the

24     two -- Ms. Weston and Mr. Levine continue to talk about

25     this consent order and come up with a proposal, and if the

1    only -- and Mr. Levine -- the hospital's proposal is that

2    essentially we don't need a hearing when the time expires,

3    then he would be unconditionally released.  But this consent

4    order, I think, has explicit or implicit within it that

5    we're going to have a consent order that will last for a

6    period of time with very limited -- much more limited

7    conditions.  At the end of that period of time, whatever it

8    is, there will be a hearing scheduled, and people can file

9    whatever they want to file.  It is possible that the

10   government will say:  Based on what's happened in the last X

11   period of time, we don't need a hearing, or we just need a

12   status conference, or we need a limited hearing only.  But

13   we could set it for an evidentiary hearing, which may or may

14   not -- but we may decide we actually don't need evidence, we

15   don't need a lot of evidence or whatever.

16            And the only -- if I'm hearing this correctly, the

17   question is when that hearing takes place.  And if that's

18   the only point, if you all can agree on everything else

19   except that, then we have one open question:  Three months?

20   Six months?  Eight months?  Whatever.  And I don't know that

21   I need to decide that today, but I will decide -- and maybe

22   you want to either -- when you file the consent order or

23   submit the consent order, you maybe want to file a joint

24   document or separate documents very brief about what you

25   think about the timing of the hearing.

1          The reality is that the Court has resumed -- some

2      judges have resumed in-person, in-court hearings, and I

3      don't know whether many of them have had evidentiary

4      hearings yet with examination and cross-examination, but

5      about half the courtrooms have been equipped with Plexiglas

6      separating everybody and all sorts of other precautions, and

7      that process continues.

8          There are a maximum of 14 people in the courtroom

9      at any given time -- Tanya can correct me if I'm wrong

10     because she's actually been at some of these hearings; I

11     have not -- and limited people at counsel table and all the

12     rest of it.

13         So that started to happen on September the 14th,

14     and I have told my staff and every other lawyer in every

15     other case, I don't care what other judges are doing.  I am

16     not going back to the courthouse until January at the

17     earliest.  So if it's an evidentiary hearing before then, we

18     could do it by video, which isn't very good, or we could

19     find a date in January or later and see what happens.

20         So that's just guidance for you guys when you

21     continue to talk to each other over the next couple of days

22     to see if you can agree on a consent order followed by

23     whatever filing you want to make about a proposed hearing

24     date, or maybe it would have to be, to plan for the worst-

25     case scenario, several days as we have had in the past.

1        So that's my proposal, is that you present the

2   consent order, and you operate on the assumption that we're

3   moving towards the same goal or you're moving towards the

4   same goal, assuming everything is successful over the next X

5   period of time.

6        And if the only strong point of disagreement is

7   when this hearing can be, I'll decide when the hearing will

8   be after considering what each of you have to say about it.

9   You can either do it in writing, or we can have another

10  status conference to debate the number of months.

11       MS. WESTON:  Your Honor, I do just want to flag

12  for you -- because you've now said a couple of different

13  times "the only point of disagreement," and I do just want

14  to flag for Your Honor, though I'm optimistic that we can

15  work this out, that I have already raised with Mr. Levine

16  that one condition that the government does plan on

17  including in some form in the consent order is that with

18  regards to Mr. Hinckley now being -- what's been recommended

19  and what the government is willing to agree to is to allow

20  him to publish or potentially sell his art and/or music

21  under his own name.  That has always given the government

22  great pause.  That is one of the very untested areas as to

23  how he will handle either critique or success should that go

24  in either direction.  And so that has always been one of the

25  areas that the government is most concerned about with

1    regards to Mr. Hinckley, and what I have notified Mr. Levine

2    of is that the government is aware of a civil settlement

3    that occurred in 1995.  I do not know the specifics of the

4    settlement, but I know that it does relate to the use of

5    Mr. Hinckley's story, his name in some form or fashion, and

6    that the -- any financial benefit of that was to go to

7    victims.  And I've notified him of that as a potential

8    issue.

9          I don't intend on including any sort of specific

10   language in the order that he would absolutely have to

11   provide said financial benefit, but I do believe that -- I

12   have put him on notice and I think everyone should be on

13   notice that my understanding is that this is out there,

14   and that any financial gain would at least have to be

15   compliant with any settlement that exists.  And, again, I

16   don't know -- we're in the process of trying to locate the

17   actual settlement documents, but as Your Honor, I'm sure, is

18   aware, trying to find older documents in the current setting

19   is potentially going to take a bit of time.

20         But I just wanted to at least alert Your Honor to

21   the issue.  I have alerted Mr. Levine to the issue.  I don't

22   know what, if any of it, would be covered, but I at least

23   wanted everyone to be aware that that is an issue that's

24   potentially out there should he financially benefit from the

25   use of his name.

```
 1                 THE COURT:  Okay.  Well -- go ahead.
 2                 MR. LEVINE:  I'm sorry.
 3                 THE COURT:  No, you go ahead.
 4                 MR. LEVINE:  I have a quick comment about that.
 5       Of course one of the things that Mr. Hinckley cares
 6       particularly about is the ability to sell, publish, perform
 7       his art in public.  Your Honor invoked a question about the
 8       cart -- the horse and the cart.  I'm not sure it's going to
 9       generate much in the way of income at all, but we'll find
10       that out.
11                 But in any event, simply I think we'll comport
12       with the law.  I think there may be -- and I say this to
13       you, to the Court, without having researched it, but it is
14       my belief that there is a limit on -- there's a statute of
15       limitations on enforcement of judgments.  I had thought it
16       was about 12 years.  I'm not sure.  And if it's enforceable,
17       it will be enforced.  If it's not enforceable, I guess it
18       won't be enforced.  But the question would be -- it starts
19       with whether he will earn any income at all from the sale or
20       publication or performance of his art.
21                 And I think this question is only relevant in the
22       context of an unconditional release is whether or not the
23       performance of his art, his painting or his music, would
24       subject him to criticism or rejection and whether or not
25       that criticism, rejection, or even success would cause some
```

1     sort of decompensation, some sort of symptom of a mental

2     illness, and whether it might cause him to become a danger

3     to himself or others.

4          I think the Court has had a great deal of

5     experience with this and with Mr. Hinckley.  We know he's

6     been subjected to a great deal of rejection, whether it be

7     by media or whether it be by social relationships.  There's

8     a host of rejection, and we know that he has fared well.  As

9     a psychological matter, he's done exceedingly well.  So it

10    seems to me that the only relevance of his publication of

11    music and art is its impact on his psychological state and

12    the prospect of it causing a danger, and we know there will

13    be none.

14         So while I understand the concerns by the

15    government, I'm not sure they're relevant at all.  Whatever

16    the law is, he will comply.  We will comply as an obligation

17    to put -- place the money in the hands of the victims.  We

18    will do that.  I know there is a percentage that goes to

19    one's self-support, but these are issues that will be

20    addressed when and if we have some income from his

21    performance.

22         THE COURT:  Well, I do think, all of those issues

23    aside, this is a substantial concession by the government in

24    view of the history and the concerns that have been raised.

25    And I agree with you and with the risk assessment that, in

1    comparable or similar related kinds of things, he has

2    withstood -- he's been very resilient in withstanding

3    disappointment and rejection in recent years and over a lot

4    of years.

5              But nevertheless, this has always been a sticking

6    point with the government, with the United States, and so I

7    think that this is an important concession from the

8    government and also potentially the potential for having

9    Mr. Hinckley feel very good about himself with the ability

10   to publish under his own name.

11             MR. LEVINE:  That is correct.

12             THE COURT:  So I think it's a potential positive,

13   and I think -- I think we would all be hopeful.  I'm sure

14   the government is more than hopeful that -- they've looked

15   at the risk assessments and have reached a conclusion that

16   they're willing to agree to this particular thing at this

17   point, and I think that's a good thing for everybody.  And

18   only time will tell for sure, of course.

19             Okay.  Is there anything else we need to discuss

20   today?  Or do we have a way forward for the next --

21             MS. WESTON:  Nothing from the government, Your

22   Honor.

23             THE COURT:  Okay.

24             MR. LEVINE:  If Your Honor please, the only thing

25   I would at least alert the Court to, and that is we would

1      like to reserve some time on the Court calendar for the

2      early part of January, if that were possible.

3                  MS. WESTON:  Your Honor, the government would

4      oppose -- as I told Mr. Levine yesterday, and I apologize if

5      this is being confused because as I told him yesterday, in

6      the government's opinion there are two potential avenues we

7      can take here, and if he is asking for no conditions

8      whatsoever and to set a hearing today, that's fine, but

9      that's not a consent order.  That is a contested hearing

10     because we are not agreeing at this time to no conditions.

11     That is an unconditional release, and we're not agreeing to

12     that right now.

13                  If he is agreeing to what I thought he was

14     agreeing to when we spoke yesterday, which was a consent

15     order that had a reduction of -- a great reduction of

16     conditions at the end of some period of time, there would be

17     a hearing which we could set in the order or that the Court

18     could determine after hearing from both sides as to what

19     period of time they believe is appropriate.  Then that's a

20     consent order.

21                  But I would oppose setting --

22                  THE COURT:  Let me just interrupt both of you.

23     It's not going to be less than six months because the

24     hospital has said six to twelve months.  So January is not a

25     good period.

1          So if you all can agree on a consent decree, a

2     consent order, with the understanding that we're going to

3     have a hearing sometime between six and twelve months from

4     now and the only point of contention is whether it's six,

5     seven, eight, or nine, then you probably will have a consent

6     order.

7          But I don't know why I should disagree with the

8     hospital's recommendation of let's keep tabs on him for six

9     to twelve months before there's an unconditional release.

10    They -- as I read their letter of August whatever date it

11    was, the committee made up of professionals at the hospital,

12    after consulting with the professionals in Williamsburg, met

13    three or four times to decide what recommendation to make in

14    the letter, and the letter says that they think -- even

15    though it may be an arbitrarily selected time period, they

16    recommend to the Court in their letter of August 21st six to

17    twelve months.

18         Now, they also recommend that after that period

19    that the unconditional release be self-executing.  The

20    United States government agrees to the self-executing part

21    of it, but I don't think I have -- the United States --

22         MS. WESTON:  Does not agree on --

23         THE COURT:  I meant to say the United States

24    disagrees, disagrees, with the self-executing part of it.

25    So -- but that is a separate question, it seems to me, than

1    what is an appropriate time frame.  And the hospital's

2    experts -- you know, it's like when I sentence somebody.  I

3    can't honestly say that this person will benefit more from

4    15 months incarceration than 12 months and a day.  I have to

5    make a judgment somewhere, and it's not a science as to

6    where you draw that line.

7         And so the hospital says six to twelve months.

8    Nobody but Mr. Levine has said three months, and so I want

9    to start with the premise that it's going to be at least six

10   months before we have the hearing.  And if that's the

11   baseline that both sides can live with, then you can

12   probably go forward with a consent order, and then you can

13   fight about whether it's going to be six, seven, eight, or

14   nine months, and I'll decide.  That's my suggestion.

15        MR. LEVINE:  My only observation, Judge, is that

16   letter to which you made reference does say that it is the

17   opinion of the Department of Behavioral Health that he no

18   longer meets the criteria of the commitment --

19        THE COURT:  I know that.  If you want a hearing,

20   we can have a hearing, but then you won't have a consent

21   order.  I think that's the bottom line.

22        If you want an evidentiary hearing, we'll have an

23   evidentiary hearing.  We'll do it in January.

24        If you want a consent order to let him start

25   living on reduced conditions, you can have a consent order,

1    but you two will negotiate that over the next few days or

2    however long it takes you, and we'll have a hearing in the

3    six or twelve months.

4              Those are the options.  So why don't you both file

5    something separately or jointly and tell me -- and either

6    say:  We couldn't agree, let's have a hearing in January; or

7    We could agree, here's what we've agreed to.  Mr. Levine

8    wants a hearing six months from the date of the consent

9    order, and the government wants a hearing X months from the

10   date of the consent order.

11             That's my proposal.  I don't see that it's useful

12   to keep debating it because the government's not going to

13   agree to a consent order if I say three months.

14             MR. LEVINE:  Understood.

15             THE COURT:  Anything else?

16             MS. WESTON:  Not from the government, Your Honor.

17             MR. LEVINE:  Thank you, Judge.  Thank you very

18   much.

19             THE COURT:  Okay.  Thanks, everybody.  Good to see

20   you all.  Good to hear you, Barry.  Thank you, Kacie.

21             MR. LEVINE:  Thank you, sir.  Thank you.

22             MS. WESTON:  Thank you, Your Honor.

23             MR. LEVINE:  Thank you, all.  Bye-bye.

24                  (Whereupon the hearing was

25                   concluded at 10:53 a.m.)

1

2

3                    **CERTIFICATE OF OFFICIAL COURT REPORTER**

4

5              I, LISA A. MOREIRA, RDR, CRR, do hereby

6     certify that the above and foregoing constitutes a true and

7     accurate transcript of my stenographic notes and is a full,

8     true and complete transcript of the proceedings to the best

9     of my ability.

10        **NOTE:**  This hearing was held during the COVID-19

11    pandemic stay-at-home restrictions and is subject to the

12    technological limitations of court reporting remotely.

13              Dated this 23rd day of September, 2020.

14

15

                             /s/Lisa A. Moreira, RDR, CRR
16                           Official Court Reporter
                             United States Courthouse
17                           Room 6718
                             333 Constitution Avenue, NW
18                           Washington, DC 20001

19

20

21

22

23

24

25