# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 81-306 (PLF) |
| | ) | |
| JOHN W. HINCKLEY, JR. | ) | |
| | ) | |

## CONSENT ORDER

This matter came before the Court upon an agreement by the Government and Mr. John Hinckley for his unconditional release from his commitment. On September 27, 2021, the Court held a status conference at which counsel for the Government and counsel for Mr. Hinckley discussed Mr. Hinckley's present mental stability and his compliance with the conditions of his convalescent leave, described their agreement regarding Mr. Hinckley's unconditional release from commitment, and jointly recommended this Consent Order.

The parties and the Court have considered the Department of Behavioral Health's recommendations for unconditional release dated August 21, 2020, and May 10, 2021, as well as the Department of Behavioral Health's monthly reports to the Court and counsel stating, in part, that Mr. Hinckley is and has been in full compliance with all of the conditions of release and is and has been mentally stable, with his disease in full and sustained remission, and the expert reports and risk assessments of Dr. Samantha Benesh and Dr. Mitchell Hugonnet stating that the risk of his violence is "low" and "remote."[1]

---

[1] The Department of Behavioral Health letters, dated August 21, 2020, and May 10, 2021, as well as the reports of Dr. Benesh, dated July 2, 2020, and September 16, 2021, and Dr. Hugonnet, dated September 2, 2021, are attached hereto.

On June 21, 1982, a jury found Mr. Hinckley not guilty by reason of insanity on numerous charges related to the attempted assassination and severe wounding of President Ronald Reagan as well as the severe wounding of Presidential Press Secretary James Brady, Secret Service Agent Timothy McCarthy, and Metropolitan Police Officer Thomas Delahanty. He was committed to Saint Elizabeths Hospital for an indeterminate period of time following a **Bolton** hearing.[2]

On December 17, 2003, Mr. Hinckley was granted his first conditional release for privileges in the community. Since that date, his conditional release privileges have been gradually expanded by the Court.[3] The most recent hearing occurred over several days in April and May 2015. Thereafter, on July 27, 2016, this Court issued an Opinion and Order granting Mr. Hinckley convalescent leave to reside full-time in the community. See United States v. Hinckley, 200 F. Supp. 3d 1, 63 (D.D.C. 2016).

Pursuant to that Order, on September 10, 2016, Mr. Hinckley was placed on convalescent leave to reside full-time with his mother in Williamsburg, Virginia. Since then, pursuant to the Court's Order, the Department of Behavioral Health has submitted monthly compliance reports to the Court and counsel. Those reports have consistently indicated that Mr. Hinckley has been compliant with all the conditions of his release and has remained mentally stable and asymptomatic for mental disease. Also, pursuant to Condition 32 of the Court's Order, the Department of

---

[2] Bolton v. Harris, 395 F.2d 642 (D.C. Cir. 1968).

[3] This Court has held several evidentiary hearings after which it has issued lengthy opinions detailing Mr. Hinckley's mental condition, treatment compliance, and progression towards full convalescent leave in the community. See United States v. Hinckley, 292 F. Supp. 2d 125 (D.D.C. 2003); United States v. Hinckley, 346 F. Supp. 2d 155 (D.D.C. 2004); United States v. Hinckley, 407 F. Supp. 2d 248 (D.D.C. 2005); United States v. Hinckley, 462 F. Supp. 2d 42 (D.D.C. 2006); United States v. Hinckley, 493 F. Supp. 2d 65 (D.D.C. 2007); United States v. Hinckley, 625 F. Supp. 2d 3 (D.D.C. 2009); United States v. Hinckley, 40 F. Supp. 3d 8 (D.D.C. 2013); United States v. Hinckley, 200 F. Supp. 3d 1 (D.D.C. 2016).

Behavioral Health completed an updated risk assessment of Mr. Hinckley on July 27, 2018.[4] Thereafter, it recommended several modifications, reducing the conditions to Mr. Hinckley's convalescent leave privileges in an August 2018 letter to the Court and counsel.

The Government retained two independent experts, Dr. Raymond Patterson, a forensic psychiatrist, and Dr. Mitchell Hugonnet, a forensic psychologist, to review the Department of Behavioral Health's risk assessment and proposed modifications that would eliminate certain conditions of Mr. Hinckley's convalescent leave.  On October 16, 2018, Dr. Patterson submitted his response in support of the proposed modifications to Mr. Hinckley's convalescent leave. Thereafter, on October 22, 2018, Dr. Hugonnet submitted his risk assessment of Mr. Hinckley, which also supported the proposed elimination of certain conditions of Mr. Hinckley's convalescent leave.[5]

Condition 32 of the Court's July 27, 2016 Order required the parties to "meet and come to mutual agreement regarding proposed reductions in the conditions of convalescent leave and/or the frequency of Mr. Hinckley's appointments to be submitted to the Court for approval." United States v. Hinckley, 200 F. Supp. 3d at 70.  Accordingly, based upon a review of the Department of Behavioral Health's monthly status letters, risk assessment, and recommendation for modifications to Mr. Hinckley's convalescent leave privileges; the Government's expert reports; and the proposed Consent Order jointly submitted by counsel for the Government and counsel for

---

[4] Condition 32 of the Court's July 27, 2016 Order required the Department of Behavioral Health to conduct an updated risk assessment within 18 months of the Court's Order to address Mr. Hinckley's compliance and whether any changes in the conditions of his release were warranted.  The completion of the risk assessment was delayed after Dr. Katherine Murphy, a forensic psychologist who conducted the 2015 risk assessment of Mr. Hinckley, became unavailable.  A new evaluator, Dr. Samantha Benesh, was retained by the Department of Behavioral Health and produced the required updated risk assessment.

[5] Both experts opposed the Department of Behavioral Health's recommendation to eliminate the requirement for Mr. Hinckley to maintain a daily log of his activities, finding that the logs were clinically and therapeutically beneficial to Mr. Hinckley.

Mr. Hinckley, this Court found that Mr. Hinckley would not pose a danger to himself or others if he was permitted to continue residing full-time in Williamsburg, Virginia, on convalescent leave under the proposed conditions.  Accordingly, the Court entered a modified Consent Order on November 16, 2018.  See Consent Order [Dkt. No. 663].

Thereafter, the Department of Behavioral Health continued to provide bi-monthly status reports on Mr. Hinckley's mental condition and his compliance with the conditions of release.  On August 21, 2020, it submitted a letter to the Court and counsel recommending further reduction of conditions to Mr. Hinckley's convalescent leave privileges and, after a period of 6 to 12 months, unconditional release from his commitment.  The letter indicated that an updated risk assessment conducted by Dr. Samantha Benesh on July 2, 2020, concluded that Mr. Hinckley posed a low risk for future violence under the proposed conditions.  See July 2, 2020 Violence Risk Assessment Update [Dkt. Nos. 696-1, 696-2].

Upon review of the Department of Behavioral Health's recommendation, the updated Risk Assessment and the prior bi-monthly status letters to the Court, the Government opposed Mr. Hinckley's unconditional release but did not oppose modifications to the conditions of his release consistent with the recommendations in the Department of Behavioral Health's August 21, 2020 letter.  Accordingly, following a September 23, 2020 status hearing, counsel for the Government and counsel for Mr. Hinckley submitted a proposed Consent Order.

Upon review of the Department of Behavioral Health's recommendation and after review of the proposed Consent Order as well as representations by the parties, the Court, on October 28, 2020, entered the Consent Order with modifications reducing the conditions of Mr. Hinckley's convalescent leave.  See Consent Order [Dkt. No. 696].  In part, the modified Consent Order expanded the distance Mr. Hinckley could travel, reduced his reporting requirements, and perhaps

most importantly to him at the time, allowed him to post/publish his music and/or art under his true name.  The Court set a status hearing within approximately 7 months and an evidentiary hearing approximately 9 months from the date of the Consent Order to consider whether Mr. Hinckley should be unconditionally released.

Thereafter, a status hearing was scheduled for June 3, 2021.  In advance of that hearing, the Department of Behavioral Health submitted a new letter dated May 10, 2021, indicating its continued support for Mr. Hinckley's unconditional release, and the Government requested the opportunity to have its own expert, Dr. Mitchell Hugonnet, evaluate Mr. Hinckley in advance of an evidentiary hearing.  At the June 3, 2021 status hearing, the Government indicated its continuing opposition to unconditional release, and the Court set an evidentiary hearing date.

On September 2, 2021, the Government received Dr. Hugonnet's report.  He opined that unconditional release was not appropriate immediately for two main reasons: 1) Mr. Hinckley's mother recently passed away on July 30, 2021, thus resulting in Mr. Hinckley living alone for the first time since the offense; and 2) Mr. Hinckley's long standing group therapy with Mr. Beffa is going to be terminated because of Mr. Beffa's retirement, and no replacement will be available, as of January 2022. Dr. Hugonnet opined that, because Mr. Hinckley has a tendency toward isolating in response to stress, monitoring Mr. Hinckley's response to the significant changes of losing his mother and his group therapy for a period of time is clinically appropriate.  However, Dr. Hugonnet also opined that Mr. Hinckley is doing exceedingly well so far and operating at a very high level. Dr. Hugonnet anticipates that Mr. Hinckley will continue to do well through these changes and opines that if that is the case (*i.e.,* barring no change in circumstances and assuming Mr. Hinckley continues to comply with the conditions of the existing Consent Order), he agrees that in June 2022 it will be appropriate for Mr. Hinckley to be unconditionally released.

Thereafter, on September 16, 2021, almost seven weeks after Mr. Hinckley's mother passed away, Dr. Benesh submitted an Addendum to her 2020 Risk Assessment. She continued to opine that Mr. Hinckley was ready for unconditional release and did not believe an additional period of monitoring as suggested by Dr. Hugonnet was necessary. She also opined that Mr. Hinckley coped well with the stress caused by his father's death on January 29, 2008, that he had long prepared for the death of his mother as her health declined, and that he had coped well and appropriately in the time following her death on July 30, 2021.

Following receipt of the expert reports, the Government consulted with officials within the Department of Justice and subsequently proposed a settlement to defense counsel by which Mr. Hinckley would be granted an unconditional release at this time with the Court making its findings of facts and conclusions of law but staying the execution of the Order for unconditional release until June 2022. During the interim, Mr. Hinckley would be required to continue to comply with the conditions set forth in the October 28, 2020 Consent Order governing his convalescent leave. Should the Government believe that either Mr. Hinckley's mental health has materially deteriorated or that Mr. Hinckley has failed to comply with the conditions of his release, it will bring such matters to the attention of the Court by motion no later than June 6, 2022. At any hearing on the Government's motion, the Government will have the burden of establishing the material nature of the deterioration or the noncompliance. Counsel for the parties informed the Court at the September 27, 2021 status conference that they agree that if Mr. Hinckley continues to comply with the conditions of the October 28, 2020 Consent Order and remains mentally stable until June 2022, Mr. Hinckley would meet the requirements for unconditional release, and they further agree that the Order for unconditional release will automatically become effective without

further Order of the Court.  The parties have no objection to a status hearing being scheduled on a

date convenient to the Court in June 2022.

Upon careful consideration of the agreement of the parties and the lengthy forty-year record

in this case, including in particular the evidence presented to this Court in extensive evidentiary

hearings over the last eighteen years, the Court FINDS and CONCLUDES that:

1. Mr. Hinckley's diagnosis of major depression (Axis I) has been in full and sustained remission for more than twenty-five years, and perhaps more than thirty-two years.

2. Mr. Hinckley's diagnosis of psychotic disorder not otherwise specified (Axis I), which was the linchpin of Mr. Hinckley's overt expressions of violence in the past, has been in full and sustained remission for more than twenty-five years, and perhaps more than thirty-two years.

3. Mr. Hinckley's diagnosis of narcissistic personality disorder (Axis II) continues to be significantly attenuated from its previous state in the 1980s, when Mr. Hinckley exhibited intense self-absorption and grandiosity.

4. In the five years that Mr. Hinckley has resided full-time in the Williamsburg, Virginia community on convalescent leave, he has followed every condition imposed by the Court.  He has participated successfully in music, individual, and group therapy, he has demonstrated self-awareness of and responsibility for his mental illness and need for treatment, and he has exhibited no violent, disruptive, or problematic behaviors.

5. Mr. Hinckley is currently compliant with recommended treatment and has recovered his sanity such that he does not present a danger to himself or others because of mental illness if unconditionally released on June 15, 2022.

Accordingly, it is by the Court this __30th__ day of September, 2021, hereby

ORDERED that Mr. John Hinckley is unconditionally released; it is

FURTHER ORDERED that execution of the Order for unconditional release is stayed until

June 15, 2022; it is

FURTHER ORDERED that Mr. Hinckley shall continue to abide by the conditions set

forth in the October 28, 2020 Consent Order until execution of the Order for unconditional release

on June 15, 2022; it is

FURTHER ORDERED that upon termination of Mr. Hinckley's current group therapy with Mr. Beffa in approximately January 2022, Mr. Hinckley will no longer be required to participate in group therapy, see Consent Order [Dkt. No. 696] at Condition #8; it is

FURTHER ORDERED that the Department of Behavioral Health shall submit a status letter to the Court and counsel by May 2, 2022, regarding Mr. Hinckley's compliance with the conditions of release, his current mental condition, and its position regarding Mr. Hinckley's unconditional release from his commitment; it is

FURTHER ORDERED that should either party wish to respond to or comment on the Department of Behavioral Health's status letter, or to bring other matters to the Court's attention, it shall submit a status letter to the Court doing so on or before May 16, 2022; it is

FURTHER ORDERED that the Government shall submit a status letter to the Court on or before May 23, 2022, informing the court of its position regarding Mr. Hinckley's unconditional release from his commitment; it is

FURTHER ORDERED that a status hearing shall be set for June 1, 2022, at 10:00 a.m., at which counsel for the Government and counsel for Mr. Hinckley shall inform the Court of their positions regarding Mr. Hinckley's unconditional release from his commitment; and it is

FURTHER ORDERED that in the absence of violations of the conditions set forth in this Consent Order as well as the October 28, 2020 Consent Order for conditional release, the instant Order for unconditional release shall become effective on June 15, 2022, and the patient, Mr. John Hinckley, shall be unconditionally released from his D.C. Code § 24-501(d) commitment effective immediately.

SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE: 9/30/21

9



**Benesh & Yeaw Consulting LLC**
15012 Cram Highway, Unit B #430 • Brandywine, Maryland 20613
Phone: 202-868-0806 • Fax: 202-417-3948 • forensicpsych@beneshyeaw.com

## Violence Risk Assessment Update
July 2, 2020

### 1. Identifying Information
Mr. John W. Hinckley, Jr. is a 65-year-old (Date of Birth: May 29, 1955) male who was committed to Saint Elizabeths Hospital (SEH) on June 22, 1982. He was found Not Guilty by Reason of Insanity (NGRI) on June 21, 1982 on four counts of attempted murder, four counts of criminal possession of a weapon, and four counts of possession of a prohibited weapon after he attempted to assassinate President Ronald Reagan on March 30, 1981, wounding the President and press secretary James Brady, Secret Service agent Timothy McCarthy and District of Columbia (DC) police officer Thomas Delahanty. Mr. Hinckley was discharged from SEH on convalescent leave (CL) status on September 10, 2016 pursuant to the court's conditional release (CR) order dated July 27, 2016.

Mr. Hinckley currently resides at the home of his mother, JoAnn Hinckley, in Williamsburg, Virginia (VA) along with his brother, Scott Hinckley. He is under the supervision of the DC Forensic Outpatient Department (FOPD) and receives care from a multidisciplinary treatment team in Williamsburg consisting of a psychiatrist (Dr. Deborah Giorgi-Guarnieri), individual/group therapist (Mr. Carl Beffa), case manager (Mr. Jonathan Weiss), and music therapist (Ms. Nicole Drozd).

### 2. Reason for Referral
Mr. Hinckley was referred by FOPD for an updated risk assessment; the last risk assessment I conducted for Mr. Hinckley was completed on July 27, 2018. Specifically, the Forensic Outpatient Review Board is seeking recommendations regarding unconditional release (UCR) for Mr. Hinckley.

When asked about his current community supervision status, plans for professional services and goals for the future, Mr. Hinckley stated, "I feel like it's time [to receive UCR]. I have done everything asked of me...[and] I don't feel like the check-ins are necessary anymore." He further said that if he received UCR from the court, "it's not like I would be cut loose from everything." He clarified this statement, indicating his intention to remain in group therapy and continue taking his psychiatric medications. Mr. Hinckley also expressed that his future plans include remaining in the Williamsburg area, continuing to grow his antique business, and publishing his music and artwork under his own name, with the hope of earning an income from his artistic endeavors.

### 3. Notification of the Limits of Confidentiality
Due to the COVID-19 pandemic, this evaluation was conducted on June 9, 2020 via Cisco WebEx with coordination through Chad Tillbrook, PhD, Director, Forensic Services Division, DC Department of Behavioral Health (DBH)/Mental Health Services Division (MHSD). Mr. Hinckley was advised of the following:

a. I was contracted by DBH/MHSD to complete this evaluation;

b. The evaluation was to gather information relevant to his risk for re-offending and to assist the court in making decisions regarding the conditions of his release;

c. The evaluation would include a comprehensive psychological interview, collateral interviews and review of medical and court records;

d. The evaluation was for legal purposes, and would not include a treatment relationship;

e. A report of the evaluation would be made available to his treatment team, defense attorney, government's attorney and the court;

f. If I am called to testify, the information obtained from this evaluation, as well as other conclusions, could be made public in court;

g. Although the interview was being conducted via Cisco WebEx due to the COVID-19 pandemic, no audio and/or video recording of the interview would be produced.

Mr. Hinckley voiced understanding of the parameters of the evaluation and agreed to participate in the interview.

## 4. Evaluation Methodology

A forensic psychology evaluation involves answering a question relevant to the court through the collection of information using several methods. This evaluation included the following methods: interview of Mr. Hinckley about his personal and medical history for approximately 80 minutes; review of Mr. Hinckley's medical and court records; and collateral interviews with Carl Beffa, LCSW, Mr. Hinckley's individual and group therapist; Deborah Giorgi-Guarnieri (GG), MD, Mr. Hinckley's psychiatrist; Jonathan Weiss, LCSW, Mr. Hinckley's case manager; Nicole Drozd, MS, MC-BT, Mr. Hinckley's music therapist; and Chad Tillbrook, PhD, Mr. Hinckley's point of contact from DBH/FOPD.

Specialized techniques were also used to assess Mr. Hinckley's relative risk of reoffending if granted UCR and to identify viable targets for rehabilitation. Similar to the 2018 evaluation of Mr. Hinckley I conducted, I utilized one actuarial tool, the Violence Risk Appraisal Guide – Revised (VRAG-R), and one structured professional judgement tool, the Historical Clinical Risk Management-20, Version 3 (HCR-20v3), as part of my risk assessment. The findings of the risk assessment tools were combined with the clinical evaluation into an integrated risk management assessment.

## 5. Sources of Information

All records were provided by FOPD staff members.

- October 16, 2018 - Forensic psychiatric report by Raymond Patterson, MD;
- October 22, 2018 - Psychological risk assessment update by Mitchell Hugonnet;
- November 16, 2018 - Court order for conditional release on convalescent leave by US District Judge Paul L. Friedman;
- September 10, 2019 – Status hearing transcript
- August 16, 2018 to October 24, 2018 – Bi-monthly progress reports to the court drafted by Nicole Johnson, MD;

- October 24, 2018 to January 30, 2020 – Bi-monthly progress reports to the court drafted by Marc Dalton, PhD, and Chad Tillbrook, PhD;
- January 31, 2020 to May 29, 2020 – Bi-monthly progress reports to the court drafted by Chad Tillbrook, PhD;
- August 2018 to May 2020 - Progress notes by Jonathan Weiss, LCSW; Carl Beffa, LCSW; Deborah Giorgi-Guarnieri, MD; and Nicole Drozd, MSW, MT-BC;
- August 2018 to May 2020 - Handwritten daily logs of work and travel by Mr. John Hinckley, Jr.;
- May 30, 2020 – letter from Mr. Hinckley's treatment team, drafted by Mr. Weiss, emailed to Dr. Tillbrook and Mr. Barry Levine, attorney for Mr. Hinckley.

Also considered were the following:
a. Clinical interview with Mr. Hinckley on June 9, 2020;
b. Collateral interview with Carl Beffa, LCSW, individual and group therapist, on June 9, 2020;
c. Collateral interview with Jonathan Weiss, LCSW, case manager, on June 10, 2020;
d. Collateral interview with Nicole Drozd, MS, MC-BT, music therapist, on June 10, 2020;
e. Collateral interview with Deborah Giorgi-Guarnieri, MD, psychiatrist, on June 15, 2020;
f. Collateral interview with Chad Tillbrook, PhD, from DBH/FOPD on June 17, 2020;
g. Violence Risk Appraisal Guide-Revised (VRAG-R);
h. The Historical, Clinical, Risk Management-20, Version 3 (HCR-20v3).

## 6. Summary of Recent Evaluations

On July 27, 2018, I completed a Violence Risk Assessment for Mr. Hinckley at the request of DBH/FOPD. As part of that evaluation, I opined that Mr. Hinckley was at low risk to re-offend with a violent crime over the short and long term. In addition, I opined that given his prolonged psychiatric stability and consistent engagement in treatment, he was also at low risk for another psychotic episode. In light of his low risk for violence, excellent adjustment to the community and strict adherence to the conditions of his release during the two years he had been on CL, I recommended several modifications to the conditions of his release. These recommendations included: reducing the frequency of his in-person visits with FOPD, reducing the frequency of his phone contacts with FOPD, increasing the radius he was allowed to travel unaccompanied from 30 miles to 75 miles, allowing him to anonymously publish his music and/or art work, allowing him to reside independently in approved housing, allowing him to sell his antiques online under the supervision of his treatment team and discontinuing the daily logs of his activities. I also recommended that he continue progress toward the following treatment objectives:

a. Utilize the treatment team and therapy group as a resource in decision-making while developing intimate relationships and as support in establishing and maintaining close friendships;

b. Maintain direct, honest communication with his treatment team, family members and friends; and

c. Increase socialization through community engagement and participation in leisure and educational activities.

On October 16, 2018, Robert Patterson, MD, DFAPA, completed an updated psychiatric evaluation of Mr. Hinckley at the request of the government's attorney. In his report, Dr. Patterson opined that Mr. Hinckley's Unspecified Schizophrenia Spectrum Disorder and Major Depressive Disorder were in full sustained remission and that his Narcissistic Personality Disorder was "largely attenuated." In addition, Dr. Patterson indicated that he agreed with the recommendations set forth by DBH, which largely matched those contained in my report. However, Dr. Patterson recommended that Mr. Hinckley should continue drafting daily logs of his activities because, in his opinion, there were therapeutic and forensic benefits inherent in the activity insofar as it assisted in the monitoring of his progress toward increased socialization. Dr. Patterson also recommended that Mr. Hinckley alternate in-person and remote (e.g., Skype or Cisco WebEx) face-to-face contact with FOPD each month rather than a lack of face-to-face contact with FOPD during the months he did not travel to Washington, DC.

On October 22, 2018, Mitchell Hugonnet, PhD, completed a psychological evaluation of Mr. Hinckley at the request of the government's attorney. Dr. Hugonnet opined that Mr. Hinckley's mental illness had been in full remission for at least 20 years and that he had been at low risk for psychiatric decompensation and acts of violence throughout that time. Similar to Dr. Patterson's opinion, Dr. Hugonnet indicated that he agreed with most of the recommendations made by DBH but he also agreed with Dr. Patterson's recommendations that Mr. Hinckley alternate in-person and video meetings with FOPD each month and that he continue to maintain daily activity logs. In addition, Dr. Hugonnet recommended Mr. Hinckley not be allowed to pursue publishing his music and art work anonymously at the same time due to the "significant and time intensive challenges" it would present. Dr. Hugonnet also opined that Mr. Hinckley obtaining a website to sell items as part of his antique mall business was "too complex" and not feasible.

### 7. Most Recent Outpatient Course

*Given that this evaluation serves as an update to my July 2018 report, Mr. Hinckley's psychosocial and psychiatric history is not provided below. The summary below only covers the events pertinent to Mr. Hinckley's progress on CL over the past two years. For a more detailed account of Mr. Hinckley's history, please refer to my prior report.*

From August through October 2018 no significant changes occurred with regard to Mr. Hinckley's day-to-day activities or his adherence to the conditions of his release. In October 2018, Mr. Weiss put Mr. Hinckley in touch with a realtor in the Williamsburg area, Mr. Otey, and Mr. Hinckley began exploring local housing options within his budget. After speaking with Mr. Otey and the company holding the reverse mortgage on his mother's home, Mr. Hinckley verified that he and his brother, Scott, would be able to continue residing in their mother's home up to 90 days after her death. Although Mrs. JoAnn

4

Hinckley, now aged 94, remains cognitively sharp, she has become increasing frail and Mr. Hinckley, her primary caregiver, has repeatedly expressed that he has no desire to move out until after her death. However, he utilized the realtor to find an affordable apartment complex, The Flats of Williamsburg, that he could move into quickly if the need arises. According to progress notes, a financial analysis conducted by Mr. Hinckley with Mr. Weiss' assistance indicated he would have enough money to cover expenses of daily living and to maintain a used automobile if he moved into a one-bedroom apartment.

On November 16, 2018, a modified consent order was signed by Judge Friedman granting Mr. Hinckley permission to reside independently in approved housing within a 75-mile radius of Williamsburg, alternate in-person and remote face-to-face meetings with FOPD every month, reduce telephone contact with FOPD to twice per month, and travel within a 75-mile radius of Williamsburg unaccompanied. The modified order also allowed for Mr. Hinckley to display memorabilia, works of art or music created by him anonymously on the internet, with the approval of his treatment team/FOPD, and under the supervision of Ms. Drozd or Mr. Weiss. However, Mr. Hinckley continued to be restricted from receiving any financial benefit from the displays, was not permitted to communicate with anyone who commented on the displays, was not permitted to have his own website, and was restricted from posting his private antique items online for financial gain.

On the same day the modified consent order was signed, Dr. Nicole Johnson, formerly Mr. Hinckley's primary point of contact at DBH/FOPD, informed Dr. Marc Dalton, the DBH Chief Clinical Officer, that she would be on leave through January 1, 2019. As a result, Dr. Dalton informed the court he would be taking over responsibility for Mr. Hinckley's case along with Dr. Chad Tillbrook and Ms. Dana Brooks, LICSW, Supervisory Clinical Administrator of the Forensic Division. In February 2020, Dr. Dalton separated from his position and Dr. Tillbrook took over primary responsibility for Mr. Hinckley's case.

Throughout 2019, Mr. Hinckley continued to exhibit excellent adherence to the conditions of his release. Although he looked for opportunities to volunteer in the community, as outlined in the court order and recommended by his treatment team, he was turned down by four different sites. As a result, he increased his focus on his antique business and began utilizing the 75-mile travel radius to obtain items from estate sales, flea markets and consignment shops to sell. He rented a larger booth to display his inventory and he has had no difficulty paying his rent on the expanded space. Mr. Hinckley's work logs indicate he worked between four and nine hours per day on his business prior to the COVID-19 pandemic and progress notes detail his use of the antique mall as an avenue for socialization, as well as employment.

In March 2019, the treatment team described Mr. Hinckley as more positive, optimistic and happier with himself and his life. He worked with Ms. Drozd to develop a plan to post his music online through SoundCloud, wherein she would maintain control of the account and post his music for him. However, very few people accessed Mr. Hinckley's music through SoundCloud and Ms. Drozd suggested posting compositions on YouTube as well. After registering for an account, she assisted him in creating videos using stock images to go with his music and posted the videos under an anonymous band name.

Despite switching platforms, views of Mr. Hinckley's songs continued to be low and he expressed disappointment in the lack of feedback he was receiving. During 2019, Mr. Hinckley also explored with Ms. Drozd future options for earning an income through a career related to music, such as working in a music store, giving music lessons or selling jingles. He has not pursued any of these options beyond these preliminary discussions.

During this same timeframe, Mr. Hinckley began dating Ms. H. He first met Ms. H during group therapy but, given that group rules prohibited social relationships among members, she decided to leave the group in order to pursue a romantic relationship with Mr. Hinckley. Initially the treatment team reported the relationship as being "beneficial for the whole family" and described Ms. H as "supportive" and "caring." Mr. Hinckley was also noted to be more involved in social activities and began traveling to new venues for cultural activities within the 75-mile radius. However, after a few weeks, Mr. Hinckley expressed to his treatment team that Ms. H was demanding too much of his time (i.e., 7-8 hours per day) and he wanted to set limits within the relationship. Ms. H reportedly did not respond well to his request to reduce their time together. Subsequently, Mr. Hinckley reported to his treatment team that Ms. H had "developed a demanding, irritable, angry and unpredictable disposition." After seeking guidance and support in individual and group therapy, Mr. Hinckley ended his relationship with Ms. H on or about June 20, 2019. According to progress notes, Mr. Hinckley handled the ending of the relationship "exceptionally well" and in the aftermath, he was described as having increased self-confidence and more engagement with the community.

Since his relationship with Ms. H ended, Mr. Hinckley has not engaged in any further romantic relationships. Although he has remained in daily telephonic contact with Ms. CB, their relationship continued to be platonic in nature. In early 2019, Mr. Hinckley expressed to his treatment team a desire to have Ms. CB visit him in Williamsburg given improvements in her clinical status. The treatment team recommended that prior to Ms. CB visiting, her case manager be contacted to determine her readiness to travel. However, no further coordination occurred and Ms. CB has never visited Mr. Hinckley in Williamsburg.

On April 10, 2019, Colonial Behavioral Health (CBH), the public mental health provider in the Williamsburg area, sent a letter to Mr. Hinckley declining to be involved in his mental health care. They cited their limited staffing and inability to fulfill the numerous reporting requirements listed in the current consent order as reasons for refusing him care. However, they noted that their decision was not related to Mr. Hinckley himself or their inability to meet his treatment needs generally. After Mr. Weiss investigated the issue further, it was determined that Mr. Hinckley needed to personally appeal the decision by CBH to the appropriate governing agency in Virginia. However, in light of his current treatment team members indicating their intent to provide care for him through at least the end of 2020, Mr. Hinckley did not seek an appeal.

In August 2019, after seeking advice from Mr. Beffa and Mr. Weiss, Mr. Hinckley assisted his brother in seeking medical care and inpatient psychiatric care after his psychological condition deteriorated and he developed several medical complications. In light of his

worsening condition, Mr. Scott Hinckley reportedly explored moving to New Jersey to live closer to his daughter. However, as his mental and physical health improved over the intervening months, he recommitted to remaining in the Williamsburg area indefinitely. Records indicate that Mr. Hinckley and his brother remain close and often run errands together.

In March 2020, the antique mall where Mr. Hinckley has been working closed due to the COVID-19 pandemic. Shortly thereafter, all of his treatment providers, with the exception of Dr. Giorgi-Guarnieri, moved from in-person visits to video or telephonic contact. On April 28, 2020, Dr. Tillbrook informed the court that FOPD would suspend in-person meetings with Mr. Hinckley and his treatment team; meetings were conducted via Cisco WebEx. In progress notes, Mr. Hinckley was described as missing his group therapy and socialization opportunities at the antique mall. However, the treatment team also noted that he appeared to be coping well with the increased social isolation during the stay-at-home order. The antique mall eventually reopened on May 1, 2020 and Mr. Hinckley was able to sell enough items to cover his rent for the month. He is due to resume group therapy in late June or early July 2020.

Interview with Mr. John Hinckley, Jr.

Mr. Hinckley expressed his opinion that he has "done very well the last four years" and he is ready for UCR. He indicated he initially was not in favor of requesting UCR at this time but, after learning that his treatment team was supportive of such a motion, he informed Mr. Levine that he should proceed with the filing. Although Mr. Hinckley felt ready to be granted UCR, he believed it would be "futile" to pursue such an action without the support of his treatment team. He stated he has tried to follow every step required of him over the last several years and that, at this point, he is unsure what other actions would prove his readiness for UCR to the court. He further said, "I have never let the judge down one time…If I received UCR I would not let him (i.e., Judge Friedman) down."

Mr. Hinckley noted that "not a whole lot would change" if he were granted UCR. He plans to continue to reside in the Williamsburg area, work at the antique mall, attend group therapy and take his current psychiatric medications. Mr. Hinckley described himself as "optimistic" about life and said that over the past two years since I last interviewed him, he has "felt just great…emotionally I just feel fine." He noted that he "can't say it's all the meds but I think [the Sertraline and Risperidone] is helpful." Mr. Hinckley said he has discussed with Dr. Giorgi-Guarnieri transferring his medications to his primary care doctor in the future due to the fact that he has not changed any medications in several years and is not experiencing any problematic side effects. However, Mr. Hinckley also indicated he intends to continue attending appointments with Dr. Giorgi-Guarnieri as long as she is still providing psychiatric services in the Williamsburg area.

Mr. Hinckley stated that if granted UCR he "would like to make money from my music and art." He expounded on this idea, saying "I create things I think are good and like any other artist I would like to profit from it and contribute more to my family. I feel like I could help my mother and brother out if I could make money from my art." Mr. Hinckley said he has heard from other artists that he might be able to sell his artwork on websites such as Etsy

and he has spoken to Ms. Drozd about various streaming websites where he could post his music. His intent is to sell his artistic creations under his own name, although he acknowledged there is "notoriety associated with anything I do under my own name." In addition to the financial motivation, which appears to be a secondary consideration for him, Mr. Hinckley expressed a strong desire to share his work with other people and receive feedback. He has been frustrated by his difficulty in sharing his work with others and with the limited comments he has received on the work he has shared to date. When questioned about how he would handle negative feedback or individuals seeking his work solely due to his notoriety, Mr. Hinckley said he has dealt with rejection repeatedly over the past few years without issue and that he works hard to maintain a "low-key" presence in the community. He also insisted that he is not interested in fame, but rather a desire be able to share his creative endeavors with a wider audience and support his family financially.

When asked if he had considered a move to California to pursue a career in music if he is granted UCR, as was mentioned at the status hearing in September 2019, Mr. Hinckley denied any intent to relocate outside of Virginia. He stated, "I am not going to relocate. I like it here. It's a peaceful community and I feel comfortable here." He further said, "With being online, I wouldn't need to move; you can do that (i.e., pursue a career in art or music) anywhere." Mr. Hinckley said he was unsure where the idea of moving to California came from but that it did not originate with him. When asked further about travel plans, Mr. Hinckley expressed he has no desire to "do a lot of travel." He said he has considered visiting his niece, who is his brother's daughter, in New Jersey but otherwise he has no plans to travel. He indicated he is generally "not a person who likes to travel" and "with the way the country is [now with the COVID-19 pandemic] it is not an opportune time for a 65-year-old man to travel. I prefer to stay at home."

If granted UCR, Mr. Hinckley said he looks forward to no longer driving to Washington, DC for in-person meetings with DBH/FOPD, which he dislikes due to traffic and the time commitment. Mr. Hinckley also expressed that he would have more free time and schedule flexibility if he were no longer required to conduct telephonic check-ins, participate in video meetings or complete daily activity logs. In addition, he indicated he would likely discontinue music therapy and reduce or discontinue individual therapy if he were granted UCR, with the latter being dependent on Mr. Beffa's recommendation. With regard to music therapy, Mr. Hinckley said although working with Ms. Drozd has been "very helpful," her work with him has been less about the therapeutic aspect of music for the past year and more about learning how to record and post his music. This is an area in which Mr. Hinckley sees himself progressing independently in the future.

In contrast to his desire to discontinue individual and music therapy due to a feeling of having progressed to a stopping point, Mr. Hinckley was enthusiastic about his participation in group therapy and adamant that it was something he wanted to continue. He stated he receives helpful feedback through group therapy and leaves sessions feeling "better." He described group members as "nice," "welcoming," and non-judgmental.

8

When asked about socialization outside of group therapy, Mr. Hinckley cited his interactions with people at the antique mall, classes he took last year through the Christopher Wren Association (now called the Osher Lifelong Learning Institute), his telephone contact with Ms. CB, and his romantic relationship with Ms. H. Mr. Hinckley said his relationship with Ms. H lasted approximately three months in early 2019 before he ended it. He described the initial weeks of the relationship in positive terms but said he began to notice Ms. H was "developing anger at people for no good reason." According to Mr. Hinckley, Ms. H had Bipolar Disorder and refused to take her psychiatric medication. Mr. Hinckley said he encouraged her to attend appointments with her psychiatrist and resume medication, but she had "no insight into her illness." As the relationship progressed, Mr. Hinckley became concerned Ms. H would "create a scene in public" that would draw negative attention to him. He viewed her behavior as counter to his attempts to "be low key." After consultation with Mr. Beffa during individual therapy and discussing the relationship in group therapy, Mr. Hinckley said he concluded that "for my wellbeing it was necessary" to end the relationship. Since ending the relationship, he "never regretted it a day" and he believes that his decision reflected "good judgment."

Mr. Hinckley said he has enjoyed his work at the antique mall over the past two years and plans to continue running a booth in the future. He recently rented a storage unit to reduce the clutter in his mother's home and allow for him to retain a larger inventory of items to sell. He estimated that on a "good month" his sales are "in the $1000 range," allowing him to easily cover the rent on the space and contribute to household expenses. He noted that the closure of the antique mall in April due to the COVID-19 pandemic reduced his income and that he missed the social aspect of his work. Since the re-opening of the mall on May 1, 2020, his sales have begun to rebound and he has been happy to have a social outlet outside of his home again. However, Mr. Hinckley also said that he "didn't feel too isolated" during the stay-at-home order due to his daily contact with his mother, brother and cat, Theo.

Over the past two years, Mr. Hinckley has moved into the role of caretaker for both his mother and his brother. He noted that although his mother's physical health is quite good, she is 94 years old and "would be in a nursing home" if he were not present to take care of her. Similar to the last time I interviewed Mr. Hinckley, he stated he does not find it overwhelming to take care of his mother and he is happy to be able to care for her after all the years she spent caring for him. With regard to his brother, Mr. Hinckley said Scott's depressive symptoms increased in severity approximately one year ago to the point where he determined he needed assistance getting treatment for Scott. He reached out to Mr. Beffa and Mr. Weiss to discuss his plan for seeking treatment; with their assistance, Mr. Hinckley arranged for his brother to be transported to the hospital to address his medical issues and then later arranged for him to be admitted to The Pavilion at Williamsburg Place for psychiatric treatment. Mr. Hinckley said his brother is "doing great now," has his "energy back" and "takes care of himself." However, Mr. Hinckley noted that he administers his brother's medications each day, which "may not be necessary but I don't want him to get depressed."

9

Mr. Hinckley did not identify any financial problems presently. Along with his brother, he contributes to paying for groceries and "some of the bills." However, he described feeling "inadequate" because he does not "have much money" to be able to contribute to the household. Despite his limited finances, he indicated he has located an apartment complex he likes nearby his mother's home that would be "affordable" and meet his needs. Mr. Hinckley stressed he does not want to leave while his mother still needs his help, although he acknowledged he would be required to move out within 90 days of her death.

Interview with Carl Beffa, LCSW

Mr. Beffa indicated he supports UCR for Mr. Hinckley at this time because

> "he continues to really exhibit none of the symptoms for which he was hospitalized...in addition, he has continued to display unusual responsibility not only in terms of doing what he says he's going to do,...[he] shows extreme responsibility with his appointments, his job, the business,...but caring for his mother and taking care of her needs."

Mr. Beffa also discussed Mr. Hinckley taking on the responsibility of caring for his brother when he had a "depressive episode" in 2019; "John was the one who intervened...got him to Riverside Hospital and was instrumental at getting him hospitalized at Pavilion." In addition, Mr. Beffa opined that Mr. Hinckley demonstrated personal responsibility and good judgment by taking the initiative to end his relationship with Ms. H "because her Bipolar symptoms were getting in the way of their having a productive relationship." Mr. Hinckley discussed his relationship problems with Mr. Beffa in individual therapy and brought it up as a topic in group therapy for "several sessions." Despite his desire for a romantic relationship, Mr. Hinckley came to the conclusion that "he was wearing out trying to accommodate her" rather than the relationship being mutually beneficial.

The only area Mr. Beffa identified as an issue for Mr. Hinckley was socialization. Similar to the last we spoke, Mr. Beffa stated that Mr. Hinckley "doesn't seem to take responsibility socially, involving himself or taking advantage of opportunities for different social things going on." In Mr. Beffa's opinion, Mr. Hinckley has demonstrated "no ambition or interest" in increasing his socialization. Mr. Beffa acknowledged that Mr. Hinckley had taken advantage of some education classes and has traveled to flea markets regularly; however, he believed that Mr. Hinckley's desire to seek out community events had dwindled over time.

With regard to the increased freedoms and lifting of restrictions that would come with UCR, Mr. Beffa did not identify any specific areas of concern other than Mr. Hinckley's relationship with Ms. CB. According to Mr. Beffa, Ms. CB "calls daily and they talk for a minute or two...that's about it." However, Mr. Hinckley has previously discussed Ms. CB visiting him in Williamsburg and "he may well invite her to visit if he is granted UCR." Although Mr. Hinckley "knows the ins and outs if something were to happen and he knows where to refer her if something happens," Mr. Beffa still sees this relationship as "a question mark but not a big one."

Otherwise, Mr. Beffa said he has no concerns about Mr. Hinckley living independently, does not see unrestricted travel as a problem and is "in favor of him being able to make money through the different sources" of his artistic endeavors. Per Mr. Beffa, Mr. Hinckley has not only demonstrated the ability to independently care for himself over the past few years but also to care for others (e.g., his mother and brother). Furthermore, Mr. Hinckley has shown little interest in travel and has not reacted or responded negatively when he has been approached by the press while residing in the community, leading Mr. Beffa to conclude that it would not pose an issue for Mr. Hinckley's travel restrictions to be lifted. With regard to displaying his music and art, Mr. Beffa stated,

> "I would very much like to see him be able to make an income from his artwork or his music. If it coincidentally happens his name is attached to it, I don't see it would be an issue...I would be surprised if it reverted back to this narcissism he had with Jodie Foster because it has not been present in any way whatsoever."

Finally, in regard to Mr. Hinckley's plan to stop or decrease individual therapy while remaining in group therapy, Mr. Beffa concurred. Mr. Beffa indicated Mr. Hinckley benefits less from individual therapy than he does from group therapy and he is supportive of Mr. Hinckley decreasing individual therapy to a "check-in every three or four months." However, Mr. Beffa said he plans to retire in the next few years and, at that time, he would no longer be conducting group therapy. In Mr. Beffa's opinion, there are no other suitable therapy groups for Mr. Hinckley to join in the Williamsburg area at this time.

## Interview with Deborah Giorgi-Guarnieri, MD

According to Dr. Giorgi-Guarnieri, during his time on CL Mr. Hinckley has "transitioned from being the one looked after and cared for to the one who looks after and cares for." This had led him to experience some situational stress, but in Dr. Giorgi-Guarnieri's opinion "he has done very well." There have been no changes in Mr. Hinckley's psychiatric medications since his release on CL; he continues to take 125mg Zoloft® every morning and 25 mg Zoloft® and 1mg Risperdal® every night. Although Dr. Giorgi-Guarnieri discussed adding Buspar® to this regimen two years ago to address mild side effects, Mr. Hinckley informed her he was content with his current medications.

When asked about Mr. Hinckley's future psychiatric care, Dr. Giorgi-Guarnieri said although she has "no plan to transfer his care in the near future" she is not opposed to a primary care doctor managing his psychiatric medications. Although she expressed that most primary care doctors are as not as knowledgeable as psychiatrists about the side effects of psychiatric medications, Mr. Hinckley does not identify any problems managing side effects and has been stable on his current medication regimen for many years. In addition, she noted that a primary care doctor could easily consult with a psychiatrist or refer Mr. Hinckley to a psychiatrist in the community should an issue arise with his medications.

Dr. Giorgi-Guarnieri said she is aware of Mr. Hinckley's plan to pursue an "artistic career" if he is granted UCR, including publishing music in his own name. In her discussions with

Mr. Hinckley about the matter, he has expressed to her that "he can withstand rejection." While Dr. Giorgi-Guarnieri acknowledged "that might be true at this point," she also stated "I don't know if he can withstand success." However, she noted the low likelihood of Mr. Hinckley achieving a high level of success with a career in music given his age, the genre of music he writes, and the competitiveness of the industry as a whole. In addition to the unknown of how Mr. Hinckley would handle rejection or success, Dr. Giorgi-Guarnieri indicated she has a concern about Mr. Hinckley being exploited because of his name. She stated, "I don't think he sees himself as the person who fired the shots all those years ago. So, I don't know how he would handle it if people wanted that Hinckley and not the Hinckley he is."

She indicated that, in contrast to other members of the treatment team, she does not view his Narcissistic Personality Disorder as absent but rather attenuated. Although the prominence of his narcissistic traits has decreased, Dr. Giorgi-Guarnieri said a "rigidity" in his personality remains, which may impact how he handles criticism particularly with regard to his music. She observed that he has never been able to present his music to a wide audience and, therefore, his response to repeated criticism in this area is unknown. Despite her concerns, Dr. GG said she would "be hard pressed to say he could never publish music. That would cut off a part of John. It's how he relates to other people...I think music is an affiliation of his; he enjoys other people who enjoy music."

With regard to lifting Mr. Hinckley's travel restrictions, Dr. Giorgi-Guarnieri stated, "I don't really know that would present a risk but then again we haven't really explored that...travel can be stressful in its own right." She has discussed possible stressors and negative interactions that could occur with Mr. Hinckley but his response remains consistent that he "wouldn't pay attention to it." Although Dr. Giorgi-Guarnieri said the confined spaces associated with air travel may challenge Mr. Hinckley's position that he would ignore negative attention from those around him, in her opinion he would be able to manage traveling independently. However, she noted that Mr. Hinckley's responses to situational stress associated with travel are likely to remain untested for the foreseeable future given the COVID-19 pandemic and his general lack of interest in traveling.

Dr. Giorgi-Guarnieri said she did not support UCR for Mr. Hinckley prior to 2020. However, after going through the conditions of his release item by item with the rest of the treatment team earlier this year, she came to the conclusion that, while the risks associated with unrestricted travel and pursuing artistic endeavors freely were untested, if Mr. Hinckley was granted UCR he was unlikely to pose a risk to himself or the community. She opined that his affective and thought disorders are "nice and stable...his Narcissistic Personality Disorder is well buffered" and "he has as strong defenses as he can have right now." Although she acknowledged it is possible for Mr. Hinckley to experience a significant event that could "break through those defenses," he has already experienced a number of setbacks and losses without a related relapse in symptoms. She further expressed that Mr. Hinckley remaining under court supervision for another year would be unlikely to provide additional useful information regarding his long-term risk for violence.

Interview with Jonathan Weiss, LCSW

Mr. Weiss stated that in the "past few years since we last spoke, I have just continued to see John become more in touch with himself and his life here in the community." In contrast to the rest of the treatment team, Mr. Weiss indicated that he does not see "the socialization [or lack thereof] as big an issue as they do" with regard to Mr. Hinckley's progress and adjustment to the community. In Mr. Weiss' opinion, "John's nature and his experience in life in being rejected have colored and informed his socialization. I know he is tired of being rejected." However, Mr. Weiss' perception is that Mr. Hinckley is "happy and content" and "doesn't seem to have a ton of other social needs" outside of his work at the antique mall and his relationships with family members. Mr. Weiss believes "he [Mr. Hinckley] has the right to form this world the way he wants now that he's out of the hospital" and given Mr. Hinckley's shyness, he may not desire or need more socialization than he has currently.

Mr. Weiss indicated that the one social aspect of his life Mr. Hinckley has expressed a desire to improve is with regard to romantic relationships. According to Mr. Weiss, Mr. Hinckley has indicated he would like to meet someone he could date but that he has found it difficult to do so. Mr. Weiss discussed Mr. Hinckley's relationship with Ms. H in 2019, stating "John loved having a relationship, the intimacy, but he came to the decision this [relationship] was not good for him." Mr. Weiss said he had lunch with Mr. Hinckley and Ms. H on one occasion and that Mr. Hinckley also discussed his relationship with Ms. H with him. Mr. Wiess described Ms. H as someone who "would flip from being very kind to hostile and intense." Mr. Hinckley eventually "became more concerned" that Ms. H would "potentially cause him problems" because she was making accusations of other people and calling negative attention to herself in public. As a result, Mr. Hinckley decided to end the relationship, a decision Mr. Weiss opined was "not easy" but "wise." Mr. Weiss said since the ending of this relationship in mid-2019, he is not aware of Mr. Hinckley dating anyone else.

Mr. Weiss indicated that since the modified court order was put in place in late 2018, he attempted to assist Mr. Hinckley in showing some of his art work anonymously. However, "the anonymous thing had too many challenges" and "we have not moved down that road a whole lot." When asked his opinion about Mr. Hinckley publishing his music or art work under his own name in the future, Mr. Weiss said he did not believe it would present any significant problems. In Mr. Weiss' view, Mr. Hinckley has dealt with the notoriety of his name for many years without issue and would likely continue to do so in the future. Mr. Weiss opined, "It (i.e., publishing his music and art) may not go the way he wants but he will handle it well." He explained further by saying,

"The one piece of him that is very dear is his belief in his own artistic ability. He wants to see that through before God takes him. It's been very frustrating. [However], if the court would allow him [to publish in his own name] ... I believe he will be fine. I don't know if he will be successful [but] that's an answer to a question that John needs to have."

With regard to Mr. Hinckley gaining financially from his artistic endeavors, Mr. Weiss said, "My sense of John is he likes money like everyone does. He works hard to make money

at the antique mall [and] part of making money would be to help his family. They are really tight now."

Despite his assertion that the Hinckley family is on a tight budget, Mr. Weiss indicated that Mr. Hinckley would be able to financially support himself after his mother dies. Mr. Weiss has visited the apartment complex Mr. Hinckley is planning to move into (i.e., The Flats of Williamsburg) within 90 days of his mother's death and it is a suitable place for him to reside, although "it's basic." In Mr. Weiss' opinion, Mr. Hinckley has managed his finances well and the combination of his income from the antique mall and his benefits would allow him to cover rent, food, transportation and other necessities of daily living. However, Mr. Weiss indicated that if his brother were to reside with him, as is currently the plan, he could likely afford a larger apartment with more amenities.

Mr. Weiss said he regularly visits Mr. Hinckley at home and there have been "no indications of problems" in the Hinckley home. Mr. Hinckley continues to get along well with his mother and brother; "they are a happy family" from Mr. Weiss' perspective. Mr. Weiss reported that Mr. Hinckley has become the primary caretaker of his mother, and also his brother to some degree, over the past four years. He has not observed any anger or negative feelings in Mr. Hinckley related to his role as caretaker and expressed his opinion that Mr. Hinckley has handled the responsibility well.

Mr. Weiss stated that he is in support of Mr. Hinckley being granted UCR at this time because he has the "belief that John is ready for it." He noted the progress Mr. Hinckley has made over time, particularly his move toward independence. In addition, Mr. Weiss expressed that Mr. Hinckley is "such a different man" than when he met him six years ago. He described Mr. Hinckley as "depressed and uncertain" at that time but he has not shown any indication of major thought or affective disorders for years. In addition, Mr. Weiss opined that Mr. Hinckley's "narcissism is certainly muted," as evidenced by his ability to listen and relate more easily to other people. According to Mr. Weiss,

"John is ready [for UCR]. He can handle it. I have no concerns if he is granted UCR...He is not the man he was before. He makes good decisions, has empathy and compassion. He's a smart man. He's a caring man. To me he's healthy, mentally healthy. I don't see any problems in John being able to make it and be an asset to the community and do a good job for himself and his family should the court allow him."

Mr. Weiss indicated that if the court grants Mr. Hinckley UCR, he would continue to be available to Mr. Hinckley on an as needed basis. He stated that he has not functioned as a traditional case manager for several years in light of Mr. Hinckley's ability to function independently at a high level. He sees his role over the past two years as being "a sounding board" for Mr. Hinckley.

## Interview with Nicole Drozd, MS, MT-BC

Ms. Drozd indicated that over the past two years she has primarily been working with Mr. Hinckley on sharing his music with others anonymously through media streaming. She

views the change in the court order in 2018 as a positive step for Mr. Hinckley because prior to the modification his inability to share his music had become a "barrier in music making." Since late 2018, Ms. Drozd assisted Mr. Hinckley in posting his music to SoundCloud and YouTube anonymously without the ability to view or post comments. However, she noted that the number of views has been "extremely small" and Mr. Hinckley has been "disappointed" in the lack of feedback he has received.

Due to the COVID-19 pandemic, Ms. Drozd conducted her appointments with Mr. Hinckley on Skype for the months of April and May. During this timeframe, the focus of the sessions was primarily on "encouraging him to learn a couple of things technologically…as far as sending an attachment or doing something creative through Google Docs." Ms. Drozd noted that since his ability to work in his antique business was limited during these months, Mr. Hinckley was creating more music and had greater opportunity to become more technologically knowledgeable. However, in her opinion, his knowledge of technology and social media remains limited and will be a hurdle for him to overcome in the future should he be allowed to independently post his music. She explained, "John is really behind generationally being hospitalized so long. He doesn't understand Facebook, YouTube or Instagram. Social media is a barrier and a struggle."

With regard to sharing his music under his own name, Ms. Drozd stated her "biggest concern about it is that it won't be well received." She indicated she has spoken with Mr. Hinckley about this issue at length because "I worry he's a well-known figure and I worry about someone trolling him." Mr. Hinckley responded to these discussions with some frustration, pointing out that he has had to deal with people seeking him out for his notoriety for many years. Despite this concern, Ms. Drozd said she believes "it's important he has an outlet to share; it's his creation and it's how he engages in a creative way." She acknowledged that Mr. Hinckley being able to earn money from his music "can be very controversial" but she said in her opinion, "I don't think it would be a huge issue." Ms. Drozd has explored various avenues for Mr. Hinckley working in a music-related career field but said the options are very limited given Mr. Hinckley's lack of educational background in music and the ease of creating music online, which has decreased opportunities for full-time employment writing music (e.g., jingles for advertisements).

When asked about recommendations for continuing music therapy, Ms. Drozd is in agreement with Mr. Hinckley's desire to discontinue therapy should he receive UCR. She stated, "From my point of view I don't think he needs a music therapist at this point. He'll need help with posting [his music] but that's not something a music therapist has to do." She noted that she has worked with Mr. Hinckley "for a while" and the barrier to him creating music freely has always been his inability to perform the music he creates. In Ms. Drozd's opinion, Mr. Hinckley is able to independently use music to cope with stress and express himself. Therefore, "it's not so much being a therapist for him as being an advocate for him as far as what he can do with his music. If he was free to do what he wanted (i.e., being granted UCR), he wouldn't need me."

Interview with Chad Tillbrook, PhD

15

Dr. Tillbrook became involved in Mr. Hinckley's case in November 2018 after he was hired as the Director of the Forensic Services Division for DBH. His role in Mr. Hinckley's case increased over the course of 2019 and at the end of January 2020 he took over as Mr. Hinckley's primary point of contact at DBH/FOPD. Dr. Tillbrook has been in contact with Mr. Hinckley every two weeks via either telephone or Cisco WebEx meetings, as well as in-person meetings in Washington, DC every other month prior to COVID-19 stay-at-home orders being issued in March 2020. Dr. Tillbrook also conducted two home visits to monitor Mr. Hinckley's progress and clinical status. He stated he had "no concerns whatsoever" regarding Mr. Hinckley's living situation during these visits, describing it as "clean and tidy." Dr. Tillbrook said both Mr. Hinckley's mother and brother were "more than welcoming" and "raved about how helpful he's (i.e., Mr. Hinckley) has been."

Dr. Tillbrook described Mr. Hinckley as "very responsive and responsible;" he elaborated by noting that Mr. Hinckley frequently prompts him to set up their next meeting and will call outside of scheduled times if a situation arises about which FOPD should be informed (e.g., when he called an ambulance to transport his brother to the hospital). In addition, he stated Mr. Hinckley "is maintaining his employment, participating in individual and group therapy, is medication adherent, and has primary responsibility for the well-being of his family. He is higher functioning and has some insight and is very conscientious about what he needs to do." In Dr. Tillbrook's opinion, it is "not much of a leap from what John is doing right now to UCR."

With regard to Mr. Hinckley's socialization, Dr. Tillbrook said he is aware that the treatment team has repeatedly encouraged Mr. Hinckley to "increase opportunities to socialize with the community" but that Mr. Hinckley has "been resistant." Dr. Tillbrook opined that while Mr. Hinckley will attend community events "as a means to an end," he is "not someone who is very extroverted" and engaging in social activities is "not a comfortable thing for him to do." However, Dr. Tillbrook noted that Mr. Hinckley enjoys socializing with vendors and customers at the antique mall and "described being excited to go back to the antique mall" after COVID-19 restrictions were reduced. In addition, Dr. Tillbrook described Mr. Hinckley as an active participant in his therapy group, where he is "very focused on others' well-being" and "feels fulfilled being there with others." Dr. Tillbrook also highlighted Mr. Hinckley's relationship with Ms. H in 2019 as an indicator of his ability to navigate interpersonal relationships. According to Dr. Tillbrook, "He was really into the relationship but when she began to decompensate, he immediately took actions to protect himself and ended what could have become a toxic relationship." In Dr. Tillbrook's opinion, Mr. Hinckley's actions demonstrated "a heightened level of awareness and insight" as well as "good judgment."

Dr. Tillbrook's conversations with Mr. Hinckley regarding publishing his music and artwork in his own name and earning an income from these endeavors has "been limited because he knows he can't" pursue these goals due to his court order. However, Dr. Tillbrook said he is aware Mr. Hinckley has been "frustrated" by his difficulty getting his music heard and the lack of feedback he has received. Mr. Hinckley has emphasized to Dr. Tillbrook his interest in seeing "how I measure up against my peers." From Dr. Tillbrook's viewpoint,

it is this aspect, rather than any financial incentive, that is driving Mr. Hinckley's desire to display his music and artwork more freely.

According to records, Mr. Hinckley has never submitted a request to FOPD for travel outside the area specified in the court order. When queried about this issue, Dr. Tillbrook indicated that, outside of expressing an interest to attend his niece's wedding in New Jersey, Mr. Hinckley has not made any comments suggesting he desires to travel. In Dr. Tillbrook's opinion, Mr. Hinckley's lack of interest in traveling is partially due to his concern about leaving his mother alone for an extended period of time given that he is her primary caregiver. With regard to future relocation, Mr. Hinckley informed Dr. Tillbrook that he has no interest in moving outside of Virginia and further said, he can pursue his interests in art and music "from the comfort of home."

Given the repeated discussions over the past four years regarding the retirements of several members of Mr. Hinckley's current treatment team, Dr. Tillbrook suggested that plans should be put in place for ongoing care for Mr. Hinckley. CBH initially was projected as the most straightforward choice for transitioning Mr. Hinckley's care. Dr. Tillbrook expressed some frustration with CBH and their unwillingness to provide mental health care for Mr. Hinckley. However, he observed that Mr. Hinckley forms relationships with his treatment providers easily and "could form similar [treatment] relationships with other people" should members of his treatment team retire.

### 8. Current Mental Status

Mr. John Hinckley, Jr. was a male of average stature and above average weight who appeared his stated age. He was dressed appropriately and he evidenced adequate grooming. During the interview, Mr. Hinckley was alert and oriented to person, place, and time. Throughout the evaluation, he was calm, pleasant and cooperative. His eye contact was very good. He demonstrated no significant psychomotor agitation or slowing. His rate, tone and volume of speech were normal. He has consistently demonstrated average to high average intellectual functioning on past formal testing and during the current evaluation his cognitive functioning appeared intact.

When asked to describe his mood, he stated, "I always feel good through the day." Throughout the evaluation, he demonstrated a full range of emotional expression that was appropriate to the conversation content. He did not demonstrate flat or blunted affect, as has been noted in prior evaluations. His thought processes were goal directed and flowed logically, with no evidence of abnormalities of perception, delusions (erroneous fixed beliefs) or grandiosity. He did not endorse experiencing auditory, visual, tactile or olfactory hallucinations during his lifetime. His judgment appeared non-impaired although it has historically been poor, particularly early in his hospitalization at SEH. His insight was good. He did not endorse any suicidal thoughts since 1983 or homicidal thoughts since the time of the instant offenses. He was able to report the names and dosages of his medications, as well as the purpose of his medications.

### 9. Current Psychiatric Medications
Zoloft® 125mg every morning/25mg every evening

17

Risperdal® 1mg every evening

## 10. DSM-5 Diagnoses
296.36 Major Depressive Disorder, Recurrent, In Full Remission
298.8 Other Specified Schizophrenia Spectrum and Other Psychotic Disorders, In Full Remission
301.81 Narcissistic Personality Disorder
301.20 Schizoid Personality Disorder, premorbid

## 11. Risk Assessment
*Actuarial Assessment of Violence Risk: VRAG-R*
Actuarial assessments of risk give estimates of risk for general violence; they do not provide predictions of how serious the violent recidivism would be if it did occur. Furthermore, assessments of risk are a measure of individuals' risk when they are given the opportunity to reoffend such as when placed in the community upon release, in a minimum-security psychiatric hospital or at a halfway house. The VRAG-Revised[1] was first published in 2013, with wider release in 2015.

Given the actuarial nature of the VRAG-R, Mr. Hinckley's score remains unchanged at -22, placing him in the 2nd category of 9 total risk levels (with the 9th category being highest risk). Offenders in this category violently recidivated at an average rate of 12% over five years and 24% over twelve years. This places him at a low likelihood of recidivism compared to violent offenders generally. Given the standard error of measurement (SEM) for the VRAG-R (+/- 2.19 points), Mr. Hinckley's risk score could be as low as -24 or as high as -20, with the former score moving him down to the 1st risk category with an average rate of violent recidivism of 9% over five years and 15% over twelve years.

However, as noted in my last assessment in 2018, follow-up research on the VRAG-R has demonstrated lower recidivism rates across all nine risk levels as time in community offense-free increases. Hence, conservatively adjusting Mr. Hinckley's VRAG-R scores for only the past four years he has had full-time access to the community results in expected recidivism rates consistent with the lowest category of risk (i.e., 6-16%).

| | | |
|---|---|---|
| 1. Lived with both biological parents to age of 16 (yes) | = | -2 |
| 2. Elementary school maladjustment (no) | = | -3 |
| 3. History of alcohol or drug problems (0 out 6) | = | -2 |
| 4. Marital status (never married) | = | +1 |
| 5. Criminal history score for nonviolent offenses prior to the index offense (score of 1) | = | -1 |
| 6. Failure on prior cond. release (no) | = | -2 |
| 7. Age at index offense (26) | = | +1 |
| 8. Criminal history score for violent offenses prior to the index offense (score of 0) | = | -2 |
| 9. Number of prior admissions to correctional institutions (0) | = | -2 |

[1] Harris, G.T, Rice, M.E., Quinsey, V.L., Cormier, C.A. (2015). **Violent Offenders: Appraising and Managing Risk, Third Edition.** Washington, DC: American Psychological Association.

| | | |
|---|---|---|
| 10. Conduct Disorder before age 15 (0 point) | = | -2 |
| 11. Sex offending history (no known hands-on offenses) | = | -2 |
| 12. PCL-R Facet 4 score (score of 0) | = | -6 |

TOTAL VRAG-R SCORE = -22

*Structured Professional Judgment of Risk Factors: HCR-20 Version 3*
In order to further delineate and describe the risk level Mr. Hinckley may pose, he was rated on the 20 items of the HCR-20 Version 3[2]. In my opinion, Mr. Hinckley's ratings on the HCR-20v3 suggest he is in the low range of risk for Future Violence, Serious Physical Harm and Imminent Violence.

My ratings of Mr. Hinckley on these items are listed in the table below.

| ITEM | RATING | RELEVANCE |
|---|---|---|
| H1. Violence | Y | High |
| H2. Other Antisocial Behavior | N | Low |
| H3. Relationship Instability | Y | Moderate |
| H4. Employment Problems | Y | Moderate |
| H5. Substance Use Problems | N | Low |
| H6. Major Mental Disorders | Y | High |
| H7. Personality Disorder | Y | Moderate |
| H8. Traumatic Experiences | N | Low |
| H9. Violent Attitudes | N | Low |
| H10. Treatment Response | Y | Moderate |
| | | |
| C1.  Lack of Insight | N | Low |
| C2.  Violent Ideation or Intent | N | Low |
| C3. Active Symptoms of Major Mental Illness | N | Low |
| C4. Instability | N | Low |
| C5. Treatment or Supervision Response | N | Low |
| | | |
| | OUT | |
| R1. Professional Services and Plans | N | Low |
| R2. Living Situation | P | Low |
| R3. Personal Support | P | Moderate |
| R4. Treatment or Supervision Response | N | Low |
| R5. Stress or Coping | N | Low |

The above ratings are largely consistent with the risk assessment I conducted in 2018. However, please note changes in the areas of Professional Services and Plans, Living Situation, and Personal Support, which are further described below. The following HCR-20v3 factors have been identified as being relevant in assessing Mr. Hinckley's risk for future violence:

---

[2] Douglas, K.S., Hart, S.D., Webster, C.D., Belfrage, H. (2013). **HCR-20v3: Assessing Risk for Violence.** Vancouver, Canada: Mental Health, Law and Policy Institute: Simon Fraser University.

### History of Violence/Access to Weapons

Mr. Hinckley's instant offenses were his first serious acts of violence and increase his risk for future violence. However, he has not engaged in any further acts of violence since the instant offenses, nor has he evidenced any other antisocial behaviors. Mr. Hinckley's past acts of violence occurred in the context of a lengthy period of serious mental illness, marked by prolonged social isolation, depression and grandiose delusions. However, these symptoms of mental illness have been in remission for decades (see next section).

Mr. Hinckley committed his violent acts using firearms he had spent several months acquiring. There is no indication Mr. Hinckley has sought access to weapons since the instant offenses and both his mother and brother have consistently reported that there are no firearms in his residence, in compliance with the court order.

### Major Mental and Personality Disorders

Mr. Hinckley is diagnosed with Major Depressive Disorder (MDD), Other Specified Schizophrenia Spectrum and Other Psychotic Disorders, and Narcissistic Personality Disorder. His major depressive and psychotic disorders have been in full remission for over 30 years. In addition, Mr. Hinckley has not verbalized or shown evidence of suicidal ideation since 1983, when he last attempted suicide. Although Mr. Hinckley has demonstrated some fluctuations in mood in the past, this has primarily occurred in the context of stressful life events. Mr. Hinckley has not had any notable periods of low mood or hopelessness since his release on CL. In fact, his treatment team and family have noticed marked improvements in his mood and emotional expression; he was repeatedly described as appearing "happy" and "optimistic" since his discharge on CL.

The death of Mrs. Hinckley has the potential to be traumatic for Mr. Hinckley when it occurs. However, he has managed other significant losses (e.g., the death of his father in 2008) appropriately, demonstrating normal bereavement reactions rather than symptoms of a major depressive episode. It is evident that Mr. Hinckley has thought about his mother's death and has been preparing himself for its eventuality through discussions with his treatment team and members of his therapy group, as well as planning for future housing. In addition, he has previously informed his SEH treatment providers when he was experiencing increased anxiety and requested changes in medication to manage his mood symptoms. Therefore, he is likely to reach out to his treatment team in the future should he experience an increase in anxiety or depressive symptoms in the context of his mother's death or any other stressful life event.

Although Mr. Hinckley is diagnosed with Narcissistic Personality Disorder, treating providers and other evaluators have noted that Mr. Hinckley's narcissism has been significantly attenuated over the past three decades. Consistent with prior risk assessments, there were no overt signs of this disorder present during the current evaluation. Furthermore, Narcissistic Personality Disorder is not by itself directly correlated in the scientific literature with increased risk for violence. Rather increased risk is associated with antisocial personality traits and characteristics of hostility and dominance, which are not demonstrated by Mr. Hinckley.

Relationship Instability

Mr. Hinckley did not have a history of reciprocal romantic relationships prior to the instant offenses and had distanced himself from his parents and siblings. Furthermore, his obsession with Jodie Foster, including his grandiose delusion of winning her love and respect, was a significant component of his conduct in the instant offenses. These issues suggest that interpersonal relationships are a relevant factor in assessing Mr. Hinckley's risk for future violence.

While hospitalized at SEH, Mr. Hinckley engaged in several romantic relationships, with varying levels of stability and longevity. At times he demonstrated difficulty adhering to appropriate boundaries, particularly with female staff members, and engaged in poor decision making by failing to disclose relevant information to his treatment team (e.g., Ms. LD purchasing a book on Jodie Foster in 1998). However, over the past two decades there has been no evidence that he has behaved inappropriately toward women or that he has experienced any obsessions or delusions relating to women.

Mr. Hinckley's most recent romantic relationship occurred approximately one year ago with Ms. H. While this relationship only lasted three months, his treatment team observed an increase in his self-confidence and willingness to interact with people in the community in the aftermath of the relationship. In addition, Mr. Hinckley's decision making with regard to attempting to set limits with Ms. H and ending the relationship due to her escalating behavior demonstrated improved insight and judgment in comparison to his interactions with women earlier in his life. While Mr. Hinckley has not entered into another romantic relationship over the past year, he continues to express a desire to date in the future and appeared more optimistic about this aspect of his life than when I spoke with him two years ago.

The benefits of interpersonal relationships have been repeatedly stressed to Mr. Hinckley by his treatment team but limited progress has been made in this area since the last risk assessment in 2018. Although Mr. Hinckley has acknowledged a need to make improvements in this area and said he is willing to work on his social skills, his motivation to seek out new opportunities for socialization is low. He is introverted and shy and has experienced multiple rejections during his time residing in the community. These are significant impediments to increasing his socialization. However, it is clear from progress notes and my interview with Mr. Hinckley that he does socialize with individuals at the antique mall nearly every day and in group therapy on a weekly basis. He has also developed close relationships with his mother and brother, even stepping into the role of primary caregiver – a role he has handled very well. As a result, he is no longer socially isolated as he was prior the instant offenses, and he appears to have benefited from the limited social outlets he has developed over the last four years.

Treatment Response - Minimization/Deception

Mr. Hinckley has a lengthy history of minimizing negative emotions, engaging in deceptive behavior and failing to report pertinent information (i.e., being secretive) to his treatment team, particularly early in his hospitalization as it related to his relationships with women and correspondence with others. However, there have been no documented incidents of

deceptive behavior since 2011, when Mr. Hinckley lied on two occasions about his whereabouts. In addition, since his discharge from SEH in 2016, there have been no reports he has failed to comply with the conditions of his release. In fact, family and treatment providers have commended Mr. Hinckley for his rigid adherence to the rules set out in his court order, particularly with regard to the travel restrictions. Mr. Hinckley has maintained a daily log, as instructed by the court, and has consistently reported on his activities to Mr. Weiss, Dr. Giorgi-Guarnieri and FOPD. He has also developed productive relationships with the members of his treatment team, who have noted his honesty and increasing openness during both individual and group sessions. Mr. Hinckley has repeatedly expressed that he finds his treatment beneficial and identifies his positive response to treatment as a large factor in his psychiatric stability.

### Insight

Poor insight has historically been a risk factor for Mr. Hinckley and was clearly present throughout the first two decades he was at SEH. However, through years of individual and group therapy, Mr. Hinckley has increasingly demonstrated improved insight into his emotions and behaviors. He reflects on feedback provided by his treatment team and incorporates it in his decision-making, most notably in regard to his relationships with women. Although Mr. Hinckley occasionally exhibited errors in judgment early during his period of CL (e.g., approaching a woman in his therapy group outside of group), his insight, overall, is quite good and is not presently a risk factor.

### Professional Plans and Services

It is anticipated that Mr. Hinckley will experience changes in the composition of his treatment team and level of care over the next few years, regardless of whether he is granted UCR or remains under court supervision. However, he has managed previous changes of treatment providers well, without signs of psychiatric decompensation, and it is not expected that changes in either the level of care or his providers will result in an increase in his risk.

I discussed future plans for Mr. Hinckley's professional services with all members of his current treatment team. Mr. Beffa was in support of Mr. Hinckley decreasing the frequency of individual therapy to 3-4 times per year, Ms. Drozd agreed with Mr. Hinckley's assessment that he no longer required the services of a music therapist, and Mr. Weiss indicated his willingness to be available to Mr. Hinckley on an as-needed basis and agreed that Mr. Hinckley no longer requires traditional case management services. In addition, Dr. Giorgi-Guarnieri acknowledged that Mr. Hinckley's primary care doctor would be able to manage his psychiatric medications given that he has been stable on his current regimen for many years and does not identify any side effects that would need to be addressed. Therefore, although CBH has declined to provide Mr. Hinckley services and many members of his current treatment team will retire in the next few years, Mr. Hinckley's plan for utilizing professional services in the future appears appropriate and in line with the recommendations of his treatment team.

### Living Situation

Mr. Hinckley's current living situation is stable and also provides a source of socialization for him, particularly since his brother moved into the home in June 2017. His brother's presence and willingness to continue to reside with Mr. Hinckley after their mother's death also increases the long-term stability of his living situation, reducing Mr. Hinckley's future risk. Since the last risk assessment, Mr. Hinckley has confirmed that he has 90 days to move out of his mother's house after her death and he has identified affordable and suitable apartment housing nearby in Williamsburg. In addition, Mr. Hinckley said he plans to explore additional options in Newport News over the next year, given that rents are generally lower in that area.

## Personal Support

Mr. Hinckley's family continues to be extremely supportive of him, both emotionally and financially. Mr. Scott Hinckley moved to Williamsburg in June 2017 and continues to express his intent to live with his brother in Williamsburg after their mother's death. Both brothers and the treatment team reported that Scott and John's relationship has grown much closer over time and they routinely spend time together both running errands and attending community events. In addition, Mr. Hinckley stepped into the role of caregiver for his brother in 2019, arranging for medical and psychiatric care for him and administering his medications. With regard to financial support, although the family is on a budget, they are comfortable with the current manner in which expenses are shared. Furthermore, Mr. Hinckley's benefits and steady income from his antique mall business increases his financial stability.

In addition to family support, Mr. Hinckley has also begun to establish relationships in the community through his business endeavors and attendance at group therapy. However, both Mr. Hinckley and his treatment team agree that this is an area in which Mr. Hinckley needs to continue to make progress.

## Social Isolation

While social isolation is not a risk factor specifically delineated on the HCR-20v3, it is related to relationship instability, employment instability, and personal support and has been identified as a specific risk factor for psychiatric decompensation for Mr. Hinckley.

Although some members of the treatment team remain concerned that Mr. Hinckley does not engage in enough social activities, there is general agreement that he has increased his level of socialization since his discharge from SEH nearly four years ago. He regularly socializes with employees, customers and other vendors at the antique mall where he has a booth and he expressed missing this social outlet during the COVID-19 shut-down in March and April 2020. In addition, he actively participates in group therapy and occasionally attends events in the community, including educational lectures and flea markets. In addition, the presence of Mr. Scott Hinckley in Williamsburg has clearly helped to decrease Mr. Hinckley's isolation; they frequently run errands together and have attended community events. Mr. Hinckley's relationship with Ms. H approximately one year ago is another indication of increased socialization and his decision to end the relationship suggests improvements in his insight and judgment with regard to interpersonal relationships.

Mr. Hinckley has expressed a desire to develop close friendships and a romantic relationship, both of which he admitted are lacking in his life. Repeated social rejection has certainly impacted the manner in which Mr. Hinckley engages with others and leads him to feel some trepidation participating in community events on his own. Although Mr. Hinckley's music and art were a point of connection for him in the past, his frustration with his inability to openly share his work and obtain feedback from a broader audience has negatively impacted his interest in pursuing creative endeavors. In my opinion, the restrictions on Mr. Hinckley publicly performing and sharing his music represents a lost opportunity for him to increase socialization through shared interests with others.

Currently, Mr. Hinckley is not displaying signs of the isolative behavior that marked the years prior to the instant offenses and contributed to his psychiatric decompensation and psychosis. He appears very engaged in his business endeavors and has welcomed the opportunity to become a productive member of the community through the antique mall. Although he does not take advantage of all opportunities for social engagement suggested by his treatment team, he has clearly made efforts to socialize with members of the community and has attended some events when he feels comfortable doing so.

## 12. Conclusions and Risk Management Recommendations

Mr. Hinckley's potential to act out violently is primarily associated with prolonged social isolation, major depressive episodes and psychosis marked by grandiose delusions. It remains my opinion, in concordance with my last risk assessment, that he is at low risk for another psychotic episode due to the fact that onset would follow a lengthy period of social isolation concomitant with other depressive symptoms, which have been in remission for over three decades. Mr. Hinckley's scores on actuarial and structured professional judgment risk tools suggest there is a low likelihood he will re-offend with a violent crime over the short and long term. Furthermore, it is expected that his level of risk will continue to decrease with time in light of his psychiatric stability, significant improvements in his insight and judgment, and his excellent adjustment to residing in the community over the past four years. Given these factors, it is my opinion that Mr. Hinckley will not pose a danger to himself or others if he is granted unconditional release from the court.

In assessing Mr. Hinckley's suitability for unconditional release, the primary consideration is the level of risk he would pose to others and himself if the 30 conditions detailed in the November 16, 2018 court order were removed. In arriving at my recommendation that Mr. Hinckley be considered for UCR, I evaluated how each of these conditions impact Mr. Hinckley currently and potential issues that may arise in the future if restrictions are lifted.

1. *Living Situation.* Mr. Hinckley has been adamant that he will not move out of his mother's home until after her death. He has been her primary caregiver for the past four years and has shown a high level of dedication and responsibility in caring for her, as well as his brother. Despite locating a suitable apartment nearby in which he could live independently, he has chosen to remain in his mother's home where he prepares many of the meals, cleans the home, runs errands and financially

contributes to household expenses. However, Mr. Hinckley is aware he would be required to move out of the home within 90 days of his mother's death and is prepared to do so.

During the September 2019 status hearing, the possibility of Mr. Hinckley relocating to California to pursue a career in music was discussed. This idea does not appear to have originated with Mr. Hinckley; he has repeatedly expressed that he is not interested in relocating outside of the Williamsburg-Hampton Roads area. Mr. Hinckley cited his age, his relationship with his brother, the antique business he created, and his familiarity with the area as the primary reasons he does not wish to relocate. In addition, he noted his ability to pursue his artistic interests from his current location given the access afforded by internet.

If Mr. Hinckley were to move outside of the area in which he currently resides, he would face a number of challenges, including establishing medical and psychiatric care with new providers, changes to his finances and developing outlets for socialization. However, Mr. Hinckley has already demonstrated the ability to address several of these issues during his transition to residing in Williamsburg full-time. He located a primary care doctor, applied for and received benefits from government assistance programs, and developed a business selling antiques, which has also become a source of socialization for him. In addition, even should he remain in the Williamsburg-Hampton Roads area, he will need to establish care with new providers in the future as members of his current treatment team retire.

Given Mr. Hinckley's demonstrated ability to independently manage not only his own affairs, but also to take care of both his mother and brother, as well as the feasibility of his future plans for remaining in the Williamsburg-Hampton Roads area, it is my opinion that removing the first condition in the court order would not increase Mr. Hinckley's risk of danger to himself or others.

2. *FOPD Supervision.* Multiple conditions of the court order pertain to FOPD's supervision of Mr. Hinckley and their reporting requirements to the Secret Service and the court. Mr. Hinckley has not displayed a negative attitude toward supervision during the four years he has been on CL, aside from expressing frustration over the time commitment inherent in driving to Washington, DC and navigating traffic. In addition, Dr. Tillbrook has described Mr. Hinckley as proactive and responsive in maintaining communication with FOPD and conscientious in following the conditions of his release. Following the reduction in the frequency of FOPD's contact with Mr. Hinckley in November 2018, no issues with his adherence to the court order or his mental status have arisen. Furthermore, since February 2020, in-person visits at FOPD were suspended due to the COVID-19 pandemic without documented adverse impact. Therefore, it is my opinion that if Mr. Hinckley is granted UCR, resulting in suspension of FOPD supervision, it would not increase his risk of danger to himself or others.

3. *Case Management.* In my opinion, Mr. Hinckley no longer requires formal case management services given his psychiatric stability and level of functioning. Mr. Weiss played an essential role early in Mr. Hinckley's transition to the community by connecting him to available resources, increasing his socialization through attending community events together and advising him as he formed his business. However, over the past two years Mr. Weiss' role has primarily been to report on Mr. Hinckley's activities rather than assist him in pursuing opportunities. Although Mr. Hinckley still utilizes Mr. Weiss as a "sounding board" when faced with challenging situations, he does not require the same level of support he did immediately after his discharge from SEH. Mr. Hinckley has demonstrated his ability to manage his affairs independently, including making and attending appointments, handling his finances, and running his antique business. In addition, he has taken on the responsibility of caring for both his elderly mother and brother, assisting them with health care needs and maintaining the household by cooking, cleaning and running errands. Although he functions very independently, Hinckley indicated he would like to remain in contact with Mr. Weiss after he is granted UCR because he values Mr. Weiss' guidance. When asked about his viewpoint on future services, Mr. Weiss said he would be amenable to an "as needed" arrangement, agreeing that Mr. Hinckley no longer requires regular case management services. Therefore, it is my opinion that removing the sixth condition in the court order would not increase Mr. Hinckley's risk of danger to himself or others.

4. *Structured Activities.* This condition of Mr. Hinckley's release has been met consistently over the past three years. In September 2017, Mr. Hinckley started an antique business by obtaining items from local consignment shops and estate sales and renting a booth at a local antique mall in which to sell his inventory. He has grown this business over time, renting a larger booth and obtaining a storage unit in order to increase his inventory. He noted that the increase in his travel radius from 30 to 75 miles has allowed him to obtain more items to sell and attend events such as flea markets to look for merchandise. Prior to the COVID-19 pandemic, Mr. Hinckley was working between four and nine hours per day in support of his business and had an income of up to $1000 per month. However, even with reduced business at the antique mall during the COVID-19 pandemic Mr. Hinckley was able to pay rent on his booth, indicating that it is a sustainable business endeavor even in the current economic climate. Mr. Hinckley has expressed his intent to continue working in his antique business in the future and identified it as an important source of socialization, as well as financial support. Given Mr. Hinckley's motivation to maintain employment, and by extension remain involved in a structured activity, it is my opinion that removing this condition would not increase Mr. Hinckley's danger to himself or others.

5. *Psychiatric Treatment/Medication.* Dr. Giorgi-Guarnieri has been Mr. Hinckley's psychiatrist since October 2010 and, as the only member of the Williamsburg treatment team with formal forensic training, she has had primary responsibility for monitoring Mr. Hinckley's risk factors while he is on CL. Dr. Giorgi-Guarnieri has assessed Mr. Hinckley's mental status not less than monthly, without noting any

signs of noncompliance or decompensation, including no psychosis, depression or endangerment to self or others. She is also responsible for prescribing Mr. Hinckley's psychiatric medications; these prescriptions have remained unchanged since 2008 and Mr. Hinckley has reported minimal side effects associated with them. Given the long-term stability of his psychiatric condition, Dr. Glorgi-Guarnieri indicated that she is not in opposition to a primary care provider prescribing Mr. Hinckley's psychiatric medications in the future. However, Mr. Hinckley has expressed that he does not wish to make any changes in his psychiatric care until such time as Dr. Giorgi-Guarnieri closes her practice in Newport News. Mr. Hinckley has repeatedly expressed his intention to remain on psychiatric medication for the remainder of his life and credits it, in part, for his long-term stability and ability to successfully manage his life in the community. Given Mr. Hinckley's lengthy history of medication compliance, consistent engagement in treatment, minimal medication side effects and the feasibility of his plans for future treatment, it is my opinion that removing this condition would not increase Mr. Hinckley's danger to himself or others.

6. *Individual/Group Therapy.* Mr. Hinckley has consistently been involved in some form of group and/or individual therapy for the past 38 years. While his initial progress in therapy while at SEH was slow, over the past four years he has been on CL Mr. Hinckley has largely met the treatment objectives that have been set for him. Although some treatment team members continue to express concern that Mr. Hinckley does not engage in enough socialization, he is no longer socially isolated and has expressed gaining enjoyment from, and motivation to continue to purse, the few social outlets he has developed. In addition, he has clearly used both Mr. Beffa and his therapy group as resources in decision-making with regard to intimate relationships and as support in community integration. Several members of the treatment team noted the positive benefits of Mr. Hinckley attending group therapy in particular, describing him as an "active participant" who responds openly and empathically to others. Mr. Beffa concurred with Mr. Hinckley that he benefits more from group therapy than individual therapy. As a result, Mr. Beffa recommended reducing Mr. Hinckley's individual therapy appointments to once every three or four months, as a "check-in."

One potential issue with regard to Mr. Hinckley's future involvement with therapy pertains to Mr. Beffa's plan to retire and his assertion that there are no other suitable therapy groups for Mr. Hinckley to join in the Williamsburg area. However, Mr. Hinckley has expressed a willingness to travel to Newport News to obtain psychiatric care and appears motivated to seek out alternatives should his current therapy group no longer be available. Given Mr. Hinckley's treatment progress, psychiatric stability and motivation to continue to engage In group therapy in particular, it is my opinion that it would not substantially increase his risk for future violence to remove this condition of his release.

7. *Music Therapy.* Ms. Drozd indicated that she agrees with Mr. Hinckley's assessment that he no longer requires the services of a music therapist. According

to Ms. Drozd, Mr. Hinckley has learned how to use his music therapeutically to cope with stress and has the skills to do so independently. Although she continues to support him with the technological aspect of posting his music online and oversees these activities as required by the court, as she noted, this role does not need to be fulfilled by a music therapist. It is my opinion that removing the condition requiring Mr. Hinckley to engage in music therapy would not increase his risk of danger to himself or others.

8. *Primary Care Physician.* Mr. Hinckley has met this condition by establishing care with a primary care physician and attending appointments as needed to manage his health. No concerns have been expressed by Mr. Hinckley nor by his treatment team regarding ongoing medical issues. In addition, as noted above, Mr. Hinckley has given consideration to transferring his psychiatric medications to his primary care physician upon Dr. Giorgi-Guarnieri's retirement. It is my opinion that removing this condition would not increase Mr. Hinckley's risk of danger to himself or others.

9. *Government Assistance Programs.* Within his first year of residing in Williamsburg, Mr. Hinckley applied for and obtained Supplemental Security Income (SSI), Medicaid, Medicare and Social Security Disability Insurance (SSDI) and was approved to become his own payee. Mr. Hinckley also established an Achieving a Better Life Experience (ABLE) account, which allows him to deposit money in excess of $2000 without negatively impacting his SSI, Medicaid and SSDI benefits. In addition, Mr. Hinckley is aware of the process for appealing CBH's decision to not offer him services, should he desire to do so in the future. Due to Mr. Hinckley's knowledge of government programs available, receipt of numerous benefits from various government programs and his ability to save the additional income from his business without adversely affecting his benefits, it is my opinion that removing this condition will not increase his risk of danger to himself or others.

10. *Displays of Artistic Work.* As I noted in the 2018 risk assessment I completed, granting increased freedom and flexibility in this area is a balance between the clinical benefit associated with Mr. Hinckley sharing his artistic works and the risk of fame-seeking and/or increased notoriety. It remains my opinion that the clinical benefit of providing an emotional outlet for Mr. Hinckley and increasing his opportunities for social connection substantially outweighs the risk of increasing his narcissism, which has not been overtly apparent in many years.

Following the modification of the court order in November 2018, Mr. Hinckley was permitted to physically display his artwork in public forums and share music created by him via the internet, with the caveat that steps be taken by the treatment team to ensure the displays were anonymous and there was no financial benefit associated with the activities. Mr. Weiss indicated that attempts at displaying Mr. Hinckley's artwork anonymously were unsuccessful, as it proved to be too complicated to accomplish. However, Mr. Hinckley has posted his music anonymously over the past two years, with limited views and feedback. As a result,

Mr. Hinckley expressed frustration over his inability to share his music with a wider audience, either through use of social media to generate interest or through performing in public. Mr. Hinckley has repeatedly emphasized his belief that sharing his music and being critiqued by others is part of the normal creative process.

Mr. Hinckley has expressed he would like to publish and perform his music on his own and attempt to earn some financial benefit from his music and artwork. The concerns with these increased freedoms identified previously in risk assessments and by the treatment team have primarily focused on whether Mr. Hinckley's narcissism will be activated either positively or negatively if he gains attention and monetary incentive through public displays of his art or music.

In my opinion, it is unlikely that success and financial benefits from Mr. Hinckley's artistic endeavors will increase his narcissism to the extent that it substantially increases his risk of danger to self or others. First, Narcissistic Personality Disorder is not by itself directly correlated in the scientific literature with increased risk for violence; increased risk is associated with antisocial personality traits and characteristics of hostility and dominance, which are not demonstrated by Mr. Hinckley. Second, Mr. Hinckley's narcissism has been significantly attenuated over the past three decades. Although personality disorders are enduring patterns of behavior and do not go into remission, Mr. Hinckley has developed insight and defenses to manage his maladaptive personality traits. As a result, no overt signs of narcissism have been observed in him by his treatment team and, despite receiving praise and accolades for the quality of his artistic work and the success of his business, Mr. Hinckley mental status has not been adversely impacted by this success. Finally, the likelihood of Mr. Hinckley achieving high levels of success or accruing large monetary benefits from his artistic endeavors is low. As Dr. Giorgi-Guarnieri has pointed out, even taking into account Mr. Hinckley's notoriety, the music industry is very competitive and the audience for the type of music Mr. Hinckley writes is a very small subset of music listeners overall. In addition, Mr. Hinckley must also overcome the obstacle of technology to bring his music to a wider audience and, according to Ms. Drozd, Mr. Hinckley is technologically behind due to his age, years spent hospitalized and the restrictions of the court order.

In addition to the impact of success on Mr. Hinckley's risk, his response to rejection and criticism of his artistic creations is also a factor to consider in assessing his future risk. Rejection has the potential to result in a narcissistic injury, which may lead to depression and/or anger and subsequently increase risk of danger to self or others. Should Mr. Hinckley's music or art be poorly received, or if his notoriety rather than the quality of his work becomes the primary focus of interest by the public, it is possible that he will sustain a narcissistic injury or otherwise react negatively. However, Mr. Hinckley has already been rejected on numerous occasions by the community and potential romantic partners without exhibiting feelings of hopelessness or depression. He also has not self-isolated or retaliated in response to these rejections. In fact, Mr. Hinckley has continued to make efforts

29

to be a productive member of the Williamsburg community through his business and participation in community events (e.g., education classes). In addition, over the past two decades, Mr. Hinckley has weathered negative scrutiny by both the media and the public without demonstrating increased anxiety, depression or self-isolation. Furthermore, with regard to Mr. Hinckley's personal safety, there were no incidents of attempted malice or violence against him following the deaths of President Regan and James Brady or after his release on convalescent leave. By extension, the likelihood of an act of violence being directed at Mr. Hinckley if he participated in a public musical performance or were present for a public display of his artwork is low. However, the public's reaction to Mr. Hinckley's artistic creations being readily available and identifiable is unknown and it is possible that he will be the target of trolling, heckling or musical plagiarism.  Despite these potential for negative outcomes from publicly displaying his work, it remains my opinion that the benefits of Mr. Hinckley pursuing his artistic endeavors outweighs the risk of him sustaining a narcissistic injury, which appears to be low given Mr. Hinckley's responses to negative attention in the past.

11. *Media Plan.* Early during his hospitalization at SEH, Mr. Hinckley demonstrated an excessive need for admiration and inflated sense of self-importance that contributed to his preoccupation with his notoriety and a desire for media attention to help him maintain his perceived relationship with Ms. Foster. However, these traits of Narcissistic Personality Disorder have not been overtly in evidence for many years and Mr. Hinckley has adhered to the media plan without any significant issues during periods of CR. Furthermore, Mr. Hinckley has repeatedly expressed his desire to maintain a low profile within the community and even ended his romantic relationship with Ms. H partially out of concern that her actions would draw attention to him. When his treatment team has queried whether he has seen news stories about himself over the past four years, Mr. Hinckley has replied that he avoids watching or reading media related to him or his crimes. Although it is possible that Mr. Hinckley would submit to an interview or interact with the media if he receives UCR, it is unlikely that he would be motivated to do so in an effort to seek fame or admiration given the attenuation of his Narcissistic Personality Disorder. In addition, Mr. Hinckley has repeatedly reflected to treatment providers over the years that he desires to be judged for who he is now, rather than for his notoriety; rather than relishing his notoriety, Mr. Hinckley described it as something he must overcome in order to establish relationships and be successful in the community. In my opinion, removing the condition requiring Mr. Hinckley to follow the media plan is unlikely to substantially increase his risk of danger to himself or others.

12. *Substance Use.* Mr. Hinckley previously reported using marijuana twice in college but has no other history of illicit drug use. He reported occasional alcohol use prior to the instant offenses but has not consumed alcohol since his admission to SEH in 1982. He has submitted to periodic urine drug screenings over the course of the past 38 years without a single positive result. In my opinion, substance use is not

a significant risk factor for Mr. Hinckley and removing this condition of his release would not substantially increase his risk of danger to himself or others.

13. *Contact with Identified Persons.* Mr. Hinckley has not attempted to make contact with any identified person since the 1980s, when he was continuing in his attempts to reach Jodie Foster. Furthermore, he has not expressed interest in any of the identified persons in decades, except to note the increased media attention on him following the deaths of President Reagan and James Brady. Mr. Hinckley's focus on Ms. Foster and President Reagan was primarily related to grandiose delusions associated with a major depressive episode; following remission of his symptoms, his interest dissipated. In addition, his preoccupation with the notoriety of his crimes against the identified individuals has not been in evidence since early during his hospitalization. In my opinion, Mr. Hinckley is unlikely to seek out contact with any identified person should he receive UCR and removing this condition will not increase his level of risk.

14. *Travel.* Over the past two years, Mr. Hinckley has utilized the increased travel radius of 75 miles appropriately. He has attended additional cultural events and visited consignment shops, flea markets and estate sales to procure items for his antique business. At no time have concerns been raised regarding his travel movements; he has not ventured near any government buildings, political figures or persons identified in the court order and he has appropriately notified his treatment team/FOPD of his movements. Indeed, Mr. Weiss noted that Mr. Hinckley appears hesitant to travel too far from his home, which he attributed to Mr. Hinckley's concerns about getting lost and being away from his elderly mother for an extended period of time. The latter concern has also been cited as a factor in Mr. Hinckley's lack of requests to travel outside the 75-mile radius.

Given that Mr. Hinckley has not traveled outside of the specified radius other than for his appointments in Washington, DC with FOPD, his response to the situational stressors often associated with travel, particularly air travel, is untested and is likely to remain so. Mr. Hinckley has expressed very little interest in traveling in the future, even if he is granted UCR. He indicated he would consider visiting his niece in New Jersey but otherwise has no desire to visit other places. Furthermore, he cited concerns regarding the COVID-19 pandemic, his age, and caring for his elderly mother as factors in his unwillingness to travel. Therefore, it is my opinion that removing this condition of his release will not increase his risk of danger to himself or others.

15. *Daily Log.* Although the daily log initially served as a tool to support Mr. Hinckley's disclosure of activities, there have not been any reports of problems with his level of disclosure nor have any inconsistencies between his report and his observed activities been identified by Dr. Tillbrook, Mr. Weiss or the Secret Service according to available records. Therefore, it is my opinion that removing the requirement to complete a daily log will not increase the risk for deceptive behavior by Mr. Hinckley. It is also my opinion that the daily log has had minimal therapeutic

impact in that it has not served to increased Mr. Hinckley's socialization but rather consists mainly of an accounting of his work hours and errands. Therefore, it is my opinion that removing this condition of his release will not increase his level of risk.

16. *Access to the Internet.* Mr. Hinckley is currently permitted access to the Internet with limitations. During the last risk assessment, I recommended that he be permitted to sell items from his antique business online. This was not included in the revised consent order dated November 2018. It remains my opinion that it would not increase his risk to sell items from his antique business online nor do I believe it would increase his risk to be granted broader access to the internet and social media. There have been no indications of inappropriate use of the internet by Mr. Hinckley during his time on CL. In addition, Mr. Hinckley has not shown any interest in information related to his crimes or victims in decades, expressing that he feels like a different person than he was when he committed the instant offenses. Furthermore, as discussed under the condition related to public displays of artwork, his narcissistic traits are significantly buffered and are unlikely to increase should he be permitted to utilize social media and/or be granted unrestricted access to the internet. Mr. Hinckley's technological skills are also very limited, as Ms. Drozd has pointed out, and his use of various social media platforms is likely to be impacted by his level of knowledge. Therefore, it is my opinion that it will not substantially increase his risk of danger to himself or others if this condition of his release is removed.

17. *Professional Services.* Based on my interviews with Mr. Hinckley's current treatment team, it does not appear that any changes in their roles and responsibilities are expected over the next six months. Although Dr. Giorgi-Guarnieri previously provided notice of her intent to step down as Mr. Hinckley's psychiatrist at the end of 2019 or early 2020, recently she has indicated she plans to keep her practice open at least another year. Mr. Weiss and Mr. Beffa are both planning to enter full retirement in the next few years; however, they did not have specific dates set at the time this report was completed and both indicated their intention to continue working with Mr. Hinckley through early 2021. When asked about her future plans, Ms. Drozd said she will be working as a music therapist for the foreseeable future and would be willing to continue meeting with Mr. Hinckley for at least another year should the court order require ongoing music therapy.

In the 2018 risk assessment, I recommended transfer of Mr. Hinckley's care to CBH in light of the pending retirement of several members of his treatment team and the high level of services required by the court order. However, CBH declined to provide services to Mr. Hinckley citing the numerous reporting requirements specified in the court order. Although Mr. Hinckley has the ability to appeal this decision, he has not done so due to his current treatment team remaining in place through 2020. When Mr. Hinckley ultimately is required to transfer his care to new providers, it is not expected that he will decompensate psychiatrically in light of the fact that he has experienced many transitions in his treatment providers over the nearly four decades he has been in care without decompensating.

32

As already noted, it is my opinion that given Mr. Hinckley's successful community reintegration and clinical stability, he no longer requires the level of care currently provided by his treatment team and required by his court order. Furthermore, his treatment team has variously expressed support for his plans to terminate music therapy, terminate case management services, decrease individual therapy, and transfer his psychiatric medication to his primary care physician in the future. Mr. Hinckley's plans for future professional services appear feasible and appropriate given the recommendations of his treatment team, his psychiatric stability, level of independence and increased insight. Therefore, it is my opinion that it will not increase Mr. Hinckley's risk of danger to self or others if the conditions pertaining to his treatment team and ongoing professional services are removed.

## 13. Limits on Conclusions Reached and Interpretation of Data

This report is based on a large amount of information obtained from multiple sources. I believe that all information contained herein is accurate and provides an adequate basis to form both clinical and forensic opinions. However, if any information is substantially inaccurate, I would appreciate it if this were immediately called to my attention. In addition, should I learn of any additional new information which casts substantial doubt upon either my clinical or forensic opinions, I will immediately notify the FOPD and write an addendum to this report.

Samantha M. Benesh, Psy.D., ABPP
Board-Certified Forensic Psychologist
Partner, Benesh & Yeaw Consulting LLC

July 2, 2020
Date



**DOCUMENT UNDER SEAL**

August 21, 2020

Our Reference:    DBH/FOPD/CT             John W. Hinckley, Jr. (#123,173)
Your Reference:    Criminal Case Number       81-306

The Honorable Paul L. Friedman
United States District Court for the District of Columbia
333 Constitution Avenue, NW, Room 6012
Washington, D.C. 20001

Your Honor:

We wish to call your attention to Mr. John Hinckley, Jr., who was admitted to Saint Elizabeths Hospital by Court order on June 22, 1982, pursuant to the provisions of Title 24, Section 501(e) of the D.C. Code, after having been found Not Guilty by Reason of Insanity on four counts of attempted murder, four counts of criminal possession of a weapon, and four counts of possession of a prohibited weapon. Currently, Mr. Hinckley resides full time in Williamsburg, Virginia, after this Court ordered him conditionally released for convalescent leave on July 27, 2016, and Saint Elizabeths Hospital released him on September 10, 2016.

Reference is made to our most recent letter to the Court in which we provided a clinical summary of Mr. Hinckley's progress between May 30, 2020 and July 31, 2020[1]. At this time, it is the opinion of DBH that Mr. Hinckley has recovered his sanity and will not in the reasonably foreseeable future present a danger to self or others. However, DBH is not recommending immediate Unconditional Release (UCR). Based on the fact that Mr. Hinckley's freedoms in the past have been tightly controlled with limited opportunity to observe him making his own treatment choices, DBH does not support the immediate removal of all 30 conditions and immediate UCR. Instead, DBH recommends that the Court approve UCR subject to Mr. Hinckley successfully completing a final transition monitoring period of 6-12 months. The basis of this recommendation is to provide DBH with the minimum necessary tools to monitor Mr. Hinckley as the final conditions of release are removed. If Mr. Hinckley successfully completes this transition, as both his Williamsburg treatment team and DBH team fully expect him to do, DBH recommends that Mr. Hinckley transition to UCR pursuant to Title 24, Section 501(d)(1) of the D.C. Code upon DBH's final report to the Court. To be clear, DBH does not expect that Mr. Hinckley's psychiatric stability will

---

[1] Stipulation of Mr. Hinckley's most recent consent order, dated November 16, 2018.

deteriorate without DBH/Court oversight, but in keeping with best practice risk management principles, DBH recommends a final transition period of 6-12 months[2] during which Mr. Hinckley can make the changes he wishes to make in the short-term, while retaining DBH's authority to monitor his adjustment and psychiatric status. The details of DBH's recommendation and underlying rationale are explained herein.

## Relevant History

Mr. Hinckley resided at Saint Elizabeths Hospital on full inpatient status from the time of his commitment until December 2003. At that time, Mr. Hinckley received his first conditional release for day visits with his parents locally (in the D. C. area), and he successfully completed six local day visits and two local overnight visits by November 2004. His conditional release was thereafter expanded in December 2005 to allow for seven conditional release visits to travel to his family's home in Williamsburg, VA. Between February and August 2006 he successfully completed three of these visits, which were one night in duration and four visits, which were each four nights in duration. In June 2009 Mr. Hinckley was granted an expansion of his conditional release to allow for ten days and nine night visits. In 2010 Mr. Hinckley was permitted the ability to obtain his driving license, and he was allowed to drive unaccompanied in the community. In December 2013 Mr. Hinckley was granted a 17-day visit to Williamsburg. He was allowed to drive there from SEH and travel to his appointments. He was assigned a treatment team in Williamsburg. These 17-day conditional release visits continued without incident until he was granted full convalescent leave in July 2016.

As noted previously, Mr. Hinckley was placed on convalescent leave on September 10, 2016, whereupon he resided full time in the home of his mother in Williamsburg, VA. He was granted an expansion of his conditional release for convalescent leave on November 16, 2018. The substantive changes to that consent order from his previous consent order are as follows:

1) Mr. Hinckley may reside independently in approved housing within a 75-mile radius of Williamsburg
2) Mr. Hinckley may alternate in-person and remote face to face meetings with FOPD every month
3) Mr. Hinckley may reduce telephone contact with FOPD to twice per month
4) Mr. Hinckley may travel within a 75-mile radius of Williamsburg unaccompanied
5) Mr. Hinckley may display memorabilia, works of art or music created by him anonymously on the internet with the approval of his treatment team/FOPD and under the supervision of his therapist or case manager

Since Mr. Hinckley's November 2018 consent order was issued, DBH has submitted 11 bi-monthly updates on his clinical status. These updates have consistently reported that Mr. Hinckley maintains strict adherence to the conditions of his release. Furthermore, he has navigated important life events, such as expanding his business, assisting his family members as they grappled with medical and psychiatric difficulties, and exploring romantic relationships. While these events had the potential to cause psychiatric decompensation for Mr. Hinckley, as communicated in our

---

[2] This time period was selected in line with the timeframe for which changes in dynamic risk is assessed in formal risk assessment

reports to the Court, he has handled these potentially stressful situations in a mature and responsible manner, and has maintained his psychiatric stability. Given his ongoing progress, his Williamsburg treatment team recommended Mr. Hinckley for an Unconditional Release from his commitment to DBH. Following their treatment recommendation, FOPD sought an independent risk assessment to assess Mr. Hinckley's readiness for Unconditional Release.

## Summary of Risk Assessment Findings[3]

In response to FOPD's request, Dr. Samantha Benesh evaluated Mr. Hinckley for the purposes of assessing his risk for violence in the context of Unconditional Release from his commitment to DBH. In her report, she noted that Mr. Hinckley plans to continue to reside in the Williamsburg area, maintain his business at the local antique mall, attend group therapy and take his current psychiatric medications. He does not plan to travel, particularly in light of the pandemic. He would like to discontinue music therapy, and either reduce or discontinue individual therapy, at the recommendation of his therapist, Mr. Beffa. He also expressed the desire to continue with group therapy, stating that he finds the feedback he receives to be helpful. Dr. Benesh noted that Mr. Hinckley could develop further in the area of socialization, but has made some improvements in this regard.

Dr. Benesh re-scored Mr. Hinckley on the Violence Risk Appraisal Guide, Revised (VRAG-R), on which she adjusted his risk score based on the past two years during which he has demonstrated offense-free time in the community. With this adjustment, she assessed Mr. Hinckley to fall with the lowest category of risk, (i.e., 6-16%). On a structured professional judgement tool of risk factors, the HCR-20V3, she assessed him to be at low range of risk for Future Violence, Serious Physical Harm, and Imminent Violence. Historical risk factors she noted as present included Violence (high relevance), Relationship Instability, Employment Problems, Major Mental Disorders (high relevance), Personality Disorder, and Treatment Response. She did not note the presence of any clinical risk factors. She noted that risk management issues included living situation and personal support, neither of which were rated as highly relevant.

Dr. Benesh noted that, in assessing Mr. Hinckley's suitability for Unconditional Release, she specifically evaluated the impact of the removal of the 30 conditions detailed in his most recent consent order, on his violence risk. In reviewing these conditions[4], Dr. Benesh's overall opinion was that, in light of Mr. Hinckley's successful community integration and clinical stability, that he no longer requires the level of care currently provided by his treatment team and required by his Court order. In the short term, changes to his treatment that he will likely implement (in the absence of a Court order requiring it), will include 1) discontinuing music therapy; 2) decreasing individual therapy; and 3) transitioning his psychiatric medication to a primary care physician in the near future. Dr. Benesh opined that Mr. Hinckley's risk of danger to self or others would not increase as a result of removal of Court oversight, and her risk assessment was in support of his Unconditional Release.

## DBH Recommendation

---

[3] Please see Risk Assessment report by Samantha Benesh, Ph. D, ABPP, dated July 2, 2020
[4] Pages 24-32 of the Risk Assessment

On July 15, 2020, July 22, 2020, and August 5, 2020, the Outpatient Forensic Review Board (OFRB), chaired by the undersigned, convened to discuss FOPD's recommendation for Mr. Hinckley's Unconditional Release. In considering this request, the OFRB considered the presentation given by Mr. Hinckley's treatment team, as well as the most recent risk assessment report authored by Dr. Benesh. Ultimately, the OFRB voted in favor of Unconditional Release for Mr. Hinckley after a specified period of time whereby he can make key transitions that he has expressed interest in making, while continuing under DBH/Court oversight. Relevant factors that were considered in this decision are as follows:

1) Major Mental Illness. Mr. Hinckley has not experienced symptoms of psychosis or depression in over 30 years. Any fluctuations to his mood have been in the context of situational factors, and have not risen to the level of a frank psychotic or mood episode. He is voluntarily medication adherent, and his treating psychiatrist is confident that his mental illness is well controlled on his current medication regimen.

2) History of Violence. Mr. Hinckley's instant offense occurred in the context of a worsening of his untreated psychiatric condition over five years, and contributed to an escalation of his behaviors that resulted in severe, planned violence. Since his mental illness has been in remission (thirty years), there have been no further incidents of violent behaviors, nor evidence of violent ideation. As such, the imminence of potential violence is low and contextually based. Empirically based assessment of his risk for violence places him at the lowest category of estimated risk.

3) Personality Disorder. Mr. Hinckley's diagnosis of Narcissistic Personality Disorder is noted by his providers as well as Dr. Benesh to have significantly attenuated in the past 30 years. Whereas early in his admission to Saint Elizabeths Hospital, he presented with a need for notoriety and expressed anger and agitation in the context of insults to his sense of self, Mr. Hinckley today exhibits a very different presentation. He does not seek notoriety, avoids media contact, and prefers to blend in. In fact, his treatment providers note that he has to be encouraged to socialize with others, and is rather shy. His efforts are focused on expanding his business and caring for his family members. There are no indications that he would revert to grandiosity and his previous need for self-aggrandizement. Furthermore, as noted by Dr. Benesh, Narcissistic Personality has not been established in the empirical literature as a risk factor for violence.

4) Future Plans. Mr. Hinckley's expressed plans are reasonable and address the most salient aspects of his historical risk. He wishes to remain engaged with community service providers, and would like to continue group therapy and individual therapy as needed. He intends to remain adherent to his psychiatric medication, and will follow his treating psychiatrist's recommendation for transition of psychiatric care in the long term. He plans to live in the Williamsburg/Hampton Roads area and has no interest in travelling, particularly in light of the pandemic. His plans to publish his music and art appear motivated by a desire to be seen as an artist and to receive feedback on his work, rather than to seek fame or notoriety. While there exists the potential for negative outcomes from publicly displaying his work, he has handled negative reactions well in the past, seeking the support of his therapist when needed.

5) Relationship Instability. Since his commitment to DBH, Mr. Hinckley has engaged in several romantic relationship which have ranged from short term, to an over twenty-year relationship. While early in his hospital course it was remarked that his relationships were significant for some dependency on his part, over the years his ability to navigate complex aspects of social and romantic relationships has greatly improved. This was most recently indicated by his own decision to dissolve a romantic relationship that he perceived could impact his own well-being. Mr. Hinckley is not a social person and will likely always struggle to establish and maintain social and intimate relationships. Nevertheless, the progress he has made in opening up, establishing honesty, and using his available supports to navigate difficult interpersonal situations indicate that his history of relationship instability is not a salient risk factor with regard to future dangerousness.

6) Treatment response/Insight. Mr. Hinckley has greatly improved with respect to his insight into his need for treatment. He utilizes his support network appropriately. While he has expressed the desire to reduce or discontinue some services, this has been done in concert with his treatment providers and are informed by his clinical needs. Mr. Hinckley has exhibited independence in managing his finances, business, and the care of his family members. He has demonstrated self-motivated commitment to ensuring his mental health needs are met. Available evidence suggests that this will not change with the removal of Court oversight.

In summary, it is the opinion of DBH that Mr. Hinckley no longer meets the criteria for commitment to the Department of Behavioral Health under Title 24, Section 501(d)(1) of the D.C. Code. The OFRB relies on the underlying rationale of Dr. Benesh's risk assessment and the Treatment Team/FOPD's recommendation in opining that Mr. Hinckley is entitled to an Unconditional Release from his commitment to DBH, as he has sufficiently recovered his sanity and will not in the reasonable future be dangerous to himself or others due to mental illness. Nevertheless, the OFRB supports a more gradual approach to a self-executing Unconditional Release, in which Mr. Hinckley makes the changes that he and his treatment team deem to be clinically appropriate, while continuing to remain under DBH/Court oversight. The rationale for continued oversight is based on the fact that Mr. Hinckley's freedoms in the past have been so tightly controlled that there have been no opportunities to observe him making his own treatment choices, driven by clinical needs as opposed to Court mandates. Furthermore, nomothetic risk management principles support a more graduated approach to a complete removal of protective conditions. In this vein, Mr. Hinckley and his treatment team anticipate the following changes to his treatment in the short-term will be made (should this request be approved):

1) Discontinuation of music therapy
2) Reduction in frequency of individual therapy
3) Transition to Colonial Behavioral Health or other community service provider
4) Allow unrestricted display of his art and music
5) Allow unrestricted travel

During this transition period, DBH/FOPD proposes ongoing monitoring of Mr. Hinckley's psychiatric status by maintaining monthly remote communication with Mr. Hinckley, and

maintaining monthly remote communication with his Williamsburg treatment team. Monthly notes will be documented in his medical chart and can be available to the Court/parties if requested. DBH also proposes that in order to facilitate continued monitoring for subtle signs of decompensation, we continue to have access to his phone, email, and computer/internet use. At the end of the 6-12 month period, DBH/FOPD will submit a clinical update to the Court, after which, providing his clinical status and risk picture remains unchanged, he may receive a full Unconditional Release.

If you have any questions regarding this report, Dr. Shilpa Krishnan may be contacted at (202) 815-0991 or shilpa.krishnan@dc.gov.

Respectfully,

Shilpa Krishnan, Ph.D.
Deputy Director, Forensic Services Division

cc:
Clerk, Criminal Division
United States District Court for the District of Columbia
3rd and Constitution Avenue, N.W., Room 1225
Washington, DC 20001

Kacie Weston, Esq.
Assistant United States Attorney
Judiciary Center
555 4th Street, N.W., Room 10-451
Washington, D.C. 20530

Barry Levine, Esq.
Blank Rome LLP
1825 Eye Street, N.W.
Washington, D.C. 20006-5403



**DOCUMENT UNDER SEAL**

May 10, 2021

| | | |
|---|---|---|
| Our Reference: | DBH/FOPD/SK | John W. Hinckley, Jr. (#123,173) |
| Your Reference: | Criminal Case Number | 81-306 |

The Honorable Paul L. Friedman
United States District Court for the District of Columbia
333 Constitution Avenue, NW, Room 6012
Washington, D.C. 20001

Your Honor:

We wish to call your attention to Mr. John Hinckley, Jr., who was admitted to Saint Elizabeths Hospital by Court order on June 22, 1982, pursuant to the provisions of Title 24, Section 501(e) of the D.C. Code, after having been found Not Guilty by Reason of Insanity on four counts of attempted murder, four counts of criminal possession of a weapon, and four counts of possession of a prohibited weapon. Currently, Mr. Hinckley resides full time in Williamsburg, Virginia, after this Court ordered him conditionally released for convalescent leave on July 27, 2016, and Saint Elizabeths Hospital released him on September 10, 2016.

Reference is made to our August 21, 2020, letter to the Court, in which we recommended that Mr. Hinckley be granted a self-executing Unconditional Release. Specifically, while it was the opinion of DBH that Mr. Hinckley no longer meets the criteria for commitment to the Department of Behavioral Health under Title 24, Section 501(d)(1) of the D.C. Code, we recommended a period of 6-12 months whereby DBH would retain limited oversight of Mr. Hinckley, while changes to his treatment were made. These changes would be dictated by a collaborative decision-making process between Mr. Hinckley and his treatment team. Subsequently, on October 29, 2020, Mr. Hinckley received a modified consent order that allowed for the following[1]:

1) Mr. Hinckley may reside independently or with a roommate;
2) Case management will be provided by Mr. Jonathan Weiss, as often as clinically indicated;
3) Dr. Giorgi-Guarnieri will provide psychiatric treatment for Mr. Hinckley, but has the discretion to transition him to an alternate community provider;

---

[1] Only substantial changes are listed here.

1

4) Mr. Carl Beffa will continue to provide individual and group therapy to Mr. Hinckley, as often as clinically indicated;

5) Mr. Hinckley may display, under his own name, without restriction, his artwork and music;

6) The Williamsburg treatment team and FOPD shall continue to identify alternative treatment providers in the Williamsburg area in order to facilitate Mr. Hinckley's transition to new providers when the current team members retire or leave the area;

7) A status hearing will be set for (7) months from the issuance of this order, at which the government shall inform the Court of their position with respect to any DBH recommendations and whether they intend to seek an independent evaluation of Mr. Hinckley. It was further ordered that a status update be submitted prior to the Court date, in which DBH would inform the Court of their position regarding his unconditional release from commitment.

## Review of Clinical and Risk Management Factors

*We refer the reader to our letter to the Court dated August 21, 2020, for a summary of Mr. Hinckley's relevant history. Furthermore, monthly status updates have been submitted to the Court regarding Mr. Hinckley's progress since November 2020. The following is a summary of clinical (current) risk factors and risk management (future) risk factors:*

### Treatment or Supervision Response (current and future)

Following the removal of substantive conditions of his consent order, with collaboration from his Williamsburg treatment team, Mr. Hinckley has discontinued music therapy and individual therapy. Mr. Hinckley and his therapist, Mr. Beffa, reasoned that there would not be any incremental benefit if he were to continue individual therapy, and they discussed that the option to resume therapy exists if the need arises (i.e., a stressful situation such as the death of a loved one). He remains involved in group therapy and is described as an "active participant providing help to others, as well as accepting help from others."

Mr. Hinckley is in compliance with his consent order, which is consistent with his supervision response since he received his first conditional release order in December 2003. With regard to his future plans for treatment, Mr. Hinckley is committed to continuing his participation in group therapy and as mentioned previously, is open to resuming individual therapy should the need arise. His Williamsburg treatment team is committed to continuing to provide case management, group therapy, and psychiatry support to Mr. Hinckley. There are no plans to transition him to other providers at this time. However, Mr. Weiss has represented that should a member of the treatment team retire or move from the area, there would be an overlap of care whereby the remaining Williamsburg treatment team members will continue with Mr. Hinckley, while a third member from Colonial Behavioral Health or other qualified provider assumes their role. For example, should Dr. Giorgi-Guarnieri retire or move from the area (there are no imminent plans for this), Mr. Hinckley's psychiatric care will be transferred to a psychiatrist at Colonial Behavioral Health, while Mr. Beffa and Mr. Weiss will continue to provide therapeutic services and case management. This gradual transfer of care would continue until such time that Mr. Hinckley is fully connected with Colonial Behavioral Health.

2

Should the Court grant an Unconditional Release, and should there be any emergent mental health issues, Mr. Hinkley's treatment team would pursue the usual pathway of seeking emergency hospitalization in the Commonwealth of Virginia. For the record, Mr. Hinckley's mental illness has been stable for over 30 years and it is highly unlikely that he would experience a sudden, acute episode of severe mental illness.

<u>Symptoms of Major Mental Disorder</u>

Mr. Hinckley remains connected to his Williamsburg treatment team and continues to receive psychiatric care from Dr. Giorgio-Guarnieri. Over the course of the past six months, Mr. Hinckley has maintained his psychiatric and behavioral stability with no psychotic, mood, or anxiety symptoms reported or exhibited. He is medication adherent and no changes have been made to his psychiatric medications.

<u>Insight</u>

Mr. Hinckley continues to evidence good insight into his mental illness and need for treatment. He has actively sought out advice and guidance from his treatment team before making any of his own decisions, even when he has been afforded the ability to make some of his own choices under the current Consent Order. He has expressed through therapy, remorse for his past actions and is keenly aware of his risk factors for violence, and what is needed to mitigate those risks (i.e., continuing to participate in mental health treatment).

<u>Violent Ideation or Intent</u>

Mr. Hinckley has not made any threatening statements and not engaged in any behaviors indicative of harm to himself or others. He has not displayed any disruptive or problematic behaviors. He does not have access to firearms or other weapons, nor has there been any data to suggest he is interested in procuring a firearm.

<u>Instability</u>

Mr. Hinckley does not demonstrate any cognitive, affective, or behavioral instability.

<u>Professional Services and Plans</u>

One significant change that has occurred with Mr. Hinckley in the past few months, is that he has closed down the booth he has maintained at an antique mall in Williamsburg, VA, which he has had for more than three years. In January 2021 he closed down his booth due to financial reasons; the antique mall was not doing well overall in light of the pandemic-related restrictions. In hindsight, Mr. Hinckley stated that this was "one of the best decisions he has ever made," because it freed him from monthly financial liabilities that would have been difficult to maintain. He receives SSI and, by all accounts, manages his finances well. He is considering renting a table at the Newport News Flea market in the future.

3

Regarding the public display of his art/music, under his own name, Mr. Hinckley has sent songs that he has written/produced to two local radio stations but they have not aired. He has also posted some music on the website "YouTube," and he has received positive feedback. There have not been references to his notoriety aside from one comment, "Reagan would be proud." He has not responded to any comments. Regarding the feedback he has received, Jonathan Weiss commented, "It has not all been glowing, and he has handled those responses thoughtfully and maturely." With increased focus on his mother's wellbeing, there has been less music production since end of February 2021. Mr. Hinckley's long-term plan is to compose jingles or write songs for others, and he is not particularly interested in performing before live audiences.

Regarding his art, Mr. Hinckley has sold about 15 11x14 paintings for less than $100. There has not been any mention of his notoriety in the sales. At present, he has taken a hiatus on creating new paintings, so he can focus on his music production and on caring for his mother.

As noted previously, Mr. Hinckley intends to remain adherent to his psychiatric medication, remain in group therapy, and is open to resuming individual therapy should he experience additional stressors. His Williamsburg treatment team will continue to work with him for the foreseeable future.

Living Situation

There have been several obstacles to Mr. Hinckley finding housing related to his financial eligibility. However, on May 4, 2021, he did sign a lease for a one-bedroom apartment, for which he is very excited. Mr. Hinckley has been residing with his mother since his release to the community, and undoubtedly it will be an adjustment to living alone. That said, given the nature of his current caregiver role with his mother, which requires patience and can be taxing both physically and emotionally, in some ways adjusting to singular living may involve less stress.

Personal Support

Mr. Hinckley's social interactions are limited to group therapy and a few acquaintances in the community. He is not romantically involved. His socialization has been further limited due to the pandemic and in light of his mother's health needs. As noted in our August 2020 letter to the Court, Mr. Hinckley is not a social person and will likely always struggle to establish and maintain social and intimate relationships. Nevertheless, the progress he has made in opening up, establishing honesty, and using his available supports to navigate difficult interpersonal situations indicate that his history of relationship instability is not a salient risk factor with regard to future dangerousness.

Stress or Coping

Mr. Hinckley's ability to manage stress has been one of the most relevant risk management factors that has been discussed, as his support network is so limited and due to his notoriety and likelihood of high-profile exposure. One of the goals of observing him with reduced court-mandated oversight was to note how he responded to potential stressors.

4

In the past year, Mr. Hinckley's mother has experienced a medical set-back, and currently is bed-ridden. Mr. Hinckley has been responsible for her activities of daily living, toiletry and nourishment. Recently, he started receiving help from his brother in assuming responsibility for her care. Although Mrs. Hinckley has long-term care insurance and is eligible for in-home nursing, Mr. Hinckley and his brother prefer to care for her, citing concerns over the increased risk for Covid-19 exposure, and their mother's expressed wishes. Mr. Hinckley has been "calm and collected," in light of his mother's decompensation, and he is able to discuss "more comfortably" about the eventual passing of his mother in that he feels "emotionally prepared," as much as one can be in a similar situation.

On October 29, 2020, tabloid online publisher TMZ obtained store security video of someone holding a rifle that was for sale. TMZ contacted Attorney Barry Levine, US District Court Judge Friedman Chambers, USAO, and Saint Elizabeths Hospital asking them to confirm the man in the video was Mr. Hinckley. All parties who viewed the photos and video acknowledged it did not look like him. Mr. Hinckley felt "annoyed" but was relieved and grateful that those involved in his case believed him. In mid-April 2021, two local newspaper articles discussed the motion Attorney Levine filed with the Court about requesting an UCR. Mr. Hinckley did not have any significant reaction to the media coverage, and it was "described as a fairly favorable write up." Mr. Hinckley has not been in contact with the media or engaged in political/social activist movements. He continues to express the wish of living a quiet life in the Williamsburg area. One notable discrepancy from this sentiment is his desire to be recognized as an artist under his own name. According to his DBH treatment team, Mr. Hinckley's wish in this regard is less about wanting public notoriety/fame, and more about being recognized as having successfully recovered from mental illness.

## Summary of Risk Assessment Findings[2]

In response to FOPD's request, Dr. Samantha Benesh evaluated Mr. Hinckley for the purposes of assessing his risk for violence in the context of Unconditional Release from his commitment to DBH. In her report, she noted that Mr. Hinckley plans to continue to reside in the Williamsburg area, maintain his business at the local antique mall, attend group therapy and take his current psychiatric medications. He does not plan to travel, particularly in light of the pandemic. He would like to discontinue music therapy, and either reduce or discontinue individual therapy, at the recommendation of his therapist, Mr. Beffa. He also expressed the desire to continue with group therapy, stating that he finds the feedback he receives to be helpful. Dr. Benesh noted that Mr. Hinckley could develop further in the area of socialization, but has made some improvements in this regard.

Dr. Benesh re-scored Mr. Hinckley on the Violence Risk Appraisal Guide, Revised (VRAG-R), on which she adjusted his risk score based on the past two years during which he has demonstrated offense-free time in the community. With this adjustment, she assessed Mr. Hinckley to fall with the lowest category of risk, (i.e., 6-16%). On a structured professional judgement tool of risk factors, the HCR-20V3, she assessed him to be at low range of risk for Future Violence, Serious Physical Harm, and Imminent Violence. Historical risk factors she noted as present included

---

[2] Please see Risk Assessment report by Samantha Benesh, Ph. D, ABPP, dated July 2, 2020.

Violence (high relevance), Relationship Instability, Employment Problems, Major Mental Disorders (high relevance), Personality Disorder, and Treatment Response. She did not note the presence of any current clinical risk factors. She noted that future risk management concerns included issues related to his living situation and personal support, neither of which were rated as highly relevant.

Dr. Benesh noted that, in assessing Mr. Hinckley's suitability for Unconditional Release, she specifically evaluated the impact of the removal of the 30 conditions detailed in his November 2018 Consent Order, on his violence risk. In reviewing these conditions[3], Dr. Benesh's overall opinion was that, in light of Mr. Hinckley's successful community integration and clinical stability, that he no longer requires the level of care currently provided by his treatment team and required by his Court order. In the short term, changes to his treatment that he will likely implement (in the absence of a Court order requiring it), will include 1) discontinuing music therapy; 2) decreasing individual therapy; and 3) transitioning his psychiatric medication to a primary care physician in the near future. Dr. Benesh opined that Mr. Hinckley's risk of danger to self or others would not increase as a result of removal of Court oversight, and her risk assessment was in support of his Unconditional Release.

## DBH Recommendation

On May 5, 2021, the Outpatient Forensic Review Board (OFRB), chaired by the undersigned, convened to discuss Mr. Hinckley's progress since he was granted his most recent conditional release, and in anticipation of the status hearing set in his case for June 3, 2021. The purpose of the OFRB meeting was to ascertain whether there were any adverse events that occurred as a result of the removal of substantial conditions to his conditional release, and to make any further recommendations in Mr. Hinckley's case. Within this discussion, the fact that Mr. Hinckley has not been transitioned to his new providers was noted as a concern, inasmuch that such a transition could contribute to increased risk for psychiatric decompensation. However, it was also discussed that Mr. Hinckley has transitioned to new providers before (i.e., when he transitioned from inpatient to outpatient status), and that the gradual plan for transition put forth by his Williamsburg treatment team will serve to cushion against any abrupt change. In this way, although it was suggested that an additional period of observation may be helpful, it was also noted that such an additional period would be arbitrary in light of Mr. Hinckley's stable, long-term psychiatric status. While any number of events could contribute to increased stress for Mr. Hinckley (i.e., the death of his mother, the retirement of one of his core treatment team members, negative media exposure), he has shown time and time again, the ability to work with his treatment providers to manage these stressors without any evidence of psychiatric deterioration or aggressive behavior. Within this framework, the OFRB accepted the Williamsburg treatment teams' expressed transition plan as a reasonable one.

In summary, consistent with our August 2020 letter to the Court, it is the opinion of DBH that Mr. Hinckley no longer meets the criteria for commitment to the Department of Behavioral Health under Title 24, Section 501(d)(1) of the D.C. Code. The OFRB relies on the underlying rationale of Dr. Benesh's risk assessment and the Treatment Team/FOPD's recommendation in opining that Mr. Hinckley is entitled to an Unconditional Release from his commitment to DBH, as he has

---

[3] Pages 24-32 of the Risk Assessment

sufficiently recovered his sanity and will not in the reasonable future be dangerous to himself or others due to mental illness. In making this determination, the OFRB considered Mr. Hinckley's risk factors individually, as well as the interaction of these risk factors. Over the past six months, Mr. Hinckley has maintained his psychiatric and behavioral stability while still choosing those therapeutic services that are helpful to the maintenance of his psychiatric well-being. In this way, Mr. Hinckley has shown intrinsic motivation and investment in his current level of support and psychiatric care. The additional extrinsic factor of DBH/Court oversight does not add incremental value to the maintenance of Mr. Hinckley's psychiatric status.

If you have any questions regarding this letter, or should testimony on behalf of DBH in this matter be required, Dr. Shilpa Krishnan may be contacted at (202) 815-0991 or shilpa.krishnan@dc.gov.

Respectfully,

Shilpa Krishnan, Ph.D.
Deputy Director, Forensic Services Division

cc:
Clerk, Criminal Division
United States District Court for the District of Columbia
3rd and Constitution Avenue, N.W., Room 1225
Washington, DC 20001

Kacie Weston, Esq.
Assistant United States Attorney
Judiciary Center
555 4th Street, N.W., Room 10-451
Washington, D.C. 20530

Barry Levine, Esq.
Blank Rome LLP
1825 Eye Street, N.W.
Washington, D.C. 20006-5403

7

**MITCHELL H. HUGONNET, PH.D.**
CLINICAL, FORENSIC & NEUROPSYCHOLOGY
**4405 EAST-WEST HIGHWAY**
**SUITE 312**
**BETHESDA, MD 20814 - 4585**
EMAIL: FORENSIC.CONSULTATION@GMAIL.COM
MOBILE: 202.246.4846
LICENSED IN DC, MD, VA

September 2, 2021

United States Attorney for the District of Columbia
Judiciary Center Building
555 4th Street, N.W.
Washington, DC 20530

Re:  *United States v. John W. Hinckley, Jr.*, Case No. 1981- CR- 306 (PLF)

Introduction:

John W. Hinckley, Jr. shot President Ronald Reagan and others in a thwarted assassination attempt
outside the Washington Hilton Hotel, on March 30, 1981. The bullets struck the President, Press
Secretary James Brady, Secret Service Agent Timothy McCarthy, and Metropolitan Police Officer (MPD)
Thomas Delahanty. Mr. Hinckley was adjudicated Not Guilty by Reason of Insanity (NGBRI), by jury
trial, on June 21, 1982. The jury verdict found Mr. Hinckley NGBRI with respect to four counts of
attempted murder, four counts of criminal possession of a weapon, and four counts of possession of a
prohibited weapon. The next day, on June 22, 1982, Mr. Hinckley began a 34-year forensic inpatient
commitment to the John Howard Pavilion (JHP), Saint Elizabeths Hospital's (SEH) forensic inpatient
services division. On July 27, 2016, the Court granted Mr. Hinckley convalescent leave from JHP. Mr.
Hinckley was discharged from inpatient care at St. Elizabeths JHP on September 10, 2016. Mr. Hinckley
remains on convalescent leave; Mr. Hinckley is requesting an unconditional release from the Court. Judge
Paul L. Friedman has scheduled a hearing on this matter in U.S. District Court on September 27, 2021.

I was again retained by the Office of the U.S. Attorney to independently review John W. Hinckley's
mental condition and risk of dangerousness, in response to Mr. Hinckley's motion through counsel for
unconditional release from convalescent leave. The interested reader may wish to review my original
forensic report dated October 22, 2018. U.S. District Court Judge Paul L. Friedman signed the order
approving the government's motion to retain this psychologist on May 6, 2021:

> ORDERED that Dr. Mitchell Hugonnet, may conduct such examination of John
> W. Hinckley, as he deems appropriate, in order to determine Mr. Hinckley's
> present mental condition and risk of dangerousness, if any, if unconditionally
> released from his commitment.

Mr. Hinckley's social history, and extensive 39 year legal and mental health history are well documented
in the voluminous material I reviewed and referenced in my original 2018 report. In preparation for this
2021 update report, I reviewed additional material listed below. Please refer to these reports and records
for this information.

The DBH Outpatient Forensic Review Board (OFRB), chaired by Shilpa Krishnan, Ph.D. Deputy Director, Forensic Services Division, issued a UCR (unconditional release report) on May 10, 2021, regarding unconditional release from convalescent leave for Mr. Hinckley. (Mr. Hinckley was discharged from St. Elizabeths Hospital's forensic inpatient service to full-time conditional convalescent leave on September 10, 2016, pursuant to the court order of July 27, 2016). The *italics* in the block quote below are mine; these passages are not italicized in the original document. *These italicized passages specify established time periods, 6 to 12 months, deemed clinically necessary by DBH to monitor and evaluate the potential behavioral and emotional effects resulting from changes in Mr. Hinckley's activities and treatment regimen.* (NB: Conditions 4 and 6 will end permanently within 4 to 5 months from the date of this report –this is explained below).

> In summary, consistent with our August 2020 letter to the Court, it is the opinion of DBH that Mr. Hinckley no longer meets the criteria for commitment to the Department of Behavioral Health under Title 24, Section 501(d)(1) of the D.C. Code. The OFRB relies on the underlying rationale of Dr. Benesh's risk assessment (NB: see below) and the Treatment Team/FOPD's recommendation in opining that Mr. Hinckley is entitled to an Unconditional Release from his commitment to DBH, as he has sufficiently recovered his sanity and will not in the reasonable future be dangerous to himself or others due to mental illness. In making this determination, the OFRB considered Mr. Hinckley's risk factors individually, as well as the interaction of these risk factors. *Over the past six months, Mr. Hinckley has maintained his psychiatric and behavioral stability* while still choosing those therapeutic services that are helpful to the maintenance of his psychiatric well-being. In this way, Mr. Hinckley has shown intrinsic motivation and investment in his current level of support and psychiatric care. The additional extrinsic factor of DBH/Court oversight does not add incremental value to the maintenance of Mr. Hinckley's psychiatric status (p. 7).

> Reference is made to our August 21, 2020, letter to the Court, in which we recommended that Mr. Hinckley be granted a self-executing Unconditional Release. Specifically, while it was the opinion of DBH that Mr. Hinckley no longer meets the criteria for commitment to the Department of Behavioral Health under Title 24, Section 501(d)(1) of the D.C. Code, *we recommended a period of 6-12 months whereby DBH would retain limited oversight of Mr. Hinckley, while changes to his treatment were made.* These changes would be dictated by a collaborative decision-making process between Mr. Hinckley and his treatment team. Subsequently, on October 29, 2020, Mr. Hinckley received a modified consent order that allowed for the following: 1) Mr. Hinckley may reside independently or with a roommate; 2) Case management will be provided by Mr. Jonathan Weiss, as often as clinically indicated; 3) Dr. Giorgi-Guarnieri will provide psychiatric treatment for Mr. Hinckley, but has the discretion to transition him to an alternate community provider; 4) Mr. Carl Beffa will continue to provide individual and group therapy to Mr. Hinckley, as often as clinically indicated; 5) Mr. Hinckley may display, under his own name, without restriction, his artwork and music; 6) The Williamsburg treatment team and FOPD shall continue to identify alternative treatment providers in the Williamsburg area in order to facilitate Mr. Hinckley's transition to new providers when the current team members retire or leave the area; 7) A status hearing will be set for (7) months from the issuance of this order, at which the government shall inform the Court of their position with respect to any DBH recommendations and whether they intend to seek an independent evaluation of

Mr. Hinckley. It was further ordered that a status update be submitted prior to the Court date, in which DBH would inform the Court of their position regarding his unconditional release from commitment (pp. 1-2).

The OFRB's (Outpatient Forensic Review Board) May 10, 2021, report referenced and partially relied upon the Violence Risk Assessment Update, dated July 2, 2020, authored by Samantha M. Benesh, Psy.D., ABPP; this risk assessment was conducted under the auspices of the DC Department of Behavioral Health. The *italics* in the block quote below are mine; these passages are not italicized in the original document. These italicized passages specify this analysis of risk factors inherent in prolonged social isolation potentially instigating undesirable emotional and behavioral changes in Mr. Hinckley's long standing mental stability.

> Conclusions and Risk Management Recommendations
> Mr. Hinckley's *potential to act out violently is primarily associated with prolonged social isolation, major depressive episodes and psychosis marked by grandiose delusions*. It remains my opinion, in concordance with my last risk assessment, that he is at low risk for another psychotic episode due to the fact that *onset would follow a lengthy period of social isolation concomitant with other depressive symptoms*, which have been in remission for over three decades. Mr. Hinckley's scores on actuarial and structured professional judgment risk tools suggest there is a low likelihood he will re-offend with a violent crime over the short and long term. Furthermore, it is expected that his level of risk will continue to decrease with time in light of his psychiatric stability, significant improvements in his insight and judgment, and his excellent adjustment to residing in the community over the past four years. Given these factors, it is my opinion that Mr. Hinckley will not pose a danger to himself or others if he is granted unconditional release from the court (p. 24).

Executive Summary:

John W. Hinckley, Jr. is a 66-year-old man (DOB: May 29, 1955), presently residing in Williamsburg, Virginia. Prior to his mother's recent death on July 30, 2021, Mr. Hinckley had been living in the Hinckley family home with his mother, the late JoAnn Hinckley, and older brother Scott Hinckley, since moving to Williamsburg in 2016. Since his mother's death, Mr. Hinckley has been in the process of moving out of the family residence; at the time of this report, Mr. Hinckley is living alone with his cat, in a one bedroom apartment he rented and furnished during the spring of 2021. This is the first time that Mr. Hinckley has lived alone since before his arrest 40 years ago.

Mr. Hinckley remains under the supervision of the District of Columbia Department of Behavioral Health (DBH) Forensic Outpatient Department (FOPD); since the onset of Covid pandemic restrictions in March 2020, Mr. Hinckley and Chad Tillbrook, Ph.D. meet once monthly via 30-45 minute telephonic/Skype/Zoom session. Mr. Hinckley has occasionally supplemented these scheduled sessions with optional brief telephone calls, typically to provide Dr. Tillbrook with timely updates or to seek support from Dr. Tillbrook. Both report that this arrangement has been working exceptionally well; these sessions are more therapeutic than administrative in nature. (NB: Mr. Hinckley's prior meetings with Dr. Johnson, while satisfactory, appeared to be more administrative in nature). In Williamsburg, Mr. Hinckley continues in active treatment with an experienced multidisciplinary private treatment team; Mr. Hinckley holds all members of his treatment team in very high regard. The treatment team is presently comprised of psychiatrist Deborah Giorgi-Guarnieri, MD (Dr. G-G), group therapist Carl Beffa, LCSW, and case manager Jonathan Weiss, LCSW. Mr. Hinckley has worked with Dr. G-G, Mr. Weiss, and Mr. Beffa for nearly 5 years, shortly after moving into the family residence in Williamsburg.

The consensus of the Virginia treatment team and the DC DBH Director of Forensic Services, Chad Tillbrook, Ph.D. is that Mr. Hinckley's progress in treatment and personal growth has been consistent and sustained, with excellent prognosis. Throughout, Mr. Hinckley's mental status has remained stable, asymptomatic and within normal ranges across multiple emotional and behavioral domains, even as stresses increased due to the severe illnesses of both his mother and older brother. Mr. Hinckley consistently rose to the meet the many medical and administrative challenges inherent in caring and advocating for his mother and brother.  Mr. Hinckley has functioned as the case manager and de facto head of the household during the last three years caring for and supporting his mother and brother in coordinating and implementing logistically complicated treatments, including outpatient medical appointments, and deciding upon inpatient hospital care.

All of Mr. Hinckley's current treating professionals in Williamsburg and Washington, DC consider Mr. Hinckley to be at low risk for psychological decompensation and all members of the treatment team consider Mr. Hinckley at low risk for harming others. Mr. Hinckley's treatment providers have consistently documented that Mr. Hinckley has virtually no interest whatsoever in politics, politicians, the movie industry, specific movie stars, violent movies, or violent television programs. Mr. Hinckley has no interest in firearms; since his arrest Mr. Hinckley has never attempted to procure firearms or weapons of any kind. Mr. Hinckley does not drink alcohol or use illegal drugs. There is no indication that Mr. Hinckley has aberrant sexual interests. Mr. Hinckley's dating history in Williamsburg has been limited; he demonstrated excellent judgement when he terminated two short term relationships, maintaining decorum and appropriate, respectful behavior towards these women throughout the course of both relationships. Mr. Hinckley has no history of physically or verbally aggressive behavior since his arrest. Throughout Mr. Hinckley's treatment in Williamsburg, there have been no documented red flag incidents putting Mr. Hinckley's mental health or public safety at risk.

During multiple interviews with this psychologist in 2018 and 2021, Mr. Hinckley has always been cooperative, polite, responsive, forthcoming, and thoughtful. His thinking has always been on point, goal directed with logical progression and flow. Mr. Hinckley presents as a calm, low-key and unflappable man of late middle age. His mood is typically subdued; his affect is limited in range yet responsive to changes in the content and flow of reciprocal conversation. Mr. Hinckley has a dry, wry sense of humor; he understands conversational nuances and his facial expressions are congruent with the topics being discussed.  There was absolutely no evidence of major psychiatric symptoms such as delusions, hallucinations, loose associations, or other derailments in thinking. There is no documented evidence for suicidal or homicidal thinking at any time throughout Mr. Hinckley's full time convalescent leave in the Williamsburg community.

Collateral interviews and the outpatient treatment record are replete with examples of Mr. Hinckley's organized, responsible behavior, as well as his acts of consideration and kindness towards his family, members of his therapy group, treatment providers and fellow merchants. These interviews and the record documented Mr. Hinckley's ability to engage in rational decision making and his ability to recognize when to consult other people to help him think through his deliberations. This was especially evident recently when Rolling Stone Magazine sought to interview him about his You Tube music postings and musical interests. Despite experiencing some degree of temptation from the lure of an interview with the most hallowed, storied music publication of his generation, Mr. Hinckley sought the advice of his treatment team and therapy group before deciding to decline the invitation; instead, he referred the matter to his attorney. For the most part Mr. Hinckley strives to avoid the media entirely and his efforts have usually been successful. Mr. Hinckley's life-long interest in listening to music, playing his guitar, and writing songs has been life enhancing and his natural antidote for keeping his depressive mood in check. This has been especially obvious during the latter years of his community convalescence, encouraged by his former music therapist and his pride in working on his musical craft via audio recording and You

Tube. Mr. Hinckley's efforts to connect with other musicians have been intermittently successful; he has coped with rejections and disappointments gracefully and remains motivated to find other musicians to practice with in a band setting. Mr. Hinckley's musical tastes and offerings are vintage 1960's folk/rock and roll that are typically upbeat, optimistic, romantic or thoughtful; Mr. Hinckley explicitly eschews heavy metal and other dark genres of rock music.

As my prior report indicated, Dr. Sidney Binks was Mr. Hinckley's inpatient individual therapist at St. Elizabeths since 1998, for approximately 19 years; Dr. Binks terminated psychotherapy with Mr. Hinckley on March 22, 2017, after Mr. Hinckley had moved to Williamsburg, Virginia. Dr. Binks's termination note contained a sole diagnosis of Major Depressive Disorder, with psychosis, in remission. Dr. Binks (in agreement with other prior and contemporaneous evaluators) noted that Mr. Hinckley never suffered a recurrence of psychosis or Major Depressive Disorder during the 19 years Dr. Binks had direct knowledge of Mr. Hinckley. Dr. Binks believes that Mr. Hinckley's risk for future violence will be "*entirely dependent*" on *whether* Mr. Hinckley becomes "*severely depressed, with no treatment, for a long time.*" Other risk assessors, (Drs. Carpenter and Murphy), had already put forth similar opinions that were consistent with Dr. Binks' March 2017 termination note. Most evaluators and clinicians have cited social isolation as a contributing factor in Mr. Hinckley's mental decompensation leading to psychotic depression and violence in the early 1980's. Dr. Binks did not opine about the potential effects of future social isolation with respect to Mr. Hinckley's vulnerability to severe depression.

Beginning with his mother's death on July 30, 2021, significant changes in Mr. Hinckley's life structure started to accelerate. Mr. Hinckley now lives alone in his own apartment, as planned, with the full endorsement and support of his treatment team. Mr. Hinckley reports that his old cat Theo is slowly adjusting to the new apartment. There are no plans for Mr. Hinckley to live with his brother Scott, this plan was under active consideration three years ago; ████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████.

Mr. Hinckley's primary social support network and sole psychotherapy is the weekly group therapy run by seasoned psychotherapist Carl Beffa, LCSW. Unfortunately, Mr. Hinckley's group therapy will end no later than December 2021 or January 2022, with Mr. Beffa's retirement. Furthermore, there are no other therapy groups in the Williamsburg/Newport News/Hampton Roads area. Both Mr. Beffa and case manager Jonathan Weiss, LCSW confirmed this fact; there are no community service boards (such as Colonial Behavioral Health) or private practices that offer psychotherapy groups. Simply put, after Mr. Beffa's retirement, this essential mental health service – group psychotherapy - will not be available.

These changes, living alone without the accustomed support of family and especially the members of his long-standing therapy group, in tandem, will likely increase Mr. Hinckley's social isolation significantly. Mr. Hinckley will be living alone without the weekly social and therapeutic support of his outpatient therapy group. (NB: The group is comprised of 10 patients and one therapist, Mr. Beffa. While Mr. Hinckley has the longest tenure in the group, many members of this group have regularly attended for many years). This is a cohesive and highly functioning outpatient psychotherapy group of productive, active people, 5 men and 5 women, who have been interdependent upon each other for support and personal growth for many years. The psychological effects of permanently losing this therapy group cannot be determined with certainty at this time. This uncertainty is compounded by the social isolation inherent in living alone, after many years of living with close family members, and after decades of living in a fully staffed structured inpatient treatment setting.

Mr. Hinckley's risk for depression may increase due to the likely effects of increased social isolation. Mr. Hinckley will be especially vulnerable emotionally after his group therapy ends. I discussed this with Mr. Hinckley, while referencing his already documented decision to *not* restart his business at the antique mall. Mr. Hinckley came to understand that his plan to stay in his apartment to pursue his music career

full-time would result in near total social isolation. Mr. Hinckley agreed that restarting his business at the antique mall could forestall such drastic social isolation; Mr. Hinckley promised to reconsider his decision and discuss restarting his business with members of his therapy group and treatment team. Mr. Hinckley delivered on his promise: Dr. Tillbrook, Mr. Beffa and Mr. Weiss confirmed having recent conversations with Mr. Hinckley about the benefits of restarting the business. Shortly thereafter, Mr. Hinckley informed me that he had decided to restart his business and quickly procured the last available display case at the antique mall, while putting himself on a waiting list for renting the larger booth he had before covid shut his business down. In so doing, Mr. Hinckley demonstrated in real time, his well-documented ability to effectively use his therapy group and treatment team to responsibly reconsider and recalibrate his plans for his unfolding new life, born in the wake of his mother's recent death and upcoming termination of his therapy group by year's end. His resilience and adaptability bode very well for his ability to adjust to these and other life changes within a reasonably short period of time. Mr. Hinckley's friendship with other merchants in the antique mall will likely serve as stabilizing social ballast after group therapy terminates at the end of this year, 2021. Mr. Hinckley reported, and Mr. Weiss has observed, how welcoming and demonstrative Mr. Hinckley's fellow merchants have been towards Mr. Hinckley when he returned to the mall. He returned in full bore fashion - daily, including weekends - in the process of rapidly restarting his business. Despite mourning his mother's death, Mr. Hinckley remains focused, goal-directed and energized in a very constructive fashion.

There are significant foundational elements in Mr. Hinckley's life that will not change. Mr. Hinckley affirmed, and Dr. G-G confirmed, that his monthly psychiatric treatment will continue indefinitely. Unlike three years ago, when Dr. G-G was considering ending her private practice, this is no longer the case; Dr. G-G plans to continue her private psychiatric practice for many years to come.

This continuity of continuing psychiatric treatment with his trusted and skilled psychiatrist ensures that the risk of psychosis remains low despite the looming risk inherent in Mr. Hinckley's newfound social isolation; as such, it follows that risk of violence would likely remain especially low and unlikely. Risk of violence is the last and least probable link in a four or five link chain of environmental, emotional, and behavioral events and conditions. Several other conditions must be in effect before risk of violence becomes remotely possible.

Mr. Hinckley's emotional stability, reliability, independent desire to continue in treatment, intact executive functioning, degree of insight, and Dr. G-G's availability ensure that important elements of Mr. Hinckley's treatment plan will remain in effect, despite the major life changes resulting from losing his mother, living alone and the loss of his therapy group. Mr. Weiss affirmed his continuing availability through the end of 2022; for years Mr. Weiss and Mr. Hinckley have met several times a month, both in person and by telephonic means. Mr. Weiss's case management function has evolved and expanded into the realm of professional mentorship and friendship which will continue to support and benefit Mr. Hinckley, despite the end of all formal psychotherapy in four months.

Mr. Hinckley's entire treatment team expressed confidence that Mr. Hinckley will be able to successfully adjust to these major changes in the structure of his life over the course of next year, while expressing concern about potential instability from social isolation. The treatment team believes Mr. Hinckley's long-term prognosis remains excellent, even though his life will enter relatively uncharted and lonely waters by the end of 2021.

Mr. Hinckley's voluminous case records document his behavior over four decades across a vast array of settings and conditions – with one significant exception. This information remains valuable for treatment planning, including consideration of unconditional release from all legally mandated treatment and other associated requirements. Significantly, this record contains no information derived from the direct observation, assessment, and documentation of Mr. Hinckley's adjustment to the new and to some degree

unprecedented conditions of life alone, free from mandated programming, that will confront and challenge him beginning soon, in January 2022. Until now it has not been possible to gather such essential life data and clinical information directly assessing Mr. Hinckley's behavior and emotional adjustment under conditions of fully independent living. This would include living alone in his apartment, not being involved in any kind of formal psychotherapy, and not being required to continue psychiatric treatment. Mr. Hinckley will no longer be able to rely upon the support and counsel of his therapy group, which includes Mr. Beffa who also functioned as Mr. Hinckley's weekly individual therapist for many years. Ominously, before our forensic interviews, Mr. Hinckley had already decided *not* to reopen his antique business in the mall, preferring to work on his music full-time.

For the first time in decades, Mr. Hinckley will be able to travel freely; the post-pandemic world will finally become wide open and accessible to Mr. Hinckley at this late stage of his life. There are inherent joys and stresses associated with long distance travel, but Mr. Hinckley forever has the added burden of public notoriety which may add another layer of stress and unpredictability during his free travels. By and large Mr. Hinckley is practiced and capable of properly handling unwanted or unavoidable social intrusions or  interactions with unknown strangers who may recognize and choose to confront him in an unfriendly manner. These occasional awkward or tense public interactions typically occurred close to home, within Mr. Hinckley's familiar social environment, containing reassuring social supports and knowledge of local customs and ways to remain unassuming or invisible.  On the other hand, these safety factors may be absent or inaccessible during travel to new and unfamiliar destinations. Mr. Hinckley's emotional tolerances for the vicissitudes of long distance travel are largely unknown. I have encouraged Mr. Hinckley to undertake long distance travel as soon as possible to enhance his life while learning how to travel safely.

I expect Mr. Hinckley will continue to need some degree of professional support from Dr. Tillbrook and Mr. Weiss, as psychological treatment continues to wind down, throughout this period of adjustment to his new independent life during 2022. Mr. Hinckley is committed to remaining in psychiatric treatment and taking medication for the rest of his life.  Furthermore, Mr. Hinckley finally appreciates and understands the essential nature of his daily mall activities for maintaining both his mental health and his lucrative business at the antique mall. Mr. Hinckley's original decision to  permanently end and not restart his business, would have been a colossal mistake, depriving him of income, structure and goal directed activities; most concerning would have been the loss of connection with other people resulting in near total social isolation – a major risk factor for Mr. Hinckley. By changing his mind and deciding to reopen his business, Mr. Hinckley is preserving and  ensuring opportunities for continued development of meaningful interpersonal relationships acquired over the past three years with fellow merchants, mall customers and suppliers at various antique shops throughout the region.  Mr. Hinckley's mood and confidence have been bolstered by the success of this business and his credited musical compositions and performances on You Tube. While most of the feedback on You Tube is positive, occasional negative feedback is ignored or accepted with equanimity by Mr. Hinckley.

*DSM-5 Diagnoses:*
296.36 Major Depressive Disorder, Recurrent, In Full Remission
298.8 Other Specified Schizophrenia Spectrum and Other Psychotic Disorders
301.81 Narcissistic Personality Disorder
301.20 Schizoid Personality Disorder, premorbid

*Medications:*
Zoloft 125mg AM & 25mg PM
Risperdal 1mg AM

Interviews:

- Forensic Interviews and Psychological Assessment:
    - ○ Forensic Clinical Interviews of Mr. Hinckley via telephone and Skype: June 16, July 12, 17, 25 and August 14, 2021, lasting approximately 5.6 hours.
    - ○ Psychological Assessment of Mr. Hinckley:
        - ▪ Personality Assessment Inventory Plus (PAI), administered on July 13, 2021.
        - ▪ Minnesota Multiphasic Personality Inventory, second edition, (MMPI-2), administered on July 14, 2021.
        - ▪ Minnesota Multiphasic Personality Inventory-2, Restructured Form (MMPI-2 RF), administered on July 14, 2021.
        - ▪ Minnesota Multiphasic Personality Inventory, third edition, (MMPI-3), administered on July 16, 2021.
- Collateral Interviews:
    - ○ Telephone interviews with DC Department of Behavioral Health:
        - ▪ Chad Tillbrook, Ph.D., Director, Forensic Services Division, July 28, 2021, 1.0 hour.
        - ▪ Shilpa Krishnan, Ph.D., Deputy Director, Forensic Services Division, July 29, 2021, 0.8 hour.
    - ○ Telephone interviews with members of Mr. Hinckley's treatment team in Williamsburg, Virginia:
        - ▪ Carl Beffa, LCSW, Group Therapist, August 25, 2021, 1.0 hour.
        - ▪ Deborah Giorgi-Guanari, MD, Psychiatrist, August 26 & 27, 2021, 1.7 hours.
        - ▪ Jonathan Weiss, LCSW, Case Manager, August 27, 2021, 1.5 hours.
    - ○ Consultation with Sidney Binks, Ph.D., former John Howard Pavilion inpatient therapist, July 13, 2021, 0.3 hour.

Documents/Media Reviewed:

Court Orders by The Honorable Paul L. Friedman, 2018 – 2021.

*DBH/FOPD/Williamsburg Treatment Records*:

- Chad Tillbrook, Ph.D., et al., DBH monthly progress note summaries, 2019 – 2021.
- DBH/OFRB records, 2020 – 2021.
- Shilpa Krishnan, Ph.D. Deputy Director, Forensic Services Division, OFRB UCR report, May 10, 2021.
- Violence Risk Assessments, Samantha M. Benesh, Psy.D., ABPP, July 27, 2018 & July 2, 2020.
- Williamsburg Treatment Team, monthly progress notes by Jonathan Weiss, LCSW, Carl Beffa, LCSW, Deborah Giorgi-Guarnieri, MD, 2019 – 2021.
- John Hinckley, Handwritten Daily Activity Logs, 2019 – 2021.

*Media*:

- Mr. Hinckley's You Tube channel
- Mr. Hinckley's email and browser history

Disclosure of Limited Confidentiality and Interview Parameters:

All interviews conducted telephonically or virtually due to the Covid-19 pandemic. Psychological tests were administered within secure systems provided by the test publishers. Prior to each interview, all were advised of the parameters of the interview and limits of confidentiality: All verbalized consent to be interviewed.

Psychological Testing:

As referenced above, I administered four psychological tests to Mr. Hinckley on July 13, 14 & 16, 2021. These tests are broad band measures of psychopathology typically used in forensic settings and used in prior risk assessments by clinicians at the St. Elizabeths Hospital and the John Howard Pavilion. Consistent with the psychological testing I administered in 2018, there were *no indications of psychopathology in the present testing*; results were within normal ranges *across all four tests*. The primary domains of interest with respect to Mr. Hinckley's risk of mental decompensation, risk of dangerous behavior, degree of depression, degree of social isolation, presence of significant narcissism or antisocial attitudes, *none* of these domains were significantly elevated.

Not only were Mr. Hinckley's psychological test results remarkably consistent with each other, these test results were comparable to results from the psychological testing administered by St. Elizabeths Hospital/John Howard Pavilion over the past 20 years that had reflected clinical improvement over time. Tracing Mr. Hinckley's psychological test results over 35 plus years, the graphed results steadily move downward, into normal ranges, over the decades; Mr. Hinckley's early psychological testing profiles were highly elevated due to his severe mental illness. Over years of continuous inpatient treatment, as his mental health and behavioral stability improved, the test profiles begin dropping from high ranges of severe psychopathology in the 1980's and 1990's, into low range, normal profiles evident over the past 20 years.

These normal range test results, over the past twenty years, accurately reflect the successful treatment of Mr. Hinckley's mental illness and his post-illness mental and behavioral stability reflected in decades of unremarkable entries in Mr. Hinckley's inpatient and outpatient records, by multidisciplinary treatment providers over two decades. Furthermore, Mr. Hinckley's normative psychological test results in both 2018 and 2021 were consistently confirmed by my collateral interviews with Mr. Hinckley's entire treatment team, in both Williamsburg, Virginia and Washington DC, interviewed in 2018 and again in 2021.

Results of Violence Risk Instruments:

Both Violence Risk Assessments by Samantha M. Benesh, Psy.D., ABPP, done on behalf of and under the auspices of the Department of Behavioral Health on July 27, 2018, and July 2, 2020, employed two methods to assess Mr. Hinckley's risk of future violence. The HCR-20 Version 3, a structured professional judgment instrument, is widely used in violence risk assessment. I reviewed Dr. Benesh's ratings for all items on HCR-20 Version 3; I concur with the ratings and consequent conclusion that Mr. Hinckley is at *low risk for future violence*. The VRAG-R, an actuarial method of evaluating risk of future violence, was scored properly and placed Mr. Hinckley in the *second lowest of nine risk categories*. St. Elizabeths Psychologist Dr. Katherine Murphy's *VRAG results in 2015, were identical*, placing Mr. Hinckley in the second lowest risk of re-offense category.

Forensic Qualifications:

I have practiced forensic psychology since 1988 in a variety of evaluation and treatment settings. Over the course of two (2) years, 1983 – 1985, I completed an APA internship and residency in clinical psychology under the auspices of the clinical division of the National Institute of Mental Health (NIMH), St. Elizabeths Hospital (SEH) in the forensic inpatient division, John Howard Pavilion (JHP). I directed the St. Elizabeths -JHP-9 forensic inpatient pre-trial evaluation and treatment unit for 14 years. I personally conducted pre- and post-trial forensic assessments involving competence to stand trial (CST), criminal responsibility (insanity), competency to waive the insanity defense (Frendak), Miranda rights waivers, sexual and violence risk assessments, and eligibility for civil commitment.

For 18 years, I have been a supervisory forensic psychologist at the Child Guidance Clinic of the Superior Court of the District of Columbia; I served as the Director of Internship Training at the Clinic for nine years. The Clinic conducts forensic evaluations and provides specialized treatment, including risk

management, for adolescents in Washington, DC's juvenile justice system. These court-ordered evaluations include competence to stand trial (CST), competency to waive Miranda rights, juvenile transfer to adult court, assessment of violence and sex offense risk, neuropsychological, psychological, and psycho-educational assessments, both pre- and post-disposition. I designed and direct two specialized forensic programs at the DC Superior Court, the juvenile trial competency attainment training program (CAT) and the SAVE (Sexual Abuse Violates Everyone) assessment and treatment program for adjudicated juveniles with sex offenses.

In my private practice with adult forensic cases, I have always qualified as an expert witness in forensic psychology in the U.S. District Court in Maryland, Virginia and Washington, DC, state and county courts in Maryland, Virginia, Washington, DC, and New Jersey. I have been retained by private law firms, the Office of United States Attorney in Maryland, New Jersey and Washington, DC and the Public Defender Service in Washington, DC, and Virginia.

I completed training in juvenile and adult forensic assessment at the University of Virginia's Institute of Law, Psychiatry & Public Policy (ILPPP). I am certified in Virginia to conduct juvenile and adult forensic assessments, including specialized sex offense evaluations. I completed post-doctoral training in clinical neuropsychology at the Fielding Graduate University under the supervision of Dr. Allan F. Mirsky. I earned my Ph.D. in Clinical Psychology from American University, Washington, DC, in 1986 and an A.B. with Honors from Vassar College in 1975.

### Forensic Opinion:

Mr. Hinckley has requested an unconditional release from convalescent leave; a hearing on this matter is scheduled before Judge Paul L. Friedman in U.S. District Court on September 27, 2021.

In recognition of the nature, magnitude, and permanence of these multiple and simultaneous changes in Mr. Hinckley's life, with no hard behavioral data available documenting Mr. Hinckley's successful adaptation to his radically changed life circumstances, I cannot support Mr. Hinckley's request for an unconditional release at this time. Such release would be premature, relying upon conjecture instead of real-life clinical and behavioral data properly documented in the clinical case record. This deficiency is easily remedied by continuing to monitor and document Mr. Hinckley's emotional and behavioral adjustment through June 30, 2022. Dr. Tillbrook and Dr. G-G would maintain once a month psychological and psychiatric treatment sessions with Mr. Hinckley, while Mr. Weiss would meet with Mr. Hinckley at least once a month for case management support. Monthly progress notes would be submitted to DBH and the Court as before.

Despite increased freedom and significant reduction in therapeutic and social supports, I am anticipating Mr. Hinckley's successful adjustment to these major changes in his life. Furthermore, Mr. Hinckley deserves the opportunity to fully demonstrate and document his adjustment while he is coping with significantly reduced treatment resources and new challenges inherent in the reconfigured structure of his life. Consequently, this process will provide the Court with necessary empirical information to build the most solid factual foundation for confidently granting Mr. Hinckley's request for unconditional release from convalescent leave, shortly after this final monitoring period ends on June 30, 2022.

My opinion is consistent with guidance contained in the above referenced May 10, 2021, Outpatient Forensic Review Board (OFRB) letter authored by the Deputy Director of the Forensic Services Division, Shilpa Krishnan, Ph.D. During my interview with Dr. Krishnan on July 29, 2021, she reaffirmed that the recent May 10, 2021, letter represented the current position of DBH with respect to Mr. Hinckley's treatment needs and his request for unconditional release from convalescent leave: "Reference is made to our August 21, 2020, letter to the Court....Specifically, while it was the opinion of DBH that Mr. Hinckley no longer meets the criteria for commitment to the Department of Behavioral Health,....we

*recommended a period of 6-12 months whereby DBH would retain limited oversight of Mr. Hinckley, while changes to his treatment were made.* These changes would be dictated by a collaborative decision-making process between Mr. Hinckley and his treatment team (p, 7)."

This report is based on information obtained from multiple sources. It is believed that all information contained herein is accurate and provides an adequate basis to form both clinical and forensic opinions. However, if the information is later found to be substantially inaccurate or should additional relevant information become available, such information may require a review of and/or an amendment of the opinions stated herein.

The opinions and conclusions contained in this report are offered within a degree of reasonable psychological certainty. I am available to testify about the findings in this report.


Sincerely,


Mitchell H. Hugonnet, Ph.D.
Licensed Psychologist

# Benesh & Yeaw Consulting LLC

15912 Crain Highway, Unit B #430 • Brandywine, Maryland 20613
Phone: 202-868-6806 • Fax: 202-417-3948 • forensicpsych@beneshyeaw.com

September 16, 2021

Director, Forensic Services Division
Department of Behavioral Health
35 K Street, NE
Washington, DC 20002

RE: Addendum to July 2, 2020 Violence Risk Assessment of John W. Hinckley, Jr.

Criminal Case No. 81–306

## Background

Mr. John W. Hinckley, Jr. is a 66-year-old (Date of Birth: May 29, 1955) male who was committed to Saint Elizabeths Hospital (SEH) on June 22, 1982. He was found Not Guilty by Reason of Insanity (NGRI) on June 21, 1982 on four counts of attempted murder, four counts of criminal possession of a weapon, and four counts of possession of a prohibited weapon after he attempted to assassinate President Ronald Reagan on March 30, 1981, wounding the President and press secretary James Brady, Secret Service agent Timothy McCarthy and District of Columbia (DC) police officer Thomas Delahanty. Mr. Hinckley was discharged from SEH on conditional release (CR) to reside in the community on convalescent leave (CL) status on September 10, 2016 pursuant to the Court's order dated July 27, 2016.

On July 2, 2020, I completed a Violence Risk Assessment of Mr. Hinckley at the request of Forensic Services Division (FSD), DC Department of Behavioral Health (DBH)/Mental Health Services Division (MHSD). That report was an update to the initial Violence Risk Assessment of Mr. Hinckley I completed on July 27, 2018. In the request for an updated risk assessment in 2020, the Outpatient Forensic Review Board of DBH/MHSD was specifically requested assessment of Mr. Hinckley's potential level of risk for future violence if he were unconditionally released from his commitment.

In assessing Mr. Hinckley's suitability for unconditional release, my primary consideration was the level of risk he would pose to others and himself due to mental illness if the 30 conditions detailed in the November 16, 2018 consent order were removed. I evaluated how each of these conditions impacted Mr. Hinckley at the time of my assessment and potential issues that might arise in the future if restrictions were lifted. After undertaking this analysis, I opined that in the reasonable future Mr. Hinckley would not pose a danger to himself or others due to mental illness if he were granted unconditional release from his commitment. In forming this opinion, I took into account Mr. Hinckley's scores on actuarial (i.e., Violence Risk Appraisal Guide-Revised) and structured professional judgment (i.e., Historical Clinical Risk – 20, 3rd Edition) risk tools, which suggested there was a low likelihood he would re-offend with a violent crime within the next 12 years. Furthermore, I considered his adherence to the conditions of his release since 2016, long-term psychiatric stability, significant improvements in his insight and judgment, and his excellent adjustment to residing in the community. Please refer to my July 2, 2020 report for a more in-

depth discussion of the factors considered in forming my opinion regarding Mr. Hinckley's level of risk for future violence.

In a letter to the Court dated August 21, 2020, DBH recommended that Mr. Hinckley be granted a self-executing unconditional release from commitment. They opined that Mr. Hinckley no longer met the criteria for commitment to the DBH under Title 24, Section 501(d)(1) of the DC Code. However, it was recommended that DBH "retain limited oversight of Mr. Hinckley" for a period of 6-12 months while changes to his treatment were made through "a collaborative decision-making process between Mr. Hinckley and his treatment team." The Government responded in opposition to unconditional release but did not oppose modifications to the conditions of Mr. Hinckley's release. The Government and counsel for Mr. Hinckley subsequently submitted a proposed consent order to the Court.

On October 28, 2020, the Court issued a modified consent order for Mr. Hinckley's conditional release on convalescent leave. The modified order was composed of 17 conditions, with the following notable changes from prior consent orders:

1. Mr. Hinckley may reside independently or with a roommate;
2. Mr. Hinckley will attend virtual appointments (previously in person) with FOPD on a monthly basis;
3. FOPD will submit monthly (previously bi-monthly) progress reports;
4. The treatment team (i.e., Mr. Weiss, Mr. Beffa and Dr. Giorgi-Guarnieri) will meet with Mr. Hinckley "as often as clinically indicated," with Dr. Giorgi-Guarnieri (Dr. GG) given the discretion to transfer Mr. Hinckley's psychiatric care to another provider in the community;
5. "Mr. Hinckley may publicly display, under his own name, without restriction, his memorabilia, writings, paintings, photographs, artwork, or music created by him;"
6. A status hearing was set for seven months from the issuance of the modified consent order and an evidentiary hearing was set for nine months from the issuance of the order "to address the DBH recommendations."

On May 10, 2021, DBH submitted a letter to the Court, as required by the October 2020 consent order, with an updated recommendation regarding unconditional release for Mr. Hinckley. As in their August 2020 letter to the Court, DBH opined that Mr. Hinckley no longer meets criteria for commitment to DBH under Title 24, Section 501(d)(1) of the DC Code. However, the recommendation for a continuing period of limited oversight by DBH was removed, with DBH noting that, "The additional extrinsic factor of DBH/Court oversight does not add incremental value to the maintenance of Mr. Hinckley's psychiatric status."

In June 2021, I was notified by Barry Levine, Esq., counsel for Mr. Hinckley, of his intent to call me as a witness at the evidentiary hearing in the case of *United States v. John W. Hinckley, Jr.* I promptly notified FSD, DBH that I had been identified as a witness and requested guidance due to my status as an independent contractor with DBH. Dr. Tillbrook acknowledged my participation in the hearing under the terms of my existing contract with DBH. FSD subsequently provided me with copies of the 2020-2021 monthly progress reports on Mr. Hinckley and also arranged an

interview with Mr. Hinckley via Cisco WebEx. The sources of information I reviewed since my July 2, 2021 report are detailed below.

## Sources of Information

- May 2020 to October 2020 - Progress notes Nicole Drozd, MSW, MT-BC
- October 28, 2020 - Consent order for conditional release on convalescent leave by US District Judge Paul L. Friedman;
- May 30, 2020 to November 30, 2020 – Bi-monthly progress reports to the court drafted by Chad Tillbrook, PhD;
- December 1, 2020 to August 31, 2021 – Monthly progress reports to the court drafted by Chad Tillbrook, PhD;
- May 2020 to August 2021 - Progress notes by Jonathan Weiss, LCSW; Carl Beffa, LCSW; and Deborah Giorgi-Guarnieri, MD;
- September 2, 2021 - Psychological risk assessment by Mitchell Hugonnet;
- September 10, 2021- Clinical interview with Mr. Hinckley;
- September 15, 2021- Collateral interview with Carl Beffa, LCSW, group therapist;
- September 16, 2021 - Collateral interview with Jonathan Weiss, LCSW, case manager;
- Violence Risk Appraisal Guide-Revised (VRAG-R);
- The Historical, Clinical, Risk Management-20, Version 3 (HCR-20v3);
- Mr. Hinckley's YouTube channel.

I contacted Dr. Giorgi-Guarnieri and requested to interview her as part of this update, but I did not receive a response prior to completing my letter.

## Notification of Limits of Confidentiality

My interview with Mr. Hinckley was conducted on September 10, 2021 via Cisco WebEx. Mr. Hinckley was advised of the following:

a.  I was operating in my capacity as a contractor with DBH/MHSD;
b.  This interview was to gather information relevant to his risk for re-offending and to assist the court in making decisions regarding the conditions of his release;
c.  My update for the court would include a psychological interview, collateral interviews with his treatment team and review of medical and court records;
d.  The interview was for legal purposes, and would not include a treatment relationship;
e.  An addendum to my prior report would be made available to his treatment team, defense attorney, government's attorney and the court;
f.  If I am called to testify, the information obtained from this interview, as well as other conclusions, could be made public in court;
g.  Although the interview was being conducted via Cisco WebEx, no audio and/or video recording of the interview would be produced.

Mr. Hinckley voiced understanding of the parameters of the interview and agreed to participate in the interview.

**Current Mental Status**

Mr. John Hinckley, Jr. was a male of average stature and above average weight who appeared his stated age. He was dressed appropriately and he evidenced adequate grooming. During the interview, Mr. Hinckley was alert and oriented to person, place, and time. He was calm, pleasant and cooperative. His eye contact was very good. He demonstrated no significant psychomotor agitation or slowing. His rate, tone and volume of speech were normal. He has consistently demonstrated average to high average intellectual functioning on past formal testing and during the current evaluation his cognitive functioning appeared intact.

When asked to describe his mood, he stated he is feeling "just fine" and is in a "good frame of mind." In addition, he noted that over the past year he has been more "upbeat," which he attributed to being able to share his music with other people. Throughout the evaluation, he demonstrated a full range of emotional expression that was appropriate to the conversation content. His thought processes were goal directed and flowed logically, with no evidence of abnormalities of perception, delusions (erroneous fixed beliefs) or grandiosity. He did not endorse experiencing auditory, visual, tactile or olfactory hallucinations during his lifetime. His judgment appeared non-impaired. His insight was very good. He did not endorse any suicidal thoughts since 1983 or homicidal thoughts since the time of the instant offenses. He was able to report the names and dosages of his medications, as well as the purpose of his medications.

**Current Psychiatric Medications**

Zoloft® 125mg every morning/25mg every evening
Risperdal® 1mg daily

**DSM-5 Diagnoses**

296.36 Major Depressive Disorder, Recurrent, In Full Remission
298.8 Other Specified Schizophrenia Spectrum and Other Psychotic Disorders, In Full Remission
301.81 Narcissistic Personality Disorder
301.20 Schizoid Personality Disorder, premorbid

**Recent Social and Behavioral Health History**

Throughout the past year, Mr. Hinckley has remained under the supervision of FOPD, maintaining contact with Dr. Tillbrook at least monthly. He also has continued to receive care from his multidisciplinary treatment team in Williamsburg, Virginia consisting of his psychiatrist, Dr. GG; his group therapist, Mr. Beffa; and his case manager, Mr. Weiss. A review of progress notes provided by his treatment team over the past year indicated that Mr. Hinckley remained behaviorally and psychiatrically stable, with no evidence of psychopathology. Furthermore, he has continued to demonstrate good insight, sound decision-making, and excellent adherence to treatment and the conditions of his release.

In accordance with the October 28, 2020 consent order, Mr. Hinckley made a number of changes in his psychiatric treatment and personal life in late 2020 and early 2021. In November 2020, in

consultation with Ms. Drozd, Mr. Hinckley discontinued music therapy. Ms. Drozd indicated her willingness to be available for consultation and support as needed while Mr. Hinckley pursued publishing his music under his own name. He subsequently created a channel on YouTube and began posting videos of him playing both original music and covers of songs by other artists. Mr. Hinckley currently has 26 videos posted and over 19,000 subscribers on his YouTube channel. The majority of the comments Mr. Hinckley has received on YouTube are positive, which he has accepted humbly, without evidence of grandiosity or narcissism. He has taken in stride the occasional criticism posted on YouTube and has not responded to any comments, positive or negative.

Mr. Hinckley has continued to avoid contact with the media, although he is now permitted to engage with them if he so chooses. In June 2021, he was contacted via email by Rolling Stone magazine with a request for an interview about his YouTube channel. Despite his excitement at being contacted by the preeminent music magazine, he determined that it was prudent to seek consultation rather than responding directly. After speaking to his treatment team and his attorney, Mr. Hinckley decided to respond through Mr. Levine rather than engaging directly with the journalist. During my interview with him, Mr. Hinckley expressed satisfaction with his handling of the matter and indicated he will likely to continue to avoid interacting with the media in the future.

In November 2020, Mr. Beffa and Mr. Hinckley decided to reduce his individual psychotherapy from monthly to quarterly, while continuing group therapy on a weekly basis. In January 2021, Mr. Beffa and Mr. Hinckley mutually agreed that there was little benefit to ongoing individual therapy, as his therapeutic needs were being met by group therapy. Mr. Beffa expressed that individual therapy would remain an option for Mr. Hinckley should he experience an increase in his level of stress or onset of any psychiatric symptoms necessitating additional support. However, individual therapy was not reintroduced at any point in 2021.

In August 2021, Mr. Beffa informed Mr. Hinckley that he would be retiring in early 2022 and that group therapy would be ending in either December 2021 or January 2022. After discussing the possibility of increased social isolation as a result of the termination of group therapy with his treatment team, Mr. Hinckley developed and executed a plan to resume attending weekly meetings through the National Alliance on Mental Illness (NAMI) to increase his level of socialization. Mr. Hinckley also plans to investigate whether there are any other options for group therapy, either through a private practice or Colonial Behavioral Health, over the next few months as his therapy with Mr. Beffa winds down. Mr. Weiss also indicated that the treatment team would continue to be a resource for Mr. Hinckley as far as identifying other providers in the community should it be determined that Mr. Hinckley required ongoing psychotherapy, either group or individual.

In December 2020, Mrs. Hinckley's physical health began to decline and by early 2021 she was bed-ridden. Mr. Hinckley began providing 24/7 care for her, managing all of her activities of daily living including bathing, toileting and nourishment. Although he was encouraged to seek assistance from a home health aide, he did not do so, preferring to care for his mother on his own. Mr. Hinckley's brother, Scott, provided occasional support but Mr. Hinckley expressed to his treatment team that he did not have confidence in his brother's ability to care for their mother. On July 16, 2021, Mrs. Hinckley developed kidney failure and was hospitalized. She was discharged

5

home on July 22, 2021 but, after realizing he could not provide the level of medical care required, Mr. Hinckley promptly contacted Morningside Care Facility to request admission for his mother. Mrs. Hinckley was admitted on July 23, 2021 and began receiving hospice care services. On July 30, 2021, Mrs. Hinckley died in her sleep surrounded by her three children.

Mr. Hinckley said he has been managing his mother's death well, noting her death was not unexpected and that he had a significant amount of time to emotionally prepare himself for this loss. He indicated that while he misses his mother, he has been less stressed since her death, citing the physical and emotional toll of caring for her over the past eight months. Mr. Hinckley reiterated that he did not regret providing care for his mother so she could remain in her home as long as possible and that he never uttered a complaint about caring for her or managing the household affairs over the past several years. However, her death has alleviated a large source of stress for him and has left him with considerably more free time to work on his music and to re-start his antiques business. He is currently working amicably with his sister and brother to settle his mother's estate and estimated that the sale of her home will be completed by the end of 2021.

In May 2021, Mr. Hinckley signed a lease for a one-bedroom unfurnished apartment in Williamsburg. He indicated he obtained the apartment at that time, in part, so he would be prepared with a place to live upon his mother's death. Over the last several months, he has set up his utilities, obtained renter's insurance, and begun furnishing the apartment. He noted that he is easily able to afford the costs associated with the apartment and does not feel financial stress associated with living independently. Mr. Hinckley began spending several hours per day at his apartment soon after furnishing it, but he did not stay overnight due to his concerns about leaving his mother in Scott's care for lengthy periods of time. After his mother's death in July 2021, Mr. Hinckley began residing full time in his apartment. He noted that he has been obtaining better sleep since he began staying overnight and enjoys the quiet environment to write and record music. He described meeting several of his neighbors and said he feels very comfortable in the community in which his apartment is located.

In January 2021, Mr. Hinckley closed his booth in the antique mall amid declining sales, the demands of caring for his mother and his desire to spend more time creating original music. Mr. Hinckley noted that it was becoming difficult to cover his rent with the drop in sales during the pandemic. However, after Dr. Hugonnet raised the concern that Mr. Hinckley would experience greater social isolation living alone following his mother's death, and particularly so after the termination of group therapy in December, Mr. Hinckley decided to explore reopening a booth at the antique mall. After inquiring about availability, Mr. Hinckley learned that only a showcase, rather than a booth, was available, which he promptly rented. Since renting the showcase, Mr. Hinckley has been going to the antique mall nearly every day and said he has been pleased with his sales revenue over the past several weeks. He expressed surprise at the welcome he received after his return to the mall and was grateful for the expressions of sympathy regarding his mother's death. Mr. Hinckley acknowledged that the increased social interaction has been a positive experience for him and said he hopes to rent a booth as soon as one becomes available.

**Recent Psychological Evaluation**

6

On September 2, 2021, Mitchell Hugonnet, PhD, completed an updated psychological evaluation of Mr. Hinckley at the request of the government's attorney. Four psychological tests were administered to Mr. Hinckley as part of the evaluation, which Dr. Hugonnet interpreted as being "within normal ranges across all four tests" (pg. 9) and consistent with testing administered by SEH over the past two decades. Dr. Hugonnet further opined that, "These normal range test results, over the past twenty years, accurately reflect the successful treatment of Mr. Hinckley's mental illness and his post-illness mental and behavioral stability reflected in decades of unremarkable entries in Mr. Hinckley's inpatient and outpatient records, by multidisciplinary treatment providers over two decades" (pg. 9). Dr. Hugonnet noted that Mr. Hinckley has not engaged in aggressive behavior since his arrest; he has not evidenced suicidal or homicidal thinking while residing in the community; and that during his interviews with Mr. Hinckley, "There was absolutely no evidence of major psychiatric symptoms such as delusions, hallucinations, loose associations, or other derailments in thinking" (pg. 4). Dr. Hugonnet also wrote that documentation he reviewed and information received through collateral interviews demonstrated Mr. Hinckley engaged in "...organized, responsible behavior..." and "...rational decision making..." (pg. 4). Furthermore, he concurred with my opinion from my 2018 and 2020 risk assessments that Mr. Hinckley is at low risk for future violence. However, Dr. Hugonnet opined that granting unconditional release for Mr. Hinckley "would be premature" (pg. 10) citing a lack of "hard behavioral data available documenting Mr. Hinckley's successful adaptation to his radically changed life circumstances..." (pg. 10). Dr. Hugonnet specifically cited concerns regarding Mr. Hinckley's recent move to residing full-time in a one-bedroom apartment, the potential stress associated with travelling freely and the pending termination of his group therapy in December 2021/January 2022 upon Mr. Beffa's retirement. Given these concerns, Dr. Hugonnet recommended that FOPD continue to provide monthly supervision of Mr. Hinckley through June 30, 2022, as well as Mr. Hinckley maintaining monthly contact with Dr. GG and Mr. Weiss, in order to "...provide the Court with necessary empirical information to build the most solid factual foundation for confidently granting Mr. Hinckley's request for unconditional release..." (pg. 10). Despite his lack of support for unconditional release and recommendation for continued supervision until June 30, 2022, Dr. Hugonnet noted in his report the salient protective factor of Dr. GG continuing to work with Mr. Hinckley for the foreseeable future.

> This continuity of continuing psychiatric treatment with his trusted and skilled psychiatrist ensures that the risk of psychosis remains low despite the looming risk inherent in Mr. Hinckley's newfound social isolation; as such, it follows that risk of violence would likely remain especially low and unlikely. Risk of violence is the last and least probable link in a four or five link chain of environmental, emotional, and behavioral events and conditions. Several other conditions must be in effect before risk of violence becomes remotely possible. (pg. 6)

**Updated Assessment of Risk for Violence**

*Actuarial Assessment of Violence Risk: VRAG-R*[1]
Given the actuarial nature of the VRAG-R, Mr. Hinckley's score remains unchanged at -22, placing him in the 2nd category of 9 total risk levels (with the 9th category being highest risk).

---

[1] Harris, G.T, Rice, M.E., Quinsey, V.L., Cormier, C.A. (2015). **Violent Offenders: Appraising and Managing Risk, Third Edition**. Washington, DC: American Psychological Association.

However, as noted in my 2018 and 2020 reports, follow-up research on the VRAG-R has demonstrated lower recidivism rates across all nine risk levels as time in community offense-free increases. Hence, *conservatively* adjusting Mr. Hinckley's VRAG-R scores for **only** the past five years he has had full-time access to the community results in expected recidivism rates consistent with the lowest category of risk (i.e., 5-14%).

*Structured Professional Judgment of Risk Factors: HCR-20 Version 3*[2]
My ratings of Mr. Hinckley on the HCR-20 Version 3 are largely consistent with the risk assessments I conducted in 2018 and 2020. However, changes have occurred in the areas of Professional Services and Plans, Living Situation, and Personal Support, which are further described below.

Professional Plans and Services
Mr. Beffa recently notified Mr. Hinckley that he would be retiring in early 2022. With the termination of the weekly group therapy provided by Mr. Beffa, Dr. Hugonnet expressed concern that Mr. Hinckley will experience a substantial increase in social isolation. Shortly after these concerns were raised with Mr. Hinckley, he resumed attending weekly NAMI meetings for additional socialization. In addition, he has indicated that he will explore options for group therapy in the surrounding community over the next several months. Should the need for continued psychotherapy arise, Mr. Weiss also indicated he and the other members of the treatment team could assist Mr. Hinckley in locating another provider in the community.

Despite prior discussions of retirement with other members of Mr. Hinckley's treatment team, Dr. GG and Mr. Weiss have both committed to continue working with Mr. Hinckley through 2022. The benefits of the continuity of care provided by Dr. GG and Mr. Weiss should not be under-estimated. Mr. Hinckley has been in treatment with Dr. GG for over a decade and has continued to meet with her in-person, on a monthly basis throughout the COVID-19 pandemic. He has also continued to have weekly contact with Mr. Weiss, either telephonically or in person, and frequently uses Mr. Weiss as a "sounding board."

As I noted in my last report, Mr. Hinckley has managed previous changes of treatment providers well, without signs of psychiatric decompensation, and I do not expect that changes in either the level of care or his providers will result in an increase in his risk in the foreseeable future.

Living Situation
Since my evaluation in July 2020, Mr. Hinckley's living situation has changed dramatically. In May 2021, Mr. Hinckley signed a lease for a one-bedroom apartment, in part to prepare for the change in his living situation that would occur upon his mother's death. He indicated that he did not want to have the stress of trying to find an apartment while he was grieving his mother's death and trying to settle her estate. He began spending several hours per day in the apartment almost immediately and now resides there full-time. Mr. Hinckley described feeling very comfortable in his apartment and indicated it is a great space to work on his music. He is able to cover the costs associated with the apartment, as well as his vehicle, and noted that it does not create any financial burden for him.

---

[2] Douglas, K.S., Hart, S.D., Webster, C.D., Belfrage, H. (2013). **HCR-20**[v3]**: Assessing Risk for Violence**. Vancouver, Canada: Mental Health, Law and Policy Institute: Simon Fraser University.

Although the uncertainty of Mr. Hinckley's living situation following his mother's death was a potential risk factor at the time of my last assessment, in my opinion the stability of his current living situation and decreased stress associated with his living environment (i.e., no longer caring for elderly mother) are positive developments. Mr. Hinckley described setting up his own apartment with some pride and indicated the environment is very conducive to creating and recording music, which brings him great joy. Furthermore, Mr. Hinckley has been making attempts to interact with his neighbors and his apartment community may afford increased opportunities for this type of socialization over his previous residence in Kingsmill.

Personal Support

Despite all the changes that have occurred in his life over the past two years, including decreased socialization as a result of the COVID-19 pandemic and reduced professional services (i.e., discontinuing individual and music therapy), Mr. Hinckley has not displayed signs of the isolative behavior that marked the years prior to the instant offenses and contributed to his psychiatric decompensation and psychosis. Mr. Hinckley continues to express a desire to develop close friendships and a romantic relationship, both of which he has admitted are lacking in his life.

Mr. Hinckley's mother, Joann, was a major source of personal support for him throughout his hospitalization at SEH and as he transitioned to residing in the community. He resided with her in Williamsburg for the past five years and, over the last two years, he became her primary caregiver. Although I previously noted that the death of Mrs. Hinckley had the potential to be traumatic for Mr. Hinckley, I also indicated that Mr. Hinckley was preparing himself for his mother's death by discussing it with his treatment team and members of his therapy group.

Per Mr. Hinckley's self-report, he is coping well with his mother's death. During my interview with him, he expressed appropriate grief at losing his mother, gratitude for the time he was able to spend with her prior to her death, and some measure of relief now that the stress of caring for her is over. He noted that he and his siblings are in agreement on the settlement of his mother's estate and described that process as proceeding smoothly. Based on information from the treatment team, as well as Mr. Hinckley's self-report, he has not experienced an increase in anxiety or depressed mood since his mother's death six weeks ago.

Mr. Hinckley's transition to residing alone has proceeded slowly, with him spending increasing time at his apartment over the past several months. While he began staying overnight at his apartment after his mother's death, Mr. Hinckley has continued to visit with his brother since his mother's death and Scott has reportedly expressed his intent to remain in Williamsburg for the foreseeable future. Mr. Hinckley is not as socially isolated as he was prior the instant offenses, and he appears to have benefited from the limited social outlets he has developed over the last five years. He has re-engaged in his antique mall business and has welcomed the opportunity to re-connect with other vendors and employees at the antique mall.  As noted above, he has accepted feedback from both Dr. Hugonnet and his treatment team regarding the pending termination of his group therapy and is seeking other avenues for support and socialization in the community (e.g., NAMI).

## Summary

Taking into consideration the changes that have occurred in Mr. Hinckley's life over the past year, it remains my opinion, in concordance with my risk assessment completed in July 2, 2020, that he would be at low risk for psychiatric decompensation and at low risk for future violence if he is granted unconditional release from his commitment.


_____                    _____
Samantha M. Benesh, Psy.D., ABPP                          September 16, 2021
Board-Certified Forensic Psychologist                              Date
Partner, Benesh & Yeaw Consulting LLC

10